# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>    Plaintiff,<br><br>    v.<br><br>Navient Corporation; Navient Solutions, Inc.; and Pioneer Credit Recovery, Inc.,<br><br>    Defendants. | Case No. _____<br><br><br>(Electronically Filed) |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

Plaintiff Consumer Financial Protection Bureau (Bureau) brings this action against Navient Corporation, Navient Solutions, Inc. (Navient), and Pioneer Credit Recovery, Inc. (Pioneer) (collectively, Defendants) and alleges the following:

## INTRODUCTION

1.    The Bureau brings this action under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565; the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 *et seq.*, and its implementing regulation, Regulation V, 12 C.F.R. part 1022; and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.*, based on

unlawful acts and practices in connection with Defendants' servicing and collection of student loans. The Bureau seeks to obtain permanent injunctive relief, restitution, refunds, damages, civil money penalties, and other relief for Defendants' violations of Federal consumer financial laws.

2.      Navient, formerly known as Sallie Mae, Inc., is the largest student loan servicer in the United States. Navient services the loans of more than 12 million borrowers, including over 6 million customer accounts under a contract with the U.S. Department of Education, and more than $300 billion in federal and private student loans.

3.      Navient's principal responsibilities as a servicer include managing borrowers' accounts; processing monthly payments; assisting borrowers to learn about, enroll in, and remain in alternative repayment plans; and communicating directly with borrowers about the repayment of their loans.

4.      Navient has failed to perform its core duties in the servicing of student loans, violating Federal consumer financial laws as well as the trust that borrowers placed in the company. Most federal student borrowers have a right under federal law to set their monthly student loan payment as a share of their income, an arrangement that can offer borrowers extended

payment relief and other significant benefits. Navient systematically deterred numerous borrowers from obtaining access to some or all of the benefits and protections associated with these plans. Despite assuring borrowers that it would help them find the right repayment option for their circumstances, Navient steered these borrowers experiencing financial hardship that was not short-term or temporary into costly payment relief designed for borrowers experiencing short-term financial problems, before or instead of affordable long-term repayment options that were more beneficial to them in light of their financial situation.

5.      For borrowers who did enroll in long-term repayment plans, Navient failed to disclose the annual deadline to renew those plans, misrepresented the consequences of non-renewal, and obscured its renewal notice to borrowers who were due for renewal. As a result, the affordable payment amount expired for hundreds of thousands of borrowers, resulting in an immediate increase in their monthly payment and other financial harm.

6.      Taken together, these practices prevented some of the most financially vulnerable borrowers from securing some or all of the benefits of plans that were intended to ease the burden of unaffordable student debt.

3

7.      Navient's servicing failures, however, were not just limited to enrolling and renewing borrowers in affordable repayment plans. Navient also misreported information to consumer reporting agencies about thousands of borrowers who were totally and permanently disabled, including veterans whose total and permanent disability was connected to their military service, by making it appear as if those borrowers had defaulted on their student loans when they had not, damaging their credit; misrepresented one of its requirements for borrowers to release their cosigner from their private student loan, thereby denying or delaying access to an important feature on many cosigned private loans that relieves a cosigner of responsibility for the loan once the borrower meets certain eligibility criteria; and repeated the same errors in processing federal and private student loan borrowers' payments month after month, even after borrowers complained to Navient about those errors.

8.      Since at least July 2011, tens of thousands of borrowers and cosigners have filed complaints with Navient, the Bureau, other governmental and regulatory agencies, and other entities about the difficulties and obstacles they have faced in the repayment of their federal and private student loans serviced by Navient.

9.     Pioneer is a large debt collector that primarily collects or has collected defaulted federal student loan debt on behalf of the U.S. Department of Education and several state-based loan guaranty agencies.

10.    The U.S. Department of Education and state-based guaranty agencies have collectively referred billions in defaulted student loan balances to Pioneer for collection.

11.    Much of Pioneer's work relates to the federal loan rehabilitation program, which is a program that allows federal student loan borrowers who are in default to effectively "cure" one or more defaulted federal loans.

12.    In seeking to enroll consumers in the rehabilitation program, Pioneer systematically misled consumers about the effect of rehabilitation on the consumer's credit report and overpromised the amount of collection fees that would be forgiven by enrolling in the program.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

14.    Venue is proper in this district because Defendants are located,

reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PLAINTIFF

15.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under Federal consumer financial laws, including the CFPA, the FCRA, and the FDCPA. 12 U.S.C. §§ 5481(12), (14); 5491(a); 5531(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws. 12 U.S.C. §§ 5564(a), (b); 15 U.S.C. § 1681s(b)(1)(H); 15 U.S.C. § 1692l(b)(6).

## DEFENDANTS

16.     Formerly known as Sallie Mae, Inc., defendant Navient Solutions, Inc., a wholly-owned subsidiary of Navient Corporation, is a Delaware corporation. Navient Solutions, Inc. principally engages in servicing of federal and private student loans for more than 12 million borrowers. At all times material to this complaint, Navient Solutions, Inc. has offered or provided a "consumer financial product or service," and therefore is and was a "covered person" under the CFPA. 12 U.S.C. §

6

5481(6), (15)(A)(i). At all times material to this complaint, Navient Solutions, Inc. has been located and transacted business in this district.

17.     Defendant Pioneer Credit Recovery, Inc., a wholly-owned subsidiary of Navient Corporation, is a Delaware corporation. Pioneer principally engages in debt collection activities related to outstanding and delinquent student loans on behalf of several owners of federal student loans. Pioneer is a "debt collector" under the FDCPA. 15 U.S.C. § 1692a(6). At all times material to this complaint, Pioneer has offered or provided a "consumer financial product or service," and therefore is and was a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (15)(A)(x). At all times material to this complaint, Pioneer has transacted business in this district.

18.     Defendant Navient Corporation is a loan management, servicing, and asset recovery company and is a Delaware corporation. Navient Corporation is the direct or indirect owner of all of the stock of Navient Solutions, Inc. and Pioneer. At all times material to this complaint, Navient Corporation has been located and transacted business in this district, whether directly or through its subsidiaries.

19.     At all times material to this complaint, Navient Corporation is

and was a "related person" because it has been a "shareholder ... or other person ... who materially participates in the conduct of the affairs" of Navient Solutions, Inc. and Pioneer, which are covered persons. 12 U.S.C. § 5481(25)(C)(ii). Accordingly, at all times material to this complaint, Navient Corporation is "deemed to [be] a covered person for all purposes of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

20.    There has been significant overlap between the corporate governance and management of Navient Corporation and Navient Solutions, Inc., as well as between Navient Corporation and Pioneer. Specifically, many of the directors and officers of Navient Solutions, Inc. have also been directors or officers of Navient Corporation, and many of the directors and officers of Pioneer are also directors or officers of Navient Corporation. For example, as of 2014, John Remondi served as President and Chief Executive Officer for both Navient Corporation and Navient Solutions, Inc.; John Kane served as Chief Operating Officer for both Navient Corporation and Navient Solutions, Inc.; Somsak Chivavibul served as Chief Financial Officer for both Navient Corporation and Navient Solutions, Inc.; Timothy Hynes served as Chief Risk Officer for both Navient Corporation and Navient Solutions, Inc.; and Stephen O'Connell

served as Senior Vice President and Treasurer for both Navient Corporation and Navient Solutions, Inc. Similarly, Jack Frazier, the current Director and former President of Pioneer, also serves as Senior Vice President for Navient Corporation, and Jeff Mersmann, the current President of Pioneer, also serves as Vice President of Operations for Navient Corporation.

21.    Following a corporate reorganization in 2014, Navient Corporation was the successor to SLM Corporation and Navient, LLC. As part of this reorganization, Navient Corporation assumed certain liabilities related to the servicing and collection activities of SLM Corporation, Navient, LLC, and their subsidiaries, including Pioneer. Among the liabilities assumed by Navient Corporation are all of the pre-reorganization servicing and collection conduct described in this Complaint.

22.    SLM Corporation was awarded the servicing contract with the U.S. Department of Education in 2009, and that contract continues to be in force to the present (subject to various modifications that the parties to that contract have executed). All documents related to that contract were signed in the name of SLM Corporation or, subsequently, Navient, LLC. Accordingly, as a result of the 2014 corporate reorganization, Navient Corporation is currently the entity that contracts with the U.S. Department

of Education for the servicing of federal student loans.

23.      In public statements, including annual 10-K filings with the U.S. Securities and Exchange Commission, Navient Corporation (including its predecessor SLM Corporation) has boasted about its capabilities with respect to student loan servicing and collection, including helping consumers navigate the path to financial success and select the appropriate payment plan for their circumstances. Navient Corporation has also indicated that it is responsible for overseeing the strategic direction and business goals of its subsidiaries. For instance, Navient Corporation's 2015 10-K filing includes the following statements:

- "Navient [Corporation] is the nation's leading loan management, servicing and asset recovery company, committed to helping customers navigate the path to financial success. Servicing more than $300 billion in education loans, Navient [Corporation] supports the educational and economic achievements of more than 12 million customers."

- "Navient [Corporation] services loans for more than 12 million ... customers, including 6.3 million customers whose accounts are serviced under Navient [Corporation]'s contract with ED. We help our customers navigate the path to financial success through proactive outreach and emphasis on identifying the payment plan that best fits their individual budgets and financial goals."

- "The Navient [Corporation] board of directors and its standing committees oversee our strategic direction, including setting our risk management philosophy, tolerance and parameters;

and establishing procedures for assessing the risks our businesses face as well as the risk management practices our management team develops and implements."

- "Each business area within our organization is primarily responsible for managing its specific risks following processes and procedures developed in collaboration with our executive management team and internal risk management partners."

24.     Navient Corporation also owns or leases the offices used by Navient Solutions, Inc. and Pioneer; has responsibility for the hiring of employees for Navient Solutions, Inc. and Pioneer; and manages all compliance auditing for Navient Solutions, Inc. and Pioneer.

25.     Navient Corporation consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, Inc. and Pioneer with respect to the conduct alleged in this Complaint.

## FACTUAL ALLEGATIONS

## <u>Navient Solutions, Inc.</u>

### Navient's Steering of Borrowers Experiencing Long-Term Financial Hardship into Forbearance

26.     Upon first entering repayment, a federal student loan borrower is assigned to or selects a specific repayment plan. However, that borrower has the right to change his/her repayment plan assignment or selection at

any time, including if the borrower is experiencing financial hardship or distress.

27.     The U.S. Department of Education offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make monthly repayment of these loans more affordable. These repayment plans include several income-driven repayment plans, such as Income-Based Repayment (IBR) and Pay As You Earn Repayment (PAYE).

28.     Most federal student loans are eligible for at least one income-driven repayment plan.

29.     The monthly amount that the borrower will pay under the income-driven repayment plans is set at an amount that is intended to be more affordable based on the borrower's income and family size.

30.     Depending on the borrower's income and family size, a borrower's monthly payment may be as low as $0 per month when enrolled in an income-driven repayment plan.

31.     In addition to providing a more affordable monthly payment, most income-driven repayment plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term

financial hardship. For example, for borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the plan. This interest subsidy can be a significant benefit to such borrowers because they generally have no obligation to ever pay the remaining unpaid interest that accrues during those three years. Furthermore, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan. When interest is not paid, it can be added to the principal balance of the loan; additional interest is then charged on the increased principal balance of the loan, which could significantly increase the total amount repaid over the life of the loan. Thus, the interest subsidy available to many borrowers enrolled in income-driven repayment plans can reduce these additional harmful effects, mitigating the financial strain on those borrowers.

32.     Another benefit available to borrowers who are enrolled in an income-driven repayment plan is forgiveness of the remaining balance of their federal loan, either after making 20-25 years of qualifying payments for most income-driven repayment plans or 10 years of qualifying payments

while working full time for certain public service employers.

33.    Federal student loans are generally also eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time.

34.    Navient's website states that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a temporary financial difficulty." The website also states: "Forbearance is intended to help you out in times of temporary need."[1]

35.    Forbearance is typically not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term. Borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance. These include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan. In addition, in some cases, following a forbearance, a loan may be reamortized, where the monthly payments may

---

[1] Navient, *Deferment and Forbearance*, https://www.navient.com/loan-customers/postponing-payments/deferment-and-forbearance/ (last visited Jan. 18, 2017).

be recalculated, which can lead to an increase in the borrower's monthly payment amount. As a result of these costs, long-term enrollment in forbearance can dramatically increase the total amount due each month after the forbearance period ends and over the repayment term for a borrower's federal loans.

36.   Because income-driven repayment plans enable borrowers to avoid or reduce these costs associated with forbearance, for borrowers whose financial hardship is not temporary and short-term, enrolling in an income-driven repayment plan is usually a significantly better option than forbearance.

37.   The U.S. Department of Education has publicly encouraged borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that individual borrower. In several places on its website, the U.S. Department of Education has advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance, with statements such as the following: "Work with your loan servicer to choose a federal student loan

repayment plan that's best for you";[2] "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you";[3] and "Always contact your loan servicer immediately if you are having trouble making your student loan payment."[4]

38.    Likewise, Navient, as a servicer of federal loans, has repeatedly encouraged borrowers experiencing financial hardship to contact Navient for assistance in evaluating the various alternative repayment options. For example, Navient's website has included the following statements inviting borrowers to contact Navient for guidance in finding long-term repayment solutions:

- "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default .... We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800-

---

[2] Federal Student Aid, U.S. Department of Education, *Repayment Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans (last visited Jan. 18, 2017).
[3] Federal Student Aid, U.S. Department of Education, *Income-Driven Repayment Plans*, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited Jan. 18, 2017).
[4] Federal Student Aid, U.S. Department of Education, *Deferment and Forbearance*, https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance (last visited Jan. 18, 2017).

> 722-1300 and *let us help you make the right decision for your situation.*"[5]

- "If you're experiencing problems making your loans payments, please contact us. *Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation.*"[6]

- "*Navient is here to help*. We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default."[7]

39.     For many years, Navient's website has included other, similar statements. For example, its website previously stated that it was "committed to giving you the information and tools you need to understand and evaluate your student loan payment options. *We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost.*" (emphasis added).

40.     Nevertheless, since at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate,

---

[5] Navient, *If You're Having Trouble*, https://www.navient.com/loan-customers/postponing-payments/if-you-are-having-trouble/ (last visited Jan. 18, 2017) (emphasis added).
[6] Navient, *Avoiding Delinquency and Default*, https://www.navient.com/loan-customers/postponing-payments/avoiding-default/ (last visited Jan. 18, 2017) (emphasis added).
[7] Navient, *5 Habits of Successful Borrowers*, https://www.navient.com/loan-customers/getting-started/successful-student-loan-borrowers/ (last visited Jan. 18, 2017) (emphasis added).

affordable repayment plan, Navient has routinely disregarded that commitment and instead steered borrowers experiencing long-term distress or hardship into forbearance.

41.     Navient's compensation policies for its customer service representatives have incentivized them to push numerous borrowers to forbearance without adequately exploring income-driven repayment plans with those borrowers, and in some cases, without even mentioning income-driven repayment plans at all.

42.     Because of the number and complexity of repayment options available for federal loans, a conversation about alternative repayment plans and the borrower's financial situation is usually time-consuming.

43.     Navient, however, has compensated its customer service personnel, in part, based on average call time. As a result, engaging in lengthy and detailed conversations with borrowers about their particular financial situation and trying to determine the income-driven repayment plan that is most appropriate for each borrower would have been financially detrimental for those employees.

44.     Moreover, since a borrower is required to submit a paper or online application, and include certain income tax documentation with that

application, to enroll in an income-driven repayment plan, the process of enrolling a borrower in such plans sometimes requires multiple, lengthy conversations with the borrower. This is especially true considering that more than half of Navient borrowers who enroll in income-driven repayment plans for the first time report that they could not navigate the application process on their own.

45.     In addition to the paperwork required to enroll a borrower in an income-driven repayment plan, a borrower in such a plan must also complete an annual recertification form each year to document his/her current income and family size, which is then used to adjust the borrower's payment amount. Processing this renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in an income-driven repayment plan.

46.     As the volume of income-driven repayment plan applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs.

47.     In sum, counseling borrowers about and enrolling those borrowers in income-driven repayment plans is costly for Navient and its

employees.

48.    In contrast, enrollment in forbearance can often be completed over the phone, in a matter of minutes, and generally without the submission of any paperwork.

49.    As compared to the staff resources and time expenditure required to enroll and renew borrowers in income-driven repayment plans, enrolling borrowers in forbearance is substantially less expensive for Navient and is or was financially beneficial for its employees. Navient employees have routinely failed to invest the time and effort necessary to help financially distressed borrowers identify and enroll in affordable repayment plans most appropriate for their financial situation.

50.    Between January 2010 and March 2015, the number of borrowers that Navient enrolled in forbearance has generally exceeded the number of borrowers enrolled in income-driven repayment plans. For example, in December 2010, around 9% of borrowers with Federal Family Education Loan (FFEL) loans held and serviced by Navient were enrolled in voluntary forbearance, while less than 1% of borrowers with the same loan type were enrolled in IBR. Similarly, in December 2012, approximately 7% of Navient borrowers with FFEL loans held and serviced by Navient were

enrolled in voluntary forbearance, while just 2% of borrowers with the same loan type were enrolled in IBR.

51.     Navient representatives sometimes initially responded to borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available income-driven repayment plans. This occurred even though it is likely that a large number of those borrowers would have qualified instead for a $0 payment in an income-driven repayment plan at that time. Indeed, over 50% of Navient borrowers who need payment relief, and meet the eligibility criteria for income-driven repayment plans, qualify for a $0 monthly payment.

52.     For example, between January 1, 2010 and March 31, 2015, nearly 25% of borrowers who ultimately enrolled in IBR with a $0 payment were enrolled in voluntary forbearance within the twelve-month period immediately preceding their enrollment in IBR. Similarly, during that same time period, nearly 16% of borrowers who ultimately enrolled in PAYE with a $0 payment were enrolled in voluntary forbearance within the twelve-month period immediately preceding their enrollment in PAYE. The majority of these borrowers were enrolled in voluntary forbearance more than three months prior to their enrollment in the income-driven

repayment plan, which suggests that forbearance was not merely offered to these borrowers while their application in an income-driven repayment plan was pending. Because they were placed into forbearance before ultimately enrolling in an income-driven repayment plan with a $0 payment, these borrowers had delayed access to the benefits of the income-driven repayment plan. They were also subject to the negative consequences of forbearance, including the addition of interest to the principal balance of the loan, which they potentially could have avoided had they been enrolled in the income-driven repayment plan from the start.

53.    Navient also enrolled an immense number of borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans. For example, between January 1, 2010 and March 31, 2015, Navient enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling twelve months or longer. More than 470,000 of these borrowers were enrolled in three consecutive forbearances, and more than 520,000 of them were enrolled in four or more consecutive forbearances. For borrowers enrolled in three or more consecutive forbearances, each forbearance period lasted, on average, six months. Therefore, hundreds of thousands of consumers

were continuously enrolled in forbearance for a period of two or three years, or more. Regardless of why these borrowers did not enroll in an income-driven repayment plan from the start, their long-term inability to repay was increasingly clear as each forbearance period expired. Yet Navient representatives continued to enroll them in forbearance again and again, rather than an income-driven repayment plan that would have been beneficial for many of them.

54.     Enrollment in multiple consecutive forbearances imposed a staggering financial cost on this group of borrowers. At the conclusion of those forbearances, Navient had added nearly four billion dollars of unpaid interest to the principal balance of their loans. For many of these borrowers, had they been enrolled in an income-driven repayment plan, they would have avoided much or all of their additional charges because the government would have paid the unpaid interest on their subsidized loans in full during the first three years of consecutive enrollment.

**Navient's Servicing Failures Relating to Renewal of Borrowers' Enrollment in Income-Driven Repayment Plans**

55.     A federal student loan borrower who is enrolled in an income-driven repayment plan must certify his/her income and family size to

qualify for an affordable payment amount that is based on that income and family size. This affordable payment amount applies for a period of twelve months. At the end of this twelve-month period, the affordable payment amount will expire unless the borrower renews his/her enrollment in the plan before the expiration date. To do so, the borrower must "recertify" his/her income and family size by submitting updated information, including documentation of income. The borrower must recertify income and family size information before the expiration of the twelve-month period each year in order to maintain the affordable payment amount each year.

56.     If the twelve-month period expires because the borrower has not timely recertified income and family size, several negative consequences are likely to occur. First, the borrower's monthly payment amount may immediately increase from a low affordable amount to one that is typically in the hundreds or even thousands of dollars.

57.     Other significant consequences that will occur when the twelve-month period expires without a timely recertification include (1) the addition of any unpaid, accrued interest to the principal balance of the loan; (2) for subsidized loans in the first three years of enrollment in an

24

income-driven repayment plan, the loss of an interest subsidy from the federal government for each month until the borrower renews his/her enrollment; and (3) for some borrowers who enroll in forbearance when the twelve-month period expires, delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness. These consequences are all irreversible.

58.     At the time of enrollment in the income-driven repayment plan, Navient has sent borrowers an "initial disclosure notice" which identified the beginning and end dates of the initial enrollment in the repayment plan. That notice has also advised consumers: "You'll be notified in advance when your loan(s) is up for renewal for the [income-driven repayment] plan. At that time, you'll be provided with a date to submit a new application." However, the notice has not indicated any specific renewal deadline.

59.     The "initial disclosure notice" has also outlined certain consequences that might result if the borrower "chooses not to renew" or "requests to leave the plan," including the recalculation of the borrower's monthly payment amount and the addition of unpaid interest to the principal balance of the loan. This indicates that these consequences will

result only if the borrower either "chooses not to renew" or "requests to leave the plan." The notice does not identify any consequences that might result if the borrower chooses to renew by submitting a renewal application, but the application is incorrect or incomplete in some respect or is not submitted in a timely manner.

60.    Since at least January 1, 2010, federal student loan servicers, including Navient, have been required to send at least one written notice concerning the annual renewal requirements to borrowers in advance of their renewal deadline.

61.    From at least January 1, 2010 until December 2012, Navient's annual renewal notices for income-driven repayment plans sent through U.S. mail did not inform borrowers of the actual date by which they had to submit the renewal application, including documentation of income, to avoid expiration of the twelve-month period during which payment was set at an affordable amount based on the borrower's income and family size.

62.    Instead, Navient's pre-December 2012 notices stated vaguely that the borrower's income-based repayment period would "expire in approximately 90 days" and that the "renewal process may take at least 30 days."

63.     It is impossible to determine from these two statements the
deadline by which a borrower must submit the required documentation and
information in order to timely renew enrollment in the plan. First, the
statement that the "renewal process may take at least 30 days" says nothing
about how long the renewal process will actually take, or even the
maximum number of days the renewal process could take.  Second, by
saying that the plan would expire in "approximately 90 days," Navient
provided no date by which the borrower could count backwards to calculate
the deadline – even if Navient had told the borrower how many days to
count (which it did not). The notice also failed to advise borrowers of the
likely consequences if they failed to timely submit their renewal
application.

64.     The pre-December 2012 notices also failed to advise borrowers
of the likely consequences of submitting incorrect or incomplete
information. The notices encouraged borrowers to fill out the forms
completely and warned borrowers that "by providing incorrect or
incomplete information the [renewal] process will be delayed." This falsely
implied that the only consequence of providing incorrect or incomplete
information was a "delay" in the renewal "process" – that while the renewal

*process* would be delayed by the submission of an incomplete and incorrect application for renewal, as long as the deficiencies were rectified, no other consequences would result.

65.     Borrowers who have submitted a renewal application have clearly chosen to renew their enrollment; their choice to renew was evidenced by their submission of the application, even if that application was incomplete or inaccurate in some respect. But the pre-December 2012 notice said nothing to warn these borrowers that failing to submit complete and accurate information before the end of the twelve-month period would have essentially the same consequences as if the borrower chose not to renew their enrollment in the income-driven repayment plan at all, because the consequences of a decision not to renew that were outlined in the initial disclosure letter would still result. Those consequences included at least a temporary increase in the borrower's monthly payment amount, the addition of any unpaid interest to the principal balance of the loan, and other financial consequences described above. Borrowers could not reasonably have been expected to interpret Navient's reference to a mere processing delay to actually mean irreversible financial harm.

66.     For borrowers who have consented to receiving electronic

communications, Navient has sent electronic renewal notices instead of hard copy notices by mail. More than 75% of Navient's federal student loan borrowers have consented to receiving electronic communications.

67.     Between at least mid-2010 and March 2015, these borrowers had to log in to Navient's secure website with their user ID and password to view an electronic version of the renewal notice sent via U.S. mail to other borrowers. Navient, however, failed to adequately advise these borrowers of the availability of the electronic notice on its website.

68.     The only step that Navient took to advise these borrowers of the availability of the electronic notice on its website was to send them an email with a hyperlink to its website, where the renewal notice could be viewed after the borrower logged into his/her secure account. But neither the subject line of this email nor its contents provided any indication of the purpose of the notice.

69.     From at least January 1, 2010 through November 15, 2012, the subject line of the email simply read: "Your Sallie Mae Account Information." Likewise, from at least November 16, 2012 through March 18, 2015, the subject line of the email was: "New Document Ready to View."

70.     The body of the email did not provide any greater detail. Until

mid-2015, the body of the email stated only that "a new education loan document is available. Please log in to your account to view it."

71.     In stark contrast, during the same time period, other emails sent by Navient described the content or purpose of the referenced document. For example, the subject line of one such email was "Your Sallie Mae – Department of Education Statement is Available," and the body of the email stated "Your monthly statement is now available. Please log in to your account at SallieMae.com to view and pay your bill." Another email regarding loan terms had a subject line that read "Change in Loan Terms," and the text of this email stated, "The payment term for your loan(s) has changed. Please log in to your account to view the document with your updated payment schedule."

72.     Navient has tracked the number of borrowers who click on the hyperlink in the emails that Navient sends to them. Thus, Navient has known or should have known that many borrowers did not view the electronic renewal notices.

73.     Between at least July 2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in income-driven repayment plans regularly exceeded 60%. Those borrowers who did not

timely renew experienced the significant consequences of nonrenewal, including a payment jump and the addition of any accrued, unpaid interest to the principal balance of the loan.

74.     Navient has been aware that the majority of borrowers were failing to renew their enrollment in income-driven repayment plans.

75.     Beginning in or around March 2015, Navient made several enhancements to its email that provides access to the electronic renewal notice. It changed the subject line of the email to read "Your Payment Will Increase Soon!" and the text of the email now states: "[I]n order to keep your lower payment amount, it's important that you apply soon to renew your repayment plan."

76.     Since Navient made these enhancements to its electronic notices, the renewal rate has more than doubled.

**Navient's Misreporting of Information to Consumer Reporting Agencies Regarding Loans Held by Disabled Borrowers**

77.     As a servicer of student loans, Navient routinely furnishes information about its student loan accounts to consumer reporting agencies.

78.     The U.S. Department of Education allows borrowers who have a

total and permanent disability to have their federal loans discharged,
relieving them of any obligation to pay the loans. These include loans held
by veterans whom the U.S. Department of Veterans Affairs has determined
are unemployable because of disabilities connected to their military service.

79.     In 2006, the U.S. Department of Education provided guidance
regarding appropriate credit reporting when a loan is discharged. That
guidance instructs that, when a non-defaulted loan is discharged due to the
total and permanent disability of the borrower, servicers should use only
reporting code "05" and a payment rating code applicable to the status of
the loan. Those instructions also indicate that the reporting code "AL"
(signaling that the loan is being "assigned to the government") is to be used
only: (1) by schools holding Perkins loans, not by servicers, and (2) only
when the loan is in a default status prior to being discharged due to the
disability of the borrower.

80.     Consistent with the instructions from the U.S. Department of
Education, the operative credit reporting guide, issued by the Consumer
Data Industry Association in 2012, contains a section on "Total and
Permanent Disability Discharge Procedures" for student loans. That section
indicates that the reporting code "AL" is to be used only: (1) by schools

holding Perkins loans, not by servicers, and (2) only when the loan is in a
default status prior to being discharged due to the disability of the
borrower.

81.     From at least October 2012 until approximately June 2014,
Navient used the "AL" reporting code to report a loan that had been
discharged due to the borrower's total and permanent disability, despite the
fact that Navient is not an educational institution that holds Perkins loans,
and that some of the borrowers who received a loan discharge due to a total
and permanent disability had not defaulted.

82.     Navient's furnishing of information regarding loans that had
been discharged due to the borrower's total and permanent disability was
not accurate because there was a correct reporting code available to be used
by servicers responsible for non-defaulted loans that were being discharged
due to a borrower's total and permanent disability. Navient's misreporting
made it appear as if borrowers who had not defaulted on their loans and
whose loans were being discharged due to a total and permanent disability
had actually defaulted on their loans.

83.     Navient used a reporting code for defaulted loans even though it
knew that doing so was likely to cause a significant negative impact on the

credit report and associated credit score of totally and permanently disabled borrowers, and other serious harm. For example, Navient's website warns: "Defaulting on your federal or private loans may result in serious consequences that might lead to a long lasting and harmful impact to you as the borrower or cosigner."[8] And Navient's own debt collectors tell borrowers at risk of default that a default will severely impact their credit score.

**Navient's Misrepresentations Relating to Cosigner Release**

84.     A cosigner is generally necessary for a borrower to obtain a private student loan, or to obtain that loan with more favorable terms.

85.     Once a borrower enters repayment on his/her private student loan, he or she generally can apply to release the cosigner from the loan after meeting certain eligibility criteria. This option is generally available to most Navient borrowers with cosigned private student loans.

86.     Since at least January 2010, one of the eligibility criteria that Navient has required private student loan borrowers to meet before they can apply to release a cosigner is that the borrower must make a minimum

---

[8] Navient, *Avoiding Delinquency and Default*, https://www.navient.com/loan-customers/postponing-payments/avoiding-default/ (last visited Jan. 18, 2017).

number of consecutive, on-time payments consisting of both principal and interest. Since January 21, 2014, Navient has required the borrower to "make 12 consecutive, on-time principal and interest payments" before applying for cosigner release. Prior to January 21, 2014, and depending on the applicable terms of the borrower's loan, Navient required borrowers to make between 12 and 48 "consecutive, on-time principal and interest payments" before applying for cosigner release. Navient did not, however, specifically define for borrowers what it meant by "consecutive" or "on-time" payments.

87.     A borrower in repayment will sometimes make a payment that is a multiple of the monthly payment amount due. For example, a borrower whose monthly payment amount due is $100 may choose to pay $200 or $300 instead of $100.

88.     When a borrower makes such a "multiplier overpayment," Navient generally applies the payment to satisfy the borrower's current monthly payment due, and then places the borrower in a "paid ahead" status for the subsequent months that have been satisfied by the excess payment.

89.     For each month that the borrower is in a "paid ahead" status on

his/her private student loan, Navient sends the borrower a bill indicating
that the payment due for that month is $0 because the borrower is not
required to make any payment that month in order to remain current on
his/her loan. Thus, there is no "on-time principal and interest payment"
that is even due that month.

90.    Until at least mid-2015, in determining whether a borrower
made the minimum number of "consecutive, on-time principal and interest
payments" for purposes of cosigner release, Navient treated the lack of
payment by a borrower in response to a $0 bill as a failure to make a
"consecutive, on-time principal and interest payment" that month. Navient
reset the borrower's progress towards the "consecutive, on-time principal
and interest payments" requirement to zero months.

91.    For example, suppose a borrower's monthly amount due is
$100. If she paid exactly $100 each month from January through
September 2014, Navient would have considered her to have made nine
consecutive, on-time payments. Suppose she then submitted a $200
payment in October 2014. Because that $200 payment would have been
enough to cover the monthly amount due for both October and November
2014, she would have received a $0 bill for November. Because no payment

was required by the $0 bill, she submitted no payment in November. Then, in December 2014, upon receiving the next bill that actually required a payment, she made an on-time monthly payment of $100. Because she did not submit a payment in November 2014, Navient would have reset her progress toward the consecutive, on-time principal and interest payment requirement for cosigner release. Navient would have treated this borrower as having made zero consecutive payments as of November.

92.     This is contrary to Navient's statement to borrowers that they can apply for cosigner release if they make a certain number of "consecutive, on-time principal and interest payments." The requirement is only that the "on-time principal and interest *payments*" must be consecutive – not that the "months" or "billing cycles" in which on-time principal and interest payments are made must be consecutive. The requirement does not even refer to months or billing cycles.

93.     When a borrower does not submit a payment in a particular month because he/she has received a $0 bill as a result of a previous multiplier overpayment, and then makes an on-time principal and interest payment the next time he/she receives a bill for more than $0, there is no break in eligible payments that he/she has made towards the on-time

principal and interest payment requirement. The borrower in the example above made eleven eligible payments in 2014, and they were consecutive because there was no "on-time principal and interest payment" she failed to make that year. Yet Navient would have reset her count to zero months in November 2014 because her payments were not made in consecutive months.

94.     Navient has thus misled borrowers by stating that they must make twelve "consecutive, on-time principal and interest payments" before applying for cosigner release. The actual requirement that Navient applied is that the borrower must submit a separate on-time payment in each of twelve consecutive months amounting to at least the regular principal and interest amount, even where the billing statement indicates that no payment is required.

95.     Navient failed to disclose this actual requirement. And nothing on Navient's billing statement, its website, or any other consumer-facing document advised borrowers that making no payment in response to a $0 bill could impact their eligibility for cosigner release.

96.     By resetting borrowers' progress toward the "consecutive, on-time principal and interest payments" requirement to zero months when

they submitted no payment in response to a $0 bill as a result of a previous multiplier overpayment, Navient denied or delayed cosigner release for borrowers who had already satisfied the requirement that Navient had disclosed or had made progress towards doing so, and who had met or would have been able to meet Navient's other requirements for release.

**Navient's Payment Processing Errors**

97.     One of Navient's primary responsibilities as a student loan servicer is to process payments made by borrowers and cosigners on their student loan accounts.

98.     Navient, however, does not have adequate processes and procedures in place to sufficiently address certain errors it makes in the processing of payments received from borrowers and cosigners or to prevent errors from recurring.

99.     A significant number of borrowers and cosigners do not submit payments through Navient's online portal, but instead submit their payments by mailing a check or through an external bill payment system (such as a bill payment service operated by the bank where the borrower has a checking account).

100.     Since at least July 2011, many borrowers and cosigners,

primarily those who pay by mailing a check or through an external bill payment system, have complained that Navient misallocated or misapplied submitted payments. (Errors in the allocation of payments relate to how a payment is distributed across multiple loans. Errors in the application of payments relate to how a payment is applied to a specific loan or loans based on the terms of each loan's promissory note; for example, the payment might be applied first to unpaid fees, then to unpaid interest, and then to unpaid principal.)

101.   By way of example, in some instances, Navient has misallocated payments intended and/or designated for a specific loan(s) among some or all of a borrower's other loans. Sometimes, the payment was a lump sum payment intended to pay off a specific loan, but Navient allocated the payment to all of the loans in the borrower's account, thereby not paying off the loan that the borrower intended to pay off. In other cases, Navient has disregarded borrower or cosigner instructions about how to divide a payment among loans, or incorrectly allocated payments made by cosigners to all of the loans in the borrower's account instead of only the loans which they cosigned.

102.   Each year Navient receives thousands of complaints and

inquiries relating to payment misapplication or misallocation that are escalated beyond a first-level customer service representative.

103.    One source for payment processing errors appears to be the undisclosed payment allocation methodology used by Navient. Specifically, when a borrower has more than one loan serviced by Navient, Navient generally places that borrower's loans in one or more billing groups. For borrowers who made a payment that varied from the exact amount owed on the loans in a billing group, Navient has used a default allocation methodology that was not disclosed on any billing statement, promissory note, or printed or online resource available to borrowers.

104.    In addition, the default allocation methodology varied based on whether the loan was federal or private, as well as whether the borrowed submitted an underpayment, overpayment, or an overpayment that was a multiple of the borrower's monthly payment amount due.

105.    Because Navient did not make its default allocation methodologies clear or publicly available until at least late 2013, prior to that time borrowers and cosigners had no way of knowing in advance how Navient might allocate payments (unless they specifically requested the information and a representative provided accurate information).

106.    While a borrower or cosigner could submit written instructions with a paper check as to how a payment should be processed, Navient's mail reading equipment did not always properly detect the presence of such instructions. And even where the instructions were detected and acted upon by a Navient representative, the Navient representative did not always implement the instructions properly.

107.    Thus, borrowers who did not use Navient's online portal to submit payments had to call if they discovered, as was sometimes the case, that their payment processing instructions had not been honored or had not been implemented properly.

108.    Errors made by Navient in the processing of payments received from borrowers and cosigners have resulted in borrowers and cosigners incurring improper late fees, increased interest charges, the furnishing of inaccurate negative information to consumer reporting agencies, and the loss of certain benefits.

109.    Many borrowers and cosigners have complained that a payment processing error was not an isolated event, but rather that the same payment processing error recurred time and again, even after they contacted Navient to correct the error.

110.    While Navient might correct a specific error if a consumer contacts Navient to report it, if the error is not escalated beyond a first-level customer service representative, Navient does not necessarily identify and fix the underlying issue causing the error to prevent it from recurring. As a result, some consumers have suffered the same payment processing error in multiple months.

111.    Moreover, Navient does not categorize most non-escalated consumer inquiries about payment processing errors. When borrowers and cosigners with non-escalated consumer inquiries contact Navient about payment processing errors, Navient personnel generally record details about the error in a freeform, narrative style in notes in the consumer's account, but those personnel are unable to use any codes or tags to categorize the inquiry or concern.

112.    Navient, thus, is unable to systematically search and/or aggregate these non-escalated inquiries. As a result, Navient has been unable to effectively understand many of the problems that consumers are experiencing with respect to payment processing and take action to prevent these problems from recurring or from impacting the same consumer again and again.

## <u>Pioneer Credit Recovery, Inc.</u>

## The Federal Rehabilitation Program

113.    The federal loan rehabilitation program allows federal student loan borrowers to restore the student loans on which they have defaulted to active repayment and remove the default notation from their credit histories.

114.    Once a borrower enters the program, he/she is required to make nine on-time payments over the course of ten months. If the borrower successfully makes the nine payments and submits an application, the outstanding loan balance is transferred to a new servicer and the borrower is taken out of default status.

115.    The U.S. Department of Education has relied on Pioneer and other private collection agencies to accurately explain the terms and conditions of the rehabilitation program to borrowers and enroll them in the program where appropriate.

116.    Once Pioneer enrolls a borrower in the rehabilitation program, the company receives a percentage-based fee for every monthly rehabilitation payment made by that borrower.

117.    Once a borrower completes the nine payments and the

rehabilitation application, Pioneer receives a percentage fee based on the total amount of the defaulted loan balance "cured" through rehabilitation.

**Pioneer's False Promises that Rehabilitation Would Remove All Adverse Information Regarding the Borrowers' Loans from Their Credit Reports**

118.    When a borrower is in a normal repayment status on her student loan, he/she has a related trade line on his/her credit report.

119.    If that borrower ceases making payments, eventually he/she will enter default status, at which point a new and separate default trade line will be added to his/her credit report. Hence, a borrower in default has two trade lines related to the student loan: one reflecting the late payments and delinquencies leading up to default, and another reflecting the default itself.

120.    Once a borrower completes the rehabilitation program and has the default cured, the owner of the loan removes the default trade line from the borrower's credit report. However, the original trade line reflecting late payments and delinquencies prior to the default is not removed.

121.    The U.S. Department of Education instructs its debt collectors not to state or imply to borrowers that the adverse information reported by the original lender guaranty agency will be removed from the borrower's

credit report as a result of rehabilitation: "Adverse information reported by the original lender will not be expunged or excluded from credit reports before the 7-year period that runs from the lender's report of that default, even if the loan is rehabilitated."

122.    On information and belief, despite this instruction, in calls with borrowers, Pioneer collectors routinely misrepresented the change that occurs on a borrower's credit report after rehabilitation, by stating or suggesting that all adverse information relating to the defaulted loan, including any record of late payments and delinquencies, would be removed from the borrower's credit report. Borrowers typically do not know that there are two trade lines for the defaulted loans, so unless that fact is clearly explained to the borrower, they would not reasonably understand that not all adverse information would be removed.

123.    The U.S. Department of Education, in 2015, announced its intention to end its contract with Pioneer in part because an audit, which included review of a sample of calls, indicated that Pioneer collectors misled consumers concerning the change that occurs on a borrower's credit report after rehabilitation.

124.    On information and belief, the misrepresentations made in calls

with borrowers were also consistent with the training guides used by Pioneer which included the following talking points: "You have qualified for a rehabilitation program. What you will need to do is make a minimum of 9 qualifying monthly payments. After all payments are made, a new lender will pay off the Department of Education for you. You will then in turn owe the new lender, which means you will no longer be in Federal Default. All of the collection fees will be removed at the time of the sale. *Also it will be completely deleted from your credit report as though it never happened.*" (emphasis added).

125.   In fact, after rehabilitation, these borrowers' trade lines were not erased of all adverse information related to the student loan. The original trade line, reflecting a delinquency, remained on their credit reports.

## Pioneer's False Promises Regarding Collection Fee Forgiveness

126.   When a federal student loan enters default, the U.S. Department of Education begins calculating collection fees at 24.34% of the principal amount due.

127.   The amount calculated becomes part of the overall balance owed to the federal government by the borrower.

128.    Once a borrower completes the rehabilitation program, and the default is cured, any remaining collection fees are forgiven by the U.S. Department of Education.

129.    On information and belief, in calls with some borrowers, Pioneer collectors represented that all collection fees would be forgiven.

130.    On information and belief, other times, Pioneer represented to some borrowers that the amount of collection fees currently assessed to the account would be forgiven.

131.    In reality, since 20% of each rehabilitation payment made by a borrower goes towards collection fees, many borrowers have paid down a significant portion of their collection fees by the time they have completed the rehabilitation program.

132.    As a result, by the time the borrower has finished the rehabilitation program, the amount of collection fees remaining to be forgiven was less than initially promised.

133.    The U.S. Department of Education, in 2015, announced its intention to end its contract with Pioneer in part because an audit, which included review of a sample of calls, indicated that Pioneer collectors misled consumers concerning the amount of collection fees that would be

forgiven for borrowers who completed the rehabilitation program.

## VIOLATIONS OF THE

## CONSUMER FINANCIAL PROTECTION ACT

134.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Defendants are "covered person[s]" within the meaning of the CFPA. 12 U.S.C. § 5481(6).

135.    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

136.    An act or practice is deceptive if it misleads or is likely to mislead the consumer; the consumer's interpretation of the act or practice is reasonable under the circumstances; and the misleading act or practice is material.

137.    An act or practice is abusive if it, among other things, takes

unreasonable advantage of the reasonable reliance by the consumer on a covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d).

## Count I

## Abusive Acts or Practices Related to Steering

## (Against Navient and Navient Corporation)

138.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

139.    Federal student loan borrowers relied on Navient to act in their interests in advising about options to address their financial situation, including helping borrowers experiencing financial hardship or distress select a suitable alternative repayment plan. That reliance was reasonable in part because both Navient and the U.S. Department of Education repeatedly encouraged borrowers to rely on their servicer to help them in this way.

140.    As described above, in numerous instances, Navient took unreasonable advantage of consumers' reasonable reliance on Navient to act in their interests. Navient did not act in consumers' interest because it steered borrowers experiencing long-term financial hardship to forbearance rather than adequately advising them about income-driven

repayment plans that would have been financially beneficial to those borrowers.

141.    This advantage obtained by Navient was unreasonable because Navient benefited from this conduct at the expense of the consumer. Enrolling borrowers into forbearance is quicker and less expensive to administer than other repayment plans, thus decreasing Navient's operating costs. The advantage obtained by Navient was also unreasonable because Navient fostered the reliance that it then exploited at the expense of those consumers.

142.    Therefore, Navient's acts and practices as set forth herein, together with or on behalf of Navient Corporation, constitute abusive acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## Count II

## Unfair Acts or Practices Related to Steering

## (Against Navient and Navient Corporation)

143.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

144.    Navient's acts and practice relating to steering of borrowers into

forbearance caused or was likely to cause substantial consumer injury. Navient steered hundreds of thousands of federal student loan borrowers experiencing long-term financial hardship into multiple consecutive forbearances that spanned years. Navient then added any interest that was unpaid during the forbearance period to the principal balance of these borrowers' loans, thereby drastically increasing the total costs of these loans.

145.    This consumer injury was not reasonably avoidable because Navient steered borrowers into forbearance while providing no or inadequate information about alternative repayment plans so that borrowers could make an informed decision to select the repayment option that was most appropriate for their financial circumstances.

146.    The substantial consumer injury caused or likely caused by Navient's steering of borrowers into forbearance was not outweighed by countervailing benefits to consumers or to competition.

147.    Therefore, Navient's acts and practices as set forth herein, together with or on behalf of Navient Corporation, constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1).

## Count III

## Unfair Acts or Practices Related to Recertification

## (Against Navient and Navient Corporation)

148.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

149.    As described above, Navient failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice because the email it sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

150.    These acts and practices caused or were likely to cause substantial injury to consumers because numerous federal student loan borrowers' affordable income-based payment in the income-driven repayment plan expired as a result of those acts or practices, causing them to suffer significant negative financial consequences, including an increased monthly payment, the addition of interest to the principal balance of the loan, and the partial loss of the interest subsidy provided by the federal government for eligible loans. Navient was aware that the majority of its federal student borrowers were failing to timely renew their enrollment in

income-driven repayment plans.

151.    These injuries were not reasonably avoidable. Among other things, Navient's acts and practices relating to renewal of income-driven repayment plans created an unreasonable obstacle to the exercise of consumers' decision-making with respect to renewal of income-driven recertification plans, including by obscuring access to the information necessary for consumers to take the actions necessary to avoid these injuries.

152.    The substantial consumer injury caused or likely caused by Navient's acts and practices relating to renewal of income-driven repayment plans was not outweighed by countervailing benefits to consumers or to competition.

153.    Therefore, Navient's acts and practices as set forth herein, together with or on behalf of Navient Corporation, constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## Count IV

## Deceptive Acts or Practices Related to Recertification

## (Against Navient and Navient Corporation)

154.    The allegations in Paragraph 1 to 137 are incorporated here by reference.

155.    From at least July 2011 to December 2012, in numerous instances, Navient sent federal student loan borrowers a notice regarding renewal of income-driven repayment plans that stated that providing incomplete or inaccurate information in the renewal application would result in a "delay" in the renewal "process," but Navient did not separately identify any consequences other than the processing delay. This statement made an implied representation, and created the false impression, that the only consequence of submitting a renewal application with incomplete or inaccurate information would be a processing delay and nothing more.

156.    In truth and in fact, submitting a renewal application with incomplete or inaccurate information was likely to result in several other consequences, which were more severe than a mere delay in processing the renewal. These include a significant increase in the borrower's monthly payment amount, the addition of any unpaid interest to the principal balance of the loan, and the partial loss of the federal government's interest subsidy for eligible loans.

157.    It was reasonable under the circumstances for consumers to

interpret Navient's statement to mean that a processing delay was the only consequence of submitting incomplete or incorrect information.

158.    Navient's representation was material and likely to mislead a reasonable federal student loan borrower.

159.    Therefore, Navient's misrepresentations as set forth herein, together with or on behalf of Navient Corporation, constitute deceptive acts or practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## Count V

## Deceptive Acts or Practices Related to

## Cosigner Release Requirements

## (Against Navient and Navient Corporation)

160.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

161.    As described above, in numerous instances, Navient represented to borrowers with cosigned loans that they could apply for cosigner release if the borrower made a certain minimum number of "consecutive, on-time principal and interest payments" and also met other eligibility criteria.

162.    In truth and in fact, Navient did not allow certain borrowers who met this requirement to apply for cosigner release – those who submitted no additional payment in a month in which they received a $0 bill because they had made a payment in a previous month that was a multiple of the monthly payment amount due.

163.    It was reasonable for consumers to interpret Navient's express representation about the "consecutive, on-time principal and interest payments" requirement to mean that a borrower was only required to submit consecutive "on-time principal and interest payments," and not that such payments must be made in consecutive months and even in months when no such payment was due.

164.    Navient's misrepresentations were material and likely to mislead a reasonable consumer.

165.    Therefore, Navient's misrepresentations as set forth herein, together with or on behalf of Navient Corporation, constitute deceptive acts or practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## Count VI

## Unfair Acts or Practices Related to Payment Processing Errors

**(Against Navient and Navient Corporation)**

166.   The allegations in Paragraphs 1 to 137 are incorporated here by reference.

167.   As described above, in numerous instances, Navient made errors, sometimes month after month, in misallocating and misapplying payments made by consumers.  Moreover, Navient failed to implement adequate processes and procedures to prevent the same errors from recurring, or to prevent the same errors from impacting other consumers.

168.   These acts and practices caused or were likely to cause substantial injury to consumers in the form of late fees, interest accrual, and negative credit reporting.

169.   These injuries were not reasonably avoidable because consumers had no control over errors, including repeat errors, that Navient made in the processing of their payment(s).

170.   The substantial consumer injury caused or likely caused by Navient's payment processing errors was not outweighed by countervailing benefits to consumers or to competition.

171.   Therefore, Navient's acts and practices as set forth herein, together with or on behalf of Navient Corporation, constitute unfair acts or

practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## Count VII

## Deceptive Acts or Practices Related to

## Rehabilitation Credit Reporting

## (Against Pioneer and Navient Corporation)

172.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

173.    As described above, on information and belief, Pioneer represented to borrowers that completing a rehabilitation program would remove all adverse information regarding the student loan from their credit report.

174.    In truth and in fact, completing a rehabilitation program would not remove all adverse information regarding the student loan from the borrower's credit report because the original trade line reflecting late payments and delinquencies prior to the default would remain.

175.    It was reasonable for consumers to interpret Pioneer's express representations to mean what they say.

176.    Those misrepresentations were material to consumers in

choosing whether to participate in the rehabilitation program.

177.    Therefore, Pioneer's misrepresentations as set forth herein, together with or on behalf of Navient Corporation, constitute deceptive acts or practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

**Count VIII**

**Deceptive Acts or Practices Related to**

**Rehabilitation Collection Costs**

**(Against Pioneer and Navient Corporation)**

178.    The allegations in Paragraphs 1 to 137 are incorporated here by reference.

179.    As described above, on information and belief, Pioneer represented to borrowers that all collection fees would be forgiven by the U.S. Department of Education upon completion of the rehabilitation program. On information and belief, Pioneer also represented to some borrowers that the amount of collection fees currently assessed to the account would be forgiven.

180.    In truth and in fact, the U.S. Department of Education would not forgive all collection fees or the amount of collection fees currently

assessed, upon completion of the rehabilitation program, because approximately 20% of each rehabilitation payment made by a borrower goes towards collection fees. The U.S. Department of Education would forgive only the amount of collection fees remaining after rehabilitation payments were applied.

181.    It was reasonable for consumers to interpret Pioneer's express representations to mean what they say.

182.    Those misrepresentations were material to consumers in choosing whether to participate in the rehabilitation program.

183.    Therefore, Pioneer's misrepresentations as set forth herein, together with or on behalf of Navient Corporation, constitute deceptive acts or practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### Count IX

### Deceptive Acts or Practices Related to

### Rehabilitation Credit Reporting

### (Against Pioneer and Navient Corporation)

184.    The allegations in Paragraphs 1 to 133 and 173 to 176 are incorporated here by reference.

185.    The Fair Debt Collection Practices Act prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

186.    As described above, on information and belief, Pioneer made false, deceptive, and misleading representations to borrowers that completing the federal loan rehabilitation program would remove all adverse information regarding their loan from their credit report.

187.    Therefore, Pioneer, acting together with or on behalf of Navient Corporation, violated the Fair Debt Collection Practices Act. 15 U.S.C. § 1692e, 1692e(10).

## Count X

### Deceptive Acts or Practices Related to

### Rehabilitation Collection Costs

### (Against Pioneer and Navient Corporation)

188.    The allegations in Paragraphs 1 to 133 and 179 to 182 are incorporated here by reference.

189.    The Fair Debt Collection Practices Act prohibits debt collectors

from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

190.    As described above, on information and belief, Pioneer made false, deceptive, and misleading representations to borrowers that all of their collection fees related to the federal loan rehabilitation program would be forgiven by the U.S. Department of Education or that the exact amount of collection fees currently assessed to the account would be forgiven.

191.    Therefore, Pioneer, acting together with or on behalf of Navient Corporation, violated the Fair Debt Collection Practices Act. 15 U.S.C. § 1692e, 1692e(10).

## VIOLATIONS OF REGULATION V

## Count XI

## Violations of Regulation V Related to Disabled Borrowers

## (Against Navient and Navient Corporation)

192.    The allegations in Paragraphs 1 to 133 are incorporated here by reference.

193.    Regulation V, the implementing regulation of the Fair Credit Reporting Act, 15 U.SC. §§ 1681, *et seq.*, imposes certain requirements on

persons or entities that furnish consumer information to consumer reporting agencies for inclusion in consumer reports. 12 C.F.R. § 1022.40-43.

194.    As a student loan servicer, Navient routinely furnished information about federal student loan borrowers' performance on loans to one or more consumer reporting agencies for inclusion in a consumer report, and is therefore a "furnisher" under Regulation V. 12 C.F.R. § 1022.41(c).

195.    Regulation V requires a furnisher to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnishes to a consumer reporting agency." 12 C.F.R. § 1022.42(a).

196.    However, from at least October 2012 to approximately June 2014, Navient failed to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of information that it furnished regarding borrowers who had received a discharge on their federal loans due to a total and permanent disability.

197.    Therefore, Navient, acting together with or on behalf of Navient Corporation, violated Regulation V, 12 U.S. C. § 1022.42(a).

## THE COURT'S POWER TO GRANT RELIEF

198.   The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, a permanent or temporary injunction, recession or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. §§ 5565.

## PRAYER FOR RELIEF

199.   WHEREFORE, the Bureau requests that the Court:

a.   Permanently enjoin Defendants from committing future violations of the CFPA, FCRA, Regulation V, the FDCPA, or any other provision of federal consumer financial law, as defined by 12 U.S.C. § 5481(14);

b.   Order Defendants to pay appropriate restitution to consumers harmed by their unlawful conduct;

c.   Order Defendants to institute appropriate injunctive relief;

d.   Order disgorgement of ill-gotten revenue against Defendants;

e.       Impose civil money penalties against Defendants;

f.       Order the rescission or reformation of contracts where necessary to redress injury to consumers;

g.       Order Defendants to pay the Bureau's cost incurred in connection with proceeding with this action; and

h.       Award additional relief as the Court may determine to be just and proper.

Dated: January 18, 2017                   Respectfully submitted,

Anthony Alexis
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

   _/s/ Brandis Anderson_____
Brandis Anderson, CA 261325
(Email: Brandis.Anderson@cfpb.gov)
(Phone: 202-435-7548)
Nicholas Jabbour, DC 500626
(Email: Nicholas.Jabbour@cfpb.gov)
(Phone: 202-435-7508)
*Enforcement Attorneys*

Attorneys for Plaintiff
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-9346