## APPENDIX OF UNPUBLISHED OPINIONS

A.   *Angino v. Wells Fargo Bank, N.A.*,
        No. 15-418, 2016 WL 787652 (M.D. Pa. Feb. 19, 2016)

B.   *Bret Binder v. Weststar Mortg., Inc.*,
        No. 14-7073, 2016 WL 3762710 (E.D. Pa. July 13, 2016)

C.   *Casey v. Fla. Coastal Sch. of Law*,
        No. 14-1229, 2015 WL 10096084 (M.D. Fla. Aug. 11, 2015)

D.   *CFPB v. Intercept Corp.*,
        No. 16-00144, Doc. 46 (D.N.D. Mar. 17, 2017)

E.   *CFPB. v. Prime Mktg. Holdings, LLC*,
        No. 16-07111, Doc. 32 (C.D. Cal. Nov. 15, 2016)

F.   *Dommel Props., LLC v. Jonestown Bank & Trust Co.*,
        No. 11-2316, 2013 WL 1149265 (M.D. Pa. Mar. 19, 2013)

G.   *In re Merck & Co. Sec. Derivative & ERISA Liab.*,
        No. 05-2369, 2006 WL 2050577 (D.N.J. July 11, 2006)



2016 WL 787652
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Richard Angino and Alice Angino, Plaintiffs,

v.

Wells Fargo Bank, N.A., and Wells
Fargo Home Mortgage, Defendant.

CIVIL NO. 1:15-CV-418
|
Signed 02/19/2016

**Attorneys and Law Firms**

Richard C. Angino, Angino & Lutz, P.C., Harrisburg, PA,
for Plaintiffs.

Craig A. Hirneisen, Steven J. Adams, Stevens & Lee PC,
Reading, PA, for Defendant.

*REPORT AND RECOMMENDATION*

Martin C. Carlson, United States Magistrate Judge

### I. *Statement of Facts and of the Case*

**\*1**  This lawsuit, which comes before us for consideration
of a motion to dismiss, is one of several cases [1] brought by
the plaintiffs against various financial institutions arising
out of a common core of operative facts. The plaintiffs in
this action are Richard Angino, a local attorney, and his
spouse, Alice Angino. (Doc. 1, ¶ 4.) The plaintiffs are in
their 70s and as Mr. Angino approaches the conclusion of
his professional career he and his wife have experienced a
series of financial reversals. As described by the Anginos
in the well-pleaded facts set forth in their complaint,
these financial setbacks are in large measure a product of
some $13,000,000 in loans and mortgage indebtedness
which they agreed to undertake in connection with various
residential and commercial projects over a number of
years up through 2002. (*Id.*, ¶ 6.)

[1]     *See Angino v. Santander Bank,* Civ. No. 1:15–CV–438;
        *Angino v. Santander Bank,* Civ. No. 1:15–CV1145.

This indebtedness included a mortgage on a luxurious
residential property. (*Id.*, ¶ 7.) In 2002, the Anginos had

an existing mortgage in the amount of $708,000 on this
property with First Union Bank, a financial institution
which later became the defendant, Wells Fargo. (*Id.*, ¶
8.) According to the Anginos, in 2002, they renegotiated
"once in a lifetime" terms for a new mortgage loan from
the bank. (*Id.*, ¶ 10.) This new mortgage was based upon
an appraised value for the home of $2,310,000, and was a
100% cash mortgage, with interest only payments for the
first 10 years of the loan. (*Id.*, ¶¶ 8–18.)

The Anginos agreed to these new loan terms, and used
the nearly $2.3 million dollars disbursed to them for an
array of purposes. (*Id.*, ¶ 13.) However, in the decade
which followed a confluence of events impaired the ability
of the Anginos to make the principal payments which
they had agreed to in 2002 when they refinanced this
loan. These events included the economic downturn in
20072009, which led to significant stock losses for the
Anginos in their margined stock holdings; (*Id.*, ¶ 22) as
well as severe financial reversals in various speculative
commercial and residential real estate investments. (*Id.*, ¶
23.) In addition, by 2013, Richard Angino's legal practice
was also experiencing financial difficulties "because of
having insufficient cases for eight attorneys." (*Id.*, ¶ 27.)

Confronted with this cascading array of financial
difficulties, the Anginos were unable to make full loan
payments in 2013, when principal payments began to
come due under the terms of the 2002 loan agreement. (*Id.*,
¶ 28.) These loan defaults compounded over time. (*Id.*,
¶¶ 28, 31, 32, 34, 41, 42.) Thus, the Anginos' complaint
describes in some detail the plaintiffs' breach of their
2002 agreement to make timely loan payments. However,
notably, with respect to the original 2002 loan agreement,
the Anginos' current complaint does not describe any
actions by the bank which violated the terms of this
agreement. Instead, the Anginos seem to allege that the
bank is liable to them, in part, because the bank refused
to further modify these loan terms in a fashion that would
have been more favorable to these defaulting borrowers,
something the Anginos represent they anticipated would
occur in the future. Thus, the apparent premise of
this complaint is that the plaintiffs have some right to
compel the bank to modify agreed-upon loan terms to its
detriment and to the benefit of these defaulting borrowers.
Significantly, nothing in the 2002 written loan agreement
reflected a promise of commitment by any of the parties
to refinance this loan at some time in the future.

**\*2** As the Anginos' 2002 loan fell deeper into default, the Anginos began a series of lengthy, protracted, and arduous exchanges with Wells Fargo, seeking relief under the Home Affordable Modification Program, (HAMP), or any other mortgage relief the bank could offer. (*Id.*, ¶¶ 43–78.) While the Anginos provide a detailed narrative of these communications, and characterize the discussions as an agreement to refinance their loan, what is noteworthy about the well-pleaded facts in the complaint is that they *do not* seem to reflect an agreement by Wells Fargo to refinance this $2.3 million loan. At most, these communications describe a process–albeit a frustrating process from the plaintiffs' perspective–by which the Anginos could provide information to the bank so it could determine whether to enter into a modified loan agreement. Ultimately, these efforts were entirely unavailing, since the Anginos' did not qualify for HAMP program mortgage relief. (*Id.*, ¶ 54.)

Based upon these averments, and in the face of these loan defaults, the Anginos have filed an eight-count civil complaint, which combines and conflates various claims and causes of action. In Count I the Anginos allege that Wells Fargo breached its 2002 loan agreement with the Anginos. This breach of contract claim, however, does not rest upon any breach of the actual terms of this written loan agreement. Rather, it seems premised upon "expectations of the parties that refinancing would be available." (*Id.*, ¶ 81) Thus, the breach of this 2002 contract alleged by the Anginos in fact entails a failure to enter into some new, different and more favorable loan agreement ten years later in 2012 when the Anginos began defaulting on this initial agreement. In Count II of their complaint, the Anginos allege a second breach of contract claim, an alleged breach of a series of "HAMP TPP Agreements" between the plaintiffs and the bank in 2012 through 2014. (*Id.*, ¶ 90.) However, the well-pleaded facts in the complaint describe something that appears to fall well short of an agreement to refinance. Rather, the well-pleaded facts reflect discussions regarding a process by which the Anginos could provide information to the bank so it could determine whether to enter into a modified loan agreement.

Count III of the complaint, in turn, alleged that the bank engaged in unfair and deceptive practices under Pennsylvania's Unfair Trade Practices and Consumer Protection law, 73 Pa.C.S. § 201–1, when it refused to further modify this loan. This unfair trade practice

claim, as pleaded, seems expressly premised upon the Anginos' claims that they had some free-standing right to a loan modification under HAMP or due to the Dodd–Frank Wall Street Reform and Consumer Protection Act, a premise which is a recurring theme throughout this complaint. (*Id.*, ¶¶ 100–109.) Count IV of the complaint advances a promissory estoppel claim, which is once again based upon two notions which appear unsupported by either the law or the well-pleaded facts: the idea that Wells Fargo agreed to refinance this loan, coupled with the legal premise that the Anginos had an enforceable right to refinance this loan under HAMP or some other federal statute. (*Id.*, ¶¶ 110–113.)

In Count V of the complaint, the Anginos endeavor to bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* Specifically, the Anginos seem to allege that the defendants failed to respond to the plaintiff's "Qualified Written Requests" for information their loan and failed to correct erroneous loan information. (*Id.*, ¶¶ 114–130.) Count VI of the complaint, in turn, alleged violations of the federal Fair Credit Reporting Act, by the bank. These alleged Fair Credit Report Act violations appear to have pertained to the bank's factually accurate reports that the Anginos had defaulted on their loan, but are flawed. (*Id.*, ¶¶ 132–137.) Finally, Count VII of the complaint accuses the bank in a summary fashion of fraud, deceit, conspiracy, negligence and the intentional or negligent infliction of emotional distress. (*Id.*, ¶¶ 137–143.)

**\*3** Presented with this multi-faceted complaint, Wells Fargo Bank has now moved to dismiss the complaint citing numerous legal deficiencies in this pleading. (Docs. 6 and 12.) The Anginos, in turn, have responded to this motion to dismiss, albeit frequently in a summary fashion, often arguing the viability of many of these legal claims through a single summary, assertion. (Doc. 15.) Wells Fargo's motion to dismiss is fully briefed and, therefore, is now ripe for resolution.

While we note that some of the plaintiffs' claims seem to have transmogrified factually in the course of this litigation, when we consider the allegations actually made by the plaintiffs in their complaint, we find that many of these allegations do not state a claim upon which relief may be granted. Therefore, we recommend dismissal of Counts I, II, III, IV, VI, and VII of the complaint, although some counts, and particularly

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Count III which alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1 should be dismissed without prejudice to the filing of a n amended complaint stating well-pleaded facts in support of this claim. As for Count V of the complaint, which bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, et seq., it is recommended that the motion to dismiss be denied, but that the plaintiffs be directed to file a more definite statement of their claims pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.

## II. *Discussion*

### A. *Rule 12(b)(6)– The Legal Standard*

Wells Fargo has filed a motion to dismiss this complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has recently aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (12007) continuing with our opinion in *Phillips [v. County of Allegheny,* 515 F.3d 224, 230 (3d Cir.2008)] and culminating recently with the Supreme Court's decision in *Ashcroft v. Iqbal* –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 209–10 (3d Cir.2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir.1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* As the Supreme Court held in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*4** In keeping with the principles of *Twombly,* the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-

> pleaded factual allegations, a
> court should assume their veracity
> and then determine whether they
> plausibly give rise to an entitlement
> to relief.

*Id.* at 679.

Thus, following *Twombly* and *Iqbal* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter *Iqbal,* when presented with
> a motion to dismiss for failure to
> state a claim, district courts should
> conduct a two-part analysis. First,
> the factual and legal elements of
> a claim should be separated. The
> District Court must accept all of
> the complaint's well-pleaded facts
> as true, but may disregard any
> legal conclusions. Second, a District
> Court must then determine whether
> the facts alleged in the complaint are
> sufficient to show that the plaintiff
> has a "plausible claim for relief."
> In other words, a complaint must
> do more than allege the plaintiff's
> entitlement to relief. A complaint
> has to "show" such an entitlement
> with its facts.

*Fowler*, 578 F.3d at 210–11.

As the court of appeals has observed: "The Supreme Court in *Twombly* set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in *Iqbal.* The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct.1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' *Id.* A complaint

which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 220–21 (3d Cir.2011) *cert. denied,* 132 S.Ct. 1861, 182 L.Ed.2d 644 (U.S.2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' *Iqbal,* 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' *Id.* at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' *Id.*" *Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir.2010).

**\*5** In undertaking this task, the court generally relies only on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see also, U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d382, 388 (3d Cir.2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment.") However, the court may not rely on other parts of the record in determining a motion to dismiss. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

**B.** *As Currently Pleaded Many Counts Set Forth in This Complaint Fail to State a Claim Upon Which Relief May Be Granted*

### 1. *The Plaintiffs Have Not Alleged Viable Breach of Contract Claims*

At the outset, in Counts I and II of their complaint the plaintiffs allege that Wells Fargo has breached two contracts with the Anginos–the original 2002 loan agreement between the parties, and some form of 2012–2014 HAMP–TPP loan modification agreement that the plaintiffs allege existed between the parties. As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d. Cir.2000). The legal principles governing the interpretation of contracts under Pennsylvania law is familiar and well-settled. To prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach. *See Diodato v. Wells Fargo Ins. Servs., USA,* 44 F.Supp.3d 541, 556 (M.D.Pa.2014). Furthermore, the legal benchmarks applied to contract interpretation are also clearly settled. Initially, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980) (citation omitted); *Mace v. Atl. Ref. & Mktg. Corp.,* 785 A.2d 491, 496 (Pa.2001). A contract is ambiguous only if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3d Cir.1991). Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law. *Mellon Bank,* 619 F.2d at 1011 n.10.

The United States Court of Appeals for the Third Circuit has aptly summarized Pennsylvania law regarding the interpretation of contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The

whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

**\*6** *Great Am. Ins. Co. v. Norwin Sch. Dist.,* 544 F.3d 229, 243 (3d Cir.2008) (internal citation omitted) (citing *Murphy v. Duquesne Univ.,* 777 A.2d 418, 429–30 (Pa.2001)). Furthermore, courts must, whenever possible, read contract provisions so as to avoid ambiguity. *Id.* at 247. Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to resolve the issue of interpretation as a matter of law. *See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry.,* 346 F.Supp.2d 720, 725 (M.D.Pa.2004).

Applying these legal benchmarks, we find that the Anginos' breach of contract claims, as currently pleaded, fail as a matter of law on several scores. Indeed, there is an intellectually elusive quality to these breach of contract claims which stems from a single source: In no instances do the well-pleaded facts in the complaint identify a legally

enforceable promise by Wells Fargo, the *sine qua non* of a contract claim.

For example, with respect to Count I of the complaint, the plaintiffs' claim that the 2002 loan agreement has been breached, the plaintiffs point to no breach of the actual terms of this agreement. Rather, this claim is premised upon the plaintiffs' unilateral assertions concerning "expectations of the parties that refinancing would be available." (*Id.,* ¶ 81.) Suffice it to say, that no such promise to refinance can be found within the four-corners of the 2002 contract, a fully integrated written agreement. (Doc. 1–2.) We have carefully reviewed this agreement, which is attached as an exhibit to the complaint, and find this agreement to be clear and unambiguous. Further, nothing in the plain language of the agreement gives the plaintiffs a contractual right to refinance. Therefore, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone," *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980) (citation omitted); *Mace v. Atl. Ref. & Mktg. Corp.,* 785 A.2d 491, 496 (Pa.2001), and the plaintiffs may rely upon their own unilateral wishes to add unwritten terms to this otherwise unambiguous written contract.

Likewise, Count II of the complaint alleges a breach of what the plaintiff characterize as a loan modification agreement, but the well-pleaded facts recited in the complaint disclose that Wells Fargo simply sought information from the plaintiffs in order to ascertain whether it would agree to a loan modification. Courts consistently agree that such requests fall well short of an enforceable loan modification agreement and have declined to sustain a breach of contract claim based upon mere requests for information like those made here.[2]

[2]   *See, e.g. Eckerle v. Deutsche Bank Nat' 1 Trust,* 580 F App'x. 526, 528 (9th Cir.2014); *Ruivo v. Wells Fargo Bank, N.A.,* 766 F.3d 87, 92 (1st Cir.2014); *Bloch v. Wells Fargo Home Mortgage,* 755 F.3d 886,889 (11th Cir.2014); Scott v. Wells Fargo Bank, N.A., No.1 0–3368 (MJD/SER), 2011 WL 3837077, at *9 (D.Minn. Aug. 29, 2011); *Dersch v. BAC Home Loan Servicing LP,* No. 1:11–CV–267, 2011 WL 3100561, at *8 (W.D.Mich. July 25, 2011).

The Anginos' prospects on these particular contract claims do not improve if the claims are cast as a claim for a breach of a duty of good faith. As a general rule

allegations of a breach of the covenant of good faith sound in contract, rather than tort. *See Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.,* 560 A.2d 151, 153 (Pa.Super.Ct.1989)* ("Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts."). As a result, courts have found that the breach of the covenant of good faith is subsumed in a claim for breach of contract. *See McHale v. NuEnergy Group,* No. Civ. A. 01–4111, 2002 WL 321797, *8 (E.D.Pa. Feb. 27, 2002) (concluding that Pennsylvania law would not recognize a claim for breach of the covenant of good faith and fair dealing as a separate cause of action apart from the breach of contract claim, since the actions forming the basis of the breach of contract claim were essentially the same as those brought in support of the bad faith claim); *see also JHE, Inc. v. Se. Pa. Transp. Auth.,* 2002 WL 1018941, *7 (Pa.Com.Pl. May 17, 2002) ("[A] breach of the covenant of good faith is nothing more than a breach of contract claim and ... separate causes of action cannot be maintained for each, even in the alternative."); *Commonwealth v. BASF Corp.,* No. 3127, 2001 WL 1807778, *12 (Pa.Com.Pl. Mar. 15, 2001) ("Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract."). Rather, under Pennsylvania law, such a duty of fair dealing is entirely dependent upon the existence of a contractual relationship. In short, Pennsylvania law grafts onto all contracts a responsibility by the contracting parties to deal fairly with one another. However, Pennsylvania law does not recognize an independent, and free-standing, duty of fair dealing outside a contractual context. As we have previously explained:

 **\*7**  Whether express or implied, the covenant of good faith and fair dealing acts as a term of the contract, and that covenant arises from the contract itself. *See Ash v. Cont'l Ins. Co.,* 593 Pa. 523, 932 A.2d 877, 884 (2007); *Birth Center,* 787 A.2d at 385; *Murphy,* 777 A.2d at 434 & n. 11; *Gray,* 223 A.2d at 11 ("We believe that this recent case law, employing contractual terms for the obligation of the insurer to represent in good faith the rights of the insured, indicates that a breach of such an obligation constitutes a breach of the insurance contract for which an action in assumpsit will lie."); *Cowden v. Aetna Cas. & Sur. Co.,* 389 Pa. 459, 134 A.2d 223, 229 (1957).

Because the covenant of good faith and fair dealing arises from the contract and not due to the mere

relationship of the parties-as, for example, a fiduciary duty-a breach of the covenant sounds in contract, not tort. *See Ash,* 932 A.2d at 884. There is, however, no independent cause of action for a breach of the covenant of good faith and fair dealing-arising in contract-in Pennsylvania because such a breach is merely a breach of contract. *See Birth Center,* 787 A.2d at 385–86; *Gray,* 223 A.2d at 11. It has been said that a breach of the implied covenant of good faith and fair dealing merges with a breach of contract claim. *See Meyer v. Cuna Mut. Group,* No. 03–CV–602, 2007 WL 2907276, at *14–15 (W.D.Pa. Sept. 28) (citing cases).

*Zaloga v. Provident Life and Acc. Ins. Co. of America,* 671 F.Supp.2d 623, 630–31 (M.D.Pa.2009).

Since there typically is no separate cause of action under Pennsylvania law for breach of the duties of good faith and fair dealing; *Chanel, Inc. v. Jupiter Group, Inc.,* Civ. No. 3:04–CV–1540, 2006 U.S. Dist. LEXIS 43363, at *6, 2006 WL 1793223 (M.D. Pa. June 27, 2006); *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 549 (D.N.J.2004); *Blue Mt. Mushroom Co. v. Monterey Mushroom, Inc.,* 246 F.Supp.2d 394, 400–01 (E.D.Pa.2002); *LSI Title Agency, Inc. v. Eval. Servs., Inc.,* 951 A.2d 384, 391 (Pa.Super.Ct.2008), a claim for breach of the duties of good faith and fair dealing is, at bottom, simply a claim for breach of the underlying contract. *Zaloga v. Provident Life and Acc. Ins. Co. of America,* 671 F.Supp.2d 623, 630–631 (M.D.Pa.2009). Yet, in this case the Anginos seem to be alleging a breach of the duty of good faith claim, without asserting a clearly articulated breach of the underlying contract between themselves and Wells Fargo. This is a fatal flaw and defeats this claim as it is currently pleaded.

In any event, to the extent that some duty of good faith arises in a contractual setting, it is also clear that the scope of that duty in a borrower-lender transaction is narrowly defined and does not entail some legal obligation on the part of the lender to unilaterally agree to undermine, modify or defeat its own legal rights and interests under a commercial agreement. Thus, "the Supreme Court of Pennsylvania has refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor. *Heights v. Citizens National Bank,* 463 Pa. 48, 342 A.2d 738 (1975)." *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa.Super. 30, 36, 560 A.2d 151, 154 (1989). Likewise:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons.

**\*8** *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa. Super. 30, 36–37, 560 A.2d 151, 154 (1989). In short, to the extent that Pennsylvania law recognizes a contractual duty of good faith, "courts have ... refused to apply a duty of good faith to alter or defeat the rights of a creditor which have been granted by law *or contract.*" *Stewart v. SWEPI, LP,* 918 F.Supp.2d 333, 342 (M.D.Pa.2013)(emphasis in original).

Fairly construed, the plaintiffs' complaint invites us to do precisely what Pennsylvania law says we cannot do through the rubric of a duty of good faith and fair dealing; that is, require a creditor to alter, defeat, modify, or renounce some contractual rights which it possesses. The all-encompassing duty of good faith asserted by the Anginos in this complaint would also call upon us condemn Wells Fargo for taking actions which the courts have expressly stated it is permitted to take such as "adhering to its agreement with the borrower ... by enforcing its legal and contractual rights as a creditor;" refusing "to surrender rights which it has been given by statute or by the terms of its contract;" or "negotiat[ing] terms of a loan which are favorable to itself." *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa.Super. 30, 36–37, 560 A.2d 151, 154 (1989). Since Pennsylvania case law specifically rejects the notion

that a lender must surrender its legal rights in order to demonstrate its good faith to its borrower, the Anginos' good faith claim, which is unmoored to any contractual breach by defendants and demands that defendants forego their contractual rights, fails as a matter of law and should be dismissed.

Similarly, the Anginos cannot bolster this breach of contract claim, as they attempt to do in their response to this motion to dismiss by cataloguing a series of doctrines, claims and affirmative defenses such as: Reasonable Expectations, Ambiguity, Waiver and Estoppel, Mutual Mistake of Fact, and Breach of Good Faith. As the Pennsylvania courts have previously informed the Anginos, these types of affirmative defenses under Pennsylvania law do not constitute an independent, free-standing legal claim. *Angino & Rovner, PC v. Santander Bank, N.A.,* No. 489 MDA 2014, 2015 WL 6405714, at *7 (Pa.Super.Ct. Jan. 28, 2015). Indeed, the Pennsylvania courts have already specifically rejected the application of the reasonable expectations, waiver and estoppel, impracticability and impossibility doctrines to similar claims leveled by the Anginos against another bank in state court litigation. *Id.* Thus, the Pennsylvania courts have already advised the plaintiffs that they may not transmogrify these breach of contract defenses into quasi-contractual affirmative claims.

More fundamentally, even construed as affirmative defenses to contract liability, these defenses are typically limited to instances of physical impossibility, and not mere fiscal impracticability. Thus: "[I]f the allegedly unforeseeable event was in reality a natural and fairly predictable risk arising in the normal course of business, then a court may not dissolve a [n] agreement.... An individual's financial position, for example, cannot generally be an implied 'basic assumption' of a contract, nor will it excuse a party's performance. *See* Restatement (Second) of Contracts § 261 (1981) Comment: b. Basic assumption. Illustration 2 (showing that contracting party's financial situation as result of bank failure does not excuse performance on contract)." *Step Plan Servs., Inc. v. Koresko,* 12 A.3d 401, 412–13 (Pa.Super.Ct.2010). In this case, the Anginos attempt to assert that the change in their fiscal position gives them some form of affirmative breach of contract claim against their lender. This is something they may not do under Pennsylvania law. Therefore, this claim would fail as pleaded by the Anginos, and should be dismissed. If the plaintiffs wish to try to further articulate

these claims of estoppel and waiver, they should do so through the filing of a timely amended complaint, but they may not endeavor to transform their claims through their response to this motion to dismiss.

**\*9** Finally, the breach of contract claims in the plaintiffs' complaint allude to the Home Affordable Modification Program (HAMP), a federal program designed to assist some banks and borrowers, and the Dodd–Frank financial reform laws, and may be read to allege some type of private right of action on behalf of the plaintiffs against the bank under these federal statutes. To the extent that the Anginos incorporate these matters into their breach of contract claims, these assertions merit only brief consideration by this Court. First, it is undisputed that "HAMP does not provide a private right of action. *See Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 559 n. 4 (7th Cir.2012) (noting that 'HAMP does not create a private federal right of action for borrowers against servicers')." *Sinclair v. Citi Mortgage, Inc.,* 519 F. App'x 737, 739 (3d Cir.) *cert. denied sub nom. Sinclair v. Citi Mortgage,* Inc, 134 S.Ct. 245, 187 L.Ed.2d 182 (2013) reh'g denied sub nom. *Sinclair v. Citi Mortgage, Inc.,* 134 S.Ct. 1054, 188 L.Ed.2d 140 (2014). "Quite the contrary, 'federal courts across the country have held that HAMP does not create a private right of action for borrowers.' *" Taylor v. Sovereign/Santander Bank,* No. 1:15–CV–123, 2015 WL 757543, at *5 (M.D.Pa. Feb. 23, 2015)(collecting cases). Therefore, it is well-settled that the Anginos may not premise a private right of action upon the HAMP program. Likewise with narrow exceptions that are not pertinent here, the Dodd–Frank Act does not provide for a private right of action by borrowers against lending institutions. *See, e.g., Regnante v. Sec. & Exch. Officials,* No. 14 CIV. 4880 KPF, 2015 WL 5692174, at *7 (S.D.N.Y. Sept. 28, 2015); *Diena v. Certified Credit & Collection Bureau, Inc.,* No. 14 Civ. 769(AET), 2015 WL 570247, at *2 (D.N.J. Feb. 11, 2015) ("Plaintiff offers no statutory basis for the existence of a private right of action under the Dodd–Frank Act [.]")); *Levine v. Entrust Grp., Inc.,* No. 12 Civ. 3959(WHA), 2013 WL 1320498, at *7 (N.D.Cal. Apr. 1, 2013) ("Under the Dodd–Frank Act, the Court's research can find no private right of action.")). Therefore these breach of contract claims premised upon HAMP or Dodd–Frank should also be dismissed.

#### 2. The Plaintiffs' Promissory Estoppel Claims Also Fail as a Matter of Law

These same considerations call for dismissal of the plaintiffs' promissory estoppel claim set forth in Count IV of their complaint. This promissory estoppel claim, like the breach of contract claims, appears to be based upon two notions which are unsupported by either the law or the well-pleaded facts: the idea that Wells Fargo agreed to refinance this loan, coupled with the legal premise that the Anginos had an enforceable right to refinance under HAMP or some other federal statute. (*Id*., ¶¶ 110–113.)

Under Pennsylvania law promissory estoppel is appropriate in "situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing the promise." *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990). Promissory estoppel allows the court to enforce a promise that is unsupported by consideration where: (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee; (2) the promise does induce action or forbearance by the promisee; and (3) injustice can only be avoided by enforcing the promise. *Carlson,* 918 F.2d at 416. However, in every instance a promise is an essential element of a promissory estoppel claim. Moreover, in order to avoid a party's mere hopes being transformed into a claim of promissory estoppel courts often require that pleadings and proof show the existence of "a clear and definite promise." *Obado v. Magedson,* 612 F. App'x 90, 94 (3d Cir.2015)(construing New Jersey law). "Promissory estoppel is unavailable as a basis for relief when a promise is absent." *Schleig v. Commc'ns Satellite Corp.,* 698 F.Supp. 1241, 1249 (M.D.Pa.1988).

Here we find that the complaint simply fails to allege well-pleaded facts that would support a clear and definite promise by Wells Fargo to refinance this loan. This finding is fatal to this particular claim since promissory estoppel is unavailable where no promise can be found. *Id.* Therefore, Count IV of the complaint should also be dismissed.

#### 3. The Anginos Have Failed to Properly Allege Common-Law Fraud or Violations Unfair and Deception

Practices under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1

**\*10** Furthermore, in its current form, the Anginos' complaint does not sufficiently allege either common-law fraud or a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1.

With respect to the Anginos' common-law fraud allegations, beyond labeling the bank's conduct as fraudulent, the plaintiffs' complaint is devoid of any well-pleaded factual allegations which would support these serious claims. Thus, the plaintiffs provide no description of the allegedly fraudulent representations which they contend were made here by the bank. Furthermore, the plaintiffs do not allege any facts which would support an inference that the bank's decision to enforce its contractual rights under these modified loan agreement constituted some form of fraud upon the Anginos.

These deficiencies in the plaintiffs' complaint are particularly glaring since the rules governing specificity of pleading fraud in federal court call for much greater clarity in pleading and proof to sustain such grave allegations. As the United States Court of Appeals for the Third Circuit has observed:

> [A]llegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity. In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.". Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.*

*Lum v. Bank of America*, 361 F.3d 217, 223–4 (3d Cir.2004) (citations omitted, emphasis added).

Thus, "[p]ursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper

story." ' *Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." ' *In re Rockefeller Ctr. Props. Secs. Litig.,* 311 F.3d 198, 216 (3d Cir.2002) (quoting *In re Nice Sys., Ltd. Secs. Litig.,* 135 F.Supp.2d 551, 577 (D.N.J.2001), emphasis supplied)." *Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp.,* 596 F.Supp.2d 842, 878 (D.N.J.2008).

Here, when judged against the heightened pleading standards demanded by Rule 9, the Anginos' allegations of common law fraud are wholly deficient and consist of little more than the talismanic recital of the elements of a cause of action, something that will not do as a matter of pleading. Therefore, this common law fraud claim should be dismissed.

The Anginos' closely related claims of deceptive conduct under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1 (UTPCPL), Count III of the complaint, seem flawed in a similar fashion. As to this count of the complaint, a review of the complaint suggests that, as drafted, the Anginos' claims against Wells Fargo appear to be premised upon § 2011–2(4)(xxi) of the UTPCPL, which prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." This statutory prohibition against "deceptive conduct does not require proof of the elements of common law fraud, but ... knowledge of the falsity of one's statements or the misleading quality of one's conduct is still required." *Belmont v. MB Inv. Partners, Inc.,* 708 F.3d 470, 498 (3d Cir.2013). "Therefore, in order '[t]o establish liability under the catch-all provision of the UTPCPL, "a plaintiff must present evidence showing: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *Slapikas v. First Am. Title Ins. Co.,* CIV.A. 06–0084, —— F.R.D. ——, ——, 2014 WL 899355, at *6 (W.D.Pa.Mar.7, 2014) *(citing Seldon v. Home Loan Servs.,* 647 F.Supp.2d 451, 470 (E.D.Pa.2009); *Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 223 (3d Cir.2008))).' *Prukala v. Elle,* 3:14–CV–92, 2014 WL 1311125, *3

(M.D.Pa.Mar.28, 2014)." *Stephens v. State Farm Fire & Cas. Co.,* No. 1:14–CV–160, 2014 WL 5312682, at *9 (M.D.Pa. Oct. 16, 2014).

*11 In this case, as it is currently pleaded, the plaintiffs' UTPCPL claim simply does not identify any affirmative deceptive acts by Wells Fargo upon which the plaintiffs justifiably relied to their financial detriment. Instead, the gist of this state law claim appears to be the plaintiffs' assertion that Wells Fargo did not comply with the federal HAMP guidelines, thereby denying them an opportunity to modify this loan a fourth time. While we find that these spare allegations are insufficient to meet the elements of a claim under the UTPCPL, we note that other courts have sustained such claims in cases where there have been affirmatively misleading representations made to borrowers by lenders which went beyond mere technical non-compliance with HAMP regulations. *See Wilson v. Bank of Am., N.A.,* 48 F.Supp.3d 787 (E.D.Pa.2014).

While the plaintiffs suggest in their opposition to this motion that they may be able to allege such facts, the difficulty with these belated assertions is that they are not set forth in the complaint and run afoul of the well-settled principle that a plaintiff cannot amend a complaint through the filing of a brief, or through arguments set forth in a brief opposing a dispositive motion. Indeed, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 181 (3d Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)); *cf. Frederico v. Home Depot,* 507 F.3d 188, 202 (3d Cir.2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [a] complaint under Rules 9(b) and 12(b)(6)."). Yet, while we cannot rely upon these averments set forth in the Anginos' brief in assessing the sufficiency of this specific allegation, the plaintiffs' suggestion that they may be able to allege further well-pleaded facts in support of this particular claim cautions that this count of the complaint should be dismissed without prejudice to the plaintiffs attempting to allege facts which satisfy the elements of a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1.

#### 4. *The Anginos May Not Maintain Their Currently Pleaded Claim Against Wells Fargo Bank Under the Fair Credit Reporting Act*

Likewise the Anginos may not maintain a claim against Wells Fargo under the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 (FCRA), as it is currently pleaded in Count VI of their complaint. These alleged FCRA violations appear to relate to the bank's factually accurate reports that the Anginos had defaulted on their loan. (Doc. 1, ¶¶ 131–136.)

This claim fails for two basic reasons. First, we are constrained to note that this Fair Credit Reporting Act claim actually makes no reference to the Fair Credit Report Act at all, but rather alludes to an entirely unrelated statute, the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* [3]

[3]    We separately discuss the plaintiffs' RESPA claim below.

Yet, while the Anginos' complaint does not cite any provision of the FCRA they may be relying upon in making these allegations, and in fact cites an unrelated statute, the only provisions of the Act that could arguably apply to the reporting of adverse financial information are found in § 1681 s–2 of the Act. Under § 1681 s–2(a)(1)(A). However, there is no private right of action for reporting inaccurate information to the credit agencies; instead only the government can pursue such claims. *See Noel v. First Premier Bank,* 2012 WL 832992, at *5 (M.D.Pa. Mar. 12, 2012)* (citing *Simms Parris v. Countryside Fin. Corp.,* 652 F.3d 355, 358 (3d Cir.2011)). Further, as a furnisher of information to credit reporting agencies, Wells Fargo can only be liable to private parties under 15 U.S.C. § 1681s–2(b) if the following conditions are met: (1) notice was sent by the consumer of disputed information to a consumer reporting agency, (2) the consumer reporting agency notified the furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information. *Jaramillo v. Experian Information Solutions, Inc.,* 155 F.Supp.2d 356, 362–63 (E.D.Pa. May 21, 2001); *Slimm v. Bank of America Corp.,* 2013 WL 1867035 at*9 (D.N.J. May 2, 2013).

**\*12** The Anginos do not allege that any of these conditions have been met, and in fact do not even allege a violation of the FCRA. Therefore, in the absence of any legal or factual justification for this claim, Count IV of the complaint, which alleged FCRA violations, should also be dismissed.

#### 5. *The Plaintiffs' Various Common Law Tort Claims Fail to State a Claim Upon Which Relief May Be Granted*

In Count VII of their complaint the plaintiffs combine and conflate a number of common law tort claims, accusing the bank of conspiracy, negligence and the intentional or negligent infliction of emotional distress. (Id.,¶¶ 137–143.) These claims are set forth in a serial and summary fashion by the Anginos, and as pleaded fail for at least three reasons.

First, fairly construed, with respect to these tort claims, in order to state a valid cause of action plaintiffs must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) *Id.* at 555. Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Fairly construed, as to these tort claims, the Anginos' pleadings amount to little more than a formulaic recitation of the elements of a cause of action, a form of pleading that will not do. Therefore, these claims, which are inadequately pleaded, fail as a matter of law and should be dismissed.

Second, the Anginos' civil conspiracy claim, which is also pleaded in a conclusory fashion without supporting factual detail, simply fails to state a claim upon which relief may be granted. In this regard, as we have previously noted:

> [I]n order to plead a civil ... action based upon a claim of conspiracy, a plaintiff must plead allegations that are:
>
> > supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each defendant allegedly played in carrying out those objectives. Bare conclusory allegations of "conspiracy" or "concerted action" will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or

command from which such an agreement can be inferred.

*Flanagan v. Shively*, 783 F.Supp. 922, 928 (M.D.Pa.1992). Furthermore, when pleading a conspiracy claim, a plaintiff cannot rely upon subjective suspicion and speculation. *Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir.1991). Quite the contrary, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred. *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1377 (3d Cir.1992); see also *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir.2008) (stating that a conspiracy requires a 'meeting of the minds') (further citation omitted). This holding remains good law following Twombly and Iqbal, which, in the conspiracy context, require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.' *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955, 167 L.Ed.2d 929." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir.2010) cert. denied, ––– U.S. ––––, 131 S.Ct. 1798, 179 L.Ed.2d 655 (U.S.2011). We are mindful of these pleading requirements, which are considered together with the standards of pleading applicable to all civil actions in federal court as defined in *Twombly* and *Iqbal, supra*.

**\*13** *Victor v. Huber*, No. 3:12–CV–282, 2012 WL 7463723, at \*14 (M.D.Pa. Nov. 29, 2012) report and recommendation adopted sub nom. *Victor v. Hubbard*, No. 3:12–CV–00282, 2013 WL 704654 (M.D.Pa. Feb. 26, 2013). Here the Anginos' civil conspiracy allegations meet none of these requisites for a valid cause of action. Given that: "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy [and][t]he plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred," *Flanagan v. Shively*, 783 F.Supp. 922, 928 (M.D.Pa.1992), this claim also fails as pleaded by the plaintiffs since we do not know who the alleged conspirators are, what the object of their agreement was, and what concerted actions they are alleged to have taken as part of this corrupt agreement.

Third, with respect to claims for intentional or negligent infliction of emotional distress, under Pennsylvania law, "courts have been chary to allow recovery for a claim

of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven." *Hoy v. Angelone,* 720 A.2d 745, 753–54 (Pa.1998). Indeed, the Restatement (Second) of Torts instructs that "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, comment d; *Hoy,* 720 A.2d at 754. In keeping with these restrictive standards, the Pennsylvania Supreme Court has provided examples of conduct found to state a claim for intentional infliction of emotional distress, and such examples demonstrate the extraordinary nature of the theory:

Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct. *See e.g., Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970)(defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981)(defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football* Club, 595 F.2d 1265 (3d. Cir.1979)(defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

*Hoy*, 720 A.2d at 754.

Thus, in order to sustain a claim of intentional infliction of emotional distress, Pennsylvania law requires that a plaintiff plead that: "(1) the conduct was extreme and outrageous; (2) the conduct was intentional; (3) the conduct caused emotional distress; and (4) the distress was severe. *Silver v. Mendel,* 894 F.2d 598, 606 n. 16 (3d Cir.1990). Ultimately, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct exceeded the bounds of decency and is intolerable under prevailing societal norms. *Swisher v. Pitz,* 868 A.2d 1228, 1230 (Pa.Super.Ct.2005);

*see also Cox v. Keystone Carbon Co.,* 861 F.2d 390 (3d Cir.1988)." *Kearney v. JPC Equestrian, Inc.,* No. 3:11–CV–01419, 2012 WL 1020276, at *7 (M.D.Pa. Jan. 4, 2012) *report and recommendation adopted,* No. 3:11–CV–01419, 2012 WL 1020266 (M.D.Pa. Mar. 26, 2012). Applying this exacting standard, courts generally agree that a bank efforts to enforce its contractual rights simply does not constitute intolerable or outrageous conduct. *See, e.g., DeHart v. HomEq Servicing Corp.,* 47 F.Supp.3d 246, 257 (E.D.Pa.2014); *Messer v. First Fin. Fed. Credit Union of Maryland,* No. CIV.A. 11–4144, 2012 WL 3104604, at *4 (E.D.Pa. July 30, 2012); *Wilson v. Am.* Gen. Fin. Inc., 807 F.Supp.2d 291 (W.D.Pa.2011); Brown v. Udren Law Offices PC, No. CIV.A. 11–2697, 2011 WL 4011411, at *4 (E.D.Pa. Sept. 9, 2011). In our view, this is what happened in the instant case. The Anginos defaulted on their loans, and Wells Fargo has attempted to hold them to the terms of their mortgage. As a matter of law, the exercise of these legal and contractual rights cannot rise to the level of intolerable or outrageous conduct which exceeds the bounds of decency. Therefore, this claim for intentional infliction of emotional distress should also be dismissed.

**\*14** Likewise, claims like those made here for negligent infliction of emotional distress arising out of a bank's handling of a delinquent mortgage are often dismissed by courts, particularly when those claims are set forth in a conclusory manner like the allegations made by the plaintiffs here. *Francis v. TD Bank, N.A.,* No. CIV. 12–7753 RBK/AMD, 2013 WL 4675398, at *6 (D.N.J. Aug. 30, 2013) *aff'd,* 597 F. App'x 58 (3d Cir.2014) *and aff'd,* 597 F. App'x 58 (3d Cir.2014); *Clay v. Option One Mortgage Corp.,* No. CIV. A. 07–1327, 2007 WL 2728972, at *5 (E.D.Pa. Sept. 18, 2007). Rather, as a general rule:

> To establish a claim of negligent infliction of emotional distress under Pennsylvania law, a plaintiff must prove that: (1) he or she was near the scene of an accident or negligent act; (2) shock or distress resulted from a direct emotional impact caused by the sensory or contemporaneous observance of the accident, as opposed to learning of the accident from others after its occurrence; and (3) he or she is closely related to the injured victim. *Smith v. School Dist. of Philadelphia,* 112 F.Supp.2d 417, 428 (E.D.Pa.2000) (citing *Sinn v. Burd,* 486 Pa. 146, 170–71, 404 A.2d 672, 685 (1979); *Frempong–Atuahene v. Redevelopment Auth. of Phila.,* 1999 WL 167726, *7 (E.D.Pa.1999)*). Manifestation of physical injury is

necessary to sustain a claim for negligent infliction of emotional distress. *See Redland Soccer Club, Inc. v. Department of the Army of the United States,* 55 F.3d 827, 848 (3d Cir.1995); *Smith* 112 F.Supp.2d at 42829; *Sonlin v. Abington Memorial Hospital, 2000 Pa.Super. 44, 748 A.2d 213, 217 (Pa.Super.2000); Armstrong v. Paoli Memorial Hospital,* 430 Pa.Super. 36, 44–45, 633 A.2d 605, 609 (Pa.Super.1993) (stating that "[t]emporary fright, nervous shock, nausea, grief, rage, and humiliation if transitory are not compensable injuries; but, long continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries").

*Robinson v. May Dep't Stores Co.,* 246 F.Supp.2d 440, 444–45 (E.D.Pa.2003).

Here, nothing in the spare language of the tort claim set forth in Count VII of the Anginos' complaint recites well-pleaded facts which meet the elements of a negligent infliction of emotional distress under Pennsylvania law. Therefore, this claim also fails as a matter of law.

### 6. *The Anginos' RESPA Claim Should Not Be Dismissed But The Plaintiffs' Should Be Required to File a More Definite Statement of This Claim*

Finally, in Count V of the complaint, the Anginos endeavor to bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* Specifically, the Anginos seem to allege that the defendants failed to respond to the plaintiff's "Qualified Written Requests" for information on their loan and failed to correct erroneous loan information. (Id., ¶¶ 114–130.) Wells Fargo has moved to dismiss this Count of the complaint, arguing that a qualified written request is a term of art under the law, and asserting that the Angino have not adequately described the communications which they allegedly sent to the bank and which they allege constituted qualified written requests under RESPA.

RESPA is a federal consumer protection statute applicable to mortgage lenders. In part, RESPA requires lenders to refrain from collecting unearned closing fees and kickbacks; compels lenders to disclose to borrowers the fact that servicing on their loans may be transferred; and requires loan servicers to respond in a timely fashion

to "Qualified Written Requests" from borrowers seeking information regarding the status of home loans. 12 U.S.C. §§ 2605, 2607. In his regard, RESPA simply requires that, upon receipt of a Qualified Written Request, a loan servicer must "provide the borrower with a written explanation ..." 12 U.S.C. § 2605(e)(2)(B). In this case the gist of the Anginos' RESPA claim relates to an alleged failure by Wells Fargo to respond to qualified written requests for information, and Wells Fargo contests this claim by arguing that the plaintiffs have not identified a proper written request under the statute. A "Qualified Written request" under RESPA is defined as:

**\*15** [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that-

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(1)(B).

Jones v. ABN AMRO Mortg. Group, Inc., 551 F.Supp.2d 400, 411 (E.D.Pa.2008). Because the term, "Qualified Written Request," has a specific meaning under RESPA plaintiffs alleging a violation of this particular provision of the statute must plead with specificity facts which show that they submitted a proper "Qualified Written Request" to the defendants in order to state a claim under § 2605. Thus, where "plaintiffs do not specifically allege that they sent any written correspondence to any defendant or that any correspondence met the requirements of a RESPA [Qualified Written Request] [their claims will be dismissed]." Jones v. ABN AMRO Mortg. Group, Inc. 551 F.Supp.2d 400, 411 (E.D.Pa.,2008)(emphasis added) citing Scocca v. Cendant Mortg. Corp., 2004 WL 2536837 at \*3 (E.D.Pa. Nov. 9, 2004) (dismissing a RESPA QWR claim in part because "[i]n his amended complaint, plaintiff never claims that he sent defendant a qualified written request...."); Parker v. Long Beach Mortgage Co., 2006 WL 2868983 at \*3 (E.D.Pa. Oct. 3, 2006) ("The complaint does not allege that Plaintiffs ever sent [a QWR] to either HSBC or OCWEN.")

In this case, the Anginos' description of their communications with Wells Fargo is couched in the language of RESPA as a qualified written request, but provides few details concerning the precise nature of those written requests. This lack of factual detail makes a complete assessment of this particular claim difficult. Presented with these obstacles to an informed understanding of the plaintiffs' remaining claims, we note that, when a plaintiff's complaint is unclear, the court may, *sua sponte,* order the plaintiffs to file a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure in order to clarify the plaintiffs' claims. *See, e.g., Kyeame v. Buchheit,* No. 1:07–CV–1239, 2011 WL 3651369, at \*1 (M.D.Pa. Aug. 18, 2011); *MFS, Inc. v. Twp. of South Annville,* No. 1:05–CV–1371, 2006 WL 3254535, at \*7 (M.D.Pa.Nov.9, 2006); *see also Moore's Federal Practice,* § 12.36 (Matthew Bender 3d ed.) ("Because of its potential usefulness ... courts will occasionally order a more definite statement *sua sponte,* which they have the freedom to do"); *Fikes v. City of Daphne,* 79 F.3d 1079, 1082–83 (11th Cir.1996) (finding that a more definite statement can tighten a complaint and clarify which of several possible claims are being asserted).

Here, we find that this particular complaint aptly:

> highlight[s] the particular usefulness of the Rule 12(e) motion for a more definite statement.... When a complaint fashioned under a notice pleading standard does not disclose the facts underlying a plaintiff's claim for relief, the defendant cannot reasonably be expected to frame a proper, fact-specific ... defense.... The Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief.

**\*16** *Thomas v. Independence Tp.,* 463 F.3d 285, 301 (3d Cir.2006).

Accordingly, as to this RESPA claim we recommend that the defendants' motion to dismiss be denied, without prejudice, but that the plaintiffs be directed to file a more definite statement of their claim pursuant to Rule 12(e), which provides more specific factual details on the nature of the communications which they described as qualified written requests under RESPA.

## III. *Recommendation*

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion to dismiss the complaint. (Doc. 6.) be GRANTED in part, and DENIED, in part, as follows: we recommend dismissal of Counts I, II, III, IV, VI, and VII of the complaint, although some counts, and particularly Count III which alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection law, 73 Pa.C.S. § 201–1 should be dismissed without prejudice to the filing of an amended complaint stating well-pleaded facts in support of this claim. As for Count V of the complaint, which bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.,* it is recommended that the motion to dismiss be denied, but that the plaintiffs be directed to file a more definite statement of their claims pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of February 2016.

**All Citations**

Slip Copy, 2016 WL 787652

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

B

2016 WL 3762710
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Bret Binder., Plaintiff,
v.
Weststar Mortgage, Inc., et al., Defendants.

CIVIL ACTION No. 14-7073
|
Signed 07/13/2016

**Attorneys and Law Firms**

William M. Whitman, Whitman LLC, Lansdale, PA, for Plaintiff.

Brian A. Berkley, Fox Rothschild LLP, Philadelphia, PA, Jeffrey A. Carr, Pepper Hamilton LLP, Princeton, NJ, Andrew J. Marley, Stern & Eisenberg PC, Warrington, PA, Darren William Dwyer, Troutman Sanders LLP, Washington, DC, for Defendants.

**MEMORANDUM**

PRATTER, District Judge

\*1 Bret Binder challenges the issuer, owners and servicers of a mortgage on his home, alleging these defendants violated several federal and state consumer protection statutes as well as committed breach of contract, breach of fiduciary duty, negligence and fraud. LoanCare LLC, WestStar Mortgage, Inc., Fannie Mae, and the J.G. Wentworth Company have moved to dismiss Mr. Binder's claims. Following the oral argument on the motions, the parties submitted a joint report reflecting their stipulation for the dismissal of certain claims and further outlining the contested claims for which the defendants still seek dismissal.

For the reasons outlined below, the Court will grant the motions in part and deny them in part.

**I. BACKGROUND** [1]

[1]    The factual background outlined below is drawn from the Plaintiff's Amended Complaint as well as the

exhibits attached to that amended complaint and filed on the docket. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

The claims at issue in this case emanate from a May 24, 2012 Mortgage and Promissory Note executed by Mr. Binder and WestStar Mortgage to refinance the mortgage on Mr. Binder's home. The principal balance on the promissory note at the time of mortgage agreement was $417,000. In addition, the balance on the escrow account being held on Mr. Binder's behalf in order to pay future tax and insurance payments on the property was $6,227.28. After entering into the mortgage agreement, Mr. Binder alleges that he made each of his monthly payments on time and in full.

In July 2012, Mr. Binder's mortgage was sold to Fannie Mae. At the same time, responsibility for servicing the mortgage transferred from WestStar to LoanCare. A year later, responsibility for servicing the mortgage was transferred back to WestStar. And then, in July 2015, Mr. Binder alleges that he was notified that responsibility for servicing the loan had again been transferred, this time to J.G. Wentworth Home Lending LLC.

At the point when the mortgage was initially executed, Mr. Binder alleges that WestStar was statutorily obligated to provide him with disclosures regarding a consumer's rights to rescind the transaction under certain circumstances. No such disclosures were provided. When the defendants subsequently obtained force-placed insurance, Mr. Binder alleges that this constituted a separate credit transaction for which the defendants were obligated by statute to provide him with additional disclosures. Again, Mr. Binder alleges that no such disclosures were provided.

Mr. Binder claims that starting in June 2012, shortly after the mortgage and note were executed, he began to notice that his account statements were riddled with errors. These included errors as to the beginning and ending balance of the mortgage, payment amounts due, payments received and charges imposed. In total, he alleges 288 errors on the monthly statements prepared by the defendants between July 1, 2012 and September 1, 2015. Mr. Binder alleges that he made numerous attempts during that time to contact the defendants in

order to correct the errors, but the defendants failed to make an adequate or timely response to these inquiries. He also alleges that the defendants made errors with regards to his escrow account, such as misapplying his payments to the accounts, failing to make required tax and insurance payments, and force-placing insurance—all of which resulted, he claims, in unnecessary overcharges. Mr. Binder also alleges that the defendants unlawfully increased the amount of his required escrow payment.

## II. STANDARD OF REVIEW

**\*2** All four defendants have moved pursuant to Federal Rule of Evidence 12(b)(6) to dismiss the Amended Complaint, contending that it fails to state a claim upon which relief can be granted. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not raise a claim of entitlement to relief.' " *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). In evaluating the merits of the defendants' motions to dismiss the Amended Complaint, the Court is looking for "something more than a mere possibility of the claim as alleged"; the plaintiff must have alleged in his Amended Complaint "enough facts to state a claim to relief that is plausible on its face." *See Alston v. Wenerowicz*, No. 14-2691, 2016 WL 878305, at \*1 (E.D. Pa. Mar. 7, 2016) (citing *Twombly*, 550 U.S. at 570); *accord McAndrew v. Deutsche Bank Nat. Trust Co.*, 977 F. Supp. 2d 440, 444 (M.D. Pa. 2013) ("Moreover, the plaintiff must allege facts that 'justify moving the case beyond the pleadings to the next stage of litigation.' ") (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008)). While the Court is bound to accept all allegations in the Amended Complaint as true and draw all reasonable inferences in favor of the plaintiff in determining whether the motion should be granted, the Court is not obligated to accept as true "naked assertions" or conclusions as to the requirements of the law when couched as factual assertions in the Amended Complaint. *See Alston*, 2016 WL 878305, at \*1 (citing *Twombly*, 550 U.S. at 555 (2007)); *Ciferni v. Boilermakers Local 13*, No. 15-4807, 2016 WL 304794, at \*2 (E.D. Pa. Jan. 26, 2016).

## III. ANALYSIS

The defendants have filed two separate motions to dismiss. Defendants LoanCare and Fannie Mae filed one motion to dismiss the claims in their entirety, in which WestStar and J.G. Wentworth joined. *See* Doc. No. 39 (hereinafter "LoanCare Br. at __"). In addition to presenting arguments challenging the adequacy of the pleadings or legal basis of all ten counts in the Amended Complaint, LoanCare and Fannie Mae also argue that the Amended Complaint fails to adequately distinguish which defendants were responsible for which alleged conduct. Fannie Mae argues that the claims against it specifically fail because Mr. Binder did not provide notice and opportunity to cure deficiencies, as required under the mortgage agreement.

While joining in this motion, WestStar and J.G. Wentworth also have filed a separate motion to dismiss the Amended Complaint in part. *See* Doc. No. 38 (hereinafter "WestStar Br. at ___."). This motion argues that damages under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, ("RESPA") should be capped, the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, ("TILA") claims are time barred, the plaintiff fails to state a claim for breach of contract, punitive damages are not available, and the claims against J.G. Wentworth should be dismissed. For their part, LoanCare and Fannie Mae also join in WestStar/Wentworth's motion.

Mr. Binder has responded to these motions in a single filing. Certainly, a number of the issues raised in the motions overlap. Consequently, the Court will proceed to address the issues raised in both motions together.

## Motion to Dismiss Claims Against Fannie Mae

The first argument raised in the Fannie Mae/LoanCare Motion relates to the specificity of the factual allegations against Fannie Mae. In general, the defendants argue that the Amended Complaint makes blanket allegations as to the liability of all the defendants without identifying which defendants were responsible for which conduct. In particular, the defendants point to the dearth of allegations referencing any conduct by Fannie Mae specifically. Despite spanning 33 pages and 193 paragraphs, the Amended Complaint expressly refers to Fannie Mae only four times. The only substantive factual allegation regarding Fannie Mae is that WestStar sold the mortgage to Fannie Mae on July 19, 2015. *See* Am. Compl. at ¶¶ 54, 58. The defendants contend that this blanket pleading is insufficient to state a claim against

Fannie Mae, and that the factual allegation of the sale is not actionable in and of itself.

**\*3**  "Under Rule 8, Fed. R. Civ. P., pleadings are to be liberally construed, and a pleading which gives notice to the defendant of the allegations made against him and the grounds upon which they are based is generally sufficient." *Palladino ex rel. U.S. v. VNA of S. New Jersey, Inc.*, 68 F. Supp. 2d 455, 475 (D.N.J. 1999) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Barnhart v. Compugraphic Corporation*, 936 F.2d 131, 135 n.7 (3d Cir. 1991)). Nevertheless, "[e]ven under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants." *Shaw v. Hous. Auth. of Camden*, No. 11-4291, 2012 WL 3283402, at \*2 (D.N.J. Aug. 10, 2012); *Agresta v. City of Philadelphia*, 694 F. Supp. 117, 121 (E.D. Pa. 1988) (citing *Negrich v. Hohn*, 379 F.2d 213 (3d Cir. 1967)). An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim. *See Schiano v. MBNA*, No. 05-1771, 2013 WL 2452681, at \*20 (D.N.J. Feb. 11, 2013) (unpublished magistrate judge opinion), *aff'd*, No. 05-1771, 2013 WL 2455933 (D.N.J. June 3, 2013). "Typically, a plaintiff cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant." *Indianapolis Life Ins. Co. v. Hentz*, No. 06-2152, 2008 WL 4453223, at \*11 (M.D. Pa. Sept. 30, 2008).

The defendants are correct that Mr. Binder's pleadings fail to specify the wrongful conduct for which Fannie Mae is allegedly responsible. Fannie Mae did not generate or service the mortgage. The only allegation in the Amended Complaint regarding Fannie Mae is that Fannie Mae purchased the mortgage in July 2015. An assignee of a mortgage, however, is not liable for the fraud or statutory violations of the assignor. *See Christopher v. First Mut. Corp.*, No. 05-01149, 2006 WL 166566, at \*4 (E.D. Pa. Jan. 20, 2006); *McMaster v. CIT Grp./Consumer Fin. Inc.*, No. 04-339, 2006 WL 1314379, at \*11 (E.D. Pa. May 11, 2006). In *Christopher*, the plaintiff filed a complaint against a mortgage lender, a mortgage broker, and the assignee of the plaintiff's mortgage, Associates Financial Services Corp., alleging violations of federal consumer protection statutes as well as state law claims. As to both the Pennsylvania Unfair Trade Practices and Consumer Protection Act, 73 P.S. § 201-1 *et seq.*, ("UTPCPL") and RESPA claims, the court in *Christopher* noted that the complaint failed to state a claim as to Associates because

the complaint lacked any allegation that Associates made any misrepresentations or had any involvement in wrongfully inducing the plaintiff to enter into the subject loans. *Id.* An analogous factual circumstance was present in *McMaster*—albeit one analyzed in the context of a motion for summary judgment. There, the court held that the plaintiff had "not attributed any specific acts of wrongdoing, or any unfair trade practices, to U.S. Bank. *McMaster*, 2006 WL 1314379, at \*11. While U.S. Bank was the holder of the mortgage, it could not be held liable under UTPCPL because the plaintiff had not offered any evidence to show that U.S. Bank was a culpable party. *Id.* The analyses in these cases are applicable here.

Mr. Binder makes no attempt to identify allegations relevant to his claims against Fannie Mae. Rather, he resorts to the argument that "it would be premature to dismiss Binder's claims against Fannie Mae right now, as questions of fact remain regarding Fannie Mae's own liability and its vicarious liability for the actions of its loan servicers, *which may be determined* during the course of discovery." Pl. Resp. at 17 (emphasis added). Attempting to defeat a Rule 12(b)(6) motion on such speculation is insufficient—"the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)). Having thoroughly reviewed the pleadings themselves, the Court is unable to discern any allegations regarding Fannie Mae's direct or vicarious liability for the conduct of either the originator or servicers of the mortgage, distinct from the claims against the defendants collectively. This amended complaint fails to allege the specific wrongdoing for which Fannie Mae is liable, and, consequently, the Court declines to find that Mr. Binder's pleadings as to Fannie Mae satisfy even a relaxed pleading standard. *See Pietrangelo v. NUI Corp.*, No. 04-3223, 2005 WL 1703200, at \*10 (D.N.J. July 20, 2005) ("[T]he Complaint fails to satisfy even the liberal notice pleading standard of Rule 8(a) because Plaintiff fails to differentiate between the defendants."). Therefore, the Court will grant the defendants' motions in part and dismiss without prejudice the claims to the extent they are asserted against Fannie Mae, with the one exception of the contract claims, discussed further below. Mr. Binder will be permitted to consider filing a second amended

complaint, provided he does so in a timely fashion, as addressed in the accompanying Order.

## Motion to Dismiss J.G. Wentworth Company

**\*4** The WestStar/J.G. Wentworth defendants also assert that the J.G. Wentworth Company should be dismissed and that J.G. Wentworth Home Lending LLC should be substituted as the successor in interest of WestStar. They contend that the only allegation in the Amended Complaint directed at the J.G. Wentworth Company is that the company acquired WestStar Mortgage in 2015 and is the successor in interest to claims against WestStar. They rely principally upon a July 30, 2015 letter from WestStar Mortgage, addressed to Binder & Canno, LLC, which was attached to the Amended Complaint. This letter states:

> We are pleased to inform you of the proposed acquisition of all the issued and outstanding stock of WestStar Mortgage, Inc. ("Company") by The J.G. Wentworth Company (the "Transaction"). Upon consummation of the Transaction, the Company will become an indirect, wholly-owned subsidiary of the J.G. Wentworth Company and will change its name to the J.G. Wentworth Home Lending, Inc.

Ex. M to Am. Compl.

Based upon the allegations and the documents attached to the Amended Complaint, Mr. Binder has failed to state a claim against the J.G. Wentworth Company. While the documentation suggests that J.G. Wentworth Home Lending, Inc. is the successor of WestStar, no facts are pled regarding actions taken by the J.G. Wentworth Company specifically. The fact that the J.G. Wentworth Company now owns WestStar Mortgage as an independent, wholly-owned subsidiary is insufficient to state a claim for the company's successor in interest liability.

> The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation. These principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent.

*Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)). The Court, therefore, grants the motion as to the J.G. Wentworth Company, and will dismiss this defendant with prejudice.

Because it appears, however, that J.G. Wentworth Home Lending LLC is the proper successor in interest to WestStar, the plaintiff will be allowed to file second amended complaint substituting this party if he so chooses, recognizing however that by permitted him to do so does not mean that the Court has determined that a valid claim against the substituted company exists.

## Count I RESPA Claims

The first count in Mr. Binder's complaint alleges defendants WestStar, LoanCare and Fannie Mae [2] violated the Real Estate Settlement Procedures Act. RESPA "is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans, and imposes duties on lenders and loan servicers." *McAndrew v. Deutsche Bank Nat. Trust Co.*, 977 F. Supp. 2d 440, 444 (M.D. Pa. 2013) (citing 12 U.S.C. § 2601). The statute imposes certain duties on the "servicer" of federally regulated mortgage loans, such as, for example, responding to qualified written requests from borrowers within a specified period of time. 12 U.S.C. § 2605 (West); *see* Am. Compl. at ¶ 27.

[2]     Even if the Court had not found that Mr. Binder failed to satisfy the notice pleading standards with regards to Fannie Mae generally, dismissal of the RESPA counts as to Fannie Mae would nevertheless be warranted. The defendants argue that Mr. Binder failed to plead that Fannie Mae was a "servicer," liable under RESPA. RESPA defines "servicer" as "the person responsible for servicing of a loan (including the person who makes or holds a loan if

such person also services the loan)." *McAndrew*, 977 F. Supp. 2d at 445 (citing 12 U.S.C. § 2605(i)(2)-(3)); *accord Jones v. ABN Amro Mortgage Grp., Inc.*, 606 F.3d 119, 124 (3d Cir. 2010) (dismissing RESPA claims against non-servicer defendant); *Wenglicki v. Tribeca Lending Corp.*, No. 07-4522, 2009 WL 2195221, at *4 (E.D. Pa. July 22, 2009) (dismissing RESPA claims against the owner of a loan when the complaint affirmatively pled that a separate defendant was responsible for servicing the mortgage in question). The Amended Complaint fails to allege that Fannie Mae was, at any time, the servicer of the loan in question. Mr. Binder simply claims that "WestStar sold Binder's mortgage to Fannie Mae effective on or about July 19, 2012." Am. Compl. at ¶ 13. The July 31, 2012 correspondence, attached to the Amended Complaint as Exhibit K, expressly states that "Fannie Mae does not service your loan" and identifies the servicer as "WestStar Mortgage, Inc."

The plaintiff fails to identify any authority in favor of denying the defendants' motion as to the RESPA claims asserted against Fannie Mae. Mr. Binder simply contends that it would be "premature" to dismiss the RESPA claims against Fannie Mae and speculates that in the course of discovery, evidence may be uncovered tending to prove that Fannie Mae is liable under the statute. It is precisely this type of speculative pleading the Supreme Court found impermissible in *Twombly*. *See Buoniconti v. City of Philadelphia*, No. 15-3787, 2015 WL 8007438, at *3 (E.D. Pa. Dec. 7, 2015) ("To withstand a motion to dismiss, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' ") (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Consequently, the RESPA claims against Fannie Mae are dismissed on this basis as well.

### A. Claims against LoanCare Generally

**\*5** The defendants argue that the plaintiff's RESPA claims against LoanCare should be dismissed to the extent that they predate July 20, 2012 or extend past August 1, 2013. Exhibit J to the Amended Complaint consists of a July 26, 2012 letter to Mr. Binder from LoanCare, informing him that the responsibility for servicing his mortgage transferred from WestStar to LoanCare "effective 07-20-12". The Amended Complaint itself sets the transfer date two days later, stating that on "[o]n July 22, 2012 ... WestStar sold the Mortgage to Fannie Mae, while LoanCare had become the new

servicer of the Note." Am. Compl. at ¶ 54. Regardless, Mr. Binder has pled that LoanCare was not the servicer of the Mortgage prior to July 20, 2012. The plaintiff also has stated in his Amended Complaint that "[a]fterwards, the ownership and servicing of Binder's loan was again transferred from LoanCare back to WestStar." Am. Compl. at ¶ 73. The Amended Complaint itself does not plead a specific date when LoanCare transferred responsibility for servicing the loan to WestStar, but in an October 2, 2013 letter from the plaintiff to WestStar, which has been attached to the Amended Complaint at Exhibit D, Mr. Binder states that it is his understanding that a "new loan servicer was appointed" in August of 2013.

Ultimately, the Court finds the pleadings suggest that LoanCare was the servicer of his mortgage only from July 20, 2012 to August 31, 2013. Consequently, the RESPA claims against LoanCare are limited to that period. *See Jones,* 606 F.3d at 124.

### B. Qualified Written Requests

The defendants next argue that Mr. Binder has failed to state a claim under RESPA that the defendants did not adequately respond to the plaintiff's qualified written requests ("QWRs"), as required by the statute.

> RESPA was enacted, in part, to ensure 'that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country.' It provides that borrowers may inquire about federally related mortgages by making a 'qualified written request.'

*Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 798 (E.D. Pa. 2014) (citations omitted). Pursuant to the statute,

> [i]f any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of

the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

12 U.S.C.A. § 2605(e)(1)(A) (West). Upon receipt of a QWR, certain obligations are triggered at the loan servicer, including the obligation to, within 30 days of receipt, make appropriate corrections to the borrower's account, conduct an investigation and provide the borrower with a written explanation of the reasons the account has been corrected or why any relevant requested information is unavailable. See 12 U.S.C. § 2605(e)(2).

In order for correspondence to be considered a QWR, however, there are certain requirements, set out in the statute, which must be met. The statute requires that a QWR include enough information to allow the servicer to identify the name and account of the borrower as well as provide "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(ii).

In addition, the regulations implementing RESPA set out guidance for how mortgage services must comply with requests from borrowers to resolve errors with their accounts. See 12 C.F.R. § 1024.35. [3] Under the regulations, "the servicer may, by written notice provided to a borrower, establish an address that a borrower *must* use to submit a notice of error in accordance with the procedures in this section. 12 C.F.R. § 1024.35(c) (emphasis added).

[3]     While the statute itself does not prescribe the obligation for a borrower to send correspondence to any specific address, the statute does empower the Bureau of Consumer Financial Protection to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter." 12 U.S.C. § 2617 (West). Initially, Regulation X was promulgated under the authority of the Department of Housing and Urban Development. As part of the Dodd-Frank Act, on July 16, 2014, the authority to promulgate regulations under the statute was transferred to the Bureau of Consumer Financial

Protection. See Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1148 (10th Cir. 2013); Hittle v. Residential Funding Corp., No. 2:13-CV-353, 2014 WL 3845802, at *6 n.6 (S.D. Ohio Aug. 5, 2014) (citing Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34,224 (effective July 16, 2014)).

**\*6** In the Amended Complaint, Mr. Binder alleges correspondence sent to both WestStar and LoanCare constituted QWRs and triggered the defendants' statutory response obligation. Under RESPA, there cannot be more than one servicer of a loan at any given time. McAndrew v. Deutsche Bank Nat. Trust Co., 977 F. Supp. 2d 440, 445 (M.D. Pa. 2013) ("RESPA states, however, that only one (1) entity may act as the loan servicer for purposes of a section 2605(e) violation. Thus, where one entity is acting as the servicer of a mortgage loan, a separate entity cannot also act as the servicer.") (citing Lingad v. Indymac Fed. Bank, 682 F. Supp. 2d 1142, 1151 (E.D. Cal. 2010)). Consequently, LoanCare cannot be liable under RESPA as a servicer after WestStar took over responsibility for servicing the loan in August 2013, and, conversely, WestStar could not be liable for servicing the loan between July 2012 and August 2013. The majority of the alleged QWRs cover the time period when LoanCare was servicing the mortgage. One question, however, relates to the time period after LoanCare had relinquished control of servicing the loan to WestStar in the fall of 2013. Because these two groups of correspondence raise separate issues, the Court will deal with them in turn.

### i. LoanCare Correspondence

The defendants' first argument relates to alleged QWRs sent to LoanCare. The defendants assert that Mr. Binder's RESPA claim as to these letters fails because he has not alleged that he sent his purported QWRs to the address designated by the defendants to receive such correspondence. Two of the plaintiff's monthly mortgage statements are attached to the Amended Complaint at Exhibit C. The copies attached to the Amended Complaint only provide the one side of a two-sided document. The defendants, however, attached the complete documents to the LoanCare/Fannie Mae Motion at Exhibits 2 and 3. [4] The mortgage statements state that QWRs are to be sent to "P.O. Box 8068 Virginia Beach, VA 23450, Fax 757-466-2822, Attn. Customer Service Escalation." Given this, the Court finds

that the defendants had designated a specific address to received qualified written requests, under the statute and regulations. Therefore, under Regulation X, in order for the defendants' obligation to respond to a QWR to be triggered, Mr. Binder must show that he sent his requests to the defendant as directed.

4  The defendants note in the motion to dismiss that while the plaintiff has attached copies of the 9/10/12 and 2/19/13 account statements to his Amended Complaint, he has failed to attach the entirety of these statements—most notably the "back" of the statements, which designate the address where Qualified Written Requests must be sent. Typically, when considering a motion to dismiss, "it is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *See Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016). Courts may, however, "consider exhibits attached to a defendant's motion to dismiss if it is 'an undisputedly authentic document' and 'plaintiff's claims are based on the document.' " *Id.* Here, the Court finds that the Monthly Mortgage Statements attached to the defendants' motion can properly be considered on this motion to dismiss because they are simply complete versions of documents attached to the Amended Complaint, the plaintiff has not dispute their authenticity, and the plaintiff's claims are, in part, based upon these documents.

In the Amended Complaint, Mr. Binder alleges that he sent LoanCare eleven separate requests during the eight months between September 28, 2012 and May 28, 2013, [5] which constituted QWRs. *See* Am. Compl. at ¶ 31. He has attached copies of this correspondence to his Amended Complaint at Exhibit D. A review of this correspondence, however, shows that with three exceptions, all of the plaintiff's requests took the form of email correspondence sent to the defendants' customer service email address. With regards to these emails, the Court finds that they do not constitute QWRs under RESPA because they were not sent to the address designated by LoanCare. Given that they were not QWRs under the statute, as a matter of law, LoanCare is not liable for failing to respond to them.

5  The plaintiff alleges a 12th QWR that was sent to WestStar on October 2, 2013, after LoanCare transferred responsibility for servicing the loan. Neither the briefing nor the pleading identifies an

address at WestStar designated to receive QWRs. The Court will discuss whether this correspondence meets the statutory requirements in order to qualify as a QWR *infra*.

*7  In addition to these emails, Mr. Binder has attached three letters sent to LoanCare which he also alleges constitute QWRs. These also fail to give rise to a claim under RESPA for similar reasons. None of these letters were directed to "Customer Service Escalation" at LoanCare as directed by the defendant. Rather, these letters were sent attention "LoanCare Legal Dep't." Given that Mr. Binder failed to send his request to the proper address designated by the defendant to receive such QWRs, the Court finds that this correspondence does not comply with the regulation.

The plaintiff does not dispute that his correspondence was not sent to the address and attention designated by the defendants, but rather asserts that, regardless of who he sent his requests to, the defendants actually received them. Such receipt, argues Mr. Binder, triggered LoanCare's obligation to respond. Mr. Binder cites to *Benner v. Bank of America, NA*, 917 F. Supp. 2d 338 (E.D. Pa. 2013) and *McMillen v. Resurgent Capital Servs., L.P.*, No. 13-00738, 2015 WL 5308236, at *1 (S.D. Ohio Sept. 11, 2015)(unpublished magistrate judge opinion) in support of this argument.

Both *Benner* and *McMillen* emphasize that the language of the statute itself does not mandate that correspondence be received at a specific address in order to trigger obligations under the statute. In both of these cases it was undisputed that the defendants did, in fact, receive the relevant correspondence. Those courts reason that the statute is remedial in nature and should be construed broadly with a focus on the servicer's receipt of the borrower's QWR, rather than the required procedure. *McMillen*, 2015 WL 5308236, at *7 (*citing Benner*, 917 F. Supp. 2d at 364-65). As noted in *McMillen*, however, the majority of courts which have analyzed this issue have disagreed with the reasoning articulated in *Benner*.

The leading case in which a federal court reached a different conclusion is *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141 (10th Cir. 2013). The Tenth Circuit Court of Appeals reasoned first that the statute does not mandate that servicers have a statutory duty to respond to all inquiries received from borrowers. "RESPA and its implementing regulation envisioned that only certain

communications would trigger liability for damages under § 2605, and delineated certain requirements for communications before imposing that liability." *Id.* at 1149 (citing *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 667–68 (9th Cir. 2012)). The court notes, however, that Congress has not defined the requirements for "receipt" of a QWR, and the legislative history provides no useful guidance on how Congress would have interpreted when a QWR is received for purposes of the imposition of statutory duties. *Id.* at 1148. Therefore, because Congress was silent, and because the Consumer Protection Bureau was empowered to "prescribe such rules and regulations, to make such interpretations ... as may be necessary to achieve the purposes of this chapter," 12 U.S.C. § 2617, the Tenth Circuit Court of Appeals considered, and ultimately adopted, the agency's interpretation of the statute, as reflected in the relevant regulation. The Bureau has interpreted the statute to allow servicers the option of requiring borrowers to submit qualified written requests through a designated address. "Communication failing to meet the requirements of RESPA and its implementing regulation amounts to nothing more than general correspondence between a borrower and servicer," and does not trigger RESPA duties on the part of the servicer. *Id.* at 1149. Allowing servicers to designate such an exclusive address where QWRs would be received and handled does not defeat the intention of RESPA to reform the real estate settlement process and provide consumers "greater and more timely information on the nature and costs of the settlement process." *Id.* at 1148-49.

**\*8** To be sure, *Brenner* was decided in this district, but before *Berneike*, and it is largely seen as an outlier and minority opinion. *See generally Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d 869, 873 (W.D. Mich. 2014) (collecting opinions); *In re Patrick*, No. 13-61661, 2014 WL 7338929, at \*19 (Bankr. N.D. Ohio Dec. 22, 2014). The reasoning presented in *Berneike* is more compelling and, therefore, the Court holds that the email correspondence sent to the defendants by Mr. Binder was nothing more than general correspondence between borrower and servicer, the receipt of which did not trigger RESPA duties. The Court reaches the same conclusion with regard to the three physical letters Mr. Binder allegedly sent to the defendants. While these were addressed to the post office box identified by the defendants for receipt of Qualified Written Requests, none of these letters were sent to the attention of "Customer Service Escalation." Rather, they were sent to the attention of the "LoanCare Legal Dep't."

Regulation X provides the servicer the ability to establish a specific channel for the receipt and processing of QWRs and obligates borrowers comply with the servicer's instructions in order to trigger RESPA's obligations.

Here, Mr. Binder has not alleged that he sent his correspondence to the recipient identified by the defendant. For the above reasons, the Court finds that the correspondence identified by the plaintiff in Exhibit D to the Amended Complaint and dated September 28, 2012, January 7, 2013, January 18, 2013, January 24, 2013 (both emails), February 7, 2013, February 20, 2013, March 6, 2013, March 20, 2013, April 12, 2013, and May 28, 2013 do not, as a matter of law, constitute Qualified Written Requests under RESPA, obligating a response as set out in the statute. Consequently, the Court will grant the defendants' motion to dismiss as to Mr. Binder's RESPA claims that these documents constituted QWRs under the statute.

### ii. WestStar Correspondence

In addition to the 11 documents sent to LoanCare between September 2012 and May 2013, however, Mr. Binder has also alleged that a 12th document, dated October 2, 2013 and addressed to WestStar, constituted a Qualified Written Request. Unlike the documents sent to LoanCare, however, the exhibits attached to the Amended Complaint fail to identify any address designated by WestStar to receive QWRs. Because neither the statute, nor the relevant regulations mandate such an address be designated, the Court finds that the plaintiff's allegation that this correspondence was actually received by WestStar is sufficient to state a claim.

As to the substance of the correspondence, the LoanCare/ Fannie Mae Motion argues that the October 2, 2013 letter "did not qualify a [sic] customer inquiry or a request for information 'related to the servicing of' a home loan as required by 12 U.S.C. § 2605(e)(1)(A)." Rather, the defendants argue that "[w]ritten communications making a demand for money and threatening to file a lawsuit are not QWRs." The statute, however, does not make any such distinctions; the statute simply requires that a QWR include the name and account of the borrower and "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error." 12 U.S.C. § 2605(e)(1)(B).

The case cited by the defendants in their brief does not contradict this general principle. *See Taylor v. Nelson*, No. 02-6558, 2006 WL 266052, at \*14 (E.D. Pa. Jan. 31, 2006). In *Taylor,* the court simply held that a letter which fails to request any information regarding the servicing of a loan could not trigger a servicer's obligations to investigate and respond in accordance with the statute. Here, while Mr. Binder's October 2, 2013 letter does threaten litigation, in all other respects it complies with the requirements of the statute—the letter identifies Mr. Binder and his account, describes the problem with his account, and requests information.

The defendants contend that, even if the October 2, 2013 correspondence constituted a QWR, the exhibits attached to the plaintiff's Amended Complaint establish that the defendants complied with the duties set out in the statute. Based upon a review of the documents attached to the Amended Complaint, however, there does not appear to be any response from WestStar contained in the record thus far. Consequently, the pleadings do not state that WestStar adequately responded to Mr. Binder's October 2, 2013 QWR. Therefore, the Court denies the defendants' motion as to this component of the Amended Complaint.

### C. Force-Placement of Insurance

**\*9** The LoanCare/Fannie Mae Motion next argues that Mr. Binder has failed to state a claim under RESPA for the force-placement of insurance. They argue that the section of the statute prohibiting such conduct was not in effect at the time the defendants' alleged force-placement of insurance took place.

The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pl.111-203, 124 Stat. 1376 (July 21, 2010), made a number of changes to RESPA, including the addition of a prohibition against force-placing insurance. Force-placed insurance is hazard insurance coverage obtained by a servicer of a federally regulated mortgage to cover the relevant property when the borrower has failed to maintain or renew the hazard insurance as required under the terms of the mortgage. The Dodd-Frank Act instituted certain protections for borrowers regarding force-placement of insurance. Specifically, the Act amended subpart (k) of § 2605 to prohibit mortgage servicers from

(A) Obtain[ing] force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance; (B) charge[ing] fees for responding to valid qualified written requests (as defined in regulations which the Bureau of Consumer Financial Protection shall prescribe) under this section; (C) fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties; (D) fail[ing] to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or (E) fail[ing] to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this Act.

Pub.L. 111-203, Title XIV, § 1463, July 21, 2010, 124 Stat. 1376, 2182-83; 12 U.S.C.A. § 2605 (West).

While the Act was passed in 2010, the provisions governing force-placement of insurance did not come into effect until January 10, 2014, when the underlying regulations implementing the statute became effective. *See Berneike*, 708 F.3d at 1146 n.3 ("On January 17, 2013, the Bureau issued a final rule implementing the Dodd–Frank amendments to RESPA and amending Regulation X, with an effective date of January 10, 2014."); *Gomez v. Nationstar Mortgage*, LLC, No.14-1499, 2015 WL 966224, at \*3 (E.D. Cal. Mar. 4, 2015) (Section 2605(k) took effect on January 10, 2014"); Pub.L. 111-203, Title XIV, § 1400(c), 124 Stat. 1376, 2136-37 (July 21, 2010). Moreover, courts have held that the provisions of the Dodd-Frank Act are not retroactive. *See McCauley v. Home Loan Inv. Bank*, F.S.B., 710 F.3d 551, 554 n.2

(4th Cir. 2013) ("Congress did not direct such retroactive application in the Dodd–Frank Act"). Therefore, in order to state a claim, the plaintiff must have pled that the defendants force-placed insurance sometime after January 10, 2014.

The plaintiff does not dispute the fact that the provisions of the statute governing force-placement of insurance did not come into effect until 2014, but he contends that this is an issue of fact that cannot be resolved on a motion to dismiss. *See* Pl. Memo at 14 ("Even assuming for purposes of this motion that is correct, whether Defendants force-placed insurance is a question of fact that can be resolved during discovery."). The pleadings, however, do not allege that the defendants force-placed insurance after January 10, 2014. The Amended Complaint only identifies two instances in which the defendants are alleged to have force-placed insurance improperly. The first allegedly occurred on August 2, 2012, after the defendants supposedly failed to pay Mr. Binder's insurance premiums from his escrow account. *See* Am. Comp. ¶¶ 43, 44. Mr. Binder also alleges that he received another notice on February 23, 2013 to the effect that his insurance coverage had been canceled and that, subsequently, the defendants again force-placed insurance. *See* Am. Comp. ¶¶ 47, 48. Both of these events occurred well before the January 10, 2014 effective date of section 2605(k). Consequently, the Court will grant the defendants' motion to dismiss the RESPA claims regarding the force-placement of insurance.

### D. RESPA Private Right of Action [6]

[6]   In addition to the arguments regarding the availability of a private right of action under the statute, the defendants also argue that the plaintiff has failed to state a claim under RESPA based upon the defendants' failure to notify Mr. Binder that responsibility for servicing his mortgage had been transferred to LoanCare. They cite to Exhibit J to the Amended Complaint which indicates that Mr. Binder was notified of the change six days after the transfer, which was within the 15 day statutory period set out in section 2605(c). In light of this, Mr. Binder admits that Count I should be dismissed to the extent that it is based on the defendants' failure to provide Mr. Binder notice of the servicing transfer. *See* Pl. Memo at 15; Joint Report of Parties, January 8, 2016. The

Court will therefore grant the defendants' motion as to the notice claims under Count I.

**\*10**  Under the Mortgage Agreement, Mr. Binder alleges that an escrow account was established as security for tax and insurance payments on the property. Mr. Binder was required to make payments into this account, but the account itself was managed by the defendants. Mr. Binder alleges that the defendants violated RESPA by (1) mishandling the escrow account (2) increasing in the escrow payments Mr. Binder was required to make, (3) improperly treating payments as late and (4) misrepresenting the amount in the account.

The defendants argue that the statute does not contain a private right of action for these claims. In his response, Mr. Binder acknowledges that there is no private right of action under the statute for mishandling of the escrow amounts or increasing the escrow amounts and agrees that the Court should grant the defendants' motion as to these components of the RESPA claims. Section 2609 of RESPA governs escrow fee collection. "The majority of Circuit Courts of Appeal have determined that a private right of action does not exist for violations of section 2609." *McAndrew v. Deutsche Bank Nat. Trust Co.*, 977 F. Supp. 2d 440, 446 (M.D. Pa. 2013) (citing decisions from the Fifth, Seventh and Eleventh Circuit Courts of Appeals, holding that no private right of action exists under section 2609 of RESPA.); *Allison v. Liberty Sav.*, 695 F.2d 1086, 1087 (7th Cir. 1982) ("[W]e hold that there is no private right of action under § 10 of RESPA.").

Based upon the plaintiff's stipulation that no private right of action exists for mishandling Mr. Binder's escrow account, the Court will only consider the defendants' arguments as to claims of improper handling of payments and misrepresentations on Mr. Binder's account statements, independent of the escrow account.

The plaintiff's Amended Complaint alleges 288 separate mistakes in the plaintiff's account statements. These mistakes include "incorrect beginning and ending interest and principal balances, interest and principal payments, due dates, and late fees due." Am. Compl. at ¶ 97. Mr. Binder argues that RESPA sections 2605, 2607 and 2608 all provide private rights of action, under which he brings his claims to recover for these mistakes. Unfortunately for Mr. Binder, none of these sections appear applicable: section 2605 mandates loan servicers provide borrowers with certain disclosures and respond

to borrower inquiries; section 2607 prohibits payment of kickbacks and unearned fees; and section 2608 prohibits using a particular title insurance company as a condition of a mortgage loan. None of these provide a basis for Mr. Binder to pursue claims under RESPA that the defendants made errors on Mr. Binder's monthly statements or charged him inappropriately for late payments

Mr. Binder has failed to identify any statutory basis on which to conclude that he can pursue claims under RESPA based upon the alleged errors in the account statements. The Court has conducted its own review and concluded that no such basis exists. The Court will therefore grant the defendants' motion to dismiss Count I as to RESPA claims based upon the defendants' alleged improper characterization of payments as late and misrepresentation of account statements.

### E. Damages

The final category of arguments presented by the defendants regarding RESPA relate to the damages alleged in the Amended Complaint. The LoanCare/ Fannie Mae memo argues generally that Mr. Binder has failed to identify any cognizable damages and that, to the extent he is seeking punitive damages, these are not available under the statute. In addition, the WestStar/Wentworth Memo also argues that the amount of damages available under the statute should be capped.

#### i. Actual Damages

**\*11** The LoanCare/Fannie Mae Memo first argues that Mr. Binder's RESPA claims must be dismissed because he has failed to allege actual damages. This argument lacks merit.

"A plaintiff claiming a RESPA violation must allege not only a breach of a duty required to be performed under RESPA, but must also show that the breach caused him to suffer damages." *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 799 (E.D. Pa. 2014) (quoting *Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 383 (D.N.J. 2006)). "Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for

preparing, photocopying and obtaining certified copies of correspondence." *Id.* (quoting *Cortez v. Keystone Bank, Inc.*, No. 98–2457, 2000 WL 536666, at \*12 (E.D. Pa. May 2, 2000)); *accord Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 364 (E.D. Pa. 2013).

Mr. Binder's Amended Complaint alleges the type of damages specifically referenced by the decisions in *Wilson*, *Benner* and *Cortez*:

> Being forced to spend additional time in attempting to communicate with Defendants, in writing and by phone, to get his account and statements corrected to match payments made (Binder offered time estimates in written communications with WestStar in the attempt to correct problems, including: 4-5 hours by September 28, 2012; 8 hours by January 18, 2013; and 60-70 hours to date through this lawsuit)

> Being forced to spend additional money, including overpaying on his mortgage monthly, postage (including regular or certified mailings on, inter alia, February 20, 2013, April 12, 2013 and May 28, 2013 totaling approximately 10.00), incurring the time of his insurance broker and accountant, printing (including approximately 140 pages of material at an approximate cost of 7-10 cents per page), and the like;

Amended Complaint at ¶ 5. The Court finds that Mr. Binder has alleged that he suffered actual damages as a result of the defendants' supposed conduct. Therefore, the Court denies the motion to dismiss as to failure to plead such damages

#### ii. Statutory Damages

WestStar and J.G. Wentworth, in addition to joining in the LoanCare/Fannie Mae motion to dismiss, have filed their own motion seeking to dismiss certain aspects of the Amended Complaint. The WestStar/Wentworth Memo argues that, as a matter of law, Mr. Binder is not entitled to the $250,000 in statutory damages he claims under RESPA. The defendants assert that, in addition to any alleged actual damages suffered, the plaintiff may only recover an additional $2,000 in damages if he shows a "pattern or practice of noncompliance with the requirements of the section. 12 U.S.C. § 2605(f)(1). Mr. Binder counters by arguing that he is entitled to $2,000 in additional damages for *each* violation of the statute.

The statute provides that, should Mr. Binder establish one or more violations, he may be entitled to damages as follows:

(f) Damages and costs

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) Individuals

In the case of any action by an individual, an amount equal to the sum of—

(A) any actual damages to the borrower as a result of the failure; and

**\*12** (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

12 U.S.C. § 2605(f).

The defendants' sole authority in support of their argument that the Court should find Congress intended to impose a blanket $2,000 cap on additional statutory damages is a decision from the Western District of New York. *See Katz v. The Dime Savings Bank*, 922 F. Supp. 250 (W.D.N.Y. 1997). Here a mortgagor brought suit to enjoin the foreclosure of his mortgage after he defaulted on payments and for violations of RESPA against his servicer. Among other things, the mortgagor sought statutory damages under RESPA. After holding that statutory damages are recoverable, even in the absence of any actual damages as a result of the RESPA violation, the court then went on to consider whether the language of § 2506(f)(1) implies a $2,000 per violation cap, or an overall cap on additional statutory damages which may be imposed if the court finds the defendants' conduct constituted a "pattern or practice of noncompliance." *Id.* at 258. The court identified two key phrases in the statutory language. The first is the requirement that the plaintiff show a "pattern or practice" of noncompliance with the statute in order to impose statutory damages. *Id.* The second key phrase is the allowance of recovery of damages for "each such failure" of the statute. Similar to the parties here, the *Katz* defendants argued the additional damages should be capped at $2,000 *in toto*—

regardless of the number of proven instances of statutorily violative behavior. Mr. Binder and the plaintiff in *Katz* both argue that the $2,000 cap constitutes the maximum additional damages that can be applied "for each such failure" or violation of the statute. While the *Katz* decision ultimately withheld judgment pending briefing on whether a court could find a pattern of conduct based only on allegations regarding the defendants' conduct vis-à -vis a single plaintiff, the reasoning laid out in the decision suggests that the statute should not be read to imply $2,000 in statutory damages may be tacked on for each separate violation of the statute. The court stated that "[o]ne would think that if Congress had intended that statutory damages be available for single violations of the Act, it would have not inserted the phrase 'in the case of a pattern or practice of noncompliance.' " *Id.* at 258. The court cites to similar language used in other federal statutes, namely the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telephone Consumer Protection Act, where the phrase "pattern or practice" is read to imply its "plain meaning." *Id.*

In the defendants' reply briefing, they cite a second decision which adopts the analysis in *Katz*. *See Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 869 (N.D. Ill. 2002) ("This Court agrees with the analysis in *Katz v. Dime Savings Bank, FSB*, in which the court determined that RESPA intended for individual statutory damages to be capped at $1,000 for proving a pattern or practice of noncompliance and not $1,000 for each instance.").

The Court has independently reviewed the case law and found only a handful of additional cases which address the issue. These cases reach the same conclusion as in *Katz*. *See Serfass v. CIT Grp.l Consumer Fin., Inc.*, No. CIV.A. 8:07-90-WMC, 2008 WL 4200356, at *5 (D.S.C. Sept. 10, 2008) ("Neither the Supreme Court nor any circuit courts have yet addressed the issue, but district courts considering the issue have held that a plaintiff can recover statutory damages no greater than $1,000 by proving a pattern or practice of noncompliance."); *Davis v. Greenpoint Mortgage Funding, Inc.*, No. 09-2719, 2011 WL 7070222, at *5 (N.D. Ga. Sept. 19, 2011) (Noting that "Courts also have authority to award additional or statutory damages not to exceed $1,000 in cases where there is a 'pattern or practice of noncompliance' with Section 2605. 12 U.S.C. § 2605(f) (1)(B)" but ultimately holding that pleadings failed to show a pattern or practice of noncompliance.).

**\*13** Mr. Binder does not provide any authority contradicting the reasoning offered by *Katz* and its progeny. Rather, he argues that regardless of whether the Court were to accept the analysis applied in *Katz*, his Amended Complaint actually alleges *multiple* patterns or practices, each of which would entitle the plaintiff to separate statutory damages under § 2605(f)(1)(B). However, aside from citing to a number of decisions which generally hold that the existence of a pattern or practice is a question of fact, the determination of which is generally not appropriate on a motion to dismiss, Mr. Binder provides no explanation as to how his Amended Complaint alleges distinct practices or patterns of behavior. Moreover, Mr. Binder's argument does not address the question at issue, namely whether statutory damages are capped based upon individual violations of the statute or the entirety of a practice or pattern of behavior.

Ultimately, in light of the rulings on the LoanCare/ Fannie Mae Motion, the Court determines that it need not address the question. Despite Mr. Binder's assertions that he has adequately averred the existence of multiple practices and patterns of conduct by the defendants which violate RESPA, the defendants have successfully argued that much of conduct complained of in the Amended Complaint does not establish liability under the statute. As laid out above, of the specific conduct referenced in the defendants' briefing, Mr. Binder has only properly alleged a RESPA violation with regards to a single qualified written request, sent to WestStar in October 2013. Numerous courts have held that a plaintiff cannot properly establish entitlement to additional statutory damages based upon a single violation of the statute. *See e.g. Gorbaty v. Wells Fargo Bank, N.A.,* No. 10-3291, 2012 WL 1372260, at \*5-6 (E.D.N.Y. April 18, 2012) (two violations of RESPA insufficient to establish a pattern or practice under § 2506(f)(1)(B)); *McLean v. GMAC Mortg. Corp.*, 595 F. Supp. 2d 1360, 1365–66 (S.D. Fla. 2009) (finding defendant's insufficient response to two QWRs insufficient to establish "pattern or practice"); *In re Tomasevic*, 273 B.R. 682 (Bankr. M.D. Fla. 2002) (failure to respond to one QWR did not amount to "pattern or practice" under the statute). Mr. Binder has only properly alleged a single RESPA violation and the Court holds that he has not alleged the existence of a pattern or practice of conduct by the defendants. Therefore, Mr. Binder is

not entitled to statutory damages in addition to his actual damages.

### iii. Punitive Damages

Finally, the defendants argue that the plaintiff is not entitled to recover punitive damages under RESPA. Mr. Binder does not dispute this and voluntarily withdraws his claim for punitive damages under the statute. *See* Pl. Memo at 21. The Court therefore grants the LoanCare/ Fannie Mae Motion as to punitive damages.

### Count II TILA Claims

The LoanCare/Fannie Mae defendants next argue that Mr. Binder's claims under the Truth in Lending Act should be dismissed in their entirety. They argue that, with regards to all the defendants, the TILA claims are time barred. They also argue that Mr. Binder's rescission claim under TILA fails because he did not adequately plead his ability or intent to return the loan funds. [7]

[7]   In addition, the defendants argued that all TILA claims against LoanCare must be dismissed because loan servicers are not subject to liability under the statute. The parties' January 8, 2016 joint report states that Mr. Binder is dismissing all TILA claims against LoanCare. Consequently, the Court will grant the defendants' motion to dismiss the TILA claims against LoanCare.

The purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C.A. § 1601. At closing, lenders are required to provide material disclosures to borrowers, including the finance charges associated with the loan. *See* 12 C.F.R. § 226.4. When subsequent events result in the lender altering the terms of the loan in a way unauthorized by the mortgage, the lender must provide additional disclosures. *See* 12 C.F.R. § 226.17(e).

**\*14** Mr. Binder contends that the defendants collectively violated TILA "by failing to include certain disclosures at the Closing and at other times disclosures were required." Am. Compl. at ¶ 108. As noted above, the plaintiff has

failed to allege that Fannie Mae committed any specific conduct relevant to the claims. Consequently, the claims against Fannie Mae are dismissed without prejudice. In addition, the plaintiff has expressly withdrawn any TILA claims against LoanCare. Consequently, the only remaining issues relevant to TILA involve the issuance of the mortgage by WestStar.

With regard to alleged violations by WestStar, the defendants first argue that the TILA claims against WestStar are time-barred. TILA damages claims carry a one year statute of limitations. In light of this, Mr. Binder acknowledges in his response to the defendants' motion that he "does not seek damages arising out of Defendants' TILA violations at closing." Pl. Br. at 25 n.7. Mr. Binder does, however, argue that his claim for rescission of the agreement survives.

A claim for rescission under TILA does not begin to run until the required disclosures are delivered.

> Under TILA, a borrower has three days from the later of the date of the transaction or the date of delivery of the required TILA disclosures to rescind a financing transaction. 15 U.S.C. § 1635(a). If a creditor fails to deliver the disclosures at all, the right to rescind does not expire until three years after the consummation of the transaction or upon the transfer or sale of the property, whichever occurs earlier. 15 U.S.C. § 1635(f).

*Horan v. Verano*, No. 15-1785, 2015 WL 5460603, at *2 (E.D. Pa. Sept. 15, 2015). Here, the plaintiff has alleged that he was never provided the proper disclosures at closing. Consequently, the statute of limitations on the rescission claim would run three years from the date of closure of the mortgage. WestStar corrected the initial HUD prior to the Closing but failed to provide amended disclosures based on the recalculated amounts. Am. Comp. ¶ 109.

TILA, as a remedial statute, is to be liberally construed in favor of borrowers. The Court is obliged to accept as true all factual allegations in the Amended Complaint and draw all reasonable inferences from those facts in a light most favorable to the non-moving party, to wit,

Mr. Binder. Accordingly, the motion to dismiss appears inappropriate at this time because Mr. Binder did plead a colorable claim that at closing, the defendants committed a TILA violation in failing to disclose all required material information. *Smith v. Fid Consumer Disc. Co.*, 898 F.2d 896, 898 (3d. Cir. 1990). The Court will deny the motions as to the TILA claims related to the closing disclosures.

The remaining TILA claims relate to post-closing conduct by the defendants collectively. These allegations relate to a period of time when the loan was serviced by LoanCare and owned by Fannie Mae. Mr. Binder has, however, withdrawn his claims against LoanCare and the pleadings fail to identify any relevant actionable conduct by Fannie Mae. The Court will, therefore, dismiss the remaining TILA claims without prejudice and allow the plaintiff to attempt to present an amended complaint addressing the relevant conduct at issue.

### Count III UTPCPL Claims

The third count in Mr. Binder's Amended Complaint alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

#### A. Catch-All Provision § 201-2(4)(xxi)

Mr. Binder alleges that the defendants' "error-filled statements, combined with their willful failure to investigate and/or correct those errors, and failure to respond to Binder's reasonable requests constituted fraudulent or deceptive conduct" for purposes of establishing liability under the statute. The statute makes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. 73 Pa. Stat. Ann. § 201-3. The statute provides 21 modes of conduct which constitute "unfair methods of competition" or "unfair or deceptive acts or practices" for purposes of establishing liability under the statute. 73 Pa. Stat. Ann. § 201-2(4). Mr. Binder alleges that the defendants' conduct constituted "other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Id* at § 201-2(4)(xxi).

**\*15** The defendants argue first that Mr. Binder has failed to meet the required pleading standard for establishing fraudulent or deceptive conduct. Fraud, they

contend, must be alleged with particularity and Mr. Binder's Amended Complaint fails to provide any of the specific information required under Fed. R. Civ. P. 9(b). LoanCare Br. at 26 (citing *Tran v. Metropolitan Life Ins., Co.*, 408 F.3d 130, 140-41 (3d Cir. 2005)). To the extent that the Mr. Binder is alleging the defendants engaged in fraud, the defendants are correct that the pleadings must satisfy the standards of Rule 9(b). *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 470 n.11 (E.D. Pa. 2009) ("Of course, to the extent plaintiffs allege a violation of the catchall provision on the basis of fraudulent conduct, plaintiffs must plead the elements of common law fraud and Rule 9(b)'s particularity requirement does apply.") (*citing Christopher v. First Mut. Corp.*, No. 05-01149, 2006 WL 166566, at *6 (E.D. Pa. Jan. 20, 2006) and *Cheatle v. Katz*, No. 02–4405, 2003 WL 21250583, at *8 (E.D. Pa. Apr. 1, 2003)); *Birchall v. Countrywide Home Loans, Inc.*, No. 08-2447, 2009 WL 3822201, at *8 (E.D. Pa. Nov. 12, 2009).

In order to meet the Rule 9(b) standard, a plaintiff must "plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *U.S. ex rel. Budike v. PECO Energy*, 897 F. Supp. 2d 300, 316 (E.D. Pa. 2012) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992)). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential background that would accompany the first paragraph of any newspaper story, that is, the who, what, when, where and how of the events at issue." *Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 310 F.R.D. 166, 177 (E.D. Pa. 2015) (citing *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

Applying this standard, the Court finds that Mr. Binder has specifically claimed a number of false representations of material facts, namely the misrepresentations in account statements from 2012 to 2015. Am. Compl at ¶ 128. Additionally, these statements were included in account statements and intended by the defendants to be acted upon by Mr. Binder, and Mr. Binder has alleged that he did, in fact, remit higher than required payments as a result of these misrepresentations. *See* Am. Compl. at 131. Similarly, he alleges that the defendants improperly force-placed insurance, resulting in Mr. Binder being charged higher insurance premiums.

In making these allegations, Mr. Binder has tied himself in a rhetorical knot—his attempt to circumstantially establish the defendants' knowledge of the falsity of their statements necessarily acknowledges his own concurrent knowledge of their falsity. Even if the Court were to find that the pleadings sufficiently allege that the misstatements on Mr. Binder's account statements were made with the defendants' knowledge, the pleadings clearly state Mr. Binder was aware of the mistakes on his account statements and indeed contested the accuracy of these statements regularly after September 2012. "The Supreme Court of Pennsylvania has consistently interpreted the Consumer Protection Law's private-plaintiff standing provision's causation requirement to demand a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm." *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d Cir. 2008), *as amended* (Nov. 6, 2008); *accord Schwartz v. Rockey*, 593 Pa. 536, 557, 932 A.2d 885, 898 (2007) ("The UTPCPL clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result* of the defendant's prohibited action. This means, in this case, a plaintiff must allege reliance.") (emphasis in original) (citing *Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001)). Mr. Binder affirmatively states that he did *not* rely on the statements made by the defendants and ultimately made his payments in spite of his belief that the statements were inaccurate. *See* Am. Comp. ¶ 66 ("Binder made this overpayment out of an abundance of caution to ensure a timely and full payment for the payment due October 1, 2012."). Ultimately, the Court finds that Mr. Binder has failed to state a claim for fraudulent conduct under UTPCPL.

**\*16** As Mr. Binder points out, however, the statute not only prohibits fraud, but deceptive conduct as well, and both parties acknowledge that the pleading requirements when alleging deceptive, as opposed to fraudulent conduct, are somewhat relaxed. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 548 (D.N.J. 2004). "The Pennsylvania Supreme Court has instructed that courts construe the statute liberally [to affect] its object of preventing unfair or deceptive practices." *Seldon*, 647 F. Supp. 2d at 465 (citing *Creamer v. Monumental Properties Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974)).

> To state a claim for "deceptive conduct" under the UTPCPL, a plaintiff must satisfy three elements:

First, a plaintiff must allege facts showing a deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under similar circumstances. Next, the plaintiff must allege justifiable reliance, in other words that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the defendants' misrepresentation or deceptive conduct. Finally, the plaintiff must allege that this justifiable reliance caused ascertainable loss.

*Montanez v. HSBC Mortgage Corp. ( USA)*, 876 F. Supp. 2d 504, 519 (E.D. Pa. 2012) (citing *Seldon*, 647 F. Supp. 2d at 470).

The pleadings allege that the defendants engaged in conduct which was likely to deceive a consumer acting reasonably under the circumstances—namely by making errors in compiling Mr. Binder's account statement and failing to correct errors once identified. The result of this alleged conduct was that the defendants misrepresented the amount owed by Mr. Binder on his mortgage. Under the circumstances, errors on Mr. Binder's account statement would likely deceive a consumer as to the amount he owed on his mortgage. Based upon the contents of the Amended Complaint, Mr. Binder appears to have satisfied the first required element for pleading deceptive conduct.

It is at the second and third elements of the tort, namely justifiable reliance and ascertainable loss, where Mr. Binder stumbles in the same manner as with regards to allegations of fraudulent conduct. Despite the more lenient pleading standard, Mr. Binder is still obligated to plead that he justifiably relied upon the alleged misrepresentations of the defendant. He does not, and for the same reasons identified above, his pleadings on such claims fail. Consequently, the Court grants the defendants' motion as to claims brought under the "catch-all" provision of the UPT

**B. Notice of Right to Rescind**

In addition to violations based upon fraudulent or deceptive conduct, Mr. Binder also alleges that the defendants violated 73 Pa. C.S. § 201-7 by failing to provide him with a required Notice of Cancelation.

> Where goods or services having a sale price of twenty-five dollars ($25) or more are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale.

*Id.* at § 201-79(a). At the time of the contract, the buyer shall be provided with a notice of cancelation form which substantially informs the buyer that he or she may cancel the transaction without any penalty or obligation, within three business days from the date of the contract. *Id.* at § 201-7(b)(2).

 **\*17** The statute specifically requires that the relevant good must be contracted or sold "as a result of, or in connection with, a contact with or call on the buyer or resident at his residence."

> [I]n interpreting § 201–7, we must recognize that the breadth of its wording is meant to prevent the use of devices to circumvent its underlying intention to provide protection in a broad range of "door-to-door" sales. It is not meant to open up every transaction in which a seller of goods or services has any sort of contact at all with the buyer at his residence to the scope of § 201–7.

*In re Lewis*, 290 B.R. 541, 554 (Bankr. E.D. Pa. 2003)(citing *Saler v. Hurvitz*, 84 B.R. 45 (Bankr. E.D. Pa.

1988)); *see also Lou Botti Construction v. Harbulak*, 760 A.2d 896, 898 (Pa. Super. 2000). The Amended Complaint here includes no allegation that the mortgage contract was the result of a call or visit to Mr. Binder's residence by any of the defendants. Despite the conclusory pleadings identified in his response to the motion to dismiss, Mr. Binder's conclusory allegations that the defendants were required to provide notice under § 201-7(b)(2) are insufficient to state a claim.

### C. *Per Se* Violations

The Amended Complaint also alleges that the defendants' violations of RESPA, TILA, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA") FDCPA and the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Stat. Ann. § 2270.4 ("FCEUA") each constitute *per se* violations of UTPCPL. Am. Compl. ¶ 132. Following oral argument on the motion to dismiss, Mr. Binder stipulated to dismiss any alleged *per se* violation of UTPCPL under RESPA, TILA and FDCPA, but maintained that he has stated a claim for a *per se* violation of UTPCPL under FCEUA.

"[P]er se violations of the UTPCPL should be expressly provided for in the underlying statute." *Abrams v. Toyota Motor Credit Corp.*, No. CONTROL 071049, 2001 WL 1807357, at *8 (Pa. Com. Pl. Dec. 5, 2001). The FCEUA, however, does expressly provide that a violation of that statute constitutes a *per se* violation of the UTPCPL:

> If a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation of the act of December 17, 1968 (P.L. 1224, No. 387), known as the Unfair Trade Practices and Consumer Protection Law.

73 Pa. Stat. Ann. § 2270.5 (West).

As discussed under "Count X Fair Credit Extension Uniformity Act," *infra*, however, Mr. Binder has failed to state a claim for violation of the FCEUA. Consequently, he has not pleaded a *per se* violation of the UTPCPL.

### Count IV Breach of Contract

Mr. Binder's fourth claim alleges breach of contract against all four defendants. LoanCare and Fannie Mae argue that neither is a party to the mortgage agreement at issue. LoanCare asserts that as a loan servicer and not a lender or note holder, it cannot be held liable for breaches of any mortgage obligation. Similarly, Fannie Mae asserts that none of the allegations mention Fannie Mae specifically or allege that Fannie Mae breached a duty to Mr. Binder under the agreement. Third, LoanCare and Fannie Mae argue that Mr. Binder has not pled any cognizable damages against them.

**\*18** In addition to the arguments contained in the LoanCare/Fannie Mae Memo, WestStar argues that Mr. Binder has failed to state a claim for breach of contract based upon the defendants' alleged failure to make timely escrow payments.

### A. LoanCare

LoanCare argues first that because it is only a servicer, it is not liable for breach of contract. "It is basic contract law that only a party to a contract can be liable for breach of that contract." *Comcast Spectacor L.P. v. Chubb & Son, Inc.*, No. 05-1507, 2006 WL 2302686, at *19 (E.D. Pa. Aug. 8, 2006) (citing *Electron Energy Corp. v. Short*, 408 Pa. Super. 563, 597 A.2d 175, 177 (Pa. Super. Ct. 1991)).

Mr. Binder responds that "LoanCare was the servicer of Binder's loan, and either was contractually obligated to Binder based on either contractual privity, agency principles, implied contract, or as a third party beneficiary or obligor." As a preliminary matter, despite Mr. Binder's passing reference to LoanCare as an "obligor," he has not identified any part of the Amended Complaint where he alleges that LoanCare was assigned any rights under the mortgage agreement. In fact, the Amended Complaint does not plead any facts regarding the basis of LoanCare's liability under the Mortgage Agreement whatsoever—the reference to contractual privity, agency principles, implied contract, and such first appeared in the response to the motion, not in the Amended Complaint. Taking all the facts in the Amended Complaint as true and drawing all reasonable inferences in Mr. Binder's favor, he still has provided the Court with no reason to conclude his general

averments not tied to any specific allegations or cited to any authority, adequately state a claim.

Even if Mr. Binder had properly alleged the assignment of *some* obligations under the mortgage agreement, he would still need to specify what those obligations were that gave rise to liability here. "As a servicer only receives limited rights and obligations under the mortgage contract relating to servicing, it is not a party to the original debt instruments like a lender or note holder, and, therefore, cannot be held liable for breaches in obligations that remain held by the lender or note holder." *Trunzo v. Citi Mortgage*, 876 F. Supp. 2d 521, 533 (W.D. Pa. 2012), *on reargument in part*, 43 F. Supp. 3d 517 (W.D. Pa. 2014) (citing *Ruff v. America's Servicing Co.*, No. 07–0489, 2008 WL 1830182, at *4 (W.D. Pa. Apr. 23, 2008)). Because Mr. Binder has not even attempted to plead *any* facts regarding the obligations to Mr. Binder that LoanCare had under the agreement, the Court finds that Mr. Binder has failed to state a claim for breach of contract against LoanCare.

**B. Fannie Mae**

The defendants next argue that Mr. Binder has failed to state a claim against Fannie Mae for breach of contract. As with LoanCare, the defendants argue that Fannie Mae never had any contractual relationship with Binder and therefore cannot be liable for breach of the mortgage agreement. [8] The defendants acknowledge, however, that Fannie Mae purchased Mr. Binder's mortgage. Consequently, Mr. Binder argues that Fannie Mae stepped into the shoes of WestStar and therefore is liable for any breach of the agreement. *See* Am. Comp. ¶ 58 (citing Exhibit K ("Notification of Assignment Sale, or Transfer of Your Mortgage Loan")).

[8]    The defendants' argument is presented without any actual analysis. Rather, they simply cite to the elements of a contract. *See* LoanCare Br. at 30 (citing *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053 (Pa. Super Ct. 1999)). Such a recitation provides no real help, given that the substance of the dispute as to Fannie Mae is not whether a mortgage existed or even if the terms were breached, but whether Fannie Mae had any responsibility to abide by the terms of the contract itself.

**\*19**  "An assignment is a transfer of property or some other right from one person to another, and unless in

some way qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Horbal v. Moxham Nat. Bank*, 548 Pa. 394, 406, 697 A.2d 577, 583 (Pa. 1997) (citing *In re Purman's Estate*, 358 Pa. 187, 56 A.2d 86 (Pa. 1948)). The Amended Complaint alleges that WestStar's rights under the contract were transferred to Fannie Mae as of July 2012. Once those rights were assigned, Fannie Mae would be liable for any subsequent breach of the contract by itself or its agents. The correspondence sent by Fannie Mae to Mr. Binder, which is attached to the Amended Complaint at Exhibit K, holds out WestStar Mortgage, Inc., as a servicer with "authority to act on [Fannie Mae's] behalf with regards to the administration of [Mr. Binder's] mortgage loan and respond to any questions about [the] mortgage loan." Holding the servicer out as possessing the authority to act on the principal's behalf would establish an agency relationship which would in turn bind the principal, in this case Fannie Mae, for the actions of its servicer acting within the scope of the conferred authority. *See Wisler v. Manor Care of Lancaster PA, LLC*, 2015 PA Super 189, 124 A.3d 317, 324, *appeal denied*, 128 A.3d 222 (Pa. Super. 2015); *Washburn v. N. Health Facilities, Inc.*, 2015 PA Super 168, 121 A.3d 1008, 1012 (Pa. Super. 2015) ("Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters."); *In re Estate of Brennen*, 839 A.2d 470, 473 (Pa. Commw. Ct. 2003) ("An agent's exercise of discretion binds the principal."). Because Fannie Mae held out the servicer of the mortgage to act on its behalf, Mr. Binder has adequately pled a breach of contract claim against Fannie Mae. [9]

[9]    The Court notes, however, that an individual acting as an agent for a disclosed principal is not personally liable on a contact between the principal and a third party unless the agent specifically agrees to assume liability. *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 2012 PA Super 60, 40 A.3d 145, 150 (2012). The Amended Complaint fails to plead that either LoanCare or WestStar (acting as servicer) agreed to assume liability under the agreement.

**C. Escrow Payments**

The WestStar/JG Wentworth defendants also argue that the breach of contact claims should be dismissed because Mr. Binder has not identified any contractual obligation which was breached by the alleged failure of

the defendants to make timely payments. Mr. Binder responds by citing to both his Amended Complaint as well as the mortgage agreement, which he attached as Exhibit A to the Amended Complaint:

141. Also, Binder was required to pay additional amounts to an escrow account, to guarantee the payments of various taxes and insurances for the protection of the Home and Lender's security therein. *See* Exhibit "A".

142. Pursuant to the agreements between Binder and Defendants, Defendants greed to maintain an escrow account for Binder's and their own benefit, and to make tax and insurance payments as required when due.

143. Defendants breached the agreements by failing to make these payments as required when due, resulting in Binder's insurance policies being canceled several times.

144. Defendants further breached the agreements by misapplying payments and misstating amounts paid and due on Binder's account and statements.

145. For example, misapplied principal payments, as seen in the difference between the remaining principal balance and the should be remaining principal balance. [sic]

Am. Compl. at ¶¶ 141-145. Mr. Binder also cites to the Mortgage Agreement which sets out the obligations of both borrower and lender regarding the escrow payments, which notably require that "Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA." Am. Comp. at Exhibit "A" at 4-5.

Based upon the above, the Court finds that Mr. Binder has adequately pled a breach of the mortgage agreement and, therefore, denies the WestStar/JG Wentworth motion to dismiss as to the escrow payments.

### D. Damages

The defendants make two arguments regarding damages. First, the LoanCare/Fannie Mae defendants contend that Mr. Binder has failed to plead that he suffered any compensable damages as a result of a breach of the agreement. As discussed above, the Amended Complaint alleges that the defendants breached the mortgage agreement by failing to apply the escrow

payments properly. *See* Am. Compl. at ¶¶ 141-145; *see also* ¶ 40. As a consequence of the defendants' failure to manage the escrow account, Mr. Binder alleges that he was required to pay for "force-placed" insurance and spend time and money to ensure continued coverage. Am. Compl. at ¶¶ 40-48. "In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss." *Logan v. Mirror Printing Co. of Altoona, Pa.*, 410 Pa. Super. 446, 448, 600 A.2d 225, 226 (Pa. Super. 1991). Based upon the pleadings, the Court finds that Mr. Binder has adequately pled consequential damages resulting from the alleged breach.

**\*20** In addition to the consequential damages, however, Mr. Binder alleges that he is entitled to punitive damages for the defendants' breach of the terms of the mortgage agreement. "The law in Pennsylvania has always been that punitive damages cannot be recovered for breach of contract." *Smith v. Harleysville Ins. Co.*, 275 Pa. Super. 246, 248, 418 A.2d 705, 706 (1980), *aff'd*, 494 Pa. 515, 431 A.2d 974 (1981) (citing *Hoy v. Gronoble*, 34 Pa. 9 (Pa. 1859)); *Ash v. Cont'l Ins. Co.*, 593 Pa. 523, 529, 932 A.2d 877, 881 (2007) ("[U]nder Pennsylvania law, punitive damages are typically only awarded in tor actions.") (citing *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 235 (3d Cir. 2003)). The single case cited by Mr. Binder does not contradict this. *See Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp. 2d 292 (E.D. Pa. 2008). In *Morilus*, the plaintiff's freestanding punitive damages claim was dismissed on summary judgment after the court found the plaintiffs had failed to establish liability for the underlying tort claims. *Id.* at 310. The opinion does not contradict the defendants' authority that punitive damages are not recoverable for breach of contract under Pennsylvania law. Consequently, because there is no substantive dispute, the Court grants the defendants' motion as to punitive damages alleged in Count IV.

### Count V Breach of Fiduciary Duty

#### A. Existence of a Duty

The defendants next argue that Count V should be dismissed in its entirety because, under Pennsylvania law, a mortgage lender does not owe any fiduciary duties to a borrower. The defendants rely principally on *Caplen v. Sec. Nat'l Servicing Corp.*, 514 F. Supp. 2d 746 (E.D.

Pa. 2007), *aff'd sub nom. Caplen v. SN Servicing Corp.*, 343 Fed.Appx. 833 (3d Cir. 2009). Here, on a motion for summary judgment, the court dismissed a borrower's breach of fiduciary duty claim against a mortgage lender, based upon the lender's alleged improper force-placement of insurance. *Id.* at 752. The court reasoned that "[t]here is no indication in the case law that a Pennsylvania court would find a fiduciary relationship between a mortgage lender and a homeowner-borrower." *Id.* Such a fiduciary relationship only occurs in relationships such as attorney and client, guardian and ward, or trustee and trust. *Id.* (citing *Matter of Estate of Evasew*, 526 Pa. 98, 584 A.3d 910, 913 (Pa. 1990)).

Mr. Binder counters that the fiduciary duty here arises out of the special circumstance inherent in the lender acting as an escrow agent for funds held for the purpose of paying insurance premiums and other items in the borrower's mortgage. *Laffan v. Santander Bank, N.A.*, No. 13-4040, 2014 WL 2693158 (E.D. Pa. June 12, 2014). Unlike *Caplen*, where the mortgage agreement simply gave the lender authority to purchase insurance to cover the collateral in the event the borrower failed to do so herself, the defendant in *Laffen* "pled that Defendants held funds in escrow for the purpose of paying insurance premiums and other items in the borrower's mortgages." *Id.* at *6. While *Laffen* analyzed the borrower/lender relationship under New Jersey law, in Pennsylvania, "[a]n ordinary escrow agreement creates a fiduciary relationship between the agent and the transferor." *Knoll v. Butler*, 675 A.2d 1308, 1312 (Pa. Commw. Ct. 1996), *aff'd*, 548 Pa. 18, 693 A.2d 198 (1997). Because Mr. Binder has pled that under the mortgage agreement the defendants agreed to maintain an escrow account for his benefit and to make certain payments when due, the Court finds that he has adequately pled the existence of a fiduciary relationship between himself and the mortgage lender.

This claim for breach of fiduciary duty, however, is pled as to all the defendants. With regards to the loan *servicers* Mr. Binder has failed to state a claim. The Amended Complaint does not contain any allegations which would establish a fiduciary relationship between Mr. Binder and the loan servicers. Much like mortgage lenders, loan servicers do not owe borrowers any specific fiduciary duties based upon their servicer/borrower relationship. *See Vann v. Aurora Loan Servs. LLC*, No. 10-04736, 2011 WL 2181861, at *3 (N.D. Cal. June 3, 2011) ("Courts have similarly concluded that loan servicers do not owe a

fiduciary duty to borrowers.") (citing *Moreno v. Citibank, N.A.*, No. 09–5339, 2010 WL 1038222, *3 (N.D. Cal. Mar. 19, 2010)). As noted above, the Amended Complaint fails to plead an assignment of duties to the borrower under the mortgage agreement which could lead to the existence of a fiduciary relationship with the servicers. For this reason, the Court will grant the defendants' motion as to the loan servicers.

**B. Gist of the Action Doctrine**

**\*21** The defendants also argue that Mr. Binder's breach of fiduciary duty claim is barred by the "gist of the action" doctrine. This doctrine, initially developed in England, and later imported into American common law, is intended to maintain the conceptual distinction between breach of contract claims and tort claims. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60-62 (Pa. 2014); *eToll, Inc., v. Elias/Savion Advertising, Inc.*, 2002 Pa. Super. 347, ¶ 14, 811 A.2d 10, 14 (Pa. Super. 2002). "[A]lthough mere non-performance of a contact does not constitute a fraud, it is possible that a breach of contract also gives rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral." *eToll, Inc.*, 2002 PA Super 347, ¶ 15, 811 A.2d at 14 (citing *Bash v. Bell Tel. Co. of Pennsylvania*, 411 Pa. Super. 347, 354, 601 A.2d 825, 829 (Pa. Super. 1992)).

The Supreme Court of Pennsylvania recently examined the gist of the action doctrine in the context of a motion to dismiss a negligence claim brought by insureds against insurer for representations made by insurer's agent regarding the harmfulness of certain mold discovered in insured's home. *See Bruno*, 106 A.2d at 50. After conducting a lengthy examination of both the jurisprudence of the Pennsylvania courts, as well as the English common law origins of the doctrine, the Pennsylvania Supreme Court explained that "the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract," for purposes of stating a claim, is "the nature of the duty alleged to have been breached." *Id.* at 68.

> [T]he substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere

labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* (citations omitted); *accord Downs v. Andrews,* No. 15-1216, 2016 WL 519162, at *2 (3d Cir. Feb. 10, 2016) ("The District Court appropriately focused on the nature of the duty alleged to be breached, not merely on whether the contractual duties were sufficiently intertwined with the alleged torts."); *see also Certainteed Ceilings Corp.,* 2015 WL 410029 at *7 ("In the context of a single case, some allegations of breach of fiduciary duty may be barred by the gist of the action doctrine, while others may be deemed to be outside the scope of the contract at issue.") (citing *Brown & Brown,* 745 F. Supp. 2d at 619-20).

Mr. Binder does not dispute the substantive analysis set out by the Pennsylvania Supreme Court in *Bruno* but rather asserts that courts have declined to apply the gist of the action doctrine in instances where the alleged breached fiduciary duties were imposed as a matter social policy, independent of a contractual relationship. *See* Pl. Resp. Br. at 41 (citing *Certainteed Ceilings Corp., v. Aiken,* No. 14-3925, 2015 WL 410029 (E.D. Pa. Jan 29, 2015)). Notably, the single case cited by Mr. Binder for this principle actually finds in favor of a defendant seeking to dismiss a claim of breach of fiduciary duty under the gist of the action doctrine. *See Certainteed Ceilings,* 2015 WL 410029 at *11 ("Given these alleged facts, Certainteed's claim for breach of fiduciary duty is nothing more than a restatement of its breach of contract claim."). Moreover, the gist of the action doctrine involves a context-specific analysis and the fact that some courts have found that

plaintiffs have adequately pled a breach of fiduciary duty, independent of an existing contractual relationship, does not preclude finding that Mr. Binder's claims are barred here.

**\*22** Mr. Binder also argues that the Court should decline to dismiss his claims for breach of fiduciary duty because he is entitled to plead multiple claims as alternative theories of liability. While the Court has noted in the past that one "should be slow to dismiss claims under the gist of the action doctrine," *Orthovita, Inc. v. Erbe,* No. 07-2395, 2008 WL 423446, at *4 (E.D. Pa. Feb. 14, 2008), this does not mean that the Court should or will ignore a plaintiff's attempt to repackage contract claim as a tort. Moreover, the gist of the action doctrine does not distinguish between alternative theories of liability but rather addresses whether, as a matter of law, the plaintiff is capable of pleading tort claims based upon conduct in the course of a contractual relationship. *See Bruno,* 106 A.3d at 64-65 ("*Horney* is notable for establishing that, as a matter of law, a negligence suit may not be brought for breaches of what are purely contractual duties....") (citing *Horney v. Nixon,* 213 Pa. 20, 23, 61 A. 1088, 1089 (Pa. 1905)); *Certainteed Ceilings Corp.,* 2015 WL 410029 at *7.

Pennsylvania law requires examination of the specific duties alleged to determine whether the substance of the allegations themselves implies a contractual duty. It is apparent that the only fiduciary duty implicated by the pleadings in the amended complaint here relates to the obligations of the mortgage lenders to make premium payments for insurance on the property-collateral out of the funds paid into escrow. The amended complaint expressly alleges that "[p]ursuant to the agreements between Binder and Defendants, Defendants agreed to maintain an escrow account for Binder's and their own benefit, and to make tax and insurance payments as required when due." Am. Compl. at ¶ 142. Mr. Binder alleges that the defendants breached their fiduciary duties in two ways, first by "failing to make insurance payments when due from escrow accounts funding timely and properly by Binder." *See* Am. Compl. at ¶ 151. Second, Mr. Binder alleges that the Defendants further breached their fiduciary duties by "failing or refusing to respond to Binder's reasonable questions and requests for correction and/or explanation to [sic] information he received regarding his account." *See* Am. Compl. at ¶ 152.

Applying the gist of the action analysis, the Court concludes that both alleged breaches of fiduciary duty are simply restatements of Mr. Binder's breach of contract claims. As to the first, the duty to make payments as required by the terms of the contract is an obligation defined exclusively by the terms of the contract—the plaintiff's allegations do not implicate a broader social duty owed to all individuals. To the extent that Mr. Binder alleges that the defendant mortgage lenders failed to make payments as set out in the contract, the Court finds that this is simply a restatement of the breach of contract claim and consequently barred by the gist of the action doctrine. The second alleged breach of fiduciary duty presents a somewhat closer question. The duty to respond to requests for information or to correct errors in Mr. Binder's accounts is not alleged to have been expressly set out in the four corners of the contract itself. Nevertheless, Mr. Binder has pled the obligation of defendants to maintain his account properly as falling under the duty of "good faith and fair dealing." [10] *See Northview Motors* 227 F.3d 79, 91 (3d Cir. 2000) (duty of good faith and fair dealing is an "interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action."). As set out clearly in the pleadings, the duty alleged by Mr. Binder originates with the contract and is therefore not an independent obligation.

[10]    Originally, Mr. Binder pled separate claims for breach of contract and breach of the covenant of good faith and fair dealing. As discussed *infra*, under Pennsylvania law, there is no cause of action for breach of a covenant of good faith and fair dealing independent of breach of contract. Following the oral argument, the plaintiff agreed to withdraw his separate count for breach of good faith and fair dealing. He expressly stated however, that the allegations in that count were folded into the breach of contract claim against all defendants. Doc. No. 49; *see Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 588 (E.D. Pa. 2011) (Order). In Count VI, Mr. Binder alleges that the "Defendants further breached the implied covenant of good faith and fair dealing by failing and refusing to respond to Binder's reasonable request and requests for correction and/or explanation to information he received regarding his account, including erroneous charges, balances and due dates." Am. Compl. at ¶ 158. This allegation is substantively identical to the factual allegations regarding the alleged breach of fiduciary duty. *See* Am. Compl. at ¶ 152.

### Count VI Breach of Covenants
### of Good Faith and Fair Dealing

**\*23**  The defendants challenged Count VI on the basis that this claim is not separate from a breach of contact claim and also, then, is barred by the gist of the action doctrine. As the defendants point out in their briefing, "Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing" distinct from a breach of contract claim. *See* LoanCare Br. at 32 (*citing Blue Mountain Mushroom Co. Inc., v. Monterey Mushroom, Inc.*, 246 F. Supp. 2d 394, 400-01 (E.D. Pa. 2002)).

While Mr. Binder argued in his responsive briefing that he had alleged facts in his claim for breach of implied covenant of good faith and fair dealing which were distinct from his breach of contract claims, following oral argument he informed the Court that he was withdrawing his opposition and stipulating to the dismissal of Count VI as a claim separate from his breach of contract claim but requesting that the allegations contained in Count VI be "folded" into the breach of contract claim against all defendants. Consequently, the Court grants the defendants' motion as to Count VI and will dismiss that Count with prejudice.

### Count VII Fraud/Fraudulent Misrepresentation

The defendants argue next that the Court should dismiss Mr. Binder's Count VII, which alleges fraud and fraudulent misrepresentation, for two separate reasons. First, they assert that the claim must be dismissed under the gist of the action doctrine, but the Court need not address this argument because the defendants are correct with their second argument, namely that the plaintiff has failed to plead the fraud claim with the specificity required by Rule 9(b).

The plaintiff's allegations of fraud are deficient under Rule 9(b). As to his fraud claims, Mr. Binder is obligated to "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). "Where there are multiple defendants involved, the particular fraudulent acts allegedly committed by each defendant must be specified." *Dorsey v. Bioteque, Inc.*, No. 95-6085, 1996 WL 469255, at *1 (E.D. Pa. Aug. 14, 1996) (citing *Mayor of*

*Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1060 (D.N.J. 1993)); *accord Sheehan v. Mellon Bank*, No. CIV. A. 95-2969, 1995 WL 549018, at *4 (E.D. Pa. Sept. 13, 1995) (dismissing without prejudice claim which "fails to specify which Defendants are accused of what fraudulent actions."). Here, the complaint fails to allege which fraudulent acts were committed by which specific defendants—rather Mr. Binder has claimed that the defendants are collectively responsible for all the fraudulent conduct alleged. This fails to satisfy the standard set out in the federal rules, and the Court will grant the defendants' motion and dismiss the count. Plaintiff will, however, be permitted to file an amended answer and attempt to address this deficiency.

As the Court finds that the plaintiff's pleadings are deficient, the Court does not reach the question of whether the gist of the action doctrine applies to the allegations of fraud as currently plead.

#### Count VIII Negligence/Negligent Misrepresentation

With regards to Count VIII, the defendants again argue that the gist of the action doctrine precludes the plaintiff from pursuing a negligence claim. The defendants also argue that the negligence claim is precluded under the economic loss doctrine.

As discussed above, the gist of the action analysis requires analysis of "the nature of the duty alleged to have been breached." *Bruno*, 106 A.2d at 68. Here, the Amended Complaint identifies that duty as one to "maintain [the] account correctly, in accordance with the parties' agreements" and "to investigate and respond to [Mr. Binder's] questions and concerns thoroughly, accurately, and in a timely fashion." *See* Am. Compl. at ¶¶ 172-73. As pled, the plaintiff appears to have alleged that the duties at issue were specifically created by the existence of the mortgage agreement.

 **\*24** Had these been the only pleadings regarding negligence provided in the Amended Complaint, the Court may very well have found that the negligence count was defeated by the gist of the action doctrine alone. Mr. Binder has, however, also alleged that the defendants were negligent *per se* for their alleged violations of RESPA, TILA, FDCPA, and FCEUA.

Negligence *per se* is conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances. Pennsylvania recognizes that a violation of a statute or ordinance may serve as the basis for negligence *per se*. However, a court will not use a statute or regulation as the basis of negligence per se where the purpose of the statute is to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public.

*Mahan v. Am-Gard, Inc.*, 2003 Pa. Super 510, ¶ 23, 841 A.2d 1052, 1059 (2003) (citing *Wagner v. Anzon, Inc.*, 453 Pa. Super. 619, 684 A.2d 570, 574 (1996)).

The Pennsylvania courts have established four elements that need to be satisfied in order for a plaintiff to make out a claim of negligence *per se*. Notably, the second element requires that "the statute or regulation must clearly apply to the conduct of the defendant." *Mahan*, 2003 PA Super 510 at ¶ 23, 841 A.2d at 1059. Here, while the plaintiff has alleged liability collectively as to all defendants, based upon the above analysis—and given the fact that the Court finds that the plaintiff has failed to state a claim as to statutory claims against certain defendants—the Court finds that the pleadings as to this element of negligence *per se* are deficient. The claim is therefore dismissed. The plaintiff is granted leave to file an amended answer to include specific pleadings.

#### Count IX Fair Debt Collection Practices Act

The defendants next argue that the Court should dismiss the plaintiff's claims brought under the FDCPA. The defendants contend that LoanCare and Fannie Mae were acting as mortgage lenders and servicers and that Mr. Binder has failed to plead that they were acting as debt collectors as defined under the statute. Mr. Binder responds that the statute does not categorically exclude mortgage lenders and servicers from liability under the statute and that his pleadings establish that the defendants

were treating the mortgage as if it was in default at the time they acquired it. He claims that given that they were treating the loan as in default, they should be foreclosed from arguing they were not acting as debt collectors.

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C.A. § 1692 (West). The statute defines debt collectors as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). "Courts have held that mortgage lenders and mortgage servicing companies are not debt collectors when they attempt to collect their own debts." *New-Howard v. JP Morgan Chase Bank N.A.*, No. 11-2855, 2013 WL 6096232, at *7 (E.D. Pa. Nov. 20, 2013)(collecting cases); *see* 15 U.S.C.A. § 1692a(6) (F) (excluding from the definition of debt collector "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity..." "concerns a debt which was not in default at the time it was obtained by such person.")

**\*25** As a preliminary matter, it is undisputed that, at the time the mortgage was acquired by Fannie Mae, Mr. Binder was not in default. Rather, Mr. Binder argues that mortgage lenders and servicers have, in the past, been held liable under the statute when they mistakenly treated a loan as in default.

To support his allegation that a mortgage lender can be estopped from claiming that it is excluded from the statute when it mistakenly treats a mortgage as in default, plaintiff points to a single decision from the Seventh Circuit Court of Appeals, *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 535 (7th Cir. 2003). The court here considered whether the acquirer of a mortgage's mistaken belief as to the status of a mortgage had any relevance to determining whether that acquirer should be considered a creditor or a debt collector for purposes of the statute. *Id.* at 537. After analyzing the language of the statute, the court found that mistaken belief by the defendant was no defense to liability under the FDCPA. *Id.* at 538. The holding in *Schlosser*, however, is clearly distinguishable from the operative facts here. There, the mortgage in question was listed in the original lender's records as in default at the time it was acquired by the defendant. *Id.* at 535. Moreover,

while the *Schlosser* mortgage was not, in fact, in default when it was acquired, the defendant nevertheless treated it as such by sending a demand letter to the plaintiff, explicitly identifying itself as a debt collector. *Id.* When the plaintiffs argued that the mortgage was not in error, the defendant nevertheless refused to accept the regular monthly payments and instituted foreclosure proceedings. *Id.*

Conversely, the pleadings and the documents attached to the Amended Complaint here clearly show that the defendants were acting as mortgage lenders and not as debt collectors. Mr. Binder has not alleged that WestStar, the original lender, ever considered the mortgage in default or that the defendants treated the mortgage in default at the time it was transferred. Mr. Binder only provides conclusory assertions that the defendants were treating the mortgage as in default when it was acquired. *See* Am. Compl. at ¶ 180 ("By way of example only, and on information and belief, defendants have at various times —including when transferring ownership and/or servicing of the debt—treated the loan as being delinquent and or in default, including charging Binder late fees in multiple occasions.") "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. The plaintiff has failed to plead that any of the defendants were principally engaged in the business of collecting debts, that they regularly engaged in the practice of collecting debts, or that they ever identified themselves as debt collectors. Rather, the pleadings expressly state that LoanCare identified itself as a "loan servicer" when communicating to the plaintiff. Am Compl at ¶ 56. In fact, the entirety of the pled allegations regarding the nature of the defendants' business operations is consistent with the conclusion that these entities were principally engaged in mortgage lending and servicing. *See* Am. Compl. at ¶¶ 11-14.

**\*26** The Court, therefore, concludes that Mr. Binder has failed to allege that the defendants were acting as debt collectors for purposes of the statute. Therefore, he has failed to state a claim. As Mr. Binder's allegations affirmatively state that these defendants are not debt collectors for purposes of the statute, the Court finds that allowing the plaintiff to amend this claim would be futile. Consequently, the Court will grant the defendants' motion to dismiss Count IX with prejudice.

## Count X Fair Credit Extension Uniformity Act

Similar to the FDCPA, the Pennsylvania Fair Credit Extension Uniformity Act (FCEUA) prohibits "unfair methods of competition and unfair or deceptive acts or practices with regard to the collection of debts, including any violation of the FDCPA by a debt collector." *Glover v. F.D.I.C.*, 698 F.3d 139, 152 (3d Cir. 2012) (citing 73 Pa Stat Ann. §§ 2270.2, 2270.4(a) (West)). A debt collector under the FCEUA is defined as "[a] person not a creditor conducting business within this Commonwealth, acting on behalf of a creditor, engaging or aiding directly or indirectly in collecting a debt owed or alleged to be owed a creditor or assignee of a creditor." 73 Pa. Stat. Ann. § 2270.3. This definition, however, is narrower than that used in the FDCPA and therefore, "even where a defendant ostensibly falls within the FDCPA's definition of 'debt collector,' such defendant may not be liable under the FCEUA's narrower scope." *Id.*

For the same reasons outlined above, Mr. Binder has failed to allege the defendants were acting as debt collectors for purposes of the FCEUA. Consequently, the Court will grant the defendants' motion and dismiss Count X with prejudice.

## IV. CONCLUSION

For the reasons outlined above, the Court will grant the defendants' two motions in part and deny the defendants' motions in part.

\* \* \*

An appropriate Order follows.

**All Citations**

Slip Copy, 2016 WL 3762710

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

C

2015 WL 10096084
Only the Westlaw citation is currently available.
United States District Court,
M.D. Florida,
Jacksonville Division.

Taylor Casey et al., Plaintiffs,

v.

Florida Coastal School of Law, Inc., Defendant.

NO. 3:14–cv–1229–J–39PDB
|
Signed August 11, 2015

**Attorneys and Law Firms**

Richard Bec, Elio F. Martinez, Jr., Carlos F. Concepcion, Concepcion, Martinez & Bellido, Coral Gables, FL, Jesse Strauss, Strauss Law, PLLC, David Anziska, The Law Office of David Anziska, New York, NY, for Plaintiffs.

Michael Colbert Hartmere, Michael J. Volpe, Edmund M. O'Toole, Venable, LLP, New York, NY, Herman J. Russomanno, Herman J. Russomanno, III, Russomanno & Borrello, PA, Miami, FL, for Defendant.

**Report & Recommendation on Motion to Dismiss**

Patricia D. Barksdale, United States Magistrate Judge

**\*1** Complaining that Florida Coastal School of Law ("Florida Coastal") publicized deceptive and unfair employment and salary data, seven of its graduates sue under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201–213, seeking $100 million, equitable relief, and class-action status.[1] Doc. 74. Florida Coastal moves to dismiss the case "in its entirety and with prejudice" under Federal Rule of Civil Procedure 12(b)(6), arguing its compliance with American Bar Association ("ABA") standards activates FDUTPA's safe-harbor provision, the plaintiffs insufficiently allege deception, causation, and actual damages, and the statute of limitations bars most of the claims. Doc. 76. The plaintiffs disagree. Doc. 83. The Court allowed them to amend their pleading before, Doc. 69, and they do not seek to do so again, *see generally* Doc. 83.

[1] Six of the plaintiffs filed the original complaint in state court in February 2012 on behalf of themselves and a proposed class of all persons "who are either presently enrolled or graduated from Florida Coastal ... within the statutory period." Doc. 1–1 ¶ 85. Florida Coastal removed the case to the United States District Court for the Southern District of Florida under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Doc. 1. The plaintiffs moved to remand it, Doc. 6, and Florida Coastal moved to dismiss it, Doc. 5. That court denied the motion to remand, Doc. 45, denied the motion to dismiss without prejudice, Doc. 46, and transferred the case here, Doc. 46. Upon the parties' joint request, this Court stayed discovery and deferred issuance of a case management and scheduling order pending a decision on the motion to dismiss. Doc. 81. No party has moved for class certification yet.

**I. Overview**

Although this case is the first and only of its kind in Florida, many cases against law schools for allegedly publishing deceptive and unfair employment and salary data have been brought elsewhere under various state tort and consumer-protection laws.[2] *See* Ogechi Achuko, *The Blame Game: Law Students Sue Their Law Schools for Deceptive Employment Reporting Practices,* 20 Va. J. Soc. Pol'y & L. 517 (2013). The plaintiffs in those cases have met with mixed success. *Compare MacDonald v. Thomas M. Cooley Law Sch.,* 724 F.3d 654 (6th Cir.2013) (affirming dismissal of Michigan claims because law inapplicable to purchase of education); *Phillips v. DePaul Univ.,* 19 N.E.3d 1019 (Ill.App.Ct.2014) (affirming dismissal of Illinois claims because plaintiffs insufficiently alleged deceptive act or practice, causation, and actual damages); *Evans v. Ill. Inst. of Tech.,* No. 1–12–3611, 2014 WL 4803004 (Ill.App.Ct. Sept. 26, 2014) (unpublished) (same); *Gomez–Jimenez v. N.Y. Law Sch.,* 943 N.Y.S.2d 834 (N.Y.Sup.Ct.2012) (dismissing New York claims because plaintiffs insufficiently alleged deceptive act and actual damages), *aff'd,* 103 A.D.3d 13, 956 N.Y.S.2d 54 (N.Y.App.Div.2012); *Austin v. Albany Law Sch. of Union Univ.,* 957 N.Y.S.2d 833 (N.Y.Sup.Ct. Jan. 3, 2013) (same); *Bevelacqua v. Brooklyn Law Sch.,* No. 500175/2012, 2013 WL 1761504 (N.Y.Sup.Ct. Apr. 22, 2013) (unpublished) (same); *with Harnish v. Widener Univ. Sch. of Law,* 931 F.Supp.2d 641 (D.N.J.2013) (denying dismissal of New Jersey and Delaware claims because plaintiffs alleged plausible unlawful conduct, ascertainable damages, and causation); *Hallock v. Univ. of S.F.,* No. CGC–12–517861 (Cal.Super.Ct., July 19,

2012) (unpublished) (overruling demurrer on California claims because plaintiffs alleged plausible deceptive act); *Alaburda v. Thomas Jefferson Sch. of Law,* No. 37–201100091898, 2012 WL 6039151 (Cal.Super.Ct. Tr. Div. Nov. 29, 2012) (unpublished) (denying summary judgment on California claims because plaintiff's reliance was reasonable and she sustained damages from attending school "that is not what it purported to be").

2        Graduates filed a FDUTPA class action against Barry University School of Law in Orlando but alleged a different deceptive or unfair act (failure to use promised best efforts to obtain accreditation). *See Cheatwood v. Barry Univ., Inc.,* No. C10M01–0003986, 2001 WL 1769914 (Fla.Cir.Ct. Dec. 26, 2001) (unpublished).

## II. Alleged Facts[3]

3        The plaintiffs say their allegations "are based on the investigation of counsel, including but not limited to reviews of advertising and marketing material, various publicly available information and interviews of former students, and are thus made on information and belief, except as to individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge." Doc. 74 at 1.

**\*2** InfiLaw Corporation, a fund owned by Sterling Partners, a private-equity firm, owns and operates three for-profit law schools, including Florida Coastal. Doc. 74 ¶¶ 1, 20. Founded in 1996 and accredited by the ABA in 2002, Florida Coastal is now one of the country's largest law schools, having grown dramatically since Sterling Partners acquired it. Doc. 74 ¶¶ 1, 21, 26. Enrollment increased from 449 first-year students in 2005 to 722 first-year students in 2010. Doc. 74 ¶ 22. It now enrolls more than 1700 students. Doc. 74 ¶ 1.

Florida Coastal has some of the country's most relaxed admissions standards, admitting almost 70 percent of applicants and placing in the bottom 5 percent of accredited law schools based on grade point averages and LSAT scores. Doc. 74 ¶¶ 21– 22. About a third of its students leave before their third year. Doc. 74 ¶ 23. Annual tuition increased by almost 50 percent between 2005 ($23,410) and now ($36,960). Doc. 74 ¶ 24. Almost all students take out loans and graduate with significant debt, recently averaging $120,000 to $150,000. Doc. 74 ¶ 25.

The ABA requires accredited law schools to "publish basic consumer information" in a "fair and accurate manner reflective of actual practice." Doc. 74 ¶ 26 (quoting Section 509(a) of the ABA's 2010–2011 Standards for Approval of Law Schools).[4] Florida Coastal "publishes its employment statistics on its website" under "Career Services." Doc. 74 ¶¶ 27, 28. There, Florida Coastal touts that its career-services department "enjoys a first-rate staff that stands ready to guide you along your own unique career path. We will assist you with all phases of your job search and professional development. From personalized career counseling to on-campus interviewing programs, our office will facilitate your transition from law school to legal practice. We pride ourselves in developing strong working relationships with our students that continue long after graduation." Doc. 74 ¶ 27.

4        The ABA's 2010–2011 Standards for Approval of Law Schools are available at http://www.americanbar.org/content/dam/aba/publications/misc/legal_ education/Sta ndards/standardsarchive/2010_2011_standards.authcheckdam.pdf.

Florida Coastal obtains the employment and salary data from surveys it sends to all recent graduates. Doc. 74 ¶ 28. The data therefore is "unaudited, unverified and self-reported." Doc. 74 ¶¶ 5, 28. Between 2008 and 2010, for class of 2007 graduates, Florida Coastal posted that 96.4 percent had obtained employment within nine months of graduation. Doc. 74 ¶ 28; *see also* Doc. 1–1 at 60. That number "rivals those of much higher ranked, top-tier schools, such as the University of Florida, which had a 95.9 percent placement rate" for its class of 2007 graduates. Doc. 74 ¶ 28. "Florida Coastal's employment data did not disclose the percentage of graduates who were employed in jobs that were not either temporary, part-time, voluntary, or JD required/JD preferred, and did not disclose the percentage of graduates who actually reported salary information." Doc. 74 ¶ 28.

"Upon information and belief, the school also posted the employment data and salary information for the classes of 2004, 2005, 2006, and 2009, reporting placement rates of 92 percent for the class of 2004, 91 percent for the class of 2005, 88 percent for the class of 2006, and 90 percent for the class of 2009." Doc. 74 ¶ 29. "Upon information and belief, for all ... employment reports published before July 2011, Florida Coastal failed to disclose the overall percentage of graduates who reported salary information." Doc. 74 ¶ 41.

**\*3** Beginning in July 2011, for class of 2010 graduates, Florida Coastal posted that 80 percent were employed nine months after graduation and included that 38 percent worked in private practice, 17 percent worked in "business," 10 percent worked in government, 22.5 percent worked in public interest, 4 percent served in judicial clerkships, 3 percent worked in academia, 5 percent were seeking employment, 3 percent were unemployed and not seeking employment, and 4 percent were "unknown." Doc. 74 ¶¶ 5, 30. Florida Coastal posted that 82 percent of the employed graduates had jobs for which a J.D. was required or preferred. Doc. 74 ¶ 30. Florida Coastal "disclosed" a $48,615 average starting salary (including a $51,981 average salary for private practitioners), with 29 percent of employed graduates (23 percent of the entire class) providing salary data. [5] Doc. 74 ¶¶ 30, 41. Florida Coastal did not disclose "the exact percentages of graduates for each particular job category who reported salary information." Doc. 74 ¶ 41. The data appeared as follows, together with corresponding pie graphs:

[5]   In a section of the complaint titled, "Preliminary Statement," the plaintiffs allege that "[o]nly 23 percent of the 2009 class reported any type of salary information." Doc. 74 ¶ 3. Considering their use of that same percentage for the class of 2010 elsewhere, Doc. 74 ¶¶ 5, 30, 41, and their allegation that "employment reports published before July 2011 ... failed to disclose the overall percentage of graduates who reported salary information," Doc. 74 ¶ 41, the plaintiffs presumably mistakenly used "2009" instead of "2010" in the "Preliminary Statement."

Tabular or Graphical Material not displayable at this time.

Doc. 1–1 at 56–58; Doc. 76–1 at 4–6. [6]

[6]   The plaintiffs attached the posting to their original complaint, Doc. 1–1 at 56–58; and Florida Coastal attached it to its motion to dismiss, Doc. 76–1 at 4–6.

Florida Coastal provided employment and salary data to three sources used by all accredited law schools and readily available to prospective students, the ABA, *U.S. News,* and the National Association for Law Placement ("NALP"). Doc. 74 ¶ 32. The ABA and *U.S. News* required only aggregate employment data. Doc. 74 ¶ 32. The NALP required data specific to the type of job obtained but published and otherwise made available only aggregate employment numbers. Doc. 74 ¶ 34. Based on data Florida Coastal provided, the ABA and *U.S. News* reported the following percentages of graduates obtaining employment within nine months of graduation: 96 percent of class of 2003 graduates (*U.S. News*), 94(ABA) and 92 (*U.S. News)* percent of class of 2004 graduates, 90(ABA) and 91 (*U.S. News* ) percent of class of 2005 graduates, 90(ABA) and 88 (*U.S. News* ) percent of class of 2006 graduates, 87(ABA) and 96 (*U.S. News* ) percent of class of 2007 graduates, 95(ABA) and 95.4 (*U.S. News* ) percent of class of 2008 graduates, and 91.4(ABA) and 81.4 (*U.S. News* ) percent of class of 2009 graduates. [7] Doc. 74 ¶ 33.

[7]   The plaintiffs do not allege facts that would explain why, for some years, the employment percentages in the ABA and *U.S. News* publications differed by up to 10 percentage points. *See generally* Doc. 74.

"Florida Coastal's reported employment placement rates and salary information barely dipped following the aftermath of the 'Great Recession,' as the ... rates for the class of 2008 was an impressive 95 percent and 90 percent in 2009. With legal jobs becoming increasingly scarce, Florida Coastal continued to claim that the majority of its graduates are gainfully employed." Doc. 74 ¶ 5(b). "In reality, the employment data reported and marketed by Florida Coastal during the Class Period [an unspecified period to August 2012] bears little resemblance to the actual experiences and dim employment opportunities encountered by its graduates." Doc. 74 ¶ 36. Interviews of former students, a published study and article, other investigatory work by the plaintiffs' counsel, and an inference from the low percentage of graduates in the classes of 2010 and 2011 providing salary information, indicate that fewer than 30 to 40 percent "(if not even fewer)" of Florida Coastal graduates obtained full-time, permanent employment for which a J.D. was required or preferred within nine months of graduation. Doc. 74 ¶¶ 5, 36, 39. Most worked in part-time, temporary, or volunteer positions. Doc. 74 ¶ 36. Few earned salaries like the published average salaries. Doc. 74 ¶ 36.

**\*4** The employment percentages were higher because Florida Coastal, like most or all law schools before August 2012, included part-time, non-legal, temporary, voluntary, school-funded, and solo-practitioner jobs began in desperation. Doc. 74 ¶¶ 26, 28, 37, 38. Florida Coastal also "included graduates who were employed at

any point within nine months of the graduate survey, even if they were not employed as of the reporting date for the survey." Doc. 74 ¶ 37. Prospective students would not have been able to find the percentage of graduates who, within nine months of graduation, obtained and kept full-time, permanent employment for which a J.D. was required or preferred. Doc. 74 ¶ 4.

The salary averages were higher because Florida Coastal "calculated them based on a small, deliberately selected subset of compensated graduates who reported their salary information, and not on a broad, statistically meaningful representation of its graduates." Doc. 74 ¶ 40. It "inflates its graduates' reported mean/median salaries by calculating them based on a small subset of graduates who actually submit their salary information and are high earners." Doc. 74 ¶ 3. It "chose a few graduates in high-paying jobs to respond to its job survey while ignoring all other graduates." Doc. 74 ¶ 40. "This had the effect of ensuring that graduates with salaries in legal jobs were disproportionately overrepresented in its reported salary information, and that underemployed or unemployed graduates were disproportionately underrepresented." Doc. 74 ¶ 40. "Florida Coastal[ ] tabulated, calculated, and tallied the raw data inputted in the job surveys filled out by recent graduates in a shoddy manner, and omitted or ignored critical statistical data that would substantially lower both placement rates and salary information." Doc. 74 ¶ 37.

The plaintiffs enrolled in Florida Coastal to secure full-time, permanent jobs for which a J.D. is required or preferred. Doc. 74 ¶ 59. Taylor Casey graduated in 2010. Doc. 74 ¶ 13. Although in the top 13 percent of his class, he could not secure "full-time, permanent legal employment." Doc. 74 ¶ 13. He therefore started his own firm after obtaining Florida Bar membership. Doc. 74 ¶ 13. He continues to operate the firm. Doc. 74 ¶ 13. Audra Awai graduated in 2008. Doc. 74 ¶ 14. Discouraged by "dim job prospects in the legal sector," she joined the United States Army without taking a bar examination. Doc. 74 ¶ 14. Clifford Klein graduated in 2010. Doc. 74 ¶ 15. He is a member of the Florida Bar and a practicing lawyer. Doc. 74 ¶ 15. Jocelyn Stinson graduated in 2011. Doc. 74 ¶ 16. She moved to Maryland. Doc. 74 ¶ 16. Melissa Shipman could not secure "full-time, permanent employment" following graduation (at an unspecified time from an unspecified place but presumably Florida Coastal). Doc. 74 ¶ 17. She therefore opened her own law firm. Doc. 74 ¶ 17. She is a member of the Tennessee and Florida Bars. Doc. 74 ¶ 17. Amy Kisz graduated in 2010. Doc. 74 ¶ 18. She likewise could not secure "full, permanent employment." Doc. 74 ¶ 18. She therefore "was compelled to accept part-time, temporary positions doing mostly document review." Doc. 74 ¶ 18. She is a member of the North Carolina and Florida Bars and a practicing lawyer. Doc. 74 ¶ 18. Christopher Wickersham graduated in 2009. Doc. 74 ¶ 19. He was "initially unable to obtain any type of gainful legal employment." Doc. 74 ¶ 19. He therefore opened his own firm and operated it for several years. Doc. 74 ¶ 19. He is a member of the Florida Bar and a practicing lawyer. Doc. 74 ¶ 19.

After the plaintiffs enrolled at Florida Coastal, law schools received public criticism for reporting aggregate employment data. Doc. 74 ¶¶ 42–43. The criticism included correspondence from United States Senator Barbara Boxer to the ABA and the United States Department of Education "decrying the systemic lack of transparency in the reporting of employment data by law schools to prospective and current students," and from the *U.S. News* editor-in-chief to law school deans opining " 'the entire law school sector is perceived to be less than candid' when reporting employment data." Doc. 74 ¶ 43. The ABA recently adopted standards requiring law schools to indicate whether jobs are full-time or part-time, permanent or temporary, law-school funded or not, and J.D. required or preferred. Doc. 74 ¶ 44.

 **\*5** Beginning in April 2012, for the class of 2011 graduates, Florida Coastal's website posted that 38.6 percent have full-time, J.D. required positions, 44.3 percent have full-time, J.D. required or preferred positions, and 124 graduates (27.5 percent of the class) reported salary data (including 33 percent of those in private practice, 34 percent of those in "business," 72 percent of those in government, and 17 percent of those in public interest). Doc. 74 ¶¶ 31, 41. The "changes come too late for [the plaintiffs] since they have already taken on tens of thousands of dollars in non-dischargeable debt based on Florida Coastal's ... statements." Doc. 74 ¶ 44.

### III. Claims

In a single count, the plaintiffs claim Florida Coastal's "actions constitute unlawful, unfair, deceptive and fraudulent practices" prohibited by FDUTPA. Doc. 74 ¶ 55. They assert, "As part of its fraudulent marketing practices and recruitment program, Florida Coastal

engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and members of the Class." Doc. 74 ¶ 58. They continue, These false representations and omissions were uniform and identical in nature, and include, without limitation, the following:

 a) Stating false placement rates during the recruitment and retention process, including that approximately 80–95 percent of Florida Coastal graduates secured employment within nine months of graduation;

 b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secured full-time, permanent employment for which a JD degree is required or preferred;

 c) Grossly inflating the reported mean/median salaries earned by recent graduates;

 d) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

 e) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates could obtain gainful employment in their chosen field; and

 f) Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically, that approximately 80–95 percent of Florida Coastal graduates secure gainful employment.

Doc. 74 ¶ 58.

The plaintiffs demand preliminary and permanent injunctive relief (enjoining Florida Coastal from engaging in unfair, unlawful, or fraudulent practices), other equitable relief (requiring Florida Coastal to retain independent persons to audit and verify employment and salary data), certification of a class comprising all persons enrolled in Florida Coastal before August 2012 (with conflict-of-interest exceptions),[8] $100 million in restitution and disgorgement of tuition paid ("which is the difference between the inflated tuition paid by Class members based on the material misrepresentations that

approximately 80–95 percent of graduates are employed within nine months of graduation and the true value of a Florida Coastal degree"), unspecified damages, punitive damages, an accounting of profits, attorney's fees and costs, pre-judgment interest, and any other relief the Court deems warranted. Doc. 74 at 6, 23–24.

[8]      In the first line of the amended complaint, the plaintiffs state they are acting for themselves "and for all persons who currently attend or graduated from [Florida Coastal] during the relevant time period." Doc. 74 at 1. They clarify the class they seek to represent in the later class-action allegations. Doc. 74 ¶¶ 6, 45.

## IV. FDUTPA

**\*6**  FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). FDUTPA's provisions "shall be construed liberally" to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). Furthermore, in construing "[u]nfair methods of competition, unconscionable acts or practices, and deceptive or unfair acts or practices in the conduct of any trade or commerce," courts should give "due consideration and great weight" to interpretations by the Federal Trade Commission and federal courts construing section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Fla. Stat. § 501.204(2).

An act or practice is deceptive if it "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *State v. Beach Blvd. Automotive, Inc.,* 139 So.3d 380, 387 (Fla. 1st DCA 2014). That standard requires a showing of "probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Grp., Inc.,* 480 F.3d 1281, 1284 (11th Cir.2007) (internal quotation marks omitted). An act or practice is "unfair" if it causes consumer injury that is (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition, and (3) one that consumers themselves could not have reasonably avoided. *Porsche Cars N. Amer., Inc. v. Diamond,* 140 So.3d 1090, 1096 (Fla. 3d DCA 2014).[9] An injury is reasonably avoidable if

consumers "have reason to anticipate the impending harm and the means to avoid it." *Orkin Exterm. Co., Inc. v. FTC,* 849 F.2d 1354, 1365–66 (11th Cir.1988).

9

Although courts applying FDUTPA have long defined an "unfair" act or practice as one that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," *see, e.g., PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla.2003) (quoted), that definition is outdated, *Porsche,* 140 So.3d at 1096. Regardless, my recommended conclusion does not depend on which definition is used.

Alleged acts or practices deemed sufficiently deceptive or unfair include installing GPS tracking devices on cars without consent and leading car buyers to believe they would get their deposits back if they did not buy the cars, *Beach Blvd. Auto.,* 139 So.3d at 390; refusing to return a deposit despite a promise to do so, *Wright v. Emory,* 41 So.3d 290, 292–93 (Fla. 4th DCA 2010); identifying a home in a reservation form but later offering a home on an inferior lot at a higher price, *Fendrick v. RBF, L.L.C.,* 842 So.2d 1076, 1079 (Fla. 4th DCA 2003); intentionally concealing from a car buyer he was entering into a lease agreement rather than a sales agreement, *Cummings v. Warren Henry Motors, Inc.,* 648 So.2d 1230, 1232 (Fla.Dist.Ct.App.1995); and deliberately misleading a distributor into making sales and then using the sales as a pretext for terminating the distributor's contact, *Day v. Le–Jo Enter., Inc.* 521 So.2d 175, 178 (Fla. 3d DCA 1988).

Whether an alleged act or practice is deceptive or unfair may be decided as a matter of law. *See, e.g.P.C. Cellular, Inc. v. Sprint Solutions, Inc.,* No. 5:14–cv–237–RS–GRJ, 2015 WL 128070, at *5 (N.D.Fla. Jan. 8, 2015) (unpublished); *Zambrano v. Indian Creek Holding, LLC,* No. 09–20453–CIV, 2009 WL 2365842, at *1 (S.D.Fla. July 30, 2009) (unpublished); *Brett v. Toyota Motor Sales, U.S.A., Inc.,* No. 6:08–cv–1168–Orl–28GJK, 2008 WL 4329876, at *7 (M.D.Fla. Sept. 15, 2008) (unpublished); *but see Herrera v. JFK Med. Ctr. Ltd. P' ship.,* No. 8:14–cv–2327–T–30TBM, 2015 WL 730039, at *3 (M.D.Fla. Feb. 20, 2015) (to be published) (expressing "serious doubts" whether alleged practice "rises to the level of unfairness and deception as contemplated" by FDUTPA but allowing plaintiffs to proceed, along with other claims, with statement that court would "revisit this issue at summary judgment").

*7 Exempted from FDUTPA liability is any "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). The safe harbor does not exist merely because state or federal law does not prohibit an act or practice. *Dep't of Legal Affairs v. Father & Son Moving & Storage, Inc.,* 643 So.2d 22, 24 (Fla. 4th DCA 1994). A defendant must establish the safe harbor's applicability. *Marty v. Anheuser–Busch Cos., LLC,* 43 F.Supp.3d 1333, 1344 (S.D.Fla.2014). Whether the safe harbor applies may be decided as a matter of law. *See, e.g., Prohias v. AstraZeneca Pharms., L.P.,* 958 So.2d 1054, 1056 (Fla. 3d DCA 2007); *Prohias v. Pfizer, Inc.,* 490 F.Supp.2d 1228, 1234 (S.D.Fla.2007).

To augment public enforcement, [10] FDUTPA creates a private cause of action for "anyone aggrieved by a violation" to "obtain a declaratory judgment that an act or practice violates [FDUTPA] and to enjoin a person who has violated, is violating, or is otherwise likely to violate [FDUTPA]." Fla. Stat. § 501.211(1). A claim for declaratory and injunctive relief has two elements: (1) the defendant engaged in a deceptive or unfair act or practice; and (2) the plaintiff is "aggrieved" by the act or practice. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.,* No. 4D13–3916, 2015 WL 3480114, at *2 (Fla. 4th DCA June 3, 2015) (to be published). "The statute is clear on its face. It merely requires an allegation that the consumer is in a position to complain (that he or she is aggrieved by the alleged violation) and that the violation has occurred, is now occurring, or is likely to occur in the future." *Davis v. Powertel, Inc.,* 776 So.2d 971, 975 (Fla. 1st DCA 2000).

10

To publicly enforce FDUTPA, Florida's Office of the State Attorney or Department of Legal Affairs may seek injunctive relief, actual damages, and cease-and-desist orders on behalf of consumers. *S.D.S. Autos, Inc. v. Chrzanowski,* 976 So.2d 600, 609 (Fla. 1st DCA 2007).

"In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may [also] recover actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(2). Actual damages are " 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.' " *Rodriguez v. Recovery Performance & Marine, LLC,* 38

So.3d 178, 180 (Fla. 3d DCA 2010). Actual damages do not include nominal damages, speculative losses, or compensation for feelings of disappointment. *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006). A claim for damages has three elements: (1) a deceptive or unfair act or practice, (2) causation, and (3) actual damages. *Id.* Reliance by the plaintiff is not an element because the question "is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Davis,* 776 So.2d at 974.

An aggrieved person may obtain declaratory and injunctive relief even if he cannot obtain actual damages. *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.,* 123 So.3d 1149, 1152 (Fla. 5th DCA 2012). FDUTPA "is broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit.... [It] is designed to protect not only the rights of litigants, but also the rights of the consuming public at large." *Davis,* 776 So.2d at 975.

**\*8** A FDUTPA claim is subject to a four-year statute of limitations. *Brown v. Nationscredit Fin. Servs. Corp.,* 32 So.3d 661, 662 n.1 (Fla. 1st DCA 2010). A claim generally accrues for statute-of-limitations purposes when the last element occurs. Fla. Stat. § 95.031. A FDUTPA claim usually accrues on the purchase date, but not always. *Compare Plank Solutions v. Toyobo Am., Inc.,* No. 09–61166–CIV, 2011 WL 2214357, at \*2 (S.D. Fla. June 7, 2011) (unpublished) (purchase date) *with Saavedra v. Albin Mfg. Corp.,* No. 8:11–cv–1893–T–33TBM, 2012 WL 254122, at \*3–4 (M.D.Fla. Jan. 27, 2012) (unpublished) (not necessarily purchase date).

## V. Standards

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief may be granted." In a case filed as a class action, a court may rule on a Rule 12(b)(6) motion to dismiss before deciding class certification. *Tapken v. Brown,* No. 90–691–CIV–MARCUS, 1992 WL 178984, at \*12 (S.D.Fla., Mar. 13, 1992) (unpublished).

To decide a Rule 12(b)(6) motion to dismiss, a court may consider only the factual allegations in the complaint, anything attached to the complaint, anything extrinsic to the complaint that is central to the claim and without challenge to its authenticity, and any judicially noticeable facts.[11] *United States ex rel. Osheroff v. Humana Inc.,* 776 F.3d 805, 811 (11th Cir.2015). The court must accept as true factual allegations and construe them in the light most favorable to the non-movant. *Fuller v. SunTrust Banks, Inc.,* 744 F.3d 685, 687 n.1 (11th Cir.2014). The court need not accept as true internally inconsistent factual allegations or unwarranted deductions. *Response Oncology, Inc. v. Metrahealth Ins. Co.,* 978 F.Supp. 1052, 1058 (S.D.Fla.1997).

[11]     Under that standard, the Court may consider the data posting attached to the original complaint, Doc. 1–1 at 56–58, and the motion to dismiss, Doc. 76–1 at 4–6, because it is central to the claim and without challenge to its authenticity, though doing so is unnecessary because the allegations in the amended complaint summarize the data posting.

Federal Rule of Civil Procedure 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). While allegations need not satisfy any "technical form," Rule 8 requires them to be "simple, concise, and direct." Fed.R.Civ.P. 8(e)(1). Rule 8 does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). If allegations are just "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," the claim will not survive a Rule 12(b)(6) motion to dismiss. *Twombly,* 550 U.S. at 555. To survive, the allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 570). A claim is facially plausible if the factual allegations permit the court to reasonably infer that the alleged misconduct was unlawful. *Id.* Factual allegations that are "'merely consistent with' a defendant's liability," however, are not facially plausible. *Id.* (*quoting Twombly,* 550 U.S. at 557).

**\*9** If fraud is alleged, Rule 8 is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). *Urquila–Diaz v. Kaplan Univ.,* 780 F.3d 1039, 1051 (11th Cir.2015). In recognition that a fraud allegation can be easily fabricated, *Bennett v. MIS Corp.,* 607 F.3d 1076, 1101 (6th Cir.2010), and carries "potential

stigmatic injury," *Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 949 (7th Cir.2013),* including great harm to a business's reputation, *Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir.2007),* Rule 9(b) requires a plaintiff "alleging fraud," to "state with particularity the circumstances constituting fraud," Fed.R.Civ.P. 9(b), forcing "the plaintiff to do more than the usual investigation" before alleging fraud. *Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir.2014).*

Rule 9(b) serves many purposes. It ensures a fraud allegation is "responsible and supported, rather than defamatory and extortionate." *Borsellino, 477 F.3d at 507.* It discourages a "sue first, ask questions later" approach. *Cincinnati Life, 722 F.3d at 949.* It alerts the defendant to "the precise misconduct with which [it is] charged." *United States ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir.2012).* And it narrows potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C., 655 F.3d 461, 466 (6th Cir.2011).*

"While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; [12] (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir.2011).* Allegations generally must be made on more than mere information and belief, though that requirement may be relaxed if the information is only within the defendant's knowledge or control and the plaintiff sufficiently states the reasons for the belief. *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 & n.25 (11th Cir.2002); Hill v. Morehouse Med. Assocs., Inc., No. 02–14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003)* (unpublished); *see, e.g., United States ex rel. Walker v. R & F Properties of Lake Cnty., Inc., 433 F.3d 1349, 1360 (11th Cir.2005)* (Rule 9(b)) satisfied by nurse's belief that employer submitted false claims based on personal discussions with office administrator; distinguishable from cases involving outsider making speculative allegations that fraudulent claims must have been made or plaintiff failing to explain

basis for belief). Failure to satisfy Rule 9(b) is a ground for dismissal. *FindWhat, 658 F.3d at 1296.*

12       If a corporation may be liable, specifying those within the corporation who allegedly perpetrated fraud is pertinent to the particularity requirement but not mandatory. *United States ex rel. Health v. AT & T, Inc.,* No. 14–7094, 2015 WL 3852180, at *11 (D.C.Cir. June 23, 2015)* (to be published); *United States ex rel. Bledsoe v. Cnty. Health Sys., Inc., 501 F.3d 493, 506 (6th Cir.2007).*

For its arguments, Florida Coastal applies Rule 9(b)'s heightened pleading standard. Doc. 76 at 9–10. The plaintiffs respond the standard does not apply in FDUTPA cases but they satisfied it regardless. Doc. 83 at 8.

**\*10** The Eleventh Circuit has not discussed Rule 9(b) in a case raising a FDUTPA claim. It has held that Rule 9(b) extends beyond common-law fraud allegations to statutory fraud allegations. *Urquilla–Diaz, 780 F.3d at 1052* (False Claims Act, 31 U.S.C. §§ 3729–33); *Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1292 (11th Cir.2010)* (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, if based on racketeering pattern consisting entirely of predicate acts of fraud); *Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir.2001)* (§ 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)). It has also held that Rule 9(b) extends to fraud allegations even when the elements of the claim asserted do not perfectly overlap with the elements of common-law fraud. *Clausen, 290 F.3d at 1309.* And recently, it held that Rule 9(b) extends to allegations of negligent misrepresentation under Florida law because that tort "sounds" in fraud. *Lamm v. State St. Bank & Trust, 749 F.3d 938, 950 (11th Cir.2014).*

Addressing Rule 9(b) in a case raising a claim under another state consumer-protection law, the Seventh Circuit held Rule 9(b) does not apply to allegations of an unfair act or practice, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc., 536 F.3d 663, 670 (7th Cir.2008),* but applies to allegations of a fraudulent act or practice, *Camasta, 761 F.3d at 736–37.* The Seventh Circuit reasoned that because Rule 9(b) applies to allegations of fraud–not claims of fraud– it applies if a claim "sounds" in fraud; "in other words, if it is premised on a course of fraudulent conduct."

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v.* Walgreen Co., 631 F.3d 436, 446–47 (7th Cir.2011).

The Ninth Circuit takes that approach, *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124–25 (9th Cir.2009), this Court has recently recognized that approach as the "emerging trend" among federal courts in cases raising FDUTPA claims, *Total Containment Solutions, Inc. v. Glacier Energy Servs., Inc.,* No. 2:15–cv–63–FtM–38CM, 2015 WL 3562622, at *2 (M.D. Fla. June 5, 2015) (unpublished), and that approach accords with the language of Rule 9(b) (its use of "alleging" rather than "claiming"), the purposes of Rule 9(b) (including to protect against unsubstantiated fraud allegations), and the Eleventh Circuit's recent holding that Rule 9(b) applies to allegations sounding in fraud (*see Lamm,* 749 F.3d at 950). That a FDUTPA claim does not require reliance does not matter because perfect overlap with common-law fraud is not dispositive. *See Clausen,* 290 F.3d at 1309 (quoted).

I recommend that approach as well reasoned here. Under that approach, whether Rule 9(b)'s heightened pleading standard applies depends not on the mere fact that the plaintiffs raise FDUTPA claims but on whether the plaintiff's allegations sound in fraud. *See Lamm,* 749 F.3d at 950. Fraud "is not limited to misrepresentations and misleading omissions"; it is "a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain advantage over another by false suggestions or by the suppression of truth." *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir.2000).

With the peppering of fraud allegations throughout the amended complaint, the plaintiff's FDUTPA claims sound in fraud. *See* Doc. 74 ¶ 55 (Florida Coastal's "actions constitute unlawful, unfair, deceptive **and fraudulent** practices"); Doc. 74 ¶ 58 ("As part of its **fraudulent** marketing practices and recruitment program, Florida Coastal engaged in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and **fraudulently** induce reliance by Plaintiffs and members of the Class"); Doc. 74 ¶ 23 (seeking an injunction enjoining Florida Coastal from engaging in unfair, unlawful, **or fraudulent** practices). *See Borsellino,* 477 F.3d at 507 ("[T]he ... opening brief is riddled with references to fraud, showing that this theory

pervades the entire case."). Because the FDUTPA claims sound in fraud, Rule 9(b) applies.

**VI. Motion and Response**

**\*11** For its safe-harbor argument, Florida Coastal observes the ABA is a "quasi-governmental agency" because, for student-assistance programs, the United States Department of Education has appointed the ABA as the national agency for law-school accreditation. Doc. 76 at 11–15. Florida Coastal contends by publishing aggregate figures, it and other law schools satisfied the ABA standard requiring reporting of consumer information, and the plaintiffs' only allegation that Florida Coastal failed to comply with the ABA standard is insufficiently specific to satisfy Rule 9(b)'s heightened pleading standard. Doc. 76 at 11–15. The plaintiffs respond that any safe-harbor defense should not be decided on a motion to dismiss, Florida Coastal has "conveniently ignored" the numerous allegations it failed to comply with the ABA standard, the safe harbor does not apply merely because no law expressly prohibit an act or practice, and Florida Coastal has not shown how any state or federal law required or specifically permitted its acts. Doc. 83 at 4–7.

For its argument that the plaintiffs insufficiently allege a deceptive or unfair act or practice, Florida Coastal observes, for employment data, that the plaintiffs do not allege Florida Coastal ever claimed its figures represented only full-time, J.D. required or preferred positions and contends they do not allege facts specifying when, where, and how the figures were published. Doc. 76 at 15–16. It contends that, for salary data, the plaintiffs concede it disclosed the percentage of responding graduates for the 2009, 2010, and 2011 classes and otherwise allege only facts that should not be considered because they are based only on information and belief. Doc. 76 at 16–17. The plaintiffs respond their allegations sufficiently allege and amply apprise Florida Coastal of its deceptive and unfair acts, pointing to the following particular allegations:

a) Stating false placement rates during the recruitment and retention process, including that approximately 80–95 percent of Florida Coastal graduates secured employment within nine months of graduation;

b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secured full-time,

permanent employment for which a JD degree is required or preferred;

c) Grossly inflating the reported mean/median salaries earned by recent graduates;

d) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News* ;

e) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates could obtain gainful employment in their chosen field; and

f) Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically, that approximately 80–95 percent of Florida Coastal graduates secure gainful employment.

Doc. 83 at 7–9 (quoting Doc. 74 ¶ 59).

For its argument that the plaintiffs insufficiently allege causation, Florida Coastal observes they allege no knowledge about its employment or salary data when they enrolled or stayed enrolled or how they would have proceeded differently. Doc. 76 at 17–18. It contends their allegations that the data was "material" to their decision to enroll and "proximately caused" them to pay inflated tuition are legal conclusions entitled to no consideration. Doc. 76 at 18. The plaintiffs respond they only need to sufficiently allege Florida Coastal's acts were "*a* cause," not "*the* cause," and they have done so with the allegation that they "enrolled at Florida Coastal for the purpose of securing upon graduation full-time, permanent employment for which a JD degree is required or preferred. [Florida Coastal's] acts, practices and omissions, therefore, were material to Plaintiffs' decision to enroll and attend Florida Coastal, and further proximately caused Plaintiffs ... to pay inflated tuition." Doc. 83 at 9–10 (quoting Doc. 74 ¶ 59). The plaintiffs contend Florida Coastal improperly conflates causation with actual reliance, which is not required to state a FDUTPA claim.

**\*12**  For its argument that the plaintiffs insufficiently allege they suffered actual damages, Florida Coastal contends the only inference that can be drawn from the plaintiffs' allegations about their livelihoods is that it

"provided [them] with a thorough legal education that prepared them to practice law–if they wished to do so." Doc. 76 at 20. Florida Coastal contends they cannot proceed under a "price premium" approach (assessing actual damages based on a deceptive or unfair act or practice that allowed a vendor to charge a premium it would not have charged absent the deceptive or unfair act or practice) because any benchmark price against which to calculate the premium would be speculative (what the price of a Florida Coastal education would have been absent the published employment and salary data). Doc. 76 at 21–22. Florida Coastal observes the plaintiffs' allegations undercut their theory that its data caused students to pay inflated tuition because employment numbers allegedly fell while tuition numbers rose. Doc. 76 at 22. They respond the damages they seek–"a refund of the portion of their tuition inflated by [Florida Coastal's] misstatements (compared to a law school that did not make such misstatements) as well as other damages such as fees paid to [Florida Coastal], books, travel expenses and other pecuniary loss incidental to their purchase of a [Florida Coastal] degree"– are not speculative because they have been incurred and the Court is equipped to value degrees. Doc. 83 at 12–13. They emphasize a complaint need not plead a method for calculating damages. Doc. 83 at 14.

For its argument the statute of limitations bars most of the claims, Florida Coastal contends the amended complaint may add a "completely new group" of students (students who never graduated from Florida Coastal) and argues the amended complaint may not relate back to them. Doc. 76 at 23; *compare* Doc. 1–1 ¶ 85 (original complaint filed in February 2012 on behalf of all persons "who are either presently enrolled or graduated from Florida Coastal ... within the statutory period") *with* Doc. 74 ¶ 45 (amended complaint filed in November 2014 on behalf of all persons enrolled in Florida Coastal before August 2012). Florida Coastal contends for any of those new plaintiffs or proposed class members who enrolled before November 2010 (4 years before the amended complaint), the statute of limitations has run. Doc. 76 at 24–25. The plaintiffs respond claims between February 2008 and 2012 are within the statute of limitations, they attended Florida Coastal between 2008 and 2012, and the accrual dates, even assuming they are enrollment dates, are factual matters that should not be decided on a motion to dismiss.

**VII. Analysis**

Florida Coastal borrows its arguments from cases in which law schools succeeded at the dismissal stage. Those cases, and the cases in which law schools did not succeed then, have limited persuasive value as to most of the arguments because they did not involve the same factual allegations or state consumer-protection laws. In-depth analysis is unwarranted on all but one of Florida Coastal's arguments.

The safe-harbor provision does not apply because Florida Coastal has not shown any "federal or state law" that "required or specifically permitted" its alleged acts. *See* Fla. Stat. § 501.212(1) (quoted). The ABA is a private entity, its standards are not law, and its standards did not require or specifically permit Florida Coastal– at a minimum–to collect and publish salary data in the manner it allegedly did. [13] Any failure to sufficiently allege causation or damages is not a basis for the action Florida Coastal requests–dismissal of the amended complaint "in its entirety, and with prejudice," Doc. 76 at 1, 25. Although whether Florida Coastal's alleged acts caused the plaintiffs actual damages is debatable, neither causation nor actual damages must be alleged for other relief they request: enjoining Florida Coastal from engaging in unfair, unlawful, or fraudulent practices, Doc. 74 at 23–24. *See* Caribbean Cruise, 2015 WL 3480114, at *2; Wyndham, 123 So.3d at 1152. [14] Florida Coastal has not contended they have insufficiently alleged the "aggrieved" element for injunctive relief as a basis for the all-encompassing action it requests. *See generally* Doc. 76. Likewise any possible running of the statute of limitations as to some plaintiffs; Florida Coastal concedes the defense does not apply to all plaintiffs and all claims, *see* Doc. 76 at 23 ("The relevant statute of limitations bars most of the named plaintiffs' claims"), and assuming enrollment dates are accrual dates, no allegation or document the Court may consider at this stage includes those. That defense is best left for certification [15] or summary-judgment proceedings. [16]

[13] To participate in student assistance programs, a school must follow criteria, including providing prospective students "the placement in employment of, and types of employment obtained by, graduates of the institution's or certificate programs, gathered from such sources as alumni surveys, student satisfaction surveys, ... or other relevant sources." 20 U.S.C. § 1092(a)(1)(R). If a school "advertises job placement rates as a means of

attracting students," the school must provide "the most recent available data concerning employment statistics ... and any other information necessary to substantiate the truthfulness of the advertisements," 20 U.S.C. § 1094(a)(8), including information about "the placement of, and types of employment obtained by, graduates of the institution's or degree or certificate programs," 34 C.F.R. § 668.41(d)(5).

The Secretary of the Department of Education recognizes national accrediting agencies that develop standards and determine if the standards are met, including, for law schools, the ABA. 20 U.S.C. §§ 1099b, 1221e–3. Federal agencies "do not accredit schools; instead they accredit accrediting agencies, which apply standards of their own devising but satisfactory to the national government." *Chicago Sch. of Automatic Trans., Inc. v. Accreditation Alliance of Career Schs. & Colleges,* 44 F.3d 447, 448 (7th Cir.1994). Although accrediting agencies serve an "important quasi-public role ... they are also private entities." *Prof'l Massage Training Ctr., Inc. v. Accreditation Alliance of Career Schs. & Colleges,* 781 F.3d 161, 171 (4th Cir.2015). The Secretary may not establish criteria that would interfere with an accrediting agency's standards for assessing an institution's success with respect to student achievement, including job placement rates. 20 U.S.C. § 1099b(a)(5)(A) & (c).

The Administrative Procedure Act, 5 U.S.C. §§ 551–559, applies to federal agencies but not accrediting agencies, though courts have applied administrative law principles in evaluating their decisions. *Prof'l Massage,* 781 F.3d at 170. Rules that go through the notice-and-comment process have "the force and effect of law"; interpretative rules that do not "are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n,* 135 S.Ct. 1199, 1203–04 (2015).

Florida Coastal asserts, "Other courts considering consumer fraud claims against law schools have found that the ABA's regulations fall under similar statutory safe harbors." Doc. 76 at 12 n.5. The only case Florida Coastal cites– *Phillips v. DePaul Univ.,* No. 12CH3523, 2012 WL 40000001 (Ill.Cir.Ct. Sept. 11, 2012) (unpublished)–is inapposite because it analyzed the very different safe-harbor provision of the Illinois Consumer Fraud Act. *Compare* Fla. Stat. § 501.212(1) (exempting from FDUTPA liability any "act or practice required or specifically permitted by federal or state law"), *with* 805 ILCS 505/10b(1) (exempting from Illinois Consumer Fraud Act liability for conduct "specifically

authorized by any regulatory body or office acting under statutory authority of this State or the United States"). If anything, that case hurts Florida Coastal's argument; had the Florida legislature wanted a broader safe-harbor provision, it could have used that language. *See Gomez–Jimenez,* 943 N.Y.S.2d at 842 ("If the state legislature had intended to include associations as interpreting bodies it could easily have done so, and did not").

14    The plaintiffs do not assert neither causation nor damages must be alleged for the injunctive relief they request, instead just confronting head-on Florida Coastal's arguments concerning the elements for the actual damages they request. They nevertheless have not affirmatively indicated any intent to abandon the injunctive relief they request.

15    "Courts commonly certify classes with start dates that are linked to the statute of limitations periods." *In re Checking Account Overdraft Litig.,* 286 F.R.D. 645, 650 n.3 (S.D.Fla.2012). When an action occurred for purposes of determining the accrual date is a question of fact. *Morton′s Market, Inc. v. Gustafson′s Dairy, Inc.,* 198 F.3d 823, 828 (11th Cir.1999).

16    A statute-of-limitations bar is an affirmative defense, Fed.R.Civ.P. 8(c), and "plaintiffs are not required to negate an affirmative defense in their complaint," *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir.2004) (alterations omitted). A Rule 12(b)(6) dismissal on statute-of-limitations grounds is inappropriate unless it is "apparent from the face of the complaint that the claim is time-barred." *Id.* (internal quotation marks omitted).

**\*13** That leaves the Court with Florida Coastal's strongest argument for dismissal of the entire case with prejudice: the plaintiffs do not allege a plausible deceptive or unfair act or practice actionable under FDUTPA; in other words, an act or practice that "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment," *Beach,* 139 So.3d at 387, or an act or practice that causes substantial consumer injury that the consumers could not have reasonably avoided (and no outweighing countervailing interests), *Porsche,* 140 So.3d at 1096.

Two recent cases against other law schools provide contrasting ways of viewing the argument: *Gomez–Jimenez,* 943 N.Y.S.2d 834, and *Harnish,* 931 F.Supp.2d 641. In *Gomez–Jimenez,* the court held that similar factual allegations stated no claim under state law prohibiting an

act or practice that is deceptive or misleading in a material way to a reasonable consumer. 943 N.Y.S.2d at 843–47. The court deemed college graduates considering law school "a sophisticated subset of education consumers, capable of sifting through data and weighing alternatives before making a decision regarding their post-college options." *Id.* at 843. The court found they had "any number of sources of information to review when making their decisions," including NALP reports and studies (which the plaintiffs here and there referenced in the complaint) and *U.S. News* publications (of which the court took judicial notice) indicating modest employment rates. *Id.* at 843–44. Regarding salary data alleged to be misleading because it was based on a " 'deliberately selected' small sample of graduates," the court observed "the relatively small percentage of students was disclosed whenever the salary data included the average salary statistic," the law school cautioned the highest reported salary was atypical for most graduates, and there was no statement that the salaries represented the salaries earned by all graduates. *Id.* at 845. The court emphasized, "In researching law school options, it also should have come as no surprise to these law school consumers that the most lucrative law jobs often are associated with having attended a high ranking school.... [A] reasonable consumer who is seriously considering [the law school] is more likely to appreciate the nexus between high law school rankings and commensurate employment and earning expectations." *Id.* "It is difficult for the court to conceive," it continued, "that somehow lost on these plaintiffs is the fact that a goodly number of law school graduates toil (perhaps part time) in drudgery or have less than hugely successful careers. [The] applicants, as reasonable consumers of a legal education, would have to be wearing blinders not to be aware of these well-established facts of life in the world of legal employment." *Id.* Noting the law school's website published that the course of study for a J.D. prepares students to practice law but is also ideal for other professions, the court opined that the plaintiffs had "selectively relied only on the relatively incomplete statistics ... and mischaracterized them in their entirety as a deceptive enticement that makes it appear all jobs reported are full-time law jobs for which a law degree is required or preferred." *Id.* at 846. The court concluded that, "[g]iven the impact of the 2008 Great Recession on the legal job market as described in the plaintiffs' complaint, ... [the] statements could not have been materially misleading to a reasonable consumer acting reasonably under the circumstances,

i.e. taking into account the obvious, dramatic changes in the economy as they began to impact the legal profession." *Id.; accord MacDonald v. Thomas M. Cooley Law Sch.,* 880 F.Supp.2d 785, 794 (W.D.Mich.2012) ("[B]asic deductive reasoning ... informs a reasonable person that the employment statistic includes all employed graduates, not just those who obtained or started full-time legal positions."), *aff'd on other gds.* 724 F.3d 654.

**\*14**  In *Harnish,* the court held that similar factual allegations stated a claim under state law prohibiting an affirmative act or practice that is misleading and outside the norm of reasonable business practice in that it will victimize the average consumer or an omission that knowingly conceals a material fact with the intent that the plaintiff will rely on the concealment. 931 F.Supp.2d at 648–52. Observing the law school placed the data above, "Full Time Legal Employers," the court rhetorically asked, "Why should a reasonable student looking to go to law school consider that data to include non law-related and part-time employment? Should that student think going to [the law school] would open employment as a public school teacher, full or part-time, or an administrative assistant, or a sales clerk, or a medical assistant?" *Id.* at 649–50. The court added the study of law is the learning of a profession, the law school sought to persuade a prospective law student to attend to receive a J.D., and the information was disseminated to third-party evaluators to establish the law school's standing among law schools. *Id.* at 650. "Within this context," the court concluded, "it is not implausible that a prospective law student making the choice of whether or which law school to attend, would believe that the employment rate referred to law related employment." *Id.* The court disagreed that basic deductive reasoning would inform a reasonable person that the statistics included all types of jobs. *Id.* Emphasizing the law is intended to promote the disclosure of relevant information to enable the consumer to make intelligent decisions, the court concluded, "an employment rate upwards of 90 percent plausibly gave false assurance to prospective students regarding their legal employment opportunities upon investment in and attainment of [the law school's] degree. While the thread of plausibility may be slight, it is still a thread." *Id.* at 651.

Here, setting aside the allegations are made only on information and belief (for the moment) and omitting legal conclusions, internal inconsistencies, and unwarranted inferences, the well-pleaded factual allegations can be summarized as follows. Florida Coastal published on its website and through outside sources employment and salary data obtained from responses to surveys sent to all recent graduates. Doc. 74 ¶ 28. Its website touted a career staff that would both guide a student along his "own unique career path" and facilitate his transition from law school to legal practice. Doc. 74 ¶ 27. For the 2004 to 2009 classes, it published rates of employment within nine months of graduation of 88 percent and higher. Doc. 74 ¶ 28, 29. For the class of 2010, it published a rate of employment within nine months of graduation of 80 percent, breaking down that percentage by private practice, business, government, public interest, judicial clerkships, academia, seeking employment, unemployed and not seeking employment, and unknown. Doc. 74 ¶¶ 5, 30. It added that 82 percent of those employed had jobs for which a J.D. was required or preferred. Doc. 74 ¶ 30. Like most or all law schools before August 2012, it included in the data part-time, non-legal, temporary, voluntary, school-funded, and solo-practitioner jobs without saying so. Doc. 74 ¶¶ 26, 28, 37, 38. The percentages would have been much lower if it had not included those jobs. Doc. 74 ¶¶ 31, 41. It also included anyone employed at any point in the nine months even if no longer employed as of the reporting date. Doc. 74 ¶ 37. For the class of 2010, it published the average starting salary as $48,615, with 29 percent of employed graduates sharing their salary, and the average salary for all graduates in private practice as $51,981. Doc. 74 ¶¶ 30, 41. It did not disclose the percentages of graduates for each job category who reported salaries. Doc. 74 ¶ 41. It calculated the average salary based only on those who submitted their salaries, which, from the numbers, appeared to be mostly the private practitioners.[17] Doc. 74 ¶ 3.

[17]  The plaintiffs allege the more troubling fact that Florida Coastal "chose a few graduates in high-paying jobs to respond to its job survey while ignoring all other graduates." Doc. 74 ¶ 40. The Court should not consider that allegation because it conflicts with the allegations that Florida Coastal obtained the employment and salary data it publicizes from surveys it sends to all recent graduates, Doc. 74 ¶ 28, and "calculated the [percentages] based on a small, deliberately selected subset of compensated graduates who reported their salary information," Doc. 74 ¶ 40; *see also* Doc. 74 ¶ 3. *See Response,* 978 F.Supp. at 1058 (court deciding motion to dismiss need not accept as true internally inconsistent factual allegations or

unwarranted deductions). The Court also should not consider the allegations, "Upon information and belief, for all ... employment reports published before July 2011, Florida Coastal failed to disclose the overall percentage of graduates who reported salary information," Doc. 74 ¶ 41, and "few Florida Coastal graduates earned anything near the reported mean/ median salaries," Doc. 74 ¶ 36, because they lack specifics that would make them meaningful, including the average salaries provided before July 2011.

**\*15** All of those allegations are based on information and belief, with counsel explaining the bases for that information and belief ("including but not limited to reviews of advertising and marketing material, various publicly available information and interviews of former students," Doc. 74 at 1). Because Rule 9(b) applies and the plaintiffs have not shown the information is only within Florida Coastal's knowledge and control, the Court should not consider those allegations. *See Clausen,* 290 F.3d at 1311 & 1314 n.25. Regardless, they fail to state a plausible deceptive or unfair act or practice as a matter of law.

In recommending that conclusion, I am persuaded by *Gomez–Jimenez.* FDUTPA does not require companies to be wholly transparent or prohibit them from publishing facts in the light most conducive to business, as long as the publication is not probably deceptive and likely to cause injury to a reasonably relying consumer, *Zlotnick,* 480 F.3d at 1284, or resulting in substantial injury to consumers that they could not reasonably avoid and not outweighed by countervailing policies, *Porsche,* 140 So.3d at 1096. A person considering law school, while not necessarily sophisticated, is college-educated and may be reasonably expected to perform some due diligence that goes beyond glancing at a for-profit enterprise's self-serving numbers before plunging into substantial debt. *See* Doc. 74 ¶ 25 (allegation that almost all Florida Coastal students take out loans and graduate with significant debt, recently averaging $120,000 to $150,000). As the court in *Gomez–Jimenez* observed, it was and remains common knowledge that law-school rankings correlate with legal-job prospects, law graduates do not necessarily work as lawyers, and the downturn in the economy meant fewer jobs no matter the kind. Beyond that common knowledge, there were, as that court further observed, numerous sources of information available to prospective law students indicating modest employment rates. *Id.* at 843–44. The plaintiffs do not allege that Florida Coastal ever affirmatively and wrongfully stated that

the employment rate was based on a limited subset of lucrative jobs. *See generally* Doc. 74. For a prospective student to have read the data Florida Coastal published to include only full-time, permanent, non-solo-practitioner, non-school-created, amply paid jobs for which a J.D. is required or preferred would have been for that student to believe there was an almost unlimited supply of those jobs for nearly all graduates of a law school "placing in the bottom 5 percent of accredited law schools based on grade point averages and LSAT scores," Doc. 74 ¶¶ 21–22, including during times of economic instability. That would have been unreasonable, and that would have been reasonably avoidable.

Unlike in *Harnish,* there is no allegation that Florida Coastal published the data alongside, "Full Time Legal Employers," or another misleading heading. And unlike in *Harnish,* the question under FDUTPA is not whether the employment and salary data "plausibly gave false assurance to prospective students," *Harnish,* 931 F.Supp.2d 641 (quoted), but whether the plaintiffs have stated a plausible claim that publishing the employment and salary data in the manner alleged would result in probable deception to a reasonably relying consumer, *Zlotnick,* 480 F.3d at 1284, or substantial injury that could not have been reasonably avoided, *Porsche,* 140 So.3d at 1096. Although the website touted staffers who would facilitate a student's transition from law school to legal practice, Doc. 74 ¶ 27, suggesting the employment and salary data included only law-related jobs, it also touted staffers who would help guide a student along his "own unique career path," Doc. 74 ¶ 27, suggesting the employment and salary data included a variety of things a student could do with his J.D. Although the employment data encompassing all jobs was above the salary data indicating an average salary higher than what a part-time, temporary, or non-legal jobs would pay, the website provided information about a variety of jobs and specified the salary data was based on responses supplied by only 29 percent of the employed graduates. Doc. 74 ¶ 30; *see also* Doc. 1–1 at 56–58. A reasonable consumer would not draw from that small sampling that it reflected the average salary of all employed graduates or that nearly all employed graduates were in working in a full-time, permanent job for which a J.D. was required or preferred. *See Bevelacqua,* 39 Misc.3d 1216(A) at \*9 ("Reasonable college graduates would quickly conclude [from disclosure that salary information was from only 40 percent of graduates] that the reported information

was not a statistically meaningful measure of the salary experience of all graduates for that year.").

 **\*16**  In short, Florida Coastal raises one argument that warrants the action requested: the plaintiffs fail to allege facts that state a plausible deceptive or unfair act or practice under FDUTPA, and therefore fail to state a FDUTPA claim upon which relief may be granted. That failure warrants dismissal of the case with prejudice.

## VIII. Recommendation

I recommend **granting** the motion to dismiss, Doc. 76; **dismissing** the case with prejudice, Doc. 74; and **directing** the clerk to enter judgment in favor of Florida Coastal School of Law, Inc., and close the case. [18]

[18]     "Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion],

a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3–1; Local Rule 6.02.

**Entered** in Jacksonville, Florida, on August 11, 2015.

## All Citations

Slip Copy, 2015 WL 10096084

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
| Plaintiff, | Civil Case No. 3:16-cv-144 |
| vs. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| Intercept Corporation, d/b/a InterceptEFT, Bryan Smith, individually, and as owner and president of Intercept Corporation, and Craig Dresser, individually and as owner and CEO of Intercept Corporation, | |
| Defendants. | |

## INTRODUCTION AND SUMMARY OF HOLDING

Before the court is DEFENDANTS' MOTION TO DISMISS THE COMPLAINT.[1]

Because the complaint[2] fails to allege facts sufficient to support a plausible claim upon

which relief can be granted, the Motion to Dismiss the Complaint is **GRANTED** and the

case is **DISMISSED WITHOUT PREJUDICE.**

## POSTURE OF THE CASE

Plaintiff, Consumer Financial Protection Bureau ("the CFPB"), filed a complaint

against Defendants, Intercept Corporation, Bryan Smith, and Craig Dresser (collectively

"the Intercept defendants"), containing two causes of action which alleged violations of the

Consumer Financial Protection Act ("the CFPA").[3] Defendants filed a motion to dismiss the

complaint[4] under Rule 12 of the Federal Rules of Civil Procedure on the ground that the

---

[1] Doc. #18.

[2] Doc. #1.

[3] Doc. #1.

[4] Doc. #18.

Complaint failed to state a plausible claim. The issues were fully briefed by the parties. In addition, the court received a brief from *Amicus Curiae*, Third Party Payment Processors. The motion came on for a hearing on February 27, 2017. Attorneys Richard Zach, Mike Andrews, and David Hauff appeared on behalf of the Intercept defendants. Attorneys Kevin Friedl, Jenelle Dennis, and Richa Shyam Dasgupta appeared for the CFPB. Attorney Keith Barnett appeared for *Amicus Curiae*. The court heard arguments from the parties and the *amicus*.

## **FACTS**

Under Rule 12 the court considers and accepts the facts alleged in the complaint as true. The CFPB is an independent agency of the United States set up to regulate the exchange of consumer financial products or services under federal consumer financial laws.[5] It has the authority to pursue litigation to enforce those laws.[6] Intercept is a third party payment processor in the business of processing the electronic transfer of funds through the Automated Clearing House ("ACH") network on behalf of its clients.[7] Bryan Smith is Intercept's president and owns fifty percent of its shares.[8] Craig Dresser is the CEO of Intercept and owns the remaining fifty percent of its shares.[9] Intercept is a "covered person" and a "service provider" under the CFPA.[10] Smith and Dresser are "related persons"

---

[5] Doc. #1, ¶ 7; 12 U.S.C. § 5491(a).

[6] Doc. #1, ¶ 7; 12 U.S.C. § 5481(14), 5564 (a) and (b).

[7] Doc. #1, ¶ 8.

[8] Doc. #1, ¶ 12.

[9] Doc. #1, ¶ 19.

[10] Doc. #1, ¶¶ 9 and 10; 12 U.S.C. § 5481(15)(A)(vii) and 5481(26)(A)(ii).

2

under the CFPA because of their status as officers of Intercept.[11]

As a third party payment processor, Intercept provides its clients with access to banks in order to facilitate the debiting and crediting of funds electronically from consumer bank accounts. Intercept's clients include consumer lenders, auto title lenders, sales finance companies, and debt collectors.[12] Businesses and individuals utilize third party processors like Intercept when they are unable to establish their own relationships with banking institutions or because it is more administratively convenient.[13]

Intercept's clients are known as "Originators."[14] When an Originator sends a request to Intercept, Intercept conveys the request to its own bank, which is known as the "Originating Depository Financial Institution" or "ODFI".[15] The ODFI then forwards the debit or credit request to an ACH operator, who transmits the request to the recipient's bank, known as the "Receiving Depository Financial Institution" or "RDFI".[16] The RDFI then credits or debits the recipient's account and sends the money back to Intercept through the ODFI.[17] Intercept remits the debit amount back to its client and charges the client fees for its services.[18]

---

[11] Doc. #1, ¶ ¶ 16 & 23; 12 U.S.C. § 5481(25)(c).

[12] Doc. #1, ¶ 26.

[13] Doc. #1, ¶ 29.

[14] Doc. #1, ¶ 30.

[15] Doc. #1, ¶ 32.

[16] Doc. #1, ¶ ¶ 33-34.

[17] Doc. #1, ¶ 35.

[18] Doc. #1, ¶ 36.

According to the complaint:

> In a typical transaction that Intercept undertakes on behalf of a lender or debt collector, the client instructs Intercept to withdraw loan repayments from the borrower's bank account, directing Intercept on which bank to contact, the payment schedule to use, and the amount to withdraw. Intercept instructs its bank to contact the borrower's bank to withdraw the money. The borrower's bank debits the account and remits it to Intercept's bank, and Intercept then transfers the money to its client.
>
> Industry rules and guidelines emphasize the responsibility of all ACH participants, including third party payment processors like Intercept, to monitor merchant return rates and other suspicious activity to detect and prevent fraud in the ACH network.
>
> Defendants, however, have processed payments for many clients even in the face of numerous indicators that those clients were engaged in fraudulent or illegal transactions. Even though they knew or should have known of this illegal behavior, Defendants continued to process for these companies anyway. Defendants have ignored red flags, including concerns from ODFIs about the lawfulness of the transactions Intercept was processing, complaints from customers, high return rates, and law enforcement actions against its clients. Intercept's due diligence procedures when signing up clients have also been perfunctory, and it has ignored indicia of problems that were revealed through even it minimal due diligence.[19]

Intercept is alleged to have ignored warnings from ODFIs of possible illegal activity by its clients, of debits unauthorized by consumers, of potential indicia of fraud by its clients, of discrepancies in dates and amounts debited, and of other possibly suspicious activity.[20]

> For example, an ODFI complained to the Defendants that one of its clients, an auto title lender, which was debiting varying amounts from consumers' accounts multiple times, did not have the contractual right or proper consumer authorization to do so, stating that it was "not ok [for the] merchant to us[e] the ACH to 'sneak' attack a consumer's account, [as] it will only draw regulatory attention.[21]

---

[19] Doc. #1, ¶ ¶ 37-39.

[20] Doc. #1, ¶ ¶ 40-41.

[21] Doc. #1, ¶ 42.

If an ODFI raised concerns or terminated its relationship with Intercept, Intercept would find another ODFI to process transactions for the same clients who were the subject of the concerns.[22] Intercept is alleged to have not properly investigated when ODFIs expressed concerns about high return rates for some of its clients.[23] Numerous consumers have complained about Defendants' processing activities.[24] "Despite all of these warning signs from ODFIs and consumers, Defendants continued payment processing for these clients without investigation or consequence."[25] Consumers did not have access to the same warning signs about Intercept's clients.[26] According to the complaint, the defendants did not properly monitor or respond to high return rates.[27] NACHA, a trade association governing the use of the ACH system, establishes standards to which Intercept is expected to adhere.[28] Intercept's clients "unauthorized returns" rates have only stayed below the NACHA guideline amount because of Intercept's use of a fee-based "Xcelerated Returns" program, which prevents transactions form being processed through the ACH network.[29] In 2011 and 2012, Intercept and its clients generated unusually and unacceptably high return rates.[30] Defendants have ignored law enforcement activity relating to its clients'

---

[22] Doc. #1, ¶ 44.

[23] Doc. #1, ¶¶ 47-49.

[24] Doc. #1, ¶¶ 50-54.

[25] Doc. #1, ¶ 55.

[26] Doc. #1, ¶ 56.

[27] Doc. #1, ¶ 57 *et seq.*

[28] Doc. #1, ¶¶ 61-63.

[29] Doc. #1, ¶¶ 65-70.

[30] Doc. #1, ¶¶ 76-82.

activity, including a Federal Trade Commission lawsuit against AMG Services, Inc., which Defendants knew about in the spring of 2012.[31]

Intercept did not properly investigate "red flags" during its clients' application process, instead using a "5-Star-Risk Level Rating" to merely determine the client's ability to pay.[32] This rating did not include indicators of fraud, illegal activity, consumer disputes, BBB ratings, law enforcement actions, high return rates, requests for proof or authorization, or "failure to supply satisfactory information" in the application.[33]

## **DISCUSSION**

At a minimum a complaint must give defendants fair notice of the grounds for the claim and at least a general indication of what the litigation involves.[34] Although the complaint need not contain detailed factual allegations, it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[35] Formulaic recitations of the elements of a claim or assertions lacking factual enhancement are not sufficient.[36] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[37] "Factual allegations must

---

[31] Doc. #1, ¶ ¶ 82-97.

[32] Doc. #1, ¶ ¶ 98-113.

[33] Doc. #1, ¶ 113.

[34] Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 848 (8th Cir. 2014).

[35] Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009).

[36] Id. at 678.

[37] Id. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

be enough to raise a right to relief above the speculative level[.]"[38] In other words, the facts alleged in the complaint must be plausible, not merely conceivable.[39]

The court must review the facts alleged, "not the legal theories of recovery or legal conclusions identified" in the complaint, "to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules." The court will not dismiss merely because the factual allegations do not support a legal theory advanced in the complaint, but must instead review the complaint to determine if the allegations support relief on any possible legal theory.[40] The court "'will not mine a [lengthy] complaint searching for nuggets that might refute obvious pleading deficiencies.'"[41]

The complaint contains two counts, both based in the CFPA's prohibition of covered persons or service providers engaging "in any unfair, deceptive, or abusive act or practice."[42] First, it alleges that Intercept Corporation, Bryan Smith, and Craig Dresser, as "covered persons" under the Consumer Financial Protection Act ("the CFPA") engaged in unfair acts and practices in violation of the Act. Secondly, it alleges that Bryan Smith and Craig Dresser, as "related persons" under the CFPA, provided substantial assistance to Intercept's violations of the CFPA.

Although dates indicated in the complaint would suggest that at least some of the

---

[38] Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007).

[39] Id. at 570.

[40] Id. at 849.

[41] Neubauer v. FedEx Corporation, 849 F.3d 400, 404-05 (8th Cir. 2017) (citing Quintero Community Ass'n Inc. v. F.D.I.C., 792 F.3d 1002, 1009 (8th Cir. 2015)).

[42] 12 U.S.C. § § 5531, 5536(a)(1)(B).

alleged acts or practices are likely outside of the CFPA's three-year statute of limitations[43], the current record does not support a finding that plaintiff's claims are time-barred as a matter of law. As such, a time bar analysis does not support the motion to dismiss. It is also clear that the complaint sufficiently alleges facts that, if proven, would support a finding that defendants are "covered persons", "service providers", or "related persons" under the CFPA.

The analysis therefor hinges on whether the complaint adequately states causes for "unfair, deceptive, or abusive acts or practices." The CFPA provides that it is unlawful for "(1) any covered person or service provider – . . . to engage in any unfair, deceptive, or abusive act or practice."[44] An act or practice is "unfair" under the CFPA only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and . . . such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[45] An act or practice cannot be considered "abusive" under the CFPA unless it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or . . . takes unreasonable advantage of – (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests

---

[43] 12 U.S.C. § 5564(g).

[44] 12 U.S.C. § 5536(a)(1)(B).

[45] 12 U.S.C. § 5531(c)(1).

of the consumer."[46]

A close review of the complaint yields a conclusion that the complaint does not contain sufficient factual allegations to back up its conclusory statements regarding Intercept's allegedly unlawful acts or omissions.  While the complaint indicates that Intercept was required to follow certain industry standards, it fails to sufficiently allege facts tending to show that those standards were violated.  Although the complaint contains several allegations that Intercept engaged in or assisted in unfair acts or practices, it never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured.  Nothing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the consumers at issue.

The complaint lacks factual allegations that would support a finding that Intercept interfered with consumers' ability to understand the terms of their dealings with Intercept's clients or that would support a finding that Intercept took unlawful advantage of consumers.

The complaint simply does not sufficiently identify particular clients whose actions provided "red flags" to Intercept or how Intercept's failure to act upon those "red flags" caused harm or was likely to cause harm to any identified consumer or group of consumers.  Although the CFPB strongly urges this court to find that the complaint's factual detail is sufficient to allow defendants to recognize the specific clients,[47] the complaint does not provide the court with sufficient information or factual detail to analyze whether it is

---

[46] 12 U.S.C. § 5531(d).

[47] Doc. #28, pp. 28-29.

sufficient to state a claim for relief. A complaint containing mere conclusory statements without sufficient factual allegations to support the conclusory statements cannot survive a motion to dismiss.[48] The defendants' motion to dismiss, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim is granted.

The court deems it unnecessary to decide the issue of the constitutionality of the CFPB at this time. Should the CFPB decide to renew this action in this court or another court, the issue may be addressed appropriately at that time.

## CONCLUSION

The MOTION TO DISMISS is **GRANTED**. This case is hereby **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 17th day of March, 2017.

/s/   Ralph R. Erickson
Ralph R. Erickson, District Judge
United States District Court

---

[48] <u>Neubauer v. FedEx Corporation</u>, 849 F.3d 400, 404 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."). The court is aware of <u>Consumer Financial Protection Bureau v. NDG Financial Corp.</u>, Slip Copy, No. 15-cv-5211, 2016 WL 7188792, *13 (S.D.N.Y. 2016), a case in which Chief Judge McMahon acknowledged: "The CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations."). The court notes, however, that the "First Amended Complaint" at Doc. #47 in that case alleged specific fraudulent actions by the defendants, including threatening actions against consumers which they could not legally maintain and alleged admissions by the defendants that supported the claims. The complaint in the New York case was not as deficient in factual allegations as the complaint in this case. Further, notwithstanding its lack of identifying specific consumers, it contained factual details to back up its allegations of wrongdoing.

E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

Present: The Honorable    **BEVERLY REID O'CONNELL, United States District Judge**

| Renee A. Fisher | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present                    Not Present

**Proceedings:**      (IN CHAMBERS)

## ORDER RE DEFENDANT'S MOTION TO DISMISS
[14]

## I.      INTRODUCTION

Pending before the Court is Defendant Prime Marketing Holdings, LLC's ("Defendant") Motion to Dismiss.  (*See* Dkt. No. 14 (hereinafter, "Mot.").)  After considering the papers filed in support of and in opposition the instant Motion, the Court finds this matter appropriate for resolution without oral argument of counsel.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons set forth below, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

## II.      BACKGROUND

### A.      Factual Background

Plaintiff the Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") brings this action against Defendant, alleging that Defendant engages in an ongoing, unlawful credit repair business that charges unlawful advance fees and misrepresents the costs and benefits of its services.  (Dkt. No. 1 (hereinafter, "Compl.") ¶ 2.)  The CFPB is an independent agency of the United States charged with enforcing federal consumer financial laws.  (Compl. ¶ 5 (citing 12 U.S.C. §§ 5491, 5563, 5564).)  Further, the CFPB has independent litigating authority, including the authority to enforce the Telemarketing Sales Rule ("TSR").  (*Id.* (citing 12 U.S.C. §§ 5564(a), (b), 6105(d).)  Defendant is a Delaware company organized in 2014 that has a place of business in Van Nuys, California.  (Compl. ¶ 6.)

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

According to Plaintiff, Defendant began offering credit repair services to consumers in October 2014. (Compl. ¶ 7.) Plaintiff avers that Defendant entered into an agreement with a company owned by a California attorney that was registered as a credit services organization ("CSO") with the California Department of Justice. (Compl. ¶¶ 9–10.) Under the agreement, which allowed Defendant to offer credit repair services using the CSO's name, Defendant handled marketing and performed credit repair services for consumers who contracted with the CSO. (Compl. ¶¶ 11–12.) Plaintiff claims that this agreement was terminated on or about June 29, 2015. (Compl. ¶¶ 13.)

In approximately November 2015, Defendant began doing business as Park View Credit, National Credit Advisors, and Credit Experts. (Compl. ¶¶ 14–16.) With these new companies, Defendant offered credit repair to consumers. (Compl. ¶ 17.) Defendant's customers include individuals who were attempting to obtain mortgage, loan, refinancing, or other credit lines at the time when Defendant first contacted them. (Compl. ¶ 22.) Plaintiff claims that Defendant would either contact a consumer after the consumer inquired about a loan through Defendant's website, or the consumer would reach out to Plaintiff after seeing information online about the credit repair services that Defendant offered. (Compl. ¶¶ 23–24.)

Plaintiff alleges that Defendant would request or receive payment for services such as removing derogatory information from, or to improve, consumers' credit histories, credit records, or credit ratings. (Compl. ¶ 25.) According to Plaintiff, Defendant represented that the first step in the credit repair process was to set up a consultation with the consumer, which Defendant would market as free. (Compl. ¶¶ 28–29.) However, Plaintiff claims that Defendant would typically tell consumers that they were required to pay an initial fee (that Defendant claimed was for a credit report or "lender report") before proceeding with a consultation. (Compl. ¶¶ 26–27, 30–31.) During the consultation, an analyst would review and discuss the consumer's credit report with the consumer and identifies ways in which Defendant could assist the consumer in increasing his or her credit score. (Compl. ¶ 33.) If the consumer agreed to hire Defendant, he or she was required to sign an online contract. (Compl. ¶ 34.) Plaintiff avers that Defendant would refuse to provide consumers with a copy of the contract until after the consumer had paid the initial fee. (Compl. ¶ 32.) Further, Plaintiff claims that, at times, consumers were "hurried through the signature process" by Defendant's salesperson. (Compl. ¶ 35.) Consumers who used Defendant's services were charged a monthly fee as high as $89.99 until consumers affirmatively cancelled their contracts. (Compl. ¶¶ 36–38.) In addition,

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

Plaintiff claims that, at other times, Defendant charged a separate "set-up fee" of several hundred dollars for the first two months and then charged a monthly fee in later months. (Compl. ¶ 39.)  Plaintiff claims that Defendant would request and collect any fees charged before providing the consumer with a consumer report from a reporting agency demonstrating that the promised results had been achieved.  (Compl. ¶ 40.)

Plaintiff also alleges that Defendant misrepresented the efficacy of its services by representing that it would remove "virtually any negative information" from an individual's credit report without having a reasonable basis for this representation. (Compl. ¶¶ 41–42, 44.)  Plaintiff avers that Defendant would inform consumers that it often raised consumers' credit scores by more than 100 points, though it did not have a reasonable basis for making these claims (or for claiming that it could raise an individual's credit score by any specific amount).  (Compl. ¶¶ 46, 48–49.)

According to Plaintiff, Defendant also represented that it offered a money-back guarantee, but failed to disclose the significant limitations associated with this guarantee. (Compl. ¶¶ 50–51.)  For instance, Plaintiff claims that Defendant failed to explain to consumers that they would have to pay for at least six months of service before becoming eligible for the money-back guarantee.  (Compl. ¶ 54.)  Further, Plaintiff contends that consumers have encountered difficulty in obtaining refunds.  (Compl. ¶ 55.)  And finally, Plaintiff claims that Defendant has misrepresented the costs of its services by failing to disclose the monthly fees associated with their services and that consumers would be automatically charged for their services.  (Compl. ¶¶ 56–59.)

### B.    Procedural History

Plaintiff initiated this action in this Court on September 22, 2016.  (*See* Compl.)  In its Complaint, Plaintiff alleged five causes of action for various conduct arising under the TSR and the Consumer Financial Protection Act of 2010 ("CFPA"): (1) violation of the TSR, 16 C.F.R. § 310.4(a)(2), for collecting fees for credit repair prior to demonstrating the promised results have been achieved, (Compl. ¶¶ 60–62); (2) violation of the TSR, 16 C.F.R. § 310.3(a)(2)(iii), for misrepresentations about material aspects of the efficacy of its services, (Compl. ¶¶ 63–69); (3) violation of the TSR, 16 C.F.R. § 310.3(a)(1)(iii), for failure to disclose limitations on its money back guarantee, (Compl. ¶¶ 70–75); (4) violation of the TSR, 16 C.F.R. § 310.3 (a)(2)(i), for misrepresenting the costs of its services, (Compl. ¶¶ 76–80); and, (5) violations of the CFPA, 12 U.S.C. §§ 5531, 5536, for alleged deceptive acts or practices, (Compl. ¶¶ 81–88).  Plaintiff requests that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | **CV 16-07111-BRO (JEMx)** | Date | November 15, 2016 |
|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | |

Court grant injunctive relief and award Plaintiff equitable monetary relief along with civil penalties. (*See* Compl. ¶ 89; *see also* Compl. at 15.)

On October 7, 2016, Defendant filed the instant Motion to Dismiss, (*See* Mot.), along with a Request for Judicial Notice, (Dkt. No. 15 (hereinafter, "RJN")). Plaintiff timely filed its Opposition on October 24, 2016, (Dkt. No. 27 (hereinafter, "Opp'n")), along with its own Request for Judicial Notice, (*see* Dkt. Nos. 27-1 (hereinafter, "Pl.'s RJN")).[1] Defendant timely replied on October 31, 2016. (Dkt. No. 29 (hereinafter, "Reply").)

## II. REQUESTS FOR JUDICIAL NOTICE

As noted above, both Plaintiff and Defendant filed Requests for Judicial Notice along with their papers. (*See* Def.'s RJN; Pl.'s RJN.) When considering a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Notwithstanding this precept, a court may properly take judicial notice of (1) material which is included as part of the complaint or relied upon by the complaint, and, (2) matters in the public record. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001); *see also Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1137 (C.D. Cal. 2010) (holding that a court may "consider documents that are incorporated by reference but not physically attached to the complaint if they are central to the plaintiff's claim and no party questions their authenticity"). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *See* Fed. R. Evid. 201(c)(2); *In re Icenhower*, 755 F.3d 1130, 1142 (9th Cir. 2014).

Specifically, Defendant requests that the Court take judicial notice of five documents: (1) Exhibit A, a press release from the Federal Trade Commission ("FTC") entitled "States Announce Crackdown on Scams that Bilk Customers," dated March 5, 1998; (2) Exhibit B, a minute order dated December 3, 1996, in *State of Illinois v. National Credit Management Group*, No. 1:96-cv-02073 (N.D. Ill.); (3) Exhibit C, a

---

[1] On October 25, 2016, Plaintiff's counsel Sarah Preis filed a separate declaration authenticating the document Plaintiff requested the Court judicially notice. (Dkt. No. 28.)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

portion of the FTC website entitled "Complying with the Telemarketing Sales Rule," dated October 1, 2016; (4) Exhibit D, an excerpt of the CFPB Supervision and Examination Manual Version 2, dated October 2012; and, (5) Exhibit E, pages from Park View Credit's website. (*See* Def.'s RJN at 1.) Plaintiff, along with its Opposition also requests that the Court take judicial notice of an Order Denying Motion for More Definite Statement in *Consumer Financial Protection Bureau v. All American Check Cashing Inc., et al.*, No. 3:16-cv-356-WHB-JCG (S.D. Miss.). (*See* Pl.'s RJN.) In addition, Plaintiff objects to the Court taking judicial notice of Park View Credit's website. (*See* Opp'n at 24.)

Defendant argues that Exhibits A through E are matters of the public record that are properly noticeable. (Def.'s RJN at 2.) When deciding a motion to dismiss, the court "may take judicial notice of matters of public record," *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986), including "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue," *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted). However, "a court can only take judicial notice of *existence* of those matters of public record (the existence of a motion or of representations having been made therein) but not the *veracity* of the arguments and disputed facts contained therein." *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (emphasis in original). In addition, "[a] court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted."

As to Defendant's Exhibits A, C, and D, the Court may take judicial notice of publicly available information found on a government agency's website. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." (alteration and internal quotation marks omitted)); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of online information "made publicly available by government entities"). As these exhibits come from the FTC and the CFPB's website, the Court finds they are properly subject to judicial notice. Accordingly, the Court **GRANTS** Defendant's Request as to Exhibits A, C, and D.

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

As to Defendant's Exhibit B and Plaintiff's Exhibit, as noted above, the Court may take judicial notice of proceedings in other courts that are related to the instant proceedings. *See Robinson*, 971 F.2d at 248. It appears the filings that the parties proffer here are related to this case as they address similar issues to the instant litigation. (*See* Def.'s RJN, Ex. B; Pl.'s RJN.) Therefore, the Court **GRANTS** Defendant's Request as to Exhibit B and **GRANTS** Plaintiff's Request.

As to Defendant's Exhibit E, however, "information appearing on . . . third party websites is not a proper subject of judicial notice because it is not capable of accurate and ready determination." *Gerritsen*, 112 F. Supp. 3d at 1029. Defendant has not explained how information found on its own website is capable of accurate and ready determination, and "[t]he potential for fabrication or for inaccurate information is simply too great to be reconciled with the language of Rule 201." *Id.* at 1031 (refusing to take judicial notice of information found on the defendant's website); *see also Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F. Supp. 2d 997, 1004 (N.D. Cal. 2012) ("[I]t is inappropriate for the Court to take judicial notice of facts on a webpage whose source and reliability are unknown."). Therefore, the Court **DENIES** Defendant's Request as to Exhibit E.

## III. LEGAL STANDARD

### A. Rule 8(a)

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

In ruling on a motion to dismiss for failure to state a claim, a court should follow a two-pronged approach: first, the court must discount conclusory statements, which are not presumed to be true; and then, assuming any factual allegations are true, the court shall determine "whether they plausibly give rise to entitlement to relief." *See id.* at 679; *accord Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). A court should consider the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *Lee*, 250 F.3d at 688 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

### B. Rule 9(b)

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud. *Odom*, 486 F.3d at 553. Where multiple defendants allegedly engaged in fraudulent activity, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Rather, a plaintiff must identify each defendant's role in the alleged scheme. *Id.* at 765.

## IV. DISCUSSION

Plaintiff alleges violations of several sections of the TSR as well as violation of the CFPA. (*See* Compl.) Specifically, Plaintiff alleges violations of the following sections of the TSR: (1) section 310.4(a)(2), which makes it unlawful for a telemarketer

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

advertising that it can improve a person's credit history to receive payment until it has provided documentation of the effect of its services at least six months after the results have been achieved, *see* 16 C.F.R. § 310.4(a)(2); (2) section 310.3(a)(2)(iii), which makes it unlawful for a telemarketer to misrepresent any material aspect of its goods or services' performance or efficacy, *see* 16 C.F.R. § 310.3(a)(2)(iii); (3) section 310.3(a)(1)(iii), which requires a telemarketer to disclose all material terms and conditions of any policy regarding refunds before a customer pays for goods or services offered, *see* 16 C.F.R. § 310.3(a)(1)(iii); and, (4) section 310.3(a)(2)(i), which makes it unlawful for a telemarketer to misrepresent the cost of its services, *see* 16 C.F.R. § 310.3(a)(2)(i). In addition, the CFPA makes it unlawful for any covered entity "to engage in any unfair, deceptive, or abusive act or practice," *see* 12 U.S.C. § 5536(a)(1)(B). "An act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Consumer Fin'l Protection Bur. v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (internal quotation marks omitted). Defendant argues that Plaintiff has failed to state a claim upon which relief can be granted, that Plaintiff lacks standing, and that Plaintiff's claims fail as a matter of law. The Court will address each argument in turn.

## A. Whether the Heightened Pleading Standard for Rule 9(b) Applies

As a preliminary matter, Defendant argues that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to Plaintiff's claims regarding deception because these claims sound in fraud. (*See* Mot. at 5–7.) Plaintiff argues that deception and fraud are distinct legal theories, and thus, Rule 9(b) does not apply to its deception claims. (*See* Opp'n at 6–10.)

The Ninth Circuit has held that in cases where fraud is not an element of a claim, but a plaintiff alleges that the defendant has engaged in "a unified course of fraudulent conduct," the claim "sound[s] in fraud" and therefore must meet Rule 9(b)'s heightened pleading requirements. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). Further, in cases where a plaintiff does not allege a unified course of fraudulent conduct, but instead alleges "some fraudulent conduct and some non-fraudulent conduct," the allegations of fraud are subject to Rule 9(b). *See id.* at 1104. "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." *Id.* at 1105. Thus, Rule 9(b)'s

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

heightened pleading standard is implicated "when: (1) a complaint specifically alleges fraud as an essential element of a claim, (2) when the claim 'sounds in fraud' by alleging that the defendant engaged in fraudulent conduct . . . and (3) to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound in fraud.'" *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1089–90 (C.D. Cal. 2009) (citation omitted).

Plaintiff argues that courts have refused to extend Rule 9(b)'s requirements to claims brought under the CFPA. (Opp'n at 7–8.) At least one court within this district, however, has held that Rule 9(b) should apply to claims brought under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 45(a)(1), 53(b), which, much like the TSR and the CFPA, prohibits "unfair or deceptive acts or practices in or affecting commerce." *FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 851 (C.D. Cal. 2010). There, the court held that Rule 9(b) applied because the FTC's claims alleged a fraudulent course of conduct where (1) the defendants "distributed promotional materials that made specific representations about the watt equivalency, lumen output, and life spans of their LED lamps," (2) these representations were false, and, (3) the defendants knew or should have known that their conduct was unfair or deceptive. *Id.* at 852–53. Though the FTC omitted the word "fraud" from its complaint, the court held that this omission did "not detract from the apparently fraudulent nature of the allegations." *Id.* at 853. In coming to its decision, the court found persuasive the "analogous," though "not identical," elements of a violation of the FTCA and negligent misrepresentation.[2] *Id.*

---

[2] A claim under the FTCA requires the plaintiff to prove (1) misrepresentations or omissions, (2) of material fact, (3) of a kind usually relied upon by reasonably prudent persons, (4) creating consumer injury, and, (5) that the individual participated in or controlled the underlying acts. *See FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *3 (N.D. Cal. Feb. 22, 2010). The elements of negligent misrepresentation are: (1) a false representation; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) intent to deceive; (4) justifiable reliance; and, (5) damages. *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (Cal. Ct. App. 2013). In *Lights of America*, the Court explained that the plaintiff's complaint explicitly alleged misrepresentation and the resulting damages and, though the complaint did "not specifically allege intent to induce reliance and justifiable reliance," it followed from the facts that these elements were also alleged. *Lights of Am.*, 760 F. Supp. 2d at 854. Moreover, as the *Lights of America* court noted, under Ninth Circuit law, "a claim does not need to include *all* of the elements of a claim for fraud or negligent misrepresentation in order for it to trigger the heightened pleading standard of Rule 9(b)." *Id.*; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that plaintiff must meet Rule 9(b) requirements when alleging fraudulent conduct pursuant to California's consumer protection

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

The crux of Plaintiff's claims here (other than its first cause of action for violation of the advance fee provision) is that Plaintiff purposefully misrepresented the efficacy of its services, its money back guarantee, and the costs of its services and that these statements were likely to mislead consumers. (*See* Compl. ¶¶ 41–59, 67, 79, 87.) There is no indication from Plaintiff's Complaint that any of these misrepresentations were accidental or the result of a mistake. (*See id.*) Thus, it appears that Plaintiff is alleging that Defendant participated in a unified course of fraudulent conduct, multiple portions of which violated the TSR.[3] *See TransFresh Corp. v. Ganzerla & Assocs., Inc.*, 862 F. Supp. 2d 1009, 1017–18 (N.D. Cal. 2012) (finding claims sounded in fraud where the crux of the plaintiff's claims were that the defendant had "made numerous misleading and false representations" knowingly and intentionally); *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2011 WL 2118626, at *1, *3 (D. Nev. May 25, 2011) (applying Rule 9(b) standard in claim brought under the FTCA where the FTC "alleged that the defendants collectively engaged in a unified course of fraudulent conduct, which forms the entire basis of the claims alleged"); *Davis*, 650 F. Supp. 2d at 1089–90 (applying Rule 9(b) standard to claims sounding in misrepresentation). Therefore, the

---

statutes though fraud is not a necessary element of these claims); *see FTC v. ELH Consulting, LLC*, No. CV 12-02246-PHX-FJM, 2013 WL 4759267, at *1 (D. Ariz. Sept. 4, 2013) (holding that claims arising under the FTCA and the TSR sounded in fraud and had to meet Rule 9(b) where complaint alleged "that defendants engaged in deceptive acts and practices and 'operate a tangled network of telemarketing companies and telemarketing service providers' who make representations that are 'false'").

[3] The Court's conclusion is further supported by the similarities between the elements of fraud and the elements of a TCPA claim. As noted above, a TCPA claim requires a plaintiff to establish (1) a misrepresentation, (2) that is likely to mislead consumers, (3) that is material. *See Gordon*, 819 F.3d at 1192. Thus, though a plaintiff is not explicitly required to plead intent or damages under the TCPA, the Court finds the elements sufficiently analogous to support the proposition that the TCPA can implicate Rule 9(b). *See Lights of Am., Inc.*, 760 F. Supp. at 853–54.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

Court finds that, in this case, Plaintiff's second, third, fourth, and fifth[4] causes of action sound in fraud and must meet the heightened pleading standards of Rule 9(b).[5]

### B.      Whether Plaintiff Sufficiently Pleads Its Claims

#### 1.      Plaintiff's First Claim

The TSR provides that it is an abusive telemarketing act or practice to request or receive "payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until" after the telemarketer "has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." *See* 16 C.F.R. § 310.4(a)(2).  Plaintiff's first claim alleges that Defendant violates the TSR when it charges the consumer initial report fees, a set-up fee, and its monthly fees before it has provided the consumer with a

---

[4] Defendant argues that Plaintiff's first cause of action sounds in fraud also because it incorporates by reference all of Plaintiff's other allegations. (*See* Reply at 3.)  Plaintiff's first cause of action alleges that Defendant sought payment for its services prematurely, but does not include any allegations of misrepresentation or reliance. (*See* Compl. ¶¶ 60–62.)  Thus, fraud is not implicated as this claim does not appear to incorporate *any* of the elements of fraud and includes no facts indicating that Defendant acted fraudulently.  Therefore, the Court disagrees with Defendant's argument and holds that Plaintiff need only plead this cause of action in compliance with the Rule 8(a) standard.

[5] Plaintiff makes two additional arguments.  First, Plaintiff argues that applying a heightened pleading standard to consumer protection claims would contravene the liberal notice pleading standard. (Opp'n at 8.)  The Ninth Circuit has already made clear, however, that Rule 9(b) may apply to consumer protection claims such as California's Unfair Competition and False Advertising Laws. *See Kearns*, 567 F.3d at 1125.  Thus, the Court finds Plaintiff's argument unavailing.

Plaintiff also argues that heightened pleading should not be required here because violations of the TSR do not have the "same reputational consequences as do allegations of intentional harm" and the risk of using litigation as a pretext for discovery is lower in suits brought by federal law enforcement agencies. (Opp'n at 9.)  The Court finds these arguments unpersuasive as well.  First, accusations of fraud are likely to have the same reputational consequences regardless of what statute provides the cause of action.  Second, Rule 9(b) does not differentiate between governmental agency plaintiffs and private plaintiffs and courts within this Circuit have not found the difference dispositive. *See ELH Consulting, LLC*, 2013 WL 4759267, at *1; *Lights of Am., Inc.*, 760 F. Supp. 2d at 854; *see also FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *3.

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

consumer report. (Compl. ¶¶ 40, 61–62.) As noted above, Plaintiff's claim need only comply with the pleading requirements of Rule 8(a).

Plaintiff has adequately pleaded its claim. Defendant raises no arguments specifically attacking the adequacy of Plaintiff's first claim, other than alleging that Plaintiff's Complaint generally "is inundated with vague terms." (*See* Mot.) However, Plaintiff has pleaded facts indicating that Defendant (1) charged consumers fees prior to an initial consultation, (2) charged set-up fees within two months of the initial consultation, and, (3) charged monthly fees thereafter, prior to providing the consumer with a consumer agency report. (*See* Compl. ¶¶ 25–40.) Accordingly, Plaintiff's Complaint is sufficient to state a claim for its first cause of action.

### 2.    Plaintiff's Second Claim

The TSR also provides that it is unlawful for a telemarketer to misrepresent "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." *See* 16 C.F.R. § 310.3(a)(2)(iii). As noted above, Plaintiff must comply with Rule 9(b)'s pleading standards for this claim. Here, Plaintiff's allegations fall short. Plaintiff fails to identify any specific instances where Defendant made such a misrepresentation. *See Swartz*, 476 F.3d at 764 (explaining that Rule 9(b) "requires more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations'" (citation omitted)). Further, while Plaintiff claims in a conclusory manner that Defendant did not "have a reasonable basis" for its claims that it could raise consumers' credit score by an average of 100 points, Plaintiff fails to provide any facts indicating that Defendant's representations lacked a reasonable basis. (*See* Compl. ¶ 48.) For instance, Plaintiff provides no factual examples of instances where Defendant represented that it would raise a consumer's score but it failed to do so. Accordingly, Plaintiff's second claim is **DISMISSED without prejudice**.

### 3.    Plaintiff's Third Claim

Next, the TSR provides that a telemarketer must "disclose truthfully, in a clear and conspicuous manner" "all material terms and conditions" of any policy regarding refund or cancellation. *See* 16 C.F.R. § 310.3(a)(1)(iii). As with its second claim, Plaintiff must meet Rule 9(b)'s heightened pleading standard. In this case, Plaintiff pleads more facts than with its second claim by providing some of the policies of which Defendant failed to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|----------|------------------------|------|-------------------|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

inform consumers. (*See* Compl. ¶¶ 51–54.) However, Plaintiff's claim is still insufficiently pleaded as it fails to provide details of any instances when Defendant failed to make these disclosures. *See Swartz*, 476 F.3d at 764. Therefore, Plaintiff's Fourth Claim is **DISMISSED without prejudice**.

### 4. Plaintiff's Fourth Claim

Further, the TSR prohibits telemarketers from misrepresenting the total cost to purchase, receive, or use the telemarketer's services. *See* 16 C.F.R. § 310.3(a)(2)(i). As with its second and third claims, Plaintiff's fourth claim must be pleaded according to Rule 9(b). Plaintiff's fourth claims suffers from the same deficiencies as its second and third claims. Plaintiff pleads in general terms that "at times" Defendant has failed to disclose its monthly fees and has falsely represented that it would not charge monthly fees immediately. (Compl. ¶¶ 57–59.) Again, however, Plaintiff fails to plead with specificity what representations were made, when these representations were made, and to whom they were made. *See Swartz*, 476 F.3d at 764. Accordingly, Plaintiff's fourth claim is **DISMISSED without prejudice**.

### 5. Plaintiff's Fifth Claim

Plaintiff's fifth claim arises under the CFPA, which, as noted above, makes it unlawful for any covered entity "to engage in any unfair, deceptive, or abusive act or practice," *see* 12 U.S.C. § 5536(a)(1)(B). Plaintiff's CFPA claim must also be pleaded in compliance with Rule 9(b). Plaintiff's CFPA claim appears to be tethered entirely to its second and fourth claims arising under the TSR, however, and alleges that Defendant committed deceptive acts by misrepresenting the efficacy of its services and the cost of its services. (*See* Compl. ¶¶ 82–88.) Just as Plaintiff's second and fourth claims fail, so too does Plaintiff's fifth claim. Therefore, Plaintiff's fifth claim is **DISMISSED without prejudice**.

### C. Whether Plaintiff Has Standing

Next, the Court will address whether Plaintiff has standing to pursue its first claim—the only surviving cause of action. Defendant argues that Plaintiff lacks standing to bring this claim because (1) Plaintiff is not a covered person within the meaning of the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

CFPA, (2) Plaintiff's claims are not redressable,[6] and, (3) Plaintiff is not entitled to monetary relief. The Court finds these arguments unconvincing.

First, Defendant argues that it is not a "covered person" under the CFPA. (*See* Mot. at 7 n.3.) The Court disagrees. A covered person under the CFPA is defined as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). The definition of "consumer financial product or service" includes "collecting, analyzing, maintaining, or providing consumer report information, *including information relating to the credit history of consumers*." 12 U.S.C. § 5481(15)(A)(ix) (emphasis added). As Plaintiff's Complaint alleges that Defendant is in the business of providing consumer report information about consumers' credit history, Defendant falls squarely within the definition of "covered person" as it is defined in the CFPA.

Further, Defendant claims that Plaintiff's Complaint establishes only past violations and thus, injunctive relief is inappropriate. (*See* Mot. at 8–9.) Defendant is correct that "[p]ast wrongs are not enough for the grant of an injunction." *Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1253 (9th Cir. 1984). However, the Court does not interpret Plaintiff's Complaint as alleging only past conduct regarding its first cause of action. Plaintiff's Complaint does not indicate that Defendant no longer performs credit repair services; in fact, its Complaint alleges that "Defendant engages in an ongoing" credit repair business. (Compl. ¶ 2.) Thus, so long as Defendant is still in business, it appears that Defendant could again violate the TSR. *See SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("An inference arises from illegal past conduct that future violations may occur.").

Third, under consumer protection statutes, the Court has the power to order equitable economic relief when there is "proof of injury" caused by unlawful practices. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1994). Defendant argues that Plaintiff has not established that there is any proof of injury in this case. (Mot. at 10.) The Court disagrees. If the advance fees Plaintiff charged prior to supplying a consumer report were unlawful, then consumers will have, by definition, suffered financial injury. Therefore, the Court finds that Plaintiff has standing to pursue its first claim.

---

[6] It appears Plaintiff raises this argument only as to Plaintiff's second through fifth claims. (*See* Mot. at 8–9.) Regardless, the Court finds this argument unpersuasive as to Plaintiff's first claim.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

### D.    Whether Plaintiff's Advanced Fee Claim Fails as a Matter of Law

Finally, Defendant argues that Plaintiff's claim under the advance fee provision of the TSR, 16 C.F.R. § 310.4(a)(2), fails as a matter of law for several reasons: (1) the Credit Repair Organizations Act ("CROA") "trumps" the TSR; (2) Plaintiff's application of the advance fee provision does not comport with the FTC's interpretation of the rule; (3) the advance fee provision does not apply to Defendant; (4) Plaintiff's application of the advance fee provision conflicts with state law; and, (5) even if applied, Defendant does not violate the advance fee provision.  (Mot. at 11–19.)

### 1.    Whether the CROA Supersedes the TSR

The CROA, enacted September 30, 1996, provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."  15 U.S.C. § 1679b(b).  In Defendant's view, this provision conflicts with the advance fee provision of the TSR, which provides that a credit repair company cannot collect payment until the company has provided documentation of the efficacy of its services at least six months after the company's "promised results have been achieved."  16 C.F.R. § 310.4(a)(2)(ii).  Defendant argues that the CROA should trump the TSR because (1) the CROA was enacted after the TSR, and, (2) a valid statute always supersedes a conflicting regulation.  (Mot. at 11–12.)

There is a dearth of case law addressing the interaction between the CROA and the TSR.  In fact, the only decision addressing the interplay between the CROA and the TSR identified by the parties or found by the Court is *Tennessee v. Lexington Law Firms*, No. 3:96-0344, 1997 WL 367409, at *6 (M.D. Tenn. May 14, 1997).  In that case, the defendant contended that the CROA (recently enacted at the time) was specifically enacted to govern credit repair agencies, and therefore, based on the TSR's "more general wording," Congress "must not have intended credit repair services" be governed by the TSR.  *Id.*  The court disagreed and held that, though the CROA "undoubtedly governs" credit repair agencies, "there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the [TSR]."  *Id.*  The Court finds the court's analysis persuasive.

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

Just as the court in *Lexington Law Firms* held, the Court here finds that Defendant's argument fails at the outset, because contrary to Defendant's contention, the CROA and the TSR do not conflict. The CROA prohibits all *credit repair agencies* from charging advance fees, *see* 15 U.S.C. § 1679b(b), while the TSR prohibits all *telemarketers* who participate in credit repair services from charging advance fees until six months after the promised results have been achieved, *see* 16 C.F.R. § 310.4(a)(2); *see also* Dee Pridgen & Richard M. Alderman, Consumer Credit and the Law, § 2A:12 Credit Repair Organizations Act (Nov. 2016) ("Echoing and effectively broadening the provision in the [TSR], the CROA bans the taking of any advance fees by credit repair organizations before their services have been fully performed. The CROA, however, applies to all credit repair sales, not just those that are telemarketed, so its scope is more comprehensive than the FTC rule." (footnote omitted)). In other words, when a business is both a credit repair agency and a telemarketer, it is required to comply with both the CROA and the TSR. On the other hand, if a credit repair agency does not qualify as a telemarketer, then it need not comply with the TSR—only the CROA is applicable.

Under the CROA, even if a credit repair agency is not a telemarketer, it may not collect payment for its services until the services are completed. *See* 15 U.S.C. § 1679b(b). If that credit repair agency is also a telemarketer, however, then it may not collect services until its services are completed *and* it has provided documentation to the consumer at least six months after the services are completed evidencing the agency's efficacy. *See* 16 C.F.R. § 310.4(a)(2). Thus, the two provisions may be complied with concurrently; they do not conflict. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem."). "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012–13 (9th Cir. 2000) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Accordingly, the Court finds that Plaintiff's first claim under the advance fee provision does not fail as a matter of law on this ground.

//

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

**2.** **Whether Plaintiff's Interpretation of the TSR Comports with the FTC's Interpretation**

Defendant's next argument is that the FTC has chosen not to enforce the advance fee provision, though it is the agency charged with promulgating the TSR. (Mot. at 14–16.) However, while Defendant's argument identifies litigation from another jurisdiction where the FTC initially chose to prosecute under the advance fee provision then later voluntarily dismissed its claim, the argument fails to provide a legal basis on which this Court could dismiss Plaintiff's claim. Thus, the Court finds Defendant's argument unavailing.

**3.** **Whether the Advance Fee Provision Applies to Defendant**

Next, Defendant argues that the advance fee provision does not apply to companies like Defendant, because the provision "was meant to apply to 'bogus' credit repair establishments." (Mot. at 16.) Defendant points to information released by the FTC that indicates the purpose of the TSR was to curtail "bogus credit services." (*Id.*; *see also* Def.'s RJN, Ex. C at 63 ("This prohibition is directed at the deceptive marketing and sale of bogus credit repair services; it is not directed at the non-deceptive telemarketing of secured credit cards or legitimate credit monitoring services.").) In its Motion, Defendant alleges that the advance fee provision specifically targets credit repair agencies that fraudulently dispute negative credit items on a consumer's report that only temporarily benefit a consumer's credit score, (Mot. at 16); but Defendant provides no authority for the proposition that this is the *only* conduct to which the advance fee provision is intended to prevent. (*See id.*) Thus, though Defendant argues that it "does not engage" in this specific form of fraudulent conduct, (Mot. at 17), other than Defendant's self-serving argument, there is no evidence currently before the Court that the advance fee provision was not intended to prevent other forms of fraudulent conduct. In fact, the FTC literature indicates that its purpose is much broader than Defendant's suggested scope: to curtail "bogus credit services" in general. (*See* Def.s' RJN, Ex. C at 63.) Whether Defendant acts deceptively, and thus, may be considered a "bogus" credit service, is one of the disputes in this litigation. Accordingly, Defendant cannot escape liability by itself concluding that it does not participate in deceptive conduct and, therefore, the TSR does not apply to it. Accordingly, the Court finds Defendant's argument unpersuasive.

//

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

**4.    Whether Plaintiff's Application of the Advance Fee Provision Unlawfully Conflicts with California Law**

Defendant's fourth argument is that the TSR conflicts with California law and, because consumer protection laws are not intended to preempt state law, cannot be enforced. (Mot. at 17–18.)  Specifically, Plaintiff notes that the California Credit Services Act of 1984 (the "CCSA") requires a credit services company "to perform the agreed services within six months following the date the buyer signs the contract for those services."  *See* Cal. Civ. Code § 1789.13(b).  In Defendant's view, Plaintiff's interpretation of the advance fee provision would prevent Defendant from fully performing the contracted services within six months, as Defendant is required to wait, at minimum, six months before providing the consumer with documentation of its services' efficacy.  (Mot. at 17.)

Again, however, the Court is not persuaded that the two provisions conflict.  The CCSA defines a "credit services organization" as any person who (1) improves a buyer's credit record, history, or rating, (2) obtains a loan or other credit line for a buyer, or, (3) provides assistance to a buyer regarding (1) or (2).  *See* Cal. Civ. Code § 1789.12(a).  Simply providing a credit report does not appear to be contemplated under California law as a service provided by a credit services organization.  In other words, the CCSA requires that when a consumer contracts with a credit services organization, the organization is required to complete "the services of a credit services organization"—i.e., the services that improve the consumer's credit record, history, or rating—within six months of the execution of a contract.  *See* Cal. Civ. Code §§ 1789.12(a), 1789.13(b).  The TSR then separately requires that at least six months following the *completion* of these services, the credit agency provide the consumer with a report evidencing the efficacy of its services.  *See* 16 C.F.R. § 310.4(a)(2).  But nothing in the language of the CCSA suggests that providing a credit report as evidence of the organization's effective assistance is itself a service that must be completed within six months of the execution of the contract.[7]  Therefore, the two provisions do not conflict as a credit repair organization

---

[7] In practical terms, if a consumer contracts with a credit services agency on January 1, under California law, the agency has until June 30 to perform the services required to improve the consumer's credit history or score.  Assuming the consumer's credit score improves on June 30, under the TSR, the credit services agency must then provide the consumer with a credit reported dated December 31 or later showing the improvement in the consumer's credit score.  Providing this report, however, is not intended to have any effect on the consumer's score; rather, it is mere evidence of the credit agency's

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

may comply with both by performing the services intended to improve a consumer's credit score within six months, followed by providing evidence of those services through a credit report more than six months after they have been completed. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (explaining that impossibility preemption is implicated only "where it is impossible for a private party to comply with both state and federal law" (citation omitted)). Accordingly, the Court will not dismiss Plaintiff's first cause of action on this ground.

### 5. Whether Defendant Violated the Advance Fee Provision

Defendant's final argument is that, even if the advance fee provision applies, it has not violated the advance fee provision. (Mot. at 18–19.) First, Defendant argues that a credit consultation is not a product or service covered by the TSR. (Mot. at 18.) The Court disagrees. The advance fee provision prohibits a telemarketer from requiring advance payment for "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." 16 C.F.R. § 310.4(a)(2). Plaintiff's Complaint alleges that Defendant represented that the consultation was the first step in the credit repair process; (*see* Compl. ¶ 28); thus, taking Plaintiff's allegations as true, Defendant represented that the consultation was part of the process for removing derogatory or negative information from the consumer's credit report. Therefore, consultations would be conduct covered by the TSR and requiring payment prior to conducting a consultation would be a violation of the TSR.[8]

Second, Defendant argues that Plaintiff has failed to establish that Defendant participates in "telemarketing" under the TSR because Plaintiff has not explicitly alleged that Defendant makes "interstate" telephone calls. (Mot. at 5 n.2, 18.) Under the TSR, telemarketing is any plan or program that "is conducted to induce the purchase of goods or services . . . and which involves more than one interstate telephone call." 16 C.F.R.

---

prior conduct that had an impact on the consumer's credit score. Thus, the Court finds that providing the report is not a "service" under the CCSA that must be completed within six months of the execution of the contract between the consumer and the credit services agency.

[8] These representations do not have to be pleaded in accordance with Rule 9(b), however, because as addressed above, Plaintiff's Complaint does not allege that these representations were fraudulent or that Plaintiff participated in a course of fraudulent conduct related to these representations. Rather, the relevance of the representations is only to determine whether the initial consultation falls within the scope of the TSR.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

§ 310.2(gg). Plaintiff's Complaint, however, alleges that Defendant operates on a nationwide basis, (Compl. ¶ 2), and initiates and receives telephone calls from its customers, (Compl. ¶ 19). Therefore, construing the Complaint in the light most favorable to Plaintiff, the Court finds Plaintiff sufficiently pleads facts indicating that Defendant's business involves interstate phone calls.

Further, Defendant argues that Plaintiff has not sufficiently included allegations regarding the "promises" that Defendant has made to consumers. (Mot. at 18–19.) The Court finds Defendant's argument unavailing. To have a viable claim under the advance fee provision, Plaintiff must allege that (1) Defendant requested or required payment, (2) for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating, (3) less than six months before the seller has provided the consumer with documentation (i.e., a credit report) indicating that it has completed the requested or promised services. *See* 16 C.F.R. § 310.4(a)(2). Plaintiff's Complaint alleges that Defendant (1) required consultation fees, set-up fees, and monthly fees, (Compl. ¶ 40), (2) before and after entering into a contract with the consumer with the intent to increase or improve the consumer's credit score, (Compl. ¶¶ 33–34, 36), (3) but before six months has passed and Defendant has provided the consumer with documentation of its services, (Compl. ¶ 40). Thus, Plaintiff has sufficiently pleaded all three elements here and the terms of the promises that Plaintiff made are immaterial to its advance fee provision claim. Therefore, the Court does not find dismissal of Plaintiff's first cause of action warranted on these grounds. Therefore, Defendant's Motion to Dismiss Plaintiff's first cause of action is **DENIED**.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED in part** and **DENIED in part**. Defendant's Motion is **DENIED** as to Plaintiff's first claim. Plaintiff's second, third, fourth, and fifth causes of action are **DISMISSED without prejudice**. Plaintiff is **ORDERED** to file a First Amended Complaint, if any, no later than November 28, 2016.

### IT IS SO ORDERED.

| | : |
|---|---|
| Initials of Preparer | rf |



Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 93 of 126

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

2013 WL 1149265
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

DOMMEL PROPERTIES, LLC, Land of
Believe Farm, Inc., William J. Dommel,
and Robert W. Dommel, Plaintiffs,
v.
JONESTOWN BANK AND TRUST COMPANY,
now known as JBT, Lebanon County
Tax Claim Bureau, and Sallie A. Neuin.

Civil Action No. 1:11–cv–2316.
|
March 19, 2013.

**Attorneys and Law Firms**

David L. Braverman, Michelle S. Walker, Braverman
Daniels Kaskey Ltd., Philadelphia, PA, for Plaintiffs.

Stephanie E. Divittore, Timothy J. Nieman, Rhoads
& Sinon LLP, David L. Schwalm, John F. Yaninek,
Thomas, Thomas & Hafer, LLP, Harrisburg, PA, for
Jonestown Bank and Trust Company, now known as JBT,
Lebanon County Tax Claim Bureau, and Sallie A. Neuin.

*MEMORANDUM*

CHRISTOPHER C. CONNER, District Judge.

 **\*1** Presently before the court in the above-captioned
matter are the motions to dismiss of defendants
Lebanon County Tax Claim Bureau and Sallie A.
Neuin (collectively, where appropriate, the "county
defendants"), (Doc. 29), and defendant Jonestown Bank
and Trust Company, (Doc. 30). The motions are fully
briefed, and are ripe for disposition. For the reasons set
forth below, the court will grant each motion in part, and
will deny each motion in part.

**I. *Factual Background***
When ruling on a motion to dismiss under Rule 12(b)
(6), the court must "accept all factual allegations as true,
construe the complaint in the light most favorable to the
plaintiff, and determine whether, under any reasonable

reading of the complaint, the plaintiff may be entitled to
relief." *Gelman v. State Farm Mut. Auto. Ins. Co.,* 583
F.3d 187, 190 (3d Cir.2009) (quoting *Phillips v. County
of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)); *see also
Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007) (quoting
*Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005)).
Accordingly, the court will present the well-pleaded facts
as set forth in the complaint.

Plaintiffs William J. Dommel and his father Robert W.
Dommel reside in Palmyra and Drumore Pennsylvania,
respectively. The Dommels engage in the horse breeding
trade, through their businesses Land of Believe Farm,
Inc., and Dommel Properties, LLC, both of which are also
plaintiffs in the above-captioned matter. Plaintiffs filed
the Complaint (Doc. 1) against defendants The Lebanon
County Tax Claim Bureau (the "TCB"), a municipal
agency located in Lebanon, Pennsylvania; Jonestown
Bank (the "Bank"), a banking corporation located in
Cleona, Pennsylvania; and Salle A. Neuin ("Neuin"),
Director of the TCB and a member of the Board of
Directors of the Bank.

A. *The Dommel Properties and Promissory Notes*
Collectively, the Dommels have been in the commercial
horse breeding business for over twenty-five years. Of
relevance to this litigation are three properties currently
or at one time owned by the Dommels. The first ("Farm
One") is located in Palmyra, and consists of 96 acres of
farmland, including 62 horse stalls in four barns, a pond,
and a four bedroom home. The Land of Believe Farm
("Farm Two") is also located in Palmyra, and consists of
68 acres, upon which sit a two-story home and a number
of horse barns and outbuildings. The Dommels live on
Farm Two, where they board, breed, and foal thirty-five
thoroughbred horses. Finally, the Dommels owned, but
have sold, a property known as the "Hunting Camp," in
Lycoming County, that consisted of five hundred acres of
hunting land. The Dommels sold this property in March
2010, for $575,000.

On March 26, 2006, the Dommels and Land of Believe
Farm, Inc., executed a Demand Promissory Note with the
Bank (the "First Note"). The First Note provided a $1.3
million line of credit to be used to expand the Dommels'
horse breeding business, and was secured by a mortgage
against Farm One and Farm Two. Dommel Properties
LLC signed a Guaranty and Suretyship agreement,

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 94 of 126

guaranteeing Land of Believe Farm, Inc.'s repayment of the First Note.

**\*2** On January 23, 2007, the Dommels took out a construction loan with the Bank, in the amount of $2,425,000 (the "Second Note"). The Dommels intended to use this loan to finance construction on Farm Two. On the same day, Land of Believe Farm, Inc. and Dommel Properties LLC signed a Guaranty and Suretyship agreement, guarantying the Dommels' repayment of the Second Note, which was secured by a mortgage against Farm One and Farm Two.

On May 31, 2007, the Dommels secured a loan from the Bank in the amount of $605,000 (the "Third Note"). Land of Believe Farm, Inc. and Dommel Properties, LLC signed a Guaranty and Suretyship agreement, guaranteeing the Dommels' repayment of the Third Note. The Third Note was secured by a mortgage against the Hunting Camp.

According to the Complaint, at no time during the executions of the First, Second, or Third Notes did the Dommels have counsel present, nor were the agreements reviewed by counsel.

B. *Farm One*

The Dommels listed Farm One for private sale in 2007, and received a bona fide offer of $4.5 million dollars, but a sale was never consummated. The unsuccessful sale of Farm One, coupled with a lull in the market for thoroughbred horses brought on by the economic recession of recent years, put the Dommels into a financially precarious position. Mr. Dommel [1] met with bank executives to express his concern about ongoing construction on Farm Two, given the failed sale of Farm One. According to the Complaint, the Bank encouraged Mr. Dommel to continue with construction on Farm Two, notwithstanding his over-extended credit line, and "not to worry, we will work it out." (Doc. 1 at 6).

[1]  The complaint is vague as to whether this was Robert or William Dommel.

The Dommels saw a 50% decline in business in 2007, from breeding and boarding 80–90 horses prior to that year, to fewer than 50 horses after. They were no longer able meet their monthly payment obligations to the Bank. On October 10, 2008, the Bank confessed judgment against the Dommels in the amount of $1,520,827.33 on the First

Note; $2,936,408.53 on the Second Note; and $716,424.24 on the Third Note. [2]

[2]  The Complaint contains a more detailed accounting of these figures, which combine the unpaid balances on the notes, late charges, interest, and attorney's fees.

Plaintiffs assert that Mr. Dommel met repeatedly with executives from the Bank throughout the fall and winter of 2008, during which time they repeatedly assured him that the Bank would continue to work with him to resolve the debts, notwithstanding the confessed judgments on the notes. Allegedly, the Bank also represented to Mr. Dommel that it would not execute upon the judgments.

The Dommels held a public auction for Farm One on August 21, 2008. The auction was attended by developers, horse breeders, and investors, numbering over 150. According to the Complaint, a Senior Vice President of the Bank announced at the podium that any offer was "contingent upon approval by the Bank's Board of Directors." (*Id.* at 8). Plaintiffs allege that this statement was made in an effort to chill the bidding. Farm One received a high bid of $1,815,000, [3] but the Bank rejected it, purportedly to avoid crediting the equity against the Dommels' debt, and to pave the way for the Bank's ownership of Farm One.

[3]  Consisting of $1,650,000 plus a 10% buyer's premium.

**\*3** The Dommels had Farm One appraised in July 2008, and it was valued at $2.3 million. In June 2009, however, the Bank had its own appraiser assess Farm One, who devalued it by 46%. The Bank conducted a sheriff's sale of Farm One on July 23, 2009, "surreptitiously" purchasing the property for $11,053.31. Plaintiffs allege that the sheriff's sale was conducted to usurp the Dommels' property.

On January 18, 2010, the Bank filed a petition to fix the fair market value of Farm One. [4] At a hearing on September 27, 2011, the court fixed the fair market value of Farm One as $1.5 million, crediting the Dommels with this amount and any accrued interest and legal fees. According to plaintiffs' Complaint, the Bank has not credited the $1.5 million against the Dommels' debt.

[4]  The Complaint does not specify in what court this petition was filed.

C. *Farm Two*
Neuin is a member of the Bank's Board of Directors. She is also the Treasurer for Lebanon County and Director of the TCB. She is married to the Director Emeritus and former President of Jonestown Bank, Howard M. Neuin; together, they are two of the Bank's largest shareholders.

Plaintiffs allege that Neuin, through her positions at the Bank and the TCB, discovered confidential information related to the Dommels, the properties that they owned, the value of their properties, and their businesses, collateral, and clients. According to plaintiffs' Complaint, Neuin was aware of the Dommels' history with the bank, including their loan agreements and borrowing history, and with their tax situation. On May 25, 2011 and July 7, 2011, plaintiff Dommel Properties LLC received a notice from the TCB stating that, due to delinquent real estate taxes during tax year 2009, the TCB would hold a tax sale of Farm Two on September 12, 2011. Plaintiffs allege that notice of the sale for delinquent taxes was not properly "posted."

Throughout the spring and summer of 2011, the Dommels continued to meet with the Bank in an effort to negotiate a resolution to their outstanding debt. According to the Dommels, they were repeatedly assured by Bank executives that the Bank had no interest in taking Farm Two. The Complaint details one occasion in August 2011, when Mr. Dommel met with Bank Vice President Richard Rollman ("Rollman"). Rollman allegedly agreed to negotiate in good faith with the Dommels to reach a settlement proposal that could be taken to the Bank Board for approval. Rollman continued to assure Mr. Dommel that the Bank would not seize the farm. On September 9, 2011, three days before the tax sale, Mr. Dommel met with Roger Jeremiah ("Jeremiah"), Senior Vice President of the Bank, who assured Mr. Dommel that the bank would not bid on Farm Two. Mr. Dommel gave the Bank $5,000 as a good faith payment toward his outstanding debt. Mr. Dommel spoke to Rollman again on September 9, who again assured him that the Bank was not planning to bid on Farm Two.

On September 12, 2011, the TCB held the tax sale on Farm Two. The Dommels did not attend. According to the Complaint, notwithstanding their assurances to the contrary, the Bank "surreptitiously" purchased the property at an "upset price" of $110,401.95. (*See* Doc. 1 at 11). When Mr. Dommel called the TCB on September

13, 2011, to inquire as to the outcome of the sale, Neuin allegedly informed him "We own your property. You will be looking for a new place to live." (*Id.*) Mr. Dommel then spoke with Jeremiah, who advised him that the Bank purchased the property because "it puts us ... in a better position." (*Id.*) Mr. Dommel stopped payment on the $5,000 check that he wrote to the Bank.

**\*4** In a letter dated September 28, 2011, the Bank contacted the Dommels' largest client, Thomas McClay. In the letter, the Bank stated that it was "the current owner of the property. The Bank understands that you are currently leasing the Property or have horses under a management/boarding agreement with the prior owner, William J. Dommel .... the Bank demands that any and all lease payments ... be remitted directly to the Bank as the current owner of the Property." (Doc. 1 at 13).

## II. *Procedural History*
The Dommels challenged the Tax Sale in the Lebanon County Court of Common Pleas. *See In re Lebanon County Tax Claim Bureau Real Estate Tax Sale* 2011, No.2011–01738 (Lebanon County Court of Common Pleas). They filed objections and exceptions to the sale, alleging that: (1) the tax sale was void because the TCB failed to properly post Farm Two pursuant to Pennsylvania real estate law; (2) the sale violated the Dommels' substantive due process rights; (3) that the Bank and TCB conspired to destroy the Dommels' business through the tax sale; and (4) that the Bank's purchase of Farm Two was fraudulent, *inter alia,* because it was contrary to the Bank's prior representations to Mr. Dommel. (*See* Doc. 35 at 7). The Court of Common Pleas held a hearing on June 11, 2012, at which it addressed "the September 2011 Tax Sale, and the dealings between Tax *[sic]* Claim Bureau, the bank, and the objectors [plaintiffs]" with regard to the sale of Farm Two. (*See* Doc. 31–1 at 11).

On August 17, 2012, the Court of Common Pleas overruled the Dommels' objections and exceptions to the tax sale, ruling against them on the merits of their claim that the TCB failed to provide statutorily required notices, and declining to consider the Dommels' second, third, and fourth claims. The court stated that "the only issues that are cognizable on exceptions or objections to a tax sale are whether the [TCB] complied with the procedures required by statute," and that while the Dommels' other arguments "may present a cognizable basis for legal action in other

Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 96 of 126

Dommel Properties, LLC v. Johnstown Bank and Trust Co., Not Reported in F.Supp.2d...

proceedings before this and/or other courts or tribunals, ... [they do not] present an actionable objection or exception to a tax sale." *In re Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011,* No.2011–01738, slip op. at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41–1). Plaintiffs noticed their appeal to the Commonwealth Court on August 24, 2012, and submitted an emergency application for supersedeas on September 4, 2012. The court denied the application for supersedeas on September 26, 2012, and the matter was discontinued on November 15, 2012. *See Dommel Properties v. Lebanon Co. Tax Claim Bureau,* No. 1621–CD–2012 (Pa.Commw.Ct. Nov. 16, 2012).

On February 7, 2012, Dommel Properties LLC filed a Chapter 11 Voluntary Bankruptcy Petition in the Bankruptcy Court for the Middle District of Pennsylvania. *In re Dommel Properties LLC,* No. 1–12–691 (M.D.Pa.Bankr.). On April 3, 2012, the Bankruptcy Court entered an order lifting the automatic stay, see 11 U.S.C. § 362(a), allowing "the parties to pursue the Federal Litigation to judgment, including any ancillary injunctive relief." *See In re Dommel Properties* LLC, No. 1:12–691 (M.D. Pa. Bankr.April 3, 2012).

 **\*5**  Plaintiffs bring eleven claims, alleging violations of their procedural and substantive due process rights under § 1983 (Count I); federal inverse condemnation under 40 U.S.C. § 3113 (Count II); state inverse condemnation (Count III); civil conspiracy (Count IV); intentional interference with contract (Count V); conversion (Count VI); fraud (Count VII); negligence (Count VIII); breach of fiduciary duty (Count IX); promissory estoppel (Count X); and deepening insolvency (Count XI). Plaintiffs seek compensatory and punitive damages, and attorney's fees.

### III. *Jurisdiction and Standard of Review*
Jurisdiction in this case is premised on the court's power to decide questions of federal law. District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The court has supplemental jurisdiction to decide state law causes of action that are "so related" to accompanying federal claims "that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The standard of review under Rule 12(b)(6) is well established. The court must conduct a two-part analysis to determine the sufficiency of the complaint. First, the

court must separate the factual matters averred from legal conclusions asserted. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). Although facts pled in the complaint must be taken as true, the court may disregard any legal conclusions. *Id.* at 210–11. Second, the court must determine whether the factual matters averred are sufficient to show that plaintiff has a "plausible claim for relief." *Id.* at 211 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Ultimately, the analysis is "context-specific" and requires the court to "draw on its judicial experience and common sense" to determine whether facts alleged in the complaint suggest "more than the mere possibility of misconduct." *Ashcroft,* 556 U.S. at 679.

### IV. *Discussion*
Presently before the court are two motions to dismiss, filed by the Bank (Doc. 30) and by the county defendants jointly (Doc. 29). The motions present arguments distinct to their movants, and so the court will address each motion separately.

#### A. *The County Defendants*
The county defendants raise a number of arguments in support of their motion to dismiss. The court will address these arguments *seriatim.*

##### i. *Standing*
The county defendants argue that plaintiffs Land of Believe Farm, Inc., William J. Dommel, and Robert W. Dommel lack Article III standing to bring these claims, because they have no legal interest in Farm Two and have therefore suffered no injury. They assert that Dommel Properties, LLC is the only plaintiff that has standing. The court rejects this argument.

A motion to dismiss for lack of standing is properly brought pursuant to Federal Rule of Civil Procedure 12(b)(1), because standing is a question of 11 jurisdiction. *In re Schering Plough Corp. Intron/Temodar Consumar Class Action,* 678 F.3d 235, 243 (3d Cir.2012). The requirements of Article III standing are "familiar ." *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 11–12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). The plaintiff must show that he or she suffered an "injury in fact," that the complained-of-conduct is the cause of the plaintiff's injury, and that a favorable judgment from the court will redress that injury.

Dommel Properties, LLC v. Jamestown Bank and Trust Co., Not Reported in F.Supp.2d...

Case 3:17-cv-00101-RDM  Document 29-5  Filed 03/24/17  Page 97 of 126

*Id.* The plaintiff carries the burden to establish standing by the manner and degree of proof commensurate with each "successive stage[ ] of the litigation." *American Civil Liberties Union of New Jersey v. Township of Wall,* 246 F.3d 258, 261 (3d Cir.2001). To determine whether a complaint sufficiently pleads the elements of standing to survive a motion to dismiss, the court must adopt the standard of Rule 12(b)(6), accepting as true all material allegations set forth in the complaint and construing those facts in the light most favorable to the nonmoving party. *In re Schering Plough,* 678 F.3d at 243.

**\*6** Here, the Complaint makes clear that Farm Two is the locus at which the Land of Believe Farm business is located—thirty-five thoroughbred horses are boarded, bred, and foaled there by the Dommels as part of the Land of Believe Farm's operations. (Complaint, Doc. 1 at ¶ 13(b)). The Dommels have maintained a principal residence on Farm Two. *Id.* It is difficult to conceive of an injury in fact more concrete and more particularized than the loss of the property upon which one's home and business are located. The county defendants' motion to dismiss for lack of standing is rejected.

### ii. The Tax Injunction Act

The county defendants assert that the court lacks jurisdiction to hear this case under the Tax Injunction Act. For the reasons to be discussed, the court finds this argument unpersuasive.

The Tax Injunction Act, 28 U.S.C. § 1341 ("the TIA"), states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The TIA divests the district courts of jurisdiction over "suits relating to the collection of State taxes," *Hibbs v. Winn,* 542 U.S. 88, 104, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (quoting S.Rep. No. 1035, 75th Cong ., 1st Sess., 1 (1937)), and is "first and foremost a vehicle to limit drastically federal court jurisdiction to interfere with so important a local concern" as taxation. *Rosewell v. LaSalle Nat. Bank,* 450 U.S. 503, 522, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981).

In determining whether a claim falls within the ambit of the TIA, "it is appropriate, first, to identify the relief sought." *Hibbs,* 542 U.S. at 99. Though by its plain language the TIA applies only to "injunctions," the principle of comity has led courts to interpret the TIA more broadly, as a general barrier to federal court intervention in state tax collection. *See, e.g., California v. Grace Brethren Church,* 457 U.S. 393, 408, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982) (interpreting the TIA to include declaratory judgments); *see also Behe v. Chester Cnty. Bd. of Assessment Appeals,* 952 F.2d 66, 68 (3d Cir.1991) ("As a result of its expansive reading of the Act, the Court has woven an almost impenetrable barrier to state tax challenges in federal court.") (internal citation and quotation marks omitted). This includes damages actions brought under 42 U.S.C. § 1983. *See Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 115–16, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981); *id.* at 111 ("The focus was not on the specific form of relief requested, but on the fact that 'in every practical sense [it] operate[d] to suspend collection of the state taxes until the litigation [was] ended." (quoting *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 299, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943) (alterations in original)).

Actions for damages under § 1983 fall within the TIA's prohibition because they necessarily interfere with the revenue collection abilities of the state. *See McNary,* 454 U.S. at 113–14 (noting that, in order for a plaintiff to recover damages under § 1983, "in effect, the district court must first enter a declaratory judgment like that barred in *Great Lakes"* ). The TIA applies if the effect of the plaintiffs' lawsuit is to challenge the "assessment, levy or collection" of a tax. Plaintiffs argue their suit does "not seek[ ] to 'enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law.' " (Doc. 35 at 12). Rather, plaintiffs challenge "the unconstitutionality of the tax sale procedures used by defendants that deprived plaintiffs of their due process rights." (*Id.*) Thus, as a threshold matter, the court must decide whether the tax procedures employed by the county defendants were deficient.

**\*7** As the Supreme Court explained in *Hibbs,* the "moorings" of the TIA can be found in state revenue protection. 542 U.S. at 106; *see also id.* (explaining that prior decisions interpreting the TIA had disallowed lawsuits that "would have operated to reduce the flow of state tax revenue"). Plaintiffs directly challenge the validity of a tax collection procedure—a tax sale held to collect upon delinquent real estate taxes. (*See* Complaint, Doc. 1 at 10 ("[O]wner Dommel Properties LLC received a notice from the Tax Claim bureau stating that, due to delinquent real estate taxes incurred in the Tax Year

2009 on Farm Two, a tax sale of Farm Two was scheduled for September 12, 2011")). Despite the fact that plaintiffs seek damages rather than an injunction, their suit would nonetheless disrupt the orderly collection of revenue—precisely the concern that the TIA speaks to. *See California v. Grace Brethren Church,* 457 U.S. 393, 410, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982) ("If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law."). Culled to its essence, plaintiffs' claim is a challenge to the collection of a tax, falling squarely within the ambit of the TIA. *See Potter County v. Heinrich,* 408 Pa. 321, 323, 183 A.2d 726 (1962) (noting that the purpose of a tax sale is not to deprive the taxpayer of property but to ensure the collection of taxes).

Because the TIA applies to plaintiffs' suit, this court lacks jurisdiction to hear their claims against the county defendants if the available state remedies are "plain, speedy and efficient." *See* § 1341. State remedies satisfy the TIA if they meet "certain minimal *procedural* criteria," but need not be "the best, most convenient, or speediest" remedies. *Gass v. Cnty. of Allegheny, PA.,* 371 F.3d 134, 137 (3d Cir.2004) (quoting *Rosewell v. La Salle Nat'l Bank,* 450 U.S. 503, 512, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981)) (emphasis in original). The state must provide the taxpayer with "a full hearing and judicial determination of the controversy," *id.,* and "a fair opportunity to challenge the accuracy and legal validity of their tax obligation." *Berne Corp. v. Government of The Virgin Islands,* 570 F.3d 130, 137 (3d Cir.2009) (quoting *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 39, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990)).

Pennsylvania law sets forth a scheme by which real estate tax sales may be held to satisfy delinquent tax debts. *See generally* 72 PA. CONS. STAT. § 5860.101 *et seq.* Pennsylvania law requires that tax claim bureaus must, within 30 days of sale, give notice to owners that the property was sold, and that the owner "may file objections or exceptions with the court relating to the regularity and procedures followed during the sale" within 30 days after the court has made a confirmation nisi of the tax claim bureau's consolidated return. § 5960.607(a.1)(1). Bureaus are also required to publish notice of tax sales in newspapers and legal journals. § 5960.607(b.1). Taxpayers may then raise objections or exceptions to the "regularity

or legality of the proceedings" undertaken in the course of the sale, but may *not* challenge the validity of the taxes upon which the sale was held, the tax collector's return to the bureau, or the claim entered. § 5860.607(d). Taxpayers are "clearly and unequivocally" limited in the types of objections they can raise, to "whether the Bureau complied with the procedures delineated by the legislature to bring a delinquent tax property to a public sale and the return and confirmation thereof." *Appeal of Yardley,* 166 Pa.Cmwlth. 596, 646 A.2d 751, 755 (Pa.Commw.Ct.1994).

**\*8** Hence, the courts of common pleas have only limited power to review tax sales. Consistent with this limited authority, the Lebanon County Court of Common Pleas held that plaintiffs' constitutional arguments were not cognizable as objections or exceptions to the tax sale. *See In re Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011,* No.2011–01738, at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41–1). The circumscribed nature of the court's review renders plaintiffs' state remedies inadequate, because a taxpayer must be able to pursue federal constitutional claims in the state proceedings. If the taxpayer is precluded from asserting federal constitutional claims, the state proceeding cannot be regarded as "plain, speedy, or efficient." *See Strescon Industries, Inc. v. Cohen,* 664 F.2d 929, 931–32 (4th Cir.1981) (citing *Township of Hillsborough v. Cromwell,* 326 U.S. 620, 623, 66 S.Ct. 445, 90 L.Ed. 358 (1946)). Here, plaintiffs attempted to raise their constitutional claims in the state court and were denied the ability to do so. In light of deficient state court remedies, this court has subject matter jurisdiction to hear their claims.

Defendants urge the court, in the alternative, to abstain from hearing this case under *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The court declines to do so. " '[T]he pendency of an action in ... state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.' " *Marshall v. Lauriault,* 372 F.3d 175, 183 (3d Cir.2004) (quoting *Colorado River,* 424 U.S. at 817)); *id.* (abstention is appropriate only in "exceptional circumstances" and the court's analysis should be "heavily weighted in the favor of the exercise of jurisdiction") (internal citations omitted)). Plaintiffs in this matter have been denied a state forum to air their constitutional claims; to abstain from hearing the case would put plaintiffs "effectively out of court."

Dommel Properties LLC v. Jenstown Bank and Trust Co., Not Reported in F.Supp.2d....

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 99 of 126

*Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 713, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal citation and quotation marks omitted). Abstention is therefore inappropriate in the instant matter.

*iii. Substantive and Procedural Due Process (Count I)*
County defendants have moved to dismiss plaintiffs' claims alleging violations of their procedural and substantive due process rights. In Count I of the Complaint, plaintiffs allege that the defendants collectively violated their due process rights by (1) orchestrating the Tax Sale with the specific intent of depriving the Dommels of their property; (2) surreptitiously buying Farm Two at the sale; (3) misleading Mr. Dommel into believing that the Bank would not bid at the sale, and failing to inform Mr. Dommel that he may lose Farm Two to the Bank; (4) misrepresenting the Bank's intent to purchase Farm Two, and failing to credit the equity in Farm Two to the Dommels' debt; and (5) failing to comply with certain elements of Pennsylvania law regarding notice of tax sales. Plaintiffs' procedural and substantive due process claims require distinct analyses, and so will be addressed separately.

**\*9** A threshold issue exists, however, as to whether plaintiffs can pursue either due process claim against the TCB under a theory of municipal liability. In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local government entities may be held liable under § 1983. *See Indep. Enterprises Inc. v. Pittsburgh Water and Sewer Authority,* 103 F.3d 1165, 1173 (3d Cir.1997). When a plaintiff brings suit against a municipality under § 1983, "the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted custom." *Mulholland v. Government Cnty. of Berks, Pa.,* 706 F.3d 227, 237 (3d Cir.2013) (internal citation and quotation marks omitted). Courts have recognized two distinct theories under which *Monell* liability can lie: "policy" and "custom."

Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such

practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Andrews v. City of Phila.,* 895 F.2d 1469, 1480 (3d Cir.1990) (internal citations omitted; alterations in original).

Here, plaintiffs have pled no facts tending to show *either* a policy or custom on the part of the TCB to engage in deprivations of the Dommels' procedural or substantive due process rights. Indeed, the only allegations of wrongdoing attributed to the TCB derive from Neuin's alleged misconduct. (*See, e.g.,* Complaint, Doc. 1 at 11 ("Mr. Dommel telephoned County Treasurer Neuin at the Tax Claim Bureau to ask how the Tax Sale went.... Neuin told Mr. Dommel 'We own your property. You will be looking for a new place to live.' ") (emphasis omitted)). Plaintiffs make no allegation that the TCB adopted an official policy or maintained an unofficial custom of engaging in fraudulent tax sales. Plaintiffs seek to hold the TCB liable for the acts of Neuin under what amounts to nothing more than a theory of *respondeat superior* vicarious liability, which is not permitted under § 1983. *Andrews,* 895 F.2d at 1480. Plaintiffs' § 1983 claim against the TCB must therefore be dismissed.

The court will turn now to plaintiffs' § 1983 claim against Neuin. To survive a motion to dismiss for failure to state a claim, a plaintiff alleging deprivation of their procedural due process rights "must allege that they were deprived of an interest encompassed within the Fourteenth Amendment's protection of life, liberty, or property and that available procedures did not provide due process of law." *Association New Jersey Rifle and Pistol Clubs v. Governor of New Jersey,* 707 F.3d 238, 2013 WL 336680, at \*3 (3d Cir. January 30, 2013). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Miller v. City of Philadelphia,* 174 F.3d 368, 373 (3d Cir.1999) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); internal quotation marks omitted). To determine whether the plaintiff has been given due process, a court must consider the factors set forth by the Supreme Court in *Mathews:*

> **\*10** [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of

Case 3:17-cv-00101-RDM   Document 28-5   Filed 03/24/17   Page 100 of 126

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

Plaintiffs do not facially challenge the manner in which Pennsylvania real estate tax sales are conducted; i.e., they do not allege that the statutory scheme enacted to govern tax sales is inherently constitutionally deficient. Rather, their argument is that Neuin's alleged conflict of interest and deleterious intent in bringing Farm Two to sale violated their right to due process.

Plaintiffs allege that they have been wrongly deprived of their property, an injury that clearly falls within the protections guaranteed by the Fourteenth Amendment. *See Chambers ex rel. Chambers v. School Dist. of Phila. Bd. of Educ.,* 587 F.3d 176, 194 (3d Cir.2009). As was discussed at length *supra,* Pennsylvania law implements procedures that must be followed in order to execute a tax sale for the collection of unpaid taxes. These procedures also provide for review of tax sales, including judicial review. *See, e.g.,* 72 PA. CONS. STAT. § 5020–511 (allowing for appeal to the Board of Revision for the revision of taxes); § 5020–518.1 (allowing for appeal to the Court of Common Pleas of a county board's tax assessment); § 5020–519 (allowing for appeal to the Superior Court or to the Supreme Court). As previously noted, Pennsylvania law provides an opportunity to challenge confirmation of a tax sale in a state court, *see* § 5860.607(d), and to appeal an adverse decision, which plaintiffs have done. *See Dommel Properties v. Lebanon Co. Tax Claim Bureau,* No. 1621–CD–2012 (Pa.Commw.Ct. Nov. 16, 2012); *cf. Berne Corp. v. Government of the Virgin Islands,* 570 F.3d 130 (3d Cir.2009) ("[D]ue process requires ... notice and opportunity for hearing appropriate to the nature of the case."); *id.* ("[P]rocedural due process requires at a minimum that the taxpayer have both notice and the right to participate."). Plaintiffs have availed themselves of Pennsylvania's "fully-developed administrative and judicial apparatus" for challenging taxes, and have not been deprived of their procedural due

process rights. *See Gass v. Cnty. of Allegheny, PA.,* 371 F.3d 134, 140 (3d Cir.2004).

Turning now to plaintiffs' substantive due process claim against Neuin, we note that the core concept of substantive due process is "protection against arbitrary action" on the part of government officials, and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA,* 316 F.3d 392, 399 (3d Cir.2003) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). A government employee violates the substantive component of the Due Process Clause when their "conduct amounts to an abuse of official power that 'shocks the conscience.' " *Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994) (internal citation omitted). "State conduct violates an individual's substantive-due-process rights when it is 'so brutal, demeaning, and harmful that it is shocking to the conscience.' " *Elena v. Municipality of San Juan,* 677 F.3d 1, 7–8 (1st Cir.2012) (quoting *Maymi v. P.R. Ports Auth.,* 515 F.3d 20, 30 (1st Cir.2008)).

**\*11** What qualifies as conscience shocking is an intensely fact-specific inquiry and is likely to vary from case to case. *See Lewis,* 523 U.S. at 847 ("the measure of what is conscience-shocking is no calibrated yard stick"). Generally, "it is governmental conduct intended to injure that is most likely to rise to the conscience-shocking level." *Evans v. Sec'y of Pa. Dep't of Corr.,* 645 F.3d 650, 660 (3d Cir.2011). The Third Circuit has suggested that some allegations of corruption and self-dealing may suffice to state a claim for violation of a plaintiff's substantive due process rights. *See Eichenlaub v. Township of Indiana,* 385 F.3d 274, 285–86 (3d Cir.2004); *see also Chainey v. Street,* 523 F.3d 200, 220 (3d Cir.2008) (allegations of "corruption, [or] self-dealing" may suggest conscience-shocking behavior).

In the instant matter, plaintiffs' allegations against Neuin may be readily construed as claims of corruption and self-dealing. The Complaint asserts that Neuin used knowledge of the Dommels' finances, gained through her role as a member of the Bank's Board of Directors, to drive the Dommels out of business, acquire their property and home, and expand her own assets. The Complaint further alleges that all of Neuin's actions were executed under color of state law in her role as Lebanon

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

Case 3:17-cv-00101-RDM Document 28-5 Filed 03/24/17 Page 101 of 126

County Treasurer and as Director of the TCB. These allegations are sufficient to plead a claim for violation of the Dommels' substantive due process rights.

The county defendants' motion to dismiss Count I as to Neuin will be denied with respect to the substantive due process argument, but granted with respect to the procedural due process argument. As to the TCB, Count I will be dismissed in its entirety.

*iv. Inverse Condemnation (Counts II and III)*
Plaintiffs bring claims for inverse condemnation under 40 U.S.C. § 3113 (Count II) and 26 PA. CONS. STAT. § 101 et seq. (Count III). [5] They allege that defendants, "by preventing [the Dommels] ... from generating the cash flow necessary to fulfill their financial obligations, including paying their property taxes, ... depriv[ed] the Dommels of their property without just compensation." (Complaint, Doc. 1 at 19–20).

[5]    The court notes that, in both the Complaint and in their brief, plaintiffs cite 28 PA. CONS. STAT. § 101 as the statutory provision governing their state inverse condemnation claim. Title 28 of the Pennsylvania statutes is reserved for the law of escheats; title 26 contains the law of eminent domain.

A claim for inverse condemnation requires a taking by the government. See *Cowell v. Palmer Tp.,* 263 F.3d 286, 290 (3d Cir.2001) ("Pennsylvania's Eminent Domain Code provides inverse condemnation procedures through which a landowner may seek just compensation for the taking of property." (citing 26 PA. CONS. STAT. §§ 1–408, 1–502(e), 1–609)). "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). A tax sale, however, is not a taking for a public purpose pursuant to a state's power of eminent domain, but is instead an exercise of the state's taxing power. See *In re Murphy,* 331 B.R. 107, 128 (S.D.N.Y.Bankr.2005). The purpose of a tax sale is not to deprive the taxpayer of property but to ensure the collection of taxes. *Potter County v. Heinrich,* 408 Pa. 321, 323, 183 A.2d 726 (1962); *see also Golden v. Mercer Cty. Tax Claim Bureau (In re Golden),* 190 B.R. 52, 57 (W.D.Penn.Bankr.1995) ( "In a tax sale context, the

takings clause is not dispositive nor the appropriate basis for starting an inquiry."); *Industrial Bank of Washington v. Sheve,* 307 F.Supp. 98, 99 (D.D.C.1969) ("A tax sale is not a government taking for which just compensation must be paid under the Constitution after judicial proceedings.").

**\*12**  Plaintiffs cite *Villareal v. Harris County,* 226 S.W.3d 537 (Tex.App.2006), for the proposition that an irrational and egregious misuse of a state's taxing power could constitute a taking. In *Villareal,* the Texas state court held that "if the government improperly uses its taxing power to take private property for public use, then an article I, section 17 taking has occurred." *Id.* at 544. The court does not find this case persuasive. The limitations of the Texas court's holding undermines plaintiffs' argument, because the court concluded only that a use of the taxing power to take private property *for public use* could constitute a taking. Even if the Tax Sale was fraudulently conducted, it would not constitute a taking because it benefitted a private entity—specifically, by enhancing the Bank's equity position with respect to the property—and is therefore not a taking "for public use."

Plaintiffs' Complaint fails to state a claim for inverse condemnation. Therefore, the county defendants' motion to dismiss will be granted as to Counts II and III.

*v. The TCB's Municipal Immunity*
The Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") provides that, "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 PA. CONS. STAT. § 8541. The PSTCA expresses the legislature's "intent ... to shield government from liability." *Jones v. Southeastern Pennsylvania Transp. Auth.,* 772 A.2d 435, 440 (Pa.2001).

There are instances, however, in which a local agency will not be immune under the PSTCA. *See* § 8542. For municipal liability to be abrogated, the allegedly tortious conduct must satisfy two preconditions and fall into one of eight exemption categories. First, the tort must be one that would be recoverable from a defendant not having a defense of governmental immunity under § 8541, or official immunity under § 8546. § 8542(a)(1). The injury also must have been "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties," and does not include any

Case 3:17-cv-00101-RDM Document 28-5 Filed 03/24/17 Page 102 of 126

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

"acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct." § 8542(a)(2). If a plaintiff's claim satisfies these two prerequisites, then local agencies and their employees may be liable if the claim involves vehicular liability; the agency's care, custody or control of personal property or real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; or the care, custody or control of animals. § 8542(b).

Plaintiffs do not argue that their claims fall into one of these eight enumerated exceptions. Instead, they seek to circumvent § 8542(a)(2) under a theory of vicarious liability. Plaintiffs argue that § 8550 strips Neuin of official immunity because their claims against her allege intentional misconduct. Section 8550 states

> **\*13** In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (related to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

Plaintiffs claim that Neuin's intentional misconduct can be attributed to the TCB under a theory of vicarious liability. This argument is unpersuasive. Plaintiffs cite general propositions of agency law, but fail to comprehend the differences that inhere when the principal is a government agency. Although § 8550 abrogates official immunity for intentional torts, that abrogation does not extend to municipalities such as the TCB. *See Udujih v. City of Philadelphia,* 513 F.Supp.2d 350, 357–58 (E.D.Pa.2007). Indeed, to hold otherwise would negate the *express exclusion* of "crime, actual fraud, actual malice or willful misconduct" from the torts for which municipal immunity is waived under § 8542(a)(2). Therefore, defendants' motion to dismiss Counts IV, V and VI as to the TCB will be granted.

### vi. Neuin's Official Immunity

County defendants next move to dismiss Counts IV, V, and VI as against Neuin, on the grounds that she is cloaked in official immunity for conduct performed in the course of her duties as Lebanon County Treasurer. (Doc. 32 at 17). [6] Section 8546 grants official immunity to employees of local agencies, but an "employee is not protected by the local agency's immunity if his act constitutes a crime, actual fraud, actual malice, or willful misconduct." *Lancie v. Giles,* 132 Pa.Cmwlth. 255, 572 A.2d 827, 830 (Pa.Commw.Ct.1990) (citing § 8550). Pennsylvania courts have interpreted "willful misconduct" to mean intentional torts. *Id.* Counts IV, V, and VI allege civil conspiracy, intentional interference with contract, and conversion, respectively. Each is an intentional tort. *See Weaver v. Franklin Cnty.,* 918 A.2d 194, 202 (Pa.Commw.Ct.2007) (conspiracy); *Walnut Street Assoc., Inc. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 97 (Pa.Super.Ct.2009) (interference with contract); *Snead v. Society for Prevention of Cruelty to Animals of Pennsylvania,* 929 A.2d 1169, 1183 (Pa.Super.Ct.2007) (conversion). Therefore, Neuin is not immune from liability by virtue of her official employment, and the county defendants' motion to dismiss Counts IV, V, and VI as against Neuin, on the grounds of official immunity, will be denied.

6     Defendants argue in their reply brief, for the first time, that Neuin is immune from liability, notwithstanding the intentional misconduct provision of § 8550, because she is a "high public official." (Doc. 37 at 11–13). Arguments raised for the first time in a reply brief are generally waived because fairness requires that nonmovants have the opportunity to respond to any arguments presented by the movant. *Tristate HVAC Equipment, LLP v. Big Belly Solar, Inc.,* 752 F.Supp.2d 517, 529 n. 8 (E.D.Pa.2010). Accordingly, the court deems this argument waived, and declines to consider it. *Id.*

### vii. Civil Conspiracy (Count IV)

County defendants have moved to dismiss Count IV, civil conspiracy, as to both the TCB and Neuin. To state a claim for civil conspiracy, a plaintiff must set forth the following allegations: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *General*

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

Case 3:17-cv-00101-RDM   Document 28-5   Filed 03/24/17   Page 103 of 126

*Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir.2003) (quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 987–988 (Pa.Super.Ct.1997)).

**\*14** In *Capogrosso v. The Supreme Court of New Jersey,* 588 F.3d 180, 184–85 (3d Cir.2009), the Third Circuit emphasized that "allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." The Complaint "must include at least a discernible factual basis" to survive a motion to dismiss. *Id.* at 184; *see also Feliz v. Kintock Group,* 297 Fed. App'x 131, 136 (3d Cir.2008) (recognizing that "conclusory allegations of concerted action are insufficient to satisfy the notice-pleading standard") (internal citation and quotation marks omitted); *Adams v. Teamsters Local 115,* 214 Fed. App'x 167, 175 (3d Cir.2007) (noting that the complaint must "set[ ] forth a valid legal theory and ... adequately state[ ] the conduct, time, place, and persons responsible" for the alleged conspiracy).

Plaintiffs' Complaint fails to plead a sufficient factual basis to support the existence of a conspiracy. The Complaint alleges that "Defendants knowingly and willfully conspired to maximize the assets of the Bank for the benefit of the Bank's shareholders ... [or] of the Tax Claim Bureau, at the expense and destruction of the Dommels' businesses," (Doc. 1 at 21), but this allegation amounts to nothing more than a conclusory assertion of misconduct. The Complaint fails to identify any specific individuals, other than Neuin, who were parties to the alleged conspiracy, and seeks to extrapolate a conspiracy between the Bank, Neuin, and the TCB based principally upon Nuein's alleged misuse of confidential information about the Dommels' finances. (*Id.* at 21–23). Plaintiffs do not allege facts that would circumstantially suggest an agreement or conduct undertaken in furtherance of an agreed-upon endeavor. They merely make conclusory allegations that defendants acted in concert and with improper motives, without factual support. Plaintiffs have not plead sufficient facts to create a plausible inference of a conspiracy. Accordingly, the county defendants' motion to dismiss will be granted as to Count IV.

*viii. Deepening Insolvency ( Count XI)*
Count XI of the Complaint alleges that defendants fraudulently expanded the Dommels' corporate debt, increasing "their insolvency to a point that they could never recover." (Complaint, Doc. 1 at 33). Count XI

names all defendants, but the allegations of fraudulent conduct relate only to the Bank. Count XI does not levy allegations of fraud against either county defendant, nor are the county defendants named in Count VII, which alleges a separate count of fraud against the Bank. Defendants argue that deepening insolvency is not a valid cause of action under Pennsylvania law, and that plaintiffs' claim fails as a matter of law. (Doc. 32 at 21–22).

Plaintiffs are correct that no Pennsylvania state court has directly addressed whether a claim for deepening insolvency exists under Pennsylvania law. However, the Third Circuit has "don[ned] the soothsayer's garb" and predicted that the Pennsylvania Supreme Court would hold that deepening insolvency may give rise to a cognizable injury. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 349–50 (3d Cir.2001). In the absence of an authoritative ruling from the Pennsylvania Supreme Court, the court is compelled to follow the Third Circuit's lead. [7]

[7]    Defendants suggest that the Pennsylvania Supreme Court's decision in *Official Comm. of Unsecured Creditors v. Pricewaterhousecoopers, LLP,* 605 Pa. 269, 989 A.2d 313, 332 n. 25 (2010) (hereinafter, *"PWC"* ), casts doubt on the continued viability of the *R.F. Lafferty* decision. *PWC,* however, did not address the Third Circuit's prediction regarding the claim of deepening insolvency; hence, it does not control the court's ruling in the instant matter.

**\*15**   Deepening insolvency occurs when "corporate property is injured through the fraudulent or concealed expansion of corporate debt and prolongation of corporate life." *Corporate Aviation Concepts, Inc. v. Multi–Service Aviation Corp.,* No. 03–3020, 2004 WL 1900001, at \*3 (E.D.Pa. Aug.25, 2004) (citing *R.F. Lafferty,* 267 F.3d at 347). As the county defendants correctly observe, integral to the claim of deepening insolvency is an act of fraud or the concealment of debt. Count XI simply does not allege fraud or concealment on the part of the county defendants—all allegedly fraudulent actions were undertaken by the Bank. The Complaint is devoid of any allegations of fraud on the part of the county defendants. Thus, plaintiffs have failed to state a claim for deepening insolvency against the county defendants, and the county defendants' motion to dismiss will be granted as to Count XI.

B. *The Bank*

The Bank alleges numerous grounds for dismissing the Complaint. Several of their arguments substantially track those made by the county defendants, and where appropriate the court will simply refer back to its previous analysis. However, as a private actor, the Bank must be distinguished from the county defendants, and certain arguments are unique to it. The court will therefore address each argument discretely.

*i. Ripeness*

Notwithstanding the *allegata,* the Bank argues that each of plaintiffs' claims arises out of the Tax Sale during which the Bank purchased Farm Two. It argues that because the state court proceedings determining the validity of the Tax Sale have not yet been resolved, the plaintiffs' claims against the Bank are premature. However, during the pendency of the instant motions to dismiss, the Pennsylvania Commonwealth Court discontinued plaintiffs' appeal. *Dommel Properties v. Lebanon Co. Tax Claim Bureau,* No. 1621–CD–2012 (Pa.Commw.Ct. Nov. 16, 2012) (notice of discontinuance). For the reasons discussed below, the court disagrees with the Bank's argument, and finds that plaintiffs' claims are ripe for review.

Article III limits federal court jurisdiction to "cases and controversies," and "[r]ipeness is among the requirements for a case or controversy to exist." *Birdman v. Office of the Governor,* 677 F.3d 167, 173 (3d Cir.2012). Ripeness is "peculiarly a question of timing." *Taylor Inv., Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1290 (3d Cir.1993). The ripeness analysis involves two discrete steps: first, the court must determine the fitness of the issue for judicial decision; and second, the court must weigh the relative hardships the parties would face if the court withheld consideration. *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). For a dispute to be ripe, there must exist a "concrete set of facts" upon which the court could render a decision. *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1455–56 (3d Cir.1994).

**\*16** With regard to the "fitness" prong of the ripeness analysis, the Third Circuit has identified a non-exclusive list of factors that courts should consider to determine whether a case is "fit" for judicial review. These considerations include whether the dispute is "purely legal" rather than factual, "the degree to which the challenged action is final, whether the claim involves uncertain and contingent events," whether further factual development is necessary to aid decision, and whether the parties are sufficiently adverse. *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 342 n. 8 (3d Cir.2001). With respect to the "hardship" prong, the court should consider "whether a plaintiff faces a direct and immediate dilemma, such that lack of review will put it to costly choices." *Id.*

The gravamen of the Bank's ripeness argument is that the validity of the Tax Sale remains unsettled in the Pennsylvania court system. Plaintiffs respond that the Pennsylvania court has declined to hear their constitutional challenges to the Tax Sale, and that the only issue addressed by the state courts is whether sufficient notice was provided to the Dommels in anticipation of the Tax Sale to comply with Pennsylvania law. On August 17, 2012, the Court of Common Pleas overruled the Dommels' objections and exceptions to the tax sale. See *In re Lebanon County Tax Claim Bureau Real Estate Tax Sale 2011,* No.2011–01738, slip op. at 13 (Lebanon Cnty. Ct. of Common Pleas August 17, 2012) (docketed as Doc. 41–1). The Commonwealth Court denied plaintiffs' application for emergency supersedeas on September 26, 2012, and the matter was discontinued on November 16, 2012. *Dommel Properties v. Lebanon Co. Tax Claim Bureau,* No. 1621– CD–2012 (Pa.Commw.Ct. Nov. 16, 2012).

The court concludes that plaintiffs' claims are ripe for review. First, plaintiffs claims in the instant matter differ materially from the claims they brought in state court. As previously discussed, the Lebanon County Court of Common Pleas expressly limited the scope of its review to whether the Tax Sale was conducted in compliance with statutory procedure, and it declined to consider various constitutional and state law claims presented *sub judice.* The outcome of plaintiffs' federal litigation does not depend on the outcome of the state proceedings, nor is further factual development necessary to resolve the dispute. In addition, the Complaint alleges several claims that arise out of factual circumstances separate from the Tax Sale. For example, plaintiffs have alleged that the Bank committed the tort of intentional interference with contract, by contacting the Dommels largest client and suggesting that the Dommels no longer held title

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

Case 3:17-cv-00101-RDM Document 28-5 Filed 03/24/17 Page 105 of 126

to Farm Two. Should the court decline to consider the claims, the hardship to plaintiffs would be significant, in light of the state court's refusal to consider plaintiffs' federal constitutional arguments, and the ancillary state law claims challenging more than the procedural propriety of the Tax Sale proceedings. Therefore, the court finds that plaintiffs' claims are ripe under Article III, and the Bank's motion to dismiss based upon ripeness will be denied.

*ii. Civil Conspiracy (Count IV)*
**\*17**  Count IV of the Complaint alleges civil conspiracy to interrupt business operations against all defendants. As the court previously noted, plaintiffs have failed to plead facts sufficient to raise a plausible inference of conspiracy against the county defendants. *See supra* Part IV(A)(vii). Plaintiffs' conspiracy claims against the Bank suffer from the same infirmities, namely: the claims consist of little more than conclusory allegations of concerted action.

As discussed at length *supra,* "allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. The Supreme Court of New Jersey,* 588 F.3d 180, 184–85 (3d Cir.2009). Beyond bald conclusions, the Complaint fails to allege any facts supporting an inference of an agreement to engage in collusive activity, between the Bank and either the TCB or Neuin, or any other party for that matter. Nor does the Complaint allege facts regarding the "conduct, time, place, and persons responsible" for the alleged conspiracy. *Adams v. Teamsters Local 115,* 214 Fed. App'x 167, 175 (3d Cir.2007). Thus, plaintiffs have failed to set forth a plausible claim for relief based upon civil conspiracy. The Bank's motion to dismiss will be granted as to Count IV.

*iii. Substantive and Procedural Due Process (Count I)*
Plaintiffs bring their due process claims under 42 U.S.C. § 1983. A properly plead § 1983 claim must allege "(1) a violation of a federally protected constitutional or statutory right; (2) by state action or action under color of law." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1264 (3d Cir.1994). Critically—and fatal to plaintiffs' claim—section 1983 applies *only* to state action, excluding "merely private conduct, no matter how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1003,

102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). State action is part of the prima facie case under § 1983, and the plaintiffs bear the burden of proof. *Groman v. Township of Manalapan,* 47 F.3d 628, 638 (3d Cir.1995). "[T]he defendant in a § 1983 action [must] have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Id.* (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

There is no dispute that the Bank is a private entity, not a state actor. Plaintiffs attempt to shoehorn the Bank into their § 1983 claim through a narrow exception for conspiratorial, collusive, or concerted action between private and state actors. *See United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). However, as discussed *supra,* plaintiffs have failed to plead a claim of conspiracy between the Bank and the county defendants. The *allegata* fail to establish even a "tenuous connection" between the Bank and the alleged misconduct of the county defendants. *See Groman,* 47 F.3d at 638. The Bank's motion to dismiss will therefore be granted as to Count I.

*iv. Inverse Condemnation (Counts II and III)*
**\*18**  The Bank has moved to dismiss Counts II and III for inverse condemnation, on the grounds that, as a private actor, the Bank is incapable of committing a government taking. *See* 40 U.S.C. § 3113 ("An officer of the Federal Government authorized to acquire real estate for ... public uses may acquire the real estate for the Government by condemnation, under judicial process ..."); *see also Elena v. Municipality of San Juan,* 677 F.3d 1, 7 (1st Cir.2012) ("The Fifth Amendment ... permits *government takings* of private property *only for public use* and with just compensation ...") (emphasis added). The Bank argues, in the alternative, that Counts II and III fail to state a claim upon which relief can be granted because tax sales are not takings for purposes of an inverse condemnation claim. As discussed *supra,* the court agrees with the latter contention. A tax sale is not a government taking pursuant to the state's power of eminent domain; rather, it is an exercise of the state's taxing power, intended to enforce tax laws and ensure the collection of revenue. *See Bank of Washington v. Sheve,* 307 F.Supp. 98, 99 (D.D.C.1969) ("A tax sale is not a government taking for which just compensation must be paid under the Constitution after judicial proceedings."). It is therefore unnecessary for the court to address the Bank's state action argument. The

Bank's motion to dismiss will be granted as to Counts II and III.

### v. Tortious Interference with Contract (Count V)

In Count V, plaintiffs allege that the Bank intentionally and tortiously interfered with the Dommels' contractual relationship with Thomas McClay ("McClay"), their largest client and a tenant of Farm Two. They assert that the Bank's September 28, 2011 letter to McClay (the "McClay letter"), in which the Bank claimed that it was the lawful owner of Farm Two, and demanded that McClay remit all rent payments to the Bank, constituted tortious interference with contract.

Pennsylvania courts have adopted § 766 of the RESTATEMENT (SECOND) OF TORTS, which states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The Restatement articulates seven factors that a court should consider in determining whether interference is "improper"—and thus actionable. See RESTATEMENT § 767. In *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.,* 610 Pa. 371, 20 A.3d 468 (Pa.2011), the Pennsylvania Supreme Court formally adopted § 772 of the Restatement. Section 772 states that intentional interference with a contract or prospective contractual relation is not improper if the interference consists of giving either truthful information, or honest advice within the scope of a request for advice. RESTATEMENT § 772; *see also Brokerage Concepts,* 610 Pa. 371, 20 A.3d at 476–77. The Supreme Court held that § 772 specifically excludes imparting truthful information from the realm of improper interference, and that this specific exclusion trumps the general principles enunciated in § 767. *Id.* at 477.

**\*19** The dispute between the Bank and plaintiffs is whether the McClay letter contains truthful or false information. If the Bank actually owned Farm Two after purchasing it at the Tax Sale, then the letter contains only truthful information, and plaintiffs' claim is barred as a matter of law. *See id.* at 478 (noting that the information imparted in an allegedly improper interference was indisputably true, and therefore if § 772 applied then the defendant would be entitled to judgment as a matter of law). The Bank argues that there is no dispute that it purchased Farm Two at the Tax Sale, thus making it the lawful owner of the property notwithstanding the fact that the Dommels were still in possession of the land. (Doc. 34 at 21) ("While Plaintiff subsequently challenged the tax sale, without a ruling from the Common Pleas Court, Jonestown Bank remains the owner of the real property."). Plaintiffs view the issue in precisely the opposite way. They argue the Bank was not the lawful owner of Farm Two at the time of the letter, because the objections and exceptions to the Tax Sale were pending before the Pennsylvania courts. The essential question, then, is: who owns the real property pending final disposition of objections to the Tax Sale?

The answer lies within Pennsylvania statutes governing tax sales. Within sixty days following a tax sale, the tax claim bureaus are required to file a consolidated return with the court of common pleas of the appropriate county setting forth, *inter alia,* the name of the owner in whose name the property was assessed, the name of the owner at the time of sale and who was notified, and the name of the purchaser. *See* 72 PA. CONS.STAT. § 5860.607(a). Upon satisfactory review of the consolidated return by the court of common pleas, the return will then be confirmed nisi. *Id.* The owner then has thirty days following confirmation nisi of the consolidated return to file objections and exceptions. § 5860.607(b). If no objections or exception to the sale are filed within thirty days after confirmation nisi, or if the court of common pleas overrules or sets aside the objections, then the prothonotary must then enter a decree of absolute confirmation. § 5860.607(d). If, however, the objections or exceptions are sustained, the court then must enter an order invalidating the sale and ordering another sale to be held to collect the delinquent taxes. § 5860.607(e). Once a sale is confirmed absolutely, the "sale shall be deemed to pass a good and valid title to the purchaser, free from any liens or encumbrances whatsoever, except such liens as are hereafter specifically saved, and in all respects as valid and effective as if acquired by a sheriff's deed." § 5860.607(g). Critically, title to the land *does not pass* to the purchaser, in this case the

Bank, until the sale is confirmed absolutely. At the time that the Bank mailed the McClay letter, the sale had not been confirmed absolutely, meaning that the Bank did not have title to Farm Two. Hence, the Bank's argument that its claim of ownership in the McClay letter was factually accurate, barring as a matter of law plaintiffs' tortious interference with contract claim, is without merit. The Bank's motion to dismiss will be denied as to Count V.

### vi. Conversion (Count VI)

**\*20**  In Count VI, plaintiffs' allege conversion against all defendants. The Bank has moved to dismiss on the grounds that Pennsylvania does not recognize the tort of conversion of real property. The court agrees.

Conversion is, by definition, "an act of willful interference with *a chattel,* done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Norriton East Realty Corp. v. Central–Penn Nat'l Bank,* 435 Pa. 57, 254 A.2d 637, 638 (Pa.1969) (emphasis added); *see also Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 197 A.2d 721, 726 (Pa.1964) ("A conversion is the deprivation of another's right of property in, or use or possession of, *a chattel,* or other interference therewith, without the owner's consent and without lawful justification.") (emphasis added). And it is black letter law that a chattel is defined as "an article of personal property: any species of property *not amounting to a freehold or fee in land." Commonwealth v. Rosicci,* 199 Pa.Super. 609, 186 A.2d 648, 652 (Pa.Super.Ct.1963) (quoting BLACK'S LAW DICTIONARY 316 (3d ed.1933)) (emphasis added).

Plaintiffs cite *James v. City of Philadelphia,* Civ. Action No. 98–4916, 1999 WL 674371, at \*3 n. 2 (E.D.Pa. August 18, 1999), for the proposition that "at best, it is unclear whether Pennsylvania courts would hold real property cannot be the subject of conversion." Plaintiffs overstate the value of *James* to their argument by an extraordinary degree. The sum total of the *James* court's discussion of this issue appears in a footnote, and is reproduced here in full:

> Plaintiff's complaint describes count I as [*sic* ] claim for conversion. Pennsylvania defines the tort of conversion as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Bernhardt v. Needleman,* 705 A.2d 875, 878 (Pa.Super.1998).

As a real property is not a chattel, it is unclear whether a claim of conversion can be maintained under Pennsylvania law. However, as this count cannot, in any case, be maintained, it is unnecessary to struggle with that question today.

*Id.* First, the court's single sentence, that supposedly casts doubt on the prodigious volume of contrary precedent, was pure dictum, as the court expressly stated that it was unnecessary to address that issue. *Id.* The court eschewed any review of Pennsylvania precedent because it concluded that the conversion claim "cannot, in any case, be maintained...." *Id.* Plaintiffs also fail to acknowledge the introductory clause of the court's sentence, which clearly states that "a real property is not a chattel." Plaintiffs assert that "the Bank has not cited any authority which states this proposition definitively," patently ignoring the syllogism, rife in the case law, that conversion is interference with an owner's interest in chattel, and chattel definitionally excludes real property. *See, e.g., Rosicci,* 186 A.2d at 652. In sum, plaintiffs have failed to state a claim for conversion, and the Bank's motion to dismiss will be granted as to Count VI.

### vii. Breach of Fiduciary Duty (Count IX)

**\*21**  The Bank has moved to dismiss Count IX of the Complaint, alleging breach of fiduciary duty, on the grounds that no such duty arose through the course of the lender-borrower relationship between the Bank and plaintiffs.

A fiduciary relationship exists when a party acts as an "advisor or counselor" to another, such that they may reasonably be expected to act with good faith in the other's best interest. *Silver v. Silver,* 219 A.3d 659, 662 (Pa.1966). Typically, the lender-borrower relationship does not create a fiduciary duty. *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, 410 A.2d 344, 348 (Pa.Super.Ct.1979) (citing *Grace et ux. v.* Moll, 285 Pa. 353, 132 A. 171, 171 (Pa.1926)). Lenders and borrowers are presumed to have conducted their transactions at arms-length. *Clark Motor Co., Inc. v. Manufacturers and Traders Trust, Co.,* No. 4:07–CV–856, 2007 WL 2155528, at \*8 (M.D.Pa. July 26, 2007) (citing *Temp–Way Corp. v. Continental Bank,* 139 B.R. 299, 318 (E.D.Pa.1992)). However, a fiduciary duty may arise in situations where the creditor "gains substantial control over the debtor's business affairs." *Blue Line Coal Co., Inc. v. Equibank,* 683 F.Supp. 493, 496 (E.D.Pa.1988) (quoting *Stainton v.*

Case 3:17-cv-00101-RDM   Document 28-5   Filed 03/24/17   Page 108 of 126

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

*Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986)). To establish a fiduciary relationship, plaintiffs must show that the Bank exercised control over the "day-to-day management and operations" of plaintiffs' business, or that the Bank "had the ability to compel ... [plaintiffs] to engage in unusual transactions." *Temp–Way,* 139 B.R. at 318. "[T]he mere monitoring of the borrower's operations and the proffering of management advice by lenders without more is not enough to create a fiduciary duty." *Clark Motor Co.,* 2007 WL 2155528, at \*8.

Plaintiffs assert that the power disparity between the Bank and plaintiffs, coupled with the Bank's recommendation that plaintiffs press forth with their construction loan despite being over-extended, gave rise to a fiduciary duty. (*See, e.g.,* Complaint, Doc. 1 at ¶ 12 ("the Dommels relied upon the Bank's superior expertise, knowledge and advice in connection with the Dommels loans and business dealings with the Bank"); ¶ 23 (plaintiffs did not seek the advice of counsel before executing promissory notes); ¶ 26 (the Bank advised plaintiffs to continue construction on Farm Two); ¶ 27 (Mr. Dommel believed that the Bank would act in the Dommels' best interests)). These allegations, plaintiffs suggest, demonstrate that the Bank had become so ensconced in the financial affairs of plaintiffs horse-breeding business that a duty arose to act in plaintiffs' best interests. The court disagrees.

The critical element necessary to establish a fiduciary duty between a lender and a borrower is the lender's control over the borrower's business. None of plaintiffs' allegations come close to establishing that the Bank exercised the kind of control over the Dommels' business necessary to trigger that type of relationship. The only allegation that edges in the right direction is that the Bank advised the Dommels to continue with construction on Farm Two, and that is plainly insufficient to demonstrate that the Bank exercised day-to-day control over management decisions. *See Temp–Way,* 139 B.R. at 318. Similarly, the Bank's purported assertions that it would continue to act "in good faith" with the Dommels in attempting to settle their debt did not create a fiduciary duty, because a lender's mere attempt to minimize risk does not establish the lender's "control" over the borrower. *James E. McFadden, Inc. v. Baltimore Contractors, Inc.,* 609 F.Supp. 1102, 1105 (E.D.Pa.1985).

**\*22** Plaintiffs fail to plead facts sufficient to support their claim for breach of fiduciary duty, and so the Bank's motion to dismiss will be granted as to Count IX.

### viii. Deepening Insolvency (Count XI)

The only ground that the Bank asserts for dismissing plaintiffs' claim for deepening insolvency is that this tort is not recognized in Pennsylvania. The Bank does not challenge the claim on its merits. As discussed *supra,* however, the court is bound by the Third Circuit's holding in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 349 (3d Cir.2001), predicting that Pennsylvania courts would in fact recognize such a tort. Therefore, the Bank's motion to dismiss Count XI will be denied.

### ix. Supplemental Jurisdiction

The Bank argues that if the federal claims are dismissed, the court should decline to exercise supplemental jurisdiction over the remaining state law claims. District courts have supplemental jurisdiction over state law claims that are "so related" to federal claims "that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). District courts, however, "may" decline supplemental jurisdiction if all claims over which it had original jurisdiction are dismissed. *See* 28 U.S.C. § 1367(c)(3). However, § 1367(c)(3) is not implicated here because a district court's supplemental jurisdiction extends even over "claims asserted by or against additional parties," so long as the claims "form part of the same case or controversy" over which the court has original jurisdiction. HB *General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1197–98 (3d Cir.1996). As noted previously, the court will dismiss the federal claims against the Bank, but a federal claim remains against Neuin. The remaining claims against the Bank share a "common nucleus of operative fact," *see City of Chicago v. Intern'l College of Surgeons,* 522 U.S. 156, 164–65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997), with the remaining constitutional claim against Neuin, such that it is appropriate for the court to exercise jurisdiction over the remaining claims against the Bank. Therefore, the Bank's motion to dismiss for want of supplemental jurisdiction will be denied.

### V. Conclusion

Case 3:17-cv-00101-RDM Document 28-5 Filed 03/24/17 Page 109 of 126

Dommel Properties, LLC v. Jonestown Bank and Trust Co., Not Reported in F.Supp.2d...

For the reasons previously discussed, the defendants' motions to dismiss will be granted in part and denied in part. An appropriate order will issue.

### *ORDER*

AND NOW, this 19th day of March, 2013, upon consideration of the motions to dismiss of defendants Lebanon County Tax Claim Bureau and Sallie A. Neuin (Doc. 29), and defendant Jonestown Bank and Trust Company (Doc. 30), and for the reasons discussed in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motions to dismiss are GRANTED in part and DENIED in part.

2. Counts I, II, III, IV, V, VI and XI are dismissed in their entirety as to the Lebanon County Tax Claim Bureau.

3. Counts II, III, IV, and XI are dismissed in their entirety as to Sallie A. Neuin. Count I is dismissed as to Neuin with respect to plaintiffs' procedural due process claim.

 **\*23** 4. Counts I, II, III, IV, VI, and IX are dismissed in their entirety as to Jonestown Bank and Trust Company.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1149265

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

G

In re Merck & Co., Inc., Securities Derivative & ERISA Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 111 of 126

2006 WL 2050577
United States District Court,
D. New Jersey.

In re MERCK & CO., INC., SECURITIES
DERIVATIVE & ERISA LITIGATION.

Civil Action No. 05-2369(SRC).
|
July 11, 2006.

**Attorneys and Law Firms**

Lisa J. Rodriguez, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, for Cynthia Campbell, Robert Cimato, Robert Mortensen and Blossom Smith.

Roberta Koss, William R. Stein, Washington, DC, for H. Brewster Atwater, Marcia J. Avedon, Sir Derek Birkin, Lawrence A. Bossidy, William G. Bowen, Erskine B. Bowles, Johnetta B. Cole, William M. Daley, Caroline Dorsa, Lloyd C. Elam, Charles E. Exley, Jr., Carleton S. Fiorina, Niall Fitzgerald, Kenneth C. Frazier, Raymond V. Gilmartin, William B. Harrison, William N. Kelly, Judy C. Lewent, Merck, Hedi G. Miller, Bradley T. Sheares, Thomas E. Shenk, Anne M. Tatlock, Samuel O. Thier, Dennis Weatherstone, Wendell P. Weeks and Peter C. Wendell.

Robert H. Baron, New York, NY, for Edward M. Scolnick, H. Brewster Atwater, Marcia J. Avedon, Sir Derek Birkin, Lawrence A. Bossidy, William G. Bowen, Erskine B. Bowles, Johnetta B. Cole, William M. Daley, Caroline Dorsa, Lloyd C. Elam, Charles E. Exley, Jr., Carleton S. Fiorina, Niall Fitzgerald, Kenneth C. Frazier, Raymond V. Gilmartin, William B. Harrison, William N. Kelly, Judy C. Lewent, Merck, Hedi G. Miller, Bradley T. Sheares, Thomas E. Shenk, Anne M. Tatlock, Samuel O. Thier, Dennis Weatherstone, Wendell P. Weeks and Peter C. Wendell.

Vimal Kumar Shah, George H. Parsells, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, for Merck-Medco Managed Care LLC.

## OPINION

CHESLER, District Judge.

**\*1** THIS MATTER comes before the Court on four Motions to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint: (1) Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint brought by Defendant Merck-Medco Managed Care, LLC (docket # 19); (2) Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint brought by Defendants Atwater, Bossidy, Bowen, Cole, Daley, Dorsa, Elam, Frazier, Gilmartin, Kelly, Lewent, and Merck & Co., Inc. (docket # 5); (3) Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint brought by Defendants Avendon, Bowles, Exley, Fiorina, Fitzgerald, Harrison, Miller, Scolnick, Sheares, Shenk, Tatlock, Their, Weatherstone, Weeks, and Wendell (docket # 17); and (4) Motion to Dismiss the Plaintiffs' Consolidated Amended Class Action Complaint brought by Defendant Birkin (docket # 23).[1] The Court, having considered the papers submitted, for the reasons set forth below, and for good cause shown, **PARTIALLY GRANTS AND PARTIALLY DENIES** the Defendants' Motions.

[1]     The Court, in referring to the papers filed in the various motions being addressed in this Opinion, will refer to papers filed in the Motion to Dismiss by Merck-Medco as "Medco Def." papers (e.g. Medco Def. Br.), papers filed in the Motion to Dismiss by Defendants Atwater, Bossidy, Bowen, Cole, Daley, Dorsa, Elam, Frazier, Gilmartin, Kelly, Lewent, and Merck & Co., Inc. as "Merck Def." papers (e.g. "Merck Def. Def. Br."), papers filed in the Motion to Dismiss by Avendon, Bowles, Exley, Fiorina, Fitzgerald, Harrison, Miller, Scolnick, Sheares, Shenk, Tatlock, Their, Weatherstone, Weeks, and Wendell as "New Def." papers (e.g. "New Def. Def. Br.), and papers filed in the Motion to Dismiss by Def. Birkin as "Birkin Def." papers (e.g. "Birkin Def. Def. Br.").

## I. BACKGROUND OF THE CASE [2]

[2]     Unless otherwise noted, the recitation of the facts in this case are drawn from the allegations contained in the Plaintiffs' Consolidated Amended Class Action Complaint.

The Plaintiffs in these consolidated cases are current participants in Merck & Co., Inc. Savings and Stock Ownership Plans (the "Plans"), and a class of all others similarly situated, during the period between October 1,

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 112 of 126

In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

1998 through September 30, 2004 (the "Class Period"). The Plans at issue were the Merck & Co., Inc. Employee Savings and Security Plan (the "Salaried Plan"), Merck & Co., Inc. Employee Stock Purchase and Savings Plan (the "Hourly Plan"), the Merck-Medco Managed Care LLC 401(k) Savings Plan (the "Medco Plan"), and the Merck Puerto Rico Employee Savings Plan (the "Puerto Rico Plan") (collectively, the "Plans"). The Salaried and Hourly Plans were sponsored by Merck & Co., Inc. ("Merck"). The Medco Plan was sponsored by Merck-Medco Managed Care, LLC. ("Medco"). The Puerto Rico Plan was sponsored by Merck Sharp & Dohme Quimica de Puerto Rico, Inc. ("Merck Puerto Rico"), a Merck subsidiary who is not named as a defendant in this action.

**A. The Plans**
The Plans were defined contribution 'employee pension benefit plans,' within the meaning of ERISA. 29 U.S.C. § 1002(2)(A). During the Class Period, the assets of the Salaried and Hourly Plans were held in trust by Fidelity Management Trust Company ("FMTC"). The assets of the Medco Plan were held in a master trust with the assets of the Salaried and Hourly Plans until December 31, 2002, when they were placed in a separate trust with FMTC in preparation for a spin-off of Medco. The assets of the Puerto Rico Plan were held in trust by Banco Popular de Puerto Rico.

The Salaried, Hourly, and Puerto Rico Plans allowed eligible employees to contribute on both a pre-tax and after-tax basis, while the Medco Plan only permitted contributions on a pre-tax basis. Merck offered various matching contributions into an employee's individual account, depending on the Plan. Each of the Plans offered a variety of investment options to participants. These options included a variety of mutual funds and the Merck Common Stock Fund ("MCSF"). The MCSF invested primarily in Merck common stock. Participants in the Plans could select the funds or other investment vehicles where their contributions would be invested. (Merck Def. Br. at Ex. 1, Art. VIII, § 8.2; *Id.* at Ex. 2, Art. VIII, § 8.2; *Id.* at Ex. 3, Art. VIII, § 8.2; *Id.* at Ex. 4, Art. VII, § 7. 1.) During the Class Period, company matching contributions to the Salaried and Hourly Plans were invested at fifty percent in the MCSF and the remaining fifty percent as directed by the participant. [3] (*Id.* at Ex. 1, Art. VIII, §§ 8 .1-8.2; *Id.* at Ex. 2, Art. VIII, § 8.1) Company matching contributions to the Puerto Rico Plan

were invested only in the MCSF (*id.* at Ex. 3, Art. VIII, § 8. 1), while company matching contributions from the Medco Plan were invested as directed by the individual participant. (*Id.* at Ex. 4, Art. VII, § 7. 1.)

[3]     Note-when a participant in the Salaried or Hourly Plans attained age fifty (50), they could direct the investment of 100% of the company matching contributions. (Merck Def. Br. at Ex. 1, Art. VIII, § 8.1; Ex. 2, Art. VIII, § 8. 1.)

**\*2** As the plans' sponsor, Merck was the plan administrator for both the Salaried and Hourly Plans. Merck Puerto Rico was the plan sponsor and administrator for the Puerto Rico Plan. Merck was also responsible for entering into a trust agreement with a Trustee to be designated by the company's Management Pension Investment Committee ("MPIC") for the Salaried, Hourly, and Puerto Rico Plans. (*Id.* at Ex. 1, Art. XIV, § 14.1; *Id.* at Ex. 2, Art. XIV, § 14.1; *Id.* at Ex. 3, Art. XIV, § 14. 1.) Members of the MPIC were appointed by the Merck Board of Directors' Compensation and Benefits Committee ("CBC"). In addition to designating a trustee, the MPIC was responsible for determining which investments, funds, and mutual funds would be permitted investments in the three plans. (*Id.* at Ex. 1, Art. IX, § 9.1; *Id.* at Ex. 2, Art. IX, § 9.1; *Id.* at Ex. 3, Art. IX, § 9. 1.) Under the terms of all three plans, however, "a fund or investment which includes shares of Merck Common Stock and such other investments (such as short term, liquid investments) as determined by MPIC, shall be permitted under the Plan[s]." (*Id.* at Ex. 1, Art. IX, § 9.2; *Id.* at Ex. 2, Art. IX, § 9.2; *Id.* at Ex. 3, Art. IX, § 9.2.)

Medco was the plan sponsor and administrator for the Medco Plan. Like the Puerto Rico Plan, Merck was directly responsible for appointing a trustee for the Medco Plan as well. (*Id.* at Ex. 4, Art. XII, § 12. 1.) Also like the other plans at issue here, Merck's MPIC was charged with determining the appropriate investments for the Medco Plan. (*Id.* at Ex. 4, Art. VIII, § 8.1.) The Medco Plan also required, in addition to the other funds offered, "a fund or investment which includes shares of Merck Common Stock and such other investments (such as short term, liquid investments) as determined by [the] MPIC, shall be permitted under the [Medco] Plan." (*Id.* at § 8.2.) After Medco's spin-off from Merck on August 19, 2003 (*Id.* at Ex. 7, p9), the Medco Plan was amended. These amendments vested any responsibilities

Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 113 of 126

In re CIGNA Corp. Sec. Litig., Not Reported in... *69 Employee Benefits Cas. 1053*

39 Employee Benefits Cas. 1053

formerly held by Merck and Merck's MPIC to Medco, and to Medco's MPIC. (*Id.* at Ex. 4, Amend.2003-2, § 3.) A Medco Fund was also added to the investment portfolio, consisting "only of Medco Shares and such amount of short term liquid investments as determined by [Medco's] MPIC," and the MCSF was phased out as an ongoing investment option-being permitted to remain as part of the Medco Plan "only until the second anniversary of the Distribution date or as soon thereafter as is administratively feasible." (*Id.* at § 4.) Additional participant contributions to the MCSF were also discontinued with this amendment. (*Id.*)

**B. Vioxx and its Impact on the Plans' Investment Portfolio**

On or about May 20, 1999 the Food and Drug Administration ("FDA") approved Merck's drug, Vioxx, for relief of signs and symptoms of acute pain, dysmenorrhea, and osteoarthritis. In a press release dated January 26, 2000, Merck referred to Vioxx as "the fastest growing prescription arthritis and pain medicine in the United States" and to its Vioxx launch as "one of the most successful product introductions in the pharmaceutical industry's history." (Compl. at 46, ¶ 175.) In March 2000, Merck received study results on its Vioxx drug which the Plaintiffs allege "devastatingly reinforced cardiovascular safety concerns [that Merck's] employees and consultants had repeatedly voiced for several years." (*Id.* at ¶ 176.) Merck's stock price initially dropped when the results of this study were made public, but Merck continued to promote Vioxx. Merck began to recommend low-dose aspirin for Vioxx patients at risk for cardiovascular disease. At this time, Merck also launched a subsequent study of the drug, which the Plaintiffs allege "only reinforced the cardiovascular hazards of Vioxx." (*Id.* at 49, ¶ 186.) The Plaintiffs further allege that Merck had knowledge that contradicted its public statements made during this time that Vioxx was safe. Between June 30, 2000 and December 2000, Merck's stock price rose nineteen percent, "helped by increasing sales of Vioxx." (*Id.* at 54, ¶ 200.) In 2000, Vioxx sales were $2.2 billion, making its launch "the industry's second-best ever." (*Id.* at ¶ 201.) Throughout 2001, Merck continued to publicly support the cardiovascular safety of Vioxx, and rejected an FDA recommendation to add a warning of increased risk of cardiovascular thrombotic events to the drug's labeling. As additional information about the cardiovascular risks of Vioxx began to emerge publicly, Vioxx sales began to slip, pushing Merck's profits below

forecasts. In April 2002, following negotiations with the FDA, Merck revised Vioxx's labeling to reflect the possible increased risk of heart attacks from the drug's use. As additional studies demonstrating the potential cardiovascular risks of Vioxx continued to emerge, Merck withdrew Vioxx from the market on September 30, 2004 as a result of new study data from Merck's APPROVe study which demonstrated the increased risk of cardiovascular events in patients taking Vioxx compared to those ingesting a placebo.

**\*3** Vioxx was the biggest drug, measured by sales, ever withdrawn from the market. On the announcement of Vioxx's withdrawal from the market, Merck's stock plunged twenty seven percent that day, erasing about $26.8 billion in market value for the company. By November 2004, the stock fell almost thirteen percent more, leaving it down thirty nine percent for the year. Some estimates of Merck's legal liabilities from injuries caused by Vioxx were as high as eighteen billion dollars, not including potential punitive damages. During the Class Period, the Plaintiffs' allege that over one billion dollars in the Plans' assets were invested in the MCSF.

**C. The Current Claims**

The Plaintiffs filed the current Amended Complaint on August 3, 2005, asserting claims against Merck, Medco, and twenty-eight (28) individual defendants for alleged breaches of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.,* with respect to the administration of the Plans. The Defendants in this case can be grouped into the following categories:

• Corporate defendants Merck and Medco.

• Twenty-three current or former members of the Merck Board of Directors ("Merck Director Defendants"). These include Defendants Gilmartin, Scolnick, Atwater, Birkin, Bossidy, Bowen, Bowles, Cole, Daley, Davis, Elam, Exley, Fiorina, Fitzgerald, Harrison, Kelly, Miller, Shenk, Tatlock, Their, Weatherstone, Weeks, and Wendell.

• Current or former members of Merck's MPIC ("MPIC Defendants"). These include Defendants Scolnick, Lewent, Avedon, Dorsa, and fictitious defendants John and Jane Doe 1-10.

In re Merck & Co., Inc., Securities, Derivative & Erisa Litigation, Not Reported in...

Case 3:17-cv-00101-RDM  Document 29-5  Filed 03/24/17  Page 114 of 126

39 Employee Benefits Cas. 1053

• Current or former members of the Merck Compensation and Benefits Committee ("CBC Defendants"). These include Defendants Atwater, Bossidy, Bowen, Cole, Kelly, and Daley

• Current or former members of the Merck-Medco Board of Directors ("Medco Director Defendants"). These include Defendants Lewent and Frazier.

• Officers of Merck, including Defendant Gilmartin (Chairman of the Board and Chief Executive Officer of Merck), and Lewent (Chief Financial Officer of Merck), Frazier (General Counsel of Merck).

The Plaintiffs in this action all allege that they are current participants in one of the Plans, who invested in shares of the MCSF as part of their Plan accounts. Plaintiff Campbell was and is a participant in the Medco Plan, Plaintiffs Climato and Smith were and are participants in the Salaried Plan, and Plaintiff Mortensen was and is a participant in the Hourly Plan.

The Plaintiffs are claiming that the Defendants breached their fiduciary duties owed to them by:
• **Count I**-Defendants who were responsible for investment of assets in the Plans failed to manage these investments prudently and loyally. This Count is brought against Defendants Merck, Gilmartin and the MPIC Defendants;

• **Count II**-Defendants who were responsible for communicating with participants regarding the Plans and the Plans' assets failed to provide complete and accurate information. This Count is brought against Defendants Merck, Medco, Gilmartin, Lewent, Frazier, Merck Director Defendants, MPIC Defendants, and the CBC Defendants;

**\*4** • **Count III**-Defendants who were responsible for selection, removal, and monitoring of other Plan fiduciaries failed to do so properly and failed to remove or replace fiduciaries whose performance was inadequate. This Count is brought against Defendants Merck, Gilmartin and the Merck Director Defendants;

• **Count IV**-Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries. This Count is brought against Defendants Merck, Scolnick, Gilmartin, Lewent, Frazier, MPIC Defendants, CBC Defendants, Merck Director Defendants, and Medco;

• **Count V**-Defendant Merck, to the extent that it was not a fiduciary or that it was not acting in a fiduciary capacity, knowingly participated in the breaches of fiduciary duty by Defendants who were acting in a fiduciary capacity.

## II. DISCUSSION

The Defendants have moved to dismiss the claims against them under FED.R.CIV.P. 12(b)(6). The Defendants' motions challenge the sufficiency of the Plaintiffs' Complaint to set forth a legally cognizable claim against the various Defendants for breach of fiduciary duty under ERISA. In deciding a motion to dismiss under FED.R.CIV.P. 12(b)(6), the Court must presume that all allegations in the Complaint must be taken as true and viewed in the light most favorable to the complainant. *See* *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). Resolution of these motions in no way indicates a predisposition by the Court of an issue of contested facts. FED.R.CIV.P. 12(b)(6). Where, as here, the Complaint at issue attaches or references various documents, the Court is not limited to reviewing the allegations set forth in the body of the Complaint in deciding a motion to dismiss. The Court may properly consider these additional materials without the need to convert the motion into one for summary judgment. *See* *Beddall v. State St. Bank and Trust Co.,* 137 F.3d 12, 17 (1st Cir.1998) (holding court may look to materials outside the complaint in deciding a 12(b)(6) motion where the claims in the complaint "are expressly linked to-and admittedly dependent upon-a document"); *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

The basis for the Plaintiffs' Complaint is the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.,* that governs employee benefit plans. "ERISA protects employee pensions and benefit plans by, among other things, 'setting forth certain general fiduciary duties applicable to the management of both pension

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

and non-pension benefit plans.' " *In re WorldCom, Inc. ERISA Litig.,* 263 F.Supp.2d 745, 757-58 (S.D.N.Y.2003) (quoting *Varity Corp. v. Howe,* 516 U.S. 489, 496 (1996)). As a threshold matter, in order to hold a party liable for a breach of fiduciary duty under ERISA, that party must first be an ERISA fiduciary. ERISA contains a statutory definition of a fiduciary, providing that:

> **\*5** [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Under ERISA, fiduciaries are defined "in functional terms of control and authority over the plan." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993). The "threshold question" in an action charging breach of fiduciary duty under ERISA is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000). Consistent with this standard, the Court will evaluate each of the Plaintiffs' claims in turn.

## A. Count I-Breach of Fiduciary Duty for Continued Investment in Merck Securities

Count I of the Plaintiffs' Complaint alleges that Defendants Merck, Gilmartin, and the MPIC Defendants [4] failed to "[p]rudently and [l]oyally [m]anage the Plans and Plans [a]ssets and [s]hare [m]aterial [i]nformation [w]ith [f]ellow [f]iduciaries." (Compl. at 78, § IX(A).) The Plaintiffs' Complaint alleges that the MPIC Defendants exercised responsibility for managing the Plans' assets "for the sole and exclusive benefit

of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA." (Compl. at 78, ¶ 288.) The Plaintiffs' argument against Defendants Merck and Gilmartin in this Count is based on their supervisory role over the MPIC which, the Plaintiffs argue, gives them *de facto* responsibility over the Plans' assets. (Compl. at 79, ¶¶ 289-290.)

[4]    The Plaintiffs' Complaint identifies Defendants Scolnick and Lewent individually in this Count, as well as all the members of the MPIC, of which Scolnick and Lewent were both members. Because the Plaintiffs' Complaint alleges liability on Scolnick and Lewent related to their responsibilities as members of the MPIC, they are included, for the purposes of this Opinion, with the other "MPIC Defendants."

*1. Count I of the Plaintiffs' Complaint Sufficiently States a Claim Against the MPIC Defendants for Breach of Fiduciary Duty Under ERISA for Maintaining Merck Stock as an Investment Option and Continuing to Invest Assets From the Plans Into Merck Stock.*

In determining whether a party is a fiduciary under ERISA, the Court must first examine the terms of the ERISA plan at issue. *Varity Corp.,* 516 U.S. at 502 (1996). Responsibility for managing the investment portfolios of the Plans was delegated to the MPIC Defendants. (Merck Def. Br. at Ex. 1, Art. XIV, § 14.1; *Id.* at Ex. 2, Art. XIV, § 14.1; *Id.* at Ex. 3 Art. XIV, § 14.1; *Id.* at Ex. 4, Art. XIV, § 14. 1.) According to the Plans' governing documents, the MPIC Defendants were responsible for designating a trustee and for determining which investments, funds, and mutual funds would be permitted investments in the Plans. [5] (*Id.* at Ex. 1, Art. IX, § 9.1; *Id.* at Ex. 2, Art. IX, § 9.1; *Id.* at Ex. 3, Art. IX, § 9.1; *Id.*. at Ex. 4, Art. VII, § 8. 1.)

[5]    Note, the MPIC Defendants' responsibilities for the Medco Plan ended when Medco was spun off from Merck in 2003. (Merck Def. Br. at Ex. 4, Art. VIII, § 8. 1.) That year, responsibility for investment decisions for the Medco Plan was transitioned to the Medco MPIC (*id.* at Ex. 4, Amend.2003-2, § 3), and the Merck Stock Fund began to be phased out and the Medco Stock fund was added to the plan's investment choices. (*Id.* at § 4.)

**\*6** Despite the grant of authority to the MPIC Defendants to select investment alternatives for the Plans, the Plans all had provisions in their governing documents requiring the availability of a fund investing primarily in

In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation, Not Reported in...
Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 116 of 126
39 Employee Benefits Cas. 1053

Merck securities. Under the Plans, "a fund or investment which includes shares of Merck Common Stock and such other investments (such as short term, liquid investments) as determined by MPIC, *shall be* permitted under the Plan [s]." [6] (*Id.* at Ex. 1, Art. IX, § 9.2; *Id.* at Ex. 2, Art. IX, § 9.2; *Id.* at Ex. 3, Art. IX, § 9.2; *Id.* at Ex. 4, Art. VIII, § 8.2) (emphasis added).)

[6]    Note that this requirement was eliminated from the Medco Plan with the 2003 spin-off of Medco and the subsequent amendments to the Medco Plan's terms.

Programs like this, which encourage employee ownership of their employer's stock, are recognized as furthering an independent and compelling Congressional objective. *See Moench v. Robertson,* 62 F.3d 553, 568 (3d Cir.1995) ("[T]he concept of employee ownership constitute[s] a goal in and of itself."); *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1097 (9th Cir.2004) (recognizing Congressional goal to support employee investment in their employer's stock). These Plans, as Eligible Individual Account Plans ("EIAP"), are also granted special treatment under ERISA which exempts them from any specific statutory diversification requirements. *See* 29 U.S.C. 1104(a)(2) (noting that prudence by diversification requirements are not violated by "acquisition or holding of qualifying employer securities").

Under Third Circuit law, Employee Stock Ownership Plans ("ESOPs") are entitled to judicial deference for their decisions to invest assets in the stock of the sponsoring company. *See Moench,* 62 F.3d at 571. Because ESOPs require investment in a given company's stock, they act like "a trust, where the trustee is directed to invest the assets primarily in the stock of a single company." *Id.* Under the deferential standard from *Moench v. Robertson,* as a general rule, fiduciaries of such ESOPs " 'should not be subject to breach-of-duty liability for investing plan assets in the manner and for the purposes that Congress intended.' " *Id.* (quoting *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992)). Despite this general rule, however, fiduciaries of these funds are still required to " 'exercise care, skill, and caution in making decisions to acquire or retain the investment.' " *Id.* (quoting RESTATEMENT (THIRD) OF TRUSTS § 228, cmt. (f)).

Like a traditional ESOP, the Salaried, Hourly, and Puerto Rico Plans [7] had the stated goal of "provid[ing] an opportunity for employees to become stockholders of

Merck & Co., Inc." (Merck Def. Br. at Ex. 1, Art. I, ¶ 1.1; *Id.* at Ex. 2, Art. I, ¶ 1.1; *Id.* at Ex. 3, Art. I, ¶ 1.1.) The Medco Plan's stated purpose, however, does not mention encouraging employee investment in the employer's stock, but rather states only that it is to "provide an opportunity for employees to save on a regular basis by setting aside part of their earnings." (*Id.* at Ex. 4, Introduction.) While the Third Circuit has held that not all employee stock ownership plans are entitled to the deferential *Moench* standard of review, even for decisions to invest plan funds in the sponsoring employer's securities, the discretionary standard from *Moench* is properly applied to all four of these Plans, even if they are not all considered ESOPs.

[7]    The Plan materials indicate that the Merck Stock Fund component of the Salaried Plan was formally converted to an ESOP as of January 15, 2001. (Compl. at 20, ¶ 67.) The Defendants also note that the Merck Stock Fund component of the Hourly Plan began converting to an ESOP in 2003 pursuant to negotiations between Merck and the collective bargaining units whose members participate in that plan. (Merck Def. Br., Ex. 10 at 1288.)

**\*7**  In *In re Schering-Plough Corp. ERISA Litigation,* 420 F.3d 231 (3d Cir.2005), the Third Circuit held that the *Moench* standard is "inapposite" to employer-sponsored retirement plans where the company is " 'simply *permitted* to make ... investments' in 'employer securities.' " *In re Schering-Plough Corp.,* 420 F.3d at 238, n. 5 (quoting *Moench,* 62 F.3d at 571) (emphasis added). Unlike the plan at issue in *Schering-Plough,* however, the Hourly, Salaried, Puerto Rico, and Medco (prior to the post-spinoff amendments) Plans all *required* that Merck securities be offered as one of the investment options of the Plan. Where an EIAP, like these Plans, "require[s] the investment of plan funds in employer securities, just as required by an ESOP, 'it would seem appropriate to give the same deference in either case to fiduciary decisions that conform to the demands of the plan.' " *Edgar v. Avaya,* 2006 WL 1084087, \*5 (D.N.J. April 26, 2006) (quoting *In re Honeywell International ERISA Litig.,* 2004 WL 3245931, \*11 n. 15 (D.N.J. June 14, 2004)). Accordingly, this Court finds that the abuse of discretion standard from *Moench* is directly applicable to the Defendants' decisions to continue offering and maintaining investments from all four Plans in the Merck stock throughout the Class Period.

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 117 of 126

In re Merck & Co., Inc. Securities, Derivative & Erisa Litigation Not Reported in...

39 Employee Benefits Cas. 1053

Even with the benefit of the *Moench* presumption, however, there are circumstances where such continued investment in Merck stock may indeed be a breach of the MPIC Defendants' fiduciary duties under ERISA. "Even in the context of an ESOP, which is designed to offer employees the opportunity solely to invest in the employer's stock, a fiduciary may be liable for continuing to offer an investment in the employer's securities, at least where the plaintiff can show that circumstances arose which were not known or anticipated by the settlor of the trust that made a continued investment in the company's stock imprudent, and in effect, impaired the purpose for which the trust was established." *In re WorldCom,* 263 F.Supp.2d at 764-65 (citing *Moench,* 62 F.3d at 571).

The *Moench* standard does not require fiduciaries to diversify their EIAP holdings before or after each major corporate development, "it merely requires fiduciaries to act reasonably." *Wright,* 360 F.3d at 1099. For the purposes of evaluating the Complaint under the highly deferential FED.R.CIV.P. 12(b)(6) standard, however, the allegations in the Plaintiffs' Complaint of the adverse financial impact of Merck's withdrawal of Vioxx from the market and the potential liability for Merck for injuries attributed to Vioxx meet the threshold of "present[ing] a situation where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing" sufficient to call into question the fiduciary propriety of continued investment in the Company's securities by Plan fiduciaries. *Id.* at 1098. Accordingly, the Plaintiffs have sufficiently stated a claim for breach of fiduciary duty by the MPIC Defendants in their Complaint by alleging that they were obligated to, but did not, act with prudence regarding the continued offering of Merck stock as an investment option and continuing to invest Plan assets in Merck stock. Therefore, the Defendants' Motion to Dismiss Count I of the Plaintiffs' Complaint against the MPIC Defendants is **DENIED.**

*2. The Named Plaintiffs Have Standing to Bring Claims for Breach of Fiduciary Duty Against the MPIC Defendants on Behalf of the Puerto Rico Plan.*

**\*8** In addition to their claims regarding the management of the Salaried, Hourly, and Medco Plans, the Plaintiffs are also claiming breach of fiduciary duty related to the management of assets in the Puerto Rico Plan. While the named Plaintiffs in this action are current participants of either the Hourly, Salaried, or Medco Plans, it is not

claimed that any of the named Plaintiffs are now or have ever been participants in the Puerto Rico Plan.

Establishing individual standing is a threshold prerequisite for all civil actions. *See O'Shea v. Littleton,* 414 U.S. 488, 494 (1974); *Sierra Club v. Morton,* 405 U.S. 727 (1972). "A potential class representative must demonstrate individual standing vis-as-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Fallick v. Nationwide Mutual Insurance,* 162 F.3d 410, 423 (6th Cir.1998) (citing *Brown v. Sibley,* 650 F.2d 760, 770 (5th Cir.1981)). The question before this Court then is whether these named Plaintiffs can properly assert claims on behalf of the Puerto Rico Plan, even though none of them are participants of that Plan under ERISA.

" '[A]n individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans.' " *Mulder v. PCS Health Systems, Inc.,* 216 F.R.D. 307, 317 (D.N.J.2003) (quoting *Fallick,* 650 F .2d at 422). As class representatives, the named Plaintiffs can represent absent class members, provided that they satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." FED.R.CIV.P. 23(a). A plaintiff can meet this requirement by showing "the presence of a single common issue." *In re Prudential Insurance Co. of America Sales Practices Litigation,* 962 F.Supp. 450, 510 (D.N.J.1997) (citations omitted).

The claims brought against the MPIC Defendants in Count One of the Plaintiffs' Complaint all arise from a single issue-did the MPIC Defendants fail to act responsibly by continuing to invest plan assets in Merck stock, and continuing to offer the MCSF as an investment option, despite the financial risks that Vioxx and its safety profile created for Merck's stock? All four of the Plans were very similar in structure and all of them offered the MCSF as an investment option for the participants. While the Puerto Rico Plan was a separate and distinct plan from the Hourly, Salaried, and Medco Plans, the responsibility for managing the investment options for all four Plans was assigned to the same entity, the MPIC, whose conduct is at issue in this Count. The MPIC Defendants owed the participants of all four Plans fiduciary duties under ERISA and their actions affected all the potential class

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 118 of 126

In re Merck & Co., Inc. Securities, Derivative & Erisa Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

members in a similar manner-including the participants in the Puerto Rico Plan. Accordingly, the Court finds that the Plaintiffs' can pursue the claims in Count One against the MPIC Defendants on behalf of all four Plans, including the Puerto Rico Plan.

*3. Count I of the Plaintiffs' Complaint Does Not Sufficiently State a Claim Against Merck or Gilmartin for Breach of Fiduciary Duty Under ERISA for Maintaining Merck Stock as an Investment Option for the Plans and Continuing to Invest Assets From the Plans Into Merck Stock.*

**\*9** While the responsibility for determining the investment offerings under the Plans was delegated to the MPIC Defendants, the Plaintiffs' Complaint also alleges that Defendants Merck and Gilmartin had control over the MPIC Defendants which gave them discretionary authority and *de facto* responsibility for management of the Plans' assets and the investment decisions made by the MPIC Defendants. (Compl. at 78-79, ¶ 289-90.) The fact that Defendants Merck and Gilmartin retained authority over the MPIC Defendants, who were the designated fiduciaries responsible for managing the Plans' assets and investment options, however, is not sufficient to confer fiduciary responsibility on these defendants.

ERISA allows employers, like Merck, to "wear 'two hats,'" one as a plan's administrator, the other as a plan's sponsor. *Blaw Knox Ret. Income Plan v. White Consol. Indus.,* 998 F.2d 1185, 1189 (3d Cir.1993) (quoting *Payonk v. HMW Indus., Inc.,* 883 F.2d 221, 225 (3d Cir.1989)). ERISA defines a fiduciary "in functional terms of control and authority over the plan." *Mertens v. Hewitt Assoc .,* 508 U.S. 248, 262 (1993). Fiduciary duties attach to the actions of an employer, " 'only when and to the extent' that they function in their capacity as plan administrators." *Id.* ERISA also allows the allocation of fiduciary duties among various actors and, in most cases, liability for a breach of fiduciary duty is limited to the actor(s) to whom the responsibilities have been so allocated. "[A] plan may expressly provide for procedures (A) for allocating fiduciary responsibilities ... and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities." 29 U.S.C. § 1105(c)(1).

Merck is named as the Plan Administrator in the operating documents for both the Hourly and Salaried Plans. Medco is named the Plan Administrator for the Medco Plan, and the Puerto Rico Plan was administered by Merck Puerto Rico. In the governing documents for all four of these Plans, however, the MPIC is expressly charged with the responsibility for determining which investments, funds, and mutual funds would be permitted investments. (Merck Def. Br. at Ex. 1, Art. IX, § 9.1; *Id.* at Ex. 2, Art. IX, § 9.1; *Id.* at Ex. 4, Art. VIII, § 8. 1.) Merck, Medco, and Merck Puerto Rico, as the Plan Administrators, established the Plans, and their terms, and then appointed the MPIC to administer the Plans' investments. Following such an allocation of fiduciary duties, the named fiduciary "shall not be liable for an act or omission of such person in carrying out such responsibility" unless the allocation itself was a fiduciary breach or the named fiduciary committed a co-fiduciary breach as to the allocated responsibilities. 29 U.S.C. § 1105(c)(2).

Count I of the Plaintiffs' Complaint, however, alleges a breach of duty that is beyond the appointment or retention of members of the MPIC. Count I alleges liability for the investment decisions in the Plan and a failure to protect the Plan and its assets invested in Merck stock when information regarding the withdrawal of Vioxx went public. This investment responsibility, however, was expressly allocated to the MPIC who was designated under the Plans' governing documents as having the authority to manage or dispose of the Plans' assets. The question of whether, under ERISA, Merck and Gilmartin exercised authority or control over the Plan and its assets depends, therefore, on whether they actually exercised authority or control over the MPIC. As the Fifth Circuit noted:

**\*10** ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (1982), states:

[A] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

(Emphasis added.) The phrase "to the extent" indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control. *See Brandt v. Grounds,* 687 F.2d 895, 897 (7th Cir.1982). For example, if an employer and its board of

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 119 of 126

In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

directors have no power with respect to a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions. *See Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir.1985); *Leigh v. Engle,* 727 F.2d 113, 133-35 (7th Cir.1984); 29 C.F.R. § 2509.75-8 D-4 (1985) (Department of Labor interpretation of § 3(21)(A)).

*Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 793 F.2d 1456, 1459-60 (5th Cir.1986).

The Plaintiffs' Complaint alleges that the defined functions of the Plans' fiduciaries was "in large measure, a formality" and that decisions, including governing investment decisions over the Plans' assets, were "made on a routine basis by Merck's regular chain of command," which gave Defendants Merck and Gilmartin *de facto* fiduciary status over the investment of the Plans' assets. (Compl. at 25, ¶ 87.) This assertion alone, however, is insufficient to plead that these defendants exercised discretionary authority over the MPIC regarding the administration or disposition of the Plans' assets. It is well established that, in deciding a motion to dismiss, the Court need not 'credit a [C]omplaint's 'bald assertions' or 'legal conclusions.' " *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1429-30 (3d Cir.1997) (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996)). *See also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1997) (noting that courts, when examining 12(b)(6) motions, have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations").

Beyond these conclusory assertions, the only authority Defendants Merck and Gilmartin are alleged to have retained over the MPIC was the power to appoint and remove its members. These Defendants may be deemed ERISA fiduciaries with regards to management of the Plans' assets and investments *only* if it is shown that they exercised actual control over the MPIC's decisions regarding the Plans' management. *Sommers Drug Stores Co.,* 793 F.2d at 1460. Simply because they had the power to appoint and remove members of the MPIC is not enough to plead, as the Plaintiffs attempt to in their Complaint, that they exercised the required control over the management of the Plans' assets. "To permit

[such] an inference ... would vitiate the notion of limited fiduciary responsibility established by the 'to the extent' language in ERISA § 3(21)(A)." *Id.* Under this view of limited fiduciary responsibility, in order to impose fiduciary responsibility for the management of the Plan's assets on Defendants Merck and Gilmartin, the Plaintiffs would need to allege that these defendants, either through the use of their positions or otherwise, caused the MPIC to relinquish their independent discretion in deciding whether to continue investing the Plans' assets into Merck securities. No such direct exercise of control over the MPIC and its actions, however, is adequately alleged in the Plaintiffs' Complaint. The claims in Count I against Defendants Merck and Gilmartin are, therefore, **DISMISSED.**

*4. Count I of the Plaintiffs' Complaint Does Not Sufficiently State a Claim Against Defendants Merck, Gilmartin, or the MPIC Defendants for a Separate Breach of a Fiduciary Duty of Loyalty Under ERISA.*

**\*11** In Count I of their Complaint, the Plaintiffs also claim that Defendants Merck, Gilmartin, and the MPIC Defendants breached "the fiduciary duty of loyalty" by failing to "avoid conflicts of interest and to resolve them promptly when they occur." (Compl. at 82, ¶ 298.) The Plaintiffs claim that these Defendants' compensation and tenure was "tied to the performance of Merck stock and/ or the publicly reported financial performance of Merck" which created an inherent conflict with their duty to the Plans' participants. (*Id.*) By failing to obtain independent advisors to administer the Plans or notifying appropriate federal agencies of "the facts and circumstances that made the [Merck Common Stock] Fund an unsuitable investment for the [P]lans" in order to avoid adversely impacting their own compensation, the Plaintiffs claim that these defendants placed "their own and Merck's improper interests above the interests of the participants with respect to the Plans' investment in the [MCSF]." (*Id.* at ¶ 299.)

Administering a fund that invests in company stock, as part of a company-administered ERISA plan, requires the employer-administer to "wear two hats" and to administer the company stock "investments consistent with the provisions of both a specific employee benefits plan and ERISA." *Moench,* 62 F.3d at 569. As the *Moench* Court noted:

[A]s the financial state of the company deteriorates, ESOP fiduciaries who double as directors of the corporation

often begin to serve two masters. And the more uncertain the loyalties of the fiduciary, the less discretion it has to act. Indeed, " '[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.' " *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted). As the *Feilen* court stated in the context of a closely held corporation:

[T]his case graphically illustrates the risk of liability that ESOP fiduciaries bear when they act with dual loyalties without obtaining the impartial guidance of a disinterested outside advisor to the plan. Because the potential for disloyal self-dealing and the risk to the beneficiaries from undiversified investing are inherently great when insiders act for a closely held corporation's ESOP, courts should look closely at whether the fiduciaries investigated alternative actions and relied on outside advisors before implementing a challenged transaction.

*Id.* at 670-71. And, if the fiduciary cannot show that he or she impartially investigated the options, courts should be willing to find an abuse of discretion.

*Moench*, 62 F.3d at 572. The inherent risk of dual loyalties for corporate directors and officers who also serve as administrators for their company's stock ownership plans is to be taken into account as a factor in applying judicial scrutiny to an administrator's decision with regard to their management of ERISA funds. This is not, however, a separate and distinct ERISA duty. This is merely a restatement of the Plaintiff's other allegations in Count I-namely that these Defendants breached their fiduciary duty under ERISA by failing to manage the Plans in the best interests of the Plans' participants. Accordingly, the Plaintiffs' claims against Merck, Gilmartin, and the MPIC Defendants for a separate breach of fiduciary duty of loyalty under ERISA are properly **DISMISSED.**

## B. Count II-Breach of Fiduciary Duty for Failing to Provide Complete and Accurate Information to Plan Participants and Beneficiaries

**\*12** Count II of the Plaintiffs' Complaint alleges a breach of fiduciary duty under ERISA against Defendants Merck, Medco, Gilmartin, Scolnick, Lewent, Frazier, Merck Director Defendants, the MPIC Defendants, and the CBC Defendants for "[f]ailure to [p]rovide

[c]omplete and [a]ccurate [i]nformation to [p]articipants and [b]eneficiaries." (Compl. at 84.) The crux of this count is that these defendants "breached their ERISA duty to inform participants by failing to provide complete and accurate information, regarding the health risks that accompanied Vioxx and the prudence of investing retirement contributions in the Fund." (Compl. at 85, ¶ 309.) The Plaintiffs claim that, "[h]ad such disclosures been made to participants or Plan fiduciaries, if any, who were not aware of Vioxx health risks and the inevitable impact of such risks on Merck's stock price, they could have taken action to protect the Plans. [Furthermore, t]he disclosure to participants necessarily would have been accompanied by disclosure to the market and would have assured that any further acquisitions of Merck stock by the Plans would have occurred at an appropriate price." (*Id.* at ¶ 310.)

The Plaintiffs allege that "Merck knew that, because Vioxx inhibited COX-2 but not COX-1, use of the drug increased platelet aggregation (blood clotting) and thereby increased the risk of heart attacks and strokes." (Compl. at 40, ¶ 148.) To support this allegation, the Plaintiffs cite to Merck studies dating back to 1997 that indicate the potential cardiovascular risks of COX-2 inhibitors like Vioxx. (*Id.* at 40-41, ¶¶ 149-51.) Despite this knowledge, the Plaintiffs allege that Merck mislead the marketplace and understated the cardiovascular risks of Vioxx with a series of alleged misstatements which form the basis for the Plaintiffs' allegations in Count II of their Complaint. These communications, in aggregate, "fostered an inaccurately rosy picture of the soundness of the Fund[s] or Merck stock as a Plan investment." (*Id.* at 74, ¶ 277.) These alleged misstatements include:
• A statement to the FDA's Arthritis Advisory Committee in April 1999 that "there is no evidence, preclinically or clinically, to suggest that rofecoxib [Vioxx] carries any increased risk for cardiovascular events." (Compl. at 45, ¶ 170.)

• Two Merck press releases in November 1999 allegedly misrepresenting Vioxx's safety profile. (Compl. at 45-46, ¶ 173.)

• Merck publicly promoting the "naproxen theory" that the differences in cardiovascular events between Vioxx and naproxen from prior clinical studies was because naproxen has a cardiovascular protective effect, which Vioxx does not-rather than attributing these events to

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 121 of 126

In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

higher risk of cardiovascular danger from Vioxx. (*Id.* at 49, ¶ 186.) This theory was promoted by the company to medical journals and members of the medical community. (*Id.*)

• Altering the released data from the ADVANTAGE study to reflect three, rather than five, cardiac deaths from Vioxx-rendering the increased number not statistically significant. (*Id.* at 49, ¶ 186.)

 **\*13** • Press release in May 2001, "reconfirming the favorable cardiovascular safety profile of Vioxx." (*Id.* at 55, ¶ 204.)

• Press release in August 2001, along with "Dear Doctor" letters to physicians around the country supporting the cardiovascular safety of Vioxx in response to a study published in the Journal of the American Medical Association calling into question the cardiovascular safety of Vioxx. (*Id.* at 56, ¶¶ 208-09.)

• Using a continued promotional campaign to "falsely minimize the risks and dangers associated with [Vioxx]." (*Id.* at 57, ¶ 212.)

• Understating the significance of the cardiovascular risks of Vioxx in an April 2002 revision of the drug's FDA-approved labeling. (*Id.* at 60, ¶ 219.)

• Publicly discounting the findings in October 2002 of two independent studies regarding the increased cardiovascular risks from Vioxx and maintaining that, in Merck's own "placebo controlled randomized trials, we have found no significant difference between Vioxx and placebo." (*Id.* at 60-61, ¶¶ 220-23.)

• An August 2004 press release disagreeing with an FDA-funded observational study showing higher heart attack risks from Vioxx and stating that "Merck stands behind the efficacy and safety, including cardiovascular safety, of Vioxx." (*Id.* at 61-62, ¶¶ 226-28.)

In addition to the above statements made to the general public regarding Merck's Vioxx drug, the Plaintiffs also claim that Merck made "negligent misrepresentations and omissions" in numerous SEC filings that were "incorporated by reference" into Plan communications regarding the safety profile and financial risks associated with Vioxx. (Compl. at 75, ¶ 281.) These communications

include 10-K, 10-Q, and 8-K Forms filed with the SEC at various times from 1998 to 2004. (*Id.* at 75-56, ¶ 281.) These filings were "incorporated into [the Plans'] Form S-8 registration statements, SPDs, prospectuses and/or other fiduciary communications." (*Id.* at 75, ¶ 279.) The Plaintiffs contend that the statements in these SEC filings were "false and misleading because they failed to disclose all the risks associated with Vioxx" by "presenting only [Merck's] positive 'spin' on [research] data while simultaneously mischaracterizing or omitting material facts which suggested significant health risks" and mischaracterized or omitted "material facts about the financial risks and potential legal liabilities created by the drug's health risks." (*Id.* at 76, ¶ 282.)

*1. The Specific Communications Cited to by the Plaintiffs in Their Complaint Were Not Made in an ERISA Fiduciary Capacity, and Cannot be the Sole Basis of ERISA Fiduciary Liability*

The Defendants contend that they were not acting in a fiduciary capacity when Merck made the public statements and filed the SEC disclosures that the Plaintiffs cite to as the basis for their claim that the Defendants presented false and misleading information to the Plans' participants regarding the safety profile and potential financial liabilities associated with Vioxx. ERISA liability "arises only from actions taken or duties breached in the performance of ERISA obligations." *In re WorldCom,* 263 F.Supp.2d at 760 (citing *Pegram,* 530 U.S. at 225-26). The crucial distinction here is one between "ordinary business decisions made" in a corporate capacity "which might have an adverse impact on the plan" and actions by an employer in a fiduciary capacity directed toward plan participants. *Varity Corp.,* 516 U.S. at 505.

 **\*14** None of the alleged misstatements made by Merck or its officers cited to in the Plaintiffs' Complaint, regardless of their truth or falsity, were made in a fiduciary capacity regarding the Plans. *See Crowley ex rel. Corning, Inc., Inv. Plan v. Corning, Inc.,* 234 F.Supp.2d 222, 228 (W.D.N.Y.2002). The public statements, press releases, and other dissemination of information cited to by the Plaintiffs in their Complaint were all statements to the general public, investment community, or to potential medical prescribers of Vioxx, and not communications directed at the Plans' participants in any type of ERISA fiduciary capacity. *See, e.g., In re RCN Litigation,* 2006 WL 753149, *12 (D.N.J. March 21, 2006).* The SEC statements, while incorporated into

Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 122 of 126

In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation, Not Reported in...

39 Employee Benefits Cas. 1053

Plan communications, were also not made in an ERISA fiduciary capacity, and cannot be the sole basis for ERISA liability.

The Plaintiffs are attempting to leverage these communications to impose fiduciary duties under ERISA on a large group of Defendants, including Defendants Merck, Medco, Gilmartin, Scolnick, Lewent, and Frazier, as well as the Merck Director Defendants, MPIC Defendants, and CBC Defendants. According to the Plaintiffs' Complaint, however, only Defendants Merck and Medco "[u]pon information and belief" were responsible for "preparing and distributing communications to participants regarding the Plans" (Compl. at 23, ¶ 80; *Id.* at 26, ¶ 91.) While the actions of Merck, the corporate entity, are carried out by the Merck Board Defendants, the Plaintiffs fail to allege how any fiduciary duty to communicate to participants of the Plans is properly imposed on the MPIC or CBC Defendants. Accordingly, the Defendants' motion to dismiss Count II against the MPIC and CBC Defendants is hereby **GRANTED.**

The Plaintiffs' imposition of fiduciary duty to communicate with the Plans' participants on Defendants Gilmartin, Scolnick, Lewent, and Frazier is based on the assertion that they "determin[ed] or participat[ed] in decisions about the substantive content of Merck's SEC filings" which were incorporated into the Plans' communications with participants." (Compl. at 27, ¶ 98; *Id.* at 29, ¶ 105; *Id.* at 30, ¶ 110; *Id.* at 31, ¶ 114.) This, however, is insufficient to create a fiduciary duty to communicate with the Plans' participants. "Those who prepare and sign SEC filings do not become ERISA fiduciaries through these acts, and consequently, do not violate ERISA if the filings contain misrepresentations." *In re Worldcom, Inc.,* 263 F.Supp.2d at 766-67. The Plaintiffs are attempting to state a claim for a breach of duty under ERISA against Defendants Gilmartin (in his capacity as CEO), Scolnick (in his capacity as EVP for Science and Technology and President of Merck Research Labs),[8] Lewent, and Frazier where no such duty exists. Therefore, the Defendants' motion to dismiss Count II against Defendants Gilmartin (in his capacity as CEO), Scolnick (in his capacity as EVP of Science and Technology and President of Merck Research Labs), Lewent, and Frazier is hereby **GRANTED.**

[8]     Note, Gilmartin and Scolnick were also members of Merck's Board of Directors during the Class Period, making them also Merck Board Defendants. In that capacity, for the reasons discussed *supra,* the claims in Count II of the Plaintiffs' Complaint are not dismissed against Defendants Gilmartin or Scolnick in their capacity as members of Merck's Board of Directors.

### 2. The Plaintiffs' Complaint Does Not Adequately Allege a Breach of Fiduciary Duty to Communicate to Participants in the Puerto Rico Plan

**\*15** While the investment options for the Puerto Rico Plan were determined by Merck's MPIC (Merck Def. Br. at Ex. 3, Art. XIV, § 14. 1), the Puerto Rico Plan was sponsored and administered by Merck Puerto Rico.[9] (*Id.* at Ex. 3, p 2.) As administrator of the Puerto Rico Plan, Merck Puerto Rico had the fiduciary duty to communicate with that plan's participants-not the defendants named in this Count of the Plaintiffs' Complaint. Merck Puerto Rico, however, is not named as a defendant in this action. Accordingly, the Plaintiffs' claims for breach of fiduciary duty for failure communicate to participants in the Puerto Rico Plan regarding Vioxx's safety profile is **DISMISSED.**

[9]     The Puerto Rico Plan was part of the Merck Hourly Plan until it was spun off in July 1997, prior to the Class Period. (Merck Def. Br. at Ex. 3, p 2.)

### 3. The Plaintiffs' Complaint Adequately Alleges That Defendants Merck, Medco, and the Merck Director Defendants Breached Their Fiduciary Duty to Communicate to Participants in the Hourly, Salaried, and Medco Plans by Failing to Disclose Adverse Information Regarding Vioxx's Safety Profile to the Plans' Participants

Defendants Merck, Medco, and the Merck Director Defendants, however, did have a fiduciary responsibility under ERISA to communicate with the participants in the Hourly, Salaried, and Medco Plans. (Compl. at 23, ¶ 80; *Id.* at 26, ¶ 91.) As ERISA fiduciaries, these defendants "may not knowingly present false information regarding a plan investment option to plan participants. There is no exception to the obligation to speak truthfully when the disclosure concerns the employer's stock." *In re WorldCom, Inc.,* 263 F.Supp.2d at 766. *See also Martinez v. Schlumberger, Ltd.,* 338 F.3d 407, 425 (5th Cir.2003) ("When an ERISA plan administrator speaks in its fiduciary capacity concerning a material aspect of

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 123 of 126

In re Merck & Co., Inc., Securities, Derivative & Erisa Litigation Not Reported in...

39 Employee Benefits Cas. 1053

the plan, it must speak truthfully."); *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 668 (2d Cir.1994) (same). ERISA imposes a "legal duty to disclose to the beneficiary only those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection. The scope of that duty to disclose is governed by ERISA's Section 404(a), and is defined by what a reasonable fiduciary, exercising 'care, skill, prudence and diligence,' would believe to be in the best interest of the beneficiary to disclose." *Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc.,* 93 F.3d 1171, 1182 (3d Cir.1996). *See also Bins v. Exxon Co. U.S.A.,* 189 F.3d 929, 939 (1999) ("We believe that once an ERISA fiduciary has material information relevant to a plan participant or beneficiary, it must provide that information whether or not it is asked a question."), *on rehearing en banc,* 220 F.3d 1042, 1048-49 (9th Cir.2000) (when a proposed change in retirement benefits becomes sufficiently likely and therefore material, the employer has a duty to provide complete and truthful information); *Schmidt v. Sheet Metal Workers' Nat. Pension Fund,* 128 F.3d 541, 546-47 (7th Cir.1997) ("A plan fiduciary may violate its duties ... either by affirmatively misleading plan participants about the operations of a plan, or by remaining silent in circumstances where silence could be misleading."), *cert. denied,* 523 U.S. 1073 (1998). "[The] duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler v. Central Pa. Teamsters Health-Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993). *See also In re Williams Companies ERISA Litig.,* 271 F.Supp.2d 1328, 1343 (N.D.Oka.2003) (holding when defendants are "charged with the fiduciary responsibility to tend to the Plan's investments" that duty encompasses a "duty to provide useful and accurate information to Plan participants, to identify sound investment options.").

**\*16** The Plaintiffs' Complaint outlines, in some detail, the importance of Vioxx to Merck's financial well-being during the Class Period as well as a series of early trials and test results on the drug that indicated that Vioxx may present an increased risk of cardiovascular injury for certain patients. (Compl. at 40-62, ¶¶ 148-228.) The Plaintiffs claim that Defendant Scolnick, in his role as EVP for Science and Technology of Merck, was directly aware of the early study data regarding

Vioxx's cardiovascular safety profile and, as a member of Merck's Board of Directors, had a duty under ERISA to communicate this information to the participants of the Hourly and Salaried Plans. (Compl. at 68, ¶¶ 254-56.) The Plaintiffs also claim that, as a result of the importance of Vioxx to Merck's financial state during the Class Period, Defendants Gilmartin, as CEO, Lewent, as CFO of Merck, and Gilmartin, as VP of Public Affairs and Deputy General Counsel of Merck, all knew or should have known about potential issues with Vioxx's cardiovascular safety early on in the Class Period and, by virtue of their positions on the Merck and/or Medco Board of Directors, had a duty to communicate this information to the participants of the Hourly, Salaried, and Medco Plans. (Compl. at 66-67, ¶¶ 248-50; *Id.* at 69-70, ¶ 261; *Id.* at 71, ¶ 267.) The crux of the Plaintiffs' Complaint is that, had one or more of these ERISA fiduciaries publicly released this adverse information regarding the safety profile of Vioxx earlier, the drug would not have been a financial success, and the subsequent run-up in Merck stock would not have occurred. Absent the inflation of Merck stock caused by the success of Vioxx, the Plaintiffs' acquisition of Merck stock during the Class Period as part of their investments in the Plans would not have been at "overvalued" prices and the Plaintiffs would not have suffered the subsequent financial loss when the stock price dropped following the withdrawal of Vioxx from the market.

The Third Circuit has held that a plan fiduciary has " 'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.' " *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 492 (3d Cir.2000) (quoting *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 57 F.3d 1255, 1262 (3d Cir.1995), *cert. denied,* 517 U.S. 1103 (1996)). The context of this affirmative duty to inform, however, has been applied to communications regarding changes to employee benefit plans, and not to communications regarding the financial state of the employing corporation. *See, e.g., Unisys Corp.,* 57 F.3d at 1262 (citing *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 132 (3d Cir.1993)). The duty of disclosure under ERISA regarding the financial state of the employing corporation, however, has been aptly described as "an area of developing and controversial law." *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 555 (S.D.Tex.2003). In situations such as this, where a company has a duties under securities laws and as an ERISA fiduciary to disclose relevant information regarding the financial state of the corporation, there is

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 124 of 126

In re Merck & Co., Inc. Securities, Derivative & Erisa Litigation Not Reported in...

39 Employee Benefits Cas. 1053

the potential for significant overlap between ERISA and federal securities laws. As some courts have noted, "[i]f the allegations of wrongdoing, including allegations of providing misinformation and failing to provide accurate information, ultimately prove true, the Plan [s'] remed[ies] will be the same as for the plaintiff class [as they would be] in [a] related securities class action." *Vivien v. Worldcom, Inc.,* 2002 WL 31640557, \*7 -8 (N.D.Cal., July 26, 2002).

**\*17** While the allegation against these defendants for failing to disclose adverse information regarding Vioxx may appear, at first impression, as an effort to present " 'repackaged securities fraud claims,' for which plaintiffs have an adequate remedy in ... securities litigation," *In re CMS Energy ERISA Litig.,* 312 F.Supp.2d 898, 915 (E.D.Mich.2004), the allegations do touch upon fiduciary duties surrounding disclosure found in ERISA-namely, the duty to not mislead or fail to disclose information that these defendants knew or should have known would be needed for the Plans' participants to prevent losses. Absent factual development, therefore, this claim is adequate to survive the Defendants' motion to dismiss. Accordingly, the Defendants' motion to dismiss Count II against Defendants Merck, Medco and the Merck Director Defendants is **DENIED.**

**D. Count III-Failure to Monitor Other Plan Fiduciaries**
Count III of the Plaintiffs' Complaint alleges a breach of fiduciary duty against Defendants Merck, Gilmartin, and the Merck Director Defendants for failing to monitor the performance of other fiduciaries. (Compl. at 86-88, ¶¶ 317-324.) The Plaintiffs' Complaint alleges that Defendant Gilmartin and the Merck Director Defendants breached their fiduciary duty to monitor the MPIC Defendants, while they allege that Defendant Merck breached its fiduciary duty to monitor both the Merck Director Defendants and the MPIC Defendants.

The Plaintiffs' Complaint notes that "[u]nder relevant New Jersey law and Merck's charter and bylaws, Merck's Board of Directors had the authority to manage the business and affairs of Merck" and that the Board "had the ultimate authority for the affairs of Merck." (Compl. at 32, ¶ 119.) The Plaintiffs' Complaint also states that the Merck Director Defendants appointed the members of Merck's Compensation and Benefits Committee ("CBC") of the Merck Board of Directors. (Compl. at 33, ¶ 120.) The CBC was "composed of three or more non-

employee directors of Merck. [10] " (*Id.*) The CBC, in turn, had the power to "appoint, remove and accept the resignation of members of the MPIC, who [were] named fiduciar[ies] under each of the Plans." (*Id.*) The Plaintiffs also allege that Defendant Gilmartin, in his capacity as CEO of Merck, exerted "influence over the CBC in connection with the CBC's appointment of MPIC members" including "recommending persons that the CBC should appoint to the MPIC." (Compl. at 27, ¶ 97.)

[10]  During the Class Period, the following Merck Director Defendants were members of the CBC: Defendants Atwater, Bossidy, Bowen, Cole, Kelly, and Daley. (Compl. at 33, ¶ 121.)

The power to appoint, retain, and remove members of the MPIC creates a fiduciary duty under ERISA to monitor the MPIC. See *Hickman v. Tosco Corp.,* 840 F.2d 564, 566 (8th Cir.1988) ("Tosco is a fiduciary within the meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan."); *Sommers Drug Stores Co.,* 793 F.2d at 1459-60; *Leigh,* 727 F.2d at 133-35; *Edgar,* 2006 WL 1084087 at \*11 (finding ERISA duty to monitor other fiduciaries "imposed as an implicit duty upon those who have the power to appoint and remove other fiduciaries") (citations omitted); *In re RCN Litigation,* 2006 WL 753149 at \*9 (power to appoint, retain, and remove plan fiduciaries makes one a fiduciary under ERISA); *In re Cardinal Health ERISA Litig.,* 424 F.Supp.2d 1002, 1047 (S.D.Ohio 2006) ("[T]he ERISA statutory scheme imposes upon fiduciaries a duty to monitor when they appoint other individuals to make decisions about the plan"); *In re Electronic Data Systems Corp. ERISA Litig.,* 305 F.Supp.2d 658, 670 (E.D.Tex.2004) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power"); *In re Enron Corp.,* 284 F.Supp.2d at 661 (same) (citing *Coyne & Delany Co.,* 98 F.3d at 1464-65 ("the power ... to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)"); *Detroit Terrazzo Contractors Ass'n v. Board of Trustees of B.A.C. Local 32 Ins. Fund,* 176 F.Supp.2d 733, 739-40 (E.D.Mich.2001); ERISA Interpretative Bulletin 75-8, 29 C.F.R. § 2509.75-8(D-4) (members of a board of directors "responsible for the selection and retention of plan fiduciaries" have " 'discretionary authority or discretionary control respecting the management of such plan' and are, therefore, fiduciaries with respect to the

Case 3:17-cv-00101-RDM   Document 29-5   Filed 03/24/17   Page 125 of 126
In re Merck & Co., Inc. Securities, Derivative & Erisa Litigation, Not Reported in...
39 Employee Benefits Cas. 1053

plan."). The power to appoint fiduciaries is itself a fiduciary function. *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1465 (4th Cir.1996); *Mehling v. New York Life Ins. Co.,* 163 F.Supp.2d 502, 509-10 (E.D.Pa.2001). Implicit in this power is the duty to monitor. *Leigh,* 727 F.2d at 134-35; 29 C.F.R. § 2509.75-8, FR-17. "The duty to monitor carries with it ... the duty to take action upon discovery that the appointed fiduciaries are not performing properly." *Liss v. Smith,* 991 F.Supp. 278, 311 (S.D.N.Y.1998).

 **\*18** The ability to appoint and remove members of the MPIC was expressly delegated to the CBC, not to the entire Board of Directors. The members of the Merck Board who were not also members of the CBC during the Class Period, therefore, did not have a fiduciary duty under ERISA to monitor the activities of the MPIC. Accordingly, the Defendants' Motion to Dismiss Count III against the Merck Director Defendants who were not also members of the CBC during the Class Period, namely Defendants Scolnick, Birkin, Bowles, Davis, Elam, Exley, Fiorina, Fitzgerald, Harrison, Miller, Shenk, Tatlock, Their, Weatherstone, Weeks, and Wendell, is **GRANTED.**

Those members of Merck's Board of Directors who did serve on the CBC during the class period, however, had a fiduciary duty to monitor the MPIC in its management of the assets of the Plans. These CBC Defendants are Defendants Atwater, Bossidy, Bowen, Cole, Kelly, and Daley. It is also sufficiently alleged that Defendant Gilmartin had a *de facto* fiduciary duty to monitor the MPIC as a result of his exercise of direct influence over the CBC in the appointment of MPIC members. Because, for the reasons noted above, the Plaintiffs' Complaint sets forth a sufficient claim against the MPIC Defendants for breach of their fiduciary duties, the Complaint also sets forth a cognizable claim against the CBC Defendants and Defendant Gilmartin for failure to supervise the MPIC Defendants in the performance of their duties. Therefore, the Defendants' Motion to Dismiss Count III against Defendants Atwater, Bossidy, Bowen, Cole, Kelly, Daley, and Gilmartin is **DENIED.**

The Plaintiffs' Complaint also alleges a breach of fiduciary duty by Defendant Merck for failure to adequately supervise the activities of the MPIC and the Board of Directors during the Class Period. As noted above, the responsibility to appoint and remove members of the MPIC, as well as the ERISA fiduciary duty to

monitor the MPIC, was expressly delegated to the CBC Defendants. With respect to the responsibility of Merck to monitor the activities of the Board of Directors, the traditional role of a corporate board is to " 'oversee' or 'monitor' the conduct of the corporation's business and to approve major corporate plans and actions"-not the other way around. *Bins,* 220 F.3d at 1051 (citing American Law Inst., *Principles of Corporate Governance: Analysis and Recommendations,* §§ 3.01, 3.02(a)(1)-(2) (1994)). Accordingly, the Defendants' Motion to Dismiss Count III against Defendant Merck is **GRANTED.**

### E. Count IV-Co-Fiduciary Liability
Count IV of the Plaintiffs' Complaint alleges that Defendants Merck, Medco, Gilmartin, Scolnick, Lewent, Frazier, the Merck MPIC Defendants, and the Merck Director Defendants breached their co-fiduciary liability to the Plans' participants by:
• Not communicating "their knowledge of the Company's illegal activity to the other fiduciaries" (Compl. at 89, ¶ 329);

• Withholding material information and providing "the market with misleading disclosures" (*Id.* at ¶ 330);

 **\*19** • Failing to undertake any effort to remedy known breaches of fiduciary duty by the Defendants who imprudently continued to invest the Plans' assets in Merck securities and provided incomplete and misleading communications to the Plans' participants (*Id.* at 90, ¶ 332);

• Defendant Merck "knowingly participated in the fiduciary breaches" of the Defendants who imprudently continued to invest the Plans' assets in Merck securities because it "benefitted from the sale or contribution of its stock at artificially inflated prices" and participated as a *de facto* fiduciary in this breach because it "participated in all aspects of the fiduciary breaches of the other Defendants, which it controlled" (*Id.* at ¶ 333);

• Defendants Gilmartin, Scolnick, Lewent, and Frazier knowingly "participated in the breaches of" the fiduciaries who imprudently invested the Plans' assets in Merck securities and provided incomplete and misleading communications to the Plans' participants by "having actual knowledge of the Company's misrepresentations and nondisclosures regarding the health risks of Vioxx and the impact such disclosure would have on [Merck's]

Case 3:17-cv-00101-RDM Document 29-5 Filed 03/24/17 Page 126 of 126

In re Merck & Co., Inc., Securities Derivative & ERISA Litigation Not Reported in...

39 Employee Benefits Cas. 1053

stock price" but still permitting these other fiduciaries "to breach their duties" (*Id.*);

• Defendants Merck, Medco, Gilmartin, Lewent, Frazier, Merck Director Defendants, and the Merck MPIC Defendants enabled the breaches of the Merck MPIC Defendants by failing "to provide complete and accurate information to the MPIC or the participants that would have protected the Plans and Plan participants from harm" (*Id.* at 91, ¶ 335);

• Defendants Merck, Gilmartin, and the Merck Director Defendants failed to monitor the Merck Director Defendants and the Merck MPIC Defendants, enabling them to breach their duties. (*Id.* at ¶ 336.)

Section 405(a) of ERISA recognizes that a fiduciary may be liable for breaches of duty committed by other fiduciaries:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). Many of the specific allegations included in this Count are largely duplicative of the allegations brought in other Counts of the Plaintiffs' Complaint. Absent the opportunity for additional factual development to determine whether the named defendants in this Count knew of the alleged breaches of fiduciary duty by their co-fiduciaries, and the extent to which their own actions may have enabled their co-fiduciaries to

breach their duties to the Plans' participants, however, the allegations in this Count that relate directly to potential co-fiduciary liability for these named defendants are sufficient to survive the Defendants' motion to dismiss. Accordingly, the Defendants' Motion to Dismiss Count IV is **DENIED.**

## F. Count V-Knowing Participation in a Breach of Fiduciary Duty

**\*20** Count V of the Plaintiffs' Complaint alleges that Defendant Merck, to the extent that it is found not to be a fiduciary or not to have been acting in a fiduciary capacity under ERISA, "knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity." (Compl. at 91, ¶ 341.) Count IV of the Plaintiffs' Complaint, however, has almost identical allegations in its assertion of co-fiduciary liability against Defendant Merck in its claim that Defendant Merck "knowingly participated" in the fiduciary breaches of "the other Defendants, which it controlled." (Compl. at 90, ¶ 333.) Because this Count is essentially duplicative of the claims raised in Count IV, the Defendants' Motion to Dismiss Count V of the Plaintiffs' Complaint is **GRANTED.**

## III. CONCLUSION

For the reasons stated above, and for good cause shown, the Court **PARTIALLY GRANTS AND PARTIALLY DENIES** the Defendants' Motions to Dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. An appropriate form of order will be filed herewith.

## All Citations

Not Reported in F.Supp.2d, 2006 WL 2050577, 39 Employee Benefits Cas. 1053

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.