# <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A. *Alexander v. Coast Prof'l,*
No. 12-1461, 2014 WL 4413598 (E.D. Pa. Sept. 5, 2014) ..................... 3

B. *Angino v. Wells Fargo Bank,*
No. 1:15-CV-418, 2016 WL 787652 (M.D. Pa. Feb. 19, 2016) ............. 11

C. *Brogan v. Tunkhannock Twp.,*
No. 3:14-CV-1690, 2015 WL 5028812 (M.D. Pa. Aug. 19, 2015) ....... 27

D. *CFPB v. CashCall, Inc.,*
No. CV 15-7522-JFW (RAOx), 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) .................................................................................................. 34

E. *CFPB v. D&D Mktg.,*
No. 15-9692-PSG (C.D. Cal. Nov. 17, 2016),
Order Denying Defendants' Motion to Dismiss ................................. 47

F. *CFPB v. ITT Educ. Servs.,*
No. 1:14-cv-00292-SEB-TAB, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) .................................................................................................. 74

G. *CFPB v. Prime Mktg. Holdings, LLC,*
No. CV 16-07111-BRO (JEMx) (C.D. Cal. Nov. 15, 2016),
Order Re Defendant's Motion to Dismiss ........................................ 112

H. *FTC v. AFD Advisors,*
No. 13 CV 6420, 2014 WL 274097 (N.D. Ill. Jan. 24, 2014) ............ 133

I. *FTC v. Willms,*
No. C11-828 MJP, 2011 WL 4103542 (W.D. Wash. Sept. 13, 2011) ..137

J. *Illinois v. Alta Colleges,*
No. 14 C 3786, 2014 WL 4377579 (N.D. Ill., Sept. 4, 2014) ............. 148

K. *In re UJB Financial Corp. S'holder Litig.,*
No. 90-1569, 1991 WL 321909 (D.N.J. Jan. 22, 1991) ...................... 155

L.   *Smith v. Ingram Micro, Inc.,*
     No. 1:15-CV-1301, 2015 WL 7736742 (M.D. Pa. Dec. 1, 2015) ......... 163

M.   *Tucker v. Mann Bracken, LLC,*
     No. 1:08-CV-1677, 2009 WL 151669 (M.D. Pa. Jan. 21, 2009) ....... 169

N.   *United States v. Eastwick Coll.,*
     657 F. App'x 89 (3d Cir. 2016) ..........................................................174



2014 WL 4413598
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Sheena ALEXANDER, on behalf of herself
and all others similarly situated, Plaintiff
v.
COAST PROFESSIONAL INC., et al., Defendants.

Civil Action No. 12–1461.
|
Signed Sept. 5, 2014.

**Attorneys and Law Firms**

Joshua R.I. Cohen, Cromnell, CT, Robert P. Cocco, Law
Offices of Robert P. Cocco PC, Scott A. George, Seeger
Weiss, Philadelphia, PA, for Plaintiff.

Andrew M. Schwartz, Ronald M. Metcho, II, Marshall
Dennehey Warner Coleman & Goggin, Philadelphia, PA,
for Defendants.

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, District Judge.

**INTRODUCTION**

 **\*1** Before this Court is a *motion for class certification*
filed by Plaintiff Sheena Alexander ("Plaintiff") pursuant
to Federal Rule of Civil Procedure (Rule) 23. [ECF 55].
Defendant Coast Professional Inc. ("Defendant") has
filed an opposition. [ECF 57]. Plaintiff filed a reply, [ECF
60], Defendant filed a sur-reply, [ECF 63], and Plaintiff
filed a response to Defendant's sur-reply. [ECF 66]. The
motion is ripe for disposition.

For the reasons stated herein, the motion for class
certification is granted.

**BACKGROUND**

In 1992, Congress amended Section 428F of the Higher
Education Act, 20 U.S.C. § 1078–6, *et seq.,* ("HEA"), to
enable students with defaulted federally-insured student
loans to rehabilitate the loans by making a fixed number
of consecutive monthly payments in an amount that was
"reasonable and affordable," based on the individual

borrower's "total financial circumstances." Specifically,
the relevant provision provides:

> Neither the guaranty agency nor
> the Secretary shall demand from
> a borrower as monthly payment
> amounts described in subparagraph
> (A) more than is reasonable and
> affordable based on the borrower's
> total financial circumstances.

20 U.S.C. § 1078–6(a)(1)(B). Under the rehabilitation
program, once the borrower makes the necessary number
of monthly payments, the loan is no longer in default
and the borrower is eligible to receive additional student
financial aid. 20 U.S.C. § 1078–6(a)(1) (C) and (a)(3).

In 2002, Plaintiff applied for and received a student loan
through the Federal Family Education Loan Program
("FFELP loan"). At the time of the underlying events,
Plaintiff's loan was in default with an outstanding
balance of approximately $27,500. The defaulted loan was
assigned to the Department of Education, which in turn,
assigned it to Defendant for collection purposes.

Defendant is in the collection business, with an emphasis
on collecting student loans, including, FFELP and Direct
loans. In February 2012, Defendant contacted Plaintiff
by telephone to discuss Plaintiff's defaulted school loan
and potential repayment options. Defendant advised
Plaintiff that failure to cure her default could result
in garnishment, litigation, or other actions to recover
the unpaid balance of her loan. Only after determining
that Plaintiff could not pay off the loan and advising
her that involuntary administrative wage garnishment
was a possibility, Defendant informed Plaintiff that she
had some rehabilitation options. At the time, Plaintiff's
monthly expenses exceeded her monthly income, leaving
her with a monthly financial shortfall of $145. Despite
being aware of Plaintiff's financial situation, Defendant
offered Plaintiff a loan rehabilitation program consisting
of monthly payments in the amount of $260, and advised
her that this amount was the minimum amount that
would be accepted. Pursuant to its policies and practices,
Defendant calculated Plaintiff's monthly payment based
solely on a percentage of her outstanding loan balance.
Defendant followed this same policy and practice with
regard to other student loan debtors.

**\*2** Defendant maintains that this rehabilitation practice for collecting defaulted student loans was in line with rehabilitation program guidelines issued by the Department of Education. In contrast, Plaintiff contends that Defendant's practice violated the HEA by failing to take into account Plaintiff's "total financial circumstances" when determining the monthly payments required for Plaintiff to rehabilitate her defaulted school loan.

Plaintiff commenced this action by filing a complaint on March 23, 2012. [ECF 1]. On June 22, 2012, Plaintiff filed an amended complaint in which she asserted her original individual claims as well as claims on behalf of a purported class of similarly-situated student loan debtors. [ECF 15]. Plaintiff has moved to certify a class based on the allegations in her amended complaint. As defined by Plaintiff, the proposed class is:

> All residents of the Commonwealth of Pennsylvania with Federal FFELP and/or Direct Loans whose loans were serviced by Coast Professional, Inc., in default, had no judgments related to the default, were not previously rehabilitated and were otherwise qualified for rehabilitation and who did not pursue an offer of balance in full or settlement in full payment.

**LEGAL STANDARD**

Rule 23 governs the certification of class actions in federal court. A plaintiff seeking class certification must satisfy all requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* ─── U.S. ───, 133 S.Ct. 1184, 1194, 185 L.Ed.2d 308 (2013); *see also Marcus v. BMW of North America,* 687 F.3d 583, 590 (3d Cir.2012). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal–Mart Stores, Inc. v. Dukes,* ─── U.S. ───, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). A district court's analysis of a motion for class certification "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " *Amgen Inc.* at 1194 (quoting *Dukes,* 131 S.Ct. at 2551). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the

certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194–95. "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir.2008).

To satisfy the Rule 23(a) requirements:

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

**\*3** *Marcus,* 687 F.3d at 590–91 (citations omitted).

In this case, Plaintiff seeks certification of the proposed class under Rule 23(b)(3), which permits certification when a court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Under this Rule, the court must also consider matters pertinent to these findings which include, in part, the class members' interest, if any, to the management of the class action itself.

**DISCUSSION**

In the class action complaint, Plaintiff contends that Defendant violated § 1078–6 of the HEA and the implementing regulations found in 34 CFR § 685.211(f) and § 682.405(b)(13) when it failed to consider her "total financial circumstances" at the time Defendant calculated the "reasonable and affordable" monthly payments she needed to make to rehabilitate her defaulted FFELP student loan. [1] Through the underlying motion, Plaintiff seeks class certification.

In opposing the motion for class certification, Defendant directs its argument to the merits of Plaintiff's claims rather than to the Rule 23 class certification requirements.

Specifically, Defendant argues that Plaintiffs claims fail because: (1) the cited statute and regulations do not apply to either Defendant or Plaintiff's FFELP student loans; and (2) while servicing Plaintiff's loans, Defendant calculated her rehabilitation payments based on the 2009 Guidelines for the "Minimum Payment Amount," issued by the Department of Education, which, according to Defendant, are deemed as "reasonable and affordable" for purposes of the applicable statute and regulations.

As stated, however, when seeking class certification, a plaintiff need not "prove" success on the merits. "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen,* 133 S.Ct. at 1191. As the Third Circuit has explained, "there is no 'claims' or 'merits' litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 305 (3d Cir.2011). This Court must, therefore, limit its analysis to the Rule 23 requirements and only wade into the merits to the extent relevant and necessary to those requirements. As such, this Court finds that Defendant's arguments regarding the merits of Plaintiff's case are neither relevant nor necessary to that analysis. Therefore, they are rejected at this stage, without prejudice, to their renewal at the appropriate stage of these proceedings. [2]

### Rule 23(a) Requirements

#### 1. Ascertainability

As a prerequisite to class certification, a plaintiff "must show by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class." *Hayes v. Wal–Mart Stores, Inc.,* 725 F.3d 349, 356 (3d Cir.2013). To meet this prerequisite, "the class must be defined with reference to objective criteria." *Id.* at 355. Second, "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.*

**\*4** This Court finds that the proposed class is sufficiently ascertainable. The class is limited to Pennsylvania

residents who had defaulted on FFELP and/or Direct student loans, qualified for rehabilitation programs, and did not pursue an offer for balance in full or settlement in full payment. Members of the proposed class can likely be identified through a review of Defendant's company records, which track Defendant's communications with the defaulted borrowers. As described below, Defendant has already identified at least seventy-six (76) class members. Accordingly, Plaintiff has satisfied the preliminary Rule 23(a) considerations.

#### 2. Numerosity

Under Rule 23(a)(1), the court must determine whether the potential class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Although "Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members ... in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding." *Hayes,* 725 F.3d at 357. "Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." *Id.*

Plaintiff contends that the number of potential class members is in the hundreds. Despite opposing the class certification, Defendant concedes that there are seventy-six (76) defaulted Pennsylvania-based borrowers who were offered the balance-sensitive repayment as a rehabilitation option. [3] Based on this concession, this Court finds that Plaintiff has met her burden as to numerosity.

#### 3. Commonality

Pursuant to Rule 23(a)(2), this Court must determine whether "there are questions of law or fact common to the class," commonly known as "commonality." Fed.R.Civ.P. 23(a)(2). Under the rule, commonality "requires the plaintiff to demonstrate that the class

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

members 'have suffered the same injury.' " *Wal–Mart,* 131 S.Ct. at 2551. It "does not require identical claims or facts among class member[s]." *Marcus v. BMW of North America, LLC,* 687 F.3d 583, 597 (2012) (citations omitted). "For purposes of Rule 23(a) (2), even a single common question will do." *Id.* Claims common to the entire class "must depend on a common contention ... [that is] of such a nature that it is capable of classwide resolution ... [and] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart,* 131 S.Ct. at 2551.

**\*5** In opposing certification, Defendant argues that Plaintiff lacks commonality with the proposed class because liability as to each class member will turn on individualized inquiries regarding, *inter alia,* the type of loan, the borrower's default and the calculations used by Defendant to implement the rehabilitation program. Although dissimilarities between the class members are likely, there are several common questions of fact and law. As stated, the proposed class consists of Pennsylvania residents who defaulted on either their Direct or FFELP student loans and were contacted by Defendant regarding post-default repayment options but not offered monthly payments that took into consideration the borrower's total financial circumstances. As such, the factual basis of the claim is common to all potential class plaintiffs. In addition, each proposed plaintiff's claim is dependent on the resolution of at least one common legal issue: whether Defendant administered the rehabilitation program in violation of the HEA and implementing regulations by failing to take into consideration each individual borrower's "total financial circumstances" when determining the "reasonable and affordable" monthly payments required. This Court finds that these issues are common to all class members. Indeed, each class member's claim will turn on whether Defendant considered each individual plaintiff's "total financial circumstances" when calculating the reasonable and affordable monthly repayment plan. Therefore, Plaintiff has met the commonality requirement.

### *4. Typicality*

Under Rule 23(a)(3), this Court must also determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

Fed.R.Civ.P. 23(a)(3). Typicality and commonality are closely related and often merge. *Marcus,* 687 F.3d at 597. Typicality, however, "derives its independent legal significance from its ability to 'screen out class actions in which the legal and factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present.' " *Id.* at 598. "If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise [ ] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*

Typicality ensures that the putative class members' and class representative's interests "are aligned 'so that the latter will work to benefit the entire class through the pursuit of [their] own goals.' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183 (3d Cir.2001) (citations omitted). Typicality is met "when the named plaintiffs and the proposed class members 'challenge [ ] the same unlawful conduct." *Thomas v. SmithKline Beecham Corp.,* 201 F.R.D. 386, 394 (E.D.Pa.2001) (quoting *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 58 (3d Cir.1994)). Complete "factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of other class members will be fairly and adequately protected in their absence." *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 598 (3d Cir.2009).

**\*6** Defendant argues that Plaintiff cannot meet the typicality requirement because she was the beneficiary of a FFELP loan, yet she seeks to include Direct loan borrowers within the class. This issue is similar to one addressed by the Third Circuit in *Marcus v. BMW of N. Am., LLC.* In *Marcus,* the plaintiff sought to certify a class to include persons who leased or bought various models of BMWs, though the named plaintiff leased only one model. The defendants argued that the plaintiff could not meet the typicality requirement under the circumstances because each model had different characteristics, designs, and uses. 687 F.3d at 599. Rejecting the defendants' argument, the Court found that the plaintiff met the typicality requirement because the claims were based upon alleged misrepresentations by the defendants which did not differ between models. *Id.* "When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type

of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types." *Id.* (citations omitted).

Here, though Plaintiff seeks certification of a class to include persons who essentially obtained two different products, *i.e.,* FFELP loans and Direct loans, Plaintiff has presented evidence that Defendant made the same misrepresentations as to both types of loans and failed to consider the borrower's "total financial circumstances" when calculating the monthly payments as required by the statute and regulations applicable to each type of federal student loan. Thus, like the plaintiff in *Marcus,* Plaintiff has met the typicality requirement.

Defendant also argues that Plaintiff's claims are not typical of those of the proposed class because she testified during her deposition that she was seeking lower monthly payments rather than monetary damages, the only remedy afforded by the FDCPA. While Plaintiff, a non-lawyer, may not fully understand each of the legal intricacies involved in this matter, such knowledge is not required. It is clear, however, from Plaintiff's amended complaint that she seeks monetary relief.

In this case, the facts and legal underpinnings of Plaintiff's case are typical of those of the proposed class. While there may be some factual disparities, they should not pose a conflict between the named plaintiff and the class she seeks to represent. Each class member's claim arises from the same or similar course of events in that each member was offered rehabilitation payments which were allegedly calculated by Defendant without consideration of the individual member's "total financial circumstances." Plaintiff's legal theory and burden of proof are the same as they would be for each member of the putative class. Therefore, this Court finds that the typicality requirement is satisfied.

### 5. Adequacy

Under Rule 23(a)(4), this Court must also determine whether the proposed class representatives, Plaintiff and her counsel, "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To meet the adequacy requirement, a finding must be made that (1) Plaintiff's interests do not "conflict with those of the class" and (2) the proposed class counsel are "capable

of representing the class." *Newton,* 259 F.3d at 185. The Third Circuit has "recognized that the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class," *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 183 (3d Cir.2012), and "not proof of vigorous pursuit of the claim." *In re Community Bank of Northern Virginia,* 418 F.3d 277, 307 (3d Cir.2005). This requirement serves "to ensure that the putative named plaintiff has the incentive to represent the claims of the class vigorously." *Dewey,* 681 F.3d at 184.

**\*7** While Defendant does not question the qualifications or competency of Plaintiff's counsel, Defendant challenges the adequacy of Plaintiff's counsel to serve as class counsel here by raising counsel's alleged failure to advise Plaintiff of the Defendant's offer of judgment. As support, Defendant points to Plaintiff's deposition testimony in which she was unable to recall whether she had been advised of the Defendant's previous offer of judgment. Notably absent from Defendant's argument, however, is the fact that Defendant's offer of judgment was stricken by the Court because such offers of judgment in the class action context "run afoul of the provisions of Fed.R.Civ. 23." [ECF 31]. Regardless, this Court is satisfied that proposed class counsel are sufficiently experienced in class litigation, including litigation under the FDCPA, to adequately represent the proposed class in this matter.

Defendant also challenges the adequacy of Plaintiff to represent the class members because of various deposition testimony wherein she lacked precise knowledge of the legal premise of her claims. "A class representative need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.' " *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 313 (3d Cir.2007). While Plaintiff's cited deposition testimony may suggest that she is not fluent with the legal theories of her case, it generally reveals a basic understanding of the factual underpinnings of the claim. This Court is satisfied that Plaintiff is adequate to represent the proposed class.

### *Rule 23(b) (3)* Requirements

Having found that Plaintiff has satisfied each of the Rule 23(a) prerequisites, this Court must turn to the requirements contained in Rule 23(b) and determine whether "the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These two requirements are generally referred to as "predominance and superiority."

### a. Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Issues common to the class must "predominate" over individual issues. *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 313–14 (3d Cir.1998). "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.' " *In re Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005)).

As stated, the essence of Plaintiff's claim is that Defendant's policy and practice of calculating a borrower's monthly rehabilitation payment without regard to the "total financial circumstances" of the borrower violated Defendant's regulatory obligations to Plaintiff and the proposed class members. To succeed on her FDCPA claim, Plaintiff need only show that Defendant's debt collection practice was deceptive from the perspective of the least sophisticated consumer. *See Graziano v. Harrison,* 950 F.2d 107, 111 (3d Cir.1991). This is the same showing any member of the class would have to make in order to prevail on an FDCPA claim based upon the same conduct and representations of Defendant. Indeed, as other courts in this district have found, the factual and legal issues involved in an FDCPA class action based on a debt collector's alleged misrepresentations are generally identical for all class members. *See e.g., Seawell v. Universal Fidelity Corp.,* 235 F.R.D. 64, 67 (E.D.Pa.2006) (certifying class for FDCPA claims); *Oslan v. Collection Bureau of Hudson Valley,* 206 F.R.D. 109, 111–12 (E.D.Pa.2002) (same); *see also Amchem Prods. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("[P]redominance is a test

readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). As such, this Court finds that the questions of law or fact common to class members that involve liability predominate over questions involving only individual members.

### b. Superiority

**\*8** Under the second criterion of Rule 23(b), this Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b). The superiority element requires courts "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods of adjudication.' " *Community Bank of Northern Virginia,* 418 F.3d at 309 (citations omitted). A "nonexhaustive list of factors pertinent to a court's 'close look' " at the superiority requirement is found in the text itself." *Amchem,* 521 U.S. at 615–16. The list includes:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3)(A)-(D). The Third Circuit has noted that the FDCPA specifically provides for class damages and recognized that a class action is a benefit to claimants who can share the cost of litigation when their individual recoveries are relatively small, as is the case here. *Weiss v. Regal Collections,* 385 F.3d 337, 344–45 (3d Cir.2004) ("Representative actions, therefore, appear to be fundamental to the statutory structure of the FDCPA."); *see also Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1190 (9th Cir.2001) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action.").

Based upon this analysis, this Court finds that consideration of the above-mentioned factors weighs favorably for certification. Further, because of the number and nature of potential class plaintiffs and the fact that each member's potential recovery is likely to be small compared to the cost of litigating an individual case, maintaining this matter as a class action is superior to other available methods.

**CONCLUSION**

Having concluded the requisite "vigorous analysis" of the Rule 23(a) and (b) factors and considering the case law cited, this Court finds that the requirements of Rule 23 have been met and that certification of Plaintiff's proposed class is proper. An order consistent with this memorandum opinion follows.

**ORDER**

**AND NOW,** this 5th day of September 2014, upon consideration of the *motion for class certification* filed by Plaintiff Sheena Alexander pursuant to Federal Rule of Civil Procedure 23, [ECF 55], Defendant's opposition thereto, [ECF 57], Plaintiff's reply, [ECF 60], Defendant's sur-reply, [ECF 63], Plaintiff's response to the sur-

reply, [ECF 66], and for the reasons set forth in the accompanying memorandum opinion, it is hereby **ORDERED** that the motion is **GRANTED.** This action is hereby certified as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of the following class:

> ***9** All residents of the Commonwealth of Pennsylvania with Federal FFELP and/or Direct Loans whose loans were serviced by Coast Professional, Inc., in default, had no judgments related to the default, were not previously rehabilitated and were otherwise qualified for rehabilitation and who did not pursue an offer of balance in full or settlement in full payment.

It is further **ORDERED** that Plaintiff Sheena Alexander is hereby designated as the representative of the class, and the law firms of Seeger Weiss LLP, the Law Offices of Robert P. Cocco PC and the Law Offices of Joshua Cohen, shall serve as class counsel.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4413598

Footnotes

1   While there is no express or implied private right of action under the HEA, a violation of the HEA can give rise to a private cause of action under the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692a, *et seq. See Cliff v. Payco General American Credits, Inc.,* 363 F.3d 1113, 1123–24 (11th Cir.2004) (noting that "the Secretary of Education has expressed the belief that third-party debt collectors acting on behalf of guaranty agencies to collect federal student loans must comply with the FDCPA ."). The FDCPA regulates the ways in which debt collectors can undertake collection activities and, generally, prevents all manner of coercive, deceptive, misleading and unconscionable collections practices. "Among the practices prohibited by the FDCPA is the use of 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.' " *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1167 (3d Cir.2000).

2   Notably, Defendant makes these same merits-based arguments in a motion for summary judgment that it filed about the same time that it filed its opposition to class certification. [ECF 59]. As Plaintiff argues in her opposition to that motion, Defendant's motion for summary judgment is premature. The scheduling orders in this matter, which generally took the form submitted by the parties in various joint stipulations, clearly contemplate a first phase of discovery limited to class certification issues. [ECF 51].

3   Defendant's Opposition at pp. 20–21.

# B

2016 WL 787652
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Richard Angino and Alice Angino, Plaintiffs,

v.

Wells Fargo Bank, N.A., and Wells
Fargo Home Mortgage, Defendant.

CIVIL NO. 1:15-CV-418
|
Signed 02/19/2016

**Attorneys and Law Firms**

Richard C. Angino, Angino & Lutz, P.C., Harrisburg, PA,
for Plaintiffs.

Craig A. Hirneisen, Steven J. Adams, Stevens & Lee PC,
Reading, PA, for Defendant.

*REPORT AND RECOMMENDATION*

Martin C. Carlson, United States Magistrate Judge

### I. *Statement of Facts and of the Case*

**\*1** This lawsuit, which comes before us for consideration
of a motion to dismiss, is one of several cases [1] brought by
the plaintiffs against various financial institutions arising
out of a common core of operative facts. The plaintiffs in
this action are Richard Angino, a local attorney, and his
spouse, Alice Angino. (Doc. 1, ¶ 4.) The plaintiffs are in
their 70s and as Mr. Angino approaches the conclusion of
his professional career he and his wife have experienced a
series of financial reversals. As described by the Anginos
in the well-pleaded facts set forth in their complaint,
these financial setbacks are in large measure a product
of some $13,000,000 in loans and mortgage indebtedness
which they agreed to undertake in connection with various
residential and commercial projects over a number of
years up through 2002. (*Id.*, ¶ 6.)

This indebtedness included a mortgage on a luxurious
residential property. (*Id.*, ¶ 7.) In 2002, the Anginos had
an existing mortgage in the amount of $708,000 on this
property with First Union Bank, a financial institution
which later became the defendant, Wells Fargo. *(Id.,* ¶
8.) According to the Anginos, in 2002, they renegotiated

"once in a lifetime" terms for a new mortgage loan from
the bank. (*Id.*, ¶ 10.) This new mortgage was based upon
an appraised value for the home of $2,310,000, and was a
100% cash mortgage, with interest only payments for the
first 10 years of the loan. (*Id.*, ¶¶ 8–18.)

The Anginos agreed to these new loan terms, and used
the nearly $2.3 million dollars disbursed to them for an
array of purposes. (*Id.*, ¶ 13.) However, in the decade
which followed a confluence of events impaired the ability
of the Anginos to make the principal payments which
they had agreed to in 2002 when they refinanced this
loan. These events included the economic downturn in
20072008, which led to significant stock losses for the
Anginos in their margined stock holdings; (*Id.*, ¶ 22) as
well as severe financial reversals in various speculative
commercial and residential real estate investments. (*Id.*, ¶
23.) In addition, by 2013, Richard Angino's legal practice
was also experiencing financial difficulties "because of
having insufficient cases for eight attorneys." (*Id.*, ¶ 27.)

Confronted with this cascading array of financial
difficulties, the Anginos were unable to make full loan
payments in 2013, when principal payments began to
come due under the terms of the 2002 loan agreement. (*Id.*,
¶ 28.) These loan defaults compounded over time. (*Id.*,
¶¶ 28, 31, 32, 34, 41, 42.) Thus, the Anginos' complaint
describes in some detail the plaintiffs' breach of their
2002 agreement to make timely loan payments. However,
notably, with respect to the original 2002 loan agreement,
the Anginos' current complaint does not describe any
actions by the bank which violated the terms of this
agreement. Instead, the Anginos seem to allege that the
bank is liable to them, in part, because the bank refused
to further modify these loan terms in a fashion that would
have been more favorable to these defaulting borrowers,
something the Anginos represent they anticipated would
occur in the future. Thus, the apparent premise of
this complaint is that the plaintiffs have some right to
compel the bank to modify agreed-upon loan terms to its
detriment and to the benefit of these defaulting borrowers.
Significantly, nothing in the 2002 written loan agreement
reflected a promise of commitment by any of the parties
to refinance this loan at some time in the future.

**\*2** As the Anginos' 2002 loan fell deeper into default,
the Anginos began a series of lengthy, protracted, and
arduous exchanges with Wells Fargo, seeking relief under
the Home Affordable Modification Program, (HAMP),

or any other mortgage relief the bank could offer. (*Id.*, ¶¶ 43–78.) While the Anginos provide a detailed narrative of these communications, and characterize the discussions as an agreement to refinance their loan, what is noteworthy about the well-pleaded facts in the complaint is that they *do not* seem to reflect an agreement by Wells Fargo to refinance this $2.3 million loan. At most, these communications describe a process–albeit a frustrating process from the plaintiffs' perspective–by which the Anginos could provide information to the bank so it could determine whether to enter into a modified loan agreement. Ultimately, these efforts were entirely unavailing, since the Anginos' did not qualify for HAMP program mortgage relief. (*Id.*, ¶ 54.)

Based upon these averments, and in the face of these loan defaults, the Anginos have filed an eight-count civil complaint, which combines and conflates various claims and causes of action. In Count I the Anginos allege that Wells Fargo breached its 2002 loan agreement with the Anginos. This breach of contract claim, however, does not rest upon any breach of the actual terms of this written loan agreement. Rather, it seems premised upon "expectations of the parties that refinancing would be available." (*Id.*, ¶ 81) Thus, the breach of this 2002 contract alleged by the Anginos in fact entails a failure to enter into some new, different and more favorable loan agreement ten years later in 2012 when the Anginos began defaulting on this initial agreement. In Count II of their complaint, the Anginos allege a second breach of contract claim, an alleged breach of a series of "HAMP TPP Agreements" between the plaintiffs and the bank in 2012 through 2014. (*Id.*, ¶ 90.) However, the well-pleaded facts in the complaint describe something that appears to fall well short of an agreement to refinance. Rather, the well-pleaded facts reflect discussions regarding a process by which the Anginos could provide information to the bank so it could determine whether to enter into a modified loan agreement.

Count III of the complaint, in turn, alleged that the bank engaged in unfair and deceptive practices under Pennsylvania's Unfair Trade Practices and Consumer Protection law, 73 Pa.C.S. § 201–1, when it refused to further modify this loan. This unfair trade practice claim, as pleaded, seems expressly premised upon the Anginos' claims that they had some free-standing right to a loan modification under HAMP or due to the Dodd–Frank Wall Street Reform and Consumer Protection Act,

a premise which is a recurring theme throughout this complaint. (*Id.*, ¶¶ 100–109.) Count IV of the complaint advances a promissory estoppel claim, which is once again based upon two notions which appear unsupported by either the law or the well-pleaded facts: the idea that Wells Fargo agreed to refinance this loan, coupled with the legal premise that the Anginos had an enforceable right to refinance this loan under HAMP or some other federal statute. (*Id.*, ¶¶ 110–113.)

In Count V of the complaint, the Anginos endeavor to bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* Specifically, the Anginos seem to allege that the defendants failed to respond to the plaintiff's "Qualified Written Requests" for information their loan and failed to correct erroneous loan information. (*Id.*, ¶¶ 114–130.) Count VI of the complaint, in turn, alleged violations of the federal Fair Credit Reporting Act, by the bank. These alleged Fair Credit Report Act violations appear to have pertained to the bank's factually accurate reports that the Anginos had defaulted on their loan, but are flawed. (*Id.*, ¶¶ 132–137.) Finally, Count VII of the complaint accuses the bank in a summary fashion of fraud, deceit, conspiracy, negligence and the intentional or negligent infliction of emotional distress. (*Id.*,¶¶ 137–143.)

**\*3** Presented with this multi-faceted complaint, Wells Fargo Bank has now moved to dismiss the complaint citing numerous legal deficiencies in this pleading. (Docs. 6 and 12.) The Anginos, in turn, have responded to this motion to dismiss, albeit frequently in a summary fashion, often arguing the viability of many of these legal claims through a single summary, assertion. (Doc. 15.) Wells Fargo's motion to dismiss is fully briefed and, therefore, is now ripe for resolution.

While we note that some of the plaintiffs' claims seem to have transmogrified factually in the course of this litigation, when we consider the allegations actually made by the plaintiffs in their complaint, we find that many of these allegations do not state a claim upon which relief may be granted. Therefore, we recommend dismissal of Counts I, II, III, IV, VI, and VII of the complaint, although some counts, and particularly Count III which alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1 should be dismissed without prejudice to the filing of a n amended complaint stating well-

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

pleaded facts in support of this claim. As for Count V of the complaint, which bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, et seq., it is recommended that the motion to dismiss be denied, but that the plaintiffs be directed to file a more definite statement of their claims pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.

## II. *Discussion*

### A. *Rule 12(b)(6)– The Legal Standard*

Wells Fargo has filed a motion to dismiss this complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has recently aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (12007) continuing with our opinion in *Phillips [v. County of Allegheny,* 515 F.3d 224, 230 (3d Cir.2008) ] and culminating recently with the Supreme Court's decision in *Ashcroft v. Iqbal* –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 209–10 (3d Cir.2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff.

*Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir.1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*4** In keeping with the principles of *Twombly,* the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement
to relief.

*Id.* at 679.

Thus, following *Twombly* and *Iqbal* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

*Fowler*, 578 F.3d at 210–11.

As the court of appeals has observed: "The Supreme Court in *Twombly* set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in *Iqbal*. The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct.1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' *Id.* A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " *Burch v. Milberg*

*Factors, Inc.,* 662 F.3d 212, 220–21 (3d Cir.2011) *cert. denied,* 132 S.Ct. 1861, 182 L.Ed.2d 644 (U.S.2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' *Iqbal,* 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' *Id.* at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' *Id." Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir.2010).

**\*5** In undertaking this task, the court generally relies only on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see also, U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d382, 388 (3d Cir.2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment.") However, the court may not rely on other parts of the record in determining a motion to dismiss. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

### B. *As Currently Pleaded Many Counts Set Forth in This Complaint Fail to State a Claim Upon Which Relief May Be Granted*

#### 1. *The Plaintiffs Have Not Alleged Viable Breach of Contract Claims*

At the outset, in Counts I and II of their complaint the plaintiffs allege that Wells Fargo has breached

two contracts with the Anginos–the original 2002 loan agreement between the parties, and some form of 2012–2014 HAMP–TPP loan modification agreement that the plaintiffs allege existed between the parties. As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d. Cir.2000). The legal principles governing the interpretation of contracts under Pennsylvania law is familiar and well-settled. To prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach. *See Diodato v. Wells Fargo Ins. Servs., USA,* 44 F.Supp.3d 541, 556 (M.D.Pa.2014). Furthermore, the legal benchmarks applied to contract interpretation are also clearly settled. Initially, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980)* (citation omitted); *Mace v. Atl. Ref. & Mktg. Corp.,* 785 A.2d 491, 496 (Pa.2001). A contract is ambiguous only if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3d Cir.1991). Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law. *Mellon Bank,* 619 F.2d at 1011 n.10.

The United States Court of Appeals for the Third Circuit has aptly summarized Pennsylvania law regarding the interpretation of contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they

employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

**\*6** *Great Am. Ins. Co. v. Norwin Sch. Dist.,* 544 F.3d 229, 243 (3d Cir.2008) (internal citation omitted) (citing *Murphy v. Duquesne Univ.,* 777 A.2d 418, 429–30 (Pa.2001)). Furthermore, courts must, whenever possible, read contract provisions so as to avoid ambiguity. *Id. at 247.* Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to resolve the issue of interpretation as a matter of law. *See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry.,* 346 F.Supp.2d 720, 725 (M.D.Pa.2004).

Applying these legal benchmarks, we find that the Anginos' breach of contract claims, as currently pleaded, fail as a matter of law on several scores. Indeed, there is an intellectually elusive quality to these breach of contract claims which stems from a single source: In no instances do the well-pleaded facts in the complaint identify a legally enforceable promise by Wells Fargo, the *sine qua non* of a contract claim.

For example, with respect to Count I of the complaint, the plaintiffs' claim that the 2002 loan agreement has been breached, the plaintiffs point to no breach of the actual terms of this agreement. Rather, this claim is premised upon the plaintiffs' unilateral assertions

concerning "expectations of the parties that refinancing would be available." (*Id.,* ¶ 81.) Suffice it to say, that no such promise to refinance can be found within the four-corners of the 2002 contract, a fully integrated written agreement. (Doc. 1–2.) We have carefully reviewed this agreement, which is attached as an exhibit to the complaint, and find this agreement to be clear and unambiguous. Further, nothing in the plain language of the agreement gives the plaintiffs a contractual right to refinance. Therefore, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone," *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 619 F.2d 1001, 1010 (3d Cir.1980) (citation omitted); *Mace v. Atl. Ref. & Mktg. Corp.,* 785 A.2d 491, 496 (Pa.2001), and the plaintiffs may rely upon their own unilateral wishes to add unwritten terms to this otherwise unambiguous written contract.

Likewise, Count II of the complaint alleges a breach of what the plaintiff characterize as a loan modification agreement, but the well-pleaded facts recited in the complaint disclose that Wells Fargo simply sought information from the plaintiffs in order to ascertain whether it would agree to a loan modification. Courts consistently agree that such requests fall well short of an enforceable loan modification agreement and have declined to sustain a breach of contract claim based upon mere requests for information like those made here.[2]

The Anginos' prospects on these particular contract claims do not improve if the claims are cast as a claim for a breach of a duty of good faith. As a general rule allegations of a breach of the covenant of good faith sound in contract, rather than tort. *See Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.,* 560 A.2d 151, 153 (Pa.Super.Ct.1989) ("Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts."). As a result, courts have found that the breach of the covenant of good faith is subsumed in a claim for breach of contract. *See McHale v. NuEnergy Group,* No. Civ. A. 01–4111, 2002 WL 321797, *8 (E.D.Pa. Feb. 27, 2002) (concluding that Pennsylvania law would not recognize a claim for breach of the covenant of good faith and fair dealing as a separate cause of action apart from the breach of contract claim, since the actions forming the basis of the breach of contract claim were essentially the same as those brought in support of the bad faith claim); *see also JHE, Inc. v. Se. Pa. Transp. Auth.,* 2002 WL 1018941, *7 (Pa.Com.Pl. May 17, 2002) ("[A]

breach of the covenant of good faith is nothing more than a breach of contract claim and ... separate causes of action cannot be maintained for each, even in the alternative."); *Commonwealth v. BASF Corp.,* No. 3127, 2001 WL 1807788, *12 (Pa.Com.Pl. Mar. 15, 2001) ("Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract."). Rather, under Pennsylvania law, such a duty of fair dealing is entirely dependent upon the existence of a contractual relationship. In short, Pennsylvania law grafts onto all contracts a responsibility by the contracting parties to deal fairly with one another. However, Pennsylvania law does not recognize an independent, and free-standing, duty of fair dealing outside a contractual context. As we have previously explained:

> **\*7** Whether express or implied, the covenant of good faith and fair dealing acts as a term of the contract, and that covenant arises from the contract itself. *See Ash v. Cont'l Ins. Co.,* 593 Pa. 523, 932 A.2d 877, 884 (2007); *Birth Center,* 787 A.2d at 385; *Murphy,* 777 A.2d at 434 & n. 11; *Gray,* 223 A.2d at 11 ("We believe that this recent case law, employing contractual terms for the obligation of the insurer to represent in good faith the rights of the insured, indicates that a breach of such an obligation constitutes a breach of the insurance contract for which an action in assumpsit will lie."); *Cowden v. Aetna Cas. & Sur. Co.,* 389 Pa. 459, 134 A.2d 223, 229 (1957).

Because the covenant of good faith and fair dealing arises from the contract and not due to the mere relationship of the parties-as, for example, a fiduciary duty-a breach of the covenant sounds in contract, not tort. *See Ash,* 932 A.2d at 884. There is, however, no independent cause of action for a breach of the covenant of good faith and fair dealing-arising in contract-in Pennsylvania because such a breach is merely a breach of contract. *See Birth Center,* 787 A.2d at 385–86; *Gray,* 223 A.2d at 11. It has been said that a breach of the implied covenant of good faith and fair dealing merges with a breach of contract claim. *See Meyer v. Cuna Mut. Group,* No. 03–CV–602, 2007 WL 2907276, at *14–15 (W.D.Pa. Sept. 28) (citing cases).

*Zaloga v. Provident Life and Acc. Ins. Co. of America,* 671 F.Supp.2d 623, 630–31 (M.D.Pa.2009).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 6

Since there typically is no separate cause of action under Pennsylvania law for breach of the duties of good faith and fair dealing; *Chanel, Inc. v. Jupiter Group, Inc.,* Civ. No. 3:04–CV–1540, 2006 U.S. Dist. LEXIS 43363, at *6, 2006 WL 1793223 (M.D. Pa. June 27, 2006); *In re K– Dur Antitrust Litig.,* 338 F.Supp.2d 517, 549 (D.N.J.2004); *Blue Mt. Mushroom Co. v. Monterey Mushroom, Inc.,* 246 F.Supp.2d 394, 400–01 (E.D.Pa.2002); *LSI Title Agency, Inc. v. Eval. Servs., Inc.,* 951 A.2d 384, 391 (Pa.Super.Ct.2008), a claim for breach of the duties of good faith and fair dealing is, at bottom, simply a claim for breach of the underlying contract. *Zaloga v. Provident Life and Acc. Ins. Co. of America,* 671 F.Supp.2d 623, 630–631 (M.D.Pa.2009). Yet, in this case the Anginos seem to be alleging a breach of the duty of good faith claim, without asserting a clearly articulated breach of the underlying contract between themselves and Wells Fargo. This is a fatal flaw and defeats this claim as it is currently pleaded.

In any event, to the extent that some duty of good faith arises in a contractual setting, it is also clear that the scope of that duty in a borrower-lender transaction is narrowly defined and does not entail some legal obligation on the part of the lender to unilaterally agree to undermine, modify or defeat its own legal rights and interests under a commercial agreement. Thus, "the Supreme Court of Pennsylvania has refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor. *Heights v. Citizens National Bank,* 463 Pa. 48, 342 A.2d 738 (1975)." *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa.Super. 30, 36, 560 A.2d 151, 154 (1989). Likewise:

> It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender

generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons.

**\*8** *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa. Super. 30, 36–37, 560 A.2d 151, 154 (1989). In short, to the extent that Pennsylvania law recognizes a contractual duty of good faith, "courts have ... refused to apply a duty of good faith to alter or defeat the rights of a creditor which have been granted by law *or contract.*" *Stewart v. SWEPI, LP,* 918 F.Supp.2d 333, 342 (M.D.Pa.2013)(emphasis in original).

Fairly construed, the plaintiffs' complaint invites us to do precisely what Pennsylvania law says we cannot do through the rubric of a duty of good faith and fair dealing; that is, require a creditor to alter, defeat, modify, or renounce some contractual rights which it possesses. The all-encompassing duty of good faith asserted by the Anginos in this complaint would also call upon us condemn Wells Fargo for taking actions which the courts have expressly stated it is permitted to take such as "adhering to its agreement with the borrower ... by enforcing its legal and contractual rights as a creditor;" refusing "to surrender rights which it has been given by statute or by the terms of its contract;" or "negotiat[ing] terms of a loan which are favorable to itself." *Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.,* 385 Pa.Super. 30, 36–37, 560 A.2d 151, 154 (1989). Since Pennsylvania case law specifically rejects the notion that a lender must surrender its legal rights in order to demonstrate its good faith to its borrower, the Anginos' good faith claim, which is unmoored to any contractual breach by defendants and demands that defendants forego their contractual rights, fails as a matter of law and should be dismissed.

Similarly, the Anginos cannot bolster this breach of contract claim, as they attempt to do in their response to this motion to dismiss by cataloguing a series of doctrines, claims and affirmative defenses such as: Reasonable Expectations, Ambiguity, Waiver and Estoppel, Mutual Mistake of Fact, and Breach of Good Faith. As the Pennsylvania courts have previously informed the Anginos, these types of affirmative defenses under Pennsylvania law do not constitute an independent, free-standing legal claim. *Angino & Rovner, PC v. Santander Bank, N.A.,* No. 489 MDA 2014, 2015 WL 6405714, at

*7 (Pa.Super.Ct. Jan. 28, 2015). Indeed, the Pennsylvania courts have already specifically rejected the application of the reasonable expectations, waiver and estoppel, impracticability and impossibility doctrines to similar claims leveled by the Anginos against another bank in state court litigation. *Id.* Thus, the Pennsylvania courts have already advised the plaintiffs that they may not transmogrify these breach of contract defenses into quasi-contractual affirmative claims.

More fundamentally, even construed as affirmative defenses to contract liability, these defenses are typically limited to instances of physical impossibility, and not mere fiscal impracticability. Thus: "[I]f the allegedly unforeseeable event was in reality a natural and fairly predictable risk arising in the normal course of business, then a court may not dissolve a [n] agreement.... An individual's financial position, for example, cannot generally be an implied 'basic assumption' of a contract, nor will it excuse a party's performance. *See* Restatement (Second) of Contracts § 261 (1981) Comment: b. Basic assumption. Illustration 2 (showing that contracting party's financial situation as result of bank failure does not excuse performance on contract)." *Step Plan Servs., Inc. v. Koresko,* 12 A.3d 401, 412–13 (Pa.Super.Ct.2010). In this case, the Anginos attempt to assert that the change in their fiscal position gives them some form of affirmative breach of contract claim against their lender. This is something they may not do under Pennsylvania law. Therefore, this claim would fail as pleaded by the Anginos, and should be dismissed. If the plaintiffs wish to try to further articulate these claims of estoppel and waiver, they should do so through the filing of a timely amended complaint, but they may not endeavor to transform their claims through their response to this motion to dismiss.

*9 Finally, the breach of contract claims in the plaintiffs' complaint allude to the Home Affordable Modification Program (HAMP), a federal program designed to assist some banks and borrowers, and the Dodd–Frank financial reform laws, and may be read to allege some type of private right of action on behalf of the plaintiffs against the bank under these federal statutes. To the extent that the Anginos incorporate these matters into their breach of contract claims, these assertions merit only brief consideration by this Court. First, it is undisputed that "HAMP does not provide a private right of action. *See* Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 559 n. 4 (7th Cir.2012) (noting that 'HAMP does not

create a private federal right of action for borrowers against servicers')." *Sinclair v. Citi Mortgage, Inc.,* 519 F. App'x 737, 739 (3d Cir.) *cert. denied sub nom. Sinclair v. Citi Mortgage,* Inc, 134 S.Ct. 245, 187 L.Ed.2d 182 (2013) reh'g denied sub nom. *Sinclair v. Citi Mortgage, Inc.,* 134 S.Ct. 1054, 188 L.Ed.2d 140 (2014). "Quite the contrary, 'federal courts across the country have held that HAMP does not create a private right of action for borrowers.' " *Taylor v. Sovereign/Santander Bank,* No. 1:15–CV–123, 2015 WL 757543, at *5 (M.D.Pa. Feb. 23, 2015)(collecting cases). Therefore, it is well-settled that the Anginos may not premise a private right of action upon the HAMP program. Likewise with narrow exceptions that are not pertinent here, the Dodd–Frank Act does not provide for a private right of action by borrowers against lending institutions. *See, e.g.,* Regnante v. Sec. & Exch. Officials, No. 14 CIV. 4880 KPF, 2015 WL 5692174, at *7 (S.D.N.Y. Sept. 28, 2015); *Diena v. Certified Credit & Collection Bureau, Inc.,* No. 14 Civ. 769(AET), 2015 WL 570247, at *2 (D.N.J. Feb. 11, 2015) ("Plaintiff offers no statutory basis for the existence of a private right of action under the Dodd–Frank Act [.]")); *Levine v. Entrust Grp., Inc.,* No. 12 Civ. 3959(WHA), 2013 WL 1320498, at *7 (N.D.Cal. Apr. 1, 2013) ("Under the Dodd–Frank Act, the Court's research can find no private right of action."))). Therefore these breach of contract claims premised upon HAMP or Dodd–Frank should also be dismissed.

### 2. *The Plaintiffs' Promissory Estoppel Claims Also Fail as a Matter of Law*

These same considerations call for dismissal of the plaintiffs' promissory estoppel claim set forth in Count IV of their complaint. This promissory estoppel claim, like the breach of contract claims, appears to be based upon two notions which are unsupported by either the law or the well-pleaded facts: the idea that Wells Fargo agreed to refinance this loan, coupled with the legal premise that the Anginos had an enforceable right to refinance under HAMP or some other federal statute. (*Id.*, ¶¶ 110–113.)

Under Pennsylvania law promissory estoppel is appropriate in "situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing the promise." *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990). Promissory estoppel allows the court to enforce a promise that is unsupported by consideration where:

(1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee; (2) the promise does induce action or forbearance by the promisee; and (3) injustice can only be avoided by enforcing the promise. *Carlson,* 918 F.2d at 416. However, in every instance a promise is an essential element of a promissory estoppel claim. Moreover, in order to avoid a party's mere hopes being transformed into a claim of promissory estoppel courts often require that pleadings and proof show the existence of "a clear and definite promise." *Obado v. Magedson,* 612 F. App'x 90, 94 (3d Cir.2015)(construing New Jersey law). "Promissory estoppel is unavailable as a basis for relief when a promise is absent." *Schleig v. Commc'ns Satellite Corp.,* 698 F.Supp. 1241, 1249 (M.D.Pa.1988).

Here we find that the complaint simply fails to allege well-pleaded facts that would support a clear and definite promise by Wells Fargo to refinance this loan. This finding is fatal to this particular claim since promissory estoppel is unavailable where no promise can be found. *Id.* Therefore, Count IV of the complaint should also be dismissed.

### 3. *The Anginos Have Failed to Properly Allege Common-Law Fraud or Violations Unfair and Deception Practices under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1*

**\*10** Furthermore, in its current form, the Anginos' complaint does not sufficiently allege either common-law fraud or a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1.

With respect to the Anginos' common-law fraud allegations, beyond labeling the bank's conduct as fraudulent, the plaintiffs' complaint is devoid of any well-pleaded factual allegations which would support these serious claims. Thus, the plaintiffs provide no description of the allegedly fraudulent representations which they contend were made here by the bank. Furthermore, the plaintiffs do not allege any facts which would support an inference that the bank's decision to enforce its contractual rights under these modified loan agreement constituted some form of fraud upon the Anginos.

These deficiencies in the plaintiffs' complaint are particularly glaring since the rules governing specificity of pleading fraud in federal court call for much greater clarity in pleading and proof to sustain such grave allegations. As the United States Court of Appeals for the Third Circuit has observed:

> [A]llegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity. In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.". Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.*

*Lum v. Bank of America,* 361 F.3d 217, 223–4 (3d Cir.2004) (citations omitted, emphasis added).

Thus, "[p]ursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper story." ' *Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." ' *In re Rockefeller Ctr. Props. Secs. Litig.,* 311 F.3d 198, 216 (3d Cir.2002) (quoting *In re Nice Sys., Ltd. Secs. Litig.,* 135 F.Supp.2d 551, 577 (D.N.J.2001), emphasis supplied)." *Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp.,* 596 F.Supp.2d 842, 878 (D.N.J.2008).

Here, when judged against the heightened pleading standards demanded by Rule 9, the Anginos' allegations of common law fraud are wholly deficient and consist of little more than the talismanic recital of the elements of a cause of action, something that will not do as a matter of pleading. Therefore, this common law fraud claim should be dismissed.

The Anginos' closely related claims of deceptive conduct under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1 (UTPCPL), Count III of the complaint, seem flawed in a similar fashion. As to this count of the complaint, a review of the complaint suggests that, as drafted, the Anginos' claims against Wells Fargo appear to be premised upon § 2011–2(4)(xxi) of the UTPCPL, which prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." This statutory prohibition against "deceptive conduct does not require proof of the elements of common law fraud, but ... knowledge of the falsity of one's statements or the misleading quality of one's conduct is still required." *Belmont v. MB Inv. Partners, Inc.,* 708 F.3d 470, 498 (3d Cir.2013). "Therefore, in order '[t]o establish liability under the catch-all provision of the UTPCPL, "a plaintiff must present evidence showing: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *Slapikas v. First Am. Title Ins. Co.,* CIV.A. 06–0084, ––– F.R.D. ––––, ––––, 2014 WL 899355, at *6 (W.D.Pa.Mar.7, 2014) *(citing Seldon v. Home Loan Servs.,* 647 F.Supp.2d 451, 470 (E.D.Pa.2009); *Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 223 (3d Cir.2008)).' *Prukala v. Elle,* 3:14–CV–92, 2014 WL 1311125, *3 (M.D.Pa.Mar.28, 2014)." *Stephens v. State Farm Fire & Cas. Co.,* No. 1:14–CV–160, 2014 WL 5312682, at *9 (M.D.Pa. Oct. 16, 2014).

**\*11** In this case, as it is currently pleaded, the plaintiffs' UTPCPL claim simply does not identify any affirmative deceptive acts by Wells Fargo upon which the plaintiffs justifiably relied to their financial detriment. Instead, the gist of this state law claim appears to be the plaintiffs' assertion that Wells Fargo did not comply with the federal HAMP guidelines, thereby denying them an opportunity to modify this loan a fourth time. While we find that these spare allegations are insufficient to meet the elements of a claim under the UTPCPL, we note that other courts have sustained such claims in cases where there have been affirmatively misleading representations made to borrowers by lenders which went beyond mere technical non-compliance with HAMP regulations. *See Wilson v. Bank of Am., N.A.,* 48 F.Supp.3d 787 (E.D.Pa.2014).

While the plaintiffs suggest in their opposition to this motion that they may be able to allege such facts, the difficulty with these belated assertions is that they are not set forth in the complaint and run afoul of the well-settled principle that a plaintiff cannot amend a complaint through the filing of a brief, or through arguments set forth in a brief opposing a dispositive motion. Indeed, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 181 (3d Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)); *cf. Frederico v. Home Depot,* 507 F.3d 188, 202 (3d Cir.2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [a] complaint under Rules 9(b) and 12(b)(6)."). Yet, while we cannot rely upon these averments set forth in the Anginos' brief in assessing the sufficiency of this specific allegation, the plaintiffs' suggestion that they may be able to allege further well-pleaded facts in support of this particular claim cautions that this count of the complaint should be dismissed without prejudice to the plaintiffs attempting to allege facts which satisfy the elements of a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 201–1.

### 4. *The Anginos May Not Maintain Their Currently Pleaded Claim Against Wells Fargo Bank Under the Fair Credit Reporting Act*

Likewise the Anginos may not maintain a claim against Wells Fargo under the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 (FCRA), as it is currently pleaded in Count VI of their complaint. These alleged FCRA violations appear to relate to the bank's factually accurate reports that the Anginos had defaulted on their loan. (Doc. 1, ¶¶ 131–136.)

This claim fails for two basic reasons. First, we are constrained to note that this Fair Credit Reporting Act claim actually makes no reference to the Fair Credit Report Act at all, but rather alludes to an entirely unrelated statute, the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* [3]

Yet, while the Anginos' complaint does not cite any provision of the FCRA they may be relying upon in making these allegations, and in fact cites an unrelated

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

10

statute, the only provisions of the Act that could arguably apply to the reporting of adverse financial information are found in § 1681 s–2 of the Act. Under § 1681 s–2(a)(1)(A). However, there is no private right of action for reporting inaccurate information to the credit agencies; instead only the government can pursue such claims. *See Noel v. First Premier Bank,* 2012 WL 832992, at *5 (M.D.Pa. Mar. 12, 2012) (citing *Simms Parris v. Countryside Fin. Corp.,* 652 F.3d 355, 358 (3d Cir.2011)). Further, as a furnisher of information to credit agencies, Wells Fargo can only be liable to private parties under 15 U.S.C. § 1681s–2(b) if the following conditions are met: (1) notice was sent by the consumer of disputed information to a consumer reporting agency, (2) the consumer reporting agency notified the furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information. *Jaramillo v. Experian Information Solutions, Inc.,* 155 F.Supp.2d 356, 362–63 (E.D.Pa. May 21, 2001); *Slimm v. Bank of America Corp.,* 2013 WL 1867035 at*9 (D.N.J. May 2, 2013).

**\*12** The Anginos do not allege that any of these conditions have been met, and in fact do not even allege a violation of the FCRA. Therefore, in the absence of any legal or factual justification for this claim, Count IV of the complaint, which alleged FCRA violations, should also be dismissed.

### 5. *The Plaintiffs' Various Common Law Tort Claims Fail to State a Claim Upon Which Relief May Be Granted*

In Count VII of their complaint the plaintiffs combine and conflate a number of common law tort claims, accusing the bank of conspiracy, negligence and the intentional or negligent infliction of emotional distress. (Id.,¶¶ 137–143.) These claims are set forth in a serial and summary fashion by the Anginos, and as pleaded fail for at least three reasons.

First, fairly construed, with respect to these tort claims, in order to state a valid cause of action plaintiffs must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) *Id.* at 555. Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Fairly construed, as to these tort claims, the

Anginos' pleadings amount to little more than a formulaic recitation of the elements of a cause of action, a form of pleading that will not do. Therefore, these claims, which are inadequately pleaded, fail as a matter of law and should be dismissed.

Second, the Anginos' civil conspiracy claim, which is also pleaded in a conclusory fashion without supporting factual detail, simply fails to state a claim upon which relief may be granted. In this regard, as we have previously noted:

[I]n order to plead a civil ... action based upon a claim of conspiracy, a plaintiff must plead allegations that are:

supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each defendant allegedly played in carrying out those objectives. Bare conclusory allegations of "conspiracy" or "concerted action" will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred.

*Flanagan v. Shively,* 783 F.Supp. 922, 928 (M.D.Pa.1992). Furthermore, when pleading a conspiracy claim, a plaintiff cannot rely upon subjective suspicion and speculation. *Young v. Kann,* 926 F.2d 1396, 1405 n. 16 (3d Cir.1991). Quite the contrary, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred. *D.R. v. Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1377 (3d Cir.1992); *see* also Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir.2008) (stating that a conspiracy requires a 'meeting of the minds') (further citation omitted). This holding remains good law following Twombly and Iqbal, which, in the conspiracy context, require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.' *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955, 167 L.Ed.2d 929." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 178 (3d Cir.2010) cert. denied, —— U.S. ——, 131 S.Ct. 1798, 179 L.Ed.2d 655 (U.S.2011). We are mindful of these pleading requirements, which are considered together with the standards of pleading applicable to all

civil actions in federal court as defined in *Twombly* and *Iqbal, supra.*

**\*13** *Victor v. Huber,* No. 3:12–CV–282, 2012 WL 7463723, at \*14 (M.D.Pa. Nov. 29, 2012) report and recommendation adopted sub nom. *Victor v. Hubbard,* No. 3:12–CV–00282, 2013 WL 704654 (M.D.Pa. Feb. 26, 2013). Here the Aninos' civil conspiracy allegations meet none of these requisites for a valid cause of action. Given that: "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy [and][t]he plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred," *Flanagan v. Shively,* 783 F.Supp. 922, 928 (M.D.Pa.1992), this claim also fails as pleaded by the plaintiffs since we do not know who the alleged conspirators are, what the object of their agreement was, and what concerted actions they are alleged to have taken as part of this corrupt agreement.

Third, with respect to claims for intentional or negligent infliction of emotional distress, under Pennsylvania law, "courts have been chary to allow recovery for a claim of intentional infliction of emotional distress. Only if conduct which is extreme or clearly outrageous is established will a claim be proven." *Hoy v. Angelone,* 720 A.2d 745, 753–54 (Pa.1998). Indeed, the Restatement (Second) of Torts instructs that "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, comment d; *Hoy,* 720 A.2d at 754. In keeping with these restrictive standards, the Pennsylvania Supreme Court has provided examples of conduct found to state a claim for intentional infliction of emotional distress, and such examples demonstrate the extraordinary nature of the theory:

Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct. *See e.g.,* Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970)(defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned

to parents (recognizing but not adopting section 46)); *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981)(defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football* Club, 595 F.2d 1265 (3d. Cir.1979)(defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

*Hoy,* 720 A.2d at 754.

Thus, in order to sustain a claim of intentional infliction of emotional distress, Pennsylvania law requires that a plaintiff plead that: "(1) the conduct was extreme and outrageous; (2) the conduct was intentional; (3) the conduct caused emotional distress; and (4) the distress was severe. *Silver v. Mendel,* 894 F.2d 598, 606 n. 16 (3d Cir.1990). Ultimately, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct exceeded the bounds of decency and is intolerable under prevailing societal norms. *Swisher v. Pitz,* 868 A.2d 1228, 1230 (Pa.Super.Ct.2005); *see also Cox v. Keystone Carbon Co.,* 861 F.2d 390 (3d Cir.1988)." *Kearney v. JPC Equestrian, Inc.,* No. 3:11–CV–01419, 2012 WL 1020276, at \*7 (M.D.Pa. Jan. 4, 2012) *report and recommendation adopted,* No. 3:11–CV–01419, 2012 WL 1020266 (M.D.Pa. Mar. 26, 2012). Applying this exacting standard, courts generally agree that a bank efforts to enforce its contractual rights simply does not constitute intolerable or outrageous conduct. *See, e.g., DeHart v. HomEq Servicing Corp.,* 47 F.Supp.3d 246, 257 (E.D.Pa.2014); *Messer v. First Fin. Fed. Credit Union of Maryland,* No. CIV.A. 11–4144, 2012 WL 3104604, at \*4 (E.D.Pa. July 30, 2012); *Wilson v. Am.* Gen. Fin. Inc., 807 F.Supp.2d 291 (W.D.Pa.2011); Brown v. Udren Law Offices PC, No. CIV.A. 11–2697, 2011 WL 4011411, at \*4 (E.D.Pa. Sept. 9, 2011). In our view, this is what happened in the instant case. The Aninos defaulted on their loans, and Wells Fargo has attempted to hold them to the terms of their mortgage. As a matter of law, the exercise of these legal and contractual rights cannot rise to the level of intolerable or outrageous conduct which exceeds the bounds of decency. Therefore, this claim for intentional infliction of emotional distress should also be dismissed.

**\*14** Likewise, claims like those made here for negligent infliction of emotional distress arising out of a bank's

handling of a delinquent mortgage are often dismissed by courts, particularly when those claims are set forth in a conclusory manner like the allegations made by the plaintiffs here. *Francis v. TD Bank, N.A.,* No. CIV. 12–7753 RBK/AMD, 2013 WL 4675398, at *6 (D.N.J. Aug. 30, 2013) *aff'd,* 597 F. App'x 58 (3d Cir.2014) *and aff'd,* 597 F. App'x 58 (3d Cir.2014); *Clay v. Option One Mortgage Corp.,* No. CIV. A. 07–1327, 2007 WL 2728972, at *5 (E.D.Pa. Sept. 18, 2007). Rather, as a general rule:

> To establish a claim of negligent infliction of emotional distress under Pennsylvania law, a plaintiff must prove that: (1) he or she was near the scene of an accident or negligent act; (2) shock or distress resulted from a direct emotional impact caused by the sensory or contemporaneous observance of the accident, as opposed to learning of the accident from others after its occurrence; and (3) he or she is closely related to the injured victim. *Smith v. School Dist. of Philadelphia,* 112 F.Supp.2d 417, 428 (E.D.Pa.2000) (citing *Sinn v. Burd,* 486 Pa. 146, 170–71, 404 A.2d 672, 685 (1979); *Frempong–Atuahene v. Redevelopment Auth. of Phila.,* 1999 WL 167726, *7 (E.D.Pa.1999)).* Manifestation of physical injury is necessary to sustain a claim for negligent infliction of emotional distress. *See Redland Soccer Club, Inc. v. Department of the Army of the United States,* 55 F.3d 827, 848 (3d Cir.1995); *Smith* 112 F.Supp.2d at 42829; *Sonlin v. Abington Memorial Hospital,* 2000 Pa.Super. 44, 748 A.2d 213, 217 (Pa.Super.2000); *Armstrong v. Paoli Memorial Hospital,* 430 Pa.Super. 36, 44–45, 633 A.2d 605, 609 (Pa.Super.1993) (stating that "[t]emporary fright, nervous shock, nausea, grief, rage, and humiliation if transitory are not compensable injuries; but, long continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries").

*Robinson v. May Dep't Stores Co.,* 246 F.Supp.2d 440, 444–45 (E.D.Pa.2003).

Here, nothing in the spare language of the tort claim set forth in Count VII of the Anginos' complaint recites well-pleaded facts which meet the elements of a negligent infliction of emotional distress under Pennsylvania law. Therefore, this claim also fails as a matter of law.

### 6. The Anginos' RESPA Claim Should Not Be Dismissed But The Plaintiffs' Should Be Required to File a More Definite Statement of This Claim

Finally, in Count V of the complaint, the Anginos endeavor to bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.* Specifically, the Anginos seem to allege that the defendants failed to respond to the plaintiff's "Qualified Written Requests" for information on their loan and failed to correct erroneous loan information. (Id., ¶¶ 114–130.) Wells Fargo has moved to dismiss this Count of the complaint, arguing that a qualified written request is a term of art under the law, and asserting that the Angino have not adequately described the communications which they allegedly sent to the bank and which they allege constituted qualified written requests under RESPA.

RESPA is a federal consumer protection statute applicable to mortgage lenders. In part, RESPA requires lenders to refrain from collecting unearned closing fees and kickbacks; compels lenders to disclose to borrowers the fact that servicing on their loans may be transferred; and requires loan servicers to respond in a timely fashion to "Qualified Written Requests" from borrowers seeking information regarding the status of home loans. 12 U.S.C. §§ 2605, 2607. In his regard, RESPA simply requires that, upon receipt of a Qualified Written Request, a loan servicer must "provide the borrower with a written explanation ..." 12 U.S.C. § 2605(e)(2)(B). In this case the gist of the Anginos' RESPA claim relates to an alleged failure by Wells Fargo to respond to qualified written requests for information, and Wells Fargo contests this claim by arguing that the plaintiffs have not identified a proper written request under the statute. A "Qualified Written request" under RESPA is defined as:

> **\*15** [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that-
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer

regarding other information sought by the borrower. 12 U.S.C. § 2605(e)(1)(B).

*Jones v. ABN AMRO Mortg. Group, Inc.*, 551 F.Supp.2d 400, 411 (E.D.Pa.2008). Because the term, "Qualified Written Request," has a specific meaning under RESPA plaintiffs alleging a violation of this particular provision of the statute must plead with specificity facts which show that they submitted a proper "Qualified Written Request" to the defendants in order to state a claim under § 2605. Thus, where "plaintiffs do not specifically allege that they sent any written correspondence to any defendant *or that any correspondence met the requirements of a RESPA* [Qualified Written Request] [their claims will be dismissed]." *Jones v. ABN AMRO Mortg. Group,* Inc. 551 F.Supp.2d 400, 411 (E.D.Pa.,2008)(emphasis added) citing *Scocca v. Cendant Mortg. Corp.,* 2004 WL 2536837 at *3 (E.D.Pa. Nov. 9, 2004) (dismissing a RESPA QWR claim in part because "[i]n his amended complaint, plaintiff never claims that he sent defendant a qualified written request...."); *Parker v. Long Beach Mortgage Co.,* 2006 WL 2868983 at *3 (E.D.Pa. Oct. 3, 2006) ("The complaint does not allege that Plaintiffs ever sent [a QWR] to either HSBC or OCWEN.")

In this case, the Anginos' description of their communications with Wells Fargo is couched in the language of RESPA as a qualified written request, but provides few details concerning the precise nature of those written requests. This lack of factual detail makes a complete assessment of this particular claim difficult. Presented with these obstacles to an informed understanding of the plaintiffs' remaining claims, we note that, when a plaintiff's complaint is unclear, the court may, *sua sponte,* order the plaintiffs to file a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure in order to clarify the plaintiffs' claims. *See, e.g., Kyeame v. Buchheit,* No. 1:07–CV–1239, 2011 WL 3651369, at *1 (M.D.Pa. Aug. 18, 2011); *MFS, Inc. v. Twp. of South Annville,* No. 1:05–CV–1371, 2006 WL 3254535, at *7 (M.D.Pa.Nov.9, 2006); *see also Moore's Federal Practice,* § 12.36 (Matthew Bender 3d ed.) ("Because of its potential usefulness ... courts will occasionally order a more definite statement *sua sponte,* which they have the freedom to do"); *Fikes v. City of Daphne,* 79 F.3d 1079, 1082–83 (11th Cir.1996) (finding that a more definite statement can tighten a complaint and clarify which of several possible claims are being asserted).

Here, we find that this particular complaint aptly:

highlight[s] the particular usefulness of the Rule 12(e) motion for a more definite statement.... When a complaint fashioned under a notice pleading standard does not disclose the facts underlying a plaintiff's claim for relief, the defendant cannot reasonably be expected to frame a proper, fact-specific ... defense.... The Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief.

**\*16** *Thomas v. Independence Tp.*, 463 F.3d 285, 301 (3d Cir.2006).

Accordingly, as to this RESPA claim we recommend that the defendants' motion to dismiss be denied, without prejudice, but that the plaintiffs be directed to file a more definite statement of their claim pursuant to Rule 12(e), which provides more specific factual details on the nature of the communications which they described as qualified written requests under RESPA.

### III. *Recommendation*

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion to dismiss the complaint. (Doc. 6.) be GRANTED in part, and DENIED, in part, as follows: we recommend dismissal of Counts I, II, III, IV, VI, and VII of the complaint, although some counts, and particularly Count III which alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection law, 73 Pa.C.S. § 201–1 should be dismissed without prejudice to the filing of an amended complaint stating well-pleaded facts in support of this claim. As for Count V of the complaint, which bring claims charging alleged violations of the Real Estate Settlement Procedures Act, ("RESPA"), 12 U.S.C. § 2605, *et seq.,* it is recommended that the motion to dismiss be denied, but that the plaintiffs be directed to file a more definite statement of their claims pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.

The parties are further placed on notice that pursuant to Local Rule 72.3:

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of February 2016.

**All Citations**

Slip Copy, 2016 WL 787652

Footnotes

1    *See Angino v. Santander Bank,* Civ No. 1:15–CV–438; *Angino v. Santander Bank,* Civ. No. 1:15–CV1145.

2    *See, e.g. Eckerle v. Deutsche Bank Nat' 1 Trust,* 580 F App'x. 526, 528 (9th Cir.2014); *Ruivo v. Wells Fargo Bank, N.A.,* 766 F.3d 87, 92 (1st Cir.2014); *Bloch v. Wells Fargo Home Mortgage,* 755 F.3d 886,889 (11th Cir.2014); Scott v. Wells Fargo Bank, N.A., No.1 0–3368 (MJD/SER), 2011 WL 3837077, at *9 (D.Minn. Aug. 29, 2011); *Dersch v. BAC Home Loan Servicing LP,* No. 1:11–CV–267, 2011 WL 3100561, at *8 (W.D.Mich. July 25, 2011).

3    We separately discuss the plaintiffs' RESPA claim below.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



2015 WL 5028812
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Patrick BROGAN, Plaintiff,

v.

TUNKHANNOCK TOWNSHIP, et al., Defendants.

No. 3:14–CV–1690.
|
Signed Aug. 19, 2015.

**Attorneys and Law Firms**

Cynthia L. Pollick, The Employment Law Firm, Pittston,
PA, for Plaintiff.

John P. Gonzales, Marshall, Dennehey, Warner, Coleman
& Goggin, Philadelphia, PA, Robert J. Murphy, Murphy
Law Office P.C., Dunmore, PA, for Defendants.

*MEMORANDUM OPINION*

ROBERT D. MARIANI, District Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

 **\*1** Presently before the Court is the "Consolidated
Motion of Defendant, James Sebolka, Pursuant to Rule
12(b)(1), 12(b)(6) and 12(e) Seeking to Strike Off Plaintiff's
Complaint or, in the Alternative, for a More Definite
Statement" (Doc. 10).

On August 28, 2014, Plaintiff, Patrick Brogan, filed
a Complaint in the abovecaptioned matter (Doc. 1)
and subsequently filed an Amended Complaint on
September 2, 2014 (Doc. 3) naming as defendants
Tunkhannock Township, John Benjamin Zdaniewicz, and
James Sebolka. Plaintiff's Amended Complaint sets forth
five counts: unlawful seizure and search in violation
of the Fourth Amendment against Tunkhannock
Township and Zdaniewicz (Count I); excessive force in
violation of the Fourth and Eighth Amendments against
Tunkhannock Township and Zdaniewicz (Count II); First
Amendment Retaliation against Tunkhannock Township
and Zdaniewicz (Count III); violation of Plaintiff's
constitutional rights due to inadequate supervision/hiring/

training against Tunkhannock Township (Count IV); and
assault and battery against Sebolka (Count V).

Defendant Sebolka filed his Rule 12 motion on September
23, 2014. (Doc. 10). Defendants Tunkhannock Township
and Officer Zdaniewicz also moved to partially dismiss
the Amended Complaint (Doc. 8) which the Court will
address in a separate opinion. The parties have fully
briefed the motion, and it is now ripe for decision. For
the reasons set forth below, the Court will deny Sebolka's
motion.

## II. FACTUAL ALLEGATIONS

Plaintiff's Amended Complaint alleges the following facts;

On or about June 26, 2014, at approximately 12:15
a.m., Plaintiff Patrick Brogan, a 65–year old man, and
his wife were sleeping in their home when they were
awoken by noise coming from outside. (Doc. 3, ¶¶ 1,
6). Plaintiff, in his pajamas, went outside and saw his
neighbor, Defendant James Sebolka working on a diesel
tractor outside his home. (*Id.* at ¶¶ 7, 9). At the same time,
Brogan saw a Tunkhannock Township police cruiser stop
at the end of his property and Defendant John Benjamin
Zdaniewicz, a Tunkhannock Township police officer, exit
his police vehicle and go onto Sebolka's property. (*Id.* at
¶¶ 3, 8, 11).

Brogan walked through his yard and approached the
police cruiser, waiting at the cruiser to speak with Officer
Zdaniewicz. (*Id.* at ¶¶ 10, 12). Sebolka told Brogan to "get
the fuck out of here, asshole." (*Id.* at ¶ 13). Zdaniewicz and
Sebolka went to another neighbor's residence and soon
after Sebolka returned to where Brogan was waiting, and
again stated "get the fuck out of here" and then "viciously
attacked and beat" Brogan. (*Id.* at ¶¶ 14, 15). Officer
Zdaniewicz then tased Brogan, causing Brogan to slam off
the police cruiser and fall to the ground at which point
Officer Zdaniewicz handcuffed Brogan while he was on
the ground. (Doc. 3, ¶ 16).

Subsequently, two Pennsylvania State Troopers arrived
on scene and helped Brogan sit up on the ground. One
of the troopers and Brogan's wife then helped Brogan to
his feet and he was transported by ambulance to Tyler
Memorial Hospital where the Taser dart was removed
from his body. (*Id.* at ¶¶ 17, 18). Brogan was not

arrested or taken to the Tunkhannock Township police department on this day. (*Id.* at ¶ 19, 23).

**\*2** Plaintiff alleges that prior to this incident, in or around September or October of 2013, at approximately 11 p.m., Brogan contacted authorities about Sebolka "creating excessive noise due to him working on diesel tractor trailer outside his home." (*Id.* at ¶ 32). In response, Officer Zdaniewicz came to Brogan's home and told him and his wife that they were a nuisance, that he would not put up with them calling the police and if they kept it up, they would be arrested. (*Id.* at ¶ 33). Plaintiff and his wife consequently met with the Tunkhannock Township Chief of Police wherein they related to him this experience. (*Id.* at ¶ 35).

### III. STANDARD OF REVIEW

A complaint must be dismissed under [Fed.R.Civ.P. 12(b) (6)](), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* [550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)](). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* [556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)]().

"Though a complaint 'does not need detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do.' " *DelRio–Mocci v. Connolly Prop. Inc.,* [672 F.3d 241, 245 (3d Cir.2012)]() (citing *Twombly,* 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials,* [710 F.3d 114, 118 (3d Cir.2013)]() (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories,* [707 F.3d 223, 231, n. 14 (3d Cir.2013)]() (internal citations and quotation marks omitted).

*Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.,* [706 F.3d 209, 212 (3d Cir.2013)]().

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show [n]-that the pleader is entitled to relief." *Iqbal,* [556 U.S. at 679]() (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### IV. ANALYSIS

#### A. The Court has jurisdiction over the state law claim against Defendant Sebolka.

**\*3** Pursuant to [18 U.S.C. § 1367](),

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

[18 U.S.C. § 1367(a)]().

The Supreme Court has set forth three requirements which must be met for a federal court to exercise supplemental jurisdiction over state law claims.

> The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

*United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (internal citation omitted). "Under *Gibbs,* a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). "[T]he doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Id.*

Here, it is undisputed that the federal claims brought against the other defendants confer subject matter jurisdiction on the Court. Sebolka only places at issue whether a sufficient factual nexus exists between the claim against him and those brought under federal law against his co-defendants. [1] (Doc. 10, ¶¶ 16–25).

"The test for a 'common nucleus of operative facts' is not self-evident. Indeed, '[i]n trying to set out standards for supplemental jurisdiction and to apply them consistently, we observe that, like unhappy families, no two cases of supplemental jurisdiction are exactly alike.' " *Lyon v. Whisman,* 45 F.3d 758, 760 (3d Cir.1995) (quoting *Nanavati v. Burdette Tomlin Memorial Hosp.,* 857 F.2d 96, 105 (3d Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989)). While complete congruity between the operative facts is not necessary, "mere

tangential overlap of facts is insufficient." *Nanavati,* 857 F.2d at 105. "Supplemental claims 'may be separate claims, *or* they may merely be different "counts" or "grounds" or "theories" in support of what is essentially a single claim.' 28 U.S.C. § 1367 Practice Commentary (emphasis added). The claims need only revolve around a central fact pattern." *White v. Cnty. Of Newberry,* 985 F.2d 168, 172 (4th Cir.1993). *See also, Lyndonviile Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704 (2d Cir.2000) ("We have routinely upheld the exercise of pendent jurisdiction where the facts underlying the federal and state claims substantially overlapped.").

**\*4** In this case, the facts supporting Plaintiff's federal and state claims are so significantly intertwined that they may be said to form a common factual nucleus. Brogan's original complaint against Sebolka in September or October of 2013 regarding "excessive noise due to [Sebolka] working on diesel tractor trailer outside his home" forms both the basis of Plaintiff's First Amendment claim and demonstrates possible animosity between Brogan and Sebolka, a relationship which may have contributed to the events of June 26, 2014. Furthermore, Plaintiff's ability to succeed on his excessive force and illegal search and seizure claims necessarily depends on what happened between Brogan and Sebolka on June 26. Plaintiff's Amended Complaint alleges that after Sebolka swore at Plaintiff and "viciously attacked and beat" him, Officer Zdaniewicz tased Plaintiff and handcuffed him. (Doc. 3, ¶¶ 15, 16). Sebolka claims that the Officer was required to intervene after the Plaintiff began harassing and "aggressively approach[ing]" Sebolka. (Doc. 10, ¶¶ 10–12). Regardless of how the interaction between Brogan and Sebolka is characterized, Officer Zdaniewicz's actions were presumably at least in part the result of this interaction. Thus, an assessment of the reasonableness of the Officer's actions is dependent on what transpired between Plaintiff and Defendant Sebolka. As such, Sebolka and Officer Zdaniewicz's actions were part of chain of inextricable events and cannot be separated from one another. To properly evaluate the veracity of Plaintiff's claims, a jury must be informed of the same set of facts which led up to both Sebolka's alleged attack and Officer Zdaniewicz's purported Fourth Amendment violations. "[T]he values of judicial economy, convenience, fairness, and comity" therefore heavily weigh in favor of trying Plaintiff's state law claim together with the substantial federal claims.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

The Court will therefore not dismiss Count V on the basis of lack of supplemental jurisdiction.

**B. Plaintiff has set forth a cause of action upon which relief can be granted.**

Count V, alleges assault and battery by Sebolka and requests in the prayer for relief "all remedies available pursuant to state law, including but not limited to emotional distress, punitive damages, injunction against future acts, attorney fees and costs, pre-and post-interest, and delay damages." (Doc. 3, at 12). Defendant moves for the dismissal of Count V on the basis that Plaintiff has not set forth a cause of action upon which relief can be granted. (Doc. 12, at 8–12). Specifically, Sebolka alleges that Plaintiff has failed to allege that he suffered any bodily injury as a result of the alleged confrontation with Sebolka and that Plaintiff has not stated a cause of action for the first four categories of damages requested in the prayer for relief. (*Id.*).

*1. Assault and Battery*

In actuality, Count V of Plaintiff's Amended Complaint comprises two separate tort theories. To state a claim for assault, Pennsylvania law requires a showing of "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann,* 399 Pa. 26, 159 A.2d 216, 217 (Pa.1960); *see also* Restatement (Second) of Torts § 21(1) (1965). "[T]he actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so." *Id.* To establish a claim of battery, a person must act intending to cause a harmful or offensive contact with another person, or an imminent apprehension of such contact, and an offensive contact with the person is the direct or indirect result. *Herr v. Booten,* 398 Pa.Super. 166, 580 A.2d 1115, 1117 (Pa.Super.Ct.1990); Restatement (Second) of Torts § 18(1) (1965).

**\*5** Plaintiff has clearly set forth sufficient facts to properly allege both assault and battery. The Amended Complaint alleges that Sebolka "viciously attacked and beat" Brogan and "struck him violently" (Doc. 3, ¶¶ 15, 46, 48). Defendant argues that Plaintiff's claim must fail because he has not alleged that he suffered any bodily injury as a result of the confrontation. (Doc. 12 at 8). This argument necessarily can only be applied to

the battery claim, leaving the Court to conclude that Defendant is not challenging Plaintiff's claim for assault. Nonetheless, Sebolka's argument is unsuccessful for two reasons. First, a plaintiff is not required to show actual physical injury to establish a battery, only an unpermitted and therefore "offensive" contact. *Montgomery v. Bazaz–Sehgal,* 742 A.2d 1125, 1131 (Pa.Super.Ct.1999), *aff'd,* 568 Pa. 574, 798 A.2d 742 (Pa.2002); *see also, Bowman v. Home Life Ins. Co.,* 243 F.2d 331 (3d Cir.1957) (insurance agent who represented himself as a doctor and performed an "intimate examination" upon a mother and daughter constitutes "offensive bodily contact" sufficient to establish liability for a battery). Allegations in the present case of a "vicious" attack and beating certainly establish unwanted and offensive contact, even in the absence of a specific allegation of a resulting physical injury. Second, while Defendant is correct that Plaintiff did not plead the existence of an actual bodily injury, it is entirely plausible to infer that being struck, beaten, and "viciously" attacked would result in a physical injury. For Defendant to say otherwise at this stage in the proceedings borders on desperation.

As a result, the Court will not dismiss Plaintiff's claim for assault and battery based on a failure to state a cause of action upon which relief can be granted.

*2. Plaintiff's Prayer for Relief*

Defendant Sebolka seemingly misinterprets Plaintiff's pleadings in Count V, arguing that Plaintiff's request for damages in the form of "emotional distress, punitive damages, injunction against future acts, [and] attorney fees" found in the prayer for relief (Doc. 3 at 12), must be dismissed because Plaintiff has not stated a cause of action for any of the aforementioned categories (Doc. 12 at 9–12). The Federal Rules of Civil Procedure merely require that a pleading contain "a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed.R.Civ.P. 8(a)(3). The Court deems Plaintiff's prayer for relief in Count V to be just and proper. Plaintiff's requests in his prayer for relief are not "claims" within the meaning of Rule 8(a)(3); rather, they are simply the form of relief demanded as part of the titled claim. Plaintiff's allegations of assault and battery are broad enough to encompass each type of relief requested. While the Court is not expressing an opinion as to whether Brogan is entitled to each of the aforementioned categories of damages as a matter of law, we decline to strike any of Plaintiff's prayer for relief in

this Count because a determination of what damages are available to Brogan cannot be determined at this time.

### C. Plaintiff will not be directed to submit a more definite statement.

**\*6** The clear text of Federal Rule of Civil Procedure 12(e) states that a party may move for a more definite statement when a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed.R.Civ.P. 12(e). The rule "is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading." *Schaedler v. Reading Eagle Publ'n,* 370 F.2d 795, 798 (3d Cir.1966). "Motions for a more definite statement are not viewed with favor and should be granted only if the allegations contained in the complaint are so vague that the defendant cannot reasonably be expected to frame a response to it." *Wilson v. U.S .,* 585 F.Supp. 202, 205 (M.D.Pa.1984).

Sebolka's motion for a more definite statement rests on the basis that he is "entitled to know, at the outset of this litigation, where the Plaintiff alleges he was struck" and that he is entitled to know the basis for the claims for emotional distress, injunctive relief, punitive damages, and attorney's fees, (Doc. 10, ¶¶ 38–42). The Court has already addressed the propriety of the categories of damages requested in the prayer for relief and need not do so again. With respect to Defendant's argument that a more definite statement is required which includes a specific allegation of where Plaintiff was struck, such an argument is meritless. Rule 8 only requires that a party put forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Count V, sets forth facts to put Sebolka on notice that he allegedly "violently and without provocation attacked" Brogan, that Sebolka intended to cause Brogan bodily harm, and the day and time of this alleged attack. Even

if the Court were to assume that Plaintiff's Amended Complaint omits one or more facts that Defendant deems important, in light of the facts that are asserted, to suggest that Defendant is unable to file a responsive pleading in the absence of an assertion as to what part of Plaintiff's body was supposedly struck is hypercritical. Whether Plaintiff was struck in the head, arm, leg, or elsewhere is largely irrelevant to Sebolka's ability to adequately respond to the allegations against him.

Therefore, Sebolka's motion for a more definite statement will be denied.

### V. CONCLUSION

For the foregoing reasons, the Court will deny the "Consolidated Motion of Defendant, James Sebolka, Pursuant to Rule 12(b)(1), 12(b)(6) and 12(e) Seeking to Strike Off Plaintiff's Complaint or, in the Alternative, for a More Definite Statement" (Doc. 10). A separate Order follows.

### *ORDER*

**AND NOW, THIS *19th* DAY OF AUGUST 2015,** upon consideration of the "Consolidated Motion of Defendant, James Sebolka, Pursuant to Rule 12(b)(1), 12(b)(6) and 12(e) Seeking to Strike Off Plaintiff's Complaint or, in the Alternative, for a More Definite Statement" (Doc. 10), **IT IS HEREBY ORDERED THAT** the Defendant Sebolka's motion is **DENIED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5028812

---

Footnotes

1    Section 1367 also provides specific exceptions to supplemental jurisdiction. A district court may decline to exercise supplemental jurisdiction over a state law claim if:
      (1) the claim raises a novel or complex issue of State law,
      (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
      (3) the district court has dismissed all claims over which it has original jurisdiction, or
      (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
      18 U.S.C. § 1367(c). None of these exceptions are applicable in the present case.

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# D

2016 WL 4820635
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Consumer Financial Protection Bureau

v.

CashCall, Inc., et al.

Case No. CV 15-7522-JFW (RAOx)
|
Signed 08/31/2016

**Attorneys and Law Firms**

Anthony Alexis, Enforcement Director, Jeffrey Paul Ehrlich, Deputy Enforcement Director, Consumer Financial Protection Bureau, Washington, DC, Christina Stuart Coll, Leanne E. Hartmann, Lisa Diane Rosenthal, Owen Peter Martikan, Consumer Financial Protection Bureau, San Francisco, CA, Kent A. Kawakami, AUSA – Office of US Attorney, Los Angeles, CA, Barry E. Reiferson, Paula A. Tuffin, Consumer Financial Protection Bureau, New York, NY, for Consumer Financial Protection Bureau.

Thomas Jerome Nolan, Caroline Williams Van Ness, Julia M. Nahigian, Skadden Arps Slate Meagher and Flom LLP, Los Angeles, CA, Austin K. Brown, Joseph L. Barloon, Skadden Arps Slate Meagher and Flom LLP, Matthew S. Hellman, Jenner and Block LLP, Washington, DC, Brian J. Fischer, Katya Jestin, Neil M. Barofsky, Jenner and Block LLP, New York, NY, Carol E. Kamm, Donn A. Randall, Bulkley Richardson and Gelinas, James R. Carroll, Skadden Arps Slate Meagher and Flom LLP, Boston, MA, for CashCall, Inc., et al.

**PROCEEDINGS (IN CHAMBERS): ORDER GRANTING PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S MOTION FOR PARTIAL SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 144];**

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 139]**

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

**\*1** On June 30, 2016, Plaintiff Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") filed a Motion for Partial Summary Judgment. On July 11, 2016, Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corporation ("Delbert Services"), and J. Paul Reddam ("Reddam") (collectively, "Defendants") filed their Opposition. On July 18, 2016, Plaintiff filed a Reply.

On June 30, 2016, Defendants filed a Motion for Summary Judgment. On July 11, 2016, Plaintiff filed its Opposition. On July 18, 2016, Defendants filed a Reply.

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's August 15, 2016 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I. FACTUAL AND PROCEDURAL BACKGROUND** [1]

**A. The Defendants**
Defendant CashCall, a California corporation, is a lender to consumers and small businesses. Defendant Reddam is the founder, CEO, sole owner, and President of CashCall. Defendant WS Funding is a wholly-owned subsidiary of CashCall, which was formed to purchase loans made by non-party Western Sky Financial. [2] Defendant Delbert Services is a Nevada corporation which was formed to service loans that CashCall deemed in default, or "charged-off", and to provide collection services for other, unrelated clients.

**B. CashCall's Consumer Loan Business**
CashCall entered the unsecured consumer lending market in 2003 to provide a lower cost alternative to payday loans for credit-impaired borrowers and small businesses. Before 2006, CashCall primarily (if not exclusively) made loans to customers in California. In 2006, CashCall decided to expand its business beyond California. However, it opted not to obtain licenses to lend in

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

other states because "in many of those states, the usury laws would not permit [CashCall] to make or service loans at the rates [CashCall] deemed necessary to make a profit." Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make loans that CashCall then purchased and serviced. The Maryland Court of Appeals recently referred to CashCall's arrangement with the state-chartered banks as a " 'rent-a-bank' scheme" designed to take advantage of a federally-insured bank's exemption from state usury limits. *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, 139 A.3d 990, 995 n.12 (Md. 2016). This lending model was successful for CashCall until the two state-charted banks withdrew from the arrangement under pressure from the FDIC.

**\*2** After the two state-chartered banks withdrew from the arrangement, counsel Claudia Callaway of Katten Muchin Rosenman LLP ("Katten") advised CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." Baren described the "tribal model" as "almost identical to the [state-chartered] bank model."

Callaway introduced Baren to Martin Webb, who was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota and who had founded two or three previous payday lending companies that used the tribal lending model. Webb and Baren discussed forming a tribal lending entity through which Webb would sell loans to CashCall.

As a result of those discussions, in 2009, Webb formed Western Sky Financial ("Western Sky") with CashCall in mind. Western Sky was a South Dakota limited liability company and was licensed to do business by the CRST. Webb was Western Sky's sole owner. Western Sky's offices were located in Timber Lake and Eagle Butte, on the CRST Reservation in South Dakota. Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. Between January 2010 and August 2013, Western Sky was one of the largest private employers on the Reservation, employing more than 100 employees.

## C. CashCall and Western Sky's Agreements and Business Relationship

CashCall and Western Sky entered into two agreements signed by Reddam and Webb on behalf of their respective companies: (1) an Agreement for the Assignment and Purchase of Promissory Notes (the "Assignment Agreement"), and (2) an Agreement for Service (the "Service Agreement"). These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013.

Pursuant to the Assignment Agreement, signed in February 2010, CashCall, through its wholly-owned subsidiary WS Funding, agreed to "purchase from Western Sky Financial all loans made through www.westernsky.com as evidenced by the Notes." CashCall's purchase obligation was "subject to the accuracy and correctness of Western Sky's representations and warranties contained in the Agreement," including that borrowers satisfy "the criteria as set by Western Sky Financial from time to time, as shown more fully in the Criteria Appendix provided by Western Sky Financial." To fund the Western Sky loans, a reserve account was established for Western Sky, into which CashCall deposited enough money to fund two days of loans, calculated on the previous month's daily average. Western Sky used this money to fund consumer loans. CashCall purchased all of Western Sky's loans after waiting a minimum of three days after the funding of each loan. CashCall never declined to purchase a loan made by Western Sky.

CashCall paid Western Sky the full amount disbursed to the borrower under the loan agreement plus a premium of 5.145% (either of the principal loan amount or the amount disbursed to the borrower). CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Western Sky agreed to sell the loans to CashCall before any payments had been made by the borrowers. Accordingly, borrowers made all of their loan payments to CashCall, and did not make a single payment to Western Sky. Once Western Sky sold a loan to CashCall, all economic risks and benefits of the transaction passed to CashCall.

**\*3** CashCall agreed to reimburse Western Sky for any repair, maintenance and update costs associated with Western Sky's server. CashCall also reimbursed Western Sky for all of its marketing expenses and bank fees, and

some, but not all, of its office and personnel costs. In addition, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/ or penalties ... [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Pursuant to the Service Agreement between CashCall and Western Sky, Western Sky granted CashCall a "non-exclusive license, to reproduce the name, trade name, trademarks, and logos of Western Sky Financial." CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, assignment of a toll-free phone number, and to handle electronic communications with customers (although not all of these services were ultimately provided). In exchange for these services, Western Sky paid CashCall 2.02% of the face value of each loan that it sold to CashCall.

#### D. The Lending Process for Western Sky Loans

Consumers applied for Western Sky loans by telephone or online. When Western Sky commenced operations, all telephone calls from prospective borrowers were routed to CashCall agents in California. As the business developed, a growing number of Western Sky loan agents on the Reservation handled calls from prospective borrowers. Over time, "[l]oan agents for CashCall only handled the overflow for CashCall applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." CashCall loan agents were instructed to tell loan applicants that CashCall was hired to handle overflow calls for Western Sky.

Western Sky developed the underwriting criteria for its loans with input from CashCall. Although Western Sky employees reviewed, audited, and approved loans from the Western Sky offices on the Reservation, CashCall employees also independently reviewed the documentation submitted by borrowers to determine if it met program criteria and performed other loan origination and underwriting functions.

A borrower approved for a Western Sky loan would electronically sign the loan agreement on Western Sky's website, which was hosted by CashCall's servers in California. The loan proceeds would be transferred from Western Sky's account to the borrower's account. After a minimum of three days had passed, the borrower would

receive a notice that the loan had been assigned to WS Funding, and that all payments on the loan should be made to CashCall as servicer. Charged-off loans were transferred to Delbert Services for collection.

The loan agreement for a Western Sky loan identified Western Sky Funding, LLC as the lender, and informed the borrower, in bold type, that it was "**subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" In the "Governing Law" section of the agreement, the borrower was informed that:

> This Agreement is governed by the Indian Commerce Provision of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America.

In a separate section of the loan agreement, the borrower was informed that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." The interest rate on the Western Sky loans was clearly and prominently disclosed on the first page of the loan agreement.

 **\*4** Western Sky's loan products included a $2,600 loan with an APR of 134.34%, a $700 loan with an APR of 318.52%, and $5,000 and $10,000 loans. The typical CashCall borrower had a lower-than-average FICO score.

#### E. This Action

In its First Amended Complaint filed on March 21, 2014, Plaintiff CFPB alleges that Defendants have engaged in unfair, deceptive, and abusive acts and practices ("UDAAP") in violation of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a) (1)(B), by servicing and collecting full payment on loans that state-licensing and usury laws had rendered wholly or partially void or uncollectible.

The CFPB moves for partial summary judgment as to the liability of Defendants under the CFPA. The CFPB's

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   3

liability theory is dependent on the Court reaching the following four conclusions: (1) CashCall, and not Western Sky, was the "true lender;" (2) the laws of the borrowers' home states applies to the loan agreements, despite the tribal choice-of-law provision in the loan agreements; (3) the Western Sky loan agreements are void or uncollectible under the laws of 16 states; and (4) CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing

Defendants move for summary judgment in relevant part on the grounds that: (1) the CFPB has exceeded the authority granted it under the CFPA by predicating its claims solely upon violations of state law; (2) the CFPB seeks to establish a usury limit, which is expressly prohibited by the CFPA; (3) the loan agreements are not void because the laws of the CRST apply in accordance with the choice-of-law provision in those loan agreements; (4) the Defendants' conduct was not unfair, deceptive, or abusive as a matter of law under the CFPA; (5) the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice of what conduct is prohibited; and (6) the CFPB's structure is unconstitutional.

## II. LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Fed. R. Civ. P. 56(c), (e); see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International*

*Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

**\*5** An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.' " *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. DISCUSSION

**A. The Court will apply the law of the 16 subject states.**
The CFPB's theory as to Defendants' liability rests entirely on its argument that the Court should disregard the tribal choice-of-law provision in the loan agreements, and apply the law of the borrowers' home states. Accordingly, the Court must first determine whether the loan agreements are governed by CRST law, as provided by the choice-of-law provision, or the law of the borrowers' home states.

Because the Court's jurisdiction is premised on federal question jurisdiction, federal common law supplies the choice-of-law rules. *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding that, where jurisdiction is not premised on diversity of citizenship, federal common law governs). "Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws." *Huynh*, 465 F.3d at 997. Pursuant to section 187(2) of the Restatement

(Second) of Conflict of Laws ("Restatement"), "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, ..., unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2). The Court concludes that the CRST choice-of-law provision fails both of these tests, and that the law of the borrowers' home states applies to the loan agreements.

### 1. CashCall, not Western Sky, is the "true" or "de facto" lender.

In order to properly apply the choice-of-law principles set forth in Restatement § 187(2), the Court must determine the identity of the parties to the loan agreements. Although Western Sky is identified as the lender in the loan agreements, the CFPB argues that the Court should consider the substance, not the form, of the transaction and determine that CashCall is the "true" or "de facto" lender. [3] Neither the Court nor the parties have discovered any binding precedent on this issue. However, after reviewing all of the relevant case law and authorities cited by the parties, the Court agrees with the CFPB and concludes that it should look to the substance, not the form, of the transaction to identify the true lender. See *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (after conducting an extensive review of the relevant case law, noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); *Eastern v. American West Financial*, 381 F.3d 948, 957 (9th Cir. 2004) (applying the de facto lender doctrine under Washington state law, recognizing that "Washington courts consistently look to the substance, not the form, of an allegedly usurious action"); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W. Va. May 30, 2014) (unpublished) (looking to the substance, not form, of the transaction to determine if the loan was usurious under West Virginia law); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 846

N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function."). [4] "In short, [the Court] must determine whether an animal which looks like a duck, walks like a duck, and quacks like a duck, is in fact a duck." *In re Safeguard Self-Storage Trust*, 2 F.3d 967, 970 (9th Cir. 1993).

**\*6** In identifying the true or de facto lender, courts generally consider the totality of the circumstances and apply a "predominant economic interest," which examines which party or entity has the predominant economic interest in the transaction. See *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W.D. Va. May 30, 2014) (affirming the lower court's application of the "predominant economic interest" test to determine the true lender, which examines which party has the predominant economic interest in the loans); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is the 'true lender,' with the key factor being 'who had the predominant economic interest' in the transactions."); *cf.* Ga. Code Ann. § 16-17-2(b)(4) ("A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan."). The key and most determinative factor is whether Western Sky placed its own money at risk at any time during the transactions, or whether the entire monetary burden and risk of the loan program was borne by CashCall. See, e.g., *Eastern*, 381 F.3d at 957 ("[T]he touchstone for decision here is whether licensed or unlicensed parties were placing their own money at risk at any time during the transactions."); *Morrisey*, 2014 WL 2404300 at *7 (in reaching its conclusion that CashCall was the true or de facto lender, the lower court found that "numerous provisions of CashCall's agreements with FB & T placed the entire monetary burden and risk of the loan program on CashCall, and not on FB & T."). Indeed, as the Ninth Circuit stated in *Eastern*, "a lender is one who puts money at risk." *Eastern*, 381 F.3d at 957.

Based on the totality of the circumstances, the Court concludes that CashCall, not Western Sky, was the true

lender. CashCall, and not Western Sky, placed its money at risk. It is undisputed that CashCall deposited enough money into a reserve account to fund two days of loans, calculated on the previous month's daily average and that Western Sky used this money to fund consumer loans. It is also undisputed CashCall purchased *all* of Western Sky's loans, and in fact paid Western Sky more for each loan than the amount actually financed by Western Sky. Moreover, CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Although CashCall waited a minimum of three days after the funding of each loan before purchasing it, it is undisputed that CashCall purchased each and every loan *before* any payments on the loan had been made. CashCall assumed all economic risks and benefits of the loans immediately upon assignment. CashCall bore the risk of default as well as the regulatory risk. Indeed, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties ... [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Accordingly, the Court concludes that the entire monetary burden and risk of the loan program was placed on CashCall, such that CashCall, and not Western Sky, had the predominant economic interest in the loans and was the "true lender" and real party in interest. The Court will now apply the principles set forth in Restatement § 187(2), in light of the Court's determination of the real parties in interest to the loan agreement, i.e., CashCall and the borrower.

### 2. The Cheyenne River Sioux Tribe has no substantial relationship to the parties or the transactions and there is no other reasonable basis for the parties' choice of CRST law.

The Court concludes that the CRST has no substantial relationship to the parties or the transactions and that there is no other reasonable basis for the parties' choice of CRST law. *See* Restatement § 187(2)(a).

As indicated in the comments to Restatement § 187(2), a state has a substantial relationship to the parties or the transaction when, for example, "this state is that where performance by one of the parties is to take place or where

one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties." Restatement § 187(2), comment f.

**\*7** In light of CashCall's status as the true lender, the Court concludes that the CRST does not have a substantial relationship to the parties or the transactions. Indeed, CashCall, the true lender, is a California corporation domiciled in Orange County that the CRST neither owns or manages. The borrowers do not reside on the Reservation and, in fact, never entered CRST lands to apply for loans. They applied for their loans online, and made all of their payments from their home states. Although a borrower electronically signed the loan agreement on Western Sky's website, that website was, in fact, hosted by CashCall's servers in California. While Western Sky performed loan origination functions on the Reservation, the Court finds these contacts are insufficient to establish that the CRST had a *substantial* relationship to the parties or the transaction, especially given that CashCall funded and purchased all of the loans and was the true lender. *Cf. Ubaldi v. SLM Corp.*, 2013 WL 4015776, at *6 (N.D. Cal. Aug. 5, 2013)* ("If Plaintiffs' *de facto* lender allegations are true, then Oklahoma does not have a substantial relationship to Sallie Mae or Plaintiffs or the loans.").

The Court also finds that there is no other "reasonable basis" for the parties' choice of CRST law. Indeed, it is clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws. Accordingly, after applying the principles of Restatement § 187(2)(a), the Court concludes that the tribal choice of law provision is unenforceable.

### 3. Fundamental public policy disfavors the choice of CRST law.

In addition, even if the parties had a reasonable basis for choosing CRST law under Restatement § 187(2)(a), the Court concludes that the tribal choice-of-law provision would still be unenforceable under Restatement § 187(2)(b). Specifically, the Court concludes that application of CRST law "would be contrary to a fundamental policy of a state which has a materially greater interest than the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

[CRST] in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2)(b).

> *(a) Application of CRST law would be contrary to a fundamental public policy of sixteen states, and those states have a materially greater interest than CRST in the application of their laws.*

The Court concludes that sixteen states (Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio) (the "Subject States") have expressed a fundamental public policy in protecting its citizens from usurious loans and unlicensed lenders by enacting statutes that render contracts that violate those policies void and/or uncollectible. *See* Restatement § 187 comment g ("[A] fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining strength."). Although not every statute expresses a state's fundamental policy, statutes that render contracts void are certainly much more likely to express that state's fundamental policy.

Moreover, each of these Subject States has a materially greater interest than the CRST in determining the validity of the Western Sky loan agreements. Indeed, the CRST does not have a significant interest in the application of its law when Western Sky is neither a tribally-owned corporation, nor the true lender. Moreover, as a district court in Colorado noted in describing the Western Sky loan transactions, "[t]he borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing defendants' website. They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts. The impact of the allegedly excessive charges was felt in Colorado." *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011).

**\*8** Although Defendants argue that the CRST has a strong interest in the application of its laws (based on Western Sky's involvement in the loan transactions), Defendants never address whether the CRST has a strong

interest in the application of its laws specifically as they relate to interest rates and licensing. As the Restatement counsels, the Court must weigh the interests of the CRST and the Subject States in "the determination of the *particular* issue." Defendants fail to present evidence regarding what, if any, CRST laws apply to these transactions. Of course, the lack of a usury law or licensing law does not necessarily mean that the CRST has a less substantial concern than the Subject States in interest rates and licensing. Indeed, the lack of such laws may instead merely "reflect a choice to favor individual contract decisions and the free flow of capital." *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2001). However, as the CFPB points out, the CRST has enacted laws that *criminalize* usury, [5] suggesting that the CRST does not have any interest in protecting these types of transactions.

Accordingly, the Court concludes that application of CRST law would be contrary to a fundamental policy of the Subject States, and that the Subject States have a materially greater interest than the CRST in the enforcement of its usury and licensing laws.

> *(b) Absent an effective choice-of-law provision, the Subject States' laws apply.*

Pursuant to Restatement § 188, absent an effective choice of law provision by the parties, courts apply the local law of the state which "has the most significant relationship to the transaction and the parties." Restatement § 188(1). In making this determination, courts consider the following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* at § 188(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In light of the CashCall's status as true lender, these factors weigh in favor of the application of the law of the borrowers' home states. The borrowers were citizens or residents of the addresses listed on their loan applications (i.e., their home states), the borrowers applied for the loans from their home states, the funds were received by the borrowers in their home states,

and the borrowers made payments on their loans from their home states. In addition to the home states of the borrowers, California also has significant contacts to the loan transactions. CashCall is a California corporation domiciled in Orange County. In order to apply for the loan, the borrowers visited Western Sky's website, which was hosted by CashCall's servers in California. In addition, the funds for the loans were provided by CashCall in California (albeit initially funneled through Western Sky's bank accounts). Moreover, although some loan origination functions took place on the Reservation, some also took place in California. Although California, the CRST, and the borrowers' home states each have *some* interest in the loan transactions, the Court is required to determine which state has the *most* significant relationship to the transaction and the parties. After weighing all of the factors, the Court concludes that the borrowers' home states have the most significant relationship to transactions. [6]

**\*9** The Court's conclusion is consistent with Restatement § 195, which specifically governs the "Contracts for the Repayment of Money Lent." Section 195 provides in relevant part: "The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made...." However, Restatement § 195 only applies "when the contract requires that the loan be repaid in a particular state. It is necessary either that the place of repayment be explicitly stated in the contract, or that it can be determined by necessary inference from the contract's terms, or lastly, that repayment in a particular place is required by business usage. The rule does not apply when the loan can be repaid in any one of two or more states." Restatement § 195, comment a. In this case, nine of the ten sample loan agreements provided to the Court authorized Western Sky (and in reality, CashCall) to withdraw the borrower's loan payments by electronic funds transfer from the borrower's bank account, unless the borrower opted out. Thus, repayment was generally required to be made by EFT from or in the borrowers' home states.

Accordingly, the Court concludes that, absent an effective choice-of-law provision, the law of the borrowers' home states applies to the loan agreements.

For the foregoing reasons, where Western Sky loans were made to borrowers in the Subject States, the Court concludes that the tribal choice of law provision is unenforceable and the Court will apply the laws of the Subject States.

### B. Western Sky loans are void or uncollectible under the laws of most of the Subject States.

Because the CFPB has established that CashCall is the true lender and that the laws of the Subject States apply to the loan agreements, the Court must now determine whether the CFPB has demonstrated that the loans are void or uncollectible under the laws of the Subject States. In absence of any meaningful briefing by the Defendants on this issue, the Court concludes that Defendants do not seriously dispute the CFPB's argument.

The Court concludes that the CFPB has established that the Western Sky loans are void or uncollectible under the laws of most of the Subject States. [7] *See* CFPB's Combined Statement of Facts [Docket No. 190] ("CFPB's CSF") at ¶¶ 147-235. Indeed, CashCall has admitted that the interest rates that it charged on Western Sky loans exceeded 80%, which substantially exceeds the maximum usury limits in Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina. (Arkansas's usury limit is 17%; Colorado's usury limit is 12%; Minnesota's usury limit is 8%; New Hampshire's usury limit is 36%; New York's usury limit is 16%; and North Carolina's usury limit is 8%). A violation of these usury laws either renders the loan agreement void or relieves the borrower of the obligation to pay the usurious charges. In addition, all but one of the sixteen Subject States (Arkansas) require consumer lenders to obtain a license before making loans to consumers who reside there. Lending without a license in these states renders the loan contract void and/or relieves the borrower of the obligation to pay certain charges. CashCall admits that, with the exception of New Mexico and Colorado, it did not hold a license to make loans in the Subject States during at least some of the relevant time periods. [8]

### C. CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing.

**\*10** After resolving these preliminary issues, the Court is finally able to address the gravamen of the CFPB's claims

– whether Defendants' conduct violates the CFPA. Under section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person "to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). [9] "An act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." Consumer Fin. Prot. Bureau v. Gordon, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (quotations and citations omitted). "Deception may be found based on the 'net impression' created by a representation." Id. (quotations and citations omitted).

Based on the undisputed facts, the Court concludes that CashCall and Delbert Services engaged in a deceptive practice prohibited by the CFPA. By servicing and collecting on Western Sky loans, CashCall and Delbert Services created the "net impression" that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements. As discussed *supra*, that impression was patently false — the loan agreements were void and/or the borrowers were not obligated to pay.

The Court concludes that the false impression created by CashCall's and Delbert Services' conduct was likely to mislead consumers acting reasonably under the circumstances. Indeed, the intentionally complicated and sham structure of the Western Sky loan program would have made it impossible for reasonable consumers to know that CRST did not govern the loan agreements, and thus that their loans were void and/or not payable under the laws of their home states. Not surprisingly, the CFPB has presented evidence that borrowers were, in fact, misled. *See* CFPB's Exh. 524 (Affidavit of Karen Barboza) at ¶ 12 ("I was under the impression that I was obligated to pay back the full amount of my loan. I do not recall ever being told by anyone at CashCall that I was not obligated to pay back all or some of my loan."); Exh. 526 (Affidavit of John A. Melo) at ¶ 12 ("From the beginning I was led to believe that I was obligated to repay my loan in full. Aside from the May 2013 phone call wherein they said that they are not presently collecting from Massachusetts' residents, I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan."); Exh. 527 (Declaration of Stephen J. Viera) at ¶ 15 ("Until I received this letter, I was led to believe that I was obligated to repay

my loan in full. I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan."). And, not surprisingly, Defendants have presented no evidence to the contrary.

Lastly, the Court easily concludes that the false impression created by CashCall's and Delbert Services' conduct is material. *See* F.T.C. v. AMG Servs., Inc., 29 F. Supp. 3d 1338, 1372 (D. Nev. 2014) ("The number of finance charges, the total amount owed, the existence of an automatic renewal plan, and the procedure for declining the renewal plan are material terms of a loan contract."). Accordingly, CashCall and Delbert Services engaged in a deceptive practice under the CFPA.

**\*11** Defendants fail to make any meaningful arguments to the contrary. For example, Defendants argue that their conduct was not deceptive, as a matter of law, because every loan agreement contained a prominent choice-of-law provision and a prominent interest rate disclosure. In other words, Defendants contend that their conduct was not deceptive because they were merely enforcing the express terms of their agreements with the borrowers. However, this argument is entirely irrelevant and misplaced given the CFPB's theory of liability and the Court's ultimate conclusion that the loan agreements were void and/or not payable. Defendants completely and utterly fail to explain how the alleged (and now proven) conduct at issue (i.e., servicing and collecting on loans where no payment is due) was not deceptive under the CFPA.

Defendants also argue, without citation to any relevant authority, that, "where, as here, a UDAAP claim is predicated on the resolution of an underlying legal question, such as whether the loans on which Defendants collected are void, a defendant's reasonable belief on that question serves as a complete defense to liability." Defendants' Memorandum [Docket No. 139] at 21. However, a mistake of law is not typically a defense to liability, no matter how reasonable that mistake. *See* Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds that ignorance of the law will not excuse any person, either civilly or criminally."). Defendants fail to point to any language in the CFPA that alters this general rule. Accordingly, the Court declines

Defendant's invitation to re-write the CFPA to include a general mistake-of-law defense. *Id.* ("[W]hen Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly .....").

Because the Court concludes that CashCall and Delbert Services' conduct was deceptive, the Court finds it unnecessary to address whether their conduct was also unfair and abusive.

### D. Reddam is individually liable under the CFPA.

The Court concludes that Reddam is individually liable under the CFPA.

"An individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (quotations and citations omitted).

The Court concludes that Reddam both participated directly in and had the authority to control CashCall's and Delbert Services' deceptive acts. Reddam is the founder, sole owner, and president of CashCall, the president of CashCall's wholly-owned subsidiary WS Funding, and the founder, owner, and CEO of Delbert Services. He had the complete authority to approve CashCall's agreement with Western Sky and, in fact, approved CashCall's purchase of the Western Sky loans. He signed both the Assignment Agreement and the Service Agreement on behalf of WS Funding and CashCall. In addition, as a key member of CashCall's executive team, he had the authority to decide whether and when to transfer delinquent CashCall loans to Delbert Services. Furthermore, he made the ultimate decision to wind down the Western Sky loan program in the face of "regulatory problems," and he frequently discussed the status of CashCall's many lawsuits involving Western Sky loans with CashCall's general counsel, Dan Baren.

Reddam does not seriously dispute that he participated in and had the authority to control CashCall's implementation of the Western Sky loan program based upon the tribal lending model, which was intentionally designed to avoid state usury limits and licensing laws. Instead, he argues that the CFPB has failed to demonstrate that he had the requisite knowledge, or that he was recklessly indifferent to the wrongdoing, which is necessary to hold him individually liable under the CFPA. Specifically, Reddam argues that, based on the legal advice provided by Katten,[10] he did not have actual knowledge of any potential UDAAP violations because "his understanding was that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall." Defendants' Memorandum [Docket No. 139] at 5. In other words, Reddam claims that he believed that the loans were payable and fully collectible based on the advice of his counsel.

**\*12** However, "[r]eliance on advice of counsel is not a valid defense on the question of knowledge required for individual liability." *Federal Trade Commission v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally."). In this case, the Court concludes that the undisputed facts demonstrate that Reddam had the requisite factual knowledge to subject him to individual liability under the CFPA, e.g., he knew of and approved the tribal lending model to avoid state usury limits and licensing laws; he knew that CashCall would fund Western Sky's loans and bear the entire financial risk of the loan program; he knew that CashCall, through its wholly owned-subsidiary, WS Funding, would purchase all of Western Sky's loans at a premium; he knew that CashCall and Delbert Services would attempt to collect on such loans; and he knew that borrowers would believe that they were obligated to pay such loans in accordance with their loan agreements. At the very least, these facts demonstrate that Reddam was recklessly indifferent to the wrongdoing.

Accordingly, based on the undisputed facts, the Court concludes that Reddam is individually liable under the CFPA.

### E. Defendants' Other Arguments

Defendants argue that they cannot be held liable under the CFPA, in relevant part, because the CFPB's claims are predicated upon state law violations and Congress

did not authorize the CFPB to transform a state law violation into a violation of federal law. Defendants raised the identical argument in their prior Motion for Judgment on the Pleadings [Docket No. 104], which was rejected by the Court. The Court concludes that there is no basis to reconsider its prior ruling. As the Court previously held, while Congress did not intend to turn every violation of state law into a violation of the CFPA, that does not mean that a violation of a state law can never be a violation of the CFPA. *See* Order [Docket No. *110*]; *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 537 (6th Cir. 2014). The proper question is whether the CFPB has alleged, and proven, that Defendants have engaged in conduct that falls within the broad range of conduct prohibited by the CFPA. The Court concludes that Defendants' conduct, i.e., servicing and collecting on Western Sky loans where payments were not due and owing, satisfies the requisite elements of a UDAAP violation under the CFPA. [11]

Defendants also repeat another argument raised in their Motion for Judgment on the Pleadings, i.e, that the CFPB is seeking to establish a usury limit, which is expressly prohibited by the CFPA, 12 U.S.C. § 5517(o). The Court again concludes that there is no basis to reconsider its prior ruling. As the Court previously held, the CFPB is not seeking to establish a usury limit, but is instead seeking to enforce a prohibition on collecting amounts that consumers do not owe.

The Court also rejects Defendants' arguments that the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice, especially in light of the CFPA's use of language or terms that have established meanings under other consumer-protection statutes. *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) ("The term 'deceptive act or practice' has an established meaning in the context of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and Congress used very similar phrasing in § 5536(a)(1)(B)."); *CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015) ("Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive – and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations – we conclude that the language in question provides at least the minimal level of clarity that the due process provision demands of non-criminal economic regulation.").

**\*13** Finally, for the reasons stated in *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-1092, the Court rejects Defendants' challenges to the constitutionality of the CFPB's structure.

## IV. CONCLUSION

For the foregoing reasons, the CFPB's Motion for Partial Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED.**

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 4820635

---

Footnotes

1   To the extent any of these facts are disputed, they are not material to the disposition of this motion. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

2   References to CashCall in this Order include WS Funding.

3   Defendants argue that the Court should not consider the CFPB's "true lender" theory because it was not alleged in the First Amended Complaint and they have been unfairly surprised. However, not only is the "true lender" theory not a claim that must be pled in the First Amended Complaint, the Court concludes that Defendants had fair notice of the CFPB's theory. *See* First Amended Complaint [Docket No. 27] at ¶ 21 ("Under these agreements, WS Loans were made in Western Sky's name, but were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall, Delbert, or both."); Joint Statement Re: Local Rule 7-3 Conference of Counsel Prior to Filing of Motion [Docket No. 138] ("The Bureau also referenced the decision concerning CashCall released that day by Maryland's highest court, noting the portion of that decision holding that CashCall was the de facto lender in its dealings with a state-chartered bank.").

4    *But see* Sawyer v. Bill Me Later, Inc., 23 F. Supp. 3d 1359, 1367-1369 (D. Utah 2014); Hudson v. Ace Cash Express, Inc., 2002 WL 1205060 (S.D. Ind. May 30, 2002).

5    Defendants contend that the tribal council's adoption of the Uniform Commercial Code in 1997 and, specifically, its enactment of CRST UCC § 16-3-112 somehow superseded the CRST's criminal usury law. However, this argument is simply wrong. *See* Unif. Comm. Code § 3-112 cmt 2. ("The purpose of subsection (b) is to clarify the meaning of 'interest' in the introductory provision of Section 3-104(a). It is not intended to validate a provision for interest in an instrument if that provision violates other law."); 6B Anderson U.C.C. § 3-112:4 (3d. ed.) ("The authorization of interest by Revised Article 3 does not address whether the rate so specified is, or is not, usurious. The purpose of this section is simply to make clear that the interest term of an instrument does not affect the negotiability of the instrument and to authorize various rates of interest. Nothing in the Uniform Commercial Code is intended to have any effect upon the non-Code law governing usury, which law therefore continues in effect.").

6    Although California has a significant relationship to the parties and the transactions (and certainly a more significant relationship than the CRST), the Court concludes that the law of the borrowers' home states should apply, especially in light of the fact that the borrowers would have had no expectation that California law would apply. *See* Restatement § 6 (listing "the protection of justified expectations" as one of the key principles to consider in determining what law to apply).

7    The Court cannot, on this record, determine exactly which loans are void or uncollectible under the Subject States' laws, given, for example, that CashCall held licenses in some states during at least some of the relevant time periods.

8    The CFPB apparently contends that the Court should find that Western Sky loans made to borrowers in New Mexico and Colorado are void under those state's licensing laws, even though CashCall held a license to make loans in those states. The CFPB appears to rely on the fact that Western Sky was not licensed in those states. The Court finds that the CFPB's position is disingenuous in light of its argument that CashCall, not Western Sky, is the true lender.

9    A "covered person" is "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "financial product or service" includes "extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit". 12 U.S.C. § 5481(15)(A)(i). CashCall, WS Funding, and Delbert Services — by acquiring and servicing consumer loans — are all "covered persons" under the CFPA.

10   Katten issued several opinions to both CashCall and its lenders on the enforceability of the choice-of-law provision in the loan agreements, concluding that "we are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable federal and state law ... should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements" because those states will "enforce the choice of CRST law set forth in the loan agreements," and further, "upon assignment, CashCall, as assignee, will be entitled to the ... choice of law rights held by Western Sky."

11   The Court's conclusion is further supported by the fact that, when a "covered person" under the CFPA violates the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, that covered person also violates the CFPA. *See* 12 U.S.C. §§ 5536(a)(1)(A); 5481(12)(H), (14). The FDCPA prohibits using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", including falsely representing "the legal status of any debt," as well as using "unfair or unconscionable means to collect or attempt to collect any debt", including attempting to collect amounts not permitted by law. *See* 15 U.S.C. §§ 1692e, 1692e(2)(A), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1).

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):**      **Order DENYING Defendants' Motions to Dismiss**

Before the Court are three motions to dismiss in three related cases. *See Consumer Financial Protection Bureau* ("*CFPB*") *v. D and D Marketing, et al.*, CV 15-9692 PSG (Ex), Dkt. # 39 ("*T3 Mot.*"); *CFPB v. Fomichev*, CV 16-2724 PSG (Ex), Dkt. # 29 ("*Fomichev Mot.*"); *CFPB v. Gasparyan*, CV 16-2725 PSG (Ex), Dkt. # 31 ("*Gasparyan Mot.*"). The Court finds the matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); L.R. 7-15. After considering all the papers submitted by all the parties, the Court DENIES Defendants' motions.

## I.      Background

In December 2015, Plaintiff CFPB filed a Complaint against Defendants D and D Marketing, Inc., d/b/a T3Leads ("T3"), and Grigor and Marina Demirchyan for violations of the Consumer Financial Protection Act ("CFPA") of 2010. *See* CV 15-9692 PSG (Ex), Dkt. # 1. Grigor Demirchyan is T3's president, CEO, CFO, and sole director, and Marina Demirchyan is T3's vice president and accountant. In April 2016, Plaintiff filed two additional, related complaints for similar violations against Defendants Dmitry Fomichev and Davit Gasparyan, who both played a role in the founding and management of T3. *See* CV 16-2724 PSG (Ex), Dkt. # 1 ("*Fomichev Compl.*"), ¶¶ 7-10; CV 16-2725 PSG (Ex), Dkt. # 1 ("*Gasparyan Compl.*"), ¶ 5. Plaintiff subsequently filed amended Complaints in all three cases. *See* CV 15-9692 PSG (Ex), Dkt. # 37 ("*T3 Amended Compl.*"); CV 16-2724 PSG (Ex), Dkt. # 28 ("*Fomichev Amended Compl.*"); CV 16-2725 PSG (Ex), Dkt. # 30 ("*Gasparyan Amended Compl.*"). Because the three

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| --- | --- | --- | --- |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |

| Title | CFPB v. D and D Marketing *et al.* |
| --- | --- |
| | CFPB v. Fomichev |
| | CFPB v. Gasparyan |

Complaints are related and the three motions to dismiss are interlocking, the Court treats them together.

Defendant T3 is in the business of purchasing and selling consumer information, known as "leads." *T3 Amended Compl.* ¶ 5. T3 purchases leads from non-party entities, called "lead generators," and it sells the leads to other non-party entities, called "lead purchasers." *Id.* ¶¶ 8-10, 18-25. The gravamen of the CFPB's Complaints is a concern that deception is an integral part of the lead-generating and lead-purchasing system run by Defendants. At the front end, "lead generators" make representations to consumers about the quality of loans that they will receive from lenders. On the back end, "lead purchasers" offer consumers loans at usurious rates. Plaintiff alleges that T3 acts as a "middle man" or "lead aggregator" in the system and controls the information flow between the lead generators and the lead purchasers. *Id.* ¶¶ 40-41. It also alleges that T3 occasionally acts as its own "lead generator." *Id.* ¶ 9. As described in the Complaints, T3's role as a "middle man" in the system allows the lead generators to "claim ignorance" of the terms of the loans ultimately offered to consumers, and it allows the lead purchasers to "claim ignorance" of the methods used to attract consumers. *Id.*

The system starts with the lead generators that advertise short-term and payday loans to consumers through various websites. *Id.* ¶¶ 8-9, 18-25. To induce consumers to enter financial information into the websites, the lead generators make representations about the quality of loans that consumers are likely to receive from lenders. Lead generators make statements like, "lenders comply with all state and federal regulations to short-term loans" and "[t]heir rates are reasonable." *Id.* ¶ 21. Plaintiff alleges that the lead generators make it seem as if, by entering their information, the consumer is providing information directly to lenders. In reality, however, as soon as the consumer enters financial information, the "lead" is transferred to T3 and sold to "lead purchasers." *Id.* ¶ 18. T3 aggregates the leads and sells them to the highest bidder through a software system known as "ping tree." *Id.* ¶¶ 16, 25. Because the whole process happens in a matter of seconds and the consumer is redirected to a lead purchaser website without notice, the consumer has no way of knowing that the representations made on the lead-generator website are no longer valid or that their financial information has been shared with third parties. *Id.* ¶¶ 27, 40-41.

The system ends with the "lead purchasers." The lead purchaser base is largely comprised of small-loan and payday lenders that rely on leads to generate business for their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |

| Title | CFPB v. D and D Marketing *et al.* |
|---|---|
| | CFPB v. Fomichev |
| | CFPB v. Gasparyan |

loans. Plaintiff alleges that the majority of lenders affiliated with T3's services are lenders organized by Indian tribes, also known as "tribal lenders" or "offshore lenders." *Id.* ¶¶ 31-32. By virtue of their organization under the laws of a foreign jurisdiction, offshore lenders do not need to comply with state consumer protection laws or state laws against usury. *Id.* Some of T3's lead purchasers are lenders that have been barred from lending in certain states because they charge unlawfully high interest rates to consumers. *Id.* ¶ 40. For these lenders, the only way to continue to access consumers in the state where they are barred is through a "lead aggregator" like T3. *Id.* In addition to charging high interest rates, Plaintiff alleges that many lead purchasers are involved in "fraudulent schemes," including "contacting consumers to collect non-existing debt." *Id.* ¶ 36. To demonstrate the pervasiveness of such unlawful conduct, Plaintiff points to an internal email from a T3 employee who referred to "the notorious scams we deal with on a daily basis." *Id.*

In 2012, the CFPB issued guidance to businesses operating in the consumer lead industry. *Defendant D&D Marketing's Request for Judicial Notice* ("*T3 RJN*"), Ex. A. The Court may take judicial notice of the guidance pursuant to Rule 201(b), which allows the Court to take notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Because the guidance is publicly available on the CFPB website, and Defendants do not challenge its accuracy, judicial notice is proper here. In relevant part, the guidance states:

> The Consumer Financial Protection Bureau ("CFPB") expects supervised banks and nonbanks to oversee their business relationships with service providers in a matter than ensures compliance with Federal consumer financial law . . .

> A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, can harm consumers and create potential liabilities for both the service provider and the entity with which it has a business relationship. Depending on the circumstances, legal responsibility may lie with the supervised bank or nonbank as well as with the supervised service provider.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

*T3 RJN*, Ex. A.  In 2013, T3 developed a "Lender Audit Questionnaire" and requested information regarding whether its lead purchasers complied with the laws of the states where they made loans.  *T3 Amended Compl.* ¶ 37.  Plaintiff asserts that, although many purchasers failed to respond to the questionnaire or provided incomplete information, T3 continued to do business with them.  *Id.*

The CFPB now alleges that T3 and its founders and officers, the Demirchyans, Fomichev, and Gasparyan ("Defendants"), have violated the Consumer Financial Protection Act ("CFPA").  Specifically, Plaintiff alleges that Defendants allowed consumers to be exposed to lenders that could cause them substantial harm and they took advantage of consumers' lack of understanding of the material risks, costs, and conditions of their loans.  Because the CFPB filed three separate complaints, Defendants have filed three motions to dismiss.

## II.   Legal Standard

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations of material facts in the Complaint and must construe all inferences in the light most favorable to the non-moving party.  *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).  Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attacked to the pleading."  *Branch v. Tunnell*, 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbrath v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

III.   <u>Discussion</u>

Defendants move to dismiss the Complaints on what the Court characterizes as seven different grounds.  The Court organizes these grounds for dismissal from most expansive to least, and ultimately finds each ground without merit.

First, Defendant Fomichev challenges the constitutionality of the structure of the CFPB, arguing that it violates the removal power of Article II and the Appropriations Clause of Article I. *See Fomichev Mot.* 6:16-22, 8:4-13.  The other Defendants incorporate these constitutional arguments by reference in their own motions to dismiss.

Second, Defendants argue that the CFPA and the CFPB have not given Defendants adequate notice of conduct that is "unfair" or "abusive" under the CFPA.  *See T3 Mot.* 9:13-16, 11:15-24, 15:21-25; *Gasparyan Mot.* 3:14-17.  Defendants assert that the terms "unfair" and "abusive" are unconstitutionally vague, and they fault Plaintiff for rushing to litigation without adequately defining the terms through a proper rulemaking.

Third, Defendants argue that T3 is not a "service provider" under the CFPA because it provides only "ministerial" services to lead generators and purchasers.

Fourth, Defendants argue that the Complaints fail to state a claim for relief.  Defendants argue that the Court should dismiss the Complaints as a matter of law because the conduct that they allege is lawful, given that the law imposes no duty on Defendants to monitor third-party generators and purchasers.  Defendants also argue that the Complaints must be judged by a heightened pleading standard.  Individually, Defendants then assert particular reasons about why the Complaint against them is conclusory and lacking in sufficient facts.

Fifth, Defendants contend that the CFPB is not entitled to the relief it seeks because the CFPA does not allow for the recovery of restitution, penalties, or attorneys' fees.

Sixth, Defendant Gasparyan asserts that the Complaint against him must be dismissed for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

failure to join indispensable parties.

Seventh, Defendant Gasparyan argues that the allegations against him are untimely because his conduct occurred outside the CFPA's statute of limitations.

The Court will take each of Defendants' arguments in turn.

A.   <u>Constitutional Argument</u>

Defendants argue that the CFPB has no power to enforce the CFPA because the structure of the CFPB is unconstitutional.  *See Fomichev Mot.* 6:16-22, 8:4-13.  Specifically, Defendants argue that three features render the CFPB unconstitutional: (1) the President's ability to remove the CFPB Director for cause only, (2) that the CFPB is led by a Director, not a multi-member commission, and (3) that the CFPB is funded by the Federal Reserve System, and not by regular congressional appropriations, and so cannot be monitored adequately by Congress.  *See generally Fomichev Mot.*  The structure of the CFPB is essential to this issue, so the Court will briefly review its key features.

Congress created the CFPB in 2010 with the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "Act").  The Act tasked the CFPB with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws."  *See* 12 U.S.C. § 5491(a).  Those laws included eighteen pre-existing consumer-protection statutes and Title X of the Dodd-Frank Act, 12 U.S.C. §§ 5531(a), 5536(a)(1), under which this case is prosecuted.  At the head of the CFPB is a single Director, who is appointed to a five-year term by the President with the advice and consent of the Senate. *Id.* § 5491(a)-(b).  The President may remove the Director only "for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 5491(c)(3).  The CFPB receives its funding from the Federal Reserve, not annual congressional appropriations.  *Id.* § 5497(a)(1).  Each year, funding is capped at 12 percent of the operating expenses of the Federal Reserve (adjusted for inflation). *Id.* § 5497(a)(1), (2).

The CFPB has provided much fodder for constitutional objection in the years since its creation.  Courts across the country are split over whether the structure of the CFPB—particularly the powers accorded to the Director—violates Article II of the Constitution.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

*Compare PHH Corp. v. CFPB*, No. 15-1177, 2016 WL 5898801 (D.C. Cir. Oct. 11, 2016) (holding that the CFPB is unconstitutionally structured in violation of Article II of the Constitution), *with CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014) (finding that the CFPB does not impermissibly interfere with the President's removal power)*, and CFPB v. ITT Educational Servs.*, CV 14-292 SEB (TABx), 2015 WL 1013508, at *9 (S.D. Ind. Mar. 6, 2015) (upholding the CFPB structure as constitutional). The Ninth Circuit has not yet addressed the issue.

Having reviewed the relevant cases, the Court finds the recent opinion of the D.C. Circuit most persuasive. In its lengthy and comprehensive analysis, the D.C. Circuit reviewed the foundations of the executive removal powers and surveyed the structure of executive branch agencies, and found the CFPA truly unusual in the amount of power that it conferred on a single Director. *See PHH Corp.*, 2016 WL 5898801, at *7-12 ("The concentration of massive, unchecked power in a single Director marks a departure from settled historical practice and makes the CFPB unique among traditional independent agencies . . ."). In light of the Director's expansive powers, the Circuit ultimately concluded that the limitation on the President's removal powers—requiring the President to establish that the Director had engaged in "inefficiency, neglect of duty, or malfeasance"—violated Article II of the U.S. Constitution. *See id.* at *4 ("This new agency, the CFPB, lacks that critical check and structural protection, yet wields vast power over the U.S. economy. So 'this wolf comes as a wolf.'"). Importantly, however, although the court found the structure unconstitutional, it recognized that the remedy for the violation did not require the CFPB to halt operations. *Id.* Instead, the D.C. Circuit reasoned:

> What is the remedy for that constitutional flaw? PHH contends that the constitutional flaw means that we must shut down the entire CFPB (if not invalidate the entire Dodd-Frank Act) until Congress, if it chooses, passes new legislation fixing the constitutional flaw. To remedy the constitutional flaw, we follow the Supreme Court's precedents, including *Free Enterprise Fund*, and simply sever the statute's unconstitutional for-cause provision from the remainder of the statute. Here, that targeted remedy will not affect the ongoing operations of the CFPB.

> …

> In so ruling, we underscore the important but limited real-world implications of our

| | | |
|---|---|---|
| CV-90 (10/08) | **CIVIL MINUTES - GENERAL** | Page 7 of 26 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|----------|---------------------|------|-------------------|
|          | CV 16-2724 PSG (Ex) |      |                   |
|          | CV 16-2725 PSG (Ex) |      |                   |

| Title | CFPB v. D and D Marketing *et al.* |
|-------|-----------------------------------|
|       | CFPB v. Fomichev                  |
|       | CFPB v. Gasparyan                 |

decision. As before, the CFPB will continue to operate and perform its many critical responsibilities, albeit under the ultimate supervision and direction of the President.

*Id.* at *4-5. Thus, the court severed the for-cause provision from the law and allowed the CFPB to continue operations. *Id.* The Court finds this result measured and well-conceived, and accordingly, the Court adopts the same reasoning here. The CFPB may continue to perform its duties, including the prosecution of this case against Defendants, even though its Director is now subject to direct removal by the President.

Because the D.C. Circuit did not consider whether the funding structure of the CFPB violated the Appropriations Clause, the Court separately considers this argument here. Defendants argue that, by receiving its funding through the Federal Reserve instead of congressional appropriations, the CFPB is unconstitutionally exempted from congressional oversight. *See Fomichev Mot.* 11:4-28. The Court disagrees. The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. However, as Judge Staton reasoned in *CFPB v. Morgan Drexen, Inc.*, "[t]he Appropriations Clause 'does not in any way circumscribe Congress from creating self-financing programs . . . without first appropriating the funds as it does in typical appropriation and supplement appropriation acts." *See* 60 F. Supp. 3d 1082, 1089 (quoting *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003), *aff'd*, 365 F.3d 1333 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011)). Congress's decision to allow the CFPB to self-fund through the Federal Reserve instead of annual appropriations from Congress does not violate the Appropriations Clause because it was still Congress, and not the executive or judicial branch, that made the decision about how the CFPB should be funded. The Court therefore also concludes that the funding structure of the CFPB does not violate the Appropriations Clause, and it dismisses Defendants' constitutional arguments about the CFPB's structure.

B.    <u>CFPA Arguments</u>

Defendants next argue that the Section X of the Dodd-Frank Act—Congress's most recent addition to the country's consumer financial protection laws—is unconstitutional because it does not provide regulated entities with adequate notice of the conduct that the CFPB will deem unlawful. The CFPA makes it unlawful for "any covered person or service provider" to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

"engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B); *see also* 12 U.S.C. § 5531(a). The law defines an "unfair" act as:

> **(A)** [an] act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

> **(B)** such substantial injury is not outweighed by counterveiling benefits to consumers or to competition.

*See* 12 U.S.C. § 5531(c). The law defines an "abusive" act as an act or practice that:

> **(1)** materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

> **(2)** takes unreasonable advantage of—

>> **(A)** a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

>> **(B)** the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

>> **(C)** the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

*Id.* § 5531(d). The CFPA also imposes liability on any person who "knowingly or recklessly provide[s] substantial assistance to a covered person or service provider in violation" of the act. 12 U.S.C. § 5536(a)(3). Section 5564(a) of the Act authorizes the CFPB to "commence a civil action against such person to impose a civil penalty . . . ." *Id.* § 5564; *see also id.* § 5565 (describing penalties for violations).

Defendants first argue that the CFPA is unconstitutional because it does not provide Defendants with notice of the activities that might give rise to a violation of the statute and because it is overly vague. *See Fomichev Mot.* 11:15-25; 13:23-24. Defendants do not point to a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
|  | CV 16-2724 PSG (Ex) |  |  |
|  | CV 16-2725 PSG (Ex) |  |  |

| Title | CFPB v. D and D Marketing *et al.* |
|---|---|
|  | CFPB v. Fomichev |
|  | CFPB v. Gasparyan |

specific vague term in the statute, but instead argue generally that the law does not provide fair notice of the need to "vet and monitor" the conduct of the third parties. *See T3 Mot.* 10:8-10 ("Defendants are not aware of any case law, statute, regulation, rule, or other agency guidance that requires any service provider to 'vet and monitor' the conduct of the third parties with which they do business."); *Gasparyan Mot.* 7:17-19.

It is well established that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). However, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (internal citations omitted). Moreover, courts have recognized that "most statutes must deal with untold and unforeseen variations in factual situations," and as a result, Congress must "inevitably limit the specificity with which legislators can spell out prohibitions." *See CFPB v. CashCall, Inc.*, CV 15-7522 JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016).

Courts have recognized that the term "unfair" in Section X of the Dodd Frank Act taps into a "well-developed and long-established" definition of the same term in section 5 of the Federal Trade Commission Act ("FTCA"). *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (recognizing that the CFPA and the FTCA use "very similar phrasing"); *accord ITT Education Services, Inc.*, 2015 WL 1013508, at *17 ("The Bureau's own Supervision and Examination Manual confirms what the near-identical language of the two statutes suggests: that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well."). The FTCA is now more than a century old and Courts have given shape to the meaning of its ban on "unfair or deceptive acts or practices." Because of the tradition of these terms and Congress's reliance on the FTCA in crafting the CFPA, the Court cannot conclude that the use of the term "unfair" in Section X of the Dodd-Frank Act renders the CFPA unconstitutionally vague. *See* 12 U.S.C. § 5531(d) (defining the term "abusive").

The Court makes the same determination as to the term "abusive." Although the term "abusive" does not appear in the FTCA, the courts that have examined this term have found that it represents a "more flexible, expansive standard" than the term "unfair" for consumer protection laws. *See ITT Education Servs.*, 2015 WL 1013508, at *18-19. The added flexibility

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

of the standard does not make the law unconstitutionally vague, especially since the statute itself provides ample definition for the term "abusive." *See* 12 U.S.C. 5531(d); *see also ITT Education Servs.*, 2015 WL 1013508, at *19. It defines an "abusive" act as an act that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" and an act that takes "unreasonable advantage" of consumers' lack of understanding of material conditions, inability to protect themselves, or reasonable reliance. *See* 12 U.S.C. 5531(d). Because the law itself explains what the term "abusive" means, the Court cannot conclude that any part of Section X is unconstitutionally vague.

In further support of this conclusion, the Court recognizes the ample guidance that the CFPB has provided to businesses of how it intends to interpret the mandates in the CFPA.[1] In 2012, the CFPB told businesses that they would be held responsible for monitoring the practices of third parties. *See T3 Opp.* 6:5-8 (citing *T3's RJN*, Ex. A). The guidance contained no ambiguity: businesses were instructed to monitor each other or risk liability under the law.[2]

---

[1]     The Court is in receipt of a Notice of Supplemental Authority, filed by Defendants T3 and the Demirchyans on November 3, 2016. Dkt. # 55. In the Notice, Defendants ask the Court to consider the CFPB's most recent Compliance Bulletin and Policy Guidance. *Id.* In significant part, the 2016 guidance is identical to the guidance already before the Court. *See Notice of Supplemental Authority*, Ex. A, at 2 ("Service provider is generally defined in section 1002(26) of the Dodd-Frank Act as 'any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product of service.'") ("A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, can harm consumers and create potential liabilities for both the service provider and the entity with which it has a legal relationship."). Thus, the updated Notice does not change the outcome here.

[2]     Defendants argue that the "duty to monitor" that the guidance describes only flows one way: from banks and other lenders to service providers. A review of the guidance demonstrates that this is not true. The CFPB instructed businesses that "legal responsibility may lie with the supervised bank or non-bank *as well as* with the supervised service provider." *See T3 RJN*, Ex. A.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|-------------------------------------------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

Because this guidance came from the agency responsible for administering the statute, Defendants should have taken the CFPB's expert opinion quite seriously.   The Complaints suggests that Defendants did so—at least initially.  In 2013, Defendants developed and issued a "Lender Audit Questionnaire" to prospective lead purchasers.  *Fomichev Amended Compl.* ¶ 39; *Gasparyan Amended Compl.* ¶ 39.  Despite these initial steps toward compliance, Defendants never followed up on the questionnaire and continued to do business with non-responsive entities.  *T3 Opp.* 5:1-7.  In light of the allegations in the Complaint, Defendants' argument that they did not have adequate notice of a duty to monitor third-party lead purchasers and generators is implausible.

Even if the Court were to accept Defendants' arguments that this CFPB prosecution is a departure from other prosecutions and that the CFBP now advances a new interpretation of the law, courts have recognized that due process concerns do not preclude an agency from prosecuting "borderline cases."  *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256 (3d Cir. 2015).  In a case interpreting the FTCA, the Third Circuit recognized that, although the terms of the law may be "far from precise," the law provides adequate notice if Defendants could "reasonably foresee" that a court could construe its conduct as falling within the statute.  *See id.* at 256 ("[A] company is not entitled to such precision as would eliminate all close calls. . . . the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." (citing *Nash v. United States*, 299 U.S. 373, 377 (1913)).  Here, there is little doubt that fair notice is satisfied, given the links between the CFPA and the FTCA, and the CFPB's guidance as to liability.  Thus, the Court declines Defendants' invitation to find that the law—or, more precisely, the CFPB's interpretation of the law—is invalid.

Finally, Defendants fault the CFPB for rushing to litigation rather than first clarifying the scope of Section X of the Dodd-Frank Act through rulemaking.  They argue that this enforcement action is the equivalent of "retroactive legislation" because it seeks to penalize Defendants for conduct that was lawful at the time it was completed and because the CFPB is "not authorized to utilize this complaint as the first means of giving [Defendants] notice of the duties the CFPB seeks to establish."  *See Gasparyan Mot.* 3:14-17, 9:13-16.  For the reasons already discussed above and those below, the Court finds these arguments lacking in merit.  It is the agency's prerogative to decide whether to proceed through a rulemaking, where it issues regulations associated with the law, or through an adjudication, where it develops the law

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

through adversarial process.  *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.").  The CFPB here has chosen to proceed through litigation.  It did not abuse its discretion in so deciding.

In sum, the Court rejects Defendants' arguments that the CFPA is vague or that the CFPB did not provide Defendants with adequate notice that their conduct might be subject to civil penalties.

C.     Service Provider Status

Defendants next argue that T3 is not a "service provider" and so is not covered by the CFPA.  *See T3 Mot.* 4:20-27.  Under the CFPA, a "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that . . . processes transactions relating to the consumer financial product or service." 12 U.S.C. § 5481(26)(A). The law excludes from the definition of service provider "any person who provides a support service of a type provided to businesses generally or a similar ministerial service." § 5481(26)(B).

Plaintiff argues that T3 is a service provider because it plays an "integral role" in "processing and selling consumer-loan applications to small-dollar lenders."  *T3 Opp.* 2:25-27. It also asserts that, because T3's services are "uniquely tailored to the needs of small-dollar lenders," T3 is not a seller that supplies services to "businesses generally."  *See id.* 4:1-4.  For their part, Defendants suggest that T3 is only a "ministerial service" because it transfers consumer data from generators to purchasers without any "discretion" from its staff.  *T3 Mot.* 6:6-14; *see also T3 Mot.* 5:19-21; *Gasparyan Mot.* 14-17.

Defendants have failed to show why "discretion" should have anything to do with the assessment of whether it is a "service provider" under the CFPA.  Instead, the Court is convinced by Plaintiff's argument that Congress designed the service provider exception for "ministerial" service providers to protect third-party services—like office supply or food vendors, or internet service providers—that supply "material" services to "covered persons" but

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

do not have reason to know of the underlying illegality of the covered person's conduct. Plaintiff's interpretation of the ministerial exemption is supported by an explicit exemption in the law for businesses that provide "time or space for an advertisement" of a consumer financial product, including "print, newspaper, or electronic media." *Id.* § 5481(26)(B)(ii). Vendors that provide advertising space are akin to the office supply or food vendors because these third-party businesses cannot reasonably be expected to vet and monitor the entities with which they do business. But T3 does not qualify as such a "ministerial" service provider. As Plaintiff points out, T3's services are specific to the business of small-dollar lending, so it has reason to know the dynamics of the trade. Moreover, T3 has the capacity, through its connections with purchasers and lenders, to vet and monitor "covered persons," like the lenders with which it does business. *See T3 Opp.* 3:25-4:1. The law explicitly contemplates that entities like T3 that "process transactions" related to consumer financial products will be liable for violations of the law. *See* § 5481(26)(A).

Accordingly, the Court cannot conclude, based on the facts alleged in the Complaint, that T3 is not a service provider under the CFPA.

D.    <u>Failure to State a Claim</u>

Defendants dispute the sufficiency of the amended Complaints by arguing that (1) the claims fail as a matter of law, (2) the Complaints must be subjected to a heightened pleading standard, and (3) the CFPB's factual allegations are inadequate. The Court first addresses Defendants' argument that T3's conduct is lawful. The Court then turns to assess the pleading standard and the individual allegations against each Defendant.

*i.   Unlawful Conduct*

The CFPB alleges that Defendants' conduct is unlawful under both the unfair and abusive prongs of the CFPA. *See T3 Amended Compl.* ¶¶ 43-53, 59-67. Under the law, conduct is "unfair" if it (1) causes or is likely to cause substantial injury to consumers, (2) is not reasonably avoidable by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition. *See* 12 U.S.C. § 5531(c)(1). Conduct is abusive if it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or takes unreasonable advantage of consumers. *See id.* § 5531(d).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) CV 16-2724 PSG (Ex) CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|----------------------------------------------|------|-------------------|

| Title | CFPB v. D and D Marketing *et al.* CFPB v. Fomichev CFPB v. Gasparyan |
|-------|----------------------------------------------|

Defendants make three general arguments about why the conduct alleged in the Complaints is lawful. First, they argue that they have no duty to monitor the statements made by the third-party generators and purchasers. *See id.* 18:4-20; *see also supra* Part B & C. Second, T3 argues that its conduct is "commercially reasonable" and an "undeniably common practice." *See T3 Reply* 6:12-17; *T3 Mot.* 11:24-28 (arguing that the lead generators' statements are "puffery"); *T3 Mot.* 12:15-16 (arguing that the tribal lenders' statements are lawful because tribal lenders do not have to comply with state usury laws). They argue that the lead generators' statements are lawful because the lead generators have no way of knowing what loan terms are ultimately offered to consumers, and they do not know what T3 intends to do with the lead. Defendants argue that the lead purchasers' practices are similarly lawful because purchasers, like tribal lenders, do not violate the laws of the jurisdictions in which they sit. Third, Defendants argue that their conduct is lawful because the lead purchasers make disclosures that negate any "misleading statements" from other parties. *See T3 Mot.* 11:24-28, 12:3-11; *see also id.* 12:3-11 ("Even if the statements were misleading, they are not unlawful because, as the Bureau alleges, consumers are automatically redirected to lenders' websites, which disclose the identity of the lender and the terms of the offered loans.").

The Court dismisses Defendants' first and second arguments straight away. The Court has already addressed the first, having found that CFPB and the CFPA provided Defendants with adequate notice of their duty to monitor the businesses with which they transact. *See supra* Part B & C. The Court finds the second argument equally unavailing because it takes too narrow a view of the allegations in the Complaints. Plaintiff's case does not rest on an assumption that the lead purchasers or lead generators violated the law. Rather, Plaintiff asserts that Defendants, as the middle men, made it possible for each party to claim ignorance of the other's unlawful practices. It also alleges that the collaboration among the entities, when taken together, was designed to confuse consumers. Thus, Defendants' argument that the practices of its generators and purchasers are "commercially reasonable" is neither here nor there. Defendants are also wrong that the conduct of their partners is lawful. As an example, courts in this district and elsewhere have recognized that "offshore lenders" that charge usurious interest rates to consumers violate state consumer financial protection laws. *See CFPB v. CashCall, Inc.*, CV 15-7522 JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016).

Having disposed of the first and second arguments, the Court now turns to the third: whether the "disclosures" made by the lead generators and lead purchasers negate wrongfulness

| CV-90 (10/08) | **CIVIL MINUTES - GENERAL** | Page 15 of 26 |
|---------------|------------------------------|---------------|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

on the part of Defendants. Defendants point to legal precedents that fault consumers for failing to read and fully understand their legal obligations. *See FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945-46 (N.D. Ill. 2008). The Court construes this argument as part of Defendants' broader argument that consumers could have "reasonably avoided" injury by reading the disclosures.

"In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010). An injury is reasonably avoidable if consumers "'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (quoting *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)).

Although the law generally requires consumers to understand their legal obligations, the Dodd-Frank Act recognized that even diligent consumers could be misled by bad actors. In the scheme alleged in the Complaints, Defendants purportedly took advantage of a system of disclosures designed to deceive even consumers that read disclosures. At the start of the scheme, lead generators disclose that "lenders comply with all state and federal regulations to short-term loans" and that "[t]heir rates are reasonable." *T3 Amended Compl.* ¶ 21. But, by the end of the scheme, after the lead generators sell the consumer information to T3 and T3 sells it to lead purchasers, the initial disclosures are ignored. *See id.* ¶ 36; *T3 Opp.* 11:24-12:1. Many consumers end up in loans that do not comply with state or federal regulations. No amount of disclosure at the back-end can negate the contradiction between the lead generators' representations and the lead purchasers' back-end disclosures. In short, because Defendants' system, as alleged, was designed to deceive, it is unreasonable for Defendants to now argue that consumers could have avoided injury by wising up to the scheme earlier on.

Accordingly, the Court finds that the allegations in the Complaint, which must be taken as true, are sufficient to raise a plausible inference that Defendants have engaged in unlawful conduct. *T3 Opp.* 13:5-7.

   *ii.  Heightened Pleading Standard*

CV-90 (10/08)        **CIVIL MINUTES - GENERAL**        Page 16 of 26

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|-------------------------------------------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

In their next argument, Defendants assert that the Rule 9(b) pleading standard applies to claims under the CFPA. Under Rule 9(b), a party alleging fraud or mistake must state their allegations with "particularity." Although district courts are split as to whether Rule 9(b) should apply to consumer protection claims, the majority of courts have found that a heightened pleading standard is inappropriate, even if there is a "deceptive" dimension to such claims. *See CFPB v. Frederick J. Hanna & Assoc., P.C.*, 114 F. Supp. 3d 1342 (N.D. Ga. 2015); *Neild v. Wolpoff & Abramson, LLP*, 453 F. Supp. 2d 918, 923-24 (E.D. Va. 2006) (collecting cases and deciding that a § 1692e(8) violation is not fraud so Rule 9(b) does not apply); *see also FTC v. Freecom Commc'ns, Inc.*, 410 F.3d 1192, 1204 n.7 (10th Cir. 2005) (declining to apply Rule 9(b) to the FTCA); *Le Blanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (declining to apply Rule 9(b) to the Fair Debt Collection Practices Act). These courts rely on the United States Supreme Court's caution against extending the heightened pleading standard beyond claims for fraud of mistake, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), and the "remedial nature" of consumer protection statutes, which are designed to facilitate a consumer's ability to enforce their rights. *See Frederick J. Hanna & Assoc.*, 114 F. Supp. 3d at 1371-74.

Defendants point to *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) as a controlling case in this Circuit on the issue of whether consumer financial protection laws are subject to a heightened pleading standard. Having reviewed the case, the Court finds the holding in *Vess* too narrow to extend to the Complaints here. In *Vess*, plaintiff alleged violations of California Civil Code section 1770 and California Business and Professions Code sections 17200 and 17500, which prohibit "unfair methods of competition and unfair or deceptive acts" and "untrue or misleading statements." *Id.* at 1101-02. The Ninth Circuit recognized that the complaint in *Vess* contained both fraud allegations and allegations where fraud was not an essential element to the claim. *See id.* at 1103. The court concluded, "[W]here fraud is not an essential element of a claim, only allegations ("averments") of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Id.* at 1105. The Ninth Circuit defined "fraud" narrowly to include only claims that allege that a defendant made a false representation, knew of its falsity, and intended to defraud, and where the plaintiff relied on the statement and established damages. *Id.* The court went on to find that many of plaintiff's consumer protection claims—including claims that defendant failed to act to protect consumers—were not fraud claims and thus subject only to the Rule 8 pleading standard. *Id.* at 1106.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|-------------------------------------------------------------------|------|-------------------|

| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan |
|-------|------------------------------------------------------------------------------|

The Complaints here do not allege that Defendants made misrepresentations to consumers knowing of their falsity—an element essential to a fraud claim. Instead, the Complaints allege that Defendants failed to monitor and vet the entities with which they did business and so facilitated a scheme that took advantage of consumer confusion. Given the Ninth Circuit's narrow interpretation of "fraud" in *Vess*, these claims need not satisfy a heightened pleading standard. Accordingly, the Court rejects Defendants' argument that a heightened pleading standard applies to the Complaints.

  iii.  *Allegations Specific to Each Defendant*

The Court now individually examines each Complaint to determine whether Plaintiff has pled sufficient facts to state a plausible claim for relief against each Defendant. The Court proceeds in the order that Plaintiff filed its Complaints by first examining the allegations against T3 and the Demirchyans, then Fomichev and Gasparyan. The Court ultimately finds that the Complaints raise a plausible inference of illegal conduct as to all Defendants, and accordingly, the Court denies Defendants' motions to dismiss for failure to state a claim.

  a.  *T3*

As it relates to the specific allegations against it, T3 argues that the CFPB has not pled enough facts to support the allegation that its conduct is likely to result in substantial injury to consumers. *See* 12 U.S.C. § 5531(c)(1); *T3 Mot.* 17:16-18, 18:4-20. Courts have found that there is a "likelihood of substantial injury" to consumers where plaintiff can show that "injury is a predictable consequence" of the Defendant's actions. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010).

The CFPB alleges that T3 knew or should have known that the leads that it provided to lead purchasers would result in void loans because the lead purchasers would fail to comply with the laws of the consumer's state. *See T3 Opp.* 10:14-20. It also asserts that T3 sold consumer information to entities that it knew were likely involved in fraudulent activity. *Id.* 10:21-11:2. Accepting the allegations in the Complaint as true, Plaintiff has adequately pled substantial injury. It has shown it likely that consumers, who provide their financial information to lead generators, may end up entering into loans that are either void or in violation of state usury laws. If the facts are true, consumers may also be exposed to fraudulent schemes that jeopardize their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |

| Title | CFPB v. D and D Marketing *et al.* |
|---|---|
| | CFPB v. Fomichev |
| | CFPB v. Gasparyan |

credit and financial health.  Given these possibilities, the Court cannot conclude, at this phase in the litigation, that there is no likelihood of substantial injury to consumers.

　　　　*b.　Demirchyans*

　　The CFPA makes it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of [§ 5531]."  *See* 12 U.S.C. § 5536(a)(3).  The Demirchyans argue that the factual allegations in the Complaint are insufficient to establish that they (1) acted knowingly or recklessly, or (2) provided "substantial assistance" in violation of § 5531.  *See T3 Mot.* 21:3-23:8.

　　Turning first to the state of mind required to violate the CFPA, the parties dispute the definition of "knowingly" under the law.  *See T3 Opp.* 13-14; *T3 Reply* 10.  Plaintiff argues that "knowingly" requires defendants to have only "knowledge of the facts, acts or transactions constituting the alleged violation."  *See T3 Opp.* 13-14.  Defendants argue that they must have "'actual knowledge' of the primary wrong and of the aider and abettor's 'role in furthering that violation.'"  *See T3 Reply* 10.  Although Defendants have the better of this argument,[3] it is of no moment because the allegations against the Dmirchyans satisfy even the stricter definition of "knowing."  The allegations also meet the standard for recklessness, which requires Plaintiff to establish sufficient facts to show that defendant's conduct led to "an unjustifiably high risk of

---

[3]　　Ninth Circuit courts have recognized the Federal Trade Commission Act ("FTCA") as an important analog for interpreting terms in the CFPA.  *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (adopting meaning of "deceptive act or practice" from the FTCA in recognition of Congress's reliance on the FTCA in drafting the CFPA); *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072 n.3 (9th Cir. 2016) (recognizing that the CFPB shares concurrent authority with the Federal Trade Commission to enforce the FTCA and that the missions of the laws are overlapping); *CFPB v. IrvineWebWorks, Inc.*, SACV 14-1967 JVS (ANx), 2016 WL 1056662, at *12.  The term "knowing" has an established meaning in the context of the FTCA, 15 U.S.C. § 45(m)(1)(A), which is "actual knowledge or knowledge fairly implied based on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."  Thus, the Court adopts the FTCA's interpretation for the term "knowingly" in the CFPA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) CV 16-2724 PSG (Ex) CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* CFPB v. Fomichev CFPB v. Gasparyan | | |

harm that is either known or so obvious that it should be known." *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007).

The Complaint alleges that both Grigor and Marina Demirchyan had significant responsibility in managing T3 and its operations. Grigor Demirchyan is President, CEO, CFO, and T3's sole director. *T3 Amended Compl.* ¶ 6. He also provided accounting services for the corporation. *Id.* Marina Demirchyan is T3's Vice President and also provides accounting services. *Id.* ¶ 7. The Complaint alleges that the Demirchyans "had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network." *Id.* ¶ 15. They also designed T3's process for filtering and selling consumer information to lead purchasers. *Id.* ¶ 17. These allegations raise a plausible inference that the Demirchyans not only knew of T3's business model, but also of the unlawful conduct of T3's lead generators and purchasers, and T3's role in the scheme. Accordingly, the Court declines to dismiss the Complaint for failure to state sufficient facts to establish that the Demirchyans acted knowingly or recklessly.

Second, the Demirchyans argue that they did not provide "substantial assistance" to T3. To show "substantial assistance," Plaintiff must establish that Defendants "in some sort associate[d] himself with the venture, that [they] participate[d] in it as in something that [they] wishe[d] to bring about, [and] that [they sought] by his action to make it succeed." *See SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).[4] Courts have found that the substantial assistance doctrine does not impose a demanding standard. *See FTC v. Consumer Health Benefits Ass'n*, CV 10-3551 ILG (RLMx), 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011). Rather, the law requires only that the assistance be "more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule." *See id.*

---

[4]     Because Courts have not interpreted the term "substantial assistance" in the context of the CFPA, it is appropriate to look to analogous administrative laws, like the FTCA and federal securities laws, for guidance. *See United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

The T3 Amended Complaint alleges that the Demirchyans "had the authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network." *T3 Amended Compl.* ¶ 15.  It also asserts that the Demirchyans "shared responsibility for deciding the position of each purchaser in the ping tree" used to distribute consumer information to lead purchasers. *Id.* ¶ 17.  Accepting these factual allegations as true, Plaintiff has established a plausible inference that the Demirchyans were more than incidentally involved in T3's business.[5]

> c.      Fomichev

Defendant Fomichev argues that the Complaint does not show that he provided "substantial assistance" to T3 or other service providers. *Fomichev Mot.* 15:10-22, 16:15-21 ("[N]owhere does the Amended Complaint allege that Mr. Fomichev has ever read such an application, visited the websites that allegedly contain inaccurate statements, or otherwise acted or possessed any knowledge that would cause him to be personally liable for wrongdoing.").  He also asserts that the Complaint "fails to allege any conduct to which injury is attributed" because all injuries are "future and potential." *Id.* 17:3-12.  Because the Court has already established that the CFPB adequately pled injury, the Court focuses here on whether the CFPB has demonstrated that Fomichev substantially assisted in the alleged illegal enterprise.

Contrary to Fomichev's characterization that the Complaint only alleges his status as an officer of T3, the Complaint contains enough facts that, taken as a true, raise a plausible inference that Fomichev is liable for violations of the CFPA.  It asserts that Fomichev co-founded T3 in 2005 and owns more than 50 percent of the business. *Fomichev Amended Compl.* ¶ 7.  It also asserts that Fomichev "design[ed] the proprietary software and systems used to transact T3's business." *Id.* ¶ 8.  Like the Demirchyans, the Complaint also concludes that Fomichev had the authority and responsibility to decide whether to accept a purchaser or

---

[5]       The Court declines the CFPB's invitation to examine the filings in the state court cases, *Gasparyan v. Demirchyan, et al.*, BC554306 (Cal. Super. Ct. Aug. 8, 2014), and *Gasparyan v. D and D Marketing, et al.*, BC585895 (Cal. Super. Ct. June 23, 2015), where Defendants purportedly make competing claims as to their ownership of T3. *See T3 Opp.* 17 n.77.  The allegations in the Complaint are sufficient to raise a plausible inference that Defendants provided substantial assistance to T3 in connection with a violation of the CFPA.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

generator into T3's business.  *Id.* ¶ 17.  Even if it is true that Fomichev never visited the third-party websites personally, his alleged knowledge of the consumer information industry, his significant involvement with T3, and his awareness of the interplay among consumers, generators, and purchasers, is enough to raise a plausible inference that Fomichev is liable for substantially assisting T3 in a violation of the CFPA.  Accordingly, the Court denies Fomichev's motion for failure to state a claim.

> d.    *Gasparyan*

Defendant Gasparyan also asserts two reasons why the Court should dismiss the Complaint against him.  First, Gasparyan argues that the Complaint does not allege "any facts to support the allegation that Gasparyan acted 'knowingly and recklessly.'"  *Gasparyan Mot.* 10-12.  Second, Gasparyan argues that the Complaint does not allege a "substantial causal connection" between Gasparyan's action and the purported harm.  *Id.* 13-14.  Like the previous arguments, the Court likewise finds both of Gasparyan's arguments availing.

As the Court concluded above, "knowingly" under the CFPA means to have "actual knowledge or knowledge fairly implied" that the acts are "unfair or deceptive and [are] prohibited by such rule."  *See* 15 U.S.C. § 45(m)(1)(A) (defining "knowingly" under the FTCA). "Recklessness" requires the defendant to take "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *See Safeco*, 551 U.S. at 68-69.  The Complaint alleges that Defendant Gasparyan co-founded T3 with Fomichev in 2005, and served as the company's chief financial officer until 2009 and its chief marketing officer until 2014. *Gasparyan Compl.* ¶¶ 7-8.  Like the other Complaints, the Gasparyan Complaint asserts that Gasparyan "had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network."  *Id.* ¶ 17.  It also alleges that Gasparyan played a role in designing T3's "ping" system, which sold consumer data to the highest bidder without regard for consumer expectations or the promises made to consumers by lead generators. *Id.* ¶ 19.  As with the other Complaints, these facts are sufficient to raise a plausible inference that Gasparyan knew of the company's conduct and disregarded a substantial risk that consumers would be misled or harmed by the sharing of their information with unsavory purchasers.

Moving to Gasparyan's second argument, the Court is also satisfied that the complaint

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
|  | CV 16-2724 PSG (Ex) |  |  |
|  | CV 16-2725 PSG (Ex) |  |  |
| Title | CFPB v. D and D Marketing *et al.* | | |
|  | CFPB v. Fomichev | | |
|  | CFPB v. Gasparyan | | |

shows a causal connection between Gasparyan's conduct and consumer harm.  By alleging that Gasparyan founded and maintained a service that sells consumer information without adequate vetting, the Complaint raises a plausible inference that Gasparyan's conduct is linked to the consumer harm.  Gasparyan's attempts to argue that the Complaint does not allege any actual harm or actual misconduct are meritless.  Accordingly, the Court denies Defendant Gasparyan's motion to dismiss for failure to state a claim.

       E.    <u>Remedies</u>

Defendants next argue that the CFBP cannot recover restitution, penalties, or its attorneys' fees.  *See T3 Mot.* 24:17-20.  Where relief is unavailable as a matter of law, that portion of the prayer of relief must be dismissed.  *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1170 (C.D. Cal. 2011).  However, that is not the case here.  The CFPA permits the Court to order Defendants to pay restitution and other penalties for violations of the CFPA, and to pay the costs of the litigation.  *See* 12 U.S.C. §§ 5565(a)(2)(C), (H), 5565(b) ("In any action brought by the Bureau . . . [it] may recover its costs in connection with prosecuting such action if the Bureau . . . is the prevailing party in the action.").  Because the law is abundantly clear on this point, the Court finds Defendants' argument meritless and declines to strike any portion of Plaintiff's prayer for relief.

       F.    <u>Lead Generators and Purchasers are Indispensable Parties</u>

In the sixth category of arguments, Defendant Gasparyan argues that T3, the lead generators, and the lead purchasers are indispensable parties.  *Gasparyan Mot.* 17-20.  Specifically, Gasparyan argues that he will be unable to defend the claims against him because his liability is tied to T3.  He is also concerned that, because some of the tribal lenders possess sovereign immunity, he would not be able to obtain discovery from these parties unless they are joined.  *Id.* 18.

Gasparyan's reasons do not meet the standard required for joinder of parties.  The Federal Rules of Civil Procedure provide that a party must be joined if (1) the Court cannot accord complete relief without the absent party, or if proceeding without the party might (2) impair the party's ability to protect their interest, or (3) subject the party to a substantial risk that it might incur "double, multiple, or otherwise inconsistent obligations because of the interest."  *See* Fed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

R. Civ. P. 19(a)(1). The three grounds do not apply here. First, there is no risk that the Court cannot provide complete relief because the Gasparyan Complaint seeks only to hold Gasparyan liable for his actions in operating T3. Second, although there is a risk that third parties will be affected by the enforcement action against Gasparyan, nothing about this litigation impairs the third party's ability to protect their interest through separate litigation. *See Gasparyan Opp.* 21. Third, there is no risk of "double, multiple, or otherwise inconsistent" obligations. The three CFPB complaints related to T3's conduct are all before the Court, which can provide a uniform and consistent disposition as to all parties. Because none of the three grounds for necessary joinder apply to this case, the Court denies Defendant Gasparyan's motion to dismiss for failure to join indispensable parties.

        G.      Time-Barred

        Finally, Gasparyan argues that the CFPB "is barred by the statute of limitations from bringing any claims against Gasparyan for any action which took place prior to 2013." *Gasparyan Mot.* 21. Gasparyan faults the CFPB for failing to plead the dates of the wrongful conduct. *Id.* 21:20-28. Under the CFPA, the CFPB may not bring an action for conduct that occurred "more than 3 years after the date of discovery of the violation to which the action relates." 12 U.S.C. § 5564(g). The CFPB correctly points out that nothing on the face of the amended complaint suggests that Gasparyan's conduct occurred before April 2013, more than three years before CFPB brought the Complaint. *See Gasparyan Opp.* 22:5-15. Accordingly, the Court cannot conclude that the Complaint is barred by the statute of limitations. Should the issue remain relevant, however, Defendant may renew the argument in a motion for summary judgment.

IV.    Conclusion

        Having considered the moving, opposing, and reply papers in the three related cases, the Court DENIES Defendants' motions to dismiss. The Court concludes:

        1.      Although the Court finds that the combination of the power accorded to the CFPB Director and the limitations on the President's removal powers violate Article II of the Constitution, these constitutional concerns do not prevent the CFPB from prosecuting this case and do not warrant dismissal of the Complaints.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | | Date | November 17, 2016 |
|----------|------|---|------|-------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | | |

2.  The CFPA and the CFPB provided adequate notice of conduct that is "unfair" or "abusive," the CFPA is not unconstitutionally vague, and the CFPB did not abuse its discretion by choosing to enforce the CFPA through adjudications rather than rulemaking.

3.  T3 is a service provider as contemplated by the CFPA.

4.  Interpreting the Complaints in Plaintiff's favor, the Complaints state violations under the CFPA and plead sufficient facts to raise a plausible inference that Defendants are liable for the conduct alleged.  The Complaints are not subject to a heightened pleading standard.

5.  The CFPB is entitled to the relief that it seeks because it can recover restitution, penalties, and costs under the CFPA.

6.  Plaintiff has not failed to join indispensable parties to the Gasparyan Complaint.

7.  Because the face of the Gasparyan Complaint does not allege a violation for conduct that occurred before April 2013, the Court cannot conclude that the Gasparyan Complaint is barred by the CFPA's three-year statute of limitations.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

CV-90 (10/08)                              **CIVIL MINUTES - GENERAL**                              Page 26 of 26



KeyCite Blue Flag – Appeal Notification

Appeal Filed by CFPB v. ITT EDUCATIONAL SERVICES, INC., 7th Cir., April 8, 2015

2015 WL 1013508
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

CONSUMER FINANCIAL
PROTECTION BUREAU, Plaintiff,

v.

ITT EDUCATIONAL SERVICES, INC., Defendant.

No. 1:14–cv–00292–SEB–TAB.
|
Signed March 6, 2015.

**Synopsis**

**Background:** The Consumer Financial Protection Bureau (CFPB) brought action against a for-profit, post-secondary educational institution, claiming that the educational institution's extension of temporary credit to students violated the Consumer Financial Protection Act (CFPA) and the Truth in Lending Act (TILA). The educational institution moved to dismiss.

**Holdings:** The District Court, Sarah Evans Barker, J., held that:

[1] the CFPA's restriction on the President's ability to remove the CFPB's Director did not violate the President's constitutional removal powers;

[2] a provision of the CFPA which stated that the CFPB's determinations were subject to *Chevron* deference did not impermissibly limit judicial oversight;

[3] the CFPA's prohibition of "any unfair act or practice" was not void for vagueness;

[4] the CFPA's prohibition of "abusive" acts or practices was not void for vagueness;

[5] the institution qualified as a "covered person" and a "service provider" under the CFPA;

[6] the CFPB stated an unfair act or practice claim against the institution;

[7] the CFPB stated an abusive practice claim against the institution; and

[8] in a matter of first impression, the Truth in Lending Act's (TILA) one-year statute of limitations applied to civil actions brought by the CFPB.

Motion granted in part and denied in part.

West Headnotes (41)

[1]    **Federal Courts**
        Evidence; Affidavits

        **Federal Courts**
        Presumptions and burden of proof

        In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor; however, a court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

        Cases that cite this headnote

[2]    **Federal Civil Procedure**
        Claim for relief in general

        A pleading satisfies the core requirement of fairness to the defendant so long as it provides enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests.

        Cases that cite this headnote

[3]    **Federal Civil Procedure**
        Construction of pleadings

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1

On a motion to dismiss for failure to state a claim, a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[4]**  **Public Employment**
 Selection by officers

 **Public Employment**
 Authority to impose adverse action; manner and mode of imposition

 **United States**
 Power to appoint

 **United States**
 In general;power to remove

The President's power to appoint and remove officers of the Executive Branch broadly derives from his Article II mandate to take care that the laws be faithfully executed. U.S.C.A. Const. Art. 2, § 3.

Cases that cite this headnote

**[5]**  **Public Employment**
 Competence or performance in general

 **United States**
 Grounds

The Consumer Financial Protection Act's (CFPA) restriction on the President's ability remove the Director of the Consumer Financial Protection Bureau to when the President "loses confidence in the intelligence, ability, judgment, or loyalty" of the Director did not violate the President's power under Article II to appoint and remove officers of the Executive Branch under the "Take Care" Clause, as the Bureau had some of the quasi-legislative and quasi-judicial functions that characterized other independent regulatory agencies. U.S.C.A. Const. Art. 2, § 3; Consumer Financial Protection Act of 2010, § 1011(c)(3), 12 U.S.C.A. § 5491(c)(3).

Cases that cite this headnote

**[6]**  **Constitutional Law**
 Appointment, tenure and removal of public employees and officials

 **Public Employment**
 Authority to impose adverse action; manner and mode of imposition

 **United States**
 In general;power to remove

Congress may place restrictions on the removal of the officers of quasi-legislative or quasi-judicial independent regulatory agencies; Congress may likewise enact tenure protections for an executive inferior officer, if his or her duties are well-defined and discrete in scope, but Congress may not, however, shield an inferior officer behind two layers of tenure protection.

Cases that cite this headnote

**[7]**  **Statutes**
 Powers of separate houses of legislature

The Origination Clause does not prohibit Congress from enacting funding structures for agencies that differ from the procedures prescribed by the ordinary appropriations process; nor does the Constitution prohibit Congress from creating funding mechanisms that enjoy some degree of insulation from its own year-to-year control. U.S.C.A. Const. Art. 1, § 7, cl. 1.

Cases that cite this headnote

**[8]**  **Administrative Law and Procedure**
 Trade or business

 **Antitrust and Trade Regulation**
 Powers, functions, jurisdiction, and authority

 **Antitrust and Trade Regulation**
 Judicial review

 **Constitutional Law**
 Appellate procedure and judicial review

A provision of the Consumer Financial Protection Act (CFPA), which stated that the determinations of the Consumer Financial

Protection Board (CFPB) regarding any federal consumer law would be applied as if the CFPB was the only agency authorized to apply, enforce, interpret, or administer the provisions of such federal consumer financial law, did not impermissibly limit judicial oversight in ways that were relevant to separation of powers analysis; the provision merely prescribed that the CFPB's constructions of organic law in its subject area are to be given *Chevron* deference. Consumer Financial Protection Act of 2010, § 1022(b)(4)(B), [12 U.S.C.A. § 5512(b)(4)(B).](#)

[1 Cases that cite this headnote](#)

---

**[9]** **Constitutional Law**
    ☞ [Constitutionality of Statutory Provisions](#)

Where Congress has acted, a challenge to the constitutionality of its enactments must show not merely that the legislature has taken a path not before explicitly sanctioned by the judicial branch, but that it has affirmatively violated constitutional principles.

[Cases that cite this headnote](#)

---

**[10]** **Constitutional Law**
    ☞ [Presumptions and Construction as to Constitutionality](#)

While novelty does not create a presumption of unconstitutionality, a court may well find, in certain circumstances, that the lack of historical precedent for an entity raises a red flag.

[Cases that cite this headnote](#)

---

**[11]** **Constitutional Law**
    ☞ [Vagueness as to Covered Conduct or Standards of Enforcement; Offenses and Penalties](#)

A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.

[Cases that cite this headnote](#)

---

**[12]** **Constitutional Law**
    ☞ [Certainty and definiteness; vagueness](#)

A statute is void for vagueness under the Fifth Amendment if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. [U.S.C.A. Const.Amend. 5.](#)

[Cases that cite this headnote](#)

---

**[13]** **Constitutional Law**
    ☞ [Certainty and definiteness; vagueness](#)

The void for vagueness doctrine under the Fifth Amendment is not implicated merely because it may at times be difficult to prove an incriminating fact, nor can a court declare a law unconstitutionally vague based on the mere fact that close cases can be envisioned under its provisions; rather, courts refuse to apply a statutory standard only where it is so amorphous that reasonable observers have no choice but to guess at its meaning, and differ as to its application. [U.S.C.A. Const.Amend. 5.](#)

[Cases that cite this headnote](#)

---

**[14]** **Constitutional Law**
    ☞ [Certainty and definiteness; vagueness](#)

The degree of vagueness that the Constitution tolerates under the Fifth Amendment, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment. [U.S.C.A. Const.Amend. 5.](#)

[Cases that cite this headnote](#)

---

**[15]** **Constitutional Law**
    ☞ [Certainty and definiteness; vagueness](#)

**Constitutional Law**
    ☞ [Vagueness](#)

Under the Fifth Amendment's void for vagueness doctrine, less clarity is demanded of laws or regulations that are enforced through

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

civil action rather than prosecution. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

---

**[16]**  **Constitutional Law**
    Penalties, fines, and sanctions in general

The possibility of steep fines, by itself, does not render a statute quasi-criminal, and thus subject to more stringent review afforded to criminal statutes under the Fifth Amendment's void for vagueness doctrine. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

---

**[17]**  **Constitutional Law**
    Certainty and definiteness;vagueness

**Constitutional Law**
    Speech, press, assembly, and petition

If the enforcement of a law threatens to chill protected speech or the exercise of another fundamental right, courts apply more stringent scrutiny to its clarity and the fairness of its notice under the Fifth Amendment's void for vagueness doctrine. U.S.C.A. Const.Amends. 1, 5.

Cases that cite this headnote

---

**[18]**  **Constitutional Law**
    Trade or Business

Courts review economic regulations with less severe scrutiny when conducting a vagueness inquiry, because their subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.

Cases that cite this headnote

---

**[19]**  **Constitutional Law**
    Particular Subjects and Regulations

Provisions of the Consumer Financial Protection Act (CFPA), which prohibited unfair and abusive conduct, were not subject to heightened scrutiny on a Fifth Amendment void for vagueness challenge, where the CFPA only imposed civil liability, and the CFPA only governed economic activity rather than protected constitutional interests, like free expression. U.S.C.A. Const.Amends. 1, 5; Consumer Financial Protection Act of 2010, § 1036(a)(1)(B), 12 U.S.C.A. § 5536(a)(1)(B).

1 Cases that cite this headnote

---

**[20]**  **Antitrust and Trade Regulation**
    Validity

**Constitutional Law**
    Particular Subjects and Regulations

The Consumer Financial Protection Act's (CFPA) prohibition on "any unfair act or practice" was not void for vagueness under the Fifth Amendment, where the CFPA's prohibition closely mirrored language used in the Federal Trade Commission Act that prohibited "unfair or deceptive acts or practices in or affecting commerce," and the FTCA's definition of "unfair and or deceptive acts" had been subject to a century of interpretation and refinement. U.S.C.A. Const.Amend. 5; Consumer Financial Protection Act of 2010, § 1036(a)(1)(B), 12 U.S.C.A. § 5536(a)(1)(B); Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

4 Cases that cite this headnote

---

**[21]**  **Statutes**
    Defined terms;definitional provisions

It is a fundamental canon of construction that when Congress employs a term with a specialized meaning relevant to the matter at hand, that meaning governs.

Cases that cite this headnote

---

**[22]**  **Statutes**
    Technical terms, terms of art, and legal terms

If Congress has borrowed a term of art from its own existing body of legislation, a court presumes that it did so advisedly.

Cases that cite this headnote

**[23]** **Antitrust and Trade Regulation**
　🗝 In general;unfairness

**Antitrust and Trade Regulation**
　🗝 Source of prohibition or obligation; lawfulness

A practice is unfair under the Federal Trade Commission Act (FTCA) when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

1 Cases that cite this headnote

**[24]** **Antitrust and Trade Regulation**
　🗝 Validity

**Constitutional Law**
　🗝 Particular Subjects and Regulations

The Consumer Financial Protection Act's (CFPA) prohibition on "abusive" acts or practices was not void for vagueness under the Fifth Amendment, even though the expansion of consumer protection law to abusive practices was novel in the context of the CFPA, where the CFPA elaborated on the conditions under which a business's conduct may be found abusive, and agencies and courts had successfully applied the term "abusive" as used in closely related consumer protection statutes and regulations. U.S.C.A. Const.Amend. 5; Consumer Financial Protection Act of 2010, §§ 1031(d), 1036(a)(1)(B), 12 U.S.C.A. §§ 5531(d), 5536(a)(1)(B); Fair Debt Collection Practices Act, § 802(a), 15 U.S.C.A. § 1692(a); Telemarketing and Consumer Fraud and Abuse Prevention Act, § 3, 15 U.S.C.A. § 6102.

2 Cases that cite this headnote

**[25]** **Constitutional Law**

🗝 Rule making

Congress cannot grant an executive agency rulemaking powers so broad that it has empowered the agency to engage in de facto legislating itself, in other words, Congress's mandate must lay down an intelligible principle to which the agency is directed to conform.

Cases that cite this headnote

**[26]** **Statutes**
　🗝 Undefined terms

When a word is not defined by statute, a court normally construes it in accord with its ordinary or natural meaning.

Cases that cite this headnote

**[27]** **Statutes**
　🗝 Plain Language;Plain, Ordinary, or Common Meaning

**Statutes**
　🗝 Design, structure, or scheme

In ascertaining the plain meaning of a statute a court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.

Cases that cite this headnote

**[28]** **Antitrust and Trade Regulation**
　🗝 Credit repair and counseling

Claims that a for-profit, post-secondary educational institution advised students on how to manage their debt to the institution, after taking out temporary loans, that the institution channeled students into a private loan program, and that the institution completed nearly every step in the process of acquiring loans on the students' behalf, including filling out the requisite forms, save signatures, and forwarding them to the lender, sufficiently alleged that the institution engaged in credit counseling and assisting a consumer with debt management, as required to be a "covered person" under the Consumer Financial Protection Act (CFPA). Consumer

Financial Protection Act of 2010, § 1002(15)(A)(viii), 12 U.S.C.A. § 5481(15)(A)(viii).

Cases that cite this headnote

**[29]** **Statutes**

🔑 Plain, literal, or clear meaning; ambiguity

Where legislative history has interpretive value, that value lies in clarifying statutory ambiguity.

Cases that cite this headnote

**[30]** **Antitrust and Trade Regulation**

🔑 Finance and banking in general;lending

Claims that a for-profit, post-secondary educational institution used temporary loans as a tool to pre-qualify students for private loans, that the institution developed the loans' underwriting criteria, and that the institution paid the credit union membership fees in a lead credit union that made loans to the students on behalf of the students who took out the loans, sufficiently alleged that the institution qualified as a "service provider" under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1002(26)(A)(i), 12 U.S.C.A. § 5481(26)(A)(i).

Cases that cite this headnote

**[31]** **Antitrust and Trade Regulation**

🔑 Reliance;causation;injury, loss, or damage

Although the harm involved need not be massive on an annual basis to count as substantial injury under the Consumer Financial Protection Act (CFPA), a trivial or speculative harm will not suffice. Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

**[32]** **Antitrust and Trade Regulation**

🔑 Finance and banking in general;lending

**Antitrust and Trade Regulation**

🔑 Credit repair and counseling

Claims that a for-profit, post-secondary educational institution directed 8,600 students into private loans, that the private loans carried interest rates as high as 16.25% and origination fees as high as 10%, and that some 64% of the students defaulted on their private loans, exacerbating their debt and financial distress, adequately alleged a substantial financial injury to the students, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

**[33]** **Antitrust and Trade Regulation**

🔑 Finance and banking in general;lending

**Antitrust and Trade Regulation**

🔑 Credit repair and counseling

Claims that a for-profit, post-secondary educational institution employed intrusive and overbearing tactics in ensuring that students rolled over their temporary loans into private loans, that some students did not realize that they had taken out private loans because of the rushed and automated manner in which institution processed the students' paperwork, and that the institution used the withholding of course materials, transcripts, and transfer credits as leverage to convince students to take out the private loans, sufficiently alleged that the institution's tactics caused the students' injuries, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

**[34]** **Antitrust and Trade Regulation**

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

🖙 Contractual relationships and breach of contract in general

While relevant, formal contract principles are not conclusive in an unfair practices claim.

Cases that cite this headnote

[35] **Antitrust and Trade Regulation**
🖙 Finance and banking in general;lending

**Antitrust and Trade Regulation**
🖙 Credit repair and counseling

Claims that a for-profit, post-secondary educational institution engaged in so much "hand-holding" in assisting students in applying for private loans that the students' role was often reduced to signing completed forms, and that the institution leveraged the threat of withholding transcripts and denying transferability of credits, or expelling students outright if they failed to make up their "tuition gap," sufficiently alleged that the students lacked a reasonable alternative to agreeing to take out private loans, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[36] **Antitrust and Trade Regulation**
🖙 Reliance;causation;injury, loss, or damage

An injury is reasonably avoidable under the Consumer Financial Protection Act (CFPA) if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact. Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[37] **Antitrust and Trade Regulation**

🖙 Finance and banking in general;lending

**Antitrust and Trade Regulation**
🖙 Credit repair and counseling

Claims that signing up students for private loans enabled a for-profit, post-secondary educational institution to clear doubtful assets from its balance sheets, created by extending temporary loans to students, sufficiently alleged that the institution derived unreasonable advantage from its conduct, as required for the Consumer Finance Protection Bureau to bring an abusive practice claim against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(d)(2), 12 U.S.C.A. § 5531(d)(2).

Cases that cite this headnote

[38] **Antitrust and Trade Regulation**
🖙 Particular cases

To withstand a motion to dismiss for failure to state a claim, a plaintiff's allegations that a group of consumers relied on a defendant's representations need not contain specific allegations as to any particular consumer's individual reliance. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

[39] **Antitrust and Trade Regulation**
🖙 Finance and banking in general;lending

**Antitrust and Trade Regulation**
🖙 Credit repair and counseling

Claims that staff at a for-profit, post-secondary educational institution represented to students that they would work in the interests of their students to better their lives, that the staff assured prospective students of large salaries upon graduation, and that some students believed that the staff was acting in the students' interests in signing them up for private loans, sufficiently alleged that the institution took unreasonable advantage of students' reasonable reliance, as required for the Consumer Finance Protection Bureau to bring an abusive practice claim against the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

institution. Consumer Financial Protection Act of 2010, § 1031(d)(2)(C), 12 U.S.C.A. § 5531(d)(2)(C).

Cases that cite this headnote

---

[40]     **Federal Civil Procedure**
👉 Alternate, Hypothetical and Inconsistent Claims

A complaint may advance inconsistent legal theories based on the same set of facts.

Cases that cite this headnote

---

[41]     **Consumer Credit**
👉 Time to sue and limitations

The one-year limitations period in the Truth in Lending Act's (TILA) provision governing civil liability applied to actions brought by the Consumer Finance Protection Bureau, even though the Consumer Financial Protection Act (CFPA) amended the TILA to grant the Bureau the power to bring administrative enforcement actions, which was not subject to any limitations period. Truth in Lending Act, §§ 108(a)(6), 130(e), 15 U.S.C.A. §§ 1607(a)(6), 1640(e).

Cases that cite this headnote

---

**Attorneys and Law Firms**

Ethan H. Levisohn, Maureen E. McOwen, Cynthia Gooen Lesser, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Douglas R. Cox, Jason J. Mendro, Lucas C. Townsend, Gibson Dunn & Crutcher LLP, Washington, DC, Philip A. Whistler, Thomas Eugene Mixdorf, Ice Miller LLP, Indianapolis, IN, Timothy John Hatch, Gibson Dunn & Crutcher LLP, Los Angeles, CA, for Defendant.

---

*ORDER ON DEFENDANT'S MOTION TO DISMISS*

SARAH EVANS BARKER, District Judge.

**\*1** This cause is before the Court on Defendant ITT Educational Services, Inc.'s Motion to Dismiss [Docket

No. 15], filed on April 28, 2014 pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). For the reasons set forth below, the Motion is DENIED in part and GRANTED in part.

---

*Factual and Procedural Background*

Plaintiff Consumer Financial Protection Bureau ("the Bureau"), a United States federal agency, has brought this suit against Defendant, alleging violations of provisions of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), & 5565, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, and regulations thereunder. Because this cause is before us on a motion to dismiss, we consider the facts as presented by the Bureau's Complaint.

Defendant ITT Educational Services, Inc. ("ITT") is a publicly-traded, for-profit company offering post-secondary courses and degrees to students at more than 100 locations nationwide. [1] ¶ 2. [2] Many of ITT's students and prospective students have limited financial means [3], and ITT therefore derives much of its revenue from federal aid, including loans, secured by the students. ¶¶ 4–5. Some 80% of ITT's revenue, in fact, comes from aid granted under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("Title IV Aid"). However, a large number of students are still unable to afford full tuition to enroll at ITT even with federal assistance. To enable students to close this "tuition gap," ITT extended to many of them short-term, no-interest loans called "Temporary Credit." The Temporary Credit packages were offered to students at the beginning of an academic year, and payment was due nine months later, at the close of the school year. ¶ 6.

---

**ITT's aggressive tactics**

The Bureau alleges that ITT employed the Temporary Credit loans as an "entry point" for "pushing" students into taking out private loans when the Temporary Credit came due and students were again unable fully to afford tuition for coming school terms. ¶ 7. According to the Bureau, ITT misled students about the balance of costs and benefits associated with ITT enrollment—thus guiding them into an unmanageable financial predicament —in a number of ways.

In the first place, ITT represented to students through oral representations and advertisements that its programs greatly advanced an enrollee's career prospects and job placement rates; the Bureau alleges that these representations were exaggerated and were based on incomplete information. ¶¶ 29–33. The Bureau utilized "mystery shoppers"—young men or women presenting themselves as prospective students—who reported that ITT staff made exaggerated claims about student success, such as that graduates with associates' degrees "usually make six figures." ¶ 41. In contrast to these claims, ITT's annual disclosures in 2012 indicated that "reported annualized salaries initially following graduation averaged approximately $32,061 for the Employable Graduates in 2011." ¶ 46. [4]

 **\*2** The Bureau alleges that ITT also misleadingly represented to prospective students that its "national accreditation" placed it on par with other major educational institutions. ¶ 54. In fact, while a "national" accreditation sounds authoritative, most non-profit colleges and universities are "regionally" accredited; such institutions accept transfer credits from for-profit schools like ITT only on a case-by-case basis. ¶¶ 50–53. According to the Bureau, ITT not only created an inaccurate overall impression in this respect, but also misled some prospective students in a more specific way: one recruiter claimed that ITT had the same accreditation as "all other schools"; another falsely claimed that "ITT Tech is accredited by the Department of Defense." ¶ 54.

Having given prospective students an inflated notion of the standing of the school and the career benefits derived from the degrees it bestowed, the Bureau alleges that ITT's recruiting staff engaged in heavy-handed methods to convince students to enroll. These methods included frequent phone calls and in-person multimedia presentations that mystery shoppers described as overwhelming in nature. ¶¶ 56, 58–60, 62. Prospective students were encouraged to take an admission test that, in fact, was "virtually impossible to fail," but was used to give them the impression that the school had rigorous admissions standards and that their passing the test augured well for their prospects. ¶ 61. Despite the volubility of the overall sales pitch, the Bureau maintains that ITT recruiters were instructed to be vague and evasive on the question of costs; they responded to applicants' questions by stating, "I cannot tell you what your exact cost will be," or by asking, "Do you want a discount education, or a valuable one that will give you a return in the future?" ¶ 57.

Once students agreed to enroll, the Bureau alleges that ITT then switched gears, hurrying them through the enrollment and financial aid processes—so quickly that "many consumers did not know or did not understand what they signed up for." ¶ 64. Specifically, ITT required enrollees to sign an Enrollment Agreement before they could receive any information about their financial aid options or meet with financial aid staff. ¶ 66. Mystery shoppers reported being rushed through e-signatures of documents, including authorizations to request transcripts and credit check approvals without understanding the nature of the forms they were signing. ¶ 67. One mystery shopper recounted that an ITT representative forged her signature on a number of e-documents, explaining that she was "trying to help and it was the only way she could give me the test to help push me through." ¶ 72. The Bureau asserts that financial aid officers then "took control" of the process, rushing enrollees through form signatures and providing them with little detailed information; in the words of a mystery shopper, the process was "a bit overwhelming with how quickly we went through everything, and I wasn't exactly clear on everything the [staff member] was having me sign up for." ¶ 83.

 **\*3** Once students had completed an academic term at ITT, the time came for them to "repackage" their financial aid and loans for the next year. The Bureau alleges that ITT's financial aid staff employed aggressive tactics in seeking to repackage students, including tracking them down on campus, barring or pulling them from class, and enlisting the aid of other ITT staff such as professors. An ITT executive conceded that the school also used the threat of withholding course materials and transcripts as "leverage" to ensure that students would repackage. ¶¶ 85–87. At both the initial and repackaging stages, ITT staff encouraged students to rely on school representatives in seeing them through the process, including the use of forms that automatically populated and required only the students' signatures at the conclusion of the process. An executive stated that ITT was "essentially holding [the students'] hands"; one mystery shopper stated that a financial aid coordinator told him that he would "get more free money that I don't have to pay back if I let them take care of my paperwork." [5] ¶¶ 90–92.

**The "private loans"**

The Bureau's claims against ITT focus on its assertion that, having knowingly cajoled and guided students into a financial predicament in which they were already heavily invested in an ITT degree yet lacked the financial resources to complete it—with the Temporary Credit expiring and financial aid insufficient to fully cover the "tuition gap"—ITT then persuaded continuing students to take out financially irresponsible "private loans" from third-party lenders. In the Bureau's words:

> ITT Financial Aid staff coerced students into taking out loans that they did not want, did not understand, or did not even realize they were getting.... ITT sought to have its students pay for the tuition gap with ostensible third-party loans because outside sources of payment could be booked as income to the company, improving its free cash flow and the appearance of its financial statements, and because outside sources of revenue helped ITT meet a requirement by the Department of Education that at least 10% of its revenue be derived from sources outside Title IV loans and grants.

¶¶ 97–98.

One of the sources of the students' predicament was ITT's alleged failure to adequately disclose the nature of the nine-month Temporary Credit to new students. Students who received the Temporary Credit signed a "Cost Summary Payment Addendum" (CSPA), which stated that the loan was to last for the length of an academic year and carry no interest. According to the Bureau, however, the CSPA's references to "new temporary credit" and "renewal of carryforward temporary credit" could mislead students into believing that renewal of the no-interest loan for future academic years was available. Some students believed that the Temporary Credit would be available until they graduated, ¶ 105, and a mystery shopper reported that she had been led to believe that future years' costs would be "covered under a new temporary credit and that I would owe no money out of pocket." ¶ 107. One director of finance at an ITT location instructed staff to describe the Temporary Credit as "funding" rather than as a loan that would have to be repaid. ¶ 108. ITT was aware that many or most students lacked the ability to repay the Temporary Credit, and it characterized them as "doubtful accounts" on its balance sheets. ¶ 113.

**\*4** The Bureau alleges that, beginning in 2008, ITT constructed two "private loan" programs as a vehicle for students to discharge the Temporary Credit: continuing students would use the cash they received from the new loans to pay off their debt to ITT and thus remove the "doubtful accounts" from ITT's balance sheets. Of these two programs, only one—the Student CU Connect (SCUC) program—operated during the July–December 2011 time period covered by the Complaint. [6] The Complaint asserts that ITT was heavily involved in the creation of the SCUC program: developing its underwriting criteria, providing a credit facility, paying the credit union membership fees in the lead credit union on behalf of the students taking out the SCUC loans, and providing the SCUC loan originators with a stop-loss guarantee that it would make them whole for losses if defaults on the loans exceeded 35%. ¶ 121. ITT was the "sole intermediary" between SCUC and its students; funds were disbursed through ITT to the student, and could be used only to pay ITT for tuition and not for any other purpose. Additionally, eligibility criteria for the loans were tailored such that, if students had received Temporary Credit, they were automatically eligible for an ITT private loan. [7] ¶¶ 116, 122.

The loans granted under the SCUC program carried a 10–year term. For students with credit scores below 600, the interest rate after April 2011 was 13% plus prime—or 16.25%—in addition to a 10% origination fee. Nearly half of the students taking SCUC loans fell into this low-credit-score cohort. ¶¶ 123–124. These rates are drastically higher than those available under federal Stafford loans, whose rates since 2009 have ranged from 3.4% for subsidized borrowers to 6.8% for unsubsidized borrowers. ¶ 125. Despite their exacting terms, some 79% of the SCUC loans issued went to continuing ITT students who had previously received Temporary Credit in their first year at ITT. ¶ 126. As of May 2011, ITT's consultant for loan default analysis projected a gross default rate of 61.3% for the existing SCUC loans. ¶ 127.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   10

Crucially, the Bureau alleges that these "private" loans, though nominally originated by third-party lenders, were the brainchild of ITT and that ITT consciously steered economically distressed students, faced with indebtedness upon the expiration of the Temporary Credit, into the SCUC loans. ITT executives, in quarterly earnings calls with investors and analysts, stated that the ITT private loan program was a vehicle for taking the Temporary Credit off of ITT's balance sheets. ¶ 134. In referring to the PEAKS program, which ran from 2009 to 2011 and operated similarly to the SCUC program, ITT's CEO allegedly discussed the interrelatedness of the programs as follows:

We still anticipate offering internal financing to first-year students.... Second year students then would be eligible for financing through the PEAKS program, to have financing for their forward-looking studies, as well as refinancing any institutional funding provided to them during the first year.... But it works that way, second-year students are in the PEAKS program, and first year will continue to be on the balance sheet.

**\*5** ...

Basically the way the program is set up, if you think about the balance sheet aspects of this, obviously positive cash flow elements there. And some of that will come from [accounts receivable] that is going to be converted into the PEAKS program, which was our plan all along.

¶¶ 135–136. In a later conference call in 2011, ITT's CEO affirmed that the SCUC program was part of this same "plan," noting that SCUC was "substantially similar for us relative to the PEAKS program so that it's structurally similar and the economics are very, very similar." ¶ 137. According to the Bureau, many students did not migrate from the Temporary Credit to the "private loans" with eyes fully open: some accepted the new loans in reliance upon ITT's acting in their interests, while others did not realize they had incurred a new type of debt because of the "rushed and automated manner" in which ITT financial staff processed the students' paperwork. ¶¶ 141–142.

For those students who had Temporary Credit debt at the close of their first year at ITT but who did not take out "private loans," ITT offered them an incentive to pay off the debt in a lump sum upon graduation—in the form of a 25% discount. ¶ 144. For those students who were

unable to pay off the Temporary Credit debt in a lump sum, ITT offered a "temporary credit installment plan" involving monthly payments that ranged, depending on the total amount owed, from six months to more than six years. ¶ 146. According to the Bureau, the paperwork students were given upon enrolling in the installment plan did not disclose this forgone 25% discount as constituting a "finance charge." ¶¶ 148–151.

### *Legal Analysis*

### Standard of Review

### 1. Standard under Rule 12(b)(1)

**[1]** The Federal Rules of Civil Procedure command that courts dismiss any suit over which they lack subject matter jurisdiction—whether acting on the motion of a party or *sua sponte. See* Fed. R. Civ. Pro. 12(b)(1). In ruling on a motion to dismiss under Rule 12(b)(1), we "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 771 (7th Cir.2002); *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir.2001). We may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993); *Estate of Eiteljorg ex rel. Eiteljorg v. Eiteljorg,* 813 F.Supp.2d 1069, 1074 (S.D.Ind.2011).

### 2. Standard under Rule 12(b)(6)

**[2]** Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted." Fed.R.Civ.P. 12(b)(6). In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir.2000). Federal Rule of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 779 (7th Cir.2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed.2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir.2008).

**\*6** In its decisions in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F.Supp.2d 363, 370 (M.D.Pa.2008).

**[3]** Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' " *United States v. City of Evansville,* 2011 WL 52467, at \*1 (S.D.Ind. Jan. 8, 2011) (quoting *Tamayo,* 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v.*

*Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994).

## Discussion

This suit arises primarily under the Consumer Financial Protection Act (CFPA), the Bureau's organic statute. Congress enacted the CFPA as Title X of the "Dodd–Frank Act" of 2010, with the stated purpose of "ensuring that the federal consumer financial laws are enforced consistently so that consumers may access markets for financial products, and so that these markets are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Counts One through Three of the Complaint allege that ITT engaged in "unfair" and "abusive" acts or practices, in violation of the CFPA's operative provisions, 12 U.S.C. §§ 5531(c)(1), 5531(d)(2)(B) & 5531(d)(2)(C). The Bureau further alleges in Count Four that ITT's nondisclosure of a finance charge violated the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.,* and its implementing Regulation Z, 12 C.F.R. § 1026.17.

**\*7** ITT seeks dismissal on three broad grounds. First, it contends that the Bureau lacks standing to bring this suit because it is an unconstitutional entity and the CFPA's prohibitions violate the due process clause. Second, ITT urges that the complaint fails to state a claim because ITT is not a covered entity subject to its provisions. Lastly, ITT argues that all four counts fail on their merits. We address these bases of ITT's motion in turn.

## I. Constitutionality of the CFPA

### A. Removal Power and the "Take Care" Clause

ITT argues that the CFPA violates the constitutional separation of powers by unduly restricting the President's authority to remove the Bureau's Director if he "loses confidence in the intelligence, ability, judgment, or loyalty" of that officer. *See* Def.'s Br. 8 (citing *Myers v. United States,* 272 U.S. 52, 134, 47 S.Ct. 21, 71 L.Ed. 160 (1926)). Because the Bureau is an unconstitutional entity and thus lacks standing, ITT urges that the suit must be dismissed in its entirety for the absence of a judiciable case or controversy. Def.'s Reply 3 n. 4; *Susan B. Anthony List v. Driehaus,* ——U.S. ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014). To explain ITT's misreading of the constitutional protections afforded the President's power

to remove officials like the Director of the Bureau, it is necessary to review the evolution of the doctrine.

### 1. Evolution of Removal Power Doctrine

[4] The President's power to appoint and remove officers of the Executive Branch broadly derives from his Article II mandate to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. *See also* U.S. Const. Art. II, § 1, cl. 1 (the "Vesting Clause") ("The executive Power shall be vested in a President of the United States of America."). The Constitution also specifically delineates the scope of the President's appointment power:

> He shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2. As to the question of the President's *removal* authority, however, the document is conspicuously silent.

Despite the lack of a clear textual command, the Supreme Court has long recognized that some degree of discretion in removing executive officers is inherent in the President's powers and must be protected from excessive legislative encroachment. The Court first addressed the issue in Chief Justice Taft's voluminous opinion in *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). After examining at length the course of debates in 1789's First Congress, the Court found evidence of an early consensus that, though appointment of principal executive officers was conditioned upon the "advice and consent" of the Senate, the authority to remove lay with the President alone. 272 U.S. at 111–115, 47 S.Ct. 21. The Court found the assumptions of the early Congress to be sound, and explicitly ratified them. The Constitution vested the executive power in the President, the Court reasoned,

and the removal power inherent in executive authority —based on traditions inherited from the prerogatives of the British Crown—remained vested in him unless the Constitution specified otherwise. [8] Moreover, on more functional grounds, it would be difficult to imagine the President successfully fulfilling his mandate to "take care that the laws be faithfully executed" if he were unable to command the obedience of the subordinates through which he exercised his powers. *Id.* at 115–135, 47 S.Ct. 21. The *Myers* Court therefore held that Congress was prohibited from unduly limiting the President's "power of removing those for whom he cannot continue to be responsible." *Id.* at 117, 47 S.Ct. 21.

**\*8** But the Executive Branch is far larger, and its responsibilities far more diverse, now than in the time of the First Congress or even of William Howard Taft. The rise of the "administrative state" during the New Deal and in ensuing decades has spawned a number of independent agencies—formally within the Executive Branch but deriving much of their perceived value from their insulation from party politics and the President's personal fiat. In *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), the Court recognized that with respect to the officers of agencies like the Federal Trade Commission, which are "quasi-legislative and quasi-judicial" rather than "purely executive," the President's authority to remove need not be as absolute as *Myers* had proclaimed. 295 U.S. at 627–629, 55 S.Ct. 869. Because "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will," *id.* at 629, 55 S.Ct. 869, the Court upheld Congress's statutory mandate that the FTC commissioners be removed only for cause—for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620, 55 S.Ct. 869 (quoting 15 U.S.C. § 41).

In two more recent landmark cases, the Supreme Court has considered the application of its removal doctrine to "inferior" officers: those who report directly not to the President but to another appointed official within the Executive Branch. In *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Court determined that the statute [9] authorizing "independent counsels" within the Department of Justice, whom the Attorney General appointed and could remove only for cause, did not unconstitutionally abridge the President's powers. Though the independent counsel

was surely an "executive" rather than "quasi-legislative" or "quasi-judicial" officer—his primary function, after all, was criminal investigation and prosecution—Congress's protection of his independence was nonetheless appropriate. This was so in large part because the independent counsel's duties were discrete in scope:

> [T]he independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority. Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out his or her duties under the Act, we simply do not see how the President's need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.

*Id.* at 691–692, 108 S.Ct. 2597. Moreover, the Court noted, the President did retain the ability to exercise some control over an independent counsel through his at-will appointee, the Attorney General. *Id.* at 692, 108 S.Ct. 2597.

In its 2010 decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010), however, the Court drew a bright line limiting the leeway afforded to Congress by the progeny of *Humphrey's Executor* and *Morrison:* Congress could not insulate an inferior officer from presidential oversight with *two* layers of for-cause protection. There, the Court held that the for-cause removal of the commissioners of the Public Company Accounting Oversight Board, an entity created by the Sarbanes–Oxley Act under the aegis of the SEC—whose commissioners themselves may be removed by the President only in limited circumstances—violated the spirit of the "take care" clause. It reasoned as follows:

**\*9** A second level of tenure protection changes the nature of the President's review. Now the Commission cannot remove a Board member at will.

The President therefore cannot hold the Commission fully accountable for the Board's conduct, to the same extent that he may hold the Commission accountable for everything else that it does. The Commissioners are not responsible for the Board's actions. They are only responsible for their own determination of whether the Act's rigorous good-cause standard is met. And even if the President disagrees with their determination, he is powerless to intervene-unless that determination is so unreasonable as to constitute "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Executor,* [295 U.S. at 620, 55 S.Ct. 869].... This novel structure does not merely add to the Board's independence, but transforms it.

561 U.S. at 496, 130 S.Ct. 3138.

### 2. ITT's Principal Argument

**[5]  [6]**    Thus, in the nearly 90 years since *Myers,* the Supreme Court has qualified the doctrine of the President's removal authority it espoused in that decision in at least three respects. Congress may place restrictions on the removal of the officers of "quasi-legislative" or "quasi-judicial" independent regulatory agencies (*Humphrey's Executor* ); it may likewise enact tenure protections for an executive inferior officer, if his or her duties are well-defined and discrete in scope (*Morrison* ). It may *not,* however, shield an inferior officer behind two layers of tenure protection (*Free Enterprise Fund* ). ITT's contentions notwithstanding, we conclude that the structure of the CFPA is permissible when viewed through this doctrinal prism.

ITT first argues that, because "the limitations on removal here are far more restrictive than a 'good cause' provision," the CFPA runs afoul of *Free Enterprise Fund's* dictum that "the President cannot 'take care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." Def.'s Br. 8 (quoting *Free Enter. Fund,* 561 U.S. at 484, 130 S.Ct. 3138). In fact, however, the CFPA specifies precisely the same grounds for removal as the archetypal "for cause" provision approved by the Court in *Humphrey's Executor:* the President may remove the Bureau's director only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). *Compare with* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.")

(cited in *Humphrey's Executor,* 295 U.S. at 619, 628, 632, 55 S.Ct. 869).

ITT's notion that the degree of insulation from executive oversight afforded the Bureau's Director is explicitly proscribed by precedent therefore lacks merit. The Director is responsible directly to the President, without the additional layer of screening the Court found problematic in the structure of the Public Company Accounting Oversight Board. *Cf. Free Enterprise Fund,* 561 U.S. at 507, 130 S.Ct. 3138 (distinguishing circumstances where "the President has ... authority to initiate a Board member's removal for cause"). The CFPA's structure is thus constitutional only if the authority wielded by the Bureau exceeds the bounds recognized by *Humphrey's Executor* and *Morrison.*

**\*10** Here, there is no doubt that the Bureau partakes of some of the quasi-legislative and quasi-judicial functions that characterize an independent regulatory agency. It is invested with the authority to engage in rulemaking to further implement Congress's enactments on the subject of consumer financial protection, and its regulatory powers include administrative adjudication. 12 U.S.C. §§ 5511, 5562–5565. *Cf. Humphrey's Executor,* 295 U.S. at 628, 55 S.Ct. 869 (noting that the FTC "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute"); *Buckley v. Valeo,* 424 U.S. 1, 140–141, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (noting that the "administrative" functions performed by the Federal Election Commission are "of kinds usually performed by independent regulatory agencies"). The Bureau also undoubtedly wields paradigmatic "executive" powers—notably the authority to bring suit on behalf of the United States—but we find no basis for concluding that the Director's powers are so great that the inability to remove him or her at whim fatally undermines the President's constitutional prerogatives.

While it is true that the Bureau does not operate only for a fixed time like a Department of Justice independent counsel, *cf. Morrison,* 487 U.S. at 672, 108 S.Ct. 2597 ("[T]he office of the independent counsel is 'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task ...."), its enforcement powers are constrained within the subject-matter of its organic statute. ITT objects specifically to CFPA's grant of litigating authority, arguing that the Bureau has "broad jurisdiction and significant power

over numerous industries," and that "without meaningful Presidential control over the Director, the Director could initiate suits advancing his—and not the President's—views on the proper construction of federal laws." Def.'s Br. 9. But courts have long and consistently upheld the endowment of regulatory agencies with law enforcement powers against constitutional challenge. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (implicitly affirming the proposition that "officers of the United States" other than the President and Attorney General, such as FTC commissioners, may engage in the enforcement of federal law). This is true of the Securities and Exchange Commission, whose commissioners are subject to removal only for cause and which enjoys broad enforcement powers over publicly traded companies. *See SEC v. Blinder, Robinson, & Co., Inc.,* 855 F.2d 677, 682 (10th Cir.1988) (upholding the SEC's constitutionality and observing that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted to inefficiency, neglect of duty, or malfeasance in office"); *see also SEC v. Sachdeva,* 2011 WL 933967, at \*1 (E.D.Wis. Mar. 16, 2011) (employing the same reasoning). It is true as well of the FTC, which possesses similar power to bring civil suit on the government's behalf and upon whose organic statute a considerable portion of the CFPA's operative language is based. *See FTC v. Am. Nat'l Cellular, Inc.,* 810 F.2d 1511, 1514 (9th Cir.1987).

**\*11** We therefore reject ITT's argument that the Supreme Court's established removal power jurisprudence forecloses the for-cause removal protections of the Bureau's Director.

### 3. ITT's Alternate Grounds of Unconstitutionality

In its reply brief, ITT shifts gears. Rather than contending that the Bureau runs afoul of any particular precedent, it asserts that no federal entity has heretofore "combine[d] the Bureau's panoply of problematic features"—including the length of the Director's tenure, 12 U.S.C. § 5491(c)(3); for-cause removal of the Director, *id.* at § 5491(c)(3); the fact that the Bureau's authority is concentrated in a single director rather than a multi-member commission [10], *id.* at § 5491(b)(1); its "unconstitutionally appointed" Deputy Director, *id.* at § 5491(b)(5); its "immunity from the congressional appropriations process," *id.* at § 5497(a)

(2)(C); and its "unprecedented restrictions on judicial review," *id.* at §§ 5512(b)(4)(B), 5513(a), 5513(c)(3)(B)(ii), & 5513(c)(8); among other ostensibly problematic features. Def.'s Reply 3.

There are at least two problems with ITT's "mosaic" theory of the Bureau's unconstitutionality. First, ITT never offers a convincing basis for the conclusion that many of these features of the CFPA contribute, even in a piecemeal sense, to the Bureau's unconstitutionality. Second, its generalized assault on the "unprecedented" nature of the Bureau proceeds from the mistaken premise that that which is not specifically approved by precedent is forbidden.

ITT notes, for instance, that the CFPA empowers the Director to delegate any or all of his powers to any "duly authorized employee, representative, or agent." 12 U.S.C. § 5492(b). Citing the Supreme Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), it then asserts that this power to delegate "further undermines the President's control over Executive officials." Def.'s Br. 9 (citing *Buckley,* 424 U.S. at 36, 96 S.Ct. 612). The cited portion of *Buckley* merely reviews the body of Supreme Court precedent on the appointment and removal powers of the President, and reaffirms the unremarkable proposition that "members of independent agencies are not independent of the Executive with respect to their appointments." 424 U.S. at 136, 96 S.Ct. 612. We have difficulty extracting from this language any notion that the Constitution is offended by allowing a presidential appointee to delegate some of her own authority to her subordinates; such delegation is a commonplace and unavoidable feature of any large institution. *See, e.g.,* 21 U.S.C. § 871(a) (permitting the Attorney General to "delegate any of his functions [under the Controlled Substances Act] to any officer or employee of the Department of Justice"). *See also Touby v. United States,* 500 U.S. 160, 169, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (implicitly affirming the constitutionality of the delegation authority granted in 21 U.S.C. § 871(a)).

ITT also takes issue with the Director's authority to appoint the Deputy Director. *See* Def.'s Br. 9 n. 6 (citing 12 U.S.C. § 5491(b)(5)). The Constitution provides that Congress may vest the heads of Executive Departments with authority to appoint inferior officers. U.S. Const. Art. II, § 2, cl. 2; *Free Enter. Fund,* 561 U.S. at 510–511, 130 S.Ct. 3138. ITT insists that the Bureau, as an entity "established in the Federal Reserve system"—itself an independent regulatory agency, *see* 12 U.S.C. § 5491(a); 44 U.S.C. § 3502(5)—is not an Executive Department. The Director, it contends, thus lacks constitutional sanction to appoint his own deputy. We disagree. As the Bureau notes, the CFPB is not in any meaningful sense subordinate to the Federal Reserve Board of Governors, and its Director, as we have seen, is appointed by the President directly. Under the more expansive definition of "department" approved by the Court in *Free Enterprise Fund,* the Bureau likely qualifies as a "separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person." *See* 561 U.S. at 511, 130 S.Ct. 3138 (concluding that the SEC is a " 'Department' for the purposes of the Appointments Clause"). [11] We need not decide the question, however, because ITT has not attempted to demonstrate that the Deputy Director has any relationship to this matter, or that the unconstitutionality of his or her appointment process affects the Bureau's standing to bring suit. *See generally Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 328–329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (discussing the severability of unconstitutional portions of statutes and affirming that, "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem").

**\*12** [7] Turning to the Bureau's funding, ITT complains that the "Director may unilaterally claim up to 12% of the Federal Reserve's budget ... without Congress's approval." Def.'s Br. 9 (citing 12 U.S.C. § 5497(a)). According to ITT, this "immunity from the Congressional appropriations process" further contributes to the Bureau's unconstitutionality. Def.'s Reply 3. ITT overstates the degree of the Bureau's insulation from congressional control; more to the point, it neglects to explain how the Bureau's source of funding implicates constitutional concerns. The CFPA does indeed restrict the House and Senate Appropriations Committees from reviewing the Bureau's primary funding source, *see* 12 U.S.C. § 5497(a)(2)(C), but it does not strip Congress *as a whole* of its power to modify appropriations as it sees fit. [12] As the Bureau has pointed out, the Constitution does not prohibit Congress from enacting funding structures for agencies that differ from the procedures prescribed by the ordinary appropriations process. *See AINS, Inc. v. United States,* 56 Fed.Cl. 522, 539 (Fed.Cl.2003) (criticizing the "erroneous view that

Congress cannot create special funds and self-financing programs distinct and isolated from the general Treasury funds"). Nor does the Constitution prohibit Congress from creating funding mechanisms that enjoy some degree of insulation from its own year-to-year control. "Congress itself may choose, however, to loosen its own reins on public expenditure. So, for example, although Congress ordinarily requires that appropriations be spent within a single year, it may also authorize appropriations that continue for a longer period of time." *Am. Fed'n of Gov't Emps., AFL–CIO, Local 1647 v. Fed. Labor Relations Auth.,* 388 F.3d 405, 409 (3d Cir.2004). *See also See Nat'l Ass'n of Reg'l Councils v. Costle,* 564 F.2d 583, 587 & n. 10 (D.C.Cir.1977). ITT's conclusory assertion that the CFPA's funding structure violates the Origination Clause, U.S. Const. Art. I, § 7, cl. 1, is therefore without merit.

[8] Lastly, ITT argues, in a footnote, that the "CFPA ... limits judicial oversight in ways that are relevant to separation of powers analysis." Def.'s Br. 10 n. 7. ITT cites three statutory provisions in support of this point. Two of them, 12 U.S.C. § 5513(a) and 12 U.S.C. § 5513(c)(3)(B)(ii), have nothing to do with judicial review. [13] The third cited provision does concern judicial review, stating that "the deference that a court affords the Bureau with respect to a determination by the Bureau regarding the meaning of interpretation of any provision of a Federal consumer law shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law." 12 U.S.C. § 5512(b)(4)(B). This merely prescribes that the Bureau's constructions of organic law in its subject area are to be given deference, in accordance with the well-established principles first enunciated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 740, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."). ITT has not succeeded in identifying anything remotely problematic about the CFPA's provision for judicial review of the Bureau's decisions.

*13 Regardless of the groundlessness of its individualized objections to the Bureau's statutory features, ITT's argument in reply proceeds from a flawed premise. The CFPA is undoubtedly new—and its combination of features thus, in some sense, "unprecedented." Its constitutionality has not yet been subject to authoritative review by the Supreme Court or by any of the Courts of Appeals, and while a number of United States District Courts around the nation have begun to apply the Act, only one so far has addressed a challenge to its constitutionality based on the separation of powers. [14] In that case, *Consumer Financial Protection Bureau v. Morgan Drexen, Inc.,* ——F.Supp.3d ——, 2014 WL 5785615 (C.D.Cal. Jan. 10, 2014), the Central District of California considered, and rejected, a defendant's claims that the CFPA unlawfully abridged the President's removal power and that the statute endowed the Director with unconstitutional power to delegate his or her authority. ——F.Supp.3d at —— – ——, 2014 WL 5785615, at *3–4.

[9] Apart from two law review articles [15] and an opinion piece in the *Wall Street Journal* [16], ITT cites no authority for its theory that the Bureau's amalgamated features render it unconstitutional. Rather, it appears to argue that, because precedent does not explicitly sanction the Bureau's structure and range of powers—which ITT asserts constitute "a gross departure from longstanding practice"—the CFPA exceeds constitutional bounds. Def.'s Reply 2. This inverts the premise from which we must start in exercising judicial review over Congress: the presumption of constitutionality. *Morrison,* 529 U.S. at 607, 120 S.Ct. 1740; *Brown v. Maryland,* 25 U.S. 419, 436, 12 Wheat. 419, 6 L.Ed. 678 (1827). This principle of prudential judicial deference is a venerable one: Chief Justice Marshall, the Court's first and greatest exponent of judicial review, cautioned that a court should declare legislation unconstitutional only when "[t]he opposition between the constitution and the law [is] such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck,* 10 U.S. 87, 128, 6 Cranch 87, 3 L.Ed. 162 (1810). Where Congress has acted, a challenge to the constitutionality of its enactments must show not merely that the legislature has taken a path not before explicitly sanctioned by the judicial branch, but that it has affirmatively violated constitutional principles.

[10] ITT thus bears a considerable burden in arguing that, though none of the CFPA's features is itself expressly unconstitutional, the statute as a whole nonetheless runs afoul of the separation of powers. Such a

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

showing is certainly not impossible. *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 721 F.3d 666, 673 (D.C.Cir.2013) ("Just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute."). Moreover, while novelty does not create a presumption of unconstitutionality, a court may well find, in certain circumstances, that the lack of historical precedent for an entity raises a red flag. *Nat'l Fed'n of Indep. Bus. v. Sebelius,* ____ U.S. ____, 132 S.Ct. 2566, 2586, 183 L.Ed.2d 450 (2012) (in addressing the constitutionality of the "Obamacare" individual mandate, noting that while "there is a first time for everything," "sometimes the most telling indication of a severe constitutional problem, is the lack of historical precedent") (additional citations omitted). The Bureau, however, is no venture into uncharted waters; it is a variation on a theme —the independent regulatory agency with enforcement power—that has been a recurring feature of the modern administrative state. *See Humphrey's Executor,* 295 U.S. at 629, 55 S.Ct. 869; *SEC v. Blinder, Robinson, & Co.,* 855 F.2d 677, 682 (10th Cir.1988).

**\*14** With respect to the removal power doctrine that serves as the core of ITT's claim, the question we must answer, at its simplest level, is a functional one: "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison,* 487 U.S. at 691, 108 S.Ct. 2597. As we have already noted, we believe that the structure and powers of the Bureau are sufficiently analogous to those of the FTC, SEC, and other regulatory agencies that the question of the constitutionality of the CFPA's removal provision is settled by *Humphrey's Executor* and its progeny. *See Humphrey's Executor,* 295 U.S. at 629, 55 S.Ct. 869. *See also Morgan Drexen,* ____ F.Supp.3d at ____, 2014 WL 5785615, at \*4 ("It is no more difficult for the President to assure that the Director of the CFPB is 'competently performing his or her statutory responsibilities' than it was for the President to oversee the leadership of the FTC at the time of *Humphrey's Executor.*"). Additionally, ITT has not shown that any of the CFPA's other provisions, whether considered individually or in the aggregate, unconstitutionally infringe on the President's authority to "take care that the laws be faithfully executed"— or otherwise undermine the constitutional separation of powers. We therefore reject ITT's challenge to the

constitutionality of the Consumer Financial Protection Act on this basis.

**B. Statutory Vagueness in Violation of Due Process**
ITT also asserts that the Bureau's claims against it under the CFPA fail because the statute's prohibitions on "unfair" and "abusive" conduct "fail to give educational institutions fair notice of what is required of them." Def.'s Br. 4 (citing *FCC v. Fox Television Stations, Inc.,* ____ U.S. ____, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012)). This vagueness, it insists, violates the Due Process clause of the Fifth Amendment and renders these portions of the CFPA unenforceable against ITT. [17]

[11] [12] [13] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television,* 132 S.Ct. at 2315; *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids.") (citations omitted). A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir.2001). This doctrine is not implicated merely because "it may at times be difficult to prove an incriminating fact." *Fox Television,* 132 S.Ct. at 2315. Nor can a court declare a law unconstitutionally vague based on "the mere fact that close cases can be envisioned" under its provisions. *Williams,* 553 U.S. at 305–306, 128 S.Ct. 1830. Rather, we refuse to apply a statutory standard only where it is so amorphous that reasonable observers have no choice but to "guess at its meaning [,] and differ as to its application." *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). *See also Fox Television,* 132 S.Ct. at 2315.

**\*15** The CFPA provides: "It shall be unlawful for ... any covered person or service provider ... to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). Count One of the Complaint

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 18

alleges that ITT violated the Act by engaging in "unfair" conduct, while Counts Two and Three allege "abusive" conduct. ITT argues that the unconstitutional vagueness of Section 5536, as applied here, mandates the dismissal of all three counts. Before addressing, in turn, the purported vagueness of the terms "unfair" and "abusive," we pause to resolve the parties' dispute regarding the level of judicial scrutiny warranted by the economic regulation in question.

**1. Level of Scrutiny**

[14] [15] [16] Not all laws are created equal with respect to vagueness doctrine. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). One important distinguishing factor is whether a statute imposes criminal, or merely civil, penalties; less clarity is demanded of laws or regulations that are enforced through civil action rather than prosecution. *Id.* at 498–499, 102 S.Ct. 1186 ("The Court has ... expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *Gresham v. Peterson,* 225 F.3d 899, 908 (7th Cir.2000) (observing that "laws imposing civil rather than criminal penalties do not demand the same high level of clarity"). [18]

[17] [18] Regardless of whether a statute is civil or criminal in nature, courts also demand considerably greater clarity from laws impacting "the exercise of constitutionally protected rights"—particularly the expression rights guaranteed in the First Amendment. *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186. If the enforcement of a law threatens to chill protected speech or the exercise of another fundamental right, we apply more stringent scrutiny to its clarity and the fairness of its notice. *See Fox Television,* 132 S.Ct. at 2318 (discussing the heightened stringency of the vagueness inquiry for regulations that "touch upon sensitive areas of basic First Amendment freedoms" (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). *See also Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870–871, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because

of its obvious chilling effect"). We review economic regulations, however, with less severe scrutiny. This is because their "subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186.

**\*16** [19] Here, ITT asserts that, despite the concededly economic nature of the CFPA's prohibitions, a stricter vagueness standard should nonetheless apply, for two reasons. First, it contends that economic regulations receive lax scrutiny only if their subject area is "narrow"; since the FCPA, by contrast, is "broad," a reviewing court should demand more clarity. This misconstrues the case law. ITT cites *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), in which the Court stated that "[i]n the field of regulatory statutes governing business activities, where the acts are in a narrow category, greater leeway is allowed." 405 U.S. at 162, 92 S.Ct. 839. In both *Papachristou* and the landmark *Hoffman Estates* decision that followed it, the Supreme Court reasoned that economic regulations deserve looser scrutiny not *if* their subject matter is narrow, but *because* the subject matter of such regulations is inherently more likely to be narrow. *Id., Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186. *See also Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 1 F.3d 1, 4 (D.C.Cir.1993) (noting that "modern vagueness cases have *invariably* afforded less protection" to regulations of economic activity) (emphasis added). Like other federal regulatory statutes, the FCPA is indeed "narrower" than a criminal statute, in that it applies only to certain covered entities and to a particular class of economic activity. *See* 12 U.S.C. § 5536(a)(1).

Second, ITT insists that the CFPA warrants greater scrutiny because it does, in fact, impinge on its constitutionally protected rights. ITT urges that it has a "constitutionally protected property interest[ ]" in participating in federal student loan programs, and the regulation of its communications to its students chills its First Amendment speech rights. [19] Def.'s Reply 4–5. ITT proves too much by this contention: such a broad conception of a statute's impact on constitutional rights would render the distinction between economic and non-

economic regulations nugatory. Almost by definition, an economic regulation impacts the "property" interests of the regulated party; short of contending that the CFPA constitutes a "taking" without due process of its property interest in participating in the federal student loan programs under the Fifth Amendment—a claim ITT never makes—ITT cannot invoke the aura of fundamental constitutional rights simply because the law impacts the disposition of its property. *See, e.g., Betancourt v. Bloomberg,* 448 F.3d 547 (2d Cir.2006) (city ordinance forbidding property from being left in public areas, as applied to a homeless man's cardboard shelter, did not encroach on any constitutionally protected rights).

ITT's invocation of its free speech rights is similarly overstated. In support of the notion that "the Bureau ... is attempting to impose liability for truthful communications between ITT and students, chilling ITT's First Amendment rights," ITT cites *Sorrell v. IMS Health, Inc.,* —— U.S. ——, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011). Unlike the law at issue in *Sorrell,* however, the CFPA does not target commercial *speech;* still less does it constitute content discrimination. *Cf.* 131 S.Ct. at 2665 ("But [the statute] imposes more than an incidental burden on protected expression. Both on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker."). Commercial activity inevitably involves "communications" between buyers and sellers; it does not follow, however, that economic regulations targeting economic behavior violate the First Amendment simply because they might impact speech in this broadest sense. *Id.* at 2664 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). A great deal of the body of national antitrust and consumer protection law—of which the CFPA is the latest exemplar—depends for its well-established legality on the recognition that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *See Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949).

**\*17** We therefore conclude that, as a statute imposing only civil liability and governing economic activity rather than protected constitutional interest like free expression, the CFPA's language is not subject to heightened scrutiny

for vagueness. *See Illinois v. Alta Colleges, Inc.,* 2014 WL 4377579, at \*3–4 (N.D.Ill. Sept. 4, 2014) (finding that "the CFPA is an economic regulation ... subject to a lenient vagueness test"). We proceed to consider the two statutory terms at issue with that understanding in mind.

**2. "Unfair" Act or Practice**

**[20]** ITT argues that the CFPA's prohibition on "any unfair ... act or practice," 12 U.S.C. § 5536(a)(1)(B), is utterly "standardless" and thus unacceptably vague. Because the prohibition on "unfair" practices taps into a well-developed and long-established definition of the term, we disagree.

**[21]** **[22]** It is a fundamental canon of construction that when Congress employs a term with a specialized meaning relevant to the matter at hand, that meaning governs. *See Moskal v. United States,* 498 U.S. 103, 121, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (Scalia, J., dissenting). If Congress has "borrowed" a term of art from its own existing body of legislation, we therefore presume that it did so advisedly. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In the words of Justice Frankfurter, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L.Rev. 527, 537 (1947).

Here, the statute's prohibition on "any unfair [or] deceptive act or practice" closely mirrors the language employed by Section 5 of the Federal Trade Commission Act, which proscribes "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Bureau's own Supervision and Examination Manual confirms what the near-identical language of the two statutes suggests: that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well. *See* CFPB Supervision and Examination Manual at 174 n. 2 (2d ed.2012). [20]

**[23]** The FTCA is now more than a century old, and the meaning of its terminology—such as "unfair or deceptive acts or practices" (or "UDAPs")—has been given concrete shape by successive generations of interpretation and refinement. Indeed, the definition has grown more precise over time. "A practice is 'unfair,' " as the Seventh Circuit observed in 1976 according to the FTC's older,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

broader standard, when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir.1976). From the earliest days of the statute, courts have turned aside challenges to the language on the basis of vagueness. "The phrase is no more indefinite than 'due process of law.' ... If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' ... 'unfair use,' ... and the like." *Sears, Roebuck & Co. v. Fed. Trade Comm'n,* 258 F. 307, 311 (7th Cir.1919). [21] A 1980 FTC policy statement, followed by a 1994 congressional amendment to the statutory language itself, provided more robust—and quantitative—guidance on the meaning of the term. Conduct may only qualify as an unfair act or practice (UDAP) if it: (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n), added by P.L. 103–312, § 9 (Aug. 26, 1994).

**\*18** ITT's contention that the term "unfair ... act or practice" is unconstitutionally vague falters in the face of a century's worth of legislative and judicial guidance establishing and refining the term's meaning. We recognize, of course, that the language *itself* may be "inherently insusceptible of precise definition." *See Scott v. Ass'n for Childbirth at Home, Int'l,* 88 Ill.2d 279, 58 Ill.Dec. 761, 430 N.E.2d 1012, 1018 (1981). [22] But Congress's charter for an agency could not, and should not, use descriptions so precise that they foreclose any interpretive uncertainty. "[F]ew words possess the precision of mathematical symbols; most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The CFPA, like the FTCA before it, has empowered the agency itself to fill in the broad outlines of its authority with specific regulations and interpretations. The agency and the courts have done so in fleshing out the term "unfair ... act or practice," and Congress has tapped into that existing body of law in framing the CFPA with identical terminology. We thus have no difficulty in rejecting ITT's suggestion

that a reasonable business entity would be forced to guess at the term's meaning, or would be subject to agency's standardless discretion in its enforcement. *Cf. Papachristou,* 405 U.S. at 161, 92 S.Ct. 839. [23]

### 3. "Abusive" Act or Practice

**[24]** ITT likewise argues that the CFPA's prohibition on "abusive" acts or practices, upon which Counts Two and Three of the Complaint are predicated, is unconstitutionally vague.

The one respect in which the CFPA's definition of covered misconduct differs from that of the FTCA is the addition of the term "abusive." *Compare* 12 U.S.C. § 5536(a)(1)(B) *with* 15 U.S.C. § 45(a). The legislative history of the CFPA suggests that the term was added, in part, to enable the Bureau to reach forms of misconduct not embraced by the more rigid, cost-benefit standard that had grown up around the terms "unfair" and "deceptive." Sheila Bair, then the chairwoman of the FDIC, advocated adding the term to consumer finance legislation in a 2007 hearing, stating: " 'Abusive' is a more flexible standard [than "unfair" or "deceptive"] to address some of the practices that make us all uncomfortable." *Improving Fed. Consumer Protection in Fin. Servs., Hearing Before the H. Comm. on Fin. Servs.,* 110th Cong. 37–41 (2007). The new "abusive" standard is one of the chief salient features of the CFPA, and has been widely recognized as such. *See* Tiffany S. Lee, *No More Abuse: The Dodd–Frank and Consumer Fin. Protection Act's "Abusive" Standard,* 14 J. Consumer & Com. L. 118, 119–121 (2011) (collecting academic and industry commentary).

Contextual evidence thus suggests that "abusive" conduct is defined according to a more flexible, expansive standard than had heretofore been present in federal consumer protection law. *See Improving Fed. Consumer Protection, supra,* at 40. We need not read the tea leaves of legislative history, however, to apprehend a standard according to which abusive conduct may be measured. In fact, the statute itself provides significant guidance:

**\*19** The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

(1) Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) Takes unreasonable advantage of-

  (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

  (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

  (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d). [24]

ITT observes, correctly, that "abusive" is a novel term in the context of the statute. To emphasize what they characterize as the fatal indefiniteness of the language, they quote the 2012 hearing testimony of inaugural Bureau Director Richard Cordray:

> [The Bureau] ha[s] been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue.... Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs.

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Fin. Servs. & Bailouts of Pub. & Private Programs,* 112th Cong. 112–107, at 69 (2012). While the term's meaning may be less well-established in the field of consumer protection that that of "unfair," however, the CFPA hardly marks the first time Congress has employed it. The Fair Debt Collections Practices Act (FDCPA), first enacted in 1977, specifically declared as its aim to redress "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The statute prohibits "any conduct the natural consequence of which is to harass, oppress, or *abuse* any person," and it proceeds

to enumerate a non-exhaustive list of six types of offending conduct. 15 U.S.C. § 1692d. The FTC has brought over 60 enforcement actions pursuant to this provision since it became effective in 1978, enabling the growth of an appreciable corpus of judicial commentary explicating the meaning of abusive treatment of consumers. *See* Amanda L. Wait, *The New Bureau of Consumer Fin. Protection—An Overview,* at 1 (Am. Bar Ass'n 2010). In a similar vein, the Federal Telemarketing Sales Rule ("FTSR"), promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102, forbids "abusive telemarketing acts or practices." 16 C.F.R. § 310.4. Like the FDCPA, the Rule provides an illustrative list of conduct qualifying as "abusive." *Id.*

ITT also cites judicial decisions in which judges expressed frustration with the amorphous nature of the term "abusive." In *Ustrak v. Fairman,* 781 F.2d 573 (7th Cir.1986), the Seventh Circuit decried a prison regulation forbidding "disrespectful" and "abusive" prisoner conduct for its vagueness. The court declined to find the regulation unconstitutional, however, reasoning that First Amendment vagueness doctrine is less strictly applied in the context of prisons. 781 F.2d at 580. In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), Justice Scalia—concurring separately—discussed Title VII's prohibition on "hostile or abusive work environments." He mused that " '[a]busive' (or 'hostile,' which in this context I take to mean the same thing) does not seem to be a very clear standard." 510 U.S. at 24, 114 S.Ct. 367 (Scalia, J., concurring). Despite his misgivings about the statute's language, however, he acquiesced in the test the Court had adopted to give shape to the "inherently vague statutory language." *Id.* at 25, 114 S.Ct. 367.

**\*20** **[25]**   As ITT itself acknowledges, however, the issue before us is not whether the word "abusive" can be vague in *any* context, but whether the statutory language incorporating that term gives ITT fair notice of conduct forbidden and permitted in *this* context. Def.'s Reply 5 (citing *Holder,* 561 U.S. at 18, 130 S.Ct. 2705). Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive—and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations—we conclude that the language in question provides at least the minimal level of clarity that the due process clause demands of non-criminal economic

regulation. See *Alta Colleges, Inc.,* 2014 WL 4377579, at *3–4. Cf. *Gates & Fox Co., Inc. v. Occupational Safety & Health Review Comm'n,* 790 F.2d 154, 156 (D.C.Cir.1986) (invalidating OSHA's interpretation of a regulation as applied to a defendant, but expressing no opinion on "whether, in a non-penal context, the Commission's interpretation ... might be permissible"). [25]

## II. Whether ITT is a "Covered Entity"

ITT argues that Counts One, Two, and Three of the Complaint fail to state a claim because ITT is not a covered entity subject to suit under the CFPA. Def.'s Br. 13–19. We conclude that, taking the Bureau's factual allegations as true, the pleadings place ITT within the statute's purview.

The operative provisions under which the Bureau has sued ITT apply only to a "covered person" or "service provider." 12 U.S.C. § 5536(a)(1). The Act defines a "covered person," in turn, as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "product or service," as the phrase implies, is more than simply the direct extension of a loan to a consumer: it may include "brokering" or servicing loans, 12 U.S.C. § 5481(15)(A)(i), as well as "providing financial advisory services ... to consumers on individual financial matters." *Id.* at § 5481(15)(A)(viii). The CFPA defines a "service provider," on the other hand, as one who "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." *Id.* at § 5481(26)(A). Such material service may include participating in "designing, operating, or maintaining the consumer financial product or service," or processing "transactions relating to the consumer financial product or service." *Id.*

ITT may thus qualify as a "covered person" in three ways germane to the conduct alleged: (1) as a direct provider of consumer financial products—loans—to its students; (2) as a "broker" of those loans or other credit instruments; or (3) by providing "financial advisory services" to students. Alternatively, it may qualify as a "service provider" if it provided a material service to another covered entity— here, the originator of the third-party loans—as defined under the statute.

## A. Whether ITT is a "Covered Person"

### 1. "Engages In"

**\*21** As an antecedent matter, ITT insists that it is not a "covered person" because it has not "engaged in" any of the statutory activities. According to ITT, an entity "engages" in the provision of consumer financial products or services only if it does so as a business or profession. Since it is primarily an educational institution and only tangentially, if at all, involved in consumer financial products and services, ITT maintains that its business falls outside the CFPA's scope. Def.'s Reply 8–9.

ITT notes, correctly, that we should "look to the language and design of the statute as a whole" in construing the meaning of a particular statutory provision. Def.'s Reply 8 (citing *United States v. Graham,* 305 F.3d 1094, 1102 (10th Cir.2002)). It then points to 12 U.S.C. § 5393(b)(1)(B), a provision which extends the coverage of a different portion of the consumer protection law to executives and senior officers of companies who "engaged or participated in any unsafe or unsound practice." 12 U.S.C. § 5393(b)(1)(B). The use of the disjunctive "or," ITT contends, signals that to "engage" must denote a greater degree of involvement than mere "participation." Def.'s Reply 9. ITT also appeals to Webster's Dictionary, one of whose definitions of "engage" is "to begin and carry on an enterprise, especially a business or profession." *Id.* at 8 (citing Webster's Third New Int'l Dictionary 751 (1976)).

**[26]** **[27]** We are not persuaded that the CFPA uses "engage" here in anything other than its ordinary sense. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). "In ascertaining the plain meaning of [a] statute," in turn, "[we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). The plainest meaning of the term "engage" is "to occupy or involve oneself; take part; be active." *See United States v. Graham,* 305 F.3d 1094, 1102 (10th Cir.2002) (citing Webster's New World College Dictionary at 450 (3rd ed.1997)). Congress's use of the term elsewhere in the Dodd–Frank Act comports with this broad, common-sense reading. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  23

is used, and the broader context of the statute as a whole."). For instance, the Act defines the term "person regulated by a State insurance regulator" as "any person that is *engaged in the business of* insurance." 12 U.S.C. § 5481(22) (emphasis added). If "engaging" in an activity were synonymous with "being in the business of" that activity, this definition would be redundant. *Cf. In re Total Realty Management, LLC,* 706 F.3d 245, 251 (4th Cir.2013) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplussage.") (quoting *PSINet, Inc. v. Chapman,* 362 F.3d 227, 232 (4th Cir.2004)). [26]

### 2. "Financial Advisory Services"

**\*22** ITT may thus qualify as a "covered person" under the CFPA so long as it involved itself in any of the statutorily-governed conduct, regardless of whether doing so was its primary business focus. Here, the Bureau has not pleaded that ITT itself offered to students the "third-party loans" that are the subject of its claims—at least in the sense that ITT, rather than the third-party creditors, was the titular lender. *See* Compl. ¶¶ 11, 18, 98, 110, 130. *See also* Compl. ¶ 17 (alleging that ITT engaged in "offering or providing loans, *through certain private loan programs,* to its students") (emphasis added). [27] Nor has the Bureau satisfactorily pleaded that ITT served as a "broker," as the statute defines that term. The Dodd–Frank Act expressly incorporates the definition of "broker" contained in the Securities Exchange Act of 1934. 12 U.S.C. § 5301(15). A broker is therefore "any person engaged in the business of effecting transactions ... for the account of others." [28] 15 U.S.C. § 78c(a)(4)(A). While the Bureau protests that we should apply this definition only "except as the context otherwise requires," 12 U.S.C. § 5301, it has pointed to no indication that the context of Title X actually does dictate a different usage. In fact, the CFPA's own definitions section makes reference to "broker[s] or dealer[s] that [are] required to be registered under the Securities Exchange Act"—a context clue that, if anything, further suggests that the specialized, imported meaning applies. 12 U.S.C. § 5481(21)(A). Because the Bureau has not alleged that ITT was engaged in the "business" of effecting loan transactions on behalf of its students, its conduct as an educational institution does not qualify it as a broker under 12 U.S.C. § 5481(15)(A)(i).

[28] The Bureau has, however, sufficiently stated a claim that ITT engaged in conduct qualifying as the provision of "financial advisory services." The Act specifies that such advisory services include, without limitation, "providing credit counseling to any consumer" and "providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure." 12 U.S.C. § 5481(15)(A)(viii). The Complaint includes allegations that ITT advised students on how to manage their debt to the school after having taken out Temporary Credit; this advice often channeled the students into the private loan programs. Compl. at ¶¶ 110, 138–151. According to the Bureau, ITT completed nearly every step in the process of acquiring CUSO loans on the students' behalf, including filling out the requisite forms (save signatures) and forwarding them to the lending credit union. *Id.* at ¶¶ 91–92, 122, 139. At a minimum, we conclude that such conduct, if proven, would fall within the realm of "credit counseling" and "assist[ing] a consumer with debt management."

ITT retorts that, despite the fact that the statute itself defines "financial advisory services" only by a non-exclusive list of qualifying conduct, we should apply a more specialized, restrictive definition: those services "so closely related to banking ... as to be a proper incident thereto." Def.'s Br. 16 (citing 12 C.F.R. § 225.28(a)). It bases this definition on the CFPA's legislative history—specifically, the report of the Committee on Banking, Housing, and Urban Affairs to the full Senate recommending the measure's passage. S.Rep. No. 111–176, at 160 (2010). That report, officially authored by Senator Dodd, notes that the term "financial product or service," as used in the CFPA, was "modeled on the activities that are permissible for a bank or a bank holding company, such as under section 4(k) of the Bank Holding Company Act [BHCA] and implementing regulations." *Id.* The BHCA, which as its title suggests regulates bank holding companies, provides in relevant part that, in addition to banking itself, the regulated entities are permitted to engage in activities that are "financial in nature or incidental to such financial activity" or are "complementary to a financial activity." 12 U.S.C. § 1843(k). Both that statute and its implementing "Regulation Y" go on to provide lists of such permissible activities. *Id.* at § 1843(k)(4); 12 C.F.R. § 225.28(b).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**\*23** We approach the use of legislative history as an aid to statutory interpretation with serious reservations. The myriad legislative materials accompanying any statute, none of which have been subject to bicameralism and presentment, lend themselves easily to manipulation. In the Supreme Court's words, "judicial investigation of legislative history has a tendency to become ... an exercise in 'looking over a crowd and picking out your friends.' " *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (citations omitted). Committee reports merit particular skepticism, for they "may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Id. See also Milner v. Dep't of the Navy,* 562 U.S. 562, 131 S.Ct. 1259, 1267, 179 L.Ed.2d 268 (2011).

**[29]**  Those reservations notwithstanding, ITT's reasoning is unconvincing. While the reference to activities "so closely related to banking ... as to be a proper incident thereto" may seem on its face as if it would exclude any activities conducted by an educational entity, the definition proffered by the BHCA and its regulations is permissive in nature—and is accompanied by a broad list of non-banking activities that qualify. The BHCA provides that "[p]roviding financial, investment, or economic advisory services" qualifies as an activity that is "financial in nature." 12 U.S.C. § 1843(k)(4)(C). Its implementing regulation affirms that "[f]inancial and investment advisory activities" are permissible for the bank holding companies subject to the statute. 12 C.F.R. § 225.28(b)(6). Even if Congress did intend the statute to track the BHCA's definition, in other words, the BHCA does not state that "activities so closely related to banking ... as to be incident thereto" excludes advisory services. And as to what the term "advisory services" *itself* means, the BHCA is no more enlightening than the CFPA. Where legislative history has interpretive value, that value lies in clarifying statutory ambiguity. *See Milner,* 131 S.Ct. at 1267 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."). The Senate Report serves no such purpose here. While the statute itself may not define "financial advisory services" in pellucid terms, the legislative history cited by ITT offers no significant support for ITT's preferred restrictive definition.

ITT offers another, related argument against interpreting the CFPA's "financial advisory services" to include its interactions with its students. "Congress," it reminds us, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Including an educational institution like ITT within the ambit of entities liable under the statute for providing financial advisory services is such a significant step, ITT insists, that Congress could hardly have taken it without more explicitly saying so. In *American Bar Association v. F.T.C.,* 430 F.3d 457 (D.C.Cir.2005), which ITT cites in support of its argument, the D.C. Circuit rejected the FTC's attempt to regulate a law firm as a "financial institution." There, the FTC had supported its expansive reading by pointing to the statute's broad definition of a financial institution as "any institution the business of which is engaging in financial activities," and by noting the same lengthy list of permissible non-banking activities for "financial institutions" that we have already discussed above. 430 F.3d at 467. The court ruled that the statutory framework governing financial institutions, including Congress's definition of the term, contained insufficient ambiguity to warrant deference to the agency's attempt to cram a "rather large elephant in a rather obscure mousehole." *Id.* at 469.

**\*24**  While we do not question the wisdom of the D.C. Circuit's decision in *American Bar Association,* we find it distinguishable. The Consumer Financial Protection Act is aptly named: Congress stated that its purpose is to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511. As we have already discussed, the statute does *not* restrict its regulatory reach to "financial institutions." *See* 12 U.S.C. §§ 5536, 5481. In the absence of any indication that holding educational institutions—or law firms, for that matter—liable for unfairness to consumers is contrary to the statute's goals, we see no reason to circumscribe what Congress has spoken broadly. *See* Pl.'s Ex. 3 (*Consumer Fin. Prot. Bureau v. Gordon* (C.D.Cal. June 26, 2013)).[29] While it may be an unacceptably dramatic conceptual leap to label a law firm as a "financial institution," it is hardly a leap at all to say that a school offers "financial advisory services" to its students —particularly on the facts alleged here.

### B. "Service Provider"

**[30]** ITT also qualifies as a "service provider" under the CFPA. As we have previously noted, the statute extends its reach to any entity that "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." A "material service" may include participating in the "designing, operating, or maintaining" of the consumer financial product or service in question. *See* 12 U.S.C. § 5481(26) (A)(i).

ITT does not dispute that the third-party originators of the SCUC "private loans" were "covered persons" based on the Bureau's allegations. *See* 12 U.S.C. §§ 5481(5), 5481(6). As for ITT's accessory role, the school cannot be held to account for its role in "designing" the loan programs in 2008 and 2009, since the CFPA did not take effect until July 2011. Def.'s Br. 17 (citing *Molosky v. Wash. Mut., Inc.,* 664 F.3d 109, 113 n.1 (6th Cir.2011) (provisions of the Dodd–Frank Act are not retroactive)). *See also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (discussing principles of statutory retroactivity). The Bureau has also pleaded, however, that ITT was heavily involved in operating and maintaining the loan program. The Complaint alleges that ITT used Temporary Credit as a tool to pre-qualify students for the private loans, that ITT developed the loans' underwriting criteria, that it paid the credit union membership fees in the lead credit union on behalf of the students who took out the loans, and that it provided a stop-loss guarantee to the programs' lenders—covering any losses from defaults exceeding 35% of participating students. Compl. ¶¶ 116–117, 121–122. These allegations are more than "unsupported generalities"—as ITT calls them—and they suffice to meet the Bureau's burden at this stage of the litigation. *Cf. Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

**\*25** The only piece of evidence ITT offers in favor of a reading of "operating" and "maintaining" that excludes the alleged conduct is a quotation from the 2012 CFPB bulletin. According to ITT, "the Bureau ... has stated that 'service providers' are entities to whom covered persons have 'outsource[d]' functions that would otherwise fall within the Bureau's jurisdiction." Def.'s Br. 18 n. 11 (citing CFPB Bulletin 2012–03, at 1). An examination of the Bureau's full statement in the 2012 Bulletin, however, is inconsistent with the impression ITT seeks to convey. The Bulletin states as follows:

> The CFPB recognizes that the use of service providers is often an appropriate business decision for supervised banks and nonbanks. Supervised banks and nonbanks may outsource certain functions to service providers due to resource constraints, use service providers to develop and market additional products or services, or rely on expertise from service providers that would not otherwise be available without significant investment.

CFPB Bulletin 2012–03, at 1. Thus, whether or not we view "outsourced" functions as distinctive from those allegedly performed by ITT, ITT's cited source does not actually assert that an entity is a service provider only if it performs such functions. We see no reason to read "operating" and "maintaining" as bearing anything other than their ordinary meaning; seen in this light, the Bureau has stated a claim that ITT falls into the covered category of "service provider."

### III. Adequacy of the Bureau's Pleadings under the CFPA

We now turn, lastly, to the Bureau's allegations themselves. ITT argues that each of Counts One, Two, and Three fails to state a claim. Because the guiding standard for each count is different, we consider them separately.

### A. Count One: Unfair Acts or Practices

Count One of the Complaint alleges that, "[f]rom July 21, 2011 through December 2011, ITT subjected consumers to undue influence or coerced them into taking out ITT Private Loans through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed, uncoerced choices." Compl. ¶ 160. The Bureau alleges that this conduct constituted an "unfair ... act or practice" under the CFPA. 12 U.S.C. § 5536(a)(1) (B).

In order to state a claim for an unfair act or practice under the Act, a plaintiff must establish that: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or

competition." 12 U.S.C. § 5531(c)(1). The parties dispute the sufficiency of the Complaint with respect to each of these three elements.

### 1. Substantial Injury

[31] Under the standard for unfair practices that the statute has borrowed from the FTCA, a "substantial" injury in the context of consumer protection is often a financial one. See *F.T.C. v. Direct Mktg. Concepts, Inc.,* 569 F.Supp.2d 285, 299 (D.Mass.2008) (citing Letter from Federal Trade Comm'n to Senators Ford and Danforth (Dec. 17, 1980)); *Am. Fin. Servs. Ass'n v. F.T.C.,* 767 F.2d 957, 972 (D.C.Cir.1985). Although the harm involved need not be massive on an annual basis to count as substantial, *cf. Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1365 (11th Cir.1988), a "trivial or speculative" harm will not suffice. See *FTC v. IFC Credit Corp.,* 543 F.Supp.2d 925, 945 (N.D.Ill.2008).

*26 [32] Here, the Bureau has alleged that approximately 8,600 ITT students suffered financial harm when they were directed by ITT into the "private loans" between July and December 2011. Compl. ¶¶ 120, 162. The private loans into which ITT channeled its students carried interest rates as high as 16.25% and origination fees as high as 10%, which "translates to thousands of dollars for each customer over the life of the loan, and millions of dollars across the group." Pl.'s Resp. 20 (citing Compl. ¶ 124). According to the Bureau, the students who took out these loans were predominantly in fragile financial health and, according to ITT's own projections, some 64% of them defaulted, exacerbating their debt and financial distress. Compl. ¶¶ 124, 154. These allegations adequately describe a substantial financial injury to the students.[30]

Rather than engage directly with these accusations, ITT contends that the Court necessarily lacks a metric by which to judge whether the students were harmed by the loans. According to ITT, there is no "discernible standard" by which the Court could determine that a loan was "unaffordable"; ITT points out that while there is a lengthy regulation defining the scope of affordability for *mortgages,* no analogous authoritative guidance exists for these loans. Def.'s Br. 20–21 (citing 12 C.F.R. § 1026.43(c)). Further, ITT cites 12 U.S.C. § 5517(o), which prohibits the Bureau from establishing a "usury limit applicable to an extension of credit"—

with the implication that if the Bureau cannot impose usury caps, then it cannot object to loans on the basis of their unaffordability. *Id.* at 21. ITT's thrusts here are misdirected. The Bureau is not required to plead here that the private loans crossed any sort of discrete "affordability" threshold, nor does the ultimate success of the claim hinge on whether the rates charged in the loans are *per se* unreasonable or usurious. Rather, the Bureau must plead that ITT's conduct harmed the students' welfare, and the facts it has plausibly pled could support such an inference if proven.

More to the point, ITT objects that the Complaint has not stated a claim that the misconduct caused the harm of which the Bureau complains. The essence of ITT's argument is that the Bureau has not shown that ITT *forced* any students to take out the private loans —and that without coercion it is impossible to show that ITT's actions were the proximate cause of any subsequent financial harm. Def.'s Br. 21–23. ITT relies on *Cohen v. American Security Insurance Co.,* 735 F.3d 601 (7th Cir.2013). In that decision, the Seventh Circuit addressed a homeowner's claim against a mortgage lender that, pursuant to its contract with the homeowner, had procured hazard insurance on the homeowner's behalf after the homeowner allowed previous coverage to lapse. 735 F.3d at 603–606. The homeowner brought a claim under Illinois's analogue to the FTCA, alleging that the lender had engaged in unfair practices by "coercing" her into paying for high-cost insurance coverage. The court rejected the plaintiff's theory, reasoning that the coverage requirement was common in such contracts, and "if it was not coercive to demand that [she] maintain insurance coverage on the property (and it certainly was not), it cannot have been coercive for [the lender] to threaten to invoke the contractual remedies available for breach of that duty." *Id.* at 610. In other words, the plaintiff had not demonstrated that either the circumstances of the signing of the contract, or its enforcement by the lender in signing up the plaintiff for expensive coverage, had unduly impeded the plaintiff's freedom of choice.

*27 *Cohen* affirms that "insisting that a contract partner fulfill his contractual duties ... is not coercion," 735 F.3d at 609, but it does not speak meaningfully to the separate question of when the circumstances of a contract's formation may be coercive. Rather, the Seventh Circuit there found that the plaintiff's allegations of unfairness in the contracts' origins lacked plausibility: the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

lender disclosed the insurance requirement "clearly and fully" throughout the process, and the plaintiff's allegation that the lender was providing a "kickback" to its insurance affiliate was conclusory. *Id.* at 609–610. In short, there was "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness." *Id.* at 610 (quoting *Robinson v. Toyota Motor Credit Co.,* 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 962 (2002)).

**[33]** **[34]** While relevant, formal contract principles are thus "not conclusive" in an unfair practices claim, for this "is an action that charges 'unfairness,' and legality and unfairness are not necessarily congruent." *FTC v. IFC Credit Corp.,* 543 F.Supp.2d 925, 948, 953 (N.D.Ill.2008) (citing *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). Here, the Bureau alleges that ITT's tactics were effectively "coercive" for two principal reasons. First, the "repackaging" process was "rushed and controlled" by the ITT financial aid staff, and staff members employed intrusive and overbearing tactics in ensuring that students rolled over their Temporary Credit into private loans, Compl. ¶¶ 85, 87; some students, according to the Bureau, "did not even realize they took out the ITT Private Loans because of the rushed and automated manner in which ITT Financial Aid staff processed ITT students' paperwork." *Id.* at ¶ 142. Second, ITT used the withholding of course materials, transcripts, and transfer credits as leverage to convince impecunious students who had already invested greatly in an ITT education to take out the loans to enable them to keep their heads above water. *Id.* at ¶¶ 160(a)–(c). *See also* ¶¶ 8, 9, 87, 97, 139–140. The Complaint states that "[s]ome students objected to the ITT Private Loans, but they were told that if they refused to use them, they either had to pay any outstanding Temporary Credit and the next year's tuition gap—which most could not do—or leave the school in the middle of their program and forfeit the investment they had made so far." *Id.* at ¶ 140. Courts have found that both types of tactic can satisfy the causation element of an unfair practices claim. *See F.T.C. v. Zamani,* 2011 WL 2222065, at *9 (C.D.Cal. June 6, 2011) (purveyors of mortgage refinance service committed unfair practices by signing up customers by misrepresenting the "success rate" of the modification program, the recoverability of an up-front fee, and the rates and terms available). In particular, we agree with the Bureau that the threat of withholding vital educational assets like transcripts and class credit is not only likely but appears calculated to produce considerable leverage

over ITT students, and that under certain circumstances the deployment of such leverage could fairly be termed "coercive." *Am. Fin. Servs. Ass'n,* 767 F.2d at 973 ("The injury resulting from 'threats' or 'suggestions' of seizure [of household furnishings pursuant to a credit agreement] is not limited to psychological harm. Consumers threatened with the loss of their most basic possessions become desperate and peculiarly vulnerable to any suggested 'ways out.' ").

**\*28** The Bureau has alleged that ITT rushed students through the loan "repackaging" process, left them ill-informed about the nature of the contracts they were signing, and exploited the students' vulnerable financial positions to steer them into loans that provided a temporary solution to the students' problems (and benefited ITT's balance sheets) but deepened their longterm distress. [31] Without abandoning the common law's presumption that parties should be held to the terms of contracts to which they freely agreed, our inquiry into "unfair" practices under the statute requires us to look past form and into substance. *See IFC Credit,* 543 F.Supp.2d at 948 ("[T]his is not an action at common law for simple breach of contract or for fraud. Rather it is an action under a federal statute that makes unlawful conduct causing substantial, unavoidable injury...."). These allegations, if substantiated, would satisfy the Bureau's burden of proof on the question of substantial injury and causation.

### 2. "Reasonably Avoidable"

**[35]** **[36]** Our inquiry into whether consumers' injury was "reasonably avoidable" focuses on "whether the consumers had a free and informed choice," and it thus overlaps significantly with the previous discussion of coercion. *See Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1168 (9th Cir.2012); *Am. Fin. Servs.,* 767 F.2d at 976. "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (quoting *Orkin,* 849 F.2d at 1365–1366 (11th Cir.1988)).

Here, ITT contends that any injury sustained by the students as a result of the private loan debt was reasonably avoidable because the students always remained formally free to fill their "tuition gaps" by any means they chose;

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

indeed, as the Complaint concedes, some students opted not to take out the private loans and managed to satisfy their debts by other means. *See* Compl. ¶¶ 25–26, 143. Moreover, ITT notes that the contracts signed by students did disclose the nature of both the Temporary Credit and the private loans, and it further insists that the school disclosed the effect of outstanding debt on the transferability of credit. Def.'s Br. 24.

In response, the Bureau urges that its pleadings demonstrate that, regardless of whether the injury was formally avoidable, students lacked a free choice as a practical matter. First, the Bureau has alleged that the choice students made was not a meaningfully "informed" one, since ITT staff engaged in so much "hand-holding" that the students' role was often reduced to signing forms already completed for them. [32] Compl. ¶¶ 85–87, 91, 141–142. Since the public policy in favor of holding contracting parties to their agreements depends in part on their having a "full opportunity to read" the contracts in question, these allegations at least raise a question regarding whether the students were adequately informed. *Cf. Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 394 (7th Cir.2003). *See also Paterson v. Wells Fargo Bank, N.A.,* 2012 WL 4483525, at *5 (N.D.Ill. Sept. 27, 2012) (allowing claim under the Illinois analogue to the FTCA to proceed even where written terms of the contract conflicted with alleged misrepresentations). Second, the Complaint states that the "choice" enjoyed by students, even assuming they fully understood its nature, was an illusory one. As the FTC has explained in fleshing out its parallel "unfairness" standard, an injury may not be reasonably avoidable where a defendant "exercise[s] undue influence over highly susceptible classes of purchasers." *See IFC Credit Corp.,* 543 F.Supp.2d at 946 (quoting H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983)). The Bureau's allegations that ITT leveraged the threat of withholding transcripts and denying transferability of credits, or expelling students outright if they failed to make up their "tuition gap," describe a scenario in which students were boxed into a corner. *See* Compl. ¶¶ 87, 160(a)–(b), 163. *See also Wendorf v. Landers,* 755 F.Supp.2d 972, 979 (N.D.Ill.2010) (noting that a plaintiff states a claim under Illinois's analogue to the FTCA where "the defendant's conduct gave plaintiff no reasonable alternative" to suffering the injury in question). [33]

**\*29** We agree with the Bureau. Regardless of any difficulty it may face in proving its allegations that ITT guided its students into a precarious position and exploited that vulnerability to channel them into unwise and damaging debt obligations, its Complaint satisfactorily states its claim at this stage. We "give the plaintiff the benefit of imagination, so long as the hypothesis are consistent with the complaint." *Bissessur v. Ind. Univ. Bd. of Trustees,* 581 F.3d 599, 603 (7th Cir.2009) (quoting *Sanjuan,* 40 F.3d at 251).

### 3. Whether Harm Outweighed Benefit to Consumers

The harm-benefit balance associated with ITT's conduct is a particularly fact-dependent issue. *See Am. Fin. Servs.,* 767 F.2d at 986–988. Perhaps realizing as much, neither party devotes much discussion to it. ITT argues, in effect, that the lifelong benefits flowing from a postsecondary degree must outweigh the economic harm allegedly inflicted by the loans: "Many graduates from various types of post-secondary educational institutions advance in their careers following the 'entry-level' positions obtained upon graduation.... [A]bsent private loans, students with Temporary Credit balances or otherwise in need of funds to cover an additional year of tuition would almost certainly have been worse off." Def.'s Br. 25. This argument misses the central thrust of the Bureau's accusations: that ITT's unfair practices lay in creating a stark choice between the private loans and dropping out of college. *See* Pl.'s Resp. 25. The finder of fact will thus need to frame the question more precisely, inquiring whether the harm of the situation created by ITT's conduct outweighed any benefit such conduct conveyed upon students.

The Bureau has alleged in its Complaint that "[t]he injury to the ITT students who took out ITT Private Loans was not outweighed by countervailing benefits to consumers or to competition." Compl. ¶ 164. Standing on its own, such an allegation might be inadequate and conclusory. Read in conjunction with the Complaint's other, more detailed, allegations concerning the nature of the harm suffered, however, we conclude that it is sufficient to state a claim that the third element of the "unfairness" test has been satisfied. *See* Compl. ¶¶ 46–49, 85–87, 97–98, 138–142.

### B. Counts Two and Three: Abusive Practices

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

The Bureau brings two counts alleging that "abusive" acts or practices in violation of 12 U.S.C. § 5531: Count Two alleges that ITT took unreasonable advantage of the inability of consumers to protect their own interests in selecting or using a consumer financial product, Compl. ¶¶ 166–173; and Count Three alleges that ITT took unreasonable advantage of the reasonable reliance by consumers on ITT to act in the consumers' interests. Compl. ¶¶ 174–182.

### 1. "Unreasonable Advantage"

**[37]** As a threshold matter, ITT objects that the Bureau has not stated a claim that it took "unreasonable advantage" of its students—a necessary element of both of its claims regarding "abusive" acts or practices. Def.'s Br. 25–27 (citing 12 U.S.C. § 5531(d)(2)). In ITT's words: "There is no allegation that ITT received any fees or interest from any private loan. To the contrary, the complaint alleges that ITT 'guaranteed' the very same private loans for which it supposedly predicted a 60% default rate ... which undermines the Bureau's unlikely claim of 'advantage.' " Def.'s Br. 26 (citing *Bissessur,* 581 F.3d at 603–604).

**\*30** But the Bureau has, in fact, alleged that ITT derived an advantage from its conduct. In the absence of evidence indicating that we should do otherwise, we construe the language of a statute according to its "plain language, giving the words used their ordinary meaning." *Lara Ruiz v. I.N.S.,* 241 F.3d 934, 940 (7th Cir.2001) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs., Ltd. P'ship,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). The ordinary meaning of "to take advantage of" is "to make use of for one's own benefit," to "use to advantage," or to "profit by." Webster's Third New Int'l Dictionary 2331 (3d ed.1993). Here, the Bureau has alleged that signing up students for the private loans enabled ITT to clear the "doubtful assets" represented by the Temporary Credit off its balance sheets, converting it into "immediate income and cash-on-hand." Compl. ¶ 114.[34] In fact, the Bureau's allegations quote senior ITT officials stating that ITT designed the loan programs precisely in order to derive such an economic benefit from them. Compl. ¶¶ 134–137. Given the Bureau's allegations about the unfair nature of the students' predicament, the Complaint sufficiently pleads that ITT derived "unreasonable advantage" from its conduct, according to the term's ordinary, broad meaning.[35]

### 2. Count Two: Students' Inability to Protect Their Interests

In defining the scope of "abusive" acts or practices, the CFPA lays out several routes to liability. One means by which a defendant's conduct may be abusive is if the defendant "takes unreasonable advantage of ... the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

ITT assails the Complaint for "posit[ing] that students were unable to protect their own interests in the repackaging process 'because' they lacked the resources or time to repay any outstanding Temporary Credit or obtain private loans elsewhere." Def.'s Br. 28 (citing Compl. ¶ 171). ITT continues, objecting that "[t]he complaint does not show that ITT limited the amount of time students had to arrange financing from any source, prevented students from paying with family funds, or prevented students from taking a period to work and then resuming their education when they had paid their Temporary Credit balance." *Id.* Contrary to ITT's assertions, the Bureau has in fact alleged that ITT contributed to the students' vulnerability by knowingly waiving its minimal credit criteria to allow students to take out Temporary Credit, and by engaging in the same aggressive, hand-holding tactics described elsewhere in connection with the later "repackaging" process. Compl. ¶¶ 100, 63–84.

Regardless of who caused the students' vulnerability, the Bureau's burden here is to show that they were, in fact, unable to protect their own interests. As we have discussed before in connection with "coercion" and the lack of a reasonable alternative, ITT's argument relies too heavily on a formalistic reading of the statutory requirement. It is likely true, as ITT asserts, that students never lost the theoretical power to defend their interests, in the sense that they could have walked away from ITT entirely and refused to take out new debt. *See* Def.'s Br. 28. A reasonable reading of the statutory language, however, is that it refers to oppressive circumstances—when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of the defendant. *See, e.g., Ting v. AT & T,* 319 F.3d 1126, 1148–1149 (9th Cir.2003) (noting that, under the doctrine of procedural unconscionability, a literal, physical lack of consumer choice is not necessary to show oppressiveness). *See also* Carey Alexander, *Abusive: Dodd–Frank Section*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 30

*1031 and the Continuing Struggle to Protect Consumers,* 85 St. John's L.Rev. 1105, 1114–1119 (2011) (discussing the legislative history of the "abusive" standard as consistent with the understanding that it is a statutory codification of the common-law doctrine of unconscionability). As we have already discussed, the Complaint sufficiently alleges that such oppressive circumstances existed here. [36] We therefore conclude that Count Two of the Complaint states a claim for relief.

### 3. Count Three: Students' Reasonable Reliance on ITT

**\*31** Count Three of the Complaint asserts an alternate ground of ITT's liability for "abusive" conduct: that ITT "[took] unreasonable advantage of ... the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

**[38]** "Reasonable reliance" is a familiar concept in tort law, and it is a question of fact generally not appropriate for resolution on a motion to dismiss, or even summary judgment. *See Pippenger v. McQuik's Oilube, Inc.,* 854 F.Supp. 1411, 1427 (S.D.Ind.1994) ("[G]enerally speaking, the questions of reasonable diligence and reasonable reliance are questions of fact for the jury to decide."). To withstand a motion to dismiss, a plaintiff's allegations that a group of consumers relied on a defendant's representations need not contain specific allegations as to any particular consumer's individual reliance. *See F.T.C. v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991) ("It would be inconsistent with the statutory purpose [of the FTC] for the court to require proof of subjective reliance by each individual consumer."); *F.T.C. v. Kuykendall,* 371 F.3d 745, 765–766 (10th Cir.2004).

**[39]** The Bureau has alleged that, throughout their time at the school, ITT staff represented to students that they would "work in the interests of [their] students to better their lives." Compl. ¶¶ 29–32. This included orally assuring prospective students of large salaries, "usually ... six figures," upon graduation. *Id.* at ¶¶ 40–42. According to the Complaint, "[s]ome ITT students accepted the ITT Private Loans because they believed ITT Financial Aid staff was acting in their interests in signing them up for such loans, and they believed, based on ITT's representations, that ITT in general was acting in their interest to better their lives." Compl. ¶ 141. Thus, the Bureau has alleged both that ITT students relied

upon staff members' representations as to the private loans, and that students act in reasonable reliance on the school's misrepresentations as to the nature and role of the financial aid staff. *See* Compl. ¶¶ 95–96 ("Despite words and actions to the contrary, ITT staff was not trained, nor was the staff instructed, to safeguard students' financial interests.... Most of ITT's metrics for evaluating the performance of Financial Aid staff were related to how many students had completed financial aid packages...."). *See also Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.,* 773 F.Supp.2d 151, 172 (D.D.C.2011) ("Even though mortgage brokers operate on behalf of neither the consumer nor the creditor, reasonable consumers may erroneous believe that loan originators are working on their behalf.") (citations omitted). [37]

**[40]** ITT argues broadly that the claim fails both because its allegations are inconsistent with the Bureau's theory that students were "coerced" into taking out the private loans, and because the Bureau's allegations are nothing more than "bare assertions." ITT's first argument is groundless: a complaint may advance inconsistent legal theories based on the same set of facts. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir.2008) ("Although our pleading rules do not tolerate factual inconsistencies in a complaint, they do permit inconsistencies in legal theories.") (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)). The Bureau has alleged no facts overtly inconsistent with those upon which it bases its claim in Count Three.

**\*32** ITT's argument that the Bureau's allegations fail the *Iqbal/Twombly* "plausibility" standard spring from a similarly erroneous premise. ITT insists that paragraphs 65 and 92 of the complaint, alleging that students were given insufficient information about the loan process and that ITT employees "did all the work" for them, offer only "bare conclusions." Def.'s Br. 31 (citing Compl. ¶¶ 65, 92). As for the allegations of misconduct more specifically relating to the "repackaging" process, Compl. ¶¶ 85–87, 138–142, ITT asserts that they are nothing more than " 'threadbare recitals of the elements of a cause of action' devoid of factual content." *Id.* (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

"A plaintiff must provide only enough detail to give the defendant fair notice of what the claim is and the grounds

upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 764 (7th Cir.2010) (quoting *Tamayo,* 526 F.3d at 1083). In other words, a plaintiff must plead facts that plausibly give rise to a right to relief—but he need not, at this stage, *prove* those facts. The portions of the Complaint to which ITT refers are not "recitals" of the elements of a legal claim at all; rather, they are allegations of fact. *See* Compl. ¶¶ 85–87, 138–142. Reading these allegations in the context of the extensive and detailed allegations of the Complaint as a whole, we find that they contain enough facts to "state a claim to relief that is plausible on its face." *See Killingsworth,* 507 F.3d at 618–619. The Bureau need not do more at this stage, and we thus reject ITT's repeated suggestions otherwise.

We thus conclude that Count Three, like Count Two, satisfies the pleading requirements imposed by the Federal Rules of Civil Procedure and withstands ITT's motion to dismiss.

### 4. Count Four: Violation of the Truth in Lending Act

[41] "Regulation Z," promulgated by the Federal Reserve Board in implementation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* requires the disclosure of certain "finance charges," as defined by the Act, in writing before the consummation of the transaction giving rise to the charges. 12 C.F.R. §§ 1026.17, 18(d). [38] *See also* 15 U.S.C. § 1605(a) (defining "finance charge"). The Bureau alleges that the discount ITT offered students who paid off their Temporary Credit balances in a lump sum constituted a finance charge, and that ITT's failure to disclose the charge violated TILA and Regulation Z. Compl. ¶¶ 184–191. We do not reach the merits of the claim, because we agree with ITT that Count Four is barred by the applicable statute of limitations.

ITT contends that this claim is governed by the section of TILA governing "civil liability," which provides that "any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e); *Basham v. Fin. Am. Corp.,* 583 F.2d 918, 927 (7th Cir.1978). Because the Complaint was filed on February 26, 2014—well more than one year after the conduct described in the allegations occurred—ITT asserts that

this action lies outside the limitations period. Def.'s Br. 34; Def.'s Reply 19.

**\*33** The Bureau counters that its claim in Count Four is governed not by TILA's civil liability provision, but by 15 U.S.C. § 1607, the section of the statute which grants the Bureau—together with several other federal agencies—power to "enforce[e] compliance with any requirement imposed" by the Act. 15 U.S.C. § 1607(a) (6). Enforcement actions brought under 15 U.S.C. § 1607 are not subject to the one-year statute of limitations imposed by Section 1640. *See* Fed. Reserve Bd. Consumer Compliance Handbook, Regulation Z, at 57. *See also Household Credit Servs., Inc. v. Pfennig,* 541 U.S. 232, 238, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004) (noting that the Federal Reserve Board and its staff have been designated by Congress as the primary source for interpretation and application of TILA).

We disagree with the Bureau's interpretation of the distinction between the two statutory provisions. First, we see no persuasive evidence that 15 U.S.C. § 1640 governs only *private* civil actions. The provision itself does not exclude actions in which a government agency is the plaintiff, and in fact it explicitly recognizes the possibility of intervention by federal agencies in civil suits initiated by private parties. 15 U.S.C. § 1640(e)(1). [39] Second, agency interpretations support the conclusion that the agency enforcement powers contemplated by Section 1607 are *administrative* in nature, and are separate from any authorization to file civil suits. In interpreting its enforcement authority under TILA, the Comptroller of the Currency stated that "[t]he Comptroller's administrative authority to enforce compliance with the Truth in Lending Act and Regulation Z ... [is] based on Section 108 of the Act [15 U.S.C. § 1607] and 12 U.S.C. § 1818(b) [the Federal Institutions Supervisory Act]. The authority of these sections is separate from and independent of the civil liability provisions of ... the Truth in Lending Act." OCC Interpretive Letter, Fed. Banking L. Rep. 85,040 (Oct. 6, 1977). Similarly, the Federal Reserve's interpretive manual for Regulation Z states that "*regulatory administrative* enforcement actions ... are not subject to the one-year statute of limitations." Fed. Reserve Board Consumer Compliance Handbook, Regulation Z at 57 (Nov.2013) (emphasis added).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

In a recent decision, the Supreme Court reaffirmed the principle that "the cases in which a statute of limitation may be suspended by causes not mentioned in the statute itself ... are very limited in character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it." *Gabelli v. SEC,* ––– U.S. ––––, 133 S.Ct. 1216, 1224, 185 L.Ed.2d 297 (2013) (quoting *Amy v. City of Watertown,* 130 U.S. 320, 324, 9 S.Ct. 537, 32 L.Ed. 953 (1889)). Here, Congress demonstrated its "concern that a creditor not face limitless liability in terms of time" by setting a one-year statute of limitations for the filing of civil suits under TILA. *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Office of Comptroller of Currency,* 118 F.3d 1461, 1467 (11th Cir.1997). When the government chooses to enforce the Act by filing a civil suit rather than resorting to the administrative actions under its power, we see no reason why the same congressional concerns should not apply —indeed, they may apply with still greater force. *See Gabelli,* 133 S.Ct. at 1223 (noting that government "civil penalty" actions under the SEC, among other things, "label defendants [as] wrongdoers"). This seems to be a case of first impression: ITT can point to no cases in which a court has applied the civil statute of limitations to a suit brought by the Bureau, and the Bureau has pointed to no civil actions brought by the CFPB—or any other agency— pursuant to 15 U.S.C. § 1607. Under such circumstances, guided by the agencies' own interpretive language and the jurisprudential rule-of-thumb recently reaffirmed by the Supreme Court, we decline to read an exception for agency plaintiffs into the one-year statute of limitations imposed by TILA's civil liability provision. We therefore dismiss Count Four as time-barred.

### IV. Failure to Join Necessary Parties

**\*34** Hidden within ITT's brief is an extraordinarily concise alternative argument for dismissal. "To the extent the Bureau seeks to recover from ITT the payments made by students to third-party lenders pursuant to their lending contracts, the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join those third-party lenders as necessary parties." Def.'s Br. 14 (citing *United States ex rel. Hall v. Tribal Dev. Corp.,* 100 F.3d 476, 479–481 (7th Cir.1996)). Federal Rule of Civil Procedure 19 prescribes a multi-part inquiry to guide courts and parties in ensuring "the joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Davis Cos. v. Emerald Casino, Inc.,* 268 F.3d 477, 481–482 (7th Cir.2001) (quoting *Moore v. Ashland Oil, Inc.,* 901 F.2d 1445, 1447 (7th Cir.1990)). ITT has not engaged in any analysis under this standard, nor has it provided any argument at all in support of its Rule 12(b)(7) motion other than the single sentence quoted above. We deem this underdeveloped argument to be waived. *See DeBoard v. Comfort Inn,* 2013 WL 5592418, at \*3 (S.D.Ind. Oct. 9, 2013) (citing *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 718 (7th Cir.2012)). *See also United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

### *Conclusion*

For the foregoing reasons, ITT's motion to dismiss is DENIED as to Counts One, Two, and Three of the Complaint, and GRANTED as to Count Four of the Complaint.

IT IS SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2015 WL 1013508

### Footnotes

1    ITT is incorporated in Delaware, and maintains its headquarters in Carmel, Indiana, within the Southern District of Indiana. ¶ 16.

2    Within this narrative of the facts, citations containing only paragraph numbers refer to the Complaint, found at Docket No. 1.

3    The Bureau quotes ITT's chief financial officer as stating that the "average ITT student is earning around $18,000 per year and has a credit score under 600 at the time he or she enrolls." Compl. ¶ 24.

4    The Bureau asserts that even these numbers are exaggerated because "annualizing" graduates' salaries hides the effect of part-time jobs. Compl. ¶ 47.

5    As ITT has pointed out, the "mystery shoppers," for obvious reasons, were utilized only in reporting on how ITT treated enrollees during the initial stage, rather than the repackaging stage for continuing students. Although the Bureau's allegations regarding mystery shopper reports are placed in its Complaint adjacent to allegations regarding the repackaging stage, it is important to bear this distinction in mind.

6    The other, the PEAKS program, evidently ran out of funds and stopped operating earlier in 2011. ¶¶ 129–132.

7    An exception to this eligibility was made for students who had declared bankruptcy within the previous 24 months. ¶ 116.

8    *See also United States v. Williams,* 504 U.S. 36, 51, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (discussing the interpretive value of British monarchical tradition).

9    The Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq.*

10    ITT never elaborates on this objection or provides any rationale for the objectionability of concentrating the agency's authority in a Director rather than a commission. American constitutional history, in certain contexts, does undoubtedly betray a certain antipathy to the concentration of power. In the Federalist Papers, James Madison cautioned that "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands ... may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed.1961). Justice Stevens later cited this language, in his opinion in *Hamdan v. Rumsfeld,* 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), in explaining his opposition to the excessive combination of executive, legislative, and adjudicative authority in military tribunals. *See Consumer Fin. Protection Bureau v. Morgan Drexen, Inc.,* ——F.Supp.3d ——, ——, 2014 WL 5785615, at *8 (C.D.Cal. Jan. 10, 2014) (citing *Hamdan,* 548 U.S. at 600–602, 126 S.Ct. 2749). But we find no support for the notion that creating a consumer protection agency with a single head rather than a commission structure necessarily runs counter to constitutional principles, and ITT has certainly provided us with no such argument.

11    ITT's undeveloped contention that the CFPB is unprecedented and problematic because it is "an independent agency within an independent agency," Def.'s Reply 3 (citing 12 U.S.C. § 5491(a)), is unpersuasive for the same reason.

12    The statute empowers the Director to draw funds annually from the Federal Reserve in the amount he determines to be "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1). It does, however, place a formula-based spending cap on this amount, *id.* at § 5497(a)(2), and it imposes a number of other conditions on the Director's use of the funds so derived.

13    Both these subsections of the statute concern the authority of the Financial Stability Oversight Council established under subchapter 1 (12 U.S.C. § 5311 *et seq.*) of the legislation. They set for the Council's ability to review, stay, or reverse a regulation promulgated by the Bureau under certain defined circumstances.

14    The Northern District of Illinois recently rejected a defendant's argument that the Bureau is an unconstitutional entity because the operative provisions of the CFPA are impermissibly vague, in violation of the Due Process clause. *See Illinois v. Alta Colleges, Inc.,* 2014 WL 4377579, at *3–4 (N.D.Ill. Sept. 4, 2014). We address this issue below, and we ultimately agree with the conclusion reached by our sister district court.

15    Of the two articles cited by ITT, one posits that the Bureau's "unique" structure raises questions of constitutionality, while the other more specifically critiques the Director's power to appoint the Deputy Director. *See* Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau,* 47 Creighton L.Rev. 99, 120–121 (Dec.2013) (criticizing the "functionalist" approach to the separation of powers analysis); Kent Barnett, *The Consumer Financial Protection Bureau's Appointment with Trouble,* 60 Am. U.L.Rev. 1459, 1488 (June 2011) (arguing that "the Deputy Director's appointment is constitutional is a significant question" deserving of courts' attention). Both articles, while certainly offering legitimate and serious analysis, proceed from a formalist understanding of the separation of powers that we conclude is not supported by the Supreme Court's jurisprudence—including its most recent authoritative discussion of the issue in *Free Enterprise Fund.*

16    The article to which ITT refers, "Why Dodd–Frank is Unconstitutional," was written by two attorneys in conjunction with a suit they filed in D.C. District Court seeking a declaration that Titles I, II, and X of the Act (including the CFPA) were unconstitutional. C. Boyden Gray & Jim R. Purcell, *Why Dodd–Frank is Unconstitutional,* Wall St. J., June 21, 2012, at A17. That suit was subsequently dismissed for lack of standing. *See State Nat'l Bank of Big Spring v. Lew,* 958 F.Supp.2d 127 (D.D.C.2013) (granting the Secretary of the Treasury's motion to dismiss). While the article may be interesting as a sort of executive summary of that ill-fated suit, it hardly qualifies as constitutional analysis in its own right.

17    The Bureau correctly notes that, at least outside the context of First Amendment overbreadth, it is only appropriate here for ITT to challenge the statute *as applied* rather than facially. *See* Pl.'s Resp. 7 n. 6 (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 18, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)). *See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

18    In a footnote to its reply brief, ITT argues that, under *Hoffman Estates,* the CFPA merits stricter review because its penalties, though civil in nature, are "quasi-criminal," with a "prohibitory and stigmatizing effect." Def.'s Reply 5 n. 5 (citing *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186). Though ITT is correct that the CFPA does authorize the imposition of heavy fines, 12 U.S.C. § 5565(c)(2), it forbids exemplary or punitive damages. And although it has sought rescission, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties, its Complaint does not seek "public notification regarding the violation" or "limits on the activities or functions of the [defendant]." Compl. 33–34. *Cf.* 12 U.S.C. § 5565(a)(2). The possibility of steep fines, by itself, does not render a statute "quasi-criminal." *See Ford Motor Co. v. Tex. Dep't of Transp.,* 264 F.3d 493, 508 (5th Cir.2001). *Cf. Karlin v. Foust,* 188 F.3d 446, 465 (7th Cir.1999) (statute is quasi-criminal in that it "imposes professional discipline" and levies forfeiture penalties upon physicians who make unreasonable emergency medical determinations).

19    ITT also urges that it "has a protected interest in not being subject to an enforcement action by an unconstitutional agency." Def.'s Reply 5 (citing *Nat'l Labor Relations Bd. v. Noel Canning,* ——U.S. ——, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014); *Free Enter. Fund,* 561 U.S. at 491 & n., 130 S.Ct. 31382). We have already entertained, and rejected, ITT's argument that the Bureau's structure is unconstitutional. Alternatively, if ITT is attempting to argue that the operative language of the CFPA is unconstitutionally vague because the CFPA is unconstitutional, ITT is arguing in circles.

20    Accessed at http://files.consumerfinance.gov/f/201210_cfpb_ supervision-and-examination-manual-v2.pdf (February 19, 2015).

21    Although the statute was never overturned as vague and was repeatedly held to be enforceable by the courts, it must be noted in the interests of historical accuracy that the 1980 FTC guidance and subsequent 1994 statutory amendment were prompted, at least in part, by criticism that the existing construction of the language rendered it too indefinite. *See, e.g.,* Nelson, *The Politicization of FTC Rulemaking,* 8 Conn. L.Rev. 413, 414 (1976); The Washington Post, Sec. A, p. 22 (Mar. 1, 1978) (cited in "Modern Refinement of F.T.C. Standards," 1 Consumer Law Sales Practices and Credit Regulation § 120 (updated Sept. 2014)).

22    ITT also cites *Beler v. Blatt, Hasenmiller, Leibskre & Moore,* 480 F.3d 470, 474 (7th Cir.2007), a Seventh Circuit decision which observes that, in the context of the FDCPA, "the phrase 'unfair or unconscionable' is as vague as they come." 480 F.3d at 474. The court noted that the statute authorized the FTC to issue advisory opinions "giving shape to these and other vague terms"; the problem was that, unlike here, no such agency guidance had been forthcoming. *Id.* Regardless, the court in *Beler* addressed a different question than that presented here: whether "federal judges ought ... use this ambulatory language to displace decisions consciously made by state legislatures and courts about how judgment creditors collect judgments entered under state law." *Id. at 475.*

23    ITT's argument that the statute is vague and standardless is somewhat compromised by its ease in applying the very same supposedly nonexistent standards, later in its brief, to insist that the Bureau has failed to state a claim for unfair acts or practices.

24    ITT contends that this provision's reference to "unreasonable advantage" and "reasonable reliance" is *itself* vague. ITT's Br. 12. In support, it quotes Justice Scalia's concurrence in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), in which he opined that " '[a]busive' ... does not seem to me a very clear standard—and I do not think clarity at all is increased by adding the adverb 'objectively' or by appealing to a 'reasonable person['s]' notion of what the vague word means." 510 U.S. at 24, 114 S.Ct. 367 (Scalia, J., concurring). While Justice Scalia complained about the indefinite nature of the standards guiding judicial construction of a criminal statute's prohibition of "abusive" conduct—and further observe that the "reasonable man" test did not meaningfully clarify matters—he did not actually assert that the statute in question was void for vagueness. And as the Bureau has noted, the use of "reasonableness" as a proxy for objectivity is hardly an alien feature in the law. *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 315–316, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) ("We note, initially, that 'reasonableness' is a guide admitting effective judicial review in myriad settings, from encounters between the police and citizenry ... to the more closely analogous federal income tax context.") (citations omitted); *United States v. Ragen,* 314 U.S. 513, 522, 62 S.Ct. 374, 86 L.Ed. 383 (1942) (noting that determinations "by reference to a standard of 'reasonableness' are not unusual under federal income tax laws").

25    In a footnote to its brief, ITT argues that these statutory provisions are unconstitutional, alternatively, because they constitute impermissible delegation of legislative power to the Executive Branch. Def.'s Br. 12 n. 9. Congress cannot grant an executive agency rulemaking powers so broad that it has empowered the agency to engage in *de facto* legislating itself—in other words, Congress's mandate must lay down "an intelligible principle to which the [agency] is directed to conform." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The Supreme Court has invalidated Acts of Congress on this basis on less than a handful of occasions; most famously, in *A.L.A. Schechter*

*Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court struck down a portion of the National Industrial Recovery Act, a centerpiece of the New Deal, because it granted the President the authority to regulate the economy by promulgating "codes of fair competition." 295 U.S. at 531, 55 S.Ct. 837. While the Supreme Court's relatively recent decision in *Whitman* may have dispelled the impression that the "non-delegation" doctrine was a dormant relic of pre(or anti-) New Deal conservatism, there is no doubt here that Congress has supplied an "intelligible principle" to the Bureau. As the Bureau points out, the degree of specificity provided in the CFPA compares quite favorably to other organic statutes that have withstood constitutional challenge. *See, e.g., Yakus v. United States,* 321 U.S. 414, 420, 426–427, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (mandate to the Office of Price Administration to fix "fair and equitable" commodity prices laid down an intelligible principle); *Touby v. United States,* 500 U.S. 160, 165–167, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (provision of Controlled Substances Act empowering Attorney General to classify a drug on a temporary basis where "necessary to avoid an imminent hazard to the public safety" laid down an intelligible principle).

26      We find that ITT's citation to another portion of the statute, 12 U.S.C. § 5393(b)(1)(B), which refers to a company that "engaged *or* participated" in qualifying activities, is less persuasive. As we have noted, ITT insists that the disjunctive "or" should signal that to *engage* is to be involved in greater depth in an activity than to merely *participate.* But the fact that the statute uses those two words tells us nothing about which of the two has the "deeper" meaning, if either. In our view, this passage is most naturally read as an instance of what Justice Scalia called the "iteration to which lawyers, alas, are particularly addicted—such as 'give, grant, bargain, sell, and convey,' ... or 'right, title, and interest.' " *Moskal v. United States,* 498 U.S. 103, 120, 111 S.Ct. 461 (Scalia, J., dissenting) (citing B. Garner, *A Dictionary of Modern Legal Usage,* at 197–200 (1987)). Webster's Dictionary, for instance, recognizes that the two words may be used interchangeably. Webster's Third New Int'l Dictionary 751 (3d ed.1993).

27      The CFPA's "merchant exclusion," 12 U.S.C. § 5517(a), does not apply. The Act states that the Bureau may not generally exercise authority "with respect to a person who is a merchant, retailer, or seller of any nonfinancial good or service and is engaged in the sale or brokerage of such nonfinancial good or service." *Id.* at § 5517(a)(1). The exclusion only applies, however, insofar as the merchant in question "extends credit directly to a consumer ... for the purpose of enabling that consumer to purchase" non-financial goods from that merchant—or engages in two other types of conduct not material here. *Id.* at § 5517(a)(2)(i)–(iii).With respect to the private loans, the Bureau has not successfully pleaded that ITT "directly extended" credit; therefore, any statutory exclusion that would bar this route to liability is irrelevant. With respect to the Temporary Credit, the Bureau has pleaded that ITT charged students a "finance charge." *See* Compl. ¶¶ 185–187 (citing 12 C.F.R. § 1026.4(b)(9)). Under another limitation to the statutory exemption, ITT's conduct in "regularly" extending credit that bears a finance charge is also unshielded by the "merchant exclusion." *See* 12 U.S.C. § 5517(a)(2)(B)(iii).

28      The Securities Exchange Act definition further specifies that the "transactions" in question must be "in securities." 15 U.S.C. § 78c(a)(4)(A). We assume that Congress intended to import the definition without that limitation; including the limitation would render the definition inapposite for the context of consumer financial protection.

29      The CFPA expressly restricts the authority of the Bureau over the "practice of law." 12 U.S.C. § 5517(e). However, this limitation applies only to products or services "offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* at § 5517(e)(2)(A). Thus, the CFPA could bring suit against a law firm engaged in the provision of financial products or services not incident to its legal representation of its clients. Notably, the statute contains no such exclusion concerning educational institutions. *See* 12 U.S.C. § 5517.

30      ITT takes issue with the Bureau's "conclusory assertions" regarding what students "wanted, understood, or knew" when they took out the ITT private loans. Def.'s Br. 20 (citing *Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir.2014)) (discussing the *Twombly/Iqbal* pleading standards requiring a plaintiff to "state a claim to relief that is plausible on its face"). This objection is misguided. Regardless of whether the Bureau's allegations regarding the students' state of mind are plausible, that question has no bearing on whether the students suffered substantial harm.

31      ITT objects that the bulk of the Bureau's allegations regarding misinformation to "mystery shoppers" fall outside the statute's effective date, and that the Bureau has not specifically alleged that misconduct occurred during the "repackaging" stage for continuing students. Def.'s Br. 21–22. To the contrary, although many of the "mystery shopper" allegations are not directly relevant here, the Complaint also contains a number of allegations that specifically concern the process in question. *See* Compl. ¶¶ 85–87, 97–98, 138–142. Even if we view the allegations concerning ITT's conduct towards prospective students as mere table-setting and immaterial to the CFPA claims, the Complaint contains more than enough relevant allegations to state a claim.

32      The Bureau additionally alleges that the students were victims of a larger "bait-and-switch" pattern, since they were rushed through the earlier Temporary Credit applications and ill-informed of the nature of that debt—which in turn rendered them more vulnerable when it came to "repackage." Compl. ¶¶ 103–108. We agree with ITT, however, that we must focus

on ITT's conduct that fell within the July–December 2011 period in which the CFPA was enforceable; since the allegations center on the private loans and no student's initial and "repackaging" stages could both have taken place in that six-month window, we do not directly consider the allegations of antecedent misconduct. *See* Def.'s Reply 12–13.

33    ITT points to *Todd v. Collecto, Inc.,* 731 F.3d 734 (7th Cir.2013), an FDCPA decision in which the Seventh Circuit observed that it was not "unfair," in the context of the FDCPA, "for a college to withhold a student's transcript until she has settled her debt to the school." 731 F.3d at 739. As the court in *Todd* itself noted, however, the three-part standard for unfairness under the FTCA (and now the CFPA) does not fit perfectly with the "unfairness" described in Section 1692f of the FDCPA. *Id.* Regardless, the question of whether it is unfair to *collect* a pre-existing debt by withholding transcripts is a different question than whether it is unfair to goad students into *incurring* debt by use of such a threat.

34    ITT argues that since the Bureau has not alleged that the school caused the students' subsequent high default rate on the private loans, the Bureau cannot have stated a claim that the loans were "abusive." While proximate cause is indeed a necessarily element of a theory of liability, as ITT points out, *see* Def.'s Br. 27 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* ——— U.S. ———, 134 S.Ct. 1377, 1390, 188 L.Ed.2d 392 (2014)), the Bureau's claim is not that ITT derived advantage from the fact that the students later defaulted, but from the cash flow generated by their taking out the loans in the first place. Whether or not ITT caused the students later to default—or derived some sort of benefit from that default—is irrelevant.

35    As to the "unreasonable" nature of the advantage ITT allegedly derived from the transactions, ITT objects that its course of conduct is simply "how financial aid in higher education works." In support, it cites *Jackson v. Bank of America Corp.,* 711 F.3d 788 (7th Cir.2013), in which the Seventh Circuit dismissed a procedural unconscionability claim regarding a mortgage contract because "[t]here is nothing in the record to indicate that [plaintiffs] did not understand the terms of their loan ... [or] that the [plaintiffs] did not understand the potential consequences of defaulting on their loan." 711 F.3d at 793. Here, the Bureau has, in fact, alleged such lack of understanding on the part of the students. *See* Compl. ¶ 142. More to the point, ITT's "slippery slope" argument is inapposite. If, once the factual record is developed, it turns out that ITT's practices are fully in line with the practices of colleges and universities nationwide, the Bureau would face a steep (but not necessarily impossible) hill to climb in establishing that such common practices "take unreasonable advantage" of students. But the Bureau has alleged conduct that—we hope—is not simply par for the course; at any rate, the "everyone else is doing it" defense does not support a motion to dismiss absent an argument that the allegations are legally invalid or factually implausible.

36    In its brief, ITT again raises the argument that using transfer credits as leverage cannot be a violation of the statute because precedent dictates that "educational institutions may—and do—withhold credits for transferring students with outstanding tuition balances." Def.'s Br. 28 (citing *In re Oliver,* 499 B.R. 617, 620–621 (Bankr.S.D.Ind.2013)). *In re Oliver,* the new case ITT cites (in addition to *Todd v. Collecto,* which we have already discussed), is a bankruptcy decision concerning whether an unpaid balance on a student account meets the definition of an education loan under the statutory discharge exception for student loan debt. 499 B.R. at 620–621. Like *Todd,* it has nothing to do with the separate question of whether it may be "abusive" for an educational institution to use its authority to withhold transcripts or transfer credits as leverage in persuading students to take out new debt.

37    As we have stated above, we conclude that the absence of overt misrepresentations in the forms the students signed, to the extent that their formal correctness conflicts with the Bureau's allegations of oral misrepresentations, is not fatal to the Bureau's claim. While a common-law fraud action might be frustrated under most conditions by the existence of a written contract without any factual misrepresentations, the standard may be different under a statutory cause of action —particularly one that does not authorize private enforcement. *See FTC v. Minuteman Press,* 53 F.Supp.2d 248, 262–263 (E.D.N.Y.1998) ("Thus, ... a conflict between a specific disclaimer and a contrary oral representation—typically fatal to a reasonable reliance argument in a purely private suit—is ... actionable by the FTC....").

38    The CFPA subsequently transferred rulemaking authority pursuant to this regulation from the Federal Reserve to the Bureau. *See* Pl.'s Resp. 33 n. 23.

39    As the Bureau notes, the Third Circuit in *Vallies v. Sky Bank,* 591 F.3d 152 (3d Cir.2009), did refer to Section 1640 as creating a "private" cause of action. 591 F.3d at 156. That discussion was outside the context of the distinction we examine here, however; we read the court's description as a slightly overbroad paraphrase rather than a considered restriction.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **CV 16-07111-BRO (JEMx)** | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | | |

Present: The Honorable   **BEVERLY REID O'CONNELL, United States District Judge**

| Renee A. Fisher | Not Present | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      (IN CHAMBERS)

## ORDER RE DEFENDANT'S MOTION TO DISMISS
## [14]

## I.      INTRODUCTION

Pending before the Court is Defendant Prime Marketing Holdings, LLC's ("Defendant") Motion to Dismiss.  (*See* Dkt. No. 14 (hereinafter, "Mot.").)  After considering the papers filed in support of and in opposition the instant Motion, the Court finds this matter appropriate for resolution without oral argument of counsel.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons set forth below, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

## II.      BACKGROUND

### A.      Factual Background

Plaintiff the Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") brings this action against Defendant, alleging that Defendant engages in an ongoing, unlawful credit repair business that charges unlawful advance fees and misrepresents the costs and benefits of its services.  (Dkt. No. 1 (hereinafter, "Compl.") ¶ 2.)  The CFPB is an independent agency of the United States charged with enforcing federal consumer financial laws.  (Compl. ¶ 5 (citing 12 U.S.C. §§ 5491, 5563, 5564).)  Further, the CFPB has independent litigating authority, including the authority to enforce the Telemarketing Sales Rule ("TSR").  (*Id.* (citing 12 U.S.C. §§ 5564(a), (b), 6105(d).)  Defendant is a Delaware company organized in 2014 that has a place of business in Van Nuys, California.  (Compl. ¶ 6.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **CV 16-07111-BRO (JEMx)** | Date | November 15, 2016 |
|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | |

According to Plaintiff, Defendant began offering credit repair services to consumers in October 2014. (Compl. ¶ 7.) Plaintiff avers that Defendant entered into an agreement with a company owned by a California attorney that was registered as a credit services organization ("CSO") with the California Department of Justice. (Compl. ¶¶ 9–10.) Under the agreement, which allowed Defendant to offer credit repair services using the CSO's name, Defendant handled marketing and performed credit repair services for consumers who contracted with the CSO. (Compl. ¶¶ 11–12.) Plaintiff claims that this agreement was terminated on or about June 29, 2015. (Compl. ¶¶ 13.)

In approximately November 2015, Defendant began doing business as Park View Credit, National Credit Advisors, and Credit Experts. (Compl. ¶¶ 14–16.) With these new companies, Defendant offered credit repair to consumers. (Compl. ¶ 17.) Defendant's customers include individuals who were attempting to obtain mortgage, loan, refinancing, or other credit lines at the time when Defendant first contacted them. (Compl. ¶ 22.) Plaintiff claims that Defendant would either contact a consumer after the consumer inquired about a loan through Defendant's website, or the consumer would reach out to Plaintiff after seeing information online about the credit repair services that Defendant offered. (Compl. ¶¶ 23–24.)

Plaintiff alleges that Defendant would request or receive payment for services such as removing derogatory information from, or to improve, consumers' credit histories, credit records, or credit ratings. (Compl. ¶ 25.) According to Plaintiff, Defendant represented that the first step in the credit repair process was to set up a consultation with the consumer, which Defendant would market as free. (Compl. ¶¶ 28–29.) However, Plaintiff claims that Defendant would typically tell consumers that they were required to pay an initial fee (that Defendant claimed was for a credit report or "lender report") before proceeding with a consultation. (Compl. ¶¶ 26–27, 30–31.) During the consultation, an analyst would review and discuss the consumer's credit report with the consumer and identifies ways in which Defendant could assist the consumer in increasing his or her credit score. (Compl. ¶ 33.) If the consumer agreed to hire Defendant, he or she was required to sign an online contract. (Compl. ¶ 34.) Plaintiff avers that Defendant would refuse to provide consumers with a copy of the contract until after the consumer had paid the initial fee. (Compl. ¶ 32.) Further, Plaintiff claims that, at times, consumers were "hurried through the signature process" by Defendant's salesperson. (Compl. ¶ 35.) Consumers who used Defendant's services were charged a monthly fee as high as $89.99 until consumers affirmatively cancelled their contracts. (Compl. ¶¶ 36–38.) In addition,

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **CV 16-07111-BRO (JEMx)** | Date | November 15, 2016 |
|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | |

Plaintiff claims that, at other times, Defendant charged a separate "set-up fee" of several hundred dollars for the first two months and then charged a monthly fee in later months. (Compl. ¶ 39.)  Plaintiff claims that Defendant would request and collect any fees charged before providing the consumer with a consumer report from a reporting agency demonstrating that the promised results had been achieved.  (Compl. ¶ 40.)

Plaintiff also alleges that Defendant misrepresented the efficacy of its services by representing that it would remove "virtually any negative information" from an individual's credit report without having a reasonable basis for this representation. (Compl. ¶¶ 41–42, 44.)  Plaintiff avers that Defendant would inform consumers that it often raised consumers' credit scores by more than 100 points, though it did not have a reasonable basis for making these claims (or for claiming that it could raise an individual's credit score by any specific amount).  (Compl. ¶¶ 46, 48–49.)

According to Plaintiff, Defendant also represented that it offered a money-back guarantee, but failed to disclose the significant limitations associated with this guarantee. (Compl. ¶¶ 50–51.)  For instance, Plaintiff claims that Defendant failed to explain to consumers that they would have to pay for at least six months of service before becoming eligible for the money-back guarantee.  (Compl. ¶ 54.)  Further, Plaintiff contends that consumers have encountered difficulty in obtaining refunds.  (Compl. ¶ 55.)  And finally, Plaintiff claims that Defendant has misrepresented the costs of its services by failing to disclose the monthly fees associated with their services and that consumers would be automatically charged for their services.  (Compl. ¶¶ 56–59.)

### B.    Procedural History

Plaintiff initiated this action in this Court on September 22, 2016.  (*See* Compl.)  In its Complaint, Plaintiff alleged five causes of action for various conduct arising under the TSR and the Consumer Financial Protection Act of 2010 ("CFPA"): (1) violation of the TSR, 16 C.F.R. § 310.4(a)(2), for collecting fees for credit repair prior to demonstrating the promised results have been achieved, (Compl. ¶¶ 60–62); (2) violation of the TSR, 16 C.F.R. § 310.3(a)(2)(iii), for misrepresentations about material aspects of the efficacy of its services, (Compl. ¶¶ 63–69); (3) violation of the TSR, 16 C.F.R. § 310.3(a)(1)(iii), for failure to disclose limitations on its money back guarantee, (Compl. ¶¶ 70–75); (4) violation of the TSR, 16 C.F.R. § 310.3 (a)(2)(i), for misrepresenting the costs of its services, (Compl. ¶¶ 76–80); and, (5) violations of the CFPA, 12 U.S.C. §§ 5531, 5536, for alleged deceptive acts or practices, (Compl. ¶¶ 81–88).  Plaintiff requests that the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

Court grant injunctive relief and award Plaintiff equitable monetary relief along with civil penalties.  (*See* Compl. ¶ 89; *see also* Compl. at 15.)

On October 7, 2016, Defendant filed the instant Motion to Dismiss, (*See* Mot.), along with a Request for Judicial Notice, (Dkt. No. 15 (hereinafter, "RJN")).  Plaintiff timely filed its Opposition on October 24, 2016, (Dkt. No. 27 (hereinafter, "Opp'n")), along with its own Request for Judicial Notice, (*see* Dkt. Nos. 27-1 (hereinafter, "Pl.'s RJN)).[1]  Defendant timely replied on October 31, 2016.  (Dkt. No. 29 (hereinafter, "Reply").)

## II.   REQUESTS FOR JUDICIAL NOTICE

As noted above, both Plaintiff and Defendant filed Requests for Judicial Notice along with their papers.  (*See* Def.'s RJN; Pl.'s RJN.)  When considering a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment.  *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).  Notwithstanding this precept, a court may properly take judicial notice of (1) material which is included as part of the complaint or relied upon by the complaint, and, (2) matters in the public record.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001); *see also Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1134, 1137 (C.D. Cal. 2010) (holding that a court may "consider documents that are incorporated by reference but not physically attached to the complaint if they are central to the plaintiff's claim and no party questions their authenticity").  A court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  *See* Fed. R. Evid. 201(c)(2); *In re Icenhower*, 755 F.3d 1130, 1142 (9th Cir. 2014).

Specifically, Defendant requests that the Court take judicial notice of five documents: (1) Exhibit A, a press release from the Federal Trade Commission ("FTC") entitled "States Announce Crackdown on Scams that Bilk Customers," dated March 5, 1998; (2) Exhibit B, a minute order dated December 3, 1996, in *State of Illinois v. National Credit Management Group*, No. 1:96-cv-02073 (N.D. Ill.); (3) Exhibit C, a

---

[1] On October 25, 2016, Plaintiff's counsel Sarah Preis filed a separate declaration authenticating the document Plaintiff requested the Court judicially notice.  (Dkt. No. 28.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

portion of the FTC website entitled "Complying with the Telemarketing Sales Rule," dated October 1, 2016; (4) Exhibit D, an excerpt of the CFPB Supervision and Examination Manual Version 2, dated October 2012; and, (5) Exhibit E, pages from Park View Credit's website. (*See* Def.'s RJN at 1.)  Plaintiff, along with its Opposition also requests that the Court take judicial notice of an Order Denying Motion for More Definite Statement in *Consumer Financial Protection Bureau v. All American Check Cashing Inc., et al.*, No. 3:16-cv-356-WHB-JCG (S.D. Miss.).  (*See* Pl.'s RJN.)  In addition, Plaintiff objects to the Court taking judicial notice of Park View Credit's website. (*See* Opp'n at 24.)

Defendant argues that Exhibits A through E are matters of the public record that are properly noticeable.  (Def.'s RJN at 2.)  When deciding a motion to dismiss, the court "may take judicial notice of matters of public record," *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986), including "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue," *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted).  However, "a court can only take judicial notice of *existence* of those matters of public record (the existence of a motion or of representations having been made therein) but not the *veracity* of the arguments and disputed facts contained therein."  *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) (emphasis in original).  In addition, "[a] court may not take judicial notice of one party's opinion of how a matter of public record should be interpreted."

As to Defendant's Exhibits A, C, and D, the Court may take judicial notice of publicly available information found on a government agency's website.  *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." (alteration and internal quotation marks omitted)); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of online information "made publicly available by government entities").   As these exhibits come from the FTC and the CFPB's website, the Court finds they are properly subject to judicial notice.  Accordingly, the Court **GRANTS** Defendant's Request as to Exhibits A, C, and D.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

As to Defendant's Exhibit B and Plaintiff's Exhibit, as noted above, the Court may take judicial notice of proceedings in other courts that are related to the instant proceedings. *See Robinson*, 971 F.2d at 248. It appears the filings that the parties proffer here are related to this case as they address similar issues to the instant litigation. (*See* Def.'s RJN, Ex. B; Pl.'s RJN.) Therefore, the Court **GRANTS** Defendant's Request as to Exhibit B and **GRANTS** Plaintiff's Request.

As to Defendant's Exhibit E, however, "information appearing on . . . third party websites is not a proper subject of judicial notice because it is not capable of accurate and ready determination." *Gerritsen*, 112 F. Supp. 3d at 1029. Defendant has not explained how information found on its own website is capable of accurate and ready determination, and "[t]he potential for fabrication or for inaccurate information is simply too great to be reconciled with the language of Rule 201." *Id.* at 1031 (refusing to take judicial notice of information found on the defendant's website); *see also Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F. Supp. 2d 997, 1004 (N.D. Cal. 2012) ("[I]t is inappropriate for the Court to take judicial notice of facts on a webpage whose source and reliability are unknown."). Therefore, the Court **DENIES** Defendant's Request as to Exhibit E.

## III.   LEGAL STANDARD

### A.   Rule 8(a)

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

In ruling on a motion to dismiss for failure to state a claim, a court should follow a two-pronged approach: first, the court must discount conclusory statements, which are not presumed to be true; and then, assuming any factual allegations are true, the court shall determine "whether they plausibly give rise to entitlement to relief." *See id.* at 679; *accord Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). A court should consider the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *Lee*, 250 F.3d at 688 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

### B. Rule 9(b)

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud. *Odom*, 486 F.3d at 553. Where multiple defendants allegedly engaged in fraudulent activity, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Rather, a plaintiff must identify each defendant's role in the alleged scheme. *Id.* at 765.

## IV. DISCUSSION

Plaintiff alleges violations of several sections of the TSR as well as violation of the CFPA. (*See* Compl.) Specifically, Plaintiff alleges violations of the following sections of the TSR: (1) section 310.4(a)(2), which makes it unlawful for a telemarketer

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **CV 16-07111-BRO (JEMx)** | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | | |

advertising that it can improve a person's credit history to receive payment until it has provided documentation of the effect of its services at least six months after the results have been achieved, *see* 16 C.F.R. § 310.4(a)(2); (2) section 310.3(a)(2)(iii), which makes it unlawful for a telemarketer to misrepresent any material aspect of its goods or services' performance or efficacy, *see* 16 C.F.R. § 310.3(a)(2)(iii);  (3) section 310.3(a)(1)(iii), which requires a telemarketer to disclose all material terms and conditions of any policy regarding refunds before a customer pays for goods or services offered, *see* 16 C.F.R. § 310.3(a)(1)(iii); and, (4) section 310.3(a)(2)(i), which makes it unlawful for a telemarketer to misrepresent the cost of its services, *see* 16 C.F.R. § 310.3(a)(2)(i).  In addition, the CFPA makes it unlawful for any covered entity "to engage in any unfair, deceptive, or abusive act or practice," *see* 12 U.S.C. § 5536(a)(1)(B).  "An act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Consumer Fin'l Protection Bur. v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (internal quotation marks omitted).  Defendant argues that Plaintiff has failed to state a claim upon which relief can be granted, that Plaintiff lacks standing, and that Plaintiff's claims fail as a matter of law.  The Court will address each argument in turn.

### A.    Whether the Heightened Pleading Standard for Rule 9(b) Applies

As a preliminary matter, Defendant argues that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to Plaintiff's claims regarding deception because these claims sound in fraud.  (*See* Mot. at 5–7.)  Plaintiff argues that deception and fraud are distinct legal theories, and thus, Rule 9(b) does not apply to its deception claims.  (*See* Opp'n at 6–10.)

The Ninth Circuit has held that in cases where fraud is not an element of a claim, but a plaintiff alleges that the defendant has engaged in "a unified course of fraudulent conduct," the claim "sound[s] in fraud" and therefore must meet Rule 9(b)'s heightened pleading requirements.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  Further, in cases where a plaintiff does not allege a unified course of fraudulent conduct, but instead alleges "some fraudulent conduct and some non-fraudulent conduct," the allegations of fraud are subject to Rule 9(b).  *See id.* at 1104.  "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)."  *Id.* at 1105.  Thus, Rule 9(b)'s

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

heightened pleading standard is implicated "when: (1) a complaint specifically alleges fraud as an essential element of a claim, (2) when the claim 'sounds in fraud' by alleging that the defendant engaged in fraudulent conduct . . . and (3) to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound in fraud.'" *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1089–90 (C.D. Cal. 2009) (citation omitted).

Plaintiff argues that courts have refused to extend Rule 9(b)'s requirements to claims brought under the CFPA.  (Opp'n at 7–8.)  At least one court within this district, however, has held that Rule 9(b) should apply to claims brought under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 45(a)(1), 53(b), which, much like the TSR and the CFPA, prohibits "unfair or deceptive acts or practices in or affecting commerce." *FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 851 (C.D. Cal. 2010).  There, the court held that Rule 9(b) applied because the FTC's claims alleged a fraudulent course of conduct where (1) the defendants "distributed promotional materials that made specific representations about the watt equivalency, lumen output, and life spans of their LED lamps," (2) these representations were false, and, (3) the defendants knew or should have known that their conduct was unfair or deceptive.  *Id.* at 852–53.  Though the FTC omitted the word "fraud" from its complaint, the court held that this omission did "not detract from the apparently fraudulent nature of the allegations." *Id.* at 853.  In coming to its decision, the court found persuasive the "analogous," though "not identical," elements of a violation of the FTCA and negligent misrepresentation.[2]  *Id.*

---

[2] A claim under the FTCA requires the plaintiff to prove (1) misrepresentations or omissions, (2) of material fact, (3) of a kind usually relied upon by reasonably prudent persons, (4) creating consumer injury, and, (5) that the individual participated in or controlled the underlying acts.  *See FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *3 (N.D. Cal. Feb. 22, 2010).  The elements of negligent misrepresentation are: (1) a false representation; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) intent to deceive; (4) justifiable reliance; and, (5) damages.  *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (Cal. Ct. App. 2013).  In *Lights of America*, the Court explained that the plaintiff's complaint explicitly alleged misrepresentation and the resulting damages and, though the complaint did "not specifically allege intent to induce reliance and justifiable reliance," it followed from the facts that these elements were also alleged.  *Lights of Am.*, 760 F. Supp. 2d at 854.  Moreover, as the *Lights of America* court noted, under Ninth Circuit law, "a claim does not need to include *all* of the elements of a claim for fraud or negligent misrepresentation in order for it to trigger the heightened pleading standard of Rule 9(b)." *Id.*; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that plaintiff must meet Rule 9(b) requirements when alleging fraudulent conduct pursuant to California's consumer protection

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

The crux of Plaintiff's claims here (other than its first cause of action for violation of the advance fee provision) is that Plaintiff purposefully misrepresented the efficacy of its services, its money back guarantee, and the costs of its services and that these statements were likely to mislead consumers.  (*See* Compl. ¶¶ 41–59, 67, 79, 87.)  There is no indication from Plaintiff's Complaint that any of these misrepresentations were accidental or the result of a mistake.  (*See id.*)  Thus, it appears that Plaintiff is alleging that Defendant participated in a unified course of fraudulent conduct, multiple portions of which violated the TSR.[3]  *See TransFresh Corp. v. Ganzerla & Assocs., Inc.*, 862 F. Supp. 2d 1009, 1017–18 (N.D. Cal. 2012) (finding claims sounded in fraud where the crux of the plaintiff's claims were that the defendant had "made numerous misleading and false representations" knowingly and intentionally); *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF),  2011 WL 2118626, at *1, *3 (D. Nev. May 25, 2011) (applying Rule 9(b) standard in claim brought under the FTCA where the FTC "alleged that the defendants collectively engaged in a unified course of fraudulent conduct, which forms the entire basis of the claims alleged"); *Davis*, 650 F. Supp. 2d at 1089–90 (applying Rule 9(b) standard to claims sounding in misrepresentation).   Therefore, the

---

statutes though fraud is not a necessary element of these claims); *see FTC v. ELH Consulting, LLC*, No. CV 12-02246-PHX-FJM, 2013 WL 4759267, at *1 (D. Ariz. Sept. 4, 2013) (holding that claims arising under the FTCA and the TSR sounded in fraud and had to meet Rule 9(b) where complaint alleged "that defendants engaged in deceptive acts and practices and 'operate a tangled network of telemarketing companies and telemarketing service providers' who make representations that are 'false'").

[3] The Court's conclusion is further supported by the similarities between the elements of fraud and the elements of a TCPA claim.  As noted above, a TCPA claim requires a plaintiff to establish (1) a misrepresentation, (2) that is likely to mislead consumers, (3) that is material.  *See Gordon*, 819 F.3d at 1192.  Thus, though a plaintiff is not explicitly required to plead intent or damages under the TCPA, the Court finds the elements sufficiently analogous to support the proposition that the TCPA can implicate Rule 9(b).  *See Lights of Am., Inc.*, 760 F. Supp. at 853–54.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

Court finds that, in this case, Plaintiff's second, third, fourth, and fifth[4] causes of action sound in fraud and must meet the heightened pleading standards of Rule 9(b).[5]

### B.    Whether Plaintiff Sufficiently Pleads Its Claims

### 1.    Plaintiff's First Claim

The TSR provides that it is an abusive telemarketing act or practice to request or receive "payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until" after the telemarketer "has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved." *See* 16 C.F.R. § 310.4(a)(2).  Plaintiff's first claim alleges that Defendant violates the TSR when it charges the consumer initial report fees, a set-up fee, and its monthly fees before it has provided the consumer with a

---

[4] Defendant argues that Plaintiff's first cause of action sounds in fraud also because it incorporates by reference all of Plaintiff's other allegations.  (*See* Reply at 3.)  Plaintiff's first cause of action alleges that Defendant sought payment for its services prematurely, but does not include any allegations of misrepresentation or reliance.  (*See* Compl. ¶¶ 60–62.)  Thus, fraud is not implicated as this claim does not appear to incorporate *any* of the elements of fraud and includes no facts indicating that Defendant acted fraudulently.  Therefore, the Court disagrees with Defendant's argument and holds that Plaintiff need only plead this cause of action in compliance with the Rule 8(a) standard.

[5] Plaintiff makes two additional arguments.  First, Plaintiff argues that applying a heightened pleading standard to consumer protection claims would contravene the liberal notice pleading standard.  (Opp'n at 8.)  The Ninth Circuit has already made clear, however, that Rule 9(b) may apply to consumer protection claims such as California's Unfair Competition and False Advertising Laws.  *See Kearns*, 567 F.3d at 1125.  Thus, the Court finds Plaintiff's argument unavailing.

Plaintiff also argues that heightened pleading should not be required here because violations of the TSR do not have the "same reputational consequences as do allegations of intentional harm" and the risk of using litigation as a pretext for discovery is lower in suits brought by federal law enforcement agencies.  (Opp'n at 9.)  The Court finds these arguments unpersuasive as well.  First, accusations of fraud are likely to have the same reputational consequences regardless of what statute provides the cause of action.  Second, Rule 9(b) does not differentiate between governmental agency plaintiffs and private plaintiffs and courts within this Circuit have not found the difference dispositive.  *See ELH Consulting, LLC*, 2013 WL 4759267, at *1; *Lights of Am., Inc.*, 760 F. Supp. 2d at 854; *see also FTC v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *3.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

consumer report. (Compl. ¶¶ 40, 61–62.) As noted above, Plaintiff's claim need only comply with the pleading requirements of Rule 8(a).

Plaintiff has adequately pleaded its claim. Defendant raises no arguments specifically attacking the adequacy of Plaintiff's first claim, other than alleging that Plaintiff's Complaint generally "is inundated with vague terms." (*See* Mot.) However, Plaintiff has pleaded facts indicating that Defendant (1) charged consumers fees prior to an initial consultation, (2) charged set-up fees within two months of the initial consultation, and, (3) charged monthly fees thereafter, prior to providing the consumer with a consumer agency report. (*See* Compl. ¶¶ 25–40.) Accordingly, Plaintiff's Complaint is sufficient to state a claim for its first cause of action.

### 2.    Plaintiff's Second Claim

The TSR also provides that it is unlawful for a telemarketer to misrepresent "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." *See* 16 C.F.R. § 310.3(a)(2)(iii). As noted above, Plaintiff must comply with Rule 9(b)'s pleading standards for this claim. Here, Plaintiff's allegations fall short. Plaintiff fails to identify any specific instances where Defendant made such a misrepresentation. *See Swartz*, 476 F.3d at 764 (explaining that Rule 9(b) "requires more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations'" (citation omitted)). Further, while Plaintiff claims in a conclusory manner that Defendant did not "have a reasonable basis" for its claims that it could raise consumers' credit score by an average of 100 points, Plaintiff fails to provide any facts indicating that Defendant's representations lacked a reasonable basis. (*See* Compl. ¶ 48.) For instance, Plaintiff provides no factual examples of instances where Defendant represented that it would raise a consumer's score but it failed to do so. Accordingly, Plaintiff's second claim is **DISMISSED without prejudice**.

### 3.    Plaintiff's Third Claim

Next, the TSR provides that a telemarketer must "disclose truthfully, in a clear and conspicuous manner" "all material terms and conditions" of any policy regarding refund or cancellation. *See* 16 C.F.R. § 310.3(a)(1)(iii). As with its second claim, Plaintiff must meet Rule 9(b)'s heightened pleading standard. In this case, Plaintiff pleads more facts than with its second claim by providing some of the policies of which Defendant failed to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

inform consumers.  (*See* Compl. ¶¶ 51–54.)  However, Plaintiff's claim is still insufficiently pleaded as it fails to provide details of any instances when Defendant failed to make these disclosures.  *See Swartz*, 476 F.3d at 764.  Therefore, Plaintiff's Fourth Claim is **DISMISSED without prejudice**.

### 4.    Plaintiff's Fourth Claim

Further, the TSR prohibits telemarketers from misrepresenting the total cost to purchase, receive, or use the telemarketer's services.  *See* 16 C.F.R. § 310.3(a)(2)(i).  As with its second and third claims, Plaintiff's fourth claim must be pleaded according to Rule 9(b).  Plaintiff's fourth claims suffers from the same deficiencies as its second and third claims.  Plaintiff pleads in general terms that "at times" Defendant has failed to disclose its monthly fees and has falsely represented that it would not charge monthly fees immediately.  (Compl. ¶¶ 57–59.)  Again, however, Plaintiff fails to plead with specificity what representations were made, when these representations were made, and to whom they were made.  *See Swartz*, 476 F.3d at 764.  Accordingly, Plaintiff's fourth claim is **DISMISSED without prejudice**.

### 5.    Plaintiff's Fifth Claim

Plaintiff's fifth claim arises under the CFPA, which, as noted above, makes it unlawful for any covered entity "to engage in any unfair, deceptive, or abusive act or practice," *see* 12 U.S.C. § 5536(a)(1)(B).  Plaintiff's CFPA claim must also be pleaded in compliance with Rule 9(b).  Plaintiff's CFPA claim appears to be tethered entirely to its second and fourth claims arising under the TSR, however, and alleges that Defendant committed deceptive acts by misrepresenting the efficacy of its services and the cost of its services.  (*See* Compl. ¶¶ 82–88.)  Just as Plaintiff's second and fourth claims fail, so too does Plaintiff's fifth claim.  Therefore, Plaintiff's fifth claim is **DISMISSED without prejudice**.

### C.    Whether Plaintiff Has Standing

Next, the Court will address whether Plaintiff has standing to pursue its first claim—the only surviving cause of action.  Defendant argues that Plaintiff lacks standing to bring this claim because (1) Plaintiff is not a covered person within the meaning of the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

CFPA, (2) Plaintiff's claims are not redressable,[6] and, (3) Plaintiff is not entitled to monetary relief.  The Court finds these arguments unconvincing.

First, Defendant argues that it is not a "covered person" under the CFPA.  (*See* Mot. at 7 n.3.)  The Court disagrees.  A covered person under the CFPA is defined as "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).  The definition of "consumer financial product or service" includes "collecting, analyzing, maintaining, or providing consumer report information, *including information relating to the credit history of consumers*."  12 U.S.C. § 5481(15)(A)(ix) (emphasis added).  As Plaintiff's Complaint alleges that Defendant is in the business of providing consumer report information about consumers' credit history, Defendant falls squarely within the definition of "covered person" as it is defined in the CFPA.

Further, Defendant claims that Plaintiff's Complaint establishes only past violations and thus, injunctive relief is inappropriate.  (*See* Mot. at 8–9.)  Defendant is correct that "[p]ast wrongs are not enough for the grant of an injunction."  *Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1253 (9th Cir. 1984).  However, the Court does not interpret Plaintiff's Complaint as alleging only past conduct regarding its first cause of action. Plaintiff's Complaint does not indicate that Defendant no longer performs credit repair services; in fact, its Complaint alleges that "Defendant engages in an ongoing" credit repair business.  (Compl. ¶ 2.)  Thus, so long as Defendant is still in business, it appears that Defendant could again violate the TSR.  *See SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("An inference arises from illegal past conduct that future violations may occur.").

Third, under consumer protection statutes, the Court has the power to order equitable economic relief when there is "proof of injury" caused by unlawful practices. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1994).  Defendant argues that Plaintiff has not established that there is any proof of injury in this case.  (Mot. at 10.) The Court disagrees.  If the advance fees Plaintiff charged prior to supplying a consumer report were unlawful, then consumers will have, by definition, suffered financial injury. Therefore, the Court finds that Plaintiff has standing to pursue its first claim.

---

[6] It appears Plaintiff raises this argument only as to Plaintiff's second through fifth claims.  (*See* Mot. at 8–9.)  Regardless, the Court finds this argument unpersuasive as to Plaintiff's first claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

### D.    Whether Plaintiff's Advanced Fee Claim Fails as a Matter of Law

Finally, Defendant argues that Plaintiff's claim under the advance fee provision of the TSR, 16 C.F.R. § 310.4(a)(2), fails as a matter of law for several reasons: (1) the Credit Repair Organizations Act ("CROA") "trumps" the TSR; (2) Plaintiff's application of the advance fee provision does not comport with the FTC's interpretation of the rule; (3) the advance fee provision does not apply to Defendant; (4) Plaintiff's application of the advance fee provision conflicts with state law; and, (5) even if applied, Defendant does not violate the advance fee provision.  (Mot. at 11–19.)

### 1.    Whether the CROA Supersedes the TSR

The CROA, enacted September 30, 1996, provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."  15 U.S.C. § 1679b(b).  In Defendant's view, this provision conflicts with the advance fee provision of the TSR, which provides that a credit repair company cannot collect payment until the company has provided documentation of the efficacy of its services at least six months after the company's "promised results have been achieved."  16 C.F.R. § 310.4(a)(2)(ii).  Defendant argues that the CROA should trump the TSR because (1) the CROA was enacted after the TSR, and, (2) a valid statute always supersedes a conflicting regulation.  (Mot. at 11–12.)

There is a dearth of case law addressing the interaction between the CROA and the TSR.  In fact, the only decision addressing the interplay between the CROA and the TSR identified by the parties or found by the Court is *Tennessee v. Lexington Law Firms*, No. 3:96-0344, 1997 WL 367409, at *6 (M.D. Tenn. May 14, 1997).  In that case, the defendant contended that the CROA (recently enacted at the time) was specifically enacted to govern credit repair agencies, and therefore, based on the TSR's "more general wording," Congress "must not have intended credit repair services" be governed by the TSR.  *Id.*  The court disagreed and held that, though the CROA "undoubtedly governs" credit repair agencies, "there is no language in that statute indicating that Defendant's telemarketing activities may not simultaneously be regulated by the [TSR]."  *Id.*  The Court finds the court's analysis persuasive.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | **CV 16-07111-BRO (JEMx)** | | Date | November 15, 2016 |
|---|---|---|---|---|
| Title | **CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC** | | | |

Just as the court in *Lexington Law Firms* held, the Court here finds that Defendant's argument fails at the outset, because contrary to Defendant's contention, the CROA and the TSR do not conflict. The CROA prohibits all *credit repair agencies* from charging advance fees, *see* 15 U.S.C. § 1679b(b), while the TSR prohibits all *telemarketers* who participate in credit repair services from charging advance fees until six months after the promised results have been achieved, *see* 16 C.F.R. § 310.4(a)(2); *see also* Dee Pridgen & Richard M. Alderman, Consumer Credit and the Law, § 2A:12 Credit Repair Organizations Act (Nov. 2016) ("Echoing and effectively broadening the provision in the [TSR], the CROA bans the taking of any advance fees by credit repair organizations before their services have been fully performed. The CROA, however, applies to all credit repair sales, not just those that are telemarketed, so its scope is more comprehensive than the FTC rule." (footnote omitted)). In other words, when a business is both a credit repair agency and a telemarketer, it is required to comply with both the CROA and the TSR. On the other hand, if a credit repair agency does not qualify as a telemarketer, then it need not comply with the TSR—only the CROA is applicable.

Under the CROA, even if a credit repair agency is not a telemarketer, it may not collect payment for its services until the services are completed. *See* 15 U.S.C. § 1679b(b). If that credit repair agency is also a telemarketer, however, then it may not collect services until its services are completed *and* it has provided documentation to the consumer at least six months after the services are completed evidencing the agency's efficacy. *See* 16 C.F.R. § 310.4(a)(2). Thus, the two provisions may be complied with concurrently; they do not conflict. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem."). "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012–13 (9th Cir. 2000) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Accordingly, the Court finds that Plaintiff's first claim under the advance fee provision does not fail as a matter of law on this ground.

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | | Date | November 15, 2016 |
|----------|------------------------|--|------|-------------------|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | | |

### 2. Whether Plaintiff's Interpretation of the TSR Comports with the FTC's Interpretation

Defendant's next argument is that the FTC has chosen not to enforce the advance fee provision, though it is the agency charged with promulgating the TSR. (Mot. at 14–16.) However, while Defendant's argument identifies litigation from another jurisdiction where the FTC initially chose to prosecute under the advance fee provision then later voluntarily dismissed its claim, the argument fails to provide a legal basis on which this Court could dismiss Plaintiff's claim. Thus, the Court finds Defendant's argument unavailing.

### 3. Whether the Advance Fee Provision Applies to Defendant

Next, Defendant argues that the advance fee provision does not apply to companies like Defendant, because the provision "was meant to apply to 'bogus' credit repair establishments." (Mot. at 16.) Defendant points to information released by the FTC that indicates the purpose of the TSR was to curtail "bogus credit services." (*Id.*; *see also* Def.'s RJN, Ex. C at 63 ("This prohibition is directed at the deceptive marketing and sale of bogus credit repair services; it is not directed at the non-deceptive telemarketing of secured credit cards or legitimate credit monitoring services.").) In its Motion, Defendant alleges that the advance fee provision specifically targets credit repair agencies that fraudulently dispute negative credit items on a consumer's report that only temporarily benefit a consumer's credit score, (Mot. at 16); but Defendant provides no authority for the proposition that this is the *only* conduct to which the advance fee provision is intended to prevent. (*See id.*) Thus, though Defendant argues that it "does not engage" in this specific form of fraudulent conduct, (Mot. at 17), other than Defendant's self-serving argument, there is no evidence currently before the Court that the advance fee provision was not intended to prevent other forms of fraudulent conduct. In fact, the FTC literature indicates that its purpose is much broader than Defendant's suggested scope: to curtail "bogus credit services" in general. (*See* Def.'s RJN, Ex. C at 63.) Whether Defendant acts deceptively, and thus, may be considered a "bogus" credit service, is one of the disputes in this litigation. Accordingly, Defendant cannot escape liability by itself concluding that it does not participate in deceptive conduct and, therefore, the TSR does not apply to it. Accordingly, the Court finds Defendant's argument unpersuasive.

//

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

### 4. Whether Plaintiff's Application of the Advance Fee Provision Unlawfully Conflicts with California Law

Defendant's fourth argument is that the TSR conflicts with California law and, because consumer protection laws are not intended to preempt state law, cannot be enforced. (Mot. at 17–18.) Specifically, Plaintiff notes that the California Credit Services Act of 1984 (the "CCSA") requires a credit services company "to perform the agreed services within six months following the date the buyer signs the contract for those services." *See* Cal. Civ. Code § 1789.13(b). In Defendant's view, Plaintiff's interpretation of the advance fee provision would prevent Defendant from fully performing the contracted services within six months, as Defendant is required to wait, at minimum, six months before providing the consumer with documentation of its services' efficacy. (Mot. at 17.)

Again, however, the Court is not persuaded that the two provisions conflict. The CCSA defines a "credit services organization" as any person who (1) improves a buyer's credit record, history, or rating, (2) obtains a loan or other credit line for a buyer, or, (3) provides assistance to a buyer regarding (1) or (2). *See* Cal. Civ. Code § 1789.12(a). Simply providing a credit report does not appear to be contemplated under California law as a service provided by a credit services organization. In other words, the CCSA requires that when a consumer contracts with a credit services organization, the organization is required to complete "the services of a credit services organization"—i.e., the services that improve the consumer's credit record, history, or rating—within six months of the execution of a contract. *See* Cal. Civ. Code §§ 1789.12(a), 1789.13(b). The TSR then separately requires that at least six months following the *completion* of these services, the credit agency provide the consumer with a report evidencing the efficacy of its services. *See* 16 C.F.R. § 310.4(a)(2). But nothing in the language of the CCSA suggests that providing a credit report as evidence of the organization's effective assistance is itself a service that must be completed within six months of the execution of the contract.[7] Therefore, the two provisions do not conflict as a credit repair organization

---

[7] In practical terms, if a consumer contracts with a credit services agency on January 1, under California law, the agency has until June 30 to perform the services required to improve the consumer's credit history or score. Assuming the consumer's credit score improves on June 30, under the TSR, the credit services agency must then provide the consumer with a credit reported dated December 31 or later showing the improvement in the consumer's credit score. Providing this report, however, is not intended to have any effect on the consumer's score; rather, it is mere evidence of the credit agency's

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

may comply with both by performing the services intended to improve a consumer's credit score within six months, followed by providing evidence of those services through a credit report more than six months after they have been completed. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (explaining that impossibility preemption is implicated only "where it is impossible for a private party to comply with both state and federal law" (citation omitted)). Accordingly, the Court will not dismiss Plaintiff's first cause of action on this ground.

### 5.    Whether Defendant Violated the Advance Fee Provision

Defendant's final argument is that, even if the advance fee provision applies, it has not violated the advance fee provision. (Mot. at 18–19.) First, Defendant argues that a credit consultation is not a product or service covered by the TSR. (Mot. at 18.) The Court disagrees. The advance fee provision prohibits a telemarketer from requiring advance payment for "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating." 16 C.F.R. § 310.4(a)(2). Plaintiff's Complaint alleges that Defendant represented that the consultation was the first step in the credit repair process; (*see* Compl. ¶ 28); thus, taking Plaintiff's allegations as true, Defendant represented that the consultation was part of the process for removing derogatory or negative information from the consumer's credit report. Therefore, consultations would be conduct covered by the TSR and requiring payment prior to conducting a consultation would be a violation of the TSR.[8]

Second, Defendant argues that Plaintiff has failed to establish that Defendant participates in "telemarketing" under the TSR because Plaintiff has not explicitly alleged that Defendant makes "interstate" telephone calls. (Mot. at 5 n.2, 18.) Under the TSR, telemarketing is any plan or program that "is conducted to induce the purchase of goods or services . . . and which involves more than one interstate telephone call." 16 C.F.R.

---

prior conduct that had an impact on the consumer's credit score. Thus, the Court finds that providing the report is not a "service" under the CCSA that must be completed within six months of the execution of the contract between the consumer and the credit services agency.

[8] These representations do not have to be pleaded in accordance with Rule 9(b), however, because as addressed above, Plaintiff's Complaint does not allege that these representations were fraudulent or that Plaintiff participated in a course of fraudulent conduct related to these representations. Rather, the relevance of the representations is only to determine whether the initial consultation falls within the scope of the TSR.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| Case No. | CV 16-07111-BRO (JEMx) | Date | November 15, 2016 |
|---|---|---|---|
| Title | CONSUMER FINANCIAL PROTECTION BUREAU V. PRIME MARKETING HOLDINGS, LLC | | |

§ 310.2(gg). Plaintiff's Complaint, however, alleges that Defendant operates on a nationwide basis, (Compl. ¶ 2), and initiates and receives telephone calls from its customers, (Compl. ¶ 19). Therefore, construing the Complaint in the light most favorable to Plaintiff, the Court finds Plaintiff sufficiently pleads facts indicating that Defendant's business involves interstate phone calls.

Further, Defendant argues that Plaintiff has not sufficiently included allegations regarding the "promises" that Defendant has made to consumers. (Mot. at 18–19.) The Court finds Defendant's argument unavailing. To have a viable claim under the advance fee provision, Plaintiff must allege that (1) Defendant requested or required payment, (2) for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating, (3) less than six months before the seller has provided the consumer with documentation (i.e., a credit report) indicating that it has completed the requested or promised services. *See* 16 C.F.R. § 310.4(a)(2). Plaintiff's Complaint alleges that Defendant (1) required consultation fees, set-up fees, and monthly fees, (Compl. ¶ 40), (2) before and after entering into a contract with the consumer with the intent to increase or improve the consumer's credit score, (Compl. ¶¶ 33–34, 36), (3) but before six months has passed and Defendant has provided the consumer with documentation of its services, (Compl. ¶ 40). Thus, Plaintiff has sufficiently pleaded all three elements here and the terms of the promises that Plaintiff made are immaterial to its advance fee provision claim. Therefore, the Court does not find dismissal of Plaintiff's first cause of action warranted on these grounds. Therefore, Defendant's Motion to Dismiss Plaintiff's first cause of action is **DENIED**.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED in part** and **DENIED in part**. Defendant's Motion is **DENIED** as to Plaintiff's first claim. Plaintiff's second, third, fourth, and fifth causes of action are **DISMISSED without prejudice**. Plaintiff is **ORDERED** to file a First Amended Complaint, if any, no later than November 28, 2016.

**IT IS SO ORDERED.**                                                                    :

                                                            Initials of Preparer            rf



2014 WL 274097
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Federal Trade Commission, Plaintiff,

v.

AFD Advisors, LLC, et al., Defendants.

No. 13 CV 6420
|
Filed January 24, 2014

**Attorneys and Law Firms**

William Joseph Hodor, Theresa M. McGrew, Federal
Trade Commission, AUSA, United States Attorney's
Office, Chicago, IL, for Plaintiff.

David B.H. Williams, Williams, Bax & Saltzman, P.C.,
Patrick Edward Deady, Hogan Marren, Ltd., Chicago,
IL, Andrew B. Gordon, Gordon Law Group, Lake
Zurich, IL, Andrew N. Cove, Cove & Associates, P.A.,
Hollywood, FL, for Defendant.

Aaron F. DuPont, Wausau, WI, pro se.

### MEMORANDUM OPINION AND ORDER

James B. Zagel, United States District Judge

*1 Plaintiff Federal Trade Commission has filed a
complaint against Defendants AFD Advisors, LLC,
AMG Associates, LLC, Park 295 Corp., Cal Consulting,
LLC, 9262–2182 Quebec Inc., 9210–7838 Quebec Inc.,
Dupont, Charles A. Lamborn III, Stephane Scabbe, and
Fawaz Sebai for conducting a deceptive telemarketing
campaign in violation of § 5(a) of the Federal Trade
Commission Act ("FTC Act"), 15 U.S.C. § 45(a) and
four violations of the Telemarketing Sale Rule ("TSR"),
16 C.F.R. Part 310. Currently before the court is
Defendants 9262–2182 Quebec Inc., Stephane Scebba,
9210–7838 Quebec Inc., and Fawaz Sebai's motion to
dismiss Plaintiff's complaint. For the following reasons,
Defendants' motion is denied.

## I. DISCUSSION

A. Federal Rule of Civil Procedure 8

Rule 8 requires that a complaint contain a "short and
plain statement of the claim showing that the pleader is
entitled to relief." Fed.R.Civ.P. 8. Rule 8(a)(2). While
Rule 8 "does not require 'detailed factual allegations,' "
it does demand "more than an unadorned, the-defendant-
unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009)(quoting Twombly, 550 U.S. at 555).
Notice pleading remains the standard under Rule 8, and
heightened fact pleading is not required to state a claim.
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007);
Pisciotta v. Old Nat'l Bankcorp, 499 F.2d 629, 633 (7th Cir.
2007).

While specific facts are not necessary to give the defendant
the required fair notice of the plaintiff's claim and its
grounds, notice pleading requires that a complaint contain
more than bare legal conclusions. Swanson v. Citibank,
N.A., 614 F.3d 400, 404 (7th Cir. 2010)(quoting Erickson v.
Pardus, 551 U.S. 89, 93 (2007). A complaint must set forth
"sufficient factual matter" to state a "claim to relief that
is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009). While there must be a reasonable expectation
that discovery will reveal evidence to support the plaintiff's
allegations, a plaintiff's pleading burden corresponds to
the amount of information available. Id.; see also Brooks
v. Ross, 578 F.3d 574, 581 (7th Cir. 2009).

The complaint is to be liberally construed in favor of
plaintiff. See Fed.R.Civ.P. 8(f); Conley v. Gibson, 355 U.S.
41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint should
not be dismissed unless it appears that Plaintiff could
"prove no set of facts in support of his claim which would
entitle him to relief." Conley v. Gibson, 355 U.S. at 45–46,
78 S.Ct. at 102; Forseth v. Vill. of Sussex, 199 F.3d 363, 368
(7th Cir. 2000).

A motion under Rule 12(b)(6) can be based only on the
complaint itself, documents attached to the complaint,
documents that are critical to the complaint and referred
to in it, and information that is subject to proper
judicial notice. See Fed.R.Civ.P. 10(c). However, in
the district court, a party opposing a Rule 12(b)(6)
motion may submit materials outside the pleadings to
illustrate the facts the party expects to be able to prove.
See Geinosky v. City of Chicago, 675 F.3d 743, 745
n.I (7th Cir. 2012) (collecting cases). Plaintiff served
on Defendants two volumes of documentary evidence,
including seventeen declarations from consumer detailing
deceptive practices consumers suffered at the hands

of Defendants, declarations of two law enforcement investigators, and a statement by the Vice President of the Better Business Bureau of Wisconsin explaining the corporate defendant's structure and the role each individual played in the scheme. Plaintiff also produced a script allegedly used by Defendants in its telemarketing calls. These documents may be considered in evaluating the sufficiency of Plaintiff's claims.

**\*2** Defendants argue that the Federal Rule of Civil Procedure 9(b) heightened pleading standard applies here. Rule 9(b) requires that a party pleading fraud or mistake must state a claim with "particularity," generally recognized as the "who, what, when, where, and how" of the claim. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446 (7th Cir. 2011)(quoting *United States ex rel. Lusby v. Rolls–Royce Corp.,* 570 F.3d 849, 854 (7th Cir. 2009)). Rule 9(b), however, expressly limits this standard to fraud or mistake and states that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

While the 7th Circuit has not squarely addressed whether a general or heightened pleading standard should be applied to a claim for deceptive conduct, it has applied the Rule 8 general pleading standard to a claim for unfair conduct because neither fraud nor mistake was an element under the Illinois' Consumer Fraud Act. *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.,* 536 F.3d 663, 670 (7th Cir. 2008). Similarly, because neither fraud nor mistake is an element of deceptive conduct under the FTC Act and the TSR, allegations that provide notice under the relaxed pleading standard of Rule 8 are sufficient. *F.T.C. v. Communidyne,* Case No. 93–cv–6043, 1993 WL 558754, at \*2 (N.D.Ill.Dec. 3 1993) ("A claim under Section 5(a) of the FTC Act is not a claim of fraud or mistake, so Rule 9(b) does not apply.").

### 1. Section 5(a) of the FTC Act

Section 5(a) of the FTC Act prohibits "unfair and deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). To state a claim under § 5(a) of the FTC Act, a plaintiff must allege that the defendant was involved in (1) an act or practice that involved a(2) material misrepresentation or omission that is (3) likely to mislead consumers acting reasonably under the circumstances.

*Kraft, Inc. v. F.T.C.,* 970 F.2d 311, 314 (7th Cir. 1992), *cert. denied,* 113 S.Ct. 1254 (1993); *F.T.C. v. Amy Travel Service, Inc.,* 875 F.2d 564, 573 (7th Cir.), *cert. denied,* 493 U.S. 954 (1989). A misrepresentation or omission is material if it involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service. *Id.* at 322. Unlike establishing a claim for fraud, the plaintiff is not required to allege intent to deceive under § 5 of the FTC Act. *F.T.C. v. Bay Area Bus. Council,* 423 F.3d 627, 635.

Plaintiff's Complaint alleges in detail Defendants' telemarketing scheme involving deceptively marketing and selling a medical discount plan primarily to elderly and infirm consumers throughout the United States. Compl. ¶ 17. Plaintiff alleges that Defendants engaged in the practice of contacting consumers and either directly misrepresented or indirectly led consumers to believe that they were affiliated with a United States government program, such as Medicare or Social Security, or the consumer's own medical insurance provider. Compl. ¶¶ 22–23. Plaintiff contends that Defendants represented that the Defendant had an existing relationship with the, primarily elderly and infirm, consumer and wanted to discuss continuation of a consumer's benefit, enrollment in a new prescription drug discount card offered under consumer's existing insurance, or enrollment in a medical discount plan that would provide consumers with substantial discounts on their prescription drugs. *Id.* at ¶¶ 20–21. Plaintiffs also allege that Defendants often led consumers to believe that the prescription drug discount card was required for consumers to continue receiving Medicare, Social Security, or medical insurance benefits. Plaintiff alleges that Defendants then asked consumers to "verify" their bank account information and then attempted to obtain recorded verifications of consumers' agreement to purchase and be charged for the prescription drug discount card. *Id.* at ¶ 25. Plaintiff alleges that Defendants debited funds from consumers using "demand draft" checks and sent consumers a package with a purported prescription drug discount card that is available free of charge online—and which Plaintiff alleges typically provides no additional benefit to consumers receiving government or private medical insurance benefits. *Id.* at ¶¶ 30–31.

**\*3** The Complaint also contains allegations supporting both Defendants Scebba and Sebai's individual liability for the actions of, respectively, 9262–2182 Quebec Inc.

and 9210–7838 Quebec Inc. The Complaint alleges that Scebba and Sebai (1) participated directly in, or had some control over, a corporation's deceptive practices, and (2) had actual or constructive knowledge of their practices. *FTC v. World Media Brokers,* 415 F.3d 758, 764 (7th Cir. 2005); *FTC v. Bay Area Bus. Council, Inc.,* 423 F.3d 627, 636 (7th Cir. 2005). Plaintiff alleges that Scebba and Sebai "formulated, directed, controlled, had the authority to control, or participated in" the complained-of practices. Compl., at ¶¶ 14, 15.

Defendants argue that Plaintiff failed to plead with specificity and did not pinpoint which acts or practices were violated by which of the ten separate and distinct individuals and companies named in its Complaint, preventing Defendants from properly responding. Defendants further argue that Plaintiff did not allege how any of the Defendants were interrelated or how or whether any had control over or constructive knowledge of, the other named codefendants' acts or practices. Regardless, Plaintiff is not required to plead each of its allegations with specificity under Rule 8(a) general pleading standards. As Plaintiff has alleged more than "naked assertions devoid of further factual enhancement" sufficient to provide notice of Plaintiff's claims against Defendant, Defendants' motion to dismiss Plaintiff's § 5 claims is denied. *Iqbal,* 556 U.S. at 678.

### 2. Telemarketing Sale Rule Claims

Plaintiff also alleges the following four violations of the Telemarketing Sale Rule ("TSR"), 16 C.F.R. Part 310:(1) Defendants misrepresented that they were calling from, calling on behalf of, or were otherwise affiliated with, a government program such as Medicare or Social Security, or the consumer's medical insurance provider (Count III); (2) Defendants misrepresented that their medical discount plan would provide consumers with substantial discounts on prescription drugs (Count IV); (3) Defendants called consumer numbers that had been registered on the National Do Not Call Registry (Count V); and (4) Defendants failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the recipient of the call certain required disclosures about Defendants' telemarketing campaign, such as the identity of the seller, that the purpose of the call was to sell goods and services, and the nature of the goods and services (Count VI).

Plaintiff's Count III and IV claims mirror its claims on § 5(a) of the FTC Act, and, as discussed, are sufficient on Counts III and IV of the Complaint. Plaintiff additionally alleged in its Complaint, in conjunction with additional documentation on the record, that Defendants had, acting directly or through one or more intermediaries, made numerous calls to telephone numbers on the National Do Not Call Registry, and failed to properly disclose its identity. Compl. at ¶¶ 32–33. Plaintiff has provided Defendants with sufficient notice of Plaintiff's claims on Counts V and VI and Defendants' motion to dismiss Plaintiff's claims under the TSR is denied.

### II. CONCLUSION
For the foregoing reasons, Defendant's motion to dismiss is denied in its entirety.

### All Citations

Not Reported in F.Supp.2d, 2014 WL 274097

I

2011 WL 4103542
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

Jesse WILLMS, et al., Defendants.

No. C11–828 MJP.
|
Sept. 13, 2011.

**Attorneys and Law Firms**

Julie K. Mayer, Kathryn Carleton Decker, Nadine S. Samter, Richard McKewen, Eleanor Durham, Federal Trade Commission, Seattle, WA, for Plaintiff.

James Kaminski, Hughes & Bentzen, PLLC, Jonathan N. Rosen, Shook, Hardy & Bacon, LLP, Dawn C. Stewart, The Stewart Law Firm PLLC, Washington, DC, Lynn M. Engel, Molly A. Terwilliger, Summit Law Group, Seattle, WA, for Defendants.

ORDER GRANTING
PRELIMINARY INJUNCTION

MARSHA J. PECHMAN, District Judge.

 **\*1** This matter comes before the Court on Plaintiff's motion for a preliminary injunction. (Dkt. No. 40.) Having reviewed the motion, the oppositions (Dkt.Nos.43, 45), the replies (Dkt.Nos.63, 65, 68), Defendants' surreply (Dkt. No. 73), and all related papers, and having held oral argument on August 4, 2011, the Court GRANTS the motion and enters a preliminary injunction.

**Background**

The FTC accuses Jesse Willms of selling products and services over the internet in violation of the Federal Trade Commission Act ("FTCA"). The FTC's lawsuit names several corporations as defendants, where Willms is either the sole owner or president. The FTC names several individuals as defendants, where they allegedly created certain corporations to assist Willms in securing merchant processing services. (Dkt. No. 40 at 7–8.) Through these various corporate entities, Willms is alleged to have violated the FTCA by engaging in misleading or deceptive conduct targeted at consumers. The FTC also claims Willms has moved assets to offshore accounts to avoid scrutiny and liability. The FTC addresses three types of internet-based activities that Willms spearheaded. The first two are alleged as past conduct, while the latter remains actively on offer: (1) the sale of health and beauty supplements; (2) operation of penny auctions; and (3) research services ranging from reverse telephone research to genealogical research.

A. *Past Conduct*

Starting in 2007, Willms and the other Defendants allegedly used deceptive marketing tactics to sell various products, programs, and services through the internet. These included Acai-based weight loss supplements ("AcaiBurn"), colon cleansing supplements ("PureCleanse"), teeth whiteners, and credit report programs. Defendants marketed these products and services as either free or risk-free trials in which the purchaser had to pay only a nominal fee. According to the FTC, the purchasers were not adequately informed that the purchase was not free or that they were being enrolled in a recurring fee program wherein they would be charged for products or services unless they opted out shortly after placing their order. Although details of the charges were visible on Defendants' websites, they were de-emphasized and placed such that it was not obvious to the consumer the products were not free or risk-free.

The FTC has produced statements from consumers who complain that they were unaware of exactly how many services with recurring fees they were enrolled into and that they found it exceedingly difficult remove themselves from the continuity plans. Defendants often used "upsells" to enroll a buyer of one product into several "free" trial programs for unrelated products at the time of purchase. For example, a customer might buy the weight loss supplement and then be instantly enrolled in three other programs, each of which had its own recurring monthly charges. The information about the upsells was usually disclosed only on the ordering page, where the buyer was otherwise likely to focus on filling out the requested information to complete the sale. Defendants assert they no longer offer upsells or enrollment in programs unrelated to the products actually for sale. (Stefaniuk Decl. ¶ 11.) Many consumers

also complained about the cancellation and refunds policies. If the consumer did not return the product and affirmatively cancel the service within a narrow window of time, they would be charged for the trial product itself and any recurring fees for enrollment in the continuity programs. The FTC contends the terms of cancellation were not prominently displayed and customer complaints skyrocketed about the cancellation policies. Refunds were purportedly difficult to obtain.

**\*2** The FTC also alleges that Defendants made false and misleading claims about the efficacy of the weight loss and colon cleansing products and used false celebrity endorsements. The FTC claims Defendants inaccurately marketed AcaiBurn, the weight loss supplement, as a product that would lead to massive and rapid weight loss without any scientific evidence. The FTC also argues that the colon cleansing supplement, PureCleanse, was touted as preventing colon cancer without scientific support. Lastly, the FTC alleges that Defendants used false celebrity endorsements to convince customers of the validity of the products. Defendants used both Rachel Ray and Oprah Winfrey to market Acai-based supplements without permission from either individual. (Pl Ex. 18 at 1705, 1708.) The FTC claims these practices are attempts to mislead customers about the products' safety and reputation.

In late 2009, Defendants began operating penny auction websites in a manner the FTC alleges violated the FTCA. (*See* Stefaniuk Decl. ¶ 8.) The FTC asserts the penny auctions use misleading terms to lure customers in with the promise of winning expensive items for mere pennies. Users of the website are offered bonus bids, but the website requires an enrollment fee of $150 and a recurring monthly charge of $11.95. (Pl.Ex. 6 at 283.) The membership fee and recurring charges are not allegedly disclosed up front and are only set forth in small font. The FTC also contends that refunds of the service are extremely difficult to obtain, because the customer is required to use up all of her bids without winning an item. This has led to hundreds of customer complaints with the Better Business Bureau and the FTC.

Throughout 2009 and 2010, the FTC alleges that Defendants unfairly and improperly charged clients for services in violation of the FTCA. As evidence, the FTC points to Defendants' high charge-back rates from various credit card companies and the use of various

corporations as shells. A charge-back occurs when the cardholder contacts his or her issuer to dispute a charge and the charge is cancelled or refunded. The ratio of charge-backs to a merchant is monitored by Visa and MasterCard to ensure the merchant is not engaging in overly-risky or predatory conduct. Generally any rate of 1% or more will invite scrutiny from Visa or MasterCard's risk management divisions. (*See* Pl.Ex. 56 at 2907–08, 2918–19; Pl.Ex. 57 at 2986–87.) The FTC alleges that Defendants had charge-back rates over 1% and as high as 22.7%. Defendants allegedly could not get their charge-back rates down, and created new shell companies that contracted with new and different merchant processors to avoid any investigation from Visa and MasterCard. These companies were used, the FTC alleges, to hide Defendants Willms' association with them and artificially lower the charge-back rates. Defendants also allegedly changed the billing descriptions that appear on consumers' bills in order to deceive consumers and avoid further scrutiny.

**\*3** The FTC alleges Defendant Willms moved substantial funds offshore through the corporate defendants to his corporations in Cyprus. Defendants are alleged to have produced over $400 million in gross revenues from their various products and services over the time in question. Emails the FTC has provided suggest that at least some of these funds were moved to accounts in Cyprus, potentially to avoid scrutiny. The FTC has requested a full accounting of the funds, as it is not clear the full status of Defendants' holdings.

**B.** *Current Conduct*

The FTC alleges that Defendants' current eighty-eight websites offering services ranging from phone number lookup services to criminal background checks and to judicial records search services violate the FTCA by inadequately disclosing the existence and terms of negative option continuity plans with recurring monthly charges. The websites contain nearly identical landing pages where users enter in information about which they wish to search. Several pages later, the user is presented with a page stating "For a Limited time, we are offering your report for $1. Please continue to ensure you get your report." (*See, e.g.,* Dkt. No. 79–1 at 6.) The page also says that the report just costs one dollar. If the user presses the "SHOW ME MY REPORT!" button, she is directed to a page where she can fill in her credit card information. On the page in larger font in red is stated "Your Report is Ready. Please Order Now to Ensure You Get Your

Report." (*See e.g.,* Dkt. No. 79–1 at 7.) In smaller font to the upper right of the page and below the credit card information space is written "Pay just $1.00 today to receive your search report, after 7 days if you do not cancel your account you will be billed $18.95 and each month thereafter for up to 5 searches of 500 million records and additional searches for only $1. To cancel anytime simply contact us by calling 866–437–1702." (*See, e.g., id.*) These disclosures, the FTC argues, are inadequate to satisfy the FTCA.

**Analysis**

A. *Standards*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter. v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The parties agree that under § 13(b) of the FTCA, the FTC does not have to demonstrate irreparable harm. *F.T.C. v. Affordable Media,* 179 F.3d 1228, 1236 (9th Cir.1999); (*see* Dkt. No. 43 at 17; Dkt. No. 40 at 34). "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.' " *Affordable Media,* 179 F.3d at 1233 (quoting *FTC v. Warner Commc'ns Inc.,* 742 F.2d 1156, 1160 (9th Cir.1984)). "Under this Circuit's precedents, 'when a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight.' " *Id.* (quoting *F.T.C. v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir.1989)).

B. *Injunction*

**\*4** The FTC argues that Defendants' past and current conduct violates Section 5(a) of the FTCA. The FTC also argues that certain claims about the weight loss and colon cleanse products and the use of celebrity endorsements violates Section 12 of the FTCA. Lastly, the FTC argues Defendants violated Section 5(a) of the FTCA and the Electronic Funds Transfer Act by using unauthorized billing practices. The FTC has shown a likelihood of success on these claims.

1. *Likelihood of Success on Merits: Section 5(a) Claims*

The FTC argues that the following practices violate Section 5 of the FTCA: (1) failing to disclose negative option and continuity features for services offered for low initial costs or that were advertised as free or risk-free; (2) misleading consumers that cancellation and refunds were easy to obtain. The FTC has shown a likelihood of success that Defendants' practices violate the Act.

a. *Standard*

Section 5(a) of the FTCA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "[A] practice falls within [Section 5(a)'s] prohibition (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." *F.T.C. v. Cyberspace.com LLC,* 453 F.3d 1196, 1199 (9th Cir.2006). "An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *F.T.C. v. Stefanchik,* 559 F.3d 924, 928 (9th Cir.2009) (quotation omitted). "Deception may be found based on the net impression created by a representation." *Id.* (quotation omitted). "A misleading impression created by a solicitation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.' " *Cyberspace.com,* 453 F.3d at 1201 (quoting *In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 165 (1984)).

b. *Past Practices*

The FTC has provided substantial information showing Defendants' websites contain misleading and deceptive offers or advertisement of "risk free" or "free" trial offers. The basic scheme used in the sale of weight loss, colon cleanse, and teeth whitener products was to lure the purchaser in with only the payment of a low shipping fee. This was not the only charge. At the same time as the trial package was ordered, the purchaser was enrolled in a membership plan that included recurring charges unless the trial was cancelled in a narrow window of time. As part of the "upselling" practice, Defendants would also enroll the purchaser into several unrelated programs that had recurring fees. Similarly, Defendants offered the penny

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

auction services with purportedly "bonus" introductory bids, while the $150 membership fee and monthly charges were not adequately disclosed. (*See* Pl.Ex. 15, Attach. F., at 1497; Attach H at 1554–55; Pl Ex. 38 at 2016–18; Pl Ex. 40, at 2042–44; Pl.Ex. 43 at 2130.) As explained further, the Court finds these practices likely violate the FTCA.

**\*5** The FTC provides substantial anecdotal testimony these billing practices were actually misleading. The FTC provides declarations from twenty-seven individuals who purchased products or services from the Defendants in which they nearly all complain that the true costs of the products were not made clear. (Pl.Exs.20–46.) The FTC also offers a statistical sampling of forty-eight customer calls made to Defendants that the Defendants provided, which show that customer confusion over the terms of the offers. (Declaration of Eleanor Durham ¶¶ 3–4.) Forty-four percent of the forty-eight calls showed the consumer did not understand the true nature of the charges, fifty-five percent of the call showed the customers were not aware they were enrolled in a monthly program, and nineteen percent of the callers were unaware that they were enrolled in related "upsell" programs. (Durham Decl. ¶¶ 6.) The FTC also provides data from roughly six-hundred-thirty-five consumer complaints submitted to the FTC with regard to the penny auction sites run by Defendants, wherein six hundred complained of being charged a sign-up fee that was not fully disclosed. (Brannon–Quale Decl. ¶¶ 3, 6.) In addition, between March 2010 to February 2011, the Better Business Bureau of Alberta, Canada received roughly 1,100 consumer complaints, most of which were about the charges made for the membership fees and monthly bid fees. (Brozek Decl. ¶¶ 5–6.) Defendants' argument that these sampling sizes are too small to be significant misses the mark. Consumer complaints are highly probative of whether a practice is deceptive, and the mere fact that some persons did not know they were deceived is not proof the acts are not deceptive. *See* Cyberspace.com, 453 F.3d at 1199, 1201.

The FTC has provided an expert declaration from Susan Kleimann, who concludes the AcaiBurn and SwipeBids websites are misleading. First, she explains the landing pages advertising the services do not contain the terms and conditions laying out the recurring charges and membership fees. (Kleimann Decl. ¶¶ 20–21, 28, 39–40.) Second, the websites use font size, white spaces, color, boxes and arrows to emphasize the purported benefits of the products and services, while minimizing

the information about the costs. (*Id.* ¶¶ 42–53.) Third, the websites provide information about costs below the "fold" of the page, which is unreadable unless the viewer scrolls down. (*Id.* ¶¶ 54–55.) This helps obscure the material terms of the bargain. Fourth, the webpages place the key information about the costs on pages where the user is focused on filling out other information and distracted. (*Id.* ¶¶ 66–67.) Defendants' expert, Ingrid Martin, disputes Kleimann's conclusions. Martin argues that Kleimann's approach assumes improperly that buyers are not capable of making their own decisions. This argument may ultimately convince a jury, but it does not plainly rebut Kleimann's analysis of the placement of key elements of the bargain outside of the buyer's view. Martin's analysis does directly controvert Kleimann's analysis that the net impression of the websites is misleading. *See* Cyberspace.com, 453 F.3d at 1200.

**\*6** Lastly, the FTC attacks the misleading nature of Defendants' cancellation policies and practices. Defendants made claims that refunds were available and customers would have full satisfaction. (*See* Pl Exs. 19 at 1728–30; 54 at 2730, 2737; 15 at 1418, 1497.) Consumers were often told that "you will never be charged" and that there was a "TRUE SATISFACTION GUARANTEE" for many of the services. (Dkt. No. 40 at 25; Pl.Ex. 54 at 2730; Pl.Ex. 15 at 1418.) Yet refunds were usually only available by jumping through a myriad of hoops. Cancellation periods were exceedingly short and the terms required for a refunds were difficult to meet. (Dkt. No. 40 at 25.) For those enrolling in penny auctions, a refund was only possible when all of the bids were used and the buyer won no items. (Pl Ex. 43 at 2131 ¶ 6.) Out of six-hundred-thirty-five consumer complaints related to the auctions, five-hundred-twenty-nine stated that they never received a refund, despite trying to follow the complex process. (Pl.Ex. 51 at 2667.) Similarly, with regard to the trial products, nearly half of those complaining to the FTC did not receive full refunds. (Pl Ex. 54 at 2697–98.) The Court finds this likely violates § 5 of the FTCA.

The Court finds the FTC likely to succeed on its claims that Defendants' websites violated the FTCA. The Court finds it likely that Defendants' failure to disclose the true terms of the negative option and continuity plans, as well as their refund and cancellation policies violate the FTCA.

c. *Current Practices*

Defendants contend that their current websites are compliant with the FTCA, and that an injunction should not issue. The Court does not agree. Regardless of these changes, the FTC is likely to succeed in demonstrating that Defendants' current websites violate Section 5 of the FTCA.

The FTC offers evidence of current websites Defendants operate likely violate Section 5 of the FTCA. The Court has reviewed evidence submitted by the FTC showing Defendants new websites selling phone number search services, as well as evidence submitted by Defendants of eighty-eight websites they currently operate selling similar services. These websites continue to contain negative option and continuity plans (e.g. "trial" packages) whose enrollment fees and recurring costs are poorly disclosed. Notably, the fact that the services for sale contain any continuity plan or negative option is not disclosed until the user lands on the sixth page on which he or she is required to enter credit card information. The landing page and the four following pages nowhere suggest there are any other charges but a one-dollar fee. (*See, e.g.,* Dkt. No. 79–1 at 2–6.) The ordering page itself discloses the terms of the continuity plan in text that is smaller than the other text. The placement is not central, and there is no means of purchasing the service without accepting enrollment into the continuity plan. The website design and layout are similar to those the FTC's expert reviewed and found to have a net impression that was misleading. (*See* Kleimann Decl. ¶¶ 42–53.) The Court finds the FTC likely to succeed in demonstrating these websites violate the FTCA.

 **\*7** Defendants argue that their current websites are indistinguishable from a website run by Intellius that the district court found to be deceptive. (Dkt. No. 73 at 7.) The Intellius websites merely highlight the reasons why Defendants' websites likely violate the FTCA. (Engel Decl. (Dkt. No. 74) Ex. 2.) First, the Intellius website contains a stand-alone page explaining the terms of the offer, including the continuity plan and negative option, without any requirement to input information. Second, there is a separate box on the same page labeled "Remove Identity Protect Trial" that the user may select to avoid being enrolled in the continuity plan before making the purchase. (*Id.*) This is a key difference, as Defendants' websites do not permit the purchase of the services without the continuity plan. Third, the font size, placement of text, and overall display of the page is entirely different. The font size on the Intellius page appears roughly the

same throughout the page disclosing the continuity plan, while Defendants webpages minimize the font size and prominence. Fourth, on the Intellius site, two successive pages disclose to the user she is being enrolled in a continuity plan before she arrives at the page where she has to input credit card information. In the case before the Court, Defendants' websites only make the disclosure of a negative option continuity plan on the same page where the user is required to input credit card information. There is no opportunity to unenroll from the trial plan before purchasing the service. As the Ninth Circuit has held, even if the solicitation contains truthful disclosures, it may still leave a net impression that is misleading and violates the FTCA. Cyberspace.com, 453 F.3d at 1200. The comparison of Defendants' websites to the Intellius website Defendants present helps reaffirm the FTC's likelihood of success.

Defendants' experts do not rebut the FTC's showing that the websites are likely deceptive under the FTCA. Ingrid Martin and Thomas Maronick argue that the fees are adequately disclosed and placed on the websites. The experts conclude that no reasonable consumer would be deceived, a highly speculative proposition. The FTC's expert analysis of websites similar to those Defendants currently operate suggests a different view: that the disclosures do not satisfy the FTCA and may leave a net impression that is misleading and deceptive. Having reviewed the evidence of the current websites, the Court finds the FTC has shown a likelihood of success on their claim that the current websites violate the FTCA by inadequately disclosing the negative option and continuity plans.

 *2. Likelihood of Success on Merits: Section 12 Claims*
The FTC argues Defendants have violated Section 12 of the FTCA by making false claims about AcaiBurn and PureCleanse products; and (2) by using false celebrity or other endorsements.

Section 12 of the FTCA is specifically directed to false advertising. F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir.1994). "That section prohibits the dissemination of 'any false advertisement' in order to induce the purchase of 'food, drugs, devices, or cosmetics.' " *Id.* (quoting 15 U.S.C. § 52(a)(2)). The dissemination of any such false advertisement is an "unfair or deceptive act or practice in or affecting commerce" within the meaning of Section 5 of the FTCA. 15 U.S.C. § 52(b). The Act

defines "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect." 15 U.S.C. § 55. The FTC generally satisfies its burden by showing the advertisement is false or by showing the advertiser "lacked a reasonable basis for asserting that the message was true." *Pantron I*, 33 F.3d at 1096 (quotation omitted). A representation may be misleading if express or implied. *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir.1993).

**\*8** The FTC has shown a likelihood of success on its claim Defendants falsely advertised the effectiveness of the AcaiBurn product. AcaiBurn was advertised as a weight loss product, a claim that "the key ingredients in AcaiBurn were found to cause up to 450% MORE WEIGHT LOSS than dieting and exercise alone will get you." (Pl Ex. 15 at 1355, 1406, 1518 and 1442 (emphasis in original).) The FTC provides a declaration from Robert F. Kushner, M.D., an expert on obesity and weight loss, who states that these ingredients will not cause rapid, substantial weight loss. (Pl.Ex. 16 at 1589.) In response, Defendants offer the declaration of Frank Greenway, M.D., who argues that the AcaiBurn product was marketed as just one component of a weight loss regime, and that the claims about rapid weight loss were not false. (Dkt. No. 56 at 1–6.) However, Dr. Greenway's opinion does not provide any factual basis that substantiates Defendants' claim that the key ingredients of AcaiBurn will cause rapid weight loss. The Court finds the FTC has a likelihood of success on this claim.

The FTC also argues that the PureCleanse products "made strongly implied representations ... [they] help prevent colon cancer." (Dkt. No. 40 at 28.) The FTC argues an embedded video of Katie Couric on the PureCleanse website discussing colon cancer misled consumers to think the cleansing of the colon would prevent cancer. (*Id.*) Defendants respond by arguing that nowhere did the website actually state that the PureCleanse would prevent colon cancer. Ingrid Martin, a marketing expert, avers that no one would conclude that PureCleanse prevents colon cancer. (Dkt. No. 51.) Martin argues that the video of Couric only goes on to show that the colonoscopies are important they to obtain in order to prevent and catch colon cancer at an early stage. (Dkt. No. 51 at 9–10.) The inclusion of the video, however, suggests that the pills may have a strong correlation to prevention of colon cancer, a fact that has not been shown to be true.

While this is a close question, the Court is persuaded that the FTC has a likelihood of success on the merits.

The FTC also argues that the use of celebrity endorsements to advertise the products violates § 12 of the FTCA. Defendants offer no response. This is unsurprising, as both Rachel Ray and Oprah have denounced the use of their personalities to advertise these products.

The Court finds the FTC has a likelihood of success on its § 12 claims tied to Defendants' statements about the efficacy of their products, and the use of false celebrity endorsements. Although there is no evidence that Defendants continued claims and endorsements, the Court finds it proper to issue an injunction barring such activity. *See FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 395, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). Defendants do not seem to disagree. Defendants' proposed injunction forbids any misrepresentation of "[a]ny material aspect of the benefits, performance, efficacy, nature or central characteristics of the product, program or service" and misrepresenting any celebrity endorsements. (Dkt. No. 73–1 at 8, 13.) The Court finds an injunction appropriate to forbid such activity.

### 3. *Likelihood of Success on Merits: Unauthorized Billing Practices*

**\*9** The FTC argues Defendants have violated Section 5 of the FTCA by charging consumers' accounts without express informed consent and ignoring proper attempts to cancel charges. (Dkt. No. 40 at 41.) The evidence is sufficient to support a finding a likelihood of success for the FTC.

As explained above, Section 5(a) of the FTCA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). Courts have found a violation of Section 5(a) where the defendant has withdrawn money from a consumer's bank account without informed consent. *See F.T.C. v. Global Marketing Group, Inc.*, 594 F.Supp.2d 1281, 1288–89 (M.D.Fla.2008); *F.T.C. v. J.K. Publications, Inc.*, 99 F.Supp.2d 1176, 1201

(C.D.Cal.2000) (noting that debiting a consumer's account without authorization is an unfair practice under the FTCA). The FTC also argues these practices violated the Electronic Funds Transfer Act and its regulations because Defendants failed to obtain written authorization from consumers for the merchant to place recurring charges on consumers' debit accounts, and provide a copy of the written authorization to the consumers. *See* 15 U.S.C § 1693(a); 12 C.F.R. § 205.10(b). Failure to comply with these requirements is a violation of the FTCA, 15 U.S.C. § 1693*o*(c).

The FTC argues that the high charge-back rates from Visa and MasterCard to Defendants is evidence that Defendants were making unauthorized charges to consumers. (Dkt. No. 40 at 30–32.) Defendants do not necessarily dispute that they had charge-back rates above the 1% limit that Visa and MasterCard require, and that they were as high as 22.7%. (Chen Decl.) Throughout 2009, companies associated with Defendant Willms had very high charge-back rates. (*Id.* at 13–19.) Many of the charge-backs were coded as unauthorized charges or fraudulent charges. (Durham Decl. ¶¶ 17–23, 33.) For example, from July 1, 2009 to August 18, 2009, MasterCard had 1,273 charge-backs (thirty-eight percent of the total) that were coded as "fraud transaction —no cardholder authorization" or "non-possession of card" as the reason for the chargeback. (*Id.* ¶ 18.) This significant level was found throughout 2010. (*See id.* ¶ 33.) The FTC alleges that Willms and the other individual defendants tried to minimize charge-backs by using splitting up charges, relabeling them in a confusing way, and processing sales through multiple merchant accounts with different payment processors. (*See* Pl Ex. 381–82, 2904, 2917, 2434.) Defendants also allegedly created different corporations with nominee principals to obtain merchant accounts that would appear unrelated to Willms' companies already flagged by Visa and MasterCard. (Pl Ex. 56 at 2921–22; Pl Ex. 50 at 2442–43, 2351–2665.)

**\*10** The Defendants present a substantial defense that the use of corporate affiliates to obtain merchant processing was not an unfair practice that violates the FTCA, and that the affiliates were responsible for the high chargebacks. First, Defendants argue that because merchant processers require an American citizen to be the signatory, Willms was required to use other individuals to open these accounts. (Meltzer ¶¶ 9–13.) Defendants

stress the Willms did not hide his beneficial interest in the companies and that he never directly dealt with Visa or MasterCard. (*Id.* ¶¶ 15–17.) Willms states that he used multiple processors "to obtain increased volume to satisfy the bona fide customer demand for his product and not for any other reason." (Willms Decl. at 20.) Defendants argue there was no motive for using multiple processors as part of a deceptive practice. Lastly, Defendants argue that they were "repeatedly victimized by affiliate fraud." (Dkt. No. 43 at 28.) This, they argue, is the reason for the high chargebacks.

The FTC mounts a substantial attack to these defenses that the Court finds sufficient to find a likelihood of success on this claim. The FTC presents substantial testimony that Willms' beneficial ownership interests in the corporations were not adequately disclosed and that the structure of the affiliate defendant corporations was a means to avoid further scrutiny. The FTC also presents unrebutted evidence that the charges were coded in a confusing manner on consumers' charge accounts. Whether the corporations related to Willms are shells is a close question. The Court need not resolve that issue to find sufficient evidence here that the FTC is likely to succeed on its claim that Defendants violated the EFTA and the FTCA.

### 4. *Public Interest*

In weighing the equities, the Court is to favor the public interest against the private interest where the FTC establishes a likelihood of success on the merits. *Affordable Media,* 179 F.3d at 1236. The Court finds the equities weigh in favor of the FTC, as the evidence of consumer harm is substantial. Defendants' main argument is that they have ceased to engage in any conduct that violates the FTCA. As explained above, the Court disagrees.

### 5. *Scope of Injunction*

The Court finds that an injunction should issue in this case. The evidence of Defendants' past conduct is sufficiently serious and deliberate to suggest a strong likelihood of continued unfair advertising practices in the absence of an injunction. *See Sears, Roebuck and Co. v. F.T.C.,* 76 F.2d 385, 392 (9th Cir.1982). This is particularly the case where Defendants' present conduct also likely violates the FTCA. The Court finds the scope of the injunction the FTC requests in its proposed order

to be properly tailored to the controversy before the Court. (Dkt. No. 3–1.) The FTC seeks an injunction that would prohibit Defendants from a plethora of activities, including: (1) offering for sale any product with a negative option and continuity plan feature; (2) offering any products, programs or services as "free" trial" or "bonus"; (3) misrepresenting the nature of the costs to receive the product and any cancellation policy; (4) failing to disclose the amount, timing, and manner of payment of fees and the terms and conditions of any refunds; (5) making representations about the performance, benefits, and safety of any products, including those about weight loss and colon cancer; (6) misrepresenting that any product is endorsed by a celebrity or using consumer testimonials about obtaining refunds; (7) charging or debiting a consumer's bank account or credit car without express informed consent; and (8) ceasing collection activities, maintaining proper accounting, and preserving all records related to this action. (Dkt. No. 3–1 at 9–12, 14, 18–20.) The FTC also asks that Defendants be ordered to engage in compliance monitoring and to distribute copies of the order. (*Id.* at 20–22.) The Court finds these aspects of the requested order proper.

**\*11** Defendants primarily argue that the restriction on negative option and continuity plans is unconstitutional and improper. The Court does not agree. "Commercial expression is protected only if it concerns lawful activity and is not misleading." *Litton Indus. ., Inc. v. F.T.C.,* 676 F.2d 364, 373 (9th Cir.1982). "Even truthful commercial speech can be regulated if the government's interest in regulation is substantial and if the regulation directly advances that interest and is not more extensive than necessary." *Id.* "Any remedy formulated by the FTC that is reasonably necessary to the prevention of future violations does not impinge upon constitutionally protected commercial speech." *United States v. Reader's Digest Ass'n,* 662 F.2d 955, 965 (3d Cir.1981) (emphasis in original). Here, the speech to be regulated appears to violate the FTCA in that it is deceptive and misleading. The prohibitions the FTC seeks to impose are tailored only to those activities the FTC has shown likely violate the FTCA. As such, the proposed injunction does not run afoul of the First Amendment.

The Court GRANTS the preliminary injunction. As part of this order, the Court incorporates the FTC's proposed order in full, with only one exception as to the asset freeze, as explained below. (Dkt. No. 3–1.)

## C. *Asset Freeze*

The FTC requests a freeze of all assets held by Defendants and to require repatriation of the funds to the United States. There is adequate evidence to support both requests as to Defendant Willms only.

Congress has given district courts equitable authority to order the freezing of assets under § 13(b) of the FTCA. *F.T.C. v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982). An asset freeze is proper to ensure that a rescission of contract damages can be awarded and funded by the defendants. *Id.* "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier,* 572 F.3d 1067, 1085 (9th Cir.2009). The Court is to consider whether the freezing of assets "under certain circumstances ... might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed." *Id.* (quoting *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1106 (2d Cir.1972)).

The FTC has shown sufficient evidence to justify an asset freeze. Not only has it shown a likelihood that Defendants have engaged in misleading marketing practices, but it has also shown that Defendants have moved substantial funds to offshore companies and bank accounts. (Pl.Ex. 2 at 51–55; Pl.Ex. 3 at 192–96, 198, 254; Pl.Ex. 50 at 2442–44.) Willms has admitted to establishing several holding companies in Cyprus to facilitate international merchant banking. (Pl.Ex. 2 at 95.) Email exchanges show that funds were likely transferred from Willms' accounts to Cyprus and possibly for the purpose of hiding assets. For example, on October 22, 2009, Phyllis Plester sent an email to Willms showing the daily movement of funds to Cyprus: "Why can't we have Dan wire lump sum $ to our HSBC accounts in Seattle from each of the 4 Cyprus accounts ... ? Right now he's transferring $ daily from 3 Cyprus accounts to one major Cyprus account [Rivierico] anyway." (Pl.Ex. 3 at 194.) Elsewhere Plester wrote of Willms' contact in Cyprus: "First and foremost, the 'money laundering squad' I'm sure is watching us very closely and we don't want to look 'stupid' in Dan's and/or Dee's eyes." (*Id.* at 254.) These facts, combined with the FTC's purported inability to trace the whereabouts of the over $400 million in revenue suffice to support the asset freeze and an accounting.

**\*12** Defendants argue that the FTC has not produced any evidence that any significant funds were moved to Cyprus. Defendants rely on two declarations from Bryan Moser who reviewed bank statements from 2009 through 2011. Mr. Moser contends that he analyzed bank statements for Defendant Willms' related business for 2009 and did not find "significant transfers of money to entities outside of the United States and Canada for which there was not a reasonable business purpose." (Second Moser Decl. ¶ 9.) Moser's conclusion does not satisfy the Court that there has been a full accounting of the Willms accounts or the revenue generated in 2009. Nowhere has Mr. Moser suggested he examined the accounts of the two Cyprus entities who are defendants to this action. He has not stated with any certainty that there have not been movements of assets outside of the United States from Defendants. He does not rebut the other evidence the FTC has offered of such movement of funds. The Court is not persuaded by Defendant Willms' argument on this issue.

Defendants rely on *F.T.C. v. John Beck Amazing Profits, LLC,* 2009 WL 7844076, at \*15 (C.D.Cal. Nov.17, 2009), to argue that the FTC cannot meet its burden to obtain an asset freeze. The FTC correctly points out, in *John Beck* there was no evidence of any dissipation or transfer of assets. Rather, the FTC in *John Beck* relied on evidence that the defendants' conduct alone was fraudulent. Here, the FTC has shown that at the bare minimum, Defendants have bank accounts in Cyprus through which they have transferred funds and there is no full accounting of where their assets are. The email activity cited above also suggests the movement of funds outside of the United States may be for an improper purpose. This is sufficient to justify the asset freeze. There is also no showing that the asset freeze will hamper the recovery of funds for consumers, should damages be awarded.

Given that the FTC has not shown little if any evidence of the other individual defendants engaging in off-shore transfers of assets, the Court finds that the asset freeze should apply only to Defendant Willms and those corporate Defendants that he controls and directs. The FTC's proposed order, which the Court incorporates into its own, is modified on page 15 lines 5–9 to be phrases as follows:

> IT IS FURTHER ORDERED that Defendant Willms, whether acting directly or through any corporation,

> partnership, subsidiary, division, affiliate, or other entity or device, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, except as directed by further order of the Court, is hereby preliminary restrained and enjoined from ...

(*See* Dkt. No. 3–1 at 15.) This excludes the other individual Defendants and their personal assets. Should the FTC discover evidence that the individual Defendants are engaged in any activities in concert with Defendant Willms that violates the injunction, it may seek leave of Court to expand the asset freeze.

### D. *Motion to Strike*

**\*13** Defendants move to strike several of Plaintiffs' exhibits submitted in support of the motion for a preliminary injunction. Defendants' attack to Exhibits 2, 3, 8–13, 47–49, 50, 51, 54, and 57 is without merit.

In the preliminary injunction context, the Court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984). Generally, however, the government must make a "prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity or identification." *United States v. Workinger,* 90 F.3d 1409, 1415 (9th Cir.1996) (quotation omitted). Documents produced by a party in discovery can be deemed authentic where the documents bear evidence of authenticity and the producing party does not dispute the authenticity. *Maljack Prods, Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 889 n. 12 (9th Cir.1996).

The Court does not find exhibits 2, 3, and 8 properly stricken. The FTC claims that its exhibits 2, 3, and 8 were produced by Defendants in response to investigatory access letters and civil investigation demands ("CID") and are therefore authenticated. (Dkt. No. 63 at 19.) Exhibits 2 and 3 contain a letter from counsel for Defendants to the FTC in which counsel responds to investigatory questions with a large body of appended materials that are Bates stamped and specifically cited in the letter. This has sufficient indicia of authenticity to qualify as

admissible, particularly under the relaxed standards for a preliminary injunction motion. *Maljack,* 81 F.3d at 889 n. 12. Similarly, the documents in Exhibit 8 were produced by Defendants to the FTC as part of a CID, and Defendants' counsel again provided a detailed letter with corresponding Bates stamping to explain the nature of the documents.

Defendants' request to strike Exhibits 9–13, 47–49, and 57 as non-authenticated is not sufficient. The documents in these exhibits were produced to the FTC in response to CIDs issue to third-party businesses. Exhibits 9–11, 47–49, and 57 are CID responses from attorneys or representatives of the third-party companies explaining the nature of the documents which also contain Bates stamping. Such responses from non-adverse third-parties in response to a de facto discovery request are sufficient to satisfy authenticity. *See Metro Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 454 F.Supp.2d 966, 972 (C.D.Cal.2006). Exhibit 12 also contains a certification of authenticity, which is sufficient to establish authenticity. *See SEC v. Franklin,* 348 F.Supp.2d 1159, 1161 (S.D.Cal.2004). Exhibit 13 is a transcript of testimony given to the Senate, which is self-authenticating under FRE 902(5). *See United States ex rel. Parikh v. Premera Blue Cross,* No. C01–0476P, 2006 WL 2841998, at *8 (W.D.Wash. Sept.29, 2006) (finding an excerpt of a hearing before the House Subcommittee on Oversight and Investigations self-authenticating). The Court DENIES the motion to strike these exhibits. Defendants' motion to strike Exhibit 5 is MOOT, as the Court did not consider this exhibit in ruling on the motion.

 *14 Defendants lastly argue that Exhibits 50, 51, and 54 are inadmissible because they contain hearsay or summaries of information with multiple levels of hearsay. The exhibits are admissible. First, Exhibit 50 is a declaration of Eleanor Durham in which she summarizes information taken from documents produced by Defendants and third-party businesses in response to CIDs. These are authenticated and Durham has averred that they are not purely hearsay. They are admissible summaries under FRE 1006. Exhibit 51 summarizes complaints filed with the FTC itself and it is admissible

under FRE 1006. Exhibit 54 summarizes consumer complaints produced by Defendants. The Court will not strike these documents.

### E. *Evidentiary Hearing*

Defendants request that the Court hold an evidentiary hearing prior to ruling on the motion for preliminary injunction. There is no presumption in favor of an evidentiary hearing. *Int'l Molders and Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 554 (9th Cir.1986). Only "[w]here sharply disputed the facts are simple and little time would be required for an evidentiary hearing, proceeding on affidavits alone might be inappropriate." *Id.* The Court does not find itself in that position. Rather, the parties dispute the interpretation of and spin on the facts more than the accuracy of the facts themselves. Moreover, even a lengthy evidentiary hearing would not likely clarify the record. The Court thus DENIES the request.

### Conclusion

The Court finds the FTC has shown a likelihood of success on its claims brought under the FTCA. Defendants' past and present conduct justifies issuance of the preliminary injunction as presented by the FTC in its proposed order. (Dkt. No. 3–1.) The Court adopts and incorporates the FTC's proposed order as part of this ruling. The Court, however, limits the asset freeze to Defendant Willms. It does not apply to the other Defendants. The Court DENIES Defendants' motion to strike and request for an evidentiary hearing.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 12th day of September, 2011.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4103542, 2011-2 Trade Cases P 77,599

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# J

2014 WL 4377579
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

People of The State of Illinois, Plaintiff,

v.

Alta Colleges, Inc., a Delaware corporation,
Westwood College, Inc., a Colorado corporation
d/b/a Westwood College and Westwood College
Online, Wesgray Corporation, a Colorado
corporation d/b/a Westwood College–
River Oaks and Westwood College–Chicago
Loop, Elbert, Inc., a Colorado corporation
d/b/a/ Westwood College–DuPage, and
El Nell, Inc., a Colorado corporation d/b/a
Westwood College–O'Hare Airport, Defendants.

No. 14 C 3786
|
Signed September 4, 2014

**Attorneys and Law Firms**

Gary Steven Caplan, Cecilia T. Abundis, Joseph
Michael Sanders, John P. Wolfsmith, Khara Coleman
Washington, Oscar Pina, Samuel Aaron Abraham Levine,
Office of Illinois Attorney General, Thomas Patrick
James, Chicago, IL, Susan N. Ellis, Office of Illinois
Attorney General, Springfield, IL, for Plaintiff.

Joseph J. Duffy, Henry M. Baskerville, Mariah E. Moran,
William Paul Ziegelmueller, Stetler, Duffy & Rotert, Ltd.,
Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

HON. RONALD A. GUZMAN, United States District
Judge

**\*1** Plaintiff sues defendants (collectively, "Westwood")
for their alleged violations of the Consumer Financial
Protection Act and the Illinois Consumer Fraud and
Deceptive Business Practices Act. The case is before the
Court on Westwood's Federal Rule of Civil Procedure
("Rule") 12(b)(6) motion to dismiss and plaintiff's motion
to sever and remand. For the reasons stated below, the
Court denies both motions.

### *Facts*

Westwood is a for-profit, post-secondary school that
has four campuses in Illinois and an online school that
operates here. (2d Am.Compl.¶ 1.) Westwood aggressively
markets its programs to Illinois consumers in print media,
on the internet, television and radio, through direct mail
and at job fairs. (*Id.* ¶¶ 1–2, 37–41, 46–49, 54–66.)
Moreover, it makes false or misleading representations
to consumers about the school's accreditation and
admissions process, the cost of attaining a degree, the
terms of loans offered by Westwood's in-house lending
program, the jobs graduates will be qualified to obtain,
and the likelihood that graduates will obtain employment
in their chosen field. (*Id.* ¶¶ 1–7, 48–49, 56–58, 60–61, 67–
78, 89, 91–92, 107–35, 141–42, 162–89, 192–216, 218, 226–
70.)

On January 18, 2012, plaintiff filed a one-count complaint
in state court alleging that defendants engaged in
deceptive practices in violation of the Illinois Consumer
Fraud and Deceptive Business Practices Act ("ICFA").
(*See* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss 2d Am.
Compl., Ex. 1, Compl., *People v. Alta*, No. 12 CH
1587 (Cir. Ct. Cook Cnty.).) In March 2014, plaintiff
sought leave to amend its complaint to add Count II, an
ICFA unfair practice claim, and Counts III and IV for
violation of the federal Consumer Financial Protection
Act ("CFPA"). On May 6, 2014, the state court granted
plaintiff's motion, and on May 22, 2104, defendants
removed the suit to this Court.

### *Discussion*

**Motion to Dismiss—Federal Claims**
Westwood argues that the CFPA claims should be
dismissed because plaintiff has not alleged that it is an
entity subject to the statute. The Court disagrees. In
relevant part, the statute defines "covered person" as
one "that engages in offering or providing a consumer
financial product or service," *i.e.,* "extend [s] credit and
servic[es] loans ... or [makes] other extensions of credit,"
if the service "is offered or provided for use by consumers
primarily for personal, family, or household purposes."
12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(i). Plaintiff
alleges that Westwood operates an in-house student loan
program called APEX, which places Westwood squarely

within the definition of "covered person." (*See* 2d Am. Compl. ¶¶ 89–92, 127–34.)

Even if it is a "covered person," Westwood argues that it falls within the exemption for "merchant[s], retailer[s], or seller[s] of any nonfinancial good or service." *See* 12 U.S.C. § 5517(a). However, that exemption does not apply if the merchant "regularly extends credit ... [that] is subject to a finance charge," and "is ... engaged significantly in offering or providing consumer financial products or services." 12 U.S.C. § 5517(a)(2)(B)(iii), (C)(i). Plaintiff alleges that Westwood meets these qualifications. (*See* 2d Am. Compl. ¶¶ 67–135.)

**\*2** Equally unpersuasive is Westwood's argument that the CFPA claims are doomed because the students identified in the complaint took out APEX loans before the Act's effective date. Though, as plaintiff concedes, it cannot recover for violations of the CFPA that occurred before the statute went in effect on July 21, 2011 (*see* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss 2d Am. Compl. at 18), its failure to identify students who took out loans after that date is not fatal to its claims. Given plaintiff's allegation that Westwood has operated its APEX program since 2002 and continues to do so today (*see* 2d Am. Compl. ¶¶ 89, 477, 487–88), its failure to identify specific students who received APEX financing after July 21, 2011 is not a basis for dismissing the CFPA claims.

Alternatively, Westwood contends that Counts III and IV do not sufficiently allege the elements of an abusive or unfair practice claim under the CFPA. An unfair practice claim requires allegations that the practice causes or is likely to cause "substantial injury to consumers," consumers cannot reasonably avoid that injury, and the injury "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). An abusive practice claim requires allegations that a practice: (1) "materially interferes with [a consumer's] ability to understand a term or condition of a consumer financial product or service"; or (2) "takes unreasonable advantage of (A) a [consumer's] lack of understanding ... of the material risks, costs, or conditions of the product or service; (B) [his] inability ... to protect [his] interests ... in selecting or using a consumer financial product or service; or (C) [his] reasonable reliance ... on a covered person to act in [his] interests." 12 U.S.C. § 5531(d).

Plaintiff alleges that Westwood induces students to enter into financing contracts with APEX, by:

(1) targeting as potential students people who, because of socioeconomic background or lack of sophistication, have little or no knowledge about higher education and financial aid;

(2) holding out salespeople as "admissions representatives" who will guide potential students to the education program best suited for them;

(3) instructing admissions representatives to build a rapport with potential students and then pressure them to enroll immediately, using scripts provided by Westwood to overcome any objections or reluctance;

(4) falsely telling potential students that Westwood has a selective or competitive admissions process, its credits are easily transferrable to other schools, and a Westwood degree can be the foundation for a graduate degree;

(5) simultaneously enrolling students and signing them up for financial aid;

(6) downplaying or misrepresenting the cost of Westwood's programs or evading cost-related questions;

(7) falsely telling students that their APEX loans will be paid in full upon their graduation;

(8) falsely telling students that Westwood has regional accreditation;

(9) falsely telling students that (a) Westwood Criminal Justice graduates are eligible to be hired as federal, state or local police officers in Illinois; (b) most graduates of Westwood's Criminal Justice Program get law enforcement jobs, (c) Westwood graduates earn about $20,000.00 more per year than people with just a high school diploma, and (d) a Westwood Criminal Justice Program graduate can obtain employment in law enforcement even if he has a criminal record; and

(10) bidding on internet search terms such as "FBI" and "state trooper," so that a Westwood ad appears when an Illinois consumer searches for such terms.

(2d Am. Compl. ¶¶ 46–49, 54–78, 107–35, 139–89, 193–298, 300–10, 477; *id.,* Ex. 1, Staff of S. Comm. on

Health, Education, Labor and Pensions, 112 Cong., *For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* 37 ("HELP Report"), at 214–25 (Comm. Print July 30, 2012).) Plaintiff also alleges that Westwood takes these actions knowing that most students will leave Westwood without a degree or the hope of obtaining a well-paying job and with a debt that will take decades to repay and/or the certainty of being hounded by collection agencies. (2d Am. Comp. ¶ 477; *id.,* Ex. 1, HELP Report at 206, 214–25 (2012).) These allegations are sufficient to state CFPA claims for unfair and abusive practices.

**\*3** Alternatively, Westwood asserts that the CFPA does not give plaintiff independent enforcement power but simply permits it to act as a "proxy" for an unconstitutional entity created by the statute, the Consumer Financial Protection Bureau ("Bureau"). Because the Bureau is unconstitutional, Westwood argues, it cannot permissibly enforce the statute by itself or through a proxy such as plaintiff.

The premise of this argument, that plaintiff does not have independent enforcement power, is based on § 5552 of the CFPA. That section permits a state attorney general to sue to enforce the statute, after notifying the Bureau of the state's intention to sue and giving the Bureau a copy of the complaint. 12 U.S.C. § 5552(a)(1), (b)(1)(A). After receiving the notice:

> [T]he Bureau may—
>
> (A) intervene in the action as a party;
>
> (B) upon intervening—
>
> (i) remove the action to the appropriate United States district court, if the action was not originally brought there; and
>
> (ii) be heard on all matters arising in the action; and
>
> (C) appeal any order or judgment, to the same extent as any other party in the proceeding may.

12 U.S.C. § 5552(b)(2). In Westwood's view, subsection (C) allows the Bureau to appeal orders issued in state-filed enforcement actions in which the Bureau has not intervened, thus establishing that a state sues on behalf of the Bureau, not itself, when it enforces the CFPA.

The Court disagrees for two reasons. First, § 5552 expressly authorizes states to sue on their own behalf. *See* 12 U.S.C. § 5552(a)(1) ("[T]he attorney general ... of any State may bring a civil action *in the name of such State* ... to enforce provisions of this [statute] ....") (emphasis added); *United States v. Misc. Firearms, Explosives, Destructive Devices & Ammunition,* 376 F.3d 709, 712 (7th Cir.2004) (stating that a court "must ... assume that [the] plain meaning [of statutory language] accurately expresses the legislative purpose") (quotation omitted). Second, Westwood's interpretation of the Bureau's appellate rights as set forth in subsection (C), conflicts with the other subsections of this provision. Subsection (A) allows the Bureau to intervene "as a party" in a statefiled suit, and subsection (B) sets forth the actions the Bureau can take after intervening. Thus, read in context, subsection (C) —"[T]he Bureau may ... appeal any order or judgment, to the same extent *as any other party* in the proceeding"— can only mean that the Bureau's appellate rights are limited to cases in which it intervenes. *See Misc. Firearms, Explosives, Destructive Devices & Ammunition,* 376 F.3d at 712 (stating that courts must interpret statutory provisions in their context and "not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous"). Because the plain language of the statute refutes the notion that the CFPA gives plaintiff no independent enforcement power, and that notion is the basis for Westwood's constitutional challenge to plaintiff's prosecution of this suit, the Court rejects that challenge. Even if plaintiff's prosecution of this suit is constitutional, Westwood says the statute itself is not because its prohibition of "unfair, deceptive, or abusive act[s] or practice[s]" is unconstitutionally vague. *See* 12 U.S.C. § 5536(a)(1)(B). According to the Supreme Court:

> The degree of vagueness that the Constitution tolerates —as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.

**\*4** Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498—99 (1982) (footnotes omitted). Because the CFPA is an economic regulation, and Westwood does not contend that the statute inhibits its constitutionally-protected activity, the CFPA is subject to a lenient vagueness test.

The statute easily passes that test. The CFPA provides a definition of "unfair" and "abusive" practices. *See* 12 U.S.C. § 5531(c)(1), (d) (defining an unfair practice as one that causes or is likely to cause substantial injury to consumers that they cannot reasonably avoid and is not outweighed by benefits to consumers or competition, and an abusive practice as one that materially interferes with a consumer's ability to understand a term of a financial product, or takes unreasonable advantage of his lack of understanding of the product's risks, costs, or conditions, his inability to protect his interest in selecting it or his reasonable reliance on defendant to act in his best interests). The statute does not define a "deceptive" practice, but the Bureau says the phrase has the same meaning under the CFPA as it does under the Federal Trade Commission Act, *i.e.,* that the act or practice is "material," it "misleads or is likely to mislead the consumer," and "[t]he consumer's interpretation [of the act or practice] is reasonable under the circumstances." *See* Consumer Fraud Protection Bureau Supervision and Examination Manual v.2, pt. IIC at UDAAP 5 & n.10 (Oct.2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf (last visited Aug. 28, 2014) (citing Federal Trade Commission Policy Statement on Deception (Oct. 14, 1983), *available at* http:// www.ftc.gov/public-statements/1983/10/ftc-policy-statement-deception (last visited Aug. 28, 2014).) In fact, the CFPA's general prohibition of "unfair, deceptive, or abusive act[s] or practice[s]," is virtually identical to the prohibition of

"unfair or deceptive acts or practices" contained in the Federal Trade Commission Act, which the Seventh Circuit held was not unconstitutionally vague nearly a century ago. *See* 12 U.S.C. § 5536(a)(1)(B); 15 U.S.C. § 45(a)(1); *Sears, Roebuck & Co. v. F.T.C.,* 258 F. 307, 311 (7th Cir.1919). In short, the Court rejects Westwood's vagueness challenge.

The Court is no more persuaded by Westwood's argument that plaintiff's enforcement of the CFPA violates the Illinois Constitution. Article V states that "[t]he Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law." Ill. Const. art. V, § 15. These statutory duties include: (1) "institut[ing] and prosecut[ing] all actions and proceedings in favor of or for the use of the State, which may be necessary in the execution of the duties of any State officer"; (2) "investigat[ing] alleged violations of the statutes which the Attorney General has a duty to enforce"; and (3) "attend[ing] to and perform [ing] any other duty which may, from time to time, be required of him by law." 15 Ill. Comp. Stat. 205/4. The plain meaning of this language encompasses the AG's enforcement of federal law as directed by statute, and Westwood offers no authority to support a different interpretation. Accordingly, the Court denies Westwood's motion to dismiss this suit as contrary to the Illinois Constitution.

### State Law Claims

**\*5** Westwood moves to dismiss the Count I ICFA deceptive practices claim as insufficiently pled. Plaintiff contends that this request is doomed by law of the case, the principle that courts generally do not revisit decisions they make during the course of a single case, unless refusing to do so will "produce an injustice" or the decision was "clearly erroneous." *Redfield v. Continental Cas. Corp.,* 818 F.2d 596, 605 (7th Cir.1987). Plaintiff asks the Court to abide by the state court's determination that nearly identical allegations made in plaintiff's initial complaint stated a viable ICFA deceptive practices claim. (*See* Pl.'s Mem. Opp'n Mot. Dismiss 2d Am. Compl. Ex. 1, Compl., *People v. Alta,* 12 CH 1587 (Cir. Ct. Cook Cnty.); *id.,* Ex. 2, Defs.' Mem. Supp. Section 2–619.1 Mot. Dismiss, *People v. Alta,* 12 CH 1587 (Cir. Ct. Cook Cnty.); *id.,* Ex. 3, Order Denying Mot. Dismiss, *People v. Alta,* 12 CH 1587 (Cir. Ct. Cook Cnty.)); *see also Rekhi v. Wildwood Indus., Inc.,* 61 F.3d 1313, 1317–18 (7th Cir.1995) (noting that law of the case applies to suits removed from state court).

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Westwood contends that the Court should revisit the issue because the state court used the wrong legal standard to decide the motion. Specifically, Westwood says the state court wrongly believed that ICFA fraud claims were not subject to a heightened pleading standard. Though the state court recited a notice pleading standard, it nonetheless applied a heightened pleading standard, concluding that plaintiff stated a viable ICFA claim because it identified specific misrepresentations made by specific Westwood representatives on specific dates. (*See* Pl.'s Mem. Opp'n Mot. Dismiss 2d Am. Compl. Ex. 3, Order Denying Mot. Dismiss at 4–6, *People v. Alta,* 12 CH 1587 (Cir. Ct. Cook Cnty.).) Because the state court applied the proper standard, despite its stated intent to do otherwise, there is no reason for this Court to revisit the decision. Accordingly, the Court denies Westwood's motion to dismiss Count I.

Westwood also asks the Court to dismiss the ICFA claim alleged in Count II because it "does not allege a single deception ... much less identify one with particularity, as Rule 9(b) requires." (Defs.' Mem. Supp. Mot. Dismiss 2d Am. Compl. at 12.) Count II, however, is an unfair, not a deceptive, practices claim, and thus not subject to Rule 9(b). *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 670 (7th Cir.2008) ("[A] cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)."). Because plaintiffs' allegations are sufficient to state an ICFA unfair practice claim under Rule 8 pleading standards, the Court denies Westwood's motion to dismiss it. *See id.* at 669 (stating that a practice is unfair within the meaning of ICFA if it "offends public policy," is "immoral, unethical, oppressive, or unscrupulous" or "causes substantial injury to consumers"); (2d Am. Compl. ¶¶ 46–49, 54–78,107–35, 139–89, 193–298, 300–10, 477; *id.,* Ex. 1, Staff of S. Comm. on Health, Education, Labor and Pensions, 112 Cong., *For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* 37 ("HELP Report"), at 214–25 (Comm. Print July 30, 2012).)

### Motion to Sever

Plaintiff asks the Court to sever the Count I ICFA deceptive practice claim from this suit, decline to exercise supplemental over the Count II ICFA unfair practice claim, and remand both claims to state court. Severance

is necessary, plaintiff contends, because Count I arises from operative facts that are "separate and distinct" from those underlying the federal claims, and thus is not subject to the Court's supplemental jurisdiction. (Pl.'s Mem. Supp. Mot. Sever & Remand at 1); *see* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all [state law] claims that are so related to [the federal] claims ... that they form part of the same case or controversy...."); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966) (stating that supplemental jurisdiction can be exercised over state claims that arise from the same "nucleus of operative fact" as federal claims "such that [plaintiff] would ordinarily be expected to try" the state and federal claims together). This argument is a nonstarter, given that the state court allowed plaintiff to join the claims in one suit, which is only permissible when claims "arise out of closely related 'transactions' and ... [have] a significant question of law or fact ... [in] common." *See Boyd v. Travelers Ins. Co.,* 652 N.E.2d 267, 272 (Ill.1995).

**\*6** Even if supplemental jurisdiction exists over Count I, plaintiff argues that the Court should not exercise it. Because the parties completed discovery and were ready to try Count I in state court, plaintiff says keeping that claim here will inevitably result in this Court's duplication of work done by the state court. The Court disagrees. Discovery done on Count I in state court will not be repeated here, and absent unusual circumstances, the doctrines of law of the case or collateral estoppel will bar relitigation of issues decided by that court. Thus, judicial economy is not a basis for splitting this case in two.

Alternatively, plaintiff asks the Court to decline to exercise supplemental jurisdiction over the ICFA claim in Count II because it raises a novel issue of state law: Is extending loans to borrowers without considering their ability to pay an unfair practice under the ICFA? (Pl.'s Mem. Supp. Mot. Sever & Remand at 14); *see* 28 U.S.C. § 1367(c)(1) ("[The district courts may decline to exercise supplemental jurisdiction over a claim ... [that] raises a novel or complex issue of State law...."). As Westwood implicitly admits, the Illinois courts have yet to address precisely this question. (*See* Defs.' Resp. Pl.'s Mot. Sever & Remand at 12–13.) Thus, the Court agrees with plaintiff that this is a novel issue of Illinois law.

The Court does not agree, however, that it should relinquish supplemental jurisdiction over the claim. Courts generally do so only when:

> [The state law claims] address issues of first impression that are numerous or of constitutional magnitude. *See, e.g., Fielder v. Credit Acceptance Corp.,* 188 F.3d 1031, 1037–38 (8th Cir.1999) (affirming a district court's decision to decline to exercise jurisdiction under § 1367(c)(1) when the claims involved at least six "complex substantive and remedial issues of first impression"); *Castellano v. Bd. of Trustees of Police Officers' Variable Supplements,* 937 F.2d 752, 758–59 (2d Cir.1991) (declining supplemental jurisdiction and concluding that "it would be, at the very least, imprudent for us to determine a state constitutional claim of first impression").

*Schwarm v. Craighead,* 233 F.R.D. 655, 659 (E.D.Cal.2006); *see Bonilla v. City Council of City of Chi.,* 809 F.Supp. 590, 599 (N.D.Ill.1992) (stating that supplemental jurisdiction should not be exercised over the issue of whether "enactment of a redistricting ordinance pursuant to the Illinois statutory scheme can create mid-term aldermanic vacancies"). However, when a court "faces a single, unexceptional question of statutory interpretation," it is appropriate to exercise supplemental jurisdiction. *Schwarm,* 233 F.R.D. at 659 (exercising supplemental jurisdiction over the novel claim of "whether [defendant debt collectors] had statutory authorization under California law to seek fees from putative plaintiffs beyond the actual amount of bank charges incurred"). Given Count II's unremarkable nature, the wealth of case law interpreting the ICFA, the commonality of the claims in this suit, and the efficiency of litigating them together, the lack of precedent "on all fours" with Count II is not a basis for declining to exercise supplemental jurisdiction over it.

### *Conclusion*

For the reasons set forth above, the Court denies Westwood's motion to dismiss [17] and plaintiff's motion to sever and remand [23].

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 4377579

---



KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Reversed in Part by Shapiro v. UJB Financial Corp.,
3rd Cir.(N.J.), May 20, 1992

1991 WL 321909
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re UJB FINANCIAL CORP.
SHAREHOLDER LITIGATION.

No. 90–1569.
|
Jan. 22, 1991.

**Attorneys and Law Firms**

Barrack, Rodos & Bacine by Samuel R. Simon, Cherry
Hill, N.J., for plaintiffs.

Wilentz, Goldman & Spitzer by Frederic K. Becker,
Woodbridge, N.J., for defendants.

**Opinion**

ANNE E. THOMPSON, District Judge.

**\*1** THE COURT: This matter arises on defendants's
motion to dismiss the complaint pursuant to Rules 9(b),
12(b)(6), 12(b)(1), and 23.1 of the Federal Rules of Civil
Procedure.

Plaintiffs, in their complaint, seek damages arising
from the alleged overstatement of UJB's financial
condition through mismanagement and inadequate loan
reserves. Plaintiffs maintain that they relied on fraudulent
statements when purchasing stock which was overvalued
as a result of defendants' actions. The complaint is
comprised of several separate counts. Count I alleges
violation of § 10(b) of the Securities Exchange Act
of 1934 and SEC rule 10b–5. Count II claims that
defendants violated §§ 11, 12 and 15 of the Securities
Act of 1933. Count III is a state law claim of negligent
misrepresentation. Count IV charges proxy violations
under § 14(a) of the Security Exchange Act. Finally, Count
V alleges breach of fiduciary duty. Plaintiffs premise their
claims on a lengthy set of factual allegations, set out in
¶¶ 1–46 of the complaint. Rather than conduct a lengthy
review of these assertions of fact, the court will refer where
appropriate to those specific facts necessary to analyze the
motion.

*Rule 12(b)(6)*

Defendants seek to dismiss Counts I and II for failure
to state a claim upon which relief may be granted.
They argue that these counts are based on allegations of
mismanagement, and as such are not cognizable under the
1933 or 1934 Acts.

Mismanagement alone is an insufficient basis on which
to base a claim under either act. *Santa Fe Industries, Inc.
v. Green,* 430 U.S. 462, 476–79 (1977); *In re Craftmatic
Securities,* 890 F.2d 628, 638 n. 14 (3d Cir.1989). As well,
claims based solely on "soft," speculative matters, such
as failure to predict future performance, will not stand.
*Craftmatic* at 640–44. "The Third Circuit has limited the
application of the *Santa Fe* case ... to those situations
wherein plaintiffs do not allege material omissions or
misstatements by defendants [which are] actionable under
the securities laws." *In re Avant–Garde Computing, Inc.,*
Civ. No. 85–4149 (AET) at 14 (D.N.J. Sept. 5, 1989).
Omissions or misstatements *of mismanagement* are not
actionable under security laws, however, where the
essence of the claim alleges mismanagement, rather than
misrepresentation. *Craftmatic* at 640.

Defendants argue that plaintiffs' claims amount to
nothing more than mismanagement, deceptively framed
as fraud claims. Plaintiffs counter that the claims
are based on material omissions or misstatements
concerning management policies and success, rather than
on mismanagement itself. "[W]e must be alert to ensure
that the purpose of *Santa Fe* is not undermined by 'artful
legal draftsmanship;' [since] claims *essentially* grounded
on corporate mismanagement are not cognizable under
federal law." *Craftmatic* at 638–39 (emphasis added).
Thus, we must determine the core nature of plaintiffs'
factual allegations.

**\*2** The issue revolves around the definition of "material
facts." Only where the alleged mismanagement is material
will the claim be cognizable. Determining what is material
can be a difficult task.

"The line between a material nondisclosure and the
nondisclosure of mere mismanagement is often difficult
to draw. Arguably, any action amounting to corporate
mismanagement would be material.... However, courts
have been reluctant to permit a federal securities claim
to stand when the plaintiff has failed to allege more than
nondisclosure of mismanagement. Where the incremental

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." *Id.* at 639–40 (citations omitted).

Thus, we must examine each of the bases for Counts I and II in light of this vague standard, to determine whether they constitute material omissions or misstatements. *Craftmatic* provides some guidance. There, the court upheld the dismissal of claims that defendant failed to disclose that it was "unfocused" and "unable to manage" and that "its financial reporting and accounting controls [are] inadequate and ineffective." *Id.* at 640. These claims were essentially grounded in allegations of mismanagement, as as such did not involve "material" omissions. The court allowed claims, however, which were based on "the omission or misrepresentation of information regarding Craftmatic's advertising, promotion, and marking program," where those activities were under investigation by several states. *Id.* at 646. These claims were based on specific omissions of facts which were material in nature.

Plaintiffs' factual allegations in Count I are contained in ¶ 52. Several of these claims, at their core, are nothing more than assertions of mismanagement. Others are a mixture of mismanagement and fraud, while some are fundamentally claims of fraud. The court finds that Count I is based on mismanagement rather than fraud so far as it relies on the following points:

"[52] (a) that the earnings, assets, and net worth of UJB were improperly and materially overstated in inflated ... due to grossly inadequate provisions for loan loss reserves;

(b) that the defendants caused UJB to continually understate its non-performing loans and failed to provide adequate loan loss reserves for problem loans promptly and properly, and instead granted extensions, further credits, and other beneficial terms to its problem loan customers ...;

(c) that UJB's total loan loss reserves ... were not maintained at an adequate level in light of the economic conditions ...; [1]

(f) that, [sic] UJB's lending practices and controls were not sufficiently centralized, were unmanageable and UJB's commercial lending officers had engaged in high risk

and speculative loan transactions, which were not being adequately supervised, controlled, or directed by higher management, contrary to defendants' representations ...

**\*3** (g) that UJB would be required to add substantial additional amounts to its loan loss reserves as a result of its lending practices, contrary to defendants representations.... [specific representations omitted]" [2]

In making this determination, the court notes that points (a), (b), and (c) did not even allege omissions or misstatements. Instead, they simply discuss specific ways in which defendants should have performed better. Further, while points (f) and (g) were presented in the context of fraud, the core of each point revolves around mismanagement. The alleged misstatements in (f) are only generally referred to. As well, defendants are not required "to place potential investors on notice that management is culpable of a breach of faith or incompetence." *Craftmatic* at 639–40. The specific representations referred to in (g) also do not rise to violations of the securities acts, because they only amount to speculative predictions. *Id.* at 640–44.

The following points present a mixed issue of fraud and mismanagement, so that Count I should be dismissed to the extent that it relies on those portions of the following points which revolve around mismanagement:

(d) that, [sic] many of UJB's larger problem loans ... were not adequately collateralized or secure, contrary to defendants' representations that [representations omitted].

(e) that UJB's credit review and authorization standards and policies and system of internal controls to assure adequate collateralization and prompt recognition and accounting for problem loans were not conservative, were not functioning adequately or were being disregarded ... contrary to defendants' representations that .... [representations omitted]"

Here, plaintiffs complain about defendants' business practices. However, they also present very specific references to claims made by defendants. Distinguishing between, for example, the allegedly inadequate collateralization and plaintiffs' reliance on assurances about collateralization, the court finds that the former is an allegation of mismanagement which does not state a claim under the securities acts, whereas the latter

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

does state a claim, since it asserts that defendants made omissions or misstatements of material facts.

Finally, the court finds that the points raised in 52(h) and (i) are allegations of misstatements or omissions, and should be allowed to remain. Accordingly, Count I is dismissed to the extent that it relies on the points raised in ¶ 52(a), (b), (c), (f), and (g), as well as the allegations of mismanagement contained in ¶ 52(d) and (e). All other portions of Count I raise a claim upon which relief may be granted, and will not be dismissed.

Count II is based on the same set of facts. *See* Complaint at ¶ 63. The court will therefore dismiss that count to the extent that it relies on the points raised in ¶ 52(a), (b), (c), (f), and (g), and the allegations of mismanagement contained in ¶ 52(d) and (e).

 **\*4** Defendants next argue that plaintiffs' securities claims in Counts I and II are too conclusory to satisfy Rule 12(b)(6). While this position is not without merit, this court will refrain from dismissing the action at this point, in order to allow time for discovery. The court is motivated in part by the realization that many of the facts necessary to prove or disprove these allegations are largely within the peculiar knowledge of defendants.

Defendants also seek to dismiss the § 11 claim in Count II because the complaint fails to allege that the relevant securities were traceable to a registration statement alleged to be materially false or misleading. As plaintiffs point out, the complaint alleges that the shares at issue were purchased " 'during the Class Period [from] the Company's common stock pursuant to the DRISP prospectus.' " Pl. brief at 34, quoting from Complaint at ¶ 61. However, defendants note that, under the DRISP prospectus, stocks may have been purchased in the secondary market, and therefore may not have been purchased during the class period. The court finds persuasive the following language from a case raising the same issues:

"On this pleading it is by no means certain that any of the stock purchased by plaintiffs is traceable to the public offerings during the Class Period. Plaintiffs need not, of course, prove that their shares are traceable to the [challenged] offerings at this early stage of the litigation. But they must allege it." *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 972 (E.D.N.Y.1988), *vacated in part, In re Crazy Eddie,* 714 F.Supp. 1285 (E.D.N.Y.1989).

However, at this time the court will not dismiss the § 11 claim on this basis. Instead, the court will allow plaintiffs to amend their complaint to comply with the requirements of § 11. If plaintiffs do not amend within 30 days, the court will entertain a new motion to dismiss this particular claim.

Defendants argue that the § 12 claim contained in Count II should be dismissed because defendants are not "sellers" under the meaning of § 12(2). ¶ 62 of the complaint alleges: "In connection with the sale of the Company's common stock pursuant to the DRISP prospectus, defendant UJB was the 'seller' of such stock, within the meaning of Section 12(2) of the Securities Act of 1933." However, this bare allegation is not enough. *See VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 839 (D.N.J.1990). Plaintiffs must "demonstrate *direct and active participation* in the solicitation of the *immediate* sale to hold the issuer liable as a § 12(2) seller." *Craftmatic* at 636 (emphasis added).

Here, there is no factual allegation which specifies how UJB "directly and actively participated" in the immediate sale, so that ¶ 62 of the complaint is too conclusory under Rule 12(b)(6). *Garshaman v. Universal Resources Holding, Inc.,* 625 F.Supp. 737, 741 (D.N.J.1986). Plaintiffs point to the DRISP prospectus which was prepared by UJB. However, mere preparation of a prospectus, without more, does not rise to a level of direct participation in the *immediate* sale. The court in *Craftmatic* found sufficient factual allegations in the complaint to deny the motion to dismiss. Specifically, the complaint alleged

 **\*5** "[e]ach of the defendants ... either sold said securities directly to plaintiffs ... or solicited plaintiffs ... to buy Craftmatic common stock ... and they ... conspired with and aided and abetted one another in connection with the preparation of the false and misleading Prospectus and Registration Statement used in conjunction with the sale of Craftmatic securities."

Here, plaintiffs have alleged far less.

In addition, defendants argue that the § 12(2) claim should be dismissed for failure to allege that the stocks were " 'issued pursuant to the defective prospectus.' " Def. brief

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

at 27, citing *Crazy Eddie,* 702 F.Supp. at 972. Plaintiff relies on its reasoning in opposition to the motion to dismiss the § 11 claim. For the same reasons, the court agrees that plaintiffs have failed to state a claim upon which relief may be granted.

However, once again the court will give plaintiffs leave to amend their complaint to comply with both requirements under § 12(2), with the proviso that the court will entertain a new motion to dismiss this particular claim if plaintiffs do not amend within 30 days.

Defendants further argue that plaintiffs' § 15 claim, contained in Count II at ¶ 68, and their § 20 claim, contained in Count I at ¶ 59, should be dismissed for failure to state a "controlling person" claim. Plaintiffs argue that they have presented sufficient factual allegations to raise this claim in ¶¶ 6, 54, and 59 of their complaint. These paragraphs relate only to the individual defendants. The claim under § 15 is asserted in Count II. Since Count II is directed only at UJB, Complaint at ¶ 61, and since there is no factual allegation to support a "controlling person" claim against UJB, the § 15 claim is dismissed.

§ 20(a) of the Security Exchange Act of 1934 states:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78t(a).

Defendants argue that plaintiffs "allege no facts reflecting culpable participation by any of the individual defendants...." It may be true that "a mere showing of ... status ... does not automatically connote liability as a controlling person." *Laven v. Flanagan,* 695 F.Supp. 800, 808 (D.N.J.1988). However, *Laven* dismissed the complaint after discovery was completed. *Id.* at 803.

This court finds persuasive the reasoning of *In re Midlantic Corp.,* Civ. No. 90–1275 (DRD) (D.N.J. October 11, 1990). There, the court stated, "prior to discovery in any meaningful sense, plaintiff can hardly be able to plead the precise culpable conduct of each individual defendant." *Midlantic* at 22. The court also noted that this circuit "has 'given heavy consideration to the power or potential

power to influence and control the activities of a person, as opposed to the actual exercise thereof.' " *Id.* (citing *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 890–91 (3d Cir.1975). Thus, the court will not dismiss plaintiffs' claim under § 20(a) at this time.

**\*6** Defendants next assert that plaintiffs' state law claim of negligent misrepresentation should be dismissed. Such a claim may be brought based on business reports where the plaintiffs "should reasonably [be] foresee[n] as recipients from the company of the statements for its proper *business* purposes...." *Rosenblum v. Adler,* 93 N.J. 324, 352 (1983). [3] This district has read *Rosenblum* as an attempt to narrow the scope of this state law claim. "The argument might be made by plaintiffs that their decision to invest was a 'business decision,' and that the audit was performed for them in the sense that accountants' audit reports are prepared, and filed under the Exchange Act, with the purpose of, among other things, keeping investors informed. To conclude on that basis alone there is a negligence cause of action for the investing public generally, however, would be a liberal reading of *Rosenblum.*" *Cammer v. Bloom,* 711 F.Supp. 1264, 1298–99 (D.N.J.1989); *see also id.* at 1299 n. 57. Accordingly, this court will dismiss plaintiffs' third count. [4]

Defendants further argue that Count IV should be dismissed, because plaintiff Chappaqua has failed to allege all the necessary elements under § 14(a) of the Security Exchange Act. § 14(a) addresses omissions or misrepresentations in proxy statements. The complaint states that defendants should have revealed

"the utter failure of the individual defendants ... to cause UJB to disseminate reports to the investing public and to file with the SEC documents in full compliance with the federal securities laws, and to continue to cause the Company to overstate its earnings, assets and net worth by under-reserving for loan losses by at least $50 million or more, thereby causing the Company substantial losses, ... as alleged in Counts I–III herein." Complaint at ¶ 81.

Defendants argue that this cause of action does not allege "transaction causation" as required under § 14(a). A similar argument was rejected by this district in *Midlantic,* Civ. No. 90–1275 at 20. There, plaintiffs' allegation was almost identically worded to the allegation in this case. *Compare Midlantic* at 20 *with* Complaint at ¶ 81. The court stated that "[t]he harm alleged here is that corporate

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

directors were elected on the basis of materially false or misleading proxy statements. The causation alleged is perfectly clear on the face of the Complaint." *Midlantic* at 20.

Defendants argue that this count should be dismissed because plaintiffs fail to allege actionable misrepresentations. In *Midlantic,* "[t]he foundation of the defendants' argument [was] that the information they did not disclose was either a matter of mismanagement or too speculative and predictive and therefore is not actionable. Both these issues have been disposed of by this opinion in plaintiffs' favor...." *Midlantic* at 20. Here, this court has determined that plaintiffs' fraud claims are actionable. Following the reasoning put forth in *Midlantic,* the court finds that Count IV is not an appropriate target at this time for a motion to dismiss. [5]

### *Rule 23.1*

**\*7** Defendant argues that Count V should be dismissed because plaintiffs have not made a prelitigation demand, have not pled particularized facts showing that such a demand on the board is excused, and have not made a demand on UJB's shareholders. Fed.R.Civ.Pro. 23.1. Plaintiffs argue that they are excused from the prelitigation demand requirement.

Plaintiffs assert that " 'the allegations of the complaint permit the inference by the court that the directors upon whom demand would be made lack the requisite disinterestedness to determine fairly whether the corporate claim should be pursued.' " Pl. brief at 42, citing *Lewis v. Curtis,* 671 F.2d 779, 785 (3d Cir.1982), *cert. denied* 459 U.S. 880 (1982). Plaintiffs assert that they are exempt because a majority of the board are named defendants. However, this type of argument has been rejected by the courts. *See Lewis* at 785. Similarly, plaintiffs' arguments for exemption presented in ¶ 98 of their complaint are too speculative. Thus, it is not sufficient to allege, without particularized facts to back up the assertion, that the board "would refuse to take action with respect to these claims because any such action would require them to sue themselves, their friends, and their business associates." *See id.* Similarly, plaintiffs' allegation that the board is "dominated" by co-defendant Semrod is too conclusory, as is the assertions that the board participated in the wrongdoing, that the board is "self-interested," and that the board impliedly will not exercise

proper business judgment on the issues presented because it has not acted in the past. *See Landy v. FDIC,* 486 F.2d 139, 148 (3d Cir.1973) ("[t]hese allegations do not supply with particularity the reasons for failing to make the demand required by Rule 23.1"), *cert. denied* 416 U.S. 960 (1974). Accordingly, the fifth count will be dismissed.

### *Rule 9(b)*

Defendant argues that the allegations raised in Counts I and II should be dismissed because plaintiffs have failed to plead with sufficient particularity the bases for their claims of fraud, as is required under Rule 9(b). Plaintiffs first argue that the rule does not apply to its §§ 11 and 12 claims. As noted by defendant, "[a]lthough an open issue in this Circuit, numerous courts have held that Rule 9(b) applies to claims under Sections 12 and 12 of the Securities Act where, as here, the complaint sounds in fraud." Def. brief at 12 (citation omitted). Rule 9(b) states that it is applicable to "*all* averments of fraud...." Here, the remaining portions of plaintiffs' §§ 11 and 12 claims sound in fraud. Accordingly, Rule 9(b) applies by its clear wording.

This circuit has taken a narrow approach to Rule 9(b). "Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.' " *Craftmatic,* 890 F.2d at 645 (citing *Christidis v. First Penn. Mortgage Trust,* 717 F.2d 96, 99–100 (3d Cir.1983).

**\*8** Nonetheless, plaintiffs must present adequate pleadings to put defendants on notice of the basis of the claim. *Kronfeld v. First Jersey Nat'l Bank,* 638 F.2d 1454, 1463 (D.N.J.1986). Here, plaintiffs have pled with great specificity the particular statements which are allegedly false, as well as when, where, and by whom those claims were made. Despite their assertions to the contrary, however, plaintiffs have not indicated with sufficient particularity how those statements are false. *Christidis* is instructive. There, the court dismissed an action on the basis of Rule 9(b) because the complaint did not set out the *method* and *manner* in which defendants' statements were contradicted by their actions. *Christidis,* 717 F.2d at 99, 100. Thus, ¶ 52(d) alleges that UJB's loans "were not adequately collateralized or secure, contrary to defendants representations ..." without indicating *how* those loans were not adequately collateralized. In ¶ 52(h), plaintiffs do not indicate *how* "defendants failed to

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

5

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

disclose the full truth regarding UJB's problems loans and lack of controls." The other remaining claims in Counts I and II are similarly pled without sufficient particularly.

The Third Circuit tends to relax the application of Rule 9(b) "when factual information is peculiarly within the defendant's knowledge or control." *Craftmatic* at 645. "Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Id.* However, as *Craftmatic* noted, "pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Id.* Here, such pleadings are lacking.

In keeping with the rest of this opinion, however, this court will give plaintiffs the opportunity to amend their complaint in order to comply with the requirements of Rule 9(b), especially in light of the fact that discovery is still ongoing. Once again, plaintiffs will have 30 days in which to submit their amended complaint, and the court will consider a motion to dismiss if plaintiffs fail to comply with this deadline.

For the reasons presented, defendants' motion to dismiss will be granted in part and denied in part. Further, plaintiffs are instructed to amend their complaint in order to comply with this court's instructions. The court orders counsel for defendants to submit a proposed order consistent with this opinion no later than Wednesday, January 30, 1991.

## ORDER

For the reasons stated in this court's opinion of January 22, 1991, and upon consideration of the papers submitted, and for good cause

It is therefore on this ___ day of February, 1991

ORDERED that defendant's motion to dismiss the consolidated amended complaint be and hereby is granted in part and denied in part, in the following manner:

(1) Counts I and II are dismissed to the extent that they rely on ¶¶ 52(a), (b), (c), (f), and (g) of the amended complaint, and to the extent that they rely on allegations of mismanagement in ¶¶ 52(d) and (e) of the amended complaint. The claim in Count II for relief under § 15 of the Securities Act is dismissed. Counts III and V are dismissed;

 **\*9** (2) Plaintiffs are given thirty days from the date of this order to amend: Counts I and II, to the extent that they rely on the allegations in ¶¶ 52(d), (e), (h) and (i), in order to comply with FED.R.CIV.PRO. 9(b); and the claims in Count II under §§ 11 and 12(2) of the Securities Act in order to comply with FED.R.CIV.PRO. 12(b)(6) and this court's opinion of January 22, 1991. To the extent that plaintiffs do not submit these amendments within thirty days, the court will entertain a renewed motion to dismiss;

(3) Plaintiffs claim in Count I under § 20(a), and Count IV are not dismissed;

and it is further

ORDERED that putative class plaintiff Katz, who seeks to assert a claim under sections 11 and 12 of the Securities Act, provide security pursuant to such Act in the amount of $50,000.00 within five days of the date of this order, and it is further

ORDERED that the putative derivative plaintiff Chappaqua Family Trust provide security pursuant to N.J.S.A. section 14A:3–6 in the amount of $50,000.00 within five days of the date of this order.

## All Citations

Not Reported in F.Supp., 1991 WL 321909

## Footnotes

1    In *Craftmatic,* the court discussed "failure to predict" as a separate issue. That discussion centered around failure to release predictions to the public. Here, the crux of plaintiffs' claim is that defendants' failure to make predictions exhibited poor judgment, and so we deal with this claim as a management issue. *See Craftmatic* at 644. Under either analysis discussed in *Craftmatic,* however, this claim should be dismissed. *Id.*

In re UJB Finacial Corp. Shareholder Litigation, Not Reported in F.Supp. (1991)

1991 WL 321909

2    Although points (f) and (g) are presented as if they alleged fraud, the core of each claim is mismanagement.

3    Defendants also argue that this claim should be dismissed under Rule 12(b)(1) if the federal claims have been dismissed. Since the court has currently declined to dismiss all the federal claims, we will not dismiss this count under Rule 12(b)(1).

4    Plaintiffs cite to *Midlantic* for the proposition that negligent misrepresentation can be based on investor decisions. However, that court does not appear to have been presented with the issue raised in *Cammer*. Rather, defendants appear to have merely argued that "plaintiffs failed to allege the requisite reliance." *Midlantic* at 24. Thus, *Midlantic* is not helpful in the instant action.

5    Because this court does not dismiss Chappaqua's federal claim, defendants' arguments that Chappaqua's state law claims should be dismissed under Rule 12(b)(1) cannot stand.

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.



2015 WL 7736742
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Kathleen T. Smith, Individually and as Executrix of
the Estate of Richard G. Smith, Deceased, Plaintiff

v.

INGRAM MICRO, INC., Defendant/
Counter-claim Defendant

v.

Bryan B. Schoener d/b/a Bryan B.
Schoener Construction, Third Party
Defendant/Counter-claim Plaintiff

v.

Merit Service Solutions, Fourth Party
Defendant/Counter-claim Defendant.

Civil No. 1:15-CV-1301
|
Signed 12/01/2015

MEMORANDUM

Sylvia H. Rambo, United States District Judge

**\*1** In this wrongful death action, Plaintiff brings claims on behalf of the estate of her deceased husband arising out of a slip and fall accident. Plaintiff alleges that the owner of a warehouse and the companies it hired to remove snow and ice from the premises were negligent and reckless in failing to remove the dangerous patch of ice on which her husband slipped and fell, resulting in blunt head trauma, and, ultimately, his death. Presently before the court is Defendant Ingram Micro, Inc.'s motion to dismiss (Doc. 26) Plaintiff's allegations of reckless conduct from the amended complaint, or for a more definite statement. (Doc. 26.) For the reasons stated herein, the motion will be denied.

I. Background

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Thus, for purposes of the motion sub judice, the court only considers the allegations contained in the complaint (Doc. 3-2), and

will accept as true all well-pleaded factual allegations contained therein. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998) (citing Warth v. Seldin, 422 U.S. 490, 501 (1975)).

**A. Facts**

Plaintiff's deceased husband, Richard G. Smith ("Smith"), was a tractor trailer operator by trade. On the snowy morning of February 17, 2015, Smith arrived at the Jonestown, Pennsylvania warehouse and distribution center of Defendant Ingram Micro, Inc. ("Ingram Micro"), one of the world's largest wholesale technology products distributors, to deliver a tractor trailer load. (Doc. 19, ¶¶ 10, 13a.)

Ingram Micro was under contract at the time with Third Party Defendant Bryan B. Schoener, who does business as Bryan B. Schoener Construction ("Schoener"), and Fourth Party Defendant Merit Service Solutions ("Merit Service" and, collectively with Ingram Micro and Schoener, "Defendants") for snow and ice removal services at its Jonestown location. (Id. at ¶¶ 22-23.) Pursuant to the contract, Schoener and Merit Service were responsible for immediately de-icing any groundcover of ice and plowing snow once it reached a depth of one inch. (Id. at ¶ 23a.)

Smith signed in with the driver's lounge receptionist, Julie Witmer, who directed him to pull his tractor trailer around to a loading dock at the rear of the warehouse for the trailer to be unloaded. (Id. at ¶¶ 13b, 24a.) Surveillance videos show that, approximately one hour later, Smith exited the cab of his tractor trailer and walked around the front of the truck to the passenger side. (Id. at ¶¶ 13d-e.) A few minutes later, Smith was found lying unresponsive on his back in front of the adjacent loading dock, breathing shallowly and bleeding from the back of his head and both ears. (Id. at ¶ 13g.) Smith was transported to Good Samaritan Hospital and pronounced dead less than two hours later as a result of his injuries, and an autopsy revealed that the cause of death was accidental blunt force trauma to the head. (Id. at ¶¶ 14-15.)

**\*2** The Pennsylvania State Police performed a comprehensive investigation of the incident, and documented that there was "a large patch of ice that was partially covered by a fresh coat of snow...[that] was several inches thick and uneven," and "appeared to be from a drain pipe located on the north side of

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1

[the adjacent] loading dock." ( [1] *Id.* at ¶ 17.) Based on the evidence at the scene, the Pennsylvania State Police concluded as follows:

> [T]he victim most likely slipped on a thick layer of ice that formulated at the base of [the adjacent] loading dock [ +] and struck his head on either the ice itself or the trailer lock that was attached to the middle of the loading dock. The ice was covered by a fresh coat of snow that fell throughout the early morning hours of 02/17/15 and... made it 'impossible to see.'

(*Id.* at ¶ 18.)

### B. Procedural History

Smith's wife, Kathleen T. Smith ("Plaintiff"), initiated this action sounding in negligence by filing a complaint on July 1, 2015, pursuant to Pennsylvania's Wrongful Death Act, 42 Pa. Cons. Stat. § 8301, and the Probate, Estate and Fiduciaries Code, 20 Pa. Cons. Stat. § 3373. (*See* Doc. 1.) Ingram Micro joined Schoener in the action by filing a third party complaint on September 3, 2015 (Doc. 17), and Plaintiff filed an amended complaint on September 9, 2015 (Doc. 19). In her amended complaint, Plaintiff claims that Defendants' negligent and reckless conduct wrongfully caused her husband's death. (*Id.* at ¶¶ 22, 24.) Ingram Micro filed the instant motion to dismiss the allegations of reckless conduct, or for a more definite statement, as well as a brief in support thereof, on October 5, 2015. (Docs. 25 & 26.) Schoener subsequently filed a fourth party complaint to join Merit Service to this action on October 30, 2015. (Doc. 30.)

Plaintiff filed its opposition to Ingram Micro's motion to dismiss or for a more definite statement on October 7, 2015 (Doc. 28), and the time for Ingram Micro's reply has lapsed. Thus, this matter is ripe for consideration.

### II. Legal Standard

Ingram Micro's motion challenges Plaintiff's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e). A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a), which requires that a complaint contain a short and plain

statement of the claim showing that the pleader is entitled to relief "in order to 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.' +" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S 41, 47 (1957)). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' +" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Thus, when adjudicating a motion to dismiss for failure to state a claim, the court must view all of the allegations and facts in the complaint in the light most favorable to the plaintiff, and must grant the plaintiff the benefit of all reasonable inferences that can be derived therefrom. *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)). However, the court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *See Reuben v. U.S. Airways, Inc.*, 500 F. App'x 103, 104 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (stating that district courts "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions").

**\*3** Ultimately, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Iqbal*, 556 U.S. at 679; *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The "plausibility standard" requires "more than a sheer possibility" that a defendant is liable for the alleged misconduct. *Reuben*, 500 F. App'x at 104 (citing *Iqbal*, 556 U.S. at 678). Rather, the complaint must show the plaintiff's entitlement to relief with its facts. *Steedley v. McBride*, 446 F. App'x 424, 425 (3d Cir. 2011) (citing *Fowler*, 578 F.3d at 211). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show [n]' – 'that the pleader is entitled to relief.' +" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alterations in original). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

To evaluate whether allegations in a complaint survive a Rule 12(b)(6) motion, the district court must initially "tak[e] note of the elements a plaintiff must plead to state a claim." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (citation omitted). Next, the court should identify allegations that "are no more than conclusions" and thus, "not entitled to the assumption of truth." *Id.* Lastly, "where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*

A complaint "may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 588 n.8). Rule 8 " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Id.* at 234 (quoting *Twombly*, 550 U.S. at 545).

Rule 12(e), on the other hand, allows a party to move for a more definite statement when a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Like Rule 12(b)(6), Rule 12(e) must be read in conjunction with Rule 8, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8. Thus, "courts have held that '[t]he class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small—the pleading must be sufficiently unintelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed.' " *Pozarlik v. Camelback Assocs., Inc.*, Civ. No. 11-cv-1349, 2011 WL 6003841, *2 (M.D. Pa. Nov. 30, 2011) (quoting *Lapcevic v. Strive Enters., Inc.*, Civ. No. 09-cv-0564, 2010 WL 1816752 (W.D. Pa. Apr. 8, 2010)) (quoting *Sun Co., Inc. ( R & M) v. Badger Design & Constructors*, 939 F. Supp. 365, 368 (E.D. Pa. 1996)). "The basis for granting such a motion is unintelligibility, not lack of detail." *Cobb v. Nye*, Civ. No. 14-cv-0865, 2014 WL 7067578, *5 (M.D. Pa. Dec. 12, 2014) (quoting *Wood & Locker, Inc. v. Doran & Assocs.*, 708 F. Supp. 684, 691 (W.D. Pa. 1989)). Accordingly, the court should grant a Rule 12(e) motion only when the pleading is "so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good

faith, without prejudice to itself." *Sun Co., Inc.*, 939 F.Supp. at 368.

## III. Discussion

As a federal court sitting in diversity, the court will apply the laws of the forum state. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). In Pennsylvania, "[w]rongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Williams v. City of Scranton*, Civ. No. 3:10-cv-388, 2013 WL 1339027, *13 n.7 (M.D. Pa. Apr. 1, 2013) (quoting *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011)).

**\*4** In this wrongful death and survival action, Plaintiff asserts that Defendants' negligent and reckless conduct resulted in her husband's death and seeks both compensatory damages and "other items of recovery as permitted by [l]aw." (*See* Doc. 19, ¶¶ 24, 29, 32.) Ingram Micro anticipates that the other recovery Plaintiff seeks may be a claim for punitive damages based on her allegations of reckless conduct, and argues in its instant motion that Plaintiff has failed to allege sufficient facts in her complaint to demonstrate reckless conduct, and, therefore, the court should dismiss Plaintiff's recklessness claim. (Doc. 26, p. 2 of 5.) Specifically, Ingram Micro argues that the allegations set forth in the complaint fail to demonstrate that any conduct of Defendants rose to a level that could be considered reckless, but rather merely support a claim for negligence. (Doc. 26, p. 4 of 5.) In the alternative, Ingram Micro contends that Plaintiff's complaint should be dismissed without prejudice with leave to be re-filed with a more definite statement of facts showing reckless conduct. (*Id.* at p. 5 of 5.) Because the court finds that Plaintiff has sufficiently pleaded her claim of recklessness, it need not address Ingram Micro's second argument.

As stated above, Rules 8(a) and 12(b)(6), in conjunction, impose on Plaintiff the burden to plead enough facts to create a reasonable expectation that discovery will reveal evidence of the elements of Plaintiff's claim. *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 545). To support a claim for punitive damages, a plaintiff must show that "the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). In Pennsylvania, reckless indifference is sufficient to support

a claim for punitive damages, and occurs when an " 'actor knows, or has reason to know,... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk.' " *Arias v. Decker Transp.*, Civ. No. 3:06-cv-638, 2008 WL 450435, *3 (M.D. Pa. Feb. 14, 2008) (quoting *SHV Coal v. Cont'l Grain Co.*, 587 A.2d 702, 704 (Pa. 1991) (citation omitted). Because the actor must appreciate the risk of harm to another, a showing of mere negligence, or even gross negligence, will not suffice to support an award of punitive damages. *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).

In her complaint, Plaintiff alleged that Smith was a business invitee of Ingram Micro, and Ingram Micro permitted a dangerous condition to exist on its premises. (*Id.* at ¶¶ 12, 16.) A possessor of land is liable for physical harm to its invitees caused by a condition on the land if the possessor:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

*Canton v. Kmart Corp.*, 470 F. App'x 79, 83 (3d Cir. 2012) (citing Restatement (Second) of Torts § 343 (1965)). In the slip and fall context, a plaintiff can show that the possessor had constructive notice of the dangerous condition by demonstrating that the condition existed for such a length of time that the possessor, in the exercise of ordinary care, should have been aware of the condition. *See David v. Pueblo Supermarket of St. Thomas*, 740 F.2d 230, 236 (3d Cir. 1984).

Here, Plaintiff has alleged that, although Ingram Micro had contractually retained Schoener and Merit Service to "begin de-icing [its Jonestown premises] immediately after any ground cover of ice had formed," and to keep conditions "as close to bare blacktop as possible," the patch of ice upon which Smith slipped was left unattended for such a long period of time that it became "a large patch of ice, several inches thick and uneven." (*Id.* at

¶¶ 24a, c, f, h.) Plaintiff further alleged that Defendants knew that tractor trailer operators would regularly walk to adjacent loading docks to see if their trailers were finished being unloaded, and that the patch of ice upon which Smith slipped and fell was in the area between the loading dock where his trailer was being unloaded and the adjacent loading dock. (Doc. 19, ¶¶ 24a-b.) Although Ingram Micro argues that these allegations support, at most, a claim for negligence, the motion to dismiss stage is not the appropriate time to differentiate between negligent and reckless conduct. As the court has previously held:

> **\*5** [C]laims sounding in negligence can qualify for punitive damages if the conduct engaged in is outrageous enough. Although the facts may later prove at most that [D]efendants were merely negligent, discovery is necessary to help make this determination. Dismissing [P]laintiff['s] punitive damages claim now at the pleading stage would be premature.

*Young v. Westfall*, Civ. No. 06-cv-2325, 2007 WL 675182, *2 (M.D. Pa. Mar. 1, 2007); *see also Hutchison*, 870 A.2d at 770. Accordingly, the court finds that Plaintiff has pleaded sufficient facts to support her claim for recklessness. Discovery may uncover that Defendants actually knew about, or were on constructive notice of, the patch of ice due to the amount of time that would need to pass in order for the patch to become several inches thick, and that Defendants both knew of and were indifferent to the unreasonable risk of harm that a large ice patch would pose to invitees. Therefore, the court concludes that Plaintiff may have a cognizable claim for recklessness against Defendants, and will deny Ingram Micro's motion in this regard.

## IV. Conclusion

In conclusion, the court finds that Plaintiff has sufficiently supported her allegations that Defendants acted recklessly and that such recklessness leaves open the possibility of recovery of punitive damages in a survival action. Therefore, the court will deny Ingram Micro's motion to dismiss Plaintiff's claim for recklessness pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the court has found that Plaintiff's complaint alleges sufficient facts to support her allegations of reckless conduct, the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

court will likewise deny Defendants' motion insofar as it seeks to have Plaintiff provide a more definite statement of the facts supporting such reckless conduct pursuant to Rule 12(e).

An appropriate order will issue.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 7736742

Footnotes

1    The complaint appears to quote a report generated by the PSP after its investigation of Smith's death, but Plaintiff has neither attached a report or directly cited to one. For purposes of the instant motion, however, the court will nonetheless accept the factual allegations as true.

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    5



2009 WL 151669
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Burton F. TUCKER & Ida Tucker, Plaintiffs

v.

MANN BRACKEN, LLC, Defendant.

Civil No. 1:08–CV–1677.
|
Jan. 21, 2009.

West KeySummary

**1**   Limitation of Actions
👉 Liabilities Created by Statute

A debtor's claims under the Fair Debt Collection Practices Act against a debt collector were not barred by the statute of limitations as they were alleged to be part of a continuing violation. The debtor alleged that ten phone calls he received were made in the same year he filed the action. Furthermore, the collector placed a series of calls to the debtor over the course of a year or longer which demonstrated a continuing pattern of conduct. Fair Debt Collection Practices Act, § 813, 15 U.S.C.A. § 1692k.

Cases that cite this headnote

**Attorneys and Law Firms**

Burton F. Tucker, Waynesboro, PA, pro se.

Ida Tucker, Waynesboro, PA, pro se.

Ronald S. Canter, The Law Offices of Ronald S. Canter, LLC, Rockville, MD, for Defendant.

***MEMORANDUM***

SYLVIA H. RAMBO, District Judge.

**\*1**  Plaintiffs Burton F. Tucker and Ida Tucker filed a *pro se* complaint alleging that Defendant Mann Bracken, LLC violated the federal Fair Debt Collection Practices Act, 15

U.S.C. § 1692, *et seq.* ("FDCPA"). Defendant has filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief may be granted, on the grounds that Plaintiffs' claims are time barred. Because the court finds that Plaintiffs' complaint was filed within one year of the most recent alleged FDCPA violation and Plaintiffs have alleged a continuing violation, Defendant's motion to dismiss will be denied.

**I.** *Background*

The court sets forth the facts alleged in Plaintiffs' complaint and accepts them as true. Plaintiff Burton F. Tucker incurred debt on a credit card issued to him by MBNA America Bank, N.A. ("MBNA"). (Compl.¶ 8.) MBNA retained Defendant Mann Bracken, LLC [1] who then filed a complaint against Burton Tucker on July 28, 2006 to collect that debt. [2] (*Id.*) By that point, the debt totaled more than $95,243.00, including interest and attorney's fees. (*Id* . ¶ 10.) Prior to filing the collection lawsuit, Defendant attempted to collect the debt by making telephone calls to Plaintiffs' home on their personal and business lines as early as January 14, 2005. (*Id.* Ex. 4.) Documents attached to Plaintiffs' complaint indicate that the telephone calls continued until March 14, 2008. (*Id.*) Plaintiffs characterize these telephone communications as harassing. (Compl.¶¶ 12, 14, 16, 21, 23.)

Accordingly, Plaintiffs filed a complaint against Defendant on September 10, 2008, alleging violations of the FDCPA, 15 U.S.C. §§ 1692c, 1692d, and 1692k. (*Id.* ¶ 21.) Plaintiffs' complaint seeks $54,000.00 in damages for the harassing telephone calls. (*Id.* ¶ 24.) Defendant filed a motion to dismiss on October 8, 2008, arguing that Plaintiffs' claims are time barred under the FDCPA. (Doc. 6.) The parties have briefed the issues and the matter is now ripe for disposition.

**II.** *Legal Standard*

Among other requirements, a sound complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a) (2). This statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1

80 (1957)). "Fair notice" in Rule 8(a)(2) "depends on the type of case—some complaints will require at least some factual allegations to make out a showing that the pleader is entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 232 (3d Cir.2008) (quotation omitted). "A situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8." *Id.* A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief. *Twombly,* 127 S.Ct. at 1965; *accord Phillips,* 515 F.3d at 238–39; *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007) (The court is not "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation." (quotations and citations omitted)); *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005).

**\*2** A defendant may attack a complaint by a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint, *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington Twp.,* 478 F.3d 144, 150 (3d Cir.2007), viewing them in the light most favorable to the plaintiff, *Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007). If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss. *Twombly,* 127 S.Ct. at 1965, 1974; *Phillips,* 515 F.3d at 234; *Victaulic Co. v. Tieman,* 499 F.3d 227, 234 (3d Cir.2007); *Stevenson v. Caroll,* 495 F.3d 62, 66 (3d Cir.2007). This requirement "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. *Twombly,* 127 S.Ct. at 1965.

The "Third Circuit Rule" permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002) (quoting *Hanna v. U.S. Veterans Admin. Hosp.,* 514 F.2d 1092, 1094 (3d Cir.1975).

**III.** *Discussion*

Defendant challenges the timeliness of Plaintiffs' complaint. Section 1692k(d) of the FDCPA provides that an "action to enforce any liability created by [the FDCPA] may be brought ... within one year from the date on which the violation occurs." The dispute between the parties is when the alleged FDCPA violation occurred. Defendant argues that Plaintiffs' FDCPA claim accrued when the first telephone call was received by the Plaintiffs in 2005, and Plaintiffs' claims are barred because they filed their action more than a year after the first call.

FDCPA has a one year initiation period. While there are no cases in this circuit addressing this issue, courts in other circuits have barred FDCPA claims arising from discrete acts occurring outside the one year limitations period. *See, e.g., Sierra v. Foster & Garbus,* 48 F.Supp.2d 393, 395 (S.D.N.Y.1999) (holding that the continuing violations doctrine did not apply to two separate events and holding that FDCPA claim arising from an event beyond the limitations period was time barred); *Pittman v. J.J. MacIntyre Co.,* 969 F.Supp. 609, 611 (D.Nev.1997) (allowing claims for telephone calls made within the one year period but barring claims for telephone calls made beyond that period); *Pagan v. Monterrey Collection Servs.,* No. 07–80, 2007 WL 966009, at \*2 (E.D.Pa. Mar.29, 2007) (barring FDCPA claims arising from telephone calls made beyond the one year limitations period). The above cases adopt the discrete acts as dispositive of the limitations period.

**\*3** However, other courts considering FDCPA claims stemming from a pattern of repeated conduct have held that the entire pattern may be considered a continuing violation. *See, e.g., Joseph v. J.J. MacIntyre Co., LLC,* 281 F.Supp.2d 1156, 1162 (N.D.Ca.2003) (applying the continuing violation doctrine where plaintiff alleged over 200 telephone calls spanning a nineteen month period); *Padilla v. Payco General American Credits, Inc.,* 161 F.Supp.2d 264, 273 (S.D.N.Y.2001) (holding that the one year limitations period "is not intended to deprive plaintiffs of the use of evidence of violations that took place more than a year before filing, but rather to protect defendants by ensuring that the action is filed within one year of the most recent date on which the defendant is alleged to have violated the [FDCPA]."); *Sierra,* 48 F.Supp.2d at 395 (indicating in dicta that "a series of threatening letters, each of which violate the FDCPA and

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2

only some of which are time-barred" might be considered a continuing violation).

There are no cases in the Third Circuit considering whether the continuing violations theory may be applied to FDCPA claims. However, the Third Circuit has held that, "[t]he application of the continuing violations theory may be appropriate in cases in which a plaintiff can demonstrate that the defendant's allegedly wrongful conduct was part of a practice or pattern of conduct in which he engaged both without and within the limitations period." *McAleese v. Brennan,* 483 F.3d 206, 218 (3d Cir.2007); *see also Joseph,* 281 F.Supp.2d at 1160–61 (adopting the continuing violations doctrine in FDCPA claims and explaining that the doctrine is properly applied in other remedial actions such as hostile work environment claims, Title VII claims, and anti-discrimination claims). The court acknowledges that mechanical application of the one-year limitations period could operate to defeat some of the remedial consumer protection goals of the FDCPA. For these reasons, this court holds that a continuing violations theory may be applied to FDCPA claims.

To base a claim on conduct alleged to be part of a continuing violation, a plaintiff must demonstrate two things: (1) at least one act occurred within the filing period; and (2) the alleged conduct must be more than isolated, sporadic acts—in other words, the conduct "must be a persistent, on-going pattern." *McAleese,* 483 F.3d at 218 (quoting *West v. Phila. Elec. Co.,* 45 F.3d 744, 754–55 (3d Cir.1995)). The focus is on the affirmative unlawful conduct of the defendant, not the lingering effects of the unlawful conduct. *Weis–Buy Services, Inc. v. Paglia,* 411 F.3d 415, 423 (3d Cir.2005).

Here, Defendant argues that collection telephone calls are analogous to a discrete act and Plaintiffs are not entitled to the continuing violation theory because Plaintiffs were aware of any FDCPA claims when they received the very first call. (Doc. 7.) Defendant argues that because Plaintiffs failed to file within one year of receiving the first call, their claim should be barred by the statute of limitations. Defendant's arguments fail for two reasons.

**\*4** First, a portion of the telephone calls at issue are not time barred at all. Unlike the plaintiffs in *Pittman* or *Pagan,* here Plaintiffs allege ten specific instances of allegedly harassing calls received from Defendant in 2008.

(Compl.Ex. 4.) Plaintiffs filed suit on September 10, 2008. Claims arising from any calls received within one year of September 10, 2008 would not be time barred under the FDCPA. *See* 15 U.S.C. § 1692k(d); *Pagan,* 2007 WL 966009, at \*2, n. 1. Therefore, claims arising from the ten calls received in 2008 and any other calls made after September 11, 2007 are not barred by the one year limitation period of § 1692k(d).

Second, like the plaintiffs in *Joseph,* Plaintiffs have sufficiently alleged that the telephone calls were a continuing violation. Plaintiffs averred that the first harassing telephone call was received on January 14, 2005. (Compl.Ex. 4.) They further allege that they received 95 harassing telephone calls from January to March 2005 and that these calls continued "for the next 12 to 18 months." (Compl.Ex. 4.) Plaintiffs alleged that they received ten calls in 2008, well within the one year limitation period, and that these calls were part of a series of calls that "continued unabated" from 2005 to 2008. (Compl.¶ ¶ 12, 14.) By pleading the receipt of telephone calls within the limitation period of § 1692k that are part of a continuing pattern of conduct, Plaintiffs have satisfied the requirements for pleading a continuing violation. *See McAleese,* 483 F.3d at 218. Therefore, Plaintiffs' FDCPA claims arising from conduct occurring prior to September 7, 2007 are not barred by the limitation period of § 1692k(d) because they are alleged to be part of a continuing violation.

Defendant is correct that FDCPA claims arising from the commencement of a collection action occur when the action is filed. *Nass v. Stolman,* 130 F.3d 892, 893 (9th Cir.1997); *see also Sierra,* 48 F.Supp.2d. at 395; *Calka v. Kucker, Kraus and Bruh, LLP,* No. 98 Civ. 0990(RWS), 1998 WL 437151, at \*3 (S.D.N.Y. Aug.3, 1998); *Schaffhauser v. Burton Neil & Assoc.,* No. 1:05–CV–02075, 2008 WL 857523, at \*2 (M.D.Pa. Mar.27, 2008); *Sprague v. Neil,* No. 1:CV–05–1605, 2008 WL 140718, at \*4 (M.D.Pa. Jan. 10, 2008). However, the allegations before the court in this matter do not concern FDCPA claims arising from the commencement of a collection lawsuit. Here, Plaintiffs have alleged FDCPA claims based on a series of telephone calls. Defendant has cited no binding case law importing the limitations rules for collection lawsuits into claims for continuing violations arising from telephone calls. [3] The purpose of the FDCPA is to protect consumer debtors from abusive and harassing collection practices by debt collectors and

the court will not bar Plaintiffs' claims at this early stage of litigation.

Consequently, the Defendant's motion to dismiss will be denied.

#### IV. *Conclusion*

**\*5** For the foregoing reasons, the motion to dismiss (Doc. 6.) filed by Defendant Mann Bracken will be denied. An appropriate order will be issued.

### *ORDER*

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant's motion to dismiss (Doc. 6.) is **DENIED.**

### All Citations

Not Reported in F.Supp.2d, 2009 WL 151669

#### Footnotes

1   Plaintiff identifies Mann Bracken, LLC as "successor by merger" to MBNA's original debt collection agent, Wolpoff and Abramson, LLP.

2   In response to the action commenced by MBNA, Tucker filed an answer with counterclaims on August 29, 2006. (Compl.Ex. 3.)

3   Defendants cite an unpublished case, *Burgi v. Gurstel Law Firm, P.A.,* No. 07–cv–04772, (D.Minn. Sept. 24, 2008), as "nearly identical" to the matter before the court here. However, *Burgi* was decided on facts quite different from the allegations before the court here. In *Burgi,* the plaintiff filed a claim nearly fourteen months after the last harassing phone call took place. None of the telephone calls giving rise to FDCPA claims took place within the limitations period, a prerequisite for an allegation of a continuing violation.

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.



657 Fed.Appx. 89
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

United States of America, Ex Rel. Sueda
Whatley; John and Jane DOE, individually
v.
Eastwick College; Hohokus Schools;
Eastwick Education; Thomas Eastwick
Sueda Whatley; John and Jane
Doe, individually, Appellant

No. 15-3019
|
Argued: September 14, 2016
|
(Filed: October 28, 2016)

**Synopsis**
**Background:** Relator, former nursing student, commenced
action against for-profit educational institutions, alleging
violations of, inter alia, False Claims Act (FCA) and New
Jersey Consumer Fraud Act (NJCFA). The United States
District Court for the District of New Jersey, William
J. Martini, J., 2015 WL 4487747, dismissed the action.
Relator appealed.

**Holdings:** The Court of Appeals Greenaway, Jr., Circuit
Judge, held that:

[1] relator did not allege factually false or legally false
claim against institutions;

[2] relator's allegation that admissions counselors-sales
representatives for for-profit educational institutions who
"recruited a greater number of students would be publicly
rewarded with cash bonuses at the end of the year at
the annual holiday party, of $300, $500 or $1000" was
not sufficiently particular to state claim under FCA
that institutions falsely certified compliance with Higher
Education Act (HEA) ban on incentive payments for
recruitment employees;

[3] relator's conclusory assertion that she believed that
fees charged by for-profit educational institutions were
to cover costs for Free Application for Federal Student
Aid (FAFSA) was not sufficient to allege on information
and belief that for-profit educational institutions falsely
certified compliance with HEA ban on charging fees for
processing FAFSA applications;

[4] relator's allegation that many students' grades were
arbitrarily inflated or depressed by school administrators
and teachers employed by for-profit educational
institutions was not sufficient to state claim under
FCA with particularity that institutions falsely certified
compliance with regulations requiring that they establish
satisfactory academic progress policy; and

[5] relator's allegation that for-profit educational
institution claimed federal financial aid funds for her
education after she had withdrawn from her program and
altered her attendance records to justify that claim of
funds was not sufficient to state claim under FCA with
particularity.

Affirmed.

West Headnotes (5)

**[1]** **United States**
⬦ Elements

Relator, former nursing student, did not
state claim under False Claims Act (FCA)
against for-profit institutions, on allegations
that schools drew down students' federal
financial aid for multiple sets of book fees,
lab fees, and other fees by transferring them
between programs, charged exorbitant fees,
and "front-loaded" charges for fees that
were not refunded if student later withdrew
from or failed out of program, resulting
in submission of "fraudulent" or "false"
claims to government, since relator did not
identify any misrepresentations made by
schools to government about their alleged
behavior, or identify any statutes, regulations,
or contractual provisions that they violated

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

through their alleged behavior. 31 U.S.C.A. § 3729 et seq.

1 Cases that cite this headnote

[2]    Federal Civil Procedure
       👉 Fraud, mistake and condition of mind

Relator's allegation that admissions counselors-sales representatives (AC-SRs) for for-profit educational institutions who "recruited a greater number of students would be publicly rewarded with cash bonuses at the end of the year at the annual holiday party, of $300, $500 or $1000" was not sufficiently particular to state claim under False Claims Act (FCA) that institutions falsely certified compliance with Higher Education Act (HEA) ban on incentive payments for recruitment employees, since relator did not provide information as to who provided those payments, to whom payments were made, or under what criteria those payments were awarded. 20 U.S.C.A. § 1094(a)(20); 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

1 Cases that cite this headnote

[3]    Federal Civil Procedure
       👉 Fraud, mistake and condition of mind

Relator's conclusory assertion that she believed that fees charged by for-profit educational institutions were to cover costs for Free Application for Federal Student Aid (FAFSA) was not sufficiently particular to allege on information and belief that for-profit educational institutions falsely certified compliance with Higher Education Act (HEA) ban on charging fees for processing FAFSA applications. 20 U.S.C.A. § 1094(a)(2); 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

Cases that cite this headnote

[4]    Federal Civil Procedure
       👉 Fraud, mistake and condition of mind

Relator's allegation that many students' grades were arbitrarily inflated or depressed by school administrators and teachers employed by for-profit educational institutions was not sufficient to state claim under False Claims Act with particularity that institutions falsely certified compliance with regulations requiring that they establish satisfactory academic progress policy, since relator did not specify what specific grades were altered by what individuals in what semesters. Fed. R. Civ. P. 9(b); 31 U.S.C.A. § 3729 et seq.; 34 C.F.R. § 668.34.

Cases that cite this headnote

[5]    Federal Civil Procedure
       👉 Fraud, mistake and condition of mind

Relator's allegation that for-profit educational institution claimed federal financial aid funds for her education after she had withdrawn from her program and altered her attendance records to justify that claim of funds was not sufficient to state claim under False Claims Act with particularity, since relator did not specify who made key misrepresentations to her during withdrawal process or who altered her attendance records. 31 U.S.C.A. § 3729 et seq.; Fed. R. Civ. P. 9(b).

Cases that cite this headnote

**\*91** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, (D.C. Civil Action No. 2–13–cv–01226), District Judge: Honorable William J. Martini

Attorneys and Law Firms

Robert J. Donaher, Esq., Herold Law, 25 Independence Boulevard, Warren, NJ 07059, James A. Plaisted, Esq. [ARGUED], Walder Hayden, 5 Becker Farm Road, 3rd Floor, Roseland, NJ 07068, Counsel for Appellant

Renee Steinhagen, Esq., Appleseed Public Interest Law Center, 744 Broad Street, Room 1525, Newark, NJ 07102, Counsel for Amici Curiae

Peter R. Bray, Esq. [ARGUED], Bray & Bray, 100 Misty Lane, Lanidex Executive Center, Parsippany, NY 07054,

Steven M. Gombos, Esq. [ARGUED], Rizert & Leyton, 11350 Random Hills Road, Suite 400, Fairfax, VA 22030, Counsel for Appellees

Before: CHAGARES, GREENAWAY, JR. and RESTREPO, Circuit Judges.

OPINION [*]

GREENAWAY, JR., Circuit Judge.

Relator–Appellant Sueda Whatley appeals the District Court's judgment dismissing with prejudice her First Amended Complaint ("FAC") against Defendants–Appellees Eastwick Education, Eastwick College, Hohokus Schools, and Thomas Eastwick for violations of, inter alia, the False Claims Act ("FCA") and New Jersey Consumer Fraud Act ("NJCFA"). She also appeals the District Court's judgment denying her motion to file a Supplemental Amended Complaint ("SAC"). For the following reasons, we will affirm the District Court's judgments.

## I. Background [1]

Appellees Eastwick College and Hohokus Schools (collectively, the "Schools") are for-profit educational institutions owned by Thomas Eastwick through Eastwick Education. Whatley was enrolled at Hohokus Schools from August 2011 to October 2012 in various nursing-related programs. After suffering an accident, Whatley took medical leave from her program and eventually decided to withdraw from the program. On February 26, 2013, she filed suit against Appellees, asserting several FCA and state law claims. After the United States declined to intervene in her suit, Whatley filed the FAC, which is the subject of this appeal, on July 3, 2014. The FAC alleges a wide-ranging effort on the part of Appellees to mistreat prospective and current students of three main educational programs: Licensed Practical Nursing ("LPN"), Bilingual Licensed Practical Nursing ("BLPN"), and Medical Assistant ("MA"). [2]

**\*92** The Schools employed Admissions Counselors/Sales Representatives ("AC/SRs") to recruit prospective students into school programs. School administrators provided cash incentives at the annual holiday party of between $300 and $1,000 to those AC/SRs who enrolled

the most students. As a result of this practice, AC/SRs recruited students who were not qualified for the LPN program into the less-demanding BLPN/MA programs. In order to convince prospective students to sign up for the MA program, AC/SRs falsely promised the students that their credits from the MA program would be transferable to the LPN program and to other schools. AC/SRs also falsely represented to prospective students that 71% of LPN and 77% of BLPN students graduated on time and that 77% of LPN graduates obtained jobs after graduation.

As soon as students enrolled in a program, they were immediately assessed book fees, lab fees, and "other fees" for the entire program (described as "frontloaded" fees). The Schools drew down the students' available federal financial aid to satisfy these fees, but did not provide refunds of frontloaded fees for students who failed out of a program. In addition, no refunds of the frontloaded fees were provided to students who transferred from the BLPN/MA programs to the LPN program, so those students were assessed the fees twice. Book fees were grossly inflated, and lab fees were exorbitant because school labs contained only basic medical equipment. The Schools did not describe what costs "other fees" were meant to cover, but Whatley alleges that those fees were meant to cover the cost of processing FAFSA applications.

For many students who enrolled in a program, grades were arbitrarily assigned. Some students had their grades artificially inflated to prevent them from failing out of their program. Other students had their grades artificially depressed to ensure that they failed courses. After a student failed a course, school administrators conditioned continued enrollment on the student paying with his or her personal funds to retake the course.

Whatley's personal experience with Hohokus Schools, in large part, mirrors the general allegations described above. However, Whatley also alleges that Hohokus Schools claimed federal financial aid for her education in the month after she withdrew from her program. Hohokus Schools drew down these federal funds despite the fact that Whatley was told she had successfully withdrawn and would not incur any financial obligations for her program. In order to justify the claim of federal funds, Whatley's attendance records were altered to falsely reflect

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

3

that she had attended a course in the program after her withdrawal.

On November 21, 2014, Appellees filed a motion to dismiss the FAC for failure to state a claim. Whatley opposed the motion and also moved for leave to file the SAC, which added ten plaintiffs to the action and restyled the state law claims in the FAC as a class action.

The District Court began by reviewing the FCA counts in the FAC and determined that those counts were deficient. Having found the federal claims in the FAC to be deficient, the District Court declined to exercise supplemental jurisdiction over the state law claims in the FAC. The District Court then turned to the SAC and determined that it failed to cure the deficiencies in the FCA counts. However, because the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), provided an independent basis for federal jurisdiction over the state law claims in the SAC, the District Court examined those claims and found them to be deficient as well. The **\*93** District Court then observed that Appellees' motion to dismiss papers put Whatley on notice of the deficiencies in the FAC and Whatley had nonetheless failed to cure those deficiencies in the SAC. On the basis of those findings, the District Court dismissed the FAC with prejudice, and denied Whatley's motion for leave to amend. Whatley timely appealed.

## II. Jurisdiction and Standard of Review
The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3732(a), and 28 U.S.C. § 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the District Court's dismissal of the complaint. *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 601 (3d Cir. 2015). We accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* at 604. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Because FCA and NJCFA claims allege fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 301 n.9 (3d Cir. 2011); *Frederico v. Home Depot*, 507 F.3d 188, 202–03

(3d Cir. 2007). In order to satisfy Rule 9(b), a complaint must provide "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)).

"[A]lthough we review a denial of leave to amend for abuse of discretion, we review the District Court's determination that ... amendment would be futile de novo." *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016) (emphasis omitted). In determining whether amendment would be futile, we "apply the 'same standard of legal sufficiency' as would be applied to a motion to dismiss under Rule 12(b)(6)." *Id.* (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000)).

## III. Analysis
We begin by examining the FCA counts in the FAC to determine whether the District Court properly dismissed the FAC. We then turn to the SAC to determine whether the District Court correctly denied Whatley's motion for leave to amend.

### A. Dismissal of the FAC

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government." *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). To that end, the Act contains a qui tam provision that permits private parties (known as "relators") to bring suit "on behalf of the United States against anyone submitting a false claim to the Government." *Id.* (internal quotation marks omitted) (quoting *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 941, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997)). If a qui tam suit is successful, the relator has the opportunity to share in the recovery.

We have previously recognized that "[t]here are two categories of false claims" that may form the basis of an FCA qui tam suit: (1) factually false claims; and (2) legally false claims. *Wilkins*, 659 F.3d at 305. **\*94** "A claim is factually false when the claimant [knowingly] misrepresents what goods or services that it

provided to the Government." *Id.* "[A] claim is legally false when the claimant knowingly falsely certifies that it has complied with" a material statute, regulation, or contractual provision. *Id.* Such certification may be express or implied. "Under the 'express false certification' theory, [a claimant] is liable under the FCA for falsely certifying that it is in compliance with" a material statute, regulation, or contractual provision. *Id.* By contrast, implied false certification liability attaches when a claimant "makes specific representations about the goods or services provided" and the claimant's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements" makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States*, —— U.S. ——, 136 S.Ct. 1989, 2001, 195 L.Ed.2d 348 (2016).

**[1]** The FAC contains five FCA counts and we address each in turn. Count one premises FCA liability on the following general allegations: (1) the Schools transferred students in between the BLPN/MA and LPN programs thereby drawing down students' federal financial aid for multiple sets of book fees, lab fees, and "other fees"; (2) book fees and lab fees were exorbitantly priced; and (3) the Schools "frontloaded" charges for book fees and lab fees, which were not refunded if a student later withdrew from or failed out of a program.

Whatley states numerous times that the Schools' behavior as to count one resulted in the submission of "fraudulent" or "false" claims to the government. However, beyond those conclusory assertions, Whatley makes no attempt to situate the Schools' alleged behavior within the established FCA liability framework that we outlined above. Whatley does not explain how the Schools submitted any factually false claims because she does not identify any misrepresentations made by the Schools to the government about their alleged behavior. *See Wilkins*, 659 F.3d at 305. Similarly, Whatley does not explain how the Schools submitted any legally false claims because she does not identify any statutes, regulations, or contractual provisions that the Schools violated through their alleged behavior. *See U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 445 (3d Cir. 2004).

For example, Whatley does not identify any misrepresentation made by the Schools to the government with respect to the cost of book fees or lab fees (factual falsity) or any statute, regulation, or contractual provision

that requires the Schools to set those fees within a certain range (legal falsity). To take another example, Whatley does not identify any misrepresentation made by the Schools to the government with respect to potential future refunds of the frontloaded fees for students who withdrew from or failed out of a program (factual falsity). Nor does she identify any statute, regulation, or contractual provision that the Schools violated by not providing refunds of frontloaded fees for such students (legal falsity). [3] We therefore agree with the District Court's dismissal of count one of the FAC.

**[2]** Counts two to four of the FAC allege that the Schools violated specific statutes and regulations and so are properly **\*95** premised on legally false claims. Specifically, count two alleges that the Schools falsely certified compliance with the Higher Education Act ("HEA") ban on incentive payments for recruitment employees, 20 U.S.C. § 1094(a)(20). The FAC includes only a single well-pled allegation as to incentive payments. It alleges that AC/SRs who "recruited a greater number of students would be publicly rewarded with cash bonuses at the end of the year at the annual holiday party, of $300, $500 or $1000." App. 87 ¶ 91. However, this allegation is insufficiently particular under Rule 9(b). No information is provided as to *who* provided the payments, to *whom* the payments were made, or under *what* criteria the payments were awarded. *See U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1169, 1175 (9th Cir. 2006) (concluding violation of incentive compensation ban sufficiently pled where complaint "allege[d] *specific instances* of violation, where higher salaries, benefits, and incentives were given in response to increased enrollment" (emphasis added)). Therefore, the District Court properly dismissed count two of the FAC.

**[3]** Count three alleges that the Schools falsely certified compliance with the HEA ban on charging fees for processing FAFSA applications, presumably in violation of 20 U.S.C. § 1094(a)(2). The FAC alleges that "[the Schools] charged each and every student who was enrolled multiple 'fees' and 'other fees' in addition to application fees and those charges were to cover FAFSA costs." App. 101 ¶ 172. The FAC concedes that the fees were "not specifically labeled as fees for processing FAFSA paperwork" but alleges "upon information and belief, such other fees were in fact to cover the cost of that service." App. 101 ¶ 173. A plaintiff is permitted to plead on information and belief in the Rule 9(b)

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

context "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control." *In re Rockefeller*, 311 F.3d at 216. However, even assuming Whatley had made such a showing here, when pleading on information and belief, "boilerplate and conclusory allegations will not suffice" and the plaintiffs must make "factual allegations that make their theoretically viable claim plausible." *Id.* (emphasis omitted) (quoting *Burlington Coat Factory*, 114 F.3d at 1418). Count three contains no such factual allegations, instead relying on the conclusory assertion that Whatley believes the fees were to cover FAFSA costs. Since the FAC's allegations as to count three amount to nothing more than speculation, the District Court properly dismissed that count.

**[4]** Count four alleges that the Schools falsely certified compliance with regulations requiring that they establish a satisfactory academic progress policy, 34 C.F.R. § 668.34. Whatley argues that the Schools violated those regulations by arbitrarily passing and failing students. However, the underlying allegations as to the arbitrary grade assignment scheme fail to satisfy Rule 9(b). Although the FAC alleges that many students' grades were arbitrarily inflated or depressed by school administrators and teachers, it fails to specify what specific grades were altered by what individuals in what semesters. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 158 (3d Cir. 2014) (observing that FCA complaint that included patient logs showing consumption of medicine alleged to be misused satisfied Rule 9(b)). Thus, the District Court properly dismissed count four of the FAC.

**[5]** Count five of the FAC details Whatley's personal experience with Hohokus Schools and is premised on many of the same general allegations of improper conduct we examined above with respect **\*96** to count one. However, count five also contains an additional set of allegations specific to Whatley that suggest Hohokus Schools claimed federal financial aid funds for her education after she had withdrawn from her program and altered her attendance records to justify that claim of funds. These allegations similarly fail to satisfy Rule 9(b) because they do not specify who made key misrepresentations to Whatley during the withdrawal process or who altered her attendance records. Accordingly, the District Court properly dismissed count five of the FAC.

*B. Denial of Motion for Leave to Amend*

As we noted above, Whatley filed a motion for leave to file the SAC, which the District Court denied. After reviewing the SAC, we agree with the District Court that the SAC does not cure the deficient allegations of the FCA counts of the FAC. However, as the District Court observed, the SAC restyles the state law claims from the FAC into a class action brought under CAFA, and so we will examine the state law counts of the SAC.

Count five of the SAC purports to bring a consumer fraud claim against Appellees under the NJCFA. This NJCFA claim is based on all of the allegations of misconduct in the SAC. Our review of the SAC reveals that, although it sporadically provides particularized detail in places, as a whole, it continues to rely on conclusory assertions that are devoid of the factual support—who, what, when, where, and how—required by Rule 9(b). *See In re Rockefeller*, 311 F.3d at 217. The following examples are illustrative of the general pleading deficiencies of count five of the SAC.

The SAC repeats the FAC's general allegation that student grades were arbitrarily inflated and depressed by school administrators and teachers, but fails to allege the details of any specific instances of grade manipulation. It alleges that credits from the Schools were not transferable to other schools but does not specify what credits were not transferable and specific institutions that refused to accept those credits. It goes on to attribute general misrepresentations to the Schools' employees without providing details of the "time, place, and contents of the false representations or omissions" or "the identity of the person making the misrepresentation[s]." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1297 (3d ed. 2016); *see, e.g.*, App. 137 ¶ 57; App. 144 ¶¶ 114, 118; App. 153 ¶¶ 186, 195. Thus, we conclude that the allegations of count five of the SAC are insufficient to meet the Rule 9(b) pleading standard.

Count six of the SAC purports to bring a claim for a breach of the covenant of good faith and fair dealing, which requires the existence of a contract between the Schools and students. *See Noye v. Hoffmann–La Roche Inc.*, 238 N.J.Super. 430, 570 A.2d 12, 14 (App. Div. 1990) ("In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing.") As

the District Court observed, the SAC fails to identify such a contract. Count seven of the SAC purports to bring a claim for unjust enrichment, which is premised on money "collected from Plaintiffs ... pursuant to unlawful and/or unconscionable provisions in applicable contracts." App. 196 ¶ 411. Again, the SAC fails to identify these contracts. Count eight of the SAC purports to bring a claim for "intentional tort," but the SAC does not identify what intentional tort Appellees allegedly committed. Count nine of the SAC purports to bring a claim for "tort," which appears to sound in negligence. However, the SAC does not allege that Appellees owed students a duty of **\*97** care or articulate the precise scope of any duty of care. *See Michelman v. Ehrlich*, 311 N.J.Super. 57, 709 A.2d 281, 286 (App. Div. 1998) ("[I]t is simply not enough to ground liability in the fact that the defendant did not act with reasonable care and that his carelessness caused injury.... Rather, to establish liability, the plaintiff must demonstrate that the defendant owes him a duty of care." (internal quotation marks and alterations omitted) (quoting *Taylor by Taylor v. Cutler*, 306 N.J.Super. 37, 703 A.2d 294, 297 (App. Div. 1997))). Therefore, the District Court correctly concluded that counts six to nine of the SAC were not properly pled.

The District Court concluded that Appellees' motion to dismiss papers put Whatley on notice of the deficiencies in the FAC and she nonetheless failed to cure them in the SAC. After reviewing Appellees' motion to dismiss papers and the two complaints, we agree with the District Court. "[A] District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them." *Schumann*, 769 F.3d at 849 (internal quotation marks omitted) (quoting *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002)). The District Court did not err in denying Whatley's motion for leave to amend the FAC.

### IV. Conclusion

For the foregoing reasons, we will affirm the District Court's judgments.

### All Citations

657 Fed.Appx. 89, 337 Ed. Law Rep. 666

### Footnotes

\*   This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1   As this matter is before us at the motion to dismiss stage, the following facts, which are taken from the allegations in the FAC, are set forth as if true. *See PittsburghMack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 187 n.1 (3d Cir. 2009).

2   The FAC contains allegations involving multiple aspects of the Schools' programs. The following is a recitation only of the factual allegations in the FAC that are most relevant to our analysis.

3   In demonstrating the insufficiency of Whatley's pleading and argument on this point, Appellees point us to the relevant regulation that governs the refund of federal financial aid required when a student withdraws from a program, 34 C.F.R. § 668.22. However, as Appellees observe, Whatley "neglects to provide any of the factual allegations necessary for a court to infer that [Appellees] violated this provision." Appellees' Br. at 25.

End of Document                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.