THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 3:17-CV-101 |
| v. | : | (JUDGE MARIANI) |
| | : | |
| NAVIENT CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

This case requires the Court to resolve several issues of statutory interpretation with respect to Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act as well as address whether the structure of the independent executive agency created by the Act, the Consumer Financial Protection Bureau, offends the Constitution.  For the reasons that follow, the Court finds (1) the Bureau was within its statutory authority to bring an enforcement action without first engaging in rulemaking, (2) there are no constitutional defects with the structure of the Consumer Financial Protection Bureau, and (3) the Bureau's Complaint against Navient is adequately pleaded.

### I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff, the Consumer Financial Protection Bureau ("CFPB" or "Bureau"), filed a Complaint in the above captioned action on January 18, 2017.  (Doc. 1).  The eleven count Complaint alleges that Defendants, Navient Corporation, Navient Solutions, Inc., and

Pioneer Credit Recovery, Inc., (collectively "Navient"), committed various violations of the Consumer Financial Protection Act ("CFP Act" or "Act"), 12 U.S.C. §§ 5531, 5536 (Counts I-VIII), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e (Counts IX-X), and Regulation V of the Fair Credit Reporting Act, 12 C.F.R. §1022.42 (Count XI). (Doc. 1). On March 24, 2017, Navient filed a Motion to Dismiss or, in the alternative, for a More Definite Statement. (Doc. 28). Specifically, Navient raised the following arguments: (1) Counts I-VIII should be dismissed because the Bureau lacks authority to bring suit under the CFP Act without first engaging in rulemaking to declare specific acts or practices unfair, deceptive, or abusive; (2) the entire Complaint should be dismissed because the structure of the CFPB is unconstitutional and therefore the Director of the Bureau was acting without authority when he authorized the present suit; (3) Counts I-IV and Counts VII-X fail to state a claim for which relief can be granted; and (4) Count VI is so vague that Navient is unable to respond to it by way of an answer. (Doc. 29). For the reasons that follow, the Court will deny Navient's Motion in its entirety.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following facts which this Court accepts as true for the purposes of this Motion:

Navient Corporation is a company specializing in loan management, loan servicing, and asset recovery. (Doc. 1 at ¶ 18). In that role, Navient Corporation holds contracts with the U.S. Department of Education for the servicing of over six million federal student loans.

2

(*Id*. at ¶¶ 2, 21-23). In turn, Navient Solutions (formerly Sallie Mae) and Pioneer Credit Recovery are both wholly-owned subsidiaries of Navient Corporation. (*Id*. at ¶¶ 16-17). As relevant to this action, Navient Solutions services federal and private student loans while Pioneer Credit Recovery performs debt collection activities on delinquent and defaulted student loans. (*Id*.).

As a loan servicer, Navient Solutions is responsible for managing student loan borrowers' accounts, which includes activities such as processing monthly payments and communicating with borrowers about repayment of their loans. (*Id*. at ¶ 3). Navient Solutions has repeatedly encouraged those borrowers who are having trouble paying their monthly bill to contact Navient Solutions. (*Id*. at ¶ 38). For example, Navient Solutions' webpage contained the following statement: "If you're experiencing problems making your loans payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation." (*Id*.). The U.S. Department of Education's webpage has similarly encouraged financially troubled borrowers to contact their loan servicer for help. (*Id*. at ¶ 37).

Most federal loan borrowers experiencing financial difficulties have several options to address unaffordable monthly payments. (*Id*. at ¶ 27). One such option is forbearance. (*Id*. at ¶ 33). Although forbearance allows a borrower to stop making payments temporarily, interest continues to accrue and will eventually capitalize on the principal of the loan. (*Id*. at ¶¶ 33, 35). Thus, a borrower who places his or her loan in forbearance for a long period of

3

time is likely to see a significant increase in the total amount he or she must ultimately pay back and, upon resuming repayment, may be required to make a larger monthly payment than was required before entering forbearance. (*Id*. at ¶ 35). As a result, forbearance is not a good option for those experiencing long-term financial hardship. (*Id*.).

Another option for borrowers with certain eligible federal loans is to enter into one of several different types of income-driven repayment plans that calculate a borrower's monthly payment based on his or her income and family size and result in an affordable monthly payment that can be as low as $0 per month. (*Id*. at ¶¶ 27-30). For some borrowers, income-driven repayment plans offer several secondary benefits as well, including (1) an interest subsidy where the government pays off the unpaid accruing interest, preventing it from being added to the principal, and (2) treating low payments as "qualifying payments" for certain programs that forgive the balance of the loan after a borrower makes a certain number of qualifying payments. (*Id*. at ¶¶ 31-32). Because of these benefits, income-driven repayment plans are usually the best option for those borrowers experiencing long-term financial hardship. (*Id*. at ¶ 36).

Nevertheless, entering a borrower into an income-driven repayment plan is more time-intensive and expensive for Navient Solutions then putting a borrower's loan into forbearance. (*Id*. at ¶¶ 47-49). While a Navient Solutions customer service representative can put a borrower's loan into forbearance quickly over the phone, generally without filling out any paperwork, entering a borrower into an income-driven repayment plan involves

4

lengthy conversations about different plans, helping a borrower fill out the initial application, and possessing both the initial and annual renewal paperwork. (*Id*. at ¶¶ 42-45, 48). Thus, Navient Solutions has had to increase its staff size—and overall operating costs—as the number of borrowers entering income-driven repayment plans has increased. (*Id*. at ¶ 46). Additionally, taking the time to enter a borrower into an income-driven repayment plan is less appealing to Navient Solutions' customer service representatives because they are compensated, in part, based on how short they can keep their average call. (*Id*. at ¶ 43). As a result, Navient Solutions, through its customer service representatives, routinely entered financially distressed borrowers into forbearance without adequately discussing—or sometimes discussing at all—the option of income-driven repayment plans. (*Id*. at ¶¶ 40-41, 49, 51). As a consequence of guiding borrowers—including those borrowers who had demonstrated long-term financial difficulties—into forbearance and even multiple consecutive forbearances, Navient Solutions routinely had more borrowers with loans in forbearance then in income-driven repayment plans. (*Id*. at ¶¶ 50-53). This has imposed significant monetary costs on those borrowers who qualified for an income-driven repayment plan but whose loans were placed in forbearance. (*Id*. at ¶ 54).

For those borrowers who did enroll in an income-driven repayment plan, Navient Solutions was obligated to send a written notice with the requirements for annual renewal of the plan. (*Id*. at ¶ 60). Unless a borrower properly recertified his or her income and family size once a year, the borrower would automatically be removed from the income-driven

5

repayment plan. (*Id.* at ¶ 55). Even temporary removal from the plan would result in one or more of the following negative consequences for borrowers: (1) an immediate increase in his or her monthly payment; (2) the addition of any unpaid, accrued interest onto the principal; and (3) the loss of an interest subsidy. (*Id.* at ¶¶ 56-57).

From mid-2010 to March of 2015, for those borrowers who had consented to receiving electronic communication, Navient Solutions sent borrowers an email with the subject line of either "Your Sallie Mae Account Information" or "New Document Ready to View," when the borrower's annual renewal notice was available. (*Id.* at ¶¶ 66-67, 69). Upon opening the email, a borrower would be instructed that "a new education loan document is available. Please log in to your account to view it." (*Id.* at ¶ 70). The email would also contain a hyperlink to Navient Solutions' website, where a borrower could log in to his or her account and view the renewal notice. (*Id.* at ¶ 68). Upon changing both the subject line and body of the email in March of 2015 to contain more descriptive information concerning which specific document was available, renewal rates for borrowers more than doubled. (*Id.* at ¶¶ 75-76).

For those borrowers who had not consented to receiving electronic communication, Navient Solutions would send the annual renewal notice through the mail. (*Id.* at ¶ 61). From January of 2010 until December of 2012, the mailed notice stated that the borrower's participation in an income-driven repayment plan would "expire in approximately 90 days" and that the "renewal process may take at least 30 days." (*Id.* at ¶ 62). It further told

6

borrowers to fill out the renewal forms completely and that if a borrower "provid[ed] incorrect or incomplete information the [renewal] process will be delayed." (*Id.* at ¶ 64). The renewal notice, however, did not (1) provide any specific date for which a borrower's participation in an income-driven repayment plan would expire, (2) specify that submitting an incomplete or inaccurate renewal form may result in his or her removal, at least temporarily, from the plan, or (3) explain that certain irreversible consequences such as the capitalization of unpaid interest would occur if the plan expired, even temporarily. (*Id.* at ¶¶ 61, 63, 65).

Another one of Navient Solutions' responsibilities was the processing of student loan payments. (*Id.* at ¶ 97). This involved receiving a borrower's check and both allocating the payment between his or her multiple loans and applying the payment to each loan according to the terms of the promissory note. (*Id.* at ¶ 100). Many payments, however, were either misallocated or misapplied by Navient Solutions. (*Id.* at ¶¶ 100-102). These errors occurred for multiple reasons, including that Navient Solutions (1) did not disclose its payment allocation methodology, (2) failed to read borrowers' allocation and application instructions, and (3) failed to implement borrowers' instructions properly. (*Id.* at ¶¶ 103-106). Such processing errors resulted in a range of negative consequences for borrowers including the assessment of improper late fees and interest, the loss of certain benefits, and having inaccurate negative information about them shared with consumer reporting agencies. (*Id.* at ¶ 108).

7

If a borrower discovered such a processing error, he or she would need to contact Navient Solutions to correct it. (*Id*. at ¶ 107). Nevertheless, even after reporting an error, some borrowers experienced the same processing errors month after month. (*Id*. at ¶ 109). This occurred because an error reported only to the first level of Navient Solutions' customer service was not categorized or tagged in such a manner as to allow the company to identify the underlying issues causing the errors. (*Id*. at ¶¶ 110-112). As a result, Navient Solutions was generally unable to prevent the reoccurrence of errors that borrowers were experiencing month after month. (*Id*. at ¶ 112).

For those borrowers who failed to make payments on their student loans, after a certain number of missed payments, the loan would enter default status. (*Id*. at ¶ 119). Some student loans which entered default were referred to Pioneer Credit Recovery for collection. (*Id*. at ¶¶ 9-10). In addition to being referred to collection, there are at least two other negative consequences of a federal student loan entering default. (*Id*. at ¶¶ 9-10, 119, 126). First, multiple negative notations indicating the default are placed on the borrower's credit report. (*Id*. at ¶ 119). Second, the U.S. Department of Education begins assessing collection fees on the loan. (*Id*. at ¶ 126).

When certain federal student loans entered default, Pioneer could enroll borrowers into the federal loan rehabilitation program. (*Id*. at ¶¶ 11, 115). The federal loan rehabilitation program helps borrowers get their loan out of default status and back into active repayment status. (*Id*. at ¶¶ 113-114). Additionally, completion of the program

8

removes some, but not all, of the negative notations from a borrower's credit history and forgives any remaining unpaid collection fees. (*Id.* at ¶¶ 113, 119-120, 125, 128, 132). Nevertheless, in calls with borrowers, Pioneer collectors routinely overstated the benefits of the rehabilitation program by claiming that all negative information on a borrower's credit history would be removed and all collection fees would be forgiven. (*Id.* at ¶¶ 122, 129-132).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . .

9

disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*,

707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and

quotation marks omitted). This "plausibility" determination will be a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

As discussed above, Navient first raises two broad attacks against the power of the

CFPB to maintain all or most of the present action against them before they argue for

dismissal of individual counts and for a more definite statement. The Court will address

each of Navient's arguments in turn.

10

## A. Statutory Authority to Bring Suit before Rulemaking

Navient first argues that the CFPB lacks statutory authority to bring an enforcement

action without first engaging in rulemaking to declare a specific act or practice unfair,

deceptive, or abusive. (Doc. 29 at 12-14). This argument requires the Court to interpret

provisions of Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

"The first step in interpreting a statute is to determine 'whether the language at issue has a

plain and unambiguous meaning with regard to the particular dispute in the case.'" *Marshak*

*v. Treadwell*, 240 F.3d 184, 192 (3d Cir. 2001) (quoting *Robinson v. Shell Oil Co.*, 519 U.S.

337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). "The plainness or ambiguity of

statutory language is determined by reference to the language itself, the specific context in

which that language is used, and the broader context of the statute as a whole." *Robinson*,

519 U.S. at 341. "When the statutory language has a clear meaning, [a court] need not look

further." *Valansi v. Ashcroft*, 278 F.3d 203, 209 (3d Cir. 2002).

Here, the statutory provision at issue provides, in relevant part,

### (a) In general

The Bureau may take any action authorized under part E to prevent a
covered person[1] or service provider from committing or engaging in an unfair,
deceptive, or abusive act or practice under Federal law in connection with any
transaction with a consumer for a consumer financial product or service, or
the offering of a consumer financial product or service.

---

[1] There appears to be no dispute that all three Defendants are covered persons or are deemed to
be covered persons under the Act. (Doc. 1 at ¶¶ 16-17, 19).

11

### (b) Rulemaking

The Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. Rules under this section may include requirements for the purpose of preventing such acts or practices.

12 U.S.C. § 5531. Part E of the Act, titled "Enforcement Powers," provides, in part, that "[i]f any person violates a Federal consumer financial law, the Bureau may . . . commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

In addition to section 5531, section 5492 states that "[t]he Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including . . . implementing the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions." 12 U.S.C. § 5492(a)(10). Further, section 5512 provides that "[t]he Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof," and then delineates standards for rulemaking. 12 U.S.C. § 5512(b).

Navient's argument is in essence that the CFPB is authorized to "take any action authorized under part E"—which includes enforcement actions—only to prevent a regulated

entity "from committing or engaging in an unfair, deceptive, or abusive act or practice *under Federal law*." 12 U.S.C. § 5531(a) (emphasis added). According to Navient, the use of the term "under Federal law" looks to the following subsection on rulemaking which allows the CFPB to "identify[ ] as unlawful unfair, deceptive, or abusive acts or practices." Thus, Navient argues that until the CFPB uses its rulemaking authority to declare an act or practice unlawful, that act or practice is not unlawful under federal law, and therefore cannot serve as a basis for an enforcement action. (Doc. 29 at 13; Doc. 43 at 3-4; Oral Arg. Tr., Doc. 55 at 96).

This argument fails in light of another section of the Act that plainly declares that "[i]t shall be unlawful for . . . any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). Thus, there appears to be no reason why the CFPB cannot base an enforcement action on a violation of this provision of federal law. Indeed, reading sections 5531(a), 5536(a)(1)(B), and 5564(a) together, their plain language provides that the CFPB may, among other things, commence a civil action "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law," 12 U.S.C. § 5531(a), and that one such violation of federal law occurs when a "covered person . . . engage[s] in any unfair, deceptive, or abusive act[s] or practice[s]," 12 U.S.C. § 5536(a)(1)(B).[2]

---

[2] In their reply brief, Navient argues that this statutory interpretation is defectively circular because section 5536(a)(1)(B) does not say what conduct constitutes an unfair, deceptive, or abusive act or practice. (Doc. 43 at 3-4). This, however, overlooks the reality that these terms are defined both under the

13

At oral argument, Navient argued that subsections (c) and (d) of section 5531

support its position:

### (c) Unfairness

#### (1) In general

The Bureau shall have no authority under this section to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—

> **(A)** the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

> **(B)** such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

. . .

### (d) Abusive

The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

**(1)** materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

**(2)** takes unreasonable advantage of—

---

Act and within the common law. *See* 12 U.S.C. § 5531(c)-(d); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 902-06 (S.D. Ind. 2015) (discussing the meaning of both "unfair" and "abusive" as defined in the Act); *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *12 (C.D. Cal. 2016) (noting that "unfair," "deceptive," and "abusive" are "terms that have established meanings under other consumer-protection statutes"); *see also CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (applying the deceptive standard used in the FTC context to the CFP Act).

> **(A)** a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;
>
> **(B)** the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or
>
> **(C)** the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531. Navient argues that these provisions—specifically, the use of the word "declare" in each subsection—constrain the CFPB's authority to engage in rulemaking. (Oral Arg. Tr., Doc. 55 at 98-102). According to Navient, because "declare" refers to rulemaking, and not litigation, the only way the CFPB would be statutorily authorized to initiate litigation is in the circumstances where the Bureau first declares an act or practice unlawful through rulemaking. (Id.). Otherwise, Navient contends, the CFPB could avoid these limitations by bringing a lawsuit and arguing that unfairness and abusiveness mean whatever the Bureau wanted it to mean without constraint from the Act. (Id.).

Navient, however, has failed to explain—or cite to any authority which would explain—why "declare" must refer only to rulemaking and not litigation, and why it would be improper for the CFPB to declare something unlawful through litigation. See generally FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015). The Court is not persuaded that the language of section 5531 should be read in the manner advocated by Navient. Subsections (c) and (d) of section 5531 fall within the section of the Act titled "Prohibiting unfair, deceptive, or abusive acts or practices." That section states that the Bureau may (a)

15

"take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law," and (b) "prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices." 12 U.S.C. § 5531(a)-(b). The section then states the requirements that must be met before the Bureau can declare an act or practice unfair or abusive. 12 U.S.C. § 5531(c)-(d). There is no reason, therefore that subsections (c) and (d) should not constrain the CFPB equally in litigation and in rulemaking.

In the end, Navient is unable to point to any clear language in the statutory scheme that requires the CFPB to first engage in rulemaking before bringing an enforcement action for unfair, deceptive, or abusive acts or practices. The plain meaning of the statutory language provides that the CFPB has both the power to engage in rulemaking, 12 U.S.C. §§ 5512(b)(1), 5531(b), and litigation, 12 U.S.C §§ 5531(a), 5564(a), to address unfair, deceptive, or abusive acts or practices. The most harmonious construction of these provisions is that the CFPB may proceed either via rulemaking or an enforcement action.[3] This interpretation is supported not only by the plain language of the provisions at issue, but finds support in other places as well.

---

[3] See Corley v. United States, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) (recognizing "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and alterations omitted)); see also ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 180-82 (2012) (discussing the "Harmonious-Reading" cannon of statutory interpretation which provides that "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

16

First, all of the language regarding rulemaking is permissive. *See* 12 U.S.C. §

5531(b) ("The Bureau may prescribe rules . . . ."); 12 U.S.C. § 5512(b)(1) ("The Director

may prescribe rules . . . ."). Nevertheless, the Act provides that the Bureau "*shall* regulate

the offering and provision of consumer financial products or services under the Federal

consumer financial laws." 12 U.S.C. § 5491(a) (emphasis added); *see also* 12 U.S.C. §

5511(a) ("The Bureau shall seek to implement and, where applicable, enforce Federal

consumer financial law consistently for the purpose of ensuring that all consumers have

access to markets for consumer financial products and services and that markets for

consumer financial products and services are fair, transparent, and competitive."). Thus, if

rulemaking was a prerequisite for the Bureau to exercise any of its enforcement powers

under Part E,[4] it would make little sense for rulemaking to be designated permissive in the

language of the statute itself.

Second, this interpretation is consonant with how courts have interpreted the older

but analogous language found in the Federal Trade Commission Act ("FTC Act"). That

scheme provides, in part, that the Federal Trade Commission ("FTC")

> shall have no authority under this section . . . to declare unlawful an act or
> practice on the grounds that such act or practice is unfair unless the act or
> practice causes or is likely to cause substantial injury to consumers which is
> not reasonably avoidable by consumers themselves and not outweighed by
> countervailing benefits to consumers or to competition.

---

[4] In addition to litigation authority, Part E of the Act provides that the CFPB has investigatory
powers, 12 U.S.C. § 5562, adjudication powers, 12 U.S.C. § 5563, and the power to make referrals for
criminal prosecution, 12 U.S.C. § 5566.

15 U.S.C. § 45(n). This Court is unaware of any court that has held that the use of "declare" in section 45(n) requires the FTC to proceed via rulemaking before institution of an enforcement action. Instead, "Circuit Courts of Appeal have affirmed FTC unfairness actions in a variety of contexts *without* preexisting rules or regulations specifically addressing the conduct-at-issue." *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 618 (D.N.J. 2014) *aff'd*, 799 F.3d 236 (3d Cir. 2015).

In sum, the Court finds that the plain language of the CFP Act does not impose a requirement on the Bureau to engage in rulemaking before bringing an enforcement action. Nonetheless, Navient contends that dismissal of Counts I-VIII are still warranted because the CFPB's failure to promulgate rules before filing the present action has left Navient without fair notice of what acts or practices the Bureau considered unfair, deceptive, or abusive. (Doc. 29 at 14-15; Doc. 43 at 5-6). The Navient Defendants, however, do not contend that the CFP Act is unconstitutionally vague on its face. (Doc. 43 at 6). Instead, they are arguing that "[t]he CFPB's suit is an attempt to retroactively 'declare' new student loan servicing obligations." (*Id.* at 5).

Navient's argument misstates the nature of this lawsuit. The CFP Act makes it "unlawful for . . . any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). The CFPB's lawsuit does not retroactively impose any requirements on Navient. Instead, it seeks to impose liability for Navient's alleged acts or practices that the CFPB believes violates section 5536(a)(1)(B)

18

of the CFP Act. As discussed further below, this case involves "ordinary judicial interpretation of a civil statute." *Wyndham*, 799 F.3d at 253. As such, the relevant legal question is not whether Navient had fair notice of what acts or practices the CFPB has *interpreted* as unlawful under the Act, but only whether Navient had fair notice of what the Act requires.

This same argument, within the context of the FTC Act, arose in *FTC v. Wyndham Worldwide Corporation*, 799 F.3d 236 (3d Cir. 2015). In *Wyndham*, the FTC filed a lawsuit against Wyndham Worldwide Corporation alleging that the company's deficient cybersecurity, which had led to customer data being stolen, was an unfair practice in violation of the FTC Act. *Id.* at 240. Wyndham moved to dismiss, arguing that because there was no relevant FTC rule or adjudication on the matter, it lacked fair notice that its cybersecurity practices could violate the unfairness provision of the FTC Act. *Id.* On interlocutory appeal of the denial of Wyndham's motion, the Third Circuit held that

> if the federal courts are to decide whether Wyndham's conduct was unfair in the first instance under the statute without deferring to any FTC interpretation, then this case involves ordinary judicial interpretation of a civil statute . . . . The relevant question is not whether Wyndham had fair notice of the FTC's interpretation of the statute, but whether Wyndham had fair notice of what the *statute itself* requires.

*Id.* at 253-54. With the issue properly framed, the Third Circuit found that "for civil statutes that regulate economic activities," such as the FTC Act, "a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *Id.* at 250, 255 (quoting *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013)). Stated otherwise,

"[f]air notice is satisfied . . . as long as the company can reasonably foresee that a court could construe its conduct as falling within the meaning of the statute." *Id.* at 256.

Therefore, in light of *Wyndham*, Navient's fair notice argument fails if it was reasonably foreseeable to Navient that a court could construe their alleged conduct as unfair, deceptive, or abusive under the CFP Act. Navient, however, has only advanced arguments as to why it did not have fair notice of *the Bureau's* interpretation of the CFP Act. (Doc. 29 at 14-15; Doc. 43 at 5-6). But, as discussed above, the CFPB's interpretation of whether its allegations constitute unfair, deceptive, or abusive acts or practices is irrelevant to whether Navient had fair notice of the conduct the CFP Act itself proscribes. Stripped of these irrelevant arguments, Navient's position reduces to its assertion that it complied with the Higher Education Act, the Department of Education's regulations related to the Higher Education Act, and Navient's contracts with the Department of Education. (*Id.*).

Nevertheless, even assuming the truth of these assertions, complying with other statutory, regulatory, and contractual obligations does not relieve Navient of its obligation to refrain from committing acts that are unlawful under the CFP Act. Nor does it begin to explain why it was not reasonably foreseeable to Navient that a court could construe the acts or practices alleged in the Complaint as violations of the CFP Act. As Navient has put forth no specific argument as to how or why the standards found in the CFP Act are so vague as to be no standards at all when applied to the facts of this case, the Court need not address this

argument further. *See Commonwealth of Pa. v. HHS*, 101 F.3d. 939, 945 (3d Cir. 1996) (noting that arguments that are not squarely argued are waived).

In sum, the Court finds no merit in Navient's assertion that the CFP Act requires the CFPB to engage in rulemaking before initiating an enforcement action, or that Navient lacked fair notice of what the CFP Act proscribes.

### B. Constitutionality of the Agency's Structure

Next, Navient argues that the CFPB's structure improperly interferes with the President's powers under Article II of the Constitution because it combines the following three characteristics: (1) the agency is headed by a single director who wields executive power; (2) the director is only removable for cause; and (3) the agency is funded outside the normal budgetary process. (Doc. 29 at 15-16). At oral argument, counsel for Navient made clear that it is not any one of these attributes in isolation that renders the Bureau constitutionally problematic, but the combination of all three together. (Oral Arg. Tr., Doc. 55 at 75, 78, 81). Thus, to fully understand Navient's arguments, it is important to first understand how the CFPB is structured.

The Consumer Financial Protection Bureau is an independent agency within the Federal Reserve System created by the Consumer Financial Protection Act of 2010, otherwise known as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act. 12 U.S.C. § 5491(a); Pub. L. No. 111-203, § 1001, 124 Stat. 1376, 1955 (2010). The Bureau is headed by a single director, appointed by the President with the advice and

consent of the Senate, who serves a fixed five year term. 12 U.S.C. § 5491(b)(1)-(2), (c)(1). "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). As for funding, the Director determines the amount of the Bureau's yearly operating expenses and that amount is transferred to the CFPB from the Federal Reserve System. 12 U.S.C. § 5497(a)(1). In a given fiscal year, however, the Bureau is prohibited from receiving more than twelve percent of the Federal Reserve System's operating expenses. 12 U.S.C. § 5497(a)(2)(A)(iii).

The CFP Act instructs that the Bureau "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). To accomplish this directive, the Bureau can "prescribe rules and issue orders and guidance," 12 U.S.C. § 5512(b)(1), "engage in joint investigations and requests for information," 12 U.S.C. § 5562(a)(1), "conduct hearings and adjudication proceedings," 12 U.S.C. § 5563(a), "commence a civil action," 12 U.S.C. § 5564(a), and refer appropriate matters for criminal prosecution, 12 U.S.C. § 5566. Generally speaking, the CFPB may only exercise these authorities within the realm of federal consumer financial law, but the Act also provides more specific subject matter limitations on the Bureau's powers. 12 U.S.C. § 5517.

In both their brief and at oral argument, Navient argued that this structure brings the CFPB so far outside of the control of the President that it violates Article II of the

Constitution. To address this argument, the Court begins by reviewing the underlying

principles that will guide its analysis of the issue at hand.

Article II of the Constitution begins by proclaiming that "[t]he executive Power shall

be vested in a President of the United States of America." U.S. CONST. art. II, § 1, cl. 1. It

further instructs that the President "shall take Care that the Laws be faithfully executed."

U.S. CONST. art. II, § 3. With respect to the appointment of officers, the Constitution

provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall
> appoint Ambassadors, other public Ministers and Consuls, Judges of the
> supreme Court, and all other Officers of the United States, whose
> Appointments are not herein otherwise provided for, and which shall be
> established by Law: but the Congress may by Law vest the Appointment of
> such inferior Officers, as they think proper, in the President alone, in the
> Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2. Thus, under the Appointments Clause, officers are divided into

two classes. *United States v. Germaine*, 99 U.S. 508, 509, 25 L. Ed. 482 (1878). "Principal

officers are selected by the President with the advice and consent of the Senate. Inferior

officers Congress may allow to be appointed by the President alone, by the heads of

departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1,132, 96 S. Ct. 612, 46 L.

Ed. 2d 659 (1976).

Nevertheless, while the Constitution provides some detail concerning the

appointment of officers, the document does not speak to the President's power to remove

either principal or inferior officers. Accordingly, in 1926, the Supreme Court took up the

23

question of what limits could properly be placed on the President's power to remove appointed officers within the executive branch. *Myers v. United States*, 272 U.S. 52, 47 S. Ct. 21, 71 L. Ed. 160 (1926). *Myers* involved a postmaster of the first class who was appointed by the President with the advice and consent of the Senate for a four year term. *Id.* at 106. The relevant statute provided that postmasters of the first class could only "be removed by the President by and with the advice and consent of the Senate." *Id.* at 107. Nevertheless, two and a half years into Myers's term, the President demanded his resignation. *Id.* at 106. When Myers refused, the President, through the Postmaster General, terminated him without Senate approval. *Id.* Myers then filed a lawsuit for back pay. *Id.* In a lengthy opinion authored by former President and then Chief Justice Taft, the Supreme Court, after a thorough review of the historical record, held that Congress could not "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power." *Id.* at 161.

Nine years later, the Supreme Court addressed a slightly different question in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S. Ct. 869, 79 L. Ed. 1611 (1935). Humphrey was a principal officer appointed by President Hoover, with the advice and consent of the Senate, to serve a seven year term as a commissioner on the FTC. *Id.* at 618. Unlike *Myers*, the relevant statute in this case did not condition removal of the commissioner on Senate approval, but instead provided "that 'any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.'" *Id.* at

619 (quoting 15 U.S.C. § 41). Two years into Humphrey's term, President Roosevelt was elected and requested Humphrey's resignation so that the President could appoint someone of his own choosing. *Id*. at 618-19. After Humphrey refused to resign, the President terminated him. *Id*. at 619.

After first determining that the language of the statute restricted the President's power to remove commissioners at will, the Court turned to the question of whether such a restriction was an unconstitutional limit on the President's Article II powers. *Id*. at 621-26. On that point, the government argued that language in *Myers* supported an unfettered presidential power of removal, such that any limitation on the President's ability to terminate executive officers at will was unconstitutional. *Id*. at 626. The Court responded that

the narrow point actually decided [in *Myers*] was only that the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress. In the course of the opinion of the court, expressions occur which tend to sustain the government's contention, but these are beyond the point involved and, therefore, do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved.

*Id*. The Court then went on to describe the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id*. at 628. Therefore, according to the Court, the FTC could not "in any proper sense be characterized as an arm or an eye of the executive," but instead "acts in part quasi legislatively and in part quasi judicially." *Id*.

25

Accordingly, the unanimous Court held that the "illimitable power of removal is not possessed by the President in respect of officers of the character of those just named." *Id.* at 629. Looking to future cases, the Court instructed that "[w]hether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office." *Id.* at 631.

The Court reaffirmed this principle in 1958 when it held that the President could not, without cause, remove a member of the War Claims Commission—a body set up to adjudicate certain classes of claims involving those who sustained an injury during World War II—because that agency was judicial in nature. *Wiener v. United States*, 357 U.S. 349, 355-56, 78 S. Ct. 1275, 2 L. Ed. 2d 1377 (1958). In response to "the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission," the Court "conclude[d] that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it." *Id.* at 356.

Over thirty years later, in *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988), the Supreme Court addressed the question of whether Congress may place restrictions on the President's power to remove an inferior officer within the executive branch who performs core executive functions. Specifically, *Morrison* involved Title VI of

the Ethics in Government Act, 28 U.S.C. §§ 591-599, which allowed a special court, upon

request by the Attorney General, to appoint "an 'independent counsel' to investigate and, if

appropriate, prosecute certain high-ranking Government officials for violations of federal

criminal laws." *Id.* at 660-61. The Office of the Independent Counsel automatically

terminated upon completion of his or her investigations or prosecutions, but otherwise the

independent counsel could only be removed by the Attorney General and only for cause.

*Id.* at 663-64. After one such independent counsel was appointed pursuant to the Ethics

Act, she caused a grand jury to issue subpoenas to several government officials. *Id.* at 668.

Those officials moved to quash the subpoenas on the basis that, among other reasons, the

Ethics Act violated Article II and the principle of separation of powers. *Id.* at 668-69.

Responding to the argument that *Myers* was controlling because the independent

counsel exercised core executive powers, the Court held that

> the determination of whether the Constitution allows Congress to impose a
> "good cause"-type restriction on the President's power to remove an official
> cannot be made to turn on whether or not that official is classified as "purely
> executive." The analysis contained in our removal cases is designed not to
> define rigid categories of those officials who may or may not be removed at
> will by the President, but to ensure that Congress does not interfere with the
> President's exercise of the "executive power" and his constitutionally
> appointed duty to "take care that the laws be faithfully executed" under Article
> II. . . . [T]he characterization of the agencies in *Humphrey's Executor* and
> *Wiener* as "quasi-legislative" or "quasi-judicial" in large part reflected our
> judgment that it was not essential to the President's proper execution of his
> Article II powers that these agencies be headed up by individuals who were
> removable at will. We do not mean to suggest that an analysis of the
> functions served by the officials at issue is irrelevant. But the real question is
> whether the removal restrictions are of such a nature that they impede the

27

President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.

*Id.* at 689-91 (footnotes omitted). The Court then analyzed whether the for cause removal provision inhibited the President's ability to perform his constitutional functions under Article II. *Id.* at 691. After determining that the independent counsel was "an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority," but one who "exercise[d] no small amount of discretion and judgment," the Court found that "the President's need to control the exercise of that discretion" was not "so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92.

Further, with respect to the President's Article II powers, the Court also found that the removal provision did not

impermissibly burden[ ] the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act. This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws. Rather, because the independent counsel may be terminated for "good cause," the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act. . . .

*Id.* at 692. Thus, the Court concluded that the for cause removal provision did not

"sufficiently deprive[ ] the President of control over the independent counsel" so as "to

28

interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws." *Id.* at 693.

Turning to the question of whether the Ethics Act violated the principle of separation of powers, the Court first observed that this was not a case in which there was any legislative or judicial usurpation of executive functions. *Id.* at 693-95. The Court then held that the Ethics Act did not "impermissibly undermine[ ] the powers of the Executive Branch, or disrupt[ ] the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 695 (internal citations, alterations, and quotations marks omitted). In coming to this conclusion, the Court found that

the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel. Most importantly, the Attorney General retains the power to remove the counsel for "good cause," a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are "faithfully executed" by an independent counsel.

*Id.* at 696.

Most recently, in 2010, the Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477, 483-84, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010), addressed the question of whether an inferior officer on the Public Company Accounting Oversight Board may be given for cause removal protection when the principal officers of the Securities and Exchange Commission who oversee the Board can

themselves only be removed for cause. Finding such a structure unconstitutional, the Court

distinguished prior decisions that had upheld for cause removal restrictions, reasoning that

> [t]he added layer of tenure protection makes a difference. Without a layer of
> insulation between the Commission and the Board, the Commission could
> remove a Board member at any time, and therefore would be fully responsible
> for what the Board does. The President could then hold the Commission to
> account for its supervision of the Board, to the same extent that he may hold
> the Commission to account for everything else it does.
>
> A second level of tenure protection changes the nature of the President's
> review. Now the Commission cannot remove a Board member at will. The
> President therefore cannot hold the Commission fully accountable for the
> Board's conduct, to the same extent that he may hold the Commission
> accountable for everything else that it does.

*Id.* at 495-96. Thus, the Court concluded, "[b]y granting the Board executive power without

the Executive's oversight, this Act subverts the President's ability to ensure that the laws are

faithfully executed." *Id.* at 498.

With this line of cases to guide its analysis, the Court addresses whether the

structure particular to the CFPB violates the Constitution. Even on this narrow point,

however, the Court does not write on a blank slate. Four published cases have addressed

this topic as of this writing.

The first two published opinions, *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082

(C.D. Cal. 2014), and *CFPB v. ITT Educational Services, Inc.*, 219 F. Supp. 3d 878 (S.D.

Ind. 2015), found no constitutional deficiencies. Relying on *Humphrey's Executor* and

*Morrison*, both district courts found the for cause removal provision did not impermissibly

invade the President's Article II powers. *Morgan Drexen,* 60 F. Supp. 3d at 1087-89; *ITT*

*Educ. Servs.,* 219 F. Supp. 3d at 893-94. Similarly, both courts also rejected the idea that there was any constitutional significance to the fact that (1) the CFPB is funded outside the normal appropriation process, and (2) the CFPB is run by a single director, as opposed to a multi-member board or commission. *Morgan Drexen,* 60 F. Supp. 3d at 1089,1092; *ITT Educ. Servs.,* 219 F. Supp. 3d at 894-97. Finally, both courts also rejected the argument that the combination of the above characteristics in one agency rendered the CFPB unconstitutional. *Morgan Drexen,* 60 F. Supp. 3d at 1092; *ITT Educ. Servs.,* 219 F. Supp. 3d at 895.

The Court of Appeals for the District of Columbia was the next court to issue a published opinion on this topic. *See PHH Corp. v. CFPB,* 839 F.3d 1, (D.C. Cir. 2016), *reh'g en banc granted, order vacated,* (Feb. 16, 2017). In a lengthy and detailed opinion, the *PHH* court found it constitutionally untenable for the CFPB to be headed by a single director who could only be removed for cause. *Id.* at 8. The panel's majority summarized their rationale as follows:

In order to preserve individual liberty and ensure accountability, Article II of the Constitution assigns the executive power to the President. The President operates with the assistance of subordinates, but the President acts as a critical check on those subordinates. That check provides accountability and protects against arbitrary decisionmaking by executive agencies, thereby helping to safeguard individual liberty. Article II has been interpreted by the Supreme Court to allow independent agencies in certain circumstances. Independent agencies lack the ordinary constitutional checks and balances that come from Presidential supervision and direction. But to ensure some check against arbitrary decisionmaking and to help preserve individual liberty, independent agencies have traditionally been structured as multi-member bodies where the commissioners or board members can check one another.

The check from other commissioners or board members substitutes for the check by the President. As an independent agency with just a single Director, the CFPB represents a sharp break from historical practice, lacks the critical internal check on arbitrary decisionmaking, and poses a far greater threat to individual liberty than does a multi-member independent agency.

*Id*. at 30-31. To remedy the constitutional deficiency, the court severed the for cause removal provision, making the Director removable at the will of the President. *Id*. at 39.

Subsequently, the Court of Appeals for the District of Columbia granted a rehearing en banc and the *PHH* opinion was vacated. *See PHH Corp. v. CFPB*, 2017 U.S. App. LEXIS 2733 (D.C. Cir. 2017). As of this writing, the en banc court has not issued an opinion.

The latest published opinion to address the constitutionality of the CFPB's structure is *CFPB v. Future Income Payments*, LLC, ___ F. Supp. 3d. ___, 2017 WL 2190069 (C.D. Cal. 2017). Applying *Humphrey's Executor* and *Morrison*, the *Future Income* court found that "the CFPB's structure is at least as constitutionally sound as the FTC" and that "there [was] no textual basis in the Constitution for concluding that independent agencies must be led by multimember commissions." *Id*. at *6. Addressing the *PHH* decision, the court observed that

whether to structure an independent agency as a multimember or director-led body depends on the proper weighing of the advantages and drawbacks of each structure. But neither the text of the Constitution nor any Supreme Court precedent supports drawing a constitutional distinction between multimember and director-led independent agencies, so the question is properly reserved for the political branches and the democratic process.

*Id.* at *9.

This Court comes to the same conclusion as that reached by our sister district courts, namely that *Humphrey's Executor* and *Morrison* compel the conclusion that the CFPB's structure does not violate the Constitution. As discussed above, Navient has argued that the combination of three characteristics of the Bureau's structure render it unconstitutional: (1) the agency is headed by a single director who wields executive power; (2) the director is only removable for cause; and (3) the agency is funded outside the normal budgetary process. (Doc. 29 at 15-16). Although it is not entirely clear whether Navient has argued that this structure violates Article II by impermissibly interfering with the President's duty to "take Care that the Laws be faithfully executed," or whether they have argued that it violates the principle of separation of powers by undermining the President's executive powers—*Morrison* clearly addressed these as two separate and distinct concerns—this Court is convinced that, under either analysis, the Bureau's structure is not constitutionally deficient.

With respect to whether CFPB's structure violates Article II, the Court first notes that the provision providing that the Director of the Bureau may only be removed for cause is nearly identical to the for cause removal provision found to be constitutionally permissible in *Humphrey's Executor. Compare* 12 U.S.C. § 5491(c)(3) ("The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office") *with* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."). The similarities between *Humphrey's Executor* and this case do

not end there. First, both the CFPB and the agency at issue in *Humphrey's Executor*, the

FTC, are charged with similar tasks in comparable subject matter. In 1935, the FTC was

tasked with "prevent[ing] persons, partnerships, or corporations . . . from using unfair

methods of competition in commerce." Federal Trade Commission Act, Pub. L. No. 63-203,

§ 5, 38 Stat. 717, 719 (1914). The Bureau is similarly directed to "regulate the offering and

provision of consumer financial products or services under the Federal consumer financial

laws," 12 U.S.C. § 5491(a), and "prevent a covered person or service provider from

committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law

in connection with" consumer financial products, 12 U.S.C. § 5531(a).

Second, "[t]he CFPB's authority closely parallels the FTC's powers considered in

*Humphrey's Executor*." *Future Income Payments, LLC*, 2017 WL 2190069, at *6. Just as

the CFPB does now, in 1935 the FTC had the power to conduct investigations, promulgate

rules, conduct administrative adjudications, and issue cease-and-desist orders. *Compare*

12 U.S.C. §§ 5512(b), 5562-5563 *with* Federal Trade Commission Act, §§ 5-6, 9. Unlike the

CFPB, however, in 1935 the FTC could not bring a civil action in a district court for monetary

penalties.[5] Nevertheless, the FTC could bring actions in court to enforce its orders and

---

[5] In this vein, Navient argues that the CFPB is unlike other independent agencies because, in part,
it exercises "broad executive authority." (Doc. 29 at 17). Although the Court in *Humphrey's Executor*
rested its conclusion partially on the fact that the FTC was "in part quasi legislatively and in part quasi
judicially" and therefore could not "in any proper sense be characterized as an arm or an eye of the
executive," 295 U.S. at 628, the Court in *Morrison* distanced itself from this classification system, stating
that "whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's
power to remove an official cannot be made to turn on whether or not that official is classified as 'purely
executive.'" 487 U.S. at 689. The *Morrison* Court further noted that "it is hard to dispute that the powers of

regulated entities were subject to fines for failing to comply with lawful requests of the Commission. Federal Trade Commission Act, §§ 5, 10. Further, in 1975, the FTC gained the explicit authority to "commence a civil action to recover a civil penalty in a district court of the United States." See Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 205(a), 88 Stat. 2183, 2200-01 (1975) (codified as amended at 15 U.S.C. § 45(m)(1)(A)). In the intervening forty years no court questioned the continued validity of the holding of *Humphrey's Executor* in light of the change.

In addition to *Humphrey's Executor*, the Supreme Court's decision in *Morrison* supports the conclusion that the removal provision here does not violate the Constitution. Even though *Morrison* involved an inferior officer "with limited jurisdiction and tenure and lacking policymaking or significant administrative authority," the Court made clear that a provision limiting removal "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties" did not "impermissibly burden[ ] the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act." *Morrison*, 487 U.S. at 663, 691-92; *see also Bowsher v. Synar*, 478 U.S. 714, 729, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986) ("The statute permits removal for 'inefficiency,' 'neglect of duty,' or 'malfeasance.' These terms are very broad and, as interpreted by

the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Id*. at 689 n.28. Thus, while "analysis of the functions served by the officials at issue is [not] irrelevant," *Id*. at 691, the mere fact that the CFPB may perform certain tasks that could be considered "executive powers" does not necessarily bring it outside of the holding of *Humphrey's Executor*.

35

Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will."). There is no basis to characterize the CFP Act's removal provision as more burdensome.

Finally, the removal provision does not have any of the qualities that the Supreme Court found constitutionally troubling in *Free Enterprise Fund*. The Director of the CFPB is not insulated by a second layer of tenure and is removable directly by the President. As such, the President "may hold the [Director] to account for everything . . . [he or she] does." *Free Enter. Fund*, 561 U.S. at 495-96. Accordingly, in light of the above, *Humphrey's Executor* and *Morrison* are controlling with respect to the for cause removal provision. *See Future Income Payments, LLC*, 2017 WL 2190069, at *6, *Morgan Drexen,* 60 F. Supp. 3d at 1087-89; *ITT Educ. Servs.,* 219 F. Supp. 3d at 893-94.

Next, looking at the other two characteristics of the Bureau's structure that Navient identified—its funding and single director structure—neither is constitutionally concerning by itself. With respect to the fact that the CFPB is funded by a percentage of the Federal Reserve System's earnings, 12 U.S.C. § 5497(a), and not through the normal appropriations process, Navient argues that this makes the Director unaccountable to both Congress and the President. (Doc. 29 at 16 n.12; Oral Arg. Tr., Doc. 55 at 80-81). Congress, however, "may choose . . . to loosen its own reins on public expenditure . . . [and] decide not to finance a federal entity with appropriations." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004).

Moreover, although the CFPB is funded outside of the appropriations process, Congress has not relinquished all control over the agency's funding because it remains free to change how the Bureau is funded at any time. Navient's argument in this regard does not support its claim that *the President's* powers under Article II have been curtailed.

Nor does the Court see how the agency's funding significantly removes the CFPB from the control of the President. Navient argues that the President lacks control over the CFPB because the President cannot annually propose the level of funding the President believes the agency should receive and cannot veto a congressional budget that funds the CFPB. (Oral Arg. Tr., Doc. 55 at 80-81). Although the President does propose a budget that includes levels of funding that he or she believes an agency should receive, it is Congress that actually sets the agency's level of funding in the appropriations bill. And although the President may veto an appropriations bill, the President lacks the power to veto a specific budget line such as an individual agency's funding. In order for the President to reject a specific agency's funding through the exercise of a veto, the President would have to veto the entire appropriations bill. U.S. CONST. art. I, § 7, cl. 2. Thus, while this presidential power serves as an important check on Congress's power, its application is too diluted at the agency level for this Court to find that removal of the CFPB from the appropriations process inhibits the President from executing his or her Article II powers.

More importantly, however, this argument ignores the fact that an independent agency with funding outside the normal appropriations process has existed for over one

hundred years. *See* Federal Reserve Act, Pub. L. No. 63-43, § 10, 38 Stat. 251, 261 (1913) (codified as amended at 12 U.S.C. § 243). Moreover, the Federal Reserve Board of Governors' composition presents no anomaly. There are at least five other independent agencies that operate completely outside of the normal annual appropriations process. *See* 12 U.S.C. § 1811, *et seq.* (Federal Deposit Insurance Corporation);[6] 12 U.S.C. § 1755 (National Credit Union Administration); 12 U.S.C. § 4516 (Federal Housing Finance Agency); 12 U.S.C. § 2250 (Farm Credit Administration); 15 U.S.C. § 7219 (Public Company Accounting Oversight Board). None of these agencies' funding structures, however, have ever been held to violate Article II of the Constitution. Consequently, the Court cannot say that the CFPB's system of funding, by itself, violates the Constitution.

Nor can the Court say that a single director structure by itself violates the Constitution. Indeed, many executive agencies are headed by a single individual. In addition, at least three other independent agencies are headed by a single individual. *See* 5 U.S.C. § 1211 (Office of Special Counsel); 12 U.S.C. § 4512 (Federal Housing Finance Agency); 42 U.S.C. § 902 (Social Security Administration). Thus, the CFPB's single director structure, in and of itself, does not offend the Constitution.

At oral argument, counsel for Navient agreed that each of the structural aspects of the CFPB could be found in other agencies. (Oral Arg. Tr., Doc. 55 at 75). Consequently,

---

[6] *See also Slattery v. United States*, 635 F.3d 1298, 1328 (Fed. Cir. 2011) (Gajarsa, J., dissenting) (observing that "the FDIC does not receive funding through congressional appropriation. There is no provision within the FDIC's enabling statute authorizing the appropriation of funds to the Deposit Insurance Fund ('DIF'), the fund the FDIC uses to perform its insurance and regulatory functions. Simply put, the FDIC is a self-funded entity.").

Navient does not argue that any of these attributes in isolation violates the Constitution. Instead, Navient argues that these three otherwise unoffending attributes, when combined together in a single agency, run afoul of Article II and bring this case outside of the holdings of *Humphrey's Executor* and *Morrison*. (*Id*. at 78-79, 81).

As outlined above, two of the core holdings in *Morrison* were that (1) the mere fact that an agency exercises executive functions does not necessarily mean it falls outside of the holding of *Humphrey's Executor*, and (2) a for cause removal provision is not a significant bar to the President's ability to supervise and control heads of independent agencies. *Morrison*, 487 U.S. at 688-91, 696. Navient has failed to put forth any persuasive arguments as to why the three characteristics Navient has identified combine to unconstitutionally prevent the President from ensuring that the Bureau is performing its functions under the CFP Act. Indeed, to the contrary, there is good reason to believe that these characteristics function to increase the President's ability to supervise the Bureau over other independent agencies.

As the CFPB argues in its brief, because the Bureau is headed by a single Director instead of a multi-member body, it is easier for the President to hold the director accountable for the actions of the agency. (Doc. 36 at 16). With a multi-member body, it is more difficult to assess or allocate responsibility among the members of the body for policy decisions or actions taken because decision making is made within the group and may be the product of compromise. In contrast, with a single director, it is very clear who made the

decision. Further, it is a similarly difficult task to hold an individual commissioner or board member responsible for the acts or omissions of the agency. This is not the case with a single director whose responsibility for any agency action or omission is easily assessed.

Further, the President's appointment of a single director, as opposed to a member of a multi-member commission or board, has an immediate impact because the appointee, and the appointee alone, now heads the agency. In contrast, in the case of a multi-member agency, the establishment of majority control of the agency requires successive appointments by the President and, at least in some instances, will take more time. For example, because the President serves a four year term and the Director serves a five year term, eighty percent of presidential terms will enable the President to appoint a Director. In contrast, the FTC has five commissioners with staggered seven year terms. 15 U.S.C. § 41. Because of the manner in which the commissioners' terms are staggered, only four-sevenths, or approximately fifty-seven percent, of presidential terms will enable a president to appoint a controlling majority of three or more commissioners.[7]

---

[7] The Federal Trade Act provides, in pertinent part,

The first Commissioners appointed shall continue in office for terms of three, four, five, six, and seven years, respectively, from September 26, 1914, the term of each to be designated by the President, but their successors shall be appointed for terms of seven years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the Commissioner whom he shall succeed: *Provided, however,* That upon the expiration of his term of office a Commissioner shall continue to serve until his successor shall have been appointed and shall have qualified.

15 U.S.C. § 41. This creates a repeating seven year sequence where no commissioner's term expires in year one and two and one commissioner's term expires annually in years three through seven. Cross-referencing these commissioner term expirations with the presidential terms creates a twenty-eight year

Navient, however, points to the *PHH* decision. (Doc. 29 at 16). As a reminder, the

*PHH* panel held that the for cause removal provision in combination with the single director

structure was unprecedented and unconstitutional. The panel's holding proceeded on the

basis that, because independent agencies lack presidential supervision and direction, they

are traditionally set up as multi-member bodies so that "[t]he check from other

commissioners or board members substitutes for the check by the President." *PHH Corp.*,

839 F.3d at 30-31. No Supreme Court decision has adopted the principle that the

Constitution allows multi-member bodies whose members are removable only for cause

because, in lieu of checks from the President, the members provide checks on each other.

To the extent that Navient also argues that CFPB's structure violates the principle of

separation of powers, this argument fares no better. As laid out above, this is not a case,

and Navient does not so argue, that either the legislative or judicial branch has usurped

executive power. Nevertheless, legislation may still violate the principle of separation of

powers if it "impermissibly undermines the powers of the Executive Branch, or disrupts the

proper balance between the coordinate branches by preventing the Executive Branch from

---

cycle (seven presidential terms) in which some presidential terms will allow for the appointment of three or
four commissioners, while other terms will only allow a president to appoint two commissioners. For
example, the 1917 to 1921 presidential term allowed for the appointment of four FTC commissioners, while
the presidential term beginning in 1921 allowed only for two appointments. This was followed by four
available appointments for the 1925 presidential term, two appointments for the 1929 presidential term,
three appointments each for the 1933 and 1937 presidential term, and two appointments for the 1941
presidential term. This twenty-eight year cycle then started over with the 1945 presidential term.
Consequently, for every seven presidential terms, four presidential terms will allow for the appointment of
three or more commissioners, while three presidential terms will only allow for the appointment of two
commissioners.

accomplishing its constitutionally assigned functions." *Morrison*, 487 U.S. at 695 (internal citations, alterations, and quotations marks omitted). Given this Court's above analysis and its conclusion that the CFPB's structure does not impede a president's ability to execute his or her Article II powers, the Court sees no reason to conclude differently here.

In sum, the Court finds that the CFPB's structure does not violate Article II or the principle of separation of powers in that it does not impede the President's ability to "take Care that the Laws be faithfully executed." Accordingly, the Court will deny Navient's Motion to Dismiss on these grounds.

In any event, were this Court, or any other, to find that the CFPB's structure violates Article II, Dodd-Franks has a severance clause that provides that "[i]f any provision of this Act . . . or the application of such provision . . . to any person or circumstance is held to be unconstitutional, the remainder of this Act . . . and the application of the provisions of such to any person or circumstance shall not be affected thereby." 12 U.S.C. § 5302. Accordingly, when the *PHH* court found the for cause provision violated the Constitution, the panel "remed[ied] the constitutional violation . . . by severing the for-cause removal provision from the statute" and making the Director of the CFPB removable by the President at will. *PHH Corp.*, 839 F.3d at 37-39.

If any of the provisions Navient has identified were to be held unconstitutional and are severed from the CFP Act, the question then presented is how would such a ruling affect the present lawsuit. At oral argument, Navient advocated for the position that, if the

CFPB's structure is unconstitutional, then the Director is acting outside of Executive control and therefore the actions of the Director in bringing the current lawsuit are unauthorized and void. (Oral Arg. Tr., Doc. 55 at 82). As a result, Navient argues that the present lawsuit should be dismissed if any provision is found unconstitutional. (*Id*. at 82-84). Conversely, the CFPB argued that if the for cause provision was severed, the President, if he did not approve of the current lawsuit, could simply instruct the Director to dismiss the action. (*Id*. at 94). If the present Director refused, the President could simply remove the Director and replace him with someone who would dismiss the lawsuit. (*Id*.).

This Court views the latter position as the more prudent course of action for two reasons. First, and most importantly, it finds support in the case law. *See, e.g., Buckley*, 424 U.S. at 142 (according "*de facto* validity" to the past acts of the Federal Election Commission even though four members of the Commission were appointed in violation of the Appointments Clause); *John Doe Co. v. CFPB*, 849 F.3d 1129, 1133 (D.C. Cir. 2017) ("[T]he Supreme Court and this court have often accorded validity to past acts of unconstitutionally structured governmental agencies."). Second, it affords the President the ability to make the determination as to whether or not he or she wishes for the Director to continue with the present litigation.

Accordingly, in the event that the Bureau's structure is found to be unconstitutional and the problematic provisions are severed from the CFP Act, the severance would not affect the CFPB's ability to maintain the present suit.

*C. Count I*

Turning to the individual claims against Navient,[8] Count I of the CFPB's Complaint alleges that Navient violated the CFP Act's prohibition on abusive acts or practices. Specifically, the Complaint alleges that Navient's webpage stated that Navient would help borrowers find a repayment option appropriate for the individual borrower's situation but that Navient instead steered borrowers into forbearance without adequately advising them about other repayment options. (Doc. 1 at ¶¶ 139-142). Navient argues that Count I should be dismissed because they had no duty to provide individualized financial counseling to borrowers. (Doc. 29 at 18).

The CFP Act makes it "unlawful for . . . any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). An act or practice is not abusive unless it meets certain statutory criteria. 12 U.S.C. § 5531(d). One way an act or practice can be abusive is if it "takes unreasonable advantage of . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

Navient argues that Count I is deficient because it only alleges an omission on their part. (Doc. 29 at 18). The Complaint, Navient contends, does not allege that they made any false statements or misrepresentations, but only that Navient did not provide adequate

---

[8] For simplicity sake and because Navient Solutions, Navient Corporations, and Pioneer Credit Recovery, Inc. are all represented by the same counsel and have filed a singular motion, the Court will refer to the individual counts as against "Navient," even though not all Defendants are named in each individual count.

44

financial counseling. (Id.). Navient therefore argues that "[b]orrowers could not reasonably

rely on Navient to counsel them into alternative payment plans unless Navient had an

affirmative duty to provide such individualized financial counseling." (Id. at 20). The law,

according to Navient, imposes no such duty because Navient is a loan servicer, not a

fiduciary. (Id. at 20-21).

Navient's arguments cloud, rather than clarify, the issue. Navient's alleged practice

is abusive under the CFP Act if Navient took unreasonable advantage of a borrower's

reasonable reliance that Navient would act in the borrower's interest. The CFPB has

alleged that Navient made various statements on their webpage that indicated that if a

borrower in financial distress contacted them, Navient would give them enough information

about different repayment options so the borrower could make an informed decision about

which repayment plan was right for them. (Doc. 1 at ¶ 38-39). For example, the Complaint

alleges that Navient's webpage contained the following statement: "If you're experiencing

problems making your loans payments, please contact us. Our representatives can help you

by identifying options and solutions, so you can make the right decision for your situation."

(Id. at ¶ 38). The Complaint further alleges that, when borrowers called, Navient

representatives did not give complete information on income-driven repayment plans and

instead pushed borrowers into forbearance. (Id. at ¶¶ 40-41, 49, 51). Finally, the Complaint

alleges that this was both detrimental to borrowers and beneficial to Navient. (Id. at ¶ 45,

49, 54). This is sufficient at the pleading stage to allege that Navient took unreasonable

45

advantage of borrowers' reasonable reliance on Navient's statements that Navient would give them adequate information to properly choose a repayment plan.

Navient's focus on whether the law imposes an underlying duty is misplaced for two reasons. First, the statutory language does not state that a duty is an element of an abusive act or practice but instead states that a loan servicer cannot take unreasonable advantage of "the reasonable reliance by the consumer" that the loan servicer will "act in the interests of the consumer." The concept of reasonable reliance, however, is not always paired with a preexisting legal duty. *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 90 ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). It is therefore enough that a borrower's reliance that a loan servicer will act in their interest is reasonable, irrespective of whether a legal duty actually exists on the part of the loan servicer to act in the borrower's interest.

Second, although Navient contends that the Complaint alleges only omissions, the Complaint alleges that Navient placed reliance inducing statements on their webpage. Thus, even assuming the truth of Navient's arguments that there must be some underlying

legal duty in order for a borrower's reliance to be reasonable, the Court is satisfied that

Navient's active conduct created a duty to act in accordance with their own statements.[9]

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count I

of the CFPB's Complaint.

### D. Count II

Count II of the CFPB's Complaint alleges that the same factual allegations that form

the basis of Count I also violate the CFP Act's prohibition on unfair acts or practices. (Doc.

1 at ¶¶ 144-47). An act or practice is not unfair under the CFP Act unless (1) "the act or

practice causes or is likely to cause substantial injury to consumers," (2) such substantial

injury "is not reasonably avoidable by consumers," and (3) "such substantial injury is not

outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §

5531(C)(1); *see also ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913. Navient's only

---

[9] Navient cites two published cases for the proposition that "publicly disseminated statements
reaching millions of borrowers cannot create a fiduciary-type relationship or obligation." (Doc. 29 at 22).
Neither of the cases Navient cites, however, are factually analogous or applicable to the case at hand. In
*Barron Partners, LP v. Lab123, Inc.*, the court held that the statements on a webpage that the counterclaim
Defendant "assists and invests in private companies that commit to immediately go public" and "helps
companies go public 'by introducing them to proven professionals including lawyers and accountants to
navigate through the going public process cost effectively and painlessly'" did not give rise to a duty to
disclose the counterclaim Defendant's "managing partner's prior criminal record and related prior
misconduct." 593 F. Supp. 2d 667, 670-72 (S.D.N.Y. 2009). Further, *Alpine Bank v. Hubbell* held that it
was not reasonable for the counterclaim plaintiff to rely on the bank's advertising slogan "So . . . you're
about to buy a new home, or build one. You concentrate on your dream. We'll take care of everything else"
because it was puffery that "no reasonable person would rely on as assertions of particular facts." 555 F.3d
1097, 1101, 1106-07 (10th Cir. 2009). In contrast, the case at hand involves the allegation that Navient
made a specific statement that it would give a borrower sufficient information to make an informed decision
about which repayment plan would be best for his or her situation and then failed to follow through with that
promise. Thus, the cases Navient relies on are not factually analogous to the present case. Finally,
Navient also cites two unpublished opinions that merit no further discussion here except to say that neither
opinion is factually similar to the present case and are therefore unpersuasive.

argument for dismissal of Count II is that the harm in this case was reasonably avoidable. Thus, Navient takes issue only with the second element of the unfairness standard.

"An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (citing *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)).[10] Thus, "[i]n determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010).

With respect to reasonable avoidability, the Bureau's Complaint alleges that Navient gave borrowers who called them incomplete or, on other occasions, no information about income-driven repayment plans and instead pushed borrowers into forbearances. (Doc. 1 at ¶¶ 49, 51, 145). The Complaint further alleges that, as a result, borrowers ended up in forbearance instead of being able to make an informed decision as to what repayment plan was best for their circumstances. (*Id.* at ¶¶ 51-53, 145). These allegations, taken as true for the purpose of this Motion, are sufficient to state a claim that the injury to borrowers was not reasonably avoidable.

_____

[10] The definition of unfair act or practice under the CFP Act is almost identical to the definition of unfair act or practice under the FTC Act. *Compare* 12 U.S.C. § 5531(c)(1) *with* 15 U.S.C. § 45(n). Because the FTC Act has been more heavily interpreted by courts, this Court will use interpretations of § 45(n) as a guide to what reasonably avoidable means in the context of the CFP Act.

Navient, however, argues that because they made numerous disclosures that provided borrowers with information about income-driven repayment plans and because there was information publicly available about income-driven repayment plans, any injury was reasonably avoidable. (Doc. 29 at 19, 24). Navient states that this Court can consider this information because federal law requires Navient to make such disclosures and there is no allegation that Navient did not make them. (Oral Arg. Tr., Doc. 55 at 22-23, 26). Even assuming the truth of Navient's contentions, dismissing Count II would require this Court to rule, as a matter of law, that borrowers understood the disclosures that were made to them so that they had "reason to anticipate the impending harm and the means to avoid it." These facts are not before the Court at the pleading stage and therefore, the Court cannot make such a ruling.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count II of the CFPB's Complaint.

### E. Count III

Navient next seeks dismissal of Count III of the CFPB's Complaint which alleges that Navient violated the CFP Act's prohibition on unfair acts or practices by failing to adequately notify borrowers who were enrolled in income-driven repayment plans that their annual recertification notice was available. (Doc. 1 at ¶¶ 149-153). Specifically, the Complaint alleges that Navient obscured the fact that the recertification notice was available by sending borrowers—who consented to electronic notification—an email with the subject line

of either "Your Sallie Mae Account Information" or "New Document Ready to view," and text in the body of the email that stated "a new education loan document is available. Please log in to your account to view it." (*Id.* at ¶¶ 66-67, 69-70). To know that the "new education loan document" was specifically an income-driven repayment plan recertification notice, a borrower would need to click on a hyperlink in the email and go to Navient's website, where the borrower could then log in to his or her account and view the renewal notice. (*Id.* at ¶ 68).

As stated in the prior section, an act or practice is not unfair under the CFP Act unless (1) "the act or practice causes or is likely to cause substantial injury to consumers," (2) such substantial injury "is not reasonably avoidable by consumers," and (3) "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(C)(1). Once again, Navient has only taken issue with the second element of the unfairness claim. Specifically, Navient argues that the harm was reasonably avoidable because borrowers could simply click on the provided link and log into their accounts to avoid the harm.[11] (Doc. 29 at 25-26; Oral Arg. Tr., Doc. 55 at 28-29, 31-36).

---

[11] At oral argument, Navient analogized their email to the outside of an envelope. (Oral Arg. Tr., Doc. 55 at 29, 31-39). According to Navient, just like their email, envelopes rarely have information on the outside letting the recipient know of the specifics of what is inside. It is up to the letter's recipient to open the envelope and see what is inside, just as it was up to the borrower to click on the link and log onto Navient's webpage and see what the document concerned. Without getting into a lengthy discussion about the comparability of email and postal mail, the Court does not find the two situations analogous because the CFPB's Complaint alleges that, with respect to the email Navient sent, both the email's subject line and the text in the body of the email were similarly lacking in pertinent information. Thus, according to the

Given the allegations in the Complaint, the Court finds that, at this early stage, it cannot rule as a matter of law that the harm was reasonably avoidable. First, the allegation that the email itself does not contain any information as to what document was available or express any urgency in the matter would plausibly support a conclusion that borrowers did not "have reason to anticipate the impending harm." Second, the Complaint alleges that when Navient changed both the subject line and the body of the email to inform borrowers that the recertification notification was available, the rate at which borrowers renewed their income-driven repayment plans more than doubled. (Doc. 1 at ¶¶ 75-76). This allegation, taken as true for the purposes of this Motion, indicates that a good number of borrowers did not avoid the harm when presented with Navient's original email. The allegation that many people did not avoid the harm plausibly supports the allegation that the harm was not reasonably avoidable by borrowers.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count III of the CFPB's Complaint.[12]

---

Complaint, in order to find out that the renewal notice was available and that the borrower needed to take action on it, the borrower had to open the email, click on a hyperlink, log into Navient's webpage, and open the document—all allegedly without being given any initial indication as to what the document referred to in the email concerns and whether or not the matter is urgent. Thus, if a comparison has to be made, a more apt analogy is that a borrower opening the email is comparable to a recipient opening the envelope. That is, both the letter recipient and the email recipient have to take an initial first action by opening the letter or email. Both the letter recipient and the email recipient are then presented with additional information, i.e. the letter itself or the text in the body of the email. The Bureau's contention is that even the information inside the email—or by analogy, inside the envelope—was lacking. Navient's email as alleged in the Complaint would thus be more analogous to receiving an envelope, opening it, and finding that the letter instructed the recipient to call a phone number to receive more information as to what the letter concerns.

[12] Navient also argues that "sending secure information in this manner is a widely accepted practice under federal law." (Doc. 29 at 26). This argument, however, misses the point. The Complaint

## F. Count IV

Navient next moves to dismiss Count IV of the Bureau's Complaint. Count IV alleges that the income-driven repayment plan recertification notice that Navient sent borrowers through the postal mail between July 2011 until December of 2012 was a deceptive act or practice in violation of the CFP Act. (Doc. 1 at ¶¶ 155-59). Specifically, the Bureau's Complaint alleges that Navient's notice stated that if a borrower "provid[ed] incorrect or incomplete information the [renewal] process will be delayed," and thus implied that delay was the only consequence of submitting incorrect or incomplete information, when in truth it could have several irreversible consequences. (Id. at ¶¶ 64-65, 155-56).

Unlike unfair and abusive acts or practices, the term "deceptive . . . act or practice" is not defined in the CFP Act. The same term, however, also appears in the more heavily interpreted FTC Act. Therefore, courts have construed "deceptive . . . act or practice" to have the same meaning under the CFP Act as it does under the FTC Act. See, e.g., Gordon, 819 F.3d at 1193 n.7; ITT Educ. Servs., 219 F. Supp. 3d at 903; CFPB v. Frederick J. Hanna & Assocs., P.C., 114 F. Supp. 3d 1342, 1369-70 (N.D. Ga. 2015). Thus, "[a]n act or practice is deceptive if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'" Gordon, 819 F.3d at 1192-93 (quoting

---

cannot be read to fault Navient for sending an email notifying borrowers that the recertification letter is available on Navient's webpage. Instead, the Complaint alleges that the contents of the email was insufficient to inform borrowers of the nature of the document that was available and the urgency of the matter.

52

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). "Deception may be found based on the net impression created by a representation." *Id*. at 1193 (internal quotation marks omitted).

Navient argues that the statement in the renewal letter was not likely to mislead a reasonable borrower because, "[w]hile the notice states that failure to submit a complete and accurate application may result in a processing delay, it does *not* state that no other consequences could result from such failure." (Doc. 29 at 27). Navient further argues that other parts of the letter explain the consequence of not completing the recertification, and that the statement that the CFPB cites is taken out of context. (*Id*. at 28-29). Along with their brief, Navient submitted two examples of the renewal letter they used along with the renewal forms issued by the United States. (Docs. 29-3, 29-4); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that district courts, on a motion to dismiss, may consider a document "*integral to or explicitly relied* upon in the Complaint." (internal quotation marks omitted)).

Upon review of the attachments, the Court cannot say, as a matter of law, that the letter was not likely to mislead a borrower acting reasonably under the circumstances. Under the plausibility standard of *Iqbal/Twombly*, neither the alleged cause of action nor the allegations of fact underlying it are capable of resolution as a matter of law on Navient's Motion to Dismiss. The Bureau has stated a plausible claim for relief that Navient's letter created a false impression that a processing delay was the only adverse consequence of

filing an incomplete or inaccurate applications when, according to the Complaint, there was a host of other negative consequences. This is sufficient at the pleading stage to allege a claim for a deceptive act or practice.

Nevertheless, in their reply brief Navient argues that the CFPB's claim is still inadequate because the Bureau's claim is limited only to those borrowers making inadvertent errors or omissions. (Doc. 43 at 17). Thus, according to Navient, "[b]orrowers who . . . *mistakenly* submitted a defective form necessarily did so because of a mistake, not based on any alleged misrepresentation." (*Id.*). A fair inference from the Complaint, however, is that borrowers who were misled into believing that a processing delay was the only negative consequence of submitting an incomplete or inaccurate form were not as careful when filling out the form as they would have been if they had known the true consequences of an error or omission.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Count IV of the CFPB's Complaint.

### G. Counts VII-X

Counts VII-X of the Bureau's Complaint allege that Navient, while working to enroll borrowers into the federal loan rehabilitation program, engaged in deceptive acts or practices in violation of both the CFP Act and the Fair Debt Collection Practices Act ("FDCPA"). (Doc. 1 at ¶¶ 172-91). Specifically, the Complaint alleges that Navient employees told borrowers in default that completion of the federal loan rehabilitation

program would remove all adverse information from their credit histories and that all assessed collection fees would be forgiven, when in fact only some of the adverse information would be removed from borrowers' credit histories and only some of the collection fees would be forgiven. (*Id.* at ¶¶ 173-74, 179-80).

Navient raises two arguments for dismissal of these counts. First, Navient argues that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to deception claims under the CFP Act and the FDCPA and that a party is not allowed to plead such claims "on information and belief" as the Bureau has done here. (Doc. 29 at 30-31). Second, Navient argues that the alleged statements of Navient's employees could not be material because "a borrower would not choose default over rehabilitation because he or she misunderstood that some portion of payments made during the program would be allocated to collection fees rather than ultimately forgiven." (*Id.* at 31-32). The Court will address each argument in turn.

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Only one published case has addressed whether this heightened pleading standard applies to deception claims under the CFP Act. In *CFPB v. Frederick J. Hanna & Associates, P.C.*, the district court held that claims for deception under the FDCPA and the CFP Act should not be subject to Rule 9(b) for three reasons. 114 F. Supp. 3d at 1371-74. First, "Rule 9(b) expressly applies only to claims alleging 'fraud or mistake,' and as the Tenth Circuit and

several district courts have reasoned, consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them." *Id.* at 1372. Second, "the United States Supreme Court has consistently cautioned against extending this heightened pleading standard beyond claims for fraud or mistake." *Id.* Third, applying Rule 9(b) "to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." *Id.* at 1373. Thus, the Court held that Rule 9(b) did not apply to FDCPA or CFP Act claims. *Id.* at 1373-74.

This Court finds the rational underlying the *Frederick J. Hanna & Associates* decision persuasive and adopts it. Therefore, the Court holds that Rule 9(b)'s heightened pleading standard does not apply to the Bureau's claims brought under the FDCPA or the CFP Act. *Cf. FTC v. Freecom Commc'n, Inc.*, 401 F.3d 1192, 1203-04 n.7 (10th Cir. 2005) (noting that applying Rule 9(b) to claims under the FTC Act was "inconsistent with the purpose of the FTC Act and highly impractical" and that a deception "claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)").

Nonetheless, Navient argues that Third Circuit precedent forecloses the above conclusion. (Doc. 29 at 30-31). Two of the cases Navient cites, *In re Westinghouse Securities Litigation*, 90 F.3d 696 (3d Cir. 1996), and *Shapiro v. UJB Financial Corporation*, 964 F.2d 272 (3d Cir. 1992), address whether Rule 9(b) applies to claims under the Securities Exchange Act of 1934 that are grounded in fraud. These cases thus stand for the

unremarkable proposition that when a cause of action under the Securities Exchange Act is grounded in fraud, Rule 9(b) applies. CFP Act and FDCPA claims, however, "are not claims of fraud, even if there is a deceptive dimension to them." *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1372. Indeed, as discussed above, an act or practice is deceptive under the CFP Act, "if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'" *Gordon*, 819 F.3d at 1192-93 (quoting *Pantron I Corp.*, 33 F.3d at 1095 ). Thus, unlike a fraud claim, the CFP Act does not have an intent element. Likewise "[u]nlike a fraud claim, the FDCPA 'does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute.'" *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1372 (quoting *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010)); *see also Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector.").

As both *In re Westinghouse Securities Litigation* and *Shapiro v. UJB Financial Corporation* recognized, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." 90 F.3d at 710; 964 F.2d at 284. Therefore, requiring the CFPB to plead in conformity with Rule 9(b) would graft an

intent requirement onto the claims under the FDCPA and CFP Act that is not otherwise present.[13]

Next, Navient argues that the representations that Navient allegedly made to borrowers were not material because, even with complete information, borrowers would have entered the rehabilitation program instead of remaining in default. (Doc. 29 at 31-32). A fact-based argument such as this, however, is premature at the pleading stage. Discovery may show that Navient is correct that borrowers in default had no other good option except to enter the federal rehabilitation program. In such a case, the alleged misrepresentations, if proven, may not be material. The facts necessary to judge this argument, however, are not presently before this Court. As a result, Navient's argument is well outside of the scope of a motion to dismiss.[14]

---

[13] Navient also cites to *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007), a case which recognized that Rule 9(b) applied to claims brought under the New Jersey Consumer Fraud Act ("NJCFA"). Although an injured party need not always prove intent to state a claim under the NJCFA, *see Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994), the Court finds *Frederico* and other cases dealing with the NJCFA inapplicable for two reasons. First, unlike the CFP Act and the FDCPA, the NJCFA falls expressly within Rule 9(b) because it is primarily concerned with fraud. N.J. STAT. ANN. § 56:8-2. Second, other courts in this circuit have held that the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 P.S. § 201-3, which is not primarily concerned with fraud, does not require a plaintiff to meet Rule 9(b)'s requirements when pleading deception. Similar to the CFP Act, the PUTPCPL prohibits certain "unfair or deceptive acts or practices." *Id.* "Unfair or deceptive acts or practices" is defined, in part, as "[e]ngaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). However, "to the extent plaintiffs allege deceptive conduct [under the PUTPCPL], plaintiffs do not need to allege the elements of common law fraud or, as a result, meet Rule 9(b)'s particularity requirement, which applies only to claims of fraud." *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 469 (E.D. Pa. 2009); *see also Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452, 463 (E.D. Pa. 2013); *Schnell v. Bank of N.Y. Mellon*, 828 F. Supp. 2d 798, 807 (E.D. Pa. 2011); *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 511 (E.D. Pa. 2010).

[14] In a footnote, Navient also argues that, because the FDCPA has a one-year statute of limitations, those claims should be limited to conduct that occurred after January 18, 2016. (Doc. 29 at 32 n.24). Because this issue was not fully briefed by the parties, the Court declines to address it at this time.

Accordingly, the Court will deny Navient's Motion to Dismiss as it pertains to Counts VII-X of the CFPB's Complaint.

## H. More Definite Statement

Lastly, Navient argues that they require a more definite statement with respect to Count VI before they can respond by way of an answer. (Doc. 29 at 29-30). Count VI of the Complaint alleges that Navient committed an unfair act or practice in violation of the CFP Act by failing to have policies and procedures in place to prevent the same payment processing errors from reoccurring month after month. (Doc. 1 at ¶¶ 167-71).

The clear text of Federal Rule of Civil Procedure 12(e) states that a party may move for a more definite statement when a pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." FED. R. CIV. P. 12(e). The rule "is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading." *Schaedler v. Reading Eagle Publ'n*, 370 F.2d 795, 798 (3d Cir. 1967). "Motions for a more definite statement are not viewed with favor and should be granted only if the allegations contained in the complaint are so vague that the defendant cannot reasonably be expected to frame a response to it." *Wilson v. United States*, 585 F. Supp. 202, 205 (M.D. Pa. 1984).

Navient's brief provides no specifics as to why they need a more definite statement except to say that "the Complaint describes only a random assemblage of customer service

---

See *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

59

issues, vague accusations about the adequacy of policies and procedures, and an apparent

disagreement with payment allocation methodologies." (Doc. 29 at 29). Upon review of the

Complaint the Court finds that this is not the "rare case" where the Complaint "is so vague

or ambiguous that the party cannot reasonably prepare a response." The Bureau's

Complaint provides multiple specific examples of payment processing errors and then

alleges that Navient failed to have policies and procedures in place to identify and prevent

the same processing errors from occurring month after month. These allegations are

specific enough for Navient to respond to by way of an answer.

Accordingly, the Court will deny Navient's motion for a More Definite Statement as to

Count VI.

## V. CONCLUSION

For the reasons outlined above, this Court will deny Navient's Motion to Dismiss or,

in the alternative, for a More Definite Statement, (Doc. 28), in its entirety. A separate Order

follows.

Robert D. Mariani
United States District Judge