**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL               )
PROTECTION BUREAU,               )
                                 )
              Plaintiff          )
                                 )
         vs                      )   3:17-CV-00101
                                 )
NAVIENT CORPORATION,             )
                                 )
              Defendant          )
_____)

TRANSCRIPT OF PROCEEDINGS - TELEPHONE CONFERENCE
BEFORE THE HONORABLE ROBERT D. MARIANI
THURSDAY, JANUARY 18, 2018
SCRANTON, PENNSYLVANIA

FOR PLAINTIFF:
    NICHOLAS K. JABBOUR,  ESQ.
    ANDREA J. MATTHEWS, ESQ.
    EBONY S. JOHNSON, ESQ.
    NICHOLAS C. LEE, ESQ.
    MANUEL G. ARREAZA, ESQ.
    Consumer Financial Protection Bureau
    1700 G Street, NW
    Washington, DC 20552

FOR DEFENDANT:
    JONATHAN E. PAIKIN, ESQ.
    DANIEL P. KEARNEY, ESQ.
    MATTHEW T. MARTENS, ESQ.
    Wilmer, Cutler, Pickering, Hale and Dorr, LLP
    1875 Pennsylvania Avenue, NW
    Washington, DC  20006

    DONNA A. WALSH, ESQ.
    Myers, Brier & Kelly, LLP
    415 Spruce Street
    Suite 200
    Scranton, PA  18503

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.
_____

SUZANNE A. HALKO, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

1　　　　THE COURT: Counsel, good afternoon. It would be

2 helpful if each of you would identify yourselves for the

3 benefit of my stenographer beginning with Mr. Jabbour.

4　　　　MR. JABBOUR: Hi. Good morning, Your Honor. This is

5 Nicholas Jabbour for the Bureau.

6　　　　THE COURT: Thank you. Next.

7　　　　MR. PAIKIN: Good morning, Your Honor. This is

8 Jonathan Paikin for defendants.

9　　　　THE COURT: I know that there are a number of other

10 counsel participating in the call. Perhaps, again, they should

11 identify themselves in the event that they find it necessary to

12 address an issue during this discussion.

13　　　　So along with Mr. Jabbour is Andrea Matthews, is that

14 right?

15　　　　MS. MATTHEWS: Yes, Your Honor.

16　　　　THE COURT: And Lawrence DeMille-Wagman?

17　　　　MR. JABBOUR: Your Honor, he's not on the call.

18　　　　THE COUR: I see. Thank you.

19　　　　Ebony Johnson?

20　　　　MS. JOHNSON: Yes, Your Honor.

21　　　　THE COURT: Nicholas Lee is also on this call, am I

22 correct?

23　　　　MR. LEE: Yes, Your Honor. Good afternoon.

24　　　　THE COURT: Good afternoon.

25　　　　And Manual Arreaza?

1          MR. ARREAZA:  Yes, Your Honor.

2          THE COURT:  That completes the counsel for the

3 plaintiff, is that right, Mr. Jabbour?

4          MR. JABBOUR:  Yes, that's correct.

5          THE COURT:  And for Navient, Daniel Kearney?

6          MR. KEARNEY:  Good afternoon, Your Honor.

7          THE COURT:  And, of course, Jonathan Paikin has

8 already noted his appearance.

9          Matthew Martens?

10          MR. MARTENS:  Yes, Your Honor.

11          THE COURT:  And Donna Walsh?

12          MS. WALSH:  Yes, Your Honor.

13          THE COURT:  I have read your submissions and the case

14 law that each of you have cited in support of your submissions

15 on this issue.

16          The initial and, perhaps, the most significant

17 problem I'm having in resolving your dispute is that after

18 reading the January 5th letter that was sent to me by you,

19 Mr. Paikin, I'm not certain I know what it is precisely that

20 you're seeking that you have been denied.

21          Now, the letter in response to your letter to me, the

22 letter of January 16th of Mr. Jabbour, it seems to give me --

23 well, it does give me the view of the CFPB as to what you are

24 seeking, but I'm obviously not prepared to accept that as your

25 statement.

**4**

1        So in light of that, you need to tell me just exactly
2   what documents, what policies, what guidance materials or what
3   preliminary or interim or draft documents you're seeking,
4   because it seems that reading Mr. Jabbour's letter, the
5   description of what I believe the Bureau is saying you're
6   asking for is precisely along those lines and you may disagree
7   with that.  So if you do, I need to understand that.

8        So tell me what it is that you're seeking in your
9   Request for Production of Documents, as well as in your Answers
10  to Interrogatories.

11        MR. PAIKIN:  Thank you, Your Honor.  This is Jonathan
12  Paikin.

13        So in direct response to your question, I think there
14  are two areas where we have discovery disputes that we have
15  raised with the Court.

16        The first is that we're seeking documents and
17  communications, both internal and external, which I think
18  Mr. Jabbour's letter indicates that it's only internal to CFPB
19  documents, but there are external communications that the CFPB
20  had with the Department of Education, members of congress and
21  others about, and we have identified also for the CFPB, which
22  isn't in their letter, 20 specific instances where there was
23  policies or guidance that was put out by either the Department
24  of Education or the CFPB addressing the specific issues that
25  are involved in the litigation.

5

1        So that's the first dispute is that we have sought

2   those documents and communications, both internal and external,

3   with respect to policies and guidance in those 20 instances

4   that we have identified, which each of those relate to the

5   litigation.

6        The second area where we have a dispute is documents

7   and communications that the CFPB has had with third-party

8   servicers that are in the same space as we are, and many of

9   them also under contract with the Department of Education, that

10  relate to specific issues in this case.

11       In back and forth correspondence and meeting confers

12  that we have had with the CFPB, we have identified on the

13  servicers' side, there are six specific issues, and I think

14  there are about four servicers that are in play, and on the

15  collection side, I think the universe is a little bit broader,

16  the number of parties potentially involved, but there is two

17  issues.

18       So those are the two areas that are in dispute, and

19  if I may be permitted, Your Honor, to sort of step back and

20  give context and respond to some of the points that are in the

21  CFPB's letter to you on January 16th?

22       THE COURT:  Sure.  Go ahead.

23       MR. PAIKIN:  So I think, Your Honor, what is

24  important to know about this case that distinguishes it from

25  many of the other cases that are set forth in the CFPB's letter

1 is that in this case, the defendants are vendors of the Federal

2 Government that have been hired by the Department of Education

3 to service and collect Federal student loans, and that regimen

4 is governed both by extensive and detailed regulations that are

5 constantly being debated and revised, but also by the

6 government contract.

7       If the government wants something done differently by

8 Navient or by Pioneer, there is a process in those contracts to

9 change that practice, and in most instances where there is

10 costs that are associated with that change in practice, there

11 is also a process that adjusts the compensation that's paid

12 under the contract.

13       The government also regularly audits the defendants,

14 and more than that, this isn't a circumstance where there is an

15 annual audit.  This is a circumstance where they are really

16 hand in glove, where there is daily contact between my clients

17 and the Department of Education reviewing calls, e-mails, data

18 reporting and the like, and so the relationship is very close

19 here.

20       What we have is a situation where the CFPB and the

21 Department of Education are different arms of the Federal

22 Government.

23       Navient -- I think the best analogy here -- Navient

24 is really a marionette that is being held by the Department of

25 Education.

1          What this case really comes down to is the CFPB is

2     seeking fines against my client for what the right hand of the

3     government has told them to do, the Department of Education,

4     and the left hand, the CFPB, has a different view with respect

5     to some things as to what should be done.

6          Because of that, unlike a situation where there's a

7     party that's simply involved in an enforcement action trying to

8     seek information about the policies of, say, the FCC or some

9     enforcement agency, this is not that situation.

10          In this case, the Department of Education and the

11    CFPB have looked very closely and been interacting with one

12    another at various times, as well as members of congress, to

13    determine how the government should administer its vendors

14    through the regulation and guidance and through the contracts

15    that they administer.

16          We have identified, as I said earlier, 20 times when

17    the government has issued guidance or regulations that are

18    directly related to the practices at issue in this complaint.

19    We provided that list, as I said, to the CFPB on October 24th.

20          We served, by the way, a subpoena on the Department

21    of Education seeking these same documents, and the Department

22    of Education did not object to that subpoena on relevance or

23    proportionality grounds.

24          From our perspective, the CFPB put the reasonableness

25    of defendant's conduct into issue.  That's the core of what a

1  UDAP claim is, that we're acting in an unfair or abusive way.

2       The conversations that took place, both internally at

3  the CFPB and the conversations that the CFPB had externally

4  with the Department of Education, with members of congress and

5  other interest groups with respect to what is the appropriate

6  guidance issues, are clearly relevant, particularly under the

7  relevant standard applicable in discovery, are clearly relevant

8  and highly probative to affirmative defenses that we have pled

9  and, frankly, a key narrative that we intend to present at

10 trial in this action.

11      THE COURT:  Apparently, these are not documents that

12 have been officially published such that they are in the public

13 domain via one or another official government publication, is

14 that correct?

15      MR. PAIKIN:  Correct, Your Honor.

16      We do have -- and that is how we were able to

17 identify the 20 instances where there was policy or guidance

18 that was issued because we had seen that in the Federal

19 Register or in other publications that have been put out.

20      But what we're seeking is the communications that

21 surround those publications.

22      THE COURT:  But as to the publications themselves, am

23 I understanding -- and correct me if I'm wrong -- am I

24 understanding that the publications themselves were locatable

25 by you in the Federal Register or in the Code of Federal

1  Regulations?

2          MR. PAIKIN:  Yes, Your Honor, or otherwise publically

3  available.

4          THE COURT:  I understand.  You can continue.

5          MR. PAIKIN:  So some of those things, just to put a

6  little bit of meat on the bones and give some examples, there

7  has been guidance that has been put out about repayment plans,

8  and one of the big issues, as Your Honor may recall from the

9  motion to dismiss arguments, is the steering allegations about

10 whether or not forbearance or IDR plans are better from the

11 standpoint of the borrower.

12         There has been guidance that's been put out about

13 that, and there were discussions among various government

14 parties to determine when in different circumstances one is

15 better than the other, and the CFPB's position here is

16 forbearance is bad and IDR is good.

17         You know, we would show and we will show that that is

18 not always the case, that there is a lot of gray and a lot of

19 different reasons for that, and the Department of Education has

20 a much more nuanced approach.  So those types of communications

21 surrounding that guidance that was issued are highly relevant.

22         Another example is the CFPB takes issue with the

23 disclosures that were made on IDR recertification notices.

24 There are rules that have been out about what disclosures need

25 to happen and look like in the IDR recertification context.

1          So the CFPB's position here that the recertification

2    notices that were sent out were unfair in some way, the

3    discussions that took place between the Department of

4    Education, the CFPB, that's all highly relevant to the question

5    of the reasonableness of the defendant's actions.

6          Another one, the last one is that the CFPB has

7    regulations on balancing privacy interest.

8          As Your Honor may recall, Count 3 alleges that by

9    sending an e-mail that contained a link to the renewal

10   documents that that was an unfair practice.

11          THE COURT:  Yes, I recall that.

12          MR. PAIKIN:  So there are regulations that surround

13   that about how do you balance privacy interest and what would

14   be appropriate to send to borrowers.

15          All of that has been placed, in our view, directly at

16   issue, and knowing what the CFPB, the Department of Education,

17   and others, how they were weighing that, is all information

18   that we should be entitled to see.

19          You know, maybe I'll stop there.  That sort of brings

20   us to the end of the first discovery dispute.  I can go on to

21   the second one which deals with the third-party issues, or if

22   Your Honor would prefer, maybe I should stop here?

23          THE COURT:  I think, Mr. Paikin, that is a

24   substantial amount of information you have given me with

25   respect to this first issue, and it might be useful for me to

1    hear from Mr. Jabbour in response before we move on to anything

2    else.

3            Mr. Jabbour.

4            MR. JABBOUR:   Thank you, Your Honor.

5            To the extent that there are any Bureau policies or

6    Department of Education policies or guidance that have any

7    bearing on the claims in this case, really, the only applicable

8    inquiry is to look at what that policy or guidance document

9    says on its face, as well as what any public interpretations

10   there has been regarding that policy or guidance, and how

11   Navient applied that policy or guidance to its own conduct such

12   that it believes it didn't violate the law.

13           But, really, the predecisional views of Bureau

14   employees or Department of Education employees that are

15   contained in intra-agency documents are not expressions of

16   agency policy, and they don't carry any weight when trying to

17   apply a policy or guidance document to the facts of this case.

18           So, simply put, agency employees don't speak for the

19   Bureau, and there is always frank and honest communication

20   among agency employees to reach any sort of policy or guidance

21   document, and those intra-agency communications would be

22   chilled if we started to attach legal significance to them.

23           So, really, the bottom line here is that to the

24   extent that Navient is putting forth any defense based on

25   Bureau policies or guidance, the only relevant exercise is to

1    look at the language of those policy or guidance documents and

2    any official public interpretations of them and to see whether

3    or not Navient's defense carries any weight.

4         But Navient could not have been aware of any

5    intra-Bureau communications, and so it could not have fashioned

6    its conduct based on those intra-Bureau communications.  So

7    they're simply not relevant to any claim or defense in the

8    case.

9         I will note that the view I have articulated here is

10   not novel in any way.  Numerous courts, as we cited in our

11   letter to the Court, have held that unpublished views of agency

12   staff is not official agency position and don't carry any legal

13   significance.

14        In addition to those we cite in our letter to the

15   Court, there are many more.  This is a very commonly held view

16   by Courts.

17        So that is our basic position here regarding the

18   relevance issue.

19        I also note as a side issue that even if these

20   documents were determined to have some sort of marginal

21   relevance, we do think that they would be protected by the

22   deliberative process privilege in any event, but we think the

23   much easier route here to take is that they're simply not

24   relevant in the first place so we don't need to reach the

25   privilege question.

1          THE COURT:  The sense of your argument as I'm

2    receiving it is that what you term the intra-agency employee

3    discussions were either preliminary to or collateral to the

4    ultimate determination of the official policy of the CFPB such

5    that much like the pre-contract formation discussions of the

6    parties in a contract action, they are not relevant because the

7    contract itself, when its an integrated document and complete

8    on its face, represents the meaning of the document as intended

9    by the parties, and you don't look behind that.

10          Is that analogous argument I'm raising what you're

11   telling me?

12          MR. JABBOUR:  Yes, Your Honor.  I think that is an

13   analogous argument.

14          I think that there's the additional points that

15   government formulations of policy and guidance rely on the

16   ability of employees to carry out these sorts of open

17   communications, and so we don't want to chill that exercise.

18          So there is that additional policy factor that I

19   think weighs in favor of not allowing the discoverability of

20   these documents.

21          THE COURT:  Mr. Paikin also mentioned external

22   communications.  Do you want to address that?

23          MR. JABBOUR:  Sure.

24          Our view of that is to the extent there are external

25   communications that went into the formulation of these policies

1  or guidance, then those may be protected as well, but it really

2  just depends on whether or not -- I don't think there are many

3  in that category where we externally consulted with parties in

4  order to formulate a policy or guidance.

5          I think the one exception to what I just said is the

6  Department of Education, and we would view those as falling

7  into the same category where we don't think it's discoverable.

8          So to the extent there is an external party that

9  communicated with us in order to help us reach a policy or

10  guidance decision, then we would view that as falling into this

11  category.

12          THE COURT:  So, Mr. Paikin, is the argument raised

13  here by Mr. Jabbour that you are essentially looking for

14  information that is in the nature of pre-policy determination

15  discussions among employees of the agency, and since they are

16  as such pre-policy determinations undertaken in the process of

17  reaching an ultimate policy that they're of no relevance to

18  you?

19          Is that what you're seeking, discussions of

20  pre-policy determination internally by agency employees?

21          MR. PAIKIN:  So, yes, Your Honor, and let me tell you

22  why I think they're relevant and I think they're actually two

23  issues that have been blurred together.

24          One is a question of relevance and the second is

25  whether or not a deliberative process privilege would apply,

1  and I think some of the policy arguments that Mr. Jabbour

2  raised need to be looked at.

3  You know, these issues about chilling internal

4  deliberations really need to be looked at, not through a

5  relevance thing, because to be sure they're relevant, and I

6  will come back to that, but within the context of whether or

7  not a deliberative process privilege applies, and that is not

8  an absolute privilege.

9  There is Third Circuit law, and we have not briefed

10  it -- well, we didn't brief anything, but we didn't put it in

11  our letter, because when we had meeting confers, we had

12  understood that the CFPB was standing only on the relevance

13  ground and not on deliberative process.

14  With respect to the deliberative process, there is a

15  wealth of law that looks at that very issue, and that is not an

16  absolute privilege.  It's a qualified privilege.  It needs to

17  be viewed narrowly, and there is case law that makes very clear

18  that it needs to be reviewed narrowly.

19  The case law -- and there's a Third Circuit case

20  Redland Soccer Club versus Department of Army, which is 55 F.3d

21  827.  It's a 1995 case.  It says the defendant can overcome the

22  government's privilege claim by showing a sufficient need for

23  the material and the context of the facts or the nature of the

24  case.

25  You know, that same case says that the deliberate

1 process privilege, like other executive privileges, should be

2 narrowly construed.

3         At this point, we don't have the specific documents,

4 because what should happen is the government should produce a

5 log to the extent there are particular documents that it

6 believes are implicated.

7         By the way, those documents, you would have to redact

8 out the part that they think relate to internal deliberations

9 that would be privileged and would leave open a wide swath of

10 information that would be -- that would be responsive and not

11 privileged, and we would end up fighting over the question of

12 whether or not the specific documents that we narrow it down to

13 are impacted by the deliberative process privilege.

14         THE COURT:  It would seem to me also that if this

15 issue of the deliberative privilege becomes dispositive here,

16 if we get beyond relevance, I don't know how I could rule on

17 such claims without engaging in an in camera inspection.  You

18 tell me how I could do it.

19         OMR. PAIKIN:  I'm not sure, given that at this point,

20 Your Honor, we don't know what documents we're talking about.

21         I mean, we're having the same conversations with the

22 Department of Education, who is not standing on relevance

23 grounds and they are producing materials, and to be sure there

24 are some documents that may well be covered by the deliberative

25 process privilege, but we're having discussions with them and

1  trying to narrow that through the met and confer process.  I

2  expect we will work that out with the Department of Education.

3  I would envision if the CFPB would take a similar

4  approach here, we would have similar conversations with them.

5  The problem is that they are taking a carte blanche at the gate

6  position that none of this material is relevant, and I think

7  just by looking at the cases that discuss the deliberative

8  process privilege and the reason why it exists and the unique

9  facts of this case where, in fact, we are a government

10 contractor and so, you know, if this was a breach of contract

11 type of case, to draw on the analogy, the communications that

12 the contractor was having about what would be appropriate

13 performance by the subcontractor takes a position that that

14 somehow is not relevant in a breach of contract case, I don't

15 think it would pass muster.

16 What is unique here, though, is this deliberative

17 process privilege, which, again, is a qualified privilege to be

18 narrowly construed.

19 We're open to having discussions with the CFPB about

20 how that applies, but without knowing the documents -- and the

21 Rules of Civil Procedure envision that that's why you have a

22 privilege law, you know, with an identification of the

23 documents and the subject matter.

24 So we can have a discussion with them in the first

25 instance, and to the extent we have a dispute, bring it to the

1  Court.  It may well require in camera review of some documents,

2  if we get there, but we're at the threshold stage, and that's

3  where the holdup has come and that's why we are before the

4  Court to rule on the relevance issue today, and if there is a

5  deliberative process issue, then that would come down the line.

6          THE COURT:  Mr. Jabbour, are you there?

7          MR. JABBOUR:  Yes.

8          THE COURT:  Address this question of the deliberative

9  process privilege with particular reference to whether this is

10  something that is even remotely in a posture where I can decide

11  that issue.

12          MR. JABBOUR:  Your Honor, we think that this issue

13  can be decided purely on the relevance issue and that the

14  deliberative process issue need not be reached by the Court,

15  and it's probably not in the correct posture for the Court to

16  reach it at this point.

17          Again, the Court need not reach that issue if it

18  decides that the documents are not relevant in the first place,

19  and I do want to take the opportunity, Your Honor, to address

20  some of the points that Mr. Paikin made, if that is okay?

21          THE COURT:  Sure.  Go ahead.

22          MR. JABBOUR:  Mr. Paikin has brought up on a couple

23  of occasions that Ed. has not made any relevance objections to

24  producing the documents that have been sought.

25          I will note that Ed. is not the party that's

1   asserting the claims here and Ed. is not charged with enforcing

2   the laws that we have brought the claims under.  So Ed. is not

3   in a position to know what is or is not relevant to the

4   Bureau's claim.

5          So the fact that they're producing documents and

6   haven't asserted relevance objections shouldn't come as a

7   surprise.

8          With respect to this argument that Mr. Paikin has

9   continually made about how Navient is a government contractor,

10  I guess I fail to understand exactly what the significance of

11  that fact is.

12         If the significance of that fact is that there's a

13  contract at play here, Navient asserts that on the face of the

14  contract there is some provision that absolves us from

15  liability or that Ed. told, gave it explicit guidance that said

16  that it was all right to do the conduct that we have alleged is

17  illegal, then certainly Navient should come forward with that

18  evidence and show it to the Court, but the fact that there are

19  underlying intra-agency communications that preceded some of

20  these policy or guidance documents from the Bureau, doesn't

21  really -- there is no connection between those intra-agency

22  communications and the fact that Navient is a government

23  contractor.

24         If Navient wants to assert various defenses based on

25  documents that it already has in its possession, it's free to

1  do that.

2      THE COURT:  Let me ask you, if I may, Mr. Jabbour,

3  and pardon me for interrupting you, but let me ask you, if Mr.

4  Paikin were to argue that there are internal agency documents

5  or memorializations of discussions within the agency whose

6  content is at variance with the positions or allegations of the

7  complaint that's been filed against Navient, why aren't they

8  entitled to that?

9      MR. JABBOUR:  Well, they're not entitled to that,

10  because those sorts of positions actually are common and they

11  are not unexpected.

12      In any government deliberation, there are going to be

13  weighing of both sides of an argument or reach the final policy

14  formulation, and so, really, the only thing that matters is

15  what that final policy formulation is, but the government

16  shouldn't have to think about, well, if we are weighing the

17  pros and cons of a particular policy decision, do we have to

18  worry that some party is later on going to try to interpret

19  that to mean that we held a particular view and rejected it at

20  one point.

21      THE COURT:  I'm not so much worried about the

22  circumstance where there is a weighing of the pros and cons,

23  because I understand your argument completely on that, that the

24  agency ought to be free in formulating its ultimate policy, to

25  consider contrary views or to identify deficiencies in the

1 agency's rationale with respect to any position it takes, and

2 that you ought to be able to do that in connection with the

3 formulation of a policy.

4 　　　　Rather, I'm talking more about the circumstance where

5 there are simply internal policies formulated and concluded

6 that are at variance with the positions taken by the CFPB in

7 this case.

8 　　　　Certainly, as to those, wouldn't they be

9 discoverable, to the extent they exist?

10 　　　　MR. JABBOUR:  No, Your Honor.

11 　　　　To the extent that there is any final policy decision

12 that was reached, that would have been published and

13 communicated more broadly.  So everything preceding --

14 　　　　THE COURT:  So there is nothing else?

15 　　　　What you're telling me in terms of finalized

16 conclusive policies of the Bureau, those are all matters in the

17 public domain which have been duly published either in the

18 Federal Register or in another appropriate governmental

19 publication?

20 　　　　MR. JABBOUR:  That's correct.

21 　　　　We provided a large volume of those to the defendants

22 back in August.

23 　　　　So, yes, those are all out there, and everything

24 before is in the nature of predecisional documents.

25 　　　　THE COURT:  All right.  I understand your position.

1          MR. PAIKIN:  Your Honor, may I speak?

2          THE COURT:  Go right ahead.

3          MR. PAIKIN:  What's different about this case, Your

4    Honor, is that what's directly at issue is the reasonableness

5    of the conduct.

6          That policy debate about pros and cons, the

7    Department of Education came out in a particular way, not just

8    in regulations, but through the contract directives or the

9    omissions or knowing after the audit that something was

10   happening a certain way and not directing that it be done

11   differently, and the weighing of the pros and cons and the

12   policy debates, to be sure there's going to be differences and

13   there's going to be debate, and there has been and Navient

14   takes direction.

15         What's different here is that the CFPB is saying that

16   the conduct of Navient was so unfair, so egregious, that they

17   should be penalized to the tune of millions of dollars.

18         And the very fact that there is that debate, that

19   internal policy debate and the external policy debate about the

20   range of reasonableness, in itself shows that Navient, acting

21   under the direction, an audit of the Department of Education

22   and its policy judgment, shouldn't be held liable for

23   multi-millions of dollars because the CFPB lost a policy debate

24   and now wants to use its UDAP authority to try to impose

25   retroactive penalties in those levels.  They have put that

1  debate clearly into relevance.

2          Whether there is a deliberative process privilege

3  that might protect some of it, that's for another day.  The

4  issue now is, is that relevant?  It clearly is.

5          THE COURT:  If you can, tell me as specifically as

6  you can what documents you're looking for, because I'm still

7  struggling with your request, because it seems -- and, please,

8  I mean no disrespect by this -- it seems that you are not quite

9  sure what you're looking for.

10         MR. PAIKIN:  So I think what we're looking for are

11 with respect to -- and there is a list of 20 guidance that was

12 put out that we provided to CFPB -- there are 20 specific

13 instances where the government had made determinations about

14 particular policies and issued guidance or regulation, and we

15 do have those, the end product.

16         What we're looking for is both the internal at the

17 CFPB and the communications that the CFPB had with the

18 Department of Education discussing those policies.

19         So coming back to a specific example, one of the 20,

20 with respect to the Count 3 issue for sending a notice and

21 whether or not sending a notice with a link would be

22 appropriate or not.

23         There were, we believe, that there were discussions

24 between members of the CFPB and with the Department of

25 Education discussing how do you weigh those various issues, and

1  no doubt some people and some guidance that's put out favors

2  the privacy interest and took the position that it's dangerous

3  to send personally identifying information to borrowers by

4  e-mail, and that the appropriate way to do it is to send an

5  e-mail saying, click on this link, and then that's at a secure

6  location, and the borrower's information is protected in that

7  manner.

8          Others said, no.  Instead, what we should do is, we

9  want to err on the side of providing more notice and sending

10  the document or saying a different header or, in fact, what was

11  done when the policy was changed at the direction of the

12  Department of Education to do what is being done now.

13          So the documents that relate to that discussion is

14  the evidence that we would put in front of the jury to say --

15  for the CFPB to now come in and say that my client's decision

16  to send an e-mail with a link in it is so unfair that they need

17  to be penalized millions of dollars is itself unfair and is

18  wrong and my client should not be found liable.

19          THE COURT:  Because somewhere in the process that led

20  to the final policy, one or more persons voiced the view that

21  what Navient is being accused of was, in fact, not

22  inappropriate.

23          Is that what you're telling me?

24          MR. PAIKIN:  Correct.  Because the standard that the

25  jury needs to determine at the end of the day really boils

1  down -- the question of unfairness boils down to the

2  reasonableness of that conduct, and the fact that there is

3  legitimate policy debates about the range of reasonableness

4  demonstrates that the conduct here was not so unreasonable as

5  to justify massive fines.

6          THE COURT:  I would like you to at some point as soon

7  as possible, after we conclude this conference, I would like

8  you to identify of record the 20 policies that you have made

9  reference to so that I may understand what specific policies

10  you are speaking of.

11          MR. PAIKIN:  We will do that, Your Honor.

12          It's contained in the October 24th letter that we

13  sent to the CFPB, and we will submit that and maybe a little

14  explanation of each to the Court.

15          THE COURT:  I would appreciate that.

16          Unless either one of you have anything else to say on

17  that issue, I think I understand what divides you.  This is not

18  an issue I'm going to resolve over the telephone here today,

19  but I do understand where each side stands.

20          With that, Mr. Paikin, you can move to that second

21  issue, which, I believe, was the question of communications

22  with third-party service providers.

23          MR. PAIKIN:  Thank you, Your Honor.

24          So with respect to this second issue, we have a

25  disagreement over whether or not the CFPB should produce the

1  documents and communications that it's had with other servicers

2  and collection companies.

3         Through the course of the meeting confers that we've

4  had with the CFPB, we narrowed that down to 8 specific issues,

5  and that's also in the October 24th letter that we provided to

6  the CFPB, which are communications with borrowers about

7  repayment plans and policies, rates of enrollment and

8  forbearance and income driven repayment, some call center

9  operations, compensation plans and metrics and things of the

10  like.

11         I'm happy to provide the Court, when we submit the

12  other information, the list, but we have taken efforts to

13  narrow it to the issues that are specifically related to the

14  allegations in the complaint.

15         We have also had discussions both with the CFPB and

16  with the Department of Education in their producing this

17  information to us that they have in their possession.

18         There are really probably four servicers that are

19  particularly at issue.  Three of them are also under contract

20  with the Department of Education.  It's Great Lakes, PHEAA and

21  Nelnet, and there is one other major servicer out there, ACF.

22         It is not some mass.  We're talking about four

23  specific servicers with a collection universe.  There may be 20

24  or so people out there, but the issues are far narrower.

25         So we focused in and explained to the CFPB what the

1  issues and who the third parties are that are at issue.

2       The CFPB in their letter to Your Honor say that the

3  reason why we're going after this is because we want to

4  basically make a why me defense, a selective enforcement

5  defense, and that's not relevant.

6       That's not, as the CFPB should well know, because we

7  have discussed it with them many times.

8       The reason why this information is relevant is not

9  because of a selective enforcement defense, but, again, because

10  it goes to the reasonableness of defendant's conduct and

11  industry practice.

12       Again, Navient and these other providers; Great

13  Lakes, PHEAA, Nelnet, they're under daily oversight by the

14  Department of Education, and what those other industry players

15  understood the rules to be with respect to the allegations are

16  directly relevant to this case.

17       In fact, in a case that the CFPB didn't cite, the

18  CFPB has made the opposite argument and said that where

19  Defendants are not complying with industry practice, that is

20  evidence of unfairness.

21       There is a North Dakota case, the CFPB versus

22  Intercept Corporation, which is 2017 Westlaw 3774379.  It's a

23  district in the northern North Dakota, March 17th, 2017, where

24  that was the CFPB's argument, that the failure to comply with

25  industry practices regarding payment processing demonstrated

1  unfair conduct under UDAP.

2         So the fact that Navient was acting consistent with

3  what all the other players in the industry understood the rules

4  to be from the Department of Education is very relevant.

5         The other reason why this information is relevant is

6  because, in large measure, the CFPB has put it directly into

7  issue.

8         Again, just taking one example to this going back to

9  Count 3, one of the issues -- and when Your Honor denied our

10  motion to dismiss, one of the allegations that was pointed to

11  was the fact that after the recertification notice change, so

12  after the e-mail then changed the language that was sent out,

13  the response rate for those people that were recertifying

14  change, it went up dramatically and that that was an indication

15  that perhaps it was unfair.

16         What we couldn't argue on a motion to dismiss,

17  because we're bound to the allegation, is that, in fact, in

18  that same time period, the Department of Education did a

19  targeted communications blitz to borrowers, all the borrowers

20  that had Federal loans, advising them of the recertification

21  process.

22         In fact, the Department of Education told the

23  servicers during that period not to send any notices to the

24  borrowers.

25         So the fact that there was in the after period, after

1   the e-mail change, the fact that there was an uptick in

2   recertification rates probably reflects more of the fact of the

3   targeted communications effort by the Department of Education

4   than the language or the practice of sending a link in an

5   e-mail.

6          That's extremely relevant, and the CFPB has made that

7   allegation, and Your Honor, in fact, pointed to that allegation

8   in denying our motion to dismiss.

9          It's very relevant to know whether or not the

10  experience of other loan servicers, given the notices that they

11  were sending out, whether they had a similar experience,

12  whether they also saw that this targeted communications effort

13  changed the recertification rates, or whether it was because of

14  their language.  We've got test cases from at least three other

15  servicers that would answer that question.

16         Similarly, the CFPB puts into issue the amount of

17  people that are serviced by Navient that went into forbearance

18  versus the amount of people that went into the IDR plans that

19  they think are better.  They imply that somehow Navient was

20  acting improperly in what it was doing.

21         It becomes very relevant whether or not is that what

22  the Department of Education wanted?  Did the Department of

23  Education think that that was problematic?  Did they have an

24  issue with it?  What were the rates with respect to the other

25  servicers of their borrowers that they were servicing?  How

1   many of them were going into forbearance and how many of them

2   were going into IDR plans?

3          THE COURT:  Mr. Paikin, let me just interrupt you and

4   ask you, as I listen carefully to what you tell me, it seems

5   that your focus has been on the Department of Education

6   communications more so than -- much more so than communications

7   from the CFPB to the other third-party service providers like

8   PHEAA and Great Lakes, et cetera.

9          Unless I'm misunderstanding you, why is it that those

10  communications are not obtainable by you through the Department

11  of Education?

12         MR. PAIKIN:  So we are going to obtain what the

13  Department of Education has, but in addition to that,

14  separately, the CFPB has supervisory role over the servicers

15  here, and so the CFPB was having conversations and

16  communications with the servicers that the Department of

17  Education wouldn't have been involved with.

18         We have limited the communications that we're seeking

19  to the ones on that list which are specific to the issues in

20  the lawsuit.

21         So those are the documents we're seeking, the

22  communications that the CFPB had with those servicers and

23  collection companies that relate to the issues in the lawsuit,

24  and we don't believe that those are communications that the

25  Department of Education would have.

1          THE COURT:  So, Mr. Jabbour, let me ask you to

2   respond to that.

3          The thrust of the argument made by Mr. Paikin is that

4   it ought to know -- Navient ought to know what, not only the

5   Department of Education, but also the Consumer Financial

6   Protection Bureau has told other service providers with respect

7   to the manner in which they're to conduct their service

8   providing so as to allow Navient to make the argument if the

9   facts support it that they did nothing different than what

10  other third-party service providers did, and that what those

11  providers did was not found by the Bureau to be inappropriate

12  or otherwise in violation of the act.  That is his argument.

13         Why isn't he entitled to know what the Bureau has

14  done with other providers?

15         MR. JABBOUR:  Well, there are two main reasons.

16         First of all, even assuming for the sake of

17  argument -- and really this is a hypothetical so I'm not trying

18  to message anything here -- even assuming that there was some

19  instance where the Bureau examined some other entity and it

20  turned out that that other entity was violating the law and was

21  treated differently, that fact actually wouldn't be relevant,

22  and the case law supports that view over and over again.

23         It is really in the Bureau's discretion and any other

24  government regulator's discretion to determine how to allocate

25  resources, how best to enforce the law, and so there can be

1   instances where other competitors violated the law and they are

2   not prosecuted, and the Courts have consistently held that that

3   fact is irrelevant.

4           But the second point I also want to make here is that

5   Mr. Paikin constantly throws around the big word of

6   reasonableness and says that that's what this case is all

7   about, but I think we really need to focus here on the specific

8   elements of the claims that the Bureau has brought and

9   understanding specifically where this reasonableness standard

10  that Mr. Paikin has tried to invoke comes into play.

11          In our view, every single element of every claim that

12  the Bureau has brought looks at the relationship between

13  Navient and the consumer.  It doesn't look at what other

14  industry players are doing.  The only thing that matters is

15  what is the relationship between Navient and the consumer and

16  how is Navient interacting with the consumer.

17          It is not an instance where a comparison between

18  Navient and its peers is relevant, because what we don't want

19  in the consumer finance world is basically a race to the bottom

20  where every player in the industry can injure consumers in the

21  same way and then claim -- and then tell a fact finder, look,

22  our behavior was no worse than anybody else's and so we

23  shouldn't be prosecuted because everyone else was doing this.

24          THE COURT:  Well, sure.

25          Suppose -- in connection with this request that

 1  Navient has made -- suppose the documents disclose specific

 2  occasions when the Bureau approved of conduct for another

 3  provider, conduct that is now being asserted as unlawful in

 4  connection with Navient.

 5          This is not -- in other words, this is not a

 6  situation where the inquiry is to see whether other persons

 7  have gotten away with anything, other providers have gotten

 8  away with anything, but rather the circumstance where the

 9  Bureau has actually approved or condoned conduct that it now

10  charges Navient with having engaged in as unlawful.

11          If such documents existed, aren't they discoverable?

12          MR. JABBOUR:  Your Honor, no, they wouldn't be.

13          THE COURT:  Why not?

14          If the Bureau approved of a certain course of conduct

15  by another provider that you're now seeing fit to indicate is

16  unlawful with respect to Navient, why aren't they entitled to

17  know that?

18          MR. JABBOUR:  First off, I note that the Bureau

19  doesn't approve of --

20          THE COURT:  That may be, but that's our frame of

21  reference for purposes of this discussion anyway.

22          Go ahead.

23          MR. JABBOUR:  Sure.  Every service provider presents

24  with different facts and different circumstances.

25          So an exact one-to-one comparison between Navient and

1   another service provider is actually really difficult to do.

2   There can be comparisons, I suppose, but I think this actually

3   borders on getting into a little bit of an unmanageable

4   exercise.

5         For instance, Mr. Paikin zeroed in on the percent of

6   borrowers who are in forbearance as some sort of relevant data

7   point, but really the fact that there is a certain percentage

8   of borrowers in forbearance for Navient versus some other

9   servicer doesn't actually answer the question as to whether or

10  not Navient was steering borrowers into forbearance.

11        Navient could have some low percentage for some

12  reason, but the fact for borrowers who are having trouble

13  making payments, Navient still isn't giving them the right

14  advice.

15        So that's why I think it's important for Mr. Paikin

16  to actually articulate in more detail, which I think he is

17  unable to do, what element of each claim he believes demands

18  some sort of comparison to competitors and exactly what

19  evidence would be used to support that inquiry, because I think

20  once we engage in that inquiry, there really is no place where

21  a comparison with competitors is appropriate.

22        THE COURT:  Well, I will agree with you that I have

23  difficulty at this point identifying specifically what is being

24  sought by Navient, although I appreciate Mr. Paikin's efforts

25  to give me that information.

1        That's why in connection with the previous issue, I

2   asked for the 20 policy publications as to which requests are

3   being made for the discussions leading to those policies.  At

4   least that gives me a frame of reference, gentlemen, to

5   evaluate what it is you want.

6        I'm having a lot of difficulty -- of course, I don't

7   have the interrogatories, nor do I have the Request for

8   Production of Documents, so I'm at a significant disadvantage

9   in knowing what has been asked for.

10       But in all candor, I don't have enough information to

11  make a ruling on this matter based on what I've heard.

12       I understand your arguments and you have made them

13  clearly, but when I try to apply them to specific requests or

14  specific documents or specific categories of documents, I'm

15  coming up short here, and you're going to have to come back to

16  me and refine what your issues are; otherwise, this is going to

17  be a very, very difficult decision for me to make and one that

18  may leave more questions than answers and I don't want that.

19       So my suggestion here is -- and I'm willing to

20  discuss this with you again if you are so inclined -- but my

21  suggestion is that you need to try to give me a joint statement

22  of what precisely separates you.

23       Again, I know the arguments as to why you're

24  separated, but I don't think I understand fully what it is

25  substantively that you're at loggerheads over; what documents,

1  what kinds of documents, and in connection with what claims;

2  otherwise, deciding relevancy becomes a very, very amorphous

3  pursuit for me, and I think that's not what is going to serve

4  anybody's interest here, certainly not yours.

5          That's my suggestion to you, in addition to

6  Mr. Paikin sending me the letter to which he made reference

7  where 20 policies are set forth.

8          Can you do that?

9          MR. PAIKIN:  Your Honor, this is Jonathan Paikin.  I

10  believe we can and we will endeavor to do so.

11          THE COURT:  How much time do you need to do that?

12          MR. PAIKIN:  Well, given that it's a joint -- you

13  requested a joint effort, we probably need to work with CFPB to

14  try to reach agreement as to what that list is.

15          I ask Mr. Jabbour, you know, if we could get him

16  something by a week from today over to CFPB, that would give

17  them an opportunity then to look at it, and I'm not sure how

18  long they would need, but, perhaps, you know, two weeks from

19  today we endeavor to submit something to the Court.

20          THE COURT:  I will give you whatever time the two of

21  you think you need.  The issue is that important to the

22  development of the case, I'm well aware of that, and I don't

23  want to rush you on this, but, obviously, we are all interested

24  in moving the case along.

25          Mr. Jabbour, what do you think?

1          MR. JABBOUR:  Your Honor, I think a total -- just

2   going off of what Mr. Paikin said -- first of all, we're fine

3   with the joint statement.

4          I think if they would like a week to kind of

5   articulate their position, we can place our position in the

6   same document in another week, and there may be some back and

7   forth after that, so perhaps three weeks is kind of a

8   reasonable estimate of the total time this would take.

9          THE COURT:  All right.  That is certainly fine with

10  me.

11          If you wish, I will issue a formal order beyond what

12  I have said in this conversation.

13          If you are satisfied that you understand what I'm

14  looking for, I will defer issuing any order, but I will let

15  that up to you.

16          I will give you three weeks to send me that joint

17  statement of what precisely is at dispute here.

18          MR. PAIKIN:  Your Honor, in a separate filing, you

19  had asked that we identify the specific guidance.  Would you

20  like that sooner, or should we do that on the same schedule?

21          THE COURT:  If you can get it to me sooner, that's

22  fine, but, obviously, that document, together with the joint

23  statement, will put me in a far better position to rule on this

24  than I am right now.

25          So if it's fitting for the two of you, you can submit

1  that along with the joint statement.

2          MR. PAIKIN:  Very good, Your Honor.  We will do that.

3          THE COURT:  All right.

4          MR. JABBOUR:  That's fine with the Bureau as well,

5  Your Honor, and we don't need an order.

6          THE COURT:  You do not need an order, is that

7  correct?

8          MR. JABBOUR:  From the Bureau's standpoint, we do

9  not.

10         MR. PAIKIN:  Your Honor, everything you say I think

11  is in order.

12         THE COURT:  Fair enough.

13         MR. PAIKIN:  It will be unnecessary.

14         THE COURT:  Thank you, gentlemen.  I will look

15  forward to your statement and the other document as well.

16         Thank you very much.

17      (At this time, the proceedings in the above-captioned

18  matter concluded.)

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4         I, SUZANNE A. HALKO, Official Court Reporter for the

5   United States District Court for the Middle District of

6   Pennsylvania, appointed pursuant to the provisions of

7   Title 28, United States Code, Section 753, do hereby certify

8   that the foregoing is a true and correct transcript of the

9   within-mentioned proceedings had in the above-mentioned and

10  numbered cause on the date or dates hereinbefore set forth; and

11  I do further certify that the foregoing transcript has

12  been prepared by me or under my supervision.

13

14                          _____
                            SUZANNE A. HALKO, RMR,CRR
15                          Official Court Reporter

16
    REPORTED BY:
17
        SUZANNE A. HALKO, RMR,CRR
18      Official Court Reporter
        United States District Court
19      Middle District of Pennsylvania
        Scranton, Pennsylvania  18501
20

21

22         (The foregoing certificate of this transcript
    does not apply to any reproduction of the same by any means
23  unless under the direct control and/or supervision of the
    certifying reporter.)

24

25