

14 February 2018

# What Does the CFPB Complaint Database Tell Us About the Quality of Servicing of Student Loans?[1]



By **Faten Sabry,**
**Ignacio Franceschelli,**
and **David Cen**

## Introduction

On 18 January 2017, the Consumer Financial Protection Bureau ("Bureau" or CFPB) filed a lawsuit against a large student loan servicer that manages over $300 billion in federal and private loans for over 12 million borrowers. The CFPB alleged that the servicer failed to provide borrowers with adequate information about repayment plans when borrowers were unable to pay and did not help them identify eligibility for and enrollment in income-based repayment plans.

In this litigation, the CFPB relied on the number of complaints that borrowers and co-signers filed with the Bureau in its Consumer Complaint Database ("Complaint Database"). The CFPB focuses exclusively on the number of complaints when ranking student loan servicers in its Annual Reports of the Student Loan Ombudsman.[2] Academic sources note that the Bureau uses the Complaint Database to inform rulemaking, enforcement actions, and consumer education.[3] The database helps the CFPB process consumer complaints and provides some information about problems that consumers face. However, there are statistical and economic limitations that may render the number of complaints or the complaint rates as unreliable for the purpose of evaluating whether a company is appropriately conducting business.[4] The complaint rate is the ratio of borrowers and co-signers of student loans that have filed complaints with the Bureau against a servicer to the total number of borrowers serviced.[5]

This article illustrates potential limitations of relying on the volume or rate of complaints that borrowers and co-signers of student loans filed with the Bureau and are reported in the public Complaint Database as a basis for the CFPB's regulatory actions against servicers of student loans and/or to develop servicer rankings in reports used to educate consumers.[6]

Insight in Economics™

The most notable limitation is self-selection bias. Self-selection bias arises when the individuals that select themselves into a group—such as borrowers who decide to file a complaint with the Bureau—are different, by virtue of their inclusion, from the remaining individuals.[7] The Bureau's complaint database disregards neutral or positive opinions. In addition, each servicer faces a different portfolio of borrowers with different financial situations and ability to repay and a spike in the complaints against a given servicer may reflect the high credit risk of its portfolio rather than the quality of its servicing. Also, the propensity to file a complaint could be influenced by other factors such as negative media coverage, for example. As a result, other factors that could cause the increase in the complaint rate against a given servicer cannot be ruled out if one relied on the Complaint Database to assess servicing quality.

The CFPB does not determine the merits of the complaints and therefore the complaints are an aggregated set of allegations—that may arise from issues outside the control of the servicer—from a self-selected group of borrowers:

> … many of the complaints about both federal and private education loans seem to be about issues that are beyond the control of the lender or servicer. We have seen a substantial number of complaints that express generalized unhappiness and frustration with the consumer's situation—the inability to get a job coupled with concern that the education that they received was not worth the price that they paid and the amount that they borrowed.[8]

Complaint rates, if used exclusively and without consideration of additional metrics, need not provide a reliable measure of servicer quality because the database simply reflects allegations by dissatisfied borrowers and does not represent the views from a servicer's entire portfolio.

The CFPB Complaint Database does not include information on the borrowers' credit attributes, ability to pay, employment, income, loan terms, or other characteristics of the servicers' loan portfolios. As such, it cannot be used to reliably compare the quality of servicing across servicers given the distinct composition of each servicer's loan portfolio. Each servicer faces a multitude of individual borrower risk profiles, which may explain the observed discrepancies in complaint rates. Without controlling for the credit attributes of the loans across servicers, complaint rates against different servicers could be an apple-to-orange comparison.[9]

In fact, our data analysis shows that while student loan servicers experienced notable differences in complaint rates based on the Bureau's database, the same servicers had similar borrower satisfaction scores according to Department of Education surveys ("DoE surveys").[10] These DoE surveys include metrics to assess consumer satisfaction—not only complaints—and account for variations in each servicer's loan portfolio. As such, the DoE surveys provide contradictory findings to the CFPB's Complaint Database regarding borrowers' satisfaction.[11]

Another limitation of relying on the complaints filed with the CFPB to evaluate quality of servicing is that the number or the rate of complaints as a measure of quality does not consider the disposition of the complaints.[12] Our analysis of the outcomes of private student loan complaints shows that between 73% and 91% are resolved without monetary or non-monetary relief to the consumer each year. Complaint rates may not be a reliable indicator of the quality of loan servicing, given that the CFPB does not validate the merits of the complaints in its database and the majority of the complaints were resolved without the servicer providing the consumer either monetary or non-monetary relief.[13]

Further, between 77% and 85% of the borrowers did not dispute the resolution of the complaints even for servicers who experienced higher rates of federal loan complaints relative to the other federal loan servicers.[14] Indeed, the servicer with the least number of complaints per thousand borrowers was the one with the highest rate of disputed resolutions. While the complaint resolution process can be viewed as another measure of servicer quality, the Bureau's Annual Reports of the Student Loan Ombudsman focus exclusively on the number of complaints when ranking student loan servicers.[15]

Lastly, the Bureau uses the Complaint Database to identify trends in the marketplace.[16] However, changes in complaint rates over time may be associated with factors like negative press, which can affect the propensity to file complaints. For example, there was a dramatic increase in the complaint rate against student loans servicers immediately after the CFPB's recent lawsuit in January 2017. On the other hand, borrower satisfaction scores increased slightly after the lawsuit according to the DoE surveys.

In summary, using the CFPB Complaint Database could result in unreliable conclusions about the quality of servicing of student loans due to self-selection bias and the lack of information about the servicers' loan portfolios, such as loan types and income of borrowers.[17] Our empirical evidence shows that the majority of private student loan complaints are resolved without the servicer providing the consumer with monetary or non-monetary relief and the rate of resolving complaints without further disputes is high and similar across servicers. This suggests that complaint rates, by themselves, may not be a reliable indicator of servicer conduct. Lastly, confounding factors such as news coverage may also affect complaint rates, which would further complicate the use of the Complaint Database to assess changes in the quality of servicing over time.

Alternative measures of the quality of student loan servicing may be more reliable. For example, one could compare the loan performance of each servicer's portfolio after controlling for the credit attributes of the loans and borrowers, such as re-default rates across comparable loan types.[18] In addition, various statistical metrics can be used to assess the servicers' efforts to rehabilitate and restore delinquent or defaulted loans to a paying status, which can be tracked over time rather than at a single point in time. The quality of servicing measures may also include the percentage of borrowers seeking forbearance, deferment, or income-based repayment; the rates at which these repayment inquiries are approved; and whether income-based repayment plan reminders are initiated by the servicer.

## The Student Loans Market

There was approximately $1.3 trillion in outstanding federal loans by the end of 2016.[19] In addition, there was an estimated $108 billion in outstanding private student loans.[20] In total, outstanding student loan debt at the end of 2016 was approximately $1.4 trillion dollars, as shown in Figure 1.

Figure 1. **Total Student Loan Market Outstanding Balance ($ Billion)**



**Private**
$108.2
8%

**Federal**
$1,299.7
92%

Source:
Data are from US Department of Education and MeasureOne.

Federal loans are currently originated under the Direct Loan Program or the Perkins Loan Program.[21] For both programs, the borrower's college, university, or trade school determines his/her eligibility and loan amounts.[22] The main difference between the two programs is the lender to whom repayment is owed.[23] Under the Direct Loan Program, students receive the loans from and owe repayment to the Department of Education. Under the Perkins Loan Program, schools make loans to students with exceptional financial need and repayment is owed to the schools.

The major differences between federal and private loans are the types of interest rates, repayment options, and whether they are guaranteed by the DoE.[24] Interest rates on all federal loans are fixed, and vary by loan type and the date of first disbursement. Federal loans that were credited to borrowers between 1 July 2016 and 30 June 2017 carried fixed interest rates between 3.76% and 6.31%.[25] By comparison, private student loans can have either a fixed or an adjustable rate. These interest rates vary by lender and the applicant's credit application; fixed-rate loans for undergraduates can range between 4.751% and 12.99%, and adjustable-rate loans can range between 2.751% and 11.22%.[26] Additionally, nearly 90% of private loans require a co-signer.[27]

The majority of federal loans allow a borrower to apply for forbearance or deferment, a temporary reduction or postponement of payments, during the life of the loan if the borrower experiences temporary financial trouble.[28] For instance, if a borrower applies for and is granted deferment, the borrower is allowed to temporarily suspend his/her monthly payments, and will not be responsible for any interest accrued during the deferment period for certain federal loans. Additionally, many federal loans offer income-based repayment options with monthly payment amounts between 10% and 20% of the borrower's discretionary income.[29] For private loans, the option for a borrower to enter forbearance, deferment, or an income-based repayment plan depends on the loan terms.

Figure 2 shows that approximately 14.3% of federal Direct Loans and Federal Family Education Loans (FFEL) held by the DoE were 31 days or more delinquent at the end of 2016, by balance of loans in repayment. For private loans at the end of 2016, only 4.8% of repaying loans by balance were 30 days or more delinquent. One possible explanation for the difference in delinquency rates could be the lending criteria of these loans. Unlike federal programs that limit credit information about the borrowers through a uniform application, private lenders mitigate the risk of delinquency and default by using tougher underwriting criteria and co-signers.[30]

Figure 2. **Delinquency Rates for Federal and Private Student Loans 2016**



Notes and Sources:
Data are from Department of Education and MeasureOne. All numbers are represented as the percentage of balance of loans in repayment status.
For private loans, early-stage delinquency is defined as 30–89 days delinquent and late-stage delinquency is defined as 90 or more days delinquent.
For federal loans, data is on Direct Loans and Department of Education-held FFEL loans. Early-stage delinquency is defined as 31–90 days delinquent and late-stage delinquency is defined as 91 or more days delinquent.

## CFPB Consumer Complaint Database

The Bureau began accepting consumer complaints related to certain financial products and services in July 2011.[31] It later expanded the database to accept complaints related to private student loans in March 2012 and complaints related to federal student loans in February 2016.[32]

When a consumer submits a complaint to the Bureau, the CFPB first verifies that a commercial relationship exists between the consumer and the company.[33] The Bureau also checks that the submission is a complaint and not an inquiry or feedback.[34] However, the CFPB does not verify the accuracy of all details in the complaint and "does not adjudicate the merits of each individual complaint."[35] The complaint is then forwarded to the appropriate company for response. The company can communicate with the consumer to try to solve the complaint. When the company has made a determination, the company posts a resolution (e.g., "Closed with relief") on a website hosted by the CFPB. After the company posts the resolution to the website, the CFPB notifies the consumer, at which time the consumer can review and decide whether to dispute the company's response. The various types of company responses for both federal and private loans are provided in Table 1.[36]

Table 1. **Resolution of Student Loan Complaints**
2012–2016

| Resolution | 2012–2016 Count | 2012–2016 Percentage |
| --- | --- | --- |
| Closed | 44 | 0.3% |
| Closed with explanation | 12,077 | 81.1% |
| Closed with monetary relief | 1,003 | 6.7% |
| Closed with non-monetary relief | 1,302 | 8.7% |
| Closed with relief | 51 | 0.3% |
| Closed without relief | 418 | 2.8% |
| Untimely reponse | 2 | 0.0% |
| **Total** | 14,897 | 100.0% |

Notes and Sources:
The CFPB started accepting private student loan companies in March 2012 and federal student loan complaints in February 2016. Thus, the 2012 year covers complaints submitted between March 2012 and December 2012. Similarly, the 2016 year incorporates federal student loan complaints beginning February 2016, in addition to private student loan complaints.
Data on complaints are from the Consumer Financial Protection Bureau for selected servicers.

Monetary relief is defined as "objective, measureable, and verifiable monetary relief to the consumer as a direct result of the steps that have been or that will be taken in response to the complaint." Non-monetary relief is defined as "other objective and verifiable relief to the consumer as a direct result of the steps that have been or that will be taken in response to the complaint." A complaint closed with explanation indicates that the company responded to the complaint with "an explanation that was tailored to the individual consumer's complaint."[37]
A closed complaint indicates the company did not provide relief or an explanation.

Table 2 lists the types of problems that borrowers identified using the Complaint Database. The table shows that there were almost 15,000 student loan complaints between 2012 and the end of 2016, of which 49.4% were related to dealing with the lender or servicer and 48.8% were related to issues with repayment.

Table 2.  **Student Loan Complaint Issues and Sub-Issues**
2012–2016

| Issue | 2012–2016 Count | 2012–2016 Percentage |
|---|---|---|
| Can't repay my loan | 7,266 | 48.8% |
| Dealing with my lender or servicer | 7,358 | 49.4% |
| Getting a loan | 273 | 1.8% |
| **Total** | 14,897 | 100.0% |

Notes and Sources:
The CFPB started accepting private student loan companies in March 2012 and federal student loan complaints in February 2016. Thus, the 2012 year covers complaints submitted between March 2012 and December 2012. Similarly, the 2016 year incorporates federal student loan complaints beginning February 2016, in addition to private student loan complaints.
The option to file a complaint under the issues "Problems when you are unable to pay" and "Repaying your loan" was discontinued in December 2013. It was primarily replaced with the "Can't repay my loan" issue. We understand these three issues represent the same categorical problem consumers face with repayment and combine them into the "Can't repay my loan" issue.
Data on complaints are from the Consumer Financial Protection Bureau for selected servicers.

Table 2 lists the types of issues that a borrower can identify in his/her complaints: getting a loan, dealing with lender or servicer, or struggling to repay. In addition, the CFPB Complaint Database allows the borrower to provide more detail about the problems, such as the refusal of the servicer to postpone payments. The Complaint Database provides additional details including the dates of the complaint submission, an identification of the company, the state and zip code of the customer's mailing address, and a flag for whether the consumer was above 62 years old or a service member. Two optional fields are available for the consumer's detailed narrative of the situation and the company's public response. For tracking outcomes, the CFPB Complaint Database has fields on the resolution, whether the company response was timely, and whether the consumer disputed the resolution.

## Complaint Rates Against Servicers as a Measure of Quality

In addition to processing complaints, the CFPB relies on the Complaint Database to inform rulemaking, enforcement actions, and consumer education.[38] In this section, we discuss potential drawbacks of using complaint rates, defined as the fraction of borrowers and co-signers of student loans that have filed a complaint with the Bureau against a servicer, to assess the quality of servicing in the student loan market. While the Complaint Database provides some information about problems that consumers face, there are statistical and economic limitations that may render the complaint rates unreliable for the purpose of evaluating whether a company is appropriately conducting business. The CFPB does not determine the merits of the complaints and the majority of the complaints were resolved without the servicer providing the consumer with either monetary or non-monetary relief. Thus, other factors that could result in the increase in the complaint rate cannot be ruled out if one relied on the Complaint Database to assess servicing quality. Also, relying on complaint rates to compare or assess servicers is problematic as each servicer faces a different portfolio of borrowers with different financial situations and ability to repay. Furthermore, such reliance is problematic because complaint behavior is influenced by various factors, including the inability of borrowers to pay due to job loss, for example, or negative media coverage regarding a given servicer. In addition, the resolution of the complaints may be a relevant measure of servicer quality that the complaint rates alone do not capture.

Self-selection bias and the lack of information in the Complaint Database about loan and borrowers' credit characteristics are two key limitations to relying on the Complaint Database to assess quality of servicing. The Complaint Database focuses solely on consumers with negative opinions of their servicer and may provide a biased perspective when comparing across dissimilar servicers' portfolios. Notably, one cannot exclude the possibility that a servicer has a higher complaint rate because it has riskier borrowers who are more likely to have problems repaying their loans or due to other reasons outside the control of the servicer. These concerns are demonstrated by our empirical analysis, which shows that the same servicers with notable differences in complaint rates based on the CFPB database have similar consumer satisfaction scores according to the DoE surveys during the same time period.

In addition, the CFPB focuses on the number of complaints and not necessarily the outcome of such complaints, which could be more informative when evaluating servicers.[39] Neither the number of complaints nor the complaint rate may be a reliable indicator of the quality of loan servicing, given that the CFPB does not validate the merits of the complaints in its database and that the majority of the complaints were resolved without the servicer providing the consumer with monetary or non-monetary relief. Our analysis of the outcomes of private student loan complaints shows that 73% to 91% of the complaints have been resolved without monetary or non-monetary relief to the consumer each year since 2012. Also, even though certain servicers experienced higher complaint rates, the proportion of borrowers who were satisfied with the complaint resolution was similar and in the range of 77% to 85%—that is, after the servicer made a determination and the consumer was notified of this resolution, the consumer did not dispute the resolution. Indeed, over the period examined, the servicer with the lowest complaint rate was the servicer with the highest percentage of resolutions that were disputed by consumers. The Bureau's Annual Reports of the Student Loan Ombudsman focus exclusively on the number of complaints and contain a table showing the companies with the most private student loan complaints ranked by volume. This type of ranking does not take into account how customers rate the resolution process, another measure of servicer quality.

Finally, confounding factors such as negative press can affect the propensity to file complaints against a given servicer. For example, there was a dramatic increase in the complaint rate immediately after the CFPB's recent lawsuit against a servicer in January 2017, which could be related to the publicity effect of the lawsuit on consumers' propensity to file complaints. However, the DoE surveys' borrower satisfaction scores for the same servicers increased slightly over the same time period, indicating that the complaint rate on its own is not indicative of worse business practices.

### Self-Selection and Lack of Credit Information in the CFPB Database

The self-reporting nature of the complaints raises concerns about using the number or the rate of complaints in the Complaint Database as a reliable measure of servicing quality.[40] The Complaint Database does not account for neutral or positive feedback from the borrowers. As a result, the Complaint Database is not representative of borrowers who did not complain and may not be representative of a servicer's entire portfolio.[41]

The Bureau itself acknowledged the need to create opportunities for consumers to share accounts of positive experiences with companies:

> One commenter suggested that if the Database is to function as a marketplace of ideas, then it should reflect the entire market and not solely consumers submitting complaints. Several trade associations stated that if the Database is to be likened to private web-based review sites, then positive feedback is necessary. Consistent with these comments, the Bureau believes that the Bureau should share data that provides an unbiased perspective on company behavior toward consumers.[42]

The Bureau intends to further explore ways in which positive company behavior may be highlighted, but its current focus on the number of complaints has failed, thus far, to account for the opinions of all the market participants.[43]

Using the number of complaints or the complaint rate alone to evaluate the quality of a servicer may lead to inaccurate conclusions about the servicer's entire portfolio.[44] The Complaint Database does not include any metrics to assess the satisfaction of consumers who did not submit complaints with the Bureau, as only feedback from dissatisfied consumers are included in the database. A standard principle in sampling is that a sample that fails to include part of the population can result in "biased estimates of population quantities."[45] Analysis based on a representative sample of borrowers' perceptions of the servicer would provide a better indicator of servicing quality than a complaint rate.

In addition, the Complaint Database does not provide enough information to control for the composition of each servicer's loan portfolio and allow for reliable comparisons across servicers.[46] The CFPB Complaint Database does not include information about the borrowers' debt or income levels or other metrics that might affect the propensity to submit complaints. Raw complaint rates may be uninformative about quality of servicing as they do not account for differences in borrower and loan credit characteristics across servicer's portfolios.[47] For example, a servicer with a portfolio of borrowers with higher credit risk may face higher rates of complaints relative to the other servicers for reasons related to the ability of the borrowers to repay their loans and not necessarily the quality of servicing.

To demonstrate the potential bias with using the complaint rate based on the CFPB database to draw conclusions about the quality of servicing for a servicer's entire portfolio, we examined the results of the survey that the Department of Education conducts every quarter to assess borrower satisfaction with the servicers of federal loans.[48] The DoE allows its federal loan servicers to determine how to best service their assigned loans in order to obtain high levels of customer satisfaction. Our analysis of the data shows that the same servicers who had notably different complaint rates for federal loans per the Complaint Database between February and May 2016, had similar borrower satisfaction scores in the DoE surveys over the same period, as seen in Figures 3 and 4. By incorporating neutral and positive feedback, the DoE results are better suited to compare servicers.

Figure 3. **CFPB Federal Loan Complaints per Thousand Borrowers**



Notes and Sources:
This is the proportion of complaints related to federal student loans submitted to the CFPB between 25 February 2016 and 31 May 2016 per one thousand borrowers.
Borrower data is based on the number of borrowers with Direct Loans and Federal Family Education Loans owned by the Department of Education, as of 30 June 2016.

Figure 4. **Borrower Satisfaction Score Survey Results of the Department of Education**

Notes and Sources:
The Department of Education conducts surveys of federal student loan servicers. One metric is based on borrower satisfaction with their loan servicer and the average scores from the March 2016 and May 2016 surveys for borrower satisfaction is presented here.
For the quarters ending 31 March 2016 and 31 May 2016, data are from "Servicer Performance Metrics and Allocations," Federal Student Aid, an Office of the US Department of Education.

The DoE surveys borrowers in each servicer's loan portfolio by segment, defined by loan status (borrowers in repayment, in grace period, in school, or delinquent), as applicable to allow for comparability across servicers. The segment scores are then averaged to compute a borrower satisfaction score for each servicer. For example, two servicers with the same satisfaction score in each segment will receive the same overall score, regardless of differences in the servicers' portfolios, such as the fraction of borrowers still in school.

The DoE determines the allocation of new federal loans to the eligible servicers based on the customer satisfaction survey scores discussed above as well as measures of borrower delinquency.[49] The DoE also accounts for the distinct composition of each servicer's loan portfolio when evaluating delinquency rates across servicers. The DoE claims that if one servicer's portfolio contains more borrowers from higher-risk groups than another servicer's portfolio, the first servicer may have higher delinquency rates due to factors outside the servicer's control.[50] To account for these differences in the servicer's portfolio, the DoE reviews the risk profiles of the servicing portfolios, and contacts servicers to solicit advice on constructing performance metrics that reflect variations in each servicer's portfolio.[51] The DoE compares delinquency rates across servicers by subdividing a servicer's portfolio into five segments based on loan type and a combination of whether the borrower graduated and whether the borrower left school less than or more than three years ago. Within each of these five segments, three delinquency metrics are considered, yielding a total of 15 measured segments.

In summary, the CFPB Complaint Database may suffer from self-selection bias and lacks adequate information about the credit attributes and income of the borrowers, which could result in unreliable conclusions if using the number of complaints or complaint rates to assess the quality of servicing.

### Data on the Resolution of Student Loan Complaints

In addition to self-selection bias and lack of information about the income and credit of the borrowers in the Complaint Database, the CFPB does not account for the disposition of the complaints when ranking servicers. After the complaint is forwarded to the servicer, the servicer can communicate with the consumer to try to resolve the complaint. When the servicer has determined a resolution, the company posts the resolution (e.g., "Closed with relief") to a web portal hosted by the CFPB and the CFPB notifies the consumer. The consumer can then review and decide whether to dispute the company's response. Dispute resolution, another aspect of servicing quality, is not accounted for in the Bureau's Annual Reports of the Student Loan Ombudsman. Instead, the CFPB focuses exclusively on the number of private student loan complaints when ranking student loan servicers.

Our analysis of the outcomes of the private student loan complaints shows that the vast majority are resolved without the servicer providing monetary or non-monetary relief to the borrowers.[52] Between 2012 and 2016, 73% to 91% of private student loan complaints each year were resolved without consumer relief.[53] For example, of the 2,502 private student loan complaints submitted in 2016 related to the selected servicers, 2,284 (91% of complaints) were resolved without relief. The number or rate of complaints filed with the CFPB may not be a reliable indicator of the quality of loan servicing, given that the CFPB does not validate the merits of the complaints in its database and that the majority of the complaints were resolved without any relief.

Figure 5 shows that the proportion of complaints that were closed without relief has been increasing each year.

Figure 5. **Percentage of Complaints Without Consumer Relief**



Notes and Sources:
The CFPB started accepting private student loan complaints in March 2012.
Data on complaints are from the Consumer Financial Protection Bureau for selected servicers.

In addition, four federal loan servicers settled a similar fraction of federal loan complaints without further dispute from the borrowers. For each of the four servicers, less than one-quarter of the resolutions were disputed by consumers for complaints received between February and May 2016. Figures 6 and 7 show that servicer B had the lowest complaint rate for federal loans between February and May 2016 as presented in Figure 6, but the percentage of complaint resolutions with dispute for servicer B was the highest among the four, as presented in Figure 7. The Bureau's annual reports do not take into account how customers rate the complaint resolution process with their servicer and instead focus exclusively on the number of complaints when ranking student loan servicers.

Figure 6. **CFPB Federal Loan Complaints per Thousand Borrowers**



Notes and Sources:
This is the proportion of complaints related to federal student loans submitted to the CFPB between 25 February 2016 and 31 May 2016 per one thousand borrowers.
Borrower data is based on the number of borrowers with Direct Loans and Federal Family Education Loans owned by the Department of Education, as of 30 June 2016.

Figure 7. **Percentage of Federal Loan Complaint Resolutions with Dispute**

Note:
This is the proportion of complaints related to federal student loans submitted to the CFPB between 25 February 2016 and 31 May 2016, where the consumer did dispute the resolution outcome.

The number of complaints filed with the CFPB or complaint rates alone may not be a reliable indicator of the quality of loan servicing, given that they do not account for the disposition of the complaints (e.g., relief or dispute rates), which is at least as informative as the volume or rate of complaints when evaluating servicers.

## A Notable Surge in Complaint Rate After the CFPB Lawsuit

There has been a notable increase in the complaint rate for student loans after the CFPB's recent lawsuit as of January 2017, as seen in Figure 8. This may partly reflect the impact of the media on the propensity to file complaints. Without further analysis and validation of these complaints, it is not clear whether the increase in the complaint rate following the CFPB lawsuit on 18 January 2017 is attributable to a change in servicer behavior, public awareness of the Complaint Database, or other factors. In contrast, the DoE borrower satisfaction survey scores increase slightly after the lawsuit.

Figures 8. **Quarterly Complaint Rate and DoE Borrower Satisfaction Results Before and After the CFPB Lawsuit**



Note:
The Department of Education survey results for 2016 Q2 are for the period ending 31 May 2016. We define 2016 Q2 as 1 April 2016–30 June 2016.

The number of complaints or the complaint rate alone may be insufficient to assess the quality of servicing given that changes in the filing of complaints could be affected by other confounding factors such as negative media coverage.

The impact of negative publicity on filing or claiming behavior has been well documented in the academic literature. According to Robbennolt and Studebaker (2003), decisions by consumers to take any legal action, including the decision of whether to file a claim, are dependent on perceptions of the judicial process as well as the expectation of likely outcomes.[54] Bailis and MacCoun (1996) conclude that an individual's decision to pursue legal action may be distorted by stories in the media because media coverage of litigation typically skews toward covering litigation with large jury awards and plaintiff victories.[55] The media is also the primary source of information for individuals about the litigation system.[56] The mass media has been cited as one factor for the rise of mass torts litigation in the 1980s.[57] For example, in the Dalkon Shield litigation arising in the 1970s and lasting until 1988, national news coverage such as 60 Minutes reported on potential health concerns of using the contraceptive device and notified consumers that they might have a claim against the Dalkon Shield manufacturer. As these stories aired in the early 1980s, "the number of Dalkon Shield claims rose during this period of media attention."[58]

## Summary

The CFPB Consumer Complaint Database consists of complaints that are self-reported by consumers and the CFPB relies on it to assess the quality of servicing student loans. There are several statistical and economic problems with relying on the number of complaints or complaint rates to assess servicing quality. These problems include self-selection and the lack of any data on the credit attributes of the loan portfolios among the different servicers. Relying on the complaint rates to compare or assess servicers means that one cannot exclude the possibility that a servicer has a higher complaint rate because they have riskier borrowers who are more likely to face problems repaying their loans, for example. A servicer may also face a higher complaint rate due to negative publicity about the company that may not be related to the quality of servicing. These concerns are demonstrated by our empirical analysis, which shows that the same servicers with notable differences in complaint rates based on the CFPB database have similar consumer satisfaction scores according to the DoE's surveys. The DoE surveys account for positive as well as negative feedback. Also, our empirical evidence shows that most private student loan complaints were resolved without monetary payments or other consumer relief during the period from 2012 to 2016. In addition, a set of servicers with different complaint rates seem to have similar rates of resolving complaints without further disputes from borrowers. However, the CFPB's Annual Reports of the Student Loan Ombudsman do not account for the resolution of the complaints when ranking servicers. Finally, our findings suggest that confounding factors such as negative media coverage could have a notable impact on the rate of filing of complaints.

The CFPB Consumer Complaint Database helps the CFPB process consumer complaints and provides useful information about the types of problems that borrowers face, and can be used to identify emerging issues faced by consumers. However, on its own and without additional information and analysis, the number of complaints and complaint rates based on the Complaint Database cannot be used to reliably assess the quality of loan servicing. Our analysis of the Complaint Database raises questions about the relationship between volume or rate of complaints against a servicer and the quality of its servicing. In particular, self-selection and data limitations about the credit attributes of the borrowers in the CFPB Complaint Database could render conclusions about servicing quality unreliable.

## Notes

1. The authors would like to thank Eugene Ericksen, Jonathan Falk, Drew Claxton, Sungi Lee, Tamas Batyi, Wendy Kim, and Christopher Yhun for their insightful comments and research. All errors and omissions are ours.

2. See, for example, "Annual report of the CFPB Student Loan Ombudsman," Consumer Financial Protection Bureau, October 2016, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf.

3. Angela Littwin, "Why Process Complaints? Then and Now," *Temple Law Review*, Vol. 87, 2015. Also see Kelly Thompson Cochran, "The CFPB at Five Years: Beyond the Numbers," *North Carolina Banking Institute*, Vol. 21, 2017, and Ian Ayres, Jeff Lingwall, and Sonia Steinway, "Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints," *Fordham Journal of Corporate & Financial Law*, Vol. 19, 2014.

4. The Oregon Department of Justice states that: "[t]he number of complaints about a business may not be a reliable measure as to whether it is appropriately conducting business." Statement available at https://justice.oregon.gov/complaints/.

5. In review of the federal student loan complaint rate, we use "Servicer Portfolio by Loan Status" data, available from the Department of Education at https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

6. In analyzing the CFPB Complaint Database, we restrict the set of complaints to those filed against servicers of student loans we have identified. The Complaint Database was downloaded on 5 July 2017.

7. Andrew Rutherford, "Self-Selected Samples," *Encyclopedia of Statistical Sciences*, John Wiley & Sons, Inc., 2006.

8. See letter from the Student Loan Servicing Alliance to the CFPB dated 19 July 2012, available at https://www.regulations.gov/document?D=CFPB-2012-0023-0028.

9. For example, the Department of Education accounts for differences in loan status across servicers' portfolios when comparing borrower satisfaction levels. See "Explanation of Allocation and Performance Measure Methodology," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/05312016/ExplanationQuarterEnd053116.pdf.

10. The Department of Education survey results are available for the quarters ended 31 March 2016 and 31 May 2016, available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing/servicer-performance#05312016.

11. We focus on the four federal loan servicers with Title IV Additional Servicing Contracts as of 2014.

12. The Office of the Attorney General in the New Hampshire Department of Justice claims that "[u]sers should judge a business's complaints history primarily on the disposition of the complaints and not on the number of complaints or on the fact that a complaint was filed." Statement available at https://business.nh.gov/ConsumerComplaint/index.asp. Similar statements are made by South Carolina Department of Consumer Affairs and the State of Hawaii Office of Consumer Protection. Statements available at http://www.consumer.sc.gov/consumer/ComplaintInstructions/Pages/default.aspx and http://web.dcca.hawaii.gov/OCP/OCP_NAMES/OCP_Disclaimer.aspx.

13. "Consumer Complaint Database API docs," Consumer Financial Protection Bureau, available at https://cfpb.github.io/api/ccdb/ and "Disclosure of Consumer Complaint Data," Docket No. CFPB-2012-0023, Bureau of Consumer Financial Protection, 2013.

14. We focus on the four federal loan servicers with Title IV Additional Servicing Contracts as of 2014.

15. See, for example, "Annual report of the CFPB Student Loan Ombudsman," Consumer Financial Protection Bureau, October 2016, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf.

16. "Consumer Complaint Database," Consumer Financial Protection Bureau, available at https://www.consumerfinance.gov/data-research/consumer-complaints/.

17. Andrew Rutherford, "Self-Selected Samples," *Encyclopedia of Statistical Sciences*, John Wiley & Sons, Inc., 2006, and Wilfrid J. Dixon and Frank J. Massey, Jr., *Introduction to Statistical Analysis*, McGraw-Hill Book Company, 1983.

18. For example, see the metrics and segmentation methodology used by the Department of Education to measure performance of loan servicers. "Explanation of Allocation and Performance Measure Methodology," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/05312016/ExplanationQuarterEnd053116.pdf.

19. "Federal Student Loan Portfolio," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

20. "The MeasureOne Private Student Loan Report," MeasureOne, 27 June 2017.

21. "Loans," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/types/loans.

22. Annual and aggregate federal loan amounts to each borrower are subject to limits set by the Department of Education.

23. "Federal Student Loan Programs," Federal Student Aid, an Office of the US Department of Education, December 2016, available at https://studentaid.ed.gov/sa/sites/default/files/federal-loan-programs.pdf.

24. The Department of Education used to guarantee student loans that private lenders originated under the Family Federal Education Loan Program (FFEL) but has ceased to do so after 30 June 2010.

25. "Interest Rates and Fees," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/types/loans/interest-rates.

26. "Current Student Loan Interest Rates," LendEDU, last updated 20 July 2017, available at https://lendedu.com/blog/student-loan-interest-rates.

27. "Private Student Loans," Consumer Financial Protection Bureau and US Department of Education, 29 August 2012, available at http://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf.

28. "Deferment and Forbearance," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance.

29. "Income-Driven Plans," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

30. Kelly D. Edmiston, Lara Brooks, and Steven Shepelwich, "Student Loans: Overview and Issues (Update)," The Federal Reserve Bank of Kansas City Research Working Papers, April 2013.

31 "Consumer Complaint Database," Consumer Financial Protection Bureau, available at https://www.consumerfinance.gov/data-research/consumer-complaints/.

32 "Mid-year snapshot of private student loan complaints," Consumer Financial Protection Bureau, July 2013, available at http://files.consumerfinance.gov/f/201308_cfpb_complaint-snapshot.pdf and "Annual report of the CFPB Student Loan Ombudsman," Consumer Financial Protection Bureau, October 2016, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf.

32 "Consumer Complaint Database API docs," Consumer Financial Protection Bureau, available at https://cfpb.github.io/api/ccdb/ and "Disclosure of Consumer Complaint Data," Docket No. CFPB-2012-0023, Bureau of Consumer Financial Protection.

34 "Disclosure of Consumer Complaint Narrative Data," Docket No. CFPB-2014-0016, Bureau of Consumer Financial Protection.

35 Ibid.

36 "Consumer Response Annual Report," Consumer Financial Protection Bureau, March 2017, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201703_cfpb_Consumer-Response-Annual-Report-2016.PDF. The resolution outcomes "Closed with monetary relief," "Closed with non-monetary relief, "Closed with explanation," and "Closed" were used beginning June 2012. We understand that "Closed with relief" and "Closed without relief" were used prior to June 2012 and relate to "Closed with monetary relief" and "Closed with explanation," respectively. "Closed with non-monetary relief" and "Closed" reflect new options beginning June 2012. The resolution outcomes "Closed with relief" and "Closed without relief" appear to be discontinued beginning 2013. "Consumer Response Annual Report," Consumer Financial Protection Bureau, March 2013, available at http://files.consumerfinance.gov/f/201303_cfpb_Consumer-Response-Annual-Report-to-Congress.pdf.

37 "Consumer Response Annual Report," Consumer Financial Protection Bureau, March 2017, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201703_cfpb_Consumer-Response-Annual-Report-2016.PDF.

38 Angela Littwin, "Why Process Complaints? Then and Now," *Temple Law Review*, Vol. 87, 2015, and Kelly Thompson Cochran, "The CFPB at Five Years: Beyond the Numbers," *North Carolina Banking Institute*, Vol. 21, 2017, and Ian Ayres, Jeff Lingwall, and Sonia Steinway, "Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints," *Fordham Journal of Corporate & Financial Law*, Vol. 19, 2014.

39 For example, the Office of the Attorney General of Virginia claims that "[f]iling of a complaint and entry in this database is not a finding of wrongdoing." Statement available at https://www.oag.state.va.us/consumer-protection/complaint/search/.

40 Andrew Rutherford, "Self-Selected Samples," *Encyclopedia of Statistical Sciences*, John Wiley & Sons, Inc., 2006, and Wilfrid J. Dixon and Frank J. Massey, Jr., *Introduction to Statistical Analysis*, McGraw-Hill Book Company, 1983.

41 Deborah Hensler et al., 1991, examined factors affecting claiming rates using a national household survey on the decision to seek any claiming actions. Hensler's analysis showed that "attributions of causation and fault are critical steps on the road that lead to tort liability claiming. Those who mostly blame others for their injury are 12 times more likely to consider claiming than those who blame themselves."

42 "Disclosure of Consumer Complaint Narrative Data," Docket No. CFPB-2014-0016, Bureau of Consumer Financial Protection.

43 Ibid.

44 Andrew Rutherford, "Self-Selected Samples," *Encyclopedia of Statistical Sciences*, John Wiley & Sons, Inc., 2006.

45 Sharon L. Lohr, *Sampling: Design and Analysis*, 2nd Ed., Cengage Learning, 2010.

46 "The Bureau notes the general acceptance by consumer and industry groups that normalization can improve data utility." See "Disclosure of Consumer Complaint Data," Docket No. CFPB-2012-0023, Bureau of Consumer Financial Protection.

47 The CFPB has proposed to collect from student loan servicers other information that would "provide the CFPB with a broader and deeper look into the student loan market." This data includes measures of income-driven repayment applications, re-certification applications, and data on servicer-borrower contact related to forbearance or income-driven repayment plans. Seth Frotman and John McNamara, "Increasing transparency in the student loan servicing market," Consumer Financial Protection Bureau, 16 February 2017, available at https://www.consumerfinance.gov/about-us/blog/increasing-transparency-student-loan-servicing-market/

48 "Explanation of Allocation and Performance Measure Methodology," Federal Student Aid, an Office of the US Department of Education, available at https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/servicer/05312016/ExplanationQuarterEnd053116.pdf.

49 Ibid.

50 Ibid.

51 Ibid.

52 A complaint is considered resolved without relief if the "Company response to consumer" field is tagged "Closed," "Closed with explanation," or "Closed without relief."

53 There is no financial cost to consumers for submitting complaints to the CFPB. According to the CFPB, the average time required to complete a complaint submission on the website is eight minutes. "Disclosure of Consumer Complaint Narrative Data," Docket No. CFPB-2014-0016, Bureau of Consumer Financial Protection.

54 Jennifer K. Robbennolt and Christina A. Studebaker, "News Media Reporting on Civil Litigation and Its Influence on Civil Justice Decision Making," *Law and Human Behavior*, Vol. 27, 2003.

55 Daniel S. Bailis and Robert J. MacCoun, "Estimating Liability Risks with the Media as Your Guide," Berkeley Law Scholarship Repository, 1996.

56 Jennifer K. Robbennolt and Christina A. Studebaker, "News Media Reporting on Civil Litigation and Its Influence on Civil Justice Decision Making," *Law and Human Behavior*, Vol. 27, 2003.

57 Deborah R. Hensler and Mark A. Peterson, "Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis," *Brooklyn Law Review*, Vol. 59, 1993.

58 Ibid.



## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For over half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from more than 25 offices across North America, Europe, and Asia Pacific.

## Contacts

For further information and questions, please contact the authors:

**Faten Sabry**
Bankruptcy Practice Chair
New York City: +1 212 345 3285
faten.sabry@nera.com

**David Cen**
Analyst
New York City: +1 212 345 3113
david.cen@nera.com

**Ignacio Franceschelli**
Senior Consultant
New York City: +1 212 345 2842
ignacio.franceschelli@nera.com



To receive publications, news, and insights from NERA, please visit **www.nera.com/subscribe**.

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant. Please do not cite without explicit permission from the author.*