WILMERHALE

April 9, 2018

**Via Electronic Filing**

The Honorable Robert D. Mariani
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Building & U.S. Courthouse
235 North Washington Avenue
Scranton, PA 18503

Jonathan E. Paikin

+1 202 663 6703 (t)
+1 202 663 6363 (f)
jonathan.paikin@wilmerhale.com

Re: *CFPB v. Navient Corp. et al.*, No. 3:CV-17-00101 (M.D. Pa)

Dear Judge Mariani:

Pursuant to the Court's March 5 order, Defendants respectfully submit the following response to the CFPB's February 27 letter. By way of background, Defendants repeatedly requested a meeting with the CFPB to discuss these issues. The CFPB agreed to meet on February 23, but then cancelled. The CFPB's characterizations of Defendants' positions are inaccurate and misleading, as set forth below.

I.  **Defendants Did Not Apply The Substantive Limitations Set Forth In The February 27 Letter And Accompanying Chart (CFPB Issue #1, at pages 1–3).**

Before this lawsuit was filed, the CFPB already had in its possession hundreds of thousands of pages of documents, testimony from several witnesses, and multiple written responses as a result of its investigation. In May and June of 2017, the CFPB served 48 document requests (although with subparts the requests exceeded 80). Counsel engaged in hours of calls with the custodians responsible for relevant subject areas, who were asked to review the requests and identify the locations of potentially responsive documents. Defendants collected more than 6 million potentially responsive documents and hired 35 full-time contract attorneys to assist in the review. After search terms were run against the material collected, Defendants hand reviewed more than 650,000 documents. To date, Defendants have produced close to 1.5 million pages. Defendants have substantially completed production of the documents they agreed to produce in response to the first set of requests.

Other than the specific objections discussed in Sections II–IV of this letter, Defendants placed *none* of the limitations on the searches or review protocols that they are accused of on pages 1–3 of the CFPB's letter and in Appendix A. For example, Defendants are not excluding the following:

- Responsive documents concerning the *ineffectiveness* of policies as opposed to the *effectiveness* of policies in response to Request 5.[1]

---

[1] *See* CFPB Appendix at p. 2–3.

WILMERHALE

April 9, 2018
Page 2

- Responsive documents in which *only* forbearance or *only* IDR is discussed as opposed to documents comparing forbearance and IDR in response to Request 7.[2]

- Responsive documents, including emails, that discuss the *proper* reporting code to use for borrowers with total and permanent disabilities whose loans have been discharged (i.e., not the AL code) in response to Request 23.

Defendants also did not use the word "analyses" or "evaluations" or "policies and procedures" as terms of art to exclude documents.[3] Indeed, it is difficult to conceive of how instructions could be given to contract reviewers to tag an "analysis" but not an "evaluation" as responsive. Moreover, many of the documents that the CFPB imagines were withheld have been in their possession for months and, in some cases, years.

The CFPB asserts that Defendants "failed to provide assurances that Defendants would conduct a reasonable search for the documents excluded by their formal responses." But, on November 10 and 13, the parties spoke by phone for over four hours during which Defendants described in detail the steps taken to respond to every document request that had been propounded. Two more calls were held on November 27 and 28 that cumulatively lasted over another three hours. Altogether, Defendants spent over *seven* hours explaining in detail their search process for each request, and providing assurances that they did not apply the substantive exclusions that they are now accused of making. Defendants did not hear anything further from the CFPB for 51 days, until January 18, 2017, when the CFPB raised the same issues as if the earlier discussions had not happened.

The CFPB says it "must treat the responses as limiting the scope of the search and production" because Defendants "refused" to confirm in writing "that they never imposed substantive limitations on their responses." But on February 5, Defendants wrote: "Specifically, you have asked us to confirm whether the use of certain words operates as a substantive limitation on Defendant's responses. They do not." On February 8, the CFPB acknowledged as much: "Thank you for informing us that your use of certain words in your responses to the [CFPB's] document requests does not operate as a substantive limitation on Defendants' responses and that you have made no categorical exclusions." The CFPB nevertheless raised the same issues again, and Defendants provided further written assurance on February 15: "As best we can ascertain, you seem to be concerned that there are instances where searches were conducted that resulted in an output of documents, and then reviewers excluded responsive documents by applying criteria narrower than your requests. We did not do that." As noted above, Defendants requested a meeting to discuss whatever concerns persisted, but the CFPB cancelled the meeting.

---

[2] Appendix at 4–5.
[3] Relevant to Requests 5, 7, 13, 15, and 16 to Navient Solutions. *See* CFPB Appendix.

WilmerHale

April 9, 2018
Page 3

Put simply, there is no merit to the CFPB's contention that Defendants imposed "substantive limitation[s]" on their production and no basis to compel additional discovery.

## II. A Hand Review Of A Million-Plus Emails Concerning Policies, Etc. That Are Not At Issue Is Unreasonable (CFPB Issue #2, at pages 3–5).

As part of the November discussions, Defendants resisted the CFPB's unreasonable demand that Defendants review internal emails related to nearly *any* policy, *any* notice, *any* training that was ever in place over a nine-year period without regard to whether the policy, notice, or training document was the basis for any of the CFPB's claims. When Defendants applied search terms designed to capture the set of materials requested, the result was over a million emails. Defendants explained that reviewing this volume was prohibitively expensive, especially considering their limited relevance. Defendants agreed to provide their search reports, and the CFPB promised that it would promptly review and propose modifications to narrow the scope. Defendants provided the reports on December 6. The CFPB waited two months, until February 8, to propose modifications. The CFPB's proposal did not narrow the focus to the policies, notices, or trainings actually at issue, and still required manual review of over a million emails. Again, Defendants requested a meeting, but the CFPB refused.

Defendants sought to negotiate search terms tailored to the policies and notices identified by the CFPB during discovery as being at issue. On August 4, 2017, Defendants conducted a 30(b)(6) deposition of the CFPB during which the CFPB produced a binder of 85 documents that were identified as the policies, procedures, trainings, and other evidentiary support for the allegations in the Complaint.[4] In response to subsequent document requests seeking additional policies, etc., at issue, the CFPB responded: "[T]he Bureau objects to this request on the ground that it has already produced documents responsive to this request at the Rule 30(b)(6) deposition that occurred on August 4, 2017." The CFPB has never identified policies, procedures, trainings, or disclosures beyond those in the binder as being at issue in this lawsuit.

Because the CFPB would not meet and confer, Defendants proceeded on their own to craft search terms tailored to the policies and procedures identified as being at issue. Defendants have since been hand reviewing over 100,000 emails that resulted from application of those terms. Although the CFPB identifies fifteen requests that are at issue, many overlap such that there are a total of seven categories in dispute. The first five are discussed in the CFPB's letter at pages 3–4. The last two appear only in the Appendix at pages 9–11, but are addressed here for completeness.

---

[4] The binder was the result of diligent efforts. The CFPB stated that "its attorneys … spent hundreds of hours preparing for the deposition." Plaintiffs' Motion For Enlargement of Time, at 12 (Dkt. No. 81).

WILMERHALE

April 9, 2018
Page 4

      **(1)    Emails relating to "policies, procedures, and guidance to employees relating to communications with borrowers about repayment options."**[5]  Defendants produced tens of thousands of pages of policies, procedures, flow charts, scripts, call agent guidance, notices, and training materials.  The CFPB also received borrower complaints about repayment options, summaries of how those complaints were addressed and resolved, and internal and external audits and reviews of communications about repayment options, including audits by the U.S. Department of Education.  The CFPB has identified two flowcharts relating to communications with borrowers about repayment options as being at issue.  Nevertheless, the CFPB demands hand review of approximately 480,000 emails and attachments related to every policy on the books.[6]  Defendants crafted search terms related to the policies identified by the CFPB as being at issue, which resulted in a universe of 61,048 potentially responsive documents that are being reviewed.  Non-privileged, responsive documents in this tranche will be produced.  There is no basis to compel additional discovery relating to policies that are not at issue.

      **(2)    Emails relating to "auditing, monitoring, and quality assurance relating to communications with borrowers about repayment options."**[7]  As noted, Defendants produced internal and external audits, including audits by the Department of Education, quality assurance reviews, and call monitoring reviews evaluating individual call agents on specific calls.  The CFPB demands that Defendants hand review 95,000 additional emails because some may note "an instruction that caused employees to provide no or incomplete information about IDR plans."  But the CFPB has the instructions and the audits, and the actions taken in response will show the results of those instructions.  In any event, as noted, Defendants are reviewing the emails and attachments related to the policies at issue, which would capture for those policies "an instruction that caused employees to provide no or incomplete information about IDR plans."  There is no basis to compel any additional discovery.

      **(3)    Emails relating to the "suitability, unsuitability, appropriateness, inappropriateness, advantages, disadvantages, benefits or costs of forbearance or any type of IDR plan for particular groups of borrowers."**[8]  The Education Department determines the suitability of forbearance, deferment, and the various repayment options offered by the federal government for particular borrowers.  For this reason, there are few documents where anyone at Navient Solutions discussed the "suitability, unsuitability, appropriateness, inappropriateness, advantages, disadvantages, benefits or costs of forbearance or any type of IDR plan for particular groups of borrowers."  Defendants cannot create documents that do not exist, and what has been found after diligent searches has already been produced.  Specifically, Defendants produced

---

[5] Requests 3, 4, and 5 to Navient Solutions.
[6] The volume of this demand alone is larger than the entire universe of 478,000 actually-relevant documents that the CFPB has been reviewing.  The CFPB complains that its review is "labor-intensive" and will require 2,000 days of attorney time, not counting the privilege review.  *See* Plaintiffs' Mot. For Enlargement of Time, at 11 (Dkt. No. 81).
[7] Request 6 to Navient Solutions.
[8] Request 7 to Navient Solutions.

WilmerHale

April 9, 2018
Page 5

thousands of contract documents and emails exchanged with the Department of Education, which will show the Department's directives on these issues.  And Defendants are producing the policies and procedures implementing those directives.  Aside from these documents, Navient Solutions did not generate documents specific to this request because it was not its role to do so.  To the extent there is a one-off discussion of the suitability or appropriateness of repayment options in emails, they will be found in the search described above.  Again, there is no basis to compel any additional discovery.

**(4)** **Emails relating to "communications with borrowers about renewal of IDR plans, including emails discussing any deficiencies or problems with those policies, procedures, or guidance."**[9]  Defendants produced more than 450 different types of notices regarding repayment options, including notices sent to borrowers regarding IDR renewal.  Defendants also produced evaluations of those notices and emails, data regarding IDR renewal rates, and documents exchanged with the Education Department regarding IDR renewal.  Although the CFPB identified one letter and one email notice as being at issue, it demands manual review of approximately 275,000 emails and attachments, almost all of which are unrelated to the letter and notice at issue.  Defendants crafted search terms tailored to the email and letter at issue, which resulted in 27,265 potentially responsive documents – the review of which will be complete this week.  The CFPB has no reasonable basis to demand any additional review or production.

**(5)** **Emails relating to "the terms of Navient Corp.'s contract with the Department of Education and Defendants' performance under that contract with respect to issues relevant to the [CFPB's] claims or their defenses."**[10]  Defendants produced thousands of contract documents and change requests; regular reports provided to the Education Department, such as call center metrics and IDR application rates; audits by the Department; borrower complaints received from the Education Department; and tens of thousands of emails exchanged with the Department.  The CFPB's statement that Defendants refuse to review and produce emails relating to "the terms of Navient' Corp.'s contract with the Education Department and Defendants' performance under that contract" is not true.  Defendants already hand reviewed over 100,000 emails and attachments exchanged with the Education Department relating to Defendants' performance under the contract and produced 50,000 responsive emails.  Defendants also expanded their search to emails between custodians responsible for analyzing revenues and costs under the contract.  The dispute is limited to whether Defendants should also hand review an additional 90,000 internal emails.  The CFPB argues these emails are "extrinsic evidence" relating to the parties' interpretation of the contract.  But the CFPB has yet to identify a contract term that it believes is ambiguous, and this is not a breach of contract action.  In any event, the parties' understanding of the contract requirements are contained in the thousands of

---

[9] Requests 13, 14, 15, 16, and 17 to Navient Solutions.
[10] Requests 1 and 2 to Navient Corporation.

WILMERHALE

April 9, 2018
Page 6

emails between the Department of Education and Defendants that have been produced. The burden of reviewing these additional emails is unjustified.

**(6) Emails relating to errors or problems in the processing, application, and allocation of borrower payments, the categorization of borrower inquiries related to such errors, and actions taken to address those inquiries.**[11] In the CFPB's supplemental response to Navient Solutions' Interrogatory Number 15, the CFPB averred that it is challenging Navient Solutions' policies for the categorization and escalation of payment processing errors. Defendants agreed to produce policies, procedures, and guidance related to these issues. The CFPB demands that Defendants also review approximately 63,000 emails, many of which have nothing to do with the policies identified. Defendants crafted search terms related to the policies at issue and are reviewing the results.

**(7) Emails relating to Navient Solutions' requirement that borrowers make a certain number of "consecutive, on-time principal and interest payments" to be eligible for cosigner release, and related communications to borrowers.**[12] The CFPB challenges statements made about the number of payments required for a cosigner to be eligible for release as guarantor on a loan. Defendants produced communications with borrowers about eligibility requirements for cosigner release and internal policies about how the requirements apply. During the investigation, Defendants also provided written responses and testimony regarding these requirements, which the CFPB cited in its 30(b)(6) deposition. As with the other issues above, Defendants crafted terms related to the requirements at issue and have reviewed the results. Responsive documents will be produced.

**III.    The CFPB's Demand For Drafts Of Notices Is The Same As Its Demand For Emails In Section II(4) Above (CFPB Issue # 3, at page 5).**

In response to Request 13 to Navient Solutions, Defendants produced *all* versions of responsive notices maintained in the files where notices are ordinarily kept. Drafts are not maintained in the repository, so to the extent drafts exist they would be found only as attachments to emails. Defendants produced emails with the Department of Education, which would include drafts proposed by or shared with the Department. The dispute is over whether Defendants should conduct a search of internal emails for additional drafts. As discussed, Defendants crafted search terms designed to return emails related to the notices identified as being at issue, and to the extent drafts of those notices exist as attachments to internal emails, they will be contained in that review.

---

[11] Request 18 to Navient Solutions.
[12] Requests 19 and 21 to Navient Solutions.

WILMERHALE

April 9, 2018
Page 7

### IV. The Date Parameters Applied Are Significantly Broader Than The Periods Of Alleged Wrongdoing (CFPB Issue #4, at pages 5–6).

As a general matter, the default rule applied to the Defendants' searches was January 1, 2010 through the current date, which is a time period of over *eight years*. The CFPB selected January 1, 2010 (or later) as the temporal starting point for the information it requested in the eight CIDs it served during the multi-year investigation. That date precedes the date the CFPB assumed legal authority by more than a year and a half, and thus covers conduct that the CFPB has no authority to police. If the CFPB believed 2009 was the appropriate start time, it should have said so in the investigation, and Defendants would have used that date. The costs and expense of recreating searches that were done during the investigation to capture an additional six months of material with no apparent connection to the allegations in the Complaint is unreasonable.

Contrary to the CFPB's letter, Defendants did use January 1, 2009 as the start date for searches related to the Department of the Education contract, communications with the Department of Education, and emails relating to costs and revenues under the contract. This date was also used for the subpoena to the Department of Education. Thus, also contrary to the CFPB's letter, there is no "inconsistency" in the dates Defendants applied for this material. What is inconsistent, however, is that the CFPB now says that June 17, 2009 (and not its previous demand for January 1, 2009) should have been the start date for these searches, which means the time and expense spent by Defendants and the Department of Education sifting through documents between January 1, 2009 and June 16, 2009 was unnecessary. Other than documents relating to the Department of Education contract, the CFPB has yet to articulate the relevance of documents created prior to January 1, 2010.

For discovery related to Counts in the Complaint that specify the period of alleged wrongful conduct, the CFPB claims that "Defendants seek to limit discovery to time periods specified in the Complaint." That is not true. Defendants have, in fact, expanded time periods beyond the dates alleged in the Complaint. The allegations in the Complaint regarding renewal notices date from January 1, 2010 through March 18, 2015 for Count III, and from January 1, 2010 through December 1, 2012 for Count IV. For these counts, Defendants have agreed to produce responsive documents from January 1, 2010 to December 31, 2015, which postdates Count III by *nine months* and Count IV by *more than three years*. The CFPB's demand for documents created after January 1, 2016 makes no sense. There would be no material discussions about long defunct notices by that point.

Respectfully submitted,

Jonathan E. Paikin