

1700 G Street NW, Washington, DC 20552

April 9, 2018

**Filed Via ECF**

The Honorable Robert D. Mariani
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re:    *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Mariani:

      Pursuant to the Court's March 12, 2018 order (Doc. 80), the Bureau respectfully submits this response to Defendants' March 6, 2018 letter (Doc. 79). At the outset, it is important to note that, while Defendants seek relief on various discovery disputes, they did not confer with the Bureau to seek agreement concerning those issues. Defendants have not articulated why an agreement could not be reached on the issues, as required by Local Rule 26.3.

## I.    Defendants' "counting" objection to the Second RFPs is not well-founded.

      On February 28, 2018, the Bureau served its second set of requests for production on Navient Solutions ("Second RFPs"). A194-195.[1] On March 5, Defendants' counsel notified the Bureau that Navient Solutions would not be responding to the Second RFPs. A194. Defendants argued that between the first set of requests for production to Navient Solutions ("First RFPs") and the Second RFPs, the Bureau had served a total of 120 RFPs on Navient Solutions, thereby exceeding the limit of 50. Because the First RFPs contained 26 requests and the Second RFPs contained 17 requests, on March 6, the Bureau asked Defendants' counsel how they were counting the RFPs to arrive at the figure of 120. A193. Defendants' counsel provided no counting methodology; instead, they merely described how two RFPs out of the 43 served by the Bureau supposedly contained a total of 30 requests. *Id.* Later that same day, Defendants filed their letter with the Court, still not explaining how they arrived at their total count of 120 RFPs.

      On March 30, 2018, Navient Solutions provided written responses to the Second RFPs. In those responses, Navient Solutions indicated that, though the issue of the Second RFPs will be discussed at the Court hearing on April 17, "Navient Solutions has nevertheless begun the steps necessary to be in position to promptly produce, or make available for inspection, documents responsive to these Requests in the event the Court permits them to be served." A210-211. The Bureau requests that the Court permit the Second RFPs for the two reasons discussed below.

### A.    Because Defendants have not explained how they have arrived at their count of 120 RFPs, the objection should be considered waived.

      Defendants have not provided the Bureau or the Court with any explanation as to how they reached their count of 120 RFPs so that the propriety of the count can be determined. In the

---

[1] "A__" refers to a page in the appendix being filed with this letter.

absence of adequate information to assess Defendants' objection that the Bureau has supposedly exceeded the allowable number of RFPs, Defendants should be deemed to have waived the objection. *See Avante Int'l Tech., Inc. v. Hart Intercivic, Inc.*, 2008 WL 2074093, at *3 (S.D. Ill. May 14, 2008) (general objection regarding counting waived where party "has not specified which of the 'discrete subparts' it counts as separate interrogatories"); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 756631, at *6 n.6 (D. Kan. Mar. 8, 2007) (party waived "general objection" concerning subparts by not specifically explaining the objection).

In addition, by not explaining to the Bureau how they have counted 120 RFPs, Defendants have not made "a good faith effort to resolve by agreement the issues raised . . . without the intervention of the court," as required by Local Rule 26.3. *See Ott v. Mortg. Investors Corp. of Ohio, Inc.*, 2015 WL 691643, at *4 (D. Or. 2015) (ordering responses to interrogatories where party did not meet-and-confer concerning counting issue). If Defendants had to explain their count to the Bureau, the parties could have discussed whether Defendants' own RFPs exceeded the allowed limits, and whether any compromise was possible without Court intervention. *Id.* (criticizing party that took "inconsistent position" by counting opposing party's discovery requests using a different methodology from that applied to its own requests, and noting that the meet-and-confer process, if followed, may have revealed this inconsistency).

If the counting methodology that Defendants appear to be proposing is applied to their own RFPs, they would almost certainly exceed the RFP limits. For example, Request #5 from Navient Corporation sought: "All Communications relating to this Action or the allegations in the Complaint, including internal Communications and external Communications with the U.S. Department of Education or any other federal agency or official, States Attorney General, Borrowers, members and/or committees of the U.S. Congress, consumer advocacy organizations, and/or the media." A40. Rather than serving many separate requests, each seeking communications relating to one allegation or a set of related allegations, Navient Corporation served a single, broad request that in one fell swoop encompasses each of the Complaint's 199 allegations. Additionally, this request specifies six categories of communications for each allegation. Under Defendants' approach, which appears to automatically count subparts, Request #5 could be counted as hundreds of separate requests. This sort of request – where a party seeks all documents relating to the entire complaint – contains so many discrete requests that courts have stricken such requests. *See Carbajal v. Warner*, 2015 WL 4456190, at *4 (D. Colo. July 21, 2015); *Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575, 586 (N.D. Tex. 2016). While the Bureau, to minimize disputes, did not lodge an objection concerning the number of discrete requests encompassed by Defendants' RFPs, it is problematic for Defendants to now suggest that the Bureau should be subject to a standard that they cannot meet themselves.

Defendants' failure to justify its count of 120 RFPs should not be excused. Defendants clearly did a count, and there is no reason they could not have explained that count. In any event, the time to do so has passed, especially in light of Defendants' rapid-fire escalation of the issue to the Court. The objection has not been properly presented and should be deemed waived.

**B.  Each request in the Second RFPs should be counted as a single request because each clause specifies the type of detail that the Bureau is seeking.**

Though the Bureau does not know how Defendants arrived at their tally of 120 RFPs, the Bureau does know that its own requests do not exceed 50.

While FRCP 33 provides that "discrete subparts" of interrogatories should be counted separately towards the limit of 25, there is no analogous provision in FRCP 34. But even in the context of Rule 33, courts have made clear that an interrogatory that specifies the expected level of detail constitutes a single interrogatory. *See, e.g.*, *Kates v. Packer*, 2017 WL 3118774, at *4 (M.D. Pa. July 21, 2017) (explaining that subparts addressing a "single topic" should not be separately counted); *Medigus Ltd. v. Endochoice, Inc.*, 2016 WL 5791409, at *2 (D. Del. July 19, 2016) (noting that a single interrogatory may "list[] specific types of information that are both logically and factually related"); *Simon v. State Farm Lloyds*, 2015 WL 12777219 (S.D. Tex. Apr. 9, 2015) ("As to the subparts of the interrogatories, they are not discrete questions, . . . but are an effort to guide Plaintiff's answers to an appropriate level of thoroughness and specificity"); 8B Wright, Miller & Marcus, *Federal Practice and Procedure* § 2168.1 (3d. ed. 2010) (noting that subparts "directed at eliciting details concerning a common theme should be considered a single question"). Even if the Court were to use Rule 33 case law as a guide, the subparts in the Bureau's RFPs should not be counted separately. This is evident from the two RFPs discussed in Defendants' letter.

Request #5 of the First RFPs seeks documents relating to the adequacy, inadequacy, effectiveness, ineffectiveness, appropriateness, or inappropriateness of Navient Solutions's materials relating to communications with borrowers about forbearance and income-driven repayment plans. A100. Each subpart of Request #5 is entirely subsumed within Request #5 because it specifies a type of responsive document that might exist. Providing examples of documents that fall within the scope of a request does not transform that request into multiple, discrete requests. Similarly, Request #34 seeks all data regarding any borrower who was unable to make their standard payment amount. A216-217. The Bureau could have phrased the request using those words, but instead attempted to guide Navient Solutions concerning subcategories of such borrowers and what types of data might exist. It is appropriate for a request to be centered on a single topic, and for all parts of the request to be subsumed within that topic, as is the case with this request.

The Bureau, of course, could have drafted Requests #5 and #34 without any subparts, and the universe of responsive documents would have been the same. The Bureau was doing nothing more than providing detail concerning the types of documents sought by each request, without expanding the request in any way. Defendants' apparent approach to counting subparts of RFPs as separate requests would incentivize broad RFPs while penalizing parties who identify subcategories of documents to provide greater specificity as to what the request is seeking.

To demonstrate that the Bureau has not exceeded the allowed number of requests, the Bureau is filing with this letter a chart containing the full text of the 43 RFPs served on Navient Solutions. The chart also shows how the Bureau could have worded each request in an abbreviated way that would have sought the same information and avoided the use of subparts, but that would not have provided detail as to the type of documents that the Bureau was seeking.[2]

_____

[2] If the Court determines that the Bureau has served a number of RFPs on Navient Solutions that exceeds the limit of 50 allowed by the joint case management plan, the Bureau respectfully requests that the Court find that good cause exists to permit any such requests in

**C.     Defendants' other arguments about the Second RFPs have no basis.**

Defendants assert two other complaints regarding the Second RFPs. First, they claim that the Second RFPs should have been served sooner. The Bureau is unaware of any authority prohibiting a party from serving document requests 2.5 months before the conclusion of the original fact discovery period, nor have Defendants cited any. Second, Defendants reference the volume of data sought by the Bureau. However, in its responses to the Second RFPs, Navient Solutions indicated that it is willing to give the Bureau access to certain of the data that the Bureau has requested if the Second RFPs are allowed. A219-232. The Bureau intends to meet and confer with Defendants regarding their offer to provide access.

## II.     Defendants' untenable positions are illustrated by their Rule 26(a)(1) disclosures.

Defendants take issue with the Bureau's Rule 26(a)(1) disclosures, which the Bureau addresses in Section III.C. But Defendants' own disclosures raise significant concerns.

*First*, Defendants disclosed twelve current employees in their Rule 26(a)(1) disclosures, and their subjects of discoverable information show they likely have documents responsive to the Bureau's requests. A204. Yet it does not appear that Defendants have searched for relevant emails from the majority of those twelve employees. As we articulated in our February 27, 2018 letter to the Court, Defendants have selectively picked what categories of emails they are willing to produce, deciding that they will only produce external emails between Navient Solutions and the U.S. Department of Education, as well as emails relating to Pioneer's activities. Doc 74. Defendants cannot legitimately contend that they can call twelve employees as witnesses without allowing discovery of their communications concerning their areas of relevant knowledge. Defendants appear to want to give these witnesses a free pass to testify as to whatever they want, unconstrained by their own past communications. And because Defendants have refused to produce many of those employees' emails, the Bureau is now significantly delayed in assimilating the information necessary to begin noticing those employees for depositions.

*Second,* while Defendants have taken the position that the Bureau should have achieved a standard approaching perfection in its Rule 26(a)(1) disclosures, Defendants' own Rule 26(a)(1) disclosures fall far short of that standard. On March 15, 2018, Defendants supplemented their initial disclosures to add six current employees to the previous six that had been disclosed. A3; A204. It is unclear why Defendants waited ten months from the beginning of discovery to add six of their own employees to their initial disclosures. In addition, even now, Defendants continue to write that they "will supplement" their initial disclosures with the names of witnesses from the Department of Education at some later date. A205. To put this in context, Defendants have made their contracts with the Department of Education the center of their defense, asserting it in their Answer as the response to over 30 of the Bureau's allegations and making it the basis of five affirmative defenses. Doc. 61.

---

excess of 50. *See, e.g., Iconfind, Inc. v. Google, Inc.*, 2011 WL 3501348, at *5 (E.D. Cal. Aug. 9, 2011). The Bureau believes that good cause has been demonstrated because the Bureau, rather than propounding broadly worded requests, tried to thoroughly describe the types of documents it was seeking, and all of the requests are relevant to the Bureau's claims.

The Bureau does not, in principle, take issue with the idea that a party may learn of new witnesses late in the discovery process and that, should this occur, the parties will work together to seek an appropriate extension of the discovery period to allow all late-disclosed witnesses to be deposed. But given Defendants' insistence on near perfection in the Bureau's initial disclosures, it is worth emphasizing that Defendants do not come close to meeting that standard.

### III.   Defendants have grossly mischaracterized the Bureau's investigation and the Bureau's conduct in discovery.

#### A.   Defendants rehash their misleading characterization of the investigation.

In a familiar refrain, Defendants continue to mischaracterize the Bureau's investigation that preceded this case. The Bureau did not conduct litigation-style discovery during its investigation, largely at the urging of Defendants. As the Bureau previously explained, while the Bureau conducted an investigation sufficient to identify the violations alleged in the Complaint, the amount of information sought and obtained by the Bureau during the investigation was far short of what is common in discovery in a complex civil litigation, as the Bureau did not have to obtain the full quantum of evidence necessary to meet a plaintiff's burden to prove claims in a court of law. Doc 39, at 2-4. And critically, to limit the breadth of the investigation due to claims of burden from Defendants, the Bureau crafted its requests so that the searching and production of internal emails was not required, and even the production of external emails was limited to emails relating to consumer complaints. *Id.* at 4. The Bureau also granted a large number of Defendants' modification requests to address burden concerns. *Id.* Defendants' efforts to substantially limit the investigation should not be rewarded by disallowing the discovery that is necessary to allow for a complete record to be presented to the factfinder.

#### B.   The Bureau has been working diligently to complete a reasonable search for documents responsive to the broad requests served by Defendants.

Defendants request that the Court direct the Bureau to produce documents on a rolling basis. But the Bureau is already doing that (just as Defendants continue to do as well). Moreover, the Bureau began producing documents in this case on August 4, 2017, six months before Defendants began doing so, despite the fact that the Bureau served its requests for production two weeks before Defendants served theirs. And even when Defendants produced documents for the first time on January 29, 2018, they did so in a format that did not comply with the Stipulation and Order Regarding Technical Specifications for Discovery. They did not correct the issue until March 15, 2018, one month after the Bureau brought it to Defendants' attention.

The Bureau has been diligently reviewing 478,000 documents in an effort to locate documents responsive to Defendants' requests. Defendants' suggestion, however, that there is a minimum percentage of documents that the Bureau should be producing is unfounded. Defendants issued very broad requests, and to be as responsive as possible to those requests, the Bureau gathered a large volume of documents from approximately 40 custodians and applied broad search terms. It should not be surprising that the number of responsive, non-privileged documents produced by the Bureau will be relatively small, and far fewer than the number in Defendants' possession, custody, or control. This is because it is Defendants' conduct that forms the basis of the claims in this case, not the Bureau's. In addition, many of the Bureau's responsive documents are privileged because Bureau personnel routinely engage in pre-

decisional deliberations over government decisions and policies, or because they reflect legal advice or work product of Bureau attorneys.

Though the Bureau's efforts to locate non-privileged responsive documents have taken longer than anticipated, the Bureau is working diligently to complete its production. But Defendants' complaints concerning the Bureau's efforts cannot be squared with their failure to even begin searching for numerous categories of emails and other highly relevant documents responsive to the Bureau's requests.[3] Defendants cannot insist on a timeframe for the Bureau's production that they cannot meet because they continue to refuse to search for relevant emails and other documents. As to documents that Defendants have agreed to produce, Defendants have not completed production of such documents. And to the extent Defendants are able to finish producing the documents they have agreed to produce earlier than the Bureau, that is because they have unjustifiably restricted that set of documents by refusing to search for the vast majority of emails the Bureau has requested, as well as other documents.

Defendants have also asserted that the Bureau "possesses a number of declarations, but none of them have been produced." The Bureau informed Defendants on September 18, 2017 that it would not be producing witness statements, citing case law holding that witness statements are privileged. A152. Until Defendants' letter to the Court, Defendants did not express disagreement with that position. In the interest of compromise, the Bureau has produced all declarations it has obtained. A197-200. As with other "issues" that Defendants raised with the Court, this too could have been resolved by conferring with the Bureau.

## C.     The Bureau properly identified and removed potential consumer witnesses in its Rule 26(a)(1) disclosures and interrogatory responses.

In its investigation, the Bureau uncovered evidence supporting all of the alleged violations in the Complaint, and it produced that evidence during a Rule 30(b)(6) deposition on August 4, 2017. For example, with respect to its steering claim, the Bureau provided a list of call recordings in which steering occurred, data showing the effect of interest capitalization on borrowers whom the Bureau believes were likely placed into forbearance improperly, flow charts guiding Navient representatives to not offer income-driven repayment (IDR) in certain circumstances where IDR might be beneficial, and emails from employees of a third-party counseling service who remarked upon how borrowers they were counseling would ask Navient representatives for IDR, but the representatives instead would push them into forbearance.

The Bureau's Rule 26(a)(1) disclosures made at the outset of the case reflect the fact that, while the Bureau had evidence supporting its allegations, the Bureau could not commit to specific witnesses at that juncture, especially in light of the fact that the investigation had been focused mostly on systemic issues, not on identifying individual witnesses. Thus, the Bureau

---

[3] The meet-and-confer process regarding Defendants' refusal to search for these documents included four teleconferences and eleven substantive letters over several months. During that time, the Bureau did not involve the Court because it believed an agreement could be reached. But finally, it became clear to the Bureau that Defendants were unwilling to conduct a reasonable search for wide swaths of documents, and despite suggesting that they might be willing to produce more documents, they repeatedly refused to accept proposals put forth by the Bureau.

indicated, in the first iteration of its Rule 26(a)(1) disclosures, that "[t]he Bureau has received some information from Defendants about consumers with complaints against Defendants, and the Bureau has also received thousands of complaints from consumers about Defendants," and "[d]uring discovery, the Bureau will seek to identify specific consumers who are likely to have discoverable information that the Bureau may use to support its claims." A16-17.

On October 20, 2017, the Bureau supplemented its Rule 26(a)(1) disclosures with a list of 58 consumers (A162-166) whom the Bureau determined "were likely to have discoverable information that the Bureau may use to support its claims." FRCP 26(a)(1)(A). The Federal Rules encourage parties to include all possible witnesses to avoid the risk of sanctions: "Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26(a) or Rule 26(e) may not use or call that witness to supply evidence . . ., 'unless the failure was substantially justified or is harmless.' This sanction creates an incentive to be over-inclusive, rather than under-inclusive." *Roberts v. Legacy Meridian Park Hosp., Inc.*, 2014 WL 294549, at *16 (D. Or. Jan. 24, 2014); *see also United States v. Merck-Medco Managed Care, LLC*, 223 F.R.D. 330, 334-35 (E.D. Pa. 2004) (where defendants possessed more information about potential witnesses than the government, defendants' arguments concerning over-disclosure rang hollow).

In good faith, the Bureau included each consumer on its supplemental disclosures based on communications with the consumers. But the Bureau does not have borrowers' complete servicing records in its possession; that information resides with Defendants. (The Bureau has requested that information in its Second RFPs). And because consumers' understanding of their loans can be incomplete or incorrect, it was certainly possible that some consumers whom the Bureau disclosed might need to be removed as discovery progressed. This is normal in discovery, and it is why Rule 26(e)(1) allows a party to "supplement or correct" its disclosures. The Bureau did exactly that – supplementing its initial disclosures after re-interviewing many of the consumers it identified. A183-189.

The Bureau will not speculate as to why Defendants selected borrowers KB and SC[4] to be deposed first out of the 58 consumers listed. In any case, while both consumers had been interviewed by a Bureau investigator, it became evident during their depositions that they had substantial confusion about their experiences with Navient and that the Bureau would not rely on them to support its claims. The Bureau removed them from its initial disclosures, just as it did for others of the 58 consumers who had not been deposed.

Three additional borrower depositions have since occurred, and all demonstrate the steering conduct described in the Complaint. Borrower GJ was not presented with IDR as an option in 2010 when he called Navient and indicated an inability to afford his payments, and thus he enrolled in forbearance. One year later, he was informed about IDR and enrolled with a $0 payment amount. Similarly, borrower JB was receiving food stamps at the time he called Navient in 2016 seeking advice about repayment options; he was only advised about forbearance despite expressing concerns about interest capitalization. About six months later, he learned about IDR from a different servicer and enrolled with a $0 payment amount. Finally, borrower CP's deposition revealed that she enrolled in forbearance in 2011 for over one year, following a December 2010 phone call in which a Navient representative sent her an application for

---

[4] The Bureau is identifying borrowers by their initials due to potential privacy concerns.

7

forbearance but not for any other repayment options. It was not until several years later, following a default, that she successfully enrolled in IDR.

While Defendants complain about the Bureau's removal of borrowers KB and SC from the Bureau's Rule 26(a)(1) disclosures, Defendants supplemented their Rule 26(a)(1) disclosures to add those consumers. A204. Thus, even though the Bureau has determined that it will not rely on those two consumers, Defendants have concluded that taking their depositions resulted in some value to their case, so it is not clear what harm they suffered from doing so.

Defendants have requested an increase of the deposition limit, apparently because of the Bureau's removal of those two witnesses from its Rule 26(a)(1) disclosures. The Bureau notes that, on February 6, 2018, in response to an email from Defendants' counsel expressing concern about the limit of 20 depositions, the Bureau invited Defendants to propose a modification of the case management order (A173), but they never made any request to increase the limit before escalating the issue to the Court. The Bureau believes it acted properly in preparing its Rule 26(a)(1) disclosures, then amending them through the course of discovery. Nonetheless, the Bureau consents to an increase in Defendants' limit to 22 depositions to address their concern. And if Defendants seek more than 22 depositions, the Bureau will confer about such a request.

Defendants also complain that over 50 individuals are named in response to an interrogatory seeking every individual who "has or *might* have information or knowledge relating to the allegations in the Complaint against Navient Solutions." A51 (emphasis added). Having served such an exceedingly broad interrogatory, Defendants cannot be heard to complain that the Bureau identified individuals who meet that standard.

Finally, Defendants assert that some of the consumers describe conduct that, according to Defendants, predates the Bureau's authority. But, even assuming that Defendants' contention is correct, it is well-established that parties are entitled to seek discovery of "[i]nformation concerning events that substantially preceded the occurrence of the incident that is the basis for the suit" because it "may shed important light on the facts directly relevant to a claim or defense, and thus may be relevant for discovery purposes." 6 James Wm. Moore et al., *Moore's Federal Practice* § 26.41[12] (3d ed.). Thus, the Bureau has appropriately disclosed these individuals who may have been steered prior to the date upon which Defendants contend that the Bureau's authority began.

To summarize the foregoing, the Bureau respectfully requests that the Court allow the Second RFPs. As to the other issues raised in Defendants' letter, it is not clear that any relief is needed from the Court: the Bureau is producing documents on a rolling basis, has produced witness declarations, and has agreed to increase the deposition limit for Defendants.

Thank you for your time and consideration.

Sincerely,

    /s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
Consumer Financial Protection Bureau

Cc:    All counsel (via operation of ECF)