## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL             :
PROTECTION BUREAU,             :
                              :
        Plaintiff,        :
                              :   **3:17-CV-101**
   v.                     :   **(JUDGE MARIANI)**
                              :
NAVIENT CORPORATION, et al.,   :
                              :
        Defendants.        :

### MEMORANDUM OPINION

### I. INTRODUCTION

Through this lawsuit, the Consumer Financial Protection Bureau ("Plaintiff") seeks to prove that Navient Corporation, Navient Solutions, Inc., and Pioneer Credit Recovery, Inc., (collectively "Defendants"), committed various violations of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531, 5536, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e, and Regulation V of the Fair Credit Reporting Act, 12 C.F.R. §1022.42. (Doc. 1). Presently before the Court are several disputes that have arisen during the course of discovery.

The first set of disputes came to the Court's attention on January 5, 2018. Per the procedure of the Court, Defendants, instead of filing a motion, filed a brief letter with the Court identifying the dispute and requesting a telephone conference. (Doc. 68). The Court set a date for a telephone conference and directed that, before the conference would take

place, "Plaintiff shall submit a concise letter to the Court briefly outlining its position with respect to Defendants' letter." (Doc. 69). After Plaintiff responded with a somewhat lengthy letter, (Doc. 70), the Court held a telephone conference on January 18, 2018. (Doc. 76). After hearing from each side, the Court made clear that, while it understood each side's legal arguments, it was having difficulty identifying what was specifically being sought by Defendants and, therefore, the Court did not have enough information to issue a ruling on the matter. (*Id.* at 34-35). Accordingly, the Court ordered the parties to file a joint statement identifying what was in dispute—that is, "what documents, what kinds of documents, and in connection with what claims." (*Id.* at 35-36). The parties, however, disregarded the Court's Order and filed two separate statements on February 8, 2018. (Docs. 72, 73).

On February 27, 2018, while those disputes remained pending, Plaintiff filed a lengthy letter with the Court requesting a telephone conference to address several new disputes that had arisen between the parties. (Doc. 74). The Court scheduled a telephone conference and directed Defendants to file a concise letter before that time which briefly outlined their position with respect to Plaintiff's letter. (Doc. 78). Before responding to Plaintiff's letter, however, Defendants filed a lengthy letter of their own which identified different disputes that they wished to have discussed during the scheduled telephone conference. (Doc. 79). Given the breadth of the disputes raised, the Court cancelled the telephone conference and ordered the parties to appear in person to discuss all pending

discovery disputes. (Doc. 80). Additionally, the Court ordered each side to respond to the other side's letter. (Id.). On April 9, 2018, Defendants and Plaintiff filed their respective lengthy responses. (Docs. 83, 84).

The parties appeared before the Court on April 17, 2018. While some of the disputes had resolved themselves by that time, the majority of the disputes remained pending. Each side was afforded ample time to present their arguments as to why certain discovery should or should not be allowed. For the reasons that follow, the Court will sustain in part and overrule in part Plaintiff's objections to Defendants' requests for production of documents, and sustain in part and overrule in part Defendants' objection to Plaintiff's requests for production of documents.[1] Further, in light of the extensive number and scope of discovery requests propounded to date and for the reasons discussed during the April 17 conference, the Court will order that the parties serve no additional interrogatories or requests for production of documents beyond those which have already been served.

## II. ANALYSIS

The Court will address each dispute individually. To begin with, however, the Court will briefly explain two general principles that have guided the Court's rulings. First, the parties' arguments have tended to conflate relevancy in the context of discovery with admissibility at trial. Nevertheless, as both parties are aware, Federal Rule of Civil

---

[1] Additionally, during the in-court conference, the Court granted Defendants' request to increase the per side deposition limit from twenty depositions to thirty depositions.

Procedure 26 provides, in part, that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." FED. R. CIV. P. 26(b)(1). Further, "[i]t is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999); *see also In re MSTG, Inc.*, 675 F.3d 1337, 1346 (Fed. Cir. 2012) ("In general, the Federal Rules of Civil Procedure promote a 'broad and liberal' policy of discovery 'for the parties to obtain the fullest possible knowledge of the issues and facts before trial.'" (quoting *Hickman v. Taylor*, 329 U.S. 495, 501, 507, 67 S. Ct. 385, 91 L. Ed. 451 (1947))). Accordingly, the Court will not sustain a relevancy objection unless it can determine at this early stage that the materials sought cannot, as a matter of law, have any possible relevance to the present matter.

Second, both parties have raised proportionality arguments. Federal Rule of Civil Procedure 26 provides, in part, that

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

FED. R. CIV. P. 26(b)(1). The matter before the Court is a massive piece of litigation which raises multiple important issues that have the potential of impacting thousands, if not hundreds of thousands, of student loan borrowers. The amount in controversy is potentially into the hundreds of millions of dollars, (April 17, 2018, Hr'g Tr. at 40), and every party

4

involved is a sophisticated corporate or government entity with significant resources at its disposal. Accordingly, given that these factors weigh in favor of extensive discovery being proportional to the needs of the case, the Court is not inclined to sustain a proportionality objection without a showing that the sought after material is unimportant to the issues in this case and the burden or expense of producing such material is excessive in comparison to the size of this litigation.

With those guiding principles in mind, the Court will now turn to the specific discovery disputes raised by the parties.

### A. Documents Related to Policies and Guidance Considered
### by Plaintiff and the Department of Education

Defendants first argue that, based on several requests for production of documents that they served on Plaintiff, Defendants are entitled to documents related to proposed or final policies and guidance considered by Plaintiff and the Department of Education.[2] (Doc. 68 at 1). According to Defendants, this includes "information received from third parties, such as borrower surveys and complaints, and internal and external communications with stakeholders such as the Department of Education, State Attorneys General, borrowers, members of Congress, and consumer advocacy organizations." (Doc. 72 at 3). Defendants have identified a list of "fourteen publicly issued rules, regulations, or guidance that Defendants believe are clearly relevant to the administration of the government contracts

---

[2] Defendants specified that they are not seeking to have Plaintiff produce the documents that have been officially published because those documents are in the public domain. (Doc. 76 at 8-9).

and federal regulations governing federal student loan servicing and collection practices at issue in the Complaint." (*Id.*).

Plaintiff argues that unpublished, predecisional views of, and internal discussions among, Plaintiff's staff are not binding on Plaintiff and are therefore not relevant to present action. (Doc. 73-1 at 4). Stated otherwise, Plaintiff's position is that, because unpublished views of an agency employee or group of agency employees are not official agency positions, they carry no legal significance and are thus have no relevance. (Doc. 70 at 1-2). Further, Plaintiff's contend that Defendants have failed to show that these documents are relevant because they have not shown that Defendants were aware of them and thus could have based their behavior on them. (Doc. 73-1 at 4; April 17, 2018, Hr'g Tr. at 62).

Defendants reply that these documents are relevant because communications, internal and external, regarding policies or guidance that touch upon issues in this case are relevant to whether Defendants acted reasonably. (Doc. 76 at 9-10, 22; April 17, 2018, Hr'g Tr. at 59-60). For example, these documents could show that Plaintiff had internal policy debates about what conduct was reasonable and unreasonable and "the fact that there [were] legitimate policy debates about the range of reasonableness demonstrates that the conduct here was not so unreasonable as to justify massive fines." (Doc. 76 at 24-25). Further, Defendants argue that these documents are relevant because Defendants are vendors of the Federal Government through contracts with the Department of Education, and therefore many of the actions they took were at the direction of, or with the approval of,

the Department of Education. (*Id.* at 6-8; April 17, 2018, Hr'g Tr. at 59-60). Thus, if there was a policy debate relevant to the issues in this case between Plaintiff and the Department of Education, Defendants contend that they are entitled to know if Plaintiff lost that policy debate and is bringing the present action in an effort to vindicate its position. (Doc. 76 at 22-23).

The position Plaintiff takes is not without support. In *United States v. Farley*, the United States sued Farley because he failed to notify the Department of Justice and the FTC when the purchases he made of a particular stock triggered a reporting requirement under Section 7A of the Hart–Scott–Rodino Antitrust Improvements Act ("HSR Act"), 15 U.S.C. § 18a(a)(3)(B). 11 F.3d 1385, 1387 (7th Cir. 1993). During the course of litigation, the United States refused to turn over certain requested documents on the basis of the work product and deliberative process privilege. *Id.* at 1388. The dispute was ultimately whittled down to nine documents. *Id* at 1388-89. The contested "documents included memoranda of FTC staff members and discussions of the Farley matter, as well as documents containing the FTC staff's views on the investment-only exemption and recommendations for future action." *Id.*

On appeal of the District Court's order to produce those documents, the Seventh Circuit first found that the nine documents fell within the deliberative process privilege and therefore "the government could only be required to produce them if Farley made a showing that his need for the documents outweighed the government's interest in not disclosing

them." *Id*. at 1389. Turning to the issue of need, the Court held that "[s]ince the documents

at issue are not relevant to the controversy before us, Farley cannot, as a matter of law,

make a showing of need." *Id*. at 1390. According to the Court:

> The FTC documents are definitely not relevant to Farley's claim that his
> purchases fell within the investment-only exemption to the HSR Act's
> reporting requirements. This defense requires only that the district court
> interpret the statutory exemption and determine whether Farley's purchases
> were within the scope of that exemption. The suppositions of FTC staff
> members expressed in internal memoranda as to requirements of the Act are
> not pertinent to this task. In its attempt to decipher the meaning of a statute a
> court may rely on various tools, including official agency interpretations.
> Courts may not, however, rely on unpublished opinions of agency staff. The
> documents at issue here clearly fall in the latter category and as such are not
> germane to the court's inquiry.

*Id*. (internal citations omitted).

The Second Circuit reached a similar conclusion in *International Paper Company v.*

*Federal Power Commission*, 438 F.2d 1349 (2d Cir. 1971). There, the Federal Power

Commission was investigating International Paper Company in connection with

International's natural gas pipeline. *Id*. at 1352. Eventually, the Commission ordered

"International to show cause why its transportation of natural gas should not be subject to

the Commission's jurisdiction . . . and why International should not be required to apply for

and obtain a certificate of public convenience and necessity . . . to operate a transmission

line across a state line." *Id*. International then requested from the Commission "all staff

memoranda in three earlier [jurisdiction] disclaimer cases, which it claimed related to similar

rulings affecting other companies." *Id.* The Commission refused, and International

eventually sought a Court order compelling disclosure under the Freedom of Information Act. *Id.* at 1351-52.

Applying the same standard applicable to discovery in civil cases, the District Court denied International's request, finding "that the material sought by [International] were not 'orders' of the Commission nor were they 'necessary parts' thereof." *Id.* at 1358. On appeal of the District Court's order, International argued that the requested material would show that "the Commission's action favored the legal position taken by International" in the enforcement action. *Id.* The Second Circuit, however, upheld the District Court's decision, finding that "the views of individual members of the Commission's staff are not legally germane, either individually or collectively to the actual making of final orders." *Id.*

According to the Court, these views

> could be grossly misleading, when applied to the ultimate findings and conclusions reached by the [Federal Power Commission] as a whole, because at best they are only advisory in character. To allow disclosure of these documents would interfere with two important policy considerations on which [the applicable provision of the Freedom of Information Act] is based: encouraging full and candid intra-agency discussion, and shielding from disclosure the mental processes of executive and administrative officers.

*Id.* at 1358-59 (footnote omitted). Further, as the Court made clear, "the staff memoranda sought can in no way be construed, as being a part of the Commission's final orders. They were merely preliminary interagency memoranda, compiled preparatory to the formulation of the Commission's final decisions." *Id.* at 1359.

Applying *Farley* and *International Paper* to the facts of this case compels the conclusion that, subject to the exception discussed below, the discovery that Defendants seek is not relevant to any of their defenses.[3] Defendants assert that this material is relevant because it bears on the reasonableness of Defendants' actions. Even if there were policy debates in which agency staff took positions favorable to Defendants, however, these statements would have no legal significance because they would not be official agency positions. In the end, the fact finder will be called upon to determine if Defendants engaged in any "unfair, deceptive, or abusive act[s] or practice[s]" in violation of the Consumer Financial Protection Act. 12 U.S.C. § 5536(a)(1)(B). What agency staff said in communication leading up to the issuance or non-issuance of rules, policies, or guidance has no bearing on that determination. If it were otherwise, these predecisional communications would possess de-facto official status. *See Kan. State Network, Inc. v. FCC*, 720 F.2d 185, 191 (D.C. Cir. 1983) ("Just as disclosure of predecisional documents would injure the consultative process within the government, so too would judicial review of the agency's deliberations in this case. In general, an agency's action should be reviewed based upon what it accomplishes and the agency's stated justifications." (internal quotation marks and citation omitted)). Accordingly, because these types of communications have no legal significance, they are simply not relevant to Defendants' defenses.

---

[3] Defendants argue that *United States v. Exxon Corporation*, 87 F.R.D. 624 (D.D.C. 1980), held that agency staff opinions are relevant to a determination of the legitimacy of industry conduct. That case, however, was explicitly limited to situations where a government agency "enforces, retrospectively, regulations that proscribe industry conduct unaddressed by prior regulations." *Id.* at 633. Here, Plaintiff is not seeking to retroactively enforce any regulations.

Defendants, however, argue that this case falls outside of *Farley* and *International Paper* because of Defendants' unique status as a government contractor. That is, Defendants contend that because they were acting on behalf of, or at the direction of, the government, they are entitled to know what the government had to say about their actions. The Court agrees, to an extent, that this case presents somewhat unique circumstances. Accordingly, the Court will overrule Plaintiff's objection to the extent that Defendant is seeking communication between Plaintiff and the Department of Education. Given Defendants' relationship with the Department of Education, this type of communication may be relevant to their defenses. Further, the Court will order Plaintiff to create, maintain, and produce a privilege log with respect to documents falling within any of Defendants' requests.

To recap, Plaintiff shall produce all non-privileged communication it had with the Department of Education that falls within the subject matter of Defendants' requests, but Plaintiff need not turn over any other predecisional communications related to the fourteen publicly issued rules, regulations, and guidance that Defendants identified or any other predecisional communications related to proposed rules, regulations, and guidance that were not ultimately issued. Plaintiff shall, however, keep a privilege log concerning all these predecisional communications which identifies the documents Plaintiff believes falls under the attorney-client, work product, deliberative process, or other recognized privilege.

11

*B. Documents Related to the Policies and Practices of Other Servicers*

*and Collection Agencies that Service Federal Student Loans*

Defendants next seek documents related to the policies and practices of other

entities that service federal student loans. (Doc. 68 at 1). "Such documents include

information [Plaintiff] obtained from third-party servicers and collection agencies . . . ,

supervisory reviews and other interactions, as well as examination reports and associated

materials prepared by [Plaintiff] and any internal and external communications about the

relevant practices and policies of third-party servicers and collection agencies." (Doc. 72 at

6). Defendants seek these type of documents as they related to "eight specific practices" of

third party services.[4] (*Id.* at 6-7).

---

[4] These eight specific practices include:

- Communications with borrowers about repayment plans and policies, procedures, call scripts, and training materials related to such communications;

- Rates of enrollment in forbearance and income-driven repayment plans and rates of income-driven repayment plan recertification;

- Call center operations, including compensation plans and metrics for call center employees and average call times;

- Notices and disclosures regarding repayment options and income-driven repayment plan recertification;

- Policies and procedures for the categorization and escalation of borrower complaints and inquiries related to payment processing;

- Disclosures to borrowers regarding payment allocation and application;

- Policies, procedures, and call scripts relating to communications with borrowers regarding the impact of federal loan rehabilitation on credit reporting and collection fees;

Plaintiff argues that this information is not relevant because the conduct of other entities has no bearing on whether Defendants violated the law. (Doc. 70 at 3). According to Plaintiff, "courts have repeatedly rejected the 'everyone else is doing it' or 'why me' defense—the notion that, because competitors allegedly were engaging in the same conduct as the defendant, the government cannot take action against the defendant." (*Id.*). Thus, according to Plaintiff, because Defendants' request concerns a defense that is unavailable to them, such information is not relevant to the present action.

Plaintiff cites a number of Federal Trade Commission ("FTC") enforcement cases to support its position. *See, e.g., Moog Indus., Inc. v. FTC*, 355 U.S. 411, 413, 78 S. Ct. 377, 2 L. Ed. 2d 370 (1958) (holding that an FTC cease and desist order against a single firm was valid despite the fact that the FTC had not yet pursued similar enforcement actions against other firms allegedly engaging in the same behavior). Of particular relevance to the present action is *FTC v. Chemence, Inc.*, 209 F. Supp. 3d 981 (N.D. Ohio 2016). There, the FTC was pursuing a Section 5 action[5] against Chemence, a company that advertised, sold, and distributed cyanoacrylate glue products, based on that company's use of the phrase "Made in the USA" on its glue labels. *Id.* at 983, 985. In discovery, Chemence asked the

---

- Rates of defaulted borrowers who rehabilitated their loans, consolidated their loans, or remained in default.

(Doc. 72 at 6-7).

   [5] Similar to a provision in the Consumer Financial Protection Act that makes it "unlawful for . . . any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B), Section 5 of the Federal Trade Commission Act makes "unfair or deceptive acts or practices in or affecting commerce" unlawful, 15 U.S.C. § 45(a)(1).

FTC to produce documents related to Chemence's competitors, such as "[a]ny documents including, referring, or evidencing communications between the FTC and Gorilla Glue Company, and its affiliated entities, officers, directors, employees, agents, representatives and attorneys, regarding superglues and cyanoacrylates." *Id*. at 983. Gorilla Glue and other non-parties intervened and sought a protective order. *Id.* at 982-83. Chemence opposed the protective order, arguing that such information was relevant "because it [would] show that the FTC has applied inconsistent standards in pursuing 'Made in the USA' claims against different companies" and because it would show that "the FTC [had] never promulgated rules or issued clear standards about the use of 'Made in the USA' claims on products." *Id*. at 985.

The District Court rejected these arguments, finding that "[t]he FTC's lawsuit concerns *Chemence's* actions, not its competitor's actions." *Id*. (emphasis in original). According to the Court, "[e]very element in a Section 5 claim relates to the conduct of the *defendant* in the lawsuit, not the conduct of other industry participants. Thus, the conduct of other participants in the cyanoacrylate glue industry—the information that Chemence now seeks—has no bearing on the FTC's claim." *Id*. (emphasis in original). Relying on the proposition in *Moog Industries* that "[t]he FTC 'alone is empowered to develop [an] enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically,'" the Court then concluded that "[e]ven if Chemence could demonstrate

14

that its competitors had violated the FTC Act but were not prosecuted, that would be irrelevant to the current lawsuit." *Id.* (alteration in original) (quoting *Moog Indus.,* 355 U.S. at 413). Accordingly, the Court held that "the information that Chemence seeks is not relevant to this dispute and Chemence has no need for it. As a result, it is not discoverable." *Id.* at 987.

Defendants respond that they are not pursuing a "selective enforcement" defense, but require information about third party servicers "because it goes to the reasonableness of Defendant[s'] conduct and industry practice." (Doc. 76 at 27). According to Defendants, the information they seek regards other loan servicers who are "under daily oversight by the Department of Education, and what those other industry players understood the rules to be with respect to the allegations are directly relevant to this case." (*Id.*).

While phrased somewhat differently from the barred "selective enforcement" defense, the Court sees no meaningful distinction in Defendants' proposed defense. Establishing industry practice and the reasonableness of Defendants' actions in comparison to other loan servicers is ultimately an argument that Defendants should not be held liable for their actions—or, alternatively, that those actions are not illegal—because others in the industry were engaging in the same or similar behavior. Even if Defendants were able to show that they conducted themselves in a manner consistent with every other industry participant, it does not follow that those industry-wide actions could not be "unfair, deceptive, or abusive act[s] or practice[s]" under the Consumer Financial Protection Act, 12

15

U.S.C. § 5536(a)(1)(B).  *See Int'l Art Co. v. FTC*, 109 F.2d 393, 397 (7th Cir. 1940) ("It is also immaterial that competitors employ the same or similar methods. If such be the case, it would afford the basis for an argument that such competitors should be dealt with likewise, not that petitioners should escape."); *Aloha Airlines, Inc. v. Civil Aeronautics Bd.*, 598 F.2d 250, 258 (D.C. Cir. 1979) ("Aloha could not justify a violation of [a statute prohibiting unfair or deceptive practices in air transportation] by proof that its competitor also violated that [statute]."). Thus, the actions, inactions, or understandings of other industry participants are not relevant to the present lawsuit. Just as in *Chemence*, this suit is against specific defendants, and, consequently, those defendants are the only loan servicers whose actions are relevant.[6]

Accordingly, the Court will sustain Plaintiff's objection to Defendants' proposed discovery. Plaintiff need not produce any documents related to the policies and practices of other entities that service federal student loans.

### C. Internal and External Emails

Turning now to disputes that Plaintiff has raised, Plaintiff first argues that Defendants have improperly refused to search for and produce emails relating to fifteen requests for documents. (Doc. 74 at 3-5). Defendants contend that when they applied search terms to

---

[6] Defendants cite to *FTC v. Amazon.com, Inc.*, 2016 WL 1221654, at *5 (W.D. Wash. 2016), in support of their position. (Doc. 68 at 2). That case concerned an FTC motion in limine which sought to bar a rebuttal expert witness who would testify that Amazon's alleged unlawful practices were consistent with industry practice. *Amazon.com, Inc.*, 2016 WL 1221654, at *1, *5. While the Court refused to bar the expert from testifying at trial, the Court did not ultimately resolve the relevancy of the proposed testimony, stating that "the Court may sustain any well-placed relevance objections at trial." *Id.* at *5. Accordingly, the Court does not find this case to be of use in resolving the present issue.

the universe of emails, there were over one million responsive documents which would have to be hand reviewed before being turned over. (Doc. 83 at 3). Defendants then crafted narrower search terms, "tailored to the policies and procedures identified as being at issue," which resulted in approximately 100,000 responsive documents. (*Id.*). Defendants state that they are in the process of reviewing and handing over these emails. Defendants argue that reviewing the additional emails would not be proportional to the needs of this case given their limited relevance. (April 17, 2018, Hr'g Tr. at 22, 32).

The parties seem to be in agreement that the fifteen requests can be organized into seven subject areas. At the conference, Plaintiff identified that there is no longer any dispute as to two of these seven subject areas. (April 17, 2018, Hr'g Tr. at 138-139). The remaining five subject areas involve emails relating to (1) policies, procedures, and guidance to Defendants' employees relating to communications with borrowers about repayment options,[7] (2) auditing, monitoring, and quality assurance relating to communications with borrowers about repayment options,[8] (3) the suitability, unsuitability,

---

[7] With respect to this request, Defendants' initial search identified approximately 480,000 potentially responsive emails. (April 17, 2018, Hr'g Tr. at 126). When Defendants' narrowed their search terms by only searching for documents related to the two flow charts that Plaintiff previously identified, Defendants' search resulted in 61,048 potentially responsive emails. (*Id.*). Defendants have agreed to search and produce any responsive document contained in these 61,048 emails and Plaintiff has requested that Defendants produce all responsive documents out of the original 480,000 potentially responsive emails. (*Id.* at 126-128). Plaintiff argues that the narrowed search is incomplete because emails related to other flow charts, decision trees, and training materials that Plaintiff has not yet specifically identified are relevant to this matter. (*Id.* at 128-129).

[8] With respect to this request, Defendants' narrowed search eliminated 95,000 potentially responsive documents. (April 17, 2018, Hr'g Tr. at 129-131). Plaintiff argues that the eliminated documents are relevant to this action because they might contain statements or instructions to employees

appropriateness, inappropriateness, advantages, disadvantages, benefits, or costs of

forbearance or any type of IDR plan for particular groups of borrowers,[9] (4) communications

with borrowers about renewal of IDR plans, including emails discussing any deficiencies or

problems with those policies, procedures, or guidance,[10] and (5) the terms of Navient

Corporation's contract with the Department of Education and Defendants' performance

under that contract with respect to the issues relevant to Plaintiff's claims or Defendants'

defenses.[11]   (Doc. 83 at 4-6; April 17, 2018, Hr'g Tr. at 126-138).   Upon review of the

record, the Court concludes that all these categories of documents are potentially relevant

and therefore discoverable.   Accordingly, it was improper for Defendants to unilaterally

narrow the search terms with respect to these requests and only turn over documents from

the narrowed universe of potentially responsive documents.

---

that caused them to provide incomplete information to borrowers about income base repayment plans.
(Id.).

[9] With respect to this request, Defendants argue that they have produced all responsive documents, but that there were few identified. (April 17, 2018, Hr'g Tr. at 131-132). Plaintiff argues that such an assertion is not credible. (Id. at 132-133).

[10] With respect to this request, Defendants' initial search identified approximately 275,000 potentially responsive emails. (April 17, 2018, Hr'g Tr. at 133). When Defendants' narrowed their search terms by only searching for documents related to the one email notice and the one letter that Plaintiff previously identified as being deceptive, Defendants' search resulted in 27,265 potentially responsive emails. (Id.). Defendants have agreed to search and produce any responsive document contained in these 27,265 emails and Plaintiff has requested that Defendants produce all responsive documents out of the original 275,000 potentially responsive emails. (Id. at 133-134). Plaintiff argues that the narrowed search is incomplete because other recertification notices that Plaintiff has yet to identify may have been deceptive. (Id. at 134-136).

[11] With respect to this request, Defendants argue that they have reviewed approximately 100,000 potentially responsive emails and turned over those that were actually responsive to Plaintiff's request. (April 17, 2018, Hr'g Tr. at 136). Plaintiff argues that Defendants have only searched external emails connected with this request. Plaintiff contends that Defendant should review the additional 90,000 potentially responsive internal emails that they have identified. (Id. at 136-137).

Nevertheless, in order to address Defendants' concerns about proportionality, the Court will order the parties to meet and decide on mutually agreeable search terms that eliminate from the universe of potentially responsive documents that must be hand reviewed those emails and attachments that are unlikely to contain relevant information. If the parties are unable to reach an agreement on the search terms, they shall promptly notify the Court.

## D. Draft Notices and Disclosures

Next, Plaintiff argues that Defendants are refusing to produce drafts of notices and other communications that they sent to borrowers regarding enrollment recertification for income-driven repayment plans. (Doc. 74 at 5). Plaintiff argues that this information is relevant to determining whether the final draft of the documents were deceptive. (*Id.*). Defendants respond that this request is encompassed within the email request because draft notices would only be maintained as attachments to emails. (Doc. 83 at 6).

To the extent that this issue is not resolved by the Court's ruling on Defendants' objections to the requests for emails, the Court will order drafts of notices and other communications that Defendants sent to borrowers regarding enrollment recertification for income-driven repayment plans to be produced subject to any assertion of privilege. This information may be relevant to Plaintiff's deception claim. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 323 (7th Cir. 1992) (considering the fact that Defendant rejected proposed alternative advertisements in connection with a claim that Defendant's final advertisement was deceptive); *FTC v. Directv, Inc.*, 2015 WL 7775274, *6-*7 (N.D. Cal. 2015) ("[T]he Court

19

finds that if Defendants rejected draft ads with clearer disclosures out of concern that such ads would attract fewer customers, this would tend to show they acted consistently with an incentive to mislead the public.").

### E. Relevant Time Period for Discovery

Finally, Plaintiff argues that for certain requests that it made, Defendants have refused to produce documents for relevant time periods. (Doc. 74 at 5-6). According to Plaintiff, in some cases Defendants have limited their document production to those documents created after January 1, 2010, but then sent subpoenas to the Department of Education that sought documents created as early as January 1, 2009. Plaintiff argues that documents created earlier to that time are relevant to this action because some of the documents key to this lawsuit would have been developed during that time. Further, Plaintiff argues that in other cases Defendants have refused to produce documents created after a certain date.

Defendants respond that Plaintiff's pre-lawsuit investigation focused on time periods beginning on January 1, 2010, or later and argue that if Plaintiff believed earlier time periods were relevant, it should have indicated as much during the investigation.    (Doc. 83 at 7). Further, Defendants contend that Plaintiff is factually incorrect as to some of the specific date ranges that Defendants have searched. Finally, Defendants assert that when they have limited the range, it is because the allegations of the Complaint are time specific and,

for certain claims, searching through time periods far outside the allegations serves no purpose.

The Court is troubled that the parties were unable to reach a reasonable agreement on an issue as fundamental to the parties' claims and defenses as the relevant time period for discovery. This dispute, more so than any other addressed thus far, highlights the lack of cooperation between professionals. Moving forward, the Court expects counsel to put more effort into resolving disputes of this nature without intervention from the Court.

The Court will not micromanage discovery by determining the relevant time period for every document request made. Upon review of the Complaint, the materials submitted, and the parties' arguments, the Court has determined that the relevant time period for this litigation is the effective date of Defendants' contracts with the Department of Education, June 17, 2009, through the date that this lawsuit was filed, January 18, 2017. Absent an agreement between the parties to the contrary, either side may request documents from the other within this time frame.

### III. CONCLUSION

For the reasons outlined above, the Court will sustain in part and overrule in part Plaintiff's objections to Defendants' requests for production of documents, sustain in part and overrule in part Defendants' objection to Plaintiff's requests for production of documents, and order that the parties serve no additional interrogatories or requests for

production of documents beyond those which have already been served.  A separate Order

follows.

Robert D. Mariani
United States District Judge