# EXHIBIT 4

  

# The Case for Payroll Withholding

**Preventing Student Loan Defaults With Automatic Income-Based Repayment**

@NEWAMERICAED  |  REPORT  |  DECEMBER 2014  |  #PAYROLLWITHHOLDING  |  #OPENTR.AL/PAYROLLWITHHOLDING

CFPB-NAV-0008481

## About the Consortium

This paper is the first in a body of work on the viability of Income-Based Repayment and payroll withholding for federal student loans. The three primary authors on the report were **New America**, **Young Invincibles**, and the **National Association of Student Financial Aid Administrators**. The **Urban Institute** provided significant support as a technical advisor. The **U.S. Chamber of Commerce Foundation (USCCF)** also serves as a technical advisor for this project but its main function will be to serve as a key voice throughout the development of the next phase, which will further examine the possibility of implementing payroll withholding, including consideration of its effects on the business community. This paper is not endorsed by and does not necessarily reflect the opinions of USCCF. Financial support for this research was provided by a grant from the **Bill & Melinda Gates Foundation** through the **Reimagining Aid Design and Delivery (RADD)** project.

  

 

## Acknowledgments

We would like to thank the **Bill and Melinda Gates Foundation** for their generous support of this important research. Thank you to the numerous organizations and individuals who provided thoughtful contributions and reviews for this report. The conclusions reached in this report are those of the authors alone.

CFPB-NAV-0008482

## Contents

The Student Loan Repayment Problem                                                        2

Solving the Repayment Problem with Income-Based Repayment                                 4

The Problem with Scaling Up the Existing System                                           5

Can The Government Automatically Retrieve Income Information?                             8

Without Payroll Withholding, Automatic IBR Cannot Prevent All Defaults                   10

Conclusion: The Promise of Automatic IBR With Payroll Withholding                        12

Appendix: U.S. Department of Education Form "Income-Based Repayment                       13
Plan: Alternative Documentation of Income"

Notes                                                                                     15

CFPB-NAV-0008483

# THE STUDENT LOAN REPAYMENT PROBLEM

**T**he United States Department of Education ("the Department") plans to lend about $100 billion to millions of students across the country this year. Without major reductions in college costs, the majority of students will continue to depend on loans to pay for at least part of their post-secondary education, and the majority of those borrowers rely on the federal student loan program. However, something is deeply amiss. The government *expects* about a fifth of new borrowers to default at some point during repayment,[1] and as high as a third of borrowers pursuing two-year degrees.[2] That the government makes loans to students while fully expecting that a sizeable minority to suffer serious financial consequences is a big problem for both borrowers and taxpayers.

Of course, for many students, taking on a moderate amount of debt to earn a degree that substantially increases lifetime earnings is a solid investment.[3] The average graduating college senior who borrows to attend a four-year public school leaves with $29,400 in loans, but will earn an estimated $650,000 more over the course of her career due to her credential.[4] But if higher education is such a good investment, why do so many borrowers run into problems repaying their debts?

One reason is that policymakers have placed a priority on making student loans available to borrowers, but have failed to implement an effective repayment process. The federal student loan program—which makes up over 90 percent of student lending—counts some 40 million Americans as borrowers.[5] That is nearly the same number of people over age 65 who receive Social Security retirement benefits.[6] Yet for a program with such a major role in financing higher education, it is alarming how many borrowers become delinquent and default on their loans.

Many within the policymaking community have proposed expanding access to federal Income-Based Repayment (IBR) plans to stem the tide of delinquency

**Box 1: A   Two-Paper Series on Automatic IBR**

This paper is the first in a two-part series on how employer withholding and automatic Income-Based Repayment for federal student loans would work together. It focuses on how implementing automatic IBR using the existing IBR system entails shortcomings that are mitigated using employer withholding, a system whereby employers withhold student loan payments from borrower paychecks. The second, forthcoming, paper will examine the barriers and challenges to implementing an automatic IBR system using employer withholding.

If done well, withholding could provide the best way to implement automatic IBR and address many problems in the student loan program along the way. If executed poorly, it would leave not just the government and borrowers worse off, but a new, third group: employers.

The forthcoming report will highlight the challenges of implementing such a system and the inherent tradeoffs policymakers would confront. These include how the system would treat non-wage income and married borrowers; reconciling withheld payments with total income; servicing; prepayments; opt-out mechanisms; self-employed borrowers; small businesses; whether or not other payment plans should be available; and privacy concerns. The report will also detail how different payment calculation formulas affect the implementation of automatic IBR with employer withholding, and present the tradeoffs for all parties involved depending on which components of a formula are chosen.

A variety of stakeholders and experts will vet and discuss the analysis and conclusions, after which we will publish the report, and include the views of these stakeholders and experts. Ideally, the report will provide a roadmap for policymakers on how to implement automatic IBR via employer withholding.

CFPB-NAV-0008484

**Figure 1: Policy Options for Automating IBR**

| Policy Option | Enrollment<br>How does the borrower select IBR? | Notification<br>How does the borrower know what to pay? | Repayment<br>How are the IBR payments made? | Timing<br>Is the IBR payment based on present or past income? |
|---|---|---|---|---|
| 1. Status Quo | **Non-Automatic**<br>Borrowers must opt into IBR, and reapply annually | **Non-Automatic**<br>Borrower manually submits income information; servicer then informs borrower about amount owed | **Non-Automatic**<br>By default borrower makes manual payments, but can register for automatic account deductions | **Past Income**<br>Up to two years old |
| 2. Automatic Enrollment Only | **Automatic**<br>IBR is opt-out or the only repayment option, with no annual application | **Non-Automatic**<br>Borrower manually submits income information; servicer then informs borrower about amount owed | **Non-Automatic**<br>By default borrower makes manual payments, but can register for automatic account deductions | **Past Income**<br>Up to two years old |
| 3. Government Retrieves IRS/ SSA Earnings Data | **Automatic**<br>IBR is opt-out or the only repayment option, with no annual application | **Automatic**<br>Department retrieves income information from IRS or SSA and notifies borrower about amount owed | **Non-Automatic**<br>Borrower makes manual payments, but can register for automatic account deductions | **Past Income**<br>Up to two years old |
| 4. Payroll Withholding | **Automatic**<br>IBR is opt-out or the only repayment option, with no annual application | **Automatic**<br>Borrower's employer calculates amount owed | **Automatic**<br>Borrower's employer withholds amount owed | **Present Income** |

and defaults. While the proposals take different forms, the basic idea is to enroll more borrowers in plans that peg monthly payments to an affordable percentage of a borrower's income. In theory, this would alleviate financial burdens and prevent borrowers from falling behind. Many support enrolling all borrowers in some form of IBR automatically.

Given the growing interest in such an option, this paper lays out the various administrative avenues for automatically enrolling borrowers in IBR. It begins with a brief survey of IBR expansion proposals, and then examines the possibility of automatically enrolling borrowers in IBR through the current federal student loan servicing system.

Many proposals would automatically enroll borrowers in IBR without the borrower initiating the process. In this case the Department would retrieve income information from the Internal Revenue Service or Social Security Administration on the borrower's behalf to calculate the monthly payment owed, but still require the borrower to submit the appropriate payment (see Policy Option 3 in Figure 1). But automatically enrolling borrowers in IBR without also creating a system by which payments are automatically deducted could make matters worse by adding complexity and failing to solve repayment problems other than those related to loan affordability. Though significant administrative hurdles remain, we believe that a well-implemented automatic IBR system would alleviate the repayment crisis. The key is marrying automatic enrollment with an automatic payment system (see Policy Option 4 in Figure 1). Payroll withholding of student loan payments offers the best way to implement automatic IBR, and the final section of the paper discusses that option briefly. A follow-up paper will discuss the option in depth. See Box 1.

CFPB-NAV-0008485

# SOLVING THE REPAYMENT PROBLEM WITH INCOME-BASED REPAYMENT

**P**resently, borrowers can opt into IBR and make student loan payments capped at 10 percent of their discretionary income (although the effective income share is often considerably less because the formula exempts a minimum of $17,505 of a borrower's income).[7] Remaining debt is forgiven after 10 or 20 years of payments. Older versions of the program exist for less-recent borrowers and together about 14 percent of borrowers use one of three existing plans that allow them to make payments as a share of income.[8]

Proposals to expand the existing IBR program range from stepped-up informational campaigns to making the benefits it provides more generous. Informational campaigns are based on the premise that not enough borrowers know about IBR and therefore do not enroll and then default.[9] Those who argue for greater benefits believe that lower monthly payments and earlier loan forgiveness will cause delinquencies to fall.[10]

Another popular idea for expanding IBR enrollment is to enroll borrowers in the program automatically. In fact, of the fourteen think tanks, advocacy organizations, and research groups taking part in the Bill & Melinda Gates Foundation project, Reimagining Aid Design and Delivery (RADD), eight proposed automatically enrolling borrowers into some form of income-based

repayment, including the authors of this paper.[11] Besides the widespread support among the groups participating in that project, lawmakers have recently proposed numerous ideas for some form of automatic IBR.[12]

One idea is to make IBR the only repayment option, and therefore the automatic one. Another is to make IBR the *initial* option, similar to the way in which the 10-year standard plan is currently the initial repayment plan into which borrowers are enrolled when they begin repayment. A third approach is to make IBR automatic for a specific subset of borrowers, such as those who are delinquent on their federal student loans.[13] Despite these differences, all approaches make IBR enrollment automatic in some form and we will refer to them as "automatic IBR" throughout the rest of the paper.

Before discussing automatic IBR implementation, it bears mentioning that this paper does not delve into the relative merits of the terms and benefits of various income-based repayment plans (for example, whether a borrower should repay 10 percent or 15 percent of her discretionary income). We discussed those issues thoroughly in the paper *Automatic for the Borrower* published in March.[14] This paper focuses on how borrowers enroll in such plans and how payments are collected.

CFPB-NAV-0008486

# THE PROBLEM WITH SCALING UP THE EXISTING SYSTEM

**D**espite our own optimism about the promise of automatic IBR, we believe that expanding IBR's role must overcome significant design hurdles to be effective. Typically, proposals for automatic IBR would use much of the existing administrative process and servicing structure that underpins IBR as it exists today. But scaling up IBR enrollment by an order of magnitude could expose this already clunky system to challenges it was never designed to handle. The current IBR repayment scheme requires significant administrative steps on the part of borrowers and suffers from severe timing lags. Policymakers must understand how these challenges would affect borrowers, what harmful side effects they entail, and to what extent different designs provide a workaround.

## Requiring Borrowers to Report Income and Send Payments Makes IBR Repayment Non-Automatic

The only way that the government can calculate a borrower's payment for an IBR plan is if it knows the borrower's income. Under the existing federal student loan and IBR system, borrowers must take the initiative to send income information to the government. Borrowers forward their income information to the Department using a prior year's tax return or other sources of income documentation. The agency then calculates their loan payments. This process must be repeated annually. Requiring all borrowers to submit annual documentation is the opposite of automatic. Using this approach as part of an automatic IBR system would place large additional burdens on borrowers given that most still opt to repay their loans through a non-income-based plan, such as the standard or consolidation repayment plans.

In fact, only income-based repayment plans require borrowers to submit information before the Department can calculate the monthly payment owed. For all other repayment plans, the Department calculates payments automatically, relying simply on a borrower's loan balance and interest rate. There are no forms to

complete, and no information to send in.[15] At least in terms of administrative burden, any of the other repayment plans that the government currently offers better lend themselves to automatic enrollment than the current IBR option.

As a result, an automatic IBR system based on the current administrative design would require a *greater* compliance burden for borrowers than the current repayment system. Most borrowers would move from plans in which the Department calculates payments to a plan in which they must take additional steps to determine their monthly payments. Such an increase in complexity and burden would almost certainly contribute to greater delinquency and default. The process of filling out paperwork, completing online or paper forms, and then sending in updated income information annually makes using IBR difficult for borrowers. And in a world where IBR is the only repayment option, such tasks would be mandatory. An automatic IBR system relying on the existing administrative design might burden more people by adding administrative steps, and then punish borrowers when they fail to provide necessary income information. These are some of the reasons why the existing administrative design of IBR is ill-suited to making IBR automatic.

## Timing Problems with Income Reporting

There is a further issue with using the current IBR design to implement an automatic IBR system. The existing IBR program bases payments on a borrower's past income as reported on a tax return.[16] This information can be up to two years old. Pegged to outdated income results, monthly payments are often too high or too low relative to what someone is currently earning. Moreover, many recent undergraduates have yet to file a tax return by the time their loans come due. Even if they have, the return likely reflects a partial-year's income or was filed when the borrower was a dependent. Box 2 gives a sense of how those dynamics complicate an automatic IBR that is overlaid on the existing administrative design.

CFPB-NAV-0008487

## Box 2: Why it is Difficult to Track Income in the Current IBR System

**Jenna Hypothetical** is graduating in June of 2015 with a B.A. and she did not earn enough income in 2013 or 2014 (second and third year of college) to file a federal tax return. If a universal or automatic IBR program that relies on the existing IBR administration (see Policy Option 2 in Figure 1) were in place when it comes time to repay her federal student loans, in December 2015, she would confront the following situation. First, she must inform the Department (or a loan servicing company contracted by the Department) of her income. Without a tax return, she would have to send in paystubs or other documents listed on a government form (see appendix), as well as designate her household size to claim an exemption.[17] The word "automatic" hardly describes the scheme.

Next year, in December 2016, she will have to do it all again. Because she found a job a few months after graduating in 2015, and filed a tax return for that year, she will be able to use the return instead of alternative documentation. However, her tax return will reflect her prior year's income, during which she worked full-time but for only part of the year. But IBR can only treat that figure as if it is her annual income. Because Jenna's prior-year payment was calculated using alternative documentation of income, and her tax return makes her income appear as if it is only a fraction of that amount, her payment under IBR will decrease from the prior year. Yet her income is largely unchanged.



2014 — College Year 3
Does Not File 2013 Tax Return

2015 — College Year 4
Does Not File 2014 Tax Return
Graduates
Finds Job
No Payments (Grace Period)

2016
Files 2015 Tax Return
Auto-enrolled in IBR. With no tax return, manually submits documentation to account for earnings from job, which are then annualized.

2017 — Paying Off Loan
Files 2016 Tax Return
Re-enrolls in IBR manually. Uses 2015 Tax Return, which reflects artificially low earnings and decreases IBR payments.

CFPB-NAV-0008488

**Jenna Hypothetical Continued...**

Now assume a slightly different example in which Jenna will finish graduate school in 2015. While in graduate school, she worked off and on, but only earned about $15,000 for the year, a figure reflected on her tax return. After graduating in June, Jenna begins her student loan repayment process in September and documents her income using her recently filed tax return. The loan program, because it includes an exemption that exceeds her income last year, automatically allows her to make $0 payments for over a year after she leaves school. Yet Jenna actually landed a job a month after graduation and is earning a $55,000 salary by the time loan payments would normally begin. Meanwhile, she need not make any payments for a year. Interest on her loan piles up and she is a year closer to loan forgiveness.

The existing IBR program does have a method, called "alternative documentation," for addressing timing challenges related to income reporting. The process requires a borrower to submit documents like pay stubs, bank statements, and employer correspondence to document his current income. The program uses this method when a borrower did not file a prior year tax return or his income changed substantially from the previous year. However, the alternative documentation method has inherent limitations that make it a poor fit with automatic IBR. Expanding it to millions more borrowers would expose this already inefficient administrative system to further strain, costing borrowers time and taxpayers money.

The glaring issues with alternative documentation start with whether a borrower is required to supply it at all.[18] When applying for IBR each year, a borrower is asked, via the application form, if his current income "does not reasonably reflect" the income on his tax return. Anyone answering "yes" must send in alternative documentation.[19] With no guidance on exactly how much of an earnings change merits reporting, borrowers must make their best guess. Moreover, the question was probably designed to protect borrowers whose incomes had gone *down*, rather than create additional requirements for borrowers who saw their incomes *rise*.[20] Without a definition for what "reasonably reflect" means, people in either scenario are at a loss.

Another problem with this approach is that it burdens borrowers, loan servicers, and the Department. There are delays for borrowers, as the documents must be completed, submitted, and subsequently processed by the Department or loan servicers. A borrower who has to complete this process faces a greater compliance burden

than under any other repayment plan the federal loan program offers. Automatic IBR, if it relied on alternative documentation like the current program does, would likely make the federal loan program more burdensome for many borrowers.

The process also lacks standardization and verification. The documents borrowers submit do not follow a common form and the Department has no way of checking that individuals made the correct decision in providing alternative documentation and whether the information is accurate and complete. As a result, many borrowers' payments could be far above or below what they ought to be. It is also unclear whether the Department could or should implement a verification system. It would be expensive and the Department would have to define a "reasonable" income change, making arbitrary cut-offs such as +/- $5,000 or a 5 percent change. Even with clearer rules and definitions about alternative documentation, borrowers may err and face either penalties or non-enforcement, neither of which are desirable outcomes.

Other problems occur when a borrower has a sudden decline in income due to job loss or some other event. In its current form, IBR cannot provide automatic insurance that loan payments will closely track a borrower's income. The income information on which payments are based lags behind a borrower's current income. A job loss or a significant drop in income requires that a borrower contact the Department and provide alternative documentation of his new income to recalculate his payments. It is another burden during an already stressful period. It is hardly an "automatic" income-based repayment system for student loans.

CFPB-NAV-0008489

# CAN THE GOVERNMENT AUTOMATICALLY RETRIEVE INCOME INFORMATION?

**W**hile we believe that employer withholding addresses these issues, some observers believe that income reporting and timing problems can be solved by having the government automatically update a borrower's payments in IBR as it receives new information about his income. (This is Policy Option 3 in Figure 1.) Automatic updates could take one of two forms. In one, the Department automatically retrieves a borrower's most recently filed federal income tax return and uses it to set a payment under IBR (*the automatic retrieval option*). Alternatively, the government would use information on a borrower's current earnings through Social Security payments withheld on her behalf, sent to the IRS, and recorded in her Social Security account (*approximating income via tax payments*).[21]

Despite the appeal of these designs, both entail significant barriers that have thus far escaped scrutiny. Payments in IBR, even if updated automatically based on income tax filings or withheld taxes, would provide lagged and inaccurate income information.

## Automatic Retrieval of Federal Income Tax Information

Under the existing IBR system, the Department uses a borrower's federal income tax return to determine a borrower's income. To make IBR enrollment automatic, the argument goes, the Department need only access this information automatically rather than have the borrower initiate the transfer to the Department. To be sure, this removes an administrative burden on the borrower, but it leaves other issues unaddressed.

Not all borrowers enter repayment having recently filed a tax return (or they did, but as dependents). This puts us back with the same challenges the current system faces. A borrower without a tax return would need to rely

on alternative documentation or have his payments set to $0 until his next tax return is completed, filed, and automatically retrieved. A proposal sponsored by Senator Tom Harkin and introduced in 2014 would set payments to $0 when automatically enrolling borrowers in IBR who are delinquent if they have not filed a federal tax return recently.[22] While that seems like a good solution to the alternative documentation process (particularly for already struggling borrowers), it means that payments would be based on an inaccurate reading of a borrower's income. That has consequences for both borrowers and taxpayers.

Setting payments to zero should a borrower not have a recently-filed income tax return will provide many borrowers with an additional grace period of up to a year, or even longer in some cases.[23] The current grace period is six months after leaving school. Interest on the loans would accrue, and while assiduous borrowers might prepay, others may feel caught off guard (and indignant) after filing a tax return in the following year and discovering that they suddenly need to start paying a loan that has grown in size after 18 months of additional interest accrual. This lag period also has the unintended consequence of artificially shortening, by at least a year, the time a borrower must repay to qualify for any loan forgiveness benefit the program offers.

Additionally, those who suggest that automatic IBR could be implemented with the government automatically identifying and updating borrowers' incomes generally assume that the borrower has a steady job and all income is reported. Reality is much more complicated. Take the borrowers whose incomes suddenly drop. Under the automatic retrieval approach, their payments would be based on income tax information from the prior year, which does not reflect current income. The borrowers would then need to initiate a reporting process (i.e.,

CFPB-NAV-0008490

alternative documentation) to have their payments reduced to reflect their current income.

In other words, the automatic retrieval option does not provide *automatic* insurance against having to make high payments when a borrower's income drops. In these cases, the purported automatic IBR functions exactly like the opt-in program of today, offering no improvement. Income is reported with a lag, there is still a need for alternative documentation, and borrowers whose incomes suddenly fall must take the initiative to have their payments reduced.

## Approximating Income Via Tax Payments

Other observers argue that income reporting for IBR can be automated by referencing income and payroll tax payments that borrowers have withheld by their employers. Under this idea, the government "knows" a borrower's income in nearly real-time because his employer withholds and remits income and payroll taxes for him. But this solution offers little improvement over the government automatically retrieving a borrower's income outlined above.

The government does not track Social Security tax receipts, matched to an individual, on a real-time basis. At best, these payments track individual income on a lagged, quarterly basis. Even assuming that the government can receive this information directly from Social Security payments, the data would be available only after the government reconciles accounts, creating a delay. The government would therefore set a borrower's payments on income levels up to six months out of date, perhaps even longer. That is an improvement over using tax returns, but it is still a significant delay. For borrowers who become unemployed or experience a sudden drop in income, such a delay still invites risk and undermines IBR's insurance benefits.

Federal income tax payments withheld by employers, as opposed to Social Security and Medicare taxes, are subject to even greater delays when they are matched to an individual. Income is only verified and confirmed when tax returns are due, either the following April, or, if an extension is filed, a further six months. Like all other lagged income reporting systems, this introduces a host of issues, not least of which is that borrowers who lose their jobs would still owe payments for at least a few months based on incomes they no longer have.

## Reconciliation

The federal tax collection system uses a special set of procedures to address both the mismatch between when income is earned versus when it is reported and taxed, as well as the different types of income an individual can earn. Specifically, it minimizes income tracking problems by requiring employers to withhold tax payments from wages and then uses an annual reconciliation process (i.e., filing income tax returns) to capture other income and assess tax payments.

A reconciliation process could be added to an IBR system to address similar problems. Indeed, any automatic IBR system that aims to base payments off of a borrower's total income and goes beyond using the existing administrative design will require a reconciliation process. That is because no IBR system can accurately capture all of a borrower's income at the point he earns it. The objective, then, is to create processes that minimize burden on the borrower and do not increase delinquencies.

For example, a reconciliation process means that borrowers could end up owing not only their monthly payments throughout the year but also large, unexpected lump-sum payments annually. Those amounts would accrue interest daily and create a new way for borrowers to become delinquent on their loans.[24] On the flip side, some borrowers would inevitably overpay (or pay faster, as these are loans). That is not necessarily bad , unless the borrower needed the income for something else. The program may need to provide refunds for prepayments, which would introduce a new complicated process into the student loan program. All of this could require borrowers to complete forms or take some other initiative annually, adding new elements of complexity and compliance burden.

Automatic IBR coupled with a payroll withholding system that uses real-time income information mitigates these burdens. The vast majority of borrowers would never need to complete a reconciliation process because they would have paid back exactly what they owed that year. With other approaches to automatic IBR many borrowers would need to reconcile, fill out extra forms, and end up owing sizeable lump-sum payments at the end of each year.

CFPB-NAV-0008491

# WITHOUT PAYROLL WITHHOLDING, AUTOMATIC IBR CANNOT PREVENT ALL DEFAULTS

**A**utomatic IBR aims to address defaults and delinquencies by ensuring that borrower payments always match a preset share of income. However, that logic assumes that the overwhelming majority of delinquency and default is due *solely* to the unaffordability of the loan. While unaffordability surely accounts for many defaults and delinquencies, other factors likely contribute to non-repayment. We assign no judgments to borrowers' reasons for not repaying. Rather, we believe default and delinquency is harmful to all parties, and we strive for a fair and reasonable policy solution.

Furthermore, we posit that there is no reason to assume that reducing a borrower's payment to what the government deems an "affordable" level would necessarily eliminate all defaults. Different borrowers likely fail to repay for a variety (or combination) of reasons. Even if borrowers can "afford" to pay their loans under IBR, they may still feel unable to pay for myriad reasons that IBR cannot incorporate into its affordability calculation.

Much of the motivation for using automatic IBR to reduce defaults seems to rest on the assumption that defaulters have extremely low earnings. IBR exempts at least $17,505 of a borrower's income, thus making it impossible for someone with an income below that threshold to default. (Payments in IBR are 10 percent of income *above* the exemption, but zero below it.) Yet while defaulters likely have low average earnings, we cannot tell *how low* from available data, and thus we do not know how many would qualify for $0 monthly payments.

Many would-be defaulters would likely still have to make monthly payments under automatic IBR. The table below helps illustrate this point. It shows the monthly payments lower-income borrowers would have to make under IBR, using the average loan balance of those who default ($15,000). A would-be delinquent borrower with an Adjusted Gross Income of $25,000 provides a good example. Even though automatic IBR reduces what was a $167 monthly payment to $62, a would-be delinquent borrower with an Adjusted Gross Income of $25,000 may, for whatever reason, still feel as if she cannot pay that amount. Furthermore, a borrower with a $30,000 income must still pay over $100 a month under IBR. In short, automatic IBR would still require many borrowers—even those with low incomes—to send in monthly payments.

**Monthly Loan Payment for Single Borrower ($15,000 Balance at 6% Interest Rate)**

| Adjusted Gross Income [Household Size of 1] | IBR Monthly Payment* | Standard 10-Year Monthly Payment |
|---|---|---|
| $15,000 | $0 | $167 |
| $20,000 | $21 | $167 |
| $25,000 | $62 | $167 |
| $30,000 | $104 | $167 |
| $35,000 | $146 | $167 |
| $40,000 | $167 | $167 |

*Calculated as 10 percent of income after an exemption of 150 percent of federal poverty guidelines adjusted for household size. These IBR terms are available to all new borrowers in the federal student loan program as of 2014.

CFPB-NAV-0008492



*An automatic IBR system must address non-repayment that occurs for reasons other than unaffordability if it is to make default and delinquency rare, if not impossible*

An automatic IBR system must address non-repayment that occurs for reasons other than unaffordability (as it is defined through IBR's formula) if it is to make default and delinquency rare, if not impossible. Automatic IBR that does not include payroll withholding and instead relies on borrowers to send in the requisite payment each month—and possibly even send in updated income information annually—would likely suffer the same response from borrowers who do not pay, and the extra administrative burden may even exacerbate the issue. A policy that simply lowers a borrower's payment does not guarantee regular, on-time payments. Box 3 provides an interesting thought experiment to illustrate this point.

### BOX 3: What if Social Security Taxes Were Paid Like Student Loans?

Imagine that the Social Security payroll tax system worked more like student loans than its current design. Under this imaginary system, the Social Security Administration would bill individuals for their monthly Social Security taxes. Instead of employers withholding payments from employees' paychecks as they do now, individuals would have to send in the amount due each month based on what they earned.

For many workers, these checks would be less than $250 a month. And the individuals who owe Social Security taxes would have, by definition, earned enough to make the payment. The tax is a flat share of their monthly income, much like an IBR system for student loan repayment. It is not hard to imagine that the delinquency rate would likely be quite high under such a system. The burden of the payment relative to the individual's income is not what causes the delinquency in this scenario. Automatic withholding of payments does the heavy lifting in ensuring that the individual's payments remain current.

CFPB-NAV-0008493

# CONCLUSION: THE PROMISE OF AUTOMATIC IBR WITH PAYROLL WITHHOLDING

**T**here is tremendous potential in a well-designed automatic IBR system. It could dramatically reduce defaults and delinquency while keeping payments affordable. However, creating such a system requires thoughtful analysis of every aspect of implementation. This discussion has focused on the inherent limitations of various approaches to implementing automatic IBR. First, overlaying an automatic IBR on the existing IBR infrastructure, or implementing an automatic income retrieval process, would fail to accurately track income in real time. Second, none of these approaches makes repayment automatic. Borrowers must take the initiative to send in payments each month regardless of how affordable the payments are.

Coupling automatic IBR with payroll withholding addresses both of these issues *and* it has all of the affordability benefits of automatic IBR. Under a withholding system, loan payment amounts are calculated and withheld at the same point that income is generated. The entity that disburses the wages—the employer—knows an individual's earnings and can deduct a payment based on a share of that amount. As a result, payments track income in real time, a key advantage over other approaches.

The other advantage of payroll withholding is that borrowers who miss payments or do not pay for reasons other than unaffordability would find it more difficult to become delinquent or default on their federal student loans. Borrowers would no longer fall behind on payments because the loan program is confusing. For borrowers who procrastinate, postpone, or forget to make payments, payroll withholding keeps them on track.

Implementing payroll withholding would come with its own implementation challenges. For example, a poorly designed system could seriously burden employers and borrowers. The Department will need a new process to track loan payments and display the status of borrowers' loans. And payroll withholding will automatically elevate student loan payments to a higher priority in a borrower's monthly budget.[25] We turn to these issues in our next paper as we lay out a payroll withholding process that addresses these concerns.

While there will be issues and trade-offs with any newly proposed repayment system, the goal is to reduce default while minimizing burden. Only automatic IBR coupled with an effective payroll withholding system can reduce defaults and delinquencies on a large scale.

CFPB-NAV-0008494

**APPENDIX: U.S. Department of Education Form "Income-Based Repayment Plan: Alternative Documentation of Income"**



**Income-Based Repayment Plan**
**Alternative Documentation of Income**
Federal Family Education Loan Program

OMB No. 1845-0102
Form Approved
Exp. Date 04/30/2013

**IBR ALT DOC**

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying documents is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

---

**SECTION 1: BORROWER IDENTIFICATION**

Please enter or correct the following information.

SSN |__|__|__| - |__|__| - |__|__|__|__|

Name _____

Address _____

City, State, Zip Code _____

Telephone - Home ( ) _____

Telephone - Other ( ) _____

E-mail Address (Optional) _____

---

**SECTION 2: INSTRUCTIONS AND INFORMATION**

Type or print using dark ink. If you need help completing this form, contact your loan holder. Return the completed form and any required documentation to the address shown in Section 6.

Complete this form if you want to repay or continue to repay your eligible Federal Family Education Loan Program (FFELP) loan(s) under the Income-Based Repayment (IBR) plan and:

(1) You believe that your adjusted gross income (AGI), as reported on your most recently filed federal income tax return, does not reasonably reflect your current income (and/or your spouse's current income, if you are married and file a joint federal income tax return); your loan holder will make this determination based on the information you provide with this form;

(2) Your loan holder has requested that you provide alternative documentation of income because your loan holder believes that your adjusted gross income (AGI), as reported on your most recently filed federal income tax return, does not reasonably reflect your current income (and/or your spouse's current income, if you are married and file a joint federal income tax return);

(3) You have been notified by your loan holder that the Internal Revenue Service (IRS) is unable to provide your loan holder with documentation of your AGI; or

(4) You have notified your loan holder that you are not required to file a federal income tax return for the most recently ended tax year.

The amount of your monthly payment under the IBR plan is based on your current income (and your spouse's current income, if you are married and file a joint federal income tax return) and is reevaluated annually. To submit alternative documentation of your income, you must attach documentation of that income as described in Section 4, complete this form, including your signature in Section 5, and return it to the address shown in Section 6. If you are married and file a joint federal income tax return, your spouse must also sign in Section 5.

---

**SECTION 3: SPOUSE INFORMATION (IF YOU ARE MARRIED AND FILE A JOINT FEDERAL INCOME TAX RETURN)**

Name _____
     Last                          First                          Middle Initial

Address _____
     Number and Street                City                State          Zip Code

---

**SECTION 4: INCOME INFORMATION (MUST BE COMPLETED BY THE BORROWER AND SPOUSE, IF MARRIED AND FILE A JOINT FEDERAL INCOME TAX RETURN)**

You must provide your total annual taxable income from all sources that you currently receive (for example, income from employment, unemployment income, dividend income, interest income, tips, alimony). If you are married and file a joint federal income tax return, you must also provide your spouse's annual taxable income. **Do not report untaxed income such as Supplemental Security income, child support, or federal or state public assistance.**

You must provide supporting documentation for all income (yours and your spouse's) reported in this section (for example, pay stubs, letters from your employers listing income, interest or bank statements, dividend statements), or, if these forms of documentation are unavailable, a signed statement explaining the income source(s) and giving the name and the address of the source(s). The date on any supporting documentation you provide must be no older than 90 days from the date you sign this form.

Your eligibility for the IBR plan and your payment amount will be determined based on your annual income as supported by the documentation you provide.

☐ Check this box if you do not have any income or receive only untaxed income such as Supplemental Security income, child support, or federal or state public assistance.

☐ Check this box if you are married and file a joint federal income tax return and your spouse does not have any income or receives only untaxed income such as Supplemental Security income, child support, or federal or state public assistance.

Complete the items below by entering your annual taxable income (as defined above).

Your annual taxable income:  $ _____ (as supported by the documentation you provide)

Your spouse's annual taxable income, if you are married and file a joint federal income tax return:  $ _____ (as supported by the documentation you provide)

---

**SECTION 5: AUTHORIZATION, UNDERSTANDINGS, CERTIFICATION AND SIGNATURE**
**(MUST BE COMPLETED BY THE BORROWER AND SPOUSE, IF MARRIED AND FILE A JOINT FEDERAL INCOME TAX RETURN)**

■ I authorize the school, the lender, the guarantor, the U.S. Department of Education, and their respective agents and contractors to contact me regarding my loan(s), including repayment of my loan(s), at the current or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

■ I understand that my income information may be requested from the IRS even if alternative documentation of my income is accepted. I understand that if I am married and file a joint federal income tax return with my spouse, my spouse's income information, documentation, and signature are required. I understand I must agree to provide to the loan holder on an annual basis documentation of my income for the purpose of determining my monthly payment amount under the IBR plan.

■ I certify that all of the information I have provided on this form and in any accompanying documentation is true, complete, and correct to the best of my knowledge and belief.

Borrower Signature _____ Date (mm-dd-yyyy) _____

Spouse Signature (if required) _____ Date (mm-dd-yyyy) _____

CFPB-NAV-0008495

| SECTION 6: WHERE TO SEND THE COMPLETED IBR PLAN ALTERNATIVE DOCUMENTATION OF INCOME FORM |
|---|

| Return the completed IBR Plan Alternative Documentation of Income form and any required documentation to: (If no address is shown, return to your loan holder.) | If you need help completing this form, call: (If no telephone number is shown, call your loan holder.) |
|---|---|
| | |

| SECTION 7: IMPORTANT NOTICES |
|---|

**Privacy Act Notice**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §428(b)(2)(A) et seq. of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1078(b)(2)(A) et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091a(a)(4)) and 31 U.S.C. 7701(b). Participating in the Federal Family Education Loan (FFEL) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the FFEL Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions efficiently to submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**Paperwork Reduction Notice**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a currently valid OMB control number. The valid OMB control number for this information collection is 1845-0102. The time required to complete this information collection is estimated to average one hour (60 minutes) per response, including the time to review instructions, search existing data resources, gather and maintain the data needed, and complete and review the information collection. **If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to:**

U.S. Department of Education, Washington, DC 20202-4651

**If you have any comments or concerns regarding the status of your individual submission of this form, write directly to the address shown in Section 6.**

Source: http://www.usafunds.org/USAFunds%20ResourceLibrary/IBRAltIncomeDocumentation.pdf

CFPB-NAV-0008496

**Notes**

1 Figure is for undergraduate borrowers only.
It does not include loans to graduate and
professional students. Department of Education,
*Student Loans Overview: Fiscal Year 2015 Budget
Proposal*, 2014.

2 Taken from Department of Education, "FY 2015
Cohort Lifetime Dollar Default and Recovery
Rates," *Default Rates: Budget Lifetime Default
Rate*, November 2013, http://www.ifap.ed.gov/
eannouncements/ttachments/060614
DefaultRatesforCohortYears20072011.pdf.

3 Taking out a significant amount of student debt
to attend, say, medical school that substantially
increases lifetime earnings can also be a solid
investment. We recognize that the right amount to
borrow depends on the student's situation.

4 Ben Miller, *The Student Debt Review: Analyzing
the State of Undergraduate Student Borrowing*
(Washington, DC: New America Foundation,
February 2014), http://education.newamerica.
net/sites/newamerica.net/files/policydocs/
TheStudentDebtReview_2_18_14.pdf; Paul Taylor
et al., *Is College Worth It? College Presidents,
Public Assess Value, Quality and Mission of Higher
Education* (Washington, DC: Pew Research Center,
May 2011), http://www.pewsocialtrends.org/
files/2011/05/higher-ed-report.pdf.

5 Douglas W. Elmendorf, Director, Congressional
Budget Office, Letter to Senator Elizabeth Warren
regarding cost estimate for the *Bank on Students
Emergency Loan Refinancing Act*, June 4, 2014,
http://www.cbo.gov/sites/default/files/s2292.pdf

6 U.S. Department of Education, Federal Student
Aid, "Federal Student Aid Portfolio Summary,"
2014. See column "Unduplicated Recipients" for Q3
2014, https://studentaid.ed.gov/sites/default/files/
fsawg/datacenter/library/PortfolioSummary.xls.

According to the Social Security Administration's
Monthly Statistical Snapshot, 42.6 million people
age 65 and over received Social Security benefits
in August 2014. See Table 1, http://www.ssa.gov/
policy/docs/quickfacts/stat_snapshot/2014-08.pdf.

7 U.S. Department of Education, Federal Student
Aid, "Income Driven Plans," 2014, https://
studentaid.ed.gov/repay-loans/understand/plans/
income-driven.

8 U.S. Department of Education, Federal Student
Aid, "Direct Loan by Repayment Plan," 2014.
Authors' calculation from Q3 2014, direct
loans only. See https://studentaid.ed.gov/
sites/default/files/fsawg/datacenter/library/
DLPortfoliobyRepaymentPlan.xls.

9 Michael Stratford, "You've Got Mail," Inside
Higher Ed, November 4, 2013, https://www.
insidehighered.com/news/2013/11/04/education-
dept-will-email-35-million-student-loan-borrowers-
about-income-based.

10 Molly Corbett Broad to Joseph Biden, 24
February 2010. Lauren Asher to Joseph Biden,
22 February 2010. Linda D. Hallman to Joseph
Biden, 24 February 2010. Gregory Cendana to
Joseph Biden, 22 February 2010. Rich Williams to
Joseph Biden, 23 February 2010. David Halperin,
23 February 2010. Michael L. Lomax to Joseph
Biden, 24 February 2010. All letters available at:
http://www.whitehouse.gov/sites/default/files/
microsites/100226-capping-student-loan-payments.
pdf.

11 National Association of Student Financial
Aid Administrators, "Policy Themes in
RADD Reports: A Summary Matrix," March
8, 2013, http://www.nasfaa.org/WorkArea/
DownloadAsset.aspx?id=13701; and *Automatic
for the Borrower: How Repayment Based on
Income Can Reduce Defaults and Manage Risk*
(Washington, DC: YI, NASFAA, IHEP, NA, and
HCM, March 2014), http://younginvincibles.org/
wp-content/uploads/2014/03/Automatic-for-the-
Borrower-3.19.14.pdf.

The *Automatic* authors proposed a reform package
termed "auto-IBR" that includes three major
elements: 1) automatically enrolling all borrowers
in a modified IBR plan as the sole repayment
option; 2) new institutional accountability metrics
to replace cohort default rates; and 3) payroll
withholding to repay student loans.

12 Senate Committee on Health, Education, Labor,

CFPB-NAV-0008497

and Pensions, *Higher Education Affordability Act* (Discussion Draft), 2014, http://www.help.senate.gov/imo/media/doc/HEAA%20Discussion%20Draft%20Language%206.25.14.pdf;

*S. 2612 Dynamic Repayment Act of 2014*, Office of Senator Angus King, *The Repay Act* (Discussion Draft) 2014, http://www.king.senate.gov/download/?id=9C912F0A-F897-4B83-8164-B9D479C58E6F&inline=file.

13 Senate Committee on Health, Education, Labor, and Pensions, "HELP Chairman Tom Harkin Unveils Higher Education Affordability Act," http://www.help.senate.gov/imo/media/doc/Higher%20Education%20Affordability%20Act%20Summary%20Final.pdf.

14 *Automatic for the Borrower: How Repayment Based on Income Can Reduce Defaults and Manage Risk* (Washington, DC: YI, NASFAA, IHEP, NA, and HCM, March 2014).

15 Technically the consolidation repayment option currently requires borrowers to complete forms but this is not an inherent design feature. The loans could be consolidated with no paperwork if designed as such. Moreover, monthly payments are not set based on information the borrower reports. Rather, payments are set based on loan balance and interest rate. This makes the income-based plans the only plans where payment amounts are contingent on information conveyed via paperwork.

16 34 CFR 682.214(a)(4)(i).

17 Ibid.

18 34 CFR 682.214(e)(1)(i) states that the borrower must "provide documentation, acceptable to the loan holder, of the borrower's AGI." This manifests as a complicated form explaining different possibilities for alternative documentation. Department of Education: Information for Financial Aid Professionals, "Income-Based (IBR) / Pay As You Earn / Income-Contingent (ICR) Repayment Plan Request," OMB No. 1845-0102, http://ifap.ed.gov/dpcletters/attachments/GEN1222AttachFINAL1845dash0102Expires20151131.pdf.

19 Ibid. Section 5 of the form states, "To be completed if (1) you did not file a federal income tax return for the two most recently completed tax years, (2) your AGI from your most recently filed federal income tax return does not reasonably reflect your current income (due to circumstances such as the loss of or change in employment), or (3) your loan holder(s) informed you that alternative documentation of income is required."

20 Ibid. The examples on the form ("loss of or change in employment") seem aimed at those facing negative incomes shocks.

21 A similar approach could be used with Medicare taxes or information gathered from the National Directory of New Hires.

22 Senate Committee on Health, Education, Labor, and Pensions, *Higher Education Affordability Act* (Discussion Draft), 2014, http://www.help.senate.gov/imo/media/doc/HEAA%20Discussion%20Draft%20Language%206.25.14.pdf

23 34 CFR 682.200(b).

24 Alternatively, the unpaid amount could be rolled into the loan balance, although that means that many borrowers would not really be making payments based on their incomes and this possibility creates an incentive to under-withhold. If the IBR system provides loan forgiveness after a certain number of payments, borrowers who have underpaid in some years may have that amount ultimately forgiven as their future payments, which are based solely on their reported income, never catch up with the amount by which they underpaid in earlier years. Such an outcome would mean that borrowers were not truly repaying based on their incomes.

25 While such a system would automatically increase the priority of the loan payment, students could still opt out and make monthly payments outside of employer withholding.

CFPB-NAV-0008498

CFPB-NAV-0008499





This report carries a Creative Commons license, which permits non-commercial re-use of New America content when proper attribution is provided. This means you are free to copy, display and distribute New America's work, or include our content in derivative works, under the following conditions:

> **Attribution.** You must clearly attribute the work to New America and provide a link back to **www.newamerica.org**.

> **Noncommercial.** You may not use this work for commercial purposes without explicit prior permission from New America.

> **Share Alike.** If you alter, transform, or build upon this work, you may distribute the resulting work only under a license identical to this one.

For the full legal code of this Creative Commons license, please visit creativecommons.org. If you have any questions about citing or reusing New America content, please contact us.

Photos in this report are supplied by, and licensed to, **shutterstock.com**.

© 2014 New America

CFPB-NAV-0008500

CFPB-NAV-0008501

CFPB-NAV-0008502