1700 G Street NW,
Washington, DC 20552



November 2, 2018

**Filed Via ECF**

The Honorable Robert D. Mariani
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503



   Re: *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Mariani:

   In accordance with the Court's October 30, 2018 order (Doc. 109), I write on behalf of the Bureau to respond to the letter filed by Defendants on October 10, 2018 (Doc. 107). For the reasons below, the Bureau respectfully requests that the Court deny the relief that Defendants have sought.

   **1.**  **The Bureau is not improperly withholding documents.** Defendants' claim that the Bureau is withholding responsive documents is baseless. As an initial matter, it is not clear why Defendants expect that the Bureau would be in possession of a large volume of non-privileged responsive documents, when this case concerns Defendants' conduct, and the Bureau has no relevant relationship with Defendants apart from being a regulator. In any event, Defendants point to no authority to support the notion that producing fewer than a certain percentage of documents returned after application of search terms means that documents were improperly withheld. If that were so, parties would have a perverse incentive to craft extremely narrow search terms to achieve a small universe of documents to review. Instead, the Bureau used very broad search terms, including "forbearance," "income driven," and "IDR," to search for, among other things, all documents that relate to any of the allegations in the Complaint. Casting this wide net increased the Bureau's ability to find responsive documents, but it also returned many "false positives." For example, there are myriad ways in which a document mentioned "forbearance" without relating to any allegation in the Complaint, such as being about mortgage servicing or about the conduct of a different student loan servicer. Another reason many documents were nonresponsive is that, of the documents reviewed, only 143,000 were unique documents that pre-dated the January 18, 2017 discovery cutoff and hit on any of the Bureau's search terms (*i.e.*, many were merely a "family member" – a cover email or attachment – associated with a document hitting on a search term).[1]

---

   [1] Defendants' search counts for the terms "Pioneer" and "Navient" (Doc. 107 at 2) include documents post-dating January 18, 2017, as well as family members without hits on those terms. There were approximately 32,000 unique documents that hit on the term "Navient" and 23,000 unique documents that hit on the term "Pioneer" that are dated on or before January 18, 2017. This includes a large number of documents that contain mere references to the investigation and internal communications of enforcement staff, both of which Defendants agreed are not responsive (*see* A2-3); as well as documents that deal with an issue that was not alleged in the Complaint. ("A__" refers to a page of the appendix of supporting documentation filed with this letter.)

Had the Bureau employed the much narrower search terms used by Defendants, there would have been many fewer "false positives." For example, Defendants' search queries required that the term "forbearance" or "IDR" appear within a certain distance of another word such as "good" or "better." This type of query presents a greater risk that responsive documents were missed compared to simply using the term "forbearance." As the Bureau explained to Defendants (an explanation that Defendants have mischaracterized – *see* Doc. 107 at 2), the Bureau took an expansive view of Defendants' document requests and made responsiveness determinations without regard to whether the documents might be helpful or harmful to the Bureau's case. Defendants have no basis for suggesting anything to the contrary. *See, e.g., Carter, Fullerton & Hayes, LLC v. FTC*, 601 F. Supp. 2d 728, 736 (E.D. Va. 2009) ("It would be a stretch for the Court to issue a finding that the agency's procedures [to search for and produce documents] were flawed purely because they did not produce the [private party's] desired results.").[2]

Defendants also incorrectly assert that the Bureau produced none of the documents it obtained from the i3 Group (i3) before this lawsuit. In fact, the Bureau searched those documents and produced not only documents reflecting steering into forbearance, but also documents showing that Navient enrolled borrowers in IDR. Defendants now demand production of all documents from i3 "relating to Defendants," but that is a new document request and, in any event, is impermissibly overbroad because the mere mention of Navient does not make a document relevant. Defendants never sought to discuss with the Bureau the search terms used to locate responsive documents from i3. Indeed, Defendants did not produce relevant communications in which i3 employees told Navient that Navient representatives refused to offer IDR to borrowers. The Bureau only discovered these communications through its subpoena to i3. Nor do Defendants have any basis to object to the subpoena; if Defendants believed that the Bureau's subpoena was deficient (it was not), they were free to serve their own subpoena. Defendants also assert that the Bureau withheld a draft declaration exchanged with a former i3 employee after the January 18, 2017 discovery cutoff; however, the Bureau proposed that both parties share communications with third-party witnesses post-dating January 18, 2017, but Defendants refused.

Finally, Defendants incorrectly claim that the Bureau is withholding communications with Congress or the media. The Bureau searched for responsive communications with Congress or the media and produced all responsive communications located from that search. The Bureau did not locate any communications with Congress or the media concerning the Navient investigation that pre-dated the Complaint (the email with a Congressional staffer referenced by Defendants did not relate to the investigation), but did locate and produce multiple communications with the media on the date that the Complaint was filed. The lack of responsive documents makes perfect sense. With limited exceptions not applicable here, the Bureau's investigations are not public until a settlement is reached or a lawsuit is filed. Thus, as a general matter, the Bureau does not communicate with Congress or the media about its investigations.

**2.     The Bureau's privilege claims are valid.** In claiming that the Bureau's privilege assertions are deficient, Defendants mischaracterize the information they received from the Bureau.

---

[2] Although some of the cases cited in this letter arise in the FOIA context, the common law deliberative process privilege is coextensive with FOIA's deliberative process exemption. *See Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 601 (D.C. Cir. 2001).

For example, to claim that the descriptions for 26 categories of documents described on the Bureau's privilege log are deficient, Defendants point to one phrase in the description provided for five categories: "identification and analysis of problems or failures in the student loan market." Doc. 107 at 5. But the Bureau provided much more information than that for each of those five categories, not only in the privilege log itself (A82-131), but also in two documents Defendants omitted from their filing – a 71-page declaration of a senior Bureau official (A10-80), as well as a September 20, 2018 letter (A138-39). The Bureau included substantial detail on its log, while also disclosing the sender, recipient(s), and date of every withheld email, as well as descriptions of the emails based on grouping them into categories. This was consistent with the parties' agreement that categorical privilege logs were allowed. *See* Doc. 66-2; *see also U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 527 (6th Cir. 2012) (upholding privilege assertions and denying *in camera* review where agency submitted declaration and categorical privilege log justifying assertions of deliberative process privilege); *Auto. Club of NY, Inc. v. Port Auth. of NY & NJ*, 2014 WL 2518959 (S.D.N.Y. June 4, 2014), at *5-7 (same), *aff'd*, 2015 WL 3404111 (S.D.N.Y. May 27, 2015).[3]

Contrary to Defendants' assertions, the Bureau is not required to identify a specific decision to which the withheld communications pertain. *See Access Reports v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991). The Bureau "need only identify the decisionmaking *process* to which the withheld documents contributed." *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 52 (D.D.C. 2012) (quotation omitted); *see also Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018) ("The point of the deliberative-process privilege is to protect internal agency deliberations; it would make no sense for the privilege to turn on whether the internal advice was ultimately followed."). The Bureau has met this requirement. For example, the documents in Category 30 were used in the "process of formulating the Bureau's positions, policies, and strategies for" the student loan market. A138. Discussions about "policy matters are quintessentially deliberative." *ICM Registry, LLC v. Dep't of Commerce*, 538 F. Supp. 2d 130, 135 (D.D.C. 2008); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (privilege applies to "process by which governmental decisions and policies are formulated") (quotation omitted).

Defendants also assert that the Bureau "made no attempt to segregate and produce factual material" in documents withheld as deliberative. But the declaration that Defendants omitted

---

[3] *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980), relied upon by Defendants (Doc. 107 at 4), does not deal with a situation where (as here) the parties agreed that categorical privilege logs would be allowed – which, as Defendants explained, was done "specifically to avoid unnecessary burdens" (A133) – nor does it purport to set forth a bright-line rule about what fields must be contained within a privilege log. Defendants categorical log shows the level of detail they believe is sufficient to assert privileges, and their log is much less detailed than the Bureau's log. *See* A142-43. For example, Defendants asserted the bank examination privilege in sweeping fashion over 6,044 documents (A143), without any description of the nature of the deliberative communications that occurred between Defendants and their regulators, much less any explanation of what they did to determine if the regulator wanted to assert the privilege. *See In re Wilmington Trust Sec. Litig.*, 2016 WL 9753979, at *4 (D. Del. 2016) (bank examiner privilege is a "variant" of the deliberative process privilege) (citing *Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827, 853 n.18 (3d Cir. 1995)); *In re Bankers Tr. Co.*, 61 F.3d 465, 472 (6th Cir. 1995) (privilege can be asserted only by the regulator)

describes how the Bureau analyzed the documents described on its July 6 log to determine what factual information, if any, could be segregated, as well as the results of that analysis for each category. *See* A10-80 (¶¶ 45, 51, 58, 63, 68, 73, 78, 91, 92, 106, 112, 117, 122, 127, 132, 142, 150, 155, 160, 165, 174, 183, 186, 190, 217). This analysis resulted in production of documents with segregable facts disclosed. To the extent any facts related to the alleged conduct in this case were withheld, they reflect the Bureau's internal and deliberative selection or evaluation of those facts, which is privileged. *See Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (allowing withholding of factual material "culled . . . from [a] much larger universe of facts" and that "reflect[ed] an exercise of judgment as to what issues are most relevant to the pre-decisional findings and recommendations") (quotation omitted); *Elec. Frontier Found.*, 890 F. Supp. 2d at 53 (agreeing with government that "employees' deliberative process of selecting and presenting facts" fell within privilege); Doc. 88 (May 4, 2018 Order) at 5-10. Additionally, there are no facts about Defendants' alleged conduct in these documents that Defendants do not already have in their original form.

Defendants are also wrong to claim that there is any blanket prohibition on redacting or withholding for non-responsiveness. Indeed, while Defendants contend that "[t]here is absolutely no basis to do that," they cite a single case which contains no such categorical rule, but rather acknowledges that such redactions are allowed "in limited circumstances." Doc. 107 at 5-6. And as the Bureau explained in a letter to Defendants, those limited circumstances are present here. A8. As the Bureau described, some Bureau document families cover both student loan servicing, as well as topics unrelated to student loan servicing, simply by virtue of the fact that the Bureau deals with a large number of markets. *Id.* Thus, "an email might include one responsive attachment, along with various other attachments that relate to other markets (such as mortgage origination or payday loans), investigations of entities that have no connection to this action, or internal personnel matters (such as human resources issues)." *Id.* The Bureau further explained that redaction or withholding of this information "is appropriate given the complete lack of relevance of such documents and portions of documents to any claim or defense in this action, and also because the withheld information may constitute or contain confidential supervisory information or confidential investigative information relating to non-parties." *Id.* Given the sensitivity and irrelevance of such information, these redactions are appropriate. *See, e.g., Dettmann v. DOJ*, 802 F.2d 1472, 1474-75 (D.C. Cir. 1986) (allowing redaction of non-responsive portions of documents that "cover different subjects [or] refer to people unrelated to plaintiff and her activities") (quotation omitted); *Schiller v. City of NY*, 2006 WL 3592547, at *7 (S.D.N.Y. Dec. 7, 2006) (upholding redaction of portions of documents based on irrelevance of information).

Finally, Defendants' arguments about the Bureau's assertion of law enforcement privilege are without merit. The Bureau is not using that privilege to withhold any information produced by sources that relate to Defendants, or even any information relating to the practices alleged in the Complaint. Portions of certain responsive documents included information about techniques or procedures for law enforcement that are entirely unrelated to any issue in this lawsuit, such as the identity of the Bureau's law enforcement partners in unrelated investigations or subjects of unrelated supervisory actions.

**3.    Neither an *in camera* review nor appointment of a master is warranted.** Because Defendants have identified no legitimate basis to contest the Bureau's productions and privilege logs, an *in camera* review is not necessary. An *in camera* review "is generally disfavored" and "not

warranted" where the agency has demonstrated "with reasonable specificity why the documents are exempt, if the government's claim of exemption is not contradicted in the record, and there is no evidence of bad faith on the part of the agency." *Manna v. DOJ*, 832 F. Supp. 866, 874 (D.N.J. 1993); *see also Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) ("[W]hen the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate") (quotation omitted); *Renal Care Grp.*, 696 F.3d at 527 (upholding deliberative process privilege assertions without *in camera* review); *AIDS Healthcare Found. v. Leavitt*, 256 F. App'x 954, 956 (9th Cir. 2007) (same); *Brinton v. Dep't of State*, 636 F.2d 600, 606 (D.C. Cir. 1980) (same); *Ctr. for Pub. Integrity v. Fed. Election Comm'n*, 2018 WL 4473515, at *4 (D.D.C. Sept. 18, 2018) (same); *EEOC v. FAPS, Inc.*, 2012 WL 1656738, at *32 (D.N.J. 2012) (same).

Defendants' challenges to the Bureau's privilege assertions can be resolved without *in camera* review. The Court has held: "Even if there were policy debates in which agency staff took positions favorable to Defendants, however, these statements would have no legal significance because they would not be official agency positions." Doc. 88 at 10. This holding did not turn on whether guidance was issued; it expressly applied to guidance that was "not ultimately issued." *Id.* at 11. Likewise, intra-agency communications unrelated even to the issuance of possible guidance have no relevance to this case. *See United States v. Elsass*, 2012 WL 353739, at *1 (S.D. Ohio 2012) (denying motion to compel production of intra-agency communications because "'[a]ctions or positions of which Defendants had no knowledge are simply irrelevant") (quotation omitted); *SEC v. Nacchio*, 704 F. Supp. 2d 1099, 1112 (D. Colo. 2010) (denying motion to compel production "general communication[s] among SEC staff regarding accounting issues"). In any event, the Bureau's positions on the issues in this lawsuit were published in its Complaint; prior internal discussions about those issues have no legal significance.

In addition, while Defendants claim a "need" for communications with ED regarding the deliberative process leading to various public reports, they do nothing to elaborate upon that "need." *See* Doc. 107 at 6-7. None of the withheld communications contains any statement blessing Defendants' conduct or expressing a view that such conduct was reasonable – Defendants' only relevance argument. *See* 4/17/18 Hearing Tr. at 60. Defendants have not identified any portion of the public reports that is related to the alleged conduct at issue in this case. Thus, Defendants have not (and cannot) demonstrate that deliberations leading to the reports might contain information about the government's views of Defendants' conduct.  *See Citizens Union of City of NY v. Attorney Gen. of NY*, 269 F. Supp. 3d 124, 171 (S.D.N.Y. 2017) (declining to order *in camera* review where "Plaintiffs have failed to meet their burden of establishing how [the deliberative documents] are relevant to the claims and defenses").

With respect to Defendants' argument that disclosure should be ordered because the Bureau initiated this litigation, there is a difference between cases where the government's conduct is the subject of the litigation, and cases where the government, as a regulator, is suing a private party regarding that party's conduct. The cases relied upon by Defendants fall into the former category. *See Redland Soccer Club*, 55 F.3d at 833-34 (lawsuit concerning alleged exposure to toxic waste deposited by Army); *United States v. Bd. of Educ. of City of Chicago*, 610 F. Supp. 695, 697 (N.D. Ill. 1985) (lawsuit concerning whether United States had complied with consent decree). In contrast, where the government is merely the regulator, courts have frequently upheld assertions of the deliberative process privilege because the issue in the case is the legality of the private party's conduct, and thus the government's nonpublic deliberations are irrelevant. *See, e.g., Int'l Paper Co.*

*v. Fed. Power Comm'n*, 438 F.2d 1349, 1358-59 (2d Cir. 1971).

In a similar vein, a special master is not warranted to adjudicate issues that are without merit. *See, e.g., Milliron v. T-Mobile USA, Inc.*, 2009 WL 3345762, at *23 (D.N.J. Sept. 10, 2009) ("the Court need not sift through reams of [documents]" to adjudicate an unmeritorious argument, "nor need it appoint a special master to do so").

Finally, in considering the necessity of an *in camera* review or a special master, it is important to consider where this case stands:

- Fact discovery is scheduled to close in approximately one month. Yet, just within the past month, Defendants produced approximately 455,000 documents in response to the requests for production served *seventeen months ago*. The Bureau is diligently reviewing these documents and noticing additional depositions as needed.

- In September, Defendants provided phone numbers for former employees – information that the Bureau had requested *six months earlier*. The Bureau is working to contact some of the former employees, and expects to add witnesses to its Rule 26(a)(1) disclosures based on the interviews that are being conducted. Defendants likely will seek to depose those individuals.

- Within the past few weeks, Defendants agreed to produce consumer data requested *over eight months ago*.[4] The Bureau does not know when Defendants will begin or complete that production, but when they do, the Bureau will need to work with its experts to analyze that data. During the investigation, Defendants represented that their data was so complex that it took their employees – who had much greater familiarity with the data – months to analyze.

The Bureau respectfully submits that the parties' efforts should not be diverted from the huge amount of work that is left to be completed. The Bureau has complied with all of its discovery obligations, and Defendants have presented no legitimate argument to the contrary.

Respectfully submitted,
/s/ Nicholas Jabbour

---

[4] As the Court is aware, one roadblock that the Bureau faced was that Privacy Act issues purportedly had to be resolved. However, after the Court's ruling on Privacy Act issues, Navient indicated that the burden of notifying borrowers whose data would be implicated by the Privacy Act was too significant such that Navient would be de-identifying the data. While the Bureau agreed to de-identification, it was perplexing that Navient had raised the Privacy Act as an issue over the course of several months, when there was apparently, in Navient's view, a way to produce the data that would avoid implicating the Privacy Act entirely. In the end, once Navient committed to actually discussing the substance of the Bureau's data requests in a meaningful way, it became evident that the discussion could have proceeded eight months earlier had Navient not been so committed to this (and other) procedural roadblocks.