IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *Plaintiff*, <br><br> v. <br><br> NAVIENT CORPORATION, *et al.*, *Defendants*. | Case No. 3:17-CV-101-RDM <br> (Judge Robert D. Mariani) <br><br> Electronically Filed |

**DECLARATION OF SETH FROTMAN**

I, Seth Frotman, declare as follows:

1. My name is Seth Frotman. I am currently the Executive Director of the nonprofit Student Borrower Protection Center. I am making this declaration in connection with a subpoena served on me by Navient Corporation, demanding that I sit for a deposition concerning my former federal government service.

2. I submit this declaration to help explain why, if the deposition were to proceed, I would not have any relevant, non-privileged information to offer. I also want to highlight my concern that allowing a deposition like this would set a bad precedent. I fear that it would be a green light to litigants nationwide that they can drag me and other former high-level officials into the very large number of court cases over student-loan-servicing and other consumer-finance practices, which would be very burdensome. In addition to inappropriately pulling back the curtain on high-level policymaking, and chilling the frank exchange necessary to a good deliberative process, I also worry that this would discourage people from future public service.

3. Until September 1, 2018, I was the Student Loan Ombudsman of the Consumer Financial Protection Bureau—the official charged with overseeing the nation's student loan

market. The Student Loan Ombudsman is the only position in the Bureau appointed directly by a member of the cabinet: the Secretary of the Treasury. *See* 12 U.S.C. § 5535(a). Along with the Bureau's Director and Deputy Director, it is one of less than a handful of Bureau positions specifically listed in the Dodd-Frank Act. Congress gave the Ombudsman the power, unique within the Bureau, to publicly issue his or her own reports, and to make independent recommendations, to the Secretary of Treasury, the Secretary of Education, and the relevant committees in Congress. *See* 12 U.S.C. §§ 5535(b)(4) and 5535(d). At the time of my departure, I was a member of the Senior Executive Service (SES). I became the Ombudsman in 2015, after my predecessor, Rohit Chopra (now a Federal Trade Commissioner), resigned. Treasury Secretary Jack Lew designated me to fill this role on an acting basis from June 2015 to March 2016, and on a permanent basis beginning in March of 2016. Before that, I was Deputy Director of the Office for Students (2015) and Senior Advisor in the Office of Servicemember Affairs (2011-2015). I have also worked as a staff member focused on education policy in the U.S. Senate Committee on Health, Education, Labor and Pensions and, before that, as Deputy Chief of Staff and Legislative Director for U.S. Congressman Patrick Murphy of Pennsylvania's 8th District. I am an attorney and a member in good standing of the New Jersey Bar.

4. From the time that my predecessor first assumed the role in 2011 until my resignation, the CFPB Student Loan Ombudsman served as the senior official at the CFPB responsible for overseeing all policymaking on student loans. In this capacity, I chaired the cross-Bureau policymaking body focused on student loans comprised of representatives from each of the Bureau's primary divisions—Research, Markets and Regulations, Supervision, Enforcement and Fair Lending, Consumer Education and Engagement, External Affairs, Operations, and the Legal Division. I also led the Bureau's Office for Students and Young Consumers.

5. The vast majority of my seven years of service at the Bureau was devoted to the internal development of a wide range of consumer-protection policy—first on issues affecting military families (from 2011 to 2015) and then on issues affecting students and student-loan borrowers (from 2015 to 2018). Once finalized, the policies on which I worked were made public. Beforehand however, the communications and interactions concerning internal policy development would have been pre-decisional, deliberative, and not subject to public disclosure.

6. In March 2015, President Obama issued a Presidential Memorandum laying out a series of specific instructions to the U.S. Department of the Treasury, the U.S. Department of Education, the Office of Management and Budget, and the White House Domestic Policy Council to study the effects of student debt and take specific actions to address abuses by the student loan industry and strengthen protections for borrowers. As part of this Presidential Memorandum, these agencies were instructed to consult with the Bureau on a broad range of work to take place between March 2015 and January 2017. I was the senior official designated to lead the Bureau's work on this effort—which included regular participation in senior-level staff discussions about specific policymaking efforts and the creation and transmittal of confidential work-product designed to inform and support these efforts.

7. To support the Administration's future policy and regulatory initiatives on student loan servicing and perform the consultative role envisioned by the Presidential Memorandum, the Bureau held a field hearing in June 2015 and launched a "public inquiry" into student loan servicing practices. I directed this inquiry and directed the development of the Bureau's landmark 2015 report on student loan servicing, which included a series of specific policy recommendations to address these failures.

8. In addition to the specific consultation function contemplated under the Presidential Memorandum, Director Cordray instructed the Bureau to consider how to use its

independent authorities to crack down on abuses across the student loan servicing market. As we compiled the evidence of widespread problems that informed the report described above, we also conducted an internal deliberative process to evaluate the applicability of the rulemaking tool to this market. This internal deliberative process culminated with the Bureau's 2015 public announcement that student loan servicing would be placed on the Bureau's rulemaking calendar.

9. While at the Bureau, I did not have *any* authority over the initiation, investigation, or litigation of enforcement actions (whether against Navient or any other company). Rather, to the extent that I was involved in communications related to investigations or enforcement actions, that involvement was entirely at the behest of, and at the direction of, Office of Enforcement attorneys—with whom I worked as a subject-matter expert to help them develop their conclusions, opinions, and legal theories in preparation for and during investigations and litigation.

10. The previous five paragraphs, taken together, should largely explain why I would be unable to offer relevant, non-privileged information in this matter. To the extent I spent any time related to the Navient matter during my government service, all work-product generated would be privileged. As is true for all senior-level federal officials engaged in policymaking, any work-product generated to support internal decision-making related to student loan servicing would also be privileged. Further, any counsel I would have provided to the team investigating or litigating this matter would have been covered by attorney-client privilege. It is therefore difficult to imagine any deliberation, advice, or work-product directly related to this matter—or any deliberations or decision-making processes about which I may have specific, relevant knowledge—that would fall outside of the scope of the applicable privileges.

11. Other than participating (along with Director Rich Cordray) in a single public press conference on the day that this action was filed, I did not make public statements about this

action within the relevant time period. Nor did I engage in any substantive communications concerning the investigation or action outside the Bureau's shield of privilege—which encompassed State Attorneys General and the U.S. Department of Education—during the relevant time period. I believe that doing so would have been a violation of my confidentiality obligations as a Bureau employee and as an attorney.

12. In addition to policymaking and any assistance that I provided to Office of Enforcement lawyers, Navient also says that it wants to depose me concerning the "circumstances of [my] resignation." I submitted my letter of resignation on August 27, 2018, and my last day at the Bureau was September 1, 2018—well after this action was underway—so I cannot imagine what the "circumstances of [my] resignation" could possibly have to do with information needed to address the claims and defenses that are actually at issue in this litigation.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on December 4, 2018.

*/s/ Seth Frotman*
_____
Seth Frotman