IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL
PROTECTION BUREAU,
            *Plaintiff*,

v.

NAVIENT CORPORATION, *et al.*,
            *Defendants*.

Case No. 3:17-CV-101-RDM
(Judge Robert D. Mariani)

Electronically Filed

# MEMORANDUM IN SUPPORT OF NON-PARTY SETH FROTMAN'S MOTION TO QUASH SUBPOENA, TO STAY DEPOSITION, AND IN THE ALTERNATIVE FOR PROTECTIVE ORDER

CARLO SABATINI (PA 83831)
SABATINI FREEMAN LLC
216 North Blakely Street
Dunmore, PA 18512
Tel.: (570) 341-9000
Fax: (570) 504-2769
*carlo@bankruptcypa.com*

DEEPAK GUPTA (DC 495451)
GUPTA WESSLER PLLC
1900 L Street, NW
Washington, DC 20036
Tel.: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*

*Attorneys for Non-Party Movant Seth Frotman*

# TABLE OF CONTENTS

Table of authorities ........................................................................................ ii

Introduction ................................................................................................... 1

Background .................................................................................................... 4

    A.    Mr. Frotman's service as a top CFPB policy official .................. 4

    B.    Following a year and a half of extensive discovery, Navient
          first seeks to depose Mr. Frotman after he resigns ..................... 5

    C.    Unsuccessful efforts to cooperate with Navient's counsel .......... 7

Argument ....................................................................................................... 8

    I.    Navient cannot demonstrate the exceptional circumstances
        necessary to justify deposing a high-ranking former
        government official like Mr. Frotman. ....................................... 8

    II.    Navient cannot show that deposing Mr. Frotman is
        necessary to discover information relevant to its claims or
        defenses in this litigation........................................................... 13

    III.    The proposed deposition overwhelmingly covers
        information protected by the work-product doctrine and
        the Bureau's deliberative-process, law-enforcement, and
        attorney-client privileges. ......................................................... 15

Conclusion .................................................................................................... 18

## TABLE OF AUTHORITIES

### Cases

*Bank of Commerce of Laredo v. City National Bank of Laredo*,
  484 F.2d 284 (5th Cir. 1973) ....................................................................... 9

*Consumer Financial Protection Bureau v. Navient*,
  2018 WL 2088760 (May 4, 2018) ........................................................ 3, 14

*Chazanow v. Sussex Bank*,
  2014 WL 2965697 (D.N.J. 2014) ............................................................. 13

*Fox v. Lackawanna County*,
  2018 WL 4095854 (M.D. Pa. 2018) ........................................................ 13

*In re Cendant Corp. Securities Litigation*,
  343 F.3d 658 (3d Cir. 2003) ..................................................................... 16

*Lederman v. New York City Department of Parks*,
  731 F.3d 199 (2d Cir. 2013) ................................................................. 9, 10

*Redland Soccer Club, Inc. v. Department of Army*,
  55 F.3d 827 (3d Cir. 1995) ....................................................................... 17

*Shelton v. American Motors*,
  805 F.2d 1323 (8th Cir. 1986) ................................................................... 3

*United States ex rel. Touhy v. Ragen*,
  340 U.S. 462 (1951) ............................................................................ 1, 17

*United States v. Buzzard*,
  674 F.2d 1382 (11th Cir. 1982) ................................................................ 17

*United States v. Morgan*,
  313 U.S. 409 (1941) .............................................................................. 2, 9

*United States v. Sensient Colors*,
  649 F.Supp.2d 309 (D.N.J. 2009) ..................................................... 10, 12

*United States v. Wal-Mart Stores, Inc.*,
  2002 WL 562301 (D. Md. 2002) .............................................................. 10

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ............................................................................... 9

### Statutes and Regulations

12 U.S.C. § 5535(a) ...................................................................................... 11

12 U.S.C. § 5535(b)(4) .................................................................................. 11

12 U.S.C. § 5535(d)...................................................................................... 11

12 C.F.R. § 1070.30(e)(3) ............................................................................ 2

12 C.F.R. § 1070.32(a)................................................................................. 2

12 C.F.R. § 1070.35...................................................................................... 2

12 C.F.R. § 1070.36................................................................................. 2, 17

## INTRODUCTION

Navient has served a deposition subpoena on Seth Frotman, the CFPB's former Student Loan Ombudsman. Absent an immediate stay or other order of this Court, Navient's subpoena puts Mr. Frotman in an untenable situation: a choice between incompatible legal commands.

On the one hand, Navient's subpoena commands Mr. Frotman to appear for the purpose of testifying about a broad array of topics—starting with the obviously privileged ("communications related to the investigation") and ending with the plainly irrelevant (the "circumstances of [his] resignation," which occurred more than a year after the parties' agreed-upon time period). In response, Mr. Frotman has had to retain his own personal lawyers, who have repeatedly tried to get Navient to clarify or limit its subpoena. Navient has steadfastly refused, insisting that it need not even stick to its own proposed topics. Based on the subpoena alone, it would seem that he must submit to Navient's open-ended fishing expedition.

On the other hand, even if Mr. Frotman were intent on divulging privileged and confidential matters arising from his government service, as things stand, he would be legally barred from testifying. Like most federal agencies, the CFPB has issued regulations under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), to allow the agency an opportunity to assess

burdensomeness, privilege, and confidentiality concerns in the first instance—including protecting its "deliberative processes" and "ongoing investigations or enforcement proceedings." 12 C.F.R. § 1070.36. Until the agency (or this Court) can make an informed assessment of Navient's demands, Mr. Frotman's legal obligation is unambiguous: "[N]o employee or former employee of the CFPB shall, in response to a demand or request[,] provide oral or written testimony by deposition . . . concerning any official information." *Id.* § 1070.32(a). (Here, "official information" means "all information of any kind . . . acquired by CFPB employees or former employees as part of their official duties or because of their official status." *Id.* § 1070.30(e)(3).) If the deposition is not stayed, Mr. Frotman must nevertheless "decline to comply with the demand." *Id.* § 1070.35.

For three reasons, the Court should release Mr. Frotman from this conundrum and quash Navient's subpoena. *First*, Navient cannot overcome the strong presumption against deposing former high-level officials like Mr. Frotman. To do so, Navient would have to demonstrate extraordinary circumstances—among other things, that the testimony it seeks is essential to its defense and is necessary to obtain relevant first-hand information unavailable from any other source. This longstanding rule, derived from *United States v. Morgan*, 313 U.S. 409 (1941), is designed to protect agency

2

deliberative processes, encourage public service, and deter litigants from harassing officials and former officials on account of their official duties.

*Second*, Navient cannot demonstrate that it is necessary to depose Mr. Frotman to get information relevant to this case. This Court has already held that the communications and internal deliberations of CFPB policymakers like Mr. Frotman "have no legal significance" and "are simply not relevant to Defendants' defenses," which turn on whether Navient "engaged in any ""unfair, deceptive, or abusive act[s] or practice[s].'" *CFPB v. Navient*, 2018 WL 2088760, at *4 (May 4, 2018). And, even apart from his status as a former official, Mr. Frotman is entitled to heightened protection as a non-party, requiring Navient to meet an even higher standard of relevance than for ordinary party discovery. This Navient simply cannot do.

*Finally*, the proposed deposition overwhelmingly covers information protected by the work-product doctrine and the Bureau's deliberative-process, law-enforcement, and attorney-client privileges. And, to the extent that Navient seeks to depose Mr. Frotman because he is an attorney who assisted enforcement counsel in preparing their case, such a tactic "disrupts the adversarial system," "lowers the standards of the profession," and "adds to the already burdensome time and costs of litigation." *Shelton v. Am. Motors*, 805 F.2d 1323, 1327 (8th Cir. 1986). It should not be encouraged.

# BACKGROUND

## A.     Mr. Frotman's service as a top CFPB policy official

Until September 1, 2018, Seth Frotman was the CFPB's Student Loan Ombudsman—the top federal official charged with overseeing consumer protection in the nation's student loan market, and the only official in the Bureau appointed directly by a member of the President's cabinet: the Secretary of the Treasury. Frotman Decl. ¶ 3. Mr. Frotman chaired the cross-Bureau policymaking body focused on student loans and also led the staff of the Bureau's Office for Students and Young Consumers. *Id.* ¶ 4.

The vast majority of Mr. Frotman's role was devoted to policy development. *Id.* ¶ 5. In 2015, President Obama directed federal agencies to study the effects of student debt, address industry abuses, and strengthen borrower protections. *Id.* ¶ 6. During the period in which the Bureau's work under this directive took place (March 2015 through January 2017), Mr. Frotman was the senior official designated to lead this internal policy process. *Id.* Among other things, he directed the development of a major 2015 report making specific recommendations. *Id.* ¶ 7. In addition, Director Cordray instructed the Bureau to consider how to use its own authorities to address abuses. *Id.* ¶ 8. In response, Mr. Frotman and his staff conducted an internal deliberative process to evaluate rulemaking options, culminating

with the Bureau's 2015 announcement that student loan servicing would be placed on the agency's rulemaking calendar. *Id.*

In contrast with his top role as a policymaker, Mr. Frotman "did not have *any* authority over the initiation, investigation, or litigation of enforcement actions (whether against Navient or any other company)." *Id.* ¶ 9. Instead, any involvement would have been "entirely at the behest of, and at the direction of" enforcement attorneys, "with whom [he] worked as a subject-matter expert to help them develop their conclusions, opinions, and legal theories." *Id.* Beyond a single press conference on the day that the action was filed, Mr. Frotman "did not make public statements about this action within the relevant time period." *Id.* ¶ 11. "Nor did [he] engage in any substantive communications concerning the investigation or action outside the Bureau's shield of privilege—which encompassed State Attorneys General and the U.S. Department of Education—during the relevant time period." *Id.* Doing so "would have been a violation of [his] confidentiality obligations as a Bureau employee and as an attorney." *Id.*

## B. Following a year and a half of extensive discovery, Navient first seeks to depose Mr. Frotman after he resigns

As far as he and his counsel are aware, Navient never identified Mr. Frotman or any member of his former staff as a potential witness until after he resigned from the CFPB. Gupta Decl. ¶ 2. Navient thus apparently never

suggested a need to seek discovery from Mr. Frotman or his staff between May 2017, when discovery commenced, and October 2018, when it decided to subpoena him. Nor did Navient serve Mr. Frotman or any member of his former staff with any interrogatories, or otherwise seek to obtain any information from them by other means. *Id.* Instead, Mr. Frotman first learned of Navient's intentions when he was served with a subpoena seeking to depose him on "your former role" at the CFPB, "including but not limited to" the following topics:

1. Your knowledge of, participation in, and Communications related to the Investigation and the Servicing Practices alleged in the Complaint.

2. Your knowledge of, participation in, and Communications related to the [CFPB's] decisions, actions, and/or statements in connection with the Action.

3. Your communications and interactions with Third Parties, including the U.S. Department of Education and any other federal agencies, any State Attorney General, any members or staff of the U.S. Congress, consumer advocacy organizations, any employee, agent, or officer of the [CFPB], and/or the media, relating to the Investigation or Action.

4. Your knowledge of the factual basis of the allegations in the Complaint.

5. Your public statements during the Relevant Time Period relating to the Investigation or this Action.

6. Your knowledge of and involvement in Communications between the [CFPB] and the U.S. Department of Education

relating to proposed and final rules, regulations, and guidance the [CFPB] or Department of Education considered or issued relating to Servicing Practices or Communications relating to the Federal Loan Rehabilitation Program that are the subject of the allegations in the [CFPB's] Complaint filed in this Action.

7.  The circumstances of your resignation from the [CFPB].

8.  The steps you have taken to prepare to answer questions on the foregoing topics.

*Id.*, Exhibit 1.

## C.   Unsuccessful efforts to cooperate with Navient's counsel

Shortly after being retained, Mr. Frotman's lawyers approached Navient's counsel with the aim of working cooperatively to identify and resolve issues concerning the subpoena. Gupta Decl. ¶ 3. They wrote to Navient's counsel on October 23, October 30, November 3, and November 9—each time respectfully requesting Navient to answer a few basic questions about the relevance, burdensomeness, and apparently privileged nature of the inquiries. *Id.* ¶¶ 3–4. Each time, Navient declined. Eventually, Navient's counsel wrote back to say that it did not have any obligation to clarify its proposed deposition. "Our initial subpoena included a list of topics as a courtesy to Mr. Frotman," Daniel Kearney wrote. *Id.* ¶ 5. "But we were not required to provide you any topics at all, and we do not have an obligation to clarify for you exactly what questions we intend to ask in the deposition."

7

*Id.* Then, on November 26, counsel met and conferred by telephone. *Id.* ¶ 7.

Navient reiterated its position that it has no obligation to clarify or explain its

proposed inquiries and stated that the proposed deposition would not even

necessarily be "limited" to the open-ended topics it had identified. *Id.*

## ARGUMENT

### I.   Navient cannot demonstrate the exceptional circumstances necessary to justify deposing a high-ranking former government official like Mr. Frotman.

The threshold problem with Navient's subpoena is that it cannot

overcome the strong presumption that former high-level federal agency

officials like Mr. Frotman are immune from depositions concerning

information acquired in the course of their official duties—especially where,

as here, the deposition is aimed at policymaking and law-enforcement

functions. Federal courts uniformly hold that, to overcome this presumption,

"a party must demonstrate exceptional circumstances justifying the

deposition," meaning that the party must "identify with particularity the

information" sought and show that the official has "first-hand knowledge" of

relevant, non-privileged information that "cannot be obtained through

other, less burdensome or intrusive means." *Lederman v. New York City Dep't of Parks*, 731 F.3d 199, 203 (2d Cir. 2013).[1]

This "exceptional circumstances" rule derives from *United States v. Morgan*, 313 U.S. 409, 422 (1941), in which the Supreme Court strongly cautioned against deposing top federal officials, citing the need to protect "the integrity of the administrative process." Since then, the Supreme Court has repeatedly warned of the "heavy costs" of saddling former federal officials with discovery into "discussions and deliberations that led to [] policies and governmental acts." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860–61 (2017). Courts have also particularly discouraged deposing agency officials responsible for financial regulatory policy and enforcement. *See Bank of Commerce of Laredo v. City Nat'l Bank of Laredo*, 484 F.2d 284, 288 (5th Cir. 1973) (explaining that such depositions "would be utterly destructive of the manifested Congressional intent to vest a broad discretion to the expertise of an administrative official in this sensitive and complex area of banking").

---

[1] Additionally, when an agency has "regulations prohibiting a former [] employee from testifying as to information acquired during the performance of his official duties without approval," courts may quash the subpoena if the party hasn't taken steps to obtain approval. *United States v. Buzzard*, 674 F.2d 1382, 1387 (11th Cir. 1982). This typically requires the party to give the agency "a summary of the desired testimony," facilitating an informed assessment of burdensomeness and privileges. *Id.*; *see* 12 C.F.R. § 1070.36 (factors to be assessed); *id.* § 1070.32(a) (prohibition on testimony of former employees absent approval).

The concerns animating the exceptional-circumstances rule—protecting deliberations and encouraging public service—"apply with equal force to situations in which the depositions of *former* high government officials are sought." *United States v. Wal-Mart Stores, Inc*., 2002 WL 562301, *3 (D. Md. 2002) (quashing subpoena to former high-ranking consumer-protection official); *Lederman*, 731 F.3d at 203 (quashing subpoena to depose a former deputy mayor); *United States v. Sensient Colors*, 649 F.Supp.2d 309, 316 (D.N.J. 2009) (quashing subpoena to former environmental administrator). Courts recognize that "[s]ubjecting former officials' decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." *Wal-Mart*, 2002 WL 562301, at *3. "If the immunity *Morgan* affords is to have any meaning, the protections must continue on the official's departure from public service." *Id.*

Mr. Frotman's role unquestionably qualified him for the *Morgan* presumption. Until he announced his resignation on August 27, 2018, he was the Student Loan Ombudsman of the Consumer Financial Protection Bureau. His resignation was widely covered in the national press, which highlighted his role as "the government's top official overseeing the $1.5

trillion student loan market."[2] The Student Loan Ombudsman is the only position in the Bureau appointed directly by a member of the cabinet: the Secretary of the Treasury. *See* 12 U.S.C. § 5535(a). Congress gave the Ombudsman the power, unique within the Bureau, to publicly issue his or her own reports, and to make independent recommendations, to the Secretary of Treasury, the Secretary of Education, and the relevant committees in Congress. *See* 12 U.S.C. §§ 5535(b)(4) and 5535(d). Numerous courts have applied the doctrine to state and federal officials of lower rank, such as regional administrators, deputies, and legal counsel.[3]

---

[2] Associated Press, *Top Student Loan Official Resigns, Citing White House Hostility to Borrowers*, Bloomberg, L.A. Times, Aug. 27, 2018 ("The government's top official overseeing the $1.5 trillion student loan market resigned in protest on Monday, citing what he says is the White House's open hostility toward protecting the nation's millions of student borrowers."); *see also* Laura Meckler and Jeff Stein, *Top student loan watchdog resigns over Trump administration policies*, Washington Post, Aug. 27, 2018; Stacy Cowley, *Student Loan Watchdog Quits, Saying Trump Administration Is Harming Students*, N.Y. Times, Aug. 27, 2018 ("A top federal official in charge of handling complaints about student loans stepped down on Monday, blasting the Trump administration for protecting predatory lenders at the expense of borrowers").

[3] *See Sensient Colors*, 649 F. Supp. 2d at 321 (a former regional administrator covering one of the EPA's ten regions); *Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002) (deputy chief of staff of the EPA); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (several Labor Department officials, including a regional administrator of OSHA); *Alexander v. FBI*, 1999 WL 270022, *1 (D.D.C. 1999) (one of several deputy White House counsels and assistants to the President); *RI, Inc. v. Gardner*, 2011 WL 4974834 (E.D. N.Y. 2011) (the solicitor of the Labor Department); *New York v. Nat'l R.R. Passenger Corp.*, 2007 WL 4377721 (N.D. N.Y. 2007) (a

District courts in the Third Circuit have developed a five-prong inquiry "to determine whether extraordinary circumstances exist in a given case." *Sensient Colors*, 649 F. Supp.2d at 322. Under this inquiry, the party seeking the deposition must show that (1) the official's testimony is necessary to obtain relevant information that is not available from another source; (2) the official has first-hand information that cannot reasonably be obtained from another source; (3) the testimony is essential to the case at hand; (4) the deposition would not cause significant interference with official duties; and (5) the evidence sought is not available through less burdensome means or alternative sources. *Id.*

Navient has not only failed to make this special showing; it has declined to show Mr. Frotman or the CFPB the ordinary courtesy of clarifying its proposed inquiries and their relevance. It has not explained why, if Mr. Frotman is uniquely in possession of essential information, it failed to identify him until the eve of discovery closing. It has not explained why it did not seek information from him or any of his staff via interrogatories or other means. The bottom line, as Mr. Frotman explains at

---

former first deputy comptroller); *Thomas v. Cate*, 2010 WL 1343789 (E.D. Cal. 2010) (the legal affairs secretary in the Governor's office); *Central Valley Chrysler Valley Jeep, Inc. v. Witherspoon*, 2006 WL 2619962 (E.D. Cal. 2006) (the executive officer of the state Air Resources Board); *K.C.R. v. Cnty. of Los Angeles*, 2014 WL 3434257 (C.D. Cal. 2014) (undersheriff of city police).

length in his declaration, and as further discussed below, is that he "would not have any relevant, non-privileged information to offer" in this case. Frotman Decl. ¶ 2. Navient has a high burden to show otherwise.

## II. Navient cannot show that deposing Mr. Frotman is necessary to discover information relevant to its claims or defenses in this litigation.

Even apart from the *Morgan* doctrine, Navient cannot show that Mr. Frotman's deposition is necessary to elicit relevant, non-privileged information, and that its relevance outweighs the burdensomeness to Mr. Frotman. "[T]he subpoenaing party bears the initial burden to establish the relevance of the material sought" in response to a motion to quash. *Fox v. Lackawanna Cnty.*, 2018 WL 4095854 (M.D. Pa. 2018) (Caputo, J.). Mr. Frotman "is a non-party and therefore is afforded greater protection from discovery than a normal party." *Chazanow v. Sussex Bank*, 2014 WL 2965697, at *3 (D.N.J. 2014) In particular, "the standards for nonparty discovery require a stronger showing of relevance than for simple party discovery." *Id.*

Even if the ordinary standards of relevance were applied, Navient's attempt to depose Mr. Frotman on his high-level policymaking role at the Bureau would fail largely for the reasons already articulated in this Court's May 4 order. That order carefully considered Navient's request to the CFPB for "documents related to proposed or final policies or guidance" on student

loan servicing. *CFPB v. Navient*, 2018 WL 2088760, at *2 (May 4, 2018). Echoing language in Navient's subpoena to Mr. Frotman, the request at issue covered "internal and external communications with stakeholders such as the Department of Education, State Attorneys General, borrowers, members of Congress, and consumer advocacy organizations." *Id.*

Citing the need to preserve the confidentiality of agency deliberations, this Court concluded that, with one potential exception, "the discovery that Defendants seek is not relevant to any of their defenses." *Id.* at *4. Inquiries concerning Bureau policymaking and deliberations on student-loan servicing, the Court explained, "have no legal significance" and "are simply not relevant to Defendants' defenses," which turn on whether Navient "engaged in any 'unfair, deceptive, or abusive act[s] or practice[s]' in violation of the Consumer Financial Protection Act." *Id.* (quoting 12 U.S.C. § 5536(a)(1)(B)). "What agency staff said in communications leading up to the issuance or non-issuance of rules, policies, or guidance has no bearing on that determination." *Id.*

And, even the one potential exception suggested in the Court's order (which held open the possibility that certain communications between the CFPB and the Department of Education might have relevance to this action) is inapplicable here. The Court's identification of that exception rested

entirely on Navient's "status as a government contractor," related to which the Court permitted the production of "non-privileged communication . . . with the Department of Education," excluding "predecisional communications" related to specified rules "or any other precdecisional communications related to proposed rules, regulations, and guidance that were not ultimately issued." *Id.* at *5. But Navient's subpoena does not seek any non-privileged communications relating to its "role as a government contractor." To the contrary, as Mr. Frotman explains in his declaration, he did not "engage in any substantive communications concerning [the Navient] investigation or action outside the Bureau's shield of privilege— which encompassed State Attorneys General and the U.S. Department of Education—during the relevant time period." Frotman Decl. ¶ 11. Simply put, Mr. Frotman has nothing relevant to offer here.

## III. The proposed deposition overwhelmingly covers information protected by the work-product doctrine and the Bureau's deliberative-process, law-enforcement, and attorney-client privileges.

Finally, Navient's subpoena must be quashed in its entirety because it is premised on an unconcealed disregard for the confidential and privileged nature of the information that it seeks. Virtually every topic identified in Navient's subpoena overwhelmingly covers information protected by the work-product doctrine and the applicable privileges belonging to the Bureau.

Topics one, two, three, four, and five all focus on the assistance that Mr. Frotman and his staff may have provided to line enforcement lawyers in preparing their investigation of, and litigation against, Navient, and knowledge arising therefrom. But, as he explains in his declaration, Mr. Frotman "did not have *any* authority over the initiation, investigation, or litigation of enforcement actions (whether against Navient or any other company)." *Id.* ¶ 9. Any involvement would therefore have been "entirely at the behest of, and at the direction of" enforcement attorneys, "with whom [he] worked as a subject-matter expert to help them develop their conclusions, opinions, and legal theories." *Id.* Such matters would unquestionably constitute "core" or "opinion" work product because they would necessarily reflect the "mental impressions, conclusions, opinion, or legal theories" of the attorneys who directed Mr. Frotman and his staff. *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003). Such opinion work product receives the highest level of protection and can be overcome "only upon a showing of rare and exceptional circumstances." *Id.* Meanwhile, topic six concerns the development of "proposed rules, regulations, and guidance"—matters that go to the heart of the deliberative-process privilege and the *Morgan* doctrine—and that are precisely the sort of predecisional communications excluded by this Court's May 4 order. *See also Redland Soccer*

*Club, Inc. v. Dep't of Army*, 55 F.3d 827, 854 (3d Cir. 1995). Only one of Navient's topics, topic seven—concerning the "circumstances of [Mr. Frotman's] resignation"—is not overwhelmingly focused on privileged information. But it is also well outside the parties' agreed-upon time period and has no discernible relevance to the claims or defenses in this case.

When Mr. Frotman's counsel raised these confidentiality and privilege concerns and sought clarification, Navient's only response was that the relevant privileges "belong to the government, and Mr. Frotman does not have standing to assert them." Gupta Decl., Exh. 9. This conundrum—that depositions of former high-ranking policymaking officials put them in the uncomfortable position of having to reveal agency deliberations and confidences—is precisely why the *Morgan* doctrine exists. It is also why agencies issue regulations, under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), to protect their "deliberative processes" and "ongoing investigations or enforcement proceedings." 12 C.F.R. § 1070.36. Where, as here, a deposition proponent has failed to give the agency enough information to assess these concerns in the first instance, that may be reason enough to quash the subpoena. *See United States v. Buzzard*, 674 F.2d 1382, 1387 (11th Cir. 1982). At the very least, the Court should stay the deposition

17

until Navient has attempted to meet its burden to identify some legitimate basis for the proposed deposition.

## CONCLUSION

This Court should issue an order immediately staying the proposed deposition scheduled for December 14, 2018, until such time as this Court can decide the motion to quash, the CFPB can make a determination under its regulations, or both. For all the reasons given above, the Court should also issue an order quashing the subpoena. In the alternative, if the Court declines to do so, it should issue an appropriate protective order sharply limiting any deposition to ensure that it covers only non-privileged, relevant first-hand information essential to Navient's defenses and unavailable from any other source.

Respectfully submitted,

/s/ Deepak Gupta

| | |
|---|---|
| CARLO SABATINI (PA 83831) | DEEPAK GUPTA (DC 495451) |
| SABATINI FREEMAN LLC | GUPTA WESSLER PLLC |
| 216 North Blakely Street | 1900 L Street, NW, Suite 312 |
| Dunmore, PA 18512 | Washington, DC 20036 |
| Tel.: (570) 341-9000 | Tel.: (202) 888-1741 |
| Fax: (570) 504-2769 | Fax: (202) 888-7792 |
| carlo@bankruptcypa.com | deepak@guptawessler.com |

*Attorneys for Non-Party Movant Seth Frotman*

## CERTIFICATE OF WORD COUNT

I hereby certify that this memorandum complies with Local Rule 7.8(b) because it contains 3,953 words, as calculated by my word processing program.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, I electronically filed this memorandum through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*/s/ Deepak Gupta*
Deepak Gupta