# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | |
| Navient Corporation, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF
# <u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

SUMMARY OF UNDISPUTED FACTS .................................................................2

I.      THE CFPB'S "STEERING" ALLEGATIONS...........................................2

II.     FEDERAL REPAYMENT OPTIONS .......................................................2

III.    NAVIENT PROVIDED INFORMATION ABOUT IDR TO BORROWERS....................4

IV.     BORROWERS IDENTIFIED BY THE CFPB ...........................................5

        A.      Borrowers Informed About IDR, But Ineligible .................................7

        B.      Borrowers Who Enrolled in IDR ........................................................8

        C.      Borrowers Who Avoided Efforts to Inform Them About IDR...........12

ARGUMENT .........................................................................................................14

I.      NAVIENT DID NOT ENGAGE IN "STEERING" .................................15

        A.      The Undisputed Facts Show That None Of The CFPB's Borrowers
                Were "Steered"..................................................................................15

        B.      The Undisputed Material Facts Require Summary Judgment On
                Counts I and II...................................................................................20

CONCLUSION ......................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Campuzano-Burgos v. Midland Credit Management, Inc.*,
    550 F.3d 294 (3d Cir. 2008) ................................................................................17

*Casey v. Florida Coastal School of Law, Inc.*,
    No. 3:14-CV-1229, 2015 WL 10096084 (M.D. Fla. Aug. 11, 2015) ...............17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................14

*CFPB v. ITT Educational Services, Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015)..........................................................20, 21

*Cohen v. American Security Insurance Co.*,
    735 F.3d 601 (7th Cir. 2013) ......................................................................16, 20

*Croftcheck v. Accounts Recovery Bureau, Inc.*,
    No. 1:11-CV-1220, 2012 WL 1378683 (M.D. Pa. Apr. 20, 2012) ...............18, 2

*Federal Trade Commission v. Amazon.com, Inc.*,
    No. C14-1038, 2016 WL 10654030 (W.D. Wash. July 22, 2016).....................18

*Federal Trade Commission v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ...........................................................................14

*Ford v. Hotwire, Inc.*,
    No. 07–CV–1312, 2008 WL 2874305 (S.D. Cal. Feb. 25, 2008) .....................17

*Harris v. Las Vegas Sands, LLC*,
    No. CV 12–10858, 2013 WL 5291142 (C.D. Cal. Aug. 16, 2013)....................17

*Johnston v. HBO Film Management, Inc.*,
    265 F.3d 178 (3d Cir. 2001) .............................................................................15

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990).........................................................................................15

*Moody v. Atlantic City Board of Education*,
    870 F.3d 206 (3d Cir. 2017) .............................................................................14

*Tennier v. Wells Fargo Bank, N.A.*,
    666 F. App'x 689 (9th Cir. 2016) ........................................................................18

**State Cases**

*Gomez-Jimenez v. New York Law School*,
    943 N.Y.S.2d 834 (N.Y. Sup. Ct. 2012) ............................................................17

**Federal Statutes**

12 U.S.C. § 5531 ..............................................................................................15, 19

20 U.S.C. § 1083 ......................................................................................................5

20 U.S.C. § 1087e(p) ...............................................................................................5

**Rules**

Fed. R. Civ. P. 56(a) ..............................................................................................14

## PRELIMINARY STATEMENT

When the CFPB brought this lawsuit, it said that Navient[1] had injured "hundreds of thousands" of federal student loan borrowers by failing to inform them about repayment options based on income (known as "income-driven repayment" or "IDR").  Compl. ¶ 144.  As the Court stated at a hearing on April 17, 2018, these claims must be grounded in "the experiences of borrowers, themselves, with Navient."[2]

Navient is mindful of the Court's time, but respectfully submits that the undisputed facts require summary judgment on Counts I and II.  Two years after filing suit—and more than five years after launching its investigation—the CFPB has not only failed to show that "hundreds of thousands" of borrowers were harmed, it has not identified a single borrower who supports its allegations of "steering."  The CFPB ultimately named only fifteen people who experienced the alleged misconduct.  All but one have been deposed, and all testified that Navient repeatedly advised them about income-driven repayment.

Student debt is indeed a challenge for many Americans, and Navient is dedicated to supporting borrowers, continuous enhancements, and working with policymakers to simplify and improve the federal program.  The CFPB cannot

---

[1] "Navient" refers to Navient Solutions, LLC (formerly "Sallie Mae, Inc.").

[2] Doc. 87, Apr. 17, 2018 Hrg. Tr. at 8:19–9:5.

meet its burden to show a genuine dispute of material fact with respect to whether

Navient informed borrowers about IDR.  At a minimum, a ruling as to Navient's

conduct toward the identified borrowers would serve to define the relevant issues

for trial.[3]

## SUMMARY OF UNDISPUTED FACTS

### I.   THE CFPB'S "STEERING" ALLEGATIONS

Counts I and II allege that since July 2011 Navient unfairly and abusively

"steered" borrowers into forbearance "rather than an income-driven repayment

plan."  Compl. ¶¶ 40, 53.  The Complaint does not allege that Navient made any

misstatements.  Rather, the allegation is that Navient *omitted* to inform borrowers

about IDR.  The CFPB's claim is that "borrowers were not advised about income-

driven repayment options."  Doc. 55, Mot. to Dismiss Hrg. Tr. 57:25–58:4.[4]

### II.   FEDERAL REPAYMENT OPTIONS

Generally, there are three options offered by the Department of Education

("ED") to help struggling borrowers avoid default.  SUF ¶ 1–5.  *Forbearance*

allows borrowers to temporarily stop making payments or to cover past-due

---

[3] Defendants intend to move for summary judgment on Counts III–XI at a later date.

[4] *See also* Compl. ¶¶ 139–40, 145; Dec. 10, 2018 Hrg. Tr. at 18:24–19:1 (CFPB's claim is that Navient did not "make available -- or at least make the information available … with respect to the [IDR] plan").

amounts.  SUF ¶ 3.  A borrower in forbearance can continue to make regular payments if desired; the forbearance simply means that she will not be delinquent if she decides not to make payments.  *Id.*  **Repayment plans**, including IDR plans, allow borrowers to lower the monthly payment amount.  SUF ¶ 4.  **Deferment**, which allows borrowers in specific situations, like unemployment or economic hardship, to temporarily stop making payments.  SUF ¶ 5.

The CFPB's allegations ignore various undisputed facts about how federal loan programs operate.

*First*, the CFPB presents forbearance and IDR as mutually exclusive.  But they are complementary.  A forbearance does not prevent a borrower from concurrently applying for IDR; rather, it is often a *prerequisite* to being eligible for IDR.  For example, a delinquent borrower is ineligible for IDR or deferment (under ED rules) and usually needs a forbearance to cover the past-due amount.  SUF ¶ 6.  In addition, borrowers often need forbearance to allow time to complete the IDR paperwork, which generally requires income information, like tax returns or paystubs.  SUF ¶ 7.  Some borrowers in IDR still cannot manage their payments, and request forbearance while in IDR.  SUF ¶ 8.

*Second*, the CFPB suggests that Navient could have enrolled borrowers in IDR over the phone but chose to offer forbearance instead.  Compl. ¶ 53.  Servicers *cannot* enroll borrowers in IDR over the phone under ED rules; borrowers must

3

submit a written application and income information, usually via ED's own website. SUF ¶ 9. Thus, a phone call with a delinquent borrower will often result in a forbearance (because servicers must attempt to prevent delinquent borrowers from defaulting) and can *never* result in a completed IDR enrollment. In addition, under federal law, servicers are encouraged to grant a forbearance if requested by an eligible borrower. SUF ¶ 10.

*Third*, the CFPB wrongly assumes most borrowers are eligible for IDR. ED formulas determine whether borrowers are eligible based on income and family size, along with other guidelines. SUF ¶ 11. ED significantly expanded available IDR plans and lowered income requirements during the alleged time period, meaning that some borrowers would not have been eligible for IDR in earlier years. SUF ¶¶ 12–18. Moreover, certain types of loans (FFELP and Parent PLUS) remain ineligible for certain IDR plans. SUF ¶ 19.

*Fourth*, the CFPB suggests that borrowers always pay more interest in forbearance. But interest also accrues while a borrower is enrolled in IDR (unless the borrower is entitled to interest subsidies). SUF ¶ 21. Unpaid interest will be capitalized under federal rules when a borrower is no longer enrolled in IDR. *Id.*

## III.   NAVIENT PROVIDED INFORMATION ABOUT IDR TO BORROWERS

It is undisputed that Navient provided the following information about IDR to borrowers during the alleged time period:

4

- For borrowers who started repaying their loans, Navient sent a letter offering options to "make student loan payments more manageable," including "[p]ayments tied to your income." *See, e.g.*, SUF ¶¶ 23, 160; *see also* 20 U.S.C. §§ 1083(b)(6), 1087e(p).

- Borrowers who expressed difficulty making payments received a letter explaining IDR.  For example, Navient explained that a borrower could "[c]hange your [r]epayment [p]lan" to "Income-Related Plans," which offered "[m]onthly payments that can change annually as your income changes." *See, e.g.*, SUF ¶¶ 24, 165; *see also* 20 U.S.C. §§ 1083(e)(2), 1087e(p).

- For borrowers who fell behind on their payments, Navient sent notices explaining that "options may be available to help bring your account current," including "lower monthly payments provided through income-sensitive or income-based repayment plans." *See, e.g.*, SUF ¶ 25.

- Borrowers who expressed an interest in IDR received a letter explaining how to apply.  *See, e.g.*, SUF ¶¶ 26, 57.

- Borrowers approaching the end of deferment or forbearance received a notice asking whether the borrower had "looked into the federal government's income-driven repayment plans."  The notice went on: "These repayment options can allow you to make monthly payments based on your current income. **You could even qualify for a payment of $0!** It's worth checking out!" *See, e.g.*, SUF ¶¶ 27, 143 (emphasis in original).

In addition, several borrowers recalled viewing Navient's website, which has information about IDR prominently displayed.  SUF ¶ 28.

## IV. BORROWERS IDENTIFIED BY THE CFPB

Navient asked the CFPB to "Identify each Navient Borrower harmed by enrollment in a forbearance, as alleged in paragraph 146 of the Complaint." SUF ¶ 29.  The CFPB initially refused but eventually identified thirty-two

5

borrowers.  SUF ¶¶ 30–31.  After Navient deposed three who admitted to receiving IDR information, the CFPB promptly withdrew fifteen; it has since removed three others and added one.  SUF ¶¶ 32–33.  Fifteen borrowers remain, and Navient has deposed all but one.  SUF ¶ 33–34.[5]

All fourteen borrowers whom Navient deposed were informed about IDR, including prior to and immediately after obtaining forbearance.  Navient repeatedly sent them information about IDR, and Navient representatives discussed IDR on the phone with all but one.  Several borrowers *admitted* that they were informed about IDR before obtaining forbearance.  Many borrowers chose not to apply for IDR; others did not qualify under ED formulas.  None were "steered."  This is unsurprising given that Navient's procedures and training materials highlighted in red that "Forbearance should not be considered until all other options have been exhausted."  SUF ¶ 229.  Likewise, representatives used an online tool that guided them "to ask specific questions designed to determine the best option for the borrower based on their current situation."  SUF ¶ 230.

---

[5] On December 5, 2018, the CFPB added an additional borrower, whose deposition is being scheduled.  Navient expects the borrower's experience to be similar to the others.  During initial scheduling conversations, the borrower said she did not know why the CFPB had identified her as a witness because she told them that she has no information and does not remember anything.

The appendix includes a chart summarizing the ways in which the identified borrowers were informed about IDR—and whether they decided to act on that information. Each borrower's circumstances are described in detail in the Statement of Material Undisputed Facts. A summary follows:

### A.    Borrowers Informed About IDR, But Ineligible

Several borrowers were repeatedly informed about the availability of IDR but did not enroll because they ultimately did not qualify under ED formulas.

CC was too wealthy. SUF ¶ 38. In March 2016, a Navient phone representative asked CC about her family size and income, and CC responded that her income was $450,000 per year. SUF ¶ 39. When the representative told CC that she would not qualify for IDR, CC responded (falsely) that her husband did not actually have any income because of a recent health issue and that her income was $4,000 per month. SUF ¶ 40. The representative sent an IDR application and processed a forbearance to provide time for CC to complete the paperwork. SUF ¶¶ 41–42. CC did not apply. SUF ¶ 43. In October 2016, a representative again discussed IDR with CC, who inquired about other options that did not require any paperwork. SUF ¶ 44. The representative explained that all options would require an application and, at CC's request, granted a forbearance while she considered her options. SUF ¶ 46. CC (who is an attorney) later applied for and received an unemployment deferment, despite being employed and earning $120,000 annually.

7

SUF ¶ 47.  During calls that year, CC also claimed her husband had died and she

needed forbearance while she got her finances together.  SUF ¶ 48.  Records show

that CC and her husband – who is alive – purchased a $1 million home outside

Chicago in 2012.  SUF ¶ 49.

NN, AS, and CP were also informed about the availability of IDR but were

ultimately determined to be ineligible under ED rules.  SUF ¶ 55–82.

### B.    Borrowers Who Enrolled in IDR

#### 1.  FB

Although Navient repeatedly informed FB about IDR, she did not enroll

until September 2013.  SUF ¶ 93–94, 99.  Unfortunately, FB could not afford her

IDR payments and requested multiple forbearances while in IDR.  SUF ¶ 100.

Navient began servicing her loans in August 2011, when her loans were

transferred from a prior servicer.  SUF ¶ 86.  That month, a Navient representative

checked whether FB was eligible for IDR during a phone call.  SUF ¶ 87.

Afterwards, Navient sent her information about "Income-Related Plans (Income-

Based and Income Sensitive) – Monthly payments that can change annually as

your income changes."  SUF ¶ 88.  FB did not apply, and instead enrolled in

another forbearance in October 2011.  SUF ¶ 89.

Before that forbearance ended, in August 2012, FB called Navient and

expressed interest in IDR.  SUF ¶¶ 90–91.  Navient sent FB an application, but she

applied for economic-hardship deferment instead, which was denied because she did not meet the federal requirements.  SUF ¶ 91.  Rather than apply for IDR at that time, FB requested a forbearance online without speaking to Navient.  SUF ¶ 92.  FB received additional information about IDR on multiple occasions.  Between August 2011 and August 2013, Navient sent her information about IDR at least nine times.  SUF ¶ 93.  Navient also discussed IDR with FB on the phone at least two more times before FB finally applied for IDR.  SUF ¶¶ 95, 98–99.

### 2.  UE, VH, and MP

The only forbearances UE ever received from Navient were to provide her time to complete an IDR application.  SUF ¶¶ 101–111.  UE eventually applied for IDR and was approved in August 2016.  SUF ¶ 112.

VH and her husband enrolled in IDR in December 2012.  SUF ¶ 114.  Because the IDR payment was still more than she and her husband could afford, they continued to request forbearances.  SUF ¶ 115.  In April 2013, the couple requested to be removed from IDR and requested another forbearance, but they were no longer eligible.  SUF ¶ 116.  The couple subsequently reenrolled in IDR but consistently missed payments.  SUF ¶ 117.

Prior to December 2012, Navient had informed VH about IDR on multiple occasions.  SUF ¶¶ 118–120.  For example, on November 9, 2009, Navient sent a letter offering Income-Based Repayment, which could reduce her monthly

9

payment based on "a federal formula that considers your income and your family size." SUF ¶ 119.  Although VH does not remember the specific repayment options that she discussed with representatives between 2009 and 2011, she does remember representatives asking about her family size and income—questions that would be used to determine IDR eligibility.  SUF ¶ 121.

Like VH, MP has been enrolled in IDR for much of the alleged timeframe. MP enrolled in IDR in October 2013, and apart from short gaps when information was required to verify his income, he has been enrolled in IDR ever since.  SUF ¶ 122.  Prior to enrolling, Navient sent MP information about IDR on multiple occasions, including after calls where he had expressed interest in the plan.  SUF ¶¶ 123–130.  Navient also discussed IDR on the phone with MP at least two more times before he finally applied.  SUF ¶¶ 132, 137.

### 3.  JB

JB enrolled in IDR in December 2016.  SUF ¶ 139.  Four months prior, in August 2016, JB spoke to a Navient representative about obtaining additional deferment time.  SUF ¶ 140.  However, no additional time was available to him, and he enrolled in a forbearance.  SUF ¶ 141.

Before and after that call, Navient repeatedly informed JB about IDR.  SUF ¶ 142.  JB produced an email he received in June 2016, which asked whether he had "looked into the government's income-driven repayment plans for federal

10

loans." SUF ¶ 143.  In bold, purple text, the email said, "You could even qualify for a payment of $0!"  *Id.*  By the time he called Navient in August 2016, JB had received this email at least *eight* times.  SUF ¶ 144.  Immediately after he was granted forbearance, Navient sent JB an email that stated "[a]s a follow-up, we want to be sure you know about additional repayment options" and explained how to enroll in an IDR plan.  SUF ¶ 146.

### 4. GJ

GJ was enrolled in IDR from May 2011 through August 2015, when he was no longer eligible under ED formulas because his income had increased.  SUF ¶ 150.  GJ enrolled in one forbearance before May 2011 but does not remember the repayment options discussed on the call.  SUF ¶¶ 151–152.  Before that call, however, GJ received a letter explaining that Navient "offers several repayment options that help make payments more manageable," including Income-Sensitive Repayment and Income-Based Repayment.  SUF ¶ 153.  After he was no longer enrolled in IDR, he requested another forbearance.  SUF ¶ 154.

GJ's complaint, evidently, is that his principal balance increased under both forbearance *and* IDR.  Because GJ did not pay accrued interest while enrolled in IDR, his unpaid interest capitalized when he was no longer enrolled, as required by federal regulations, increasing his principal by more than $3,000.  SUF ¶¶ 155–

156.  GJ told a Navient representative that he had been "screwed" by IDR and that the program was "stupid as f***."  SUF ¶ 157.

### C.  Borrowers Who Avoided Efforts to Inform Them About IDR

#### 1.  RD, ZB, and LF

Despite being informed about IDR dozens of times, RD did not apply for IDR until after the CFPB filed its lawsuit.  Navient repeatedly sent RD information about IDR.  SUF ¶¶ 158–162, 165–166.  On February 12, 2009, before her first payment was due, Navient sent a letter explaining that Navient "offers several repayment options that help make student loan payments more manageable," including "payments that are tied to your income."  SUF ¶ 160.

By April 2009, RD was delinquent, and Navient sent a letter that asked, "NEED SMALLER PAYMENTS?" and went on to explain that "Income-Sensitive Repayment allows for payments based on a percentage of your income."  SUF ¶ 161.  On September 20, 2009, after speaking to RD on the phone, Navient sent an IDR application because she had expressed interest in IDR.  SUF ¶ 162.  From 2009 to 2015, Navient sent her information about IDR at least thirty-five times.  SUF ¶ 165–166.  RD did not apply during that time.  SUF ¶ 166.  Instead, RD continued to miss payments on her student loans while consistently making payments on two luxury automobiles.  SUF ¶ 164.

Navient also attempted repeatedly to reach RD by phone when she was delinquent, but she often did not answer or hung up.  SUF ¶ 167.  Navient representatives successfully reached her on April 1, 2014 and October 17, 2014, and both times they requested income information to determine her IDR eligibility.  SUF ¶¶ 168, 170.  On both calls, RD declined to provide this information.  *Id.* Instead, in August 2014, she enrolled in a forbearance online without speaking to a representative.  SUF ¶ 169.  Navient discussed IDR with RD on the phone at least two times in 2015, but RD did not apply until 2017.  SUF ¶¶ 171–176.

The experiences of ZB and LF are similar.  Despite being repeatedly informed about IDR, ZB and LF did not apply for IDR until October 2015 and February 2016, respectively.  SUF ¶¶ 180–195, 201–214.  Instead, they persistently fell behind on their payments and avoided Navient's attempts to assist them.  SUF ¶¶ 186, 208, 210.  Unfortunately, even with a reduced payment under IDR, LF has repeatedly missed her payments.  SUF ¶ 215.

2.  KR

Navient made consistent efforts to assist KR, but he often ignored phone calls and, when he answered, frequently prevented representatives from discussing his loans by refusing to provide identifying information, verbally abusing them, or hanging up.  SUF ¶ 220.  In one instance, on June 28, 2012, KR called the representative a "stupid b**ch" before asking what options were available.  SUF

13

¶ 221.  The representative responded that KR "might be able to apply for income-based repayment," and he interrupted her and asked for someone "more competent."  SUF ¶ 222.  After she again offered IDR as an option, KR responded, "Look, b**ch, I don't want to talk to you."  SUF ¶ 223.  On at least ten other calls, KR referred to representatives as "b**ch," "dumbass," and other profanities.  SUF ¶ 224.  Navient repeatedly sent him information about IDR, but he did not apply and instead defaulted.  SUF ¶¶ 226, 227, 228.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to summary judgment where "the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

The CFPB bears the burden of proving each element under the Consumer Financial Protection Act ("CFP Act").  *See F.T.C. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  To prevail on its abusiveness claim (Count I), the CFPB must prove that Navient took "unreasonable advantage of . . . reasonable reliance by the consumer" that Navient would "act in the interests of the consumer."  12 U.S.C.

14

§ 5531(d)(2)(C).  For its unfairness claim (Count II), the CFPB must demonstrate that Navient "cause[d]" the consumer "substantial injury" that was neither "reasonably avoidable" nor "outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1)(A)–(B).  The CFPB alleges the same conduct—Navient's alleged failure to inform borrowers about IDR (*i.e.*, "steering")—for both claims.  At this stage, the CFPB must come forward with specific facts showing that Navient engaged in the alleged practice of failing to inform borrowers about IDR.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

## I.   NAVIENT DID NOT ENGAGE IN "STEERING"

### A.   The Undisputed Facts Show That None Of The CFPB's Borrowers Were "Steered"

The CFPB brought this lawsuit on behalf of "hundreds of thousands" of borrowers allegedly harmed by Navient.  As this Court recognized, the CFPB's case therefore "depend[s] on applying the elements" of the CFP Act to the experiences of the borrowers "on whose behalf" the CFPB purports to be proceeding.  Doc. 87, Apr. 17, 2018 Hrg. Tr. at 6:8–10.  The CFPB assured the Court that it will "have a representative number of consumers come forward" to substantiate its claims.  *Id.* at 6:11–12.  *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185–90 (3d Cir. 2001) (claim based on discussions that "varied from

customer-to-customer" "necessarily involves an individual review of what each [individual] was told and what information was provided"). The experiences of the identified borrowers do not support the allegation that Navient failed to inform them about IDR.

As an initial matter, the entire course of dealing between Navient and a borrower must be considered in assessing whether Navient had a practice of omitting information about IDR. *See* CFPB UDAAP Examination Manual at 5 ("an individual statement, representation, or omission" must be evaluated "not in isolation but rather in the context of the entire . . . transaction[] or course of dealing"); *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (collection of "loan agreement . . . , disclosures, notices, and correspondence conclusively defeat[ed] any claim of fraud . . . [or] concealment" under consumer

protection statute).[6]  Thus, in assessing the CFPB's claims, the Court must consider

*all* of the information made available to borrowers.

The undisputed facts show that, in its dealings with borrowers, Navient

consistently sought to inform them about IDR in letters and emails and on phone

calls.  As the borrowers' experiences show, Navient sent repeated written

communications to them about IDR.  The law assumes "a basic level of

understanding and willingness to read with care" information sent to consumers

about their loans.  *See Campuzano-Burgos v. Midland Credit Mgmt., Inc.*, 550 F.3d

294, 299 (3d Cir. 2008).  Moreover, information about IDR was prominently

described, often in the middle of the first page, in bold or all capital letters, and

with exclamation points.  *See, e.g.*, SUF ¶ 143.  And the information was described

in plain terms.  *See, e.g.*, SUF ¶ 160 (offering "payments that are tied to your

---

[6] *See also Harris v. Las Vegas Sands, LLC*, No. CV 12–10858, 2013 WL 5291142,
at *5 (C.D. Cal. Aug. 16, 2013) (dismissing consumer protection claim after
considering disclosures in billing page, hyperlinked "Terms and Conditions" page,
and email to plaintiff); *Ford v. Hotwire, Inc.*, No. 07–CV–1312, 2008 WL
5874305, at *2, 4 (S.D. Cal. Feb. 25, 2008) (dismissing consumer protection
complaint in part because allegedly omitted information was "freely accessible" on
third-party website); *Casey v. Fla. Coastal Sch. of Law, Inc.*, No. 3:14-CV-1229,
2015 WL 10096084, at *15 (M.D. Fla. Aug. 11, 2015) (recommending dismissal
of unfairness claim because "numerous sources of information available"); *Gomez-
Jimenez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834, 843 (N.Y. Sup. Ct. 2012) (dismissing
consumer protection claim because "reasonable consumers ha[d] available to them
any number of sources of information to review").

income" to "make student loan payments more manageable").  Navient provided

this information both before and immediately after borrowers enrolled in

forbearance.  Because servicers are not permitted to enroll borrowers in IDR over

the phone, Navient followed phone calls with further information about IDR.  And

borrowers who received a forbearance were not at all prevented from applying for

IDR; in fact, borrowers were often in a better position to apply because they were

no longer delinquent (a prerequisite for IDR).

Based on these communications, summary judgment must be granted

because it is undisputed that Navient informed each of the CFPB's identified

borrowers about IDR on many occasions.  *See Croftcheck v. Accounts Recovery

Bureau, Inc.*, No. 1:11-CV-1220, 2012 WL 1378683, at *5 (M.D. Pa. Apr. 20,

2012) (summary judgment for defendant debt collection agency where no dispute

of fact about what communications entailed); *see also Tennier v. Wells Fargo

Bank, N.A.*, 666 F. App'x 689, 691 (9th Cir. 2016) (affirming summary judgment

on omission claim where undisputed facts showed defendant disclosed

information); *F.T.C. v. Amazon.com, Inc.*, No. C14-1038, 2016 WL 10654030, at

*4 (W.D. Wash. July 22, 2016) (summary judgment appropriate where issue was

"whether the facts in the present case constitute an unfair practice under Section 5

of the FTC Act").

Even if individual phone calls are considered in isolation (contrary to what the law requires), the CFPB's claims *still* fail because the calls with the identified borrowers demonstrate that Navient's practice was to inform borrowers about IDR over the phone.  In fact, it is undisputed that all but one of the deposed borrowers discussed IDR with Navient representatives.  Yet some still chose not to apply.

As to calls that did not discuss IDR, the following is demonstrated by the undisputed facts:

- Several borrowers prevented representatives from discussing IDR on calls.  For example, when a representative tried to tell KR about IDR, he interrupted and called her a "b\*\*ch."  SUF ¶¶ 221–223.  Others, like CP and RD, declined to provide financial information necessary to determine their eligibility.  SUF ¶¶ 79, 168, 170.

- Some borrowers discussed IDR on the phone in the months preceding such a call, but nonetheless did not apply.  For example, FB had two calls where IDR was not discussed, but she did not enroll in forbearance on either call and had discussed IDR on the phone with Navient representatives twice in the five months before and after those calls.  SUF ¶¶ 95–98.

- Borrowers received information about IDR shortly before and immediately after such a call.  For example, JB had a call with a representative where IDR was not discussed.  But he had received information about IDR at least eight times in the months preceding the call.  SUF ¶¶ 140–144.  After reading an email stating "You could even qualify for a payment of $0," SUF ¶ 146, JB did not ask the representative about IDR and instead pressed for deferment options, SUF ¶ 140.  Immediately after the call, Navient sent JB an email stating "[a]s a follow-up, we want to be sure you know about additional repayment options" and describing how to enroll in IDR.  SUF ¶ 146.

In any event, isolated phone calls are not evidence of a Company practice.

19

To the contrary, a Navient supervisor testified that the call with JB was *not* consistent with the Company's policies and practices: he stated that the representative on the call with JB should have discussed IDR, and that the supervisor would have provided coaching to the representative had he listened to the call during Navient's regular call monitoring.  SUF ¶ 233.

### B.   The Undisputed Material Facts Require Summary Judgment On Counts I and II

Simply put, Navient did not cause substantial injury to, or take advantage of, borrowers, as required to establish an unfair or abusive practice.  *See* 12 U.S.C. § 5531.

Unfairness involves an element of *coercion* through which a defendant's unscrupulous conduct deprives the consumer of any meaningful choice, causing substantial unavoidable injury.  *See, e.g.*, *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 915–17 (S.D. Ind. 2015) (defendant used educational resources "as leverage," by pulling students from class, withholding course materials and transcripts, and threatening students with expulsion).  The undisputed facts here demonstrate a "total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness."  *Cohen*, 735 F.3d at 610.

Navient's conduct toward the CFPB's borrowers is far from what courts have regarded as "unfair."  To the contrary, Navient repeatedly told borrowers

about IDR, allowing them to decide whether to apply.[7]  The CFPB can point to no interaction where an agent coerced a borrower into forbearance.  In fact, in many instances, Navient informed the borrower about IDR, and the borrower chose forbearance (either because forbearance was necessary to cover past-due amounts, because the borrower needed time to fill out an application, because the borrower was ineligible for IDR, or simply because the borrower was not interested in IDR).

As to the abusiveness claim, which would involve even greater culpability than unfairness, the undisputed facts likewise show that Navient did not "take unreasonable advantage" of borrowers.  *See ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 918 ("'to take advantage of' is 'to make use of for one's own benefit'" (citing Webster's Third New Int'l Dictionary 2331 (3d ed.1993))).  To the contrary, Navient repeatedly informed borrowers about IDR.  There is no factual support for the CFPB's allegations that Navient exploited borrowers for its own profit.

## CONCLUSION

Summary judgment on Counts I and II is warranted because the CFPB's "steering" allegations are not only unsupported, they are directly contradicted by the undisputed experience of each borrower identified by the CFPB.  *See*

---

[7] Again, Navient could not, under federal law, enroll borrowers in IDR over the phone.  Thus, in any scenario, the borrowers themselves needed to complete a federal government application or visit ED's website to apply.

21

*Croftcheck*, 2012 WL 1378683, at *5 (summary judgment for defendant where no dispute about substance of communications).  In the alternative, and at the very least, Navient is entitled to partial summary judgment as to Counts I and II for each of the CFPB's borrowers.  The Court has raised concerns about how the CFPB intends to present its case at trial, Doc. 87, Apr. 17, 2018 Hrg. Tr. at 5:19–7:6, and Navient believes that a decision regarding Navient's conduct toward the CFPB's borrowers would assist in making trial more manageable.

Dated:  January 17, 2019                     Respectfully submitted,


/s/ Jonathan E. Paikin
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient
Solutions, LLC, and Pioneer Credit Recovery,
Inc.*

## CERTIFICATE OF WORD COUNT

I hereby certify in accordance with Local Rule 7.8(b)(2) that the foregoing

document is 4,998 words.

<div style="margin-left:40%">

/s/ Karin Dryhurst

Karin Dryhurst (DC 1034290) (*pro hac vice*)

Wilmer Cutler Pickering
  Hale and Dorr LLP

1875 Pennsylvania Avenue, NW

Washington, DC 20006

karin.dryhurst@wilmerhale.com

Tel: 202-663-6000

Fax: 202-663-6363

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2019, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363