# EXHIBIT 1

Confidential
Pursuant to Protective Order

Page 1

1      LaVIA
2      IN THE UNITED STATES DISTRICT COURT
3      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
4           Case No. 3:17-cv-00101
5           - - - - - - - -
6
7   CONSUMER FINANCIAL PROTECTION BUREAU,
8           Plaintiff,
9   vs.
10  NAVIENT CORPORATION, et al.,
11          Defendants.
12  _____/
13
14
15               CONFIDENTIAL
16       PURSUANT TO THE PROTECTIVE ORDER
17
18      VIDEOTAPED DEPOSITION OF CYNTHIA BATTLE
19              Washington, D.C.
20           Wednesday, May 23, 2018
21
22
23  Reported by:
24  SUSAN ASHE, RMR, CSR, CRR
25  Job No.: 142320

Confidential
Pursuant to Protective Order

## Page 2

```
 1            BATTLE
 2      Wednesday, May 23, 2018
 3           9:18 a.m.
 4
 5
 6    Videotaped deposition of CYNTHIA BATTLE,
 7  taken on behalf of Defendant, at WILMERHALE, 1875
 8  Pennsylvania Avenue, Northwest, Washington, D.C.,
 9  beginning at 9:18 a.m., on Wednesday, May 23, 2018,
10  before Susan Ashe, RMR, CSR, CRR.
```

## Page 3

```
 1            BATTLE
 2    APPEARANCE OF COUNSEL:
 3      FOR PLAINTIFF:
 4        CONSUMER FINANCIAL PROTECTION BUREAU
 5        BY:  ANDREA MATTHEWS, ESQ.
 6           DAVID DUDLEY, ESQ.
 7        1700 G Street, NW
 8        Washington, DC  20552
 9
10
11
12
13
14      FOR DEFENDANTS:
15        WILMERHALE
16        BY:  DANIEL KEARNEY, ESQ.
17           GARY DYAL, ESQ.
18        1875 Pennsylvania Avenue, NW
19        Washington, DC  20006
```

## Page 4

```
 1            BATTLE
 2    ALSO PRESENT:
 3      FOR THE WITNESS:
 4        UNITED STATES ATTORNEY'S OFFICE,
 5        DISTRICT OF COLUMBIA
 6        BY:  JOSHUA KOLSKY, ESQ.
 7        555 4th Street, NW
 8        Washington, DC  20530
 9          - and -
10        U.S. DEPARTMENT OF EDUCATION
11        BY:  BRIAN SIEGEL, ESQ.
12        400 Maryland Avenue, SW
13        Washington, DC  20202
14
15
16
17
18
19    David Voigtsberger, Videographer
```

## Page 5

```
 1            BATTLE
 2            INDEX
 3      Deposition of CYNTHIA BATTLE
 4           May 23, 2018
 5
 6    Examination By:              Page
 7    Mr. Kearney                  8, 172
 8    Ms. Matthews                 108, 189
 9
10    BATTLE
11    Exhibit No.              Marked
12    Exhibit 300  Subpoena         12
13    Exhibit 301  Regulations Excerpt     30
14    Exhibit 302  Business Operations
15       Change Request Form
16       NAV-00710092 and -093       51
17    Exhibit 303  Regulations Excerpt     57
18    Exhibit 304  Business Operations
19       Change Request Form
20       NAV-00005283 and -284       62
21    Exhibit 305  Federal Loan Servicing Update
22       Session #7
23       NAV-00701018 with Attachment   65
```

Confidential
Pursuant to Protective Order

Page 26

BATTLE

servicers to ensure that servicers are providing good customer service to federal student loan borrowers?
  A.  Yes, to a degree.
  Q.  What types of requirements would those be?
  A.  So we may -- depending on the area that we want to have the servicers target, we may describe how we want the servicers to interact with the customer.
     Likewise, as part of a change that goes in, we may request to see a servicer's communications or a servicer's procedures for how they interact with the customer.
  Q.  Are the Department's regular communications with servicers also designed to ensure that servicers are providing good customer service?
  A.  Okay --
  Q.  Let me --
  A.  -- yeah.
  Q.  -- restate it.
  A.  Okay.
  Q.  So you said the Department imposes certain requirements on servicers to ensure that they're

Page 27

BATTLE

providing good customer service.
     Are the Department's regular communications with servicers designed to make sure that servicers are abiding by those requirements?
  A.  I guess I -- can you kind of give me a little....
  Q.  Sure.  So you described daily interactions --
  A.  Yes.
  Q.  -- between the Department and servicers.
  A.  Um-hum.
  Q.  What are those interactions -- and you also said that there are requirements on servicers to provide good customer service.
     To what extent do those daily interactions involve discussions about whether servicers are providing good customer service to borrowers?
  A.  So can I kind of frame this in context?
  Q.  Sure.
  A.  Okay.  So our -- my specific area, the staff in my group, we're responsible for many of the -- either the legislative changes, the business decisions, requirements around that.
     So if I put it in context of, say, a

Page 28

BATTLE

change that went in specifically about a repayment plan, we may have requirements in that -- in that document that describe our expectations for the servicer around customer service.
     But I don't know whether I can say that through all communications that we have with the servicer there is an overarching theme or response around customer service.
     So it really depends on the topic that we're addressing.
  Q.  Okay.  Does the Department impose requirements on servicers that are designed to help borrowers avoid default?
  A.  Yes.  To some degree, yes.
  Q.  Are you able to say, generally, what those requirements might be?
  A.  So, specifically, can you kind of -- what kind of requirements are you referring to around default?
  Q.  Is one of the Department's goal in having private servicers service loans to help borrowers avoid default?
  A.  Sure -- yes.
  Q.  And what does the Department do, in its

Page 29

BATTLE

communications with servicers and in the requirements it imposes on servicers, to achieve that goal?
  A.  So in -- there may be communications about -- there may be communications about how we want a particular servicer to address, say, repayment plans.
     So I would say, specifically, we would look to the servicer to offer various repayment plans as part of keeping default down.
  Q.  Do ED's -- sorry.  Does the Department's -- strike that.
     Does the Department impose requirements on servicers to make certain disclosures to direct loan borrowers?
  A.  Yes.
  Q.  What is the purpose of the Department's disclosure requirements to borrowers?
  A.  To ensure that the borrower is informed about the terms of their repayment, the actual repayment plan, the actual terms of their agreement to repay that loan.
  Q.  Does the Department impose -- sorry, strike that.

Confidential
Pursuant to Protective Order

Page 30

BATTLE

2  Does the Department require servicers to
3 send notices to borrowers who are entering repayment
4 on their direct loans?
5  A. Yes.
6  Q. What information do those disclosures
7 contain?
8  A. The notices themselves could vary.
9  But it would -- again, most of the
10 servicers are providing terms and conditions of --
11 you said -- I'm sorry, you said "repayment notices."
12  Q. Right.
13  A. So it's going to describe the repayment
14 options that the borrower would have if they're
15 entering into repayment, as well as some of the
16 terms of those repayment plans.
17    MR. KEARNEY: Okay. I was going to
18 introduce this as 301. Right?
19    (Whereupon, Defendants Exhibit 301 was
20 marked for identification.)
21  Q. Ms. Battle, do you recognize this
22 document?
23  A. Yes -- yes.
24  Q. What is it?
25  A. It's part of the regulations that dictate

Page 31

BATTLE

2 our loan program.
3  Q. And do you see under the heading on this
4 document, it says a little "a," and then "Repayment
5 information, Disclosures at or prior to repayment"?
6  A. Where are you looking? Which subtopic are
7 you -- where are you?
8  Q. This is under -- sorry. It says
9 "Disclosure requirements for lenders," in bold on
10 the right side.
11  A. I see that. Yes.
12  Q. And then in the first paragraph, it says
13 "Repayment information, Disclosures at or prior to
14 repayment"?
15  A. Um-hum, yes.
16  Q. Can you just read the first sentence?
17  A. The first sentence?
18  Q. Yep.
19  A. (Reading:) The lender must disclose the
20 information described in paragraph (a)(2) of this
21 section in simple and understandable terms, in a
22 statement provided to the borrower at or prior to
23 the beginning of the repayment period.
24  Q. And the sentence you just read references
25 "paragraph (a)(2)."

Page 32

BATTLE

2  Is that right?
3  A. Yes.
4  Q. Can you turn to page -- what's numbered
5 page 35 in this exhibit.
6  And if you look down the left-hand column
7 on 34, there's a Roman numeral 12.
8  Do you see that? It begins (reading): A
9 description of all...?
10  A. A reminder?
11  Q. Sorry. Do you see little Roman numeral
12 12?
13  A. Oh, you're there -- yes.
14  Q. It says (reading): A description of all
15 the repayment plans...?
16  A. Yes.
17  Q. Could you read that sentence.
18  A. (Reading:) A description of all repayment
19 plans available to the borrower and a statement that
20 the borrower may change plans during the repayment
21 period at least annually.
22  Q. Is this information required to be
23 included in the repayment disclosure under this
24 regulation?
25  A. Yes.

Page 33

BATTLE

2  Q. If you turn back to 34, it says -- if you
3 look under the Heading 2 --
4  A. Under the Heading 2?
5  Q. Yes. Sorry. It says....
6  Below the paragraph we read previously, it
7 says (reading): (2) The lender shall provide the
8 borrower with....
9  Do you see that?
10  A. Yes, I do.
11  Q. And then there's the following paragraphs
12 about what must be provided with the statement.
13 Correct?
14  A. Yes.
15  Q. Why does it say the lender shall provide
16 the borrower with that information?
17  A. Well, this specific regulation is
18 targeting at FFEL -- but we would have a comparable
19 one in Direct Loan.
20  Q. Okay. Do you know how the comparable one
21 in Direct Loan -- do you know where it appears?
22  A. It would be 685. I'm not sure of the
23 exact reference.
24  But it should be comparable to what's
25 here.

Page 42

1  BATTLE
2       So if it's a notice specifically around
3  having trouble making payments, that may not be a
4  required notice.
5       Q.  Okay.
6       A.  But the servicers would be required to
7  send out a delinquency notice to let borrowers know
8  that they are behind in their payments, if that's
9  the case.
10      Q.  Okay.  So let's look on page 36 of this
11 same exhibit.
12      A.  Okay.  Sure.
13      Q.  The left-hand column, numbered 5,
14 "Required disclosures for borrowers who are 60-days
15 delinquent in making payments on a loan."
16      A.  Yes.
17      Q.  Is that what you were describing?
18      A.  Yes.
19      Q.  Does this or a similar regulation apply to
20 direct loan servicers?
21      A.  I believe so, yes.
22      Q.  Can you describe, generally, what this
23 notice requires?
24      A.  So a borrower that has become
25 delinquent -- so they have been -- they're not able

Page 43

1  BATTLE
2  to make payments beyond -- they are not current on
3  their payments -- the servicer would be required to
4  send them a delinquency notice that describes the
5  current status of their loan.
6       Q.  Do you know what the notice -- well, you
7  said the notice must describe the current status of
8  their loan.
9       Is there anything else the notice needs to
10 contain?
11      A.  The notice may have repayment options.
12      And the notice may contain just
13 information about -- well, the notice generally
14 always contains a note that, the borrower to contact
15 the servicer for options.
16      Q.  Could you look on this same paragraph, 5,
17 for this delinquency notice, do you see a paragraph
18 with a heading, capital "C," "A description of the
19 options available to the borrower..."?
20      A.  Yes.
21      Q.  Can you read that paragraph to me.
22      A.  (Reading:)  (C) A description of the
23 options available to the borrower to avoid default,
24 including deferment and forbearance and any fees and
25 costs associated with those options.

Page 44

1  BATTLE
2       Q.  Is that description required to be
3  included in the 60-day delinquency notice?
4       A.  So that could -- yes, it could possibly
5  be -- I think there's a comparable requirement for
6  that.
7       So, yes, it would contain some information
8  about forbearance and deferment options.
9       Q.  Do you know why the requirement
10 specifically calls out deferment and forbearance?
11      A.  Because, again, it's a tool that the
12 servicers can use to cure a default or a
13 delinquency.
14      Q.  Are you familiar with "income-driven
15 repayment"?
16      A.  I am, yes.
17      Q.  What is "income-driven repayment"?
18      A.  "Income-driven repayment" is a repayment
19 plan that uses a borrower's income and family size
20 to make a payment.
21      So it uses their income in order for them
22 to make payments on their student loans.
23      Q.  And is there only one income-driven
24 repayment program?
25      A.  There are four different income-driven

Page 45

1  BATTLE
2  repayment plans.
3       Q.  Does this delinquency notice require
4  servicers to disclose information about
5  income-driven repayment plans?
6       A.  Specifically, this reference, no, it does
7  not -- it does not require the servicers to disclose
8  information about repayment plans.
9       Q.  Do you know how long this or a comparable
10 regulation for direct loan borrowers has been in
11 place?
12      A.  I believe it's been in place since the
13 inception.
14      Q.  Does the Department impose requirements on
15 schools to counsel or provide disclosures to
16 borrowers in connection with their direct loans?
17      A.  No, not that I'm aware of.
18      Q.  I'm going to ask you about contractual
19 requirements on direct loan servicers.
20      A.  Sure.
21      Q.  How does the Department go about the
22 process of deciding what contractual requirements to
23 impose on its private servicers in the Direct Loan
24 Program?
25      A.  Could you be a little bit more specific?

Confidential
Pursuant to Protective Order

Page 78

BATTLE

Q. No; that's good. Thank you.
A. Um-hum.
Q. I know you're not familiar with this particular e-mail exchange, but is this type of communication generally the type of communication you were referring to earlier when you described daily communication between the Department and its servicers?
A. It could be, sure.
    Servicers absolutely would exchange specific issues or concerns or follow-up directly with their operations counterparts.
Q. This third sentence you read referred to a "graphical representation of the communication process."
A. Um-hum.
Q. Can you turn over to the next two pages.
A. Um-hum.
Q. Do you see the....
    This is -- well, the page marked 1 of 2 says at the top "Determine the Root Cause of Financial Difficulty."
A. Correct.
Q. Do you see that?

Page 79

BATTLE

A. Yes.
Q. And then page 2 of 2 says "Repayment Options Guide."
A. Yes.
Q. Do you see that?
A. Yes.
Q. Do you recognize this --
A. I do not.
Q. -- document?
A. I do not.
Q. Why...? Strike that.
    Do you know why the Department would be interested in information about how servicers like Navient communicate with borrowers about root causes of financial difficulty and repayment options?
A. Well, we would care because this would be the result of maybe a change or a discussion -- or we are trying to get a result, we're trying to make sure -- ensure that the servicers are really counseling borrowers appropriately on repayment options before applying a forbearance.
Q. I'm going to ask you a few questions about income-driven repayment.
A. Sure.

Page 80

BATTLE

Q. Does a borrower have to be current on his or her direct loans to enter income-driven repayment?
A. No.
Q. So is it possible for a borrower who is delinquent on a loan to enter income-driven repayment?
A. Yes.
Q. And how does that occur?
A. So the....
    It would occur just the way a borrower would be current -- a borrower that is current.
    So a borrower that requests an income plan -- or any repayment plan, for that matter -- would go through the steps in order to -- the servicer would go through the steps to determine eligibility.
    And they would likely cure the -- any past delinquency with an administrative forbearance.
Q. Okay. How do borrowers apply for income-driven repayment plans?
A. So there is a couple of different ways the borrower would apply.
    So the borrower can contact their servicer

Page 81

BATTLE

and maybe go through the paper process in order to apply, or more readily available and more efficient would be the online tool on StudentLoans.gov.
    So we have a tool that borrowers can access electronically to apply for IDR.
Q. And is StudentLoans.gov a Department of Education website?
A. It is.
    It is a Department of Education's website that's maintained by a contractor, just to be clear about that.
Q. Okay. Is the contractor one of the Department's servicers in the Direct Loan Program?
A. It is not.
Q. Okay. Do borrowers have to provide proof of income in connection with their applications for income-driven repayment?
A. Yes, they would.
Q. How do they prove -- how do borrowers who are applying prove their income?
A. So currently in the tool that's on StudentLoans.gov, there is an interface directly with the IRS.
    And information is transferred from the

Confidential
Pursuant to Protective Order

Page 86

BATTLE

Likewise, we may conduct tests or pilots to determine ways or identify ways that we can improve our operational processes.

Q. Can you give an example of a test or pilot of the kind you just described?

A. So I remember us having conversations about how to improve the recertification process for income-driven.

And there was a period of time where we conducted a couple of different pilots to determine how we can improve recertification rates, how could we improve borrowers' understanding of the income plans.

Q. What about with respect to initial enrollment, were there any pilots or tests conducted by the Department for that?

A. Specifically about initial enrollments, we likely had a number of campaigns, enrollment campaigns, that just -- that's more around awareness of the plans as it is improvement.

So I guess I draw a distinction between discussions around how to improve and make things more efficient versus campaigns or outreach activities where we're making borrowers aware of

Page 87

BATTLE

their options.

Q. What might those campaigns or outreach activities consist of?

A. It could be e-mail campaigns.

It could be servicer-led kinds of outreach activities, all around options for IDR.

Q. So some of these campaigns -- did some of these campaigns involve servicer participation?

A. Most of the campaigns would involve the servicers, because any campaign that the Department initiates is going to impact the servicer.

So we generally did campaigns in partnership with the servicers so that they were aware of volumes that were coming in.

Q. Did the Department also communicate directly with borrowers in connection with these campaigns?

A. That is correct.

Q. You said earlier that the IDR application process cannot be completed over the phone.

Is that right?

A. That is right.

Q. Did the Department ever consider implementing a process for completing IDR

Page 88

BATTLE

application over the phone?

MR. KOLSKY: I'm going to object to the extent you're asking for deliberative information about the deliberative process of the agency.

Any predecisional deliberative information, that should not be disclosed because that's privileged.

Q. Has the Department identified any elements of the application process that present obstacles to borrowers enrolling in IDR?

A. So could you be more specific?

Q. Does the Department from time to time assess the efficacy of its IDR enrollment processes?

A. I would say yes.

Q. Informally or formally?

A. Yes, I would say yes.

Q. In reviewing IDR enrollment processes, has the Department identified any elements of the process that pose potential obstacles to increasing IDR enrollment or to a borrower completing IDR enrollment?

A. I would say yes.

Q. Can you give an example of an obstacle?

Page 89

BATTLE

A. An example would be the recertification process and how borrowers -- under the income plans, the borrower is required to provide documentation annually, and sometimes borrowers have challenges either providing or understanding their requirements around those annual recertification processes.

Q. What about providing proof of income; is that sometimes an obstacle for borrowers applying for IDR?

A. I don't know whether I could speak to it as a general problem -- and that was partly why the implementation of the tool was so critical, because it took away the need for borrowers to provide paper via mail.

Q. I'm sorry. Can you explain -- perhaps I missed it -- and if I did, I apologize -- why exactly can -- is it not possible to complete IDR enrollment over the phone with a servicer?

A. Because there are income requirements, there's documentation, there is income requirements that are required as part of the application.

Q. I see. So the tool is able....

That is not a problem for the tool -- am I right? -- because it --

Page 182

BATTLE

Q. And then next to it in a column, the heading of which, all the way at the top, do you see, says "Types of Borrowers"?
A. Yes.
Q. Next to "Forbearance," there are two bullets in that column.
    Do you see those?
A. Yes, I do.
Q. Can you read those --
A. Sure.
Q. -- two bullets.
A. (Reading:) Forbearance should only be considered after it was determined that no lower payment option is acceptable and borrower is not eligible for any deferments. Forbearance can be used to bring account current while customer is addressing long-term solution.
Q. Does the use of forbearance described in those bullets accord with Department policy?
A. Yes.
Q. Is it possible to apply for forbearance without calling a servicer?
A. Yes, there are instances where a forbearance can be applied without calling the

Page 183

BATTLE

servicer.
Q. And how would a borrower do that?
A. Okay. Let me go back.
    Can you give some specifics about, when you mean a forbearance can be applied without contacting the servicer.
Q. Oh -- can a borrower request a forbearance without making a phone call to the servicer or talking to the servicer on the phone?
A. We are speaking about a borrower making a request. Then the borrower can contact the servicer, either in writing or a phone call, are the ways that -- there has to be some contact for a forbearance to be applied.
Q. That makes sense.
    Is it possible for a borrower to apply for a forbearance through servicer websites?
A. Yes.
Q. And in that circumstance, could a borrower obtain a forbearance without speaking on the phone with the servicer?
A. Yes; in that circumstance it could, yes.
Q. And in that circumstance, how does the Department ensure that borrowers are given

Page 184

BATTLE

information about other options they may have for managing their loans?
A. We would hope that the servicing tools are robust enough to be able to allow for appropriate navigation so that borrowers are just not allowed to apply for forbearance without appropriate counseling.
    So if the tools allow for some level of communication or information about other options other than forbearance, then it can still be applied over the website.
    So there's still an expectation that borrowers would get appropriately notified about other options, even if they used the online tools.
Q. When you say borrowers would be appropriately notified, are you talking about written disclosures of some kind?
A. Either written disclosures or even through the website itself -- through the navigation itself.
Q. So is one way the Department ensures that borrowers get information about repayment options through written disclosures?
A. Sure, that's one way -- or electronically, sure.

Page 185

BATTLE

Q. Electronically on the web --
A. Yes.
Q. -- potentially?
A. Either one of those ways, sure.
Q. Or through various servicer notices?
A. Through notices, through the websites, or -- and, of course, through phone calls.
Q. So the Department doesn't rely exclusively on phone calls to provide information to borrowers about repayment options?
A. Oh, not -- yeah, that's one way to notify a borrower, sure.
Q. Through the phone?
A. Through the phone, sure.
Q. But also there are ways to do it through other disclosures?
A. The tools or other disclosures, sure.
Q. Ms. Matthews asked you about the benefits of income-driven repayment plans.
A. Yes.
Q. Are there any downsides in income-driven repayment plans from the Department's perspective?
A. Downsides from...?
Q. For borrowers.

Confidential
Pursuant to Protective Order

Page 194

BATTLE

CERTIFICATE

I, SUSAN ASHE, a Registered Merit Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of June, 2018.

_____
Susan Ashe, Notary Public
of the District of Columbia
My commission expires: May 31, 2022.