# EXHIBIT 2

Confidential - Pursuant to the Protective Order

Page 1

1  　　　　　　　　　　　TESSITORE

2  　　　　IN THE UNITED STATES DISTRICT COURT

3  　　　FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

4  　　　　　　　　Case No. 3:17-cv-00101

5  　　　　　　　－　－　－　－　－　－　－　－

6

7  CONSUMER FINANCIAL PROTECTION BUREAU,

8  　　　　　Plaintiff,

9  vs.

10 NAVIENT CORPORATION, et al.,

11 　　　　　Defendants.

12 _____/

13

14

15 　　　　　　　　　　CONFIDENTIAL

16 　　　　PURSUANT TO THE PROTECTIVE ORDER

17

18 　　　VIDEOTAPE DEPOSITION OF LISA TESSITORE

19 　　　　　　　　　Washington, D.C.

20 　　　　　　　Thursday, May 24, 2018

21

22

23 Reported by:

24 SUSAN ASHE, RMR, CSR, CRR

25 Job No.:  142321

Confidential - Pursuant to the Protective Order

Page 2

1  TESSITORE
2  Thursday, May 24, 2018
3  9:15 a.m.
4
5
6  Videotape deposition of LISA TESSITORE,
7  taken on behalf of Defendants, at WILMERHALE, 1875
8  Pennsylvania Avenue, Northwest, Washington, D.C.,
9  beginning at 9:15 a.m., on Thursday, May 24, 2018,
10 before Susan Ashe, RMR, CSR, CRR.

Page 3

1  TESSITORE
2  APPEARANCE OF COUNSEL:
3  FOR PLAINTIFF:
4    CONSUMER FINANCIAL PROTECTION BUREAU
5    BY: ANDREA MATTHEWS, ESQ.
6    BY: DAVID DUDLEY, ESQ.
7    1700 G Street, NW
8    Washington, DC 20552
14 FOR DEFENDANTS:
15   WILMERHALE
16   BY: DANIEL KEARNEY, ESQ.
17   BY: GARY DYAL, ESQ.
18   1875 Pennsylvania Avenue, NW
19   Washington, DC 20006

Page 4

1  TESSITORE
2  ALSO PRESENT:
3  FOR THE WITNESS:
4    UNITED STATES ATTORNEY'S OFFICE
5    BY: JOSHUA KOLSKY, ESQ.
6    555 4th Street, NW
7    Washington, DC 20530
10   - and -
11   OFFICE OF THE GENERAL COUNSEL
12   BY: BRIAN SIEGEL, ESQ.
13   U.S. Department of Education
14   400 Maryland Avenue, SW
15   Washington, DC 20202
19 David Voigtsberger, Videographer

Page 5

1  TESSITORE
2  INDEX
3  Deposition of LISA TESSITORE
4  May 24, 2018
6  Examination By:                Page
7  Mr. Kearney                    9, 267
8  Ms. Matthews                   14
10 DEFENDANTS
11 Exhibit No.                    Marked
12 Exhibit 315  E-Mail Correspondence
13      NAV-00781753 and -754
14      with Attachment            34
15 Exhibit 316  E-Mail Correspondence
16      NAV-00627332 through -338  42
17 Exhibit 317  E-Mail Correspondence
18      NAV-00728862 through -867  72
19 Exhibit 318  E-Mail Correspondence
20      NAV-01561968 through -970  80
21 Exhibit 319  E-Mail Correspondence
22      NAV-01235100               84
23 Exhibit 320  Evaluation Document
24      NAV-00975861 through -864  90

Confidential - Pursuant to the Protective Order

Page 6

TESSITORE
DEFENDANTS
Exhibit No.                              Marked
Exhibit 321  E-Mail Correspondence
       NAV-00689225, -227
       with Attachment                94
Exhibit 322  E-Mail Correspondence
       NAV-00628986 through -994      112
Exhibit 323  E-Mail Correspondence
       NAV-01561977 through -980      121
Exhibit 324  Business Operations
       Change Request Form
       NAV-00016770 through -772
       with Attachment                132
Exhibit 325  E-Mail Correspondence
       NAV-00744366 through -370      136
Exhibit 326  Federal Student Aid Document
       ED000560 through -570          148
Exhibit 327  Servicer Site Visit Review
       ED000541 through -551          225
Exhibit 328  E-Mail Correspondence
       NAV-00823454 through -458      276

Page 7

TESSITORE
PREVIOUSLY MARKED EXHIBITS
Exhibit No.                              Marked
Exhibit 300  Subpoena                 12
Exhibit 306  E-Mail Correspondence
       NAV-00686505, -507, -508, and
       NAV-00686237                   28

Page 8

TESSITORE
        WASHINGTON, D.C.;
    THURSDAY, MAY 24, 2018, 9:15 A.M.
               --o0o--
        VIDEOGRAPHER: Good morning. This is the start of tape labeled No. 1 of the videotaped deposition of Lisa Tessitore in the matter of Consumer Financial Protection Bureau versus Navient Corporation, et al. in the United States District Court for the Middle District of Pennsylvania, Case No. 3-cv-1700101.
        This deposition is being held at WilmerHale, 1875 Pennsylvania Avenue, Northwest, Washington, D.C. on May 24, 2018; and the time is 9:15 a.m.
        My name is David Voigtsberger, from TSG Reporting, Incorporated; and I am the legal video specialist.
        The court reporter is Susan Ashe, in association with TSG Reporting.
        Will counsel please introduce yourselves and whom you represent.
        MR. KEARNEY: Dan Kearney, of WilmerHale, for the Defendants.
        MR. DYAL: Gary Dyal, of WilmerHale,

Page 9

TESSITORE
for the Defendants.
        MR. KOLSKY: Josh Kolsky, from the United States Attorney's Office, for the Department of Education.
        MR. SIEGEL: Brian Siegel, of the Department of Education.
        MS. MATTHEWS: Andrea Matthews, of the Consumer Financial Protection Bureau, Plaintiff.
        MR. DUDLEY: David Dudley, Consumer Financial Protection Bureau.
        VIDEOGRAPHER: Will the court reporter please swear in the witness.
Whereupon,
        LISA TESSITORE,
the Witness, called for examination, having been first duly sworn according to law, was examined and testified as follows:
                EXAMINATION
BY MR. KEARNEY:
    Q.  Good morning, Ms. Tessitore.
    A.  Good morning.
    Q.  Could you please state your full name for the record.
    A.  Sure. Lisa Tessitore.

Confidential - Pursuant to the Protective Order

Page 106

TESSITORE

And certainly, from the -- on behalf of the servicers, there's less risk involved. There's less processing and less delays.

It's still a complicated process to speak about over the phone.

But the actual procedures of processing and doing the IDR is much better than it used to be back in 2011, '12, '13, '14.

Q. And how does the Department communicate the changing expectations with respect to these new IDR programs to its servicers?

A. Through our change request program, CRs.

So it goes through a very rigid process. And in that process, for the most part, it is an all-servicer-type approach.

So all of the servicers, with their subject matter experts, are in attendance -- generally on the phone. You can show up in person if you so choose.

But they have working sessions, knowledge sessions, and then the actual delivery of the CR and the cost and all of those procedural-type things that they have to go through.

But there is a lot of collaboration and

Page 107

TESSITORE

understanding, working with policy that....

And the CR itself may take on iterations as experts understand the regulations and how it is moved into procedural-type processes.

So it's a long process.

Q. And does the Department track the extent to which borrowers are using various IDR programs?

A. Yes.

Q. And for how long has it tracked those participation rates?

A. Sure. So I talked about the NSLDS data -- database that we have.

It has a historical and a loan level for a borrower. And so it tracks where a borrower was and what type of repayment program.

But that's as best as the information coming in from each of the servicers that are doing the reporting, as well as our origination system that holds -- and our Student Loan -- that the -- the interface to the borrower is -- it holds all of that information.

So it's only as good as what is received into it. But it is the database that holds that information, so we track it.

Page 108

TESSITORE

Q. And how has the participation in IDR programs changed over time?

A. As the affordability and the opportunities for the programs have advanced, we have more programs that allows different individuals to participate in the program who otherwise wouldn't in the early years.

So that alone has increased the volume.

And then I spoke a little bit earlier about initiatives that -- in -- coming from the White House, coming from the Department of Education itself, or within FSA, where we're trying to promote the use of IDR.

So there's been a lot of campaigns done for these cohorts of borrowers, if you will, based on various statuses.

And so there was a big push to get borrowers into these repayment programs in an effort to make it more affordable, reduce the delinquency rates, and so forth.

Q. Are there a lot more borrowers in IDR today than there were, say --

A. Yes.

Q. -- in 2010, 2011?

Page 109

TESSITORE

A. Yes.

Q. Why were there fewer borrowers in IDR back in 2010, 2011?

A. Well, there was a lot less borrowers in the portfolio, to begin with. Right?

And as I said earlier, there wasn't enough programs to be encompassing of the needs we were trying to meet within the IDR programs at the time.

They were very limited, and the requirements were limited to a select group of people.

Now it's a larger group of people, and there's just more borrowers.

Q. Are there more borrowers in IDR today as a percentage of total borrowers?

A. Yes.

Q. So what types of strategies has the Department undertaken to -- let me back up, actually.

Does the Department have an interest in promoting income-driven repayment?

A. Let me say it this way: The Department has an interest in promoting IDR when applicable.

It's not always applicable. Right? So

Confidential - Pursuant to the Protective Order

Page 194

TESSITORE
borrower.
Q. Let me make sure I understand.
Is the thought that having that sort of rigid requirement would preclude the kind of discussion that we were talking about that servicers should be having with the borrower?
A. My personal opinion is yes.
FSA's perspective is it likely could be.
If you don't have that full conversation, you didn't listen very well.
You need to hear what the borrower has to say and know what the borrower's future looks like.
I mean, you -- and as -- from an FSA employee -- remember, I told you I have two sides? I have a taxpayer side, and I have the responsibility of the borrower.
It would be wrong of me to assume that everybody should fit into a repayment plan of an IDR.
I need to collect the funds to use those funds for other things as a taxpayer for the government.
So putting somebody in a forgiveness is not always the best option. It's not always the

Page 195

TESSITORE
right option.
If a borrower can make the repayment under a standard repayment plan, that is the best option for our borrowers. It's the best for them and the lifetime of their loan. They're done. They're out in ten years.
If they can pay it off early, absolutely better for the borrower -- but better for us if they can adhere to what was designed for the program at the onset. Right?
So there's more interest. There's just a longer burden in your discretionary income if you're prolonging this payment for years and years and years.
And that's not what anybody ever was wanting for these borrowers coming out of school at such a young age, is to have a debt burden that's hanging over their head for the next 20 years.
Q. If you had a borrower who couldn't make the regular payment --
A. Sure.
Q. -- if you had a borrower who couldn't make any payment, what kind of options might be appropriate for that borrower?

Page 196

TESSITORE
A. It depends.
It depends on why that borrower can't make that payment.
Is it because your car broke down this month? Okay. Then perhaps we will be talking about a forbearance.
Is it because you're serving in the military and you're going overseas? Okay. I'm going to talk about a military deferment with you.
Is your inability to pay because your sister's family is all of a sudden living with you and there's ten extra family members coming in?
Those conversations are all different, and each one of them will likely end up with a different result.
So is it a short term, again, or is it a long term?
And knowing that borrower as best you can will get you to the right answer, to the best of your ability.
But you can't forgive -- catch up with me next month -- you know, that kind of thing.
There's rules that go into place, and each of those have consequences.

Page 197

TESSITORE
And so as long as the borrower understands that, given what their circumstances are, I think at the end of the day the customer service rep has done their job.
Q. And are those kinds of questions that you were just modeling for us -- are those the kinds of questions that FSA is hoping or relying on servicers to be asking?
A. Yes.
Q. If we can keep going down the page --
A. Okay.
Q. -- to where it says "Recommendation" the first time underneath Observation 1.
A. Okay.
Q. Can you read that paragraph out loud for me, please.
A. Sure.
(Reading:) FSA recommends that Navient ask questions so that the borrower is able to determine which option -- parenthetical, like promise to pay, end parenthetical -- would be most beneficial to resolve the delinquency. If the borrower is willing and able to make a payment to resolve the delinquency in the account and can

Confidential - Pursuant to the Protective Order

Page 198

TESSITORE

continue to make payments, FSA does not believe a borrower should use unnecessary forbearance time that will result in interest capitalization.

Q. Is this recommendation -- could that encompass the kind of borrower that you were just talking about, the one who can make a payment --

A. Um-hum.

Q. -- can make a standard payment?

A. Um-hum. So this....

I might take a little issue with the recommendation, because what's throwing it off is the word "delinquency" in here.

Q. Okay.

A. Okay?

So in instances to understand the complexity of the Student Loan program.

So again, the use of forbearance in this instance might -- you can't get around it.

And what I'm saying is: So even if I want to afford this same borrower, these 220 borrowers, the ability to go into an IDR repayment program, if they are delinquent, if they don't pay up, get yourself current, you're going to have a forbearance.

Page 199

TESSITORE

There's no way around it, because you can't at a point in time put somebody into an IDR program and still carry their delinquency with you.

You just -- you can't have a rolling delinquency. You have to bring them current to do the next step.

So if they're 30 days delinquent, there's a 30-day forbearance. If they're 60 days or two payments behind, they're 60 days of forbearance.

That doesn't count in the 36 consecutive months because it's trying to get them into another repayment plan.

And as they're applying, even if they weren't delinquent -- if this is a borrower who says today, "I want to apply for an IDR," and they go online or they do the paper process -- right? -- the very first thing that you do to stop where they're at, because they just told you I can't afford it, is to put them in a stop of payment. That is a forbearance.

And each time that you do that, unfortunately, it is a capped interest event. And so we have that to deal with.

But they are -- in order to get to your

Page 200

TESSITORE

end means, which is to reduce your payment, you have to go through that forbearance process.

So kind of goes -- what do they call that? -- hand in glove.

So at the rate that you're increasing your IDR performance and your uptick in IDR, your forbearance uptick is going to go right along with it, because there is no way to get somebody out of that delinquent status to get to IDR without first passing through forbearance.

Same thing with any IDR processing -- whether it takes them a whole 60 days or not, there's generally a forbearance that is going to be placed on that IDR process.

Q. I want to make sure I understand the duration of that forbearance.

A. Sure.

Q. The forbearance that you're talking about is in order to get them out of delinquency so that they can be enrolled in IDR. Right?

A. Correct.

Q. How long should that delinquency run? -- I mean, I'm sorry, how long should that forbearance run?

Page 201

TESSITORE

A. "How many payments are you behind?" is the answer.

So if that outreach to that borrower is ten days after their payment due date, they would get one, because it's really -- even though we say a 30-day forbearance, it's really covering one billing statement -- right? -- one billing cycle.

But if that borrower is 270 days delinquent, what does that equate to? You know, something less than 12 months of -- you know, 10 months, 11 months.

So it depends on how severely delinquent they are.

And of course, we encourage -- you saw that from the campaigns -- target this group of people. These are the delinquent people.

They're clearly telling you, "I can't make my payment -- or unwilling to make my payment." Is it perhaps because of an income level?

So when you're targeting that group of people who's that delinquent, you're going to see a stretch of forbearances that sit behind it -- one to cover the process itself, and two to cover that delinquency. That's the only way to move it

Page 202

1  TESSITORE
2  forward.
3      Q. So let me make sure that I get this right.
4      A. Sure.
5      Q. If I'm a borrower and I'm 45 days
6  delinquent, you or the servicer contact me.
7      At that point I'm 45 days delinquent. We
8  have a great conversation. I say, you know what, I
9  think IDR is the right plan for me. And I submit an
10 application within 15 days.
11     A. Okay.
12     Q. So that's 45 -- it's 15 -- that's 60 days.
13     Are we looking at 60 days of forbearance
14 then?
15     A. No.
16     So as I'm having that conversation with
17 you, the first thing I'm going to do when you agree
18 that that's what you want to do and you say, yes,
19 sign me up, go ahead, send me that link, and I get
20 you to that link -- the first thing I'm going to do
21 is cover that delinquency, bring you current.
22     Q. So you're covering a delinquency of the 45
23 days?
24     A. Yep. So --
25     Q. With a forbearance?

Page 203

1  TESSITORE
2      A. -- I'm assuming there's two payments, at
3  least, in there -- right? We haven't quite bridged
4  the third one. So there's two. There's 60 days of
5  forbearance in there.
6      But with any IDR, one of the things that
7  we afford all of our borrowers is a 60-day doc
8  review. And it happens, if I'm having a
9  conversation with you, the day I'm having my
10 conversation with you that you agree to do this and
11 this is what you said you want to do.
12     So then that's a 60-day forbearance.
13     So that 60 days doesn't cover the
14 delinquency. The notion is that gives you 60 days
15 to get your paperwork in and get the right paperwork
16 in, because we know how complicated that process is.
17 Right?
18     So I just gave you 60 days to cover the 45
19 days -- two payments.
20     Now I'm going to give you 60 days, which
21 would amount to two more payments in the future.
22     Q. So is that a total of 120 days of
23 forbearance?
24     A. It depends on where your payment falls;
25 but theoretically speaking, yes, 120 days.

Page 204

1  TESSITORE
2      Q. What if I get my application in to you in
3  fewer than 60 days?
4      A. Good for you. I will back it off.
5      And so what that affords is the ability to
6  undo some of that capped interest.
7      I mean, the interest won't cap until the
8  end of that forbearance period for the delinquency.
9  So that one's taking place, and then -- it's
10 complicated.
11     Then if you -- if you have them back to
12 back, it happens at the end.
13     So if I can shorten up that time period --
14 absolutely, it's going to save you some money. But
15 at the end of the day, it depends on what your
16 balance is and what that interest accrual is.
17     Q. So when you say back it off or shorten the
18 time period, do you mean we wouldn't get the full 60
19 days on the back end of forbearance, we'd get
20 something less than that?
21     A. You could.
22     But generally speaking -- now, remember,
23 part of the forbearance -- or if you don't know --
24 part of the forbearance is a followup in written
25 form to say, I'm putting you into a forbearance to

Page 205

1  TESSITORE
2  cover "X." And it tells you when it's going to end.
3      And when it's ending, I'm also telling you
4  you're coming out of forbearance.
5      Most of the time if the paperwork comes in
6  early, which is not always the case, there's usually
7  a conversation -- because the other piece of that
8  is: Your forbearance also has to cover to the point
9  of time when you're expected to make your next
10 payment.
11     So while you might be speedy, you might
12 not be ready to make your payment in 10 days.
13     But giving you the 30 days -- because I
14 have to gear up and get you the billing information
15 out the door and -- or put in your ACH again, set
16 you up for automatic payments -- doesn't happen
17 overnight.
18     I need that ability to process what's
19 taking place, and you need the ability as a borrower
20 or the consumer to react to it. I can't expect you
21 to do it tomorrow.
22     Q. I hear that you're saying that, because
23 getting the forms in is tricky, it seems that for at
24 least some borrowers they will need the full 60 days
25 of forbearance on the back end.

Page 206

TESSITORE

A. Yes.
Q. Is that always going to be the case?
A. It's not the case -- it's probably more that way for a borrower who's just stepping into -- because we're talking about those that are delinquent -- right? -- so it's those who are just coming into a repayment plan versus somebody who's already in that repayment plan, is just doing the renewal.
     So yes to the delinquency group, no to the other group.
Q. I see. I want to look at Observation 2.
A. Okay.
Q. Still on the page marked 2 or ED000561. Can you please read out loud the text next to Observation 2.
A. Sure.
     (Reading:) Similar to the first observation, many CSRs did not offer alternative or beneficial options when attempting to assist borrowers with bringing their account current or managing repayment. CSRs did not ask probing questions to determine if it would be more beneficial for the borrower to enter a deferment or

Page 207

TESSITORE

to change to one of the income-driven repayment plans, IDR.
Q. When that last sentence references "probing questions," are those the types of questions that we've been talking about today?
A. That's what I would expect it to, yeah -- exactly.
Q. Those are the types of questions that you modeled for us a few minutes ago?
A. Yes.
Q. Is that the conversation that FSA expects the servicers to be having with borrowers?
A. Yes.
Q. Moving on to the recommendation right underneath that, could you read that out loud, please.
A. (Reading:) FSA recommends that Navient provide borrowers with all options available so that the borrower may make an informed decision based on their current situation. The use of forbearance in lieu of any other option can cause more undue hardship to a borrower in the long term.
Q. Is this a recommendation that FSA made, taking into account Navient's response to this

Page 208

TESSITORE

report?
A. I would like to think yes; but I honestly can't remember, because I don't know what their response was without reading it.
Q. Is this recommendation in line with what FSA had been communicating to servicers up until 2017?
A. Right. So, again, it's -- if you ask the probing questions, then you should get to the end solution.
     And knowing that there is this crazy population who's used to getting forbearances every year at this time period, to introduce a new forbearance without going through the means of getting an IDR probably at this point was not beneficial.
     But if that forbearance is a result of getting to an IDR, to me that's a different -- that's a different outcome. It's a different group of people.
     So this would -- if you didn't ask those probing questions and you put them in a forbearance, it's probably not the best choice or at least it doesn't sound to be the best choice on the surface.

Page 209

TESSITORE

     If you know those end goals and you end up in a forbearance, so be it.
     If you know those end goals and you're trying to get to an IDR, you generally have to pass through forbearance land to get there.
     So to me, while they're still all forbearances, the end result is really what's driving how you got there and the use of that forbearance and the limited use of that forbearance.
Q. This idea that you've just expressed about the purpose of the forbearance and the limited use of the forbearance, especially as it relates to using forbearance to get into IDR, is that a conversation that FSA had had with the servicers before?
A. Sure. It goes back to changing borrower behavior.
     So forbearances, while we can look at it and say it drives up your balance because you're going to have capped interest -- certainly see that -- but there's a purpose for it. And then there's a real purpose.
     And it doesn't mean don't use it because it has bad outcomes. It's used -- used in the right

Confidential - Pursuant to the Protective Order

Page 287

1               TESSITORE

2              CERTIFICATE

3

4          I, SUSAN ASHE, a Registered Merit

5   Reporter and Notary Public, hereby certify that the

6   foregoing is a true and accurate transcript of the

7   deposition of said witness, who was first duly sworn

8   by me on the date and place hereinbefore set forth.

9              I FURTHER CERTIFY that I am neither

10  attorney nor counsel, nor related to or employed by

11  any of the parties to the action in which this

12  deposition was taken, and further that I am not a

13  relative or employee of any attorney or counsel

14  employed in this action, nor am I financially

15  interested in this case.

16              Dated this 6th day of

17  June, 2018.

18

19

20          _____

21           Susan Ashe, Notary Public

22           of the District of Columbia

23  My commission expires:  May 31, 2022.

24

25