# EXHIBIT 10

Page 1

1                    T. RIDDER

2     IN THE UNITED STATES DISTRICT COURT

3   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

4            Case No. 3:CV-17-00101

5   _____

6   CONSUMER FINANCIAL PROTECTION            )

7   BUREAU,                                  )

8                 Plaintiff,                 )

9        v.                                  )

10  NAVIENT CORPORATION; NAVIENT             )

11  SOLUTIONS, INC.; and PIONEER             )

12  CREDIT RECOVERY, INC.,                   )

13                Defendants.                )

14  _____  )

15

16

17        DEPOSITION OF THERESA A. RIDDER

18               Washington, D.C.

19               November 6, 2018

20

21

22

23

24  Reported by:  Mary Ann Payonk

25  Job No. 150557

Page 2

1  T. RIDDER
2
3
4
5
6
7         November 6, 2018
8            9:00 a.m.
9
10
11
12     Deposition of THERESA A. RIDDER, held
13 at the law offices of WilmerHale, 1875
14 Pennsylvania Avenue, N.W., Washington, DC,
15 pursuant to Notice before Mary Ann Payonk,
16 Realtime Reporter and notary public of the
17 District of Columbia, Commonwealth of Virginia,
18 and State of New York.

Page 3

1  T. RIDDER
2 APPEARANCES:
3 ON BEHALF OF PLAINTIFF:
4    NICHOLAS JABBOUR, Enforcement Attorney
5    MANUEL ARREAZA, Attorney Advisor
6    Consumer Financial Protection Bureau
7    1700 G Street, NW
8    Washington, DC 20552
9
10
11 ON BEHALF OF DEFENDANTS:
12    KARIN DRYHURST, ESQUIRE
13    JOSHUA ABBUHL, ESQUIRE
14    WilmerHale
15    1875 Pennsylvania Avenue, NW
16    Washington, DC 20006
17
18 Also present:
19    Randall Short, videographer
20    Paul Lyons

Page 4

1              T. RIDDER
2       THE VIDEOGRAPHER:  This is the
3  start of tape labeled number 1 of the
4  videotaped deposition of Theresa Ridder
5  in the matter of Consumer Protection
6  Bureau versus Navient Corporation,
7  et al., in the United States District
8  Court for the Middle District of
9  Pennsylvania, Case Number 3:CV-17-OO101.
10      The deposition is being held at
11 1875 Pennsylvania Avenue, Northwest,
12 Washington, D.C. on November 6, 2018, at
13 approximately 9:11 in the morning.
14      My name is Randy Short from
15 TSG Reporting, and I am the legal video
16 specialist.
17      The court reporter is Mary Payonk
18 in association with TSG Reporting.
19      Will counsel please introduce
20 yourselves?
21      (Whereupon, counsel placed their
22 appearances on the video record.)

Page 5

1              T. RIDDER
2  THERESA A. RIDDER,
3     called as a witness, having been duly
4     sworn, was examined and testified as
5     follows:
6          EXAMINATION
7  BY MS. DRYHURST:
8     Q.  Good morning, Ms. Ridder.  Would you
9  please state your full name for the record?
10    A.  Theresa Ann Ridder.
11    Q.  Have you been deposed before?
12    A.  I've not.
13    Q.  I'll start with some brief
14 instructions.  I'll be asking you questions
15 today, and your testimony will be taken by the
16 court reporter.
17    Do you understand?
18    A.  I do.
19    Q.  You were sworn in by the court
20 reporter.  Do you understand that you are under
21 oath today?
22    A.  I do.
23    Q.  I will try to make my questions
24 clear.  If I ask you a question and you don't
25 understand, please ask me to rephrase and I

Page 34

T. RIDDER

A. I contacted consumers, and I think there was one point in time for which I contacted a couple of former employees.

Q. Do you remember who those were?

A. I don't.

Q. Over what time period have you contacted consumers for the Navient investigation?

A. At least starting since January of 2017 or somewhere around there.

Q. And to when?

A. And you mean actually going out and contacting consumers?

Q. Speaking to consumers.

A. Speaking to consumers? So I guess as of maybe a month or so ago.

Q. And when were you involved in contacting former employees?

A. I don't remember when that was, to be honest. I'm not sure.

Q. Was it in 2017?

A. It may have been, but I don't think so. I'm not sure. It may have been before then but I really don't know, honestly.

Page 35

T. RIDDER

Q. Well, it couldn't have been before then; right? Because you started in January 2017.

A. Perhaps I started earlier and maybe I was just considering when I contacted consumers so it may be earlier than this. But perhaps it was early 2017. I really don't know. I don't remember.

Q. Do you remember if the CFPB had already filed its lawsuit when you joined the team?

A. When I joined the Navient team, yes.

Q. Do you view your role as an investigator to be finding out the facts?

A. Yes.

Q. Do you view it to be the lead case?

A. No.

Q. If you learn something that did not support the CFPB's case, would you tell someone?

A. Absolutely.

Q. Can you provide an example?

MR. JABBOUR: Objection. I'm going to -- this calls for work product and so

Page 36

T. RIDDER

I'm going to instruct the witness not to answer this question. Her work was done at the direction of attorneys.

Q. Are you refusing to answer?

MR. JABBOUR: I'm instructing her not to answer.

MS. DRYHURST: I'm asking if she's refusing to answer.

MR. JABBOUR: I'm instructing her not to answer so she's refusing to answer.

MS. DRYHURST: She can answer whether she's not going to answer for the record.

Q. Are you not going to answer my question?

A. I am not going to answer your question.

Q. Thank you.

When you started working on the Navient investigation did you do any research into student loans?

MR. JABBOUR: Object. Again, this calls for attorney work product so I'm

Page 37

T. RIDDER

going to instruct the witness not to answer the question.

Q. Prior to joining the Navient investigation had you done any research on student loans?

A. I don't know if I did or not, to be honest with you. I don't know.

Q. You don't recall ever doing any research on student loans?

A. Prior to the Navient matter, I don't know if I did any research. I don't recall if I did or did not. I'm not sure.

Q. Did you work on any investigations related to student loans?

A. I did not.

Q. Do you know what the different types of federal loans are?

A. I can't tell you right now because I -- I'm sure I knew at one point but I don't right now.

Q. Do you know the difference between a direct loan and a FFELP loan?

A. I'm sure did I at one point but I don't right now.

10 (Pages 34 to 37)

Page 38

T. RIDDER

Q. Do you know what repayment options are available for direct loans versus FFELP loans?
A. I'm sure I knew at one point but I don't know right now.
Q. You said you stopped communicating with consumers about a month ago; is that right?
A. Correct.
Q. Do you think you knew a month ago?
A. Probably not.
Q. Do you know what the difference between a subsidized loan and an unsubsidized loan is?
A. I did at one point but I don't right now.
Q. On what basis do you say -- when do you think you knew the difference between subsidized and unsubsidized loans?
A. Likely more than a year ago.
Q. And why would you have known the difference then?
A. Because at that point, I read the Complaint and I had a little bit more knowledge

Page 39

T. RIDDER
about the matter.
Q. What is a forbearance?
A. I'm sure I knew about a year ago what specifically a forbearance is, but I can't specifically tell you what it is right now.
Q. Have you been speaking to consumers over the last year for the Navient investigation?
A. I have.
Q. Over that time period you didn't know what a forbearance was?
A. I'm sure I did at that time point, during that time period, but I don't at this point in time.
Q. Did you know a month ago when you were speaking to consumers?
A. I'm not sure if I knew a month ago whether or not I knew what forbearance was specifically.
Q. Do you know what a deferment is?
A. I -- I maybe generally know what a deferment is, but I can't specifically state what a deferment is because I'm not -- I haven't been involved specifically related to

Page 40

T. RIDDER
the definitions concerning this matter for a little bit of time so I -- I don't know specifically.
Q. What's your general understanding?
A. That after an individual takes out a student loan and they've completed their -- their degree, whatever it may be, there's a certain point in time for which they can defer without -- defer their loan without having to make any payments on it and without having the interest capitalized on their loan.
Q. Are you referring to a grace period?
A. Yes.
Q. Are you aware of any other deferments?
A. At this time, no. I'm sure I knew before.
Q. Did you know a month ago?
A. I'm not sure if I knew a month ago.
Q. Do you know what the different income-driven repayment options are?
A. I'm sure I knew about a year ago, but I'm not exactly sure specifically what the income-driven repayment options are at this

Page 41

T. RIDDER
point in time.
Q. Did you know a month ago?
A. I -- maybe I did. I'm not sure.
Q. Do you know what the application process is for an income-driven repayment option?
A. I may have known about a year ago, but I am not specifically -- I do not have a specific understanding of what the application process is for an income-driven repayment option at this time.
Q. Did you know a month ago?
A. I'm not sure if I did.
Q. Do you know if you can apply for an IDR plan over the phone?
A. I'm not sure if you can. I don't know.
Q. Do you know what kinds of information a borrower needs to provide in an IDR application?
A. I'm not sure at this point in time.
Q. Did you know a month ago?
A. Maybe. I'm not sure.
Q. Do you know whether there are any

11 (Pages 38 to 41)

## Page 42

T. RIDDER

downsides to an IDR plan?
A. I'm not sure. I don't know specifically at this time.
Q. Did you know a month ago?
A. I'm not sure if I did.
Q. Do you know a year ago?
A. I likely did, yes.
Q. Why do you say that?
A. Because a year ago I was more involved in the matter and I had a better understanding after reading the Complaint and discussing with attorneys the various parts of the Complaint.
Q. How has your involvement in the Navient investigation changed from a year ago to today?
A. Right now, I'm a point of contact for consumers.
Q. What were you before?
A. I interviewed -- I actually interviewed consumers.
Q. When did you stop interviewing consumers?
A. More or less a year ago, but I'm not

## Page 43

T. RIDDER

100 percent sure.
Q. So despite being a point of contact for consumers you don't know what a forbearance is?
A. Right now? Specifically, no.
Q. Despite being a contact for consumers you don't know what a deferment is?
A. Right now? Specifically, no.
Q. And despite being a contact for consumers you don't know what the different IDR options are?
A. Right now? Specifically, no.
Q. How many borrowers have you interviewed for the Navient investigation?
MR. JABBOUR: Objection. That work was done at direction of attorneys. I'm going to instruct the witness not to answer on the ground of work product privilege.
MS. DRYHURST: I believe we have a discovery request related to the number of interviews that occurred with borrowers, and you answered it, so it's discoverable information.

## Page 44

T. RIDDER

MR. JABBOUR: I'm going to instruct the witness not to answer the question.
Q. Are you not answering that question?
A. I'm not going to answer that question.
Q. For how many borrowers have you served as a point of contact?
MR. JABBOUR: Again, I'm going to instruct the witness not to answer on the ground of attorney work product. This work was done at the direction of attorneys.
Q. Who selected the borrowers?
MR. JABBOUR: I'm going to instruct the witness not to answer on the grounds of attorney work product privilege. That work was done at the direction of attorneys.
Q. Do you know how the borrowers were selected?
MR. JABBOUR: Instruct the witness not to answer. That work was done at the direction of attorneys.
Q. Did you ever receive CFPB portal

## Page 45

T. RIDDER

complaints?
MR. JABBOUR: Objection, vague. And I'm going to instruct the witness not to answer on the grounds of attorney work product privilege. That work was -- all of her work was done at direction of attorneys.
Q. Have you ever reviewed complaints on the CFPB portal?
A. I have.
Q. Have you ever reviewed those complaints for the Navient investigation?
MR. JABBOUR: I'm going to instruct the witness not to answer this question on the grounds of attorney work product privilege.
Q. Have you ever received a complaint directly from a consumer?
A. No.
Q. So you always receive them from attorneys for the CFPB?
A. No.
Q. In what other circumstances have you received complaints from consumers?

Page 238

T. RIDDER

You have discovered those facts through this document, through what we've produced to you, as well as through the depositions of those consumers, so we're not relying on anything those consumers told to Ms. Ridder that has not been produced to you because we told you the fact here and you gathered those facts through your depositions. There's no reason for us to be relying on Ms. Ridder to relay those facts thirdhand, which is exactly what I told you in my email to you approximately three weeks ago.

MS. DRYHURST: So your position is that you're not relying on the borrower's conversations with Ms. Ridder themselves.

MR. JABBOUR: That's correct.

MS. DRYHURST: Will you be relying on the declarations she drafted for them?

MR. JABBOUR: The declarations are a separate matter entirely. Those are

Page 239

T. RIDDER

not communications with Ms. Ridder. These are declarations that they signed.

MS. DRYHURST: Ms. Ridder said she drafted those declarations based on conversations with the consumers.

MR. JABBOUR: Attorneys are permitted to draft declarations. People working under the direction of attorneys are permitted to draft declarations.

MS. DRYHURST: I'm not talking about whether people are permitted to draft declarations. I'm asking you whether you plan to rely on the declarations.

MR. JABBOUR: Yeah, we do.

MS. DRYHURST: But we're not entitled to discover the circumstances of those declarations being drafted.

MR. JABBOUR: You did through talking with the witnesses. Sorry, if you think that when an attorney drafts a declaration you're entitled to ask the attorney about the drafting process of that declaration, sorry, you're not.

Page 240

T. RIDDER

MS. DRYHURST: Do you have an attorney-client relationship with the borrowers?

MR. JABBOUR: Okay, look, again, we have asserted the work product privilege. If you want to challenge it before the Court, feel free to do that.

MS. DRYHURST: We will.

BY MS. DRYHURST:

Q. Other than Mr. Thomas, are you aware of any other investigators that have worked on the Navient investigation?

A. I am not.

MS. DRYHURST: Can we take a break?

THE VIDEOGRAPHER: We are off the record at 3:31 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are on the record at 3:40 p.m.

MS. DRYHURST: We have no further questions. Thank you for your time, Ms. Ridder.

THE WITNESS: Thank you.

MR. JABBOUR: We don't have any

Page 241

T. RIDDER

questions either. Thanks so much for your time.

THE WITNESS: Thank you.

MR. JABBOUR: And we will read and sign.

THE VIDEOGRAPHER: Off the record at 3:40 p.m.

(Deposition adjourned at 3:40 p.m.)

1              T. RIDDER
2  C E R T I F I C A T E
3  DISTRICT OF COLUMBIA:
4       I, MARY ANN PAYONK, shorthand reporter,
5  do hereby certify that the witness whose
6  deposition is hereinbefore set forth was duly
7  sworn, and that such deposition is a true,
8  correct, and full record of the testimony
9  given.
10      I further certify that I am not related
11 to any of the parties to this action by blood
12 or by marriage, and that I am in no way
13 interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto set
15 my hand this 12th day of November, 2018.
16
17      *[signature: Mary Ann Payonk]*
       _____
18      MARY ANN PAYONK, Shorthand Reporter
19
20
21
22
23
24
25