

1700 G Street NW,
Washington, DC 20552

January 25, 2019

**Filed Via ECF**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

Re: *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Vanaskie:

Pursuant to Your Honor's January 17, 2019 Order (Doc. 164), I am writing on behalf of Plaintiff Consumer Financial Protection Bureau ("Bureau") to summarize the discovery disputes referenced in paragraph 2 of the Court's January 16, 2019 Order (Doc. 158). The Bureau will be appearing in person for the hearing on January 28, 2019 to discuss these disputes. I will be in attendance, as will Nicholas Lee and Thomas Kim.

To aid in the discussion of the matters identified in Your Honor's January 22, 2019 Order (Doc. 197), I have summarized the discovery disputes that appear to be ripe for resolution in terms of priority, beginning with the highest priority dispute. I have also summarized the disputes that the Bureau reasonably anticipates at this time.

## DISCOVERY DISPUTES THAT MAY BE RIPE FOR RESOLUTION

### I. Whether the Discovery Protocol contains an exhaustive list of fields that should be used to adequately assert privileges

#### A. Relevant docket entries

- Parties' proposed Stipulation and Order Regarding Technical Specifications for Discovery ("Discovery Protocol") (Doc. 66-2 at 12-13), as accepted by the Court (Doc. 67)
- Bureau's letter dated December 27, 2018 (Docs. 146, 146-1, and Exhibits 3-8 (filed under seal))
- Defendants' letter dated January 7, 2019 (Docs. 153, 153-1)

#### B. Summary of issue

In disputing the adequacy of each side's privilege logs, the parties appear to be in disagreement regarding the meaning of language in the Discovery Protocol. Specifically, paragraph 7 of the Protocol states the following:

> Should any documents be withheld, in whole or in part, by either Party on the basis of attorney/client privilege, work-product privilege, a joint-defense privilege or any other applicable privilege, immunity or protective doctrine, the parties will exchange privilege logs. Each party may use a categorical privilege log in lieu of a traditional privilege log. If using a traditional privilege log, state the

> following information separately for each document or portion of a document withheld:
>
> (a) the specific privilege, protection, or immunity claimed;
>
> (b) the type of document (i.e. e-mail reflecting legal advice);
>
> (c) the date of the document, which may be extracted in an automated fashion via available metadata;
>
> (d) the author(s) of the document, which may be extracted in an automated fashion via available metadata;
>
> (e) the sender(s), addressee(s) and/or recipient(s) of the document, which may be extracted in an automated fashion via available metadata;
>
> (f) the custodian(s) of the document;
>
> (g) the Bates number range of the document and family, if applicable; and
>
> (h) the general subject matter of the document (e.g., "legal advice regarding borrower communications").
>
> If a claim of privilege applies to only a portion of a document, the document should be produced and the portion claimed to be privileged obscured and stamped "redacted." The parties shall meet and confer in good faith regarding any additional substantive and formatting requirements for privilege logs.

Doc. 66-2, ¶ 7. The Bureau believes that the items listed for a traditional log are not sufficient to satisfy any privilege assertion, and that instead privilege assertions must meet the elements set forth in the case law. *See* Doc. 146. Defendants appear to take the position that the listed items displace the elements set forth in the case law and that no further information needs to be provided as it relates to their privilege assertions (*see* Doc. 153, at 2), but have demanded that the Bureau provide substantially more information with respect to its privilege assertions (*see* Doc. 107, at 3-7).

It is necessary to resolve this fundamental dispute so that each party's logs are held to the same standard. It is illogical for Defendants to argue that the Discovery Protocol governs only *their* assertions of privilege and that the Bureau needs to be held to a more stringent standard. The Protocol does not draw distinctions based on the type of privilege asserted or which party asserts the privilege, so either it provides an exhaustive list of requirements applicable to any privilege assertion by any party (including attorney-client, attorney work product, and deliberative process), or it does not (because the elements for each privilege as set forth in the case law must also be demonstrated). Should Your Honor determine that it provides an exhaustive list of requirements, the Bureau will be prepared to provide such a privilege log in short order.

As part of the discussion on this issue, the Bureau believes that a side-by-side comparison of both parties' categorical logs will help inform the discussion. The Bureau catalogued 9,300 documents into 109 categories, while Defendants catalogued 45,000 documents into 11 categories. Both parties also provided certain other information on a document-by-document basis, but in different formats. The Bureau disclosed the sender, recipient(s), and date for every email (including for each individual email in each email chain) by unredacting such information in the headers of

each such email. Defendants provided a metadata spreadsheet that listed the sender, recipient(s), and date information only for the most recent email in a chain, as well as certain other metadata that was automatically extracted from the documents. (Excerpts from that metadata spreadsheet are Exhibits 3-6 of Doc. 146-1.)

Defendants' metadata spreadsheet certainly does not constitute a document-by-document log, as they claim in their January 7, 2019 letter, because it lacks any descriptions of the basis for asserting privilege for that is specific to each document, including information that satisfies the elements of each privilege for each document. Rather, it merely identifies within which of their extraordinarily broad and vague categories each document falls. Neither that spreadsheet nor the two-page letter listing categories (Doc. 110-1, at A143) is remotely sufficient to meet the standard set forth in the case law. *See*, *e.g.*, *Robocast, Inc. v. Apple, Inc*., 2013 WL 12147601, at *3 (D. Del. July 19, 2013) ("The proponent of the privilege log must deliver a sufficiently-detailed description of each document such that the court can determine whether the elements of attorney-client privilege have been established."); *AVCO Corporation v. Turn and Bank Holdings, Inc*., 2015 WL 12834519, at *2 (M.D. Pa. Oct. 7, 2015) ("The standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed.") (quotation omitted); *N.J. Manufacturers Insurance Co. v. Brady*, 2017 WL 264457, at *8 (M.D. Pa. Jan. 20, 2017) ("[T]he descriptions are too vague to permit the Court to find that each element of the privilege claimed is satisfied . . . . NJM must provide more detailed descriptions explaining the contents of the documents withheld . . . that allow the Court to determine whether each element of the privilege claimed is satisfied").

To be clear, the Bureau believes that the Protocol's express authorization of categorical logs allows documents to be grouped into categories if all of the documents in each category share a common privilege justification. But Defendants have argued that the vague and conclusory category descriptions in their two-page letter suffices regardless of the case law standard, while the Bureau's far more granular and detailed category descriptions are deficient in light of the case law standard. Accepting Defendants' position would be a fundamentally inequitable result and cause significant prejudice to the Bureau.

### C. Next steps

The Bureau believes that the parties' existing filings have adequately presented the issue for resolution, but the Bureau is amenable to further briefing if it would be helpful. The Bureau also believes that oral argument on this issue is appropriate.

## II. Deficiencies in Defendants' privilege log

### A. Relevant docket entries

- Bureau's letter dated December 27, 2018 (Docs. 146, 146-1, and Exhibits 3-8 (filed under seal))
- Defendants' letter dated January 7, 2019 (Docs. 153, 153-1)

### B. Summary of issue

There are five major deficiencies regarding Defendants' privilege log. The parties have completed conferrals about the first four issues below, but not the fifth.

**Deficiency #1:** Defendants' metadata spreadsheet includes only the sender and recipient information for individuals appearing on the most recent email in a chain, omitting the identities of individuals appearing earlier in the email chain. The Bureau's concern is that this omits critical information, such as whether an earlier-in-time disclosure to a third party has destroyed the alleged privilege. This issue affects virtually all of the documents on Defendants' privilege log.

The Bureau cannot rely on Defendants' assertion that it conducted a review for "privilege-breaking" communications and produced any such communications. Defendants' initial privilege log inaccurately described whether allegedly privileged communications were sent or received by third parties. It was only after the Bureau raised the issue that Defendants amended certain category descriptions on their two-page categorical log. And now, the Bureau has discovered that other category descriptions on the two-page categorical log continue to hide the fact that Defendants are asserting privilege over documents sent or received by third parties. Given this track record, it is imperative that the Bureau and Your Honor be provided complete sender and recipient information and not be forced to rely on Defendants' vague and conclusory representations.

Defendants' statement that they "logged each privileged document *that was reviewed*, even if the document was embedded in another email chain" (Doc. 153 at 2 (emphasis added)), does not address the Bureau's concern. As Defendants know, a May 2018 agreement between the parties obviated the need for Defendants to review earlier-in-time communications that were completely subsumed within a later-in-time email. Thus, *Defendants did not review* myriad earlier-in-time communications and therefore they did not log them at all. This distinction is critical, because Defendants' statement can be easily misunderstood to imply that they logged each version of an email when, in fact, after May 2018 they would not have reviewed and would not have logged earlier-in-time emails that are subsumed within other emails. Thus, their statement may apply to productions predating the May 2018 agreement but it has no relevance to the review of documents that occurred after May 2018 (which is hundreds of thousands of documents).

As discussed in the Bureau's December 27 letter (Doc. 146 at 1 n.3), Defendants' argument that they need only provide metadata to satisfy their obligations is also misplaced.

The Bureau's request at this time is for Defendants to provide complete sender and recipient information, including job titles of individuals employed by any Defendant or affiliate of Defendants, for all privilege assertions where more than one distinct legal entity sent or received a communication. This information can be provided in a spreadsheet or through unredacted email headers, as the Bureau has done.

**Deficiency #2:** Defendants have asserted attorney-client privilege over documents shared with third parties without providing information to demonstrate the applicability of the privilege. Part of the problem is that the Bureau cannot identify the universe of affected documents, because Defendants have refused to provide complete sender and recipient information. (However, based on the limited sender and recipient information that was produced, the Bureau does know that this deficiency affects *at least* four of Defendants' privilege categories.) Additionally, the log's lack of information about the purpose behind the disclosures to third parties makes it impossible for the Bureau to assess whether there is any basis for Defendants to claim an exception to the normal rule that disclosure to a third party waives the privilege.

In attempting to defend its disclosure of information to the Department of Education, Defendants state that "it should not be surprising that *there are times* when their communications are covered by a common interest." Doc. 153 at 3 (emphasis added). Such hedging underscores that there are also times when the communications are not covered by a common interest, such as when the Department and Defendants discussed the unilateral termination of Pioneer's contract. In any event, nowhere in Defendants' privilege log do they assert common interest privilege. Nor does the log include information sufficient to establish the applicability of the common interest privilege, including by establishing that the communications were between attorneys. Additionally, their metadata spreadsheet indicates that Defendants have withheld communications with many other third parties, without providing any explanation of the basis for doing so.

The Bureau's request at this time is for Defendants to establish each element of the attorney-client privilege for all documents involving third parties that are withheld on that privilege ground, including why the privilege survives the disclosure to a third party. If Defendants believe common-interest privilege or joint-representation privilege applies, then they should establish the elements associated with those privileges.

**Deficiency #3**: Defendants' assertions of work product privilege largely fail to identify the factual situation of the particular cases, which prevents the Bureau from knowing whether the documents were prepared because of actual or anticipated litigation. In its place, Defendants generically assert for nearly 15,000 documents that the documents were prepared because of actual or anticipated litigation. The Bureau's concern is that much of this information could have been prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes.

The Bureau does not dispute that metadata for certain documents may already identify the actual or anticipated litigation involved. But, as the examples the Bureau attached to its December 27 filing (Doc. 146-1, at A14) show, Defendants cannot say that their metadata spreadsheet provides this information for each of the nearly 15,000 documents protected by the work product doctrine. Defendants' suggestion that in-house counsel's presence on an email makes the document plainly protected under work product doctrine (Doc. 153 at 3) would grossly expand the doctrine's applicability, subsuming everything an attorney touches, regardless of whether it related to actual or anticipated litigation. This cannot be the case.

At this time, the Bureau requests that Defendants describe for each document or category of documents the litigation or anticipated litigation involved.

**Deficiency #4:** Defendants' privilege log does not provide information to assess whether communications among Navient Corporation subsidiaries—all separate legal entities—are protected. The Bureau's focus here is on communications involving businesspeople from two or more distinct legal entities where Defendants are asserting attorney client privilege. *See, e.g.,* Doc. 146-1 at A18-20.[1]

[1] The Bureau is not challenging communications solely between (a) Navient Solutions's in-house counsel and (b) businesspeople from one subsidiary of Navient Corporation.

The Bureau agrees with Defendants that courts generally "hold that intra-group information sharing does not implicate the disclosure rule." Doc. 153 at 3. The reason courts reach this result is what is at issue here. In the Third Circuit, intra-group information sharing does not implicate the disclosure rule if (1) a common interest exists or (2) joint representation exists. Defendants have not established the existence of either.

Defendants' admission that in-house counsel is centralized in Navient Solutions (*see* Doc 146-1, at A2) is irreconcilable with their assertion of the common interest privilege. And, at present, Defendants have not provided information sufficient to assess whether communications involving businesspeople from two or more distinct legal entities were in connection with legal interests that were identical or nearly so, as the Third Circuit requires for joint representation to apply. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366-71 (3d Cir. 2007). Defendants' focus on the existence of inter-affiliate service agreements does nothing to demonstrate that the specific communications at issue here were made in connection with common legal interests that were nearly identical. If Defendants' standard were sufficient to assert a privilege, it would render meaningless the standards set forth by the Third Circuit in *Teleglobe*.

For each withheld document or communication exchanged between Navient Corporation and its subsidiaries, or between its subsidiaries, the Bureau requests that Defendants provide information showing how those entities had shared "legal interests" that were "identical (or nearly so)." The fact that the entities are part of the same corporate family (which appears to be the standard that Defendants seek to employ) does not suffice under *Teleglobe*.

**Deficiency #5:** The parties have begun, but have not completed, conferring about Defendants' withholding of documents pursuant to the bank examination privilege.[2] Defendants asserted bank examiner privilege – a variant of the deliberative process privilege – in sweeping fashion over 6,044 documents, without any explanation whatsoever as to the nature of the deliberative communications that occurred between Defendants and their regulators. *See In re Wilmington Trust Sec. Litig.*, 2016 WL 9753979, at *4 (D. Del. 2016) (bank examiner privilege is a "variant" of the deliberative process privilege) (citing *Redland Soccer Club*, 55 F.3d at 827 n.18). And Defendants' assertions of the bank examination privilege appear only on their two-page categorical log; there are no assertions of the bank examination privilege on their metadata spreadsheet, which means that Defendants have not even identified which of the 6,044 documents in their production were withheld or redacted, nor have Defendants provided the metadata that they claim is required by the Discovery Protocol for those 6,044 documents. Nor have they identified all of the regulators whose documents are implicated.

This privilege also is not held by Defendants. Rather, it can only be asserted by the governmental bank examiner. Yet Defendants have acknowledged during conferrals that as of mid-December they had done nothing to determine whether the governmental bank examiners actually want to assert the privilege. Defendants' unilateral withholding of 6,044 documents that may not even be privileged is unwarranted.

---

[2] The Bureau has expressed its position in a telephonic conferral with Defendants, and Defendants expressed disagreement with the Bureau's position during that telephonic conferral. The Bureau intends to reiterate its position in writing to Defendants.

Defendants' total lack of information to justify their assertions of bank examiner privilege cannot be squared with their attacks on the Bureau's assertions of deliberative process privilege. Because the bank examination privilege is a variant of the deliberative process privilege, Defendants must supply, at a minimum, the same type of information they have demanded from the Bureau with respect to the deliberative process privilege. They should gather this information from the regulators or notify Your Honor and the Bureau that the regulators do not want to assert the privilege.

With respect to these 6,044 documents, the Bureau requests that Defendants be required to provide the same type of information required of the Bureau with respect to the deliberative process privilege, including the following for each document or category of documents: the sender and recipient of the deliberative communication, the date of the ultimate decision (to ensure that the withheld communications pre-date that decision), the issue under consideration, and the names of the decision-makers at the governmental regulator associated with each decision under deliberation. Defendants must also confirm that they have contacted the regulator and that the regulator desires to assert the privilege. Additionally, Defendants must produce all segregable factual information and submit a declaration from an appropriate official at each regulator.

### C. Next steps

The Bureau believes that the parties' existing filings have adequately presented Deficiencies #1-4 above for resolution, but the Bureau is amenable to further briefing on these issues if Your Honor believes it would be helpful. The Bureau also believes that oral argument on these issues is appropriate. With respect to Deficiency #5, if the parties reach an impasse, the Bureau will inform Your Honor.

## III. *In camera* review of Bureau documents in 35 disputed categories

### A. Relevant docket entries

- Court's Opinion and Order dated May 4, 2018 (Doc. 88)
- Transcript of oral argument held on December 10, 2018 (Doc. 134)
- Defendants' brief dated December 17, 2018 (Doc. 139)
- Court's Opinion dated December 21, 2018 (Doc. 140)
- Court's Order dated December 21, 2018 (Doc. 141)
- Bureau's brief dated December 24, 2018 (Doc. 144)

### B. Summary of issue

The Court has ordered the *in camera* review of 35 categories of documents for which the Bureau asserted the deliberative process privilege. The Bureau intends to seek leave to supplement its privilege log prior to that *in camera* review. (The Bureau notes, however, that if Defendants' view that paragraph 7 of the Discovery Protocol provides an exhaustive list of requirements for a privilege to be asserted were to prevail, the Bureau's supplemental log would mirror those items, and the analysis would be limited to whether Defendants have carried their burden of overcoming the privilege.)

In conducting any *in camera* review, Your Honor should apply the balancing test set forth in *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 854 (3d Cir. 1995), to determine whether Defendants have carried their burden of showing that the Bureau's privilege claims should be overcome. That balancing test requires consideration of five factors:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; [and] (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

If the documents are not relevant under the first prong of this test, there is no need for the remaining four factors to be considered. *See United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir. 1993) (noting that where "the documents at issue are not relevant to the controversy," the party seeking the documents "cannot, as a matter of law" overcome the deliberative process privilege); *accord Rupert v. United States*, 225 F.R.D. 154, 157 (M.D. Pa. 2004).

In conducting this balancing test, it is important to keep in mind that the Bureau did not independently generate any facts about Defendants. Defendants already have all of the facts about their alleged conduct in the 35 disputed categories in their original form. For example, this is not a case where Defendants claim that the Bureau gave them specific advice about Defendants' conduct, and Defendants relied on it to their detriment (even if that were true, Defendants would have those communications). This is a case where the Bureau conducted an investigation of Defendants, which consisted of gathering facts about their practices from Defendants and from complaints submitted to the Bureau (which have already been provided to Defendants) – and then brought a lawsuit based on its findings. The issues in the lawsuit relate to the legality of Defendants' conduct under the law. Defendants have never been able to articulate why Bureau documents would aid the factfinder in determining whether Defendants' conduct violates the law. And Defendants have failed to rebut the long line of case law developed across multiple jurisdictions establishing the legal irrelevance of the federal agency's documents in such an enforcement action. They failed to distinguish these cases (most of which have been cited in multiple prior filings) or cite any contrary cases.

As the Bureau detailed in its December 24, 2018 brief (Doc. No. 144), 22 of the 35 disputed categories contain documents that are irrelevant, and the case law indicates that a party cannot demonstrate a need for irrelevant information:

- For five of the categories (labeled "Bucket 1" by the Bureau), the Court's May 4, 2018 Order (Doc. 88) is dispositive on the lack of relevance of the documents. These documents are predecisional to fourteen rules, regulations, and public guidance that Defendants previously identified as somehow being relevant to this case. The Court held that predecisional documents about those rules, regulations, and guidance are irrelevant and refused to compel the Bureau to produce them. Doc. 88, at 10.

- For three of the categories (labeled "Bucket 2" by the Bureau), the reasoning of the Court as to why the documents in Bucket 1 are irrelevant applies equally to the documents in these categories. These documents are predecisional to publicly communicated rules, regulations, and guidance that are not among the fourteen rules, regulations, and public guidance that Defendants previously identified as relevant to this case.

- For fifteen of the categories (labeled "Bucket 3" by the Bureau), the Court's reasoning as to

why the documents in Bucket 1 are irrelevant, combined with legal precedent concerning the lack of relevance of internal policy and strategy debates that are not directly connected to any particular rule, regulation, or public guidance, leads to the conclusion that the documents in these categories are irrelevant to the factfinder.

For the remaining 13 categories, which are the categories containing communications between the Bureau and the Department of Education, Defendants cannot make a "particularized" or "compelling" showing as to why the specific documents in these categories are necessary to establish a specific defense, including why that defense cannot be established through other evidence. Defendants have posited that ED's expectations are relevant to their defenses, but they have failed identify any *specific*, pled defense that requires this information, and exactly why this information is required to establish that pled defense. Additionally, there are other sources of evidence regarding ED's expectations. For example, Defendants have their written communications with ED, and their employees have knowledge of any oral communications with ED in which such expectations were expressed. Defendants also subpoenaed documents from ED. And Defendants took three days of Rule 30(b)(6) testimony from ED on topics that were expansive.

**C. Next steps**

The Bureau believes that the docket entries specified above have adequately described the parameters of the *in camera* review, but the Bureau is amenable to further briefing on this issue if it would be helpful. The Bureau also believes that oral argument on this issue is appropriate.

Additionally, for the reasons set forth in Bureau's brief dated December 24, 2018 (Doc. 144), Defendants should not be allowed to pre-screen the documents before Your Honor conducts the *in camera* review.

The Bureau will be prepared to supplement approximately half of its privilege log for the documents at issue, and to transmit to Your Honor the accompanying documents, by February 8, 2019, with the remainder to follow approximately two weeks later. The Bureau does not believe that the need for any evidentiary hearing can be determined until Your Honor has conducted the *in camera* reviews, including applying the balancing test set forth in *Redland Soccer Club*, 55 F.3d at 854, to determine which documents are still potentially at issue.

In addition, the Bureau submits that, based on Defendants' brief dated December 17, 2018 (Doc. 139) and the Bureau's brief dated December 24, 2018 (Doc. 144), Your Honor has all of the information necessary to make a ruling now on the legal irrelevance of the documents in 22 of the disputed categories, as well as Defendants' lack of need for the documents in all 35 of the disputed categories. Defendants' December 17, 2018 submission completely ignores the case law, and their failure to address that law can be resolved before any *in camera* review is undertaken. A ruling on these issues may even obviate the need for *in camera* review entirely, because where, as here, "the documents at issue are not relevant to the controversy," the party seeking the documents "cannot, as a matter of law" overcome the deliberative process privilege. *Farley*, 11 F.3d at 1390; *see also Rupert*, 225 F.R.D. at 157. And even if relevance can be established, "relevance alone is an insufficient reason for breaching" the privilege. *Farley*, 11 F.3d at 1390. "The party seeking discovery bears the burden of showing that its need for the documents outweighs the government's interest." *Redland Soccer Club*, 55 F.3d at 854. Defendants have not met that burden here.

**IV. The schedule for the document review and production that the Bureau must conduct pursuant to the Court's December 21 Order**

**A. Relevant docket entries**

- Bureau's letter dated November 2, 2018 (Doc. 110)
- Transcript of oral argument held on December 10, 2018 (Doc. 134)
- Court's Opinion dated December 21, 2018 (Doc. 140)
- Court's Order dated December 21, 2018 (Doc. 141)
- Defendants' letter dated January 11, 2019 (Doc. 155)
- Bureau's letter dated January 11, 2019 (Doc. 156)

**B. Summary of the issue**

In its December 21 Order, the Court ordered the parties to "meet and confer to discuss and establish a reasonable schedule for the Bureau's production" of "all non-privileged documents that mention 'Navient' or 'Pioneer'" and the privilege log for any withheld documents. Doc. 141, at 1. Though the parties were able to agree on a schedule, a key disagreement arose regarding what was to be accomplished within that schedule. If the Court's Order is applied as written, and the Bureau's obligation is to produce "all non-privileged documents that mention 'Navient' or 'Pioneer'" and the privilege log for any withheld documents, the Bureau believes that the following schedule is appropriate:

- February 28, 2019: Midpoint production of non-privileged documents
- April 19, 2019: Completion of production of non-privileged documents
- April 30, 2019: Production of privilege log for withheld documents

While Defendants have agreed to the above schedule, their position expands the Court's December 21 Order to impose new production obligations upon the Bureau. Specifically, Defendants have demanded that the Bureau review, and produce or log, not only the more than 55,000 documents that mention "Navient" or "Pioneer," as the Court's Order requires, but additionally all documents *that do not mention "Navient" or "Pioneer"* but that are "family members" (*i.e.*, accompanying emails and attachments) of documents that do mention "Navient" or "Pioneer." This demand *doubles* the scope of the review to *approximately 110,000 documents*.

To understand why Defendants' position about the scope of the review is untenable, some background is necessary. Defendants initially raised that they believed that the Bureau had improperly withheld documents, based on nothing more than the fact that Defendants believed that the Bureau should have produced a larger percentage of documents that the Bureau reviewed. Defendants did not point to any authority to support the notion that producing fewer than a certain percentage of documents returned after application of search terms means that documents were improperly withheld. If that were so, parties would have a perverse incentive to craft extremely narrow search terms to achieve a small universe of documents to review. Instead, the Bureau used very broad search terms, including single word search terms without any other limiters – such as "forbearance," "Navient," and "Pioneer" – to search for, among other things, all documents that

relate to any of the allegations in the Complaint. Casting this wide net increased the Bureau's ability to find responsive documents, but it also returned many "false positives." For example, "forbearance" is a concept that exists in mortgage servicing, and many individuals who meet with Bureau's leaders might describe themselves as a "pioneer" in a certain field.

In contrast, Defendants' search terms were far narrower and more convoluted, requiring the presence of certain terms within ten words of other terms:

- ((forbearance* OR FORA OR FORV OR FORB) OR ("income-driven" OR "income-based" OR "income-contingent" OR "income based" OR "income driven" OR "income contingent" OR IDR OR IBR OR PAYE OR REPAYE OR ICR)) w/10 (good OR better OR best OR bad OR wors* OR ideal OR prefer* OR priorit* OR optimal OR first OR last OR always OR explor* OR temporar* OR brief* OR advantag* OR disadvantag* OR positive* OR negative* OR benefi* OR suited OR suitable OR applicab* OR compar* OR default* OR push* OR steer* OR pressur*)

As a result of the Bureau's expansive search terms, only a small percentage of documents that the Bureau reviewed were responsive to Defendants' document requests. Defendants believed this to be improper, and took the position that any documents that hit on the terms "Navient" or "Pioneer" should be produced. The Bureau identified, in a November 2, 2018 filing, that the number of documents that mentioned "Navient" or "Pioneer" was approximately 55,000, and made clear that this figure excludes "family members without hits on those terms," so that everyone was on the same page about the universe of documents at issue. Doc 110, at 1 n.1. And at the December 10 hearing, the Court phrased the issue for the parties as "whether [the Court] ought to order CFPB to turn over those documents that mention Navient and mention Pioneer[.]" Doc. 140, at 3. Defendants did not, at the hearing, indicate that their request was actually broader than what the Court stated, nor did Defendants argue that the universe of documents at issue should include the family member documents that the Bureau had explicitly carved out in its November 2 letter and which the Court did not include in its framing of the discussion.

Accordingly, with the issue having been clearly framed, the Court, in its December 21 Opinion, decided the issue that was squarely before it: "the CFPB should turn over all documents that mention 'Navient' or 'Pioneer.'" Doc. 140 at 5. The Court's Order was consistent with its Opinion, requiring that the parties "meet and confer to discuss and establish a reasonable schedule for the Bureau's production" of "all non-privileged documents that mention 'Navient' or 'Pioneer.'" Doc. 141, at 1.

Accordingly, the Bureau believes that the plain text of the Court's Opinion and Order, which were guided by the framing of the issue both before and during the hearing, should govern. Defendants should not be permitted to relitigate issues about which the Court heard argument in the December 10 hearing, in an attempt to rewrite the December 21 Order.

One other point bears specific mention. While often family members are produced in discovery, in this instance, Defendants did not serve a document request for all documents mentioning "Navient" or "Pioneer," and there is no basis to assert that a document is relevant merely because it is a family member of a relevant document. In other words, the Bureau's task of producing all non-privileged documents that mention "Navient" or "Pioneer" is separate from the written requests for production served by the parties, and serves in part to test Defendants' suspicion that documents were improperly withheld (or otherwise missed through human error). The Court defined the bounds of this test exercise, and there is no basis to now expand it.

Seeking to avoid the plain text of the December 21 Order, as well as the fact that the Bureau had defined the parameters of the documents mentioning "Navient" and "Pioneer" in its November 2 letter, Defendants claim that the discovery protocol in this case requires the production of family member documents. But the protocol does not require disclosure of "irrelevant information" (Doc. 66-2, at ¶ 8(c)), and the Court determined that only documents mentioning "Navient" or "Pioneer" meet the relevance threshold. *See* Doc. 140, at 6-7. In addition, the protocol does not speak to whether all family members must be produced if only one document has been determined to be relevant, as is the case here. Rather, in a section titled "Production of ESI" that deals with the procedural technicalities of productions, the protocol makes clear that parent-child relationships must be preserved; it does not mandate that a "parent" email and its "child" attachments must all be produced if only one of the documents has been determined to be relevant. *See* Doc 66-2, ¶ 2(k). Moreover, the protocol expressly says that "*if* a party produces an e-mail with its attachments," they must be produced consecutively – not that emails *must* be produced with their attachments. *Id.* (emphasis added). Indeed, if the protocol was intended to mandate production of family members, the protocol could have simply said that – but it does not.

If Your Honor were to agree with Defendants that the scope of the Bureau's review should be expanded to encompass more than the documents that mention "Navient" or "Pioneer," such an expansion of the review would necessitate an enlargement of the deadline for fact discovery, as it is not feasible for the Bureau to review 110,000 documents, including logging many of those documents as privileged, within the current fact discovery period. *See, e.g., Ford Motor Co. v. United States*, 84 Fed. Cl. 168, 171–72 (Fed. Cl. 2008) (granting 4-month extension to make deliberative process privilege assertions for 1,074 documents already identified as privileged); *Sanchez v. Johnson*, 2001 WL 1870308, at *3 (N.D. Cal. 2001) (government took one year to assert deliberative process privilege for 12,000 *pages* of documents); *Vidrine v. United States*, No. 6:07-cv-01204-RFD-KK (W.D. La.), Docs. 58, 61, 65 (allowing 4 months for deliberative process privilege assertions concerning approximately 5,400 *pages* of documents).

### C. Next steps

The Bureau believes that the parties' existing filings have adequately presented this issue for resolution, but the Bureau is amenable to further briefing on this issue if it would be helpful. The Bureau also believes that oral argument on this issue is appropriate.

## V. Deposition of Seth Frotman

### A. Relevant docket entries

- Mr. Frotman's motion to quash (Docs. 123, 124, 125, 128)
- Defendants' opposition (Doc. 143)

### B. Summary of the issue

Defendants subpoenaed Seth Frotman, the former Student Loan Ombudsman for the Bureau, seeking deposition testimony from him. Mr. Frotman has moved to quash the subpoena. All parties, including Mr. Frotman have agreed that resolution of the motion to quash should be referred to Your Honor, and will be notifying the Court shortly regarding this agreement.

### C. Next steps

The Bureau defers to Mr. Frotman and Defendants as to the next steps for resolution of Mr.

Frotman's motion.

## DISCOVERY DISPUTES THAT ARE REASONABLY ANTICIPATED

### VI. Defendants' apparent failure to search the documents of key custodians

The Bureau is in the process of reviewing Defendants' document productions, with approximately half of the production occurring just three months ago, 17 months after the Bureau served most of its requests. Based on that review, it has now become evident to the Bureau that Defendants did not search the files of key custodians for documents responsive to the Bureau's requests for production.

First, it appears that Defendants did not search the documents of Matthew Bailer, the head of all of Navient's call centers from approximately 2011 to 2012. Mr. Bailer authored a memorandum in which he described how Navient pushed borrowers into forbearance: "Our battle cry remains 'forbear them, forbear them, make them relinquish the ball.'" This memorandum was produced only because it was sent to an individual whose emails Defendants did search and review. During his deposition, Mr. Bailer testified that there were significant emails exchanged concerning whether borrowers who could not afford to make any payments should be placed into income-driven repayment plans. Because Mr. Bailer's emails were not searched and reviewed, these emails were not produced. Additionally, Mr. Bailer was the point person for development of a job aid that the Bureau alleges call center representatives used to steer borrowers in financial distress away from income-driven repayment plans. Because he was the head of Navient's call centers during a critical time period and was intimately involved in the creation of an important piece of evidence, Mr. Bailer's emails should have been searched, and the emails he referenced in his deposition, as well as other responsive documents, should have been produced.

Second, it appears that Defendants did not search custodians responsible for loan securitization. The Bureau propounded a request to Navient Solutions for "[a]ll documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review (including those conducted by or on behalf of an investor or trustee of a loan securitization trust) relating to communications with or enrollment of borrowers in forbearance or any type of income-driven repayment plan." The Bureau has searched for documents relating to reviews done for investors or trustees of loan securitization trusts, and while the Bureau has located reviews done for the holders of the loans that are serviced by Navient, it is not clear that reviews done for investors and trustees, and communications relating to them, have been produced. This, in turn, suggests that custodians responsible for communicating with investors and trustees did not have their files searched.

The Bureau intends to confer with Defendants regarding these issues, but if the parties reach an impasse, Your Honor's involvement in resolving the parties' differences may become necessary.

### VII. Defendants' intentional withholding of relevant documents for borrowers whom they subpoenaed for depositions

It is not debatable that Defendants withheld relevant documents for borrowers whom they subpoenaed for depositions. Prior to the Bureau raising the issue to the Court in August 2018 (*see* Doc. 99), Defendants had been withholding loan history logs that showed every instance in which borrowers agreed to forbearances. Defendants also unquestionably withheld correspondence sent by Navient when borrowers enrolled in verbal forbearances. Defendants then conducted depositions of

these borrowers without having produced these relevant documents. This was highly improper.

Against this backdrop, the Court set a clear procedure for the production of borrower records for subpoenaed borrowers to prevent these improprieties going forward: Defendants had to produce the logs, and any relevant documents and calls; the Bureau could then review the logs to determine if any relevant documents or calls were withheld; and if the Bureau determined that relevant documents and calls were withheld, Defendants had to produce the documents and calls that the Bureau identified. *See* August 29, 2018 hearing transcript, at 53:7 to 56:18. The Bureau followed this procedure and produced a 26-page list of relevant documents and calls that had been withheld. Defendants have not yet committed to producing all documents and calls on that list.

In addition, it appears that many calls from 2009 through 2013 have not been preserved, though it is not clear why certain calls from that time period were preserved and others were not. If it is the case that any calls for the subpoenaed borrowers were not produced because they were not preserved, the Bureau asked for a date when those calls were destroyed. However, the Bureau received no response. In light of past improper withholding of documents for subpoenaed borrowers, it is necessary for Defendants to provide this information.

The Bureau will attempt to continue conferring with Defendants regarding these issue, but if Defendants' cooperation is not forthcoming, Your Honor's involvement will become necessary.

**VIII. Production of call sample**

In February 2018, the Bureau propounded a request for production for all data, including loan histories, correspondence, and calls, for a large population of borrowers, including any borrower enrolled at any time in forbearance or income-driven repayment. Rather than engaging with the Bureau to produce this data, or to narrow the request, Defendants instead engaged in a multi-staged, nearly year-long effort to avoid producing anything at all in response to the request:

- Defendants first claimed that the Bureau's request for the data was not allowed because the Bureau had supposedly exceeded the allowable number of requests for production (the Bureau had not done so). It was not until the April 17, 2018 hearing, when the Court expressed concerns about the legitimacy of that objection, that Defendants indicated they would no longer be pursuing the objection. *See* April 17, 2018 hearing transcript, at 140:3 to 142:15.

- After the April 2018 hearing, Defendants invoked the Privacy Act as a bar to production of the data, despite having previously produced some borrower records that fell within the scope of the Privacy Act. The Bureau was forced bring that issue to the Court for resolution (Doc. 95), and the Court held that the Privacy Act does not bar the production of any borrower records (Doc. 103, at 3-6; Doc. 104 ¶ 1).

- After the Privacy Act issues were resolved, Defendants indicated that the data could not be produced until the Bureau executed a "data access protocol" and came onsite to view Defendants' data systems, ostensibly so that the Bureau could understand how Defendants "run scripts and queries that exist in the ordinary course of business." Yet after negotiating and executing the protocol, then traveling to Defendants' servicing center in Wilkes-Barre, PA, the Bureau and its experts were denied access to any systems that would demonstrate how scripts and queries are run across the population of borrowers (even though this type of querying is done routinely by Defendants in the ordinary course of business for reporting to

the Department of Education, investors, regulators, loan holders, and the public). Thus, at the conclusion of the onsite visit, the Bureau was left in virtually no better position to understand how Defendants query data in ways that would be relevant to this case.

After all of the foregoing roadblocks, Defendants' counsel finally engaged with the Bureau, beginning in late September 2018, regarding the Bureau's data needs, based on the requests issued in February 2018 and the Court's August 2018 Order, so that the parties could agree on the data that would be produced. Once those discussions occurred, the parties agreed on parameters for the production of data within a few weeks. None of the roadblocks that Defendants had constructed were necessary to have these discussions; they could have easily occurred at the time that the Bureau propounded its requests for data in February 2018.

After nearly a year of delays, the data was finally produced two weeks ago. Defendants initially claimed that the volume of data would be close to 80 TB, but in actuality, the data fit on a single 10 TB hard drive. Defendants also indicated that it would take them close to three weeks to simply burn the data to hard drives because of its volume, though Defendants missed their December 2018 goal for the production, suggesting that it took even longer than three weeks to burn the data to the hard drive.

The Bureau requires time to work with its experts to download, organize, and analyze that data. This will likely be a complex task and will require more time than Defendants needed to pull the data since our experts are unfamiliar with the data. Indeed, during the investigation, Defendants repeatedly represented that their data was so complex that it took their employees – who have much greater familiarity with the data – months to analyze the data in order to respond to Bureau requests that were much narrower than the requests and corresponding analyses that may need to be done for purposes of an expert report in litigation. For example, on June 7, 2016, the Bureau asked Navient various discrete questions about specific populations of borrowers, and did not receive responses until August 29 and September 15, 2016.

The parties had agreed that the Bureau will identify recordings of calls between Defendants and consumers that the Bureau would like to be produced based on the Bureau's review of the data. Because Defendants have represented that querying call recordings is a cumbersome process for Defendants, and that many call recordings were not retained such that calls are unavailable before mid-2013 for most borrowers, the parties agreed that it would make the most sense for the Bureau to analyze the data and then identify various available call recordings most likely to be relevant to this case. This method will allow the Bureau to request fewer call recordings than it would otherwise have to, because the Bureau will aim to minimize the production of call recordings that are not relevant (*e.g.*, call recordings where borrowers seek only to change their mailing address).

Defendants recently wrote to the Bureau requesting identification of calls for production by January 31, 2019, a deadline that is obviously nonsensical in light of the fact that Defendants took eleven months to produce the data, including five weeks to simply burn it to a hard drive. It appears to be Defendants' preference to produce a random sample in which the bulk of calls will be on issues unrelated to this case (such as, for example, change of address requests). Defendants are not entitled to dictate the Bureau's methodology for identifying calls for production, much less to do so in an attempt to ensure that as few calls as possible are produced on issues relevant to this case.

Defendants have also recently begun to suggest that they may take the position that the Privacy Act prevents production of the calls. This is an issue that has already been decided by the Court, and Defendants have no basis for withholding any calls, in whole or in part, on the basis of

the Privacy Act. If they do so, the Bureau believes that they will be violating a Court Order. *See* Doc. 104 ¶ 1.

Finally, the Bureau urges skepticism regarding any claims that Defendants raise regarding the burden of producing calls. As an initial matter, the Bureau has not specified which calls it will need to be produced, and will not be able to do so until its experts have had sufficient time to analyze the data. In addition, as demonstrated above, Defendants were off *by a factor of eight* in estimating the volume of data that the Bureau requested. Thus, claims of burden based on the number of calls to be produced should be viewed as the product of guesswork. Defendants have indicated to the Bureau that each call has a unique identifier that the Bureau will be able to locate in the data that has been produced; the Bureau will provide the identifier for every call that is to be produced, and if Defendants want the Court to believe that retrieving calls based on these unique identifiers is too excessively burdensome, Defendants should be required to substantiate that burden with great specificity.

The Bureau will attempt to continue conferring with Defendants regarding this issue, but if Defendants' continue to suggest imposing arbitrary deadlines or suggest that they will be invoking the Privacy Act to prevent production of call recordings in violation of an existing Court Order, it may be necessary for Your Honor to become involved.

**IX. Rule 30(b)(6) deposition of Navient Corporation**

The Bureau has noticed a deposition of Navient Corporation pursuant to Fed. R. Civ. P. 30(b)(6). In response to that notice, Defendants lodged a variety of objections, including indicating that a witness will not be produced as to certain topics that the Bureau believes are relevant to its claims. The Bureau intends to confer with Defendants regarding their objections, but if the parties reach an impasse, Your Honor's involvement in resolving the parties' differences may become necessary.

The Bureau looks forward to discussing the foregoing issues on January 28, 2019, as well as the procedural matters identified by Your Honor in the January 22, 2019 Order.

Respectfully submitted,
/s/ Nicholas Jabbour