1700 G Street NW,
Washington, DC 20552



February 4, 2019

**Filed Via ECF**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re:    *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Vanaskie:

      Pursuant to Your Honor's January 29, 2019 Order (Doc. 200), I write on behalf of Plaintiff Consumer Financial Protection Bureau ("Bureau") to submit the following proposed agenda items for the February 5, 2019 teleconference.

**I.**      **Deficiencies in Defendants' privilege log**

      At the January 28 hearing, there was a discussion about four deficiencies with respect to Defendants' privilege log.  Your Honor ordered briefing on one issue, but the other three warrant discussion.  (There is also a fifth deficiency about which the parties are continuing to confer.)  The status of these three issues is as follows:

      **Deficiency #1:** As the Bureau previously explained, Defendants' metadata spreadsheet includes only the sender and recipient information for individuals appearing on the most recent email in a chain, omitting the identities of individuals appearing earlier in the email chain. The Bureau's concern is that this omits critical information, such as whether an earlier-in-time disclosure to a third party has destroyed the alleged privilege.

      At the January 28 hearing, Defendants represented that they believed there was a universe of approximately 1096 documents where complete sender and recipient information was not included (Jan. 28 Transcript at 45:1-5), and indicated that they would be willing to provide complete sender and recipient information for that universe. Your Honor asked the Bureau to consider this as an "interim step," with respect to "at least, as to those thousand emails, whether that would be a way of resolving the question." *Id.* at 29:23, 44:17-20. Your Honor further indicated that he was "not asking you to commit that that's the only solution here," because the Bureau had no way of determining whether Defendants' representation that only 1096 entries failed to disclose complete sender and recipient information was accurate. *Id.* at 45:18-46:3. Accordingly, taking at face value Defendants' claim that the issue only affects approximately 1096 documents, the Bureau accepts the proposal to provide the complete sender and recipient information for those approximately 1096 documents.  The Bureau requests that this task be completed within four weeks.

      **Deficiency #2:** The Bureau previously explained that Defendants have asserted attorney-client privilege over documents shared with third parties without providing information to demonstrate the applicability of the privilege. Your Honor requested that the Bureau identify the entries with third parties if it can be done "in an electronic means using filters," with "the caveat that that may not be completely accurate, but it's a starting point . . . ." *Id.* at 58:9-11.  An employee

of the Bureau with expertise in Excel was not able to filter Defendants' spreadsheet electronically in a way that guarantees perfect accuracy, though our belief is that, because Defendants extracted the data that populates the names in the metadata spreadsheet, there likely is an automated way for them to readily locate entries with third parties. Notwithstanding this, the Bureau has made exhaustive efforts to locate the entries with third parties using targeted searches, and is producing a list of those entries to Defendants with the understanding that the list may not have captured every entry with a third party.

For all of the entries identified by the Bureau, the Bureau's request at this time is for Defendants to establish each element of the attorney-client privilege for all documents involving third parties that are withheld on that privilege ground, including why the privilege survives the disclosure to a third party. If Defendants believe common-interest privilege or joint-representation privilege applies, then they should establish the elements associated with those privileges.

**Deficiency #3**: The Bureau previously raised that Defendants generically assert attorney work product protection for nearly 15,000 documents, but do not indicate the actual or anticipated litigation for many of those entries. The Bureau does not dispute that metadata for certain documents may already identify the actual or anticipated litigation involved.

At the last hearing, Your Honor suggested that a sample could be drawn from entries that contain a work product protection claim. Defendants would be given an opportunity to supplement their log for that sample. The Bureau could then review that sample of entries and indicate unilaterally whether it wanted Your Honor to review the documents associated with those entries *in camera* to determine, within that sample, how often the work product privilege was inappropriately invoked. *See* Jan. 28 Transcript at 66:25-72:6.

Your Honor invited the parties to propose possible sample sizes that would be statistically significant. *Id.* at 71:20-24. The Bureau proposes a sample size of 997 (which is under 7% of the universe at issue). This sample size would allow Your Honor to make a determination with 95% confidence that the frequency of correct privilege assertions observed is within 3% (in either direction) of the actual frequency, which are common statistical norms.

Accordingly, the Bureau respectfully requests that the parties coordinate to generate a list of all 15,000 documents withheld on the basis of the attorney work product privilege, that Your Honor draw a sample of 997 numbers from 1 to 15,000 using any readily available random number generator on the internet, and that Defendants supplement their privilege assertions for those 997 entries within four weeks.

## II. Defendants' failure to search the documents of key custodians

The Bureau is in the process of reviewing Defendants' document productions, with approximately half of the production occurring just three months ago, 17 months after the Bureau served most of its requests. Based on that review, it has now become evident to the Bureau that Defendants did not search the files of key custodians for documents responsive to the Bureau's requests for production.

First, it appears that Defendants did not search the documents of Matthew Bailer, the head of all of Navient's call centers from approximately 2011 to 2012. The Bureau will be prepared to

discuss information that has come to light concerning Mr. Bailer's documents and communications, which the Bureau cannot include in this public filing due to confidentiality designations made by Defendants on their document production and his deposition transcript. Based on this information, it is clear that Mr. Bailer was the custodian for critical documents and his emails should have been searched.

Second, it appears that Defendants did not search custodians responsible for loan securitization. The Bureau propounded a request to Navient Solutions for "[a]ll documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review (including those conducted by or on behalf of an investor or trustee of a loan securitization trust) relating to communications with or enrollment of borrowers in forbearance or any type of income-driven repayment plan." The Bureau has searched for documents relating to reviews done for investors or trustees of loan securitization trusts, and while the Bureau has located reviews done for the holders of the loans that are serviced by Navient, it is not clear that reviews done for investors and trustees, and communications relating to them, have been produced. This, in turn, suggests that custodians responsible for communicating with investors and trustees did not have their files searched.

The Bureau has conferred with Defendants regarding these failures, and they have refused to do any additional document review in response to the Bureau's concerns. They responded that they previously provided a list of custodians and their titles to the Bureau, and that the Bureau agreed to those search parameters as part of a compromise. However, Defendants represented in their written responses and objections that the custodians they would search were "principally responsible" for the issues that are the subject matter of the Bureau's requests, and the Bureau relied on those representations without agreeing that Defendants identified the appropriate custodians. Mr. Bailer is absolutely a custodian who was principally responsible for many of the core issues that are the subject matter of the Bureau's requests. And Defendants apparently did not include any custodian who was principally responsible for loan securitization. Under these circumstances, it is appropriate to order the search of additional custodians. *See, e.g., California Earthquake Auth. v. Metro. W. Secs., LLC*, 2012 WL 5880345, at *5 (E.D. Cal. Nov. 21, 2012) ("[T]he burden to identify appropriate custodians is on [the producing party], not [the requesting party]."); *Dryer v. Nat'l Football League*, 2012 WL 12895563, at *2, 7 (D. Minn. May 21, 2012) (ordering search of additional custodian despite producing party's argument that hundreds of thousands of documents had already been produced)

### III.  Production of call sample

As the Bureau previously explained, in February 2018, the Bureau propounded a request for production for all data, including loan histories, correspondence, and calls, for a large population of borrowers, including any borrower enrolled at any time in forbearance or income-driven repayment. Rather than engaging with the Bureau to produce this data, or to narrow the request, Defendants instead engaged in a multi-stage, nearly year-long effort to avoid producing anything at all in response to the request.

After nearly a year of delays, the data was finally produced three weeks ago. After a very preliminary review of the data, it appears that the production is deficient in at least four ways. The Bureau relayed these deficiencies to Defendants' counsel on February 4, 2019. The Bureau does not believe that these deficiencies will take long to cure, and has suggested that Defendants' data production point-person and the Bureau's data experts convene for a call to ensure that the parties

are on the same page regarding how to rectify the deficiencies. The Bureau believes that the deficiencies must be rectified no later than February 15, 2019. The correction of the deficiencies is a necessary prerequisite to the Bureau's identification of calls for production.

In addition, to aid the Bureau in determining an appropriate set of calls for production – including avoiding a situation in which the Bureau requests calls that no longer exist – the Bureau has asked Defendants to explain (1) what exact date serves as the dividing line between when all calls have been retained, and when only some calls were retained, (2) if there is any way to know from the data production which calls have been retained and which calls have not been retained, (3) which call databases allow for calls to be readily queried in bulk, versus which do not, and (4) if there is any way to know from the data production which calls exist in databases that can be queried in bulk, versus which do not. The Bureau believes that this information should be provided in writing by February 15, 2019.

Assuming that Defendants correct the production and provide answers to the foregoing questions by February 15, the Bureau will be in a position to identify calls for production six weeks thereafter (*i.e.*, no later than March 29). The Bureau requires this amount of time because the Bureau and its experts are unfamiliar with the data, and recognize that Defendants themselves have had difficulty working with the data. For instance, during the investigation, Defendants repeatedly represented that their data was so complex that it took their employees – who have much greater familiarity with it – months to analyze the data in order to respond to Bureau requests that were much narrower than the requests and corresponding analyses that may need to be done for purposes of an expert report in litigation. For example, on June 7, 2016, the Bureau asked Navient various discrete questions about specific populations of borrowers, and did not receive responses until August 29 and September 15, 2016.

After the Bureau's identification of calls, the Bureau believes that the deadline for the calls to be produced should be two weeks (*i.e.*, assuming the Bureau identifies the calls for production on March 29, Defendants would need to produce the calls by April 12). The Bureau believes this deadline is reasonable and appropriate in light of the fact that each call has a unique identifier and should be easily retrievable if the Bureau supplies the identifiers for the calls it desires.

## IV.     Other issues

The foregoing list is not intended to be exhaustive, but the Bureau believes that these are the issues ripe for resolution during this week's hearing. The parties are conferring about other issues, including some raised in the Bureau's January 25, 2019 letter, and those issues will be raised as needed if the parties are unable to resolve them on their own.

The Bureau looks forward to the February 5, 2019 hearing, and appreciates Your Honor's time and attention to these issues.

Respectfully submitted,
/s/ Nicholas Jabbour