# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Consumer Financial Protection Bureau,

      Plaintiff,

      v.

Navient Corporation, *et al.*,

      Defendants.

Case No. 3:17-CV-00101-RDM
(Hon. Robert D. Mariani)

FILED UNDER SEAL

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO DEFER THE DEADLINE FOR ITS RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO PROHIBIT FURTHER MOTIONS FOR SUMMARY JUDGMENT BEFORE THE CLOSE OF DISCOVERY



FILED
SCRANTON

FEB 0 7 2019

PER _____
DEPUTY CLERK

Kristen Donoghue
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

Nicholas Jabbour, DC 500626
Manuel Arreaza, DC 1015283
David Dudley, DC 474120
Ebony Sunala Johnson, VA 76890
Nicholas Lee, DC 1004186
Andrea Matthews, MA 694538
*Enforcement Attorneys*

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.    INTRODUCTION. ........................................................................ 1

II.   FACTS AND PROCEDURAL HISTORY.. ................................... 3

    A.    The Bureau's Steering Claims ............................................ 3

    B.    Steering Did, In Fact, Occur.:............................................ 5

    C.    Navient's Incomplete Production of Borrower Records...................... 11

III.  STATEMENT OF QUESTION INVOLVED.............................................. 16

IV.   ARGUMENT.. ............................................................................. 17

V.    CONCLUSION.. .......................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Sys., Inc. v. Huber,*
    2015 WL 1729375 (M.D. Pa. Apr. 15, 2015) .................................................... 21

*Dean v. Douglas,*
    2012 WL 6151137 (M.D. Ga. Dec. 11, 2012) .................................................... 21

*Doe v. Abington Friends Sch.,*
    480 F.3d 252 (3d Cir. 2007) ........................................................................ 17, 20

*Humbert v. Kurtz,*
    2008 WL 719244 (M.D. Pa. Mar. 14, 2008) ...................................................... 20

*In re G–I Holdings Inc.,*
    2007 WL 1412294 (D.N.J. May 14, 2007) ........................................................ 21

*La Fata v. Raytheon Co.,*
    223 F.Supp.2d 668 (E.D. Pa. 2002) .................................................................. 20

*Shelton v. Bledsoe,*
    775 F.3d 554 (3d Cir. 2015) ............................................................................. 17

*Smithson v. Rizzo,*
    2015 WL 1636143 (M.D. Pa. Apr. 7, 2015) ...................................................... 20

**Statutes**

12 U.S.C. § 5531 ................................................................................................... 3, 4

12 U.S.C. § 5536 ................................................................................................... 3, 4

**<u>Regulations</u>**

34 C.F.R. § 682.210 ................................................................................................... 5

34 C.F.R. § 685.207 ................................................................................................... 6

## **INTRODUCTION**

After substantially delaying the production of documents and data, Navient now tries to benefit from those delays by moving for partial summary judgment on the "steering" claims in the Bureau's complaint (counts I and II) before the Bureau has had the opportunity to review, or even obtain, documents and calls it has requested. Navient's motion is procedurally improper, and the deadline for the Bureau's response to the motion should be deferred, for three principal reasons.

*First*, the case is in active discovery, and just four months ago, Navient produced 455,000 documents responsive to requests issued by the Bureau in May 2017. It is not feasible for the Bureau to have completed its review of those documents by now, much less take all of the depositions it is entitled to take based on the information it learns from that review. While the Bureau's review is ongoing, the Bureau has discovered substantial documentary evidence supporting its steering claims, including evidence in Defendants' most recent production. It is not surprising that Navient seeks to dismiss those claims before the Bureau can complete its review. Navient also filed its motion at a time when the parties are engaged in an extremely busy phase of discovery, with a full slate of issues to be litigated before the recently-appointed special master, all of which need to be resolved in approximately four months.

*Second*, to this day, six months after the Bureau expressed concerns to the Court that Navient had not produced documents and calls for borrowers who had already been deposed, and after the Court had set forth a procedure to ensure that those records would be produced, Navient still has not produced all of the documents and calls requested by the Bureau. Now, as the Bureau presses Navient on its failure to produce the missing documents and calls for borrowers whom Navient deposed, Navient has made those borrowers the centerpiece of its summary judgment motion before that dispute is even resolved. And Navient ironically claims that "the entire course of dealing between Navient and the borrowers must be considered" (Navient Brief, at 16), even while it has not completed productions that would reveal those "entire course[s] of dealing."

*Third*, Navient asks the Court to grant summary judgment by engaging in a borrower-by-borrower loan file review. But paradoxically, Navient also argues that "isolated phone calls are not evidence of a Company practice." Navient Brief, at 19. Thus, even Navient seems to understand that file-level review for 14 borrowers (whose records have not even been fully produced) is not the correct way to adjudicate this case. This is not an action in which 14 borrowers brought suit against Navient; rather, the Bureau's allegations are that Navient engaged in a widespread practice of steering that was not limited to those 14 borrowers. And, as described in more detail below, the Bureau already has uncovered substantial

2

evidence demonstrating that Navient's "Company practice" was indeed to steer borrowers facing hardships that were not temporary or short-term into forbearance. The Bureau should be allowed to complete development of the record concerning Navient's "Company practice."

By filing the motion, Navient seeks to deprive the Bureau of an opportunity to complete discovery – which has, thus far, supported the Bureau's claims. Navient should not be allowed to short-circuit the discovery process and the development of a full record for the factfinder. Thus, discovery should be allowed to run its course, and the deadline for the Bureau's response should be deferred until 21 days after the deadline for motions for summary judgment, which is currently set at November 7, 2019. Doc. 141, ¶ 4a. In addition, so that the parties do not divert resources from the important tasks that are necessary to bring discovery to a close so that this matter can be adjudicated on a complete record, rather than on a piecemeal basis, the Bureau requests that the parties be prohibited from filing further summary judgment motions before the close of discovery.

## FACTS AND PROCEDURAL HISTORY

### I.    The Bureau's Steering Claims

The first two counts of the Bureau's complaint allege that Navient violated the Consumer Financial Protection Act's prohibitions against abusive acts and practices, 12 U.S.C. §§ 5531(d)(2)(C), 5536(a)(1)(B), and unfair acts and practices,

3

12 U.S.C. §§ 5531(c), 5536(a)(1)(B), when Navient steered federal loan borrowers experiencing financial hardship that was not short-term or temporary into forbearance, before or instead of advising them about income-driven repayment ("IDR") plans. IDR plans allow borrowers to pay an amount that is based on their current income and household size, thereby accounting for the fact that borrowers' incomes may fluctuate over time. The payments can be as low as zero dollars if a borrower's discretionary income is not sufficient to pay any portion of his or her student loans, such as during a period of unemployment.

While forbearance can be appropriate for short-term or temporary hardships, borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance, making it a significantly worse option than IDR for borrowers experiencing a long-term hardship. Some of these costs include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan (typically called interest capitalization). In addition, in some cases, after a forbearance, a loan may be reamortized, which can lead to an increase in the borrower's monthly payment amount. Borrowers who enroll in forbearance, rather than IDR, also do not make any progress toward potential loan forgiveness, nor are they eligible for an interest subsidy available to

borrowers with subsidized loans enrolled in IDR. The high use of forbearance is also associated with increased rates of borrower defaults.[1]

## II.   Steering Did, In Fact, Occur

While the parties are engaged in ongoing discovery and the record continues to be developed as the Bureau reviews Defendants' productions and takes additional depositions, the documentary evidence uncovered thus far, as well as deposition testimony, corroborate the Bureau's allegations. For example, a June 2010 memorandum demonstrated that the culture of promoting forbearance at Navient was so pervasive that the company had a "battle cry" about it: "Our battle cry remains '*forbear them, forbear them, make them relinquish the ball.*'" A2 (emphasis in original).[2] The memorandum noted that, for borrowers whose accounts Navient brought out of delinquency, 70% were being placed in forbearance. *Id.*[3]

---

[1] Navient writes that forbearance and IDR are "complementary" because borrowers "often need forbearance to allow time to complete IDR paperwork." Navient Brief, at 3. This is a red herring; as Navient well knows, this case is *not* about the use of administrative forbearances, which are typically three months or less and are designed to give borrowers time to apply for IDR.

[2] "A__" refers to a page of the appendix filed with this brief.

[3] The memorandum also stated that "we are very liberal with the use of forbearance once it is determined that a borrower cannot pay cash or utilize other entitlement programs." A2. Under ED regulations, "entitlement programs" refers to deferment and grace periods, not to IDR. *See* 34 C.F.R. § 682.210 (describing

The high rate of enrollment in forbearance for borrowers in distress was not surprising in light of the fact that Navient provided its call center representatives with a job aid that directed representatives to steer borrowers facing financial difficulty toward forbearance. The first page of the job aid contains a decision tree that guides the representative to ask "Can the borrower pay some portion?" A5. IDR plans are shown as options available to borrowers who can afford a payment, while forbearance and deferments are the only options shown to be available to borrowers who cannot make any payment. *Id.* Following the lead of the decision tree, the second page of the job aid is a matrix that sorts repayment options according to whether a borrower "Can Make Monthly Payments" or "CAN NOT Make Monthly Payments." A6. Again, IDR plans are listed only under the category "Can Make Monthly Payments," while forbearance and deferment are the only options listed for borrowers who "CAN NOT Make Monthly Payments." *Id.*

While Navient repeatedly touts in its brief that it informed students that "You could even qualify for a payment of $0!", Navient employees confirmed that, dating back to at least 2011, Navient did not offer IDR to borrowers who could not afford to make payments. For example, the head of all four of Navient's call

---

"entitle[ment]" to deferments); 34 C.F.R. § 685.207 (describing "entitle[ment]" to grace periods).

centers stated that he had not been aware, during most or all of his tenure from 2011 to 2012, that IDR was even an option for borrowers who could not afford to make payments. A9. And a Navient call center supervisor confirmed that, through at least 2012 and perhaps for years after that, the job aid that guided calls with delinquent borrowers did not include IDR as an option. A13.

Consistent with the fact that Navient did not adequately advise borrowers about IDR, the Bureau is already in possession of dozens of calls in which steering occurred, which were obtained through Navient's document productions (for example, calls attached to internal emails). And the Bureau has not yet obtained in this litigation a sample of calls for review, but is currently in the process of negotiating the parameters of that call sample production.

Navient's steering of borrowers into forbearance came to the attention of third-party student loan counselors, who were puzzled by Navient's refusal to offer IDR plans to borrowers who were obvious candidates for it. For example:

- Employees of the i3 Group – a third-party counseling service – observed in 2013: "We have been experiencing [Navient] reps who are refusing to send out the IBR, hanging up after the forbearance is read, and then also refusing to put a supervisor on the line when requested.'" A16. A Senior Vice President from i3 brought the issue to Navient's attention, explaining how Navient representatives were "not wanting to offer IBR"

or were making up restrictions about IBR eligibility to avoid offering IBR. A183-84.[4]

- Loan counselors at the University of Phoenix made similar observations in 2013, following an incident in which Navient representatives "refused to go over IBR" with a borrower with no income. A19. University of Phoenix representatives received confirmation from two different Navient representatives that it was Navient's policy "that if a student says they cannot make any payments that [Navient] go over *only* Deferment and Forbearance options." A18-19 (emphasis in original).

Navient's internal emails also demonstrate that Navient employees reviewing calls were providing samples of steering that they thought would be brought to the attention of Navient's CEO. For example, in February 2014, Navient personnel flagged for CEO Jack Remondi's attention a borrower call where the borrower was placed in forbearance even though she "may have qualified for IBR." A22. Through at least 2016, the issue of borrower steering had persisted, with examples of problematic calls having been brought to Mr. Remondi's attention on at least four additional occasions. A27, 29, 32, 35.

In 2017, the Department of Education ("ED") conducted a review of Navient's call center activities, and after listening to a sample of calls, ED concluded that, in some of those calls, "Navient CSRs neglected to offer the borrower an option other than forbearance." A40. ED noted that "[t]he use of

---

[4] IBR stands for income-based repayment, which is one of the types of plans that falls under the broader umbrella phrase of IDR plans.

8

forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term." *Id.*

According to former employees of Navient, the occurrence of steering was also a consequence of Navient's compensation policies. Navient's compensation policies for its customer service personnel incentivized them to deal with calls quickly, which resulted in borrowers not being advised about IDR plans or being directed toward forbearance. As one former employee recounted: "The company fostered a culture within the call center that prioritized speed in resolving borrower calls. The company imposed a requirement that employees maintain an average call time of approximately seven minutes. It initially conveyed the requirement during training. Managers reinforced the requirement through regular feedback sessions." A88-89. Employees were informed daily or weekly how their average call time compared with their peers through tracking spreadsheets sent to employees by email that showed the names of employees along with their average call times. A former employee described these reports as follows: "The spreadsheet ranked employees according to the colors green, yellow, and red. Top performers were green. Marginal performers were yellow. And poor performers were red." A89. Thus, "[n]ot only did I know what my average call time was, I knew where I stood relative to other customer service representatives." A90. Navient employees understood that the way to achieve short call times was to offer

9

forbearance. If a borrower called to discuss repayment options, and the representative placed the borrower into forbearance, that could be accomplished in under 3.5 minutes. A102. In contrast, discussing IDR would be a much longer conversation. A93-94.

Even though call representatives had their calls audited on a monthly basis by their supervisors, this auditing was not thorough, nor was it designed to prevent incidents of steering. A supervisor was required to listen to only five calls per month for each agent, and those five calls could cover any subject, including topics unrelated to choosing a repayment plan. A100-01. Even if, in these limited audits, a representative was deemed not to have properly discussed IDR as a repayment option, the representative's conduct would not be written up in any way or lead to any sort of warning. A108-09.

Finally, Navient has always understood that sending boilerplate written information about IDR does not give it *carte blanche* to give borrowers inadequate advice over the phone. To the contrary, despite what Navient is now arguing in this litigation, Navient has always known that struggling borrowers faced with the complexity of repayment options rely on phone advice, and Navient has encouraged borrowers to trust that they can receive accurate advice by phone. Indeed, in 2016, Navient urged to the FCC that regulations concerning phone contact should be changed to remove "impediments . . . to reaching and helping

10

struggling and at-risk borrowers" because of "the importance of [phone] contact." A116. Navient summarized its position as follows: "one thing has become crystal clear from our years of experience: live contact with borrowers is key to helping them navigate the multitude of options and the complexity of the repayment system." A117.

## III.    Navient's Incomplete Production of Borrower Records

Against this backdrop of evidence that Navient had a systemic practice of steering, Navient has pursued a consistent strategy in this litigation of trying to hinder key aspects of discovery. For example, with respect to the production of emails, Navient initially took the remarkable position that it would produce virtually no internal emails about the Bureau's steering claim and various other practices alleged in the complaint. The Bureau was required to seek the involvement of the Court to compel production of those emails. *See* Doc. 74. And indeed, the productions have and are continuing to yield evidence supporting the Bureau's claims, as described above. Similarly, Defendants resisted production of contact information of former employees, again requiring the Bureau to seek the involvement of the Court. *See* Doc. 99. And by contacting those former employees, the Bureau continues to learn information corroborating its claims.

Another front in Navient's ongoing battle to hinder discovery has been to resist production of records and calls for borrowers whom Navient is deposing. Put

11

differently, Navient has taken the position that borrowers are not entitled to see all of the loan records and calls that Navient has in its possession about them. *See, e.g.*, A125-27, 129, 133, 136-37, 140, 144. The Bureau raised this issue with the Court at the August 8, 2018 hearing, specifically noting that the Bureau had become aware that relevant documents – such as letters confirming enrollment in verbal forbearances – were being withheld for borrowers being deposed. *See* Aug. 8, 2018 Hearing Transcript, at 39:13-40:25. The Bureau also noted that calls in which borrowers agreed to enroll in forbearances were not being produced. *Id.*; *see also* Doc. 99.

At that hearing, the Court asked Navient's counsel about its questionable claim that producing all documents and calls for approximately 25 borrowers being deposed would be too burdensome: "Aren't the files of individual borrowers maintained by Navient in some coherent fashion, such that if you want to access the file of [a] borrower it can be done without a great deal of work and effort? I mean, are you telling me that's not the case?" Aug. 8, 2018 Hearing Transcript, at 51:10-14.

Navient responded as follows with respect to borrower correspondence: "I don't know if you remember the old dos [sic, DOS] screens with like black – black screens with the green flashing – green flashing language . . . . So it's like that. And in order – so what we look at is we look at that screen, and there's a screen

12

that shows the whole history of the loan. . . . [Y]ou have to look at that screen, click – click the entry, that gets sent to another part of the business, downloaded, and then we can produce it." *Id.* at 51:23-52:11.

With respect to call recordings, Navient stated as follows: "And I can tell you that the company cannot pull them by account numbers. . . . Instead, we have to look at the call notes, look at the time and date, go to the system where that call would have been located, match the time and date with the agent name who took the call and see if we can find the borrower's call." *Id.* at 52:18-24.

Based on these explanations, the Court set out the procedure by which the Bureau could request documents withheld: the Bureau would "look at the loan history" to be provided by Defendants, "identify the calls [and correspondence] that relate to the specific activities at issue," and Navient would then have to "go and try to locate those calls and correspondence." *Id.* at 52:9-11; 55:19-24.

Information that the Bureau has learned since that hearing raises serious doubts about the accuracy of the descriptions Navient provided about the process of locating borrower correspondence and calls and the associated burden. During an onsite visit to a Navient servicing center for purposes of finalizing the Bureau's data requests, the Bureau learned that borrower calls and correspondence are indeed maintained in a "coherent fashion." All correspondence can be queried by a borrower's social security number, and that correspondence is located in a white-

13

screen database (with no flashing text) that does not resemble DOS at all. *See*

A147 (screenshot of database showing borrower documents queried by social

security number). In addition, all of that correspondence can be opened and

downloaded without having to make contact with another business area. And in

separate databases (which, again, have white screens with no flashing text, and do

not look like DOS), a borrower's calls typically can be retrieved simply by

querying that borrower's phone number. *See* A149, 151, 153 (screenshots of

databases showing borrower calls queried by phone number). Indeed, a current

Navient call supervisor described the process of locating calls as straightforward:

"I usually don't struggle to find calls. Like it's pretty easy to find the calls most of

the time. . . . I honestly have never had a time that I've run into where I couldn't

find a call." A103, 105. In sum, the documents for specific borrowers are

segregated in "coherent fashion," and claims of excessive burden to download all

of those documents do not withstand scrutiny.[5]

---

[5] It would seem to take more effort for Navient's counsel to engage in a
process of listening to all calls for a borrower, and reading all correspondence with
the borrower, to determine what to produce and what to withhold, rather than to
simply produce all of a borrower's documents and calls. And, on some occasions,
Navient has delayed borrower depositions due to the inability to timely make their
selective production of records for the borrower to be deposed. Thus, it appears
that the culling exercise that Navient's counsel performs, not the process of

After the August 8, 2018 hearing, pursuant to the Court's instructions, Navient produced a loan history log for each borrower, printed from a screen in their servicing system, so that the Bureau could determine what potentially relevant items on those logs were withheld and should have been produced.[6] The Bureau compared Navient's productions for borrowers with their loan history logs, and discovered a significant volume of potentially relevant calls and correspondence that had not been produced. (A 26-page list of documents and calls that the Bureau believed had not been produced is attached at A156-81). The Bureau requested that Navient produce all of those documents and calls on December 7, 2018. A155. To date, Navient has not yet produced all of the calls and correspondence on that list, despite the procedure that the Court set forth at the August 2018 hearing requiring them to do exactly that.[7] The Bureau also expressed

---

gathering all documents and calls associated with the borrower, is what is labor intensive.

[6] These logs should have been produced in advance of the borrower depositions, as they are unquestionably relevant. Navient's counsel admits that they consulted these logs to determine what to produce, and thus they made the conscious decision that the logs themselves would be among the items to improperly withhold before the depositions occurred. The logs include relevant information about the specific dates borrowers contacted Navient, and in certain instances, the apparent outcome of those calls.

[7] The Bureau received a small production of documents and calls on February 5, 2019 in response to the 26-page list from the Bureau. The Bureau is in the process of reviewing that production, but it is evident to the Bureau that some

concerns that some loan history logs had been improperly withheld (A155), and Navient did not respond to that concern.

While the Bureau is continuing to pursue this issue with Defendants and intends to seek relief if relevant records continue to be withheld, Navient ironically has made the experiences of borrowers whose records they have not fully produced the centerpiece of their motion.

## STATEMENT OF QUESTION INVOLVED

Should the deadline for Bureau's response to Navient's motion for partial summary judgment be deferred until 21 days after the deadline for filing summary judgment motions, and should the parties be prohibited from filing further summary judgment motions before the close of discovery?

**Suggested answer**: Yes, because: (a) the parties are in the middle of active discovery; (b) Navient has acknowledged that this case should be about "Company practice" (Navient Brief, at 19), and while the Bureau is still reviewing Navient's document production, the Bureau has already uncovered substantial evidence showing a "Company practice" of inadequately advising borrowers about IDR; and

---

items from the 26-page list have not been produced. It appears that some of the calls on the 26-page list were not retained, but the Bureau has not received a response to its inquiry regarding which calls were not retained and when the non-retention occurred. *See* A155.

16

(c) the motion is based on the experiences of specific borrowers for whom Navient has not fully produced potentially relevant documents and calls.

## ARGUMENT

Navient's motion is premature because discovery is not complete. Accordingly, the Bureau's response to the motion should be deferred until 21 days after the deadline for summary judgment motions, which is after the close of all discovery. In addition, for the efficiency of this case – including so that the parties can focus their efforts on bringing fact discovery to a close in four months – further summary judgment motions before the close of discovery should be prohibited.

Navient's motion is an attempt to short-circuit the Bureau's ability to create an adequate record through the discovery process. Yet "it is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery' . . . . because, by its very nature, the summary judgment process presupposes the existence of an adequate record." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007); *see also Shelton v. Bledsoe*, 775 F.3d 554, 565 (3d Cir. 2015) (noting that "[i]f discovery is incomplete, a district court is rarely justified in granting summary judgment").

Navient is undoubtedly aware that it is not feasible for the Bureau to have completed review of Navient's document productions. Navient recently insisted upon *seven weeks* to review the Bureau's forthcoming production of the non-

17

privileged documents from a universe of 55,000 documents mentioning the words

"Navient" or "Pioneer." *See* Doc. 155, at 1. Thus, it is not realistic for Navient to

expect the Bureau to review a volume of documents that is *over eight times as*

*large* in the four months that have elapsed since Navient produced those

documents, let alone for the Bureau to supplement its Rule 26(a)(1) disclosures and

notice and take additional depositions based on information from those documents.

In addition, in mid-January 2019, Navient produced certain borrower data that the

Bureau requested in *February 2018*; the 11-month production period included

approximately 9 months in which Navient sought to block the production entirely.

This delay prevented the Bureau from being able to analyze this data and select a

call sample for production based on the data by this point in the discovery process.

Navient also delayed production, until September 2018, of contact information for

former call center employees, which limited the Bureau's ability to interview these

individuals, supplement the Bureau's Rule 26(a)(1) disclosures with additional

potential witnesses, and notice and take depositions, if necessary. Had Navient

produced this information when its interrogatory responses were due in late March

2018, the Bureau could have begun its outreach over five months earlier.

In addition, though the review of Navient's productions is ongoing, the

Bureau has already obtained significant evidence showing that Navient's

"Company practice" was that it did not adequately advise borrowers about IDR. As

described above, this evidence includes internal emails, job aids, calls, observations from third-party student loan counselors, a review by ED, and Navient's own acknowledgement about the importance of calls with borrowers in helping them understand repayment options. The Bureau should be allowed to fully develop this evidence, including by completing its review of Navient's productions and by obtaining a sample of calls.

Finally, as described above, Navient's motion is premised on the experiences of borrowers whom Navient has subpoenaed and deposed, yet Navient has not produced all of the correspondence and call recordings that would allow for these borrowers' experiences to be fully understood. For example, even though many of those borrowers ultimately enrolled in IDR, that is not surprising: it is possible that Navient changed some of its practices in response to the Bureau's investigation, this lawsuit, and the lawsuits filed by the Attorneys General of five states, and thus many borrowers who had extended periods of forbearance were eventually informed about IDR during phone conversations with Navient and enrolled in IDR. However, for the periods preceding IDR enrollment, Navient has not produced relevant documents concerning those borrowers (such as letters confirming enrollment in verbal forbearances), as well as numerous calls in which forbearance enrollment occurred. Their experiences cannot be accurately and

completely presented until all of their relevant documents and calls are produced and analyzed.

In light of these factors, as well as a host of discovery issues to be litigated before the special master, an adequate record in this case has yet to be developed, and summary judgment is inappropriate. *See, e.g., Smithson v. Rizzo*, 2015 WL 1636143, at *5 (M.D. Pa. Apr. 7, 2015) (denying motion for summary judgment as premature); *Humbert v. Kurtz*, 2008 WL 719244, at *8 (M.D. Pa. Mar. 14, 2008) (same); *La Fata v. Raytheon Co.*, 223 F.Supp.2d 668, 680 (E.D. Pa. 2002) (same).

The information asymmetry found in enforcement actions such as this disproportionately favors Navient. Its conduct is at the heart of the case, and it is in possession of the vast majority of relevant information. The above-described events have exacerbated this asymmetry, putting the Bureau at an unfair disadvantage. This case involves important issues affecting potentially hundreds of thousands of consumers. The factfinder should have a full evidentiary record to resolve these issues. *See, e.g., Doe*, 480 F.3d at 257 (noting that deferring consideration of summary judgment is particularly appropriate "when there are discovery requests outstanding or relevant facts are under the control of the moving party"). The Bureau would be severely prejudiced by a premature

adjudication of a summary judgment motion, especially in light of Navient's delayed and incomplete productions to date.

In addition, in light of the discovery issues that need to be resolved, it would be inefficient for the parties to litigate, and for the Court to adjudicate, a summary judgment motion now. The parties should be working toward resolution of a litany of discovery disputes to complete development of the factual record in this case, not diverting resources to briefing premature motions. Particularly in light of potentially serious issues concerning Navient's deficient production of records relating to borrowers who have already been deposed and who are at the center of Navient's motion, the record in this case is "so significantly clouded . . . that resolution of [a] motion for partial summary judgment . . . at this time would constitute an inefficient use of judicial resources and frustrate the purpose of summary adjudication." *Advanced Fluid Sys., Inc. v. Huber*, 2015 WL 1729375, at *1 (M.D. Pa. Apr. 15, 2015); *see also Dean v. Douglas,* 2012 WL 6151137, at *6 (M.D. Ga. Dec. 11, 2012) (denying motion for partial summary judgment on the basis of efficiency); *In re G–I Holdings Inc.,* 2007 WL 1412294, at *4 (D.N.J. May 14, 2007) (same).

## CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court enter the attached proposed order deferring the deadline for the Bureau's response

to Navient's motion for partial summary judgment until 21 days after the deadline for motions for summary judgment and prohibiting the parties from filing any further summary judgment motions until both fact and expert discovery have concluded.

Dated: February 6, 2019          Respectfully submitted,

Kristen Donoghue
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

   /s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
(Nicholas.Jabbour@cfpb.gov; 202-435-7508)
Manuel Arreaza, DC 1015283
(Manuel.Arreaza@cfpb.gov; 202-435-7850)
David Dudley, DC 474120
(David.Dudley@cfpb.gov; 202-435-9284)
Ebony Sunala Johnson, VA 76890
(Ebony.Johnson@cfpb.gov; 202-435-7245)
Nicholas Lee, DC 1004186
(Nicholas.Lee@cfpb.gov; 202-435-7059)
Andrea Matthews, MA 694538
(Andrea.Matthews@cfpb.gov; 202-435-7591)
*Enforcement Attorneys*

1700 G Street NW
Washington, DC 20552
Fax: 202-435-9346

*Attorneys for Plaintiff*

## **CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.8(b)(2), I hereby certify that the foregoing brief in opposition contains 4614 words.

　　　　　　　　　　　　　　　　　 /s/ Nicholas Jabbour　　　　　　
　　　　　　　　　　　　　　　　Nicholas Jabbour, DC 500626
　　　　　　　　　　　　　　　　Nicholas.Jabbour@cfpb.gov
　　　　　　　　　　　　　　　　1700 G Street NW
　　　　　　　　　　　　　　　　Washington, DC 20552
　　　　　　　　　　　　　　　　Phone: 202-435-7508
　　　　　　　　　　　　　　　　Fax: 202-435-9346

　　　　　　　　　　　　　　　　*Attorney for Plaintiff*

23

## **CERTIFICATE OF SERVICE**

I certify that, on February 6, 2019, I served the foregoing document and the

accompanying materials by email to the following counsel for Defendants:

     Natalie Bilbrough: natalie.bilbrough@wilmerhale.com
     Daniel Brier: dbrier@mbklaw.com
     Karin Dryhust: karin.dryhurst@wilmerhale.com
     Daniel Kearney: daniel.kearney@wilmerhale.com
     Webb Lyons: webb.lyons@wilmerhale.com
     Matthew Martens: matthew.martens@wilmerhale.com
     Jonathan Paikin: jonathan.paikin@wilmerhale.com
     Arin Smith: arin.smith@wilmerhale.com
     Donna Walsh: dwalsh@mbklaw.com


Mr. Kearney previously consented to service by email on Defendants'

counsel.

                         /s/ Nicholas Jabbour
                       Nicholas Jabbour, DC 500626
                       Nicholas.Jabbour@cfpb.gov
                       1700 G Street NW
                       Washington, DC 20552
                       Phone: 202-435-7508
                       Fax: 202-435-9346

                       *Attorney for Plaintiff*

1700 G Street NW,
Washington, DC 20552

February 6, 2019

**By UPS Overnight**

Clerk, U.S. District Court for the Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re:    *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Clerk:

     Enclosed please find documents to be filed under seal in the above-captioned matter.
Specifically, these documents are a brief in support of a motion that the Plaintiff filed on
February 6, 2019, as well as an appendix of exhibits to that brief. There is a protective order in
the case that authorizes these documents to be filed under seal (*see* ECF Doc. 66-1, ¶ 11; ECF
Doc. 67).

     Please do not hesitate to contact me if you have any questions. Thank you for your
assistance.

FILED
SCRANTON

FEB 0 7 2019

PER _____
DEPUTY CLERK

                              Sincerely,

                              */s/ Nicholas Jabbour*

                              Nicholas.Jabbour@cfpb.gov
                              1700 G Street NW
                              Washington, DC 20552
                              Phone: 202-435-7508
                              Fax: 202-435-9346
                              Attorney for Plaintiff

Enclosures

cc: Defendants' Counsel (by email only)