# EXHIBIT 1

Confidential - Pursuant to the Protective Order

Page 1

1              TESSITORE
2     IN THE UNITED STATES DISTRICT COURT
3    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
4           Case No. 3:17-cv-00101
5           - - - - - - - -
6
7   CONSUMER FINANCIAL PROTECTION BUREAU,
8            Plaintiff,
9   vs.
10  NAVIENT CORPORATION, et al.,
11           Defendants.
12  _____/
13
14
15              CONFIDENTIAL
16     PURSUANT TO THE PROTECTIVE ORDER
17
18    VIDEOTAPE DEPOSITION OF LISA TESSITORE
19              Washington, D.C.
20           Thursday, May 24, 2018
21
22
23  Reported by:
24  SUSAN ASHE, RMR, CSR, CRR
25  Job No.: 142321

Confidential - Pursuant to the Protective Order

Page 2

1       TESSITORE
2       Thursday, May 24, 2018
3       9:15 a.m.
4
5
6       Videotape deposition of LISA TESSITORE,
7   taken on behalf of Defendants, at WILMERHALE, 1875
8   Pennsylvania Avenue, Northwest, Washington, D.C.,
9   beginning at 9:15 a.m., on Thursday, May 24, 2018,
10  before Susan Ashe, RMR, CSR, CRR.

Page 3

1       TESSITORE
2   APPEARANCE OF COUNSEL:
3     FOR PLAINTIFF:
4       CONSUMER FINANCIAL PROTECTION BUREAU
5       BY: ANDREA MATTHEWS, ESQ.
6       BY: DAVID DUDLEY, ESQ.
7       1700 G Street, NW
8       Washington, DC  20552
9
10
11
12
13
14     FOR DEFENDANTS:
15       WILMERHALE
16       BY: DANIEL KEARNEY, ESQ.
17       BY: GARY DYAL, ESQ.
18       1875 Pennsylvania Avenue, NW
19       Washington, DC  20006

Page 4

1       TESSITORE
2   ALSO PRESENT:
3     FOR THE WITNESS:
4       UNITED STATES ATTORNEY'S OFFICE
5       BY: JOSHUA KOLSKY, ESQ.
6       555 4th Street, NW
7       Washington, DC  20530
8
9
10      - and -
11      OFFICE OF THE GENERAL COUNSEL
12      BY: BRIAN SIEGEL, ESQ.
13      U.S. Department of Education
14      400 Maryland Avenue, SW
15      Washington, DC  20202
16
17
18
19   David Voigtsberger, Videographer

Page 5

1       TESSITORE
2                 INDEX
3       Deposition of LISA TESSITORE
4                May 24, 2018
5
6   Examination By:                 Page
7   Mr. Kearney                     9, 267
8   Ms. Matthews                    14
9
10  DEFENDANTS
11  Exhibit No.                     Marked
12  Exhibit 315  E-Mail Correspondence
13       NAV-00781753 and -754
14       with Attachment            34
15  Exhibit 316  E-Mail Correspondence
16       NAV-00627332 through -338  42
17  Exhibit 317  E-Mail Correspondence
18       NAV-00728862 through -867  72
19  Exhibit 318  E-Mail Correspondence
20       NAV-01561968 through -970  80
21  Exhibit 319  E-Mail Correspondence
22       NAV-01235100               84
23  Exhibit 320  Evaluation Document
24       NAV-00975861 through -864  90

Confidential - Pursuant to the Protective Order

---

Page 6

TESSITORE
DEFENDANTS
| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 321 | E-Mail Correspondence NAV-00689225, -227 with Attachment | 94 |
| Exhibit 322 | E-Mail Correspondence NAV-00628986 through -994 | 112 |
| Exhibit 323 | E-Mail Correspondence NAV-01561977 through -980 | 121 |
| Exhibit 324 | Business Operations Change Request Form NAV-00016770 through -772 with Attachment | 132 |
| Exhibit 325 | E-Mail Correspondence NAV-00744366 through -370 | 136 |
| Exhibit 326 | Federal Student Aid Document ED000560 through -570 | 148 |
| Exhibit 327 | Servicer Site Visit Review ED000541 through -551 | 225 |
| Exhibit 328 | E-Mail Correspondence NAV-00823454 through -458 | 276 |

---

Page 7

TESSITORE
PREVIOUSLY MARKED EXHIBITS
| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 300 | Subpoena | 12 |
| Exhibit 306 | E-Mail Correspondence NAV-00686505, -507, -508, and NAV-00686237 | 28 |

---

Page 8

TESSITORE

WASHINGTON, D.C.;
THURSDAY, MAY 24, 2018, 9:15 A.M.
--o0o--

VIDEOGRAPHER: Good morning. This is the start of tape labeled No. 1 of the videotaped deposition of Lisa Tessitore in the matter of Consumer Financial Protection Bureau versus Navient Corporation, et al. in the United States District Court for the Middle District of Pennsylvania, Case No. 3-cv-1700101.

This deposition is being held at WilmerHale, 1875 Pennsylvania Avenue, Northwest, Washington, D.C. on May 24, 2018; and the time is 9:15 a.m.

My name is David Voigtsberger, from TSG Reporting, Incorporated; and I am the legal video specialist.

The court reporter is Susan Ashe, in association with TSG Reporting.

Will counsel please introduce yourselves and whom you represent.

MR. KEARNEY: Dan Kearney, of WilmerHale, for the Defendants.

MR. DYAL: Gary Dyal, of WilmerHale,

---

Page 9

TESSITORE

for the Defendants.

MR. KOLSKY: Josh Kolsky, from the United States Attorney's Office, for the Department of Education.

MR. SIEGEL: Brian Siegel, of the Department of Education.

MS. MATTHEWS: Andrea Matthews, of the Consumer Financial Protection Bureau, Plaintiff.

MR. DUDLEY: David Dudley, Consumer Financial Protection Bureau.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

Whereupon,

LISA TESSITORE,

the Witness, called for examination, having been first duly sworn according to law, was examined and testified as follows:

EXAMINATION
BY MR. KEARNEY:

Q. Good morning, Ms. Tessitore.

A. Good morning.

Q. Could you please state your full name for the record.

A. Sure. Lisa Tessitore.

Page 26

TESSITORE

the TIVAs on board, but to a bigger degree in the beginning of 2012.

Q. And as part of this oversight, did you say that the Department reviews servicers' policies for communicating with borrowers?

A. We review -- I wouldn't say top to bottom because they have a lot of policies and --

Q. Right.

A. -- procedures.

That would be a little -- a little too much.

So what we generally do when we're doing a particular review is: We might just capture those policies and procedures as it pertains to the particular review that we are doing.

And in the essence of a call-monitoring review, we have some of their scripts, not all of their scripts. "Scripts" would be the script that a call center rep would be following as they're having the conversation with a borrower.

We have some of those, not all of those, again.

We do ask for them if we see a potential problem or a concern that might be coming up or if

Page 27

TESSITORE

they're not addressing a borrower's questions in the way that we would like them to see -- or the call's not going in the direction we would want those calls to go. If we see patterns, those types of things, then we would ask for call scripts as well.

Q. And if you do see a problem and confirm that perhaps it is a problem, what do you then do as part of your oversight activity?

A. Sure. Generally if we see something, it depends on what the severity of that issue might be.

If it's putting FSA or the Department at risk, we're moving on it very quickly and we'll pull in all the appropriate parties and generally have a conversation to say what's going on and ask for data, ask for system issues -- you know, if it's something on the system that needs to be changed.

It may even escalate up to Contracts to put in a corrective action plan, which would be -- the contracting officer has now stepped in and is taking over.

But most of them are at a smaller level and can be managed within my team -- in which, again, we would just reach out to that servicer.

If we think it's a pattern, we would ask

Page 28

TESSITORE

them to go look and see if they can identify any borrowers or any of these same situations that are taking place -- could they query their system? Is it something that we can query?

We're trying to find out the population and how we can -- and resolve it.

But all of our issues that have that magnitude, that there is a harm to the borrower or to something at the Department of Education, has some type of remediation sitting behind it.

So whether that's -- we are monitoring all of that through fruition -- so we're seeing all the remediation taking place -- we control that piece of it from soup to nuts, if you will.

MR. KEARNEY: Let's look at Exhibit 306.

(Whereupon, Defendants Exhibit 306, previously marked, was presented to the witness.)

Q. Take a minute to look at that document.

(Witness reading.)

A. Okay.

Q. Are you familiar with this document?

A. Only just recently, yes.

Q. Okay. Just recently when?

Page 29

TESSITORE

A. When Brian shared it with me.

Q. Do you see an e-mail on the first page of the document?

A. Yes.

Q. And do you see in the "to" line there are three names listed?

A. Yes.

Q. Could you read those three names to me.

A. Sure.

(Reading:) Mary Oknich, Jana Hernandes, and Sue O'Flaherty.

Q. Do you know who any of those people are?

A. I know all three of them, yes.

Q. Who are they?

A. Mary Oknich is still with the Department of Education. She was my supervisor when I started in 2011. Her director was Jana Hernandes, now named "Jana Hough."

And Sue O'Flaherty -- and so -- I'm sorry, Jana was the director within the operation services area.

And Sue O'Flaherty has since retired. But she was at that time the deputy and then became the director of program management.

Page 30

1　　　　　　TESSITORE
2　　Q. Okay. So do any of these people work
3　within the component that you now oversee?
4　　A. No.
5　　Q. No. Have you had a chance to read the
6　cover e-mail here?
7　　A. From Kevin?
8　　Q. Yes.
9　　A. Yes.
10　　Q. Do you see that on the first line, he....
11　　　　Can you read the first three sentences of
12　the e-mail, just so we get a sense of the content.
13　　　　Can you read it out loud to us.
14　　A. Yes, I can.
15　　Q. Thank you.
16　　A. (Reading:) Given all the recent talk
17　about forbearances, I wanted to share something with
18　you. It's a draft document that our call center
19　team is developing as part of the training program.
20　It shows a graphical representation of the
21　communication process that typically occurs in our
22　call centers when counseling borrowers who are
23　having difficulty making payments.
24　　Q. I meant to ask you: Do you know who Kevin
25　Woods is?

Page 31

1　　　　　　TESSITORE
2　　A. I know -- yes, I know Kevin.
3　　Q. Who is he?
4　　A. Kevin Woods is the contracting
5　representative for -- well, now Navient Solutions,
6　with a contract at FSA.
7　　Q. Do you know why the three individuals on
8　the "to" line would be communicating with Kevin
9　Woods in this e-mail?
10　　　　Well, generally, why would they be --
11　　A. Yes.
12　　Q. -- communicating with them?
13　　A. It would make sense, because you would
14　insert my name into one of those three names onto
15　that list.
16　　　　So it would make sense that Kevin and/or
17　Bob Leary would be having that conversation with the
18　oversight group and, to some degree, the program
19　management team.
20　　　　That line has changed a little bit since
21　then; but at that time, it makes perfect sense that
22　he would be reaching out to those three ladies.
23　　Q. And you said you could insert your name
24　in. What did you mean by that?
25　　A. Well, where it says Mary Oknich and Jana,

Page 32

1　　　　　　TESSITORE
2　and you could insert -- now I'm Jana.
3　　Q. I see.
4　　A. So that's my role.
5　　Q. I see.
6　　A. Yeah.
7　　Q. So when we were talking about the
8　oversight process a moment ago, is a communication
9　like this in Exhibit 306 part of the oversight
10　process you were describing?
11　　A. Yes. So one of the requirements, if you
12　will, that we ask a servicer to share with FSA is:
13　When they make a significant change to their process
14　or when they want to show that they are being
15　competitive, they generally share that information.
16　　　　But more importantly, when they are making
17　a requirement change or something that they want us
18　to be aware of -- you can call it a "pilot program,"
19　you can call it just a different reach, outreach to
20　our borrowers -- they are asked to share that
21　information with us.
22　　　　And that looks like that would be
23　something that we would expect them to share if
24　they're changing their outreach.
25　　Q. Would the Department -- would this -- your

Page 33

1　　　　　　TESSITORE
2　team typically have a conversation with the servicer
3　about these types of issues?
4　　A. Depending on what the content is or what
5　the change is and how it impacts our borrowers.
6　　　　Sometimes the servicers don't know a
7　direction that we're heading, that we're looking at
8　going in the future.
9　　　　And so we ask them to share information to
10　make sure that we're continuing down the same path
11　versus taking a different path.
12　　　　So this conversation is relevant. We
13　would expect them to share it with us, and we would
14　have a discussion with them.
15　　　　This particular one, if the attachments
16　came along, the discussion would have been around
17　those attachments to ensure that it does meet what
18　we're asking them to do or where our vision is
19　going.
20　　Q. So what would the oversight group do once
21　it received this information from the servicer?
22　　A. We would -- well, whoever our subject
23　matter expert is on this particular item would have
24　likely received it as well and would have gone over
25　it with the servicer and brought in our call center

Page 34

TESSITORE

monitoring person to ensure that this is -- this is what they said they were doing, this is now a procedure.

So they would look for that in the call monitoring as well, to make sure that they're following what they said they were going to do as well meeting our regulations.

But if there were something that we didn't want them to do, we would call it out and say you can't implement this.

But in this instance, because I know that this was their process at the time, it was -- it must have been passed.

Q. When you say you would call it out, what do you mean by that?

A. So if they were offering -- I don't know, I'm going to give you an example -- a program that we didn't support for repayment program or offer a deferment that doesn't belong in that category, we would tell them absolutely you cannot do this and here's why.

(Whereupon, Defendants Exhibit 315 was marked for identification.)

Q. Please just take a minute to look over

Page 35

TESSITORE

this document.

(Witness reading.)

Q. Okay. Have you had a minute to look at it?

A. Yes.

Q. Do you recognize the document?

A. I don't -- not the e-mail, anyway.

Q. Do you see the e-mail on the first page?

A. Yes.

Q. Do you see the recipient line, the "to" line on the e-mail?

A. For Bill? Yes.

Q. Who is the recipient?

A. Bill Leith is -- or at that time was the director of program management.

So Sue O'Flaherty was reporting to Bill.

Q. And was Mr. Leith operating -- I'm sorry, strike that.

Was Mr. Leith in the oversight program that you described before?

A. No; he was in program management.

Q. How was program management different from oversight?

A. Good question.

Page 36

TESSITORE

The intention was to have program management bring up a program so when legislative changes came about or regulatory changes or participate in negotiated rulemaking, they would be the spokesperson or the first point of contact for anything that had to do with that program in its startup.

Once the startup happened, there should have been or should be an overlap between the program management and the operation services.

And that then bleeds into my team, which is the oversight team.

So then we would take it over and ensure that the processing continued, as expected, based on the regulations and requirements.

So there was a lot of overlap between program management, directed by Bill Leith and at that time Jana Hernandes, for operation services.

Q. And do you see the "from" line of the e-mail?

A. Yes.

Q. Who is the sender of the e-mail?

A. Well, I knew her as "Judi Grassi."

Q. So you know who "Judi Grassi" is?

Page 37

TESSITORE

A. Um-hum.

Q. Who is she?

A. I believe she's left the organization now; but years ago she worked -- at that time there were three main contact points at Navient. Judi was one of them, along with Bob and Kevin Woods.

Q. Do you know why Ms. Grassi would be sending an e-mail of this type to Mr. Leith?

A. The only -- when I read it, what it looks like -- and I don't know, because I would have to go back in my own log to see what happened back in January -- but Navient used to come in on a quarterly basis to do a -- I don't even know what we called them -- where they would -- they would do a session with us.

They would bring in a PowerPoint and a lot of their staff, their Department leads, to go over operational changes they had or some of their success stories. Right?

So they would share what was going on within their business unit, and they would come in on a quarterly basis.

It appears that they may have introduced or talked about repayment guides, because that's

Page 287

1                     TESSITORE

2                     CERTIFICATE

3

4           I, SUSAN ASHE, a Registered Merit

5   Reporter and Notary Public, hereby certify that the

6   foregoing is a true and accurate transcript of the

7   deposition of said witness, who was first duly sworn

8   by me on the date and place hereinbefore set forth.

9           I FURTHER CERTIFY that I am neither

10  attorney nor counsel, nor related to or employed by

11  any of the parties to the action in which this

12  deposition was taken, and further that I am not a

13  relative or employee of any attorney or counsel

14  employed in this action, nor am I financially

15  interested in this case.

16           Dated this 6th day of

17  June, 2018.

18

19

20   _____

21       Susan Ashe, Notary Public

22       of the District of Columbia

23  My commission expires:  May 31, 2022.

24

25