1700 G Street NW,
Washington, DC 20552



February 18, 2019

**Via ECF**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re:    *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Vanaskie:

      As discussed during the February 14, 2019 hearing, the Bureau submits this letter concerning Defendants' failure to search the emails of key custodians responsible for reviews and risk analyses relating to enrollment of borrowers in forbearance and in income-driven repayment ("IDR") plans, which were done for investors or trustees of student loan asset-backed securitization trusts.

      **1.    The Bureau was not in a position to know the identities of appropriate custodians, and Defendants chose most custodians unilaterally**: On May 19, 2017, the Bureau propounded request for production #6 to Defendant Navient Corporation seeking "[a]ll documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review relating to any aspect of the servicing or collection of student loans." A99-100.[1] And on June 5, 2017, the Bureau propounded request for production #6 to Defendant Navient Solutions LLC seeking "[a]ll documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review (including those conducted by or on behalf of an investor or trustee of a loan securitization trust) relating to communications with or enrollment of borrowers in forbearance or any type of income-driven repayment plan." A129.

      Through early 2018 – over the course of extensive conferrals – Defendants continuously resisted the production of almost all internal emails. *See* Doc. 74 (Bureau letter dated Feb. 27, 2018).[2] When the issue went before the Court for resolution in April 2018, Defendants premised their resistance to producing almost all internal emails on the fact that they would have to review approximately one million documents, gathered from custodians whom they had unilaterally identified. The Court determined that the internal emails needed to be reviewed and produced, and ordered the parties "to meet and decide on mutually agreeable search terms that eliminate from the universe of potentially responsive documents that must be hand reviewed those emails and attachments that are unlikely to contain relevant information." *See* Doc. 88 (May 4, 2018 Opinion), at 19.

---

    [1] "A__" refers to a page in the appendix to this letter.

    [2] The request to Navient Corporation was not separately presented to the Court because Navient Corporation had written that request #6 directed to it was "duplicative of Request Nos. 1 and 4 to Pioneer and Request No. 6 to Navient Solutions, and direct[ed] CFPB to the responses to those Requests." A100.

During the ensuing negotiations, the Bureau requested lists of custodians in order to assess whether there were any obvious omissions. The Bureau noted that Defendants had included no low-level employees among their custodians, nor had they included the CEO, so the parties negotiated the addition of four random low-level employees as well as the CEO. But the Bureau made clear that it was not in a position to further confirm the completeness of Defendants' list of custodians, writing in a May 16, 2018 letter that "we do not understand how we can identify the relevant custodians, as that information is within Defendants' control." A164.

**2.    Defendants' productions contain documents – excluding emails – related to securitization:** Defendants clearly understood that the concept of securitization was within the scope of the Bureau's requests for production, because they produced many documents (but no emails from key custodians) on the topic.

Specifically, the document productions contain materials on securitization from both Navient Solutions and Navient Corporation, including minutes of the Finance and Operations committee for the Navient Corporation board, presentation materials by the Chief Financial Officer to the Navient Corporation board, minutes of the Navient Corporation board and audit committee, annual financial statements, and powerpoint documents from Navient Solutions. These are all freestanding documents that appear to have been collected from hard drives, unattached to any emails.

These documents reveal that the topic of securitization is indeed relevant to the Bureau's claims in this case. One of the Bureau's claims is that Navient Corporation and Navient Solutions (collectively, "Navient") steered borrowers experiencing financial distress that was not short-term or temporary into forbearance, instead of adequately advising them about IDR plans that were more beneficial.

The non-email documents produced by Defendants point to a possible reason that Navient steered borrowers into forbearance. Some of the federal loans eligible for IDR plans were privately-funded through a program known as the Federal Family Education Loan Program ("FFELP"). For years, there has been concern from investors that placing FFELP borrowers into IDR plans would be problematic because the securitized FFELP loans would not be repaid by their expected maturity dates, due to the longer repayment terms associated with IDR plans. For example, those documents show that, in 2015, Moody's Investors Service published a Request for Comments on proposed changes to its rating methodology for securities backed by FFELP loans.  *See* A7-10.[3] Moody's seems to have been re-evaluating its ratings methodology because it had observed a reduction in repayment activity on FFELP loans, and pointed to IDR plans as a potential cause. *See* A7. Moody's specifically noted that IDR plans would generate a risk that the securities would miss their final maturity dates, which meant the loans would not all be paid back by the date that they were originally supposed to be repaid. *Id.*

---

[3] Only Moody's announcement of the Request for Comments is included in the appendix to this letter. The full Request for Comments is linked from https://www.moodys.com/research/Moodys-proposes-changes-to-approach-to-rating-US-ABS-FFELP--PR_329808 (free registration required).


Navient submitted a comment letter in response to Moody's proposal on October 19, 2015. *See* A12-82.[4] That letter makes it clear that Navient – for many years prior to 2015 – engaged in significant reviews and risk management analyses, including for investors and trustees, relating to the enrollment of borrowers in forbearance and IDR plans. *See, e.g.*, A13 ("Because repayment rates have been increasing since 2014, deferment and forbearance usage has been declining since 2008, and FFELP loans enrolled in the IBR plan pay down over time, we urge Moody's not to use repayment trends from the period of 2008 through 2013 as the expected base case scenario in the revised methodology."). Navient's comment letter was produced as a freestanding document within Navient's productions to the Bureau, demonstrating that Defendants correctly understood that documents relating to their loan securitization activities were responsive to the Bureau's requests.

In addition, the Bureau's review of publicly available materials demonstrates that the issue of extending maturity dates of securitized loans was a concern to Navient well before 2015. For example, Navient Corporation's 2012 10-K demonstrates that the final maturity date of securitized loans were being amended. *See* A3 ("On January 13, 2012, the FFELP ABCP Facility was amended . . . . [T]he amendment extends the final maturity date by one year to January 9, 2015."). The 10-K also notes that failure to meet the maturity date can result in the collateral being "foreclosed upon." A5.[5] It appears to be the case that such extensions of maturity dates may have been occurring because of IDR enrollment, as Navient suggested in subsequent 10-Ks. *See, e.g.,* A85-86 (2015 10-K of Navient Corporation) ("Higher or lower than expected prepayments of loans could change the expected net interest income the Company receives as the holder of the Residual Interests of securitization trusts . . . . FFELP Loan borrowers may be eligible for various existing income-based repayment programs under which borrowers can qualify for reduced or zero monthly payment or even debt forgiveness after a certain number of years of repayment. . . . [I]f the prepayment rate is especially slow and certain rights of the sellers or the servicer are not exercised or are insufficient or other action is not taken to counter the slower prepayment rate, the trust's bonds may not be repaid by their legal final maturity date(s), which could result in an event of default under the underlying securitization agreements.") (emphasis omitted).[6]

At bottom, the Bureau has not received emails relating to reviews and risk management analyses done for investors and trustees of loan securitization trusts, despite the Bureau's requests for such information and the relevance of the information to this case. The fact that emails for key custodians were not searched on this issue is a significant deficiency in Defendants' productions.

3.    **The complaint need not have specifically mentioned securitization for the Bureau to be entitled to discovery on the issue**: In the Third Circuit, "[i]t is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999). Thus, "[r]elevancy is broadly construed for discovery purposes and is not limited to the

---

[4] The full document is also available at https://navient.com/assets/about/investors/debtasset/Navient-Comments-to-Moody%27s-Proposed-FFELP-ABS-Rating-Methodology.pdf.

[5] The full 10-K from 2012 is available at: https://navient.com/assets/about/investors/shareholder/annual-reports/201210K.pdf.  Only excerpts are included in the appendix to this letter.

[6] The full 10-K from 2015 is available at: https://navient.com/assets/about/investors/shareholder/annual-reports/NAVI_2015_Form_10-K_2-25-16_Final.pdf.  Only excerpts are included in the appendix to this letter.

precise issues set out in the pleadings." *Frank Brunckhorst Co. v. Ihm*, 2012 WL 5250399, at *3 (E.D. Pa. Oct. 23, 2012) (quotation omitted); *accord, e.g., United States ex rel Krahling v. Merck & Co.*, 2016 WL 7042203, at *2 (E.D. Pa. Feb. 5, 2016). Accordingly, "discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action." *American Health Sys., Inc. v. Liberty Health Sys.*, 1991 WL 30726, at *2 (E.D. Pa. 1991).

Under this standard, discovery of emails relating to securitization should be allowed. An issue in the case is whether Navient derived an unreasonable advantage through its conduct of steering borrowers into forbearance, by fostering in borrowers a reliance on Navient to give adequate advice about repayment options, and then exploiting that reliance to its benefit by not adequately advising borrowers about IDR plans. Another issue in the case is the problematic recertification practices of Navient with respect to borrowers who did enroll in IDR plans. The Bureau is entitled to explore whether Navient's conduct was motivated by concerns from investors about the impact of IDR plans on the value of securitized student loans.

4. **Requiring searches of new custodians is appropriate where the responding party's selection of custodians is found to be insufficient:** The burden of selecting appropriate custodians for document productions lies with the responding party. *See, e.g., California Earthquake Auth. v. Metro. W. Secs., LLC*, 2012 WL 5880345, at *5 (E.D. Cal. Nov. 21, 2012) ("[T]he burden to identify appropriate custodians is on [the producing party], not [the requesting party]."); "The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production," *The Sedona Conference Journal* 19:1, at 124 (2018) ("a responding party cannot unilaterally demand the requesting party submit proposed search terms and a list of custodians against which to run the search terms, or use the requesting party's reluctance to provide search terms as a shield to defend its own inadequate search terms").

Indeed, Defendants represented in their written responses and objections to the Bureau's requests for production that the custodians they would search were "principally responsible" for the issues that are the subject matter of the Bureau's requests. *See, e.g.*, A131. The Bureau relied on those representations without agreeing that Defendants identified the appropriate custodians. Yet Defendants apparently did not do an email search from any custodian who was principally responsible for loan securitization. Instead, Defendants merely produced some non-email documents (such as board meeting materials and publicly available shareholder information) relating to securitization.

In situations where a responding party's choice of custodians is deemed to be deficient, courts have often required searches of additional custodians. *See, e.g., Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 269 F.R.D. 609, 617 (S.D. W.Va. 2010) (compelling production from nine additional custodians). A search of additional custodians is especially appropriate where deficiencies have been discovered, and the amount in controversy is significant. *See, e.g., Greater New York Taxi Ass'n v. City of New York*, 2017 WL 4012051, at *5 (S.D.N.Y. Sept. 11, 2017) (compelling production from four additional custodians, in addition to previous searches of 31 custodians, "[g]iven the seriousness of the allegations" and the fact that "tens of millions of dollars" in damages were at stake); *City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5055241, at *3 (D.N.J. Aug. 21, 2015) ("allowing plaintiffs a moderate number of additional custodians does not seem disproportionate to the size and scale of this action").

Defendants have argued that they have already produced a large volume of documents in this case, but that argument says nothing about whether the custodians they chose were the correct

ones, nor whether they omitted custodians who should have been included. Simply put, "[t]he mere fact that many documents have already been produced is not sufficient to establish that there are no other relevant materials to be found." *Family Wireless #1, LLC v. Auto. Techs., Inc.*, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) (compelling production from three additional custodians). Indeed, "the total number of documents 'harvested' is not a particularly compelling statistic by itself, because it says nothing about the possible significance of the documents and may in fact reflect an inefficient search protocol." *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, 2012 WL 5927379, at *2 (S.D.N.Y. Nov. 21, 2012); *accord, e.g., Dryer v. Nat'l Football League*, 2012 WL 12895563, at *2, 7 (D. Minn. May 21, 2012) (ordering search of additional custodian despite producing party's argument that hundreds of thousands of documents had already been produced).

As one court noted in requiring searches of additional custodians, a plaintiff can come into possession of information in discovery demonstrating that the defendants' custodian choices were deficient, and requiring searches of additional custodians is appropriate in such a situation:

> Although the Court is aware that the parties did agree upon certain custodians, it is always possible that Plaintiff, who has less information about Defendants' documents and custodians than Defendants have, will identify additional custodians after some process of education. Given the unequal information of the parties, the Court finds that Plaintiff's request is reasonable. And given the clearly relevant nature of the information sought, the Court orders Defendants to produce this information as requested by Plaintiff.

*Shenwick v. Twitter, Inc.*, 2018 WL 1801290, at *3 (N.D. Cal. Apr. 12, 2018). This is particularly the case here: the Bureau was not in a position to know the identities of the appropriate custodians relating to securitization issues, but it has now become apparent that Defendants did not search the emails of *any* key custodians on this issue.

Accordingly, the Bureau respectfully requests that Defendants be required to conduct email searches of the key custodians responsible for reviews and risk analyses done for investors or trustees of student loan asset-backed securitization trusts containing FFELP loans, including reviews and risk analyses relating to the impact of enrollment of FFELP borrowers in IDR plans.

Respectfully submitted,

/s/ Nicholas Jabbour