## **APPENDIX TO BUREAU'S FEBRUARY 18, 2019 LETTER**

| Exhibit | Date of exhibit | Description of exhibit | Beginning page number |
|---------|-----------------|------------------------|-----------------------|
| 1 | December 31, 2012 | SLM Corporation form 10-K for 2012 (excerpts) | A1 |
| 2 | July 9, 2015 | Moody's Investors Service, "Moody's proposes changes to approach to rating US ABS FFELP securitizations" | A6 |
| 3 | October 19, 2015 | Navient's letter to Moody's Investors Service | A11 |
| 4 | December 31, 2015 | Navient Corporation form 10-K for 2015 (excerpts) | A83 |
| 5 | August 21, 2017 | Defendants Navient Corporation's Objections and Responses to Plaintiff's First Set of Requests for Production | A87 |
| 6 | August 21, 2017 | Defendant Navient Solutions, LLC's Objections and Responses to Plaintiff's First Set of Requests for Production | A114 |
| 7 | May 16, 2018 | Letter from Bureau's counsel to Defendants' counsel | A162 |

# Exhibit 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                    to

Commission file numbers 001-13251

# SLM Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| **Delaware** | **52-2013874** |
|---|---|
| *(State of Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **300 Continental Drive, Newark, Delaware** | **19713** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

**(302) 283-8000**
*(Registrant's Telephone Number, Including Area Code)*

Securities registered pursuant to Section 12(b) of the Act
Common Stock, par value $.20 per share.
Name of Exchange on which Listed:
The NASDAQ Global Select Market
6.97% Cumulative Redeemable Preferred Stock, Series A, par value $.20 per share
Floating Rate Non-Cumulative Preferred Stock, Series B, par value $.20 per share
Name of Exchange on which Listed:
The NASDAQ Global Select Market
Medium Term Notes, Series A, CPI-Linked Notes due 2017
Medium Term Notes, Series A, CPI-Linked Notes due 2018
6% Senior Notes due December 15, 2043
Name of Exchange on which Listed:
The NASDAQ Global Select Market
Securities registered pursuant to Section 12(g) of the Act:
None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑                                                                      Accelerated filer ☐
Non-accelerated filer ☐                                                           Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2012 was $7.3 billion (based on closing sale price of $15.71 per share as reported for the NASDAQ Global Select Market).

As of January 31, 2013, there were 453,341,352 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement relating to the registrant's Annual Meeting of Shareholders scheduled to be held on May 30, 2013 are incorporated by reference into Part III of this Report.

The Bank's ability to pay dividends is subject to the laws of Utah and the regulations of the FDIC. Generally, under Utah's industrial bank laws and regulations as well as FDIC regulations, the Bank may pay dividends from its net profits without regulatory approval if, following the payment of the dividend, the Bank's capital and surplus would not be impaired. While applicable Utah and FDIC regulations differ in approach as to determinations of impairment of capital and surplus, neither method of determination has historically required the Bank to obtain consent to the payment of dividends. For the years ended December 31, 2012, 2011 and 2010, the Bank paid dividends of $420 million, $100 million and $400 million, respectively.

For further discussion of our various sources of liquidity, such as the ED Conduit Program, the Bank, our continued access to the ABS market, our asset-backed financing facilities, the lending agreement we entered into with the FHLB-DM and our issuance of unsecured debt, see "Note 6 — Borrowings."

The following table reconciles encumbered and unencumbered assets and their net impact on total tangible equity.

|  | December 31, | |
|---|---|---|
| (Dollars in billions) | 2012 | 2011 |
| Net assets of consolidated variable interest entities (encumbered assets) — FFELP Loans | $  6.6 | $  7.4 |
| Net assets of consolidated variable interest entities (encumbered assets) — Private Education Loans | 6.6 | 5.5 |
| Tangible unencumbered assets[1] | 21.2 | 20.2 |
| Unsecured debt | (26.7) | (24.1) |
| Mark-to-market on unsecured hedged debt[2] | (1.7) | (1.9) |
| Other liabilities, net | (1.4) | (2.3) |
| Total tangible equity | $  4.6 | $  4.8 |

[1]  Excludes goodwill and acquired intangible assets.

[2]  At December 31, 2012 and 2011, there were $1.4 billion and $1.6 billion, respectively, of net gains on derivatives hedging this debt in unencumbered assets, which partially offset these losses.

### 2012 Transactions

On January 13, 2012, the FFELP ABCP Facility was amended to increase the amount available to $7.5 billion, reflecting an increase of $2.5 billion over the previously scheduled facility reduction. In addition, the amendment extends the final maturity date by one year to January 9, 2015 and increases the amount available at future step-down dates.

In 2012, we issued $9.7 billion of FFELP ABS in eight separate transactions and $4.2 billion of Private Education Loan ABS in five separate transactions.

Unsecured Financings:

- January 27, 2012 — issued $1.5 billion senior unsecured debt, consisting of a $750 million five-year term bond and a $750 million ten-year term bond.

- June 18, 2012 — issued $350 million unsecured debt with an average life of 4.5 years.

- September 12, 2012 — issued an $800 million senior unsecured bond, consisting of a $300 million three-year term bond and $500 million five-year term bond.

### Shareholder Distributions

On January 26, 2012, we increased our quarterly dividend on our common stock to $0.125 per common share. We paid our quarterly dividend on March 16, 2012, June 15, 2012, September 12, 2012 and December 21,

**SLM CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.   Borrowings (Continued)**

### ED Funding Programs

#### ED Purchase and Participation Programs

In August 2008, ED implemented the Purchase Program and the Participation Program pursuant to The Ensuring Continued Access to Student Loans Act of 2008 ("ECASLA"). Under the Purchase Program, ED purchased eligible FFELP Loans at a price equal to the sum of (i) par value, (ii) accrued interest, (iii) the one percent origination fee paid to ED, and (iv) a fixed amount of $75 per loan. Under the Participation Program, ED provided short-term liquidity to FFELP lenders by purchasing participation interests in pools of FFELP Loans. FFELP lenders were charged a rate equal to the preceding quarter commercial paper rate plus 0.50 percent on the principal amount of participation interests outstanding. Loans eligible for the Participation or Purchase Programs were limited to FFELP Stafford or PLUS Loans, first disbursed on or after May 1, 2008 but no later than July 1, 2010, with no ongoing borrower benefits other than permitted rate reductions of 0.25 percent for automatic payment processing. In October 2010, we sold $20.4 billion of loans to ED and paid off $20.3 billion of advances outstanding under the Participation Program. This program is no longer in effect and is not available as a source of funding.

#### ED Conduit Program

Pursuant to ECASLA, on January 15, 2009, ED announced they would purchase eligible FFELP Stafford and PLUS Loans from a conduit vehicle established to provide funding for eligible student lenders (the "ED Conduit Program"). Loans eligible for the ED Conduit Program must be first disbursed on or after October 1, 2003, but not later than July 1, 2009, and fully disbursed before September 30, 2009, and meet certain other requirements, including those relating to borrower benefits. The ED Conduit Program was launched on May 11, 2009 and accepted eligible loans through July 1, 2010. The ED Conduit Program expires on January 19, 2014. Funding for the ED Conduit Program is provided by the capital markets at a cost based on market rates, with us being advanced 97 percent of the student loan face amount. If the conduit does not have sufficient funds to make the required payments on the notes issued by the conduit, then the notes will be repaid with funds from the Federal Financing Bank ("FFB"). The FFB will hold the notes for a short period of time and, if at the end of that time, the notes still cannot be paid off, the underlying FFELP Loans that serve as collateral to the ED Conduit will be sold to ED through a put agreement at a price of 97 percent of the face amount of the loans. Our intent is to term securitize the loans in the facility before the facility expires. Any loans that remain in the facility as of the expiration date will be sold to ED at a price of 97 percent of the face amount of the loans. At December 31, 2012 and 2011, we had $9.5 billion and $21.2 billion, respectively, in principal amount of FFELP Loans remaining in the ED Conduit Program.

#### Asset-Backed Financing Facilities

#### FFELP ABCP Facility

The maximum facility amount is $7.5 billion. The scheduled maturity date of the facility is January 9, 2015. The usage fee for the facility is 0.50 percent over the applicable funding rate. The amended facility features two contractual step-down reductions on the amount available for borrowing. The first reduction was on January 11, 2013, to $6.5 billion. The second reduction is on January 10, 2014, to $5.5 billion.

Our borrowings under the FFELP ABCP Facility are non-recourse. The maximum amount we may borrow under the FFELP ABCP Facility is limited based on certain factors, including market conditions and the fair value of student loans in the facility. In addition to the funding limits described above, funding under the FFELP

**SLM CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**6.  Borrowings (Continued)**

ABCP Facility is subject to usual and customary conditions. The FFELP ABCP Facility is subject to termination under certain circumstances. In addition, the facility has financial covenants that if not maintained, will cause the facility to become an amortizing facility. The covenants are, however, curable. The principal financial covenants require us to maintain consolidated tangible net worth of at least $1.38 billion at all times. Consolidated tangible net worth as calculated for purposes of this covenant was $3.4 billion as of December 31, 2012. The covenants also require us to meet either a minimum interest coverage ratio or a minimum net adjusted revenue test based on the four preceding quarters' adjusted "Core Earnings" financial performance. We were compliant with both of the minimum interest coverage ratio and the minimum net adjusted revenue tests as of the quarter ended December 31, 2012. Increases in the borrowing rate of up to LIBOR plus 4.50 percent could occur if certain asset coverage ratio thresholds are not met. If liquidity agreements are not renewed on the trigger dates, the usage fee increases to 1.00 percent over the applicable funding rate on January 10, 2014. Failure to pay off the FFELP ABCP Facility on the maturity date or to reduce amounts outstanding below the annual maximum step downs will result in a 90-day extension of the facility with the interest rate increasing from LIBOR plus 1.00 percent to LIBOR plus 2.00 percent over that period. If, at the end of the 90-day extension, these required paydown amounts have not been made, the collateral can be foreclosed upon. As of December 31, 2012, there was approximately $4.2 billion outstanding in this facility. The book basis of the assets securing this facility at December 31, 2012 was $4.5 billion.

*Private Education Loan ABCP Facility*

On October 5, 2011, we closed on a $3.4 billion asset-backed commercial paper facility, which matures in January 2014, to fund the call of certain Private Education Loan trust securities issued under the TALF program. The cost of borrowing under the facility is commercial paper issuance cost plus 1.10 percent, excluding up-front commitment and unused fees. The maximum amount that can be financed steps down to $2.5 billion on July 25, 2012, $1.7 billion on January 25, 2013 and $0.8 billion on July 25, 2013 with final maturity on January 27, 2014. If the amount outstanding is greater than the maximum amount at any step down, the cost increases to commercial paper issuance cost plus 1.95 percent. Our borrowings under the facility are non-recourse. On November 15, 2011, the facility provided the financing to call the outstanding securities issued by SLM Private Education Loan Trust 2009-B ($2.5 billion principal) at its call price of 93 percent of par. On January 17, 2012 the facility was also used to call the outstanding securities issued by SLM Private Education Loan Trust 2009-C ($1.0 billion principal) at its call price of 94 percent of par. At December 31, 2012, there was $1.1 billion outstanding in this facility. The book basis of the assets securing the facility at December 31, 2012 was $1.8 billion.

*SLC Acquisition Financing*

On December 31, 2010, we closed on our agreement to purchase an interest in $26.1 billion of securitized federal student loans and related assets from the Student Loan Corporation ("SLC"), a subsidiary of Citibank, N.A. The purchase price was approximately $1.1 billion. The transaction was funded by a 5-year term loan provided by Citibank in an amount equal to the purchase price. The loan is secured by the purchased assets and guaranteed by us. The loan bears interest at a rate of LIBOR plus 4.50 percent, and is subject to scheduled quarterly principal payments of the lesser of (i) 2.5 percent of the original principal amount of the term loan or (ii) the residual cash flow derived from the assets securing the loan. In addition, the remaining balance is due on December 31, 2015. Residual cash flow in excess of that needed to make quarterly principal payments is restricted but we are permitted, at our option, to prepay the obligation, in whole or in part, at any time without penalty.

# Exhibit 2



**Announcement:** **Moody's proposes changes to approach to rating US ABS FFELP securitizations**

09 Jul 2015

New York, July 09, 2015 -- Moody's Investors Service has published a Request for Comment (RFC)  proposing changes to the cash flow assumptions the agency uses in its  approach to rating US Federal Family Education Loan Program (FFELP) securitizations.

Moody's proposals to adjust its current assumptions regarding defaults,  voluntary prepayments, deferment and forbearance, and to introduce a new assumption to address the Income-based Repayment program  (IBR), are detailed in "Request for Comment: Proposed Changes to Moody's Approach to Rating Securities Backed by FFELP Student Loans."

"Low prepayment rates, persistently high rates of deferment  and forbearance, and the growing use of IBR and other similar programs have increased the risk that some tranches will not pay off by their final  maturity dates, which would trigger an event of default for the  securitizations," says Irina Faynzilberg, a Moody's Vice President and Senior Credit Officer.

Since the recession, many student loan borrowers have struggled  to make their monthly payments. This has resulted in historically low rates of voluntary prepayments, high volumes of loans in deferment  and forbearance, and the growing popularity of IBR and other similar  programs.

"These trends have persisted despite the economic recovery and improving  employment picture, and some levels of deferment, forbearance and IBR will be sustained through the life of the FFELP loan pools,"  according to Faynzilberg "Some repayment plans can extend loan repayment  periods significantly, from the standard 10-year term for non-consolidation loans."

In April and June of this year, Moody's placed approximately  $37 billion of FFELP asset-backed securities on review for downgrade. These rating actions are available at  https://www.moodys.com/research/Moodys-reviews-for-downgrade-several-tranches-in-FFELP-student-loan--PR_322642  and

https://www.moodys.com/research/Moodys-reviews-for-downgrade-106-tranches-from-57-FFELP-student--PR_328361.

The agency identified those tranches based on the low paydown rates on  the securitized pools. If Moody's adopts the proposed assumptions,  their implementation might also affect the ratings of additional tranches  not currently on review. "If we adopt the proposed cash flow  assumptions, we expect that the ratings of downgraded tranches will  range between low investment grade and non-investment grade," says Moody's Managing Director Debash Chatterjee.

The extent of the downgrades will depend on the composition of the underlying  loan pools (non-consolidation loan pools versus consolidation loan pools), the position of the securities within the capital structure  (senior versus subordinated), the remaining time to maturity of  a tranche, and a tranche's expected repayment date relative to the final maturity date under different stress scenarios. "We  will also consider the ability and willingness of transaction sponsors to accelerate pool amortization rates by optionally repurchasing loans  from the underlying collateral pools," says Chatterjee.

Moody's invites market participants to comment on the RFC by September  7, 2015, by submitting their comments on the Request for Comment Page on www.moodys.com.

The rating agency will finalize the ratings of the tranches currently  on review, and potentially the ratings of other tranches not currently on review, after finalizing changes to the methodology.

In addition, Moody's will be hosting a teleconference on this  RFC on July 15, 2015 at 10:00 am EST. The agency invites market participants to register for the event at  http://www.cvent.com/d/trq41h/4W.

This press release is not intended to provide a summary of the proposed  methodology. For a full explanation

of the proposed methodology, please consult the RFC, now available at

http://www.moodys.com/viewresearchdoc.aspx?docid=PBS_SF412194 .

\*\*\*

NOTE TO JOURNALISTS ONLY: For more information, please call  one of our global press information hotlines: New York +1-212-553-0376, London +44-20-7772-5456, Tokyo +813-5408-4110,  Hong Kong +852-3758-1350, Sydney +61-2-9270-8141, Mexico City 001-888-779-5833, São Paulo  0800-891-2518, or Buenos Aires 0800-666-3506. You can also email us at mediarelations@moodys.com or visit our  web site at www.moodys.com.

This publication does not announce a credit rating action. For  any credit ratings referenced in this publication, please see the ratings tab on the issuer/entity page on www.moodys.com  for the most updated credit rating action information and rating history.

Irina Faynzilberg
VP - Sr Credit Officer/Manager
Structured Finance Group
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

Debashish Chatterjee
Managing Director
Structured Finance Group
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653

Releasing Office:
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 212-553-0376
SUBSCRIBERS: 212-553-1653



© 2019 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

**CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. AND ITS RATINGS AFFILIATES ("MIS") ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MOODY'S PUBLICATIONS MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED**

**BY MOODY'S ANALYTICS, INC. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.**

MOODY'S CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS OR MOODY'S PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing the Moody's publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY CREDIT RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any rating, agreed to pay to Moody's Investors Service, Inc. for ratings opinions and

A9

services rendered by it fees ranging from $1,000 to approximately $2,700,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any rating, agreed to pay to MJKK or MSFJ (as applicable) for ratings opinions and services rendered by it fees ranging from JPY125,000 to approximately JPY250,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

A10

# Exhibit 3



123 Justison Street
Wilmington, Delaware 19801

October 19, 2015

VIA ELECTRONIC MAIL

Moody's Investors Service, Inc.
7 World Trade Center
At 250 Greenwich Street
New York, New York 10007

> **Re:**   **Proposed Changes to Moody's Approach to Rating Securities Backed by FFELP Student Loans**

Ladies and Gentlemen:

Navient is pleased to have the opportunity to submit this comment letter in response to Moody's Investors Service, Inc.'s "*Proposed Changes to Moody's Approach to Rating Securities Backed by FFELP Student Loans*," which was published on July 9, 2015 (the "*Request for Comments*").  In the Request for Comments, Moody's proposes comprehensive changes to its current methodology for rating asset-backed securities backed by student loans made under the Federal Family Education Loan Program (such program, the "*FFELP*" and such securities, "*FFELP ABS*").  We welcome Moody's request for comments to the proposed methodology and we are encouraged that Moody's seeks to develop its revised methodology for rating FFELP ABS by incorporating perspectives of industry participants through this comment process.

## INTRODUCTION

The repayment activity of FFELP loans in the recent past was slower than historical norms as a result of (a) an increase in use of deferment and forbearance and a decrease in voluntary prepayments during the economic recession, (b) the introduction of various plans under the Income-Driven Repayment ("*IDR*") program, and (c) leading servicers, such as Navient, helping to reduce borrower defaults through the successful implementation of default prevention programs.  In response to this reduction in repayment activity, Moody's has proposed to make comprehensive changes to its rating methodology for evaluating FFELP ABS.  While we agree with Moody's that there have been some periods in the recent past in which repayment activity was at levels below historical norms, based on a robust analysis of segmented views of our FFELP portfolio, we believe that Moody's proposed methodology reflects a disproportionate response to the overall degree of extension risk in pools of FFELP loans.

In the Request for Comments, Moody's assumes that selected repayment trends from the period of 2008 through 2013 will continue unchanged far into the future.  However,

we believe that the lower level of repayment activity experienced during that period is an historical outlier and is not indicative of future activity for at least three reasons.

First, repayment rates began to increase in 2014, they remain on that increased trajectory today, and we expect that they will continue to increase as: (a) the economic recovery continues to gain traction, (b) payment programs, such as IDR and Pay As You Earn ("*PAYE*"), reach equilibrium levels, and (c) new programs, such as Revised Pay As You Earn ("*RePAYE*"), are implemented.

Second, rates of the use of deferment and forbearance have been declining since 2008. On a combined basis, Stafford loan deferment and forbearance use rates are at their lowest levels since early 2008.  Consolidation loan deferment and forbearance use rates are at their lowest levels since we began to track Consolidation vintage performance in 2000.

Third, data on the impacts of IDR program enrollment on long-term repayment activity is not yet mature.  In 2009, the Income-Based Repayment ("*IBR*") plan was introduced as a new repayment plan under the IDR program.[1]  Some of the borrowers who likely would have used deferment or forbearance statuses in periods prior to 2009 have been enrolling in the IBR plan instead.  FFELP loans enrolled in an IBR plan have materially different performance characteristics than FFELP loans in a deferment or forbearance status for several reasons, including the fact that IBR loans amortize over time.  Because the IBR plan was introduced relatively recently and during a period of economic recession, it is difficult to know how many FFELP borrowers are enrolling in an IBR plan to ease the transition from school until they reach their earning potential and how many are enrolling in response to higher levels of economic hardship experienced during the period of 2008 through 2013.  As a result, mature data does not yet exist regarding the impact that IBR plan enrollment will have on FFELP loan extension.

Because repayment rates have been increasing since 2014, deferment and forbearance usage has been declining since 2008, and FFELP loans enrolled in the IBR plan pay down over time, we urge Moody's not to use repayment trends from the period of 2008 through 2013 as the expected base case scenario in the revised methodology.

As a result of Moody's proposal to project selected repayment trends from the period of 2008 through 2013, the proposed methodology would assume significant extension in the term of FFELP loans and, therefore, in the lives of FFELP ABS.  However, the proposed methodology does not take into account the relationships among default, prepayment and extension performance that mitigate overall extension risk.  For example, based on our experience with FFELP loans, default risk is greater among loans that use long periods of deferment and forbearance statuses, among older loans enrolled in an IBR plan, and among aging borrowers who struggle to make loan payments over an extended period of time or whose loans are eventually paid through a

---

[1] As discussed more fully in <u>Appendix A</u> to this comment letter, the IBR plan is one of two plans available to FFELP borrowers under the Income-Driven Repayment ("IDR") program.

2

death or disability claim.  As a result of the federal guarantee inherent in FFELP loans, a default on a FFELP loan results in a payment of at least 97% of principal and interest to the FFELP ABS trust that owns the loan.

Further, the proposed methodology does not take into account the structural limitations on the duration of FFELP loans that make impossible the levels of loan extension assumed under the proposed methodology.  Under the FFELP, there are no cumulative use limits to borrowers' use of school or military deferment or of certain types of forbearance.[2]  However, other types of deferment and forbearance statuses are subject to regulatory limits on cumulative use under the FFELP or under servicing policies.

As a result of several factors, including the loan forgiveness aspect of the IBR plan, the regulatory limits under the FFELP on the cumulative use of deferments other than school-related deferments ("*hardship deferment*"), the servicing policy limits on the cumulative use of discretionary forbearance, and portfolio performance dynamics, there is an outside date by which the entire FFELP loan portfolio must have paid off, defaulted or been forgiven.  Each of those events results in a reduction of the principal balance of the FFELP loan to zero and a corresponding payment of 97% to 100% of principal and interest either by the borrower or through the guarantee process to the FFELP ABS trust that owns the loan.

In considering its revised methodology, Moody's should adopt a balanced, long-term and sustainable approach to rating FFELP ABS that mitigates the risk of unnecessary ratings volatility.  With a stated term of up to 30 years, FFELP loans – and, therefore, FFELP ABS – have very long lives that can span multiple economic cycles.  Also, the overall FFELP portfolio is mature and seasoned and retains its government guarantee.  Recognizing the fact that economic, social, regulatory and political conditions impacting FFELP loan performance have evolved, and will likely continue to evolve over the life of a FFELP loan, Moody's should adopt an approach to rating FFELP ABS that is stable through changing conditions.

Further, Moody's approach to rating FFELP ABS should not overreact to short-term variances in FFELP loan performance.  Moody's should recognize that, over time, loan performance tends to revert to historically typical levels despite short-term variances from the mean.  In our view, it is not possible to have sufficient clarity about FFELP ABS performance to take actions outside of a five-year window.

As the largest issuer of FFELP ABS with the longest history of issuing such securities, we take our leadership role seriously.  We look forward to continuing to work with Moody's and other securitization industry participants to develop appropriate, sustainable approaches to properly evaluating risks associated with FFELP ABS.

---

[2] A more detailed description of the types of deferment and forbearance statuses and their respective cumulative use limits is provided in <u>Appendix A</u> to this comment letter

3

## OVERVIEW OF FFELP LOANS

Throughout this comment letter, we refer to a number of key features of FFELP loans, including the nature of the government guarantee applicable to FFELP loans and the various types of FFELP loans (*e.g.*, Stafford, Consolidation and Non-Consolidation). We also refer to FFELP loans on the basis of their loan status (*e.g.*, in-school, grace, repayment, deferment and forbearance) or their participation in income-driven repayment plans (*e.g.*, IDR).  In Appendix A to this comment letter, we provide a high-level overview of the key features of the FFELP relevant to the concepts in this comment letter and in Moody's proposed methodology.

## DATA METHODOLOGY

Throughout this letter, we provide data to support our comments.  The methodology for presenting this data is described in Appendix B to this comment letter.

# TABLE OF CONTENTS

**I.**    **EXECUTIVE SUMMARY OF NAVIENT COMMENTS** ............................................. 8

   **A.**    **General Comments to Proposed Methodology** ............................................ 8

     1.    Reactivity to Short-Term Variances in Loan Performance ............................. 8

     2.    Projection of Dynamic Trends ...................................................................... 8

     3.    Existence of Loan Performance Backstops to Extension ............................. 8

     4.    Existence of Inherent FFEL Program Backstops to Extension ....................... 8

     5.    Clean-up Calls and Turbo Features Limit Extension ...................................... 9

     6.    Tier Responses Based on Precision of Estimates for Distant Outcomes ........ 9

     7.    Transparency Regarding Granular Ratings Actions ......................................... 9

     8.    Stable Ratings Approach ............................................................................... 9

   **B.**    **Specific Comments to Proposed Loan Performance Assumptions** .......... 10

     1.    Default Assumptions ...................................................................................... 10

     2.    Voluntary Prepayment Assumptions ............................................................. 10

     3.    Deferment and Forbearance Assumptions.................................................... 10

     4.    Income-Driven Repayment Plan Assumptions ............................................. 11

     5.    Application of Assumptions in Cash Flow Modeling ...................................... 11

**II.**    **GENERAL COMMENTS TO PROPOSED METHODOLOGY** ............................... 13

   **A.**    **Repayment rates for the period of 2008 through 2013 should not be used as the expected base case assumption.** ..................................................... 13

   **B.**    **The revised methodology should be flexible enough to recognize dynamic trends in FFELP loan performance.** ............................................. 14

   **C.**    **The revised methodology should properly acknowledge the relationships among defaults, prepayments and reduced payments that mitigate overall extension risk.** ............................................................................................... 15

   **D.**    **The revised methodology should recognize the structural limitations on the duration of FFELP loans.** ...................................................................... 16

     1.    Loan Forgiveness........................................................................................... 16

     2.    Limits on the Cumulative Use of Hardship Deferment and Discretionary Forbearance ................................................................................................... 17

     3.    How Loan Forgiveness and Deferment and Forbearance Limits Provide Structural Back-Stop to Duration .................................................................. 17

5

**E.      The revised methodology should recognize the economic realities associated with turbo features and optional servicer clean-up calls.** ........ 18

**F.      The revised methodology should tier Moody's ratings response to loan performance trends based on the precision of its loan performance outcome prediction.** ...................................................................................... 19

**G.      The revised methodology should provide more detailed guidance regarding how it will weigh the many different factors that influence whether a FFELP ABS will be paid in full by its legal final maturity date.** 19

**H.      Moody's should adopt a balanced, long-term and sustainable approach to rating FFELP ABS.** ...................................................................................... 21

**III.    COMMENTS TO MOODY'S PROPOSED LOAN PERFORMANCE ASSUMPTIONS** ...................................................................................... 22

**A.      Default Assumptions** ...................................................................... 22

1.      Default Assumption Should Incorporate Changing Future Expectations for Non-Consolidation Loans ................................................................. 23

3.      Default Assumption Should Account for Additional Factors At Play in Extension Scenarios ...................................................................... 25

**B.      Voluntary Prepayment Assumptions** ........................................... 34

1.      Use CPR1 Methodology for Calculating Voluntary Prepayments .................. 35

2.      Proposed Assumptions for Prepayment Levels Are Too Conservative ......... 36

**C.      DEFERMENT AND FORBEARANCE ASSUMPTIONS** ................................. 41

1.      Rates of Deferment and Forbearance Usage Give Distorted View of FFELP ABS Pool Performance Expectation When the Remaining Outstanding Principal Balance of the Trust Student Loans is Low .................................... 41

2.      Administrative Forbearance Should Be Excluded When Deriving the Slope of Forbearance Usage Projections .................................................... 42

3.      Deferment and Forbearance Policies and Previous Usage Limit Amount of Future Deferment and Forbearance that Can Occur ..................................... 47

4.      Pool-Wide Usage of Deferment and Forbearance Decreases as FFELP Loans Pay off, Default or Meet Criteria for Guarantee Claim Payments ....... 58

**D.      Income-Driven Repayment Assumptions** ..................................................... 59

1.      Loan Forgiveness Aspect of IBR Plan ............................................. 59

2.      Technical Considerations Relating to IDR Loans ......................................... 59

3.      IBR Loans Amortize Over Time ..................................................................... 61

4.      Older FFELP Loans Using IDR Have Higher Default Risk ............................ 63

6

**E.**    **Cash Flow Modeling Implications of Proposed Loan Performance Assumptions** ............................................................................................. 63

    1.    Revised Methodology Should Clarify How Certain Loan Performance Assumptions Will Be Established for New Transactions ............................... 63

    2.    Revised Methodology's Cash Flow Model Should Rely on Issuer-Specific Data and Transaction-Specific Data............................................................. 64

**Appendices**

**Appendix A:  Overview of FFELP Loans**
**Appendix B:  Data Methodology**

## I.  EXECUTIVE SUMMARY OF NAVIENT COMMENTS

We believe that Moody's proposed methodology reflects a disproportionate response to the overall degree of extension risk in pools of FFELP loans.  In this letter, we respectfully submit both (a) general comments regarding the proposed methodology and (b) specific comments to the loan performance assumptions in the proposed methodology**.**

### A.  General Comments to Proposed Methodology

Our general comments to Moody's proposed methodology include:

1. Reactivity to Short-Term Variances in Loan Performance

Under the proposed methodology, Moody's proposes to project selected repayment trends from the period of 2008 through 2013 unchanged far into the future.  However, repayment activity has been increasing since the beginning of 2014 and we expect that repayment activity will continue to increase.  In the revised methodology, repayment rates for the period of 2008 through 2013 should not be used as the expected base case assumptions.

2. Projection of Dynamic Trends

Under the proposed methodology, Moody's proposes to use different data periods and trend methods for each of the assumptions used to estimate future FFELP loan performance.  However, mixing these periods and methods leads to inappropriate results and does not lead to a stable rating methodology. For every loan performance assumption, the revised methodology should either: (a) establish constant loan performance assumptions based on a true, long-term average of FFELP loan performance, with deviations from the average recognized through the use of stress case scenarios, or (b) establish dynamic loan performance assumptions that are flexible enough to recognize variations across economic cycles.

3. Existence of Loan Performance Backstops to Extension

The proposed methodology does not recognize the relationships among defaults, prepayments and reduced payments that mitigate overall extension risk.  The revised methodology should: (a) consider the increased risk of default associated with high levels of assumed FFELP loan extension and (b) consider the inverse relationships among FFELP loan performance measures (*i.e.*, default activity and prepayment activity typically move in opposite directions).

4. Existence of Inherent FFEL Program Backstops to Extension

The proposed methodology also does not recognize the structural limitations on the overall duration of FFELP loans.  As a result of several factors, including the loan

forgiveness aspect of the IBR plan, regulatory limits under the FFELP on the cumulative use of hardship deferment, servicing policy limits on the cumulative use of discretionary forbearance, and portfolio dynamics, there is an outside date by which the entire FFELP loan portfolio will have paid off, defaulted or been forgiven.

### 5. Clean-up Calls and Turbo Features Limit Extension

The proposed methodology does not recognize two structural features in FFELP ABS transactions that increase the likelihood that a FFELP ABS will be paid off once the outstanding principal balance of the related trust student loans falls below 10% of the initial principal balance:  (a) turbo features and (b) optional servicer clean-up calls.  The revised methodology should recognize the economic realities associated with turbo features and optional servicer clean-up calls and should incorporate them as mitigating factors against long extension of FFELP ABS.

### 6. Tier Responses Based on Precision of Estimates for Distant Outcomes

The revised methodology should tier Moody's ratings response to loan performance trends based on the precision of its loan performance outcome predictions.  More simply, the revised methodology should recognize that the certainty of an outcome diminishes as the occurrence of that outcome becomes more distant in time.  The revised methodology should also recognize that, over time, loan performance tends to revert to historically typical levels despite short-term variances from the mean.  In our view, it is not possible to have sufficient clarity about FFELP ABS performance to take ratings actions outside of a five-year window.

### 7. Transparency Regarding Granular Ratings Actions

In the Request for Comments, Moody's acknowledges that there are many factors that influence whether a FFELP ABS will be paid in full by its legal final maturity date.  However, each of those many factors has a range of possible performance outcomes, each of which, in turn, has a corresponding degree of likelihood of occurrence.  The revised methodology should provide more detailed guidance regarding how it will weigh the many different factors that influence whether a FFELP ABS will be paid in full by its legal final maturity date, including how it will measure various types of sponsor support.

### 8. Stable Ratings Approach

Moody's should adopt a balanced, long-term and sustainable approach to rating FFELP ABS.  FFELP loans have very long stated terms that can span multiple economic cycles with significantly different effects on the payment behavior of FFELP loans.  Also, the overall FFELP portfolio is mature and seasoned and retains its government guarantee.  Therefore, Moody's should adopt an approach to rating FFELP ABS that does not overreact to short-term variances in FFELP loan performance.

9

### B. Specific Comments to Proposed Loan Performance Assumptions

Our specific comments to Moody's proposed methodology's loan performance assumptions include:

1. Default Assumptions

(a)     We agree that Moody's proposed application of defaults to the repayment balance would more appropriately capture the ongoing default risk that exists in a Stafford loan pool as it amortizes.

(b)     The revised methodology's default assumption should acknowledge that the default rates applied to a FFELP ABS trust's remaining FFELP loans may need to be adjusted over time to reflect changing future expectations for default activity.

(c)     The revised methodology should retain the existing life-of-loan approach to determine default risk for Consolidation loan pools.

(d)     The default assumptions in the revised methodology should take into account additional factors that impact default rates in extension scenarios, including the association of higher default rates with (i) FFELP loans that use long periods of deferment and forbearance, (ii) older loans enrolled in the IDR program, and (iii) aging borrowers who struggle to make payments over a long period of time or whose loans are eventually paid through a death or disability claim.

2. Voluntary Prepayment Assumptions

(a)     The revised methodology should use the CPR1 methodology[3] to calculate voluntary prepayments and should clarify how repayment dollars will be calculated.

(b)     The voluntary prepayment assumptions in the revised methodology should be increased from the levels in the proposed methodology given that: (i) improving economic conditions are likely to increase voluntary prepayment rates, (ii) loan refinancing levels have been increasing in FFELP ABS trusts since the beginning of 2014, and (iii) the new RePAYE program could potentially increase FFELP loan refinancing activity for certain borrowers in the near term.

3. Deferment and Forbearance Assumptions

(a)     The rates of deferment and forbearance usage prescribed by the proposed methodology give a distorted view of FFELP ABS pool performance expectations when the remaining outstanding principal balance of trust student loans is low.

---

[3] A detailed explanation of the CPR1 methodology is included in Section III.B.1 of this comment letter.

(b) Administrative forbearance should be excluded when deriving the slope of forbearance usage projections.

(c) The revised methodology should use more sophisticated means of analyzing the likelihood of borrowers' future use of deferment and forbearance statuses based on: (i) regulatory and servicing policy limits on the cumulative use of hardship deferment and discretionary forbearance, (ii) the progression of older FFELP loans towards those regulatory and servicing policy limits, (iii) predictions of future use of deferment and forbearance in light of borrowers' past deferment and forbearance use, and (iv) the propensity and ability of FFELP borrowers to use additional forbearance, which create a mathematical limit on the amount of extension that can occur.

(d) The revised methodology should recognize that the likelihood of additional future use of deferment and forbearance decreases as FFELP loans within the pool pay off, default or meet other criteria for a guarantee claim payment under the FFELP.

4. <u>Income-Driven Repayment Plan Assumptions</u>

(a) We agree with Moody's that it is appropriate to adjust the ratings methodology to consider the usage of IDR programs.  However, IDR usage should be modeled separately from other loan performance assumptions rather than as an adjustment factor to forbearance assumptions.

(b) The IDR assumptions in the revised methodology should recognize the loan forgiveness aspect of the IBR plan.

(c) In developing the new IDR assumption for the revised methodology, Moody's should consider the following technical aspects of the IDR program: (i) interest payments are made on certain IDR loans, (ii) IBR loans only capitalize interest upon exit from the Partial Financial Hardship ("*PFH*") period of the IBR plan, and (iii) IDR loans can be in a deferment or forbearance status.

(d) The IDR assumptions in the revised methodology should recognize that IBR loans amortize over time.

(e) The IDR assumptions in the revised methodology should recognize that older FFELP loans using IBR have higher default risk because the borrowers of those older FFELP loans enroll in the IBR plan as a result of financial struggle.

5. <u>Application of Assumptions in Cash Flow Modeling</u>

(a) The revised methodology should clarify how certain loan performance assumptions will be established for new FFELP ABS transactions.

(b)     The cash flow model for the revised methodology should rely on issuer-specific data and transaction-specific data rather than aggregate industry data when evaluating a particular FFELP ABS transaction.

[Remainder of Page Intentionally Left Blank]

12

## II.  GENERAL COMMENTS TO PROPOSED METHODOLOGY

We believe that Moody's proposed methodology reflects a disproportionate response to the overall degree of extension risk in pools of FFELP loans.

### A.  Repayment rates for the period of 2008 through 2013 should not be used as the expected base case assumption.

Under the proposed methodology, Moody's assumes that selected repayment trends from the period of 2008 through 2013 will continue unchanged far into the future. However, repayment activity for the period of 2008 through 2013 was an historical outlier.  Looking at historical repayment trends, the period of 2008 through 2013 was significantly different from prior periods: by more than one standard deviation in the early part of 2008 (Chart 1).  While repayment speeds have been low over the last six years, repayment speeds have been increasing since the beginning of 2014.



**Chart 1**
**FFELP Non-Consolidation ABS Trust CPR History[4]**

The social, regulatory, political and economic conditions giving rise to lower repayment rates during the period of 2008 through 2013 developed relatively quickly and we do not believe those conditions represent the norm.  We expect that repayment rates will

---

[4] CPR is the constant prepayment rate used to measure prepayment activities in a pool of FFELP loans. Data in Chart 1 includes loans in all Navient issued Non-Consolidation loan securitization trusts, regardless of loan servicer.  Prior to the company's separation from SLM Corporation in 2014, Navient sponsored FFELP securitizations under the name SLM.

13

increase as: (i) the economic recovery continues to gain traction, (ii) payment programs, such as IBR and PAYE, reach equilibrium levels, and (iii) new programs, such as RePAYE, are implemented.  In fact, repayment trends are already changing:  loan refinancings and prepayments are increasing while deferments, forbearances and defaults are declining.

Further, data on the impacts of IDR program enrollment on long-term repayment activity is not yet mature enough to accurately predict future repayment activity.  In 2009, the IBR plan was introduced as a new IDR repayment plan under the IDR program.  Some of the borrowers who likely would have used deferment or forbearance statuses in periods prior to 2009 have been enrolling in the IBR plan instead.  FFELP loans enrolled in an IBR plan have materially different performance characteristics than FFELP loans in a deferment or forbearance status for several reasons, including the fact that IBR loans amortize over time.  Because the IBR plan was introduced relatively recently and during a period of economic recession, it is difficult to know how many FFELP borrowers are enrolling in an IBR plan to ease the transition from the school until they reach their earning potential and how many are enrolling in response to higher levels of economic hardship experienced during the period of 2008 through 2013.  As a result, mature data does not yet exist regarding the impact that IBR plan enrollment will have on FFELP loan extension.

With a stated loan term of up to 30 years, FFELP loans – and, therefore, FFELP ABS - have very long lives that can span multiple economic cycles.  Also, the overall FFELP portfolio is mature and seasoned and retains its government guarantee.  In considering the revised methodology, Moody's should recognize that repayment rates from the period of 2008 through 2013 reflect a stress scenario.  Moody's should adopt a balanced, long-term approach to rating FFELP ABS that reflects those multiple economic cycles and mitigates the risk of unnecessary ratings volatility in the context of short-term variances in FFELP loan performance.

**B. The revised methodology should be flexible enough to recognize dynamic trends in FFELP loan performance.**

In the Request for Comments, Moody's proposed to revise its assumptions regarding rates of default, voluntary prepayments, deferment and forbearance and to add an assumption to address the growing use of the IBR plan and similar income-driven repayment programs.  However, as detailed in Moody's "*Cash Flow Modeling Guide for FFELP Student Loan ABS Using Proposed Assumptions*," Moody's proposed methodology uses different data periods and trend methods for each of the performance assumptions it uses to estimate future FFELP loan performance.  The revised methodology should incorporate a more consistent approach to selecting data periods and trend methods used to develop loan performance assumptions.

Under the proposed methodology, the expected base case assumptions for deferment and forbearance performance are set by taking the observed slope over the prior two years of performance and extrapolating that slope forward on a dynamic basis into the

14

future, subject to a floor that increases with higher ratings stresses.  However, all assumptions other than the deferment and forbearance assumptions are set by taking the average levels experienced over the most recent one-year performance period and projecting that level on a constant basis into the future.  It is unclear why Moody's uses a dynamic method to set deferment and forbearance assumptions but uses a constant method to set other performance assumptions.

Using a mixture of trends and fixed estimates to establish loan performance assumptions leads to inappropriate results.  For example, even though recent default rates have been falling, the default assumptions in the proposed methodology project that default rates will remain constant.  Also, notwithstanding the fact that recent prepayment rates have been rising and are still below their historical mean, the voluntary prepayment assumptions in the proposed methodology project that prepayments will not increase.  There is no reason to believe that these current trends in defaults and prepayments will not persist into the future.  As a result, it is unclear why Moody's would select a constant method for determining default and prepayment assumptions.

Moody's proposed approach to mixing a constant method and a dynamic method for its loan performance assumptions will not lead to a stable rating methodology.  Instead, for every loan performance assumption, the revised methodology should either (1) establish constant loan performance assumptions based on a true, long-term average of FFELP loan performance, with deviations from the average recognized through the use of stress case scenarios, or (2) establish dynamic loan performance assumptions that are flexible enough to recognize variations across economic cycles.

**C. The revised methodology should properly acknowledge the relationships among defaults, prepayments and reduced payments that mitigate overall extension risk.**

Under the proposed methodology, Moody's assumes that selected repayment trends from the period of 2008 through 2013 will continue unchanged far into the future. Therefore, its proposed methodology simultaneously incorporates low prepayment and default assumptions and above trend deferment and forbearance assumptions.  These proposed assumptions would improperly predict the extension of portfolios of FFELP loans far into the future.  The revised methodology should (1) consider the increased risk of default associated with high levels of assumed FFELP loan extension and (2) consider the long-term inverse relationships among FFELP loan performance measures.

The proposed methodology does not acknowledge the relationships among defaults, prepayments and reduced payments that mitigate overall extension risk.  For example, as discussed in Section III.A.2 below, based on our experience with FFELP loans, default risk is greater among loans that use long periods of deferment and forbearance, among older FFELP loans enrolled in an IBR plan, and among aging borrowers who struggle to make loan payments over a long period of time or whose loans are

15

eventually paid through a death or disability claim.  Because of the government guarantee of at least 97% of principal and interest, FFELP loan defaults accelerate the repayment rate of FFELP loan pools.  Therefore, the revised methodology should properly consider the increased risk of default associated with high levels of assumed FFELP loan extension.

Further, the proposed methodology does not recognize the typical inverse relationships among FFELP loan performance measures.  Defaults and prepayments typically move in opposite directions.  In a stressed economic environment, some borrowers encounter hardships that cause them to default while other borrowers tend to conserve their cash as a buffer against economic hardship instead of making voluntary prepayments.  Then, as the economy improves, defaults tend to decline and prepayments increase as borrowers who were conserving cash regain willingness to use their cash to retire debt.

Under the proposed methodology, Moody's assumes that the typical relationships among these FFELP loan performance measures will break down.  However, that view is not supported by historical activity.  We agree that short-term scenarios could conceivably cause distortion of the typical inverse relationships among loan performance measures.  However, those distortions are not sufficiently likely to occur to justify their inclusion in Moody's expected base case assumptions.  Even in stress scenarios, it is not likely that those distortions, should they occur, would persist across the very long lives of FFELP loans.  Therefore, the revised methodology should recognize the typical long-term inverse relationships among FFELP loan performance measures.

### D. The revised methodology should recognize the structural limitations on the duration of FFELP loans.

Moody's proposed methodology ignores the structural limitations on the duration of FFELP loans that make impossible the levels of assumed loan extension in the proposed methodology.  As a result several factors, including the loan forgiveness aspect of the IBR plan, regulatory limits under the FFELP on the cumulative use of hardship deferment, servicing policy limits on the cumulative use of discretionary forbearance, and portfolio performance dynamics, there is an outside date by which the entire FFELP loan portfolio will have paid off, defaulted or been forgiven.  Each of those events results in a reduction of the principal balance of the FFELP loan to zero and a corresponding payment of at least 97% of principal and interest to the FFELP ABS trust that owns the FFELP loan.

#### 1. Loan Forgiveness

The proposed methodology does not consider the loan performance implications of the loan forgiveness aspect of the IBR plan.  As discussed more fully in Appendix A to this comment letter, FFELP loans that have been enrolled in an IBR plan at any point in their lifetime are eligible for loan forgiveness on the later of 25 years following the qualification date and 25 years of qualifying payments made (including periods where

the calculated payment was zero).  When a FFELP loan is forgiven, the principal balance of the loan is reduced to zero and a corresponding payment equal to 100% of principal and interest is made to the FFELP ABS trust that owns the FFELP loan.

Generally, borrowers with low incomes relative to their debt are likely to become eligible for loan forgiveness.  Given the distribution of the current IBR loan portfolio by current aggregate outstanding principal balance, we project that, depending on borrowers' future salaries, between 22% and 76% of FFELP loans that are currently in the PFH period of an IBR plan will become eligible for loan forgiveness.

### 2. Limits on the Cumulative Use of Hardship Deferment and Discretionary Forbearance

The proposed methodology does not properly consider regulatory and servicing policy limits on the cumulative use of hardship deferment and discretionary forbearance statuses.  While school-related deferments do not have a cumulative use limit in the FFELP, hardship deferment (which includes all deferments other than school-related deferments) is limited under the FFELP to a cumulative maximum use of 36 months. Also, as described more fully in Section III.C.3(b)(ii) below, Navient's servicing policy is to give no more than 60 months of cumulative discretionary forbearance with only limited exceptions.

### 3. How Loan Forgiveness and Deferment and Forbearance Limits Provide Structural Back-Stop to Duration

A FFELP borrower's use of deferment and forbearance statuses and enrollment in the IDR program individually or in various combinations can generate extension risk. Except in rare instances or where a borrower remains in school for extended periods of time, the final payoff date for any FFELP loan will not extend past the year 2048.[5] Further, FFELP loans (other than those that have used in-school deferment) that are eligible for loan forgiveness will be paid off between the years 2034 and 2039.

Approximately 5.4% of our FFELP ABS trusts' loans are currently using in-school deferment.  On a relative basis, the usage of in-school deferment has declined by 10% over the last year and is down to half the peak level experienced at the end of 2006. Given this downward trajectory and the fact that there is no other way for a FFELP loan to be outstanding past the year 2048, Moody's projected legal final maturity dates for outstanding FFELP ABS transactions in the 2050s and later are not supportable.

---

[5] Stafford loans cannot extend past the year 2048.  Consolidation loans may extend past the year 2048 only if they (a) enroll in the IBR plan in the future, (b) have not used hardship deferment or IBR in the past, (c) do not elect Expedited Standard option, and (d) do not otherwise pay off.

**E. The revised methodology should recognize the economic realities associated with turbo features and optional servicer clean-up calls.**

The proposed methodology does not recognize two economic realities that impact the likelihood that a FFELP ABS will be paid off once the outstanding principal balance of the trust student loans falls below 10% of the initial principal balance.

First, all of Navient's FFELP ABS transaction structures incorporate a turbo feature that requires that, after the outstanding principal balance of the trust student loans falls below 10% of the initial principal balance, cash collections that otherwise would have been released to the holder of the residual interest in the FFELP ABS trust instead will be applied to make principal payments on the outstanding FFELP ABS until they are reduced to zero. This turbo feature is an inherent structural feature of the FFELP ABS trust that obligates the trust to make bond payments rather than an option on the part of the servicer or any other party. As a result, the cash flow model under the revised methodology should assume that this turbo of the FFELP ABS will occur pursuant to the terms of the transaction documents and should use reasonable assumptions based on historical experience regarding the amount of trustee fees and other trust payment obligations that could disrupt payments to the FFELP ABS in a turbo scenario.

Second, Navient's FFELP ABS transaction structures typically give the servicer the right to exercise an optional purchase of all remaining trust student loans once the outstanding principal balance of the trust student loans falls below 10% of the initial principal balance (an "*optional servicer clean-up call*")[6] Because the call is an option rather than an obligation of the servicer, Moody's has not historically assumed that the optional servicer clean-up call will occur in the A and AAA cases to which recent FFELP ABS transactions have been rated. However, in the new extension scenarios proposed by Moody's, each FFELP ABS transaction now has a point in time after which the amount of cash collections coming into the trust with respect to the underlying FFELP loans will be less than the fixed costs of the trust (including servicing fees, administration fees and trustee fees), but the servicer's cost of conducting an optional servicer clean-up could be minimal.

Under Moody's proposed assumptions, FFELP ABS transactions experience significant loan extension in later simulation periods where the remaining outstanding principal balance of the trust student loans is very low. For example, in Moody's expected base case for the SLM Student Loan Trust 2006-1, there are more than eight years during which the FFELP ABS trust's quarterly cash flows are projected to be less than the trust's administration fee alone. The remaining pool balance when the quarterly cash flows are less than the quarterly administration fee is less than $200,000. During that time, as a result of the turbo feature, cash collections will be applied to make payments on the FFELP ABS instead of being released to the holder of the residual interest in the

---

[6] The SLM Student Loan Trust 2004-10 transaction includes a turbo feature but it is triggered only once the outstanding principal balance of the trust student loans falls below 5% (instead of 10%) of the initial principal balance.

trust.  In that case, the servicer would have a clear economic incentive to exercise the optional servicer clean-up call.

The revised methodology should assume the exercise of the optional servicer clean-up call when the economics become compelling (*i.e.*, when the amount of cash collections are less than the fixed costs of the trust) and the liquidity required to do so is minimal.

**F.  The revised methodology should tier Moody's ratings response to loan performance trends based on the precision of its loan performance outcome prediction.**

The revised methodology should recognize that the certainty of an outcome diminishes as the occurrence of that outcome becomes more distant in time.  The revised methodology should also recognize that, over time, loan performance tends to revert to historically typical levels despite short-term variances from the mean.  When developing the rating methodology for a long-term asset like FFELP ABS, Moody's should tier its ratings response to loan performance trends based on the precision of its loan performance prediction in light of the duration.

For example, assume that the rating methodology predicts that one FFELP ABS ("*Bond A*") will miss payment on its legal final maturity date by one calendar quarter one year from now and also predicts that a different FFELP ABS ("*Bond B*") will miss payment on its legal final maturity date by one calendar quarter ten years from now.  The rating methodology should accommodate Moody's taking action with respect to Bond A but not Bond B because of the lack of certainty of the Bond B estimate in light of historical variability.

In our view, it is not possible to have sufficient clarity about FFELP ABS performance to take ratings actions in surveillance activities outside of a five-year window.  As Moody's itself noted in its April 2015 Ratings Action[7]:

> "the ratings actions are focusing on tranches that mature in the next five years because they are at most risk of breaching legal final maturity dates. <u>Tranches that mature after that could benefit from higher voluntary repayments and lower deferment and forbearance rates as economic conditions continue to improve</u>" (emphasis added).

**G.  The revised methodology should provide more detailed guidance regarding how it will weigh the many different factors that influence whether a FFELP ABS will be paid in full by its legal final maturity date.**

As Moody's acknowledges in its Request for Comments, there are many factors that influence whether a FFELP ABS will be paid by its legal final maturity date, including the underlying pool composition, the position of the ABS in the trust's capital structure, the

---

[7] Moody's Rating Action, "*Moody's reviews for downgrade several tranches in FFELP student loan securitizations as a result of the risk of default at maturity*" (April 8, 2015).

A30

time remaining to maturity, the expected payment date relative to the current legal final maturity date, and the aggregate outstanding principal balance at the current legal final maturity date.  Each of those many factors has a range of possible performance outcomes, each of which, in turn, has a corresponding range of degree of likelihood of occurrence.  To provide stability and transparency in the ratings process, Moody's should provide additional guidance on how the granular ratings levels will be determined under the revised methodology, including greater clarity regarding the nature and relative importance of these factors and the positive or negative ratings impact of each.

In the Request for Comments, Moody's identified several key factors to be considered under the proposed methodology relating to sponsor support, including the level of loan purchases permitted under the relevant transaction documents (including the legal impact of those purchase levels on true sale or non-consolidation opinions), the demonstrated willingness of the sponsor to exercise those support mechanisms, the sponsor's creditworthiness and liquidity position, and the sponsor's reliance on the securitization markets.  We respectfully request that Moody's revise the proposed methodology to (a) provide clarity and detail on the relative importance of these factors and how the factors would combine to impact granular ratings levels and (b) to take into account other types of sponsor support that reduce the likelihood of non-payment of a FFELP ABS, including, without limitation, subordinated lending arrangements made available to the FFELP ABS trust or optional servicer clean-up calls.

In response to the recent trends in repayment rates of FFELP loans, Moody's has placed 51 Navient-sponsored FFELP ABS trusts on watch for downgrade.  Of the trusts on watch for downgrade, six will have been paid in full through the exercise of the optional servicer clean-up call by the end of October 2015.

As the largest issuer of FFELP ABS with the longest history of issuing such securities, we take our leadership role seriously and we are working with rating agencies, trustees and investors to create and deploy means of addressing concerns relating to repayment activity.  Examples include:

  (1) <u>Exercise Optional Servicer Clean-Up Calls</u>:  As of the end of October 2015, we will have exercised our 10% optional servicer clean-up call with respect to eight Navient-sponsored FFELP ABS trusts in 2015.

  (2) <u>Exercise Optional Servicer Purchases</u>:  We have amended the servicing agreements for 33 Navient-sponsored FFELP ABS trusts to incorporate a servicer right to purchase trust student loans aggregating up to 10% of the trust's initial pool balance.  As demonstrated in our trust reports, we have been exercising our optional servicer purchase rights.

  (3) <u>Amend to Add Revolving Credit Agreements</u>:  We have amended the administration agreements and indentures for 16 Navient-sponsored FFELP ABS trusts to incorporate a subordinated revolving credit agreement pursuant to which Navient Corporation can provide liquidity financing to the trust.

20

(4)    <u>Disclosure of Loan Performance Data</u>:  In response to requests for information from investors, rating agencies and other market participants, we: (a) enhanced our quarterly reporting spreadsheets to provide additional information on (i) the level of enrollment in the IDR program, (ii) the payments owed by FFELP loans enrolled in the IDR program, (iii) the distribution of FFELP loans in a deferment status between school deferment and hardship deferment; and (iv) the distribution of FFELP loans in a forbearance status between discretionary forbearance and other types of forbearance; and (b) released a FFELP loan repayment data package disclosing performance trends in deferment, forbearance, defaults, prepayments and income-driven repayment.

(5)    <u>Enhanced Means for Investor Communication</u>:  We launched a new online investor forum designed to facilitate communication with investors in Navient-sponsored FFELP ABS.  Through this online forum, investors can register to receive notifications regarding their FFELP ABS and can also communicate with Navient and directly with other investors through identity-protected messages.

Through these activities, Navient has already taken actions that counteract some of Moody's concerns.  For example, in October 2015, we released performance reports with respect to 81 FFELP ABS trusts disclosing new performance and cash flow data. This data shows the observable effects of exercise of additional optional servicer loan purchases and additional optional servicer clean-up calls.  We believe that data over the coming months will further demonstrate the beneficial impact of sponsor support. Moody's should review the impact of these and similar actions by sponsors and other market participants before finalizing the revised methodology.

## H. Moody's should adopt a balanced, long-term and sustainable approach to rating FFELP ABS.

In considering its revised methodology, Moody's should adopt a balanced, long-term and sustainable approach to rating FFELP ABS that mitigates the risk of unnecessary ratings volatility.  As noted above, FFELP loans have very long stated terms that can span multiple economic cycles with significantly different effects on the payment behavior of FFELP loans.  Further, FFELP loans are subject to a variety of economic, social, regulatory and political conditions that can change quickly and can impact the timing of payments on the loans.  Despite those changing conditions, Moody's should not lose sight of the fact that FFELP loans will ultimately be repaid either by the borrowers themselves, through loan forgiveness or through the guarantee process. Therefore, Moody's should adopt an approach to rating FFELP ABS that accurately reflects those changing conditions.

In Moody's most recent FFELP ABS methodology revision, released in 2012, the most significant stresses on prepayment involved stresses on the higher end (*i.e.*, as high as 18%).  However, under the proposed methodology, Moody's is now focused on stresses on the lower end (*i.e.*, as low as 0%).  If Moody's continues with this approach to

21

developing the FFELP ABS rating methodology and if, repayment activity levels increase in the near term as we expect, then it is foreseeable that Moody's would further revise its methodology to account for that improvement. However, in the case of each revision, Moody's actions would be reactive to short term trends in FFELP loan performance rather than long-term averages and would not necessarily truly reflect the likelihood of payment in full of a FFELP ABS by its legal final maturity date.

While the ratings methodology must be routinely evaluated to recognize long-term shifts in FFELP loan performance, Moody's must not overreact to short-term variances in FFELP loan performance in a manner that establishes an expected base case scenario that is actually a stress scenario. Revising the rating methodology to react to short-term variances that ideally would be accommodated within Moody's stress scenarios does not help investors identify risks associated but instead creates additional risks and market disruption.

In considering whether to project selected repayment trends from the period of 2008 through 2013 period unchanged far into the future, Moody's placed 61 FFELP ABS trusts on watch for downgrade. This has created significant disruption in a historically stable market.

## III. COMMENTS TO MOODY'S PROPOSED LOAN PERFORMANCE ASSUMPTIONS

In the Request for Comments, Moody's proposes to revise its loan performance assumptions regarding rates of default, voluntary prepayments, deferment and forbearance and to add an assumption to address the growing use of the IBR plan and similar programs. In this Section III, we provide comments to each of the loan performance assumptions in the proposed methodology. We also provide comments regarding certain cash flow modeling implications under the proposed loan performance assumptions.

### A. Default Assumptions

Because of the government guarantee of at least 97%, FFELP loan defaults accelerate the repayment rate of FFELP loan pools. In the Request for Comments, Moody's proposes to alter its default assumption to a single constant rate of default of outstanding loans in repayment during the entire life of the FFELP ABS transaction. As Moody's points out, the slowdown of repayment rates and the resulting lengthened lives of securitized loan pools have caused a material amount of defaults to occur after the tenth year in many FFELP ABS transactions. We agree that the mechanics of Moody's default rate methodology that apply to outstanding balances rather than the original balances would more appropriately capture the ongoing default risk in a Stafford loan pool as it amortizes. However, the revised methodology should acknowledge that default rates applied to a FFELP ABS trust's remaining FFELP loans may need to be adjusted over time. We believe that the proposed methodology should be modified (1) to recognize trends in default performance in the Stafford loan portfolio, (2) to retain

22

the existing life-of-loan approach to evaluating default risk for pools of Consolidation loans, and (3) to account for additional factors that may impact default rates.

1. Default Assumption Should Incorporate Changing Future Expectations for Non-Consolidation Loans

Moody's existing rating methodology for FFELP ABS approaches default assumptions by estimating a cumulative default percentage over the life of the FFELP ABS transaction (the "*life-of-loan approach*").  While we agree with Moody's that, strictly mechanically, application of a default rate against the remaining repayment balance is appropriate for non-Consolidation loans as they amortize, default rates are not constant. Recent non-Consolidation loan default rates have been declining (Chart 2).

Chart 2[8]
**Non-Consolidation ABS Trust Constant Default Rates**



In addition, as we will discuss further, in scenarios that assume significant future portfolio extension, we believe that Stafford loan portfolios have back end default risks that a constant default rate does not address.  Moody's should address these potentially offsetting trends in the revised methodology.

---

[8] Data includes Navient serviced loans in all Navient sponsored Non-Consolidation loan ABS trusts.  Prior to the company's separation from SLM Corporation in 2014, Navient sponsored FFELP securitizations under the name SLM.

23

2. <u>Default Assumptions Should Retain Life-of-Loan Approach for Pools of Consolidation Loans</u>

We believe that the proposed constant default rate approach does not accurately portray the performance trend for Consolidation loans and we request that Moody's retain the existing life-of-loan approach for Consolidation loan pools. When analyzed under the life-of-loan approach, as a percentage of original principal balance, Consolidation loans have a long and low steady rate of defaults, which have also been declining recently (<u>Chart 3</u>).



**Chart 3**
**Consolidation ABS Trust Periodic Defaults by Trust Vintage**

Expressed as a percentage of the repayment balance, Consolidation loan ABS trust performance data demonstrate that annualized default rates increase for the first six years of FFELP ABS transaction performance before they stabilize (Chart 4).

**Chart 4**[9]
**Consolidation ABS Trust Annualized Defaults by Trust Vintage**



The slope of default trends in the early performance periods of Consolidation loan ABS trusts suggests an increase of 0.2% to 0.3% per year in the constant default rate.  At these rates, Moody's proposed steady constant default rate assumption, when applied to a Consolidation loan pool, is at risk of understating the actual defaults occurring by 25-30% on a relative basis after five years.

Given the predictability and less front-loaded nature of the life of loan curves for Consolidation loans, we believe Moody's would achieve more accurate cash flow expectations by continuing to use a life-of-loan approach to evaluate default rates for Consolidation loans.

3.  Default Assumption Should Account for Additional Factors At Play in Extension Scenarios

In longer FFELP loan extension scenarios, additional factors may impact default rates, including the association of higher default rates with (a) FFELP loans that use long periods of deferment and forbearance, (b) older FFELP loans enrolled in the IDR

---

[9] Data includes all Navient-sponsored Consolidation loan ABS trusts.  Prior to the company's separation from SLM Corporation in 2014, Navient sponsored FFELP securitizations under the name SLM.

program, and (c) aging borrowers who struggle to make loan payments over a longer period of time or whose loans are eventually paid through a death or disability claim.

    (a) *Default Risk Associated with Loans With Long Periods in Deferment and Forbearance Statuses*

FFELP borrowers who utilize lengthy deferment and forbearance statuses likely do so as a result of credit stress.  As a FFELP loan pool continues to age, a meaningful number of the loans that are at a heightened risk for additional use of deferment and forbearance statuses are also at an increased risk for default.  Therefore, the revised methodology should incorporate an appropriate default assumption for FFELP loans that remain in a deferment or forbearance status for long periods of time.

[Remainder of Page Intentionally Left Blank]

26

Table 1 below demonstrates average annualized default performance over a four-year period.

**Table 1**
**Risk Profile of Loans in Deferment and Forbearance**

| Annualized Default Rate by Time in Repayment (Years) | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | > 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 2.7% | | | | | | | | | | | | | | | | | | | | | |
| 1 | 2.8% | 0.6% | | | | | | | | | | | | | | | | | | | | |
| 2 | 4.7% | 1.8% | 0.3% | | | | | | | | | | | | | | | | | | | |
| 3 | 5.6% | 3.0% | 1.3% | 0.4% | | | | | | | | | | | | | | | | | | |
| 4 | 5.3% | 3.7% | 2.1% | 1.4% | 0.5% | | | | | | | | | | | | | | | | | |
| 5 | 4.5% | 4.0% | 2.3% | 1.6% | 1.1% | 0.4% | | | | | | | | | | | | | | | | |
| 6 | 5.0% | 3.9% | 2.6% | 1.7% | 1.4% | 1.0% | 0.4% | | | | | | | | | | | | | | | |
| 7 | 5.8% | 4.9% | 3.1% | 2.4% | 1.7% | 1.4% | 0.9% | 0.4% | | | | | | | | | | | | | | |
| 8 | 6.0% | 5.1% | 3.8% | 2.6% | 2.0% | 1.4% | 1.2% | 0.9% | 0.3% | | | | | | | | | | | | | |
| 9 | 6.1% | 5.3% | 4.3% | 3.1% | 2.2% | 1.8% | 1.3% | 1.1% | 0.8% | 0.3% | | | | | | | | | | | | |
| 10 | 6.3% | 5.4% | 4.6% | 3.8% | 3.1% | 2.3% | 1.9% | 1.5% | 1.1% | 0.7% | 0.4% | | | | | | | | | | | |
| 11 | 6.2% | 5.7% | 5.2% | 4.4% | 3.9% | 3.1% | 2.4% | 2.0% | 1.6% | 1.1% | 0.8% | 0.3% | | | | | | | | | | |
| 12 | 7.0% | 6.1% | 6.1% | 4.4% | 3.8% | 2.9% | 2.5% | 1.9% | 1.5% | 1.1% | 0.8% | 0.3% | 0.3% | | | | | | | | | |
| 13 | 7.6% | 7.1% | 6.0% | 5.4% | 4.7% | 4.4% | 3.4% | 2.7% | 2.6% | 1.8% | 1.4% | 1.3% | 0.8% | 0.3% | | | | | | | | |
| 14 | 8.3% | 7.8% | 6.7% | 5.2% | 5.4% | 4.7% | 4.4% | 4.5% | 3.2% | 2.4% | 2.2% | 1.3% | 0.9% | 0.9% | 0.3% | | | | | | | |
| 15 | 8.4% | 6.6% | 7.3% | 6.4% | 6.2% | 5.0% | 4.4% | 4.4% | 3.7% | 3.2% | 2.0% | 2.4% | 1.7% | 1.1% | 0.8% | 0.3% | | | | | | |
| 16 | 8.6% | 7.5% | 6.8% | 6.1% | 4.5% | 5.2% | 4.9% | 5.1% | 3.7% | 3.8% | 2.7% | 1.9% | 2.2% | 1.8% | 1.1% | 0.6% | 0.4% | | | | | |
| 17 | 8.6% | 7.9% | 6.6% | 5.3% | 5.4% | 5.4% | 5.4% | 4.3% | 4.2% | 3.4% | 2.8% | 1.8% | 2.4% | 1.5% | 1.2% | 0.9% | 0.3% | | | | | |
| 18 | 7.7% | 8.2% | 6.7% | 5.9% | 5.1% | 3.9% | 4.5% | 4.2% | 5.0% | 4.4% | 4.2% | 2.9% | 2.6% | 2.5% | 2.0% | 1.8% | 1.0% | 0.8% | 0.4% | | | |
| 19 | 6.8% | 7.1% | 7.8% | 6.9% | 5.7% | 4.6% | 4.1% | 4.1% | 4.6% | 3.4% | 6.0% | 5.9% | 4.3% | 3.0% | 2.2% | 1.7% | 0.9% | 0.7% | 0.0% | | | |
| 20 | 6.8% | 6.2% | 8.5% | 5.8% | 4.4% | 3.7% | 2.6% | 4.0% | 2.6% | 4.0% | 5.0% | 5.3% | 4.3% | 3.9% | 2.7% | 2.4% | 2.2% | 1.0% | 0.4% | 0.0% | | |
| > 20 | 8.8% | 8.7% | 9.4% | 8.8% | 7.5% | 5.6% | 5.7% | 5.8% | 5.0% | 5.4% | 5.8% | 8.3% | 6.0% | 5.2% | 4.5% | 4.1% | 2.4% | 2.7% | 1.6% | 1.8% | 1.2% | 0.7% |

Callout notes within the table:

- The diagonal represents loans which have made payments for the same number of years since they entered repayment; they are the lowest risk
- The more time has elapsed with fewer payments made, the higher the risk

The repayment portfolio distribution is concentrated along the diagonal where loans have made the same number of payments as months since the start of repayment.

The deferment and forbearance portfolios have more loans that have never made payments.

In Table 1:

- The left-hand axis shows the number of years since loans first entered repayment, and the top axis shows the number of years of payments made on the loans.
- The diagonal from left to right represents default performance for loans that have made the same number of payments as they have spent time since entering repayment.  These loans are the lowest risk, with average annualized default rates for the segments with the largest portfolio volume generally around 0.3-0.4% per year.
- Reading down the left-hand axis of the matrix gives the average annualized default rate for loans that have never made a payment.  The longer the time a borrower has been in repayment without payment demonstration, the higher potential for some loans to default.
- Reading from left to right on the chart, the more payments a loan has made in any given category of time since repayment began, the lower the risk of the loan.

The use of deferment and forbearance causes divergence between the amount of time since borrowers entered repayment and the number of payments they have made.  The larger this divergence, the longer borrowers have been struggling to make payments and the higher the risk that some of those borrowers will default.

27

A38

Tables 2 through 4 below show the distribution of the repayment, deferment and forbearance portfolios across time in repayment and payments made.  Darker shaded segments show the highest concentrations of volume.  Whereas 24% of the repayment portfolio has made the same number of payments as they have time since entering repayment, only 1% of the current deferment and forbearance populations are part of this segment.  On the other hand, while only 9% of the loans currently in repayment have never made a payment, approximately 37% of loans in deferment and forbearance have never made a payment.

**Table 2**
**Distribution of Loans in Repayment**
**Time in Repayment vs. Payments Made**



**Table 3**
**Distribution of Loans in Deferment**
**Time in Repayment vs. Payments Made**



The population of loans in deferment are more likely to have never made a payment. Only 1% have made the same number of payments as they have months since entering repayment. 37% have made 0 payments.

29

**Table 4**
**Distribution of Loans in Forbearance**
**Time in Repayment vs. Payments Made**



The population of loans in forbearance are more likely to have never made a payment. Only 1% have made the same number of payments as they have months since entering repayment. 37% have made 0 payments.

Multiplying the portfolio distribution in Tables 2 through 4 by the risk expectations in Table 1 results in different weighted average implied annualized default rates for the portfolio by loan status. The weighted average annualized default rate for loans in a repayment status is 2.2%. The weighted average annualized default rate for the loans in a deferment status is 3.7% and for loans in a forbearance status is 3.8%.

In short, a longer degree of extension means that borrowers have been struggling to make payments for long periods of time. Such long duration of payment difficulty results in a higher degree of default risk, suggesting that higher levels of defaults should be expected in portfolios that experience significant extension. However, Moody's constant default rate approach, in which projected defaults are based on current default levels, does not adequately match the increased risk of default associated with long FFELP loan durations.

Any scenario with significant assumed extension must also consider the attendant non-payment risk of the extended portfolio and the likelihood of back-end default and reimbursements through the guarantee process.

30

(b) *Default Risk Associated with Older Loans Enrolled in the IDR Program*

Delinquency and default rates for FFELP loans that are in the Permanent Standard period of the IBR plan are higher than the delinquency and default rates of FFELP loans that are in a PFH period of the IBR plan or in the seasoned loan population.  As a result, Moody's should modify the default assumption in the proposed methodology to properly account for these increased default rates.

The IBR plan, which accounts for 95% of current IDR program usage, requires that FFELP borrowers qualify for reduced payments based on their income, geography and family size.  Under the IBR plan, as a FFELP borrower's discretionary income increases, the required loan payments may also increase.  As a result of the IBR payment formula, there is a risk that borrowers could realize a relatively small increase in income that would cause them to no longer be eligible for the PFH period.  As a result, the borrowers' FFELP loans would transition from the PFH period to the Permanent Standard period but the borrowers' increased income might not be sufficient to support an increase in payments.

Indeed, for the oldest FFELP loans in the IDR program, the delinquency and default rates for FFELP loans that have exited the reduced payment phase are higher than the delinquency and default rates for FFELP loans that are making reduced payments or otherwise are not in an IDR plan (Chart 5).



**Chart 5**
**Annualized Default Rate**
**IDR Statuses vs. Rest of Vintage**
**2004 Repayment Vintage**

31

In contrast, borrowers that are newer to repayment show fewer defaults upon transition out of the reduced payment phase of the IDR program (Chart 6).  One reason to explain this is that borrowers are typically enrolled in the IDR program to provide relief during the transition between school and employment.



**Chart 6**
**Annualized Default Rate**
**IDR Statuses vs. Rest of Vintage**
**2010 Repayment Vintage**

(c) *Default Risks Associated With Aging Borrowers Who Struggle to Make Payments for a Long Period of Time or Whose Loans are Eventually Paid Through a Death or Disability Claim*

In the FFELP, death and disability claims are guaranteed at 100% of principal and interest balances.  In the universe of FFELP claims, death and disability are small in overall terms because the number of aging borrowers in the program is relatively low.  Currently, fewer than 10% of all FFELP loan balances are owed by borrowers older than age 60.  As a result, a borrower's age and mortality has not historically been a significant consideration in evaluating FFELP loan defaults.  However, in light of Moody's proposed assumptions regarding the long duration of FFELP loans, Moody's should consider an increasing amount of FFELP loan balances being owed by aging borrowers who struggle to make payments for a long period of time or whose loans are eventually paid through a death or disability claim, and incorporate these factors in developing the revised methodology.

32

The latest legal final maturity date of a Navient-sponsored FFELP ABS trust that is on watch for downgrade by Moody's is 2043.  The average current age of Stafford loan borrowers and Grad Plus loan borrowers is 37 years old, the average current age of Consolidation loan borrowers is 43 years old and the average current age of parent PLUS loan borrowers is 58 years old.  As of a legal final maturity date in 2043, the average age of Stafford loan borrowers and Grad Plus loan borrowers will be 65 years old, the average age of Consolidation loan borrowers will be 71 years old and the average age of parent PLUS loan borrowers will be 86 years old.

Grouping historical default claims by borrower age demonstrates that the oldest borrowers generate a higher default rate than all other borrowers (Chart 7).  The oldest borrowers represented in this data were older when their loans were originated than younger borrowers who experienced payment difficulty at an earlier age.  However, under the proposed methodology, Moody's assumes that high volumes of borrowers will struggle to make payments and, therefore, enroll in a deferment or forbearance status or in the IDR program at earlier stages in the lives of their FFELP loans.  If that were to occur, even those younger borrowers would be subject to higher default risks as they are assumed to remain in the portfolio for long periods of time.



**Chart 7**
**Cumulative Amount Defaulted**
**June 2011 through June 2015 by Borrower Age**
**All Default Types**

Further, as borrowers age, death and disability claims will increase as a proportion of total claims (Chart 8).



**Chart 8**
**Claims Filed by Claim Type and Borrower Age**

Because Moody's proposed methodology predicts that FFELP loans will be outstanding for a significant portion of borrowers' lives, we urge Moody's to give additional consideration in the revised methodology to (i) the correlation between borrower age and the likelihood of default and (ii) the increase in death and disability claims that would occur in very long extension scenarios. We do not suggest that significant future defaults will occur because borrowers are aging. Instead, we suggest that the long FFELP loan extensions projected under Moody's stressed assumptions are unlikely to occur because the assumptions do not appropriately consider the logical implications of assumed long durations.

### B. Voluntary Prepayment Assumptions

In the Request for Comments, Moody's proposes to adjust its assumptions regarding voluntary prepayments. However, it is unclear whether Moody's proposed methodology accurately forecasts voluntary prepayments for FFELP loans in the repayment status. The revised methodology should (1) use the CPR1 approach to calculating voluntary prepayment rates and (2) should take into account additional factors that influence default rates in extension scenarios.

1.  Use CPR1 Methodology for Calculating Voluntary Prepayments

It is unclear whether Moody's is using the correct methodology to calculate the constant prepayment rate ("*CPR*").  We respectfully request that Moody's confirm (a) that it is using the CPR1 methodology (defined below) when calculating CPR for loans that are in repayment status and (b) how the voluntary prepayment rate will be calculated under the revised methodology.

(a) *Confirm Use of CPR1 Methodology*

Navient discloses information regarding voluntary prepayment rates each calendar quarter in the form of CPRs, which are calculated using two different methodologies. Under both methodologies, the CPR is an annualized amount by which the actual pool amortization exceeds the expected pool amortization as a percentage of the total pool balance.

However, the two methodologies differ regarding the categories of loan statuses that are included in determining the expected amount of pool amortization.  The CPR1 methodology expects payments only from FFELP loans in a repayment status.  FFELP loans that are in a deferment or forbearance status are not expected to make payments under the CPR1 methodology and, thus, are neutral to the CPR determined using that methodology.  On the other hand, the CPR2 methodology expects payments from FFELP loans that are in repayment, deferment and forbearance statuses.  Under the CPR2 methodology, FFELP loans that are in a deferment or forbearance status have CPRs less than zero.

Under the proposed methodology, each loan status bucket will be modeled separately. The appropriate CPR methodology to apply is the CPR1 methodology because, when determining the CPR for FFELP loans that are in a repayment status, the CPR1 methodology prevents double-counting the impacts of deferment and forbearance status on the cash flows.

However, because Moody's proposes to model CPR for Consolidation loan transactions and because Navient does not currently report CPR for Consolidation loan transactions using the CPR1 methodology, we are concerned that Moody's may be inappropriately applying the CPR2 methodology when calculating voluntary prepayments.  We respectfully request that Moody's clarify that the CPR1 methodology is being used to calculate voluntary repayment rates under the proposed methodology.  We note and agree with Moody's use of the repayment balance as the denominator for the prepayment rate.

(b) *Confirm How Voluntary Prepayment Dollars are Calculated*

As demonstrated by Moody's sample cash flow released in connection with the Request for Comments, the proposed methodology appropriately relies on prepayment dollars to calculate the numerator of the CPR methodology.  However, we respectfully request

35

that Moody's clarify how prepayment dollars will be calculated under the revised methodology.[10]

### 2. Proposed Assumptions for Prepayment Levels Are Too Conservative

In the Request for Comments, Moody's indicates that it will assume an annual voluntary prepayment rate of 0% CPR in certain circumstances, including in the expected base case for Consolidation loans.  However, we believe that a 0% CPR is too conservative an assumption because (a) improving economic conditions are likely to increase voluntary prepayment rates, (b) loan refinancing levels have been increasing in FFELP ABS trusts since the beginning of 2014, and (c) the new RePAYE program could potentially further increase FFELP loan refinancing activity for certain borrowers in the near term.

### (a) *Improving Economic Conditions Likely to Increase Voluntary Payment Rates*

Economic conditions have a significant impact on prepayment rates.  During periods of economic recession, borrowers were more likely to conserve cash and, therefore, less likely to make voluntary prepayments on their FFELP loans.  However, we are currently in a period of economic recovery during which the labor market, housing market and overall economy are transitioning to a more stable footing.  We are seeing relatively high correlation of higher prepayment rates to positive trends in economic variables.

[Remainder of Page Intentionally Left Blank]

---

[10] To determine CPR for voluntary repayments, we believe that is possible to derive the voluntary payment rate used in the proposed methodology by deducting the constant default rate from the aggregate CPR.  We request that Moody's clarify whether the assumptions in the proposed methodology were created on this basis and, if so, that Moody's provide more detailed guidance on this in the final revised methodology.

For example, when we normalize for loan refinancing activity, we see that interest rates and consumer sentiment explain 80% of the variation in historical prepayment activity (Table 5 and Chart 9[11]).  Apart from consumer sentiment, which is more difficult to forecast and can be expected to vary around a base line index level, the expected positive direction of all economic variables identified will tend to increase prepayment activity.

**Table 5**
**Variables Impacting CPR1**

| Variable | Relationship | Rationale | Expectations |
|---|---|---|---|
| Consolidation Principal | Higher consolidation associated with higher CPRs | Normalizes for the impact of different levels of loan refinancing over time | Rising |
| Federal Funds Rate | Higher fed funds associated with higher CPRs | Reflects expectations of economic improvement, borrowers more likely to retire debt than conserve cash; as Fed Funds rises, variable rate borrowers may consolidate to lock in lower fixed rates | Rising |
| Consumer Sentiment | Improving consumer sentiment associated with higher CPRs | Favorable outlook for economic prospects makes borrowers more willing to retire debt rather than focus on cash conservation | Improved from recession, variable around base of 100 |

---

[11] Data includes loans in all Navient-sponsored Non-Consolidation loan ABS trusts, regardless of servicer.  Prior to the company's separation from SLM Corporation in 2014, Navient sponsored FFELP securitizations under the name SLM.

37





**Chart 9**
**Non-Consolidation Loan Prepayments,**
**Performance Compared to Macroeconomic Forecast Model**

(b) *Loan Refinancing Activity Is Increasing*

Loan refinancing levels have been increasing in our FFELP ABS trusts since the beginning of 2014 (Chart 10 and Chart 11[12]) for at least two reasons.

First, the Department of Education's Direct Loan program has provided a loan refinancing option for some FFELP borrowers.  In addition to the FFELP, the Department of Education has a separate student loan program called the Direct Loan program under which FFELP borrowers are able to refinance their FFELP loans in certain circumstances.  The Direct Loan program's repayment plans allow borrowers to become eligible for income-driven repayment plans at higher income levels and also provides for earlier loan forgiveness.  We believe that increased public awareness of the Direct Loan program's plans has spurred loan refinancing activity among FFELP borrowers who qualify for the Direct Loan program's income-driven repayment and loan forgiveness plans.

---

[12] Data includes Navient serviced loans in all Navient-sponsored issued Non-Consolidation and Consolidation loan ABS trusts for Chart 9 and Chart 10, respectively.  Prior to the company's separation from SLM Corporation in 2014, Navient sponsored FFELP securitizations under the name SLM.

38

Second, in light of expectations that interest rates will begin to rise in the future, some borrowers of older FFELP loans who still have variable rate loans may be seeking to lock in current low interest rates through loan refinancing.  This would lead to higher prepayment rates.



**Chart 10**
**CPR Attributable to Loan Refinancing**
**FFELP Non-Consolidation ABS Trusts**
**By Trust Vintage**

39

A50



**Chart 11**
**CPR Attributable to Loan Refinancing**
**Consolidation ABS Trusts**
**By  Trust Vintage**

(c) *RePAYE Program Likely to Further Increase Refinancing Activity for Certain Borrowers in Future*

The anticipated RePAYE program could potentially further increase FFELP loan refinancing activity for certain borrowers in the future.  Under the existing PAYE program, certain borrowers who were "new borrowers" as of October 1, 2007 are eligible to refinance their FFELP loans into a refinancing loan under the Direct Loan program that ties loan repayment to income and family size and provides benefits that are not available under the FFELP.

On July 9, 2015, the Department of Education released a notice of proposed rulemaking detailing the proposed RePAYE program.  It is expected that the final RePAYE rule will be issued before the end of 2015 and that borrowers will be able to refinance their FFELP loans to enroll in the RePAYE program soon after the final rule is issued.

If adopted as proposed, the RePAYE program would (i) cap loan payments at 10% of the borrower's discretionary income, (ii) make loans eligible for forgiveness after 20 years (for borrowers who only took out undergraduate loans), and (iii) forgive half of the unpaid interest accrued during the reduced payment period.  These provisions of the RePAYE program may be attractive to eligible FFELP borrowers who have been struggling to make their existing payments for an extended period of time.  In contrast to

40

the RePAYE program, the existing FFELP IDR program (x) caps loan payments at 15% of the borrower's discretionary income, (y) make loans eligible for forgiveness after 25 years, and (z) does not provide forgiveness of any portion of unpaid interest associated with the reduced payment period.

## C. DEFERMENT AND FORBEARANCE ASSUMPTIONS

In the Request for Comments, Moody's proposes to apply its deferment and forbearance assumptions in both the expected base case and stress case scenarios throughout the life of a FFELP ABS transaction. While Moody's recognizes that, in dollar terms, the levels of deferment and forbearance usage decrease over time, Moody's indicates that the trend of deferment and forbearance usage remains flat when expressed as a percentage of the aggregate outstanding principal balance of the FFELP loans underlying the FFELP ABS trust. We disagree with Moody's interpretations of the data showing constant percentages of deferment and forbearance usage.

1. <u>Rates of Deferment and Forbearance Usage Give Distorted View of FFELP ABS Pool Performance Expectation When the Remaining Outstanding Principal Balance of the Trust Student Loans is Low</u>

Moody's indicates that constant usage rates of deferment and forbearance will result in longer weighted-average remaining terms for FFELP ABS trusts. This assertion seems to be based on a mathematical calculation that ignores the fact that the FFELP loan pools are amortizing on a net basis (<u>Chart 12</u>). For example, if there are only ten FFELP loans left in a FFELP ABS trust and one is in a deferment status, Moody's proposed methodology would indicate that there is a 10% deferment usage rate. If 100 FFELP loans had originally been in the FFELP ABS trust, that one remaining loan in a deferment status would represent only 1% of the original pool. So, this 10% deferment usage rate used under the proposed methodology gives an inflated view of the expected overall FFELP ABS performance.

For seasoned pools, Moody's proposed deferment and forbearance usage rates would be applied against a very small aggregate outstanding principal balance of FFELP loans. For example, in the 2001 vintage shown in Chart 12, 1.8% of the aggregate principal balance of the FFELP loans at the beginning of repayment remains outstanding and, of that outstanding principal balance, approximately 32% is in a deferment or a forbearance status. This 32% of loan volume that is currently in a deferment or forbearance status represent only $32 million of outstanding principal balance and only 0.6% of the initial principal balance of the 2001 vintage. Therefore, the 32% usage rate, in and of itself, is not indicative of the overall extension experience of the 2001 vintage.

When analyzing extension risk, Moody's should recognize that the weight given to deferment and forbearance usage rates should decline as the pool balance amortizes. In addition, Moody's should recognize that, as a FFELP ABS trust's loan pool seasons

further into repayment, only a small volume of remaining loans will exist even if deferment and forbearance persist.  Once the pool factor reaches a very low level, the servicer's execution of the optional servicer clean-up call is economically compelling, given the magnitude of a trust's fixed costs compared to the loans' balances, and does not require significant liquidity to execute.  Therefore, the revised methodology should assume the exercise of the optional servicer clean-up call in this case.[13]

Chart 12 below illustrates that deferment and forbearance usage rates have fallen as a percentage of the original pool balance for the 2001 vintage.



**Chart 12**
**Managed Stafford Loans Entering Repayment in 2001**

2.  <u>Administrative Forbearance Should Be Excluded When Deriving the Slope of Forbearance Usage Projections</u>

As described more fully in <u>Appendix A</u> to this comment letter, there are four different types of forbearance statuses available under the FFELP: (a) administrative, (b) discretionary, (c) mandatory administrative and (d) mandatory forbearance.[14]  To more accurately analyze the FFELP ABS extension risk associated with forbearance usage rates, Moody's should analyze the impact of administrative forbearance

---

[13] A more detailed discussion of the optional servicer clean-up call can be found in Section II.E. of this comment letter.
[14] A more detailed description of the types of forbearance statuses available under the FFELP is provided in <u>Appendix A</u> to this comment letter.

separately from the impact of forbearance relating to the economic hardship of the borrower.

One type of forbearance permitted under the FFELP is a short-term administrative forbearance (which we call "*FORM*") that provides a borrower a period of up to 60 days of nonpayment while that borrower applies and submits documentation for a requested change in repayment plans.  Beginning in 2014, Navient began to utilize FORM forbearance at higher rates as borrowers needed additional time to enroll in the IDR program or a deferment status.

Without normalizing for the use of FORM, forbearance rates appear to be at steady or increased levels compared to historical usage (Chart 13 and Chart 14).



**Chart 13**
**Stafford Loan Forbearance Usage by Repayment Vintage**

43



**Chart 14**
**Consolidation Loan Forbearance Usage by Repayment Vintage**

However, when impact of FORM is removed, the normalized trend shows declining forbearance usage (Chart 15).

**Chart 15**
**Impact of FORM Status on Forbearance Usage**



FFELP loans in a FORM status are in forbearance given that no payments are due during that short transition period.  Navient expects to continue to process borrower transitions among payment plans through the use of the FORM status.  As a result, we do not propose that the FORM status be ignored when setting the absolute level of forbearance usage in modeling Moody's assumptions.

45

However, when extrapolating the last two years of forbearance performance to derive a slope for Moody's proposed cash flow assumptions, the beginning of the use of FORM distorts the historical trend for administrative forbearance and, therefore, for overall forbearance.  For example, as shown in Chart 16, without normalizing for administrative forbearance in the last two years of history, the slope for future forbearance would suggest an increase of 0.5% in the forbearance rate each calendar quarter.  In fact, the hardship forbearance levels have been decreasing by 0.1% per calendar quarter.



**Chart 16**
**Impact of Administrative Forbearance Usage on Forbearance Trend SLM Student Loan Trust 2006-1**

We also note that the duration of FORM status is limited to 60 days, and only two FORM statuses may be given consecutively.  Given its short duration, we do not expect the use of FORM to increase overall portfolio extension meaningfully.

To address the issue that changes in the application of administrative forbearance are obscuring the declining usage of hardship-related forbearance, we propose that Moody's final revised methodology derive the *current forbearance level* from all FFELP loans in any type of a forbearance status (*i.e.*, including FFELP loans in an administrative forbearance status) but derive the *slope of the forbearance usage projection* based only on FFELP loans in a discretionary forbearance status (*i.e.*, not including FFELP loans in an administrative forbearance status).

46

3.   Deferment and Forbearance Policies and Previous Usage Limit Amount of Future Deferment and Forbearance that Can Occur

The proposed methodology applies a forbearance and deferment usage assumption across the entire lives of borrowers.  However, based on historical activity, we urge Moody's to use more sophisticated means of analyzing the likelihood of borrowers' future use of forbearance and deferment statuses based on: (a) regulatory and servicing policy limits on the cumulative use of hardship deferment and discretionary forbearance, (b) the progression of older FFELP loans towards those regulatory and servicing policy limits, (c) predictions of future use of deferment and forbearance in light of borrowers' past deferment and forbearance, and (d) the propensity and ability of FFELP borrowers to use additional forbearance, which create a mathematical limit on the amount of extension that can occur.

(a) *Limits on the Cumulative Use of Hardship Deferment and Discretionary Forbearance*

Deferment and forbearance policies limit the cumulative use of hardship deferment and discretionary forbearance.  School-related deferments on average account for 57% of total deferment usage and school-related deferments do not have a cumulative use limit under the FFELP so long as the borrower provides the proper enrollment documentation.  However, deferments other than school-related deferments ("*hardship deferments*") do have regulatory policies under the FFELP that limit the cumulative length of time that a borrower may use those types of deferment to 36 months.  Further, as described more fully in Section III.C.3(b)(ii) below, Navient's servicing policy is to give no more than 60 months of cumulative discretionary forbearance with limited exceptions.

(b) *Older FFELP Loans are Progressing Towards Regulatory and Servicing Policy Limits*

Cumulative usage of deferment and forbearance to date by older FFELP loans reflects a decrease in borrowers' future ability to use additional deferment and forbearance.

47

(i)  <u>Deferment</u>

Charts 17 and 18 below demonstrate the distribution of deferment used by repayment vintage for Stafford and Consolidation loans, respectively.  Among the remaining Stafford loans that entered repayment prior to 2006, approximately 20% of those loans have never used deferment.  While 30% of remaining Stafford loans that entered repayment prior to 2006 have used more than 60 months of deferment, the average pool factor of these vintages is 3% and these loans are likely to have reached or be near the limit on future hardship deferment usage.[15]



**Chart 17**
**Outstanding Stafford Loans by Vintage**
**Loans Remaining in Portfolio (Not Paid Off)**
**Distribution of Cumulative Deferment Months Used**

---

[15] The pool factor is defined as the aggregate remaining outstanding principal balance of the FFELP loans in a repayment vintage, expressed as a percentage of the aggregate principal balance of the FFELP in that repayment vintage at the beginning of repayment.

48



**Chart 18**
**Outstanding Consolidation Loans by Vintage**
**Loans Remaining in Portfolio (Not Paid Off)**
**Distribution of Cumulative Deferment Months Used**

Consolidation loans are less likely than Stafford loans to have used deferment and usage is more consistent across vintages of Consolidation loans. Across all Consolidation loan vintages, 43% of loans remaining have never used deferment and 7% have used more than 60 months of deferment. However, the older Consolidation loans are still progressing towards the cumulative use limit for hardship deferment.

49

(ii) <u>Forbearance</u>

Charts 19 and 20 below demonstrate the distribution of forbearance usage by repayment vintage for Stafford and Consolidation loans, respectively.  Similar to deferment, loans remaining in older vintages are more likely to have used forbearance than newer vintages.  Remaining Consolidation loans are less likely to have used forbearance than remaining Stafford loans.



**Chart 19**
**Outstanding Stafford Loans by Vintage**
**Loans Remaining in Portfolio (Not Paid Off)**
**Distribution of Cumulative Hardship Forbearance Months Used**





**Chart 20**
**Outstanding Consolidation Loans by Vintage**
**Loans Remaining in Portfolio (Not Paid Off)**
**Distribution of Cumulative Discretionary Forbearance Months Used**

Navient's servicing policy is to limit one type of forbearance - discretionary forbearance - to no more than 60 months on a cumulative basis.[16]  Exceptions are limited and are applied on a case by case basis.  Charts 19 and 20 above demonstrate that approximately 1.2% of the loans remaining in the Stafford and Consolidation loan portfolios have used more than 60 months of discretionary forbearance.  Of that 1.2% of loans, nearly 60% had a cumulative discretionary forbearance usage of 61 months and 97% had a cumulative discretionary forbearance usage of 72 or fewer months.  As a result, even though a small number of FFELP loans may receive discretionary forbearance past Navient's 60-month servicing policy limit, the cumulative discretionary forbearance usage still has an upper limit, with only a very small number of FFELP loans exceeding the servicing policy limit and with those exceptions providing only a short period of additional discretionary forbearance.

(c)  *Use Borrowers' Past Deferment and Forbearance Activity to Predict Future Deferment and Forbearance Activity*

Cumulative usage of deferment and forbearance to date within a pool of FFELP loans is important because prior usage of deferment and forbearance is predictive of future usage.  Simply stated, FFELP borrowers who have never used deferment or

---

[16] A more detailed description of the various types of forbearance statuses available under the FFELP is provided in Appendix A to this comment letter.

forbearance in the past are significantly less likely to enter deferment or forbearance in the future.

The tables below reflect the performance of a population of FFELP loans based on their cumulative prior deferment usage or forbearance usage, as applicable, as of June 2010. The percentages in each table reflect the percentage of FFELP loans that used, or did not use, deferment or forbearance, as applicable, between July 2010 and June 2015 (the "*review period*").

(i)  Deferment

Table 6 demonstrates that, of the Stafford loans that had never used a deferment prior to the review period, approximately 40% used a first deferment by June 2015 and 60% did not use deferment at all during the review period.  Conversely, 68-72% of Stafford loans that had used deferment prior to the review period used additional deferment during the review period, suggesting high repeat usage of deferment.  The cumulative amount of deferment used by these Stafford loans prior to the review period did not have a significant impact on the likelihood of those Stafford loans to use additional deferment during the review period.  Rather, mere usage of deferment in the past was a significant indicator of future usage.

**Table 6**
**Propensity of Stafford Loans to Use Additional Deferment**

| Cumulative Deferment Used As of June 2010 | % of Loans Using Additional Deferment through June 2015 | % of Loans That Did Not Use Additional Deferment through June 2015 |
|---|---|---|
| Never Used | 40% | 60% |
| 1-12 Months | 68% | 32% |
| 13-24 Months | 68% | 32% |
| 25-36 Months | 68% | 32% |
| 37-48 Months | 70% | 30% |
| 49-60 Months | 72% | 28% |

52

Table 7 demonstrates the trends in repeat deferment usage for Consolidation loans.  At all levels of prior deferment usage, Consolidation loans are less likely to use additional deferment than are Stafford loans.  In particular, 84% of Consolidation loans that never used deferment prior to the review period did not use deferment within the review period.  Once again, the usage of deferment in the past seems is a significant indicator of future usage.

**Table 7**
**Propensity of Consolidation Loans to Use Additional Deferment**

| Cumulative Deferment Used As of June 2010 | % of Loans Using Additional Deferment through June 2015 | % of Loans That Did Not Use Additional Deferment through June 2015 |
|---|---|---|
| Never Used | 16% | 84% |
| 1-12 Months | 44% | 56% |
| 13-24 Months | 48% | 52% |
| 25-36 Months | 42% | 58% |
| 37-48 Months | 49% | 51% |
| 49-60 Months | 54% | 46% |

53

(ii) Forbearance

Tables 8 and 9 demonstrate the likelihood that a Stafford or Consolidation loan would use additional forbearance during the review period.  Stafford loans have the lowest likelihood of using additional forbearance where they have never used forbearance in the past (*i.e.*, where 47% of loans used forbearance within the review period) and as they approach Navient's 60-month servicing policy limit (*i.e.*, where only 40% of the loans used forbearance during the review period).  As with deferment, Consolidation loans have a lower likelihood of using forbearance across all categories of previous usage and, like for Stafford loans, they have the lowest likelihood of using forbearance if they have never used it before and as they approach the servicing policy limit.

### Table 8
### Propensity of Stafford Loans to Use Additional Forbearance

| Cumulative Forbearance Used As of June 2010 | % of Loans Using Additional Forbearance through June 2015 | % of Loans That Did Not Use Additional Forbearance through June 2015 |
|---|---|---|
| Never Used | 47% | 53% |
| 1-12 Months | 81% | 19% |
| 13-24 Months | 89% | 11% |
| 25-36 Months | 89% | 11% |
| 37-48 Months | 81% | 19% |
| 49-60 Months | 40% | 60% |

### Table 9
### Propensity of Consolidation Loans to Use Additional Forbearance

| Cumulative Forbearance Use As of June 2010 | % of Loans Using Additional Forbearance through June 2015 | % of Loans That Did Not Use Additional Forbearance through June 2015 |
|---|---|---|
| Never Used | 15% | 85% |
| 1-12 Months | 57% | 43% |
| 13-24 Months | 75% | 25% |
| 25-36 Months | 82% | 18% |
| 37-48 Months | 71% | 29% |
| 49-60 Months | 32% | 68% |

54

(d) *Propensity and Ability of FFELP Borrowers to Use Additional Forbearance Create a Mathematical Limit on Extension*

The propensity and ability of FFELP borrowers to use additional forbearance create a mathematical limit on the amount of extension that can occur.

Table 10 demonstrates how the usage to date and usage expectations combine to generate an overall limit on future use of the forbearance status. To best explore the ability of forbearance to persist as FFELP loans age, we conducted the analysis on vintages that already have a significant performance history; that is, Stafford loans that entered repayment prior to 2006.

**Table 10**

**Distribution of Cumulative Forbearance Used Among Remaining Stafford Loans That Entered Repayment Before 2006 and Propensity to Use Additional Forbearance**

| Cumulative Forb Used | (A) Portfolio Distribution | (B) % Use Additional Forbearance in Next 5 Years | (C) Number of Additional Forb Months Available |
|---|---|---|---|
| Never Used | 14% | 35% | 60 |
| 1-12 Months | 10% | 64% | 54 |
| 13-24 Months | 9% | 68% | 41 |
| 25-36 Months | 10% | 66% | 29 |
| 37-48 Months | 12% | 70% | 18 |
| 49-60 Months | 41% | 72% | 3 |
| > 60 Months | 4% | n/a | 0 |

Based on the distribution of prior forbearance usage in column (A) of Table 10, multiplied by the likelihood that Stafford loans in each category use additional forbearance in column (B) of Table 10, 62% of the overall portfolio would be expected to use additional forbearance. Within this portion of the portfolio, Stafford borrowers may use variable amounts up to a total of 60 months of discretionary forbearance. The product of columns (A) and (C) of Table 10 suggests that the weighted average remaining duration of discretionary forbearance that can be used in the portfolio would only be approximately 24 months.

If the remaining expected forbearance assumption is that 10% of the FFELP loans in the portfolio remain in a forbearance status, the facts above can be used to determine how long 10% of the seasoned portfolio can remain in a forbearance status without exceeding the cumulative use servicing policy limit on discretionary forbearance.

55

Table 11 demonstrates the calculation for Stafford loans that entered repayment before 2006.

**Table 11**
**Derivation of Maximum Expected Duration of Forbearance Use**
**For Remaining Stafford Loans that Entered Repayment Prior to 2006**

| | |
|---|---|
| (A) Assumed Forbearance Rate | 10% |
| (B) Proportion of Portfolio Expected to Use Forbearance in the Future | 62% |
| | |
| (C) Percentage of Portfolio Expected to Eventually Use Forbearance that is in Forbearance at Any Given Time (C = A / B) | 16% |
| | |
| (D) Number of Remaining Months Eligible for Forbearance | 24 |
| (E) Number of Remaining Years Eligible for Forbearance (E = D / 12) | 2 |
| | |
| (F) Remaining Possible Years of Forbearance Usage (F = E / C) | 12 |

Given that only approximately 62% of the population is likely to use additional forbearance in the future, to keep the portfolio forbearance rate at 10% of the population, at any given time approximately 16% of those likely to use forbearance must be in a forbearance status (or 10% divided by the 62% who are likely to use forbearance). This 16% can only remain in a forbearance status for approximately 24 months before they exceed the servicing policy limit. Most simply, assume that 16% of those likely to use forbearance remain in a forbearance status for 24 months and then the next 16% take their place. In that case, the total duration that forbearance can logically persist is for an additional two years for each 16% of the portfolio, or approximately 12 years.

While 12 years is a significant period of time, it is significantly shorter than the proposed methodology's assumption projecting ongoing forbearance usage through legal final maturity dates of outstanding FFELP ABS trusts into the 2030s and 2040s.

Under Moody's proposed methodology, the AAA assumption is that no less than 20% of the Stafford loan portfolio is in a forbearance status. However, that 20% level is only mathematically possible for six years.

In addition, as the portfolio continues to age, both prepayments out of the FFELP loan pool and increased use of the IDR program reduce the propensity of the remaining

56

FFELP loans to use deferment and forbearance.  As a result, the estimate in Table 11 is most likely conservative.

Table 12 demonstrates the population distribution and likelihood that Consolidation loans will use additional forbearance.  As demonstrated in Chart 20 and Table 9, Consolidation loans are less likely to have used forbearance than Stafford loans, and are less likely to begin to use forbearance if they have not done so before.  On a net basis, the lower expected usage of forbearance, even for longer periods of time, leads to a logical limit of an additional 10 years of forbearance for the most seasoned Consolidation loans.

**Table 12**
**Distribution of Cumulative Forbearance Among**
**Remaining Consolidation Loans that Entered Repayment Before 2006 and**
**Propensity to Use Additional Forbearance**

| Cumulative Forb Used | (A) Portfolio Distribution | (B) % Use Additional Forbearance in Next 5 Years | (C) Number of Additional Forb Months Available |
|---|---|---|---|
| Never Used | 38% | 11% | 60 |
| 1-12 Months | 13% | 47% | 53 |
| 13-24 Months | 8% | 64% | 41 |
| 25-36 Months | 7% | 74% | 29 |
| 37-48 Months | 7% | 66% | 17 |
| 49-60 Months | 26% | 32% | 2 |
| > 60 Months | 2% | n/a | 0 |

57

Table 13 demonstrates the forbearance limit calculation for Consolidation loans. Consolidation loans have lower repeat usage of forbearance, but they also have used less forbearance to date, meaning those Consolidation loan borrowers who use additional forbearance in the future can remain in such status for longer.  On a net basis, the lower expected usage of forbearance, even for longer periods of time, leads to a logical limit of an additional 10 years of forbearance for the most seasoned Consolidation loans, assuming a forbearance usage rate of 10%.  Under Moody's proposed methodology, the AAA assumption is that not less than 15% of the Consolidation loan portfolio is in a forbearance status.  However, that 15% level is only mathematically possible for seven years.

**Table 13**
**Derivation of Maximum Expected Duration of Forbearance Use for Remaining Consolidation Loans That Entered Repayment Prior to 2006**

| | |
|---|---|
| (A) Assumed Forbearance Rate | 10% |
| (B) Proportion of Portfolio Expected to Use Forbearance in the Future | 33% |
| | |
| (C) Percentage of Portfolio Expected to Eventually Use Forbearance that is in Forbearance at Any Given Time (C = A / B) | 30% |
| | |
| (D) Number of Remaining Months Eligible for Forbearance | 36 |
| (E) Number of Remaining Years Eligible for Forbearance (E = D / 12) | 3 |
| | |
| (F) Remaining Possible Years of Forbearance Usage (F = E / C) | 10 |

Given regulatory limits on hardship deferment, servicing policy limits on discretionary forbearance, and seasoning benefits, we submit, therefore, that indefinite extension of deferment and forbearance is not realistic.

4. <u>Pool-Wide Usage of Deferment and Forbearance Decreases as FFELP Loans Pay off, Default or Meet Criteria for Guarantee Claim Payments</u>

As discussed more fully in Section III.A.2(b) above, FFELP borrowers who use lengthy deferment and forbearance statuses do so as a result of credit stress.  So, as a FFELP loan pool continues to season, a meaningful number of the loans that are at a heightened risk for additional use of deferment and forbearance will instead default and be removed from the loan pool.

58

Further, to the extent high defaults have already occurred within a loan pool and the defaulted loans have been removed from the pool, higher levels of deferment and forbearance usage are not as likely to occur with respect to the remaining higher credit-quality loans.

## D. Income-Driven Repayment Assumptions

In the Request for Comments, Moody's proposes to adjust the existing methodology to account for the growing use of the IBR plan or other similar plans by adding an IBR adjustment factor to forbearance assumptions.  While we agree with Moody's that it is appropriate to adjust the ratings model to consider the usage of IDR programs, such as IBR, we believe the impacts of IDR usage should be modeled separately from other loan performance assumptions to more precisely account for the parameters of the IDR program and to more accurately reflect the historical performance of IDR loans.

The new IDR assumption in the revised methodology should reflect (1) the loan forgiveness aspect of the IBR plan, (2) the technical aspects of IDR loans, (3) the amortization of IBR loans over time, and (4) the higher default risk of older FFELP loans using IDR.

### 1. Loan Forgiveness Aspect of IBR Plan

In developing the new IDR assumption, Moody's should appropriately account for the loan forgiveness aspect of the IDR program.  As described more fully in Section II.D.1 of this comment letter and in Appendix A to this comment letter, FFELP loans that have been enrolled in an IBR plan at any point in their lifetime are eligible for loan forgiveness on the later of 25 years following the qualification date and 25 years of qualifying payments made (including periods where the calculated payment was zero).  When a FFELP loan is forgiven, the principal balance of the loan is reduced to zero and a corresponding payment equal to 100% of principal and interest is made to the FFELP ABS trust that owns the FFELP loan.

Generally, borrowers with low incomes relative to their debt burdens are likely to become eligible for loan forgiveness.  Given the distribution of the current IBR loan portfolio by current aggregate outstanding principal balance, we project that between 22% and 76% of FFELP loans that are currently in the PFH period of an IBR plan will become eligible for loan forgiveness.

### 2. Technical Considerations Relating to IDR Loans

In developing the new IDR assumption, Moody's should consider the following technical aspects of the IDR program: (a) interest payments are made on certain IDR loans, (b) IBR loans only capitalize interest upon exit from the PFH period, and (c) IDR loans can be in a deferment or forbearance status.

59

(a) *Interest Payments are Made on Certain IDR Loans*

The proposed methodology does not take into account the interest payments made on certain IDR loans.  The Department of Education pays the unpaid accrued interest on subsidized loans that are in the IBR plan.  Among loans in the IDR plan that do not owe a monthly payment, 46% of Stafford loans and 44% of Consolidation loans are subsidized loans.  This is similar to the interest subsidy payments that are paid on FFELP loans in the deferment status.  Therefore, to the extent that the revised methodology does not create a new, separate IDR assumption, it should model IDR loans as additions to FFELP loans in a deferment status to more accurately reflect the mechanisms of trust payments and borrower interest balances.

(b) *IBR Loans Only Capitalize Interest Upon Exit from PFH Period*

The proposed methodology assumes that IBR loans will capitalize interest annually.  This assumption is incorrect.  In reality, IBR loans will capitalize interest only once upon exiting the income-driven, reduced payment PFH period of the IBR plan.

(c) *IDR Loans Can Be in a Deferment or Forbearance Status*

A FFELP loan's participation in an IDR program is a separate concept from that loan's status.  Under the FFELP, each loan is characterized to be in one of five statuses: (i) in-school, (ii) grace, (iii) repayment, (iv) deferment, and (iv) forbearance.  IDR describes the payment amount that is due regardless of the status.  Borrowers typically enroll in an IDR program while in a repayment status.  However, IDR borrowers can place their FFELP loans in a deferment or forbearance status if those borrowers return to school or if the IDR payments pose a hardship.

[Remainder of Page Intentionally Left Blank]

As demonstrated in Chart 21, on average over time, approximately 13% of IDR loans are in a deferment or forbearance status.



**Chart 21**
**Repayment Status of Loans in IDR Reduced Payment Period**

Moody's should ensure that the assumptions in the revised methodology do not double-count IDR loans that are in deferment or forbearance.

3. <u>IBR Loans Amortize Over Time</u>

The IBR assumptions in the revised methodology should recognize that IBR loans do, in fact, amortize over time.  When considering the pool factors of Stafford loans from the time of IBR entry, Stafford loans pay down 30-40% of the initial loan balance over approximately five years (<u>Chart 22</u>).  Consolidation loans also amortize between 10% and 20% over the same period (<u>Chart 23</u>).  The payments on the IBR loans come primarily through either (a) partial prepayments made opportunistically by the borrower (for example, some borrowers elect to make extra principal payments on their IBR loans upon receipt of their tax refunds) and (b) payments in full through loan refinancing to the Direct Loan program.  This amortization should not be ignored in Moody's revised methodology.

61





Chart 24 demonstrates the change in the pool balance of PFH loans, net of negative amortization that occurs as PFH loans capitalize interest upon exiting the income-driven reduced payment portion to a Permanent Standard period or to a deferment or forbearance status.  IBR loans amortize through a combination of partial prepayments and payments in full, many of which are payments through loan refinancing.

**Chart 24**
**Sources of Pool Amortization, Loans Entering PFH in January 2010**



4.  <u>Older FFELP Loans Using IDR Have Higher Default Risk</u>

As discussed more fully in Section III.A.2(c) above, the final default assumptions should properly account for the default risk of older FFELP loans enrolled in the IDR program.

**E.  Cash Flow Modeling Implications of Proposed Loan Performance Assumptions**

When applying the revised methodology's loan performance assumptions in connection with ratings activity, Moody's should (1) clarify how loan performance assumptions will be established for new transactions and (2) confirm that it will rely on issuer-specific and transaction-specific data.

1.  <u>Revised Methodology Should Clarify How Certain Loan Performance Assumptions Will Be Established for New Transactions</u>

The proposed methodology primarily refers to how assumptions will be set for existing FFELP ABS transactions where historical performance data can be used to project

63

future performance of the related FFELP loans.  However, for new FFELP ABS issuances evaluated under the revised methodology, transaction-specific historical performance data will not be available.  The default and IDR assumptions state how expectations will be set where historical performance is not available, but do not provide guidance on how prepayment, deferment, and forbearance levels will be set where there is no transaction specific history to provide a trend.  The individual asset pools for new FFELP ABS issuances may not perform comparably to one another, to existing FFELP ABS asset pools or to the total population of FFELP loans depending on their program composition, vintage, previous performance history, and other factors. Moody's should clarify how it will set performance assumptions for new FFELP ABS issuances.

2. <u>Revised Methodology's Cash Flow Model Should Rely on Issuer-Specific Data and Transaction-Specific Data</u>

We are concerned that Moody's intends to use industry aggregate data to establish loan performance assumptions where issuer-specific data is not available.  It is critical that the rating methodology recognize the transaction-specific differences in loan performance, particularly in the surveillance context.  One size does not fit all.  We are concerned that use of issuer- or transaction-specific data in some cases and industry-level data in other cases will create market distortion among the ratings levels of sponsors with different ability and willingness to provide detailed loan performance data. Sponsors who have demonstrated the ability and willingness to provide detailed loan performance data should be rewarded for this factor versus new entrants or other entities that have a different ability or willingness.  Moody's proposal to use industry-level data where issuer-specific data and transaction-specific data are not available is not commensurate with the fact that the presence of issuer-specific data and transaction-specific data eases Moody's modeling and monitoring concerns.

**CONCLUDING REMARKS**

We thank Moody's for considering these comments and for providing transparency regarding your methodology.  Should you have questions, please contact me, Mark Rein or Wendy Zorick.

Sincerely,

Stephen O'Connell
Senior Vice President & Treasurer
Navient Corporation

**Appendix A**

**OVERVIEW OF FFELP LOANS**

Throughout our comment letter, we refer to a number of key features of FFELP loans, including the nature of the government guarantee and the various types of FFELP loans.  We also refer to FFELP loans on the basis of their loan status or their participation in income-driven repayment plans.  In this Appendix A, we provide a high-level overview of the key features of the FFELP relevant to this comment letter and to the proposed methodology.  For additional information about the FFELP, please refer to the Common Manual.[17]

**A.  Federal Guaranty**

A FFELP loan is a loan originated under the Federal Family Education Program (the "*FFELP*"), which was established under Title IV of the Higher Education Act of 1965.  Under the FFELP, loans were extended to students enrolled in eligible institutions, or to parents of dependent students, to finance their education costs.  In addition to the FFELP, the Department of Education has a separate student loan program called the Direct Loan program but loans originated under that program are not FFELP loans and they are never included in FFELP ABS.

Under the FFELP, student loans originated by eligible private lenders were guaranteed by designated state agencies and other not-for-profit organizations and reinsured by the federal government.

Notwithstanding the fact that the FFELP was terminated as of July 1, 2010 and no FFELP loans have been originated since that time, outstanding FFELP loans retain their federal guarantee.

Payment of principal and interest on the FFELP loans is guaranteed against: (a) default of the borrower; (b) death, bankruptcy or permanent, total disability of the borrower; (c) closing of the borrower's school prior to the end of the academic period; (d) false certification by the borrower's school of his eligibility for the loan; and (e) an unpaid school refund.

FFELP loans are insured as to 100% of principal and accrued interest against death or discharge.  FFELP loans are also insured against default at a percentage of 97% to 100% based on the date of disbursement of the FFELP loan.

---

[17] First published in December 1995, the Common Manual is a cooperative effort of the nation's guarantors that participate in the FFELP.  The manual is a resource created and maintained by guarantors to simplify and streamline the federal rules and regulations for the FFELP, and provides single, standardized policy guidance for schools and lenders.

### B.  Types of FFELP Loans

Five types of FFELP loans were authorized under the Higher Education Act:
(1) subsidized Stafford Loans to students who demonstrate requisite financial need;
(2) unsubsidized Stafford Loans to students who either do not demonstrate financial need or require additional loans to supplement their Subsidized Stafford Loans;
(3) loans to parents of dependent undergraduate students whose estimated costs of attending school exceed other available financial aid; (4) loans to parents of dependent graduate students whose estimated costs of attending school exceed other available financial aid; and (5) Consolidation Loans, which consolidate into a single loan a borrower's obligations under various federally authorized student loan programs.

In this comment letter, (a) the loans identified in clause (1) and (2) above are collectively referred to as "*Stafford loans*"; (b) Stafford loans and the loans identified in clauses (3) and (4) above are collectively referred to as "*Non-Consolidation loans*"; and (c) the loans identified in clause (5) above are referred to as "*Consolidation loans.*"

99% of Stafford Loans will have entered repayment by the end of 2015 and all Consolidation loans entered repayment before or during 2008.

### C.  FFELP Loan Statuses

Under the FFELP, each loan is characterized in one of five loan statuses: (1) in-school, (2) grace, (3) repayment, (4) deferment or (5) forbearance.

　　　　1.　　<u>In-School</u>:  The in-school status applies to a FFELP borrower for the initial period during which the borrower is enrolled in school at least half-time.  During this time, the borrower is not obligated to make payments with respect to the FFELP loan.

　　　　2.　　<u>Grace</u>:  The grace status is a period during which the FFELP borrower is not obligated to make payment on the FFELP loan.  The grace status is intended to provide the student borrower with time after school to find employment and prepare to repay the FFELP loan.

　　　　3.　　<u>Repayment</u>:  The repayment status is a period during which the FFELP borrower is obligated to make scheduled loan payments.

　　　　4.　　<u>Deferment</u>:  Deferment is a status available to FFELP borrowers to help them meet their loan repayment obligations.  Once the repayment period has begun, the borrower is entitled to defer payments on a FFELP loan when applicable eligibility criteria are met.

The circumstances that establish a FFELP borrower's eligibility for a deferment status are when the borrower is: (a) enrolled in school at least half-time; (b) enrolled in an approved graduate fellowship program or rehabilitation program; (c) seeking, but unable

to find, full-time employment; (e) experiencing economic hardship; or (e) in active or post-active military service.

The cumulative use limit for a deferment status depends on the type of deferment. There is no limit for school or military service deferments.  However, under the FFELP, all other deferments are considered hardship deferments and are limited to 36 months of cumulative use.

     5.     <u>Forbearance</u>:  Forbearance is a status available to FFELP borrowers to help them meet their loan repayment obligations.  By granting a forbearance status, a servicer permits a temporary cessation of payments, allows an extension of time for making payments, or temporarily accepts smaller payments than were previously scheduled.

Today, a forbearance status is most often granted when a deferment status or participation in an Income-Driven Repayment (IDR) program is not available to the borrower, the borrower's hardship is considered temporary, or when IDR payments still pose a financial hardship for the borrower.

There are four types of forbearance available to FFELP borrowers:

1. <u>Administrative Forbearance</u>:  Administrative forbearance is granted for payments of principal and interest that are overdue or would be due in circumstances including, but not limited to, a bankruptcy filing, closed school or false certification, identity theft, or to cover periods of delinquency before or after an authorized deferment or forbearance status.

2. <u>Discretionary Forbearance</u>:  Discretionary forbearance is given where the borrower intends to repay the FFELP loan but cannot make payments in the short term as a result of economic hardship, health concerns or other acceptable reasons.  As the name suggestions, this type of forbearance status is granted at the discretion of the servicer.

3. <u>Mandatory Administrative Forbearance</u>:  Under the FFELP, a servicer must grant a mandatory administrative forbearance in cases such as in a national emergency, for military mobilization, or for borrowers in a designated disaster area.  Mandatory administrative forbearance does not require a request from the borrower.

4. <u>Mandatory Forbearance</u>:  Upon receiving a FFELP borrower's request and documentation required to support the borrower's eligibility, a servicer must grant a mandatory forbearance status in situations including, but not limited to, medical or dental internship or residency, active military state duty as a member of the National Guard, or the Department of Defense Student Loan Repayment Program.  The servicer must grant a mandatory forbearance upon the borrower's request.

Like for deferments, the cumulative use limits for forbearance depends on the forbearance type.  Under the FFELP, there is no cumulative use limit for discretionary forbearance or for most mandatory forbearance statuses.  The cumulative use limit for most types of administrative forbearance varies between 60 and 120 days.  Other types of administrative forbearance, such as internship or residency forbearance, extend for the entire duration that the borrower is experiencing the eligible condition.  As described more fully in Section III.C.3(b)(ii) of the comment letter, Navient's servicing policy is to limit the cumulative use of discretionary forbearance to 60 months with limited exceptions.

### D.  Income-Driven Repayment Programs

The Income-Driven Repayment (IDR) program are available to assist FFELP borrowers by setting their monthly loan payment at an amount that is intended to be affordable based on the borrower's income and family size.  A FFELP borrower's enrollment in the IDR program determines the amount of the borrower's monthly loan payment regardless of loan status.  In other words, IDR is not a loan status but instead is a repayment program that a FFELP loan of any loan status can enroll in.

There are two IDR plans available in the FFELP: (1) Income-Sensitive Repayment (ISR); and (2) Income-Based Repayment (IBR).

### 1.  Income-Sensitive Repayment

ISR has been available under the FFELP since 1995.  Where the FFELP borrower's income is insufficient to repay the FFELP loan over a maximum repayment period, the borrower can designate a monthly payment amount between 4% and 25% of his or her monthly income, so long as the payment is sufficient to cover interest payments.  If this payment amount does not amortize the FFELP loan over its maximum term, the servicer can grant up to five years of reduced payment forbearance in order to amortize the FFELP loan fully.  The borrower must re-certify income annually to continue to make reduced payments under the ISR plan, and there is no loan forgiveness associated with the ISR plan.  ISR comprises approximately 5% of current IDR program usage.

### 2.  Income-Based Repayment

The remaining 95% of current IDR program usage is made up of FFELP loans in the IBR plan.  The IBR plan has been available to FFELP borrowers since July 1, 2009 and provides for payments to be capped based on the borrower's adjusted gross income.

#### (a) Partial Financial Hardship

Loans enter IBR based on the presence of a Partial Financial Hardship ("*PFH*").  A PFH is present when the loan payment calculated under the IBR formula is lower than the loan's stated payment amount.  The IBR payment is set at 15% of the difference

A-4

between the borrower's adjusted gross income and one-and-a-half times the poverty guideline for the borrower's family size and state; with the preceding quantity divided by 12.  Borrowers must reapply annually to certify that they still meet the criteria for reduced payments under the PFH period of the IBR plan.  Parent PLUS loans are not eligible for an IBR plan.

During the PFH period of the IBR plan, subsidized loans will receive subsidy payments for up to three consecutive calendar years of PFH enrollment.  Interest capitalization occurs when FFELP loans transition out of the PFH period; there is no interest capitalization during the PFH period.

(b) *IBR Repayment Plans*

FFELP borrowers who are no longer eligible for the PFH period may transition to one of two repayment alternatives.  If borrowers do not elect otherwise, their FFELP loans will transition to the "Permanent Standard" repayment period.  When a loan exits the PFH period and enters the Permanent Standard period, interest capitalizes and a new payment is determined.  The payment is equal to an amortizing payment based on (i) the balance that originally entered the PFH period, (ii) the loan's interest rate, and (iii) a 120-month term.  Once the payment amount has been determined, the remaining term will equal the number of months required to fully amortize the FFELP loan at the determined payment amount.  Because the balance exiting the PFH period could exceed the balance that originally entered in the PFH period, the term required to amortize the FFELP loan could exceed 120 months.

The other possible repayment option under IBR is called the "Expedited Standard" repayment period.  A FFELP borrower can enter an Expedited Standard phase at any time after the PFH period, including from a Permanent Standard phase.  Under the Expedited Standard phase, the borrower leaves the IBR plan altogether.  When the borrower opts for Expedited Standard, the remaining term of the FFELP loan is reset to the original contractual term, minus payments made to date (including payments made during the PFH and any Permanent Standard periods).

(c) *Loan Forgiveness*

FFELP loans that have been enrolled in an IBR plan at any point in their lifetime are eligible for loan forgiveness after the later of 25 years following the qualification date and 25 years of qualifying payments made.  When a FFELP loan is forgiven, the principal balance of the FFELP loan is reduced to zero and the guarantor provides reimbursement of 100% of outstanding principal and interest on the FFELP loan.

Qualification Date:  The qualification date for measuring whether 25 years has passed under the loan forgiveness program is: (a) the date of the first payment (based on 120-month amortization) or the date of economic hardship since July 1, 2009; or (b) for loans with no payments or deferments, the date of first enrollment in the IDR plan.

<u>Qualifying Payments</u>:  Payments that accrue toward loan forgiveness include: (a) all payments made while the FFELP loan was in a PFH period or a Permanent Standard period of the IBR plan; (b) any other payments made under a 10-year repayment term; (c) payment dates that occur while the FFELP loan is in a hardship deferment status (*i.e.*, including periods where the calculated payment is zero).

**Appendix B**

**DATA METHODOLOGY**

Throughout our comment letter, we provide data to support our comments.  The methodology for presenting this data is described in this Appendix B.

Unless otherwise noted, the data reflect Navient-serviced FFELP loans that are owned by Navient or by a Navient-sponsored securitization trust. The data are presented as of June 30, 2015.  The data do not include Navient-owned FFELP loans that are serviced by third parties, even where Navient acts as the master servicer for those FFELP loans in connection with a securitization trust.

The FFELP loans included in this data were originated prior to the end of the FFELP program on June 30, 2010 and most were originated prior to June 2008.  Since July 1, 2010, all federal student loans are made directly by the Department of Education and serviced by companies including Navient.  Loans serviced under Navient's contract with the Department of Education are not included in this data.

Vintage refers to the year in which FFELP loans entered repayment for the first time. Vintage-based amortization analysis included in the data presented in this comment letter is limited to FFELP loans that were present in the Navient-serviced portfolio for their full repayment lives and exclude loans that were acquired by Navient after initially entering repayment.

Each FFELP ABS trust sponsored by Navient is backed by a discrete pool of FFELP loans.  The data in this comment letter may not necessarily be reflective of the performance of the FFELP loans owned by a particular FFELP ABS trust.

# Exhibit 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

### Commission file numbers 001-36228

# Navient Corporation
*(Exact Name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **46-4054283** |
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(I.R.S. Employer Identification No.)* |
| **123 Justison Street, Wilmington, Delaware 19801** | **(302) 283-8000** |
| *(Address of Principal Executive Offices)* | *(Telephone Number)* |

**Securities registered pursuant to Section 12(b) of the Act**

| Title of Each Class | Name of Exchange on which Listed |
|---|---|
| Common stock, par value $.01 per share | The NASDAQ Global Select Market |
| Medium Term Notes, Series A, CPI-Linked Notes due 2017 | The NASDAQ Global Select Market |
| Medium Term Notes, Series A, CPI-Linked Notes due 2018 | The NASDAQ Global Select Market |
| 6% Senior Notes due December 15, 2043 | The NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2015 was $6.8 billion (based on closing sale price of $18.21 per share as reported for the NASDAQ Global Select Market).

As of January 31, 2016, there were 342,817,020 shares of common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the proxy statement relating to the Registrant's 2016 Annual Meeting of Stockholders, currently scheduled to be held on May 26, 2016, are incorporated by reference into Part III of this Annual Report on Form 10-K.

The occurrences or conditions described above could affect not only Navient's business with the particular government entities involved, but also its business or potential future business with other entities of the same or other governmental bodies or with commercial clients, and could have a material adverse effect on its business or its results of operations.

***If Navient is unable to attract and retain professionals with strong leadership skills, its business, results of operations and financial condition may be materially adversely affected.***

Navient's success is dependent, in large part, on its ability to attract and retain personnel with the knowledge and skills to lead its business. Experienced personnel in its industry are in high demand, and competition for talent is very high. Navient must hire, retain and motivate appropriate numbers of talented people with diverse skills in order to serve its clients, respond quickly to rapid and ongoing technology, industry and macroeconomic developments, and grow and manage its business. As Navient expands its services and solutions, it must also hire and retain an increasing number of professionals with different skills and professional expectations than those of the professionals it has historically hired and retained. If Navient is unable to successfully integrate, motivate and retain these professionals, its ability to continue to secure work in those industries and for its services and solutions may suffer.

**MARKET, FUNDING & LIQUIDITY RISK. Market risk is the risk to earnings or capital resulting from changes in market conditions, such as interest rates, index mismatches or credit spreads. Navient is exposed to various types of market risk, in particular the risk of loss resulting in a mismatch between the maturity/duration of assets and liabilities, interest rate risk and other risks that arise through the management of our investment, debt and education loan portfolios. Funding and liquidity risk is the risk to earnings, capital or the conduct of our business arising from the inability to meet our obligations when they become due, such as the ability to access the unsecured or asset backed securities credit markets to fund liability maturities or invest in future asset growth and business operations at reasonable market rates.**

***Navient's business is affected by the cost and availability of funding in the capital markets.***

The capital markets are now and have from time to time experienced periods of significant volatility. This volatility can dramatically and adversely affect financing costs when compared to historical norms or make funding unavailable at any costs. Additional factors that could make financing more expensive or unavailable to Navient include, but are not limited to, financial losses, events that have an adverse impact on Navient's reputation, changes in the activities of Navient's business partners, events that have an adverse impact on the financial services industry generally, counterparty availability, changes affecting Navient's assets, corporate and regulatory actions, absolute and comparative interest rate changes, general economic conditions and the legal, regulatory and tax environments governing funding transactions. If financing is difficult, expensive or unavailable, Navient's results of operations, cash flow or financial condition could be materially and adversely affected.

***Higher or lower than expected prepayments of loans could change the expected net interest income the Company receives as the holder of the Residual Interests of securitization trusts holding education loans or cause the bonds issued by the securitization trust to be paid at a different speed than originally anticipated. These factors could materially alter our net interest margin or the value of our Residual Interests.***

The rate at which borrowers prepay their loans can have a material impact on our net interest margin or the value of our Residual Interests. Prepayment rates and levels are subject to a variety of economic, social, competitive and other factors, including changes in interest rates, availability of alternative financings, regulatory changes affecting the education loan market and the general economy.

FFELP Loans and Private Education Loans may be voluntarily prepaid without penalty by the borrower or consolidated with the borrower's other education loans through refinancing. FFELP Loans may also be repaid

19

A85

after default by the Guarantors of FFELP Loans. On the other hand, borrowers might not choose to prepay their education loans or the education loans may be extended as a result of grace periods, deferment periods, income-driven repayment plans or other repayment term or monthly payment amount modifications agreed to by the servicer, for example. FFELP Loan borrowers may be eligible for various existing income-based repayment programs under which borrowers can qualify for reduced or zero monthly payment or even debt forgiveness after a certain number of years of repayment.

Future initiatives by ED or by Congress to encourage or force consolidation, create additional income-based repayment programs or debt forgiveness programs or establish other factors affecting borrowers' repayment of their loans, could also affect prepayments on education loans. Additionally, several recent entrants into the student loan refinancing market may increase the rate at which borrowers prepay their loans. These companies specialize in refinancing student loans and may have certain advantages including lower cost structures, fewer regulatory constraints and the ability to be highly selective in choosing borrowers who are eligible to refinance. The ability to focus on borrowers with high incomes, high credit scores or other credit indices may adversely impact our remaining portfolio.

While we anticipate some variability in prepayment levels, extraordinary or extended increases or decreases in prepayment rates could materially affect our liquidity, interest income, net interest margin and the value of those Residual Interests. When, as a result of unanticipated prepayment levels, education loans within a securitization trust amortize faster than originally contracted, the trust's pool balance may decline at a rate faster than the prepayment rate assumed when the trust's bonds were originally issued. If the trust's pool balance declines faster than originally anticipated, in most of our securitization structures, the bonds issued by that trust will also be repaid faster than originally anticipated. In such cases, the Company's net interest income may decrease and the value of any retained Residual Interest in the trust may similarly decline.

Conversely, when education loans within a securitization trust amortize more slowly than originally contracted, the trust's pool balance may decline more slowly than the prepayment rate assumed when the trust's bonds were originally issued and the bonds may be repaid more slowly than originally anticipated. In these cases, the Company's net interest income increases and the value of any retained Residual Interest in the trust may increase. In addition, if the prepayment rate is especially slow and certain rights of the sellers or the servicer are not exercised or are insufficient or other action is not taken to counter the slower prepayment rate, the trust's bonds may not be repaid by their legal final maturity date(s), which could result in an event of default under the underlying securitization agreements.

Finally, rating agencies may place bonds on watch or change their ratings on (or their ratings methodology for) the bonds issued by a securitization trust, possibly raising or lowering their ratings, based upon these prepayment rates and their perception of the risk posed by those rates to the timing of the trust cash flows. Placing bonds on watch, or changing ratings negatively or proposing or making changes to ratings methodology could: (i) affect our liquidity; (ii) impede our access to the securitization markets; (iii) make us change our securitization structures; (iv) impact our net interest margins; and/or (v) raise or lower the value of our Residual Interests of our future securitization transactions.

***High or increasing interest rate environments may cause Navient's Floor Income to decline, which may adversely affect its earnings.***

FFELP Loans disbursed before April 1, 2006, generally earn interest at the higher of either the borrower rate, which is fixed over a period of time, or a floating rate based on a SAP formula set by ED. Navient has generally financed its FFELP Loans with floating rate debt whose interest is matched closely to the floating nature of the applicable SAP formula. If a decline in interest rates causes the borrower rate to exceed the SAP formula rate, Navient will continue to earn interest on the loan at the fixed borrower rate while the floating rate interest on Navient debt will continue to decline. The additional spread earned between the fixed borrower rate and the SAP formula rate is referred to as "Floor Income."

Depending on the type of FFELP Loan and when it was originated, the borrower rate is either fixed to term or is reset to a market rate on July 1 of each year. For loans where the borrower rate is fixed to term, Navient may

20

# Exhibit 5

**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| Navient Corporation, *et al.*, | ) | |
| | ) | |
| *Defendants* | ) | |

## <u>DEFENDANT NAVIENT CORPORATION'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION</u>

Pursuant to Rule 34 of the Federal Rules of Civil Procedure ("FRCP"),

Defendant Navient Corporation ("Navient Corp."), by and through its undersigned

attorneys, responds and objects to Plaintiff Consumer Financial Protection Bureau

("CFPB")'s First Set of Requests for Production, dated May 19, 2017 (the

"Requests").  These objections and responses are based on information reasonably

available and known as of the current date.  Navient Corp. reserves the right to

supplement, amend, modify, or correct its objections and responses should further

investigation or discovery disclose additional information.

Navient Corp. further states that the vast majority of documents responsive

to these Requests are maintained on computer systems in electronic format.  The

process for identifying, gathering, uploading, reviewing, and producing responsive

1

documents is underway, but as of the date of these responses is not completed. Navient Corp. states that it will produce its documents on a rolling basis at a mutually agreeable date and location.

## GENERAL OBJECTIONS

The general objections apply to each specific Request, whether or not they are specifically referenced in response to a particular Request.  By making any general or specific objection, Navient Corp. expressly does not waive or prejudice any further objections it may later assert in response to a specific Request or any other discovery.

1.     Navient Corp. objects to the extent a Request seeks documents that are unreasonably cumulative or duplicative with those already in the possession of CFPB.  In response to multiple administrative subpoenas and informal requests during the investigation preceding this lawsuit, Defendants collectively provided more than 450,000 pages of documents, answered dozens of interrogatories, prepared over 30 written reports containing complex analyses of borrower data and information, and produced nine witnesses for testimony.  Navient Corp. has identified Bates numbers for responsive materials previously produced where it is reasonably able to do so.

2

2.       Navient Corp. also objects on burdensomeness grounds to the extraordinary number of Requests, including subparts, served by CFPB on Defendants, both in its numerous administrative subpoenas and in the discovery served in this action.

3.       Navient Corp. objects to the extent a Request purports to impose on Navient Corp. a duty to search for documents beyond a reasonable search of the locations and files where potentially responsive materials would reasonably be found.  To the extent electronically stored information is necessary to answer a Request, Navient Corp. will search for responsive electronically stored documents in a manner that balances the desire to identify responsive documents with the avoidance of undue burden or expense.  Navient Corp. objects to the extent that each Request requires it to search for electronically stored information on back-up or legacy systems or to the extent that the Request calls for the restoration of any systems, programs, or media.  Navient Corp. further objects to the extent that a Request seeks voluminous information which can be located and copied only at tremendous expense of money and/or personnel resources and/or that will create a significant delay that would be disproportionate to the probative value or relevance of the material sought.

3

4.      Navient Corp. objects to the extent a Request purports to seek discovery of documents that are not in its immediate and present possession, including documents that are maintained in the files of subsidiaries and/or affiliates.  CFPB sought permission to serve specific discovery on each separate Defendant, and it has served such discovery.  Thus, unless otherwise stated, Navient Corp. interprets the discovery directed to a particular Defendant to be seeking documents and information that is in the immediate possession of that particular Defendant (and not its subsidiaries and/or affiliates that are also Defendants).

5.      Navient Corp. will produce confidential, proprietary, or personal information subject to the terms of a mutually agreeable protective order.  Navient Corp. notes that the U.S. Department of Education ("Education Department") mandates that Navient Corp. seek approval for the production of protected borrower information accompanied by a letter from the requesting party, here, CFPB.  To the extent any of the Requests seek documents for which the Education Department requires such approval, Navient Corp. will produce responsive documents, should any exist, consistent with those requirements and pursuant to a process agreed upon with CFPB.

4

6.      Navient Corp. objects to the extent a Request seeks documents protected under the attorney-client privilege, the work product doctrine, examination, or other applicable privileges.  If any protected information or material is produced, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.  To the extent Navient Corp. identifies privileged materials responsive to a Request, it will produce a log of those documents in a format consistent with the requirements of FRCP 26(b)(5). Navient Corp. will not undertake a search of the files of in-house counsel (or produce a log) unless it has reason to believe that non-duplicative, non-privileged materials can be located in those files.

7.      Navient Corp. objects to the extent a Request is vague, ambiguous, indefinite, overbroad, or otherwise unclear as to the information sought.  As a general matter, Navient Corp. will interpret the Requests as not seeking documents that are not relevant to the specific practices relating to the servicing and collection of student loans alleged in the Complaint.  In addition, Navient Corp. does not adopt by responding to these Requests any definition of words or phrases or any express or implied characterizations of fact or law contained in the Requests.

8.      The responses below are made without waiver of, and with preservation of:

5

a.     all objections as to competency, relevancy, materiality, privilege, and admissibility of the responses and the subject matter thereof as evidence for any purposes in any further proceeding in this action (including the trial of this action) and any other action;

b.     Navient Corp.'s right to object on any ground and at any time to a demand or request for additional documents or other discovery procedures related to the subject matter of this case; and

c.     Navient Corp.'s right, at any time, to revise, correct, add to or clarify any of the documents produced by Navient Corp.

## OBJECTIONS TO INSTRUCTIONS

1.     Navient Corp. objects to Instruction No. 3(b) to the extent it requires Navient Corp. to produce a log other than for documents withheld on the basis that they are "privileged or subject to protection as trial-preparation material."  FRCP 26(b)(5).  Navient Corp. will produce a privilege log at a mutually agreeable date and time after a production is made from which privileged documents were withheld.

2.     Navient Corp. objects to Instruction No. 6 on the grounds that the timeframe specified for all of the Requests (January 1, 2009 to the present) seeks information beyond the scope of the Complaint, which alleges conduct occurring no earlier than January 1, 2010.  *See* Compl. ¶¶ 50–61, 67–69, 86.  Unless otherwise specified, Navient Corp. will provide documents responsive to each request from January 1, 2010 to the present.

6

3.      Navient Corp. objects to Instruction No. 9 to the extent it purports to require Navient Corp. to call CFPB should any materials responsive to the Requests contain the sensitive personally identifiable information of any individual.  As noted above in General Objection No. 2, Navient Corp. will produce such documents pursuant to a mutually agreeable protective order and consistent with applicable Education Department requirements.

## SPECIFIC OBJECTIONS AND RESPONSES

**DOCUMENT REQUEST NO. 1:  All documents reflecting or discussing any potential or actual terms, provisions, or requirements of any contract or agreement between (a) the U.S. Department of Education or any guaranty agency, and (b) Navient Corporation or any subsidiary or affiliate of Navient Corporation (including Navient Solutions or Pioneer) relating to the servicing or collection of student loans, including the contracts and agreements themselves; all amendments or modifications thereto; all documents reflecting any proposal or request to alter, modify, or waive the terms, provisions, or requirements of any such contract or agreement (including all change orders or requests for equitable adjustment); and all documents reflecting any response to any proposal or request to alter, modify, or waive the terms, provisions, or requirements of any such contract or agreement.**

**Response:**

In addition to the general objections, Request No. 1 is overbroad and unduly burdensome to the extent that it seeks documents (a) unrelated to the claims in this action and/or the types of loans at issue, (b) regarding contract terms that were never implemented, and (c) "[a]ll documents reflecting or discussing" contract

7

terms.  Navient Corp. also objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On December 31, 2014, Navient Solutions, Inc. and Pioneer produced documents responsive to Document Request 5 of the November 24, 2014 Civil Investigative Demand "CID" issued by CFPB to Pioneer, which sought "contracts and agreements including notes and records of oral contracts and agreements, entered into between [Pioneer] and a. the U.S. Department of Education; b. any Guaranty Agency."  CFPB CID to Pioneer, Nov. 24, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(A) to these responses.

- On August 8, 2014, Navient Corp. produced to the Attorney General of Illinois documents responsive to a request for "all contracts related to loan servicing and collection between [Sallie Mae, Inc.] and the U.S. Department of Education."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014, June 27, 2014, and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(B) to these responses.

- On August 8, 2014, Navient Corp. produced to the Attorney General of Illinois documents responsive to a request for "any and all agreements… between Sallie Mae and any Guaranty Agency, including but not limited to USA Group."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014, June 27, 2014, and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB. These documents are located at the Bates Ranges detailed in Appendix 1(C) to these responses.

- On June 27, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 2 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "copies of all servicing manuals, pooling and servicing agreements, and other documentation governing

8

the servicing of loans held in trust that are serviced by you." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(D) to these responses.

Defendants generally maintain centralized files for documents related to contracts with the Education Department and guaranty agencies. Although this request was served only on Navient Corp., Navient Corp., Navient Solutions, and Pioneer will undertake a search of those files, and produce responsive documents, which they expect will include contracts, change requests, associated impact analyses and cost proposals, modifications, and external communications with the contracting officers.

**<u>DOCUMENT REQUEST NO. 2</u>: All documents reflecting any discussion, evaluation, analysis, or dispute relating to any party's performance or failure to perform under any contract or agreement produced in response to Request for Production No. 1, including all documents reflecting any instruction, guidance, or advice from the U.S. Department of Education relating to any party's performance; any notices of breach; any response to any notice of breach; all documents reflecting any belief that a party has violated or failed to comply with any term, provision, or requirement of any such contract or agreement; and all documents reflecting any dispute regarding payment under any such contract or agreement.**

**<u>Response</u>:**

In addition to the general objections, Request No. 2 is overbroad and unduly burdensome to the extent that it seeks documents (a) unrelated to the claims in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting any

9

discussion."  Although this request was served only on Navient Corp., Navient

Corp., Navient Solutions, and Pioneer will apply reasonable search terms to the

files of the custodians with principal responsibility for communicating with the

Education Department and guaranty agencies regarding contractual performance

during the relevant timeframe and will produce non-privileged communications

exchanged with the Education Department that are related to the claims in this

lawsuit.

**DOCUMENT REQUEST NO. 3:  All documents reflecting any invoice or request for payment submitted by Navient Corporation or any subsidiary or affiliate of Navient Corporation (including Navient Solutions or Pioneer) under any contract or agreement produced in response to Request for Production No. 1.**

**Response:**

In addition to the general objections, Request No. 3 is unduly burdensome

to the extent that it seeks "[a]ll documents" "reflecting" invoices and requests for

payment.  Navient Corp. will undertake a reasonable search for and produce

invoices and requests for payment submitted under any contract produced in

response to Request No. 1.

**DOCUMENT REQUEST NO. 4:  All documents reflecting any discussion, evaluation, or analysis of the actual or anticipated profitability, costs, or losses**

10

A97

**relating to any aspect of performance under any contract or agreement produced in response to Request for Production No. 1.**

**Response:**

In addition to the general objections, Request No. 4 is overbroad and unduly burdensome to the extent that it seeks documents (a) relating to the actual or anticipated profitability of aspects of contractual performance that are unrelated to the claims in this action, and (b) "[a]ll documents reflecting any discussion."

Navient Corp. will undertake a reasonable search for and produce year-end profit and loss analyses related to any contract produced in response to Request No. 1.  In addition, although this request was served only on Navient Corp., Navient Corp., Navient Solutions, and Pioneer will further undertake a search of the documents of the custodians principally responsible for assessing the profitability of performance under the contracts produced in response to Request No. 1, and will use reasonable search terms to identify and produce documents related to the claims in this lawsuit.  Navient Corp. also will produce the impact analyses for any change request or modification to any contract produced in response to Request No. 1.

**DOCUMENT REQUEST NO. 5:  All documents reflecting the provision, issuance, or communication of any instruction, requirement, command, directive, advice, guidance, suggestion, recommendation, or critique from Navient Corporation (including any business plans, strategic plans, policies,**

11

**or procedures created or issued by Navient Corporation) relating to the servicing or collection of student loans.**

**Response:**

In addition to the general objections, Request No. 5 is overbroad and unduly burdensome to the extent that it seeks documents unrelated to the claims in this action and/or the types of loans at issue.

Navient Corp. will produce any non-privileged Board minutes reflecting the approval of policies and procedures related to the claims in this action in response to Request No. 7.  Navient Corp. also will apply reasonable search terms to the files of relevant persons who served on Navient Corp. committees that may have discussed policies and procedures related to the claims in this action.  Navient Corp. will also produce documents sufficient to show the discussion of such policies and procedures, to the extent any exist.

**DOCUMENT REQUEST NO. 6:  All documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review relating to any aspect of the servicing or collection of student loans, including any audit or compliance reports, any risk management analyses, all communications relating to any such audit or**

12

**compliance reports or risk management analyses, and any action plans in response to any audit or compliance reports or risk management analyses.**

**<u>Response</u>:**

In addition to the general objections, Request No. 6 is overbroad and unduly burdensome to the extent that it seeks documents (a) unrelated to the claims in this action and/or the types of loans at issue, and (b) "all documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review." Navient Corp. further objects to the extent this Request is duplicative of Request Nos. 1 and 4 to Pioneer and Request No. 6 to Navient Solutions, and directs CFPB to the responses to those Requests.

To the extent this Request calls for communications with regulators during the course of a supervisory exam, Navient Corp. objects on privilege grounds. Navient Corp. will not undertake a search of the files of in-house counsel or employees involved in those examinations, or produce a log, because it would be unduly burdensome and not likely to lead to relevant non-privileged materials.

Navient Corp. also objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request. Specifically:

- On June 13, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 1(d) of the April 29, 2014 CID issued

13

A100

by CFPB to Sallie Mae, Inc., which sought "[a]ll policies and procedures relating to . . . [q]uality assurance with respect to call center employees and customer service employees." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(E) to these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 5 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll unique versions of any checklist used by your employees to perform quality assurance or conduct a compliance review of your call center employees or customer service representatives." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(F) to these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 6 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of each quality assurance report provided to your call center management team." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(G) to these responses.

- On July 11, 2014, Navient Solutions, Inc. provided a response to Interrogatory 11 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought a description of "any quality assurance reviews conducted with respect to your customer service representatives or call center employees, including the substance of the reviews, the frequency of the reviews, how such reviews are conducted, how such reviews are memorialized, and any adverse action taken as a result of such reviews." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. Navient Solutions, Inc.'s response is located in its July 11, 2014 letter to CFPB.

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 4 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of all reports and presentations documenting complaints received by you about your servicing of student loans, including, but not limited to, reports and

14

presentations provided to your executives, vice presidents, and other senior staff." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(H) to these responses.

- On April 8, 2014, SLM Corporation produced documents to the Attorney General of Illinois documents responsive to a request for "all documents, including without limitation all policies and procedures, concerning how Sallie Mae ensures compliance with the Fair Debt Collection Practices Act . . . and any other state or federal law that governs Collection Activity . . . [or] credit reporting . . . ." CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013. On May 30, 2014, June 27, 2014, and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB. These documents are located at the Bates Ranges detailed in Appendix 1(I) to these responses.

Navient Solutions' internal audit function conducts audits related to the servicing or collection of student loans, and certain of those reports are shared with Navient Corp.'s Board of Directors. Navient Corp. will produce internal audit reports related to the claims in lawsuit and presented to the Board of Directors in response to Request No. 7.

**DOCUMENT REQUEST NO. 7:  All documents (including communications, agendas, minutes, reports, and presentations) sent or received by the board of directors of Navient Corporation, by any committee or subcommittee of the board of directors, or by any member of the board of directors in his or her**

**capacity as a member of the board, relating to the servicing or collection of student loans.**

**<u>Response</u>:**

In addition to the general objections, Request No. 7 is overbroad and unduly burdensome to the extent that it seeks documents (a) unrelated to the claims in this action and/or the types of loans at issue, and (b) every communication sent or received by any past or present member of the board of directors relating to the servicing or collection of student loans.

Navient Corp. will undertake a reasonable search for and produce documents presented to or approved by the Board, including agendas, minutes, reports, and presentations that are related to the claims in this lawsuit.

**<u>DOCUMENT REQUEST NO. 8</u>: All documents drafted, created, or generated in whole or in part by Navient Corporation relating to any aspect of forbearance or income-driven repayment plans (including any type of income-driven repayment plan, such as income-based repayment or "pay as you earn").**

**<u>Response</u>:**

Navient Corp. is not aware of any documents "drafted, created, or generated in whole or in part by Navient Corporation relating to any aspect of forbearance or income-driven repayment plans (including any type of income-driven repayment plan, such as income-based repayment or 'pay as you earn')."

16

**DOCUMENT REQUEST NO. 9:  All documents drafted, created, or generated in whole or in part by Navient Corporation relating to errors in the processing of payments for student loans that were happening on a repeated, recurring, or non-isolated basis or that had been the subject of complaints from more than one consumer.**

**Response:**

Navient Corp. is not aware of any documents "drafted, created, or generated in whole or in part by Navient Corporation relating to errors in the processing of payments for student loans that were happening on a repeated, recurring, or non-isolated basis or that had been the subject of complaints from more than one consumer."

**DOCUMENT REQUEST NO. 10:  All documents drafted, created, or generated in whole or in part by Navient Corporation relating to any requirement that a borrower demonstrate a certain payment history (such as making a certain number of consecutive, on-time payments) to become eligible for cosigner release for student loans.**

**Response:**

Navient Corp. is not aware of any documents "drafted, created, or generated in whole or in part by Navient Corporation relating to any requirement that a borrower demonstrate a certain payment history (such as making a certain number of consecutive, on time payments) to become eligible for cosigner release for student loans."

17

**DOCUMENT REQUEST NO. 11:  All documents drafted, created, or generated in whole or in part by Navient Corporation relating to credit reporting (i.e., the furnishing of information to credit reporting agencies) for disabled borrowers with student loans.**

**Response:**

Navient Corp. is not aware of any documents "drafted, created, or generated in whole or in part by Navient Corporation relating to credit reporting (i.e., the furnishing of information to credit reporting agencies) for disabled borrowers with student loans."

**DOCUMENT REQUEST NO. 12:  All documents drafted, created, or generated in whole or in part by Navient Corporation relating to communications with borrowers about the federal loan rehabilitation program.**

**Response:**

Navient Corp. is not aware of any documents "drafted, created, or generated in whole or in part by Navient Corporation relating to communications with borrowers about the federal loan rehabilitation program."

**DOCUMENT REQUEST NO. 13:  All documents on which you rely to support any defense that you are asserting or will assert in this lawsuit.**

**Response:**

Navient Corp. objects to Request No. 13 as premature because it has not yet answered the Complaint or pled affirmative defenses.  Navient Corp. will produce documents on which it intends to rely for summary judgment or trial.

18

Dated:  August 21, 2017       Respectfully submitted,

/s/ Matthew T. Martens

Matthew T. Martens (DC 1019099) (*pro hac vice*)
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
matthew.martens@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Donna A. Walsh (PA 74833)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
dwalsh@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient Solutions, LLC, and Pioneer Credit Recovery, Inc*

19

A106

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2017, I served the foregoing Objections and Responses to Plaintiff's First Set of Requests for Production to CFPB by email to the following counsel for Plaintiff:

Nicholas Jabbour:  Nicholas.Jabbour@cfpb.gov
Ebony Sunala Johnson:  Ebony.Johnson@cfpb.gov
Lawrence DeMille-Wagman:  Lawrence.Wagman@cfpb.gov
Andrea Matthews:  Andrea.Matthews@cfpb.gov
Thomas H. Kim:  Thomas.Kim@cfpb.gov

Mr. Jabbour, on behalf of Plaintiff, previously consented to electronic service.


/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

*Counsel for Navient Corporation, Navient
Solutions, LLC, and Pioneer Credit Recovery, Inc.*

# Appendix 1

## (A)

| Bates Begin | Bates End |
|---|---|
| PCR0000033 | PCR0001233 |
| PCR0001267 | PCR0001279 |

## (B)

| Bates Begin | Bates End |
|---|---|
| NSI-001-0005876 | NSI-001-0006394 |
| NSI-004-0000001 | NSI-004-0054022 |
| NSI-016-0000001 | NSI-016-0000066 |
| NSI-016-0000753 | NSI-016-0001302 |

## (C)

| Bates Begin | Bates End |
|---|---|
| NSI-016-0000779 | NSI-016-0000791 |
| NSI-016-0004383 | NSI-016-0004397 |

## (D)

| Bates Begin | Bates End |
|---|---|
| NSI-004-0000001 | NSI-004-0054022 |

## (E)

| Bates Begin | Bates End |
|---|---|
| NSI-002-0000001 | NSI-002-0179951 |

## (F)

| Bates Begin | Bates End |
|---|---|
| NSI-007-0062298 | NSI-007-0062321 |
| NSI-010-0010016 | NSI-010-0013012 |

**(G)**

| Bates Begin | Bates End |
|---|---|
| NSI-007-0062322 | NSI-007-0071458 |
| NSI-014-0002728 | NSI-014-0003399 |
| NSI-010-0010016 | NSI-010-0013012 |

**(H)**

| Bates Begin | Bates End |
|---|---|
| NSI-014-0001631 | NSI-014-0003399 |

**(I)**

| Bates Begin | Bates End |
|---|---|
| NSI-001-0004140 | NSI-001-0004298 |
| NSI-001-0004407 | NSI-001-0004418 |
| NSI-001-0004520 | NSI-001-0004535 |
| NSI-001-0004540 | NSI-001-0004552 |
| NSI-001-0004556 | NSI-001-0004671 |
| NSI-001-0004674 | NSI-001-0004675 |
| NSI-001-0004680 | NSI-001-0004684 |
| NSI-001-0004690 | NSI-001-0004692 |
| NSI-001-0004700 | NSI-001-0004701 |
| NSI-001-0004711 | NSI-001-0004716 |
| NSI-001-0004719 | NSI-001-0004720 |
| NSI-001-0004724 | NSI-001-0004737 |
| NSI-001-0004787 | NSI-001-0004788 |
| NSI-001-0004795 | NSI-001-0004797 |
| NSI-001-0004803 | NSI-001-0004809 |
| NSI-001-0004814 | NSI-001-0004814 |
| NSI-001-0004821 | NSI-001-0004828 |
| NSI-001-0004853 | NSI-001-0004857 |
| NSI-001-0004862 | NSI-001-0004863 |
| NSI-001-0004866 | NSI-001-0004873 |
| NSI-001-0004878 | NSI-001-0004881 |
| NSI-001-0004891 | NSI-001-0004902 |
| NSI-001-0004904 | NSI-001-0004907 |

| | |
|---|---|
| NSI-001-0004923 | NSI-001-0004930 |
| NSI-001-0004948 | NSI-001-0004954 |
| NSI-001-0004970 | NSI-001-0004988 |
| NSI-001-0004992 | NSI-001-0005015 |
| NSI-001-0005021 | NSI-001-0005031 |
| NSI-001-0005046 | NSI-001-0005048 |
| NSI-001-0005054 | NSI-001-0005057 |
| NSI-001-0005067 | NSI-001-0005072 |
| NSI-001-0005075 | NSI-001-0005080 |
| NSI-001-0005089 | NSI-001-0005100 |
| NSI-001-0005129 | NSI-001-0005367 |
| NSI-001-0005407 | NSI-001-0005869 |
| NSI-001-0006415 | NSI-001-0006510 |
| NSI-001-0006525 | NSI-001-0006575 |
| NSI-001-0006582 | NSI-001-0006584 |
| NSI-001-0006590 | NSI-001-0006592 |
| NSI-001-0006634 | NSI-001-0006663 |
| NSI-001-0006673 | NSI-001-0006710 |
| NSI-001-0006714 | NSI-001-0006848 |
| NSI-001-0007504 | NSI-001-0007516 |
| NSI-001-0007575 | NSI-001-0007772 |
| NSI-001-0007777 | NSI-001-0007814 |
| NSI-001-0007876 | NSI-001-0007877 |
| NSI-001-0007898 | NSI-001-0007928 |
| NSI-001-0007949 | NSI-001-0007950 |
| NSI-001-0007968 | NSI-001-0007991 |
| NSI-001-0008009 | NSI-001-0008169 |
| NSI-001-0008337 | NSI-001-0008347 |
| NSI-001-0008376 | NSI-001-0008376 |
| NSI-001-0008378 | NSI-001-0008395 |
| NSI-001-0008400 | NSI-001-0008403 |
| NSI-001-0008410 | NSI-001-0008496 |
| NSI-001-0008500 | NSI-001-0008519 |
| NSI-001-0008525 | NSI-001-0008574 |
| NSI-001-0008600 | NSI-001-0008914 |
| NSI-001-0008918 | NSI-001-0009305 |
| NSI-001-0009334 | NSI-001-0009350 |

| | |
|---|---|
| NSI-001-0009355 | NSI-001-0009470 |
| NSI-001-0009589 | NSI-001-0010077 |
| NSI-001-0010159 | NSI-001-0010174 |
| NSI-001-0010686 | NSI-001-0010687 |
| NSI-001-0011070 | NSI-001-0011085 |
| NSI-001-0011241 | NSI-001-0012132 |
| NSI-001-0012158 | NSI-001-0012212 |
| NSI-001-0012242 | NSI-001-0012243 |
| NSI-001-0012273 | NSI-001-0014070 |
| NSI-001-0014073 | NSI-001-0014976 |
| NSI-001-0014980 | NSI-001-0016069 |
| NSI-001-0016075 | NSI-001-0016132 |
| NSI-001-0016141 | NSI-001-0016153 |
| NSI-001-0016166 | NSI-001-0016184 |
| NSI-001-0016188 | NSI-001-0016196 |
| NSI-001-0016200 | NSI-001-0016228 |
| NSI-001-0016231 | NSI-001-0016232 |
| NSI-001-0016236 | NSI-001-0016246 |
| NSI-001-0016286 | NSI-001-0016315 |
| NSI-001-0016487 | NSI-001-0016494 |
| NSI-001-0016502 | NSI-001-0016505 |
| NSI-001-0016566 | NSI-001-0016568 |
| NSI-001-0016605 | NSI-001-0016615 |
| NSI-001-0016630 | NSI-001-0017063 |
| NSI-001-0017164 | NSI-001-0018023 |
| NSI-001-0018072 | NSI-001-0018084 |
| NSI-001-0018102 | NSI-001-0018115 |
| NSI-001-0018129 | NSI-001-0018132 |
| NSI-001-0018168 | NSI-001-0018170 |
| NSI-001-0018224 | NSI-001-0018228 |
| NSI-001-0018533 | NSI-001-0018560 |
| NSI-001-0018594 | NSI-001-0018597 |
| NSI-001-0018622 | NSI-001-0018708 |
| NSI-001-0018783 | NSI-001-0018792 |
| NSI-001-0018826 | NSI-001-0018832 |
| NSI-001-0018836 | NSI-001-0018848 |
| NSI-016-0001423 | NSI-016-0001424 |

| | |
|---|---|
| NSI-016-0008312 | NSI-016-0008330 |
| NSI-016-0009573 | NSI-016-0009864 |
| NSI-016-0009915 | NSI-016-0011116 |
| NSI-016-0011123 | NSI-016-0011219 |
| NSI-016-0011361 | NSI-016-0011365 |
| NSI-016-0011367 | NSI-016-0011368 |
| NSI-016-0011370 | NSI-016-0012095 |
| NSI-016-0012255 | NSI-016-0012294 |
| NSI-016-0012400 | NSI-016-0012504 |
| NSI-016-0012776 | NSI-016-0012778 |
| NSI-016-0012843 | NSI-016-0012846 |
| NSI-016-0012909 | NSI-016-0012910 |
| NSI-016-0012915 | NSI-016-0012920 |
| NSI-016-0012925 | NSI-016-0013042 |
| NSI-016-0013047 | NSI-016-0013055 |
| NSI-016-0013081 | NSI-016-0013083 |
| NSI-016-0013960 | NSI-016-0014076 |
| NSI-016-0014192 | NSI-016-0014321 |
| NSI-016-0014784 | NSI-016-0014898 |
| NSI-016-0014940 | NSI-016-0015054 |
| NSI-016-0015186 | NSI-016-0015192 |
| NSI-016-0015202 | NSI-016-0015207 |
| NSI-016-0015224 | NSI-016-0015235 |
| NSI-016-0016309 | NSI-016-0016538 |
| NSI-016-0017055 | NSI-016-0017503 |
| NSI-016-0017519 | NSI-016-0017574 |
| NSI-016-0017635 | NSI-016-0017665 |
| NSI-016-0017668 | NSI-016-0017668 |
| NSI-016-0017720 | NSI-016-0017734 |
| NSI-016-0017736 | NSI-016-0017743 |
| NSI-016-0017747 | NSI-016-0017819 |
| NSI-016-0017833 | NSI-016-0017898 |
| NSI-016-0017921 | NSI-016-0017941 |
| NSI-016-0018159 | NSI-016-0018163 |
| NSI-016-0018592 | NSI-016-0018592 |
| NSI-016-0018600 | NSI-016-0018633 |
| NSI-016-0019067 | NSI-016-0022797 |

| | |
|---|---|
| NSI-016-0023017 | NSI-016-0025358 |
| NSI-016-0025455 | NSI-016-0025972 |
| NSI-016-0026073 | NSI-016-0026451 |
| NSI-016-0026524 | NSI-016-0026798 |
| NSI-016-0026846 | NSI-016-0027135 |
| NSI-016-0027166 | NSI-016-0027451 |
| NSI-016-0027524 | NSI-016-0027878 |
| NSI-016-0028085 | NSI-016-0034224 |
| NSI-016-0034233 | NSI-016-0050050 |
| NSI-016-0050763 | NSI-016-0051032 |
| NSI-016-0051787 | NSI-016-0052026 |
| NSI-016-0052883 | NSI-016-0052907 |
| NSI-016-0053311 | NSI-016-0053513 |
| NSI-016-0053708 | NSI-016-0055312 |
| NSI-016-0058326 | NSI-016-0058327 |
| NSI-016-0058337 | NSI-016-0058337 |
| NSI-016-0063051 | NSI-016-0063053 |
| NSI-016-0063056 | NSI-016-0063060 |
| NSI-016-0063068 | NSI-016-0063069 |
| NSI-016-0063080 | NSI-016-0063083 |
| NSI-016-0063193 | NSI-016-0063194 |
| NSI-016-0064290 | NSI-016-0064295 |
| NSI-016-0064413 | NSI-016-0064418 |
| NSI-016-0064424 | NSI-016-0064426 |
| NSI-016-0064440 | NSI-016-0064445 |
| NSI-016-0064459 | NSI-016-0064466 |
| NSI-016-0064490 | NSI-016-0064491 |
| NSI-016-0064706 | NSI-016-0064709 |

# Exhibit 6

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| Navient Corporation, *et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

## <u>DEFENDANT NAVIENT SOLUTIONS, LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION</u>

Pursuant to Rule 34 of the Federal Rules of Civil Procedure ("FRCP"), Defendant Navient Solutions, LLC ("Navient Solutions"), through its undersigned counsel, responds and objects to Plaintiff the Consumer Financial Protection Bureau ("CFPB")'s First Set of Requests for Production, dated June 5, 2017, including the instructions and definitions therein (the "Requests").

Navient Solutions further states that the vast majority of documents responsive to these Requests are maintained on its computer systems in electronic format. The process for identifying, gathering, uploading, reviewing, and producing responsive documents is underway, but as of the date of these responses is not completed. Navient Solutions states that it will produce its documents on a rolling basis at a mutually agreeable date and location.

1

## GENERAL OBJECTIONS

The general objections apply to each specific Request, whether or not they are specifically referenced in response to a particular Request.  By making any general or specific objection, Navient Solutions expressly does not waive or prejudice any further objections it may later assert in response to a specific Request or any other discovery.

1.      Navient Solutions objects to the extent a Request seeks documents that are unreasonably cumulative or duplicative with those already in the possession of CFPB.  In response to multiple administrative subpoenas and informal requests during the investigation preceding this lawsuit, Defendants collectively provided more than 450,000 pages of documents, answered dozens of interrogatories, prepared over 30 written reports containing complex analyses of borrower data and information, and produced nine witnesses for testimony. Navient Solutions has identified Bates numbers for responsive materials previously produced where it is reasonably able to do so.

2.      Navient Solutions also objects on burden grounds to the extraordinary number of Requests, including subparts, served by CFPB on Defendants, both in its numerous administrative subpoenas and the discovery served in this action.

2

CFPB has served 26 Requests on Navient Solutions alone, each with multiple and distinct (49 total) sub-parts.

3.      Navient Solutions objects to each of the Requests to the extent it purports to impose on Navient Solutions a duty to search for documents beyond a reasonable search of the locations and files where potentially responsive materials would reasonably be found.  To the extent electronically stored information is necessary to answer a Request, Navient Solutions will search for responsive electronically stored documents in a manner that balances the desire to identify responsive documents with the avoidance of undue burden or expense.  Navient Solutions objects to the extent that each Request requires it to search for electronically stored information on back-up or legacy systems or to the extent that the Request calls for the restoration of any systems, programs, or media.  Navient Solutions further objects to the extent that a Request seeks voluminous information which can be located and copied only at tremendous expense of money and/or personnel resources and/or that will create a significant delay that would be disproportionate to the probative value or relevance of the material sought.

4.      Navient Solutions objects to the extent a Request purports to seek discovery of documents that are not in its immediate and present possession, including documents that are maintained in the files of subsidiaries and/or

3

affiliates.  CFPB sought permission to serve specific discovery on each separate

Defendant, and it has served such discovery.  Thus, unless otherwise stated,

Navient Solutions interprets the discovery directed to a particular Defendant to be

seeking documents and information that is in the immediate possession of that

particular Defendant (and not its subsidiaries and/or affiliates that are also

Defendants).

     5.     Navient Solutions will produce confidential, proprietary, or personal

information subject to the terms of a mutually agreeable protective order.  Navient

Solutions notes that the U.S. Department of Education ("Education Department")

mandates that Navient Solutions seek approval for the production of protected

borrower information accompanied by a letter from the requesting party, here,

CFPB.  To the extent any of the Requests seek documents for which the Education

Department requires such approval, Navient Solutions will produce responsive

documents, should any exist, consistent with those requirements and pursuant to a

process agreed upon with CFPB.

     6.     Navient Solutions objects to the extent a Request seeks documents

protected under the attorney-client privilege, the work product doctrine,

examination, or other applicable privileges.  If any protected information or

material is produced, such disclosure is not intentional and shall not be deemed a

4

waiver of any privilege or protection.  To the extent Navient Solutions identifies

privileged materials responsive to a Request, it will produce a log of those

documents in a format consistent with the requirements of FRCP 26(b)(5).

Navient Solutions will not undertake a search of the files of in-house counsel (or

produce a log) unless it has reason to believe that non-duplicative, non-privileged

materials can be located in those files.

7.      Navient Solutions objects to the extent a Request is vague,

ambiguous, indefinite, overbroad, or otherwise unclear as to the information

sought.  As a general matter, Navient Solutions will interpret the Requests as not

seeking documents unrelated to the practices and statements alleged in the

Complaint.  In addition, Navient Solutions does not adopt by responding to these

Requests any definition of words or phrases or any express or implied

characterizations of fact or law contained in the Requests.

8.      The responses below are made without waiver of, and with

preservation of:

a.      all objections as to competency, relevancy, materiality, privilege, and
admissibility of the responses and the subject matter thereof as
evidence for any purposes in any further proceeding in this action
(including the trial of this action) and any other action;

5

b.    Navient Solutions' right to object on any ground and at any time to a demand or request for additional documents or other discovery procedures related to the subject matter of this case; and

c.    Navient Solutions' right, at any time, to revise, correct, add to or clarify any of the documents produced by Navient Solutions.

## OBJECTIONS TO INSTRUCTIONS

1.    Navient Solutions objects to Instruction No. 3(b) to the extent it requires Navient Solutions to produce a log other than for documents withheld on the basis that they are "privileged or subject to protection as trial-preparation material." FRCP 26(b)(5). Navient Solutions will produce a log at a mutually agreeable date and time after a production is made from which privileged documents were withheld.

2.    Navient Solutions objects to Instruction No. 6 on the grounds that the timeframe specified for all of the Requests (January 1, 2009 to the present) seeks information beyond the scope of the Complaint, which alleges conduct occurring no earlier than January 1, 2010. *See* Compl. ¶¶ 50–61, 67–69, 86. Unless otherwise specified, Navient Solutions will provide documents responsive to each request from January 1, 2010 to the present.

3.    Navient Solutions objects to Instruction No. 9 to the extent it purports to require Navient Solutions to call CFPB should any materials responsive to the Requests contain the sensitive personally identifiable information of any

6

individual.  As noted above in General Objection No. 2, Navient Solutions will

produce such documents pursuant to a mutually agreeable protective order and

consistent with applicable Education Department requirements.

## SPECIFIC OBJECTIONS AND RESPONSES
## TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

**DOCUMENT REQUEST NO. 1:  All documents reflecting the provision, issuance, or communication of any instruction, requirement, command, directive, advice, guidance, suggestion, recommendation, or critique from Navient Corporation (including any business plans, strategic plans, policies, or procedures created or issued by Navient Corporation) relating to the servicing of student loans.**

**Response:**

In addition to the general objections, Request No. 1 is overbroad and unduly

burdensome to the extent that it seeks documents unrelated to the claims in this

action and/or the types of loans at issue.  Navient Solutions further objects to

Request No. 1 to the extent it is duplicative of Request No. 5 to Navient Corp., and

directs the CFPB to Navient Corp.'s response to that Request and the documents

produced in response thereto.  Navient Solutions is not aware of additional

responsive documents beyond those identified by Navient Corp.

**DOCUMENT REQUEST NO. 2:  For each type of notice or disclosure referenced on pages 9-10 of Defendants' brief in support of their motion to dismiss (docket entry #29), and any other written communication with borrowers about forbearance or income-driven repayment plans: (a) one example of every version of the notice, disclosure, or written communication**

7

**in the format as it was sent to a consumer (including any attachments to the notice, disclosure, or written communication), (b) all drafts of each version of the notice, disclosure, or written communication, and (c) all documents reflecting any testing or evaluation (such as through a focus group) of the notice, disclosure, or written communication, including any drafts. For part (a) of this Request, a notice, disclosure, or written communication that is identical to another notice, disclosure, or written communication but for information that is specific to the borrower shall not be considered a separate version of the document.**

**Response:**

In addition to the general objections, Request No. 2 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) "all drafts" of "each version" of every written communication with borrowers about forbearance or income-driven repayment plans.  Navient Solutions further objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On October 25, 2013, Sallie Mae, Inc. produced documents responsive to Document Request 5 of the September 5, 2013 CID issued by CFPB to Sallie Mae, Inc., which sought "Exemplars of all forms of billing statements for borrowers with multiple loans in repayment."  CFPB CID to Sallie Mae, Inc., Sep. 5, 2013.  These documents are located at the Bates Range detailed in Appendix 1(A) to these responses.

- On June 27, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 11 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "Each unique version of form or template documents and advertisements used to

8

communicate information to a student loan borrower or cosigner about repayment plans for Federal Student Loans and Private Student Loans." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(B) to these responses.

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois documents responsive to a request for "all . . . scripts, form letters, policies, and training manuals related to advising borrowers of their repayment rights, including but not limited to any type of Loss Mitigation program including the ability for their loans to be placed into forbearance."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(C) to these responses

- On August 8, 2014, SLM Corporation produced to the Attorney General of Illinois documents responsive to a request for "all . . . educational, promotional, and other material provided by Sallie Mae and Third Parties to borrowers who are in default or have indicated an inability to pay on their (a) Government Education and (b) Private Education Loans."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013. On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(D) to these responses.

Navient Solutions will identify the employees principally responsible for drafting or creating written communications with borrowers about forbearance or income-driven repayment plans.  Navient Solutions will use reasonable search terms to identify and produce final versions of templates used for written communications with borrowers that are related to the claims in this action and

9

were created after April 1, 2014, so as to capture materials, if any, created after the prior productions.  In the regular course of business, Navient Solutions contracts with Siegel and Gale, a brand strategy firm, to evaluate certain written communications to borrowers.  Navient Solutions will produce evaluations conducted by Siegel & Gale from July 1, 2011 to the present of written communications with borrowers about forbearance or income-driven repayment plans.

**DOCUMENT REQUEST NO. 3:  All documents containing, discussing, or reflecting any requirements, instructions, policies, procedures, guidance, or training provided to employees, agents, or subcontractors of Navient Solutions relating to the handling of, or communications with, borrowers who indicate that they are having difficulty paying their student loans, would like to reduce payments on their student loans (including paying zero), or would like to enroll in forbearance or an income-driven repayment plan, including all scripts, flowcharts, and decision trees relating to such interactions or communications.**

**Response:**

In addition to the general objections, Request No. 3 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans at issue, and (b) "[a]ll" documents, even those "discussing" instructions, policies, procedures, guidance, or training relating to communications with borrowers who indicate they are having difficulty paying their student loans, would like to their reduce payments, or would like to enroll in forbearance or an income-driven

10

repayment plan.  Navient Solutions further objects that this Request is duplicative

of previous requests for information, and that CFPB is already in possession of

documents that appear to be responsive to this Request.  Specifically:

- On June 13, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 1(a) of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "All policies and procedures relating to . . . a. Communications to borrowers regarding repayment plans for Federal Student Loans and Private Student Loans; b. Cosigner release; c. Consequences resulting from the death or bankruptcy of a cosigner; d. Quality assurance with respect to call center employees and customer service employees; and e. Collections for delinquent or defaulted student loans."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Range detailed in Appendix 1(E) to these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 3 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll unique versions of any training materials provided to your call center employees and customer service representatives."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(F) to these responses.

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois its response to a request for a description of "all policies and procedures . . . concerning placing borrowers in forbearance."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced this response to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(G) to these responses.

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois its response to a request for a description of "all policies and procedures . . .  regarding communications with a borrower who is

11

delinquent."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced this response to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(H) to these responses.

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois its response to a request for a description of "all policies and procedures . . . for dealing with a borrower who has indicated a current inability to make payments in connection with a (a) Government Education Loan or (b) Private Education Loan."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced this response to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(I) to these responses.

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois documents responsive to a request for "all . . . scripts, form letters, policies, and training manuals related to advising borrowers of their repayment rights, including but not limited to any type of Loss Mitigation program including the ability for their loans to be placed into forbearance."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(J) to these responses.

- On August 8, 2014, SLM Corporation produced to the Attorney General of Illinois documents responsive to a request for "all training materials Sallie Mae provides to its employees regarding servicing or Collection of (a) Government Education and (b) Private Education Loans."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(K) to these responses.

12

Navient Solutions will identify the employees principally responsible for drafting or creating policies and procedures, call scripts, and training materials related to communications with borrowers who indicate they are having difficulty paying their student loans, would like to reduce their payments, or would like to enroll in forbearance or an income-driven repayment plan.  Navient Solutions will use reasonable search terms to identify and produce such policies and procedures, call scripts, and training materials created after April 1, 2014, so as to capture materials, if any, created after the prior productions.

**DOCUMENT REQUEST NO. 4:  All documents containing, discussing, or reflecting any requirements, instructions, policies, procedures, guidance, or training provided to employees, agents, or subcontractors of Navient Solutions relating to communications with borrowers about forbearance or income-driven repayment plans, including: (a) communications about the potential or actual suitability, unsuitability, appropriateness, inappropriateness, advantages, disadvantages, benefits, or costs of forbearance or any type of income-driven repayment plan for any type, category, or group of borrowers (including borrowers with a particular characteristic such as a temporary or long-term financial hardship), and (b) communications in which Navient Solutions recommends, advises, or suggests that the borrower consider or enroll in forbearance or any type of income-driven repayment plan, including all scripts, flowcharts, and decision trees relating to such communications.**

**Response:**

In addition to the general objections, Request No. 4 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans at issue, and (b) "[a]ll" documents, even those "discussing" requirements,

13

instructions, policies, procedures, guidance, or training relating to communications with borrowers about forbearance or income-driven repayment plans.  Navient Solutions further objects to the extent that this Request seeks documents already encompassed by the response to Request No. 3, and directs CFPB to its response to that Request.

**DOCUMENT REQUEST NO. 5:  All documents reflecting any discussion, evaluation, or analysis of the adequacy, inadequacy, effectiveness, ineffectiveness, appropriateness, or inappropriateness of any requirements, instructions, policies, procedures, guidance, or training relating to the communications described in subparts (a) and (b) of Request for Documents No. 4, including: (a) all communications or analyses regarding any deficiencies or problems in such requirements, instructions, policies, procedures, guidance, or training, (b) any analysis of the impact on borrowers of such requirements, instructions, policies, procedures, guidance, or training, and (c) all communications or analyses regarding potential improvements in such requirements, instructions, policies, procedures, guidance, or training.**

**Response:**

In addition to the general objections, Request No. 5 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans at issue, and (b) "[a]ll documents reflecting any discussion" of the adequacy of any requirements, instructions, policies, procedures, guidance, or training relating to communications with borrowers about forbearance or income-driven repayment plans.

14

Navient Solutions will identify the employees principally responsible for evaluating the effectiveness of policies governing communications with borrowers regarding forbearance or income-driven repayment plans.  Navient Solutions will use reasonable search terms to identify and produce analyses of policies, procedures, guidance, call scripts, or training materials regarding forbearance or income-driven repayment plans that were conducted after July 1, 2011.

**DOCUMENT REQUEST NO. 6:  All documents relating to any evaluation, auditing, monitoring, oversight, due diligence, quality assurance, or compliance review (including those conducted by or on behalf of an investor or trustee of a loan securitization trust) relating to communications with or enrollment of borrowers in forbearance or any type of income-driven repayment plan, including any audit or compliance reports, any risk management analyses, all communications relating to any such audit or compliance reports or risk management analyses, and any action plans in response to any audit or compliance reports or risk management analyses.**

**Response:**

In addition to the general objections, Request No. 6 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans at issue, and (b) "[a]ll documents relating to any evaluation" relating to communications with or enrollment of borrowers in forbearance or income-driven repayment plans.

To the extent this Request calls for communications with regulators during the course of a supervisory exam, Navient Solutions objects on privilege grounds.

15

Navient Solutions will not undertake a search of the files of in-house counsel or employees involved in those examinations, or produce a log, because it would be unduly burdensome and not likely to lead to relevant non-privileged materials.

Navient Solutions further objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On June 13, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 1(d) of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll policies and procedures relating to . . . Quality assurance with respect to call center employees and customer service employees."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Range detailed in Appendix 1(L) of these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 5 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll unique versions of any checklist used by your employees to perform quality assurance or conduct a compliance review of your call center employees or customer service representatives."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Ranges detailed in Appendix 1(M) of these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 6 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of each quality assurance report provided to your call center management team." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(N) of these responses.

16

- On July 11, 2014, Navient Solutions, Inc. produced its response to Interrogatory 11 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought a description of "any quality assurance reviews conducted with respect to . . . customer service representatives or call center employees." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.

Navient Solutions will identify the employees principally responsible for conducting audits, compliance reviews, or quality assurance reviews of communications with borrowers regarding forbearance or income-driven repayment plans.  Navient Solutions will use reasonable search terms to identify and produce audits or compliance reviews conducted after July 1, 2011, and quality assurance reviews conducted after April 30, 2014, so as to capture materials, if any, created after the prior productions.

**DOCUMENT REQUEST NO. 7:  All documents reflecting any discussion, evaluation, or analysis of the potential or actual suitability, unsuitability, appropriateness, inappropriateness, advantages, disadvantages, benefits, or costs of forbearance or any type of income-driven repayment plan for any type, category, or group of borrowers (including borrowers with a particular characteristic such as a temporary or long-term financial hardship), including any quantification or assessment of the costs of forbearance or any type of income-driven repayment plan for any type, category, or group of borrowers (whether on an absolute or relative basis). Communications with individual borrowers are not responsive to this Request.**

**Response:**

In addition to the general objections, Request No. 7 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans

17

at issue, and (b) "[a]ll documents reflecting any discussion" of the costs to borrowers of forbearance and income-driven repayment plans.

Navient Solutions will identify the employees principally responsible for evaluating the costs and benefits to borrowers of forbearance as compared to income-driven repayment plans as well as the employees likely to receive such analyses.  Navient Solutions will use reasonable search terms to identify and produce evaluations—to the extent they exist—undertaken after July 1, 2011.

**DOCUMENT REQUEST NO. 8:  All documents reflecting any discussion, evaluation, analysis, quantification, or calculation of the time, expense, or burden incurred by Navient Solutions or any affiliate of Navient Solutions in enrolling borrowers in or communicating with borrowers about forbearance or income-driven repayment plans, including any cost savings resulting from enrolling borrowers in or communicating with borrowers about any particular type of repayment option (such as forbearance).**

**Response:**

In addition to the general objections, Request No. 8 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting any discussion" of the time, expense, or burden incurred by enrolling borrowers in or communicating with borrowers about forbearance or income-driven repayment plans.

18

To the extent this Request calls for internal analyses conducted at the direction of counsel regarding the costs of any settlement demands by CFPB or certain state Attorneys General, Navient Solutions objects on privilege grounds. Navient Solutions will not undertake a search of the files of in-house counsel or those directed by counsel, or produce a log, because it would be unduly burdensome and not likely to lead to relevant non-duplicative, non-privileged materials.

Navient Solutions will produce year-end profit and loss reports from July 1, 2011 to the present for specific activities related to enrolling borrowers in forbearance and income-driven repayment plans.

**<u>DOCUMENT REQUEST NO. 9</u>:  All documents reflecting complaints, disputes, notices of error, or requests for escalation relating to any communication of the type described in subpart (a) or subpart (b) of Request for Documents No. 4.**

**<u>Response</u>:**

In addition to the general objections, Request No. 9 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the types of loans at issue, and (b) "[a]ll documents reflecting complaints" that relate to "any" communication.  Navient Solutions further objects that this Request is duplicative

19

of previous requests for information, and that CFPB is already in possession of

documents that appear to be responsive to this Request.  Specifically:

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 4 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of all reports and presentations documenting complaints received by you about your servicing of student loans."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Range detailed in Appendix 1(O) to these responses.

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 7 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll documents referencing complaints about your customer service representatives or call center employees."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(P) to these responses.

Navient Solutions states that it maintains a computer database in which

customer complaints are logged.  Navient Solutions will generate a report from that

system that describes complaints related to forbearance and income-driven

repayment plans that were received after July 1, 2011.

**DOCUMENT REQUEST NO. 10:  An image of each page of any consumer-facing website of Navient Solutions or Navient Corporation that contains any information about repayment options such as forbearance and income-driven repayment plans, including all versions of each such page during the time period set forth in Instruction No. 6, and documents sufficient to show how**

20

**each such page is connected (directly or indirectly) to each other page and to the homepage of the Navient website.**

**<u>Response</u>:**

In addition to the general objections, Request No. 10 is overbroad and unduly burdensome to the extent it seeks historical webpages that are located on legacy systems and no longer in the possession, custody, or control of Navient Solutions.  Navient Solutions will produce current versions and historical screenshots of each page of its consumer-facing public website and pages accessible by borrower log-in that contain information about forbearance and income-driven repayment plans.  To the extent they are available, Navient Solutions will produce webpage organizational charts that depict how webpages are connected.

**<u>DOCUMENT REQUEST NO. 11</u>:  Documents sufficient to show all compensation metrics or policies for any employee, agent, or subcontractor of Navient Solutions responsible for communications with or enrollment of borrowers in forbearance or income-driven repayment plans, including any incentive compensation structure applicable to any such employees, agents, or subcontractors.**

**<u>Response</u>:**

In addition to the general objections, Request No. 11 is overbroad and unduly burdensome to the extent that it seeks documents unrelated to the types of loans at issue.  Navient Solutions further states that Request No. 11 is duplicative

21

of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On April 8, 2014, SLM Corporation produced to the Attorney General of Illinois documents responsive to a request for "all . . . policies regarding compensation of employees, supervisors, and managers charged with servicing and/or Collecting (a) Government Education and (b) Private Education Loans."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at the Bates Ranges detailed in Appendix 1(Q) to these responses.

- On August 8, 2014, SLM Corporation produced to the Attorney General of Illinois its response to a request for a description of  "any and all remuneration or compensation . . . provide[d] to  . . . employees in connection with servicing (a) Government Education Loan products and (b) Private Education Loan products."  CID by the Attorney General of Illinois to SLM Corporation, Dec. 4, 2013.  On May 30, 2014 and August 15, 2014, Navient Solutions, Inc. produced these documents to CFPB.  These documents are located at Bates Ranges detailed in Appendix 1(R) to these responses.

Navient Solutions will use reasonable search terms to identify and produce compensation policies and metrics created after April 1, 2014 for Navient Solutions employees, agents, and subcontractors responsible for communicating with or enrolling borrowers in forbearance or income-driven repayment plans, so as to capture materials, if any, created after the prior productions.

**DOCUMENT REQUEST NO. 12:  All documents discussing, describing, or recording any infraction, error, non-compliance, or violation by any employee, agent, or subcontractor of Navient Solutions relating to**

22

A136

**communications with borrowers about, or enrollment of borrowers in, forbearance or any income-driven repayment plan, including any disciplinary records.**

**Response:**

    In addition to the general objections, Request No. 12 is overbroad and unduly burdensome to the extent that it seeks documents unrelated to the types of loans at issue, and because its use of the undefined terms "error" and "non-compliance" fails to identify with reasonable particularity the type of documents sought.  Navient Solutions will construe the request to seek records of violations contained in the official disciplinary files of employees, agents, and subcontractors. Navient Solutions will undertake a reasonable search of documents in those files and produce: (1) disciplinary records related to communications with borrowers about, or enrollment of borrowers in, forbearance or any income-driven repayment plan, and (2) the audit and compliance reports produced in response to Request No. 6.

**DOCUMENT REQUEST NO. 13:  For every version of every notice, disclosure, or other written communication used by Navient Solutions relating to a borrower's need to renew or recertify enrollment in any income-driven repayment plan: (a) one example of the notice, disclosure, or written communication in the format as it was sent to a consumer (including any attachments to the notice, disclosure, or written communication), (b) all drafts of the notice, disclosure, or written communication, and (c) all communications concerning the drafting of the notice, disclosure, or written communication, and (d) all documents reflecting any testing or evaluation**

23

**(such as through a focus group) of the notice, disclosure, or written communication, including any drafts. For part (a) of this Request, a notice, disclosure, or written communication that is identical to another notice, disclosure, or written communication but for information that is specific to the borrower shall not be considered a separate version of the document.**

**<u>Response</u>:**

In addition to the general objections, Request No. 13 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action, which concern only "pre-December 2012 notices" that included specific language, *see* Compl. ¶ 64, and "electronic communications" sent between mid-2010 and March 2015, *see* Compl. ¶¶ 66-68, (b) "all drafts of [each] notice, disclosure, or written communication," and (c) "all communications concerning the drafting of [each] notice, disclosure, or written communication."  Navient Solutions further objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On June 27, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 11 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "Each unique version of form or template documents and advertisements used to communicate information to a student loan borrower or cosigner about repayment plans for Federal Student Loans and Private Student Loans." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(S) to these responses.

24

- On September 25, 2015, Navient Solutions, Inc. responded to the CFPB's September 18, 2015 email asking Navient Solutions, Inc. to identify the subject lines of its income-driven repayment plan renewal emails sent to borrowers.  In addition to its response, Navient Solutions, Inc. produced two examples of income-driven repayment plan renewal emails.  These documents are located at the Bates Range detailed in Appendix 1(T) to these responses.

Navient Solutions will produce one example of each notice referred to in paragraph 64 of the Complaint, created between June 1, 2010 and December 1, 2012, and not previously produced.  Navient Solutions also will produce one example of each electronic communication referred to in paragraphs 66–68 of the Complaint and created between June 1, 2014 and March 30, 2015, so as to capture materials, if any, created after the prior productions.  Navient Solutions will produce analyses of notices and/or disclosures regarding renewal and/or recertification that were conducted between June 1, 2010 and March 30, 2015.

**DOCUMENT REQUEST NO. 14:  All documents reflecting any discussion, evaluation, or analysis of the adequacy, inadequacy, effectiveness, ineffectiveness, appropriateness, or inappropriateness of any notice, disclosure, or written communication produced in response to Request for Documents No. 13.**

**Response:**

In addition to the general objections, Request No. 14 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action, which concern only "pre-December 2012 notices" that included

25

specific language, *see* Compl. ¶ 64, and "electronic communications" sent between mid-2010 and March 2015, *see* Compl. ¶¶ 66-68, and (b) "[a]ll documents reflecting any discussion" of the adequacy of the notices and written communications.  Navient Solutions further objects to the extent that this Request seeks documents already encompassed by the response to Request No. 13, and directs CFPB to its response to that Request.

**DOCUMENT REQUEST NO. 15:  All documents relating to the number, percentage, or rate of borrowers with federal loans serviced by Navient Solutions who were (or were not) opening, clicking links within, or otherwise responding to any email concerning renewal or recertification of a borrower's enrollment in any income-driven repayment plan, including any analysis, discussion, explanation, or evaluation of this data.**

**Response:**

In addition to the general objections, Request No. 15 is vague, overbroad, and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) does not define with reasonable particularity how borrowers could have "otherwise respond[ed]" to an email concerning renewal or recertification.  Navient Solutions will identify the custodians principally responsible for analyzing the rates at which borrowers opened and clicked links within emails concerning the renewal of income-driven repayment plans during the relevant timeframe.  Navient Solutions will conduct a

26

reasonable search for and produce analyses of the number or percentage of

borrowers opening and/or clicking links within such emails that were conducted

between June 1, 2010 and March 30, 2015.

**DOCUMENT REQUEST NO. 16:  All documents reflecting the number, percentage, or rate of borrowers with federal loans serviced by Navient Solutions who timely renewed or recertified their enrollment in any income-driven repayment plan or who did not timely renew or recertify their enrollment in any income-driven repayment plan, including any analysis, discussion, explanation, or evaluation of this data.**

**Response:**

In addition to the general objections, Request No. 16 is overbroad and

unduly burdensome to the extent that it seeks (a) documents unrelated to the claims

in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting"

the number or percentage of borrowers who did or did not timely renew their

enrollment in any income-driven repayment plan.  Navient Solutions further

objects that this Request is duplicative of previous requests for information, and

that CFPB is already in possession of documents that appear to be responsive to

this Request.  Specifically:

- On August 7, 2015 and September 10, 2015, Navient Solutions, Inc. produced documents responsive to Written Report Request 11 of the July 7, 2015 CID issued by CFPB to Navient Solutions, Inc., which sought, "[f]or the time period between January 1, 2010 and March 31, 2015, in an Excel spreadsheet . . . a. The total number of borrowers with at least one subsidized Federal Student Loan that is within the

27

first three years of enrollment in IBR or PAYE who meet all of the following criteria: i. Had a $0 monthly payment amount for the subsidized Federal Student Loan(s) enrolled in IBR or PAYE; ii. Failed to recertify income information under IBR or PAYE for at least one billing period, causing the payment amount for the enrolled loan(s) to change from $0 to the permanent standard payment for at least one billing period; iii. Either enrolled in voluntary forbearance or had their delinquency cured by retroactive application of administrative forbearance following the failure to recertify income information under IBR or PAYE; and iv. Subsequently recertified income information under IBR, and returned to a $0 monthly payment amount for the loan(s) enrolled in IBR or PAYE." Navient Solutions, Inc., July 7, 2015.  These documents are located at the Bates Ranges detailed in Appendix 1(U) to these responses.

Navient Solutions will identify the custodians principally responsible for analyzing or receiving data related to whether borrowers renew their enrollment in income-driven repayment plans during the relevant timeframe.  Navient Solutions will conduct a reasonable search for and produce analyses of the number or percentage of borrowers who renewed or failed to renew their enrollment in such plans between June 1, 2010 and March 30, 2015, to the extent any exist.

**DOCUMENT REQUEST NO. 17:  All documents reflecting the number, percentage, or rate of borrowers with federal loans serviced by Navient Solutions enrolled in any income-driven repayment plan who submitted an application to renew or recertify their enrollment in any income-driven repayment plan that was initially deemed incomplete or inaccurate but was subsequently made complete and accurate before the renewal deadline, who submitted an application to renew or recertify their enrollment in any income-driven repayment plan that was initially deemed incomplete or inaccurate but was not subsequently made complete and accurate before the renewal deadline, or who submitted an application to renew or recertify their**

28

**enrollment in any income-driven repayment plan that was initially deemed complete and accurate, including any analysis, discussion, explanation, or evaluation of this data.**

**Response:**

In addition to the general objections, Request No. 17 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting" the number or percentage of borrowers who "did or did not" submit renewal forms. Navient Solutions further objects to the extent that this Request seeks documents already encompassed by the response to Request No. 16, and directs CFPB to its response to that Request.

**DOCUMENT REQUEST NO. 18:  All documents reflecting any discussion, evaluation, or analysis of errors or problems in the processing, application, or allocation of payments for student loans that were happening on a repeated, recurring, or non-isolated basis or that had been the subject of complaints from more than one consumer, including any discussion, evaluation, or analysis of the adequacy, inadequacy, effectiveness, ineffectiveness, appropriateness, or inappropriateness of any policies, procedures, practices of Navient Solutions to prevent or reduce such errors or problems.**

**Response:**

In addition to the general objections, Request No. 18 is overbroad and unduly burdensome to the extent that it seeks documents unrelated to the claims in this action and/or the types of loans at issue.  CFPB has failed to identify any

29

specific payment processing errors underlying its claim that such errors were unfair to borrowers.  *See* Compl. ¶¶ 97-112.  Navient Solutions receives complaints regarding payment processing errors on a range of topics.  CFPB's request that Navient Solutions search for and produce documents related to payment processing errors without identifying the errors at issue is unreasonable.  Navient Solutions further objects that this Request is overbroad and unduly burdensome because it seeks "[a]ll documents reflecting" discussion, evaluation, and analysis of undefined payment processing errors.  Finally, Navient Solutions objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request. Specifically:

- On October 25, 2013 and December 20, 2013, Sallie Mae, Inc. produced documents responsive to Document Request 6 of the September 5, 2013 CID issued by CFPB to Sallie Mae, Inc., which sought "All customer complaints, whether received directly from the customer or through an intermediary, relating to your student loan payment processing, including, but not limited to, how overpayments, partial payments, and underpayments were applied to loans."  These documents are located at the Bates Ranges detailed in Appendix 1(V) to these responses.

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 4 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of all reports and presentations documenting complaints received by you about your servicing of student loans."  CFPB CID to Sallie Mae, Inc., Apr. 29,

30

2014.  These documents are located at the Bates Range detailed in Appendix 1(W) of these responses.

**DOCUMENT REQUEST NO. 19:  All documents containing, discussing, or reflecting any requirements, instructions, policies, procedures, guidance, or training provided to employees, agents, or subcontractors of Navient Solutions relating to any requirement that a borrower demonstrate a certain payment history (such as making a certain number of consecutive, on-time payments) to become eligible for cosigner release for student loans.**

**Response:**

In addition to the general objections, Request No. 19 is unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue; and (b) "[a]ll documents," even those "discussing" requirements, instructions, policies, procedures, guidance, or training relating to communications regarding the payment history a borrower must demonstrate to be eligible for cosigner release.  Navient Solutions further objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On June 13, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 1 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "All policies and procedures relating to . . . a. Communications to borrowers regarding repayment plans for Federal Student Loans and Private Student Loans; b. Cosigner release; c. Consequences resulting from the death or bankruptcy of a cosigner; d. Quality assurance with respect to call center employees and customer service employees; and e. Collections for delinquent or defaulted student loans."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.

31

These documents are located at the Bates Range detailed in Appendix 1(X) to these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 3 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll unique versions of any training materials provided to your call center employees and customer service representatives." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Range detailed in Appendix 1(Y) to these responses.

Navient Solutions will identify the custodians principally responsible for drafting or creating policies and procedures, call scripts, and training materials related to the payment history a borrower must demonstrate to be eligible for cosigner release. Navient Solutions will undertake a reasonable search for and produce any such policies and procedures, call scripts, and training materials created between June 1, 2014 and July 1, 2015 so as to capture materials, if any, created after the prior productions.

**DOCUMENT REQUEST NO. 20:** **All documents reflecting complaints, disputes, notices of error, or requests for escalation relating to any requirement that a borrower demonstrate a certain payment history (such as making a certain number of consecutive, on-time payments) to become eligible for cosigner release for student loans.**

**Response:**

In addition to the general objections, Request No. 20 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims

32

in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting" borrower complaints and disputes relating to any requirement that a borrower demonstrate a certain payment history to become eligible for cosigner release.

Navient Solutions further objects that this Request is duplicative of previous requests for information, and that CFPB is already in possession of documents that appear to be responsive to this Request.  Specifically:

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 7 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a]ll documents referencing complaints about your customer service representatives or call center employees."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(Z) to these responses.

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 4 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of all reports and presentations documenting complaints received by you about your servicing of student loans."  CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Range detailed in Appendix 1(AA) of these responses.

- On July 11, 2014 and July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 6 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[a] copy of each quality assurance report provided to your call center management team." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014.  These documents are located at the Bates Ranges detailed in Appendix 1(BB) of these responses.

33

- On July 30, 2014, Navient Solutions, Inc. produced documents responsive to Document Request 8 of the April 29, 2014 CID issued by CFPB to Sallie Mae, Inc., which sought "[c]opies of all customer complaints, including, but not limited to, complaints received directly from a customer, indirectly through a governmental or other regulatory authority or the Better Business Bureau, or addressed to a Company executive, related to . . . [a] request to release the cosigner from obligations under the student loan borrower's loan." CFPB CID to Sallie Mae, Inc., Apr. 29, 2014. These documents are located at the Bates Range detailed in Appendix 1(CC) of these responses.

Navient Solutions states that it maintains a computer database in which customer complaints are logged. Navient Solutions will generate a report from that system that describes complaints related to eligibility for cosigner release that were received between July 1, 2014 and July 1, 2015, so as to capture customer complaints received after the prior productions.

**DOCUMENT REQUEST NO. 21:  All documents containing any discussion or analysis of the meaning or interpretation of any requirement that a borrower make a certain number of consecutive, on-time payments to become eligible for cosigner release for student loans.**

**Response:**

In addition to the general objections, Request No. 21 is unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) "all" documents, even those "containing any discussion" of the number of consecutive, on-time payments a borrower must make to become eligible for cosigner release. Navient Solutions further objects to

34

A148

the extent that this Request seeks documents already encompassed by the response

to Request No. 19, and directs CFPB to its response to that Request.

**DOCUMENT REQUEST NO. 22:  All documents describing or referring to two or more on-time principal and interest payments that were not made in consecutive months as constituting "consecutive" payments (regardless of whether the document specifically relates to any cosigner release requirement).**

**Response:**

In addition to the general objections, Request No. 22 is overbroad and

unduly burdensome to the extent that it seeks (a) documents unrelated to the claims

in this action and/or the types of loans at issue, and (b) "[a]ll documents describing

or referring to" two or more on-time principal and interest payments that were not

made in consecutive months as constituting "consecutive payments," regardless of

whether such documents reflect any actual policy maintained by Navient Solutions.

Navient Solutions will identify the custodians principally responsible for

drafting or creating requirements, instructions, policies, procedures, guidance, or

training materials relating to borrower benefits during the relevant timeframe.

Navient Solutions will conduct a reasonable search for and produce any such

instructions, policies, procedures, guidance, or training materials created between

January 1, 2010 and July 1, 2015, to the extent they define as "consecutive" two or

35

A149

more on-time principal and interest payments, even if the payments are not made in consecutive months.

**DOCUMENT REQUEST NO. 23:  All documents containing, discussing, or reflecting any requirements, instructions, policies, procedures, guidance, or training provided to employees, agents, or subcontractors of Navient Solutions relating to credit reporting (i.e., the furnishing of information to credit reporting agencies) for borrowers whose federal student loans are discharged due to disability.**

**Response:**

In addition to the general objections, Request No. 23 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, including documents unrelated to use of the AL ("Assigned to Government") code for borrowers whose federal student loans are discharged due to disability, and (b) "[a]ll documents," even those "discussing" requirements, instructions, policies, procedures, guidance, or training materials.

Navient Solutions states that on or about May 17, 2013, Navient Solutions discovered an issue regarding its use of the AL code to report a loan that had been discharged due to the borrower's total and permanent disability.  Navient Solutions will identify the custodians principally involved in discussions regarding Navient

36

Solutions' use of the AL Code after May 17, 2013 and will produce related documents.

**DOCUMENT REQUEST NO. 24:** **All documents relating to the use of the "AL—Assigned to Government" code (or any variation thereof, including "AL" or "Assigned to Government") in furnishing information to credit reporting agencies, including (a) all documents containing, discussing, or reflecting any requirements, instructions, policies, procedures, guidance, or training relating to the use of the code in furnishing information to credit reporting agencies, (b) all documents reflecting any awareness, discussion, or analysis of the circumstances in which it is appropriate or inappropriate to use the code in furnishing information to credit reporting agencies, and (c) all documents reflecting any discussion, analysis, or quantification of the impact on borrowers of the use of the code in furnishing information to credit reporting agencies.**

**Response:**

In addition to the general objections, Request No. 24 is overbroad and unduly burdensome to the extent that it seeks documents unrelated to the claims in this action and/or the types of loans at issue.  Navient Solutions further objects to the extent that this Request seeks documents already encompassed by the response to Request No. 23, and directs CFPB to its response to that Request.

**DOCUMENT REQUEST NO. 25:** **All documents reflecting complaints, disputes, notices of error, or requests for escalation relating to credit reporting for borrowers whose federal loans are discharged due to disability, including any record of how such complaints or disputes were resolved and**

37

**any communications with any credit reporting agency about any such complaints or disputes.**

**<u>Response</u>:**

In addition to the general objections, Request No. 25 is overbroad and unduly burdensome to the extent that it seeks (a) documents unrelated to the claims in this action and/or the types of loans at issue, and (b) "[a]ll documents reflecting" borrower complaints, disputes, error notices, or escalation requests relating to credit reporting for borrowers whose federal loans are discharged due to disability, including documents not related to use of the AL code.

Navient Solutions states that it maintains a computer database in which customer complaints are logged. Navient Solutions will generate a report from that system that describes substantiated complaints related to use of the AL code.

**<u>DOCUMENT REQUEST NO. 26</u>:  All documents on which you rely to support any defense that you are asserting or will assert in this lawsuit.**

**<u>Response</u>:**

Navient Solutions objects to Request No. 26 as premature because it has not yet answered the Complaint or pled affirmative defenses. Navient Solutions will produce documents on which it intends to rely for summary judgment or trial.

38

Dated:  August 21, 2017          Respectfully submitted,

/s/ Matthew T. Martens
Matthew T. Martens (DC 1019099) (*pro hac vice*)
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
matthew.martens@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Donna A. Walsh (PA 74833)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
dwalsh@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient
Solutions, LLC, and Navient Solutions Credit
Recovery, Inc.*

39

A153

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2017, I served the foregoing Objections

and Responses to Plaintiff's First Set of Requests for Production to CFPB by email

to the following counsel for Plaintiff:

Nicholas Jabbour:  Nicholas.Jabbour@cfpb.gov
Ebony Sunala Johnson:  Ebony.Johnson@cfpb.gov
Lawrence DeMille-Wagman:  Lawrence.Wagman@cfpb.gov
Andrea Matthews:  Andrea.Matthews@cfpb.gov
Thomas H. Kim:  Thomas.Kim@cfpb.gov

Mr. Jabbour, on behalf of Plaintiff, previously consented to electronic service.


/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

*Counsel for Navient Corporation, Navient
Solutions, LLC, and Navient Solutions Credit
Recovery, Inc.*

## Appendix 1

### (A)

| Bates Begin | Bates End |
|---|---|
| SLMA-005-0000001 | SLMA-005-0000100 |

### (B)

| Bates Begin | Bates End |
|---|---|
| NSI-005-0000754 | NSI-005-0009511 |
| NSI-010-0013393 | NSI-010-0013437 |
| NSI-011-0000001 | NSI-011-0004193 |

### (C)

| Bates Begin | Bates End |
|---|---|
| NSI-001-0004407 | NSI-001-0018519 |
| NSI-016-0018154 | NSI-016-0064412 |

### (D)

| Bates Begin | Bates End |
|---|---|
| NSI-001-0018849 | NSI-001-0018849 |
| NSI-016-0055313 | NSI-016-0055314 |
| NSI-016-0063674 | NSI-016-0063675 |

### (E)

| Bates Begin | Bates End |
|---|---|
| NSI-002-0000001 | NSI-002-0179951 |

### (F)

| Bates Begin | Bates End |
|---|---|
| NSI-007-0000001 | NSI-007-0062297 |
| NSI-008-0000001 | NSI-008-0005969 |
| NSI-010-0000001 | NSI-010-0007870 |

| NSI-014-0000001 | NSI-014-0001630 |
|---|---|

**(G)**

| Bates Begin | Bates End |
|---|---|
| NSI-001-0014644 | NSI-001-0014648 |
| NSI-001-0015569 | NSI-001-0015576 |
| NSI-001-0015577 | NSI-001-0015584 |
| NSI-001-0015942 | NSI-001-0015943 |

**(H)**

| Bates Begin | Bates End |
|---|---|
| NSI-001-0004558 | NSI-001-0004560 |
| NSI-001-0006490 | NSI-001-0006491 |
| NSI-001-0006497 | NSI-001-0006499 |
| NSI-001-0006617 | NSI-001-0006622 |
| NSI-001-0006664 | NSI-001-0006668 |
| NSI-001-0013592 | NSI-001-0013593 |
| NSI-001-0013596 | NSI-001-0013599 |
| NSI-001-0013600 | NSI-001-0013604 |
| NSI-001-0014542 | NSI-001-0014546 |
| NSI-001-0015530 | NSI-001-0015536 |
| NSI-001-0017164 | NSI-001-0018023 |

**(I)**

| Bates Begin | Bates End |
|---|---|
| NSI-001-0011222 | NSI-001-0011225 |
| NSI-001-0014817 | NSI-001-0014818 |
| NSI-001-0015926 | NSI-001-0015929 |
| NSI-001-0015942 | NSI-001-0015943 |
| NSI-001-0017164 | NSI-001-0018023 |

**(J)**

| Bates Begin | Bates End |
|---|---|

| NSI-001-0004407 | NSI-001-0018519 |
| NSI-016-0018154 | NSI-016-0064412 |

**(K)**

| Bates Begin | Bates End |
| --- | --- |
| NSI-016-0000426 | NSI-016-0000427 |
| NSI-016-0005083 | NSI-016-0005122 |
| NSI-016-0005126 | NSI-016-0005126 |
| NSI-016-0005129 | NSI-016-0005129 |
| NSI-016-0008336 | NSI-016-0008336 |
| NSI-016-0008399 | NSI-016-0011122 |
| NSI-016-0011124 | NSI-016-0011125 |
| NSI-016-0011129 | NSI-016-0011218 |
| NSI-016-0011220 | NSI-016-0011394 |
| NSI-016-0011400 | NSI-016-0012399 |
| NSI-016-0012505 | NSI-016-0012775 |
| NSI-016-0012779 | NSI-016-0012842 |
| NSI-016-0012847 | NSI-016-0013040 |
| NSI-016-0013043 | NSI-016-0013046 |
| NSI-016-0013056 | NSI-016-0013080 |
| NSI-016-0013086 | NSI-016-0014783 |
| NSI-016-0014791 | NSI-016-0015054 |
| NSI-016-0015057 | NSI-016-0015185 |
| NSI-016-0015193 | NSI-016-0016698 |
| NSI-016-0016700 | NSI-016-0016958 |
| NSI-016-0016960 | NSI-016-0017033 |
| NSI-016-0017055 | NSI-016-0017400 |
| NSI-016-0017403 | NSI-016-0017500 |
| NSI-016-0017504 | NSI-016-0017518 |
| NSI-016-0017576 | NSI-016-0017667 |
| NSI-016-0017669 | NSI-016-0017685 |
| NSI-016-0017689 | NSI-016-0017718 |
| NSI-016-0017732 | NSI-016-0017737 |
| NSI-016-0017739 | NSI-016-0017742 |
| NSI-016-0017744 | NSI-016-0017746 |
| NSI-016-0017820 | NSI-016-0017832 |

| | |
|---|---|
| NSI-016-0017899 | NSI-016-0017920 |
| NSI-016-0017942 | NSI-016-0018158 |
| NSI-016-0018163 | NSI-016-0018599 |
| NSI-016-0018634 | NSI-016-0055312 |
| NSI-016-0062919 | NSI-016-0062954 |
| NSI-016-0063107 | NSI-016-0063139 |

**(L)**

| Bates Begin | Bates End |
|---|---|
| NSI-002-0000001 | NSI-002-0179951 |

**(M)**

| Bates Begin | Bates End |
|---|---|
| NSI-007-0062298 | NSI-007-0062321 |
| NSI-010-0010016 | NSI-010-0013012 |

**(N)**

| Bates Begin | Bates End |
|---|---|
| NSI-007-0062322 | NSI-007-0071458 |
| NSI-010-0010016 | NSI-010-0013012 |
| NSI-014-0002728 | NSI-014-0003399 |

**(O)**

| Bates Begin | Bates End |
|---|---|
| NSI-014-0001631 | NSI-014-0003399 |

**(P)**

| Bates Begin | Bates End |
|---|---|
| NSI-012-0000001 | NSI-012-0007982 |
| NSI-013-0000001 | NSI-013-0038459 |

**(Q)**

| Bates Begin | Bates End |
| --- | --- |
| NSI-001-0000786 | NSI-001-0002205 |
| NSI-001-0002267 | NSI-001-0004082 |
| NSI-001-0005166 | NSI-001-0005190 |
| NSI-001-0005388 | NSI-001-0005390 |
| NSI-001-0006395 | NSI-001-0006414 |
| NSI-001-0006711 | NSI-001-0006713 |
| NSI-001-0012213 | NSI-001-0012241 |
| NSI-001-0012244 | NSI-001-0012288 |
| NSI-001-0012297 | NSI-001-0012310 |
| NSI-001-0012626 | NSI-001-0012631 |
| NSI-001-0013346 | NSI-001-0013370 |
| NSI-001-0013554 | NSI-001-0013591 |
| NSI-001-0013600 | NSI-001-0013616 |
| NSI-001-0013837 | NSI-001-0013855 |
| NSI-001-0014324 | NSI-001-0014349 |
| NSI-001-0014537 | NSI-001-0014551 |
| NSI-001-0014562 | NSI-001-0014594 |
| NSI-016-0016699 | NSI-016-0016699 |
| NSI-016-0017034 | NSI-016-0017043 |
| NSI-016-0063195 | NSI-016-0063224 |
| NSI-016-0063907 | NSI-016-0063916 |

**(R)**

| Bates Begin | Bates End |
| --- | --- |
| NSI-001-0000786 | NSI-001-0000794 |
| NSI-001-0000943 | NSI-001-0000954 |
| NSI-001-0000990 | NSI-001-0001003 |
| NSI-001-0001866 | NSI-001-0001877 |
| NSI-001-0001878 | NSI-001-0001879 |
| NSI-001-0003014 | NSI-001-0003030 |
| NSI-001-0004021 | NSI-001-0004032 |

**(S)**

| Bates Begin | Bates End |
| --- | --- |

A159

| | |
|---|---|
| NSI-005-0000754 | NSI-005-0009511 |
| NSI-010-0013393 | NSI-010-0013437 |
| NSI-011-0000001 | NSI-0004193 |

**(T)**

| Bates Begin | Bates End |
|---|---|
| NSI-030-0000001 | NSI-030-0000003 |

**(U)**

| Bates Begin | Bates End |
|---|---|
| NSI-029-0000001 | NSI-029-0000002 |
| NSI-026-0000001 | NSI-026-0000002 |

**(V)**

| Bates Begin | Bates End |
|---|---|
| SLMA-005-0000101 | SLMA-005-0000101 |
| SLMA-012-0000001 | SLMA-012-0000822 |

**(W)**

| Bates Begin | Bates End |
|---|---|
| NSI-014-0001631 | NSI-014-0003399 |

**(X)**

| Bates Begin | Bates End |
|---|---|
| NSI-002-0000001 | NSI-002-0179951 |

**(Y)**

| Bates Begin | Bates End |
|---|---|
| NSI-010-0002973 | NSI-010-0007870 |

**(Z)**

| Bates Begin | Bates End |
|---|---|
| NSI-012-0000001 | NSI-012-0007982 |
| NSI-013-0000001 | NSI-013-0038459 |

**(AA)**

| Bates Begin | Bates End |
|---|---|
| NSI-014-0001631 | NSI-014-0003399 |

**(BB)**

| Bates Begin | Bates End |
|---|---|
| NSI-007-0062322 | NSI-007-0071458 |
| NSI-010-0010016 | NSI-010-0013012 |
| NSI-014-0002728 | NSI-014-0003399 |

**(CC)**

| Bates Begin | Bates End |
|---|---|
| NSI-013-0000001 | NSI-013-0003845 |

# Exhibit 7

1700 G Street NW,
Washington, DC 20552

May 16, 2018

<u>**Via E-mail to Defendants' Counsel**</u>

       Re:    *Consumer Financial Protection Bureau v. Navient Corp., et al.*, Case No. 3:17-CV-00101

Counsel:

       In advance of our call tomorrow, we write in response to your May 11, 2018 email as it relates to the Court's May 4 Order.

       ***First,*** thank you for providing search reports in connection with four of the five categories of documents at issue.[1] Setting aside the issue of Email Xtender, we understand that your updated search reports reflect the hits that result from (1) changing the applicable time period for discovery to comply with the Court's May 4 Order and (2) reducing proximity limiters as proposed by the Bureau. Because the applicable time period has changed, the parties cannot, without more information, conduct an apples-to-apples comparison of the volume of potentially responsive documents using Defendants' original, larger proximity limiters and the narrower proximity limiters the Bureau has proposed. Accordingly, we request that you provide search term reports for the same categories and time period reflected in the reports you provided on May 11, but using your original, larger proximity limiters. This would eliminate the changing time period as a variable, leaving only the Bureau's proposed reduction in proximity limiters to account for any change in the universe of documents. We remain hopeful that by working further with the already developed search terms and proximity limiters, we will be able to eliminate additional emails unlikely to contain relevant information.

       ***Second***, we are concerned that the 1.1. million total that you have cited may double-count documents that are returned as "hits" for multiple categories (i.e., certain documents are counted as hits on multiple reports, even though they only need to be reviewed once). We would like to understand what steps, if any, you have taken to avoid such double-counting, as well as to remove documents that have already been reviewed in connection with prior productions. To the extent that no such filtering has occurred, we request that a report be run to show the volume of unique documents that would need to be reviewed under the parties' respective proposals.

       I want to reiterate the Bureau's willingness to engage with you in a productive conversation about whether the Bureau's proposal effectively eliminates emails that are unlikely to be relevant to this case, as the Court directed. The above-requested information is critical to this endeavor. If the Bureau's initial proposal proves ineffective, we are willing to revise it or consider other options.

       ***Third***, as to documents pre-dating 2012 that are electronically stored on Defendants' Email Xtender system, we respectfully disagree with your statement "that this issue was

---

[1] We note the absence of both custodians and a search term report for category 3. We understand this to mean that you did not previously run independent email searches for this category of emails. Accordingly, we will craft search terms and identify categories of custodians.

resolved." And we also do not understand your statement that Defendants "understood from our conversations that we had reached agreement," as the parties did not confer orally on this issue after Defendants never provided the Bureau with information about the burden associated with porting electronically stored information from one database to another, as we requested on January 18, 2018. In our February 22 letter to the Court (Doc. 74) and appendix (Doc. 74-1), we also made clear that we were seeking email from 2009 forward. Certain pre-2012 email is housed exclusively on Email Xtender. As we noted last Wednesday, it was not the Bureau's burden to identify the specific databases on which the information was electronically stored, much less provide information about the burden associated with data retrieval from those databases. Though you noted in a January 26 letter that if the Bureau identifies particular "custodians or issues of interest for pre-2012 emails, [Defendants] will consider further efforts" to search the data," we cannot evaluate the reasonableness of the substantially more limited searches you appear to be proposing without the specific details regarding the burden that you have yet to provide. As we also mentioned last Wednesday, we reiterate our January 18 request for information regarding why you believe documents on the Email Xtender system are not readily accessible.

In the interest of trying to move forward while we await this information from you, we would like to discuss your request for an identification of "custodians or issues of interest." First, we do not understand how we can identify the relevant custodians, as that information is within Defendants' control. Second, we do not understand your request for an identification of "issues of interest." The "issues of interest" are identified in the document requests we served. If you can provide us with an understanding of why the burden of accessing information on the Email Xtender system would depend on identification of "issues of interest," perhaps we can find a way to alleviate the burden.

Relatedly, we note that the Washington and Pennsylvania Attorneys General have alleged loan origination violations dating back well before 2009, and thus we would like to understand whether data from Email Xtender is already being restored to provide documents responsive to requests from those Attorneys General.

**Fourth,** in addition to our initial proposal, we are interested in your feedback on a second proposal that could result in a global compromise. Because this proposal would result in a massive reduction of the documents to be reviewed, it is contingent on Defendants agreeing to all three of the components described below. First, the Bureau would agree that Defendants need not review for responsiveness the 685,737 documents that your search reports indicate do not have hits (i.e., family members without hits). This would remove approximately 62 percent of the 1.1 million documents that you indicated must be reviewed as a result of the Bureau's initial proposal. Should documents from that group be family members of documents that your reviewers determine are responsive, they would only need to be reviewed for privilege. Second, Defendants would agree to search emails on Email Xtender, and the Bureau would agree that Defendants could apply the search protocol outlined above to the emails housed on Email Xtender. Because Defendants have not provided information on the volume of email on Email Xtender associated with the applicable custodians, we do not know how many documents this proposal will exclude from the review, but we suspect that the 62 percent reduction outlined above is a fair estimate. Third, the parties would need to agree on custodians and searches to be applied to category 3. As noted above, the Bureau will craft searches and identify categories of

2

custodians. The parties would further agree that the same protocol outlined above for reviewing documents will apply here too. Given that Defendants have argued that there is much overlap between the first, second, and third categories of documents, we are hopeful that our searches will not result in a significant increase in the volume of *unique* documents to be reviewed.

**Fifth,** the Bureau is willing to agree that only "inclusive emails" (as defined by Relativity) need to be reviewed. This should also reduce the volume of documents that you have to review by obviating the need to review earlier communications in an email chain that are completely subsumed within a later version of the chain. We are happy to discuss this further to ensure that the parties have a consistent definition of "inclusive emails."

We look forward to receiving the information requested above and continuing to meet and confer to reach an agreement on these and other issues.

Regards,

/s/ Nicholas Lee

3