**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CONSUMER FINANCIAL                :
PROTECTION BUREAU,                 :
                                   :
      Plaintiff              :
                                   :
                                   :    3:17-CV-101
     v.                     :    (Judge Mariani)
                                   :
                                   :
NAVIENT CORPORATION, et al.,       :
                                   :
      Defendants.            :

**SPECIAL MASTER REPORT #3**
***IN CAMERA* REVIEW OF DOCUMENTS WITHHELD IN WHOLE OR IN**
**PART ON THE BASIS OF THE DELIBERATIVE PROCESS PRIVILEGE –**
**FEBRUARY 4, 2019 PRODUCTION**

By Order entered on January 16, 2019, the undersigned was appointed

pursuant to Federal Rule of Civil Procedure 53 to serve as Special Master for the

purpose of "decid[ing] all current and future discovery disputes in this action. . . ."

(Doc. 158 at 2.)  One of the discovery disputes concerns the assertion of the

deliberative process privilege by Plaintiff Consumer Financial Protection Bureau

(the "Bureau" or "CFPB") over hundreds of intra- and inter-agency documents.

This report sets forth the preliminary conclusions of my *in camera* review of the

withheld and partially withheld documents produced by the Bureau by letter dated

February 4, 2019 (Doc. 207).  The parties shall be afforded an opportunity to object to this Report before it is finalized.

## I.     BACKGROUND

The Bureau, an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under Federal consumer financial laws, brought this suit against Navient Corporation and two of its subsidiaries, Navient Solutions, Inc. and Pioneer Credit Recovery, Inc.  Defendant Navient Corporation is a Delaware loan management, servicing, and asset recovery corporation.  Defendant Navient Solutions, Inc., a wholly-owned subsidiary of Navient Corporation and formerly known as Sallie Mae, Inc., services federal and private student loans for more than 12 million borrowers.  Defendant Pioneer Credit Recovery, Inc., an indirect wholly-owned subsidiary of Navient Corporation, is a debt collector that has collected defaulted federal student loan debt on behalf of the United States Department of Education ("ED") and several state-based loan guaranty agencies.  The Bureau's 11-count Complaint asserts claims against Defendants under the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq., and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 et seq., for alleged unlawful acts and practices in connection with Defendants' servicing and collection of student loans.  The

Bureau requests, among other things, injunctive relief, restitution to harmed student borrowers, disgorgement of "ill-gotten revenue," and monetary penalties. (Doc. 1 at 65-66.)  Defendants have denied the claims and asserted several affirmative defenses, including the defense that Defendants' conduct complied with ED regulations as well as their contracts with ED, so that they lacked "fair notice of what conduct the CFPB would later assert in this lawsuit are 'unfair', 'deceptive', or 'abusive' acts or practices." (Doc. 61 at 29.)

As to be expected in a case of this magnitude, involving the servicing of millions of student loans over a number of years, discovery has been massive. Discovery has also been quite contentious.

The dispute concerning documents that the Bureau is withholding, in whole or in part, on the basis of the deliberative process privilege was first presented to Judge Mariani in early 2018.  (*See* Docs. 68, 70, 72 and 73.)  Judge Mariani held oral argument on this dispute on April 17, 2018, (Doc. 87), and issued a written decision and order dated May 3, 2018 (Docs. 88 & 89.)  Summarizing the parties' contentions pertinent to the deliberative process privilege, Judge Mariani wrote:

> Defendants first argue that, based on several requests for production of documents that they served on Plaintiff, Defendants are entitled to documents related to proposed or final policies and guidance considered by Plaintiff and the Department of Education. (Doc. 68 at 1). According to Defendants, this includes "information received from third parties, such as borrower surveys and complaints, and internal and external communications with stakeholders such as the Department of Education, State Attorneys

3

General, borrowers, members of Congress, and consumer advocacy organizations." (Doc. 72 at 3). Defendants have identified a list of "fourteen publicly issued rules, regulations, or guidance that Defendants believe are clearly relevant to the administration of the government contracts and federal regulations governing federal student loan servicing and collection practices at issue in the Complaint."

Plaintiff argues that unpublished, predecisional views of, and internal discussions among, Plaintiff's staff are not binding on Plaintiff and are therefore not relevant to present action. (Doc. 73-1 at 4 ). Stated otherwise, Plaintiff's position is that, because unpublished views of an agency employee or group of agency employees are not official agency positions, they carry no legal significance and are thus have no relevance. (Doc. 70 at 1-2). Further, Plaintiff contends that Defendants have failed to show that these documents are relevant because they have not shown that Defendants were aware of them and thus could have based their behavior on them. (Doc. 73-1 at 4; April 17, 2018, Hr'g Tr. at 62).

Defendants reply that these documents are relevant because communications, internal and external, regarding policies or guidance that touch upon issues in this case are relevant to whether Defendants acted reasonably. (Doc. 76 at 9-10, 22; April 17, 2018, Hr'g Tr. at 59-60). For example, these documents could show that Plaintiff had internal policy debates about what conduct was reasonable and unreasonable and "the fact that there [were] legitimate policy debates about the range of reasonableness demonstrates that the conduct here was not so unreasonable as to justify massive fines." (Doc. 76 at 24-25). Further, Defendants argue that these documents are relevant because Defendants are vendors of the Federal Government through contracts with the Department of Education, and therefore many of the actions they took were at the direction of, or with the approval of, the Department of Education. (*Id.* at 6-8; April 17, 2018, Hr'g Tr. at 59-60). Thus, if there was a policy debate relevant to the issues in this case between Plaintiff and the Department of Education, Defendants contend that they are entitled to know if Plaintiff lost that policy debate and is bringing the present action in an effort to vindicate its position. (Doc. 76 at 22-23).

(Doc. 88 at 5-7).

After surveying the applicable caselaw, Judge Mariani concluded as to

communications that did not involve ED staff:

> Even if there were policy debates in which agency staff took
> positions favorable to Defendants, . . . these statements would have
> no legal significance because they would not be official agency
> positions. In the end, the fact finder will be called upon to
> determine if Defendants engaged in any 'unfair, deceptive, or
> abusive act[s] or practice[s]' in violation of the Consumer Financial
> Protection Act. What agency staff said in communication leading
> up to the issuance or non-issuance of rules, policies, or guidance
> has no bearing on that determination. If it were otherwise, these
> predecisional communications would possess de-facto official
> status. Accordingly, because these types of communications have
> no legal significance, they are simply not relevant to Defendants'
> defenses.

(*Id.* at 10; citations omitted).  As to communications with ED staff, however, Judge

Mariani concluded that "they may be relevant to their defenses."  (*Id.* at 11).

Accordingly, Judge Mariani ruled:

> Plaintiff shall produce all *non-privileged* communication it had with
> the Department of Education that falls within the subject matter of
> Defendants' requests, but Plaintiff need not turn over any other
> predecisional communications related to the fourteen publicly issued rules,
> regulations, and guidance that Defendants identified or any other
> predecisional communications related to proposed rules, regulations, and
> guidance that were not ultimately issued. *Plaintiff shall, however, keep a
> privilege log concerning all these predecisional communications which
> identifies the documents Plaintiff believes falls under the attorney-client,
> work product, deliberative process, or other recognized privilege.*

(*Id.*; emphasis added).

The Bureau served its initial privilege log on July 9, 2018, employing a "categorical" approach.[1]   That log listed 70 categories of documents being withheld, with the individual withheld documents identified by Bates number.  According to Defendants, 416 documents were identified on the July 9, 2018 categorical privilege log as having been withheld on the basis of the deliberative process privilege.  (*See* Doc. 207 at 6.)  The Bureau produced its second categorical privilege log on August 31, 2018, listing an additional 15 categories of documents being withheld.  According to Defendants, this log identified 430 withheld documents that pertained to communications with ED.[2]   (*Id.*)

Defendants challenged the assertion of the deliberative process privilege in a letter to the Court dated October 10, 2018.[3]   (*Id.*)  The Bureau responded by letter dated November 2, 2018.  (Doc. 110.)  Judge Mariani conducted lengthy oral argument on the matter on

---

[1] "A categorical privilege log is one where common documents are grouped into different classes, rather than logging each document on an individual basis." *Norton v. Town of Islip*, No. CV043079PKCSIL, 2017 WL 943927, at *7 (E.D.N.Y. Mar. 9, 2017).  In this case, Judge Mariani sanctioned use of categorical privilege logs as an alternative to a document-by-document claim for protection from disclosure. *See* Par. 7 of the parties' stipulated "Discovery Protocol," (Doc. 66).

[2] In support of its deliberative process privilege claims, the Bureau presented declarations of Christopher D'Angelo dated July 2, and December 7, 2018.  Mr. D'Angelo represented that he oversees all matters handled by the Bureau's Office of Enforcement, including this case.  He further represented that he had reviewed all documents withheld on the basis of the deliberative process privilege and concluded that the privilege applied.

[3] The categorical privilege logs also presented attorney-client and attorney work product privilege assertions.  Defendants are not challenging those assertions.

December 10, 2018.  (Doc. 134.)  During the course of the argument, Judge Mariani

articulated the questions that were germane to his review of the sufficiency of the

categorical privilege logs:

> As to any deliberative privilege asserted, does the response indicate what
> decision was under discussion or deliberation?  Likewise, as to any such
> assertion of privilege, why is there no date that would frame the -- serve as
> a framing or reference point for determining whether the privilege is
> validly asserted, with respect to the same categories where I found that, on
> its face, the privilege assertion is insufficient?  Is there any indication, with
> respect to these deliberations, were they to set CFPB policy or to make a
> specific decision on a matter relevant to this case?  And, if so, where is the
> identification of the policy or the decision?  In addition, where the
> deliberations were undertaken with representatives of other agencies, such
> as the Education Department, of which there are several, have I not
> already ruled that communications between CFPB and the Education
> Department are to be provided by CFPB to Navient?

(*Id.* at 47-48.)

Assessed against the context of these questions, Judge Mariani preliminarily

concluded that 42 of the 85 categories in the privilege logs did not present a valid basis for

concluding that the documents were shielded from production under the deliberative process

privilege.  Defendants, however, had identified only 35 categories of withheld documents

that they were challenging: Categories 1-2, 11, 22, 27-31, 33, 35-50, 71-75, 79-81, and 85.[4]

(*Id.* at 81.)  Defendants requested appointment of a Special Master to conduct an *in camera*

---

[4] As part of its "re-review" process, the Bureau elected to waive the
deliberative process privilege as to 11 of the 35 categories (Categories 27, 29, 31,
33, 36, 38, 45, 46, 47, 49, and 50), and has produced the documents falling under
those categories.  (*See* the Bureau letter of March 8, 2019 (Doc. 245).)

review of all documents withheld on the basis of the deliberative process privilege, a request

to which the Bureau eventually assented.

Because the deliberative process privilege is a "qualified" one, *i.e.*, it may be

overcome if the requesting party shows that its need for the documents outweighs the

government's interest in protecting the document, *see Redland Soccer Club, Inc. v. Dep't of

the Army*, 55 F.3d 827, 853-54 (3d Cir. 1995), Judge Mariani ordered Defendants to file a

statement as to the relevance of each of the 35 disputed categories or to explain in detail why

they may be unable to articulate the relevance of such documents. (Doc. 132 at 2.) The

Bureau was afforded an opportunity to respond to Defendants' statement. (*Id.*) Both parties

complied with this directive. (*See* Docs. 139 and 144.)

It is within this posture that the *in camera* review assignment was received by me as

the Special Master. At the initial status conference conducted by me on January 28, 2019,

the Bureau indicated that it would be supplementing its categorical logs with the kind of

information that Judge Mariani suggested was missing from the categorical privilege logs

during the December 10, 2018 proceeding: "what decision was under deliberation, who the

decision-maker was, the date of any decision, if one was reached, the dates of the

deliberative communications, and the senders and recipients of those communications." (Tr.

of Jan. 28, 2019 status conference at 88.) The Bureau also undertook to provide documents

for *in camera* review on a rolling basis. Its first set of documents was produced on February

4, 2019 (Doc. 207), with subsequent productions occurring on February 11 (Doc. 219),

February 15 (Doc. 225), and February 25, 2019 (Doc. 233).  Accompanying each

production, in addition to a letter brief from the Bureau, was an updated description of the

Category to which the documents produced for *in camera* review related.[5]

As part of its "re-review of all of the documents in the 35 Disputed Categories,"

(Doc. 207 at 1), the Bureau decided to waive the deliberative process privilege in whole or

in part as to a number of documents.  By my calculation, 734 individual documents

ultimately were provided for *in camera* review, suggesting that the Bureau waived its

deliberative process privilege claim over more than 100 documents.

The letters transmitting the documents for *in camera* review included legal argument,

and Defendants responded to the Bureau's legal arguments by letter brief filed on February

15, 2019.  (Doc. 226.)  Document-by-document review commenced after receipt of

Defendants' letter brief.

The *in camera* process consisted of the following:

---

[5] In accordance with my request, all documents were presented to me in electronic format.  The first production was accompanied by copies of Mr. D'Angelo's declarations.  The Bureau also provided electronic spreadsheets listing by Bates number and by separate document number each of the items submitted for *in camera* review.  For example, the documents submitted with the Bureau's February 4, 2019 letter (Doc. 207) were listed on the spreadsheet in numerical order from 1 through 172 (the number of the document appears in the left hand column, just above the document's Bates number, explaining the discrepancy between the Bureau's assertion that it produced 173 documents and my finding that 172 documents were produced), followed by each document's individual Bates number.  And so on for each of the next three productions.  The spreadsheets also identified the Category number under which the documents had been withheld or redacted.

- review the description of each Category of documents set forth in the Appendix that accompanied each transmittal letter;
- review the paragraphs of the D'Angelo declarations that corresponded with the Category number;
- review the Complaint (Doc. 1) and Defendants' Answer (Doc. 61), with particular attention paid to Defendants' Affirmative Defenses;
- review the section of Defendants' Statement of Relevance (Doc. 139) that corresponded with the Category number;
- review the Bureau's response to Defendants' Statement of Relevance (Doc. 144)
- review pertinent case law
- review each document, noting whether (a) it fell within the deliberative process privilege, and if so (b) the relevance of the document to the issues at play in this litigation.

During the course of this review, orders were issued to have the Bureau produce final copies of documents that were the subject of claims of deliberative process and that had been available to Defendants, such as the "Payback Playbook" and the September 15, 2014 Examination Report of Pioneer Credit Recovery, Inc. (Special Master Order #11.)  The final copies were then reviewed to place in better context the withheld and redacted documents. Also during the course of the review, orders were issued to the Bureau to show cause why certain documents should not be produced.  (*See* Special Master Orders #11, #12, #15, and #16 (Docs. 231, 242, 249, and 252.)  As a result, the Bureau waived its assertion of the deliberative process privilege over the Fors-Marsh documents withheld under Category 28 (relating to the development of the Payback Playbook),[6] five specifically identified

---

[6] Fors Marsh is a consultant retained by the Bureau to undertake survey-type work on its behalf.

documents withheld under Category 37 (relating to student loan credit reporting), two

documents falling under Category 40 (relating to briefing former Bureau Director Richard

Cordray in preparation for an August 29, 2016 Federal Student Advisory Board meeting),

two documents falling under Category 41 (relating to briefing former Director Cordray in

preparation for a November 22, 2016 Federal Student Advisory Board meeting), and thirteen

documents falling under Category 1-E (relating to coordination  of activities and allocation

of resources across the Bureau's divisions to address issues in the student finance market).[7]

*See* the Bureau's letters of March 13, and 20, 2019 (Docs. 248 and 254).  As to parts of the

one document withheld under Category 1-G (relating to the Bureau's Office of

Supervision's strategies for FY 2016 and FY 2017), the Bureau is now asserting that they

are covered by the attorney-client privilege.  (*See* the Bureau's letter of March 20, 2019

(Doc. 254).)[8]  Finally, as to five documents withheld under Category 79 (relating to a July

20, 2016 Memorandum from the Under-Secretary of ED to the Chief Operating Officer of

---

[7] In its letter of February 25, 2019 transmitting the final set of deliberative process privilege documents (Doc. 233), the Bureau explained that it had divided Category 1 on its July 6, 2018 privilege log into 9 subcategories (1-A through 1-J), and that the descriptions for these subcategories replaced the description of Category 1 on the original privilege log.

[8] Because Defendants have not challenged the Bureau's assertion of the attorney-client privilege, no additional analysis of this document will be undertaken.

Federal Student Aid),[9] the Bureau continues to press the applicability of the deliberative process privilege.  (*Id.*)[10]

The Bureau's letter of March 20, 2019 (Doc. 254) concluded the submission of legal argumentation on the applicability of the deliberative process privilege for the documents withheld in whole or in part.  The following is my report on the results of the *in camera* review process for the first set of produced documents.

## II.     DISCUSSION

### A.  Governing Principles

As summarized in Paul F. Rothstein and Susan W. Crump, *Federal Testimonial Privileges: Evidentiary Privileges Relating to Witnesses & Documents in Federal-Law Cases* § 5:3 (2d ed. 2006), the deliberative process privilege, also known as the "Inter- and Intra-Agency Deliberative Communications Privilege," "protects from disclosure those communications within the federal government, and between the government and its duly retained outside consultants, which consist of advice, recommendations, opinions, and other information transfers involved in the deliberative or policymaking processes of the government agency."  To be protected, the document must be both "'predecisional,' that is, actually antecedent to the adoption of a policy or arrival at a decision, and . . . 'deliberative,'

---

[9] The Memorandum itself has been made available to Defendants and a copy was provided to me to facilitate *in camera* review.

[10] The Bureau's arguments with respect to these five documents will be addressed in a future report.

that is, actually related to the process by which the policy was formulated or decision reached." *Id.; see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 152 (D.D.C. 2013) (the document in question must have been "genuinely part of the agency's deliberative process"). Indeed, "[t]he scope of the privilege extends beyond documents to protect the integrity of the deliberative process itself." Rothstein and Crump, *supra*, at § 5:3. An agency, however, need not have actually reached a final decision or issued a final policy to secure protection of a document. *See NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975) ("Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process."). Courts "have repeatedly held the pre-decisional prong met so long as an agency can establish 'what deliberative process is involved, and the role the document at issue played in that process.'" *Soghoian v. Office of Mgmt. & Budget*, 932 F. Supp. 2d 167, 179 (D.D.C. 2013).

"[T]he ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Id.* at 151. As explained in Rothstein and Crump, *supra*, at § 5:3, "[s]ince the quality of any agency decision will almost always be affected by the

communications on the subject of the decision received by the decision maker prior to the time the decision is made, a substantial public interest exists in maintaining and ensuring full, frank, open exchanges of ideas between members of the agency and other advisors and the decision maker." Factors to consider in determining whether a document is predecisional and part of the deliberative process include the identities and positions of its author(s) and recipient(s); the contents of the document; the timing of the document relative to the decision in question; and "the status of the document as an opinion or recommendation." *Id.*

Not protected by the privilege, however, are purely factual statements, the agency's final decisions, post-decision documents explaining or interpreting an agency's final decision or policy, and documents that were made public before the requested disclosure. *Id.* at § 5:4. As to factual statements, "[i]t is only when the disclosure of factual material would neither hinder the free flow of advice nor result in undue interference with the decision- or policy-making process that such material need not be protected." *Id.*

The privilege, however, is not absolute. *See Redland Soccer Club,* 55 F.3d at 853-54. "After the government makes a sufficient showing of entitlement to the privilege, the district court should balance the competing interests of the parties. The party seeking discovery bears the burden of showing that its need for the documents outweighs the government's interest." *Id.* at 854. Factors to be considered in balancing these interests include "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; the

seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." Rothstein and Crump, *supra*, at § 5:10; *see also Redland Soccer Club,* 55 F.3d at 854; *United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993) ("The deliberative process privilege may be overcome where there is a sufficient showing of a particularized need to outweigh the reasons for confidentiality."). In balancing the interests, it must be borne in mind that the deliberative process privilege "should be narrowly construed." *Redland Soccer Club*, 55 F.3d at 856.

In short, a two-step process is to be applied in assessing the government's claim that documents are protected by the deliberative process privilege: first, it must be determined that the communications are "predecisional" and "deliberative"; and second, "the court must balance the parties' interests." *Id.* at 854. I will now proceed to undertake this two-step process for each of the categories of documents withheld in whole or in part under the deliberative process privilege.

### B. Document Review by Category – The February 4, 2019 Production

The first production by Plaintiff was transmitted by letter dated February 4, 2019 (Doc. 207) and consisted of 172 documents from 6 separate Categories: 22, 28, 37, 40, 44, and 80.

#### 1. Category 22

Category 22 is described as follows:

15

> Confidential pre-decisional and deliberative communications prepared by
> or shared among Bureau examiners and Bureau attorneys relating to the
> drafting of the September 15, 2014 Examination Report to Pioneer,[11]
> including drafts of the report and communications about drafting the report;
> communications and documents contain or reflect analyses, opinions,
> recommendations, and/or suggestions of Bureau examiners and Bureau
> attorneys in connection with the process of determining the content of the
> report; communications and documents preceded any final determination
> regarding the content of the report.

(Doc. 207 at 6.)

There are 15 documents withheld in whole or in part under Category 22. The first

three documents are initial drafts of the report. They are clearly pre-decisional, deliberative

in nature, and thus covered by the deliberative process privilege. *See Wadhwa v. Sec'y*

*United States Dep't of Veterans Affairs,* 707 F. App'x 61, 63 (3d Cir. 2017) ("draft reports

and internal communications generated as part of agency decisionmaking may be properly

withheld pursuant to [the deliberative process privilege]); *Competitive Enter. Inst. v. Office*

*of Sci. & Tech. Policy,* 161 F. Supp. 3d 120, 128 (D.D.C.), *modified,* 185 F. Supp. 3d 26

(D.D.C. 2016) ("drafts can be subject to the deliberative process privilege . . . if the drafts

are both deliberative and predecisional").

---

[11] The September 15, 2014 Examination Report followed the Bureau's
review of Pioneer's debt collection practices for ED and the Guaranty Agency
student loan portfolios. Bureau examiners listened to debt collection calls and
interviewed Pioneer management and debt collection agents to assess Pioneer's
compliance with the FDCPA. The Bureau concluded that Pioneer's Compliance
Management System was weak. The final report was given to Pioneer.

Document 4 consists of a series of emails among Bureau staff, with the redacted content concerning what the Bureau referred to as "Matters Requiring Attention" or "MRAs" in the Examination Report, as well as proposed remediation options.  This document reflects internal policy debates and is plainly covered by the privilege.  As the final examination report is the operative document from a relevance perspective, the qualified deliberative process privilege has not been overcome.  As Judge Mariani observed in his May 3, 2018 Memorandum Opinion, "[w]hat agency staff said in communication leading up to the issuance or non-issuance of rules, policies, or guidance has no bearing" on Defendants' potential liability." (Doc. 88 at 10.)

Documents 5 and 9, withheld entirely, are duplicate copies of a Bureau memorandum dated September 2, 2014 reflecting internal policy debates on the subject of MRAs and what remedial actions should be required of Pioneer as a result of alleged deficiencies in its Compliance Management System.  The document falls squarely within the deliberative process privilege, and, for the reasons articulated by Judge Mariani, "has no bearing" on the matters germane to Defendants' potential liability.[12]

---

[12]  Document 9 is a duplicate copy of Document 5.  As will be made clear in this Report, there are scores of duplicate or near-duplicate copies of documents, with the difference sometimes being only the identity of the custodian.  Because it is the substantive content of the document, and not the identity of a particular custodian, that is the focus of the deliberative process privilege, the *in camera* review would have been greatly facilitated had the Bureau identified the numerous instances when duplicate copies of the same document were being produced.

Documents 6, 7 and 8 consist of a series of overlapping, internal Bureau emails that preceded the September 2, 2014 memorandum (Documents 5 and 9). Redacted from the emails are intra-Bureau discussions on the subject of MRAs, possible actions to require of Pioneer, and the finalization of the Examination Report. For the reasons expressed above, the redacted discussions are not relevant to the matters at issue here.

Documents 10 through 12 (CFPB-NAV-0056897, 0056773, and 005677) consist of emails among Bureau staff concerning the content of the Examination Report. For the reasons expressed above, the redacted discussions are not relevant to the matters at issue here.

Document 13 (CFPB-NAV-0056779) is a summary of problematic Pioneer collection calls reviewed as part of the Bureau's examination of Pioneer's debt collection practices. By Special Master Order #11 (Doc. 231), the Bureau was directed to explain its rationale for withholding this document during our February 26, 2019 conference call. There was indeed extensive discussion about this document during that conference call, spanning pages 24 through 37 of the transcript of that call. The Bureau elaborated on the content of this document, stating:

> This document relates to the Bureau's examination of Pioneer. What it is is it's a selection of specific calls from a much broader universe of calls that Pioneer had produced to the Bureau. So when you look at the document, you see each paragraph starts with an alphanumeric code. That code corresponds to a specific call that Pioneer produced to the Bureau, in connection with its examination. And then the paragraph that followed that alphanumeric code is an examiner's notes about which portions of that call the examiner believes were relevant to the Bureau's analysis of Pioneer's

conduct. The reason it's redacted entirely is because, as a selection of
material from a much broader universe, it shows the examiner's
recommendations, opinions and advice regarding what the examiner thinks
is relevant to an issue that was being considered, in connection with the
drafting of the Pioneer reports. Pioneer and Defendants have the factual
material underlying this document in their entirety, they have all of their
own calls. So the only information that is unique to this document is the
examiner's selection of portions of calls and specific calls to consider, and
so that's why it is protected.

(*Id.* at 25-26.)

Document 13 is clearly part of the process of preparing the Examination Report. In

this regard, the Examination Report includes summaries of some collection calls. The

deliberative process privilege protects "not only the opinions, comments and

recommendations in the draft, but also the process itself." *Marzen v. Dep't of Health &*

*Human Servs.*, 825 F.2d 1148, 1155 (7th Cir. 1987). Thus, the document falls within the

scope of the privilege.

Defendants argued that the balance of interests tips in favor of compelling disclosure

of this document, pointing to the role of the Bureau in initiating this litigation. Defendants

asserted that "this is an investigator's notes in gathering fact evidence to bring enforcement

action against the Defendants. Just because there are Brady protections in the criminal

context, basic fairness requires that the Government turn over that type of

investigative record to a Defendant in a civil enforcement action." (Tr. of Feb. 26, 2019

Conference Call at 32.) There is, however, nothing exculpatory in the call summaries

contained in Document 13 and Defendants have available the recordings of all the calls

selected as part of the Bureau's examination of Pioneer's debt collection practices. Under

these circumstances, I conclude that the balance of interests does not tip in favor of

Defendants, and will not require production of Document 13.

Document 14 (CFPB-NAV-0056781) is a July 14, 2014 email transmitting

Document 15 (CFPB-NAV-0056782), which is a draft of the Examination Report. Redacted

from the email are some comments concerning the content of the Examination Report. Both

documents are plainly covered by the deliberative process privilege and not subject to

production.

### 2. Category 28

Documents 16 through 83 come under Category 28 of the Categorical Privilege Log.

Category 28 is described as follows:

> Confidential pre-decisional and deliberative communications and
> documents relating to the development of the Bureau's "Payback
> Playbook";[13] communications and documents contain or reflect analyses of
> borrower experiences and perceptions relating to student loan servicing
> practices that an outside consultant (Fors Marsh) performed for the Bureau
> to assist in the development of the Payback Playbook, and discussions,
> evaluations, selections, or summaries of the data obtained by Fors Marsh
> on behalf of the Bureau; facilitated the Office for Students's ability to
> develop and arrive at recommendations to former Director Cordray
> regarding the Payback Playbook and reflects the process used by staff in
> the Office for Students to develop the Payback Playbook, including the
> factors they considered and the analyses performed by Fors Marsh at their
> request to help them make recommendations to former Director Cordray

---

[13] The "Payback Playbook" is a publicly accessible document developed by
the Bureau to provide advice to student borrowers on repayment options intended
to enable student borrowers to avoid default.

> regarding the content and publication of the Payback Playbook;
> communications and documents precede any final decisions about the
> content of the Payback Playbook that was released to the public or any
> other proposed courses of action, decisions, or recommendations based on
> the results of the testing and analysis reflected in the documents.

(Doc. 207 at 6.)

As indicated in the description for Category 28, documents withheld, in whole or in

part, included materials generated by an outside consultant, Fors Marsh.  Special Master

Order #12 (Doc. 242) directed the Bureau to explain why it withheld the Fors Marsh

documents as well as the relevance of those documents.  By letter dated March 13, 2019

(Doc. 248), the Bureau indicated that it was waiving the deliberative process privilege over

the Fors Marsh documents and would be producing them.[14]  In connection with each

instance of the Fors Marsh Student Loans CFPB Report, the Bureau withheld spreadsheets

that reflected certain demographic data that were included in the Fors Marsh Report.  If not

already produced, the Bureau will be directed to produce those spreadsheets.[15]

---

[14]  During our March 5, 2019 telephone conference, I stated that I was
"particularly interested" in learning the Bureau's rationale for withholding what
was referred to on the CFPB Supplemental Privilege Log as "Student Loans CFPB
Report," and bearing Bates Numbers CFBP-NAV-0056812, 0056823, 0056835,
0056844, 0056853, 0056874, and 0056763.  These are Documents numbered 17,
27, 33, 41, 49, 57, 66, and 76 on the CFPB Supplemental Privilege Log.  It is
assumed that these are the documents that have been produced.

[15]  The documents that must be produced are numbered 18 through 24, 34
through 40, 42 through 48, 50 through 56, 58 through 63, 67 through 73, and 77
through 83 on the CFPB Supplemental Privilege Log.

Document 16 (CFPB-NAV-0056811) is a redacted July 8, 2016 email from a Fors Marsh representative to a Bureau staff member.  The redactions pertain to the content of a draft of the Fors Marsh Student Loans CFPB Report.  Because the Bureau has produced the draft report itself, the entire email should be produced as well.

Document 25 (CFPB-NAV-0056820) is a redacted series of emails between Bureau staff and Fors Marsh staff.  The redactions reflect discussions about how best to conduct the study to be undertaken by Fors Marsh, and clearly concern matters of strategy.  As such, the emails are part of the deliberative process pursued by the Bureau to develop the Payback Playbook.  On the other hand, the Bureau has produced the results of the Fors Marsh study, and understanding how the study was constructed may prove useful in connection with an analysis of the results of the study.  Under these circumstances, Defendants' interests to best understand the contents of Fors Marsh reports that have been presented to it outweigh the Bureau's interest in maintaining the confidentiality of its communications with its consultant.  Accordingly, the Bureau will be directed to produce Document 25.

Documents 26 (CFPB-NAV-0056821) and 28 (CFPB-NAV-0056825) are copies of a July 20, 2016 draft "Research Plan for Payback Playbook Testing Interviews" prepared by Fors Marsh.[16]  The subject of how best to communicate to student loan borrowers repayment alternatives is central to this lawsuit.  Under these circumstances, Defendants' interests in

---

[16] Document 28 contains a comment bubble, but is otherwise identical to Document 26.

understanding how Fors Marsh conducted its study outweigh the Bureau's interest in safeguarding from disclosure the Fors Marsh document. Accordingly, the Bureau will be directed to produce these documents.

Documents 29 (CFPB-NAV-0056827) and 30 (CFPB-NAV-0056830) are duplicate copies of a draft "Payback Playbook Testing Discussion Guide" with comments in the margin. Essentially, the documents present a script to be followed by Fors Marsh representatives in interviewing student loan borrowers to assess the effectiveness of various options of a "Payback Playbook." For the reasons articulated above, the Bureau will be directed to produce these documents.

Document 31 (CFPB-NAV-0056831) is a redacted email exchange between CFPB personnel pertaining to the "Repayment Disclosure Testing." Most of this document has been produced. The redaction concerns an irrelevant matter. Accordingly, it need not be produced.

Documents 32 (CFPB-NAV-0056833) and 65 (CFPB-NAV-0056872) are edited versions of Documents 29 and 30. The edits have no bearing on the substance of the document – a discussion guide for conducting interviews of student loan borrowers. Because the Bureau has been directed to produce Documents 29 and 30, it will be ordered to produce Documents 32 and 65 as well.

Documents 75 (CFPB-NAV-0056883) and 76 ((CFPB-NAV-0056885) are duplicate

clean copies of the Payback Playbook Testing Discussion Guide. The Bureau will also be

directed to produce these documents.

Document 66 ((CFPB-NAV-0056873) is a redacted email exchange on the Student

Loans CFPB Report. The redactions are not germane to this litigation, concerning as they

do quotes from borrowers that are included in the Fors Marsh draft reports that have been

produced. Thus, there is no need to produce in unredacted form this email exchange.

### 3. Category 37

Documents 84 through 108 were withheld under Category 37, described as follows:

> Confidential pre-decisional and deliberative communications and
> documents relating to an inter-agency collaborative process between the
> Bureau and the Department of Education to consider, develop, and
> potentially pursue policies or strategies to address problems and other
> issues relating to student loan credit reporting, including drafts or versions
> of internal Bureau documents prepared by personnel in the Office of
> Markets containing their analysis of problems and other issues relating to
> student loan credit reporting and proposed policy recommendations to
> address such problems or issues, and communications relating to the
> preparation and drafting of these documents; documents and
> communications enabled personnel in the Office of Research, Markets &
> Regulations to develop an understanding of risks, problems, and other
> issues in the student loan servicing market in order to directly inform the
> discussion, consideration, and implementation of strategies in other Bureau
> offices to address those risks, problems, and other issues, including the
> provision of technical assistance and other recommendations by the
> Bureau's Office for Students to the Department of Education in connection
> with the Department of Education's consideration of whether to develop
> and issue public guidance regarding student loan credit reporting;
> documents and communications reflect the opinions, impressions, or
> recommendations of the employees who drafted them, including comments
> and revisions proposed by the employees involved in the drafting process;

documents and communications preceded any final decisions regarding
strategies or potential courses of action by other Bureau offices in response
to the assessments performed by the Office of Research, Markets &
Regulations reflected in the documents and any final decisions by
the Department of Education regarding what, if any, policies and strategies
to adopt or pursue regarding student loan credit reporting.

(Doc. 207 at 6-7.)

Preliminarily, it must be noted that, in response to Special Master Order #12 (Doc.

242), the Bureau agreed to produce documents identified on its supplemental privilege log

as numbers 85 (CFPB-NAV-0056795); 88 (CFPB-NAV-0056804); 91 (CFPB-NAV-

0056792); 94 (CFPB-NAV-0056670); and 98 (CFPB-NAV-0056674[17]).  *See* the Bureau's

letter to the Special Master dated March 13, 2019 (Doc. 248).  Accordingly, there will be no

discussion concerning these documents in this report.

Document 84 (CFPB-NAV-0056794) consists of redacted email exchanges within

the Bureau concerning student loan credit reporting by student loan servicing companies.

The redactions reflect internal deliberations on the question of whether policy guidance

should be issued to encourage consistency in making reports to credit reporting agencies by

student loan servicers.  Although ultimately no decision was made on this matter, the

existence of the deliberative process privilege does not depend upon the agency having

taken final action.  *See Soghoian v. Office of Mgmt. & Budget,* 932 F. Supp. 2d 167, 179

(D.D.C. 2013).  "Instead, the agency must only demonstrate that each withholding, 'draft or

---

[17] This document was misidentified in Special Master Order #12 as having
Bates number CFPB-NAV-0056774.

otherwise,' was genuinely part of the agency's deliberative process." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 155 (D.D.C. 2013).  As Judge Lamberth explained in *Soghoian*, courts "have repeatedly held the pre-decisional prong met so long as an agency can establish 'what deliberative process is involved, and the role the document at issue played in that process.'"  932 F. Supp. 2d at 179.  The Bureau has shown the deliberative process at issue in connection with Document 84, and the role the document played in that process.  Moreover, the relevance of this document to the matters at issue here is not such as to overcome the deliberative process privilege.

Documents 86 (CFPB-NAV-0056796), 89 (CFPB-NAV-0056805), 92 (CFPB-NAV-0056793), 95 (CFPB-NAV-0056671), 99 (CFPB-NAV-0056675) and 101 (CFPB-NAV-0056772) are duplicates of proposed policy guidance on student loans credit reporting dated September 23, 2015.  They contain recommendations on what information should be transmitted by student loan servicers to credit reporting agencies.  Document 102 (CFPB-NAV-0056788) is a September 16, 2015 draft of the proposed policy guidance.  Documents 87 (CFPB-NAV-0056803) and 90 (CFPB-NAV-0056791) consist of emails transmitting the September 23, 2015 proposed policy guidance on student loans credit reporting along with some commentary redacted.  Documents 93 (CFPB-NAV-0056669) and 97 (CFPB-NAV-0056673) consist of October, 2015 email exchanges within the Bureau pertaining to the proposed policy guidance.  Document 96 (CFPB-NAV-0056672) is comprised of email exchanges within the Bureau in December of 2015 concerning what advice the Bureau

should be giving to ED on this subject. Document 100 (CFPB-NAV-0056771) is an undated

message between Bureau personnel questioning the applicable codes for student loan

reporting.   Document 103 (CFPB-NAV-0056789) is a December 3, 2015 email between

Bureau personnel concerning possible changes to the policy guidance.  Documents 104

(CFPB-NAV-0056790) and 105 (CFPB-NAV-0056677) are edited, redlined versions of the

draft policy guidance.  Documents 106 (CFPB-NAV-0056751), 107 (CFPB-NAV-0056753),

and 108 (CFPB-NAV-0056686) appear to be clean copies of the September 23, 2015 policy

guidance on student loan reporting.[18]  These documents are clearly part of the deliberative

process, and the Bureau's significant interest in maintaining the confidentiality of its internal

deliberations is not overcome by any relevance they may have to the issues in this litigation.

### 4. Category 40

Documents 109 through 122 on the Bureau's supplemental privilege log were withheld

under Category 40, which covers:

> Confidential pre-decisional and deliberative communications and
> documents relating to the drafting and submission of briefing materials to
> former Director Richard Cordray regarding an August 29, 2016 Federal
> Student Aid Advisory Board Meeting, including draft and final versions of
> a memorandum presented to the former Director and related
> communications containing selections or summaries of facts and issues

---

[18] The Bureau's supplemental privilege log identifies different custodians of
these three documents, but they appear to be exact duplicates.  This is yet another
example of the way in which the documents were logged and produced that
extended the amount of time necessary to conduct the *in camera* review and
produce this report.  This process would have been greatly facilitated and the
generation of this report expedited had the Bureau identified such instances of
duplications.

deemed pertinent to the meeting and recommended discussion points for
the meeting in connection with the process of preparing the former Director
for the meeting and furthering the partnership among various executive
agencies regarding the student loan market; purpose of documents and
communications was to compile the information staff deemed most
pertinent to former Director Cordray's participation in the meetings, to
present him with candid assessments about issues likely to be discussed at
the meetings, and to make suggestions about questions and key discussion
points to raise during the meetings; briefing materials formed part of an
analysis or discussion that was considered as part of Director Cordray's
anticipated participation in the meetings but did not result in a specific
decision, were advisory only, and were prepared by subordinates who
lacked authority to make final decisions on these topics or direct Director
Cordray's actions.

(Doc. 207 at 7.)

Preliminarily, it must be noted that, in response to Special Master Order #12

(Doc. 242), the Bureau agreed to produce Documents 112 (CFPB-NAV-0056759)

and 122 (CFPB-NAV-0056741).  *See* the Bureau's letter to the Special Master dated

March 13, 2019 (Doc. 248).  These documents are duplicate copies of the 27-page ED

Student Loan Default Prevention Strategy dated January 29, 2016.

Documents 110 (CFPB-NAV-0056755), 113 (CFPB-NAV-0056728), 114

(CFPB-NAV-0056730), 115 (CFPB-NAV-0056732), 117 (CFPB-NAV-0056734),

118 (CFPB-NAV-0056736), and 120 ((CFPB-NAV-0056738) are various versions

of the August 25, 2016 "briefing memorandum" to former Bureau Director

Cordray to prepare him for a meeting of the Federal Student Aid Board.  The

briefing memorandum as well as the edited versions of the memorandum reflect

the advice and candid assessment of Bureau personnel with respect to topics

expected to be covered during that meeting.  Also providing advice and
recommendations for the Bureau's then Director is the internal Bureau email
exchange reflected in Document 116 (CFPB-NAV-0056733), a redacted version of
which has been produced.  Briefing materials and internal emails that "reveal the
agency 'employees' deliberative process of selecting and presenting facts,' which
required them to 'exercise [ ] their judgment by anticipating what information
these officials would need in order to be prepared to address any questions or
issues,'" *Elec. Frontier Found. v. U.S. Dep't of Justice*, 890 F. Supp. 2d 35, 53
(D.D.C. 2012), likely to arise during the course of an inter-agency meeting, such as
the Federal Student Aid Board meeting, are protected by the deliberative process
privilege.  Although the information in the briefing memorandum may be relevant
to the matters at issue in this litigation, Defendants' interests in obtaining the
briefing memorandum, its earlier drafts, and related internal emails are not so
strong as to overcome the Bureau's need for candid and forthright input from staff
members.  Defendants' interest is also offset by the fact that the Bureau has
produced the ED Student Loan Default Prevention Strategy.  Accordingly, the
Bureau will not be required to produce the August 25, 2016 briefing memorandum
in any of its iterations and the related email exchange.

     The Bureau, however, will be required to produce in unredacted form the
email exchange within the Bureau that is reflected in Documents 110 (CFPB-

NAV-0056756) and 119 (CFPB-NAV-0056737). The redactions on this email

exchange are insignificant, especially in light of the production of the ED Student

Loan Default Prevention Strategy. The Bureau also will be required to produce in

unredacted form the agenda for the Federal Student Aid Board meeting,

Documents 111 (CFPB-NAV-0056756) and 121 (CFPB-NAV-0056740). The

redaction from the agenda is insignificant in light of the production of the ED

Student Loan Default Prevention Strategy.

### 5. Category 44.

Documents 123 through 131 on the Bureau's supplemental privilege log are

grouped under Category 44, which carries the following description:

> Confidential pre-decisional and deliberative communications and
> documents relating to the drafting and submission of briefing
> materials to former Director Richard Cordray regarding a May 9,
> 2016 meeting between the former Director and Navient's CEO,
> including draft and final versions of a memorandum presented to
> the former Director and related communications containing
> selections or summaries of facts and issues deemed pertinent to the
> meeting and recommended discussion points for the meeting in
> connection with the process of preparing the former Director for the
> meeting; purpose of communications and documents was to bring
> former Director Cordray up to speed on Bureau and other state and
> federal government activity relevant to the meetings, to select and
> distill the facts deemed most relevant to the Director's participation
> in the meetings, and to suggest key discussion points for the
> Director to raise during the meetings; briefing materials formed part
> of an analysis or discussion that was considered as part of Director
> Cordray's anticipated participation in the meetings but did not
> result in a specific decision, were advisory only, and were prepared

by subordinates who lacked authority to make final decisions on these topics or direct Director Cordray's actions.

As noted above, briefing materials are inherently deliberative in nature. They are intended to provide an agency's leader with candid advice to best prepare her to represent the government's interests.

The materials withheld under Category 44 fall squarely within the deliberative process privilege. Documents 124 ((CFPB-NAV-0056807) and 128 (CFPB-NAV-0056723) are drafts of the memorandum used to prepare former Director Cordray for his meeting with Navient's CEO. Document 126 (CFPB-NAV-0056899) includes the briefing memorandum and the documents accompanying the briefing memorandum that comprised the briefing book for the former Director.[19] Documents 123 (CFPB-NAV-0056806) and 127 (CFPB-NAV-0056722) are emails that have been redacted to avoid disclosure of the attachments to the briefing memorandum. Documents 125 (CFPB-NAV-0056810), 129 (CFPB-NAV-0056724), 130 (CFPB-NAV-0056725), and 131 (CFPB-NAV-0056726) are the attachments to the briefing memorandum.

---

[19] The Bureau inadvertently produced parts of the briefing book to Defendants. When its error was called to its attention, it requested Defendants to "destroy the inadvertently produced version along with all associated metadata." Bureau's letter of February 27, 2019 (Doc. 237).

The Bureau is entitled to withhold these documents, some of which Defendants already have or which are publicly accessible.  Navient's CEO participated in the meeting with former Director Cordray, and so has knowledge of what was discussed.  Under these circumstances, Defendants cannot show that its interests in knowing what information was provided to former Director Cordray outweighs the Bureau's interest in ensuring that its leader has received all the information and advice essential to prepare him to represent the Bureau in its dealings with student loan servicers.

## 6. Category 80.

Documents 132 through 172 on the Bureau's supplemental privilege log have been withheld under Category 80, which has the following description:

> Confidential pre-decisional and deliberative communications and documents prepared by or shared among personnel in the Bureau, personnel in the Department of Education, personnel in the Department of Treasury, and/or personnel in the Executive Office of the President relating to the development and drafting of the documents titled "Fact Sheet: Protecting Student Loan Borrowers" and "Fact Sheet: Taking Action to Help More Americans Manage Student Debt" (released on April 28, 2016), including drafts of the documents and related communications; purpose of communications and documents was to develop, obtain, provide, or discuss opinions, recommendations, reactions, suggestions, or views of personnel in the Bureau and other federal agencies or offices regarding the content of the document in connection with the process of drafting the document; communications and documents contain or reflect non-final analyses, reactions, recommendations, suggestions, or views of personnel in the aforementioned federal agencies or offices in connection with the aforementioned process; communications and documents preceded

final decisions regarding the content and publication of the
document.

There are 24 instances of drafts of the publicly-released "Fact Sheet:
Protecting Student Loan Borrowers." (Documents 132, 134 through 140, 142, 144,
146 through 157, 159, and 160 on the Bureau's supplemental privilege log.)[20]
These instances reflect input from not only the Bureau, but also ED and the
Department of the Treasury. Indeed, the withheld documents are replete with
comments from these sources. Email exchanges associated with the preparation of
the "Fact Sheet: Protecting Student Loan Borrowers" (Documents 133, 141, 143,
145, 158, and 161)[21] also reflect substantive comments or edits pertaining to the
content of this publicly-released document that have been redacted from the copies
produced to Defendants.

Email exchanges initiated by the Bureau that involved other agencies
contained the following notation:

> This document contains deliberative, pre-decisional information of
> the CFPB. It is being shared in response to a request for technical
> assistance and consultation from the Department of Education and
> the Department of the Treasury on the matters contained herein. As
> required by the CFPB's confidentiality rules, please treat this
> information in accordance with applicable Federal laws for
> confidentiality and data security and integrity, including the CFPB's

---

[20] The Bates numbers associated with these Document numbers appear on
the supplemental privilege log and will not be reproduced here.

[21] See the Bureau's supplemental privilege log for the Bates numbers
associated with these emails.

confidentiality rules, 12 CFR Part I 070, and please do not further
disclose this information without written permission from the
CFPB unless required by applicable law.

(Document 145, CFPB-NAV-0056691.)  The Bureau was correct to include this

notation because the deliberative process privilege protects an agency's

communication with another agency "as long as [it is] involved in deliberations

that will contribute to policy choices made by the President or [other] agencies."

*Soghoian*, 932 F. Supp. 2d at 178.  The Bureau played such a role with respect to

the development of the "Fact Sheet: Protecting Student Loan Borrowers."

The Bureau played a similar role in the development of the publicly-released

"Fact Sheet: Taking Action to Help More Americans Manage Student Debt."

Drafts of the final document are at Documents 162 (CFPB-NAV-0056715) and

164 (CFPB-NAV-0056717).  These drafts are filled with comments from the

involved agencies, including the Bureau.  Documents 163 (CFPB-NAV-0056716)

and 165 through 172 (CFPB-NAV-0056906, 0056907, 0056900, 0056901,

0056902, 0056903, 0056904, and 0056905) are email exchanges pertaining to this

publicly released Fact Sheet.  The Bureau has redacted from the email substantive

comments and language suggestions for the final version.

Documents 132 through 172 are plainly part of the deliberative process that

produced the "Fact Sheet: Protecting Student Loan Borrowers" and the "Fact

Sheet: Taking Action to Help More Americans Manage Debt."  As noted above,

drafts of publicly-released documents are covered by the deliberative process privilege. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).   Although documents 132 through 172 contain information related to the matters at issue in this litigation, Defendants have the operative documents – the Fact Sheets.  The end-product of the deliberative process establishes what is relevant here.  As Judge Mariani said in his May 4, 2018 Opinion, "[w]hat agency staff said in communication leading up to the issuance or non-issuance of rules, policies, or guidance has no bearing on [the] determination [of Defendants' alleged liability]."  (Doc. 88 at 10.)

The fact that the Bureau engaged in a deliberative process with ED (as well as other agencies) does not alter the conclusion that these documents are not subject to production.  Judge Mariani directed the Bureau to "produce all *non-privileged communication* it had with the Department of Education that falls within the subject matter of Defendants' requests, but Plaintiff need not turn over any other predecisional communications related to the fourteen publicly issued rules, regulations, and guidance that Defendants identified or any other predecisional communications related to proposed rules, regulations, and guidance that were not ultimately issued." (*Id.* at 11; emphasis added.)[22]  Thus, Judge Mariani did not

---

[22]  It does not appear that the two Fact Sheets at issue in relation to Documents 132 through 172 are among the "fourteen publicly issued rules,

preemptively rule that any communication between the Bureau and ED was so

highly probative of the matters at issue here so as to overcome the deliberative

process privilege.  In this instance, where the Defendants have the publicly-

released "Fact Sheets," and the "Fact Sheets" do not appear to be included in the

list of "fourteen publicly issued rules, regulations, or guidance that Defendants

believe are clearly relevant to the administration of the government contracts and

federal regulations governing federal student loan servicing and collection

practices at issue in the Complaint," (Doc. 72 at 3), Defendants' desire for the

documents in question does not overcome the Bureau's need to protect the

"'creative debate and candid consideration of alternatives'" that the deliberative

process privilege is intended to foster.  *Russell*, 682 F.2d at 1048 (D.C. Cir. 1982),

quoting *Mead Data Central, Inc. v. U. S. Dep't of the Air Force*, 566 F.2d 242, 256

(D.C.Cir.1977).  Defendants also have available the option of seeking production

of the documents in question from ED or any of the other agencies involved by

way of subpoena, and ED or the other agencies can then determine the extent to

which they would assert the deliberative process protection.  It is clear, however,

that the Bureau did validly assert that privilege with respect to Documents 132

through 172 on its February 5, 2018 supplemental privilege log.

---

regulations, and guidance that Defendants identified." (*Id.*)  Thus, it is not clear
that these communications would fall within the scope of Defendants' requests for
information.

## III.   CONCLUSION

For the reasons expressed above, I have concluded preliminarily that the Bureau should produce under Category 28 documents numbered 16, 18 through 26, 29, 32, 34 through 40, 42 through 48, 50 through 56, 58 through 63, 65, 67 through 73, and 75 through 83 on the CFPB Supplemental Privilege Log; and under Category 40, documents numbered 110, 111, 119, and 121.  The parties will be afforded an opportunity to object to this Report.  The timetable for objections will be addressed during our April 16, 2019 weekly conference call.

s/ Thomas I. Vanaskie
THOMAS I. VANASKIE
SPECIAL MASTER