# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Consumer Financial Protection Bureau,

        Plaintiff,

        v.

Navient Corporation, *et al.*,

        Defendants.

Case No. 3:17-CV-00101-RDM
(Hon. Robert D. Mariani)

FILED UNDER SEAL

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO
## DEFER THE DEADLINE FOR ITS RESPONSE TO DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT AND
## TO PROHIBIT FURTHER MOTIONS FOR
## SUMMARY JUDGMENT BEFORE THE CLOSE OF DISCOVERY

Kristen Donoghue
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

Nicholas Jabbour, DC 500626
Manuel Arreaza, DC 1015283
David Dudley, DC 474120
Ebony Sunala Johnson, VA 76890
Nicholas Lee, DC 1004186
Andrea Matthews, MA 694538
*Enforcement Attorneys*

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

I.     INTRODUCTION. ...................................................................................1

II.    FACTS AND PROCEDURAL HISTORY. ............................................3

     A.   The Bureau's Steering Claims ................................................3

     B.   Steering Did, In Fact, Occur ...................................................5

     C.   Navient's Incomplete Production of Borrower Records ......11

III.   STATEMENT OF QUESTION INVOLVED ............................................16

IV.   ARGUMENT .........................................................................................17

V.   CONCLUSION .....................................................................................21

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Sys., Inc. v. Huber*,
2015 WL 1729375 (M.D. Pa. Apr. 15, 2015)................................................... 21

*Dean v. Douglas*,
2012 WL 6151137 (M.D. Ga. Dec. 11, 2012)................................................. 21

*Doe v. Abington Friends Sch.*,
480 F.3d 252 (3d Cir. 2007) ...................................................... 17, 20

*Humbert v. Kurtz*,
2008 WL 719244 (M.D. Pa. Mar. 14, 2008) ................................................ 20

*In re G–I Holdings Inc.*,
2007 WL 1412294 (D.N.J. May 14, 2007)....................................................... 21

*La Fata v. Raytheon Co.*,
223 F.Supp.2d 668 (E.D. Pa. 2002) ................................................ 20

*Shelton v. Bledsoe*,
775 F.3d 554 (3d Cir. 2015) .......................................................... 17

*Smithson v. Rizzo*,
2015 WL 1636143 (M.D. Pa. Apr. 7, 2015)...................................................... 20

**Statutes**

12 U.S.C. § 5531 ............................................................................... 3, 4

12 U.S.C. § 5536.............................................................................. 3, 4

**<u>Regulations</u>**

34 C.F.R. § 682.210 ............................................................................................ 5

34 C.F.R. § 685.207 ............................................................................................ 6

## **INTRODUCTION**

After substantially delaying the production of documents and data, Navient now tries to benefit from those delays by moving for partial summary judgment on the "steering" claims in the Bureau's complaint (counts I and II) before the Bureau has had the opportunity to review, or even obtain, documents and calls it has requested. Navient's motion is procedurally improper, and the deadline for the Bureau's response to the motion should be deferred, for three principal reasons.

*First*, the case is in active discovery, and just four months ago, Navient produced 455,000 documents responsive to requests issued by the Bureau in May 2017. It is not feasible for the Bureau to have completed its review of those documents by now, much less take all of the depositions it is entitled to take based on the information it learns from that review. While the Bureau's review is ongoing, the Bureau has discovered substantial documentary evidence supporting its steering claims, including evidence in Defendants' most recent production. It is not surprising that Navient seeks to dismiss those claims before the Bureau can complete its review. Navient also filed its motion at a time when the parties are engaged in an extremely busy phase of discovery, with a full slate of issues to be litigated before the recently-appointed special master, all of which need to be resolved in approximately four months.

1

*Second*, to this day, six months after the Bureau expressed concerns to the Court that Navient had not produced documents and calls for borrowers who had already been deposed, and after the Court had set forth a procedure to ensure that those records would be produced, Navient still has not produced all of the documents and calls requested by the Bureau. Now, as the Bureau presses Navient on its failure to produce the missing documents and calls for borrowers whom Navient deposed, Navient has made those borrowers the centerpiece of its summary judgment motion before that dispute is even resolved. And Navient ironically claims that "the entire course of dealing between Navient and the borrowers must be considered" (Navient Brief, at 16), even while it has not completed productions that would reveal those "entire course[s] of dealing."

*Third*, Navient asks the Court to grant summary judgment by engaging in a borrower-by-borrower loan file review. But paradoxically, Navient also argues that "isolated phone calls are not evidence of a Company practice." Navient Brief, at 19. Thus, even Navient seems to understand that file-level review for 14 borrowers (whose records have not even been fully produced) is not the correct way to adjudicate this case. This is not an action in which 14 borrowers brought suit against Navient; rather, the Bureau's allegations are that Navient engaged in a widespread practice of steering that was not limited to those 14 borrowers. And, as described in more detail below, the Bureau already has uncovered substantial

2

evidence demonstrating that Navient's "Company practice" was indeed to steer borrowers facing hardships that were not temporary or short-term into forbearance. The Bureau should be allowed to complete development of the record concerning Navient's "Company practice."

By filing the motion, Navient seeks to deprive the Bureau of an opportunity to complete discovery – which has, thus far, supported the Bureau's claims. Navient should not be allowed to short-circuit the discovery process and the development of a full record for the factfinder. Thus, discovery should be allowed to run its course, and the deadline for the Bureau's response should be deferred until 21 days after the deadline for motions for summary judgment, which is currently set at November 7, 2019. Doc. 141, ¶ 4a. In addition, so that the parties do not divert resources from the important tasks that are necessary to bring discovery to a close so that this matter can be adjudicated on a complete record, rather than on a piecemeal basis, the Bureau requests that the parties be prohibited from filing further summary judgment motions before the close of discovery.

## FACTS AND PROCEDURAL HISTORY

### I.    The Bureau's Steering Claims

The first two counts of the Bureau's complaint allege that Navient violated the Consumer Financial Protection Act's prohibitions against abusive acts and practices, 12 U.S.C. §§ 5531(d)(2)(C), 5536(a)(1)(B), and unfair acts and practices,

3

12 U.S.C. §§ 5531(c), 5536(a)(1)(B), when Navient steered federal loan borrowers experiencing financial hardship that was not short-term or temporary into forbearance, before or instead of advising them about income-driven repayment ("IDR") plans. IDR plans allow borrowers to pay an amount that is based on their current income and household size, thereby accounting for the fact that borrowers' incomes may fluctuate over time. The payments can be as low as zero dollars if a borrower's discretionary income is not sufficient to pay any portion of his or her student loans, such as during a period of unemployment.

While forbearance can be appropriate for short-term or temporary hardships, borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance, making it a significantly worse option than IDR for borrowers experiencing a long-term hardship. Some of these costs include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan (typically called interest capitalization). In addition, in some cases, after a forbearance, a loan may be reamortized, which can lead to an increase in the borrower's monthly payment amount. Borrowers who enroll in forbearance, rather than IDR, also do not make any progress toward potential loan forgiveness, nor are they eligible for an interest subsidy available to

4

borrowers with subsidized loans enrolled in IDR. The high use of forbearance is also associated with increased rates of borrower defaults.[1]

## II.   **Steering Did, In Fact, Occur**

While the parties are engaged in ongoing discovery and the record continues to be developed as the Bureau reviews Defendants' productions and takes additional depositions, the documentary evidence uncovered thus far, as well as deposition testimony, corroborate the Bureau's allegations. For example, a June 2010 memorandum demonstrated that the culture of promoting forbearance at Navient was so pervasive that the company had a "battle cry" about it: "Our battle cry remains *'forbear them, forbear them, make them relinquish the ball.'*" A2 (emphasis in original).[2] The memorandum noted that, for borrowers whose accounts Navient brought out of delinquency, 70% were being placed in forbearance. *Id.*[3]

---

[1] Navient writes that forbearance and IDR are "complementary" because borrowers "often need forbearance to allow time to complete IDR paperwork." Navient Brief, at 3. This is a red herring; as Navient well knows, this case is *not* about the use of administrative forbearances, which are typically three months or less and are designed to give borrowers time to apply for IDR.

[2] "A__" refers to a page of the appendix filed with this brief.

[3] The memorandum also stated that "we are very liberal with the use of forbearance once it is determined that a borrower cannot pay cash or utilize other entitlement programs." A2. Under ED regulations, "entitlement programs" refers to deferment and grace periods, not to IDR. *See* 34 C.F.R. § 682.210 (describing

The high rate of enrollment in forbearance for borrowers in distress was not surprising in light of the fact that Navient provided its call center representatives with a job aid that directed representatives to steer borrowers facing financial difficulty toward forbearance. The first page of the job aid contains a decision tree that guides the representative to ask "Can the borrower pay some portion?" A5. IDR plans are shown as options available to borrowers who can afford a payment, while forbearance and deferments are the only options shown to be available to borrowers who cannot make any payment. *Id.* Following the lead of the decision tree, the second page of the job aid is a matrix that sorts repayment options according to whether a borrower "Can Make Monthly Payments" or "CAN NOT Make Monthly Payments." A6. Again, IDR plans are listed only under the category "Can Make Monthly Payments," while forbearance and deferment are the only options listed for borrowers who "CAN NOT Make Monthly Payments." *Id.*

While Navient repeatedly touts in its brief that it informed students that "You could even qualify for a payment of $0!", Navient employees confirmed that, dating back to at least 2011, Navient did not offer IDR to borrowers who could not afford to make payments. For example, the head of all four of Navient's call

_____

"entitle[ment]" to deferments); 34 C.F.R. § 685.207 (describing "entitle[ment]" to grace periods).

centers stated that he had not been aware, during most or all of his tenure from 2011 to 2012, that IDR was even an option for borrowers who could not afford to make payments. A9. And a Navient call center supervisor confirmed that, through at least 2012 and perhaps for years after that, the job aid that guided calls with delinquent borrowers did not include IDR as an option. A13.

Consistent with the fact that Navient did not adequately advise borrowers about IDR, the Bureau is already in possession of dozens of calls in which steering occurred, which were obtained through Navient's document productions (for example, calls attached to internal emails). And the Bureau has not yet obtained in this litigation a sample of calls for review, but is currently in the process of negotiating the parameters of that call sample production.

Navient's steering of borrowers into forbearance came to the attention of third-party student loan counselors, who were puzzled by Navient's refusal to offer IDR plans to borrowers who were obvious candidates for it. For example:

- Employees of the i3 Group – a third-party counseling service – observed in 2013: "We have been experiencing [Navient] reps who are refusing to send out the IBR, hanging up after the forbearance is read, and then also refusing to put a supervisor on the line when requested.'" A16. A Senior Vice President from i3 brought the issue to Navient's attention, explaining how Navient representatives were "not wanting to offer IBR"

7

or were making up restrictions about IBR eligibility to avoid offering IBR. A183-84.[4]

○ Loan counselors at the University of Phoenix made similar observations in 2013, following an incident in which Navient representatives "refused to go over IBR" with a borrower with no income. A19. University of Phoenix representatives received confirmation from two different Navient representatives that it was Navient's policy "that if a student says they cannot make any payments that [Navient] go over *only* Deferment and Forbearance options." A18-19 (emphasis in original).

Navient's internal emails also demonstrate that Navient employees reviewing calls were providing samples of steering that they thought would be brought to the attention of Navient's CEO. For example, in February 2014, Navient personnel flagged for CEO Jack Remondi's attention a borrower call where the borrower was placed in forbearance even though she "may have qualified for IBR." A22. Through at least 2016, the issue of borrower steering had persisted, with examples of problematic calls having been brought to Mr. Remondi's attention on at least four additional occasions. A27, 29, 32, 35.

In 2017, the Department of Education ("ED") conducted a review of Navient's call center activities, and after listening to a sample of calls, ED concluded that, in some of those calls, "Navient CSRs neglected to offer the borrower an option other than forbearance." A40. ED noted that "[t]he use of

---

[4] IBR stands for income-based repayment, which is one of the types of plans that falls under the broader umbrella phrase of IDR plans.

forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term." *Id.*

According to former employees of Navient, the occurrence of steering was also a consequence of Navient's compensation policies. Navient's compensation policies for its customer service personnel incentivized them to deal with calls quickly, which resulted in borrowers not being advised about IDR plans or being directed toward forbearance. As one former employee recounted: "The company fostered a culture within the call center that prioritized speed in resolving borrower calls. The company imposed a requirement that employees maintain an average call time of approximately seven minutes. It initially conveyed the requirement during training. Managers reinforced the requirement through regular feedback sessions." A88-89. Employees were informed daily or weekly how their average call time compared with their peers through tracking spreadsheets sent to employees by email that showed the names of employees along with their average call times.  A former employee described these reports as follows: "The spreadsheet ranked employees according to the colors green, yellow, and red. Top performers were green. Marginal performers were yellow. And poor performers were red." A89. Thus, "[n]ot only did I know what my average call time was, I knew where I stood relative to other customer service representatives." A90. Navient employees understood that the way to achieve short call times was to offer

forbearance. If a borrower called to discuss repayment options, and the representative placed the borrower into forbearance, that could be accomplished in under 3.5 minutes. A102. In contrast, discussing IDR would be a much longer conversation. A93-94.

Even though call representatives had their calls audited on a monthly basis by their supervisors, this auditing was not thorough, nor was it designed to prevent incidents of steering. A supervisor was required to listen to only five calls per month for each agent, and those five calls could cover any subject, including topics unrelated to choosing a repayment plan. A100-01. Even if, in these limited audits, a representative was deemed not to have properly discussed IDR as a repayment option, the representative's conduct would not be written up in any way or lead to any sort of warning. A108-09.

Finally, Navient has always understood that sending boilerplate written information about IDR does not give it *carte blanche* to give borrowers inadequate advice over the phone. To the contrary, despite what Navient is now arguing in this litigation, Navient has always known that struggling borrowers faced with the complexity of repayment options rely on phone advice, and Navient has encouraged borrowers to trust that they can receive accurate advice by phone. Indeed, in 2016, Navient urged to the FCC that regulations concerning phone contact should be changed to remove "impediments . . . to reaching and helping

10

struggling and at-risk borrowers" because of "the importance of [phone] contact." A116. Navient summarized its position as follows: "one thing has become crystal clear from our years of experience: live contact with borrowers is key to helping them navigate the multitude of options and the complexity of the repayment system." A117.

## III.   Navient's Incomplete Production of Borrower Records

Against this backdrop of evidence that Navient had a systemic practice of steering, Navient has pursued a consistent strategy in this litigation of trying to hinder key aspects of discovery. For example, with respect to the production of emails, Navient initially took the remarkable position that it would produce virtually no internal emails about the Bureau's steering claim and various other practices alleged in the complaint. The Bureau was required to seek the involvement of the Court to compel production of those emails. *See* Doc. 74. And indeed, the productions have and are continuing to yield evidence supporting the Bureau's claims, as described above. Similarly, Defendants resisted production of contact information of former employees, again requiring the Bureau to seek the involvement of the Court. *See* Doc. 99. And by contacting those former employees, the Bureau continues to learn information corroborating its claims.

Another front in Navient's ongoing battle to hinder discovery has been to resist production of records and calls for borrowers whom Navient is deposing. Put

11

differently, Navient has taken the position that borrowers are not entitled to see all of the loan records and calls that Navient has in its possession about them. *See, e.g.*, A125-27, 129, 133, 136-37, 140, 144. The Bureau raised this issue with the Court at the August 8, 2018 hearing, specifically noting that the Bureau had become aware that relevant documents – such as letters confirming enrollment in verbal forbearances – were being withheld for borrowers being deposed. *See* Aug. 8, 2018 Hearing Transcript, at 39:13-40:25. The Bureau also noted that calls in which borrowers agreed to enroll in forbearances were not being produced. *Id.*; *see also* Doc. 99.

At that hearing, the Court asked Navient's counsel about its questionable claim that producing all documents and calls for approximately 25 borrowers being deposed would be too burdensome: "Aren't the files of individual borrowers maintained by Navient in some coherent fashion, such that if you want to access the file of [a] borrower it can be done without a great deal of work and effort? I mean, are you telling me that's not the case?" Aug. 8, 2018 Hearing Transcript, at 51:10-14.

Navient responded as follows with respect to borrower correspondence: "I don't know if you remember the old dos [sic, DOS] screens with like black – black screens with the green flashing – green flashing language . . . . So it's like that. And in order – so what we look at is we look at that screen, and there's a screen

12

that shows the whole history of the loan. . . . [Y]ou have to look at that screen,

click – click the entry, that gets sent to another part of the business, downloaded,

and then we can produce it." *Id.* at 51:23-52:11.

With respect to call recordings, Navient stated as follows: "And I can tell

you that the company cannot pull them by account numbers. . . . Instead, we have

to look at the call notes, look at the time and date, go to the system where that call

would have been located, match the time and date with the agent name who took

the call and see if we can find the borrower's call." *Id.* at 52:18-24.

Based on these explanations, the Court set out the procedure by which the

Bureau could request documents withheld: the Bureau would "look at the loan

history" to be provided by Defendants, "identify the calls [and correspondence]

that relate to the specific activities at issue," and Navient would then have to "go

and try to locate those calls and correspondence." *Id.* at 52:9-11; 55:19-24.

Information that the Bureau has learned since that hearing raises serious

doubts about the accuracy of the descriptions Navient provided about the process

of locating borrower correspondence and calls and the associated burden. During

an onsite visit to a Navient servicing center for purposes of finalizing the Bureau's

data requests, the Bureau learned that borrower calls and correspondence are

indeed maintained in a "coherent fashion." All correspondence can be queried by a

borrower's social security number, and that correspondence is located in a white-

screen database (with no flashing text) that does not resemble DOS at all. *See* A147 (screenshot of database showing borrower documents queried by social security number). In addition, all of that correspondence can be opened and downloaded without having to make contact with another business area. And in separate databases (which, again, have white screens with no flashing text, and do not look like DOS), a borrower's calls typically can be retrieved simply by querying that borrower's phone number. *See* A149, 151, 153 (screenshots of databases showing borrower calls queried by phone number). Indeed, a current Navient call supervisor described the process of locating calls as straightforward: "I usually don't struggle to find calls. Like it's pretty easy to find the calls most of the time. . . . I honestly have never had a time that I've run into where I couldn't find a call." A103, 105. In sum, the documents for specific borrowers are segregated in "coherent fashion," and claims of excessive burden to download all of those documents do not withstand scrutiny.[5]

---

[5] It would seem to take more effort for Navient's counsel to engage in a process of listening to all calls for a borrower, and reading all correspondence with the borrower, to determine what to produce and what to withhold, rather than to simply produce all of a borrower's documents and calls. And, on some occasions, Navient has delayed borrower depositions due to the inability to timely make their selective production of records for the borrower to be deposed. Thus, it appears that the culling exercise that Navient's counsel performs, not the process of

After the August 8, 2018 hearing, pursuant to the Court's instructions, Navient produced a loan history log for each borrower, printed from a screen in their servicing system, so that the Bureau could determine what potentially relevant items on those logs were withheld and should have been produced.[6] The Bureau compared Navient's productions for borrowers with their loan history logs, and discovered a significant volume of potentially relevant calls and correspondence that had not been produced. (A 26-page list of documents and calls that the Bureau believed had not been produced is attached at A156-81). The Bureau requested that Navient produce all of those documents and calls on December 7, 2018. A155. To date, Navient has not yet produced all of the calls and correspondence on that list, despite the procedure that the Court set forth at the August 2018 hearing requiring them to do exactly that.[7] The Bureau also expressed

---

gathering all documents and calls associated with the borrower, is what is labor intensive.

[6] These logs should have been produced in advance of the borrower depositions, as they are unquestionably relevant. Navient's counsel admits that they consulted these logs to determine what to produce, and thus they made the conscious decision that the logs themselves would be among the items to improperly withhold before the depositions occurred. The logs include relevant information about the specific dates borrowers contacted Navient, and in certain instances, the apparent outcome of those calls.

[7] The Bureau received a small production of documents and calls on February 5, 2019 in response to the 26-page list from the Bureau. The Bureau is in the process of reviewing that production, but it is evident to the Bureau that some

concerns that some loan history logs had been improperly withheld (A155), and Navient did not respond to that concern.

While the Bureau is continuing to pursue this issue with Defendants and intends to seek relief if relevant records continue to be withheld, Navient ironically has made the experiences of borrowers whose records they have not fully produced the centerpiece of their motion.

## STATEMENT OF QUESTION INVOLVED

Should the deadline for Bureau's response to Navient's motion for partial summary judgment be deferred until 21 days after the deadline for filing summary judgment motions, and should the parties be prohibited from filing further summary judgment motions before the close of discovery?

**Suggested answer**: Yes, because: (a) the parties are in the middle of active discovery; (b) Navient has acknowledged that this case should be about "Company practice" (Navient Brief, at 19), and while the Bureau is still reviewing Navient's document production, the Bureau has already uncovered substantial evidence showing a "Company practice" of inadequately advising borrowers about IDR; and

---

items from the 26-page list have not been produced. It appears that some of the calls on the 26-page list were not retained, but the Bureau has not received a response to its inquiry regarding which calls were not retained and when the non-retention occurred. *See* A155.

(c) the motion is based on the experiences of specific borrowers for whom Navient

has not fully produced potentially relevant documents and calls.

## **ARGUMENT**

Navient's motion is premature because discovery is not complete.

Accordingly, the Bureau's response to the motion should be deferred until 21 days

after the deadline for summary judgment motions, which is after the close of all

discovery. In addition, for the efficiency of this case – including so that the parties

can focus their efforts on bringing fact discovery to a close in four months – further

summary judgment motions before the close of discovery should be prohibited.

Navient's motion is an attempt to short-circuit the Bureau's ability to create

an adequate record through the discovery process. Yet "it is well established that a

court 'is obliged to give a party opposing summary judgment an adequate

opportunity to obtain discovery' . . . . because, by its very nature, the summary

judgment process presupposes the existence of an adequate record." *Doe v.

Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007); *see also Shelton v.

Bledsoe*, 775 F.3d 554, 565 (3d Cir. 2015) (noting that "[i]f discovery is

incomplete, a district court is rarely justified in granting summary judgment").

Navient is undoubtedly aware that it is not feasible for the Bureau to have

completed review of Navient's document productions. Navient recently insisted

upon *seven weeks* to review the Bureau's forthcoming production of the non-

privileged documents from a universe of 55,000 documents mentioning the words

"Navient" or "Pioneer." *See* Doc. 155, at 1. Thus, it is not realistic for Navient to

expect the Bureau to review a volume of documents that is *over eight times as*

*large* in the four months that have elapsed since Navient produced those

documents, let alone for the Bureau to supplement its Rule 26(a)(1) disclosures and

notice and take additional depositions based on information from those documents.

In addition, in mid-January 2019, Navient produced certain borrower data that the

Bureau requested in *February 2018*; the 11-month production period included

approximately 9 months in which Navient sought to block the production entirely.

This delay prevented the Bureau from being able to analyze this data and select a

call sample for production based on the data by this point in the discovery process.

Navient also delayed production, until September 2018, of contact information for

former call center employees, which limited the Bureau's ability to interview these

individuals, supplement the Bureau's Rule 26(a)(1) disclosures with additional

potential witnesses, and notice and take depositions, if necessary. Had Navient

produced this information when its interrogatory responses were due in late March

2018, the Bureau could have begun its outreach over five months earlier.

In addition, though the review of Navient's productions is ongoing, the

Bureau has already obtained significant evidence showing that Navient's

"Company practice" was that it did not adequately advise borrowers about IDR. As

described above, this evidence includes internal emails, job aids, calls, observations from third-party student loan counselors, a review by ED, and Navient's own acknowledgement about the importance of calls with borrowers in helping them understand repayment options. The Bureau should be allowed to fully develop this evidence, including by completing its review of Navient's productions and by obtaining a sample of calls.

Finally, as described above, Navient's motion is premised on the experiences of borrowers whom Navient has subpoenaed and deposed, yet Navient has not produced all of the correspondence and call recordings that would allow for these borrowers' experiences to be fully understood. For example, even though many of those borrowers ultimately enrolled in IDR, that is not surprising: it is possible that Navient changed some of its practices in response to the Bureau's investigation, this lawsuit, and the lawsuits filed by the Attorneys General of five states, and thus many borrowers who had extended periods of forbearance were eventually informed about IDR during phone conversations with Navient and enrolled in IDR. However, for the periods preceding IDR enrollment, Navient has not produced relevant documents concerning those borrowers (such as letters confirming enrollment in verbal forbearances), as well as numerous calls in which forbearance enrollment occurred. Their experiences cannot be accurately and

19

completely presented until all of their relevant documents and calls are produced and analyzed.

In light of these factors, as well as a host of discovery issues to be litigated before the special master, an adequate record in this case has yet to be developed, and summary judgment is inappropriate. *See, e.g., Smithson v. Rizzo*, 2015 WL 1636143, at *5 (M.D. Pa. Apr. 7, 2015) (denying motion for summary judgment as premature); *Humbert v. Kurtz*, 2008 WL 719244, at *8 (M.D. Pa. Mar. 14, 2008) (same); *La Fata v. Raytheon Co.*, 223 F.Supp.2d 668, 680 (E.D. Pa. 2002) (same).

The information asymmetry found in enforcement actions such as this disproportionately favors Navient. Its conduct is at the heart of the case, and it is in possession of the vast majority of relevant information. The above-described events have exacerbated this asymmetry, putting the Bureau at an unfair disadvantage. This case involves important issues affecting potentially hundreds of thousands of consumers. The factfinder should have a full evidentiary record to resolve these issues. *See, e.g., Doe*, 480 F.3d at 257 (noting that deferring consideration of summary judgment is particularly appropriate "when there are discovery requests outstanding or relevant facts are under the control of the moving party"). The Bureau would be severely prejudiced by a premature

20

adjudication of a summary judgment motion, especially in light of Navient's

delayed and incomplete productions to date.

In addition, in light of the discovery issues that need to be resolved, it would

be inefficient for the parties to litigate, and for the Court to adjudicate, a summary

judgment motion now. The parties should be working toward resolution of a litany

of discovery disputes to complete development of the factual record in this case,

not diverting resources to briefing premature motions. Particularly in light of

potentially serious issues concerning Navient's deficient production of records

relating to borrowers who have already been deposed and who are at the center of

Navient's motion, the record in this case is "so significantly clouded . . . that

resolution of [a] motion for partial summary judgment . . . at this time would

constitute an inefficient use of judicial resources and frustrate the purpose of

summary adjudication." *Advanced Fluid Sys., Inc. v. Huber*, 2015 WL 1729375, at

*1 (M.D. Pa. Apr. 15, 2015); *see also Dean v. Douglas,* 2012 WL 6151137, at *6

(M.D. Ga. Dec. 11, 2012) (denying motion for partial summary judgment on the

basis of efficiency); *In re G–I Holdings Inc.,* 2007 WL 1412294, at *4 (D.N.J. May

14, 2007) (same).

## CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court

enter the attached proposed order deferring the deadline for the Bureau's response

21

to Navient's motion for partial summary judgment until 21 days after the deadline

for motions for summary judgment and prohibiting the parties from filing any

further summary judgment motions until both fact and expert discovery have

concluded.

Dated: February 6, 2019          Respectfully submitted,

Kristen Donoghue
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

   /s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
(Nicholas.Jabbour@cfpb.gov; 202-435-7508)
Manuel Arreaza, DC 1015283
(Manuel.Arreaza@cfpb.gov; 202-435-7850)
David Dudley, DC 474120
(David.Dudley@cfpb.gov; 202-435-9284)
Ebony Sunala Johnson, VA 76890
(Ebony.Johnson@cfpb.gov; 202-435-7245)
Nicholas Lee, DC 1004186
(Nicholas.Lee@cfpb.gov; 202-435-7059)
Andrea Matthews, MA 694538
(Andrea.Matthews@cfpb.gov; 202-435-7591)
*Enforcement Attorneys*

1700 G Street NW
Washington, DC 20552
Fax: 202-435-9346

*Attorneys for Plaintiff*

22

## **CERTIFICATE OF WORD COUNT**

Pursuant to Local Rule 7.8(b)(2), I hereby certify that the foregoing brief in opposition contains 4614 words.

      /s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
Nicholas.Jabbour@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7508
Fax: 202-435-9346

*Attorney for Plaintiff*

23

## CERTIFICATE OF SERVICE

I certify that, on February 6, 2019, I served the foregoing document and the

accompanying materials by email to the following counsel for Defendants:

    Natalie Bilbrough: natalie.bilbrough@wilmerhale.com
    Daniel Brier: dbrier@mbklaw.com
    Karin Dryhust: karin.dryhurst@wilmerhale.com
    Daniel Kearney: daniel.kearney@wilmerhale.com
    Webb Lyons: webb.lyons@wilmerhale.com
    Matthew Martens: matthew.martens@wilmerhale.com
    Jonathan Paikin: jonathan.paikin@wilmerhale.com
    Arin Smith: arin.smith@wilmerhale.com
    Donna Walsh: dwalsh@mbklaw.com

Mr. Kearney previously consented to service by email on Defendants'

counsel.

        /s/ Nicholas Jabbour
        Nicholas Jabbour, DC 500626
        Nicholas.Jabbour@cfpb.gov
        1700 G Street NW
        Washington, DC 20552
        Phone: 202-435-7508
        Fax: 202-435-9346

        *Attorney for Plaintiff*

# Exhibit C

# APPENDIX TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO DEFER THE DEADLINE FOR ITS RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO PROHIBIT FURTHER MOTIONS FOR SUMMARY JUDGMENT BEFORE THE CLOSE OF DISCOVERY

| Exhibit | Description of exhibit | Beginning page number |
|---------|------------------------|-----------------------|
| 1 | Navient internal memorandum | A1 |
| 2 | Navient job aid | A4 |
| 3 | Excerpts from deposition of Matthew Bailer | A7 |
| 4 | Excerpts from deposition of Suzanne Croft | A10 |
| 5 | Internal emails from i3 Group | A14 |
| 6 | Emails between Navient and University of Phoenix | A17 |
| 7 | Internal emails from Navient | A21 |
| 8 | Internal emails from Navient | A26 |
| 9 | Department of Education Site Visit Review | A38 |
| 10 | Declaration of Lynn Sabulski | A85 |
| 11 | Excerpts from deposition of Johnathan Powell | A98 |
| 12 | Excerpts of Navient comments on FCC proposed regulations | A111 |
| 13 | Excerpts from borrower deposition | A121 |
| 14 | Email chain among borrower, Bureau's counsel, Defendants' counsel | A128 |

| 15 | Email chain between Bureau's counsel and Defendants' counsel | A132 |
|----|----------------------------------------------------------------|------|
| 16 | Email chain between borrower and Defendants' counsel | A135 |
| 17 | Email chain between borrower and Defendants' counsel | A139 |
| 18 | Email chain between borrower and Defendants' counsel | A143 |
| 19 | Screenshot from Navient correspondence database | A146 |
| 20 | Screenshot from Navient call database | A148 |
| 21 | Screenshot from Navient call database | A150 |
| 22 | Screenshot from Navient call database | A152 |
| 23 | Email between Bureau's counsel and Defendants' counsel | A154 |
| 24 | Email chain between i3 Group and Navient | A182 |

# Exhibit 1

Jack,

CRS is meeting with you in June for a business review and we are planning on discussing the topics you brought up on the attached document. As a preview to our June meeting, the "not so short" answers to your questions are below.

### Question #2) ED COLLECTION STRATEGY?

**The Vision** for CRS and the ED servicing business has not changed from what we presented to you in December. We want to put ourselves (CRS) out of businesses by driving borrowers to self-serve and use automation via email, text, web, letters, dialer, IVR etc. We recognize that this is a thin margin business, therefore, our goal is to drive down unit cost while maximizing fee revenue and winning the default scorecard. As of today, CRS, IT, and Channel strategies, "we", have been unsuccessful in getting low-cost, self-service channels operationalized. Email is up and running but the other channels are still in development.

We view Borrower Education as another key component of our mission. There are numerous programs in addition to FORB that allow students to resolve their delinquency. We need to point them to the optimal solution based on their unique circumstances (optimal solution for the student <u>and</u> the firm).

**Desk Loads and Bucket Segmentation Strategies** - CRS pools the entire 60+ delinquent ED borrower base and calls it on the dialer about 2.5 times daily with about 110 agents. Account loads are in the neighborhood of 1,800. We have targeted strategies to maximize servicing fee revenue in the early stages. In the 1-30 and 31-60 day buckets we use models to determine who is likely to self-cure, we then dial and email everyone who is not likely to cure in order to "throw them over the fence" to the higher fee tier (example = ~$1.44 average delinquent borrower fee flipped to the ~$2.11 up to date borrower fee). Team Tomko built the models and will be validating the effectiveness.

The only other "bucket segmentation" strategy that we have in CRS involves a team of 20 collectors who are working in a pre-charge-off capacity, 270+. This is not a fee revenue strategy but an effort to prevent defaults on borrowers who landed in severely delinquent buckets as part of the PUT process and ECASLA. We implemented the pre-charge-off strategy in the short term to get out of the gate strong on the scorecard; whether it makes sense long-term is TBD.

**Forbearance** - Our battle cry remains *"forbear them, forebear them, make them relinquish the ball."* Said another way, we are very liberal with the use of forbearance once it is determined that a borrower cannot pay cash or utilize other entitlement programs. Generally speaking, out of every 10 resolved ED borrowers, 7 will forbear, 1 will pay cash, and 2 will use a deferment or some other entitlement. That mix is likely to change over time as we improve our ability to communicate the benefits of and fulfill other programs such as "Income Based Repayment."

**Dollars Collected –** In CRS alone, we are collecting about $150mm per month and resolving about 40,000 borrowers - these are not meaningful metrics by themselves. A more useful perspective would be the default rate trend. Our ED default rate is trending towards 12% - 15% versus FFELP historical default rates of roughly 10% (See Chart 1 below for a comparison of ED and FFELP collection rates). This performance gap should be expected given the adversely selected portfolio in ED. Proprietary school borrowers make up over 60% of the 1+ delinquent ED portfolio versus about 40% of the 1+ delinquent FFELP portfolio (Prop school delinquency runs nearly double non-prop). Driving the performance variance to a lesser degree are the staffing / dialer issues that we faced in Q1 due to the fact that the delinquent borrower count was more than five times the budgeted / planned volumes. Although ED is lagging in default prevention performance when compared to FFELP, we should not assume that we are lagging behind our three competitors in the ED Servicing contract. To state the obvious, we won't really know where we stand relative to the competition until the scorecard results are published on a quarterly basis.



EXHIBIT

6

PENGAD 800-631-6989

11-16-18   AMK

Confidential Pursuant to Protective Order

NAV-02040938

**Questions #3 and #4) COMBINING SERVICING, COLLECTIONS, AND SALES INTO A SINGLE P&L UNIT**

Yes.  We don't believe the current structure is optimal and we would support evaluating a re-org.  Although combining Servicing and Collections makes sense, we need to include the P&L Manager and the Dept. of Ed relationship folks all under one organization.  This appears to be what you are proposing.

**Chart 1:**  CRS Collection Rates in ED and FFELP.



Cummulative Collection Rates - Comparing ED and FFELP

| Delinquency Cycle | 60-90 | 91-120 | 121-150 | 151-180 | 181-210 | 211-240 | 241-270 | 271-300 | 301-330 | 331-360 | 361-390 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ACTUAL | | | | | FORECAST | | | |
| ED Public | 13.88% | 41.26% | 57.79% | 67.63% | 74.42% | 78.55% | 80.43% | 82% | 83% | 83% | 83% |
| ED Proprietary | | | | | | | | | | | |
| ED Private | 19.92% | 57.05% | 69.53% | 75.14% | 80.12% | 83.42% | 85.09% | 87% | 88% | 88% | 88% |
| ED TOTAL | 14.31% | 44.40% | 56.75% | 63.81% | 70.13% | 74.69% | 77.23% | 82% | 83% | 84% | 85% |
| | | | ACTUAL | | | | | | | | |
| FFELP Historical | 36.51% | 64.47% | 72.69% | 77.95% | 81.30% | 85.48% | 87.95% | 90.22% | 90.81% | 90.82% | 90.86% |

PROP schools perform worse and make up over 60% of the delinquent ED Inventory versus about 40% in FFELP.

By the time a "batch" of 1-day delinquent FFELP accounts rolls to charge-off (claim filed), we will have collected 90.86% of those dollars, for a default rate of about 10%. The trend for the ED portfolio suggests that we will collect roughly 85% for a default rate of 15%.

NAV-02040939

# Exhibit 2

# Determine the Root Cause of Financial Difficulty

EXHIBIT
12
11-16-18 R-M2
PENGAD 800-631-6989

**Communicate to the borrower your desire to help by using a transitional phrase.**

*"I understand that you are having problems making your payments.
Let me ask you a few questions and then we can see what options we have available for you."*

*"I want to assure you that there are many different repayment options and that I am here to help find an option that works for you"*

*"Extended Repayment is a great way to lower your monthly payment without the need for consolidation."*



**Account information to look at...**
1. How long has the borrower been in repayment?
2. How far delinquent is the account?
3. What type of school did the borrower attend?
4. Loan balance
5. Payment history

**Things to think about:**
1. What is the borrower's future earning potential?
2. Where is the borrower in their career life cycle?
3. Is this the first time the borrower called about payment issues?
4. How does the borrower's income compare to their balance?
5. Has the borrower already researched their options?
6. Can the borrower comfortably/consistently make payments?

**Probing questions to ask:**
1. What caused the difficulty?
2. Are you looking for short-term or long-term relief?
3. Are you still in school?
   - If yes, are you in school at least half time?
   - If no, do you plan to go back to school?
4. Are you working?
   - If yes, how many hours per week are you working?
   - If no, are you actively seeking employment?
5. How much can you afford to pay?

Is the borrower looking for short-term or long-term relief?

Long Term → Extended Repay or IBR

Short-term → Graduated Repayment or ISR

Remember that deferments are entitlements

Can the borrower pay some portion?

YES

NO

Is borrower eligible for any deferments?

YES → Most Common Deferments: DHAR; DSCH; DUEM

NO → Is borrower eligible for any forbearance?

*"As a reminder, you can still make payments during your deferment or forbearance."*

**Forbearance should not be considered until all other options have been exhausted.**

Confidential Pursuant to Protective Order

A5

# Repayment Options Guide

**Can Make Monthly Payments**

| | Types of Borrowers | Pros | Cons | Talking Points |
|---|---|---|---|---|
| **Extended Repayment** | • Borrowers looking for a lower payment<br>• Borrower looking for consolidation<br>• Borrower with at least $30,000 balance<br>• Borrowers looking for long-term relief<br>• Borrowers who are underemployed | • Lower monthly payments<br>• Payments go towards principal and interest<br>• Can be processed immediately; Phone/MFL<br>• One-Time Processing [no annual renewal] | • Interest accrues over longer term<br>• Higher total payment over the life of the loan | • Offers a lower monthly payment without the need for consolidation<br>• Can return to non-extended level repayment plan at any time<br>• No annual renewal |
| **Graduated Repayment** | • Borrower is looking for short-term relief<br>• Recent graduates<br>• Borrowers not working in their field of study<br>• Borrowers with high earning potential | • Lower [interest-only] payment for first 2-4 years<br>• Can be combined with Extended Repayment<br>• Can be processed immediately; Phone/MFL | • Not paying principal during this time<br>• Payments will increase after 2-4 years | • Good short-term relief<br>• You can always make payments above minimum if you are able<br>• You can return to a non-extended level repayment at any time |
| **Income Based Repayment [IBR]**<br><br>**Income Contingent Repayment [ICR] for Direct Lending** | • Borrowers experiencing long-term financial hardship<br>• Low income relative to loan balance<br>• Borrowers who are underemployed<br>• Borrowers in flat income professions [teacher, nurse, etc] | • Loans are forgiven after 25 years of payments<br>• Customer benefits are not affected by IBR<br>• One application for both ED/SLM loans<br>• Interest on SUBSIDIZED portion paid by ED for 3 years | • Involved application process - must reapply annually<br>• Cannot change due date<br>• Customer payment may be less than accruing interest<br>• Interest capitalizes when borrower leaves IBR | • Good long-term relief since payments are based on adjusted gross income<br>• If you continue to make payments on time, you may qualify for our loan forgiveness program<br>• You can apply for relief on each loan individually<br>• You can complete the application on-line at salliemae.com |
| **Income Sensitive Repayment [ISR]** | • Borrower experiencing a temporary financial hardship | • Payments based on 4-25% of gross monthly income<br>• Can be used for 60 months<br>• Payment percentage can be changed<br>• Borrower still eligible for Forb/Defer during ISR. | • Must reapply annually<br>• Borrower must provide proof of income<br>• ISR does not count against standard terms | • You only have to complete one application for all of your loans<br>• You can complete the application on-line at salliemae.com |

**CAN NOT Make Monthly Payments**

| | Types of Borrowers | Pros | Cons | Talking Points |
|---|---|---|---|---|
| **Deferment** | • Deferment should only be considered after it has been determined that no lower payment option is acceptable | • Temporarily suspends monthly payment<br>• Interest on SUBSIDIZED portion of loan is paid by ED<br>• Borrower can make interest payments during deferment | • Unpaid interest will be added to loan balance at end of deferment<br>• This increases overall balance, pay back amount and monthly payment amount | • Deferment may be good alternative to forbearance<br>• DltSM can be processed for 6 mos at a time<br>• All other deferments can be processed for 12 months at a time<br>• Borrower may be eligible for same deferment more than once |
| **Forbearance** | • Forbearance should only be considered after it has been determined that no lower payment option is acceptable and borrower is not eligible for any deferments<br>• Forbearance can be used to bring account current while customer is addressing long-term solution | • Temporarily suspends monthly payment but interest will continue to accrue on a daily basis<br>• Borrower can make interest payments during deferment<br>• Avoid negative credit reporting and halt collection calls by bringing account up to date, immediately | • Borrower is responsible for all unpaid interest<br>• Unpaid interest will be added to loan balance at end of deferment<br>• This increases overall balance, pay back amount and monthly payment amount | • Forbearance results in higher loan costs overall; you may want to consider a deferment or other repayment plan<br>• Forbearance can be processed for 12 months at a time, up to a maximum of 60 months |

*Mention Public Service/Teacher Loan Forgiveness Programs [if applicable]; Mention benefits [auto-debit, etc] as a way to reduce payment*

NAV-02071060

Confidential Pursuant to Protective Order

A6

# Exhibit 3

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONSUMER FINANCIAL | : | |
| PROTECTION BUREAU | : | Civil Action No. |
| | : | |
| vs. | : | 3:17-CV-00101-RDM |
| | : | |
| NAVIENT CORPORATION, et al. | : | |

\-   \-   \-

Philadelphia, Pennsylvania
Friday, November 16, 2018

\-   \-   \-

ORAL DEPOSITION of JOHN MATTHEW BAILER, taken

pursuant to notice, held in the offices of U.S.

Attorney's Office, One Independence Mall, Suite 1250,

Philadelphia, Pennsylvania 19106 commencing at 9:36

a.m., before Angela M. King, RPR, Court Reporter -

Notary Public there being present.

\-   \-   \-

1   A.   I don't remember.

2   Q.   Was there any email traffic regarding the

3   availability of a zero dollar payment IBR?

4               MS. DRYHURST:  Objection to form.

5               THE WITNESS:  I think during my tenure,

6          there was more email traffic around that

7          concept.  My recollection when we first started

8          at servicing, it wasn't clear to me, anyway,

9          that that was an option.

10  BY MR. LEE:

11  Q.   And you mentioned toward the end of your tenure.

12  Are we talking the first couple of months of 2012?

13  A.   Yeah, thereabouts.

14  Q.   Okay.

15  A.   End of '11, early '12.  Could have that wrong, but

16  it generally, you know, eight years ago, six years ago.

17  I thought it was towards the end of my tenure, we were

18  getting more guidance from the department on that

19  topic.

20  Q.   So this document Exhibit 12 was being developed

21  prior to when you became aware that zero dollar payment

22  IBR was an option?

23               MS. DRYHURST:  Objection:  Misstates

24          testimony.

25               THE WITNESS:  My recollection is at the

# Exhibit 4

# TRANSCRIPT OF PROCEEDINGS

CONSUMER FINANCIAL   )
PROTECTION BUREAU,    )
           )
      Plaintiff,  ) Case No. 3:CV-17-00101
           )
  -vs-       )
           )
NAVIENT CORPORATION, ET AL.,)
           )
      Defendants. )

DEPOSITION OF:  Suzanne Croft

Pages:  1 through 175

Place:  Indianapolis, Indiana

Date:  November 27, 2018

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
contracts@hrccourtreporters.com

A11

```
 1   A   I believe so.

 2   Q   What is the repayment hierarchy?

 3   A   What is it specifically?

 4   Q   Sure.  I mean, describe it specifically or

 5       generally.

 6   A   So, generally, it's asking a customer probing

 7       questions to get them into the best option

 8       possible.

 9           So that can vary, but essentially we would

10       want the customers to be in some sort of a

11       repayment option.  And, then, if that doesn't work,

12       you would move down to any sort of deferments that

13       could be available and then forbearances.  That's

14       general.

15   Q   Okay.  Going to that first tier that you discussed,

16       the options that you would present before

17       deferments or forbearances, you called them

18       repayment options.

19           What are those repayment options?

20   A   At that point?

21   Q   Correct.

22   A   I don't remember all of the repayment options that

23       were available at that point in time, but I do

24       remember graduated repayment options, maybe

25       extended repayment options.
```

1    Q   Okay.  Any others?

2    A   At that point, not that I remember.

3    Q   Did it change over time?

4    A   Yes.

5    Q   And how did it change?

6    A   The income-driven repayment options started to

7        integrate into our everyday repayment options

8        offering.

9    Q   And when did the IDR plan start to integrate?

10   A   I don't remember the exact time.

11   Q   Okay.  But at least as of 2012, they weren't

12       integrated into the repayment hierarchy?

13           MS. BILBROUGH:  Object to the form.

14   Q   You can answer.

15           MS. BILBROUGH:  You can answer if you know.

16   A   When I -- I don't remember the exact date.

17   Q   Okay.  So just going back to 2012, you indicated

18       that the repayment options were graduated and

19       extended, and IDR was integrated at a later point

20       in time; is that right?

21   A   Correct.

22   Q   Okay.  What was taught during the training about --

23       was the concept of an IDT discussed during the

24       training?

25   A   Yes.

# Exhibit 7



NAV-02336040

**From:** Sheikh, Mike </O=SIEXCH/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E34555>

**To:** Fox, Annie; Hensel, Mark

**CC:** Stuilken, Hans; Hanrahan, Sean; Gramlich, Linda; Stashik, Lisa; Stine, Tracy; Smith, Robyn; Firlein, Laura; Harris, Natalie D; Rogula, Scott; Beckley, Greg; Jeckell, Holli

**Sent:** 2/20/2014 3:32:57 PM

**Subject:** RE: Weekly Sample of Serv (Offshore) - week ending 2/21/14

Hi Annie;

We have no objections, please see the call summaries below.

| Location | Agent | Segment ID | Date. | Duration | CIN | Summary |
|---|---|---|---|---|---|---|
| BGO | San Lorenzo, Erick | 898385119 | 2/17/2014 | 05:17 | 9733177583 | **Summary:** The customer called in requesting a forbearance because she was behind on her payments. The Specialist asked if the customer can pay the scheduled monthly amount to bring the account current. The customer said yes. The Specialist explained that she will be processing a FORA to bring the account current and read the script. The customer also asked about the late fees incurred on the account. **Areas of improvement:** - The Specialist could have acknowledged customer's expression of hardship. - The Repayment Hierarchy was not followed; the customer may have qualified for IBR or another Repayment Option. - The Specialist could have probed more specifically if the customer would be able to pay the monthly payment amount moving forward. - The Specialist should have advised the borrower of the correct monthly payment amount after the forbearance had been processed. When the customer asked about the fees, the Specialist said that it will go to the back end of the loan. The Specialist should have educated the customer on the accumulated late fees on the account and how the customer could address the fees. - The Specialist should have checked the forbearance window for the post forbearance payment amount in order to provide an accurate monthly payment amount. - The Specialist should have promoted the SallieMae.com |
| MNL | Mendoza, Jhoanna Princess | 898387190 | 2/17/2014 | 04:56 | 9934823861 | **Summary:** The customer wanted to reprint her 1098e tax form but could not log in to her SallieMae.com account. The Specialist confirmed the customer's User ID and advised her to try logging in. The customer tried to sign in and mentioned that she may have forgotten her password also. The Specialist then reset the customer's password. The Specialist did a good job staying on the phone with |

Confidential Pursuant to Protective Order

A22

NAV-02336041

Confidential Pursuant to Protective Order

the customer until they were able to log in.

**Areas of improvement:**
- The Specialist should have acknowledged the customer's concern.
- Since the account was in PIF-Consolidation status, the Specialist could have advised that the 1098e would only be available online until April.
- The status of the online account was "Reset", there was no need to have the customer try to login.
- The Specialist should have followed the Forgot User ID procedures on KS and not given hints to the customer.

**Summary:**
The customer setup Automatic Debit last month and was wondering if a payment was extracted for February (since the January extraction was successful). The Specialist verified that the account is still on automatic debit. The Specialist advised the customer to check with her bank if the payment was processed. The customer mentioned she will manually post a payment and requested to move the due date. The Specialist adjusted the due date as per the customer's request.

**Areas of improvement:**
- The Specialist should have acknowledged customer's confusion about the payment not getting extracted.
- The Specialist would sound more confident by avoiding statements like "I don't know"
- The Specialist stated "I can't..." or "I couldn't..." multiple times
- The Specialist should have advised the borrower to allow 2-4 days processing time for the payment to post since the due date was on a weekend.
- The Specialist could have promoted online payments via SallieMae.com.
- The Specialist should have corr'd GJ97 on the account since the Due Date was updated

**Update:** The weekend Auto Debit extraction has pasted to the account as well as the borrower's manual payment. The borrower was contacted and wants to leave both payments on her account.

| BGO | Mascañinas, Liza | 898379954 | 2/17/2014 | 05.33 | 9473967705 |

A23

| MNL | Galang, Jan Michael | 898362924 2/17/2014 | 04:35 | 9799392797 | **Summary:**<br>The customer called to request a copy of the tax letters for two borrowers she cosigned for. The Specialist provided the amounts. The customer also asked for a tax number, which the Specialist provided.<br><br>**Areas of improvement:**<br>- The Specialist answered the call with a seven second delayed greeting.<br>- The Specialist could have advised the caller to consult a tax advisor<br>- The Specialist seemed distracted from the start of the call. Screenshot shows that the Specialist was working on something else at the start of the call and asked for the customer's name twice.<br>- The Specialist should have verified the customer's email address when he pitched the cross-sell SM Login Reminder.<br>- The Specialist should have pitched the Upromise MasterCard cross-sell item. |

From: Fox, Annie
Sent: Wednesday, February 19, 2014 9:07 AM
To: Sheikh, Mike; Hensel, Mark
Cc: Stulliken, Hans; Hanrahan, Sean; Gramlich, Linda; Stashik, Lisa; Stine, Tracy; Smith, Robyn; Finfein, Laura; Harris, Natalie D; Rogula, Scott; Beckley, Greg; Jeckell, Holli
Subject: Weekly Sample of Serv (Offshore) - week ending 2/21/14

Good afternoon,

The Serv calls below have been sent to your NICE Universe for review. Please note we will be listening to these calls during the calibration. If there are any objections, please let me know by Friday 2/21 at 2:00 pm. Otherwise, they will be sent to Jack by 4:00 pm.

| Location | Agent | Date/Time | Duration | Segment | CTN |
| --- | --- | --- | --- | --- | --- |
| BU | San Lorenzo, Erick | 2/17/2014 11:51 | 0:05:17 | 898385119 | 9733177583 |
| MA | Mendoza, Jhoanna Princess | 2/17/2014 11:55 | 0:04:56 | 898387190 | 9334823861 |
| BU | Mascarinas, Liza | 2/17/2014 11:40 | 0:05:33 | 898379954 | 9473967705 |
| MA | Galang, Jan Michael | 2/17/2014 11:05 | 0:04:35 | 898362924 | 9799392797 |

Thanks!

Confidential Pursuant to Protective Order

A24

NAV-02336042

NAV-02336043

Confidential Pursuant to Protective Order

Annie

# Exhibit 8

From: Sheikh, Mike </O=SIEXCHOU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E34555>
To: Jeckell, Holli; Hensel, Mark
CC: Stuliken, Hans; Sune, Tracy; Stashik, Lisa, Tipton, Star, Johnson, Jeffrey; Tate; Brian; Champ, Jacqueline; Robinson, Hillary; Firlein, Laura, Catt, George; Smith, Robyn; Lanham, Brian, Beckley, Greg; Dudklewicz, Diane; Wisnewski, Jeanne
Sent: 4/4/2016 2:57:27 PM
Subject: RE: Weekly Sample of Offshore Serv Calls - Week ending 4/8/16

Hi Holli,

Please see the call summaries below. We have no objections.

| Specialist | Date/Time | Duration | Recording ID | CIN | Comments |
|---|---|---|---|---|---|
| Ellen Grace V. Ramires | 3/21/2016 16:25 | 4:26:00 | a5f53d14-4De9-d0c2-8cbe-c55279ac0001 | 9493998881 | • The Solutions Navigator updated the phone number that does not belong to the borrower. The borrower said the number is her husband's.<br>• The Solutions Navigator failed to advise the acceptable document for name change.<br>• The Solutions Navigator failed to provide the fax number to where the borrower can send the document for name change.<br>• The Solutions Navigator failed to promote Navient.com. The Solutions Navigator could have informed the borrower that she can see the changes on her MPA in May on our web site. The Solutions Navigator could have also informed the borrower that she can upload the document for her request for name change on line<br>• The Solutions Navigator exceeded the 2 minutes hold time that she advised. |
| Katina Yanga | 3/23/2016 8:41 | 4:30:00 | 73793e14-f04b-d0b1-8cbe-c55279ac0001 | 9943691208 | • The Solutions Navigator failed to promote the Navient web site, but promoted StudentLoans.gov for IBR (defect for now but will be revisited by Holli)<br>• The Solutions Navigator could have informed the borrower that she can upload the supporting document needed for her IBR on line. The agent could have also offered DUEM as an alternative option.<br>• Aside from asking the borrower if the all the loans were taken out for her studies, it is still the duty of the Solutions Navigator to check if all loans are qualified for IBR. There is a Parent Plus loan included on the Consolidated loan making this particular loan ineligible for IBR. |
| Rodel Prado | 3/22/2016 19:58 | 4:49:00 | d94f3e14-f403-d07f-8cbe-c55279ac0001 | 9378207859 | • The Solutions Navigator could have verbally acknowledged the customer's situation, but overall call handling showed proper empathy and ownership. No defect in Acknowledgement.<br>• The Solutions Navigator should have asked questions that will determine the borrower's eligibility for a repayment plan like IBR or Deferment before processing Forbearance.<br>• The Solutions Navigator should have followed the Repayment Hierarchy.<br>• The Solutions Navigator gave a 15 day time frame to receive a letter.<br>• The Solutions Navigator failed to inform the borrower how they will receive the Forbearance Confirmation letter - via email<br>• The Solutions Navigator should have educated the borrower about the GPR8 letter so that he can switch his permissions for the 1098e to email. |
| Luisto Young | 3/24/2016 14:20 | 4:48:00 | 8cde3e14-4330-d011-8cbe-c55279ac0001. | 8558051056 | • The Solutions Navigator provided the User Id without asking the required security questions.<br>• The Solutions Navigator failed to address the borrower properly. The Solutions Navigator should have addressed the borrower with his proper courtesy title and last name - "Mr. Dekruyf"<br>• The Solutions Navigator should have asked questions to determine the reason or probable cause why the borrower was not able to login to his on line account.<br>• The Solutions Navigator failed to inform the borrower of the password complexity. As per KS DOC: 107324 You MUST advise the customer that the new password they create must be at least 8 characters in length and must contain at least one number and one letter |

Confidential Pursuant to Protective Order

NAV-03094986

A27

**From:** Jeckell, Holli
**Sent:** Thursday, March 31, 2016 7:27 AM
**To:** Hensel, Mark <Mark.Hensel@navient.com>; Sheikh, Mike <Mike.Sheikh@navient.com>
**Cc:** Stuliken, Hans <Hans.Stuliken@navient.com>; Stine, Tracy <Tracy.a.Stine@navient.com>; Stashik, Lisa <Lisa.A.Stashik@navient.com>; Tipton, Star <Star.Tipton@navient.com>; Johnson, Jeffrey <Jeffrey.Johnson@navient.com>; Tate, Brian <Brian.Tate@navient.com>; Champi, Jacqueline <Jacqueline.Champi@navient.com>; Robinson, Hillary <Hillary.Robinson@navient.com>; Firfein, Laura <Laura.Firfein@navient.com>; Catt, George <George.Catt@navient.com>; Smith, Robyn <Robyn.R.Smith@navient.com>; Lanham, Brian <Brian.Lanham@navient.com>; Beckley, Greg <Greg.Beckley@navient.com>; Dudkiewicz, Diane <Diane.L.Dudkiewicz@navient.com>; Wisnewski, Jeanne <Jeanne.Wisnewski@navient.com>
**Subject:** Weekly Sample of Offshore Serv Calls - Week ending 4/8/16

Mark/Mike,

As mentioned on the calibration on Tuesday the calls below will be send to Jack next week for review. If you could provide a summary for each interaction by COB 4/7/16, I would appreciate it.

| Location | Specialist | Date/Time | Duration | Recording ID | CIN |
|----------|-----------|-----------|----------|--------------|-----|
| MA | Ellen Grace V. Ramires | 3/21/16 4:25 PM | 4:26:00 | a5f53d14-40e9-d0c2-8cbe-c55279ac0001 | 9493998681 |
| MA | Katrina Yanga | 3/23/16 8:41 AM | 4:30:00 | 73793e14-f64b-d0b1-8cbe-c55279ac0001 | 9943691208 |
| BU | Rodel Prado | 3/22/16 7:58 PM | 4:49:00 | d94f3e14-f403-d07f-8cbe-c55279ac0001 | 9378207859 |
| BU | Luisto Young | 3/24/16 2:20 PM | 4:48:00 | 8cda3e14-4330-d011-8cbe-c55279ac0001 | 9558051056 |

Thanks,
Holli

Confidential Pursuant to Protective Order

NAV-03094987

A28

From: Sheikh, Mike <O=SIEXCH/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E34555>
To: Fox, Annie; Hensel, Mark
CC: Stuiken, Hans; Stashik, Lisa; Jeckell, Holli; Smith, Robyn; Firlein, Laura; Standish, Troy; Lanham, Brian; Champi, Jacqueline; Tate, Brian; Catt, George; Tipton, Star, Robinson, Hillary; Beckley, Greg; Stine, Tracy; Wisnewski, Jeanne
Sent: 1/6/2016 4:59:49 AM
Subject: RE: Weekly Sample of Serv ofshore- Week ending 1/8/16

We have no objections. Please see the summaries below.



| Location | Specialist | Date/Time | Duration | Recording ID | CIN | Internal Calibration Comments |
|---|---|---|---|---|---|---|
| BU | Chester Keith Bacani | 12/21/2015 10:13AM | 6:12 | cb52114-75c4-d059-8b0b-ed79d6890001 | 9066527304 | The customer called for assistance filling out the IBR paper application form. The Solutions Navigator guided the customer and advised options to fax the application back.<br><br>Observations:<br>• Empathy : The Solutions Navigator lacked empathy and could have used more BCC statements<br>• Probing : The Solutions Navigator should have asked probing questions to establish the customer's eligibility for IBR<br>• Best Resolution: Coaching for not advising the option to submit a paperless application via studentloans.gov<br>• Recap & Customer Education: The Solutions Navigator could have educated on IBR processing timeframes<br>• Self-Service: Coaching for web help – The Solutions Navigator should have educated the customer about when/how to use the upload feature once logged on.<br>• Call Organization: Coaching on over-validation - Asking for the DOB was unnecessary. The Solutions Navigator should ask caller's name before clicking on "Yes". |
| MA | Evelyn Alcantara | 12/22/2015 6:00PM | 6:21 | d75d2214-a48d-40a1-8b0b-ed79d6890001 | 9229165027 | The customer called asking to postpone payment until the end of the month but mentioned she can start making payments by January. The Solutions Navigator processed 1 month FORV. Good empathy and ownership!<br><br>Observation:<br>• Recap & Customer Education: The customer could have been advised that we have lower repayment options for short term and long term relief |
| BU | Kathrein Arjay Garcia | 12/23/2015 12:33PM | 7:08 | 918a2214-e7e5-40ea-8b0b-ed79d6890001 | 9569203428 | The customer called requesting to resend a deferment application but was unsure what was previously sent. The Solutions Navigator sent a FRAT application form.<br><br>Observations:<br>• Empathy: The Solutions Navigator could have used stronger empathy statements<br>• Probing: The Solutions Navigator should have asked probing questions to determine the customer's situation. We could have looked into deferment eligibility.<br>• Recap & Customer Education: The Solutions Navigator misinformed the customer that if he gets approved for Total Permanent Disability then his loans will be forgiven<br>• Self-Service: Coaching for advising on upload.navient.com instead of educating the customer on the upload feature once logged into MYL<br>• Tool Utilization: Coaching. The Solutions Navigator did not determine if the customer had an existing User ID |
| MA | Jhanine Sardea | 12/23/2015 5:45PM | 6:26 | e4ab2214-b283-4010-8b0b-ed79d6890001 | 9582680033 | The customer called because she had questions about her Total Permanent Disability application. She said she was told by Navient that she is no longer required to make payments to Navient. The Solutions Navigator processed a three month forbearance to postpone payments while waiting for updates on the Total Permanent Disability application.<br><br>Observations:<br>• Empathy: The Solutions Navigator lacked empathy; could have used BCC<br>• Probing: The Solutions Navigator should have asked probing questions to establish the customer's eligibility for TPD. The Solutions Navigator did not the explore option to place loans in lower repayment option until the claim is processed<br>• Best Resolution: No attempt was made to collect a payment or partial payment<br>• Recap: Coaching for not educating the customer about late fees assessed on the account<br>• Self-Service: The Solutions Navigator could have promoted the option to update the phone number on MYL<br>• Tool Utilization: The Solutions Navigator could have been proactive in checking permissions and reverse verifying the customer's email address<br>• Documentation: No need to corr GKNF. The Solutions Navigator should have notated that the TPD application was sent to Navient |

Confidential Pursuant to Protective Order

NAV-01274339

(not Navient)

**From:** Fox, Annie
**Sent:** Tuesday, January 05, 2016 3:24 PM
**To:** Hensel, Mark; Sheikh, Mike
**Cc:** Stulken, Hans; Stashik, Lisa; Jeckell, Holli; Smith, Robyn; Firtein, Laura; Standish, Troy; Lanham, Brian; Champi, Jacqueline; Tate, Brian; Catt, George; Tipton, Star; Robinson, Hillary; Beckley, Greg; Stine, Tracy; Wisniewski, Jeanne
**Subject:** Weekly Sample of Serv offshore- Week ending 1/8/16

The Serv offshore calls below are available for review. Please note we will be listening to these calls during the calibration. Please have summaries to me by Thursday 1/7 at 2:00 pm.  If there are any objections, let me know  otherwise they will be sent to Jack by 4:00 pm.

| Location | Specialist | Date/Time | Duration | Recording ID | CIN |
|---|---|---|---|---|---|
| BU. | Chester Keith Bacilli | 12/21/2015  10:13AM | 6:12 | cbl52114-75c4-d098-8b0b-ed79d6890001 | 9066527304 |
| MA. | Evelyn Alcantara | 12/22/2015 6:00PM | 6:21 | d75d2214-a48b-d0a1-8b0b-ed79d6890001 | 9229155027 |
| BU | Kathrein Ajay Garcia. | 12/23/2015  12:33PM | 7:08 | 919a2214-e7e5-d0ee-8b0b-ed79d6890001 | 9569038428 |
| MA | Jhanine Sardea | 12/23/2015  5:45PM | 6:26 | a4ab2214-b293-d010-8b0b-ed79d6890001 | 9682638033 |

Thanks!
Annie

Confidential Pursuant to Protective Order

NAV-01274340

A30

**From:** Sheikh, Mike </O=SIEXCH/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E34555>
**To:** Fox, Annie; Hensel, Mark
**CC:** Stuliken, Hans; Stashik, Lisa; Beckley, Greg; Jeckell, Holli; Smith, Robyn; Firlein, Laura; Hewes, Christi; Lipps, Greg; Montgomery, Bob L; Standish, Troy; Lanham, Brian; Fegans, Ann; Kassem, Mohammed; Mousa, Brian; Langhom, Jacqueline; Tate, Brian; Catt, George; Tipton, Star; Robinson, Hillary; Stine, Tracy; Rogula, Scott
**Sent:** 4/18/2015 11:59:57 AM
**Subject:** RE: Weekly Sample of Offshore - Week ending 4/17/15

All,

We have no objections, please see the call summaries below.

| Location | Specialist | Date/Time | Duration | Recording ID | CIN | Summary |
|----------|-----------|-----------|----------|--------------|-----|---------|
| Baguio | Jimenez, Jona D. | 03/30/2015 | 2:25:03 | e959d013-301d-d0da-8aa7-b898f5a10001 | 957157071 | The customer called because she's having difficulty logging in to her MYL account. Due Diligence was performed and the customer was provided the correct User ID. Jona advised the customer to first click on the Forgot User ID link, then the Forgot Password link.  The call was disconnected without confirming that the customer was able to login.<br><br>Coaching Points:<br>• During validation, the customer initially provided a different last name but Jona already clicked on CARES saying that she is speaking to the account holder, and then later on asked for the customer's name again<br>• Jona should have acknowledged the customer's difficulty accessing her online account<br>• Rather than asking the customer to click on Forgot Password, Jona should have provided a temporary password since the User ID was already verified<br>• Documentation - Jona corr'd Deferment and Forbearance Question/Request but these topics were not discussed |
| Manila | Yutan, Angelita F. | 04/03/2015 | 2:17:39 | c4934113-6c75-d0aa-8be0-013255600001 | 978133684 | The customer called because he forgot his User ID and password. Good ownership and acknowledgement statements. Forgot User ID procedures were followed. The resolution was to expire the User ID and advise the customer to create a new User ID & password. Customer mentioned he needed his tax information. Angel promoted the website and highlighted that the form is available on Navient.com. Customer's account number was provided before the call ended. Good job performing a recap of what was discussed.<br><br>Coaching Points: |

Confidential Pursuant to Protective Order

A31

NAV-01969038

NAV-01969039

| Location | Name | Date/Time | Duration | ID | Number | Notes |
|---|---|---|---|---|---|---|
| Baguio | Narciza, Kerby E. | 03/31/2015 12:49 | 5:07 | 3ea3d013-1a32-d09e-8aa7-b898f5a10001 | 9813625679 | The customer called because she's having difficulty making payments and had previously requested for a deferment. She is aware that the account is past due and wanted to find out why her deferment did not go through. Kerby asked probing questions and determined that customer is receiving food stamps and Medicaid. DHAR was the option offered and advised that application will be received via email with a link to the website. FORA/FORM was processed correctly. The customer asked about "Federal Loan Forgiveness". Kerby mentioned TLF, PSLF and Disability Claim are the only ones being offered at this time.<br><br>Coaching Points:<br>• There was an empathy statement but was barely audible<br>• IBR option should have been explored<br>• Kerby should have explained that the previous DHAR app was processed on the account covering 07/15/14-10/31/14.<br>• The customer should have been advised that she might still get collections calls and educate her of the late fees assessed<br>• Kerby advised the customer to ask or find out more details about the loan forgiveness program she was informed about<br>• Website should have been promoted<br>• K109 letter was sent, however, Kerby did not ask the customer whether she would like her Permissions changed to email. It was only established that the customer would like the DHAR app sent via email. |
| Manila | Ragojo, Maricon P. | 03/30/2015 11:12 | 4:29 | 644fd013-8086-d05e-8aa7-b898f5a10001 | 9822540263 | The customer called following up on her IBR application. ECS shows we received the app on 02/24/15. Maricon advised that there is no update yet. She explained that a courtesy hold was placed on the account. She also advised that the timeframe could take 30-60 business days and provided the next payment due date on the account. Good job promoting the website.<br><br>Coaching Points:<br>• Maricon should have acknowledged the customer's reason for call |

• Angel could have educated the customer of the Forgot User ID and Forgot Password link for future reference.
• Payment was briefly mentioned and customer said his father is the one sending the payment, Auto-Debit was not promoted
• Jargon – The Solutions Navigator should use "social security number" instead of "social"

Confidential Pursuant to Protective Order

A32

- The customer said she was having difficulty understanding what Maricon was saying. She could have asked the customer if the adjustment she made was better.
- An IDT should have been sent to have processing team look at the application since it has been more 1 month since it was received (*Note: IBR was processed on the account 2 days after the call)

**From:** Fox, Annie
**Sent:** Tuesday, April 14, 2015 4:53 PM
**To:** Sheikh, Mike; Hensel, Mark
**Cc:** Stulliken, Hans; Stashik, Lisa; Beckley, Greg; Jeckell, Holli; Smith, Robyn; Firlein, Laura; Hewes, Christi; Lipps, Greg; Montgomery, Bob L; Standish, Troy; Lanham, Brian; Fegans, Ann; Kassem, Mohammed; Mousa, Brian; Langhorn, Jacqueline; Tate, Brian; Catt, George; Tipton, Star; Robinson, Hillary; Stine, Tracy; Rogula, Scott
**Subject:** Weekly Sample of Offshore - Week ending 4/17/15

A33

The Offshore calls below are available for review. Please note we will be listening to these calls during the calibration. Please have summaries to me by Thursday 4/16 at 2:00 pm. If there are any objections, let me know, otherwise they will be sent to Jack by 4:00 pm on 4/17.

| Location | Specialist | Date/Time | Duration | Recording ID | CIN |
|---|---|---|---|---|---|
| BU | Jimenez, Jona D. | 03/30/2015  2:25 | 5:03 | e959d013-301d-d0da-8aa7-b898f5a10001 | 9571570712 |
| MA | Yutan, Angelita F. | 04/03/2015  2:17 | 4:39 | c493d113-6c75-d0aa-8be0-01325f560001 | 9781336843 |
| BU | Narciza, Kerby E. | 03/31/2015  12:49 | 5:07 | 3ea3d013-1a32-d09e-8aa7-b898f5a10001 | 9813625679 |
| MA | Ragojo, Maricon P. | 03/30/2015  11:12 | 4:29 | 644fd013-8086-d05a-8aa7-b898f5a10001 | 9822540263 |

Confidential Pursuant to Protective Order

NAV-01969040

Thanks!
Annie

A34

NAV-01969041

Confidential Pursuant to Protective Order

From: Sheikh, Mike </O=SIEXCH/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E34555>
To: Fox, Annie; Hensel, Mark
CC: Stuiken, Hans; Gramlich, Linda; Stashik, Lisa; Beckley, Greg; Jeckell, Holli; Stine, Tracy; Smith, Robyn; Firlein, Laura; Rogula, Scott; Standish, Troy;
 Lanham, Brian; Fegans, Ann; Hewes, Christi; Kassem, Mohammed; Bremer, Deanna; Mousa, Brian; Lipps, Greg; Montgomery, Bob L
Sent: 12/11/2014 6:26:05 PM
Subject: RE: Weekly-Sample of Serv offshore - week ending 12/12/14

Sorry for the delay, below are the call summaries.



| Location | Specialist | Date/Time | Duration | Segment | CIN | Call Summary |
|---|---|---|---|---|---|---|
| BU | Jenny Alfonso | 11/28/2014 16:32 | 4:17 | 1266121882 | 9381484254 | **Summary**<br>The customer called advising that she received a call about a delinquency on her account.  The Solutions Navigator advised status of loans and confirmed that loan 9584 was past due.  She offered to reapply payments and verified how payments are being made.  The customer advised that she was in auto debit.  Jenny reapplied payment and advised the customer that it may take 48 hours for changes to post. |
| | | | | 1269171892 | 9273817230 | **Summary**<br>The customer advised that he initially applied for DUEM and that he is now employed working more than 40 hours a week.  Claizze offered FRAT and advised the customer that he needs to submit his application together with his proof of income.  She also advised that she will process a payment postponement (FORM) while waiting for the application and advised that next due date is going to be in February. |
| MA | Claizze Lirio | 12/5/2014 17:00 | 7:00 | | | **Coaching**<br>The Solutions Navigator should have congratulated the customer on his new job.<br><br>Claizze should have reached out to Help Queue or a Supervisor for assistance processing the FORM. Claizze should have asked questions to determine the customer's situation and offered a lower repayment option or IBR.<br><br>**Account Processing Defect** |

Confidential Pursuant to Protective Order

NAV-03086171

NAV-03086172

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The Solutions Navigator did not process FORM as promised. The customer is expecting his payment for December to be postponed. |
| BU | Rachelle Nawol | 11/24/2014 17:27 | 5:00 | 1264686584 | 9465445267 | **Summary**<br>The customer called concerned because her MPA had increased. Rachelle advised that the previous Graduated repayment plan had expired and offered to process another one. Rachelle advised the terms and customer agreed.<br><br>**Coaching**<br>The account was past due, Rachelle should have cleared the delinquency before processing the lower repayment. She could have reached out to Help Queue for assistance clearing the delinquency.<br>IBR should have been explored prior to Graduated repayment. |
| MA | Cora Vergara | 12/5/2014 16:32 | 6:41 | 1269161916 | 9934075609 | **Summary**<br>The customer advised that his IBR expired and asked if and how he could apply for another. Cora advised him to send another application together with proof of income or last year's income tax return. She encouraged the customer to print the form online and assisted him on how to fill out the form. She also advised that the form can be sent to Navient. |

Confidential Pursuant to Protective Order

A36

**From:** Fox, Annie
**Sent:** Tuesday, December 09, 2014 4:35 PM
**To:** Hensel, Mark; Sheikh, Mike
**Cc:** Stuliken, Hans; Gramlich, Linda; Stashik, Lisa; Beckley, Greg; Jeckell, Holli; Stine, Tracy; Smith, Robyn; Firlein, Laura; Rogula, Scott; Standish, Troy; Lanham, Brian; Fegans, Ann; Hewes, Christi; Kassem, Mohammed; Bremer, Deanna; Mousa, Brian; Lipps, Greg; Montgomery, Bob L
**Subject:** Weekly Sample of Serv offshore - week ending 12/12/14

The Serv calls below have been sent to your NICE Universe for review. Please note we will be listening to these calls during the calibration on Wednesday. If there are any objections, please let me know by <u>Thursday 12/11 at 2:00 pm. Otherwise, they will be sent to Jack by 4:00 pm.</u>

| Location | Specialist | Date/Time | Duration | Segment | CIN |
|---|---|---|---|---|---|
| BU | Jenny Alfonso | 11/28/2014 16:32 | 4:17 | 1266121882 | 9381484254 |
| MA | Claizze Lirio | 12/5/2014 17:00 | 7:00 | 1269171892 | 9273817230 |
| BU | Rachelle Nawol | 11/24/2014 17:27 | 5:00 | 1264686584 | 9465445267 |
| MA | Cora Vergara | 12/5/2014 16:32 | 6:41 | 1269161916 | 9934075609 |

Thanks!
Annie

Confidential Pursuant to Protective Order

NAV-03086173

A37

# Exhibit 11

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF DELAWARE


CONSUMER FINANCIAL PROTECTION :
BUREAU,                        :
                               :
            vs.                :    CASE NO.
                               :    3:17-CV-00101 RDM
                               :
NAVIENT CORPORATION, ET AL.    :



**DEPOSITION**


DEPONENT:    Johnathan Powell

DATE:        Tuesday, July 24, 2018

TIME:        9:33 a.m.

PLACE:       235 North Washington Avenue
             Scranton, PA

REPORTER:    Steven R. Mack

SOLICITOR:   Nicholas Jabbour
             David Dudley

1                         You know, we have all different kinds

2     of call listening, so it's hard to enumerate.

3          Q.    What is the minimum requirement for the

4     number of calls that you have to listen to for each

5     agent each month?

6          A.    It's around that five to ten.  I don't

7     know the exact number there.

8          Q.    Is there a policy document that indicates

9     an exact number?

10         A.    No, there's not a specific document or

11    anything.

12         Q.    Is there a policy document that sets forth

13    the procedures for listening to calls?

14         A.    Not that I'm aware of.  I mean I --

15    honestly, I've been there so long that they -- they

16    go over that stuff with new supervisors, so there --

17    I should say I don't have awareness of that because

18    I've been doing it for so long, you know?  So . . .

19         Q.    How do you choose the minimum five to ten

20    calls you listen to per month for an individual

21    agent?

22         A.    Certainly.  So -- so we as supervisors

23    have to listen to, you know, a call that's longer

24    than 15 minutes for each agent.  The team leaders

25    have to listen to calls that are longer than 10

1    minutes.

2              And then we essentially when we coach

3    our agents we listen to, you know, shorter calls and

4    medium calls.  I listen to calls with my agents

5    almost every time I meet with them, so I probably

6    listen to, you know, two a coaching at least.

7         Q.    So for the five to ten minimum per month,

8    one has to be longer than 15 minutes.  Are there any

9    other criteria?

10        A.    Not specifically.  All right.  So there --

11   there's different reports, like the low talk time

12   report.  So if somebody comes up on that for, you

13   know, going under a certain amount of time in

14   resolving an account, we're going to listen to that

15   call.

16             There's -- there's first call

17   resolution calls.  So we kind of -- you know, if --

18   if the borrower does not get the help that they need

19   to get into the right repayment option, so if

20   somebody doesn't explain.

21             You know, if they're going through an

22   income-driven repayment plan and the borrower still

23   needs assistance, we're going to help coach that

24   agent on how they could better provide like a hey,

25   here's how you fill out this application, let me

1    need to listen to, and that we listen to them to

2    verify everything was done correctly.

3         Q.    Does that report contain every instance in

4    which a call was under 3 minutes and 30 seconds and

5    resulted in forbearance or is it something else?

6         A.    Forbearance primarily.  If they did a

7    payment under that amount, if they probably did like

8    a graduated repayment option.  Those are pretty much

9    the -- and also if they did like a -- I don't know

10   how to describe it.  Like a FORA FORN, which is like

11   what we use to -- a temporary forbearance we place

12   that's like -- the FORN is non-capitalizing.  You

13   know, in case we send somebody paperwork to fill out

14   or something to give them the 60-day hold that's

15   non-capitalizing to, you know, apply for an

16   income-driven repayment plan or a deferment, those

17   calls as well that are under like a certain -- that

18   certain like threshold of 3 minutes and 30 seconds.

19                    And we do it as like a check to make

20   sure they're doing everything correctly and -- you

21   know, because sometimes people call in and they're

22   very specifically that they want things, but we like

23   to have those checks in place.

24                    (Reporter requested clarification of

25   a term.)

Page 88

1    Q.    -- earlier calls on that screen that you

2  see, right?

3    A.    Yes.

4    Q.    Okay.  Are there any other tools that you

5  can think of to kind of expedite locating a call if

6  you know the date and the borrower name but not

7  necessarily the phone number?

8    A.    By the date and borrower name, no.  In the

9  past like if I struggled to find a call, I maybe

10  reached out to my dialer team and said hey, can you

11  help me find this call with this phone number

12  attached to it like if I knew it was via a certain

13  phone number and maybe they have helped me.  But

14  yeah, not -- not really by borrower name, no, not

15  that I could think of.  But there might be.  I

16  don't -- I'm not really aware.

17    Q.    Okay.

18    A.    It's I usually don't struggle to find.

19  Like it's pretty easy to find the calls most of the

20  time, you know?

21    Q.    Okay.  Have you ever not been able to find

22  a call?

23    A.    No.

24    Q.    And when you were using the NICE software

25  instead of ICBM, was it the same search criteria

1    that you could use to locate calls?

2         A.    It's been some time, so I believe it was

3    pretty similar.  I haven't used them forever,

4    honestly, you know, so the thousands of calls I've

5    listened to, you kind of -- it's kind of a blur, but

6    I -- from what I remember, it was similar.

7         Q.    Okay.  Were there any other systems you

8    used, you've used during your time at Navient to

9    listen to calls besides ICBM and NICE?

10        A.    Not that I can remember, no.  No.

11        Q.    Okay.  And just so I understand all the

12   criteria that you can search by in ICBM.  I know

13   we've been through phone number, we've been through

14   the date.  There's the recording ID and the agent.

15   Are there any other criteria that you can search by?

16        A.    Just the couple other ones I mentioned to

17   you.  By like the person who scored a quality call,

18   the person who was scored.  There is other criteria;

19   just nothing that I really use, you know?

20        Q.    Right.  And you said -- remind me.  Did

21   you say you could search by disposition if it was a

22   CRS call?

23        A.    Correct.  You could select like, you know,

24   includes these words in the disposition or it

25   doesn't include this, that kind of thing.  Like if,

1    and, or statements somewhat.

2       Q.    Okay.  Was there ever a time in NICE when

3    you couldn't locate a call you were looking for?

4       A.    No, I honestly have never had a time that

5    I've run into where I couldn't find a call.

6       Q.    Have you ever had a situation where

7    someone was placed into forbearance without any

8    contact whatsoever?  So in other words, there was no

9    call with the borrower, there was no -- there was no

10   forms submitted by the borrower.  It was basically

11   fraudulently done without the borrower's permission

12   without any call whatsoever.

13      A.    Yeah, I mean at some point there's been

14   agents who have done something of that nature.  You

15   know, and then typically obviously when that happens

16   and it's discovered, we investigate further and kind

17   of take the appropriate action that's needed.  A

18   PDA, coaching depending on how severe it was, you

19   know.

20      Q.    Okay.  In those situations how would --

21   you know, if you saw that -- how would that

22   situation be detected since there is no call to --

23   to locate?

24      A.    Since there is no call to locate?

25      Q.    Right.  How would you -- how would you

1   we assessed them correctly.  You know, I might bring

2   it up to my manager because it is pretty -- you

3   know, that agent might need a lot of coaching to get

4   that call flow straightened out.

5                    You know, I definitely would

6   obviously meet with that agent as well and kind of

7   come up with a coaching plan to -- to help them kind

8   of navigate through those calls better because that

9   should have -- that call should have been a lot

10  better for her and the customer, you know?

11       Q.    Okay.  Would a call like that

12  automatically trigger any disciplinary action?  Or

13  would that be like a verbal warning?

14       A.    Yeah, I mean for -- depending on the

15  infraction and the level, yeah, we definitely would

16  take the appropriate steps based on that level of

17  risk for those specific infractions.

18       Q.    Okay.  If there was no compliance issue.

19  Let's say that the agent presented all of the

20  information, you know, about say forbearance

21  accurately --

22       A.    Sure.

23       Q.    -- and the big issue was just that she did

24  not go through income-driven repayment with the

25  borrower.  She didn't adequately ask questions to

1    probe the borrower's situation and determine that

2    income-driven repayment might be appropriate for

3    that borrower's circumstance, but otherwise every

4    other aspect of the call was fine.

5        A.    Sure.

6        Q.    Would that only warrant a quality write-up

7    and not a compliance write-up?

8        A.    So -- and there's not really a quality

9    write-up.  The way that it would impact her quality,

10   that is if this is a score that went towards her

11   incentive and she fell under a certain percent, it

12   could reduce or even eliminate her bonus.  So that

13   definitely could happen if it was that bad, you

14   know, because I probably would take off a lot of

15   points for this one.

16               But it also would, you know, be

17   followed up by me listening to the call with the

18   agent, trying to ask them what they saw was wrong

19   with it and kind of going over each piece and, you

20   know, trying to put that coaching plan into

21   practice, so . . .

22       Q.    Would that be -- would this be a verbal

23   warning only?

24       A.    I honestly am not a hundred percent sure

25   of what would be assessed, you know what I mean?  So

1    I don't know.

2         Q.    Okay.  So again if there was no compliance

3    issue on the call and it was -- it was just --

4         A.    Calling.

5         Q.    -- it was just about not advising the

6    borrower about income-driven repayment options, how

7    would you treat that from -- from a quality

8    standpoint?

9         A.    As far as scoring or just how I'd handle

10    it?

11         Q.    In terms of what the consequences for the

12    employee would be.

13         A.    Okay.  Yeah, I mean there -- the direct

14    consequences would not be a write-up or something.

15    The direct consequences would be coaching, review

16    it, figure out what we need to do to change her

17    practices moving forward.

18              The score would be a direct

19    consequence which could trickle into her incentive,

20    you know what I mean?  I could see an agent like

21    this who has those calls could be somebody who, if

22    you continued to speak to a borrower like that and

23    you don't really give them the proper explanation,

24    then sure, it could trigger escalation calls, which

25    maybe you have longer talk time now, maybe you're

```
 1    not getting as many resolves, which maybe hurts your

 2    performance because you're not really helping people

 3    the way you should, you're not taking the right

 4    steps, you know?  Which tends to lead to that long

 5    talk time.

 6                    So those are the impacts I think that

 7    you would see, but again there's no direct -- there

 8    would be no direct, you know, warning for that if

 9    there was no compliance issues, no -- no PDA

10    exactly.

11        Q.    Okay.  So there would -- there would be no

12    verbal warning and no written warning that would

13    emerge from a call like that?  Again if there were

14    no compliance issues, it was just about not properly

15    advising about repayment options.

16                    MS. DRYHURST:  Objection, form.

17        A.    Correct.  To clarify it, the only time

18    that -- you know, so typically, you know, if this

19    was my agent and this was a one-off call and she had

20    this call and it was all quality stuff and I coached

21    her on it and a week passes and she doesn't improve?

22    You know, when you have people who you continue to

23    coach and they continue to make these mistakes and

24    maybe it doesn't fall into compliance?

25                    Maybe then, you know, a week -- like
```

Page 184

1    I said, we come up with an action plan or I could

2    talk to employee relations about potentially like

3    a -- I don't know exactly what they call it.  Like a

4    pattern of -- of -- you know.  But that would be in

5    a very intense situation where somebody -- you're

6    meeting with somebody and they're just not listening

7    to you and they're not correcting it.  Typically

8    people correct their -- you know, they correct their

9    mistakes and they use the instruments that you give

10   them to be successful.

11       Q.    Okay.  So if this is just about not

12   properly advising about repayment options, no

13   compliance issues, all the information given is

14   accurate, it would be a coaching situation and you

15   would monitor it to determine if the problem

16   persists?

17       A.    Yeah.  Correct.

18       Q.    Do you recognize that agent's voice at

19   all?

20       A.    No.  No idea.

21       Q.    She referenced 60 months of voluntary

22   forbearance.  Is 60 months still the maximum of

23   voluntary forbearance that's allowed?

24       A.    It really depends on what -- what we're

25   looking at here.  If they're commercial-based loans,