THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| Consumer Financial Protection Bureau, | ) ) ) | |
| *Plaintiff*, | ) ) | Civil Action No. 3:CV-17-00101 (Hon. Robert D. Mariani) |
| v. | ) ) | |
| Navient Corporation, *et al*., | ) ) | |
| *Defendants*. | ) | |

## DEFENDANTS' OBJECTIONS TO SPECIAL MASTER REPORT #3

Defendants appreciate the opportunity to review Special Master Report #3, and to provide comments for consideration before the Report is finalized. As the Court knows, Defendants do not have access to the documents that were reviewed *in camera*, and thus are constrained in their ability to assess the deliberative process privilege claims at issue in the CFPB's February 4, 2019 production to the Special Master. Defendants respectfully request that the Court consider the following in connection with the Report's preliminary rulings on Categories 37 and 80.

**Category 37**

Category 37 of the CFPB's log contains documents related to credit reporting performed by student loan servicers. *See* Doc. 266 at 25-27. The CFPB

claims that it should be permitted to withhold documents discussing "whether policy guidance should be issued to encourage consistency in making reports to credit reporting agencies," and drafts of "proposed policy guidance" and "commentary" regarding those proposals, including communications "questioning the applicable codes for student loan reporting." *Id.*

While Defendants have not seen these documents, based on the vague descriptions on the log we believe they may be highly relevant to Navient's defenses to Count XI. Count XI alleges that when a borrower's loans were discharged due to total and permanent disability, the code Navient provided to credit reporting agencies (the "AL" code) inaccurately indicated the borrower had defaulted on those loans. *See* Compl. ¶¶ 192-97. For its part, Navient maintains that it reported accurate information, and that any harm resulted from the fact that a separate company—the Fair Isaac Corporation ("FICO")—interpreted the codes inappropriately in determining borrowers' credit scores. As Defendants explained in their April 17, 2019 letter to the Special Master, the CFPB produced (and subsequently asserted deliberative process over) an exculpatory internal CFPB communication on this topic.

Accordingly, Defendants believe that the appropriate weight may not have been afforded to the import of the AL code issue when the Report preliminarily concluded that the CFPB should not be required to produce additional documents

in Category 37 because "any relevance" these documents have to the issues in this litigation does not outweigh the CFPB's "interest in maintaining the confidentiality of its internal deliberations." Defendants believe that the relevant balancing test requires production of documents that: (1) discuss whether the "AL" code accurately describes the status of certain loans, (2) identify a need for further guidance to servicers reporting the "AL" code or regarding reporting for loans discharged due to disability; or (3) discuss how credit scoring entities, such as FICO, interpreted the "AL" code or scored loans discharged due to disability.

**Category 80**

Category 80 of the CFPB's privilege log concerns documents relating to two publications by the Department of Education ("ED"), entitled "Fact Sheet: Protecting Student Loan Borrowers" and "Fact Sheet: Taking Action to Help More Americans Manage Student Debt." *See* Doc. 266 at 33-35. The documents include drafts of the two publications with comments from the CFPB, ED, and the Treasury Department, as well as other communications among those agencies regarding what content should be included in the final versions, which ED released in April 2016. *Id.*

Defendants recognize that in making its preliminary determination that these documents may be withheld, the Special Master adopted and extended Judge Mariani's determination that "[w]hat agency staff said in communications leading

3

up to the issuance or non-issuance of rules, policies, or guidance has no bearing on [the] determination [of Defendants' alleged liability]." *See* Doc. 266 at 35 (quoting Doc. 88 at 10) (alteration in original). Defendants believe this ruling was made in a different context and is, in any event, incorrect. If not revisited, Defendants will be severely prejudiced in their ability to put on a core defense at trial. The heart of this case turns on the reasonableness of actions Defendants took while under contract with ED to implement the federal government's student loan program. Communications among government policymakers about ED's regulatory and contractual expectations are patently relevant to whether ED contractors such as Navient were reasonably administering the program. The government cannot cloak those internal deliberations in privilege, and then seek massive fines for actions that fall squarely within the range of conduct the government itself recognized as reasonable.

In ruling that internal CFPB communications "have no legal significance," the Court relied on decisions that are inapposite to the current case. *See* Doc. 88 at 7-10. In *United States v. Farley*, for example, the Seventh Circuit ruled that internal interpretations of a provision exempting certain securities transactions from statutory reporting requirements were irrelevant to whether the defendant's conduct fell within the scope of that exemption because to answer that question the court need only "interpret that exemption and determine whether [the defendant's

4

actions] were within the scope of that exemption." 11 F.3d 1385, 1388-90 (1993). Similarly, in *International Paper v. Federal Power Commission*, the agency's case turned on whether a company's transportation of natural gas on a company-owned pipeline for the company's own use constituted "the transportation of natural gas in interstate commerce" under the Natural Gas Act. 438 F.2d 1349, 1353 (2d Cir. 1971). The Second Circuit held that the unpublished views of individual staff at the Federal Power Commission were irrelevant to whether the statutory provision in question encompassed such conduct. *Id.* at 1359.

Rather than assess the relevance of CFPB communications to the particular issues in this lawsuit, the Court applied *Farley* and *International Paper* to conclude that all such communications have "no legal significance." *See* Doc. 88 at 10.[1] But unlike the agencies in those cases, the CFPB does not allege that Navient violated any specific laws or regulations governing student loan servicing, and Navient does not seek the CFPB's interpretations of any such rules. Instead, the CFPB's claims hinge on the *reasonableness* of Navient's conduct in light of the

---

[1] In contrast to the Court's blanket ruling regarding the legal irrelevance of internal CFPB communications, various courts have recognized that the relevance of such deliberative documents should be assessed in light of the particular legal and factual issues a case presents. *See, e.g.*, *United States ex rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 9 (D.D.C. 2016) (internal agency documents relevant to determining the scope of conduct challenged by the government); *S.E.C. v. Kovzan*, 2012 WL 4819011, at *5 (D. Kan. Oct. 10, 2012) (non-public agency documents were relevant to fair notice defense to the extent they showed inconsistent interpretations of regulation); *United States v. Exxon Corporation*, 87 F.R.D. 624, 633 (D.D.C. 1980) (internal agency documents relevant to whether agency was seeking to impose new requirements retroactively).

government's expectations. For example, Count I of the Complaint alleges that Navient "took unreasonable advantage" of certain borrowers by enrolling them in forbearance without discussing income-driven repayment ("IDR") plans. Compl. ¶ 140. This claim implicates several policy issues not addressed by the Consumer Financial Protection Act's prohibition of "abusive" acts and practices, *see* 12 U.S.C. § 3351(d), including (1) what repayment options are appropriate for borrowers in various financial circumstances; (2) what means are most effective for informing borrowers about those options; and (3) how to implement the federal student loan program in a manner that appropriately balances the interests of borrowers and taxpayers. For years prior to initiating this lawsuit, the CFPB engaged in policy discussions with ED and other stakeholders focused on these issues. To the extent those communications evidence the government's expectations for servicers and consider various approaches to these issues, that information is critically relevant to whether Navient's conduct was reasonable.

Moreover, even if internal CFPB communications are deemed to have "no legal significance," *see* Doc. 88 at 10, that conclusion should not apply to communications between the CFPB and ED. Recognizing that Navient's status as an ED contractor presented "unique circumstances," the Court's May 4, 2018 Opinion explicitly excluded CFPB communications with ED from its ruling regarding the relevance of unpublished agency documents. *See* Doc. 88 at 11; *see*

*also* Dec. 10, 2018 Hrg., at 75:4-10 (describing communications between ED and the CFPB as "inherently relevant"). The Report, in contrast, appears to apply to communications between the CFPB and ED the same reasoning applied to internal CFPB communications, concluding that even when those agencies discussed issues related to this litigation, only "[t]he end-product of [that] deliberative process establishes what is relevant." *See* Doc. 266 at 35.

Defendants believe that result does not adequately account for the heightened relevance of the CFPB's communications with ED, including the communications in Category 80. For example, in the publication entitled "Fact Sheet: Protecting Student Loan Borrowers," ED outlined a "new set of repayment rights" for borrowers, including new requirements for "personalized" disclosures about repayment options and an assurance that "specially trained servicing staff" would "always spend the appropriate amount of time needed to help . . . borrowers make informed decisions" regarding those options.[2] ED released this Fact Sheet in mid-2016, but the CFPB's claims encompass conduct dating as far back as 2011. Communications between ED and the CFPB regarding "new" rights and obligations that ED had not previously imposed through regulations or its contracts with servicers are relevant to Navient's defenses. *See, e.g.*, *S.E.C. v. Kovzan*, 2012

---

[2] *See* U.S. Department of Education, Fact Sheet: Protecting Student Loan Borrowers (April 28, 2016), available at https://www2.ed.gov/documents/press-releases/04282016-protecting-borrowers.doc.

WL 4819011, at *5 (D. Kan. Oct. 10, 2012) (ruling that non-public agency documents were relevant to fair notice defense).

Finally, Defendants respectfully ask the Court to reconsider its preliminarily conclusion that "the 'Fact Sheets' do not appear to be included in the list of 'fourteen publicly issued rules, regulations, or guidance that Defendants believe are clearly relevant to the administration of the government contracts and federal regulations at issue in the Complaint.'" Doc. 266 at 36 (quoting Doc. 72 at 3). The Fact Sheets anticipated, and are explicitly incorporated into, Under Secretary of Education Ted Mitchell's July 2016 memorandum outlining ED's "Policy Direction on Student Loan Servicing," which is included on Defendants' list. The memorandum explains that the borrower protections outlined in the Fact Sheets would be implemented as part of ED's "new vision for student loan servicing."[3] In April 2017, however, ED formally withdrew Under Secretary Mitchell's memorandum, further demonstrating that these new rights and obligations represent contested policy issues.[4]

---

[3] *See* Memorandum from Ted Mitchell, Under Secretary, U.S. Department of Education to James Runcie, Chief Operating Officer, Federal Student Aid, "Policy Direction on Federal Student Loan Servicing," at 6-7 (July 20, 2016), *available at* https://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

[4] *See* Memorandum from Betsy DeVos, Secretary, U.S. Department of Education to James Runcie, Chief Operating Officer, Federal Student Aid, "Student Loan Servicer Recompete" (April 11, 2017), *available at* https://www2.ed.gov/documents/press-releases/student-loan-servicer-recompete.pdf.

Moreover, as Defendants explained when first presenting these documents to the CFPB, the fourteen publications merely served as "examples" and were "not an exhaustive list," given that "the CFPB is best positioned to know what is in its possession." *See* Doc. 72-1 at 2-3. When the CFPB refused to produce documents relating to those examples, Defendants provided to the Court both the letter sent to the CFPB and a list of the publications the letter identified. *See* Doc. 72 at 3-5. Because Defendants' discovery requests are not limited to those fourteen examples, the documents in Category 80 (as well as other documents the CFPB identified as responsive and submitted for *in camera* review) should be assessed according to their relevance to the claims and defenses at issue in this case, rather than their inclusion on the list previously provided to the CFPB.

\* \* \*

For years prior to initiating this litigation, the CFPB engaged in ongoing policy discussions with ED and other stakeholders regarding potential rules and requirements for improving the federal student loan program. Rather than continue that debate, however, in early 2017 the CFPB sued Navient, alleging that the company's conduct under *existing* requirements violated the Consumer Financial Protection Act's prohibitions of abusive, unfair, and deceptive acts and practices. In opting to pursue its policy agenda through allegations that Navient acted unreasonably towards federal student loan borrowers, the CFPB forfeited the right

to keep secret its prior policy discussions bearing on that question. Navient should be permitted to present the contents of those communications—and in particular communications between ED and the CFPB—to the jury charged with assessing the reasonableness of Navient's conduct.

Dated:  April 26, 2019          Respectfully submitted,

/s/ Jonathan E. Paikin
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient Solutions, LLC, and Pioneer Credit Recovery, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2019, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363