# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL　　　　　：
PROTECTION BUREAU,　　　　　　：
　　　　　　　　　　　　　　　　：
　　　　　　Plaintiff　　　　　：
　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　：　　3:17-CV-101
　　　　v.　　　　　　　　　　　：　　(Judge Mariani)
　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　：
NAVIENT CORPORATION, et al.,　 ：
　　　　　　　　　　　　　　　　：
　　　　　　Defendants.　　　　 ：

## SPECIAL MASTER REPORT #6 – RULING ON DEFENDANTS' OBJECTIONS TO SPECIAL MASTER REPORT #3 AND ORDER

### I.　　INTRODUCTION

Special Master Report #3 (Doc. 266), filed on April 15, 2019, set forth my

preliminary conclusions with respect to the first 172 documents produced by

Plaintiff Consumer Financial Protection Bureau (the "Bureau") for *in camera*

review to determine whether the documents were properly withheld from

discovery, in whole or in part, based on the deliberative process privilege.  The 172

documents were divided among six categories on the Bureau's Categorical

Privilege Logs: Categories 22, 28, 37, 40, 44, and 80.  I tentatively concluded that

approximately 60 documents falling under Category 28 and four documents falling

under Category 40 should be produced.  The parties were then afforded an

opportunity to object to Special Master Report #3.  The Bureau did not object, but

did suggest corrections of "certain non-substantive clerical issues associated with

the identification of certain documents in the report." (Doc. 278 at 2.)  Defendants

have objected to my preliminary conclusions with respect to documents withheld

under two of the six categories: 37 and 80.  (Doc. 277.)  For the reasons that

follow, I will sustain in part and overrule in part the objections, confirm the other

conclusions expressed tentatively in Special Master Report #3, and correct the

clerical errors identified by the Bureau.

## II.   DISCUSSION

### A.  Category 37

Twenty-five Documents (numbered 84 through 108 on the Bureau's

February 5, 2019 Supplemental Privilege Log) were withheld by the Bureau under

Category 37, which concerns communications between the Bureau and the U.S.

Department of Education (ED) relating to how student loan servicers reported

information about student borrowers to credit reporting agencies.  In response to

Special Master Order #12, the Bureau agreed to produce five of those documents

(identified on its Supplemental Privilege Log as numbers 85 (CFPB-NAV-

0056795); 88 (CFPB-NAV-0056804); 91 (CFPB-NAV0056792); 94 (CFPB-NAV-

0056670); and 98 (CFPB-NAV-0056674).  There thus remain 20 documents

withheld under Category 37.

Defendants' objections contend that the withheld documents "may be highly

relevant to [their] defenses to Count XI."  (Doc. 277 at 2.)  Defendants explain:

> Count XI alleges that when a borrower's loans were discharged due
> to total and permanent disability, the code Navient provided to
> credit reporting agencies (the "AL" code) inaccurately indicated the
> borrower had defaulted on those loans. See Compl. ¶¶ 192-97. For
> its part, Navient maintains that it reported accurate information, and
> that any harm resulted from the fact that a separate company—the
> Fair Isaac Corporation ("FICO")—interpreted the codes
> inappropriately in determining borrowers' credit scores.  As
> Defendants explained in their April 17, 2019 letter to the Special
> Master, the CFPB produced (and subsequently asserted deliberative
> process over) an exculpatory internal CFPB communication on this
> topic.
>
> Accordingly, Defendants believe that the appropriate weight may
> not have been afforded to the import of the AL code issue when the
> Report preliminarily concluded that the CFPB should not be
> required to produce additional documents in Category 37 because
> "any relevance" these documents have to the issues in this litigation
> does not outweigh the CFPB's "interest in maintaining the
> confidentiality of its internal deliberations." Defendants believe that
> the relevant balancing test requires production of documents that:
> (1) discuss whether the "AL" code accurately describes the status
> of certain loans, (2) identify a need for further guidance to servicers
> reporting the "AL" code or regarding reporting for loans discharged
> due to disability; or (3) discuss how credit scoring entities, such as
> FICO, interpreted the "AL" code or scored loans discharged due to
> disability.

(*Id.* at 2-3.)  During the April 30, 2019 conference call, Defendants repeated that

the focus of their objection concerning the conclusions reached with respect to

documents withheld under Category 37 was to "identify documents that discuss

whether the AL code accurately describes the status of certain loans, to identify a

need for further guidance to servicers reporting the AL code in regard to reporting

for loan discharge due to disability, and emails and documents that discuss how

credit scoring entities such as FICO interpreted the AL code or scored loans

discharged due to disabilities." (Tr. of April 30, 2019 Conference Call at 39.)

Considering this articulated concern, I reviewed each of the documents

withheld, in whole or in part, under Category 37 for the purpose of seeing whether

they dealt with the AL Code or the treatment of loans discharged due to disability.

Less than one-half page of a multi-page document listed on the Bureau's

Supplemental Privilege Log as, "Student Loans and Credit Reporting –

Strawman," concerns the AL Code.  It is not evident that this document was shared

with ED.  Nonetheless, ED guidance on the use of the AL Code is referenced in the

"Strawman."  While the document is both pre-decisional and deliberative in nature,

Defendants' interest in learning how the Bureau and ED understood the proper use

of the AL Code is compelling.  Moreover, there is no other available evidence on

this issue as it does not appear that the "Strawman" was ever finalized.

Accordingly, the Bureau will be directed to produce that part of this document that

concerns the AL Code, and the balance of the text on this document may continue to be redacted.[1]

None of the email strings under Category 37, (Documents 84, 87, 90, 93, 96, 97, 100, 103), withheld in part through redactions, mentions the AL Code or reports to credit reporting agencies for student loans discharged due to the disability of the borrower. Accordingly, the Bureau will not be required to produce any parts of these redacted email messages.[2]

### B. Category 80

Withheld, in whole or in part, under Category 80 were communications relating to the preparation of two documents issued by ED: (1) "Fact Sheet: Protecting Student Loan Borrowers," and (2) "Fact Sheet: Taking Action to Help More Americans Manage Student Debt," both of which were released on April 28, 2016. I concluded that the 41 Documents withheld, in whole or in part, were pre-

---

[1] There are nine duplicate copies of the September 23, 2015 "Strawman" (Documents 86, 89, 92, 95, 99, 101, 106, 107, and 108 on the Feb. 5, 2019 Supplemental Privilege Log). There is also a September 16, 2015 Draft of the "Strawman" (Document 102), and two redlined versions of the "Strawman" (Documents 104 and 105). Each of the 12 instances of the Strawman should be produced in redacted form so that Defendants have available the Bureau's treatment of the AL Code on each of the documents.

[2] Defendants' objections to the decisions made with respect to Documents falling under Category 37 were limited to the subjects of the AL Code and the reports made by student loan servicers for student borrowers whose loans were discharged due to disability. My reexamination of the documents withheld under Category 37 was accordingly restricted to those matters.

decisional and deliberative in nature.  That conclusion is not assailed by

Defendants.

With respect to the second part of the deliberative process inquiry –

weighing the interests of Defendants in securing information to prepare their

defenses against the government's interest in having an effective deliberative

process to establish sound public policy – I concluded:

> In this instance, where the Defendants have the publicly released
> "Fact Sheets," and the "Fact Sheets" do not appear to be included in
> the list of "fourteen publicly issued rules, regulations, or guidance
> that Defendants believe are clearly relevant to the administration of
> the government contracts and federal regulations governing federal
> student loan servicing and collection practices at issue in the
> Complaint," (Doc. 72 at 3), Defendants' desire for the documents in
> question does not overcome the Bureau's need to protect the
> "'creative debate and candid consideration of alternatives'" that the
> deliberative process privilege is intended to foster.

(Doc. 266 at 36.)  Defendants do challenge this conclusion, asserting that I erred in

assigning considerable weight to the fact that the "Fact Sheets" were released to

the public, and in finding that "the 'Fact Sheets' do not appear to be included in the

list of 'fourteen publicly issued rules, regulations, or guidance that Defendants

believe are clearly relevant. . . .'" (*Id.*).  After careful reexamination of the

documents in question and the controlling case law, I remain convinced that the

Defendants' interests in obtaining the documents in question do not outweigh the

Bureau's interests in protecting its deliberative process.[3]

As Defendants recognize, my conclusions with respect to the Documents

withheld under Category 80 was influenced by Judge Mariani's May 2018

determination that "[w]hat agency staff said in communications leading up to the

issuance or non-issuance of rules, policies, or guidance has no bearing on [the]

determination [of Defendants' alleged liability]." (Doc. 88 at 10.)  Defendants

claim that Judge Mariani's determination was incorrect, arguing:

> If [Judge Mariani's conclusion is] not revisited, Defendants will be
> severely prejudiced in their ability to put on a core defense at trial.
> The heart of this case turns on the reasonableness of actions
> Defendants took while under contract with ED to implement the
> federal government's student loan program. Communications
> among government policymakers about ED's regulatory and
> contractual expectations are patently relevant to whether ED
> contractors such as Navient were reasonably administering the
> program. The government cannot cloak those internal deliberations
> in privilege, and then seek massive fines for actions that fall
> squarely within the range of conduct the government itself
> recognized as reasonable.

---

[3] During the April 30th conference call, the parties confirmed that
Defendants have sought discovery from ED that presumably would encompass the
documents withheld by the Bureau.  Defendants' counsel noted that ED has
asserted the deliberative process privilege "as to certain documents," but
Defendants "have not matched up whether they mirror the documents that are at
issue here." (April 30th Tr. at 51.)  Of course, if ED has asserted the deliberative
process privilege, that fact would reinforce my conclusion here.  And if ED has
produced the documents that are at issue here, there is no need to address the
matter.  It would be helpful if the parties could inform me as to whether ED also
has asserted the deliberative process privilege with respect to communications it
had with the Bureau in the development of the two "Fact Sheets."

(Doc. 277 at 5.)

Defendants' argument rings hollow.[4]  They assert that "in the publication

entitled 'Fact Sheet: Protecting Student Loan Borrowers,' ED outlined a 'new set

of repayment rights' for borrowers, including new requirements for 'personalized'

disclosures about repayment options and an assurance that 'specially trained

servicing staff' would 'always spend the appropriate amount of time needed to

help . . . borrowers make informed decisions' regarding those options."  (Doc. 277

at 7.)  According to Defendants, "ED had not previously imposed [these new rights

and obligations] through regulations or its contracts with servicers," (*id.*), and so

they did not have "fair notice" that the way in which they were servicing student

loans could be regarded as "abusive" acts and practices under the Consumer

Financial Protection Act.  Contrary to Defendants' assertions, they are able to

argue that their conduct was consistent with the government's expectations for

servicers by highlighting the fact that, according to Defendants, "new" rights and

obligations were established in 2016, well after the Bureau undertook its

---

[4] The cases cited by Defendants at footnote 1 of their Objections (Doc. 277) are not persuasive.  None of the cases deals with the question of how to balance the government's interest in protecting the deliberative process with the requesting party's desire to obtain the documents in question.  Indeed, both *United States v. Exxon Corp.*, 87 F.R.D. 624, 633 (D.D.C. 1980), and *S.E.C. v. Kovzan*, No. 11-2017-JWL, 2012 WL 4819011, at *6 (D. Kan. Oct. 10, 2012), noted that the applicability of the deliberative process privilege was not yet ripe for consideration.

investigation. The various drafts of the "Fact Sheets" that were part of the deliberative process are not essential to make that point.[5] And whether some members of ED, the Treasury Department, or the Bureau expressed their views that loan servicers were acting "reasonably" would not be material in light of the ultimate conclusions reached in the "Fact Sheets."

Defendants' objection that I erred in observing that the "Fact Sheets" are not within the listing of 14 publicly-issued documents that Defendants identified as "clearly relevant to the administration of the government contracts and federal regulations at issue in the Complaint," (Doc. 72 at 3), is also meritless. First, it is a correct observation that the "Fact Sheets" are not among the 14 documents explicitly identified at pages 4 and 5 of "Defendants' Statement Regarding Discovery of Documents Relating to Rules, Regulations, and Guidance and the Policies and Practices of Third-Party Loan Servicers and Collection Agencies." (Doc. 72.) Defendants themselves said that these were the documents "clearly relevant" to the matters at issue here. And second, Defendants' failure to include the "Fact Sheets" in the list of "clearly relevant" documents does factor into the analysis of whether Defendants' desire for the communications pertinent to the development of the "Fact Sheets" outweighs the government interest in protecting

---

[5] The drafts track the format and content of the publicly-issued "Fact Sheets."

the deliberative process.  In any event, even if the "Fact Sheets" had been included in the listing of "clearly relevant" documents, the outcome here would remain the same.  Defendants have the important documents, the publicly-issued "Fact Sheets," and the desire to see what was said by whom in the drafting of those documents is not compelling.

### III.   CONCLUSION

For the reasons set forth above, I will sustain Defendants' objections to the extent that I will require the Bureau to produce in redacted form the documents withheld under Category 37 that concern the AL Code and how student loans discharged due to the borrower's disability should be reported to the credit reporting agencies.  I will also amend and re-issue Special Master Report #3 to correct the clerical errors identified by the Bureau.  In all other respects, Defendants' objections are overruled, and Special Master Report #3 will not be altered.   An order identifying the Documents that must be produced and setting the deadline for filing objections to this and the Amended Special Master Report #3 follows.


s/ Thomas I. Vanaskie
THOMAS I. VANASKIE
SPECIAL MASTER

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CONSUMER FINANCIAL** | : | |
| **PROTECTION BUREAU,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| | : | **3:17-CV-101** |
| **v.** | : | **(Judge Mariani)** |
| | : | |
| | : | |
| **NAVIENT CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

**NOW,** this 7th Day of May, 2019, in accordance with Amended Special Master Report #3 and the foregoing Special Master Report #6, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff shall produce under Category 28 Documents numbered 16, 18 through 26, 28, 29, 30, 32, 34 through 40, 42 through 48, 50 through 56, 58 through 64, and 67 through 83, and 74 through 83 on the Feb. 5 Supplemental Privilege Log; and under Category 40, Documents numbered 110, 111, 119, and 121 on that log.

2. Plaintiff shall produce under Category 37 redacted copies of Documents 86, 89, 92, 95, 99, 101, 102, and 104 through 108 on the Feb. 5,

2019 Supplemental Privilege Log.  The redactions shall conform to the direction set forth in the foregoing Special Master Report #6 so that only information concerning the treatment of the AL Code need be produced.

3. Objections to this Report and Order, as well as amended Special Master Report #3, must be submitted no later than twenty-one (21) days after service of this Order.

s/ Thomas I. Vanaskie
THOMAS I. VANASKIE
SPECIAL MASTER
