

1700 G Street NW,
Washington, DC 20552

May 24, 2019

**Via ECF (publicly with redactions and under seal without redactions) and Email (without redactions)**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

      Re:    *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Vanaskie:

    I write on behalf of the Bureau to respond to Defendants' May 17, 2019 letter. For the reasons explained below, the relief that Defendants seek should be denied. However, if Your Honor grants any of the relief that Defendants seek, the Bureau respectfully requests that Your Honor also order: (1) relief to account for the serious flaws that the Bureau has uncovered with respect to Defendants' responsiveness review, and (2) an extension of the fact discovery deadline.

    **1.**    **As is now evident, the Bureau's responsiveness review was done properly.**

    The Bureau recently re-reviewed documents that contain the word "Navient" or "Pioneer," producing all non-privileged documents and logging the remainder in compliance with Special Master Report #1 (Doc. 221). This re-review was premised on Defendants' assertion that any documents in the Bureau's possession that hit on the terms "Navient" or "Pioneer" were relevant.

    As the Bureau has always maintained, the Bureau's responsiveness review was conducted properly. Now, with the Bureau having completed a re-review that consumed over 2000 hours – and the bulk of the Bureau's efforts during the six-month extension of fact discovery – it is clear that the Bureau was correct. Many of the documents that the Bureau has produced as a result of the re-review plumb the depths of irrelevance, including (as the Bureau correctly presaged) "countless documents where people are referred to as pioneers in their field" (1/28/19 Hearing Trans. at 124-25), as well as résumés from job applicants to the Bureau containing the word "pioneer," documents containing street addresses with the word "pioneer," financial disclosure forms of Bureau personnel who have investments in mutual funds containing the word "pioneer," and printouts from Westlaw of legal opinions containing the word "pioneer." If the Bureau had produced these types of documents in response to Defendants' requests for production, without a court order to do so, the Bureau likely would have faced accusations of document dumping. The re-review has also resulted in the production of huge swaths of documents that the parties agreed at the outset of this case did not need to be produced or logged, including "the internal communications of Bureau enforcement staff" (A2) and documents that "merely . . . reference[] the existence of the lawsuit or investigation" (A9).

    Faced with the foregoing facts, Defendants have tried to move the goalposts, abandoning the idea that all or most of the re-reviewed documents are relevant, and instead trying to claim that "thousands" of unidentified documents are relevant. For example, on the May 14, 2019 teleconference, Defendants stated: "it's clear to us that thousands of relevant documents were held until this stage of discovery, and, also, now, given the size of the log, that thousands of documents

continue to be withheld on deliberative process grounds." 5/14/19 Hearing Trans. at 11. The Bureau challenged Defendants to substantiate their claim that, among the documents produced, "thousands" were improperly withheld "until this stage of discovery," stating: "I'm not exactly sure what the thousands of documents Mr. Kearney is referring to actually are. And I would hope that in the letter on Friday we get more than an assertion that there are thousands of documents, and that these thousands of documents are actually itemized or categorized, somehow, so that we can see all of the relevant documents that Defendants insist were improperly deemed not responsive." 5/14/19 Hearing Trans. at 12-13. Defendants' May 17, 2019 letter makes no mention of these "thousands of relevant documents," because, in actuality, they do not exist.

Defendants now argue that the relevant documents are hidden in the Bureau's privilege log, and ask for *in camera* review to indulge their latest theory. Defendants' request for *in camera* review, however, is unwarranted in light of the fact that the current *in camera* review of the Bureau's deliberative process privilege assertions has resulted in a finding that the privilege was properly asserted in every instance. In addition, there is simply insufficient evidence that the Bureau's responsiveness review was done improperly to warrant the remedy of *in camera* review. The Bureau's re-review was based on the premise that all documents hitting on the terms "Navient" or "Pioneer" were relevant. With that premise now debunked, Defendants should not be able to insist on yet another round of *in camera* review with respect to documents that the Bureau was ordered to log under the false premise.

2.     The Bureau has grave concerns about Defendants' responsiveness review.

While Defendants have insisted that the volume of documents they produced constitutes an automatic assurance that their production was conducted properly, the fact is that incriminating documents have not been provided to the Bureau. Three examples warrant particular mention.

*First*, the Bureau obtained – through a third-party subpoena  Yet despite there being at least 8 emails within this chain that were sent or received within Navient, in the inboxes of at least four Navient employees, none of those 8 emails appears anywhere in Navient's document production. Had the Bureau not obtained the email chain through a subpoena of ▮▮▮▮, this incriminating evidence never would have seen the light of day. *See, e.g., Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 555-56 (N.D. Cal. 1997) (holding that where the plaintiff obtained relevant documents from third parties, and those same documents were not produced by the defendants, the defendants' responsiveness review was flawed).

*Second*, Jack Remondi (Navient's CEO) testified that ▮▮▮▮ the Bureau has located only a handful of such emails.

*Third*, Defendants improperly withheld incriminating documents contained in borrower loan files. Defendants represented to the Court, in an August 2018 letter, that they had produced all relevant documents pertaining to borrowers who were being deposed. *See* Doc. 100, at 1 ("Defendants are not withholding relevant documents related to borrowers identified by the

CFPB."). After the Court required production of certain documents, it became clear that Defendants had unquestionably withheld relevant documents. For example, with respect to borrower ▌▌ ▌▌ Navient produced form letters – not tailored at all to her situation – dated September 29, 2012 and March 8, 2013 that listed various repayment options; this form letter is routinely sent to borrowers, and is not in any way an indication of what is discussed on a particular call. However, Navient improperly withheld letters **bearing those exact same dates and tailored specifically to her** confirming her verbal enrollment in forbearances. *See* A29-30, A32-33. And Navient further improperly withheld **three calls in which Ms. ▌▌ was placed into forbearance without advising her about income-driven repayment**. *See* A45. It was only because of the Bureau's efforts to expose Navient's improper withholding that these incriminating documents and calls saw the light of day (which did not occur until after Ms. ▌▌ had been deposed). The Bureau's efforts – which involved hundreds of hours of work that should have never been necessary in the first place – uncovered that Defendants' improper withholding of documents and calls was not limited to Ms. ▌▌ but instead was present across multiple borrowers whom Defendants deposed.

In light of the foregoing, there are two possibilities: (1) Defendants misrepresented to the Court that they were not withholding relevant documents, when they clearly were; or (2) Defendants used an exceedingly narrow standard for relevance pursuant to which clearly incriminating documents were deemed to be not relevant. The Bureau's concerns are heightened because Defendants have been resistant to providing basic information about their responsiveness review, in stark contrast to the Bureau. The differences between the parties are summarized below:

|  | **Bureau** | **Defendants** |
| --- | --- | --- |
| Produced complete list of search terms used | Yes | No[1] |
| Used broad search terms likely to yield more non-responsive documents | Yes | No |
| Produced hit counts for every search term, along with total volume for all search terms | Yes | No |
| Offered to produce complete list of custodians, and search terms for each | Yes | No |
| Complained about percentage of documents produced, without sharing comparable information | No | Yes |

In light of Defendants' repeated assurances that their responsiveness review was done properly, it is bizarre that they have refused to share basic facts about their search and review efforts. This unwillingness, combined with the substantial evidence that Defendants have withheld responsive documents, demonstrates the need for their responsiveness review to be tested.

### 3.     If any relief is ordered, the Bureau respectfully submits that it must be bilateral.

Before the Court proceeds with another round of *in camera* review premised on the false notion that the Bureau's responsiveness review was flawed, there must be some testing of Defendants' claim that their production was proper. Given the history of Defendants' withholding of incriminating documents, there should be a sampling of Defendants' unproduced documents to allow for an error rate of improperly withheld, relevant documents to be calculated, and then

---

[1] In the May 14, 2019 teleconference, Defendants claimed that they had provided a complete list of their final search terms to the Bureau. *See* 5/14/19 Hearing Trans. at 19. Defendants should produce the alleged communication containing those final search terms to the Court. (The Bureau received no such list.)

compared with the corresponding error rate from the Bureau's recently produced documents mentioning "Navient" or "Pioneer."

Alternatively, if the Court is inclined to grant *in camera* review without any sampling, and purely based on Defendants' continued speculation that responsive documents have been withheld, the Bureau submits that it should receive responsive documents that have been withheld. The Bureau is not *speculating* that such documents have been withheld, but instead, as described above, there is *actual evidence* of such withholding. Specifically, all of the following should be produced: (1) every email that Mr. Remondi sent or received regarding [redacted]; (2) every email that Mr. Montgomery sent to or received from an entity other than Navient Corporation or one of its subsidiaries; and (3) all calls and correspondence for every deposed borrower, along with an affidavit itemizing every call and correspondence that could not be located within Navient's servicing systems, and describing the steps undertaken to locate such calls and correspondence.

**4.     If any relief is ordered, it should include an extension of the discovery deadlines.**

The Bureau has been greatly prejudiced by Defendants' delayed productions in this case, compounded by the Bureau' having to re-review documents hitting on the terms "Navient" or "Pioneer." Thus, if any additional discovery tasks are ordered relating to the Bureau's document productions, there should be an extension of the fact discovery deadline.

As an initial matter, Defendants' narrative concerning the Bureau's pace of production throughout this litigation is incorrect:

- The Bureau has made productions at a faster pace than Defendants. Defendants falsely claim that, "[i]n January 2018, having received only 600 documents, Defendants raised their concerns with the Court," and cite to docket entry #68. *See* May 17, 2019 Letter, at 1. That docket entry, filed on January 5, 2018, says nothing about the volume of the Bureau's production – which was well over the 600 documents cited by Defendants (and which included productions on August 4, 2017 and November 7, 2017). Indeed, it would have been odd for Defendants to complain at that time about the volume of documents produced by the Bureau in light of the fact that *they had not produced a single document in the litigation by that date* (even though the Bureau's requests for production were served earlier than Defendants' requests for production, and had been pending for approximately eight months by that time). The Bureau also concluded the bulk of its productions in response to Defendants' document requests in the spring of 2018, while Defendants waited until eight weeks prior to the close of fact discovery in December 2018 to produce approximately half of their production.

- The Bureau also preceded Defendants with respect to production of a privilege log. After Defendants informed the Court that they would produce their initial privilege log on May 9, 2018, and urged the Court to hold the Bureau to the same deadline (which the Bureau indicated was not possible) (*see* 4/17/18 Hearing Trans. at 144-45), Defendants blew past their own deadline. By May 9, 2018, Defendants had only generated a two-page list of 11 privilege categories, with no listing of documents withheld under each category. A36-37. This was obviously not a proper privilege log. Defendants provided a metadata extract listing documents withheld under each of the 11 categories on July 9, 2018. The Bureau's complete initial privilege log – which included 70 categories, a 70-page declaration, and a production of redacted versions of all documents falling within each category – was served on June 29, 2018.

- Just two days ago, Defendants produced 3,268 documents that they had previously withheld

based on the FDIC's bank examination privilege, without load files or basic metadata, as the parties routinely do and as is required by the Discovery Protocol. This forced the Bureau to request that Defendants produce the missing information and delayed the Bureau's ability to load the documents for review and use them in this litigation. A40.

Indeed, in light of Defendants' delayed productions in this case, it is ironic for Defendants to now claim that the deadlines for the Bureau to complete its production and logging of documents hitting on the terms "Navient" and "Pioneer" was too "lengthy," putting Defendants in the position of having "insufficient time" for review and having to raise challenges at the "eleventh hour." May 17 Letter, at 1-2. Consider the following facts:

- Defendants produced approximately 455,000 documents and a corresponding privilege log on October 9, 2018, after lengthy delays. This production contained virtually all of the internal emails of Navient Solutions that were produced in this litigation. Yet despite the fact that this production occurred at the eleventh hour – *seventeen months* after the Bureau's requests for production, and a mere *eight weeks* before the December 2018 fact discovery deadline, leaving the Bureau insufficient time for review – Defendants resisted an extension of the fact discovery deadline. The Bureau has still had only two months to review these 455,000 documents, as the Bureau, beginning in December 2018, had to expend the bulk of its time to re-reviewing the tens of thousands documents hitting on the terms "Navient" and "Pioneer."

- Nearly fifteen months after the Bureau asked for call records, production of those records is still not complete. That is largely because Defendants tried every tactic possible to prevent the Bureau from gaining access to any of those records, leading to lengthy delays. *See* Doc. 117 at 3-5. For example, in February 2018, the Bureau – concerned about excuses that Defendants were using to delay their productions – wrote as follows: "To the extent that Defendants believe that approval from the U.S. Department of Education is necessary . . . , we are happy to participate in any discussions that occur on this subject with the U.S. Department of Education and recommend that those discussions occur as soon as possible to avoid any delays in production." A43. Defendants did not respond to this message, but then several months later, invoked approval from the U.S. Department of Education as a reason that data and calls could not be produced to the Bureau. Thus, the Bureau is now receiving those productions at the eleventh hour, with insufficient time for review.

In light of the foregoing, it is simply not possible for any additional tasks relating to the Bureau's document productions to be completed within the existing discovery period, when the Bureau has a full slate of work it needs to complete, including continuing its review of the 455,000 belatedly produced documents, reviewing more than 2,000 recently produced call recordings, and reviewing at least 3,000 documents that were previously withheld on the basis of the bank examination privilege. If the parties underestimated the amount of time that would be necessary to complete discovery tasks – which appears to be what Defendants are suggesting in their letter – the solution is not to try to impose an unworkable pace to meet the current deadline. Rather, as is commonly done in civil litigation (and as Defendants have done in all of the lawsuits brought by State Attorneys General), the solution is for both parties to consent to a fact discovery extension.

Respectfully submitted,<br>
/s/ Nick Jabbour