# Exhibit 1

**No. 19-7**

# In the Supreme Court of the United States

———

SEILA LAW LLC, PETITIONER

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———

**BRIEF FOR THE RESPONDENT**

———

MARY McLEOD
  *General Counsel*
JOHN R. COLEMAN
  *Deputy General Counsel*
STEVEN Y. BRESSLER
  *Assistant General Counsel*
  *Consumer Financial*
  *Protection Bureau*
  *Washington, DC 20552*

NOEL J. FRANCISCO
  *Solicitor General*
  *Counsel of Record*
JOSEPH H. HUNT
  *Assistant Attorney General*
MARK B. STERN
DANIEL AGUILAR
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTION PRESENTED**

Whether 12 U.S.C. 5491(c)(3) violates the separation of powers by prohibiting the President from removing the Director of the Consumer Financial Protection Bureau except for "inefficiency, neglect of duty, or malfeasance in office."

(I)

**ADDITIONAL RELATED PROCEEDINGS**

United States District Court (C.D. Cal.):

*Consumer Financial Protection Bureau* v. *Seila Law, LLC*, No. 17-cv-1081 (Aug. 25, 2017)

United States Court of Appeals (9th Cir.):

*Consumer Financial Protection Bureau* v. *Seila Law LLC*, No. 17-56324 (May 6, 2019)

(II)

## TABLE OF CONTENTS

Page

Opinions below ............................................................................ 1
Jurisdiction ................................................................................... 1
Statement ...................................................................................... 1
Discussion ..................................................................................... 7
Conclusion .................................................................................. 21

## TABLE OF AUTHORITIES

Cases:

*Ayotte* v. *Planned Parenthood of N. New England,*
   546 U.S. 320 (2006) ............................................................. 16
*Bowsher* v. *Synar,* 478 U.S. 714 (1986) ...................... 8, 15, 20
*Buckley* v. *Valeo,* 424 U.S. 1 (1976) ...................................... 19
*Clinton* v. *Jones,* 520 U.S. 681 (1997) .................................. 12
*14 Penn Plaza LLC* v. *Pyett,* 556 U.S. 247 (2009) ............. 20
*Free Enterprise Fund* v. *Public Co. Accounting*
   *Oversight Bd.,* 561 U.S. 477 (2010) ........................... *passim*
*Hennen, Ex parte,* 38 U.S. (13 Pet.) 230 (1839) ................... 8
*Humphrey's Executor* v. *United States,*
   295 U.S. 602 (1935) ............................................ 6, 9, 10, 11, 13
*Lucia* v. *SEC,* 138 S. Ct. 2044 (2018) ................................. 18
*Morrison* v. *Olson,* 487 U.S. 654 (1988) ............. 5, 6, 10, 14, 15
*Myers* v. *United States,* 272 U.S. 52 (1926) ...................... 8, 9
*NLRB* v. *Noel Canning,* 134 S. Ct. 2550 (2014) ................. 14
*PHH Corp.* v. *Consumer Fin. Prot. Bureau,*
   881 F.3d 75 (D.C. Cir. 2018) ............................. 11, 14, 15, 16
*Printz* v. *United States,* 521 U.S. 898 (1997) ...................... 12
*Quinn* v. *United States,* 349 U.S. 155 (1955) ...................... 19
*The Pocket Veto Case,* 279 U.S. 655 (1929) ......................... 15
*Wiener* v. *United States,* 357 U.S. 349 (1958) .................... 10
*Zivotofsky* v. *Clinton,* 566 U.S. 189 (2012) .......................... 18

(III)

IV

Constitution and statutes:                                    Page

U.S. Const.:

Art. II ........................................................................... 7, 9

§ 1, Cl. 1 ................................................................. 7

§ 2, Cl. 2 ................................................................. 8

§ 3 ........................................................................... 7

Dodd-Frank Wall Street Reform and Consumer
Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 ......... 1

12 U.S.C. 5302 ............................................................. 17

12 U.S.C. 5481(6)(A) ..................................................... 2

12 U.S.C. 5481(12) ........................................................ 2

12 U.S.C. 5481(14) ........................................................ 2

12 U.S.C. 5491(a) .......................................................... 3

12 U.S.C. 5491(b)(1)-(2) ................................................. 3

12 U.S.C. 5491(b)(3) ...................................................... 3

12 U.S.C. 5491(c)(1) ...................................................... 13

12 U.S.C. 5491(c)(1)-(2) ................................................. 3

12 U.S.C. 5491(c)(3) ............................................... 3, 5, 16

12 U.S.C. 5497(a)(1) ....................................................... 4

12 U.S.C. 5497(a)(2)(A)-(B) ............................................ 4

12 U.S.C. 5497(e) ........................................................... 4

12 U.S.C. 5511(a) ........................................................... 2

12 U.S.C. 5531(a)-(b) ...................................................... 2

12 U.S.C. 5536(a)(1)(B) ................................................... 2

12 U.S.C. 5562-5564 ....................................................... 3

12 U.S.C. 5562(c)(1) ........................................................ 3

12 U.S.C. 5562(c)(1)(A)-(E) ............................................. 3

12 U.S.C. 5562(e)(1) ........................................................ 3

12 U.S.C. 5562(f)(1) ........................................................ 3

12 U.S.C. 5564 .............................................................. 20

12 U.S.C. 5581 ............................................................... 2

V

Statutes—Continued:                                          Page

    Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204,
        116 Stat. 745 ........................................................ 16

    15 U.S.C. 41 (1934).......................................... 9, 10

Miscellaneous:

    1 Annals of Cong. (1789) (Joseph Gales ed., 1834) .............. 7

    Robert E. Cushman, *The Independent Regulatory
        Commissions* (1941) ............................................. 11

    Letter from James Madison to Thomas Jefferson
        (June 30, 1789), *reprinted in* 16 *Documentary
        History of the First Federal Congress of the United
        States of America* (Charlene Bangs Bickford et al.
        eds., 2004) ........................................................... 8

    Senate Comm. on Governmental Affairs, *Study on
        Federal Regulation, Volume V, Regulatory
        Organization*, S. Doc. No. 91, 95th Cong., 2d Sess.
        (1977) ................................................................. 11

    S. Rep. No. 176, 111th Cong., 2d Sess. (2010)................. 1, 2

    3 Joseph Story, *Commentaries on the Constitution
        of the United States* (1833)................................... 12

    *The Federalist No. 70* (Alexander Hamilton)
        (Jacob E. Cooke ed., 1961).................................... 9

# In the Supreme Court of the United States

---

No. 19-7

SEILA LAW LLC, PETITIONER

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

---

**BRIEF FOR THE RESPONDENT**

---

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-8a) is reported at 923 F.3d 680.  The order of the district court (Pet. App. 9a-23a) is not published in the Federal Supplement but is available at 2017 WL 6536586.

### JURISDICTION

The judgment of the court of appeals was entered on May 6, 2019.  The petition for a writ of certiorari was filed on June 28, 2019.  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

### STATEMENT

1.  In July 2010, the President signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Pub. L. No. 111-203, 124 Stat. 1376.  The legislation provided "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008."  S. Rep. No.

(1)

2

176, 111th Cong., 2d Sess. 2 (2010). Its overarching purpose was to "promote the financial stability of the United States" through the establishment of measures designed to improve accountability, resiliency, and transparency in the financial system. *Ibid.* As relevant here, the Act established the Consumer Financial Protection Bureau (Bureau) to ensure "that all consumers have access to markets for consumer financial products and services and that markets for [such] products and services are fair, transparent, and competitive." 12 U.S.C. 5511(a).

a. The Dodd-Frank Act prohibits any "covered person"—generally an entity or person involved in "offering or providing a consumer financial product or service"—or any "service provider" from "engag[ing] in any unfair, deceptive, or abusive act or practice." 12 U.S.C. 5481(6)(A), 5536(a)(1)(B). The Act then authorizes the Bureau to issue regulations identifying such acts or practices and to take enforcement actions against "covered person[s]" and "service provider[s]" to prevent them from engaging in such acts or practices. 12 U.S.C. 5531(a)-(b). The Act also transfers to the Bureau much of the authority to regulate consumer financial products and services that had been vested in other federal agencies, including the authority to prescribe regulations implementing the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Truth in Lending Act, and the Real Estate Settlement Procedures Act. 12 U.S.C. 5481(12) and (14), 5581. The laws administered by the Bureau are referred to collectively as "[f]ederal consumer financial law." 12 U.S.C. 5481(14).

The Bureau has authority to conduct investigations, initiate administrative adjudications, issue subpoenas,

3

and sue in court. 12 U.S.C. 5562-5564. Before the Bureau institutes an enforcement proceeding, it may also issue a civil investigative demand (CID) to any person whom the Bureau has reason to believe "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to a violation" of federal consumer financial law. 12 U.S.C. 5562(c)(1). A person served with such a demand must provide the Bureau with the documentary material, tangible things, reports, written answers, or testimony that the demand requests. 12 U.S.C. 5562(c)(1)(A)-(E). If the person objects to all or part of the demand, he or she may petition the Bureau for an order modifying or setting it aside. 12 U.S.C. 5562(f)(1). And although the Bureau's CIDs are not self-enforcing, if the person refuses to comply, the Bureau may petition a district court to enforce the demand. 12 U.S.C. 5562(e)(1).

b. The Dodd-Frank Act established the Bureau as an "independent bureau" within the Federal Reserve System. 12 U.S.C. 5491(a). The Bureau is headed by a single Director, who is appointed by the President with the advice and consent of the Senate. 12 U.S.C. 5491(b)(1)-(2). The only qualification required for the Director is that he or she be a United States citizen. 12 U.S.C. 5491(b)(3). The Director serves for a term of five years, although he or she may continue serving as Director "until a successor has been appointed and qualified." 12 U.S.C. 5491(c)(1)-(2). The President may not remove the Director except for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. 5491(c)(3).

The Bureau's operations are largely funded from the combined earnings of the Federal Reserve System. Each quarter, the Board of Governors of the Federal Reserve is required to transfer "the amount determined by the

4

Director [of the Bureau] to be reasonably necessary to carry out the authorities of the Bureau," up to a set percentage of the Federal Reserve System's total 2009 operating expenses.  12 U.S.C. 5497(a)(1); see 12 U.S.C. 5497(a)(2)(A)-(B) (establishing a cap of 12% to be adjusted annually by any increase in the employment cost index).  The Director may also request additional funds from Congress if necessary to carry out the authorities of the Bureau.  See 12 U.S.C. 5497(e).

2. a. Petitioner is a law firm that provides "debt-relief services" to its clients.  Pet. App. 1a.  The Bureau issued a CID to petitioner, requesting written answers to interrogatories and the production of documents to aid the Bureau's investigation into whether debt-relief providers and others were "engaging in unlawful acts or practices in the advertising, marketing, or sale of debt relief services or products."  *Id.* at 10a (citation omitted).  Petitioner asked the Bureau to modify or set aside the demand, which the Bureau's Director denied.  *Ibid.* Petitioner responded to the demand, but the Bureau considered the response inadequate because it "improperly asserted general objections, failed to provide a privilege log for claims of attorney-client and attorney work product privilege, raise[d] untimely claims of privilege, withheld relevant documents based on assertions of 'confidentiality,' and otherwise provided incomplete or deficient responses."  *Id.* at 10a-11a (citation omitted).  After petitioner confirmed that it would not modify its response to comply with the Bureau's requests, the Bureau filed a petition to enforce the demand in district court.  *Id.* at 11a.

The district court granted the petition to enforce in part.  Pet. App. 9a-23a.  As relevant here, the court rejected petitioner's claim that the Bureau's Director was

5

unconstitutionally insulated from Presidential control because he could only be removed for "inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. 5491(c)(3). Pet. App. 12a-14a. It concluded that petitioner's challenge was governed by *Morrison* v. *Olson*, 487 U.S. 654 (1988), and that the restrictions on the Director's removal did not interfere "with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." Pet. App. 12a-13a (citation omitted). It further concluded that, even if the removal restriction unconstitutionally encroached upon Executive authority in some contexts, "the proper remedy would not be to refuse to enforce the CID." *Id.* at 13a-14a. It reasoned that "Congress unquestionably wields the subpoena power," and therefore the Bureau could at least lawfully execute that authority. *Id.* at 14a. The court largely rejected petitioner's statutory challenges to the CID, with the exception of one modification limiting the demand's request for information and documents concerning "services" and "other services" to mean the "advertising, marketing or sale of debt relief services or products." *Id.* at 23a; see *id.* at 14a-23a.

b. The court of appeals affirmed. Pet. App. 1a-8a. The court observed that the arguments for and against the constitutional challenge to the Director's removal restriction "have been thoroughly canvassed in the majority, concurring, and dissenting opinions in *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc)." *Id.* at 2a. The court saw "no need to re-plow the same ground here" and instead only "explain[ed] in brief why [it] agree[d] with the conclusion reached by the *PHH Corp.* majority." *Ibid.*

6

The court of appeals acknowledged that "[t]he Director exercises substantial executive power similar to the power exercised by heads of Executive Branch departments," and that petitioner's challenge to the constitutionality of the statutory restriction on removing the Director "is not without force." Pet. App. 3a. But it concluded that the restriction was permissible under *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935), and *Morrison*, *supra*. Pet. App. 3a. The court explained that the Director "is subject to the same for-cause removal restriction" that applied to the members of the Federal Trade Commission (FTC) in *Humphrey's Executor*, and that the Bureau and the FTC both "exercise[] quasi-legislative and quasi-judicial powers," such that the agencies may "discharge[] those responsibilities independently of the President's will." *Id.* at 4a.

The court of appeals found irrelevant any differences between the FTC and the Bureau. Pet. App. 4a-5a. It reasoned that, although the Bureau "possesses substantially more executive power than the FTC did back in 1935," the Court in *Morrison* upheld "a for-cause removal restriction for an official exercising one of the most significant forms of executive authority: the power to investigate and prosecute criminal wrongdoing." *Id.* at 5a. And while "[s]ome have found * * * dispositive" the fact that the Bureau is headed by a single head, instead of a multi-member commission, the court of appeals expressed the view that "the Supreme Court's decision in *Humphrey's Executor* did not appear to turn on" that fact. *Ibid.* And it concluded that *Morrison* "seems to preclude drawing a constitutional distinction between multi-member and single-individual leadership structures." *Id.* at 5a-6a.

7

The court of appeals also rejected petitioner's statutory objections to the CID.  Pet. App. 6a-8a.  It therefore affirmed the district court's order directing petitioner to comply with the demand.  *Id.* at 8a.  The court of appeals subsequently stayed the mandate for a 90-day period and, if petitioner sought certiorari, "until final disposition by the Supreme Court."  C.A. Doc. 49 (June 18, 2019).

**DISCUSSION**

Petitioner contends (Pet. 18-25) that the structure of the Bureau, including the for-cause restriction on the removal of its single director, violates the Constitution's separation of powers.  The United States previously informed this Court that it has also concluded the statutory restriction on the President's authority to remove the Director violates the Constitution's separation of powers, and that the question would warrant this Court's review in an appropriate case.  See Gov't Br. in Opp., *State Nat'l Bank of Big Spring* v. *Mnuchin* (No. 18-307).  The Director of the Bureau has since reached the same conclusion.  This case presents a suitable vehicle for the Court's review of the question.  The government thus agrees with petitioner that certiorari is warranted.

1. a. Article II of the Constitution provides that "[t]he executive Power shall be vested" in the President, § 1, Cl. 1, and that he shall "take Care that the Laws be faithfully executed," *id.* § 3.  "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws."  *Free Enterprise Fund* v. *Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (remarks of Madison)).  Just as the President's ability to "select[] * * * administrative officers is essential" to

8

the exercise of "his executive power," *Myers* v. *United States,* 272 U.S. 52, 117 (1926); see U.S. Const. Art. II, § 2, Cl. 2, so too is his ability to "remov[e] those for whom he can not continue to be responsible," *Myers,* 272 U.S. at 117; see *Bowsher* v. *Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.") (citation omitted).

"Since 1789, the Constitution has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary." *Free Enterprise Fund,* 561 U.S. at 483. Indeed, the First Congress extensively debated the President's removal authority when creating the Department of Foreign Affairs (which later became the Department of State). "The view that 'prevailed' * * * was that the executive power included a power to oversee executive officers through removal; because that traditional executive power was not 'expressly taken away, it remained with the President.'" *Id.* at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), *reprinted in* 16 *Documentary History of the First Federal Congress of the United States of America* 893 (Charlene Bangs Bickford et al. eds., 2004)). This view "soon became the 'settled and well understood construction of the Constitution.'" *Ibid.* (quoting *Ex parte Hennen,* 38 U.S. (13 Pet.) 230, 259 (1839)).

This Court affirmed that established understanding in *Myers* and held that the President's executive power necessarily includes "the exclusive power of removal." 272 U.S. at 122. "[T]o hold otherwise," the Court explained, "would make it impossible for the President * * * to take care that the laws be faithfully executed."

9

*Id.* at 164. And the Court has recently reaffirmed that the President's executive power "includes, as a general matter, the authority to remove those who assist him in carrying out his duties" to faithfully execute the laws. *Free Enterprise Fund*, 561 U.S. at 513-514. "Without such power, the President could not be held fully accountable" for how executive power is exercised, and "[s]uch diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" *Id.* at 514 (quoting *The Federalist No. 70,* at 478 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).

b. The Court has recognized only one limited exception to the President's authority under Article II to remove principal officers of the United States. See *Free Enterprise Fund*, 561 U.S. at 495.

In *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935), the Court recognized a narrow exception to the general rule in upholding a provision establishing that FTC commissioners could be removed only for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620 (quoting 15 U.S.C. 41 (1934)). The Court's conclusion "depend[ed] upon the character of the office"— namely, that, in the Court's view at the time, the FTC commissioners were not "purely executive officers," *id.* at 631-632, because they "act[ed] in part quasi-legislatively and in part quasi-judicially," *id.* at 628. In particular, the Court understood the FTC to act as a continuing deliberative body, composed of several members with staggered terms to maintain institutional expertise and promote a measure of stability that would not be immediately undermined by political vicissitudes. See *id.* at 624-625, 628. The FTC was "called upon to exercise the

10

trained judgment of a body of experts" and was "so ar-
ranged that the membership would not be subject to
complete change at any one time." *Id.* at 624.  Indeed,
the direct relationship perceived between those struc-
tural features and the restriction on the President's re-
moval power was underscored by the fact that they all
were enacted in the same statutory section.  See 15 U.S.C.
41 (1934) (quoted in *Humphrey's Executor,* 295 U.S.
at 620).

*Humphrey's Executor* has been understood to au-
thorize similar removal restrictions as applied to other
multi-member commissions with features and functions
similar to those of the FTC.  See, *e.g.*, *Wiener* v. *United
States,* 357 U.S. 349, 355-356 (1958) (holding that "[t]he
philosophy of *Humphrey's Executor*" precludes at-will
removal of members of the War Claims Commission, a
three-member body that was charged with adjudicating
war-related compensation claims); see also *Morrison* v.
*Olson,* 487 U.S. 654, 724-725 (1988) (Scalia, J., dissent-
ing) ("[R]emoval restrictions have been generally re-
garded as lawful for so-called 'independent regulatory
agencies,' such as the Federal Trade Commission, the
Interstate Commerce Commission, and the Consumer
Product Safety Commission, which engage substantially
in what has been called the 'quasi-legislative activity' of
rulemaking.") (citations omitted).[1]

---

[1]  This Court also has upheld removal restrictions for at least some
"purely executive" *inferior* officers.  See *Morrison*, 487 U.S. at 689;
cf. Pet. App. 5a-6a.  But the sole basis for *Humphrey's Executor*'s
exception for *principal* officers was the "'quasi-legislative and
quasi-judicial'" nature of FTC Commissioners.  See *Free Enterprise
Fund*, 561 U.S. at 493-495 (explaining that *Humphrey's Executor*
concerned Congress's authority to "confer[] good-cause tenure on
the principal officers of certain independent agencies" while *Morri-
son* concerned "the status of inferior officers") (citation omitted).

11

As then-Judge Kavanaugh noted in his dissent in *PHH Corp.* v. *Consumer Financial Protection Bureau*, 881 F.3d 75 (D.C. Cir. 2018) (en banc), "the multi-member structure of [such] independent agencies is not an accident." *Id.* at 186. Rather, it has been generally recognized that a removal restriction is concomitant of—indeed, "*inextricably bound together*" with—a continuing deliberative body. *Ibid.* (quoting Robert E. Cushman, *The Independent Regulatory Commissions* 188 (1941)). As an extensive study of independent agencies conducted in 1977 by the Senate Committee on Governmental Affairs concluded, "[t]he size of the commission, the length of [its members'] terms, and the fact that they do not all lapse at one time are key elements of the independent structure."  Senate Comm. on Governmental Affairs, *Study on Federal Regulation, Volume V, Regulatory Organization*, S. Doc. No. 91, 95th Cong., 2d Sess. 35 (1977); see *id.* at 79 (concluding that the "[c]hief" consideration in determining whether to create an independent commission, rather than an executive agency, "is the relative importance to be attached to group decision-making").

c. A single-headed agency lacks the critical structural attributes that were thought to justify "independent" status for the multi-member commission in *Humphrey's Executor*.

*First*, a multi-member commission with staggered-term memberships is established as a "quasi-legislative" or "quasi-judicial" "body of experts" that is supposed to operate in an interactive and deliberative manner, and is "so arranged that the membership would not be subject to complete change at any one time." *Humphrey's Executor*, 295 U.S. at 624, 628. Restricting the Presi-

12

dent's power to remove the members of such commissions was thought to facilitate deliberative group decisionmaking and promote an inherent institutional continuity.  An agency headed by a single officer, however, has none of those attributes.

To the contrary, a single-headed agency embodies a quintessentially executive structure.  See *Clinton* v. *Jones,* 520 U.S. 681, 712 (1997) (Breyer, J., concurring in the judgment) (describing how the Founders "consciously decid[ed] to vest Executive authority in one person rather than several," in contrast with their vesting of legislative and judicial powers in multi-member bodies).  It has long been recognized that "[d]ecision, activity, secre[c]y, and d[i]spatch will generally characterise the proceedings of one man in a much more eminent degree, than the proceedings of a greater number."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1414, at 283 (1833).  The Constitution specifies the official who must exercise that sort of executive power:  the President, acting either personally or through subordinate officers who are accountable to him and whose actions he can control.  See *Printz* v. *United States*, 521 U.S. 898, 922 (1997) ("The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known.").

The attributes animating the exception in *Humphrey's Executor* thus are absent when Congress carves off a portion of quintessentially executive power and vests it in a single principal officer not removable at the President's will.  And because the *rationale* for the *Humphrey's Executor* exception does not apply, even the same level of intrusion into the President's exercise of executive authority approved in *Humphrey's Executor* cannot be justified when imposed by a single-headed

13

agency like the Bureau.  See 295 U.S. at 632 (disclaiming any conclusion on the permissibility of applying removal restriction to any office other than ones "such as that here involved").

*Second*, a single-headed independent agency presents a greater risk than a multi-member independent commission of taking actions or adopting policies inconsistent with the President's executive policy.  Unlike a multi-headed commission, which generally must engage in at least some degree of deliberation and collaboration, a single Director can decisively implement his own views and exercise discretion without those structural constraints.  As noted, it is for such reasons that the Framers adopted a strong, unitary Executive—headed by the President—rather than a weak, divided one.  Vesting such power in a single person not answerable to the President represents a stark departure from the Constitution's framework.

That difference in decisionmaking is reinforced by the difference in the timing and composition of appointments to the two types of agencies.  For a multi-headed commission with staggered terms, the President is generally assured to have an opportunity to appoint at least some of its members, and the bipartisan-membership requirement that is common for such commissions further increases the likelihood that at least some of the holdover members share the President's views.  By contrast, the statutory term of a single agency head may insulate that officer from Presidential control for a significant portion of the President's term in office.  And where a single agency head has a term greater than four years, a President may never have the opportunity to appoint that officer.  Cf. 12 U.S.C. 5491(c)(1) (Bureau's Director to serve a five-year term).  An agency over

14

which the President lacks control of both back-end removal and front-end appointment represents a further departure from the constitutional design.

To be sure, the frequency with which the threat of departures from the President's executive policy materializes will depend on the particular circumstances, but the "added" risk of such departures "makes a difference." *Free Enterprise Fund*, 561 U.S. at 495.  In *Morrison*, the interference with executive power was found to be mitigated because it applied only to an inferior officer with "limited jurisdiction and tenure" and the lack of any "policymaking or significant administrative authority."  487 U.S. at 691.  And a multi-member structure, like that of the FTC in *Humphrey's Executor*, may afford the President the opportunity to appoint at least some members, and facilitate deliberation and interaction among its members.  Here, however, the interference with executive power caused by the removal restriction on the Bureau's Director is exacerbated by both the Bureau's single-headed nature and its wide-ranging policy making and enforcement authority over private conduct.

*Third*, unlike multi-member independent commissions, a single-headed independent agency like the Bureau is a relatively novel innovation.  See *PHH Corp.*, 881 F.3d at 173-176 (Kavanaugh, J., dissenting).  In the separation-of-powers context, "the lack of historical precedent" for a new structure is "[p]erhaps the most telling indication of [a] severe constitutional problem." *Free Enterprise Fund*, 561 U.S. at 505 (citation omitted); see *NLRB* v. *Noel Canning,* 134 S. Ct. 2550, 2559 (2014) ("'[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship

15

between Congress and the President.") (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). In *Free Enterprise Fund*, for instance, the Court declined to extend *Humphrey's Executor* to the "novel structure" of requiring "an unusually high standard" of cause for a principal officer to remove an inferior officer, when the principal officer, in turn, could only be removed for cause. *Free Enterprise Fund*, 561 U.S. at 496, 502-503. The Court has rightly been reluctant to expand *Humphrey's Executor* to "new situation[s] not yet encountered by the Court." *Id.* at 483.

*Finally*, there would be no meaningful limiting principle if *Humphrey's Executor* were extended beyond certain multi-member commissions to a single-headed agency like the Bureau. The functions, rather than the structure, of the FTC cannot alone justify the characterization as "quasi-legislative" or "quasi-judicial," because, as the Court later acknowledged in *Morrison*, "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Morrison*, 487 U.S. at 690 n.28 (citation omitted); accord *Bowsher*, 478 U.S. at 733 ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."). The terms "quasi-legislative" and "quasi-judicial" thus must be understood to reflect the interactive and deliberative mode of decisionmaking that is expected of multi-member legislative and judicial bodies.

Given "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials" based on function alone, *Morrison*, 487 U.S. at 689 n.28, the *PHH* court provided little basis for distinguishing even most Cabinet officers. See 881 F.3d at 106-107. And, indeed,

16

the *PHH* majority opinion emphasized Congress's authority to restrict the President's ability to remove "financial regulators," without providing a sound basis for preventing Congress from similarly restricting the President's ability to remove the Secretary of the Treasury. *Id.* at 91; see *id.* at 78-79, 91-92, 106-107.

For these reasons, neither *Humphrey's Executor* nor *Morrison* controls, and the Court should hold that the removal restriction in 12 U.S.C. 5491(c)(3) impermissibly infringes the separation of powers fundamental to our constitutional structure.[2]

d. The proper remedy for the constitutional violation is to sever the provision limiting the President's authority to remove the Bureau's Director. As explained in *Free Enterprise Fund*, when "'confronting a constitutional flaw in a statute,'" courts generally "'try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" 561 U.S. at 508 (quoting *Ayotte* v. *Planned Parenthood of N. New England*, 546 U.S. 320, 328-329 (2006)). In that case, the Court held unconstitutional only the removal restriction pertaining to members of the Public Company Accounting Oversight Board, even though Congress had not enacted a severability clause, and went on to hold that the proper remedy was to invalidate the removal restriction, leaving the board members removable at will. *Id.* at 509. The Court reasoned that the Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, would "remain[] 'fully operative as a law'

---

[2] If this Court were to conclude that *Humphrey's Executor* or *Morrison* requires upholding the removal restriction, it should consider whether those cases should be overruled in part or in whole. That issue is fairly encompassed in the question presented. Pet. I; see Pet. 24.

17

with these tenure restrictions excised," and no evidence suggested that Congress "would have preferred no Board at all to a Board whose members are removable at will." *Free Enterprise Fund*, 561 U.S. at 509 (citation omitted).

The same result follows *a fortiori* here. Absent the for-cause removal provision, the Dodd-Frank Act and its Bureau-related provisions will remain "fully operative." *Free Enterprise Fund*, 561 U.S. at 509 (citation omitted). And, as in *Free Enterprise Fund,* there is no evidence that Congress would have preferred no Bureau at all to a Bureau with a Director who is removable at will. See *ibid.* Moreover, unlike the statute at issue in *Free Enterprise Fund*, the Dodd-Frank Act includes a severability clause, providing that if one of the Act's provisions is "held to be unconstitutional," the remainder of the Act "shall not be affected thereby." 12 U.S.C. 5302. While it may be possible to conceive of other ways to remedy the constitutional violation, "such editorial freedom * * * belongs to the Legislature, not the Judiciary." *Free Enterprise Fund*, 561 U.S. at 510.

2. This case presents a suitable vehicle for resolving the important question presented, which involves serious separation-of-powers issues and raises the constitutionality of an Act of Congress. The issue was fully briefed by the parties in the courts below, and squarely decided by the court of appeals. See Pet. App. 1a-8a. The court of appeals offered no alternative grounds for enforcing the Bureau's CID, and petitioner presents only the constitutional question to this Court. Pet. 17. The court of appeals has stayed its mandate until final disposition of the case by this Court, C.A. Doc. 49 (June 18, 2019), removing any possibility that the question could become moot during the Court's consideration.

18

And there are no other apparent impediments to the Court's resolution of the question presented.

a. In the court of appeals, the Bureau argued that even if the removal restriction were unconstitutional, petitioner would not be entitled to relief because the former Director's issuance of the CID was ratified by the Bureau's then-Acting Director, who could be removed by the President at will. See Resp. C.A. Br. 13-19. But the court of appeals did not address this remedial issue, and it would not prevent the Court's resolution of the question presented. The Court has often observed that it is "a court of final review and not first view" and therefore does not ordinarily "decide in the first instance issues not decided below." *Zivotofsky* v. *Clinton*, 566 U.S. 189, 201 (2012) (citations omitted). The Court has previously declined to address whether a ratification has cured a constitutional infirmity when the court of appeals had not first addressed that question. See *Lucia* v. *SEC*, 138 S. Ct. 2044, 2055 n.6 (2018). There are compelling reasons to follow a similar course here.

First and foremost, the separation-of-powers question presented here is important, has broad implications for the President's ability to supervise the Executive Branch, and creates uncertainty that undermines the Bureau's ability to fulfill its mission. Until this Court resolves the constitutionality of the Bureau's structure, those subject to the agency's regulation or enforcement can (and often will) raise the issue as a defense to the Bureau's efforts to implement and enforce federal consumer financial law. Cf. Pet. 18. There is no sound reason for case-specific questions surrounding ratification to deter the Court from resolving the question presented.

That is particularly true here, where petitioner raised both constitutional and factual objections to the

19

Bureau's ratification argument below. See Pet. C.A. Reply Br. 6 (arguing that "the unconstitutional CFPB cannot ratify its own unconstitutional structure or conduct"); *id.* at 3 (disputing whether the Acting Director, as matter of fact, "has ratified [the Bureau's] actions with respect to the CID"). Resolving the ratification question thus would not enable the Court to avoid resolving a constitutional question. And it would be unusual for this Court to resolve in the first instance any factual dispute about the Acting Director's ratification. The parties also disputed below whether the Acting Director's ratification was effective after the Acting Director was replaced by a Senate-confirmed Director who was subject to the challenged removal restriction. C.A. Oral Argument at 4:42-6:30, 10:14-12:55. That too provides a reason for this Court not to address the ratification issue in the first instance.

b. The district court alternatively concluded that, even if the removal restriction unconstitutionally encroached upon Executive authority, it would not do so in the context of the Bureau's efforts to enforce a CID. Pet. App. 13a-14a. The court reasoned that "Congress unquestionably wields the subpoena power" itself, and "Congress may properly establish offices that 'perform duties . . . in aid of those functions that Congress may carry out by itself.'" *Id.* at 14a (quoting *Buckley* v. *Valeo*, 424 U.S. 1, 139 (1976) (per curiam)). That alternative rationale for enforcing the CID, however, provides no impediment to resolving the question presented.

As an initial matter, the Bureau's CID was issued in aid of a potential enforcement action of federal financial consumer law, see Pet. App. 10a, not in aid of any legitimate congressional investigation. See *Quinn* v. *United States*, 349 U.S. 155, 161 (1955) ("[Congress's] power to

investigate must not be confused with any of the powers of law enforcement."). And any effort to recast the Bureau as a congressional office would raise its own constitutional difficulties, given the President's unilateral (albeit restricted) authority to remove the Director. Cf. *Bowsher*, 478 U.S. at 723 ("A direct congressional role in the removal of officers charged with the execution of the laws beyond this limited one is inconsistent with separation of powers."). In any event, this Court will affirm on grounds that have not been raised below "only in exceptional cases." *14 Penn Plaza LLC* v. *Pyett*, 556 U.S. 247, 273 (2009) (citation omitted). Here, the Bureau expressly abandoned the district court's secondary rationale in the court of appeals. See Resp. C.A. Br. 22 n.4.

3. In the court of appeals, the Bureau defended the constitutionality of the statutory removal restriction. See 12 U.S.C. 5564 (granting the Bureau independent litigating authority in the lower courts). Since the court of appeals issued its decision, however, the Director has reconsidered that position and now agrees that the removal restriction is unconstitutional. For that reason, if the Court grants review, the Court may wish to consider appointing an amicus curiae to defend the judgment of the court of appeals.

21

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

| | |
|---|---|
| MARY MCLEOD<br>   *General Counsel*<br>JOHN R. COLEMAN<br>   *Deputy General Counsel*<br>STEVEN Y. BRESSLER<br>   *Assistant General Counsel*<br>   *Consumer Financial*<br>    *Protection Bureau* | NOEL J. FRANCISCO<br>   *Solicitor General*<br>JOSEPH H. HUNT<br>   *Assistant Attorney General*<br>MARK B. STERN<br>DANIEL AGUILAR<br>   *Attorneys* |

SEPTEMBER 2019