1700 G Street NW,
Washington, DC 20552
December 27, 2019



**<u>Via ECF</u>**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

   Re: *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM[1]

Dear Judge Vanaskie:

  On November 8, 2019, Navient disclosed for the first time that Dr. Xiaoling Lim Ang was one of its experts. Until then, the Bureau's enforcement lawyers were not aware that she would be involved in this case as an expert witness. Dr. Ang's report responded to the report by Dr. Charles Mullin, the Bureau's econometrics and statistics expert, concerning the harm that consumers suffered due to their enrollment in forbearance rather than an income-driven repayment (IDR) plan.

  Dr. Ang's participation in this case is improper. She is a former economist with the Bureau's Office for Research who focused on student-lending issues.[2] She worked directly on the Navient investigation during her employment at the Bureau, which ended in November 2015. Where, as is the case here, an expert has performed work for one of the parties on the very matter that is being litigated, that expert cannot switch sides. Accordingly, as discussed in more detail below, the Court should disqualify Dr. Ang, in addition to granting the other relief requested in section II of this letter.[3]

**I. Dr. Ang's side-switching mandates her disqualification.**

  There are two standards for disqualifying an expert witness based on a conflict of interest: (1) the "bright-line rule," which applies when an expert has switched sides in the exact matter being litigated, and (2) a two-part test that applies when the expert had some relationship with the moving party but did not work on the specific matter being litigated. Here, the "bright-line rule" applies because Dr. Ang worked specifically on this matter, though the two-part test is easily satisfied as well.

  **A. The "bright-line rule" requires disqualification when—as is the case here—an expert has switched sides in a matter.**

  A "bright-line rule" applies when an expert engages in "side-switching." *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F.Supp.2d 660, 666 (S.D. W. Va. 2008). This rule is "simple": "It

---

[1] This letter is seven pages in length, which is above the limit of five pages set at the outset of the proceedings before Your Honor. The Bureau requests leave to exceed the limit in light of the importance of the issue presented.

[2] The Office of Research (OR) is one of three Offices within the Bureau's Division of Research, Markets, and Regulations (RMR).

[3] If Dr. Ang is not disqualified, the Bureau respectfully requests that any rebuttal report to her report shall be due two weeks after this motion is decided or January 24, 2020, whichever is later.

requires disqualification when an expert switches sides in the same dispute." *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378337, at *2 (C.D. Cal. Sept. 22, 2017). The logic behind the rule is straightforward: "side-switching is the paradigm of inappropriate expert conduct," and "no one . . . seriously contend[s] that blatant side-switching by an expert within the same litigation should be permitted." *Rhodes*, 558 F.Supp.2d at 666 (quotation omitted).

In accordance with this rule, courts have disqualified an individual who worked on a litigated matter for one party, then switched sides to work on the same matter for the opposing party. *See, e.g.*, *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 2007 WL 4440173, at *3 (D.N.J. Dec. 17, 2007) ("The Court finds that Dr. Spiegelberg should be, and is, disqualified under the bright-line rule"); *Rhodes*, 558 F.Supp.2d at 670 ("the bright-line rule requires disqualification of Dr. Anderson"); *Calendar Research*, 2017 WL 10378337, at *1 ("The bright-line disqualification test requires the Court to disqualify Dr. Lee.") (capitalization omitted); *United States v. NHC Health Care Corp.*, 150 F.Supp.2d 1013, 1015 (W.D. Mo. 2001) (applying rule to disqualify expert who was a former employee of the agency bringing suit, and therefore "essentially started out as a litigational party and then became an expert for the opposing party testifying against her former position").

The rationale for this "simple," "bright-line rule" is that "an expert who switches sides during the same dispute jeopardizes the fundamental fairness and integrity of the judicial process." *Calendar Research*, 2017 WL 10378337, at *2; *see also Rhodes*, 558 F.Supp.2d at 671 (noting that the rule is critical "to protect the integrity of the judicial system; where, as here, an expert plainly switches sides in what is essentially the same case, the maintenance of judicial integrity requires disqualification"). In the context of a former employee who works on a matter, then is retained by the opposing party, there is too great of a risk that the former employee has "a basic understanding of plaintiff's modus operandi, patterns of operation, decision-making process and the like," such that it would be "highly prejudicial" for that former employee to be allowed to switch sides and use the knowledge gained about the former employer to benefit an adverse party. *NHC Health Care Corp.*, 150 F.Supp.2d at 1016 (quotation omitted).

In this case, Dr. Ang worked on the investigation of Navient that directly resulted in this litigation. Her involvement spanned at least two years through the end of her employment at the Bureau, and it included the following:

(1) Dr. Ang participated in at least two meetings (one with her colleagues in the Office of Research, and one with enforcement attorneys), and was included on subsequent communications with enforcement attorneys, regarding a data request issued in October 2013 that, among other things, sought borrower data relating to payment-allocation issues. A2, 10, 12, 19-31.[4] In the meeting with the enforcement attorneys, she was involved in a discussion about the enforcement team's "current plan" regarding how to prioritize data

---

[4] "A[]" refers to pages in the appendix of exhibits being submitted for *in camera* review with this letter. *In camera* review is appropriate for the reasons set forth in section III of this letter.

requests regarding payment allocation, including the types of data needed "to quantify certain types of consumer harm." A12.[5] (The final data request is included at A33-34.)

(2) Dr. Ang participated in at least two meetings in February 2014 to discuss data produced by Navient, as well as the additional categories of data that should be requested from Navient. A36, 38, 40-43, 45. The first meeting, with her colleagues in the Office of Research, concerned "if we would be able to calculate restitution for [certain] issues using the data we have." A42. The second meeting was with the enforcement attorneys "to discuss our Sallie Mae data, and what additional data we may need from the Company." A36. At that stage of the investigation, the lead enforcement attorney indicated to Dr. Ang that "we are not 100% certain about our long term data strategy for Sallie Mae, as it will depend on what issues we decide to focus on in our broader investigation." A47.

(3) Dr. Ang provided input regarding a civil investigative demand (CID) that enforcement attorneys were drafting in April 2014. A51-57. At that time, the lead enforcement attorney wrote to Dr. Ang and her colleague that enforcement attorneys had "drafted three of the four [requests to be included in the CID], and wanted to know if (1) you could review those three requests . . . ; and (2) if you could help us craft the fourth request." A55. In response, Dr. Ang provided various feedback, including input on how to obtain data regarding borrowers who "are coming up on the end of their IBR/forbearance term," in order to obtain "insight into what happens when alternative repayment status is up for renewal." A52. (The final CID is included at A59-98.)

(4) Dr. Ang met with enforcement attorneys on at least two occasions in March 2015 to "talk[] about our objectives for the CID" to be issued at that time, which, among other things, sought data concerning borrower enrollment in various payment options, including IDR plans and forbearance. A128, 130, 132, 135. The lead enforcement attorney requested the meetings because the feedback of Dr. Ang and her colleague "has been so valuable in the past on our CIDs." A100. Dr. Ang characterized the second of those meetings as having "clarified the goals of the CID." A132. In addition to feedback Dr. Ang provided during the meetings, she also provided written edits to the CID. A103-126. (The final CID is included at A149-186.)

(5) Dr. Ang provided input, in October 2015, concerning draft conduct provisions that eventually were to be sent to Navient outlining possible settlement terms for this action. A188-229.

This work reflects that Dr. Ang was repeatedly and extensively exposed to the mental strategies and impressions of Bureau attorneys concerning the enforcement action, including work product concerning litigation and settlement strategy. *See Sporck v. Peil*, 759 F.2d 312, 313 (3d Cir. 1985) (opinion work product "is accorded almost absolute protection" to "ensur[e] that each side relies on its own wit in preparing their respective cases"). Not surprisingly, Dr. Ang was on the initial list of custodians developed by the Bureau for document-gathering purposes, though she was subsequently

---

[5] Many of the exhibits cited in this section are communications involving Brandis Anderson – an enforcement attorney who was in charge of all aspects of the Navient investigation – and sometimes also Cynthia Lesser or Leanne Hartmann, who were enforcement attorneys working with Ms. Anderson.

dropped from the list due to her overlap with other custodians. Indeed, her communications appear in the Bureau's document productions to Navient, as well as on the Bureau's privilege logs.

Quite simply, Dr. Ang's participation in this case would be "the paradigm of inappropriate expert conduct." *Rhodes*, 558 F.Supp.2d at 666. She worked on this matter for the Bureau, and cannot switch sides to now work for Navient.

### B.  Disqualification is also warranted under the two-part conflict-of-interest test.

The Bureau believes that this clear case of side-switching warrants application of the bright-line rule, and the Bureau does not discern any reason to apply a different rule. Nevertheless, if the Court decides that "the circumstances at bar do not implicate the clear-cut case of an expert 'switching sides'" (*Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, 2015 WL 5163035, at *3 (D. Del. Sept. 3, 2015)), the two-part conflict-of-interest test yields the same result. Under the two-part test, courts ask: (1) whether it was "objectively reasonable" for the moving party "to believe that a confidential relationship existed" with the individual now being proffered by the opposing party as an expert; and (2) whether any confidential or privileged information was disclosed by the moving party to the expert, sufficiently related to this litigation. *Howmedica*, 2007 WL 4440173, at *2; *In re Bard*, 2014 WL 6960396, at *7; *Rhodes*, 558 F.Supp.2d at 666-67; *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D. Va. 1991). Both prongs of this test are readily satisfied.

First, it was "objectively reasonable" for the Bureau "to believe that a confidential relationship existed." Dr. Ang was subject to a regulation prohibiting the disclosure of any confidential information to "[a]ny person who is not an employee, contractor, or consultant of the CFPB." 12 C.F.R. § 1070.41(a)(1). She also appears in various entries on the Bureau's privilege log in this litigation, and she had conversations with Bureau enforcement attorneys about their strategies regarding this exact matter. Thus, the Bureau properly believed that a confidential relationship existed.

Second, Dr. Ang received confidential and privileged information related to this litigation. As noted above, Dr. Ang assisted with this specific matter over at least two years. During that time, she interacted with, among others, Bureau enforcement attorneys handling this matter, including communicating with them about their investigative strategies. Her work was substantially related to this case, including discussing data strategies and helping with the drafting of CIDs relating to borrower enrollment in IDR and forbearance. All of this work was privileged and confidential. *See, e.g.*, *Cordy*, 156 F.R.D. at 581 (disqualifying expert who was told counsel's theory of the case and had access to the mental impressions of counsel); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. at 1249 (disqualifying expert who learned counsel's views on potential defenses to suit).

In addition, Dr. Ang participated in numerous projects that Navient has identified as being "clearly" or "highly" relevant to its defenses in this case. For example:

- Dr. Ang participated in the review or drafting of the following: (1) the Bureau's 2015 request for information on student loan servicing issues (A231-255, 257); (2) the September 2015 report entitled "Student Loan Servicing: Analysis of Public Input and Recommendations for Reform" (A259-260, 262-423, 425-428, 430-432, 434-436, 438-440, 442-608, 610-775); (3) the October 2015 Student Loan Ombudsman Annual Report (A777, 779, 781-816, 818-821, 823-858, 860-899, 901-943); and (4) the materials drafted in October 2015 that were to be used for the focus groups that resulted in the "Payback Playbook" (A945-974). Navient identified these four categories of materials as "clearly

4

relevant" to its defenses. Doc. 73-2, at 2; *see also* Doc. 226, at 3 (identifying CFPB "internal documents" and documents concerning the "CFPB's engagement of an outside consultant for the Payback Playbook" as relevant); Doc. 277, at 9-10 (characterizing Bureau's internal documents concerning rules and requirements for federal student loans as reflecting "secret . . . policy discussions" that are relevant to the question of whether "Navient acted unreasonably towards federal student loan borrowers").

- In January 2014, Dr. Ang made a specific request for notes from a site visit that other Bureau employees had made to a Navient servicing center. *See* A978 ("I'm looking forward to seeing the notes from the SM [site visit]."). Navient mounted a privilege challenge concerning that specific document, and it zeroed in on material unredacted as a result of that challenge as being relevant and "exculpatory." Doc. 226, at 3.

- Dr. Ang was a participant in a large credit reporting project in which the division in which she worked engaged in an effort to provide guidance to the U.S. Department of Education regarding credit reporting codes. *See* A984 (email correspondence reflecting Dr. Ang receiving information about the project); A988 (mentioning Dr. Ang by name in a timeline of key events concerning the project). Navient identified that specific project as "relevant to the defenses" on the Bureau's credit reporting claim. *See* Doc. 226, at 3; *accord* Doc. 277, at 2 (indicating that documents about the project "may be highly relevant").

Thus, even the work that Dr. Ang did which was not specifically directed toward the Navient investigation was confidential and bore directly on issues that Navient has contended are centrally relevant to this case. *See, e.g.*, Doc. 73-2; Doc. 226; Doc. 277.

Any notion that Dr. Ang can simply segregate her extensive past work on this exact matter, as well as on the issues in this case, "is unworkable if not quixotic." *Eastman Kodak Co. v. AGFA-Gevaert N.V.*, 2003 WL 23101783, at *5 (W.D.N.Y. Dec. 4, 2003). The reason that disqualification rules exist is that it is difficult—if not impossible—"to guard against even the potential breach of confidences by experts who had a confidential relationship with the party seeking disqualification." *United States v. Larkin, Hoffman, Daly & Lindgren*, 1994 WL 627569, at *2 (D. Minn. Apr. 12, 1994). As one court noted, "The danger is that no one may know how the information [that the former employee] learned from [the moving party] may affect his opinion, and [the former employee] may inadvertently use confidential information." *Alien Tech. Corp. v. Intermec, Inc.*, 2007 WL 4261972, at *2 (D.N.D. Nov. 30, 2007); *accord Wang Labs., Inc. v. CFR Assocs., Inc.*, 125 F.R.D. 10, 12 (D. Mass. 1989) (noting that "a former employee should not be allowed to use confidential information he obtained during the course of his employment as a sword against his former employer during the discovery process, and at trial").

Indeed, "[n]o experienced litigator would freely disclose [privileged information] to opposing counsel," and therefore the very fact that the expert had access to privileged information from the moving party means that the expert cannot then work for the opposing party on the same or similar issues. *See In re C.R. Bard*, 2014 WL 6960396, at *9 (internal quotation omitted). It is immaterial if the expert makes the self-interested claim that she was privy to nothing confidential as part of the first relationship, that she will not disclose any confidential relationship that she did learn, or that she does not remember anything confidential from the former relationship. *See id.* ("Although Dr. Kohli insists that he did not receive confidential information during his nearly four-year relationship with Bard's counsel, his testimony is implausible."). Indeed, even if the information shared with an individual during the first relationship is based partly on public sources, disqualification is nonetheless required because the expert still had access to information about how

5

the moving party intended to use those public sources as part of its litigation strategy. *See id.* ("Even if the value of the information shared with [the individual during the first relationship] is debatable, its essential nature as work product is not.").

Thus, it would not matter were Dr. Ang to claim that her past employment at the Bureau did not affect her report. There is no way to verify such a claim, and therefore courts do not give these types of claims any weight. *See, e.g.*, *Cordy*, 156 F.R.D. at 578 (disqualifying defense expert even when defense counsel sent expert a letter requesting that the expert not disclose any information provided by the plaintiff); *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. Dec. 23, 1986) (disqualifying defendant's expert even when the expert pledged that "it has not divulged, and will not [divulge], any information or knowledge acquired by it during its relationship with plaintiff"); *Michelson v. Merrill Lynch Pierce Fenner & Smith*, 1989 WL 31514, at *4 (S.D.N.Y. Mar. 28, 1989) (noting that an expert "cannot possibly create separate spaces within his memory"—one for public information and another for privileged and confidential information); *Brunstad v. Medtronic, Inc.*, 2015 WL 1962104, at *3-4 (W.D. Wis. Apr. 30, 2015) ("Even if [the expert] diligently tried to respect his obligations under his confidentiality agreement, he could implicitly or unconsciously guide plaintiffs' litigation strategy on the basis of knowledge that he is contractually barred from disclosing.").

Indeed, it is almost axiomatic that a former employee with responsibility for a certain subject-matter area while employed with the moving party was exposed to confidential information that would impact her work for the opposing party on the same or similar subject matter, thereby warranting disqualification. As one court noted, any "high-level" employee who works on issues "substantially related" to a lawsuit will be bringing "expertise and knowledge" acquired from the former employer that will impact the work they do for the opposing party. *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 2010 WL 2266610, at *1-3 (S.D. Tex. June 2, 2010). And any notion "that [a former employee] can parse his knowledge of [the former employer's] confidential information to only rely upon what is provided to him [by the party who retained him/her as an expert is] unpersuasive. . . . [T]he human brain does not compartmentalize information in that manner." *Pellerin v. Honeywell Int'l Inc.*, 2012 WL 112539, at *2 (S.D. Cal. Jan. 12, 2012). For these reasons, disqualification is "more readily granted when the targeted expert is a former employee of the opposing party." *Brunstad*, 2015 WL 1962104, at *3.[6]

In summary, even under the two-part conflict of interest test, Dr. Ang's extensive involvement on the Navient matter and student loan issues while employed by the Bureau require her disqualification.

---

[6] In addition, any notion that the CFPB is limiting Dr. Ang's ability to pursue her line of work is without merit. Dr. Ang was a witness against the Bureau in an administrative trial involving a payday lender, and the Bureau raised no objection to her participation in that case. *See In the Matter of Integrity Advance, LLC*, No. 2015-CFPB-0029, *docket available at* https://www.consumerfinance.gov/administrative-adjudication-proceedings/administrative-adjudication-docket/integrity-advance/. (The discussion of Dr. Ang's testimony begins at page 58 of the Recommended Decision.) Even her biography outlines the vast array of areas in which she specializes, most of which have no relation to her work at the Bureau. *See* https://www.nera.com/experts/lingling-ang.html (noting that she "specializ[es] in consumer financial services, antitrust, and labor economics," and has done work in "fixed-income securities and insurance, as well as consumer packaged goods and electronic components").

**II.   The Bureau respectfully submits that, in addition to disqualification of Dr. Ang, additional remedies are warranted to resolve this issue.**

In addition to the disqualification of Dr. Ang, additional measures are necessary to remedy her improper participation in this case as an expert witness for Navient. Specifically, the Bureau respectfully submits that it is appropriate to require destruction of her report, her communications with Navient, and her communications with counsel for Navient. *Cf. Cordy*, 156 F.R.D. at 585 (ordering segregation of materials and prohibitions on further use of the materials). In addition, there should be no further communications between Dr. Ang and Navient (or its counsel) related to this case, and Navient (and its counsel) should be barred from sharing any information that derived solely from Dr. Ang.

While Navient likely will claim that it will suffer hardship from the foregoing measures, it bears mention that this issue has been caused by Navient's decision to retain Dr. Ang, without seeking prior input from Bureau enforcement lawyers litigating this matter. Therefore, whatever argument that Navient makes concerning the hardship or prejudice it would suffer should not be given any weight. *See Eastman Kodak Co.*, 2003 WL 23101783, at *5 (noting that, in retaining a former employee, the defendant "assumed the risk that [the former employee's] knowledge . . . was based, at least in part, on an 18 year career" with the plaintiff, and that the former employee might be disqualified on that basis); *Van Jackson v. Check 'n Go of Ill., Inc.*, 114 F.Supp.2d 732, 734 (N.D. Ill. 2000) (noting that "it was [the disqualified firm's] own personnel decision to recruit [the tainted lawyer] away from its courtroom adversary in the midst of this case which led to its disqualification"); *FMC Techs., Inc. v. Edwards*, 420 F.Supp.2d 1153, 1162 (W.D. Wash. 2006) ("Any prejudice Defendants face is due to their attorneys' decision to ignore a conflict of interest, not this Court's decision to grant Plaintiffs' motion.").

**III.   *In camera* review is appropriate for review of the materials associated with this motion.**

With this letter, the Bureau is transmitting for *in camera* review the exhibits referenced above. As numerous courts have recognized, a party should not have to jeopardize its privileged information in the context of a motion arising exclusively from the conduct of opposing counsel in choosing to hire an individual with a conflict of interest. Accordingly, *in camera* review is the accepted method for reconciling a court's need to decide motions for disqualification with a party's right to prevent disclosure of privileged information. *See, e.g., Decora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 137-38 (S.D.N.Y. 1995) (holding that a party "should not have to disclose such confidences to an adversary as the price of obtaining disqualification"); *Rogers v. Pittston Co.*, 800 F. Supp. 350, 355 (W.D. Va. 1992) ("because the moving party is not required to publicly reveal actual confidences, *in camera* submission of documents is a recognized way of establishing [that disqualification is necessary]"); *Islander East Rental Program v. Ferguson*, 917 F. Supp. 504, 511 (S.D. Tex. 1996) ("To require [a party] to present any more detail about the disclosures made to [the attorney] would effectively require him to reveal the very confidences he seeks to protect."); *O'Donnell v. Robert Half Int'l, Inc.*, 641 F.Supp.2d 84, 86 (D. Mass. 2009) (overruling objection to *in camera* review, and noting that one party was "not [] allowed to have access to the materials submitted *in camera*" that were used as a basis for disqualification).

Respectfully submitted,
/s/ Nick Jabbour