# EXHIBIT A

THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------X

CFPB,                                                   Case No. 3:17-CV-00101-RDM

        Plaintiff,

    v.                                              **DECLARATION OF DR.**
                                                        **XIAOLING LIM ANG**
NAVIENT CORP, *et al.,*

        Defendant.

-------------------------------------------------------------------X

<u>**Declaration of Dr. Xiaoling Lim Ang**</u>

    I, Dr. Xiaoling Lim Ang, make this declaration based on my personal knowledge and

hereby declare:

    **Introduction**

1.      My name is Dr. Xiaoling Lim Ang.  I am an Associate Director in the New York

      City office of National Economic Research Associates ("NERA").

2.      I submit this Declaration in response to a letter from Nick Jabbour of the Consumer

      Financial Protection Bureau ("CFPB") to the Honorable Thomas I. Vanaskie dated

      December 27, 2019 ("CFPB letter").  The CFPB letter references certain documents for

      which the CFPB has requested *in camera* review.  I do not have access to those documents

      and have not reviewed them in preparing this declaration.

3.      The CFPB letter misrepresents my role and work as an economist at the CFPB,

      including suggestions that I was substantively involved in the above-captioned litigation

      (the "Litigation") or a purported enforcement investigation of Navient.  In fact, during my

tenure at the CFPB, I was a research economist working on general policy issues. I was
not on an enforcement team; I did not work on any investigation of Navient; I do not recall
ever being aware of any CFPB investigation or enforcement proceeding against Navient;
and I did not work with any Navient borrower-level student loan servicing data.

4.      Further, while I have no or little recollection of the handful of interactions identified
in the CFPB letter, the occasional discussions I had with enforcement attorneys during my
time at the agency were (a) part of interdisciplinary meetings with personnel from other
CFPB offices, or (b) in a consultative capacity to help explain general industry data
collection, structure, and processing questions. At no time did I work substantively on the
merits or strategies of any enforcement matter involving Sallie Mae, its successor,
Navient, or any other student loan servicing firm.

**Education and employment background**

5.      I have an MS and BS in mathematics from Loyola University Chicago, an MA in
economics from Princeton University, and a PhD in economics from Princeton
University.

6.      I began working at the CFPB in July 2011. During my entire time at the agency, I
worked as an Economist in the Office of Research in the Research, Markets, and
Regulations Division of the CFPB.

7.      I left the CFPB on November 10, 2015 to pursue an opportunity in economic
consulting at Edgeworth Economics LLC ("Edgeworth"). When I left the agency, my
official title was "Economist" and my grade was CN-60. I was not a senior or high level
official at the agency.

**My role and experience at the CFPB**

8.         My role at the CFPB was to conduct research and to work on policy issues

germane to the agency's regulatory functions.  In this role, I primarily (a) worked on

agency policy projects; and (b) reviewed agency documents, including reports and

Federal Register notices, as part of an internal clearance process prior to their public

release.

9.         While at the CFPB, my work cut across different product and service markets,[1]

including the student loan servicing market.  For that market, my knowledge of the

structure of student loan servicing data was largely based on public sources.

Information on data fields generally collected on federal student loans is also available

publicly from the Department of Education and the Common Manual, which is

developed by participating guarantors "who have agreed to adopt uniform policies."[2]

Federal student loan servicing data have been reported by multiple servicers and lenders,

including Sallie Mae (the predecessor to Navient), since before the CFPB began

operations in July 2011.[3]  Since the 1990s, federal student loan origination and servicing

data have been collected by the Department of Education through the National Student

Loan Data System ("NSLDS"), to which information must be reported monthly to

---

[1] In this declaration I use the term "market" as it is used in the CFPB Larger Participant Rule for
Student Loan Servicing Market (12 C.F.R. §1090.106).

[2] Common Manual, "Common Manual: Unified Student Loan Policy," December 2012, available
at https://commonmanual.org/doc/ICMarchive/2012/ICM1212.pdf ("Common Manual"), 1.

[3] US Department of Education, Federal Student Aid, "Loan Servicing Information – Sallie Mae
Begins Servicing Direct Loans," July 14, 2010, available at
https://ifap.ed.gov/eannouncements/071410SallieMaeBeginsServicingDL.html.

NLSDS by Federal Direct Loan Program Servicers "from the time the loan originates until the loan defaults or is otherwise closed."[4]

10.     While at the CFPB, I also served on occasion as an economic and policy resource for employees across the CFPB, including enforcement attorneys.  The discussions and other communications that I had with enforcement attorneys generally related to data structures that could occur in the course of business for participants in a particular market (e.g., what data fields might be collected, how such data might be processed, stored, and retrieved, etc.).

11.     I do not recall ever speaking with enforcement attorneys about any investigation or enforcement proceeding involving a particular firm, including Navient.  Because I consulted on general industry data structure, collection, and policy questions, my responses were based on my expertise as an economist and provided independently of the facts, merits, or other circumstances of any individual firm.  As such, my responses would not have been specific to Navient and likely would apply equally to other student loan servicing firms, such as Nelnet, Great Lakes Educational Loan Services, Inc, Granite State-GSMR, and MOHELA.[5]

12.     During my agency tenure, I also reviewed data from student loan lenders, but such data were always de-identified—similar, for example, to the data included in the

---

[4] Department of Education. "Discussion of NLSDS." March 31. 1995, available at https://ifap.ed.gov/dpcletters/attachments/nslds.pdf, 6. Also referenced at https://ifap.ed.gov/dpcletters/doc0650_bodyoftext.htm ("NLSDS 1995").

[5] Department of Education, Federal Student Aid, "Loan Servicing Contracts," last accessed January 6, 2020, available at https://studentaid.gov/data-center/business-info/contracts/loan-servicing.

2012 Private Student Loan Report.[6]  De-identified data are blended data that are not described or presented as relating to any specific firm.  A common—and encouraged—practice at the CFPB was to use such data and discussions with financial institutions for policy research.  The Fiscal Year 2013-2017 Consumer Financial Protection Bureau Strategic Plan (the "Plan") states that one of the CFPB's goals is to "[i]nform the public, policy-makers, and the CFPB's own policy-making with data-driven analysis of consumer finance markets and consumer behavior."[7]  The Plan further states that "[t]he CFPB's research will support building an understanding of the markets we regulate and the nature of consumer behavior in these markets.  It will also support the consideration of the potential benefits and costs of the CFPB's work to consumers and institutions, including effects on access by consumers to consumer financial products or services."[8]

13.       Consistent with the Plan, my job as a CFPB economist was to understand how businesses and products and services work.  This included understanding how data are generated and used in the course of business.  My policy work involved learning about market participants, including through interactions with other CFPB employees (including those who had in-person meetings or correspondence with market participants); research (by CFPB staff, contractors, and external researchers); contact with external persons; and formal Requests for Information.  Requests for Information

---

[6] Consumer Financial Protection Bureau, "Private Student Loans," August 29, 2012, available at https://files.consumerfinance.gov/f/201207_cfpb_Reports_Private-Student-Loans.pdf, 7.

[7] Consumer Financial Protection Bureau. Consumer Financial Protection Bureau Strategic Plan FY 2013-2017 (April 2013), available at https://files.consumerfinance.gov/f/strategic-plan.pdf, 24.

[8] *Id.*

are public solicitations for input to help inform policy, and, Requests for Information on student loan servicing issues "become part of the public record and are subject to public disclosure."[9]

14.     I also participated in cross-bureau policy working groups comprised of representatives from various CFPB divisions.  An organizational chart identifying these different divisions is attached as **Exhibit 1**.  The meetings and discussions involved upwards of 20 representatives, and were of a generalized nature and not specific to any firm or enforcement action.  One of these cross-bureau groups, the Student Loan Working Group, included representatives from Supervision, Enforcement, and Fair Lending; Consumer Education and Engagement; Research, Markets, and Regulations; and Legal, General Counsel.  I recall that the representatives from Supervision, Enforcement, and Fair Lending included Brandis Anderson and Cynthia Lesser.  Other enforcement attorneys also participated in multiple policy meetings and discussions of this kind during my time at the CFPB.

15.     In sum, my role as an economist in the Office of Research involved working on policy projects and, on occasion, serving as a consulting resource for CFPB employees on agency policy and general industry data questions.  I was never assigned to any enforcement matter and do not recall ever being involved in the merits (or other particular facts or circumstances) of any enforcement investigation or proceeding.

---

[9] 80 FR 29302, 29303 (May 21, 2015) ("All comments, including attachments and other supporting materials, will become part of the public record and subject to public disclosure. Sensitive personal information, such as account numbers or social security numbers, should not be included.  Comments generally will not be edited to remove any identifying or contact information.")

**CFPB structure**

16.     The Office of Research, where I worked during my entire tenure at the CFPB, is
        in the Research, Markets, and Regulations Division (the "Research Division") of the
        CFPB.  Enforcement personnel are within the Supervision, Enforcement, and Fair
        Lending Division (the "Enforcement Division") of the CFPB.

17.     During my time at the CFPB, the Research Division and the Enforcement
        Division were located in separate buildings.[10]  The Enforcement Division also has
        restricted access electronic files and folders.  I did not have access to these files,
        including any files relating to Navient.

**CFPB ethics counsel advised me on post-government employment rules**

18.     In anticipation of my move to the private sector, I affirmatively sought guidance
        from CFPB ethics counsel, Amber Vail, on my post-separation work activities.  I had
        three conversations with Ms. Vail to inquire about ethics rules that I should be aware of,
        such as a recusal period for working on CFPB-related cases.

19.     My first discussion with Ms. Vail occurred by email on October 6, 2015.  A true
        and correct copy of my email exchanges with Ms. Vail are attached as **Exhibit 2**.  As
        shown in the emails, I informed Ms. Vail that I would be leaving the CFPB to join the
        private sector.  I asked what ethics rules I should consider.  In response, Ms. Vail
        provided me the CFPB's post-employment ethics briefing rules, attached as **Exhibit 3**.

---

[10] When I started, the Research Division was in 1801 L St NW, Washington, DC, 20006, and the
Enforcement Division was in 1750 Pennsylvania Ave, Washington, DC 20006.  When I resigned
from the CFPB, the Research Division was in One Constitution Square, 1275 First St NE,
Washington, DC 20002, and the Enforcement Division was in 1625 Eye St NW, Washington,
DC 20006.

20.     I reviewed the ethics rules, which explain that the "Ban On Switching Sides" applies only to CFPB employees who "participated personally and substantially" on a specific matter.  The rules further explain that "[t]o participate substantially means your involvement must be of significance to the matter, although it does not have to be determinative of the outcome of a particular matter.  If you merely have knowledge of the matter, routine or superficial involvement, or involvement on a peripheral or administrative issue, you are not "substantially" involved.  If you are not involved in the substantive merits, you may not be substantially involved, even though you put a lot of time into the matter."

21.     After reviewing these rules, I determined that the ban on switching sides should be inapplicable because, as an economist in the Office of Research, I was not substantially involved in any enforcement investigation or proceeding.  I again contacted Ms. Vail to confirm my conclusion was correct.  These discussions were by telephone on or about October 6, 2015, and on the day of my separation from the CFPB, November 10, 2015.  I described to Ms. Vail how I occasionally fielded questions from enforcement attorneys about data collection, structure, and processing related to student loan servicing firms.  I specifically asked Ms. Vail if these occasional interactions with enforcement attorneys would present any conflict were I to accept work in the private sector involving a particular firm.  Ms. Vail confirmed that no conflict would arise.

### Published Article on the Navient Litigation

22.      On March 30, 2017, after leaving the CFPB, I published an article, titled "Student Loan Repayment Options In Light Of CFPB V. Navient" in *Law360*.[11]  The article stemmed from the CFPB's filing of the Litigation against Navient, and provided my analysis of the agency's primary arguments and the relative risks and benefits of forbearance versus income-based repayment of student loans from my perspective as an economist.  The article was based entirely on the CFPB's complaint and other public information.

23.      On April 3, 2017, I spoke at CBA Live 2017, a conference hosted by the Consumer Bankers Association, in Dallas.[12]  Several CFPB employees, including Michael Pierce, Deputy Assistant Director, Senior Advisor to the Student Loan Ombudsman, were in attendance at the conference.[13]  At a reception at CBA Live 2017, Patricia Scherschel, Student Loan Program Manager at the CFPB, also mentioned that she had seen the article.  At no time did any CFPB personnel object to or raise any questions about my publication of the article.

### Expert report and data sources

24.      On February 6, 2018, over two years after I left the CFPB, I was retained by Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to provide consulting

---

[11] Xiaoling Ang, "Student Loan Repayment Options In Light Of CFPB V. Navient," March 30, 2017, *Law360,* available at https://www.law360.com/articles/907526/student-loan-repayment-options-in-light-of-cfpb-v-navient.  A copy of the article is also attached as **Exhibit 4**.

[12] Consumer Bankers Association, "CBA Live 2017, Where it Begins: Program," available at https://consumerbankers.com/sites/default/files/CBA%20LIVE%20Final%20Program.pdf, 11.

[13] *Id.* at 12.

services and, upon request, expert witness testimony in connection with WilmerHale's representation of Navient Corporation, Navient Solutions LLC, and Pioneer Credit Recovery, Inc. (collectively, "Navient") in the Litigation. WilmerHale informed me that I had been identified as a potential expert witness based in part on my *Law 360* article. I accepted this engagement after determining in good faith that it was fully appropriate, based on my lack of involvement in any enforcement investigation or proceeding against Navient while at the CFPB, as well as the guidance that I received from the CFPB's ethics counsel.

25.     On October 2, 2018, I left Edgeworth and on October 8, 2018, I joined NERA. At NERA, I continued the consulting and expert witness work I began at Edgeworth for WilmerHale in the Litigation.

26.     For my report dated November 8, 2019, I was asked to review and evaluate the opinions expressed in the Amended Expert Report of Charles H. Mullin dated October 21, 2019 ("Mullin Report").

27.     The analysis presented in my report relies on either publicly available data or data provided to me by WilmerHale during the course of my engagement with WilmerHale for the Litigation. Industry data that I had access to at the CFPB was always de-identified data from multiple market participants. I did not have access to any of the Navient data used in my report. Moreover, the analyses and opinions in my report are consistent with the general points that I made in my *Law 360* article.

**The CFPB letter mischaracterizes my occasional multidisciplinary and consultative discussions with enforcement attorneys**

28.     As previously stated, I was never assigned to any enforcement matter at the CFPB and have no recollection of any Navient investigation or enforcement proceeding. The

Litigation was not commenced until January 18, 2017, more than 14 months after I left

the CFPB.  The first time that I learned about the existence of the Litigation was from

reading the publicly posted Complaint.

29.     The CFPB letter (at pages 2-3) identifies five supposed instances over a three-year

period in which I allegedly worked on an investigation of Navient.  To the best of my

recollection, these few, episodic instances involved meetings, clearance process review,

cross-bureau policy working group discussions, and occasional discussions with

enforcement attorneys about student loan servicing industry data questions.  Each

interaction was consistent with my policy and consultative roles as an economist.  As

such, my participation would have been independent of any purported investigation of

Navient.

30.     More specifically, item (1) on page 2 of the CFPB letter describes two meetings

in the October 2013 time period, one of which was "in the Office of Research", and the

other "with enforcement attorneys."  As to the meeting within my own Division, the

Office of Research, I do not recall it, but meetings with my colleagues in the Office of

Research generally involved academic and economic research relating to agency policy

matters.  These meetings often included other economists and scientists with research

doctorates ("PhDs") in the Office of Research.  We were expected to perform self-

directed academic research to help inform agency policy.  This included thinking about

how to answer policy research questions rigorously and credibly with data, which

required (a) learning about how data are collected and generated and (b) working with

parties providing data for a research study to make sure that the interpretation of the

fields and extracts are appropriate.  Responding to a data request for any purpose (e.g.,

voluntary data submission for policy research, as part of a supervisory exam) can be
burdensome. Having a plan and strategy for how to request data, particularly when there
may be multiple questions that the data may be used to answer, can be efficient and
reduce the burdens on the party responding to the data request. To the best of my
knowledge, item (1) in the CFPB letter refers to one such meeting about these kinds of
issues. It was a group of PhDs and research staff discussing policy and research
unrelated to any investigation of Navient.

31.     As for the meeting with enforcement attorneys described in item (1), I have
minimal recollection of this event but believe that it involved multiple agency personnel,
including representatives from the Office of Markets team, and was a policy discussion
about how payment allocation may affect consumers. For example, if the excess
payment from a double payment is allocated to principal it may lower the next monthly
payment because less interest is accrued. If the overpayment amount is considered an
advance payment, and the consumer fails to make the next payment, the excess payment
can be applied to avoid late fees. To inform policy, I was interested in how this could
potentially be measured using transactional data. The CFPB used transactional data for
a variety of policy purposes, including the June 2013 CFPB Study of Overdraft
Programs.[14] I do not recall this meeting involving any discussion of Navient, any
Navient-specific data, or any investigation of Navient.

32.     Item (2) on page 3 of the CFPB letter describes a meeting with enforcement
attorneys about data. I do not recall this particular meeting. But, as previously stated, I

---

[14] CFPB, "CFPB Study of Overdraft Programs," June 2013, available at
https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf.

was occasionally consulted by various agency staff, including enforcement attorneys, about how data might be used in a particular type of business (e.g., for a mortgage servicer) and how data could be described.  Any input that I provided to the enforcement attorneys would have been based on my knowledge of general industry data collection and processing matters and independent of any specific firm.  Item (2) also references a communication in which I was allegedly told that there was a "broader investigation" that may be connected in some fashion to Sallie Mae.  I have no recollection of this communication or of the context or nature of any investigation involving Sallie Mae or any other student loan servicing firms.

33.     Items (3) and (4) refer to civil investigative demands ("CIDs") that purportedly related to Navient.  I do not recall these CIDs or whether they involved multiple student loan servicing firms or were related more specifically to Navient.  Nonetheless, to the extent that I had involvement in these communications, it would have been on an ad hoc basis and in my consultative capacity on general industry data questions—independent of the merits, facts, or circumstances of any enforcement investigation or proceeding. As noted, my understanding of the structure of federal student loan servicing data was informed by NSLDS documentation and public sources, and thus was general to federal student loan servicing firms—not specific to Navient.  For example, enforcement attorneys sometimes asked me questions about how data fields could be described and how data could be requested.  In response, I would give them a bullet point list of relevant factors to consider when phrasing data requests (e.g., there may be one table for customer contact information and one table for transactions).  Such input was on a fundamental conceptual level about how data are stored, not specific to any firm.

34.     Finally, item (5) in the CFPB letter references "draft conduct provisions." While at the CFPB, I recall being involved in policy discussions regarding general conduct principles and how to write regulations and propagate good conduct in an industry. To the extent that I discussed conduct policies or provisions with the enforcement attorneys, it would have been based on my understanding of best practices and standards for student loan servicing firms generally, and not specifically for Navient. I do not recall ever being informed of any "possible settlement" with Navient, or being aware of any investigation or enforcement proceeding against Navient.

**The CFPB letter refers to unrelated public documents and materials that likewise are not specific to Navient**

35.     The CFPB letter also points (at pages 4-5) to other aspects of my work at the CFPB. None of this work related to any investigation or enforcement proceeding involving Navient, either.

36.     The bullet point on page 4 of the CFPB Letter lists multiple public documents that I reviewed as part of my role in the agency's internal clearance process. As noted, this process involved individuals in offices across the CFPB reviewing a document shortly before it was released publicly. As a member of the Office of Research who had devoted time to reviewing the economic literature on student loans and worked on policy projects in the area, the task fell to me for the following documents (none of which relate specifically to Navient):

    a.   "The Bureau's 2015 request for information on student loan servicing issues;"

    b.   "The September 2015 report entitled 'Student Loan Servicing: Analysis of Public Input and Recommendations for Reform';" and

    c.   "The October 2015 Student Loan Ombudsman Annual Report."

37.     The CFPB letter also states that I participated in the review of or drafting of "the materials drafted in October 2015 that were to be used for the focus groups that resulted in the 'Payback Playbook.'" The "Payback Playbook" is not Navient-specific.[15] Moreover, it is standard practice for an agency to have internal policy discussions that are not shared with the general public.  I have not shared any such internal policy discussions with WilmerHale.  Instead, I have relied exclusively on information that the CFPB has disseminated in publicly available policy documents.

38.     The CFPB letter also references a January 2014 request for notes from a site visit to Sallie Mae.  I remember that I was not part of the site visit team, but that the team included personnel from the Office of Markets and the Office of Students.  I do not recall any enforcement attorneys participating in the visit.  Further, I understood the purpose of the site visit was to learn more about how a student loan servicing firm works.  In other words, it was a data collection exercise that could be applied to general policy and research.  I do not recall ever being provided with the notes.  And I do not recall this site visit relating in any way to an investigation or enforcement proceeding involving Sallie Mae (or Navient).

39.     Finally, the CFPB letter references a "large credit reporting project in which the division in which [I] worked engaged in an effort to provide guidance to the U.S. Department of Education regarding credit reporting codes."  While I was in the Office of Research, I recall reviewing student loan-related records in the CCP ("Consumer Credit Panel"), a de-identified, 1-in-48 sample of credit records purchased from a national

---

[15] CFPB, "Student Loan Payback Playbook," last accessed January 6, 2020, available at https://www.consumerfinance.gov/payback-playbook/.

credit reporting agency.[16]  I used the CCP only for research and policy purposes.  I could
not differentiate between student loan servicing firms in the CCP data.  Because the
Department of Education did not have access to such credit reporting data, the CFPB
was providing insight from our review of such data to the U.S. Department of Education
to help inform this sister agency about general credit reporting matters.  The project was
not specific to Navient and did not involve any identifiable Navient data.

40.      I declare under penalty of perjury that the foregoing is true and correct.  Executed
on January 10, 2020.



_____
Dr. Xiaoling Lim Ang

---

[16] *See, e.g.*, Consumer Financial Protection Bureau, "Buying a House: Know the Process,"
available at https://www.consumerfinance.gov/owning-a-home/process/sources/.

# EXHIBIT A-1

**Figure 1: CFPB Organization Chart as of February 27, 2013**



Organizational chart current as of February 27, 2013

Source: Consumer Financial Protection Bureau Strategic Plan 2013-2017, 38.

# EXHIBIT A-2

From: Xiaoling Ang xiaoling.ang@gmail.com
Subject: Fwd: FW: Post-separation ethics considerations
Date: Nov 20, 2015 at 10:14:53 AM
To: xang@edgewortheconomics.com

---------- Forwarded message ----------
From: **Ang, Xiaoling (CFPB)** <Xiaoling.Ang@cfpb.gov>
Date: Tue, Oct 6, 2015 at 11:13 AM
Subject: FW: Post-separation ethics considerations
To: Lingling Ang <xiaoling.ang@gmail.com>

**From:** Vail, Amber (CFPB)
**Sent:** Tuesday, October 06, 2015 10:57 AM
**To:** Ang, Xiaoling (CFPB)
**Subject:** RE: Post-separation ethics considerations

Hi Ling Ling,

Yes, that is correct.  The post-government employment rules tend to restrict you from
"switching sides" when you worked on a particular matter involving specific parties.
However, for Bureau employees who worked on regulations or broad policy decisions, the
post government employment rules do not apply to most of the projects that they worked
on while at the Bureau.  Therefore, if you did not work on a specific enforcement or
supervisory matter while you were at the Bureau, you could do so after you leave the
Bureau.  Similarly, if you worked on the larger participant rulemaking while at the Bureau,
you could still advise firms on how the this rule would apply to them after you leave the
Bureau because it is not deemed to be a "particular matter involving specific parties."

I hope that this answers your question.  Of course, if you ever have any questions after you
leave the Bureau about whether you may work on a certain matter or issue, you should feel

free to contact me.  This happens all the time.

Best,

Amber

---

**From:** Ang, Xiaoling (CFPB)
**Sent:** Tuesday, October 06, 2015 10:37 AM
**To:** Vail, Amber (CFPB)
**Subject:** RE: Post-separation ethics considerations

Hi Amber,

One additional question relating to the definition of "matter." I've worked on various larger participant rulemakings and Title XIV rulemakings, but not directly on related enforcement of supervision matters related to specific entities or persons. Does this mean that I could participate in matters that relate to specific firms without triggering an ethics violation under II.1.b in the document you sent?

Thanks,

Ling Ling

---

**From:** Vail, Amber (CFPB)
**Sent:** Tuesday, October 06, 2015 10:24 AM
**To:** Ang, Xiaoling (CFPB)
**Subject:** RE: Post-separation ethics considerations

Hi Ling Ling,

Congratulations on your new position.  I am sad to hear that you are leaving but I am certain that this is a wonderful opportunity for you.

Attached is a summary of the post-government employment rules, which will apply to you.  Please review and let me know if you would like to further discuss.

Congratulations again!

Best,

Amber

---

**From:** Ang, Xiaoling (CFPB)
**Sent:** Tuesday, October 06, 2015 10:20 AM
**To:** Vail, Amber (CFPB)
**Subject:** Post-separation ethics considerations

Dear Amber,

I am leaving the Bureau in mid-November to join Edgeworth Economics as a Principal Consultant. I was wondering if there are any ethics rules that I should be aware of, such as a recusal period or rules of engagement with current Bureau employees. I'm a CN-60

economist in the office of research, and am not directly working on any enforcement or fair lending matters.


Thanks,

Ling Ling


***************************************************************************

Xiaoling Lim Ang, PhD

Economist, Office of Research

Research, Markets, and Regulations

Consumer Financial Protection Bureau

Phone: 202-435-7686

E-mail: xiaoling.ang@cfpb.gov

**consumerfinance.gov**


Confidentiality Notice: The information contained in this transmittal, including attachments if any, may be confidential or privileged under applicable law, or otherwise may be protected from disclosure to anyone other than the intended recipient(s).  Any review, use, distribution, or copying of the contents of this e-mail or its attachments by any person other than the intended recipient for any purpose other than its intended use, is strictly prohibited and may be unlawful.  This communication is not intended as a waiver of the confidential, privileged or exempted status of the information transmitted. If you have received this e-mail in error, you should permanently delete the e-mail and any attachments.  Do not save, copy, disclose, or rely on any part of the information contained in this e-mail or its attachments.  Also immediately notify the sender of the misdirection of this transmittal.  Your cooperation is appreciated.

# EXHIBIT A-3



# POST-EMPLOYMENT ETHICS BRIEFING
## (for Employees Other Than Executives)
### (as of 2-18-2015)

## I.   FORMER SENIOR EMPLOYEES – ONE-YEAR COOLING OFF PERIOD

1.   **One-Year No-Contact Rule**.  If you are a former "senior employee," you must not for a period of one year after leaving government service attempt to influence CFPB regarding official action.  This means you may not make any communication or appearance on behalf of any other person, with intent to influence, before any officer or employee of CFPB in connection with any matter on which official action is sought.  Violations are subject to criminal prosecution and fines.  18 U.S.C. § 207(c).

2.   *Definition of "Senior Employee"*.  Employees whose *rate of basic pay* is equal to or exceeds 86.5 percent of the rate for level II of the Executive Schedule (EL II).  "Rate of basic pay" does not include locality pay, bonuses, awards, or other allowances.
- For calendar year 2015, the applicable rate of basic pay is $158,555.
- For calendar year 2015, with Washington, DC locality pay included, it is $187,094.
- For localities other than DC, use the 2015 rate of basic pay above, and add the locality pay amount applicable to the employee's official duty station, to arrive at the 2015 pay amount for that locality.

3.   **One-Year Ban on Advising Foreign Entities**.  If you are a former "senior employee," you must not within one year of leaving after government service, represent, aid, or advise a foreign entity with the intent to influence a United States government decision.  Violations are subject to criminal prosecution and fines.  18 U.S.C. § 207(f).

## II.   ALL FORMER EMPLOYEES – BAN ON SWITCHING SIDES

1.   **Lifetime Ban**.  You must not, on behalf of someone else, try to influence any federal government agency, officer, or employee concerning the same particular matter involving specific parties in which you participated personally and substantially for the government at any time, <u>for the lifetime of that particular matter</u>.  Violations are subject to criminal prosecution and fines. 18 U.S.C. § 207(a)(1).

a.   *"Particular Matter Involving Specific Parties"* (5 C.F.R. § 2641.201(h)):  matters that involve deliberation, decision, or action that is focused on the interests of specific persons.  These matters may include a contract, claim, application, judicial or other proceeding, request for a ruling or other determination, controversy, investigation, or charge.  Such a matter typically

---



involves a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identified parties, such as a specific contract, grant, license, enforcement action, administrative adjudication, or court case.

    b.  *"Personal and Substantial Participation"* (5 C.F.R. § 2641.201(i)):

    (1)  Participate means to take an action as an employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or other such action, or to purposefully forbear in order to affect the outcome.

    (2)  To participate personally means to participate directly or through the direct and active supervision of any subordinate.

    (3)  To participate substantially means your involvement must be of significance to the matter, although it does not have to be determinative of the outcome of a particular matter.  If you merely have knowledge of the matter, routine or superficial involvement, or involvement on a peripheral or administrative issue, you are not "substantially" involved.  If you are not involved in the substantive merits, you may not be substantially involved, even though you put a lot of time into the matter.  If you are merely responsible for reviewing the matter for compliance with administrative or budgetary considerations, you also are not substantially involved.

    2.  **Two-Year Ban**.  For two years after leaving federal employment, you must not, on behalf of someone else, try to influence any federal government officer or employee concerning a particular matter involving a specific party that was pending under your official responsibility during the last year of government service.  Violations are subject to criminal prosecution and fines.  18 U.S.C. § 207(a)(2).

A matter was under your "official responsibility" if you had "direct administrative or operating authority, whether intermediate or final, and either exercisable alone or with others, and either personally or through subordinates, to approve, disapprove, or otherwise direct Government action."  Ordinarily, the scope of an employee's official responsibility is determined by those functions assigned by statute, regulation, executive order, job description, or delegation of authority.

    3.  **One-Year Ban**.  You must not represent, aid, or advise any other person except the United States in a trade or treaty negotiation in which you participated personally and substantially during the last year of government service.  Violations are subject to criminal prosecution and fines.  18 U.S.C. § 207(b).



## III.  BAN ON COMPENSATION FROM REPRESENTATIONAL SERVICES PROVIDED DURING GOVERNMENT EMPLOYMENT

1.      **Prohibition on Compensation Received From Representation of Third Parties.**  You must not receive, either directly or indirectly, compensation for representational services rendered on behalf of a third party in connection with a particular matter in which the United States is a party or has a direct and substantial interest ("covered representational services").  This prohibition applies to covered representational services rendered during a time period in which you were a federal employee, either by you personally, or by another person if you share in the compensation for those services. The prohibition applies regardless of whether you receive the compensation during your federal employment or after you leave federal service. 18 U.S.C. §203.

2.      **Example of Prohibited Compensation.**  You leave federal government employment and accept a job at a law firm or consulting firm.  While you still worked at the Bureau and before you became an employee of the firm, the firm provided covered representational services. You may not receive:

- Compensation that is in part dependent on actual firm profits, where such profits include compensation for covered representational services the firm provided during the time period while you were a government employee.
- A partnership interest that includes a share of fees generated from covered representational services rendered prior to your separation from federal service.

## IV.  DISCLOSURE OF NON-PUBLIC GOVERNMENT INFORMATION

1.      **Prohibition on Disclosure of Non-Public Information.**  You must not disclose, without authorization, to any person who is not an employee of the CFPB, a record of the CFPB that the CFPB has not already made public.  12 CFR § 1070.4.

2.      **Prohibition on Disclosing the Bureau's Confidential Information**.  Except as required by law or as provided in the Bureau's regulations concerning confidential information, you must not disclose such confidential information to any person who is not an employee of the CFPB.  12 CFR § 1070.41.  Confidential information includes:

(1)   Confidential Consumer Complaint Information—information received or generated pursuant to 12 U.S.C. §§ 5493, 5534.
(2)   Confidential Investigative Information (CII)—information received subject to civil investigative demands, or received as part of a government investigation or enforcement action.  This includes information revealing the existence of any non-public investigation.



(3)  Confidential Supervisory Information (CSI)—information derived from exercise of supervisory authority.  This includes information that reveals the existence of any given examination.

(4)  Other Confidential Information—other CFPB information that is exempt from FOIA disclosure pursuant to 5 U.S.C. 552(b), such as pre-decisional deliberative process privileged material (Exemption 5), personal information (Exemption 6), or confidential commercial or financial information (Exemption 4).

3.    **Prohibition on Theft or Conversion of Government Information.**  You must not knowingly steal or convert to the use of another, a "thing of value" that belongs to the United States Government.  "Thing of value" includes intangible property such as information, records, and data.  The prohibition covers misuse, abuse, and unauthorized exercise of control over property in such a manner that creates serious interference with the government's ownership rights in the property.  Violations are subject to criminal prosecution and fines.  18 U.S.C. § 641.

## V.    DUTIES OF FORMER ATTORNEYS OF  CFPB

Various state rules and standards of professional conduct impose duties and responsibilities on lawyers leaving CFPB employment.  All American jurisdictions except California base their lawyer disciplinary rules on the ABA Model Rules.  Each jurisdiction has modified the Model Rules to fit its own particular needs.  Bureau attorneys should review the law of their licensing states to determine which rules apply to their post-employment conduct.

These are the most common rules, which generally apply to attorneys who served in a representational capacity while a Bureau employee (i.e., employees in a Schedule A, Series 0905 Attorney position).  *These are permanent duties owed to CFPB. They do not expire with the passage of time.*

**Rule 1.6:  Duty to Protect Client Confidentiality.**  A lawyer must not reveal information obtained during the course of representing CFPB that relates to that representation.  In some jurisdictions, a lawyer may not use or reveal a secret or confidence of CFPB regardless of whether the use would be harmful to CFPB.

**Rule 1.9:  Duties to Former Clients.**  A lawyer who represented CFPB in a matter may not represent a subsequent client in a same or substantially related matter where that new client's interests are materially adverse to those of CFPB.

**Rule 1.11: Special Conflicts of Interest for Former Government Employees.**  A lawyer must not represent a client in connection with a matter in which the lawyer participated personally and substantially while employed at CFPB.  This disqualifying conflict also may impute to other lawyers within a law firm that the lawyer joins after leaving CFPB, unless the firm takes certain "ethics wall" screening steps.



## VI.   PROCUREMENT INTEGRITY

1.   **One Year Ban on Accepting Compensation After Serving in One of Seven Positions on a Procurement over $10 Million**.  For one year, you may not accept compensation from a contractor if you served in one of seven positions on a procurement over $10 million. 41 U.S.C. § 423.

    a.   The seven positions are:
        (1) Contracting officer
        (2) Source selection authority
        (3) Member of the source selection evaluation board
        (4) Chief of a financial or technical evaluation team
        (5) Program manager
        (6) Deputy program manager
        (7) Administrative contracting officer

    b.   The one-year compensation ban begins on the date the contract is awarded for employees that were:
        (1) Contracting officers
        (2) Source selection authorities
        (3) Members of the source selection evaluation board
        (4) Chief of a financial or technical evaluation team

    c.   The one-year compensation ban begins on the last day the employee served in the position for:
        (1) Program managers
        (2) Deputy program managers
        (3) Administrative contracting officers

2.   **One Year Ban on Accepting Compensation After Making One of Seven Decisions on a Procurement over $10 Million**.  For one year, you may not accept compensation from a contractor if you personally made one of seven types of decisions on a procurement over $10 million.  41 U.S.C. § 423.

    a.   The seven types of decisions are:
        (1) Award a contract
        (2) Award a subcontract
        (3) Award a modification
        (4) Award a task order or delivery order
        (5) Establish overhead or other rates
        (6) Approve a contract payment or payments
        (7) Pay or settle a claim



b.    For these decision-makers, the compensation ban starts on the date of the decision.

3.    These compensation restrictions apply only to compensation by the prime contractor. It does not apply to compensation by a different division or affiliate of the contractor that does not produce the same or similar products or services.

**<u>Questions?</u>**

Please direct all questions to <u>EthicsHelp@cfpb.gov</u>.

# EXHIBIT A-4



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Student Loan Repayment Options In Light Of CFPB V. Navient

(March 30, 2017, 12:37 PM EDT)
On Jan. 18, 2017, the Consumer Financial Protection Bureau filed a complaint against student loan servicer Navient Corporation, Navient Solutions Inc. and Pioneer Credit Recovery Inc. that, among other allegations, claims that "Navient's acts and practices related to steering of borrowers into forbearance caused or was likely to cause substantial consumer injury."[1] The CFPB's argument states that "since at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate, affordable repayment plan, Navient has routinely disregarded that commitment and instead steered borrowers experiencing long-term distress or hardship into forbearance."[2]



Xiaoling Ang

Whether borrowers will benefit from loan modification is difficult to determine ex-ante, that is, when the loan modification is performed. Student loans, by design, are outstanding for months, if not years, after they are modified, and the net effect of any modification cannot be known until the full amount is repaid. Loan repayment terms may depend on multiple factors, including income, expenditures and interest rate changes. Different terms lead to different total payments, durations of repayment and instances of default. Quantifying the benefit of one measure versus another, however, depends on the individual borrower.

A few examples better illustrate the point. By way of background, federal student loan borrowers have several loan modification options.[3] For the purposes of the illustrations in this article I focus on the contrast between income-based repayment (IBR) and forbearance. IBR modifications can extend the term of a loan from the standard 10-year loan to up to 20 years for borrowers who are new borrowers as of July 1, 2014.[4] The U.S. Department of Education determines payments based on "discretionary income," which is calculated as "the difference between your income and 150 percent of the poverty guideline for your family size and state of residence."[5] The payments are then set at the maximum of 10 percent monthly discretionary income or the borrower's original monthly payment under the standard plan.[6] Borrowers experiencing financial hardship can also suspend their payments by requesting forbearance, with the condition that interest will accrue and their future payments may be reamortized.[7]

For the first example, consider two borrowers, Borrower A and Borrower B, who both initially borrow $30,000 at a fixed 6.31 percent interest rate, which corresponds to the current Direct PLUS Loans rate for newly disbursed loans.[8] Suppose that both borrowers make on-time payments for 12 months after their grace periods, but then experience periods where they have $0 in income. After these periods of $0 income end they will both start earning $45,000 per year, with 2 percent annual wage increase. At the beginning of the period where they have $0 income, Borrower A chooses to modify his loan using

forbearance, so his loan will reamortize after he exits forbearance. Borrower B, meanwhile, chooses IBR, so his payments will be the lower of 10 percent of his discretionary income or his original $337.75 monthly payment. Even with a relatively comprehensive understanding of their future earnings, based on the information at hand, it is still unclear whether Borrower A will be paying more than Borrower B over the life of the loan.

The missing piece of information to make this comparison is the number of consecutive months the borrowers will have incomes of $0. If we knew this we would know that, given these assumptions, Borrower A would pay less in total nominal payments than Borrower B if they have fewer than 49 consecutive months of $0 income, as illustrated in Exhibit 1. For example, with 25 months of $0 income, the total paid by Borrower A under forbearance would be $45,640.46, whereas the total paid by Borrower B under IBR would be $58,715.75.

**Exhibit 1**



Notes: Assumes borrower has $30,000 of student loans with an interest rate of 6.31%, makes standard payments for 12 months then enters IBR or forbearance, and has an annual income of $45,000 that grows at 2% annually after his period with $0 income.

Furthermore, as illustrated in Exhibit 2, the repayment period, conditional on making all payments, would be longer for Borrower B than Borrower A until 120 months of having $0 income. The comparison of Borrower A to Borrower B illustrates the challenge in assessing the trade-off between a longer term with potentially lower monthly payments and a shorter term with potentially higher minimum monthly payment once the $0 income period ends, and what this means in terms of total payments.

**Exhibit 2**



The example of borrower A versus borrower B includes only 1 period of $0 income and has predictable income for the remaining repayment period. Labor markets, however, are more complicated, and borrowers may experience multiple spells of low income or large differences in income between years. Exhibit 3 plots the annual income of three respondents from the Bureau of Labor Statistics' National Longitudinal Survey of Youth 1997[9] who have a bachelor's degree and had a government loan. These borrowers were born between 1980 and 1984, and the years since they received their bachelor's degree in the figure correspond to years between 2004 and 2013. While each of these borrowers experienced a year that they were not enrolled in school where their nominal income was less than $10,000 post-graduation, their income paths are very different after experiencing a sub-$10,000 income year.

Borrower 1 made only $500 two years after graduating, but that jumped to over $75,000 two years later and remained high for the rest of the survey period. Given his relatively short period of low income, retrospectively it appears that Borrower 1 may have been better off choosing forbearance over IBR. While Borrower 2 similarly experienced one year with lower income and then relatively stable earnings, he earned $9,750 the first year after graduating, $36,750 the next year, and then earns between $26,000 and $30,000 in all subsequent years. In light of these lower earnings, the appropriate choice for Borrower 2 may depend on how much debt he has and how that affects IBR payments. Borrower 3's income profile, meanwhile, illustrates an issue abstracted away from in the stylized example in Exhibit 1 and Exhibit 2: the possibility of multiple spells of low income. Borrower 3 experiences a large increase and decrease in income: household income is below $19,000 for the first four years after graduating, then $78,982 five years after graduating, and $14,500 in year 8. The contrast between these three income profiles demonstrates that borrowers who experience similar incomes early on may experience different income profiles in later years.

**Exhibit 3**



Notes: Restricted to individuals not enrolled in school after receiving their bachelor's degree who have at least 1 year after receiving their bachelor's degree with gross annual household income less than $10,000. Sample restricted to period at least 1 year after individual received his bachelor's degree.
Sources: National Longitudinal Survey of Youth 1997.

In considering a possible ex-post, or after the events have occurred, analysis of a student loan servicing program, there are a few considerations to keep in mind. First, most loans that have been modified since July 2011 have not all run their course, so there are future income and employment outcomes that may affect the total paid and duration of these loans. Loan characteristics interact in complicated ways with labor markets, including unemployment duration and benefits,[10] wage growth,[11] and income dynamics.[12] Evaluating observed outcomes involves assessing the myriad ways in which repayment may have been affected through customer income and individual consumers' preferences for longer terms, lower periodic payments or lower total payments.

Determining if one repayment plan is better than another for a given borrower is a complicated question even when the data is at hand and there is some distance between the selection of the repayment plan and when the analysis is performed. The task of "trying to determine the income-driven plan that is most-appropriate for each borrower"[13] is to provide guidance under uncertainty, and it can be a tall order even given information about the current "particular financial situation."[14] Since there may not be a clear "best" plan at the time of the loan modification, nor even clarity about whether an income-driven plan or forbearance are appropriate, protocols ought to capture the nuances and complexity of this uncertainty for a given borrower. Consequently, it would be helpful to illustrate the trade-offs between the different programs for the borrower.

The U.S. Department of Education has created an interactive online repayment estimator that illustrates the contrast between different repayment options based on current income. [15] The online tool is a decent initial resource for borrowers, but it has limitations. The calculator omits forbearance as an option, restricts discretionary income growth to 5 percent each year, and holds family size constant. A more robust tool — provided either by the government or servicers — that allows borrowers to see full amortization schedules as well as varying income profiles, family size and other parameters would be beneficial. Adding these parameters to the estimator would not only allow borrowers to see more potentially realistic repayment scenarios but also to raise awareness of the parameters

that may affect the appropriateness of particular financing decisions.

—By Xiaoling (Ling Ling) Ang, Edgeworth Economics LLC

Xiaoling Ang is a principal consultant at Edgeworth Economics in Washington, D.C.

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] Consumer Financial Protection Bureau v. Navient Corp., 3:17-cv-00101-RDM (M. D. Pa. Jan. 18, 2017) (Cmplt), ¶144.

[2] Cmplt ¶40.

[3] These include the option to modify their loans from a standard 10-year fixed rate repayment plan to a graduated repayment plan, or one of several income-based repayment plans that extend the term of the loan to up to 25 years and adjust payments based on a borrower's income. See Federal Student Aid, U.S. Department of Education. Income-Driven Plans, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited March 28, 2017).

[4] Federal Student Aid, U.S. Department of Education. Income-Driven Plans, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited March 28, 2017).

[5] Federal Student Aid, U.S. Department of Education, Glossary, https://studentaid.ed.gov/sa/glossary#Discretionary_Income (last visited March 28, 2017).

[6] Supra note 4.

[7] Ibid.

[8] Federal Student Aid, U.S. Department of Education, PLUS Loans, https://studentaid.ed.gov/sa/types/loans/plus (last visited March 28, 2017).

[9] See National Longitudinal Surveys, U.S. Bureau of Labor Statistics, National Longitudinal Survey of Youth 1997, https://www.nlsinfo.org/content/cohorts/nlsy97 (last visited March 28, 2017).

[10] See, e.g., Henry S. Farber & Robert G. Valletta, Do extended unemployment benefits lengthen unemployment spells? Evidence from recent cycles in the U.S. labor market, 50 Journal of Human Resources 873–909 (2015).

[11] See, e.g, Stephen G. Bronars & Melissa Famulari, Wage, Tenure, and Wage Growth Variation within and across Establishments, 15 Journal of Labor Economics 285–317 (1997).

[12] See, generally, studies related to the Panel Survey of Income Dynamics. https://psidonline.isr.umich.edu/ (last visited March 28, 2017).

[13] Cmplt, ¶43.

[14] Ibid.

[15] Federal Student Aid, U.S. Department of Education, Repayment Plans: Repayment Estimator, https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action (last visited March 28, 2017).

All Content © 2003-2020, Portfolio Media, Inc.