1700 G Street NW,
Washington, DC 20552

January 13, 2020

**<u>Via ECF</u>**

The Honorable Thomas I. Vanaskie, Special Master
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

Re: *CFPB v. Navient Corp., et al.*, Case No. 3:17-CV-00101-RDM

Dear Judge Vanaskie:

In accordance with paragraph 1 of Special Master Order #59, the Bureau writes to indicate that it is challenging Navient's privilege claims over documents relating to the exercise in which Navient's credit reporting expert, Beji Varghese, requested 25 accounts to be supplied by Navient and drew conclusions based on those 25 accounts. Navient has not met its burden of establishing that the work product privilege is applicable in a situation where an individual, who is not designated as an expert witness, does data selection and analysis, and a lawyer serves as a conduit to transmit the results of that individual's work to the testifying expert.[1]

The Declaration of Daniel Kearney, which Navient submitted in response to Special Master Order #59, makes manifest that there is no legitimate privilege claim associated with the documents that the Bureau seeks. As the declaration indicates, WilmerHale attorneys functioned as nothing more than intermediaries in a process by which Mr. Varghese sought and received previously unproduced data from Navient that he relied on as the basis for opinions expressed in his report. Mr. Varghese had a request, he passed along that request to a WilmerHale attorney, and that WilmerHale attorney "conveyed the request" to Navient. The request was then apparently handled by a Navient employee, Brad Jones. When Mr. Jones supplied the requested information, the WilmerHale attorney then passed along Mr. Jones's work to Mr. Varghese's assistant. The declaration does not indicate any way in which disclosure of some or all of the requested documents might reveal the attorneys' mental impressions or legal theories in connection with this litigation. Thus, there is no basis for the work product privilege claim that Navient has asserted.

Here, Mr. Jones's work is akin to that of a non-testifying expert whose work formed the basis of opinions offered by a testifying expert. Where an individual assisting a testifying expert performs work that forms the basis for a testifying expert's opinions, that work is generally discoverable, even though only the results were "considered" by the expert. *See, e.g.*, *Johnson v. Gmeinder*, 191 F.R.D. 638, 649-50 (D. Kan. 2000) (allowing discovery from records custodian because a party's testifying expert had relied on documents from that custodian); *In re Interco, Inc.*, 146 B.R. 447, 450 (Bankr. E.D. Mo. 1992) (allowing discovery where party sought "to discover the mechanical methods, tests, procedures, assumptions and comparisons which will support the conclusions of . . . the trial expert.") (quotation omitted).

In addition, the information sought here is, at best, fact work product, which receives only limited protection. *See Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 230 (E.D.N.Y. 2007)

---

[1] The burden of establishing a privilege is on the party asserting the privilege. *See, e.g.*, *U.S. Airline Pilots Ass'n v. Pension Benefit Guaranty Corp.*, 274 F.R.D. 28, 31 (D.D.C. 2011).

(distinguishing "between matters revealing the thought processes of a party's representative and factual information obtained in anticipation of litigation" and observing that while "[s]ubstantial protection is afforded the first category [only] [l]imited protection is afforded the second.") (quotation omitted). Navient cannot use work product privilege as a sword and a shield, disclosing selective accounts that have been cherry-picked while asserting immunity regarding communications that might reveal, for example, what methods were used to select those accounts and whether the larger population of accounts has different characteristics. *See, e.g.*, *SEC v. Lavin*, 111 F.3d 921, 933 (D.C. Cir. 1997) ("The prohibition against selective disclosure of privileged materials derives from the appropriate concern that parties do not employ privileges both as a sword and as a shield").

It is crystal clear that this situation parallels that for which Navient was granted discovery from TransUnion, as the Bureau urged at the December 20, 2019 hearing. Dr. Michael Turner, the Bureau's credit reporting expert, asked for data from TransUnion that was not previously produced in this litigation. Navient characterized TransUnion's work as a "black box," and Dr. Turner and TransUnion were both ordered to produce all communications regarding the work that TransUnion did.

Here, Mr. Varghese asked for data from Navient that was not previously produced in this litigation. In response, Navient performed work to determine what accounts to select for each of five months, and in connection with those accounts, Navient must have performed related tasks such as determining what data fields to supply and how to extract those fields. This process is a complete "black box" to the Bureau. Thus, the appropriate remedy, as the Bureau previously requested, is for Navient to be ordered to produce all communications relating to the exercise (excluding those exclusively among Navient's counsel), just as Navient received similar communications relating to Dr. Turner's work. In its December 6, 2019 letter making its request, the Bureau articulated three categories of potentially relevant documents.[2] With the information disclosed in Mr. Kearney's declaration, the Bureau is now in a position to refine the categories of documents to be produced. Navient should be required to produce all communications between Navient's counsel or Navigant, Inc., and any Navient employee, as well as all internal Navient documents and communications, relating to any aspect of the work done in connection with Mr. Varghese's opinions regarding the 25 accounts described in his report (at paragraphs 104, 105, 173, 175, and 178), including but not limited to communications and documents relating to the request for, selection of, or provision of records relating to those accounts, and the processing of data in connection with any of the above tasks.

Simply put, there are no meaningful distinctions that would require this issue to be treated differently from how Navient's requests for discovery relating to TransUnion's work was handled. The fact that Mr. Varghese used WilmerHale as an intermediary to convey his requests is of no consequence, just as if Dr. Turner had used Bureau attorneys as mere intermediaries (he did not),

[2] Those categories were: (a) communications between Mr. Varghese (or his assistants) and Navient relating to the exercise that resulted in Mr. Varghese drawing conclusions based on 25 accounts, (b) internal Navient documents relating to the exercise, and (c) communications with counsel about the exercise to the extent those communications "identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed" or "identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed."

that would not have given rise to any valid privilege claim whereby TransUnion's work would be completely shielded from discovery. And the fact that Dr. Turner paid money to TransUnion is also of no consequence; that is simply a function of the fact that Navient, as the party whose conduct is at issue, already possesses the unproduced data, whereas the Bureau had to seek the data from a non-party. Finally, this is not at all the same as the normal process by which attorneys select information to provide to an expert, as Navient's counsel claimed at the December 20, 2019 hearing. *See* 12/20/19 Hearing Tr. at 11 ("what I don't understand is how that is different from any other issue involving provision of documents to an expert"). Based on the declaration, this was not a situation in which WilmerHale attorneys used their judgment and discretion to select the documents or information to provide to Mr. Varghese from the universe of materials that has been produced in this case. Such compilations of previously produced documents or information that reflect an attorneys' mental impressions and legal strategies can be protected. But the declaration establishes that the work Brad Jones did was analysis and processing from an unproduced universe of data; this type of factual exercise does not receive protection.

Finally, it is important to stress that the information that the Bureau is requesting here is critical to allowing the Bureau to effectively respond to Mr. Varghese's report. Without the information that the Bureau seeks here, the Bureau has no way to evaluate Mr. Varghese's opinions that are based on the 25 accounts he received. Mr. Varghese received from Navient a highly selective data set consisting of only limited information about 25 accounts, but the Bureau has received no information as to how the 25 borrower accounts were chosen, how Navient's servicing records were processed to produce the data supplied to Mr. Varghese for those 25 accounts, what information was supplied and not supplied for those 25 accounts as a result of the processing of those records, and what methods were used internally by Navient to ensure the accuracy and reliability of its work.[3] Mr. Varghese will not be in a position to answer these questions because he relied on a Navient employee to do the work for him. Yet the information the Bureau seeks is essential to the development, foundation, and basis of Varghese's opinion. The Bureau is entitled to know how the group of 25 accounts was selected to test the reliability and validity of that process. Accordingly, it is extremely important for the Bureau to receive the documents it seeks so that it can penetrate the "black box" that currently exists regarding Mr. Varghese's use of data selectively culled from a previously unproduced data universe.

For the foregoing reasons, the Bureau respectfully requests entry of the accompanying proposed order.

Respectfully submitted,

/s/ Nick Jabbour

[3] As just one example of the numerous questions raised by the 25 borrowers chosen by Navient, 20 of the 25 borrowers apparently were chosen because their loans were discharged after Navient purportedly stopped reporting the AL code, and Mr. Varghese indicates that, based on the data he received, the AL code was not furnished for those 20 borrowers. But one of those 20 borrowers appears on the list of approximately 20,000 borrowers for whom Navient did indeed furnish the AL code.