## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL                   :
PROTECTION BUREAU,                   :
                                     :
           Plaintiff                 :
                                     :
                                     :     3:17-CV-101
           v.                        :     (Judge Mariani)
                                     :
                                     :
NAVIENT CORPORATION, et al.,         :
                                     :
           Defendants.               :

## SPECIAL MASTER REPORT #16 – REQUEST TO STRIKE PARTS OF THE DEPOSITION OF MR. AARON J. WRIGHT

## I.     INTRODUCTION

By letter dated January 21, 2020 (Doc. 401), Plaintiff Consumer Financial Protection Bureau (the "Bureau") requested that portions of the deposition of Aaron J. Wright be stricken as beyond the scope of the authorization to depose Mr. Wright granted by Special Master Order #55 (Doc. 376.)  Defendants (collectively referred to in this Report as "Navient") responded with a letter and exhibits filed on January 30, 2020.  (Doc. 411.)  Oral argument was heard by telephone on February 5, 2020.  For the reasons that follow, the Bureau's request will be granted in part and denied in part.

## II.    BACKGROUND

This dispute traces back to the August 8, 2019 report of one of the Bureau's

expert witnesses, Dr. Michael Turner, and work he commissioned to be performed

by a national credit reporting agency, TransUnion.  Dr. Turner's report relied upon

information he received from TransUnion to opine that student loan borrowers

were adversely affected by Navient's use of a certain code when reporting

information on student loan borrowers to national credit reporting agencies.

Dr. Turner's reliance upon work performed by TransUnion has been the subject

of several Special Master Orders and conference calls.  The gist of the matter is set

out at some length in Special Master Order #54:

> One of the claims presented by Plaintiff . . . is that an incorrect code
> was reported by Navient to "National Credit Reporting Agencies"
> ("NCRAs" (also known as "credit bureaus")) for student loan
> borrowers whose educational loans had been discharged due to the
> student borrowers' total and permanent disability ("TPD").
> Specifically, the Bureau contends that from 2012 to 2014, Navient
> improperly used special comment code "AL" when reporting to
> NCRAs that a student borrower's educational loan had been
> discharged due to TPD. The Bureau asserts that student borrowers'
> credit scores were adversely affected as a result of Navient's use of
> the AL special comment code, and that this adverse impact on
> credit scores caused the student borrowers to suffer various types of
> harms, including higher interest rates on mortgages, car loans, etc.
>      . . . . To ascertain the impact on credit scores resulting from
> Navient's reporting of the AL code, Dr. Turner . . . tasked
> TransUnion with running simulations on more than 19,000 student
> loan borrowers whose education loans were discharged for TPD
> and for whom Navient reported the AL code during the years 2012
> through 2014. TransUnion was asked to report the credit scores
> with and without the AL code for affected student loan borrowers

on an anonymous basis at the end of each quarter for the years in question using a computer-based credit scoring program known as VantageScore 3.0.  According to Dr. Turner:

> For each of [the] quarterly snapshots, two versions of credit scores (VantageScore 3.0) and attributes were returned. One version shows the credit file as it was at the time, with no changes to the credit file data (*i.e.*, the borrowers had the "AL" code, as furnished by Navient). The second version was based on the same set of files with the Special Comment Code "AL" removed. It was replaced with the previous code that may have been displaying prior to the Special Comment Code "AL" being added. Account Status Code was displayed as "05", as of the date when the Special Comment Code "AL" was incorrectly added. This second version shows what the credit scores and credit profiles would have been if Navient had simply not added the Special Comment Code "AL" and had left other aspects of how the account was reporting unchanged (such as the Payment Rating Code).

(Turner Report, (Ex. 1 to Navient's letter of Aug. 27, 2019) at p. 36.)

Navient raised the sufficiency of the Bureau's production of information related to Dr. Turner's report during a conference call held on August 22, 2019. Consequently, the parties were directed to provide letter briefs on the issue and to address the matter during a subsequent conference call. (See Special Master Order #42.) By Special Master Order # 46, the Bureau was directed to produce by September 13, 2019 the TransUnion data received by Dr. Turner as well as copies of all written communications between Dr. Turner and TransUnion related to this litigation. By Special Master Order #49, dated September 20, 2019, Navient was directed to "report in writing, no later than September 25, 2019, whether the information received in connection with the VantageScore 3.0 simulation ran by TransUnion is sufficient to assess the propriety of the methodology employed by [Dr. Turner], . . . or whether additional information is needed or whether the matter is one that must be presented by a Motion in Limine challenging Dr. Turner's report." Navient's letter of September 25, 2019 contended that the TransUnion data

produced in response to Special Master Order #46 was not adequate. Moreover, Navient's letter took issue with the Bureau's explanation of the nature of the work performed by TransUnion, pointing out that TransUnion had performed services over a period of at least six weeks and for which it had been paid at least $265,000.

(Doc. 374 at 1-3.)

Navient's September 25, 2019 letter requested that the Bureau be ordered to provide substantial additional information with respect to the work performed by TransUnion, including in particular: "inputs into the quarterly archive files,' including the underlying credit files and tradelines and TransUnion's treatment of certain Metro 2 special comment code AL."  (Navient's Proposed Order, Ex. 7 to Navient's Sept. 25, 2019 letter.)  On October 3, 2019, the Bureau responded to this demand as follows:

> [T]he proposed order seeks complete credit files for all of the borrowers at issue, without anonymity. Neither Dr. Turner nor the Bureau has possession, custody, or control of this information. See Ex. 7 (Turner Decl. ¶ 11). Nor did Dr. Turner consider this information. Dr. Turner considered the credit scores and certain anonymized credit file attributes that he identified in his report. See id. ¶¶ 2-3, 6. And he already produced that information to Navient.

(Bureau's Oct. 3, 2019 letter at 3.)

Navient replied by letter dated October 7, 2019, contesting the Bureau's representation that it lacked the ability to produce student loan borrowers' credit files, asserting:

> Defendants expected to receive all information provided to and
> relied upon by Dr. Turner in forming his opinions, including
> anonymized credit files. In his report, Dr. Turner explicitly stated
> that TransUnion "provided [] credit files in completely anonymized
> form," Turner Report, ¶ 57, and during the last status conference,
> CFPB counsel represented, "TransUnion pulled the historical
> versions of those borrowers' credit files" and "then provided Dr.
> Turner with those historical versions on a quarterly basis," Tr. at
> 10:24 – 11:3. Yet, this is not what Defendants received. Nor does
> the other information Defendants have received fill in the gaps. . . .
>
> Without this information, there is no way to test whether the change
> in credit score that resulted from the simulations run by TransUnion
> is a reliable assessment of the impact of the "AL" code on each of
> the 19,509 borrowers between January 1, 2012 and December 31,
> 2014. Contrary to the CFPB's statements, Defendants cannot
> replicate the custom simulations performed by "[Dr. Turner's]
> assistants employed by TransUnion," CFPB Oct. 3 Letter at 4,
> because they lack the undisclosed data inputs used by TransUnion
> and other key information about the simulations and data
> manipulations performed by TransUnion (such as what code
> replaced the comment code "AL" in the modified credit files).

(Navient Oct. 7, 2019 letter at 2-3.)

Oral argument on Navient's request that the Bureau be ordered to produce

additional information, including credit files for more than 19,000 student loan

borrowers, was heard on October 9, 2019. Navient's demand for credit files was

addressed in Special Master Order #54 as follows:

> Navient strenuously argues that it needs access to the credit files of
> the more than 19,000 student loan borrowers for whom TransUnion
> ran credit scores pursuant to Dr. Turner's directions. Navient's
> desire for the credit files is understandable, as the credit files were a
> basic input into the VantageScore 3.0 simulations. I understand that
> TransUnion produced credit scores for these borrowers by
> removing the AL code and the resulting score was compared

against the borrowers' scores with the AL code present. Navient would need the files to test TransUnion's results. But once again, the files were not produced by TransUnion to Dr. Turner. Instead, Dr. Turner received certain anonymized credit file data, and he did produce that data to Navient. Accordingly, neither the Bureau nor Dr. Turner can be compelled to produce the credit files. *It may be, however, that Navient could pursue discovery from TransUnion to obtain the credit files, and if it needs leave to do so, leave will be granted.*

(Doc. 374 at 9; emphasis added.)

By letter dated October 21, 2019 (filed under seal at Doc. 375), Navient submitted three subpoenas to pursue discovery from TransUnion. One subpoena sought ten categories of documents, including "[a]ll 'credit archives' used in the TransUnion Simulation, including the 'quarterly credit archives' used, and any modifications made to any credit archives in connection with the TransUnion Simulation." The other two subpoenas named specific TransUnion employees whom the Bureau sought to depose, including Aaron Wright.[1] Special Master Order #55, dated October 23, 2019, granted Navient "leave to serve subpoenas in relation to the work done by TransUnion and upon which Dr. Turner relied . . ., but without prejudice to either Plaintiff, TransUnion or the witnesses in question objecting to this additional discovery." (Doc. 376.)

---

[1] Navient subsequently agreed to receive a declaration from the other TransUnion employee in lieu of his deposition.

Mr. Wright's deposition was scheduled for December 16, 2019.  As for the document subpoena for "[a]ll 'credit archives' used in the TransUnion Simulation, including the 'quarterly credit archives' used, and any modifications made to any credit archives in connection with the TransUnion Simulation," counsel for Navient, in an email to TransUnion's counsel, stated that it was his understanding that "TransUnion does not have the credit archives responsive to Request #3 because the requested credit archives used in the simulation have been destroyed." TransUnion's counsel responded by email dated November 26, 2019, asserting:

> TransUnion does not have the credit archives in a manner responsive to Request #3, and . . . it would involve 50-70 hours to reformat and anonymize the raw data in a manner usable and responsive to Request #3.  TransUnion will confirm same by declaration . . . as well as confirm that . . . Dr. Turner [did not] request[] to receive copies of the credit archives or requested that TransUnion preserve them in a manner responsive to request #3.

(Ex. 4 to Doc. 401.)

In anticipation of Mr. Wright's deposition, the Bureau asked Navient to confirm that questioning would be limited to "the work done by TransUnion and upon which Dr. Turner relied."  (Ex. 3 to Doc. 401.)  Navient replied by email on December 9, 2019, stating that "with regard to the scope of Mr. Wright's deposition, the focus will be on the simulation(s) performed for Dr. Turner and the documents and materials produced in response to the document subpoena.  This

could include questions concerning . . . other issues relevant to the work TransUnion performed for Dr. Turner's report." (*Id.*)

Mr. Wright's deposition proceeded on December 16, 2019.  At approximately 3:15 p.m. on that day, the Bureau emailed the Special Master to request a teleconference due to concerns that Navient was exceeding the authorized scope of Mr. Wright's deposition.  A call with the Special Master was conducted, but a determination as to whether Navient was going beyond the scope of the orders authorizing the deposition could not be made at that time.[2]  Instead, Navient was cautioned to "ask questions that concern the work done by TransUnion and upon which Dr. Turner relied and not beyond that."  (Wright Dep. Tr. at 215:8-10.) In addition, the Bureau was told that it could "file a motion to strike testimony and ask for sanctions."  (*Id.* at 215:2-3.)

The Bureau's request to strike 33 sections of Mr. Wright's testimony, organized by the Bureau in 9 topics, was received on January 21, 2020 along with a number of exhibits.[3]  (Doc. 401.)  Navient's reply with exhibits was filed on January 30, 2020.  (Doc. 411.)  Oral argument was conducted on February 5, 2020.

---

[2] The colloquy with the parties and the Special Master appears at pages 198 through 216 of the transcript of Mr. Wright's deposition, which is attached as Ex. 2 to Doc. 401.

[3] The Bureau's letter of January 21, 2020 does not seek any sanction other than to strike testimony and preclude its use.

During the oral argument, the parties were told of tentative views of the Special Master with respect to each of the 33 sections of Mr. Wright's deposition at issue, and given an opportunity to explain why the tentative view, either to allow or to strike the challenged testimony, should not be followed.[4]  The gist of the Bureau's argument was that Navient had strayed beyond the authorization in Special Master Order #55, *i.e.*, "work done by TransUnion and upon which Dr. Turner relied." (Doc. 376 at 2.)  Navient, for its part, relied to a large extent on the document subpoena it was authorized to serve in arguing that it had stayed squarely within the scope of the authority to take discovery from TransUnion.

## III.   DISCUSSION

The Bureau's arguments will be addressed by the topic descriptions it provided, with appropriate consideration given to the document subpoena categories and exhibits cited by Navient in defense of its questioning of Mr. Wright.  The questions and testimony under each topic will be set forth.[5]

### A. Topic 1: Whether Navient's historic reporting practices were appropriate.

#### 1.  Questions and answers at issue:

_____

[4] The transcript of the argument was received on February 7, 2014.

[5] The exchanges between counsel, however, will not be reproduced.

1.[6] Q. As part of TransUnion's work, did TransUnion offer a conclusion or an opinion to PERC[7] that the use of the AL code for federal student loans that were transferred due to total permanent disability was inaccurate?

A. No.  (Tr. 58:24-59:5.)

2. Q. TransUnion never took an opinion -- never -- never expressed an opinion on that, correct?

A. That's correct.  (Tr. 59:6-9.)

3. Q. And as you sit here, you don't have – you've never taken a view of whether the AL  code reported for -- for student loans were transferred due to total permanent disability was proper or improper, correct?

A. Correct.  Tr. (60:3-8.)

4. Q. Okay. So that means that the – there's going to be no change to the account status prep -- prep -- reported by Navient in the Metro 2 data?

A. Correct.[8]

Q. Because it was accurate?

A. As far as -- as far as I understand, yes.  (Tr. 87:24-88:7.)

5. Q: And that's because it [referring to the "last reported status"] was accurate as reported, correct?

A. Correct.  Tr. (103:25-104:3.)

2. **Discussion**

---

[6]  The numbering corresponds to the numbering used by the Bureau to mark the 33 sections of Mr. Wright's testimony at issue.

[7]  "PERC," (the Policy and Economic Research Council) is the organization through which Dr. Turner commissioned TransUnion's work.

[8] During oral argument on February 5, 2020, the Bureau indicated that the first question and answer in this exchange could stand, but that the second question and answer asked for opinion testimony.  (Feb.5, 2020 Tr. at 15.)

The Bureau contends that this questioning improperly solicited "opinions about whether Navient furnished accurate information in the first instance." (Doc. 401 at 3.)  Navient responds by pointing to topics 7[9] and 10[10] of its document subpoena.

The Bureau's objection is well-taken.  The purpose of allowing discovery of TransUnion was to address the absence of the credit files that were used to conduct the TransUnion simulation, and not to inquire as to whether Navient's use of a particular reporting code was, in TransUnion's opinion, correct.  The fact that a document subpoena topic could be read to encompass such a line of inquiry is not dispositive.  Navient has not shown that TransUnion was engaged to express opinions on the correctness of the reporting codes it employed and has not shown how this questioning related to the work performed by TransUnion for Dr. Turner. That the testimony may relate tangentially to a document produced by TransUnion does not give license to ask for TransUnion's opinions.  Accordingly, Mr. Wright's deposition testimony under the Bureau's Topic 1 will be stricken.

### B. Topic 2:  Whether Dr. Turner's instructions contradicted industry standards for how Navient should furnish data.

---

[9] Document Subpoena Topic 7: "Documents relating to TransUnion's treatment and/or handling ofMetro2® special comment code 'AL,' including whether Trans Union considers Metro2® special comment code 'AL' to be a field that needs to be reported each month it applies."

[10] Document Subpoena Topic 10:  "Documents relating to the TransUnion Simulation, including any Communications with Dr. Michael Turner."

### 1.  Questions and answers at issue:

6. Q. Now, the Metro 2 -- the CRRG Metro 2 guides for reporting that were used make no reference at all to changing the generic remark first reported date; do they?

A. That is correct.[11]

Q. And, similarly, they make no reference to adding a rating remark first reported date using the effective date?

A. That is correct.

Q. So in this instance, the final modification rules are directing Matt Lamb to make changes that are not specified in the CRRG Metro 2 guidelines?

A. That is correct.  (Tr. 107:10-108:8.)

7. Q. Was that modification requirement in the M – what's it called -- Metro 2 guidelines?

A. No.  (Tr. 160:22-25.)

8. Q. Did you understand him to be saying that removing the SLP regardless of MOP is against the Metro guidelines?

A. Yes.  (Tr. 163:19-22.)

9. Q. And, in fact, the way they told you to do it was inconsistent with Metro 2 data reporting because there was no such code?

A. Correct.  (Tr. 76:16-19.)

### 2.  Discussion

The Bureau argues that this testimony concerned "opinion . . . about the requirements of the CRRG Metro 2 guidelines for furnishing credit information in the first instance."  (Doc. 401 at 3.)  Navient asserts that this testimony is factual in

---

[11] The Bureau's counsel interposed objections to the form of some of the questions. Whether those objections are well-taken is not at issue now.

nature and related to Subpoena Topics 8[12] and 10.  It also contends that this

testimony relates to Exhibit 6 to Doc. 411, "PERC Student Loan Requirements,"

about which Mr. Wright testified.  It points out that Mr. Wright testified without

objection that the Metro 2 guidelines were used to develop the simulation

performed by TransUnion.  (Feb. 5, 2020 Tr. at 19-20.)  Navient notes that it

should then be able to ascertain in what way(s) the simulation protocol varied from

the Metro 2 guidelines.  I agree.  This testimony is factual in nature and helps to

explain the work done by TransUnion.  Accordingly, the request to strike the

testimony falling under the Bureau's Topic 2 will be denied.

### C. Topic 3:  TransUnion's opinion on whether the AL code is equivalent to "default."

#### 1. Questions and answers at issue:

10. Q. AL, under TransUnion's view of the Metro 2 data, does not mean the account's in default; does it?

A. Can you clarify, please?

Q. Sure. There are -- there are other codes that indicate whether or not an account is in default in the Metro 2 data, correct, other than AL?

A. There are -- there are -- there's -- correct, there are other fields within the Metro 2 layout that could -- that helps fully describe the status of the account.

---

[12]  Document Subpoena Topic 8:  "Documents relating to the specific credit modifications that were performed pursuant to the TransUnion Simulation including what specific code(s) were substituted for the Metro2® special comment code 'AL' – Assigned to Government' in TransUnion's modification to produce the 'Modified Observation Period Archive Dates,' and which tradelines were modified."

Account status and all the various remark code fields all come into a play in a -- in an ability to fully describe the size of the account. And how a scoring model chooses to determine what is derog and not is based on the -- on each individual scoring algorithm.

Q. Does TransUnion view the presence of an AL code alone as indicating that an account is in default?

A. I do not know.  (Tr. 64:21-65:18.)

11. Q. Okay. So back to my question. From TransUnion's point of view only, there would be other information in a tradeline from a furnisher, like Navient, on a federal student loan that would inform TransUnion as to whether the loan was in a collection account, correct?

A. Correct.  (Tr. 66:15-21.)

## 2. Discussion

Navient's expert, Beji Varghese, has stated that Navient was informed that use of "Special Comment Code 'AL' was not viewed as a default by the CRAs." (Ex. 6 to Doc. 401 at 14.)  The Bureau complains that the testimony elicited from Mr. Wright is intended to buttress Mr. Varghese's statement.  Navient asserts that this testimony relates to Subpoena Topics 1[13] and 7.  Navient, however, does not point to a specific document produced by TransUnion in relation to this line of inquiry. The questioning is plainly seeking TransUnion's opinion about the significance of

---

[13]  Document Subpoena Topic 1:  "Documents relating to the weight of and/or interpretation given to Metro2® special comment code 'AL – Assigned to Government' by the specific VantageScore 3.0 iteration(s) used in the TransUnion Simulation."

the code, "AL." As such, it falls outside the permissible bounds of the deposition and the testimony under Topic 3 will be stricken.

### D. Topic 4: Whether Dr. Turner's reliance on VantageScore 3.0 credit scores is defensible.

#### 1. Questions and answers at issue:

12. Q. So did -- did you raise the issue with anybody that you were using a version of VantageScore 3.0 that wasn't commercially available during the entire observation period?

A. I do not recall.

Q. Did you ever discuss that with anybody other than – I'm not asking about conversations with counsel. Did you ever discuss that with anybody?

A. No. (Tr. 30:20-31:6.)

13. Q. But to be clear, if VantageScore 3.0 wasn't commercially available in December of 2012, TransUnion could not have scored the as-is files using VantageScore 3.0 in December of 2012, right?

A. In December 2012, no. (Tr. 31:7-12.)

14. Q. When did TransUnion first start using VantageScore 3.0?

A. That I'm not sure.

Q. Do you know when it first became available commercially?

A. I believe it was available in -- around 2014. (Tr. 30:9-15.)

15. Q. What scoring model was TransUnion using in December, 2012 for its production scoring?

A. Well, I would say there's many scoring models out there. So -- and those scoring models are -- what scoring models are chosen are by clients.

Q. Okay. What VantageScore version was TransUnion using in December of 2012?

A. I believe it would be Vantage 2.0.  (Tr. 31:16-25.)

16. Q. So you mentioned VantageScore 3.0. Who decided that VantageScore 3.0 would be the scoring algorithm used on both the as-is and the simulated files?

A. Ultimately, PERC decides what scores they wanted.

Q. Okay. And you may have answered my question but the question was slightly different.

A. Okay.

Q. Who decided to use VantageScore 3.0?

A. I -- I'm trying to think. I would say that we -- TransUnion would provide what scores were available for our simulation. And PERC wanted a -- you know, an industry score. So that -- you know, ultimately -- so I can't remember exactly if it was Dr. Turner or Patrick Walker. But ultimately, PERC ultimately, decided that we would go with the Vantage 3.0 score.

Q. Thank you. That helps me understand it. So it's a PERC-driven decision to use VantageScore 3.0?

A. Yes.  (Tr. 28:24-29:24.)

17. Q. Okay. Why wasn't Vantage 2.0 used to score the production as-is credit files and the simulated credit files as of the archive period, 12/31/12?

A. Typically when you do a -- a score simulation, there's a desire to use the -- you know, a consistent score, you know -- you know, for the time periods. So that -- well, that's typically the reason we -- you do a research time periods.  (Tr. 32:2-15.)

18. Q. Mr. Wright, did you personally investigate whether VantageScore 3.0 was tested and certified for purposes of performing a simulation?

A. No.

Q. As you sit here today, do you know whether VantageScore 3.0 has been tested and certified for performing accurate simulations?

A. I would -- I would answer that as I'm not aware of -- if it's been tested for purposes of simulation. I -- but I'm aware that Vantage 3.0 was, through whatever the normal model governance process, was certified for use in credit reporting, in scoring credit reports.

Q. Okay. But not until after it was released, which was sometime after January of 2012, right?

A. Correct.

Q. And after January of 2013?

A. Correct.  (Tr. 37:12-38:8.)

19. Q. Do you know, as you sit here, how VantageScore 2.0's scoring algorithm differs from VantageScore 3.0's scoring algorithm as it relates to the AL code?

A. I do not.  (Tr. 33:4-8.)

## 2. Discussion

The Bureau argues that whether it was "methodologically sound" to use

VantageScore 3.0 was beyond the permissible scope of Mr. Wright's deposition.

(Doc. 401 at 4.)  Navient contends that the questioning relates to Document

Subpoena Topics 2[14] and 10.  Navient, however, does not point to a specific

---

[14] Document Subpoena Topic 2:  "Documents relating to any differences between each iterations/version(s) of VantageScore in use between January 1, 2012 and December 31, 2014 and the version that was used for the TransUnion Simulation, with regard to the methodology and process to weight and/or interpret Metro2® special comment code 'AL.'"

document produced by TransUnion to which these questions related.  Furthermore,

it appears to be undisputed that it was Dr. Turner who directed the use of

VantageScore 3.0, a scoring algorithm that was not commercially available until

2014.  He is the appropriate person to ask why VantageScore 3.0 was used.

Accordingly, the testimony under the Bureau's Topic 4 will be stricken.

### E. Topic 5: Whether Dr. Turner's decision to use FICO credit risk tiers when analyzing changes in borrowers' VantageScore scores is defensible

#### 1.  Question at issue:

20. Q. Bear with me one second. I'm sorry. I covered that. Does TransUnion ever use VantageScore credit scores and plug them into FICO credit scoring tiers? Let me – let me rephrase the question.

A. Okay.

Q. Is it a practice of TransUnion to report credit scoring by using a credit scoring model like VantageScore and not using VantageScore's tiering but using FICO's tiering? So you're taking the VantageScore score and putting it into a FICO tiering. Do you do that?

There then ensued a colloquy with counsel, and Mr. Wright was directed not to

answer the question.  Accordingly, as Navient acknowledged (Feb. 5, 2020 Tr. at

41), there is nothing to decide under Topic 5 and the question and colloquy at page

131:9 through page 133:14 of Mr. Wright's deposition transcript will be stricken.

### F. Topic 6:  Whether standards or guidance exist for performing a simulation such as the one Dr. Turner directed.

#### 1.  Questions and answers at issue

21. Q. There's nowhere in the guidelines where it says if you're going to perform a simulation, to show the effect of the AL code, here's what you do to perform that simulation, correct?

A. That's correct.  (Tr. 81:10-15.)

22. Q. Was there any authoritative text or industry guidance that you could look to to inform the decision-making about how to perform this custom simulation, where -- in other words, something that had been issued where it said if you want to simulate how the AL code affects credit rating scores, perform the following modifications to a credit file? Did you look at anything like that?

A.  There -- there was no -- we – there was no previous studies that we had ever – or exercises that I was aware of. So we – there was nothing to look at. How to --how to do the study, one was the study itself is what was needed was direct -- was directed by Dr. Turner from PERC. And then what we would reference in order to figure out what the actual -what  the – what the data simulation should be was the – the Metro 2 guidelines, you know, from the consumer reporting resource guide.

Q. Okay. But to go back to my initial question, there was no published literature or authoritative text that you could refer to to inform and guide how you did the simulation, correct?

A. That's correct.

Q. Because to the best of your knowledge, it was the first-of-a-kind, custom simulation?

A. Correct.  (Tr. 20:2-21:8.)

23. Q. And what are you referring to as being 'typical'? Is there a guidance – industry guidance that says that's how you do it?

A. Industry guidance, no, just...

Q. So it's your own view of it?

A. That is correct. (Tr. 32:16-22.)

24. Q. And because this was a custom simulation, there was no literature to look to to know what modifications should be made to the credit archives, correct?

THE WITNESS: There was no previous studies that -- you know, that we can – we can rely upon. But, you know, using the -- you know, using the CRRG guide that relates to student loan reporting, PERC would then determine what status that they would like us to submit. (Tr. 78:21-79:8.)

25. Q. Prior to the engagement with PERC that we're here about today, had you ever performed or directed your team to perform any study of how the code AL impacts borrowers' credit rating or scores?

A. No.

Q. So this was the first time, in your work at TransUnion, that you were involved in any type of a simulation like that, correct?

A. Correct.

Q. I'm sorry. I didn't mean to speak over you. Your answer is?

A. Correct.  (Tr. 18:25-19:13.)

## 2.  Discussion

The Bureau argues that this line of questioning "boils down to . . . whether

[TransUnion's] work is defensible as an accepted industry practice, and is

appropriate questioning for Dr. Turner." (Doc. 401 at 4.)  Navient, citing

Document Subpoena Topics 8 and 10, counters that the questioning is

"foundational, it's not opinion, it's factual."  (Feb. 5, 2020 Tr. at 49.)  I agree with

Navient's view.  The questions do not ask for opinion, and it was appropriate to

ascertain whether the simulation was guided in some manner by any literature or

industry guidance.  The questioning went directly to the work performed by

TransUnion and upon which Dr. Turner relied.  Accordingly, the request to strike

the testimony under the Bureau's Topic 6 will be denied.

### G. Topic 7: How Dr. Turner used the information TransUnion provided, including information about employment screening, tenant screening, and insurance underwriting products

### 1. Questions and answers at issue:

26. Q. I'm going to show you, sir, what we're marking as exhibit 907. (Deposition Exhibit 907 was marked for identification.)  I'm going to direct your attention to the second-to-last page of the exhibit. I think it's number 4 at the bottom. Do you see that?

A. Yes.

Q. And just so we're on the same page, it's an e-mail from Mr. Wiermanski to you and others at TransUnion on November 26th of 2018, right?

A. Yes.

Q. Now, at this point, the simulations had been executed and the work had been – the outputs had been provided to TransUnion – or I'm sorry, to PERC, correct?

A. I do believe so, it was delivered at this time.

Q. Okay. So do you recall this e-mail where Mr. Wiermanski is asking TransUnion questions regarding how inquiries requesting information on the reports appear on a consumer's credit file?

A. Can I read this for a second, please?

Q. Of course.  (Witness reviewing document.)

THE WITNESS: I do recall these questions.

BY MR. BRIER: Q. Okay. What's your general understanding of what he was asking?

A. Honestly -- honestly, my general understanding was exactly what he -- it had in the questions. He was looking to understand the various ways a different -- how inquiry -- how inquiries would either be output or not output and -- on different products. Like I think specifically he was asking for like what would an insurance inquiry look like versus, you know, what would be an employment-tenant screening.

Q. Okay. And was this in addition to the work that was required by the contract? Was this another example of something you were asked to do that wasn't required by the contract?

A. Yes.

Q. And you respond on November 27 and copy your colleagues and you respond to Mr. Wiermanski and you state, "Chet, we are researching answers to your questions but I have two questions. Will the answers be quoted within your report as sourced by TU? If so, I may need to seek your legal approval for our responses." What was his response to whether the answers would be sourced to TU in the report?

A. I do not recall. Can I take a look to see if there's something in the e-mails string?

Q. Sure. Sure. Yep. (Witness reviewing document.)

THE WITNESS: So can you repeat your question?

BY MR. BRIER: Q. What was PERC or Dr. Turner's answer to the question of whether the answers that you would be providing to their questions would be sourced to TU in the expert report?

A. I do not recall what the answer was. I can just surmise, based on my response, that it - it -- it must -- they must not have if we're going to use it within their – their report, otherwise, I would have had to move forward with legal approval. But I do not recall what the exact response was.

Q. I want to understand your position. Is it your position that if PERC or Dr. Turner was going to use the information provided by TransUnion in response to these questions, you would needed to get legal approval to permit them to do that?

A. I would have, yes.

Q. And as you sit here, do you know whether any of the answers provided in response to these questions were used in Dr. Turner's report?

A. I do not know.

Q. Did you ever go to legal to get approval to let Dr. Turner use the information?

A. I do not recall.

Q. Okay. Let's look at your e-mail on page 3 of the document. It's November 28th from you to Dr. Turner and others. It's in the middle of page 3.

A. I do see it.

Q. And it says, "Thanks for the quick response. It makes it easier as I won't need legal approval on our responses. We are actively working to get you the answers and hope to complete by end of week or at the very least provide answers on those questions we have confirmed." So as of this e-mail, you're planning to give him answers to the questions and there's going to be no effort to get legal approval for him to use the answers, right?

A. Based on this, yes.

Q. Did he tell you he wasn't going to use the information in his report?

A. That I do not recall.

Q. Did you give him permission to use the information just so it wasn't sourced to TU?

A. That I do not recall.

Q. Would you have been authorized to give him permission to use this type of information, just so he didn't source it to TU? Is that within your – the authority of your job?

A. I don't know if it -- I would – I don'' know if I can answer one way or the other if it's - - if it's within my authority of the job. But typically in situations like this, I would – I would talk to legal to make sure that -- I would be more concerned -- I would be concerned and would be talking to legal to ensure that any -- any information that we give out is appropriate from both a legal perspective and from, you know, a TransUnion position.

Q. And why wasn't that done in this instance?

THE WITNESS: Do I -- as I said, I don't recall, you know, what the – the response was because it's not in this e-mail string. So I don't recall if there's another e-mail that I – that I'm not seeing or if it was a -- if it was a verbal phone call to talk about what their intended -- their intended purpose of the question is. All I can surmise is the fact that because on November 28th when I say I won't need legal approval, that I must have felt that they -- you know, they -- how PERC was going to use the data was more for their -- their -- was it was for a use case that I would not need to go to legal.

BY MR. BRIER: Q. If you go to the e-mail at the bottom of page 1. And it's from your colleague – I'm going to say it wrong again -- Michaela, on November 30. And would you agree with me that on this e-mail, she provides answers to the questions that were posed by Mr. Wiermanski on November 26th that we looked at earlier?

A. Yes, she is answering, in this case, looks like question number 1 related to employment and tenant screening -- oh, and insurance underwriting.

Q. And she answers number as -- number 2; doesn't she?

A. Oh, sorry. I didn't go to the next page. So it looks like she provided an -- an answer to all the questions, yes.

Q. Okay. And do you know whether any of these answers are reflected in Dr. Turner's expert report?

A. I'm not aware.

Q. Did he have the authorization of TransUnion to use these answers in his report?

THE WITNESS: I'm not aware that PERC had any authorization of TransUnion to use these answers in their report.

BY MR. BRIER: Q. And you didn't give his authorization, correct?

A. I did not -- .

BY MR. BRIER: Q. Is it correct that you did not give him authorization?

A. I do not recall that I ever gave authorization.

Q. Do you know of anybody at TransUnion that did give PERC or Dr. Turner authorization to use the information?

THE WITNESS: I'm not aware of anybody from TransUnion providing authorization to use these -- to answers these questions in the report.  (Tr. 178:16-191:9.)

27. Q. And do you know, as you sit here, whether PERC or the CFPB used any of that data to communicate with borrowers?

A. I do not know.  (Tr. 41:20-23.)

## 2.  Discussion

Focusing on questions that relate to what Dr. Turner included in his report, the Bureau argues that this line of questioning has nothing to do with the work performed by TransUnion.  It is certainly clear that the question and answer at number 27 above have nothing to do with the work performed by TransUnion. Accordingly, the testimony at page 41, lines 20 through 23 will be stricken.  But the lengthy excerpt of testimony starting at page 178, line 16 and ending at page 191, line 9, does concern the work performed by TransUnion.  And the questioning plainly relates to a document produced pursuant to the document subpoena.

Accordingly, the request to strike what has been marked as section 26 of the Mr.

White's contested testimony will be denied.

### H. Topic 8:  Reporting practices of other servicers.

#### 1.  Questions and answers at issue:

28. BY MR. BRIER: Q. Mr. Wright, I'm showing you a document that we've marked as Exhibit 906. It's, again, a compilation of e-mails. And it's small print. I apologize. But I want to focus on the second e-mail on page 1, which is from you to Messrs. Walker, Turner, and Wiermanski dated October 15. Do you see that?

A. I'm having a hard time.

Q. I know. It's –

THE WITNESS: So it looks like it's the -- toward the top, the second one?

BY MR. BRIER: Q. Yeah.

A. So, yes, I can see that I'm sending something to Patrick.

Q. All right. Let me read it –

A. Okay.

Q. -- with my cheaters on. It says, "PERC team, below are stats around student loan reporting from 2013 archives to put into context the assigned to government reporting. Let me know if these are the stats you are looking for as part of your analysis. If these stats are what you need, I can also have run for 2012 and 2014." And then the stats that are populated below look like they're stats from the four archive dates in 2013. And the second column says, "student loan values" -- or I'm sorry, "total student loans" and approximately 33 million student loans are referenced in that column? Would that be all of the student loans in TransUnion's database as of those archive dates?

A. I -- I do believe that is the case. I'd have to go back and confirm that we didn't have any other criteria, you know, to segment out certain -- you know, status types or, you know, like in repayment or not repayment. But if -- but to be -- I

mean, that column is -- is we're looking for any A loan type that had, you know, student -- the student – the TransUnion student loan were – loan type, then that's what we produced this document for.

Q. Okay. And the next column says "total SLs with remark of SLP." And there's various values for each quarter but they range from about 3-1/2 million to 4-1/2 million. That would be, if I'm understanding this table correctly, student loans reported by furnishers other than Navient and including Navient but all student loan furnishers recording SLP code?

A. That is correct. It would be a subset of that -- the previous column's 33 million.

Q. Right. And SLP is the one-for-one conversion for AL, right?

A. That is correct.

Q. And then if you go over to the fourth column, it's a percent of total student loans with remark of SLP. And for the four quarters in question, it ranges from about 10.8 to 13.4.  Do you see that?

A. I do.

Q. So that's the entire population, not just Navient, it's student loan servicers reporting the SLP code, and it's in TransUnion's data?

A. Correct.

Q. Okay. And then moving across the table, there's a column labeled "percent Navient student loans with remark of SLP" for each of those respective quarters. And it's – it ranges from about 2 percent to 5.6 percent over the four quarters. Do you see that?

A. I do.

Q. Which is less than the general population that we just looked at, which ranged from 10 percent up to about 13 percent. Do you see the – the comparison?

A. Yes, I do.

*Q. What -- was there any discussion with PERC or Dr. Turner about this – the statistics that are reflected here and the fact that Navient's reporting of the SLP code, according to this table, is lower than the general population of serve -- of furnishers who reported with the SLP?*

*A. I don't recall us having – I don't recall myself having any conversations with PERC to discuss the details or the – the results of the stats.*

*Q. Did you make any judgments or conclusions based on this table?*

*A. No.*

*Q. Do you know why Navient's reporting of the SLP code was less than the average calculated in the table?*

*A. I do not.*

*Q. Was it interrogated or investigated as part of the engagement with PERC?*

*A. No.*

*Q. And what's SGL?*

*A. I'm trying to read the little notes below the table. But, you know, per the notes, SGL is a remark that comes from the Metro 2 account status 88. And if I can read that, I believe the description is "claim filed with government on a defaulted loan."*

*Q. Okay. So the SGL statistics that are reported here, would they be student loans – does that mean those are student loans that are reported as defaulted or am I misunderstanding?*

*A. So I won't be able -- I -- I can't answer that question based on just this information here.*

*Q. Okay. Did Navient – I'm sorry. Did PERC or Dr. Turner ask you to explain this analysis or table or do you recall any discussions about it?*

*A. I do not recall any discussion. It's quite possible they might have asked me to clarify, you know, the – the label headings and what it meant. But I don't recall any details on that.*

Q. Were you ever asked to look at any drafts of Dr. Turner's expert report?

A. I was not.

Q. Were -- were any portions of it or segments of it ever read to you or reviewed with you orally?

A. No.

Q. Have you seen it, as you sit here?

A. No.

Q. Have you discussed it with Dr. Turner?

A. No.

Q. Was this extra work – I'm sorry, I'm referring, again, to Exhibit 906. The analysis -- or I'm sorry, the -- the generation of the statistics here, is this extra work beyond what was specified in the contract between PERC and TransUnion that we looked at earlier today?

A. Yes, it was.

Q. Is there an agreement that one could look at to see what additional work TransUnion did for PERC other than what's outlined in the contract?

A. I'm not aware of any.

Q. So would it be fair to say that the engagement became sort of iterative where in addition to doing the simulations PERC and Dr. Turner were asking you to do additional things that weren't in the contract?

A. If you -- additional things is categorized like stats, for example, then, yes.

Q. Was TransUnion paid extra for the work that it did that wasn't specified or required by the contract?

A. To my knowledge, no.  (Tr. 171:9-178:15**.)**

### 2.  Discussion

The Bureau contends that questioning about other student loan servicers' practices in relation to loans discharged for total and permanent disability did not fall withing the scope of the work performed by TransUnion for Dr. Turner. Navient, pointing to Document Subpoena Topics 6 and 10, as well as Deposition Exhibit 906 (Ex. 10 to Doc. 411), argues that this inquiry was proper.  Both sides are partially correct.  The part of the contested testimony italicized above (Tr. 175:7 -177:3) is plainly outside the allowable scope of the deposition.  Whether Navient's treatment of student loans discharged due to total and permanent disability differed from other student loan services was not withing the scope of TransUnion's work.  Accordingly, that testimony will be stricken.  The balance of the testimony under Topic 8, however, does relate to work performed by TransUnion and a specific document produced by TransUnion in connection with that deposition.  Accordingly, the testimony from page 171, line 9 through page 175, line 6, and page 177, line 4 through page 178, line 15 will not be stricken.

### I.  Topic 9: Mr. Wright's opinion on what Dr. Turner knew and why Dr. Turner took certain actions.

### 1.  Questions and answers at issue:

29. Q. Do you know why they wanted the scores as of September of '18?

A. I do not.  (Tr. 46:22-24.)

30. Q. What is your understanding of why PERC asked TransUnion to provide these depersonalized credit reports?

A. I -- best of my recollection, it was they wanted to -- they were still trying to figure out what the final modification rules should be. And I believe that they – my understanding is they wanted to see this -- some sample depersonalized credit reports so they can see how the account was -- how the Navient student loan accounts were reported on the -- you know, were reported within the archives.  (Tr. 165:23-166:11.)

31. Q. Dr. Turner identifies this e-mail with the following category: "Sensitivity: Confidential." Do you know why he did that?

A. I did not.  (Tr. 195:25-196:5.)

32. Q. Did you read into it that he didn't want to make an e-mail record of those conversations, he wanted to have a telephone call instead?

A. I don't recall if I -- if I made that  opinion. I mean, sometimes you could -- you know, sometimes it could -- we get on a phone call because these topics are so complex and it's just easier to talk -- to talk it through it versus going back and forth on e-mail.  (Tr. 197:2-12.)

33. Q. So as of September of 2018, PERC didn't know what remark code should have been reported if it was reported accurately?

A. Correct.  (Tr. 55:16-19.)

## 2.  Discussion

The Bureau argues that questioning why Dr. Turner took certain actions or

what he knew or didn't know has nothing to do with the work performed by

TransUnion.  Navient counters by identifying certain documents to which the

questions related, such as the TransUnion services agreement (Ex. 3 to Doc. 411) or certain emails (e.g., Ex. 12 to Doc. 411).  But the questions, although related to documents produced by TransUnion, either called for speculation (and received "I don't know" types of responses), or did not concern the work performed by TransUnion (e.g., PERC didn't know what remark code should have been reported?).  Accordingly, the Bureau's request to strike the testimony under its Topic 9 will be granted.

## IV.    CONCLUSION

For the foregoing reasons, the Bureau's request to strike Mr. Wright's deposition testimony will be granted in part.  An appropriate Order follows.


s/ Thomas I. Vanaskie
THOMAS I. VANASKIE
SPECIAL MASTER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CONSUMER FINANCIAL          :
PROTECTION BUREAU,          :
                            :
    **Plaintiff**            :
                            :
                            :   **3:17-CV-101**
    **v.**                   :   **(Judge Mariani)**
                            :
                            :
NAVIENT CORPORATION, et al.,  :
                            :
    **Defendants.**          :

## ORDER

**NOW,** this 14th Day of February, 2020, in accordance with the foregoing Special Master Report #16, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's request to strike parts of the deposition testimony of Mr. Aaron Wright is **GRANTED IN PART**.  The following shall be stricken from his testimony and not be used in this matter: page 28:24 to 29:24; 30:9 to 31:16; 31:7-12; 32:2-15; 33:4-8; 37:12 to 38:8; 41:20-23; 46:22-24; 55:16-19; 58:24 to 59:9; 60:3-8; 64:21 to 65:18; 87:24 to 88:4; 103:25 to 104:3; 131:9 to 133:14; 165:23 to 166:11; 175:7 to 177:3; 195:25 to 196:5; and 197:2-12. In all other respects, the request to strike parts of Mr. Wright's deposition testimony is **DENIED**.

**2.** Objections to this Report #16 and Order must be submitted no later than twenty-one (21) days after service of this Order.

s/ Thomas I. Vanaskie
THOMAS I. VANASKIE
SPECIAL MASTER
