# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 3:17-cv-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | |
| Navient Corporation, *et al.,* | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY DR. XIAOLING ANG

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

   A. Dr. Ang's Work at the CFPB...........................................................................2

   B. Dr. Ang's Role in this Litigation ...................................................................5

ARGUMENT ......................................................................................................5

I.      The CFPB Has Failed To Demonstrate That Dr. Ang Received Specific, Confidential, And Substantially Relevant Information Warranting Her Disqualification.............................................................................................6

   A. The CFPB's 2013 Request for Payment Allocation Data is Irrelevant to this Lawsuit. ........................................................................................................10

   B. Communications Related to the April 2014 CID Did Not Involve Dr. Ang's Receipt of Confidential Information Substantially Related to this Lawsuit. .......12

   C. Communications Related to the April 2015 CID Did Not Involve Any Disclosure of Relevant Confidential Information. ...............................................14

   D. Communications Related to Draft Servicing Standards Do Not Show That Dr. Ang Received Relevant Confidential Information..............................................17

II.    The Balance Of Additional Factors Weighs Against Dr. Ang's Disqualification...........................................................................................18

CONCLUSION .................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Cordy v. Sherwin-Williams Co.*,
 156 F.R.D. 575 (D.N.J. 1994) ........................................................................8

*Crenshaw v. MONY Life Ins. Co.*,
 318 F. Supp. 2d 1015 (S.D. Cal. 2004) ......................................................9, 11

*Fed. Trade Comm'n v. Innovative Designs, Inc.*,
 2018 WL 1334830 (W.D. Pa. Mar. 15, 2018)...................................7, 8, 9, 12

*Grant Thornton, LLP. v. F.D.I.C.*,
 297 F. Supp. 2d 880 (S.D. W. Va. 2004) .................................................13, 18

*Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*,
 202 F.R.D. 426 (E.D. Pa. 2001) .............................................................6, 7, 10

*Hess Corp. v. Schlumberger Tech. Corp.*,
 2018 WL 6618068 (S.D. Tex. Dec. 18, 2018) ................................................8

*Hewlett-Packard Co. v. EMC Corp.*,
 330 F. Supp. 2d 1087 (N.D. Cal. 2004)................................................. Passim

*Koch Refining Co. v. Boudreaux MV*,
 85 F.3d 1178 (5th Cir.1996) ...........................................................................7

*Orion Corp. v. Sun Pharm. Indus., Ltd.*,
 2009 WL 5872982 (D.N.J. June 12, 2009).....................................................7

*Return Mail, Inc. v. United States*,
 107 Fed. Cl. 459 (2012)..................................................................................8

*Rhodes v. E.I. Du Pont De Nemours & Co.*,
 558 F. Supp. 2d 660 (S.D. W.Va. 2008) ........................................................6

*U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab*
 *Sys., Inc.*, 994 F. Supp. 244 (D.N.J. 1997) ........................................... Passim

*United States v. Medico Indus., Inc.*,
    784 F.2d 840 (7th Cir. 1986) ............................................................................6

*Wang Labs., Inc. v. Toshiba Corp.*,
    762 F. Supp. 1246 (E.D. Va. 1991) ..................................................................8

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 207 ..................................................................................................6

Department of Education, Memorandum from Ted Mitchell to James
    Runcie, "Policy Direction on Federal Student Loan Servicing,"
    *available at* https://www2.ed.gov/documents/press-
    releases/loan-servicing-policy-memo.pdf ......................................................17

## OTHER AUTHORITIES

H.R. Rep. No. 748, 87th Cong., 1st Sess. (1961) ......................................................6

FDIC, "FDIC Announces Settlement with Sallie Mae for Unfair and
    FDIC Announces Settlement with Sallie Mae for Unfair and
    Deceptive Practices and Violations of the Servicemembers
    Civil Relief Act" (May 13, 2014), available at
    https://www.fdic.gov/news/news/press/2014/pr14033.html ..........................10

iv

## **INTRODUCTION**

To support its motion for disqualification, the CFPB was required to present evidence of "specific and unambiguous disclosures" by CFPB lawyers to Dr. Xiaoling Ang of confidential information that is substantially related to the claims in this lawsuit.  *See Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004).  After many written submissions and an extensive evidentiary hearing, the CFPB has failed to identify *any* such evidence.  That failure requires rejection of the disqualification motion.

Rather than point to such evidence, the CFPB has resorted to generalities to support their motion—claiming that Dr. Ang was "exposed" to the "mental impressions" of CFPB lawyers or to the "goals" of a particular information request. These conclusory assertions fall well short of the high burden required for a party seeking the "rare" and "drastic" measure of expert disqualification.  *Id.* at 1092.  In particular, there is no evidence that CFPB lawyers—during interactions with Dr. Ang almost two years (or more) *before* the CFPB filed suit—shared their views on the strengths and weaknesses of their litigated claims against Navient, Navient's anticipated defenses, or the arguments the CFPB might make to overcome those defenses and prove their claims.  Indeed, the CFPB has presented no evidence that CFPB lawyers ever shared with Dr. Ang any information that even approaches the

information available in the CFPB's publicly filed complaint in this lawsuit.

The evidentiary hearing also revealed the vast gulf between the economic analysis in Dr. Ang's report and the technical comments she made to several Bureau Civil Investigative Demand ("CID") requests.  Dr. Ang's report relies exclusively on her expertise as an economist, and involves analysis of a massive loan-level dataset produced in discovery as part of her rebuttal of the opinions of the CFPB's expert regarding the relative costs and benefits of forbearance and income-driven repayment ("IDR") plans.  That work bears no resemblance to the technical comments she provided for several CID requests while employed at the Bureau.  Rather, the CIDs involved requests for aggregate, summary information concerning matters far afield from her report, and the evidence showed that Dr. Ang only once received any produced information (concerning an issue that is not part of this lawsuit).  In light of those differences, the CFPB's claim that they are somehow prejudiced by Dr. Ang's incidental contacts with CFPB enforcement lawyers are implausible.  Absent any such evidence, and given the significant prejudice that disqualification would cause both Defendants and Dr. Ang, the CFPB's request for disqualification should be denied.

## **BACKGROUND**

### **A. Dr. Ang's Work at the CFPB**

From July 2011 until November 2015, Dr. Ang worked as an Economist in

the Office of Research in the Research, Markets, and Regulations ("RMR")

Division of the CFPB.  Doc. 393, Ex. A (Declaration of Dr. Xiaoling Lim Ang)

¶¶ 6-7.  In that role, she worked on general research and policy issues impacting

various product and service markets, including the student loan servicing market.

*Id.* ¶ 9.  Dr. Ang was occasionally consulted by members of other CFPB offices

regarding technical matters involving student loans.  *Id.* ¶ 4.

The evidentiary record consists of a mere four episodes during Dr. Ang's

tenure at the CFPB that had any potential relevance to the Navient matter:[1]

**Episode #1**.  In September 2013, Brandis Anderson, an attorney in the

CFPB's Enforcement office, reached out to Tim Critchfield, an analyst in the

Office of Research, regarding a request for data regarding Navient's "payment

allocation method" when a borrower made a "partial payment."  Feb. 20, 2020

Hrg. Tr. at 74:17-19.  After Michelle Kambara, another analyst, was assigned to

---

[1] The CFPB relies almost exclusively on hearsay emails to meet its burden.  Its witnesses generally lacked independent recollections of the events and could not corroborate their substance.  Defendants objected and moved to strike CFPB Exhibits 1-4, 6-11, 13-18, 20, and 42-45.  Notably, the CFPB no longer argues that the exhibits are admissible as business records, effectively conceding they are not (and waiving any argument to the contrary).  *See* Doc. 439.  In various guises, the CFPB argues instead that the exhibits should be admitted for purposes other than the truth of their contents.  *Id.* at 9-10.  Given the procedural posture here, for purposes of this brief Defendants treat the challenged exhibits as admitted for their truth, but it is important to note that if they are admitted for the limited purposes sought by the CFPB, their substance cannot be properly considered in determining the nature and extent of Dr. Ang's involvement in the Navient investigation.

work on this issue, *see* Feb. 20 Hrg. Tr. at 51, Dr. Ang was asked to attend

meetings regarding "various allocation methodologies," *see* CFPB Ex. 2, and

whether data could be used to "calculate restitution" relating to Navient's payment

allocation method. *See* CFPB Exs. 42-44; Feb. 20 Hrg. Tr. at 74:17-19.

**Episode #2**. In April 2014, Ms. Anderson reached out to Dr. Ang and Mr.

Critchfield to obtain their input on "four requests for written reports" that

Enforcement was planning to send to Navient as part of a Civil Investigative

Demand ("CID"). CFPB Ex. 11 at A55. Four days later, Dr. Ang responded with

an e-mail providing "[a] few thoughts" on these requests. CFPB Ex. 11 at A52.

**Episode #3**. Nearly a year later, in March 2015, Ms. Anderson again e-

mailed Dr. Ang and Mr. Critchfield regarding a CID. Dr. Ang did not initially

respond to Ms. Anderson's e-mail, but eventually provided two brief edits. CFPB

Ex. 14, at A103-107, A118, A122. After sending this response, Dr. Ang also met

with Ms. Anderson to discuss "resource allocation" and how Ms. Anderson "was

willing to have a dialogue about how to think about data analysis and how to

effectively work and interact with colleagues in other divisions." Feb. 20 Hrg. Tr.

at 301-302.

**Episode #4**. Finally, in October 2015, Dr. Ang was among more than ten

members of the RMR Division asked for feedback on a draft set of "servicing

standards" prepared by the CFPB's Office for Students. CFPB Ex. 20 at A189.

4

Ten days later, Dr. Ang provided "a couple of quick bubbles" about a single topic. *Id.* at A188.  She left the CFPB less than a month later.  *See* Doc. 393 Ex. A ¶ 7.

## B.  Dr. Ang's Role in This Litigation

Dr. Ang's expert report in this matter rebuts conclusions reached by the CFPB's expert, Dr. Charles Mullin, regarding interest costs to Navient borrowers who enrolled in forbearance rather than IDR plans.  Feb. 20 Hrg. Tr. at 264.  In preparing this report, Dr. Ang relied on her general knowledge of federal student loan policy and regulations, as well as a large dataset of borrower- and transaction-level information produced in this litigation.  *Id.* at 267-268.  Dr. Ang's report does not include any criticism of the sufficiency of the borrower data requested by the CFPB and analyzed by Dr. Mullin.  *Id.* at 273-74.  Rather, it points out flaws in Dr. Mullin's methodologies for analyzing that data, including his unfounded assumptions regarding borrower incomes and his failure to account for the various factors affecting the relative costs and benefits of forbearance and IDR plans.  *Id.* at 264; 272-73.  This analysis adheres closely to an article Dr. Ang published in March 2017, shortly after the CFPB filed its Complaint, in which she demonstrated the difficulty of predicting *ex ante* whether forbearance or IDR would prove a better long-term option for borrowers.  *Id.* at 311:11-23; Doc. 393 Ex. A at 33.

## ARGUMENT

Expert disqualification is a "drastic measure" that should be imposed "only

5

hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004).  The CFPB has failed to demonstrate that this extraordinary remedy is warranted here.

I.      **THE CFPB HAS FAILED TO DEMONSTRATE THAT DR. ANG RECEIVED SPECIFIC, CONFIDENTIAL, AND SUBSTANTIALLY RELEVANT INFORMATION WARRANTING HER DISQUALIFICATION.**

Where a party seeks to disqualify an adversary's expert witness due to the party's prior employment of the expert, the two-part conflict-of-interest test applies.  *See Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 429 (E.D. Pa. 2001); *see also* Doc. 393 at 3 (collecting cases applying this test).[2]  Under this test, the party seeking disqualification must establish both that it had a confidential relationship with the expert and that the expert in fact

---

[2] The CFPB has repeatedly suggested that a bright-line "side-switching" rule applies here.  *See* Doc. 387 at 1-2; Doc. 425 at 1-2.  As explained in Defendants' January 13, 2020 letter, the Bureau's bright-line rule has been applied only in narrow circumstances not present here, and it has *never* been the sole basis for disqualification.  Any such rule is inapplicable because Dr. Ang was not "retained as an expert by the adverse party in the same litigation."  *See* Doc. 393 at 5 (quoting *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660, 664 (S.D. W.Va. 2008)).  We are aware of no case (and the CFPB cites none) disqualifying a former federal government employee based on the Bureau's "bright-line" rule.  To apply the Bureau's rule in this context would run counter to Congress's enactment of express statutory provisions governing the post-employment activities of federal employees.  *See* 18 U.S.C. § 207; *see also United States v. Medico Indus., Inc.*, 784 F.2d 840, 843 (7th Cir. 1986) (explaining that the purpose of § 207 is to prevent officials from "switching sides in a matter" (quoting H.R. Rep. No. 748, 87th Cong., 1st Sess. (1961)).

received "confidential information" relevant to the current litigation. *Id.* at 432. In addition, courts applying this test have made clear that the party seeking disqualification must show that the "confidential information" disclosed to the former employee satisfies several criteria.

*First*, the information in question must be "substantially related" to the issues in the litigation. *See Greene, Tweed*, 202 F.R.D. at 430; *see also Orion Corp. v. Sun Pharm. Indus., Ltd.*, 2009 WL 5872982, at *3 (D.N.J. June 12, 2009) ("In the context of expert disqualification, disclosure of 'confidential information' encompasses facts and ideas *directly relating to or impacting the litigation in issue*.") (emphasis added). As courts have widely recognized, such information includes "discussion of the retaining party's strategies in the litigation, the party's views of the strengths and weaknesses of each side, the role of each of the party's witnesses to be hired, and anticipated defenses." *Id.* (quoting *U.S. ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 250 (D.N.J. 1997) (same); *see also Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir.1996) (same); *Fed. Trade Comm'n v. Innovative Designs, Inc.*, 2018

WL 1334830, at *7 (W.D. Pa. Mar. 15, 2018) (same).[3]

*Second*, the relevant confidential information disclosed to the expert must be identified with *specificity*. "Conclusory assertions, unproven statements, or generalized and vague allegations" regarding the information the expert may have received are not sufficient. *Innovative Designs, Inc.*, 2018 WL 1334830, at *8. Similarly, "discussions between…counsel and experts do not carry the presumption that confidential information was exchanged." *Return Mail, Inc. v. United States*, 107 Fed. Cl. 459, 465 (2012). Rather, disqualifying an expert witness requires evidence of "specific and unambiguous disclosures" that if revealed by an expert to an opponent "would prejudice the party" seeking disqualification. *Hewlett-Packard Co.*, 330 F. Supp. at 1087; *see also Hess Corp. v. Schlumberger Tech. Corp.*, 2018 WL 6618068, at *3 (S.D. Tex. Dec. 18, 2018)

---

[3] The CFPB argues that disclosure of protected information to an expert requires disqualification "regardless of the content of that information." *See* Doc. 425 at 2. Indeed, the CFPB appears to assert that the mere fact that Dr. Ang received material that the CFPB has now redacted on work product or deliberative process grounds is sufficient to disqualify her. But that is not the law. The cases the CFPB cites demonstrate that only disclosures substantially related to and directly impacting litigation issues warrant disqualification. In *Wang Labs., Inc. v. Toshiba Corp.*, for example, the court disqualified an expert who had received a "lengthy, detailed memorandum" concerning the patents at issue and a letter outlining the attorney's views on potential defenses to the lawsuit. 762 F. Supp. 1246, 1247, 1249 (E.D. Va. 1991). Similarly, in *Cordy v. Sherwin-Williams Co.*, the disqualified expert received "a three ring binder containing the investigation conducted by plaintiff's counsel" as well as "a cover letter with counsel's impression of the case." 156 F.R.D. 575, 577 (D.N.J. 1994).

(no disqualification where party "fail[ed] to cite any *specific* confidential

information" disclosed to expert) (emphasis added).

*Third*, the specific, substantially relevant information to which the expert

was privy must be information that "remains confidential." *See, e.g.*, *Crenshaw v.

MONY Life Ins. Co.*, 318 F. Supp. 2d 1015, 1027 (S.D. Cal. 2004) (expert not

disqualified where information disclosed did not exceed facts encompassed by

plaintiff's complaint).  Disqualification is not required where the purportedly

confidential information was subsequently provided to the opposing party.  *See*

*Hewlett-Packard Co.*, 330 F. Supp. 2d at 1097 (no disqualification where allegedly

confidential information was part of "the parties' extensive disclosures" during

litigation).  Similarly, an expert's receipt of information that later becomes

"discoverable" or "publicly-available" does not warrant disqualification.  *See*

*Innovative Designs, Inc.*, 2018 WL 1334830, at *9.

The CFPB has failed to demonstrate that Dr. Ang received any information

that could trigger disqualification under the two-part test.  The Bureau's evidence

at the hearing focused on a mere *four* episodes during Dr. Ang's employment at the

Bureau that allegedly touched on the Navient matter.  But the evidence as to each

of these episodes failed to demonstrate any disclosure of specific, confidential

information relevant to the CFPB's claims in this case.  To the contrary, the

evidentiary record shows that any information Dr. Ang received fell well short of

the information contained in the Bureau's publicly filed Complaint.

    A.    <u>The CFPB's 2013 Request for Payment Allocation Data is Irrelevant to this Lawsuit.</u>

The first episode cited by the CFPB, which encompasses Exhibits 1-9 and 42-44 and related testimony, satisfies none of the criteria required for disqualification.  Most importantly, the data request described in these exhibits has no relationship—much less a "substantial[]" relationship—to any issue in this litigation.  *See Greene, Tweed*, 202 F.R.D. at 429.  The request sought information regarding late fees charged as a result of Navient's methodologies for allocating partial payments across a borrower's various loans.  *See* CFPB Ex. 6; Feb. 20 Hrg. Tr. at 74:17-19 (testimony by Ms. Kambara).[4]  There is no such claim in this litigation.  And while some Bureau witnesses referred to this as a "payment processing" issue, *see, e.g.*, Feb. 20 Hrg. Tr. at 85:13-18 (testimony by Mr. Critchfield), 204-205 (testimony by Ms. Lesser), the issue has nothing to do with the actual "payment processing" claim in the lawsuit, which focuses on alleged errors Navient made in implementing borrower instructions and "the time that

_____

[4] As Mr. Critchfield testified, this was an issue that the "[Federal Deposit Insurance Corporation ("FDIC")] went after . . . in a separate suit."  *See* Feb. 20 Hrg. Tr. at 110:22-25.  In May 2014, Navient entered into a consent order with the FDIC to resolve the agency's claim that its allocation methodologies resulted in unlawful late fee charges.  *See* FDIC, "FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act" (May 13, 2014), *available at* https://www.fdic.gov/news/news/press/2014/pr14033.html.

[borrowers] expended" seeking to correct those alleged errors.  *See* Compl. ¶¶ 97-112; Ex. A (Plaintiff's Seventh Supplemental and Amended Initial Disclosures) at 6.[5]

Apart from the irrelevance of this episode to the litigation and Dr. Ang's report, the CFPB also has failed to show that any communications with Dr. Ang involved the disclosure of "specific" confidential information, *see Hewlett-Packard Co.*, 330 F. Supp. at 1087, that "remains confidential," *see Crenshaw*, 318 F. Supp. at 1027.  The data request shared with Dr. Ang was itself sent to Navient, *see* Ex. 5, and thus is no longer "confidential" material.  Further, general statements by Bureau witnesses that Dr. Ang may have participated in a discussion of the "goals" and "legal theories" for the data request are entitled to no weight given the witnesses' inability to recall any specific information shared during these

---

[5] Attempting to sidestep the irrelevance of the October 2013 data request to any issues in this case, the CFPB has sought to draw a parallel between its decision not to bring certain claims against Navient and decisions by Navient regarding what defenses to raise against the CFPB's claims.  *See, e.g.*, Feb. 14 Hrg. Tr. at 17; Feb. 20 Hrg. Tr. at 400-01.  This nonsensical comparison ignores the fact that this litigation—like any lawsuit—is defined by the four corners of the plaintiff's complaint.  Although Navient may evaluate the strengths and weaknesses of various defenses to the claims included in the CFPB's Complaint, choosing to raise some while discarding others, it remains limited to defending itself against claims the CFPB actually brought in this lawsuit.

discussions.[6]  Thus, even if the October 2013 request were relevant to this lawsuit (which it is not), the CFPB's "conclusory assertions" regarding the information shared with Dr. Ang fall short of the specific evidence required to disqualify an expert.  *See Innovative Designs, Inc.*, 2018 WL 1334830, at *8.

      B.    <u>Communications Related to the April 2014 CID Did Not Involve Dr.
Ang's Receipt of Confidential Information Substantially Related to
this Lawsuit.</u>

The next episode, which includes Exhibits 10-12 and associated testimony, likewise cannot support Dr. Ang's disqualification, for several reasons.  First, the evidence shows that the *only* information Dr. Ang received were draft versions of written report requests that were ultimately sent to Navient.  *See* CFPB Ex. 11, at A55-57.  There is no evidence in the record of Ms. Anderson or anyone else sharing any additional information about these requests, much less information regarding Enforcement's "strategies in the litigation" the "strengths and weaknesses" of its case, or any other confidential information substantially

_____

[6] Rather than identify any specific disclosures regarding "goals" or "legal theories," Mr. Critchfield testified only that information about such topics typically "would" have been shared by enforcement attorneys "in most of the cases."  *See* Feb. 20 Hrg. Tr. at 89:1-9.  Similarly, Ms. Lesser could not specify any particular information disclosed to attendees of these meetings, *see* Feb. 20 Hrg. Tr. at 215-16, 234-37.  Ms. Kambara likewise could not remember any specific facts about these meetings beyond what is evident from the exhibits.  *See* Feb. 20 Hrg. Tr. 52:17-21, 54-55, 58:3-7, 65:8-25.

relevant to the litigation.  *See U.S. ex rel. Cherry Hill*, 994 F. Supp. at 250.[7]

Moreover, none of the requests for written reports included in the final CID and evidently shared with Dr. Ang have any bearing on the issues regarding IDR and forbearance addressed in Dr. Ang's report.  *See Grant Thornton, LLP. v. F.D.I.C.*, 297 F. Supp. 2d 880, 883 (S.D. W. Va. 2004) (recognizing that disqualification requires showing that information disclosed "has affected or will affect the expert's opinions").  Instead, they relate to the number of borrowers who were denied cosigner release, the number of borrowers whose cosigners died or went into bankruptcy, and disclosure of late fees.  Ex. 12, A68-69.  Indeed, Mr. Critchfield, who appears with Dr. Ang on these communications, testified that he did not, at any time, "recall working on income-based repayment plans or forbearance . . . on the Navient case."  Feb. 20 Hrg. Tr. at 125:14-22.  The only topics he remembered discussing were "late payments and payment processing orders."  Feb. 20 Hrg. Tr. at 125:19-22.

Finally, like the October 2013 data request, the April 2014 CID is no longer confidential because it was ultimately shared with Navient.  *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1097 (information "disclos[ed]" to opposing party is not

---

[7] Although Mr. Critchfield and Ms. Lesser each testified regarding this episode, their testimony did not reveal any facts not evident from the face of the documents. *See* Feb. 20 Hrg. Tr. at 95-100 (testimony by Mr. Critchfield); Feb. 20 Hrg. Tr. at 212-13 (testimony by Ms. Lesser).

confidential).  And there is no evidence Dr. Ang ever received, reviewed, or discussed any data produced in response to the requests.  Absent documents or testimony indicating that Dr. Ang received confidential information substantially related to the claims in this lawsuit, the handful of "thoughts" she contributed to the document provide no support for the CFPB's disqualification motion.

C.      Communications Related to the April 2015 CID Did Not Involve Any Disclosure of Relevant Confidential Information.

Exhibits 13-19 concern an episode during which Ms. Anderson requested Dr. Ang's assistance for an April 2015 CID to Navient.  Like the earlier episodes, the evidence as to this exchange fails to show that Dr. Ang received any confidential information relevant to the issues in this case.  Again, the only evidence of any "specific" information conveyed to Dr. Ang was a draft of the CID the CFPB subsequently sent Navient—that document is no longer confidential. *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1087, 1097.

Moreover, while the CFPB's exhibits suggest that Dr. Ang may have had one or more discussions with Ms. Anderson regarding the CID, *see* CFPB Exs. 15, 16, 17, there is no evidence that any specific confidential information was conveyed to Dr. Ang during discussions in March 2015.  Nor is there any evidence that Dr. Ang received information regarding the Bureau Enforcement's "strategies in…litigation," or the "strengths and weaknesses" of Enforcement's case against Navient.  *See U.S. ex rel. Cherry Hill*, 994 F. Supp. at 250.  Indeed, Ms. Hartmann

14

could not describe *any* information that was discussed at these meetings, and Ms.

Anderson was not present at the hearing to testify regarding what was discussed.

Feb. 20, 2020 Hrg. Tr. at 175, 178-79.

Moreover, Dr. Ang recalled that any such meeting concerned "resource

allocation" and how Ms. Anderson "was willing to have a dialogue about how to

think about data analysis and how to effectively work and interact with colleagues

in other divisions." Feb. 20 Hrg. Tr. at 301-302. That description is consistent

with Dr. Ang's contemporaneous e-mails regarding the discussion. For example,

Dr. Ang's initial response to Ms. Anderson included general suggestions for how

Ms. Anderson should go about enlisting help from the Office of Research on

Enforcement matters. *See* Ex. 14 at A103. This advice included engaging an

"analyst" in the "full lifecycle" of a matter, rather than sending ad hoc requests.

*Id.* Similarly, the e-mail Dr. Ang sent to her supervisors after the meeting explains

her hope that the discussion would prove "useful" for "future interactions with

Enforcement," and "encourages more structured thinking about strategies and

objectives." CFPB Ex. 17, at A132-33.

Although Dr. Ang's e-mail mentions that Ms. Anderson "clarified the goals

of the CID," there is no evidence that this "clarification" involved the

communication of any confidential information relevant to the issues in this

litigation. *See* CFPB Ex. 17 at A132. Because no other witness testified regarding

15

the discussion, the evidence in the record is limited to the description in Dr. Ang's

e-mail, which states that Enforcement sought information that would allow "[r]ates

of entry into particular repayment categories [to] be compared." *Id.* That objective

is not confidential, as the CID itself makes clear that Enforcement wanted

aggregate data regarding the number of borrowers enrolling in different repayment

options. *See* CFPB Ex. 19 at A151 (requesting data regarding "the total number of

borrowers" enrolled in various options). Moreover, there is no evidence that Dr.

Ang received any information Navient produced in response to this request.

Indeed, Dr. Ang appears on no further communications regarding data requests to

Navient. The record also does not show that Dr. Ang was privy to any "litigation

strategy" or other confidential information regarding how the CFPB sought to use

data produced in response to this request. *See Hewlett-Packard Co.*, 330 F. Supp.

at 1096.[8] Finally, the high-level, aggregate data requested in the 2015 CID bears

no resemblance to the massive set of borrower- and transaction-level data that was

produced by Navient in discovery and that Dr. Ang and Dr. Mullin each analyzed

in their respective expert reports.

---

[8] Whereas there is no evidence any such strategies were shared with Dr. Ang, the
CFPB's Complaint makes plain its theory that the rate at which borrowers enrolled
in different options supports its "steering" claims. *See, e.g.*, Compl. ¶ 50 (alleging
that "the number of borrowers that Navient enrolled in forbearance has generally
exceeded the number of borrowers enrolled in income-driven repayment plans"
and citing data regarding enrollment rates under those options).

16

Absent specific evidence that her interactions with Ms. Anderson involved the disclosure of any relevant confidential information, neither Dr. Ang's cursory edits to the April 2015 CID nor her high-level feedback for improving coordination between Enforcement and the Office of Research support her disqualification.

> D.   Communications Related to Draft Servicing Standards Do Not Show That Dr. Ang Received Relevant Confidential Information.

The final document the CFPB points to in support of disqualification—the single e-mail chain in Exhibit 20—includes nothing approaching the specific and substantially relevant confidential information required to disqualify an expert. First, the document has at most an attenuated connection to the Navient matter. It is evident from the face of the e-mail exchange that development of the "servicing standards" represented a policy-driven effort directed by an official in the CFPB's Office for Students (Michael Pierce) rather than Enforcement. *See* CFPB Ex. 20, at A188-89.[9]  Indeed, not a single enforcement attorney is included on the e-mail chain. *Id.*; Feb. 20 Hrg. Tr. at 157:23-25.  Second, the CFPB's proposed conduct

---

[9] The record shows that around the same period, the Office for Students was working on another set of "guidelines . . . for student loan servicing" that were "not specific to Navient." *See* Feb. 20, 2020 Hrg. at 161; Defs.' Ex. 7.  This set of standards was provided to the Department of Education, *see id.*, and they were ultimately incorporated into a public memorandum providing "policy direction for the servicing of all federal student loans."  *See* Department of Education, Memorandum from Ted Mitchell to James Runcie, "Policy Direction on Federal Student Loan Servicing," *available at* https://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

standards were "eventually . . . sent to Navient," *see* Doc. 387 at 3, and thus are no

longer confidential in any relevant sense, *see Hewlett-Packard Co.*, 330 F. Supp.

2d at 1097.

Finally, nothing in the record indicates that the accompanying e-mail chain

contained the type of relevant confidential information warranting disqualification.

To the contrary, Thomas Conkling, an economist in the Office of Research who

participated in developing the standards, confirmed that the emails sent to Dr. Ang

included nothing regarding "the strengths and weaknesses of [Enforcement's] case

against Navient," the "defenses Navient might assert in litigation," or "the various

arguments [Enforcement lawyers] might make." *See* Feb. 20, 2020 Hrg. at 158:1-

15.  Instead, like the CFPB's other evidence, Dr. Ang's input on the servicing

standards—a "couple of quick bubbles" on what appears to be a single topic, *see*

CFPB Ex. 20, at A188—is entirely consistent with her role as a research economist

who had only episodic, limited, and technical involvement in such matters.

## II.      THE BALANCE OF ADDITIONAL FACTORS WEIGHS AGAINST DR. ANG'S DISQUALIFICATION

By failing to identify any specific disclosure of confidential information

substantially related to the issues in this case, the CFPB has fallen far short of the

"'high standard of proof' to show that disqualification is warranted." *Grant*

*Thornton, LLP*, 297 F. Supp. 2d at 882.  While that failure alone is sufficient to

deny the CFPB's request, the ultimate question before the Court is whether

18

permitting Dr. Ang to participate in this matter would in any way undermine "the fairness and integrity of [these] proceedings." *See U.S. ex rel. Cherry Hill*, 994 F. Supp. at 248.  Each of the "policy objectives" relevant to that inquiry weighs against disqualification here.  *Id.* at 252.

First, the CFPB is in no way "prejudiced by [Dr. Ang's] continued participation in this litigation." *See id.*  As made clear in her declaration and testimony, Dr. Ang's expert report in this matter is focused on specific opinions presented by the CFPB's expert regarding the costs of forbearance compared to income-driven repayment ("IDR") plans.  *See* Doc. 393 Ex. 1 ¶¶ 26-27; Feb. 20 Hrg. Tr. at 271-74.  To rebut Dr. Mullin's conclusions, Dr. Ang relied on her expertise as an economist and information produced in this litigation—including transaction-level data involving "millions if not billions of records" of Navient borrowers.  *Id.* at 268:17-25.  Contrary to the CFPB's misleading statement that Dr. Ang's report concerns "the exact same topics that she was assisting Bureau attorneys with," *see* Jan. 16 Hrg. Tr. at 36, none of Dr. Ang's brief, episodic interactions with these attorneys—in which she provided technical input on data requests for *aggregate* information—had anything to do with analysis of borrower-level data.[10]  Having established no plausible relationship between Dr. Ang's work

---

[10] As confirmed in her testimony, at no point during her tenure at the CFPB did Dr. Ang review loan-level data for Navient or other servicers.  Feb. 20 Hrg. Tr. at 396.

at the CFPB and the issues addressed in her expert report, the CFPB cannot claim any prejudice from Dr. Ang's participation in this case.

Second, disqualifying Dr. Ang would cause Defendants significant prejudice. Defendants engaged Dr. Ang based on her unique qualifications as an economist with student loan policy experience. At this "late stage of the litigation," the exclusion of an expert with that type of "specialized knowledge" would set Defendants back significantly in their years-long effort to reach the merits of the CFPB's claims and respond fully to the unfounded charges leveled by the CFPB. *See U.S. ex rel. Cherry Hill*, 994 F. Supp. at 252.

Finally, it bears mentioning that disqualification could significantly impair Dr. Ang's ability to "pursue [her] professional calling." *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1095. Absent any indication that Dr. Ang even *received* confidential information relevant to issues in this litigation—much less attempted to use such information to obtain any advantage in this case—neither fundamental fairness nor the integrity of these proceedings requires such a result.

## <u>CONCLUSION</u>

For the foregoing reasons, the CFPB's request to disqualify Dr. Ang from participating as an expert in this matter should be denied.

Dated:  March 3, 2020           Respectfully submitted,

/s/ Daniel P. Kearney
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient Solutions, LLC, and Pioneer Credit Recovery, Inc.*

## CERTIFICATE OF WORD COUNT

I hereby certify pursuant to Local Rule 7.8(b)(2) that the foregoing

document is 5,028 words.  Pursuant to Local Rule 7.8(b)(3), the length of this

document complies with the prior authorization of the Court.  *See* Doc. 434.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service:

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363