# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | |
| | : | |
| Plaintiff | : | 3:17-CV-101 |
| | : | |
| v. | : | |
| | : | Hon. Robert D. Mariani |
| NAVIENT CORPORATION, et al., | : | Special Master Thomas I. Vanaskie |
| | : | |
| Defendants. | : | |
| | : | |

## SPECIAL MASTER REPORT #18 – PLAINTIFF'S REQUEST TO DISQUALIFY DR. ANG AS AN EXPERT WITNESS FOR NAVIENT

### I.     INTRODUCTION

Plaintiff Consumer Financial Protection Bureau (the "Bureau") seeks to disqualify its former employee, Economist Xiaoling Lim Ang, Ph. D.,  ("Dr. Ang"), from serving as an expert witness for Defendants Navient Corporation, Navient Solutions, Inc., and Pioneer Credit Recovery, Inc. (collectively "Defendants" or "Navient") (Doc. 387).  The Bureau argues that a "bright-line rule" for disqualification of "side-switching" experts applies here.  Alternatively, the Bureau asserts that the existence of a "confidential relationship" between the Bureau and Dr. Ang, coupled with her receipt of "confidential" information relating to the Bureau's investigation of Navient, requires her disqualification.

Having undertaken the requisite "fact-intensive" inquiry, *see Hess Corp. v. Schlumberger Tech. Corp.,* No. CV H-16-3415, 2018 WL 6618068, at *2 (S.D. Tex. Dec. 18, 2018), consisting of review of hundreds of pages of exhibits and a hearing transcript of more than 400 pages, I have concluded that the "bright line" rule does not apply here. I have also concluded that Dr. Ang's sporadic and brief interactions with the Bureau's Office of Enforcement attorneys over a period of two years did not expose her to confidential information substantially related to the opinions she has offered in her report in this matter such that the Bureau will be prejudiced if she remains an expert witness in this particular case. Because the Bureau has not carried its heavy burden of showing that the "drastic measure" of disqualification of Dr. Ang is warranted, *see Hewlett-Packard Co. v. EMC Corp.,* 330 F. Supp. 2d 1087, 1090 (N.D. Cal. 2004), its request will be denied.

## II.    BACKGROUND

From July of 2011 until November of 2015, Dr. Ang was an Economist in the Bureau's "Office of Research" in its "Research, Markets, & Regulations Division."[1] (Feb. 20, 2020 Tr. at 254-55.) Her responsibilities included

---

[1] As of February of 2013, the Bureau was organized into six "Divisions": (1) Operations; (2) Consumer Education & Engagement; (3) Supervision, Enforcement & Fair Lending; (4) Research Markets & Regulations; (5) External Affairs; and (6) Legal. There were several "Offices" under each Division. The Research, Markets & Regulations Division had six "Offices": (1) Card Markets; (2) Credit Information, Collections, and Deposits Markets; (3) Installment and Liquidity Lending Markets; (4) Mortgage Markets; (5) Regulations; and (6)

performance of "research in support of policy projects." (*Id.* at 255.) For a period

of time, she was assigned to the Bureau's Division of Consumer Education &

Engagement working on financial coaching programs. Dr. Ang devoted several

hours per week for a year or two on that particular assignment. (*Id.* at 256-57.)

The Bureau's investigation of Navient was active during Dr. Ang's tenure

there.[2] The investigation was undertaken by the Office of Enforcement within the

Bureau's Division of Supervision, Enforcement & Fair Lending ("SEFL"). (*Id.* at

24-26.) The Office of Enforcement was located in a building different than the

building housing the Office of Research, and Dr. Ang did not have access to

Enforcement's files. (*Id.* at 256.)

Attorneys in the Office of Enforcement called upon the Office of Research

on a few occasions for advice in connection with requests for information from

Navient. These requests were made informally and on an *ad hoc* basis. As set

forth in more detail below, Dr. Ang was consulted by attorneys from the Office of

Enforcement about the Navient investigation in September of 2013, February of

2014, April of 2014, March of 2015, and October of 2015. Each of these

interactions was relatively brief, and Dr. Ang did not devote a substantial amount

---

Research. *See* Exhibit A-1 to Dr. Ang's Declaration, filed on Jan. 13, 2020 (Doc.
393-1, p. 19.)

[2] At the time that the Bureau's investigation began, Navient was known as
"Sallie Mae," and references to Sallie Mae in this Report mean Navient.

of time to these episodic engagements.  It does not appear that Dr. Ang supervised

any other person's work on the Navient investigation.  Notably, Dr. Ang was not

asked to provide a report as an expert witness.

This litigation was brought in January of 2017, about 14 months after Dr.

Ang left the Bureau.  (*Id.* at 255.)  One of the central claims of the lawsuit is that

student loan borrowers were wrongfully steered into "forbearance" of loan

payments instead of "income-based repayment" plans.  The Bureau contends that

borrowers wrongfully "steered" into forbearance incurred considerable costs.

In March of 2017, while engaged as a consultant for Edgeworth Economics,

Dr. Ang published an article in *Law360* entitled, "Student Loan Repayment

Options in Light of CFPB v. Navient."  (Feb. 20, 2020 Tr. at 308.)  Dr. Ang

testified that the article opines that "income-driven repayment is not necessarily

better for a borrower and that is not possible to determine [that] at the time the

decision [to enroll in the forbearance program] is made."  (*Id.* at 311.)  The Bureau

was aware of publication of the article in the Spring of 2017, but did not object to

Dr. Ang's authoring of the article or contend that it relied upon information

disclosed to her in confidence while she was employed by the Bureau.  (*Id.* at 312-

13.)

In August of 2017, Dr. Ang was contacted by Navient's counsel about the

prospect of testifying as an expert witness on behalf of Navient.  (*Id.* at 341-42.)

Navient's interest in Dr. Ang was sparked by her *Law360* article. She was formally retained by Navient's counsel in February of 2018. In November of 2019, Navient served the Bureau with Dr. Ang's report. Her report is intended to rebut the report of one of the Bureau's experts, Dr. Charles Mullin, and reflects information in her article.[3]

By letter dated December 27, 2019, the Bureau requested disqualification of Dr. Ang along with other relief for having "switched sides."[4] (Doc. 287.) Citing *Rhodes v. E.I. Du Pont de Nemours & Co.*, 558 F. Supp. 2d 660, 666 (S.D. W. Va. 2008), for the recognition of a "bright-line" rule mandating disqualification when an expert "switches sides," the Bureau argues that Dr. Ang switched sides because she worked directly on the Navient investigation during her employment with the Bureau and then accepted an engagement to serve as an expert for Navient. The Bureau argues alternatively that disqualification is warranted because the Bureau reasonably believed that it had a confidential relationship with Dr. Ang and confidential information "sufficiently related to this litigation" had been disclosed to her. (Doc. 387 at 4, citing, *inter alia, Rhodes,* 558 F. Supp. 2d at 666-67.) In

---

[3] Dr. Ang's report was presented as an exhibit at the Feb. 20, 2020 hearing.

[4] In addition to disqualification, the Bureau requests that Dr. Ang's report, her communications with Navient, and her communications with counsel for Navient be destroyed.

support of its application for disqualification, the Bureau submitted for *in camera* review 41 separately numbered exhibits comprising nearly a thousand pages.

On January 13, 2020, Navient timely responded to the Bureau's request to disqualify Dr. Ang. (Doc. 393.) While arguing that the "bright line" rule for "side-switching" did not apply here and that Dr. Ang's limited technical guidance on data collection during the Bureau's investigation of Navient was insufficient to merit disqualification, Navient also objected to the Bureau's reliance upon *in camera* review of documents and requested an "in-person hearing" on the question of disqualification. (*Id.* at 2-3.)

Argument on the matter was heard by telephone on January 16, 2020. By Order issued later that day, the Bureau was directed to "submit for *in camera* review a declaration identifying the matters claimed to be protected by the attorney-client and/or work product privilege in Exhibits 1 through 20 filed in support of the request to disqualify Dr. Ang, along with an explanation as to why those matters should not be disclosed to defense counsel and/or Dr. Ang and her counsel."[5] (Doc. 398.) The Bureau timely complied with this Order (Doc. 404),

---

[5] Exhibits 1 through 20 pertain to the request to disqualify Dr. Ang based on a conflict of interest arising out of the Navient investigation. Exhibits 21 through 41 concern policy projects on which Dr Ang had some involvement, The Bureau contended that Navient had claimed that the policy projects were relevant to this matter. (Doc. 387 at 4.) Exhibits 21 through 41 were not introduced at the evidentiary hearing held on the request to disqualify Dr. Ang and were not referenced by the Bureau in its post-hearing brief.

and Navient responded with a request for a teleconference in advance of any

hearing. (Doc. 408.) Following another conference call held on January 28, 2020,

the Bureau was directed to "produce to Defendants in unredacted form Exhibits 2,

5 through 9, 12, 15, 16 and 19, and in redacted form Exhibits 1, 3, 4, 10, 11, 13,

14, 17, 18 and 20 to Plaintiff's request to disqualify Dr. Ang no later than February

7, 2020." (Doc. 412 at 2.) A hearing on the disqualification request was scheduled

for February 20, 2020 in Washington, D.C. The Order also set in motion processes

that resulted in Dr. Ang and defense counsel producing email communications

potentially pertinent to the disqualification question. Specifically, Dr. Ang

produced messages from her personal email from the date she left the employ of

the Bureau to February 6, 2018 that mention "Navient" or "Sallie Mae." In

addition, defense counsel produced communications with Dr. Ang from August 18,

2017 until February 6, 2018 concerning her role at the Bureau, including in relation

to the Navient investigation. This time frame encompasses the time from when

defense counsel first communicated with Dr. Ang to the date she was retained.

Also produced for consideration were Dr. Ang's billing records for her work for

Navient. In order to protect privileged information, I reviewed the information

produced by Dr. Ang and defense counsel *in camera*.[6]

---

[6] There was nothing in these documents that was material to the disqualification question.

The evidentiary hearing was held on February 20, 2020 and included testimony from 7 witnesses (6 from Plaintiff and 1 from Defendants). Following the hearing, Navient renewed its hearsay objections to the admissibility of Bureau Exhibits 1-4, 6-11, 13-18, 20, and 42-45. Pursuant to Special Master Report #17 issued on March 6, 2020 (Doc. 446), Navient's challenge to the admissibility of the exhibits was denied in large measure, although much of the unredacted information in the contested exhibits was considered for limited purposes unrelated to the truth of the matters asserted. Specifically, Navient's motion to strike Plaintiff's Exhibits 1, 2, 4, 6 through 11, 13 through 17, 20, and 42 through 45 was denied. Exhibits 3 and 15 were stricken in part, and Exhibit 18 was stricken in its entirety. Post-hearing briefs were submitted by the parties on March 3, 2014. (Docs. 443 and 444.)

### III.    Discussion

Although federal courts have the inherent power to disqualify experts, "disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1090 (citing *Koch Refining Co. v. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996)). Therefore, the party seeking disqualification "bears a 'high standard of proof' to show that disqualification is warranted." *Rhodes*, 558 F. Supp. 2d at 664 (citing *Grant Thornton, LLP v. FDIC*, 297 F. Supp. 2d 880, 882 (S.D. W.Va. 2004).

Several courts have cited to *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F. Supp 1246 (E.D. Va. 1991), to determine whether an expert should be disqualified. *See, e.g.*, *Koch Refining*, 85 F.3d at 1181; *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1093; *Grant Thornton*, 297 F. Supp. 2d at 883 n.2; *U.S. ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 249 (D.N.J. 1997). Based on *Wang Laboratories*, some courts have identified two standards for disqualifying an expert witness based on an asserted conflict of interest: (1) the "bright-line rule," which applies when an expert has switched sides in the exact matter being litigated, and (2) a two-part test that applies when the moving party (a) has an objective belief that it had a confidential relationship with the expert, and (b) disclosed confidential or privileged information concerning the matter being litigated to the expert. *Wang Laboratories*, 762 F. Supp. at 1248. "It is important to remember that the 'expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than do attorneys. Experts are not advocates in the litigation but sources of information and opinions.'" *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d at 1090. The overriding purpose of disqualification of an expert is to protect the "fairness and integrity of judicial proceedings." *Grant Thornton*, 297 F. Supp. 2d at 882.

### A.    Bright-Line Rule

In cases in which "it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention," disqualification is "clear." *Rhodes*, 558 F. Supp. 2d at 664 (quoting *Wang Labs.*, 762 F. Supp. at 1248); *see also Calendar Research LLC v. StubHub, Inc.*, No. 2:17-CV-04062-SVW-SS, 2017 WL 10378337, at *2 (C.D. Cal. Sept. 22, 2017) (noting that the bright-line rule "required disqualification when an expert switches sides in the same dispute"); *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. CIVA05-0897(WHW-CCC), 2007 WL 4440173, at *3 (D.N.J. Dec. 17, 2007) (expert disqualified under the bright-line rule); *United States v. NHC Health Care Corp.*, 150 F. Supp. 2d 1013, 1015 (W.D. Mo. 2001) (noting that "[g]enerally, a conflict of interest arises when an expert witness is retained by one party and then 'switches sides'").[7] "The primary concern in side-switching experts is the protection of litigation strategy." *Freight Tracking Techs., LLC v. Virginia Int'l Gateway, Inc.*, No. 2:13CV708, 2015 WL 12602435, at *5 (E.D. Va. Feb. 11, 2015).

---

[7] Even where courts have held that the bright-line rule applied to disqualify an expert, they go on to hold that the same result would follow under the two-part test and do not rely on the bright-line test as the sole basis for disqualification. *Rhodes*, 558 F. Supp. 2d at 666.

In this case, the Bureau argues that the "bright-line rule" applies to disqualify Dr. Ang from serving as an expert for the Defendants. Bureau Exhibits 1-20 are specifically offered as evidence that the bright-line test is satisfied. None of those exhibits, however, reveals information that could be said to be litigation strategy. Indeed, all the exhibits were prepared long before this litigation was brought.

The Bureau relies in part on *United States v. NHC Health Care Corporation*, 150 F. Supp. 2d 1013 (W.D. Mo. 2001), to support its position that a former employee who works on a matter and is then retained as an expert by the opposing party would use the plaintiff's modus operandi, patterns of operation, and decision-making process in such a way as to be highly prejudicial. The Bureau observes that Dr. Ang worked for two years on the investigation of Navient that resulted in this litigation. Further, the Bureau asserts in conclusory fashion that Dr. Ang was repeatedly exposed to the mental strategies and impressions of Bureau Enforcement attorneys concerning the enforcement action, including work product concerning litigation and settlement strategy. The Bureau notes that Dr. Ang was also on the original list of custodians developed by the Bureau for document-gathering purposes.

*NHC*, on which the Bureau relies, is distinguishable. The Government sued defendant health care facilities in *NHC* for submitting fraudulent bills under the

Medicare/Medicaid programs. Defendants' expert witness in *NHC* "essentially

started out as a litigational party and then became an expert for the opposing party

testifying against her former position." *Id.* at 1015. She had worked for the

Division of Aging for twenty-two years, had management and oversight

responsibilities, and admittedly had general knowledge of the Government's

investigation and sanctions against the defendants. 150 F. Supp. 2d at 1014. The

court found that although the expert witness denied having contacts with the

investigation or gaining any confidential information, the record, which included

witness testimony and documentary evidence, demonstrated that the expert

participated in and directed meetings involving the *NHC* investigation and made

the final decision regarding the recommendation of civil penalties. *Id.* at 1014-

1015. Finding a clear conflict of interest under these circumstances, the court

disqualified the expert. *Id.* at 1015. *See also Brunstad v. Medtronic, Inc.,* No. 14-

V-255-JDP, 2015 WL 1962104, at *3 (W.D. Wis. Apr. 30, 2015) (disqualification

of plaintiff's expert warranted where expert had been "vice president of research

and development for one of the defendants, and . . . played an important role in the

design and quality control of the product line at issue").

The same clear involvement in the Navient investigation is not apparent

here. Dr. Ang was employed by the Bureau for only four years, mainly worked on

policy and research matters, was assigned to an office within a Bureau Division

located in a building apart from the location for the Office of Enforcement, and was only involved sporadically on the Navient matter over a two-year period. None of the evidence submitted by the Bureau shows that Dr. Ang had any managerial role or directed any meetings regarding the investigation of Navient. Dr. Ang's involvement with the Navient investigation was episodic and not extensive. Furthermore, although submitting copious evidence for *in camera* review and offering the testimony of six witnesses, the Bureau points to no specific evidence that Dr. Ang was exposed to litigation strategy. Therefore, the clear "side switching" supported by the evidence in *NHC* is not present in the case of Dr. Ang.

Further, Dr. Ang was not specifically hired by the Bureau to work on the Navient investigation or litigation. She was a research economist who, based on the record, focused largely on policy and research matters. Therefore, Dr. Ang does not neatly fit within the bright-line test for disqualification, especially given the judicial disfavor for disqualifying experts with specialized information. Accordingly, analysis under the two-part conflict-of-interest test is required.

**B.    Conflict-of-Interest Test**

As noted above, the conflict-of-interest test asks: (1) whether it is objectively reasonable for the moving party to believe that it had a confidential relationship with the expert, and (2) whether any relevant confidential or privileged information was disclosed by the moving party to the expert. *Rhodes*, 558 F. Supp.

2d at 667 (citing *Koch Refining*, 85 F.3d at 1181). Both questions must be

answered in the affirmative to warrant disqualification. *Fed. Trade Comm'n v.*

*Innovative Designs, Inc.*, No. CV 16-1669, 2018 WL 1334830, at *6 (W.D. Pa.

Mar. 15, 2018) (quotation marks omitted); *Cherry Hill.*, 994 F. Supp. at 249.

Thus, generally, disqualification "should not occur where a confidential

relationship existed but no privileged information was communicated or

alternatively, where no confidential relationship existed but privileged information

was nonetheless disclosed." *Greene, Tweed of Delaware, Inc. v. DuPont Dow*

*Elastomers, L.L.C.*, 202 F.R.D. 426, 429 (E.D. Pa. 2001).

"'The party moving for disqualification bears the burden of proof with

respect to each of these factors.' In this regard, a party seeking disqualification

must present more than conclusory assertions to carry its burden." *Fed. Trade*

*Comm'n*, 2018 WL 1334830, at *6 (quoting *Syngenta Seeds, Inc. v. Monsanto Co.*,

No. 02-1331-SLR, 2004 WL 2223252, at *2 (D. Del. Sept. 27, 2004); *see also*

*Greene, Tweed of Delaware*, 202 F.R.D. at 429 ("the party requesting

disqualification may not meet its burden with 'mere conclusory or *ipse dixit*

assertions'").

If the moving party meets its burden on both factors, courts then address

policy considerations that bear on disqualification. *Fed. Trade Comm'n*, 2018 WL

1334830, at *6. "The policy objectives that favor disqualification include the

court's interest in preventing conflicts of interest and in maintaining judicial integrity. The policy objectives that weigh against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." *Weaver v. Mobile Diagnostech, Inc.*, No. CIV. A. 02-1719, 2009 WL 1230297, at *9 (W.D. Pa. Apr. 30, 2009).

### 1.    Confidential relationship between the Bureau and Dr. Ang

In applying the confidential relationship part of the conflict-of-interest test in this case, "the proper focus . . . is whether [the Bureau] acted reasonably in assuming that a confidential or fiduciary relationship existed between [it] and [Dr. Ang], and that any confidential communications between them regarding this litigation would be maintained in confidence." *Cherry Hill*, 994 F. Supp. at 249. To determine reasonableness, courts evaluate a number of factors including: whether the relationship was long standing and involved frequent contacts; whether the expert is to be called as a witness in the underlying case; whether the moving party funded or directed the formation of the opinion; whether the parties entered into a formal confidentiality agreement; whether the expert was retained to assist in the litigation; whether work product was discussed or documents were provided to the expert; whether the expert was paid a fee; and whether the expert derived any of his specific ideas from work done under the direction of the retaining party. *Rhodes*, 558 F. Supp. 2d at 667 (citing *Hewlett Packard Co.*, 330

F. Supp. 2d at 1093); *see also Koch Refining*, 85 F.3d at 1182 (holding that a confidential relationship existed when the record supported a longstanding series of interactions which likely led to a basic understanding of the retaining party's modus operandi, patterns of operations, and decision-making process). "The objectively reasonable belief of a confidential relationship is not a 'high hurdle' for the moving party to clear." *Fed. Trade Comm'n*, 2018 WL 1334830, at *7 (quotation marks omitted).

Many of the factors considered by the courts in determining whether it was reasonable for the Bureau to believe that it had a confidential relationship with Dr. Ang are not present here. Their relationship was relatively brief. There is no evidence that the Bureau ever anticipated she would be an expert witness in this matter. She was not even asked to opine on the issues in this litigation. Bureau enforcement attorneys simply sought her technical advice as to how best to ask for data from Navient.

The Bureau observes, however, that Dr. Ang was subject to a regulation prohibiting the disclosure of any confidential information. 12 C.F.R. § 1070.41(a)(1). The Bureau further notes that she appears on various entries on the Bureau's privilege log,[8] and claims that she had conversations with Bureau

---

[8] During the hearing, Navient's cross examination of one of the Bureau's witnesses suggested that Dr. Ang's name appeared only six times on the Bureau's

attorneys about strategy regarding this matter, although no specific evidence was presented on this point.

Dr. Ang's sporadic involvement with the Navient matter began in September of 2013 and ended in October of 2015. *See* Bureau Exhibits 1, 2 and 20.[9] The documents submitted by the Bureau in support of disqualification are sometimes marked or noted by the sender to be confidential, business confidential, or sensitive. By way of example, Bureau Exhibit 11 is an email chain from Ms. Anderson to Dr. Ang and Mr. Critchfield which specifically states the attached document is "confidential and should not be circulated."[10]

---

privilege log, which was said to contain 22,426 entries. (Feb. 20, 2020 Tr. at 232—33.) The Bureau did not contest this assertion.

[9] Bureau Exhibit 1 is an email thread covering the period September 13, through September 24, 2013. Dr. Ang is neither a participant nor recipient in this email thread, but her name is mentioned in a request from fellow Office of Research employee Michelle Kambara, asking if she could share a Civil Investigative Demand ("CID") with Dr. Ang. Lead Office of Enforcement Attorney Brandis Anderson responded in the affirmative. Bureau Exhibit 2 is an October 3, 2013 meeting invitation with a question posed by Brandis Anderson. The question, addressed to Dr. Ang and other Bureau staff members in the Office of Research as well the Office of Enforcement, simply asked "[c]an we meet to discuss Sallie Mae data and the various allocation methodologies?" Bureau Exhibit 20 is an October, 2015 email chain with the subject line, "Student Loan Servicing Check-in," attached to which is a draft of proposed standards for student loan servicing. None of the persons listed on Exhibit 20 was working in the Office of Enforcement at the time. (Feb. 20, 2020 Tr. at 157.)

[10] Exhibit 11 is a largely redacted email thread that begins with an April 24, 2014 request from Ms. Anderson to Dr. Ang and Mr. Critchfield in the Office of

Although the evidence of a confidential relationship between Dr. Ang and the Bureau is not substantial, it does suffice to surpass the relatively low hurdle that the Bureau must carry here, especially given the existence of 12 C.F.R. § 1070.41(a)(1).  Therefore, based on Dr. Ang's role and contacts with Enforcement attorneys regarding the Navient investigation and the confidential nature of the material received and sent by Dr. Ang to other Bureau employees, the Bureau acted reasonably in assuming that a confidential relationship existed between itself and Dr. Ang.[11]

## 2.    Confidential information received by Dr. Ang

"In the context of expert disqualification, disclosure of 'confidential information' encompasses facts and ideas directly relating to or impacting the litigation in issue." *Orion Corp. v. Sun Pharm. Indus., Ltd.*, No. CIV.A. 07-5436(MLC), 2009 WL 5872982, at *2 (D.N.J. June 12, 2009).  "Such information would include 'discussion of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Koch Refining*, 85 F.3d at 1182. Thus, for example, an

---

Research for advice on how best to phrase requests for four written reports from Navient as part of a CID.

[11]    The Bureau notes that Navient has not disputed that the first prong of this test is satisfied.  Plaintiff's Post-Hearing Brief (Doc. 444) at 15.

expert who was told counsel's theory of the case and had access to the mental

impressions of counsel was disqualified in *Cordy v. Sherwin-Williams Co.*, 156

F.R.D. 575, 581 (D.N.J. 1994). And the court disqualified an expert who learned

counsel's views on potential defenses in *Wang Laboratories*, 762 F. Supp. at 1249.

Notably, however, purely technical information is not regarded as confidential.

*See Glasser v. Hilton Grand Vacations Co., LLC,* No. 8:16-CV-952-T-27AAS,

2017 WL 3584930, at *3–4 (M.D. Fla. July 24, 2017). Disclosure of discoverable

material also does not merit disqualification. *See Cherry Hill*, 994 S. Supp. at 250.

The Bureau must shoulder the "'burden of pointing to specific and

unambiguous confidential disclosures' that it made to [Dr. Ang] . . . which, if

revealed, would prejudice [the Bureau]. Conclusory assertions, unproven

statements, or generalized and vague allegations do not satisfy this burden."

*Fed. Trade Comm'n*, 2018 WL 1334830, at *8 (citations and quotation marks

omitted). Indeed, the mere likelihood that confidential information would have

been disclosed to Dr. Ang is not enough. *See In re Bard IVC Filters Prod. Liab.*

*Litig.,* No. MDL 15-02641-PHX DGC, 2017 WL 6603467, at *4 (D. Ariz. Dec. 21,

2017) ("It appears likely from these agreements and retentions that Dr. Kinney

actually received confidential information. But likelihood is not enough.

Defendants must present evidence that confidential information was in fact

conveyed."). Thus, for example, a District Court was found to have abused its

19

discretion in disqualifying an expert witness where "[t]he defendants did not

submit testimony or a declaration of anyone . . . who could attest to whether or

how any information provided to [the expert] was relevant to the current litigation,

and [the expert] averred that in reaching his opinions and preparing his report for

this litigation, he did not rely on any information, confidential or otherwise, that he

obtained from his consulting relationship with [the defendants]." *In re Incretin-*

*Based Therapies Prod. Liab. Litig.*, 721 F. App'x 580, 584 (9th Cir. 2017).  The

appellate court explained that "[w]ithout more, the defendants did not meet their

burden of showing '*specific* and *unambiguous*' disclosures required to trigger

disqualification. *Id.* (quoting *Hewlett-Packard*, 330 F.Supp.2d at 1094 (emphasis

added in appellate court opinion).  By way of contrast, experts have been

disqualified where there was unequivocal evidence that protected information

directly relevant to the litigation at issue had been shared with the challenged

expert. *See, e.g., Rhodes*, 558 F. Supp. 2d at 671 (moving party produced a

memorandum given to the expert that summarized the facts of the case and

"counsel's views on . . . key issues and strategies," and provided testimony that

counsel's selection of documents for the expert to review was based on what

counsel believed was "most central" to the case).

    The Bureau argues that Dr. Ang received confidential and privileged

attorney work product related to this litigation when she was occasionally called

upon to provide advice in connection with data requests during the Bureau's

investigation.  Navient responds that Dr. Ang was not personally or substantially

involved in the Navient enforcement matter.  Navient asserts that the Bureau has

not demonstrated that it disclosed to her any specific information pertaining to the

present litigation.  Further, Navient argues that Dr. Ang's input on data requests

was not dependent upon the circumstances of any individual firm.  Navient notes

that Dr. Ang did not have access to the Enforcement Office's restricted and

confidential files.  Navient asserts that Dr. Ang's expert report, which rebuts the

conclusions reached by Dr. Mullin regarding interest costs to Navient borrowers

who enrolled in forbearance rather than income-based repayment plans, was based

on Dr. Ang's general knowledge and a large dataset of borrower- and transaction-

level information produced during this litigation and long after Dr. Ang left the

Bureau.  Navient argues that the Bureau is unable to prove that any confidential

information Dr. Ang received is substantially related to the issues in this case.

(Defendants' Post-Hearing Br. (Doc 443) at 7-9.)

A close analysis of the testimony presented at the evidentiary hearing held

on Feb. 20, 2020, the redacted documents admitted into evidence at that hearing,

and the *unredacted* documents submitted by the Bureau for *in camera* review

reveals that the documents shared with Dr. Ang are unrelated to the issues in this

litigation.  Furthermore, no Bureau witness was able to relate with specificity any

instance in which the Bureau's Enforcement attorneys informed Dr. Ang of

litigation strategy, expected experts, the Bureau's views on the strengths and

weaknesses of the case, roles of witnesses, and anticipated defenses.

Because of the gravity of this issue, the following analysis of the evidence

presented by the Bureau for each occasion when Dr. Ang's assistance was solicited

is provided.

1.    **September 2013.** Dr. Ang was first requested to
      comment upon a data request for the Navient
      investigation in September 2013. This is supported by
      the testimony of Tim Critchfield ("Mr. Critchfield") (a
      colleague of Dr. Ang's) and Michelle Kambara ("Ms.
      Kambara") (a junior employee in the Office of Research).
      The relevant documents are Exhibits 1 through 5
      introduced at the hearing, consisting of email threads
      covering the period September 13, 2013 through October
      9, 2013. The email threads indicate that lead
      Enforcement Attorney Brandis Anderson was seeking
      advice from the Office of Research on what data to
      request in connection with payment allocation
      methodologies, late fees, and disclosures in billing
      statements. It was Ms. Kambara who asked whether she
      could share with Dr. Ang a Bureau CID addressed to
      Sallie Mae. (Ex. 1 at A3.) Dr. Ang was invited to attend
      a meeting with Enforcement attorneys, Ms. Kambara,
      and Mr. Critchfield on October 3, 2013, to discuss "Sallie
      Mae data and the various allocation methodologies."
      (Ex. 2 at A10.) Exhibit 5, which is an email from Ms.
      Anderson to counsel who was representing Sallie Mae at
      that time shows that the Bureau was concerned with
      obtaining data concerning late fees for partial payments
      or underpayments and allocation of partial payments
      among several loans. (A33.) Those matters are not the
      subject of Dr. Ang's work for Navient in this case. Mr.
      Critchfield testified in conclusory terms that the

enforcement attorneys "la[id] out what the goals [are] –
and the strategies" for the case as well as the "legal
things that they want to get at by looking at the data,"
Feb. 20, 2020 Tr. at 84:23-84:2; *accord* Tr. at 89:8-18,
but offered no specifics as to what those strategies may
have been and how they related, if at all, to the issues the
Bureau is now pursuing.  Ms. Kambara also testified in
general terms that the meeting helped her understand the
goals of the investigation, but also failed to present any
specifics that relate to the issues now being pursued.  Tr.
at 33:21-34:4.  Their testimony does not rise to the
requisite specific and unambiguous information to
warrant disqualification of Dr. Ang.  Moreover, it is
evident that Dr. Ang's involvement at this time was *de
minimis*.

2.    **Documents Relating to a 2014 Discussion of Data
Needs.**  The next interaction between Dr. Ang and
Enforcement attorneys in relation to the Navient matter
evidently did not occur again until February of 2014.
Email threads marked as Exhibits 6 through 9 and 42
through 44 show Ms. Anderson setting up two meetings
for the purpose of discussing "Sallie Mae data," but no
substantive information is provided in the emails.  One
email relates that on February 25, 2014, Ms. Kambara,
Mr. Critchfield, and Dr. Ang (all of whom worked in the
Office of Research) had "met . . . to determine if we
would be able to calculate restitution for both issues
using the data we have," (Ex. 8 at A42), but there is no
indication as to what those issues involved.  Review of
the unredacted version of these exhibits does not reveal
any information relevant to the matters at issue here.
Significantly, moreover, the only CIDs that had been
issued to Navient at that time did not concern the matters
at issue in this litigation, and testimony at the hearing
indicated that the "restitution analysis" at that time
concerned allocations of partial payments.  (Tr. at 64, 73-
74).  No testimony was presented to suggest that
confidential information related to the matters at issue in
the litigation was imparted to Dr. Ang at that time.  An

email thread spanning April 22 and 23, 2014, marked as
Exhibit 10, had Ms. Anderson inquiring as to whether
Mr. Critchfield or Dr. Ang could attend yet-to-be-
scheduled "investigational hearings" of Sallie Mae. (Ex.
10 at A49).  The unredacted copy of Exhibit 10 indicates
that the hearings would not concern the matters at issue
in this litigation.  Furthermore, neither Dr. Ang nor Mr.
Critchfield ever attended any "investigational hearing"
involving Sallie Mae. (Feb. 20, 2020 Tr. at 212.)  In an
email dated April 23, 2014, Dr. Ang said "[i]t would be
helpful to know what Enforcement has in mind for the
long term data strategy with Sallie Mae." (Ex. 10 at
A48).  Ms. Anderson's redacted reply stated that "we are
not 100% certain about our long term data strategy . . . as
it will depend on what issues we decide to focus on in
our broader investigation. . . ." (*Id.* at A47).  The
redacted part of this email does not relate to the matters
at issue here.

3.    **April 2014 CID.**  Enforcement attorneys reached out to
Dr. Ang and Mr. Critchfield on April 24, 2014 to review
drafts of four requests for written reports from Sallie
Mae. (Ex. 11 at A55-57).  The unredacted version of Ex.
11 indicates that one of the requests concerned matters at
issue here, *i.e.,* enrollment in forbearance or income-
based repayment programs, and Dr. Ang did comment on
that request ("getting roll rates for loans that are coming
up on the end of their IBR/forbearance term might be
informative because it could give the Bureau insight into
what happens when alternative repayment status is up for
renewal," *id.* at A52).  That request, however, was not
included in the CID issued on April 29, 2014. *See* Ex. 12
at A66-71.  Instead the written reports called for by this
CID focused on cosigned loans, billing disclosure
statements, and late fees. (*Id.* at 68-70).  Notably, none
of the requests for written reports in the final CID have
any bearing on the issues regarding IBR and forbearance
addressed in the report submitted by Dr. Ang in
November of 2019.  Instead, the requests relate to the
number of borrowers who were denied cosigner releases,

the number of borrowers whose cosigners died or went into bankruptcy, and disclosure of late fees. Mr. Critchfield, who is included on these communications with Dr. Ang, testified that he did not "recall working on income-based repayment plans or forbearance . . . on the Navient case." (Tr. at 125:14-22). Furthermore, there is no documentary or testimonial evidence that Dr. Ang ever received, reviewed, or discussed any data produced in response to this request. Notably, the April 2014 CID was shared with Navient and is therefore, no longer confidential for the purposes of disqualification.

4.    **April 2015 CID.** Almost a full year passed before Dr. Ang's feedback was again sought by Ms. Anderson regarding a CID for the Navient investigation. (Exhibits 13-19). Dr. Ang received a draft of the CID which was subsequently sent to Navient. Although Exhibits 15-17 indicate that Dr. Ang may have had discussions with Ms. Anderson regarding the CID, there is no specific information offered by the Bureau regarding these discussions. Leanne Hartmann ("Ms. Hartmann"), an Enforcement attorney working on the Navient matter, testified that she could not recall any information that was discussed at these meetings. (Feb. 20, 2020 Tr. at 193-94.) Significantly, Ms. Anderson was not called by the Bureau to testify.[12] Dr. Ang testified that the meeting concerned "resource allocation" and how Ms. Anderson "was willing to have a dialogue about how to think about data analysis and how to effectively work and interact with colleagues in other divisions." *Id.* at 301-302. This

---

[12] Ms. Anderson no longer works for the Bureau. As she was the lead Enforcement attorney on the Navient litigation during the period of Dr. Ang's limited involvement, it would have been instructive to learn her view of the relative significance of Dr. Ang's role and what information had been imparted to Dr. Ang. During the hearing, Dr. Ang testified that she had much respect for Ms. Anderson (Feb. 20, 2020 Tr. at 301), and that they had worked together on a Cross-Bureau working group on student loans that did not concern a specific enforcement matter. (*Id.* at 260, 322-23.) The Bureau, however, did not offer a declaration from Ms. Anderson or seek judicial assistance to secure her testimony.

testimony is consistent with Dr. Ang's email responses to Ms. Anderson in which she makes general suggestions for improving coordination between Enforcement and the Office of Research rather than granular suggestions specific to the Navient case. By way of example, in an email Dr. Ang sent to her supervisors following the meeting, she explains her hope that the discussion would prove "useful" for "future interactions with Enforcement," and "encourages more structured thinking about strategies and objectives." (Ex. 17, at A132-33.) No evidence regarding litigation strategy, defenses, or potential experts is apparent in these communications. Although Dr. Ang noted in Exhibit 17 that the meeting "clarified the goals of the CID," nothing specific was offered by way of exhibits or testimony to describe what, if any, confidential information was shared with Dr. Ang or whether that information related to the legal theories, strategies, or defenses of this case. Instead, Exhibit17 shows Dr. Ang's concern from a researcher's perspective and is aimed at policy-related matters. It is not Navient-specific. As with respect to earlier CIDs, there is no evidence that Dr. Ang received information Navient produced in response to this CID.

5. **Meeting Regarding Payment Processing.** Cynthia Lesser ("Ms. Lesser"), an Enforcement attorney working on the Navient matter, testified that a meeting took place on the Navient matter during which Dr. Ang ran through scenarios about payment processing issues. Tr. at 215:21-216:21. However, once again, no specifics were provided about what information Dr. Ang gave or received during that meeting and whether that information was even relevant to the present litigation.

6. **October 2015 Draft Servicing Standards.** Dr. Ang's final contact regarding Navient involves an email chain in Exhibit 20. The email exchange involves the development of "servicing standards" and was a policy-driven effort directed by an official in the Bureau's Office for Students (Michael Pierce). *See* Ex. 20 at

A188-89. Dr. Ang's input on the servicing standards
included a "couple of quick [comment] bubbles." These
comments are consistent with her role as a research
economist who was tapped to weigh in on technical or
policy matters. As with the draft CIDs, these proposed
conduct standards were sent to Navient. Despite the
Bureau's position that Exhibit 20 is a term sheet for
settlement, this does not appear to be the case as the
document does not refer to any particular servicer, does
not include discussion by Enforcement attorneys
regarding the strengths or weaknesses of the case, and
does not include a discussion of the defenses Navient
might assert or the arguments Enforcement attorneys
might make. Tr. at 156:17-19, 158:1-15. Indeed, no
Enforcement attorneys are even listed on the email chain.

The evidence shows that Dr. Ang's work related to the Navient matter was
general in nature and episodic. That there were more than over 50 emails on which
Dr. Ang was included that referenced Sallie Mae/Navient is not particularly telling.
In today's connected and busy world, 50 emails over the course of two years is not
significant. Dr. Ang's contacts with Enforcement attorneys occurred sporadically
over the course of two years.[13] There certainly is no clear evidence of specific
confidential information related to the present litigation received by Dr. Ang. *See*

---

[13] The relative insignificance of Dr. Ang's involvement with Enforcement
attorneys working on the Navient investigation is suggested by Defense Exhibit 10,
a June 4, 2015 calendar appointment invitation to a number of Bureau staff in
various Bureau divisions. The purpose of the proposed meeting was to discuss
"what's likely to transpire over the next several months and set expectations for
how and when various folks around the Bureau should be involved." Notably, Dr.
Ang was not among the more than 15 Bureau staff members invited to this
meeting. (Feb. 20, 2020 Tr. at 245.)

*Hewlett-Packard*, 330 F. Supp. 2d at 1094 ("Because the burden is on the party seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party.") (citations omitted). Significantly, the Bureau does not point to any information in the report Dr. Ang submitted in November of 2019 that is derived from her work on the Navient matter while at the Bureau. And independent review of that report does not reveal any information that could be said to be "confidential information" in the context of expert witness disqualification.

In *Hewlett-Packard*, the court found that defendant did not meet its burden of demonstrating that confidential information was communicated to the expert, Randy Katz ("Mr. Katz"). 330 F.Supp.2d at 1097. There was only one alleged communication by way of telephone conversation between defendant and Mr. Katz during the relevant time period. *Id.* The conversation was approximately one hour and the expert asserted that he discussed only his "impressions of the validity of the claims of six of [defendant's] patents." *Id.* Defendant argued that it shared information with respect to its litigation strategy but "offered neither specific details of such discussion nor evidence contradicting Katz's version of the events." *Id.* Accordingly, the court denied the motion to disqualify. *Id.* at 1098; *see also Freight Tracking Techs.*, 2015 WL 12602435, at *4 (declining to disqualify plaintiff's expert, who had previously served as a consultant for defendants,

because defendants "pointed to nothing disclosed to [the expert] during his business evaluation services provided in 2012 that is 'of either particular significance or . . . which can be readily identified as either attorney work product or within the scope of the attorney-client privilege'"); *In re Bard IVC Filters Prod. Liab. Litig.*, at *4–5 (refusing to disqualify expert because "Defendants have not produced specific and unambiguous evidence that [the challenged expert] received confidential information. They claim in their briefing that he received such information from various attorneys—attorneys who are still involved in this litigation—but they provide no declarations from those attorneys concerning information they shared with Dr. Kinney."); *Murray Energy Corp. v. McCarthy*, No. 5:14-CV-39, 2016 WL 3390517, at *4 (N.D.W. Va. June 17, 2016) (refusing to disqualify former EPA official where the EPA claimed that his report was based upon privileged and confidential information he received at the EPA but failed to identify any part of the report that was premised upon such information and no such information in the report was evident); *NXP B.V. v. Research in Motion, Ltd.*, No. 612CV498ORL22TBS, 2013 WL 12158602, at *2 (M.D. Fla. Mar. 14, 2013) (holding that disqualification was not warranted where the information defendant had disclosed to Plaintiff's expert "was technical and, depending upon the claims and defenses of the parties, discoverable. It did not involve litigation strategy, litigation theories or defenses, the strengths and weaknesses of [defendant's]

position, the role of witnesses or the specialties and identities of experts to be

retained"); *Greene, Tweed of Delaware*, 202 F.R.D. at 429 *Greene, Tweed of*

*Delaware*, 202 F.R.D. at 430 (party does not carry heavy burden for

disqualification of an expert witness "by making conclusory assertions that the

proposed experts were 'privy to substantial confidential information related and

unrelated to this litigation'"); *Hess Corp.*, 2018 WL 6618068, at *2 (expert's

acquisition of general knowledge relevant to the litigation while working for

defendant did not disqualify him from serving as an expert for plaintiff because

defendant failed to point to specific confidential information that was relevant to

the matters at issue in the case); *Orion Corp.*, 2009 WL 5872982, at *4 ("Based

upon Orion's broad generalizations as to the type of information to which Mr.

Politi was exposed, the Court is left unsatisfied that Mr. Politi was privy to

confidential information relating specifically to the products at issue in these

actions. Therefore, Orion's Motion to disqualify Mr. Politi as Defendants' outside

expert will be denied."); *Return Mail, Inc. v. United States*, 107 Fed. Cl. 459, 467-

68 (2012) (plaintiff's expert, Mr. Wider, who worked for the USPS for twenty-nine

years, was permitted to offer expert testimony against the USPS because the court

found that "defendant has not established that relevant confidential, proprietary or

privileged disclosures were made to Mr. Wider, or that he was privy to confidential

or privileged attorney/client discussions concerning '[litigation] strategy.'").

In this case, the testimony and exhibits showed only that Dr. Ang was a research economist for the Bureau who was brought in on a few occasions to weigh in on general policy matters. Furthermore, there is no evidence that Dr. Ang analyzed any of the information produced by Navient. Given the episodic nature of Dr. Ang's involvement with the Navient matter, the passage of time after she left the Bureau's employ, the limited nature of Dr. Ang's role, and the absence of testimony from Ms. Anderson, who was the lead Enforcement attorney in charge of the Navient investigation while Dr. Ang was employed with the Bureau, I cannot find that the Bureau met its heavy burden of showing unambiguous, specific examples of confidential information that was communicate to Dr. Ang that is substantially related to the present litigation. Accordingly, her disqualification is not warranted.

### 3. Policy Considerations

Even if the limited information that was provided to Dr. Ang is regarded as "confidential" for purposes of a disqualification analysis, the balancing of competing policy objectives would warrant denial of the Bureau's request. As noted above, the competing policy objectives are "preventing conflicts of interest," "maintaining the integrity of the judicial process," maintaining accessibility to experts with specialized knowledge, encouraging experts to "pursue their professional calling," and avoiding undue burden on the opposing

party by forcing it to retain a new expert.    *Rhodes*, 558 F. Supp. 2d at 667-68

(quoting *Cordy*, 156 F.R.D. at 580); *Cherry Hill*, 994 F. Supp. at 251.

Navient argues that the Bureau is not prejudiced by Dr. Ang's continued

participation in this litigation while Defendants would be significantly prejudiced

if she were to be disqualified at this late stage.  Further, Defendants assert that

disqualification could impair Dr. Ang's ability to pursue her professional calling.

The Bureau argues that it is not limiting Dr. Ang's ability to pursue her line of

work, noting that she served as a witness against the Bureau without objection in

an administrative trial involving a payday lender.

Dr. Ang, when she was leaving the Bureau, did seek the guidance of a

Bureau ethics official regarding her post-separation work activities and was told

that if she was not substantially involved in a matter, she could pursue

opportunities regarding specific entities.  (Ang Decl. ¶¶ 18-21.)[14]  The Bureau's

---

[14] The Bureau argues that this advice was based on representations of Dr. Ang that do not accurately reflect her involvement in the Navient matter. (Jan. 16, 2020 Tr. 37:19-25, 38:1-13.)  As noted above, the number of communications involving Dr. Ang concerning the Navient investigation are relatively insignificant. And none show that she was involved in the substantive merits of the investigation. Instead, she gave technical advice on a few occasions about how best to structure data requests.  Although it is difficult to credit Dr. Ang's testimony that she believed that the CIDs on which she consulted were requests for "voluntary" production of information (Feb. 20, 2020 Tr. at 318-20), the fact remains that there is no evidence that "confidential information," as that term is used in the context of disqualifying an expert, was ever shared with Dr. Ang.  And it is also undeniable that Dr. Ang's involvement was sporadic and limited in nature.

Post Employment Briefing document, attached as Exhibit A-3 to Dr. Ang's Declaration (Doc. 393 at 25-31), explains that if an employees was "not involved in the substantive merits [of a particular matter], you may not be substantially involved, even though you put a lot of time into the matter." (*Id.* at 27.) No evidence was presented that Dr. Ang was involved in the "substantive merits" of the Bureau's investigation of Navient, and she certainly did not devote a lot of time to it.

"Disqualification of an expert witness is a drastic measure that is imposed reluctantly." *Weaver*, 2009 WL 1230297, at *9. Thus, the "interest in disqualification must substantially outweigh the interest in . . . non-disqualification of the expert." *Hewlett-Packard*, 330 F. Supp. 2d at 1095 (quoting *Proctor & Gamble Co. v. Haugen*, 184 F.R.D. 410, 414 (D. Utah 1999).

In balancing the lack of specific evidence that Dr. Ang received confidential information that would now prejudice the Bureau in the present litigation with the harm to Navient in having to retain a new expert at this stage of the process and the harm to Dr. Ang by disqualification for a conflict of interest, I find that the policy considerations weigh in favor of allowing Dr. Ang to continue serving as an expert for Navient. Although the Bureau did not learn that Navient had retained Dr. Ang as an expert until November 8, 2019, no one from the Bureau objected in any way when Dr. Ang's article, titled "Student Loan Repayment Options in Light of CFPB

v. Navient," was published in *Law360* in March of 2017. It appears that her report

in this case flows from that article. Furthermore, the Bureau has not pointed to any

part of Dr. Ang's report that is based upon confidential information she received

while working for the Bureau. Therefore, fundamental fairness and the integrity of

these proceedings require that Dr. Ang be permitted to pursue her professional

calling as an expert for Navient.

## IV.    CONCLUSION

For the reasons set forth above, the Bureau's request for disqualification of

Dr. Ang will be denied. An appropriate Order follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
Special Master

34

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | : | |
| | : | |
| **Plaintiff** | : | **3:17-CV-101** |
| | : | |
| **v.** | : | |
| | : | **Hon. Robert D. Mariani** |
| **NAVIENT CORPORATION, et al.,** | : | **Special Master Thomas I. Vanaskie** |
| | : | |
| **Defendants.** | : | |
| | : | |

## ORDER

**AND NOW, this 19th Day of March 2019,** for the reasons set forth in the foregoing Special Master Report #18, **IT IS HEREBY ORDERED THAT:**

1.  The request of Plaintiff Consumer Financial Protection Bureau to disqualify Dr. Ang from serving as an expert witness in this litigation is denied.

2.  Unless otherwise extended, objections to this Report and Order must be submitted no later than twenty-one (21) days after service of this Report and Order.

3.  No later than March 26, 2020, counsel shall submit an agreed upon order setting a deadline by which the Bureau must submit a report in response to the report of Dr. Ang.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
Special Master
