# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Consumer Financial Protection Bureau,

    Plaintiff,

    v.

Navient Corporation, *et al.*,

    Defendants.

Case No. 3:17-CV-00101-RDM
(Hon. Robert D. Mariani)

ELECTRONICALLY FILED

ORAL ARGUMENT REQUESTED[1]

## PLAINTIFF'S OBJECTIONS TO SPECIAL MASTER REPORT #18

Thomas G. Ward
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

Nicholas Jabbour, DC 500626
Manuel Arreaza, DC 1015283
Ebony Sunala Johnson, VA 76890
Nicholas Lee, DC 1004186
Andrea Matthews, MA 694538
Jonathan Reischl, IL 6305260
*Enforcement Attorneys*

*Attorneys for Plaintiff*

---

[1] If the Court orders oral argument on these Objections, the Bureau is amenable to having oral argument at the same time on the Bureau's motion *in limine* to preclude evidence from outside the relevant time period in this litigation (ECF Dkt. 391), if the Court believes that oral argument on that motion potentially would be helpful.

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................4

    I.    Dr. Ang worked on the Navient investigation while employed at the Bureau and received privileged work product from the attorneys responsible for the investigation.. ........................................................4

    II.    The subject matter of Dr. Ang's work for the Bureau is related to the issues in this litigation... .................................................................9

    III.    Dr. Ang left the Bureau and was retained by Navient without the Bureau's knowledge... .......................................................................11

ARGUMENT ......................................................................................................12

    I.    There are two tests that courts apply to adjudicate expert disqualification issues.. .......................................................................12

    II.    When an expert received privileged information from the moving party, as opposed to information that is merely confidential, courts consistently disqualify the expert.......................................................14

    III.    Policy considerations militate in favor of disqualification .................20

CONCLUSION ...................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alien Tech. Corp. v. Intermec, Inc.*,
  2007 WL 4261972 (D.N.D. Nov. 30, 2007)......................................................... 14

*Brunstad v. Medtronic, Inc.*,
  2015 WL 1962104 (W.D. Wis. Apr. 30, 2015)..................................................... 19

*Calendar Research LLC v. StubHub, Inc.*,
  2017 WL 10378337 (C.D. Cal. Sept. 22, 2017) ............................................. 12, 13

*Cordy v. Sherwin-Williams Co.*,
  156 F.R.D. 575 (D.N.J. 1994).......................................................................... 16, 17

*H. Lundbeck A/S v. Apotex Inc.*,
  2020 WL 1285834 (D. Del. Mar. 18, 2020) ................................................... 14, 15

*Hewlett-Packard Co. v. EMC Corp.*,
  330 F. Supp. 2d 1087 (N.D. Cal. 2004).................................................................. 17

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
  2007 WL 4440173 (D.N.J. Dec. 17, 2007)..................................................... 12, 13

*In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,
  2014 WL 6960396 (S.D.W. Va. Dec. 8, 2014) .............................................. 13, 16

*Koch Ref. Co. v. Jennifer L. Boudreau M/V*,
  85 F.3d 1178 (5th Cir. 1996) ................................................................................. 16

*Palomar Med. Techs., Inc. v. Tria Beauty, Inc.*,
  2012 WL 517532 (D. Mass. Feb. 15, 2012)........................................................... 17

*Rhodes v. E.I. Du Pont De Nemours & Co.*,
  558 F.Supp.2d 660 (S.D. W. Va. 2008).......................................................... 12, 13

ii

*Space Systems/Loral v. Martin Marietta Corp.*,
  1995 WL 686369 (N.D. Cal. Nov. 15, 1995), the court denied ........................ 18

*Stabilus v. Haysnworth, Baldwin, Johnson & Greaves*,
  1992 WL 68563 (E.D. Pa. Mar. 31, 1992) ........................................................ 21

*United States v. NHC Health Care Corp.*,
  150 F.Supp.2d 1013 (W.D. Mo. 2001) ........................................................ 13, 14

*Wang Labs., Inc. v. CFR Assocs., Inc.*,
  125 F.R.D. 10 (D. Mass. 1989) ........................................................................ 14

## **Rules**

Federal Rule of Civil Procedure 53(f) ...................................................................... 3

Plaintiff Consumer Financial Protection Bureau ("Bureau") respectfully files these objections to Special Master Report #18 ("Report #18"), which recommended against the disqualification of Dr. Xiaoling Lim Ang – the expert witness retained by Defendants (collectively, "Navient") to rebut Dr. Charles Mullin, a Bureau expert witness. Dr. Mullin's report details the monetary harm suffered by borrowers with respect to the Bureau's claim that Navient steered borrowers into costly forbearances, rather than adequately advising them about income-driven repayment options.

## INTRODUCTION

The central premise of Report #18 is that the record is devoid of any evidence that Dr. Ang was exposed to the privileged work product of Bureau attorneys during her work on this exact matter while employed at the Bureau: "[A]lthough submitting copious evidence for *in camera* review and offering the testimony of six witnesses, the Bureau points to no specific evidence that Dr. Ang was exposed to litigation strategy." ECF Dkt. 453, at 13. Yet, contrary to this premise, the record is replete with such evidence. Through dozens of emails and testimony of multiple witnesses, the Bureau established that Dr. Ang met with the Bureau's Enforcement attorneys working on this exact matter and discussed their theories of the case to understand exactly what they hoped to accomplish through their data requests to Navient. Without knowing these things, there would have

been no way for Dr. Ang to provide the input that she did on those data requests.

Navient's argument that the information Dr. Ang learned from Bureau Enforcement attorneys is not privileged – an argument that was fully adopted by Report #18 – is meritless. Specifically, Navient pressed the idea that Dr. Ang provided feedback on data requests without knowing anything about this case, and that instead there was some body of "technical" knowledge that Dr. Ang drew upon that was totally independent of knowing anything about this matter. Contrary to that notion, however, Dr. Ang was not merely some vessel of "technical" knowledge who opined on litigation documents without knowing anything about this case: rather, as Dr. Ang herself memorialized at the time, the attorneys working on the case "clarified the goals" of their data requests to her and engaged in "structured thinking about strategies and objectives" so that Dr. Ang and her colleagues would know exactly what sort of input they should be providing. Exhibit 17, at A132-133.[2] This is quintessential work product, and the case law repeatedly counsels that when an individual is exposed to *privileged* information

---

[2] "Exhibit __" refers to the exhibits previously submitted to the special master in connection with this dispute. Because not all exhibits submitted to the special master are being relied upon in these objections, there are gaps in the exhibit numbering. Portions of these exhibits are privileged; thus, they are being transmitted for *in camera* review, which is appropriate for the reasons set forth in the Bureau's December 27, 2019 motion. *See* ECF Dkt. 387 at 7. Navient previously received versions of the exhibits with the privileged information redacted.

like this (as opposed to information that is merely *confidential*), then tries to become an expert for the opposing party, disqualification is required.

Rather than acknowledging the record evidence clearly establishing that Dr. Ang was exposed to *privileged* work product on this specific matter while employed at the Bureau, Report #18 creates a set of criteria that have no bearing on whether Dr. Ang was exposed to privileged information and treats those criteria as determinative of the disqualification inquiry. *See, e.g.*, *id.* at 12-13 (giving weight to the fact that Dr. Ang worked in a "building apart" from Enforcement attorneys and did not have a "managerial role"). But Dr. Ang was indeed exposed to privileged work product on this specific matter while at the Bureau. The fact that she was not a manager and worked in a separate building from Enforcement attorneys cannot negate that she communicated with Enforcement attorneys working on this exact matter, and that those attorneys shared their mental impressions and legal strategies with her so she could have a foundation for advising them on data requests.

When a court uses a special master to make recommendations, a party is entitled to object to those recommendations, and the court may not simply defer to the master's recommendations. Rather, pursuant to Federal Rule of Civil Procedure 53(f), "[t]he court must decide *de novo* all objections to findings of fact . . . [and]

3

to conclusions of law made or recommended by a master." This is a situation in which *de novo* review of the Special Master's findings is particularly important because key evidence in the record that is outcome determinative – specifically, the fact that Dr. Ang was exposed to privileged information on this specific matter while working at the Bureau – was not given any weight in Report #18.

The Bureau respectfully requests that the Court decline to adopt the recommendations from Report #18, and that the Court disqualify Dr. Ang from serving as an expert witness in this matter.

## FACTUAL AND PROCEDURAL BACKGROUND

I.   **Dr. Ang worked on the Navient investigation while employed at the Bureau and received privileged work product from the attorneys responsible for the investigation.**

In October 2013, attorneys from the Bureau's Office of Enforcement working on the investigation of Navient (known at the time as Sallie Mae) reached out to the Bureau's Office of Research for assistance. *See* Exhibit 1, at A2-7. Dr. Ang, along with Michelle Kambara and Tim Critchfield, were the employees in the Office of Research who were tasked with assisting with the investigation. *Id.*

Initially, the Enforcement attorneys sought assistance in determining whether the data that they had requested through a previously issued civil

investigative demand[3] – without the involvement of the Office of Research

employees – was adequate. *Id.* At that time, a meeting occurred among the

Enforcement attorneys and the three Office of Research employees to discuss the

conclusion of the Office of Research employees that "the level of detail [of data

requested by that previously issued CID] would not be sufficient for a restitution

analysis." Transcript 35:20-36:14, 88:1-22;[4] *see also* Exhibits 2, 3. At that meeting,

the Office of Research employees discussed with the Enforcement attorneys

"strategies for how to get the right [data] fields" from Navient in the future to

"calculate harm." Transcript 84:11-18. In these discussions, according to Mr.

Critchfield, the Enforcement attorneys "la[id] out what the goals [are] – and the

strategies" for the case, as well as the "legal things that they want to get at by

looking at the data." Transcript 84:23-84:2; *accord* Transcript 89:8-18. Put

differently, the attorneys "la[id] out exactly what [they're] interested in seeking

from the data" and what borrower "complaints" about Navient are relevant to the

issue. Transcript 91:13-21. Ms. Kambara likewise testified that she used the

meeting to help herself "understand what [the Enforcement attorneys] were trying

---

[3] A civil investigative demand ("CID") is an investigative subpoena that seeks information from the subject of an investigation.

[4] "Transcript __" is a reference to the transcript from the evidentiary hearing in this dispute, which is being filed with this brief.

to accomplish," because she needed to understand the goals of the investigation in order to determine whether the correct data was being requested. Transcript 33:21-34:4.

Because the Office of Research employees, in consultation with the Enforcement attorneys, concluded that the data requested by that point was insufficient, the Office of Research employees shifted to drafting a new data request that would allow the Enforcement attorneys to get the data they needed to achieve the goals of the investigation at that time. As one of the Enforcement attorneys testified, the Office of Research employees drafted a new data request "based on all of the information that [was] presented to them about what we needed, what our goals were, our legal theories at that time." Transcript 206:5-16. Specifically, Dr. Ang, Ms. Kambara, and Mr. Critchfield were the architects of determining "how to structure information requests to Salle Mae . . . that's going to provide us with the data that we can use to support the issues that we're seeking to prove." Transcript 206:22-207:11.

Navient subsequently produced data in response to the request that had been drafted by Dr. Ang, Ms. Kambara, and Mr. Critchfield. Once the Bureau received the data in early 2014, the Enforcement attorneys reached out to Dr. Ang, Ms. Kambara, and Mr. Critchfield for their input. Transcript 43:7-12; *see also* Exhibit

6

6. Those three individuals met and reviewed Navient's data submission and concluded that the data "was not at the loan level that we [had] requested." Transcript 47:7-9, 48:6-9, 66:14-18, 90:9-17. Specifically, they discussed "each individual field and table and – and the details of – of why [each] spreadsheet wasn't going to be adequate" to accomplish the goals of the investigation set forth by the Enforcement attorneys. Transcript 94:20-24. Then, after meeting amongst themselves, they reached out to the Enforcement attorneys to discuss the conclusions that they had reached. Transcript 47:19-48:2; *see also* Exhibit 8.

Because Navient had still not produced data that would allow the Enforcement attorneys to achieve the objectives of the investigation at that time, the Enforcement attorneys sought to issue a new CID to Navient in April 2014. The Enforcement attorneys again contacted Mr. Critchfield and Dr. Ang for their input, to ensure that the CID was requesting the type of data that was necessary for the investigation to move forward productively.[5] As Mr. Critchfield testified, the Enforcement attorneys had "a specific theory of what's going on [in] the case" and wanted to ensure that they were requesting data to help "evaluate" that theory. Transcript 98:8-14. Mr. Critchfield provided edits to the CID, and Dr. Ang agreed with Mr. Critchfield's edits, in addition to providing edits of her own. Transcript

---

[5] By this time, Ms. Kambara was no longer available to assist with the Navient matter. Transcript 96:1-19.

7

99:17-22; *see also* Exhibit 11. This was "part of the iterative process [that the Enforcement attorneys] had going on, in working with Dr. Ang and Mr. Critchfield in . . . formulating requests . . . with an eye towards what we had already received, what we needed to receive, with an awareness of what our legal theories were and what our goals were." Transcript 213:1-15.

In March 2015, Dr. Ang and Mr. Critchfield were contacted again by the Enforcement attorneys to provide input on another CID for the Navient investigation. Transcript 101:10-102:14; *see also* Exhibit 14. Both Mr. Critchfield and Dr. Ang provided written comments to the Enforcement attorneys on the CID. Transcript 103:15-104:8; *see also* Exhibit 14. In addition, Dr. Ang and Mr. Critchfield both participated in at least one meeting with the Enforcement attorneys to discuss the CID. Transcript 104:15-105:5. That conversation included a discussion of what theories the Enforcement attorneys were pursuing and what data would be needed "to test those theories" and determine "whether there's a violation of the law happening." Transcript 181:5-12. Dr. Ang subsequently recounted to her colleagues that the meeting was a success: "Tim [Critchfield] and I had a very productive conversation with the Sallie Mae/Navient team in Enforcement," during which the Enforcement attorneys "clarified the goals of the CID," which in turn allowed Dr. Ang to provide constructive feedback on the CID.

Exhibit 17; *see also* Transcript 105:6-106:16.

In the course of her work on the Navient matter, Dr. Ang received or sent over 50 emails that specifically referenced the Navient matter, and was present for at least six meetings regarding the matter. *See* Exhibits 1-17, 19-20, 42-45. Mr. Critchfield noted that he viewed the work of he and his colleagues from the Office of Research as being so instrumental to the investigation that he viewed himself as part of the Navient "team" from the time he began working on the matter. Transcript 106:17-107:1. In addition, an Enforcement attorney testified at the hearing as to how valuable the input of the Office of Research employees was in moving the Navient investigation forward:

> [W]e really valued their input enormously . . . . [T]o the extent we could share with them, you know, sort of lay on the table for them what our case was, you know, what our legal theories were, what our damages theories were, and sort of lay our CID requests or what we envisioned our CID requests would be and get their feedback on that, discuss with them some of the challenges we were having relating to data . . . , it really gave us confidence that we were -- we were going to get better information[.]

Transcript 217:8-218:4.

## II.   The subject matter of Dr. Ang's work for the Bureau is related to the issues in this litigation.

During the course of the foregoing work that occurred between Dr. Ang and the Enforcement attorneys, Dr. Ang worked on two types of issues, both of which are related to issues in the current litigation:

- She worked on payment processing issues, including the methods by which Navient allocates borrower overpayments. *See, e.g.*, Transcript 215:21-216:21 ("I remember very specifically [Dr. Ang] using a white board to kind of run through scenarios with us about payment processing issues"). While the Bureau's theories have evolved, the fact that Navient's failure to follow borrower instructions regarding allocation of payments results in harm to borrowers (such as late fees) is a central part of the Bureau's payment processing claim in this case. *See, e.g.*, Complaint, at ¶¶ 103-108.

- She provided input on how to obtain data regarding borrowers who "are coming up on the end of their IBR/forbearance term," in order to obtain "insight into what happens when alternative repayment status is up for renewal." Exhibit 11, at A52. This input was incorporated into a CID issued by the Bureau (*see* Exhibit 19, at A151-153), and the issue of what happens to borrowers after a forbearance or IDR ends is a central feature of Dr. Ang's expert report. Indeed, the Bureau's steering and recertification claims deal precisely with the circumstances under which borrowers may enter into forbearances and IDR, as well as the circumstances under which they exit those programs. *See, e.g.*,

10

Complaint, at ¶¶ 47-76.

As an Enforcement attorney testified at the hearing, it is common that, when developing claims throughout the course of an investigation, the legal theories and precise facts supporting those theories evolve:

> So when we start an investigation, frequently, you know, we start it based on . . . all kinds of information that might come into us, and . . . we have very little insight into what's actually going on. And as we sort of start the investigation through conversations with opposing counsel, through collecting information from the CID, through conversations with other third parties, we gain more information. And based on that information, theories . . . will develop, they will change, they will morph . . . . [I]t's not static.

Transcript 249:10-250:8. Thus, the precise theories in this litigation are naturally the product of some evolution over time as additional facts and information were gathered.

## III.   Dr. Ang left the Bureau and was retained by Navient without the Bureau's knowledge.

In November 2015, Dr. Ang left the Bureau. Prior to her departure, she communicated with a Bureau ethics official, during which she represented to the Bureau ethics official on two occasions that she had not worked directly on any Enforcement matters while at the Bureau. *See* ECF Dkt. 393-1, at Exhibit A-2.  As detailed above, and certainly from the Bureau's perspective, that was not accurate.

Navient apparently began communicating with Dr. Ang in August 2017 concerning possible retention as an expert witness in this case. In November 2019,

11

she authored an expert report on behalf of Navient. Prior to receiving the expert report, the Bureau had not received any notification that Navient had hired a former Bureau employee as an expert.

## **ARGUMENT**

## I.     **There are two tests that courts apply to adjudicate expert disqualification issues.**

Courts have articulated various tests for determining whether an expert should be disqualified. These tests fall into two general categories, either of which yields the same result in this case.

A "bright-line rule" applies when an expert engages in "side-switching." *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F.Supp.2d 660, 666 (S.D. W. Va. 2008). This rule is "simple": "It requires disqualification when an expert switches sides in the same dispute." *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378337, at *2 (C.D. Cal. Sept. 22, 2017). The logic behind the rule is straightforward: "side-switching is the paradigm of inappropriate expert conduct," and "no one . . . seriously contend[s] that blatant side-switching by an expert within the same litigation should be permitted." *Rhodes*, 558 F.Supp.2d at 666 (quotation omitted). Under the rule, courts disqualify an individual who works on a matter for one party, then switches sides to work on the same matter for the opposing party. *See, e.g.*, *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 2007 WL

12

4440173, at *3 (D.N.J. Dec. 17, 2007); *Rhodes*, 558 F.Supp.2d at 670; *Calendar Research*, 2017 WL 10378337, at *1; *United States v. NHC Health Care Corp.*, 150 F.Supp.2d 1013, 1015 (W.D. Mo. 2001).

Alternatively, a two-part conflict of interest test applies when the side-switching test does not apply. That test asks (1) whether it was "objectively reasonable" for the moving party "to believe that a confidential relationship existed" with the expert; and (2) whether any confidential or privileged information was disclosed by the moving party to the expert, "sufficiently related" to this litigation. *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 6960396, at *7 (S.D.W. Va. Dec. 8, 2014).

Under either test, the individual at issue need not have served specifically as an expert witness for the moving party to be disqualified. Rather, disqualification may be warranted in any scenario where an individual worked for one party in any capacity, but then became an expert witness for the opposing party. For example, in *Calendar Research*, the expert who was disqualified had been engaged as a third-party neutral during pre-filing settlement negotiations, then was retained by one of the parties after the litigation commenced to serve as an expert witness. 2017 WL 10378337, at *2. Similarly, in *NHC Health Care,* the expert who was disqualified had been an employee of a government agency and had worked on an

13

investigation into a particular company, then became an expert witness on behalf of that company in subsequent litigation. 150 F. Supp. 2d at 1015; *see also Alien Tech. Corp. v. Intermec, Inc.*, 2007 WL 4261972, at *2 (D.N.D. Nov. 30, 2007) (disqualifying expert who was former employee of moving party); *Wang Labs., Inc. v. CFR Assocs., Inc.*, 125 F.R.D. 10, 12 (D. Mass. 1989) (same).

As discussed in more detail below, regardless of which test is applied, the result is the same when the expert has received privileged information: the expert is disqualified. That result is also warranted here.

## II.   When an expert received privileged information from the moving party, as opposed to information that is merely confidential, courts consistently disqualify the expert.

The threshold issue in deciding whether an expert should be disqualified is whether the expert was exposed to merely *confidential* information while working with the party seeking disqualification, or whether the expert was exposed to *privileged* information while working with the party seeking disqualification. If the expert was exposed to privileged information, disqualification is required, and no further inquiry is needed. In contrast, if the expert was exposed to information that was confidential (but not privileged), the inquiry is much more complex and fact-intensive.

A recent district court case from this circuit demonstrates this concept. In *H.*

14

*Lundbeck A/S v. Apotex Inc.*, 2020 WL 1285834 (D. Del. Mar. 18, 2020), the

expert at issue had been a principal investigator on numerous clinical trials while

he was employed by the moving party. But the moving party was unable to point to

any privileged information that the expert had ever received in the course of his

employment as a principal investigator. *Id.* at *1 ("it does not appear that Dr.

Rothschild received any privileged information"). In other words, while the

clinical trials had exposed the expert to confidential information, there was no

claim that the expert met with attorneys for the moving party to discuss their legal

theories in the litigation before being retained by the opposing party. This was

dispositive. As the court explained, when an expert only received confidential

information from the moving party, an inquiry is required into the nature of the

expert's prior employment and what types of confidential information the expert

received during that employment, because much of that confidential information

would be "discoverable" anyways. *See id.* at *2. But such factors need not be

analyzed when the expert received privileged information because the expert's

potential disclosure of the moving party's privileged information to the opposing

party creates the "potential for an unfair advantage" and thereby mandates

disqualification. *Id.*

This is a critical distinction and one that is made repeatedly in the case law.

15

When courts grant disqualification motions because the expert received *privileged* information while working with the moving party, they specifically focus on that fact alone and reject any attempt by the opposing party to downplay the value of the privileged information through clever labels. For example, in *Koch Ref. Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178 (5th Cir. 1996), the moving party "contend[ed] [that] its counsel spent considerable time with [the expert] explaining [the moving party's] entire theory of the case as well as trial tactics." *Id.* at 1182. The opposing party attempted to minimize the significance of this privileged information by characterizing it as "technical information." *Id.* The appeals court disagreed with that characterization and determined that the district court had properly disqualified the expert. *Id.* Similarly, in *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 6960396 (S.D.W. Va. Dec. 8, 2014), the party retaining the expert claimed that the allegedly privileged material to which the expert had been exposed while working for the moving party was of questionable value because it was "obtained from an FDA database that is available to the public." *Id.* at *9. The court disagreed that the need to protect work product could be so easily cast aside through this type of characterization: "Even if the value of the information shared with [the expert] is debatable, its essential nature as work product is not." *Id*. And in *Cordy v. Sherwin-Williams Co.*, 156

16

F.R.D. 575 (D.N.J. 1994), the court disqualified an expert who "learned [the moving party's] litigation strategy," even though the expert sought to claim that whatever allegedly privileged information he learned from the moving party was so insignificant that he "did not and will not remember and ultimately use that information." *Id.* at 584.

Conversely, when courts deny disqualification motions, they often make clear that the individual at issue had only been exposed to *confidential* information and that the result may have been different if the expert had been exposed to *privileged* information.  For example, in *Palomar Med. Techs., Inc. v. Tria Beauty, Inc.*, 2012 WL 517532, at *4 (D. Mass. Feb. 15, 2012), the court denied the motion to disqualify because the expert had not received privileged work product from the moving party, a fact that the court noted "weigh[ed] strongly against disqualification." *Id.* at *4. Similarly, in *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004), the court denied the disqualification motion where the moving party had only a one-hour consultation with the individual at issue. *Id.* at 1096. The court noted that it "strain[ed] credulity to argue that . . . [the moving party's] counsel would disclose aspects of its litigation strategy to someone who had not yet signed a confidentiality agreement and that such a conversation could have occurred in the span of a one-hour conversation." *Id.*  And

in *Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369, at *2 (N.D. Cal. Nov. 15, 1995), the court denied the disqualification motion because the expert was, at best, exposed to "confidential factual material obtained outside the context of the litigation." *Id.* at *2. The court noted, however, that the result would likely have been different if the expert had been exposed to privileged information from the moving party: "The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined." *Id.*

As the hearing testimony summarized above demonstrates, Dr. Ang was repeatedly exposed to the mental strategies and impressions of Bureau attorneys concerning their investigation into Navient. Indeed, she provided input on litigation-related documents, and she would have had no basis for doing so if the Enforcement attorneys had not communicated with her regarding their strategies and goals. Therefore, she should be disqualified from serving as an expert witness for Navient.

While Navient and Report #18 dispute that Dr. Ang was even exposed to privileged information, they also contend that it does not matter if she did receive privileged information because that information is not contained in her expert report. But courts do not insist on being able to pinpoint that the privileged

information is contained within the four corners of the expert report in order for

disqualification to be the proper result, because the fact is that an expert who

obtained privileged information from the moving party can "implicitly or

unconsciously guide [the retaining party's] litigation strategy" in ways that are

incapable of detection from the expert report itself. *Brunstad v. Medtronic, Inc.*,

2015 WL 1962104, at *3-4 (W.D. Wis. Apr. 30, 2015). In addition, as Dr. Ang

herself admitted, it would be unacceptable for her to work on one set of claims for

the plaintiff in a case, and a distinct set of claims for the defendant in the same

case, even though that would yield two expert reports that have no overlap. *See*

Transcript 399:12-25 (indicating she would be "conflicted out" if she was

"working for both sides in the same matter," such that she could not

"simultaneously serve as Navient's expert with respect to the steering issues and

the Bureau's expert with respect to the payment processing issues"). And as a

Bureau Enforcement attorney testified, theories "develop, they will change, they

will morph" (Transcript 249:10-250:8), such that it makes little sense to look at the

Bureau's theories on payment processing and steering as they existed during the

Bureau's investigation into Navient and claim that they must be identical to the

allegations in this litigation for disqualification to be warranted.

The Bureau respectfully submits that the rule that is laid out in the case law

avoids the morass of trying to get into the expert's mind to determine the extent to which privileged information from the moving party may have guided the expert's work. Rather, the rule in the case law is much more straightforward: once an individual is exposed to privileged work product for one party in litigation, that individual cannot be an expert for the opposing party in that same litigation. That rules requires Dr. Ang's disqualification.

**III.    Policy considerations militate in favor of disqualification.**

While Report #18 includes a discussion of policy considerations, a more complete accounting of relevant policy considerations demonstrates that disqualification is the proper result in this case.

*First*, Report #18 gives weight to the fact that Dr. Ang sought the guidance of a Bureau ethics official upon leaving the Bureau. However, Report #18 does not appear to give any weight to the fact that Dr. Ang represented to the Bureau ethics official on two occasions that she had not worked directly on any Enforcement matters while at the Bureau. *See* ECF Dkt. 393-1, at Exhibit A-2. That was not accurate. The Court should encourage government employees to be truthful and fully forthcoming in their dealings with ethics officials. Dr. Ang was neither.

*Second*, Report #18 gives weight to the fact that Dr. Ang published an article in *Law360* about the Navient litigation after the Bureau's complaint was filed in

20

this Court. The Court should not approve of the idea that publishing a high-level article on a website eliminates the need to respect privileges. For example, if a WilmerHale attorney working on this litigation left that firm, and then published a high-level article about an issue in this litigation, surely that article would not function as a "free pass" allowing the attorney to join the Bureau and commence work on this litigation on behalf of the Bureau.

*Third*, the Court should encourage communication at the earliest possible opportunity when a party in litigation seeks to hire an expert witness who worked for the opposing party. Indeed, it is typically advisable to notify opposing counsel before contacting a former employee who is reasonably likely to possess privileged information from the prior employment and who might divulge that privileged information in speaking with the contacting party. *See, e.g.*, *Stabilus v. Haysnworth, Baldwin, Johnson & Greaves*, 1992 WL 68563, at *2 (E.D. Pa. Mar. 31, 1992). Here, by contrast, the Bureau did not learn that Dr. Ang had been retained until receiving her expert report in November 2019. The Court should not give credit to arguments about possible "prejudice" to Navient at this "late stage" (ECF Dkt. 453, at 32) when any such prejudice could have been avoided through an earlier disclosure of Dr. Ang's retention.

*Finally*, it bears mention that, as Report #18 noted, Dr. Ang was a witness

21

against the Bureau in an administrative trial involving a payday lender, and the Bureau raised no objection to her participation in that case. As that case demonstrates, the Bureau certainly has no objection to Dr. Ang testifying in matters when she did not previously work on those precise matters with Enforcement attorneys while she was employed by the Bureau.

## **CONCLUSION**

For the foregoing reasons, Dr. Ang should be disqualified from serving as an expert witness in this case, and her expert report should be stricken.

Dated: April 9, 2020          Respectfully submitted,

Thomas G. Ward
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

   /s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
(Nicholas.Jabbour@cfpb.gov; 202-435-7508)
Ebony Sunala Johnson, VA 76890
(Ebony.Johnson@cfpb.gov; 202-435-7245)
Nicholas Lee, DC 1004186
(Nicholas.Lee@cfpb.gov; 202-435-7059)
Manuel Arreaza, DC 1015283
(Manuel.Arreaza@cfpb.gov; 202-435-7850)
Andrea Matthews, MA 694538
(Andrea.Matthews@cfpb.gov; 202-435-7591)
Jonathan Reischl, IL 6305260
(Jonathan.Reischl@cfpb.gov; 202-435-9202)
*Enforcement Attorneys*

1700 G Street NW
Washington, DC 20552
Fax: 202-435-9346

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Local Rule 7.8(b)(2), I hereby certify that the foregoing brief

contains 4989 words.


     <u>  /s/ Nicholas Jabbour       </u>
Nicholas Jabbour, DC 500626
Nicholas.Jabbour@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7508
Fax: 202-435-9346

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 9, 2020, I filed the foregoing document with the

Court's ECF system, which will send notification of such filing to counsel for

Defendants.

   /s/ Nicholas Jabbour     
Nicholas Jabbour, DC 500626
Nicholas.Jabbour@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7508
Fax: 202-435-9346

*Attorney for Plaintiff*
