# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 3:17-cv-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | |
| Navient Corporation, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTIONS TO SPECIAL MASTER REPORT #18

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................2

ARGUMENT ...................................................................................9

I.   The Special Master Correctly Found That Dr. Ang Did Not Receive Any
     Specific, Confidential, And Substantially Relevant Information Warranting Her
     Disqualification................................................................................10

     A. The Special Master Correctly Applied the Relevant Legal Standard ...........10

     B. The CFPB's *Per Se* Disqualification Rule Is Unsupported...........................14

II.  The Special Master Correctly Found That Policy Considerations Warrant
     Denial of the CFPB's Request. .........................................................18

CONCLUSION ...................................................................................21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Federal. Trade Commission v. Innovative Designs, Inc.*, No. 16-1669, 2018 WL 1334830 (W.D. Pa. Mar. 15, 2018) ................................................ 11

*Glasser v. Hilton Grand Vacations Co., LLC*, No. 8:16-cv-952-T-27AAS, 2017 WL 3584930 (M.D. Fla. July 24, 2017) ................................. 11

*Grant Thornton, LLP. v. F.D.I.C.*, 297 F. Supp. 2d 880 (S.D. W. Va. 2004) ..................................................................................................... 10, 19

*Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426 (E.D. Pa. 2001) ..................................................................... 10

*H. Lundbeck A/S v. Apotex Inc.*, No. 18-88-LPS, 2020 WL 1285834 (D. Del. Mar. 18, 2020) ................................................................................. 17

*Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004) ....................................................................................................... passim

*In re Bard IVC Filters Products Liability Litigation*, No. MDL 15-02641, 2017 WL 6603467 (D. Ariz. Dec. 21, 2017) ............................. 12, 16

*In re Incretin-Based Therapies Products Liability Litigation*, 721 F. App'x 580 (9th Cir. 2017) ............................................................................... 2

*Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178 (5th Cir.1996) ................ 11, 17

*Orion Corp. v. Sun Pharmaceutical Industries, Ltd.*, Nos. 05-5436 (MLC), 08-5545 (MLC), 2009 WL 5872982 (D.N.J. June 12, 2009) .......................................................................................................... 10

*Palomar Medical Technologies, Inc. v. Tria Beauty, Inc.*, No. 09-11081, 2012 WL 517532 (D. Mass. Feb. 15, 2012) ..................................... 18

*Return Mail, Inc. v. United States*, 107 Fed. Cl. 459 (2012) ................................... 11

*Rhodes v. E.I Du Pont de Nemours & Co.*, 558 F. Supp. 2d 660 (S.D. W. Va. 2008) ..................................................................................... 10, 15, 18

*Space Systems/Loral v. Martin Marietta Corp.*, No. 95-20122, 1995
        WL 686369 (N.D. Cal. Nov. 15, 1995) ........................................................18

*U.S. ex rel. Cherry Hill Convalescent Center, Inc. v. Healthcare
        Rehab Sys., Inc.*, 994 F. Supp. 244 (D.N.J. 1997) ...................................11, 14

## **INTRODUCTION**

The CFPB's objections press the same erroneous argument they made before the Special Master: that the mere "expos[ure]" of Dr. Ang to any CFPB work product during its years-long investigation of Navient requires *per se* disqualification of Dr. Ang from serving as an expert in the litigation.  Doc. 459 at 24.  As the Special Master recognized, that is not the law, and the CFPB's "conclusory" claim of "expos[ure]" falls well short of the high bar courts have set for parties seeking to disqualify an opponent's expert.  Doc. 453 at 11.  Rather, based on a "close analysis" of the evidence, *id.* at 21-27, and after a full evidentiary hearing, the Special Master properly considered whether Dr. Ang had received "*specific* confidential information related to the present litigation" that would warrant her disqualification, *id.* at 27 (citing *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004) (emphasis added)), and concluded that the CFPB "ha[d] not carried its heavy burden of showing that the 'drastic measure' of disqualification of Dr. Ang is warranted."  *See* Doc. 453 at 2 (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1094).

Notably, the CFPB's objections do not contest the findings of fact made by the Special Master.  Those findings make clear (1) that any communications involving Dr. Ang related to the Navient matter occurred years before this lawsuit was even filed and were "general in nature and episodic," Doc. 453 at 27; (2) that

CFPB documents provided to Dr. Ang were ultimately "shared with Navient" and thus "no longer confidential for the purposes of disqualification," *id*. at 25; and (3) that there was "[n]o testimony . . . to suggest that confidential information related to the matters at issue in the litigation was imparted to Dr. Ang," *id*. at 23.  In light of these findings, and setting aside the CFPB's rhetoric and misdirection, nothing in the evidentiary record approaches the "'*specific* and *unambiguous* disclosures' required to trigger disqualification."  *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 721 F. App'x 580, 584 (9th Cir. 2017) (quoting *Hewlett Packard*, 330 F. Supp. 2d at 1094) (emphasis in original).

## **FACTUAL AND PROCEDURAL BACKGROUND**

The CFPB's attempt to disqualify Dr. Ang was the subject of extensive proceedings before the Special Master, which resulted in a comprehensive record of the relevant evidence.  On December 27, 2019, the CFPB filed a letter requesting Dr. Ang's disqualification.  Doc. 453 at 5.  Navient responded on January 13, 2020, and the Special Master initially heard arguments from the parties on January 16 and January 28.  *Id.* at 6-7.  At the CFPB's request, the Special Master directed that both defense counsel and Dr. Ang produce certain communications potentially relevant to the disqualification issue.  *Id.* at 7; *see also* Ex. A (Jan. 28 Hrg. Tr.) at 25-26 (relating to CFPB's request for defense counsel's e-mails with Dr. Ang and Dr. Ang's "personal e-mail that referenced Sallie Mae or

Navient").  Defendants also provided Dr. Ang's billing records for her work for Navient.  Doc. 453 at 7.  The Special Master found that there was "nothing in these documents that was material to the disqualification question."  *Id.* at 7 n.6.

In light of the importance of the issue, the Special Master determined that an evidentiary hearing was appropriate, and on February 20, 2020, the parties appeared before the Special Master in Washington, D.C. at a full-day hearing at which the CFPB presented six witnesses and Dr. Ang testified.  *Id.* at 8.  On March 3, the parties submitted post-hearing briefs addressing the hearing evidence and setting out their respective legal arguments.  *Id.*  On March 19, the Special Master issued a report and order denying the CFPB's disqualification request.  *Id.* at 35.  The CFPB does not dispute the extensive factual findings in the Special Master's report, which are set forth below.

### A.      Dr. Ang's Tenure at the CFPB

From July 2011 until November 2015, Dr. Ang worked as an Economist in the Office of Research in the Research, Markets, and Regulations ("RMR") Division of the CFPB.  Doc. 453 at 2.  RMR is a separate division of the Bureau focused on policy issues, not enforcement activities, and Dr. Ang did not have access to any enforcement files.  *Id.* at 3.  Dr. Ang's responsibilities in the Office of Research included performance of "research in support of policy projects."  *Id.* at 3 (quoting Feb. 20 Hrg. Tr. at 255).  For a period of time, Dr. Ang was also

assigned to the CFPB's Division of Consumer Education & Engagement to work on "financial coaching programs." *Id.*

During Dr. Ang's tenure in the Office of Research, the CFPB's Office of Enforcement was conducting an investigation of Navient. *Id.* The Special Master identified "a few occasions" on which Enforcement Attorneys "called upon the Office of Research . . . for advice in connection with requests for information from Navient." Doc. 453 at 3. Recognizing that "[t]hese requests were made informally and on an *ad hoc* basis," *id.*, the Special Master reviewed the evidence based on the discrete episodes in which the requests occurred:

**Episode #1**: In September 2013, Brandis Anderson, the attorney leading Enforcement's investigation, reached out to Tim Critchfield, an analyst in the Office of Research, regarding a request for data relating to Navient's "payment allocation methodologies, late fees, and disclosures in billing statements." Doc. 453 at 22. After Michelle Kambara, another analyst, was assigned to work on the request, Dr. Ang was asked to attend a meeting on October 3, 2013, to discuss "Sallie Mae data and the various allocation methodologies." *Id.* (quoting CFPB Ex. 2 at A10). Mr. Critchfield testified that at meetings of this type, Enforcement attorneys "'la[id] out what the goals [are] – and the strategies for the case' as well as the 'legal things they want to get at by looking at the data.'" Doc. 453 at 22-23 (quoting Feb. 20 Hrg. Tr. at 84:23-85:2). However, this "conclusory" statement

was unsupported by any "specifics as to what those strategies may have been and how they related, if at all, to the issues the Bureau is now pursuing" in litigation. Doc. 453 at 22-23.  Similarly, while Ms. Kambara "testified in general terms that the meeting helped her understand the goals of the investigation," she "failed to present any specifics that relate to the issues now being pursued."  *Id*. (citing Feb. 20 Hrg. Tr. at 33:21-34:4).

**Episode #2**.  The next interaction between Dr. Ang and Enforcement attorneys occurred in February 2014.  *Id.*  E-mails submitted by the CFPB show that Ms. Anderson set up "two meetings for the purpose of discussing 'Sallie Mae data,' but no substantive information is provided in the e-mails."  *Id.* (citing CFPB Exs. 6-9).  One email states that Dr. Ang met with Mr. Critchfield and Ms. Kambara to "determine if we would be able to calculate restitution for both issues using the data we have."  *Id.* (quoting CFPB Ex. 8 at A42).  However, the communications contain "no indication as to what those issues involved" and the only requests issued to Navient at that time "did not concern the matters at issue in this litigation."  *Id.*  Moreover, "[n]o testimony was presented to suggest that confidential information related to the matters at issue in the litigation was imparted to Dr. Ang at that time."  *Id.* at 23.

**Episode #3.**  Enforcement attorneys reached out to Dr. Ang and Mr. Critchfield on April 24, 2014, asking them "to review drafts of four requests for

written reports from Sallie Mae." Doc. 453 at 24. Dr. Ang commented on one request relating to "enrollment in forbearance or income-based repayment programs." *Id.* However, that request "was not included in the CID [Civil Investigative Demand] issued on April 29, 2014," which instead "focused on cosigned loans, billing disclosure statements, and late fees." *Id.* Nor is there any "documentary or testimonial evidence that Dr. Ang ever received, reviewed, or discussed any data produced in response to this request." *Id* at 25.

**Episode #4**. Following the exchange in April 2014, "[a]lmost a full year passed before Dr. Ang's feedback was again sought by Ms. Anderson regarding a CID for the Navient investigation." Doc. 453 at 25. Communications indicate that Dr. Ang "received a draft of the CID" that the CFPB issued to Navient in April 2015, and that Dr. Ang "may have had discussions with Ms. Anderson" regarding the document. *Id.* However, the CFPB offered "no specific information . . . regarding these discussions." *Id.* Leanne Hartmann, another Enforcement attorney, "testified that she could not recall any information that was

6

discussed at these meetings." *Id.*[1]  Ms. Anderson, meanwhile, "was not called by

the Bureau to testify."[2]  *Id.* at 25 n.12.  Dr. Ang noted in an e-mail that one of these

discussions '"clarified the goals of the CID."'  *Id.* at 26 (quoting CFPB Ex. 17).

However, "nothing specific was offered by way of exhibits or testimony to

describe what, if any, confidential information was shared with Dr. Ang."  *Id.*

Instead, Dr. Ang's e-mail "shows [her] concern from a researcher's perspective."

---

[1] The CFPB misleadingly cites Ms. Hartmann's testimony to claim that one such
meeting "included a discussion of what theories the Enforcement attorneys were
pursuing and what data would be needed 'to test those theories' and determine
'whether there's a violation of the law happening.'"  Doc. 459 at 12 (quoting Feb.
20 Hrg. Tr. 181:5-12).  In fact, the quoted portions of testimony concerned only
Ms. Hartmann's *general recollection* of what was "typically" discussed when
Enforcement attorneys "enlisted the assistance of staff" in other offices.  Feb. 20
Hrg. Tr. 179:10-181:16.  Based on Ms. Hartmann's admission that she lacked "any
recollection" of the specific meeting, the Special Master struck her attempt to
"guess" at what was discussed.  *Id.* at 177:25-179:8.  The CFPB does not contest
that ruling.

[2] The Special Master noted, based on Ms. Anderson's role leading the Navient
investigation, that "it would have been instructive to learn her view of the relative
significance of Dr. Ang's role and what information had been imparted to Dr.
Ang."  Doc. 453 at 25 n.12.  However, the CFPB "did not offer a declaration from
Ms. Anderson or seek judicial assistance to secure her testimony."  *Id.*

*Id.* It is "aimed at policy related matters" and "is not Navient-specific." *Id.*[3]

**Episode #5**. Cynthia Lesser, another Enforcement attorney who worked on the Navient matter, testified regarding a meeting she attended at which "Dr. Ang ran through scenarios about payment processing issues." *Id.* at 26. However, "no specifics were provided about what information Dr. Ang gave or received during that meeting and whether that information was even relevant to the present litigation." *Id.*

**Episode #6.** Dr. Ang's "final contact regarding Navient" involved an e-mail exchange pertaining to the development of "servicing standards." *Id.* These standards represented part of "a policy-driven effort directed by an official in the Bureau's Office for Students (Michael Pierce)." *Id.* No Enforcement attorneys are included on the e-mails, and Dr. Ang's input was limited to "'a couple of quick [comment] bubbles.'" *Id.* (quoting CFPB Ex. 20 at A189).

---

[3] The CFPB again mischaracterizes the record when it quotes Dr. Ang's statement regarding "structured thinking about strategies and objectives" as relating specifically to a meeting about the Navient investigation. *See* Doc. 459 at 2. As the Special Master found, it is clear from context that this comment was "not Navient-specific" and instead reflected Dr. Ang's "concern from a researcher's perspective" about coordination between Enforcement and the Office of Research on *future projects*. *See* Doc. 453 at 26 (citing CFPB Ex. 17). In any event, the CFPB provided no evidence regarding what litigation "strategies and objectives" may have been discussed in this or any other meeting involving Dr. Ang. *Id.* at 26.

### B.     Dr. Ang's Role in This Litigation

Dr. Ang left the CFPB in November 2015, about fourteen months before this
lawsuit was filed.  Doc. 453 at 4.  In March 2017, Dr. Ang published an article in
*Law 360* entitled "'Student Loan Repayment Options in Light of CFPB v.
Navient.'"  *Id.* (quoting Feb. 20 Hrg. Tr. at 308).  In the article, Dr. Ang opined
that "income-driven repayment is not necessarily better for a borrower and that [it]
is not possible to determine [that] at the time the decision [to enroll in forbearance]
is made."  *Id.* (quoting Feb. 20 Hrg. Tr. at 311).  The CFPB "was aware of the
publication of the article in the Spring of 2017, but did not object to Dr. Ang's
authoring of the article or contend that it relied upon information disclosed to her
in confidence while she was employed by the Bureau."  *Id.*  After reading Dr.
Ang's article, counsel for Navient contacted her about serving as an expert in this
litigation.  *Id.* at 4-5.  She was formally retained in February 2018.  *Id.*  Dr. Ang's
report, which rebuts conclusions reached by the CFPB's expert, Dr. Charles
Mullin, reflects analysis in her *Law360* article regarding the relative costs and
benefits of Income-Driven Repayment ("IDR") plans and forbearance.  *Id.*

## <u>ARGUMENT</u>

Expert disqualification is a "drastic measure" that should be imposed "only
hesitantly, reluctantly, and rarely."  *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1087.
A party seeking disqualification thus "bears a 'high standard of proof' to show that

disqualification is warranted." *Rhodes v. E.I Du Pont de Nemours & Co.*, 558 F.

Supp. 2d 660, 664 (S.D. W.Va. 2008) (quoting *Grant Thornton, LLP. v. F.D.I.C.*,

297 F. Supp. 2d 880, 882 (S.D. W.Va. 2004).  As the Special Master correctly

found, the CFPB failed to carry its heavy burden of showing that the extraordinary

remedy of disqualifying Dr. Ang is warranted.

I.   **The Special Master Correctly Found That Dr. Ang Did Not Receive Any Specific, Confidential, And Substantially Relevant Information Warranting Her Disqualification.**

A.   <u>The Special Master Correctly Applied the Relevant Legal Standard</u>

As the Special Master recognized, the CFPB's request to disqualify Dr. Ang

based on her prior employment at the CFPB requires application of "the two-part

conflict of interest test."  Doc. 453 at 13-14 (citing *Rhodes*, 558 F. Supp. 2d at

667).  Under this test, the party seeking disqualification must establish both that it

had a confidential relationship with the expert and that the expert received

"confidential information" relevant to the current litigation.  *Greene, Tweed of*

*Del., Inc. v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 429 (E.D. Pa. 2001).

"In the context of expert disqualification, disclosure of 'confidential

information' encompasses facts and ideas *directly relating to or impacting the*

*litigation in issue*."  *Orion Corp. v. Sun Pharm. Indus., Ltd.*, 2009 WL 5872982, at

*2 (D.N.J. June 12, 2009) (emphasis added).  As courts have widely recognized,

such information includes "discussion of the retaining party's strategies in the

litigation, the party's views of the strengths and weaknesses of each side, the role of each of the party's witnesses to be hired, and anticipated defenses." *Id.* (quoting *U.S. ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 250 (D.N.J. 1997) (same)); *see also Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178, 1182 (5th Cir.1996) (same); *Fed. Trade Comm'n v. Innovative Designs, Inc.*, 2018 WL 1334830, at *7 (W.D. Pa. Mar. 15, 2018) (same).  In contrast, purely technical information is not regarded as confidential.  *Glasser v. Hilton Grand Vacations Co., LLC*, 2017 WL 3584930, at *3-4 (M.D. Fla. July 24, 2017).  Moreover, an expert's receipt of information that later becomes "discoverable" or "publicly-available" does not warrant disqualification. *Innovative Designs, Inc.*, 2018 WL 1334830, at *9; *see also Hewlett-Packard Co.*, 330 F. Supp. 2d at 1097 (no disqualification where allegedly confidential information was part of "the parties' extensive disclosures" during litigation).

A party seeking disqualification bears the burden of identifying *with specificity* the confidential disclosures on which its request is based.  *See* Doc. 453 at 19.  "Conclusory assertions, unproven statements, or generalized and vague allegations do not satisfy this burden."  *Innovative Designs, Inc.*, 2018 WL 1334830, at *8.  Similarly, "[d]iscussions between…counsel and experts do not carry the presumption that confidential information was exchanged."  *Return Mail, Inc. v. United States*, 107 Fed. Cl. 459, 465 (2012).  Indeed, even the "likelihood"

11

that relevant confidential information was disclosed to an expert "is not enough."

*In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6603467, at *4 (D. Ariz. Dec.

21, 2017).  Rather, disqualifying an expert requires evidence of "specific and

unambiguous disclosures" that if revealed by an expert to an opponent "would

prejudice the party" seeking disqualification.  *Hewlett-Packard Co.*, 330 F. Supp.

2d at 1094.

Applying this standard, the Special Master correctly found that there was no

evidence that Dr. Ang was privy to specific confidential information relevant to

this litigation.  Noting that Dr. Ang's involvement in the Navient investigation was

"sporadic and brief," Doc. 453 at 2, the Special Master conducted a "close

analysis" of each interaction Dr. Ang had with Enforcement attorneys conducting

the investigation, Doc. 453 at 21.

Reviewing the written communications submitted by the CFPB, the Special

Master found no evidence that relevant confidential information was shared with

Dr. Ang, because the documents were "unrelated to the issues in this litigation,"

*id.*, and because the information (*e.g.*, draft CID requests) was ultimately "shared

with Navient" and thus "no longer confidential for the purposes of

disqualification," *id.* at 25.  Apart from the written communications, the only

evidence of potentially relevant communications presented by the CFPB involved

testimony about two sets of meetings Dr. Ang attended—the first regarding the

12

CFPB's 2013 request for payment allocation data, *see id.* at 22-24, and the second concerning the CID issued to Navient in April 2015, *see id.* at 25-26. But the CFPB's witnesses provided only "general" and "conclusory" testimony regarding these discussions—and no evidence of any specific confidential information disclosed to Dr. Ang or how such information related to this litigation. *See id.* at 23-26. In particular, "no Bureau witness was able to relate with specificity any instance in which the Bureau's Enforcement attorneys informed Dr. Ang of litigation strategy, expected experts, the Bureau's views on the strengths and weaknesses of the case, roles of witnesses, and anticipated defenses." *Id.* at 21-22.

The CFPB does not contest any of these findings. Although it claims Dr. Ang "worked on payment processing issues," Doc. 459 at 14, its objections point to no particular document or testimony showing Dr. Ang received privileged or confidential information relevant to its payment processing claim in this case.[4] Similarly, while the CFPB claims Dr. Ang "provided input" on a data request

---

[4] As the Special Master recognized, the CFPB's data request regarding late fees charged due to Navient's methodology for allocating partial payments "did not concern the matters at issue in this litigation." Doc. 453 at 23. Despite the CFPB's vague contention that the issue represents an early iteration of an "evolv[ing]" payment processing theory, *see* Doc. 459 at 14, the CFPB's own witness confirmed that the "[Federal Deposit Insurance Corporation ("FDIC")] went after [the payment allocation issue] in a separate suit." *See* Feb. 20 Hrg. Tr. at 110:22-25. In any event, the CFPB's characterization of the 2013 request is irrelevant given the absence of specific evidence that discussions surrounding the request disclosed confidential information. *See* Doc. 453 at 22-24.

relating to IDR and forbearance, *id.*, it does not dispute that any such request was ultimately "shared with Navient" and thus is "no longer confidential for the purposes of disqualification," Doc. 353 at 25.[5]  With respect to neither of these purportedly "relevant" episodes—nor for any other interaction between Dr. Ang and Bureau attorneys—does the CFPB point to any evidence that Dr. Ang was exposed to its "strategies in the litigation," the "strengths and weaknesses" of its case, or any other *specific* privileged or confidential information relevant to this litigation.  *See U.S. ex rel. Cherry Hill*, 994 F. Supp. at 250.  Absent such evidence, the CFPB fails to meet the high bar for disqualification.

B.    The CFPB's *Per Se* Disqualification Rule Is Unsupported

Rather than identify any specific, relevant, confidential information disclosed to Dr. Ang, the CFPB's objections reprise the legal argument the Bureau made before the Special Master—namely, that Dr. Ang is subject to *per se* disqualification because she purportedly was "exposed" to privileged information.

---

[5] The CFPB's characterization of this "input" is itself exaggerated and misleading. It consists of a single comment in which Dr. Ang agreed such information would be "informative."  The CFPB has not asserted privilege over that comment.  *See* CFPB Ex. 11 at A52.  Moreover, as the Special Master noted, this request "was not included in the CID" on which Dr. Ang was providing input—only a year later did the CFPB issue its first request for data regarding IDR and forbearance.  *See* Doc. 453 at 24.

*See* Doc. 459 at 22.[6]  According to the CFPB, some of the information Dr. Ang

received was "privileged," rather than "merely confidential," and that fact alone

requires disqualification.  Thus, the CFPB claims that it was not required to present

*any* evidence of specific disclosures to Dr. Ang regarding the Bureau's litigation

strategies or otherwise significantly related to the issues in the lawsuit.  *See* Doc.

459 at 18 (disputing the "need[]" for this "further inquiry").

That is not the law.  Contrary to the CFPB's asserted rule, the Special

Master properly relied on a host of decisions demonstrating that, regardless of

whether a party describes its communications with a former employee as

"privileged," the drastic remedy of expert disqualification requires "specific and

unambiguous" evidence of the relevant information received by the expert.  *See*

Doc. 453 at 28 (quoting *Hewlett Packard*, 330 F. Supp. 2d at 1094); *see also* Doc.

453 at 28-30 (collecting cases).  In *Hewlett Packard*, for example, the court

---

[6] Although it is unclear whether the Bureau is renewing the argument in its objections, the Special Master properly rejected the CFPB's claim that its motion to disqualify Dr. Ang should be assessed under any "bright-line" side-switching rule.  Doc. 453 at 10-13.  Courts have applied this rule only in narrow circumstances not present here, *id.*, and even the few courts to adopt the test have not relied on it as "the sole basis for disqualification" of an expert, *id.* at 10 n.7; *see also Rhodes*, 558 F. Supp. 2d at 666 (recognizing the test's "lack of support" in the case law).  Rather than dispute this ruling, the CFPB appears to argue that disqualification is warranted "regardless of which test is applied" because Dr. Ang "received privileged information."  *See* Doc. 459 at 18.  But as explained below, no court has ever adopted the *per se* rule the CFPB advances.

rejected the movant's contention that its attorneys had provided an expert with "detailed elements of its litigation strategy" because the party "offered neither specific details of such discussion nor evidence contradicting [the expert's] version of events." 330 F. Supp. 2d at 1097.  Similarly, in *Murray Energy Corp. v. McCarthy*, attorneys for the Environmental Protection Agency ("EPA") claimed a former official had been privy to the agency's "*privileged* and confidential information" and that such information "form[ed] the basis of his report." 2016 WL 3390517, at *4 (N.D. W.Va. June 17, 2016) (emphasis added).  However, the court declined to disqualify the expert because the EPA could not "point[] to any 'privileged communications' that ha[d] anything to do with [the expert's] report." *Id.*  Likewise, in *Bard IVC Filters*, the moving party provided "general descriptions" of information provided by "various attorneys" but made "no effort to identify the confidential information [the expert] received." 2017 WL 6603467, at *4-5.  Although the court concluded it was "likely" that the expert "actually received confidential information" from those attorneys, this "likelihood" was "not enough" to meet the movant's burden to present "specific and unambiguous" evidence of such disclosures.  *Id.*

Moreover, the cases on which the CFPB relies for its asserted "critical distinction" between "privileged" and "merely confidential" information offer no such rule of *per se* disqualification.  *See* Doc. 459 at 18-20.  The case the CFPB

holds up to "demonstrat[e] this concept," *id.* at 18, in fact adopted precisely the same legal standard the Special Master applied here.  *See H. Lundbeck A/S v. Apotex Inc.*, 2020 WL 1285834 (D. Del. Mar. 18, 2020) (recognizing that "general allegations that the expert was privy to legal strategies and the opinions of its legal counsel were insufficient" to support disqualification) (internal quotation marks omitted)).  Indeed, in each case on which the CFPB relies, the court excluded the expert in question based on *specific* and *unambiguous* evidence far exceeding anything the CFPB has presented here.  In *Koch Refining*, for example, the Fifth Circuit upheld the district court's exclusion of an expert because the expert's report *itself* "clearly revealed that . . . it would have embodied confidential disclosures." 85 F.3d at 1182.  The record showed the expert had obtained this "confidential information" in part through "documents that had been generated in preparation for . . . trial." *Id.*  Similarly, in *In re C.R. Bard, Inc.*, the disqualified expert had previously participated in the moving party's "decisions regarding [how] to allocate fault" in the litigation, "vetted [other] potential expert witnesses" and "discussed strategies on how to cross-examine plaintiffs' experts."  2014 WL 6960396, at *9 (S.D. W.Va. Dec. 8, 2014).  And in *Cordy v. Sherwin-Williams Co.*, the disqualified expert had received "a three-ring binder containing the

17

investigation conducted by plaintiff's counsel" as well as "a cover letter with counsel's impression of the case."  156 F.R.D. 575, 577 (D.N.J. 1994).[7]

As the above cases demonstrate, regardless of whether information is labeled as "privileged" or "confidential," *see* Doc. 459 at 18, disqualifying an expert requires evidence of "specific and unambiguous disclosures" that if revealed by an expert to an opponent "would prejudice the party" seeking disqualification, *see Hewlett-Packard Co.*, 330 F. Supp. 2d at 1087.  The Special Master found no evidence that such disclosures were made to Dr. Ang, and the CFPB has pointed to no specific documents or testimony undermining that finding.

## II.     The Special Master Correctly Found That Policy Considerations Warrant Denial of the CFPB's Request.

The CFPB has fallen far short of the "'high standard of proof' to show that disqualification is warranted."  *Rhodes*, 558 F. Supp. 2d at 664 (quoting *Grant*

───────────────

[7] The cases the CFPB cites as falling on the other side of this "privileged" vs. "confidential" divide only solidify that the distinction is entirely of the CFPB's own invention.  *See* Doc. 459 at 21.  In none of those decisions was a disqualification motion denied because the information at issue was "merely confidential."  Rather, like the CFPB, the movants in each case failed to identify evidence of "specific and unambiguous disclosures" of relevant confidential information.  *See Hewlett-Packard Co.*, 330 F. Supp. 2d at 1097 (citing absence of "specific details" regarding discussion in which attorney purportedly divulged the party's "litigation strategy"); *Space Sys./Loral v. Martin Marietta Corp.*, 1995 WL 686369, at *5 (N.D. Cal. Nov. 15, 1995) (movant "offer[ed] only unsubstantiated speculation that there is some risk of confidential disclosure."); *Palomar Med. Techs., Inc. v. Tria Beauty, Inc.*, 2012 WL 517532, at *4 (D. Mass. Feb. 15, 2012) (information was not "of particular significance relevant to this litigation").

*Thornton, LLP*, 297 F. Supp. 2d at 882).  While that failure alone warrants denial of the CFPB's motion, disqualifying Dr. Ang requires a further showing that the "policy considerations" supporting disqualification "'substantially outweigh the interest in . . . non-disqualification.'"  Doc. 353 at 33 (quoting *Hewlett-Packard Co.*, 330 F. Supp. 2d at 1095).

The Special Master properly identified several "considerations" weighing against disqualification, including the prejudice to Defendants of retaining a new expert, Dr. Ang's interest in pursuing her professional calling, the fact that Dr. Ang consulted with Bureau ethics officials,[8] and the CFPB's failure to object to Dr. Ang's publication of an article that relates closely to the analysis in her expert report.  Doc. 453 at 33-34.  While the CFPB disputes the weight afforded those findings, it identifies no contrary considerations tipping the balance in favor of disqualification.  *See* Doc. 459 at 24-26.  As the party bearing the burden, that failure is fatal to the CFPB's request.  *See Hewlett-Packard Co.*, 330 F. Supp. at 1095-96.

---

[8] Although the CFPB claims that Dr. Ang was neither "truthful" nor "fully forthcoming" in her conversations with CFPB ethics officers, *see* Doc. 459 at 24, its objections fail to confront the Special Master's conclusion that Dr. Ang's statements were in line with the CFPB's *own guidelines*, which permit former employees to work on matters in which they were not "substantially involved" while at the Bureau, *see* Doc. 453 at 33 ("[N]o evidence was presented that Dr. Ang was involved in the 'substantive merits' of the Bureau's investigation of Navient, and she certainly did not devote a lot of time to it").

Most importantly, the CFPB fails to contest the Special Master's finding that Dr. Ang's participation as an expert would not "prejudice the Bureau in the present litigation." *See* Doc. 453 at 33.  As Defendants informed the Special Master, Navient retained Dr. Ang on the understanding that she had not participated in any CFPB matters that would preclude her from serving as an expert in this litigation. *See* Doc. 393 at 1.  In keeping with that understanding, Dr. Ang's report relies exclusively on her expertise as an economist and her general knowledge of student loans to analyze information produced in this litigation—including transaction-level data involving "millions if not billions of records" of Navient borrowers. Feb. 20 Hrg. Tr. at 268:17-25.  As the Special Master recognized, Dr. Ang's episodic interactions with the CFPB attorneys investigating Navient—in which she provided discrete "technical advice as to how best to ask for data"—have nothing to do with the detailed borrower-level analysis that is the basis of her report.  *See* Doc. 453 at 16, 34-35.  Absent any indication that Dr. Ang even *received* confidential information relevant to her work as an expert—much less attempted to use such information to obtain any advantage in this case—neither fundamental fairness nor the integrity of these proceedings warrants her disqualification.

20

## **CONCLUSION**

For the foregoing reasons, the CFPB's objections to Special Master Report

#18 should be overruled, and the Court should adopt the Special Master's Order

denying the CFPB's request to disqualify Dr. Ang.


Dated:  April 23, 2020                    Respectfully submitted,

                                          /s/ Daniel P. Kearney
                                          Jonathan E. Paikin (DC 466445) (*pro hac vice*)
                                          Daniel P. Kearney (DC 977148) (*pro hac vice*)
                                          Karin Dryhurst (DC 1034290) (*pro hac vice*)
                                          Gary Dyal (DC 176830) (*pro hac vice*)
                                          Wilmer Cutler Pickering Hale and Dorr LLP
                                          1875 Pennsylvania Avenue, NW
                                          Washington, DC 20006
                                          jonathan.paikin@wilmerhale.com
                                          daniel.kearney@wilmerhale.com
                                          karin.dryhurst@wilmerhale.com
                                          gary.dyal@wilmerhale.com
                                          Tel: 202-663-6000
                                          Fax: 202-663-6363

                                          Daniel T. Brier (PA 52348)
                                          Myers Brier & Kelly, LLP
                                          425 Spruce Street, Suite 200
                                          Scranton, PA 18503
                                          dbrier@mbklaw.com
                                          Tel: 570-342-6100
                                          Fax: 570-342-6147

                                          *Counsel for Navient Corporation, Navient
                                          Solutions, LLC, and Pioneer Credit Recovery,
                                          Inc.*

## CERTIFICATE OF WORD COUNT

I hereby certify pursuant to Local Rule 7.8(b)(2) that the foregoing document is 4,998 words.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service:

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363