**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

Consumer Financial Protection Bureau,

Plaintiff,

v.

Navient Corporation, *et al.*,

Defendants.

Case No. 3:17-CV-00101-RDM
(Hon. Robert D. Mariani)

ELECTRONICALLY FILED

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
<u>OBJECTIONS TO SPECIAL MASTER REPORT #18</u>**

Thomas G. Ward
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

Nicholas Jabbour, DC 500626
Manuel Arreaza, DC 1015283
Ebony Sunala Johnson, VA 76890
Nicholas Lee, DC 1004186
Andrea Matthews, MA 694538
Jonathan Reischl, IL 6305260
*Enforcement Attorneys*

*Attorneys for Plaintiff*

Plaintiff Consumer Financial Protection Bureau ("Bureau") respectfully files this reply in support of its objections to Special Master Report #18 ("Report #18"), which recommended against the disqualification of Dr. Xiaoling Lim Ang – a former Bureau employee who worked on this exact matter while at the Bureau and is now an expert witness for Defendants (collectively, "Navient").

## ARGUMENT

### I. Navient does not explain how Dr. Ang could have made her contributions to this matter while at the Bureau without knowing specific privileged information.

The Bureau's opening brief made a simple point at the outset: "Without knowing [privileged information from Bureau Enforcement attorneys], there would have been no way for Dr. Ang to provide the input that she did[.]" ECF Dkt. 459, at 1-2. Navient avoids this central issue, because the fact is that Dr. Ang could not have made her contributions to this matter while at the Bureau unless she was told specific privileged information by Bureau Enforcement attorneys.

If it were truly the case that Dr. Ang could have provided input on data requests without knowing anything about this particular matter, it begs the question as to why she needed to engage in the numerous meetings and email exchanges with Bureau Enforcement attorneys that occurred here. The Enforcement attorneys simply could have written to her, "Please provide a template as to what data we should request from a student loan servicer," Dr. Ang could have provided such a

template, and that would have been the end of Dr. Ang bringing her "technical" expertise to bear with respect to the data requests.

Similarly, if it were truly the case that Dr. Ang could meaningfully contribute to a restitution analysis without knowing anything about this case, then the attorneys simply could have said, "Here's some student loan data. Please calculate restitution." Dr. Ang apparently then would have used her "technical" expertise to determine exactly how consumers were harmed and how they should be compensated for that harm, all without being told anything further by the Bureau Enforcement attorneys.

Of course, none of this remotely resembles what happened here. The reason that Dr. Ang was able to contribute to data requests – including with regards to payment processing and borrower enrollment in income-driven repayment – is that she was involved in communications with the Enforcement attorneys to understand what legal theories they were trying to prove. And the reason she was able to contribute to restitution issues, which involves trying to determine how consumers should be compensated for wrongful conduct by Navient, is because the Enforcement attorneys told her their theories as to what wrongful conduct Navient had engaged in and how consumers were harmed by it.

The notion that the evidence in this case does not bear out the fact that the

Enforcement attorneys provided this type of specific work product to Dr. Ang is belied by the record. For example, as detailed by the Bureau in its opening brief:

- In October 2013, the Office of Research employees (including Dr. Ang) discussed with the Enforcement attorneys "strategies for how to get the right [data] fields" from Navient to "calculate harm" regarding certain payment processing issues. Transcript 84:11-18.[1] In these discussions, according to one of Dr. Ang's colleagues, the Enforcement attorneys "la[id] out what the goals [are] – and the strategies" for the case, as well as the "legal things that they want to get at by looking at the data." Transcript 84:23-84:2; *accord* Transcript 89:8-18. Put differently, the attorneys "la[id] out exactly what [they're] interested in seeking from the data" and what borrower "complaints" about Navient are relevant to the issue. Transcript 91:13-21. Another of Dr. Ang's colleagues likewise testified that she used the meeting to help herself "understand what [the Enforcement attorneys] were trying to accomplish." Transcript 33:21-34:4.
- The Office of Research employees then drafted a new data request "based on all

---

[1] Transcript __" is a reference to the transcript from the evidentiary hearing in this dispute, which was filed with the Bureau's opening brief. *See* ECF Dkt. 459-1. "Exhibit __" refers to the exhibits transmitted to the Court for *in camera* review, in conjunction with the Bureau's opening brief.

of the information that [was] presented to them about what we needed, what our goals were, our legal theories at that time." Transcript 206:5-16. Specifically, the Office of Research employees (including Dr. Ang) were the architects of determining "how to structure information requests to Salle Mae . . . that's going to provide us with the data that we can use to support the issues that we're seeking to prove." Transcript 206:22-207:11.

- When the data was received, the Office of Research employees discussed "each individual field and table and – and the details of – of why [each] spreadsheet wasn't going to be adequate" to accomplish the goals of the investigation set forth by the Enforcement attorneys. Transcript 94:20-24. Then, after meeting amongst themselves, they reached out to the Enforcement attorneys to discuss the conclusions that they had reached. Transcript 47:19-48:2; *see also* Exhibit 8.
- Because Navient had still not produced data that would allow the Enforcement attorneys to achieve the objectives of the investigation at that time, the Enforcement attorneys sought to issue a new civil investigative demand ("CID") to Navient in April 2014. As one of Dr. Ang's colleagues testified, the Enforcement attorneys had "a specific theory of what's going on [in] the case" and wanted to ensure that they were requesting data to help "evaluate" that theory. Transcript 98:8-14. Among the feedback provided by Dr. Ang was that

included the Enforcement attorneys should obtain data regarding borrowers who "are coming up on the end of their IBR/forbearance term," in order to obtain "insight into what happens when alternative repayment status is up for renewal." Exhibit 11, at A52.

- In March 2015, Dr. Ang and one of her colleagues were contacted again by the Enforcement attorneys to provide input on another CID to Navient. Transcript 101:10-102:14; *see also* Exhibit 14. A conversation with the attorneys about the CID included a discussion of what theories the Enforcement attorneys were pursuing and what data would be needed "to test those theories." Transcript 181:5-12. Dr. Ang subsequently recounted to her colleagues that she "had a very productive conversation with the Sallie Mae/Navient team in Enforcement," during which the Enforcement attorneys "clarified the goals of the CID," which in turn allowed her to provide constructive feedback on the CID. Exhibit 17; *see also* Transcript 105:6-106:16.

In summary, the record evidence is clear that Dr. Ang was provided specific privileged information that enabled her to make meaningful contributions to the work of the Bureau Enforcement attorneys regarding data requests and restitution. Navient does not (and cannot) answer the question as to how Dr. Ang could have provided this input without receiving specific privileged information.

## II. Contrary to Navient's argument, work product that is conveyed orally and that occurs in the early stages of a case is protected.

Central to Navient's argument is the notion that because the work product of Bureau Enforcement attorneys was conveyed in large part to Dr. Ang and her colleagues in oral form, and occurred in the early stages of this case, that automatically means that it is not worthy of protection. The bias demonstrated by Navient against early-stage, oral work product finds no support in the case law.

For example, Navient fixates on cases in which the expert was presented with "a cover letter with counsel's impression of the case," a "three-ring binder," or "documents that had been generated in preparation for . . . trial," and argues that this written work product "far exceed[s] anything the CFPB has presented here." ECF Dkt. 465, at 17-18 (quotations omitted). But this argument is built on a false premise: that communications with attorneys in the context of a specific matter are deserving of protection only if it they are conveyed in written form.

Contrary to Navient's argument, however, communications do not need to take the form of a "binder," "cover letter," or anything else that is tangible to be privileged. *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (noting that attorney work product "is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways"); *In re Cendant Corp. Sec. Litig.*,

343 F.3d 658, 662 (3d Cir. 2003) ("It is clear . . . that work product protection extends to both tangible and intangible work product."). Protecting all types of work product – whether tangible or intangible – "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).

In addition, the fact that Dr. Ang was involved at an early stage of this matter when the Bureau's legal theories were being developed does not render the Bureau's work product too unspecific to warrant protection. Contrary to Navient's contention (ECF Dkt. 465, at 10-11), the Bureau did not need to be discussing specific trial witnesses and anticipated defenses for its work product to deserve protection. As the U.S. Supreme Court stated in *Hickman v. Taylor*, "Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests." *Hickman*, 329 U.S. at 511. Testimony at the evidentiary hearing in this case from one of the Enforcement attorneys aligns with the Supreme Court's language from *Hickman*:

> So when we start an investigation, frequently, you know, we start it based on . . . all kinds of information that might come into us, and . . . we have very little insight into what's actually going on. And as we sort of start the investigation through conversations with opposing counsel, through collecting information from the CID, through conversations with other third parties, we gain more information. And based on that information, theories . . . will develop, they will change, they will morph . . . . [I]t's not static.

Transcript 249:10-250:8.

Cases in which courts deny disqualification motions do not rely on the artificial lines that Navient attempts to create between oral and written work product, or work product that occurs early versus late in a case. Rather, they involve situations in which the individual whom the moving party seeks to disqualify never even received work product from the moving party. For example, in *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087 (N.D. Cal. 2004) – which is the principal case that Navient has relied upon – the court denied the disqualification motion where the moving party had only a one-hour consultation with the individual at issue, which occurred before the individual had even signed a confidentiality agreement. *Id.* at 1096. The court noted that it "strain[ed] credulity to argue that . . . [the moving party's] counsel would disclose aspects of its litigation strategy to someone who had not yet signed a confidentiality agreement and that such a conversation could have occurred in the span of a one-hour conversation." *Id.* Similarly, in *Return Mail, Inc. v. United States*, 107 Fed.

Cl. 459, 467 (2012) – another case relied upon by Navient – the moving party sought to argue that the individual at issue had received privileged information by virtue of being at corporate "committee meetings" at which an attorney was also present, where those committee meetings were not related to the litigation. *Id.* at 467-68. As the court noted, "[the moving party] has not supplied a sufficient basis on which to conclude that [the expert's prior] employment," including those committee meetings, "addressed the particular matter now in litigation." *Id.* at 468.

This case is markedly different than *Hewlett-Packard, Return Mail*, and other cases on which Navient relies. Here, in contrast to those cases, Dr. Ang performed work on this specific matter, and received privileged information in the course of performing her work on this specific matter. Thus, she should be disqualified.

## III. The Bureau is not arguing for a *per se* rule.

Contrary to Navient's argument, the Bureau is not arguing for a *per se* rule that any time an expert receives privileged information from his/her prior employment, then that expert cannot be adverse to his/her prior employer. ECF Dkt. 465, at 14-15. Indeed, by Dr. Ang's own admission, she recalled routinely receiving information marked as privileged from attorneys in her division at the Bureau. Transcript 365:14-15. Yet the Bureau raised no objection to Dr. Ang

serving a witness against the Bureau in an administrative trial involving a payday lender. If it were the case that the Bureau were advocating for a *per se* rule, the Bureau would have sought to disqualify Dr. Ang in that other matter involving a payday lender, even though she did not work on that specific matter.

Rather than arguing for a *per se* rule, the Bureau is merely advocating for straightforward application of the standards set forth in the case law. Specifically, under application of the "simple," "bright-line rule," Dr. Ang has clearly switched sides. *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378337, at *2 (C.D. Cal. Sept. 22, 2017); *see also Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F.Supp.2d 660, 666 (S.D. W. Va. 2008). She worked on the investigation of Navient that directly resulted in this litigation, and now she has switched sides to work for Navient in this litigation.

Application of the two-part conflict of interest test, which applies when the side-switching test does not apply, yields the same outcome. That test asks (1) whether it was "objectively reasonable" for the moving party "to believe that a confidential relationship existed" with the individual now being proffered by the opposing party as an expert; and (2) whether any confidential or privileged information was disclosed by the moving party to the expert, "sufficiently related" to this litigation. *In re C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2014

WL 6960396, at *7 (S.D.W. Va. Dec. 8, 2014). If privileged information was obtained specifically in the context of a potential litigation – *this litigation*, as was the case with the information that Dr. Ang received during her employment with the Bureau – then naturally it is "sufficiently related" to *this litigation*. *See Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 578 (D.N.J. 1994) (disqualifying expert who "learned [the moving party's] litigation strategy"); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1249 (E.D. Va. 1991) (disqualifying expert to whom moving party had made disclosures of work product, even though "the value of the disclosures is debatable").

In contrast, where the expert has obtained privileged information from a *different matter*, then there is a need for further analysis to determine if that information from the *different matter* is "sufficiently related" to *this litigation*. This is made clear by the very cases that Navient relies upon. For example, in *FTC v. Innovative Designs, Inc.*, 2018 WL 1334830 (W.D. Pa. Mar. 15, 2018) (cited by Navient at ECF Dkt. 465, at 11), the court denied the motion to disqualify the expert "because the relevant communications did not occur during the pendency of this litigation or relate to same," and therefore the moving party "plainly cannot satisfy the second step of this inquiry" under the two-part test. *Id.* at *7. Similarly, in *Orion Corp. v. Sun Pharm. Indus., Ltd.*, 2009 WL 5872982 (D.N.J. June 12,

2009) (cited by Navient at ECF Dkt. 465, at 10), "the Court [was] left unsatisfied that [the expert] was privy to confidential information relating specifically to the products at issue in these actions." *Id.* at *4. And in *Space Systems/Loral v. Martin Marietta Corp.*, 1995 WL 686369 (N.D. Cal. Nov. 15, 1995) (cited by Navient, at ECF Dkt. 393, at 4), the court denied the disqualification motion because the expert was, at best, exposed to "confidential factual material obtained outside the context of the litigation." *Id.* at *2.

Dr. Ang received privileged information from Bureau Enforcement attorneys in connection with *this litigation*, and therefore under either legal standard, her disqualification is warranted.

**IV. Policy considerations strongly support disqualification.**

Navient makes the claim that the Bureau "identifies no [policy] considerations tipping the balance in favor of disqualification." ECF Dkt. 465, at 19. But the Bureau enumerated four such policy considerations in its opening brief: (1) "[t]he Court should encourage government employees to be truthful and fully forthcoming in their dealings with ethics officials"; (2) "[t]he Court should not approve of the idea that publishing a high-level article on a website eliminates the need to respect privileges"; (3) "the Court should encourage communication at the earliest possible opportunity when a party in litigation seeks to hire an expert

witness who worked for the opposing party"; and (4) the Bureau has been judicious in objecting to Dr. Ang's participation in cases against the Bureau. ECF Dkt. 459, at 20-22. These policy considerations do not just "tip[] the balance" in favor of disqualification; they weigh heavily in favor of it.

Navient's claim that "the CFPB fails to contest the Special Master's finding that Dr. Ang's participation as an expert would not prejudice the Bureau in the present litigation" (ECF Dkt. 465, at 24) similarly ignores the Bureau's opening brief. As the Bureau explained (ECF Dkt. 459, at 19), Dr. Ang may have "implicitly or unconsciously guide[d] [Navient's] litigation strategy" in ways that are incapable of detection from the expert report itself. *Brunstad v. Medtronic, Inc.*, 2015 WL 1962104, at *3-4 (W.D. Wis. Apr. 30, 2015). Indeed, the notion that a former employee "can parse his knowledge of [the former employer's] confidential information to only rely upon what is provided to him [by the party who retained him/her as an expert is] unpersuasive. . . . [T]he human brain does not compartmentalize information in that manner." *Pellerin v. Honeywell Int'l Inc.*, 2012 WL 112539, at *2 (S.D. Cal. Jan. 12, 2012). Allowing an expert who was exposed to privilege information belonging to one side of a matter to switch sides would itself undermine fundamental policy considerations underlying the attorney-client privilege and attorney work product doctrine, including the promotion of

trust and candor in communications among attorneys and others encompassed by those privileges, preserving confidences, and assuring that the other side does not benefit from a breach of those privileges. Indeed, allowing Dr. Ang to serve as an expert for Navient would have a chilling effect on the willingness of attorneys in the Bureau to work with internal Bureau experts going forward, because such a breach of confidences would be impossible to rule out. Application of the governing legal standards in the manner described above avoids this prejudicial result.

Further, it is odd that Navient is so adamantly insisting that the Bureau cannot be prejudiced by Dr. Ang's participation, when Navient has studiously avoided a full exposition of Dr. Ang's work for Navient. Navient's production to date has not been sufficient to fairly determine the extent to which Dr. Ang improperly used her knowledge from the Bureau to inform her work for Navient. In addition, there was no testimony from Navient's attorneys at the hearing to understand the ways in which Dr. Ang participated in this matter that might not be evident from her expert report.[2] Heightening the Bureau's concern is the fact that Dr. Ang was unable to rule out that she did work for Navient other than her expert

---

[2] Even though Bureau Enforcement attorneys who worked on this matter throughout all of the events at issue did testify, and none of Navient's attorneys testified, Report #18 nonetheless faulted *the Bureau* for not calling yet another of its own attorneys to testify. ECF Dkt. 453 at 25 n.12.

report. *See* Transcript 335:18-336:24 ("I don't remember working on other items [besides the expert report]."); Transcript 338:5-21 (answering "I don't believe so" to questions about whether she had worked on the debt collection, payment processing, and cosigner release claims that are part of this litigation). In light of Dr. Ang's testimony at the hearing that suggests her work may have extended beyond what is in her expert report, the Bureau is more than justified in its concern that Dr. Ang has improperly used her knowledge from her work on this matter at the Bureau. As one court aptly described, "The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined." *Space Systems/Loral*, 1995 WL 686369, at *2. Dr. Ang's continued participation in this case undermines the adversary system and is prejudicial to the Bureau.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Bureau's opening brief, Dr. Ang should be disqualified from serving as an expert witness in this case, and her expert report should be stricken.

Dated: May 7, 2020

Respectfully submitted,

Thomas G. Ward
*Enforcement Director*

David Rubenstein
*Deputy Enforcement Director*

Thomas Kim
*Assistant Deputy Enforcement Director*

/s/ Nicholas Jabbour
Nicholas Jabbour, DC 500626
(Nicholas.Jabbour@cfpb.gov; 202-435-7508)
Ebony Sunala Johnson, VA 76890
(Ebony.Johnson@cfpb.gov; 202-435-7245)
Nicholas Lee, DC 1004186
(Nicholas.Lee@cfpb.gov; 202-435-7059)
Manuel Arreaza, DC 1015283
(Manuel.Arreaza@cfpb.gov; 202-435-7850)
Andrea Matthews, MA 694538
(Andrea.Matthews@cfpb.gov; 202-435-7591)
Jonathan Reischl, IL 6305260
(Jonathan.Reischl@cfpb.gov; 202-435-9202)
*Enforcement Attorneys*

1700 G Street NW
Washington, DC 20552
Fax: 202-435-9346

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on May 7, 2020, I filed the foregoing document with the Court's ECF system, which will send notification of such filing to counsel for Defendants.

/s/ Nicholas Jabbour

Nicholas Jabbour, DC 500626
Nicholas.Jabbour@cfpb.gov
1700 G Street NW
Washington, DC 20552
Phone: 202-435-7508
Fax: 202-435-9346

*Attorney for Plaintiff*