**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | |
| Navient Corporation, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

SUMMARY OF UNDISPUTED FACTS ..............................................3

I.   FEDERAL STUDENT LOANS .................................................4

II.  NAVIENT PROVIDED INFORMATION ABOUT REPAYMENT OPTIONS...................5

     A.   Federal Repayment Options ...................................5

     B.   Navient Provided Borrowers With Information About IDR
          (Counts I and II) ...................................................8

     C.   Navient Informed Borrowers About The Need To Renew
          Enrollment In IDR (Counts III and IV)............................10

III. NAVIENT REQUIRED CONSECUTIVE ON-TIME PAYMENTS FOR COSIGNER
     RELEASE (COUNT V) .......................................................13

IV.  NAVIENT PROCESSES TENS OF MILLIONS OF STUDENT LOAN
     PAYMENTS, AND TRACKS AND CORRECTS ANY ERRORS (COUNT VI) ...........14

V.   NAVIENT ACCURATELY REPORTED BORROWERS' ACCOUNT STATUSES
     (COUNT XI) ..............................................................16

VI.  PIONEER'S ALLEGED STATEMENTS REGARDING THE BENEFITS OF
     FEDERAL LOAN REHABILITATION (COUNTS VII THROUGH X)......................19

     A.   Default And The Federal Loan Rehabilitation Program.....................19

     B.   Pioneer Provided Borrowers With Information About The
          Benefits Of Rehabilitation...................................................20

ARGUMENT .......................................................................22

     I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND
          II BECAUSE THE CFPB CANNOT ESTABLISH ANY UNFAIR OR
          ABUSIVE PRACTICES WITH RESPECT TO "STEERING" .........................23

A.   The Undisputed Facts Show That All Of The CFPB's
Borrowers Were Repeatedly Informed about IDR ...........................25

B.   The CFPB's Prescriptive New "Steering" Theory Fails As A
Matter Of Law ...................................................................................32

1.   The CFPB's New Requirements Do Not Meet The
Elements Of The Statute. ...........................................34

2.   The CFPB's Asserted Requirements Conflict With
Congressional And ED Mandates................................38

II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS III AND VI
BECAUSE THE CFPB CANNOT SHOW ANY UNFAIR PRACTICES.....................40

A.   There Is No Evidence That Any Borrower Experienced
Substantial Injury That Was Not Reasonably Avoidable From
Navient's IDR Recertification Email ..................................................40

B.   There Is No Evidence That Navient's Payment Processing
Practices Caused Substantial Injury ..................................................43

III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS IV AND V
BECAUSE THE CFPB CANNOT SHOW ANY DECEPTION .................................49

A.   There Is No Evidence Of A Materially Misleading Statement In
Support Of Count IV ..........................................................................50

B.   There Is No Evidence Of A Materially Misleading Statement In
Support Of Count V ...........................................................................57

IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT XI BECAUSE
SPECIAL COMMENT CODE "AL" WAS ACCURATE ..........................................59

V.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO CONDUCT OUTSIDE
THE APPLICABLE STATUTE OF LIMITATIONS PERIODS ...................................63

A.   Summary Judgment Should Be Granted In Part On Counts I-VI.......63

B.   Summary Judgment Should Be Granted On Counts VII-X
Because There Is No Evidence Of Any Material
Misrepresentation Made Within The Applicable Limitations
Periods ...............................................................................................64

1.      There Is No Evidence Of Any Misrepresentation Made Within The Three-Year Period Under The CFPA ...................64

2.      There Is No Evidence Of Any Misrepresentation Made Within The One-Year Period Under The FDCPA....................65

3.      Any Statement Was Not Material To Borrowers' Decisions To Participate In Loan Rehabilitation ......................66

CONCLUSION ........................................................................................68

CERTIFICATE OF WORD COUNT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adams v. National Engineering Service Corp.*,
620 F. Supp. 2d 319 (D. Conn. 2009) .....................................................22, 60

*Banneck v. HSBC Bank USA, N.A.*,
No. 15-cv-02250-HSG, 2016 WL 3383960
(N.D. Cal. June 20, 2016) ................................................................................61

*Calex Express, Inc. v. Bank of America*,
401 F. Supp. 2d 407 (M.D. Pa. 2005).............................................................65

*Campuzano-Burgos v. Midland Credit Management, Inc.*,
550 F.3d 294 (3d Cir. 2008) ...........................................................................27

*Casey v. Florida Coastal School of Law, Inc.*,
No. 3:14-cv-1229-J-39PDB, 2015 WL 10096084
(M.D. Fla. Aug. 11, 2015), *adopted by* 2015 WL 10818746
(M.D. Fla. Sept. 29, 2015) ..............................................................................26

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012).........................................................................................56

*Cohen v. American Security Insurance Co.*,
735 F.3d 601 (7th Cir. 2013) ..........................................................................26

*Consumer Financial Protection Bureau v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ..................................................................49, 53

*Consumer Financial Protection Bureau v. ITT Educational Services,
Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015) ...........................................*passim*

*Consumer Financial Protection Bureau v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018) ............................................................53

*Consumer Financial Protection Bureau v. Universal Debt & Payment
Solutions, LLC*, No. 1:15-CV-0859-RWS
(N.D. Ga. Mar. 21, 2019) ...............................................................................22

*Croftcheck v. Accounts Recovery Bureau, Inc.*,
　　No. 1:11-CV-1220, 2012 WL 1378683
　　(M.D. Pa. Apr. 20, 2012) ...............................................................................31

*Davis v. HSBC Bank Nevada, N.A.*,
　　691 F.3d 1152 (9th Cir. 2012) ...........................................................29, 35, 37

*Fanning v. Federal Trade Commission*,
　　821 F.3d 164 (1st Cir. 2016) .........................................................................52

*Federal Trade Commission v. Accusearch, Inc.*,
　　No. 06-CV-105-D, 2007 WL 4356786
　　(D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009) ................48

*Federal Trade Commission v. Amazon.com, Inc.*,
　　No. C14-1038-JCC, 2016 WL 10654030
　　(W.D. Wash. July 22, 2016) ....................................................................31, 48

*Federal Trade Commission v. Davison Associates, Inc.*,
　　431 F. Supp. 2d 548 (W.D. Pa. 2006) ......................................................50–51

*Federal Trade Commission v. Freecom Communications, Inc.*,
　　401 F.3d 1192 (10th Cir. 2005) ...............................................................59, 67

*Federal Trade Commission v. IFC Credit Corp.*,
　　543 F. Supp. 2d 925 (N.D. Ill. 2008) .......................................................30, 49

*Federal Trade Commission v. Neovi, Inc.*,
　　604 F.3d 1150 (9th Cir. 2010) .......................................................................49

*Federal Trade Commission v. NHS Systems, Inc.*,
　　936 F. Supp. 2d 520 (E.D. Pa. 2013) .............................................................64

*Federal Trade Commission v. Stefanchik*,
　　559 F.3d 924 (9th Cir. 2009) .........................................................................58

*Federal Trade Commission v. Sterling Drug, Inc.*,
　　317 F.2d 669 (2d. Cir. 1963) .........................................................................54

*Federal Trade Commission v. Wyndham Worldwide Corp.*,
　　799 F.3d 236 (3d Cir. 2015) ..........................................................................35

*Felts v. Wells Fargo Bank, N.A.*,
  893 F.3d 1305 (11th Cir. 2018) ..................................................60

*Ford v. Hotwire, Inc.*,
  No. 07-CV-1312 H(NLS), 2008 WL 5874305 (S.D. Cal. Feb.
  25, 2008) ........................................................................................26

*Goldenstein v. Repossessors Inc.*,
  815 F.3d 142 (3d Cir. 2016) ..........................................22, 40, 43

*Gomez-Jimenez v. New York Law School*,
  943 N.Y.S.2d 834 (Sup. Ct.), *aff'd*, 956 N.Y.S.2d 54 (2012) ......................26

*Harris v. Las Vegas Sands, L.L.C.*,
  No. CV 12-10858 DMG (FFMx), 2013 WL 5291142
  (C.D. Cal. Aug. 16, 2013)..............................................................26

*Jensen v. Pressler & Pressler*,
  791 F.3d 413 (3d Cir. 2015) ....................................................65, 67

*Johnston v. HBO Film Management, Inc.*,
  265 F.3d 178 (3d Cir. 2001) ..........................................................25

*Kraft, Inc. v. Federal Trade Commission*,
  970 F.2d 311 (7th Cir. 1992) ....................................................53, 54

*LabMD, Inc. v. Federal Trade Commission*,
  678 F. App'x 816 (11th Cir. 2016)................................................48

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
  653 F.3d 241 (3d Cir. 2011) ....................................................51, 53

*Rotkiske v. Klemm*,
  140 S. Ct. 355 (2019).....................................................................65

*Schweitzer v. Equifax Information Solutions, LLC*,
  441 F. App'x 896 (3d Cir. 2011) ..................................................60

*Shaw v. Experian Information Solutions, Inc.*,
  891 F.3d 749 (9th Cir. 2018) .........................................................62

*Siegel v. Shell Oil Co.*,
  612 F.3d 932 (7th Cir. 2010) .........................................................45

*Tennier v. Wells Fargo Bank, N.A.*,
    666 F. App'x 689 (9th Cir. 2016) .................................................................31

*Thomas v. Cumberland County*,
    749 F.3d 217 (3d Cir. 2014) ........................................................................22

## STATUTES, RULES, AND REGULATIONS

12 U.S.C.
    § 5495 .........................................................................................................39
    § 5531 .....................................................................................3, 24, 34, 44
    § 5536 .........................................................................................................64
    § 5564 .........................................................................................................63

15 U.S.C.
    § 1681 .....................................................................................................3, 59
    § 1692e .......................................................................................................65
    § 1692k .......................................................................................................65

20 U.S.C.
    § 1003 ...........................................................................................................4
    § 1071 ...........................................................................................................4
    § 1078-6 ......................................................................................................20
    § 1078 ...........................................................................................................5
    § 1082 .......................................................................................................6, 38
    § 1083 ...........................................................................................................8
    § 1087a .........................................................................................................4
    § 1087e .....................................................................................................5, 8
    § 1087f ..........................................................................................................4
    § 1091 .........................................................................................................19
    § 1095a .......................................................................................................19

31 U.S.C. § 3720A ...........................................................................................19

Fed. R. Civ. P. 56 .............................................................................................22

73 Fed. Reg. 63,232 (Oct. 23, 2008) ................................................................5

77 Fed. Reg. 42,085 (July 17, 2012) ..............................................................55

77 Fed. Reg. 66,088 (Nov. 1, 2012) ...............................................................56

80 Fed. Reg. 67,204 (Oct. 30, 2015) ................................................................5

84 Fed. Reg. 4,252 (Feb. 14, 2019) ........................................................................36

12 C.F.R.
    § 1022.40 ..........................................................................................................4
    § 1022.41 ..........................................................................................................4
    § 1022.42 ....................................................................................................4, 60
    § 1022.43 ..........................................................................................................4

34 C.F.R.
    § 682.100 ....................................................................................................4, 17
    § 682.101 ..........................................................................................................4
    § 682.200 ........................................................................................................19
    § 682.202 ..........................................................................................................7
    § 682.209 ....................................................................................................5, 14
    § 682.210 ..........................................................................................................6
    § 682.211 ...................................................................................................*passim*
    § 682.215 ...................................................................................................*passim*
    § 682.405 ........................................................................................................20
    § 685.100 ..........................................................................................................4
    § 685.102 ........................................................................................................19
    § 685.204 ....................................................................................................6, 19
    § 685.205 ..................................................................................................6, 7, 38
    § 685.208 ....................................................................................................5, 6
    § 685.211 ..................................................................................................19, 20
    § 685.221 ...................................................................................................*passim*

# OTHER AUTHORITIES

CFPB Consumer Laws and Regulations: Unfair, Deceptive, or
  Abusive Acts or Practices (2012),
  https://files.consumerfinance.gov/f/documents/102012_cfpb_un
  fair-deceptive-abusive-acts-practices-udaaps_procedures.pdf....25, 26, 36, 48

FTC Policy Statement on Unfairness (Dec. 17, 1980) (appended to *In
  re Int'l Harvester Co.*, 104 F.T.C. 949 (1984)),
  https://www.ftc.gov/public-statements/1980/12/ftc-policy-
  statement-unfairness ...............................................................................30, 35

FTC Policy Statement on Deception (Oct. 14, 1983) (appended to *In
  re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 183 (1984)),
  https://www.ftc.gov/public-statements/1983/10/ftc-policy-
  statement-deception ........................................................................................54

## PRELIMINARY STATEMENT

Six and a half years have passed since the Consumer Financial Protection Bureau ("CFPB") began its investigation into Defendants.  In those years, the CFPB engaged in extensive discovery, resulting in four discovery extensions and requiring a Court-appointed Special Master to manage a considerable number of discovery disputes.  Through all this, a central focus of Defendants' discovery has been to determine what, if any, factual support the CFPB had developed to back up the allegations in its Complaint.  That discovery has shown that the CFPB still has no evidence to support essential elements of its claims.

Notably missing from the CFPB's case is any evidence for its central claim (Counts I and II) that Navient "steered" borrowers into forbearance by keeping them in the dark about income-driven repayment ("IDR") options.  As the Court forewarned more than two years ago, "[the CFPB's] proof will depend on applying the elements of the statute to th[e] many persons on whose behalf [the CFPB is] proceeding," Doc. 87, at 6:8–10, and the Court made clear that it "expect[ed] to hear testimony from real people about their experiences," *id.* at 9:4–5.  Yet *every one* of the witnesses the CFPB put forward during discovery had been repeatedly informed by Navient about the availability of IDR and other repayment options.

Unable to prove its claims under the applicable legal standards, the CFPB seeks to invent a novel and unsupported one.  According to the CFPB, any isolated

call with a borrower was unlawful if the representative did not engage in an elaborate matrix of CFPB-prescribed questions and answers before granting a request for forbearance benefits.  This entirely invented theory is untethered from the actual elements of a claim for "unfair" or "abusive" conduct, which require the CFPB to prove *coercive* conduct by Navient that *interfered* with consumers' ability to make their own decisions about their loans.  The failure to run through the CFPB's contrived Q&A on every call (which it labels "steering") is not a coercive act.  Nor does it interfere with a borrower's ability to make a decision about whether to apply for IDR based on the information Navient repeatedly provided. The CFPB's asserted requirements instead would discourage access to a federally-provided benefit designed to protect borrowers from delinquency and default.

The CFPB's lack of evidentiary support for its other claims is likewise fatal.

- Counts III and VI, both unfairness claims, fail because the CFPB has no evidence of any substantial injury to borrowers that was not reasonably avoidable.

- Counts IV and V, both deception claims, fail because the CFPB has pointed to no evidence of any materially misleading representation.

- Count XI, the CFPB's claimed violation of the Fair Credit Reporting Act and Regulation V, fails because the CFPB lacks any evidence that the credit information Navient reported was inaccurate.

2

- Counts VII through X, the CFPB's deception claims against Pioneer, all fail because there is no evidence of a material misrepresentation made within the applicable statute of limitations period.

- Finally, to the extent Counts I through VI are based on conduct outside of the statute of limitations period, those claims must be dismissed in part if they are not otherwise dismissed in their entirety.

The CFPB has had more than six years to develop evidence to substantiate its claims. At the motion to dismiss stage, its allegations were accepted as true. To survive summary judgment, the CFPB must establish that it has proof for the statutorily required elements of its claims. It has not and cannot meet its burden. Accordingly, Defendants are entitled to summary judgment.

## SUMMARY OF UNDISPUTED FACTS

The CFPB asserts eleven claims against Navient Corporation and its subsidiaries, Navient Solutions, LLC ("Navient"), and Pioneer Credit Recovery, Inc. ("Pioneer") (together, "Defendants"). Navient, formerly Sallie Mae, Inc., is a student loan servicer that primarily services federal student loans, and Pioneer works with defaulted federal student loan borrowers. The CFPB claims that Defendants violated the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531 *et seq.*; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et*

*seq.*, and its implementing regulation, Regulation V, 12 C.F.R. §§ 1022.40–43; and

the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*

## I.   FEDERAL STUDENT LOANS

All but one of the CFPB's claims involve federal student loans.  Federal

student loans are either owned or guaranteed by the Department of Education

("ED").  20 U.S.C. § 1087a *et seq.* ("Direct Loan Program"); 20 U.S.C. § 1071 *et*

*seq.* ("Federal Family Education Loan Program"); Joint Statement of Undisputed

Facts ("JSUF") ¶ 2.  ED originates Direct loans, *see* 34 C.F.R. § 685.100, while

loans under the Federal Family Education Loan Program ("FFELP")—

discontinued in 2010—were originated by private lenders and ultimately

guaranteed by ED in the case of default, *see* 34 C.F.R. §§ 682.100(b), 682.101(a);

*see also* 20 U.S.C. § 1071(d) (2010) (terminating authority to make or insure new

FFELP loans after June 30, 2010); JSUF ¶ 1.  For FFELP loans, guaranty agencies

pay the private lenders if FFELP borrowers default, and ED in turn reimburses the

guaranty agencies.  34 C.F.R. § 682.100(b); JSUF ¶ 2.  ED regulations govern both

Direct and FFELP loans.  20 U.S.C. § 1003(4), (17); *id.* §§ 1071, 1087a; JSUF ¶ 5.

ED contracts with servicers, such as Navient, to administer the loans that it owns,

20 U.S.C. § 1087f(a)(1); Statement of Undisputed Material Facts in Support of

Defendants' Motion for Summary Judgment ("SUF") ¶ 4; JSUF ¶ 4, and both ED

and the guaranty agencies contract with collection agencies, such as Pioneer, to work with defaulted borrowers to cure default, SUF ¶ 340; JSUF ¶¶ 57–58.

## II.   NAVIENT PROVIDED INFORMATION ABOUT REPAYMENT OPTIONS

### A.   Federal Repayment Options

The Higher Education Act ("HEA") and ED regulations dictate the repayment options available to borrowers of federal student loans.  20 U.S.C. §§ 1078(b)(9), 1087e(d).  The standard repayment plan is ten years, but eligible borrowers may enroll in various repayment plans, including graduated repayment, extended repayment, and IDR plans.  34 CFR §§ 682.209, 685.208.  Servicers such as Navient have no discretion in determining borrowers' eligibility for participating in IDR plans.  Instead, ED formulas determine whether borrowers are eligible for IDR plans based on loan type, income, and family size, along with other eligibility criteria.  34 C.F.R. §§ 682.209, 682.215, 685.209, 685.221; JSUF ¶¶ 16–18.  From July 2009 through December 2015, Congress and ED significantly expanded the number of available IDR plans and offered some plans to individuals with higher incomes.  *See* 73 Fed. Reg. 63,232, 63,248–59 (Oct. 23, 2008); 80 Fed. Reg. 67,204, 67,204–05 (Oct. 30, 2015); JSUF ¶¶ 8–14.  However, certain types of loans (FFELP and Parent PLUS) remained ineligible for some IDR plans.  *See* 34 C.F.R. § 682.209(a)(6)(iii) (FFELP loans are not eligible for either the PAYE or REPAYE plan); *see* 34 C.F.R. § 682.215(a)(2); 34 C.F.R.

§ 685.208(a)(1)–(2) (Parent Plus Loans are not eligible for any IDR plan); JSUF

¶ 15.  Borrowers must submit a written application and income information to

enroll in IDR.  *See* 34 C.F.R. §§ 682.215(e)(1)(i)–(ii), 685.221(e)(1)(i)–(ii); JSUF

¶ 29.  ED does not permit servicers to enroll borrowers in IDR over the phone.  34

C.F.R. §§ 685.221(e)(1), 682.215(e)(1); JSUF ¶ 30.

The HEA also mandates the availability of forbearance, 20 U.S.C.

§ 1082(l)(1)(E), which can be used to bring a delinquent borrower current by

covering past-due amounts or to postpone payments for a set period of time,

34 C.F.R. §§ 682.211, 685.205.  ED "encourages" the use of forbearance "for the

benefit of a borrower . . . to prevent [a] borrower . . . from defaulting," 34 C.F.R.

§ 682.211(a)(1), and allows borrowers to enroll in forbearance for a period of up to

one year at a time after agreeing that they intend to repay their loans but are

temporarily unable to make scheduled payments, 34 C.F.R. § 682.211(a)–(c);

JSUF ¶ 23.  Forbearance may also be used to pause payments for up to 60 days to

give borrowers time to apply for other options.  34 C.F.R. §§ 682.211(f)(11),

685.205(b)(9); JSUF ¶ 24.

The HEA also requires ED to establish rules regarding deferment.  20 U.S.C.

§ 1082(l)(1)(D).  Deferments allow borrowers in certain situations, such as

unemployment, economic hardship, or active military service, to temporarily stop

making payments on their loans.  34 C.F.R. §§ 682.210, 685.204.

Under forbearance, deferment, and IDR, interest continues to accrue on a

borrower's loan unless the loan is eligible for subsidies under IDR or deferment.

34 C.F.R. §§ 682.211(a)(4), 685.205(a); 682.215(b)(4), 685.221(b)(3); *see also*

JSUF ¶¶ 19, 26.  Except for administrative forbearances used to allow time to

enroll in a new option, unpaid interest is "capitalized" at the end of a forbearance,

which means the interest is added to the principal balance of the loan.  34 C.F.R.

§§ 682.211(a)(4), 682.202(b), 685.205(a), 682.211(f)(11), 685.205(b)(9); JSUF

¶ 26.  For borrowers who accrue interest while enrolled in IDR, unpaid interest is

capitalized when they are no longer eligible for IDR or choose to leave the plan.

34 C.F.R. §§ 682.215(b)(5), 685.221(b)(4); JSUF ¶ 19.

Forbearance and IDR are not mutually exclusive.  For example, a

forbearance is often a prerequisite to enrolling in IDR.  Delinquent borrowers are

ineligible for IDR under ED rules and may need a forbearance to cover the past-

due amount and to give them time to apply for IDR.  34 C.F.R. §§ 682.211(f)(14),

685.205(b)(2).  In addition, some borrowers in IDR still cannot manage their

payments, and request forbearance benefits while enrolled in IDR.  *See, e.g.*,

SUF ¶ 73.

**B.** **Navient Provided Borrowers With Information About IDR (Counts I and II)**

It is undisputed that Navient provided the following information about IDR to borrowers:

- When borrowers first started repaying their loans, Navient sent a letter describing options to "make student loan payments more manageable," including "[p]ayments tied to your income."  SUF ¶ 6; *cf.* 20 U.S.C. §§ 1083(b)(6), 1087e(p).

- For borrowers who communicated a difficulty making payments, including when a borrower enrolled in a forbearance, Navient sent a letter explaining that the borrower could "[c]hange your [r]epayment [p]lan" to "Income-Related Plans," which offered "[m]onthly payments that can change annually as your income changes." SUF ¶ 7; *cf.* 20 U.S.C. §§ 1083(e)(2), 1087e(p).

- For borrowers who fell behind on payments, Navient sent letters describing options "to help bring your account current," including "lower monthly payments provided through income-sensitive or income-based repayment plans."  SUF ¶ 8.

- Borrowers approaching the end of deferment or forbearance received a notice asking whether the borrower had "looked into the federal government's income-driven repayment plans."  The notice went on: "These repayment options can allow you to make monthly payments based on your current income.  **You could even qualify for a payment of $0!**  It's worth checking out!"  SUF ¶ 11 (emphasis in original); *see also* SUF ¶ 10.

- Navient's website also prominently displayed information about IDR, among other repayment options.  SUF ¶¶ 12–13.

In addition to providing written information about IDR, Navient representatives are trained to inform borrowers about IDR over the phone and to consider forbearance only after "all other options have been exhausted."

SUF ¶ 204.  Representatives interacting with delinquent borrowers are instructed to use an online tool that guides them "to ask specific questions designed to determine the best option for the borrower based on their current situation." SUF ¶ 208.  In turn, representatives are scored on how well they follow Navient's instructions to ask "probing questions" and offer an appropriate solution based on the borrower's circumstances.  SUF ¶ 212.  Representatives who receive low scores may receive coaching and reduced compensation, and representatives with consistently low scores may face termination.  SUF ¶ 214.

Consistent with Navient's policies, every borrower the CFPB identified to support its "steering" claims repeatedly received information about IDR, including before and immediately after enrolling in forbearance.[1]  All but one of the CFPB's identified borrowers discussed IDR with Navient on the phone.[2]  Several were ineligible; others actually enrolled in IDR.[3]  Some borrowers avoided Navient's efforts to inform them about IDR or simply chose not to apply.[4]  A more detailed

---

[1] *See* SUF ¶¶ 15–16, 19–21, 23, 26–27, 32, 34, 36, 39, 41–42, 45–46, 48–50, 52–54, 59–61, 63, 66–67, 69–72, 77, 81–85, 89–90, 94–96, 98–99, 102–04, 108, 111–12, 114, 121–24, 126–27, 133, 135, 144–46, 148, 153, 156–57, 160, 162–69, 171, 175–77, 180, 183, 185–88, 199–200; *see also* Ex. C.

[2] *See* SUF ¶¶ 19–21, 23, 26, 32, 36, 41, 45, 50, 52–53, 59, 66, 71–72, 85, 88–89, 108, 111–12, 117, 133, 153, 157, 171, 180, 183, 186–87, 199.

[3] *See* SUF ¶¶ 19, 31, 36, 56, 67, 72, 91, 100, 109, 113, 117, 136.

[4] *See* SUF ¶¶ 125, 127–30, 132, 134, 145–46, 148–49, 152, 168–70, 177, 181, 189, 196–200.

summary of Navient's communications with the CFPB's identified borrowers is set

forth in the accompanying statement of undisputed facts.  SUF ¶¶ 14–203.

### C. Navient Informed Borrowers About The Need To Renew Enrollment In IDR (Counts III and IV)

Once borrowers enroll in IDR, that enrollment lasts for twelve months, at

which point the plan expires unless the borrower renews her enrollment in the plan.

34 C.F.R. § 685.221(e) (2013); JSUF ¶ 31.  To renew, the borrower must recertify

her income and family size by providing updated information and income

documentation (*e.g.*, paystubs).  34 C.F.R. § 685.221(e) (2013); JSUF ¶ 32.  A

borrower's failure to renew will result in the borrower returning to standard

payments.  34 C.F.R. § 685.221(e) (2013); JSUF ¶ 33

Before December 2012, neither ED's regulations nor its contract with

Navient required that Navient send borrowers notice about the need to renew their

IDR enrollment.  *See* 34 C.F.R. § 682.215 (July 1, 2012); 34 C.F.R. § 685.221

(July 1, 2012).  Nonetheless, Navient sent notices 90 days prior to the IDR plans'

expiration that informed borrowers of the need to recertify their income and family

size prior to the expiration of the borrowers' enrollment in IDR.  SUF ¶¶ 216–17,

222.  The letters explained that the borrowers' IDR period "will expire in

approximately 90 days" and that "to continue with the [IDR]" payments, the borrowers would have to complete the attached form.[5]  SUF ¶¶ 218, 223.

The notices also provided information regarding the required documentation and instructions for how to return the form(s) and documentation online, by fax, or by mail.  SUF ¶ 218.  The notices further instructed borrowers to "make sure the forms are filled out completely" and warned that "[b]y providing incorrect or incomplete information the process will be delayed."  SUF ¶¶ 219, 224.  The notices stated that "the IBR renewal process may take at least 30 days, depending on the application method."  SUF ¶¶ 220, 223.

The ED form attached to Navient's notices (which, again, were not required by ED regulation) provided additional instructions for completing "the required annual reevaluation of [the borrower's] payment amount under the IBR plan."  SUF ¶ 220; *accord* SUF ¶ 225.  The form instructed borrowers that "[b]efore answering any questions" they should "carefully read the entire form" and warned that "[a]ny person who knowingly makes a false statement or misrepresentation on this form or any accompanying documents is subject to penalties."  SUF ¶¶ 220, 226.  The ED form for FFELP borrowers also stated that borrowers "must annually

---

[5] There were slight differences in the language used in the notices sent to FFELP borrowers compared to those sent to Direct loan borrowers.  The precise content of the notices is described in detail in the accompanying statement of undisputed facts at ¶¶ 216–26.

certify [their] family size and provide income documentation for determination of whether [they] have a partial financial hardship;" that if borrowers "do not have a partial financial hardship, [their] payment amount will be. . . the standard repayment plan with a 10-year repayment period;" and that "[a]ccrued interest is capitalized at the time you choose to leave the IBR plan or no longer have a partial financial hardship." SUF ¶ 221. The ED form for Direct loan borrowers stated that "[u]ntil [the] servicer receives the information needed to calculate your [IDR] Plan payment amount, your initial payment amount will be the full amount of interest that accumulates on your loan each month." SUF ¶ 225.

The notice and enclosed forms were sent via U.S. mail unless borrowers consented to receive electronic communications. JSUF ¶ 34. Borrowers who consented to receive electronic communications from Navient agreed that communications "may be delivered . . . by posting such [c]ommunications to [their] online account[s]," and that "[e]mail [c]ommunications may include attachments or embedded links." SUF ¶ 231. Likewise, borrowers who consented to receive electronic communications from ED consented to their federal loan servicers "provid[ing] notices and correspondence" to borrowers "by posting it to [their] online account." SUF ¶ 233.

Prior to November 2012, borrowers who consented to receive electronic communications received an email with the subject line "Your [Navient] Account

Information." JSUF ¶ 35.  Between November 2012 and March 2015, borrowers

received an email with the subject line "New Document Ready to View."

JSUF ¶ 36.  Borrowers could click on a link in the email to access the IDR

recertification notice and form in their online accounts.  SUF ¶ 234.

### III.   NAVIENT REQUIRED CONSECUTIVE ON-TIME PAYMENTS FOR COSIGNER RELEASE (COUNT V)

When federal aid falls short of covering a student's full educational

expenses, the student may apply for a private loan.  JSUF ¶ 38.  Because most

students lack both income and credit history when they first apply for private

student loans, a cosigner is often required.  JSUF ¶¶ 39–40.  Cosigners help

borrowers obtain loans they otherwise could not or more favorable terms than

would otherwise have been available.  JSUF ¶ 40.

After students graduate and start paying off their cosigned private loans,

students may apply for cosigner release if they meet certain requirements and if

permitted by the borrower's promissory note.  SUF ¶ 257.  Those requirements

include, among other things, proof of graduation and a minimum number of on-

time payments, which must be made consecutively.  SUF ¶ 257.  A borrower who

meets these eligibility requirements must then submit an application and meet

credit underwriting criteria.  SUF ¶¶ 257–58.  These requirements are aimed at

ensuring that the borrower will be able to consistently make payments on the loan

without the assistance of a cosigner.  SUF ¶ 259.

13

Until August 2014, Navient required the minimum payments to apply for cosigner release to be made in consecutive months, even if a borrower had paid her loan ahead.  SUF ¶ 260.  For instance, if a borrower made a lump-sum payment in January that was 12 times the monthly payment amount and paid nothing the remainder of the year, that would be treated as one payment, rather than 12 consecutive payments.  This was because consecutive, on-time monthly payments best demonstrate a borrower's ability and willingness to consistently make scheduled payments on the loan over time, while a lump-sum payment may not demonstrate the same ability.  *See* SUF ¶ 259.

## IV. NAVIENT PROCESSES TENS OF MILLIONS OF STUDENT LOAN PAYMENTS, AND TRACKS AND CORRECTS ANY ERRORS (COUNT VI)

Navient processes tens of millions of student loan payments every year.  For example, in 2013 alone, Navient processed 62 million payments.  SUF ¶ 268.  Typically, payments are applied to the loan according to the terms of the loan's promissory note—for example, for federal loans in standard repayment, a borrower's payments go first to any fees, then to interest, and finally to principal, in a process known as "payment application."  JSUF ¶¶ 55–56; SUF ¶ 269.

Many borrowers have multiple student loans.  Consistent with ED's preference, 34 C.F.R. § 682.209(a)(6)(xii), Navient combines the federal loans it services into a single billing group (except that FFELP and Direct loans must be serviced separately under ED rules).  JSUF ¶ 51; SUF ¶ 270.  This means that,

14

rather than receiving multiple bills every month (*e.g.*, one bill for each loan),

borrowers receive a single bill for each billing group showing one consolidated

payment due each month that covers the full balance due on all loans in that

particular billing group.  JSUF ¶ 51.  For instance, if a borrower has three Direct

loans, and her monthly payment amounts on those three loans are $50, $30, and

$20, the borrower would receive one bill in the amount of $100, and that $100

payment would be distributed according to the amount owed on each loan, in a

process known as "payment allocation," JSUF ¶ 54.  For a borrower who chooses

to make more than her monthly payment, the additional amount would be

distributed among the loans based on the monthly payment amounts—e.g., an

additional $100 would be allocated to the loans as $50, $30, and $20, respectively.

Borrowers can request, however, that an overpayment be allocated to a particular

loan (e.g., to the loan with the largest balance or the highest interest rate).  SUF

¶ 271.

Navient has multiple internal processes for tracking and correcting potential

payment processing errors and escalating borrower complaints or inquiries related

to payment processing.  For example, Navient's compliance team conducts testing

on a monthly basis to ensure that Navient representatives are following company

practices, including payment processing practices.  SUF ¶ 275.  The results are

reviewed at quarterly compliance committee meetings.  SUF ¶ 276.

The CFPB has identified a handful[6] of individual borrowers who it claims experienced payment processing issues.  SUF ¶ 1.  In each instance in which these borrowers requested that Navient re-apply or re-allocate loan payments, it is indisputable that Navient did so according to the borrowers' instructions.  SUF ¶¶ 279–304.

## V.   NAVIENT ACCURATELY REPORTED BORROWERS' ACCOUNT STATUSES (COUNT XI)

For each student loan account it services, Navient reports information to credit reporting agencies, such as Equifax, Experian, and TransUnion.  The credit reporting agencies, along with other industry participants, are members of a trade association called the Consumer Data Industry Association ("CDIA"), which publishes annual credit reporting guidance in the Credit Reporting Resource Guide ("CRRG").  JSUF ¶ 62.  The credit reporting agencies and the CDIA together also formed the Metro 2 Format Task Force ("Task Force") to "provide a standardized method for the reporting of accurate, complete, and timely data."  JSUF ¶ 63. Credit modeling companies, such as FICO and VantageScore, have proprietary

---

[6] One of the CFPB's witnesses (NT) did not experience any payment processing issues until after January 18, 2017.  The CFPB contends that any conduct after that date is not part of this litigation, so it is unclear if the CFPB believes NT's experiences are at issue.  Nevertheless, when NT requested that Navient re-allocate payments, it did so.  SUF ¶¶ 288–91.

models for calculating credit scores and are not members of the CDIA or the Task Force.  SUF ¶¶ 306–07.

The CRRG instructs entities that provide credit information, such as Navient, to provide the Payment Rating, which indicates whether an account is current, and Account Status, which identifies the status of an account (e.g., "13" means "Paid or closed account/zero balance").  SUF ¶ 309; SUF Ex. 180 at NAV-01144608, 44632, 4684.  Pursuant to the CRRG's instructions, a field called Special Comment Code is used in conjunction with Account Status and Payment Rating "to further define the account" (e.g., "AH" indicates that the account has been purchased by another company).  SUF ¶ 310.

As described above, FFELP loans are guaranteed by guaranty agencies and, ultimately, the federal government.  34 C.F.R. § 682.100(b).  In the event a loan is discharged, such as through a Total and Permanent Disability ("TPD") claim, the guaranty agency typically accepts and pays the claim.  JSUF ¶¶ 59–60.  The 2011 version of the CRRG introduced, for the first time, the combination of Account Status "05," meaning "transferred," and Special Comment Code "AL," meaning "assigned to the government," to be used together "when a claim was accepted and paid by the guarantor."  SUF ¶¶ 316–18.  Because this was a change from the prior guide, Navient reached out to the Task Force in June 2012 before making changes to how certain loans were reported.  SUF ¶¶ 319, 321.  The Task Force confirmed

17

that Account Status "05" and Special Comment Code "AL" did not indicate default.  SUF ¶ 320.

In October 2012, Navient began reporting Account Status Code "05" and Special Comment Code "AL" for loans with claims that had been accepted and paid by a guaranty agency.  SUF ¶ 321.  This included borrowers whose claims to discharge their student loans due to TPD had been accepted and paid by a guaranty agency.  SUF ¶ 321.  Once a loan is discharged due to TPD, the account is transferred and assigned to ED.  SUF ¶ 311.

In May 2013, FICO informed Navient, after Navient inquired, that it interpreted the code to be "negative."  SUF ¶ 322.  Navient shared FICO's interpretation with the Task Force, which again confirmed: "[w]e do not believe that Account Status 05 (transferred) and Special Comment AL (assigned to government) mean that the loan is in default."  SUF ¶¶ 323–24.

Even though all industry participants—including FICO—considered Special Comment Code "AL" to accurately reflect that the account had been "Assigned to Government," Navient began in November 2013 to manually remove the code from its monthly reporting to avoid any harm to borrowers from FICO's misinterpretation, and implemented system changes to end the reporting of the code for TPD-discharged loans.  SUF ¶¶ 325–27.  Navient completed the system

changes in June 2014.  SUF ¶ 327.  By December 2014, Navient had also removed the code from all historical reporting.  SUF ¶ 328.

## VI.   PIONEER'S ALLEGED STATEMENTS REGARDING THE BENEFITS OF FEDERAL LOAN REHABILITATION (COUNTS VII THROUGH X)

### A.   Default And The Federal Loan Rehabilitation Program

Borrowers who are unable to manage their loan payments and do not take advantage of available options like IDR or forbearance may miss payments on their loans.  After 270 days without payment, most federal loans will enter default. 34 C.F.R. § 685.102(b); 34 C.F.R. § 682.200(b).  Once the loans are transferred to collections, the consequences are significant:  The entire unpaid balance of the loan becomes due immediately; collection fees may be added to the balance of the loan; borrowers may have their wages garnished and tax refunds and federal benefits payments withheld; they are no longer eligible for benefits like deferment and forbearance; they cannot receive additional federal student aid; and their credit suffers.  *See* 34 C.F.R. § 685.204(a)(3) (loss of eligibility for deferment); *id.* § 685.211(d) (acceleration of unpaid balance, assessment of collection charges, and reporting to consumer reporting agencies); 20 U.S.C. § 1095a(a) (administrative wage garnishment); 31 U.S.C. § 3720A(a) (tax refund offset); 20 U.S.C. § 1091(a)(3) (eligibility for federal aid); ¶ 311 (describing the consequences of default, including loss of eligibility for forbearance, as stated on ED's website, studentaid.gov).

In light of the significant negative consequences of default, the benefits to a borrower of bringing a federal student loan out of default are substantial.  Congress enacted the loan rehabilitation program as the primary federal "[d]efault reduction program."  20 U.S.C. § 1078-6.  It is a one-time opportunity for borrowers to bring their federal loans out of default and requires that, for ten consecutive months, borrowers make nine voluntary, reasonable, and affordable payments within 20 days of the payment due date.  *See* 34 C.F.R. § 685.211(f)(1), (12); 34 C.F.R. § 682.405(a)(2)(i).

Rehabilitation cures a borrower's default and confers additional benefits.  Pursuant to statute, once the loan is rehabilitated, either ED, the guaranty agency, or the lender must request that credit reporting agencies remove the record of default from the borrower's credit report.  20 U.S.C. § 1078-6(a)(1)(C); SUF ¶ 336.  Moreover, for ED loans, all collection fees remaining at the time of rehabilitation are waived.  SUF ¶ 334.  These benefits are only available through rehabilitation.  SUF ¶¶ 334, 336.  Indeed, the CFPB itself promotes rehabilitation as the option for curing default with "the greatest opportunity to protect your credit record."  SUF ¶ 338.

### B.    Pioneer Provided Borrowers With Information About The Benefits Of Rehabilitation

ED and the guaranty agencies contract with Pioneer to "[l]ocate and contact borrowers" in default in order to "resolve their debt," including through loan

rehabilitation.  SUF ¶ 340; *see also* JSUF ¶ 57.  Pioneer trains its collections

representatives regarding the benefits of rehabilitation and provides them with

"talk offs" to inform their conversations with borrowers.  SUF ¶ 341.  Until April

2014, Pioneer's training materials for ED loans explained that "[a]ll . . . collection

fees are removed once you complete the program" and that after completion of the

required payments, "the defaulted student loan is eligible to be taken out of default

and the record be removed from the borrower's credit report."  SUF ¶ 342.  The

"talk off" stated that, after completion of the program, "you will no longer be in

Federal Default.  All the collection fees will be removed at the time of sale.  Also,

it will be completely deleted from your credit report as though it had never

happened."  SUF ¶ 343.

Pioneer revised these materials in 2014.  SUF ¶ 344.  Regarding collection

costs, Pioneer revised its ED "talk off" as of April 21, 2014, to state that "any

remaining collection fees on your loan(s) will be waived."  SUF ¶ 344.  Regarding

changes to borrowers' credit reports, Pioneer revised its ED "talk off" as of July

11, 2014, to state that "the Department of Education will notify the credit bureaus

to remove the default status from the credit report for the rehabilitated loan(s)."

SUF ¶ 345.

Pioneer also had "talk offs" for FFELP loans managed by guaranty agencies.

SUF ¶ 347.  In August 2013, the "talk off" instructed agents to inform borrowers

that "[o]nce [the borrower's] loan is removed from default, [his/her] delinquent trade line with [Client Name] will be removed from [the borrower's] current report as if it never existed and replaced with an open current trade."  SUF ¶ 347.  On July 11, 2014, Pioneer revised this "talk off" to explain that Pioneer would contact the borrower's original lender and request that it "remove the record of default from [the borrower's] credit history."  SUF ¶ 348.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).  "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial," summary judgment must be granted.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).  The CFPB bears the burden of proving each element of its claims.  *See CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *6 (N.D. Ga. Mar. 21, 2019); *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 (D. Conn. 2009).  Because the CFPB cannot

meet its burden on elements of each count, summary judgment must be granted for Defendants.[7]

## I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND II BECAUSE THE CFPB CANNOT ESTABLISH ANY UNFAIR OR ABUSIVE PRACTICES WITH RESPECT TO "STEERING"

Counts I and II allege that Navient "steered" borrowers into forbearance instead of IDR plans.  The CFPB initially alleged that Navient did not provide borrowers with "enough information" for them to "make an informed decision about which repayment plan was right for them."  Doc. 57, at 45; *see also id.* at 48 (stating that Complaint alleged that "borrowers ended up in forbearance instead of being able to make an informed decision as to what repayment plan was best for their circumstances").  As shown in Section A below, the undisputed facts show that each of the CFPB's identified borrowers was repeatedly informed about repayment options, including IDR.

Given this failure of proof, the CFPB has invented a new theory of "steering."  The CFPB no longer seeks to prove that Navient affirmatively "pushed" borrowers into forbearance.  Doc. 57, at 45.  The CFPB does not even seek to prove that Navient kept borrowers in the dark about IDR.  Instead, the CFPB claims that the repeated disclosures to borrowers about IDR are immaterial,

---

[7] Because summary judgment should be granted for Navient and Pioneer, there is no basis for the case to proceed against Navient Corporation.

Ex. B at 1–2, and that servicers were statutorily required, on every single phone call, to follow an unpublished, CFPB-prescribed Q&A before granting a forbearance—and that the failure to do so was abusive and unfair.  As shown in Section B, this new theory is contrary to the CFPB's own guidelines and has no support in law.

Navient need only show a failure of proof as to *any one* of the following elements to be entitled to summary judgment:

<u>Abusiveness (Count I)</u>:  The CFPB must show that Navient took "unreasonable advantage of . . . reasonable reliance by the consumer" that Navient would "act in the interests of the consumer."  12 U.S.C. § 5531(d)(2)(C).

<u>Unfairness (Count II)</u>:  The CFPB must demonstrate that Navient "cause[d]" the consumer "substantial injury" that was neither "reasonably avoidable" nor "outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1)(A)–(B).

The CFPB cannot establish that Navient took "unreasonable advantage" of any borrower (as required for an abusiveness claim), or that borrowers suffered a "substantial injury" that was not "reasonably avoidable" (as required for an unfairness claim).  The undisputed facts show that Navient informed borrowers about repayment options, helped borrowers enroll in IDR, and properly granted borrowers' requests for forbearance, consistent with ED requirements.

24

**A.     The Undisputed Facts Show That All Of The CFPB's Borrowers Were Repeatedly Informed about IDR**

As this Court recognized, the CFPB's "proof will depend on applying the elements to th[e] many persons on whose behalf [the CFPB is] proceeding," Doc. 87, at 6:8–10, and the Court said that it "expect[ed] to hear testimony from real people about their experiences," *id.* at 9:4–5. *See also Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185–90 (3d Cir. 2001) (claim based on discussions that "varied from customer-to-customer" "necessarily involves an individual review of what each [individual] was told and what information was provided"). The CFPB assured the Court that its "plan [was] to have a representative number of consumers . . . who would testify on each particular issue." Doc. 87, at 6:18–19. The CFPB identified 16 borrowers in support of its "steering" claims, SUF ¶ 1; each borrower was repeatedly informed about IDR, *supra* p. 9 & n.1; Ex. C.

In assessing the experiences of the CFPB's borrowers, the law requires that the ***entire course of dealing*** between Navient and a borrower be considered—not an individual phone call in isolation. This is even recognized in the CFPB's UDAAP Examination Manual, which provides that "an individual statement, representation, or omission" must be evaluated "not in isolation but rather in the context of the entire . . . transaction[] or course of dealing." CFPB Consumer Laws and Regulations: Unfair, Deceptive, or Abusive Acts or Practices at 5 (2012), https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-

abusive-acts-practices-udaaps_procedures.pdf (hereinafter "CFPB UDAAP

Examination Manual"); *accord Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th

Cir. 2013) (holding that "disclosures, notices, and correspondence conclusively

defeat any claim of . . . concealment" under consumer protection statute).[8]  As set

forth in great detail in the accompanying statement of undisputed facts, SUF

¶¶ 14–203, Navient's history of communications with the CFPB's borrowers

demonstrates a consistent practice of informing borrowers about IDR.  Based on

those experiences, the CFPB cannot show that Navient took "advantage" of any

borrower or caused "substantial injury" that was "not reasonably avoidable."

The undisputed facts show that Navient sent borrowers written information

about IDR on multiple occasions, including when they started repayment,

---

[8] *See also Harris v. Las Vegas Sands, L.L.C.*, No. CV 12-10858 DMG (FFMx), 2013 WL 5291142, at *5 (C.D. Cal. Aug. 16, 2013) (dismissing claim brought under consumer protection statute after considering defendant's disclosures in billing page, hyperlinked "Terms and Conditions" page, and in an email to plaintiff); *Ford v. Hotwire, Inc.*, No. 07-CV-1312 H(NLS), 2008 WL 5874305, at *1, 4 (S.D. Cal. Feb. 25, 2008) (dismissing complaint brought under consumer protection law in part because allegedly omitted information was "freely accessible" on third-party website); *Casey v. Florida Coastal Sch. of Law, Inc.*, No. 3:14-cv-1229-J-39PDB, 2015 WL 10096084, at *15 (M.D. Fla. Aug. 11, 2015) (considering fact that "there were . . . numerous sources of information available" in recommending dismissal of an unfairness claim brought under a consumer protection statute), *adopted by* 2015 WL 10818746 (M.D. Fla. Sept. 29, 2015); *Gomez-Jimenez v. New York Law Sch.*, 943 N.Y.S.2d 834, 843 (Sup. Ct.) (dismissing claim brought under consumer protection statute because "reasonable consumers ha[d] available to them any number of sources of information to review . . ."), *aff'd*, 956 N.Y.S.2d 54 (2012).

expressed difficulty making payments, and fell behind on payments.  SUF ¶¶ 5–11.

IDR was prominently described, often in the middle of the first page, in bold or all

capital letters, and with exclamation points.  For example, one of the CFPB's

borrowers, JB, received at least eight emails from Navient asking whether he had

"looked into the government's income-driven repayment plans for federal loans."

SUF ¶¶ 94–96.  In purple text, the email said, "**You could even qualify for a**

**payment of $0!**"  SUF ¶ 94 (emphasis in original).  Navient also displayed

information about IDR on its webpage, along with a tool to help borrowers

determine their eligibility.  SUF ¶¶ 12, 37.  Indeed, information about IDR

appeared directly below the very statements the CFPB uses to support its claim that

borrowers reasonably relied on Navient to provide them information about IDR.

SUF ¶ 13.  And the information was described in plain terms.  *See, e.g.*, SUF ¶ 6

(offering "[p]ayments tied to your income" to "make student loan payments more

manageable"); *id.* ¶ 98 ("[Y]ou may also qualify for loan forgiveness after 20 or 25

years.").

Although the CFPB ignores these disclosures, the law presumes "a basic

level of understanding and willingness to read with care" information sent to

consumers about their loans.  *Campuzano-Burgos v. Midland Credit Mgmt., Inc.*,

550 F.3d 294, 299 (3d Cir. 2008) (quoting *Rosenau v. Unifund Corp.*, 539 F.3d

218, 221 (3d Cir. 2008)). The law "does not," after all, "go so far as to provide solace to the willfully blind or non-observant." *Id.*

Consistent with Navient's procedures, Navient also informed these borrowers about IDR over the phone. Indeed, Navient representatives discussed IDR over the phone *with all but one* of the CFPB's borrowers.[9] While representatives did not discuss IDR on every single call, calls in which IDR was not discussed were generally preceded or followed by calls in which it was discussed. For example, one of the CFPB's borrowers, FB, had two phone calls in June and July 2013 where the Navient representative did not discuss IDR. SUF ¶ 51. But FB discussed IDR with a Navient representative only a few months earlier—in March 2013—and again shortly after those calls, in August 2013. SUF ¶¶ 50, 53. She applied for IDR that month. SUF ¶ 55.

Other borrowers actively avoided or rebuffed Navient's attempts to discuss IDR with them, even going so far as to verbally abuse the representatives trying to help them.[10] For example, a Navient representative repeatedly suggested IDR on a call with one of the CFPB's borrowers, KR, even though he responded with profane insults. SUF ¶ 199. Another borrower, RD, when asked for income

---

[9] *See supra* p. 9 & n.2; Ex. C. And the one borrower who did not discuss IDR over the phone, JB, received multiple communications informing him about IDR. SUF ¶¶ 94–96, 98–99.

[10] SUF ¶¶ 120, 129–30, 132, 199, 202.

information to qualify her for repayment options, asked to call Navient back, but then did not.  SUF ¶¶ 129–30.  Other borrowers, despite discussing IDR on the phone and receiving IDR applications after the calls, did not apply.[11]

Applying the elements of unfairness and abusiveness to the undisputed facts regarding the experiences of the CFPB's witnesses, Navient is entitled to summary judgment.

Unfairness.  An injury is reasonably avoidable if "consumers had a free and informed choice."  *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 916 (S.D. Ind. 2015) (quoting *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)).  Each borrower identified by the CFPB made the "free and informed choice" to request forbearance *after* being repeatedly informed about the availability of IDR.  In addition, borrowers also received information about IDR immediately after enrolling in forbearance, *see supra* p. 9 & n.1, meaning that they were "aware of, and . . . reasonably capable of pursuing [IDR] after the fact."  *Id.* (quoting *Davis*, 691 F.3d at 1168–69).

The facts of the CFPB's borrower experiences bear no resemblance to the coercive conduct that courts have required to prove unfairness.  For conduct to be unfair, it must "unreasonably create[] or take[] advantage of an obstacle to the free

---

[11] *See, e.g.*, SUF ¶¶ 21–22, 26–28, 41–43, 77–79, 85–87, 124–25, 133–34, 168–70, 180–81.

exercise of consumer decisionmaking," such as "withhold[ing] critical price or performance data, . . . leaving buyers with insufficient information for informed comparisons," "engag[ing] in overt coercion" (such as "by dismantling a home appliance for 'inspection' and refusing to reassemble it until a service contract is signed"), or "exercis[ing] undue influence over highly susceptible classes of purchasers" (such as "by promoting fraudulent 'cures' to seriously ill cancer patients").  FTC Policy Statement on Unfairness (Dec. 17, 1980) (appended to *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1074 (1984)), https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness (hereinafter "FTC Policy Statement on Unfairness").  To prove unfairness, courts have thus required conduct that would "***prevent consumers from effectively making their own decisions***," *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 946 (N.D. Ill. 2008) (emphasis added), or that makes use of "coercive" or "oppressive circumstances," *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913–18.  There is no evidence of coercion here.  To the contrary, Navient provided borrowers with information about available repayment options by email, letter, telephone, and on its website.

Abusiveness.  For similar reasons, there is no evidence of abusiveness, which would require the CFPB to show that Navient took "unreasonable advantage" of consumers.  *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 918.  "The ordinary meaning of 'to take advantage of' is 'to make use of for one's own

benefit,' to 'use to advantage,' or to 'profit by.'" *Id.* (quoting Webster's Third New Int'l Dictionary 2331 (3d ed. 1993)).  And the statute's requirement of taking "unreasonable advantage" is reasonably read to "refer[] to oppressive circumstances" in which "a consumer is unable to protect herself . . . relative to the excessively stronger position of the defendant." *Id.* at 919 (emphasis omitted).

Again, rather than taking advantage of borrowers, the undisputed facts show that Navient affirmatively takes steps to provide borrowers with all the information necessary for them to decide whether IDR is an appropriate option.  Navient makes information about IDR easily available on its website, SUF ¶¶ 12–13—including a tool that enables borrowers to determine their eligibility, SUF ¶ 37—and repeatedly informs borrowers about IDR both in writing and over the phone, *see supra* pp. 8–10.

Based on these communications, summary judgment must be granted.  *See Croftcheck v. Accounts Recovery Bureau, Inc.*, No. 1:11-CV-1220, 2012 WL 1378683, at \*5–6 (M.D. Pa. Apr. 20, 2012) (summary judgment for defendant debt collection agency where no dispute of fact about what communications entailed); *see also Tennier v. Wells Fargo Bank, N.A.*, 666 F. App'x 689, 691 (9th Cir. 2016) (affirming summary judgment on omission claim where undisputed facts showed defendant disclosed information); *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at \*4 (W.D. Wash. July 22, 2016) (summary judgment

appropriate where issue was "whether the facts in the present case constitute an unfair practice under Section 5 of the FTC Act").

## B. The CFPB's Prescriptive New "Steering" Theory Fails As A Matter Of Law

As noted, the CFPB now takes the position that Navient's extensive communications about IDR are not "material" to its claims because the claims concern only what happened on individual phone calls with borrowers.[12] According to the CFPB's proffered "definition of steering," each isolated phone call with a borrower was "abusive" and "unfair" if the call:

1) "result[s] in a decision to enter into a prospective forbearance that [is] not purely an administrative forbearance"; AND

2) the "representative d[oes] not probe the borrower's hardship to understand the nature of the hardship, including the reasons or bases to determine":

   a) "that the hardship [is] not indefinite," AND

   b) "that the circumstances giving rise to the hardship w[ill] conclude by the end of the forbearance," AND

   c) "that the borrower [w]ill be able to resume payment once the forbearance conclude[s];" AND

3) the "representative d[oes] not adequately advise the borrower about IDR options" either because

   a) "IDR [is] not mentioned," unless the representative "asked all necessary questions to calculate the borrower's IDR payment, and the representative did not indicate that the purpose of those

---

[12] *See* Ex. B at 1.

questions was to qualify for a different option (such as
deferment);" OR

b) the representative "d[oes] not provide accurate and clear
information about the IDR payment amount" (with "accurate and
clear information" defined to mean "that the representative ask[]
all questions that would be needed to provide an accurate estimate
of the borrower's IDR payment amount . . . and then
communicated the IDR payment amount to the borrower or told
the borrower that he/she d[oes] not qualify for IDR"); OR

c) "regardless of whether the Navient representative provided
accurate and clear information about the IDR payment amount, the
Navient representative d[oes] not explain the following benefits of
IDR:  possible principal forgiveness, avoidance of interest
capitalization, and interest subsidies."

Ex. A at 1–2 (Letter from Plaintiff).  In addition, for criterion #3, the CFPB

declares that it "d[oes] not accord any value to the scripted forbearance terms

disclosure read or played after the borrower opted for forbearance."  *Id.* at 1.  That

disclosure states "you may be eligible for repayment options, which include . . .

income-driven repayment plans."  SUF ¶ 209.

The CFPB's attempt to impose these new requirements retroactively exceeds

its authority, which is "constrain[ed]" by the statutory definitions of unfairness and

abusiveness, Doc. 57, at 16, and informed by decades of case law.  Indeed, the

CFPB's current theory is so far removed from its original claim that Navient

"push[ed]" borrowers into forbearance, *see id.* at 45, 48, that its continued use of

the label "steering" is contrived and misleading.  It also fails as a matter of law for

two reasons.  *First*, it is completely disconnected from the statutory elements of

unfairness and abusiveness.  *Second*, it directly conflicts with and would render

unlawful servicer conduct that is expressly prescribed by ED, the agency

responsible for the implementation of the federal student loan program.

> 1.     *The CFPB's New Requirements Do Not Meet The Elements Of The Statute*

The CFPB has "no authority . . . to declare an act or practice . . . unfair"

unless "the act or practice causes or is likely to cause substantial injury to

consumers which is not reasonably avoidable by consumers" and "is not

outweighed by countervailing benefits to consumers or to competition."  12

U.S.C. § 5531(c)(1).  The CFPB similarly has "no authority . . . to declare an act or

practice abusive . . . unless the act or practice," as alleged here, "takes

unreasonable advantage of" consumers' "reasonable reliance . . . on a covered

person to act in the interests of the consumer."  *Id.* at § 5531(d).  The CFPB's new

"steering" theory fails to meet these statutory elements.

*First*, contrary to federal law, the CFPB's position starts with the premise

that forbearance (i.e., not being required to make loan payments) is a *per se* harm.

But federal law provides that forbearance is a borrower ***benefit*** made available by

Congress and encouraged by ED.  34 C.F.R. § 682.211(a)(1) ("The Secretary

encourages a lender to grant forbearance *for the benefit of a borrower . . . .*"

(emphasis added)).  Forbearance gives the borrower the option to temporarily

forgo making payments without suffering the negative consequences of delinquency and default.

*Second*, the CFPB writes out of the statute the element that any injury was not "reasonably avoidable." Because unfairness law does not "second-guess the wisdom of particular consumer decisions," the law "anticipates that consumers will survey the available alternatives," and choose the option that works for them. FTC Policy Statement on Unfairness, 104 F.T.C. at 1074.[13] The law only steps in when "certain types of sales techniques . . . prevent consumers from effectively making their own decisions," by "behavior that . . . creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." *Id*. In other words, an injury is "reasonably avoidable" if consumers "have reason to anticipate the impending harm and the means to avoid it." *Davis*, 691 F.3d at 1168 (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988)).

Under the CFPB's theory, the statute would no longer be about providing "enough information" for borrowers to "make an informed decision" for themselves. Doc. 57, at 45, 48. Indeed, the CFPB does "not accord any value" to informing borrowers on the same phone call that they "may be eligible for . . .

---

[13] The CFPA's unfairness standard derives from the Federal Trade Commission Act ("FTCA"), *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 903, the present form of which traces back to the Policy Statement on Unfairness codified in 1994. *See also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015).

income-driven repayment plans." *See* Ex. A at 2; SUF ¶ 209.  Instead, the CFPB

would require servicers to affirmatively engage in an elaborate matrix of

previously undisclosed criteria and make an individualized determination that a

borrower's "hardship [is] not indefinite," "the circumstances giving rise to the

hardship would conclude," and "that the borrower will be able to resume payment

once the forbearance concluded." *Id*.

The CFPB has recognized that requiring lenders "to engage in extremely

detailed, specific action with regard to particular consumers to correct for the

consumers' individualized understanding—or lack of understanding—about their

own finances and likely experiences" is inconsistent with how courts and the FTC

have long interpreted the unfairness standard.  Payday, Vehicle Title, and Certain

High-Cost Installment Loans, 84 Fed. Reg. 4,252, 4,270–71 (Feb. 14, 2019).

The CFPB's current litigation position is also contrary to its *own* guidelines,

which, as noted above, require consideration of the entire course of dealing

between Navient and borrowers, not looking at individual phone calls in isolation

(or as here, ignoring parts of the very same phone call).  *See* CFPB UDAAP

Examination Manual at 5 (instructing that "an individual statement, representation,

or omission" must be evaluated "not in isolation but rather in the context of the

entire . . . transaction[] or course of dealing").  The CFPB would declare a phone

call ending in a borrower receiving forbearance unlawful even if the borrower had

researched her options, read the information Navient sent, previously discussed IDR with a Navient representative on the phone, and then decided that forbearance was the best option at the time.  Indeed, the CFPB would declare unlawful an individual phone call even if, the very same day, the borrower had another phone call with Navient where the representative did precisely what the CFPB would require.  The CFPB's position eviscerates the statutory requirement that it prove that the harm was not reasonably avoidable.  *Davis*, 691 F.3d at 1168–69.

*Third*, and for similar reasons, the CFPB's theory writes out of the abusiveness statute the requirement that Navient "take unreasonable advantage of" borrowers.  The CFPB would declare a forbearance "abusive" unless a servicer first walks through the CFPB's preferred Q&A matrix, makes a determination that the borrower's circumstances will change in a specified period of time, and if the borrower's circumstances will not change, provides the borrower with an estimated payment amount and describes the potential benefits (but not the downsides) of IDR.  Rather than demonstrate the "coercive" or "oppressive circumstances" required to show that Navient has taken advantage of a borrower, *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913–16, 919, the CFPB seeks instead to discourage access to a federally prescribed benefit—forbearance—in favor of its preferred option, IDR.  Moreover, the CFPB cannot show that Navient derives any benefit from a particular phone call that does not follow the CFPB's asserted requirements.  *Id.* at

918 ("The ordinary meaning of 'to take advantage of' is 'to make use of for one's own benefit,' to 'use to advantage,' or to 'profit by.'" (quoting Webster's Third New Int'l Dictionary 2331 (3d ed. 1993))).

### 2. The CFPB's Asserted Requirements Conflict With Congressional And ED Mandates

The CFPB's invented Q&A requirements also impermissibly conflict with the statute and regulations mandating and encouraging forbearance in the federal student loan program. Congress authorized ED to "prescribe standardized . . . procedures regarding . . . forbearance." 20 U.S.C. § 1082(l)(1)(E). Under ED rules, servicers *must* grant forbearance to eligible borrowers with Direct loans, *see* 34 C.F.R. § 685.205(a), and are "encourage[d]" to grant forbearance for FFELP borrowers, *id.* at § 682.211(a)(1). And ED regulations expressly provide for the determination servicers must make before granting a forbearance:  the servicer must "*reasonably* believe[] . . . that the borrower . . . intends to repay the loan but, . . . is *currently* unable to make scheduled payments," 34 C.F.R. § 682.211(a)(2)(i) (emphasis added). Thus, before obtaining a forbearance, a borrower must agree that she intends to repay her loan but is temporarily unable to make her monthly payments. 34 C.F.R. § 682.211(b)(1); SUF ¶ 209.

The CFPB's new theory seeks to impose an entirely different—and inconsistent—set of requirements:  A servicer could not enroll a borrower in forbearance unless the servicer determined that "the circumstances giving rise to

the [borrower's financial] hardship *would* conclude by the end of the forbearance," and that a borrower "*would* be able to resume payment once the forbearance concluded." Ex. A at 1 (emphases added). The CFPB's theory would, in effect, nullify the borrower's agreement and the servicer's reasonable belief that the borrower meets ED's requirements, unless the servicer could somehow determine that the borrower's circumstances "*would* conclude" before the end of the forbearance period. *Id.* at 1 (emphasis added). This puts servicers in the untenable position of choosing between granting a forbearance that the CFPB would deem unlawful, or denying the forbearance in contravention of ED regulations—the type of regulatory inconsistency Congress expressly instructed the CFPB to avoid. *See* 12 U.S.C. § 5495 ("The [CFPB] shall coordinate with . . . other federal agencies . . . to promote consistent regulatory treatment of consumer financial and investment products and services.").

***

The CFPB's novel theory of abusiveness and unfairness has no basis in law and must be rejected. There is no basis for its preferred call dialogue, and isolated phone calls cannot be divorced from the course of dealing between borrowers and Navient. When borrower phone calls are properly evaluated in the context of repeated communications about IDR, the undisputed facts show that borrowers were informed about IDR and chose forbearance, defeating any claim of

abusiveness or unfairness.  *See supra* pp. 8–10.  Summary judgment should be granted for Navient on Counts I and II.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS III AND VI BECAUSE THE CFPB CANNOT SHOW ANY UNFAIR PRACTICES

Because the applicable law is the same, the two remaining unfairness claims—the IDR recertification email (Count III) and payment processing errors (Count VI)—are addressed together below.  Both fail because the CFPB lacks evidence for essential elements of its claims.

### A.   There Is No Evidence That Any Borrower Experienced Substantial Injury That Was Not Reasonably Avoidable From Navient's IDR Recertification Email

Count III asserts that Navient's practice of sending an email with a link to an IDR recertification notice posted on borrowers' online accounts was unfair because the email did not specify the content of the awaiting message.  Compl. ¶¶ 149–50. The CFPB has failed to identify evidence to establish "substantial injury," or that any injury was not "reasonably avoidable" by, for example, the borrower simply clicking on the link in the email or opting out of electronic communications.  *See Goldenstein*, 815 F.3d at 146 (without evidence of an "essential element of its case," summary judgment is warranted (quoting *Blunt*, 767 F.3d at 265)). Moreover, even if the CFPB could establish injury, summary judgment is warranted because the CFPA did not require Navient to send borrowers *any* notice

regarding IDR recertification—much less comply with the delivery procedure the CFPB would prefer.  *See* Compl. ¶ 149.

The CFPB has proffered only one consumer witness—MT—in support of Count III.  SUF ¶¶ 1, 235–52.  ███████████████████████

███████████.  SUF ¶ 235.  ████████████████████

████████████████, SUF ¶ 237, ████████████

██████████████████████, SUF ¶ 238.[14]  ██████████

████████████████████████, SUF ¶ 237, █████████

████████████████████████████████

██████, SUF ¶ 247.  ████████████████████

████████████████████████████████

████████████.  SUF ¶ 243.  The challenged email therefore had nothing to do with MT's inaction in renewing his spouse's IDR plan before the deadline, and the CFPB's only witness—who was not a Navient borrower—could have avoided any harm by following the guidance received in other communications or relying on his knowledge of the recertification requirements.

---

[14] This was consistent with the electronic consent form, which put borrowers on notice that messages could be posted to their online accounts (even without an accompanying email), and therefore borrowers could have reasonably avoided any harm by monitoring their online accounts.  SUF ¶ 231.

Lacking a fact witness, the CFPB's only potential support for this claim comes from the opinion of its expert, Dr. Tülin Erdem, who performed a survey using the challenged email.  That survey, however, measured only whether participants understood from the text of the email that it was ███████████ ████████████████████████████████████ SUF Ex. 4 at ¶ 55. Participants in the survey had no option to click on the link or otherwise view the document linked to in the email.  SUF Ex. 152 at 248:9–12.  Dr. Erdem conceded that the survey was "not actually measuring how many respondents would have logged on to their accounts."  SUF ¶ 255.  And, although not designed for that purpose, Dr. Erdem's survey actually shows ███████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████. SUF ¶ 254.  Thus, rather than meeting the CFPB's burden of proof, the results of Dr. Erdem's survey strongly suggest that a significant percentage of respondents would indeed click on the link, log into their accounts, and view the IDR notice.

As with its "steering" claims, the CFPB improperly advances an "unfairness" theory to create affirmative obligations that are inconsistent with ED's requirements.  The requirements to send the recertification notice are established by ED regulations, 34 C.F.R. §§ 685.221(e)(3), 682.215; and ED and

42

Navient informed borrowers who consented to electronic communications that notices and correspondence could be posted to their online accounts, SUF ¶¶ 231–33.  It is undisputed that Navient complied with these requirements.  SUF ¶¶ 231–34, 245–46.

Finally, the CFPB has produced no evidence of harm.  In its disclosures, the CFPB claimed that it would seek "damages and/or restitution" for borrowers "harmed" as a result of the conduct alleged in Count III, and that "[t]he computation of these damages and/or restitution will be set forth in Rule 26(a)(2) expert disclosures."  SUF ¶ 2.  No such computation was done, which is telling and constitutes another failure of proof.  SUF ¶ 3.

Because the CFPB cannot meet its burden to show that any borrower was harmed or that any theoretical harm was not reasonably avoidable, summary judgment is required on Count III.  *See Goldenstein*, 815 F.3d at 146.

### B.    There Is No Evidence That Navient's Payment Processing Practices Caused Substantial Injury

In Count VI, the CFPB alleges that Navient made errors processing borrowers' student loan payments, and that the failure to implement practices that theoretically could have prevented such errors constitutes an unfair practice.  *See* Compl. ¶ 167.  There is no dispute that Navient, which processes roughly *60 million* loan payments a year, SUF ¶ 268, occasionally made errors in processing payments—like any other company that handles payments.  To establish a

statutory violation, however, the CFPB must prove an "act or practice [that] causes or is likely to cause substantial injury to consumers."  12 U.S.C. § 5531(c)(1).

At this late stage, it is still not at all clear which specific practices the CFPB believes were unfair.  As best we can tell, the CFPB's claim is that Navient violated the CFPA by *not* adopting certain changes to its processes, including: (a) standing instructions to allow borrowers to allocate overpayments the same way every month; (b) different payment options via Navient's website; (c) enhanced functionality for payment via third-party bill payers; (d) less call time "pressure" on agents processing payments; and (e) a different means for agents to record payment processing errors.  SUF Ex. 3 at ¶¶ 43, 53, 109–10, 114–15, 122–24, 126–27.[15]

The CFPB's attempt to use "unfairness" law as a vehicle for its own arbitrary preferences fails for two reasons:  There is no evidence from which a

---

[15] This claim, like much of the CFPB's lawsuit, appears to be an attempt to impose new regulatory requirements—above and beyond those required by ED regulations, the ED contract, or any other applicable law—by alleging that Navient engaged in unfair business practices as a result of not implementing the CFPB's preferences.  This is a particularly untenable position with respect to at least one of the practices at issue—standing instructions—given that ED *explicitly* rejected any such requirement by withdrawing a change order that would have required federal loan servicers to implement this functionality.  SUF ¶ 273.  In fact, ███████████ ████████████████████████████████████████████████████████████ .  SUF ¶ 274.

reasonable jury could conclude either (1) that the lack of practices set forth above *caused* substantial injury or (2) that borrowers even experienced *substantial injury*.

    <u>The CFPB cannot establish causation</u>.  The only evidence the CFPB has put forth in support of its payment processing claim are Navient's own internal tracking of payment processing issues and the experiences of a handful of borrowers.  This evidence fails to meet the CFPB's burden.  If anything, the tracking reports establish only that there was a company practice to identify errors and consider process improvements.  To be sure, the reports identify instances of payment errors, but the reports do not link any errors to the CFPB's preferred operating practices.  Two examples demonstrate the point:



-                                     SUF Ex. 173 at NAV-03727599.

- SUF Ex. 172 at NAV-03664259.

    There is simply no basis from which a reasonable jury could conclude that such errors were caused by the lack of any particular practice.  *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (plaintiff must put forward evidence on summary judgment that defendants' conduct caused harm under state unfairness law).

Moreover, some of the "errors" the CFPB identifies are entirely outside of Navient's control.  For example:

- ED requires Direct loan borrowers to mail their payments to a lockbox maintained by Bank of America.  SUF ¶ 272.  Bank of America, not Navient, is responsible for depositing those payments into the federal treasury, and then communicating to Navient any special instructions the borrower provided.  SUF ¶ 272.  Any errors that Bank of America made were not caused by any practices that Navient failed to adopt, and Navient had no authority to have borrowers direct payments somewhere else.

- TC, a borrower identified by the CFPB, ██████████████████ ███████████████████████████████████████████████. SUF ¶¶ 295, 297. ███████████████ ███████████████████████████████████ ██████████████ SUF ¶ 298. █████████████████████ █████████████████████████████████ ███████████████████████████████████████ ████████ SUF ¶ 298.



- Another borrower, KSC, complained that she sent a check with written instructions to pay off one of her loans but that Navient "just

applied it to other loans."  SUF ¶ 281.  The reason: "because I sent it to the wrong address, maybe."  SUF ¶ 282 & n.380.  Obviously Navient did not cause a payment processing error that resulted from a customer's mistake—and once KSC called Navient to reallocate the payment, Navient did so, SUF ¶ 282.

Tellingly, after accessing all the documents produced in this case, the best the CFPB's own expert, Shannon Millard, could muster is: 

SUF Ex. 3 at ¶ 124 (emphasis added).

does not come close to establishing causation.

<u>The CFPB cannot establish substantial injury</u>.  The CFPB initially alleged that payment processing errors resulted in borrowers "incurring improper late fees, increased interest charges, the furnishing of inaccurate negative information to consumer reporting agencies, and the loss of certain benefits."  Compl. ¶ 108.  The CFPB failed to find evidence supporting these assertions.  As a result, the CFPB now seeks only "damages and/or restitution to compensate consumers harmed *for*

*the time that they expended* in dealing with Defendants' repeated payment processing errors."  SUF Ex. 1 at *135 (emphasis added).

This fallback theory is inconsistent with the CFPB's own guidelines, which recognize that "[s]ubstantial injury usually involves monetary harm," and "more subjective types of harm . . . will not ordinarily amount to substantial injury." CFPB UDAAP Examination Manual, at 2; *accord LabMD, Inc. v. FTC*, 678 F. App'x 816, 820 (11th Cir. 2016) (stating that "it is not clear that a reasonable interpretation of [15 U.S.C.] §45(n) includes intangible harms" under the FTCA); *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913 (citing cases and stating, "'substantial' injury in the context of consumer protection is most often a financial one").  Defendants are not aware of a single case holding that time spent, without more, constitutes "substantial injury"—and with good reason, because it would transform every imperfect customer interaction into an illegal act.[16]

---

[16] In the few cases where "time spent" was recognized as an injury, it was claimed *along with* tangible forms of harm.  *Cf. Amazon.com, Inc.*, 2016 WL 10654030, at *8 (recognizing as substantial injury "time spent seeking refunds" along with "[t]he millions of dollars billed to Amazon customers without a mechanism for consent"); *FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007) (recognizing as substantial injury "lost time and productivity" along with "economic harm" and "severe harm experienced by some consumers from stalkers and abusers who procured the consumers' phone records [which] constitut[ed] a clear and unwarranted risk to those consumers' health and safety"), *aff'd*, 570 F.3d 1187 (10th Cir. 2009).

Moreover, the CFPB's witnesses made clear that Navient *corrected* their payment processing errors when asked, and only two of the witnesses, TC and CH, even estimated the amount of time spent obtaining the correction. *See* SUF ¶¶ 282, 288–91, 293, 296, 299–300, 303. Although the CFPB promised to provide an expert computation of "damages and/or restitution to compensate consumers harmed for the time that they expended in dealing with Defendants' repeated payment processing errors," SUF Ex. 1 at *135, it yet again failed to do so, SUF ¶ 3. There is therefore no proof of tangible harm in the record, and "a 'trivial or speculative' harm will not suffice" for substantial injury. *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913 (quoting *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945 (N.D. Ill. 2008)); *cf. FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (holding that the district court's "*concrete and quantifiable finding*" of harm was sufficient (emphasis added)).

### III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS IV AND V BECAUSE THE CFPB CANNOT SHOW ANY DECEPTION

Counts IV and V are deception claims. To prevail, the CFPB must establish that (1) "there is a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088,

1095 (9th Cir. 1994)).  Because the CFPB has no evidence that any consumer was

materially misled, summary judgment must be granted on Counts IV and V.

### A.   There Is No Evidence Of A Materially Misleading Statement In Support Of Count IV

The CFPB alleges that before December 2012,[17] Navient's IDR

recertification notice deceived borrowers because it omitted:  1) "the actual date by

which [borrowers] had to submit the renewal application," and 2) "the likely

consequences of submitting incorrect or incomplete information."  Doc. 36, at 28.

At the motion-to-dismiss stage, this Court "[could not] say, as a matter of law, that

the letter was not likely to mislead a borrower acting reasonably under the

circumstances."  Doc. 57, at 53.  After more than two years of discovery, the CFPB

has presented no evidence that the asserted omissions were likely to mislead a

reasonable consumer or that any purported omission was material to anyone.

The Notice Was Not False or Misleading.  In determining whether the notice

is likely to mislead, the court "must consider the overall common sense, net-

impression" of the notice "on a reasonable consumer," and the notice "must be

viewed as a whole without emphasizing isolated words or phrases."  *FTC v.*

---

[17] The CFPB alleged that the notices at issue were sent "[f]rom at least January 1, 2010 until December 2012."  Compl. ¶ 61.  The evidence shows the challenged statement regarding "delay" was in use from, at the earliest, December 2011 to December 2012.  SUF ¶¶ 219, 224, 227–28.  In any event, as discussed in below, *infra* p. 63, claims against Navient based on conduct prior to January 20, 2012 are time-barred.

*Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 559–60 (W.D. Pa. 2006); *see Pernod*

*Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 252 (3d Cir. 2011).

Viewed as a whole, the notice and attached form informed borrowers when to

submit the required paperwork and the consequences of failing to do so.

    *First*, the omission of a specific date was not misleading.  The notice alerted

borrowers that they had 90 days to submit their documentation before their IDR

plan expired.  SUF ¶¶ 218, 223.  The letters were also dated, so borrowers could

easily calculate 90 days from the date the letter was sent.  SUF ¶¶ 218, 223.  The

plain meaning of the letter is confirmed by the report of the CFPB's own expert.

In her Recertification Notice Survey, Dr. Erdem ███████████████████

████████████████████████████████████████████████████

████████████████████████  SUF Ex. 4 at ¶¶ 66, 72.  Almost every

respondent who saw the letter identified a deadline within 90 days—that is, within

the timeframe to submit the application before the plan expired.  *See* SUF ¶ 256.

    *Second*, contrary to the CFPB's claim, there was no implied

misrepresentation regarding the consequences of failing to submit complete and

accurate paperwork.  For an implied representation to be actionable, the CFPB

must show that Navient made a representation, *to the omission of another*, that

implied a claim that was misleading to a "reasonable consumer."  *See, e.g.*,

*Fanning v. FTC*, 821 F.3d 164, 171–72 (1st Cir. 2016).  The CFPB alleges that by

stating that "if a borrower 'provid[ed] incorrect or incomplete information the [renewal] process will be delayed,'" the notice "implied that the only consequence of providing incorrect or incomplete information was a 'delay' in the renewal 'process.'"  Doc. 57, at 52.  Yet, looking to the notice as a whole as the CFPB's own standards require, *see supra* p. 25–26, the notice did not "impl[y]" that the "only consequence" was delay because the other consequences were not, in fact, omitted.

The first paragraph of the recertification notice from Navient states that the IDR period "will expire in approximately 90 days," and "[i]f [the borrower would] like to continue with the IBR" payments they must "complete the included . . . Form."  SUF ¶¶ 218, 223.  The attached form instructs borrowers to "carefully read the entire form" before filling it out.  SUF ¶¶ 220, 225.  In other words, if the borrower does not "carefully read" and "complete" the IDR form, the "IBR period will expire in approximately 90 days."  In addition, the included form for FFELP borrowers explained that, absent recertification: 1) the borrower's "payment amount will be the payment amount for [her] loan(s) under the standard repayment plan with a 10-year repayment period," and 2) "[a]ccrued interest is capitalized."  SUF ¶ 221.  The letter sent to ED borrowers stated: "[i]f you don't provide the requested information, you'll remain in the IBR plan but your monthly education loan payment could increase significantly."  SUF ¶ 223.  A reasonable consumer

would understand that if she did not timely fill out the required form carefully and completely, her IDR repayment period would expire, her monthly payment amount would increase, and unpaid interest would be capitalized.

The asserted omission was not material.  In order to prevail on its claim, the CFPB also must prove that the challenged omission was material.  *Gordon*, 819 F.3d at 1192.  Unlike an express misrepresentation, an omission is not presumptively material.  *Cf. Kraft, Inc. v. FTC*, 970 F.2d 311, 322–23 (7th Cir. 1992); *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 773 (S.D.N.Y. 2018).  An alleged misrepresentation is only material if "it is likely to influence" consumer decisionmaking.  *See Pernod Ricard USA, LLC*, 653 F.3d at 248; *NDG Fin. Corp.*, 2016 WL 7188792, at *14 (describing materiality as "likely to affect consumer decisionmaking").  Even if the court agrees that there was an implied misrepresentation, the CFPB cannot show that the asserted omissions—of the due date and of further consequences attending incomplete or inaccurate applications— were material.

At the motion-to-dismiss stage, this Court stated that a "fair inference from the complaint" was that the alleged misrepresentation was material because "borrowers who were misled into believing that a processing delay was the only negative consequence of submitting an incomplete or inaccurate form were not as careful when filling out the form as they would have been if they had known the

true consequences of an error or omission." Doc. 57, at 54. But the CFPB has

produced no evidence to support this claim. Indeed, the CFPB has not identified a

single borrower who missed the deadline or submitted an inaccurate or incomplete

application based on a misunderstanding of the notice. And while the CFPB

conducted surveys on other issues, it put forth no survey or other expert evidence

of materiality.

Materiality is "a finding that injury is *likely to exist* because of the . . .

omission." FTC Policy Statement on Deception (Oct. 14, 1983) (appended to *In re*

*Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 183 (1984)) (emphasis added),

https://www.ftc.gov/public-statements/1983/10/ftc-policy-statement-deception; *see*

*also FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d. Cir. 1963) ("[T]he cardinal

factor is the *probable effect* which the advertiser's handiwork will have upon the

eye and mind of the reader" (emphasis added)). Materiality, therefore, requires

that consumers would have made a different choice. *See, e.g.*, *Kraft*, 970 F.2d at

324 (borrowers would not have purchased Kraft Cheese if they were aware of its

actual calcium content). The CFPB's claim presumes an improbable scenario

where borrowers were capable of submitting an accurate and complete

recertification form but—because of the alleged omission—carelessly did not.

Lacking any evidence of that scenario, the CFPB's theory that borrowers would

have acted differently but for the alleged omission is far too speculative to survive.

*See id.* at 320 ("The Commission does not have license . . . to pin liability . . . for barely imaginable [implied] claims").

The CFPB improperly seeks to impose ED regulations retroactively.

Ultimately, under the guise of a "deceptiveness" claim, the CFPB actually seeks to impose ED's regulations retroactively.  Beginning in May 2011 (before Navient began using the challenged version of the notice), ED engaged in a negotiated rulemaking process with industry stakeholders regarding proposed improvements to the IDR program.  77 Fed. Reg. 42,085–87, 42,146–48 (July 17, 2012).  Prior to that process, "current regulations [did] not require that borrowers be notified each year in advance of the annual requirement to provide income information and certify family size, nor [did] current regulations specify a deadline by which the borrower must provide this information."  *Id.* at 42,106.  During the rulemaking process, commenters noted that (unlike Navient) some servicers were not notifying borrowers at all in advance of the annual requirement, and the lack of an ED-prescribed deadline was leading to inconsistent amounts of time being provided to borrowers.  *Id.*

To create consistency, ED promulgated new rules that set a deadline for borrowers to send annual income information and required servicers to send borrowers a renewal notice that detailed 1) "the date, no earlier than 35 days before the end of the borrower's annual payment period, by which the loan holder must

receive all of the [necessary] information," and 2) "[t]he consequences if [ED] does not receive the [required] information within 10 days following the annual deadline specified in the notice."  34 C.F.R. § 685.221(e)(3).  The description of consequences must "includ[e] the borrower's new monthly payment amount [absent an IDR plan] . . . and the fact that unpaid interest will be capitalized at the end of the borrower's current annual payment period."  *Id.*

Although these regulatory changes did not go into effect until July 2013, 77 Fed. Reg. 66,088, 66,088 (Nov. 1, 2012), ED issued a contract modification in July 2012 requiring servicers to implement these changes by the end of 2012.  SUF ¶ 227.  As part of the contract modification, ED paid servicers additional fees to provide the notices.  SUF ¶ 230.  Navient implemented the required changes in December 2012 and sent the notice to ED for review.  SUF ¶¶ 228–29.

Thus, for the entire period that the challenged notice was in use, ED was engaged in a cooperative process with servicers to develop 1) a deadline, and 2) a requirement to disclose that deadline and the consequences of not meeting it.  The CFPB's theory amounts to the untenable claim that Navient should have implemented ED's eventual notice requirements earlier than even ED itself required.  *See also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to

require regulated parties to divine the agency's interpretations in advance").

Summary judgment should be granted on Count IV.

### B. There Is No Evidence Of A Materially Misleading Statement In Support Of Count V

In Count V, the CFPB claims that Navient deceived borrowers by stating that they must make a minimum number of "consecutive, on-time principal and interest payments" in order to be eligible to apply for cosigner release.  Compl. ¶¶ 86, 161.  The CFPB asserts that such statements were deceptive because a borrower who made a lump-sum payment was considered to have made only one payment, rather than the multiple of the monthly payment amount covered by the lump sum.  *See* Compl. ¶¶ 86–96.  As with Count IV, the CFPB has presented no evidence that any statement related to cosigner release was materially misleading, and summary judgment must be granted on Count V.

The CFPB has entirely failed to develop its claim that Navient made materially misleading statements about its cosigner release requirements.  It has identified no specific misstatement made to any particular borrower or cosigner who was misled into making a lump-sum payment and then denied cosigner release.  When Navient asked the CFPB to identify "any and all false or misleading [c]ommunications," the CFPB responded:  "Navient['s] representation to borrowers that they could apply for co-signer release if they made a certain number of 'consecutive, on-time principal and interest payments.'"  SUF ¶ 261.  The CFPB

did not identify when or to whom this statement was made.  *See* SUF Ex. 1 at *99–103.

And when asked to identify each borrower who "was wrongly denied cosigner release for failing to make an on-time payment in each of 12 consecutive months," the CFPB pointed to a handful of consumer complaints.  SUF ¶¶ 262–67.  These complaints cannot sustain this count.  Two of the complaints do not even pertain to the CFPB's claim, relating instead to cosigners' confusion over whether payments made by the cosigner, rather than the borrower, count toward the minimum number of payments.  SUF ¶¶ 263–64.  Three complaints did express confusion about whether a gap in payments—whether occasioned by a lump-sum payment or a temporary deferment—restarted the clock on the minimum number of payments.  SUF ¶¶ 265–67.  For two of those complaints, that confusion is not attributed to any statement by Navient.  SUF ¶¶ 265–66.  And the final complaint involved a borrower who was mistakenly one payment short of the minimum number of payments and met the required number of payments the following month.  SUF ¶ 267.

The CFPB has also failed to adduce evidence that any misstatement was likely to mislead, for example, through survey or expert evidence.  *FTC v. Stefanchik*, 559 F.3d 924, 928–29 (9th Cir. 2009).  Nor has the CFPB developed evidence that any misstatement was material, to whom it was material (the

cosigner or the borrower), or to what decision it was material.  *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) (misrepresentation "material" when it "strike[s] at the heart of a consumer's purchasing decision"). Given the absence of such evidence, summary judgment must be granted.

## IV.   SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNT XI BECAUSE SPECIAL COMMENT CODE "AL" WAS ACCURATE

The CFPB alleges that Navient's furnishing of Special Comment Code "AL" was inaccurate because it "made it appear as if borrowers who had not defaulted on their loans and whose loans were being discharged due to a total and permanent disability had actually defaulted on their loans."  Compl. ¶ 82.  The CFPB claims in turn that this violated Regulation V, which requires Navient to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of information that it furnished regarding borrowers who had received a discharge on their federal loans due to a total and permanent disability."  Compl. ¶ 196.  Because the CFPB cannot show—as it must—that the use of Special Comment Code "AL" was inaccurate, summary judgment should be granted on Count XI.

The FCRA requires "fair and accurate credit reporting."  15 U.S.C. § 1681(a)(1).  Regulation V implements that requirement by requiring furnishers to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information related to consumers that it furnishes to a

consumer reporting agency."  12 C.F.R. § 1022.42(a).  "[T]he threshold question [under the FCRA] is whether the challenged credit information is accurate," for "if the information is accurate, no further inquiry into the reasonableness of . . . procedures is necessary."  *Adams*, 620 F. Supp. 2d at 330 (first alteration in original) (quoting *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989)).

"A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse[]' effect."  *Schweitzer v. Equifax Info. Sols., LLC*, 441 F. App'x 896, 902 (3d Cir. 2011) (alterations in original) (quoting *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2011)).  Where neither the facts in the record nor the CDIA guidelines establish that a furnisher reported inaccurate information, summary judgment should be granted.  *See Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1315–16, 1318–19 (11th Cir. 2018) (granting summary judgment where information reported was not inaccurate).

The CFPB cannot show that Navient's reporting of Special Comment Code "AL" was inaccurate.  The straightforward meaning of the code in the CDIA guidelines demonstrates the accuracy of Navient's reporting.  The code translates to "[s]tudent loan assigned to government."  SUF ¶¶ 317–18.  It is undisputed that this is precisely what occurs when a borrower's student loans are discharged due to

TPD:  The loan is assigned to the government.  SUF ¶ 311.  Indeed, the CFPB's own expert admits that the ███████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████       SUF Ex. 193 at ¶ 28.

Nor was the reporting of Special Comment Code "AL" materially misleading.  The CDIA guidelines encouraged furnishers to furnish Special Comment Codes, noting that these codes may be "[u]sed in conjunction with Account Status to . . . further define the account."  SUF ¶ 310.  Even if the "AL" code had multiple meanings—which it did not—Navient reported the code in combination with other codes that made clear when a loan was not in default.  For example, Navient reported the following information for non-defaulted, TPD-discharged loans: a Payment Rating of "0," which indicated that the account was current (as opposed to Payment Rating "G," which indicated that an account was in collections); a Date of First Delinquency of "00000000," which indicated that there was no delinquency; and a Payment History Profile, which would have indicated historical on-time payment information.  SUF ¶¶ 312–15.  The "simultaneous reporting" of information that made clear that borrowers were not in default is dispositive.  *Banneck v. HSBC Bank USA., N.A.*, No. 15-cv-02250-HSG, 2016 WL 3383960, at *6–7 (N.D. Cal. June 20, 2016).

Likewise, the record shows that industry participants considered the code to be accurate, and when asked, did not interpret the code to mean that a borrower had defaulted.  Specifically, the Task Force stated:  "We do not believe that Account Status 05 (transferred) and Special Comment Code AL (assigned to government) mean that the loan is in default."  SUF ¶ 324; *see also* SUF ¶ 320 ("[T]he combination of Status 05 and Special Comment Code AL does not specify 'default'").  Likewise, FICO wrote contemporaneously in 2014 that the information "is not inaccurate:  [The borrower] did have a loan that was discharged through an assignment to the federal government."  SUF ¶ 326.

That FICO interpreted the code as "negative" was a function of its proprietary credit risk model, which FICO guards as a secret and which has nothing to do with the accuracy of reporting the "AL" code.  SUF ¶ 326.  In fact, despite its litigation position, the CFPB recognized at the time that it was FICO's apparent interpretation of the "AL" code that was the problem.  SUF ¶ 329 & n.451

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████.

Navient is not responsible for FICO's treatment of Navient's accurate reporting. *See Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 758 (9th Cir. 2018) (upholding summary judgment in favor of Experian because the source of error

was "Fannie Mae's mistreatment of Experian's coding, not Experian's own inaccuracies").

Because the CFPB cannot make the "threshold" showing that Special Comment Code "AL" was inaccurate, no further inquiry is required, and summary judgment should be granted on Count XI.

## V.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO CONDUCT OUTSIDE THE APPLICABLE STATUTE OF LIMITATIONS PERIODS

### A.   Summary Judgment Should Be Granted In Part On Counts I-VI

The CFPA provides that "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1).  Although that would typically preclude liability for acts prior to January 18, 2014, Navient agreed during the investigation to toll the statute of limitations from January 20, 2015 until the filing of the complaint.  SUF ¶ 375. Therefore, the CFPB's claims against Navient based on conduct prior to January 20, 2012 are barred, and summary judgment must be granted in part.[18]  *See NDG Fin. Corp.*, 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (calculating three years back from date of complaint).

---

[18] Navient Corporation did not sign the tolling agreement, SUF ¶ 376, and therefore, it cannot be held liable for CFPA claims prior to January 18, 2014. Summary judgment should thus be granted on claims against Navient Corporation for acts prior to January 18, 2014.

**B.      Summary Judgment Should Be Granted On Counts VII-X Because There Is No Evidence Of Any Material Misrepresentation Made Within The Applicable Limitations Periods**

        *1.      There Is No Evidence Of Any Misrepresentation Made Within The Three-Year Period Under The CFPA*

Counts VII and VIII allege that Pioneer made deceptive statements regarding the credit reporting and collection fee benefits of rehabilitation in violation of § 1036(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B).  As discussed above, to establish a deceptive act or practice under the CFPA, the CFPB must establish that (1) "there was a representation" that was (2) "likely to mislead customers acting reasonably under the circumstances" and that was (3) "material." *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013) (quoting *FTC v. Magazine Sols., LLC*, No. CIVA 7-692, 2010 WL 1009442, at *11 (W.D. Pa. Mar. 15, 2010), *aff'd*, 432 F. App'x 155 (3d Cir. 2011)).  Because Pioneer did not agree to toll the statute of limitations, the limitations period for the CFPA claims begins on January 18, 2014.[19]  Here, the CFPB's claims fail at the threshold:  There is no evidence of any alleged misrepresentation made within the statute of limitations period.

---

[19] The CFPB has made clear that it only asserts claims under Counts VII and VIII for alleged violations that occurred on or after January 18, 2014.  SUF Ex. 209 at *6.

The only borrowers identified by the CFPB with knowledge of the alleged representations heard those statements in May 2013, approximately *eight months* before the applicable limitations period.  SUF ¶¶ 355–59, 366–70.  And the only other calls in evidence in which the alleged representations were made took place on or before March 31, 2013, at least *ten months* before the limitations period.  SUF ¶ 349.  Because it is the CFPB's burden to establish that the alleged misstatements were made, the absence of such evidence requires summary judgment in favor of Pioneer on Counts VII and VIII.  *See Calex Express, Inc. v. Bank of Am.*, 401 F. Supp. 2d 407, 410–12 (M.D. Pa. 2005) (granting summary judgment on statute-of-limitations grounds).

### 2.  There Is No Evidence Of Any Misrepresentation Made Within The One-Year Period Under The FDCPA

Counts IX and X allege that the same statements regarding the federal loan rehabilitation program also violate § 1692e of the FDCPA.  The FDCPA provides that "[a]ny action to enforce any liability created by this subchapter may be brought . . . within <u>one year</u> from the date on which the violation occurs."  15 U.S.C. § 1692k(d) (emphasis added); *accord Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019).  To prevail on its FDCPA claims, the CFPB must establish that Pioneer "use[d] a[] false, deceptive, or misleading representation or means in connection with the collection of any debt."  *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015) (quoting 15 U.S.C. § 1692e).  But, again, there is no

evidence of any deceptive statement actually made to borrowers after 2013.

Because there is no evidence of any alleged misstatement made within one year of

the filing of this action (that is, on or after January 18, 2016) judgment should be

granted on Counts IX and X.

> 3.   *Any Statement Was Not Material To Borrowers' Decisions To Participate In Loan Rehabilitation*

Even if the CFPB could identify a misstatement during the applicable

limitations period, the CFPB's claims still fail because it cannot meet its burden to

show that the alleged statements are material to the decision to participate in

rehabilitation.  It is undisputed that rehabilitation confers significant *benefits* to

borrowers by enabling them to exit default.  SUF ¶¶ 331, 332.  Among those

benefits are the removal of the record of default from a borrower's credit report,

and, for ED loans, the waiver of remaining collection fees at the time the borrower

completes rehabilitation.  SUF ¶¶ 334–36.  The CFPB's claim is not that Pioneer

fabricated a new set of purported benefits to get borrowers to enroll in

rehabilitation, but rather that Pioneer did not describe the credit reporting and

collection fee benefits with sufficient precision.

The experiences of the CFPB's two identified borrowers show that these

claimed misstatements were not material given the consequences of default and the

benefits provided by rehabilitation.  One borrower, JS, had no complaints about

participating in rehabilitation with Pioneer and was "glad that [he] was able get the

loans . . . out of default." SUF ¶ 374. The CFPB's other witness, KMC, had already used her one opportunity to consolidate her loans, so her only option to exit default was to participate in rehabilitation. SUF ¶ 354. KMC completed the rehabilitation program in January 2014, and getting out of default allowed her to receive financial aid, complete her master's degree, and have more financial stability. SUF ¶ 361–62. The alleged statements regarding the credit reporting or collection fee benefits of rehabilitation—benefits that are only available through rehabilitation—clearly were not material to borrowers' decisions to enroll. *See Freecom Commc'ns, Inc.*, 401 F.3d at 1203 (misrepresentation "material" when it "strike[s] at the heart of a consumer's purchasing decision"); *Jensen*, 791 F.3d at 422–24 (granting summary judgment where statement not material).

## <u>CONCLUSION</u>

Summary judgment should be granted on all counts.


Dated:  May 19, 2020                    Respectfully submitted,


<u>/s/ Jonathan E. Paikin</u>
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient Solutions, LLC, and Pioneer Credit Recovery, Inc.*

## CERTIFICATE OF WORD COUNT

I hereby certify in accordance with Local Rule 7.8(b)(2) that the foregoing document is 15,938 words.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Dated:  May 19, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
   Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363