# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | |
| Navient Corporation, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

# STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
# <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

I.    The CFPB's Disclosures ................................................................. 1

II.   Navient's Procedures Were To Provide Information About IDR To
      Borrowers ...................................................................................... 2

III.  Navient Provided Information About IDR To The Borrowers
      Identified By The CFPB ................................................................ 4

      A.    Borrowers Informed About IDR, But Ineligible .................... 4

            1.    CC ................................................................................ 4

            2.    NN ................................................................................ 8

            3.    AS .............................................................................. 11

      B.    Borrowers Who Enrolled In IDR ......................................... 12

            1.    FB .............................................................................. 12

            2.    UE .............................................................................. 15

            3.    VH .............................................................................. 17

            4.    MP .............................................................................. 19

            5.    JB .............................................................................. 22

            6.    AN .............................................................................. 25

            7.    GJ .............................................................................. 28

      C.    Borrowers Who Avoided Or Rebuffed Efforts To Inform Them
            About IDR, Or Chose Not To Enroll ................................... 29

            1.    RD .............................................................................. 29

            2.    ZB .............................................................................. 34

            3.    CP .............................................................................. 38

            4.    LF .............................................................................. 41

            5.    AK .............................................................................. 44

            6.    KR .............................................................................. 46

IV.   Navient's Procedures Instructed Representatives To Discuss
      Appropriate Repayment Options .................................................. 48

V.    Navient Informed Borrowers About The Need To Recertify Their IDR
      Eligibility .................................................................................... 53

      A.    Navient's Letters Regarding IDR Renewal .......................... 53

B.     ED Began Requiring Servicers To Send IDR Renewal Notices In 2012 .................................................................................57

C.     Navient Sent Borrowers Who Consented To Emails A Link To The IDR Recertification Notice ..........................................58

D.     The Witness Identified By The CFPB Did Not Review The Challenged Email ...............................................................59

E.     The CFPB's Expert Conducted Surveys Regarding Recertification Communications ..........................................64

VI.     Navient Required Consecutive On-Time Payments For Cosigner Release .......................................................................................65

VII.     Navient Processes Tens Of Millions Of Student Loan Payments And Tracks And Corrects Any Processing Errors ..................................68

A.     Navient Processes Tens Of Millions Of Payments Each Year ..........68

B.     Navient Tracks Payment Processing Errors ........................................70

C.     The CFPB's Identified Borrowers Had Any Errors Corrected ..........71

      1.     KSC ..........................................................................................71

      2.     NT ............................................................................................73

      3.     SW ...........................................................................................74

      4.     TC ............................................................................................75

      5.     CH ...........................................................................................76

VIII.     Navient Accurately Reported The "AL" Code For Loans Assigned To The Government .......................................................................................77

IX.     Even Though The "AL" Code Did Not Indicate Default, Navient Removed The Code From Borrowers' Accounts ..........................................81

X.     Pioneer Informed Borrowers About The Benefit Of Rehabilitation ............84

A.     Federal Loan Rehabilitation Provides Unique Benefits .....................86

B.     Pioneer Trains Its Agents Regarding The Benefits Of Rehabilitation ....................................................................................87

C.     The CFPB's Identified Calls With Borrowers About Rehabilitation All Predate January 2014 ...........................................90

      1.     KMC .........................................................................................91

      2.     JS .............................................................................................94

XI.     Navient Signed A Tolling Agreement ................................................96

In accordance with Local Rule 56(a)(1) and in support of the Motion for Summary Judgment, Defendants submit the following statement of undisputed material facts.

## I.   THE CFPB'S DISCLOSURES

1.     The Consumer Financial Protection Bureau ("CFPB") has identified 16 borrowers who it states were harmed by enrollment in a forbearance; one individual it states has information about efforts to recertify; five borrowers it states experienced payment processing challenges; and two borrowers it points to in support of its claims regarding loan rehabilitation.[1]

2.     In its supplemental disclosures, the CFPB claimed that it would seek "damages and/or restitution" for borrowers "harmed" as a result of the conduct alleged in Counts III and VI, and that "[t]he computation of these damages and/or restitution will be set forth in Rule 26(a)(2) expert disclosures."[2]

3.     No expert provided any computation of harm for Count III or Count VI.[3]

---

[1] Ex. 1 at *27–28, *87–88, *126–27 (asking the CFPB to "[i]dentify each Navient Borrower harmed by enrollment in a forbearance, as alleged in paragraph 146 of the Complaint, and describe the injury suffered by that Borrower"); Ex. 2 at *4, *11–12, *17, *21–22.

[2] Ex. 2 at *28–29.

[3] *See* Ex. 3; Ex. 4.

## II. Navient's Procedures Were To Provide Information About IDR To Borrowers

4.     Navient Solutions, LLC, ("Navient") contracts with the Department of Education ("ED"), to service loans that ED owns.[4]

5.     Navient's procedures were to provide the following information about income-driven repayment ("IDR") to borrowers during the alleged time period:

6.     When borrowers started repaying their loans, Navient sent a letter describing, for example, options to "make student loan payments more manageable," including "[p]ayments tied to your income."[5]

7.     For borrowers who communicated a difficulty making payments, Navient sent a letter about the availability of IDR.  For example, letters stated that a borrower could "[c]hange your [r]epayment [p]lan" to "Income-Related Plans," which offered "[m]onthly payments that can change annually as your income changes."[6]

---

[4] 20 U.S.C. § 1087f(a)(1); Ex. 5 at NAV-00000001.

[5] Ex. 6 at *1; *see also, e.g.*, Ex. 7 at *25 (2010 letter); Ex. 8 at *14 (2011 letter); Ex. 9 at NAV-03305437 (2012 letter); Ex. 10 at NAV-04066646 (2013 letter); Ex. 11 at NAV-02431404 (2014 letter); Ex. 12 at NAV-03860743 – 0744 (2015 letter); Ex. 13 at NAV-01575324 (2016 letter).

[6] Ex. 14 at *1 (2009 letter); *see also, e.g.*, Ex. 15 at *1 (2010 letter),*4 (2011 letter),*7 (2012 letter); Ex. 16 at *37 (2013 letter); Ex. 17 at NAV-01970701 (2014 letter); Ex. 18 at NAV-03924031 (2015 letter); Ex. 13 at NAV-01575324 (2016 letter); Ex. 19 at NAV-02358753 (2017 letter).

8.      For borrowers who fell behind on payments, Navient sent letters stating that "options may be available to help bring your account current," including "lower monthly payments provided through income-sensitive, income-based, or income-contingent repayment plans."[7]

9.      For borrowers who expressed an interest in IDR, Navient sent a letter stating how to apply.[8]

10.     Starting in August 2012, borrowers approaching the end of a deferment received a communication asking borrowers if they "still need help?" and noting that the "the federal government's [IDR] plan" is "worth checking out!"[9]

11.     Beginning in March 2013, a similar letter was sent to borrowers approaching the end of a forbearance.  As of 2013, the communication stated: "Have you looked into the federal government's income-driven repayment plans?

---

[7] Ex. 20 at NAV-00729729 (2010 letter); *see also, e.g.*, Ex. 7 at *12 (2009 letter); Ex. 21 at *45 (2011 letter); Ex. 22 at *22 (2012 letter),*34 (2013 letter); Ex. 23 at NAV-04018069 (2014 letter); Ex. 24 at NAV-04318973 (2016 letter); Ex. 25 at NAV-02357179 (2017 letter).

[8] Ex. 6 at *2 (2009 letter); *see also, e.g.*, Ex. 26 at NAV-02555115 (2010 letter); Ex. 27 at NAV-02136427 (2011 letter); Ex. 16 at *9 (2012 letter); Ex. 28 at *44 (2013 letter); Ex. 29 at NAV-00069979 (2014 letter); Ex. 30 at *10 (2015 letter); Ex. 31 at *1 (2016 letter); Ex. 32 at NAV-00065147 (2017 letter).

[9] Ex. 33 at NAV-02027930 (2012 letter); *see also, e.g.*, Ex. 34 at NAV-00626512 (2013 letter); Ex. 35 at NAV-02324032 (2014 letter); Ex. 36 at NAV-01903436 (2015 letter); Ex. 37 at NAV-02352692 (2016 letter).

These repayment options can allow you to make monthly payments based on your current income.  You could even qualify for a payment of $0!  That's right, zero! It's worth checking out!"[10]

12.     Borrowers identified by the CFPB recalled visiting Navient's website, which has information about IDR displayed.[11]

13.     Immediately below language on Navient's website cited by the CFPB,[12] the website stated that Navient offered "standard, graduated, income-sensitive, income-based, and extended repayment plans on federal student loans."[13]

## III.   NAVIENT PROVIDED INFORMATION ABOUT IDR TO THE BORROWERS IDENTIFIED BY THE CFPB

### A.   Borrowers Informed About IDR, But Ineligible

#### 1.   CC[14]

14.     ██████████████████████████████████████████

████████████████████████████████████████

---

[10] Ex. 38 at NAV-02294410 (2013 letter); Ex. 39 at NAV-03428822 (2014 letter); Ex. 40 (2015 letter); Ex. 41 (2016 letter); Ex. 42 (2017 letter).

[11] *See, e.g.*, Ex. 43 at 110:9–113:9 (JB); Ex 44 at 97:6–98:14 (AS); *see, e.g.*, Ex. 45 (Navient's website).

[12] Compl. ¶ 39.

[13] *See* Ex. 8 at *12 (emphasis omitted); *infra* ¶ 141.

[14] To preserve borrower privacy, the borrowers have been identified only by their initials, and all personal identifying information has been redacted from Defendants' exhibits.



15.

16.

17.

18.

---

[15] Ex. 47 at *1; Ex. 46 at 144:22–145:12, 150:9–23 (CC).

[16] Ex. 47 at *6, *8.

[17] *Id.* at *9.

[18] Ex. 51 at NAV-02357301 – 7302; Ex. 47 at *9; Ex. 48 at *25–26.

[19] Ex. 46 at 26:4–28:4 (CC).



19.

20.

21.

---

[20] Ex. 49 at *13 (lines 13–18); Ex. 46 at 187:19–24 (CC).

[21] Ex. 49 at *13 (line 19) through *14 (line 3); Ex. 46 at 190:3–6 (CC).

[22] Ex. 46 at 190:3–6 (CC).

[23] Ex. 49 at *19 (lines 10–13).

[24] Ex. 49 at *19 (line 14), *20 (lines 8–13).

[25] *Id.* at *24 (lines 10–14).



22.

23.

[26] *Id.* at \*22 (line 4) through \*25 (line 21); Ex. 46 at 200:11–201:23 (CC); *see also* Ex. 47 at \*11.

[27] Ex. 46 at 203:12–14 (CC).

[28] Ex. 48 at \*3 (lines 8–10).

[29] *Id.* at \*4 (lines 14–23); Ex. 46 at 234:13–236:14 (CC).

[30] Ex. 48 at \*5 (line 8) through \*8 (line 6); Ex. 46 at 234:13–236:14 (CC).

[31] Ex. 48 at \*8 (lines 7–9).

[32] *Id.* at \*8 (lines 11–15).



24.

25.

### 2. NN

26.     NN spoke to Navient representatives on the phone on August 12 and 18, 2009, before his first payment was due, and on both occasions the Navient representative checked NN's eligibility for IDR.[37]

---

[33] *Id.* at \*14 (line 1) through \*17 (line 21).

[34] *Id.* at \*20–23; Ex. 46 at 260:13–264:17 (CC).

[35] Ex. 46 at 263:20–264:3 (CC).

[36] Ex. 48 at \*2 (lines 11–24), \*4 (line 3) through \*5 (line 5); *see also* Ex. 50 at \*2 (line 23) through \*3 (line 2),\*4 (lines 19–21); Ex. 46 at 26:4–28:4, 213:10–217:6, 219:4–220:14 (CC).

[37] Ex. 53 at NAV-02967333, 7336; Ex. 52 at 67:25–69:23 (NN).

27.     On August 12, 2009, Navient sent NN a letter that stated, "Thank you for your interest in an Income-Based Repayment (IBR) plan" and that included an application form and instructions for how to apply for the plan.[38]

28.     NN did not apply for IDR in 2009.[39]

29.     NN's repayment period began in September 2009, and he requested forbearance "rather immediately."[40]

30.     Since 2010, NN has worked at a bank, where he now provides wealth management services.[41]

31.     His FFELP loans have "not [been] eligible for income-based repayment programs" since 2010, because he was "a single, no-dependent [individual] that had little debt-to-income."[42]

32.     NN specifically remembered discussing IDR "[i]n a telephone conversation" with Navient at some point in 2012,[43] but he "simply didn't qualify" because of his income.[44]

––––––––––––––––––

[38] Ex. 6 at *2–4; Ex. 52 at 66:3–67:5 (NN).

[39] Ex. 53 at NAV-02967330 – 7343.

[40] Ex. 52 at 70:10–72:16 (NN).

[41] *Id.* at 25:6–26:21, 31:7–32:2 (NN).

[42] *Id.* at 94:16–95:13 (NN).

[43] *Id.* at 79:10–12 (NN).

[44] *Id.* at 88:14–23 (NN).

33.     NN does not remember what repayment options were discussed on calls with Navient representatives between 2009 and 2012,[45] but he does remember that on calls during that time, he was asked about "[h]ow much [he was] earning and [his] family size."[46]

34.     Navient sent NN information about IDR multiple times prior to 2012.[47]  For example, in July 2009, Navient sent him a letter that described the availability of "several repayment options that help make student loan payments more manageable," including "Income-Based Repayment," which offered payments based on "your income, your family size and total outstanding balance of eligible loans."[48]

35.     NN admitted at his deposition that his "situation" was "outside the scope of the current CFPB complaint," because the CFPB was "specifically wanting to focus on [his] federal loan" instead of his "private student loans," which "were the burdensome component of [his] entire student loan equation."[49]

---

[45] *Id.* at 76:3–17 (NN).

[46] *Id.* at 83:9–87:6 (NN).

[47] *See, e.g.*, *id.* at 59:4–18, 66:3–67:5 (NN).

[48] Ex. 6 at *1; Ex. 53 at NAV-02967332 – 7333; Ex. 52 at 59:4–18 (NN).

[49] Ex. 52 at 140:8–141:24 (NN).

### 3. AS

36.     AS testified that she knew about IDR options "throughout the life of" her FFELP loan because she "researched all of the options that were available" and called Navient to discuss those options, including "call[ing] about income-based" and the "zero payment" option,[50] but she enrolled in forbearances because she "did not qualify" for IDR options.[51]

37.     At one point, AS used a tool on Navient's website where she "input[] various information to determine if [she] qualified for an income-driven repayment plan" and confirmed that she was not eligible.[52]

38.     During her deposition, AS would not answer questions about either her income or her husband's income during the alleged time period.[53]

39.     Navient sent AS information about IDR on multiple occasions.  For example, in July 2010, Navient sent AS a letter containing "a list of options for which you might qualify on your federal student loan(s)," including "Income-Based Repayment," which would provide "a reduction in your monthly payment

---

[50] Ex. 44 at 97:4–98:10 (AS); *see also id.* at 116:21–24 (AS) ("I know that I inquired about [income-drive repayment options], both over the phone over the years and on the website").

[51] *Id.* at 99:12–13, 125:22–128:10 (AS).

[52] *Id.* at 116:21–117:10 (AS).

[53] *Id.* at 62:22–63:5, 73:17–21, 75:21–78:19 (AS).

based on a federal formula that considers your income and family size."[54]  AS

enrolled in a forbearance after receiving that information.[55]

**B.      Borrowers Who Enrolled In IDR**

*1.      FB*

40.      Navient began servicing FB's loans in August 2011, when they were

transferred from another servicer.[56]

41.      On August 31, 2011, a Navient representative checked whether FB

was eligible for IDR during a phone call.[57]

42.      Following the call, Navient sent FB information about "Income-

Related Plans (Income-Based and Income Sensitive) – Monthly payments that can

change annually as your income changes."[58]

43.      FB did not apply for IDR at that time.[59]

44.      FB enrolled in a forbearance in October 2011.[60]

---

[54] Ex. 15 at *1–3; *4–7; Ex. 44 at 126:6–127:14, 136:4–137:7, 144:14–145:10 (AS).

[55] Ex. 44 at 133:4–23 (AS).

[56] Ex. 16 at *1; Ex. 54 at 35:3–36:12 (FB).

[57] Ex. 55 at NAV-02359386.

[58] Ex. 16 at *3–4; Ex. 54 at 36:22–39:16 (FB).

[59] Ex. 55 at NAV-02359386 – 9387.

[60] Ex. 16 at *5.

45.     Before that forbearance period ended, in August 2012, FB called Navient, and the representative checked whether FB was eligible for IDR.[61]

46.     Following that phone call, Navient sent FB a letter stating, "Thanks for your interest in an Income-Based Repayment (IBR) Plan," along with an application and instructions on how to apply.[62]

47.     FB applied for an economic hardship deferment,[63] which was denied because she did not meet the federal requirements,[64] and she requested a forbearance online without speaking to a Navient representative.[65]

48.     Between August 2011 and August 2013, Navient sent her information about IDR at least nine times.[66]

49.     FB admitted in her deposition that such letters "informed [her] of income-related repayment plans."[67]

50.     On March 29, 2013, FB discussed IDR on the phone with a Navient representative, who informed FB that her "remaining balance will be forgiven"

---

[61] Ex. 55 at NAV-02359390.

[62] Ex. 16 at *8–10; Ex. 54 at 44:10–47:3 (FB).

[63] Ex. 16 at *17–22.

[64] *Id.* at *24; Ex. 54 at 53:2–14 (FB).

[65] Ex. 16 at *26; Ex. 55 at NAV-02359391 – 9392.

[66] Ex. 16 at *3–4, *8, *16, *23, *25, *37–39.

[67] Ex. 54 at 41:16–20 (FB).

after "25 years of being in an income-based repayment [plan]."[68]  The

representative stated that FB could go to studentloans.gov to apply for the plan.[69]

51.     On June 14, 2013, and July 26, 2013, FB spoke to Navient

representatives, who did not discuss IDR during the calls, and FB did not enroll in

a forbearance on either call.[70]

52.     FB admitted in her deposition that she was "informed about income-

based repayment options prior to . . . [the] two calls" that took place on June 14,

2013 and July 26, 2013.[71]

53.     A Navient representative checked FB's eligibility for IDR during a

phone call on August 20, 2013.[72]

54.     Navient sent FB an IDR application the same day.[73]

55.     In August 2013, FB applied for IDR, and she was approved in

September 2013.[74]

---

[68] Ex. 16 at *33 (lines 3–5); Ex. 54 at 61:6–25 (FB).

[69] Ex. 16 at *34 (lines 15–17); Ex. 55 at NAV-02359393 – 9394.

[70] Ex. 54 at 111:12–113:15, 114:8–115:22 (FB).

[71] *Id.* at 128:11–14 (FB).

[72] Ex. 55 at NAV-02359395.

[73] *Id.*; Ex. 16 at *40.

[74] Ex. 16 at *42, *47; Ex. 54 at 65:8–66:11, 69:9–70:12 (FB).

56.     The same month that FB enrolled in IDR, FB told a Navient representative that Navient had "tried to do that IBR, in which the payment is still not low enough."[75]

57.     FB requested forbearances while enrolled in IDR.[76]

### 2.     UE

58.     Although UE received forbearances from her prior loan servicer, [77] UE regularly made payments for over two years after Navient started servicing her loans in September 2011.[78]

59.     On October 23, 2013, a Navient representative told UE about "an income-based repayment plan where we can lower the monthly payment amount based [on] your income."[79]   UE asked the representative to "send [her] the paperwork."[80]

60.     Navient mailed her an IDR application that same day.[81]

---

[75] Ex. 56 at *3 (lines 23–24); Ex. 54 at 71:2–73:8 (FB).

[76] Ex. 56 at *2 (line 16) through *3 (line 14), *9, *10, *17 (line 7) through *22 (line 2); Ex. 54 at 71:2–73:14; 79:17–81:25, 82:10–83:16, 86:2–93:22 (FB).

[77] Ex. 58 at *3; Ex. 57 at 41:5–9 (UE).

[78] Ex. 58 at *4; Ex. 59 at NAV-02356613 – 6655; Ex. 57 at 48:5–9, 49:22–24 (UE).

[79] Ex. 58 at *12 (line 19) through *13 (line 4).

[80] *Id.* at *14 (lines 15–18).

[81] *Id.* at *17–23; Ex. 57 at 55:14–56:13 (UE).

61.     UE acknowledged in her deposition that by October 23, 2013, "[Navient] had informed [her] about income-based repayment plans."[82]

62.     UE did not return the application and continued to make regular payments on her student loans.[83]

63.     On December 31, 2015, an individual working for a third party contacted Navient, claimed to be UE, and provided UE's personal information, including her birthdate.  On that call, the Navient representative described the IDR application process and processed a two-month forbearance to allow time to apply.[84]

64.     Navient received an IDR application for UE dated December 31, 2015.[85]

65.     On January 20, 2016, Navient sent UE a letter stating that it could not process her IDR application because it did not include the required income documentation.[86]

---

[82] Ex. 57 at 55:5–9 (UE).

[83] *Id.* at 58:2–15 (UE).

[84] Ex. 58 at *25 (line 1) through *29 (line 17); Ex. 57 at 58:16–63:24 (UE).

[85] Ex. 58 at *32–37; Ex. 57 at 64:15–67:13 (UE).

[86] Ex. 58 at *38; Ex. 57 at 71:3–72:7 (UE).

66.     UE called Navient on April 15, 2016 and confirmed that she had previously applied for IDR "through a third-party company" that "took [her] money."[87]  On that call, the Navient representative stated that UE could apply for IDR directly at studentloans.gov.  The representative processed a two-month forbearance to "give [UE] some time to get that information over."[88]

67.     UE applied for IDR and was approved on August 4, 2016.[89]

68.     Although UE had complained to the CFPB about forbearances she received from Navient, she admitted in her deposition that she may have confused Navient with her prior servicer.[90]

### 3.     VH

69.     From 2009 through 2011, Navient on at least four occasions sent VH information about Income-Based Repayment, under which she could potentially qualify for a reduction in her monthly payment based on "a federal formula that considers your income and your family size."[91]

---

[87] Ex. 60 at *3 (line 22) through *4 (line 2); Ex. 57 at 72:25–74:6 (UE).

[88] Ex. 60 at *4 (line 11) through *5 (line 13).

[89] Ex. 60 at *15; Ex. 57 at 81:6–8, 82:11–25 (UE).

[90] Ex. 60 at *17; Ex. 57 at 40:11–41:11, 84:8–88:21 (UE).

[91] *See* Ex. 14 at *1, *4, *7, *10, *13; Ex. 61 at 85:24–89:2 (VH).

70.     VH confirmed at her deposition that such letters "inform[ed]" her and her husband about "repayment options based on income."[92]

71.     VH "did not remember" whether "Navient discussed [IDR] options" during phone calls between 2009 and 2011, but she remembers calls during that period during which Navient representatives asked her "questions about household size and income . . . to determine what repayment options might work for [her]."[93]

72.     During a phone call in November 2012, a Navient representative checked whether VH and her husband were eligible for an IDR plan.[94]  The same day, Navient sent VH and her husband an IDR application.[95]  VH and her husband enrolled in IDR in December 2012.[96]

73.     The couple continued to request forbearance while enrolled in IDR.[97]

74.     In April 2013, the couple requested to be removed from IDR, and then requested a forbearance, but did not qualify because they had "already used the maximum time allowed for a forbearance."[98]

---

[92] Ex. 61 at 93:19–94:18 (VH).

[93] *Id.* at. 22:5–15, 187:5–12 (VH).

[94] Ex. 62 at NAV-02966092.

[95] *Id.* at NAV-02966093.

[96] Ex. 14 at *14–15; Ex. 61 at 118:6–24 (VH).

[97] Ex. 62 at NAV-02966100; Ex. 61 at 119:1–120:6 (VH).

[98] Ex. 14 at *16–17; Ex. 61 at 134:7–137:19 (VH).

75.    The couple reenrolled in IDR on June 28, 2014, but by February 25, 2016, their "loan [was] severely delinquent," with payments "120 days past due."[99]

### 4.    MP



76.

[100]

77.

.[101]

78.

.[102]

79.    [103]

---

[99] Ex. 14 at *18; Ex. 61 at 137:20–139:11, 141:18–145:21 (VH).

[100] Ex. 28 at *1–3; Ex. 63 at 29:8–31:12 (MP).  MP brought documents to his deposition, many of which were marked as exhibits and therefore lack Bates numbers.  *See* Ex. 63 at 39:4–39:12 (MP).

[101] Ex. 28 at *16–19; Ex. 63 at 47:20–49:25 (MP).

[102] Ex. 28 at *20.

[103] Ex. 63 at 49:23–50:4 (MP).



80.

04

81.

105

82.

106

83.

107

84.

108

---

[104] Ex. 28 at *23, *37; Ex. 64 at NAV-02358928 – 8929.

[105] Ex. 28 at *34.

[106] Ex. 28 at *10, *34, *40, *42, *43, *62; Ex. 63 at 61:16–63:9 (MP).

[107] Ex. 28 at *10, *34, *40; Ex. 63 at 64:20–65:10 (MP).

[108] Ex. 63 at 93:14–99:10 (MP); Ex. 28 at *25–33, *41.

85. ████████████████████████████████████

████████████████████████████████████ [109]

86.     The tool estimated monthly payment based on income, family size, loan type, and outstanding federal student loan debt and included an option to automatically send an IDR application at the borrower's request. [110]

87. ████████████████████ [111]

88. ████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████ [112] ██████████████████

████████████████████████████████████

███████ [113]

89. ████████████████████████████

████████████████████████████████

████████████████ [114]

---

[109] Ex. 64 at NAV-02358932.

[110] Ex. 65 at NAV-01771835 – 1837.

[111] Ex. 64 at NAV-02358932 – 8933; Ex. 63 at 65:19–68:22 (MP).

[112] Ex. 63 at 68:14–22, 71:17–24 (MP).

[113] *Id.* at 68:14–22 (MP).

[114] Ex. 64 at NAV-02358936; Ex. 63 at 72:9–73:5, 75:21–77:25 (MP).

90.   

91.

### 5.    *JB*

92.    JB received unemployment and hardship deferments online from December 2011 to July 2016, without speaking to a Navient representative.[118]

93.    During his deposition, JB did not answer whether he was unemployed while he was enrolled in unemployment deferment.[119]  When asked about his financial circumstances or employment history, he invoked the Fifth Amendment or otherwise did not answer.[120]

94.    JB produced an email he received on June 8, 2016, which asked whether he had "looked into the government's income-driven repayment plans for

---

[115] Ex. 28 at *44; Ex. 63 at 75:19–76:19 (MP).

[116] Ex. 28 at *51; Ex. 64 at NAV-02358937; Ex. 63 at 78:1–18 (MP).

[117] Ex. 64 at NAV-02358937 – 8990; Ex. 63 at 78:1–79:19 (MP).

[118] Ex. 66 at NAV-02966037 – 6045; Ex. 43 at 126:17–127:5, 138:13–140:24 (JB).

[119] Ex. 43 at 127:6–134:3 (JB).

[120] *Id.* at 10:16–20:21, 76:8–78:24, 80:20–25, 127:6–22, 133:18–134:13, 135:4–6 (JB).

federal loans."  In bold, purple text, set off from the black text of the rest of the email, the email said, "**You could even qualify for a payment of $0!**"  The email then provided instructions for applying on studentloans.gov.[121]

95.    JB remembered receiving additional emails from Navient similar to that June 8, 2016 message.[122]

96.    By the time he called Navient in August 2016, Navient had sent JB this email at least eight times.[123]

97.    On August 11, 2016, JB spoke to a Navient representative about obtaining additional deferment time, but he enrolled in a forbearance because he did not have any additional deferment time available to him.[124]

98.    The same day, Navient sent JB a letter informing him that it had "approved [his] request for forbearance."[125]  The letter also offered a "quick summary of ways to reduce or postpone your monthly payments," including a

---

[121] Ex. 67 at *1; Ex. 43 at 154:24–163:24 (JB).

[122] Ex. 43 at 164:13–15 (JB).

[123] Ex. 66 at NAV-02966042 – 6045 ("X558 – EXIT DUAR/DUEM EMAIL SNT"); Ex. 43 at 164:4–15 (JB).

[124] Ex. 66 at NAV-02966046; Ex. 43 at 186:12–187:22 (JB); *see also* Ex. 68.

[125] Ex. 67 at *5.

description of "[i]ncome-driven" repayment, under which "[y]ou may also qualify for loan forgiveness after 20 or 25 years."[126]

99.     The next day, Navient sent JB an email with the subject line "Here are some payment options that may help you."[127]  The top of the email stated, "**[JB], we have payment options that may help you.**"[128]  The body of the email thanked JB for his recent phone call and stated, "[a]s a follow-up, we want to be sure you know about additional repayment options," including the option to "reduce your monthly payments for twelve months based on your income and other factors."[129]

100.   JB enrolled in IDR in December 2016.[130]

101.   At the CFPB's request, JB signed a declaration on August 24, 2017. The declaration omitted the fact that he received multiple written communications about IDR, including a letter Navient sent at the same time it sent confirmation of JB's enrollment in forbearance.[131]  At his deposition, JB testified that the CFPB

---

[126] Ex. 67 at *8.

[127] Ex. 67 at *10–11; *see also* Ex. 43 at 194:9–198:13 (JB).

[128] Ex. 67 at *10 (emphasis in original).

[129] *Id.* at *10, *11.

[130] Ex. 67 at *13; Ex. 43 at 214:17–215:14 (JB).

[131] *See* Ex. 68.

investigator who drafted his declaration had only requested letters related to forbearance.[132]

### 6.   AN



102.

134

103.

135

104.

136

---

[132] Ex. 43 at 241:20–242:7, 248:8–25 (JB).

[133] Ex. 69 at 68:12–20 (AN); Ex. 70 at *1.

[134] Ex. 70 at *2, *4, *17, *31; Ex. 69 at 79:18–81:22, 100:18–102:10, 118:18–24, 134:23–136:12 (AN).

[135] Ex. 69 at 20:24–21:15 (AN).

[136] Ex. 69 at 111:4–113:5, 138:20–139:9, 170:14–172:5 (AN).

105. 

106.

107.

108.

---

[137] Ex. 70 at *6, *9; Ex. 69 at 108:8–110:24 (AN).

[138] Ex. 69 at 115:13–116:5 (AN); Ex. 70 at *15–16.

[139] Ex. 71.

[140] Id.

[141] Ex. 72 at NAV-06500573.

[142] Id.



[143] Ex. 70 at *24 (lines 5–12); Ex. 69 at 121:8–126:15 (AN).

[144] Ex. 70 at *25 (line 5) through *26 (line 16).

[145] *Id.* at *26 (line 15) through *28 (line 5).

[146] *Id.* at *33; Ex. 69 at 148:3–16 (AN).

[147] Ex. 69 at 151:23–152:9, 154:4–7 (AN).

[148] *Id.* at 159:25–161:9 (AN).

[149] *Id.* at 164:11–18 (AN).

[150] *Id.* at 165:6–15 (AN).

113. ███████████████████████████████████████[151]

### 7.   GJ

114.   On December 31, 2009, Navient sent a letter describing "several repayment options that help make payments more manageable," including "[i]ncome-sensitive repayment" and "[i]ncome-based repayment."[152]

115.   On April 6, 2010, GJ called Navient and enrolled in a forbearance.[153]

116.   GJ does not remember the other repayment options discussed on the call.[154]

117.   During a phone call on March 24, 2011, GJ discussed IDR with a Navient representative.[155]  The same day, Navient sent GJ an IDR application.[156] GJ was enrolled in IDR from May 2011 through August 2015, at which point he was no longer eligible under ED formulas because his income had increased.[157]

---

[151] Ex. 70 at *35; Ex. 69 at 166:4–13 (AN).

[152] Ex. 74 at *1; Ex. 73 at 93:4–95:4 (GJ).

[153] Ex. 75 at NAV-02966724; Ex. 73 at 113:18–24 (GJ).

[154] Ex. 73 at 104:23–105:3 (GJ).

[155] Ex. 75 at NAV-02966740.

[156] *Id.*

[157] Ex. 74 at *14, *23 (line 19) through *24 (line 2); Ex. 73 at 111:9–16, 129:6–8, 130:11–134:9, 140:20–141:8 (GJ).

118.    After he was no longer eligible for IDR, GJ requested a forbearance.[158]

119.    Because GJ did not pay accrued interest during the three years he was enrolled in IDR, about $3,000 in unpaid interest was capitalized when he was no longer enrolled.[159]

120.    GJ complained to Navient that he "owe[d] like 30,000 more dollars than [he] originally took out for a loan."[160]  He told the representative that he had been "screwed" by IDR and that the program was "stupid as f***."[161]

## C.    Borrowers Who Avoided Or Rebuffed Efforts To Inform Them About IDR, Or Chose Not To Enroll

### 1.    RD

121.    When RD took out FFELP loans, she signed a promissory note that listed the "Income-Sensitive Payment Plan" as a repayment option.[162]

122.    On February 12, 2009, before her first payment was due, Navient sent RD a letter stating that Navient "offers several repayment options that help make

---

[158] Ex. 74 at *2, *15, *23 (line 19) through *25 (line 14), *29 (lines 4–20); Ex. 73 at 139:3–141:25 (GJ).

[159] Ex. 74 at *12; Ex. 73 at 135:6–136:24 (GJ).

[160] Ex. 74 at *39 (line 18) through *40 (line 3).

[161] *Id.* at *39 (line 19) through *41 (line 12); Ex. 73 at 135:6–136:24 (GJ).

[162] Ex. 21 at *1–4; Ex. 76 at 101:8–104:19 (RD).

student loan payments more manageable," including "[p]ayments that are tied to your income."[163]

123.    In April 2009, RD was delinquent on her loans, and Navient sent a letter that asked, "NEED SMALLER PAYMENTS?" and went on to state that "Income-sensitive repayment allows for payments based on a percentage of your income."[164]

124.    On September 20, 2009, after speaking to RD on the phone, Navient sent RD a letter stating, "Thank you for your interest in an Income-Based Repayment (IBR) plan," along with an application and instructions for how to apply.[165]

125.    RD did not apply for IDR during that time.[166]

126.    From 2009 to 2015, Navient sent RD information about IDR at least 36 times.[167]  For example, when RD expressed difficulty making payments to Navient representatives, Navient sent a letter stating, "**Important Information –**

---

[163] Ex. 21 at *5; Ex. 76 at 122:1–8 (RD).

[164] Ex. 21 at *8–9; Ex. 76 at 130:5–132:9 (RD).

[165] Ex. 21 at *19–21; Ex. 76 at 142:10–146:14 (RD).

[166] Ex. 76 at 146:15–147:5 (RD).

[167] *See* Ex. 21 at *8–9, *10–11, *13, *16, *22, *24, *27, *30, *32, *35, *37, *40, *42, *45, *47, *48; Ex. 77 at *1, *4, *6, *7, *8, *10, *13, *15, *16, *19, *20, *21, *22–23, *25, *38, *39, *42, *44; Ex. 78 at *10, *12.

**Please Read**."  The letter listed available options, including "**Income-Related Plans** (such as Income-Based and Income-Sensitive) [which] allow monthly payments that can change annually as your income changes."[168]

127.   RD acknowledged in her deposition that "from 2010 through 2014, [Navient] sent [her] multiple letters with information about income-based repayment options," but she did not "pursue [an IDR plan] because [she] had the best one, forbearance."[169]

128.   Navient also attempted to reach RD by phone when she was delinquent, but on at least 197 occasions, she did not answer or hung up.[170]

129.   A Navient representative contacted RD on April 1, 2014.  RD confirmed that, during that call, the representative said she wanted "to see what options [RD] qualified for" but she could not do that unless RD "told [the representative her] monthly income."[171]  RD did not provide the information requested by the representative and asked if she could "call [Navient] back at another time."[172]

---

[168] *See, e.g.*, Ex. 77 at *19.

[169] Ex. 76 at 169:17–170:4 (RD).

[170] Ex. 79 at NAV-01147604 – 7672.

[171] Ex. 76 at 182:25–187:13 (RD).

[172] Ex. 77 at *33 (line 7) through *34 (line 22).

130.   RD did not call Navient back.[173]

131.   In August 2014, RD requested a forbearance online, without speaking to a Navient representative.[174]

132.   Navient again contacted RD on October 17, 2014.  The representative explained that he could "prequalify [RD] for [her] options," but when he asked for RD's "gross monthly income," RD asked if she could call him back.[175]  RD did not provide income information despite the representative explaining repeatedly that he was "trying to check on [her] options."[176]

133.   On August 28, 2015, a Navient representative contacted RD.[177]  RD explained that she was not working, and the representative pre-qualified her for "a zero dollar amount" under the "income-based program," stating that under that program "your loans are forgiven at the end of that 25 years as long as you're making payments—even if they happen to be a zero dollar payment."[178]  The

---

[173] Ex. 79 at NAV-01147646 – 7648; Ex. 76 at 187:23–25 (RD).

[174] Ex. 79 at NAV-01147649.

[175] Ex. 78 at *3 (lines 20–22), *6 (lines 12–17).

[176] Ex. 78 at *6 (line 18) through *7 (line 25); Ex. 76 at 205:19–207:17 (RD).

[177] Ex. 79 at NAV-01147661 – 7663; Ex. 76 at 213:16–214:22 (RD).

[178] Ex. 78 at *17 (lines 4–16); Ex. 76 at 213:16–214:22 (RD).

representative processed a forbearance to cover past-due payments and sent RD an IDR application.[179]

134.   RD did not apply for IDR at that time.[180]

135.   In October 2015, a Navient representative again sent an IDR application after speaking with RD on the phone.[181]

136.   RD applied for unemployment deferment through February 2017.[182] In April 2017 she applied for and was approved for an IDR plan.[183]

137.   RD did not make any payments on her student loans from 2011 to 2014,[184] yet she consistently "made monthly payments on all [her] vehicles," which included a 2012 BMW X3 and before that a 2010 BMW 328i.[185]

138.   RD testified that "from 2010 to 2015, [she] was not focused on [her] school loans," and "if [she] didn't get on an income-based repayment plan back then, it wasn't intentional."[186]

---

[179] Ex. 78 at *20–21, *25–36.

[180] Ex. 76 at 225:9–18 (RD).

[181] Ex. 80 at *10 (lines 4–8), *14–25; Ex. 76 at 228:20–24, 241:8–25 (RD).

[182] Ex. 80 at *26–29; Ex. 76 at 243:6–244:19, 322:14–323:1 (RD).

[183] Ex. 79 at NAV-01147679.

[184] Ex. 76 at 180:17–182:6 (RD).

[185] *Id.* at 86:24–88:2 (RD).

[186] *Id.* at 194:5–10 (RD).

139.   On August 18, 2017, RD signed a declaration drafted by the CFPB stating that Navient had consistently informed her that her "best and only repayment option . . . was forbearance" and that she learned about the IBR plan only after completing her "own research in 2015."[187]

140.   When asked about the statements in her declaration, RD explained that she did not "intentionally lie" by signing the declaration because she "didn't remember" the calls in which Navient informed her about IDR options.[188]

### 2.   ZB

141.   Although ZB testified that she did not remember whether she read about IDR options on the Navient website, she testified that she had visited the website[189] and "would have" clicked on a link entitled "Repaying your student loans."[190]

142.    Initially, Navient serviced only ZB's FFELP loans.[191]

143.   ZB's first payment on those loans was due in May 2011 because she had been enrolled in an in-school deferment and then had a grace period.[192]

---

[187] Ex. 81 at ¶¶ 7–8.; Ex. 76 at 315:11–316:17 (RD).

[188] Ex. 76 at 217:9–17 (RD).

[189] Ex. 82 at 83:12–18 (ZB).

[190] Ex. 8 at *12; Ex. 82 at 83:19–84:15 (ZB).

[191] Ex. 82 at 180:9–23 (ZB).

[192] Ex. 8 at *16; Ex. 82 at 79:15–81:3 (ZB).

144.   On February 10, 2011, Navient sent a letter asking, "Want to lower your scheduled payments?" and stating that Navient "offers several repayment plans," including "Income-Sensitive Repayment" and "Income-Based Repayment."[193]

145.   ZB was delinquent on her loans from 2011 to 2014 on multiple occasions, and at least 22 times, she received delinquency letters informing her that she "may be eligible" for "lower monthly payments provided through income-sensitive, income-contingent or income-based repayment plans."[194]

146.   In December 2011, Navient sent a letter notifying ZB that she was close to default and stating that she "may still be eligible for . . . repayment plans such as income-sensitive and income-based repayment."[195]

147.   Navient began servicing ZB's Direct Loans in April 2012, by which time she had already defaulted on those loans.[196]

148.   ZB confirmed that she "read letters from [Navient]" and that "[Navient] informed [her] about income-related plans."[197]

---

[193] Ex. 8 at *14; Ex. 82 at 75:9–23 (ZB).

[194] *See, e.g.*, Ex. 8 at *18, *20, *23, *25, *27, *29; Ex. 22 at *7, *9, *11, *14, *16, *19, *22, *24, *26, *28, *31, *34, *36, *38, *41, *43.

[195] Ex. 8 at *29.

[196] Ex. 22 at *1, *4; Ex. 82 at 182:8–183:2 (ZB).

[197] Ex. 82 at 76:5–9, 111:4–9, 116:16–23 (ZB).

149.   Navient representatives attempted to reach ZB on the phone, but on at least 403 occasions, ZB did not answer or hung up.[198]

150.   In February 2012, ZB's loans were 254 days delinquent and she was nearing default.[199]

151.   At that time, ZB spoke with a Navient representative, who processed a forbearance to bring her account current.[200]   The representative also sent ZB an application for unemployment deferment and processed a forbearance of 21 days that provided time "to fill out the unemployment deferment request."[201]

152.   ZB did not apply for an unemployment deferment at that time.[202]

153.   On January 12, 2015, ZB spoke to a Navient representative who told her that she was "pre-eligible for zero dollar monthly payments with the income-based repayment program," sent ZB an IDR application, and stated that ZB could apply at studentloans.gov.[203]   The representative processed a forbearance effective

---

[198] *See, e.g.*, Ex. 83 at NAV-02966819 – 6905.

[199] *Id.* at NAV-02966828; Ex. 8 at *31.

[200] Ex. 8 at *33; Ex. 83 at NAV-02966827 – 6828; Ex. 82 at 112:2–113:9 (ZB).

[201] Ex. 8 at *36–40, *35; Ex. 83 at NAV-02966827 – 6828; Ex. 82 at 112:2–113:22 (ZB).

[202] Ex. 83 at NAV-02966827 – 6828.

[203] Ex. 30 at *6 (lines 3–24), *10–21; Ex. 82 at 185:23–186:22 (ZB).

until March 14, 2015 and stated that ZB "would need to get that [IDR] application turned in before then" to avoid going "straight back into repayment."[204]

154.   ZB did not apply for IDR until October 2015, but she was approved on October 6, 2015.[205]

155.   ZB did not renew her IDR plan the next year and instead applied for another unemployment deferment.[206]

156.   The unemployment deferment application she signed stated "[i]nstead of deferment, I may be eligible for a repayment plan that determines my monthly payment amount based on my income."[207]

157.   In January 2017, a Navient representative recommended that ZB re-apply for IDR, stating, "you would still want to get back on the income-based program so that when [your loans] go into repayment, you'll have a payment based on your income and your family size."[208]

158.   ZB applied and was approved until July 25, 2018.[209]

---

[204] Ex. 30 at *6 (line 23) through *7 (line 23).

[205] *Id.* at *24; Ex. 83 at NAV-02966879; Ex. 82 at 197:22–199:20 (ZB).

[206] Ex. 30 at *25–26; Ex. 82 at 199:25–202:6 (ZB).

[207] Ex. 30 at *26; Ex. 82 at 200:20–203:14 (ZB).

[208] Ex. 30 at *32 (line 23) through *33 (line 7); Ex. 82 at 204:3–207:5 (ZB).

[209] Ex. 30 at *40.

159.   ZB does not remember the repayment options she discussed with Navient between 2011 and 2016.[210]

160.   ZB testified in her deposition that the sworn statement in her declaration that "[f]rom 2010 through 2014, the only repayment option that [Navient] offered was forbearance" was incorrect, [211] stating, "[n]ow that we're sitting here reading these letters, the letters say that I was offered more than that."[212]

### 3.   CP

161.   From 2009 to 2015, CP was delinquent on 16 monthly payments[213] and received 6 forbearances to bring her account current.[214]

162.   Before and after receiving forbearances, CP received information about IDR.[215]  For example, on November 27, 2009, she received a letter that she was past due and advising her that she "may be eligible for reduced payment

---

[210] Ex. 82 at 101:4–102:10 (ZB).

[211] Ex. 84 at ¶ 9.

[212] Ex. 82 at 151:7–155:8 (ZB).

[213] *See, e.g.*, Ex. 7 at *2, *4, *8, *10, *17, *19, *21, *23, *26, *35, *37; Ex. 85 at *1, *4, *7, *10, *12, *25.

[214] Ex. 86 at NAV-02967236 – 7237, NAV-02967240 – 7241, NAV-02967244 – 7245, NAV-02967256, NAV-02967260 – 7261, NAV-02967266 – 7267.

[215] *See, e.g.*, Ex. 7 at *8–9, *12, *15–17, *19, *21–22, *25, *28, *35, *37; Ex. 85 at *1–2, *3, *4, *6, *7.

options, such as interest-only payments, income-based repayment and income-sensitive repayment."[216]

163.   On October 20, 2010, Navient sent CP a letter asking, "Want to lower your scheduled payments?" and stating that "[Navient] offers . . . several repayment options that help make payments more manageable," including "[i]ncome-based repayment with payments that are tied to your income, family size, and total outstanding balance of eligible loans."[217]

164.   On December 10, 2010, Navient sent a letter describing "Repayment Plan Options," including information about "Income-Sensitive Repayment," and "Income-Based Repayment."[218]

165.   She received a similar letter at least six times.[219]

166.   CP confirmed at her deposition that such documents "inform[ed] [her] of a variety of repayment options," "[i]ncluding payments that are tied to your income."[220]

---

[216] Ex. 7 at *12.

[217] *Id.* at *25.

[218] *Id.* at *28; Ex. 87 at 128:19–131:18 (CP).

[219] Ex. 7 at *28; Ex. 85 at *3, *22, *23, *27, *29.

[220] Ex. 7 at *1, *7; Ex. 87 at 99:17–102:2, 113:14–115:17 (CP).

167.    CP also "recall[ed] inquiring about . . . payments that are tied to my income" sometime after 2011.[221]

168.    In November 2013, a Navient representative asked CP on the phone "[w]hat if we lower down your regular monthly payments to something you can afford on a monthly basis?"[222]  CP stated that she did not want to pursue that option, and did not answer when asked, "do you receive any public assistance from the government, Medicaid, food stamps?"[223]

169.    Navient sent CP a letter that same day explaining that she "may qualify" for "Income-Related Plans (such as Income-Based and Income-Sensitive)," which "allow monthly payments that can change annually as your income changes."[224]

170.    CP did not apply at that time.[225]

171.    During a phone call on January 2, 2015, a Navient representative modeled CP's eligibility for IDR.[226]  After the call, Navient sent CP an IDR

---

[221] Ex. 87 at 102:7–15 (CP).

[222] Ex. 85 at *19 (lines 1–3); Ex. 87 at 191:14–193:5, 205:16–208:4 (CP).

[223] Ex. 85 at *18 (line 19) through *19 (line 18); Ex. 87 at 191:14–193:5, 205:16–208:4 (CP).

[224] Ex. 85 at *22; Ex. 87 at 209:17–210:19 (CP).

[225] Ex. 86 at NAV-02967284 – 7286.

[226] *Id.* at NAV-02967186 – 7187.

application.[227]  CP applied for IDR on April 13, 2015 but was denied because she did not meet the "federal definition of 'partial financial hardship.'"[228]

172.   CP submitted a sworn declaration to the CFPB stating that Navient only told her about forbearance and that she had enrolled in forbearance in January 2011.[229]

173.   CP submitted an unemployment deferment application to Navient on January 5, 2011.[230]

174.   CP testified that she did not know the difference between an unemployment deferment and forbearance when she submitted her declaration.[231]

### 4.   LF

175.   When LF took out FFELP loans in 2006, she signed a promissory note describing IDR.[232]

---

[227] *Id.*

[228] Ex. 85 at *31.

[229] Ex. 88 at ¶ 5.

[230] Ex. 7 at *33; Ex. 87 at 138:8–147:18 (CP).

[231] Ex. 87 at 144:15–145:7, 146:9–19 (CP).

[232] Ex. 89 at 50:24–55:17 (LF); Ex. 90 at *5 ("**Income-Sensitive Repayment Plan** – If I choose this plan, my monthly payments will be adjusted annually based on my expected total monthly gross income from all sources.  I may call my lender at any time for more information about this repayment plan option.").

176.    On January 20, 2009, when she was scheduled to begin repaying her loans, Navient sent LF a letter stating that Navient "offers several repayment options that help make student loan payments more manageable," including "[p]ayments that are tied to your income."[233]

177.    From 2009 through 2014, she received information about IDR at least 18 times.[234]

178.    LF does not remember the repayment options that she discussed with Navient representatives from 2009 to 2014.[235]

179.    On January 27, 2010 and February 3, 2012, LF requested and received forbearances online without speaking to a Navient representative.[236]

180.    On April 23, 2015, a Navient representative discussed repayment options with LF and "pre-qualified" her for the "income-based repayment program," explaining that her payment under this plan could be as low as "zero

---

[233] Ex. 90 at *10–13; Ex. 89 at 58:14–60:21 (LF).

[234] Ex. 90 at *14–16, *19–21, *22–24, *25–27, *33; Ex. 91 at *1–3, *4–5, *6–7, *8–9, *10–11, *12, *13–15, *16–17, *18–19, *20–21, *22–23, *24–25, *26; Ex. 31 at *15, *18.

[235] Ex. 89 at 84:14–85:8, 86:12–20, 96:10–12, 173:11–175:24 (LF).

[236] Ex. 90 at *34–35, *36–37; Ex. 89 at 77:7–82:3, 94:17–95:21 (LF).

dollars."[237]  The representative applied a forbearance to cover past-due amounts and sent LF an IDR application.[238]

181.  LF did not apply for IDR at that time.[239]

182.  On July 15, 2015, LF called Navient to request another forbearance to bring her loans current so that she could apply for an apartment.[240]  After asking LF questions about her income and family size, the representative approved a forbearance until December 2016.[241]

183.  In January 2016, LF again contacted Navient and asked to "defer [her] loan."  The representative offered to "pre-qualify [LF] for other options."  Based on the financial information LF provided, the representative informed her that she "may be eligible to have a zero [dollar] payment for 12 months and that's renewable every year."[242]  LF responded that she was interested in this plan.  The representative sent LF IDR application instructions, processed a forbearance to

---

[237] Ex. 91 at *29 (line 25) through *31 (line 7); Ex. 89 at 122:14–123:14 (LF).

[238] Ex. 91 at *31 (lines 5–24); Ex. 89 at 125:13–128:10 (LF).

[239] Ex. 89 at 133:3–16 (LF).

[240] Ex. 91 at *35 (line 4) through *36 (line 10); Ex. 89 at 130:19–134:19 (LF).

[241] Ex. 91 at *36 (line 14) through *37 (line 16), *43 (line 24) through *44 (line 3); Ex. 89 at 133:17–134:19 (LF).

[242] Ex. 31 at *5 (line 7) through *8 (line 7); Ex. 89 at 137:24–140:17 (LF).

cover the past-due amounts, and applied a forbearance to "postpone [her] payments for 60 days while waiting for th[e] application to go through."[243]

184.   LF submitted the application in February 2016 and was approved that month.[244]

### 5.   AK

185.   On at least four occasions, Navient sent AK letters regarding the availability of "lower monthly payments provided through . . . income-based repayment plans."[245]

186.   On at least two occasions, Navient representatives informed AK that she would likely "qualif[y] for Income-Based Repayment" including the possibility of a "current monthly payment [of] zero to $10 per month."[246]  The representatives told AK that she could "apply online at . . . studentloans.gov."[247]

187.   A Navient representative explained to AK that, together with IDR, the public-service forgiveness program would enable her to "have a zero-dollar

_____

[243] Ex. 31 at *1–3, *8 (line 2) through *11 (line 5).

[244] Ex. 31 at *13–14; Ex. 89 at 143:8–23 (LF).

[245] Ex. 92 at *1; *see also, e.g.*, *id.* at *3, *6, *8, *11.

[246] Ex. 248; Ex. 92 at *17 (lines 1–6); *accord* Ex. 249; Ex. 92 at *29 (lines 12–20), *30 (lines 15–16).

[247] Ex. 248; Ex. 92 *17 (lines 7–10); *accord* Ex. 249; Ex. 92 at *29 (lines 7–8), *30 (lines 10–14).

payment" for ten years, at the end of which her "entire loan would be forgiven."[248]

The representative told AK that "this is going to be an excellent option" for her,[249]

and she agreed, saying "[t]hat would be great."[250]

188.   The representative mailed AK an IDR application the same day.[251]





---

[248] Ex. 249; Ex. 92 at *29 (lines 17–20), *30 (lines 21–25).

[249] Ex. 249; Ex. 92 at *30 (lines 1–2).

[250] Ex. 249; Ex. 92 at *31 (lines 15–16).

[251] Ex. 92 at *31 (lines 17–21); Ex. 93 at 260:4–11, 267:17–268:14 (AK).

[252] Ex. 93 at 300:10–16, 302:7–16 (AK).

[253] *Id.* at 266:19–267:16 (AK).

[254] *Id.* at 128:5–129:11 (AK).

[255] *Id.* at 129:11–131:3 (AK).

[256] *Id.* at 130:4–10, 271:9–10, 272:17–273:14 (AK).

### 6.    KR

192.    KR consolidated his FFELP loans in 2005 and selected a standard repayment plan instead of IDR.[257]

193.    Initially, Navient serviced KR's consolidated loan and one private loan.[258]

194.    After KR defaulted on five other federal student loans in 2005 and 2006 and completed federal loan rehabilitation, Navient began servicing those loans as well.[259]

195.    KR testified that "church contributions, car payments and mortgage payments [were] higher [financial priorities] than [his] student loan payments at certain points in time."[260]

196.    Between 2005 and 2014, KR did not answer a large number of phone calls from Navient.[261]

---

[257] Ex. 95 at *1–*7; Ex. 94 at 63:7–64:12, 65:18–66:21, 101:22–102:10 (KR).

[258] Ex. 96 at NAV-01576289 – 6291.

[259] Ex. 97 at *10, *12, *14, *16, *19.

[260] Ex. 94 at 172:10–174:25 (KR).

[261] *See, e.g.*, Ex. 96 at NAV-01576291 – 6594.

197.   On at least two occasions when KR answered, he did not provide identifying information.[262]

198.   On at least one occasion, he hung up the phone in the middle of the conversation.[263]

199.   On at least 11 occasions, KR referred to the agents as "b**ch," "dumb*ss," and other profanities.[264]  For example, on June 28, 2012, KR called the representative a "stupid b**ch" before asking what options were available.[265]  The representative responded that KR could "possibly apply[] for income-based repayments."  KR interrupted the representative and asked for someone "more competent."[266]  After the representative again stated that he could "possibly be[] able to apply for income based repayment,"[267] KR responded, "Look, b**ch, I don't want to talk to you."[268]

---

[262] *See, e.g.*, Ex. 98 at *16 (line 1) through *20 (line 10); Ex. 99 at *15 (line 1) through *17 (line 12), *38 (lines 1–18); Ex. 100 at *19 (line 1) through *24 (line 17); *see also* Ex. 94 at 146:2–151:17, 152:17–154:2, 195:4–197:15, 279:24–281:23 (KR).

[263] Ex. 99 at *27 (line 17) through *28 (line 2); Ex. 94 at 212:10–22 (KR).

[264] Ex. 222 at NAV-01576047, NAV-01576052, NAV-01576055, NAV-01576068, NAV-01576142, NAV-01576204, NAV-02966658, NAV-02966663, NAV-02966665, NAV-02966666, NAV-02966668.

[265] Ex. 99 at *39 (lines 1–10); Ex. 94 at 221:24–222:2 (KR).

[266] Ex. 99 at *39 (lines 11–18); Ex. 94 at 222:25–223:7 (KR).

[267] Ex. 99 at *39 (lines 19–21); Ex. 94 at 223:21–224:18, 227:24–228:6 (KR).

[268] Ex. 99 at *40 (lines 2–9); Ex. 94 at 230:6–10 (KR).

200.   From June 2009 to June 2013, KR received more than 50 letters describing "Income-Sensitive Repayment [which] allows for payments based on a percentage of your income (4% - 25%)" and "Income-Based Repayment [which] determines your monthly payment amount by taking into account your income, family size, and total amount borrowed."[269]

201.   KR requested and received at least three forbearances to cover past-due amounts.[270]

202.   On September 10, 2013, Navient warned KR that he needed to make a "minimum payment" otherwise Navient would "default the loan" and it would "be sent to third-party collections." [271]  KR responded by saying "Okay, that's not going to happen, ever," and "I told you that I don't care."[272]

203.   He again defaulted.[273]

## IV.   NAVIENT'S PROCEDURES INSTRUCTED REPRESENTATIVES TO DISCUSS APPROPRIATE REPAYMENT OPTIONS

204.   Since at least October 2011 until October 2015, Navient's servicing procedures have stated in a red box that "Forbearance should not be considered

---

[269] Ex. 95 at *8–9, *11–36; Ex. 98 at *1–14, *38–43; Ex. 99 at *1–13, *30–36; Ex. 101 at *1, *5–46; Ex. 100 at *1–10.

[270] Ex. 95 at *10; Ex. 98 at *44–46; Ex. 101 at *2–4.

[271] Ex. 100 at *27 (line 9) through *28 (line 8).

[272] *Id.*

[273] Ex. 94 at 71:8–73:16 (KR).

until all other options have been exhausted."[274] ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ [275]

205.   Since at least October 2011, Navient's procedures for borrowers experiencing difficulty making their loan payments have guided representatives to ask questions to determine the "[r]oot [c]ause" of borrowers' hardship[276] and to then discuss appropriate repayment options depending on whether the borrower needs a "[s]hort [t]erm or [l]ong [t]erm solution."[277]  The procedures guide representatives to suggest IDR to borrowers "experiencing long term financial hardship."[278]

---

[274] Ex. 102 at NAV-01665845 – 5847; *see also* Ex. 103 at NAV-01054696; Ex. 104 at NAV-01000510; Ex. 105.

[275] Ex. 106 at NAV-01001505; Ex. 107 at NAV-03210952.

[276] Ex. 102 at NAV-01665846 – 5847; Ex. 103 at NAV-01054696; Ex. 104 at NAV-01000510; Ex. 105 at NAV-03197206; *see also* Ex. 106 at NAV-01001504.

[277] Ex. 102 at NAV-01665846 – 5847; Ex. 103 at NAV-01054696; Ex. 104 at NAV-01000510; Ex. 105 at NAV-03197206; *see also* Ex. 106 at NAV-01001504; Ex. 107 at NAV-03210952.

[278] Ex. 102 NAV-01665846 – 5847; Ex. 103 at NAV-01054696; Ex. 104 at NAV-01000510; Ex. 105 at NAV-03197206; *see also* Ex. 106 at NAV-01001505; Ex. 107 at NAV-03210952.

206.   Representatives are also guided, when discussing IDR, to estimate borrowers' monthly IDR payments based on their family size, marital status, and annual gross income.[279]

207.   Since at least July 2011, Navient's procedures have stated that borrowers who enroll in IDR may be eligible for "a $0 monthly payment."[280]

208.   Since at least March 2014, representatives interacting with delinquent borrowers have been instructed to use an online tool that "guide[s] [the representative] through the right repayment option for the customer."[281]  The tool prompts the representatives "to ask specific questions designed to determine the best option for the borrower based on their current situation," including "questions geared to determine eligibility for $0 IBR."[282]

209.   Before granting a forbearance over the phone, Navient requires a borrower to agree that "you are willing but temporarily unable to make your payments due to hardship" and that "you may be eligible for repayment options, which include . . . income driven repayment plans."[283]

---

[279] *See* Ex. 65 at NAV-01771835 – 1836.

[280] Ex. 108 at NAV-00980415.

[281] Ex. 148 at 181:22–24.

[282] Ex. 109 at NAV-01668302; *see also* Ex. 110 at NAV-01671255.

[283] Ex. 111 at NAV-01723760.

210.   Navient has processes for monitoring and reviewing representatives' phone calls with borrowers, using scorecards to rate representatives' compliance with Navient's procedures.[284]

211.   Although scorecards have changed over time, the scorecards have asked, for instance, whether the "[b]est repayment option/deferment [was] offered based on customer needs," and whether "the agent provide[d] the best solution for the customer's situation."[285]

212.   As part of Navient's quality assurance process, representatives are also scored based on, among other things, how well they follow Navient's instructions to ask "probing questions" to "confirm[] [the] customer's best option."[286]

213.   When Navient identifies a call where a representative does not discuss appropriate repayment options, Navient's practice has been to "provide the

---

[284] *See, e.g.*, Ex. 112 at 62:22–66:14, 85:10–12, 89:15–93:15 (Jeckell); Ex. 113 at 34:10–17, 93:9–94:8, 99:22–100:1 (Wisnewski); Ex. 114 at 48:24–49:25 (Potomis).

[285] Ex. 115 at NAV-01967974; Ex. 116 at NAV-02949977; *see also* Ex. 117 at NAV-04836996; Ex. 118 at NAV-04354127; Ex. 119 at NAV-02949848; Ex. 120 at NAV-02069894.

[286] Ex. 121 at NAV-02579984, Ex. 122 at NAV-02659442; Ex. 114 at 152:3–153:11, 159:12–23 (Potomis).

feedback to the agent" and "call the customer back" to discuss available options, including IDR plans where appropriate.[287]

214.   Representatives who receive low scores may have their bonuses "reduce[d] or even eliminate[d]" under Navient's incentive-compensation plan.[288] Representatives with consistently low scores may face termination.[289]

215.   A Navient supervisor testified after listening to the August 2016 call with JB that, had he listened to the call during Navient's regular call monitoring, he would have found "infractions" of the Company's policies and practices:  He stated that the representative on the call with JB "should have . . . look[ed] into income-driven repayment option[s]," and that the supervisor would have provided "a lot of coaching" to the representative.[290]

---

[287] Ex. 112 at 66:4–25, 203:15–204:4 (Jeckell); Ex. 123 at 186:14–187:10, 188:21–190:8 (Bailer).

[288] Ex. 124 at 180:18–181:15 (Powell); *see also* Ex. 123 at 22:18–28:20 (Bailer); Ex. 125 at 43:3–46:9 (Catt); Ex. 126 at NAV-01515891 – 5893.

[289] Ex. 123 at 187:6–10 (Bailer).

[290] Ex. 124 at 169:9–173:25, 179:19–180:4 (Powell); *see supra* ¶ 97.

**V.    NAVIENT INFORMED BORROWERS ABOUT THE NEED TO RECERTIFY THEIR IDR ELIGIBILITY**

### A.    Navient's Letters Regarding IDR Renewal

216.    Since at least 2009, Navient has sent borrowers whose IDR enrollment periods are expiring a renewal letter accompanied by an enrollment renewal form.[291]

217.    To borrowers with FFELP loans, Navient has sent its H356 letter and an accompanying "Income-Based Repayment Plan Request Form" ("IBR Request Form").[292]  Templates for this letter state that it is "[s]ent to income based borrowers 90 days prior to their income based expiration due date."[293]

218.    The H356 letter, which was dated, stated that the borrower's "IBR period will expire in approximately 90 days" and that "[i]f [the borrower would] like to continue with the IBR plan," the borrower must "complete the included Income-Based Repayment Plan Request Form."[294]  The H356 letter additionally instructed borrowers that they could "fax," "mail," or "upload" their "form(s) and

---

[291] *See, e.g.*, Ex. 127 at NAV-02553937.

[292] *Id.*

[293] *Id.*

[294] *Id.* at NAV-02553939; Ex. 128 at NAV-00000085.

documentation," and provided a toll-free number for borrowers to call if they had questions.[295]

219.   No earlier than December 2011, Navient added the following language to the H356:  "Please make sure the forms are filled out completely.  By providing incorrect or incomplete information the process will be delayed. Typically, the IBR renewal process may take at least 30 days, depending on the application method."[296]

220.   The attached ED "IBR Request Form" for FFELP loans provided "instructions," information about "required . . . documentation," information about "eligibility criteria," and relevant "definitions" to aid borrowers with "the required annual reevaluation of [the] payment amount under the IBR Plan."[297]  The form also instructed:  "Before answering any questions, carefully read the entire form, including Sections 6, 7, and 9."[298]

221.   Section 7 of the ED IBR Request Form provided "Eligibility Criteria." This section stated that "[a]fter entry into the IBR plan, you must annually certify your family size and provide income documentation for determination of whether

---

[295] Ex. 127 at NAV-02553939 – 3940.

[296] Ex. 127 at NAV-02553937 ("[u]pdated language" added "02/09/12"); Ex. 131 at NAV-02132422, 2423 – 2425 (internal email showing proposed change).

[297] Ex. 128 at NAV-0000087 – 0089.

[298] *Id.* at NAV-00000087.

you have a partial financial hardship," and that "[f]or any year you do not have a partial financial hardship, your payment amount will be the payment amount for your loan[s] under the standard repayment plan with a 10-year repayment period, based on the amount owed on your eligible loan[s] at the time you initially entered the IBR plan."[299]  Section 7 further provided that "[i]n some circumstances your IBR plan monthly payment may not cover all interest that accrues, and your debt may increase," and stated that "[a]ccrued interest is capitalized at the time you choose to leave the IBR plan or no longer have a partial financial hardship."[300]

222.   To borrowers with Direct loans, Navient sent H388 renewal letters with two attached ED forms: the "Repayment Plan Selection Form" and the "Repayment Plan Choice Form."[301]  Templates for this letter state that it was "[s]ent to income based borrowers 90 days prior to their income based . . . expiration due date."[302]

223.   The H388 letter, which was dated, stated that "[y]our current IBR 12-month repayment period will expire in approximately 90 days," and "[i]f you'd like to continue with the IBR payments, please complete the included Repayment

---

[299] *Id.* at NAV-00000088.

[300] *Id.*

[301] Ex. 129 at NAV-02137835.

[302] *Id.*

Plan Selection Form."[303]  The letter further stated, "[p]lease make sure the forms are filled out completely and return them within the next 45 to 60 days," and "[i]f you don't provide the requested information, you'll remain in the IBR plan but your monthly education loan payment could increase significantly."[304]  The letter also stated that "[t]he IBR renewal process may take at least 30 days, depending on the application method."[305]

224.   Navient added the following language no earlier than December 2011: "Please make sure the forms are filled out completely. . . .  By providing incorrect or incomplete information the process will be delayed."[306]

225.   The enclosed ED "Repayment Plan Selection Form" for Direct Loans told borrowers under the "Instructions" section to "carefully read this entire form."[307]  The form notes that the borrower must "complete and return the required form(s) or other required documentation along with this Repayment Plan Selection Form,"[308] and states that "[u]ntil [the] servicer receives the information needed to

---

[303] *Id.* at NAV-02137836; Ex. 132 at NAV-00000094 – 0095.

[304] Ex. 129 at NAV-02137836.

[305] *Id.*

[306] Ex. 130 at NAV-02555158 ("[u]pdated language" added "02/09/12"); Ex. 131 at NAV-02132422, 2434–2436 (internal email showing proposed change).

[307] Ex. 132 at NAV-00000097.

[308] *Id.*

calculate your [IDR] Plan payment amount, your initial payment amount will be the full amount of interest that accumulates on your loan each month."[309]

226.   Both the IBR Request Form and the Repayment Selection Form for Direct loans stated, "WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying documents is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. [§] 1097."[310]

### B.   ED Began Requiring Servicers To Send IDR Renewal Notices In 2012

227.   In July 2012, ED issued a contract modification instructing that, by December 2012, "the servicer shall send an *annual notification of terms and conditions* to the borrower indicating that the borrower is on IBR and explaining the terms and conditions of the plan,"[311] which included an "[e]xplanation of the consequences if the borrower does not submit updated information within (10) days of the soft deadline . . . including explanation that the monthly payment amount will increase, what the new monthly payment amount will be, and any

---

[309] *Id.*

[310] Ex. 128 at NAV-00000087; Ex. 132 at NAV-00000097.

[311] Ex. 133 at NAV-00041997, 1989 (emphasis in original).

unpaid interest will be capitalized at the end of the current annual payment period."[312]

228.    Navient revised its letters to reflect these changes in December 2012.[313]

229.    Navient sent the revised letters to ED for review.[314]

230.    ED paid Navient to implement the changes.[315]

**C.    Navient Sent Borrowers Who Consented To Emails A Link To The IDR Recertification Notice**

231.    Borrowers consenting to electronic communications agreed that such communications "may be delivered to you by posting such Communications to your online account or on our website at http://mediaserver.salliemae.com, by sending such Communications to your designated email address, or by making such Communications available to you during your online session," and agreed that "[e]mail Communications may include attachments or embedded links."[316]

_____

[312] *Id.*

[313] *See* Ex. 134 at NAV-02555077; Ex. 135 at NAV-00648363.

[314] *See* Ex. 135 at NAV-00648363.

[315] Ex. 133 at NAV-00041988.

[316] Ex. 136 at NAV-03283858; Ex. 137 at NAV-02644323; Ex. 138 at NAV-03062221.

Such borrowers also agreed that such communications "would include . . . all notices and disclosures," among other types of communications.[317]

232.    Beginning in March 2010, borrowers could consent to receive electronic communications on ED's website, studentloans.gov, and borrowers were told that they "[would] receive an email notifying [them] when new correspondence is available in [their] electronic mailbox and a link to it."[318]

233.    In Spring 2014, ED updated the consent language to state that servicers would be "provid[ing] notices and correspondence" to borrowers "by posting it to [their] online account or on the servicer's website or notifying [them] at the electronic contact information listed in [their] profile."[319]

234.    Borrowers could click on a link in the email to access the IDR recertification letter and IDR renewal form in their inbox on Navient's website.[320]

**D.    The Witness Identified By The CFPB Did Not Review The Challenged Email**

235.    ████████████████████████████████████████

████████████████████████████████████[321]

---

[317] Ex. 136 at NAV-03283858; Ex. 138 at NAV-03062221.

[318] Ex. 139 at NAV-00684886; Ex. 140 at NAV-01852824.

[319] Ex. 141 at NAV-00004642.

[320] Ex. 148 at 98:20–99:15 (Navient 30(b)(6) – Peterson); Ex. 149 at 151:25–152:7 (MT).

[321] Ex. 149 at 18:6–7, 54:11–15, 63:19–22 (MT).



236.

237.

238.

239.



240.

241.

242.

---

[327] Ex. 150 at *1–5.

[328] Ex. 149 at 90:19–24 (MT).

[329] Ex. 144 at *1; Ex. 149 at 101:12–18 (MT).

[330] Ex. 144 at *1; Ex. 149 at 104:8–9 (MT).

[331] Ex. 144 at *1; Ex. 149 at 106:9–16 (MT).

[332] Ex. 149 at 101:12–25 (MT).



243.

244.

245.

---

[333] *Id.* at 92:3–5, 91:3–13, 105:13–24 (MT).

[334] *Id.* at 119:13–120:4 (MT).

[335] Ex. 144 at *2; Ex. 149 at 121:18–24 (MT).

[336] Ex. 144 at *2.

[337] *Id.*



246. ████████████████████████

████████████████ 338 ████████████████████

███████████████████████████████████████

█ 339 ███████████████████████████████ . 340

247. ████████████████████████

███████████ . 341

248. ████████████████████████

██████████████████ . 342

249. ████████████████████

███████████████████ . 343

250. █████████████████████████

███████████████████████████████████████

████████████████████████████████████ 344

---

338 Ex. 145 at *30; Ex. 149 at 145:11–24 (MT).

339 Ex. 145 at *30.

340 *Id.*; Ex. 149 at 151:25–152:7 (MT).

341 Ex. 149 at 148:10–16, 151:13–21, 183:9–13 (MT).

342 *Id.* at 123:4–6; 113:7–10 (MT).

343 *Id.* at 112:25–113:5 (MT).

344 Ex. 146 at *1, *13.

251. 

[345]

252.

[346]

### E.     The CFPB's Expert Conducted Surveys Regarding Recertification Communications

253.   The CFPB engaged Dr. Tülin Erdem to conduct surveys relating to

Navient's IDR recertification emails and letters.[347]

254.   Dr. Erdem asked respondents



[348]

[349]

255.   In her rebuttal report, Dr. Erdem stated

---

[345] Ex. 149 at 153:23–154:7 (MT).

[346] Ex. 147 at *1.

[347] Ex. 4 at ¶ 15a.

[348] *Id.* at ¶¶ 52, 60.

[349] *Id.* at ¶ 60 & fig. 6.

██████████████████████████████████████████[350]   Likewise, at her

deposition, Dr. Erdem agreed that the survey was "not actually measuring how

many respondents would have logged on to their accounts."[351]

256.   "[A]lmost every respondent [to Dr. Erdem's Recertification Notice

Survey] who saw the 2012 letter understood that the 'deadline to renew' was on or

before February 12th—90 days after the date of the letter, and the approximate

date the IBR plan would expire."[352]

## VI.   NAVIENT REQUIRED CONSECUTIVE ON-TIME PAYMENTS FOR COSIGNER RELEASE

257.   After students have graduated, borrowers may apply for cosigner

release if they meet certain requirements.[353]   Those requirements include "proof of

citizenship, proof of graduation," and a minimum number (generally 12 or 24) of

"on-time payments," which must be made consecutively.[354]

---

[350] Ex. 151 at ¶ 50.

[351] Ex. 152 at 260:21–261:4 (Erdem).

[352] Ex. 153 at ¶ 76.

[353] Ex. 155 at 41:13–22 (Stashik).

[354] *Id.* (Stashik) ("Q:  [W]hat are the current requirements for a cosigner to be released from a private student loan?  A:  Proof of citizenship, proof of graduation, 12 on-time payments[,] . . . [and] they have to meet the credit review criteria as well."); *id.* at 69:15–16 ("Q:  And there's the requirement that they're consecutive as well; is that correct?  A:  Yes.").

258.   Cosigner release will only be granted if the borrower can meet credit underwriting criteria.[355]

259.   The "on-time payments [requirement] is to demonstrate the capacity to make continuous, on-time payments" without the assistance of a cosigner.[356]

260.   Until August 2014, Navient required the payments to be made in consecutive months, even if a borrower had paid her loan ahead.[357]

261.   Navient asked the CFPB to identify "any and all false or misleading Communications," and the CFPB answered "Navient['s] . . . representation to borrowers that they could apply for co-signer release if they made a certain number of 'consecutive, on-time principal and interest payments.'"[358]

262.   Navient also asked the CFPB to "[i]dentify each Navient Borrower who allegedly was wrongly denied cosigner release for failing to make an on-time payment in each of 12 consecutive months and describe the circumstances."[359]

---

[355] *Id.* at 61:11–62:7, 105:23–25 (Stashik) (discussing Navient's practice of pulling and reviewing a credit report for borrowers applying for cosigner release).

[356] *Id.* at 46:23–25 (Stashik); *see also* Ex. 154 at 189:9–19 (Sbriglia).

[357] *Id.* at 46:11–16 (Stashik) ("Q:  If a borrower . . . paid ahead by a multiplier of two months . . . [and did not pay the following month], would that borrower be considered as making on-time payments …?  A:  That would not qualify."); *see also* Ex. 156 at NAV-01637891 – 92.

[358] Ex. 1 at *99–100, *103.

[359] *Id.* at *36.

The CFPB responded that "the complaints located at tabs C-7 through C-11 of the binder produced by the Bureau at the Rule 30(b)(6) deposition of the Bureau contain examples of Navient . . . borrowers or cosigners whose complaints suggest that they may have been wrongly denied cosigner release for failing to make an on-time payment in each of 12 consecutive months."[360]  The complaints identified by the CFPB are described below, *infra* ¶¶ 263–67.

263.   One complaint identified by the CFPB involves a complaint by a cosigner that "she was never told that the payments had to be made by the Primary Borrower."[361]

264.   One complaint identified by the CFPB involved a complaint that a cosigner wanted a "lump-sum payment made by [the cosigner]" to "count to the twenty four on time payments by the borrower."[362]  The complaint does not identify a statement made by Navient.[363]

265.   One complaint identified by the CFPB involves a borrower who took a school deferment, which "broke up the 24 consecutive monthly payments."[364]

---

[360] *Id.* at *37.

[361] Ex. 157 at *12.

[362] *Id.* at *14.

[363] *Id.*

[364] *Id.* at *10.

266.    One complaint identified by the CFPB states that the "borrower . . . alleg[es] he was misinformed with regard to whether a lump sum payment will count toward multiple payments toward Cosigner Release."[365]  The complaint does not specify when, how, or by whom the borrower was "misinformed."[366]

267.    One complaint identified by the CFPB states that a borrower who had "made twenty three (23) payments on his loans" was denied cosigner release.[367] As Navient's response to the complaint explained, the "application was denied on May 16, 2012 because [Navient] had not yet received the full 24 payments";  the "requirements for review were met with the [borrower's] June 7, 2012 payment," and the cosigner "was removed as a cosigner on June 14, 2012."[368]

## VII.    NAVIENT PROCESSES TENS OF MILLIONS OF STUDENT LOAN PAYMENTS AND TRACKS AND CORRECTS ANY PROCESSING ERRORS

### A.    Navient Processes Tens Of Millions Of Payments Each Year

268.    In 2013, Navient processed 62 million payments.[369]

---

[365] *Id.* at *8.

[366] *Id.*

[367] *Id.* at *5.

[368] *Id.* at *6.

[369] Ex. 158 at SLMA2-003-0000001.

269.    Payments on FFELP and Direct Loans in standard repayment must go "first to late charges and collection costs that are due, then to interest that has not been paid, and finally to the principal amount of the loan."[370]

270.    FFELP and Direct loans must be serviced on separate systems per ED requirements.[371]

271.    Borrowers may "include instructions with their payment, if they would like their payment . . . allocated a certain way."[372]

272.    "[W]hen a borrower makes a payment on a . . . [Direct] loan by check, it goes to the Bank of America lockbox."[373]  Bank of America is responsible for "the receipt, imaging, and depositing of those payments into Treasury."[374]  If Bank of America receives "any payment . . . with correspondence," including "special instructions," it "overnight[s] [the correspondence] to Navient."[375]

---

[370] Ex. 159 at NAV-02074498; Ex. 160 at NAV-03246005.

[371] Ex. 162 at 31:2–8 (Zemetro).

[372] Ex. 163 at 88:12–89:3 (Stine); *see also* Ex. 197, *About Payments*, https://navient.com/in-repayment/about-payments (last accessed May 16, 2020); Ex. 164 at NAV-04014369 ("You can instruct us to allocate payments differently.").

[373] Ex. 165 at 83:11–13 (Harman); Ex. 161 at 86:11–24 (Zemetro).

[374] *Id.* at 83:16–17 (Harman).

[375] *Id.* at 86:9–11, 87:2–3 (Harman).

273.    "[A]t one time," ED "was reviewing th[e] functionality [for standing instructions] and had worked with various servicers to . . . solicit input."[376]  ED "issue[d] a change request" that would have required servicers to implement standing instructions "that was later withdrawn."[377]

274.    ███████████████████████████████████████████

████████████████ [378] ███████████████████████.[379]

## B.    Navient Tracks Payment Processing Errors

275.    Navient's compliance division conducts testing on a monthly basis to ensure that Navient's representatives are following company practices, including payment processing practices.[380]

276.    The results of this testing were reviewed by Navient's Corporate Compliance Committee at their quarterly meetings.[381]

---

[376] Ex. 163 at 101:2–102:7 (Stine).

[377] *Id.* at 102:6–7 (Stine); *see also* Ex. 168 at NAV-00765665 – 5667.

[378] Ex. 166 at CFPB-NAV-0256008; Ex. 167 at CFPB-NAV-0256014.

[379] Ex. 167 at CFPB-NAV-0256014.

[380] Ex. 169 at NAV02447981 – 7983.

[381] Ex. 170 at NAV-00872042.

277.   The CFPB engaged Shannon Millard to ████████████████████████

████████████████████████████████████████████████████████████████

███████████████ [382]

278.   Millard's analysis ███████████████████████████████████

████████████████████████.[383]

## C.   The CFPB's Identified Borrowers Had Any Errors Corrected

### 1.   *KSC*

279.   In early November of 2016, KSC sent "a handwritten note [and] a check for a payoff amount."[384]  The note "explain[ed] that [KSC] wanted [a particular loan] paid off."[385]

280.   The payment "was allocated to [two] loans," such that the loan KSC had wished to pay off "was not paid off."[386]  KSC "did not follow up on this."[387]

281.   On November 21, 2016, KSC sent "a letter to Navient about [her] husband's account," with "a check to pay off a loan and then instructions about

---

[382] Ex. 3 at ¶ 16(b).

[383] Ex. 3 at ¶¶ 75–77; Ex. 171 at ¶¶ 41–43, 52–53.  For examples of Complaint Tracking Reports, *see* Ex. 172 at NAV- 03664259; Ex. 173 at NAV-03727599.

[384] Ex. 174 at 52:21–53:1 (KSC).

[385] *Id.* at 53:2–6 (KSC).

[386] *Id.* at 53:13–14 (KSC).

[387] *Id.* at 53:14–15 (KSC).

how to apply payments when there is an overpayment," but Navient "just applied [the payment] to other loans."[388]

282.   KSC testified that this letter was "sent . . . to the wrong address originally," and once sent to the correct address, the payment "[w]as . . . ultimately allocated correctly."[389]

283.   In the November 21, 2016 letter, KSC also "t[old] [Navient] how to allocate any extra payment . . . [for] all future overpayments."[390]  KSC asked that Navient "confirm that these payments will be processed as specified, or . . . provide an explanation as to why [Navient was] unable to follow the[] instructions."[391]

284.   Navient sent a letter in December 2016 explaining that "[w]e are unable to retain" the instructions KSC had sent "for future use."[392]  The letter stated, "if you want your extra payments applied in a specific manner, you will need to include instructions with each payment."[393]

---

[388] Ex. 174 at 106:2–6, 45:13 (KSC).

[389] *Id.* at 45:15–16 ("[T]hat was because I sent it to the wrong address, maybe."), 114:9–10, 124:22–25 (KSC); Ex. 175 at NAV-02968108; *see also* Ex. 174 at 108:1–11 (KSC).

[390] Ex. 174 at 103:11–24 (KSC).

[391] *Id.*

[392] Ex. 175 at NAV-02968108.

[393] *Id.*

285.   KSC testified that any harm she suffered was "in terms of . . . mak[ing] more phone calls" and "writ[ing] a letter every month with my payment."[394]

### 2.   NT

286.   NT had three complaints about Navient's payment processing,[395] all three of which arose on or after January 18, 2017.[396]

287.   First, NT found the "process to make the payment to the highest-interest-rate loan" to be "burdensome to have to go through th[e] extra step" of "having to call" Navient "just to have the money allocated to a certain loan."[397]

288.   NT acknowledged that "Navient always allocated [her] overpayments according to [her] instructions."[398]  Her complaint related instead to "the extra steps" required.[399]

_____

[394] Ex. 174 at 125:18–25 (KSC).

[395] Ex. 176 at 49:10–14 (NT).

[396] *Id.* at 50:8–12, 52:13–17, 75:17–25 (NT).

[397] *Id.* at 43:21–44:2, 64:13–18 (NT).

[398] *Id.* at 65:19–22 (NT).

[399] *Id.* at 66:22–67:10 (NT).

289. Second, NT disliked that, "if [she] made [an] overpayment [on one loan], the auto debit would be distributed to the other loans that had an amount due but not to the loan [she] had already paid."[400]

290. When NT called Navient about this issue, "[t]hey made sure that that money got allocated" as she requested.[401] The issue was also corrected going forward.[402]

291. Third, when NT called Navient and asked that a loan be "split apart from the rest" so that she could pay it separately, the representative did so, but NT was bothered that she would "have to do this every single time [she] want[ed] to split apart a loan."[403] Navient never refused to "break out a particular loan."[404]

### 3. SW

292. ████████████████████████████████████████

████████████████████[405] ██████████████████████████

████████████████████████.[406]

---

[400] *Id.* at 44:20–24, 41:8–43:5 (NT).

[401] *Id.* at 77:24 (NT).

[402] *Id.* at 79:17–23 (NT).

[403] *Id.* at 46:2–21 (NT).

[404] *Id.* at 72:8–11 (NT).

[405] Ex. 177 at 145:8–16, 147:6–10 (SW).

[406] *Id.* at 146:6–10 (SW).

293. ██████████████████████████████

████████████407 ████████████████████████

████████████408

294. █████████████████████████████

████████████409

**4.    *TC***

295. ████████████████████████

██████████████████████████410

296. First, ████████████████████████████

██████████████411 ████████████████████

████412

297. Second, ██████████████████████████

████████████413

---

407 *Id.* at 147:15–19 (SW).

408 *Id.* at 104:20–22 (SW).

409 *Id.* at 87:3–4, 147:15–156:6 (SW).

410 Ex. 178 at 91:2–8 (TC).

411 *Id.* at 91:9–12 (TC).

412 *Id.* at 91:16–20 (TC).

413 *Id.* at 91:21–24 (TC).

298. 

299. Third,

300.

5.    *CH*

301.   CH "attempt[ed] to enroll in automatic debit" as early as "May of 2016," but Navient "did not" "begin automatically withdrawing payments" as CH expected.[419]

---

[414] *Id.* at 91:25–92:1, 62:15–63:3, 63:21–64:4 (TC).

[415] *Id.* at 92:18–93:5 (TC).

[416] *Id.* at 92:23–25 (TC).

[417] *Id.* at 127:19–20 (TC).

[418] *Id.* at 127:23–128:9 (TC).

[419] Ex. 179 at 35:11–19; 40:18–23 (CH).

302.    "At least part of the problem" was caused by loans that had entered repayment being "grouped together" with loans that were not yet in repayment.[420]

303.    CH estimated that in total he spent "in the realm of maybe 8 to 14 hours" trying to resolve his automatic payment issue.[421]

304.    "[B]eginning in November 2016, Navient did, in fact, begin . . . withdrawing [CH's] payments automatically."[422]

305.    "[I]n the interim," between CH's first attempt to enroll in automatic payments and the first time a payment was withdrawn automatically, "no late fees were assessed," and CH suffered no financial consequences.[423]

## VIII.   Navient Accurately Reported The "AL" Code For Loans Assigned To The Government

306.    The Fair Isaac Corporation ("FICO") and VantageScore are credit modeling companies with their own proprietary models for calculating credit scores.[424]

---

[420] *Id.* at 84:14–19 (CH).

[421] *Id.* at 159:3–12 (CH).

[422] *Id.* at 129:13–16 (CH).

[423] *Id.* at 130:17–131:15 (CH).

[424] Ex. 254 at 10 n.6, *available at* cdiaonline.org/wp-content/uploads/2019/10/Credit-Bureaus-in-the-Digital-Age_paper.pdf ("VantageScore scores are based on models produced by VantageScore Solutions, LLC, which is a joint venture of the three national credit bureaus.  FICO scores are based on models produced by FICO.").

307.   FICO and VantageScore are not members of the Consumer Data Industry Association's ("CDIA") "Metro 2 Format Task Force" ("Task Force").[425]

308.   CDIA's "Credit Reporting Resource Guide" ("CRRG") states that "[w]hile all applicable fields within the Metro 2 Format should be reported, these guidelines provide specific values that apply to Student Loans."[426]

309.   For each student loan account it services, Navient must report a number of pieces of information each month, including the Payment History Profile, which indicates "up to 24 months of consecutive payment activity" and whether the borrower has "payments past due," and the Account Status, which identifies the status of the account.[427]

310.   A "Special Comment" Code is "[u]sed in conjunction with Account Status (Field 17A) and Payment Rating (Field 17B) to further define the account (e.g., closed accounts or adjustments pending)."[428]   The guidelines for Student Loan Reporters lists the following "Special Comment Codes" for loans that are

---

[425] *See* Ex. 180 at NAV-01144586 ("The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis and TransUnion and is supported by the CDIA.").

[426] *Id.* at NAV-01144599.

[427] *Id.* at NAV-01144608 (listing these fields as "required"); *see also* NAV-01144599 (providing "applicable fields within the Metro 2 Format . . . that apply to Student Loans").

[428] *Id.* at NAV-01144634.

"transferred": "O, AH, AL, AN, AT."[429]  For example, "AH," means that the account has been "Purchased by Another Company."[430]

311.   A loan that is discharged due to total and permanent disability ("TPD") is transferred and assigned to ED.[431]

312.   Navient reported the following information for non-defaulted, TPD-discharged loans:  a Payment Rating of "0;" a Date of First Delinquency of "00000000;" and a Payment History Profile.[432]

313.   A Payment Rating of "0" indicated that the account was current (as opposed to Payment Rating "G," which indicated that an account was in collections).[433]

---

[429] *Id.* at NAV-01144599.

[430] *Id.* at NAV-01144693.

[431] *See* Ex. 181 at NAV-01854024.

[432] *See* Ex. 182 at NAV-04895572 █████████████████████████

█████████████████████████████████████████████████

█████████; *infra ¶¶* 311–13, *see also* Ex. 180 at NAV-01144807.

[433] Ex. 180 at NAV-01144632 (stating that "Payment Rating" is reported as 0 for "current account").

314.   A Date of First Delinquency of "00000000" indicated that there was no delinquency.[434]

315.   A Payment History Profile provided historical on-time payment information.[435]

316.   In 2011, the CDIA changed the guidelines for reporting TPD-discharged loans and ███████████████████████████████ ████████████████████████████████████████ ██████[436]

317.   The CRRG describes the Special Comment Code 'AL' as "Student loan assigned to government."[437]

318.   For "student loans that are guaranteed," the CRRG states, "05 (Account transferred) with Special Comment Code AL (Account assigned to

---

[434] *Id.* at NAV-01144638 (providing that "Date of First Delinquency" should be reported in "MMDDYYYY" format and noting that "[f]or Account Status Code[] 05" "the Date of First Delinquency should be zero filled" for accounts that are "current").

[435] *Id.* at NAV-01144633 (stating that Payment History Profile should report "0" where "0 payments [are] past due").

[436] Ex. 183 at NAV-00003385.

[437] Ex. 180 at NAV-01144694; *see also id.* at NAV-01144807 (noting that the "Special Comment Code states 'Student loan – assigned to government.'").

government) – Use this combination of codes when a claim was accepted and paid by the guarantor."[438]

## IX.   EVEN THOUGH THE "AL" CODE DID NOT INDICATE DEFAULT, NAVIENT REMOVED THE CODE FROM BORROWERS' ACCOUNTS

319.   In June 2012, Navient emailed Debbie Seneway, Navient's contact at the Task Force, regarding "a question [that] has been raised about the new reporting guidelines for student loans that are guaranteed and claim accepted/paid by the guarantor."[439]  In a follow-up email, Navient asked, "If our delinquency defaults are reported now with an 05/AL combination, if and when we receive notification that an account was successfully rehabbed, how and what would we remove or charge as the record of default with the new reporting rules on this original trade . . . .  Or would nothing need to be updated since the 05/AL doesn't necessarily reflect 'default' status like the 88 or AB did?"[440]

320.   On July 11, 2012, Seneway replied, "No action would be needed since the combination of Status 05 and Special Comment AL does not specify 'default.'"[441]

---

[438] *See id.* at NAV-01144802.

[439] Ex. 184 at NAV-00003409.

[440] *Id.* at NAV-00003408.

[441] *Id.*

321.    In October 2012, Navient began reporting Account Status Code "05" and Special Comment "AL" for loans with claims that had been accepted and paid by the guarantor, including for borrowers whose claims to discharge their student loans due to TPD had been accepted and paid.[442]

322.    On May 17, 2013, in response to Navient's inquiry, FICO emailed Navient stating that Special Comment Code "AL" "is still considered negative by the FICO Score."[443]

323.    That day, Navient forwarded the email to Seneway stating, "[FICO] is still considering [AL] to be negative . . . There is [a lot] of confusion out there and it seems like [FICO's] treatment of these special comment codes is not at all in line with industry rehab process and what benefits it should give to the borrowers.  Can I get your thoughts?"[444]

324.    After meeting with the Task Force, Seneway replied on June 4, 2013 stating, "The CDIA Metro 2 Format Task Force reviewed the guidelines for reporting rehabilitated loans and confirmed that the guidelines are correct.  We do

---

[442] *See* Ex. 253 at NAV-01144836.

[443] Ex. 186 at NAV-00003412.

[444] *Id.* at NAV-00003411.

not believe that Account Status 05 (transferred) and Special Comment AL (assigned to government) mean that the loan is in default."[445]

325.   In November 2013, Navient started to manually remove the "AL" code from its reporting each month.[446]

326.   In an April 3, 2014 letter, FICO stated that the reporting of the "AL" Code "is not inaccurate:  [The borrower] did have a loan that was discharged through an assignment to the federal government."[447]  The proprietary model employed by FICO "treated [the discharge] as a negative indicator, just as it would any other discharge of a debt or assignment of the debt."[448]

327.   In June 2014, Navient implemented a system-wide process to cease reporting the "AL" code for all TPD-discharged loans.[449]

---

[445] *Id.*

[446] *See* Ex. 185 at NAV-02512338 (Email from Leanne Carson to Tracy Stine, Evelyn Capodanno, and Robert Sommer, Nov. 14, 2013) ███████████
███████████████████████████████ Ex. 187 at 112:24–114:11 (Carson).  An "AUD" is a "manual account correction through e-OSCAR."  *Id.* at 113:7–8 (Carson).

[447] Ex. 188.

[448] *Id.*

[449] *See* Ex. 189 at NAV-01141454.

328.   The AL code was removed from all TPD-discharged loans as of

December 2014, after Navient asked the credit reporting agencies 

[450]

329.   Michael Pierce, Senior Advisor to the CFPB Student Loan

Ombudsman, and other CFPB staff,

.[451]

330.   The CFPB engaged Dr. Michael A. Turner to

[452]

## X.   PIONEER INFORMED BORROWERS ABOUT THE BENEFIT OF REHABILITATION

331.   After 270 days without payments, federal loans enter default, which

has consequences that include the unpaid balance becomes due immediately;

collections fees may be added to the balance of the loan; borrowers may have their

---



[450] Ex. 190 at NAV 03158142

[451] *See* Ex. 191 at CFPB-NAV-0256460

Ex. 192 at CFPB-NAV-0010075

[452] Ex. 193 at ¶ 1.

wages garnished and tax refunds and federal benefits payments withheld; they are no longer eligible for benefits like deferment and forbearance; they cannot receive additional federal student aid; and their credit suffers.[453]

332.   There are four options to exit default: 1) paying off the entire loan balance, 2) reaching a settlement, 3) completing the federal loan rehabilitation program ("rehabilitation"), 4) or consolidating the loans ("consolidation").[454]

333.   According to ED, payment in full is "not a practical option for most borrowers."[455]

---

[453] *See* Ex. 194, *Student Loan Delinquency and Default*, https://studentaid.ed.gov/sa/repay-loans/default (last accessed May 16, 2020); 20 U.S.C. § 1095a(a) (authorizing ED or a Guaranty Agency to pursue recovery of defaulted loans through administrative wage garnishment).

[454] *See* Ex. 195, *Getting Out of Default*, https://studentaid.gov/manage-loans/default/get-out (last accessed May 16, 2020) (explaining that repayment in full, loan rehabilitation, and loan consolidation are three ways to get out of default).

[455] *See id.*

## A.     Federal Loan Rehabilitation Provides Unique Benefits

334.    When an ED loan is rehabilitated, ED waives all remaining collection fees at the time of rehabilitation.[456]  Guaranty agencies ("GAs") typically waive only a portion of fees.[457]

335.    Under both rehabilitation and consolidation, the missed payments leading up to the default remain on the borrower's credit report for seven years.[458]

336.    Only rehabilitation removes the record of default.[459]

337.    ED has set a "goal of increasing borrower participation in the loan rehabilitation program."[460]  It has stated that "rehabilitation offers benefits for students, the Department, and the Nation."[461]

---

[456] *See* Ex. 196 at NAV-03641583 ███████████████████████ ████████████████

[457] Ex. 198 at NAV-00062586 (noting that, for loans owned by GAs, collection costs are reduced to 16 % once the loan is out of default).

[458] *See* Ex. 195.

[459] *See id.* (explaining that "loan rehabilitation provides certain benefits that are not available through loan consolidation" and indicating that only rehabilitation provides removal of record of default).

[460] *See* Notice of Final Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 78 Fed. Reg. 65,768, 65,776 (Nov. 1, 2013) (referring to "the Department's goal of increasing borrower participation in the loan rehabilitation program").

[461] *Id.* at 65,784.

338.    The CFPB has stated, "If you are currently in default on a federal student loan and you are interested in pursuing an option that offers the lowest monthly payment or the greatest opportunity to protect your credit record, you may wish to look into rehabilitation."[462]

### B.    Pioneer Trains Its Agents Regarding The Benefits Of Rehabilitation

339.    Defendant Pioneer Credit Recovery, Inc. ("Pioneer") services federal student loans in default on behalf of both ED and the GAs and helps borrowers enroll in and complete rehabilitation.[463]

340.    ED contracts with Pioneer to "[l]ocate and contact borrowers" in default in order to "resolve their debt," including through rehabilitation.[464]

341.    Pioneer issues training manuals for agents regarding rehabilitation of ED and GA loans.[465]  These manuals include "Rehab Talk Offs," which are "guidelines . . . to be followed when pitching a rehabilitation program to a debtor."[466]

---

[462] Ex. 199, CFPB, *Rehabilitation*, *available at* https://www.consumerfinance.gov/paying-for-college/repay-student-debt/#federal:yes:yes:no (emphasis omitted).

[463] *See* Ex. 200 at 22:20–24:17, 57:15–58:11, 61:19–62:3 (Frazier).

[464] Ex. 201 at NAV-00093685, 3693, 3706.

[465] *See, e.g.*, Ex. 202; Ex. 203; Ex. 204.

[466] Ex. 198 at NAV-00062586; Ex. 202 at NSI-016-0028590.  *See also* Ex. 200 at 130:14–132:16, 166:2–16, 173:3–21 (Frazier).

342.   Until April 2014, Pioneer's training manual for ED loans stated, "[a]ll of the collection fees are removed once you complete the program," and "[a]fter a minimum of 9 qualifying payments have been made, the defaulted student loan is eligible to be taken out of default and the record be removed from the borrower's credit report (all three national credit bureaus); and a positive trade displaying the new balance is placed on the credit report."[467]

343.   This manual also included a "Rehab Talk Off," which read, "I have great news for you!  You have qualified for a rehabilitation program.  What you will need to do is make a minimum of 9 qualifying monthly payments.  After all payments are made, a new servicer will pay off the Department of Education for you.  You will then in turn owe the new servicer, which means you will no longer be in Federal Default.  All the collection fees will be removed at the time of sale.  Also, it will be completely deleted from your credit report as though it never happened."[468]

344.   As of April 21, 2014, Pioneer updated its training manual for ED loans, including revising the "Rehab Talk Off" to state, "[a]fter you have made your ninth payment and provided any necessary documentation, your loan(s) will

---

[467] Ex. 205 at NAV-00122089.

[468] *Id.* at NAV-00122105.

be transferred to a new servicer that will take over collecting on your loan(s) . . . .
Once that happens, you will no longer be subject to having your taxes offset or
wages garnished and any remaining collection fees on your loan(s) will be
waived."[469]

345.   On July 11, 2014, Pioneer again revised the ED training manual.[470]
The "Rehab Talk-Off" was revised to state the following with respect to the credit
reporting benefit:  "[T]he Department of Education will notify the credit bureaus to
remove the default status from the credit report for the rehabilitated loan(s)."[471]
The collection-fees section of the Talk Off was not changed.[472]

346.   The manual for GA loans outlined the "Rehabilitation Program" and
stated that the "benefits" to borrowers include that "[o]nce the loan is removed
from default, the delinquent trade line with [Client Name] will be removed from
[the Credit Bureau Report] and a[n] open, current trade will be added."[473]  The
manual also included a "Rehab Checklist" which stated that "[o]nce out of default,
the delinquent trade line with [client name] will be removed."[474]

---

[469] Ex. 204 at NAV-01916551.

[470] Ex. 203 at NAV-00062744.

[471] *Id.* at NAV-00062746.

[472] *Id.* ("[A]ny remaining collection fees on your loan(s) will be waived.").

[473] Ex. 206 at NAV-03739932.

[474] *Id.* at NAV-03739933.

347.   In August 2013, Pioneer published a "Rehabilitation Talk Off" for GA loans.[475]  The Talk Off stated that, "[o]nce [the borrower's] loan is removed from default, [his/her] delinquent trade line with [Client Name] will be removed from [the borrower's] current report as if it never existed and replaced with an open, current trade."[476]

348.   On July 11, 2014, Pioneer released a "Rehab Process Guide" for GA loans.[477]  The Rehab Talk Off included in the Guide stated the following with respect to the credit reporting benefit:  "Once your loan is removed from default, [client name] will notify the consumer reporting agencies to delete the derogatory trade line from your credit report regarding your loan(s).  In addition, your prior lender that reported the default of the loan(s) approved for rehabilitation will be notified and will be requested to remove the record of default from your credit history."[478]

## C.    The CFPB's Identified Calls With Borrowers About Rehabilitation All Predate January 2014

349.   The CFPB has identified 236 calls in which it claims that Pioneer representatives made deceptive statements regarding credit reporting and collection

---

[475] Ex. 207 at NAV-00562076.

[476] Ex. 208 at NAV-00562078.

[477] Ex. 198 at NAV-00062584.

[478]  *Id.* at NAV-00062586.

fees.[479]  Each of those calls occurred between January 1, 2012 and March 31, 2013.[480]

350.   The CFPB has identified two borrowers in support of its claims against Pioneer.[481]

### 1.   KMC

351.   In February 2010, KMC consolidated her federal student loans into a Federal Direct Consolidated Loan.[482]

352.   In 2013, KMC defaulted on her consolidated federal student loan.[483]

353.   KMC testified that her "credit sucks," which "limits [her] financial options" and "always will."[484]  She explained that her "car insurance went up" and that bad credit "made it so that [she] wasn't able to take out . . . personal loans . . . to start [her] own business."[485]  She further testified that she needed to get out of

---

[479] Ex. 209 at *11–14, *17–22, *54–63.

[480] Ex. 210 at 3 ███████████████████████████████████
████████████████

[481] Ex. 2 at *12, *22.

[482] Ex. 211 at *1; Ex. 212 at 59:7–10, 62:24–64:3, 75:3–7 (KMC).

[483] Ex. 212 at 82:17–84:9 (KMC).

[484] *Id.* at 91:19–21 (KMC).

[485] *Id.* at 97:14–20 (KMC).

default in order to receive financial aid for her master's degree, which she needed for her job.[486]

354.   KMC owed over \$58,000 on her defaulted loans, and she had "already consolidated" her defaulted student loan.[487]   KMC acknowledged at her deposition that, because it was "not realistic" for her to "pay [her loans] in full," she lacked any option other than "to go into . . . the rehabilitation program."[488]

355.   On May 3, 2013, a Pioneer representative connected to KMC via phone.[489]

356.   With respect to credit reporting, the representative stated, "[A]fter your ninth payment, this is going to be waived off of your credit report showing that this was never in collections."[490]

357.   With respect to collection fees, the representative made two statements as follows:

358.   "PIONEER REP: [Y]ou've actually accrued in penalties and fees \$11,450.93.  [KMC]: Oh, my God.  PIONEER REP: When – when you're back in

---

[486] *Id.* at 44:17–22, 53:25–54:19, 88:24–89:14, 120:3–14 (KMC).

[487] *Id.* at 117:18–118:9, 139:23–140:7 (KMC).

[488] *Id.* at 105:22–106:15 (KMC).

[489] Ex. 247; Ex. 211 at *8–9 (KMC).

[490] Ex. 247; Ex. 211 at *15:7–10 (KMC).

good standing after the ninth payment, that's going to be waived off of your – your

balance.  Okay?  [KMC]: Okay.  PIONEER REP: They're going to actually

remove those, so you're going to be paying only your principal and interest."[491]

359.   "PIONEER REP: And what happened when you consolidate all your

loans together, your interest and your collection fees actually combine together, but

just think, after this program, though, you're going to be saving yourself

$11,000."[492]

360.   KMC enrolled in the rehabilitation program in May 2013 with a

monthly payment amount of $362.[493]

361.   KMC completed the rehabilitation program in January 2014, and she

was no longer in default.[494]

362.   KMC testified that getting out of default allowed her to receive

additional financial aid to get her master's degree.[495]  KMC testified that if she did

not get her master's degree she "would still be making $30,000.00 a year" and that

the degree has "allowed [her] to have a little bit more financial stability."[496]

---

[491] Ex. 211 at *15:12–22.

[492] Ex. 247; Ex. 211 at *36:4–9 (KMC).

[493] Ex. 211 at *57.

[494] Ex. 212 at 223:14–20 (KMC).

[495] *Id.* at 83:14–19, 97:25–98:17 (KMC).

[496] *Id.* at 54:4–13 (KMC).

### 2.  JS

363.   JS testified that he took out approximately six or eight federal student loans and that "[a]s far as [he] is aware," he defaulted on all of them.[497]

364.   Prior to enrolling in rehabilitation with Pioneer, JS had completed "the first rehabilitation through ECMC,"[498] and as a result, JS knew how the rehabilitation program worked and was aware of its benefits.[499]

365.   By April 2013, JS had not taken any action with respect to his defaulted loans, but the government had taken an offset from JS's tax refund, reducing the amount he owed on his loans to $14,979.65.[500]

366.   On May 2, 2013, a Pioneer representative connected to JS via phone.[501]

367.   The representative made the following statements related to credit reporting and collection fees:

368.   <u>Collection fees</u>: REPRESENTATIVE: Okay.  So right now if we got you into a program it could actually save you $2,900 because we would –

---

[497] Ex. 213 at 57:2–16, 59:4–61:18 (JS).

[498] *Id.* at 61:7–13, 68:17–24 (JS).

[499] Ex. 252; Ex. 214 at *4 (lines 6–16), *18 (lines 1–5).

[500] Ex. 213 81:6–82:8 (JS).

[501] Ex. 214 at *9; Ex. 213 at 93:2–6 (JS).

CUSTOMER: Yeah.  I mean -- REPRESENTATIVE: -- do it and remove all of the collection fees.[502]

369.  Collection fees and credit reporting: "REPRESENTATIVE: After all the payments are made the new lender would pay off the Department of Education for you, and then you would in turn, owe the new lender which means you would no longer be in federal default.  So the only person who would know that you were ever in default was yourself, so this completely removed from the credit report. All the collection fees would be removed at the time of sale, which at this time is $2,949.03.  So those fees would be completely removed and you would not pay those fees.  CUSTOMER: Okay.  REPRESENTATIVE: "It would also be completely deleted from the credit report as of then and you would be eligible for additional financial aid once the loan has funded and is out of default and also once the loan is funded and is out of default you would not have to worry about the administrative wage garnishment."[503]

370.  Collection fees and credit reporting: "I mean, you would save $2,800 by all the collection fees being removed and completely removed from your credit report.  This is a great program."[504]

---

[502] Ex. 214 at *11 (lines 20–25).

[503] *Id.* at *18 (line 12) through *19 (line 5).

[504] *Id.* at *24 (lines 1–4).

371.   JS enrolled in the rehabilitation program in May 2013 with a monthly payment amount of $34.[505]

372.   JS completed the rehabilitation program in January 2014, and he was no longer in default.[506]

373.   At his deposition, when asked whether "there [were] any downsides to completing the rehabilitation," JS answered "[n]o."[507] When asked whether "there [were] any positives," JS identified "fiscal responsibility" and agreed that "no longer hav[ing] those loans in default" was another "positive."[508]

374.   When asked whether he "ha[d] any complaints with respect to participating in the rehabilitation program with Pioneer," JS answered "[n]o," and when asked whether he was "glad that [he] was able to get the loans that [he] rehabilitated with Pioneer out of default," JS answered, "[y]es."[509]

## XI.   NAVIENT SIGNED A TOLLING AGREEMENT

375.   The CFPB and Navient agreed "to a suspension of the running of any applicable unexpired statute of limitations for any cause of action or related claim

---

[505] *Id.* at *41.

[506] Ex. 213 at 127:22–128:24 (JS).

[507] *Id.* at 130:7–130:10 (JS).

[508] *Id.* at 130:11–130:19 (JS).

[509] *Id.* at 131:8–131:15 (JS).

or remedy that could be brought against Navient by the Bureau arising from its investigation," from January 20, 2015 until January 19, 2017.[510]

376.   Navient Corporation and Pioneer did not sign the tolling agreement with the CFPB.[511]

---

[510] Ex. 215 (Tolling Agreement); Ex. 216 (First Extension); Ex. 217 (Second Extension).

[511] *Id.*

Dated:  May 19, 2020          Respectfully submitted,

/s/ Jonathan E. Paikin
Jonathan E. Paikin (DC 466445) (*pro hac vice*)
Daniel P. Kearney (DC 977148) (*pro hac vice*)
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
jonathan.paikin@wilmerhale.com
daniel.kearney@wilmerhale.com
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Daniel T. Brier (PA 52348)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
dbrier@mbklaw.com
Tel: 570-342-6100
Fax: 570-342-6147

*Counsel for Navient Corporation, Navient Solutions, LLC, and Pioneer Credit Recovery, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363