# EXHIBIT 148

# In the Matter of:

# CFPB v. Navient Corporation, et al.

*June 8, 2018*
*Patricia Peterson*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

--- Page 1 ---

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3
 4   CONSUMER FINANCIAL PROTECTION   )
 5   BUREAU,                         )
 6              Plaintiff,           ) Case No.
 7        vs.                        ) 3:17-CV-00101-RDM
 8   NAVIENT CORPORATION, et al.,    )
 9              Defendants.          )
10   --------------------------------)
11
12                   Friday, June 8, 2018
13
14                   Consumer Financial Protection Bureau
15                   1990 K Street, NW
16                   Washington, DC
17
18
19        The above-entitled matter came on for
20   investigational hearing, pursuant to notice, at
21   9:40 a.m.
22
23
24
25
```

--- Page 2 ---

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE CONSUMER FINANCIAL PROTECTION BUREAU:
 4        NICHOLAS JABBOUR, ESQ.
 5        ANDREA MATTHEWS, ESQ.
 6        Consumer Financial Protection Bureau
 7        1990 K Street, NW
 8        Washington, DC 20006
 9        (202) 435-7591
10        nicholas.jabbour@cfpb.gov
11        andrea.matthews@cfpb.gov
12
13   ON BEHALF OF NAVIENT AND THE WITNESS:
14        JONATHAN E. PAIKIN, ESQ.
15        KARIN DRYHURST, ESQ.
16        DANIEL KEARNEY, ESQ.
17        Wilmer Cutler Pickering Hale & Dorr LLP
18        1875 Pennsylvania Avenue, NW
19        Washington, DC 20006
20        (202) 663-6703
21        jonathan.paikin@wilmerhale.com
22        karin.dryhurst@wilmerhale.com
23        daniel.kearney@wilmerhale.com
24             and
25
```

--- Page 3 ---

```
 1        MIKE KILGARRIFF, ESQ.
 2        Kirkland & Ellis LLP
 3        665 Fifteenth Street, NW
 4        Washington, DC 20005
 5        (202) 879-5149
 6        mike.kilgarriff@kirkland.com
 7             and
 8        MATTHEW SHELDON, ESQ.
 9        Navient Solutions LLC
10        2001 Edmund Halley Drive
11        Reston, Virginia 20191
12        (703) 984-6732
13        matthew.sheldon@navient.com
14
15   ALSO PRESENT:
16        April Carter, Video Specialist
17
18
19
20
21
22
23
24
25
```

--- Page 4 ---

```
                    I N D E X
            DEPOSITION OF PATRICIA PETERSON
                    JUNE 19, 2018

EXAMINATION                              PAGE
   By Mr. Jabbour                           6

EXHIBITS MARKED                          PAGE
   Number 1                                 7
   Number 2                                 7
   Number 3                                22
   Number 4                                27
   Number 5                                75
   Number 6                                85
   Number 7                                96
   Number 8                               104
   Number 9                               118
   Number 10                              124
   Number 11                              149
   Number 12                              152
   Number 13                              153
   Number 14                              180
```

97

1  reviewed this letter?
2      A. I know they received a copy of the letter, but I
3  don't know if there was an affirmative approval or
4  denial that was required. They don't typically require
5  us to get their approval before putting a letter in, but
6  we did share with them a copy of the letter.
7      Q. How do you know that a copy was shared with the
8  department?
9      A. Based on the prep we saw some correspondence
10 that was sent to them. I could be -- I know they've
11 seen some of our letters. This H356 may not have been
12 one of them, but I know there are some letters they have
13 seen. I don't recall if H356 was one.
14     Q. And when you're referring to some letters that
15 they have seen, are you referring to some
16 recertification letters in particular, regardless of
17 whether it's the H356 letter, or just letters generally?
18     A. Letters generally. In the course of my prep, I
19 recall seeing a letter that they -- that was sent to
20 them. I don't recall which letter it was.
21         (Peterson Exhibit Number 7 was marked for
22 identification.)
23         BY MR. JABBOUR:
24     Q. Ms. Peterson, you've been handed what's been
25 marked as Exhibit 7, and this is a slide from a

98

1  presentation given by Navient Solutions to the Bureau
2  and others, that I believe you may have been at, in
3  Chicago at some point. And you can take however long
4  you need to review it.
5      A. I'm fine.
6      Q. Do you recognize the -- both of the documents
7  that are depicted on this slide?
8      A. Yes, I've seen them before.
9      Q. And these are images of emails that borrowers
10 received at different points in time concerning the
11 needs to recertify their enrollment in income-driven
12 repayment. Is that right?
13     A. Yeah, these are the -- the wrapper, the
14 correspondence that they would see, and these are at --
15 like you said, two different points in time.
16     Q. And when you refer to the wrapper, what does
17 that mean?
18     A. It actually is the letter that goes into the
19 customer's inbox, into their email address itself.
20     Q. And then to access the -- a separate letter,
21 they have to click something in that email. Is that
22 right?
23     A. To see the full -- the rest of the
24 communication, which in a lot of cases it's the same as
25 what's in the wrapper, they would go into what we call

99

1  the media server to pick up the full correspondence.
2      Q. The media server, is that something that's
3  accessed through the MYL portal?
4      A. They can get to it from there, yes.
5      Q. Is there another way to access it?
6      A. Well, it's technically it's a separate -- they
7  can -- they have to log in, like they're going into it,
8  but it's technically a separate application from MYL.
9      Q. Okay. So it requires a login, but they're just
10 not actually accessing the document on the MYL portal?
11     A. Technically speaking, yes.
12     Q. Okay. Do email wrappers go through the same
13 drafting and approval process as letters that are sent
14 through the mail?
15     A. Yes.
16     Q. Is there a communication event document for
17 emails, similar to what is on Exhibit 6?
18     A. It's a -- this wrapper is a part of a letter.
19 So there is -- they go together. When we say we're
20 going to change a letter, we're either going to create a
21 specific wrapper like what's on the right, or we're
22 going to use a general wrapper like what's on the left.
23 And that decision and that is documented through this
24 same communication event.
25     Q. Does the communication event indicate both --

100

1  does it contain both the email wrapper and whatever
2  documents are linked from the email wrapper in a single
3  communication event, or would there be two communication
4  events, one for the email wrapper and one for any letter
5  that's linked from the email wrapper?
6      A. I'm not sure if it's two events or if it's just
7  one.
8      Q. And you used the word "specific" versus
9  "general" wrapper. Are those terms that the company
10 uses?
11     A. I am not sure how the correspondence team calls
12 them, but the one on the left is the general or generic,
13 it's a -- it is not specific to a -- tied to a specific
14 letter, versus the one on the right is only used for a
15 specific letter, in this case the renewal letter -- or
16 one of the renewal letters.
17     Q. So the general or generic wrapper -- when you
18 say it's not tied to a specific letter, that means that
19 there's no description in the wrapper as to what it
20 concerns?
21         MR. PAIKIN: Object to form.
22         THE WITNESS: It means that the customer needs
23 to get the specific information from the media server to
24 get the actual content. We're giving them information
25 that says, you have correspondence available, log in to

181

1 borrower has been in repayment when you come up with the
2 solution, make sure the borrower understands that they
3 are going to have to make monthly payments, make sure
4 that they understand that then, you know, in the case of
5 income-driven repayment, they're going to have to
6 qualify year over year.
7      So it's guiding the conversation. So I think
8 that's consistent with how I would describe it and we as
9 a company describe it.
10      (Peterson Exhibit Number 14 was marked for
11 identification.)
12      BY MR. JABBOUR:
13   **Q. You've been handed what has been marked as**
14 **Exhibit 14 with the Bates number NAVAG-0077778. Let me**
15 **know when you're ready to discuss the document.**
16   A. I'm ready.
17   **Q. Do you know where this document came from?**
18   A. I don't know specifically this version, I know
19 that this is a document that is a part of KS and used
20 by -- used to explain the options for a CRS agent to
21 talk through, and this is -- we have something in CRS
22 called a pop pad that is actually what's used to guide
23 the CRS agent through the right repayment option for the
24 customer, and this is just a visual depiction at the
25 very highest level of what that pop pad is doing.

182

1   **Q. When you say pop pad, that's P O T?**
2   A. P O P. Or power pad or pop pad, I think it's
3 referenced both ways.
4   **Q. You referenced that this tool is used in CRS, so**
5 **it's used primarily for delinquent customers?**
6   A. Yes.
7   **Q. Okay, I was hoping you could help me understand**
8 **parts of this tool. Is this a tool that's still used**
9 **today?**
10   A. The pop pad? Yes.
11   **Q. Did you say this was part of the pop pad, or --**
12   A. So to give you a visual depiction of what the
13 pop pad is. So the pop pad is an interactive tool that
14 our CRS agents interact with when they're talking to the
15 customer. So it gets its name pop, because it pops the
16 series of questions depending on the customer's
17 situation, and the answers that they give us. So it
18 guides them down to what the specific options that would
19 fit their condition would be.
20      And again, this particular document is not what
21 the CRS agents are referencing, they're using the actual
22 pop pad that guides them through that conversation.
23   **Q. Okay, so this is a visual depiction of some of**
24 **the questions that are asked on the pop pad?**
25   A. I'd probably describe it slightly different.

183

1 This is a visual depiction of what at the very highest
2 level could happen depending on how the customer answers
3 the questions. So this is, you know, where the customer
4 option that would show up, depending on how they answer
5 the questions. And these are not all of the questions
6 that are answered -- asked within the pop pad, these are
7 just very broad questions.
8   **Q. Okay. So I want to make sure I understand it**
9 **correctly. If the answer to the initial question, the**
10 **start question, is no, that the borrower cannot bring**
11 **the account current with a check, credit or debit, the**
12 **next question is can the borrower make a lower monthly**
13 **payment. And if the answer to that question is no, then**
14 **there are two options.**
15      **If the borrower cannot make a payment today but**
16 **can resume their next scheduled payment, voluntary**
17 **forbearance should be implemented. Let's say that's not**
18 **the case. Let's say the borrower cannot resume their**
19 **next scheduled payment. So we go to the right.**
20      **Am I okay so far, or have I described anything**
21 **incorrectly?**
22      MR. PAIKIN: Are you describing the chart or are
23 you describing a process, just to be clear? Because the
24 document speaks for itself. If that's what you're --
25 just to clarify your question.

184

1      BY MR. JABBOUR:
2   **Q. Do you understand my question?**
3   A. If -- can you clarify? I was going to ask if
4 you were talking about the document or the flow. So --
5   **Q. I'm talking about a hypothetical borrower for**
6 **which a customer service or a CRS employee is using this**
7 **tool. So a borrower calls in, the CRS employee asks if**
8 **the borrower is able to bring the account current with**
9 **check, credit, or debit. The answer is no. The**
10 **employee then asks, can you resume your next scheduled**
11 **payment? The answer again is no.**
12      **And so then we get to -- we get to the question,**
13 **"does the borrower pre-qualify for deferment or**
14 **nonverbal forbearance." Do you see that?**
15   A. Yes.
16   **Q. And have I described the process correctly so**
17 **far in this hypothetical?**
18      MR. PAIKIN: Object to form. You have
19 mischaracterized her prior testimony.
20      THE WITNESS: This is not what the agents would
21 work from. They'll have that pop pad that's actually
22 driving the conversation, so they would never look at
23 this particular flow chart in their normal course of
24 their work throughout the day.
25      BY MR. JABBOUR:

1  DISTRICT OF COLUMBIA, to wit:

2

3      I, Sally Jo Quade, CERT, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before

4  me at the time and place herein set out, and after having been duly sworn by me, according to law, was

5  examined by counsel.

6      I further certify that the examination was recorded stenographically by me and this transcript is a

7  true record of the proceedings.

8      I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor

9  related to any of the parties, nor in any way interested in the outcome of this action.

10

    As witness my hand and notarial seal this 22th

11  day of June, 2018.

12

13

14  *[signature: Sally Jo Quade]*

15      Sally Jo Quade, CERT
    Notary Public

16

17

18

19

20

21

22

23

24

25