# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 3:CV-17-00101 |
| | ) | (Hon. Robert D. Mariani) |
| v. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| Navient Corporation, *et al.,* | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

COUNTER STATEMENT OF FACTS ....................................................................2

I.   NAVIENT SERVICES STUDENT LOANS PRIMARILY ON BEHALF OF THE
     FEDERAL GOVERNMENT ..........................................................................2

II.  NAVIENT PROVIDED BORROWERS INFORMATION ABOUT REPAYMENT
     OPTIONS, INCLUDING IDR OPTIONS ...................................................4

     A.   Federal Repayment Options ...................................................4

     B.   Navient Provided Borrowers With Information About IDR
          (Counts I And II) ...................................................................4

     C.   Navient Informed Borrowers About The Need To Renew
          Enrollment In IDR (Counts III And IV) ................................8

III. NAVIENT REQUIRED CONSECUTIVE ON-TIME PAYMENTS FOR COSIGNER
     RELEASE (COUNT V) ................................................................................10

IV.  NAVIENT PROCESSES TENS OF MILLIONS OF STUDENT LOAN
     PAYMENTS, AND TRACKS AND CORRECTS ANY ERRORS (COUNT VI) ...........11

V.   NAVIENT ACCURATELY REPORTED INFORMATION REGARDING TPD-
     DISCHARGED STUDENT LOANS ACCORDING TO ITS POLICIES AND
     PROCEDURES (COUNT XI) .......................................................................13

VI.  PIONEER EXPLAINED THE BENEFITS OF FEDERAL LOAN
     REHABILITATION (COUNTS VII THROUGH X) .................................15

ARGUMENT ..........................................................................................................18

I.   THE CFPB'S MOTION ON COUNTS I AND II SHOULD BE DENIED
     BECAUSE THE CFPB CANNOT ESTABLISH ANY UNFAIR OR ABUSIVE
     ACTS OR PRACTICES WITH RESPECT TO "STEERING" ...................................19

     A.   The CFPB Cannot Show That Navient Had A Practice Of
          "Steering" Borrowers Into Forbearance Without Advising
          Them About IDR................................................................20

1.      Navient's Consistent Policy And Practice Was To Inform Borrowers About IDR And Discuss Forbearance As A Last Resort ...................................................................21

2.      The CFPB Has No Evidentiary Support For Its Claims Regarding The "Methods" By Which Navient Encouraged "Steering"............................................................22

3.      The CFPB's Evidence Regarding Purported Instances Of Steering Fails To Demonstrate That Navient Engaged In An Unfair Or Abusive Practice................................................26

4.      The CFPB's Theories Regarding The "Reasons" Navient Might Have Engaged In Steering Are Contradicted By Its Own Evidence ...........................................................30

B.      The CFPB Fails To Establish Any Abusive Or Unfair Acts ..............34

     1.      The CFPB Cannot Satisfy The Elements Of Unfairness Or Abusiveness With Isolated Calls .........................................35

     2.      When (Inappropriately) Applied To Isolated Calls, The CFPB's "Steering" Criteria Remain Divorced From The Actual Elements Of Unfairness And Abusiveness ..................40

II.    THE COURT SHOULD DENY THE CFPB'S MOTION ON COUNTS III AND VI BECAUSE THE CFPB HAS FAILED TO PROVE ANY UNFAIR PRACTICES ....................................................................................43

A.      The CFPB Fails To Prove Navient's Use Of Secure Emails Was An Unfair Practice................................................................43

     1.      The CFPB Has No Evidence That Any Borrower Experienced "Substantial Injury" That Was "Not Reasonably Avoidable" ............................................................44

     2.      The CFPB Ignores The Countervailing Benefits of Secure Emails...............................................................46

B.      The CFPB Failed To Establish Any Unfair Practices In Navient's Payment Processing ...........................................................48

      1.    The CFPB Does Not Identify A Specific "Act or Practice" That "Caused" Any Particular Injury ........................ 48

      2.    There Is No Evidence of "Substantial Injury" ........................ 50

III.    THE CFPB CANNOT ESTABLISH DECEPTION AS REQUIRED FOR COUNTS IV AND V ................................................................................ 54

    A.    The CFPB Cannot Establish That The Renewal Notices Were Materially Misleading ............................................................ 54

    B.    The CFPB Cannot Establish That Statements Regarding Cosigner Release Were Materially Misleading ................................. 57

      1.    The Statements Were Not False .................................. 57

      2.    There Is No Evidence The Statements Were Likely to Mislead Or Material .................................................. 58

IV.    THE CFPB CANNOT ESTABLISH ANY DECEPTION WITHIN THE APPLICABLE LIMITATIONS PERIOD ON COUNTS VII THROUGH X ................. 61

    A.    There Is No Evidence of Any Alleged Misstatements Within the Statute of Limitations Period ........................................... 62

    B.    The CFPB Has No Evidence That Any Alleged Misstatement Was Misleading ..................................................................... 64

    C.    The Alleged Misstatements Were Not Material ................................. 65

V.    THE CFPB CANNOT MEET ITS BURDEN ON COUNT XI BECAUSE SPECIAL COMMENT CODE "AL" WAS ACCURATE AND NAVIENT HAD REASONABLE PROCEDURES ............................................................. 67

    A.    Navient's Credit Reporting For TPD-Discharged Loans Was Accurate ............................................................................... 67

    B.    A Reasonable Juror Could Conclude That Navient's Policies And Procedures Were Reasonable ........................................... 70

VI.    SUMMARY JUDGMENT AGAINST NAVIENT CORPORATION SHOULD BE DENIED ................................................................................ 73

CONCLUSION ................................................................................ 75

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adams v. Berger Chevrolet, Inc.*,
   No. 1:00-cv-225, 2001 WL 533811 (W.D. Mich. May 7, 2001) ................. 72

*Adams v. National Engineering Service Corp.*,
   620 F. Supp. 2d 319 (D. Conn. 2009) .................................................... 18, 69

*Banneck v. HSBC Bank USA, N.A.*,
   No. 15-cv-02250-HSG, 2016 WL 3383960 (N.D. Cal. June 20,
   2016) ........................................................................................................ 71

*Beary v. Norton-Simon, Inc.*,
   479 F. Supp. 812 (W.D. Pa. 1979) ...................................................... 73–74

*Berrier v. Simplicity Manufacturing, Inc.*,
   563 F.3d 38 (3d Cir. 2009) .................................................................... 44

*Cahlin v. General Motors Acceptance Corp.*,
   936 F.2d 1151 (11th Cir. 1991) ............................................................. 69

*Consumer Financial Protection Bureau v. Gordon*,
   819 F.3d 1179 (9th Cir. 2016) ........................................................... 54, 61

*Consumer Financial Protection Bureau v. ITT Educational
   Services, Inc.*,
   219 F. Supp. 3d 878 (S.D. Ind. 2015) .................................. 21, 42, 44, 50, 52

*Consumer Financial Protection Bureau v. Morgan Drexen, Inc.*,
   No. SACV-13-1267-JLS, 2014 WL 12581776 (C.D. Cal. Nov.
   25, 2014) ............................................................................................... 58–59

*Consumer Financial Protection Bureau v. NDG Financial Corp.*,
   No. 15-CV-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2,
   2016) ..................................................................................................... 56, 73

*Consumer Financial Protection Bureau v. Universal Debt & Payment
   Sols., LLC*,
   No. 1:15-CV-0859-RWS, 2019 WL 1295004 (N.D. Ga. Mar.
   21, 2019) ................................................................................................. 18

*Cortez v. Trans Union, LLC*,
   617 F.3d 688 (3d Cir. 2010) ....................................................69, 70

*Cox Operating, L.L.C. v. Settoon Towing, L.L.C.*,
   No. CIV.A. 17-1933, 2018 WL 3862072 (E.D. La. Aug. 13,
   2018) .............................................................................................45–46

*Davis v. HSBC Bank Nev., N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ........................................................44

*Dickerson v. United States Steel Corp.*,
   No. 73-1292, 1977 WL 833 (E.D. Pa. Feb. 28, 1977)............................31, 51

*El v. Southeastern Pennsylvania Transportation Authority (SEPTA)*,
   479 F.3d 232 (3d Cir. 2007) ...........................................................18

*Federal Trade Commission v. Atlantex Associates*,
   No. 87-0045-CIV-NESBITT, 1987 WL 20384 (S.D. Fla. Nov.
   25, 1987), *aff'd*, 872 F.2d 966 (11th Cir. 1989) ...........................59

*Federal Trade Commission v. Davison Associates, Inc.*,
   431 F. Supp. 2d 548 (W.D. Pa. 2006) ..........................................55

*Federal Trade Commission v. Freecom Communications, Inc.*,
   401 F.3d 1192 (10th Cir. 2005) ....................................................66

*Federal Trade Commission v. LendingClub Corp.*,
   No. 18-CV-02454-JSC, 2020 WL 2838827 (N.D. Cal. June 1,
   2020) .............................................................................................49

*Federal Trade Commission v. Life Management Services of Orange
   County, LLC*,
   350 F. Supp. 3d 1246 (M.D. Fla. 2018) ...............................62–63

*Federal Trade Commission v. Medical Billers Network, Inc.*,
   543 F. Supp. 2d 283 (S.D.N.Y. 2008) ..........................................60

*Federal Trade Commission v. National Urological Group, Inc.*,
   645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd*, 356 Fed. App'x
   358 (11th Cir. 2009) .....................................................................56

*Federal Trade Commission v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) ...............................................50, 51

*Federal Trade Commission v. NHS Systems, Inc.*,
     936 F. Supp. 2d 520 (E.D. Pa. 2013)................................................................62

*Federal Trade Commission v. Pantron I Corp.*,
     33 F.3d 1088 (9th Cir. 1994) ..........................................................................54

*Federal Trade Commission v. Patriot Alcohol Testers, Inc.*,
     798 F. Supp. 851 (D. Mass. 1992)...................................................................58

*Federal Trade Commission v. Stefanchik*,
     559 F.3d 924 (9th Cir. 2009) ..........................................................................59

*Federal Trade Commission v. Wyndham Worldwide Corp.*,
     10 F. Supp. 3d 602 (D.N.J. 2014), *aff'd*, 799 F.3d 236
     (3d Cir. 2015)..................................................................................................49

*Hogan v. City of Easton*,
     No. 04-759, 2006 WL 3702637 (E.D. Pa. Dec. 12, 2006) ............................44

*Houston v. TRW Information Services, Inc.*,
     707 F. Supp. 689 (S.D.N.Y. 1989) ..................................................................69

*Hunt v. Cromartie*,
     526 U.S. 541 (1999)........................................................................................18

*International Brotherhood of Teamsters v. United States*,
     431 U.S. 324 (1977)..................................................................................21, 28

*Jensen v. Pressler & Pressler*,
     791 F.3d 413 (3d Cir. 2015) ...........................................................................62

*Kaplan v. First Options of Chicago, Inc.*,
     19 F.3d 1503 (3d Cir. 1994) ...........................................................................73

*Kindred Studio Illustration & Design, LLC v. Electronic
     Communications Technology, LLC*,
     No. CV 18-7661-GW, 2018 WL 6985317 (C.D. Cal.
     Dec. 3, 2018)...................................................................................................47

*Kraft, Inc. v. Federal Trade Commission*,
     970 F.2d 311 (7th Cir. 1992) .....................................................................56, 58

*Newton v. United Cos. Financial Corp.*,
    24 F. Supp. 2d 444 (E.D. Pa. 1998)................................................................21

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
    Consumer Pharmaceutical Co.*,
    290 F.3d 578 (3d Cir. 2002) ..................................................................58, 66

*Orkin Exterminating Co. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988) .............................................................37, 38

*Pearson v. Component Technology Corp.*,
    247 F.3d 471 (3d Cir. 2001) ..................................................................73–74

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
    653 F.3d 241 (3d Cir. 2011) ........................................................................59

*QVC, Inc. v. MJC America Ltd.*,
    No. CIV.A. 08-3830, 2012 WL 33026 (E.D. Pa. Jan. 6, 2012) ........45, 53, 59

*Reardon v. ClosetMaid Corp.*,
    No. 2:08-cv-01730, 2013 WL 6231606 (W.D. Pa. Dec. 2, 2013) ...............72

*Reynolds v. University of Pennsylvania*,
    483 Fed. App'x 726 (3d Cir. 2012) .............................................................45

*Reynolds v. University of Pennsylvania*,
    No. CIV.A 06-1237, 2010 WL 2253732 (E.D. Pa. June 2,
    2010), *aff'd*, 483 Fed. App'x 726 (3d Cir. 2012) ........................................60

*Scharf v. Trans Union, LLC*,
    No. 14-14322, 2015 WL 6387501 (E.D. Mich. Oct. 22, 2015) ...................72

*Schriner v. Sysco Food Service of Central Pennsylvania*,
    No. CIV. 1CV032122, 2005 WL 1498497 (M.D. Pa. June 23,
    2005) .....................................................................................................45, 59

*Schweitzer v. Equifax Information Solutions,
    LLC*, 441 Fed. App'x 896 (3d Cir. 2011) .....................................................68

*Seamans v. Temple University*,
    744 F.3d 853 (3d Cir. 2014) ........................................................................70

*Shaw v. Experian Information Solutions, Inc.*,
    891 F.3d 749 (9th Cir. 2018) ........................................................68

*Siegel v. Shell Oil Co.*,
    612 F.3d 932 (7th Cir. 2010) ...................................................18, 50

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
    328 F. Supp. 3d 53 (E.D.N.Y. 2018)..............................................56

*Stone v. Troy Construction, LLC*,
    935 F.3d 141 (3d Cir. 2019) .........................................................46

*Thomas v. Cumberland County*,
    749 F.3d 217 (3d Cir. 2014) .........................................................18

*United States v. Bestfoods*, 524 U.S. 51 (1998).................................73

*Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*,
    758 F. Supp. 1054 (W.D. Pa. 1990) ..............................................73

*William H. Morris Co. v. Group W, Inc.*,
    66 F.3d 255 (9th Cir. 1995) .........................................................59

*Wirtz v. Specialized Loan Servicing*,
    886 F.3d 713 (8th Cir. 2018) ...................................................21, 28

## STATUTES, RULES, AND REGULATIONS

12 U.S.C. § 5531 ...............................................................20, 36, 40, 43

12 U.S.C. § 5564 ...............................................................................62

15 U.S.C. § 1692k .............................................................................62

15 U.S.C. § 6801 ...............................................................................46

20 U.S.C. § 1078 .................................................................................4

20 U.S.C. § 1082 .................................................................................4

20 U.S.C. § 1083 .................................................................................6

20 U.S.C. § 1087e ............................................................................4, 6

Fed. R. Civ. P. 56 ..................................................................................18

Fed. R. Evid. 407 ....................................................................44, 45, 46

12 C.F.R. § 1016.1 ...............................................................................46

12 C.F.R. pt. 1022, App. E .................................................................71

12 C.F.R. § 1022.42 .......................................................................70, 71

34 C.F.R. § 682.209 ...............................................................................4

34 C.F.R. § 682.211 ...............................................................................4

34 C.F.R. § 682.215 ...............................................................................4

34 C.F.R. § 685.205 ...............................................................................4

34 C.F.R. § 685.209 ...............................................................................4

34 C.F.R. § 685.221 .......................................................................4, 8, 9

CFPB, Final Rule on Payday, Vehicle Title, and Certain High-Cost
    Installment Loans (July 7, 2020),
    https://files.consumerfinance.gov/f/documents/cfpb_payday_fin
    al-rule-2020-revocation.pdf............................................................36, 37, 38

## OTHER AUTHORITIES

CFPB Consumer Laws and Regulations: Unfair, Deceptive, or
    Abusive Acts or Practices (2012),
    https://files.consumerfinance.gov/f/documents/102012_cfpb_un
    fair-deceptive-abusive-acts-practices-udaaps_procedures.pdf....35, 41, 50, 55

CFPB Payback Playbook (2017),
    https://files.consumerfinance.gov/f/documents/201701_cfpb_pa
    yback-playbook-disclosures-revised.pdf......................................................39

Chase, *Send Secure Messages. Get Secure Responses*,
    https://www.chase.com/digital/login-secure-message (last
    visited July 10, 2020)..................................................................................47

ED, *List of Negotiators*,
https://www2.ed.gov/policy/highered/reg/hearulemaking/2011/loans-negotiators.pdf (last visited July 15, 2020).............................................9

HSBC, *Secure Email Communications,* https://www.hsbc.com/online-security/secure-email-communications (last visited July 10, 2020)..................................................................................................47

Miles Tracy et al., National Institute of Standards & Technology, U.S. Department of Commerce, *Guidelines on Electronic Mail Security* (2007), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-45ver2.pdf...................................................................46–47

TD Bank, *What is My Secure Inbox?,* https://td.intelliresponse.com/login/?requestType=NormalRequest&source=3&id=1092&question=What+is+my+secure+inbox (last visited July 10, 2020)..........................................................47

## PRELIMINARY STATEMENT

After years of sweeping discovery, the CFPB has no evidence to support key elements of each of its claims—a failure of proof that entitles *Defendants* to summary judgment.  Yet the CFPB has filed its own summary judgment motion, claiming that the undisputed facts compel a jury finding of liability in *its* favor. This would be a remarkable request for any plaintiff; given the CFPB's utter failure of proof, the request is truly extraordinary.

The proof deficiencies infect all of the CFPB's claims, but they are especially notable for its headline claim of "steering"—the claim that Navient allegedly failed to inform borrowers about income-driven repayment ("IDR") options and pushed them into forbearance.  Having assured the Court that it would present the testimony of "representative" borrowers, the CFPB fails to offer a single borrower supporting its claim.  Moreover, the CFPB acknowledges, as it must, that Navient's policy was to "counsel borrowers about IDR, and to present forbearance only as a last resort."  Doc. 482 ("CFPB Br.") at 7–8.  The CFPB's case is instead built on Navient's compliance efforts to enforce the policy, specifically one-off calls identified by Navient's quality control functions.  The CFPB also offers up isolated borrower calls (from the *millions* Navient handles each year) as purported instances of "steering," based on a review performed by the CFPB's own enforcement team, applying criteria with no basis in law and

shielded from discovery by privilege assertions.  To mask its lack of evidence, the

CFPB speculates at length about reasons why Navient *might have wanted* to

"steer" borrowers into forbearance, but it never links these supposed motives to

any actual policy or practice which, as noted, were admittedly to the contrary.

The rest of the CFPB's claims suffer from similar deficiencies.  The CFPB

fails to offer *any* borrower testimony for seven of its remaining nine counts.

Instead, the CFPB attaches boxloads of exhibits, but bulk cannot obscure the lack

of substance.  As with its "steering" claims, the CFPB relies heavily on the

company's internal monitoring processes that exist to ensure compliance with the

very policies the CFPB claims were lacking.  Many of the exhibits are inadmissible

(hearsay, subsequent remedial measures, or other deficiencies).  Others are from

outside the statute of limitations period or relate to disclosures that have not been

in use for almost a decade.  In any event, far from showing unlawful practices, in

the words of one of the CFPB's own exhibits, the CFPB has shown only that

Navient has a robust "compliance culture."

The CFPB's Motion must be denied, and Defendants' granted.

## COUNTER STATEMENT OF FACTS

**I.    NAVIENT SERVICES STUDENT LOANS PRIMARILY ON BEHALF OF THE FEDERAL GOVERNMENT**

Navient Solutions, LLC ("Navient") contracts with the Department of

Education ("ED") to service federal student loans.  Joint Statement of Undisputed

Facts ("JSUF") ¶ 4; Statement of Undisputed Material Facts in Support of

Defendants' Motion for Summary Judgment ("SUF") ¶ 4.  As a federal student

loan servicer, Navient is responsible for, among other things, communicating with

borrowers regarding available repayment options and processing payments.  SUF

¶ 268.  Navient has serviced over six million borrowers under its contract with ED

during the alleged time period.  Defendants' Response to Plaintiff's Statement of

Undisputed Material Facts ("RSUF") ¶ 7.

Navient's call center representatives participate in millions of phone calls

per year and communicate with borrowers regarding all aspects of their student

loans, including repayment options and payments.  RSUF ¶¶ 13, 145, 226, 236.  As

part of its "compliance culture," Plaintiff's Statement of Undisputed Material Facts

In Support of its Motion for Summary Judgment ("PSUF") Ex. 110 at A-2014,

Navient continuously identifies and implements potential improvements to its call

centers, including through multiple layers of call monitoring; logging, responding

to, and tracking customer complaints; and conducting internal compliance reviews.

SUF ¶¶ 210–14, 275–78; RSUF ¶ 125.  Navient also regularly retains consultants

and engages in pilot projects to identify ways to improve the customer experience.

*See, e.g.*, RSUF ¶¶ 47, 168, 239.  Navient is also closely monitored by ED, SUF

Ex. 5 at NAV-00000053, which conducts its own call monitoring, site visits, and

reviews, RSUF ¶¶ 31, 107.

3

## II.   NAVIENT PROVIDED BORROWERS INFORMATION ABOUT REPAYMENT OPTIONS, INCLUDING IDR

### A.   Federal Repayment Options

ED prescribes the options that federal student loan servicers can offer to

borrowers unable to make their standard monthly payments.  20 U.S.C.

§§ 1078(b)(9), 1087e(d).  These options include IDR plans, under which monthly

payments are based on a borrower's income, family size, outstanding balance, and

other criteria.  *See* 34 C.F.R. §§ 682.209, 682.215, 685.209, 685.221.  The Higher

Education Act ("HEA") also mandates the availability of forbearance, 20 U.S.C.

§ 1082(l)(1)(E), which, regardless of income, can be used to bring a delinquent

borrower current by covering past-due amounts or to postpone payments for a set

period of time, *see* 34 C.F.R. §§ 682.211, 685.205.

### B.   Navient Provided Borrowers With Information About IDR (Counts I And II)

It is undisputed that Navient's policy and practice throughout the alleged

time period was to "counsel borrowers about IDR, and to present forbearance only

as a last resort."  CFPB Br. at 7–8.  The CFPB now admits this to be true.  *Id.*

Navient consistently communicates this instruction, first during a multi-week

training for all new representatives—training the CFPB's lead witness describes as

"consistent with providing quality customer service," and that "taught employees

to provide thorough information about borrowers' repayment options."  PSUF Ex.

100, ¶ 6.  In the call centers, representatives are provided with various tools to

guide conversations with borrowers about repayment options, including a
"hierarchy" that lists repayment plans first and forbearance last, RSUF ¶ 99, and a
guide for "determin[ing] the root cause of financial difficulty," which advises
against exploring forbearance until "all other options have been exhausted," SUF
Ex. 102 at NAV-01665846; SUF ¶ 204.  Similarly, ██████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████.  SUF Ex. 111 at
NAV-01723759.  Unlike forbearance, ED does not permit servicers like Navient to
enroll borrowers in IDR over the phone.  JSUF ¶ 30.

    Call center representatives and supervisors—including the CFPB's
witnesses—consistently testified that they complied with and enforced these
policies.  RSUF ¶¶ 124–26.  Moreover, to identify and address potential issues,
Navient has implemented multiple layers of call monitoring, with supervisors, call
center managers, quality assurance and compliance departments, and the CEO all
regularly reviewing calls.  *Id.* ¶¶ 125, 137.  Representatives are scored on how well
they follow Navient's instructions to ask "probing questions" and offer an
appropriate solution based on the borrower's circumstances.  SUF ¶¶ 130–32, 135,
140.  Representatives who receive low scores may receive coaching and reduced
compensation, and representatives with consistently low scores may face
termination.  *Id.* ¶ 214; RSUF ¶ 126.

In addition, Navient's compensation plans for call center representatives take into account average call time and a metric called "first call resolution," which is designed to ensure customers' questions are resolved on their first call.  RSUF ¶ 110.  The call-time metric encourages representatives to become well-versed in the rules governing student loans, to carefully listen to borrowers' questions, and to efficiently locate and convey the information most relevant to borrowers' inquiries. *Id.* ¶ 113.  Importantly, the CFPB's own witnesses have denied that the call-time metric led them to cut short discussions with borrowers about repayment options. *Id.* ¶¶ 113, 123–24.

Navient also communicates repayment options through other channels, including mail and email.  *See, e.g.*, SUF ¶¶ 6–11, 94–96, 99.  For example, ED rules mandate that borrowers receive notices about repayment options whenever a borrower expresses a difficulty making payments, *see* 20 U.S.C. §§ 1083(e)(2), 1087e(p), but Navient goes beyond ED's requirements, providing IDR communications throughout the borrower's experience, *see* SUF ¶¶ 5–11.  As the CFPB's exhibits show, Navient sends 170 *million* communications about repayment options each year.  *See, e.g.*, PSUF Ex. 40 at A-646.

Notably, ED compensates servicers more for borrowers in repayment— including IDR—than borrowers in delinquency, deferment, or forbearance.  RSUF ¶ 31.  ED regularly collects data regarding the repayment options in which

borrowers enroll and call center metrics—even data on average call time—to compare performance across servicers.  *Id.*  ED also collects thousands of call recordings each month for review.  *Id.*  In addition, servicers undergo site visits and annual reviews, in which ED has found that Navient ███████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████       *Id.*

Navient has worked in partnership with ED to increase IDR awareness and enrollment.  Such initiatives include Navient's leadership of a 2013 servicer working group to "improve overall customer understanding of IDR plans" and "increase IDR take rates," *id.* ¶ 47; a 2015 project to increase IDR renewal rates, PSUF Ex. 116 at A-2037, A-2096–A-2106; and a 2015 pilot program to test verbal IDR applications, RSUF ¶ 47.  Navient also participated in ED-driven email campaigns, helping to assess the effectiveness of ED communications about repayment options.  *Id.* ¶ 58.

Navient's efforts led to better outcomes for borrowers.  Navient-serviced borrowers are far less likely to default than borrowers with other servicers.  PSUF Ex. 110 at A-2015.  And as ED confirmed in a recent statement, Navient has "among the highest" IDR enrollment rate of federal student loan servicers, while

the average duration of forbearances for Navient borrowers is "among the lowest."

RSUF ¶ 107.

### C.     Navient Informed Borrowers About The Need To Renew Enrollment In IDR (Counts III And IV)

IDR enrollment must be renewed every year or the borrower will return to

standard monthly payments. *See* 34 C.F.R. § 685.221(e); JSUF ¶¶ 31–33.  In

December 2012, ED began requiring servicers to send annual reminders of the

need to renew.  SUF ¶ 227.  Previously, Navient voluntarily sent a reminder to

borrowers that their IDR period "will expire in approximately 90 days" and that,

"to continue with the [IDR]" payments, borrowers would have to complete the

attached forms.  *Id.* ¶¶ 216, 218, 223.  The attached ED forms provided additional

instructions for completing "the required annual reevaluation of [the borrower's]

payment amount under the [IDR] plan."  *Id.* ¶ 220; *accord id.* ¶ 225.  The forms

instructed that "[b]efore answering any questions" borrowers should "carefully

read the entire form."  *Id.* ¶ 220; *accord id.* ¶ 225.  The ED form for FFELP loans

stated that borrowers "must annually certify [their] family size and provide income

documentation for determination of whether [they] have a partial financial

hardship;" that if borrowers "do not have a partial financial hardship, [their]

payment amount will be will be the payment amount for [their] loan[s] under the

standard repayment plan with a 10-year repayment period;" and that "[a]ccrued

interest is capitalized at the time you choose to leave the [IDR] plan or no longer

8

have a partial financial hardship." *Id.* ¶ 221.  The ED form for Direct loan

borrowers stated that "[u]ntil [the] servicer receives the information needed to

calculate your [IDR] Plan payment amount, your initial payment amount will be

the full amount of interest that accumulates on your loan each month."  *Id.* ¶ 225.

In 2012, the cover letter also stated:  "Please make sure the forms are filled

out completely. . . By providing incorrect or incomplete information the process

will be delayed.  Typically, the [IDR] renewal process may take at least 30 days,

depending on the application method."  *Id.* ¶¶ 219, 224, 227.[1]  Following a

negotiated rulemaking process that involved ED (but not the CFPB),[2] ED required

servicers to send renewal reminders that included a date to submit the required

paperwork and the consequences of failing to meet that deadline.  *See* 34 C.F.R.

§ 685.221(e)(3); SUF ¶ 227; RSUF ¶ 190.  Navient implemented ED's instructions

in December 2012.  SUF ¶ 228; RSUF ¶ 190.

Navient sent the notices via U.S. mail unless borrowers consented to receive

electronic communications.  JSUF ¶ 34.  Consenting borrowers agreed that

---

[1] Navient sent different notices depending on whether the borrower had FFELP
loans or Direct loans.  *See* SUF ¶¶ 217, 222.  The CFPB does not distinguish
between these two letters, *see* PSUF ¶¶ 185–88, though they differ slightly, *see*
SUF ¶¶ 218, 223.

[2] *See* ED, *List of Negotiators*,
https://www2.ed.gov/policy/highered/reg/hearulemaking/2011/loans-
negotiators.pdf (last visited July 15, 2020).

communications "may be delivered . . . by posting such [c]ommunications to [their] online account[s]," and that "[e]mail [c]ommunications may include attachments or embedded links." SUF ¶ 231; *see also id.* ¶¶ 232–33. Borrowers who consented received an email with a link to access the IDR recertification notice and form in their online accounts. *Id.* ¶ 234; RSUF ¶ 160.

In 2014, Navient retained a consultant to assist in simplifying and improving its communications with borrowers. *See* RSUF ¶ 168. Due to privacy concerns, Navient primarily sent documents to borrowers via secure email with a link to read the message in their online accounts. *See id.* ¶ 169. Over time, Navient sought to balance customer privacy with customer experience to include more information in the emails sent to borrowers. *See id.* As part of that effort, Navient updated its email in March 2015. *See id.* ¶¶ 171–172.

## III. NAVIENT REQUIRED CONSECUTIVE ON-TIME PAYMENTS FOR COSIGNER RELEASE (COUNT V)

Navient also services private student loans, which typically require a cosigner either to obtain the loan or to be approved on more favorable terms. JSUF ¶¶ 37, 40, 42. Borrowers may apply to release a cosigner after meeting eligibility criteria, including that the borrower has made a minimum number of consecutive, on-time payments. SUF ¶¶ 257–58. The purpose of this requirement is to assess the borrower's ability to make continuous payments without the cosigner's assistance. *Id.* ¶ 259. Indeed, Navient's analyses have shown that ▮

██████████████████████████

████████. RSUF ¶ 206.  Prior to August 2014, lump-sum payments were "not

valid" ways of satisfying the consecutive payment requirement.  *Id.* ¶ 207; PSUF

Ex. 159 at A-2643–A-2644.  Rather, the borrower was required to make the

required *number* of payments.  RSUF ¶ 207.

## IV.    NAVIENT PROCESSES TENS OF MILLIONS OF STUDENT LOAN PAYMENTS, AND TRACKS AND CORRECTS ANY ERRORS (COUNT VI)

As a student loan servicer, Navient processes tens of millions of student loan

payments per year.  SUF ¶ 268.  The lender's promissory note determines how

payments must be applied to principal and interest.  RSUF ¶ 219.  For federal

loans, ED requires Navient to apply payments to fees, then interest, then principal.

SUF ¶ 269; SUF Ex. 159 at NAV-02074498; SUF Ex. 160 at NAV-03246005.

When a borrower has multiple loans, Navient must also allocate payments across

the loans.  JSUF ¶ 54.  Some aspects of payment allocation are also mandated by

the lender; for example, if a borrower's monthly payment does not cover the full

amount due on each of her federal loans, ED does not allow her to allocate extra

payment toward the principal of one loan.  34 C.F.R. § 685.211(a)(4).  Where there

is no express guidance from the lender, Navient has developed default allocation

rules that it discloses to borrowers.  RSUF ¶ 218; PSUF Ex. 205 at A-4401.  When

a borrower with multiple loans makes a payment greater than the minimum,

Navient's default rule is to apply the excess across the loans pro rata.  PSUF

Ex. 198 at A-4190–A-4191.  However, a borrower may instruct Navient to allocate the overpayment to a particular loan, for example, the loan with the highest interest rate.  SUF ¶ 271; PSUF Ex. 224 at A-4708.

Although Navient occasionally made errors, such errors represented a tiny percentage of the payments it processes.  *Compare* PSUF Ex. 222 at A-4693

(███████████████████████████████████████████████

███████████████), *with* SUF ¶ 268 (Navient processed sixty-two million payments in a year).  Navient sought to improve its processes over time.  For example,

███████████████████████████████████████████

███████████████████████████████████████.  *See, e.g.*, PSUF Exs. 212, 213, 222; RSUF ¶¶ 258–63.  And in 2014, Navient's Payment Allocation Task Force evaluated the company's payment allocation procedures and assessed whether any changes were necessary.  PSUF Ex. 198 at A-4184.  Navient has also retained consultants to identify potential process improvements; for example, in 2011, Navient retained The Lab to identify ways to reduce the number of payments reapplied on a monthly basis.  PSUF Ex. 179 at A-3194.  When The Lab recommended that Navient provide the ability for borrowers to allocate payments to particular loans online, *id.* at A-3207, Navient implemented that recommendation the same year, *id.* at A-3209.

When borrowers request reallocation of their payments, Navient's practice is to adjust payments to avoid any potential harm to the borrower, such as additional interest or fees.  SUF ¶¶ 279–305.  Critically, the CFPB has not identified a single borrower witness who suffered financial harm from a payment processing error. *Id.*; *see also id.* ¶ 1.

## V.    NAVIENT ACCURATELY REPORTED INFORMATION REGARDING TPD-DISCHARGED STUDENT LOANS ACCORDING TO ITS POLICIES AND PROCEDURES (COUNT XI)

For each student loan it services, Navient furnishes information to credit reporting agencies.  JSUF ¶ 61.  The agencies, together with furnishers like Navient, are members of the Consumer Data Industry Association ("CDIA"), which developed the Metro 2 Format and established credit reporting standards. *Id.* ¶ 62.  The CDIA provides annual credit reporting guidance in the Credit Reporting Resource Guide ("CRRG") and through the Metro 2 Format Task Force ("Task Force"), whose purpose is to "provide a standardized method for the reporting of accurate, complete, and timely data."  JSUF ¶¶ 62–63.  The Metro 2 Format, accepted by all credit reporting agencies, requires furnishers to report dozens of different data fields per account.  RSUF ¶ 360, 376.

Within Navient, a unit named Credit Bureau Management ("CBM"), in consultation with Legal and Compliance, develops and updates Navient's policies and procedures related to credit reporting, maintains quality controls for credit

13

reporting data, and responds to disputes regarding credit reporting.  RSUF ¶¶ 373,

376–77.  Navient's policies and procedures require CBM to use the Metro 2

Format and to consult the CRRG, the Task Force, and Legal and Compliance for

guidance on how to report in particular scenarios.  *Id.* ¶¶ 374, 376.  Compliance

and Legal are responsible for working with CBM to ensure compliance with the

Metro 2 standards.  *Id.* ¶ 376.

The CRRG provides both general guidance for the fields required for all

student loan accounts and specific guidance for particular scenarios.  *See* SUF

¶¶ 308–10; PSUF Ex. 274 at A-7660, A-7861 (general guidance); PSUF Ex. 274 at

A-7866 (specific guidance).  In the specific guidance the CFPB points to, the

CRRG provides guidance on certain fields, but does not explicitly mention the

remaining fields, even though they must still be reported.  SUF ¶ 309; RSUF

¶¶ 360, 369–70.

In 2011, the CDIA updated its guidance to instruct furnishers to report

Account Status "05" and Special Comment Code "AL" together "when a claim

was accepted and paid by the guarantor."  SUF ¶¶ 316–18.  After consulting the

Task Force, Navient began reporting Account Status "05" and Special Comment

Code "AL" for loans with claims that had been accepted and paid by a guaranty

agency, including claims discharged due to a borrower's total and permanent

disability ("TPD").  *Id.* ¶¶ 319–21.  The reporting of Account Status "05," meaning

"transferred," and Special Comment Code "AL," meaning "Student loan assigned to Government," reflected that the discharged student loans had been *transferred* to the guarantor and *assigned to the government*—here, ED.  *Id.* ¶¶ 311, 317–18.

In May 2013, after FICO told Navient that it considered Special Comment Code "AL" to be "negative," *id.* ¶ 323, Navient *again* confirmed with the Task Force that Account Status "05" and Special Comment "AL" were accurate, *id.* ¶¶ 323–24.  Nonetheless, to avoid any negative impacts to borrowers, Navient started to manually remove Special Comment Code "AL" from its reporting each month in November 2013, and by December 2014, Special Comment Code "AL" was removed from all TPD-discharged loans, per Navient's request to the credit reporting agencies.  *Id.* ¶¶ 325, 327–28.

## VI.  PIONEER EXPLAINED THE BENEFITS OF FEDERAL LOAN REHABILITATION (COUNTS VII THROUGH X)

Borrowers sometimes default on their student loans.  ED contracts with private collection agencies, such as Pioneer Credit Recovery, Inc. ("Pioneer"), to help "resolve" their defaults, including through the federal rehabilitation program. JSUF ¶¶ 57–58; SUF ¶ 340.  Because the consequences of default are so significant—the unpaid balance is due immediately; wages can be garnished; tax refunds and federal benefits can be withheld; there are negative credit effects; and the borrower is unable to receive additional federal student aid or benefits on

existing loans, SUF ¶ 331; RSUF ¶ 307—the benefits of completing the rehabilitation program are substantial.

Most borrowers in default have only two practical options: rehabilitation or consolidation. SUF ¶ 333; RSUF ¶ 316; SUF Ex. 195 at 1–2. To rehabilitate, a borrower must make nine qualifying payments over a consecutive ten-month period. RSUF ¶ 305. To consolidate, if a borrower is eligible and has eligible loans, she combines her loans into a new loan, paying off the prior loans. *Id.* ¶ 309; SUF Ex. 195 at 4–5. Rehabilitation is the federal government's preferred option. SUF ¶¶ 337–38. As the CFPB acknowledges, ED pays Pioneer a higher rate for rehabilitated loans than for consolidated ones. PSUF ¶ 349.

Rehabilitation offers benefits to the borrower that consolidation does not. *First*, once a borrower completes rehabilitation, the record of default is removed from her credit report. RSUF ¶ 307. When a borrower defaults, two negative tradelines appear on her credit report—one associated with the missed payments, and one associated with the default itself. *Id.* When a borrower consolidates, the default trade line is marked "paid in full." *Id.* ¶ 315. But when a borrower rehabilitates, the default tradeline is *removed entirely*. *Id.* ¶ 307. As the CFPB has stated, rehabilitation is the option with "the greatest opportunity to protect your credit record." SUF ¶ 338.

16

*Second*, once rehabilitated, ED waives all remaining collection fees on its loans.  RSUF ¶ 308.  During the alleged time period, 24.34% of a defaulted ED loan's principal and interest was added in collection fees, and 19.58% of any payment made would be applied to collection fees.  *Id.* ¶ 315.  For example, if the defaulted loan was $10,000, ED would add $2,434 in collection fees, and if a borrower had a $10 monthly rehabilitation payment, $1.96 of that monthly payment would go toward those fees.  Once a borrower completed rehabilitation, the remaining collection fees were waived.  Consolidation does not offer this benefit; instead, a portion of remaining collection fees are absorbed into the principal of the new loan.  *Id.*

The CFPB identified phone calls from more than seven years ago (outside the limitations period) to claim that Pioneer representatives made statements inaccurately describing these benefits because, for example, the representative said "*all* . . . collection fees" instead of "*remaining* collection fees," or "*it's* taken off your credit report" instead of "*the default* is taken off your credit report."  *Id.* ¶¶ 332, 333, 338, 340; SUF ¶ 349.  The borrowers identified by the CFPB who heard similar statements were not under any misimpression as a result of those statements.  SUF ¶ 350; RSUF ¶ 344.

17

# **ARGUMENT**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).  Where the moving party bears the burden of persuasion at trial, as the CFPB does here,[3] "it is inappropriate to grant summary judgment . . . unless a reasonable juror would be *compelled* to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (emphasis added) (footnote omitted); *see also Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." (footnote omitted)).

Summary judgment is the "'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010).  Having failed to put up evidence that would compel a reasonable juror to find in the CFPB's favor, the CFPB's Motion must be denied.  To the contrary, Defendants are entitled to summary judgment. *See* Doc. 470.

---

[3] *See CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *6 (N.D. Ga. Mar. 21, 2019); *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 (D. Conn. 2009).

# I.   THE CFPB'S MOTION ON COUNTS I AND II SHOULD BE DENIED BECAUSE THE CFPB CANNOT ESTABLISH ANY UNFAIR OR ABUSIVE ACTS OR PRACTICES WITH RESPECT TO "STEERING"

The CFPB claims in Counts I and II that Navient engaged in the allegedly abusive and unfair practice of "failing to adequately advise [borrowers] about IDR," instead "steering them into costly forbearances."  CFPB Br. at 26, 34.  The CFPB's Motion does not define "steering" or explain what constitutes "adequate" advice about IDR.  Nor does it identify any borrowers harmed by Navient's alleged conduct, any call center representative claiming she engaged in or was directed to engage in "steering," or any testimony supporting the scheme the CFPB describes.

As set forth in Section I.A., a close examination of the proof submitted shows that the CFPB has not established an unfair or abusive practice of "steering."  *First,* and most critically, the evidence shows that Navient's policy and practice was to inform borrowers about IDR and to present forbearance as a last resort; *the CFPB admits as much.  Second*, the CFPB's contorted and unsupported interpretations of Navient's procedures are consistently contradicted by witness testimony.  *Third,* neither Navient's efforts to ensure compliance with its policies, nor the CFPB's internal and undisclosed analysis of an unrepresentative "sample" of calls (███████ of twenty-four *million* calls, RSUF ¶ 145) show anything other than isolated instances of employees *not following* Navient's procedures. *Fourth*, with no evidence of an actual practice, the CFPB instead invents

unsupported motives for favoring forbearance over IDR, but its theories are undermined by the very exhibits proffered as support and the CFPB never connects these supposed motives to any conduct.

In addition to these evidentiary failures, as discussed in Section I.B., the CFPB has not established the legal elements of any unfair or abusive act, for two additional reasons. *First*, the CFPB does not offer a single borrower who says she was "steered," instead relying on a biased "sample" of isolated phone calls it claims constituted "steering" based on the CFPB's own criteria. But the law requires an assessment of the entire course of dealing between Navient and the borrowers—a requirement the CFPB simply ignores because Navient repeatedly provided these same borrowers with information about IDR in other calls and in written communications. *Second*, the CFPB's "steering" criteria fail to correspond to the elements of an unfair or abusive "act," which require that Navient took "unreasonable advantage of" consumers (as required for abusiveness, 12 U.S.C. § 5531(d)(2)(C)), or "cause[d]" the consumer "substantial injury" that was not "reasonably avoidable" (as required for unfairness, *id.* § 5531(c)(1)(A)–(B)).

**A.    The CFPB Cannot Show That Navient Had A Practice Of "Steering" Borrowers Into Forbearance Without Advising Them About IDR**

The CFPB lacks evidence of any practice of steering borrowers into forbearance while not informing them of IDR. Although the CFPA does not define

the term "practice," the ordinary meaning of the term is "a customary action or procedure." Black's Law Dictionary (11th ed. 2019); *see also CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015) (interpreting undefined CFPA term by its dictionary definition). Cases interpreting similar terms in other federal statutes confirm that proving a "practice" requires evidence that the asserted conduct was the defendant's "standard operating procedure—the regular rather than the unusual practice." *Wirtz v. Specialized Loan Servicing*, 886 F.3d 713, 720 (8th Cir. 2018) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 & n.16 (1977)); *see also Newton v. United Cos. Fin. Corp.*, 24 F. Supp. 2d 444, 456 (E.D. Pa. 1998) (proof of a "pattern or practice" requires evidence of "wide-ranging and institutionalized practices" rather than "a few isolated examples"). The CFPB cannot establish that Navient's "standard operating procedure" was to "steer" borrowers into forbearance without informing them about IDR.

1. *Navient's Consistent Policy And Practice Was To Inform Borrowers About IDR And Discuss Forbearance As A Last Resort*

The CFPB's own exhibits establish that Navient's standard policy and procedure was to inform borrowers about IDR. In addition to the numerous written notices Navient sent about IDR, SUF ¶¶ 5–11, Navient's procedures required call center representatives to discuss IDR and to explore "forbearance

only as a last resort," CFPB Br. at 7–8.  A wealth of other materials, omitted by the

CFPB, further confirm that instruction.  SUF ¶ 204.  Navient conveyed this

instruction through training, RSUF ¶¶ 41, 61, 123; PSUF Ex. 100 ¶ 6, resources

available to representatives, SUF ¶¶ 205–08; RSUF ¶ 99, and multiple layers of

call monitoring, SUF ¶¶ 210–14; RSUF ¶¶ 125, 136–37, 140.  Indeed, the CFPB

cites a number of exhibits and testimony corroborating that this instruction came

from the top of the company.  *See* PSUF ¶¶ 37–38, 136–40.  And the CFPB's own

witnesses *consistently* testified both that they were expected to discuss IDR and

that they met that expectation.  RSUF ¶ 124.

> 2. *The CFPB Has No Evidentiary Support For Its Claims Regarding The "Methods" By Which Navient Encouraged "Steering"*

Unable to dispute that Navient's policies and procedures required

representatives to discuss IDR, the CFPB aggressively distorts and

mischaracterizes certain documents to claim that Navient implemented a practice

of "steering" indirectly or even subliminally.  The CFPB describes four supposed

"methods" for conveying that "IDR enrollment was not important."  *See* CFPB Br.

at 9.  The evidence directly contradicts these claims.

*First*, out of the many procedures and tools that required Navient

representatives to inform borrowers about IDR, the CFPB misinterprets a single

"repayment guide."  *Id.*  The CFPB asserts that when borrowers "expressed that

they could not make their payment," the guide directed representatives to "offer only deferment and forbearance," even though borrowers could be eligible for $0 IDR payments. *Id.* Yet each time the CFPB asked a Navient employee—current or former—to interpret the guide the way the CFPB reads it, each witness testified that the CFPB had it wrong. RSUF ¶ 101. On its face, the guide prominently states in a red box that forbearance should not be considered "until all other options have been exhausted." SUF ¶ 204; PSUF Ex. 72. Moreover, other materials available to representatives throughout the alleged time period made clear that borrowers may be eligible for a $0 payment under IDR, SUF ¶¶ 204, 207–08, and representatives consistently testified that they discussed IDR with borrowers who could not make monthly payments, RSUF ¶ 101. Although the CFPB was able to lead an ED witness through its contorted interpretation, PSUF ¶ 106, the document was provided contemporaneously to ED officials, who approved the approach, RSUF ¶ 107, and said it would be "really helpful" in providing repayment information to borrowers, *id.*

*Second*, the CFPB points to the "average handle time" metric used as a component of employees' compensation and the supposed "pressure" placed on employees to meet that metric. CFPB Br. at 9. Again, it is only the CFPB's lawyers who theorize that encouraging representatives to have compliant and efficient calls resulted in "steering." The CFPB has not put forward *one witness*

23

who shortened call times by engaging in "steering" or otherwise omitting information about IDR, despite the fact that Navient produced the names and contact information for more than 3,000 former call representatives and supervisors, many of whom the CFPB evidently contacted.  RSUF ¶ 124 & n.6. The CFPB cites the declaration of one former representative who worked at the company for only five months.  *Id.* ¶ 109.  But even she testified that she did not attempt to shorten call times by enrolling borrowers in forbearance, nor could she identify a single instance in which a Navient colleague ever engaged in such conduct.  *Id.* ¶¶ 123–24.

The CFPB also submits .  PSUF ¶¶ 113–22.  But again, these documents provide no support for the CFPB's theory because

.  *See* PSUF Exs. 79, 83, 86–91. Indeed, other feedback from Navient's call monitoring instructed representatives to

RSUF ¶ 126; *see also id.* ¶¶ 113, 117. The CFPB itself relies on testimony showing that Navient implemented controls designed to prevent call representatives from cutting calls short by not assisting

borrowers.  *Id.* ¶¶ 65, 125.  But the CFPB turns this fact around to claim that it shows the Company "knew" forbearances *could* be provided quickly.  CFPB Br. at 31.  Thus, in the CFPB's perverse view, every compliance control is just more evidence that the company is promoting misconduct.

The CFPB's own evidence delivers the final blow. 

. RSUF ¶ 65.  Likewise, the call used in the CFPB's own expert survey as an example of a call that "described" IDR's benefits lasted just over four minutes,

. *Id.*  The CFPB fails to explain how Navient's efficiency metrics could have caused "steering" when such calls apparently take *twice as long* as conversations conveying the availability and benefits of IDR.

*Third*, unable to dispute that Navient representatives were *required* to discuss IDR when appropriate, the CFPB makes the conclusory assertion that the consequences of failing to do so were not "severe" enough.  CFPB Br. at 9.  Yet again, the record directly contradicts this assertion.  The very witness whose testimony the CFPB cites for this point explained that failing to discuss IDR would impact representatives' incentive compensation, and that further consequences would result if the conduct was not promptly corrected.  RSUF ¶ 126.  Other call

center supervisors, including the CFPB's own witnesses, confirmed that representatives were disciplined if monitoring revealed calls where they should have discussed IDR and failure to address the issue could result in termination. *Id.*

3.   *The CFPB's Evidence Regarding Purported Instances Of Steering Fails To Demonstrate That Navient Engaged In An Unfair Or Abusive Practice*

Given the CFPB's allegations of "pervasive" "steering," the CFPB should have no issue identifying impacted borrowers.  Yet, despite its assurances to the Court, Doc. 87, at 6:18–19, the CFPB's Motion does not present *even one borrower* it claims was "steered."  Instead, the CFPB points to two categories of material to claim that "steering" is "pervasive."  *First*, the CFPB cites a handful of Navient emails that purportedly describe instances of "steering."  *Second*, the CFPB relies on isolated phone calls its enforcement team identified as "steering" during a call review exercise it shielded from discovery.  Neither category of material meets the CFPB's burden to show a practice of "steering."

Isolated Emails.  The CFPB improperly relies on emails describing Navient's efforts to address one-off instances of non-compliance with its policies and procedures in support of its claim that Navient had a practice of "steering."  To the contrary, the documents show that when third parties informed Navient that individual representatives were not discussing IDR with borrowers, Navient took immediate steps to identify those representatives, ensure the issue was "isolated,"

and correct any misunderstandings regarding company's policies.  PSUF Exs. 56,

82.  Similarly, the internal emails the CFPB cites are yet more examples of the

system Navient put in place to identify and address instances in which

representatives acted *contrary to* Navient policies.  RSUF ¶¶ 127–40.  These

efforts were part of Navient's "commitment to compliance," which involved

"multiple layers of responsibility," PSUF Ex. 110 at A-2014, with call center

supervisors and management, compliance and quality assurance divisions, and the

CEO all listening to calls to ensure representatives were compliant with its

procedures and taking action when issues were identified, RSUF ¶¶ 127–34.

Isolated Calls.  In the face of substantial evidence that Navient established

and enforced procedures to inform borrowers about IDR, the CFPB relies on

improper evidence of isolated calls derived from an unrepresentative "sample" of

approximately ▮▮▮ calls (out of millions handled by Navient).  In a secret call

review by the CFPB enforcement team—shielded from discovery with attorney-

client privilege and work product assertions—450 calls were categorized as

"steering."  For the reasons set forth in Defendants' Motion to Strike, the

declarations supporting these assertions must be struck.  *See* Doc. 508.  Even if

considered, the declarations fail to support the CFPB's assertions that "steering"

was "pervasive" or "routine" for three reasons.

*First*, although the CFPB's statement of facts describes the sample as ███

█████████████████████████ the only citation in support is a declaration from

its own enforcement attorney, which █████████████████████████████

█████████████████ *See* PSUF ¶ 145, PSUF Ex. 288; Doc. 508 at 1, 12–13.

The CFPB's own description makes clear that the calls are not representative of

"borrowers . . . call[ing] about payment difficulties," CFPB Br. at 37. ████



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ PSUF Ex. 288 ¶ 3. ████████████

████████████████████████████████████████████

█████████████████████████████████████████ . RSUF ¶ 145.

With no evidence that the sample is representative, no extrapolation is possible:

the calls represent only isolated instances among the more than twenty-four *million*

calls from this time period (approximately 0.002%).  Doc. 470-1, Ex. A at 4–14;

RSUF ¶ 145.  The CFPB cites no authority for any claim that a tiny smattering of

calls establishes that Navient's "standard operating procedure" was to enroll

borrowers in forbearance without advising them about IDR.  *Wirtz*, 886 F.3d at 720

(quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 336 & n.16).

*Second*, the calls identified by the CFPB do not reveal any coherent practice of "steering." Instead, the CFPB uses the pejorative "steering" as a catch-all for different combinations of the CFPB's own criteria that meet five subjective "characteristics."[4] The first two criteria—that the call resulted in a prospective forbearance and that the "representative did not probe the borrower's hardship"— appear to be required (although apparently not always) for a call to "exhibit steering." Doc. 470-1, Ex. A at 1. But the third criteria, that the "representative did not adequately advise the borrower about IDR options," has three "different ways in which" that criteria can be met. *Id.* As just one perplexing example of many, the CFPB characterizes a call as "steering" where the representative describes IDR as "a very beneficial plan" and tells the borrower that it "sets you up for loan forgiveness after 25 years." RSUF ¶ 148. In response, the borrower requests forbearance "for [a] while until [he could] just get [his] feet more on the ground, since [he] just switched jobs." *Id.* It is unclear how such a call can be part of a "practice" of "pushing" borrowers into forbearance, or how the Court would craft an actionable injunction prohibiting such a "practice" of "steering."

---

[4] The CFPB's assertions regarding these calls are often inaccurate and disregard this Court's Order limiting the number of factual assertions allowed. RSUF ¶¶ 145–51, 155–57; Doc. 463 at 2.

*Third*, the CFPB's claims regarding this supposed "sample" are undermined by a separate call review exercise conducted by ED.  After analyzing more than 2,000 interactions between Navient representatives and borrowers from January 2014 to March 2017, ED "concluded that Navient *was not improperly steering borrowers into forbearance*."  *Id.* ¶ 107 (emphasis added).  Based on its review and ongoing oversight, ED recognized that Navient "had among the highest take-up rates for [IDR] plans [of federal loan servicers]," and "the duration of forbearances for Navient borrowers was actually among the lowest of the Department's nine servicers."  *Id.*  As the contracting party and the agency actually responsible for setting requirements and overseeing federal student loan servicers—as well as the agency *on whose behalf* Navient serviced most of these loans—ED's views on this issue should be dispositive.

> 4. *The CFPB's Theories Regarding The "Reasons" Navient Might Have Engaged In Steering Are Contradicted By Its Own Evidence*

Unable to identify evidence of an actual practice of "steering," the CFPB resorts to unsupported theories of why Navient might have wanted "to maintain low IDR enrollment."  CFPB Br. at 8.  These theories ignore critical and undisputed facts—notably that, under its ED contract, Navient was paid more for borrowers in repayment, including IDR, than for borrowers in forbearance.  RSUF ¶¶ 31, 35.  The CFPB does not even attempt to prove that its nebulous and

speculative theories outweigh the profit motive Navient had under the ED contract.

Moreover, the CFPB entirely fails to connect any of its supposed motives to

Navient policies or the conduct of call center representatives.

*First*, the CFPB claims that Navient "understood that it would realize

significant cost savings by keeping calls with borrowers as short as possible."

CFPB Br. at 8.  It is self-evident that, all else equal, reducing average call times

can result in a reduction in employee costs.  RSUF ¶ 67.  But the CFPB has no

evidence to draw a line from an interest in efficient calls to the use of forbearance.

*See supra* pp. 4–6.  To the contrary, several witnesses testified that efficient calls

can be beneficial to borrowers' understanding of repayment options.  RSUF ¶ 113.

Tellingly, the CFPB relies on a ten-year-old document for its call-time

theory.  PSUF ¶ 61.  Such evidence, from well outside the applicable limitations

period, can have only limited relevance.  *Dickerson v. U.S. Steel Corp.*, No. 73-

1292, 1977 WL 833, at *2 (E.D. Pa. Feb. 28, 1977) ("[P]re-limitations period

evidence[] is relevant only to the extent it is perpetuated into the relevant time

period.").[5]  In any event, the document makes no mention of reducing call times by

---

[5] Putting aside the statute of limitations issues created by the Supreme Court's
recent *Seila Law* decision, Doc. 505, the CFPA counts against Navient are
otherwise barred for conduct prior to January 20, 2012.  Doc. 470 at 63.  Claims
against Navient Corporation and Pioneer, which were not parties to the tolling
agreement, are otherwise precluded for acts prior to January 18, 2014.  *Id.* at 63
n.18, 64.

"steering" borrowers into forbearance. Instead, the document specifically references Navient's efforts to "improve our ability to communicate the benefits of . . . 'Income Based Repayment.'" PSUF Ex. 67 at A-1279. That makes sense; Congress had recently expanded the availability of IDR to borrowers with higher incomes. JSUF ¶¶ 9–10. Less than a month later, the document's author circulated several IDR-related initiatives, describing IDR as a "silver bullet" that was "critical to [Navient's] success." RSUF ¶ 61. The CFPB does not explain how a 2010 document discussing the company's plan to improve its IDR communications as the program expanded shows a nefarious "motive" to steer borrowers away from IDR for the following decade. The CFPB also cites a document that in fact confirms that Navient's "current philosophy" in 2013 was to "[m]inimize use of forbearance prospectively" and "[m]aximize use of repayment options." *Id.* ¶ 63. Nothing in the record indicates Navient changed this philosophy, as its policy continued to be to inform borrowers about IDR and present forbearance as a last resort. SUF ¶¶ 204–05. Again, Navient's actual incentives under the ED contract were consistent with its policy: ED paid Navient *more* for borrowers in repayment, including IDR, than for borrowers in forbearance, and assigned more loans to servicers based on a scorecard that factored in the results of ED's oversight. *Id.* ¶¶ 31, 35.

*Second*, the CFPB's theory regarding asset-backed securities is completely devoid of support.  The theory, it seems, is that Navient had a motive to avoid extending the payment terms of federal loans packaged into asset-backed securities and therefore sought to discourage IDR enrollment (which can extend the term of a borrower's loan).  But as the CFPB concedes, forbearance can *also* extend the term of a borrower's loan, *see* CFPB Br. at 32, and the CFPB offers no evidence whatsoever that IDR and forbearance differ in their effects on asset-backed securities.  That failure of proof alone dooms the CFPB's theory.[6]  Further, the CFPB provides no explanation for how its theory could apply to the majority of the loans serviced by Navient, those owned by ED, which are not included in asset-backed securities.  RSUF ¶¶ 13, 68; JSUF ¶ 3; RSUF Ex. 23 at NAV-00001228.

Moreover, even if the CFPB had evidence that IDR posed some special risk to asset-backed securities compared to forbearance, there is yet another missing link in its theory:  How did Navient Corporation employees, who oversaw asset-backed securities, communicate a supposed interest in "keeping IDR enrollment

---

[6] Contrary to the CFPB's assertion that Navient Corporation "sought to assure investors that IDR enrollment would be limited," CFPB Br. at 8, the record shows that Navient *in fact* told investors it "promotes" IDR in its call centers, but that enrollment had been limited by income requirements and the paperwork required to enroll, *see* RSUF ¶ 80.  The CFPB also ignores that Navient Corporation found a simple (and not costly) solution to the "perceived risk" that its bonds would not pay off by their legal final maturity dates, CFPB Br. at 31; it extended the maturity date, RSUF ¶ 95.

low" to the representatives in Navient's call centers?  The answer is they did not; there is no evidence whatsoever of such a scheme, which would be entirely inconsistent with Navient's policy and practice of promoting IDR, including through *millions* of notices about IDR every year, millions of calls with representatives trained to discuss IDR, and various initiatives specifically designed to increase IDR enrollment.  SUF ¶¶ 5–11; RSUF ¶¶ 47, 123, 145, 170–74; PSUF Ex. 40 at A-646.[7]  The CFPB makes no attempt to reconcile these efforts with a secret motivation to "keep[] IDR enrollment rates low."  CFPB Br. at 33.

### B.      The CFPB Fails To Establish Any Abusive Or Unfair Acts

After interviewing at least forty-eight borrowers in search of support for its "steering" claims, the CFPB has not put forward a single "steered" borrower in support of its Motion.  Instead, the CFPB's purported evidence of "steering" boils down to isolated phone calls declared to be "steering" based on an elaborate CFPB-created review matrix.  Doc. 470-1, Ex. A; *see also* CFPB Br. at 9–10; RSUF ¶¶ 145–51; PSUF Ex. 289.  The outcome of this review should be disregarded, *see* Doc. 508, but even if the review is considered, the conduct the CFPB labels "steering" fails to meet the statutory requirements for an unfair or

---

[7] Indeed, the CFPB's *entire argument* on Count III arises from a Navient project designed to *increase* IDR recertification rates by revising its communications regarding IDR renewal deadlines.  *See* RSUF ¶¶ 168–75.

abusive act under the CFPA, for two reasons.  *First*, the law requires the Court to consider the "entire course of dealing" between Navient and a borrower—not an individual phone call in isolation.  *Second*, even when applied to isolated calls, the CFPB's steering criteria do not satisfy the elements of unfairness and abusiveness.

### 1.   The CFPB Cannot Satisfy The Elements Of Unfairness Or Abusiveness With Isolated Calls

The law does not permit a single call to be evaluated "in isolation."  *See* CFPB Consumer Laws and Regulations: Unfair, Deceptive, or Abusive Acts or Practices (hereinafter "CFPB UDAAP Examination Manual") at 5 (2012)[8] ("[A]n individual statement, representation, or omission" must be evaluated "not in isolation, but rather in the context of the entire . . . transaction[] or course of dealing."); *see also* Doc. 470 at 25–26 (collecting cases).  Accordingly, the 450 calls the CFPB identifies as instances of "steering" must be considered in the "entire course of dealing" between Navient and each of those 450 individual borrowers.

As with the experiences of the CFPB's borrower witnesses, the course of dealing between Navient and these borrowers shows that they were repeatedly informed about IDR, both before and after the call selected by the CFPB.  ▮

---

[8] https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf.

██████████████████████████████████████████████████

████████████████████████████████████████.  RSUF

¶ 145.  █████████████████████████████████████████

███████████████████████.  *Id.*  Moreover, the experiences of the CFPB's

actual witnesses suggest that borrowers may have otherwise been aware of IDR.

SUF ¶¶ 36, 84.

Against this evidence, the CFPB fails to meet its burden to show that any

injury to these borrowers was "not reasonably avoidable."  12 U.S.C.

§ 5531(c)(1)(A).  Although the CFPB claims that borrowers "would have no

reason to suspect that the representative is omitting a potentially beneficial option

from the discussion," CFPB Br. at 38, this conclusory claim ignores completely the

numerous IDR notices each borrower received and the "routinely established

[federal] disclosure requirements that mandate that businesses provide to

consumers general information about material terms, conditions, or risks related to

products or services."  CFPB, Final Rule on Payday, Vehicle Title, and Certain

High-Cost Installment Loans ("Revocation Final Rule") at 35 (July 7, 2020).[9]

Similarly, the CFPB inappropriately disregards the disclosure made on each phone

call that *identified IDR* as a potential option, Doc. 470-1, Ex. A at 1, as well as the

---

[9] https://files.consumerfinance.gov/f/documents/cfpb_payday_final-rule-2020-revocation.pdf.

numerous additional calls involving *the same borrowers* on which Navient representatives explained IDR and its potential benefits—many of which occurred shortly before or after the calls arbitrarily selected by the CFPB, RSUF ¶ 145.

Instead, the CFPB's "steering" criteria would require servicers to make an individualized determination on each phone call that "the borrower would be able to resume repayment once the forbearance concluded."  Doc. 470-1, Ex. A at 1. But just last week the CFPB issued a final regulation (after prolonged notice and comment) expressly rejecting the notion that such individualized assessments of a borrower's financial circumstances have any place in a "reasonable avoidability" analysis, describing such a standard as "problematic" and contrary to decades of unfairness precedent.  Revocation Final Rule, at 51; *see also id.* at 34–36, 46–48. The correct standard is whether consumers "have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end."  *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988); *see also* Revocation Final Rule at 55 ("[T]he revised reasonable avoidability standard adopted by the Bureau in this final rule requires that covered loan borrowers have an understanding of the likelihood and magnitude of risks of harm . . . *sufficient* for them to anticipate those harms and understand the necessity of taking reasonable

steps to prevent resulting injury." (emphasis added)).[10]  The CFPB's unsupported "steering" criteria in this case is inconsistent with decades of "reasonable avoidability" jurisprudence and its own recent regulatory pronouncements.  The pertinent legal question is not whether Navient made individualized determinations for each borrower, but rather whether borrowers received sufficient information about the availability of IDR prior to, during, or after the call such that they have the awareness and means to choose that option and avoid any injury.  *See* Revocation Final Rule at 56 ("It is well-established that consumers can reasonably avoid injury through either 'anticipatory avoidance' or 'subsequent mitigation' . . . ." (quoting *Orkin Exterminating Co.*, 849 F.2d at 1365)).

Furthermore, the CFPB's own evidence defeats its assertion that any injury was not "reasonably avoidable." ███████████████████████████

████████████████████████████████████████████

███████████████████████ RSUF ¶ 151. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███. *Id.*  This evidence reflects a critical fact that the CFPB prefers to ignore:

---

[10] The Final Rule adopted the reasoning and legal analysis in its prior proposed rule, which reasoned that consumers did not need to have a "specific understanding of their individualized likelihood and magnitude of harm."  Revocation Final Rule at 34.

servicers like Navient are *unable* to enroll borrowers in IDR over the phone.  JSUF
¶ 30.  Rather, borrowers must use the ED website (or a paper form) to enroll, JSUF
Ex. 4 at JS113, and therefore the only thing servicers can do is to provide
borrowers with information about IDR options, which is exactly what Navient did.

Likewise, the CFPB has not and cannot show that these borrowers suffered
"substantial injury" or were "[taken] advantage of" by enrolling in forbearance.  As
the CFPB concedes, choosing the "best" repayment plan is an "individualized
decision."  PSUF ¶ 59.  But whether a borrowers' individual circumstances support
an "individualized decision" to enroll in IDR cannot be determined from the four
corners of a single isolated phone call.  For example, an individual borrower may
be better off obtaining a forbearance and remaining on the standard ten-year
payment plan, rather than enrolling in IDR.  Although its Motion focuses solely on
IDR's benefits, the CFPB and its witnesses have elsewhere acknowledged the
downsides of enrolling in IDR.  As the CFPB has publicly stated, enrolling in IDR
"often means paying more over the life of your loan."  *See* CFPB Payback
Playback (2017);[11] *see also* PSUF Ex. 51 (ED Website) at A-1113 ("[W]henever
you make lower payments or extend your repayment period, you will likely pay
more interest over time—sometimes significantly more."); PSUF Ex. 52 at A-1117

---

[11] https://files.consumerfinance.gov/f/documents/201701_cfpb_payback-playbook-disclosures-revised.pdf.

(ED Website) (explaining that the Standard Repayment Plan "saves you money over time").  And one of the CFPB's borrower witnesses complained that he had been "screwed" by IDR because, after he was enrolled for a number of years, he actually owed more than he did before.  SUF ¶¶ 119–20.  Moreover, among the borrowers who were purportedly "steered," Doc. 470-1, Ex. A at 4–14, are many who made clear that their hardship was short-term, RSUF ¶ 149, and resumed making payments after their forbearances ended, *id.*  The CFPB cannot show that these borrowers would have been better off in IDR and were harmed by enrolling in forbearance.

2.   *When (Inappropriately) Applied To Isolated Calls, The CFPB's "Steering" Criteria Remain Divorced From The Actual Elements Of Unfairness And Abusiveness*

Even if—contrary to law and the CFPB's own guidance—the calls are considered apart from the borrowers' other communications with Navient, the calls themselves demonstrate that the CFPB's "steering" matrix has nothing to do with the elements of an unfair or abusive act.  To the contrary, the CFPB identifies as "steering" numerous calls that lack anything approaching the coercive conduct or hindrance to consumer decision-making required under the CFPA.

*First*, the CFPB's "steering" matrix includes no requirement that the borrower demonstrate any "reliance" on Navient to identify the best option for their financial situation.  12 U.S.C. § 5531(d)(2)(C).  Although the CFPB asserts

that borrowers "reasonably relied on Navient for advice about repayment options in phone calls," CFPB Br. at 27, it points to just three calls on which borrowers indicated any such reliance, claiming without support that borrowers exhibited similar "reliance" on "numerous" other calls. PSUF ¶¶ 155–57. In fact, borrowers far more commonly called Navient specifically to request forbearance, without inquiring as to other options, ███████████████████████████████████ ███████████. RSUF ¶ 155. The CFPB fails to explain how any of these borrowers "relied on Navient for advice about repayment options," CFPB Br. at 27, or how Navient "hinder[ed] [borrowers'] decision-making" merely by granting the option the borrowers requested (as required by ED rules), CFPB UDAAP Examination Manual at 2.

*Second*, the CFPB's matrix categorizes calls as "steering" with no consideration for whether IDR represented a viable alternative for the borrower. *See* Doc. 470-1, Ex. A at 1–2. This includes calls where the borrower was not eligible for IDR, *id.* ¶¶ 146–47, could not afford the IDR payment available under federal rules, *id.* ¶ 148, or were seeking to have their loans paid off, *id.* ¶ 149. The CFPB fails to explain how any of these borrowers were harmed by forbearance.

*Third*, the calls fail to establish that Navient obtained any "advantage" from the calls meeting the CFPB's criteria, or that Navient representatives engaged in anything like the "coercive" or "oppressive" behavior required to prove unfairness

41

or abusiveness. *See ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913–19. Rather, these calls consistently show Navient representatives taking significant time— often upwards of twenty and even forty minutes—to listen to borrowers and walk them through potential solutions. There is no allegation that borrowers were not informed of the terms and conditions of forbearance. Moreover, ███████████████ ███████████████████████████████████████████, RSUF ¶ 155, where the likely outcome if Navient had not called was further delinquency and potentially default, PSUF Ex. 110 at A-2016. The CFPB does not even attempt to show that such borrowers were rendered worse off by answering Navient's call and enrolling in forbearance.

Far from demonstrating that Navient "injured" or "took advantage" of borrowers by granting them forbearance, the calls identified by the CFPB confirm that its pejorative "steering" catch-all has nothing to do with the actual elements of unfairness or abusiveness, and would instead work to deny borrowers' access to a federally provided *benefit* designed to help borrowers avoid delinquency and default. As demonstrated in Defendants' Motion, the CFPB's failure to establish "steering" as an act or practice inconsistent with the CFPA requires summary judgment in Navient's favor. *See* Doc. 470 at 32–40.

## II.  THE COURT SHOULD DENY THE CFPB'S MOTION ON COUNTS III AND VI BECAUSE THE CFPB HAS FAILED TO PROVE ANY UNFAIR PRACTICES

Defendants address the CFPB's additional unfairness claims together.  For Counts III and VI, the CFPB must establish "substantial injury" that was neither "reasonably avoidable" nor "outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1)(A)–(B).  The CFPB fails to do so; its Motion must be denied and Navient's granted.

### A.  The CFPB Fails To Prove Navient's Use Of Secure Emails Was An Unfair Practice

The CFPB's Motion asserts that Navient's practice until March 2015 of sending an email notification with a link to a message posted on borrowers' online accounts was unfair because the notification did not specify that the linked message related to IDR renewal.  CFPB Br. at 41–42.  The CFPB lacks a single witness or any other admissible evidence of "substantial injury" that was not "reasonably avoidable" by the borrower simply clicking on the link or opting out of electronic communications.[12]  And on the final element it must prove, the CFPB simply asserts that no countervailing benefits exist, ignoring that secure emails promote privacy and safeguard consumer information.

---

[12] Tellingly, despite claiming it would "set forth" the "computation of . . . damages . . . in Rule 26(a)(2) expert disclosures," SUF ¶ 2, the CFPB has produced no such calculation, *id.* ¶ 3.

1. *The CFPB Has No Evidence That Any Borrower Experienced "Substantial Injury" That Was "Not Reasonably Avoidable"*

Substantial injury:  The CFPB's "evidence" of substantial injury consists entirely of inadmissible inferences from a March 2015 change to the email notification.  In particular, the CFPB focuses on (1) a change in the rate that borrowers opened their emails and (2) a change in the percentage of borrowers who recertified, and claims that these changes show that the earlier email notification was unlawful.  CFPB Br. at 41–44.  But this evidence is clearly impermissible:  "only admissible evidence [can] be offered in summary judgment proceedings [and] [e]vidence of subsequent remedial measures is not admissible to prove . . . culpable conduct," *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 43 n.7 (3d Cir. 2009).  *See* Fed. R. Evid. 407; *Hogan v. City of Easton*, No. 04-759, 2006 WL 3702637, at *7 (E.D. Pa. Dec. 12, 2006) (Rule 407 exists to encourage parties to "take action" and "make[] improvements").

Reasonably avoidable.  Evidence that any injury was not "reasonably avoidable" is also lacking.  An injury is reasonably avoidable if "consumers had a free and informed choice."  *ITT Educ. Servs. Inc.*, 219 F. Supp. 3d at 916 (quoting *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)).  Here, it is undisputed that all borrowers who received the notification *chose* to have electronic communications posted on their online accounts (even without an accompanying email notification).  SUF ¶ 231.  Any harm was thus entirely

avoidable by borrowers clicking the link in the email notification or monitoring their online accounts.  *Id.*

The evidence on which the CFPB relies for this element is inadmissible and irrelevant.  *First*, the CFPB cites three borrower complaints as support for its assertion that "[b]orrowers complained to Navient about the volume of 'spam' email they received from Navient."  CFPB Br. at 43.  None of these complaints concerned the email at issue.  PSUF Ex. 136 at A-2278; PSUF Exs. 135 at A-2273, 130 at A-2201.  They are also inadmissible hearsay.  *See, e.g.*, Fed. Rs. Evid. 802, 805; *QVC, Inc. v. MJC Am. Ltd.*, No. CIV.A. 08-3830, 2012 WL 33026, at *2 (E.D. Pa. Jan. 6, 2012); *Schriner v. Sysco Food Serv. of Cent. Pa.*, No. CIV. 1CV032122, 2005 WL 1498497, at *1 n.2 (M.D. Pa. June 23, 2005).  The only borrower witness to testify on this claim (whom the CFPB tellingly ignores) stated that his practice was to regularly monitor the online account—showing that any harm was in fact "reasonably avoidable."  Doc. 470 at 41.

*Second*, the CFPB cites internal Navient emails regarding ████████████ ████████████████████████████████████████████████.  RSUF ¶¶ 167, 168, 170.  This is more inadmissible "subsequent remedial measures" evidence.  *See Reynolds v. Univ. of Pennsylvania*, 483 Fed. App'x 726, 731 n.2 (3d Cir. 2012) ("Changes in contract language may be considered subsequent remedial measures or 'repairs,' pursuant to Rule 407."); *Cox Operating, L.L.C. v. Settoon*

*Towing, L.L.C.*, No. CIV.A. 17-1933, 2018 WL 3862072, at *1–2 (E.D. La. Aug. 13, 2018) (all evidence of an internal policy improvement, including an email and related deposition testimony, were inadmissible under Rule 407).  The Court should "forbid [this] later corrective action from being used as evidence, so as to not pose a disincentive to appropriate changes in behavior." *Stone v. Troy Constr., LLC*, 935 F.3d 141, 151 n.13 (3d Cir. 2019).

>    2.    *The CFPB Ignores The Countervailing Benefits of Secure Emails*

Directing personal financial communications to a borrower's online account as Navient did has obvious privacy and security benefits.  Yet the CFPB contends that it "is aware of no benefits to consumers and competition" from that practice. CFPB Br. at 44.  That assertion is refuted by the laws the CFPB administers and its own regulations.  Financial institutions have "an affirmative and continuing obligation to respect the privacy of [their] customers and to protect the security and confidentiality of those customers' nonpublic information."  15 U.S.C. § 6801(a); *see also* 12 C.F.R. § 1016.1 (Privacy of Consumer Financial Information (Regulation P)).  As the Commerce Department explained, "[a]s a general rule unencrypted email should be treated as a postcard – anyone can read and modify."  Miles Tracy et al., Nat'l Inst. of Standards & Tech., U.S. Dep't of

Commerce, *Guidelines on Electronic Mail Security* 8-4 (2007).[13]  Accordingly,

secure emails are still widely used in the financial services industry to protect

consumer information.[14]  Navient has continuously sought to strike a balance

between customer privacy and customer experience by limiting personal

information in emails.  RSUF ¶ 169.  That the balance changed over time does not

mean that the practice of limiting personal information in the earlier notification

had no countervailing benefits for privacy and security.  The CFPB's conclusory

assertions claiming otherwise are unavailing.  *See Kindred Studio Illustration &*

*Design, LLC v. Elec. Commc'n Tech., LLC*, No. CV 18-7661-GW(GJSX), 2018

WL 6985317, at *7 (C.D. Cal. Dec. 3, 2018) (conclusory assertion that injury is

not outweighed by countervailing benefit is insufficient, even at motion to

dismiss).

---

[13] https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-45ver2.pdf.

[14] *See* Chase, *Send Secure Messages. Get Secure Responses*, https://www.chase.com/digital/login-secure-message (last visited July 10, 2020); HSBC, *Secure Email Communications*, https://www.hsbc.com/online-security/secure-email-communications (last visited July 10, 2020); TD Bank, *What Is My Secure Inbox?*, https://td.intelliresponse.com/login/?requestType=NormalRequest&source=3&id=1092&question=What+is+my+secure+inbox (last visited July 10, 2020).

**B.     The CFPB Failed To Establish Any Unfair Practices In Navient's Payment Processing**

Navient processes tens of millions of loan transactions every year, SUF ¶ 268, and as with any operation of that size, there are likely to be occasional errors.  The CFPB attempts to turn those occasional errors into a violation of the CFPA by rewriting the standard for unfairness in two ways.  *First,* as a threshold matter, the CFPB's Motion never identifies a specific "act or practice" that it contends caused any particular injury.  *Second,* the evidence the CFPB advances cannot satisfy the "substantial injury" element.  Rather than establish an "unfair practice," the CFPB's exhibits show that Navient has robust processes in place to address errors and proactively identifies areas for improvement.  As such, the CFPB's claim fails as a matter of law.

> 1.     *The CFPB Does Not Identify A Specific "Act or Practice" That "Caused" Any Particular Injury*

This Court permitted the CFPB's claim to proceed without requiring a more definite statement because the CFPB had identified "specific examples of payment processing errors and then allege[d] that Navient *failed to have policies and procedures in place* to identify and prevent *the same processing errors* from occurring month after month."  Doc. 57 at 60 (emphasis added).  On summary judgment, the CFPB now must identify the *specific* policies and procedures that were lacking and therefore caused injury.  Instead, the CFPB's claim is no more

definite than it was at the start:  it continues to vaguely assert that "Navient created

numerous obstacles that hindered borrowers' ability to instruct Navient how to

apply or allocate their payments to their loans," CFPB Br. at 55, without

identifying how those obstacles caused any particular injury.  Such a generalized

critique falls far short of identifying a particular unfair act or practice.  *See FTC v.*

*LendingClub Corp.*, No. 18-CV-02454-JSC, 2020 WL 2838827, at *22 (N.D. Cal.

June 1, 2020) (denying summary judgment because question whether

"unauthorized withdrawals at issue constitute an 'unfair practice,' or if they were

instead the result of inadvertent human and automated error inherent in any ACH

payment system that services millions of consumers"); *cf. FTC v. Wyndham*

*Worldwide Corp.*, 10 F. Supp. 3d 602, 624 (D.N.J. 2014) (denying motion to

dismiss unfairness claim where FTC alleged four lacking security practices and the

four corresponding ways in which hackers were able to breach defendant's

security), *aff'd*, 799 F.3d 236 (3d Cir. 2015).  The closest the CFPB comes to

identifying a "practice" is to point to the lack of system functionality to handle

"standing" borrower instructions.  CFPB Br. at 56–57, PSUF ¶¶ 292–98.  But the

CFPB stops short of claiming that this itself was an unfair practice—in part, no

doubt, because ED explicitly rejected such a requirement for federal student loan

servicers.  SUF ¶¶ 273.

Because the CFPB has not identified *any* particular practice, it also has not met its burden to establish that any act or practice "caused" a particular injury. Instead, the CFPB summarily asserts that Navient could have improved its payment functionality and that, "as a result of these issues, large numbers of its borrowers found it difficult to apply or allocate their payments the way they wanted," and "these errors resulted in a number of injuries to borrowers." CFPB Br. at 57. This kind of broad-brush claim—in effect, that a defendant "could have done better"—is not sufficient to establish that an act or practice caused a concrete and quantifiable harm. *See Siegel*, 612 F.3d at 937 (plaintiff must put forward evidence on summary judgment that defendants' conduct caused harm under state unfairness law).

### 2. There Is No Evidence of "Substantial Injury"

The CFPB's Motion should also be denied because it cannot meet its burden to prove "substantial injury." As the CFPB recognizes, "[s]ubstantial injury usually involves monetary harm," and "more subjective types of harm . . . will not ordinarily amount to substantial injury." CFPB UDAAP Examination Manual at 2. "[A] trivial or speculative harm will not suffice." *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 913; *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (affirming district court's "concrete and quantifiable finding" of harm). The CFPB

puts forward three categories of evidence, PSUF ¶¶ 283–91, none of which support

a "concrete and quantifiable finding" of harm.

    <u>Evidence of Process Improvements.</u>  More than forty paragraphs in the

CFPB's statement of facts recount Navient's continuous efforts to improve its

payment processes.  PSUF ¶¶ 239–79.  Much of this material is the same sort of

inadmissible "subsequent remedial measures" the CFPB relies on elsewhere, *see*

RSUF ¶¶ 239–49, 258–79; *supra* pp. 44, 45–46, but in any event, it does not

establish a "concrete and quantifiable" harm to borrowers, *see Neovi, Inc.*, 604

F.3d at 1157.

    *First*, presentations by a consultant identifying opportunities for

improvement in 2011 do not support the CFPB's assertion that Navient's

"misapplied and misallocated payments resulted in issues such as 'inaccurate credit

bureau reporting' and 'continued collection efforts.'"  CFPB Br. at 57; RSUF

¶ 283, PSUF Exs. 178, 179.[15]  In suggesting process improvements, the

presentations merely call out the potential "impact" of "misapplied payments,"

without any discussion as to whether it actually occurred.  PSUF Ex. 178 at

A-3113; *accord* PSUF Ex. 179 at A-3197.

---

[15] These exhibits not only describe subsequent remedial measures, but ones that were implemented *before* the applicable limitations period. *Dickerson*, 1977 WL 833, at *2 ("[P]re-limitations period evidence[] is relevant only to the extent it is perpetuated into the relevant time period.").

*Second*, a 2014 presentation from Navient's Payment Allocation Task Force says nothing about any injury. The Task Force, which focused on potential *improvements* to the customer experience, interviewed twenty customers who had made more than their minimum monthly payment at least once over the prior year. RSUF ¶ 272. Included in the Task Force's summary of findings from these interviews is the following bullet: "Customers who do not choose to indicate a particular loan against which to allocate extra payments do so because it isn't easy to indicate, or they don't differentiate among their loans." *Id.* ¶ 284. From this statement alone, the CFPB concludes that, had an unknown number of those borrowers found it easier to allocate extra payments to their loans, and had they in fact made those extra payments, then they may have ended up paying less over the life of their loan. This is the very definition of "speculative harm [which] will not suffice." *ITT Educ. Servs., Inc.*, 219 F Supp. 3d at 913.[16]

Borrower Complaints. The CFPB relies on one anonymous borrower complaint Navient received in 2010 (again, outside the limitations period), and another complaint from 2013 submitted to the CFPB Complaint Database. CFPB Br. at 57–58, PSUF ¶¶ 286–87. Neither of these individuals are witnesses and

---

[16] The cited statement is also hearsay within hearsay—Navient's Task Force reporting on what the interviewed consumers told them—and therefore inadmissible. *See* Fed. Rs. Evid. 802, 805; *see also* RSUF ¶ 274.

these complaints are no more than hearsay.  *See QVC, Inc.*, 2012 WL 33026, at *2;

RSUF ¶ 286–87.  But even if considered, they do not establish "substantial injury"

for these two (out of millions of) borrowers.  Navient's internal summary of the

2010 complaint states:

> Collections contacts her stating her account is past due however her
> bank has submitted the payments on her behalf. . . . Letter has been sent
> to BBB explaining that the co-signers payments received were
> misapplied.  The payments have been corrected and any late fees
> assessed were reversed.

PSUF Ex. 173 at A-2921; *see also* RSUF ¶ 286.  The CFPB's exhibit therefore

establishes that this unidentified individual suffered no financial harm, even though

the CFPB cites it as evidence that Navient's practices resulted in "the borrower

incurring late fees," CFPB Br. at 57.  Likewise, Navient's response to the 2013

complaint states that the error "was corrected . . . [and] any late fees assessed as a

result of the misapplied payment have been reversed."  PSUF Ex. 168 at A-2731;

*see also* RSUF ¶ 287.

Borrower Witnesses. The CFPB cites the experiences of just four borrowers

identified as witnesses (and therefore deposed) to argue that "[s]everal consumers

testified regarding the need for multiple calls month after month and the stress,

frustration, and lost time spent trying to address misapplied payments."  CFPB Br.

at 58.  But their deposition testimony confirms that *none* of them suffered financial

harm, SUF ¶¶ 279–305, and time spent, without any tangible harm, is insufficient

to establish "substantial injury," *see* Doc. 470 at 47–49 & n.16.  The CFPB's

Motion must be denied, and summary judgment should be granted for Navient.

## III.  THE CFPB CANNOT ESTABLISH DECEPTION AS REQUIRED FOR COUNTS IV AND V

To prevail on Counts IV and V, both deception claims, the CFPB must

establish that (1) "there is a representation, omission, or practice that," (2) "is

likely to mislead consumers acting reasonably under the circumstances," and

(3) "the representation, omission, or practice is material."  *CFPB v. Gordon*, 819

F.3d 1179, 1192–93 (9th Cir. 2016) (quoting *FTC v. Pantron I Corp.*, 33 F.3d

1088, 1095 (9th Cir. 1994)).  The CFPB has not and cannot meet these elements on

either claim.

### A.  The CFPB Cannot Establish That The Renewal Notices Were Materially Misleading

The CFPB survived Defendants' motion to dismiss Count IV by arguing that

dismissal could not be premised on the face of the letter alone and that after the

opportunity for discovery it could "prevail in proving its factual allegations" that

the renewal notice materially misled borrowers.  Doc. 36 at 28.  Yet, three years

later, the CFPB seeks summary judgment based entirely on "the language in the

letter."  CFPB Br. at 48.  The CFPB has run out of mulligans.  Its Motion should

be denied and Defendants' granted for three reasons.

*First*, as described above, "an individual statement, representation, or omission" must be evaluated "not in isolation, but rather in the context of the entire . . . transaction[] or course of dealing."  CFPB UDAAP Examination Manual at 5.  Nevertheless, the CFPB argues that Navient "created the false impression that a processing delay would be the only consequence of submitting an incorrect or incomplete recertification application," CFPB Br. at 45, but *fails even to submit to the Court a complete exhibit* of the entire communication, *see* PSUF Exs. 118, 121.  When the notice is considered as a whole, including the attached forms the CFPB failed to include, the consequences of failing to renew are clearly disclosed.  Doc. 470 at 50–52.  *See, e.g., FTC v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 559–60 (W.D. Pa. 2006) (stating that the court "must consider the overall, common sense, net-impression" of the notice "on a reasonable consumer," and the notice "must be viewed as a whole without emphasizing isolated words or phrases").

*Second*, contrary to the promises it made to survive the motion to dismiss, the CFPB has no evidence that *a single consumer* was likely to be misled into thinking "that a processing delay would be the only consequence of submitting an incorrect or incomplete recertification application."  CFPB Br. at 45.  The CFPB has no borrower witnesses in support of this claim; nor does the CFPB have any survey evidence showing that borrowers presented with the notice as a whole would perceive the message the CFPB argues was implied.  Such evidence is

required where a notice, at best, "faintly implies a claim," *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 Fed. App'x 358 (11th Cir. 2009), or in this case, does not imply the alleged claim at all, *see Kraft, Inc. v. FTC*, 970 F.2d 311, 320 (7th Cir. 1992) ("The Commission does not have license to go on a fishing expedition to pin liability on advertisers for barely imaginable claims falling at [the barely discernible] end of this spectrum.").

*Third*, the CFPB also has no evidence that the alleged false impression was material. In support of materiality, the CFPB cites only the fact that Navient revised its letters in December 2012. *See* CFPB Br. at 49–50 (citing only PSUF ¶¶ 190–91). Besides once again relying on subsequent remedial measures, *see supra* pp. 44, 45–46, that fact has no bearing on whether the statement was material to borrowers' decisions to carefully complete an IDR application. *See CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016) (holding misrepresentations are material if "they are likely to affect the consumer's conduct"). At summary judgment, the moving party must come forth with evidence. *Cf. SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 328 F. Supp. 3d 53, 64–65 (E.D.N.Y. 2018) (materiality requires "some evidence that customers' purchasing decisions were likely influenced by those statements"). The CFPB has none, and its Motion should be denied and Navient's granted.

### B.     The CFPB Cannot Establish That Statements Regarding Cosigner Release Were Materially Misleading

The CFPB similarly lacks evidence that Navient's statements regarding eligibility for cosigner release were materially misleading.  Again, the CFPB primarily relies on isolated statements—without consumer witnesses or survey evidence—to argue that the statements were false, and therefore material and likely to mislead.  CFPB Br. at 52, 54.  As an initial matter, the statements were true.  As such, to prove deception, the CFPB must present actual evidence that the statements were nevertheless likely to mislead and were material to consumers' decisions to take out or cosign loans.  The CFPB has no such evidence.

#### 1.     The Statements Were Not False

The CFPB points to a footnote on Navient's website stating, "To qualify for cosigner release, the borrower must have . . . made 12 consecutive on-time principal and interest payments."  PSUF ¶ 199.  *See also, e.g., id.* ¶¶ 200–01.  This statement is true.  A borrower who makes twelve consecutive, on-time payments is eligible to apply for cosigner release.  SUF ¶ 257; RSUF ¶¶ 195–96; *see* "Consecutive," Oxford Living Dictionary ("consecutive" means "[f]ollowing continuously," or "in unbroken sequence").

The CFPB's contorted explanations for how this statement is false are unavailing.  *First*, the CFPB complains that Navient did not "define the phrase 'consecutive on-time principal and interest payments,'" CFPB Br. at 12 (emphasis

added), and therefore had an "undisclosed requirement," *id.* at 50–51.  But in

arguing that *clarification* is required, the CFPB undercuts its position because

"only an *unambiguous* message can be literally false."  *Novartis Consumer Health,*

*Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587 (3d

Cir. 2002) (emphasis added).  *Second*, the CFPB resorts to elaborate speculation

that the statements were "false" for an imagined subset of borrowers who (1) might

have made a lump-sum payment, (2) might not have made a payment in a later

month when they received a bill for $0, (3) otherwise might have made the

required number of monthly payments, and (4) might thus be denied eligibility to

apply for cosigner release.  CFPB Br. at 51–52.  Such hypothetical theories cannot,

as a matter of law, be the basis for a claim of literal falsity.  *See Kraft, Inc.*, 970

F.2d at 318 n.4  ("Express claims directly represent the fact at issue while implied

claims do so in an oblique or indirect way."); *FTC v. Patriot Alcohol Testers, Inc.*,

798 F. Supp. 851, 858 (D. Mass. 1992) (denying summary judgment where

challenged representation was true for some consumers but not others).

> ###    2.    *There Is No Evidence The Statements Were Likely to Mislead*
> *Or Material*

"Where a statement is not literally false and is only misleading in context,"

"proof that the [representation] *actually* conveyed the implied message and thereby

deceived a significant portion of the recipients becomes critical."  *CFPB v.*

*Morgan Drexen, Inc.*, No. SACV-13-1267-JLS (JEMx), 2014 WL 12581776, at *7

(C.D. Cal. Nov. 25, 2014) (quoting *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (emphasis added)).  The CFPB has no such proof.  Here again, the CFPB has no borrower who claims she was misled; nor has it presented any survey evidence in support of this claim.  *See FTC v. Stefanchik*, 559 F.3d 924, 928–29 (9th Cir. 2009) (FTC submitted declarations from consumers who were misled, a consumer survey performed by a marketing expert, and customer records); *FTC v. Atlantex Assocs.*, No. 87-0045-CIV-NESBITT, 1987 WL 20384, at *10 (S.D. Fla. Nov. 25, 1987) (FTC offered consumer and expert testimony), *aff'd*, 872 F.2d 966 (11th Cir. 1989); *cf. Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 248 (3d Cir. 2011) ("If the message conveyed by an advertisement is literally true or ambiguous . . . the plaintiff must prove actual deception or a tendency to deceive, and it may do so with a properly conducted consumer survey.").

Instead, the CFPB again resorts to inadmissible evidence.  *First*, the CFPB points to hearsay complaints from borrowers who were never identified as witnesses.[17]  Most of these untested complaints concern cosigner release issues generally and do not refer to any misleading statement regarding the "consecutive,

---

[17] The complaints are inadmissible hearsay within hearsay not subject to an exception.  *See* Fed. Rs. Evid. 802, 805; *QVC, Inc.*, 2012 WL 33026, at *2; *Schriner*, 2005 WL 1498497, at *1 n.2; *see also* RSUF ¶¶ 194, 215.

on-time" payment requirement. *See, e.g.*, PSUF Ex. 285; RSUF ¶¶ 194, 215; *see FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 316 (S.D.N.Y. 2008) (granting defendant summary judgment where FTC's only evidence was a consumer declaration that did not indicate the defendant made any representation).

*Second*, the CFPB again relies on Navient's subsequent remedial measures—this time also resorting to reliance on work performed at the direction of in-house counsel and inadvertently produced in this litigation. *See* PSUF Exs. 17, 146, 148, and 157; RSUF ¶¶ 212–14, 217. That Navient changed its procedures, and engaged in efforts to confirm its representatives proceeded accordingly, does not show that any prior statements were misleading. *See supra* pp. 44, 45–46; *see also Reynolds v. Univ. of Pennsylvania*, No. CIV.A 06-1237, 2010 WL 2253732, at *3–5 (E.D. Pa. June 2, 2010) (excluding evidence of revisions to clarify possibly misleading statement and declining to parse out remedial statements from non-remedial statements), *aff'd*, 483 Fed. App'x 726 (3d Cir. 2012).

Nor does the CFPB have evidence of materiality. *See supra* p. 56. The CFPB primarily relies on the mere fact that Navient informs borrowers about cosigner release and the results of an internal Navient survey regarding the desirability of certain private loan features. CFPB Br. at 54–55. The fact that Navient marketed the availability of cosigner release generally does nothing to

show that a statement about the specific consecutive, on-time payments requirement was material to a consumer's decision to obtain or cosign a loan.[18] *See Gordon*, 819 F.3d at 1192 (an act or practice is deceptive if "the *representation . . .* is material."). And the survey in fact shows the opposite: it found that "cosigner release is *not* a statistical key driver" of interest in the private loan. RSUF ¶ 193 (emphasis added).

## IV. THE CFPB CANNOT ESTABLISH ANY DECEPTION WITHIN THE APPLICABLE LIMITATIONS PERIOD ON COUNTS VII THROUGH X

To encourage rehabilitation, the government offers significant benefits to borrowers who have defaulted on their federal student loans, including (1) deletion of the default trade line from a borrower's credit report, and (2) waiver of all remaining government-assessed collection fees once a borrower completes rehabilitation of an ED loan. *See* SUF ¶¶ 334, 336–37; RSUF ¶ 307. Borrowers were provided these benefits. The CFPB claims, however, that Pioneer agents made statements that led borrowers to believe that (1) *all* negative credit information related to the loan would be removed (beyond the record of default),

---

[18] Cosigner release is one of several private loan features displayed in Navient's marketing materials, including "Interest Rates," "Rewards for paying on time," "Repayment Terms," and "Fees." *See, e.g.*, PSUF Ex. 151 at A-2478, A-2484; *see also* PSUF Ex. 156 at A-2539–40 (cosigner release eligibility criteria is the last item mentioned after discussion of other cosigner considerations). That the specific cosigner release criteria were not prominently featured also suggests that it was not viewed as material to the consumer's decision.

CFPB Br. at 17–18, and (2) rehabilitation payments would not be applied to collection fees prior to completing rehabilitation.  *Id.* at 19; *see supra* pp. 16–17.

To prevail at summary judgment—and to defeat Pioneer's Motion—the CFPB must present evidence that Pioneer's statements were made during the limitations period and were both misleading and material to borrowers' decisions to enroll in rehabilitation.  *See FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013); *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015). It failed to do so.

### A.      There Is No Evidence of Any Alleged Misstatements Within the Statute of Limitations Period

The statute of limitations is one year under the FDCPA, and three years under the CFPA.  *See* 12 U.S.C. § 5564(g)(1) (CFPA); 15 U.S.C. § 1692k(d) (FDCPA); *see also* Doc. 470 at 64–66.  Yet every phone call the CFPB submitted in support of its Motion occurred prior to January 18, 2014, RSUF ¶¶ 332–33, 338, 340; SUF ¶ 349, the earliest the limitations period can extend against Pioneer.  The CFPB therefore has absolutely no evidence to show that the alleged statements were made during the limitations period.[19]  *Cf. FTC v. Life Mgmt. Servs. of Orange Cty., LLC*, 350 F. Supp. 3d 1246, 1264 (M.D. Fla. 2018) (finding that deceptive

---

[19] Other evidence on which the CFPB relies also predates the limitations period, including testimony of a former employee who left Pioneer in *November 2012*, CFPB Br. at 20; RSUF ¶¶ 353–54.

statements were made when the FTC submitted as evidence scripts, declarations, *and* transcripts of phone calls).

With no call recordings from the limitations period, the CFPB relies on a few specific words in Pioneer's training materials that—only if repeated *verbatim*—would allegedly leave borrowers with a misimpression about rehabilitation's benefits.[20]  CFPB Br. at 70.  But of the sixteen calls the CFPB submitted, *only one* repeats the language from the training materials verbatim.  *See* PSUF ¶¶ 332–33, 338, 340.  And none of the calls uses the same language as any other call.  *Id.*  As shown in the chart below, even minor deviations from the training materials would be enough to eliminate the purported misimpression claimed by the CFPB.

---

[20] Because the CFPB acknowledges that Pioneer's July 11, 2014, Rehab Process Guide did not contain any false or misleading statements, the only period potentially at issue under the CFPA is the six months between January 18, 2014 to July 11, 2014, and there is no evidence within the FDCPA limitations period. PSUF ¶¶ 341–42.  The CFPB points to three emails after July 2014 discussing ███. PSUF Exs. 231–33.  Each is again inadmissible evidence of remedial measures.  *See supra* pp. 44, 45–46.  Moreover, the emails discuss whether to discipline agents for making statements that may be *contrary to policy*, serving only to establish that Pioneer's materials were indisputably accurate by this time.

| Alleged Misrepresentation in Pioneer Training Materials | No Misimpression According to the CFPB |
|---|---|
| All the collection fees will be removed at the time of sale.  Also, it will be completely deleted from your credit report as though it never happened. PSUF ¶ 329. | All the **remaining** collection fees will be removed at the time of sale.  Also, **the record of default** will be completely deleted from your credit report as though it never happened. |
| After a minimum of 9 qualifying payments have been made, the defaulted student loan is eligible to be taken out of default and the record be removed from the borrower's credit report (all three national credit bureaus); and a positive trade displaying the new balance is placed on the credit report.  PSUF ¶ 327. | After a minimum of 9 qualifying payments have been made, the defaulted student loan is eligible to be taken out of default and the **default** record be removed from the borrower's credit report (all three national credit bureaus); and a positive trade displaying the new balance is placed on the credit report. |
| All of [the] collection fees are removed once you complete the program.  PSUF ¶ 335. | All of [the] **remaining** collection fees are removed once you complete the program. |

There is no basis to infer from the training manuals that any agent made the specific misstatements alleged during the limitations period.

## B.    The CFPB Has No Evidence That Any Alleged Misstatement Was Misleading

Even if the CFPB had evidence that such statements were made during the limitations period, it has no evidence that an alleged statement was misleading to consumers.  Again, the CFPB cites to sixteen different statements, RSUF ¶¶ 332–33, 338, 340, and summarily argues that any similar statement would be misleading to a "reasonable" consumer, CFPB Br. at 71–72.  As with other claims, the CFPB has no survey evidence that consumers found the alleged statements

misleading.  And the testimonial evidence (from outside the limitations period)

suggests that these statements were not misleading.

The CFPB disclosed two witnesses in support of this claim, both of whom

were deposed.  Tellingly, the CFPB proffers neither in support of its Motion.

- JS heard the following statements with respect to credit reporting: (1) "So the only person who would know that you were ever in default was yourself, so this completely removed from the credit report," SUF ¶ 369, and (2) "It would also be completely deleted from the credit report as of then," *id.*  JS testified that his "understanding at the time of the call regarding the effect that rehabilitation would have on [his] credit report" was that "it would remove the fact that I had ever actually defaulted on the loans."  RSUF Ex. 134 at 142:22–143:9.  *JS's understanding of the credit reporting benefit was identical to the benefit he received.*

- KMC



. SUF ¶¶ 358–59.

RSUF Ex. 135 at 130:20–133:7, 148:18–149:22, 173:18–175:4.

The CFPB's speculation that Pioneer's statements regarding the credit

reporting and collection fee waiver benefits were misleading to borrowers is

undercut by the only borrowers identified in support of this claim.

### C.    The Alleged Misstatements Were Not Material

The CFPB's claims fail for yet another independent reason: there is no

evidence of materiality.  The CFPB attempts to elide this failure of proof by

asserting a presumption of materiality.  But such a presumption is available only

for *express* false claims and "only an unambiguous message can be literally false." *Novartis Consumer Health, Inc.*, 290 F.3d at 587.  The CFPB instead claims an implied misrepresentation.  *See* CFPB Br. at 67–68 ("Borrowers typically do not know that there are two trade lines for the defaulted loans, so unless that fact is clearly explained to the borrower, they would not likely . . . understand that . . . the tradeline reflecting delinquencies [] would remain."); *id.* at 69 ("[T]elling borrowers *when* fees are waived [at the time of sale] does not convey *what* fees will be waived, and the statement's inclusion of 'all' in reference to the collection fees was likely to lead the borrower to believe that all collection fees would be waived.").

For an implied misrepresentation to be material, it must "strike at the heart of a consumer's purchasing decision."  *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005).  That standard is not met here.  Rehabilitation provides a significant benefit—curing the default.  Furthermore, rehabilitation provided credit reporting and collection fee benefits that borrowers would *not* receive with consolidation, the only other practical option.  No reasonable borrower would choose *not* to enroll in rehabilitation—and forego these significant benefits—simply because the delinquency history would not be deleted or a small portion of their payments would go toward collection fees.  Nor does the CFPB present any consumer or survey evidence of materiality, *i.e.* that consumers would

66

have declined rehabilitation had they been presented with the precise disclosure the CFPB asserts was not provided. Again, the testimony of its own witnesses shows that any misstatements were in fact not material to their decisions to enroll. *See* Doc. 470 at 66–67.

## V.  THE CFPB CANNOT MEET ITS BURDEN ON COUNT XI BECAUSE SPECIAL COMMENT CODE "AL" WAS ACCURATE AND NAVIENT HAD REASONABLE PROCEDURES

The CFPB moves for summary judgment on its claim that Navient violated the Fair Credit Reporting Act ("FCRA") and its implementing regulation, Regulation V, because "Navient did not establish and implement reasonable policies and procedures to ensure the accuracy of the credit reporting code used for borrowers whose loans were discharged due to a TPD." CFPB Br. at 74. The CFPB's Motion should be denied, and Navient's Motion granted, because the undisputed facts show that Navient's use of Special Comment Code "AL" was accurate. Even if the Court concludes otherwise, the CFPB's Motion must *still* be denied because there is at least a dispute of fact regarding whether Navient's policies and procedures were reasonable.

### A.  Navient's Credit Reporting For TPD-Discharged Loans Was Accurate

Two undisputed facts should resolve the threshold question whether Special Comment Code "AL" was accurate for loans discharged due to TPD:

(1) Special Comment Code "AL" means "permanently assigned to the government," SUF ¶¶ 317–18; PSUF ¶ 364, and

(2) when loans are discharged due to TPD, the loan is assigned to the government.  SUF ¶ 311.

As recognized by the CFPB's own expert, ███████████████████

███████████████████████████████████████████ SUF Ex. 193 ¶ 28.

Thus, there is no real argument that Special Comment Code "AL" was "patently incorrect" or "misleading" as required to show that credit information was inaccurate.  *Schweitzer v. Equifax Info. Sols., LLC*, 441 Fed. App'x 896, 902 (3d Cir. 2011); *see also Shaw v. Experian Info. Sols., Inc*., 891 F.3d 749, 756 (9th Cir. 2018).  The CFPB makes no attempt to engage with the definition of Special Comment Code "AL," SUF ¶ 317; PSUF ¶ 364; the evidence showing that all industry participants believed the code to be accurate, SUF ¶¶ 319–20, 323–24, 326; or the 2011 CRRG instruction to furnishers to report Account Status "05" and Special Comment Code "AL" together "when a claim was accepted and paid by the guarantor," *id.* ¶¶ 316, 318, the instruction that Navient followed.

Instead, the CFPB relies entirely on its own misreading of a snippet of guidance to assert that Special Comment Code "AL" should be used "*only* for defaulted loans held by Perkins Schools."  CFPB Br. at 75 (emphasis added).  But the CRRG says no such thing.  Rather, the guideline cited by the CFPB provides instructions to *Perkins Schools* to use Special Comment Code "AL" and Account

Status "05" in combination with Payment Rating Code "G" (which is what signifies that a loan is in collections) for Perkins loans that have defaulted. PSUF ¶ 359; SUF ¶ 313. That guidance simply does not apply to Navient as a servicer. Indeed, there is no instruction anywhere in the CRRG that Special Comment Code "AL" should be used *only* in that circumstance, much less any statement instructing furnishers *not* to report Special Comment Code "AL" for loans discharged due to TPD, even though the CRRG makes such instructions elsewhere. *See* RSUF ¶ 360 ("Debt Being Paid Through Insurance (Account Status Code should ***not*** be 13 or 61-65)"; *id.* ("**For Defaulted Loans**: . . . report *only* the following . . . .").

Because Navient's reporting was accurate, it is Navient who is entitled to summary judgment. *See Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 330 (D. Conn. 2009) ("[I]f the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary." (quoting *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989)); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) (if a consumer fails to "present evidence tending to show that a credit reporting agency prepared a report containing 'inaccurate' information . . . a court need not inquire further as to the reasonableness of the procedures"); *accord Cortez v. Trans Union, LLC*, 617 F.3d 688, 708 (3d Cir. 2010).

69

**B.     A Reasonable Juror Could Conclude That Navient's Policies And Procedures Were Reasonable**

Even if the Court concludes that Navient's reporting was inaccurate, the CFPB's Motion must be denied because there is, at a minimum, a disputed issue of fact whether Navient's credit reporting policies and procedures were reasonable. The reasonableness of a furnisher's procedures is a question for the jury "unless the reasonableness or unreasonableness of the procedures is beyond question." *Seamans v. Temple Univ.*, 744 F.3d 853, 864–65 (3d Cir. 2014) (quoting *Cortez*, 617 F.3d at 709).

The record shows that Navient established and implemented reasonable policies and procedures pursuant to Regulation V. *See* RSUF ¶ 373. Regulation V requires furnishers to "establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information [it furnishes]." 12 C.F.R.§ 1022.42(a). Navient's policies and procedures directed CBM to use the Metro 2 Format and refer to the CRRG. RSUF ¶¶ 376, 378. The Metro 2 Format, developed by the CDIA's Metro 2 Task Force, "enables the reporting of accurate, complete and timely credit information," "[m]eets all requirements of the . . . FCRA," and "[a]llows complete identification information to be reported . . . ." PSUF Ex. 274 at A-7649; *see also* JSUF ¶ 63.

The CFPB complains that Navient's procedures "do not describe how a decision is made to begin furnishing a particular code." CFPB Br. at 75. This

supposed deficiency is completely divorced from the actual requirements in Regulation V.[21]  *See* 12 C.F.R. § 1022.42.  Furnishers need not specifically list how to report in every reporting scenario—that is why the CRRG exists.  *Cf. Banneck v. HSBC Bank USA, N.A.*, No. 15-CV-02250-HSG, 2016 WL 3383960, at *3, *7 (N.D. Cal. June 20, 2016) (furnisher's reporting in accordance with the CRRG was "dispositive").

Furthermore, the CFPB's assertion that there is "no evidence showing how Navient followed the ED and CRRG guidance for TPD-discharged loans prior to October 2012," CFPB Br. at 77, mischaracterizes the record.  When the CRRG first instructed the use of Special Comment Code "AL" for claims accepted and paid by the guarantor, Navient contacted the Task Force to confirm its interpretation of the new guidance.  SUF ¶¶ 316, 318–21.  Only after confirming that its understanding was correct did Navient update its credit reporting to report Special Comment Code "AL" for such loans.  *Id.*

The CFPB is also incorrect that Navient's policies and procedures did not direct CBM to follow ED's guidance; ED's guidance was based on the recommendations of the CDIA, and CBM was directed to adhere to CDIA

---

[21] The CFPB's "requirements" are also not found in the detailed guidelines in Appendix E to Regulation V, which furnishers are required to consider.  *See* 12 C.F.R. pt. 1022, App. E.

recommendations.[22]  RSUF ¶ 374.  The CFPB also ignores testimony that

Navient's Compliance Department would provide guidance from ED to CBM and

that Navient would update its policies and procedures based on "[n]otification from

the Department of Education."  *Id.*

The cases relied upon by the CFPB bear no resemblance to the

circumstances here.  None involved Regulation V's requirement to establish

reasonable procedures to ensure accurate reporting.  And all involved conduct that

was directly contrary to FCRA's requirements.  *See Scharf v. Trans Union, LLC*,

No. 14-14322, 2015 WL 6387501, at *2 (E.D. Mich. Oct. 22, 2015) (policy was

itself contrary to the FCRA requirement to investigate because policy was not to

"investigate the consumer dispute itself"); *Adams v. Berger Chevrolet, Inc.*, No.

1:00-cv-225, 2001 WL 533811, at *1 (W.D. Mich. May 7, 2001) (defendant liable

for wrongful use of a credit report where employee used plaintiff's credit report to

obtain financing for other applicants with poor credit); *Reardon v. ClosetMaid*

*Corp.*, No. 2:08-cv-01730, 2013 WL 6231606, at *9 (W.D. Pa. Dec. 2, 2013)

(disclosure form violated "FCRA's express requirement that the disclosure appear

---

[22]  The CFPB alleges "the record contains no evidence showing how Navient
followed the ED and CRRG guidance for TPD-discharged loans prior to October
2012," CFPB Br. at 77, but it is *the CFPB's burden* to request and put forth such
evidence to support its claim.

in a document that consists solely of the disclosure" because it also included a

waiver of rights provision).

## VI. SUMMARY JUDGMENT AGAINST NAVIENT CORPORATION SHOULD BE DENIED

The CFPB's request to summarily impose liability on Navient Corporation

for the acts of its subsidiaries is not based on any articulated principle of law.

CFPB Br. at 25–26.[23]   The CFPB points to four facts, with no analysis of whether

they satisfy the Third Circuit's "notoriously difficult" eight-factor veil-piercing

standard, *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484–85 (3d Cir.

2001).[24]   They do not.

- Liability will not "be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary." *Pearson*, 247 F.3d at 484; *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[C]ourts generally presume that [officers] are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary.").

- That Navient Corporation conducts audits of its subsidiaries and provides Pioneer with a line of credit does not suffice. *See Pearson*, 247 F.3d at 484; *cf. Beary v. Norton-Simon, Inc.*, 479 F. Supp. 812,

---

[23] The CFPB cannot rely solely on the CFPA's related person definition, which "merely expands the universe of actors who may be responsible for *their own* violations of the [CFPA] provision." *NDG Fin. Corp.*, 2016 WL 7188792, at *16 (emphasis added).

[24] *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994) ("The corporate veil is pierced only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.'" (alteration in original) (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1058 (W.D. Pa. 1990))).

815 (W.D. Pa. 1979) (finding subsidiary did not act as parent's agent, despite parent company directing "the marketing, auditing and advertising functions of its subsidiaries").

- Although Navient Corporation is the party identified on the contract with ED, CFPB Br. at 25–26, Navient Corporation assigned performance of the ED contract to Navient, RSUF ¶ 5.

- The CFPB fails to explain how Navient Corporation's Form 10-K filings—which, contrary to the CFPB's mischaracterizations, refer to the work of a family of organizations, not Navient Corporation alone, *see id.* ¶¶ 6–8—provides any support for piercing the corporate veil.

Summary judgment against Navient Corporation must be denied.

## **CONCLUSION**

The CFPB's Motion should be denied and Defendants' Motion for Summary

Judgment granted.


Dated:  July 16, 2020                    Respectfully submitted,


                                         /s/ Jonathan E. Paikin
                                         Jonathan E. Paikin (DC 466445) (*pro hac vice*)
                                         Daniel P. Kearney (DC 977148) (*pro hac vice*)
                                         Karin Dryhurst (DC 1034290) (*pro hac vice*)
                                         Wilmer Cutler Pickering
                                            Hale and Dorr LLP
                                         1875 Pennsylvania Avenue, NW
                                         Washington, DC 20006
                                         jonathan.paikin@wilmerhale.com
                                         daniel.kearney@wilmerhale.com
                                         karin.dryhurst@wilmerhale.com
                                         Tel: 202-663-6000
                                         Fax: 202-663-6363

                                         Daniel T. Brier (PA 52348)
                                         Myers Brier & Kelly, LLP
                                         425 Spruce Street, Suite 200
                                         Scranton, PA 18503
                                         dbrier@mbklaw.com
                                         Tel: 570-342-6100
                                         Fax: 570-342-6147

                                         *Counsel for Navient Corporation, Navient*
                                         *Solutions, LLC, and Pioneer Credit*
                                         *Recovery, Inc.*

## CERTIFICATE OF WORD COUNT

I hereby certify in accordance with Local Rule 7.8(b)(2) that the foregoing

document is 17,473 words.

/s/ Karin Dryhurst

Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363

Dated:  July 16, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2020, I filed the foregoing document with

the Clerk of Court using the CM/ECF system, which will send notification of such

filing to all counsel of record who are deemed to have consented to electronic

service.

/s/ Karin Dryhurst
Karin Dryhurst (DC 1034290) (*pro hac vice*)
Wilmer Cutler Pickering
  Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
karin.dryhurst@wilmerhale.com
Tel: 202-663-6000
Fax: 202-663-6363