# EXHIBIT 11

Confidential
Pursuant to Protective Order

Page 1

1                           LaVIA
2         IN THE UNITED STATES DISTRICT COURT
3         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
4                Case No. 3:17-cv-00101
5                - - - - - - - -
6
7    CONSUMER FINANCIAL PROTECTION BUREAU,
8             Plaintiff,
9    vs.
10   NAVIENT CORPORATION, et al.,
11            Defendants.
12   _____/
13
14
15                      CONFIDENTIAL
16         PURSUANT TO THE PROTECTIVE ORDER
17
18      VIDEOTAPED DEPOSITION OF CYNTHIA BATTLE
19                   Washington, D.C.
20               Wednesday, May 23, 2018
21
22
23   Reported by:
24   SUSAN ASHE, RMR, CSR, CRR
25   Job No.: 142320

Confidential
Pursuant to Protective Order

Page 90

1   BATTLE
2   A.  -- interfaces with --
3   Q.  -- interfaces with the IRS.
4   A.  -- the IRS.
5   Q.  Correct?
6   A.  Income is passed, and then that
7   information -- borrower data -- including income, is
8   passed to the servicer to process.
9   Q.  Okay.  Do servicers have direct access to
10  IRS data?
11  A.  They do not.
12      (Whereupon, Defendants Exhibit 307 was
13  marked for identification.)
14  Q.  Ms. Battle, just take a minute to look at
15  Exhibit 307.
16  A.  Okay.
17      (Witness reading.)
18  Q.  Have you had an opportunity to look at the
19  document?
20  A.  Yes, I have.  Um-hum.
21  Q.  Do you recognize Exhibit 307?
22  A.  Vaguely, yes.
23      COURT REPORTER:  I'm sorry.  One at a
24  time.
25      Could you repeat your question.

Page 91

1   BATTLE
2   Q.  Sure.  Do you recognize Exhibit 307?
3   A.  Yes.
4   Q.  What is it?
5   A.  It's a proposal from Navient on some
6   opportunities to improve the take-up rate for IDR
7   plans.
8       And they've just provided kind of their
9   view of some opportunities that the Department may
10  want to consider.
11  Q.  Do you recall receiving this proposal?
12  A.  Yes, vaguely -- years ago.
13  Q.  Do you recall the substance of the
14  proposal?
15  A.  What do you mean?
16  Q.  Well, what was Navient proposing?
17  A.  Oh, what's here.
18      They were proposing that we look at a
19  verbal request to be able to capture some of the
20  program requirements verbally for IBR borrowers.
21  Q.  Do you know if the Department reached a
22  formal decision in response to this proposal?
23  A.  I don't know whether there was a formal
24  decision on this document; but we did later try a
25  pilot, verbally.  We did try a pilot for a short

Page 92

1   BATTLE
2   period of time.
3   Q.  When did that pilot occur?
4   A.  I believe that was in 2016.
5   Q.  And what was the objective of the pilot?
6   A.  The objective of that, the verbal pilot,
7   was similar:  To just determine the take-up rates
8   for -- how to make it easier for borrowers if we
9   were to look at applying -- or allowing borrowers to
10  provide income verbally.
11      But it was a very small window that we
12  used in -- I believe it was 2016.
13  Q.  And was that implemented across all
14  servicers?
15  A.  We gave all servicers the opportunity to
16  participate, yes.
17  Q.  And how long did the pilot last for?
18  A.  About two months.
19  Q.  And what were the results of the pilot?
20  A.  I don't recall what the results were.
21  Q.  Has the Department implemented any changes
22  to enrollment processes as a result of the pilot?
23  A.  No.
24  Q.  You mentioned earlier the difficulties
25  around recertification of IDR programs.  Correct?

Page 93

1   BATTLE
2   A.  Correct.
3   Q.  Can you describe what those
4   recertification requirements are?
5   A.  So, annually, a borrower would be required
6   to provide income requirements at the time that --
7   their anniversary date, once they hit an anniversary
8   date.
9       So the income plans are designed in a way
10  that we would recalculate your payment every year
11  based on changes in your income and family size.
12  Q.  Does the Department of Education provide
13  notices to borrowers at the time or before --
14  A.  The Department or the servicers?
15  Q.  Well, I'm asking if the Department
16  provides notifications to borrowers.
17  A.  The Department does not.
18      MR. KEARNEY:  308.
19      (Whereupon, Defendants Exhibit 308 was
20  marked for identification.)
21  Q.  Just take a minute to look at 308 --
22  A.  Um-hum.
23  Q.  -- Ms. Battle.
24      (Witness reading.)
25  Q.  I can probably simplify it --

Confidential
Pursuant to Protective Order

Page 182

1  BATTLE
2  Q. And then next to it in a column, the
3  heading of which, all the way at the top, do you
4  see, says "Types of Borrowers"?
5  A. Yes.
6  Q. Next to "Forbearance," there are two
7  bullets in that column.
8      Do you see those?
9  A. Yes, I do.
10 Q. Can you read those --
11 A. Sure.
12 Q. -- two bullets.
13 A. (Reading:) Forbearance should only be
14 considered after it was determined that no lower
15 payment option is acceptable and borrower is not
16 eligible for any deferments. Forbearance can be
17 used to bring account current while customer is
18 addressing long-term solution.
19 Q. Does the use of forbearance described in
20 those bullets accord with Department policy?
21 A. Yes.
22 Q. Is it possible to apply for forbearance
23 without calling a servicer?
24 A. Yes, there are instances where a
25 forbearance can be applied without calling the

Page 183

1  BATTLE
2  servicer.
3  Q. And how would a borrower do that?
4  A. Okay. Let me go back.
5      Can you give some specifics about, when
6  you mean a forbearance can be applied without
7  contacting the servicer.
8  Q. Oh -- can a borrower request a forbearance
9  without making a phone call to the servicer or
10 talking to the servicer on the phone?
11 A. We are speaking about a borrower making a
12 request. Then the borrower can contact the
13 servicer, either in writing or a phone call, are the
14 ways that -- there has to be some contact for a
15 forbearance to be applied.
16 Q. That makes sense.
17     Is it possible for a borrower to apply for
18 a forbearance through servicer websites?
19 A. Yes.
20 Q. And in that circumstance, could a borrower
21 obtain a forbearance without speaking on the phone
22 with the servicer?
23 A. Yes; in that circumstance it could, yes.
24 Q. And in that circumstance, how does the
25 Department ensure that borrowers are given

Page 184

1  BATTLE
2  information about other options they may have for
3  managing their loans?
4  A. We would hope that the servicing tools are
5  robust enough to be able to allow for appropriate
6  navigation so that borrowers are just not allowed to
7  apply for forbearance without appropriate
8  counseling.
9      So if the tools allow for some level of
10 communication or information about other options
11 other than forbearance, then it can still be applied
12 over the website.
13     So there's still an expectation that
14 borrowers would get appropriately notified about
15 other options, even if they used the online tools.
16 Q. When you say borrowers would be
17 appropriately notified, are you talking about
18 written disclosures of some kind?
19 A. Either written disclosures or even through
20 the website itself -- through the navigation itself.
21 Q. So is one way the Department ensures that
22 borrowers get information about repayment options
23 through written disclosures?
24 A. Sure, that's one way -- or electronically,
25 sure.

Page 185

1  BATTLE
2  Q. Electronically on the web --
3  A. Yes.
4  Q. -- potentially?
5  A. Either one of those ways, sure.
6  Q. Or through various servicer notices?
7  A. Through notices, through the websites,
8  or -- and, of course, through phone calls.
9  Q. So the Department doesn't rely exclusively
10 on phone calls to provide information to borrowers
11 about repayment options?
12 A. Oh, not -- yeah, that's one way to notify
13 a borrower, sure.
14 Q. Through the phone?
15 A. Through the phone, sure.
16 Q. But also there are ways to do it through
17 other disclosures?
18 A. The tools or other disclosures, sure.
19 Q. Ms. Matthews asked you about the benefits
20 of income-driven repayment plans.
21 A. Yes.
22 Q. Are there any downsides in income-driven
23 repayment plans from the Department's perspective?
24 A. Downsides from...?
25 Q. For borrowers.

Confidential
Pursuant to Protective Order

Page 194

1  BATTLE

2  CERTIFICATE

3

4     I, SUSAN ASHE, a Registered Merit

5  Reporter and Notary Public, hereby certify that the

6  foregoing is a true and accurate transcript of the

7  deposition of said witness, who was first duly sworn

8  by me on the date and place hereinbefore set forth.

9     I FURTHER CERTIFY that I am neither

10 attorney nor counsel, nor related to or employed by

11 any of the parties to the action in which this

12 deposition was taken, and further that I am not a

13 relative or employee of any attorney or counsel

14 employed in this action, nor am I financially

15 interested in this case.

16     Dated this 6th day of June, 2018.

17

18

19

20 _____

21 Susan Ashe, Notary Public

22 of the District of Columbia

23 My commission expires: May 31, 2022.

24

25