# EXHIBIT 21

## Page 1

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
- - -

CONSUMER FINANCIAL      :
PROTECTION BUREAU,       :
: CIVIL ACTION
Plaintiff,   :  NO. 3:CV-17-00101
:
vs.        :
:
NAVIENT CORPORATION,   :
et al.,
:
Defendants.  :


***DEPOSITION***
DEPONENT:  JACK REMONDI
DATE:     Thursday, May 9, 2019
TIME:     9:46 a.m.
PLACE:    Residence Inn
1300 North Market Street
Wilmington, DE 19801

REPORTER:  Natalie J. Goldhill

## Page 2

1    APPEARANCES:
2
3    CONSUMER FINANCIAL PROTECTION BUREAU
     BY:  ANDREA MATTHEWS, ESQUIRE
4        NICHOLAS JABBOUR, ESQUIRE
     1700 G Street NW
5    Washington, D.C., 20552
     (202) 435-7245
6    andrea.matthews@cfpb.gov
         Representing the Plaintiff
7
8
     WILMER HALE
9    BY:  DANIEL KEARNEY, ESQUIRE
         KARIN DRYHURST, ESQUIRE
10   1875 Pennsylvania Avenue NW
     Washington, D.C., 20006
11   (202) 663-6285
     daniel.kearney@wilmerhale.com
12       Representing the Defendant, Jack Remondi
13
14   NAVIENT SOLUTIONS, LLC
     BY:  MATTHEW SHELDON, ESQUIRE
15       MARK HELEEN, ESQUIRE
     2001 Edmund Halley Drive
16   Reston, Virginia 20191
     (703) 984-6732
17   matthew.sheldon@navient.com
         Representing the Defendant, Navient
18   Solutions, LLC
19       - - -
20   ALSO PRESENT:
21   Lindsay DuPhily, Videographer
22
23
24
25

## Page 3

1              I N D E X
2    WITNESS                PAGE
3    JACK REMONDI
4        Examination by Ms. Matthews   7
5
6        - - E X H I B I T S - -
7    EXHIBIT NUMBER   DESCRIPTION      PAGE MARKED
8    Remondi 1       Navient E-mail   152
9
10   Remondi 2       Navient E-mail   155
11
12   Remondi 3       Sallie Mae Press   157
                     Release
13
14   Remondi 4       Sallie Mae Press   161
                     Release
15
16   Remondi 5       Sallie Mae Press   163
                     Release
17
18   Remondi 6       Sallie Mae Press   171
                     Release
19
20   Remondi 7       Sallie Mae Press   174
                     Release
21
22   Remondi 8       Sallie Mae Press   177
                     Release
23
24   Remondi 9       Sallie Mae Press   181
                     Release
25

## Page 4

1        - - E X H I B I T S (Cont'd.) - -
2    EXHIBIT NUMBER   DESCRIPTION      PAGE MARKED
3    Remondi 10      Sallie Mae Press   186
                     Release
4
5    Remondi 11      Sallie Mae Press   191
                     Release
6
7    Remondi 12      Sallie Mae Press   195
                     Release
8
9    Remondi 13      Live Tape Transcript 200
10
11   Remondi 14      Disc Recording   243
12
13   Remondi 15      Live Tape Transcript 243
14
15   Remondi 16      Disc Recording   253
16
17   Remondi 17      E-mail Chain     173
18
19   Remondi 18      E-mail Chain and   286
                     Attachment
20
21   Remondi 19      E-mail and       292
                     Attachment
22
23   Remondi 20      E-mail Chain and   296
                     Attachment
24
25   Remondi 21      E-mail Chain     301

1  possibility of income-driven repayment raised on a
2  call with a Navient call center representative and
3  rejects it on time.  And then at time two, they call
4  back in.  Is it fair for the Navient call center
5  representative at time two to not raise
6  income-driven repayment?
7      A.    I'm not sure what you mean by fair.
8  Fair in what sense?  Or what does that -- define it,
9  I guess.
10     Q.    Would it meet your expectations for
11  the call center representative not to mention
12  income-driven repayment?
13     A.    Um, no.  I mean, in the set of
14  circumstances, I might want to see, um,
15  income-driven repayment, um, discussed more
16  prominently than just in the disclosure statement.
17  Um, but I don't know the circumstances and I don't
18  have the account history in front of me to know, um,
19  other factors that might be involved here.  I don't
20  know the loan balance.  It looks like it's
21  relatively small given the monthly payment amount or
22  how many months she has left.  Um, those would be
23  factors involved.  You certainly wouldn't put
24  someone who has five months left in payment into a
25  20-year repayment plan.  Right?  Um, but we don't

1  have all of that information to know what the
2  customer service rep was looking at that time.
3     Q.    So it may be the case that if a
4  borrower has declined income-driven repayment in one
5  time period that you may still expect a Navient call
6  center representative to raise the possibility of
7  income-driven repayment in a subsequent time period?
8     A.    Yeah.  If it was appropriate, yes,
9  absolutely.
10     Q.    How would you know if it was
11  appropriate?
12     A.    Well, some of the factors I just
13  mentioned.  Those would be examples of that.
14     Q.    So if the loan was eligible?
15     A.    Yeah.  The challenge is looking at a
16  single transaction with a customer and not knowing
17  any of the other details, it's very hard to make a
18  judgment call on what should or should not have
19  happened on this call.  Um, you know, I'm not --
20  it's possible you would have done something
21  differently.  But without knowing those other
22  factors, I'm just saying I can't tell you whether
23  this call should have had more activity associated
24  with it or not.
25     Q.    And in our hypothetical situation, we

1  were just discussing the case where at time one,
2  income-driven repayment had been raised and the
3  borrower had said no.  And then in time two,
4  income-driven repayment was not raised.
5     A.    Mm-hmm.
6     Q.    Let's consider the same borrower, same
7  hypothetical borrower, but instead in time one the
8  borrower does not discuss income-driven repayment,
9  the Navient call center representative does not
10  raise it at all, borrower leaves that call and
11  enrolled in forbearance.  Three months later, that
12  forbearance is on the eve of expiration, the
13  borrower calls back in.  Now time two, that second
14  call, would you expect the Navient call center
15  representative to raise income-driven repayment with
16  the borrower?
17     MR. KEARNEY:  Objection to form.
18     THE WITNESS:  Again, I don't know the
19  other factors associated with the loan.  I mean,
20  um...
21  BY MS. MATTHEWS:
22     Q.    Direct loan eligible for income-driven
23  repayment.
24     A.    Well, as we discussed, you can have a
25  direct loan with someone with $500 left on the

1  balance and five months left to go.  They would be
2  eligible, would that be an appropriate conversation
3  to have with the customer?  I would say no.  Um, so
4  I mean, I think it depends on the facts and
5  circumstances of the individual account.
6     Q.    Let's say she has 15,000 left.
7     A.    Well, um, I would expect somebody who
8  looked like they had a longer term payment
9  affordability issue with that kind of balance to
10  have a discussion greater than what was mentioned on
11  this call on repayment options.
12     Q.    If you heard the call that is
13  transcribed in Remondi Exhibit 13 in one of your
14  weekly call listening exercises, what would you do?
15     A.    Um, I probably would have some
16  follow-up on this customer, um, to see what were the
17  circumstances.  I would ask the questions that
18  similar to what I asked -- stated to you earlier.
19  What was the situation with the account, how was it
20  resolved, um, et cetera.
21     Q.    To whom would you communicate that
22  follow-up?
23     A.    The same people we discussed earlier.
24  So um, either the OCA department or the department
25  manager, the person -- the head of the department.

Page 221

1    Q.    And as we discussed earlier, would you
2  communicate that follow-up via e-mail?
3    A.    Um, yeah.  It may depend if I had a
4  meeting or a call with that person scheduled that
5  day.  I might do it by in-person.
6    Q.    Would it be likely that you would
7  conduct that follow-up via e-mail?
8    A.    I mean, I think it happens.  I mean, I
9  have a meeting with staff, um, every week.  So it
10  it's just a question of when the timing of that
11  meeting isn't when I listen to the phone calls that
12  week.  So it could happen -- I don't know if it's
13  more or less common.  It could happen either way.
14    Q.    The considerations that we were just
15  discussing whether a borrower has a significant or a
16  very small amount of outstanding balance on their
17  loan or whether or not a borrower explicitly
18  rejected IDR at some previous contact in the past,
19  are those considerations written down anywhere?
20    A.    Um, in terms of whether something's
21  appropriate or not?
22    Q.    Yes.
23    A.    Um, I think we are -- the training
24  that we try to provide to our customer service reps
25  are to ask enough questions and information so that

Page 222

1  they can help the customer identify repayment
2  solutions that are able to them.  Um, you know, this
3  customer, um, came with a specific request, um,
4  whether that, um, led to a phone conversation that
5  was different than what would have happened under
6  other circumstances or not, I don't know.  I would
7  be speculative.  Um, um, but, you know, again, you
8  would want to know a little bit more about the facts
9  and circumstances here.
10    Q.    When borrowers call in with specific
11  requests relating to a specific repayment option
12  that they want --
13    A.    Mm-hmm.
14    Q.    -- do you expect your call center
15  representatives to still explore other available
16  options even if the borrower doesn't raise them?
17    A.    Um, I doubt we would be having this
18  conversation if the caller asked for specifically
19  her income-based repayment.  Um, so I think you
20  would have a different opinion there.  For example,
21  perhaps I think you would have to look at the facts
22  and circumstances of the individual borrower
23  account.  Um, there is certainly examples where you
24  would say there is nothing -- you shouldn't do --
25  you don't need to do something else.  I'm going to

Page 223

1  back to school, for example.  Right?  I'm going to
2  consolidate my loan.  You wouldn't recommend
3  income-driven repayment plans for a short period of
4  time like that.  So yeah, there are absolutely
5  requests that would go in where you would not have
6  that second -- that second conversation.
7    Q.    Where a borrower calls in and
8  explicitly asks for forbearance, but isn't abusive,
9  isn't seeking to end the call as quickly as
10  possible, would you expect a call center
11  representative to raise the possibility of other
12  repayment options if the borrower was eligible for
13  them?
14    A.    I think, again, it depends on the
15  facts and circumstances of the borrower account.
16  Um, you know, in some of the hypotheticals that
17  you've described, you would say yes, they should
18  talk about other repayment options, but there are
19  hypotheticals that -- and actual examples you could
20  create where that would not be an appropriate next
21  step.
22    Q.    In what situation would it not be an
23  appropriate next step to discuss any other repayment
24  options?
25    A.    I need to extend my forbearance

Page 224

1  because I need time to complete my forms.
2    Q.    Anything else?
3    A.    I need a forbearance because I'm about
4  to -- I'm consolidating my loan.
5    Q.    Anything else?
6    A.    Um, I need a forbearance because I'm
7  going to go back to school in six months.
8    Q.    Anything else?
9    A.    I need a forbearance because I am
10  qualified to enroll in a military deferment plan.
11    Q.    Anything else?
12    A.    There are 50 options.  I don't want to
13  go through each one.  There's a lot of options that
14  are available for customers as examples.
15    Q.    Would you say that the examples you
16  just raised are examples in which either the
17  borrower has a concrete date that there's something
18  that they know will happen, going to go back to
19  school on August 22nd or I'm going to consolidate my
20  loan next month, the examples that you provided fall
21  outside of that?
22        MR. KEARNEY:  Objection to form.
23        THE WITNESS:  What was the question?
24  BY MS. MATTHEWS:
25    Q.    I was trying to make sure that I

1   the customer find a repayment solution that meets
2   their needs.
3       Q.   How is that less of a focus on
4   customer service?
5       A.   I don't know what he means by that
6   statement.
7       Q.   Is there a trade-off between
8   delinquency resolution and customer service?
9       A.   No.
10      Q.   Why?
11      A.   I mean, you're trying to resolve a
12  status that is detrimental to the customer. I don't
13  -- I think that's a positive -- so that's a positive
14  to the customer. Right? The customer may not think
15  that, but I think it's a positive to the customer.
16      Q.   Who is in charge of CRS at this time?
17      A.   Um, I believe it was Troy Standish.
18           MS MATTHEWS: Handing the court
19  reporter what I will ask her to mark as Remondi
20  Exhibit 21.
21           (Whereupon the document was marked, for
22  identification purposes, as Remondi 21.)
23  BY MS. MATTHEWS:
24      Q.   Take a look. Let me know when you get
25  comfortable.

1           (Whereupon there was a brief pause.)
2           THE WITNESS: Okay.
3   BY MS. MATTHEWS:
4       Q.   Looking at the top e-mail in this
5   chain, are you the sender?
6       A.   Yes.
7       Q.   Who's the recipient?
8       A.   Mark Giambrone.
9       Q.   Who is that?
10      A.   He's a portfolio manager at Barrow
11  Hanley and investor in the company -- in the
12  company's equity.
13           MS. MATTHEWS: I'm handing the court
14  reporter what I will ask her to mark as Remondi
15  Exhibit 22.
16           (Whereupon the document was marked, for
17  identification purposes, as Remondi 22 followed by a
18           brief pause.)
19           THE WITNESS: Okay.
20  BY MS. MATTHEWS:
21      Q.   Who is the recipient of this e-mail?
22      A.   Um, myself and Steve McGarry.
23      Q.   Who is the sender?
24      A.   Al Natali.
25      Q.   Who is Al Natali?

1       A.   Al Natali worked in our, um, default
2   resolution team during this short -- he was here for
3   just a short period of time.
4       Q.   On what date did you receive this
5   e-mail?
6       A.   November 4th, 2010.
7       Q.   Looking at the attachment in this
8   e-mail, what's the title of the attachment?
9       A.   Forbearance Usage.
10      Q.   What's the date?
11      A.   November 4th, 2010.
12      Q.   What is this attachment about?
13      A.   Um, it's reporting on various
14  statistics and, um, collection, um, routines for
15  student debt. Loans both federal and private, it
16  looks like.
17      Q.   Looking at the bottom end of the first
18  page of the attachment where it says Collections and
19  Servicing Specialist Protocol.
20      A.   Yep.
21      Q.   Can you read down the numbered list?
22      A.   Yep. Number one, ask for cash payment
23  of present amount due, plus fees. Number two, ask
24  for cash payment of delinquent amount due, plus
25  fees. Number three, ask for cash payment of one

1   monthly payment. Number four, ask what they can
2   afford income sensitive repayment or income-based
3   repayment. Number five, deferment. Deferment
4   types: in school, unemployment, temporary, total --
5   temporary and total disability.
6       Q.   I'll save you from going through the
7   list. What is number six?
8       A.   Forbearance. Want me to list --
9       Q.   No, that's all right. What does the
10  section Collections and Servicing Specialist
11  Protocol telling us?
12      A.   It would be like the process of what a
13  collection agent would be, um, moving through with a
14  customer on the call. So if someone's delinquent,
15  you would, at first, ask them to bring their account
16  current.
17      Q.   Is this the flow of options --
18      A.   Yes.
19      Q.   -- that a collections and servicing
20  specialist would go through?
21      A.   Yeah.
22           MR. KEARNEY: Can I get a time check?
23  Are we at seven hours or so at this point?
24           THE VIDEOGRAPHER: You're at seven
25  hours and six minutes.

```
 1                   C E R T I F I C A T E

 2

 3

 4            I, Natalie J. Goldhill, a Court Reporter

 5  and Notary Public, Philadelphia, Pennsylvania, do

 6  hereby certify that JACK REMONDI was by me first

 7  duly sworn to testify to the whole truth and that

 8  the above deposition was recorded stenographically

 9  by me and was transcribed by means of computer-aided

10  transcription under my personal direction and that

11  the said deposition constitutes a true record of the

12  testimony given by said witness.

13            I further certify that I am not a relative

14  or employee of any of the parties, a relative or

15  employee of any attorney involved in this action, or

16  financially interested directly or indirectly in

17  this action.

18

19

20         Natalie J. Goldhill /kw
           Natalie J. Goldhill, Notary Public
21         Philadelphia, Pennsylvania

22

23

24

25
```

## ERRATA

I, Jack Remondi, wish to make the following changes, for the following reasons:

| Page: Line | Correction | Reason |
|---|---|---|
| 2:12 | Change "Defendant, Jack Remondi" to "Defendants, and the witness, Jack Remondi" | Inaccurate description |
| 18:15 | Change "jut" to "just" | Transcription error |
| 27:12 | Change "SCC" to "SEC" | Transcription error |
| 43:3 | Capitalize "congress" | Capitalization error |
| 45:3 | Change "borrowed" to "borrower" | Transcription error |
| 58:13 | Change "too" to "to" | Transcription error |
| 60:18 | Change "unemployment forbearance" to "unemployment deferment" | Witness error |
| 62:19 | Change "replacement" to "repayment" | Transcription error |
| 75:7 | Change "FELP" to "FFELP" | Transcription error |
| 75:10 | Change "FELP" to "FFELP" | Transcription error |
| 75:12 | Capitalize "higher" | Capitalization error |
| 81:24 | Change "call" to "calls" | Transcription error |
| 92:25 | Change "and" to "an" | Transcription error |
| 107:1 | Capitalize "department" | Capitalization error |
| 107:3 | Capitalize "department" | Capitalization error |
| 107:5 | Capitalize "department" | Capitalization error |
| 107:24 | Capitalize "department" | Capitalization error |
| 108:5 | Change "if" to "of" | Transcription error |
| 108:21 | Change "program's" to "program" | Transcription error |
| 108:22 | Change "scrips" to "scripts" | Transcription error |
| 113:3 | Capitalize "department" | Capitalization error |
| 114:12 | Capitalize "department" | Capitalization error |
| 115:6 | Capitalize "department" | Capitalization error |
| 115:12 | Capitalize "department" | Capitalization error |
| 119:16 | Capitalize "department" | Capitalization error |
| 119:22 | Capitalize "department" | Capitalization error |
| 123:9 | Change "say" to "stay" | Transcription error |
| 127:11 | Capitalize "department" | Capitalization error |
| 140:21 | Change "to the" to "to tell the" | Transcription error |
| 144:7 | Change "FELP" to "FFELP" and "ed" to "ED" | Transcription error |
| 149:6 | Change "call" to "calls" | Transcription error |
| 151:6 | Change "weight" to "wait" | Transcription error |
| 159:6 | Change "stay" to "say" | Transcription error |
| 190:19 | Change "your" to "you" | Transcription error |
| 210:4 | Change "FELP" to "FFELP" | Transcription error |

| 210:6 | Change "FELP" to "FFELP" | Transcription error |
|---|---|---|
| 225:9 | Change "form" to "FORM" | Transcription error |
| 226:7 | Change "form" to "FORM" | Transcription error |
| 226:16 | Change "form" to "FORM" | Transcription error |
| 231:13 | Change "form" to "FORM" | Transcription error |
| 231:25 | Change "form" to "FORM" | Transcription error |
| 233:13 | Change "lost" to "loss" | Transcription error |
| 259:23 | Change "no" to "on" | Transcription error |
| 260:13 | Change "out" to "our" | Transcription error |
| 262:12 | Capitalize "barrow" | Capitalization error |
| 271:8 | Change "though" to "thought" | Transcription error |
| 274:5 | Change "FELP and Ed" to "FFELP and ED" | Transcription error |
| 274:21 | Change "way our" to "our way" | Transcription error |
| 279:19 | Change "FELP" to "FFELP" | Transcription error |
| 282:12 | Change "form" to "FORM" | Transcription error |
| 282:13 | Change "reason" to "reasons" and "form" to "FORM" | Transcription error |
| 282:21 | Change "forms" to "FORMs" | Transcription error |
| 282:22 | Change "form" to "FORM" | Transcription error |
| 283:5 | Change "form" to "FORM" | Transcription error |
| 283:9 | Change "form" to "FORM" | Transcription error |
| 283:11 | Change "form" to "FORM" | Transcription error |
| 284:10 | Change "form" to "FORM" | Transcription error |
| 284:25 | Change "account s" to "accounts" | Transcription error |
| 285:2 | Change "higher" to "hire" | Transcription error |
| 285:4 | Change "form" to "FORM" | Transcription error |
| 286:8 | Change "form" to "FORM" | Transcription error |
| 289:6 | Change "form" to "FORM" | Transcription error |
| 297:16 | Change "Dec" to "Deck" | Transcription error |
| 297:24 | Change "dec" to "deck" | Transcription error |
| 298:8 | Change "SRS PCC" to "CRS/PCC" | Transcription error |

## ACKNOWLEDGMENT OF DEPONENT

I, Jack Remondi, do hereby certify that I have read the forgoing 305 pages and that they are a true and accurate transcript of the testimony given by me in the above entitled action on May 9, 2019, except for the corrections or changes in form or substance noted on this Errata Sheet.

Date: ___7/17/19___          Signature of Witness: _____

Jack Remondi