# EXHIBIT 25

# In the Matter of:

# CFPB v. Navient Corporation, et al.

*June 8, 2018*
*Patricia Peterson*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Page 93

1    A. I don't know if there were specific to this
2  letter at this point in time, but over time, there has
3  been a review. I believe we've talked a little bit
4  about a company coming in and helping us look at how to
5  make our letters more -- simplify our letters, and that
6  was a process of looking at where we could make the
7  messaging more clear to the customers. So there's that
8  process that's been in place.
9        We do take customer feedback, so if things
10  aren't happening, we could modify letters. I think what
11  I was describing earlier the different ways that we
12  could get requests, and one of those requests could come
13  through because we feel like we needed to clarify
14  something within the letter.
15    Q. What was the outside company that did testing of
16  different letters?
17    A. Seigal & Gale was the consultant that we used to
18  help us rewrite our letters and put them in a new
19  format.
20    Q. Any other outside entities that did that work?
21    A. Not that I'm aware of.
22    Q. Did the company look at recertification rates to
23  make any sort of determination as to whether this letter
24  was effective?
25    A. We look at -- we have looked at recertification

Page 94

1  rates, and we have adjusted processes to try and make
2  it -- those recertification rates go up, but one thing
3  about -- that we've learned in every -- that the data
4  continues to point that not every customer wants to
5  renew. So even though we may see recertification rates
6  maybe are low in some standards, we wouldn't necessarily
7  say that all of those customers may want to recertify.
8        So I don't know that we are in any position to
9  be able to say what's a good number or not, because of
10  the individual factors that go into whether a customer
11  chooses to recertify or not.
12    Q. And when you say the data show that certain
13  customers don't want to renew or recertify, what data
14  are you referring to?
15    A. Well, holistically, we look at the whole process
16  of recertification, or if a customer that's been in an
17  income-driven repayment program, that is still in an
18  income-driven repayment program 12, 18, 24, three years
19  later, and what we find in that data is that the number
20  is not the same as what it was that started. So factors
21  change with that, that we don't have information on to
22  say why the customer chooses not to recertify. Even
23  though they have been given correspondence and given the
24  opportunities and the outreach, they choose not to,
25  maybe because they don't like the program for some

Page 95

1  reason, or maybe because they no longer qualify for the
2  program.
3    Q. So, just so I understand, when a consumer
4  doesn't renew, does the company have some way of telling
5  whether the consumer has made an affirmative choice that
6  they don't want to renew, they don't want to be in an
7  IBR program -- or IDR program anymore, versus them just
8  not understanding the steps that they have to take to
9  renew, or not wanting to complete those steps?
10    A. I don't know how we would know that at this
11  point, because -- so no, I don't know that we have
12  anything that would point to which of those it would be.
13    Q. Has Navient Solutions ever tried to test whether
14  recertification rates go up or down based on how a
15  recertification letter is drafted?
16    A. We have made many changes over the period here
17  with the letters. We've inserted new letters into the
18  mix. We have changed and simplified the letter based on
19  some Seigal & Gale and other processes. We've done
20  outreach. The Department of Education has tested
21  different outreach methods. We've, you know, inserted
22  email communication into the mix that's not necessarily
23  required.
24        So there has been lots of things to test that to
25  see if we can increase the certification --

Page 96

1  recertification rate. And we, inclusive of things the
2  Department of Education is doing, press, website, you
3  know, notifications to customers.
4    Q. Why did the company retain Seigal & Gail?
5    A. We originally retained Seigal & Gail as part of
6  the company split, when we were splitting from Sallie
7  Mae, to create some communication that would make it
8  very clear to our customers what that meant to them. We
9  liked what they did with that process and we decided to
10  keep them and to have them help us simplify our
11  correspondence. And so that's the engagement that we
12  did with them after the split.
13    Q. Was there any particular reason the company
14  determined that it needed an outside entity to review
15  its correspondence?
16      MR. PAIKIN: Object to form.
17      THE WITNESS: I don't know the background on
18  what went into that decision, other than there's
19  hundreds of letters, and so looking at an outside --
20  much of the same reason we would bring consultants in
21  for other processes, this is another outsider that's an
22  expert in customer correspondence to help us figure out
23  the best way to communicate with our customers.
24      BY MR. JABBOUR:
25    Q. Do you know if the Department of Education ever

### Page 101

1  get that information.
2      BY MR. JABBOUR:
3      Q. For what other types of correspondence would the
4  general wrapper or generic wrapper be used?
5      A. This generic wrapper was our -- was used almost
6  for every email until approximately -- we started making
7  changes to wrappers in the 20 -- roughly 2014, 2015
8  period. Prior to that time, we actually had policy that
9  did not allow us to put information into the body of our
10 email, and that was based off of privacy. So we were
11 concerned our information security was trying to protect
12 the privacy of our customers by not putting too much
13 private information into the body of the email in case
14 that email doesn't belong to our customer. So that
15 policy was not changed until the 2014, 2015 timeline,
16 and then at that point in time, we started updating our
17 email wrappers to include more specific information.
18     Q. Do you know of any specific wrapper that was
19 used prior to 2014?
20     A. I don't -- I don't have that memorized at all.
21 I'm sorry, I don't know.
22     Q. Rather than giving a specific example, do you
23 know if a specific wrapper was ever used prior to 2014?
24     A. I don't recall the first dates that we changed
25 letters, and I don't recall which was our first letter

### Page 102

1  to get a more specific wrapper.
2      Q. And in 2014, why was it determined that the
3  privacy issue was no longer there, or that the specific
4  wrappers could be drafted in a way to avoid the privacy
5  issue?
6      MR. PAIKIN: Object to form.
7      THE WITNESS: We're in a constant state of
8  trying to figure out the best balance between customer
9  privacy and customer experience, and so with multiple
10 conversations with our information security team, a new
11 policy was drafted that would get them comfortable with
12 putting a certain number of elements and then limited
13 type of elements into the body of the email. So that
14 was worked through with our information security team at
15 that point, and I think it's just as technology has
16 changed and more and more people are using this form of
17 communication. Another factor that was brought in is
18 the -- our email addresses have been provided by
19 customers, whether that's explicitly opted in to allow
20 us to send them communication, or provided that
21 information to us in their promissory notes.
22     BY MR. JABBOUR:
23     Q. Has Navient Solutions ever tested the
24 effectiveness of either of the email wrappers that's
25 depicted on Exhibit 7?

### Page 103

1      A. As far as a testing control that was put in
2  place, I don't believe we did only a partial test. We
3  put wrappers in place at the same time we also made
4  other changes, and there were a lot of other
5  communications that were going out to customers. So I
6  don't know that there is 100 percent confidence that a
7  new wrapper or the change in wrapper is the single cause
8  of an increase in recertification rates, because many
9  other things were going on at the same time.
10     Q. Okay, so the company did see an increase in
11 recertification rates around the time that the specific
12 wrapper on Exhibit 7 was used. Is that right?
13     MR. PAIKIN: Object to form.
14     THE WITNESS: There was an increase, but again,
15 this wasn't the only change that was made. At the same
16 time, we were also -- the body of the letter itself was
17 changed. We also had the Department of Education was
18 sending out communication to customers directly about
19 their recertification, and there was a lot of
20 communication being sent to customers through, you know,
21 just general outreach, meaning in the media, and
22 different Department of Education notifications to let
23 customers know.
24     So it was not the single only event that was
25 happening at the point in time we put this in place.

### Page 104

1      BY MR. JABBOUR:
2      Q. Do you know the department -- the timing of the
3  Department of Education notifications that you're
4  referring to?
5      A. This -- this was in the early 2015, early to
6  mid-2015.
7      Q. Do you know if the Department of Education
8  notifications were sent to all borrowers at the same
9  time, or was it tied to the borrower's recertification
10 deadline?
11     MR. PAIKIN: Object to form and foundation.
12 It's also really not within the scope of the topics
13 she's been noticed on. But if you know, you can
14 certainly answer.
15     THE WITNESS: I don't know.
16     BY MR. JABBOUR:
17     Q. You referenced earlier a conversation with the
18 information security team within Navient Solutions
19 concerning the privacy issues that eventually resulted
20 in the company's ability to use specific wrappers. What
21 prompted that conversation?
22     A. I don't know what prompted specifically as it
23 relates to the wrapper conversation. I know that we
24 have been testing it out in some of our collections
25 areas, email as a way to communicate to customers. So

Page 113

1  in that may or may not have been there the whole time.
2      Q. Okay. So compliance is one aspect of the
3  progressive disciplinary plan. Is that right?
4      A. Yes.
5      Q. And the other aspect is performance. Is that
6  right?
7      A. Yes.
8      Q. At least in this document, there are two
9  performance criteria, average handle of time and CSAT.
10 Is that right?
11     A. In this document, yes.
12     Q. What does CSAT stand for?
13     A. Customer satisfaction.
14     Q. And in parentheses after CSAT, at the top of the
15 page, it says, "Combination of agent satisfaction plus
16 issue resolution." Can you describe to me what agent
17 satisfaction means?
18     A. I am drawing a blank.
19     Q. What does issue resolution mean?
20     A. First call resolution. So how well we did at
21 answering the customer's question the first time that
22 they called. Agent satisfaction, the highest level, is
23 how well we did at -- the customer has an option to do a
24 survey, so that's one of the components that's in there
25 as well.

Page 114

1      Q. How is issue resolution determined?
2      A. Whether the customer called back again in the
3  next five days. That may have varied over time, but
4  generally it's been about five days that they look at,
5  that window.
6      Q. How is -- if the customer calls back on a
7  different issue within five days, is that still tracked
8  as an unsatisfactory issue resolution? In other words,
9  is the customer calling back within five days
10 automatically an indicator that the issue wasn't
11 resolved?
12     A. For this calculation, yes, unless the customer
13 just stayed within the IDR and didn't come to a
14 representative, then it didn't count against them.
15     Q. Technologically, how is that determined? Is
16 there just something automatically within the computer
17 system that flags if a customer reaches a representative
18 twice within a five-day period?
19     A. It's a report that's looking at the customer,
20 each of the customers that we talk to -- or each agent
21 talked to and see if they called back again in five
22 days.
23     Q. When you say it's a report, what do you mean by
24 that? Is it a document that's created? Is it a
25 notation in the CLASS system?

Page 115

1      A. Each time the customer does call in, there's a
2  notation in the CLASS system. I don't know if they use
3  that notation or if they use like call -- call --
4  inbound call reporting to determine it. I'm not sure
5  the source that our reporting team uses to get to that.
6      Q. Has the time period by which issue resolution is
7  judged always been five days?
8      A. I am not sure. It's generally five days, but I
9  don't know how much it's varied over time.
10     Q. And you indicated agent satisfaction is based on
11 a survey that customers can complete at the end of a
12 call. Is that right?
13     A. Yes.
14     Q. Is that a mandatory survey or an optional
15 survey?
16     A. Optional survey. Meaning the customer can
17 choose not to complete it.
18     Q. In terms of average handle time, what types of
19 calls are used to determine the average? Is it all
20 calls or is it only certain types of calls?
21     A. Those are all calls that were handled by the
22 customers as a part of the customer service center.
23     Q. If a customer service representative hangs up on
24 a customer very quickly into the call, would that call
25 be factored into their average handle time?

Page 116

1      A. Yes. That would also be one of those violations
2  if we saw it in our monitoring session that would skip
3  to progressive disciplinary action as well.
4      Q. So that would be an extremely high risk
5  violation?
6      A. Yes.
7      Q. Is the compliance review also looking for
8  instances in which a customer service representative
9  transfers a call in order to keep their call time short,
10 when they could have actually resolved the issue without
11 transferring the call?
12        MR. PAIKIN: Object to form.
13        THE WITNESS: One of the items that they're
14 looking for on call monitoring is appropriate handling
15 of the call. So that example would have been caught in
16 call monitoring.
17        BY MR. JABBOUR:
18     Q. How many calls does an average customer service
19 center employee handle per month?
20     A. I don't know.
21     Q. Do you know if it's more than 500?
22     A. I don't know.
23     Q. Who determines what an appropriate average
24 handle time is?
25     A. The lead of the customer service area, which I

125

1  (Peterson Exhibit Number 10 was marked for
2  identification.)
3      BY MR. JABBOUR:
4      Q. You've been handed Exhibit 10, which is a
5  document Bates numbered NSI-019-0000112 through 197.
6  And this is a long document, so I will say I'm going to
7  be asking you about what begins at page 136, which is
8  Exhibit B.
9      MR. PAIKIN: So should she -- you're only going
10 to ask questions about Exhibit B? I'm just trying to
11 figure out what she should look at.
12     MR. JABBOUR: Yes.
13     MR. PAIKIN: So it looks like 137 to 149.
14     THE WITNESS: I'm ready.
15     MR. PAIKIN: There's a front letter you might
16 just read.
17     THE WITNESS: Okay.
18     MR. PAIKIN: Where is Exhibit B referenced in
19 the front? Just to put it kind of in context.
20     MR. JABBOUR: Sure. I don't believe there's an
21 actual reference to Exhibit B, but on page 117 of the
22 document -- I'm sorry, page 115 of the document, there
23 is a reference to the Bates numbers that are in Exhibit
24 B, and actually as I said that, I now see there is a
25 reference to Exhibit B on page 115 under Performance

126

1  Measures & Goals. The first time a Bates number is
2  referenced, there's also reference to Exhibit B.
3      MR. PAIKIN: Okay, so maybe just give her --
4  just let her look at the letter. I'm just trying to
5  expedite this.
6      THE WITNESS: Okay.
7      BY MR. JABBOUR:
8      Q. Looking at page 137, this is a document that
9  describes incentive compensation for customer service
10 specialists in 2013. Is that right?
11     A. Yes, that's what the document says.
12     MADAM REPORTER: Could you repeat that?
13     THE WITNESS: Yes, that's what the document
14 says. Sorry.
15     BY MR. JABBOUR:
16     Q. Average handle call time is a component of the
17 incentive compensation for customer service specialists
18 in 2013. Is that right?
19     A. Yes.
20     Q. Under Minimum Monthly Plan Qualifiers, it
21 indicates that you need an average handle call time if
22 you're a specialist I -- I'm sorry, let me rephrase.
23     For both specialists I and specialists II, your
24 average handle call time has to be below a certain
25 number in order to avoid the DQ category. Is that

127

1  right?
2      MR. PAIKIN: Object to form.
3      THE WITNESS: Average handle time, yeah, there
4  is a minimum listed here, yes.
5      BY MR. JABBOUR:
6      Q. If you're below that minimum, does the DQ mean
7  you're disqualified from getting any incentive
8  compensation whatsoever?
9      A. Yes.
10     Q. Under the Potential payout & Costs, it indicates
11 that the targeted average payout is a certain amount
12 with a 60 percent participation rate. What does a 60
13 percent participation rate mean? Is that out of the
14 universe of all customer service specialists, 60 percent
15 of them will get incentive compensation of some sort?
16     A. Incentive compensation at Navient is intended to
17 be a supplement to their annual salary, and so we do not
18 budget or plan that 100 percent of our employees will
19 qualify for an incentive compensation plan. So what
20 we're saying in this bullet is, we have -- we assume or
21 budgeted towards 60 percent of our employees will
22 qualify for the incentive.
23     Q. On page 138, under Potential Benefits, it reads,
24 "Across the entire ED call center, each 1% increase in
25 FCR results in a 1% reduction in call volume and a

128

1  $100,000 reduction in annual costs ($4 cost per call.
2  Each 5 seconds of reduced average -- AHT results in a 1%
3  improvement in productivity and a $100,000 reduction in
4  annual costs."
5      This reference to the entire ED call center, is
6  that the ED call center within Navient, or some sort of
7  Department of Education metric?
8      A. This document is only for a Navient call center
9  employee.
10     Q. Do you know where these numbers are derived from
11 in terms of how much of a reduction or how much of a
12 change in FCR and AHT changes annual costs to the
13 company?
14     A. I don't -- didn't do the math to calculate it
15 out, but it would be our total number of employees that
16 we have, times the reduction in -- from our average talk
17 time, times their hourly rate, times the number of calls
18 that they are going to take, an average.
19     Q. If you didn't do the analysis, how do you know
20 that is how that's calculated?
21     A. Because I've had conversations on how it was
22 calculated.
23     Q. Okay. And who did you have those conversations
24 with?
25     A. With Brian Lanham.

Case 3:17-cv-00101-RDM   Document 511-25   Filed 07/16/20   Page 7 of 10
Peterson
CFPB v. Navient Corporation, et al.                                      6/8/2018

149

1  Q. Specifically if there were a flow chart about
2  how a customer service representative is supposed to
3  present repayment options to borrowers, would that be
4  the type of document that would be on the KS site?
5      A. Yes, but I wouldn't -- it's unlikely that it's a
6  document that's a standalone document. There's
7  typically some other content that's around that
8  particular document or that flow chart. So additional
9  facts that they should consider or it's a reference tool
10 that they can look at to understand high-level what
11 another process is doing.
12     Q. Are there any specific scripts that a customer
13 service center representative is supposed to use when
14 speaking with borrowers about repayment options?
15     A. I don't think of them as scripts, I mean, we
16 have some very specific scripts that need to be read
17 when a customer is enrolling in a specific program, like
18 a forbearance as an example, we've got the specific
19 terms and conditions, but we don't typically script our
20 agents on everything that they should say, we -- our
21 philosophy is to give them guidance on enough
22 information that that leads them to a conversation with
23 the customer.
24     We do provide a -- a good level of understanding
25 so that they know which option they should be getting

150

1  more information to the customer about so that they know
2  whether that option is right for the customer, but I
3  wouldn't consider our training material or our
4  expectations that anything is scripted.
5     Q. Who leads the training department?
6     A. This -- for customer service right now, it's
7  Patty Novrocki.
8     Q. And how long has she been in that role?
9     A. About three years.
10    Q. Who was in that role before her?
11    A. Debra Walsh.
12    Q. Is Ms. Walsh still with the company?
13    A. No.
14    Q. And how long was Ms. Walsh in that role?
15    A. Five -- four more years.
16    (Peterson Exhibit Number 11 was marked for
17 identification.)
18    BY MR. JABBOUR:
19    Q. You have been handed Exhibit 11, which is Bates
20 numbered NAV-00686505 through 08. And please let me
21 know when you're ready to discuss it.
22    A. (Document review.)
23    I'm ready.
24    Q. Okay. Looking at the page that begins -- or I'm
25 sorry, the page that ends in Bates number 07 and 08, I'm

151

1  not asking you if this specific document was on the KS
2  site, but is a flow chart similar -- is this a type of
3  document that might appear on the KnowledgeShare site?
4     A. Yes. This specific document or a document --
5  may not be this exact one as it's sitting here, because
6  it was a draft, is in KnowledgeShare as a document -- as
7  a reference for our customer service agents to use, but
8  it's a part of a -- another set of information that's
9  available to the customer -- or to the customer service
10 agent in KS.
11    Q. I just want to make sure I understood what you
12 said. Is it a standalone document as well as a document
13 that's referenced by other documents?
14    A. This particular document is an embedded document
15 within a KnowledgeShare document. So a customer service
16 agent would get general information and then to get to
17 this document, they are clicking on the embedded
18 document to open this one up.
19    Q. Is this a document that would have been -- that
20 was drafted by the training department?
21    A. Based on what Kevin has put in his email, yes,
22 and based off what the typical process is, I assume yes.
23    Q. When a document is added to the KS site, did you
24 indicate that customer service representatives are
25 informed that the document has been added, or is it just

152

1  something that they'll now be able to search for and
2  find?
3     A. We have a process that sends them a email
4  communication that there's a new document available.
5     Q. Is the new document contained within that email
6  communication, or they have to go to the KS site to look
7  at what that new document is?
8     A. I believe it gives them the -- each document has
9  a KS document number. I believe it gives that, I don't
10 recall whether it also allows them to link on it -- you
11 know, click on it to get the document to open. I don't
12 recall that part.
13    Q. Are customer service representatives expected to
14 read every new document that they get an email about?
15    A. Yes.
16    Q. Is there any testing that's done on the
17 documents to make sure that they read them?
18    A. The quality monitoring that happens uses
19 documents from KS to determine whether they're following
20 the procedures. So in a roundabout way, that's the
21 testing, because if they don't follow them, then they
22 will get a bad quality score. That's not to say that
23 some material couldn't be tested as well, but generally
24 speaking, that's the way that we ensure that they follow
25 it.

38 (Pages 149 to 152)

Case 3:17-cv-00101-RDM   Document 511-25   Filed 07/16/20   Page 8 of 10
Peterson
CFPB v. Navient Corporation, et al.                                6/8/2018

177

1  tool.  If a customer service representative receives a
2  call from a borrower who says that they cannot make any
3  payment on their federal student loan, is it correct
4  that this reference tool indicates that they should go
5  down the "no" path at the first decision point?
6      A.  I don't -- our representatives are not using
7  this as a true flow of if they say yes, then you should
8  automatically go to the top or the bottom or the left or
9  the right.  These are just things that they should
10 consider as they're talking to the customer trying to
11 figure out what the right repayment option is for the
12 customer.  When we ask them if they can afford to make
13 any sort of payment, we're trying to understand, are you
14 in a position to pay month over month, or do you need
15 some sort of a relief that is getting you a
16 short-term -- through a short-term bridge.
17     Q.  So this reference tool is not intended to be
18 taken literally by customer service representatives?
19     A.  It is purely a guide that they can use as a
20 reference to try and get the right questions to help
21 the -- guide the conversation with the customer.
22     Q.  Okay.  If I'm an agent, and I'm trying to be
23 guided, and I literally ask that first question to the
24 borrower, can the borrower pay some portion, and they
25 tell me no, would it be wrong for me then to just

178

1  continue to follow the flow chart as is prescribed here?
2      A.  You -- if you recall, we're not scripted at all
3  for the customers, so by going to that next step, it's
4  almost like we're scripting them, but that's not the way
5  the conversations go.  What that does is it opens to the
6  next question you should be thinking about is a
7  deferment a better option for this customer, is it a
8  forbearance that we should be looking at.
9          So that's the intention of the "no" down here is
10 to get them thinking about what other questions they
11 need to ask to understand where they should go with the
12 next set of questions.
13         Typically, they're -- if they can't afford to
14 make any sort of payment, then they're in a short-term
15 condition that's causing that, and so a deferment or
16 forbearance is typically that right solution for them.
17     Q.  What if the borrower indicates that they can't
18 afford to make any payment and they have been unemployed
19 for 13 months, this reference tool still guides the
20 customer service representative to the bottom half.  Is
21 that right?
22     MR. PAIKIN:  Object to form.
23     THE WITNESS:  That's where we would rely on what
24 the customer is telling us, so they may have been
25 unemployed for 13 months because they've been out on

179

1  maternity leave and now they're going back to look for a
2  job.  So then in that case, it could be considered still
3  a short-term situation, and the bottom is the
4  appropriate.  If it's unemployment and they think that
5  they are not going to be getting a job any longer, then
6  they would know that they should look at an income-based
7  repayment or another longer term solution.
8      BY MR. JABBOUR:
9      Q.  Okay.  Why does this reference tool depict it as
10 a binary choice that if a borrower can't pay some
11 portion, they should be guided towards deferment or
12 forbearance, rather than what you are describing?
13     A.  I think -- KS, where this is just an embedded
14 document within KS, is this particular tool or this
15 particular document, is a part of the section if a
16 borrower is having difficulty making payments.  So
17 within that section, it also talks about counseling the
18 customer on their situation, and this is just 100
19 percent intended to be a guide.
20         There's information on the second page of this
21 document that explains the pros and cons of each of the
22 repayment options that our agents are also taught to
23 understand.  I mean, we're very clear in forbearance
24 that it's not -- it's the last choice.  We've got that
25 in the red in the bottom of the first page that

180

1  forbearance is not the right solution, we should always
2  try and find a different solution before forbearance,
3  but in some cases, forbearance is the only option, and
4  as we know for repayment programs, it is required for us
5  to put them in another program.
6      Q.  Okay.  So this may have been embedded, or it may
7  be embedded in a different document on KnowledgeShare,
8  but when Ms. Grassi transmitted it to the Department of
9  Education, she characterized it as "our call center
10 guide that is used to walk borrowers through the process
11 of understanding their options."  And she said, "We
12 follow this and help them understand choice between
13 moving toward forbearance as you will see."
14         So she characterized it as the guide, or our
15 guide, and she didn't characterize it as a document
16 that's to be read in the context of other documents on
17 the KnowledgeShare site.  Do you disagree with how she
18 characterized it?
19     MR. PAIKIN:  Object to form.
20     THE WITNESS:  No, because that's actually how I
21 characterized it when I started talking about that this
22 is a guide.  This is guiding the conversation.  If you,
23 you know, read the things that are off to the left,
24 these are all meant to be things that the agents -- just
25 a reminder, hey, make sure you understand how long the

185

1  Q. So why is the information presented in this
2  format, if this is not how they would ever use it?
3  A. High level giving the -- giving a reference of
4  what the end result of the pop pad may look like,
5  depending on what the questions are. I mean, the one
6  thing at the very start of this is if a customer can
7  make a payment, that's the number one best choice we
8  will 100 percent of the time go to. We want the
9  customer to be making their payment. So that's why it's
10 very first in our questions.
11     If they can continue to make their payments,
12 then we don't need to put them on another program,
13 because that's going to be less expensive in the end for
14 the customer to pay their loan in 10 years versus paying
15 it in 15 or 20 years, or maybe paying more interest
16 because we went down a graduated program. So what we're
17 trying to do with our pop pad and with our process is to
18 find the most economical solution for the customer that
19 meets their condition that they have.
20     And so this tool that's listed here is really a
21 reference guide. The pop pad does all of that. There's
22 questions in the pop pad that even make sure that we're
23 in compliance with our state law disclosures that we
24 need to read and making sure that we're actually doing
25 our scripts that we need to do.

186

1     So that is the document that the agents are
2  using every day because it's an all-encompassing flow
3  that they need to follow. But again, every one of these
4  is based off of how the customer answers the question,
5  and trying to find the least expensive overall program
6  for the customer.
7  Q. Was it always the case that the CRS employee was
8  simply supposed to follow the -- the flow on their
9  computer screen, or was it ever the case that they were
10 supposed to be using this printed version?
11 A. They've had this pop pad in place since 2013.
12 Prior to that, they would have leveraged the same KS
13 document that we reviewed earlier that the CSC agents
14 read.
15 Q. Which document are you referring to?
16 A. The document from Exhibit 13, or the equivalent
17 of that is what was in place prior to the pop pad coming
18 into place in 2013.
19 Q. And so this printed document that's Exhibit 14
20 came into existence at the same time that the pop pad
21 came into existence?
22    MR. PAIKIN: Object to form.
23    THE WITNESS: I don't know when specifically
24 this -- if they were at the same time or if this was
25 created after the pop pad was. I'm not sure.

187

1    BY MR. JABBOUR:
2  Q. Okay. This document would not have existed
3  before the pop pad?
4     MR. PAIKIN: Object to form.
5     THE WITNESS: Not that I'm aware of.
6     BY MR. JABBOUR:
7  Q. Who is the intended audience for this chart, if
8  it's not the employees in CRS, who should instead be
9  relying on what's on their computer screen?
10    MR. PAIKIN: Object to form and foundation.
11    THE WITNESS: I don't know that there is a --
12 this is a reference within the KS document, because the
13 pop pad is not something that you can visually depict to
14 a customer service or a CRS agent. The pop pad, you
15 have to have a customer account pulled up in order to
16 get the pop pad to work, so this just gives them a very
17 high-level understanding of what they are going to
18 experience when they use the pop pad.
19    BY MR. JABBOUR:
20 Q. Is this intended to be an accurate description
21 of how the questions flow in the pop pad?
22    MR. PAIKIN: Objection, asked and answered.
23    THE WITNESS: This is a general depiction of
24 what could happen depending on what the situation is and
25 how the customer answers it, because there are many

188

1  questions that are not depicted on here.
2     BY MR. JABBOUR:
3  Q. There are questions on the pop pad that are not
4  depicted on here?
5  A. Correct.
6  Q. I would like to shift and I want your -- I want
7  to talk about the different servicing platforms and
8  databases that Navient Solutions uses. And I know we've
9  discussed some of them here today, but I want to
10 understand the time periods in which they were used and
11 the types of loans for which they were used, or the
12 types of data they store.
13    So let's start with FDR. During what time
14 period was that used and how would you describe what FDR
15 is?
16 A. FDR is our primary servicing system for our
17 private student loans. I believe it began in 2013. It
18 may have had some loans on there prior to 2013, but our
19 conversion, I believe, was in July of 2013.
20 Q. What is the CLASS system?
21 A. It's our servicing system of record for our
22 federal student loans. There's two versions of that
23 system, one for our Department of Education service
24 loans and one for the rest of our federal student loans.
25 Q. And how long has the CLASS system been used?

1   DISTRICT OF COLUMBIA, to wit:

2

3       I, Sally Jo Quade, CERT, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before

4   me at the time and place herein set out, and after having been duly sworn by me, according to law, was

5   examined by counsel.

6       I further certify that the examination was recorded stenographically by me and this transcript is a

7   true record of the proceedings.

8       I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor

9   related to any of the parties, nor in any way interested in the outcome of this action.

10

11       As witness my hand and notarial seal this 22th day of June, 2018.

*[Signature: Sally Jo Quade]*

Sally Jo Quade, CERT
Notary Public