# EXHIBIT 131



On October 17, 2016, a clarification to this policy memorandum was issued and is included as an addendum to this document.

**To:** **James Runcie, Chief Operating Officer, Federal Student Aid**
**CC:** **Sarah Bloom Raskin, Deputy Secretary, U.S. Department of the Treasury**
     **Richard Cordray, Director, Consumer Financial Protection Bureau**
**From:** **Ted Mitchell, Under Secretary, U.S. Department of Education**
**Date:** **July 20, 2016**
**RE:** **Policy Direction on Federal Student Loan Servicing**

## I.    INTRODUCTION

This memorandum provides policy direction for the servicing of all federal student loans. The direction below is driven by the experiences of federal student loan borrowers and is responsive to the need to establish a transparent and accountable system that allows for continuous improvement. Federal Student Aid should continuously evaluate its servicing contracts to ensure that public resources are used efficiently and effectively to promote borrower success and protect taxpayers' investments. We look forward to working with you in developing a servicing system consistent with the following policy direction.  To that end, we will continue our collaboration with our colleagues across the Administration as we work with Congress to ensure the public's commitment to these programs is safeguarded by the investment necessary to create the high-quality student loan servicing system warranted by a trillion dollar portfolio, and that adequate resources are made available to ensure success.

Pursuant to the Health Care and Education Reconciliation Act of 2010 and the Administration's move to 100 percent Direct Lending for federal student loans, adjustments to servicing practices for Direct Loans to reflect the Department of Education's (Education's) policies can be implemented through Education's loan servicing contract(s) and through guidance provided to the vendors that receive awards under these contracts.[1] These directives and policy choices should be applied equally to the servicing of all loans made, insured, or guaranteed under Title IV of the Higher Education Act, to the maximum extent feasible.[2]

The policy direction described in this document is intended to be reflected in the new state-of-the-art loan servicing ecosystem that FSA has begun to procure.  As we have previously described, this new ecosystem will consist of a single servicing platform on which all borrower accounts held by the Education will reside, and to which multiple customer service providers will have access in order to provide state of the art borrower engagement.  This new ecosystem will function in a manner that will clarify for borrowers that the U.S. Department of Education is the servicer of their loan.  During the next phase of the procurement process, those offerors selected to participate will be required to propose a limited number of unaffiliated entities to perform as customer service providers as part of a

---

[1] *See* Pub. L. No. 111-152, 124 Stat. 1029.
[2] *See* 20 U.S.C. § 1070a et. seq. To the extent aspects of this policy guidance are not currently allowable under Education's regulations, they should be considered for future rulemakings.



subcontracting plan, and will be evaluated, in part, on the basis of any proposed scope, methodology and schedule for distributing call volume to such entities. This will help to reduce risk for borrowers, increase the likelihood of a successful transition, and ensure that the new ecosystem is capable of supporting multiple customer service providers. Consequently, when a final contract is awarded under the current procurement process, a substantial part of our new vision for student loan servicing will be realized—a single platform for all borrower accounts, and multiple customer service providers who will receive call volume, all of whom will be subject to routine performance monitoring and oversight. After contract award under the current process, new procurement actions will be undertaken to provide for a direct contracting relationship between Education and customer service providers. These customer service providers will be held accountable for meeting the same servicing standards, whether they begin operations as a result of an award under the current procurement process or enter the new servicing ecosystem through a subsequent procurement action. While in the end, no single vendor will be responsible for every aspect of student loan servicing in our new ecosystem, the new servicing experience will be seamless for borrowers, and reflect the servicing policy direction discussed in this memorandum.

Education expects the following policy direction to guide the development of contract provisions related to the servicing of federal student loans and will continue to work with federal and state law enforcement agencies and regulators to apply this policy direction expeditiously to the servicing of all student loans, to the maximum extent practicable.

Following a discussion of the background of federal student loan servicing and the vision for the future of federal student loan servicing, this memorandum is organized into five parts. Each section reflects the pillars upon which our student loan servicing policy direction is based:

- **Economic Incentives to Provide High-Quality Student Loan Servicing**. This section discusses the critical role that economic incentives and baseline borrower protections play in a servicing system that provides high-quality service and encourages optimal borrower outcomes.

- **Accurate and Actionable**. This section outlines a list of directives federal student loan borrowers can expect their servicer to follow, including specific baseline standards when providing customer service to "at-risk" borrowers.

- **Consistency**. This section describes how borrowers should receive adequate and timely communications and that all common servicing functions should be consistent.

- **Accountability**. This section details how borrowers will be able to expect a high level of accountability in their federal student loan servicing experience, including timely and accurate responses to inquiries and complaints, and transparent resolutions when problems occur. Taxpayers should expect that loan servicing is provided in a cost-effective manner.

- **Transparency**. This section details the expectation for a higher level of federal student loan data transparency on the performance of the portfolio, the performance of individual service providers,



and publically available information on the tracking and reporting of requests for assistance, including income-driven repayment plan enrollment, escalations, and appeals.

## II.  BACKGROUND

### A Unified Approach to Student Loan Servicing

Throughout this Administration, we have engaged with consumer advocates and stakeholders across the country to develop policies that better protect federal student loan borrowers as they navigate repayment of their loans. More recently, we have sought public input on standards for entities servicing student loans. In late 2014, FSA released a Request for Information (RFI) regarding Title IV Student Loan Servicing.[3] The RFI noted that, at the time, FSA's portfolio of federal student loans was serviced by eleven separate loan servicers. Today, the federal portfolio is serviced under ten separate contracts.[4]

The 2014 RFI sought information on how FSA could efficiently and effectively manage a growing portfolio in a manner that improves borrower satisfaction and outcomes, provides common borrower experiences, and allows for consolidated reporting of financial information and borrower data.[5] Given the extensive experience with the current multi-servicer, multi-system contract model, FSA asked for information on alternative approaches to servicing, such as the use of a single servicing platform and the use of specialized vendors to provide discrete services like call center operations.

In 2014, Education hosted a Servicing Summit seeking input on needed reforms to servicing and appropriate methods of implementation. The purpose of the one-day session on servicing was to explore various topics of interest to student borrowers, consumer advocates, financial aid administrators, and policymakers.

### Establishing a Student Aid Bill of Rights

---

[3] *See* U.S. Department of Education, *Title IV Student Loan Servicing*, Solicitation Number: FinancialAidLoan Servicing (Nov. 25, 2014), *available at* https://www.fbo.gov/?s=opportunity&mode=form&id=c5f6d78eae627127d09fdebc2de6eb05&tab=core&_cview=0.
[4] The current contracts were awarded through the *Title IV Additional Servicer* and *Not-for-Profit Loan Servicer* solicitations. While there are inherent advantages to a multi-servicer market, including using competition to try to drive higher customer satisfaction and lower borrower delinquencies, there are also several disadvantages, such as lack of consistency across platforms and servicers, operational complexity and inefficiency, and additional costs.
[5] *See* U.S. Department of Education, *Servicing Summit* (Dec. 1, 2014), *available at* http://fsaconferences.ed.gov/servicingsummit.html. The summit was held in advance of the 2014 FSA Training Conference for Financial Aid Professionals in Atlanta, Georgia.



Last year, President Barack Obama signed a Presidential Memorandum on the Student Aid Bill of Rights (SABOR), calling on several federal agencies to work together to strengthen student loan servicing and improve borrower outcomes on a host of different measures.[6] Specifically, SABOR calls for:

- ***Making it Easier for Federal Direct Student Loan Borrowers to Repay Their Student Loans.*** *As soon as practicable, the Secretary of Education shall establish a centralized point of access for all Federal student loan borrowers in repayment, including a central location for account information and payment  processing for all Federal student loan servicing, regardless of the specific servicer.*

- ***Higher Standards for Federal Direct Loan Servicing.*** *By January 1, 2016, the Secretary of Education shall require all Federal Direct student loan servicers to provide enhanced disclosures to borrowers and strengthened consumer protections. These disclosures and consumer protections shall be improved throughout the loan repayment process, and shall include disclosures to borrowers regarding loan transfers from one servicer to another and notifications when borrowers become delinquent or have incomplete applications to change repayment plans. As soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers.*

The SABOR effort also calls for several reports to inform federal student loan servicing policy, including:

- **Public inquiry and analysis of public input on student loan servicing practices.** In May 2015, Education joined with the Department of the Treasury (Treasury) and the Consumer Financial Protection Bureau (CFPB) to launch a public inquiry into student loan servicing practices, calling for input from individual consumers, the servicing industry, consumer advocates, state law enforcement agencies and regulators, policy experts, and other stakeholders.  In response to this inquiry, more than 30,000 individual consumers and other stakeholders provided input, informing a report published by the CFPB in September 2015.[7] This report highlighted widespread servicing problems reported by consumers and other stakeholders, assessed the applicability of the federal standards in place for the servicing of mortgages and credit cards, and offered a series of recommendations for student loan servicing reform.

- **Performance-based contracting.** In August 2015, Education released a report on best practices in performance-based contracting, including foundational recommendations produced by an interagency task force comprised of Education, Treasury, the Office of Management and Budget,

---

[6] *See* White House, *Press Release: Presidential Memorandum on a Student Aid Bill of Rights* (Mar. 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/03/10/presidential-memorandum-student-aidbill-rights.
[7] *See* Consumer Financial Protection Bureau, *Student Loan Servicing* (Sept. 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.



and the Domestic Policy Council.[8] The report called for: (1) a compensation structure that focuses servicer attention and resources on keeping borrowers current and provides targeted incentives for servicing borrowers at greatest risk of default; (2) a system to allocate new loan volume based on positive borrower performance, quality customer service, and strong compliance; (3) standardized service-level and borrower communication requirements; (4) robust consumer protections and a centralized compliant system; and (5) strong oversight and enforcement mechanisms to ensure compliance.

- **Joint principles on student loan servicing.** In September 2015, Education, Treasury, and the CFPB published a joint statement of principles calling for new student loan servicing standards in order to improve borrower outcomes and reduce loan defaults.[9]

- **Education report on necessary statutory, regulatory, and administrative changes to protect student loan borrowers.** On October 1, 2015, Education released a report, developed in consultation with Treasury and the CFPB, outlining a series of statutory, regulatory, and administrative recommendations to safeguard student borrowers.[10]

- **Borrower repayment rights and credit reporting reform.** In April 2016, Education and Treasury, in consultation with the CFPB, announced new borrower repayment rights that build on the joint statement of principles and the work of federal and state law enforcement agencies, including the CFPB and state attorneys general.[11]

Recognizing the importance of immediate action to reduce student loan defaults and encourage borrower success, Education has also worked in partnership with Treasury and the CFPB, as well as with students, colleges and universities, and higher education and loan experts to identify and incorporate student loan servicing best practices to support the more than 40 million Americans with federal student loans.

Those actions include:

---

[8] *See* U.S. Department of Education, *Recommendations on Best Practices in Performance-Based Contracting* (Aug. 2015), *available at* http://www2.ed.gov/finaid/loans/repay/best-practices-recommendations.pdf; U.S. Department of Education, *Another Step Forward Under the Student Aid Bill of Rights* (Aug, 2015), *available at* http://www.ed.gov/blog/2015/08/another-step-forward-under-the-student-aid-bill-of-rights/.

[9] *See* U.S. Department of Education, *Department of Education, Department of Treasury and the Consumer Financial Protection Bureau Issue Joint Principles on Student Loan Servicing* (Sept. 29, 2015), *available at* http://www.ed.gov/news/press-releases/department-education-department-treasury-and-consumer-financial-protection-bureau-issue-joint-principles-student-loan-servicing.

[10] *See* U.S. Department of Education, *U.S. Department of Education Releases Report on Strengthening the Student Loan System to Better Protect All Borrowers* (Oct. 1, 2015), *available at* http://www.ed.gov/news/press-releases/us-department-education-releases-report-strengthening-student-loan-system-better-protect-all-borrowers.

[11] *See* U.S. Department of Education, *Fact Sheet: Protecting Student Loan Borrowers* (Apr. 28, 2016), *available at* http://www2.ed.gov/documents/press-releases/04282016-protecting-borrowers.doc.



- **Reforming the Total and Permanent Disability discharge process.** Education moved to identify and protect federal student loan borrowers who may be eligible to have their loans discharged under the Total and Permanent Disability loan discharge program.[12]

- **Completing a pilot program to explore innovative approaches to assisting delinquent borrowers.** Last December, Education announced the results of a pilot program intended to reach and provide assistance to seriously delinquent borrowers.

- **Expanding publicly available data about student loans in default.** Education also publishes quarterly data updates on Private Collection Agency performance and implemented a new set of student loan statement disclosures to provide clear and direct information to borrowers.

- **Launching the FSA Feedback System for borrowers with complaints about student loans or institutions of higher education.** On July 1, 2016 we launched the FSA Feedback System, an online portal that allows federal student aid customers to submit complaints, provide positive feedback, and report allegations of suspicious activity regarding their experience with federal student aid programs.

As the focal point of many of these efforts, in April of this year, Education laid out a vision of world-class service for borrowers and challenged the industry to compete to fulfill that vision to make sure all borrowers are getting the customer service they deserve.[13] Six years ago, the President signed into law landmark student loan reform legislation that shifted $60 billion in subsidies that would have been paid to banks and lenders and instead made historic investments to help millions of American families pay for college and provide student loan borrowers with access to consistent, high-quality loan servicing in the future. Under the old system, banks and lenders received federal subsidies to make loans and Education had few levers to ensure that borrowers were getting quality servicing and fair treatment. Now that Education is both the lender and the servicer, it is able to better address any challenges facing borrowers, manage the portion of the federal student loan portfolio it holds, and continuously work to improve the borrower experience.

## III.   A NEW VISION FOR STUDENT LOAN SERVICING

We made clear in April that the challenges borrowers face will be addressed by guaranteeing borrowers receive fair treatment while repaying their federally held loans, no matter what company is handling their account.[14] Any third party providing student loan servicing on behalf of the government should adhere to

---

[12] *See* U.S. Department of Education, *U.S. Department of Education Acts to Protect Social Security Benefits for Borrowers with Disabilities* (Apr. 12, 2016), *available at* http://www.ed.gov/news/press-releases/us-department-education-acts-protect-social-security-benefits-borrowers-disabilities.

[13] *See* U.S. Department of Education, *A New Vision for Serving Student Loan Borrowers* (Apr. 2016), *available at* http://blog.ed.gov/2016/04/a-new-vision-for-serving-student-loan-borrowers/.

[14] *See* U.S. Department of Education, *Fact Sheet: Protecting Student Loan Borrowers* (Apr. 28, 2016), *available at* http://www2.ed.gov/documents/press-releases/04282016-protecting-borrowers.doc.



the joint statement of principles on student loan servicing. The contracts that govern those relationships must ensure borrower protections. Borrowers can expect to be able to rely on the monitoring and reporting of conduct by third-party contractors, and that findings are shared appropriately with Education, and federal and state law enforcement officials.

The vision outlined in April executes the framework for consumer protection announced last year by describing a new system that makes it easier for borrowers to navigate loan repayment and provides clarity on where the system is working well and where improvements are needed. In order to achieve this vision, Education has begun the process to design a single servicing platform that makes clear to all borrowers that the U.S. Department of Education is responsible for the servicing of their loans. This single portal will mean that borrowers can log into one website to get information about their Education-held loans, make payments, apply for benefits, and manage their account. The single portal will allow for other entities to connect such that Education will be able to contract with additional vendors to perform critical customer service functions. This vision serves as the foundation for this policy memorandum and the forthcoming contract actions, which are designed to ensure that borrowers and taxpayers can depend on high-quality servicing, including:

- Education-branded communication that is standard—eliminating differences that currently exist among multiple servicers that co-brand borrower communications—and that will help borrowers stay on top of their debt and avoid confusion about who is servicing their loans;

- A streamlined borrower experience via a single web portal through which all borrowers can find the latest information about their Education-held loans, make payments, and apply for benefits, eliminating the need for borrowers to know the name of their servicer;

- High-quality customer service practices that will be common for all borrowers and will ensure a consistent customer experience, regardless of which contractor is providing that customer service;

- Reduced, and to the extent practical, eliminated loan transfers and other borrower disruptions that can make it hard for borrowers to keep current with their loan payments and seek help when they need it;

- Enhanced oversight and accountability that will ensure that borrowers are treated fairly and given clear, actionable information at every step of the repayment process, including enhanced customer service practices and a new complaint system to empower borrowers when something is not right; and

- A single, consumer-tested platform for all federal student loans allowing for a more seamless connection for future customer service centers.

In recent months, Education engaged with stakeholders, advocates, and borrowers to ensure we are including all of the relevant policy direction in this memorandum, which will direct FSA's



implementation of federal student loan servicing.[15] As part of that effort, we received a substantial number of written comments that provided input on a range of issues.

---

[15] *See* U.S. Department of Education, *Speak Up on Student Loan Servicing* (June 2016), *available at* http://sites.ed.gov/ous/2016/06/speak-up-on-student-loan-servicing/.



**Part One: Economic Incentives to Provide High-Quality Student Loan Servicing**

The incentives in the student loan servicing contract must drive servicers to take action that will result in the best outcomes for borrowers. In the past, the incentive structure in some contracts may not have optimally encouraged servicing entities to favor actions that maximized the benefits for borrowers. As Education takes action to make improvements to these relationships and incentives, this new contract provides a meaningful opportunity to design incentives to promote the best outcomes for borrowers.

**Strengthening Consumer Protections by Aligning Economic Incentives with Borrower Success**

*The structure and incentives in student loan servicing contracts affect servicer behavior. The current contract includes incentives for servicers to keep borrowers in current status and to avoid default through a fee schedule that provides declining compensation as borrowers become more severely delinquent. The contract also includes incentives for greater enrollment in income-driven repayment plans—a better outcome for borrowers who can start working towards loan forgiveness—over postponed payments, which benefit servicers as they require less time and processing. Since the contracts were changed in September 2014 to deter the usage of forbearance, there has been a decline in the use of forbearance, and enrollment in income-driven repayment plans has steadily increased. We believe that it is important to incent servicers properly to help ensure that borrowers receive high-quality service, and that the current fee schedule has significant advantages over other servicing compensation models.*

**Incentives to keep all borrowers current, while providing resources to borrowers most at risk.** The development of a new student loan servicing contract provides the opportunity to enhance the incentive improvements implemented in 2014. The performance-based contracting recommendations contemplate a servicing incentive structure designed to balance the need to keep borrowers current and the need to direct servicer resources to borrowers most in need of assistance. These recommendations suggest specific changes to the compensation structure and performance measurements included in the federal Direct Loan servicing contracts with the goal of maximizing the financial incentives for servicers to provide borrowers with high-quality customer service.[16]

- FSA should specify a baseline level of service for all borrowers and reinforce these minimum expectations via a compensation model that incents contractors to help borrowers remain current in a qualified repayment plan (*i.e.*, not deferment or forbearance).

- FSA should provide targeted incentives based on the performance of borrowers identified by FSA as being at a greater risk of default when they separate from school to help ensure at-risk (defined further in this document) borrowers achieve positive outcomes before reaching delinquency. This can include a framework that provides flexibility to enable specialty or higher-touch servicing to certain borrowers by deploying specialized units or sub-servicers to handle certain functions or

---

[16] *See* U.S. Department of Education, *Another Step Forward Under the Student Aid Bill of Rights* (Aug. 28, 2015), *available at* http://www.ed.gov/blog/2015/08/another-step-forward-under-the-student-aid-bill-of-rights/.



service certain borrower segments based on specific outcomes. For example, FSA should consider targeted financial incentives directed to dedicated service providers, sub-servicers, or servicing units focused on enrolling at-risk borrowers, including severely delinquent or hard-to-reach borrowers, in income-driven repayment plans or other options designed to avoid default.

- FSA should ensure that the contracts preserve Education's flexibility to penalize service providers if they are unable to provide high-quality service or otherwise fail to meet contract requirements. FSA should regularly evaluate the impact of contract incentives to determine their efficacy and whether they should be continued throughout the duration of the contract.

While aligning contractor incentives through targeted compensation and performance measurement is an important tool for producing positive performance, this tool should be complemented with proper monitoring of contractor performance.

- **Monitoring servicer performance.** Servicer performance should be reviewed on a regular basis through audits of records, systems, complaints, and through on-site audits and a compliance-review process.  Through a contract with specific customer service standards, FSA must confirm that contractors are meeting the baseline requirements of the contract and providing necessary customer service.

- **Penalties for contract non-compliance.** Where required services are not appropriately provided in accordance with the contract, servicers should be penalized through all appropriate tools, including:

  o   Withholding of compensation;

  o   Reduced future loan allocations;

  o   Loss of bonus funds or other targeted performance incentives; and

  o   Where appropriate, other penalties or sanctions.

**Compensation should be driven by servicing performance on a range of indicators.** Response time to answer calls and the response time while borrowers are on hold should meet or exceed industry standards in other servicing markets (such as mortgage servicers). The following metrics should be used and expanded upon to create standards that are publically available on Studentloans.gov and should be updated with performance data on a quarterly basis as a mechanism to drive servicer compensation:

- Response time from phone or email inquiry;

- Hold time;

- Feedback should be acknowledged within 24 hours;



- Complete Public Service Loan Forgiveness Employment Certification Forms should be processed within 10 business days;

- Complete income-driven repayment applications should be processed within 10 business days;

- Direct ACH debit applications should take no longer than five business days to process, and revisions to existing accounts should be completed within three business days;

- Average speed of answer;

- Maximum hold time;

- Call abandon rate; and

- Call quality error rate.

**Borrowers can expect to be able to benefit from the knowledge and improvements identified through the provision of a robust customer satisfaction survey.** Servicers should provide a high-quality customer experience that facilitates borrower satisfaction and helps borrowers avoid delinquency and default. FSA should implement operational metrics that track servicers' adherence to the baseline level of services and monitor the quantity of valid consumer disputes and requests for assistance submitted to the FSA Feedback System or complaints submitted to the servicer. FSA should evaluate servicers' performance based on a quarterly survey of borrower experience, with a weighting that will reward servicers for targeted efforts to reach borrowers who are at risk of default. In addition to measures of overall satisfaction, this survey should include:

- Questions that measure how well servicers convey essential information to borrowers, help borrowers make optimal repayment decisions, provide support and resources to borrowers, and facilitate dispute resolution mechanisms;

- A sufficiently large sample to make statistically valid conclusions about borrowers who are delinquent, in grace, have a recently rehabilitated loan, or did not complete their education; and

- A sufficiently large sample to make statistically valid conclusions about the borrower experience in each type of repayment plan.

Finally, these results should be published quarterly in conjunction with other accountability and audit metrics.



**Part Two: Accurate and Actionable**

Student loan borrowers depend on servicers to provide basic information about account features, borrower protections, and loan terms. It is critical that information provided to borrowers by student loan servicers be accurate. Borrowers have varying levels of knowledge about the way their loans work and the various resources and relief options available to them. Borrowers may miss out on opportunities to seek remedies, such as enrolling in alternative repayment options, because they may not know the "right language" to use with the servicing entity or may not know where to go to find out more information. A new Education servicing contract process provides an important opportunity to build in meaningful requirements to ensure that borrowers, even those who do not know the full range options available to them, are met with knowledgeable staff who can help these borrowers understand their options.

**Strengthening Consumer Protections for Borrowers in Distress through Accurate, High-Quality, High-Touch Loan Servicing.**

*Since 2009, the vast majority of federal student loan borrowers have had the right under the Higher Education Act to set their monthly student loan payment based on their income.[17] President Obama expanded the availability of these critical options to provide additional payment relief to millions of student loan borrowers experiencing financial distress. Despite the widespread availability of income-driven repayment plans, the federal student loan portfolio continues to reflect unacceptably high levels of delinquency and default. As the CFPB noted in its report on student loan servicing last year, breakdowns in communication between student loan servicers and borrowers related to the availability, terms, and cost of these protections may deter borrowers from taking advantage of these options—driving unnecessary student loan defaults.[18] The prioritization of postponing payments over enrolling borrowers in income-driven repayment plans, the absence of accurate and actionable information about alternative repayment options, and limited access to well-trained customer service personnel may diminish the effectiveness of these plans as a default aversion tool.*

*At the same time, the growing prevalence of fraudulent or predatory third-party debt relief organizations suggests borrowers do not understand their options and don't know where to go to ask for help.*

*In order to provide borrowers with the accurate and actionable information necessary to better mitigate defaults and ensure borrower success, FSA should direct its contractors to designate, train, and appropriately compensate a specialized unit of servicing personnel to assist at-risk borrowers and borrowers who have expressed interest in a more affordable monthly payment. These high-touch servicing staff should be expected to comply with a set of baseline standards that emphasize consideration of borrowers' financial circumstances and the benefits of long-term repayment options that meet*

---

[17] *See* Pub. L. No. 110-315, 122 Stat. 3078 (Aug. 14, 2008).
[18] *See* Consumer Financial Protection Bureau, *Student Loan Servicing* (Sept. 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.



*borrowers' needs. FSA should also direct its servicers to emphasize clear, user-tested, plain language written and oral communications related to these options, in order to promote increased borrower understanding and improve consumer decision-making during repayment.*

The following framework provides additional policy direction related to the enhancement of written and oral communications and the designation of high-touch servicing staff to provide a higher level of service to the borrowers most at risk of default:

- **Borrowers can expect to be able to access a unit of high-touch servicing staff— knowledgeable, specially-trained personnel who will evaluate borrowers' specific circumstances to help them stay on track.** Borrowers can expect direct access to a unit of high-touch servicing staff who are well-versed in repayment and forgiveness options, including income-driven repayment plans, when additional assistance is needed. When borrowers ask about ways to lower their monthly payment, describe experiencing financial distress, or otherwise have characteristics that indicate they are at higher risk of default, they should have direct access to high-touch servicing staff who are equipped to answer their questions and identify options that best fit their financial circumstances. These staff should prioritize setting up borrowers for long-term success, including by helping borrowers enroll in income-driven repayment plans prior to advising them to suspend making monthly payments.

- **When borrowers are at risk of default, they can expect to be able to depend on high-touch servicing staff to reach out.** Borrowers who are at risk of default can expect to receive actionable information early enough to help them get back on track, and to empower them to successfully manage their student loans over the long term. Borrowers who are at risk of default may need extra help to stay on track and can expect proactive outreach, including a good faith effort—defined as reasonable steps under the circumstances—to establish contact between the borrower and a unit of high-touch servicing staff, in order to discuss alternative repayment plans and select an option that best meets the borrower's financial needs.

- **High-touch servicing staff should receive rigorous, ongoing training related to available repayment plans, loan forgiveness, and cancellation and discharge options.** At-risk borrowers can expect to be able to receive the help of a unit of dedicated staff who receive enhanced training related to repayment and forgiveness options. On an annual basis, these high-touch servicing staff should be trained to ask appropriate questions regarding borrowers' personal financial circumstances and to provide accurate and complete information regarding alternative repayment plans, loan forgiveness, and cancellation and discharge options. FSA should review, on an ongoing basis, the adequacy of this training, in coordination with other agencies with regulatory oversight over servicing-related contractors.

- **All borrowers considered to be at risk of default will get help from a specially-trained unit of high-touch servicing staff.** This unit of specially-trained staff should serve as the primary



point of contact for all interactions between the servicer and any borrower who is known to be at risk of default. Borrowers identified as at risk of default should include the following categories:

o       Any borrower who requests information related to options to reduce or suspend his or her monthly payment, or otherwise indicates that he or she is experiencing or is about to experience financial hardship or distress;

o       Any borrower who becomes 60 calendar days delinquent on any loan;

o       Any borrower who has not completed the program of study for which the borrower received the loans;

o       Any borrower who is enrolled in discretionary forbearance for more than nine months of the previous 12 months;

o       Any borrower who has rehabilitated or consolidated one or more student loans out of default within the prior 12 months; and

o       Any borrower or segment of borrowers determined by Education to be at risk of default.

- **At-risk borrowers can expect to receive expedited access to a unit of high-touch servicing staff who can provide high-quality service and information on repayment plans, including income-driven repayment plans.** At-risk borrowers can expect to always be directed to high-touch servicing staff when they contact their servicer, either when calling their servicer directly or when their servicer reaches out to them. These borrowers can expect to always receive information about alternative repayment plans that may be available to them, unless they have called in for a specific, unrelated question. In discussing alternative repayment plans, high-touch servicing staff should assess the borrower's long-term and short-term financial situation and consider all available information about the borrower's income and family size, including any personalized information provided to the servicer by Education or Treasury. If appropriate, borrowers should be asked for specific information to assist in determining whether a particular plan may be suitable for their circumstances.

o       **Income-driven repayment plans:** High-touch servicing staff should first discuss the concept of income-driven repayment plans, reminding borrowers that there is no charge to enroll. Borrowers should also be informed that even with little or no income, borrowers may be eligible to enroll in an income-driven repayment plan that could potentially enable them to make payments as low as $0 per month. Borrowers can expect to be told what their lowest possible monthly payment could be under the various repayment options, and which options potentially count towards future loan forgiveness. These servicing personnel should highlight the requirement to recertify income every



year and explain that the borrower is likely to pay more interest over the life of the loan under an income-driven repayment plan. Servicing personnel should also explain when interest capitalization events will occur, and any potential costs and consequences associated with enrollment in income-driven repayment plans. Borrowers should also be given information about potential tax consequences of loan forgiveness.

After discussing the available income-driven repayment plans with the borrower, the borrower can expect to be informed of the availability of other types of repayment options for which they are potentially eligible, including extended and graduated repayment plans.

o  **Forbearance and deferment:** High-touch servicing staff should inform borrowers of forbearance or deferment as an option available to them, but only after they have described income-driven and other repayment plans. Servicers should note the potential availability of $0 monthly payments for those with very low incomes and potential loan forgiveness under income-driven repayment plans. When discussing forbearance and deferment, borrowers can expect to be asked whether their financial hardship is specific and temporary. Borrowers can expect to be informed of the costs and consequences on the loan balance associated with forbearance and deferment, and informed that they can continue to pay accrued interest during a forbearance period. When a borrower selects forbearance or deferment, rather than another repayment plan, there should be documentation noted on his or her account, to the extent practicable, as to the reasons why the borrower selected the forbearance or deferment, and this documentation should be maintained for the life of the loan.

o  **Loan discharge:** In the event that there is information sufficient to determine that a borrower may be eligible for a closed-school discharge or a defense to repayment claim, or may be eligible to have his or her loans discharged because of a total and permanent disability, the borrower should be informed of these options during any inbound or outbound telephone communication, prior to receiving information about any other options for repayment.  Borrowers should be provided clear and actionable information related to the procedure for asserting a closed-school discharge claim, a defense to repayment claim, or a Total and Permanent Disability discharge application.

To the extent practicable, borrowers can expect to always be notified that they can learn additional information about any alternative repayment options through further discussion or by going to Education's website.

•  **Borrowers' requests are always the priority.**  Borrowers can expect  that servicing personnel, including high-touch servicing staff, will: (1) provide any information, within reason, specifically requested by the borrower, regardless of any other requirements related to communications about



repayment options; (2) disclose or discuss any particular alternative repayment plan that they believe is likely to be most appropriate for the borrower after assessing the borrower's long-term and short-term financial situation; (3) respect a borrower's request to end the call; and (4) take any other action explicitly requested by the borrower, to the maximum extent possible.

- **Borrowers with past-due balances can expect that servicing personnel will provide accurate, complete information.** When borrowers are discussing a past-due account, they can expect to be presented with the amount past due, the scheduled monthly payment amount for the current billing cycle, ways to address the past-due balance, and the availability of alternative repayment plans, prior to being asked to make a payment.

- **Borrowers can expect that high-touch servicing staff will have the right financial incentives to help them get on track.** Borrowers should not be penalized or receive shoddy customer service because servicing personnel are receiving compensation based on the volume of calls or accounts handled, dollar amounts collected, brevity of calls, or in any other manner that may encourage undue haste and lack of diligence over quality customer service. FSA should oversee the development and implementation of policies related to compensation, in consultation with the Office of the Under Secretary, Department of the Treasury, the Office of Management and Budget, and the Domestic Policy Council, in order to ensure that this function is designed to provide the high-level of service required to meet the needs of at-risk borrowers.

**Strengthening the Recertification Process for Borrowers in Income-Driven Repayment Plans through Accurate, High-Quality, High-Touch Loan Servicing**

*Borrowers can expect high-quality, high-touch service when seeking to recertify income and family size under an income-driven repayment plan. All borrowers approaching their annual deadline to recertify income and family size under an income-driven repayment plan can expect to receive a step-by-step, plain language guide to the recertification process, regular outreach, and personalized information about the new monthly payment amount and other consequences that will result if the borrower fails to recertify. This guidance should include the following notices and enhanced procedures:*

- **All borrowers enrolled in an income-driven repayment plan should receive timely and actionable reminders of upcoming recertification requirements.** Prior to the expiration of the borrower's current 12-month repayment period, a borrower should receive at least two written notices—95 calendar days prior to the expiration deadline and between 40 and 45 calendar days prior to the expiration deadline—regarding the deadline by which the borrower must recertify his or her income and family size. Each notice should include the deadline by which the borrower must submit the required documentation, a plain language explanation of the process to recertify, and the consequences, including the new monthly payment amount, if he or she does not recertify by the deadline or chooses to exit the income-driven repayment plan. To the extent advisable, the subject line of electronic communications about the recertification deadline should include the



borrower's new monthly payment amount and date on which that payment amount will become effective if the borrower does not recertify by the deadline, unless Education prescribes otherwise. Reminders to recertify should be sent separate from other communications, including monthly billing statements, and borrowers can expect to be able to upload and submit documentation of income and family size electronically.

- **Borrowers approaching a recertification deadline can expect their servicer to reach out and offer to help.** Borrowers who have not submitted a recertification application by 30 calendar days prior to the expiration deadline can expect to receive at least one attempted contact which can include, but need not be limited to, written, automated, recorded, or electronic communications. For borrowers who have still not submitted a recertification application by 15 business days prior to the expiration deadline, a good faith effort should be made to establish contact.

- **Borrowers who submit their paperwork by their deadline should be protected from any negative consequences caused by processing delays.** Any application received before the deadline communicated to the borrower should be considered on time for the purpose of recertifying income and family size under an income-driven repayment plan, and the borrower should be protected from negative consequences that would result from processing the application after the recertification deadline. Borrowers should not bear any negative consequences for on time applications.

- **Borrowers who need help recertifying their income and family size can expect to have access to high-touch servicing staff to walk them through the process.** Borrowers can expect access to a unit of high-touch servicing staff if they are seeking assistance to recertify or enroll in income-driven repayment plans.

- **Borrowers who miss their annual deadline to recertify can expect to receive additional written notices from their servicer explaining how to get back on track.** Any borrower enrolled in an income-driven repayment plan whose 12-month repayment period has expired and who has not recertified should receive at least two written notices—on the date the certification expired and five calendar days after the certification expired—that inform them that they did not timely complete the annual recertification of income and household size, a statement that describes the ramifications of that failure (*e.g*., an increase in monthly payment and interest capitalization), a statement that they can still recertify, and an effective and plain language description of the process for completing the recertification process.

- **Borrowers can expect actionable and direct email reminders to alert them to upcoming recertification deadlines.** To the extent advisable, the subject line of electronic communications about the recertification deadline should include a statement that the borrower's income-driven payment amount has expired because the borrower did not timely recertify.

17



- **Processes related to recertification should be informed by changes in borrower behavior and user testing.** FSA should continuously monitor the development and implementation of the systems and processes required to implement this policy direction. To the extent practicable, FSA should continuously assess and revise specific timelines related to the communications required for income-driven repayment recertification, for the purposes of enhancing consumer understanding or consumer protection, based on iterative user testing or upon determination that such changes will improve timeliness of borrowers' enrollment and recertification.

- **Processes related to income-driven repayment enrollment or recertification should be informed by pilots testing alternative approaches to enrollment.** FSA should also assess the effectiveness, costs, and benefits of alternative approaches to facilitating borrowers' enrollment or recertification, so long as there are reasonable grounds to believe that the pilot approach will be an improvement; the pilot approach anticipates, controls for, and mitigates risks to consumers; and the pilot is evaluated for effectiveness in increasing borrower understanding of the costs and benefits of an action.

**Strengthening the Income-Driven Repayment Application Process through Accurate, High-Quality, High-Touch Loan Servicing**

*Borrowers enrolled in income-driven repayment plans should not be harmed by processing delays, lost paperwork, or bad information. When paperwork is incomplete or borrowers need to provide more information, borrowers should receive a clear explanation of what is needed to complete their enrollment or re-enrollment so they can stay on track. Borrowers can expect that the process is the same for everyone, no matter who they speak with or what website they visit. This process should include the following notices and enhanced procedures:*

- **Borrowers can expect a consistent, rigorous process to govern the processing of income-driven repayment plan applications.** Within 10 business days of receiving a complete application for an income-driven repayment plan or a recertification of income and family size, the servicer shall complete processing of the application or recertification. Borrowers can expect to then receive a written notice that includes information about the determination as to whether or not they have successfully certified their income and family size, the new payment amount under the income-driven repayment plan, and the date on which that payment amount will expire. Income-driven repayment plan requests should only be denied if:

  o The borrower's loan type is ineligible for the income-driven repayment plan for which the borrower applied (if the borrower asks Education to choose the plan on behalf of the borrower based on plan characteristics (*i.e.*, lowest available monthly payment), a denial could only occur when the borrower is ineligible for any income-driven repayment plan);



○     The borrower does not provide the necessary information for a servicer to make a determination about eligibility, the borrower's income and family size does not indicate partial financial hardship, and such determination prohibits enrollment in the plan requested by the borrower; or

○     The borrower has failed to respond within 60 calendar days to a notification about a deficiency in an application.

If the initial certification or recertification application is denied based on one of the three reasons identified above, the borrower can expect to receive a notice that includes his or her subsequent monthly payment amount, the effective date for that payment, information about other material changes to the borrower's account as a result of this denial, and the reason(s) for the denial. If the application for initial certification or recertification was determined by the servicer to be deficient, incomplete, or inactionable for any reason, the borrower should receive a notice that includes a list of all actions the borrower needs to take to correct any deficiencies in the application, the deadline by which such actions must be taken, and the borrower's subsequent monthly payment amount and the effective date for that payment if such actions are not taken.

- **Borrowers who submit incomplete applications can expect high-touch servicing staff to reach out.** When an incomplete application is submitted, borrowers can expect their servicer to make a good faith effort to establish contact within 10 business days of receipt of the incomplete application, with a description of all actions required to complete the application or otherwise correct any deficiencies in the application. Contact could also be made via personalized email if the borrower has opted into receiving electronic communications and the borrower responds to this contact by addressing the deficiency identified by the servicer. Borrowers should be able to correct errors on an income-driven repayment plan application based on clear oral instructions provided over the phone, or through plain language written or electronic communications.

  Documentation of income and other application requirements should maximize flexibility for borrowers, including allowing, where possible, all forms of delivery, such as paper, mobile upload, oral communication, and email.

  Where possible, borrowers should be able to orally provide paycheck frequency and correct typographical or other errors. To the maximum extent possible, servicers should have the capacity to allow for a borrower to initially provide oral verification that the borrower no longer has income, and implement a process to subsequently verify borrower declarations. Borrowers are currently permitted to make a similar oral verification to obtain financial hardship forbearance. Corrections over the phone should be made after asking for permission to record the call and informing the borrower that, for the purpose of this call, the borrower can attest that all information provided is true, complete, and correct to his or her best knowledge and belief.



Borrowers should be instructed to follow-up with a written attestation in the form of a corrected application, as necessary.

When income-driven repayment plan applications are corrected or amended based on a phone conversation, calls should be recorded and documented, to the extent practicable. Borrowers may similarly provide information sufficient to complete the application or otherwise correct any deficiencies in the application by using electronic communications, which shall also be subject to verification by the borrower that all information provided is true, complete, and correct to the borrower's best knowledge and belief. These records should be preserved by the servicer, and when the servicer is no longer assigned to service the loan, the records should be transferred to the new servicer or Education.

**Strengthening the Customer Experience for Military Borrowers through Accurate, High-Quality, High-Touch Loan Servicing**

*Military borrowers can expect access to staff with specific training related to military benefits and protections and can depend on enhanced systems and procedures to ensure they receive high-quality service. Military borrowers can expect to be able to access specially-trained staff that are well-versed in the benefits and protections afforded to servicemembers and veterans. Servicers should identify and proactively reach out to military borrowers to help them take advantage of any available benefit or protection and to provide extra help if these borrowers fall behind. This customer experience should include the following notices and enhanced procedures related to military borrowers:*

- **Active duty servicemembers can expect their servicer to use available information systems to proactively identify them as a "military borrower," and provide high-quality, high-touch servicing.** The Department of Defense Manpower Data Center database (DMDC) should be queried on a monthly basis to determine which borrowers are serving on active duty.  This determination should be documented on each such borrower's account, and borrowers should be provided notice of their affirmative determination. The determination is already considered sufficient supporting documentation of an individual's eligibility for the Servicemembers Civil Relief Act (SCRA) interest rate limitation.

- **Military borrowers can expect to have access to staff with special training related to military benefits.** Borrowers who are determined to be serving on active duty via the DMDC query should have access to a unit of high-touch servicing staff who receive annual training related to the benefits and protections afforded to military borrowers and veterans under federal law. All oral communications regarding benefits and protections afforded to military borrowers should be handled by personnel with this special training. FSA should review, on an ongoing basis, the adequacy of this training, in coordination with other agencies with regulatory oversight over servicing-related contractors.



Information on how borrowers can access these personnel shall be made available on the website and in any written or electronic communications that are targeted to these borrowers. To the extent practicable, all inbound calls from military borrowers, borrowers who indicate that they may be a military borrower (including borrowers who request information about the benefits and protections afforded to military borrowers and veterans under federal law), and persons authorized to speak with a servicer on behalf of a military borrower should be routed to a unit of high-touch servicing staff who have received annual training related to the benefits and protections afforded to military borrowers and veterans under federal law. If a call from a military borrower is initially answered by servicing personnel that have not received this training, the employee should immediately transfer the borrower to a specialist for assistance unless the borrower affirmatively declines transfer. When initiating the transfer, the employee should inform the caller that the call will be transferred to a person with specialized training in repayment options and military benefits.

- **Eligible military borrowers can depend on their servicer to automatically provide available benefits and protections.** Pursuant to an agreement to a data exchange with the Department of Defense, on a monthly basis, the list of all military borrowers with Direct Loans should be reviewed to determine which borrowers are potentially eligible for reduced interest rates pursuant to 20 U.S.C. § 1087e(o). Once a borrower is confirmed to be eligible, the interest rate on all eligible loans should be immediately reduced to zero percent. The zero percent interest rate should also be retroactively applied beginning on the first day the borrower became eligible for the reduced interest rate. At this time, the borrower can expect to be provided notice of the reduction.

  Consistent with the requirements in the HEROES Act of 2003, and to the extent feasible under the regulations, all eligible military borrowers should have their income automatically recertified under any income-driven repayment plan.[19]

- **Military borrowers can depend on servicing personnel to reach out to help identify long-term repayment arrangements that better meet these borrowers' needs.** Borrowers who are or have been enrolled in a military deferment for more than 12 months can expect their servicer to make a good faith effort to establish live contact to discuss alternative repayment plans or send a written attempt to establish contact that includes information about the potential benefits and protections specific to military borrowers.

  Pursuant to an agreement for a data exchange with the Department of Veterans Affairs, upon receiving data confirming a military borrower has been determined to be unemployable due to a

---

[19] *See also* U.S. Department of Education, 77 Fed. Reg. 188, 29311-29318 (Sept. 27, 2012), *available at* https://ifap.ed.gov/fregisters/FR092712.html.



service-connected or other disability, a borrower can expect to be informed of his or her eligibility for loan discharge based on a total and permanent disability and an explanation of the process for applying for such discharge. To the extent possible, borrowers can expect that their loan obligation will be discharged if they are eligible.

**Strengthening the Customer Experience for All Borrowers through Accurate Servicing, Actionable, Personalized Communications and State-of-the-Art Technology**

*Borrowers can expect access to high-quality customer service when they need it, for communications to be personalized and informed by rigorous testing and evaluation, and for servicers to leverage technology to communicate with borrowers. This communication should include the following steps to strengthen the customer experience:*

- **Borrowers can expect their servicer to be open when they reach out to ask a question or ask for help.** Borrowers can expect to be able to call the call center during and after normal business hours, including availability after 5:00 pm in all continental U.S. time zones and some weekend hours.

- **Borrowers can expect clear, plain language actionable written and oral communications informed by iterative user testing.** For any disclosures, written or electronic communications, or scripts for oral communications, FSA should retain or direct its servicers to retain an independent consultant to conduct user testing with borrowers to ensure that the communication is written in plain language, conveyed in a manner that facilitates effective consumer understanding of costs and benefits, and results in the desired outcome. This user testing should be completed within 180 calendar days of the award, re-tested no less frequently than once every 24 months for all disclosures currently in use, and used to test any other new disclosures or other communication identified. If material changes are made to any of the disclosures that have been tested, they should be retested prior to use. Changes and enhancements should be made to address the results of the user testing. The tests should also be applied to verify that all new paper and electronic communications are accessible to visually impaired borrowers.

- **Borrowers can expect to receive personalized and effective information about alternative repayment plans, including income-driven repayment plans.** Monthly statements, routine email communications, and other borrower communications should provide clear, personalized information that allows all borrowers to better understand and evaluate available repayment options, including a personalized depiction of monthly payment under a selected range of alternatives. Borrowers can expect to receive information detailing their rights, including their right to enroll in a different repayment plan—particularly one that may lower their monthly payments—and can expect to be provided with actionable information on how to exercise those rights. Where permitted, electronic communications should provide this information directly,



rather than requiring borrowers to log into the online platform or through the method preferred or designated by the borrower, such as email or text.

- **Borrowers can expect to receive the Payback Playbook.** As Education develops plain language disclosures, including potential individualized disclosures, consistent with the information obtained from CFPB's Request for Information Regarding Student Loan Borrower Communications (Fed. Reg. Docket ID CFPB-2016-0018) or at a later time, the servicer should create and maintain the ability to implement and provide those disclosures to borrowers.

- **Borrowers can expect their servicer to communicate with them and accept a payment using the borrower's preferred method, including communications and payment systems optimized for mobile technology.** Via the portal, FSA should ensure that borrowers can access a mobile and online, user-friendly application, using graphical representation to present information where such representation is useful in facilitating borrowers' understanding. This application or website should provide state-of-the-art self-service for borrowers to access the status of their account, see consumer information regarding their loans, select pre-payment options, make payments, switch payment plans, capture and upload images of documents, complete forms, and confirm income for income-driven repayment plans. The portal should be fully accessible to visually impaired borrowers. In addition:

  o   Borrowers should be able to opt in to text message alerts about payment due dates and when it is time to recertify their income and family size for annual income-driven repayment calculations.

  o   As new payment technologies reach scale, FSA should seek to make these new payment options available to borrowers making student loan payments.

  o   Borrowers should be able to leverage new technology in order to submit required documents. Remote capture technology should allow users to take pictures of these documents on their smart phones and electronically submit them for processing.



**Part Three: Consistent**

The current multi-servicer, servicer-branded environment can create confusion for borrowers. In addition, variations in the way servicers work and interact with borrowers can result in varying experiences for borrowers. A single, centralized portal can ease some confusion for borrowers, including clarifying that the U.S. Department of Education is responsible for the servicing of all federal Direct Loans.

Borrowers can expect to receive adequate and timely communications related to all servicing functions, and all common servicing functions should be consistent for all borrowers across all service providers. Common servicing functions should include a single web portal and phone number for borrowers to use to access their servicer, white-label, Education-branding for all borrower information and websites, and a clear set of common processes and communications across personnel, platforms, and methods of communication, in order to ensure that process of repaying a student loan presents a consistent and continuous customer experience.

**Strengthening Consumer Protections for Borrowers through Consistent Processing of Payments**

*Borrowers depend on student loan servicers to handle payments and process borrowers' instructions in a way that facilitates successful repayment, minimizes costs to consumers, and ensures consistency. The following framework provides additional policy direction related to the development of a set of common baseline standards to govern the handling, processing, application and allocation of payments, as well as the treatment of payment instructions from borrowers.*

- **Borrowers can expect their servicer to credit payments as of the date received.** Payments should be accurately credited to borrowers' accounts as of the date a payment is received by the servicer, including payments sent by U.S. mail and electronic payments sent by a borrower's bank. To the extent possible, payments initiated on the online platform should be accurately credited as of the date the borrower initiates payment (12:01 am to 11:59 pm in the borrower's time zone). If a borrower sends a payment to the incorrect address for submitting mail payments, the payment should be forwarded to the correct address within a reasonable period of time, the borrower's account should be credited as of the date the correct department receives his or her payment, and the borrower should receive notification that this has occurred.

- **Borrowers can expect their servicer to provide extra help when payment processing policies change.** Borrowers can expect to be notified in writing and through their preferred or designated method of communication at least 45 calendar days in advance of any changes to payment processing policies, including any future changes to the payment address. Borrowers should also expect to be protected from any negative consequences for any payment made under an old policy for 90 calendar days following the change, under circumstances in which the servicer is notified of a payment submitted under the old policy. If a borrower submits payment under the old policy, he or she will receive a written notification with directions describing the new policy.



- **Borrowers with multiple student loans can expect their servicer to group their loans together into one account.** Unless a borrower instructs otherwise, loans held by Education and issued under the same loan program (*e.g*., Direct Loans, Perkins Loans) should be grouped into one account, giving the borrower one monthly billing statement for that group of loans that lists all of the loans.  Borrowers can expect be able to access information about all of their federally-held loans using a single online account, regardless of loan program. Though all the loans are listed as one group, each loan should remain a separate obligation and should also be listed individually to the borrower. Information on monthly statements should be user-tested and provided in easy-to-read tables.

- **Borrowers who overpay without providing instructions can expect their servicer to apply their payment in a way that saves them the most money.** Unless otherwise instructed by the borrower, any payment in excess of the total monthly amount due should be directed to the loan bearing the highest interest rate. If the payment is sufficient to pay off this loan in full, any remainder should be directed to each successive loan bearing the next highest interest rate, until the payment is exhausted. If multiple loans bear the same highest interest rate, the excess amount should be allocated to loans without an interest subsidy (*i.e*., unsubsidized loans and subsidized loans not currently subject to an interest subsidy) before loans with an interest subsidy. Among loans that have the same interest rate and the same subsidized or unsubsidized status, the excess amount should be allocated among those loans in proportion to their regular monthly payment amounts.

- **Under certain circumstances, borrowers can expect their overpayments to be handled to reflect their unique needs.** These include:

  o **Borrowers with Consolidation Loans.** For borrowers with Consolidation Loans, any funds in excess of the total monthly amount due should be allocated first to the unsubsidized portion of the loan, and then once that portion is satisfied, to the subsidized portion of the loan.

  o **Borrowers who are in "in-school" status, in their grace period, or who have deferred their loans.**  Borrowers in in-school status or deferment, the grace period, or any other period of deferment should have any payment made in excess of the total monthly amount due be allocated first to the accrued interest from the loan bearing the highest interest rate, and then to the accrued interest from each successive loan bearing the next highest interest rate. For loans that have the same interest rate, the overpayment should be applied to the accrued interest from those loans in proportion to their regular monthly payment amounts (or to the principal balance outstanding if the payment amount has not yet been determined for the loan(s)). Once all accrued interest on the account has been paid, any remaining excess funds should be allocated to the principal of loans without an interest subsidy (*i.e*., unsubsidized loans and subsidized loans not currently subject to an interest subsidy) before allocating to the principal of loans with an interest subsidy. For loans that have the same subsidized status, payments should be allocated



first to the principal of the loans with the highest interest rate, and then to the principals of each successive loan bearing the next highest interest rate until the payment is exhausted. For loans that have the same subsidized status and same interest rate, payments should be allocated to the principal of those loans in proportion to their regular monthly payments (or principal balance outstanding if the payment amount has not yet been determined for the loan(s)).

- **Borrowers who pay less than they owe on their statement and do not provide instructions can expect their servicer to apply their payment in a way that keeps current as many loans as possible.** Unless otherwise instructed by the borrower, any payment that does not satisfy the total monthly amount due should be allocated in a manner that seeks to minimize delinquency. For borrowers with one loan that is more delinquent than all other loans (*i.e.*, more days past due than any other loan), the servicer should apply the payment to that loan, up to the amount necessary to make it equally delinquent with the next most delinquent loan, if possible. For borrowers who have multiple, equally delinquent loans that are more delinquent than other loans, the servicer should allocate the payment to the loan in this set that has the lowest regular monthly payment, up to the amount equal to one regular monthly payment on that loan, then to each successive loan in this set with the next lowest regular monthly payment. For borrowers with no amounts past due, the payment should be allocated to the loan with the lowest regular monthly payment, and once the current amount due on that loan is satisfied, then to each successive loan with the next lowest regular monthly payment. If multiple loans bear the same lowest regular monthly payment, the payment should be allocated to the loan in the set bearing the highest interest rate, then to each successive loan bearing the next highest interest rate until the payments for that set of loans are exhausted. If multiple loans bear the same lowest monthly payment and interest rate, borrowers' payment should be allocated among that subset of loans equally.

- **Borrowers can expect their servicer to explain what it does with borrowers' money when borrowers do not provide instructions.** Borrowers can expect to receive, in plain language, an explanation of the rules for handling overpayments and underpayments on each billing statement and on the website in a location and in a manner that is easily accessible for borrowers at the time they are considering submitting electronic payments. The website disclosures should include a link to a page on the website where a detailed description of the default methodologies. Billing statement disclosures should be accompanied by a statement indicating the URL of the webpage with the detailed description of the default methodologies.  These disclosures should also include a statement informing borrowers that they have a right to direct a different application of their payment, and a concise, plain language description of the method(s) by which borrowers can make such an instruction.

- **Borrowers can expect to be provided with a simple, online method to tell their servicer how to handle a single payment.** For one-time overpayments and underpayments on the online platform, when a borrower inserts the total amount he or she plans to pay on the account, the borrower should be presented with each individual loan in rows or columns that include



characteristics of each loan, such as the balance, regular monthly payment, interest rate, accrued interest, days past due, and due date. Each row or column shall include a separate payment field, which shall be populated to reflect the applicable allocation methodology (based on a default or standing instructions). The borrower should be able to adjust the prefilled amounts for each loan before submitting the payment.

- **Borrowers can expect their servicer to provide a simple, online method to select an option to direct the handling of an extra payment, even if the borrower does not provide instructions with each individual payment.** Borrowers can expect their servicer to provide a simple, electronic method to provide standing instructions for overpayments, permitting borrowers to direct overpayments in the following ways:

    o   Apply overpayments first to loans bearing the highest interest rate (default);

    o   Apply overpayments first to loans with the lowest balance;

    o   Apply overpayments first to unsubsidized loans bearing the highest rate;

    o   Apply overpayments first to loans that are not being repaid under an income-driven repayment plan (if borrowers have some loans in income-driven repayment, and some that are not);

    o   Divide overpayments proportionately (pro-rata) based on regular monthly payment;

    o   Apply overpayments first to loans with accrued interest; and

    o   Provide a borrower-directed option that allows the borrower to divide an overpayment by percentage to each loan.

- **Borrowers can expect their servicer to provide a simple, online method to select an option to direct the handling of a single extra payment.** Borrowers can expect their servicer to provide simple, electronic method to provide one-time instructions, permitting borrowers to direct overpayments in the same manner permitted for standing instructions. On the same page, borrowers can expect to be able to provide one-time instructions related to the handling of an underpayment, provided in a menu. When a borrower chooses an option, the payment fields for each loan should re-populate based on the chosen option before the borrower submits the payment. Borrowers should still be allowed to adjust the payment amounts for each loan to any amount before submitting.

    Options for handling underpayments should include the choice to:

    o   Keep loans at the same level of delinquency, and as current as possible (default);



- o     Apply underpayments first to loans bearing the highest interest rate;

- o     Apply underpayments first to loans with the lowest balance;

- o     Apply underpayments first to unsubsidized loans bearing the highest rate;

- o     Apply underpayments first to loans that are not being repaid under an income-driven repayment plan (if borrowers have some loans in income-driven repayment, and some that are not); and

- o     Divide underpayments proportionately (pro-rata) based on regular monthly payment.

If there is a conflict between a standing instruction and a subsequently provided one-time instruction, borrowers can expect the one-time instruction to be followed. If a servicer cannot honor an instruction, a borrower should be provided with a written notice informing him or her that the instruction could not be honored, including the reasons for that determination, and explaining how the servicer handled the payment. The borrower should also be provided with directions on how to change his or her instructions for future payments.

- **Borrowers can expect to make payments for free, through any payment feature offered by their servicer.** Borrowers can expect never to be charged any convenience or processing fee for payments made electronically through the online platform or by telephone.

- **When someone else makes payments on behalf of a borrower, borrowers can expect their servicer to follow any payment instructions provided.** Borrowers can expect payments made on the behalf of a borrower by another party to be handled consistent with any instructions provided by the person who made the payment. If no such instructions have been provided, the borrower can expect the payment to be handled in accordance with any previously provided standing instructions.

- **Borrowers can expect their servicer to be able to retroactively reallocate payments.** The servicing system should have the ability to be able to reallocate payments retroactively, including payments made by third parties. Retroactive adjustments should also be able to be made whether the prepayment advances the due date, or not.

- **Borrowers can expect a simple, online method to tell their servicer whether or not they want to take a break from upcoming payments when they pay more than they owe on their bill.** When a borrower is making payments using an online servicing platform, using the page with individual loan payment fields, the borrower should be presented with the following two exclusive options after the borrower inserts a payment amount for a given loan sufficient to



advance the due date by more than one billing cycle. These options should be presented in check-box form, in the row or column for the loan:

o        The option to not advance the due date, which shall be listed first; and

o        The option to advance the due date.

Borrowers can expect to be able to indicate a preference for all loans. Borrowers can expect to see an explanation, presented in user-tested, effective, plain language, describing the future payment requirements associated with each option (including the need to make payments next month when the due date is not advanced), other differences between the two options material to the borrower's decision, how advancing the due date will suspend automatic electronic payments, and the consequences of advancing the due date and paying $0 in subsequent months. A borrower who has inserted amounts into payment fields for individual loans that are sufficient to trigger advancement of the due date shall not be able to proceed until the borrower has chosen one of the two options for those loans.

- **After making an extra payment, borrowers can expect to receive clear, plain language information about their loan explaining what it means to take a break from making upcoming payments.** If the borrower elects to advance his or her due date, the borrower should continue receiving a billing statement. Any such billing statement reflecting a $0 amount due should contain a user-tested, effective, plain language disclosure about the potential consequences of paying $0 in response to a $0 bill, and should also inform the borrower that making a payment can help the borrower pay off the loan faster and result in less total interest paid over the life of the loan.

- **Borrowers can expect to be able to easily manage automatic payments online.** Borrowers can expect be able to authorize recurring, automatic monthly payments using an online form. Borrowers can expect to be able to stop recurring payments by making a notification before a scheduled payment. Borrowers can expect to be able to stop or modify recurring payments using an online form. Borrowers should receive a copy of the notice of terms that includes the recurring nature of the payments, the amount and timing of all payments to which the consumer agreed, as well as other important information. Before borrowers authorize recurring automatic payments, borrowers should be prompted with an option to pay more than the regular monthly payments via automatic payments, which will be accompanied by a prompt to select how those payments should be allocated (including the options described above).

When a borrower signs up for automatic payments that are higher than the regular monthly payment, the borrower should be required to opt out of advancing the due date with those automatic payments so that the payments will continue. When a borrower signs up for automatic payments (of any amount), and makes a separate manual payment that either covers the monthly payment or advances the due date for future months such that $0 is due when the automatic



transfer would be processed, the automatic transfer for that month should not be processed. Borrowers should be notified when a payment is not processed.

**Strengthening Consumer Protections for Borrowers through Consistent Credit Reporting**

*For millions of consumers, student loans are their first entry into credit markets. Consequently, repaying student loans and accurately documenting payment is an important step to help pave the way for millions of consumers to access safe and affordable credit. The following framework provides additional policy direction to ensure that the furnishing of credit information is done consistently and accurately.[20]*

- **Borrowers can expect their servicer to furnish consistently accurate information about their student loans.** All loans should be reported consistently and accurately to the credit bureaus so that borrowers with similar repayment history are reported in a similar fashion. Specifically:

  o   Borrowers should be able to expect that each loan in an account will be reported as a separate trade line to the consumer reporting agencies identified by Education;

  o   Servicers should not report delinquencies to the Credit Reporting Agencies until accounts become 90 calendar days past due;

  o   Since there are relatively limited permutations on consumers' repayment histories, the use of special comment codes should be limited to a set of acceptable circumstances predetermined by FSA;

  o   All instances of borrower forbearance where no payment is due should be reported in a manner similar to deferment and should not include the "CP" special comment code;

  o   When reporting the terms duration of a loan, loans being repaid under an income-driven repayment plan should reflect the estimated maximum number of months until loan forgiveness is reached at the time the repayment plan was entered into;

  o   The original loan amount should reflect the amount borrowed at origination including all disbursements of the loan;

  o   The current balance of the loan should reflect all outstanding principal and interest owed at the time of reporting, but should not include any accrued interest charges that have been waived or subsidized by the government;

---

[20] This policy direction was developed by Education, in consultation with Treasury and the CFPB, consistent with the framework issued by the agencies in April 2016, *available at* http://www2.ed.gov/documents/press-releases/04282016-credit-reporting.doc.



o    To the maximum extent possible, a loan transfer between servicers should maintain one continuous trade line on each borrower's credit report so that consumers can easily track their repayment history on their credit report;

o    In drafting these guidelines for servicers and subsequent updates, care should be taken to manage the consequences of borrowers' access to credit where there may be material alterations to a consumer's credit history; and

o    FSA should preserve the flexibility to determine any other requirement deemed necessary to improve the consistency and accuracy of credit reporting.

**Strengthening Consumer Protections for Borrowers through Consistent Access to Clear and Accurate Payment Histories and Billing Statements**

*Borrowers should be able to request copies of their payment histories for the life of their loan and schedule of future payments, as well as receive them quickly and at no cost. Borrowers should also be able to easily access information about interest accrual and capitalization, as well as the number of qualifying payments made and/or remaining towards certain benefits and protections, such as loan forgiveness under an income-driven repayment plan. The following framework provides additional policy direction to ensure that payment histories and billing statements are readily available, accurate, and provide the right information to improve borrower understanding and facilitate successful repayment.*

•    **Upon request, borrowers can expect to receive a written payment history covering the life of the loan at no cost**. The written payment history should include, for each individual loan: the original amount borrowed, the amount owed at the start of repayment; outstanding balance as of the request date; current amount of accrued interest; current delinquency or paid ahead status; the date and amounts of all payments; how such payments were applied; periods of deferment or forbearance; details of all interest capitalization events; and number of qualifying payments towards Public Service Loan Forgiveness if borrower has submitted an Employment Certification form, income-driven repayment loan forgiveness, and any other potentially applicable borrower benefits.

•    **Borrowers can expect to regularly receive basic information about their loans.** Every billing statement a borrower receives should include, at a minimum, the information listed below. Information should be provided in easy-to-read tables similar to those found on credit card statements. This information should also appear on the borrower's online account in the same format as it appears in monthly statements. Billing statements should be user-tested for readability.

o    Basic account-level information, including:

▪    Total amount due, including a breakdown of this amount between the total amount past due and the total current scheduled monthly payment;



- ▪ Total outstanding balance on the account, including a breakdown of this amount among fees, accrued interest, and principal; and

- ▪ Due date (including the date on which amounts will be due on an account with an advanced due date).

- o Basic individual loan-level information, including:

  - ▪ Outstanding balance, including a breakdown of this amount among fees, accrued interest, and principal;

  - ▪ Regular monthly payment amount;

  - ▪ Interest rate;

  - ▪ Due date (including the date on which amounts come due on a loan with an advanced due date); and

  - ▪ Amount of any payments applied to this loan during the billing cycle.

- o The name(s) of any applicable repayment plan(s) in which the borrower is currently enrolled; applicable recertification deadline; and information related to alternative repayment plans and on how to enroll in alternative repayment plans.

- o Information about default payment processing methodologies.

- o Information about the submission of one-time or standing instructions, including a link to the website where instructions can be submitted and the phone number where they can be provided.

- o Information about how to submit a request for assistance or account dispute.

- o On the tear-away payment coupon from a billing statement, a field for writing one-time payment instructions and a way to indicate a choice on whether or not to advance the due date with a prepayment.

**Strengthening Consumer Protections for Borrowers through a Consistent and Consumer-Friendly Payoff Process**

*Borrowers should receive clear instructions about how to request payoff statements and how to pay off only the loans they want. Borrowers should receive reliable payoff statements that include a clear expiration date. Borrowers should also be able to track the processing of payoff payments and access a*

32



*"paid-in-full" confirmation. The following framework provides additional policy direction to ensure that the process for paying off student loans is simple, transparent, and facilitates successful payoff.*

- **Borrowers can expect an online explanation about how to request a payoff statement.** The methods by which a borrower may obtain a valid payoff statement for a single loan or group of loans should be clearly disclosed online.

- **Borrowers can expect basic information about payoff balances and how to pay off a loan as part of their periodic billing statement.** Borrowers' billing statements should indicate that payment of the outstanding loan balances provided on the billing statement may not pay off the loans and that the borrower must specifically request the payoff amount for a single loan or group of loans.

- **Borrowers can expect payoff statements to be complete and accurate.** Payoff statements provided to borrowers should accurately reflect the fees, interest, and principal that must be satisfied to pay off the loan, and should include all other information necessary for the borrower to pay off the loan, including the date by which the indicated payoff amount must be received to successfully pay off the loan, the mailing address to which the borrower should send the payoff payment, information about how to submit the payoff payment electronically if the borrower so chooses, and a statement that the borrower will receive a "paid-in-full" notice.

- **Borrowers can expect to have access to a simple, online mechanism to initiate, track, and manage payoff requests.** Borrowers should be able to request and receive payoff statements via an online portal and be able to check the status of their request and monitor the processing of payoff payments. Borrowers should be able to expect that the information provided in the payoff statement, including the payoff amount and the date through which the payoff amount is accurate.

   If a borrower: (1) sends a payment greater than the payment tolerance for payoff payments, regardless of whether or not the borrower has requested a payoff statement; or (2) sends the payoff amount within 14 business days after the date through which the payoff amount is valid, the borrower can expect to receive a notice stating that the attempted payoff payment was received and that the payment was insufficient to pay off the remaining balance of the loan(s), and indicating the amount necessary to pay the loan balance in full and the date until which that amount will be sufficient.

**Strengthening Consumer Protections for Borrowers during Servicing Transfers[21]**

---

[21] As FSA transitions to a new platform and communications are made using Education branding, FSA should consider how this policy direction should be adjusted to ensure a more-seamless customer experience. For example, although the notifications directed in this section may make sense when servicers communicate under proprietary branding, FSA should preserve flexibility to combine written notices from multiple service providers if all service providers are required to communicate with Education branding.



*When servicers change, borrowers can expect to be able to depend on both servicers to provide specific information to ensure they know how to make payments, understand the status of any automatic payments, and receive updates about the status of their loans. Borrowers can expect their old company to fully transfer all records relating to their loans, including any computer records, to the new company and expect their new company to actively monitor their accounts for any errors that may have occurred during transfer, to ensure borrowers' payments are on track, and to ensure that borrowers continue receiving any benefits or protections applied to their loans by their old servicer. If there is a servicer error during transfer, borrowers should not be harmed. The following framework provides additional policy direction to ensure that the process for transferring servicing is simple, transparent, and protects consumers.*

- **Borrowers can expect to hear from their current servicer when their servicer is going to change.** Each borrower subject to a transfer can expect to be provided with a written notice ("First Notice by Transferor Servicer") not more than 60 and not less than 45 calendar days before the effective date of the transfer. The notice shall contain the following information:

  o    The effective date of the transfer of servicing;

  o    The name, address, and toll-free telephone number for the Transferor Servicer's designated point of contact who can be contacted by the borrower to obtain answers to servicing inquiries;

  o    The date on which the Transferor Servicer will cease to accept payments relating to the loan and the date on which the Transferee Servicer will begin to accept such payments–these dates shall either be the same or consecutive calendar days;

  o    A statement that the transfer of servicing does not affect any term or condition of the student loan other than which entity is servicing the loan; and

  o    Information on whether the borrower's authorization for recurring electronic fund transfers, if applicable, will be transferred to the Transferee Servicer. If any such recurring electronic funds transfers cannot be transferred, the Transferor Servicer shall provide information as to how the borrower may establish new recurring electronic funds transfers in connection with transfer of servicing to the Transferee Servicer, as described in Electronic Funds Transfer Authority.

- **Borrowers can expect to get a "welcome letter" from their new servicer, when their servicer is going to change.** Borrowers can expect that their new servicer, when acting as the Transferee Servicer and written communication is sent as a communication from Education, will provide to each borrower subject to the transfer a written notice not less than 15 calendar days before the effective date of the transfer ("Notice by Transferee Servicer"). The Notice by Transferee Servicer shall contain the following information:

  o    The effective date of the transfer of servicing;



    o     The name, address, and toll-free telephone number for Transferee Servicer's designated point of contact at which the borrower can obtain answers to servicing inquiries, the date on which the Transferor Servicer will cease to accept payments relating to the loan and the date on which the Transferee Servicer will begin to accept such payments–these dates shall either be the same or consecutive calendar days. The notice shall also include a statement that the transfer of servicing does not affect any term or condition of the student loan other than which entity is servicing the loan;

    o     Information on whether the borrower's authorization for recurring electronic fund transfers, if applicable, will be transferred to the Transferee Servicer. If any such recurring electronic funds transfers cannot be transferred, the Transferee Servicer shall provide information explaining how the borrower may establish new recurring electronic funds transfers with the Transferee Servicer;

    o     Information on how to obtain a payment history, which should be derived from information transferred from the Transferor Servicer;

    o     A notification indicating whether an alternative repayment plan application is pending; and

    o     Information about how to submit a complaint to FSA in the event of a servicing error.

- **Borrowers can expect to get a "goodbye" letter from their old servicer, letting them know that a transfer is about to occur.** Borrowers subject to transfer can expect to be provided with a written notice not less than 15 business days before the effective date of the transfer and at least 30 business days after the first notice ("Second Notice by Transferor Servicer"). The Second Notice by Transferor Servicer shall contain all of the following information:

    o     All of the required information contained in the First Notice by Transferor Servicer;

    o     Information on how to obtain a payment history which should be derived from information being transferred;

    o     A notification indicating whether an alternative repayment plan application is pending; and

    o     Information about how to submit a complaint to FSA.

- **Borrowers can expect to receive extra help if they send a payment to their old servicer.** To the extent feasible, for at least 120 calendar days beginning on the effective date of transfer, borrowers should be notified in writing if any payment is received by their previous servicer, including a notice that the payment was forwarded to the correct location, if applicable.



- **Borrowers can expect to be protected from negative consequences following servicing transfers.** During the 60 calendar days following transfer, borrowers should be protected from any negative consequences, including but not limited to negative credit reporting and denial of eligibility for any benefit or protection established under Title IV of the Higher Education Act (§ 1070a et. seq.), as a result of a payment either remitted to the Transferor Servicer or made in accordance with the Transferor Servicer's prior policy.

- **Borrowers can expect their servicer to maintain a complete and accurate record of their account.** Under the new servicing system, borrowers should be able to expect that the following documents and data on each student loan account serviced by the servicer will be maintained in a manner that facilitates compiling such documents and data into a servicing file:

  o    Schedule of all transactions credited or debited to the student loan account;

  o    A copy of the promissory note for the student loan;

  o    Any notes created by servicer personnel reflecting communications with the borrower about the student loan account;

  o    A report of the data fields relating to the borrower's student loan account created by the servicer's electronic systems in connection with servicing practices;

  o    Copies of any information or documents provided by the borrower to the servicer;

  o    Usable data fields with information necessary to assess qualification for forgiveness including Public Service Loan Forgiveness; and

  o    Any information necessary to compile a payment history as described above.

- **Borrowers can expect their servicer to maintain information about their account, even after their account is closed or transferred.** To the extent practicable, records should be retained that document actions taken with respect to a borrower's student loan account until six years after the date a loan is discharged or six years after servicing of a loan is transferred to another servicer.

- **Borrowers can expect their servicer to compile their payment history and provide it to their new servicer, before their servicer changes.** Under the new servicing system, borrowers should be able to expect that their servicer has organized and sorted historical payment and account information from Transferor Servicer and Education such that it can, upon request, promptly provide borrowers with payment histories per the Payment History section, which shall include historical information from before the new servicer began servicing the borrower's loans.



**Part Four: Accountable**

Student loan borrowers can expect accountability, quick responses to inquiries and complaints, and transparent resolutions when problems occur. The current student loan servicing system, with various servicing entities managing different loan portfolios, results in varying experiences for borrowers. The new contract provides an important opportunity to improve accountability by building in higher expectations for monitoring servicing entities and integrating complaint resolution into the oversight of those entities. Borrowers can expect to be able to depend on robust oversight from Education and expect their servicer to have strong internal systems and processes to independently address any requests for assistance and servicing errors identified by borrowers. That is why in his June 30, 2016 memorandum, Secretary King noted the importance of this procurement in achieving the Administration's goals of incentivizing "high quality, transparent, and consistent servicing for borrowers" with "meaningful consequences for vendors who come up short" and directed the procurement team to, among other things, make past performance the "most important noncost factor in the evaluation, consistent with applicable procurement regulations."[22]

**Strengthening Accountability for Student Loan Servicers through Expanded Monitoring and Oversight by Education**

*On July 1, 2016, in fulfillment of the President's directive in the Student Aid Bill of Rights to "create a responsive student feedback system" for student aid customers, Education implemented the FSA Feedback System, available to customers at StudentAid.gov/feedback. This allows customers of federal student aid programs to submit complaints, provide positive feedback, and report allegations of suspicious activity to Education for review and resolution. This system can help Education to track and monitor complaints against servicing entities. The following framework provides additional policy direction to ensure that expanded oversight, including the new FSA Feedback System, is effectively leveraged to protect consumers and hold servicers accountable:*

- **Education will effectively monitor borrowers' experiences, ensuring that they receive timely and accurate help when they need it.** Borrowers can expect to be able to rely on robust oversight, including by leveraging the new FSA Feedback System; systematic tracking of the substance and outcome of all borrower calls with experts, borrower requests for assistance and account disputes, as well as a periodic review of a sample of recorded calls for quality; and corrective action when necessary. Borrowers can also expect to be able to depend on comprehensive coordination and information sharing with state and federal law enforcement agencies so these agencies can take action if illegal practices occur. Borrowers' complaints received directly by the servicer should be reported to Education.

---

[22] Memorandum from U.S. Department of Education Secretary John B. King, Jr. on Consideration of Past Performance in Student Loan Servicing Recompete (June 30, 2016), *available at* http://sites.ed.gov/ous/files/2016/06/John-King-servicer-past-performance-memo.pdf.



- **Servicing contractors should comply with federal and state law, taking any necessary steps to support oversight by federal or state agencies, regulators, or law enforcement officials.** Student loan servicers and other service providers, including sub-servicers, subcontractors, and other providers of specialty student loan servicing functions should meet all applicable requirements set forth by federal law. FSA shall codify the importance of cooperation with federal and state authorities in any agreement to provide services on behalf of borrowers.

- **Borrowers can expect to be provided meaningful resolution of servicing-related complaints about their federal student loans in a timely manner.** With a limited set of streamlined, consistent systems and processes, Education will be able to more effectively manage and oversee vendors' performance. The new FSA Feedback System, in particular, should be leveraged to ensure accuracy and excellence in federal student loan borrower customer service. Servicing entities should demonstrate that they can effectively receive and quickly address complaints, both those forwarded from Education's complaint system or sent directly from a borrower or borrower representative.

- **Borrowers can expect that servicers will develop a comprehensive complaint resolution plan that is consistent and compatible with Education's feedback system.** The newly-launched FSA Feedback System greatly enhances the ability of FSA to effectively monitor its servicer partners. Servicers are currently provided with direct access to the Feedback System through a Partner Portal through which they are expected to resolve complaints. Complaints may be routed to servicers automatically (*e.g.*, based on the complaint categorization type selected by the borrower, or manually by an FSA employee). During the case resolution process, servicers are generally expected to communicate with the borrower by using the Feedback System's own email functionality, including initial response to the borrower, interim communications, and final case resolution. The system captures every email sent or received in this manner between the borrower and the servicer, and this information is viewable by FSA staff. Servicers should manually log information created in the course of the case resolution process that is not automatically captured by the system, such as summary logs of telephone conversations made to and from the borrower, documentation related to the case, and the nature, responsible party, and completion of specific tasks required to resolve the case. As with email correspondence, all of this information should be viewable by FSA staff. This unprecedented level of insight into the case resolution communications between borrower and servicer will allow FSA to clearly identify and resolve situations in which the highest level of customer service is not provided.

- **Borrowers can expect that the complaint resolution process used by servicers ensures that the timelines established by Education for response and resolution will be met.** Education's complaint resolution plan should provide a response to the borrower within 15 calendar days of a complaint and to have a resolution within 60 calendar days for most cases. FSA staff members should perform general quality assurance on case resolution by servicers, and regularly review complaint resolutions, both completed and in progress, for timeliness and quality.



**Strengthening Accountability for Student Loan Servicers by Requiring Enhanced Internal Policies and Procedures to Support the FSA Feedback System**

*Consistent with the FSA Feedback System and related processes, servicers should have the capacity to escalate complaints that have not yet been resolved and to track and compile complaint data that can be subsequently reviewed by Education. The FSA Feedback System significantly improves FSA's ability to analyze and report on complaint data. The system itself allows for the rapid creation of reports regarding the quantity and type of feedback provided regarding individual servicers as well as the timeliness and satisfaction of complaint resolution.  FSA should monitor these reports in order to identify and manage operational issues; for example, FSA may investigate a particular servicer that has become the subject of a significant increase in complaints, or may research whether sustained differences in relative complaint volume across servicers may be the result of specific best practices that could be instituted at a systemic level.*

*FSA should send complaint data to its Enterprise Data Warehouse and Analytics (EDWA) platform, which allows data received through the Feedback System to be matched with data collected by FSA's other systems, such as the National Student Loan Data System (NSLDS) and the Common Origination and Disbursement (COD) system. This aggregated data allows FSA to perform more sophisticated analysis on complaint data; for example, FSA may be able to identify whether certain complaints are more prevalent within certain population segments, which would then allow FSA to take targeted action to improve service accordingly. Finally, FSA should produce a report, in line with the objective of the Student Aid Bill of Rights presidential memorandum, summarizing the complaints data it has compiled. The following framework provides additional policy direction to ensure that servicers take the necessary steps to support expanded oversight by FSA:*

- **Borrowers can expect prompt and thorough resolution of their complaints and the contracts should incent servicers to do so.** Borrowers can expect to never need to personally resort to escalation in order to have their complaints resolved. Therefore, FSA should identify thresholds for servicers (*i.e.*, a certain number of complaints identifying the same servicing error; certain types of serious errors; and/or unreasonable delays in response to complaints) for which, when triggered, appropriate remediation plans or sanctions will be pursued that requires the servicing servicers to pay for the costs resulting from the action.[23]

- **Servicers should work with Education to ensure that all needed complaint materials are provided to Education for enforcement purposes.** In addition to Education's own enforcement entities, FSA will send complaint data to the Federal Trade Commission's (FTC's) Consumer

---

[23] Education is also exploring additional ways to expand the role borrowers can play when policing servicers for compliance with servicer obligations under the law and under any contract servicers may hold with Education.



Sentinel system, a platform accessible by multiple Federal enforcement agencies, including the FTC, the CFPB, the Department of Veterans Affairs, and the Department of Defense.

**Strengthening Accountability for Student Loan Servicers through Enhanced Internal Processes to Accept, Track, and Resolve Requests for Assistance and Account Disputes**

*In addition to expanded resources to seek assistance through Education, borrowers can expect their servicer to provide a transparent, consistent process to seek assistance and address account disputes. Borrowers can expect their servicer to provide the first line of customer service for all requests for information or assistance and attempts to resolve account disputes or servicing errors. The following framework provides additional policy direction to ensure that borrowers can access a robust system and reach staff appropriately trained to accept, process, investigate, respond to, and resolve these borrower requests in a timely and effective manner:*

- **Borrowers can expect to easily get help from their servicer when they need it.** Borrowers can expect to be able to easily access methods to submit a request for assistance, including such methods as phone, email, and regular mail. The toll-free telephone number, email address, mailing address, and process for consumers to submit requests for assistance should be clearly posted on the website. The website should also include a clear and conspicuous disclosure the policies and procedures related to complaint resolution and escalation.

  To the extent possible, requests for assistance should be addressed over the phone in real-time, or via a chat option. For any request for assistance that includes a request for documentation or information, where a response cannot be immediately provided, borrowers should be provided with the documentation or information they requested within 14 calendar days. There should also be adequate and appropriately trained staff to accept, process, investigate, respond to, and resolve borrowers' requests for assistance in a timely and effective manner.

- **Borrowers can expect to be able to get a second opinion.** Borrowers can expect their servicer will offer a process by which any borrower can escalate any request for assistance (except account disputes, which are subject to the provisions in account dispute appeals). This process must include at least the following: (1) when making a request for assistance on the phone, the ability for the borrower to obtain immediate review of the response if an immediate response is provided during the call, by an employee of the servicer at a higher supervisory level; and (2) a clear and conspicuous disclosure of the servicer's policies and procedures related to escalation on the single portal.

- **Borrowers who encounter more serious problems (potential servicing errors) can expect to have access to a transparent, timely process to dispute the error and correct their account.** Borrowers can expect to benefit from additional safeguards when they encounter a servicing error, including an enhanced process within the servicer designed to deal with these account disputes. Borrowers can expect their servicer immediately determine whether the account dispute



can be resolved fully in favor of the borrower, upon receipt of the account dispute by their servicer. If the account dispute is resolved fully in favor of the borrower within 10 business days of receipt of such communication, the borrower can expect to be notified that the account dispute has been resolved fully in his or her favor. If the account dispute cannot be resolved fully in favor of the borrower within 10 business days of receipt of such communication, the following policies and procedures shall apply:

o       Within 10 business days of receipt of an account dispute, defined as any written borrower communication asserting that the servicer made an error, borrowers can expect their servicer to send a written response acknowledging receipt of the communication;

o       Within 30 calendar days of receiving an account dispute, borrowers can expect their servicer to complete the following actions:

▪       Conduct a thorough investigation of the account dispute; and

▪       Make all appropriate corrections to the account of the borrower, including any derogatory credit furnishing resulting from an error, and, if any corrections are made, sending the borrower a written notification that includes the following information:

•       An explanation of correction(s) to the borrower's account that have been made; and

•       The toll-free telephone number, email address, and mailing address of servicer's personnel knowledgeable about the investigation and resolution of the borrower's account dispute.

•   **Borrowers can expect their servicer to request any additional information needed to take action on their account dispute.** If account disputes are duplicative, or overbroad or overly vague such that the servicer cannot determine what the borrower is disputing, borrowers can expect their servicer to respond within 30 calendar days by notifying the borrower of this fact, and by telling the borrower what he or she needs to submit before the servicer can process the account dispute.

•   **Borrowers can expect their servicer to let them know if it cannot act on their account dispute.** Each borrower can expect that if a servicer determines as a result of its investigation that the requested changes in the borrower's dispute will not be made, his or her servicer will provide the borrower with a written notification that includes the following information:

o       A description of its determination and an explanation of the reasons for that determination;

41



- o   The toll-free telephone number, email address, and mailing address of his or her servicer's personnel knowledgeable about the investigation and resolution of the borrower's account dispute;

- o   A statement that the borrower can appeal the servicer's determination; and

- o   Information regarding the method by which the borrower may request copies of documents the servicer relied on to make a determination that no changes to a borrower's account will be made.

- **When borrowers encounter more serious problems, they can expect a more rigorous process to appeal.**  Borrowers should expect their servicer to offer a process by which the borrower can appeal, in writing, after the borrower receives a determination regarding an account dispute. The appeals process shall include:

  - o   A written acknowledgment notifying the borrower that their servicer has commenced an appeals process. Such acknowledgment shall be sent within 10 business days of receiving a written request for appeal from the borrower;

  - o   A reassessment of the servicer's determination regarding an account dispute, performed by another employee of the servicer at a higher supervisory level than the employee(s) involved in the initial account dispute determination, as described below;

  - o   Investigation and resolution of appeals within 30 calendar days of Servicer's commencement of the Appeals process; and

  - o   Notification sent to the borrower, in writing, documenting the outcome of the appeal, including any reason for denial.

- **When borrowers request assistance or submit an account dispute in writing, they can expect their servicer to handle their problem, even if it goes to the wrong servicer address.** Borrowers can expect their servicer to have reasonable policies and procedures to address written disputes sent by borrowers to an address other than one designated by their servicer for receipt of written disputes.  Such policies and procedures shall include forwarding requests for assistance or account disputes to the proper office or unit of the servicer. The servicer need not consider the request for assistance or account dispute received until it is received by the proper office or unit of the servicer.

- **When borrowers seek assistance, they should not face negative consequences while their servicer reviews their account.** While borrowers have a pending account dispute, including any applicable appeal, they should be protected from any negative consequences materially related to the subject of the account dispute, including furnishing negative information to a credit reporting

42



agency, referring the debt to a third-party debt collector, or taking any action that results in a loss of benefits or protections.

- **Servicers must take the necessary steps to ensure internal processes support robust oversight and accountability.** Servicers should establish and maintain a compliance program with proper training, policies and procedures, and monitoring and corrective action; a responsive internal consumer complaint response process; board and management oversight; and an independent compliance audit function.[24]

- **Borrowers can expect their servicer to support external complaint handling functions administered by other federal and state agencies.** There should be at least one management-level employee to be the primary contact for the CFPB, any state attorney general, or any other state or federal official charged with assisting student loan borrowers regarding consumer complaints and inquiries. For each consumer complaint submitted through the CFPB, any state attorney general, or other state or federal official charged with assisting student loan borrowers, there should be a substantive written response to the entity or official who submitted such complaint.

---

[24] *See* Consumer Financial Protection Bureau, *Supervision and Examinations*, *available at* http://www.consumerfinance.gov/policy-compliance/guidance/supervision-examinations/.



**Part Five: Transparent**

The public, including student loan borrowers, benefits from information about the performance of private and federal student loans. Publication of key loan performance indicators, expanded portfolio analytics, and sophisticated analysis offers the public necessary insight into the borrower experience and the quality of service delivered to student loan borrowers.

**Strengthening Transparency through Expanded Publication of Aggregate Data on Student Loan and Servicer Performance**

*Borrowers and the public should have access to information on aggregate student loan outcomes and key servicing functions, including indicators about whether borrowers are able to keep up with their payments and stay out of default. This includes information related to loan origination, loan terms and conditions, borrower characteristics, portfolio composition, borrower repayment rates, delinquency and default, payment plan enrollment, utilization of forbearance and deferment, the administration of borrower benefits and protections, and the handling of borrower complaints. The following framework provides additional policy direction related to the development of enhanced public reporting on loan and servicer performance:*

- **The public, including student loan borrowers, can expect to access a detailed dashboard of performance indicators related to student loan repayment and student loan servicing.** Servicers, service providers, and call centers should track and provide to FSA for publication, a variety of metrics or aggregated data in a public-facing Dashboard available online. Servicers or Education should publish servicer-level data on, at least, the following topics:

  - **Portfolio Performance and Composition Dashboard:** This public dashboard should feature servicer-level data on portfolio performance and composition, which should be filterable in order for users to easily assess volume and percentage of borrowers and dollars that fit a variety of factors and borrower characteristics, including:

    - Loan status (in-school, grace, repayment, deferment, forbearance, etc.);

    - Delinquency status (30 days past due (dpd), 60 dpd, 90 dpd, etc.);

    - Default;

    - Repayment cohort;

    - Loan type (FFELP, Direct Loan, Perkins, etc.);

    - Repayment rate (percent of borrowers' original principal balance repaid);

    - School;



- School sector and type (two-year, four-year, non-profit, for-profit, medical school, law school, etc.); and

- Repayment plan (IBR, PAYE, REPAYE, etc.).

These metrics should be provided for each repayment cohort and, where practicable, school and borrower characteristics to account for any differences in servicer portfolios when comparing performance.

o **Customer Service Dashboard:** This public dashboard should feature aggregate servicer-level data on customer service performance, including:

- Average time it takes to get a person on the phone (Average Speed of Answer);

- Average time it takes to get high-touch servicing staff on the phone (Average Speed of Answer);

- Average time it takes to get high-touch servicing staff with special training related to military benefits on the phone (Average Speed of Answer);

- Average time to process requests for assistance;

- Average time to resolve account disputes;

- Number and percentage of account disputes resolved in borrowers' favor;

- Average time to process appeals of account dispute resolution;

- Number and percentage of account disputes that were reversed on appeal;

- Number of account disputes received, categorized by topic;

- Number and percentage of borrowers who never made a payment on their loan; and

- Number and percentage of borrowers for whom the servicer never made a confirmed contact.

o **Payment Processing Dashboard:** This public dashboard should feature servicer-level data about processing and borrower preferences related to the repayment of student loans, including:

- Number and percentage of borrowers who pay by mail;



- ▪ Number and percentage of borrowers who pay using bank bill-pay;

- ▪ Number and percentage of borrowers who pay using servicer's website;

- ▪ Number and percentage of borrowers signed up for auto-debit or ACH;

- ▪ Number and percentage of borrowers who are prepaid or make prepayments;

- ▪ Number and percentage of borrowers who opted out of advancing the due date (in writing, over the phone, and online);

- ▪ Number and percentage of borrowers who have provided standing instructions on pay allocation (in writing, over the phone, and online); and

- ▪ Number and percentage of borrowers who provide one-time standing instructions (in writing, over the phone, and online).

- o **Repayment Plan Dashboard:** This public dashboard should feature servicer-level data on enrollment in income-driven repayment plans and other repayment plans, and metrics related to servicers' ability to successfully enroll borrowers, including:

  - ▪ Average time for handling each type of income-driven repayment plan application;

  - ▪ For each repayment plan, the number and percentage of borrowers who:

    - • Are enrolled in the plan,

    - • Applied for the plan,

    - • Applied for the plan using alternative documentation of income,

    - • Had to submit multiple applications,

    - • Submitted an application that was approved,

    - • Submitted an application deemed incomplete, and

    - • Submitted an application that was denied;

  - ▪ For each IDR plan, the number and percentage of borrowers who:

    - • Did not annually recertify income on time,



- Did not annually recertify income on time, but did re-enroll or recertify for certain periods of time thereafter,

- Had interest capitalize as a result of missing the recertification deadline, and

- Who have been making income-driven payments for more than one year, and who have never missed an annual recertification deadline.

o **Consumer Protection Dashboard:** This public dashboard should feature servicer-level data on the administration of borrower benefits and protections, including:

  ▪ Number and percentage of borrowers in a long-term forbearance;

  ▪ Number and percentage of borrowers in at least two consecutive periods of forbearance;

  ▪ Average time for handling applications for Direct Consolidation Loans;

  ▪ Number and percentage of FFELP and Direct Loan borrowers who obtained a Direct Consolidation Loan;

  ▪ Average time for handling Public Service Loan Forgiveness (PSLF) Employment Certification forms;

  ▪ Number and percentage of approved and denied PSLF Employment Certification forms;

  ▪ Average time for handling Total and Permanent Disability Discharge (TPD) applications; and

  ▪ Number and percentage of approved and denied TPD applications.

o **Previously-Defaulted Borrower Dashboard:** This public dashboard should feature servicer-level information on the performance of borrowers previously in default, including previously-defaulted loans that have been rehabilitated or loans consolidated from default, including:

  ▪ Loan status (in-school, grace, repayment, deferment, forbearance, etc.);

  ▪ Delinquency status (30 dpd, 60 dpd, 90 dpd, etc.);

  ▪ Re-default;



- Repayment cohort;

- Loan type (FFELP, Direct Loan, Perkins, etc.);

- School;

- School sector and type (two-year, four-year, non-profit, for-profit, medical school, law school, etc.);

- Repayment plan (IBR, PAYE, REPAYE, etc.);

- Number and percentage of borrowers who never made a payment on their loan since acquired by the servicer;

- 12 month cohort re-default rate, measured based on the date a loan reentered repayment status following rehabilitation or consolidation;

- 24 month cohort re-default rate, measured based on the date a loan reentered repayment status following rehabilitation or consolidation; and

- 36 month cohort re-default rate, measured based on the date a loan reentered repayment status following rehabilitation or consolidation.

**Strengthening Transparency through Enhanced Internal Data Collection, Monitoring and Testing by Student Loan Servicers**

*Student loan data should be collected routinely and in a consistent manner. To provide accurate and complete information to borrowers and the public, FSA should require the tracking and compilation of, and routinely collect and aggregate, comparable data from all servicers and call centers. The following framework provides additional policy direction related to the development of enhanced internal tracking, monitoring and reporting by servicers.*

- **Borrowers can expect robust internal monitoring of servicing personnel in order to ensure high-quality customer service and strengthen the customer experience**. FSA should ensure that servicers conduct continuous monitoring of all servicing personnel, based on the following policy direction:

    o   All representatives communicating with consumers should be monitored, including recording calls and conducting monthly reviews of verbal and written communication samples;

    o   All employees handling applications for repayment plans and borrower benefits should also be monitored, including with monthly reviews of application samples;



o    Enhanced monitoring policies should be enacted for high-touch servicing staff, and should also include systematic tracking of income-driven repayment applications and recertification. Individual employee metrics should consider applicable borrower outcomes, including tracking interest capitalization events associated with delayed income and household size certification, and the timeliness of recertification;

o    Employee monitoring should inform training and future monitoring efforts. Additionally, issues found during monitoring should be tracked;

o    Servicers, call centers, and service providers should conduct root-cause analyses and trending analyses of monitoring results, and errors or systemic issues should be remedied;

o    Where possible, remedies should be provided to all similarly situated borrowers when a particular problem is discovered through monitoring; and

o    Aggregate employee performance metrics should be reported publically as often as is feasible, but at a minimum, on a quarterly basis.

- **Borrowers can expect robust internal monitoring and testing of automated processes, in order to ensure high-quality servicing and strengthen the customer experience.** FSA should ensure that servicers conduct continuous monitoring and testing of all automated processes, including payment processing and furnishing of information to consumer reporting agencies. Similarly, FSA should ensure servicers track issues, conduct root cause and trending analyses, propose solutions, and provide remedies to all impacted borrowers. Basic reports on the results of systems monitoring should also be published.

- **Borrowers can expect robust internal monitoring and tracking of the subject matter and resolution of all requests for assistance and account disputes, in order to ensure high-quality customer service and strengthen the customer experience.** FSA should ensure that servicers, service providers, and call centers track, in a systematic manner, the subject matter and the resolution of all requests for assistance, account disputes, escalations and appeals, excluding those that can be resolved immediately by providing the requested information or resolution at the time of the request for assistance. Servicers, service providers, and call centers should conduct root-cause analyses of requests for assistance or account disputes that might reveal systemic concerns, should conduct trending analysis to discover recurring issues, and propose and/or implement solutions. Remedies should be provided for all similarly situated borrowers, without a request, when a particular problem is discovered. Aggregate data on requests for assistance and account disputes should be reported publically as often as is feasible, but at a minimum, on a quarterly basis.

**Strengthening Transparency through Enhanced Reporting and Analysis by Federal Student Aid and the Department of Education**



*Borrowers, policymakers and the public depend on Education to produce routine data analysis, reporting and recommendations related to the implementation of policy direction, regulations and statutory changes. The following framework provides additional policy direction related to the development of enhanced public reporting on loan and servicer performance.*

- **Education should institute routine processes to evaluate servicer and portfolio performance and for this analysis to inform policy recommendations.** The dashboards and internal monitoring should be continuously reviewed by Education to ensure that performance incentives are working and the assignment of new loans are adjusted. On a regular and continuous basis, Education shall analyze data and make broader policy recommendations or systems and procedures adjustments based on that analysis.



To:      **James Runcie, Chief Operating Officer, Federal Student Aid**
CC:      **Sarah Bloom Raskin, Deputy Secretary, U.S. Department of the Treasury**
         **Richard Cordray, Director, Consumer Financial Protection Bureau**
From:    **Ted Mitchell, Under Secretary, U.S. Department of Education**
Date:    **October 17, 2016**
RE:      **Addendum to July 20, 2016 Memorandum on Policy Direction on Federal Student Loan**
         **Servicing**

This addendum to my July 20, 2016 memorandum on "Policy Direction on Federal Student Loan Servicing" provides clarification with respect to an item included in the memorandum that is intended to be reflected in the new state-of-the-art loan servicing ecosystem that FSA has begun to procure.  As I previously described, this new ecosystem will consist of a single servicing platform on which all borrower accounts held by the Department will reside, and to which multiple customer service providers will have access in order to provide state of the art borrower engagement.  The July 20, 2016 memorandum directed that during the next phase of the procurement process, those offerors selected to participate would be required to propose a limited number of un-affiliated entities to perform as customer service providers as part of a subcontracting plan, and would be evaluated, in part, on the basis of any proposed scope, methodology and schedule for distributing call volume to such entities.

This addendum provides clarification with respect to the distribution of borrower accounts to un-affiliated entities (i.e., "customer service providers") for the purpose of those entities engaging borrowers to perform those functions specified in the solicitation that support the management of Title IV and Title VII financial aid, post loan and grant disbursement.  Specifically, borrower accounts should be allocated among an offeror's proposed customer service providers on the basis of performance as measured against specified outcome measures.  These outcome measures should be specified in the solicitation and formulated in such a manner as to provide economic incentives to provide high-quality student loan servicing, and to foster accountability in meeting standards for high-quality customer service.  Such outcome measures could include, for example, (1) the percentage of borrowers in repayment who are current; (2) the percentage of borrowers in repayment who are delinquent; (3) the percentage of borrowers who default on their loans; (4) a measure of customer satisfaction; and, (5) a measure of service quality as determined by direct or indirect observation, such as call monitoring.

After contract award under the current solicitation process, the approach described above should also be reflected in the new procurement actions to be undertaken to provide for a direct contracting relationship between the Department and customer service providers.