# EXHIBIT 142

Exhibit 142

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\- - -

Consumer Financial Protection :
Bureau, :
Plaintiff, : Civil Action No.
vs. : 3:17-CV-00101-RDM
Navient Corporation, :
Defendants. :

\- - -

Deposition of BRAD W. JONES
Wilmington, Delaware
Wednesday, August 8, 2018
9:36 a.m.

BEFORE:

Gail L. Inghram Verbano:
Registered Diplomate Reporter,
Certified Realtime Reporter,
Certified Shorthand Reporter-CA (No. 8635)

Deposition of BRAD W. JONES, held at the offices of UNITED STATES ATTORNEY, 1007 Orange Street, Suite 700, Wilmington, Delaware, on Wednesday, August 8, 2018, beginning at approximately 9:36 a.m., the proceedings being recorded stenographically by Gail Inghram Verbano, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter-CA (No. 8635), and transcribed under her direction.

A P P E A R A N C E S

On behalf of Consumer Financial Protection Bureau:
DAVID DUDLEY, ESQ.
david.dudley@cfpb.gov
MANUEL G. ARREAZA, ESQ.
manuel.arreaza@cfpb.gov
CONSUMER FINANCIAL PROTECTION BUREAU
OFFICE OF ENFORCEMENT
1700 G. Street, NW
Washington, DC 20552
202.435.9284

On behalf of Navient Corporation:
NATALIE BILBROUGH, ESQ.
natalie.bilbrough@wilmerhale.com
WILMER HALE, LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
202.663.6131

-and-

MIKE KILGARRIFF, ESQ.
mike.kilgarrif@kirkland.com
KIRKLAND & ELLIS, LLP
655 Fifteenth Street, Northwest
Washington, D.C. 20005
202.879.5951

ALSO PRESENT:
MATTHEW SHELDON, Navient

C O N T E N T S

| EXAMINATION OF: | PAGE |
|---|---|
| BRAD W. JONES | |
| By Mr. Dudley | 8 |

E X H I B I T S

| EXHIBIT | | IDENTIFIED |
|---|---|---|
| Exhibit 1 | Defendants First Supplemental and Amended Initial Disclosures | 136 |
| Exhibit 2 | Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories | 138 |
| Exhibit 3 | Letter from J. Paikin to the CFPB, 4-13-18 | 141 |
| Exhibit 4 | Index to the policies and procedures identified by Navient | 143 |
| Exhibit 5 | Spreadsheet Bates-stamped NAV-00003357 | 144 |
| Exhibit 6 | Spreadsheet Bates-stamped NAV-00003358 | 174 |
| Exhibit 7 | Document Bates-stamped NAV-00003359 to 3361 | 176 |
| Exhibit 8 | Spreadsheet Bates-stamped NAV-00003362 | 178 |
| Exhibit 9 | Spreadsheet Bates-stamped NAV-00003363 | 187 |
| Exhibit 10 | Document Bates-stamped NAV-00003364 to 3366 | 188 |
| Exhibit 11 | Spreadsheet Bates-stamped NAV-00003367 | 189 |

is procedure, not policy.
Q. What's the distinction between policies and procedures?
A. I'm not 100 percent sure.
Q. How do you use that term?
A. How do I use the term "policy"?
Q. "Policy."
A. Typically, I would use it if the word "policy" was in the document, as the subject or the header or the title.
Q. Other than Knowledge Share and Policy Tech, are you familiar with any other systems that have been used to house written policies and procedures for consumer reporting or either Sallie Mae or Navient?
A. A shared drive.
Q. Shared drive have a name?
A. I don't remember the name.
Q. Do you currently use a shared drive at Navient for written policies and procedures?
A. No.
Q. When did you stop using a shared drive?
A. I don't recall.
Q. What's your best estimate?
A. Within the last five years.

Q. Could have been one day ago; could have been four and a half years; you can't narrow it down any more than that?
A. It was not one day ago. But I don't recall exactly when the policies or procedures were in the shared drive.
Q. Other than Knowledge Share, Policy Tech and the shared drive, are there any other systems that you're aware of that house written policies and procedures for credit reporting for Sallie Mae or Navient?
A. Not to my knowledge, no.
Q. Did you have any responsibility for the written policies and procedures for consumer reporting when you started as the manager of credit reporting services for Sallie Mae in 2013?
A. Not that I recall.
Q. Who had responsibility for devising the written policies and procedures for consumer reporting for Sallie Mae in 2013?
A. I don't know.
Q. Who would know?
A. My boss at that time may know.
Q. Leanne Carson?
A. She may. I don't know if she would or

not.
Q. How about in 2014? Who had responsibility for the written policies and procedures for Sallie Mae up until the split with Navient?
A. 2014 before the split?
Q. Before the split.
A. Credit bureau management in conjunction with compliance and legal.
Q. What individuals?
A. I don't remember in 2014.
Q. Do you recall anyone's name?
A. Leanne.
Q. Leanne Carson?
A. Correct.
Q. Who else?
A. I don't remember any other people involved.
Q. Did you have any role in creating or revising the written policies and procedures for credit reporting for Sallie Mae in 2014?
A. I don't recollect.
Q. Have you ever had a role in creating or modifying written policies and procedures for credit reporting for either Sallie Mae or Navient?

A. Yes.
Q. When?
A. I don't recall the date.
Q. What's your best recollection?
A. Within the last three years is my best recollection.
Q. When Navient split from Sallie Mae, who had responsibility for Navient's written policies and procedures for credit reporting?
A. When Navient split?
Q. Yes.
A. The Navient policies and procedures?
Q. Yes.
A. The same -- not the same individuals, but the same areas that I had mentioned before that were at Navient, which would be credit bureau management, compliance, and legal.
Q. The one individual you mentioned that had a role for Sallie Mae's written policies and procedures is Leanne Carson; is that right?
A. Is it right that I mentioned that she had a role?
Q. Yes.
A. Yes.
Q. And that was the only person you could

Page 101

A. Joanne Jackson.
Q. Anyone else?
A. Compliance.
Q. No, I'm specifically talking about credit bureau management. Anyone else within credit bureau management besides yourself and Joanne Jackson?
A. And I'm sorry. Could you repeat the time frame.
Q. At any time.
A. Yeah, that's it.
Q. Mr. Jones, when did you have responsibility for credit bureau management's input into revising Navient's written policies and procedures for consumer reporting?
A. Well, I felt like I had input in the policies and procedures in 2014.
Q. What about 2015?
A. From 2014 to present.
Q. How did your role in revising Navient's written policies and procedures for consumer reporting compare with Ms. Jackson's?
A. My Jackson is my boss.
Q. Has she been your boss since the Sallie Mae/Navient split?

Page 102

A. Yes.
Q. Is she currently your boss?
A. Yes.
Q. Who from legal was involved in revising Navient's written policies and procedures for consumer reporting?
A. I don't know specifically.
Q. At any time, you don't know any individuals?
A. From the split until present day?
Q. Yes.
A. Josh Harkleroad would be the only one that I could remember.
Q. Spell his last name please.
A. H-A-R-K-L-E-R-O-A-D or D-E.
Q. When did Mr. Harkleroad have responsibility for helping with revising Navient's written policies and procedures for consumer reporting?
A. I don't know.
Q. Is Mr. Harkleroad still with Navient?
A. To the best of my knowledge, yes.
Q. Who from compliance had a role in updating and revising Navient's written policies and procedures for consumer reporting?

Page 103

A. Evelyn Capodanno.
Q. Who else?
A. That's all that I can think of from then until now.
Q. Is Ms. Capodanno still with Navient?
A. To the best of my knowledge.
Q. Would these three groups -- credit management, compliance, and legal -- hold meetings to discuss potential updates to Navient's written policies and procedures for consumer reporting?
A. When?
Q. At any time.
A. They do hold meetings as needed.
Q. How frequently?
A. Again, as needed.
Q. As 2014, approximately how many meetings?
A. I would be guessing.
Q. Best estimate.
A. I -- again, I'd be guessing.
Q. Could be hundred? Could be zero? You have no idea?
A. No, I have an idea.
Q. Well, could you narrow it down from there?

Page 104

A. Ten times. That's a guess.
Q. These were ad hoc meetings, though, not on a regular basis?
A. From what I can recall.
Q. What would prompt a meeting?
A. Potential need for a change.
Q. In the written policies and procedures?
A. Correct.
Q. How would you identify a need to update the written policies and procedures for consumer reporting?
A. There's multiple ways.
Q. What are they?
A. Notification from the Department of Education, updates that the CRGG, any federal or state laws. That would be the only ones that I could think of at this point.
Q. How would notification from the Department of Education indicate to Navient that it should update its written policies and procedures for consumer reporting?
A. The only way that I know that Department of Ed communicates change is through a change request.
Q. If the Department of Education

that I had regarding TPD and the comment code would lead me to believe that as a result of the conversation or conversations, the decision was made not to furnish the special comment code on transferred loans that have a claim type of disability.

Q. Are you able to tell, based on Exhibit 8, when Navient made that change?

A. Am I able to tell when that change was made based on this document?

Q. Based on this document, yeah.

A. Yes.

Q. Where?

A. On the Page 15 of 17.

Q. What entry are you looking at?

A. The last one that says 10/22 of 2014.

Q. What does that indicate when the change for Navient's use of special comment code AL occurred?

A. I'm sorry. Say that -- could you repeat that.

(Record read.)

A. To me, I think, that this project to do that was the MP#4027104.

Q. Is that the last row on Page 15?

A. Yes.

Q. Is there a date associated with MP#4027104?

A. It says 10/22 of 2014.

Q. What's your best understanding of that date associated with that entry?

A. That's when that MP was done.

Q. So is your best understanding then as of the day after that change -- let's say the next month, in November, that Navient was no longer furnishing special comment code AL for borrowers with TPD?

MS. BILBROUGH: Objection; form.

BY MR. DUDLEY:

Q. You can answer the question.

A. What this tells me is that I'm thinking -- what I see here, it says June 2014 release, and it has that number. So I could say that that project was what -- when the -- I believe when the code -- when the AL code was stopped. But what I don't know is one says June 2014 and the other says 10/22 of 2014.

Q. So you don't know if --

A. If it's June or if it's October.

Q. But either way, as of November 2014, is

it your understanding that Navient was no longer furnishing special comment code AL for borrowers with TPD based on this document?

A. November?

Q. November.

A. I would believe that that's correct.

Q. What about borrowers that, as of November 2014, had a previous notation of special comment code AL furnished by Navient for TPD?

A. What about those?

Q. So I guess what I'm getting at is, this looks prospectively, going forward, Navient is no longer furnishing special comment code AL for borrowers with TPD. Is that an accurate --

A. Correct. I agree.

Q. -- understanding?

What about borrowers that, say, in 2013 had a special comment code AL furnished by Sallie Mae? What would happen to those borrowers? Retroactively.

A. Right. So as you said, this project is prospective. And I don't see anything on here that would indicate that there was anything or would be anything different about what had been previously reported.

Q. So setting Exhibit 8 to the side and just your own recollection of various steps Navient has taken, has Navient taken any steps to retroactively change use of special comment code AL for borrowers with TPD?

A. Yes.

Q. What did Navient do?

A. One, we stopped furnishing it, which is what we're talking about. At a later time -- well, could you ask the question again or just rephrase.

I just want to make sure, was the question all going forward?

Q. No, the question was -- so we're talking about prospective --

A. Right.

Q. -- action, no longer continuing to furnish special comment code AL.

A. I would say that that would be identified here.

Q. And so now I'm asking whether it's in Exhibit 8 or just whether it's based on your own recollection, your own memories --

A. Sure.

Q. -- has Navient taken any steps to retroactively take steps to remove the special

comment code AL for TPD borrowers?
A. Yes.
Q. What steps did Navient take?
A. At a point in time, there was a file that was created using either SAS or SQL to identify previously reported claim types or transferred loans, I should say, with a claim type of disability on Class S. That file was downloaded and encrypted and sent to each of the four credit reporting agencies with the request to remove the special comment code from a previously reported trade or loan.
Q. Who handled that process for Navient?
A. I did.
Q. Who else was involved?
A. The bureaus. As far as internally, I don't remember.
Q. When did you do that?
A. When did I do that?
I would say within the last three or four years -- greater than two, no more than five years ago.
Q. Was it after --
A. It would have been after --
Q. -- this?

A. -- this.
Q. How much after this, best understanding?
A. Not too long.
Q. I can tell you that -- represent to you that in a submission Navient made to the bureau, Navient said that it was about a year after this -- so October 2015 -- that the retroactive change took place.
Does that sound right to you?
A. I mean, it -- I would have to see that request. I don't know if that's specific to TPD or if it's specific to special comment code AL.
It was done after this. 2015 sounds about right.
Q. Did Navient take any other steps to help make the borrowers whole that were affected by the use of the special comment code AL for TPD?
A. I'm not sure I understand that question.
Q. Other than the prospective measures that we talked about that are reflected in Exhibit 8, according to your testimony --
A. Yeah.
Q. -- and then the retroactive efforts

that you talked about that happened approximately a year later or so --
A. Sure.
Q. -- did Navient do anything else to try to benefit the consumers, the borrowers, with TPD that were affected by the AL special comment code?
A. What we did was not to benefit. What we did was to update reporting, because -- as reporting -- someone responsible for reporting, my job is to report accurately and with integrity.
So benefit is not something that we look at when we're reporting to the credit bureaus, if that -- so I don't know if I can answer your question, because I struggle with that word "benefit."
Q. Did Navient provide compensation of any kind to the borrowers that were affected by its use of the special comment code AL for borrowers with TPD?
A. I'm not aware of compensation to borrowers.
(Jones Exhibit 9 was marked for identification.)
MR. DUDLEY: The court reporter has handed the witness a document marked as Exhibit 9.

Exhibit 9 is a 20-page spreadsheet with the page Bates-stamped NAV-00003363 and at the top has the column "Claim Type" and next to it "Brief Description."
BY MR. DUDLEY:
Q. Mr. Jones, once you've had a chance to look it over, could you please tell us what Exhibit 9 is.
A. This is similar to one of the other exhibits which I didn't -- didn't look familiar to me then, and this document doesn't really look familiar to me as well.
Q. You've never seen the substance of Exhibit 9 before, to the best of your knowledge?
A. Have I ever seen the substance that's in here? I have seen it in other documents, but this document doesn't look familiar to me with all the headers and things. I'm not familiar with this document.
(Jones Exhibit 10 was marked for identification.)
MR. DUDLEY: The court reporter has handed the witness a document marked as Exhibit 10. Exhibit 10 begins with the page Bates-stamped NAV-00003364 and ends with the page Bates-stamped

A. AL.
Q. Let's just run through the rest of the columns.
A. Yeah, okay.
Q. CBR_METR_STA_CD.
Do you see that?
A. Credit -- yes.
Q. What does that refer to?
A. Credit bureau Metro status code.
Q. Those are the status codes we discussed earlier, such as 01 or 11?
A. Metro --
Q. Metro 2 status code?
A. Correct.
Q. Next to that, CBR_CLM_TP_CD.
Do you see that?
A. Uh-huh.
Q. What does that refer to?
A. The claim type code.
Q. What's the DIS refer to?
A. Disability.
Q. Would that be TPD?
A. Yes. Yes.
Q. And I know that this exhibit is just a sample of the larger file.

A. Uh-huh.
Q. But did the entire file consist of all borrowers that had a TPD? What does that refer to?
A. The file consisted of whatever the date that this was ran, all prior reported transfer status -- all prior reported loans with the transfer status of 5 and a special comment code of AL that in our database was a disability that had a DIS claim type.
Q. Were all of those disability claim types TPD?
A. I don't know of any other disability claim type. That's not saying there isn't, but I'm not familiar with any other.
Q. And then finally the column on the far right, CBR_SPC_CMT_CD.
Do you see that?
A. Uh-huh.
Q. What does that refer to?
A. The special comment code.
Q. And what's underneath that?
A. AL.
Q. And that indicates Navient furnished the special comment code AL for every borrower with that designation?

A. I don't know if -- I can't make that assumption from this document that I have in front of me. It says that the special comment code AL was on customer's Social Security number blah, blah, blah, blah, blah, suffix 1, sequence 6, reported in March of 2014 with an 05 and an AL.
Q. So let's just look at the sample here. I understand we haven't produced all 57,000 rows.
A. Sure.
Q. But for the borrowers indicated in this sample, does Exhibit 20 indicate that Navient or Sallie Mae, depending on the time period, furnished the special comment code AL and status code 05 for these borrowers with a TPD?
A. This would indicate that these borrowers did have an 05 with an AL furnished.
Q. Furnished by Navient or Sallie Mae?
A. Correct.
Q. Is it your understanding that every row in Exhibit 20 consisted of borrowers with a TPD that had a status code 05 and special comment code AL furnished by Navient or Sallie Mae?
A. I think you're saying this -- this would indicate that everything on here had a disability claim type with a Metro status code 05

and an AL, which I think is what -- I'm agreeing with what you're saying, but I just want to make sure it's clear that it has a DIS claim type.
And the reason I say that is because, as I indicated earlier, TPD would fall under a DIS claim type. I -- as I stated earlier, I just want to make sure that -- I don't believe there are any others, but if there are, they would obviously fall under the DIS 2.
So for me to say -- not knowing if there are other things besides TPD that get classified as this, I can't say with 100 percent certainty that these are all TPD. Is that fair enough?
Q. It is, yeah. So I understand you to be saying that, you know, at least some of these DIS --
A. I know all TPD will have DIS. I just don't know if DIS covers other than TPD.
Q. How would you go about finding that out?
A. I would use a document or two to research that.
Q. What documents?
A. I would -- I don't know the name of the

CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram Verbano, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter (CA) and Notary Public, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_______________________________
Gail Inghram Verbano, CSR, RDR, CRR
CA-CSR No. 8635

## ERRATA

I, Brad Jones, wish to make the following changes, for the following reasons:

| Page: Line | Correction | Reason |
|---|---|---|
| 1, Caption | Add "et al." after "Navient Corporation," | Inaccurate caption |
| 9:18 | Change "Defendant's" to "Defendants" | Transcription error |
| 9:20 | Change "Defendant's" to "Defendants" | Transcription error |
| 29:19; 29:21; 29:23; 29:24 | Change "Accurant" to "Accurint" | Transcription error |
| 30:20 | Change "defection" to "detection" | Transcription error |
| 59:1 | Change "squeak" to "speak" | Transcription error |
| 60:3 | Change "As" to "Has" | Transcription error |
| 101:23 | Change "My" to "Ms." | Transcription error |
| 104:15 | Change "CRGG" to "CRRG" | Witness error |
| 106:17 | Change "thought at" to "throughout" | Transcription error |
| 107:16 | Change "CRGG" to "CRRG" | Witness error |
| 109:14 | Change "CRGG" to "CRRG" | Witness error |
| 142:23 | Change "I'm knowledgeable" to "I'm not knowledgeable" | Transcription error |
| 158:24 | Change "W4" to "K4" | Transcription error |
| 174:3 | Change "choice be" to "choice would be" | Transcription error |
| 195:8 | Change "CFPD" to "CFPB" | Transcription error |
| 209:24 | Change "Dave" to "David" | Transcription error |
| 216:9 | Change "DIS 2" to "DIS, too" | Transcription error |
| 241:8 | Change "CRGG" to "CRRG" | Witness error |

## ACKNOWLEDGMENT OF DEPONENT

I, Brad Jones, do hereby certify that I have read the forgoing 266 pages and that they are a true and accurate transcript of the testimony given by me in the above entitled action on August 8, 2018, except for the corrections or changes in form or substance noted on this Errata Sheet.

Date: 9-4-2018 Signature of Witness: ________________

Brad Jones