## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A.   *CFPB v. Nationwide Biweekly Admin., Inc.*,
     2017 WL 3948396 (N.D. Cal. Sept. 8, 2017)

B.   *Benjamin v. V.I. Port Auth.*,
     684 F. App'x 207 (3d Cir. 2017)

C.   *First Telebanc Corp. v. First Union Corp.*,
     2007 WL 9702557 (S.D. Fla. Aug. 6, 2007)



Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 3 of 33

2017 WL 3948396

2017 WL 3948396
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

CONSUMER FINANCIAL
PROTECTION BUREAU, Plaintiff,
v.
NATIONWIDE BIWEEKLY
ADMINISTRATION, INC., et al., Defendants.

Case No. 15-cv-02106-RS
|
Signed 09/08/2017

**Attorneys and Law Firms**

Jonathan S. Urban, Marisa-Lyn Menna, Stephen Jacques, Office of Enforcement, Adrienne Warrell, Edward S. Keefe, Patrick B. Gushue, Thomas M. McCray-Worrall, Melanie Hirsch, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Allyson Beth Baker, United States Deptartment of Justice, Washington, DC, Christopher D. Stock, Markovits Stock DeMarco LLC, Cincinnati, OH, Georgia Zoe Schneider, Ponist Law Group, P.C., San Diego, CA, John David Smith, John D. Smith Co., LPA, Springboro, OH, Kimon Manolius, Samantha D. Wolff, Hanson Bridgett LLP, Sean Eric Ponist, Ponist Law Group, P.C., San Francisco, CA, Lisa Ann Messner, Helen Mac Murray, Mac Murray Shuster, LLP, New Albany, OH, for Defendants.

**OPINION AND ORDER**

RICHARD SEEBORG, United States District Judge

**I. INTRODUCTION**

**\*1** This is a civil enforcement action brought by the Consumer Financial Protection Bureau (CFPB) against entities and an individual whom the CFPB contends misled consumers. In defendants' view, the financial services product they sell provides their customers the chance to save thousands and thousands of dollars that they might otherwise pay in mortgage interest. CFPB insists, in contrast, that few, if any, consumers will come out ahead financially, given the effect of the fees defendants charge. CFPB challenges several aspects of defendants' marketing as allegedly misleading.

After the completion of a seven day bench trial, the parties submitted post-trial briefing and proposed findings of fact and conclusions of law, before returning to present closing arguments. [1]

After carefully considering the sufficiency, weight, and credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial submissions of the parties, the Court finds that CFPB has adequately shown that some, but not all, of defendants' challenged marketing statements were false or misleading. For reasons explained below, the Court finds that CFPB has not met its burden to show that the restitutionary relief it proposes is warranted, but a civil penalty will be imposed, as well as injunctive relief. The parties will be directed to meet and confer to present a proposal or proposals as to the exact terms of the injunctive relief. Defendants in turn, failed to meet their burden to establish the validity of their counterclaims. This Opinion and Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

**II. LIABILITY**

**A. The "Interest Minimizer" Program**

Defendants are Nationwide Biweekly Administration, Inc. ("Nationwide"), its wholly-owned subsidiary Loan Payment Administration ("LPA"), and Daniel Lipsky, the founder, president, sole officer, and sole owner of Nationwide. LPA functions essentially as a second name under which Nationwide markets its services.

The subject of this action, which formed the core of defendants' business, is a financial service product known as the Interest Minimizer Program ("the IM program"). A customer who signs up for the IM program, in its most typical form, agrees that every two weeks Nationwide will automatically debit from the customer's bank account an amount equal to one-half of the customer's monthly home mortgage payment. Nationwide then forwards the funds to the customer's lender on a monthly basis. Because this results in 26 debits per year of an amount equal to one-half of a mortgage payment, the customer effectively makes one extra mortgage payment each year (26 half payments = 13 full payments). Apart from an initial set-up fee, discussed below, these "extra" payments each year are applied by lenders to the principal of the loan balance, thereby reducing it more quickly than would be the case if only twelve payments were made

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....
Case 3:17-cv-00101-RDM Document 521-1 Filed 08/05/20 Page 4 of 33
2017 WL 3948396

per year. With the loan principal being paid off more quickly, the total interest charges a borrower will pay over the life of the loan are reduced. [2]

**\*2** Nationwide obtains its customers by first purchasing names and addresses from certain companies that use public records to compile lists of persons who have recently taken out home mortgages, and then sending those persons mailers. At the height of its operations, Nationwide sent out approximately 300,000 mailers per week, some under the Nationwide name, and some under the LPA name. While there were 50 to 60 different versions of the mailers used during the time period relevant to this case, the parties are in agreement many of the changes from version to version were minor, and that the exemplars they put into evidence at trial fairly present the subjects of dispute.

The Nationwide mailers generally had two sides (see Trial Exh. 36), whereas the LPA mailers typically were single-sided and conveyed less information about the IM program (see Trial Exh. 57). The mailers were transmitted in window envelopes typically bearing bold, colored, text such as "Payment Information Enclosed," "Mortgage Information Enclosed" (Accelerated Reduction in your Principal Balance), and "Mortgage Payment Information Enclosed." See Trial Exhs. 76-81. Ordinarily, the name of the lender would appear on the mailer immediately above the consumer's name and address, with the result that the lender's name would be visible through the envelope window. In those instances, the envelopes also bore a notice that "Nationwide Biweekly Administration is not affiliated with the lender." Defendants' witnesses explained that some states prohibit using the lender name, and that in those states the envelopes did not include the disclaimer.

Although the percentage of persons who responded was always very small, given the volume of mailers sent out, Nationwide fielded millions of incoming telephone calls at its call center. [3] Among those who ultimately enrolled in the IM program, the telephone calls typically would last between 30 minutes and one hour. During the calls, Nationwide's representatives used prepared "scripts" to explain and sell the product, and to respond to any questions customers might have. Nationwide introduced evidence that it trained its representatives to follow the scripts as closely as possible, that it monitored representatives' performance, and that it imposed discipline if a representative failed to make any of the disclosures called for by the scripts. In this action, CFPB is not attempting to impose any liability based on

what representatives from time to time may or may not have added to, or omitted from, the scripts. CFPB's position is that the sales presentation included false or misleading statements, and that there were material omissions, even where representatives followed the scripts scrupulously.

The evidence adduced at trial showed that the scripts and mailers were all largely written by Lipsky himself. Lipsky personally reviewed and approved all or virtually all changes in language to any of the documents. It was undisputed that Lipsky was intimately involved in managing all aspects of the business on a day-to-day basis.

### B. Legal standards

CFPB's complaint sets out four counts. First, CFPB contends defendants' conduct violates the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 ("CFPA"), as "abusive." An act or practice is "abusive" if, among other things, defendants have taken "unreasonable advantage of the consumer's lack of understanding of the material risks, costs, or conditions" of, the service or product they are selling. *See* 12 U.S.C. § 5531(d)(2)(A).

At trial, and in most of the briefing over the course of this action, CFPB has placed primary emphasis on the second count of it complaint, which seeks to impose liability under the prong of the CFPA that prohibits "deceptive" practices. *See* 12 U.S.C. § 5536(a) ("It shall be unlawful ... to engage in any unfair, deceptive, or abusive act or practice."). An act or practice is "deceptive" if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016). To determine whether a representation or practice is likely to mislead, courts examine the overall "net impression" that it leaves on a reasonable consumer. *Id.*

**\*3** Defendants urge the court not to follow the articulation of the standard for deceptiveness set out in *Gordon*, which that court expressly acknowledged it was borrowing from jurisprudence under the FTC act. *See* 819 F.3d 1193 n.7. Even assuming *Gordon* was not binding here, however, defendants have not made a persuasive showing that some other standard should apply.

Moreover, the standard defendants propose is not materially different from that set out in *Gordon*. Defendants have offered only two minor additions to the *Gordon* language.

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 5 of 33
Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....
2017 WL 3948396

First, defendants would expressly state that to be deceptive, the challenged representations or omissions must be likely to mislead "*a significant portion of targeted* consumers...." The concept that "deception" requires something that misleads more than only the most gullible or inattentive is already embedded in the borrowed FTC definition —"likely to mislead consumers *acting reasonably under the circumstances.*" *See also,* F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (upholding finding of deception where "overwhelming number of consumers" were misled.)

Second, defendants would add an express element that consumers be misled "to their financial detriment." As defendants point out in arguing for such an element, in the absence of an injury-in-fact that is "concrete and particularized," there is no standing under Article III of the Constitution. *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016). Even assuming the FTC act allows for claims based on concrete and particularized *non-monetary* injuries, and that the CFPA for some reason applies only where consumers have suffered *monetary* losses, there is no occasion to draw that distinction here, where the claim is that consumers were deceived in connection with signing up for services offered by defendants for a fee—a financial detriment. [4] Accordingly, while there are no grounds to depart from the definition of "deceptive" provided in *Gordon,* the result here would be the same even under the standard proposed by defendants.

**\*4** The third count of CFPB's complaint asserts defendants have violated the Telephone Sales Rule, 16 C.F.R. § 310.2(dd) ("TSR"), a regulation implementing the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6105(d). Finally, the fourth count alleges that defendants' violation of the TSR by definition constitutes a violation of the CFPA. [5]

### C. Alleged Misrepresentations

CFPB contends it has proven that defendants committed four basic misrepresentations or omissions in the mailers and/or the phone scripts, involving a number of sub-misrepresentations or omissions.

#### (1) The existence and/or amount of the "set up fee"

Prior to some point in 2011, Nationwide charged $245 as a one-time set up fee to participate in the IM program. That precise dollar amount was expressly disclosed during the phone enrollment call, and paid for by consumers during the call. In 2011, Nationwide switched to a "deferred fee" model, where consumers were not required to pay a set-up fee at the time of enrolling in the IM program. Instead, the amount of the fee was set to be equal to one of the bi-weekly payments the consumer was agreeing to make, and Nationwide simply kept for itself the first "extra" payment that the consumer made. [6] Nationwide capped the fee at $995. [7]

CFPB first contends defendants did not adequately disclose the existence of the setup fee, and/or its amount in the mailers. The statements CFPB points to, however, are more reasonably are characterized as misrepresentations regarding the actual savings achievable in light of the fee, rather than a failure to disclose the fee. Indeed, the "distinctive, eye-catching bold text" stating "NO UPFRONT FEE" serves as an implied warning that there likely were some fees, rather than deception. [8] As CFPB points to no rule that requires fee details to be disclosed in those initial written solicitations, the mailers present no basis to hold defendants liable for failure to disclose the set-up fee adequately. [9]

**\*5** CFPB further contends that the existence and/or amount of the set-up fee was deliberately concealed and/or inadequately disclosed in the phone conversations when consumers called in response to the mailers. Indeed, the scripts, and the directions for using them, were plainly designed to minimize the attention a consumer likely would pay to the set-up fee. CFPB particularly objects to the fact that the amount of the fee is not stated in dollars, but is instead merely referenced as "one bi-weekly payment."

The dollar amount of the bi-weekly payments is clearly disclosed. Moreover, because it is the amount a consumer who enrolls in the program will thereafter be expecting to have withdrawn from his or her account every two weeks, any consumer acting reasonably under the circumstances will have that dollar figure well in mind. CFPB's insistence that it is too much to ask the consumer to "cross-reference" the set-up fee amount to the known amount of the bi-weekly payment is not persuasive.

After the point in time that the amount of the bi-weekly payment has been calculated and disclosed to the consumer, the scripts direct Nationwide's representatives as follows:

Your one-time deferred set-up fee, which covers your lifetime program enrollment, is equal to just one standard biweekly debit.... We will simply deduct it from the first extra biweekly debit that occurs on the program within the first 6 months. The remaining extra biweekly debits will go 100% to the principal of your loan. (Pause here.) Do you have any questions? (Make sure customer understands this specific point.)

See Trial Exh. 13. [10]

Nationwide's representatives are also directed to read that paragraph in response to any question from a potential customer as to what the program costs if the bi-monthly payment amount has already been calculated. If not, the representative is directed to do that analysis with the customer first, and then to read the paragraph. See Trial Exh. 15.

The enrollment contact every Nationwide customer is required to sign states:

SETUP FEE. By signing below, I acknowledge that I agree to a non-refundable deferred setup fee equivalent to one bi-weekly debit and that I currently owe that amount to NBA; and I authorize NBA to collect such amount by deducting it from the amount it collects from my Designated Account. In addition, if I cancel my enrollment in the Program for any reason before I have paid such amount in full, I authorize NBA to collect the unpaid balance by electronically debiting the Designated Account.

This paragraph regarding the setup fee appears directly below a paragraph setting out the bi-weekly debit amount. See Trial Exh. 88. Consumers enrolling in the IM program must check a box labeled "I agree" appearing immediately below the setup fee paragraph. [11] Accordingly, CFPB has failed to show that the disclosure of the setup fee is inadequate, or that defendants have made actionable misrepresentations or omissions with respect to the existence or amount of the setup fee, or the cost of the IM program. [12]

### (2) Defendants' affiliation with consumer's lenders

**\*6** CFPB contends that defendants' mailers and phone scripts create a misleading impression as to the relationship between Nationwide (or LPA) and the potential customers' lenders. As noted above, the mailer envelopes that revealed the lender's name through the window also included a notice that Nationwide/LPA was not affiliated with the lender. The mailers themselves typically contained a more robust disclaimer that Nationwide/LPA was not "affiliated, connected, associated with, sponsored, or approved by the lender." Although those disclaimers appeared at the bottom of the page, they were printed in the same size font as the body of text. *Cf*, *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)("Fine print" disclaimers on the *reverse* side of mailers insufficient to preclude misleading effect.).

Additionally, other portions of the marketing materials and the telephone scripts would necessarily make clear to consumers that Nationwide was independent from the lender, including the fact that Nationwide's representatives had to obtain monthly payment figures from the customers, and various statements by which Nationwide contrasted itself from the lender. At least by the time of enrollment, no reasonable consumer could have been laboring under any misunderstanding that Nationwide was the lender, or even directly affiliated with the lender.

The law is clear, however:

A later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (per *curiam*) (explaining that advertising is deceptive "if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract").

*Gordon, supra*, 819 F.3d at 1194 (9th Cir. 2016).

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 7 of 33

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

Here, the disclaimers on the mailer envelopes and at the bottom of the mailers ordinarily will be sufficient to preclude any reasonable consumer from believing that Nationwide actually was the lender, or meaningfully affiliated with the lender. Nevertheless, a reasonable consumer likely would be confused—and therefore misled—by the net impression created by many of the mailers, which contained additional language designed to instill in potential customers a sense that they had some kind of existing obligation by virtue of their loan to respond to the mailers. Examples include mailers marked "Second Notice," and those including statements such as "If you waive the biweekly option, you will be asked to confirm that you understand you are voluntarily waiving the interest saving and loan term reduction achieved with the biweekly option." See, *e.g.*, Trial Exh. 42. Indeed, even the name "Loan Payment Administration," while perhaps an accurate description of the service defendants provide, potentially creates an initial impression that the consumer is being contacted by some arm or department of the lender.

That some of the mailers actually create a misleading impression is evidenced by the fact that Nationwide's scripts include responses to be given to callers who ask whether Nationwide is, or is affiliated with, the lender. [13] Accordingly, CFPB has adequately shown that some, but not all, of the mailers are likely to mislead consumers acting reasonably under the circumstances. The record does not contain a basis for determining how many of Nationwide's customers would have been impacted by this issue. [14] As such, these misrepresentations contribute to the liability finding, and must be addressed in the injunctive relief. They provide less support for monetary relief, however, than do the misrepresentations and omissions that can be presumed to have been material to virtually all Nationwide customers.

### (3) Timing and amount of interest savings

**\*7** Second only to the question of whether the set-up fee was adequately disclosed, the parties' focused most heavily on whether Nationwide's representations as to the timing and amount of interest savings were false or misleading. CFPB relied on the testimony of its expert witness, Neil Librock, who opined that given the setup fee and the per-debit fees, the typical Nationwide customer would not reach a "break-even" point until after making approximately nine years' worth of payments under the IM program. CFPB further argues that because consumers on average stay in a specific mortgage for

only four and a half years, most will end up having paid more to Nationwide in fees than they will ever realize in savings.

Librock and CFPB do not dispute that a consumer who participates in the IM program until the loan is paid in full, (1) will pay off the loan sooner, and therefore, (2) will pay less in total interest charges. Librock's analysis is premised on looking at how much total interest a borrower will have already paid as of a particular time under the IM program, contrasted with how much total interest he or she would have already paid at the same point in time without the IM program. Under that mode of analysis, the total decrease in interest payments already made will not exceed the total fees paid until approximately the ninth year, given a loan amount and interest rate that is typical of Nationwide customers.

Apart from certain quibbles not affecting the analysis, defendants do not challenge Librock's math. Rather, they and their expert Harvey Rosen, reject Librock's theoretical approach to the question. [15] Defendants argue that the interest savings resulting from making *any* extra payment towards principal can only be meaningfully measured by looking at the total interest amount that will have been paid by the end of the loan term, given the extra principal payments, and comparing that to what the total interest would have been absent those payments. Defendants point out that Truth in Lending Act disclosures lenders must provide at loan initiation calculate interest exactly that way, and show what the total interest paid will have been assuming monthly payments are timely made over the full term of the loan. Rosen testified that even if a Nationwide customer made only one extra principal payment prior to dropping out of the IM program, the reduction in total interest paid over the full term of the loan would exceed the setup fee and the charge for the one automatic debit.

Defendants further argue that looking at it from the perspective of a reduction in the total interest obligation, it becomes irrelevant that many consumers may refinance before the loan term ends, or even before the "break-even" point claimed by Librock. Because the amount refinanced will be a lower principal balance, the interest savings will automatically carry through to the new loan (although the precise amount of savings may vary, depending on differences in interest rates as between the loans). [16]

The problem with defendants' position is even if they are technically correct, at least some portions of their marketing materials are "likely to mislead consumers acting

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

Case 3:17-cv-00101-RDM Document 521-1 Filed 08/05/20 Page 8 of 33

2017 WL 3948396

reasonably under the circumstances." *Gordon, 819 F.3d at 1192*. Using their calculations for savings over the full loan term, defendants divide that by the number of months and repeatedly represent to potential customers that they will save an "average" of some specific dollar amount per month. Under the same reasoning, defendants make representations that customers will save amounts such as $1500 in the first year, and $5000 after only two years. Defendants also use the same approach in calculating figures they tout as the total savings its customers have already achieved.

**\*8** A reasonable consumer is likely to misunderstand how defendants are using "average" in this context, and is likely to assume the "average" is a caveat to address minor variations or imprecisions in the numbers from month to month. [17] A reasonable consumer is likely not to understand that in terms of actual out-of-pocket dollars being applied as interest each month, the reduction will be minimal until much later in the term of the loan, and that the total "savings" will be even less in light of the fees. In other words, a reasonable consumer is likely to understand the promises of "average monthly savings" or of the savings in the first year in a manner more congruent with the approach taken by Librock. Upon being told, for example, that there will be $1500 in interest savings the first year, a reasonable consumer can be misled into believing that his or her actual interest payments to the lender *that year* will be $1500 less than if he or she elects not to buy the IM program.

To be sure, defendants often included disclaimers explaining that their figures were based on the "life of the loan." [18] Those caveats, however, are insufficient to offset the misleading effect of the assertions about monthly savings, or savings in the first and second year. *See Cyberspace.Com, supra, 453 F.3d at 1200* ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

Additionally, even under defendants' approach, they are forced to concede there is no reduction in the lifetime interest obligation at any time before Nationwide "submits the first extra biweekly debit to the lender that is directly applied to the principal." As that may not occur for several months, and certainly does not occur for some time after Nationwide collects the set-up fee, any and all representations regarding "immediate" savings are misleading. [19]

Plainly, defendants cannot be precluded from offering projected savings calculations under the same method that

lenders are required to use when disclosing lifetime interest savings. Nor is it inherently misleading or unreasonable to use a "life of the loan" assumption, regardless of the fact that most consumers may refinance long before either the original term of the loan, or the shortened payoff period that will result under the IM programs. Thus, except for the problem of customers who cancel after seven days but before an extra principal payment has been made, CFPB has not shown it to be wrongful for Nationwide to "guarantee" savings, or to use savings figures that compare total interest on the same loan over its full term with total interest on the same loan under the IM program. Where defendants went astray was in reducing that to "monthly" and "yearly" savings figures that likely would mislead a reasonable consumer, even if not literally false.

**\*9** Finally, in what may have been a holdover from the time that Nationwide collected the setup fee upon enrollment, some of the marketing materials represented that "100%" of the "extra" payments went to reducing the loan principal. This, of course, was false insofar as the first "extra" payment was retained by Nationwide as the setup fee. While the setup fee itself was adequately disclosed elsewhere, that cannot excuse this misrepresentation.

(4) Consumers' ability to achieve
similar savings without the IM program

Defendants' telephone scripts and promotional videos included multiple statements suggesting to potential customers that, with few exceptions, the only way to achieve savings through making bi-weekly payments was to enroll in the IM program, or perhaps through some other third party "administrator." For example, defendants claimed that "[o]nly a small percentage of lenders actually offer a bi-weekly mortgage program to their customers.... The few lenders who do offer a bi-weekly program require you to set it up through an administrator like us." [20]

For customers whose loans are with lenders who in fact do not offer a biweekly payment option, any inaccuracy in defendants' representations on this issue is immaterial. The evidence shows, however, that defendants actively compiled and maintained a list of lenders who *do* offer some form of a biweekly payment plan, and that some, or perhaps many, of Nationwide's customers had loans with those lenders.

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....
Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 9 of 33
2017 WL 3948396

The record is unclear as to how many lenders offer a biweekly payment option that is functionally equivalent to the IM program—*i.e.*, a program in which one-half the ordinary monthly payment is automatically deducted from the consumer's account, with the result that the loan principal is decreased by the equivalent of one "extra" monthly payment each year. Additionally, under the IM program, payment of the setup fee entitled consumers to use the biweekly payment program indefinitely—*i.e.*, even on different loans if they refinanced later. Payment of the fee also entitled the consumer to use the program on other debts, *e.g.* credit cards. Finally, the fee also entitled consumers to receive the purported benefits of "payment audits." While there was very little evidence as to the degree to which any consumers actually used these other services or as to the value they actually provided, at least in theory they distinguish the IM program from the programs some lenders offer, and therefore could serve as a basis for consumers to elect the IM program.

That said, CFPB has adequately shown that defendants' representations to the effect a consumer must use the IM program, or perhaps a similar program from another third party administrator, were materially misleading when made in the course of enrollment telephone calls with potential customers whose loans were with lenders known to CFPB to offer a functionally-equivalent biweekly payment plan. CFPB has not shown, however, how many of Nationwide's customers fell into that class. As such, these misrepresentations, like those relating to lender affiliation, contribute to the liability finding, and must be addressed in the injunctive relief. Again, however, they provide less support for monetary relief than do the misrepresentations and omissions affecting all the customers.

### D. Statute of limitations

**\*10** Defendants contend this entire action is barred by the three-year statute of limitations of the CFPA. *See* 12 U.S.C. § 5564(g)(1) ("Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates.") Defendants argue the statute began to run on March 3, 2012, when CFPB received a relevant consumer complaint alleging that Nationwide engaged in misleading marketing practices. This action was filed on May 11, 2015, just over two months late, in defendants' view.[21]

The notion that mere receipt of a consumer complaint can trigger the statute of limitations as against CFPB is

unsupported by any authority and would be unworkable. At most, a credible and specific consumer complaint might in some circumstances serve as a "storm warning" and put the CFPB on "inquiry notice" that it should begin investigating. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). As the *Merck* court made clear, however, "discovery" of facts that would prompt a reasonably diligent plaintiff to begin investigating is not equivalent to discovery of the facts constituting the violation, and "does not automatically begin the running of the limitations period." *Id.*

Thus, even assuming the receipt of an unverified complaint from a consumer containing allegations somewhat similar to the claims later pursued by CFPB was sufficient to create a duty for CFPB to begin investigating those allegations, the statute did not begin to run until CFPB "thereafter discover[ed] or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.' " *Id.*[22] Nothing in the record suggests that CFPB actually discovered the facts, or that a reasonably diligent plaintiff would have discovered the facts, in less than the two-plus months between March 3, 2012 and May 10, 2012—the date three years prior to filing. Accordingly, there is no basis to conclude this action is time-barred.[23]

### III. REMEDIES

#### A. Restitution

The CFPA vests the court with broad authority to impose appropriate remedies for any violations.[24] It provides, in pertinent part:

**\*11** The court ... in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law....

Relief under this section may include, without limitation—

(A) rescission or reformation of contracts;

(B) refund of moneys or return of real property;

(C) restitution;

(D) disgorgement or compensation for unjust enrichment;

(E) payment of damages or other monetary relief;

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(F) public notification regarding the violation, including the costs of notification;

(G) limits on the activities or functions of the person; and

(H) civil money penalties....

12 U.S.C. § 5565(a). [25]

Here, CFPB seeks "restitution" on behalf of consumers from Nationwide and LPA, in the amount of $73,955,169, which it established at trial represents revenue from setup fees (less refunds) paid by approximately 126,500 consumers who participated in the IM Program from July 21, 2011 to December 31, 2015. [26] To the extent such restitution is not paid, CFPB also seeks "disgorgement" from Lipsky in the amount of $33,039,299, representing shareholder distributions he received from 2011 to 2015, discussed below. [27] At trial, defendants presented no evidence or argument calling into question the accuracy of these dollar figures. The question, therefore, is only whether restitution, and potentially disgorgement, in these amounts is otherwise appropriate.

Much of Ninth Circuit case law has arisen in the context of egregious frauds where the issue is what the upper limits are on restitution awards. Relatively little guidance exists as to how a court should exercise discretion in circumstances where awarding equitable relief may be less than the full measure that would theoretically be available. As the discussion above reflects, CFPB has not proved that defendants engaged in the type of fraud commonly connoted by the well-worn phrase "snake oil salesmen." Defendants have not shown, and could not show, that the IM Program never provides a benefit to consumers, or that no fully-informed consumer would ever elect to pay to participate in the program.

**\*12** The law is nonetheless clear that it is not automatically a defense to claim a consumer realized some benefit from a product that he or she would not have bought, absent misrepresentations. The Ninth Circuit explains:

> [I]t is dishonest to represent that rhinestone jewelry is actually diamond, and to charge diamond prices for it. A district court may

> properly find that a rhinestone merchant who engages in such practices has behaved in a way that a reasonable person in the circumstances would have known was dishonest or fraudulent.

*F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993).

The *Figgie* court went on to observe:

> The seller's misrepresentations tainted the customers' purchasing decisions. *If they had been told the truth, perhaps they would not have bought rhinestones at all or only some....* The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds *or to refunds for each detector that is not useful to them.*

994 F.2d at 606 (emphasis added).

Thus, in the abstract, *Figgie* arguably would support awarding the restitutionary measure that CFPB requests here—complete refund of all of the setup fees Nationwide's customers paid in the relevant time period, deducting only those refunds previously made. As noted above, however, some of the matters found to constitute misrepresentations or omissions did not apply to all customers. It is also of some consequence that CFPB did not succeed in proving that the setup fee itself was not adequately disclosed. Additionally, the one category of misleading representations that affected all or virtually all Nationwide customers—the timing of savings—involved statements that had an articulable basis in fact. While the literal truth of nearly all of those statements does not absolve defendants of liability for the misleading way they chose to present the savings calculations, it does further undercut the appropriateness of requiring refund of all setup fees customers paid.

Finally, it is worth noting that even in *Figgie*, the restitutionary award was structured in a way that those customers who elected to retain the benefits of the products they had purchased (however minimal) would not receive the

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 11 of 33

windfall of both the benefit and a refund. *See* 994 F.2d at 606 ("The district court's order creates no windfall for Figgie's customers.... Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of returning them for refunds."). While such a structure may not be legally required in every instance, it further underscores that restitution is an equitable remedy, to be applied with as much fairness as is feasible. [28]

Accordingly, taking into account all of the circumstances present here and balancing the equities, the conclusion that follows is CFPB has failed to show restitution of all customers' setup fees is appropriate. Furthermore, CFPB has not offered a basis for any restitution that might be limited in some way so as to make it a just result. Thus, no restitutionary award will issue.

### B. Disgorgement from defendant Lipsky

**\*13** The CFPB sought disgorgement from individual defendant Lipsky, but acknowledged that if the corporate entities complied with a judgment requiring them to make the full measure of restitution requested, disgorgement would be cumulative, and Lipsky would have no obligation to disgorge the shareholder distributions he derived during the relevant time periods. In light of the fact that no restitutionary award is being made, an order for disgorgement by Lipsky is likewise unwarranted.

### C. Statutory Penalties

The CFPA provides: "Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty...." 12 U.S.C. § 5565(c)(1). The statute provides for a basic penalty of up to $5000 per day, with reckless or knowing violations at progressively higher maximum rates. In setting the penalty amount, a court may consider the following mitigating factors:

(A) the size of financial resources and good faith of the person charged;

(B) the gravity of the violation or failure to pay;

(C) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D) the history of previous violations; and

(E) such other matters as justice may require.

Here, CFPB is requesting the maximum first tier penalty of $5000 per day from July 21, 2011, through November 23, 2015, for a total award of $7,930,000. While it may be that CFPB only sought first tier penalties because it believed the restitutionary award would be large, under all the circumstances that penalty figure is appropriate. The record plainly supports an inference that defendants sought to use the most effective sales tactics possible to market the IM program, and that in doing so they were willing to push up against the legal limits. The record also shows, however, that defendants took affirmative steps such as training, quality control, and seeking legal counsel, in an effort to stay on the right side of the line. As such, imposing a penalty at the higher tiers for reckless or knowing violations is not warranted. The aggressiveness with which defendants pushed the line, however, supports imposition of the first tier maximum.

Finally, CFPB proposes that the award be made against "each" defendant, without specifying whether it intends joint and several liability for the $7,930,000 amount, or three separate penalties, each in that amount. Although Nationwide, LPA, and Lipsky are legally three separate persons, there is not a sufficient basis to impose a total penalty of almost $24 million. Accordingly, a single penalty of $7,930,000 will be imposed, for which defendants are jointly and severally liable.

### D. Injunctive relief

The parties are hereby ordered to meet and confer to negotiate as to the form and content of appropriate injunctive relief, which will govern any future operation by defendants of the IM program or any substantially similar program, regardless of how it may be named. Within 30 days of the date of this opinion and order, the parties shall submit a joint proposal, or to the extent they cannot agree, separate proposals. Generally speaking, the injunctive relief should permit defendants to resume operation of the IM program, provided they make changes to the mailers, phone scripts, and promotional videos sufficient to eliminate each of the misleading or deceptive points addressed above.

## IV. COUNTERCLAIMS

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

Defendants' counterclaims allege, in essence, that CFPB acted wrongfully by engaging in extra-judicial "back-room pressure tactics" designed to coerce Nationwide's banking partners to cease doing business with it. The counterclaims were the subject of two rounds of motions to dismiss, and a motion for summary judgment. The first motion to dismiss was granted because Nationwide had failed to set out sufficient plausible facts to show (1) that CFPB had participated in allegedly wrongful conduct as part of the so-called "Operation Chokepoint" program,[29] or (2) that the banks terminated their relationships with Nationwide as the result of any such participation by CFPB in Operation Chokepoint, or any other allegedly wrongful extra-judicial conduct. A second motion to dismiss, however, was denied, because defendants presented additional factual allegations —and arguments regarding the inferences reasonably to be drawn from those averments—that a decision on the basis of the pleadings alone would not have been appropriate.

 **\*14** Then, summary judgment was also denied. The order observed that "the direct evidence tying the CFPB to any actionable wrongs remains thin," but concluded defendants had pointed to enough inferences potentially arising from all the circumstances under which their banking partners terminated the relationships that it would be premature to conclude as a matter of law no reasonable fact finder could find in their favor.

Sitting now as a trier of fact, the Court concludes the evidence at trial—no more robust than that previously presented— does not warrant drawing an inference in this case that CFPB engaged in any "back-room pressure tactics" as part of "Operation Chokehold" or otherwise, or that the banks terminated their relationships with defendants based on any such wrongful conduct by CFPB. Rather, the evidence

supports a conclusion that while the filing of this action itself —a privileged and non-actionable act—may have contributed to the termination of the banking relationships, those relationships were already strained for reasons unrelated to any conduct by CFPB. Lipsky's testimony on the point demonstrates that defendants lack any facts to support the claim of wrongful extra-judicial pressure. Rather, Lipsky testified he has drawn his own conclusion that the banks terminated the relationships because of CFPB's mere identity as the plaintiff in this action. Defendants submitted no evidence from the banks sufficient to establish the factual predicates for their counterclaims, even assuming "extra-judicial" pressure might, in some circumstances, support a claim under the legal theories advanced. Accordingly, the counterclaims fail for lack of proof.

## V. CONCLUSION

On the complaint, CFPB is entitled to judgment in its favor for a statutory penalty of $7,930,000, as against defendants Nationwide, LPA, and Lipsky jointly and severally. CFPB is further entitled to injunctive relief consistent with the findings above, the exact terms of which shall be determined after the parties engage in meet and confer and present their joint or separate proposals, which shall be submitted within 30 days of the date of this opinion and order. CFPB is also entitled to judgment in its favor on the counterclaims.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3948396

## Footnotes

1    Although this opinion differs substantially in form and substance from both parties' proposed findings and conclusions, those submissions were nonetheless very helpful for purposes of tracking and understanding the evidence and the parties' respective contentions.

2    Nationwide offers other options, such as weekly payments, and provides certain other services as part of the IM program, discussed below. The option of other payment schedules does not affect the analysis. For convenience, this opinion and order will hereafter refer only to the bi-weekly payment structure, which is also what the parties focused on at trial.

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

3    Nationwide did not make outgoing telephone sales calls, other than in response to inquiries received from potential customers.

4    Defendants appear to believe that if a "financial detriment" element is added, they can argue there was no "deceptiveness" here because, under their view of how the IM program works, all or virtually all consumers will financially benefit from participating, even if only for a short period of time. Even if that is factually accurate, it would not mean there is no financial detriment. The basic claim here is not that the IM program never could provide a financial benefit, but that consumers are misled into enrolling through misrepresentations and omissions as to the nature and timing of those benefits, and as to how easily similar benefits might be available from other sources at lower cost. If a seller of Blackacre misrepresents some material fact in connection with the sale of the property, it is entirely conceivable that the buyer might still realize an overall financial benefit from the property. If the buyer's gain is less than it would have been had the representations been true, or if the investment would have been more profitable if made elsewhere, however, there still is a cognizable financial detriment resulting from the fraud. Any definition of "deception" that excludes such circumstances merely because a buyer has a net financial gain is not a viable standard.

5    As such, the fourth claim is wholly derivative of the third. CFPB has identified no additional consequences that might flow from labeling any violation of the TSR as also constituting a violation of the CFPB. Indeed, CFPB has not sought any separate remedies under the TSR at all, under either the third or the fourth claim.

6    Consumers had the ability to select which day of the week the payment would be deducted every other week. In every calendar year there are always four months that have five occurrences of any given day of the week. For example, in 2017, there are five Mondays in January, May, July, and October. There are five Fridays in March, June, September, and December. The length of time until a customer would make the first "extra" payment therefore would depend on when he or she signed up, and which day of the week was selected for the automatic withdrawals. It could happen as early as the first month after enrollment (or possibly even in the same month), or could be a few months later.

7    When Nationwide first switched to the deferred fee, the cap was much higher. The parties have not assigned any significance to that fact.

8    CFPB's contention to the contrary that "no upfront fee" would leave reasonable consumers with the impression that there are *no* fees is not persuasive. Although a Nationwide customer testified at trial that she drew that conclusion, her testimony is not sufficient credible evidence standing alone to establish that a reasonable consumer likely would be misled by the language "no upfront fee" into believing there was no fee. Similarly, there is no requirement that defendants disclose the amount of the setup fee in promotional videos.

9    Similarly, there is no requirement that defendants disclose the amount of the setup fee in promotional videos.

10   As noted, the precise wording of the scripts varied to some degree at different points in time. This language is representative.

11   Consumers were also charged $3.50 per automatic debit. CFPB does not contend this fee was inadequately disclosed. Indeed, CFPB argues that defendants deliberately emphasized the debt fees as part of their effort to downplay the setup fee. While that undoubtedly is the case, it does not render the disclosures of the setup fee inadequate.

12   That said, in their response to CFPB's request for injunctive relief, defendants have volunteered that upon resuming operations, they will disclose the setup fee as a specific dollar amount in future scripts and contracts. Because doing so will put defendants' practices on more solid ground, they will be held to that promise, and it should be incorporated into the parties' proposal for the terms of the injunctive relief.

13   CFPB faults Nationwide's scripts for not directing representatives to eliminate any possible ambiguity by answering with a simple "no." The scripted response is sufficiently accurate to preclude finding liability based thereon. Nevertheless, an arguably better practice would be for the scripts to direct representatives to give a "no, but ..." answer, rather than never clearly saying "no." A "no, but ..." response would not necessarily have to include the word "but." It could be any answer that begins with a "no" and is followed immediately with a more fulsome explanation.

14   Because CFPB has shown there were other misrepresentations affecting all of Nationwide's customers, the failure to quantify the number implicated by this issue is not critical. It would, however, preclude awarding

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 14 of 33

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

restitution to all customers based only on these misrepresentations, were restitution otherwise appropriate. As such, this issue contributes to the conclusion set out below that CFPB has not shown a restitutionary award to be warranted.

15      Because of illness, Rosen was unable to testify at trial. The parties stipulated to admission of his deposition transcript in lieu of live testimony.

16      Of course, as defendants also point out, the IM program is fully-transferable to any new loan, without a requirement that another setup fee be paid. There was little evidence, though, as to how often Nationwide's customers took advantage of that option.

17      Additionally, at least some mailers did not use the term "average" and instead merely stated a "monthly interest savings" amount. See *e.g.* Trial Exh. 70.

18      Defendants also stated that the figures were "net of fees," which ordinarily means the fees have already been deducted from the numbers given. There is some implication in the briefing that defendants may be using the term to mean that the claimed savings do *not* reflect the fees a customer will have to pay to achieve those savings. If defendants in fact deducted the fees when calculating the stated savings figures, there is not an additional problem. If, however, they are using "net of fees" to mean its opposite, this is another misleading aspect of the marketing materials.

19      Additionally, Nationwide by policy offers only a seven day period in which to cancel, although there was evidence it would waive the setup fee in some other circumstances. In the event Nationwide retains the setup fee even where a customer leaves the program before making the first extra payment towards principal, the "guarantee" of savings will not be realized.

20      No one suggests that a sufficiently self-disciplined consumer could not follow a biweekly payment plan, even where the lender does not accept biweekly payments. For example, the consumer could make transfers of half the monthly mortgage amount from his or her main checking account into another account on a biweekly basis, and then make monthly payments to the lender from that second account—i.e., doing exactly what Nationwide does, but without either the setup fee or the per debit fee. That possibility, however, does not mean the IM program is without value, as it plainly provides both convenience and a substitute for self-discipline that a reasonable consumer might very much like to have.

21      Defendants also suggest that the statute was running as early as 2010, based on information learned by CFPB director Richard Cordray in his prior capacity as Attorney General for the State of Ohio. Defendants have not shown that the Ohio Attorney General's office in 2010 had knowledge of the matters on which the CFPB's claims in this action are based. Indeed, it is undisputed the change to the deferred set-up fee lying at the heart of the present case did not occur until 2011.

22      For the statute of limitations to be running, CFPB necessarily would have to be in possession of sufficient facts to file suit. Had CFPB rushed into court on March 4, 2012 with a complaint based on no information other than the consumer complaint received the prior day, it would have been a clear violation of Rule 11. Plainly the statute was not yet running.

23      Defendants' post-trial briefing raises an additional contention in the nature of an affirmative defense, not previously advanced in this action, that the CFPB is unconstitutional. The arguments defendants make were accepted in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), but that opinion was vacated when rehearing *en banc* was granted, and no new decision has yet issued. Remaining authority is in accord that the arguments are not tenable. *See Consumer Fin. Prot. Bureau v. Navient Corp.*, 2017 WL 3380530, at *13-18 (M.D. Pa. Aug. 4, 2017)(surveying cases).

24      The conclusions set forth above that defendants made certain misrepresentation and omissions is sufficient to support liability under both the "abusive" and "deceptive" prongs of the CFPA and under the TSR. There is no suggestion that separate remedies for those violations would be appropriate.

25      Defendants suggest that under 12 U.S. Code § 5564(a) CFPB is required to elect between civil penalties or "all appropriate legal and equitable relief." Although the statute uses the term "or," in context it plainly is listing non-exclusive options CFPB is permitted to pursue, as is confirmed by the listing of the available remedies set out in § 5565(a).

Consumer Financial Protection Bureau v. Nationwide..., Not Reported in Fed....

2017 WL 3948396

26    At argument, CFPB initially was hard-pressed to identify the rationale on which it selected refund of the setup fee as an appropriate remedy to seek. Ultimately, however, it explained that the setup fee effectively represents the purchase price of the financial services product, which consumers were misled into purchasing—even assuming the setup fee itself was adequately disclosed. Under that reasoning CFPB likely could have also sought refund of the debit charges. Its election not to do so, however, does not warrant rejecting refund of the setup fee as a theoretically appropriate remedy.

27    CFPB additionally seeks civil monetary penalties, as also discussed below.

28    Although *Figgie* involved a tangible product that customers could simply keep if they desired to do so, there could be circumstances under which a similar remedy could be fashioned even where services, as opposed to tangible goods, are at issue.

29    Nationwide alleged "Operation Chokepoint," was a campaign initiated by the United States Department of Justice to force banks to terminate their business relationships with payday lenders, and speculated that the campaign had been extended to other businesses such as its own.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

684 Fed.Appx. 207
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

Vincent Lionel BENJAMIN, et
al.; * Terri L. Griffiths, Appellant

v.

V.I. PORT AUTHORITY; Kenn Hobson, in their
official capacity; Cassan Pancham, in their official
capacity; Virgin Islands Economic Development
Authority; Economic Development Commission;
Percival Clouden, Chief Executive Officer, in his
official capacity; Ritz-Carlton Virgin Islands Inc.;
Marriott International, Inc.; Kelly Tours, Inc.;
Ritz Carlton Club; Plantation Bay LLC; Caneel
Bay, Inc.; CBI Acquisitions, d/b/a Caneel Bay, A
Rosewood Resort; Rosewood Hotels & Resorts
LLC; Starwood Hotels & Resorts Worldwide,
Inc., d/b/a Westin Resort; Windridge, Inc., d/b/
a Windspree; McLaughlin Anderson Villa Rentals;
Virgin Islands Hotel and Tourism Association, f/
k/a St. Thomas and St. John Hotel Association;
Wheatley Taxi Service and Tours; Freddy
Lettsome, d/b/a Dynamic Tours; Alex Bordeaux;
McLaughlin Anderson Vacations, Ltd.; Nancy
Anderson; McAnderson Real Estate, Inc.; East End
Operations, Inc., d/b/a East End Tax Association
Vincent Lionel Benjamin, et al

v.

V.I. Port Authority; Kenn Hobson, in their official
capacity; Cassan Pancham, in their official capacity;
Virgin Islands Economic Development Authority;
Economic Development Commission; Percival
Clouden, Chief Executive Officer, in his official
capacity; Ritz-Carlton Virgin Islands Inc.; Marriott
International, Inc.; Kelly Tours, Inc.; Ritz Carlton
Club; Plantation Bay LLC; Caneel Bay, Inc.; CBI
Acquisitions, d/b/a Caneel Bay, A Rosewood Resort;
Rosewood Hotels & Resorts LLC; Starwood Hotels
& Resorts Worldwide, Inc., d/b/a Westin Resort;

Windridge, Inc., d/b/a Windspree; McLaughlin
Anderson Villa Rentals; Virgin Islands Hotel and
Tourism Association, f/k/a St. Thomas and St.
John Hotel Association; Wheatley Taxi Service
and Tours; Freddy Lettsome, d/b/a Dynamic
Tours; Alex Bordeaux; McLaughlin Anderson
Vacations, Ltd.; Nancy Anderson; McAnderson
Real Estate, Inc.; East End Operations, Inc., d/
b/a East End Tax Association; Westin St. John
Hotel Company Inc., d/b/d Westin Resort St. John

Nos. 15-1406
|
Nos. 15-3496 & 15-3497
|
Appeal No. 15-1406 Argued on December 8, 2015
|
Appeals Nos. 15-3496 & 15-3497 Submitted
under Third Circuit LAR 34.1(a) on July 27, 2016
|
(Opinion filed: March 27, 2017)

**Synopsis**
**Background:** Taxi association and individual taxi drivers
brought action against Virgin Islands Port Authority and
various other defendants, including hotels and another
taxi company, for violating statute granting the association
exclusive concession to provide taxi service to persons
leaving airport. The District Court for the Virgin Islands,
No. 08-cv-00142, Juan R. Sanchez, J., 2015 WL 5535237,
dismissed claims and denied association's attorney's motion
to withdraw as counsel. Association, drivers, and attorney
appealed.

**Holdings:** The Court of Appeals, Roth, Circuit Judge, held
that:

under Virgin Island corporate law, taxi association's litigation
committee lacked authority to act on the association's behalf;

evidence was insufficient to support claim that association's
board of directors independently ordered the association's
counsel to file lawsuit;

under Virgin Islands law, any attempts by taxi association
to ratify decision to file lawsuit were either untimely or
improper; and

district court did not abuse its discretion in dismissing taxi drivers' claims for failure to prosecute.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

 **\*209**  Appeal from the District Court of the Virgin Islands, (D.C. No. 08-cv-00142), District Judge: Honorable Juan R. Sanchez.

**Attorneys and Law Firms**

Virgin Islands Taxi Association (VITA), Desmond Casimir, Leo Casimir, Joseph Frederick, Albert Knight, Winston Parker, Kelvin Peters, Jermaine Petty, George Richardson, Benoit Stuart, Vincent Walters, Michael Williams and Julia Percival, Personal Representative for the Estate of Errol Percival, Appellants in No. 15-3496

Kerry Harrigan, Dr. Thomas E. Donoghue, as the Personal Representative of Patrick Roach, Junior Richardson and Stetson Richardson, Appellants in No. 15-3497

Terri L. Griffiths, Esq. (Argued) P.O. Box 8647 St. Thomas, VI 00801 Counsel for Appellants in No 15-1406

Before: [*] FISHER, KRAUSE and ROTH, Circuit Judges

OPINION [**]

ROTH, Circuit Judge

Attorneys representing the Virgin Islands Taxi Association (VITA) and sixty-seven individual taxi drivers brought an  **\*210**  action in the District Court of the Virgin Islands against the Virgin Islands Port Authority and various other defendants, including hotels and another taxi company, for violating the exclusive taxi concession at Cyril E. King Airport on St. Thomas. The District Court dismissed VITA's claims and the claims of three individual drivers because the attorneys lacked authorization to file suit on behalf of VITA or the drivers, while the claims of the remaining drivers were dismissed for failure to prosecute. As this dismissal was being adjudicated by the District Court, Terri Griffiths, one of VITA's attorneys, appealed an order denying her motion to withdraw as counsel. We will affirm the District Court's dismissal of all claims, and we will consequently dismiss

as moot Griffiths' appeal of the order denying her motion withdraw.

**I.**

A Virgin Islands statute passed in 1986 granted VITA an exclusive concession at Cyril E. King Airport to provide taxi service to persons leaving the airport. The Virgin Islands Port Authority, which manages the airport, was responsible for enforcing the concession by redirecting non-VITA ground transportation. The concession had a ten-year term with an option to renew for an additional ten-year term, beginning with VITA's acceptance of the concession in 1987. The concession was renewed in 1997, and it expired in 2007 after two ten-year terms. In 2012, VITA was granted a new concession by a statute that mirrored the 1987 concession.

In 2008, Griffiths entered an appearance in the District Court of the Virgin Islands on behalf of VITA in an action against the VI Port Authority. [1] Griffiths was directed to file the lawsuit by a litigation committee created by VITA's nine-member board. Allegedly, the litigation committee was created after certain VITA board members with business ties to the defendants leaked materials related to the District Court action. The amended complaint names six board members of VITA as defendants. Another attorney, Lee Rohn, was brought on as co-counsel at the time the lawsuit was filed. In 2009, the case was stayed, pending a determination as to whether Griffiths was authorized to bring a lawsuit on behalf of VITA.

A VITA corporate resolution dated March 2, 2015, stated that Griffiths had withdrawn from representation and that VITA would retain Rohn as legal counsel for the District Court case. The same resolution also sought to ratify the litigation committee's grant of authorization to file the District Court case. On March 30, the District Court held oral argument on the issue of whether the lawsuit had been properly authorized. Rohn submitted an appearance on behalf of VITA and three individual plaintiffs. Following oral argument, the District Court dismissed all claims. Rohn appeals on behalf of VITA and twelve individually named plaintiffs, while Griffiths appeals on behalf of four individually named plaintiffs.

**II.** [2]

On appeal, Rohn argues that the District Court erred in determining that she and Griffiths did not have authority to file suit on behalf of VITA and three of the individually named plaintiffs. Both Rohn and Griffiths further argue that the District **\*211** Court erred in dismissing the remaining plaintiffs' claims for failure to prosecute.

## A.

We will first address whether dismissal of VITA's claims, as well as the claims of the three individually named plaintiffs, was proper. We interpret the District Court's dismissal of VITA's and the three individual plaintiffs' claims as a dismissal for lack of standing. Our review over questions of standing is plenary. [3]

In dismissing VITA's claims, the District Court made three determinations: first, that the litigation committee did not have authority to direct Griffiths to file a lawsuit in 2008; second, that VITA did not otherwise authorize the suit at the time it was filed; and third, that any attempts by VITA to ratify the District Court litigation were either improper or untimely.

Both parties agree that Virgin Islands corporate law governs this case. While plaintiffs argue that Virgin Island law is unresolved on the question of authority to engage in litigation, we agree with the District Court that the statute makes clear that "every corporation" is "managed by a board of directors," unless otherwise provided by the statute or the corporation's articles of incorporation. [4] And, as the District Court explained, 13 V.I.C. § 65 permits the delegation to a committee of powers reserved to the board of directors provided that the committee is formed pursuant to a board resolution, consists of at least two members of the board, and otherwise conforms to any additional requirements in the corporation's bylaws or the resolution itself. [5] One of VITA's bylaws requires that a properly formed committee consist of at least three board members. Because the litigation committee was not formed by a board resolution, in violation of 13 V.I.C. § 65, and included only two board members, in violation of VITA's bylaws, the District Court concluded the committee could not act on VITA's behalf. Rohn, on VITA's behalf, argues that adherence to corporate formalities is not the only means through which a corporation may delegate authority. In support, she cites to a case of this Court, *Schoonenjongen v. Curtiss-Wright Corp.*, where we held that a corporate board "may freely delegate the authority to manage

the business and affairs of the corporation," and that such authority may be express or implied. [6] The District Court concluded that *Schoonenjongen* involved an application of Delaware corporate law, rather than Virgin Islands corporate law, and as such was inapplicable if Virgin Islands law commanded a different result. We find the District Court's analysis persuasive, as it relied on existing Virgin Islands law in rendering its conclusion that corporate authority may only be delegated to a properly-formed committee. Because the litigation committee was not properly vested with authority to act on VITA's behalf, it did not have authority, whether express or implied, to initiate the Federal litigation.

The District Court also determined that VITA's board had not otherwise authorized this action. This conclusion was based on, *inter alia*, the fact that six of the board's nine members were named as defendants in the amended complaint, a lack of any board minutes evincing authorization, and a repudiation of the District Court action by the board's president **\*212** shortly after the action had been filed. Without any evidence that could reasonably support the conclusion that VITA's board authorized this action, we agree that VITA's board did not independently authorize the filing of this suit.

Lastly, the District Court concluded that any attempts to ratify the decision to file the District Court action were either untimely or improper. Finding no applicable Virgin Islands law on ratification, the District Court properly relied on *FEC v. NRA Political Victory Fund*, where the Supreme Court held that ratification, which is governed by principles of agency law, requires "that the party ratifying ... be able not merely to do the act ratified at the time the act was done, *but also at the time that the ratification was made.*" [7] VITA's claims are all premised on harms that accrued in 2007 at the latest—nearly eight years prior to the ratification attempt, and beyond the statutes of limitations of each of VITA's claims, the longest of which is six years. [8] Following *NRA Political Victory Fund,* [9] the District Court determined that VITA's attempt in March 2015 to ratify this suit came too late to be effective. An earlier alleged attempt at ratification —occurring in July, 2010—mentioned only the re-hiring of Griffiths as VITA's attorney, without explicitly mentioning this lawsuit. We find the District Court's application of the Restatement appropriate in the case at hand, and accordingly we adopt its conclusion that any attempts at ratification were either untimely or improper. We will therefore affirm the dismissal of VITA's claims.

Three of the individually named plaintiffs had their claims dismissed for much the same reason that VITA's claims were dismissed: Rohn and Griffiths had no records from these plaintiffs that they had authorized the suit at the time it was filed, and their subsequent attempts to ratify the suit came too late to be effective. Given that the retainer agreements Rohn submitted were dated between February 7 and March 2, 2015, and no evidence of authorization to bring suit at the time the action was commenced was produced, we will affirm the dismissal of these claims as well.

### B.

We next turn to the District Court's dismissal of the remaining plaintiffs' claims for failure to prosecute. We review this dismissal for abuse of discretion. [10]

Before dismissing a case for failure to prosecute, a court must consider and balance the factors identified by this Court in *Poulis v. State Farm Fire & Casualty Co.*:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party

or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of **\*213** alternative sanctions; and (6) the meritoriousness of the claim or defense. [11]

The District Court gave thorough consideration to the *Poulis* factors, noting specifically that all but three of the individual plaintiffs had not appeared before the court or provided any indication of their desire to continue the action. The District Court further noted that, even without applying the *Poulis* factors, the individual plaintiffs' failures to comply with the court's orders would make dismissal appropriate because adjudication of the case had become impossible. The District Court's analysis on these issues was exhaustive, and therefore we find no abuse of discretion.

### III.

For the reasons set forth above, we will affirm the order of the District Court. Additionally, we will dismiss as moot Griffiths' appeal of her motion to withdraw as counsel.

**All Citations**

684 Fed.Appx. 207

## Footnotes

\*    The Honorable D. Michael Fisher assumed senior status on February 1, 2017.

\*\*   This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1    A lawsuit based on the same facts was filed in Virgin Islands Superior Court in 1997. Those proceedings have been stayed pending a resolution in this case.

2    The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

3    *Miller v. Rite Aid Corp.*, 334 F.3d 335, 340 (3d Cir. 2003).

4    13 V.I.C. § 61.

5    13 V.I.C. § 65.

6    143 F.3d 120, 127 (3d Cir. 1998).

7    513 U.S. 88, 98, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994).

8    5 V.I.C. § 31(3)(A) (imposing a six year statute of limitations for a breach of contract claim).

9    513 U.S. at 98, 115 S.Ct. 537 (explaining that where "an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time" (quoting Restatement (Second) of Agency § 90)).

10   *Spain v. Gallegos*, 26 F.3d 439, 454 n.17 (3d Cir. 1994).

11   747 F.2d 863, 868 (3d Cir. 1984) (emphasis removed).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

C

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 23 of 33

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

2007 WL 9702557

2007 WL 9702557
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

FIRST TELEBANC CORP., a/k/a Net
First Financial Corporation, Plaintiff,

v.

FIRST UNION CORPORATION, Defendant.

CASE NO: 02-80715-CIV-GOLD/TURNOFF

|

Signed 08/06/2007

**Attorneys and Law Firms**

Atlee W. Wampler, III, Wampler Buchanan Walker Chabrow
Banciella & Stanley PA, Pinecrest, FL, Barry Steven
Mittelberg, Barry S. Mittelberg, P.A., Coral Springs, FL, J.
Stephen Walker, J. Stephen Walker PC, Michael J. Rovell,
Rovell & Associates, Chicago, IL, for Plaintiff.

Karen Jessica Jerome Smith, Groelle & Salmon, Wellington,
FL, Padmavathi Ghanta Hinrichs, Padma Hinrichs, P.A., Palm
Beach, FL, Susan Fleischner Kornspan, Boca Raton, FL, for
Defendant.

**ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT: CLOSING CASE**

THE HONORABLE ALAN S. GOLD, UNITED STATES
DISTRICT JUDGE

**\*1** This cause comes before the Court on Defendant First
Union's Motion for Summary Judgment **[DE 35]** and its
Supplemental Motion for Summary Judgment **[DE 79]**. I
have reviewed the Motions, the Plaintiff's Responses, and
the Defendant's Replies, and I have heard argument from
the parties. In addition, I have reviewed all exhibits and
supplemental filings of the parties. Upon consideration of the
record in this case, in light of the relevant legal standards and
case law, I grant summary judgment in favor of First Union.

**I. Factual Background**

The early background of this case was set forth by Florida's
Fourth District Court of Appeals in *Net First Nat'l Bank v.*

*First Telebanc Corp.,* 834 So. 2d 944 (Fla. 4th DCA 2003).
The parties do not dispute the facts as set forth by that court:

This complex case involves two groups of investors
battling for control of Net First National Bank ("the Bank")
and the Bank's sole shareholder, First Telebanc Corporation
("the holding company"). The events leading to the present
rift in leadership began in January 1999, when the directors
of the Bank appointed Keith Duffy to fill a vacant director
position. Sometime prior to May 2000, the Bank was
designated a "troubled institution" under the Financial
Institutions Reform, Recovery, and Enforcement Act of
1989 ("FIRREA").

In June 2000, Duffy began acting as president and chief
executive officer of the Bank. Throughout this time,
the Bank experienced increasing financial difficulties,
resulting in a Consent Order and Stipulation between the
Office of the Comptroller of Currency ("OCC") and the
Bank. The order gave the OCC increased oversight of the
Bank's business dealings, most importantly a veto power
over any proposed senior executive officer.

Pursuant to FIRREA requirements, Duffy submitted a form
914 Notice to the OCC detailing his qualifications for
his senior executive and director positions with the Bank.
Duffy was later interviewed, and the OCC declined to grant
him authority to act as a senior executive of the Bank,
stating that he did not have sufficient experience to hold a
leadership position in a "problem bank." The OCC did not
object at that time to Duffy's continuing as a director.

In February 2001, however, the OCC nullified its non-
objection to Duffy serving as director. In a five-page
letter, the OCC detailed material misrepresentations and
omissions Duffy made in the biographical portion of his
914 application and his interview. The OCC found that
Duffy gave a false answer and omitted material information
regarding his past involvement with a state-chartered bank,
then continued to misrepresent facts and give inconsistent
explanations in subsequent documents and his interview.

At the center of Duffy's misrepresentations to the OCC was
his past involvement with a state-chartered bank. Duffy
failed to disclose that his application to serve as president
of the state bank was disapproved by Florida's Department
of Banking and Finance, Duffy also failed to disclose that
after disapproval, he continued to serve as president of
the state bank, in violation of the Department's numerous
demands that he step down. The state bank was in poor
financial condition and under a cease and desist order

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 24 of 33

2007 WL 9702557

from the State Comptroller when Duffy arrived, and it deteriorated further during his tenure, with criticism of his performance including "inappropriate insider transactions involving Duffy-related companies, a number of violations of laws, and continued noncompliance with the cease and desist order." As a result, the OCC withdrew its approval for Duffy to have any connection with Bank leadership.

**\*2** In September 2000, the Federal Reserve Bank notified the board of the holding company that the OCC decision not only precluded Duffy from serving as a director of the Bank, but governed his actions as a director of the holding company as well. The Federal Reserve warned that "holding company board of directors' minutes should clearly note Mr. Duffy's abstention from all policymaking decisions regarding the bank." Several months later, in May 2001, the holding company elected six directors of the Bank. They included Duffy, Randall Rossilli, and Laura Pugliese, with Duffy's directorship subject to the outcome of a pending appeal of the OCC nullification. The OCC responded by advising the Bank's directors that "Mr. Duffy may not participate in the affairs of the bank or otherwise act as an 'institution affiliated party' in board meetings or under any other circumstances," and that such participation subjected other directors to civil penalties. Duffy's appeal of the OCC nullification was resolved against him.

*Id.* at 946-47. The controversy continued. As of September, 2001, the holding company board consisted of Duffy, Rosselli, and Bradley Groves. *Id.* at 947. Over the next several months, numerous board meetings and shareholder meetings were held; new board members were appointed, and ultimately the shareholders voted to remove Duffy and Groves from the board, and elect a new slate of board members. *Id.* Duffy led a group of Plaintiffs who filed suit against both the bank and the holding company, seeking temporary injunctions to stop the shareholders from removing him from the board. After several unsuccessful attempts, Duffy succeeded in gaining the injunction. *Id.* at 948. The trial court ordered as follows:

> 1. Defendants, and anyone acting in concert with Defendants, are enjoined in any way from acting in any official capacity on behalf of [the holding company], as director or otherwise.

> 2. Defendants, and anyone acting in concert with Defendants, are enjoined from interfering with Duffy and Groves' performing their duties as the lawful Board of Directors of [the holding company].

> 3. Defendants, and anyone acting in concert with Defendants, are enjoined from interfering in any way with the access of Duffy or Groves to the corporate funds, records, or offices of [the holding company].

> 4. [The holding company], Duffy and Groves shall, within 60 days, call an annual meeting, at which meeting the shareholders of [the holding company] shall elect directors as required by the Articles of Incorporation and Bylaws of [the holding company].

> 5. L. Pugliese, Rossilli, Connors, and Pasley are hereby enjoined from acting as directors of Net First National Bank.

> 6. Plaintiffs shall file an injunction bond in the amount of $ 250,000.00 within 72 hours of the entry of this Order or the injunction set forth herein shall be immediately dissolved.

*Id.* at 948-49. Less than one month after the trial court issued the injunction, the OCC closed the Bank and named the Federal Deposit Insurance Corporation ("FDIC") receiver. *Id.* at 949.

The case was appealed, and came before Florida's Fourth District Court of Appeals. The court reversed the trial court, and lifted the injunction. In its decision, the court made various findings of fact. Notable among those findings was the fact that Duffy did not have the legal right to act as he did regarding the makeup of the board:

> Duffy was precluded from any leadership role in the Bank because of material misrepresentations and omissions made to the OCC, but at the injunction hearing he described himself as the Bank president. The picture that emerges from these facts is not that the Plaintiffs had a substantial likelihood of success on the merits or a clear legal right to injunctive relief.

> \* \* \*

> Not only does Pugliese's potential status as a director of the holding company cast doubt on Duffy and Groves's actions at the November 20 meeting, Duffy acted beyond his legal capacity in voting on policy decisions affecting the Bank.

*Id.* at 949-50.

While the state court case between Duffy, the bank, and the holding company was ongoing, the Plaintiff in this case, First Telebanc, filed suit against First Union Bank in

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 25 of 33

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

2007 WL 9702557

state court. First Union removed the case to the Southern District of Florida based on diversity jurisdiction on July 30, 2002. [DE 1]. First Telebanc had three claims against First Union: breach of contract, negligent misrepresentation, and fraudulent inducement. The case was at the time assigned to the Honorable Wilkie Ferguson; he adopted the Report and Recommendation of Magistrate Judge Snow, and dismissed Counts II and III of the Complaint. [DE 32]. Only the breach of contract claim remained.

**\*3** On February 27, 2003, First Union filed a motion to stay the case, on the grounds that it had learned of the decision entered by the Fourth District Court of Appeals cited above. [DE 24]. In its motion, First Union requested that the case be stayed until it was able to file a motion for summary judgment against First Telebanc. First Union attached to its motion a letter from counsel for the board of directors of First Telebanc. The letter states, in relevant part, as follows:

> As you are aware, we represent the Appellants in the appeal in which the 4th DCA has recently issued an opinion and Mandate. (See copies enclosed). In summary, the opinion overturns Judge Wessel's preliminary injunction in its entirety, and contains significant findings regarding your clients (Mr. Duffy in particular) and their position vis a vis First Telebanc. While we understand that the Appellees are trying to obtain rehearing in this matter, the Mandate is in effect and as a result, our clients are the ones who have authority to undertake actions on behalf of Net First Financial ("former bank holding company), including the commencement of prosecution of litigation. We are aware of at least two legal actions filed by your firm on behalf of former bank holding company. These include a legal action against First Union (now "Wachovia") related to the sale of Boca Raton National Bank.
>
> Our clients believe that any such action is baseless, frivolous and without merit and is designed to cover the negligence of Mr. Duffy and his various counsel in failing to properly operate/represent the bank after its acquisition, failing to initially structure the transaction and closing documents properly, failure to complete a proper due diligence and understand the regulatory "status" of the bank during the period of ownership by First Union as opposed to it operating as a stand along entity post-closing, and other matters which would preclude any claim against this entity. Regardless, it is my client's belief that no claim exists or should be pursued against First Union/Wachovia and that any pending action in this regard should be dismissed.

> We are therefore demanding that the pending action be dismissed. We further demand that you provide this office with a list of any and all action of which you are aware which are being prosecuted or defended by First Telebanc, and that you take no further action in those lawsuits without first consulting with this office.

One month later, on April 9, 2003, First Union filed a motion for summary judgment against First Telebanc. [DE 35]. The basis of the motion was that the lawsuit had been initiated by Duffy on behalf of the bank, and that Duffy had no legal authority to act on behalf of the bank. At about the same time, the board of directors of First Telebanc moved to intervene in the action between Duffy and First Union, claiming that Duffy lacked authority to pursue the action on the bank's behalf.

On May 22, 2003, the case was reassigned to me. [DE 45], Shortly thereafter, Magistrate Judge Snow issued a report and recommendation that First Union's motion for stay be granted. I adopted the report and recommendation, and set oral argument on First Union's motion for summary judgment. [DE 55, 60]. On August 15, 2003, I heard oral argument on the motion for summary judgment. At that argument, the parties argued that the case should be stayed pending the outcome of the state case still ongoing in the Fifteenth Judicial Circuit, Palm Beach County. That case involved decisions required by the Fourth District Court of Appeals' remand to the state court to determine who legally comprised the board of directors of First Telebanc. I decided that the most prudent course of action was to stay the case pending a decision by the state court, to avoid the possibility of conflicting findings between the two courts. [DE 66], First Union moved for reconsideration of the order, which I denied, finding that First Union would suffer no prejudice from the stay. The case was therefore stayed pending the outcome of the state court case. [DE 68].

**\*4** On December 4, 2006, First Telebanc moved to reopen the case, as the state court case was closed. [DE 69]. First Telebanc informed this Court that the parties to the state court case had settled the matter, and in the settlement had agreed that

> With respect to the past business affairs of the Company (i.e. First Telebanc), the Board of Directors of First Telebanc were Duffy, Groves, and Rosselli. Further, the Company

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 26 of 33

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

2007 WL 9702557

and specifically Duffy, on behalf of the Company, had the authority to file and pursue the lawsuit filed by the Company against Wachovia Bank f/k/a First Union National Bank ... All parties acknowledge that from this point forward, Duffy and Groves are the only Directors of the Company.

First Telebanc argued that the

[d]isposition of state court proceedings in Palm Beach County Circuit Court as outlined above establishes unequivocally that at all times material to this case, Keith Duffy had the authority to act on behalf of First Telebanc in regard to the filing and prosecution of First Telebanc's complaint against First Union Corp.

[DE 69].

First Union responded, arguing that the case should not be reopened, because no judicial determination had been made regarding the makeup of the board of directors, which was a condition precedent to reopening the case. Alternatively, First Union argued that its motion for summary judgment should be granted for the same reasons earlier argued: that Duffy did not have the authority to litigate the case on behalf of First Telebanc. [DE 70]. On January 16, 2007, I granted First Telebanc's motion to reopen the case, and set a briefing schedule for First Union's renewed motion for summary judgment. [DE 78]. In its supplemental motion for summary judgment, First Union argues that summary should be granted on the grounds that Duffy did not have the authority to pursue claims against it on behalf of First Telebanc. First Union points to the decision by the Fourth District Court of *Appeals in Net First Nat'l Bank v. First Telebanc Corp.,* 834 So. 2d 944 (Fla. 4th DCA 2003), and the findings of fact contained therein, as described above. First Union also points to the January 10, 2002 affidavit of Randall R. Rossilli, in which he states that on December 18, 2001, a special shareholder's meeting was held, in which Duffy and Groves were unanimously removed from First Telebanc's Board of Directors.

In its response, First Telebanc does not dispute the existence of the *Net First Nat'l Bank v. First Telebanc Corp.* case, nor the existence of the Rossilli affidavit. First Telebanc relies upon the settlement agreement in the state court case, in which the parties agreed that Duffy and Groves, and Rossilli were the only members of Telebanc's board of directors at times material to this litigation. First Union does not dispute the existence of the settlement agreement: only its legal effect.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Bishop v. Birmingham Police Dep't,* 361 F.3d 607, 609 (11th Cir. 2004).

**\*5** The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248; *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir. 2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

Case 3:17-cv-00101-RDM   Document 521-1   Filed 08/05/20   Page 27 of 33

2007 WL 9702557

jury functions, not those of a judge." *Anderson,* 477 U.S. at 255.

Upon review of the record and the parties' arguments, I grant First Union's motion for summary judgment.

### III. Analysis

Several issues must be addressed to determine whether summary judgment should be granted in favor of First Union: (1) whether Duffy had the authority to act on behalf of First Telebanc when he initiated this lawsuit; (2) whether the settlement agreement regarding Duffy's authority creates retroactive authority for Duffy; (3) whether the subsequent ratification by the Board of Directors of Duffy's authority creates retroactive authority for Duffy; (4) whether the second ratification by the Board creates retroactive authority for Duffy; (5) whether First Union has standing to assert Duffy's lack of authority. I will address each issue in turn.

**A. Whether Duffy had the authority to act on behalf of First Telebanc when he initiated this lawsuit**

**1. Duffy lacked authority as President and CEO**

First Union argues that Duffy did not have the authority to file this lawsuit on behalf of the bank. In support of this position, First Union cites to Florida statutes and case law which hold that only the directors of a corporation have the power to manage the business affairs of a corporation-including the power to bring a lawsuit-unless the articles of incorporation or bylaws provide otherwise. *See* Fla. Stat. § 607.0801(2)("All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors, subject to any limitation set forth in the articles of incorporation or in an agreement authorized under s. 607.0732"); Fla. Stat. § 607.0206(2) ("The bylaws of a corporation may contain any provision for managing the business and regulating the affairs of the corporation that is not inconsistent with law or the articles of incorporation"); *Citizens National Bank of St. Petersberg v. Peters,* 175 So. 2d 54, 56 (Fla. 2d DCA 1965)("The corporation law of this State vests in directors the management of the corporate business").

In this action, Duffy has stated by way of affidavit that he initiated this lawsuit in his capacity as President of First Telebanc Corporation: not as a director of the corporation.

(Duffy Affidavit, DE 35, p. 187). [1] He also provided no evidence that the Board of Directors authorized the initial filing of the lawsuit. Under Florida law, therefore, Duffy did not have authority to initiate the lawsuit unless the articles of incorporation or the bylaws of the corporation conferred such authority upon him. However, neither the company's articles of incorporation nor its bylaws confer such authority upon the President or CEO. Pursuant to First Telebanc's Articles of Incorporation, *all* corporate powers are vested in the Board of Directors:

> **\*6** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by the Florida Statutes or by these Articles of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts as may be exercised or done by the corporation.

Similarly, the Bylaws vest all power with the Board of Directors:

> All corporation powers shall be exercised by or under the authority of the Board of Directors, and the business and affairs of this Corporation shall be managed under the direction of the Board of Directors.

As noted above, First Telebanc has provided no evidence that the Board of Directors ever approved the filing of this lawsuit against First Union. In fact, the only evidence as to whether the Board approved the action shows the opposite; the letter from the Board's counsel expressly directs Duffy to dismiss the action, because the Board had determined that the case was "baseless, frivolous, and without merit." (DE 81-2). In accordance with Florida law and First Telebanc's Articles of Incorporation and its Bylaws, Duffy acted without authority in his initiation of this lawsuit against First Union.

### 2. Duffy lacked authority due to the mandate of the OCC

Notably, First Telebanc fails to address, *in any fashion,* the determination by the Office of the Comptroller of Currency ("OCC") that Duffy was prohibited from participating in the affairs of the bank. As discussed above, the OCC expressly held that "Mr. Duffy may not participate in the affairs of the bank or otherwise act as an 'institution affiliated party' in board meetings or under any other circumstances." As the Fourth District Court of Appeals held, this decision by the OCC precluded Duffy from having any legal right to seek relief on behalf of the bank.

During oral argument, First Telebanc argued that Duffy was not acting on behalf of the bank itself, but only on behalf of the holding company. The OCC, argues First Telebanc, could not forbid Duffy to act on behalf of the holding company. This argument is disingenuous. The holding company had only one asset: the bank. The affairs of the holding company are therefore necessarily the affairs of the bank itself. Moreover, this argument is ineffective for the reasons stated above; *i.e.,* that Duffy, as President and CEO, had no authority to initiate the lawsuit in any event.

The OCC is a federal agency charged with regulating banking throughout the nation. 12 U.S.C. § 1. "The National Bank Act establishes the primacy of the federal government, through the Office of the Comptroller of the Currency, as the regulatory authority over national banks." *Bank of Am., N.A. v. McCann,* 444 F. Supp. 2d 1227, 1231 (N.D. Fla. 2006). The decision of the OCC was clear that Duffy was precluded from participating in any fashion with the affairs of First Telebanc. He therefore had no authority to initiate the instant lawsuit against First Union.

### 3. Duffy's authority to act is barred by the Fourth District Court of Appeals' Decision

First Telebanc also fails to acknowledge the effect of the Fourth District Court of Appeals' opinion. First Telebanc claims that the Fourth District Court of Appeals merely reversed the preliminary injunction because it found that Duffy did not have a substantial likelihood of success on the merits, and made no factual findings as to whether or not Duffy had the authority to file suit against the board of directors. First Telebanc is mistaken. The Fourth District Court of Appeals did, indeed, make factual findings concerning Duffy's authority: "Duffy was precluded from

any leadership role in the Bank because of material misrepresentations and omissions made to the OCC ... Duffy acted beyond his legal capacity in voting on policy decisions affecting the Bank." *Net First Nat'l Bank v. First Telebanc Corp.,* 834 So. 2d 944, 949-950. (Fla. 4th DCA 2003). The court further found that "The ultimate effect of the injunction was to wrest physical control of the Bank and its assets from Defendants and hand it to Duffy, when Duffy was precluded by federal authority from participating in running the Bank, at the Bank level and the holding company level." *Id.* at 949.

**\*7** Neither of the parties have raised the issue of whether collateral estoppel or the doctrine of the law of the case prevents this Court from considering the issue of Duffy's legal authority to act on behalf of First Telebanc in the wake of the Fourth District's opinion. However, I need not raise that issue *sua sponte,* because summary judgment is appropriate for First Union for other reasons. [2]

### 4. Duffy was without authority to initiate the lawsuit

Viewing all of the undisputed facts in the record before me, I must conclude that at the outset of the litigation in this case, Duffy had no authority to act on behalf of first Telebanc. Duffy was therefore without authority to bring suit on behalf of Telebanc against First Union. First Telebanc has failed to raise any genuine issue of fact to refute the fact that the lawsuit was improperly filed. This case must therefore be dismissed unless some future actions conferred retroactive authority upon Duffy such that he could properly file the lawsuit.

### B. Whether the settlement agreement provided retroactive authority for Duffy to initiate this lawsuit

First Telebanc argues that the settlement agreement between Duffy, Groves, and Rossilli confirms that Duffy had authority to act on behalf of Telebanc when he originally initiated this lawsuit. In particular, First Telebanc focuses on the portion of the settlement agreement that reads:

> With respect to the past business affairs of the Company (i.e. First Telebanc), the Board of Directors of First Telebanc were Duffy, Groves, and Rosselli. Further, the Company and specifically Duffy, on behalf of the Company, had the authority to file and pursue the lawsuit filed by the

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

2007 WL 9702557

Company against Wachovia Bank f/k/
a First Union National Bank.

First Union argues that the settlement agreement reached between the various parties to the state court lawsuit has no legal effect relevant to a decision in this case. I concur with First Union. [3]

When I originally stayed this case pending the outcome of the decision in the state court as to who comprised the board of directors, I was concerned that some holdings in this case might create conflict with determinations of the state court case. That court, however, never made any judicial determination as to who comprised the board. The parties to that case entered into a negotiated settlement, which is not binding upon this Court, nor binding upon the Defendant in this case, First Union, who was not a party to the state court action. Upon review of the record, it is clear that the issue of who were the members of the board of directors of First Telebanc at the time of the lawsuit is irrelevant to the question of whether Duffy had the authority to initiated the lawsuit. In his affidavit, Duffy acknowledged that he, alone, initiated the lawsuit, and there is no dispute between the parties that Duffy, alone, initiated the lawsuit in this case. Duffy states in his affidavit that he initiated the lawsuit in his capacity and President and CEO of First Telebanc. As discussed above, under Florida law Duffy had no authority to act in that capacity. Additionally, given the undisputed fact that the OCC-a federal body governing national banks-had prohibited Duffy from acting in connection with First Telebanc in any fashion, the makeup of the board at the time of the lawsuit is irrelevant.

**\*8** The self-serving, negotiated settlement agreement cannot retroactively confer authority upon Duffy to file suit when he was precluded from doing so by virtue of Florida law and the OCC. First Telebanc has failed to raise any issue of material fact as to whether Duffy had authority to initiate the lawsuit in this case. The undisputed facts show that he clearly did not.

## C. Whether the Board's ratification of Duffy's action creates retroactive authority for Duffy to initiate this lawsuit

First Telebanc takes the position that, assuming *arguendo* Duffy did not have the authority to initiate this lawsuit, the subsequent ratification of the lawsuit by the Board of Directors endows him with such authority. Attached to its

opposition to First Union's motion for summary judgment are two Resolutions by the Board of Directors of First Telebanc: one grants permission to Michael J. Rovell, Esq., to re-open this case and pursue it on behalf of First Telebanc; the other expressly ratifies Duffy's earlier actions in initiating the lawsuit on behalf of First Telebanc. These documents were executed by Duffy and Groves in October, 2006 and January, 2007.

There is no question that, under Florida law, a board of directors may ratify the previously unauthorized actions of a board member, director, or other office-holder of a corporation. *See Gentry-Futch Co. v. Gentry,* 90 Fla. 595, 612 (Fla. 1925)("While a corporation cannot ratify absolutely void and ultra vires acts, it may, like an individual, ratify any act done on its behalf which it had the power to do or to authorize to be done in the first instance"); *Wimbledon Townhouse Condominium I, Asso. v. Wolfson,* 510 So. 2d 1106, 1108 (Fla. 4th DCA 1987)("We also find merit in appellant's argument that the board of directors of a condominium association may ratify its prior acts"), citing *Hillsboro Light Towers, Inc. v. Sherrill,* 474 So.2d 1219 (Fla. 4th DCA 1985); *Zinger v. Gattis,* 382 So.2d 379 (Fla. 5th DCA 1980).

First Union argues that Florida law also holds that a board of directors may not ratify unlawful acts. First Union is correct in its statement of Florida law, but this alone does not resolve the issue. Florida courts have held that a board of directors may not ratify unlawful acts. *See, e.g., Flight Equip. & Eng'g Corp. v. Shelton,* 103 So. 2d 615, 621 (Fla. 1958) ("It cannot be disputed that a board of directors of a corporation is without power to ratify that which it cannot do directly or that which it could not authorize be done initially. It has no power to ratify a void or illegal act."); *Gentry-Futch Co. v. Gentry,* 1925, 90 Fla. 595,106 So. 473 ("a corporation cannot ratify absolutely void and ultra vires acts"). Other courts, examining basic corporate law principles have similarly held: *Wolf v. Frank,* 477 F.2d 467, 477 (5th Cir. 1973); 2A William M. Fletcher, Encyclopedia of the Law of Private Corporations, § 752 (2000) (noting that, like other cases of agency, a corporation cannot ratify "acts done in violation of law or in contravention of public policy").

Applying these principles, First Union argues that under Florida corporations law, Duffy had no power to initiate the lawsuit against First Union on behalf of First Telebanc; therefore, it argues, the board of directors cannot subsequently ratify Duffy's unlawful act. First Union's position has some

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

Case 3:17-cv-00101-RDM Document 521-1 Filed 08/05/20 Page 30 of 33

2007 WL 9702557

merit. Duffy was proscribed by the OCC from participating in any actions on behalf of the bank. His initiation of the lawsuit, therefore, could be seen as unlawful, in the sense that he lacked lawful authority to initiate the suit. [4]

**\*9** However, the law is clear that a board may ratify any act which it could have originally authorized. As the Florida Supreme Court stated in *Gentry-Futch*, "While a corporation cannot ratify absolutely void and ultra vires acts, it may, like an individual, ratify any act done on its behalf which it had the power to do or to authorize to be done in the first instance." *Gentry-Futch,* 90 Fla. at 612. In this case, while the board of directors may not have been able to authorize Duffy to initiate the lawsuit, the board could have initiated the lawsuit itself. In accordance with Florida law, therefore, the board may subsequently ratify the filing of the lawsuit.

Notwithstanding the board's theoretical ability to ratify the initiation of the lawsuit, problems remain given the facts of this case. First Union points out that the attempted ratification fails as a matter of law under First Telebanc's Articles of Incorporation. The Articles mandate that the "Board of Directors of the Corporation shall be comprised of not less than three (3) nor more than fifteen (15) directors." [DE 35, Exhibit B to Exhibit 4]. The Resolution by the Board, attached in support of First Telebanc's opposition to First Union's motion for summary judgment, is signed by only two Board members, and indeed makes clear that the Board consists of only two members. Without three members, the Board does not comply with First Telebanc's Articles of Incorporation, and therefore cannot take any authorized action.

Moreover, of the two board members ratifying Duffy's action, one is Duffy himself, who was proscribed by the OCC from acting as a director. In *Wolf v. Frank,* 477 F.2d 467, 477 (5th Cir. 1973), the Fifth Circuit, applying Florida corporations law, stated that "We also recognize the general rule that 'ratification can never be made on the part of the corporation by the same persons who wrongfully assume the power to make the contract,' " citing *Flight Equipment & Engineering Corp. v. Shelton,* 103 So.2d 615, 621 (1958).

Viewing all evidence in the record in the light most favorable to First Telebanc, I can only conclude that First Telebanc has not raised a genuine issue of material fact to demonstrate that ratification in this case has any effect.

First Union further argues that the ratification of January 24, 2007 is ineffective because the cause of action is barred by the

statute of limitations. [5] The original Complaint was filed on June 5, 2002, alleging a breach of contract. The allegations in the Complaint make clear that the alleged breach occurred on September 9, 1997, when First Union allegedly failed to make certain disclosures to First Telebanc regarding the financial soundness of the bank sought to be acquired by First Telebanc.

Under Florida law, the statute of limitations on a breach of contract action is five years. Fla. Stat. § 95.11(1)(b). If the cause of action accrued on September 9, 1997, the statute of limitations to bring that cause of action expired on September 9, 2002. *See Medical Jet, S.A. v. Signature Flight Support-Palm Beach, Inc.,* 941 So. 2d 576, 578 (Fla. 4th DCA 2006)("For a breach of contract action, it is well established that a statute of limitations runs from the time of the breach, although no damage occurs until later").

**\*10** While ratification of an unauthorized act may relate back to the original act, such ratification will only relate back if the rights of third parties have not been affected in the interim:

> A corporation, like an individual, may ratify and thereby render binding upon it the originally unauthorized acts of its officers or other agents. [T]he ratification of an act done by a previously unauthorized officer or agent is, unless rights of third persons have intervened, equivalent to a prior authority and relates back and supplies the authority to do such an act.

*Boyce v. Chemical Plastics, Inc.,* 175 F.2d 839, 842 (8th Cir. 1949)(citations and ellipses omitted). In this case, the rights First Union have been affected: specifically, its right to be free from suit under the statute of limitations.

The United States Supreme Court explained the limitations of a party's ability to ratify the acts of its agent:

> If an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time.... "The bringing of an action, or of an appeal, by a purported agent can not be ratified after the cause of action or right to appeal has

2007 WL 9702557

been terminated by lapse of time". Though in a different context, we have recognized the rationale behind this rule: "The intervening rights of third persons cannot be defeated by the ratification. In other words, it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was made*"

*FEC v. NRA Political Victory Fund,* 513 U.S. 88, 98 (U.S. 1994)(emphasis in original). Thus, ratification attempted after the statute of limitations has run on a cause of action is ineffective. *See Town of Nasewaupee bay v. City of Sturgeon Bay,* 251 N.W.2d 845 (Wis. 1977)(dismissing complaint where boards' attempted ratification of unauthorized but timely commencement of lawsuit came after statute of limitations had run); *Miernicki v. Duluth Curling Club,* 699 N.W.2d 787 (Minn. App. 2005)(granting summary judgment where attempted ratification occurred after expiration of statute of limitations).

To permit ratification after a statute of limitations has expired would be to render the limitations periods meaningless. As First Union argues, were a party to have the unilateral power to retroactively ratify its agent's actions years after their occurrence, a defendant could be exposed to liability for an indefinite period of time. Limitations are designed to prevent precisely that type of prolonged exposure to suit.

In this case, while the Board of Directors could have initiated the lawsuit in 2002, it could not now initiate the lawsuit because the statute of limitations is long since passed. The ratification is therefore ineffective, and fails to create an issue of material fact in this case. Duffy did not originally have the authority to file suit against First Union, and the Board's belated attempts to ratify that action fail as a matter of law.

### D. Whether the second ratification by the Board of Duffy's actions creates retroactive authority for Duffy to initiate this lawsuit

**\*11** Following oral argument on First Union's Motion for Summary Judgment, First Telebanc filed with this Court Duffy's resignation from the board, along with a Resolution of the board of First Telebanc. In this Resolution, the Board consists of three members, and does not include Duffy. This new Board ratified Duffy's action in filing the initial lawsuit on June 5, 2002. First Telebanc appears to concede that its earlier attempt at ratification failed on several bases, and attempts to cure those deficiencies with this new ratification.

However, as First Union correctly argues, this new ratification attempt is also legally invalid.

As First Union points out, First Telebanc's new filings are both unsworn and untimely. The Eleventh Circuit has stated that "only 'pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, can be considered by the district court in reviewing a summary judgment motion." *Carr v. Tatangelo,* 338 F.3d 1259, 1273 (11th Cir. 2003). First Telebanc's newly filed Resolution of the Board fits into none of these categories. Instead, it is an unsworn document filed *after* the motion for summary judgment was fully briefed, and *after* oral argument was held. Fed. R. Civ. P. 56(c) provides that" [t]he adverse party prior to the day of hearing may serve opposing affidavits." Clearly, this latest Resolution is not an affidavit, nor was it filed prior to the day of the hearing.

It appears that First Telebanc is attempting to cure its earlier papers, whose deficiencies were made clear during oral argument. For First Telebanc to attempt to change the record at this late stage appears to be merely a last ditch effort to avoid summary judgment. Such a filing is not in accordance with the Rules of Federal Procedure, and need not be considered by this Court.

However, even if I were to consider the effect of this latest attempt at ratification, I would find that it fails as a matter of law. This new ratification is ineffective on the grounds that the statute of limitations has expired on this breach of contract action. As discussed above, the January, 2007 ratification was invalid as time-barred; this new June, 2007 ratification is similarly barred.

First Telebanc has failed to create any genuine issue of material fact to defeat First Union's assertion that this lawsuit was, and continues to be, unauthorized. Duffy has never had the authority to file this suit, and as a matter of law, the Board may not now-ten years after the alleged breach of contract-ratify the action.

### E. Whether First Union has standing to assert Duffy's lack of authority

First Telebanc claims that First Union's motion for summary judgment must fail because First Union does not have standing to assert Duffy's lack of authority. First Telebanc cites no legal authority in support of its position; it merely makes the statement that "[a]lthough First Union clearly had a parochial interest in which faction ultimately was held

Case 3:17-cv-00101-RDM  Document 521-1  Filed 08/05/20  Page 32 of 33

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)

2007 WL 9702557

to be in control of First Telebanc's Board of Directors and therefore this action, at no time did First Union have standing to participate in the resolution of that dispute." First Telebanc misses the point here. First Union did not participate in the state court case in which the identity of the board of directors was at issue, and had no reason to. As First Union has agreed, its position as to the lack of authority for *this* case to go forward has no bearing on who was, or is, a member of the board of directors of First Telebanc. Because the undisputed evidence shows that Duffy initiated the lawsuit on his own, and because he lacked the authority to act, the makeup of the board at any time is simply irrelevant to First Union's position in its motion for summary judgment.

**\*12**  As to whether First Union has standing to question whether this lawsuit against it is proper, it is ludicrous to suggest it does not, A party has standing where it "has a sufficient stake in the controversy, with a legally cognizable interest which would be affected by the outcome of the litigation." *Accela, Inc. v. Sarasota Cty.,* 901 So. 2d 237, 238 (Fla. 2d DCA 2005). First Union clearly has an interest in whether Duffy had the authority to file the lawsuit against it, just as any defendant has an interest in whether the suit against it is properly brought. For the rule to be otherwise, a plaintiff with no connection to another entity could file lawsuits on its behalf, and the defendant would be forced to defend a suit brought by an improper party. For example, should a stranger to the corporation file suit against First Union, alleging that First Union had harmed the corporation, First Union would undeniably have standing to assert that the suit was improperly brought. *See Bend v. Basham,* 471 F.3d 1199 (11th Cir. 2006)(noting that among the prudential requirements for standing, a plaintiff cannot raise the rights of third parties). Given the OCC's decision that Duffy was prohibited from acting on behalf of the bank, a stranger to the corporation would have the same authority to file suit against First Union in this case as did Duffy.

First Telebanc misapprehends the standing issue. It is the plaintiff who must demonstrate its standing to bring the subject action. The United States Constitution limits the jurisdiction of the Federal Courts by permitting them to consider only disputes that rise to the level of being "cases" or "controversies." *Hugh Johnson Enterprises, Inc. v. City of Winter Park, Florida,* 2007 WL 1047071 at \*2 (Slip Copy)(11th Cir. 2007). In order for there to be a real case

or controversy, the plaintiff must have legal authority to initiate the action. Without such legal authority, the case is not ripe for consideration. "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Id.* Independently, this Court may examine whether a plaintiff has standing, and whether, as a result, this Court has jurisdiction to hear a matter. It is the responsibility of the claimant to substantiate, when the issue is raised, that it is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. *Elend v. Basham,* 471 F.3d 1199 (11th Cir. 2006).

In this case, Duffy had no corporate authority to file the lawsuit on behalf of the bank; he therefore had no standing to bring the action. Without standing, there is no case or controversy as to the plaintiff. Upon independent review, therefore, I conclude that this case is not properly before this court, and cannot proceed.

## IV. Conclusion

In light of all of the foregoing, summary judgment must be granted in favor of First Union. Viewing the all of the undisputed facts in the light most favorable to First Telebanc, summary judgment must be entered for First Union as a matter of law.

It is hereby **ORDERED and ADJUDGED** that:

1. First Union's Motion for Summary Judgment **[DE 35, 79] is GRANTED.**

2. First Telebanc's Complaint is DISMISSED.

3. This case is CLOSED.

4. All pending motions are DENIED as moot.

**DONE AND ORDERED** in chambers at Miami, Florida, this 6th day of August, 2007.

## All Citations

Not Reported in Fed. Supp., 2007 WL 9702557

First Telebanc Corp. v. First Union Corporation, Not Reported in Fed. Supp. (2007)
2007 WL 9702557

# Footnotes

1    Florida's Fourth District Court of Appeals also found that Duffy was not a director at the time he initiated the lawsuit, as he had been removed from the board.

2    Notably, under the doctrine of the law of the case, while the trial court on remand from the Fourth District Court of Appeals could have made a determination as to the makeup of the board of directors, it could not determine that Duffy had authority to file the lawsuit, as the Fourth District Court of Appeals had definitively determined that Duffy had no authority to act on behalf of the bank. *Engle v. Liggett Group, Inc.,* 945 So. 2d 1246, 1266 (Fla. 2006)("Law of the case 'requires that questions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings' "). Moreover, under that same doctrine, I could make a finding contrary to that of the Fourth District Court of Appeals only if the decision was "clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (U.S. 1988). Because I do not find that the Fourth District Court of Appeals' decision was clearly erroneous, under the law of the case I conclude that Duffy had no authority to act on behalf of the bank.

3    It is also worth note that while First Telebanc attempts to discard any findings made by the Fourth Circuit Court of Appeals as irrelevant, it attempts to rely upon a settlement agreement in a trial court case as legally binding.

4    This interpretation of "unlawful" is, however, a stretch. This is not a situation in which, for example, a director entered into a contract to purchase cocaine when he had no authority to act for the corporation. No board could ratify that action, as it is clearly an illegal act. In any event, the attempted ratification fails for the reasons discussed below.

5    Notably, the Resolution ratifying Duffy's actions was executed on January 24, 2007, and was attached as an exhibit to First Telebanc's Response in Opposition to First Union's Supplemental Motion for Summary Judgment. In its Reply, First Union raised the argument that the attempted ratification was barred by the statute of limitations. First Telebanc did not request leave to file a sur-reply to address the statute of limitations argument, nor did it address the statute of limitations issue at oral argument.

                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.