## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A.   *Chavez v. IBP, Inc.*,
     No. CV-01-5093-RHW, 2005 WL 8158586 (E.D. Wash. May 18, 2005)

B.   *General Refractories Co. v. First State Insurance Co.*,
     No. CIV.A. 04-3509, 2015 WL 3450391 (E.D. Pa. May 29, 2015)

C.   *In re Engers v. AT&T*,
     No. CIVA 98-CV-3660 JLL, 2005 WL 6460846 (D.N.J. Sept. 9, 2005)

D.   *Lovo v. Express Courier International, Inc.*,
     No. 4:16-CV-853-Y, 2018 WL 6573132 (N.D. Tex. Oct. 24, 2018)

E.   *North Trade U.S., Inc. v. Guinness Bass Import Co.*,
     No. 3:03CV1892CFDTPS, 2006 WL 2263885 (D. Conn. Aug. 7, 2006)

F.   *SEC v. Das*,
     No. 8:10CV102, 2012 WL 425182 (D. Neb. Feb. 8, 2012)

G.   *United States v. Sarraga-Solana*,
     No. CRIM.A. 04-144-6-JJF, 2005 WL 3701472 (D. Del. Oct. 6, 2005)



Chavez v. IBP, Inc., Not Reported in Fed. Supp. (2005)

2005 WL 8158586

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part Chavez v. IBP, Inc., E.D.Wash., June 28, 2005

2005 WL 8158586
Only the Westlaw citation is currently available.
United States District Court, E.D. Washington.

Maria CHAVEZ, et al., on behalf of themselves
and all others similarly situated, Plaintiffs,

v.

IBP, INC., Lasso Acquisition Corporation, and Tyson
Foods, Inc., all Delaware corporations, Defendants.

NO. CV-01-5093-RHW
|
Signed 05/18/2005

**Attorneys and Law Firms**

David N. Mark, Law Office of David N. Mark, Kathryn Goater, William Rutzick, Schroeter Goldmark & Bender, Seattle, WA, for Plaintiffs.

Joel M. Cohn, Michael J. Mueller, Nicole M. Mueller, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Robert C. Tenney, Meyer Fluegge & Tenney, Yakima, WA, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' NEW DAMAGES THEORY, *INTER ALIA*

ROBERT H. WHALEY, United States District Judge

**\*1** Before the Court are Defendants' Motion to Strike Plaintiffs' New Damages Theory (Ct. Rec. 716) and Defendants' Motion to Shorten Time for Hearing on Defendants' Motion to Strike Plaintiffs' New Damages Theory (Ct. Rec. 720). In addition, the parties raise various issues related to the damages phase of the trial in their Damages Trial Briefs. The Court will address these issues in turn.

## I. Defendants' Motion to Strike

The Defendants move to strike the portion of Plaintiffs' damages trial brief that suggests that under the FLSA, employees who have both unpaid non-overtime and overtime, should be paid at their normal rate for non-overtime wages.

Defendants allege that they are prejudiced by the Plaintiffs' failure to disclose their "new damages theory"—that class members should be compensated at their normal rate of pay for meal break damages for weeks where overtime is due—pursuant to Rule 26(a). Defendants state that they relied on the parties' stipulation that *Alvarez* would be collateral estoppel to the meal break issue, and that the new damages theory runs contrary to the stipulation. In the alternative, if the Court denies the motion to strike, Defendants seek leave to withdraw from the stipulation on meal break damages for non-*Alvarez* class plaintiffs.

The Plaintiffs respond that disclosure of their theory was not required under Rule 26(a), because it was not based upon the testimony of an expert witness. Instead, the question of damages calculations, Plaintiffs propose, only require Rule 1006 "human calculator" evidence and number crunching that need not be disclosed under Rule 26(a). The Plaintiffs argue that there has been no prejudice to the Defendants because the theory was disclosed in the deposition of Dr. Nickerson, and the Defendants will have 45 days under the stipulation, after the Final Findings of Fact, to run their damages reports. Furthermore, the Plaintiffs maintain that their FLSA straight-time theory was not precluded by the stipulation, because there were no rulings on the issue in *Alvarez*; thus, no collateral estoppel effect applies.

The Court finds that disclosure of the so called "new damages theory" was not required under Rule 26(a), because it is based merely on damages calculations. The rate at which employees should be compensated for straight time, during periods where overtime is also due, is a question of law for the Court. The method by which those damages are calculated does not turn on conflicting Fed. R. Evid. 702 expert opinions. Instead, the parties are utilizing Drs. Abbott and Munson as "human calculators" under Fed. R. Evid. 1006. Even if the Plaintiffs' Section 778.315 theory amounted to expert evidence under Rule 26(a), the Court would find that there was no prejudice in late disclosure. The damages portion of the trial has not yet commenced, and the parties have stipulated to disclose calculations 45 days prior to the damages trial.

The Court further finds that the Defendants' contention that they would not have entered into the May 2004 Stipulation had they been aware of the Plaintiffs' theory that 209 C.F.R. § 778.315 applied is without merit. The Defendants entered into the May 2004 Stipulation before the Plaintiffs had prepared any damages report. Furthermore, ¶ 93(f) of the Stipulation and Pretrial Order states that the trial will include issues of

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 4 of 46

Chavez v. IBP, Inc., Not Reported in Fed. Supp. (2005)

2005 WL 8158586

"damage calculations." There is no indication that the parties thought they were bound by the Stipulation to raising only damages theories that were raised or decided in *Alvarez.*

## II. Remaining Damages Issues

### A. Meal Break Compensation (Damages Prior to July 1, 2001)

 **\*2**  The parties dispute (1) the rate at which employees should be compensated for their meal break damages; and (2) what amount of the meal-break time should be tallied toward overtime calculations. Plaintiffs contend that all uncompensated meal-break time should be counted toward overtime calculations; Defendants contend that only "active work time" (*i.e.,* donning and doffing during meal breaks) should be counted towards overtime calculations. [1] Plaintiffs further maintain that, under the FLSA, a portion of the meal break should be compensated at employees' normal rate in weeks where employees earn overtime; Defendants disagree.

[1]     The parties agree that all overtime should be paid at time and a half of normal wages. *See* RCW 49.46.130(1).

#### (i) Meal Break Compensation Rate

In *Alvarez v. IBP, Inc.,* 339 F.3d 894, 914 (9th Cir. 2003), the Ninth Circuit found that IBP was liable to any plaintiff under the Washington MWA for the entire 30 minutes if an employee spent any amount of time during unpaid meal period on compensable activities. How damages for the meal break should be calculated (minimum wage vs. straight time) was not an issue on appeal. However, this Court's *Alvarez* contingent findings compensated employees at minimum wage rates for the full 30-minute period, and compensated any resulting overtime at time and a half of normal wages. *See Alvarez* Findings at 37 (finding that "the MWA requires IBP to pay the class members at least the state *minimum wage* for all hours worked"). The Court relied upon *Seattle Prof'l Eng'g Ass'n v. Boeing,* which held that "the WMWA does not assure payment of contractually agreed wage rates; it only requires that an employer pay the minimum wage for straight time." 139 Wash. 2d 824, 834 (2000) (pointing out that Court of Appeals erred in *United Food & Commercial Workers Union Local 1001 v. Mutual Benefit Life Ins. Co.,* 84 Wash. App. 47, 51 (1996) when it wrote: "[u]nder that statutory scheme, an employee has a right to be paid either his or her regular wage or, when appropriate, overtime for all time worked." While

the Court of Appeals was correct with regard to overtime pay, it erred as to minimum wage claims.").

Wash. Admin. Code § 296-126-092(1) provides that

> (1) Employees shall be allowed a meal period of at least 30 minutes which commences no less than two hours nor more than five hours from the beginning of the shift. Meal periods shall be on the employer's time when the employee is required by the employer to remain on duty on the premises or at a prescribed work site in the interest of the employer.

In *Alvarez,* the Ninth Circuit found that the WDLI interpreted this meal break regulation to provide

> a clear, 'bright-line' standard: it requires employers to provide meal-breaks of "at least 30 minutes," and it demands that employers interrupting meal-breaks "pay for the entire meal break, regardless of the length and the number of the work-interruptions or curtailments."

339 F.3d at 913. Under this interpretation, when employers interrupt a meal break, the entire meal break must be compensated for failure to provide a sufficient meal break. There is no distinction made between the time of actual interruption, and the remaining break time. Instead, the bright-line rule classifies the meal period as either entirely compensable, or entirely break.

Plaintiffs point to WDLI interpretive guidelines ES-026 and ES.C.6 as support for the proposition that employees should be paid their normal rate for the active meal break time. As the Ninth Circuit recognized in *Alvarez,* in Washington state "[t]he construction of a rule by the agency which promulgated it is entitled to great weight." *Washington State Liquor Control Bd. v. Washington State Personnel Bd.,* 88 Wash. 2d 368, 561 P.2d 195, 200 (Wash. 1977). ES-026, issued April 1992 and in effect until January 2, 2002, provides that "[m]eal periods are considered hours of work when the employer requires employees to remain on duty on the premises or at a prescribed work site in the interest of the employer." In contrast, "[m]eal periods are not considered hours of work when employees are completely relieved from

2005 WL 8158586

duty and allowed to leave the work site." The regulation also defines the term "on the employer's time", as used in Wash. Admin. Code 296-126-092, to mean "compensable hours of work."

**\*3** Defendants assert that the Court should adhere to the position it articulated in *Alvarez*, and find that meal breaks should be compensated at minimum wage. Furthermore, Defendants argue that the Plaintiffs have not predicated their meal break claim on a contractual theory, and so they should not be able to recover their contractual wage. In *Seattle Prof'l Eng'g*, the court noted that employees who attended an orientation without pay, must be compensable at minimum wage. 139 Wash. 2d at 831 n.3. Regular wages were not available, the court opined, because the employees had not brought suit under RCW 49.52.050 and .070. *Id.* The court noted in *Seattle Prof'l Eng'g* that those sections, not the WMWA, provide the statutory remedy for unpaid wages owing under a contract. *Id.* Here, however, the Plaintiffs have raised contractual claims for failure to compensate. Amended Complaint ¶ 50.

The Court finds that under *Seattle Prof'l Eng'g*, employees must be compensated at minimum wage for time they are not engaged in active work. Workers shall be compensated at contractual wages, however, for the times in which they are engaging in active work (*i.e.* donning and doffing equipment to use the restroom).

### (ii) Overtime Calculations and the Meal Break

Plaintiffs assert that the entire uncompensated meal-break period must be considered "hours of work" under Washington Department of Labor & Industries regulations and guidelines, and all of the time must accrue toward the 40 hour total for overtime calculations. The Defendants argue that only "active work" should be counted in calculating overtime, and "remaining break time" should only be paid at minimum wage without regard to overtime, as a penalty for the failure to have afforded a long enough meal break.

Counting "active work" toward overtime would shift unnecessary record keeping burdens onto employees. In its amicus briefing in *Alvarez*, the WDLI vehemently objected to this Court's finding that employees should receive compensation only for minutes of work performed during a meal break precisely because of the record keeping by employees that would be required. In its brief, the WDLI explained that in order to compensate workers for only the minutes worked during a meal break

[w]orkers would have to record each minute spent working during the unpaid meal break. The record-keeping would have to be exhaustively detailed.... Such is not the intent of Wash. Admin. Code § 296-126-092(1).

Amicus Brief, p. 12. Plaintiffs argue that dividing work into "active work" and break time and paying types of work at different rates would result in the same dilemma noted by the WDLI.

The Court finds that all paid meal break time should be counted toward "hours worked" for overtime purposes. Neither this Court's findings, nor the Ninth Circuit's findings reached the issue of whether the entire 30-minute meal break period (60 minutes when doubled for willfulness), should be counted as "hours worked" towards an employee's overtime calculations. Moreover, Wash. Admin. Code § 296-126-092(1) does not address whether this compensated time must be counted as "hours worked" for overtime purposes. The Court finds that counting all time as hours worked for overtime purposes would best comport with WDLI's interpretation of Wash. Admin. Code § 296-126-092(1).

### (iii) FLSA Straight Time

The Plaintiffs additionally argue that the entire meal break should be compensated at a normal rate of pay, where an employee has worked over 40 hours in one week, because the FLSA requires straight time compensation be paid "under his contract." 29 C.F.R. § 778.315. In their Motion to Strike, the Defendants respond to Plaintiffs' claim that certain meal breaks should be compensated at normal pay rate. The court in *Alvarez* did not make any findings on the impact of the FLSA on calculation of meal break damages.

**\*4** The FLSA regulations provide that whenever overtime is due, employers may comply with overtime regulations only if the employees have been paid for "all the straight time compensation due him for the nonovertime hours." 29 C.F.R. § 778.315. Payment of straight time, in turn, must be according to "contract (express or implied) or ... any applicable statute." *Id.* The Court finds that pursuant to 29

2005 WL 8158586

C.F.R. § 778.315, all meal-time work should be paid at the contractual rate of pay in weeks where both overtime and non-overtime work is performed.

**B. Averaging Technique**
The Defendants ask the court to apply an "averaging technique" to pre-shift claims and meal break claims to approximate the number of employees who are engaging in work. Defendants maintain that this averaging technique should be applied because only a certain number of Plaintiffs store equipment in their lockers (as opposed to taking equipment home), and because only a certain number of Plaintiffs don and doff their equipment or use the restroom during meal breaks. *See Reich v. Waldbaum*, 833 F. Supp. 1037 (S.D.N.Y. 1993), *rev'd on other grounds*, 52 F.3d 35 (2d Cir. 1995) (applying an "averaging" technique, where the calculations took into account that there were no violations as to some employees).

Because the Court finds that Plaintiffs have met their burden of presenting sufficient evidence to show the amount and extent of work as a matter of just and reasonable inference, it declines to apply an averaging technique. *See Anderson v. Mt. Clemens*, 328 U.S. 680, 687-88 (1946).

**C. Five Minutes of Meal Break Time After September 15, 2003**
Where employees did not use the entire 5 minutes of their clothes time at meal breaks in donning and doffing,

Defendants request a "credit" for other damages owed. The Defendants point out that this is how the Court ordered the application of the extra four minutes of clothes time in *Alvarez*. *See Alvarez* Findings at 41:8-10. The Court finds that such a "credit" is appropriate.

**D. Knife Maintenance in Hides**
Defendants propose that they allow compensation of 2/7 of the time required to maintain knives to each employee every work day, to effectuate the Court's findings that Hides workers must be paid "as if they performed pre-shift sanding and steeling 2 of every 7 days that they worked." PFOF at 43. The Court finds that 2/7 compensation per day for knife maintenance is appropriate.

Accordingly, **IT IS HEREBY ORDERED** that

1. Defendants' Motion to Strike Plaintiffs' New Damages Theory (Ct. Rec. 716) is **DENIED.**

2. Defendants' Motion to Shorten Time for Hearing on: Defendant's Motion to Strike Plaintiffs' New Damages theory (Ct. Rec. 720) is **GRANTED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8158586

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 8 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

2015 WL 3450391
United States District Court,
E.D. Pennsylvania.

GENERAL REFRACTORIES COMPANY
v.
FIRST STATE INSURANCE COMPANY, et al.

Civil Action No. 04–3509.
|
Signed May 29, 2015.

**Attorneys and Law Firms**

Mark E. Gottlieb, Meghan K. Finnerty, Michael Conley, William H. Pillsbury, Offit Kurman PA, Philadelphia, PA, for General Refractories Company.

Karen H. Moriarty, Kevin E. Wolff, Coughlin Duffy LLP, Morristown, NJ, for Centennial Insurance Company.

Samuel J. Arena, Jr., Daniel T. Fitch, William T. Mandia, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for St. Paul Travelers Successor to/or formerly known as Aetna Casualty & Surety Company.

American International Ins. Co., New York, NY, pro se.

Century Indemnity Company, Philadelphia, PA, pro se.

*MEMORANDUM*

L. FELIPE RESTREPO, District Judge.

**\*1** Plaintiff General Refractories Company ("GRC"), a manufacturer and supplier of refractory products that at times contained some asbestos, sues its insurance carriers for a declaration of excess insurance coverage against underlying asbestos-related lawsuits and for breach of insurance contract. Since about 1978, GRC has been named as a defendant in a multitude of asbestos-related suits throughout the United States. Each of those insurance carriers has now settled with GRC, except one-Defendant Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company ("The Aetna") (collectively, "Travelers"). A jury trial is scheduled for June 15, 2015. Order, dated Mar. 3, 2015, ¶ 4 (doc. no. 642). [1]

[1]

On July 23, 2004, GRC commenced this action, which was assigned to the calendar of the Honorable Edmund V. Ludwig. On July 19, 2013, it was reassigned to the calendar of the Honorable L. Felipe Restrepo (doc. no. 501). By Order dated August 15, 2013 (doc. no. 509), Judge Restrepo notified counsel that this action would be tried consistent with Judge Ludwig's Order dated April 10, 2013 (doc. no. 482), which bifurcated the insurance regulatory issue for trial first. In addition, counsel were notified that "[a]s to all other matters in this case, this Court has adopted and will follow Judge Ludwig's previous rulings," and "those rulings will not be revisited." Order, Aug. 15, 2013 (doc. no. 509).

A three-day jury trial was held. *See* Trial record ("R."), transcripts dated Jan. 13, 14, and 15, 2014 (doc. nos.590–593). The question presented to the jury was "whether the Pennsylvania insurance commissioner implemented a policy, which was uniformly executed by the insurance department, to disapprove all asbestos exclusions during the time frame at issue." R. 126:20–127:1, dated Jan. 14, 2014 (doc. no. 592); *see also* R. 18:22–19:4, 29:3–13, 249:8–14, dated Jan. 13, 2014 (doc. no. 590); R. 136:1–19, 156:16–24, dated Jan. 14, 2014 (doc. no. 592). The jury returned a verdict in favor of defendants, answering the question presented: "No." *See* R. 4:2–5:4, 5:13–25, dated Jan. 15, 2014 (doc. no. 593). On July9, 2014, by a stipulated dismissal with prejudice (doc. no. 617), Plaintiff GRC and all remaining Defendants-except Travelers-settled this action. On November 3, 2014, a bench trial was held as to the meaning of the "Asbestos Exclusion" contained in two insurance policies that Travelers sold to GRC, providing excess liability coverage for a one-year period, August 1, 1985 to August 1, 1986. *See* R., transcript dated Nov. 3, 2014 (doc. no. 634); Travelers' policies, Def. Trial Exs., D–1, D–2; parties' Stipulations, D–12 at ¶ 9. That Exclusion eliminates insurance for sums, which GRC becomes legally obligated to pay for injuries or loss "arising out of asbestos." Def. Trial Exs., D–1 and D–2. It was ruled that the Exclusion is ambiguous, which requires a ruling that favors coverage for the policyholder, GRC: "That

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 9 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

is, the Asbestos Exclusion is not enforceable and is not effective to preclude insurance coverage for GRC against underlying asbestos-related lawsuits, which sue 'typically ... for bodily injuries, diseases, and fear of contracting the same, allegedly resulting from exposure to asbestos-containing products manufactured, sold, and distributed by GRC.' " Order and Mem., dated Mar. 3, 2015 (doc. nos.637, 636) (quoting Compl. ¶ 23); *Gen. Refractories Co. v. First State Ins. Co.,* No. 04–3509, —— F.Supp.3d ——, 2015 WL 918797 (E.D.Pa. Mar.3, 2015) (Restrepo, J.).

The parties were heard as to "what adjudication, if any, is required going forward to achieve a prompt and complete resolution of this action." Order, dated Mar. 3, 2015 (doc. no. 638); Hr'g Tr ., 30:3–13, 35:10–36:6, 42:13–43:3, dated Mar. 24, 2015 (doc. no. 644). This Memorandum decides the first of the pretrial motions identified by the parties and permitted by the Court. [2]

[2]     Orders, dated Mar. 24 and 25, 2015 (doc. nos.642, 643). *See* the parties' respective Statements of issues for adjudication (doc. nos.639, 640). As permitted, GRC filed two motions (doc. nos.647, 648), and Travelers filed three motions (doc. nos.649, 650,651).

Under Rule 1006 of the Federal Rules of Evidence, Defendant Travelers moves to preclude Plaintiff GRC from introducing at trial a summary-the "Queue"-evidencing settlements of claims asserted against GRC in the underlying asbestos-related lawsuits. *See* Def. Mot., Br. at 1–2 (doc. nos.650, 650–1). The motion contends that GRC has not produced the "actual," "final," and "complete" summary that GRC intends to introduce at trial. *Id.* at 1, 5–7. It is also contended that GRC "has refused" Travelers' request to review documents supporting the summary and has failed to make them available. *Id.* at 2, 11–12. The motion acknowledges receipt of versions of the summary, criticizing them as inaccurate and "missing significant pieces of information" *Id.* at 2, 6, 10. Travelers' reply brief asserts these objections as to a separate summary proffered by GRC—the "Claims Database—which also records information about the underlying claims. Def. Reply at 1–2 (doc. no. 659). This summary, it is said, "bears some of the same deficiencies as the Queue." *Id.*

GRC maintains that under Rule 803(6) of the Federal Rules of Evidence, the Claims Database and the Queue are admissible

summaries of business records. Pl. Resp. at 8–9 (doc. no. 656). GRC also responds that during discovery, Travelers received multiple updated copies of the Claims Database and the Queue, and Travelers had "unfettered access to all of the documents that support the Claims Database and the Queue." *Id.* at 5, 3–7. In addition, GRC asserts that Travelers, "as a primary insurer for GRC, and as a litigant in this matter for over ten years, ... had access to not only GRC's current claims information, but also its historic information as well." *Id.* at 1–3.

Specifically, GRC proffers the Queue, an itemized summary spreadsheet, to evidence settlements in excess of $120 million. *See* Pl. Br. in Support of Mot. Summ. J. at 5 (doc. no. 647–1) (citing Affidavit of Michael Conley ("Conley Aff") ¶ 4, dated April 17, 2015 (doc. no. 646)). The Queue incorporates information taken from the Claims Database. The Queue lists about 31,440 to 34,440 claims for asbestos-related bodily injury claims asserted against GRC. It lists about 25,104 settlements by GRC of those claims. Declaration of Michael Conley ("Conley Decl") ¶ 16, dated May 1, 2015 (doc. no. 657). About 3,145 of the settled claims have been paid for a sum that totals $19,599,066. Conley Aff. ¶ 4 (doc. no. 646); Pl. Resp. at 6 (doc. no. 656).

**\*2** The Queue is "not a static document." Pl Resp. at 9 (doc. no. 656). GRC continues to be sued, and to defend and settle, underlying asbestos-related claims. The Claims Database and the Queue record new information as it is presented to GRC. Both databases incorporate information from documents warehoused in Pottstown, Pennsylvania and Dallas, Texas. *Id.* at 2. In large part, claimants' counsel submitted those documents to support settlements of the underlying claims. *See generally* Hr'g Tr., 3:22–7:9, dated Mar. 24, 2015 (doc. no. 644).

GRC correctly notes that Travelers' motion does not identify a single, specific entry in the proffered summaries as being faulty, inaccurate, or otherwise deficient. *See, e.g.,* Pl Resp. at 1, 10 (doc. no. 656). Travelers does not dispute this, replying only that "GRC is required to present adequate, admissible evidence of damages that would be covered under the Travelers policies." Def. Reply at 1–2 (doc. no. 659). Travelers also does not identify any specific documents that support Claims Database or the Queue as being inadmissible or otherwise faulty.

It is Travelers' position that the summaries, even if admissible, would unfairly prejudice a jury's deliberations. Def. Br. at 2,

Case 3:17-cv-00101-RDM Document 522-1 Filed 08/13/20 Page 10 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

5, 12–15 (doc. no. 650–1 (citing Fed.R.Evid. 401, 402, 403). This is so, it is contended, primarily because the summaries evidence "claims well in excess of any possible recovery of damages by GRC" under the excess insurance policies that Travelers sold to GRC. Id at 2. GRC maintains that the summaries would not unfairly prejudice the factfinder's deliberations. Pl. Resp. at 15–16 (doc. no. 656).

On March 13, 2015, for the first time in this litigation, Travelers presented its objections to GRC's methods of recording and settling the underlying claims. *See* Def. Statement (doc. no. 640). Travelers contended that additional discovery is needed before trial of GRC's damages. Id at 3. This request was denied. Fact discovery closed on June 7, 2010. Orders, Jan. 21, 2010 and Feb. 19, 2008 (doc. nos.239, 199). Expert discovery closed on April 29, 2011. Order, Mar. 17, 2011 (doc. no. 303). Dispositive motions were due by August 1, 2011. Order, Feb. 19, 2008 (doc. no. 199). Despite previous opportunities to request additional discovery, Travelers did not do so. *See generally* Hr'g Tr., 9:3–10:6, 31:23–32:11, 33:20–35:9, dated Mar. 24, 2015 (doc. no. 644).

## I. *FACTS THAT DO NOT PRESENT ANY GENUINE DISPUTES FOR TRIAL*

From 1975 through 1985, The Travelers Indemnity Company ("The Travelers") provided GRC with primary liability insurance. [3] During 1981 through 1994, The Travelers defended and indemnified GRC under those primary policies for asbestos-related bodily injury and property damage claims. The Travelers had over a decade of claims experience with GRC's liabilities for specific products, how to collect and record information about the claims, what evidence was required to resolve them, and their settlement values. The Travelers settled thousands of those claims. Ultimately, GRC's liabilities far exceeded the limits of liability of its primary insurance. By 1994, the policy limits of GRC's primary insurance with The Travelers were exhausted.

[3]   The Travelers Indemnity Company ("The Travelers") sold these primary insurance policies to GRC. Defendant Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company asserts that it had a separate incorporation and history. Def. Resp. to Pl. Mot. Summ. J. at 9 (doc. no. 652) (citing *Pulmonary Advisory Servs. v. Aetna Life & Cas. Co.,* 58 F. App'x 597, 597 (5th Cir.2003) (per

curiam) ("In 1996, Travelers Property Casualty Corporation ... acquired Aetna's property and casualty companies...."). It is suggested that Defendant Travelers did not know or could not have learned how GRC's primary insurance carrier, The Travelers, structured GRC's defense- in particular, the methods used for recording and settling claims. *Id.* No further explanation is made as to how that corporate history might have affected Defendant Travelers' response to GRC's tender on June 10, 2002, of the underlying claims along with copies of its Claims Database and the Queue. In addition, the record establishes that during the period The Travelers was defending the underlying lawsuits using claims databases, GRC fully informed The Aetna, now Defendant Travelers, of that defense strategy. Accordingly, the assertion that The Travelers and Defendant Travelers are separate corporate entities does not create any genuine disputes for trial.

**\*3** The Travelers no longer defended or indemnified GRC after exhaustion of its primary limits of liability. On June 10, 2002, GRC tendered the underlying claims to its excess liability insurance carriers. All of the excess carriers—including Defendant Travelers—denied coverage, maintaining that the policies sold to GRC contain exclusions of such claims.

Left to fend for itself, GRC has negotiated settlements on its own since about 2002, largely using the claims resolution structure initially put in place by The Travelers. Pl. Br. in Support of Mot. Summ. J. at 5 (doc. no. 647–1); Pl. Resp. at 2–6 (doc. no. 656). GRC has collected the same categories of evidence and has recorded the same types of information that The Travelers required. GRC has maintained the extensive databases recording the claims asserted against it. GRC remains a defendant in tens of thousands of asbestos-related lawsuits. New cases continue to be filed against GRC, and GRC continues to record and settle new and pending claims.

In essence, GRC has settled with underlying claimants by agreeing to pay a specific dollar amount, which is derived from valuations that claimants with similar types of asbestos-related diseases have recovered. For each settlement, GRC has required the claimant to provide:

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 11 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

sworn evidence of exposure to a GRC asbestos-containing product at some location ... as well as medical verification of an asbestos-related disease, ... and that the claims are not subject to valid jurisdictional or statute of limitations defenses.

Letter from GRC's counsel to Baron & Budd, confirming settlement, dated Dec. 11, 1998, Conley Aff., Ex. 1, dated Sept. 16, 2011 (doc. no. 364). "But it is not a done deal until we get the release." Deposition Testimony of Jamie P. Yadgaroff, Esq., 20–21, 51:9–15, dated Aug. 11, 2010, Conley Decl. ¶ 12, Ex. I (doc. no. 657–9). *See also* Yadgaroff Dep., 20:6–51:15, Conley Aff., Ex. 2, dated Sept. 16, 2011 (doc. no. 364) (describing her work).

Since about 2000–2001, each settled claimant has been assigned a right to recover funds that GRC obtained in previous coverage litigation or is successful in recovering in this action. *See, e.g.,* settlement agreement and supporting medical diagnosis, Conley Decl. ¶¶ 17–18, Exs. J, K (doc. nos.657, 657–10, 657–11). *See also* Order and Mem., dated Mar. 26, 2012 (doc. nos.432, 433), and amending Order, dated Mar. 28, 2012 (doc. nos.434, 434–1); *Gen. Refractories Co. v. First State Ins. Co.,* 862 F.Supp.2d 382 (E.D.Pa. Mar.27, 2012) (Ludwig, J.) (ruling that under Pennsylvania law, GRC's "two-tiered or conditional" settlements with the underlying claimants are permissible and constitute damages within the meaning of the excess insurance policies issued by Defendants in this action—including The Aetna, now Defendant Travelers).

### A. Databases Evidencing the Underlying Lawsuits and Claim Settlements

Beginning in 1981, The Travelers and GRC worked together to resolve the ever increasing number of asbestos-related claims. The Travelers established the structure of GRC's defense, setting the protocol and methods used to analyze, record, and settle those claims. GRC cooperated and together with The Travelers, maintained a computer software database that recorded specific information-such as each plaintiff's name, location of suit, medical diagnosis, details about exposure to specific products, status of the claim, and other information. At times, this was also referred to as the

"GENNEW" or the "Access" database. Here, all versions are referred to as the "Claims Database." *See* Claims Database excerpts, Conley Decl., Ex. E (doc. no. 657–5); Deposition Testimony of Barry L. Katz, Esq., 1277:6–1280:13, dated May 6, 2010, Conley Decl., Ex. F (doc. no. 657–6). *See also* Conley Aff. ¶¶ 5–6 (doc. no. 646); *id.,* Ex. 5, Katz letter, dated June 10, 2002 (doc. no. 646–5); *id.,* Ex. 6, letter of Travelers' counsel, Stephen B. Nolan, Esq. of Stradley Ronon Stevens & Young, LLP ("Stradley Ronon"), dated July 23, 2008 (doc. no. 646–6).

**\*4** In addition, GRC has maintained the database that summarizes settlements of the underlying asbestos-related claims, which is referred to as the Queue. In printed form, it is an excel spreadsheet arranging categories of information in vertical columns, and itemizing the details of each claim horizontally per line. According to Travelers, the Queue contains some 31,439 lines of information. Def. Br. at 11 (doc. no. 650–1).

Since about 2000 to 2001, GRC has paid claims on a "first-in-time" basis. *See* Pl. Resp. at 2 (doc. 656). At that time, Stephanie Stephens, a paralegal for the Sedgwick Law Firm in Dallas, Texas, began documenting and recording settlements on the Queue. *Id.;* Affidavit of Stephanie M. Stephens ("Stephens Aff.") ¶¶ 1, 3–4, dated May 1, 2015, Conley Decl., Ex. G (doc. no. 657–7). Stephens entered on the Queue the date of receipt of signed releases, and as to each entry:

Each entry on the Queue was made at or near the time I received the signed release. Each entry on the Queue was based on either information that I reviewed or was based on information that was provided to me by other legal assistants acting on behalf of GRC who indicated they had reviewed and received the releases and had knowledge of the settlements. I maintained the information on the Queue in the regular course of our work on behalf of GRC.

Stephens Aff. ¶¶ 16, 18. The Queue records the priority in which the underlying claims are to be paid. Released claims

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

first entered on the Queue are paid prior to subsequently released claims.

From inception of the Queue until September, 2005, Stephens performed the following as part of her duties for GRC. She reviewed submissions by counsel for underlying claimants that memorialized or supported a settlement with GRC, and she entered certain types of information on the Queue. Stephens Aff. ¶ 5. As part of this review, she confirmed:

- receipt of a medical report that reflected the diagnosis of an asbestos-related disease (*id.* ¶¶ 6, 7);

- that the plaintiff's diagnosed disease was consistent with the settlement demand (*id.* ¶ 7);

- that an asbestos-containing product assembled and sold by GRC was identified (*id.* ¶ 6); and

- that "the plaintiff alleged exposure to a GRC product, and that the alleged exposure time period was consistent with the general time GRC sold the specific product(s)" (*id.* ¶¶ 8, 10 (citing a list of GRC's former asbestos-containing products that she used in her review, Ex. 1(doc. no. 657–7 at 7)).

Stephens would reject a claimant's submission if the settlement packet:

> did not allege exposure to a GRC asbestos-containing product; ... alleged exposure outside of the time GRC sold the specific product; or ... alleged exposure at a location GRC did not believe purchased a GRC product ....

Stephens Aff. ¶ 9; *see, e.g.,* Stephens' letters rejecting individual settlements, *id.* ¶ 11, Exs. 1, 2 (doc. nos. 657–7 at 9–20, 21–33). She "does not recall ever processing a settlement where the underlying plaintiff alleged exposure to raw asbestos sold by GRC." *Id.* ¶ 10. "Settlements were approved based only on the GRC products referenced in Exhibit 1." *Id.* (citing the list of GRC's former asbestos containing products, Ex. 1 (doc. no. 657–7 at 7)).

 **\*5**  About September, 2005, Stephens transferred to others some of her duties to review settlement materials and enter

information on the Queue. Stephens Aff. 17. She continued to work on settlements, approving and rejecting claims, and continued to update the Queue upon receipt of signed releases. *Id.* Presently, she reviews and processes settlement submissions in Texas, which is the jurisdiction with the most claims on the Queue. *Id.*

Stephens reviewed a printout of the Queue, dated April, 2015, a copy of which GRC produced to Travelers. Stephens Aff. ¶ 19. She recognizes it as "the Queue I maintained for GRC through 2005," except for four new columns of information that GRC recently added: "date of first exposure, disease code, running sum and paid." *Id. See, e.g.,* excerpts from the Queue produced to Travelers in April, 2015, Conley Decl. ¶¶ 14–15, Ex. H (doc. nos.657, 657–8).

### B. GRC Made the Claim Database and the Queue Available to Travelers Along With the Documents That Support Those Summaries

In 1989, while GRC's primary carrier, The Travelers, was defending the underlying claims, GRC's Secretary and General Counsel, Dorothy Stassun Costello, wrote to GRC's excess carrier, The Aetna, now Defendant Travelers. *See* Costello letter, dated July 18,1989, Conley Aff. ¶ 10, Ex. 2 (doc. no. 646–2). This letter apprised The Aetna of about 6,000 asbestos-related bodily injury claims that The Travelers was defending under its primary policies. *Id.* In part, the letter stated:

> We believe that pursuant to the terms of the [excess] policies of insurance issued by you to GRX [GRC], [4] coverage is available to GRC for the foregoing claims, and for such similar claims as may be brought against GRC in the future. If your company's position is to the contrary, or if your company does not intend to follow the coverage of underlying insurers, we expect to hear from you in writing as soon as possible so we may avoid any unnecessary misunderstanding or disagreement in the future.

Case 3:17-cv-00101-RDM  Document 522-1  Filed 08/13/20  Page 13 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)
2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

"GRX" referred collectively to GRC and other affiliated business entities. In this Memorandum, "GRC" is substituted for "GRX."

*Id.* The letter concluded: "To the extent you have any questions or matters of inquiry, or if you desire further information with respect to the referenced claims, please let me know." *Id.* No requests for more information followed.

Ed Marek, "Product Specialist Environmental/National Accounts Claim" on behalf of The Aetna, now Defendant Travelers, responded. Marek letter, dated Aug. 8, 1989, Conley Aff. ¶ 11, Ex. 3 (doc. no. 646–3) ("reservation of rights letter"). The Aetna acknowledged GRC's July 18, 1989 notice of claims, but asserted that the policies' "Asbestos Exclusion" barred any insurance benefits. This was the sole ground for disclaimer. [5] *Id.* Furthermore, the letter informed GRC:

[5] Specifically, The Aetna's reservation of rights disclaimed as follows: "Both of these policies carry ... Exclusion No. XN–13180, which is the Asbestos Exclusion. The Asbestos Exclusion excludes all loss arising out of asbestos and includes bodily injury and property damage. It further states than any asbestos losses that are covered by any underlying insurance will not be deemed to be covered by such underlying insurance in determining whether any underlying aggregate limit of liability has been exhausted. Any payments made for asbestos losses shall be considered a self-insured retention which the Named Insured must pay before our two policies respond." Marek letter, dated Aug. 8, 1989, Conley Aff. ¶ 11, Ex. 3 (doc. no. 646–3). All of these cited defenses to coverage for the underlying claims depend on application of the Asbestos Exclusion, which was ruled to be ambiguous and unenforceable. *Gen. Refractories Co. v. First State Ins. Co.,* No. 04–3509, ——— F.Supp.3d ———, 2015 WL 918797 (E.D.Pa. Mar.3, 2015) (Restrepo, J.).

By accepting notice of these claims or suits, Aetna is not waiving any other provisions of the insurance contract and all rights are reserved.

At this point, Aetna will do nothing further with these cases and we are asking you to inform us when the underlying limits for the 1985–86 year for non-asbestos claims are near exhaustion.

*\*6 Id.* Nothing was said about the methods The Travelers and GRC were using to record and settle the underlying claims. No requests were made for more information.

In 1991, while GRC's primary carrier, The Travelers, was defending the underlying claims, GRC's Senior Vice President and General Counsel, Barry L. Katz, wrote to GRC's excess carrier, The Aetna, now Defendant Travelers. *See* Katz letter, dated Oct. 10, 1991, Conley Aff. ¶ 12, Ex. 4 (doc. no. 646–4). This letter again apprised The Aetna of the asbestos-related bodily injury claims-then numbering about 16,700 pending claims that were being indemnified under the primary policies. *Id.* The letter referred The Aetna to certain named representatives at The Aetna's offices located across the nation—that is, on the East Coast and in Baltimore, the South and Southwest, Houston, the Mid–West and Hawaii, and Denver—should "further, more detailed information" be needed. *Id.* Importantly, the letter stated in part:

> GRC has a computer generated listing of all of these cases with detailed information as to disease category and worksites. This computer listing is quite voluminous; should you desire to review this listing, it is available for inspection at General Refractories' corporate offices upon request. GRC will also reproduce this listing for you at a cost of approximately $200.00.

*Id.* Again, the letter concluded with an offer to provide more information, stating: "To the extent that you have any questions or matters of inquiry, please let me know." *Id.* The Aetna did not request more information or an appointment to inspect the computer listing.

In 1995, GRC provided to all of its excess liability insurance carriers an additional update as to the status of the asbestos-related claims—then totaling "23,420 open cases." Memo from Michael Conley, Esq., dated May 8, 1995, Conley Aff. ¶ 15, Ex. 7 (doc. no. 646–7). The memo informed the excess carriers—and in particular, The Aetna, now Defendant Travelers—as follows:

> As you have all been informed, effective November 1, 1994, The

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

Travelers exhausted its primary insurance coverage. Since that date, GRC has been coordinating its defense, largely using the defense structure put in place by [T]he Travelers.

*Id.* The memo concluded: "If you require any additional information, please contact me." *Id.* The Aetna, now Defendant Travelers did not object to the structure of GRC's defense.

On June 10, 2002, GRC tendered the underlying asbestos-related claims to Defendant Travelers, "including Aetna," as GRC's excess insurance carriers. Katz letter, dated June 10, 2002, Conley Aff. ¶ 13, Ex. 5 (doc. no. 646–5). Importantly, GRC explained that it enclosed:

> a CD that contains a database of GRC's open claims. You should consider this letter a tender of these cases. I am also enclosing a description of each field entry to the database.... The database utilizes Access software.

**\*7** *Id.* This letter was addressed to Travelers' counsel, Samuel J. Arena, Jr., Esq. of Stradley Ronon, which law firm continues to represent Defendant Travelers in this action. *Id.* Once again, Katz on behalf of GRC concluded with an offer to provide more information: "If you require any other reasonable information, please let me know." *Id.*

Before discovery in this action closed on June 7, 2010, Travelers' counsel, Stradley Ronon, made copies of the Claims Database and the Queue as maintained by GRC through April and May, 2008. *See* Stradley Ronon's letter, dated July 23, 2008, Conley Aff. 14, Ex. 6 (doc. no. 646–6). In addition, Defendants questioned GRC's Rule 30(b)(6) corporate designee, Katz, about both the Queue and the Claims Database, using printed portions of each marked as deposition exhibits. For the Queue produced in April, 2010, *see* Katz Dep., 1051:4–24, 1053:9–1054:24, and for the Claims Database produced in April, 2008, *see* Katz Dep., 1277:6–1280:13, 1280:20–1281:21, Conley Decl. ¶ 8, Exs. E, F (doc. nos. 657–5 and 657–6).

During April, 2010, on behalf of GRC, Ms. Stephens gathered documents supporting settlements of the underlying asbestos-related claims for inspection by counsel for Defendants in this action. Stephens Aff. ¶¶ 12–15, Conley Decl. ¶ 10, Ex. G (doc. no. 657–7). As part of that effort, she "pulled from storage a sampling of documents for various years in which settlements occurred and made available additional documents," which were maintained in the Dallas, Texas office. *Id.* ¶ 13. Stephens affirms that on April 6 and 7, 2010, counsel for Defendants "reviewed approximately 20 boxes of documents in our office in Dallas," and following that review, she "coordinated the scanning of the documents for the defendants." *Id.* ¶ 14. "GRC made scanned copies of all documents requested and produced in excess of 50,000 pages of documents from files in Texas." Pl. Resp. at 5 (doc. no. 656) (citing Stephens Aff. ¶ 15); Conley Aff. ¶ 9 (doc. no. 646).

In addition, GRC made available for Defendants' inspection and copying the files that GRC has maintained in Pottstown, Pennsylvania. Conley Aff. ¶ 9 (doc. no. 646). "Counsel for defendants reviewed these files on multiple occasions, identified documents for copying, and GRC produced to the defendants approximately 4000 pages of documents." *Id.* Letter of GRC's counsel, Mark Gottlieb, dated Apr. 30, 2010, addressed to all defense counsel in this action, describing how, when, and where claims information and documents underlying the Queue were available for inspection in 2008 and going forward. *Id.* ¶ 16, Ex. 8 (doc. no. 646–8).

In March and April, 2015, GRC produced to Defendant Travelers versions of the Queue updated through April, 2015. Pl. Resp. at 6 (doc. no. 656) (citing Conley Decl. ¶ 13, Ex. H (doc. nos.657, 657–8)). These were delivered in Excel format so that the data could be searched and sorted. *Id.* In addition, as to those claims listed on the Queue as having been paid, GRC's counsel produced evidence of their payment. *Id.*

**\*8** As produced in April, 2015, the Queue contained four additional columns: date of first exposure, disease code, running sum, and payment. *See, e.g.,* excerpts from the Queue produced in April, 2015, Conley Decl. ¶¶ 14–15, Ex. H (doc. nos.657, 657–8). The "running sum" column reflects the total sum of agreed settlement amounts, and the "paid" column reflects claims that were paid by GRC in "the last year or so." Pl. Resp. at 6 (doc. no. 656). The new columns of information were achieved by merging data taken from earlier iterations of the Claims Database and the Queue. *Id.* (citing Conley Decl. ¶ 14 (doc. no. 657)). GRC also removed from the Queue those claims that GRC had previously paid, but does not sue in this

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 15 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

litigation to recover payment. *Id.* (citing Conley Decl. ¶ 15). In addition, since November, 2010, GRC added about 324 new claims to Queue. *Id.* (citing Conley Decl. ¶ 15).

Neither Defendant Travelers nor The Aetna ever asked GRC to provide additional information about the methods GRC used to record and settle claims. Neither asked GRC to use different methods than those instituted by The Travelers and maintained by GRC to date.

## II. *DISCUSSION*

Under the Federal Rules of Evidence, a summary trial exhibit that meets the requirements of Rule 1006 is admissible as substantive evidence of the content of voluminous writings. [6] It is an evidentiary substitute for the voluminous documents themselves. *See United States v. Bansal,* 663 F.3d 634, 666–67 (3d Cir.2011) (admitting summary of business records subject to authentication by records custodians); *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.,* 803 F.2d 250, 257 (6th Cir.1986) (such summaries are admitted as evidence). *See* 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 1006.04[1] (Joseph M. McLaughlin, ed., 2d ed.2015) ("summary itself is the evidence to be considered by the jury").

[6]    Federal Rule of Evidence 1006 provides: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."

In *United States v. White,* 737 F.3d 1121, 1135 (7th Cir.2013), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 2717, 189 L.Ed.2d 754 (U.S.2014), the Seventh Circuit affirmed the admission of a summary spreadsheet comparable to the those at issue here. *White* explains that there are two main ways that a party can summarize complex, voluminous documents at trial, the first of which is germane here:

First, the party can introduce the information in a summary exhibit under Federal Rule of Evidence 1006, in order "to prove the content of voluminous writings ... that cannot be conveniently examined in court." If admitted this way, the summary itself is substantive evidence-in part because the party is not obligated to introduce the underlying document

themselves.... Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves, however, the exhibit must accurately summarize those document. It must not misrepresent their contents or make arguments about the inferences the jury should draw from them.

**\*9**  737 F.3d at 1135 (citing *United States v. Milkiewicz,* 470 F.3d 390, 395–98 (1st Cir.2006)) (explaining both methods of summarizing); *United States v. Janati,* 374 F.3d 263, 272–73 (4th Cir.2004) (Rule does not require that the underlying documents actually be introduced into evidence).

"Courts have cautioned that Rule 1006 is 'not a back-door vehicle for the introduction of evidence which is otherwise inadmissible,' and that the voluminous evidence that is the subject of the summary must be independently admissible." *Eichorn v. AT & T Corp.,* 484 F.3d 644, 650 (3d Cir.2007) (citing *United States v. Pelullo,* 964 F.2d 193, 204–06 (3d Cir.1992)). In addition, a summary of evidence must be an accurate compilation of the voluminous records sought to be summarized. 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 8043 at 525, §§ 8042, 8044 (1st ed. 2000 & Supp. Apr. 2015).

### A. GRC's Summary Evidence of Business Records Is Admissible, Subject to Proper Authentication by Records Custodians and Objections at Trial

Rule 1006 permits the use of a summary of voluminous records that are otherwise admissible. *Bansa,* 663 F.3d at 667; *State Office Sys., Inc. v. Olivetti Corp. of Am.,* 762 F.2d 843, 845–46 (10th Cir.1985) (admitting summary of voluminous business records proving actual loss and damages). Furthermore, Rule 803(6) of the Federal Rules of Evidence creates a hearsay exception for business records. [7] *Bansal,* 663 F.3d at 667.

[7]    "A record of an act, event, condition, opinion, or diagnosis" qualifies as an exception to the hearsay rule under Rule 803(6) if: "(A) the record was made at or near the time by—or from information transmitted by-someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by testimony of the custodian or another qualified

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 16 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed.R.Evid. 803(6).

GRC proffers the Claims Database and the Queue as summaries of voluminous business records admissible under Rule 803(6). The record supports GRC's position. In its Motion and supporting Brief, Travelers does not present any objection on this ground. In its Reply Brief, however, Travelers presents the question of whether the documents supporting the summaries constitute business records, but does not object to any specific documents. Def. Reply at 5–6 (doc. no. 659). Instead, Travelers suggests that the documents *en masse* are inadmissible because they were prepared in anticipation of litigation. No evidence is proffered that supports that conclusion. It is a characterization of the record that does not create a genuine dispute. On this record, it is ruled that the Claims Database and the Queue summarize business records admissible under Rule 803(6), subject to their proper authentication by a records custodian or another qualified witness and subject to proper, specific objections by Travelers at trial.

**B. GRC Made Its Summary Evidence Available for Inspection and Copying by Travelers at Reasonable Times and Places**

Travelers' principal objection to admission of the Claims Database and the Queue is grounded on Rule 1006's mandate that "the proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed.R.Evid. 1006. Travelers' motion asserts that GRC has not yet produced the actual, final, and complete summaries that will be used at trial. The motion also asserts that GRC has refused Travelers' request to review the documents supporting the Queue. These assertions are not supported by evidence. In fact, the record establishes just the opposite—that is, Travelers received copies of the Claims Database and the Queue on multiple occasions over many years, and certainly no later than June 10, 2002, when GRC tendered to Travelers the underlying asbestos-related claims. Travelers has been provided with timely updates as well. That the databases are updated from time to time, as GRC receives new information, does not compromise the timeliness of GRC's production of the summaries or their evidentiary value.

**\*10** Moreover, Travelers acknowledges receipt of updated iterations of the Queue that GRC produced in discovery and on multiple occasions thereafter-in November, 2010, and in February, March, and April, 2015. *See* Def. Br. at 6 & n. 3, 11–12 (doc. no. 650–1). Travelers admits, "We've got a queue," and describes its review of the supporting documentation. Hr'g Tr., 20:5–6, 21:14, 32:8–11, dated Mar. 24, 2015 (doc. no. 644); *see generally id.*, 7:7–8:25, 23:12–25:2, 32:8–11,33: 15–35:9, 37:19–24, 38:16–40:3. On this record, there is no genuine dispute that within the letter and the spirit of Rule 1006, GRC has made the Claims Database, the Queue, and their supporting documents available for examination and copying by Travelers at reasonable times and places.

The assertion that GRC has not yet produced the final and complete Queue that may be used at trial is without merit for another reason. In *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir.2005), Judge Posner ruled that the plaintiff was entitled to present to the defendants, 30 days before trial, summaries of hundreds of thousands of pages of contracts, which plaintiffs believed demonstrated how the defendant reinsurer had been enriched by fraud. As to timeliness of the summaries, Judge Posner explains:

> Rule 1006 requires only that the summarized documents be made available to the opposing party at a "reasonable time"; it does not say when the summaries must be made available to the party—for that matter, it nowhere states that the *summaries* must be made available to the opposing party.

*Id.*, 412 F.3d at 753 (quoting Fed.R.Evid. 1006). Even though the Queue is a document that changes over time in response to GRC's receipt of signed releases from the underlying claimants, GRC has timely produced updated iterations of the Queue sufficient for a fair trial.

The rulings here are also supported by *State Farm Mut. Auto. Ins. Co. v. Lincow*, 715 F.Supp.2d 617 (E.D.Pa.2010) (Robreno, J.) (ruling on post-trial motions for relief), *aff'd*, 444 F. App'x 617 (3d Cir.2011). In that case, the plaintiff insurance companies alleged that the defendant healthcare providers were members of a conspiracy that sharply inflated

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 17 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

costs of medical care for car accident victims. At trial, the plaintiffs' proof of defendants' fraud consisted in part of State Farm's claim files and an exhibit summarizing voluminous claim payments made by defendants. More than two years before trial, plaintiffs disclosed these documents to defendants, and the documents were available to defendants for review. Plaintiffs argued that defense counsel failed to review the claim files which had been made available for several years and unreasonably requested production of these files during trial. Judge Robreno ruled that it was sufficient that the supporting documents were made available at least two years before trial, and "[t]his degree of availability certainly meets the requirements of a reasonable time and place." *Id., 715 F.Supp.2d at 636–37* (citing *United States v. Jamieson,* 427 F.3d 394, 410–11 (6th Cir.2005) (notice of the last of the record summaries, over one month before trial began, was timely); *Fidelity Nat'l Title Ins. Co. of N.Y.,* 412F.3d at 753 (production 30 days before trial was a "reasonable time" when the defendant's law firm could have "easily spot checked the summaries for accuracy" but failed to do so)).

### C. The Deficiencies and Dangers of Prejudice Cited by Travelers Do Not Exist

**\*11** Travelers objects that GRC's summary evidence is inadmissible because it is inaccurate and presents dangers of unfairly prejudicing the jury. Relevant evidence may be excluded only if

> its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed.R.Evid. 403. Rule 403 "does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case." *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir.1980). It "only protects against evidence that is unfairly prejudicial," where the evidence has "an undue tendency to suggest decision on an improper basis." *Id.,* 617 F.2d at 972. GRC's summary evidence, while detrimental to Travelers' case, does not present any dangers of unfair prejudice. In short, Travelers has not shown that admission of

the Claims Database and the Queue would create an "undue tendency to suggest a decision on an improper basis." *Id.*

Travelers faults the Queue for lacking "critical information" about the date on which each of the underlying claimants was first exposed to GRC's products. Def. Br. at 9–10 (doc. no. 650–1). Travelers objects that "more than sixty percent (60%) of the claims" do not identify a date of first exposure." *Id.* at 10; Def. Reply at 3–4 ("missing exposure information on more than 20,000 claims") (doc. no. 659). Travelers would require GRC to show—as to each claim listed on the Queue—that the claimant was exposed to an asbestos-containing product manufactured or sold by GRC, and that the claimant's first exposure to that product occurred during the policies' effective period, August 1, 1985–86. Def. Br. at 3, 9–10 (doc. no. 650–1); Def. Reply at 4 n. 2 (doc. no. 659); Def. Reply at 1–2, 4–5 (doc. no. 660). In addition, Travelers objects that "4,341 of the claims" are not labeled with a disease code denoting the claimant's specific type of asbestos-related disease. Def. Br. at 10 (doc. no. 650–1). The codes, it is contended, are "highly relevant" as to whether a settlement listed on the Queue is reasonable as compared to the claimant's diagnosed disease. *Id* .

Travelers' position is that the cited shortcomings make the Queue so inaccurate that it is inadmissible: "Without this most basic information regarding exposure, the Queue is inadequate to support GRC's claim for coverage under the Travelers policies and its admission should therefore be precluded." Def. Reply at 4 (doc. no. 659). This is incorrect. As to the disease codes, the record shows that Claims Database contains information about each claimant's diagnosis. In addition, GRC added disease codes on the April, 2015, iteration of the Queue. *See* Pl. Resp. at 10 (Travelers has "disease codes for over 25,000 of the claims."). Travelers had a fair opportunity to fully discover details about the settlements. As to Travelers' demand for proof that each of the claimants was first exposed to asbestos during the policies' effective period, at best the objections go only to the weight of the evidence. Importantly, the objections are also not sound as a matter of law—there is no such requirement under controlling Third Circuit and Pennsylvania law, as follows.

**\*12** "In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage." *Kopners Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1446 (3d Cir.1996) (citing *Riehl v. Travelers Ins. Co.,* 772 F.2d 19, 23 (3d Cir.1985)). On the other hand, "the insurer bears the burden of proving

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *Id.,* 98 F.3d at 1446. Both sides agree that it falls upon GRC to initially show a right to insurance benefits; however, they disagree about what that showing entails.

Here, the policies' insuring agreement provides that Travelers will indemnify GRC "against EXCESS NET LOSS arising out of an accident or occurrence during the policy period, subject to the limits of liability ... and to all of the terms of this policy." Indemnity Agreement, Def. Exs. 1, 2 (doc. nos.650–3, 650–4). This agreement is defined more specifically, as follows:

> EXCESS NET LOSS means that part of the total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underlying Insurance, if written without any limits of liability, less realized recoveries and salvages, which is in excess of any self-insured retention and the total of the applicable limits of liability of all policies described in Section 3. Schedule of Underlying Insurance; whether or not such policies are in force.

*Id.* The terms, "accident" and "occurrence," are not otherwise defined in Travelers' policies.

Travelers interprets this policy language. Def. Br. at 9–10 (doc. no. 650–1); Def. Reply at 4 & n. 2 (doc. no. 659); Def. Reply at 2–4 (doc. no. 660). Its analysis begins by isolating from the whole insuring agreement one phrase in the first sentence-that is, "arising out of an accident or occurrence during the policy period." Parsing that phrase, it is noted that the word, "occurrence," is immediately followed by the phrase, "during the policy period." This sequence means that an insured "accident or occurrence" must take place during the policy period. So far, no one disputes these propositions. Both sides also agree that asbestos-related bodily injury claims constitute an occurrence. Pl. Br. at 1 n. 1

(doc. no. 647–1). However, Travelers finds that the sequence gives the word, "occurrence," a special meaning—that is, a reasonable policyholder in GRC's situation would understand "occurrence" to equate to a claimant's first " 'exposure to, or inhalation of asbestos,' " during the policy period. Def. Reply at 3 (doc. no. 660) (quoting *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund,* 445 Mass. 502, 838 N.E.2d 1237, 1250–53 (Mass.2005)). Travelers concludes that its liability is not triggered by a claimant's exposure either before or after the policy period.

**\*13** Travelers' analysis does not consider the definition of Excess Net Loss, which specifically provides insurance for "damages on account of any one accident or occurrence." Indemnity Agreement, *supra.* Travelers also impermissibly reads into the insuring agreement content that is not to be found in its plain language. Furthermore, *Chesterton*—the only cited authority for Travelers' position-is not persuasive. That case involves materially different policy language and another jurisdiction's peculiar rules for determining the liability of insurance carriers in the context of asbestos-related claims. Importantly, *Chesterton* as well as Travelers' understanding of its insuring agreement are fundamentally at odds with controlling Third Circuit and Pennsylvania law.

In *J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502 (Pa.1993), Pennsylvania's Supreme Court applied a "multiple-trigger" rule for determining liability of insurers to defend and indemnify against asbestos-related bodily injury claims. The "multiple-trigger" rule holds that all phases of asbestos-related disease-exposure, progression, and manifestation-independently constitute an occurrence of indivisible "bodily injury" that triggers insurance coverage:

> The medical evidence in this case unequivocally establishes that injuries occur during the development of asbestosis immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify J.H. France under the terms of the policy.

* * *

Case 3:17-cv-00101-RDM  Document 522-1  Filed 08/13/20  Page 19 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury.

*Id.,* 626 A.2d at 507, 506–08. *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. St. John,* 106 A.3d 1, 18, 20, 22–23 (Pa.2014)* (reaffirming the multiple trigger rule adopted in *J.H. France* in the context of asbestos-related bodily injury claims). Travelers' position contradicts *J.H. France's* rule that an insurer's liability is triggered by any phase of an asbestos-related disease during the policy period. Proof that each claimant was first exposed to asbestos during the policy period is not required.

Travelers contends that the "multiple-trigger" rule does not apply here. This is so, Travelers asserts, because its policies contain different insuring language from that at issue in *J.H. France.* Def. Br. at 3 (doc. no. 650–1). Travelers distinguishes the *J.H France* policies, which were triggered by "bodily injury" during the policy period, from the policies here, which are triggered by "an accident or occurrence during the policy period." *Id.* Yet the cited difference is curious, because

> **\*14** Travelers acknowledges that "bodily injury" is an "occurrence ." In fact, Travelers' insuring agreement is comparable to the agreements presented in *J.H. France,* which all provided: [The Insurer] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury ... to which this insurance applies, caused by an occurrence ....

626 A.2d at 505. In comparison, Travelers agreed to indemnify GRC for:

> that part of the total of all sums which [GRC] becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence ... in excess of ... Underlying Insurance ....

Indemnity Agreement, *supra.* A meaningful distinction has not been shown.

Applying Pennsylvania law and the "multiple-trigger" rule of *J.H. France,* our Court of Appeals in *Koppers* found that all damages resulting from a single, continuous and indivisible, environmental damage loss was one "occurrence." 98 F.3d at 1451–52. Two of the policies at issue specifically applied to "each occurrence happening during the Policy Period," and the other ten policies applied to "occurrences which happen during the currency hereof." 98 F. 3 dat 1451 & n. 11. *Koppers* did not find that the sequence of the terms —"occurrence," immediately followed by the phrase, "during the policy period"—created any special meaning, as proposed here by Travelers.

Like the policies in *Koppers* and *J.H. France,* Travelers' policies provide occurrence-based coverage for damages "arising out of an accident or occurrence" and "on account of any one accident or occurrence." Indemnity Agreement, *supra.* Under the "multiple-trigger" rule of *J.H. France,* and the "continuous trigger" rule applied by *Koppers.* Travelers' policies—once triggered by GRC's liability for damages arising from a claimant's asbestos-related disease— indemnify GRC for all net loss and damage resulting from that indivisible bodily injury:

> Being defined as one "occurrence," the entire injury, and all damages resulting therefrom, fall within the indemnification obligation of the insurer. In other words, once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk. The insurer in question must bear potential liability for the entire claim.

*J.H. France,* 626 A.2d at 508. In short, *Koppers* and *J.H. France* are fully applicable to this case. Under this controlling authority, the cited deficiencies and the asserted missing information do not affect admissibility of the Claims Database or the Queue.

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 20 of 46

2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

Travelers' motion further objects that the Queue is inadmissible because it contains "excessive, cumulative information" that would unfairly prejudice Travelers at trial. Def. Br. at 12, 12–15 (doc. no. 650–1) (citing Fed.R.Evid. 402, 402, 403). It is asserted that the Queue contains information "well beyond the claims that are potentially subject to payment by Travelers," and "[i]rrelevant evidence is not admissible." Def. Br. at 13–14 (doc. no. 650–1) (citing Fed.R.Evid. 401, 402). These objections are also not sound as a matter of fact and law, and at best go only to the weight of the summary evidence, not its admissibility.

 *15  Specifically, Travelers asks that GRC's proof be restricted to only those underlying claims where the claimant's first exposure to an asbestos-containing product, which was manufactured or sold by GRC, occurred during the policies' effective period, August 1, 1985–86. Once again, Travelers' position is based on a misunderstanding—or a rejection—of *J.H. France* and *Koppers.* GRC's proof may extend to any claim involving any phase of the pathogenesis of a claimant's indivisible asbestos-related disease that arose during the effective period of Travelers' policies. *See J.H. France,* 626 A.2d at 507, 506–08. This is what GRC's summary evidence is proffered to do. Moreover, in order to evidence its right to insurance benefits, GRC is not required to provide information on the Queue about the date each of the claimants was first exposed to GRC's products. Instead, GRC may present its damages as it chooses within the requirements of the Federal Rules of Evidence, and *Koppers* and *J.H. France.*

Travelers maintains that the Queue is inaccurate and excessive because it contains claims that arose after termination of the effective period of Travelers' policies. GRC acknowledges that its evidence includes a *de minimus* percentage of claims arising from a claimant's first exposure to asbestos after Travelers was no longer on the risk—that is, after the policies terminated on August 1, 1986. P1. Resp. at 14 (doc. no. 656). GRC agrees that it would not be able to recover damages under the policies for those claims: "the underlying claimants must have been exposed to GRC's products prior to the end of the Travelers policy period." Pl. Resp. at 3 (doc. no. 655). GRC has exposure information for about 11,196 of the claims listed on the Queue (which total about 31,440 to 34,440 claims). Nonetheless, GRC asserts that "[o]nly 10 of the 11,196 claims, or .0009%, have a date of first exposure after August 1, 1986, with 99.6% of the claims having a date of first exposure of 1980 or prior." Pl. Br. at 9 (doc. no. 647–1). GRC maintains that the Claims Database

and the Queue together evidence insured damages in excess of $120 million—enough by far to fully exhaust the limits of liability of Travelers' policies, despite the *de minimus* number of claims that are not insured. Pl. Resp. at 14 (doc. no. 656). There is "no question," GRC says, that "the vast majority" of the claims on the Queue—"approximately 99.9991%"—arise from exposures that predate termination of Travelers' policies, triggering coverage. Pl. Resp. at 5 (doc. no. 655). Travelers does not controvert these assertions with any evidence. On this record, Travelers' objections do not present a genuine dispute.

In addition, nothing in the record undercuts GRC's contention that "exposure information was tracked by GRC in its Claims Database for decades, first beginning when [The] Travelers was controlling GRC's defense," and the Claims Database "records all of the years of exposure." Pl. Resp. at 14 (doc. no. 656). The record also establishes that on multiple occasions over the years, Travelers received copies of the Claims Database and the Queue. Moreover, Travelers had a fair opportunity in discovery to examine the documents supporting GRC's summary evidence and establish for itself whether the underlying claims trigger Travelers' policies. Yet Travelers does not identify any specific claims that should be removed from GRC's summary evidence.

 *16  Travelers would also require GRC to provide better evidence than the Queue that each claimant was exposed to an asbestos-containing product manufactured or sold by GRC—as opposed to raw asbestos or perhaps a product supplied by another company. Once again, no evidence is proffered to support the objection. Since the inception of this action, it has been GRC's position that each underlying claim for which it seeks insurance benefits arises from a claimant's exposure to one of its asbestos-containing products. GRC contends that its methods for recording and settling claims ensured that only those claims based on its asbestos-containing products would be entered on its databases. Pl. Resp. at 6–7 (doc. no. 655). The record does not contain any evidence that GRC agreed to a single settlement of a claim that arose from an alleged sale of raw asbestos or another supplier's products. Travelers' objection does not present a genuine dispute. In any case, the objections on this ground go to the weight of the summary evidence, not its admissibility.

Travelers further asks that GRC's proof be limited to the "amount recoverable under the Travelers policies"—$21 million in combined limits of liability. Def. Br. at 14 (doc. no. 650–1). Both sides agree that for a full recovery under

Case 3:17-cv-00101-RDM   Document 522-1   Filed 08/13/20   Page 21 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)
2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

both policies here, GRC would have to establish $51 million in damages. *Id.* at 12–13, 626 A.2d 502; Pl. Resp. at 9 (doc. no. 647–1). It is not clear whether Travelers asks that GRC's proof be constrained to claims totaling $21 million or instead, $51 million. In any case, GRC maintains that its summary evidence establishes damages in excess of $120 million.

No matter how the proposed $21 million versus $51 million restriction is computed, this objection cannot be sustained. At trial, GRC is entitled to introduce evidence that has any "tendency to make" GRC's net loss or damage "more or less probable than it would be without the evidence." Fed.R.Evid. 401. That is, GRC may present any claim "arising out of an accident or occurrence during the policy period." Indemnity Agreement, *supra* (defining net loss in part as "all sums which [GRC] becomes legally obligated to pay or has paid, as damages on account of any one accident or occurence"). *J.H. France* and *Koppers* do not permit GRC's proof to be reduced to only those claims that exhaust the limits of liability of Travelers' policies.

As to how liability should be allocated to any one insurance carrier that was on the risk at one time or another during the span of a claimant's disease, *J.H. France* held that "every insurer which was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify" its insured. 626 A.2d at 507. Insurers whose coverage had been triggered were held jointly and severally liable for the full amount of the insured's claim up to policy limits, and the insured was entitled to select the policy or policies under which it would be indemnified. *Id.* at 508. "Any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted." *Id.* at 509.

**\*17** Applying Pennsylvania law and the rule of *J.H. France,* our Court of Appeals in *Koppers* held that where the entire injury is defined as one "occurrence," as it is in Travelers' policies here, "a triggered policy must indemnify the insured for all damages resulting from that injury." 98 F.3d at 1451. Applying *J.H. France's* "allocation approach," *Koppers* held "jointly and severally liable all policies triggered to cover a single, indivisible loss." *Id. Koppers* further held that where "multiple insurance policies are triggered to cover an indivisible loss, each insurer may be called upon to cover the entire loss up to policy limits." *Id.* at 1452. As *Koppers* explains:

> We must apply this principle of indemnity—barring recoveries greater than losses-in conjunction with the

*J.H. France* rule—holding that where multiple insurance policies are triggered to cover an indivisible loss, each insurer may be called upon to cover the entire loss up to policy limits.

\* \* \*

Under *J.H. France,* the insured gets indemnified first (pursuant to the insuring agreements) and *then* the insurers may seek to redistribute the burden among themselves....

\* \* \*

In sum, taking all of the above rules together, we predict that the Pennsylvania Supreme Court would hold that the non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, "exhausted" ... policies; and (2) the combined pro rata shares of other settling (primary and excess) insurers.

98 F.3d at 1452, 1454. Accordingly, under *Koppers* and *J.H. France,* GRC may prove any and all claims that trigger the policies on the risk for 1985–86, to establish GRC's entire loss. The Queue is admissible for that purpose—establishing a total damages figure.

Travelers contends that GRC has a burden to identify—or in Travelers' words, "allocate"—each of the underlying asbestos-related claims for which GRC seeks insurance from Travelers, and then serially prove, claim-by-claim, that each one meets Travelers' proposed requirements. Def. Reply at 5–6 (doc. no. 660). For example, it is contended that "GRC must allocate claims to the 1985–86 policy period so that any trial can be managed more easily and only relevant evidence involving claims that may be actually subject to payment under the Travelers policies will be presented to the jury." Def. Br. at 14 (doc. no. 650–1). No authority is provided to support this theory of allocation. Importantly, the theory is contradicted by controlling authority. Rule 1006 permits a summary to substitute as evidence of the contents of underlying claim documents. Importantly, under *Koppers* and *J.H. France,* GRC may sue for its total damages from any one defendant insurer on the risk-such as Travelers here. GRC's summary evidence is permissible to do just that—present its total $120 million in damages for which it sues under Travelers' policies.

**\*18** On this record, it is also ruled that the Claims Database and the Queue are summaries admissible under Rule 1006,

Case 3:17-cv-00101-RDM Document 522-1 Filed 08/13/20 Page 22 of 46

General Refractories Co. v. First State Ins. Co., Not Reported in F.Supp.3d (2015)
2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

subject to proper, specific objections by Travelers at trial. Travelers may then challenge the weight that the jury might give to the summary evidence.

Travelers' motion will be denied, and the objections set forth in Travelers' motion in their entirety are overruled.

An appropriate Order accompanies this Memorandum.

## ORDER

**AND NOW,** this 29th day of May, 2015, upon consideration of the parties' respective papers and the record, [8] it is hereby **ORDERED** that "Defendant's Motion to Preclude Admission of Plaintiff's Summary Evidence" (doc. no. 650), which was submitted by Defendant Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company (collectively, "Travelers"), is **DENIED.**

[8]     Defendant's Motion and Brief (doc. nos.650, 650–1), with Exhibits ("Exs.") 3–5 (doc. nos. 650–

3 through 650–7); Plaintiff's Response (doc. no. 656); Affidavit of Michael Conley, dated Apr. 17, 2015 (doc. no. 646), with Exs. 1–8 (doc. nos. 646–1 through 646–8); Declaration of Michael Conley, dated May 1, 2015 (doc. no. 657), with Exs. A–K (doc. nos. 657–1 through 657–11); Affidavit of Michael Conley, dated Sept. 16, 2011, with Exs. 1 and 2 (doc. no. 364), and Defendant's Reply (doc. no. 659).

It is further **ORDERED** and **DECLARED** that Plaintiff General Refractories Company's proffered trial exhibits—the "Claims Database" and the "Queue," as identified in the Memorandum that accompanies this Order—are summaries of business records admissible under the Federal Rules of Evidence, Rules 803(6) and 1006, subject to their proper authentication by a records custodian or another qualified witness, and subject to proper, specific objections at trial.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 3450391, 97 Fed. R. Evid. Serv. 903

---

C

2005 WL 6460846
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

ENGERS, et al.

v.

AT & T, et al.

Civil Action No. 98–CV–3660 (JLL).
|
Sept. 9, 2005.

Named Expert: Claude Poulin, FSA, M.A.A.A., EA

**Attorneys and Law Firms**

Neil H. Deutsch, Jonathan I. Nirenberg, Deutsch Resnick, PA, Hackensack, NJ.

Christopher H. Mills, Fisher & Phillips, LLP, Corporate Park III, Somerset, NJ.

**LETTER–OPINION & ORDER**

JOSE L. LINARES, District Judge.

*1 Dear Counsel:

### Introduction

This matter is before the Court on defendants' motion to exclude certain evidence and to strike portions of plaintiffs' statement of facts filed pursuant to Local Civil Rule 56.1. More specifically, defendants have moved to exclude the supplemental declarations of Claude Poulin and Martha Anderson, and to strike portions of plaintiffs' L. Civ. R. 56.1 statement that are argumentative, baseless, founded upon inadmissible evidence, and the like. The Court has considered the submissions in support of and in opposition to the motion. There was no oral argument. *See* Fed.R.Civ.P. 78.

### Discussion

I. *Motion to Exclude the Supplemental Declaration of Claude Poulin* [1]

[1]      Preliminarily, contrary to plaintiffs' assertions, the Court sees nothing improper about filing a motion

to strike certain evidence from summary judgment submissions in lieu of addressing such concerns in summary judgment briefs. (*See* Pls.' Br. at 5.) Plaintiffs seem to suggest that defendants are required by the rules to waste pages in their summary judgment filings addressing their adversaries' procedural transgressions instead of their adversaries' substantive arguments. If there were such a requirement, the most procedurally deficient litigants would enjoy a distinct advantage.

Rule 26(e) imposes a duty to supplement expert and other disclosures. Rule 37(c)(1) provides that failure to supplement under Rule 26(e), "unless such failure is harmless," mandates the barring of the subject evidence from trial, motions practice, and the like. *See also* Fed.R.Civ.P. 37(b)(2) (empowering district courts to bar evidence as a sanction for violating court order). In considering exclusion as a sanction, this Court considers (1) the prejudice or surprise of defendants, (2) defendants' ability to cure that prejudice, (3) disruption of the orderly and efficient progress of this litigation, and (4) bad faith or willfulness on plaintiffs' part. *Nicholas v. Penn. State Univ.,* 227 F.3d 133, 148 (3d Cir.2000).

Here, the Court deems the sanction of exclusion too extreme. *See DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1202 (3d Cir.1978) (sanction of exclusion is drastic and must survive strict four-prong test set forth above). While it is true that plaintiffs failed to supplement their expert disclosures under Rule 26(e), the opinions proffered in Mr. Poulin's four-page supplemental declaration merely expound upon—and only briefly—opinions included in his original report. [2] *See Solaia Tech. LLC v. ArvinMeritor, Inc.,* 361 F.Supp.2d 797, 807–10 (N.D.Ill.2005) (striking previously undisclosed expert opinions from a declaration in defense of a summary judgment motion and declining to strike opinions in same declaration previously disclosed in the expert report). Mr. Poulin's elaborations, moreover, are based at least in part on the Sales Agreement this Court ordered defendants to produce on May 3, 2004 (*see* Hedges, J., Letter–Opinion & Order of 5/3/04), which was unavailable to plaintiffs at the close of expert disclosures. Consequently, there is insufficient prejudice to warrant exclusion, and defendants could remedy that prejudice fairly easily. *See Nicholas,* 227 F.3d at 148. Defendants' motion is DENIED.

[2]      Insofar as any of Mr. Poulin's arguments are in fact "new," defendants do not explain how.

(*See* Defs.' Br. at 7–8.) Indeed, defendants state that Mr. Poulin's arguments "further criticize" the former's methodology for setting cash account balances (*id.* at 7), which suggests to the Court that these arguments are duplicative rather than new, surprising, and prejudicial.

Plaintiffs are admonished, however, that similar tactics in the future will result in sanctions. Rule 16 provides that scheduling orders are binding on the litigants unless modified by subsequent order. Fed.R.Civ.P. 16(b), (e). Judge Hedges established a deadline for expert disclosures of January 31, 2004. (Hedges, J., Order of 12/1/03, ¶ 8.) Plaintiffs never requested leave of Court to supplement their disclosures, and the Court entered no order modifying Judge Hedges' Order of December 1, 2003. Notwithstanding these circumstances, plaintiffs filed the supplemental declaration of Mr. Poulin with its summary judgment filings on October 7, 2004. It is quite likely that, had plaintiffs requested leave to file a supplemental report on the basis of the newly produced Sales Agreement, such relief would have been granted. *See Dodge v. Cotter Corp.,* 328 F.3d 1212, 1228 (10th Cir.2003) (district court's failure to permit supplementation of expert disclosures may be abuse of discretion if that decision unreasonably limits available evidence). Nevertheless, plaintiffs were not *entitled* simply to ignore Judge Hedges' Order, as their opposition brief implicitly suggests. [3]

[3]   Plaintiffs' comparison of Mr. Poulin's supplemental declaration with the declarations of two of defendants' fact witnesses (*see* Pls.' Br. at 4) ignores both the distinct disclosure requirements applicable to expert testimony, *see* Fed.R.Civ.P. 26(a)(2) (B), and the substance of Judge Hedges' December 2003 Order.

II. *Motion to Strike the Declaration of Martha Anderson*

 *2  Defendants' motion to strike the declaration of Martha Anderson is GRANTED. Plaintiffs have not disclosed Ms. Anderson as a witness under Rule 26. This Court is unaware of any law exempting "summary witnesses" from Rule 26's requirements, and plaintiffs have not identified any. This is not surprising, as Rule 37(c) precludes a party from using *"any* witness" not disclosed pursuant to Rule 26, absent "substantial justification" for that non-disclosure, and Rule 26(a)(1)(A) exempts only impeachment witnesses from its initial disclosure requirement. Plaintiffs do not assert any reason for their failure to disclose Ms. Anderson under the rules, and the Court cannot divine one. The declaration is

therefore excluded on these grounds alone. *See* Fed.R.Civ.P. 37(c).

Further, the information on which Ms. Anderson's declaration is based, the results of an "ad hoc" internet survey, is inadmissible hearsay. Specifically, it is submitted only to demonstrate the truth of the matter asserted in the survey results, namely, that 221 people never received the Summary Plan Description in early 1998. Because plaintiffs can identify no exception to the hearsay rule under Federal Rules of Evidence 803 or 804 that would apply to these survey answers, the Court may not consider these. *See* Fed.R.Evid. 801(c), 802; *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 516 n. 14 (3d Cir.1998).

Plaintiffs' attempt to fit this survey into the "residual exception" to the hearsay rule under Federal Rule of Evidence 807 is unavailing. [4] Polls must be " 'conducted in accordance with generally accepted survey principles' " if they are to carry the "circumstantial guarantees of trustworthiness" required by Rule 807. *Brokerage Concepts,* 140 F.3d at 516 n. 14 (quoting *Pittsburgh Press Club v. United States,* 579 F.2d 751, 755–58 (3d Cir.1978)).

[4]
      Rule 807 provides:
      A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design,

the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. *Id.* (quoting *Pittsburgh Press Club,* 579 F.2d at 755–58) (quotes omitted).

Here, the survey so clearly fails all tests of trustworthiness that the Court will only address a couple of the reasons why. First, and most obvious, plaintiffs do not even argue that Ms. Anderson or Jane Banfield, the class member who purportedly set up the survey, is an expert. Instead, they submit that the survey's admittedly unscientific results are "anecdotal evidence." (Pls.' Br. at 8–9.) This argument ignores the trustworthiness requirements of *Pittsburgh Press Club.*

Second, the poll respondents are self-selected, rendering the sample necessarily unrepresentative and the responses' objectivity dubious. The survey is physically located on a website that is supportive of and apparently intended to advance the instant litigation. *See* http://att.nac.net/main.htm. The very link on the website that brings the would-be respondent to the survey itself states: "The results of the survey may be used as part of the class action lawsuit about the cash balance conversion, of which you are likely a participant." *Id.* Therefore, it can be fairly presumed that the poll's respondents do not actually represent a cross-section of the class, but instead a group of individuals, with internet access, whose members are aware of and unhappy with defendants' pension changes, and who took affirmative steps to fill out a survey knowing that certain answers would be helpful in a lawsuit in "which [they were] likely [ ] participant[s]." *Id.* This is not a representative sample, nor was the surveying even arguably objective. *See Brokerage Concepts,* 140 F.3d at 516 n. 14.

**\*3** For all these reasons, Ms. Anderson's declaration, as well as the survey submitted therewith, are stricken.

III. *Motion to Strike Portions of Plaintiffs' L. Civ. R. 56.1 Statement of Facts*

Defendants' motion to strike portions of plaintiffs' statement of facts is GRANTED to the extent that plaintiffs' statement asserts legal and other argument or relies on the Anderson declaration. *See Rodichok v. Limitorque Corp.,* 1997 U.S. Dist. LEXIS 9975, at \*2 n. 1 (D.N.J.1997). The Court notes that, as a practical matter, it would not consider bona fide arguments advanced in a statement of facts in any event, as the purpose of these statements is to narrow the issues before the Court, L. Civ. R. 56. 1, comment 2, and arguments inserted therein accomplish the opposite. The effect of the Court's ruling, therefore, will simply be that the Court will disregard argumentative statements in plaintiffs' statement of facts (as it would anyway) as well as any references to Ms. Anderson's internet survey.

### Conclusion

For the reasons set forth above, defendants' motion [215] to exclude the supplemental declaration of Claude Poulin is DENIED, defendants' motion to exclude the declaration of Martha Anderson is GRANTED, and defendants' motion to strike portions of plaintiffs' L. Civ. R. 56.1 statement is GRANTED IN PART.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 6460846

---

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

D

2018 WL 6573132
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

Hugo LOVO, et al.

v.

EXPRESS COURIER INTERNATIONAL, INC., et al.

ACTION NO. 4:16-CV-853-Y
|
Signed 10/24/2018

**Attorneys and Law Firms**

Allen Ryan Vaught, Melinda Arbuckle, Baron & Budd PC, Roger D. Marshall, Marshall Law Firm, Dallas, TX, for Hugo Lovo, Bashar Masoud, Mark Urbina, Luis Castellanos, Kaima C. Wilder, Suraj Bajracharya, Khalid Alfheed, Tariq Alfheed, Corey Tatum, Glennis Davis, Robert Woodrow, Sanjiv Prajapati, Khaled Bira.

Emily A. Quillen, Scopelitis Garvin Light Hanson & Feary PC, Fort Worth, TX, Adam Carl Smedstad, Pro Hac Vice, Andrew Joseph Butcher, Pro Hac Vice, Scopelitis Garvin Light Hanson & Feary, Chicago, IL, Elizabeth M. Beck, Lee and Braziel, Dallas, TX, for Express Courier International, Inc., EMP LSO Holding Corporation.

ORDER DENYING MOTION TO STRIKE EVIDENCE

TERRY R. MEANS, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court are Defendants' Objections to and Motion to Strike Plaintiffs' Summary-Judgment Evidence (doc. 89). In the motion, Defendants object to three summary damages exhibits and three photographs submitted by Plaintiff as evidence in response to Defendants' summary-judgment motion. After review of the motion to strike, related briefs, and applicable law, the Court concludes that the motion should be and hereby is DENIED.

Defendants object to Plaintiffs' summary damages exhibits on the grounds that they are unauthenticated, do not qualify as a Rule 1006 summary, and were not disclosed under Rule 26(a)(1)(A)(iii). Initially, the Court notes that Plaintiffs' brief contends that the summaries are solely intended to assist the Court in computing damages and suggests that Plaintiffs

do not intend to present these exhibits to the jury. (Pls.' Resp. Br. (doc. 97) 2.) Furthermore, although presentation of the witness who prepared a summary is generally the better course to authenticate the summary, it is not necessarily required. *See Mack v. Benjamin,* No. 13-552-JWD-RLB, 2015 WL 7313869, *2 (M.D. La. Nov. 20, 2015) (noting that "the Fifth Circuit has recognized that 'Rule 1006 is a special exception to the hearsay rule and does not require an authenticating witness' ") (quoting *Right of Way Maint. Co. v. Gyro-Trac Inc.,* 303 F. App'x 229, 230 (5th Cir. 2008) ); *see also Chapman v. A.S.U.I. Healthcare and Dev. Ctr.,* 562 F. App'x 182, 186 (5th Cir. 2014) (concluding that admission of damage summary exhibits in bench trial was not abuse of discretion, even though preparer of summary was not available for cross-examination; the defendant was able to argue about any claimed inaccuracies, and the court expressly took those inaccuracies into account); 6 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 1006.05[4] (Mark S. Brodin ed., Matthew Bender 2d ed. 1997) ("In a departure from the usual practice, Rule 1006 does not expressly require that charts, summaries, or calculations be authenticated on the witness stand, for example, by the person responsible for their preparation. However, as a practical matter, such testimony is usually useful.") (footnote omitted). And, contrary to Defendants' contention in their motion to strike, Plaintiffs' summary-judgment brief pointed out the underlying evidence from which the information on the summaries allegedly was obtained, (Pls.' Summ. J. Resp. Br. (doc. 82) 55-56), and much of it apparently was produced in discovery by Defendants. *See Chapman,* 562 F. App'x at 186 (upholding consideration of Rule 1006 damage summaries where the court was able to compare the summaries with the primary evidence and summaries were based on the opposing party's own records and the plaintiff's testimony). Finally, Rule 26(a)(1)(iii), which governs a party's initial disclosures made soon after the commencement of litigation, simply requires "a computation of each category of damages claimed." It does not require that all summaries under Rule 1006 be produced as part of a party's initial disclosures. Indeed, Rule 1006 requires only that the underlying documents upon which a summary is based be produced within a reasonable time and does not require that the summary be produced during discovery. *See Mack,* 2015 WL 7313869, at *2 ("The summary need not have been produced during discovery.") (citing 31 Victor James Gold, *Federal Practice & Procedure* § 8045 (1st ed. 2015) ("Rule 1006 provides that only the underlying documents, not the summaries themselves, must be produced to the opposing

party.") ). Consequently, the Court is not inclined to strike the summary damages exhibits at this time.

**\*2** Regarding the photographs, Defendants contend that they are unauthenticated hearsay. Plaintiffs have submitted a declaration of plaintiff Lovo with their response brief, however, sufficiently authenticating the photographs. And it appears that the two photos containing writing are not hearsay but instead an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(A). [1] Consequently, the photos will not be stricken.

[1] Regarding Plaintiffs' Exhibit EE, it appears from Plaintiffs' response brief that "Lovo 000077" (which is Plaintiffs' summary-judgment exhibit EE) is merely "a wider shot of th[e] same board" depicted in "Love 000076", which Lloyd Price confirmed contained Jory Russell's handwriting. (Pls.' Reply Br. (doc. 97) 9-10.)

**All Citations**

Slip Copy, 2018 WL 6573132

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

E

🏴 KeyCite Yellow Flag - Negative Treatment

Distinguished by J.V. by Ortiz v. Seminole County School Board, M.D.Fla.,
October 12, 2006

2006 WL 2263885
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

NORTH TRADE U.S., INC., Plaintiff,

v.

GUINNESS BASS IMPORT COMPANY d/
b/a Diageo–Guinness USA, Defendant.

Civil 3:03CV1892 (CFD)(TPS).
|
Aug. 7, 2006.

**Attorneys and Law Firms**

Charles Francis Gfeller, Edwards & Angell, Hartford, CT,
Daniel C. Oliverio, Ryan K. Cummings, Hodgson Russ,
Buffalo, NY, for Plaintiff.

Craig A. Raabe, Edward J. Heath, Jason Marc Kuselias,
Robinson & Cole, Hartford, CT, Ellen R. Belfer, Laurie U.
Mathews, Marty Steinberg, Hunton & Williams LLP, Miami,
FL, for Defendant.

*RULING ON DEFENDANT'S MOTIONS TO STRIKE*

THOMAS P. SMITH, Magistrate Judge.

**\*1** Pending before the Court are Defendant's two Motions
to Strike **(Dkts. # 106, 155)**. In its first Motion to Strike
**(Dkt.# 106)**, defendant Guinness Bass Import Company d/b/
a/ Diageo–Guinness USA ("Diageo") requests that the Court
strike Michael MacPherson's errata sheet from the record,
pursuant to Federal Rule of Civil Procedure 30(e). In its
second Motion to Strike **(Dkt. # 155),** Diageo asks the Court
to strike plaintiff North Trade's alleged improper declarations
pursuant to Federal Rules of Civil Procedure 56(e) and 30(e),
and District of Connecticut Local Rule 83.13. The defendant's
motions **(Dkt.# 106, 155)** are both **DENIED.**

**I. FACTS**

The relevant facts, as described in the parties' memoranda, are
as follows. The deposition of Michael MacPherson, one of the

two owners of North Trade, was taken on January 18, 2006.
On January 20, the court reporter from Esquire Deposition
Services sent a hard copy of the deposition transcript to
North Trade's attorney, who received the transcript January
23, 2006. On March 2, 2006, Mr. MacPherson's errata sheet
was sent to the Esquire Deposition Services. On the errata
sheet, Mr. MacPherson had made thirteen (13) changes to the
transcript, eight (8) of which are at issue here.

In addition to the errata sheet, plaintiffs submitted numerous
declarations related to the pending motions. On April 3, 2006,
Ryan K. Cummings, counsel for North Trade, submitted a
declaration in support of North Trade's Motion for Summary
Judgment. On April 24, 2006, both Mr. Cummings and
Mr. MacPherson submitted declarations in support of North
Trade's Memorandum in Opposition to Defendant's Motion
to Strike the Errata Sheet of Michael MacPherson. In these
declarations, Mr. MacPherson and Mr. Cummings explained
the changes Mr. MacPherson had made to his deposition
testimony. On the same date, Attorney Cummings submitted
a declaration in support of North Trade's Memorandum in
Opposition to Defendant's Motion for Sanctions. On May 12,
2006, Mr. MacPherson submitted a declaration in support
of North Trade's Memorandum in Opposition to Defendant's
Motion for Summary Judgment. Finally, on June 3, 2006,
Attorney Cummings filed a declaration in support of North
Trade's Memorandum in Opposition to Defendant's Motion
for Further Discovery Under Rule 56(f) and Issuance of a
Letter of Request.

Defendant argues that Mr. MacPherson's errata sheet should
be stricken because it improperly contained substantive
changes to his testimony and because it was not filed within
the time required by Rule 30(e) of the Federal Rules of Civil
Procedure. Plaintiff counters that Second Circuit authority
permits the types of changes made in the errata sheet.

Defendant Diageo similarly argues that the declarations of
Attorney Cummings and Mr. MacPherson are improper.
Defendant argues that if these declarations are made based
on personal knowledge, they "would make counsel for North
Trade a witness and ineligible to represent the plaintiff, and if
not based on personal knowledge are speculation and should
be stricken from the record." (Def.'s Mem. Supp. Mot. 2.)
Plaintiff argues, *inter alia,* that the declarations need not
be stricken because they are in accordance with Federal
Rule of Civil Procedure 30(e). Further, plaintiff argues that
defendant's reliance on Rule 56(e) and Local Rule 83.13 is
misplaced.

## II. STANDARD OF REVIEW

### A. Changes to a Deposition Transcript

**\*2** Federal Rule of Civil Procedure 30(e) states:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.

Fed. R. Civ. Proc. 30(e). The circuits are split as to the scope of permissible changes that may be made to a deposition transcript under Rule 30(e). 7 *Moore's Federal Practice* § 30.60[3] (Matthew Bender 3d ed.2006). Some courts have held that the only changes permitted by Rule 30(e) are non-substantive in nature, such as the correction of typographical or spelling errors. *See, e.g., Burns v. Bd. of County Comm'rs,* 330 F.3d 1275, 1282 (10th Cir.2003); *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D .La.1992). Other courts, including the Second Circuit, have allowed deponents to make any change, in form or substance, to their deposition transcript. *See Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir.1997) (affirming District Court's finding that deponent was not entitled to have his altered answers replace the original ones, but rather that his changed answers became a part of the record generated during discovery).

### B. Attorney Affidavits

Affidavits are frequently used to support Motions for Summary Judgment, however Rule 56(a) states that the use of affidavits is within the discretion of the moving party. Fed.R.Civ.P. 56(a). Further, although Rule 56 only discusses affidavits, courts generally also treat written statements subject to the penalty of perjury as the equivalent of an affidavit for summary judgment. See *DeMars v. O'Flynn,* 287 F.Supp.2d 230, 242 (W.D.N.Y.2003).

In certain circumstances, it is appropriate for attorneys to submit personal affidavits in support of their motions for summary judgment. Counsel may present admissible evidence in an affidavit where the evidence relates to items in the case, such as items in the record or items produced in discovery. 11 Moore's Federal Practice § 56.14(1)(c) (Matthew Bender 3d ed.2006). However, an attorney may not use the affidavit as a vehicle through which to introduce new evidence in support of the litigant's position, unless the documents were "already in the record, were created as part of the litigation (e.g. discovery materials), or relate to client representation or law firm matters on which the attorney is competent to testify." *Id.*

## III. DISCUSSION

### A. Errata Sheet

Defendant argues that Mr. MacPherson's errata sheet materially altered his deposition testimony, and it should therefore be stricken. Regardless of whether the alterations made were material or not, the Court finds that MacPherson's alterations are permissible.

The rationale for allowing material changes to testimony is that the original answers to the deposition questions will remain part of the record and can be introduced at the trial. 7 *Moore's Federal Practice* § 30. 60[3] (Matthew Bender 3d ed.2006). Since the prior testimony is not removed from the record, the deponent may be cross-examined and impeached by any inconsistencies in his testimony. *Id.* Under this approach, the finder of fact may make a determination as to the credibility of the deponent, thus reducing the risk that the record can be manipulated. *Id.* For this reason, there will be no prejudice to the defendant if MacPherson's changes are not stricken from the record.

**\*3** Although Federal Rule of Civil Procedure 30(e) allows a deponent thirty (30) days to make changes to his deposition transcript, the fact that Mr. MacPherson's edits were several days overdue did not unduly prejudice the defendant. Plaintiff represents that Mr. MacPherson was on vacation during the review period, and the Court accepts this representation. Therefore, the slight delay in return is not fatal in this instance. In sum, the Court finds that there was no prejudice caused by the alterations on Mr. MacPherson's errata sheet, nor by his short delay in returning it to the deposition service.

## B. Declarations of Mr. MacPherson

Defendant Diageo also argues that Mr. MacPherson tried to change his deposition testimony through his declarations. Diageo argues that MacPherson's declaration is an opinion as to law and is an attempt to create a genuine issue of material fact to defeat summary judgment. (Def.'s Mem. Supp. Mot. 4). *Podell* did not hold that new evidence may not be introduced, but rather held that a District Court should look at the totality of the evidence when new evidence is introduced to defeat summary judgment. *Podell,* 112 F.3d at 103. The Second Circuit Court of Appeals found that it was appropriate for the District Court to make a finding of summary judgment despite the introduction of new evidence, because "Podell's effort to retrieve the situation by scratching out and recanting his original testimony [did] not weigh enough in the balance to create an issue of fact for a jury." *Id.* Similarly, in the instant case, MacPherson's declarations do not automatically create an issue of fact and therefore defeat summary judgment, as the defendant suggests. Accordingly, Defendant's Motion to Strike the Declarations of Mr. MacPherson is **DENIED.**

## C. Declarations of Attorney Cummings

Diageo also argues that Attorney Cummings' declarations should be stricken because they are not based on personal knowledge, as required by Federal Rule 56(e). However, three of the four declarations at issue **(Dkt. # 114, 118 & 165)** are unrelated to the motion for summary judgment; rather, they are related to motions for sanctions, to strike an errata sheet, and for further discovery. For this reason, the personal knowledge requirement of Rule 56(e) does not apply.

Diageo also argues that Attorney Cummings' declarations set out contested facts, in violation of Local Rule 83.13. Diageo asserts that if the Court considers the Cummings declarations, Cummings will become a witness in the case.

### 1. April 4th Declaration (Dkt.# 107)

The personal knowledge requirement of Rule 56(e) applies to affidavits in support of a Motion for Summary Judgment, such as this . [1] The Court finds that portions of the information contained in this declaration were not within Attorney Cummings' personal knowledge. Initially, the Court notes that the declaration addresses pertinent dates and events in the litigation about which any attorney involved in this case would seem to have knowledge. The exhibits attached to Attorney Cummings' declaration are also permissible, as they do not contain evidence that is not already in the record.

However, much of Attorney Cummings' declaration seems to address contested facts that are not within his personal knowledge. *(See, e.g.,* ¶¶ 70–71, 82, 97–98, 100–101, 103–104, 130–131.)

[1]      Attorney Cummings has submitted a declaration, and *not* an affidavit. However, the Court finds that this Cummings' declaration is functionally equivalent to an affidavit for the purposes of this analysis, as they are sworn to and signed.

**\*4** An attorney's affidavit or declaration not based on personal knowledge carries no weight. *Omnipoint Communs., Inc. v. Common Council of Peekskill,* 202 F.Supp.2d 210, 213 (S.D.N.Y.2002). When an affidavit does not comply with the requirements of Rule 56, the offending portions should be disregarded by the court. *Wahad v. FBI,* 179 F.R.D. 429, 435 (S.D.N.Y.1998) (citing *United States v. Alessi,* 599 F.2d 513, 514–15 (2d Cir.1979)).

Although the facts included in Attorney Cummings' declaration are not within his personal knowledge, it does not seem that the declaration prejudices the defendant. The Judge considering Plaintiff's Motion for Summary Judgment may make a determination concerning the appropriate weight to assign Attorney Cummings' declaration, and whether or not portions of it should be disregarded, at that time. Although Attorney Cummings improperly uses this declaration as a forum for legal argument, the defendant is not prejudiced, and therefore Defendant's Motion to Strike **(Dkt.# 155)** as to Cummings' April 4 declaration (Dkt.# 107) is DENIED without prejudice. Attorney Cummings should cease using declarations for the purpose of argument from this point forward. Notarized argumentation is not necessary or helpful.

### 2. The Remaining Declarations of Attorney Cummings (Dkt. # 114, 118, and 165)

The three remaining declarations of Attorney Cummings do not relate to a motion for summary judgment, and therefore the requirements of Rule 56(e) do not apply. *See U.S. Small Business Admin. v. Citibank, N.A.,* No. 94 Civ. 4259(PKL), 1997 WL 45514 (S.D.N.Y., February 4, 1997). Attorney Cummings' April 24, 2006 Declaration concerning the errata sheet sets out the circumstances surrounding Michael MacPherson's review of his deposition transcript. **(Dkt. # 114.)** The April 24, 2006 declaration concerning Diageo's Motion for Sanctions identifies relevant facts and documentary support for North Trade's opposition to the sanctions. **(Dkt.# 118.)** This declaration argues

against Diageo's Motion for Sanctions by identifying relevant facts and documentary support for North Trade's position. Cummings' June 3, 2006 declaration lays out a timeline relating to discovery issues in this litigation. **(Dkt.# 165.)**

Although the "personal knowledge" requirement does not apply, Attorney Cummings has made a representation under oath that each declaration is based upon his personal knowledge. A l t h o u g h defendant is skeptical that these declarations are based on personal knowledge, and legal arguments more appropriately placed in memoranda, the Court finds that Attorney Cummings' declarations have not prejudiced defendant Diageo. As such, Defendant's Motion to Strike is **DENIED.** There should be no further declarations of this type.

### IV. CONCLUSION

For the foregoing reasons, the Defendant's Motions to Strike **(Dkt.# 106, 155)** are hereby **DENIED.** This is not a recommended ruling. This is a discovery ruling and order reviewable pursuant to the "clearly erroneous" standard of review. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 6(a), (e) and 72(a); and Rule 2 of the Local Rules for U.S. Magistrate Judges. As such, it is an order of the court. *See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same).

**\*5** IT IS SO ORDERED at Hartford, Connecticut this 7th day of August, 2006.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2263885

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.



2012 WL 425182
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Rajnish K. DAS and Stormy L. Dean, Defendants.

No. 8:10CV102.
|
Feb. 8, 2012.

**Attorneys and Law Firms**

Gregory A. Kasper, Ian S. Karpel, Nicholas Heinke, Patricia E. Foley, Rebecca L. Franciscus, Thomas J. Krysa, Securities & Exchange Commission, Denver, CO, for Plaintiff.

Kevin M. Shea, Michael Murray, Richilano, Shea Law Firm, David A. Zisser, Michelle M. Meyer, Davis, Graham Law Firm, Denver, CO, for Defendants.

**MEMORANDUM AND ORDER**

LAURIE SMITH CAMP, Chief Judge.

**\*1** This matter is before the Court on the Defendants' Motion in Limine to Strike Witnesses from the SEC's Nonexpert Witness List and to Limit the Testimony of Steven Henning (Filing No. 156); the Defendants' Motion in Limine to Exclude Evidence of Subsequent Remedial Measures and Settlement Agreements (Filing No. 160); and the Defendants' motions requesting for hearing on the Motions in Limine (Filing Nos. 165, 176). The Court has reviewed the parties' briefs and indexes of evidence, and concludes that the motion to strike witnesses and limit testimony should be denied; the motion to exclude evidence of subsequent remedial measures and settlement agreements should be granted; and the motions for hearing should be denied. The Court's rulings are, of course, without prejudice to the Defendants raising objections to testimony and offers of evidence at the time of trial, and without prejudice to the Plaintiff revisiting the issue of the admissibility of evidence of the alleged "subsequent remedial measures" and settlement agreements, outside the presence of the jury.

**DISCUSSION**

**I. Exclusion of Recently Added Witnesses**

Defendants Rajnish Das ("Das") and Stormy L. Dean ("Dean") ask the Court to exclude the testimony of three witnesses [1] that came to the attention of the Plaintiff Securities and Exchange Commission ("SEC") during Dean's deposition, asserting that the SEC failed to disclose the witnesses in a timely and proper manner. Das and Dean suggest three separate bases for the exclusion of these witnesses: (1) the SEC's failure to make (or timely supplement) a disclosure of individuals likely to have discoverable information under Fed.R.Civ.P. 26(a)(1)(A)(I); (2) the SEC's failure to disclose witnesses under Fed.R.Civ.P. 26(a)(3)(A)(I) in a timely and proper manner; and (3) the SEC's failure to comply with the court's progression order requiring the timely disclosure of witnesses.

[1]  Bruce Baird, Joseph G. Connolly, Jr., and Joseph Gilligan.

**A. Initial Disclosures**

Rule 26(a)(1)(A)(I) requires disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the discovering party may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e) requires parties to supplement initial disclosures "in a timely manner ... if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." The parties here do not dispute that the newly disclosed witnesses were unknown to the SEC at the time initial Rule 26(a)(1)(A)(I) disclosures were due. The question is whether the SEC should have supplemented its initial disclosures upon becoming aware of the witnesses and the likelihood that they held discoverable information helpful to the SEC.

The parties appear to agree that the SEC became aware of the new witnesses during Dean's deposition on June 30, 2011. Thus, Das and Dean also became aware of the witnesses, and their potential use, at that time. Because the SEC did not interview the new witnesses until after the December 16, 2011, witness disclosure deadline, it is unlikely that the SEC knew any more about the potential testimony of the witnesses than Das and Dean knew, up until that time.

**\*2** The SEC cites to Rule 26's 1993 Advisory Committee Notes, suggesting that discovery of a new witness in a deposition is precisely the kind of notice that Rule 26(e) anticipates will relieve a party of the duty to file supplemental disclosures. Das and Dean respond that the 1993 Advisory Committee Notes are "superceded" by a 2000 amendment to Rule 26(a)(1)(A) that narrowed the scope of initial disclosures from *all* witnesses or documents whether favorable or unfavorable, to those witnesses or documents the disclosing party may use to support its claims or defenses. Das and Dean appear to argue, first, that the 1993 Committee was envisioning a party who discovered a witness during a deposition that could be of use *to the opposing party* and therefore should be relieved of making supplemental disclosures with respect to such a witness, and, second, because the amended rule no longer requires disclosure of witnesses that could be of use to the opposing party, the Committee's comments are no longer applicable. This Court is not persuaded by that argument. First, the 1993 Committee Note made no such distinction, and, second, Rule 26(e)'s language has remained unchanged since 1993—it continues to relieve a party of supplemental disclosure responsibilities when the other party receives notice through the discovery process.

### B. Pretrial Disclosures
Rule 26(a)(3)(A)(I) requires the disclosure of "the name and, if not previously provided, the address and telephone number of each witness—separately identifying those the party expects to present and those it may call if the need arises." While the Rule clearly requires basic contact information and designation of "may call" or "will call," the Rule does not require disclosure of the subject of the testimony (as does Rule 26(a)(1)(A)(I) above). Although the witness list filed with the Court does not contain contact information (it merely states that the SEC separately supplied the information to the Defendants), Das and Dean have not specifically objected to the lack of such contact information. Instead, they claim that they have not been provided with sufficient information about the witnesses to allow for the development of discovery and trial strategies. Rule 26(a)(3)(A)(I), however, merely requires disclosure of witnesses and their contact information at least 30 days before trial (Fed. R. Civ.Pro.26(a)(3)(B)). The shortness of this notice indicates that the Rule is not intended to give rise to significant discovery, but rather to give the parties some notice of the witnesses that will be called and how they can be contacted. Aside from the lack of some contact information, the SEC's December 16, 2011,

filing satisfies both the substantive and timing requirements of the Rule.

### C. Progression Orders
The initial progression order in this case required disclosure of witnesses before the October 7, 2010, planning conference. Because there was no deadline for discovery at that time, the progression order did not require more than disclosure of anticipated witnesses known as of October 7, 2010—reinforcing the initial disclosure requirements of Rule 26(a)(1)(A).I.

**\*3** The second progression order set a deadline of September 9, 2011, for the disclosure of witnesses and a discovery deadline of June 30, 2011. In August 2011, the third progression order moved the witness-disclosure deadline to December 16, 2011. Because the SEC satisfied the timing requirement of the third progression order by filing witness disclosures on December 16, 2011, and because the progression orders did not anticipate substantive discovery opportunities after the witness disclosure deadlines, the contention that the SEC violated the progression orders is unfounded.

Because the witnesses in question were disclosed during Dean's deposition, it is likely that Dean (and Das) knew more about the witnesses' contact information and potential testimony than the SEC knew. If, however, there is a question as to whether Das and Dean had timely actual notice of the witnesses' contact information and an opportunity to speak with them in preparation for trial, that will be addressed by the Court at its meeting with counsel in chambers on February 14, 2012, at 8:30 a.m.

### II. Use of SEC's Expert as a "Fact Witness"
Das and Dean object to the SEC's anticipated use of its expert witness, Steven Henning, as a "fact witness." The objection is based on the same arguments addressed above with respect to timely and adequate disclosure of witnesses: (1) failure to disclose (or timely supplement) under Rule 26(a)(1)(A)(I), (2) failure to timely disclose as a "fact witness" under Rule 26(a)(3)(A)(I), and (3) failure to timely disclose as a "fact witness" under the progression orders. Das and Dean also claim that Henning's testimony will impermissibly summarize the SEC's case. The SEC contends that Henning's "fact testimony" will simply be authentication of certain summary evidence admissible under Fed.R.Evid. 1006, or

demonstratives, permissible in the Court's discretion under Fed.R.Civ.P. 611(a). [2]

[2] Das and Dean have not specifically objected to the summary evidence itself at this time, but have expressed their intention to object to evidence underlying the summaries. Such objections are not before the Court at this time, and will be addressed when raised. Nothing in this Memorandum and Order is meant to suggest the ultimate admissibility of the summaries or of the underlying evidence. The Court simply declines to preclude Henning, in limine, from offering testimony about the summaries.

Because Das and Dean concede that Henning is an expert witness who has no first hand personal knowledge of any facts relevant to this case, there is no basis to suggest that the SEC should have disclosed, initially or in a supplement, that Henning was an "individual likely to have discoverable information." For the same reasons outlined in sections I.B and I.C. above, the disclosure of Henning as a witness on December 16, 2011, satisfied the requirements of the witness-disclosure Rules and the progression orders.

If Henning merely authenticates summary evidence, Das and Dean have no cause for concern that he will impermissibly summarize the SEC's version of the facts. The SEC does state, however, that Henning will "describe ... what those summaries reflect." Das and Dean refer the Court to two cases in support of their contention that such testimony by an expert witness should be excluded: *Schreiber v. Nebraska,* 2007 WL 610411, *4 (D.Neb., Feb. 23, 2007), and *SEC v. Shanahan,* 2010 WL 415267 * (E.D.Mo.2010). While both cases suggest that a witness should not provide analysis of evidence that the jury can evaluate on its own, neither case addresses the appropriateness of a witness describing the nature of, and basis for, summary evidence. Although not strictly necessary for the admission of summary evidence, an expert's description may prove useful to a jury unfamiliar with the nature of such summaries, and the Court will not foreclose the use of such testimony by an order in limine.

*4 As an alternative argument, Das and Dean object to the characterization of Henning's expected testimony as "non-expert." Indeed, the SEC acknowledges that the summaries include data that Henning, "confirmed, in his expert opinion, were perquisites." Das and Dean thus object on the grounds that these summaries are expert evidence that the SEC

failed to timely disclose as such. The SEC counters that the underlying evidence has been available and that no new expert testimony is being offered.

While the Court does not intend to permit Henning to suggest to the jury what conclusions it should draw from summary evidence that the jury can evaluate on its own, nor to interject non-disclosed expert opinions under the guise of "fact" testimony, the Court will not foreclose the use of Henning's testimony by an order in limine under Das and Dean's alternate argument. Their objections may be made at the time of trial, when the nature of the summaries and the line of questioning are both apparent. If necessary, the jury will be excused while the proper scope of Henning's testimony about the summaries is defined. [3]

[3] The SEC also contends that the summaries are admissible under 611(a) as demonstratives. If the Court were to permit the summaries to be shown to the jury as demonstrative of evidence already admitted, the summaries themselves would not be considered evidence and would not go to the jury at the close of the case. See, e.g.,; *U.S. v. Milkiewicz,* 470 F.3d 390, 397 (1 st Cir.2006) (noting that a chart or other summary tool must be linked to evidence previously admitted and usually is not itself admitted into evidence); *U.S. v. Janati,* 374 F.3d 263, 273 (4th Cir.2004) (holding that "pedagogical charts or summaries may include witnesses' conclusions or opinions, or they may reveal inferences drawn in a way that would assist the jury. But displaying such charts is always under the supervision of the district court under Rule 611(a), and in the end they are not admitted as evidence."); and *U.S. v. Buck,* 324 F.3d 786, 790 (5th Cir.2003) (holding that demonstratives are not evidence, and Rule 611 is meant to allow pedagogical aides to clarify evidence that has already been admitted).

### III. SEC Evidence of Subsequent Remedial Measures

The SEC intends to introduce evidence of certain amended SEC filings made by Das and Dean's former employer, to demonstrate that earlier filings made by Das and Dean were incorrect and materially false or misleading. Das and Dean contend that the later filings were "subsequent remedial measures," and should be excluded under Fed. R. Ev. 407, which provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measure is not admissible to prove ... culpable conduct.... This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, ... or impeachment.

The purposes underlying Rule 407 include (a) the elimination of a strong disincentive for remedial measures made in the public interest, and (b) the recognition that evidence of subsequent remedial measures may lead a jury to draw a powerful, but often unfair, inference of culpable conduct on the part of a defendant. This latter purpose ties in with Fed. R. Ev. 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, [or] confusion of the issues...."

It is recognized that the amended filings may have some relevance. As this Court stated in its Memorandum and Order of September 20, 2011, however, "material evidence will be that which relates to Das's and Dean's knowledge at the time of their alleged misstatements or omissions, and *not* evidence that was unknown to Das and Dean at the time they made their certifications, but has since been revealed through subsequent investigations or by remedial measures." (Filing No. 139 at 14.) It is also recognized that the amended filings ultimately may be admitted for a purpose such as impeachment. But, for now, it appears that admission of the amended filings would be unfairly prejudicial to the Defendants, and the Court will grant their motion in limine to preclude the SEC from offering such evidence in its case-in-chief. Similarly, the Court will exclude, in limine, under Rule 403, evidence of the spreadsheets created by Das and Dean's former employer under its new accounting principles.

 **\*5**  With respect to evidence of the settlement of shareholder derivative actions, which Defendants seek to exclude as evidence of a compromise or offer to compromise, under Rule 408 [4], the SEC states that it has no concrete plans to offer any such evidence. (SEC Brief, Filing No. 167 at 25.) It does, however, intend to refer to evidence gathered by the shareholders' Special Litigation Committee in preparation for the litigation that led to the settlement. (*Id.* at 26.) Defendants did not move, in limine, to exclude such evidence under Rule 408, Rule 403, or otherwise, although in their Reply Brief they argue that such evidence is irrelevant, hearsay, and not probative of any issue in this case. (Filing No. 180. at 18.) Accordingly, the Court will grant the Defendants' motion with respect to the settlement of the shareholders' derivative action and negotiations leading to that settlement, without further analysis at this juncture.

[4]   Rule 408 provides in pertinent part as follows: "Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction: (1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim,...." The purposes underlying Rule 408 include (1) the promotion of a public policy favoring compromise and settlement of disputes, and (2) elimination of the unfair inference that settlement implies culpability.

IT IS ORDERED:

1. The Defendants' Motion in Limine to Strike Witnesses from the SEC's Nonexpert Witness List and to Limit the Testimony of Steven Henning (Filing No. 156) is denied;

2. The Defendants' Motion in Limine to Exclude Evidence of Subsequent Remedial Measures and Settlement Agreements (Filing No. 160) is granted;

3. The Defendants' Request for Fed.R.Evid. 104 Hearing Regarding the Motion in Limine to Exclude Evidence of Subsequent Remedial Measures and Settlement Agreements (Filing No. 165) is denied as moot; and

4. The Defendants' Motion for Hearing regarding their Motion in Limine to Strike Witnesses from the SEC's Nonexpert Witness List and to Limit the Testimony of Steven Henning (Filing No. 176) is denied.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 425182

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

G

2005 WL 3701472
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

UNITED STATES OF AMERICA, Plaintiff,

v.

Jesus SARRAGA–SOLANA, Defendant.

No. CRIM.A. 04–144–6–JJF.
|
Oct. 6, 2005.

**Attorneys and Law Firms**

Adam Safwat, U.S. Attorneys, Wilmington, DE, for Plaintiff.

*MEMORANDUM ORDER*

FARNAN, J.

 **\*1**  Pending before the Court is the Government's Motion In Limine (D.I.234) and the Government's Supplemental Motion In Limine (D.I.238). For the reasons discussed, the Motion In Limine (D.I.234) will be granted in part and denied in part and the Supplemental Motion In Limine (D.I.238) will be granted.

I. BACKGROUND

This case involves several alleged conspirators who trafficked drugs from Philadelphia, Pennsylvania to Wilmington, Delaware. Defendant is alleged to have sold drugs to Anthony Copeland in Wilmington. Defendant is the only conspirator going to trial. Trial is scheduled to commence on October 5, 2005.

On September 23, 2005, the Government filed a Motion In Limine (D .I. 234), requesting that the Court rule on the admissibility or use of certain evidence. Attached to the Motion were two exhibits. Exhibit A included the certifications of custodians of records at T–Mobile USA, Inc. and Excelon Business Services Company; exhibit B included transcripts of tape-recorded conversations between Defendant and Copeland and Copeland and an unnamed man. On September 27, 2005, after the date that motions were due, the Government filed a Motion For Leave To File Supplemental Motion in Limine (D.I.237) and a proposed Supplemental Motion In Limine (D.I.238). By its Order, the Court granted the Government's Motion For Leave To File

(D.I.239). Defendant has not filed a response to either of the Government's motions.

II. DISCUSSION

A. *Whether testimony about Defendant's prior drug transactions should be admitted under Rule 404(b)*

The Government seeks to admit the testimony of Anthony Copeland, one of Defendant's alleged co-conspirators, who will testify about prior drug transactions with Defendant that occurred earlier in 2004. The Government contends that the testimony does not go to Defendant's propensity to commit this crime, but is being offered "to establish the closeness of the cooperation between Copeland and the defendant regarding price and volume of heroin, as well as method of delivery ... [and] the defendant's intent to deliver amounts of heroin during the conspiratorial time period that are consistent with the amount charged in the Superseding Indictment." (D.I. 234 at 2).

Evidence of other acts, which tend to show the defendant's propensity to commit the charged crime, are inadmissible. Fed.R.Evid. 404(b). Evidence of other acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

In the Third Circuit, there is a four-part test for determining the admissibility of evidence under Rule 404(b). The test requires: "(1) a proper evidentiary purpose; (2) relevance under Rule 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Rule 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used." *United States v. Butch,* 256 F.3d 171, 175–76 (3d Cir.2001).

 **\*2**  First, in order to demonstrate a proper evidentiary purpose, the Government must clearly articulate the purpose for which the evidence will be used and the inferences that can be drawn therefrom. *United States v. Mastrangelo,* 172 F.3d 288, 295 (3d Cir.1999). Copeland will testify about previous drug transactions, and from this testimony, the Government wants the jury to infer that Copeland and Defendant had a close relationship, that the prior drug transactions are similar to the one charged in the amount of drugs, etc., and that Defendant intended to sell drugs. Because the Government has articulated a purpose and has stated the inferences to be drawn from the testimony, the Court concludes that the first prong of the test has been satisfied.

Second, the evidence must have relevance under Rule 402, meaning that the evidence must be relevant under the Constitution, the Federal Rules of Evidence, and other federal statutes. Courts have accepted reasons similar to those offered by the Government as relevant under Rule 402. In *United States v. O'Leary,* the prosecution successfully argued that a co-conspirator's testimony about earlier purchases of cocaine from the defendant was necessary to demonstrate the "background of the charges, the parties' familiarity with one another, and their concert of action." *O'Leary,* 739 F.2d 135, 136–37 (3d Cir.1984). Similarly, in *Butch,* the court permitted a co-conspirator's testimony because it was "relevant to provide necessary background information, to show an ongoing relationship between [the defendant and a co-conspirator], and to help the jury understand the co-conspirator's role in the scheme." *Butch,* 256 F.3d at 176 (quoting *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.1982)). Under these decisions, the Government's reasons for offering Copeland's testimony appear to have relevance under Rule 402.

Third, the Court must make a Rule 403 determination of whether the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Fed.R.Evid. 403. If the probative value is substantially outweighed by any of those factors, the evidence must be excluded.

This evidence could unfairly prejudice Defendant and mislead the jury. The evidence is not very probative because the Government has other ways of showing the price and volume of heroin that was sold during the conspiracy —namely, recorded telephone conversations, information obtained from informants, information obtained from those involved in the conspiracy, and the heroin that was seized from the Oldsmobile Cutlass in December 2004. Additionally, Copeland could testify to the amount of drugs and money exchanged in the actual conspiracy without going into prior transactions. Finally, the Government can establish Copeland's and Defendant's relationship by having Copeland testify to their relationship during the conspiracy instead of their prior relationship.

**\*3** While the probative value is little, the potential prejudice to Defendant from use of the evidence is great. The Defendant was neither convicted of nor charged with the prior bad acts

to which Copeland could testify. Also, the jury is likely to interpret Copeland's testimony as evidence that Defendant committed the crime for which he is on trial. While limiting instructions may have some effect in reducing prejudice, the Court is not convinced that a jury can compartmentalize Copeland's testimony once it has been presented.

Because of the undue prejudice that could result and the limited probative value of Mr. Copeland's testimony under Rule 403, the Court will *DENY* the Government's Motion In Limine I Motion To Use Evidence Of Prior Drug Dealing With Co–Conspirator (D.I.234, I).

> B. *Whether Defendant's prior arrests under different aliases should be admitted for purposes of impeaching Defendant's character for truthfulness should Defendant choose to take the stand*

If the Defendant testifies, the Government seeks to impeach him regarding his truthfulness by questioning him about the use of aliases in connection with prior drug charges in 2001 and 2002. The Government asserts that it will not inquire into the nature of the charges.

Federal Rule of Evidence 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved by extrinsic evidence. They may, however, ... if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness."

Fed.R.Evid. 608(b). There are several safeguards against abuse of this form of impeachment, including Rule 403, the requirement that the government have a good faith basis for asking about the prior conduct, and the requirement that the specific instance of conduct not be too remote in time. Fed.R.Evid. 608(b) advisory committee's note. Additionally, the prohibition against extrinsic evidence "bars any reference to the consequences that a witness might have suffered as a result of the alleged bad act." *Id.*

Providing a false name is a specific act of conduct that is probative of truthfulness, and therefore, may be used to impeach Defendant's character for truthfulness if he chooses to testify, provided that the safeguards of Rule 608 do not prevent its use. *See* *United States v. Davis,* 183 F.3d 231, 256 (3d Cir.1999); *see also* *United States v. Ojeda,* 23 F.3d 1473 (8th Cir.1994). However, if Defendant denies using aliases, the Government must accept Defendant's answer due to the prohibition on extrinsic evidence. *Carter v. Hewitt,* 617 F.2d 961, 969–72 (3d Cir.1980).

The safeguards of Rule 608 do not prevent the use of this form of impeachment. The Government has matched Defendant to the aliases through fingerprints, and therefore, has a good faith basis for inquiring into the specific instances of conduct. Under Rule 403, the use of aliases is probative of Defendant's truthfulness and not unfairly prejudicial to Defendant so long as the Government avoids mentioning that the aliases were utilized by Defendant when he was charged with a drug-related crime. Drug use and possession are not probative of truthfulness, and therefore, cannot be used to impeach a witness' character for truthfulness. *See* *United States v. Wilson,* 244 F.3d 1208, *25–27 (10th Cir.2001) ("drug crimes ... have no relation to truth or untruth"); *see also* *United States v. Turner,* 104 F.3d 217, 233 (8th Cir.1997). Finally, the Government may not mention any repercussions that resulted from using the aliases. For these reasons, the Court will *GRANT* the Government's Motion in Limine II Defendant's Prior Arrests Under Different Aliases (D.I.234, II).

### C. *Whether telephone toll records and energy billing records are properly self-authenticating through certifications provided by custodians of records*

**\*4** The Government seeks to admit at trial telephone toll records from several of Defendant's cellular phones and energy billing records from Defendant's apartment at 9352 Neil Road. The Government seeks a ruling on whether the documents are properly self-authenticating and does not request that the Court determine whether the documents are relevant or otherwise admissible at this time.

Federal Rule of Evidence 803(6) allows an exception to the hearsay rule for a record if it is "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make" the record. Fed.R.Evid. 803(6). Such a record is self-authenticating under Rule 902(11),

provided that it is accompanied by a declaration, signed by the custodian of records stating that the record meets the requirements of 803(6). *See* *Rambus, Inc. v. Infineon Techs. AG,* 348 F.Supp.2d 698, 701 (D.Va.2004) ("Rules 803(6) and 902(11) go hand in hand.").

The Government has provided the Declarations of Susan Johnson and Anthony Cosuello, who swear that they are custodians of records at T–Mobile USA, Inc. and Excelon Business Services Company. The Declarations state that the records the Government seeks to admit were made at or near the time the information was transmitted by employees with knowledge, that the records are kept in the course of regularly conducted business, and that it is the regular practice of the companies to make such records. Because the Government has provided the declarations of the custodians of records, and because the declarations meet the requirements of Rule 803(6), the records are properly authenticated. Accordingly, the Court will *GRANT* the Government's Motion In Limine III Self–Authenticating Business Records (D.I.234, III). Additionally, the Court will *GRANT* the Government's Supplemental Motion in Limine (D.I.238).[1]

1     The Government first sought a ruling on the records for certain telephone numbers through its Motion In Limine, and by its Supplemental Motion In Limine, sought a ruling on an additional telephone number.

### D. *Whether summaries of telephone toll records between co-conspirators and summaries of recorded telephone conversations between Anthony Copeland and his buyers should be admitted under Rule 1006*

The Government seeks to admit a summary of telephone toll records for calls between co-defendants during the period of the alleged conspiracy. The Government also seeks to admit a summary of the recorded wire-tapped telephone conversations between Anthony Copeland and his buyers.

Federal Rule of Evidence 1006 requires the proponent of a summary to establish that: (1) the documents are so voluminous that the trier of fact cannot conveniently examine them in court; (2) the documents have been made available to the opponent for examination or copying; (3) the original documents are admissible into evidence; (4) the summary is accurate and does not prejudice the other side; and (5) a proper foundation will be laid before admitting the summaries into

evidence. Fed.R.Evid. 1006; *United States v. Pharis,* 2000 U.S. Dist. LEXIS 14514, 2–3 (E.D.Pa.2000).

1. *Whether summaries of telephone toll records between co-conspirators should be admitted under Rule 1006*

**\*5** The Government may admit the proffered evidence once it establishes the threshold facts for admission under Rule 1006. The Government must demonstrate that the documents are voluminous, the original documents have been made available to Defendant, the summary is accurate and non-prejudicial, and a proper foundation can be laid for the summaries. The foundation that must be laid for the summaries is independent of the foundation laid for the original documents. Fed.R.Evid. 1006 advisory committee's note.

Should the government meet these requirements of Rule 1006, the summary of the telephone toll records will be admissible. *See United States v. Atchley,* 699 F.2d 1055 (11th Cir.1983); *United States v. Dorta,* 783 F.2d 1179 (4th Cir.1986). Accordingly, the Court will *DENY WITH LEAVE TO RENEW* the Government's Motion in Limine IV Fed.R.Evid. 1006 Summary Exhibits Of Toll Records (D.I.234, IV) once the Government has met the requirements of Rule 1006.

2. *Whether summaries of recorded telephone conversations between Anthony Copeland and his buyers should be admitted to show the quantity of drugs discussed in those conversations*

The Government contends that "presentation of all the calls would be burdensome" (D.I. 234 at 7), thus, fulfilling the requirement that the underlying documents be voluminous.

The Government also contends that the summaries would be admissible because the underlying documents are admissible. The Government states that it will be able to authenticate the recordings by showing that the recordings are accurate and authentic. Additionally, the Government contends that the recordings are admissible because they are not hearsay. In support of this contention, the Government cites Federal Rule of Evidence 801(d)(2)(E) which provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d). Because the Government will be able to authenticate the recordings and because the statements fall within the

hearsay exclusion, the Court concludes that the recordings will be admissible.

In addition to the admissibility of the underlying documents, the Government also must demonstrate that it made the originals (and not just the summaries) available to Defendant, that the summaries are accurate and non-prejudicial, and that a proper foundation can be laid for the summaries (independent of the foundation laid for the recordings themselves, *see* E *infra* ). If the Government can meet these requirements, the summary of the recorded conversations will be admissible. *See United States v. Francis,* 131 F.3d 1452 (11th Cir.1197)(allowing summaries of recorded wire-tapped conversations). Accordingly, the Court will *DENY WITH LEAVE TO RENEW* the Government's Motion in Limine VII Fed.R.Evid. 1006 Summaries of Drug Amounts Reflected In Intercepted Communications Of Co–Conspirator (D.I.234, VII) once the Government has met the requirements of Rule 1006.

E. *Whether the Starks Foundation provided by the Government sufficiently authenticates audio-recordings of conversations obtained through wire-tapping*

**\*6** Due to the nature of audio-recordings and the ease with which they are altered, laying the foundation for an audio-recording requires the Government to prove by clear and convincing evidence:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*United States v. Starks,* 515 F.2d 112, 121 (3d Cir.1975) (discussing how simple it is to alter, tamper, and selectively edit tape recordings).

The Government moves for the admission of the audio-recordings subject to satisfaction of the *Starks* criteria. The Government has satisfied the *Starks* factors by clear and convincing evidence, and thus, authenticated the recordings. Accordingly, the Court will *GRANT* the Government's Motion in Limine V Starks Foundation For Admission of Audio–Recordings (D.I.234, V).

F. *Whether the Government should be permitted to use transcripts of the audio-recordings*

The Government seeks to use transcripts of the tape-recorded conversations between Anthony Copeland and Defendant and Copeland and one of his buyers. The Government does not seek to admit the transcripts into evidence.

Courts have permitted the use of transcripts to assist the jury while listening to tape recordings. See *United States v. DiSalvo,* 34 F.3d 1204, 1220 (3d Cir.1994); *Government of Virgin Islands v. Martinez,* 847 F.2d 125, 128–29 (3d Cir.1988).* If the Court does permit the use of transcripts, it is preferable that the Court warn the jury that the transcript is not evidence. *DiSalvo,* 34 F.3d at 1220; *Martinez,* 847 F.2d at 128.

There is a concern raised by the Defendant regarding the use of Defendant's name on the transcripts. While done, "a preferable manner of identifying the speakers on the transcript ... [is] to refer to them as 'Speaker 1' and 'Speaker 2' or such similar designation." *Martinez,* 847 F.2d at 128–29 (holding that while the use of the defendant's name on the transcript did not prejudice the defendant, it is preferable not to use the defendant's name). Once the Government establishes that the phone belonged to Defendant and authenticates Defendant's voice through Copeland's testimony, the Motion will be granted. However, the Government must distinguish the speakers until Copeland's testimony as "Speaker 1" and "Speaker 2." Accordingly, the Court will *GRANT* the Government's Motion In Limine VI Transcripts Of Audio Recordings (D.I.234, VI)

provided Defendant's name is removed from the transcripts until the voices are identified by a witness.

*ORDER*

**\*7** For the reasons discussed, it is hereby ordered that:

1. Motion In Limine I Motion To Use Evidence Of Prior Drug Dealing With Co–Conspirator (D.I.234, I) is *DENIED.*

2. Motion In Limine II Defendant's Prior Arrests Under Different Aliases (D.I.234, II) is *GRANTED.*

3. Motion In Limine III Self–Authenticating Business Records (D.I.234, III) is *GRANTED.*

4. Motion In Limine IV Fed.R.Evid. 1006 Summary Exhibits Of Toll Records (D.I.234, IV) is *DENIED WITH LEAVE TO RENEW* once the Government meets the requirements of Rule 1006.

5. Motion In Limine V Starks Foundation For Admission of Audio–Recordings (D.I.234, V) is *GRANTED.*

6. Motion In Limine VI Transcripts Of Audio Recordings (D.I.234, VI) is *GRANTED.*

7. Motion In Limine VII Fed.R.Evid. 1006 Summaries of Drug Amounts Reflected In Intercepted Communications Of Co–Conspirator (D .I. 234, VII) is *DENIED WITH LEAVE TO RENEW* once the Government has met the requirements of Rule 1006.

8. The Government's Supplemental Motion In Limine (D.I.238) is *GRANTED.*

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3701472

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.