## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A.   *Chinniah v. East Pennsboro Township*,
     No. 1:CV-08-1330, 2012 WL 2006749 (M.D. Pa. Feb. 29, 2012)

B.   *Chinniah v. East Pennsboro Township*,
     No. 1:CV-08-1330, 2012 WL 2003493 (M.D. Pa. June 5, 2012)

C.   *Gentile v. DES, Properties, Inc*,
     No. 3:08-CV-2330, 2012 WL 2792347 (M.D. Pa. July 9, 2012)

D.   *Hairston v. Lappin*,
     No. 1:11-CV-1379, 2013 WL 5701637 (M.D. Pa. Oct. 18, 2013)

E.   *Markovich v. Panther Valley School District*,
     No. CIV.A. 3:13-3096, 2015 WL 4077758 (M.D. Pa. July 6, 2015)

F.   *Park v. Veasie*,
     No. 3:09-CV-2177, 2011 WL 1831708 (M.D. Pa. May 11, 2011)

G.   *Selective Insurance Co. of America v. Novitsky*,
     No. 3:17-CV-2376, 2019 WL 1009389 (M.D. Pa. Mar. 1, 2019)

H.   *Shuman v. Remtron, Inc.*,
     No. 4:09-CV-00003, 2012 WL 315445 (M.D. Pa. Feb. 1, 2012)

I.   *United States v. Polshenski*,
     No. 3:16-CV-2515, 2018 WL 806469 (M.D. Pa. Feb. 9, 2018)

J.   *Weitzner v. Sanofi Pasteur, Inc.*,
     No. 3:11-CV-02198, 2017 WL 3894888 (M.D. Pa. Sept. 6, 2017)



2012 WL 2006749
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Gnana M. CHINNIAH a/k/a Ghana Chandra M.
Chinniah and Suganthini Chinniah, Plaintiffs
v.
EAST PENNSBORO TOWNSHIP
and Jeffrey S. Schultz, Defendants.

Civil Action No. 1:CV–08–1330.
|
Feb. 29, 2012.

**Attorneys and Law Firms**

Ghana Chinniah, Camp Hill, PA, pro se.

Suganthini Chinniah, Camp Hill, PA, pro se.

Christopher S. Underhill, Hartman, Underhill & Brubaker,
Lancaster, PA, for Defendants.

*REPORT AND RECOMMENDATION*

THOMAS M. BLEWITT, United States Magistrate Judge.

**I. Background.**

 *1 On July 14, 2008, Plaintiffs Gnana M. Chinniah, a/
k/a Ghanchandra M. Chinniah, and his wife, Suganthini
Chinniah, filed, through counsel, their original Complaint
against Defendants East Pennsboro Township ("EPT")
and Jeffery S. Shultz, EPT Building Code Official,
alleging violations of their constitutional rights under 42
U.S.C. § 1983.[1] (Doc. 1). In their original Complaint,
Plaintiffs alleged that Defendants took discriminatory
actions against them regarding their (Plaintiffs') property in
Defendant Township. Defendant Shultz filed his Answer with
Affirmative Defenses to Plaintiffs' original Complaint on
September 24, 2008. (Doc. 4). Defendant EPT filed a Rule
12(b)(6) Motion to Dismiss Plaintiffs' original Complaint on
September 24, 2008, arguing that Plaintiffs' Complaint failed
to state a municipal liability claim against it under *Monell
v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018,
56 L.Ed.2d 611 (1978). (Doc. 5). On November 18, 2008,
the Court granted Defendant EPT's Motion to Dismiss and
gave Plaintiffs leave to file an amended Complaint. (Doc.

11). Plaintiffs filed their Amended Complaint on December
8, 2008. (Doc. 14).

[1]    We note that while Plaintiffs have had three
attorneys representing them in this action, Plaintiffs
are currently proceeding *pro se.* (Doc. 149).

On December 12, 2008, Defendant EPT filed a Rule 12(b)(6)
Motion to Dismiss Plaintiffs' Amended Complaint. (Doc. 16).
Defendant EPT argued that Plaintiffs' Amended Complaint
again failed to state a municipal liability claim against it under
*Monell.* On March 12, 2009, the Court issued a Memorandum
and Order and denied Defendant EPT's Motion to Dismiss
Plaintiffs' Amended Complaint. (Doc. 23). On March 26,
2009, both Defendants filed an Answer to Plaintiffs' Amended
Complaint. (Doc. 25).

In its March 12, 2009 Memorandum, the Court stated the
following factual background of this case as follows:

On or about September 5, 2007, Plaintiffs Ghana and
Suganthini Chinniah, individuals of Indian descent who
practice Hindu, purchased property in East Pennsboro
Township which was divided into three parcels (3A, 3B,
and 3C). (Doc. No. 1 ¶ 5.) Two partially-completed
townhouse structures consisting of a concrete foundation,
framing, siding, doors, windows and a roof structure
were situated on Plaintiffs' property at the time of
purchase. (Doc. No. 1 ¶¶ 7, 9.) On or about the time
of purchase, Plaintiffs spoke to the township zoning
officer, township solicitor, and Defendant Shultz about
obtaining the necessary permits to finish construction of the
buildings on their property. (Doc. No. 1 ¶ 19.) On October
11, 2007, Plaintiffs were issued construction permits to
"Finish Interior of Dwelling Including HVAC, Electrical,
Plumbing, Drywall, Carpet, Deck and Landscaping." (Doc.
No. 1 ¶ 23–24.) After Plaintiffs had completed some
initial improvements to the townhouse on lot 3A, Plaintiffs
requested that Defendant Shultz perform an inspection of
the plumbing work and insulation. (Doc. No. 1 ¶¶ 28–
29.) On the day of the inspection, however, Plaintiffs'
plumber was unavailable. (Doc. No. 1 ¶ 28.) Rather than
perform the requested plumbing inspection, Defendant
Shultz conducted a framing inspection, during which he
determined that the insulation and partial drywall installed
by Plaintiffs needed to be removed. (Doc. No. 1 ¶ 29.)

 *2 Defendant Shultz issued a "stop work order" against
all three lots because full framing inspections had not been
completed. (Doc. No. 1 ¶ 34.) Plaintiffs objected to the

imposition of a "stop work order" in the Court of Common Pleas on the grounds that the framing had been completed by the prior owners, nearly seven years before Plaintiffs began their improvements. (Doc. No 1 ¶ 35.) The "stop work order" was enjoined. (*Id.*)

Since that time, Plaintiffs allege that Defendants have enforced other township ordinances incorrectly against them while ignoring other, "more serious violations" by non-Indian land owners. (Doc. No. 1 ¶ 38, 39.) Additionally, Plaintiffs allege that when Mr. Chinniah pointed out the inequitable conduct and suggested that other non-Indian landowners were receiving more favorable treatment, instead of rectifying the misconduct, an unidentified employee notified other landowners that Mr. Chinniah was bringing an action against them. (Doc. No. 1 ¶ 40.) As a result of this misinformation, Mr. Chinniah received threats to his personal safety from another landowner. (Doc. No 1 ¶ 40.) Although Mr. Chinniah reported the threats and intimidation to the township, he was told no action would be taken against the perpetrator. (Doc. No. 1 ¶ 41.).

(Doc. 23, pp. 1–2). [2]

[2]    See also 2009 WL 700623 (M.D.Pa.3–12–09).

The Court also stated as follows:

> Plaintiffs allege that Defendant Shultz issued a "stop work order" to Plaintiffs; that the township defended that order in court; that the township continued to enforce its ordinances against Plaintiffs, preventing them from completing construction despite the injunction against enforcement of the "stop work order;" that the township failed to take action against a similarly situated non-Indian neighbor of Plaintiffs for violations "more serious" than Plaintiffs'; and that the township showed deliberate indifference to their safety by disclosing to Plaintiffs' neighbors that Plaintiffs had made a complaint about their building code violations. Further, Plaintiffs allege that township officials treated them less favorably

and demonstrated indifference to their safety when Plaintiffs reported threats and intimidation to the township both personally and through their attorney. Lastly, Plaintiffs allege that the township officials had knowledge of all these discriminatory events. (Am.Comp.¶ ¶ 45–51.) While a municipality has discretion in enforcing its laws, selective enforcement can amount to an equal protection violation even if the plaintiff is guilty of the underlying violation. *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, 425 (3d Cir.2003).

Doc. 23, pp. 5–6).

Thus, as the Court stated in its March 12, 2009 Memorandum, "Plaintiffs claim that, as ethnic and religious minorities, their right to equal protection of the laws was violated by [EPT] because [EPT] selectively enforced construction and building ordinances against them." (*Id.,* p. 4).

**\*3**  The Court concluded as follows:

> Taking all allegations as true, the Court finds that Plaintiffs have sufficiently alleged a custom of discrimination at the township that could establish liability under *Monell.* Plaintiffs allege that the township officials' knowledge of discriminatory practices by its employees against Indians began with the initial "stop work order" issued against Plaintiffs for work that had been done by the prior owners. When the other allegations-the court proceedings, the continuing inspections against the Plaintiffs despite a court-ordered injunction, the disclosure to Plaintiffs' neighbors that Plaintiff made allegations against them, and the failure to inspect non-Indian landowners' property for violations-are added, Plaintiffs have

sufficiently alleged a pattern of discrimination. When coupled with the officials' knowledge of it, this pattern of discrimination is a sufficient allegation of a custom of discrimination on the part of the township. This is not to say the allegations are proved, but taking all allegations as true, the Court finds that Plaintiffs have alleged a custom of discrimination on the part of the township.

(Doc. 23, p. 6).

Therefore, the Court found that Plaintiffs' Amended Complaint "sufficiently alleged a § 1983 equal protection claim against [Defendant EPT]." (*Id.*).

Following extensive discovery, including the depositions of Mr. Chinniah, EPT Manager Robert Gill and EPT Commissioner James Hertzler, Defendants jointly filed a Motion for Summary Judgment, pursuant to Fed.R.Civ. P. 56, on February 18, 2011. **(Doc. 104).** Defendants filed an Appendix of Exhibits (Exs.1–21) with their Motion. Also, on February 18, 2011, Defendants filed their support brief and Statement of Material Facts ("SMF"). (Docs. 105 and 106). The Court allowed the parties additional time for discovery and gave Plaintiffs an extension of time to file their opposition brief. On April 1, 2011, Plaintiffs filed their opposition brief with Exhibits. (Docs.119–131). [3] Plaintiffs also filed their response to Defendants' SMF. (Doc. 132). Defendants filed their reply brief on April 28, 2011. (Doc. 136). Defendants also submitted additional Exhibits along with their reply brief. (Doc. 137).

[3]   We refer to Plaintiffs' Exhibits herein simply as Plaintiffs' Ex. followed by the number. All of Plaintiffs' Exhibits were bound together in a single binder.

Defendants' Summary Judgment Motion is ripe for disposition.

On April 29, 2011, the Court assigned the undersigned to issue a Report and Recommendation regarding Defendants' Summary Judgment Motion. (Doc. 138). Oral argument was conducted regarding Defendants' Summary Judgment Motion on June 22, 2011. (Docs. 151 and 152). [4]

[4]   As noted above, Plaintiffs' opposition brief was filed by their former counsel. However, at the time of oral argument, Plaintiffs were proceeding *pro se* and Mr. Chinniah argued on behalf of Plaintiffs. It is also noted, that after oral argument, the Court referred this case to Magistrate Judge Carlson for a settlement conference. (*See* Doc. 154).

## II. Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). An issue of fact is " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph,* 842 F.2d 689, 693–694 (3d Cir.1988) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if proof of its existence or nonexistence could affect the outcome of the action pursuant to the governing law. *Anderson,* 477 U.S. at 248. "Facts that could alter the outcome are material facts." *Charlton v. Aramus Bd. of Educ.,* 25 F.3d 194, 197 (3d Cir.), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994).

**\*4** The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.,* 546 F.Supp. 314, 320 (E.D.Pa.1982), *aff'd mem.* 725 F.2d 667 (3d Cir.1983). Upon such a showing, the burden shifts to the nonmoving party. *Id.* The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id., quoting Gans v. Mundy,* 762 F.2d 338, 340 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Goodman v. Mead Johnson*

*& Co.,* 534 F.2d 566, 573 (3d Cir.1976) *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Under Rule 56 summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Moreover, the Third Circuit has indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.' " *Goode v. Nash,* 2007 WL 2068365 (3d Cir.2007) (NonPrecedential) (citation omitted).

Thus, "summary judgment is proper, when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. General Motors,* 2009 WL 237247, *2 (3d Cir.) (citation omitted); *Page v. Trustees of Univ. of Pennsylvania,* 222 Fed. Appx. 144 at 145 (3d Cir.2007) (the court must "view the facts in the light most favorable to the party opposing the [summary judgment] motion when making [its] determination."); *Burlington v. News Corp.,* 759 F.Supp.2d at 589–90.

### III. Section 1983 Standard.

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993); *Beattie v. Dept. of Corrections SCI–Mahanoy,* 2009 WL 533051, *3 (M.D.Pa.). Further, Section 1983 is not a source of substantive rights. Rather, it is a means to redress violations of federal law by state actors. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). [5] *See also Holocheck v. Luzerne County Head Start, Inc.,* 385 F.Supp.2d 491, 498–499 (M.D.Pa.2005); *Phillips v. Miller,* 2010 WL 771793, *2 (M.D.Pa.).

[5]
There is no dispute that Defendants are a municipal agency and a state actor. *See D'Altilio v. Dover Tp.,* 2009 WL 2948524, *3 (M.D.Pa.9–14–09).

**\*5** It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials,* 1546 F.2d 1077, 1082 (3d Cir.1976); *Parratt, supra.* It is also well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. *Id.* Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based. *Id.* As the Court stated in *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1998):

> A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. (Citations omitted).

*See also Beattie v. Dept. of Corrections SCI–Mahanoy,* 2009 WL 533051, *3 ("a prerequisite for a viable civil rights claim is that a Defendant directed, or knew of and acquiesced in, the deprivation of a Plaintiff's constitutional rights."), citing *Rode, supra.*

### IV. Material Facts.

As mentioned, Defendants properly submitted their SMF (Doc. 106, ¶ 's 1–16) with their Summary Judgment Motion and Plaintiffs filed their response to it (Doc. 132). Defendants' SMF are, in part, supported by citation to the record. Paragraphs 1, 3, 4, 5, 6 and 16 of Defendants' SMF (Doc. 106) are not supported by citation to the record. Also, Plaintiffs' responses to Defendants' SMF which, in part, supplement

2012 WL 2006749

the SMF do not cite to the record. Regardless of the parties failure to follow Local Rule 56.1, since the parties agree, in part, upon many of Defendants' SMF, we consider all of Defendants' SMF and all of Plaintiffs' responses to them. Plaintiffs also attached to their response to Defendants' SMF, their own Statement of Disputed Facts, Doc. 132, pp. 8–10, ¶ 's 1–10. However, Local Rule 56.1, M.D. Pa., does not permit a counter statement of material facts to be filed by the nonmoving party. Further, Plaintiffs did not cite to the record to support any of their counter statements of material facts and portions of Plaintiffs' counter statement of material facts consist of legal conclusions. As such, we do not consider Plaintiffs' unsupported counter statements as material facts. [6]

[6] As noted, Plaintiffs were represented by counsel when their opposition brief was filed, and their response to Defendants' SMF and their Statement of Disputed Facts were filed. (Docs. 119 & 132).

Based on Defendants' SMF and Plaintiffs responses thereto (Docs. 106 and 132, ¶ 's 1–16), we find the following facts to be undisputed:

> 1. 3 Cassatt Street is located in Nola, East Pennsboro Township, Pennsylvania. It was originally conceived as a(sic) three separate units, Units 3A, 3B and 3C ["the property"]. It was [originally] owned by Timothy Mowery. Construction was started several years ago but was never finished.

**\*6** Plaintiffs also state that the parties dispute whether prior to 2007 and their purchase of the property, inspections of the Units were conducted after construction began by Mowery, including framing inspection. Plaintiffs state that whether the prior framing inspection occurred and the effect of the prior inspection are in dispute. [7]

[7] We refer to the 3 Cassatt Street, Enola, East Pennsboro Township, Pennsylvania, property herein, which was purchased by the Plaintiffs on September 5, 2007, as "the property."

> 2. In June 2007 the Township wrote to Mr. Mowery advising him that his building permit had expired. He had to get a new permit and finish the construction. Appendix to Defendants' Motion for Summary Judgment (Appendix), Ex. 1.

Plaintiffs also state that the parties dispute whether the new permit required an inspection of the framing at the property.

> 3. The property was purchased by the Plaintiffs in September [5] 2007. Mr. Chinniah met with the Township Building Code Official (Mr. Shultz), the head of the Department of Housing & Community Development (John Owen), the Township Solicitor (Henry Coyne), and Mr. Chinniah's then attorney (Douglas Miller). The purpose of the meeting was to discuss what had to be done to make the building habitable.

> 4. Recollections differ as to what was agreed at the [September 5, 2007] meeting. Plaintiffs state that the parties dispute the terms of the agreement which was reached as to what they had to do to get their property to pass inspection and to make their property habitable. Plaintiffs also state that a November 20, 2007 correspondence from their counsel detailed the agreement of the parties, but that the parties dispute the effect of this correspondence. *(See* Plaintiffs' Ex. 11).

According to the November 20, 2007 letter from Plaintiffs' counsel to Defendant Shultz regarding, in part, the September 5, 2007 meeting, the following agreement of the parties was reached:

> I must strongly disagree with your [Shultz's] characterization of the meeting held on September 5, 2007. The purpose of that meeting was that work already performed at the properties prior to Mr. Chinniah's ownership was not going to be altered, but would instead be subject to the building code or codes in existence at the time of original construction. I believe I emphasized that point several times. The specific building code issues going forward that we discussed at that meeting were: 1) Necessary insulation and fire wall to be installed; 2) Electrical wiring in the party (sic) wall area needed to have armored cable (which Mr. Chinniah did have installed by his contractor and inspected by the third party electrical inspector); and 3) Fire retardant spray or stripping for the eaves of the roof.

At no time do I recall discussing the need for a framing inspection. Furthermore, your assertion that no inspection of the framing was performed does not appear to be supported by the objective evidence. First, the framing at the property has been constructed and completed since approximately 2000. The Township has performed multiple inspections and site visits at the properties since that time. This construction time frame preceded your hiring by East Pennsboro Township, and I understand that having the proper paperwork in that file has been an issue. You have also visited the property on several occasions, however, and discussed "finishing requirements" with the prior owner, Mr. Mowery. Second, my client has multiple photographs of several notations made in your handwriting to the insulated walls of the properties. These notations are made in between the framing and reference the type of drywall to be used in accordance with the fire code in place at that time. There has therefore been both opportunity for and evidence of the framing inspection having been completed.

*7  (Plaintiffs' Ex. 11).

> 5. Mr. Shultz and Mr. Owen recall that [on September 5, 2007] all agreed the Pennsylvania Uniform Construction Code (UCC) would be applicable and that the existing foundation and wooden framing for the walls and ceilings [of the property] would be grandfathered and would not have to comply with the UCC.

The parties dispute whether Defendant Shultz made it clear at the September 5, 2007 meeting that once construction by Plaintiffs started, Shultz would have to perform a "framing inspection" and that this would allow the existing framing to remain, but it would require compliance with the fire stopping provisions of the PA UCC. Plaintiffs contend that the framing at the property performed by Mowery, which was previously approved by EPT, was grandfathered in and was compliant with the building code in effect at the time, prior to the enactment of the PA UCC.

> 6. Fire stopping refers to the need to seal the holes made in wall studs and ceilings where they are penetrated by such things as wiring, conduit, plumbing, etc. The fire stopping is important because it prevents fire from spreading behind walls and through ceilings. Unfortunately no records were kept of the [September 5, 2007] meeting.

Plaintiffs assert that the rough wiring, plumbing, and penetrations associated with their installation all existed prior to their purchase [of the property] on September 5, 2007. As a response to Defendant Shultz's comments made on November 2, 2007, Plaintiffs contend that they were already sealing the penetrations made by the previous owner [Mowery], and that the premature and illegal stop work order issued by Defendants prevented the completion of few remaining holes found during the inspection conducted on January 18, 2008. Therefore, Plaintiffs state that the legality of the Stop Work and its proper application is in dispute. (Doc. 132, ¶ 6).

> 7. At the time Units 3A and 3B had been partially completed. Unit 3C had not been started. The Plaintiffs were duly issued construction permits on October 1, 2007. [Doc. 104], Appendix, Ex. 2, 3.[8]

[8]  According to Defendants' Exhibits, the Plaintiffs were issued construction permits for the property on October 11, 2007. (Doc. 104, Exs. 2 and 3).

Plaintiffs point out that the Unit 3C was the vacant portion of the lot at the time and that construction did not yet start on Unit 3C. Plaintiffs further state that subsequent to their acquisition of the lot, Mr. Chinniah was advised by Mr. John Owen and others that the vacant Lot 3C would have to be used "sacrificially" to create the extra parking spaces required

for the 2–Unit apartment in Lot 3B to meet their Ordinance enacted middle of 2007. (*See* Plaintiffs' Ex. 10).

> 8. Mr. Shultz performed a framing inspection [of the property] on November 2, 2007. He found that drywall and insulation had been installed which prevented him from inspecting the fire stopping. He prepared a report listing the deficiencies. Appendix, [Doc. 104] Ex. 4.

Plaintiffs contend that the November 2, 2007 framing inspection Defendant Shultz performed was contrary to their permit. Plaintiffs state:

> **\*8** There was previously inspected framing, rough wiring and plumbing which had been installed by the prior owner [Mowery]. Mr. Shultz prepared a report listing alleged deficiencies, and ignoring the prior inspection. The effect and legality of that inspection is in dispute.

> 9. Mr. Chinniah then visited the Township on November 8, 2007 and discussed the situation with Mr. Owen and Mr. Shultz. Evidently he [Mr. Chinniah] would not agree with exposing the areas for inspection and the installation of a fire separation wall. He [Mr. Chinniah] left the meeting and stated that the Township would hear from his attorney. See the letter from Mr. Shultz to Attorney Miller dated November 16, 2007, p. 2. [Doc. 104] Appendix, Ex. 5.

In response to Defendants' ¶ 9, Plaintiffs state as follows:

> Although Mr. Chinniah attempted to work with Mr. Owen and Mr. Shultz, he reminded them, *inter alia,* of the prior inspection(s) and the aforementioned prior meeting with him and his then counsel, Douglas Miller, Esquire. At the conclusion of the meeting, Mr. Chinniah advised that he would have his attorney contact the Township to clarify the need to remove any drywall installed in the ceilings. (See Appendix to Defendants' Motion for Summary Judgment, Exhibit 5–correspondence from Mr. Shultz to attorney Miller

dated November 16, 2007, and attorney Miller's correspondence dated November 20, 2007, Exhibit 7).

> 10. That letter [correspondence from Mr. Shultz to attorney Miller dated November 16, 2007] offered the Plaintiffs an opportunity to remove the insulation and drywall to permit an inspection or to take an appeal to the Capital Area Council of Governments Board of Appeals. Mr. Shultz also wrote to Mr. Chinniah on November 19, 2007 stating that because of the violations noted on November 2, no further work would be permitted. [Doc. 104] Appendix, Ex. 6.

Plaintiffs state that the parties dispute the legality of the Stop Work Order as well as the legality of the November 2, 2007 framing inspection Defendant Shultz performed at the property.

> 11. Attorney Miller responded to Mr. Shultz by letter dated November 20, 2007 disagreeing with Mr. Shultz and recommending that Mr. Chinniah take an appeal. Appendix, Ex. 7. Mr. Shultz issued a Stop Work Order on that same date. Appendix, Ex. 8.

Plaintiffs contend that Defendant Shultz issued the Stop Work Order as to Units 3A and 3B, which they state were not inspected and as to Unit 3C, a vacant lot, in response to their attorney's November 20, 2007 letter. (Doc. 132, ¶ 11).

> 12. Instead of appealing [the Stop Work Order] Plaintiffs filed a motion for injunction with the Court of Common Pleas of Cumberland County. After a hearing the court entered an order on January 15, 2008. Appendix, Ex. 9. As can be seen, [the Order] largely permitted the Township to make the inspections it had desired.

2012 WL 2006749

Plaintiffs state that the Stop Work Order was illegally issued and that the County Court's January 15, 2008 Order was in their favor. Further, Plaintiffs state that "[i]t was promised by the Defendants that the Stop Work Order would be lifted immediately[ ]" but that "[i]t was not." Doc. 132, ¶ 12.

**\*9** The County Court's January 15, 2008 Order directed, in pertinent part, as follows:

> 1. The stop work order issued against lot 3–B, Cassatt Street, Nola, Pennsylvania, is hereby lifted effective immediately. Plaintiff shall not perform any drywall or insulation work prior to appropriate inspections by Defendants or their approved representatives;

> 2. With regard to lot 3–A, Cassatt Street, Nola, Pennsylvania, Plaintiffs and Defendants have agreed to a meeting at the property to be held to identify areas to be randomly inspected by Defendants or their approved representatives;

> 3. After being notified by Plaintiffs, Defendants or their approved representatives shall perform standard code inspections of both properties identified herein[.]

(Doc. 104, Ex. 9).

> 13. On January 18, 2008 Mr. Shultz, Mr. Owen, and Mr. Gould along with Mr. Chinniah and Attorney Miller met on the site so that Mr. Shultz could indicate what insulation and drywall should be removed to permit an inspection. While there are different versions of what transpired, it is clear that Mr. Chinniah never requested Mr. Shultz to return and inspect. Handwritten accounts of that meeting were prepared by the Township representatives. Collectively, Appendix, Ex. 10.

Also, Plaintiffs state that "the meeting was ended inconclusively" and that Defendant EPT's agents "persisted in their efforts to impose illegal and arbitrary requirements upon the Plaintiffs." (Doc. 132, ¶ 13).

> 14. Mr. Chinniah had filed written complaints with the Township about the condition of 4 Cassatt Street [Roadcap's property] in November 2007 and February 2008. Appendix, Ex. 11, 12. [9]

[9]
> Cassatt Street property was adjacent to Plaintiffs' property and owned by Tex Roadcap. Roadcap had a garage in which he repaired vehicles and Plaintiff Mr. Chinniah complained to EPT that Roadcap was violating EPT's rules regarding the repair and parking of unlicensed vehicles on private property along the street. *See* Doc. 104, Exs. 11 and 12.

> 15. Mr. Chinniah also made a complaint on April 15, 2008 to the Township Police Department about the alleged threat [by Roadcap]. The police responded and interviewed Mr. Chinniah. The police report states that Mr. Chinniah did not identify the person who threatened him. Appendix, Ex. 13.

Plaintiffs state that after the EPT police interviewed Mr. Chinniah about the threat from Roadcap, the police did not respond to the person who allegedly threatened him, and that the Police Report is erroneous insofar as it states that Mr. Chinniah did not identify the person who he claims threatened him. [10] (Doc. 132, ¶ 15).

[10]
> We find the evidence disputed as to whether Mr. Chinniah identified Tex Roadcap to the EPT Police as the person who he claimed threatened him, and whether Defendants and EPT officials advised Roadcap that Plaintiff Mr. Chinniah complained to EPT that Roadcap was violating EPT's rules regarding the repair and parking of unlicensed vehicles on private property along the street.

> 16. Mr. Chinniah had also stated that when he complained about the lack of action, Police Chief McMaster stated, "Haven't you heard of freedom of speech?" There is no written record of this conversation.

Plaintiffs state that Mr. Chinniah's prior legal counsel checked the background of the neighboring property owner, Tex Roadcap who allegedly intimidated Mr. Chinniah and contacted the Township Manager *via* telephone on April 22, 2008, and followed with an email on April 29, 2008, to express his concerns regarding this threat which resulted from one or more code officials breaching the confidentiality of Mr. Chinniah's complaints.

Plaintiffs' Ex. 1 is a copy of the email their former counsel sent to Robert Gill, EPT Manager, on April 29, 2008, in which Plaintiffs' counsel complained, in part, about a breach of confidentiality by EPT officials regarding Mr. Chinniah's complaints about Roadcap which resulted in the threatening conduct by Roadcap against Plaintiff.

## V. Discussion.

**\*10** As stated, Plaintiffs raise § 1983 equal protection claims against Defendants EPT and Shultz in their Amended Complaint. (Doc. 14). Plaintiffs' claim against Defendant EPT is brought under *Monell.* (*See* Doc. 23). *See Connick v. Thompson,* ––– U.S. ––––, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011). Plaintiffs allege that there was disparate enforcement and application of the PA UCC and, EPT's property maintenance requirements and laws as well as zoning regulations based on their Indian national origin and their Hindu religion. Plaintiffs allege that Defendants did not apply the stated requirements and regulations evenly in the Township and that Defendants failed to take similar enforcement against similarly situated non-Indian property owners. Plaintiffs further allege that Defendants had a pattern of enforcing PA UCC's and EPT's building ordinances and regulations disparately and, that they took enforcement action against them and other property owners of Indian descent, such as the Kapoors, while ignoring more serious violations by other similarly situated non-Indian and non-Hindu property owners, such as Tex Roadcap. Plaintiffs also allege that Mr. Chinniah informed EPT of serious ordinance violations committed by Tex Roadcap, a similarly situated non-Indian landowner who owned property adjacent to Plaintiffs' property, and that Defendants refused to enforce the property maintenance ordinances against Roadcap. Further, Plaintiffs indicate that Defendants informed Roadcap of the November 2007 and February 2008 complaints Mr. Chinniah lodged against him, and that Roadcap threatened Mr. Chinniah. (*See* Doc. 104, Exs. 11 and 12). Additionally, Plaintiffs' evidence shows that on April 15, 2008, Roadcap threatened Mr. Chinniah due to Chinniah's complaints against him, that Mr. Chinniah and his attorney reported the threats to EPT, and that EPT refused to take action against Roadcap. Plaintiffs point out that Roadcap's ordinance violations caused damage to their property, including their sidewalk and curb areas, and that they could not ever finish the work on their property since they did not feel safe due to Roadcap's threats. Consequently, Plaintiffs state that they have not been able to return to their property to the present day and complete the

work despite the fact that they have had to continue to pay the mortgage and taxes on the property.

Initially, we agree with Defendants that to the extent Plaintiffs sue Defendant Shultz in his official capacity and they seek monetary damages against him, they (Defendants) are entitled to summary judgment with respect to these damages claims. (Doc. 105, pp. 8–9). As Defendants point out, Plaintiffs did not state in their pleadings if they sued the individual Defendant Shultz in both his personal and official capacities. We agree with Defendants and find that, insofar as Plaintiffs seek monetary damages against Defendant Shultz, Plaintiffs can only sue Defendant Schultz in his individual or personal capacity. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Mitchell v. Luckenbill,* 680 F.Supp.2d 672, 681 (M.D.Pa.2010); *Meekins v. Beard,* 2007 WL 675358, \*3 (M.D.Pa.); *Atwell v. Schweiker,* 2007 WL 2900565 (3d Cir.2007) (Non–Precedential); *Dougherty v. Snyder,* 2011 WL 1871226, \*12 (M.D.Pa.5–16–11); *Van Tassel v. Lawrence County Domestic Relations Section,* 659 F.Supp.2d 672, 695–696 (W.D.Pa.2009). Thus, we will recommend that Defendants' Summary Judgment Motion be granted with respect to Plaintiffs' claims for monetary damages against Defendant Shultz in his official capacity. *See Mitchell v. Luckenbill,* 680 F.Supp.2d 672, 681 (M.D.Pa.2010); *Gale v. Stori,* 608 F.Supp.2d 629, 636 (E.D.Pa.2009).

**\*11** Additionally, as Defendants correctly state (*Id.*) to the extent Plaintiffs sue Defendant Shultz in his official capacity, their action against him is the same as their action against Defendant EPT. Plaintiffs' equal protection claim against Defendant Schultz in his official capacity is treated the same as a claim against Defendant EPT. Thus, we will recommend that the Court grant Defendants' Summary Judgment with respect to Plaintiffs' equal protection claim against Defendant Schultz in his official capacity. *See Stacy v. City of Hermitage,* 178 Fed. Appx. 94, 100 (3d Cir.2006) (citation omitted) ("any claims against the individual City Defendants in their official capacities should be dismissed because these claims are treated as claims against the City itself."); *Delaney v. Cambria County Sheriffs Dept.,* 2006 WL 1437174 (W.D.Pa.); *Tri Thanh Nguyen v. Franklin County Sheriff's Dept.,* Civil No. 10–1866, M.D. Pa.

Insofar as Plaintiffs' Amended Complaint (Doc. 14, p. 12, ¶ 54) alleges that Defendants' conduct "denied [them] due process of law and equal protection of the law," we do not find that the parties address in their briefs a separate due process

claim. Nor did the parties address a separate due process claim at the June 22, 2011 oral argument. In *Development Group, LLC v. Franklin Tp. Bd. of Supervisors,* the Court stated that for a Plaintiff to successfully make out a claim for procedural due process under § 1983, a Plaintiff must (1) "assert that Defendants, acting under color of state law, deprived Plaintiffs of a protected property interest," and (2) that the "local and state procedures for challenging the deprivation are inadequate." 2003 WL 22358440, at * 7–8 (E.D.Pa. September 24, 2003). In *Franklin Township,* the Court found that, "[a] state provides constitutionally adequate procedural due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.' *Id.* (quoting *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 597 (3d Cir.1995), *overruled on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 400 (3d Cir.2003). *Franklin Township* also established that "when a state affords a 'full judicial mechanism' with which to challenge administrative decisions," then a state has provided adequate procedural due process, "regardless of whether the plaintiff avails herself of that appeal mechanism." *Id.* at *8. (*quoting Midnight Sessions, Ltd. v. Philadelphia,* 945 F.2d 667, 680 (3d Cir.1991), *overruled on other grounds by United Artists,* 316 F.3d at 400) (Citations omitted).

We find in this case, as discussed above, the evidence is undisputed that adequate procedures existed under state law to remedy the alleged erroneous decision rendered by Defendants when they issued the Stop Work Order to enjoin the construction of Plaintiffs' property. Further, we find that the Plaintiffs availed themselves of the available state procedures with respect to Defendants' Stop Work Order. As discussed above, Plaintiffs did not appeal the Stop Work Order, rather, they filed an Injunction Motion in County Court to lift the Stop Work Order. On January 15, 2008, the County Court issued an Order and lifted the Stop Work Order effective immediately. (Doc. 104, Ex. 9).

**\*12** The County Court proceeding can certainly be said to have provided the Plaintiffs with ample opportunity to be heard. Further, Plaintiffs state that the County Court's January 15, 2008 Order lifting the Stop Work Order was issued in their favor.

In *Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court stated:

A § 1983 action may be brought for a violation of procedural due process, but here the existence of state remedies *is* relevant in a special sense. In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.* (Citations omitted). The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

The record is clear in the instant case that an adequate state remedy existed for the Plaintiffs, that the Plaintiffs utilized this remedy, and that this remedy was relevant to Plaintiffs' § 1983 procedural due process claim, as the *Zinermon* Court stated.

We find that the state procedures for Plaintiffs' challenge of the Stop Work Order issued by Defendants were adequate and that the state, *via* the Court of Common Pleas, by lifting the Stop Work Order effectively immediately, provided "reasonable remedies to rectify a legal error by a local administrative body." *DeBlasio,* 53 F.3d at 597. As the *Franklin Township* Court stated, the state has provided an

adequate procedural process when it affords Plaintiffs a full judicial mechanism with which to challenge the state decision, regardless of whether the Plaintiffs avail themselves of this mechanism. *Franklin Township,* 2003 WL 22358440, at *8.

The Court in *Lonzetta Trucking and Excavating, Co. v. Hazle Township Zoning Board,* considered a similar procedural due process claim regarding the closing of a quarry by zoning officials prior to a hearing, and the Court dismissed this claim since the state provided an adequate process to address the closing. 2005 WL 3277996, at * 1 (M.D.Pa. Dec, 2, 2005); *Lonzetta Trucking and Excavating, Co. v. Schan,* 144 Fed.Appx. 206 (3d Cir.2005); Desi's Pizza, Civil No. 01–0480, M.D. Pa. (8–23–06 Memorandum).

Thus, we shall recommend that Defendants' Motion for Summary Judgment (Doc. 104) be granted to the extent Plaintiffs are deemed as raising a separate procedural due process claim.

Moreover, we do not find that Plaintiffs have alleged a substantive due process claim in their Amended Complaint. The Third Circuit stated, "[w]e have serious doubts whether the Plaintiffs' allegations state a substantive due process claim." *Desi's Pizza,* 321 F.3d at 427.

 **\*13** Regarding issues of substantive process, the Fourteenth Amendment provides, in part, that "no State [shall] deprive any person of life, liberty, or property without the due process of law...." U.S. Const. Amend. XIV, § 1. "To prevail on a substantive due process claim under § 1983, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates Ltd. v. W.J. Gretkowski, et al.,* 205 F.3d 118 (3d Cir.2000). "[A] substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.' " *Woodwind Estates Ltd.,* 205 F.3d at 122, *citing Independent Enterprises, Inc. v. Pittsburgh Water & Sewer Authority,* 103 F.3d 1165, 1179 (3d Cir.1997).

In *Desi's Pizza,* the Third Circuit stated:

To obtain relief under the substantive component of the Due Process Clause for a deprivation of property, a plaintiff must make two showings. First, the plaintiff must "establish as a threshold matter that he has a protected property interest to which

the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 123 (3d Cir.2000). While the case law concerning which property interests are protected "provides very little guidance," *Homar v. Gilbert,* 89 F.3d 1009, 1021 (3d Cir.1996), one general principle is clear: 'whether a certain property interest' is constitutionally protected 'is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution." *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 140 (3d Cir.2000); *see also Dacosta v. Nwachukwa,* 304 F.3d 1045, 1048 (11th Cir.2002) (Citations omitted). Second, the plaintiff must show that a governmental actor's behavior in depriving him of the interest in question was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

321 F.3d at 426–27.

Herein, we do not find that Plaintiffs have properly alleged that Defendants deprived them of the lawful use of their property and we do not find that they have stated a substantive due process claim. (Doc. 14). As stated above, we do not find that Plaintiffs and Defendants address in their briefs whether Plaintiffs raised a substantive due process claim. Thus, to the extent Plaintiffs are deemed as raising a substantive due process claim, they have not met the threshold establishment that they have been deprived of a fundamental right protected by the Fourteenth Amendment. *Woodwind Estates Ltd.,* 205 F.3d at 122; *Galanopoulas v. Smithgall,* 2005 WL 196441, at *4 (E.D.Pa. January, 26, 2005) (citing *Independent Enterprises. v. Pittsburgh Water,* 103 F.3d 1165, 1179–80 (3d Cir.1997)).

 **\*14** Thus, we shall recommend that Defendants' Motion for Summary Judgment (Doc. 104) be granted to the extent Plaintiffs are deemed as raising a separate substantive due process claim.

We now discuss Plaintiffs' § 1983 equal protection claims against Defendant Shultz in his individual capacity and against Defendant EPT. We do not agree with Defendants, who state in part, that in addition to Plaintiffs' § 1983 claim, "presumably the Plaintiffs are proceeding under § 1981(a) of the United States Code." (Doc. 105, p. 10). As discussed above, the Court in its March 12, 2009 Memorandum clearly

found that Plaintiffs were asserting § 1983 equal protection claims against Defendants. (*See* Doc. 23).

Since Plaintiffs allege that they were treated differently by Defendants with respect to the manner in which EPT enforced construction and building ordinances and rules against them and that the ordinances were selectively enforced against them based on their national origin and religion, their § 1983 equal protection class are based upon their membership in a protected class. *See D'Altilio v. Dover Tp.,* 2009 WL 2948524, *4 (M.D.Pa.9–14–09)* (national origin is a suspect class) (citation omitted).

We agree with Plaintiffs that, in viewing the evidence in a light most favorable to them and in drawing all justifiable and reasonable inferences in their favor, there are genuine issues of material fact which preclude the granting of Defendants' Summary Judgment Motion with respect to Plaintiffs' equal protection claims. *See MARJAC, supra.* We find that Plaintiffs have submitted evidence "on which the jury could reasonably find for [them]." *Anderson,* 477 U.S. at 252. We concur with Plaintiffs' extensive statement of the evidence, which we find is disputed, with respect to their equal protection claims against Defendants. (Doc. 119, pp. 10–24).

As the Court in *Barnes Foundation v. Township of Lower Merion,* 942 F.Supp. 970, 983 (E.D.Pa.1997), stated:

> The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause announces the "fundamental principle" that "the State must govern impartially," *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979), and "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

The Fourteenth Amendment equal protection clause prohibits state officials from exercising their discretionary authority in an intentionally discriminatory purpose. *See Johnson v. Anhorn,* 416 F.Supp.3d 338 (E. D.Pa.2006).

The Court in *Johnson,* 416 F.Supp.2d at 376, also stated that, "[i]n order for a § 1983 plaintiff to survive a motion for summary judgment where intent is an element of his claim, the plaintiff must provide "affirmative evidence from which

a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." (quoting *Crawford–El,* 523 U.S. at 600). To establish their equal protection claim, the Plaintiffs are required to produce evidence that a discriminatory purpose was a motivating factor in the Defendants' actions to selectively enforce PA UCC's and EPT's property maintenance requirements and laws as well as zoning regulations based on their Indian national origin and their Hindu religion. Thus, Plaintiffs must show that Defendants treated similarly situated property owners who were not Indian and Hindus differently. *See D'Altilio v. Dover Tp.,* 2009 WL 2948524, *4. As stated, we find that Plaintiffs have provided an extensive rendition of the disputed evidence with respect to their equal protection claims against Defendants. (Doc. 119, pp. 10–24).

**\*15** In *D'Altilio v. Dover Tp.,* 2009 WL 2948524, *4, the Court stated:

> The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Two theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory. The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). To assert a protected class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir.2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals"); *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir.1992). Under this theory a plaintiff "must prove the existence of purposeful discrimination" by defendants. *Keenan,* 983 F.2d at 465.

Here, Plaintiffs claim that they and other property owners of Indian descent and who practiced the Hindu religion were treated differently by Defendants compared with other similarly situated property owners who were not Indian and Hindus. Plaintiffs claim that their property was unfairly selected for enforcement of property maintenance

requirements and laws as well as zoning regulations based on their Indian national origin and their Hindu religion. As mentioned, we find that the evidence is disputed with respect to Plaintiffs' claims. (*See* Doc. 119, pp. 10–24).

Plaintiffs must prove that they were treated differently then similarly situated property owners who were not Indian and Hindus, and the Plaintiffs must produce evidence from which a racially discriminatory purpose can be inferred. *Barnes Foundation,* 942 F.Supp. at 983. In this case, we find that Plaintiffs have produced sufficient evidence to create disputed material facts as to whether they were treated differently than similarly situated property owners who were not Indian and Hindus. (*See* Doc. 119, pp. 10–24). *See Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411 (3d Cir.2003). The Third Circuit, in *Desi's Pizza,* stated that "the Plaintiffs' claims that the Defendants' alleged campaign of harassment violated the Equal Protection Clause ... rely on the premise that the Defendants' actions were undertaken with a racially discriminatory intent." 321 F.3d at 424. The Third Circuit Court also found that the Plaintiffs' equal protection claim was "predicated on the allegation that the Defendants' various actions against the Plaintiffs were motivated by a desire to drive African–Americans and Latinos out of Wilkes–Barre." *Id.* at 415. The Third Circuit Court then stated that, "[i]t is well established, however, that selective prosecution may constitute illegal discrimination even if the prosecution is otherwise warranted." [11] *Id.* at 425. The Third Circuit Court indicated that the Plaintiffs alleged that Desi's "was treated in a 'far harsher manner than other businesses similarly situated.' " *Id.* at 417.

[11]     This Court in its March 12 2009, Memorandum also cited to *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d at 425, and stated that "[w]hile a municipality has discretion in enforcing its laws, selective enforcement can amount to an equal protection violation even if the Plaintiff is guilty of the underlying violation." *See* Doc. 23, p. 6.

**\*16** After the Third Circuit Court, in *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, remanded the case to the District Court and after discovery was completed, Defendants moved for summary judgment on Plaintiffs' claims, including their equal protection claims under § 1983. In August 2006, the Court found that there was enough evidence produced so that a jury must determine if Desi's Pizza was singled out for selective enforcement as compared to the other identified bars, and if the Defendants' motivation was the impermissible consideration of the predominantly African -American and Latino clientele of Desi's Pizza. [12] *See Desi's Pizza, Inc. v. City of Wilkes–Barre,* 01–0480, M.D. Pa. August 23, 2006 Memorandum).

[12]     The Court in *Desi's Pizza, Inc. v. City of Wilkes–Barre,* also found that the Plaintiffs did not offer evidence with respect to their *Monell* claim under the Fourteenth Amendment that their equal protection right was violated pursuant to a policy or custom of Wilkes–Barre to drive out minorities from the City. Thus, the Court dismissed Wilkes–Barre as a Defendant in *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 01–0480, M.D. Pa. August 23, 2006 Memorandum.

The Court in *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 01–0480, M.D. Pa. August 23, 2006 Memorandum, found that Plaintiffs produced enough evidence to show the two required elements of their equal protection claim against the individual Defendants, McGroarty and George. Thus, the Court denied Defendants' Motion for Summary Judgment with respect to the Plaintiffs' equal protection claim under § 1983 against the individual Defendants. *See Desi's Pizza, Inc. v. City of Wilkes–Barre,* 01–0480, M.D. Pa. (M.D.Pa. August 23, 2006).

As stated, in the instant case, Plaintiffs base their equal protection claims against Defendants on the traditional theory and there is no dispute that Plaintiffs are members of a protected class based on their Indian nationality and Hindu religion. As the Court in *D'Altilio v. Dover Tp.,* 2009 WL 2948524, \*4, stated:

> In order for his equal protection claim to survive summary judgment under the traditional theory, [Plaintiff] must present evidence that the township's treatment of similarly situated employees outside his protected class differed from the treatment he received. [Plaintiff] qualifies as a member of a protected class based upon his Italian descent. *See Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 312 n. 4, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (listing ancestry as a suspect class and referring to national

> origin as an example of a suspect
> class with a "history of purposeful
> unequal treatment"). Therefore, the
> court will turn to the question of
> whether defendants treated similarly
> situated employees outside the class
> differently.

With respect to the second element which Plaintiffs must establish, we agree with Plaintiffs (Doc. 119, pp. 10–24) and find that the evidence is disputed as to whether Defendants treated similarly situated property owners who were not of Indian descent and who did not practice Hindu religion differently with respect to their enforcement of EPT's building and zoning ordinances, and that the evidence is disputed as to whether Defendants had purposeful discrimination. Plaintiffs have sufficiently shown that Defendants approved of the framing at the 3 Cassatt Street property for the former owner, Mowery, and that before they bought the property on September 5, 2007, the rough wiring and plumbing were already preformed by Mowery. Plaintiffs produced evidence that after they bought the property, Defendants then determined that the framing had to be again inspected and applied the PA UCC rules and regulations even though the property was grandfathered in under the pre-UCC rules and regulations. Plaintiffs contend that they were singled out based on their nationality and religion to stricter building enforcement and, that the framing at the property performed by Mowery, which was previously approved by Defendant EPT, should have been grandfathered in and should have been found compliant with the building code in effect at the time Mowery did the framing, prior to the enactment of the PA UCC. Plaintiffs also argue that the Stop Work Order Defendant Shultz issued on November 20, 2007 (Doc. 104, Ex. 8), against the property was irrational and shows that Shultz intentionally treated them differently from other similarly situated property owners and, that there was no rational basis for the difference in treatment. Plaintiffs further contend that even after the Cumberland County Court immediately lifted the Stop Work Order on January 16, 2008, Defendants intentionally delayed lifting the Stop Work Order for three days.

**\*17** Defendants argue that Plaintiffs' allegations are not supported by sufficient evidence and that the Court should grant their Summary Judgment Motion with respect to Plaintiffs' § 1983 equal protection claims. We do not agree with Defendants. We find that Plaintiffs have produced

sufficient evidence to support their § 1983 equal protection claims and that a reasonable jury could find that Defendants treated them differently from similarly situated persons outside of their protected class. (See Doc. 119, pp. 10–24). For example, Plaintiffs produced the June 20, 2007 letter Defendant Shultz sent to Mowery regarding the expiration of Mowery's building permit for the property. In the letter, Shultz indicated that the 1995 CABO Code (i.e. the pre-PA UCC regulations) applied with respect to any of the completed construction of the property and that the requirements of the 2006 International Residential Code would be applied for the remainder of the construction not yet performed. (Plaintiffs' Ex. 8). However, Plaintiffs have sufficiently shown that when they bought the property, Defendant Shultz was requiring them to comply with the new stricter building requirements, instead of the 1995 CABO Code, regarding the framing of the property already performed by Mowery. Further, we find that Plaintiffs have sufficiently shown that when they complained about the several code violations by Roadcap in the adjacent property to their property and the lack of enforcement of the EPT's rules with respect to Roadcap, Defendants intentionally told Roadcap about Plaintiffs' complaints and Roadcap then threatened Plaintiff Mr. Chinniah. (Doc. 104, Exs. 11 and 12, Plaintiffs' Exs. 5 and 16 17, 18). Plaintiffs have also shown disputed facts that when the threat incident was reported to the EPT police, no action was taken. As a result, Plaintiffs have shown that they are afraid to return to their property, that they have not been able to complete the buildings on their property to the present day, and that they continue to pay the mortgage and taxes on the property.

Plaintiffs have also produced evidence that the Kapoor family, who were also Indians and owned property in EPT, were treated differently than non-Indian property owners and that Defendants more strictly enforced the building Code rules against the Kapoors. (Plaintiffs' EX. 22, 25, 26, 27, and 28). As discussed, we find that the evidence is disputed as to whether Defendants more strictly enforced the building Code rules against the Kapoors.

Plaintiffs have produced evidence that after they bought the property in September 2007, Defendant EPT initiated a new requirement with respect to Units 3A and 3B in that the Units would need three parking spaces per Unit. Plaintiffs show that Defendant EPT was requiring them to use 3C of the property, a vacant lot, only for parking for the 3A and 3B parcels. (Plaintiffs' Ex. 10). Plaintiffs have submitted evidence to show that Defendant EPT sanctioned the alleged unlawful Stop Work Order which Defendant Shultz issued against their

property as part of Shultz's alleged attempt to treat them differently than non-Indian property owners, and that EPT was aware that Shultz waited for three days to remove the Stop Work Order in contravention of the County Court's January 15, 2008 Order. Plaintiffs state that the Stop Work Order was reviewed by several EPT policymakers, including Gill, Owen, Gould and EPT Commissioners. Plaintiffs cite to their Exs. 12 and 13. Plaintiffs further state that EPT and its official treated similarly situated non-Indian property owners like Roadcap differently than Indian property owners and knowingly allowed its officials to more strictly enforce the code regulations against Indian owners since EPT officials allowed Roadcap to have a shed on his property without a permit and that is was not until this matter was brought to Mr. Owen's attention during his deposition in this case, did Owen take action to require Roadcap get a permit. Plaintiffs also indicate that EPT officials allowed the numerous violations to exist on Roadcap's property near their property and did nothing about them until Mr. Chinniah started to complain about them. As discussed above, the evidence is disputed if EPT officials then leaked the complaints to Roadcap and if Roadcap then threatened Mr. Chinniah. The evidence is also disputed as to whether Mr. Chinniah specifically identified Roadcap and if the EPT police took no action against Roadcap regarding Mr. Chinniah's police complaint about the threats.

**\*18** Also, while Defendants point out that there were not code violations found by EPT's Property Maintenance Inspectors (Mr. Gould and Ms. Dunkle) with respect to the other properties owned by non-Indians with alleged violations since there were no entries in EPT's Property Maintenance Reports and database, Plaintiffs contend that several pages of the Reports they received from Defendants during discovery were missing pages and that they found several discrepancies between the information they were provided in the redacted summary logs and the corresponding entries in the Report which they were provided.

Further, as discussed, Plaintiffs submit evidence to show that EPT also treated other Indian property owners, namely, the Kapoors, differently than non-Indian owners, such as the owners of the 300 Fourth Street property (the Zehrings).

We thus find that Plaintiffs have sufficiently shown that material facts are disputed with respect to their § 1983 equal protection claims against Defendant Shultz in his individual capacity and against Defendant EPT under *Monell.*

Based on the above discussion, we find that Plaintiffs presented sufficient evidence to show that there a genuine issues of material fact with respect to their § 1983 equal protection claim against Defendant EPT. As mentioned, to the extent Plaintiffs have named EPT as a Defendant, they are asserting a claim pursuant to *Monell v. New York Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *D'Altilio,* 2009 WL 2948524, \*5. We find that Plaintiffs' municipal liability claim against Defendant EPT should proceed to trial. See *Kokinda v. Breiner,* 557 F.Supp.2d 581, 587 (M.D.Pa.2008). Under *Monell,* "municipalities and other local government units are among those 'persons' to whom Section 1983 applies." *Meyers v. Schuylkill Co. Prison,* 2006 WL 559467, \*9. See *Malles v. Lehigh County,* 2009 WL 2258623, \*7 (E.D.Pa.); *Connick, supra.*

As the *Malles* Court stated:

> According to the teaching of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Lehigh County "can be sued directly under § 1983 ... [when] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [Lehigh County's] officers" or where the constitutional deprivations occurred pursuant to governmental custom. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018, 56 L.Ed.2d 611.

*Id.,* 2009 WL 2258623, \*7.

In *D'Altilio,* 2009 WL 2948524, \*5, the Court held that municipalities cannot be held liable under § 1983 for the acts of their employees under *respondeat superior.* The Court in *D'Altilio,* 2009 WL 2948524, \*5, stated that "a municipality may be held liable if the Plaintiff can 'identify a municipal 'policy' or 'custom' that caused the Plaintiff's injury." (Citations omitted).

As the *Kokinda* Court stated:

> A municipality cannot be held liable for the actions of its employees under § 1983 based upon *respondeat superior. Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "the government as an entity is responsible under § 1983" when it "caused" the Plaintiff's injury; that is, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflicts the injury." *Id.* at 694, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. Where, as here, Plaintiff alleges that the flawed policy is a failure to train, the municipality can be held liable when " 'that failure amounts to "deliberate indifference ... [to the constitutional rights of persons with whom the police come in contact.' " *Woloszyn v. County of Lawrence,* 396 F.3d 314, 324 (3d Cir.2005) (citations omitted). There must also be a causal nexus, in that the " 'identified deficiency in [the] training program must be closely related to the ultimate 'constitutional' injury." *Id.* at 325 (citations omitted). *Kokinda,* 557 F.Supp.2d at 590–91.

**\*19** Further, the Court in *D'Altilio,* 2009 WL 2948524, \*5, stated:

A policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Phila.,* 895 F.2d 1469, 1480 (3d Cir.1990) (citations omitted); *see also Watson v. Abington Twp.,* 478 F.3d 144, 155 (3d Cir.2007) (reiterating that municipal policy exists when an individual with final decisionmaking authority "issues an official proclamation, policy, or edict"). "A custom is an act 'that has not been formally approved by an appropriate decision maker,' but that is 'so widespread as to have the force of law." *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003) (quoting *Brown,* 520 U.S. at 404). The policy or custom upon which the plaintiff bases a claim must emanate from individuals with the authority to promulgate municipal standards in the relevant area. *See LaVerdure v. County of Montgomery,* 324 F.3d 123, 126 (3d Cir.2003) ("To be a policymaker for *§ 1983* purposes, an official must have *final* policymaking authority."). A plaintiff must demonstrate either that the policymaker's action violated the plaintiff's rights or that the policymaker failed to act when presented with an obvious need for action, rendering the municipality "deliberately indifferent" to the situation. *Natale,* 318 F.3d at 584 (quoting *Brown,* 520 U.S. at 417–18).

The Court in *Stoneking v. Bradford Area School District,* 882 F.2d 720, 725 (3d Cir.1989), held that liability for state officials can arise "from their policies maintained in deliberate indifference to action taken by their subordinates." According to *Stoneking,* "a plaintiff must do more than show the defendant could have averted her injury and failed to do so. In order to establish liability a plaintiff must

demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the [harm] and that the defendant acted with deliberate indifference to that [harm]. In order to establish deliberate indifference on the part of the defendant, 'something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm' to plaintiffs." *Id.; Black by Black v. Indiana Area School District,* 985 F.2d 707, 712–13 (3d Cir.1993) (quoting *Colburn,* 946 F.2d at 1025). Plaintiff must "demonstrate, that through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Garcia v. Newtown Tp.* 819 F.Supp.2d 416, 2011 WL 2313662, \*14 (E.D.Pa.6–10–11) (citation omitted). The deliberate indifference standard requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citation omitted).

Based on our above discussion, we find that Plaintiffs have sufficiently established their municipal liability claim against Defendant EPT under *Monell* and that there exists genuine issues of material fact with respect to this equal protection claim. Plaintiffs have shown that Defendant EPT had knowledge of selective enforcement of building code requirements by its employees against Indian property owners, such as the Stop Work Order issued against them and the actions taken against the Kapoors. Plaintiffs also have shown that disputed evidence exists as to whether the employees of Defendant EPT did not equally enforce the ordinances against other non-Indian property owners such as Roadcap, and, that when Mr. Chinniah complained about the disparate treatment and lack of enforcement with respect to Roadcap's property, EPT officials leaked the complaints to Roadcap who in turn threatened Mr. Chinniah. We find that issues of material fact exist as to whether Defendant EPT had a pattern of discrimination as to Indian property owners and whether EPT maintained an unconstitutional custom or policy that caused the alleged constitutional violation to Plaintiffs. We find that there is enough evidence for the jury to find in favor of Plaintiffs with respect to their *§ 1983* equal protection claim against Defendant EPT.

**\*20** Based on *Kokinda, Meyers,* and *Malles,* we find Plaintiffs' evidence sufficiently shows that Defendant EPT caused Defendant Shultz's alleged conduct by having customs, policies, practices and procedures, and that this conduct gave rise to the constitutional violations alleged in Plaintiffs' Amended Complaint. Therefore, we will recommend that Defendants' Summary Judgment Motion be

denied with respect to Plaintiffs' § 1983 equal protection claim against Defendant EPT.

While Defendants have submitted evidence to controvert Plaintiffs' evidence and Plaintiffs' equal protection claims against them, we find that there are too many disputed facts as to whether Defendants subjected Plaintiffs and other Indian property owners to different treatment than similarly situated non-Indian property owners. We find that the evidence could support a jury verdict in favor of Plaintiffs, that the disputes in the evidence raise genuine issues of material fact, and that the Court should deny Defendants' Summary Judgment Motion with respect to Plaintiffs' equal protection claims. (Doc. 104). *See Desi's Pizza, Inc. v. City of Wilkes–Barre,* 01–0480, M.D. Pa. August 23, 2006 Memorandum).

**VI. Recommendation.**

Based on the foregoing, it is respectfully recommend that Defendants' Summary Judgment Motion **(Doc. 104)** be granted with respect to Plaintiffs' claims for monetary damages against Defendant Shultz in his official capacity. It is also recommended that the Court grant Defendants' Summary Judgment Motion **(Doc. 104)** with respect to Plaintiffs' equal protection claim against Defendant Schultz in his official capacity. Additionally, it is recommended that Defendants' Motion for Summary Judgment **(Doc. 104)** be granted to the extent Plaintiffs are deemed as raising a separate procedural due process claim and a separate substantive due process claim. Finally, it is recommended that Defendants' Summary Judgment Motion **(Doc. 104)** be denied with respect to Plaintiffs' equal protection claims against Defendant EPT and against Defendant Shultz in his individual capacity.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2006749

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

2012 WL 2003493
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Ghana M. CHINNIAH a/k/a Gnanachandra M.
Chinniah and Suganthini Chinniah, Plaintiffs
v.
EAST PENNSBORO TOWNSHIP
and Jeffrey S. Shultz, Defendants.

Civil Action No. 1:08–cv–1330.
|
June 5, 2012.

**Attorneys and Law Firms**

Ghana Chinniah, Camp Hill, PA, pro se.

Christopher S. Underhill, Hartman, Underhill & Brubaker,
Lancaster, PA, for Defendants.

*MEMORANDUM*

YVETTE KANE, Chief Judge.

 **\*1** Currently pending before the Court is a motion for
summary judgment filed by Defendants East Pennsboro
Township an Jeffrey Shultz. (Doc. No. 104.) On February
29, 2012, Magistrate Judge Thomas Blewitt issued a Report
and Recommendation in which he recommended that
this Court grant the motion for summary judgment in part
and deny the motion in part. (Doc. No. 158.) Defendants
have filed objections to those portions of the Report and
Recommendation in which Judge Blewitt recommends that
the motion for summary judgment be denied. (Doc. Nos.159,
160.) The motion is now ripe for disposition. For the reasons
stated more fully herein, the Court will adopt the Report and
Recommendation and will grant summary judgment in part.

# I. BACKGROUND [1]

[1]
In reviewing a motion for summary judgment, the
Court must "consider all evidence in the light most
favorable to the party opposing the motion." *A.W.
v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d
Cir.2007). The Court notes that cross motions for
summary judgment have been filed; however, the

material facts in this matter do not appear to be in
dispute. Indeed, the parties' respective statements
of material fact are nearly identical.

The background of this matter has been thoroughly set forth
in Judge Blewitt's Report and Recommendation. The Court
will briefly summarize the factual issues relevant to this
matter. To the extent Defendants challenge the Report and
Recommendation's recitation of the facts, the Court will
address those disputes more fully in the discussion section of
this memorandum.

Plaintiffs Ghana and Suganthini Chinniah, who are of Indian
decent and who are adherents of Hinduism, [2] purchased
property in East Pennsboro Township in September 2007.
(Doc. No. 106 ¶ 3.) The property was subdivided into
three parcels referred to as Units 3A, 3B, and 3C. (*Id.*
¶ 1.) At the time of purchase, two partially completed
townhouses were situated on the property. [3] After purchasing
the property, Plaintiffs spoke with the township zoning
officer, the township solicitor, and Defendant Shultz, the
Township Building Code Official, regarding what needed to
be done to make the buildings habitable. (*Id.* ¶ 3.) Plaintiffs
were issued construction permits on October 11, 2007. [4]
(Doc. No. 104–2, Exs.2, 3.) On November 2, 2007, Defendant
Shultz conducted what he called a framing inspection, during
which he determined that the insulation and drywall installed
by Plaintiffs needed to be removed so that he could conduct
the framing inspection. (Doc. No. 104–2, Ex. 4.) Plaintiffs
objected to the framing inspection, at least in part, because
the framing had been approved before the property had been
purchased by Plaintiff. (Doc. No. 104–2, Ex. 7.) Defendant
Shultz issued a stop work order pending completion of
the framing inspections. (Doc. No. 104–2, Ex. 6, Ex. 8.)
However, Plaintiffs successfully challenged the stop work
order in the Court of Common Pleas for Cumberland County
and the stop work orders were lifted. (Doc. No. 104–2,
Ex. 9.) In November 2007 and February 2008, Plaintiffs
filed complaints with Defendants regarding violations on a
neighboring property. (Doc. No. 104–2, Ex 11, 12.) In April
2008, Plaintiffs reported to police that a "white male" told
Plaintiff to "mind his own business and to stop reporting
him and his property to the township or [Plaintiff] will get
his." (Doc. No. 104–2, Ex. 13.)

[2]
Neither party actually presents these facts in
their statements of undisputed material facts.
The Court does note, however, that this fact
is raised in both Plaintiffs' brief in opposition

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 22 of 102

and Plaintiffs' complaint and is not contradicted. Because Defendants do not specifically object to this fact or point to a lack of evidence supporting such a conclusion, the Court will consider it in the motion for summary judgment.

3    These facts are not directly referenced in the statement of undisputed material facts. Defendants reference "construction" having started on the property but not having been finished. (Doc. No. 106 ¶ 1.) They also note that Units 3A and 3B had been partially completed. (*Id.* ¶ 7.) Once again, Plaintiffs refer to the townhouses in their complaint and brief in opposition and Defendants do not contradict these references. Because Defendants do not specifically object to these facts, the Court will consider them in the motion for summary judgment.

4    Defendants contend, and Plaintiffs agree, that this happened on October 1, 2007. However, the permits themselves indicate that they were issued on October 11, 2007. (Doc. No. 104–2, Exs.2, 3.)

## II. STANDARD OF REVIEW

**\*2** Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251–52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W.,* 486 F.3d at 794.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 145–46 (3d Cir.2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on

assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir.2006); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotex,* 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. *Anderson,* 477 U.S. at 249–50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l Hosp.,* 192 F.3d 378, 387 (3d Cir.1999).

## III. DISCUSSION

Neither party lodged objections against the recommendation that summary judgment be entered as to: (1) any Section 1983 claims for monetary damages raised against Defendant Shultz in his official capacity; (2) any procedural due process claims; and (3) any substantive due process claims. The Court has reviewed these recommendations and concludes that, to the extent the amended complaint can be construed as to raise such claims, summary judgment is warranted as to each claim. Defendants do raise objections to those portions of the Report and Recommendation in which Magistrate Judge Blewitt recommends that this Court deny the motion for summary judgment as to Plaintiffs' equal protection claims against Defendant Shultz in his individual capacity and Defendant East Pennsboro Township. The Court will review these recommendations in turn.

### A. Defendant Shultz

**\*3** In order to succeed on their equal protection claim brought pursuant to 42 U.S.C. § 1983, Plaintiffs must prove the existence of purposeful discrimination. *Andrews v. Phila.,* 895 F.2d 1469, 1478 (3d Cir.1990). That is, they must prove that they were members of a protected class and that they received different treatment than that received by other similarly situated individuals on the basis of their status as a member of that protected class. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir.2002) (citing *Keenan*

2012 WL 2003493

*v. City of Phila.,* 983 F.2d 459, 465 (3d Cir.1992)). There does not appear to be a dispute regarding whether Plaintiffs were members of a protected class. Rather, the Defendants dispute whether Magistrate Judge Blewitt erred in concluding that there was a dispute of material fact regarding whether Plaintiffs were treated differently than similarly situated individuals on the basis of their status as individuals of Indian descent who are adherents of Hinduism.

Defendants argue that the Report and Recommendation improperly relied on three unsupported factual allegations in concluding that summary judgment was not warranted on Plaintiffs' equal protection claim against Defendant Shultz, namely that: (1) Defendant Shultz approved the framing of the property when it was owned by Timothy Mowery, but required the framing to be inspected again using a more stringent standard after it had been purchased by Plaintiffs; (2) Defendant Shultz had no basis for issuing a stop work order on November 20, 2007; and (3) Defendant Shultz intentionally delayed lifting the stop work order after the Court of Common Pleas for Cumberland County ordered Defendant to lift the order. A review of the Report and Recommendation reveals that while Magistrate Judge Blewitt noted Plaintiffs' argument on the latter two issues raised by Defendants, it does not appear that he actually relied on them in making his recommendation. (Doc. No. 158 at 29–30.) Rather, as their claim relates to Defendant Shultz, it appears that Magistrate Judge Blewitt relied solely on the issue of the framing inspection and the application of differing codes in denying summary judgment. Accordingly, the Court will only address this issue in determining whether Defendant Shultz is entitled to summary judgment on Plaintiffs' equal protection claim against him.

Regarding the issues surrounding the framing inspection of the property, the Court finds that Magistrate Judge Blewitt did not err in determining that there were disputed issues of material fact. There is evidence, which does not appear to be disputed by Defendants, that the property was inspected in 2000 when Mr. Mowery, a non-Indian, owned the property and that, as of September 2007, Plaintiffs and Defendant Shultz agreed that the 1995 CABO Building Code would apply to the already completed framing rather than the Pennsylvania Uniform Construction Code standards. (Doc. No. 104–2, Ex. 6.) Defendants argue, however, that although Defendant Shultz referred to the inspection he conducted on November 2, 2007, as a "framing inspection," that inspection was actually conducted to determine if the fire stopping had been installed and to ensure that the fire stopping satisfied

the Uniform Construction Code—which Defendants point out is identical to the 1995 CABO Building Code on this issue. (Doc. No. 160 at 4.)

**\*4** Defendants' construction of these facts may ultimately be confirmed; however, there is ample evidence to support Plaintiffs' version of the relevant events. Specifically, Defendant Shultz's inspection report states that he intended to conduct a "framing inspection" of the property. (Doc. No. 104–2, Ex. 4.) Further, his report cites Plaintiffs for, *inter alia,* "insulation already installed prior to framing inspection," "drywall hung entire 1st floor ceiling without framing inspection," and "fire rated drywall installed @ tenant separation wall without framing inspection." (*Id.*) Further, Defendant Shultz sent Plaintiffs' then-attorney Doug Miller a letter two weeks after the "framing inspection" in which he informs him that the property would need to "satisfy the requirements of the Pennsylvania Uniform Construction Code," that when he conducted his "framing inspection" he found that Plaintiffs had permitted their workers to "install[ ] the drywall to the framing that was not approved," that Plaintiff could either appeal his finding or "remove all insulation and drywall, exposing all framing members so that a thorough framing inspection may be completed," and that he was on site to "conduct a framing inspection." (Doc. No. 104–2, Ex. 5.) Defendant Shultz followed up with Plaintiffs, explaining that "no work may continue or resume [on the property] prior to inspection and approval of all framing issues." (Doc. No. 104–2, Ex. 6.)

In light of these statements, all from Defendant Shultz himself, the Court finds that Magistrate Judge Blewitt was correct in finding that there were disputed issues of fact regarding Plaintiffs' equal protection claim against Defendant Shultz. Indeed, it appears that Defendants' sole argument on this issue is that there is no dispute of fact because Defendant Shultz did not mean what he said. Determining whether this is correct is precisely the type of disputed factual question that a jury, rather than the Court, should decide. On the current record, a jury could find that Defendant Shultz quite literally applied a double standard to the property's framing when he inspected the property at the time it was owned by a white man as compared to when he inspected the property at the time it was owned by an Indian man. Accordingly, summary judgment is not warranted as to Plaintiff's equal protection claim against Defendant Shultz.

**B. Defendant East Pennsboro Township**

2012 WL 2003493

In *Monell v. New York City Department of Social Services,* the United States Supreme Court held that municipalities are "persons" subject to liability pursuant to 42 U.S.C. § 1983. 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A Section 1983 claim will not lie against a municipality, however, if it is based solely on a theory of *respondeat superior. Id.* at 691–92. Rather, a municipality may only be held liable pursuant to Section 1983 if a plaintiff is able to identify a policy or custom of the municipality that caused the constitutional violation. *A.M. v. Luzerne Cnty. Juvenile Det.* Ctr., 372 F.3d 572, 580 (3d Cir.2004) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

 **\*5**  A municipal policy is made when an official with final decision-making authority issues an official proclamation, policy, or edict. *Andrews,* 895 F.2d at 1480 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). There is no allegation that an official municipal policy resulted in Plaintiffs' injuries. Accordingly, Defendant East Pennsboro Township may only be held liable if Plaintiffs can establish that a municipal custom resulted in a constitutional violation. A custom or practice may give rise to municipal liability where a course of conduct, though not authorized by law, is so permanent and widespread as to virtually constitute law. *Id.* (quoting *Monell,* 436 U.S. at 690). To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in the original). A plaintiff may satisfy the culpability requirement in one of two ways. If a particular municipal action itself violates a plaintiff's federally protected rights or a municipal decision maker directs an employee to violate a plaintiff's rights, a showing that the municipality or its decision maker acted intentionally will suffice. *Id.* at 405. Where a facially lawful municipal action has led to a violation of plaintiff's rights, a plaintiff must demonstrate that the municipality or a decision maker had notice that a constitutional violation could occur as a result of a particular action or course of conduct and that the decision maker acted with deliberate indifference to that risk. *Id.* at 407; *Berg v. Cnty. of Allegheny,* 219 F.3d 261, 276 (3d Cir.2000). Finally, a plaintiff must establish an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation. *Bielevicz v. Dubinon,* 915 F.2d 845, 850–51 (3d Cir.1990).

Plaintiffs do not allege that Defendant East Pennsboro Township promulgated a policy of discriminating against individuals of Indian descent or adherents of Hinduism. Nor do they allege that a policymaker took any action or directed an employee to take any action that violated federal law. Accordingly, their claims against Defendant East Pennsboro Township will only rise above the level of a *respondeat superior* claim if they can point to evidence of record that would support a finding that a policymaker had knowledge of some course of conduct of municipal employees and was deliberately indifferent to the likelihood that the course of conduct would result in constitutional violations.

Whether Plaintiffs have set forth evidence from which a jury could reasonably conclude that a policymaker was deliberately indifferent to the likelihood of constitutional violations is a close question. Much of the evidence identified by Plaintiffs to support their claim in this regard is irrelevant, wholly reliant on speculation, or premised on a theory of *respondeat superior.* Plaintiffs have, however, identified some evidence from which a factfinder could plausibly conclude that Defendant East Pennsboro Township is subject to *Monell* liability. Plaintiffs note that they initiated legal proceedings in the Court of Common Pleas for Cumberland County against Defendant East Pennsboro Township to challenge Defendant Shultz's stop work order, which resulted in the order being lifted. (Doc. No. 104–2, Ex. 9.) These proceedings coupled with the many complaints raised by Plaintiffs could lead a reasonable juror to conclude that township officials either were, or should have been, aware of the alleged problems with the manner in which building codes were enforced as to these Plaintiffs. Further, although Defendants dispute the meaning of the many photographs submitted by Plaintiffs purporting to show structures violating various township building codes, to the extent Plaintiffs are able to establish that the photographs do in fact depict widespread unaddressed code violations, a jury could conclude that the sheer volume of violations committed by non-Indian owners that went unaddressed should have placed township policymakers on notice that the building inspectors were enforcing the codes differently with respect to owners who were not of Indian descent or adherents of Hinduism. Accordingly, the Court will deny Defendant East Pennsboro Township's motion for summary judgment on this basis.

### *ORDER*

**\*6** **AND NOW,** on this 5th day of June 2012, **IT IS HEREBY ORDERED THAT,** the Report and Recommendation (Doc. No. 158) is **ADOPTED.** The Court will GRANT IN PART Defendants' motion for summary judgment (Doc. No. 104) as follows:

1. The motion for summary judgment is **GRANTED** as to any Section 1983 claims for monetary damages raised against Defendant Shultz in his official capacity; any procedural due process claims; and any substantive due process claims.

2. The motion is **DENIED** as to Plaintiffs' equal protection claims against Defendant Shultz in his individual capacity and Defendant East Pennsboro Township.

The Clerk of Court is directed to reserve entry of judgment pending the disposition of all remaining claims. **IT IS FURTHER ORDERED THAT** a conference call will be held on June 28, 2012, at 1:30 p.m. Plaintiff's counsel shall initiate this call. The telephone number of the court is 717–221–3990.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2003493

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

C

2012 WL 2792347
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Annmarie GENTILE, Plaintiff,

v.

DES, PROPERTIES, INC. d/b/a Classic
Quality Homes, Inc., et al., Defendants.

No. 3:08–CV–2330.
|
July 9, 2012.

**Attorneys and Law Firms**

Garen O. Meguerian, Attorney at Law, LLC, Paoli, PA,
Kathryn V. Chandless, Chandless Law Offices, LLC,
Newtown Square, PA, for Plaintiff.

Nancy C. Demis, Ronald H. Surkin, Gallagher, Schoenfeld,
Surkin, Chupein, Media, PA, for Defendants.

***MEMORANDUM OPINION***

ROBERT D. MARIANI, District Judge.

### I. Introduction

**\*1** Before the Court are Defendants' Motion for Summary
Judgment (Doc. 61) [1] and Motion to Strike (Doc. 74). For the
reasons set forth below, the Court will grant in part and deny
in part both motions.

[1]
> At the outset, the Court notes that Plaintiff has
> voluntarily agreed to withdraw: her claims against
> David and Steven Wengerd on both Counts I and II,
> her claim against Steven on Count III, her claims
> for vacation and sick/personal time on Count IV,
> and her claim against Steven on Count V (Doc. 77).

### II. Statement of Facts and Procedural History

In June 2007, David and Emma **Wengerd** purchased a
home construction company Classic Design Homes, Inc.
("CDH"), from Plaintiff's previous employer, Raymond
Bender ("Bender"), who continued to have access to part

of the office until December 31, 2007. (Asset Purchase
Agreement, Doc. 62, Ex. D). [2] The Wengerds named their
company DES Properties, Inc. ("DES"), d/b/a Classic Quality
Homes, Inc. ("CQH"). (S. Wengerd Dep., Doc. 62, Ex. B,
15:22–24). Steven is the Wengerds' son who owns a 5% share
in the company and functions as the Vice–President (*Id.* at
12:10–12, 15:5–11). At his deposition, Steven testified that
he acts under the supervision of his father, and he does not
supervise the employees. (*Id.* at 23:19–24:4).

[2]
> "Possession of Premises and Vehicles shall be
> delivered to Buyers on the Closing Date, except
> that the Sellers reserve free of any rent or charge
> the right to occupy and use two (2) rooms in the
> sales office for their own purposes until no later
> than December 31, 2007." (*Id.* at ¶ 5).

Between the sale and December 31, 2007, Bender continued
to access the property, purportedly for business purposes.
However, his behavior while on the premises occasioned at
least two police reports of sexual harassment and assault
against Plaintiff, an employee. Between June and November
2007, David was allegedly aware of Bender's violent
tendencies. He himself described Bender as "scary." (DW1
Dep., Doc. 62, Ex. C, 62:23–63:1). Plaintiff stated that she
had informed David about Bender's history of making sexual
comments and inappropriate touching soon after he bought
the company. (Gentile Dep., Doc. 62, Ex. E, 152:4–153:12;
159:1–6, DW1 Dep., Doc. 70, Ex. A, 60:1–24). This included
an instance of Bender exposing his buttocks to Plaintiff
sometime in October 2007. (Gentile Dep., Doc. 62, Ex. E,
152:22–153:8, Police Statement, Doc. 70, Ex. K, at 3–4). [3]

[3]
> In her statement to the police, Plaintiff also alleged
> that Bender "had shoved his whole face into my
> breast." (Doc. 70, Ex. K, at 3).

On November 9, 2007, Bender returned again to DES and
allegedly sexually assaulted Andrea Costenbader, Plaintiff's
co-worker, by shoving his hand down her pants and grabbing
her buttocks. (Police Statement, Doc. 70, Ex. K). After the
incident, two male co-workers, (Gaito and Knott) advised
Costenbader to call the police. Knott also told Bender to
leave the premises, and Bender did not return that day.
(Costenbader Dep., Doc. 62, Ex. F, 91:18–94:22). Following
Bender's assault on Costenbader, Plaintiff called the police.
Both Costenbader and Plaintiff submitted statements to the
police on the 10th. (Doc. 70, Ex. K). David was not on the
premises at the time of the assault, but he came in later that day

out and found out what had happened. (DW1 Dep., Doc. 62, Ex. C, 71:12–72:7). He said that Knott "stepped in and we decided we should keep [Bender] off the property." (*Id.* at 115:19–21). Knott claims that the Wengerds "refused to believe Ms. Costenbader and Ms. Gentile, and sided with Mr. Bender. (Knott Aff., Doc. 70, Ex. L, ¶¶ 19–20).[4] David admitted he did not conduct an independent investigation because he felt the police were better equipped to handle the matter. (DW1 Dep., Doc. 62, Ex. C, 118:5–11).

[4]     Knott was also terminated in August 2009 and at the time of his affidavit was involved in a lawsuit against DES for commissions he claims he never received. *Id.* at ¶¶ 33–34.

**\*2** David acknowledged that Gentile had told him about Bender's conduct and her complaints. (DW2 Dep., Doc. 70, Ex. B, 49:9–51:4). However, after his conversation with Gentile, David admitted he did not approach Bender about it because "Bender was like $50,000,000 and I would have been a little guy. I would never dare say anything to Bender." (DW1 Dep., Doc. 62, Ex. C, 61:4–8). He then said he did not do anything after the conversation with Gentile "because [Gentile] put me under the impression that all you had to do was tell him to leave and he would go. So I didn't think it was anything serious at this point." (*Id.* at 61:11–14). David admitted that when Gentile told him about Bender's conduct, he understood her to mean that both she and Plaintiff were bothered by it. David also said that he did not fully believe Gentile because "I guess my idea would have been that, if you want to bother somebody, you would bother some different type of person." To clarify his answer he stated, "I guess somebody a little more attractive." (DW2 Dep., Doc. 70, Ex. B, 51:12–21).

Bender returned to the office on November 13, 2007, asking "Where is she?" ostensibly referring to Costenbader (Costenbader Dep., Doc. 70, Ex. F, 40:6–7). A salesman (Hanyon) distracted Bender and got him out of the office by directing him to the warehouse. (*Id.* at 41:8–14). Bender did not return, and Costenbader had no contact with him that day. (*Id.* at 40:16–18, 41:13–15). David allegedly apologized for "putting his money ahead of us girls." (*Id.* at 46:16–18). Costenbader alleges that David delayed delivering the letter until after he had closed sales on some of Bender's houses. (DW1 Dep., Doc. 70, Ex. A, 116:13–17; 116:24–117:14). Costenbader stayed home for the next two days. (Costenbader Dep., Doc. 70, Ex. F, 59:10–13). On the 15th,

David confirmed to Costenbader that he had personally delivered the letter to Bender.[5]

[5]     Defendant has not produced this letter as evidence because David's copy was allegedly destroyed in a fire at the office. His attorney who drafted the letter has a brain tumor and has been unable to produce it. (DW1 Dep., Doc. 70, Ex. A, 116:19–23).

Plaintiff settled her case separately with Raymond Bender and withdrew the criminal charges against him. After Costenbader was terminated, Plaintiff claims she was subjected to an even more hostile work environment: she was harshly disciplined, repeatedly threatened with termination, her work-station was searched for evidence to justify terminating her, and Bender's attorney repeatedly harassed her at work with phone calls. (Doc. 62, Ex. I, at ¶ 8; Gentile Dep., Doc. 62, Ex. E, 79:13–82:7). Furthermore, Plaintiff claims that after Costenbader was fired, other male co-workers made jokes about Bender to Plaintiff. On one occasion, a male co-worker "pulled a piece of lint off my shirt, and the guys made a joke saying, You better watch out or you're next, or made a joke towards what was going on with Bender. And David was sitting right there and they laughed and I was furious that he allowed them to say that." (Gentile Dep., Doc. 62, Ex. E, 150:15–24). Plaintiff also filed a written complaint with David about the offensive comments. (Gentile Dep., Doc. 70, Ex. G, 146:10–20).

**\*3** Because Defendants allegedly failed to take action, Plaintiff filed an EEOC Charge of Discrimination. (Doc. 62, Ex. I). Her Charge contained three Counts: (I) Sex Discrimination/Harassment/Pregnancy Discrimination, (II) Race Discrimination/Harassment, and (III) Retaliation. She also claimed that she experienced discrimination on a continuing basis. According to the EEOC Case Referral Log, Gentile filed her Charge on November 30, *2007*. (Doc. 62, Ex. J). Her initial charge was received by the agency that day, but the investigator did not receive it until November 25, *2008*. (*Id.*). Meanwhile, Gentile had requested a right-to-sue letter on August 28, 2008 (*Id.*) because more than 180 days had passed since she had filed her initial charge. The letter was issued on December 11, 2008 (Doc. 70, Ex. R), and she filed her Complaint in this case on December 31, 2008. (Doc. 1).

Also in November 2007, Plaintiff notified David she was pregnant, with an anticipated due date of August 2008. (Gentile Dep., Doc. 62, Ex. E, 78:5–24). According to Plaintiff, David agreed to provide her with paid maternity leave and paid vacation time. (*Id.* at 86:7–17, DW2 Dep.,

Doc. 70, Ex. B, 92:9–94:18, SW Dep., Doc. 70, Ex. C, 45–49). However, David later approached Plaintiff about taking a temporary layoff on June 28, 2008 with a return to work on October 1, 2008, and proposed she receive unemployment compensation during that time. (Gentile Dep., Doc. 62, Ex. E, 89:2–90:7, 94:2–9). During that three-month period, Plaintiff alleges Defendants continued to call her in to work without fully compensating her. (*Id.* at 19:24–20:2, 96:9–12).

Furthermore, Defendants told unemployment compensation authorities that she had quit her job (Doc. 70, Ex. Z), so she was required to pay back all of the unemployment compensation she had received. (Doc. 62, Ex. Q).

### III. Standard of Review on
### Motions for Summary Judgment

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering–Plough iCorp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of proving the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### IV. Analysis

*Motion to Strike*

**\*4** Defendants assert that portions of Plaintiff's Answer to Statement of Facts ("ASOF") (Doc. 70) are inflammatory, irrelevant, and merely opinions or conclusions of law instead of brief, helpful, factual statements.

Specifically, Defendants seek to strike ¶¶ 15, 16, 19, 21, 25, 27, 29, 31, 32, 33, 34, 37, 40, 44, 49, 50, 51, 52, 54, 55, 56, 60, 64, 66 and cite *Hartshorn v. Throop Borough,* No. 3:07–cv–01333, 2009 WL 761270, at *3 (M.D.Pa.2009); *Deluca v. Simmons Mfg. Corp., Inc.,* No. 3:07–cv–2143, 2009 WL 1107909 (M.D.Pa.2009). In both cases, Judge Caputo struck portions of the Statement of Facts because they were irrelevant, inflammatory, or conclusions of law. Plaintiff has agreed to strike portions of ¶¶ 15, 21, 25, and 33 (Doc. 74, Ex. B), so the Court will grant Defendants' motion and strike those paragraphs accordingly.

As for the remaining paragraphs that Defendants seek to strike, after a review of the ASOF, the Court notes that Defendants object to the listed paragraphs because they contain much material that would be better suited for a brief. The "counterstatements of fact" are essentially arguments. Rather than examining the remaining twenty paragraphs and excising the offending portions (an exhaustive effort that will yield little benefit to either Defendants or the Court), the Court will deny the motion to strike and instead assign any conclusions of law or inappropriate arguments no evidentiary value.

### a. Count I: Sexual discrimination/
### hostile work environment[6]

[6] Under Count I, if the Court finds that Defendants intentionally engaged in an unlawful employment practice, Plaintiff is eligible for backpay, reinstatement, and other forms of equitable relief, such as the clearing of any negative personnel files or references. 42 U.S.C. § 2000e–5(g)(1). As such, Plaintiff is entitled to seek such relief in connection with her claim that DES is directly liable for its alleged failure to take prompt remedial action in response to her complaints about Bender's activity and for perpetuating a hostile work environment after DES terminated Costenbader's employment.

Defendants allege that Gentile failed to exhaust her administrative remedies because she did not amend her EEOC charge after November 2007. However, the Court finds there is a sufficient nexus between her sexual harassment/ discrimination/hostile work environment claims in her EEOC charge from November 2007 and the same claims in her Third Amended Complaint, especially in light of Plaintiff's claims of Defendants' continuing actions of discrimination. *Anjelino v. N.Y. Times Co.,* 200 F.3d 73, 94 (3d Cir.1999). The Court thus turns to the merits of the parties' arguments.

Plaintiff is alleging that Defendants took inadequate remedial measures in response to Bender's conduct (i.e. they failed to prevent a hostile work environment). To state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. [7]

[7]  The fifth element is usually "the existence of *respondeat superior* liability." *Andreoli v. Gates,* 482 F.3d 641, 643 (3d Cir.2007). However, in this case, Bender was not an agent of DES because he was no longer an owner or employee. Plaintiff has specifically stated she is suing DES for direct, not vicarious, liability.

*Guthrie v. Baker,* 583 F.Supp.2d 668, 681 (W.D.Pa.2008) (citing *Jensen v. Potter,* 435 F.3d 444, 453 (3d Cir.2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 67–68,126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**\*5** An employer is liable under Title VII for harassment of its employees by non-employees such as Bender where it is aware of the problem and fails to take prompt and appropriate corrective action. *Faragher v. City of Boca Raton,* 524 U.S. 775, 789, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998) ("the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively by the employer"). EEOC Guidelines also provide that:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

29 C.F.R. § 1604.11(d-e).

An employer can be liable for the harassing conduct of the victim's harasser if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *See Andreoli,* 482 F.3d at 644 (citing *Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 26 (3d Cir.1997) and *Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103, 106 (3d Cir.1994)). Even if the remedial action does not stop the alleged harassment, it is "adequate" if it is "reasonably calculated" to end the harassment. *Knabe v. Boury Corp.,* 114 F.3d 407, 412–13 (3d Cir.1997). The employer also has a duty to investigate whenever it becomes aware of harassment. It is not essential for the victim of harassment to lodge a formal or informal complaint. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) ("Finally, we reject petitioner's view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.").

Bender's contract with Defendants allowed him access to two rooms in the sales office until the end of 2007. (Asset Purchase Agreement, Doc. 62, Ex. D,). Under Pennsylvania law, the contract is to be interpreted in light of an implied duty of good faith and fair dealing, as well as the doctrine of necessary implication. That doctrine, similar to the requirement of good faith, has been described as follows:

In the absence of an express provision, the law will imply an agreement by the parties to a contract ... to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Slater v. Pearle Vision Ctr.,* 376 Pa.Super. 580, 546 A.2d 676, 679 (Pa.1988); *see also Slagan v. John Whitman & Assocs.,* No. Civ.A. 97–3961, 1997 WL 587354, at *5 (E.D.Pa. Sept.10, 1997) (holding in a sexual harassment case that "Whether under the Restatement's implied duty of good faith performance of a contract or the doctrine of necessary implication, ... Plaintiffs employment contract contained the implied term that his conduct would be lawful."). Though Bender was not an employee of Defendant, his contract with Defendant contained an implied term that while on the business premises, his conduct would be lawful. Once Bender allegedly breached that duty by sexually harassing Costenbader and Plaintiff, at the very least, Defendants had a duty to investigate and prevent further harassment to its employees. *Faragher,* 524 U.S. at 789; *Mentor,* 477 U.S. at 72; *Andreoli,* 482 F.3d at 644; *Knabe,* 114 F.3d at 412–13. Because Defendants cannot establish as a matter of law that they were either unaware of Bender's conduct or that they took prompt and adequate remedial measures, the Court will deny their motion for summary judgment on this count.

**\*6** Following the events of November 9, 2007, Gentile filed formal criminal charges against Bender. (Doc. 70, Ex. K). Once David came to the office, he learned of the day's events. (DW1 Dep., Doc. 70, Ex. A, 71:12–72:7). Defendants cannot claim lack of notice. Because Defendants were as on notice, they had a duty to investigate the problem. However, David admitted he did not because he allegedly felt the police were better equipped to handle it. (*Id.* at 118:5–11). He also stated he personally delivered a letter to Bender warning him to stay off the property, but Defendants have not produced the letter yet. (*Id.* at 116:19–23). David also waited until closing on some of Bender's homes before delivering the letter (*Id.* at 116:13–17; 116:24–117:14). He also stated at his deposition that he would never dare to say anything against Bender because he, David, was a "little guy" and Bender was $50,000,000.00 (*Id.* at 61:4–8), which is inconsistent with his statement that he personally delivered the letter to Bender and told him to stay away.

Though Bender and Costenbader had no contact when Bender returned to the office on November 13, he was kept away from Costenbader not through the employer's action but because one of the salesman intervened to distract Bender. The employer itself took no action to ensure Costenbader was insulated from Bender presence. (Costenbader Dep., Doc. 70, Ex. F, 40:16–18, 41:13–15).

Plaintiff claims that after Costenbader was fired, other male co-workers made jokes about Bender to Plaintiff. On one occasion, a male co-worker "pulled a piece of lint off my shirt, and the guys made a joke saying, You better watch out or you're next, or made a joke towards what was going on with Bender. And David was sitting right there and they laughed and I was furious that he allowed them to say that." (Doc. 62, Ex. E, at 150:15–24).

Therefore, the Court will deny the motion for summary judgment on the count for sexual harassment/discrimination/ hostile work environment based on the existence of genuine issues of material fact as to Plaintiffs claims of gender and hostile work environment for failure to take prompt remedial action.

In contrast, DES is entitled to summary judgment on Plaintiffs pregnancy discrimination claim because at her deposition, she said she did not feel she was treated differently from non-pregnant employees (Gentile Dep., Doc. 62, Ex. E, at 79:5–12), even though she claimed in her Third Amended Complaint that Defendants "failed to accord Ms. Gentile, during her pregnancy, the same treatment, terms, conditions and benefits of employment afforded to other employees who were not pregnant." (Doc. 56, ¶ 54). At her deposition, when Defendants' counsel asked her how she was treated differently, she could not "think of anything at the moment." (Doc. 62, Ex. E, at 205:4–16). Plaintiff did not respond to Defendants' motion for summary judgment on this claim in her Brief in Opposition (Doc. 71). [8] Furthermore, Plaintiff cites to no evidence in the record that she was mistreated because of her pregnancy.

[8]    Plaintiff's Answer to Defendants' Statement of Facts ("ASOF") ¶ 40 partially addresses Defendants' argument. Defense counsel asked her "aside [from] issues *at the end of your employment,"* how she was treated differently based on her pregnancy. (Gentile Dep., Doc. 62, Ex. E, at 79). However, when counsel against asked

the question, this time without time limitations, her answer remained the same: she could think of no instance in which she was treated differently because of her pregnancy. (*Id.* at 205).

**\*7** Because Plaintiff did not respond to Defendants' arguments in her Brief in Opposition, she twice stated at her deposition that she was not treated differently as a result of her pregnancy, and there is no independent evidence in the record to support a pregnancy discrimination claim, the Court will grant Defendants summary judgment on Count I based on pregnancy discrimination.

### b. *Retaliation*

Under a Title VII retaliation claim, the employee bears the initial burden of establishing a *prima facie* case of retaliation. She must show (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Marra v. Philadelphia Hous. Auth.* 497 F.3d 286, 300 (3d Cir.2007). Once a plaintiff meets her burden, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Plaintiff claims she engaged in the following protected activity; (1) she complained about Bender's conduct towards her and Costenbader as early as July 2007; (2) in November 2007 when Bender sexually assaulted Costenbader, Gentile called the police on November 9, 2007. They both filed written reports on November 10th; (3) sometime in November 2007, Gentile hand-delivered a letter to David stating she "didn't think that he was protecting my rights. People in the office were making outrageous comments to me that had to do with the assault with Bender, and he never stopped it and witnessed it." (Gentile Dep., Doc. 70, Ex. G, 146:10–20); (4) Gentile led her EEOC Charge on November 30, 2007; and (5) Gentile filed an application for unemployment compensation on July 12008 and at some unknown times sought wages for time worked and maternity leave.

The Court finds as a matter of law that the actions alleged in item (5) do not constitute protected activity under a Title VII retaliation claim. At least two courts outside of this circuit have held that filing an application for unemployment compensation is not protected activity under Title VII.

*McDonald–Cuba v. Santa Fe Protective Svcs., Inc.,* 644 F.3d 1096, 1102 (10th Cir.2011) ("[Plaintiff] fails to cite any authority recognizing an application for unemployment benefits, without more, as a form of protected activity under Title VII. [Plaintiffs] retaliation claim therefore fails as a matter of law. She has identified no protected activity that could form the basis for a properly-exhausted retaliation claim."); *Edwards v. Creoks Mental Health Srvcs., Inc.,* 505 F.Supp.2d 1080, 1093 (N.D.Ok.2007) ("Here, plaintiff did not engage in protected opposition to discrimination; filing for unemployment compensation in [*sic* ] entirely unrelated to Title VII. Because plaintiff did not engage in a 'protected activity' under Title VII, defendant is entitled to summary judgment on plaintiff's retaliation claim."). Defendants do not brief this point at all while Plaintiff cites one inapposite case to support her position. *Petrunich v. Sun Bldg. Sys., Inc.,* No. 3:CV–04–2234, 2006 WL 2788208, at \*8 (M.D.Pa. Sep.26, 2006) ("The opposition to [a plaintiffs] claim for unemployment compensation benefits [may be] an adverse employment action because it [could] discourage a reasonable worker from filing [a] discrimination complaint."). *Petrunich* discusses whether *opposition* to an application for unemployment compensation could constitute an *adverse action,* whereas the issue before the Court is whether *filing* the application constitutes *protected activity.* Furthermore, requesting maternity leave is "neither participation in a Title VII proceeding nor an act in opposition of discrimination." *McCormick v. Allegheny Valley Sch.,* No. 06–3332, 2008 WL 355617, at \*17 (E.D.Pa. Feb.6, 2008). The same reasoning would apply to an attempt to recoup wages earned. Nevertheless, Gentile can still seek relief under her wrongful discharge claim for the allegations in (5).

**\*8** Plaintiff alleges that following her EEOC complaint, internal complaints, and police report, she was subjected to harsher discipline (i.e., adverse actions) in the form of: (1) an increased workload as soon as Costenbader was terminated (Gentile Dep., Doc. 62, Ex. E, 125:2–9); (2) threats of termination (on two occasions in January/February and May 2008, David told Plaintiff, "you know your job depends on it" (*Id.* at 76:7–17; 81:1–82:7; DW2 Tr., Doc. 70, Ex. B, 47:2–9); (3) a search of her work-station on November 26, 2007 for evidence to justify her termination; (4) exposure to harassing phone calls from Bender's attorney following Bender's arrest; (5) and termination in 2008.

The Court finds as a matter of law, items (1) and (3) do not constitute adverse actions. After Plaintiff complained about

her increased workload, Defendants permitted her to share it with co-workers. (Doc. 62, Ex. E, 82:20–84:15). Furthermore, her work-station was searched on only one occasion. (Gentile Dep., Doc. 70, Ex. G, 128:15–17).

However, the Court founds that items (2), (4), and (5) could constitute adverse actions when considered together and across the entire period from November 2007 to August 2008. Though Gentile acknowledges that she was never disciplined at work (e.g., reprimands, write-ups, suspensions, etc.), directions to an employee to finish a project quickly because her "job depends on it" could be adverse. Defendants' failure to intervene to prevent Bender's attorney from harassing her by calling her at work after Plaintiff complained about it could also be adverse. Obviously, terminations are adverse actions under Title VII.

Plaintiff argues both in her Charge and Complaint that the retaliatory acts were part of a continuing action against her. *See, e.g., Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir.1997) (In Title VII retaliation claims, "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). *Woodson* held that actions that by themselves would not constitute adverse action could be considered adverse action if considered as a whole (including termination). *Id.* at 921.

Plaintiff is not attempting to use temporal proximity to show causation, nor could she. Under several Third Circuit cases, the eight or nine months between Plaintiff's last protected activity in November 2007 [9] and her discharge in July/August 2008 [10] do not suggest a sufficient temporal proximity from which a court could infer a causal link. *LeBoon v. Lancaster Jewish Cmty. Ass'n,* 503 F.3d 217, 233 (3d Cir.2007) (finding that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *Andreoli v. Gates,* 482 F.3d 641, 650 (3d Cir.2007) (finding the same for a five-month gap).

[9]   Excluding her application for unemployment compensation on July 1, 2008, request for maternity leave, and attempts to recoup unpaid wages.

[10]   Defendants maintain an internally inconsistent position. They informed the Unemployment Compensation Board that Gentile had *quit.* (Doc.

70, Ex. Z; *see also* DW2 Dep., Doc. 70, Ex. B, 92:24–93:1). However, in their briefs, they agree with Gentile that at some point, Gentile was terminated.

**\*9** Rather, Plaintiff is attempting to show a pattern of antagonism in the 8–9 month interval between her last protected activity and resulting termination. In *Woodson,* the Third Circuit found that there was sufficient evidence of a pattern of antagonism in the two-year period between the plaintiffs filing of an EEOC charge and his subsequent discharge.

> The jury might reasonably have concluded that Scott engaged in a pattern of antagonistic behavior against Woodson after his complaints, setting him up to fail [by promoting him to lead] a poorly performing division, [refusing to provide him with necessary support], and then terminating him through a "sham" ranking procedure. Although none of the pieces of evidence that we have discussed, standing alone, would be sufficient to allow this inference (especially the "environment" evidence), the evidence as a whole can be so, particularly when we consider, as we must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor.

*Id.* at 924. *See also Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 178 (3d Cir.1997) (reversing district court grant of summary judgment in favor of defendant and finding sufficient pattern of antagonism between the plaintiff's last complaint about gender discrimination and discharge, a period of approximately six months. The defendant told the plaintiff she was being taken off the "management track," advised her to look for another job, and offered her position to a male while she was still employed with the defendant).

Because there is no unusually suggestive temporal proximity between Gentile's protected activity and discharge, the Court must consider whether all of the adverse actions taken

together show a causal link between Gentile's protected activity and resulting discharge. Plaintiff has sufficiently shown a pattern of antagonism over a nine-month period to establish a *prima facie* case of retaliation. With respect to this claim, Defendants spend the entirety of their brief arguing that Plaintiff has not established a *prima facie* case. Under the burden-shifting framework of *McDonnell Douglas,* they do not argue why Plaintiff was terminated for legitimate, non-retaliatory reasons. Therefore, the Court will deny Defendants' motion for summary judgment on this count.

### c. Tortious Interference

Plaintiff says she was terminated on June 28, and she filed for unemployment benefits on July 1, 2008. She began receiving them the second week of July, and her benefits ended around the beginning of August. (Gentile Dep., Doc. 62, Ex. E, 41:18–42:4).

On August 26, Steven stated in an oral interview with a Board representative that Plaintiff "just said she couldn't work anymore because she was pregnant. [S]he never gave us a dr's note or anything." (Doc. 70, Ex. Z). "She quit and we had to hire someone to replace her. There was no lack of work." (*Id.*). In a letter from DES dated August 29, 2008, Defendants reported to the Board, "Annmarie gave us notice ahead of time that she will be off for 2 or 3 weeks for maturity [*sic* ] leave starting July 1st 2008. After 5 weeks we could no longer operate without another office worker, b[e]cause we had some temporary school help, and Annmarie told us she could not be back before Oct. 1st 2008 so we therefore hired another office employee." (Doc. 70, Ex. Y).

**\*10** On August 30, Gentile filed her petition to appeal. (Doc. 62, Ex. M). At Gentile's appeal on October 1, Jeff Hanyon testified on DES's behalf, but Gentile failed to attend the referee's hearing.[11] (Doc. 62, Ex. N). The referee affirmed the denial of benefits on October 8, and Gentile filed her appeal on October 10. (Doc. 62, Ex. O, P). On November 18, the Board of Review affirmed the referee's judgment as modified and determined a $2,289 fault overpayment had been established. (Doc. 62, Ex. Q).

[11]     Defendants claim that their communications to the Board were statements in a quasi-judicial action protected by absolute immunity. *See Milliner v.*

*Enck,* 709 A.2d 417 (Pa.Super.Ct.1998). This issue is now moot.

As an at-will employee, Plaintiff was not entitled to rely on whatever promises David may have made to her regarding hiring her back in October 2008 (see discussion of at-will i employees, *infra* ). Defendants were within their rights to contest her claim for unemployment compensation under the Unemployment Compensation Law. *See generally* 43 Pa. Cons.Stat. § 821 *et seq.* Therefore, there could not have been tortious interference.

In light of the foregoing, Plaintiff's reliance on *Krashna v. Oliver Realty, Inc.,* 895 F.2d 111, 115 (3d Cir.1990) is unavailing. First, *Krashna* dealt with the claim of tortious interference of the plaintiff's right to workmen's compensation, not unemployment benefits. Second, the court in *Krashna* ultimately determined that the Labor Management Relations Act did not completely preempt state law claims for interference with the right to worker's compensation benefits, and therefore, the district court lacked removal jurisdiction. To the court, the plaintiff's claim appeared more akin to a claim of tortious interference rather than wrongful discharge, thereby exceeding the scope of the LMRA. In reaching its decision, the Third Circuit stated that "We need not consider the viability of this state claim nor whether ordinary preemption operates against it. These are matters for the state court." *Id.* at 115, n. 7. Therefore, while not explicitly recognizing a cause of action for tortious interference with the right to receive worker's compensation benefits, the Third Circuit did not foreclose the possibility that the cause of action existed.

Plaintiff has not been able to cite to any cases which recognize a cause of action for tortious interference of the right to unemployment benefits. The Court will not fashion a new state law cause of action where no authority exists to do so.[12] Thus, the Court will grant Defendants summary judgment on this claim.

[12]     By finding that Plaintiff does not have a cause of action in this case, the Court does not mean to imply that Plaintiff would not otherwise have a cause of action for the tort of wrongful discharge. *Phillips v. Babcock & Wilcox,* 349 Pa.Super. 351, 503 A.2d 36 (Pa.Super.Ct.1986) (holding that the tort of wrongful discharge was available only for at-will employees but not for employees who were protected by a collective bargaining agreement)

(citing *Geary v. United States Steel Corp.,* 319 A.3d 174 (Pa.1974).

### d. *Unpaid Wages*

Plaintiff sues under Wage Payment Protection and Collection Law ("WPCL"), 43 Pa. Cons Stat. § 260.1 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.,* for paid maternity leave, failure to provide two weeks' notice pay on termination, and failure to pay for time worked and for overtime. Plaintiff's sole basis for her claim is that despite the absence of a written policy, Costenbader was given two weeks' notice pay, but Costenbader herself acknowledged that the Wengerds had not instituted any policy regarding notice pay. (Costenbader Dep., Doc. 62, Ex. F, 211:16–21). *See Morosetti v. Louisiana Land and Exploration Co.,* 522 Pa. 492, 564 A.2d 151, 153 (Pa.1989) ( "A company may indeed have a policy upon which they intend to act, given certain circumstances or events, but unless they communicate that policy as part of a definite offer of employment they are free to change as events may require."). There is no evidence that DES required notice before an employee resigns; therefore there was no legally enforceable policy of DES entitling any employee to two weeks of notice pay under 43 Pa. Con. Stat. § 291.

 **\*11** Plaintiff also claims that Steven is liable under the WPCL as an employer, whereas Defendants argue that Steven is not an employer as defined by case law. Under the WPCL, an employer "[i]ncludes every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." 43 PA. CONS.STAT. § 260.2a. Under the plain terms of the statute, at first blush, Steven would appear to be liable as the Vice–President of DES.

However, "[t]o hold an agent or officer personally liable for unpaid wages, evidence of an active role in decision making is required." *Hirsch v. EPL Techs., Inc.,* 910 A.2d 84, 88 (Pa.Super.Ct.2006) (citing *Int'l Ass'n of Theatrical Stage Employees, Local Union No. 3 v. Mid–Atl. Promotions, Inc.,* 856 A.2d 102, 105 (Pa.Super.Ct.2004) in which the court found the defendant was not an "employer" under the WPCL because though he was a production manager, he had no authority to make independent hiring decisions or to enter binding employment contracts)) (internal quotation marks omitted). Though a defendant's title as a corporate officer may be relevant to the determination of whether he

is an "employer" under the WPCL, it is not necessarily dispositive. Thus, a plaintiff must "show [the defendant] was actively involved in corporate policy-making, such as corporate decision-making or corporate advisement on matters of pay or compensation" (i.e. being the contracting party for the payment of wages). *Id.* at 91; *see also Walsh v. Alarm Sec. Group, Inc.,* 95 F. App'x. 399, 402 (3d Cir.2004) (holding that the WPCL "imposes personal liability on high-ranking corporate officers for employees' unpaid wages.").

To illustrate when a corporate officer was or was not a policy-making officer, the *Hirsch* court cited several cases. For instance, though a defendant was authorized to sign checks on the corporate checking account, where there was no evidence that "he actively participated in decisions or gave advice regarding pay or compensation," but rather "that he merely carried out decisions made by others, .... there [was] no basis for appellee's liability, other than by virtue of holding office as corporate secretary." *Id.* at 91 (citing *Mohney v. McClure,* 568 A.2d 682, 685–66 (Pa.1990) (granting summary judgment for the defendant (Hanak) because the plaintiff failed to produce evidence that Hanak was actively involved in corporate decision-making). In *Hirsch* itself, the Superior Court affirmed the trial court's ruling that the plaintiff, a company VP, was not an employer (and was thus entitled to relief as an employee of the defendant-president under the WPCL) because even though he had the authority to sign binding documents as the corporation's assistant secretary, that authority was derived from the direction of the Board of Directors and his superiors. Hirsch "had no independent authority to settle claims or write check to pay creditors.... While he dealt administratively with unemployment compensation claims filed by former employees, he had no independent authority to hire and fire employees, or to bind the corporation to agreements or obligations," absent the approval of his superiors. *Id.* at 90.

 **\*12** Here, the undisputed evidence shows that Steven is a minority shareholder of DES (S. Wengerd Dep., Doc. 62, Ex. B, 15:5–11) and the Vice–President. (*Id.* at 12:10–12). His duties include being responsible for accounting, employee payroll matters, and warehousing. (*Id.* at 12:21–24). The evidence also shows that he was the point of contact between DES and the Unemployment Compensation Board. (Doc. 70, Exs.Y, Z). However, no evidence has been presented that indicates whether Steven has independent authority to make policy or employment decisions or whether he can enter contracts binding DES. In fact, Steven testified that he acts under the authority of his father, David, and

that he does not supervise the employees. (*Id.* at 23:19–24:4). Thus, Plaintiff has failed to meet her burden showing that Steven is actively involved in the corporate decision-making process. Like Hanak in *Mohney,* Steven is a "non-functioning corporate officer" who bears the title of Vice–President and performs some administrative work, but who lacks independent authority to do much else. *Mohney,* 568 A.2d at 683. Thus, the Court will grant summary judgment on this claim in favor of Steven.

Therefore, the Court will grant summary judgment to Defendants with respect to notice pay and will grant summary judgment to Steven Wengerd in the entirety of this count. Defendants did not move for summary judgment on the issues of paid maternity leave or failure to pay for time worked/overtime under either the WPCL or FLSA, so those claims will stand for trial against the remaining defendants.

### e. *Wrongful Discharge*

The parties disagree whether David can be held liable in his individual capacity on a wrongful discharge claim. Defendants claim that common law wrongful discharge claims can be brought only against employers and cannot be brought against individuals under a supervisory theory of liability. *Hrosik v. Latrobe Steel Co.,* No. 94–1361, 1995 WL 456212 (W.D.Pa. Apr.25, 1995); *Leslie v. Philadelphia 1976 Bicentennial Corp.,* 332 F.Supp. 83, 93 (E.D.Pa.1971) (saying it is "necessary that [the plaintiff] allege that [individual defendants] acted in their individual capacities, as opposed to corporate capacities). *See also Brennan v. Cephalon, Inc.,* No. 04–3241, 2005 WL 2807195 (D.N.J. Oct.25, 2005). Here, every fact alleged about David has been about him acting in his corporate capacity as owner of DES, so based on *Brennan, Hrosik,* and *Leslie,* the Court will dismiss him in his individual capacity.

In Pennsylvania, an employer may discharge an at-will employee for any reason whatsoever, subject to a few narrow exceptions. An employee may bring a cause of action for a termination of that employment "only in the most limited circumstances, where the termination implicates a clear mandate of public policy." *Weaver v. Harpster,* 601 Pa. 488, 975 A.2d 555, 563 (Pa.2009). Pennsylvania courts have recognized a public policy exception to the at-will employee doctrine when an employee files an unemployment compensation claim. *Weaver,* 975 A.2d at 564 (citing *Highhouse v. Avery Trans.,* 443 Pa.Super. 120, 660 A.2d 1374,

1378 (Pa.Super.Ct.1995) ("if the ... employer discharged [plaintiff] because he had made a claim for unemployment compensation during a period when he was not working and earning income, the discharge will constitute a violation of public policy and will support a tort claim for wrongful discharge.").

**\*13** Defendants attempt to distinguish *Highhouse* by saying that Plaintiff was terminated before she filed her claim for unemployment benefits, because she allegedly quit or was terminated on June 28, 2008, and she filed for unemployment benefits on July 1, 2008. Thus, she could not have been terminated in retaliation for something that had not yet occurred. However, there is conflicting evidence in the record as to when and whether Plaintiff was terminated. Steven told the Unemployment Compensation Board that Plaintiffs last day had been on June 28. (Employer Questionnaire, Doc. 70, Ex. Q). However, in a letter to the Board, Steven said that she went on maternity leave on July 1, 2008 and subsequently informed DES that she was not going to return to work. (Doc. 70, Ex. Y). Meanwhile, Plaintiff's Petition for Appeal indicated that David terminated her by phone on August 29. (Doc. 62, Ex. M, Petition for Appeal from Unemployment Compensation Board).

Because Plaintiff's actual termination date is a material fact that is in dispute, the ruling in *Highhouse* does not justify an award of summary judgment for Defendants. Therefore, the Court will dismiss David from this count but will deny Defendants' motion for summary judgment on it.

### f. *Fraud/tortious misrepresentation*

Plaintiff claims David suggested she go on unemployment (Gentile Dep., Doc. 62, Ex. E, 89:2–90:7, 94:2–9), whereas David claims that Plaintiff offered to go on unemployment instead of taking maternity leave (DW2 Dep., Doc. 70, Ex. B, 70:10–20). Despite this dispute of facts, as a matter of law, Plaintiff does not have a cause of action.

Plaintiff was an at-will employee, and as such, has no cause of action for relying on David's promises that he would re-hire her on October 1, 2008. *See Paul v. Lankenau Hosp.,* 524 Pa. 90, 569 A.2d 346 (Pa.1990); *see also Brethwaite v. Cincinnati Milacron Marketing Co.,* No. 94–3621, 1995 WL 232519 (E.D.Pa. Apr.19, 1995) ("Since a claim of negligent misrepresentation requires that a plaintiff have justifiably relied on the alleged misrepresentation, and an employer's

promise is not something which an employee can justifiably rely upon when the employment relationship is at will, this claim must fail.").

There are a few cases that support Plaintiffs position. *See, e.g., Mulgrew v. Sears Roebuck & Co.,* 868 F.Supp. 98, 104 (E.D.Pa.1994) (allowing fraudulent misrepresentation claim to stand). However, *Brethwaite* distinguished *Mulgrew* because the court in *Mulgrew* did not discuss the at-will status of the plaintiff before determining that the plaintiff could move forward on the claim for fraud. The Court doubts that Pennsylvania courts would recognize Plaintiff's fraud count as a valid claim based on her status as an at-will employee, so the Court will grant the motion for summary judgment on this count.

### V. Conclusion

For the above reasons, the Court will grant in part and deny in part Defendants' Motion to Strike and Motion for Summary Judgment.

**\*14** As agreed to by the parties, the relevant portions of paragraphs 15, 21, 25, and 33 are stricken from Plaintiff's Answer to the Statement of Facts. (Doc. 74, Ex. B). To the extent that paragraphs 16, 19, 27, 29, 31, 32, 34, 37, 40, 44, 49, 50, 51, 52, 54, 55, 56, 60, 64, 66 and the remainder of paragraphs 15, 25, and 33 are inflammatory, irrelevant, or merely opinions or conclusions of law, the Court assigns no evidentiary value to them.

The Court also grants summary judgment in favor of Defendants on Count I (pregnancy discrimination), Count III (tortious interference against Defendants DES and David Wengerd), Count IV (notice pay and with respect to Steven Wengerd), Count V (with respect to David Wengerd from the wrongful discharge claim), and Count VI (fraud).

The claims remaining for trial are: Count I: sexual harassment based on gender and hostile work environment for failure to take prompt immediate action, Count II; retaliation for engaging in protected activity, Count IV: WPCL and FLSA claims for maternity leave, overtime, and time worked, and Count V: wrongful discharge under public policy. The remaining defendants are DES, CQH, and CDH on all counts, except for Count IV under which David also remains as a defendant. A separate Order follows.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 2792347

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

D

2013 WL 5701637
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Arthur L. HAIRSTON, Plaintiff,

v.

Harley LAPPIN, et al., Defendants.

No. 1:11–cv–1379.
|
Oct. 18, 2013.

**Attorneys and Law Firms**

Arthur L. Hairston, Petersburg, VA, pro se.

G. Thiel, U.S. Attorney's Office, Scranton, PA, for
Defendants.

### ORDER

JOHN E. JONES III, District Judge.

**\*1** AND NOW, this 18th day of October, 2013, upon
consideration of the report and recommendation of Chief
United States Magistrate Judge Martin C. Carlson (Doc.
146), recommending that Defendants' motion for summary
judgment (Doc. 107) be granted and all other pending motions
(Docs.135, 137, 139, 144) be denied as moot, and, after an
independent review of the record, and noting that Plaintiff
filed objections [1] (Docs.148) to the report on September 18,
2013, and that Defendants filed a response (Doc. 149) on
October 2, 2013, to which the Plaintiff filed a reply (Docs.
150 and 151) on October 10, 2013, and the Court finding
Judge Carlson's analysis to be thorough, well-reasoned, and
fully supported by the record, and the Court further finding
the Plaintiff's objections to be without merit [2] and squarely
addressed by Judge Carlson's report, it is hereby **ORDERED**
that:

[1]  Where objections to a magistrate judge's report and
recommendation are filed, the court must perform
a *de novo* review of the contested portions of the
report. *Supinski v. United Parcel Serv.,* Civ. A.
No. 06–0793, 2009 WL 113796, at \*3 (M.D. Pa.
Jan. 16, 2009) (citing *Sample v. Diecks,* 885 F.2d

1099, 1106 n. 3 (3d Cir.1989); 28 U.S.C. § 636(b)
(1)(c)). "In this regard, Local Rule of Court 72.3
requires 'written objections which ... specifically
identify the portions of the proposed findings,
recommendations or report to which objection is
made and the basis for those objections.' " *Id.*
(citing *Shields v. Astrue,* Civ. A. No. 07–417, 2008
WL 4186951, at \*6 (M.D.Pa. Sept. 8, 2008)).

[2]  Plaintiff's objections are nothing more than attempt
to re-litigate the merits of the Defendants' summary
judgment motion and a recitation of his claims.
Because we find the reasoning, analysis and
recommendations of the Magistrate Judge to be
entirely correct and utterly without error, we
decline to conduct a discussion of the Plaintiff's
non-meritorious objections herein.

1. The Report and Recommendation of Chief Magistrate
Judge Martin C. Carlson (Doc. 146) is **ADOPTED** in its
entirety.

2. Defendants' motion for summary judgment (Doc. 107) is
**GRANTED.**

3. Plaintiff's pending miscellaneous motions (Docs.135, 137,
139, 144) are **DENIED AS MOOT.**

4. The Clerk of Court shall **CLOSE** the file on this case.

### REPORT AND RECOMMENDATION

SUSAN E. SCHWAB, United States Magistrate Judge.

Before the Court is a motion to dismiss and for summary
judgment filed by the defendants in this civil rights matter.
For the reasons set forth herein, I recommend that the motion
be granted.

### I. *Background.*

#### A. Procedural History.
On July 25, 2011, the plaintiff, Arthur Hairston ("Hairston"),
a federal prisoner currently detained at the Allenwood Low
Security Correctional Institution in White Deer, Pennsylvania
("LSCI Allenwood"), initiated this *Bivens* [1] action, under
28 U.S.C. § 1331, by filing a complaint. *Doc.* 1. In the
complaint, Hairston named the following 18 defendants: (1)
the Federal Bureau of Prisons ("FBOP"); (2) H. Lappin,

Director at the Bureau of Prison's ("BOP") Central Office in Washington, D.C.; (3) H. Watts, the National Appeals Administrator at the BOP Central Office; (4) J.L. Norwood, the BOP Northeast Regional Director; (5) W. Scism, the Warden at LSCI Allenwood; (6) D. Zickefoose, the Warden at Federal Correctional Institution at Fort Dix, New Jersey ("FCI Fort Dix"); (7) Dr. J. Miller, a physician at LSCI Allenwood; (8) D. Spotts, the Assistant Health Services Administrator ("AHSA") at LSCI Allenwood; (9) R. Henry–Ali, a Physician's Assistant ("PA") at LSCI Allenwood; (10) A. Lopez De Salle, the Clinical Director at FCI Fort Dix; (11) Dr. S. Sulayman, a physician at FCI Fort Dix; (12) Dr. J. Chung, a physician at FCI Fort Dix; (13) Dr. Turner–Foster, a physician at FCI Fort Dix; (14) S. Syjontian, a PA at FCI Fort Dix; (15) J. Nash, the Warden at FCI Schuylkill; (16) Dr. Ronald Ross, a physician at FCI Schuylkill; and (17)-(18) "John Does," PAs at FCI Schuylkill. *Id.* at 1–5. In general, Hairston raised an Eighth Amendment claim against the defendants claiming that they were deliberately indifferent to his serious medical condition from 2001 to present. *See generally Doc.* 1. Hairston sought compensatory damages against each defendant. *Id.* He also filed two motions to proceed *in forma pauperis. Docs.* 2 & 5.

[1]  *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

**\*2**  Thereafter, Magistrate Judge Smyser screened Hairston's complaint under 28 U.S.C. § 1915A. According to Judge Smyser, Hairston's complaint was deficient in a number of respects. *Doc.* 9 at 5. In particular, Judge Smyser determined that: (1) the complaint failed to state a claim against the FBOP, because a *Bivens* action cannot be brought against a federal agency; (2) some of Hairston's claims were barred by the statute of limitations; (3) Hairston failed to allege personal involvement on the part of defendants Lappin, Watts, and Norwood; and (4) the complaint violated Fed. R.Civ. P. 20(a). *Id.* at 5–9. Nevertheless, Judge Smyser gave Hairston leave to amend, and he granted Hairston's motions to proceed *in forma pauperis. Doc.* 9.

On August 31, 2011, Hairston responded to Judge Smyser's order, strenuously objecting to it and making it clear that he planned on standing on the allegations contained in his original complaint. *Doc.* 10. Thus, he re-filed his complaint, which was docketed as an amended complaint, reasserting the same claims against the same defendants. [2] *See Doc.* 11.

[2]  Hairston sues the defendants in their individual and official capacities. *Doc.* 11.

Magistrate Judge Smyser then conducted a second screening analysis recommending that: (1) the claims against the FBOP be dismissed because a *Bivens* claim cannot be brought against a federal agency; (2) the claims against Lappin, Watts, and Norwood be dismissed for Hairston's failure to allege personal involvement and for failing to allege facts from which it could be reasonably inferred that they were deliberately indifferent to his serious medical needs; (3) the claims about the level of medical care that he received at FCI Schuylkill from 2001 to 2004 were barred by the statute of limitations; and (4) that the claims against the defendants at FCI Fort Dix be severed and transferred to the District of New Jersey. *See Doc.* 14.

Subsequently, the Court reviewed Judge Smyser's report and recommendation, adopting it in part and denying it in part. *Doc.* 22. Specifically, the Court: (1) dismissed the complaint with respect to Lappin; (2) permitted the claims against Watts and Norwood to proceed through discovery to determine their level of personal involvement; (3) permitted the claims against the defendants at FCI Schuylkill to proceed because of "the possibility that the events that occurred at FCI Schuylkill might be considered related to later events to such an extent that they are part of a continuing violation"; and (4) declined to sever the FCI Fort Dix defendants. *See Doc.* 22. Additionally, the case was remanded to Judge Smyser for further proceedings. *Id.* No ruling was made with respect to Magistrate Judge Smyser's recommendation to dismiss the FBOP from the amended complaint. Two days later, Judge Smyser ordered the Clerk to serve Hairston's amended complaint (*Doc.* 24), and the defendants subsequently waived service.

After waiving service, the defendants filed an answer to Hairston's amended complaint on April 5, 2012. [3] *Doc.* 64. Then, after discovery closed on July 13, 2012 (*see Doc.* 48), the defendants filed a motion to dismiss and for summary judgment. *Doc.* 107. Following an extension of time, the defendants filed a brief in support, a statement of facts, and

other documents. *Docs.* 117, 118, 119, & 120. Afterwards, Hairston filed a timely brief in opposition, an answer to the defendants' statement of facts, and other documents. *Docs.* 128, 129, & 129–1. The defendants did not file a reply brief and their time for doing so has since expired. The motion, therefore, is ripe for disposition on the merits.

3       In the meantime, Hairston filed a slew of motions including a motion for recusal against Judge Smyser, a motion for summary judgment, a motion for preliminary injunction, and a motion to appoint counsel. None of Hairston's motions affected the outcome of the case as reflected in the docket. With respect to his motion to appoint counsel, however, Judge Smyser conditionally granted it by finding that the case appeared to be complex and likely required the use of expert witnesses. *Doc.* 54 at 7–12. Thus, Judge Smyser requested that the Panel Administrator for the Middle District's *Pro Bono* Program help find counsel to represent Hairston. *Id.* But, on June 4, 2012, the order was vacated, because the Panel Administrator informed the Court that no attorney could be secured. *Doc.* 79.

### B. Factual Statement.

**\*3** As stated, in his amended complaint, Hairston asserts that he is bringing this action against the defendants for violating his Eighth Amendment rights i n that they failed to timely, adequately, and properly treat his pre-imprisonment medical condition relating to his back. *See Doc.* 11 at ¶ 2. According to Hairston, while imprisoned, the defendants (1) refused to provide him with Percocet, which he had taken for 17 years before being sentenced; (2) failed to act upon requests for medical treatment; (3) denied him medical treatment; (4) failed to follow the recommended course of treatment; and (5) denied him access to a physician "capable of evaluating the need for treatment." *Id.* at ¶¶ 31(a)-(e). The undisputed material facts reveal the following.

### 1. Hairston's Institutional Assignments.

On June 1, 2001, Hairston entered federal custody. *Doc.* 118 at ¶ 1. From October 9, 2001, to January 5, 2004, Hairston was imprisoned at FCI Schuylkill. *Id.* at ¶ 2. On January 5, 2004, Hairston was transferred to FCI Fort Dix where he was detained until May 12, 2010. *Id.* at ¶ 4. Hairston was then moved to L SCI Allenwood, where he remains in custody. *Id.* at ¶ 6. Since he was transferred to LSCI Allenwood, Hairston

has not returned to either FCI Schuykill or FCI Fort Dix. *Id.* at ¶¶ 3, 5.

### 2. Hairston's Medical History at FCI Schuylkill.

On October 9, 2001, Hairston underwent an intake screening at FCI Schuylkill. *Id.* at ¶ 7. During the screening, Hairston revealed that he was taking Naproxen, Clonidine, and Elavil, and he also voiced complaints of back pain. *Id.* at ¶¶ 8, 9. Additionally, Hairston revealed that he was taking Percocet before being imprisoned and that Naproxen was not helping. *Id.* at ¶ 10. As a result, Hairston received prescriptions for Naproxen, Clonidine, and Elavil, and he was added to the chronic care clinic ("CCC"). *Id.* at ¶ 11.

On October 16, 2001, Hairston was seen by Dr. Ross for complaints of pain "deep in his spine." *Id.* at ¶ 12. Dr. Ross' plan for Hairston's treatment included a follow-up by an orthopedic specialist, x-rays of his back, and he added Motrin to the list of Hairston's prescribed medications. *Id.* at ¶ 14, 15. Hairston, however, refused a refill prescription for Elavil and Naproxin. *Id.* at ¶ 13. Additionally, a request for an x-ray of Hairston's lumbar spine was submitted, and it was ultimately performed on October 22, 2001. *Id.* at ¶ 16, 17. The x-ray revealed that Hairston's "[v]ertebral alignment and intervertebral disc spaces [were] normal.... The vertebral bodies [were] of normal height. The paraspinous soft tissues [was] unremarkable." *Id.* at ¶ 18.

On October 25, 2001, Hairston was presented to health services with back pain and his medication was adjusted. *Id.* at ¶¶ 19, 21. Moreover, Hairston informed health services that he had a history with a herniated disc arising out of a car accident. *Id.* at ¶ 20. Four days later, on October 29, 2001, Dr. Ross submitted a written request for an orthopedic consultation by Dr. Perkins. *Id.* at ¶ 22. Thereafter, on November 7, 2001, Hairston was evaluated by Dr. Perkins, for his chronic low back pain. *Id.* at ¶ 23. Based on his evaluation, Dr. Perkins diagnosed Hairston with chronic lumbar degenerative disc disease ("DDD") and drug dependency. Further, Dr. Perkins recommended that Hairston be considered for an analgesic replacement of Percocet. *Id.* at ¶¶ 24, 25.

**\*4** In early November 2001, Hairston submitted an Inmate Request to Staff requesting that he be provided with the medication recommended by Dr. Perkins. *Id.* at ¶ 26. According to the defendants, however, in response to Hairston's request, he was reminded about Dr. Perkins' diagnosis that he had a drug dependency and of his refusal to accept the pain medication already offered to him. *Id.* at ¶

27. Hairston was also informed that if he changed his mind he could sign up for a sick call to start pain management treatment. *Id.* The next day, Dr. Ross provided Hairston with information regarding another pain medication, but Hairston refused it. *Id.* at ¶¶ 30–31. Moreover, the defendants point out that when Hairston was evaluated for his high blood sugar, he indicated that "he could get his blood sugar down if he could get his narcotic pain meds." *Id.* at ¶ 28. It was also documented that Hairston was very resistant to any suggestions other than narcotic medications. *Id.* Similarly, on November 21, 2001, Hairston was seen by Dr. Ross for complaints of pain in his back, hips, and legs, which he indicated had been controlled by Percocet for 17 years. *Id.* at ¶ 32. Hairston, though, refused to consider any other medication. *Id.* at ¶ 33. Moreover, Dr. Ross assessed Hairston with chronic back pain syndrome, and wrote in his notes that Percocet could not be provided "because of restrictions" at the prison. *Id.* at ¶¶ 34–35. Additionally, Dr. Ross noted that a referral to a pain consultant should be considered and aggressive physical therapy should be the most beneficial treatment approach. *Id.* at ¶¶ 36–37.

Less than a week later, Hairston made additional complaints of back pain and, again, refused pain medication. *Id.* at ¶¶ 38, 39. Thereafter, Hairston was referred to a psychiatrist and to the regional medical director for evaluation. *Id.* ¶ 40.

On December 12, 2001, Hairston was again seen by Dr. Ross for complaints of constant pain in both his hip and back. *Id.* at ¶ 41. He claimed that he was having difficulty walking and requested a cane. *Id.* at ¶ 42. Hairston also referenced the need for Percocet, and he refused a pain management specialist. *Id.* at ¶¶ 43, 44. As a result, Dr. Ross prescribed Motrin and gave Hairston a cane. *Id.* at ¶ 45. Less than 45 minutes later, Dr. Ross observed Hairston walking from health services without limping.[4] *See id.* at ¶ 46.

[4] Hairston attempts to rebut this particular claim by merely asserting that this is not true; however, he has not submitted a declaration, affidavit, or any other form of admissible evidence to dispute this statement of fact. *See Doc.* 129 at ¶ 46. In addition, like most of his denials, he fails to cite to relevant portions of the record supporting his position. As such, the defendants' statement of facts should be deemed uncontested and, therefore, undisputed. *See, e.g., Bronson v. White,* NO. 1:05–CV2150, 2007 WL 3033865, at *1 n. 1 (M.D.Pa. Oct.15, 2007) ("Although Plaintiff has denied

certain paragraphs of the Defendants' Statement of Material Undisputed Facts, he has not pointed to record evidence to support such denials. Therefore, pursuant to Local Rule 56.1, those material facts are deemed to be admitted.").

A month later, on January 15, 2002, Hairston went to health services and complained of back pains. *Id.* at ¶ 47. At that visit, Hairston's medication was adjusted. *Id.* at ¶ 48. Then, on February 1, 2002, Hairston again complained of back pain. *Id.* at ¶ 49. On that date, Hairston was educated on pain management and relaxation techniques, it was noted that he was obese, and his medication was adjusted. *Id.* at ¶¶ 50–52.

Subsequently, on March 4, 2002, and again on April 4, 2002, Hairston's prescriptions for Motrin were filled. *Id.* at ¶¶ 53, 54. Thereafter, on April 9, 2002, Hairston requested and was provided with a back support. *Id.* at ¶ 55. One month later, Dr. Ross resigned from the BOP for an undisclosed reason. *Id.* at ¶ 56.

**\*5** After Dr. Ross resigned, Hairston made several more complaints of back pain. *Id.* at ¶¶ 57–60, 62, 65. Based on his complaints, the medical staff adjusted his medications, provided him with education on his condition, suggested a weight reduction plan that included the need for him to exercise, and advised him to elevate his legs. *Id.* at ¶¶ 61, 64, 66, 67, 69. On November 19, 2002, Hairston advised that he gained some relief by taking Motrin. *Id.* at ¶ 68.

Two months later, at the beginning of 2003, an x-ray of Hairston's spine and pelvis was completed due to his history of low back pain and pelvic nocturnal pain. *Id.* at ¶ 70. The radiology report, at that time, reflected that the L3–4 disc space was slightly narrowed and that the remainder of the lumbar spine and pelvic bones were unremarkable. *Id.* at ¶ 71. As a result, on April 1, 2003, and May 19, 2003, Hairston was seen at the CCC, which included an orthopedic clinic. *Id.* at ¶¶ 72, 75. During those evaluations, Hairston's back condition was discussed, his medications were reviewed, and his obesity continued to be noted. *Id.* at ¶¶ 73, 74, 76.

On September 2 and December 11, 2003, Hairston was seen in the CCC, at which time his back condition and medications were reviewed. *Id.* at ¶¶ 77–80. It was further noted that Hairston "[was] seeking narcotic analgesics" and he threatened to seek an administrative remedy if he was not provided with Percocet or Tylenol for his back pain. *Id.* at ¶ 81. Approximately four weeks later, Hairston was transferred to FCI Fort Dix. *Id.* at ¶¶ 82, 89.

### 3. Hairston's Administrative Remedy History at FCI Schuylkill.

During his imprisonment at FCI Schuylkill, Hairston filed 20 administrative remedies, only two of which related to his medical treatment at the facility. *See id.* at ¶¶ 83, 88. Of the two administrative remedies he filed concerning his medical treatment, the first was on April 8, 2002, and the second, on April 22, 2002. *Id.* at ¶¶ 84, 86. The first remedy was rejected because it was filed at the wrong level, and the second was not appealed to the Regional Office. *Id.* at ¶¶ 85, 87–88.

### 4. Hairston's Medical History at FCI Fort Dix.

Hairston arrived at FCI Fort D ix on February 3, 2004. *Id.* at ¶ 89. His first recorded visit to the CCC at Fort Dix was March 2, 2004. At that visit, Hairston received an x-ray of his hips, pelvis, and lumbar spine. *Id.* at ¶¶ 90, 93. The report indicated Hairston's history of back and bilateral hip pain. *Id.* at ¶ 91. The x-ray impressions were normal. *Id.* at ¶¶ 92, 94–95. In addition, Hairston met with Dr. Foster to discuss his conditions, including Orthopedic Rheumatology. *Id.* at ¶ 96.

At the first visit, Dr. Foster noted Hairston's obesity and complaints of pain that increased in severity throughout the course of the day. *Id.* at ¶¶ 97–98. Moreover, Dr. Foster prescribed Indocin (a non-steroidal anti-inflammatory, antipyretic, and analgesic drug used to relieve pain, fever, and inflammation) and recommended that Hairston eat oatmeal four times per week, stretch five minutes per day, five days a week, and that he continue with aerobics four times per week. *Id.* at ¶¶ 99–100.

**\*6** On June 1, 2004, and on September 14, 2004, Dr. Foster met with Hairston in the CCC, at which time it was noted that he had gained one pound, was still considered obese, and his prescription for Indocin was continued. *Id.* at ¶¶ 102–06. Several months later, on February 7, 2005, PA Syjongtian met with Hairston for complaints of pain. *Id.* at ¶ 107. Hairston's prescription for Indocin was refilled. *Id.* at ¶ 108. Moreover, PA Syjongtian issued Hairston an "Idle, Convalescent, and Change in Word Classification Status" restricting him to "idle" status until February 10, 2005. *Id.* at ¶ 109. Then, on April 8, 2005, Dr. Foster met with Hairston again. On that occasion, Hairston informed Dr. Foster that his pain was a two or three on a scale of one to nine. In addition, Dr. Foster noted that Hairston had gained eight pounds. *Id.* at ¶¶ 110–12. Based on his condition, Dr. Foster continued the Indocin

prescription and reiterated to Hairston that he should continue eating oatmeal, dieting, and exercising. *Id.* at ¶ 113.

On July 11, 2005, Dr. Foster met with Hairston on yet another occasion. *Id.* at ¶ 114. According to Dr. Foster's report, Hairston's subjective rating of pain was "None." *Id.* at ¶ 115. Still, Dr. Foster recommended that Hairston continue exercising, eating oatmeal, and remain on Indocin for pain. *Id.* at ¶ 116.

Months later, on February 13, 2006, for reasons undisclosed, Dr. Sulay man requested an MRI for Hairston. *Id.* at ¶ 119. According to the radiologist, the MRI revealed a posterior disc herniation as well as post-surgical changes of the spine, with a mild loss of vertebral body height. *Id.* at ¶ 120. Thereafter, Dr. Sulayman treated Hairston on several occasions from May to December 2006, and he continued Hairston on pain medication, educated him on dieting and exercising, and provided him with lifting restrictions. *Id.* at ¶ 121–22.

In April 2007, Hairston's Indocin was refilled and a new pain prescription (Piroxicam) was ordered. *Id.* at ¶¶ 123–24, 127. On April 16, 2007, Hairston complained that the Piroxicam was having side effects and he requested that the medication be replaced with Motrin. *Id.* at ¶¶ 125–26. The following month, Hairston was prescribed Elavil to help alleviate pain. *Id.* at ¶¶ 128–29. Subsequently, in both June and December 2007, Dr. Sulayman met with Hairston. *Id.* at ¶¶ 130–31, 135. At their June meeting, Hairston refused a physical examination. *Id.* at ¶ 132. Then, at their December meeting, Hairston informed Dr. Sulay man that his pain was only a two or three on a ten point scale. *Id.* at ¶ 135.

On July 29, 2008, Dr. Foster met with Hairston, at which time Hairston stated that he had "used all drugs except for ecstasy" before his imprisonment. *Id.* at ¶ 138. Hairston also informed Dr. Foster that he exercised daily, alternating between cardiovascular and strength training, that he did pull-ups, used a stair master, did dips, and played basketball. *Id.* at ¶¶ 139–40. Further, at the end of the visit, Hairston handed Dr. Foster an Inmate Request to Staff form requesting a narcotic for his lower back and hip pain. *Id.* at ¶ 141. Dr. Foster responded to Hairston's request in writing, stating that "[i]n this correctional setting especially and in any environment long term narcotic use to control pain associated with musculoskeletal etiology is inappropriate." *Id.* at ¶ 142. Instead, Hairston was prescribed non-narcotics for his back pain. *Id.* at ¶ 143.

**\*7** Hairston was next seen by Dr. Chung, on February 2, 2009, at which time he continued to complain of low back pain and insisted on a strong pain killer. *Id.* at ¶¶ 145–46. He refused other medications. *Id.* at ¶ 147. Several months later, on July 22, 2009, Hairston was seen again by Dr. Chung. *Id.* at ¶ 149. According to his report, Hairston insisted on a narcotic for pain control, and he was both cynical and uncooperative. *Id.* at ¶ 150. Then, on August 18, 2009, it was noted that Hairston had refused his Elavil prescription because it was being crushed. *Id.* at ¶ 151. This occurred despite the fact that the pharmacist had twice explained that the medication needed to be crushed before giving it to him. *Id.* at ¶¶ 134, 152. As well, because he stopped taking that medication, his prescription for it was discontinued on September 19, 2009. *Id.* at ¶ 153.

After several weeks passed, PA Syjontian met with Hairston, who complained of back pain, and also indicated that the Idocin prescription was not helping. *Id.* at ¶¶ 154–55. Additionally, Hairston requested to see a neurosurgeon, stating that he had already discussed this with the attending physician. *Id.* at ¶ 157. In turn, PA Syjontian ordered a Ketoralac injection, submitted a request for Hairston to consult with a neurosurgeon, and explained the utilization review procedures for such a request with Hairston. *Id.* at ¶¶ 158–59. On December 1, 2009, Hairston returned to the CCC, made more complaints of back pain, and explained that he was seen by PA Syjontian, who gave him a toradol shot for pain, but that the pain had become unbearable again by the afternoon. *Id.* at ¶¶ 160, 163. Accordingly, the Clinical Director, Dr. Lopez De Lasalle, was consulted and an order was placed for a daily Nalbuphine Hydrochloride Injection. *Id.* at ¶ 164. The next day, however, Hairston returned to the CCC, reasserted his complaints of back pain, and ended up receiving a prescription for Acetaminophen/Codeine. *Id.* at ¶ 166. Then, two days later, Dr. Chung reevaluated Hairston, who again complained of back pains, and a consultation with a neurosurgeon and an MRI was ordered. *Id.* ¶ 167–68. The next week, however, Hairston returned and met with PA Syjongtian, who noted that Hairston was self-medicating with the prescription medication Indocin. *Id.* at ¶¶ 169–70. Consequently, the Indocin was replaced with Gabapentin. *Id.* at ¶ 171.

Two weeks later, on December 28, 2009, PA Syjontian saw Hairston throwing his prescribed Gabapentin in the garbage. *Id.* at ¶ 174. Despite being educated on the need to take

his medication, Hairston refused it, and the prescription was discontinued. *Id.* at ¶ 175.

In January 2010, Dr. Chung evaluated Hairston on a couple occasions, because he continued to complain about having back pain. *See id.* at ¶¶ 177, 178, 181, 185. According to Dr. Chung's notes, Hairston was not taking his pain medication, Hairston was still obese, he was walking normal, and he was able to progress through all range of motion without pain. *Id.* at ¶¶ 179, 182, 184, 186.

**\*8** On March 8, 2010, an MRI of Hairston's lumbar spine was conducted and reflected considerable loss of intervertebral disc height. *Id.* at ¶ 187. According to Dr. Miller's declaration, the changes to Hairston's back are likely a combination of degeneration through the normal aging process, but it is accelerated due to posttraumatic changes from calcium and scarring. *Id.* at ¶ 188.

Two months later, Hairston was transferred to LSCI Allenwood, where he remains. *Id.* at ¶¶ 189, 199.

### 5. Hairston's Administrative Remedy History at FCI Fort Dix.

While Hairston was imprisoned at FCI Fort Dix, he filed 74 administrative remedies. *Id.* at ¶ 190. Only one of the administrative remedies that he filed related to his medical condition.

In particular, on December 21, 2009, Hairston submitted a Request for Administrative Remedy to the Warden complaining of severe leg and lower back pain which he claimed hurt whenever he walked or moved. *Id.* at ¶ 191. Hairston, therefore, requested medication, a first floor pass, examination by a medical specialist, and his immediate release from prison. *Id.* at ¶ 192. The remedy was denied in a response signed by Zickefoose. *Id.* at ¶ 193–94. Afterwards, on January 24, 2010, Hairston appealed the denial of his administrative remedy to the Regional Office, which, in turn, was denied on February 26, 2010. *Id.* at ¶¶ 195–96. The Regional Office's response was signed for Regional Director Norwood, by someone else. *Id.* at ¶ 197. Subsequently, Hairston's final appeal to the Central Office was denied by Watts on July 21, 2010. *Id.* at ¶ 198.

### 6. Hairston's Medical History at LSCI Allenwood.

Hairston arrived at LSCI Allenwood on May 20, 2010, and underwent an initial health screen wherein he disclosed

having chronic back pain. *Id.* at ¶¶ 199–201. During the screen, his medications and medical history were also reviewed, and he was prescribed a new medication, Indomethacin. *Id.* at ¶¶ 202–03.

In June 2010, PA Henry–Ali met with Hairston, who complained of back pains. *Id.* at ¶¶ 210–11, 213. Henry–Ali approved Hairston to see a neurosurgeon and gave Hairston a Toradol injection to help alleviate pain. *Id.* at ¶ 212, 214–15. Additionally, on July 2 and 15,, 2010, Hairston was given two more injections at Henry–Ali's request. *Id.* at ¶ 216–17.

Thereafter, on July 30, 2010, Dr. Miller met with Hairston, who was insistent on what course of treatment he desired. *Id.* at ¶¶ 217–19. Dr. Miller offered different medications to help control and manage Hairston's pain, but Hairston refused them. *Id.* at ¶ 220. Nevertheless, Dr. Miller compromised with Hairston and provided him with a daily Toradol injection for a period of 30 days. *Id.* at ¶ 221. Four days later, Hairston met with Dr. Miller again, to assess his medical problems. *Id.* at ¶ 222. During the visit, Dr. Miller discussed concerns about continuing the injections and suggested other options. *Id.* at ¶¶ 223–24. Hairston, however, was resistant to the new suggestions and stated that he believed the medical staff was being deliberately indifferent to his pain. *Id.* at ¶¶ 225–26. On the same day, shortly after meeting with Dr. Miller, Hairston went to sick call and was seen by another staff member. *Id.* at ¶ 228. Hairston told the staff member that (s) he was being deliberately indifferent to his pain, (s) he was discriminating against him, and he only wanted to be seen by PA Henry–Ali. *Id.* at ¶¶ 229–30. Moreover, Hairston refused to take his prescribed medication or to try an alternative medication for his pain. *Id.* at ¶ 231.

*9 Thereafter, Hairston met with PA Henry–Ali three more times between September and November 2010 with complaints of back pains. *Id.* at ¶¶ 232, 235, 238. At those visits, Hairston refused to take medication offered to him, but he did receive at least one injection. *Id.* at ¶¶ 233–40. Also, Hairston requested to see a neurosurgeon, but he was already scheduled to see one in January 2011. *See id.* at ¶ 240.

On January 18, 2011, Hairston was evaluated by a neurosurgeon, who opined Hairston had a lumbar cyst, Lumbar Canal Stenosis, and severe degenerative lumbar disc *disease. Id.* at ¶ 243. The neurosurgeon advised Hairston to participate in physical therapy or else surgery was a possibility. *Id.* at ¶¶ 244–45.

Following his evaluation with the neurosurgeon, PA Henry–Ali submitted a request on January 25, 2011, for Hairston to undergo physical therapy. *Id.* at ¶¶ 246–47. A week later, Dr. Miller met with Hairston for over an hour, discussed Hairston's ongoing pain, discussed his concern about Hairston's continued use of Toradol injections, suggested alternative treatments, and explained that PA Henry–Ali's physical therapy request was referred to the Utilization Review Committee ("URC") for decision. *Id.* at ¶¶ 248–50, 252, 254. Hairston, though, refused to consider any of the treatment options available to him other than to state that it would be deliberately indifferent to not follow the neurosurgeon's recommendation. *See id.* at ¶ 251–52. Then, towards the end of February, PA Henry–Ali met with Hairston again for his complaints. *Id.* at ¶ 259. PA Henry–Ali offered Hairston Gabapentin to help alleviate the pain, but Hairston refused the offer due to a "controversial lawsuit." *Id.* at ¶¶ 260–61.

Subsequently, on March 10, 2011, Hairston was seen by a physical therapist, who attempted to demonstrate exercises that he could do for his back. *Id.* at ¶ 262. Hairston, though, was not attentive and stated that he could not concentrate because his hands were cuffed behind his back. *Id.* at ¶¶ 262–63. Instead of complying, Hairston requested hot rocks and an ultrasound machine to be used for the pain. *Id.* at ¶ 264. The physical therapist informed Hairston that those would not be options for the type of problems that he had with his back. *Id.* at ¶ 265.

Two weeks later, at the end of March, PA Henry–Ali submitted a request for follow up physical therapy and recommended that it be completed before April 7, 2011. *Id.* at ¶ 266–67. The URC, however, denied the request commenting that Hairston "refus[ed] basic step treatments." *Id.* at ¶ 269; *Doc.* 120–1 at 77.

On April 26, 2011, Hairston was seen by Dr. Miller in the CCC where his medical problems were discussed and reviewed. *Id.* at ¶ 270. Furthermore, it was noted that Hairston was not willing to try any of the changes to his medication that had been previously recommended by Dr. Miller. *Id.* at ¶ 271. Then, on May 10, 2011, PA Henry–Ali spoke to Hairston regarding his daily sick call requests and offered him other medication options to assist with managing his pain, but Hairston walked away and refused. *Id.* at ¶¶ 272–74. Though, on the next day, Hairston requested Motrin, and PA Henry–Ali prescribed it for him. *Id.* at ¶ 275.

**\*10** On October 14, 2011, after Hairston had previously failed to report to health services to discuss long-term use of Motrin (*Id.* at ¶¶ 278–79), Hairston approached Dr. Miller about ordering Motrin because he was indigent. *Id.* at ¶ 283. Hairston told Dr. Miller that he understood the need for him to limit his use of Motrin and assured Dr. Miller that he does limit its use. *Id.* at ¶ 284. Thus, Dr. Miller provided him with a prescription for it. *Id.* at ¶ 285.

On October 25, 2011, Hairston was again seen by Dr. Miller at the CCC. *Id.* at ¶ 286. Dr. Miller requested a physical therapy consultation for Hairston, and the request was approved. *Id.* at ¶¶ 287–88. Then, in the middle of December, Hairston saw a physical therapist. *Id.* at ¶ 294. The physical therapist showed Hairston several pelvic exercises, and noted that Hairston had little trouble walking. *See id.* at ¶¶ 295–96.

At the beginning of 2012, Hairston was next seen at sick call complaining of severe back pain, stating that he could not work, and reminding the staff about the neurologist's surgery recommendation if relief was not gained from physical therapy. *Id.* at ¶¶ 297–98. Additionally, Hairston requested a "permanent pass convalescence" from work, a library pass in order to work on his lawsuit, and a recreation pass to work on his physical therapy exercises. *Id.* at ¶ 299.

Thereafter, on February 1, 2012, Hairston met with the physical therapist again. *Id.* at ¶ 301. At the end of the meeting, the physical therapist requested a follow-up appointment in eight to twelve weeks. *Id.* at ¶ 302. Then, in March, Dr. Miller met with Hairston, who stated that he had been doing his physical therapy and was up to five different exercises. *Id.* at ¶¶ 303, 305–07. Two months later, Hairston saw the physical therapist again. *Id.* at ¶ 311. During this visit, the therapist noted that Hairston seemed disinterested in the program. *Id.* at ¶ 312.

Finally, according to Dr. Miller, future surgery may become necessary if increased neurologic symptoms, such as weakness or bowel or bladder dysfunction are presented, but it will only be offered if progressive problems make it necessary and conservative treatment measures are ineffective. *Id.* at ¶ 350. In addition, Hairston continues to be followed by a neurosurgeon as part of his treatment, he continues to be seen in CCC, his diabetes is monitored daily, he has follow up appointments scheduled with a specialist, and he is currently being prescribed Motrin and Gabapentin for pain. *Id.* at ¶¶ 348, 351–55.

**7. Hairston's Administrative Remedy History at LSCI Allenwood.**

While imprisoned at LSCI Allenwood, Hairston has filed 52 administrative remedies concerning his detention there. *Id.* at ¶ 314. With respect to his medical complaints, on January 31, 2011, Hairston submitted an Informal Resolution Form complaining that, "[f]or 10 years now, the BOP and its staff have deliberately denied" the course of treatment recommended by Dr. Perkins. *Id.* at ¶ 315. According to the defendants, in response, the Correctional Counselor replied that, AHSA Spotts informed him that Hairston had been seen by a neurosurgeon, who gave his recommendation for possible surgery and that he was scheduled to be seen by a physical therapist on their next visit. *Id.* at ¶ 316.

**\*11** On February 4, 2011, Hairston next submitted a Request for Administrative Remedy to the Warden asking that Dr. Perkins recommended course of treatment, from 10 years earlier, be provided immediately. *Id.* at ¶ 317. In response, Warden Scism denied Hairston's request. *Id.* at ¶ 321. After his request was denied by Scism, Hairston which was signed for Norwood, by someone else, was denied. *Id.* at ¶¶ 323–24. Finally, Hairston made a timely final appeal to the Central Office, but it was also denied. *Id.* at ¶¶ 325–26.

## II. *Legal Standards.*

### A. Rule 12(b)(1).

"A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania,* 188 F.Supp.2d 532, 537 (M.D.Pa.2002) (quoting *Ballenger v. Applied Digital Solutions, Inc.,* 189 F.Supp.2d 196, 199 (D.Del.2002)). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction in fact exist." *Petruska v. Gannon Univ.,* 462 F.3d 294, 302 (3d Cir.2006); *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

There are two types of Rule 12(b)(1) motions. A motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Petruska,* 462 F.3d at 302 n. 3; *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *see also Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n,* 227 F.3d 62, 69 (3d Cir.2000). A "facial attack" assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. *Mortensen,*

549 F.2d at 891. The motion should only be granted if it appears with certainty that the court's assertion of jurisdiction would be improper. *Id.; Carpet Grp.,* 227 F.3d at 69.

The second form of a Rule 12(b)(1) motion is a "factual attack," which argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, thereby causing the matter to fall outside the court's jurisdiction. *Mortensen,* 549 F.2d at 891. On a factual attack, the court must evaluate the merits of the disputed allegations, because "the trial court's ... very power to hear the case" is at issue. *Id.; Carpet Grp.,* 227 F.3d at 69; *Kenny,* 2009 U.S. Dist. LEXIS 8322 at *5–6, 2009 WL 276511 (citing *Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police,* 920 F.2d 198, 200 (3d Cir.1990) ( [I]n making its determination, the court is not confined to examining the face of the pleading, but may consider other evidence demonstrating the existence or lack of jurisdiction).

In short, on a facial attack, the allegations of the complaint are "taken as true." *Cohen v. Kurtzman,* 45 F.Supp.2d 423, 428 (D.N.J.1999). In a motion attacking the factual existence of subject matter jurisdiction, however, "no presumptive truthfulness attaches to the allegations in the complaint." *Id.* Furthermore, when a motion under Rule 12 is based on more than one ground, the Court should consider the subject matter jurisdiction challenges first, because if it must dismiss claims for lack of subject matter jurisdiction, then all other defenses and objections become moot. *See In re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993).

### B. Rule 12(b)(2).

**\*12** Rule 12(b)(2) provides for dismissal for lack of personal jurisdiction. Once a defendant has raised lack of personal jurisdiction as a defense, the burden to prove that jurisdiction exists in the forum state lies with the plaintiff; a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 368 (3d Cir.2002). However, a plaintiff must show "with reasonable particularity" enough contact between the defendant and the forum as to support a *prima facie* case in favor of the exercise of personal jurisdiction by the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1986); *Mellon Bank v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). Thus, a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings, i.e., whether *in personam* jurisdiction actually lies." *Clark v. Matsushita Elec. Indus. Co., Ltd.,* 811 F.Supp. 1061, 1064 (M.D.Pa.1993)

(quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984)).

### C. Rule 12(b)(6).

Defendants have also filed a motion which, in part, seeks dismissal of the amended complaint on the grounds that Hairston has not stated a claim upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion, however, goes beyond a simple motion to dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents outside the pleadings contravening Hairston's claims. Moreover, Rule 12(d) provides as follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R.Civ. P. 12(d).

Here, the Court will not exclude the evidentiary materials accompanying the defendants' motion to dismiss because Hairston has also been given a reasonable opportunity to present material relevant to the motion. Thus, defendants' motion to dismiss for failure to state a claim and for summary judgment shall be treated solely as seeking summary judgment.

### D. Rule 56.

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed.R.Civ.P. 56(a), and for which a trial would be "an empty and unnecessary formality." *Univac Dental Co. v. Dentsply Int'l, Inc.,* No. 07–0493, 2010 U.S. Dist. LEXIS 31615, at *4, 2009 WL 6315330 (M.D.Pa. Mar.31, 2010). The substantive

law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

 **\*13** The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 145–46 (3d Cir.2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir.2006); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex,* 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. *Anderson,* 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d Cir.2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact, which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." *Shelton v. University*

*of Medicine & Dentistry of N.J.,* 223 F.3d 220, 223, n. 2 (3d Cir.2000), citing *Stelwagon Mfg. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1275, n. 17 (3d Cir.1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgment, a court may only consider evidence which is admissible at trial, and that a party cannot rely on hearsay evidence when opposing a motion for summary judgment. *See Buttice v. G.D. Searle & Co.,* 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. *See Burgess v. Allstate Ins. Co.,* 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. *Henry v. Colonial Baking Co. of Dothan,* 952 F.Supp. 744 (M.D.Ala.1996).

 **\*14** *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 2106582,*9 (W.D.Pa.Aug.26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. *See, e.g., Synthes v. Globus Medical, Inc.,* No. 04–1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 2106582,*9 (W.D.Pa.Aug.26, 2005); *Carpet Group In t'l v. Oriental Rug Importers Assoc., Inc.,* 256 F.Supp.2d 249 (D.N.J.2003). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA,* 254 F.App'x 896, 899 (3d Cir.2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported ..., an adverse party may not rest upon mere allegations or denial." *Fireman's Ins. Co. Of Newark NJ v. DuFresne,* 676 F.2d 965, 968 (3d

Cir.1982), *see Sunshine Books, Ltd. v. Temple University,* 697 F.2d 90, 96 (3d Cir.1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine,* 411 F.2d 455, 458 (3d Cir.1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985) (citing *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981)).

### III. *Discussion.*

In their motion to dismiss and for summary judgment, the defendants raise the following arguments: (1) the Court lacks subject matter jurisdiction over Hairston's claims against the FBOP and the named defendants in their official capacities, because of the doctrine of sovereign immunity; (2) the Court lacks personal jurisdiction over Watts, Zickefoose, Lopez de Salle, Turner–Foster, Chung, Syjongtian, and Sulayman for insufficient contacts; (3) Watts, Norwood, Scism, Spotts, Zickefoose, and Nash lack personal involvement in the alleged constitutional violation and cannot be held liable under *respondeat superior;* (4) the claims against the defendants at FCI Schuylkill are barred by the statute of limitations; (5) Hairston failed to exhaust his administrative remedies relative to the medical treatment he received at FCI Schuylkill; (6) Hairston fails to state an Eighth Amendment claim in relation to his medical care; and (7) the defendants are entitled to qualified immunity. *See Doc.* 117 at 9. These arguments will be addressed *seriatim,* but because the Court's jurisdiction has been questioned, I am required to begin there.

### A. Defendants' Motion to Dismiss for Want of Jurisdiction.

#### 1. Subject Matter Jurisdiction.

**\*15** The defendants have moved for dismissal under Fed. R.Civ.P. 12(b) (1), arguing that sovereign immunity bars Hairston's claims for money damages against the FBOP and the named defendants in their official capacities. *Doc.* 117 at 11–12. For the following reason, I agree and recommend that the defendants' motion to dismiss be granted in this respect.

Insofar as Hairston is suing the respective defendants for money damages, the law is clear that *Bivens* "only authorizes suit against federal officials in their individual capacities and not against the United States [or its] federal agencies." *Goodson v. Maggi,* 2010 WL 1006901, \*7 (W.D.Pa. Feb.22,

2010); *Debrew v. Auman,* 354 F. App'x 639, 641 (3d Cir.2009) ("no claims [under *Bivens* ] could properly be brought against Defendants in their official capacities.") (citation omitted). As such, the FBOP and named defendants in their official capacities should be dismissed with prejudice based on the doctrine of sovereign immunity, which strips the Court of subject matter jurisdiction over Hairston's claims for money damages. *See Johnson v. U.S. Attorneys,* CIV. A. 10–1643, 2010 WL 2991409, at \*2–\*3 (E.D.Pa. July 27, 2010).

#### 2. Personal Jurisdiction.

The defendants have also moved for dismissal under Fed. R. Civ.P. 12(b)(2) arguing that Watts and the FCI Fort D ix defendants lack sufficient contacts to be haled into court in Pennsylvania. [5] *Doc.* 117 at 12–15. Hairston provides no argument or evidence to the contrary; therefore, based on the record before me, I agree with the defendants.

[5]
> The defendants' objection to personal jurisdiction is timely under Fed.R.Civ.P. 12(b). After the Court ordered that Hairston's complaint be served on them, the defendants waived service. Thereafter, the defendants filed an answer to Hairston's amended complaint on April 5, 2012, wherein they raised personal jurisdiction as an affirmative defense. *Doc.* 64 at 12. Then, after discovery closed on July 13, 2012 (*see Doc.* 48), the defendants filed this motion, their first asserting any defense under Rule 12(b).

"In deciding a motion to dismiss for lack of personal jurisdiction, we take the allegations of the complaint as true." *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir.1996). "But once a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Id.* Additionally, "when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.2004).

In addition to the relevant burdens of proof, Federal Rule of Civil Procedure 4(e) authorizes federal courts to assert personal jurisdiction over non-resident defendants to the extent permissible under the law of the state where the district courts sits. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992). The forum state in this

case is Pennsylvania, and its law permits courts within it to exercise jurisdiction "to the fullest extent allowed under the Constitution of the United States." 42 Pa.C.S.A. §§ 5322(b). The law also provides that jurisdiction "may be based on the most minimum contact with [the] Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S.A. §§ 5322(b). Thus, the Court may properly exercise personal jurisdiction over the defendants in this matter as long as exercise of that jurisdiction does not violate due process. Mellon, supra, 960 F.2d at 1221.

 *16  In that regard, personal jurisdiction may be exercised either under the theory of general jurisdiction or under the theory of specific jurisdiction. First, "[w]hen a state has general jurisdiction over a party, that party can be haled into court in that state regardless of whether the subject matter of the cause of action has any connection with the forum.' " Pennzoil Products Co. v. Colelli & Associates, 149 F.3d 197, 200 (3d Cir.1998) (quoting Farino, supra 960 F.2d at 1221)). To establish general jurisdiction, "[a] nonresident's contacts with the forum must be continuous and substantial'...." Id. (quoting Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir.1987)).

Here, Hairston has not alleged or established that Watts and the FCI Fort Dix defendants had the type of continuous and substantial contacts with Pennsylvania sufficient to support general personal jurisdiction. Accordingly, we turn to the question whether the Court has specific personal jurisdiction.

In determining whether this court may exercise specific personal jurisdiction we examine the relationship among the defendant, the forum, and the litigation. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir.2002). "[T]he exercise of specific personal jurisdiction requires that the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum.' " Toys "R" US, Inc. v. Step Two, S.A., 318 F.3d 446, 451 (3d Cir.2003) (quoting Pinker, supra, 292 F.3d at 368). Beyond this basic nexus, the Due Process Clause requires "(1) that the defendant ha[ve] constitutionally sufficient minimum contacts' with the forum, ... and (2) that subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice.' " Id. (quoting Pinker, supra, 292 F.3d at 368).

In connection with the relevant portion of the instant motion, Watts and the FCI Fort Dix defendants have submitted the

declaration of Michael S. Romano, an attorney advisor at USP Lewisburg, in which he declares that such defendants neither own property nor conduct business in Pennsylvania.[6] Doc. 119 at 4. In opposition, Hairston fails to explain how, or provide evidence demonstrating that, these defendants have minimum contacts with this forum such that they would anticipate being haled into court here. See Doc. 128 at 25–26. In fact, with respect to the defendants at FCI Fort Dix, all of their alleged wrongful conduct occurred solely within the State of New Jersey, without any hint or suggestion of contact with the Commonwealth of Pennsylvania. As well, the only evidence of Watts' involvement in this case arose out of Hairston's final appeal to the Central Office, for the denial of his administrative remedy at FCI Fort Dix. Even assuming that fact alone created a sufficient minimum contact to hale Watts into this Court, that particular administrative remedy originated out of FCI Fort Dix, in New Jersey, and concerned Hairston's treatment there. Thus, none of the relevant defendants had sufficient minimum contacts with Pennsylvania and, as such, I conclude that the defendants' motion to dismiss under Fed.R.Civ. P. 12(b)(2) should be granted with respect to Watts and the FCI Fort Dix defendants.

6      The Court may consider affidavits in determining the existence of personal jurisdiction. See Patterson ex rel. Patterson v. FBI, 893 F.2d 595, 603–04 (3d Cir.1990).

**B. Defendants' Motion for Summary Judgment.**

**1. Hairston's Claims against Norwood, Scism, Spotts, and Nash.**

 *17  Defendants Norwood, Scism, Spotts, and Nash argue that Hairston has failed to establish that they had personal involvement in his medical care for purposes of establishing a violation under the Eighth Amendment. In addition, they argue that Hairston's Eighth Amendment claims against them should be dismissed because respondeat superior cannot form the basis of a Bivens action.

In order to state an actionable civil rights claim, a plaintiff must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law; and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir.1995). Further, it is well established that personal liability under § 1983[7] cannot be imposed upon a government official based on a theory of respondeat

*superior. See, e.g., Rizzo v. Goode,* 423 U.S. 362, 368, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). As well, in the Third Circuit, a defendant's personal involvement in alleged constitutional deprivations is a requirement in a civil rights action, and a complaint must allege such personal involvement. *Hampton,* 546 F.2d at 1082. The complaint must show that each named defendant was personally involved in the events or occurrences upon which a plaintiff's claims are based. *Id.* As the Court of Appeals stated in *Rode v. Dellarciprete:*

7        *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young,* 366 F.3d 238, 246 (3d Cir.2004) (citing *Brown v. Philip Morris, Inc.,* 250 F.3d 789, 800 (3d Cir.2001)). "[C]ourts have generally relied upon the principles developed in the case law applying Section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials." *Schrob v. Catterson,* 948 F.2d 1402, 1409 (3d Cir.1991).

A defendant in a civil rights action must have personal involvement in the alleged wrongs.... Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. 845 F.2d 1195, 1207 (3d Cir.1998) (citations omitted). Courts have also held that an allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to section 1983 liability.

*Id.* at 1208.

Here, I believe that Hairston has not sufficiently pleaded facts demonstrating that Norwood, Scism, Spotts, and Nash were personally involved with the alleged constitutional violation. As the defendants point out, "[p]articipation in the after-the-fact review of a grievance or appeal is not enough to establish personal involvement." *White v. Bledsoe,* No. 10–0146, 2011 WL 2292279, at *6 (M.D.Pa. Jun.8, 2011) (citing *Rode,* 845 F.2d at 1208 (finding that the filing of a grievance is insufficient to show actual knowledge necessary for personal involvement)). The situation would be different, however, if Hairston alleged facts showing that the defendants participated in or acquiesced in the alleged constitutional violation, *see, e.g., Farmer v. Carlson,* 685 F.Supp. 1335, 1338 (M.D.Pa.1988), but, liberally construed, I do not find that Hairston meets his burden. Additionally, the record reflects that Norwood was not even personally involved with

denying Hairston's administrative remedy; instead, someone else, for Norwood, signed the denial. As such, the defendants' motion should be granted.

### 2. Hairston's Claims against the Defendants at FCI Schuylkill.

**\*18** The defendants further move for summary judgment arguing that (1) Hairston's claims against the FCI Schuylkill defendants are barred by the statute of limitations and (2) Hairston failed to exhaust his administrative remedies. *Doc.* 117 at 19–26.

#### a. Statute of Limitations.

With respect to the first issue raised by the defendants here, the statute of limitations applicable to a *Bivens* claim is the state statute of limitations for personal injury claims. *Lomax v. U.S. Senate Armed Forces Serv. Comm.,* 454 F. App'x 93, 95 (3d Cir.2011). In Pennsylvania, the applicable statute is 42 Pa.C.S. § 5524(2), which provides a two-year limitations period. *See Fitzgerald v. Larson,* 769 F.2d 160, 162 (3d Cir.1985). The limitations period begins to run when the plaintiff knows or has reason to know of the injury that constitutes the basis for the action. *Sandutch v. Muroski,* 684 F.2d 252, 254 (3d Cir.1982) (per curiam).

Based on the date Hairston filed his complaint, in comparison to the dates that he received treatment at FCI Schuylkill, his claims appear time barred. But, Hairston argues and alleges, however, that his claims are saved from the statute of limitations by the continuing violations doctrine, which is an "equitable exception to the timely filing requirement." *Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir.2001) (quoting *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995)). My analysis, therefore, cannot end here.

Under the continuing violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Id.* (quoting *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.,* 927 F.2d 1283, 1295 (3d Cir.1991)). The doctrine is a narrow exception to the statute of limitations that is frequently invoked but rarely found. *See Voices for Independence (VFI) v. Pa. Dep't of Transp.,* C.A. No. 06–78, 2007 WL 2905887 (W.D.Pa. Sept. 28, 2007).

Nevertheless, though it is rarely found, "[t]o establish that a claim falls within the continuing violations [doctrine], the plaintiff must do two things. First, he must demonstrate that at least one act occurred within the filing period: The crucial question is whether any present violation exists. Next, the plaintiff must establish that the [al sporadic acts." *West,* 45 F.3d at 755. In examining this second step, "courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type ..., tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights." *Cowell,* 263 F.3d at 292 (citing *West,* 45 F.3d at 755 n. 9). The third factor, permanence, is the most important. *Id.* In considering this third factor, the court "must consider the policy rationale behind the statute of limitations. That is, the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." *Id.* at 295. The burden is on the plaintiff to demonstrate that the continuing violations doctrine applies to toll the statute of limitations. *Id.* at 292.

**\*19** Based on this standard, summary judgment should be granted for the FCI Schuylkill defendants because Hairston has not met his burden of demonstrating that his claims are saved by the continuing violation doctrine. In the amended complaint, the only named staff members at FCI Schuylkill are Ross and Nash. [8] There are no allegations that Nash ever provided Hairston with medical treatment, and the record reflects the same. *Doc.* 11 at ¶ 78. Additionally, while Hairston claims that Ross treated him from 2001 to 2004 (*id.* at ¶ 81), the record reflects that Ross resigned from the FBOP in 2002 and provided no medical care to Hairston after his resignation. *See Doc.* 118 at ¶ 56. As well, on April 22, 2002, Hairston filed an administrative remedy complaining about the medical treatment he was receiving at the prison. *Id.* at ¶ 86. Therefore, at that time, he was aware that he disagreed with his medical treatment and had the facts necessary to put him on notice of the need to investigate his claims of deliberate indifference. Hairston did not act, however, and he was subsequently transferred to another prison in 2004. Last, his complaint was not filed until 2011. *See Doc.* 1.

[8]  Hairston also raises a claim against "John Does 1 and 2," PA's at FCI Schuylkill, but they have yet to be identified.

In support of my decision, I believe that *Ozoroski v. Maue,* 460 F. App'x 94 (3d Cir.2012) is instructive. In that case, Ozoroski was a state prisoner who brought an action under 42 U.S.C. § 1983, alleging that the prison health services and medical personnel deprived him of necessary medical treatment during his incarceration. *Ozoroski,* 460 F.App'x at 96. According to the Third Circuit's opinion, Ozoroski suffered a bowel perforation while imprisoned and underwent an operation in 1993. *Id.* He subsequently underwent multiple corrective surgeries, yet he continued to experience abdominal problems and developed a new illness. *Id.* Thereafter, Ozoroski repeatedly requested additional surgery to develop his issues, but the Pennsylvania Department of Corrections ("DOC") denied his requests. *Id.* Thirteen years after his initial surgery, Ozoroski was released to a drug rehabilitation center and, while staying there, underwent another surgical procedure. *Id.* Later, Ozoroski filed his complaint in this Court, but summary judgment was ultimately granted under the statute of limitations despite Ozoroski's claim that the continuing violations doctrine saved his claims. *Id.*

Following the Court's grant of summary judgment, Ozoroski appealed to the Third Circuit. The Third Circuit, however, affirmed the Court's ruling given that one of the doctors had no authority to provide Ozoroski with medical care at the expiration of the doctor's contract, which had expired five years before the complaint was filed. *Id.* at 97. Additionally, the Third Circuit affirmed because (1) the conduct alleged against the other medical providers "was not connected to any continuing practice' but instead amounted to isolated incidents" and (2) Ozoroski had filed a grievance in connection with the level of care against another doctor causing the Third Circuit to find that the doctor's conduct was "sufficiently permanent to trigger [Ozoroski's] awareness of and duty to assert ... rights' during the limitations period." *Id.* (quoting *Cowell,* 263 F.3d at 292).

**\*20** Similarly, here, Ross had no medical authority over Hairston once he resigned, and Hairston provides no evidence to the contrary in support of the allegation contained in his complaint. Further, the defendants' conduct was sufficiently permanent to trigger Hairston's awareness of, and duty to assert, his rights during the limitations period once Hairston filed his administrative remedy on April 22, 2002. Therefore, the defendants' motion for summary judgment should be granted. [9]

9     Having found that summary judgment should
      be granted based on the governing statute of
      limitations, it is unnecessary to delve into
      the exhaustion issue. I note, however, that I
      would recommend granting the defendants' motion
      with respect to their argument that Hairston
      failed to exhaust his administrative remedies,
      despite Hairston's argument that the administrative
      remedies were unavailable to him (*see* Doc. 128
      at 14, 34), given that he had an opportunity to
      seek an extension of time for filing an appeal upon
      his transfer to another prison, *see* 28 C.F. R. §
      542.14(b).

### 3. Hairston's Claims against the Defendants a t LSCI Allenwood.

The remaining claims involve the LSCI Allenwood defendants, which are timely and properly before the Court. As stated, *supra,* Hairston asserts that he is bringing this action against the defendants for violating his Eighth Amendment rights in that they failed to timely, adequately, and properly treat his pre-imprisonment medical condition relating to his back. *See Doc.* 11 at ¶ 2. Specifically, according to Hairston, the defendants (1) refused to provide him with Percocet, which he had taken for 17 years before being sentenced; (2) failed to act upon requests for medical treatment; (3) denied him medical treatment; (4) failed to follow the recommended course of treatment; and (5) denied him access to a physician "capable of evaluating the need for treatment." *Id.* at ¶¶ 31(a)-(e). The defendants disagree by arguing that Hairston's claims do not rise to the level of deliberate indifference. *Doc.* 117 at 26–31.

The Eighth Amendment explicitly prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials. U.S. CONST. amend. VIII; *see also Rhodes v. Chapman,* 452 U.S. 337, 345–46, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In order to sustain a claim against prison officials for acting with deliberate indifference, two requirements must be satisfied:

      (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of deliberate indifference' to inmate health or safety." *Id.* "Deliberate

indifference" is a subjective standard under *Farmer*-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

*Beers–Capitol v. Whetzel,* 256 F.3d 120, 125 (3d Cir.2001).

By including a subjective intent component in this Eighth Amendment benchmark, the courts have held that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim. *See Jones v. Beard,* 145 F. App'x 743 (3d Cir.2005) (finding no Eighth Amendment violation where inmate-plaintiff complained about cell mate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to an attack). In short, when "analyzing deliberate indifference, a court must determine whether the prison official acted or failed to act despite his knowledge of a substantial risk of serious harm.' *Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prisoner plaintiff must prove that the prison official knows of and disregards an excessive risk to inmate health or safety.' *Id.* at 837." *Garvey v. Martinez,* 08–2217, 2010 WL 569852, at *6 (M.D.Pa. Feb.11, 2010).

**\*21** These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Hairston is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon,* 897 F.2d 103, 109 (3d Cir.1990).

It is also clear, however, that the mere misdiagnosis of a condition or medical need, or negligent treatment provided

for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle,* 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer,* 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe,* 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct.13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. *See, e.g., Brown v. Borough of Chambersburg,* 903 F.2d 274, 278 (3d Cir.1990) ( [A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')." *Gindraw v. Dendler,* 967 F.Supp. 833, 836 (E.D.Pa.1997).

Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; *see, e.g., Ham v. Greer,* 269 F. App'x 149 (3d Cir.2008); *James Dep't of Corrections,* 230 F. App'x 195 (3d. Cir.2007); *Gillespie v. Hogan,* 182 F. App'x 103 (3d Cir.2006); *Bronson v. White,* No. 05–2150, 2007 WL 3033865 (M.D.Pa. Oct.15, 2007); *Gindraw v. Dendler,* 967 F.Supp. 833 (E.D.Pa.1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

**\*22** The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his ... care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment

support a claim of an eighth amendment violation."....
[The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care.... Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

*James,* 230 F. App'x. at 197–198. (citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979) (quoting *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth Amendment in a prison medical setting. In a case such as this, where the plaintiff's complaint reflects that an inmate received some level of on-going medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir.1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials

could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

**\*23** *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir.2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. *See, e.g., Johnson v. Doughty,* 433 F.3d 1001 (7th Cir.2006); *Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez,* No. 08–2217, 2010 WL 569852 (M.D.Pa. Feb.11, 2010); *Hodge v. United States,* No. 06–1622, 2007 WL 2571938 (M.D.Pa.Aug.31, 2007).

Here, the defendants do not dispute that Hairston had a serious medical need. In fact, the undisputed evidence demonstrates that Hairston has a long history of back pain. At the same time, however, the record is replete with instances where Hairston met with physicians and medical staff at LSCI Allenwood, including a neurosurgeon; he was also prescribed medication to manage his pain; he was given opportunities to participate in physical therapy; alternatives were discussed with him; his diabetes was monitored daily; he was provided with x-rays and MRI's; and he was provided with injections for pain. At no time does the record reflect that any of the physicians or medical staff at LSCI Allenwood turned their backs on Hairston or refused to provide him with any form of treatment. Instead, Hairston complains about the level of care and treatment that he received. But, some significant level of medical care was offered to him, and his claims should be denied on that basis alone. Moreover, as stated above, none of the non-medical prison staff can be held accountable given that he remained under constant care and supervision of medical professionals.

Last, with respect to his complaint that he was not provided with Percocet, which he was prescribed before his imprisonment, his claim still fails as a matter of law. *See, e.g., Abdul–Wadood v. Nathan,* 91 F.3d 1023, 1024–35 (7th Cir.1996) (inmate's disagreement with selection of medicine and therapy for sickle cell anemia falls well short of demonstrating deliberate indifference); *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) (prisoner's claim that Motrin medication was insufficient and that stronger pain medication was required for his wrist injuries did not state a deliberate indifference claim); *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (defendants' decision to prescribe Tylenol or Motrin to manage prisoner's pain and to administer Demerol or Morphine only when necessary did not constitute deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr.,* No. 08 Civ. 1128, 2011 WL 2637429, at \*3 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious' medical needs."); *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004) (medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference); *Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at \*9–10 (S.D.N.Y. Dec.21, 2000) (doctor's decision to prescribe Motrin in lieu of Percocet for prisoner's medical condition did not amount to deliberate indifference, even when that decision contravened recommendation of specialist). And, while surgery was recommended, but delayed to await the effects of other forms of treatment, his disagreement with the medical staff that he was in need of surgery also fails to establish deliberate indifference. *See Czajka v. Caspari,* 995 F.2d 870, 871 (8th Cir.1993) (holding that an inmate's mere disagreement with doctor's informed decision to delay surgery does not establish Eighth Amendment claim). Consequently, the defendants' motion for summary judgment should be granted. [10]

10      Given the record in this matter, should the Court disagree with my recommendations to dismiss other defendants in this matter, I nonetheless recommend that summary judgment should be granted to them, because there is simply no evidence that any of them acted with deliberate indifference to Hairston's medical condition or

needs, in accordance with the standards set forth in this section.

## VI. *Recommendation.*

**\*24** Hence, for the foregoing reasons, IT IS RECOMMENDED that:

(1) The Defendants' Motion to Dismiss and for Summary Judgment (*Doc.* 107) be **GRANTED;** and

All other motions be **DENIED** as moot.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

A ny party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this ***27th*** day of ***August, 2013.***

## All Citations

Not Reported in F.Supp.2d, 2013 WL 5701637

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

E

2015 WL 4077758
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Major Kenneth MARKOVICH, Plaintiff

v.

PANTHER VALLEY SCHOOL DISTRICT, R.
Mickey Angst, and Rosemary Porembo, Defendants.

Civil Action No. 3:13–3096.
|
Signed July 6, 2015.

**Attorneys and Law Firms**

Michael J. Fiorillo, Fiorillo Law Office, Pottsville, PA, for Plaintiff.

John E. Freund, III, King Spry Herman Freund & Faul, LLC, Bethlehem, PA, Mark Joseph Kozlowski, Robin B. Snyder, Marshall Dennehey Warner Coleman & Goggin, Scranton, PA, for Defendants.

*MEMORANDUM*

MALACHY E. MANNION, District Judge.

**\*1** Pending before the court is the motion for summary judgment of defendants Panther Valley School District (hereinafter PVSD) and Rosemary Porembo, (Doc. *55* ). Based upon the court's review of the motion and related materials, the defendants' motion will be granted with respect to Count II, procedural due process claim. The court will not exercise supplemental jurisdiction with respect to Count IV, breach of contract claim, and this claim will be dismissed without prejudice.

**I. BACKGROUND**

Plaintiff Kenneth Markovich was a Reserve Officer Training Corps (hereinafter ROTC) instructor in the Panther Valley School District. While he was injured and out on leave, the district superintendent contacted the Army, questioning plaintiff's qualifications to teach the ROTC program. Plaintiff also received an "unsatisfactory" rating from the school board. Following these events, which plaintiff believes were retaliatory and in violation of state law and of his contract, plaintiff was placed on paid administrative leave at a public meeting. Although the board's solicitor advised the board not to make public the name of the employee being placed on leave, R. Mickey Angst, a board member, disclosed plaintiff's name at the meeting and on his personal blog. Thereafter, the local newspaper ran a story stating that plaintiff had been placed on leave. Plaintiff responded to the story and he received a letter of reprimand from the district for doing so. Plaintiff was eventually placed on unpaid leave, then fired. Plaintiff then instituted this suit against the school district, its superintendent, and Mr. Angst, bringing claims for violations of the Civil Rights Act, the U.S. Constitution, and state law claims.

Specifically, as a result of the disclosure of his employment information and his termination, plaintiff instituted this suit on December 27, 2013, bringing eight claims: Count I, against PVSD and Superintendent Porembo for retaliation under Title VII of the Civil Rights Act, *42 U.S.C. § 2000(e)*, et seq.; Count II, against PVSD and Porembo for violation of the Due Process Clause of the Fourteenth Amendment pursuant to *42 U.S.C. § 1983;* Count III, a claim for substantive due process under the Fifth and Fourteenth Amendments against PVSD and Porembo pursuant to *42 U.S.C. § 1983;* Count IV, against PVSD and Porembo for breach of contract; Count V against Mr. Angst for intentional infliction of emotional distress ("IIED"); Count VI against Mr. Angst for invasion of privacy; Count VII for enterprise liability against PVSD; and Count VIII against Mr. Angst for public disclosure of private facts.

On February 17, 2014, defendants PVSD and Superintendent Porembo filed a motion to dismiss all claims against them. (Doc. *12* ). Defendant Angst also filed a motion to dismiss the claims against him on May 7, 2014. (Doc. *30* ).

On July 28, 2014, the court issued an Amended Memorandum and Amended Order, (Docs.*46, 47* ), and directed as follows:

> **\*2** ... defendants PVSD and Porembo's motion to dismiss, (Doc. *12* ), is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as to Count I, for Title VII discrimination, which is **DISMISSED with prejudice.** The motion is **DENIED** as to Count II, the procedural due process claim. The motion is **GRANTED** as to Count

III, the 5th and 14th amendment substantive due process claims. The 5th Amendment claim is **DISMISSED with prejudice,** while the 14th Amendment claim is **DISMISSED with prejudice.** The motion is **DENIED** as to Count IV, the breach of contract claim. The motion is **GRANTED** as to Count VII, the enterprise liability claim, which is **DISMISSED with prejudice.** The claims brought pursuant to § 1983 against Porembo in her official capacity are **DISMISSED with prejudice.** Plaintiff may amend his complaint to allege additional claims against PVSD and Porembo, provided he has a good faith basis for adding the claims. Defendant Angst's motion to dismiss, (Doc. *30* ), is **GRANTED.** Counts V, VI, and VIII, the claims against Angst, are **DISMISSED with prejudice.**

Thus, defendant Angst was dismissed entirely from this case. Count II, the Fourteenth Amendment procedural due process claim against PVSD and Porembo in her individual capacity, under § 1983 remains, as well as Count IV, the breach of contract claim. On November 13, 2014, defendants PVSD and Porembo filed their answer to the complaint with "affirmative defenses." [1] (Doc. *54* ).

[1]     In their answer, defendants incorrectly referred to "new matter" which is a term used in state court pleadings and not a term used in federal court.

After discovery was completed, defendants PVSD and Porembo filed a motion for summary judgment, pursuant to *Fed.R.Civ.P. 56,* with respect to Counts II and IV. (Doc. *55* ). Defendants argue as follows: that plaintiff lacked the appropriate Pennsylvania Teaching Certification and could not continue his employment with the PVSD; plaintiff lacked the appropriate Certification from the United States Department of the Army Junior Reserve Officer Training Corps and he was ineligible to teach JROTC courses at the Panther Valley School District; and plaintiff lacked a protected property interest in his continued employment with PVSD. The motion has been briefed, a statement of material facts

and a response have been filed as well as exhibits, including plaintiff's deposition transcript. (Docs.*57, 58, 60, 61, 63* ). [2]

[2]     Plaintiff's counter statement of material facts is not proper under L.R. 56.1, M.D.Pa., as they are legal conclusions to which no response is required. (Doc. *61,* ¶'s 91–102).

## II. MATERIAL FACTS [3]

[3]     Unless otherwise noted, the facts are taken from the parties' statements of material facts, responses thereto, and the exhibits submitted. The facts are largely undisputed.

Plaintiff Major Kenneth Markovich is retired from the Pennsylvania National Guard. After retiring, he obtained a certification to teach in the ROTC program from the Department of the Army Cadet Command. He also attained a teaching certificate from the Department of Education. In 2009, he was hired as a junior ROTC ("JROTC") instructor by the PVSD. An employment contract was drafted by PVSD, which plaintiff did not receive until the last day of orientation, and plaintiff advised Superintendent Rosemary Porembo that he did not like portions of the contract since he believed he was not receiving benefits that other teachers had received. Plaintiff was not a member of the teacher's union and the contract prohibited plaintiff's membership in any union. He also found the contract very confusing since it referenced verbiage about the union despite the fact that membership in a union by the JROTC instructor would not be recognized. The original contract plaintiff had with PVSD lasted for one year. Plaintiff's contract stated that the board and the JROTC instructor will renew the contract on a yearly basis, by June 30th. The contract had a one year expiration. It is not clear if it automatically renewed each year as plaintiff believed it did, or if renewal was within the board's discretion.

**\*3** In order to be certified to teach the JROTC program, plaintiff had to be retired from military service with twenty years of military service, honorably discharged, and had to complete a certification test through Cadet Command. He was also required to send in various documents, which had to be verified, such as officer evaluation reports. Cadet Command oversaw the JROTC program and instructors and it conducted a yearly evaluation of the PVSD JROTC program. Plaintiff was required to take the teachers' certification test with the Pennsylvania Department of Education prior to being eligible to instruct the JROTC program. Additional certifications, either through Cadet Command or through

the Commonwealth of Pennsylvania, were required to continue to serve as a JROTC instructor. In particular, a JROTC instructor had to take the Praxis II to obtain the Vocational Level 2 certification through the Department of Education. Additionally, he needed to attend the basic course and advanced course of JROTC training through Cadet Command. It appears that the plaintiff never satisfied the requirements of the Vocational Level 2 certification nor did he satisfy the requirements of the Cadet Command basic course. Plaintiff did satisfy the requirements for the Cadet Command advanced course at sometime prior to his leave on workers' compensation.

Plaintiff's salary as a JROTC instructor was based on an army regulation which set minimum instructor pay, in coordination with PVSD. Under the agreement between PVSD and the Army, the district would be reimbursed one half of the plaintiff's salary by the Department of the Army.

In May 2012, three years after he was hired, plaintiff injured his Achilles tendon requiring surgery. As a result, the plaintiff was placed on workman's compensation leave from PVSD. Plaintiff alleges that he was not properly compensated by PVSD while he was unable to work. More particularly, he claims that pursuant to his contract the district failed to provide him with the difference between his workers' compensation payment and his regular pay.

In May of 2012, the plaintiff received an unsatisfactory evaluation for the 2011/2012 academic year. Plaintiff was again evaluated for the 2012/2013 academic year and again received an unsatisfactory rating, allegedly at the direction of Superintendent Rosemary Porembo. On June 6, 2012, Plaintiff submitted a Memorandum to the district challenging his performance review and unsatisfactory rating. He asked that they be purged from his record.

On August 6, 2012, plaintiff received a correspondence from Superintendent Porembo informing him that his JROTC contract for the 2012/2013 academic year had not been approved at the June 28, 2012 nor the July 26, 2012 regular board meetings. Since he was not approved as the JROTC instructor for the 2012/2013 school year, his bi-weekly pay was halted, as his contract had not been renewed for another academic year. On August 7, 2012, Superintendent Porembo received a correspondence from the Department of the Army informing the district that unless plaintiff's contract was renewed, a retired Army Officer should be hired to replace him.

*4  In July, August and September of 2012, while plaintiff was out on leave, Superintendent Porembo contacted the Cadet Command to complain about plaintiff's performance including complaints involving missing money from the JROTC program.

Also in September 2012, Principal Joseph A. Gunnels contacted the Army informing them of several concerns he had with plaintiff's ability to operate the JROTC program.

Plaintiff returned to work at PVSD in November 2012 following his Achilles tendon injury. Shortly thereafter, on December 12, 2012, the Army recommended decertification of plaintiff based on his inability to teach the JROTC class and his failure to complete courses necessary to retain his certification as both a JROTC instructor and teacher in Pennsylvania. Cadet Command had conducted an investigation, including an interview of plaintiff and taking his written statement. (Doc. 58–1). Following the investigation, on February 7, 2013, plaintiff and PVSD received notification from the Army that it was their intent to withdraw his certification to instruct the JROTC program. (Doc. 58–8). The notice informed plaintiff that withdrawing his certification would prevent him from having any association with JROTC. Superintendent Porembo followed up with a letter to plaintiff referencing the Army's notice and advising him that the district was placing him on administrative leave, with pay, beginning February 12, 2013. This administrative leave was pending resolution of the decertification proceeding initiated by the Army as well as any appeal from it. On March 3, 2013, plaintiff appealed the Army's decision to withdraw his certification and responded to the allegations against him. (Doc. 58–9).

At the PVSD board's February 28, 2013 meeting, the plaintiff was placed on administrative leave with pay. The board solicitor advised that the plaintiff should not be publicly named as the employee being placed on leave. Disregarding this advice, R. Mickey Angst, a member of the PVSD school board, yelled out "Ken Markovich ." Subsequently, a newspaper article identified plaintiff as the individual placed on administrative leave. Plaintiff responded to the article with a letter to the editor for which he received a letter of reprimand from PVSD. Additionally, before the February meeting, Mr. Angst had identified plaintiff on his blog concerning Superintendent Porembo's complaints to the Army.

On March 13, 2013, Superintendent Porembo sent plaintiff a letter advising him that his status would be changed to administrative leave without pay beginning March 15, 2013. This was as a result of the Army's suspension of their shared costs of the program.

On April 5, 2013, the plaintiff alleged that PVSD violated his contract as he could not be disciplined without just cause. He also alleged that he had been disciplined without due process. (Doc. *58*–1, at 79–80).

On April 25, 2013, Deputy Commander Erik Peterson informed plaintiff of his intention to withdraw plaintiff's certification to serve as a JROTC instructor. On May 30, 2013, Superintendent Porembo sent an e-mail to plaintiff offering him the opportunity to review any of his concerns as well as the results of the U.S. Army investigation. (Doc. *58*–11).

 **\*5** The plaintiff appealed both the investigation outcome and his decertification through Cadet Command. On June 5, 2013, Major General Jefforey A. Smith affirmed the decisions. There is no dispute that plaintiff exhausted his appellate remedies regarding his decertification through the U.S. Army Cadet Command.

On June 7, 2013, Superintendent Porembo sent a letter to plaintiff informing him that he failed to appear for a meeting that was scheduled for June 5, 2013, to discuss his decertification. (Doc. *58*–13). The purpose of the June 5 meeting was to go over all of the correspondence Porembo sent to plaintiff and to discuss the effect of his JROTC instructor decertification. Plaintiff was then informed that the district would be terminating his employment at the next regularly scheduled board meeting on June 13, 2013.

As such, plaintiff was terminated from his employment with PVSD at the June 13, 2013 board meeting. On June 14, 2013, plaintiff received a correspondence from Superintendent Porembo informing him that the board had terminated his contract upon the Army's decision to withdraw his certification to serve as JROTC instructor, in accordance with Cadet Command regulation 145–2, Chapter 4, effective April 25, 2013. Following his termination, plaintiff filed for, and was granted, unemployment compensation.

There is no dispute that plaintiff needed an active certification from Cadet Command to serve as an instructor for the JROTC program. Plaintiff did not have a JROTC certification at the end of the 2013 academic year. If the district decided to retain

an uncertified instructor, the Army would not reimburse half of the instructor's salary. (Doc. *58*–1, at 92–93).

Plaintiff alleges that his employment contract with PVSD specifically stated the district would renew his contract on a yearly basis by June 30th and, that if the district did not act, his contract would automatically renew each year, indefinitely. (*Id.,* at 91–92).

Plaintiff claims that he was not afforded an opportunity to be heard regarding any of the complaints PVSD had against him. Regarding his instant due process claim, plaintiff alleges "it's not the adequate notice [he was contesting], it's the opportunity to be heard. I was never afforded the opportunity to represent myself against any of the allegations." (*Id.,* at 90). However, plaintiff admits that the reason the district chose not to renew his contract at the end of the 2012–2013 academic year was "because [he] was not certified through Cadet Command." (*Id.,* at 94–95).

## III. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c);* see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Turner v. Schering–Plough Corp., 901 F.2d 335, 340 (3d Cir.1990).* A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F.Supp. 836, 838 (M.D.Pa.1995).* At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.2004)* (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir.2007).*

 **\*6** Moreover, the Third Circuit indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must

point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.' " *Goode v. Nash, 2007 WL 2068365 (3d Cir.2007)* (citation omitted). A material factual dispute is one that may affect the outcome of the case under applicable law. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248*.

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex, 477 U.S. at 323–24*. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman, 327 F.3d 229, 238 (3d Cir.2003)*; see also *Celotex, 477 U.S. at 325*. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.1998)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)* ). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," *Rule 56* mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp., 477 U.S. at 322–23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir.2007); Watson v. Eastman Kodak Co., 235 F.3d 851, 858 (3d Cir.2000)* (the non-movant must establish the existence of each element on which it bears the burden of proof).

## IV. DISCUSSION

### A. *Count II: § 1983 Claim for Violation of the 14th Amendment Due Process Clause*

Count II of plaintiff's complaint alleges a violation of the 14th Amendment due process clause against PVSD and Superintendent Porembo pursuant to *42 U.S.C. § 1983*. The court has jurisdiction over plaintiff's constitutional claims pursuant to *28 U.S.C. § 1331* and § 1343(a). Plaintiff alleges that his procedural due process rights were violated since he had a property and/or liberty interest in his contract to teach JROTC at PVSD, and that he was terminated without being provided adequate notice or a hearing.

*Section 1983* does not itself bestow substantive rights, but instead creates a remedy for violation of a person's constitutional rights. *Gonzaga Univ. v. Does, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002)*. The statute provides:

> **\*7** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

*42 U.S.C. § 1983*.

To establish a claim under § 1983, a person must prove that someone deprived him of a constitutional right while acting under the color of state law. *Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir.1996)*. Liability under § 1983 is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or actual knowledge and acquiescence. *See Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir.1997)* (overturned on other grounds) (citing *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)* ). Acquiescence exists where "a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so." *Festa v. Jordan, 803 F.Supp.2d 319, 325 (M.D.Pa.2011)* (quoting *Robinson, 120 F.3d, at 1294* ).

The 14th Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law." *U.S. Const. amend. XIV, § 1*. "[A] procedural due process analysis involves a two step inquiry: (1) does the complaining party have a protected liberty or property interest and, if so, (2) does the available process comport with all constitutional requirements." *Bowen v. Ryan, 2006 WL 3437287 (M.D.Pa. Nov.29, 2006)* aff'd, 248 F.App'x 302 (3d Cir.2007); see also *Shoats v. Horn, 213 F.3d 140, 143 (3d Cir.2000)*.

In our July 28, 2014 Amended Memorandum, (Doc. 46), the court held that plaintiff's contract provided him with a property interest in his employment because he could only be deprived of professional advantage for just cause. As such, the first step of the procedural due process analysis has been previously decided and is satisfied.

Since it has been determined that plaintiff has a protected property interest, the court now considers the second step of the due process analysis to determine whether the process available to plaintiff met constitutional requirements." Pre-deprivation due process is satisfied if, prior to the deprivation, a public employee is given: (1) written or oral notice of the charges; (2) an adequate explanation of the evidence; and (3) an adequate opportunity to present her side of the story." *Belas v. Juniata Cty. School Dist., 2005 WL 2100666, at \*7 (M.D.Pa. Aug, 26, 2005)* (*citing McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir.1995)* ). The case of *Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)*, requires that "an employee who has a property interest in continued employment is entitled to pretermination notice and an opportunity to respond to present reasons why proposed action should not be taken." *Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1077 (3d Cir.1990)*. In conjunction with *Laudermill,* the court must determine whether the plaintiff had sufficient notice and an opportunity to respond after defendants notified him in March 2013 that he would be placed on administrative leave without pay because the Army was decertifying him as a JROTC instructor. *470 U.S. at 546*. In his complaint, plaintiff alleged that he was not provided with "adequate notice and a meaningful opportunity to be heard" and, that the board violated its own policies as well as plaintiff's contract in failing to extend him adequate process.

 **\*8** Plaintiff argues that disputed genuine issues of material fact exist as to whether he was provided with notice of the charges, an adequate explanation of the evidence, and an adequate opportunity to present his side of the story. However, plaintiff admitted in his deposition that he was not contesting the notice he received, but rather he was contesting the opportunity to be heard. (Doc. *58*–1, at 90). Plaintiff contends that he did not have an opportunity to defend himself against any of the allegations prior to his termination by PVSD. "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch, 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)*.

As detailed above, the record indicates that plaintiff received an adequate explanation of the charges against him. He was afforded ample opportunity to explain his situation, and to challenge the decision by the Army that he should be decertified as a JROTC instructor as well as the effect of this decertification on his position with PVSD. Superintendent Porembo sent plaintiff a letter dated March 13, 2013, advising him that he would be placed on administrative leave without pay effective March 15, 2013 since the Army was suspending its share of his salary. Plaintiff admitted that he received formal notification from the district that he was being placed on administrative leave without pay and that the board had approved it. (Doc. *58*–1, at 78–79). On April 25, 2013, the Army notified plaintiff that his certification to serve a JROTC instructor was being withdrawn, and that "[e]ffective immediately you are no longer permitted to serve as a Junior ROTC Instructor or to associate officially in any manner with the Army Junior ROTC Program." (Doc. *58*–1, Ex. 10).

On May 30, 2013, Superintendent Porembo sent an e-mail to plaintiff providing him with an opportunity to meet and discuss his concerns and the results of the Army's investigation and his decertification. On June 5, 2013, plaintiff failed to attend the meeting. As such, plaintiff did not take advantage of his opportunity to present his side to defendants. Plaintiff was then informed that the district would be terminating his employment at the next regularly scheduled board meeting on June 13, 2013. There is no indication that plaintiff attended the June 13, 2013 board meeting. In fact, plaintiff indicated that after April of 2013, he did not think he spoke to anyone on the board about his position as the JROTC instructor despite the fact that he was provided with several opportunities to do so.

Plaintiff's allegations that "[t]here was no opportunity to be heard for any of the allegations" and that "I was never afforded the opportunity to represent myself against any of the allegations", (Doc. *58*–1 at 90), are belied by the evidence. Plaintiff's conclusory statements, without affirmative evidence to support, are insufficient to defeat summary judgment since the record evidences that plaintiff was given the chance to tell his side of the story. *See Rega v. Beard, 2012 WL 224894, \*1–\*2 (W.D.Pa. Jan.25, 2012)* (citations omitted); *Vetri v. Thompson Consumer Elecs., Local No. 178, 2004 WL 1490522, at \*6 (M.D.Pa. May 18, 2004)* (court found that plaintiff's "naked assertion" without corroboration of evidence was not sufficient to warrant a jury trial) (citing *Williams v. Borough of West Chester, 891 F.2d 458, 467 (3d Cir.1989)* (Garth, J., concurring) ("To

defeat a motion for summary judgment, *competent* evidence must be produced ...” (emphasis in original)). Moreover, it was the Army's determination to revoke plaintiff's JROTC certification which resulted in his inability to teach PVSD's JROTC program.

**\*9** Thus, defendants provided plaintiff with notice that the Army's decision may impact his position with PVSD. They also gave plaintiff opportunities to meet with them and discuss the effects of his decertification on his position prior to his termination. There is no evidence to support plaintiff's belief that he could continue to teach the JROTC program without having a certification from the Army, nor that PVSD would continue the program on its own without the Army to share the cost of such an instructor.

Additionally, plaintiff names PVSD as a defendant and alleges that it violated his constitutional rights, under *Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).* However, plaintiff's complaint does not state a proper municipal liability claim against PVSD under *Monell. See Moeck v. Pleasant Valley School Dist., 983 F.Supp.2d 516, 524 (M.D.Pa.2013).* “Municipal employers, such as school districts, ..., cannot be held vicariously liable for the constitutional violations committed by their employees.” *Id.* “Municipal liability only attaches when a plaintiff demonstrates that an official policy or custom caused the asserted constitutional deprivation.” *Id.* In fact, plaintiff alleges in his complaint that PVSD had policies in place with respect to the discipline of tenured teachers, including the right to notice of any accused wrongdoing and the opportunity to confront the charges and to be heard. (Doc. *1,* at 4–5). There is no official policy of PVSD alleged to have caused plaintiff's violation of his procedural due process rights.

Since the evidence demonstrates that the process plaintiff was afforded met constitutional requirements prior to his termination, i .e., notice, an explanation of the detrimental effect of decertification, and an opportunity to explain his side, defendants' summary judgment motion shall be granted with respect to Count II, the 14th Amendment procedural due process claim.

### B. *Count IV: Breach of Contract Claim*
Based on judicial economy, convenience and fairness to the litigants, the district court in its discretion is permitted to decline the exercise of supplemental jurisdiction over state law claims if the court has dismissed all of the claims over which it had original jurisdiction. *Kach v. Hose, 589 F.3d 626,* *650 (3d Cir.2009)* (citations omitted). The court has made the appropriate considerations and finds no extraordinary circumstances exist in this case to exercise supplemental jurisdiction over plaintiff's breach of contract claim. Thus, since plaintiff's only remaining federal claim over which this court had original jurisdiction (*i.e.,* 14th Amendment procedural due process claim) shall not be permitted to proceed to trial, the court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state law breach of contract claim, Count IV, against defendants. *Id.; see also 28 U.S.C. § 1367(c)(3); Verdecchia v. Prozan, 274 F.Supp.2d 712, 728 (W.D.Pa.2003).*

**\*10** As such, plaintiff's state law breach of contract claim shall be dismissed without prejudice. *Kach, 589 F.3d at 650* (“If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.”) (citation omitted).

### IV. CONCLUSION
For the foregoing reasons, defendants PVSD and Porembo's motion for summary judgment, (Doc. *55* ), is **GRANTED** as to Count II, the 14th amendment procedural due process claim. The court declines to exercise supplemental jurisdiction over plaintiff's state law breach of contract claim, Count IV, and this claim is **DISMISSED WITHOUT PREJUDICE.** A separate order shall issue.

### *ORDER*

In light of the memorandum issued this same day, **IT IS HEREBY ORDERED THAT** defendants PVSD and Porembo's motion for summary judgment, (Doc. *55* ), is **GRANTED** as to Count II, the procedural due process claim. Judgment is entered in favor of defendants PVSD and Porembo and against plaintiff Markovich with respect to Count II. The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law breach of contract claim, Count IV, and this claim is **DISMISSED WITHOUT PREJUDICE.**

The Clerk of Court is directed to close this case.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4077758

Markovich v. Panther Valley School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 4077758

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

F

KeyCite Yellow Flag - Negative Treatment

Distinguished by Reid v. Sleepy's, LLC, M.D.Pa., June 16, 2016

2011 WL 1831708
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Michael PARK and Brandy Lee Park, individually
and as parents and legal guardians of minor children
Erie Park, Joshua Michael Park, Elizabeth Mae
Park, and Desiree Marie Tarantino, Plaintiffs,
v.
Gary VEASIE, individually and in his official
capacity; Officer Michael Bogart, individually
and in his official capacity; Officer Brian
Markochik, individually and in his official capacity;
and, THe Borough of Weatherly, Defendants.

Civil No. 3:09–CV–2177.
|
May 11, 2011.

**Attorneys and Law Firms**

Jennifer R. Sletvold, Lauer & Sletvold, P.C., Easton, PA, Paul A. Lauricella, The Beasley Firm, LLC, Philadelphia, PA, for Plaintiffs.

Harry Thomas Coleman, Law Office of Harry Coleman, Carbondale, PA, for Defendants.

### *MEMORANDUM*

SYLVIA H. RAMBO, District Judge.

**\*1** Plaintiffs Michael and Brandy Park bring this civil rights case on their own behalf, and on behalf of their minor children, as a result of Defendants' search of their home on September 18, 2008. Before the court is (1) Defendants' Motion to Strike Portions of Plaintiffs' Statement of Material Facts and Exhibit in Support of Plaintiffs' Motion for Summary Judgment (Doc. 63) and (2) Defendants' Motion to Have Certain Paragraphs of Defendants' Statement of Material Facts in Support of Defendants' Motion for Summary Judgment Deemed Admitted (Doc. 65). The parties have briefed the issues and both motions are ripe for disposition.

### I. *Background*

Because the parties' statements of material facts accompanying their respective pending summary judgment motions are the subject of this memorandum, the factual record is, at this point, unclear and appears to be at least partially contested. The court will therefore refrain from providing an exhaustive factual recitation. For the purposes of this memorandum, it is sufficient to provide that this case arises from a search of Plaintiffs' home on September 18, 2008. [1] Plaintiffs' second amended complaint asserts fifteen counts. In Counts I–XII, Plaintiffs assert federal causes of action under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Specifically, in these counts, Plaintiffs assert that Defendants violated Plaintiffs' rights of: (1) freedom from unlawful arrest and seizure; (2) freedom from prosecution without probable cause; (3) freedom from unreasonable, unjustifiable, and excessive use of force; (4) not to be deprived of liberty and property without due process; (5) freedom from summary punishment; (6) freedom from arbitrary governmental action; and (7) freedom from governmental retaliation against Plaintiffs' exercise of freedom of speech. In Counts XIII–XV, Plaintiffs assert supplemental state law causes of action.

[1] For further discussion of the factual and legal background, parties may refer to this court's memorandum and order dated June 9, 2010. *Park v. Veasie, et al., 720 F.Supp.2d 658 (M.D.Pa.2010)* (denying in part Defendants' motion to dismiss and granting Plaintiffs leave to file a second amended complaint).

On January 21, 2011, Plaintiffs filed a motion for partial summary judgment (Doc. 38) and memorandum of law in support of the motion (Doc. 39). Defendants subsequently filed a brief in opposition to Plaintiffs' motion for partial summary judgment (Doc. 42) on February 11, 2011, and Plaintiffs filed a reply brief (Doc. 45) on February 17, 2011. On April 4, 2011, the court granted Plaintiff leave to file, *nunc pro tunc,* an enumerated statement of facts to accompany its motion for partial summary judgment. [2] (Doc. 58.)

[2] Plaintiffs originally submitted a recitation of facts that did not contain separately enumerated paragraphs, as required by Local Rule 56.1. The court granted Plaintiffs' uncontested request to file

an enumerated statement of facts to correct this omission.

On March 15, 2011, Defendants filed their own motion for summary judgment (Doc. 48), brief in support (Doc. 49), and statement of material facts (Doc. 50). On April 4, 2011, Plaintiffs filed a counter-statement of facts (Doc. 59) and brief in opposition to Defendants' motion for summary judgment (Doc. 60).

Both summary judgment motions are currently pending before the court. In the interim, Defendants filed the instant motion to strike a portion of Plaintiffs' statement of facts (Doc. 63) and a motion to have portions of its own statement of facts be deemed admitted (Doc. 65). For the reasons set forth below, the court will strike both Plaintiffs' and Defendants' statements of material facts accompanying their respective motions for summary judgment as well as any counter-statements thereto, and will require that the parties re-submit properly written statements of material fact. Accordingly, Defendants' motions will be deemed moot.

## II. *Discussion*

**\*2** In its motion to strike, Defendants argue that twenty-one out of forty-seven paragraphs in Plaintiffs' statement of facts should be stricken because those paragraphs contain "numerous inflammatory factual assertions, legal conclusions and argument" or because they fail to supply a proper citation to the record. (Br. in Supp. of Mot. to Strike, Doc. 64, at 3.) Defendants further argue that Plaintiffs' statement of facts violates Local Rule 56.1 which requires a "short and concise statement of material facts ... with references to the parts of the record that support the statements." L.R. 56.1. In response, Plaintiffs challenge the assertion that their statement of facts contains inflammatory and argumentative phrases and argue instead that the statement is "replete with specific, meticulous references to the evidentiary record." (Br. in Response to Def.'s Mot. to Strike, Doc. 72, at 3 of 15.) To the extent that the statement includes inflammatory or argumentative remarks, Plaintiffs state that such characterizations "are simply a function of the untenable facts themselves." (*Id.,* at 11 of 15.)

Following a review of Plaintiffs' statement of material facts, the court finds that Plaintiffs' recitation of the facts does not comport with Local Rule 56.1. The first two paragraphs alone demonstrate the argumentative and conclusive nature of the document:

1. On September 10, 2008, Michael Park spoke out at a meeting of the Weatherly Borough Council, exercising his First Amendment right to air his grievances with respect to the *arbitrary and abusive* conduct of members of the local police department. One week after he learned of Mr. Park's public statements, defendant Gary Veasie, the embattled Chief of Police, interrogated seven year old Joshua Park at his elementary school after teachers suspected that the child had brought a marijuana-type pipe to school. Without first notifying Mr. or Mrs. Park, Chief Veasie questioned the little boy *in an effort to elicit incriminating statements concerning Joshua's parents. Armed with a statement of dubious reliability* obtained from a seven year old child who was *improperly interrogated,* Veasie secured a search warrant (but only after he augmented his supporting affidavit with information which he now admits was false). Within hours, five police officers, armed with pistols and a shotgun, converged on the Park residence, *terrifying Mrs. Park and her children. The search was essentially fruitless,* uncovering no drugs, but rather, according to the defendants, only two small pieces of drug paraphernalia.

2. *Compounding their outrageous acts,* the defendants *unnecessarily handcuffed* Mr. Park, *inexplicably charged* him with possession of drug paraphernalia, and, *for good measure,* had his seven year old son taken into "protective custody" solely on the basis of *wild, imaginary, and wholly unsubstantiated concerns* for his "safety."

(Doc. 58, ¶¶ 1–2) (emphasis added.) The emphasized portions contain language that the court finds to be unnecessarily argumentative and improperly included in a short and concise statement of material facts. Similar language exists throughout the statement of material facts. Such advocacy is best left to the parties' briefs in support or in opposition to the summary judgment motions. The court notes that both parties were permitted to file briefs well in excess of 15 pages, which they did. [3]

[3]   Plaintiffs filed a 56–page brief in support of their summary judgment motion. (Doc. 39.) Defendants filed a 48–page brief in support of their motion for summary judgment. (Doc. 49.) In both cases, the responsive briefing also exceeded 15 pages. (Docs. 42 and 60.)

**\*3** Local Rule 56.1 directs parties moving for summary judgment to supply "a separate, *short and concise* statement of *material* facts, in numbered paragraphs, as to which

the moving party contends there is *no genuine issue to be tried."* L.R. 56.1 (emphasis added.) It is the obligation of the movant's counsel to scour the record thoroughly and identify facts that (it would submit) are not in genuine dispute. *Gantt v. Absolute Machine Tools, Inc.,* 2007 U.S. Dist. LEXIS 74337, 2007 WL 2908254 (M.D.Pa. Oct. 4, 2007) (Smyser, M.J.) (Kane, C.J.). The purpose of the short and concise statement of facts is "to structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration to the motion." *Hartshorn v. Throop Borough,* 2009 U.S. Dist. LEXIS 22372, at *8, 2009 WL 761270 (M.D.Pa. March 19, 2009) (citations omitted). A proper statement of facts should enable "the court to identify contested facts expeditiously and [prevent] factual disputes from becoming obscured by a lengthy record." *Pinegar v. Shinseki,* 2009 U.S. Dist. LEXIS 40067, at *2, 2009 WL 1324125 (M.D.Pa. May 12, 2009).

To dispose of this motion, the court can consider several options. For example, the court could partially grant the motion and strike those portions of the statement of facts that it finds objectionable. This, however, would hinder rather than facilitate the court's direct and accurate consideration of Plaintiffs' motion for partial summary judgment because, in addition to requiring the court to review the statement of facts line-by-line separating argumentative statements from properly supported factual assertions, it would ultimately leave the court with a still lengthy statement of facts riddled with stricken statements. Alternatively, the court could, as argued by the Plaintiffs, deny the motion and analyze Plaintiffs' statement of facts trying to separate useful information from improper or unsupported entries. (Doc. 72, at 4 of 15) (citing *Glodek v. Jersey Shore State Bank,* 2009 U.S. Dist. LEXIS 77118, *2, n. 1, 2009 WL 2778286 (M.D.Pa. Aug. 28, 2009)). However, such deciphering is an ineffective use of the court's time and resources and it runs contrary to the central purpose of a statement of material facts which is to *aid* the court to *expeditiously* identify factual arguments. Rather, the most effective option is to strike Plaintiffs' entire statement of facts from the record and permit Plaintiffs' to re-file in strict accordance with Local Rule 56.1. In doing so, the court seeks to enforce compliance with our local rules and promote judicial efficiency.

Defendants have also filed a Motion to Have Certain Paragraphs of Defendants' Statement of Material Facts Deemed Admitted (Doc. 65) that must also be addressed in the context of Local Rule 56.1. Defendants argue that seventy-four out of ninety-four paragraphs in its statement

of facts should be deemed admitted because Plaintiffs either (1) fail to respond as to whether the underlying fact is disputed or undisputed, (2) seek to argue the import of Defendants' factual statement in relationship to the legal issue presented, or (3) point to nothing on the record to controvert the Defendants' asserted facts. (Doc. 66, at 1–2.) However, in their motion, Defendants address specific objections to only five of Plaintiffs' responses, apparently leaving it to the court to determine how the other sixty-nine responses are objectionable. Plaintiffs respond by claiming that they "responded to defendants' Statement of Facts precisely as required by [Local Rule 56.1]" and, in any event, any deficiencies are not so egregious to warrant that we strike, *in toto,* those responses that Defendants find objectionable. (Doc. 73, at 12 of 15.)

**\*4** The court's independent review of Defendants' statement of facts and Plaintiffs' response thereto reveals that numerous responses are unclear or otherwise equivocal, either refusing to admit or deny the statement of fact, disputing "for the reasons set forth in the brief" (then failing to include a citation) or lodging an evidentiary objection to purportedly immaterial facts. *(See, e.g.,* Doc. 59, ¶¶ 2, 4–12, 16, 75, 77.) These responses, although perhaps not deficient to the point of warranting that the corresponding statement of fact be deemed admitted, nevertheless fall short of (1) clearly admitting or denying whether each fact contained in Plaintiffs' statement of facts is undisputed and/or material, (2) setting forth the basis for the denial if any fact is not admitted in its entirety, and (3) providing a citation to the particular pleading, deposition, answer to interrogatory, admission on file or other part of the record that supports the opposing party's denial of any fact denied in whole or in part. The court's review also reveals that many of the responses at issue admit to or partially admit to Defendants' corresponding factual statement. Thus, a motion deeming those facts admitted is superfluous. In the end, the court is left with the tedious task of reviewing a lengthy and at times vague statement of material facts [4] and an equally lengthy response in order to determine whether the responses are so inadequate to warrant the fact be deemed admitted, a notion that is entirely at odds with the very purpose of these documents. Moreover, deeming certain facts admitted will not assist the court with the "direct and accurate" consideration of the underlying summary judgment motion because it is possible that some of the facts deemed admitted might be dispositive to some of the serious claims at issue here. Until the summary judgment motions are decided, however, it is not clear how any admitted facts might affect those issues. Accordingly, the court will

strike the Defendants' statement of facts (Doc. 50) and the Plaintiffs' counter-statement of facts (Doc. 59) and will permit the parties to re-file in strict accordance with Local Rule 56.1.

4    Plaintiffs argue, quite correctly, that some of Defendants' statements of material fact are "compound and imprecise" (Doc. 73, at 5 of 15) further noting the difficulties of precisely responding to such statements.

### III. *Conclusion*

In closing, the court offers the following. A short and concise statement of material fact and a concise responsive statement are particularly important where, as here, a voluminous record and lengthy briefs accompany the summary judgment motions. If the court is unable to "expeditiously determine" what, if any, material facts are in dispute, the court can not "directly and accurately" consider the summary judgment motion, and the case must proceed to trial. In this case, the parties seem to have lost sight of this purpose and are requesting, in essence, that the court edit the statements of fact or the responses thereto such that they pass muster under Local Rule 56.1 and can properly be considered in our disposition of the underlying summary judgment motions. Such an exercise is an ineffective use of the court's time and resources and will not aid in our disposition of the summary judgment motions. The parties are on notice that the court will not tolerate argument, equivocations, immaterial or unsupported assertions, opinions, commentary or any other statements best left for briefing in the parties' re-submissions and a failure to comply with these directives will result in striking the motions for summary judgment. An appropriate order will issue.

### ORDER

**\*5** In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' statement of facts in support of its motion for partial summary judgment (Doc. 58) and Defendants' statement of facts in support of its motion for summary judgment (Doc. 50) and Plaintiffs' counter-statement of facts thereto (Doc. 59) are **STRICKEN** from the record.

2. Plaintiffs shall re-file a short and concise statement of material fact in accordance with the accompanying memorandum and Local Rule 56.1 in support of their motion for partial summary judgment by May 31, 2011.

3. Defendants' shall re-file a short and concise statement of material fact in accordance with the accompanying memorandum and Local Rule 56.1 in support of their motion for summary judgment by May 31, 2011.

4. Plaintiffs and Defendants shall file concise counter-statements of fact in accordance with the accompanying memorandum and Local Rule 56.1 by June 21, 2011.

5. The statements and counter-statements of fact shall not exceed twenty (20) pages in length.

6. The Defendants' motion to strike (Doc. 63) and motion to deem certain facts admitted (Doc. 65) are **DEEMED MOOT.**

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1831708

---

G

Selective Insurance Company of America v. Novitsky, Not Reported in Fed. Supp. (2019)

2019 WL 1009389

2019 WL 1009389
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

SELECTIVE INSURANCE
COMPANY OF AMERICA, Plaintiff,

v.

Robyn NOVITSKY, Individually and as Executrix
of the Estate of Kevin C. Novitsky, Deceased,
Village Auto Sales, Inc., and Patricia Novitsky,
Individually and as the Executrix of the Estate
of Clement Novitsky, Deceased, Defendants.

3:17-CV-2376
|
Signed 03/01/2019

**Attorneys and Law Firms**

James A. Doherty, Jr., Scanlon, Howley & Doherty, P.C.,
Scranton, PA, Michael T. McDonnell, III, Kutak Rock,
LLP, Philadelphia, PA, Robert A. Jaffe, Kutak Rock LLP,
Washington, DC, for Plaintiff.

Michael H. Roth, Michael H. Roth, P.C., Timothy G.
Lenahan, Lenahan & Dempsey, Scranton, PA, for Defendants
Robyn Novitsky, Village Auto Sales, Inc.

Julia A. Farrugia, Stoll, Nussbaum & Polakov, Los Angeles,
CA, for Defendant Patricia Novitsky.

**MEMORANDUM OPINION**

Robert D. Mariani, United States District Judge

**I. INTRODUCTION**

*1 Plaintiff filed this declaratory judgment action seeking a
judicial determination of the amount of underinsured motorist
coverage available to any Defendant in the action. (Doc. 1.)
Five motions are pending before the Court in the above-
captioned action: a motion for summary judgment filed by
Defendants Robyn Novitsky and Village Auto Sales (Doc. 9);
a motion for summary judgment filed by Defendant Patricia
Novitsky (Doc. 44); cross-motions for summary judgment
(Docs. 17, 47) filed by Plaintiff in response to Defendants'
filings; and a motion to strike certain responses contained in
Plaintiff's responses to Defendants' statement of undisputed

facts filed by Defendants Robyn Novitsky and Village Auto
Sales (Doc. 29). Here the Court addresses Defendants' motion
to strike with which they assert that Plaintiff's responses to
paragraphs 15-18, 36, 51, 55-58, 60, 61, 63, 64, 71, and 74-80
should be stricken and those paragraphs should be deemed
admitted. (Doc. 29 at 5.)

**II. STANDARD OF REVIEW**

A district court has broad discretion in the application and
interpretation of its own local rules. *Weitzner v. Sanofi
Pasteur, Inc.*, 909 F.3d 604, 613 (3d Cir. 2018). *Weitzner*
noted that Local Rule 56.1 of the Local Rules of Court of
the Middle District of Pennsylvania " 'is essential to the
Court's resolution of a summary judgment motion' due to
its role in 'organizing the evidence, identifying undisputed
facts, and demonstrating precisely how each side proposed to
prove a disputed fact with admissible evidence.' " *Id.* (quoting
*Kramer v. Peerless Indem. Ins. Co.*, No. 3:CV-08-2096, 2010
WL 11553711, at *1 (M.D. Pa. Apr. 21, 2010) ) (citing
*Hartshorn v. Throop Borough*, No. CIV.A. 3:07-CV-01333,
2009 WL 761270, at *3 (M.D. Pa. Mar. 19, 2009) ) ("The
purpose of this rule is to structure a party's summary judgment
legal and factual theory into a format that permits and
facilitates the court's direct and accurate consideration of the
motion.") ). Local Rule 56.1 provides the following:

A motion for summary judgment filed pursuant to
Fed.R.Civ.P.56, shall be accompanied by a separate, short
and concise statement of the material facts, in numbered
paragraphs, as to which the moving party contends there is
no genuine issue to be tried.

The papers opposing a motion for summary judgment
shall include a separate, short and concise statement of the
material facts, responding to the numbered paragraphs set
forth in the statement required in the foregoing paragraph,
as to which it is contended that there exists a genuine issue
to be tried.

Statements of material facts in support of, or in opposition
to, a motion shall include references to the parts of the
record that support the statements.

All material facts set forth in the statement required to be
served by the moving party will be deemed to be admitted
unless controverted by the statement required to be served
by the opposing party.

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 73 of 102
Selective Insurance Company of America v. Novitsky, Not Reported in Fed. Supp. (2019)

2019 WL 1009389

M.D. Pa. L.R. 56.1.

Where a party's Rule 56.1 statement is not short, concise or limited to material facts, and would hinder rather than facilitate the court's consideration of the pending motion, the court need not accept the statement. *Hartshorn*, 2009 WL 761270, at *3. If a responding party fails to comply with Local Rule 56.1, such failure may be deemed an admission. *Ward v. Noonan*, 147 F. Supp. 3d 262, 271 (M.D. Pa. 2015). As the rule states, responsive statements which do not contradict the veracity of the statements of fact are to be deemed admitted. *See, e.g., Mercurio v. Louisville Ladder, Inc.*, No. 3:16-CV-412, 2018 WL 2465181, at *2 (M.D. Pa. May 31, 2018).

## III. ANALYSIS

### A. Facts Concerning Corporate Status

**\*2** Defendants argue that Plaintiff's responses to facts asserting that Selective Insurance Company of America and Selective Insurance Company of South Carolina are separate, distinct, and different corporations with their own corporate identities (paragraphs 15-18 and 74) should be stricken because Plaintiff earlier admitted these facts. (Doc. 30 at 1.) Plaintiff responds it has never disputed the two entities are separate companies but asserts it objects to the characterizations set out in the identified paragraphs. (Doc. 37 at 3-4.)

To the extent paragraph 15 specifically states that Selective Insurance Company of America and Selective Insurance Company of South Carolina "are separate corporations," Plaintiff is deemed to have admitted this fact. To the extent paragraphs 16-18 and 74 are repetitious and/or present additional characterizations of the corporate identities, the Court will not consider the statements to be undisputed statements of material facts.

### B. Fact that Plaintiff's Policy is First in Priority for UIM Coverage

Defendants assert that paragraph 36, wherein they state that the vehicle occupied by the decedents is "first in priority for underinsured motorist coverage pursuant to 75 Pa. C.S. § 1733" is undisputed in that Plaintiff did not dispute that the vehicle was covered under the policy. (Doc. 30 at 8.) Plaintiff responded to this paragraph with the following statement: "Selective objects to the legal conclusion contained in this

paragraph." (Doc. 20 ¶ 36.) Defendants do not dispute that the paragraph contains a legal conclusion but rather aver that it is an appropriate conclusion. (Doc. 30 at 8-9.) Because the statement of fact inappropriately contains legal conclusions, *see Dawn L. v. Greater Johnstown Sch. Dist.*, 614 F. Supp. 2d 555, 558 (W.D. Pa. 2008), the Court will not include paragraph 36 in its consideration of undisputed material facts.

### C. Facts Concerning the "Notice of Policy Transfer Into New Selective Affiliate"

Defendants state that paragraphs related to the July 2012 "Notice" (paragraphs 51, 55-58, 60, 61, 63, 64, 76, 77, and 80) must be deemed admitted because Plaintiff's responses do not address or refute the "material fact" stated in each of the paragraphs. (Doc. 30 at 9.) Plaintiff responds that Defendants mischaracterize its responses to certain facts and "Plaintiff unequivocally disputes that the July 2012 Notice announces a new policy between new and different parties." (Doc. 37 at 6.) The Court concludes the following:

- ¶ 51 is deemed admitted in that Defendants say Village Auto Sales, Inc., was no longer insured by Selective Insurance Company of South Carolina as of July 13, 2012, at 12:01 a.m. and Plaintiff says the policy expired at that time without controverting Defendants' statement;

- ¶ 55 is deemed admitted in that Defendants' statement that, pursuant to the July 2012 Notice, Village Auto Sales, Inc.'s, policy was "rewritten" through Plaintiff Selective Insurance Company of America as of July 13, 2012, at 12:01 a.m. mirrors the language contained in the Notice itself as set out in a previous statement of fact (Doc. 10 ¶ 49) which Plaintiff did not dispute (Doc. 20 ¶ 49);

- ¶ 56 is considered disputed in that Defendants statement therein that "Selective Insurance Company of America issued a policy of insurance" as of July 13, 2012, does not accurately reflect the language contained in the Notice as stated by Defendants in a previous fact, i.e., "This realignment will result in your coverage being reissued through the new Selective affiliate" (Doc. 10 ¶ 48);

**\*3** • ¶ 57 is deemed admitted in that Defendants' statement that Plaintiff Selective Insurance Company of America as of July 13, 2012, at 12:01 a.m., "offered" Village Auto Sales, Inc., a policy of insurance pursuant to the July 2012 Notice mirrors the language contained in the Notice itself as set out in a previous statement of fact

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 74 of 102

Selective Insurance Company of America v. Novitsky, Not Reported in Fed. Supp. (2019)

2019 WL 1009389

(Doc. 10 ¶ 49) which Plaintiff did not dispute (Doc. 20 ¶ 49);

- ¶ 58 is deemed admitted in that Defendants state the relevant policy was "delivered" to Village Auto Sales, Inc., and Plaintiff does not dispute delivery (Doc. 20 ¶ 58);

- ¶ 60 is deemed admitted for reasons similar to those identified regarding ¶ 51;

- ¶ 61 is deemed admitted in that Defendants' reference to "a new policy" is consistent with a statement previously admitted wherein the Notice is quoted regarding the "New Policy Effective Date" (Doc. 10 ¶ 47; Doc. 20 ¶ 47);

- ¶ 63 is deemed admitted pursuant to previous admissions cited above (see Doc. 10 ¶¶ 47-49; Doc. 20 ¶¶ 47-49);

- ¶ 64 is deemed admitted pursuant to previous admissions cited above (see Doc. 10 ¶¶ 47-49; Doc. 20 ¶¶ 47-49);

- ¶ 76 is deemed admitted as per ¶¶ 51 and 60;

- ¶ 77 is deemed admitted as per ¶ 64;

- ¶ 80 averments by Defendants are rejected as conclusions of law.

**D. Facts Concerning the UM/UIM Reduction Form**

Defendants identify four paragraphs which they assert should be deemed admitted—paragraphs 71, 75, 78, and 79. (Doc. 30 at 12.) Defendants maintain the paragraphs are appropriately deemed admitted because the material facts set out therein establish that when Selective Insurance Company of America offered the policy indicated in the Notice it did not obtain a written request from Village Auto Sales, Inc., regarding reduction of the underinsured motorist benefits to an amount equal to or less than the limits for bodily injury. (Id. at 12-13.) Plaintiff responds that "[w]hat Defendants fail to understand is that Plaintiff is responding that it obtained a UM/UIM reduction form, and, therefore, disputes the fact." (Doc. 37 at 8.) The Court makes the following determinations as to the paragraphs identified:

- ¶ 71 is deemed disputed not because Plaintiff points to evidence that it obtained a written request to reduce underinsured motorist coverage "when" it offered the policy of insurance as stated by Defendants (see Doc. 10 ¶ 7; Doc. 20 ¶ 71) but because Defendants state that

Selective Insurance Company of America "issued" the policy (Doc. 10 ¶ 71 (emphasis added) ) and the Court found pursuant to ¶ 56 that the word "issued" does not accurately reflect the language contained in the Notice;

- ¶ 75 is deemed disputed in that the wording used by Defendants in this paragraph is open to interpretation and Plaintiff directly responds that the forms executed pursuant to 75 Pa. C.S. § 1791.1 and § 1734 dated July 31, 2001, are fully applicable to the Selective policies issued from July 13, 2012, through at least May 24, 2017 (Doc. 10 ¶ 75; Doc. 20 ¶ 75);

- ¶¶ 78 and 79 are deemed disputed in that Defendants state in both paragraphs that Plaintiff failed to obtain the "required" writings (Doc. 10 ¶¶ 78, 79 (emphasis added) ) and Plaintiff avers that the required writings were obtained on July 31, 2001 (Doc. 20 ¶¶ 78, 79).

## IV. CONCLUSION

For the reasons discussed above, Defendants' Robyn Novitsky, Individually and as Executrix of the Estate of Kevin C. Novitsky, Deceased, and Village Auto Sales, Inc.'s Motion to Strike Plaintiffs Responses to Defendants' Statement of Undisputed Facts and Deem Facts Admitted (Doc. 29) will be granted in part and denied in part. The motion will be granted in that the following paragraphs are deemed admitted: ¶¶ 15, 51, 55, 57, 58, 60, 61, 63, 64, 76, 77. The motion will be denied in that the following paragraphs are deemed disputed or otherwise excluded from consideration in the Court's recitation of undisputed material facts when considering the pending summary judgment motions: ¶¶ 16, 17, 18, 36, 56, 71, 74, 75, 78, 79, 80. [1] An appropriate Order is filed simultaneously with this Memorandum.

[1]     Nothing in this Memorandum should be read to indicate that all statements of fact deemed admitted herein and in the parties' statements of facts will be included in the Court's recitation when considering the pending summary judgment motions and cross-motions as some facts may be found to be immaterial, repetitious, or otherwise not supported by the record. See, e.g., Dawn L. v. Greater Johnstown Sch. Dist., 614 F. Supp. 2d 555, 558 (W.D. Pa. 2008).

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 75 of 102

Selective Insurance Company of America v. Novitsky, Not Reported in Fed. Supp. (2019)
2019 WL 1009389

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1009389

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

H

Case 3:17-cv-00101-RDM Document 525-1 Filed 08/18/20 Page 77 of 102

2012 WL 315445
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Frank SHUMAN and Martha
Shuman, his wife, Plaintiffs
v.
REMTRON, INC., Defendant/Third–Party Plaintiff
v.
Friedman Electric Supply Company, a/k/
a Friedman Electric Supply Co., Inc., Third–
Party Defendant/Fourth–Party Plaintiff
v.
J.L. Souser & Associates, Inc.,
Fourth–Party Defendant.

Civil No. 4:09–CV–00003.
|
Feb. 1, 2012.

**Attorneys and Law Firms**

Matthew J. Zeigler, Zeigler Law Office, Williamsport, PA, for
Plaintiffs.

Lee R. Demosky, Thomas P. Pellis, Meyer Darragh Buckler
Bebenek & Eck PLLC, Greensburg, PA, for Defendant/
Third–Party Plaintiff.

Anthony F. Andrisano, Jacob M. Theis, Thomas G. Collins,
Buchanan Ingersoll & Rooney, PC, Harrisburg, PA, for
Third–Party Defendant/Fourth–Party Plaintiff.

Thomas J. Kelley, Thomas J. Kelley & Associates, Moosic,
PA, for Fourth–Party Defendant.

### *MEMORANDUM AND ORDER*

J. ANDREW SMYSER, United States Magistrate Judge.

**\*1** This is products liability action involving a remote
control system for cranes, and involving two cranes and
two remote control units. We conclude that the defendant is
not entitled to summary judgment on the plaintiff's claims.
But we conclude that the third-party defendant is entitled to
summary judgment on the defendant's claims of indemnity
and contribution and that, in turn, the fourth-party defendant

is entitled to summary judgment on the third-party defendant's
claims of indemnity and contribution.

I. Background and Procedural History.
The plaintiffs, Frank and Martha Shuman, commenced this
action by filing a complaint against Remtron, Inc. Plaintiff
Frank Shuman was injured in an accident involving a crane [1]
on January 10, 2007. The movement of the crane was
controlled by remote control units that were manufactured by
defendant Remtron. The plaintiff [2] alleges that the accident
occurred when he turned off the remote control unit [3] that he
was using and a coworker, Dale Weaver, intending to operate
a different crane [4], used a separate remote control unit [5] to
operate the Shuman crane. Weaver released the load of steel
that the plaintiff was working with, and the plaintiff was
seriously injured when steel fell against him.

[1]     For the sake of clarity, the crane that caused the
        injury to the plaintiff will be referred to in this
        Memorandum as the "Shuman crane."

[2]     References to the plaintiff in the singular are
        references to plaintiff Frank Shuman.

[3]     For the sake of clarity, this remote control unit will
        be referred to herein as the "Shuman remote."

[4]     For the sake of clarity, this crane will be referred to
        in this Memorandum as the "Weaver crane."

[5]     For the sake of clarity, this remote control unit will
        be referred to herein as the "Weaver remote."

The complaint contains four counts. Count One is a claim
based on strict liability. Count Two is a negligence claim.
Count Three is a failure-to-warn claim. And Count Four is a
loss of consortium claim by plaintiff Martha Shuman.

Defendant Remtron filed a third-party complaint against
Friedman Electric Supply Company seeking indemnity and
contribution. Friedman Electric in turn filed a fourth-party
complaint against J.L. Souser & Associates, Inc.

The parties consented to proceed before a magistrate judge in
accordance with 28 U.S.C. § 636(c). The case is scheduled
for a pretrial conference on March 15, 2012 and a jury trial
beginning on April 2, 2012.

2012 WL 315445, Prod.Liab.Rep. (CCH) P 18,773

There are three motions for summary judgment pending: a motion by defendant Remtron, a motion by third-party defendant Friedman Electric, and a motion by fourth-party defendant J.L. Souser.

II. Summary Judgment Standard.
Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c).

 *2 Summary judgment is not appropriate when there is a genuine dispute about a material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it will affect the outcome of the trial under governing law. *Id.* A dispute as to a material fact is " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249–50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter, but it is to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex, supra,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.' " *Anderson v. CONRAIL,* 297 F.3d 242, 247 (3d Cir.2002) (quoting *Celotex, supra,* 477 U.S. at 323).

III. Material Facts.
The following facts are not in dispute for purposes of the summary judgment motions.[6]

[6]    These facts are a combination of facts taken from the statements of undisputed facts filed by Remtron, Freidman Electric, and J.L. Souser. We have not included facts which any of the parties properly dispute in accordance with Local Rule 56.1. But we have included facts which, although a party purported to dispute, were not properly disputed in accordance with Local Rule 56.1. For example, where a party purports to deny or to dispute a fact but does not include a citation to the record that supports such a denial or dispute, we deem the fact undisputed.

At the time of the accident on January 10, 2007, the plaintiff was employed by Bouras Industries as a crane operator/stock chaser. *Doc. 69* at ¶ 12. Bouras had fifteen to seventeen cranes in its factory. *Doc. 72* at ¶ 30. The plaintiff had worked in the building that housed the cranes for 22 years. *Id.* at ¶ 28.

In the past, Bouras operated its overhead cranes by having its employees control the cranes from the cabs of the cranes. *Doc. 69* at ¶ 17. In 2005, Bouras decided to change over to

having the cranes operated by remote control. *Id.* at ¶ 18. To effectuate the changeover, in June of 2005 David Masser, the Maintenance Supervisor for Bouras, contacted Tom Spangler of Friedman Electric. *Id.* at ¶¶ 13 & 20.

**\*3** Spangler and Masser met at Bouras for approximately fifteen minutes to discuss the changeover from the cab-operated format to a remote control format. *Id.* at ¶ 22. Spangler brought the only Remtron catalog that he had to the meeting with Masser. *Id.* at ¶ 24. Masser reviewed the Remtron catalog, but the catalog did not contain a suitable remote control. *Id.* at ¶ 25–26. So Spangler contacted the local manufacturing representative of Remtron, Carson Heistand of J.L. Souser. *Id.* at ¶ 27.

Spangler, Masser, and Heistand met to discuss whether Remtron manufactured a noncatalog remote control that would satisfy the needs of Bouras. *Id.* at ¶ 28. Masser explained the specific needs of Bouras. *Id.* at ¶ 29. Heistand informed Masser of the Pitch and Catch option [7] and the First Come, First Serve option [8] available in the remotes manufactured by Remtron. *Id.* at ¶ 30. Spangler was not aware of these options offered by Remtron until Heistand explained the terms to Masser. *Id.* at ¶ 31.

[7] Under the Pitch and Catch option, one crane is operated by two operators. Heistand described the Pitch and Catch option as follows:

Pitch and catch is one crane—usually with a long runway there will be an operator at one end and an operator at the other end. The operator at one end will pitch the crane to the other second operator, and he will catch it. In other words, the first operator has control. He'll send the crane down to the second operator, and he'll press a button on his transmitter to access the control.

*Doc. 95–7* at 9–10 (Heistand Dep. at 29–30).

[8] Under the First Come, First Serve option, "[i]f you have two transmitters operating the same receiver, the first one that turns their transmitter on has control of the crane." *Doc. 95–7* at 9 (Heistand Dep. at 29).

Before he could determine which Remtron remote control, if any, would satisfy the needs of Bouras, Heistand had to obtain certain information, such as the number of cranes involved, the number of speeds, the number of motions, the number of

operators, and the voltage. *Id.* at ¶¶ 32–33. On May 17, 2005, Heistand and Masser spoke via telephone. *Id.* at ¶ 34. As a result of this telephone conversation, Heistand obtained all of the information he needed to "quote" the appropriate Remtron remote control for Bouras. *Id.* at ¶¶ 41 & 91. Based upon the information provided by Masser, it was clear to Heistand that Bouras wanted two separate remote controls each of which would have the capability of operating two separate cranes. *Id.* at ¶ 42.

After speaking with Masser, Heistand contacted Hal Boult from Remtron. *Id.* at ¶ 43. On May 24, 2005, Mr. Boult sent a facsimile to Heistand informing Heistand of the specific Remtron remote controls (21T20), the specific receivers (21R22) that should be purchased by Bouras, and the prices for those components. *Id.* at ¶¶ 45, 46 & 49. Boult included a "Configuration Sheet" that provided a picture of the 21T20 remote control as well as the specific configuration of the remote. *Id.* at ¶ 48.

Heistand then sent an email to Spangler informing him of the specific equipment Remtron recommended for Bouras. *Id.* at ¶ 53. That email explicitly informed Spangler of the specific remote controls and receivers that should be purchased, the prices of the components, and that the Pitch and Catch option would not work for Bouras but that the First Come, First Serve option would work. *Id.* at ¶¶ 53–56. Heistand believed that Spangler would simply order for Bouras the remote controls and receivers that he had identified in the email. *Id.* at ¶ 59.

On May 25, 2005, Heistand faxed to Spangler the "Configuration Sheet" that had been provided to him by Boult. *Id.* at ¶ 60. Later on May 25th, Spangler drafted a Quotation to Bouras. *Id.* at ¶ 61. The Quotation was based solely upon the information provided by Heistand in the May 24th email. *Id.* at ¶ 65. Spangler provided the Quotation to Masser, and Bouras agreed to purchase the equipment. *Id.* at ¶¶ 67–68. On June 24, 2005, Spangler prepared a Purchase Order for the equipment. *Id.* at ¶ 69.

**\*4** On June 28, 2005, Heistand sent Spangler a facsimile informing him that the purchase order needed to be revised because it overcharged Bouras for a spare remote. *Id.* at ¶ 72. Friedman Electric sent a revised purchase order to Remtron, but the revised purchase order ordered 21T18 remote controls instead of 21T20 remote controls. *Id.* at ¶ 73. As Friedman had ordered the wrong equipment, Heistand contacted Spangler and specified the proper equipment that had to be ordered for Bouras. *Id.* at ¶ 76. Specifically, on August 5, 2005, Heistand

sent Spangler a facsimile directing him to return the 21T18 remotes and order 21T20 remotes. *Id.* at ¶ 77. That facsimile also directed Spangler as to what options had to be ordered with the remotes, and it included a "Configuration Sheet" detailing the layout of the remotes. *Id.* at ¶¶ 78–79.

Friedman subsequently sent a new purchase order to Remtron ordering the exact equipment detailed in Heistand's August 5th facsimile. *Id.* at ¶ 80. That equipment was the same as Boult had originally recommended and that Heistand had identified in his May 24th email. *Id.*

Remtron performed the programming of the equipment purchased by Bouras. *Id.* at ¶ 86. Neither Spangler nor Friedman Electric programmed the equipment or performed any testing on the equipment. *Id.* at ¶¶ 87 & 89. Friedman Electric's internal policies prohibited Spangler from performing any services other than processing sales. *Id.* at ¶ 92. The only role of Spangler and Friedman Electric in the purchase of the remotes was to process the sale. *Id.* at ¶ 94.[9]

[9]  Remtron failed to respond to this statement of fact in Friedman Electric's Statement of Undisputed Material Facts. We note, however, that Remtron does argue in its brief that Friedman Electric did more than merely process the sale. We address that argument in the discussion section of this Memorandum and Order.

The remotes and receivers were installed by Bouras. *Id.* at ¶ 95. Each of the remote controls was able to operate either of two separate cranes. *Id.* at ¶ 100. There was a "CRANE SELECT" knob that allowed the user to select between crane 1 and crane 2. *Id.* When a remote control is turned on to a particular crane, a horn (alarm) would automatically sound, and, while the crane is moving, a whistle would also go off. *Id.* at ¶¶ 103–104. When the remote control is turned on to activate a crane, a red, blinking light would light on both the remote control and on the crane. *Id.* at ¶ 105. The purpose of the lights is to provide to the employee a signal indicating the crane that the employee is controlling. *Id.* at ¶ 106.

The First Come, First Serve option was included with the remotes to ensure that two separate remotes could not simultaneously operate the same overhead crane. *Id.* at ¶ 97. The First Come, First Serve option ensures that the first remote that is turned on will have control of the crane and that, as long as that remote control remains on, no other available remote control is able to also operate the same crane. *Id.* at ¶

98. Under the First Come, First Serve system, a remote control has exclusive control over the crane when the remote's power is on, but when that remote is turned off the second remote control can operate the crane. *Doc. 72* at ¶ 4. The First Come, First Serve option is a safety feature offered by Remtron. *Doc. 69* at ¶ 99. The First Come, First Serve option as well as the 21T20 remote and 21R22 receiver were offered for sale to the public by Remtron and were specifically referred to in Remtron's user manual. *Doc. 81* at ¶ 55.

**\*5** The plaintiff began working as a crane operator/stock chaser approximately seven months prior to the accident. *Doc. 69* at ¶ 108. Prior to the accident, he had been trained on how to operate the remote controls. *Id.* at ¶ 109. The plaintiff understood that the power to the remote control must be on to prevent the crane from being operated by another remote control. *Doc. 72* at ¶ 7. He understood that turning the remote control off would allow another operator to take control of the crane. *Id.* at ¶ 8.

The plaintiff's position required him to climb into storage bins to hook up bundles of steel and then cut the steel bands from the bundles. *Doc. 69* at ¶ 119. On the day of the accident, the plaintiff used the Shuman remote to move the Shuman crane to get a bundle of steel. *Id.* at ¶ 123. He then climbed into a storage bin and hooked up a bundle. *Id.* at ¶ 124. He lifted the bundle up halfway, put the Shuman remote down on the bundle, and started cutting the steel bands. *Id.* He turned the Shuman remote off. *Doc. 72* at ¶ 15.

At the time the plaintiff was in the storage bin cutting the bundles, his co-worker Dale Weaver was planning to activate the Weaver crane with the Weaver remote. *Doc. 69* at ¶ 126. Before pressing the start button on the Weaver remote, Weaver did not look at the "Select Crane" knob to confirm that he was controlling the Weaver crane. *Id.* at ¶ 128. The "Select Crane" knob was, although Weaver did not know it, set to control the Shuman crane. Weaver heard the whistle blow as soon as he hit the start button on the Weaver remote. *Id.* at ¶ 130. Shortly after hitting the start button, Weaver hit the bridge button on the Weaver remote, thereby inadvertently causing the Shuman crane bridge movement. *Id.* at ¶ 131. The Shuman crane bridge movement caused the release of the bundle of steel that the plaintiff was cutting in the storage bin, pinning the plaintiff against a ladder. *Id.* at ¶ 133.

As a function of the design of the remote controls, if the plaintiff had kept the Shuman remote turned on, Weaver

would have been prevented from connecting to the Shuman crane. *Id.* at ¶ 143.

## IV. Discussion.

### A. Remtron's Motion for Summary Judgment.

Defendant Remtron contends that it is entitled to summary judgment as to the plaintiff's strict liability and negligence claims because, it contends, the record establishes that reckless conduct of the plaintiff was the proximate cause of the accident.

Defendant Remtron contends that the plaintiff acted recklessly in turning off the power to his remote. At his deposition, the plaintiff initially testified that the power to his remote was on the entire time on the day of the accident. *Doc. 95–4* at 62 (Shuman Dep. at 61). After conferring with his counsel and reviewing the allegations in the complaint, however, he testified that he doesn't know whether he turned off his remote. *Doc. 95–4* at 102–104 (Shuman Dep. at 101– 103). He then testified that if he had turned off his remote, he would have done so to ensure that the Shuman crane would not move. *Doc. 95–4* at 105 (Shuman Dep. at 104). Plaintiff's expert opines that "[i]t was reasonable and predictable that an operator would turn off the transmitter to prevent unintended actuation of the switches when handling or dropping the transmitter." *Doc. 95–9* at 22 (Eckstine Report at 21). There is evidence that a supervisor told the plaintiff to turn off the remote when entering the bins. *Doc. 95–1* at 89–92 & 104– 106 (Porter Dep. at 88–91 & 103–105). It is for the trier of fact to determine whether the plaintiff's conduct in turning off his remote was reckless.

**\*6** Defendant Remtron also suggests that the plaintiff acted recklessly by raising the bundles too high and by performing the cutting of the bands in the bin rather than in an open area contrary to the policies of his employer. The defendant cites evidence that the plaintiff was told on a number of occasions, including on the morning of the accident, to cut the bands in an open area instead of in the bins. *See Doc. 95–1* at 74–75 & 80 (Porter Dep. at 73–74 & 79). But there was no official policy on how to cut the bands. *See Doc. 95–1* at 75–76 (Porter Dep. at 74–75). There is evidence that the rules and procedures were not clear. *See Doc. 95–1* at 81 (Porter Dep. at 80); *Doc. 95–2* at 134 (Robenolt Dep. at 133); *Doc. 95–4* at 80 (Shuman Dep. at 79). It is for the trier of fact to determine whether the plaintiff's conduct was reckless.

Defendant Remtron contends that it is entitled to summary judgment on the plaintiff's failure-to-warn claim because the record establishes that a lack of warnings was not the proximate cause of the accident. It contends that the plaintiff was aware of the danger of turning off his remote, of the danger of the cutting of the bands inside the bin, and of the danger of lifting the load too high. It contends that there is insufficient evidence that additional warnings would have made any difference. As set forth above, there is evidence that the safety policies and procedures were unclear. Given the lack of clarity, we cannot say as a matter of law that a proper warning would not have made a difference. Also, regardless of whether warnings would have changed the plaintiff's behavior, there is evidence that a warning on the remote control unit telling the operator to be certain that the remote is set to the proper crane would have changed the behavior of Dale Weaver. He testified that he would have obeyed such a warning. *Doc. 95–3* at 53–54 (Weaver Dep. at 52–53). The proposition that warnings would not have made a difference is not free from genuine dispute.

Defendant Remtron also contends that it is entitled to summary judgment on the failure-to-warn claim based on the sophisticated user doctrine. Defendant Remtron contends that Bouras was a sophisticated user of cranes and remote controls and that it was in the best position to warn its employees of dangers.

Remtron contends that, because Bouras had 15 to 17 cranes in its factory and had purchased ten remote crane operating systems from Friedman Electric and had experience using Remtron remotes, it may reasonably be inferred that Bouras understands the use of cranes and Remtron remote controls and that cranes are critical to the everyday operations of its business. Remtron also asserts that the plaintiff had twenty- two years of experience working in the building that housed the cranes, that he had performed the job of crane operator for seven months, and that he had received training on the use of a crane.

All of that may be true, but there is evidence that the remote control system at issue in this case which allowed two cranes to be operated by either of two different remotes was the first such system installed by Bouras. Thus, we cannot say as a matter of law that Bouras was a sophisticated user of such a system. Neither can it be said that the plaintiff was a sophisticated user of such a system. Thus, defendant Remtron is not entitled to summary judgment on the basis of the sophisticated user doctrine.

**\*7** Based on the foregoing, we will deny defendant Remtron's motion for summary judgment.

B. Friedman Electric's Motion for Summary Judgment. Third-party defendant Friedman Electric points out that the plaintiff has not brought suit against it and that the only claims against it are the indemnification and contribution claims of Remtron. It contends that Remtron cannot prevail on its indemnification and contribution claims.

Under Pennsylvania products liability law, "all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect." *Burch v. Sears, Roebuck & Co.,* 320 Pa.Super. 444, 467 A.2d 615, 621 (Pa.Super.Ct.1983). "This rule of law ensures the availability of compensation to the injured party, and helps placed the burden of such injury on parties who, unlike the consumer, have a better opportunity to control the defect or spread its costs through pricing." *Id.* But "[t]o further achieve these policies and to do justice among the potential defendants, Pennsylvania permits the remedies of indemnity and contribution so that as among those in the chain of distribution liability may ultimately rest with, or be shared equally among, those who can best detect, control, or prevent the defect." *Id.* at 621–22 (footnote omitted).

Under Pennsylvania law, contribution applies when the parties are joint tortfeasors. *Kirschbaum v. WRGSB Assocs.,* 243 F.3d 145, 156 (3d Cir.2001). "[J]oint tortfeasors are entitled to contribution if they have paid more than their pro rata share of a common liability." *Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 24 (3d Cir.1986). Joint tortfeasors are "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322. "Under Pennsylvania law, two actors are joint tortfeasors if their conduct 'causes a single harm which cannot be apportioned ... even though [the actors] may have acted independently.' " *Rabatin, supra,* 790 F.2d at 25 (quoting *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d 1249, 1251 (Pa.Super.Ct.1984)). Contribution "is an equitable right based on a common liability to the plaintiff.' " *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454, 461 (Pa.1992) (quoting *John W. Brown, Jr. Equipment Rental Corp. v. Dickey,* 397 Pa. 454, 155 A.2d 836, 838 (Pa.1959)). Contribution "is not a recovery for the tort, but rather it is

the enforcement of an equitable duty to share liability for the wrong done by both [tortfeasors]." *Swartz v. Sunderland,* 403 Pa. 222, 169 A.2d 289, 290 (Pa.1961).

"Indemnification is 'a fault shifting mechanism.' " *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 174 (3d Cir.2008) (quoting *Sirianni v. Nugent Bros., Inc.,* 509 Pa. 564, 506 A.2d 868, 871 (Pa.1986)). Indemnity " 'shifts the entire loss from one tortfeasor who has been compelled to pay it to the shoulders of another who should bear it instead.' " *Walton, supra,* 610 A.2d at 460(quoting W. Prosser, *Law of Torts* at 310 (4th ed.1979)). The common law "right of indemnification arises when there is a 'difference between the primary and the secondary liability of two persons each of whom is made responsible by the aw to an injured party.' " *Kirschbaum, supra,* 243 F.3d at 156 ting *Builders Supply Co. v. McCabe,* 366 Pa. 322, 77 A.2d 368, 370 (Pa.1951)). "It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." *Builders Supply Co. v. McCabe,* 366 Pa. 322, 77 A.2d 368, 370 (Pa.1951). "[S]econdary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible." *Id.*

**\*8** Remtron contends that its claims for contribution and indemnity are contingent on the outcome of the plaintiff's claims against it and as such those claims will not accrue until the question of liability is resolved. Federal Rule of Civil Procedure 14(a)(1) allows a defendant/third-party plaintiff to file a complaint against an entity "who is or may be liable to it for all or part of the claim against it." There is nothing in the Rules that precludes the court from ruling on summary judgment, assuming that there is no genuine factual dispute, that the third-party defendant is not as a matter of law liable to the third-party plaintiff.

Friedman Electric also contends that Remtron cannot prevail on its indemnification and contribution claims because Remtron designed and manufactured the remotes while Friedman Electric merely processed the sale. It contends that since Remtron (in conjunction with its factory representative J.L. Souser) designed, selected, and manufactured the remotes Remtron is primarily liable for any harm to the

plaintiff. On the other hand, Friedman Electric contends that since it was merely a member of the chain of distribution it could at most only be secondarily liable for any harm to the plaintiff. Thus, it contends, because indemnity is only available from those who are primarily liable to those who are merely secondarily liable, Remtron is not entitled to indemnity from Friedman Electric but rather Friedman Electric would be entitled to indemnity from Remtron. It continues that, because an entity which has a right of indemnity against another entity is not subject to liability for contribution to that person, Remtron is also not entitled to contribution from it.

Remtron contends that questions as to material factual issues exist regarding Friedman's involvement in the project. The undisputed material facts are set forth above. Although Friedman Electric was the initial contact for the sale and facilitated the sale, it was Remtron and J.L. Souser which selected, designed, and manufactured the remotes.

The undisputed facts as set forth by the parties in their Local Rule 56.1 statements and responses are that the remotes and receivers were installed by Bouras and that the internal policies of Friedman Electric prohibited its employee, Tom Spangler, from performing any services other than processing sales. *Doc. 69* at ¶¶ 92 & 95. Remtron points to testimony that Friedman may have been involved in the installation of the remotes. It points to the following testimony of David Masser:

Q: Were you involved in the installation process?

A: My maintenance people were, yes.

Q: Did any outside contractors oversee the installation?

A. I'm not sure, but I think that I had Tom Spangler in, yes.

*Doc. 95–5* at 14–15 (Masser Dep. at 13–14). It also points to the following testimony of Edward Robenolt:

Q: ... [W]ere you involved in actually installing the remote controls on the raw stock cranes?

**\*9** A: No.

Q: Do you know who did that?

A: I thought it was Friedman Electric.

*Doc. 95–2* at 22 (Robenolt Dep. at 21).

It is not clear that Robenolt's testimony is based on personal knowledge, and Masser's testimony is equivocal. In the face of undisputed facts that the remotes and receivers were installed by Bouras and that Friedman Electric's internal policies prohibited Spangler from performing any services other than processing sales, the equivocal testimony cited by Remtron is not sufficient to create a genuine factual dispute. Moreover, Remtron has not argued that it is entitled to indemnity or contribution because the installation was somehow defective or contributed to the accident.

Although Friedman was the initial contact for the sale and facilitated the sale, it not in genuine dispute that it was Remtron and J.L. Souser who selected, designed, and manufactured the remotes. Accordingly, we conclude that if Remtron were held liable to the plaintiff it would not be entitled to indemnity or contribution from Friedman Electric. Accordingly, we will grant Friedman Electric's motion for summary judgment as to Remtron's indemnity and contribution claims. [10]

[10]  Friedman Electric argues that it is entitled to summary judgment because the plaintiffs cannot prevail on their claims against defendant Remtron. Because we will grant summary judgment to Friedman Electric on the basis that it cannot be liable to Remtron for indemnity and contribution, we need not consider Friedman Electric's other arguments in support of summary judgment. We note, however, that defendant Remtron indicates in its brief in opposition to Friedman Electric's motion that it joins in those arguments. One of those arguments is that the remotes were not unreasonably dangerous and that the court must make that determination as a matter of law. It cites to *Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 391 A.2d 1020, 1026 (Pa.1978). *Azzarello* was decided under Section 402A of the Restatement (Second) of Torts. The United States Court of Appeals of the Third Circuit, however, has recently predicted that Pennsylvania will adopt the Restatement (Third) of Torts §§ 1–2 to replace Section 402A of the Restatement (Second) of Torts. *Covell v. Bell Sports, Inc.,* 651 F.3d 357 (3d Cir.2011). Unless or until the Pennsylvania Supreme Court either rejects the Restatement (Third) or indicates that it will continue to adhere to Section 402A of the Restatement (Second), we are bound by *Covell*. Since *Azzarello* is based

2012 WL 315445, Prod.Liab.Rep. (CCH) P 18,773

on 402A of the Restatement (Second) of Torts but under *Covell* we must apply the Restatement (Third), it is not clear that it is still appropriate for the court to make the determination as a matter of law whether the remote control system was unreasonably dangerous. Assuming that it were still appropriate, after considering the facts in the light most favorable to the plaintiff and balancing the relevant factors, *see Moyer v. United Dominion Industries, Inc.,* 473 F.3d 532, 538 (3d Cir.2007), we would likely conclude that the remote control system was unreasonably dangerous.

C. J.L. Souser's Motion for Summary Judgment.

Because we will grant summary judgment in favor of Friedman Electric on Remtron's indemnity and contribution claims, Friedman Electric's claims for indemnity and

contribution against J.L. Souser are moot. So, we will grant J.L. Souser's motion for summary judgment.

V. Order.

**IT IS ORDERED** that Remtron's motion (doc. 67) for summary judgment is **DENIED,** that Friedman Electric's motion (doc. 68) for summary judgment is **GRANTED,** and that J.L. Souser's motion (doc. 74) for summary judgment is **GRANTED.** The Clerk of Court shall not enter judgment in favor of Friedman Electric and J.L. Souser until the conclusion of the case as to all parties.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 315445, Prod.Liab.Rep. (CCH) P 18,773

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

I

2018 WL 806469
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

The UNITED STATES of America, Plaintiff

v.

Robert A. POLSHENSKI, et al., Defendants

CIVIL ACTION NO. 3:16-CV-2515
|
Signed 02/09/2018

**Attorneys and Law Firms**

Thomas I. Puleo, KML Law Group, P.C., Philadelphia, PA, for Plaintiff.

Robert A. Polashenski, Freeland, PA, pro se.

Kathleen Polashenski, Freeland, PA, pro se.

### MEMORANDUM

KAROLINE MEHALCHICK, United States Magistrate Judge

**\*1** Before the Court is a motion for summary judgment filed by the plaintiff in this matter, the United States of America. The motion (Doc. 15), together with a brief in support (Doc. 16), and an affidavit in support, with exhibits (Doc. 17). No brief in opposition has been filed in this matter, despite the Court extending the deadline for filing the same. (Doc. 18). Accordingly, this motion is ripe for disposition. For the following reasons, the Court will grant the motion for summary judgment.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On December 23, 2016, Plaintiff, the United States of America, on behalf of its agency, the United States Department of Agriculture, Rural Housing Service, instituted this action to foreclose a certain real property mortgage held by Defendants, Robert A. Polashenski and Kathleen Polashenski. (Doc. 1). Defendants filed an Answer and Defenses on February 27, 2017. (Doc. 5). The parties consented to the jurisdiction of the undersigned magistrate judge on April 20, 2017. (Doc. 10; Doc. 11). Following the issuance of a case management order (Doc. 14) and a

brief period of discovery, Plaintiff filed the instant motion for summary judgment, together with brief in support and affidavit and exhibits in support of the motion.

The undisputed facts in the record before this Court are as follows. [1] On September 15, 1986, Defendants entered into a mortgage with Plaintiff for a property located at 1147 Ridge Street, Freeland, Pennsylvania. (Doc. 17-1, at 1). The mortgage was given as security for payment of a Promissory Note in the amount of $35,090.00. (Doc. 17-1, at 5). On September 15, 1999, the Promissory Note was reamortized for the second time in the amount of $42,147.26. (Doc. 17-1, at 14). Defendants have not made any payments to bring the Mortgage current since January 15, 2014. (Doc. 17, at ¶¶ 9-10). On December 8, 2014, Plaintiff mailed Defendants a "Notice of Acceleration of Your Mortgage Loan(s); Demand for Payment of That Debt; Notice of Right to Cure Your Delinquency; Notice of Intent to Foreclose and Notice of Your Opportunity to Have A Hearing Concerning This Action" to Defendants' last known address. (Doc. 17-1, at 16). As of the date of the filing of the instant motion for summary judgment, the amounts due and owing on the mortgage totaled $33,514.98. (Doc. 17, at ¶ 16).

[1]

> To comply with Local Rule 56.1, a nonmovant should (1) clearly and unequivocally admit or deny whether each fact contained in movant's statement of facts is undisputed and/or material, (2) set forth the basis for any denial if any fact is not admitted in its entirety, and (3) provide a citation to the record that supports any such denial. *Occhipinti v. Bauer*, No. 3:13-CV-1875, 2016 WL 5844327, at \*3 (M.D. Pa. Sept. 30, 2016) (emphasis added); *Park v. Veasie*, 2011 WL 1831708, \*4 (M.D. Pa. 2011). Material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. Defendants have not filed any papers in opposition to the Plaintiff's motion for summary judgment; as such, the Court deems the statements of fact submitted by Plaintiff to be admitted.

### II. LEGAL STANDARD

**\*2** Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-00101-RDM Document 525-1 Filed 08/18/20 Page 87 of 102

United States v. Polshenski, Not Reported in Fed. Supp. (2018)

2018 WL 806469

case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Fed. R. Civ. P. 56(c)*; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *see also Thomas v. Delaware State Univ.*, 626 Fed.Appx. 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary

judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony ... amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

## III. DISCUSSION

Plaintiff has moved for summary judgment, submitting that it is entitled to judgment as a matter of law in this matter where the undisputed material facts reveal that the Defendants defaulted on repayment of a promissory note secured by a mortgage pursuant to the provisions of Title V of the Housing Act of 1949, as amended 42 U.S.C. § 1471, *et seq.*

" 'In a mortgage foreclosure action, the plaintiff must show the existence of an obligation secured by a mortgage, and a default of that obligation.' " *United States v. Werner*, 2015 WL 1014041, *4 (M.D. Pa. 2015) (*quoting Chemical Bank v. Dippolito*, 897 F.Supp. 221, 224 (E.D. Pa. 1995)). " 'The entry of summary judgment is proper if the mortgagors admit that the mortgage is in default, that they have failed to pay interest on the obligation, and that the recorded mortgage is in the specified amount.' " *Wilson v. Parisi*, 549 F.Supp.2d 637, 655 (M.D. Pa. 2008) (*quoting Landau v. W. Pa. Nat'l Bank*, 445 Pa. 217, 282 A.2d 335 (Pa. 1971)); *see Werner*, 2015 WL 1014041 (*quoting Wilson*, 549 F.Supp.2d at 655).

**\*3** As recited above, the undisputed evidence before the Court establishes that on September 15, 1986, Defendants entered into a mortgage with Plaintiff for a property located at 1147 Ridge Street, Freeland, Pennsylvania, which was given as security for payment of a Promissory Note in the amount of $35,090.00. (Doc. 17-1, at 1, 5). The record also establishes that on September 15, 1999, the Promissory Note was reamortized for the second time in the amount of $42,147.26. (Doc. 17-1, at 14). The undisputed record also establishes that Defendants are in default of their obligations by failing to make payments when due, that Defendants have not made any payments to bring the Mortgage current since January 15, 2014, that Defendants received notice of acceleration and intent to foreclose, and finally, that Defendants have not cured the default. As of the date of the filing of the instant motion for summary judgment, the amounts due and owing on the mortgage totaled $33,514.98. (Doc. 17, at ¶¶ 9-10, 16; Doc. 17-1, at 16).

Defendants' answer to the complaint (Doc. 5) contains denials or assertions that they lack knowledge about the claims made in the complaint. Defendants admit that they executed the

Case 3:17-cv-00101-RDM  Document 525-1  Filed 08/18/20  Page 88 of 102

**United States v. Polshenski, Not Reported in Fed. Supp. (2018)**

2018 WL 806469

promissory note and the mortgage, and to the legal description of the property secured by the mortgage. (Doc. 5). Defendants deny that Plaintiff is the holder of the mortgage on the basis that they lack knowledge. They also deny that they are in default, stating that they sought an audit and transactional report to determine the nature of the alleged default and the amounts due and owing as alleged in the complaint. (Doc. 5, ¶¶ 9-11).However, the payment history and the amounts due and owing are established in the undisputed evidence before this Court (Doc. 17), and a non-moving party may not rest simply on the allegations in the pleadings to defeat a motion for summary judgment. *Belnick, Inc. v. TBB Glob. Logistics, Inc.*, 106 F.Supp.3d 551, 558 (M.D. Pa. 2015); *Berckeley Inv. Group. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Defendants also assert a number of affirmative defenses (Doc. 5), including that Plaintiff has failed to state a claim, failed to join indispensable parties, waiver and estoppel, statute of limitations, failure to mitigate damages, and failure to act in good faith. Defendant has failed to advance any of these affirmative defenses outside of her answer, and has not submitted any evidence that would create a genuine issue of material fact regarding the default of her obligation. Again, "mere assertions set out in a pleading are insufficient to defeat summary judgment." *Werner*, 2015 U.S. Dist. LEXIS 28290 at *13, 2015 WL 1014041 at *6 (*citing Bhatla v. U.S. Capital Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)).

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the undisputed material facts in the record establish that Plaintiff is entitled to summary judgment. As such, Plaintiff's motion will be granted, and judgment will be entered in favor of Plaintiff and against the Defendants.

An appropriate Order follows.

## All Citations

Not Reported in Fed. Supp., 2018 WL 806469

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

J

2017 WL 3894888
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Ari WEITZNER and Ari Weitzner, M.D.,
P.C., Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,

v.

SANOFI PASTEUR, INC., formerly known as
Aventis Pasteur Inc., and Vaxserve, Inc., formerly
known as Vaccess America, Inc., Defendants.

CIVIL ACTION NO. 3:11-CV-02198
|
Signed 09/06/2017

**Attorneys and Law Firms**

Daniel A. Osborn, Osborn Law PC, New York, NY, P.
Timothy Kelly, Mattise & Kelly PC, Scranton, PA, Todd C.
Bank, Law Office of Todd C. Bank, Kew Gardens, NY, for
Plaintiffs.

Carl J. Greco, Jennifer Menichini, Greco Law Associates,
P.C., Scranton, PA, for Defendants.

**MEMORANDUM**

A. Richard Caputo, United States District Judge

**\*1** This case concerns a number of facsimiles that were
allegedly sent from Defendants to Plaintiffs in violation of the
Telephone Consumer Protection Act of 1991 ("TCPA"), 47
U.S.C. § 227(b)(1)(C).

Presently before the Court is: (1) a Motion to Strike
the November 29, 2016 Declaration of Ari Weitzer, M.D
("Third Weitzner Declaration") filed by Defendants Sanofi
Pasteur, Inc., and Vaxserve, Inc. (collectively "Defendants");
(2) a Motion to Strike Plaintiffs' Answer to Defendants'
Statement of Facts filed by Defendants; (3) a Motion for
Summary Judgment filed by Defendants; and (4) a Motion
for Class Certification filed by Plaintiffs Ari Weitzner and
Ari Weitzner, M.D., P.C. (collectively "Plaintiffs"). Because
the Third Weitzner Declaration is not a sham affidavit
and the information it contains is capable of admission at
trial, the Motion to Strike the Third Weitzner Declaration
will be denied. The Motion to Strike Plaintiffs' Answer to

Defendants' Statement of Facts, however, will be granted
in part as Plaintiffs' failed to comply with the Local Rules.
Defendants' Motion for Summary Judgment will be granted
in its entirety because *American Pipe* tolling does not apply
to shield those who initiated a prior action and subsequently
assert the same facts and claims in a new action. Because
Defendants' Motion for Summary Judgment will be granted,
Plaintiffs' Motion for Class Certification will be moot.

**I. Factual Background**

**A. The Parties**

*1. Plaintiffs:*
Plaintiff Ari Weitzner, M.D. ("Dr. Weitzner"), is an
ophthalmologist who previously maintained his office in
Brooklyn, New York. (Doc. 1, ¶ 6). Dr. Weitzner is currently
employed as an employee of Union Square Eye Care. (Doc.
106, ¶ 8). Previously, Dr. Weitzner practiced though his own
professional corporation, Ari Weitzner, M.D., P.C. (Doc. 116,
¶ 2).

Ari Weitzner, M.D., P.C. ("P.C."), is also a Plaintiff in the
instant case. (Doc. 1, ¶ 7). The P.C. is a New York corporation
that maintains an "active" status with the New York Secretary
of State. (Doc. 116, Ex. A). While the P.C. remains active
on paper, it is undisputed that the P.C. has closed; it has no
assets, and no employees. (Doc. 106, ¶¶ 7, 44-46). Notably,
Dr. Weitzner is the sole shareholder of the P.C. (Doc. 106, ¶ 6).

*2. Defendants:*
Defendant Sanofi Pastuer, Inc. ("Sanofi") is a Delaware
corporation that manufactures vaccines. (Doc. 106, ¶ 1).
Defendant VaxServe, Inc. ("VaxServe") is a pharmaceutical
distribution company based in Pennsylvania. (Doc. 106, ¶
2). VaxServe is a wholly owned subsidiary of Sanofi, with a
separate board of directors, business records, employees, and
principal place of business. (Doc. 106, ¶ 3).

**B. Conduct at Issue:**
Beginning on or prior to April 21, 2004, Plaintiffs allege
that Defendants were engaged in a nationwide fax-advertising
campaign in order to promote the sale of commercial
products. (Doc 1, ¶¶ 10-11, 17).

On April 21, 2004, Plaintiffs received a fax advertisement
("First Fax") via the fax machine at the offices of the P.C.

(Doc. 106, at 23, 26). The First Fax offered discounts on pharmaceutical goods by various manufacturers. (Doc. 87, Ex. A). The fax denoted "VaxServe" in the upper right-hand corner. (Doc. 87, Ex. A). The fax does not indicate that it was sent by any party other than VaxServe. (Doc. 87, Ex. A; Doc. 106, at 25). Plaintiffs claim [1] to have received a second fax, also marked with the "VaxServe" stamp, on March 22, 2005 ("Second Fax"). (Doc. 116, at ¶ 7, Ex. C). The parties dispute who received the First and Second Fax. But, it has been admitted that the fax machine and number that received both faxes were registered to Dr. Walter Weitzner (Doc. 106, 27-29).

[1]    While this suit has been ongoing since November 28, 2011, Plaintiffs have mentioned the existence of the Second Fax for the first time in their Brief in Opposition to Defendants' motion for Summary Judgment.

*2  VaxServe admits to sending a number of advertisements during the time alleged by Plaintiffs; sending such advertisements were part of the company's business. (Doc. 106, ¶¶ 68-69). The decision regarding what products to include on any given advertisement was made internally at VaxServe. (Doc. 106, ¶ 68). In fact, none of the manufacturers, including Defendant Sanofi Pasteur, paid to include their products on the advertisements that were subsequently faxed. (Doc. 106, ¶ 69). In the instant matter, neither Plaintiffs nor Defendants are aware of how VaxServe came to possess the number for the fax machine in Dr. Weitzner's office. (Doc. 106, ¶¶ 70-73).

It was Dr. Weitzner's practice to collect unsolicited faxes received at his office and send them to Attorney Todd Bank, one of Plaintiffs' attorneys, once a week. (Doc. 106, ¶ 20). After reviewing the faxes that were passed to him by Dr. Weitzner, Attorney Bank would file charges against the company responsible for the unsolicited faxes. (Doc. 106, ¶ 21).[2]

[2]    Dr. Weitzner has filed at least 17 similar actions alleging violations of the TCPA. (Doc. 106, ¶ 33).

## C. The Complaint:

On November 26, 2011 Plaintiffs' filed this putative class action in this Court, alleging a violation of the TCPA. The class that Plaintiffs allege to represent has shifted a number of times over the course of this litigation. First, the Complaint defined the putative class as:

> [A]ll persons or entities (I) whose fax numbers were licensed, rented, or purchased by Defendants VaxServe or Sanofi from List Strategies, Inc.; (ii) whose fax numbers did not exist in Defendants' database on the date of Defendants' receipt thereof from List Strategies, Inc.; and (iii) who received an unsolicited fax advertisement transmitted to them on behalf of Defendants by VisionLab, Inc., Westfax, Inc., or Velofax LLP between February 14, 2005 and the date of the resolution of this lawsuit.

(Doc. 106, ¶ 15). But, in Plaintiffs' Memorandum in Support of their Motion for Class Certification, Plaintiffs identify the putative class as:

> [A]ll persons or entities to whom VisionLab, Inc., WestFax, Inc. or Velofax LLP sent facsimiles on behalf of Defendants between February 14, 2005 and the date of the resolution of this lawsuit for whom Defendants' only source of the name of the recipient was a list that had been provided to Defendants by List Strategies, Inc.

(Doc. 106, ¶ 16). Yet another change in the definition of the class is evident in Dr. Weitzner's Declaration in Support of the Motion for Class Certification. There, Plaintiffs defined the putative class as:

> [A]ll persons or entities that, between February 14, 2005, and the date of the resolution of this lawsuit, received faxes that were sent to them solely as a result of their fax numbers having

Case 3:17-cv-00101-RDM Document 525-1 Filed 08/18/20 Page 92 of 102

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

been provided to the defendants by a company called List Strategies, Inc.

(Doc. 106 ¶ 17). Lastly, in the Third Weitzner Declaration and Plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike, Plaintiffs make a final revision and define the class as beginning on February 14, 2001 and ending at the resolution of this action. (Doc. 152, at 19).

## II. Procedural Background

### A. The State Court Action:

Litigation remains pending in the Lackawanna County Court of Common Pleas involving Dr. Weitzner and the same Defendants for an alleged TCPA violation stemming from the same April 21, 2004 fax. (Doc. 106, ¶ 32). Dr. Weitzner commenced the state-court action with the filing of a class action complaint on February 14, 2005, seeking to represent a class of persons who received unsolicited fax advertisements from Defendants. The class identified in the state-court action was defined as: "[Dr. Weitzner] and all other individuals who received an unsolicited fax advertisement from Defendants between January 2, 2001 and the date of the resolution of this lawsuit." (Doc. 106, ¶ 31). Notably, the P.C. was neither a named-plaintiff nor identified as a putative class member in the state-court action. (Doc. 106 ¶¶ 34-36).

**\*3** On June 27, 2008, Judge Minora [3] issued an opinion and order ruling on Defendants' motion for summary judgment and Dr. Weitzner's motion to amend the complaint's class definition. (Doc. 106, ¶ 50). The opinion concluded that a class could include only Pennsylvania-resident fax recipients, rather than the proposed nationwide class, and held that Dr. Weitzner was not a proper representative plaintiff for class action purposes. (Doc. 106, ¶ 50). Additionally, Judge Minora found that Dr. Weitzner presented unique questions of fact that would not be common to the class. (Doc. 106, ¶ 52). Judge Minora permitted Dr. Weitzner to proceed on his individual TCPA claim, but found that a two-year statute of limitations applied to the TCPA claims under Pennsylvania law, and thus limited Dr. Weitzner's claims to faxes he received within two years of the date on which the complaint was filed. (Doc. 106, ¶ 50).

[3]

Judge Carmen D. Minora served as the presiding judge in *Weitzner v. Sanofi Pasteur, Inc.* in the Court of Common Pleas of Lackawanna County.

On July 25, 2008, Dr. Weitzner filed a notice of appeal from the state court's June 27, 2008 order. On June 3, 2009, the Superior Court concluded that the appeal was interlocutory and premature, and therefore quashed the appeal. The Superior Court noted that no motion for class certification was ever filed or decided by the Court of Common Pleas.

### B. The Federal Action:

Plaintiffs commenced this action on November 26, 2011. (Doc. 1). On February 6, 2012, Defendants filed their Motion for Abstention, or in the alternative, to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, to Stay Proceedings. (Doc. 20). On May 14, 2012, this Court denied Defendants' Motion, specifically noting that it was not clear from the face of the complaint that the statute of limitations barred the current action, and thus it was not appropriate to dismiss at that time. (Doc. 37). The Court also declined to address the applicability, if any, of *American Pipe* tolling at that time. (Doc. 37, at 15).

On November 12, 2013, Defendants filed their Answers and Affirmative Defenses to Plaintiffs' Complaint. (Doc., at 57, 58). Just three days later, on November 15, 2013, Defendants served Offers of Judgment pursuant to Federal Rule of Civil Procedure 68 upon Plaintiffs; offering for judgment to be entered against Defendants for the maximum statutory relief available to Plaintiffs. (Doc. 60-1, at 1-2). Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) on December 4, 2013. (Doc. 59). This Motion was denied by this Court by Order and Opinion dated March 12, 2014. (Doc. 68). The Third Circuit affirmed on April 6, 2016.

Plaintiffs' filed the instant Motion for Class Certification on June 28, 2016. (Doc. 86). Defendants filed the instant Motion for Summary Judgment on October 17, 2016. (Doc. 104). Pursuant to the Local Rule of the Middle District of Pennsylvania, Defendants filed a Statement of Facts detailing the material facts at issue in the litigation. Plaintiffs filed their Answer to Defendants' Statement of Facts on November 29, 2016. (Doc. 118). Defendants have also filed two Motions to Strike: Motion to Strike November 29, 2016 Declaration of Ari Weitzner, M.D. (Doc. 143), and Motion to Strike Plaintiffs' Answer to Defendants' Statement of Facts. (Doc.

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 93 of 102

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

145). These Motions were filed on January 27, 2017. All four Motions pending in this action are ripe for review.

### III. Legal Standard

**A. Motion to Strike**

Defendants move to strike the Third Weitzner Declaration and portions of Plaintiffs' Answer to Defendants' Statement of Facts from the record. Although neither Rule 56 nor Local Rule 56.1 specifically provide for a motion to strike, courts have held that a party wishing to challenge statements of fact made by opponents for defect under either Rule should move to strike, or face waiver of their objection. *See, e.g.,* *In Re Unisys Sav. Plan Litig.*, 74 F.3d 420, 437 n.12 (3d Cir. 1996) (explaining that the proper vehicle for an objection to a violation of Rule 56 is a Motion to Strike); *Hartshorn v. Throop Borough*, No. 3:07-CV-01333, 2009 WL 761270, at *8–9 (M.D. Pa. Mar. 19, 2009) (striking Plaintiffs' Statement of Facts from the record for non-compliance with Local Rule 56.1).

**\*4** Federal Rule of Civil Procedure 56 notes that affidavits in support or opposition to a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. FED.R.CIV.P. 56(c)(4). If portions of an affidavit do not meet this standard, it is appropriate for the court to disregard the deficient portions of the record for the purpose of resolving a motion for summary judgment. *See In Re Unisys Sav. Plan Litig.*, 74 F.3d at 437 n.12.

Further, The United States District Court for the Middle District of Pennsylvania provides in its Local Rules that:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the *statement required to be served by the opposing party.*

Local Rule 56.1. The purpose of this rule is to "structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration of the motion." *Gantt v. Absolute Machine Tools, Inc.*, No. 1:06-CV-1354, 2007 WL 2908254, at *3 (M.D. Pa. Oct. 4, 2007). It is well settled in this jurisdiction that a court "will adopt Defendants' Statement of Facts, except for those facts clearly disputed by Plaintiff with adequate record references." *McLaud v. Indus. Res.*, No. 3:14-CV-00737, 2016 WL 7048987 at *1 n.1 (M.D. Pa. Dec. 5, 2016); *see also* *United States ex rel. Paranich v. Sorgnard*, 286 F.Supp.2d 445, 448 n.3 (M.D. Pa. 2003); *N.J. Mfrs. Ins. Co. V. Brady*, No. 3:15-CV-02236, 2017 WL 264457 at *2 n.1 (M.D. Pa. Jan. 20, 2017). Alternatively, if the party opposing summary judgment fails to comply with the Local Rule it is within the courts discretion to strike the offending Statement of Facts. *See Hartshorn*, 2009 WL 761270, at *8–9.

**B. Motion for Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 94 of 102

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48, 106 S.Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*5** When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S.Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

In order to prevail on a motion for summary judgment, the non-moving party must show "specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing FED. R. CIV. P. 56(e)). Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## IV. Discussion

### A. Motion to Strike November 29, 2016 Declaration of Ari Weitzner, M.D.:

Defendants' now argue that the Third Weitzner Declaration was improper, and thus the Declaration and any reference to it should be stricken. Defendants' base their claim of impropriety on three grounds. First, Defendants invoke the Sham Affidavit Doctrine to argue that the Third Weitzner Declaration must be stricken as it disputes Dr. Weitzner's earlier sworn testimony without providing an adequate explanation for the conflict. Second, Defendants' argue that Dr. Weitzner lacked the personal knowledge required to author a Declaration compliant with Federal Rule of Civil Procedure 56(c). Third, Defendants contend that the Declaration serves to impermissibly expand the class definition in such a way that unduly prejudices the Defendants.

Plaintiffs do not directly address whether the Third Weitzner Declaration should be considered under the Sham Affidavit Doctrine, but do point to independent evidence to bolster the Declaration. Further, Plaintiffs fail to directly address whether Dr. Weitzner had the requisite personal knowledge of the claims and transactions in the Declaration and in the Complaint. However, Plaintiffs do argue that the information in the Declaration is capable of admission at trial and as such should be considered at summary judgment. Finally, Plaintiffs argue that the expansion of the class definition does not unduly prejudice the Defendants.

### 1. *The Sham Affidavit Doctrine does not bar the Third Weitzner Declaration.*

While the Federal Rules of Civil Procedure do not address how courts should address contradictory affidavits, the United States Court of Appeals for the Third Circuit ("Third Circuit") has held that "a party may not create a material issue of fact to defeat summary judgment by filling an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conduct." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)). "This principle of summary judgment practice is often referred to as the 'sham affidavit doctrine.' " *Price v. Trans Union, LLC*, 737 F.Supp.2d 281,

2017 WL 3894888

286 (E.D. Pa. 2010) (internal citation omitted). The doctrine's purpose is to remove from the record any "affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement *solely* for the purpose of defeating summary judgment." *York Int'l Corp. V. Liberty Mut. Ins. Co.*, No. 1:10-CV-0692, 2015 WL 4162981, at *15 (M.D. Pa. July, 9, 2015) (emphasis added). To that end, the doctrine permits a district court to disregard an "affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." *Baer*, 392 F.3d at 624.

**\*6** Some courts have adopted a strict interpretation of the Sham Affidavit Doctrine. These courts will strike *any* affidavit that contradicts prior sworn deposition testimony. *See, e.g., Jones v. General Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991) ("[I]t is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition."); *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996) ("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."). The Third Circuit has not been so unforgiving. Rather, the Third Circuit has adopted a more flexible approach which provides that an affidavit will not be stricken "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit," or when the affiant is able to provide a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. *Hackman*, 932 F.2d at 241. However, when independent evidence does not exist and the affiant "does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as sham...." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247 (3d Cir. 2007).

In this case, there is no question that the story provided by Dr. Weitzner has experienced variation over the course of litigation. First, and most importantly, Defendants point to the First Weitzner Declaration and subsequent deposition testimony where Dr. Weitzner made no mention of receiving any fax except the one received on April 21, 2004. (Doc. 106, ¶ 23-24) Now, in his Third Declaration, Dr. Weitzner claims he received a second fax on March 22, 2005. (Doc. 116). This would place Dr. Weitzner firmly within the class as it was defined in the Motion for Class Certification, and First

Weitzner Declaration. As properly noted by Defendants, this position was altered after Dr. Weitzner acknowledged at his second deposition on September 20, 2016 that if the First Fax was the only fax he or the P.C. received he would not be a member of the class he sought to represent. (Doc. 105, Ex. A).

While the timing of this modification is suspect, the Third Circuit directs this court to determine whether there is independent evidence or a satisfactory explanation to support the modification. Here, there is. Plaintiffs have produced evidence to support the modification: a March 22, 2005 fax in its entirety. (Doc. 116, Ex. B). The existence of the fax makes it more likely that Dr. Weitzner was simply "mistaken, confused, or without possession of all the facts during" his contradictory deposition, and negates the notion that he authored the Third Declaration with the sole intent to avoid summary judgment. *Rossi v. All Holding Co.*, No. 3:CV-11-1641, 2014 WL 346934, at * 7 (M.D. Pa. Jan. 30, 2014) (citing *Jiminez*, 503 F.3d at 254). This change in Weitzner's story will not render his Third Declaration a "sham."

Defendants also contend that the Third Weitzner Declaration contradicts prior deposition testimony related to the status of Ari Weitzner, M.D., P.C. Defendants argue that Dr. Weitzner has stated that the P.C. was closed, and at other times that it was active. Defendants point to the Second—now withdrawn—Weitzner Declaration and Dr. Weitzner's deposition testimony in an attempt to show that regarding the P.C. as active in the Third Declaration is a variation in Weitzner's story that contradicts prior sworn testimony. In the Second Declaration, Dr. Weitzner states that:

> The previous declaration that I submitted contained two oversights. First I left my optholmology practice in 2015 and joined one called Union Square Eye Care in Manhattan. However, my professional corporation, of which I am still the sole principal, has continued to maintain active status.

(Doc. 101, ¶ 2). Defendants argue that this contradicts his prior deposition testimony where he stated that the P.C. transacts no business, and has no employees. (Doc. 147, Ex. A at 25). But, Defendants are incorrect.

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

Case 3:17-cv-00101-RDM    Document 525-1    Filed 08/18/20    Page 96 of 102

**\*7** In each of the three Weitzner Declarations, Dr. Weitzner states that the P.C. remains in active status. As Plaintiffs correctly note, Defendants cite to no authority that supports the notion that a business must be operating to be considered "active." The fact that the business is not currently operating has not impacted the "active" status claimed by Dr. Weitzner or reported by the New York Department of State. Simply, the Sham Affidavit Doctrine does not apply on these facts.

Finally, the Defendants argue that the Third Weitzner Declaration contradicts prior sworn testimony provided by Dr. Weitzner regarding who received the faxes at issue. But, Dr. Weitzner has maintained throughout all three Declarations that the P.C. received a fax. This is evidenced by the fact the P.C. was named in each Declaration. Defendants point to his deposition testimony in which Dr. Weitzner states that the P.C. received no fax. (Doc. 105, Ex. A at 113.) While true, this contradiction does not render the Declaration a "sham." It is clear to the Court from the provided deposition testimony that Dr. Weitzner was, and still may be, "confused" about the distinction between his personal representation and his representation of the P.C. [4] *See Rossi*, 2014 WL 346934, at \*7. For this reason, this discrepancy will not cause the Court to strike the Third Weitzner Declaration.

[4]     On numerous occasions in Dr. Weitzner's third deposition he had to be reminded that there was a difference between his personal and representative capacity. And, on multiple occasions he confused the two. *See, e.g.*, Doc. 143-4, at 64:10-25; 65:1-5.

### 2. *The requirement of personal knowledge will not bar the Third Weitzner Declaration.*

Defendants argue that the Third Weitzner Declaration was not based on Dr. Weitzner's personal knowledge. Defendants only make a generalized claim that the entire Affidavit lacks personal knowledge, and does not point to a specific paragraph in the Third Weitzner Declaration. But, Defendants' argument references paragraphs seven and eight by implication. Thus, this Court will limit its analysis to those two paragraphs in the Third Weitzner Declaration.

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED.R.CIV.P.

56(c)(4). As such, a court should not credit statements in affidavits that amount to "unsupported assertions made in the absence of personal knowledge" *Reynolds v. Dep't of Army*, 439 Fed.Appx. 150, 152 (3d Cir. 2011). However, otherwise inadmissible evidence may be considered on summary judgment if the evidence is capable of being presented in an admissible form at trial. *See, e.g.*, *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) ("We thus concluded that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial."); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993) ("While this statement as it stands now is hearsay, in this circuit it can be considered on a motion for summary judgment because it is capable of being admissible at trial."). Thus, this analysis runs parallel to, and must consider, the Federal Rules of Evidence.

**\*8** Federal Rule of Evidence 602 governs the scope of witness testimony. Namely, it permits a witness to "testify to a matter only if sufficient evidence is introduced to support a finding that the witness has personal knowledge of the matter." FED.R.EVID. 602. The threshold for admissibility created by Rule 602 is quite low; testimony should be admitted if the judge could reasonably find that the witness perceived the events. *See, e.g.*, *Knopick v. Downey*, No. 1:09-CV-1287, 2013 WL 1882983, at \*12 (M.D. Pa. May 6, 2013) (citing *Sullivan v. Warminster Twp.*, 461 Fed.Appx. 157, 162 (3d Cir. 2012)). But, courts have not extended such leniency to allow witness testimony that is merely based on speculation as to what a third party believed or knew. *Id.*

Further, the Federal Rules of Evidence generally exclude hearsay evidence. Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. *See* FED.R.EVID. 801(c). But, not all hearsay statements are inadmissible. In fact, the Federal Rules of Evidence provide that while some statements meet the traditional definition of hearsay they are considered "not hearsay." *See* FED.R.EVID. 801(d).

Defendants' contention that the entire Third Weitzner Declaration lacks personal knowledge is incorrect. Rather, as detailed below, certain averments within the Declaration lacked sufficient personal knowledge as required by the Federal Rules.

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

First, paragraph seven of the Third Weitzner Declaration lacks the requisite personal knowledge. Paragraph seven states:

> Following discussions that I had about the class period with my counsel, Mr. Bank, to whom I had regularly sent my fax advertisements in 2004 and 2005, *Mr. Bank informed me* that there were additional faxes of the same type as the first Fax that were sent to the same fax number. One of these faxes was sent on or about March 22, 2005. ("Second Fax"). In addition, the Second Fax was sent to the same fax machine that had received the First Fax.

(Doc 116, at ¶ 7) (emphasis added). As Defendants correctly note, Dr. Weitzner did not have the requisite personal knowledge to make this statement. Dr. Weitzner admitted as much in his deposition on January 10, 2017:

> Q: Do you have any understanding, Dr. Weitzner of how many faxes you actually received other than based on the expertise of your lawyers?
>
> A: I have no independent recollection of how many faxes I received. That's exactly right.

(Doc. 145-4, at 62:21-25).

While Federal Rule of Civil Procedure 56(c)(4) and Federal Rule of Evidence 602 seem to bar this evidence because Dr. Weitzner admittedly lacked personal knowledge, it is important to remember that otherwise inadmissible evidence may be considered at summary judgment if it is capable of being presented in an admissible form at trial. While the existence and contents of the Second Fax as it stands now are inadmissible hearsay, it may still be considered at summary judgment because both are capable of being presented in an admissible form at trial. *See* FED.R.EVID. 801(d)(2); *Frankenberry v. FBI*, No. 3:08-1565, 2012 U.S. Dist. LEXIS 39027, at *19-20 (citing *J.F. Freeser, Inc.*, 909 F.2d at 1542; *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1235 n.9). As such, it would be inappropriate to strike paragraph seven.

Second, paragraph eight of the Third Weitzner Declaration arguably lacks the requisite personal knowledge. Paragraph eight states:

> I understand that, based on several parts of this Complaint in this lawsuit, and depending upon this Court's resolution of legal issues pertaining to the statute of limitations, the class period could begin as early as February 14, 2001.

**\*9** Defendants asked Dr. Weitzner about this averment in his third deposition:

> Q: Is it accurate to say that you have no personal knowledge of any parts of the Complaint that could result in the class period beginning as early as February 14, 2001?
>
> A: I have no personal knowledge. I base—I rely on the expertise of my attorneys.
>
> Q: All right. So this understanding, then, that you have is based totally on the expertise of your lawyers?
>
> A: That's exactly right.

While Defendants' properly note that he has no personal knowledge regarding the parts of the Complaint that would allow for the expansion of the class period, paragraph eight is capable of admission at trial. Remember, the standard imposed by Rule 602 presents a low bar for admission. *See United States v. Gerard*, 507 Fed.Appx. 218, 222 (3d Cir. 2012) ("Rule 602 creates a low threshold for admissibility, and a judge should admit witness testimony if the jury could reasonably find that the witness perceived the event."); *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990) ("Testimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about."); *Sullivan*, 461 Fed.Appx. at 162. All Plaintiffs would need to show is that Dr. Weitzner "perceived the events" that caused him to make the conclusions regarding the expansion of the class definition in his Third Declaration. Those "events" were meetings with his lawyers, and experiences at depositions held by the Defendants. When asked about those events at his third deposition, Dr. Weitzner provided a level of personal knowledge that would overcome a challenge under Rule 602 at trial. (Doc. 147, Ex. A at 47-48). Therefore, paragraph 8 will not be stricken.

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

3. *The Third Weitzner Declaration does not impermissibly seek to expand the class definition and amendment is not prejudicial.*

Defendants' argue that although Plaintiffs assert that the Third Weitzner Declaration merely refines Dr. Weitzner's understanding of the class definition, Plaintiffs in fact impermissibly seek to amend the scope and definition of the class sought to be certified without leave of court. Defendants contend that such leave would be required. Further, Defendants believe that permitting any amendment at this stage would be prejudicial because the Third Weitzner Declaration was filed after Defendants had submitted their Brief in Opposition to Class Certification. Plaintiffs disagree. Plaintiffs contend that leave of court is not required for amendment, and that Defendants have suffered no prejudice as a result of such amendment.

Federal Rule of Civil Procedure 23(c)(1) provides a mechanism for modification of class definition, and as such "[a] court is not bound by the class definition proposed in the complaint." *Weisfeld v. Sun Chem. Corp.*, 84 Fed.Appx. 257, 259 (3d Cir. 2004) (citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)). This is a sensible rule because holding a plaintiff to their original class definition "would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition." *In the Matter of: Monumental Life Insurance Co.*, 365 F.3d 408, 414 (5th Cir. 2004). To this end, courts have allowed Plaintiffs to substantially modify proposed class definitions initially set forth in their Complaint throughout the course of litigation. *See, e.g., Gates v. Rohm & Haas Co.*, 265 F.R.D. 208, 215 n.10 (E.D. Pa. 2010) (citing *Robidoux*, 987 F.2d at 937) (noting that Plaintiffs were permitted to substantially modify the proposed class definition in their reply brief).

**\*10** Here, the class definition provided in the Complaint identifies a class period from February 14, 2005 to the date of the resolution of this lawsuit. The First Weitzner Declaration contains a slightly different class definition than the Complaint. The Second Weitzner Declaration—now withdrawn—defined the class from June 1, 2002 to February 13, 2005. Now, in the Third Weitzner Declaration and Plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike Declarations, define the class as beginning on February 14, 2001 to the resolution of this action. (Doc. 152, at 19). Such modification is illustrative of the "give-and-

take inherent in class action litigation," and not of an attempt to unduly prejudice Defendants.

While expansion of the class period has been permitted in the past, this Court must still determine whether the modification of the class definition at this time would unduly prejudice Defendants. Defendants' correctly note that the modification of the class currently at issue occurred in the Third Weitzner Declaration. This Declaration was filed on November 29, 2016 (Doc. 116); after Defendants had already filed their Brief in Opposition to Plaintiffs' Motion for Class Certification. (Doc. 102). Defendants claim that "[s]uch amendment this late in the litigation is prejudicial to Defendants, who are deprived of meaningful opportunity to present defenses to these additional claims." (Doc. 154, at 17). However, Defendants fail to meaningfully articulate the defenses foreclosed by the timing of the modification. Rather, Defendants throughout their brief call the claims included in this modification "untimely," or "time-barred." (Doc. 154, at 17; Doc. 154, at 12). As Plaintiffs note, Defendants already raise arguments related to the timeliness of claims in their papers. (Doc. 152 at 21-22). Moreover, Defendants had the opportunity to respond to the proposed class expansion in their brief in response to Plaintiffs' Brief in Opposition to Summary Judgment. Since Defendants have failed to offer any concrete prejudice caused by the timing of the modification, this Court will not grant the Motion to Strike.

**B. Motion to Strike Plaintiffs' Answer to Defendants' Statement of Facts:**

Defendants move to strike Plaintiffs' Answer to Defendants' Statement of Facts pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56. In doing so, Defendants contend that Plaintiffs failed to properly prepare their response in three distinct respects. First, Defendants claim the Plaintiffs failed to properly deny facts provided in Defendants' Statement of Facts as required by Federal Rule of Civil Procedure 56(e) and Local Rule 56.1. Their argument follows that since Plaintiffs failed to make any denial, even generally, to forty-nine (49) of the seventy-three (73) statements of fact produced by Defendants, all forty-nine (49) should be admitted. Second, Defendants argue that any denial supported by reference to the Third Weitzner Declaration is improper as the Declaration should be considered a "sham affidavit." Such a finding would strike seven (7) of Plaintiffs' responses. Finally, Defendants contend that Plaintiffs' response impermissibly contains lengthy argument, and thus should be stricken from the record. If Defendants are correct, only three (3) statements offered by Plaintiffs would remain.

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

**\*11** Plaintiffs do not dispute that they failed to make even general denials to the forty-nine (49) statements identified by Defendants. Rather, Plaintiffs focus their argument on the propriety of the Third Weitzner Declaration and the form of statements contained in their response. Specifically, Plaintiffs claim that Defendants' reference and reliance on the Third Weitzner Declaration is improper under Local Rule 7.8(a). Further, without reference to a single authority, Plaintiffs contend that the statements contained within their response are not lengthy or argumentative in violation of the Federal or Local Rules.

1. *The forty-nine (49) unopposed statements contained in Defendants' Statement of Facts will be admitted.*

Defendants' correctly note that Plaintiffs failed to comply with Local Rule 56.1 when they did not specifically deny the averments made in Defendants' Statement of Facts. (Doc. 146, at 5-6). Rather than responding to each statement made by Defendants, (Doc. 106), Plaintiffs decided to respond to a mere twenty-four (24). (Doc. 118). Because Plaintiffs failed to provide any opposition to forty-nine (49) of the seventy-three (73) paragraphs in Defendants' Statement of Facts, all facts within the noted forty-nine (49) paragraphs will be considered unopposed and admitted under Local Rule 56.1. [5] *See Sorgnard*, 286 F.Supp.2d at 448 n.3.

[5]   The paragraphs in Defendants' Statement of Facts that were unopposed and will be deemed admitted are: 1; 2; 3; 4; 5; 8; 9; 10; 11; 12; 14; 15; 16; 17; 18; 19; 20; 23; 26; 27; 29; 30; 31; 32; 33; 34; 35; 39; 46; 47; 50; 51; 53; 55; 56; 57; 58; 62; 63; 64; 65; 66; 67; 68; 69; 70; 71; 72; and 73.

2. *Denials Supported by the Third Declaration of Dr. Weitzner will Not be Stricken.*

As noted above, the Motion to Strike the Third Weitzner Declaration will be denied. For this reason, any citation to the Third Declaration in Plaintiffs' Answer to Defendants' Statement of Facts will remain similarly intact. Notably, Local Rule 7.8(a) had no role in the Courts analysis.

3. *The form of Statements within Plaintiffs' response violate Local Rule 56.1 and will be stricken.*

As mentioned earlier, Local Rule 56.1 directs parties moving for summary judgment to provide the court with "a separate, short and concise statement of material facts, in numbered

paragraphs, as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1. Similarly it requires the non-moving party provide "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [from the moving party], as to which it is contended that there exists a genuine issue to be tried." *Id.* Both statements must "include references to the parts of the record that support" their factual statements. *Id.* The purpose of this statement of facts is "to structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration to the motion." *Hartshorn*, 2009 WL 761270, at *3 (internal citation omitted). To this end, a proper statement of facts should enable "the court to identify contested facts expeditiously and [prevent] factual disputes from becoming obscured by a lengthy record." *Pinegar v. Shinseki*, No. 1:07-CV-0313, 2009 WL 1324125, at *1 (M.D. Pa. May, 12, 2009). Courts have the discretion to either strike a statement for non-compliance with the local rule, or deem the opposing statement admitted. *See, e.g.*, *Hartshorn*, 2009 WL 761270, at *3; *Armenti v. Tomalis*, No. 1:12-CV-2039, 2016 WL 6493483, at *1-2 (M.D. Pa. Nov. 2, 2016).

**\*12** Defendants contend that many of Plaintiffs' responses contain impermissible argument and fail to provide "concise" statements in violation of Local Rule 56.1. In large part this Court agrees. Plaintiffs' have provided a lengthy [6] response that runs afoul of the purpose for Local Rule 56.1. The statements identified by Defendants [7] regularly include long excerpts from deposition testimony in an attempt to explain or contextualize a fact presented by the Defendants. Facially, this is impermissible under the Local Rule. Because this Court finds that many of the statements within Plaintiffs' response contravene the purpose of Local Rule 56.1, those statements will be stricken.

[6]   Plaintiffs' response can not be considered concise. While only responding to 24 of the 73 averments made in Defendants' Statement of Fact, Plaintiffs' response is over twice as long. As such, Plaintiffs' response is in violation of the Local Rules.

[7]   Defendants' specifically note the argumentative nature of Plaintiffs' responses to paragraphs: 13; 21; 24; 25; 36; 37; 38; 39; 41; 42; 43; 48; 49; 52; 54; 59; 60; and 61. All will be excluded.

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 100 of 102

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 3894888

Paragraph 40 will be similarly excluded for violating the Local Rule.

Therefore, only six (6) statements[8] made in Defendants' Statement of Facts will be considered contested for purposes of summary judgment.

[8]    The contested statements are found in paragraphs 6, 7, 22, 28, 44, and 45 of Defendants' Statement of Facts.

### C. Motion for Summary Judgment:

Defendants' base their Motion for Summary Judgment on four separate and distinct grounds.[9] First, Defendants' argue that Plaintiffs' claims are time-barred by the statute of limitations because the tolling principles of *American Pipe* do not apply, and alternatively, even if they do apply, Plaintiffs filed their federal complaint after the statute of limitations expired. Second, Defendants argue that Plaintiffs lack standing because Defendants believe that neither Dr. Weitzner, nor his P.C. suffered cognizable injury during the defined class period. Third, Defendants contend that Plaintiffs have failed to demonstrate that Defendant Sanofi Pasteur, Inc. sent a fax to Plaintiffs, and as such Defendant Sanofi must be removed from this action. Finally, Defendants argue that the current named Plaintiffs are not members of the class they seek to represent, and thus as a matter of law summary judgment should be granted.

[9]    This Court will not address three of the four arguments presented by Defendants' because the inapplicability of American Pipe tolling is dispositive.

#### 1. Plaintiffs' Individual and Class Claims are Time-Barred[10]

[10]    Defendants did not affirmatively raise the statute of limitations defense in their answer to the complaint as required by *Federal Rule of Civil Procedure 8(c)*, but this Court will still consider whether Plaintiffs claims are time-barred. *Federal Rule of Civil Procedure 8(c)* requires that "[i]n a pleading to a preceding pleading, a party should set forth affirmatively" the defense of statute of limitations. *FED.R.CIV.P. 8(c)*. Normally, when an a defendant fails to plead an affirmative defense in their answer, the defense is waived. *See Charpentier v.*

*Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991). However, since Plaintiffs offered no objection to the defense "when expressly invoked in [Defendants] motion for summary judgment," the Court will consider its validity. *Mitchell v. Guzick*, No. 3:02-CV-0178, 2004 U.S. Dist. LEXIS 29895, at *21 n.4 (M.D. Pa. July 26, 2004); *see Printz v. Greate Bay Cassino Corp.*, 705 F.2d 692, 694 (3d Cir. 1983) (noting that *Fed.R.Civ.P 15(c)* provides that issues tried by the express or implied consent of the parties "are treated in all respects as if they had been raised in the pleadings").

**\*13**  In *American Pipe & Construction Company v. Utah*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). In other words, the filing of a class action lawsuit tolls the statute of limitations as to all asserted members of the previously filed class. *Id.* Tolling lasts "until the propriety of maintaining the suit as a class action is determined." *Leyse v. Bank of America N.A.*, 538 Fed.Appx. 156, 161 (3d Cir. 2013), *vacated on other grounds*, 804 F.3d 316 (3d Cir. 2015); *see Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*, 642 F.3d 560, 563 (7th Cir. 2011) ("Tolling [under *American Pipe*] lasts from the day a class claim is asserted until the day the suit is conclusively not a class action—which may be because the judge rules adversely to the plaintiff, or because the plaintiff reads the handwriting on the wall and decides not to throw good money after bad.").

This doctrine is at the heart of the dispute between the parties before this Court at summary judgment. If the doctrine does not apply, Defendants are owed summary judgment as Plaintiffs' action would be barred as a matter of law. In this case, a four-year statute of limitations is appropriate.[11] The First Fax was received by Plaintiffs on April 21, 2004. (Doc. 106, ¶ 23). This means that without application of *American Pipe*, any federal complaint related to the First Fax would have needed to be filed by April 21, 2008. The Second Fax was received by Plaintiffs on March 22, 2005, and thus any federal complaint related to the Second Fax would have needed to be filed by March 22, 2009. Plaintiffs filed their federal Complaint on November 26, 2011. (Doc. 1). Therefore, without the application of a tolling doctrine it is clear Plaintiffs' Complaint is untimely.

Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)

Case 3:17-cv-00101-RDM   Document 525-1   Filed 08/18/20   Page 101 of 102

2017 WL 3894888

11    As this Court suggested during the disposition of the Motion to Dismiss, the four-year statute of limitations will apply. *See Hawk Valley, Inc., v. Taylor*, No. 10-CV-00804, 2012 WL 1079965, at \*9–10 (E.D. Pa. Mar. 30, 2012) (finding *Mims v. Arrow Fin. Servs.*, LLC., 565 U.S. 368, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012), an additional support for rejecting the argument that state statute of limitations applied to a TCPA claim); *see also*, 645 F.3d at 561 (7th Cir. 2011).

### a. Class Claims

The first question this Court must address is whether or not *American Pipe* tolling is applicable to the class claims at issue. Defendants suggest that *American Pipe* is only applicable for class claims when: (1) the proposed class is substantively identical to the class sought to be certified in the state-court action; (2) Plaintiffs were unnamed class members in the state-court action; and (3) Plaintiffs are new class representatives for the proposed class.

First, for tolling to apply, the claims do not have to be identical, but only substantially similar to those brought in the original class action. *See In re Linerboard Antitrust Litigation*, 223 F.R.D. 335, 351 (E.D. Pa. 2009) (citing *Crown, Cork & Seal, Inc. v. Parker*, 462 U.S. 345, 355, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)). Defendants properly identify this requirement. But, Defendants incorrectly suggest that Plaintiffs claims are not substantially similar to those brought in the original action. The exact same legal question is at issue: Did the Defendants violate the TCPA? And, the factual averments presented by the state and federal claims are nearly identical with exception for the class period. Therefore, when viewing the facts in the light most favorable to Plaintiffs, it is evident that Plaintiffs established that they meet this requirement.

Second, when applying *American Pipe* to subsequent class actions, Defendants are correct that the Third Circuit has limited the doctrine's application to subsequent class actions brought by *new* would-be class representatives. In fact, the Third Circuit has recently stated that *American Pipe* tolling does not apply when a named-plaintiff in a prior action subsequently files another class action based on the same claim as a named-plaintiff yet again. *See Leyse*, 538 Fed.Appx. at 162. ("*American Pipe* was intended to prevent repetitious filings and to protect unnamed plaintiffs. This

concern is not relevant with respect to the named plaintiff in the prior class action. Thus, we agree that the Supreme Court did not intend for *American Pipe* tolling to protect individuals like [plaintiff], who initiated the prior class action and was a named plaintiff in that prior suit."); *see also Vincent v. Money Store*, 915 F.Supp.2d 553, 561 (S.D. N.Y. 2013) (explaining that "[t]he policy behind *American Pipe* counsels against allowing named plaintiffs in a prior class action, as opposed to absent class members, to have their claims tolled."). This requirement prevents an earlier class representative from attempting to "resuscitate a class that a court held to be inappropriate as a class action." *Yang v. Odom*, 392 F.3d 97, 104 (3d Cir. 2004) (citing *McKowan & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, (3d Cir. 2002)).

**\*14** In this case, it does appear that Dr. Weinstein is attempting to "resuscitate" the failed state class action. As noted above, the legal and factual claims presented in the state and federal actions are nearly identical. Notably, Dr. Weitzner was the named representative for the class in the state court action, and is one of the named representatives in the action now before this Court. This runs directly contrary to the purpose of *American Pipe* tolling as it was described by the Third Circuit in *Leyse. See* 538 Fed.Appx. at 162. It is true, that Ari Weitzner, M.D., P.C. was not a named representative in the action below. However, it would be a stretch of logic to imagine the P.C., an entity solely owned and occasionally operated by Dr. Weitzner, could be used to circumvent the purpose of *American Pipe*. If that were the case, a single Plaintiff could continue to "resuscitate" claims repeatedly by hiding behind a corporate veil. Because Dr. Weitzner was the class representative in the state court action, *American Pipe* will not apply to the class claims.

Since *American Pipe* tolling is inapplicable to the class claims, Defendants are owed summary judgment on the class claims because they are time-barred. As such, summary judgment will be granted in favor of the Defendants on the class claims presently before this Court.

### b. Individual Claims

*American Pipe* tolling is similarly unavailable for Dr. Weitzner's individual claim. Just as with new class claims, individual claims may only be brought by those that did not earlier serve as class representative. The Supreme Court has suggested as much recently when it stated that *American Pipe* was grounded in "policies of judicial administration,"

Case 3:17-cv-00101-RDM Document 525-1 Filed 08/18/20 Page 102 of 102
Weitzner v. Sanofi Pasteur, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 3894888

and "demonstrate only that *a person not a party* to a class suit may receive certain benefits (such as the tolling of a limitations period) related to that proceeding." *Smith v. Bayer Corp.,* 564 U.S. 299, 313 n.10, 131 S.Ct. 2368, 180 L.Ed.2d 341 (2011) (emphasis added). Put simply, the advantages of tolling articulated by the Supreme Court in *American Pipe* and *Crown Cork do not apply to revived claims by class representatives. See id.* The purpose of tolling during a class action was to reduce duplicative filings by encouraging unnamed class members to wait on filing their own complaints. See *American Pipe,* 414 U.S. at 553-554, 94 S.Ct. 756. To allow tolling for a named representative does not decrease duplicative filings as the named representative has already filed a complaint, and likely motions, on the issue. Because Dr. Weitzner was a class representative, *American Pipe* tolling does not apply to Dr. Weitzner's individual claim. Therefore, summary judgment will be granted in favor of Defendants for Dr. Weitzner's individual claim.

It is important to remember that "the tolling rule of American Pipe is a generous one, inviting abuse." *Crown, Cork & Seal Co., Inc.,* 462 U.S. at 354, 103 S.Ct. 2392 (1983) (Powell, J. concurring). It is in this vein that Defendants argue that allowing the P.C. to raise an individual claim contravenes the purpose of *American Pipe,* and *Leyse.* At bottom, Defendants argue that the P.C. is simply a shell used by Dr. Weitzner to revive the same claim, based on the same fax transmissions, that failed in state court. As was noted above, it is not the intent of *American Pipe* to protect those who "initiated the prior class action." See *Leyse,* 538 Fed.Appx. at 162.

Dr. Weitzner is the sole shareholder of the P.C., and as he notes, he "has always identified the P.C. with [himself]." (Doc. 116, ¶ 2). In fact, Plaintiffs acknowledge and admit [12] that Dr. Weitzner believes he and the P.C. are one. (Doc 106, ¶ 14). He bases the claims brought on behalf of himself and the P.C. on identical evidence: the First and Second Fax. In every meaningful way, Dr. Weitzner would be the beneficiary of the P.C.'s individual claim, and thus tolling would serve protect a Plaintiff "who initiated the prior action." *Id.* Allowing the P.C., on these facts, to seek shelter from the statute of limitations through the use of the *American Pipe* tolling rule would condone the abuse of *American Pipe.* For this reason, *American Pipe* tolling will not apply to the P.C.'s individual claim, and this Court will grant summary judgment in favor of the Defendants.

[12]     Plaintiffs failed to deny that Dr. Weitzner believes he and the P.C. are the same entity in their Answer to Defendants' Statement of Facts. As such, the fact was deemed admitted.

### V. Conclusion

**\*15** For the above stated reasons: Defendants' Motion to Strike the November 29, 2016 Declaration of Ari Weitzner will be denied; Defendants' Motion to Strike Plaintiffs' Answer to Defendants' Statement of Facts will be granted in part as Plaintiffs' failed to comply with the Local Rules; and Defendants' Motion for Summary Judgment will be granted in its entirety because *American Pipe* tolling does not apply to shield those who initiated a prior action and subsequently assert the same facts and claims in a new action. Finally, Plaintiffs' Motion for Class Certification is moot because this Court will grant Defendants' Motion for Summary Judgment.

An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2017 WL 3894888

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.