## <u>APPENDIX OF UNPUBLISHED OPINIONS</u>

A.   *CFPB v. NDG Financial Corp.*,
     2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)

B.   *Dickerson v. U.S. Steel Corp.*,
     1977 WL 833 (E.D. Pa. Feb. 28, 1977)

C.   *FTC v. Adept Management Inc.*,
     2018 WL 4623152 (D. Or. Sept. 25, 2018)

D.   *FTC v. Alcoholism Cure Corp.*,
     2011 WL 13137951 (M.D. Fla. Sept. 16, 2011)

E.   *FTC v. Amazon.com, Inc.*,
     2016 WL 10654030 (W.D. Wash. July 22, 2016)

F.   *FTC v. Capital Choice Consumer Credit, Inc.*,
     2004 WL 5149998 (S.D. Fla. Feb. 20, 2004)

G.   *FTC v. Direct Benefits Group, LLC*,
     2013 WL 3771322 (M.D. Fla. July 18, 2013)

H.   *FTC v. Direct Marketing Concepts, Inc.*,
     2004 WL 1399185 (D. Mass. June 23, 2004)

I.   *FTC v. Loma International Business Group*,
     2013 WL 2455986 (D. Md. June 5, 2013)

J.   *FTC v. Windward Marketing, Inc.*,
     1997 WL 33642380 (N.D. Ga. Sept. 30, 1997)

K.   *Lockette v. Morgan Stanley*,
     2018 WL 4778920 (S.D.N.Y. Oct. 3, 2018)

L.   *Pennsylvania v. Navient Corp.*,
     — F.3d —, 2020 WL 4280677 (3d Cir. July 27, 2020)

M.   *Robbins v. Comcast Cable Communications, LLC*,
     2019 WL 4139297 (W.D. Wash. Aug. 30, 2019)



Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 3 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Consumer Financial Protection Bureau v. RD Legal Funding, LLC, S.D.N.Y., June 21, 2018

2016 WL 7188792

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

CONSUMER FINANCIAL

PROTECTION BUREAU, Plaintiff,

v.

NDG FINANCIAL CORP., et al., Defendants.

No. 15-cv-5211 (CM)

|

Filed 12/02/2016

### Attorneys and Law Firms

Charles Robert Gayle, Edward Joseph Reilly, II, Mark Samburg, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Jeffrey Alan Brown, Sarah Dean Lyons, Richard Francis Hans, Jr., Constance Che Hang Tse, DLA Piper LLP (US), Katie Gant Crane, Kenneth E. Lee, Levine Lee LLP, New York, NY, Steven A. Engel, Dechert, LLP, Benjamin Boyd, DLA Piper LLP, Washington, DC, for Defendants.

### DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

McMahon, C.J.

**\*1** This action was brought by Plaintiff, the Consumer Financial Protection Bureau ("CFPB") against a group of twenty-one interconnected corporations and individuals (collectively, "Defendants") [1] that allegedly operated a cross-border online payday lending scheme. Via three separate motions to dismiss (Dkt. Nos. 64, 67, and 81), Defendants argue that the first amended complaint ("FAC") should be dismissed because: (1) the Court lacks personal jurisdiction, (2) the claims presented are time-barred or retroactive, (3) the FAC fails to state a claim, and (4) the CFPB is unconstitutional.

---

[1]  Fourteen individuals or corporations are named defendants in this matter ("Named Defendants"): NDG Financial Corp.; Northway Financial Corp.,

Ltd.; Northway Broker, Ltd.; E-Care Contact Centers, Ltd.; Blizzard Interactive Corp.; New World Consolidated Lending Corp.; New World Lenders Corp.; Payroll Loans First Lenders Corp.; New World RRSP Lenders Corp.; Peter Ash; Sagewood Holdings, Ltd.; Kimberly DeThomas; Jeremy Sabourin; and William Wrixon. Twelve individuals or corporations are named as relief defendants ("Relief Defendants"), five of which are also Named Defendants: Peter Ash; Sagewood Holdings, Ltd.; Paul Ash; Knightsbridge Holdings, Ltd.; Paul Grehan; 0562752 B.C., Ltd.; Kimberly DeThomas; Emerald Willow Holdings, Ltd.; Jeremy Sabourin; Red River Holdings Company Ltd.; William Wrixon; and Twillingate Holdings Ltd.

For the reasons set forth below, Defendants' motions to dismiss are DENIED.

---

### Background Facts

The twenty-one Defendants are interconnected corporate entities or individuals that the CFPB alleges jointly operated an online payday lending scheme that made loans to U.S. customers in violation of state usury laws, and then used unfair, deceptive, and abusive practices ("UDAAP") to collect on the loans and profit from those revenues, thereby violating the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a), enacted as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376("Dodd-Frank Act"). The CFPB also alleges that some of Defendants' loan agreements contained irrevocable wage assignment clauses that violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3). The CFPB seeks permanent injunctive relief, restitution, refund of monies paid, and disgorgement of ill-gotten gains.

### I. Defendants' Corporate Structure

Defendants are a collection of individuals and corporations located in Canada and Malta that the CFPB asserts operated as "a seamless unit to offer unlicensed and usurious payday loans over the Internet to US consumers" from 2005 to 2013. (Am. Compl. ¶ 7, Dkt. No. 47.) Defendants can best be organized into four major groups based on their post-2009 corporate structure and the nature of the allegations against them: (1) the European Group; (2) the Canadian Group; (3) the Owners Group; and (4) the Officers/Directors Group.

## A. European Group

The European Group consists of Defendants (all of which are Named Defendants) Northway Financial Corp. Ltd. ("Northway"), Northway Broker, Ltd. ("Northway Broker"), and related non-defendant entities. Northway and Northway Broker are both registered private limited liability companies ("PLLCs") based out of Sliema, Malta. (*Id.* ¶¶ 26, 30.) Since 2009, both are indirect subsidiaries of non-defendant New Northway S.A. ("New Northway"), through non-defendant Cumberland Holdings Ltd. (*Id.* ¶¶ 11, 63-64, 109.)

**\*2** According to the CFPB, Northway "extends credit to US consumers in the form of payday loans" via a series of Internet "doing business as" ("DBA") websites. (*Id.* ¶ 27.) These DBA websites have various names, including "CashTransferCenters.com; PRLDirect.com; 247Greenstreet.com; GreenPicket.com; PaydayAvenue.com; CashTaxi.com; PixyCash.com; SonicPayday.com; and Zip19.com." (*Id.*) The CFPB alleges that Northway originates the loans in all fifty states, including New York. (*Id.* ¶ 152.)

The loans are generally short term, usually fourteen days, "ranging from $100-$ 1500 with finance charges between $19.26 and $26.98 per $100 borrowed." (*Id.* ¶ 153.) Due to the short-term nature of the loans, this results in an annual percentage rate ("APR") ranging from 599% to 703%. (*Id.* ¶ 158.) In addition, some of the loan agreements include an irrevocable wage assignment clause that provides, in essence, that "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.) According to the FAC, such clauses were invoked on numerous occasions to collect money directly from consumers' payroll accounts. (*Id.* ¶ 156.)

Northway Broker provides "money brokering services to US consumers applying for payday loans from Northway via the DBA websites." (*Id.* ¶ 31.) According to the CFPB, Northway Broker generates revenue through broker fees for Northway's loans as well as non-sufficient funds ("NSF") fees collected when consumers default on loan payments. (*Id.* ¶ 32.) As such, Northway Broker is a party to the loan agreements with consumers. (*Id.* ¶ 31-32.) It also "contract[s] with credit reporting agencies that provide background information on potential Northway loan applicants." (*Id.* ¶ 35.)

## B. Canadian Group

The Canadian Group consists of the following Defendants (all of which are Named Defendants only): NDG Financial Corp. ("NDG"); NDG's direct subsidiaries E-Care Contact Centers Ltd. ("E-Care"), Blizzard Interactive Corp. ("Blizzard"), and New World Consolidated Lenders Corp. ("NWCL"); and NWCL's subsidiaries New World Lenders Corp. ("NWL"), Payroll Loans First Lenders Corp. ("PLFL"), and New World RRSP Lenders ("NWRRSP"). All of the Canadian Group Defendants were or are Canadian corporations. (*Id.* ¶¶ 17, 36, 42, 49, 51-52, 54.) NDG and E-Care share the same principal place of business, an address in Surrey, British Columbia, but have other additional addresses throughout Canada. (*Id.* ¶¶ 17-20, 37-39.) Blizzard has its principal place of business in Winnipeg, Manitoba, although it also allegedly shares some addresses with E-Care and NDG. (*Id.* ¶¶ 42-43.) NWL and NWCL are incorporated in British Columbia, as were PLFL and NWRRSP, which have both been dissolved. (*Id.* ¶¶ 49-55.)

The FAC contains few direct allegations against NDG, other than that unnamed NDG "personnel" allegedly "established and managed banking and payment processing relationships with US-based service providers on behalf of [NDG's] subsidiaries and entities with which it is under common control." (*Id.* ¶ 25.)

E-Care allegedly collects the loans extended by Northway, as well as provides services to Northway such as "managing Northway's relationships with banks, Third Party Processors (TPPP), and credit reporting agencies...." (*Id.* ¶¶ 40-41.)

**\*3** Blizzard allegedly identifies potential customers for Northway by generating a target demographic profile, which it then sends to third-party lead generator services. (*Id.* ¶¶ 44-45.) Blizzard, working with a lead generator, specifically targeted potential consumers in New York and New Jersey in June 2013. (*Id.* ¶ 131.) It also allegedly "maintains software that redirects its purchased leads to the DBA websites." (*Id.* ¶ 132.)

NWCL, NWL, PLFL, and NWRRSP (collectively, the "Funding Entities") were or are fundraising vehicles for raising capital for Northway to distribute as loans. (*Id.* ¶¶ 47-56.) The FAC does not allege that this fundraising activity took place in the United States, or that the fundraising itself was in any way illegal.

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 5 of 192

2016 WL 7188792

### C. Owners Group

According to the FAC, New Northway and NDG were each controlled by three separate corporations from 2009 to 2013: (1) Sagewood Holdings Ltd. ("Sagewood"), which owned 50.1% of shares in New Northway and NDG; (2) Knightsbridge Holdings Ltd. ("Knightsbridge"), which owned 39.8% of each; and (3) 0562752 B.C. Ltd. ("0562752"), which owned 10.1% of each. (*Id.* ¶¶ 62, 92, 97.) In turn, each of these three corporations was wholly-owned by one of the three individual Defendants: (1) Peter Ash owned 100% of Sagewood; (2) Paul Ash owned 100% of Knightsbridge; and (3) Paul Grehan owned 100% of 0562752. (*Id.* ¶¶ 14-16.)

The FAC alleges that, around September 1, 2013, control was transferred from Sagewood, Knightsbridge, and 0562752 to three new corporations: (1) Emerald Willow Holdings, Ltd. ("Emerald Willow") assumed Sagewood's shares; (2) Red River Holdings Company, Ltd. ("Red River") assumed Knightsbridge's shares; and (3) Twillingate Holdings, Ltd. ("Twillingate") assumed 0562752's shares. (*Id.* ¶¶ 13, 22, 111.)

All Owners Group Defendants are listed as Relief Defendants only, except for Peter Ash and Sagewood, which are listed as both Named Defendants and Relief Defendants.

### D. Officers/Directors Group

The last group of Defendants are three officers of the various corporate Defendants: Kimberly DeThomas, Jeremy Sabourin, and William Wrixon. The FAC also refers to these individuals as the "Current Owners," but does not provide any details about their ownership interests. (*See id.* ¶ 211.) The CFPB's brief more directly alleges that these individuals are, respectively, 100% owners of Emerald Willow, Red River, and Twillingate. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl's Br.") at 8, Dkt. No. 90.) Each of the three Defendants in the Officers/Directors Group is listed as both a Named Defendant and a Relief Defendant.

DeThomas is allegedly the Chief Executive Officer ("CEO") of NDG and E-Care; the CEO, President, and Director of NWL; CEO and President of NWRRSP; Director of PLFL, NWCL, Northway, Northway Broker, and Blizzard; and charged with "managerial responsibility" over NDG and E-Care. (Am. Compl. ¶¶ 72-79.)

Sabourin is allegedly the Chief Operation Officer ("COO") of NDG; the President of Blizzard; an "officer or director" for E-Care, each of the Funding Entities, and Red River; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 81-85.)

Wrixon is allegedly the Chief Financial Officer ("CFO") of NDG, Blizzard, and NWL; an "officer or director" for E-Care, Blizzard, PLFL, NWCL, and Twillingate; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 86-88.)

## II. Defendants' Alleged Actions

**\*4** The FAC includes nine counts, based on five types of alleged activity: (1) that Defendants' misrepresentations to consumers that they owed money on illegal loans constituted "deceptive" (Count I), "unfair" (Count II), and "abusive" (Count III) practices under the CFPA, 12 U.S.C. § 5536(a)(1)(B); (2) that Defendants' misrepresentations to consumers that U.S. and state laws did not apply to their loans constituted "deceptive" (Count IV) and "abusive" (Count V) practices under the CFPA, *id.;* (3) that Defendants' misrepresentations regarding the repercussions of nonpayment constituted "deceptive" practices under the CFPA, *id.* (Count VI);[2] (4) that Defendants' conditioning of loans on illegal wage assignment clauses violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3) (Count VII), and constituted an "unfair" practice under the CFPA, 12 U.S.C. § 5536(a)(1)(B) (Count VIII); and (5) that the Relief Defendants possess funds illegally obtained through this enterprise (Count IX).

[2]     Count VI is asserted against only the European Group Defendants, the Canadian Group Defendants, and DeThomas.

### A. Misrepresentations Regarding Loan Validity

Counts I through III are based on the allegation that Defendants "represented expressly or by implication that consumers ... were obligated to repay loan amounts, an obligation that in fact did not exist because the loans violated state licensing and/or usury laws that declared such amounts void." (Am. Compl. ¶ 276.) Specifically, E-Care "contact[ed] delinquent consumers by phone, email, and letter, restating the consumer's obligation to repay the principal and interest in full, along with a $39.00 NSF fee, and a $20.00 late payment fee." (*Id.* ¶ 160.)

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 6 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

The loans are void, the CFPB argues, because various state laws prohibit charging APRs at the levels that Defendants charged (from 599% to 703%). For example, New York makes it illegal for an unlicensed person or corporation to, directly or indirectly, charge interest at a rate exceeding 16% annually on covered loans. *See* N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-a(1). Loans exceeding that rate are void *ab initio* as usurious. N.Y. Gen. Oblig. Law § 5-511(1). Additionally, New York prohibits engaging in the business of making personal loans of $25,000 or less without a license. N.Y. Banking Law § 340. Such loans are void if their interest rates exceed those permitted to a licensee. *Id.* § 355. In such case, "the lender shall have no right to collect or receive any principal, interest or charge whatsoever." *Id.*

**B. Misrepresentations Regarding Applicability of U.S. and State Laws**

Counts IV and V allege that Defendants falsely represented to consumers that U.S. and state laws did not apply to their loans. These representations were made in the loan agreements themselves, which indicated "that US federal and state laws did not apply to Northway and Northway Broker, the consumer's account, or to the terms of the loan agreement." (Am. Compl. ¶ 168.) Additionally, if consumers contacted Defendants to "report a complaint, dispute a charge, or request reimbursement," Defendants would assert "that the consumers' state laws did not apply." (*Id.* ¶ 169.) The FAC includes a portion of a form letter allegedly sent in response to consumer inquiries, which stated:

> If you take a moment to review the attached loan agreement, you will see that [Northway] is a Financial Institution licensed and regulated in accordance with the European Union (EU) Directives. As such, the laws of the Republic of Malta (member State of the European Union), not the state of [consumer's state of residence] applies to its terms. We provided you with this notice so that you would understand the terms of your loan.

(*Id.* ¶ 170.)

By contrast, the CFPB asserts, Defendants acknowledged to potential investors (in biannual Offering Memoranda issued between 2005 and 2013), to at least one U.S. bank (in an application to process Automated Clearing House ("ACH") transactions), and to its auditors (in a 2010 external audit), that Northway's loans were indeed subject to U.S. and state laws. (*Id.* ¶¶ 186-209.) According to the FAC, Northway's loans were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah. (*Id.* ¶ 268.) Additionally, consumers in Colorado were not obligated to pay the excess fees and finance charges that Northway levied. (*Id.* ¶ 269.)

**C. Misrepresentations Regarding Consequences of Non-Payment**

**\*5** Count VI alleges that certain Defendants (the European Group, the Canadian Group, and DeThomas) misrepresented to consumers the consequences of non-payment of the loans. E-Care allegedly "falsely represented to consumers that non-payment of debt would result in lawsuit, arrest, imprisonment, or wage garnishment," despite the fact that E-Care lacked "the intention or legal authority to take such actions." (*Id.* ¶ 161.)

**D. Use of Irrevocable Wage Assignment Clauses**

Counts VII and VIII allege that Northway sometimes conditioned its loans on irrevocable wage assignment clauses. According to the FAC, the standard clause provided that, "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.)

Not only were the clauses included in the loan agreements, but the CFPB alleges they were actually enforced using ACH debit entries. (*Id.* ¶¶ 156-57.) The CFPB claims such clauses can result in "serious and detrimental interference with employment relationships," can "negatively affects promotions, pay raises, and job assignments," can "result in job loss," and can "disrupt[ ] consumers' finances and ... make it difficult for ... consumer[s] to purchase necessities or discharge other obligations in a timely fashion." (*Id.* ¶¶ 328-29.)

**E. Unjust Enrichment**

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 7 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

Lastly, the FAC alleges that the Relief Defendants (the Owners Group and the Officers/Directors Group) have been unjustly enriched by their receipt of funds or other assets that are traceable to the funds unlawfully obtained from consumers. (*Id.* ¶¶ 333-35.) The CFPA empowers this Court to provide various forms of equitable or legal relief in such circumstances. *See* 12 U.S.C. § 5565(a)(1)-(2).

## Procedural History

The CFPB filed its initial complaint against Defendants in July 2015. Sagewood moved to dismiss the complaint on November 17, 2015, and then withdrew that motion on December 17, 2015. (Dkt. Nos. 41, 53.) Pursuant to a stipulation among the parties, the CFPB filed an amended complaint on December 11, 2015. (Dkt. No. 47.) Defendants then filed three separate motions to dismiss: Paul Ash, Peter Ash, Sagewood, and Knightsbridge moved on March 16, 2016 (the "Ash Motion" and the "Ash Brief") (Dkt. Nos. 64 & 65); the European Group, the Canadian Group, and the Officers/Directors Group moved on March 16, 2016 (the "NDG Motion" and the "NDG Brief") (Dkt. Nos. 67 & 68); and Grehan and 0562752 moved on April 11, 2016 (the "Grehan Motion" and the "Grehan Brief") (Dkt. Nos. 81 & 85). Each of the motions seeks a dismissal of the FAC under Rule 12(b)(2), for lack of personal jurisdiction, and dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted, on multiple (and frequently overlapping) grounds.

## Discussion

### I. Personal Jurisdiction

All Defendants argue that this Court lacks personal jurisdiction over them, and therefore the FAC must be dismissed under Rule 12(b)(2). Because the CFPB has made a *prima facie* showing of jurisdiction over all twenty-one Defendants, Defendants' motions to dismiss are denied.

### A. Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the

procedural context in which the jurisdictional challenge in raised." *Navaera Scis., LLC v. Acuity Forensic Inc.,* 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir. 1986). A *prima facie* showing requires that the plaintiff "plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.,* 975 F. Supp. 562, 564 (S.D.N.Y. 1997). Conclusory allegations that merely restate the legal standard are insufficient to constitute a *prima facie* showing —plaintiffs must cite specific facts supporting their legal conclusions. *See Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184-85 (2d Cir. 1998); *Weiss v. Barc, Inc.,* No. 12 Civ. 7571, 2013 WL 2355509, at *1 (S.D.N.Y. May 29, 2013). "Legal conclusions couched as factual allegations are not factual allegations and cannot substitute for them." *In re Ski Train Fire,* 230 F. Supp. 2d 376, 382 (S.D.N.Y. 2002); *see also Chaplin v. Kido Indus. Co., Ltd.,* No. 10 Civ. 5711, 2011 WL 2314866, at *2 (S.D.N.Y. June 7, 2011).

**\*6** A determination regarding personal jurisdiction requires a factual inquiry that goes beyond the complaint, therefore "all pertinent documentation submitted by the parties may be considered in deciding the motion." *Pilates, Inc. v. Pilates Inst.,* 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995) (internal quotation marks omitted). All pleadings and affidavits are to be construed in the light most favorable to the plaintiff, and any doubt is to be resolved in the plaintiff's favor. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir. 1985).

### B. Analysis

All parties agree that the Court lacks general jurisdiction over Defendants, none of which is domiciled in the United States. The only question is whether, as the CFPB asserts, this Court has specific jurisdiction over them. The specific jurisdiction analysis in New York is a two-fold inquiry. First, the Court must determine whether New York law permits the exercise of personal jurisdiction over any Defendant. Second, the Court must determine whether exercising jurisdiction comports with due process. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945).

The CFPB argues that the Court has jurisdiction over all Defendants via the "transacting business" prong of New York's long-arm statute. The statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 8 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

domiciliary, ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state...." C.P.L.R. § 302(a)(1). The transacting business requirement "requires only a minimal quantity of activity, provided that it is of the right nature and quality." *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*, 731 F. Supp. 587, 592 (S.D.N.Y. 1990). A single transaction may be sufficient for personal jurisdiction under § 302(a)(1), and physical presence by the defendant in New York is not required. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999).

Even the CFPB acknowledges (at least implicitly) that not all Defendants had direct contact with the New York forum. Indeed, as discussed below, it appears from the FAC that only Northway, Northway Broker, E-Care, and Blizzard did. The CFPB's theory of jurisdiction therefore hinges on treating all Defendants as a unified entity, such that the contacts made by those Defendants may justifiably be imputed to the others. To do so, the CFPB must establish that Northway, Northway Broker, E-Care, and Blizzard acted as either "agent[s]" or "mere department[s]" of the other Defendants. *Jazini,* 148 F.3d at 184. Because I conclude that the CFPB has plausibly alleged the existence of an agency relationship among all Defendants, there is no need to evaluate whether some or all Defendants would also qualify under the "mere department" test, or whether jurisdiction would lie under Fed. R. Civ. P. 4(k), which the CFPB asserts as an alternative.

### 1. Certain Defendants Had Direct Contacts with the New York Forum

The FAC contains allegations that are more than sufficient to establish that Northway, Northway Broker, E-Care, and Blizzard directly engaged in the transaction of business in New York and other states.

Northway is alleged to be the originator of loans that are made over the Internet to consumers in New York and other states, and the operator of the DBA websites. (Am. Compl. ¶¶ 27, 152.) Northway Broker provides the consumers with brokerage services for which it collects fees and, along with Northway, is a named party to the loan agreements. (*Id.* ¶¶ 31-32.) The operation of the DBA websites and the provision of financial services to New York consumers are two separate potential grounds for satisfying the transacting business test.

**\*7** Courts in New York use a "spectrum of interactivity" test to determine whether the operation of a website constitutes the transaction of business in New York. *McCrann v. RIU Hotels S.A.,* No. 09 Civ. 9188, 2010 WL 5094396, at *5 (S.D.N.Y. Dec. 6, 2010). This spectrum ranges from essentially passive websites, which are considered analogous to a widely-circulated advertisement, and which do not establish personal jurisdiction, to highly interactive websites that, for example, allow a defendant to knowingly and repeatedly transmit computer files to customers in other states. *Citigroup Inc. v. City Holding Co.,* 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

The CFPB alleges that the DBA websites operated by Northway were highly interactive, allowing customers to apply for, accept, and manage their loans online. Consumers would establish accounts on the websites with unique usernames and passwords. (Am. Compl. ¶ 135.) Users would be required to provide their checking account number, social security number, date of birth, and home address. (*Id.* ¶ 137.) Funds would be distributed directly into consumer s checking accounts via an ACH credit. (*Id.* ¶ 138.) This level of interactivity undoubtedly falls at the high end of the internet commercial activity spectrum. *Citigroup,* 97 F. Supp. 2d at 565 & n.8.

But, beyond the websites themselves, the CFPB alleges that New York consumers actually *received* loans to which Northway and Northway Broker were named parties—loans which form the basis of this lawsuit. Indeed, the FAC includes a portion of a form letter sent to New York consumers by Northway in late 2013 (after it received a cease-and-desist letter from the New York Department of Financial Services) stating that "Northway Financial Corporation Ltd has decided to no longer provide loans to residents of the State of New York.... It has always adhered strictly to the terms of its license conditions, followed federal U.S. law and treated all of its customers, *including those in New York,* with the utmost fairness and respect." (Am. Compl. ¶ 203 (emphasis added).) There is no question that the extension of consumer credit and the provision of brokerage services are qualifying business activities for purposes of the New York long-arm statute. The FAC clearly alleges that Northway and Northway Broker transacted business in New York.

E-care's debt-collection efforts also constitute transacting business within New York. According to the FAC, E-Care contacted consumers by phone, e-mail, and letter in order to obtain repayment. (*Id.* ¶¶ 40-41, 160.) While the FAC does not

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 9 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

provide details of specific transactions between E-Care and New York consumers, it does plausibly allege the extension of credit to New York consumers by Northway and Northway Broker, followed by debt-collection efforts to those same consumers by E-Care. Even minimal active efforts to collect debts from a single New York consumer—such as mailing a debt collection letter or contacting a debtor by phone—can be sufficient to establish personal jurisdiction. *See Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015); *Sisler v. Wal-Mart Stores, Inc.,* No. 02 Civ. 602A, 2003 WL 23508105, at *1 (W.D.N.Y. Dec. 24, 2003); *Sluys v. Hand,* 831 F. Supp. 321, 324 (S.D.N.Y. 1993). Furthermore, E-Care used New York correspondent bank accounts to conduct wire transfers between the enterprise's U.S. customers and its own Canadian accounts. (Am. Compl. ¶¶ 147-51.) As the New York Court of Appeals recently confirmed, deliberate use of New York-based correspondent accounts to further an international scheme can be sufficient standing alone to meet the "transacting business" requirement. *See Al Rushaid v. Pictet & Cie,* No. 180, 2016 WL 6837930 (N.Y. Nov. 22, 2016). Based on these allegations, this Court has personal jurisdiction over E-Care under New York's long-arm statute.

**\*8** Lastly, Blizzard allegedly used a lead generator service to target New York and New Jersey consumers, and allegedly maintains software to redirect those consumers to the DBA websites operated by Northway. (Am. Compl. ¶¶ 131-32.) Such activities, which directly and intentionally target New York residents, meet the transacting business requirement. *See, e.g., Lawson v. Full Tilt Poker Ltd.,* 930 F. Supp. 2d 476, 484 (S.D.N.Y. 2013).

The FAC thus contains sufficient factual allegations to conclude that the Court has personal jurisdiction under New York's long-arm statute over Northway, Northway Broker, E-Care, and Blizzard (the "New York Defendants") through their direct business transactions in New York. Personal jurisdiction over the remaining entities and individuals (the Owners Group, the Officers/Directors Group, and the Funding Entities) only exists if it can be imputed from the New York-based activities of the New York Defendants.

### 2. The FAC Plausibly Alleges the Existence of an Agency Relationship Between Defendants

New York's long-arm statute notes that jurisdiction may be established by a defendant's activities conducted either "in person or *through an agent.*" CPLR § 302 (emphasis

added). Although courts assessing the existence of an agency relationship for purposes of § 302 "have focused on the realities of the relationship in question rather than the formalities of agency law," *CutCo,* 806 F.2d at 366, there are traditionally four elements to consider. The alleged agent must have acted (1) for the benefit of, (2) with the knowledge of, (3) with the consent of, and (4) under the control of, the principal. *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir. 1981); *see also CutCo,* 806 F.2d at 366.

The CFPB plausibly alleges that the Owners Group benefitted from, knew about, consented to, and controlled, the activities of the New York Defendants. The FAC alleges that the proceeds of the payday loans extended by Northway and Northway Broker and collected by E-Care were primarily distributed to the Owners Group via shareholder dividends. (Am. Compl. ¶ 236.) These dividends, which may have amounted to millions of dollars annually, continued to be distributed to Peter Ash, Paul Ash, and Grehan through their respective companies after the 2009 handoff of "operational control" to the Officers/Directors Group until the transfer of ownership to Emerald Willow, Red River, and Twillingate in 2013. (*Id.* ¶¶ 236, 239.) As the ultimate shareholders (and, in some cases, founders) of all of the New York Defendants, the Owners Group undoubtedly had knowledge of and consented to those entities' general activities. The FAC includes details about specific actions that Peter Ash, Paul Ash, and Grehan took to establish the payday lending operation and to direct profits to themselves through accounts belonging to Sagewood, Knightsbridge, and 0562752. (*See, e.g., id.* ¶¶ 118(g)-(q), 225-28.) Lastly, the Owners Group, even if they lacked the formal status of a partnership or joint venture, nonetheless indirectly jointly owned the New York Defendants and thus exercised sufficient control over them to satisfy the agency test. *See Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.,* 319 F. Supp. 2d 352, 361 (S.D.N.Y. 2004); *see also CutCo,* 806 F.2d at 366.

Despite Defendants' arguments, this is not a case like *Gerstle v. National Credit Adjusters, LLC,* 76 F. Supp. 3d 503, 508-10 (S.D.N.Y. 2015), where the plaintiff merely alleged that the corporation's employee vaguely "authorized and permitted" the forum-targeting conduct by the corporation. The Owners Group Defendants indirectly owned all of the New York Defendants until 2013. The FAC details how each individual in the Owners Group possessed signing authority over various bank accounts used by the other Defendants to transfer proceeds from the payday loan scheme to other entities and to themselves for personal use. (Am. Compl. ¶¶ 219-29.)

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 10 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

Even after ceding day-to-day control of the companies to the Officers/Directors Group, Peter Ash, Paul Ash, and Grehan continued to collect dividends and provide strategic direction to the point that the companies continued to reflect their beliefs. (*Id.* ¶¶ 239-40.) This is sufficient, certainly at the pleading stage, to establish an agency relationship.

**\*9** Similarly, the FAC alleges that the Officers/Directors also benefitted from, had knowledge of, consented to, and exercised control over, the activities of the New York Defendants. Although the FAC is vague about what ownership role the Officers/Directors currently play, it does clearly allege that the Officers/Directors have received profits from the payday loan scheme. (*Id.* ¶ 227.) The allegations also clearly show that the Officers/Directors Group had knowledge of, consented to, and exercised control over, the scheme, and details their personal roles in recruiting employees, training staff, marketing the loans, and managing the companies. (*Id.* ¶¶ 205-09, 230-41.) DeThomas, for example, allegedly signed letters to a state financial regulator as President of E-Care regarding their alleged debt collection practices. (*Id.* ¶¶ 181-85.) Sabourin allegedly signed an agreement as President of Blizzard with a lead generator to locate potential customers in the United States. (*Id.* ¶ 241.) Wrixon allegedly signed a certification confirming he was Secretary of Blizzard and the custodian of its corporate records. (*Id.* ¶ 238.) All three individual Owners Group Defendants were signatories to the biannual offering memoranda that described the enterprise's debt-collection practices. (*Id.* ¶¶ 187-91.) The FAC contains more than adequate factual detail to support the allegation that the Officers/Directors acted as principals over the New York Defendants.

Finally, the FAC sufficiently pleads that Funding Entities meet the test for an agency relationship, although this presents a closer question. The FAC alleges that funds were transferred from the accounts used to collect the enterprise's consumer loan repayment deposits to accounts belonging to each of the Funding Entities, among other Defendants. (*Id.* ¶¶ 147, 226.) The FAC alleges that NWL issued biannual offering memoranda (signed by the individual Owners Group Defendants) between 2005 and 2013 that were used to solicit potential investors in the payday lending scheme. (*Id.* ¶¶ 187-91, 218.) These memoranda described how entities like Northway and Northway Broker were the Funding Entities' "affiliates" that made and collected the payday loans to U.S. consumers, which is how the entire enterprise generated revenue. (*Id.* ¶¶ 187-91.) These allegations make clear

that the Funding Entities knew about, consented to, and benefited from the payday lending activities of the New York Defendants.

The only close question is whether the Funding Entities exerted any degree of "control" over any of the New York Entities. This requirement, for purposes of § 302, is generally applied flexibly, requiring only "some measure" of control by the "principal" over the "agent." *Mayes v. Leipziger,* 674 F.2d 178, 181 (2d Cir. 1982). This minimal level of required control does not need to be formal or direct. *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir. 2000). Such control has been readily found among corporations where the "agent" is a wholly-owned subsidiary of the "principal," but it has also been found in numerous occasions among corporate affiliates like those at issue here. *See Palmieri v. Estefan,* 793 F. Supp. 1182, 1194 (S.D.N.Y. 1992); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.,* 756 F. Supp. 126, 130 (S.D.N.Y. 1991); *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988). The FAC alleges, with significant detail, how the work of the New York Defendants was interrelated to the activities of the Funding Entities, which could not solicit investors absent the rest of the payday lending operation. The FAC also alleges that all of the corporate Defendants are or were ultimately owned (and thus *formally* controlled) by a small group of individuals, who also serve or served in various overlapping officer and director positions at the different entities. This level of interconnection, financial reliance, and mutual benefit between the Funding Entities and the New York Defendants is sufficient, at least at the pleading stage, to establish long-arm jurisdiction over the Funding Entities.

### 3. The Exercise of Personal Jurisdiction over Defendants Comports with Due Process

Having determined that New York's long-arm statute would extend the state's jurisdiction over all twenty-one Defendants, I must assess whether the exercise of this jurisdiction comports with federal due process. This analysis has two related components: the "minimum contacts" test and the "reasonableness" inquiry. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567-58 (2d Cir. 1996).

**\*10** The first test asks whether the defendant has sufficient "minimum contacts" with the forum to justify the court's exercise of personal jurisdiction. Where, as here, the case is predicated on specific jurisdiction, minimum contacts exist "where the defendant purposefully availed itself of the

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 11 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert,* 305 F.3d at 127 (internal quotation marks omitted) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 152 (2d Cir. 2001)).

Here, according to the FAC, Defendants, through the actions of their agents Northway, Northway Broker, E-Care, and Blizzard, intentionally targeted New York consumers with their payday loans and generated profits from those consumers. Blizzard, for example, allegedly used a lead generator service to locate potential New York customers, and then directed them to the DBA websites where they could apply for loans from Northway and Northway Broker. In 2013, New York's state financial regulator sent Defendants a cease-and-desist letter regarding their New York lending activities. (Am. Compl. ¶¶ 172-73.) In response, Northway sent a letter to its New York consumers saying it was halting its New York lending activity. (*Id.* ¶ 203.) The FAC's allegations suggest that Defendants were fully aware that they were extending credit to consumers in New York, and thus Defendants could foresee being subject to litigation here as a result of their actions.

The second aspect of the due process inquiry asks whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice," that is, whether it is reasonable under the circumstances of the particular case. *Metro. Life,* 84 F.3d at 568. Courts are to consider five factors when assessing reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* While the exercise of jurisdiction is favored where minimum contacts have been found to exist, jurisdiction may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985).

Defendants present no compelling reason why the exercise of personal jurisdiction would be unreasonable in this case. The NDG Motion asserts that, because Defendants are located in Canada and Malta, litigating in New York imposes a significant burden. This may be true, but all of the other factors weigh in the CFPB's favor. The CFPB seeks to remedy wrongs allegedly committed against New York consumers in violation of federal law, which favors a finding of jurisdiction. Furthermore, evidence of the loans made to consumers may come, at least in part, from consumers themselves, who would be located in this forum. Judicial economy and the interests of the forum thus outweigh any burden imposed on Defendants.

I therefore conclude that the exercise of personal jurisdiction over all Defendants is proper, and Defendants' motions to dismiss under Rule 12(b)(2) are denied.

## II. Failure to State UDAAP Claims Under the CFPA

**\*11** Defendants argue for dismissal of the CFPA UDAAP-based claims because: (1) the FAC fails to allege that certain Defendants are covered by the CFPA's provisions, (2) it fails to extend liability to all Defendants under a "common enterprise" theory, (3) it fails to provide details on specific consumer transactions, and (4) it is an improper attempt to enforce state usury law. Each of these arguments fails.

In deciding a motion to dismiss under Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 12 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

not do." *Twombly,* 550 U.S. at 555 (internal quotation marks, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal,* 556 U.S. at 680.

**A. Applicability of the CFPA**

Defendants first argue that the FAC's UDAAP claims should be dismissed because Peter Ash, Sagewood, NDG, and the members of the Officers/Directors Group are neither "covered persons" nor "service providers" under the CFPA, and thus are not covered by its restrictions. 12 U.S.C. § 5481(6), (26). The Ash Motion also argues that Paul Ash and Knightsbridge are not covered by the CFPA's definitions but, as they are named as Relief Defendants only, that is irrelevant.

The CFPA's UDAAP provision prohibits any "covered person" or "service provider" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1). The law defines "covered person" to mean (1) "any person that engages in offering or providing a consumer financial product or service" and (2) "any affiliate" of such person if the affiliate "acts as a service provider" to them. § 5481(6). An "affiliate" of a covered person means "any person that controls, is controlled by, or is under common control with" the covered person. § 5481(1). A "service provider" means (with some exceptions not relevant here) "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." § 5481(26)(A). Although the term "material service" is not defined in the CFPA, it includes "participat[ing] in designing, operating, or maintaining [a] consumer financial product or service." 12 U.S.C. § 5481(26)(A)(i).

Additionally, the CFPA law treats as a "covered person" any person meeting the definition of a "related person." § 5481(25)(B). The definition of "related person" includes any "director," "officer," "controlling shareholder," or "agent" of a covered person, any "employee charged with managerial responsibility for" a covered person, and "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." § 5481(25)(C)(i)-(ii).

**\*12** Starting with where the parties agree, Defendants do not contest that the FAC plausibly alleges that Northway, Northway Broker, and E-Care are all covered persons by either extending loans to U.S. consumers, collecting

payments on those loans, or providing brokering services. *See* § 5481(5), (15)(A)(i), (x). The FAC also alleges that Blizzard and the Funding Entities provide material services to covered persons by recruiting investors and identifying potential customers for Northway and the other entities. Blizzard and the Funding Entities are all commonly controlled with Northway, Northway Broker, and E-Care, and thus qualify as covered persons themselves as affiliates and service providers of covered persons.

NDG, in addition to being a "related person" by virtue of its status as controlling shareholder of Blizzard and E-Care, is also a service provider to Northway and Northway Broker because it provided material services to those entities. According to the FAC, NDG personnel "established and managed banking and payment processing relationships with US-based service providers on behalf of its subsidiaries and entities with which it is under common control." (Am. Compl. ¶ 25.) NDG staff communicated with Originating Depository Financial Institution ("ODFI") service providers and TPPPs using Northway, Northway Broker, and E-Care email addresses. (*Id.* ¶¶ 143-44.) As the CFPB notes, relationships with ODFIs and TPPPs are necessary in order to transfer money to and from U.S. consumers, a vital component of the enterprise's payday lending business. (Pl.'s Br. at 27.) NDG's services were thus important for "operating" and "maintaining," § 5481(26)(A)(i), the consumer financial services Northway and Northway Broker were providing, under the ordinary meaning of those terms. *See CFPB v. ITT Educ. Servs., Inc.,* No. 1:14 Civ. 00292, 2015 WL 1013508, at *25 (S.D. Ind. Mar. 6, 2015). NDG thus also falls into the statute's definition of service provider.

Peter Ash and Sagewood, as controlling shareholders of other covered persons (NDG, Northway, Northway Broker, Blizzard, E-Care, and the Funding Entities), also qualify as covered persons through their status as "related persons." § 5481(25)(B), (C)(i). Although the FAC contains allegations that suggest the material participation by the other members of the Owners Group—Paul Ash, Knightsbridge, Grehan, 0562752, Red River, Twillingate, and the current controlling shareholder Emerald Willow—each is only named as a Relief Defendant, meaning their status as a covered person is not at issue.

Lastly, each member of the Officers/Directors Group, as an officer or director of multiple covered persons, (*see* Am. Compl. ¶¶ 72-88), qualifies as a related person under the CFPA.[3] § 5481(25)(C)(i). Thus, all are treated for

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

purposes of federal consumer financial law as covered persons themselves. § 5481(25)(B).

3    The NDG Motion's argument, (*see* NDG Br. at 21-22), that § 5481(25)(C)(i) requires directors or officers to have "managerial responsibility" over a covered person in order to qualify as related persons is a clear misreading of the statute, which only requires managerial responsibility for *employees,* not officers or directors.

The CFPB has properly alleged that the CFPA's UDAAP provision covers all of the Named Defendants in this case.

### B. Specificity of CFPA Claims

Next, the Ash and NDG Motions argue that the FAC fails to sufficiently plead the elements necessary to demonstrate that any Defendant engaged in unfair, deceptive, or abusive acts or practices in violation of the CFPA. Specifically, Defendants claim that the FAC fails to identify any particular loans made to consumers, any particular consumers injured by those loans, or any particular material statements that were deceptive. These failures, Defendants argue, make the FAC too conclusory to pass muster under the *Iqbal/Twombly* standard.

### 1. Unfair Acts or Practices

**\*13**  The FAC includes two counts of engaging in "unfair" acts or practices under the CFPA: Count II alleges that misrepresenting to consumers that they owed money on loans that they legally did not owe constitutes an "unfair" act or practice, and Count VIII alleges that conditioning certain loans on illegal wage assignment clauses is an "unfair" act or practice. Defendants argue these allegations are conclusory, and that by failing to identify specific loans or consumers affected, the FAC fails to give fair notice of the conduct alleged.

In order to declare an act or practice is "unfair" under the CFPA's rulemaking authority, the CFPB must have "a reasonable basis" to conclude that "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and that "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act ("FTCA").

*ITT Educ. Servs.,* 2015 WL 1013508, at *25. Under the FTCA, a "substantial injury" is generally a financial one, although other types of injuries are cognizable as well. *Id.*

The CFPB has plausibly pleaded that Northway, Northway Broker, and E-Care violated the CFPA's prohibition on engaging in unfair acts or practices. First, falsely representing to consumers that they owe money that they, in fact, do not owe is likely to cause consumers pecuniary injury in the form of repayments that they otherwise would not make. Although Defendants argue that the loss to consumers may have been outweighed by "countervailing benefits to consumers or competition," that argument is entirely unsupported. Losing money they are otherwise entitled to keep provides consumers no conceivable benefit, and Defendants do not even bother proffering one.

Second, incorporating irrevocable wage assignment clauses into Northway and Northway Broker's loan agreements is also an unfair practice under the CFPA. Again, such assignments, if utilized, would deprive consumers of money they were not legally obligated to repay, a clear financial harm without a possible countervailing benefit. Indeed, the FAC lays out a litany of potential harms that can result from the use of these clauses. (Am. Compl. ¶¶ 328-29.) And the FAC alleges that these clauses were not only incorporated into loan agreements but actually enforced on some occasions. (*Id.* ¶¶ 156-57.) If proved, these allegations would show that consumers were deprived of money via contractual provisions that were automatic (and thus, by definition, could not be avoided) and that have no countervailing benefits.

Third, Defendants are incorrect that *Iqbal* and *Twombly* require the CFPB to identify specific consumers targeted by the payday lending scheme in order to survive a motion to dismiss. The CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations. *See, e.g., FTC v. Tax Club, Inc.,* 994 F. Supp. 2d 461, 473 (S.D.N.Y. 2014) (finding, for state-law UDAP claim, agency was "not required to name the consumers affected by the allegedly fraudulent conduct" in complaint).

The FAC thus plausibly alleges that Northway and Northway Broker, as parties to the loan agreements with the wage-assignment clauses, (Am. Compl. ¶¶ 31-32, 155), and E-Care, as the collection agency, (*Id.* ¶ 160), engaged in unfair consumer lending practices.

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 14 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

### 2. Deceptive Acts or Practices

**\*14** The FAC includes three counts of engaging in "deceptive" acts or practices under the CFPA: Counts I, IV, and VI. Counts I and IV are asserted against all Named Defendants, Count VI is asserted only against the European Group, the Canadian Group and DeThomas. While the term "deceptive" is not defined in the CFPA, all parties accept for purposes of this case that the term bears the same meaning as under the FTCA. *See* 15 U.S.C. § 45(a)(1).

To prove the existence of a deceptive act or practice under the FTCA, a plaintiff must show three elements: "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), [that] the representation, omission, or practice is material." *FTC v. Med. Billers Network, Inc.,* 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) (alteration in original) (quoting *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d Cir. 2006)).

Count I alleges that Named Defendants deceived consumers regarding Defendants' right to collect on loans that were actually void under state usury law. Count IV alleges that Named Defendants misled consumers regarding the applicability of state and federal law. Count VI accuses the European Group, the Canadian Group and DeThomas of deception regarding the consequences of non-payment. Defendants do not contest that, for each of these counts, the FAC plausibly alleges that certain Defendants made misleading representations to consumers; Defendants only argue that the CFPB has not pleaded that those misrepresentations were *material.* (*See* NDG Br. at 25-26.)

It is well-established that falsely representing to a consumer that he or she owes money constitutes making a "material" misrepresentation. *See Verity Int'l,* 335 F. Supp. 2d at 496-97. Misrepresentations regarding the legal or practical consequences of failing to pay back such a debt— for example, that it would result in "lawsuits, arrest, imprisonment, or wage garnishment" (Am. Compl. ¶ 311)— are also material, as they are likely to affect the consumer's conduct regarding the alleged debt. *See FTC v. Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001). Similarly, misrepresenting the applicability of state or federal law to the loans—laws that would, if applicable,

make the loans void—is just as likely to affect consumer decisionmaking and is therefore a material misrepresentation.

Defendants' argument—that withholding information from (or worse, actually affirmatively lying to) consumers regarding their legal obligations to repay loans are actions that are unlikely to affect consumer decisionmaking—is, frankly, bizarre. It is also completely unsupported by caselaw, and therefore Counts I, IV, and VI will not be dismissed on these grounds.

The FAC plausibly alleges that Northway, Northway Broker, and E-Care, through their various roles in the enterprise, violated the CFPA's prohibition on deceptive practices.

### 3. Abusive Acts or Practices

Counts III and V allege that Named Defendants, by misrepresenting to consumers that they owed money on the void loans and by misrepresenting the applicability of state and federal law to the loans, engaged in "abusive" practices. Defendants argue that, by failing to identify specific loans or consumers affected, the CFPB cannot allege the elements of an abusiveness claim.

The CFPA provides that the CFPB cannot declare an act or practice abusive unless the act or practice "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage" of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service," or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

**\*15** Again, the CFPB has pleaded sufficient facts to survive a motion to dismiss on these claims. Falsely representing to consumers that the loans they sought (1) are valid and must be repaid and (2) are not covered by state or federal law "materially interferes" with consumers' ability to understand the terms and conditions of their loans. It should be patently obvious to any lender that most consumers will be completely unaware of the details of their state's usury laws, such that misrepresenting the nature of those laws will interfere with the consumer's ability to understand the loan agreement's terms and to make an informed choice about the loan. In the

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 15 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

only other case the Court is aware of interpreting the CFPA's prohibition on abusive practices, another court found that allegations of similar misrepresentations by a student loan provider were sufficient to survive a motion to dismiss. *See Illinois v. Alta Colleges, Inc.,* No. 14 Civ. 3786, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014).

Again, the misrepresentations at issue were allegedly made by Northway, Northway Broker, and E-Care, and thus the FAC has plausibly alleged violations of the abusive prong of the CFPA's UDAAP provision by these three entities.

### C. Common Enterprise Liability

The Ash and NDG Motions next argue that, even if the FAC plausibly alleges UDAAP violations by Northway, Northway Broker, and E-Care, that the CFPA claims should be dismissed as to the remaining Named Defendants, because extension of liability to them relies on a "common enterprise" theory. Defendants argue that common enterprise liability does not exist under the CFPA, and that even if it does, it was not properly pleaded here. The CFPB argues that all Named Defendants are liable under common enterprise, alter-ego, and agency theories of liability.

### 1. Existence of Common Enterprise Liability Under the CFPA

Ordinarily, pleadings against multiple defendants must specify "the claims with which each individual defendant is charged." 5 Fed. Prac. & Proc. Civ. § 1248 (3d ed. 2016). The common enterprise doctrine, in the FTCA context, operates to "prevent individuals and companies from using corporate structures to circumvent the FTCA." *FTC v. PayDay Fin. LLC,* 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013). The CFPB argues that the doctrine should also apply to the CFPA because the two statutes serve the same public purpose, and because the statutes use similar language.

The CFPB makes a compelling argument that the language of the CFPA's provisions was designed to parallel those of the FTCA. The FTCA prohibits "unfair or deceptive acts or practices," in or affecting commerce, 15 U.S.C. § 45(a)(1), while the CFPA prohibits "covered person[s] or service provider[s]" from engaging in "any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1). The FTCA's language has long been interpreted to include common enterprise liability. *See Delaware Watch Co. v. FTC,* 332

F.2d 745, 746 (2d Cir. 1964). And the Supreme Court has stated that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States,* 342 U.S. 246, 263 (1952).

Indeed, as discussed above, courts have adopted the established meaning of other words in § 5536 from the FTCA, in acknowledgment of the two provisions' similarity. *See, e.g., CFPB v. Gordon,* 819 F.3d 1179, 1193 (9th Cir. 2016) (adopting definition of "deceptive" from FTCA); *ITT Educ. Servs.,* 2015 WL 1013508, at *25 (adopting definition of "unfair" from FTCA). Defendants provide no rationale why these parallel provisions of law should not be interpreted in the same way, and even advocate in a footnote that the term "deceptive" as used in the CFPA should be interpreted to have the same meaning as under the FTCA. (*See* NDG Br. at 25 n.6).

**\*16** Defendants highlight two structural differences between the FTCA and CFPA that they argue warrant treating the two statutes differently. (*See* Ash Reply Br. at 16, n.10, Dkt. No. 93.) Defendants point to the CFPA's inclusion of a "related person" definition, 12 U.S.C. § 5481(25), and the statute's prohibition on "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider" in violation of a CFPB-promulgated rule, 12 U.S.C. § 5536(a)(3), to argue that the CFPA provides for specific types of derivative liability to the exclusion of common-law forms of liability like the common enterprise theory. However, neither of these statutory provisions provides for derivative liability for violations of the UDAAP provision. The "related person" definition merely expands the universe of actors who may be responsible for their own violations of the UDAAP provision, and the "substantial assistance" provision only applies to violations of agency-promulgated rules, not the statute's UDAAP provision. These provisions do not alter the conclusion that the similarities in language and structure between the CFPA and FTCA support the extension of the FTCA's long-established theory of common enterprise liability to the CFPA.

The FTCA and CFPA were also enacted for similar purposes. Both statutes are designed to protect the public from practices that unfairly exploit the imbalance of power between the individual consumer and the corporation. They empower

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 16 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

watchdog agencies—like the CFPB and FTC—to enforce their standards through investigation and litigation. And the FTCA's public-interest purpose is precisely why the common enterprise doctrine was established under the FTCA in the first place. As the Sixth Circuit stated nearly half a century ago: "[W]here the public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required in the determination of whether a parent should be held [liable] for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *P.F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 267 (6th Cir. 1970). The same logic has led to courts in this Circuit to apply common enterprise liability to other financial protection statutes, like the Commodity Exchange Act *See CFTC v. Int'l Fin. Servs. (N.Y.), Inc.,* 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004).

Due to the CFPA's recent vintage, only one other court has considered the question of whether common enterprise liability should apply under it. *See Pennsylvania v. Think Fin., Inc.,* No. 14 Civ. 7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016). The *Think Finance* court concluded that the doctrine should not apply under the CFPA, because (1) the CFPA may be enforced by multiple state and federal government agencies (while the FTCA may only be enforced by the FTC), and (2) the CFPA allows suit against "abusive" practices, in addition to "unfair" and "deceptive" ones, unlike the FTCA.

It is unclear why either of those is a relevant consideration when determining whether common enterprise liability exists under the CFPA, and the *Think Finance* court did not attempt to explain its reasoning. The doctrine is judicially established, and designed to deal with "a case in which the same individuals were transacting an integrated business through a maze of interrelated companies." *Delaware Watch,* 332 F.2d at 746. The fact that multiple government agencies could theoretically enforce the statute, or that the statute covers a wider array of unlawful practices, does not appear pertinent to the calculus. What appears relevant are the two statutes' public-interest purposes and Congress's use of parallel language and structure. I conclude that common enterprise liability does apply under the CFPA and reject the holding of *Think Finance.*

**2. Application of Common Enterprise Liability**

Under a common enterprise theory, "each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group." *Tax Club,* 994 F. Supp. 2d at 469. Courts consider five non-dispositive factors in evaluating whether a common enterprise exists between two defendants: "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Id.* (quoting *FTC v. Consumer Health Benefits Ass'n, No.* 10 Civ. 3551, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012)).

**\*17** First, the remaining Canadian Group entities (Blizzard, NDG, and the Funding Entities) all share most of these factors with E-Care. They all share officers and employees. (Am. Compl. ¶¶ 72-79, 81-85, 86-88.) They are all operated under common control. (*Id.* ¶ 11.) NDG, Blizzard, and E-Care all share office space. (*Id.* ¶¶ 17-20, 37-39, 42-43.) All are alleged to have comingled funds. (*Id.* ¶¶ 147, 226.)

Second, Sagewood shared some of these factors with Northway, Northway Broker, and E-Care, at least until its controlling stake in these companies was transferred to Emerald Willow in September 2013. (*Id.* ¶ 13.) Sagewood is not alleged to have had any employees, and had no officers other than Peter Ash, who was an officer and director of nearly all the other corporate Named Defendants until 2009 and continued to exert control over the enterprise until long after that. (*Id.* ¶¶ 67, 233.) Sagewood was the indirect controlling shareholder of all of the Canadian Group and European Group Defendants until 2013, satisfying the common control factor. (*Id.* ¶¶ 61-62.) Although Sagewood's address was not shared with any other entities, Peter Ash did use as his business address the same location that was used by Defendants E-Care, Emerald Willow, NDG, NWL, PLFL, and NWRRSP. (*Id.* ¶¶ 17, 18, 38, 50, 52, 54, 58, 60.) Funds allegedly travelled between accounts controlled by Sagewood and the other Defendants and were allegedly used by Peter Ash for personal purposes unrelated to the enterprise. (*Id.* ¶¶ 225, 228-29, 242-52.)

I am satisfied that, at least at the pleading stage, the CFPB has alleged common enterprise liability for the CFPA counts against Sagewood and all of the European Group and Canadian Group Defendants. However, common enterprise liability only applies to corporations, not to individuals, *see Tax Club,* 994 F. Supp. 2d at 469, so it cannot be used to extend liability to the Officers/Directors Group or to Peter Ash personally.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 17 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

#### D. Individual Liability

The CFPB argues that the four individual Named Defendants are all liable for the CFPA violations committed by the corporate Named Defendants under the standard for individual liability borrowed from the FTCA. Defendants do not appear to contest that the FTCA's standard applies here.

Under that standard, an individual will be liable for corporate unfair, deceptive, or abusive acts or practices if (1) he or she "participated directly in the wrongful acts or practices" or had the authority to control the corporate defendant who did, and (2) "had some knowledge of the acts or practices." *Tax Club,* 994 F. Supp. 2d at 471 (quoting *FTC v. Five-Star Auto Club,* 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000)); *accord Consumer Health Benefits Ass'n,* 2012 WL 1890242, at *5. Authority to control a company "can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Med. Billers Network,* 543 F. Supp. 2d at 320 (quoting *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir. 1989)). The knowledge requirement "may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* (quoting *FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

 *18 The FAC alleges that each of the Officers/Directors Defendants was actively involved in the business affairs of Northway, Northway Broker, and E-Care during the period in question, with the three individuals taking over day-to-day management of the companies beginning in 2009. (Am. Compl. ¶¶ 230-41.) Each served as an officer or director (or both) of either Northway, Northway Broker, or E-Care. (*Id.* ¶¶ 72-88.) And each had (or should have had, based on the allegations) knowledge of the misrepresentations made by the corporations they controlled. The Officers/Directors should have known that state and federal laws applied to the loans their companies issued because they signed an offering memorandum in September 2013 admitting that fact. (*Id.* ¶¶ 205, 209.) They should have known that their loans were void in many states because various state financial regulators (including New York's) sent them cease-and-desist letters between 2011 and 2014, some of which triggered responses signed by the Officers/Directors themselves. (*Id.* ¶¶ 167-76, 201-204.)

Peter Ash also meets the standard for individual liability based on the FAC's allegations. Until 2013, he was the sole controlling shareholder of all of the entities that originated the loans and made the representations at issue. He established the corporations, set up their bank accounts, and personally hired their first employees, including some of the Officers/Directors. (*Id.* ¶¶ 118, 210, 213-15, 218-23.) He, along with Paul Ash and Paul Grehan, continued to provide strategic direction as owners to the companies after they handed over day-to-day control. (*Id.* ¶ 239.) He was a personal signatory to multiple offering memoranda that described Northway's lending practices, including how the loans were secured by potentially unenforceable wage assignment clauses and were potentially void due to their violation of state usury laws. (*Id.* ¶¶ 186-89.) The FAC therefore plausibly alleges personal liability of Peter Ash and the Officers/Directors Group.

#### E. State Usury Law

The Ash and NDG Motions make another argument as to why the CFPA claims should be dismissed for failure to state a claim: that the claims are an improper attempt by the CFPB to enforce state usury laws. Defendants are correct that the CFPB is not empowered by Congress to enforce state law, and is not permitted to establish a federal usury limit by regulation. 12 U.S.C. § 5517(o). However, none of the FAC's claims is seeking relief for a violation of a usury limit. Instead, Counts I, II, and III seek relief for *misrepresentations* to consumers about their legal obligation to repay loans that were, in fact, invalid due to state usury laws. Just as lying about committing a prior crime can constitute a separate offense of perjury, misrepresenting to consumers the legal status of an invalid loan agreement can constitute a separate violation of consumer protection law. Defendants offer no legal support for their theory that the CFPB's claims in this case are an improper "end run" around the prohibition on establishment of a federal usury limit and the Court is not aware of any.

### III. Failure to State Credit Practices Rule Claim

The Ash Motion argues that Counts VII and VIII should be dismissed because Paul Ash, Peter Ash, Sagewood, and Knightsbridge are not covered by the Credit Practices Rule. The NDG Motion argues that Count VII should be dismissed as insufficiently specific to properly allege a violation of the Credit Practices Rule.

First, Count VIII is not a Credit Practices Rule claim, but rather a CFPA claim, so it will not be dismissed. Second,

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

Paul Ash and Knightsbridge are not Named Defendants and are therefore not covered by either Count VII or Count VIII. Third, for the same reasons that the CFPA claims will not be dismissed for failure to identify particular consumers and particular loans, Count VII will not be dismissed, as the CFPB is not required to identify its proof at the pleadings stage.

The Credit Practices Rule is a regulation promulgated by the FTC under 15 U.S.C. § 57a, which the CFPA gives the CFPB the authority to enforce "to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service." 12 U.S.C. § 5581(b)(5)(B)(ii). Among other things, the Credit Practices Rule prohibits a "lender" from "tak[ing] or receiv[ing] from a consumer an obligation that ... contains an assignment of wages or other earnings" unless assignment is "revocable at the will of the debtor," is a qualifying "payroll deduction plan or preauthorized payment plan," or "applies only to wages or other earnings already earned at the time of the assignment." 16 C.F.R. § 444.2(a)(3). A "lender" is elsewhere defined as any person "who engages in the business of lending money to consumers" within the FTC's jurisdiction. § 444.1(a).

**\*19** As already discussed, all Named Defendants constitute covered persons or are treated as covered persons under federal consumer financial protection law. All corporate Named Defendants are jointly and severally liable for their participation in the "common enterprise"—which all agree certainly applies to rules promulgated under the FTCA—and the individual Named Defendants are liable by virtue of their knowledge and direct participation or control over the corporate entities. Per the FAC's allegations, Northway and Northway Broker constitute lenders because they lent money to consumers. The FAC also alleges that, in their capacity as lenders, Northway and Northway Broker incorporated irrevocable wage assignment clauses into some of their loan agreements, and E-Care received automatic payments from consumers under those clauses. (Am. Compl. ¶¶ 155-57, 324.) Therefore, the CFPB has properly alleged a Credit Practices Rule violation against all Named Defendants.

## IV. Time Bar / Retroactivity

The Ash and Grehan Motions argue that the FAC should be dismissed as to their Defendants as time-barred or precluded by retroactivity, because the conduct alleged falls outside the relevant statute of limitations period or else occurred prior to the date upon which the CFPA became effective. To clarify, although the Ash and Grehan Motions appear to seek

dismissal of the entire FAC, Peter Ash and Sagewood are the only Owners Group Defendants covered by most of the FAC's claims. The other Owners Group Defendants are only Relief Defendants, and are thus implicated only by Count IX, which the Grehan Motion argues is bound by the CFPA's statute of limitations for UDAAP claims since it seeks disgorgement of funds received in violation of the CFPA's UDAAP provision. Furthermore, Count VII is not a CFPA-based claim and is therefore not covered by the law's statute of limitations, and Peter Ash and Sagewood do not specifically argue in the Ash Motion for its dismissal on timeliness grounds.

A statute of limitations defense is ordinarily an affirmative defense that must be raised in an answer; however, it may be decided on a Rule 12(b)(6) motion if the defense "is clear from the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008). The CFPA provides that, for UDAAP claims, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The date of discovery is the date when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir. 1992).

The CFPB's original complaint was filed under seal on July 6, 2015, and was unsealed on July 31, 2016. (*See* Dkt. Nos. 2, 5, 6.) That complaint did not name any individual Defendants nor any Relief Defendants; the only Owners Group Defendant named was Sagewood. (Dkt. No. 6.) The FAC (which added Peter Ash as a Named Defendant and all of the Owners Group as Relief Defendants) was filed on December 11, 2015. (Dkt. No. 47.) The Ash Motion therefore argues that the alleged offending conduct occurred prior to July 2012 and that the CFPB knew of, or should have discovered, the facts underlying the UDAAP claims prior to that date. The Grehan Motion argues that disgorgement of any funds received prior to December 2012 would be improper for the same reason.

While the CFPB does allege that some of Defendants' actions occurred prior to July 2012, it also alleges that the payday lending scheme continued to operate into 2013 and 2014. The FAC includes a table of usurious rates that Northway and Northway Broker allegedly charged U.S. consumers that was taken from one of the DBA websites in May 2013. (Am. Compl. ¶ 158.) Blizzard is accused of working with a lead generator to target New York and New Jersey

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 19 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

consumers in 2013 and of directing those leads to the DBA websites operated by Northway. (*Id.* ¶¶ 130-32, 241.) State regulators have allegedly sent multiple cease-and-desist letters to Northway from 2008 through 2014 (including one in August 2013 from the New York Department of Financial Services), suggesting that Northway's lending activities continued throughout this period across the United States. (*Id.* ¶¶ 172-73.) The Funding Entities continued to issue biannual offering memoranda into at least September 2013 in order to raise money for the enterprise, and NWRRSP and PLFL remained operational until November 2013 and July 2014, respectively. (*Id.* ¶¶ 53, 55, 187, 209.) The enterprise continued to provide information to credit reporting agencies about its consumers until 2014. (*Id.* ¶ 166.) Profits from the payday lending scheme appear to have continued to flow between the various Defendants into at least 2013. (*Id.* ¶¶ 184, 242-52.)

**\*20** Because the CFPB's UDAAP claims are based on Defendants' alleged misrepresentations to consumers regarding their loans, each representation would constitute a new and separate cause of action under the CFPA. The FAC plausibly alleges that the Canadian Group and European Group Defendants engaged in a continuing course of conduct that extended well past July 2012. The Owners Group continued to own (and provide some direction to) all of the other corporate Defendants until at least September 2013, and the Officers/Directors Group continued to operate the entities until 2014. (*Id.* ¶¶ 110-11, 230-40.) Profits from the enterprise continued to flow to Relief Defendants at least into 2013. (*Id.* ¶¶ 184, 242-52.) Although Defendants are correct that the statute of limitations timelines are different depending on whether the Defendant was named in the original complaint (in which case activity prior to July 2012 is outside the statute of limitations period) or only in the FAC (in which case activity prior to December 2012 is outside the limitations period), the FAC's UDAAP counts and the disgorgement count plausibly allege that all the relevant Defendants acted or received funds within their respective statute of limitations period, which is enough at this stage to allow discovery to proceed.

As for retroactivity, the CFPA provides that its provisions, including the UDAAP provisions the CFPB asserts were violated here, became effective on the "designated transfer date," which the Secretary of the Treasury established by regulation as July 21, 2011. *See* 12 U.S.C. §§ 5481(9), 5581, 5582; Designated Transfer Date, 75 Fed. Reg. 57,252, 52,253 (Sept. 20, 2010). While retroactivity of legislation is not per

se unlawful, there is a presumption against retroactivity—the legal effect of conduct is generally governed only by the law that existed when the conduct took place. *Gordon,* 819 F.3d at 1196-97 (vacating and remanding for further consideration of whether it is appropriate to calculate monetary judgment based on activity that pre-dated the CFPA's effectiveness).

Whether the CFPA's UDAAP provisions apply retroactively is a question that the Court need not answer today, as the CFPB has made clear that it seeks relief in Counts I-VI and VIII only for activity that occurred after July 2011—as, indeed, it must, since the statute of limitations period for all Named Defendants does not extend earlier than 2012. (*See* Pl.'s Br. at 44-45.) The FAC includes allegations about pre-July 2011 activity, but those allegations are only used establish the factual background of Defendants' activities, and are not the conduct that forms the basis of the FAC's UDAAP counts. As just discussed, the FAC includes sufficient allegations of activity occurring in 2013 and 2014 to maintain this suit at this stage, so there is no concern about retroactivity. Lastly, Count VII seeks relief for violations of the Credit Practices Rule, which went into effect in 1985, long before the enterprise was even established, and therefore it (and any related disgorgement relief sought in Count IX) are not being applied retroactively.

## V. Unjust Enrichment

The Ash and NDG Motions additionally argue that Count IX, which seeks disgorgement of funds held be Relief Defendants, should be dismissed because such relief does not exist under the CFPA and the FAC fails to identify which funds are allegedly improperly held.

A relief defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *CFTC v. Walsh,* 618 F.3d 218, 225 (2d Cir. 2010) (quoting *SEC v. Colello,* 139 F.3d 674, 676 (9th Cir. 1998)). Courts have the power to order disgorgement from a relief defendant where the relief defendant "(1) is in possession of ill-gotten funds and (2) lacks a legitimate claim to those funds." *Id.* Such disgorgement is proper even where the relief defendant is not accused of any wrongdoing. *SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998).

The federal courts have broad equitable powers which can be employed to recover ill-gotten gains for the benefit of victims, which is why courts frequently allowed agencies like the CFTC, FTC, and SEC to seek disgorgement from relief defendants. *See CFTC v. Kimberlynn Creek Ranch,*

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 20 of 192

Consumer Financial Protection Bureau v. NDG Financial Corp., Not Reported in Fed....

2016 WL 7188792

*Inc.,* 276 F.3d 187, 192 n.4 (4th Cir. 2002). The CFPA specifically provides for remedies including refunding of money, restitution, and disgorgement for unjust enrichment, among others. *See* 12 U.S.C. § 5565(a)(2). Although often asserted in the fraud context, relief defendants are sometimes named in consumer protection cases brought by the FTC. *See, e.g., FTC v. LeadClick Media, LLC,* 838 F.3d 158, 177 (2d Cir. 2016); *FTC v. Johnson,* No. 2:10 Civ. 02203, 2013 WL 2460359, at *7 (D. Nev. June 6, 2013).

**\*21** The FAC sufficiently alleges that Relief Defendants are in possession of funds which were obtained through unlawful practices and to which they are not legitimately entitled. It alleges that, as a result of the CFPA and Credit Practices Rule violations discussed above, the enterprise generated profits in the tens of millions of dollars annually. (Am. Compl. ¶¶ 118, 151, 184, 236.) These profits were distributed to the Owners Group Defendants in the form of regular dividends. (*Id.* ¶ 236.) And, reading the FAC in the light most favorable to the CFPB, it suggests that the Officers/Directors are now the owners of the enterprise and are the ultimate recipients of the dividends that have been distributed since 2013. (*Id.* ¶ 211.) The FAC does not, as Defendants note, identify every specific distribution that the CFPB will presumably seek to prove at trial. It does, however, describe the type and frequency of the payments at issue, which is sufficient at the pleadings stage. These funds, if obtained as profits from activity that violated federal law, are proper subjects of a potential future disgorgement order.

## VI. Constitutionality

Lastly, Defendants argue the CFPB is unconstitutional in structure, and that therefore the entire FAC should be dismissed. Their argument, in essence, is that the CFPB's simultaneous independence from the Legislative Branch (because it may seek funding from outside the ordinary appropriations process under 12 U.S.C. § 5497(a)) and the Executive Branch (because it is headed by a Director who may only be removed for cause under 12 U.S.C. § 5491(c)(3)) is a separation-of-powers violation. As a result, Defendants argue, the CFPB lacks the authority to bring this suit at all, and therefore the entire FAC must be dismissed.

The D.C. Circuit recently opined at length on the merits of the second half of Defendants' argument and concluded that the CFPB's structure violated Article II of the Constitution by insulating the Director from all but for-cause removal by the President. *See PHH Corp. v. CFPB,* 839 F.3d 1, 12 (D.C. Cir. 2016). Whatever the merits of that decision, I need not address its substance here, because although the D.C. Circuit found that the CFPB's structure was unconstitutional, it did not declare the agency incapable of enforcing the laws Congress charged it with executing. Instead, it merely excised the Director's for-cause removal protection from the statute and permitted the suit before it to continue unaffected. *Id.* at 39. Therefore, even if Defendants are correct that the CFPB's structure is unconstitutional, the only appropriate remedy would not prevent or delay this suit; the necessary correction (assuming that correction *was* necessary) has already been implemented by the D.C. Circuit in *PHH.* Defendants' motions to dismiss on constitutional grounds are, therefore, denied.

## All Citations

Not Reported in Fed. Supp., 2016 WL 7188792

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

B

Dickerson v. U.S. Steel Corp., Not Reported in F.Supp. (1977)

1977 WL 833, 14 Fair Empl.Prac.Cas. (BNA) 1453, 14 Empl. Prac. Dec. P 7570

1977 WL 833
United States District Court; E.D. Pennsylvania.

Moses Dickerson et al., Plaintiffs

v.

United States Steel Corporation et al., Defendants.

Civil Action No. 73-1292
|
February 28, 1977

**Opinion**

NEWCOMER, D.J.

*1 The case at bar involves a Title VII action by a class of black production and maintenance workers at defendant United States Steel's Fairless Hills plant. The action is brought against United States Steel and the union, United Steel Workers of America. The case is currently in the midst of trial. Defendants have raised objections to certain witness testimony and the Court has allowed such testimony pending in this ruling. The issues having been fully briefed and argued, this Court now sustains its earlier bench rulings and will allow in the disputed evidence, dealing with events occurring prior to the statute of limitations date.

The substantive issue before this Court is whether alleged acts and conduct by defendants which occurred prior to the period within Title VII's statute of limitations can be admitted into evidence. The only theory on which such evidence would be admissible, this Court believes, is the "lock-in" theory. Under such a theory, the pre-limitations period evidence are not in and of themselves bases of liability but are relevant only to such extent as they have been "brought forward" to the statutory time period.

This Court believes that, at this time, this theory is the proper basis on which to proceed in this case. Plaintiffs are charging, *inter alia*, that discriminatory assignment and transfer policies have resulted in their present positions in the plant. The positions of the black workers, they claim, are inferior to white workers at the plant. Thus, the case falls within the "rightful place" doctrine articulated by Judge Wisdom in *Local 189, United Papermakers and Paperworkers v. United States*, [2 EPD P 10,047] 416 F.2d 980 (5th Cir. 1969). That court admitted in evidence of past discrimination coupled upon a showing that the seniority system effectively perpetuated, or "locked-in," the effects

of that old discrimination. Because of past discriminatory conduct, the workers in *Local 189* had been denied their "rightful place" in the seniority hierarchy. Such failure to achieve under a facially-neutral seniority system is an independent violation of Title VII, under Judge Wisdom's doctrine. The past conduct is not a separate basis of liability, but merely explains to the court the foundation of the later discrimination. That appears to be the appropriate approach in this case, where plaintiffs also claim that effects of prior acts of discrimination have been continued through facially neutral seniority systems at Fairless Hills.

The defendants have cited to the Court *Machinists Local v. NLRB*, 362 U.S. 411 (1960). However, that case, which disallowed a "lock-in" theory under the National Labor Relations Act, is not controlling in this case, since it does not deal with Title VII. This Court recognizes the close relationship between Title VII and the NLRA. However, their goals are quite different and this Court must look to the policies behind Title VII to decide how relevant a NLRA case is to this situation. In a recent Title VII case, *Franks v. Bowman Transportation Co.*, [11 EPD P 10,777], – U.S. –, 47 L. Ed. 2d 444 (1976), the Supreme Court emphasized the strong remedial goals of Title VII. [1] That decision discussed at some length the legislative history of Title VII and its amendments, noting Congressional emphasis on "rightful place" as an intended goal of relief. This is also the goal of the "lock-in" theory as used in the liability phase–to find out if workers have achieved their "rightful place" in recent years, or whether prior acts are still having their discriminatory effect.

---

[1]    *Franks*, as this Court recognizes, dealt with the remedy stage of trial, not liability, as here. However, the decision still is instructive on overall Title VII goals and policies.

*2 Since the "lock-in" theory, as interpreted by this Court, seems to further the goals of Title VII, and this Court has not been shown any circuit which rejects the theory, it appears to be the proper procedure to adopt in this case.

What this means in the context of the instant case is that plaintiffs will be allowed to present evidence of discriminatory conduct and policies which occurred outside the statute of limitations period. Such evidence, standing alone, will not provide a basis for liability against the defendants. If plaintiffs can show that the effects of the past act or conduct have been perpetuated, and that the worker or

**Dickerson v. U.S. Steel Corp., Not Reported in F.Supp. (1977)**

1977 WL 833, 14 Fair Empl.Prac.Cas. (BNA) 1453, 14 Empl. Prac. Dec. P 7570

workers involved have suffered the ill effects of such an act in their employment, during the statutory period of liability, then such evidence will be admitted to show the worker has been unable to achieve his "rightful place," within the period controlled by the statute of limitations.

This holding extends to conduct occurring prior to the effective date of Title VII if that conduct still affects a worker's position today. Other cases, such as *United States v. Bethlehem Steel Corp.*, [2 EPD P 10,219] 312 F. Supp. 977 (W.D.N.Y. 1970), held that such practices are needed to evaluate the effect of present policies.[2] Pre-Act testimony, like pre-limitations period evidence, is relevant only to the extent it is perpetuated into the relevant time period.

[2]     There is dicta in *Franks* that indicates that pre-Act conduct carried forward is illegal. 47 L. Ed. 2d at 460. However, *Franks* is not decisive alone, since the facts dealt only with post-Act evidence.

Defendants have argued that accounts by individual class members are not admissible, since they are "isolated." Plaintiffs claim that such testimony is necessary to build an overall case of pattern-and-practice discrimination. This Court holds, after hearing some of the evidence, that it appears relevant as illustrative of plaintiffs' complaints. Each act alone may not be actionable under Title VII, but taken as a whole at the close of evidence, they may form a background against which disparity of positions may be inferred to be racially discriminatory. On the other hand, the aggregate may not show any pervasive discriminatory policy. It is for the Court to evaluate the testimony at the close of trial. However, if the

act or conduct occurred prior to the statute of limitations, it is relevant only if its effect is perpetuated.

In allowing all this evidence in, this Court retains the right to grant motions to strike such testimony at a later time if new precedent appears helpful. This Court is moving in uncharted waters for this Circuit and such a potentially far-reaching decision such as this is at best tentative. The Supreme Court has granted certiorari on cases which might resolve these problems, such as *Teamsters v. U.S.*, No. 75-636, 44 USLW 3669 (May 24, 1976) and *United Airlines v. Evans*, No. 76-333, 45 USLW 3321 (November 1, 1976). Should the High Court resolve any issue in a way contrary to this opinion, or should other factors appear during the further course of trial, then the Court would entertain whatever motions would be appropriate.

### Order

**\*3** And Now, to wit, the objections to witness testimony, as to events prior to the statutory period of liability under Title VII, are Overruled, as previously held, in accordance with reasons set forth in the accompanying memorandum.

And It Is So Ordered.

### All Citations

Not Reported in F.Supp., 1977 WL 833, 14 Fair Empl.Prac.Cas. (BNA) 1453, 14 Empl. Prac. Dec. P 7570

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

C

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 25 of 192

Federal Trade Commission v. Adept Management Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4623152

2018 WL 4623152
Only the Westlaw citation is currently available.
United States District Court, D. Oregon,
Medford Division.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
ADEPT MANAGEMENT INC., et al, Defendants.

Civ. No. 1:16-cv-00720-CL
|
Signed 09/25/2018

**Attorneys and Law Firms**

Connor Shively, Krista K. Bush, Laura Marie Solis, Richard McKewen, Sophia Helena Calderon, W. Stuart Hirschfeld, Federal Trade Commission, Seattle, WA, for Plaintiff.

Adept Management, Inc., Medford, OR, pro se.

Anchor Publishing Group, Inc., pro se.

Associated Publishers Network, Inc., pro se.

Clarity Group, Inc., Trail, OR, pro se.

Consolidated Publishers Exchange, Inc., Trail, OR, pro se.

Crown Resource Management LLC, Medford, OR, pro se.

Customer Access Services, Inc., pro se.

Express Publishers Service, Inc., Medford, OR, pro se.

HCG, Inc., Medford, OR, pro se.

Henry Cricket Group, LLC, pro se.

Liberty Publishers Service, Inc., pro se.

Magazine Clearing Exchange, Inc., pro se.

Magazine Link, Inc., pro se.

Maximillian, Inc., Medford, OR, pro se.

North West Data Services LLC, Eagle Point, OR, pro se.

PPP Magazines, Inc., Trail, OR, pro se.

Publishers Payment Processing, Inc., Medford, OR, pro se.

Publishers Payment Processing, Inc., pro se.

Specialties, Inc., Trail, OR, pro se.

Subscription House Agency, Inc., Trail, OR, pro se.

United Publishers Exchange, Inc., pro se.

Wineoceros Wine Club, Inc., pro se.

Colleen M. Kaylor, Central Point, OR, pro se.

Laura J. Lovrien, Eagle Point, OR, pro se.

Noel Parducci, Medford, OR, pro se.

Lydia J. Pugsley, Phoenix, AZ, pro se.

William Strickler, Jacksonville, OR, pro se.

Linda J. Babb, Eagle Point, OR, pro se.

Shannon Bacon, Trail, OR, pro se.

Atlas Business Consulting LLC, Eagle Point, OR, Jeffrey G. Bradford, Ryan M. Bledsoe, Tonkon Torp, LLP, Portland, OR, Kevin W. Bons, Beckley & Bons, Eugene, OR, Tyler J. King, Pro Hac Vice, The Franklin Square Law Group, Washington, DC, Adam Alba, Pro Hac Vice, Eric K. Schnibbe, Pro Hac Vice, James Magleby, Pro Hac Vice, Magleby Cataxinos Greenwood, Salt Lake City, UT, David B. Paradis, Brophy Schmor LLP, David Paul Lennon, Lennon & Klein, P.C., Medford, OR, for Defendants.

## OPINION AND ORDER

MARK D. CLARKE, United States Magistrate Judge

 **\*1**  This case comes before the Court on Plaintiff FTC's motion for summary judgment (#348), as well as the motions for summary judgment filed by the defendants (##320, 321, 323, 325, 327, 329, 333, 339, 341, 342). As discussed below, the FTC's motion is GRANTED in part and DENIED in part. The defendants' motions are DENIED. Plaintiff's motions to strike (##416, 449) and Hoyal defendants' motion to strike (#410) are all DENIED. The case will proceed to trial on the issues of common scheme, individual liability, and remedy.

## DISCUSSION

**I. Plaintiff FTC is entitled to summary judgment on the issue of facial deceptiveness.**

2018 WL 4623152

Section 5 of the Federal Trade Commission Act prohibits "deceptive acts or practices in or affecting commerce." FTCA § 5(a)(1), 15 U.S.C. § 45(a). As the Ninth Circuit Court of Appeals has explained, a practice falls within this prohibition: (1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material. *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir.2001) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994) ). Deception may be found based on the "net impression" created by a representation, and a solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures. *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1199-200 (9th Cir. 2006). A misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cliffdale Associates, Inc.*, 103 F.T.C. 110, 165 (1984).

Courts, including the Supreme Court, have uniformly rejected imposing a requirement on the FTC to provide extrinsic evidence to show deceptiveness. *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 319 (7th Cir. 1992) (citing *Colgate-Palmolive*, 380 U.S. at 391-92) (FTC not required to conduct consumer surveys before determining that a commercial has a tendency to mislead); *see also F.T.C. v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 126 (D. Conn. 2008) ("Even if an advertisement makes a claim by implication, extrinsic evidence is not always necessary.") When evaluating the net impression of an advertisement, it is necessary "to consider the advertisement in its entirety and not to engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." *Bronson Partners, LLC*, 564 F. Supp. 2d at 125 (citing *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 675 (2d Cir. 1963) ). The consumer "does not ordinarily carefully study or weigh each word in an advertisement. The ultimate impression upon the mind of the reader arises from the sum total of not only what is said but also of all that is reasonably implied." *Id.*

### a. The mailer is deceptive as a matter of law.

In this case, the newspaper subscription mailer [1] is deceptive as a matter of law, based on the net impression that the mailer is either from or authorized by the newspaper publication in question, that any current subscription would be "renewed" automatically, and that the consumer was being offered the lowest price available. The mailers create this impression by including a single newspaper's name in several prominent positions in bold and capital letters, by suggesting a connection with consumers' existing subscriptions, and by using a similar format to a routine invoice or renewal service.

[1]     A copy of the representative mailer, as provided in the FTC's Complaint as Exhibit A, is attached to this opinion and order. The Court notes for the record that the representation has been enlarged for reviewing purposes, and the actual mailers sent to consumers are smaller than the one attached.

**\*2** In contrast to the visibility and repetition of the newspaper's title, the full name of the defendants' dbas typically appears only once in the mailers. The dba name itself is generic-sounding and implies that the dba is a service or a department within the named newspaper's organization, such as "Reader's Payment Service" or "Publisher's Payment." The payment-return envelope defendants included with the mailer contributes to this impression and disguises the true payment recipient by bearing only the words: "ATTN: Mail Processing Department."

The net impression that the mailer is either from or authorized by the newspaper is also created by the suggestion that it is connected to a consumer's existing subscription. The word "Renewal" is featured prominently, more than once, and the mailer refers to the consumer's "regular subscription" and a purported deadline to return payment. It offers an "installment" option, implying that the consumer can arrange to pay the full subscription cost in more than one payment during the subscription period. Additionally, the formatting of the mailer implies that it is an invoice or renewal service. It includes a payment stub with framed boxes showing a "Control Number," and a "Total Amount," along with the due date and installment payment amount. Nothing on the mailer indicates that it is an advertisement.

Finally, the mailer makes other statements that are confusing at best, and wholly false at worst. "Your subscription to [THE NEWSPAPER] is automatic with receipt of your payment when you choose to renew or order a new subscription." Undisputed evidence submitted by the FTC demonstrates that the defendants would attempt to fill a subscription after receiving full payment from the consumer. Thus, rather than being "automatic," subscriptions were actually not even guaranteed to be filled. The mailer also states,

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 27 of 192

Federal Trade Commission v. Adept Management Inc., Not Reported in Fed. Supp. (2018)
2018 WL 4623152

> Fortunately, by acting now, you can lock in one of our lowest rates! **You're receiving one of the lowest available rates we can offer for your regular subscription.**

(Emphasis in original.) While the defendants point out that this is technically true, due to the qualifying words, "one of," and, "we can offer," the statements undeniably imply that the consumer is getting the best deal available, when in fact the price is significantly higher than it would be if ordering through the newspaper itself. The fact that the mailer gives the impression that the consumer is ordering through the newspaper itself compounds the misleading nature of this representation.

### b. The disclaimers are not adequate to cure the mailer's deceptiveness.

If an advertisement's net impression is deceptive, "disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989). "Anything less is only likely to cause confusion by creating contradictory double meanings." *Id.* (citing *Giant Food, Inc. v. FTC*, 322 F.2d 977, 986 (D.C.Cir.1963), *cert. dismissed*, 376 U.S. 967 (1964) ).

In this case, the purported disclaimers included on the mailer are confusing and inadequate to cure the deception. First, small words on the bottom of the mailer state "Renewal Offer – Not a Bill." This statement continues to imply that the offer is a renewal, and thus connected to their regular subscription and sent from the newspaper publisher. The helpful part of the statement, "Not a Bill," does nothing to clarify this issue.

**\*3** Second, the block of text on the reverse side of the mailer is confusing and unlikely to be read by the consumer. The text refers to magazine subscriptions, not newspapers, and a reasonable consumer would likely believe it to be inapplicable to their particular newspaper subscription. The language states that the defendants "do not necessarily have a direct relationship with the publishers or publications"

offered. This leaves open the possibility that the defendants actually do have a relationship with the newspaper, when in fact they do not. [2]

> [2] Defendants attempt to raise an issue of fact regarding whether they have "authority" to submit subscriptions either to the newspapers in question or to clearing houses in order to fill the orders they receive, after the consumer sends the defendants the payment. Regardless of this issue, however, the defendants have not raised a question as to whether or not they have an on-going, direct relationship, as implied by the mailers. It is undisputed in the record that they do not have such a relationship.

Finally, the text states, "This is a magazine subscription offer, not a bill or an invoice. You are under no obligation to either buy a magazine or renew at this time." This language once again is confusing because it relates to magazines, not newspapers. Even if it were not confusing, it would be ineffective because it is buried in the middle of a block of text, with no prominent placement or distinguishing features.

### c. Consumer complaints confirm the mailers were likely to, and did, mislead reasonable consumers.

As discussed above, the FTC is not required to produce extrinsic evidence of actual deception, but "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Cyberspace.com*, 453 F.3d at 1201. Here, the FTC has produced numerous consumer complaints showing that the mailers actually deceived consumers. Thousands of consumers complained about defendants' mailers to law enforcement, the Better Business Bureau, publishers, and to the defendants themselves. Newspapers also received thousands of complaints, and Dow Jones, the publisher of the *Wall Street Journal*, issued a fraud alert.

The Hoyal defendants have filed a motion to strike these consumer complaints as hearsay (#410). This motion is denied. Federal Rule of Evidence 807 states:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 if:
>
> a)

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 28 of 192

Federal Trade Commission v. Adept Management Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4623152

1. the statement has equivalent circumstantial guarantees of trustworthiness;

2. it is offered as evidence of a material fact;

3. it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

4. admitting it will best serve the purposes of these rules and the interests of justice.

b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

The defendants dispute only the first requirement. The Court has reviewed the complaints and find that they meet the circumstantial guarantees of trustworthiness, including 1) the fact that they all reported roughly similar experiences, 2) that they were submitted by unrelated members of the public in different cities and states, 3) that they were made proximate to the time the mailers were received, and 4) that there is a low risk that the complaints are the product of faulty perception, memory or meaning, the dangers against which the hearsay rule seeks to guard. *See, e.g., FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993); *FTC v. AMG Servs., Inc.*, No. 2:12-cv-00536-GMN-VCF, 2014 WL 317781, at *16 (D. Nev. Jan. 28, 2014). In addition, even though not raised by the defendants, the Court finds all other requirements of Rule 807 are met.

**\*4** While the Court does not find that the consumer complaints are dispositive of the issue, they are probative, and they tend to support the Court's conclusion that the net impression of the mailer is deceptive.

### d. The misrepresentations were material.

As discussed above, a misleading impression created by a solicitation is material if it involves information that is important to consumers and likely to affect their choice of or conduct regarding a product. In this case the misleading net impressions are that the mailers came from the newspaper being marketed, that any current subscription would be "renewed" automatically, and that the consumer was being offered the lowest price available. These are

misrepresentations regarding source and price – two crucial pieces of information when purchasing a product and highly likely to affect consumers' choice and conduct regarding their newspaper subscription. The misrepresentations were therefore material.

### e. 2004 Consent General Judgment

Defendants argue that the 2004 Consent General Judgment ("2004 Judgment") prevents this Court from holding that the mailers at issue are deceptive. They claim that the 2004 Judgment functioned as an agreement between the parties and the State of Oregon as to what language would acceptable for future mailers, and that the defendants "were required" to use the language specified. Paragraph 16 of the 2004 Judgment states:

Defendants shall, or shall continue, to provide consumers (inside or outside Oregon) being solicited by them by mail to purchase a magazine subscription or subscriptions with substantially the same information and explanations (with the exception of possible differing dba company name and address changes and the specific information about the subscription or subscriptions being solicited) in all future mailings sent to consumers, in as clear and conspicuous form or clearer, as set out on the attached two-sided mail piece in Exhibit 1 which is incorporated by reference. Defendants shall continue to provide in contrasting red and in the same font size on the front side of their mailers as shown in Exhibit 2 the phrase "NOTICE OF RENEWAL / NEW ORDER." In addition, on the front side of the two-sided document shown in Exhibit 1, defendants shall also provide in a clear and conspicuous way in at least 7 point font and in contrasting red color at the bottom the phrase "INDEPENDENT AGENT NOT A BILL KEEP THIS PORTION FOR RECEIPT OF OFFER." If a customer has purchased a subscription from defendants and defendants seek to offer a renewal of that subscription, the phrase "NOTICE OF RENEWAL" may be used by defendants in lieu of "NOTICE OF RENEWAL / NEW ORDER."

The Court is unpersuaded by the defendants' arguments. First, the mailer does not comply with the requirements set out in Paragraph 16. The words "INDEPENDENT AGENT" do not appear on the front of the mailer in any font size or color, let alone in contrasting red.

Second, Paragraph 8 of the 2004 Judgment states:

Federal Trade Commission v. Adept Management Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4623152

> Defendants shall not imply that that plaintiff [the State of Oregon] approves of defendants' past business practices, current efforts to reform their practices, or any future practices defendants adopt. Plaintiff's settlement of this case does not constitute approval for past, present, or future business practices.

**\*5**  The defendants' argument is thus inapposite to the plain language of the judgment itself.

Third, defendants' arguments about the 2004 Judgment ignore the existence of subsequent litigation between these same parties and the State of Oregon. In 2015, the Marion County Circuit Court entered an Assurance of Voluntary Compliance ("2015 AVC"), essentially shutting down the defendants' business and entering a permanent injunction. Paragraph 12 of the 2015 AVC states the prohibited conduct under the injunction:

> Each Respondent is permanently prohibited from engaging in any or all of the following conduct:
>
> ...
>
> c) From engaging in the magazine or newspaper subscription business. This includes the sale of newspaper or magazine subscriptions, conducting business as a subscription clearing house, and using, purchasing, renting or leasing any customer list from any third party.

It is unclear to the Court how the defendants can rely on the 2004 Judgment to show that the State of Oregon "approved" of their practices, when the same state brought the subsequent case against them, leading to the permanent injunction.

Finally, regardless of all of the above, nothing about the prior litigation or other background circumstances of this case changes the Court's legal analysis of the net impression given by the mailers at issue. The mailers are deceptive.

### f. All motions to strike expert reports are denied as moot.

The Court has determined that the mailers at issue are deceptive on their face, as a matter of law. Each side submitted expert reports to bolster their arguments for why the mailers are or are not deceptive. The Court did not find these expert opinions to be helpful to its analysis. Therefore, because the Court does not rely on any of these opinions, the motions to strike are moot and the Court need not consider whether they are admissible for summary judgment purposes.

### g. Conclusion

The net impression of the mailers at issue is that they are deceptive on their face because they are likely to mislead a reasonable consumer in a way that is material to their purchase of the product. The FTC's motion for summary judgment is GRANTED as to this issue.

### II. Plaintiff FTC's other motions for summary judgment and the defendants' motions for summary judgment are all denied.

The FTC has submitted overwhelming evidence in support of their motions for summary judgment on the issues of common enterprise, individual liability, and the remedies of permanent injunction and monetary relief. It is likely that the defendants, particularly Jeffery Hoyal, Hoyal and Associates, Dennis Simpson, and Reality Kats, Inc., were involved in a common scheme to mislead consumers and profit from their confusion. It is likely that these defendants, and possibly some others, can be held jointly and severally liable for this deception. However, the defendants have submitted declarations and affidavits in support of their own motions as well. The Court is cognizant of its role at summary judgment, which is not to weigh the evidence or make findings of fact. This role must be reserved for trial. Therefore, all of these motions are denied.

### ORDER

**\*6**  Plaintiff FTC's motion for summary judgment (#348) is GRANTED in part and DENIED in part. The defendants' motions (##320, 321, 323, 325, 327, 329, 333, 339, 341, 342) are DENIED. Plaintiff's motions to strike (#416, 449) are DENIED. The Hoyal defendants' motion to strike (#410) is DENIED. The case will proceed to trial on the issues of common scheme, individual liability, and remedy.

Federal Trade Commission v. Adept Management Inc., Not Reported in Fed. Supp. (2018)

2018 WL 4623152

It is so ORDERED and DATED this 25 day of September, 2018.


Exhibit A



Case 1:16-cv-00720-CL   Document 1-1   Filed 04/27/16   Page 2 of 2

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4623152

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

D

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 32 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

KeyCite Yellow Flag - Negative Treatment

Distinguished by Federal Trade Commission v. Agora Financial, LLC, D.Md., March 2, 2020

2011 WL 13137951
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.

FEDERAL TRADE COMMISSION and
Office of Attorney General, Department of
Legal Affairs, State of Florida, Plaintiffs,

v.

ALCOHOLISM CURE CORPORATION,
also doing business as Alcoholism Cure
Foundation, and Robert Douglas Krotzer,
individually and as an officer and/or director
of Alcoholism Cure Corporation, Defendants.

Case No. 3:10–cv–266–J–34JBT
|
Signed 09/16/2011

**Attorneys and Law Firms**

Elise Whang, Karen J. Mandel, Robert M. Frisby, Victor F. DeFrancis, Federal Trade Commission, Serena Viswanathan, Bureau of Consumer Protection, Washington, DC, Gregory A. Jackson, Jr., Laura J. Boeckman, Office of the Attorney General, Kathleen Connors Piechowiak, Jacksonville, FL, Jacek Stramski, Office of the Attorney General, Tallahassee, FL, for Plaintiffs.

Robert Douglas Krotzer, Saint Johns, FL, pro se.

**ORDER**

MARCIA MORALES HOWARD, United States District Judge

**\*1** Plaintiffs Federal Trade Commission and the State of Florida have brought this civil enforcement action seeking to shut down as unlawfully deceptive and false, Defendants' internet-based alcoholism cure business, which solicits customers by claiming to offer a "permanent cure" to alcoholism by prescribing "customized" dietary supplements for a fee. In their Complaint, Plaintiffs seek injunctive and equitable relief against Defendant, based upon alleged violations of sections 5(a) and 12 of the Federal Trade

Commission Act, 15 U.S.C. §§ 45, 52 ("FTC Act"), and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. ("FDUTPA") (Doc. 1; Complaint). On May 26, 2010, the Court granted Plaintiffs' Unopposed Motion for Entry of a Stipulated Order for Preliminary Injunction, (Doc. 12; 05/26/10 Order), and entered the Stipulated Order for Preliminary Injunction by the parties, as modified by the Court. (Doc. 12–1; Stipulated Preliminary Injunction).

The case, which is proceeding against Defendant Robert Douglas Krotzer only as Alcoholism Cure Corporation is in default, [1] is presently before the Court on the parties' cross motions for summary judgment as well as various related motions. Specifically, the Court considers: Defendant's Motion for Summary Judgment (Doc. 96; Defendant's Motion for Summary Judgment) and Plaintiff's Response in opposition (Doc. 118; Plaintiffs' Response to Defendant's Motion for Summary Judgment); Plaintiffs' Motion to Strike Text and Exhibits (Doc. 99; Plaintiffs' Motion to Strike) and Defendant's Response in opposition (Doc. 102; Defendant's Response to Motion to Strike); Plaintiffs' Motion for Summary Judgment (Doc. 123; Plaintiffs' Motion for Summary Judgment) and Defendant's Response in opposition (Doc. 136; Defendant's Response to Plaintiffs' Motion for Summary Judgment); Defendant's Motion to Strike (Doc. 131; Defendant's Motion to Strike), and Plaintiffs' Response in opposition (Doc. 132; Plaintiffs' Opposition to Motion to Strike); Plaintiffs' Motion to Strike Edwards' Affidavit (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit), and Defendant's Response in opposition. (Doc. 137; Defendant's Response to Motion to Strike Edwards Affidavit); Krotzer's Second Motion for Summary Judgment (Doc. 140); Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment (Doc. 142) and Defendant's Response in opposition (Doc. 145; Defendant's Response to Motion to Strike Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Exclude The Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And Memorandum In Support. (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony), and Defendant's Response in opposition (Docs. 147, 148, 149; Defendant's Response to Motion to Exclude Testimony); Defendant's Supplemental Memo of Law (Doc. 152) and Plaintiff's Response to Defendant's Supplemental Memo of Law (Doc. 153). [2] Additionally, the Court has before it: Defendants' Motion to Vacate the Preliminary Injunction (Doc. 56; Motion to Vacate), and Plaintiffs' Response in opposition (Doc. 71; Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion for Order to Show

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Cause to Hold Defendant Krotzer in Civil Contempt (Doc. 58; Motion for Order to Show Cause) and Defendant's Response in opposition (Doc. 74; Response to Motion for Order to Show Cause); and Defendant's Motion To Permit Speaking And Book Writing (Doc. 144; Defendant's Motion To Give Speeches and Publish Books); Plaintiffs' Response in opposition (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books). [3]

[1]    Plaintiffs originally named as defendants Alcoholism Cure Corporation and Robert Douglas Krotzer. See Complaint. On July 14, 2010, Defendants' former counsel moved to withdraw as counsel, saying that he had been discharged from employment by the Defendants, who advised that they were unable to pay attorneys' fees. (Doc. 17; Motion to Withdraw). The Court granted the Motion to Withdraw, and advised that Defendant Alcoholism Cure Corporation may appear and be heard only through counsel admitted to this Court. (Doc. 18; 7/19/10 Order (citing Rule 2.03(e)) Local Rules, United States District Court, Middle District of Florida (Local Rules(s)). The Court ordered both Defendants to respond to Plaintiffs' Complaint by August 20, 2010. Id. at 3. The Court subsequently extended the time for Defendants to respond to the Complaint to September 13, 2010, and ordered corporate Defendant Alcoholism Cure Corporation to retain counsel by that date. (Doc. 23; 8/23/10 Order); See Local Rule 2.03(e); see also Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985)("a corporation is an artificial entity that can act only through agents, cannot appear pro se, and must be represented by counsel"). Individual Defendant Krotzer answered the Complaint on September 13, 2010 (Doc. 36) and corporate Defendant Alcoholism Cure Corporation did not. Plaintiffs moved for the Clerk to enter a Default against corporate Defendant Alcoholism Cure Corporation for failure to plead or otherwise defend the action. (Doc. 37; Motion for Clerk's Default). The Court granted the Motion for Clerk's Default (Doc. 46; 9/21/10 Order), and the Clerk entered a Default against corporate Defendant Alcoholism Cure Corporation on September 22, 2010. (Doc. 47; Clerk's Default).

[2]    The full titles of the parties' motions and responses are as follows: Amendment &

Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law; Oral Hearing Requested (Doc. 96; Defendant's Motion for Summary Judgment); Plaintiffs' Opposition To Defendant Krotzer's "Amendment [sic] & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As a Matter Of Law" (Doc. 118; Plaintiffs' Response to Defendant's Motion for Summary Judgment); Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike); Response Opposing Four Motions Designed To Prolong Litigation (Doc #100 Motion to Strike Reply; Doc #99 Motion to Strike added text and certain exhibits re Amended and Corrected Motion for Summary Judgment; Doc #98 Reply to Response to Motion for Summary Judgment; and Doc #97 Opposing Protective Order) (Doc. 102; Defendant's Response to Motion to Strike); Plaintiffs' Motion For Summary Judgment And Memorandum In Support, Dispositive Motion (Doc. 123; Plaintiffs' Motion for Summary Judgment); Response To "Motion For Summary Judgment Against Robert Douglas Krotzer" (Doc #123) Emergency Going Critical (Oral Argument Requested) (Doc. 136; Defendant's Response to Plaintiffs' Motion for Summary Judgment); Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc. 131; Defendant's Motion to Strike); Plaintiffs' Opposition To Defendant Krotzer's "Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc. 132; Plaintiff's Opposition to Motion to Strike); Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit); Defendants [sic] Response To "Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer" (Doc. 137; Defendant's Response to Motion to Strike Edwards Affidavit); Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice— Need For Defendant's Judgment Without Delay

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 34 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Strike Defendant Robert Douglas Krotzer's "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice—Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology" (Doc 142; Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment); Defendant's Response To Motion To Strike "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice—Need For Defendant's Judgment Without Delay (Doc. 145; Defendant's Response to Motion to Strike Krotzer's Second Motion for Summary Judgment); Plaintiffs' Motion To Exclude The Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And Memorandum In Support (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony); Defendant's Response To "Exclude Testimony Of All Defendant's Experts" (Docs. 147, 148, 149; Defendant's Response to Motion to Exclude Expert Testimony); Defendant's Supplemental Memorandum of Law: Statutory "Truth" Is Not Only Determined By The Only Method That Would Prohibit Major Advances In Natural Medicines (Doc. 152; Defendant's Supplemental Memo of Law); and Plaintiffs' Response to Defendant Krotzer's "Supplemental Memorandum of Law" in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 153; Plaintiffs' Response to Defendant's Supplemental Memo of Law).

3    These motions and responses are entitled: Defendant's Opposed Motion to Vacate Preliminary Injunction Stipulated Under False Pretenses and Without Statutory Authority Or Jurisdiction. Alternatively Request For Order Interpreting The Injunction (Doc. 56; Motion to Vacate); Plaintiffs' Opposition To Defendant Krotzer's Motion To Vacate The Stipulated Order For Preliminary Injunction (Doc. 71; Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion For An Order To Show Cause Why Defendant Robert Douglas Krotzer Should Not Be Held In Civil Contempt, And Memorandum In Support (Doc. 58; Motion for Order to Show Cause); Defendants [sic] Amended Response To Motion

For Show Cause Order for possible violation of Preliminary Injunction (Doc. 74; Response to Motion for Order to Show Cause); Opposed Motion To Permit Unfettered Speaking And Book Writing (Doc. 144; Defendant's Motion To Give Speeches and Publish Books); and Plaintiffs' Opposition To Defendant Robert Douglas Krotzer's "Motion To Permit Unfettered Speaking And Book Writing" and Memorandum in Support (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books).

## I. Background

**\*2**    Starting in 2005, the Alcoholism Cure Foundation ("ACF") and its sole officer and shareholder, Robert Douglas Krotzer ("Krotzer") solicited consumers nationwide through its internet websites. ACF and Krotzer targeted consumers who were alcoholics. ACF enticed consumers to sign up for its "Permanent Cure Program" ("Program") by guaranteeing on its website, and through e-mail and telephone representations, that its Program could "cure" their alcoholism in five months or less by using recommended "natural" dietary supplements. After securing the consumer's credit information, ACF would not permit the "members" to cancel, and instead, charged them tens of thousands of dollars. The FTC and the State of Florida Office of the Attorney General, Department of Legal Affairs ("State of Florida") allege that ACF and Krotzer perpetrated an injurious scam upon consumers, in violation of the FTC Act and FDUPTA. Defendant Krotzer responds that he "invented a brand new cure for a major disease based [sic] a cutting edge understanding of brain chemistry of addiction and combined natural medicines." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 21. He calls his therapy "Molecule Multiplicity." Id. at 2–4. Except where otherwise noted, the following facts are undisputed.

### A. Undisputed Facts [4]

4    Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment. The Court will so note its perspective when appropriate. The facts recited in this section are either undisputed, or any disagreement has been indicated. See T–Mobile South LLC v. City

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 35 of 192
Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....
2011 WL 13137951

of Jacksonville, Fla., 564 F. Supp.2d 1337, 1340
(M.D. Fla. 2008).

### 1. The Parties

Plaintiff the Federal Trade Commission ("FTC") is an
independent agency of the United States Government created
by statute. 15 U.S.C. §§ 41–58. Among its other duties,
the FTC is charged with enforcing Section 5(a) of the FTC
Act, which prohibits unfair or deceptive acts or practices in
or affecting commerce, 15 U.S.C. § 45(a), as well as false
advertising for food, drugs, devices, services, or cosmetics in
or affecting commerce. 15 U.S.C. § 52.

Plaintiff the State of Florida enforces FDUTPA, which
prohibits unfair or deceptive acts or practices in trade or
commerce. Fla. Stat. § 501.204(1).

Defendant Alcoholism Cure Corporation is a Florida, for-
profit corporation that was incorporated in 2005, with its
principal place of business in Jacksonville, Florida. (Doc.
123–1 at 912 (Krotzer Admissions 2–4); Doc. 58–1 (Henry
1st Decl. ¶ 4); Doc. 58–2 (Corporate Records)). Alcoholism
Cure Corporation uses the registered fictitious name of
"Alcoholism Cure Foundation." ("ACF"). Krotzer Admission
5. Defendant Krotzer resides in Jacksonville, Florida, and is
the registered agent, president, sole officer and 100% owner
of Alcoholism Cure Corporation. He controls the operation of
Alcoholism Cure Corporation, and was primarily responsible
for communicating with consumers during the relevant
period. Krotzer Admissions 1, 111–113, 116; Corporate
Records. In his communications on behalf of ACF, Krotzer
used the moniker "Dr. Doug" or "DD." Krotzer is not a
medical doctor, and has not earned a "PhD," or any other
scientific degree or license relevant to alcoholism treatment.
See Krotzer Admissions 54–59.

ACF advertised, marketed, and signed-up consumers for
its Permanent Cure Program through its Alcoholism Cure
Foundation Website ("ACF Website"). Krotzer was solely
responsible for the contents of the ACF Website, (Doc. 123–
1 at 1047–48 (Krotzer Interrogatory Answer 5)), and for
communicating with consumers who signed up for the ACF
Permanent Cure Program. Krotzer Admission at 116. As of
the Spring of 2010, ACF and Krotzer had sold the Permanent
Cure Program to 450 consumers throughout the United States.
Krotzer Admission 123.

### 2. Patent Applications

Krotzer has two pending applications for patents, both filed
in 2008. Henry 1st Decl. ¶ 22; (Doc. 58–18 at 2 (Composition
Patent App.); Doc. 58–19 at 2 (Internet Patent Appl.)).
The patents provide a summary of ACF's Permanent Cure
Program and Krotzer's internet-based methodology. Krotzer
states in the Composition Patent application that his product
is:

> *3 A composition effective
> in the treatment of alcoholism
> comprising one or more alcohol
> craving blocker components such
> as Kudzu and Rhodiola Rosea,
> one or more antidepressant
> components such as St. Johns'
> Wort (Hypericin), 5–Hydroxytryptophanm
> SAMe, Melatonin and Taurine,
> and/or one or more anti-anxiety
> components such as Vitamin B
> complex, Glutamine, SAMe,
> Hops, Melatonin and Rhodiola Rosea,
> the components chosen such that
> in combination they beneficially
> affect the nutritional, physiological
> and psychological deficiencies that
> combine to cause alcohol dependency.

Composition Patent App. at 1 (Abstract). The Internet Patent
Application proposes a "method" patent, and summarizes
Krotzer's marketing methodology:

> An Internet methodology for
> the treatment of human problem
> conditions such as alcoholism, obesity/
> weight loss, depression, or the like, or
> for long-term commercial enterprise,
> wherein capturing the client during
> a short window of opportunity and
> providing means to assure continued
> participation in the treatment program
> is essential, both for the success
> of the treatment and for providing
> a viable commercial enterprise. The

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 36 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

methodology comprises control of website design, advertising, sale closing, pricing, guaranteed payment, monitoring, and quality control of nutraceuticals.

Internet Patent Appl. at 1 (Abstract). Claim 1 of the 11–claim patent describes

[a] method of capturing and retaining individuals in a voluntary treatment program ... providing an Internet website comprising large amounts of information, wherein the information is presented under different headings with multiple pages of text, the text ending beyond a single visible screen such that scroll continue reading the text, a continuously visible table of contents on each page, ... and prominent linking icons positioned on the text pages; ...; providing a means to join the voluntary treatment program immediately online through acceptance of credit cards as payment; providing an on-line assessment form to be filled out by the individual and contacting the individual within one day of filling out the assessment form; providing a pricing structure for the treatment program with a low initial cost and remaining costs disclosed as daily expenses; and providing a long-term contract that is executed by the individual, wherein the individual agrees to acceleration of all charges in the event of a cancellation request by the individual.

Id. at 1–2 (Claim 1). The description of the "Invention" in the application includes the following: "closing the sale is essential to success," "[t]he client should find it very easy to sign up by credit card, with ample linking via the many Express buttons to the sign-up page." Id. at 6, ¶ 0034. Krotzer explains in the Internet Patent Application that the customer "need[s] to be eased into pricing by avoiding the significance of the expense, instead of relating it to the amount of money to be saved when they stop drinking." Id. at ¶ 0035.

[A] long-term contract is essential, and an important component of the contract is a provision for acceleration of the total contract fees in the event that the client requests cancellation. This is a critical incentive for the client to continue with the program, as it then becomes more costly for the client to drop the program as it is for the client to continue with it.

Id. ¶ 0038. The patent application explains that "A key technique is acceleration of credit card charges. When the client indicates a reluctance to continue to pay, the payments are accelerated by previous contractual agreement. The request for cancellation is the trigger for acceleration, not actual default in payments." Id. at ¶ 0040.

### 3. The Alcoholism Cure Foundation Website

**\*4** In May, 2008, FTC investigator Linda Henry was assigned to investigate Krotzer and the Permanent Cure Program. Henry 1st Decl. ¶ 3. As part of its investigation, the FTC issued a Civil Investigative Demand ("CID") to ACF on September 11, 2008. Henry 1st Decl. ¶ 13. The FTC's investigation focused upon Defendants' website http://www.alcoholismcure.org, which advertises the Permanent Alcohol Cure Program as an individualized alcoholism cure service for people who have an addiction to alcohol. Henry 1st Decl. ¶¶ 5–6. Henry printed selected pages from the ACF Website on May 4, 2009 and June 12, 2009. Henry 1st Decl. ¶¶ 7, 8; (Docs. 58–4 and 58–5; 5/4/09 ACF Website and 6/12/09 ACF Website)). [5] The first page of the printed 59–page ACF Website [6] appeared as follows:

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 37 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951



(Doc. 58–4 (5/4/09 ACF Website at 1). The fifth page of the printed 5/4/09 ACF Website is illustrative of the "continuously visible table of contents" and the plethora of "prominent linking icons," Internet Patent Appl. at 1–2, which spill over into the following page:



Id. at 5.

5

6

Unless otherwise indicated, the following excerpts are drawn from the 5/4/09 ACF Website.

Krotzer argues that Plaintiffs' ACF Website exhibit is a "partial" copy, omitting "–100 member testimonials and–450 scientific studies supporting individual ingredients." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 5, 17, 19. As support, Defendant cites to an exhibit submitted both in support of his Motion for Summary Judgment and in response to Plaintiffs' Motion for Summary Judgment entitled "Countervailing Benefits pages Intentionally Hidden From This Court" (Docs. 96–15 and 96–16; Docs. 136–2 and 136–3 (DX–105: "OMITTED Countervailing Benefits Evidence in PLAIN SIGHT" and DX–106: "MORE OMITTED CounterVailing Evidence in PLAIN SIGHT")). The testimonials are referred to in the ACF Website: "Twenty pages of Recent Testimonials can be found starting at weekly ENews." 5/4/09 ACF Website at 37. Krotzer's Exhibit DX–105 includes images of several computer screens with such entries as "enews" and "successes." Preliminarily, the Court observes the exhibit is indecipherable. DX–106 is 27 pages, which includes "member" testimonials and interjected comments and "ENews" which Krotzer says were sent by e-mail and later published on the ACF Website with an e-mail announcement. Moreover, as Krotzer acknowledges, Plaintiffs did submit a CD–ROM of the ACF Website which included the testimonials. Additionally, Defendant's testimonials are not competent evidence. They were compiled by Defendant, and are documents that refer to anonymous unidentified alleged Permanent Cure Program customers. Lastly, Krotzer fails to cite to specific evidence within these voluminous statements, making only broad-brush references to the "testimonials." In so doing, he fails to comply with the mandate of Rule 56(c)(1)(A), which requires citation to "particular parts of materials in the record." Krotzer's complaint that Plaintiffs' printed presentation of the ACF Website is deficient does nothing to erode the significance of the actual representations made, which the Court considers here.

The ACF Website advertises that the Permanent Cure Program is supported by qualified alcoholism experts on

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 38 of 192
Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....
2011 WL 13137951

staff. The Website represents that the Program can cure people of their addiction to alcohol while still allowing them to drink alcoholic beverages "socially." Henry 1st Decl. ¶ 6. Additionally, the ACF Website states that the Permanent Cure Program offers the "best technology to end alcohol abuse permanently," that the Program is "[m]any times more effective than any other treatment," and that consumers who purchase the Permanent Cure Program may "still enjoy alcohol, but in the amount MDs recommend." Krotzer Admissions 17–19. It explains that:

> **\*5 A program that provides each abuser with an experimentally determined combination of these alcohol effective nutraceuticals is the best approach to providing a permanent cure to alcohol cravings.**

5/4/09 ACF Website at 45. [7] ACF touts a "Success Rate" of "Above 97%." Id. at 48.

[7] The ACF Website presents text in numerous fonts, faces, and sizes. Replications of the Website text in this Order will include the exact presentation when possible.

During 2009, the ACF Website could be accessed by consumers through a search of the internet using such terms as "how to stop drinking," "alcoholism" and "treatment for alcoholism." (Doc. 123–1 at 932 and 956 (Henry 2d Decl. Attach. D and E (LS Dep. at 11; JR Dep. at 10); Doc. 58–33 (Consumer 1 Decl. ¶ 3); Doc 58–48 (Consumer 2 Decl. ¶ 3)). [8]

[8] Krotzer seeks to "strike" the Second Amended Declaration Of Linda Henry (Doc. 128; Henry 2d Decl.)), filed by Plaintiffs in support of their Motion for Summary Judgment. (Doc. 131; Defendant's Motion to Strike). Krotzer argues that this declaration "should be stricken and replaced with a full text and recording of what actually was said, or provide Krotzer with copies so he can do the extracting." Id. at 1. Krotzer apparently refers to the four deposition excerpts attached as exhibits to the Henry 2d Declaration. (See Docs. 123–1 at 932, 956, 1013, 1060). Krotzer argues that the Henry

2d Declaration and attachments do not present "the whole truth" by "selectively quoting" from the depositions and taking quotations "out of context." Defendant's Motion to Strike at 1–4. Krotzer also complains that the court reporter who transcribed the depositions "refused" to give him "pro bono copies" of the deposition transcripts, making the unsubstantiated allegation that the court reporter refused to do so "citing their fear of retribution by Plaintiff FTC" who is a "very substantial customer of the Court Reporter nationwide." Id. at 6. Krotzer cites only to the "rule of evidence called the 'Best Evidence Rule' that perhaps applies" as legal authority. Id. at 5. Plaintiffs respond in opposition that it has no obligation to file the entire deposition transcripts in support of their motion for summary judgment. (Doc. 132; Plaintiff's Opposition to Motion to Strike).

First, Defendant's Motion to Strike Henry Declaration is unnecessary, inasmuch as Rule 56, Federal Rules of Civil Procedure governing summary judgment, provides a mechanism for objecting to material cited in support or opposition to a motion. See Fed. R. Civ. P. 56(c)(2). As such, "[t]here is no need to make a separate motion to strike." Fed. R. Civ. P. 56 advisory committee's note 2010 Amendments.

Moreover, newly revised Rule 56 provides that a party may support an assertion that a fact is not disputed by: "(A) citing to particular parts of materials in the record, including depositions ...." Fed. Civ. P. 56(c)(1)(A)(emphasis added). Although, often helpful, nothing in Rule 56 requires that a party must file entire depositions rather than excerpts of depositions in support of their position on a motion for summary judgment. Additionally, courts that have considered the issue have found that submission of deposition transcript excerpts, rather than entire depositions, in support of a motion for summary judgment is acceptable, "because a party who believes that there is additional relevant information in the deposition transcripts that is not contained in the excerpts is free to file its own excerpts or the full transcripts in support of its response." O'Hara v. Univ. of W. Fla., 750 F. Supp.2d 1287, 1293 (N.D. Fla. 2010); see also Clay v. Equifax, Inc., 762 F.2d 952, 955 n.2 (11th Cir. 1985); Zhanjian Go–Harvest Aquatic Products Co., Ltd. v. Southeast Fish & Seafood,

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 39 of 192

Co., No. 07cv60126–CIV, 2008 WL 516109, at *1 (S.D. Fla. Feb. 25, 2008). This conclusion applies even when the opposing party is a pro se litigant who contends he or she cannot afford to purchase a copy of the deposition, O'Hara, 750 F. Supp.2d at 1293 & n.5, 1299.

Finally, the fact that Krotzer is proceeding pro se and contends he cannot afford to purchase copies of the transcripts provides no basis to disregard the relevant evidence provided by Plaintiffs. For all of these reasons, Defendant Krotzer's Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc. 131; Defendant's Motion to Strike), is due to be **DENIED**.

*6 The ACF Website is rife with "cure" representations, beginning on page one with:

**We will cure you ... guaranteed. Often within 1–10 weeks, nearly always by 5 months.**

**You may cancel anytime you are not being cured as we describe.**

**Virtually cost free. Cure Dividend Savings typically exceed regular monthly fees.**

. . .

**only our program can guarantee success ....**

5/4/09 ACF Website at 1; see also e.g. id. at 31 ("[o]ur internet based program has a **near 100% cure rate**"). The Website "explains":

**Your Personal Doctor** (PhD, ND, JD, not MD) studies your assessment answers for many insights into what your brain seeks in alcohol. He screens to avoid any adverse interactions with your medications. Based on our successful experience, he determines the composition and amounts of your First Recommendations. We do that so well, most are cured with few further adjustments.

**Doctor Monitoring 15/7** We can safely do many others cannot because your World Class Specialist is only minutes away.

. . .

**Costs—Virtually Free**

1–10 weeks—Difficult cases spend a few hundred dollars more. This **includes the cost of ingredients** which are purchased separately .... Typically your costs are paid by your **Cure Dividend Savings**, the alcohol you no longer drink. You must follow your program for 5 months, since you may be a difficult case and may cancel anytime after 5 months if not being cured as we describe.

Id. at 2. The following representation appears on the same page:

**Molecule Multiplicity Supported By:**

**Developed by:**

• Two times Nobel prize winner known for nutraceutical work **Dr. Linus Pauling**

• PhD teams at worldwide consulting firms

• Harvard University Medical School

• $35,000,000 validating research study

• Expensive clinics use some of our technology

**Backed up by:**

• Over $200,000,000 in research

• Clinical experience of many hundreds of cured members including many doctors executives and other professionals

• **FTC determination supported by substantial science**

• $20,000 guarantee our claims are supported by actual results

• Limitless number of testimonials

• PayPal division of EBay vouches we have large numbers of satisfied members, and most members do not use PayPal

Id.

The remaining pages of the printed 59–page website repeat the aforesaid representations, and numerous hyperlinks, sometimes in a larger font size or in colored print. Representative examples (but by no means an exhaustive list), include:

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 40 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

**$35,000,000**
**Scientific Validation**
**Our Unique Permanent**
**Cure Programs**

...

**Doctor Monitoring** Your doctor is always available to answer your questions. We can safely do many thinks others cannot because you talk to your doctor as soon as you need to.

...

Id. at 5.

We want to answer you questions before you even think of joining our:

**Science Based Programs**
**Tested and Validated**
**Permanent Cures to Alcohol Abuse and Addiction**

Id. at 42; see also e.g. id. at 11 ("**$35,000,000 Scientific Validation Our Unique Permanent Cure Program**"), 13, 43 ("**$35 million study** validates our **Molecule Multiplicity** method") 39–40 ("**Many Pages of Journal Articles Supporting our Technology**" (citing articles)); 43 ("**$35 million Scientific Validation**"); 46 ("**We Cure You Permanently**"); 51 ("100's of examples of articles by **doctors validating our ingredients**"). The ACF Website also references

**\*7 The American Journal of Psychiatry** (the **most respected independent source** of information for MDs who treat alcoholism) and **The Wall Street Journal** ....

as providing support for "Molecule Multiplicity" treatment of the brain. Id. at 22.

The site repeatedly makes its representations about ACF's "team of doctors:"



Id. at 9; see also e.g. id. at 31 ("[t]he **team of doctors** employed by Alcoholism Cure did the research in the two sciences"). The Website promises:

**Only Our Doctors**

• Apply medical science directly to where the problem is, your Brain.

• Stimulates your Brain similar to alcohol every day unless not needed.

• Makes Social Drinking Part of the Program

• Gives you absolute Privacy.

• You never see your advisor face to face.

• Your advisor never knows where you live.

Id. at 48. "[P]rofessional supervision is required to safely adapt this knowledge to each alcoholic...." Id. at 51. [9]

[9]   Plaintiffs contend that "Defendant refers more than 500 times on his website to 'doctor,' 'world class specialist,' and other specialized or scientific knowledge." Plaintiffs' Motion for Summary Judgment at 8.

ACF represents that its Permanent Cure Program employs well-researched mainstream techniques, stating:

Our Formula Ingredients are all **"Dietary Supplements"** under the Dietary Supplements Health & Education Act ("DSHEA") of 1994. Vitamins, Minerals, Herbs, and Amino Acids (part of proteins). They have been part of traditional or alternative medicine for hundreds of years, mostly for other health reasons. Now called

**nurtraceuticals because of their similarity to pharmaceuticals**, all doctors embrace at least some of them. Many prescription medicines use molecules **originally found in nutraceuticals.**

Id. at 13 see also id. e.g. at 17 ("**[w]e spent a fortune learning to use over $200,000,000** in medical research on how alcohol works"); 31 ("[o]ur programs are built on two major realizations proved by over $200,000,000 in research"); 46 ("**Basic Science Advances Pointed to Alcoholism Cure by 1995**"); 47, 49 ("Based on the research of our scientists as well as many others ...."); 51 (ACF "**spent a fortune**").

Information about the cost of the program is elusive. For instance, the ACF Website represents that the Permanent Cure Program is low-cost and "virtually free".



Id. at 10; see also e.g. id. at 26, 27. The Website explains:

So that you fully understand our fees, we ask you now to agree to step up fees after the first and third months. We fully expect the money you save in **Cure Dividends** to pay for these increases. **We cheerfully refund increases** if your results are slower than typical and to help make sure most of your fees are paid from **Cure Dividends**. The only conditions are you must take your ingredients and

submit reports. Fees begin at $2/day stepping up to $6.day. Very Heavy Drinker begins at $3.33/day up to $9/day.

Id. at 43.

The three-page "free" "Assessment" sign-up page, which is the object of a number of the hyperlinks throughout the Website, requires the consumer to complete questions concerning his or her personal identification, health conditions, medication and prescriptions, alcohol use, "street drug" use, favorite foods, job description, and activity level. Id. at 23–25. It also repeats a number of the same representations made throughout the Website, including the "$35,000,000 Scientific Validation" representation, id. at 25; and costs representations:

*8 • Costs are typically under $350 until you see results in 1–10 weeks.** Difficult cases only a few hundred more.

• **We cheerfully refund step up fees** if you are not **Drinking Down Half** in the typical 1–10 weeks. This typically keeps your cost (including ingredients) less than a single bar drink/day.

• **You may cancel anytime** you are not at least **Drinking Down Half** after following your program for five months, or we can not bring you down to **Social Drinking** within a reasonable time afterwards. The **Cure Dividend Savings typically exceed all costs**. and your program is virtually **cost free** until you are **Permanently Cured.**

• **Confidentiality:** All your personal information is protected by doctor patient privilege and high level unencrypted computer security measures that have never been breached.

Id. at 23. The first page of the Assessment Page in the 5/4/09 ACF Website states in large font: "Do Your Assessment— Then Sign Up." The fill-in-the-blank form appears on pages one and two, and at the bottom of page 2, the form states:

By submitting your Free Assessment you agree to terms and conditions.

Fees are partially refundable except low cost new **Cure Yourself** Program.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 42 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Press Here To Submit Free Assessment

The hyperlink to "Terms and Conditions" appears in small print at the bottom of the third page, a page full of narrative, with nothing to fill-out. Id. at 24–25.

The 5/4/09 ACF Website sets forth ACF's "Terms and Conditions" in three pages of fine print beginning on page 53 of the printed Website. Id. at 53–57. The "Terms and Conditions" include the following:



and

Id. at 53. On Page 54 of the printed 5/4/09 Website, ACF frames the cost of the Permanent Cure Program as being based upon the "Cure Dividends" realized by the "cured" customer who is no longer purchasing large quantities of alcohol. Labeled "Payback Time," and "Legal, Moral and Financial Reasons to Continue Your Membership," ACF also provides a rationale for the "cured" customer to continue paying "to help advance our work." Id. at 54. Under "Cancellation Policies," ACF represents that "our foundation relies on your continuing membership.... All benefit by making relatively small payments over a long time." Each customer is required to **make a five month commitment**." Id. Then, "[o]nce your drinking is under control, please

repay our charity." [10] The following terms are set forth on the bottom of Page 54:

Id. at 54. On the following page, the Website refers (in fine print) to "you [sic] obligation to pay us for 76 months." Id. at 55. Specifically regarding cancellation, ACF states on the Website:

...

Id. at 55. However, cancellation rights represented throughout the Website are contradictory. For instance, at some locations on the Website, ACF represents that the customer may "**cancel anytime** if you are not being cured as we tell you." E.g. id. at 6. At other locations, ACF represents that "**You may cancel at any time** on seven months notice if you are not being cured as we described." E.g. id. at 29.

[10]     Krotzer has stated to consumers that Alcoholism Cure Corporation is a "charity." Krotzer Admission 48 ("A FOR PROFIT CHARITY"). In communications with consumers, Defendants stated: "As a charity, our major purpose is to help you." Krotzer Admission 50. However, Alcoholism Cure Corporation is not registered as a charity with the Internal Revenue Service or the State of Florida. Krotzer Admission 49.

**\*9** The "Secure Sign–Up" Page appears at page 26 of the printed Website, and contains representations of "Privacy and Security," "Doctor–Patient Privilege, "You may cancel anytime," and "You may quit anytime if not being cured as we describe." The "Terms and Conditions" are not set forth on the Sign–Up page, but rather a hyperlink to "Terms and

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 43 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Conditions" appears in small print to the right of the page. Id. at 26.



Id.

ACF's "Privacy Policy appears on Page 57 of the 5/4/09 Website, and states, inter alia:

> Alcoholism Cure Advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD). We strongly believe the DSHEA law gives us the right to extend to you the same total privacy right extended by all medical doctors.

Id. at 57.

#### 4. Science Claims

Defendant Krotzer acknowledges that the claim that the Permanent Cure Program cures alcoholism is not supported by traditional science. Krotzer Admission 45. Additionally, although Krotzer has stated to consumers that he has a "Doctorate" from Harvard, Krotzer is not a medical doctor; does not hold a "PhD" degree; "N.D." (Doctor of Naturopathic Medicine); or a "D.O. (Doctor of Osteopathic Medicine) degree. Krotzer Admission 54–57, 59. Instead, as Krotzer admitted in response to the FTC's Civil Investigative Demand ("CID"), Krotzer received a Bachelor of Science degree from Lehigh University in 1964, and graduated

from Harvard Law School in 1967. Other ACF employee "qualifications" included "one employee that had been in the military, one that had worked with nurses, one that was a recovered addict with a 'strong nutraceutical background,' and one that had a 'strong nutraceutical background.' " Henry 1st Decl. ¶¶ 12, 13.

Krotzer contends that his claim that the Permanent Cure Program had been "validated" by a $35 million study, referred to an article in the American Journal of Psychiatry, which was reported in the Wall Street Journal. Id. ¶ 14. However, he concedes that the articles in the American Journal of Psychiatry and the Wall Street Journal did not make any references to Defendants' Permanent Cure Program. Krotzer Admission 26; Henry 1st Decl. ¶ 14.

#### 5. Alcoholism Cure Foundation's Dietary Supplement Recommendation

After a consumer signs up for the Program, Krotzer e-mails the consumer ACF's "First Recommendations," an approximately twenty-page form letter, which includes instructions to buy and consume a variety of dietary supplements in the form a multiple pills. (Docs. 59–1 and 59–2 (Consumer 5 Decl. Ex. A; Recommendation)); Krotzer Admissions 36, 124, 125; JR Deposition at 40–41. For example, Krotzer recommended that Consumer 5, a pilot, purchase and take Kudzu ("start with 3 mgs ... increase by 2 mgs ... not to exceed a total of 9 mgs"); Niacin ("Do not exceed a total of 1,200 mgs (less if flushing occurs more than mildly, up to 400mg/increase if no flushing, use your judgment ... With real Niacin, some will experience alarming sensations of intense heat, blotchy skin, itching or rash. It will not hurt you ... Try to tolerate the flush ...."); 5 Hydroxy–Tryptophan ("Do not exceed a total of 300mg ... Common reactions—Nausea, vomiting and diarrhea may occur, usually gone in 5 weeks. If this occurs, cut usage to where bad symptoms stop. Increase slowly and carefully. Let me know, but not cause for alarm... Not likely but possible: difficulty sleeping, mental status changes, rigidity, hot flashes, rapidly fluctuating blood pressure and heart rate"); Vitamin B Complex ("Your Daily Amounts: Highest Label Amount ... Don't let the 1000%–3000% figures scare you; in vitamins only, they are desirable and safe"); Taurine (amount illegible). Consumer 5 Recommendation at 6–7. "Approximate amounts are always OK." Id. at 9.

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 44 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

**\*10** The Recommendation does not discuss the specific interaction of the multiple supplements with each other or with other medications, or the cumulative effect of taking the recommended supplements all at once. It states only that:

> Almost no bad interactions are reported about Formula ingredients, but are possible at some of the higher levels you will be using .... We believe we do a good job of avoiding dangerous interactions with any drugs you have told us about, but **ultimately that is up to you. In all of medicine, there are no guarantees ... Neither the drug interaction services I use, nor I am perfect. Or you could have an interaction not generally reported....  If you have any doubts, ... we strongly recommend asking your pharmacist**.

Id. at 10.

Krotzer instructs the consumer to fill out and submit by e-mail a "Diary" (in Excel spreadsheet form) of ongoing personal and health information, including any dietary supplements, prescription medicine, health conditions and feelings. The customer is required to document his or her use of the supplements recommended and the effects of those supplements. Consumer 1 Decl. ¶ 4; Krotzer Admission 37; JR Deposition at 41; (Doc. 58–34 (Consumer 1 Decl. Ex. A; Diary Template)); (Doc. 59–2 (Consumer 5 Recommendation at 11)).

Some customers reported adverse reactions to the recommended supplements. For example, Consumer 3 told Krotzer that he felt "foggy" and that "my nervous system feels like it's being pushed too far," and that "[t]he cravings for alcohol have increased." (Doc. 58–57 (Consumer 3 Decl. Ex. B)). Consumer 4 "experienced tremendous headaches, hives, body shakes, and hot flashes." (Doc. 58–61 (Consumer 4 Decl. ¶ 7)). Consumer 7 reported that the nutraceuticals, including niacin, St. Johns Wort, Vitamin B, and Kudzu, which were recommended by Krotzer at rates "far beyond what the FDA suggests," resulted in nausea, severe diarrhea, and strong flushing. (Doc. 60–14 (Consumer 7 Aff. at 4)).

And Consumer 11 reported to the State of Florida that as soon as he began ingesting the recommended supplements, "I was nauseous, I had stomach pains continuously and due to the shear quantity of pills, I obtained acid reflux. When I called to get the support that was promised, I was told I could only do so via email through my diary once a month." (Doc. 60–38 (Consumer 11 Aff. at 5)).

Krotzer has instructed consumers to discontinue their doctor-prescribed medications or to disregard their physician's concerns. JR Deposition at 29 (Krotzer recommended consumer stop taking a medication called "Campral" prescribed by consumer's psychiatrist "so that the other natural, St. John's Wort and those things could take effect"); see also id. at 33; (Doc. 58–34 (Consumer 1 Decl. Exhibit A at 1 ("Discontinue your prescription meds once your cravings start down and you are feeling a mood enhancement on our ingredients")); Consumer 2 Decl. ¶ 7 (Krotzer advised consumer to follow ACF recommendations rather than consumer's medical doctor's prescription medication recommendation). He is critical of physicians in his communications with consumers. For example, he told Consumer 2:

> Mostly, while it is good to check with your MD, you should know that no formal education of MDs spends more than an hour talking about alcohol. MDs have no prescription drug that works and cannot afford to stay current on nutraceuticals.

**\*11** By contrast curing alcohol abuse cravings is all we do. We have had PhDs assemble the research of large teams of PhDs. More importantly we are curing nearly all our members. No one else comes close to that result.

> It sounds like your MD has an interest in the subject, which is commendable. That is a long way from exhaustive knowledge.
>
> ...
>
>  ...
>
> I am amazed that your MD who feels so authoritative has not heard of **Kudzu**. By far is [sic] our best known and most scientifically researched ingredient....

(Doc. 58–50 (Consumer 2 Decl. Ex. B)).

### 6. Cancellation

When customers complained, or inquired about cancelling their participation in the ACF Permanent Cure Program, Krotzer claimed that, according to the "disclaimer" on the ACF Website, the customer was deemed "cured" and liable for thousands of dollars of fees for as much as 52 months, 76 months, "forever" or "for life." Krotzer Admissions 89, 99; LS Deposition at 40; JR Deposition at 50; JR Deposition at 32; (Doc. 58–11; Henry 1st Decl. Attach. J at 1–9). Additionally, Defendants considered customers' cancellation of PayPal or credit card accounts to be signals that the consumers had stopped drinking and were "cured." Krotzer Admission 104. Defendants considered at least 27 consumers who quit the program before five months to be "cured." Krotzer Admission 89.

Upon receiving a cancellation request from a customer, "Dr. Doug" would e-mail the customer under an ACF heading notifying the customer that "you committed to no less than five months." (See Doc. 58–9 (Henry 1st Decl. Attach. H; 11/10/06 E-Mail). In a 2006 e-mail, Krotzer included a link to the Alcoholism Cure Website and stated that the customer had made a "**long term commitment**, and that "If you are cured or being cured for any reason while a member or afterwards ... and you cancel your membership; **you agree to immediately pay fees totaling 52 months** plus attorney fees in all courts, and interest at the maximum legal rate." Id. In order to establish that the Permanent Cure Program did not cure alcoholism, and thus that no money was owed upon cancellation, the customer was required to submit a notarized note from a doctor on the doctor's stationary; notarized notes from five friends with identifying information; liquor receipts for the past two months; and laboratory testing, requiring detailed information and testing results, and "3 test tubes of at least 10 milliliter blood samples" and a "[l]arge lock of hair (at least 1½ inches long) from your body where the sun does not shine (nape of neck if you have long hair, chest or pubic hair)." Id. at 4. If the data submitted is "inconclusive," Krotzer could require lie detector test in order to establish that the customer is not cured. Id. [11] Krotzer informed customers who attempted to cancel that "**You created the same legal obligation as a written contract** when you made your first payment.... **By signing up, you committed to pay substantial sums when we cured you or you did not follow our recommendations as stated in our post cancellation policies**." Id. at 1–2. This same e-mail in substantially the same form was sent to other customers. (Doc. 58–11 (Henry

1st Decl. Attach. J; 11/6/08 E-Mail ($14,038 Due NOW!"); Doc. 58–12 (Henry 1st Decl. Attach. K 11/6/08 Breach of Contract E-Mail ($13,098 due NOW!")). Other earlier dunning e-mails contained slightly different assertions, such as representing to the customer that the customer "agreed" "[t]o pay us for 52 months which is defined as the time required to be sure Cures are Permanent." (Doc. 58–13 (Henry 1st Decl. Attach. L; 2/2/07 E-Mail).

> **\*12** By suggesting premature termination of your membership, you have triggered your preauthorization to charge you AMEX card for your entire financial obligation at once. Your weak excuse unrelated to being cured, your submission of Diaries, and our astounding track record effectively prove you have been cured.

Id. at 1. Because the customer was deemed "cured," "Our terms and conditions make it even clearer, and reduce your obligations from the lifetime obligations we say elsewhere, to the 52 months of the boilerplate legal language." Id. Warning one customer against stopping payment on his credit card, Krotzer stated that "**[o]ur chargeback department wins far more than half its cases, and has won 8 out of 8 of our last chargebacks**." Id. And in a particularly caustic passage, Krotzer told the customer:

> We have many alcoholics members who are not nice people. You are not our first cured alcoholic to attempt payment evasion. Unless you quickly understand your legal position today, you are starting a long process which is likely to restart your disease and cost you the entire amount we collected today, plus thousands more.

> You should think carefully. Everyone involved in your case (including your local media should this become a lawsuit) will focus on you saving more the **$x/day** on alcohol (your Cure Dividend). No one sides with cured alcohol abusers who are saving all that money while their life is being saved and incredibly refuse to share some of those benefits with their liberator.

> Id.

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

[11] Krotzer told the consumer that in order to prove that they were not cured, and thus possibly eligible for cancellation, the consumer was required to submit "Proof of Continued Drinking" which included:

Possible submissions suggesting you are not cured. (Include as many as possible)

A. Notarized note from you MD on their stationary

B. Notarized notes from five friends with their Name, address, phone number and email addresses.

C. Liquor receipts for the last two months

D. Laboratory testing

Print out and take the following information to a Quest Laboratory diagnostic center early in the morning (usually open at 7 am) before your first drink. Have them send all of the following to [ACF]

1) Heart panel

2) Liver panel

3) State exactly how many drinks of (hard liquor, wine, beer) you have consumed in the preceding 24 hours.

4) Patient states they have taken the following nutraceuticals in the preceding 48 hours:

a. List your ingredients

b. Each one you are taking

5) Patient states they have taken the following in the last two days

a. Beers—12 ounce—# yesterday, day before

b. Type of Liquor (brand and # of ounces—vodka, whiskey, scotch, other)—yesterday, day before

c. Wine [red or white]—# yesterday, day before

6) Do not use cloves, mint or lemon for 24 hours, and have them complete this statement: "I have smelled the patient's breath, from a distance of less that [sic] two feet, and I smell ...

a. No perfume, cologne, toothpaste or other commercial scent

b. Cloves

c. Mint

d. Lemon

e. Beer

f. Other readily identifiable alcoholic drink" [sic]

7) Have them send us directly all this information plus

a. 3 test tubes of at least 10 milliliter blood samples

b. Large lock of hair (at least 1½ inches long) from your body where the sun does not shine (nape of neck if you have long hair, chest or pubic hair)

8) Send the label of all the ingredients you were taking prior to cancelling

Send us authorization to release records from your general practitioner or family medical center for any heart or liver test you have had in the last 5 years, or a statement that no such records exist.

This data often proves members are not drinking. Occasionally it helps us decide to suspend legal action. It is not a commitment to do so. If the data are inclusive, are you willing to take a lie detector test?

Henry 1st Decl. Attach. H at 4; see also Doc. 58–11 (Henry 1st Decl. Attach. J at 8–9).

At least one consumer submitted nearly all of the required information (except the hair sample and five notarized statements of friends) and ACF refunded approximately $5,800 of the $13,378 charge on her credit card when she attempted to cancel. ACF kept the remaining $7,578. Additionally, ACF did not "allow" the consumer to cancel unless she paid a lump sum $4,000 representing a "discount" to "pay off" her "commitment." JR Deposition at 48, 53–55, 57–58, 66, 80–81; see also (Doc. 58–33; Consumer 1 Decl. ¶ 15 ("In June 2007, Dr. Doug informed me that the Board had agreed to refund 50% of the $13,378, minus three months that I owed, under the condition that I sign a notarized settlement agreement committing to continue my membership with ACF and make regular monthly payments until March 2010.... On August 2, 2007 I signed the notarized settlement agreement because I wanted to avoid a lawsuit as the ACF had previously threatened, and I could not afford to make such a large single payment.... As a result, I received a refund from the ACF for $5,879.12.")).

**7. Finances**

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 47 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

**\*13** Krotzer advises the consumer that "disclaimers" contained in the ACF Website create a "contract" which authorizes him to place charges amounting to the "full cost" of the Permanent Cure Program on consumers' accounts because the customers were "cured" or they cancelled "prematurely." Then, unbeknownst to the consumer, and without their express authorization, Krotzer actually charges thousands of dollars to the consumers' credit accounts. See LS Deposition at 24–25, 35 (upon the consumer's attempted cancellation, Krotzer charged the consumer's credit card twice, once for $800, and a second time for $12,000 without authorization); JR Deposition at 48 (charging consumer's credit card $13,378 without authorization); (Doc. 58–11 (Henry 1st Decl. Attach. J; 11/6/08 E-Mail at 1–9, and Attachment K 1/6/08 Breach of Contract E-Mail at 1–9; Doc. 58–55 (Consumer 3 Decl. ¶ 9–10 (Krotzer stating to consumer that consumer had agreed to immediately pay 52 months in fees; charging consumer's credit card $7,000 without authorization, and threatening that consumer still owed $13,527.96 which he would collect by agreement or by suing consumer) [12]); (Doc. 59 (Consumer 5 Declaration ¶ 7 (Krotzer told Consumer 5 that he "had charged me $13,527.96 for violating a so-called contract by canceling")); (Doc. 58–16 (Henry 1st Decl. Attach. O (internal ACF flow chart showing cancellation practices)).

[12]   On February 2, 2007, Krotzer wrote to Consumer 3 in part as follows:

> **By the way, you may have noticed when you refuse to follow the program for 5 months you are deemed cured, since you did not do your part. That is the essence of why we will win.** DD
>
> *Hopefully you are reading this not right after you "12 beers" and you might try thinking before your next moves.*

(Doc. 58–58 (Consumer 3 Decl. Ex. C at 3)).

At various times, Defendants had credit card processing accounts with Independent Bankers Bank and First Data Card Services. Krotzer Admission 126, 128. However, because of a high rate of consumer "charge backs" of Defendants' fees, First Data Card Services and Independent Bankers Bank terminated the accounts. Henry 1st Decl. ¶ 15. Defendants also had a PayPal account for internet payments. Henry 1st Decl. ¶¶ 9, 10; (Doc. 58–6 at 2; Henry 1st Decl. Atts. E and F; PayPal Websites). [13] On January 31, 2010, PayPal informed the FTC they had terminated Defendants' account on December 19, 2009, for violating their 'Acceptable Use Policy.' " Henry 1st Decl. ¶ 11.

[13]   The "Heavy Drinker" PayPal Website for Alcoholism Cure Foundation sets forth the above-stated costs, and represents that the payment was for "Very Heavy Drinker Membership +Free Assessment, $3.33/Day, Increases ONLY if Drinking Down: By Half–$6/Day, Social Drinker–$9D." The link also represents that "Amounts CHEERFULLY REFUNDED unless mostly paid by CURE DIVIDEND [sic] as explained." The second PayPal link represents " 'VIRTUALLY FREE'—Savings pay all but a few hundred dollars [sic]. Have Read & Accept All Terms & Conditions." PayPal Websites

Based on financial records recovered, the FTC determined that as of October 2008, ACF received $425,396 in credit card payments from consumers, and as of January 2010, ACF received approximately $291,084 in payments from consumers through PayPal. Henry 2d Decl. ¶¶ 4, 5. "The financial records ... show that Defendants' total revenue, including refunds, from May 2005 to January 2010 from all sources ... was approximately $716,480." Id. ¶ 6; accord (Doc. 53 at 3 (Krotzer Amended Answer ¶ 7 ("$700,00 gross revenue over 5 years")). ACF documents contain the names of 405 individual consumers, with 155 of those consumers making at least one entry in their ACF "diary." Henry 2d Decl. ¶ 7. Krotzer admits that approximately 450 consumers purchased the Permanent Cure Program. Krotzer Admission 123.

### 8. Relations With Consumers

#### a. FTC's Investigator's Phone Conversation With Defendant Krotzer

On September 12, 2008, FTC investigator Henry conducted an undercover phone call to ACF, calling the number listed on the ACF Website, posing as a potential customer, and recording the conversation. She spoke with a man who identified himself as "Dr. Doug." Henry 1st Decl. ¶¶ 19, 20, 21; (Doc. 58–17 (Henry 1st Decl. Attach. P; 9/12/08 Telephone Conversation Transcript (Tr.)). While acknowledging that he is not a medical doctor, "Dr. Doug" said that "my doctorate is from Harvard." 9/12/08 Telephone Conversation Tr. at 5. Later in the conversation, "Dr. Doug" stated that "quite frankly, medical doctors know very little ... about how to cure alcoholism.... We do have a medical doctor

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 48 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

who's available. He's a guy that we cured from alcohol. And he's available if we'd need him. But quite frankly, we don't." Id. at 25–26. "Dr. Doug" told the prospective customer that he has been an alcoholic all of his life, as had members of his family, and that in 1996, he began researching "the nutraceutical area." Id. at 5. "Dr. Doug" said that he spent

> **\*14** about $150,000 having a team of top-notch scientists go over everything that was known at the time. And we isolated 15 different ingredients with 50 different molecules, all of which had some effect on alcoholism and that's been proven by very reputable scientific experiments. The bibliography is on the website. There's about a thousand medical journal articles that say that these ingredients have some effect on alcohol some of the time.... [T]he basic principle was that by using combinations, about which we can make pretty good guesses based on your assessment.

Id. at 6. "[C]ombining them is so important. We call it molecule multiplicity." Id. at 17. "Dr. Doug" stated: "the guarantee that we give you is that you'll be at least drinking down half within five months, but about half of our members are cured within one to ten weeks. Id. at 7. But

> once we get your drinking down, that doesn't mean you're permanently cured.... It takes us quite a bit of time to be sure that they're long-term, and during that time, we do all of this for almost no money at the beginning. And so, while you're paying us money out of the money that you're saving from not drinking alcohol, we're learning exactly what it takes to make sure you're permanently cured.

Id. at 7.

As to costs, "Dr. Doug" stated:

> [T]he monthly fee starts off low and it steps up as you're cured. If we're slow in curing you, you can get a partial refund to keep the fee at the same base level.... And then once you're cured, it goes to the full amount, which is almost always less than you're already spending on alcohol so that you actually save money every month... The only thing that is extra is the ingredients ...."

Id. at 29. "Dr. Doug" stated that the cost for the "heavy drinker" program starts at $3 a day, climbing to $6 a day in the fourth month. Id. at 35. When asked about cancellation, "Dr. Doug" responded, "No, once we have you ... once you have started on the program, you have what will cure you... And so, the ... the only reason you can cancel is if that does not cure you." Id. at 38–39. "Dr. Doug" represented that ACF is a "charitable foundation," but that payments "are tax deductible as medical expenses." Id. at 46. Additionally, he assured the prospective customer that ACF "guards" the names of its members "jealously" using "ironclad security"; "our security is second to none" Id. at 46–47.

### b. Consumers' Statements

In the course of her investigation, FTC investigator Henry identified 235 consumer complaints regarding ACF and the Permanent Cure Program. Henry 1st Decl. ¶ 12. [14] Krotzer was aware of consumer complaints against Alcoholism Cure Corporation made to the Florida Office of the Attorney General and to the Better Business Bureau, as well as the "chargeback" requests made by consumers. Krotzer Admissions 117, 118, 120.

14    Investigator Henry stated:
      I identified(13) complaints of which three complaints had been filed using [the FTC's Consumer Information System] and eleven (11) complaints had been filed with the [Better Business Bureau]. I also identified approximately 200 complaints in the Documentation provided by Defendants

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 49 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

in response to the FTC's Civil Investigative Demand ("CID") issued to ACF on September 11, 2008. In addition to these 224 complaints, the Florida Department of Agriculture and Consumer Services provided the FTC with four (4) consumer complaints. Also, the Florida State Attorney General's Office provided the FTC with seven (7) consumer declarations concerning grievances with ACF.

Henry 1st Decl. ¶ 12.

Plaintiffs have submitted evidence that consumers relied upon the ACF Website representations relating to scientific and medical support for the Permanent Cure Program. *See* Docs. 123–1 at 932, 956, 1013 (Henry 2d Decl. Attachs. D, E and F (LS Dep. at 12, 14; JR Dep. at 11; RJ Dep. at 14)). Specifically, Plaintiffs have submitted excerpts from the depositions of three consumers, and Declarations of nine consumers. One of those consumers thought Krotzer was a medical doctor based upon the ACF Website, only to learn after he signed up for the Permanent Cure Program that Krotzer was not. LS Dep. at 16. Another believed medical doctors were involved in the Program based upon the photos of a man in a white jacket on the ACF Website and references to "Dr. Doug." JR Dep. at 11–12; *see also* RJ Dep. at 15 (Website left customer with the "impression" that he was being "treat[ed]" by an "actual doctor"); Doc. 58–61 (Consumer 4 Decl. ¶ 5 ("[w]hile I did not expect my recommendations to come from a medical doctor, I thought that my recommendations would come from an individual with a PhD in a field related to the treatment of alcohol"). Moreover, the consumers believed that their personal information would remain anonymous and confidential, based upon the representations made in the ACF Website. *See* LS Dep. at 16–17; JR Dep. at 14–15; RJ Dep. at 17.

 **\*15** As to costs and cancellation, the consumers deposed testified as to their understandings, based upon the ACF Website. "I assumed in order to participate, an individual ... needed to participate for 5 months and see how it went," and that if the Program did not cure alcoholism, the customer could cancel after five months without having to pay any additional money. JR Dep. at 12–13. JR said that when she signed up for the Permanent Cure Program, she believed she was committed to five months costing $99 a month. She testified that she did not read the "Terms and Conditions" on the ACF Website, and did not read any representation that she would be subject to accelerated payments if she cancelled the Program, or that she would have to submit

proof that she was not cured in order to cancel. JR Dep. at 16–18; *see also* R.J. Dep. at 11, 19 ("I saw it as being five months" and then cancellable). "The web site was explicit in numerous locations that that was cancellable at any time.... That if I chose not to continue the treatment, that I would just notify them and it would be cancelled," without having to meet any special qualifications first. LS Dep. at 17 (who does not recall reading "Terms and Conditions" section of the Website); *see also* RJ Dep. at 35 (does not recall seeing terms and conditions); *accord* (Doc. 58–33; Consumer 1 Decl. ¶ 4 ("I did not see any terms and conditions on the website"). LS said that he did not read on the Website before he signed up that if he was committing to a long-term contract, that if he cancelled the Program, he would subjected to having to pay advanced or accelerated fees, or that he would have to submit proof of continued drinking in order to cancel. LS Dep. at 18–19. LS testified that he did not authorize ACF to charge his credit card for 52 weeks of fees or for life. *Id.* at 28, 40. Krotzer never told the Consumers, nor did the Consumers have any understanding that by continuing to participate in the Permanent Cure Program, they were agreeing to pay $13,000 or more ($22,000) if they cancelled or that they were agreeing to pay for the program for 52 or 76 months. JR Dep. at 44; RJ Dep. at 33–34.

Plaintiffs also submitted Consumer Declarations (with the customers' names redacted). Each consumer recounted how they attempted to cancel the Permanent Cure Program, and how ACF placed unauthorized charges on their credit cards as a result. The first consumer recounted how ACF charged her credit card $13,378 when she attempted to cancel her "membership," and that she attempted to have $13,378 charged back from her credit card which was denied because she "had entered into a binding subscription with ACF." (Doc. 58–33; Consumer 1 Decl. ¶ 13). In total, the consumer paid ACF a sum of $18,300; her Declaration and the exhibits attached thereto, including e-mail exchanges with "Dr. Doug," recount the financial ruin that resulted from this ACF expenditure. *See* Consumer 1 Decl. and Exs. [15]

[15]     "So far, we sold my husbands [sic] truck, borrowed all available funds against my teacher's retirement accounts, and opened a line of credit to cover the 'accelerated payments.' " (Doc. 58–37; Consumer 1 Decl. Ex. D at 5)). "My involvement with your organization has been financially draining and a source of dispute in my marriage." (Doc. 58–45; Consumer 1 Decl. Ex. L at 2)).

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 50 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

A second consumer recounted how he signed up for the Permanent Cure Program over the phone (including providing his credit card information and e-mail address) in February 2007, after having seen the ACF Website. Although his medical doctor expressed concern that some of the ACF recommended dietary supplements would interfere with his prescription medication and suggested some changes, "Dr. Doug advised me to follow all of the ACF recommendations." (Doc. 58–48; Consumer 2 Decl. ¶ 7; Doc. 58–50; Consumer 2 Decl. Ex. B). By April, 2007, the consumer requested that his "membership be cancelled because Dr. Doug's recommendations were not working for me." Consumer 2 Decl. ¶ 8; Doc. 58–51, Consumer 2 Decl. Ex. C). Krotzer responded with the form letter to requests for cancellation, saying "You have violated your contract with us by demanding to cancel." (Doc. 58–52; Consumer 2 Decl. Ex. D). Krotzer stated in the e-mail response that "you preauthorized us to charge the unpaid balance of your fees to your credit card." Id. The consumer closed his bank VISA card in May 2007 to terminate his relationship with ACF. He had paid ACF a total of approximately $5,550. Consumer 2 Decl. ¶ 12. On January 2, 2010, Krotzer sent the consumer an e-mail threatening to sue the consumer if he did not make an "amnesty" payment of $1,889.72. Id. at ¶ 13 and Exhibit E.

Consumer Number 3 stated that he came across ACF after having conducted a search of the internet and signed up by phone using his credit card. (Doc. 58–55; Consumer 3 Decl. ¶¶ 1, 3, 5). The consumer began to follow the ACF recommendations on January 5, 2007, but, on January 30, 2007, informed "Dr. Doug" that he was terminating the Permanent Cure Program "as my cravings for alcohol had only increased and I could no longer tolerate the side effects of the recommendations." Consumer 3 Decl. ¶ 8; (Doc. 58–57; Consumer 3 Decl. Ex. B). On February 1, 2007, Krotzer informed the consumer that he was contractually obligated to pay for the program for a minimum of five months, and to pay 52 months for a permanent cure. "He also informed me that he had charged $7,000 to my credit card and that I still owed $13,527.96, which could be collected through an agreement or he could collect it by suing me." Consumer 3 Decl. ¶ 10; (Docs. 58–58–58–60; Consumer 3 Decl. Ex. C).

**\*16** A fourth consumer recounted a similar experience. This consumer, who did not want his wife and two children to know how much he drank, chose to sign up for the Very Heavy Drinker Program on-line after reading the ACF Website and corresponding with "Dr. Doug" by e-mail in January 2006. (Doc. 58–61; Consumer 4 Decl. ¶¶ 3, 4); (Docs. 58–

62, 63; Consumer 4 Decl. Exs. A and B)). The consumer followed the Permanent Cure Program recommendations for six months, paying his monthly fee with a Visa credit card through PayPal. Id ¶ 6. On August 10, 2006, the consumer sent an e-mail requesting that ACF cancel his account because "the recommendations were not working." Id. ¶ 8. The next month, ACF informed him that because his "exit interview" indicated that "ACF had cured my alcoholism," the consumer was obligated to pay $14,000 in order to cancel, or face a lawsuit. Id. at ¶ 10; (Doc. 58–65; Consumer 4 Decl. Ex. D at 8). The consumer then "received an email from ACF informing me that they had charged $8,400 to my Visa credit card as a settlement fee." Consumer 4 Decl. ¶ 11; (Doc. 58–66; Consumer 4 Decl. Ex. E). In order to avoid his family and co-workers learning about his relationship with ACF, the consumer paid ACF the $8,400 "settlement," bringing his total payments to ACF to approximately $9,000. Consumer 4 Decl. ¶¶ 12, 14; Ex. E.

Consumer 5 signed her pilot husband up for membership with the ACF on November 25, 2006. The consumer upgraded to the "more expensive membership" after being reassured by ACF employee "Pam" "that I could cancel at any time." (Doc. 59 at 2; Consumer 5 Decl. ¶ 5). After receiving the dietary supplement recommendation from "Dr. Doug," the consumer became concerned that the side effects from the recommended supplements "would negatively effect my husband's work as a pilot." Id. ¶ 6. Despite assurances to the contrary from Dr. Doug, the consumer learned that the Federal Aviation Administration ("FAA") had determined that the "side effects ... could adversely affect pilot performance," and that "supplements do not fall under FDA testing and monitoring and sometimes have unlisted ingredients." Consumer 5 Decl. ¶ 6; (Docs. 59–2, 59–3; Consumer 5 Decl. Ex. A at 10 and Ex. B at 1). On November 29, 2006, the consumer e-mailed ACF to cancel the membership. "As a result, Dr. Doug told me that the ACF had charged me $13,527.96 for violating a so-called contract by cancelling." Consumer 5 Decl. ¶ 7; (Docs. 59–4, 59–5; Consumer 5 Decl. Exs. C and D at 1). A later e-mail from "Dr. Doug," dated December 20, 2006, and entitled "**PLEASE DO NOT PUT YOUR HUSBANDS** [sic] **JOB IN FURTHER JEOPARDY**," threatened:

> As you know, a dispute will involve many people. Any one of them may feel a moral or legal obligation to report his alcoholism to the FAA. After all, totalling [sic] a car while drunk is

**Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 51 of 192**

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

not what anyone wants to read about
pilots. We certainly feel that disclosure
obligation, but we consider we are
bound by doctor-patient privilege not
to disclose it.

(Doc. 59–8; Consumer 5 Decl. Ex. G at 1); see also
LS Deposition at 42 ("he was threatening to report my
husband to the FAA"). The consumer was able to secure
a $12,688.12 "charge-back" credit from her credit card
company. Consumer 5 Decl. ¶ 10. Thereafter, in April
2007, "Dr. Doug e-mailed the consumer proposing a reduced
settlement" of "25% of the original amount you owed," or
$3,381, in order to avoid the cost and embarrassment of
litigation. Id. ¶ 11; (Doc. 59–9; Consumer 5 Decl. Ex. H).
In a January 4, 2010 e-mail, "Dr. Doug" threatened to sue
the consumer for thousands of dollars unless she paid an
"Amnesty Offer" of $1,889.72. Consumer 5 Decl. ¶ 11; (see
Doc. 59–10; Consumer 5 Decl. Ex. I).

Amy Sams, investigator with the Economics Crimes
Division of the State of Florida, Office of the Attorney
General, submitted six additional consumer affidavits which
accompanied their complaints about ACF. (Doc. 60; Sams
Decl.). Consumer 6 submitted a complaint and sworn affidavit
and supporting documentation on March 1, 2007. Sams
Decl. ¶ 5. "When [Consumer 6] attempted to cancel her
participation in the Program, she had paid a total of $149.92.
Mr. Krotzer threatened legal action and advised her that he
would collect $13,137.08." Id.; (see also Docs. 60–1–60–3;
Sams Decl. Attach. A, Consumer 6 Aff.).

Consumer 7 learned of the ACF program through an
"internet advertisement." (Doc. 60–14; Consumer 7 Aff. at
1). Consumer 7 attempted to cancel her participation in the
ACF Permanent Cure Program after having paid $957.87, and
Krotzer threatened legal action to collect $14,038.00. Sams
Decl. ¶ 6. Consumer 7 wrote:

  **\*17**  On May 4th, 2006, at a particularly difficult time of
  my life, I sought help for drinking too much by researching
  treatments on the web. I found The Alcoholism Cure
  Foundation site and called to ask more questions. I spoke
  with a man who referred to himself as Dr. Doug (real name
  Robert Krotzer) who claimed they had a 90% cure record
  through use of "neutraceuticals". After talking to him, I
  decided to give it a try and signed up. I was told I would be
  assigned a doctor who would be in constant touch with me

and would develop a plan of ingredients for me to take that
was, supposedly, tailored to my specific physical needs.

After receiving this information and ... giving my
American Express card to make payments, I purchased the
neutraceuticals (such as niacin, St. John's Wort, vitamin
B, Kudzu) and proceeded to take them as prescribed.
The doses recommended were far beyond what the FDA
suggests but I was assured this was safe. I was supposed
to increase my doses weekly but after the first week or
so, I began to have very uncomfortable responses (nausea,
severe diarrhea, strong flushing from the niacin that would
not go away and I felt very uncomfortable in general. I told
this to Doug, ... and he told me to increase at a lower rate
which I did but I felt so lousy, I discontinued and quit a
month later.

Consumer 7 Aff. at 4. Consumer 7 attempted the treatment
again, experienced the same symptoms, and quit again. On
December 29, 2006, Krotzer sent Consumer 7 a certified letter
"re: Additional Strong Evidence Confirming Your Cure—
Your Refusal to Answer Questions $14,038 Due NOW!" and
threatened legal action. Id. at 6.

Consumer 8, who submitted a complaint to the state of
Florida in December 2009, stated that he attempted to cancel
with ACF after having paid ACF $1,579.68, "Mr. Krotzer
threatened legal action and advised [Consumer 8] that he
would collect $ 22,706.00." Sams Decl. ¶ 7. Consumer 8 also
learned of ACF through an "internet advertisement." (Doc.
60–16; Sams Decl. Attach. C, Consumer 8 Aff.). Consumer
8 stated:

  After a couple of weeks of following
  the program I began to have physical
  symptoms of high blood pressure and
  nausia [sic]. I spoke with my Dr. and he
  advised me to stop taking any and all
  of the medications recommended by
  the foundation. I attempted to cancelle
  [sic] my membership several times and
  was told I would be sued for thousands
  of dollars. The foundation claims to
  have cured my disease of alcoholism.

Id. at 2. On November 11, 2009, Krotzer wrote to Consumer
8 that he should be "careful where you spread libel about us.

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 52 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Depending on how you count, that adds $100,000 or $200,000 to the amount you already cannot afford. You already know you have breached our contract, and we win regularly in court and arbitrations." Id. at 26.

Consumer 9 found ACF through an internet search. "When [Consumer 9] attempted to cancel her participation in the Program, she had paid a total of $839.84. Mr. Krotzer threatened legal action and immediately charged her credit card for $12,688.12." Sams Decl. ¶ 8. Consumer 9 found ACF through an "Internet search" on November 25, 2007. (Docs. 60–17–60–23; Sams Decl. Attach. D, Consumer 9 Aff.). Consumer 9 said he "received notice I was 'in breach of contract' and my credit card was charged $13,527.96. ($839.84 + 12,688.12)". Id. at 2.

Consumer 10 submitted a complaint to the State of Florida on January 7, 2008. Krotzer threatened legal action against Consumer 10 when Consumer 10 attempted to cancel his participation in the ACF Program after having expended $2,729.56. Sams Decl. ¶ 9. Consumer 10 discovered ACF "while surfing the internet," and after reading the ACF Website claims, he "decided to give it a try." Consumer 10 followed the ACF recommendation, purchasing and taking several varieties of over the counter "vitamins"—"ingesting over 30 vitamin tablets a day"—and experiencing such side effects as "dizziness, sour stomach, and diarrhea." (Doc. 60–24; Sams Decl. Attach. E, Consumer 10 Aff. at 5). When he communicated that he wished to "exercise my 6 month cancellation notice," ACF replied that Consumer 10 had entered into a 76–month contract and was obligated to pay the full amount. Id. at 5–6.

**\*18** And Consumer 11 told the State of Florida that when she attempted to cancel her participation in the Program, after having paid $1,397.00, "Mr. Krotzer threatened legal action and advised [Consumer 11] that he would sue her for $13,638.00." Sams Decl. ¶ 10; (Doc. 60–38; Sams Decl. Attach. F, Consumer 11 Aff. at 11). Consumer 11 recounts her experience as follows:

In January 2007 I was seeking help for an alcohol problem. I went on line and found this organization.... They offer help and support by doctors. They state that they have a cancellation policy. They state that this is a "Guaranteed Cure." They lead you to believe they are a "Foundation." When in fact they are a business.

They continue to claim they cure 100% of their "members," as they responded to the complaint I filed with the Better Business Bureau in Jacksonville.

The company states that they have a five (5) month cancellation policy. The company states that they have a scientific formula for this cure. The company states that I would have to purchase the ingredients in the formula. The company states that they are there to support you.
. . .

As soon as I purchased the "formula," and began to take it, I began to have adverse affects [sic]. I was nauseous, I had stomach pains continuously and due to the shear quantity of pills, I obtained acid reflux. When I called to get the support that was promised, I was told I could only do so via email through my diary once per month. As I continued to write, to no avail, I again called and was told that I may not call. I was told that I take up too much valuable time and I am to only send email via diary.
. . .

Finally I simply emailed them on the third month and let them know that this was not only not working, but I was still very sick, (I was scared to stop taking the stuff due to the cancellation policy) and I need to know how to get out, what the cancellation policy was. They immediately sent me an email stating that I breached the contract. They charged my credit card another $1,000. I immediately stopped that credit card and wrote to the company....
. . .

When I called them because they took the $1,000 ... [t]hey ... told me I could no longer take advantage of the cancellation policy and that they would be taking the $13,000 as quickly as they could.

Id. 5–6.

Krotzer sent the same form cancellation letters to each of the aforesaid consumers, tailoring them somewhat to the Consumer's situation.

### 9. Privacy breaches

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 53 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

The ACF Website stated that the "Doctor–Patient Privilege plus high level security assurances are important benefits" of the Permanent Cure Program, and (on the Assessment page) that "Confidentiality: All your personal information is protected by doctor patient privilege and high level unencrypted security measures that have never been breached." ACF Website at 23; see Krotzer Admissions 64, 65. On the Privacy page, the Website states that "Under no circumstances will we sell or share your identity for commercial purposes to anyone, ever, period. Your records are protected by us, Norton Internet Security Systems and PayPal ultra secure payment technology. Each the best in their class." ACF Website at 57; see Krotzer Admission 66.

However, Krotzer made veiled threats to expose the names of consumers who attempted to cancel their participation in the ACF Program. See Henry 1st Decl. Attach. K at 4 (Krotzer e-mail to a consumer stating "Avoid the hassle and expense of messy litigation and its perhaps unwanted publicity by making a one-time discounted payment"); LS Dep. at 42 ("he was threatening to report my husband to the FAA"); JR Deposition at 52 (Krotzer's threat of a lawsuit would be "a public thing. That's a public record. Your name is out there with that and that ... would also have been damaging"); RJ Deposition at 36–37 (threat of lawsuit and resultant publicity caused consumer, a pilot, to sign back up with ACF); Consumer 4 Decl. ¶¶ 10, 12 and Ex. D (consumer disturbed that ACF sent to her office a certified letter readily identified as being from Alcoholism Cure Foundation, regarding her attempted cancellation, "put[ting] my privacy at risk").

*19 Defendants disclosed consumers' sensitive health information to third parties. For instance, several ACF responses to inquiries from credit card companies and the Better Business Bureau attached e-mails between Krotzer and the consumer that discussed the consumer's medical issues and treatment. Additionally, ACF provided these entities with security information that gave them access to ACF's files, which included sensitive consumer health information. Henry 1st Decl. ¶ 17; (Doc. 58–14; Henry 1st Decl. Attach. M (E-Mail to debt collector "Sean")); (Doc. 93–1 at 43–49; 2/8/11 Henry Decl. Attach. E at 1–7 (Krotzer Letter to credit card company regarding charge-back, and including initial health and personal Assessment completed by "Complainer" Consumer). Defendants revealed the identities of at least 11 purchasers of the Permanent Cure Program in small claims lawsuits, filed against consumers who attempted to cancel the Permanent Cure Program. Krotzer Admissions 70, 109.

**10. Post Complaint Activity**

By April 9, 2010, the ACF Website, http://www.alcoholismcure.org, appeared to be inactive, consisting of a one-page "placeholder" page bearing the statement that the site was "under construction." Henry 1st Decl. ¶ 23; (Doc. 58–20; Henry 1st Decl. Attach. S)). Henry determined that on February 25, 2010, Krotzer had registered a new website: http://www.enjoyafew.com (Enjoy A Few Website), which is very similar to the Alcoholism Cure Website, with many of the pages appearing to be the same, with the same pictures and multiple hyperlinks. Henry 1st Decl. ¶¶ 24, 25; (Doc. 58–21 at 2–29; Henry 1st Decl. Attach. T ("4/16/10 Enjoy A Few Website"). On May 26, 2010, a person named "Magic Krotzer" (referred to by "Dr. Doug" in the taped telephone conversation as his wife), registered another new website entitled http://www.guiltfreedrinking.com ("Guilt Free Website"). Henry 1st Decl. ¶ 26; (Doc. 58–24; Henry 1st Decl. Attach. U); Krotzer Admissions 11–13; see 9/12/08 Telephone Conversation Tr. at 50. The Guilt Free Website was on-line throughout the summer and early fall of 2010. Henry 1st Decl. ¶ 28; (Docs. 58–26, 58–27, 58–28 at 2 (Henry 1st Decl. Attachs. W, X, Y (Guilt Free Website on 7/27/10 and 9/28/10)). The Guilt Free Website consists of approximately six pages; a home page, assessment page, terms and conditions, secure sign-up page, and privacy policy, plus 44 hyperlinks, most of which direct the user to the same six pages within the Guilt Free Website, and approximately 17 hyperlinks directing the user to the assessment page. Henry 1st Decl. ¶¶ 33–35.

Krotzer registered the website http://www.dougkrotzer.com on June 18, 2010. Henry 1st Decl. ¶ 27; Krotzer Admissions 11–13; (Doc. 58–30; Henry 1st Decl. Attach. Z ("8/27/10 Doug Krotzer Website")). The five-page website promotes Krotzer as an "innovative" "creative troubleshooter," with "spectacular successes" in diverse industries. 8/27/10 Doug Krotzer Website. One of the Doug Krotzer Website 36 hyperlinks directs the user to the Guilt Free Website. Henry 1st Decl. ¶ 36. On September 10, 2010, FTC investigator Henry accessed Krotzer's profile on the professional network information exchange website http://www.linkedin.com. There, she found Krotzer's summary. Henry 1st Decl. ¶ 37; (Doc. 58–31 at 2; Henry 1st Decl. Attach. AA (Linked In Website)). In his summary, Krotzer lists that he is "Founder/President" of "Florida for profit charity at Guilt Free Drinking," and has held that position from 1995 to the present. He provides hyperlinks to the Guilt Free

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 54 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Website and the Doug Krotzer Website. Krotzer represents that Guilt Free Drinking provides "THE ONLY LONG TERM SOLUTION FOR PROBLEM DRINKERS" and that "Payment [is] contingent on success, making a $20,000 fee 'Virtually Free.' " Linked In Website at 1–5.

Defendants started www.guiltfreedrinking.com after the Stipulated Preliminary Injunction was entered. Since the entry of the Preliminary Injunction, Krotzer has received at least $11,000 from consumers. Krotzer Admissions 132, 146.

### B. FTC and State of Florida's Complaint

**\*20** Plaintiffs initiated this action on March 29, 2010, by filing a seven-count Complaint for Permanent Injunction and other Equitable Relief against Defendants. (Doc. 1; Complaint). In the Complaint, Plaintiffs seek injunctive and equitable relief against Defendants, based upon alleged violations of sections 5(a) and 12 of the FTC Act and FDUTPA. See Complaint at 2. Counts I through VI are brought by the FTC against Defendants alleging violations of Sections 5(a) and/or 12 of the FTC Act for various aspects of Defendants' conduct. The State of Florida, Office of Attorney General, brings Count VII of the Complaint, alleging that Defendants violated the FDUTPA based upon Defendants' various representations and charge backs. It alleges that "Defendants have engaged in representations, acts, practices, or omissions that are material, and which are likely to mislead consumers under the circumstances," constituting "deceptive acts or practices" in violation of the FDUTPA. Id. ¶¶ 57–59.

Defendant Krotzer answered the Complaint generally denying its allegations. (Doc. 53; Answer at 2, 10). [16] Krotzer has asserted an estoppel affirmative defense, contending that Plaintiffs' "multiple stopping of investigation activity after hearing Defendants [sic] responses, helped Defendant reasonably conclude the complained of activities were not viewed as materially violative of law." Answer at 14. [17] ACF has not answered the Complaint and thus is in default. (Doc. 47; Clerk's Default). As such, the instant motions for summary judgment relate to Krotzer only.

[16]     Though listed as an affirmative defense of "Lack of Harm and/or Damages Fail To State A Claim No Violations of the FTC or Florida Acts As A Matter Of Law," the Court determined to treat the "defense" as a specific denial. (Doc. 77; 12/13/10 Order at 4, 6).

[17]     The remaining affirmative defenses were either stricken or re-construed as a denial of the claims. (Doc. 77; 12/13/10 Order at 5–6).

### C. Stipulated Preliminary Injunction [18]

[18]     Section 13(b) of the FTC Act gives a court the authority to issue a permanent injunction. 15 § 53(b). As an incident to that authority, the Court may also enter a preliminary injunction. FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984).

Upon the filing of their Complaint, Plaintiffs indicated that they were prepared to file a Motion for Preliminary Injunction. (See Docs. 2 at 1; 3 at 2; 10 at 2). However, on May 6, 2010, Plaintiffs filed an Unopposed Motion For Entry Of A Stipulated Order For Preliminary Injunction, in which the Plaintiffs stated that "the parties have agreed to a Stipulated Order for Preliminary Injunction that obviates the need for Plaintiffs to file a Motion for Preliminary Injunction." (Doc. 10; Unopposed Motion for Stipulated Preliminary Injunction at 2). The parties forwarded the proposed Stipulated Preliminary Injunction to the Court for the Court's review, (see Doc. 11), and on May 26, 2010, the Court granted Plaintiffs' Unopposed Motion for Entry of a Stipulated Order for Preliminary Injunction. (Doc. 12; 05/26/10 Order). The Court signed and docketed a Stipulated Order for Preliminary Injunction, as modified by the Court, which was also signed by the parties, including Krotzer, Alcoholism Cure by Krotzer, its president, and L. Michael Maddox, attorney for Defendants Alcoholism Cure and Krotzer. (Doc. 12–1; Stipulated Preliminary Injunction at 16). All sixteen pages of the Stipulated Preliminary Injunction were initialed by Krotzer.

Although Defendants entered the Stipulated Preliminary Injunction "without admitting or denying liability for any of the conduct alleged in the Complaint," id. at 1, the parties specifically agreed that "Plaintiffs have the authority to seek the relief they have requested" pursuant to the FTC Act and FDUTPA. Id. ¶ 3. The Stipulated Preliminary Injunction prohibits five categories of representations; requires clear and conspicuous disclosures of all fees and costs and material restrictions or conditions applicable to the purchase or cancellation of the product or service; prohibits unauthorized billing and the use or disclosure of personal consumer information; and requires cessation of collection efforts, and preservation of records.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 55 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

**\*21** Pursuant to the Stipulated Preliminary Injunction, Defendants [19] are prohibited from making a number of specific misrepresentations, including:

> making, or assisting others in making, directly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation that a covered product or service: [20]
>
> A. Cures alcoholism for most alcoholics who use it;
>
> B. Cures alcoholism while allowing alcoholics to drink socially; or
>
> C. Is more effective than other treatments for alcoholism.

Id. at 7. The Stipulated Preliminary Injunction also prohibits Defendants from making

> any representation about the health benefits, performance, or efficacy of any covered product or service, unless the representation is non-misleading, and, at the time of making such representation, Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

Id. at 8. Additionally, Defendants are prohibited from misrepresenting directly or by implication the conclusions of any tests, study or research including misrepresenting that the product or service:

> A. Is scientifically proven to cure alcoholism; or
>
> B. Has been validated by a $35,000,000 research study.

Id. at 9. Further, Defendants may not in any way misrepresent the "cost of any product or service; ... [t]he terms or conditions of any cancellation policy; and [t]he expertise, training, education, experience, or qualifications of Defendant Krotzer or any employee or contractor of defendants," or "the manner or extent to which any information collected from or about consumers is used, disclosed, maintained or protected." Id. at 10, 11.

[19]     The Stipulated Preliminary Injunction reaches "Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of the Order ..., in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any covered product or service, in or affecting commerce ...." Stipulated Preliminary Injunction at 7.
"Defendants" is defined as Alcoholism Cure Corporation "and its successors and assigns," and Krotzer, individually, collectively, or in any combination. Id. ¶ 1, 3.

[20]     " 'Covered product' means any dietary supplement, food, or drug," and " 'Covered service' means any health-related service or program, including, but not limited to, the Permanent Cure Program." Id. ¶¶ 9, 10.

Finally, the Stipulated Preliminary Injunction requires that Defendants "shall immediately cease all collection efforts on accounts or claims" arising from contracts or agreements between Defendants and "any person who purchase or registered for, or purportedly purchased or registered for, the Permanent Cure Program prior to the date of entry of this Order." Id. at 12. This prohibition requires Defendants to cease all collection efforts by them or third parties, cease furnishing negative information relating to any ACF customer to any consumer reporting agency, and refraining from filing lawsuits or arbitration proceedings against any such customer. Id.

## II. Standard of Review [21]

[21]     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 53(b) and 57b. This action arises under 15 U.S.C. § 45(a)(1). Defendants maintained a substantial course of trade in the offering for sale and the sale of services, in the form of purported "cure" for alcoholism, in or affecting

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 56 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

commerce, as "commerce" is defined in Section 4 of the FTC Act. 15 U.S.C. § 44. The Court rejects Krotzer's suggestion that "the Court exercise its discretion to refuse jurisdiction as this case is de minimis, odious and unfair." Defendant's Motion for Summary Judgment at 26.

**\*22** Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). [22] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

[22]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). A non-moving party "cannot merely rest upon his bare assertions, conclusory allegations, surmises, or conjectures." FTC v. 1st Guaranty Mortgage Corp., No. 09–cv–61840, 2011 WL 1233207, at \*17 (S.D. Fla. March 30, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). "[T]he non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.' " Bryant v. U.S. Steel Corp., No. 10–13165, 2011 WL 2150193, at \*2 (11th Cir. May 31, 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986)).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T–Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). Upon review of cross-motions, "the Court must determine whether either party deserves judgment as a matter of law on the undisputed facts." Id. Thus, the court must view the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolve all reasonable doubts about the facts in favor of the non-moving party Amer. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005).

**\*23** Particularly pertinent here, where the parties have flooded the Court's docket with "exhibits," many of which include argument, charts, and summaries of information compiled by Defendant Krotzer, is the new Rule 56 admonition: "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3). The Court need not "undertak[e] an independent search of the record." Rule 56(c)(3) advisory committee's note 2010 Amendments. Additionally, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 57 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Id. at 56(c)(2). "The burden is on the proponent [of the evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated." Rule 56(c)(2) advisory committee's note 2010 Amendments.

Finally, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ..., the court may ... consider the fact undisputed for purposes of the motion; [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Rule 56(e)(2) and (3). Thus, "[s]ubdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied." Rule 56(e)(2) advisory committee's note 2010 Amendments.

## III. The Federal Trade Commission Act

The FTC is authorized to initiate proceedings in federal district court to enjoin violations of the FTC Act, in order to secure such equitable relief as may be appropriate, and to obtain consumer redress. 15 U.S.C. §§ 53(b), 57b. See e.g. FTC v. Holiday Enter., Inc., No. 1:06–CV–2939–CAP, 2008 WL 953358, at *1 (N.D. Ga. Feb. 5, 2008); FTC v. Capital Choice Consumer Credit, Inc., No. 02–21050 CIV, 2004 WL 5149998, at *2 (S.D. Fla. Feb. 20, 2004), aff'd 157 Fed.Appx. 248 (11th Cir. 2005). The FTC's arguments on summary judgment are premised upon its allegations that Krotzer and ACF violated Sections 5 and 12 of the FTC Act. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a). Section 12 addresses false advertising and provides that the dissemination of false advertisements—defined as advertisements that are misleading in a material respect—is an unfair or deceptive practice. 15 U.S.C. §§ 52(b) and 55.[23] A violation of Section 12, dissemination of false advertising, constitutes a deceptive act or practice in violation of Section 5(a). FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d 1167, 1188 (N.D. Ga. 2008), aff'd 356 Fed.Appx. 358 (11th Cir. 2009), reh'g denied en banc, 401 Fed.Appx. 522 (11th Cir. 2010; cert. denied, 131 S.Ct. 505 (2010). "Given the strong similarity between the terms 'deceptive' and misleading', it is no surprise that sections 45 and 52 are sometimes applied in

tandem as the basis for an FTC action against an alleged false advertiser; indeed, such a tandem reading is expressly allowed by 15 U.S.C. § 52(b)." FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 7–8 (1st Cir. 2010)(citing 15 U.S.C. §§ 45 and 52).

**23**     Section 12 provides:

§ 52. Dissemination of false advertisements

(a) Unlawfulness

It shall be unlawful for any person, ... or corporation to disseminate, or cause to be disseminated, any false advertisement—

(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or

(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics.

(b) Unfair or deceptive act or practice

The dissemination or the causing to be disseminated of any false advertisement within the provisions of subsection (a) of this section shall be an unfair or deceptive act or practice in or affecting commerce

....

15 U.S.C. § 52.

**\*24**  The FTC Act defines "false advertisement" as follows:

The term "false advertisement" means an advertisement, other than labeling, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the commodity which the advertisement

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 58 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual....

15 U.S.C. § 55(a)(1). "Two types of false advertising are actionable: '(1) advertising which makes claims which are literally false on their face, and (2) advertising which, although literally true on its face, is perceived by a significant proportion of the relevant market as making "subliminal" or "implicit" claims which are provably false. With regard to the second type of false advertising, the courts sometimes say that the advertising has a tendency to mislead, confuse or deceive.' " FTC v. Bronson Partners, LLC, 564 F. Supp.2d 119, 124 (D. Conn. 2008)(quoting Schering Corp. v. Pfizer Inc., 189 F.3d 218, 229 (2d Cir. 1999)). Thus, even if individual statements in an advertisement are literally true, a representation will be found to be deceptive and in violation of Section 5 of the FTC Act if its net impression is likely to mislead consumers. FTC v. Braswell, No. CV 03–3700 DT (PJWX), 2005 WL 4227194, at *5 (C.D. Cal. Sept. 27, 2005)

To establish liability under Sections 5 and 12 of the FTC Act for deception and false advertising, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); see also FTC v. Peoples Credit First, LLC, 244 Fed.Appx. 942, 944 (11th Cir. 2007). "Section 5 of the FTC Act is to be applied broadly to protect the public interest ...." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. "[C]aveat emptor is simply not the law ...." FTC v. Tashman, 318 F.3d at 1277. The FTC alleges deception and false advertising claims in Counts I–V of the Complaint. In Count VI, the FTC alleges an "unfair practice" claim. "[S]ection 5 [of the FTC Act] by its very terms makes deceptive and unfair practices distinct lines of inquiry .... [W]hile a practice may be both deceptive and unfair, it may be unfair without being deceptive." Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1367 (11th Cir. 1988)(citation omitted). "[T]he unfairness doctrine 'differs from and supplements, the prohibition against consumer deception.' " Id. (citation omitted). " ' To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.' " FTC v. Direct Mktg. Concepts, Inc., 569

F. Supp.2d 285, 299 (D. Mass. 2008)(citation omitted), aff'd, 624 F.3d 1 (1st Cir. 2010); 15 U.S.C. § 45(n). "While conduct must meet each of these prongs to be deemed unfair, 15 U.S.C. § 45(n), conduct that is unfair violates section 5(a) of the FTC Act." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *37 (citing Orkin Exterminating Co., 849 F.2d at 1364). Unlike a "deceptive practice" claim, proof of consumer injury is required to establish liability for an "unfair practice." See FTC v. Braswell, 2005 WL 4227194, at *4.

A. **Representation**

**\*25** The first element in a deceptive act or practices claim under Section 5 of the FTC, is that there was a misrepresentation. Although "[t]he meaning of an advertisement, the claims or net impressions communicated to reasonable consumers is fundamentally a question of fact," the question "may be resolved by the terms of the advertisement itself or by evidence of what consumers interpreted the advertisement to convey." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189. "When assessing the meaning and representations conveyed by the advertisement, the court must look to the advertisement's overall, net impression rather than the literal truth or falsity of the words in the advertisement." Id. (citing FTC v. Peoples Credit First, LLC, No. 8:03–cv–2353–T–TBM, 2005 WL 3468588, at *5–6 (M.D. Fla. Dec. 18, 2005)(finding that an advertisement was implicitly deceptive by looking at the net impression that it was likely to make on the general public), aff'd, 244 Fed.Appx. 942 (11th Cir. 2007)); see also FTC v. RCA Credit Serv., LLC, 727 F. Supp.2d 1320, 1329 (M.D. Fla. 2010); FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. "[W]hether a representation is likely to mislead reasonable consumers, must be determined 'by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.' " FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *6 (internal quotations and citations omitted).

[T]he important criterion in determining the meaning of an advertisement [or representation] is the net impression that it is likely to make on the general populace.

[T]he determination is not restricted to a consideration of what impression an expert or careful reader would draw from the advertisement [or representation], but rather involves viewing the [representation] as it would be seen by the public generally which includes the ignorant, the unthinking and incredulous, who, in making purchases, do not stop to analyze but too often are governed by

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 59 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

appearances and general impressions. Thus, being mindful of the fact that the buying public does not weigh each word in an advertisement or a representation, the Court will consider the impression that is likely to be created upon the prospective purchaser.

FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *6 (quoting FTC v. Think Achievement Corp., 144 F. Supp.2d 993, 1010 (N.D. Ind. 2000)).

"Thus, implied claims as well as express claims may be deceptive, and a claim may be deceptive even though it is literally true." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. Indeed, "[d]eception may be accomplished by innuendo rather than by outright false statements ...." Id. (internal quotations and citations omitted); see also FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at *6.

> The elements of a sales presentation that contribute to the net impression, and so to the representations conveyed, include the headline, general tone, the presence or absence of elements contradicting a general impression or tone, the interaction of all the different elements, and the juxtaposition of phrases within the presentation.

FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *32. Additionally, "fine print notices" appearing "on the reverse side" of a solicitation do not preclude liability for deceptive advertising; "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006).

"If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189; see also FTC v. QT, Inc., 448 F. Supp.2d 908, 958 (N.D. Ill. 2006), amended in part on other grounds, 472 F. Supp.2d 990 (N.D. Ill. 2007), aff'd, 512 F.3d 858 (7th Cir. 2008). Indeed, consumer survey evidence is not required to support a finding that an advertisement has a tendency to deceive. FTC v. Medlab, Inc., 615 F. Supp.2d 1068, 1077–

78 (N.D. Cal. 2009). However, if an advertisement implies a claim, the court need not conclude that the advertisement makes such a representation without evidence of consumer perceptions. FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189.

**B. Likely to Mislead**

**\*26** To demonstrate the second element, whether a claim made is likely to mislead a reasonable customer, the FTC "may proceed under a 'falsity theory,' a 'reasonable basis theory,' or both." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citation omitted); see also FTC v. Garvey, 383 F.3d 891, 901 (9th Cir. 2004); FTC v. Pantron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994). "If the FTC proceeds under a falsity theory, it 'must demonstrate either that the express or implied message conveyed by the ad is false.' ... If the FTC proceeds under a 'reasonable basis' theory, it must demonstrate that the advertiser lacked a reasonable basis—or adequate substantiation—for asserting that the message was true." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citations omitted); FTC v. Garvey, 383 F.3d at 901; FTC v. Pantron I Corp., 33 F.3d at 1096.

The "reasonable basis" theory is particularly applicable to efficacy claims made about health-related products. An advertisement that makes an objective product claim, containing affirmative information about a product's attributes, performance or efficacy, implies support by a reasonable basis. FTC v. Braswell, 2005 WL 4227194, at *8 (citing In the Matter of Thompson Medical Co., 104 F.T.C. 648, 813 (1984), aff'd 791 F.2d 189 (D.C. Cir. 1986), cert. denied, 479 U.S. 1086 (1987)).

> If the ad contains express representations regarding the particular level of support that the advertiser has for the claim or implies a particular level of substantiation to reasonable consumers, then the reasonable basis consists of the amount and type of substantiation the advertiser claimed to have.... Typically, advertising that expressly or impliedly represents support by a scientific level of substantiation contains such words as "tested," "established," "here's proof" or

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 60 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

"medically proven." ... If such advertisement represents that a particular claim has been scientifically established, then the advertiser must possess a level of proof sufficient to satisfy the relevant scientific community of the claim's truth.

FTC v. Braswell, 2005 WL 4227193, at *8 (citations omitted). "When the FTC brings an action based on the theory that advertising is deceptive because the advertisers lacked a reasonable basis for their claims, the FTC must: (1) demonstrate 'what evidence would in fact establish such a claim in the relevant scientific community'; and (2) 'compare ... the advertisers' substantiation evidence to that required by the scientific community to see if the claims have been established.' " FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 8 (quoting Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1498 (1st Cir. 1989)). Where advertisers lack a reasonable basis, their advertisements are deceptive as a matter of law. Id., 624 F.3d at 8 (citing Removatron, 884 F.2d at 1498). "Defendants have the burden of establishing what substantiation they relied on for their product claims. The FTC has the burden of proving that Defendants' purposed substantiation is inadequate, and the FTC need not conduct or present clinical studies showing that the product does not work as claimed." FTC v. QT, Inc., 448 F. Supp.2d at 959. [24]

[24] A "reasonable basis" inquiry may apply to specific claims of scientific support, and to simple "efficacy" claims as follows:

In assessing reasonable basis arguments, two different types of advertising claims may be at issue: (1) establishment claims and (2) non-establishment claims.... Establishment claims contain express or implied representations about the level of support for a particular claim (i.e., the claim states that a product has been found to be superior by scientific tests).... For such claims, the advertiser must possess the level of proof claimed in the ad.... For non-establishment claims, claims that do not assert a specific level of substantiations (i.e. a simple claim of efficacy), "the reasonable basis inquiry has been defined more flexibly." ... For such non-establishment claims, the Court can look to a number of factors to determine what level

of substantiation was required.... The factors include: (1) the type of claim; (2) the product; (3) the consequences of a false claim; (4) the benefits of a truthful claim; (5) the cost of developing substantiation for the claim; and (6) the amount of substantiation experts in the field believe is reasonable....

FTC v. QT, Inc., 448 F. Supp.2d at 959 (citations omitted).

*27 "[I]n the case of health-related claims or claims concerning the efficacy or safety of dietary supplements, this reasonable basis must, at minimum, consist of competent and reliable scientific evidence." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citing FTC v. QT, Inc., 448 F. Supp.2d at 961). "[W]hat constitutes competent and reliable scientific evidence ... is a question of fact for expert interpretation." Id. In the case of dietary supplements or health related claims, "competent and reliable scientific evidence" consists of " 'tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.' " Id. (quoting Bureau of Consumer Protection, Federal Trade Commission, Dietary Supplements, An Advertising Guide for the Industry at 9 (2001)). "The Court can look to what experts in the relevant area of study would consider to be adequate in determining the amount and type of evidence that is sufficient" for scientific validation of the advertisement's claims. FTC v. Braswell, 2005 WL 4227193, at *10.

Notably, the FTC need not show Defendant intended to deceive the consumer; intent is not an element of a Section 5 FTC Act violation. FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *33, 34. Thus, an advertiser's "good faith" does not immunize it from responsibility for its misrepresentations, and is not a defense. Id., 2004 WL 5149998, at *34.

### C. Materiality

As to the third element, a representation or omission is "material" " 'if it is the kind usually relied on by a reasonably prudent person.' " FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (citation omitted). " 'Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumptively material.' " Id.; FTC v. Peoples Credit First, LLC, 2005 WL 3468588,

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 61 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

at \*7; FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at \*34. Likewise, an inference of materiality may reasonably be made when a deceptive omission is found. Id. at \*33. Claims that " 'significantly involve health, safety, or other issues, that would concern reasonable customers' " are presumptively material. FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190 (quoting FTC v. QT, Inc., 448 F. Supp.2d at 960, 965–66). Indeed, "when a customer makes a decision to purchase a health product that he or she will ingest for purported health benefits, any claim on the label regarding the health benefits (i.e., any product efficacy claims) or any claims regarding the safety of the product can be presumed material." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1191. Moreover, representations are material to consumers if "they were instrumental in affecting consumers' decisions to pay for goods and services." FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at \*13. Thus, "[e]xpress claims and deliberately-implied claims used to induce the purchase of a product or service are presumed to be material to consumers as a matter of law." Id. at \*12; see generally Kraft, Inc. v. FTC, 970 F.2d 311, 322 (7th Cir. 1992).

Reliance may be presumed to be reasonable when it is in response to an express claim or to a deliberately made implied claim. FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at \*33. Indeed, the Eleventh Circuit has held that a " 'presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.' " McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000)(citation omitted). "[O]nce the Commission shows that the representations were of the type ordinarily relied on by reasonably prudent persons, that they were widely disseminated, and that consumers purchased the product, the burden then shifts to Defendants to show there was no reliance." FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at \*323. (citations omitted); see also FTC v. World Traveler Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)); FTC v. Phoenix Avatar, LLC, No. 04 C 2897, 2004 WL 1746698, at \*10 (N.D. Ill. July 30, 2004).

### D. Individual Liability

**\*28** In a case brought by the FTC, individual defendants may be held directly liable for their own violations of §§ 5 and 12 of the FTC Act. FTC v. Windward Mktg., Ltd., No. Civ.A 1:96–CV–615F, 1997 WL 33642380, at \*13 (N.D. Ga. Sept. 30, 1997)). Additionally, an individual may be held liable for a corporate defendant's violation of the FTC Act if:

> the FTC demonstrates that (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices or the individual defendants had authority to control the corporate defendants; and (3) the individual defendants had some knowledge of the wrongful acts or practices.

Id. (emphasis in original); see also FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207; FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at \*7; FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at \*46. "If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207. "To establish the knowledge requirement, the FTC need not demonstrate actual knowledge of material misrepresentations; instead, the FTC may meet this element by 'showing that [an] individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of truth." ' " Id. (citations omitted); see also FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at \*14–15.

Section 13(b) of the FTC Act "authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the Commission." FTC v. Gem Merchandising Corp., 87 F.3d 466, 468 (11th Cir. 1996); see also 15 U.S.C. § 53(b). "Pursuant to this statute, the Commission may bring suit for injunctive relief when it has reason to believe 'that any person, partnership, or corporation is violating or is about to violate, any provision of law enforced by the Federal Trade Commission.' " FTC v. Citigroup, Inc., 239 F. Supp.2d 1302, 1304 (N.D. Ga. 2001)(citing 15 U.S.C. § 53(b)(1)). Additionally, "[t]he Court can order injunctive relief against individual defendants for violations of Section 5(a) of the FTC Act if the individuals participated directly in the deceptive acts or practices or had the authority to control them." FTC v. 1st Guaranty Mortgage Corp., 2011 WL 1233207, at \*15 (citing FTC v. Gem Merchandising

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Corp., 87 F.3d at 470). Lastly, "the Court may order monetary relief against the individual defendants if they had or should have had knowledge or awareness of the misrepresentations." Id.

## IV. Evidentiary Issues

### A. Plaintiffs' Motion to Strike Portions of Defendant's Motion for Summary Judgment and Exhibits (Doc. 99)

Plaintiffs have moved to strike portions of Krotzer's submissions filed with his Motion for Summary Judgment, contending that the Motion is not in compliance with the provisions of the Local Rules of the United States District Court, Middle District of Florida (Local Rule(s)). (Doc. 99; Plaintiffs' Motion to Strike). Specifically, Plaintiffs argue that five exhibits attached to Defendant's motion are actually "57 additional pages of argument" rather than evidence, and thus, violate Local Rule 3.01(a) which restricts the length of a motion to twenty-five (25) pages. Plaintiffs' Motion to Strike at 3. Additionally, Plaintiffs contend that text and exhibits added to Defendant's Motion for Summary Judgment, which is an "amended" motion, supplanting Defendant's original motion for summary judgment, (see Doc. 84), is actually a "reply" to Plaintiffs' response to the original motion for summary judgment, (see Doc. 93), filed without leave of Court as required by Local Rule 3.01(c). Plaintiffs also argue that Defendant's Motion for Summary Judgment requests a panoply of improper affirmative relief, lacks citation to authority, and "amounts to 84 pages of rambling, repetitious, and indecipherable musings ...." Plaintiff's Response to Plaintiff's Motion for Summary Judgment at 3–6.

 *29  Defendant Krotzer responds to Plaintiff's Motion to Strike that he "has done his best to fit this case within the Local Rules," that "[t]he Court does not need his permission to ignore any parts the Court may not understand," that "[t]here is no reasonable way Krotzer has the ability to condense or alter the form of those facts to fit any better than he already thinks they do within the local rules encouraging clarity," and "[l]et's stop quibbling." Defendant's Response to Motion to Strike at 10, 16.

Plaintiffs take issue with the following exhibits as being improper argument: DX–3 entitled "History and Development," (Doc. 96–3); DX–102 entitled "Krotzer's Fundamental Integrity Literal and Implied Truthfulness Counts I–VII," (Doc. 96–12); DX–104 entitled "One–Sentence–Clickwrap–Contract," (Doc. 96–14); DX–105

entitled "Countervailing Benefits Pages Intentionally Hidden From This Court," (Doc. 96–15); and DX–106 entitled "Selected Countervailing Benefits Testimonials From 50% of Members ...." (Doc, 96–16).

Defendant Krotzer has flooded this record with numerous "exhibits" which are no more than his own re-typed rendition of what he considers to be evidence, as opposed to any actual evidence. For example, DX–30 (Doc. 68–2; 96–5; "Clinical Survey Alcoholism Cure Foundation; 29 Subjects Chosen By the State of Florida August 23, 2009" (authored by Krotzer[25])), and DX–31 (Doc. 96–6 (a chart entitled "Alcoholism Cure Foundation; Clinical Survey of 27 Case Sample Chosen by Independent Researchers"; a chart prepared by Krotzer bearing the date and time "1/25/20113:44 AM")); see Defendant's Response to Plaintiffs' Motion for Summary Judgment at 8, 17), are unsworn statements and "opinions" by Defendant Krotzer prepared in the context of this litigation, and are not as the titles might suggest reliable scientific evidence. (See Doc. 123–2; Hutchinson 3/30/11 Decl. ¶ 25). As such, these exhibits are not competent evidence on the question of whether the Permanent Cure Program in fact "cures" alcoholism. See Rule 56(c)(1)(A) and (c)(4).

[25]     See Krotzer Admission 46.

Turning to the Krotzer exhibits that Plaintiffs object to, Krotzer's Exhibit 102, DX–102, entitled "Krotzer's Fundamental Integrity Literal and Implied Truthfulness," is an 18 page memorandum of argument—a "point by point analysis"—as to why he should prevail in this lawsuit. (Docs. 96–12 and 136–1; DX–102; "Krotzer's Fundamental Integrity Literal and Implied Truthfulness Counts I–VII"). See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 20. Krotzer asserts he did not include this "explanation" of his Website claims in his "Amended Answer, since [sic] not considered central issues." Defendant's Motion for Summary Judgment at 10. The exhibit is not competent evidence and constitutes nothing more than additional argument well beyond that permitted for Defendant's Motion and Response. Similarly, DX–3, (Doc. 96–3), is a two-page "history" recounting that Krotzer started his first website in 2005. DX–104, (Doc. 96–14), is three pages of extractions from the ACF Website, with Krotzer's own commentary regarding sign-up for and cancellation of the Permanent Cure Program. And DX 105, (Doc. 96–15), is three pages of Krotzer commentary about the "countervailing benefits" of the Permanent Cure Program, and four pages of

**Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 63 of 192**

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

attached "enews" computer screens showing files dated 2008, which have no meaning standing alone. These submissions constitute argument and rhetoric, and thus are not competent evidence. See Turnquist v. Noll, No. 10–80030–CIV, 2010 WL 3522011, at *4 (S.D. Fla. Aug. 11, 2010). Unsworn and conclusory statements from litigants are not competent evidence and should not be considered in determining the propriety of summary judgment. West v. Higgins, 346 Fed.Appx. 423, 425–26 (11th Cir. 2009)(citing Gordon v. Watson, 622 F.2d 120, 123 (5th Cir. 1980)); cf. McCaskill v. Ray, 279 Fed.Appx. 913, 915 (11th Cir. 2008)(litigant's unsworn allegations not admissible on motion for summary judgment); Nieves v. Univ. of Puerto Rico, 7 F.3d 270, 276 n.9 (1st Cir. 1993)("[f]actual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment"). "[C]onclusory statements of ultimate facts ... are not considered competent evidence to defeat summary judgment.' " Nisbet v. George, No. 1:05–cv–570–WKW, 2006 WL 2345884, at *3 (M.D. Ala. Aug. 11, 2006)(citation omitted). Likewise, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). These "exhibits" are not proper evidence and will not be considered by the Court. As such, the Court need not strike them.

**\*30** Krotzer's exhibit DX–106, (Doc. 96–16), is a 27–page exhibit of customer "testimonial" statements excerpted by Krotzer. Krotzer contends that these testimonials are statements by satisfied customers, and were a part of the ACF Website, which Plaintiffs failed to include in their ACF Website exhibit. See e.g. Defendant's Motion for Summary Judgment at 12; Defendant's Response to Plaintiffs' Motion for Summary Judgment at 5. [26] The Exhibit bears the heading "Selected Countervailing Benefits" at the top of each page, and cites to "http://AlcoholismCure.org/successes __" and "ENews" DX–106 at 1. Krotzer asserts that it "shows, exact member quotes expressing wonderful enlightment in 27 densely packed pages." Defendant's Motion for Summary Judgment at 11.

[26]     Krotzer acknowledges that Plaintiffs did submit a CD–ROM of the ACF Website which included the testimonials. See supra n.6.

If indeed these "testimonials" were a part of the ACF Website, they are relevant to whether the advertisement was deceptive or false. " '[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from the use of the product.' " FTC v. Bronson Partners, LLC, 564 F. Supp.2d at 125 (citation omitted) ("the testimonials in the Chinese Diet Tea advertisement are clearly tiles contributing to the mosaic"); see (Doc. 58–48; Consumer 2 Decl. ¶ 4 ("I browsed the website and read several customer testimonials")). However, if the anonymous testimonial statements are being offered for the truth of the matter asserted, that is, that the ACF Permanent Cure Program "cures" alcoholism, in their present form they constitute inadmissible hearsay, which cannot be reduced to admissible form at trial short of the actual customer testifying. See Rule 56(c)(2); see also Macuba v. DeBoer. 193 F.3d 1316, 1322–23 (11th Cir. 1999). Moreover, Krotzer has failed to meet his burden of establishing that the selected "testimonial" excerpts are admissible, nor has he explained how he might submit the evidence in admissible form. See Rule 56(c)(2) advisory committee's note 2010 Amendments.

As to Plaintiffs' request that the Court strike portions of Defendant's Motion for Summary Judgment and Exhibits because they constitute a "de facto reply" to an earlier filed response by Plaintiffs, Plaintiffs have failed to designate the portions of the motion which are "new" and the Court declines to cull through the lengthy motion and exhibits to make that determination. Accordingly, the Court will consider the Defendant's Motion for Summary Judgment and remaining exhibits in their entirety. See Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002)(in the summary judgment context, the court must construe pro se pleadings more liberally than those of a party represented by an attorney"). [27]

[27]     The Court does not consider Krotzer's Emergency Dispositive Motion #1: Summary Judgment, Failure to State a Claim, and Judgment as a Matter of Law (Doc. 84; Defendant's First Motion for Summary Judgment), which was superceded by his second, amended motion for summary judgment (Doc. 96; Defendant's Motion for Summary Judgment). Nor does it consider Plaintiffs' first response, (Doc. 93), as it was a response to a motion which has been superceded.

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 64 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Finally, the affirmative relief requested by Krotzer in his Motion for Summary Judgment, beyond judgment in his favor and "dismissal of this lawsuit with prejudice," including granting his pending Motion to Vacate Preliminary Injunction (Doc. 56); arranging meetings with officers of the "National Institutes of Health ('NIH')," the "National Institutes of Alcohol Addiction and Abuse (NIAAA)," the Governor and Attorney General of the State of Florida; ordering the NIH to fund a $5 million grant to study the efficacy of his Molecule Multiplicity theory; and ordering the withdrawal of all prejudicial pretrial publicity, Defendant's Motion for Summary Judgment at 3–4, is disregarded, as being beyond the scope of the pending cross motions for summary judgment under consideration here, and thus improperly sought.

**\*31**  For the foregoing reasons, Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike) is due to be **GRANTED IN PART** to the extent that the Court will not consider Exhibits to Defendant's Motion for Summary Judgment that are not competent evidence, and otherwise **DENIED**.

### B. Plaintiffs' Motions to Strike or to Exclude Defendant's Proffered "Expert" Testimony (Docs. 135, 143)

After filing his Motion for Summary Judgment (Doc. 96), Defendant Krotzer filed what he has labeled "Affidavit of Robert Douglas Krotzer," (Doc. 122; Krotzer Affidavit), and "Affidavit of Carl Edwards." (Doc. 133; Edwards Affidavit). Krotzer subsequently filed his Second Motion for Summary Judgment (Doc. 140), Defendant's Supplemental Memo of Law, (Doc. 152), and Defendant's Response to Plaintiff's Motion for Summary Judgment. (Doc. 136). In the Krotzer Affidavit, Defendant Krotzer professes to be an expert in curing alcoholism and repeats arguments that he has presented extensively in his motion papers. Krotzer Affidavit ¶ 1. Edwards is a former ACF employee, paid consultant of ACF, and then an unpaid consultant. Edwards Affidavit ¶ II.A.3. He alleges that he is an "expert in evaluating and adjusting consumer issues." Id. at ¶ 1.B. Edwards states his belief that ACF customers with whom he communicated "understood the One Sentence Clickwrap Contract." Id. ¶ II.A.3. Additionally, as support for his opinion, Edwards recounts his experience with ACF, and repeats arguments made by Krotzer in his papers.

Plaintiffs move to strike Edwards' Affidavit contending that the affidavit "is permeated by inadmissible purported evidence, including undesignated and unqualified expert opinion testimony, misplaced legal argument, and rank hearsay attributed to alleged, though unidentified, customers of Defendant." (Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit at 1). Plaintiffs also note that Defendant Krotzer has not disclosed what the Edwards Affidavit is intended to support. Id. at 4. Additionally, Plaintiffs move to exclude both the Krotzer Affidavit and the Edwards Affidavit, arguing that both affidavits "fail[ ] to meet admissibility standards, including qualifications, reliability, and relevance." (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony at 1 (citing Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)).

Krotzer does not rely on either affidavit as support for his Motion for Summary Judgment. He mentions the affidavits in his Response to Plaintiffs' Motion for Summary Judgment, but does not actually cite to them as expert opinion supporting his position. First, Krotzer cites to a chart entitled "Evidence of Cure," which he calls "my summary" and which is attached as an exhibit to the Krotzer Affidavit, see Krotzer Affidavit at 3 ¶ 3; (Doc. 122–3; DX–502; "Evidence of Cure" Chart), in support for his argument that "it appears the few complainers were mostly cured quite quickly." Defendant's Response to Plaintiff's Motion for Summary Judgment at 17 (citing DX–502; "Evidence of Cure" Chart). Citing the "Evidence of Cure" Chart, Krotzer argues that "Only 11 answered the governments [sic] search for complaining affidavits, most had already confirmed they were cured." Response to Plaintiff's Motion for Summary Judgment at 8 (citing DX–502 "Evidence of Cure" Chart). The "Evidence of Cure" Chart appears to refer to 12 unnamed consumers labeled "Cancelled Before Five Months?", and who Krotzer contends in the "summary" Chart, with no citation to actual admissible evidence, were "cured." The "Evidence of Cure" Chart is not admissible evidence. Fed. R. Evid. 1006; see also Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1160–61 (11th Cir. 2004)(materials or documents on which a Rule 1006 exhibit is based must be admissible; the chart or summary cannot be based upon hearsay statements or conclusory allegations).

**\*32**  Krotzer also includes a reference to the Krotzer and Edwards Affidavits as part of a string-cite in support of his argument that he has adduced "admissible evidence" to oppose Plaintiffs' Motion for Summary Judgment.

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 65 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Defendant's Response to Plaintiffs' Motion for Summary Judgment at 19. [28] This broad brush citation to the affidavits does not invoke the alleged "expertise" of Krotzer or Edwards sufficient to require the Court to consider the affidavits as "expert" testimony. Nor does Krotzer cite to any particular paragraphs of the 25–page Krotzer Affidavit or 22–page Edwards affidavit in support of his assertion.

[28]    Specifically, Krotzer argues in response to Plaintiffs' Motion for Summary Judgment that Plaintiffs' argument that he has not presented " 'admissible evidence' " is:

CLEARLY NOT TRUE unless the Court buys Plaintiffs [sic] argument actual facts do not matter and applies that to many categories of facts. ADMISSIBLE EVIDENCE INCLUDES over 10,000 unalterable Yahoo email admissions of cure, details of cure and payment negotiations, also, expert Affidavits of Krotzer (Doc # 122) and Edwards, (Doc # 133, and the business records too numerous to mention of direct probative value attached to Defendant various filings as well as the physical filings of CDs, DVD, and books.

Defendant's Response to Plaintiffs' Motion for Summary Judgment at 19.

Finally Krotzer cites to the Edwards Affidavit in connection with his denial that he has violated the Stipulated Preliminary Injunction regarding continued collections of fees from consumers. Id. at 20. Again, Krotzer simply cites generally to the Edwards Affidavit to support his assertion that the consumers "understood" the payment terms of the Permanent Cure Program. In addition to not relying upon any specific "expert" opinion by Edwards, Krotzer concedes that Edwards states "what is common sense among ... 'reasonable consumers.' " Id. [29] Such a common sense determination requires no technical or specialized assistance from an expert. See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)(expert testimony must "assist[ ] the trier of fact through the application of scientific, technical, or specialized expertise, to understand evidence or to determine a fact in issue"). Thus, it is not an appropriate area for expert testimony.

[29]    Specifically, Krotzer responded:

... the *One–Sentence–Clickwrap Contract* terms reasonable consumers understand. (*Edwards Affidavit Doc # 133 stating what is common*

*sense among non-lawyers, aka "reasonable consumers"*).

Defendant's Response for Plaintiffs' Motion for Summary Judgment at 20.

Rule 56 provides that a party must support all assertions made in support of or in opposition to a motion for summary judgment by "citing to particular parts of materials in the record, including ... affidavits or declarations ...." Rule 56(c)(1)(A). Moreover, while the Court may consider other evidence, "[t]he court need consider only the cited materials ...." Rule 56(c)(3). Here, Krotzer has filed two "expert" affidavits, but has not connected them with any other pending filings. The Court will not scour un-cited portions of the summary judgment record, including lengthy affidavits, searching for evidence that might bolster either side's argument.

Moreover, the Court has serious doubts whether Krotzer can meet his burden of establishing that his and Edwards opinions are supported by the necessary qualifications, reliability and helpfulness to render them admissible expert testimony. See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 (11th Cir. 2005). Nevertheless, inasmuch as Krotzer did not rely upon any of the opinions expressed by Krotzer and Edwards in the Affidavits, the Court will not consider them in conjunction with the pending cross motions for summary judgment, and will not engage in a Daubert analysis of the proffered testimony at this time. [30] Accordingly, Plaintiffs' Motion to Strike Edwards' Affidavit at 1. (Doc. 135), and Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony at 1 (Doc. 143) are due to be **DENIED WITHOUT PREJUDICE** to renewal.

[30]    It is also not necessary for the Court to determine at this time whether Krotzer provided the required expert disclosure by January 25, 2011, (see Doc. 62; 10/25/10 Case Management Order), and whether the proffered testimony is inadmissible based upon inadequate expert disclosure. See Fed. R. Civ. P. 26(2). Nor does the Court make a determination at this time whether the proffered affidavits meet the requirements of Rule 56(c)(4) which requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 66 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

## V. Discussion of Cross–Motions for Summary Judgment

**\*33** Plaintiffs have alleged seven claims against Defendant Krotzer, and Krotzer has one remaining affirmative defense. Plaintiffs have moved for summary judgment against Krotzer on their claims, and Krotzer has moved for summary judgment, requesting "immediate dismissal of this lawsuit with prejudice." The parties' arguments in their respective motions for summary judgment and responses repeat themselves and overlap. Accordingly, the Court will draw on their arguments and cited evidence from all of their submissions on these cross-motions. The Court will address each claim individually, but opts first to dispense with Krotzer's remaining affirmative defense.

### A. Defendant's Affirmative Defense: Estoppel

Krotzer has asserted an affirmative defense of "estoppel," contending that Plaintiffs' "multiple stopping of investigation activity after hearing Defendants [sic] responses, helped Defendant reasonably conclude the complained of activities were not viewed as materially violative of law." Answer at 14. Krotzer alleges that Plaintiffs have damaged him "thru [sic] years of harassment and diversion," and that Plaintiffs should be "estopped from legal relief whose only and announced effect will be to assure the destruction of such promising technology." Id. at 14–15. The parties did not address this defense in their motions or responses seeking or opposing summary judgment.

Krotzer's estoppel defense is meritless. "As a matter of law, mere inaction, i.e., failing to enforce a statute, cannot give rise to an estoppel claim against [the government]." United States v. Carver, No. 10–11599, 2011 WL 1304757, at \*3 (11th Cir. April 6, 2011)(citing United States v. McCorkle, 321 F.3d 1292, 1297 (11th Cir. 2003)). As noted by the Eleventh Circuit,

> To make out a claim of estoppel against the Government, a party must adduce evidence of the following: (1) words, conduct, or acquiescence that induces reliance; (2) willfulness or negligence with regards to the acts, conduct, or acquiescence; (3) detrimental reliance; and (4) affirmative misconduct by the Government.... Affirmative misconduct requires more than negligence or inaction; otherwise

prong two and prong four would be redundant.

United States v. McCorkle, 321 F.3d at 1297; see also Savoury v. U.S. Atty. Gen., 449 F.3d 1307, 1318–19 (11th Cir. 2006). The burden on the private party seeking to assert equitable estoppel against the government is heavy; equitable estoppel will be applied against the government only in extreme circumstances. Ellinger v. United States, 470 F.3d 1325, 1336 n.9 (11th Cir. 2006); Feldman v. C.I.R. 20 F.3d 1128, 1134 (11th Cir. 1994). Krotzer has not cited to any evidence in the record of any action by the Plaintiffs which could have induced his reasonable reliance, or to any affirmative misconduct on the part of Plaintiffs. See Feldman, 20 F.3d at 1134. Accordingly, judgment is due to be entered in favor of Plaintiffs as to Krotzer's one remaining affirmative defense.

### B. False or Unsubstantiated Efficacy Claims (Count I)

The FTC alleges in Count I of the Complaint, that Defendants ACF and Krotzer directly or indirectly, expressly or by implication represented that the Permeant Cure Program:

a. Cures alcoholism for most alcoholics who sign up for the Program;

b. Cures alcoholism while allowing alcoholics to drink socially; and

c. Is more effective than other treatments for alcoholism.

Complaint ¶ 38 (" 'cure' claims"). The FTC alleges that the representations were "false or were not substantiated at the time the representations were made," and thus, constituted "a deceptive act or practice" and "false advertisement," in violation of §§ 5(a) and 12 of the FTC Act. 15 U.S.C. §§ 45(a) and 52. Complaint ¶¶ 39, 40.

**\*34** Krotzer contends that Plaintiffs' claims fail because "1.) Reasonable consumers could have easily avoided harm AND enough members were helped or cured of abusing alcohol to qualify as Countervailing Benefits." Defendant's Motion for Summary Judgment at 6, 8–9. Krotzer argues that the FTC Act §§ 5(n) and 12 "not only require [the FTC] to prove falsity, they require them [sic] to prove no countervailing benefit, and that reasonable consumers were not able to avoid substantial harm." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 24. Krotzer's argument that he is entitled to judgment on Count I (and also as to

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 67 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Counts II through V) because any harm caused to consumers was "reasonably avoidable" "outweighed by countervailing benefits," 15 U.S.C. § 45(n), [31] is misdirected to the FTC's deception and false advertising claims found in Counts I through V of the Complaint, which are brought pursuant to §§ 5(a) and 12. Section 5(n) of the FTC Act, 15 U.S.C. § 45(n), sets forth the elements for an "unfair practices" claim, which is pertinent only to Count VI of the Complaint. Rather, to establish liability under §§ 5(a) and 12 of the FTC Act for deceptive practices and false advertising, the FTC must prove: (1) that there was a representation; (2) that the representation was likely to mislead customers acting reasonably under the circumstances; and (3) that the representation was material. FTC v. Tashman, 318 F.3d at 1277.

[31]    Section 5(n) of the FTC Act, 15 U.S.C. § 45, provides:

> (n) Standard of proof: public policy consideration
> The Commission shall have no authority under this section ... to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.
> 15 U.S.C. § 45(n).

### 1. Representation

The first page of ACF's printed Website states in boldface type that the ACF Program offers the "Best Technology to End Alcohol Abuse Permanently ... Enjoy A Few Drinks"—Without Cravings." Other representations on the first page include:

Will We Work for You?

Yes, beyond our PhDs' wildest dreams. We have cured nearly all members—many hundreds. Your guarantees are explained below.

. . .

You can really enjoy a few drinks. No cravings!

. . .

Welcome to your only chance to have it all—

You can Enjoy A Few Drinks, without wanting more.

. . .

We will cure you ... guaranteed. Often within 1–10 weeks, nearly always by 5 months.

. . .

Our program can guarantee success

. . .

Over the years nearly all have been cured.

. . .

Lowest cost program anywhere that really works.

5/4/09 ACF Website at 1. Additionally, the first page advises: "Expect a long term cure rate 50% better than expensive clinics." Id. Nearly every page of the Website contains similar "cure" representations: "Permanent Cure;" "Most importantly, everyone who faithfully follows their program is Permanently Cured!;" and "only we permanently cure nearly everyone." Id. at 5. ACF touts a "Success Rate" of "Above 97%." Id. "Permanent Cure is many times more effective than any other treatment, and the only treatment with a truly permanent cure." Id. at 3; see also id. at 6, 31. As to social drinking, the ACF Website represents:

**Can I Drink Socially?**

in your brain much of the stimulation you now seek in alcohol. We give you a **stable good mood** and eliminate your cravings for "something better." Then, **if you want a buzz, have a drink or two**. When your brain chemistry is in balance, **you won't need more**.

Id. at 16 (emphasis in original); see also id. at 37 ("Social Drinking is actually part of your cure. You will feel better about yourself ... One drink cannot make you need another ... Two Drinks: Great Buzz No Cravings"); 46 (same). The Court concludes from the face of the ACF Website that the

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 68 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

advertisement makes the alleged claims. Defendants' repeated representations are express and not subtle; there is no question as to the "net impression" of Defendants' "cure claims." Defendants do not "imply" or employ innuendo to claim that the Permanent Cure Program cures alcoholism for most who subscribe. ACF unequivocally and indisputably represents that its Permanent Cure Program "cures" alcoholism while allowing for "social drinking," and that its program is superior to all others.

## 2. **Materiality**

**\*35** It is also undisputed that the "cure" representations are "material." ACF's claims were widely disseminated via the internet, and easily located using popular search engines. Approximately 450 consumers across the country subscribed, confirming the presumption of actual reliance by consumers. See Krotzer Admission 123. The claims of a "cure" were indisputably used to induce consumers to sign up for the Permanent Cure Program. Because the "cure" representations addressed in Count I of the Complaint center on the efficacy claim that ACF's Permanent Cure Program "cures" alcoholism, the claims are health related and therefore material. FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1191; see also Kraft. Inc. v. FTC, 970 F.2d at 322–24; FTC v. SlimAmerica, Inc., 77 F. Supp.2d 1263, 1272 (S.D. Fla. 1999)("Express claims or deliberately made implied claims used to induce the purchase of a particular product or service are presumed to be material"). No reasonable juror could conclude, after reading the ACF Website, that the "cure" claims were not important to consumers and not likely to affect the consumer's choice regarding the product. Thus, the only significant question with respect to these efficacy claims is whether ACF and Krotzer had sufficient substantiation for the claims asserted, or whether the claims of "cure" were false. See FTC v. Pantron I Corp., 33 F.3d at 1095–96 (discussing "likely to mislead" element where no dispute about representation and materiality).

## 3. **Likely To Mislead**

The FTC argues that Krotzer has provided "no evidence whatsoever to support his assertion that the majority of users were 'cured' by any reasonable definition," Plaintiffs' Response to Defendant's Motion for Summary Judgment at 10 (emphasis in original), and "no scientific evidence to support any of the challenged efficacy claims." Plaintiffs'

Motion for Summary Judgment at 20 (emphasis in original). Plaintiffs also argue that Defendant's claims of "cure" are false, contending that the "1000 Diary reports" to which Krotzer points are not of record, and anecdotal statements (testimonials) of unidentified customers summarized by Defendant, have never been evaluated by an independent reviewer or scientist. As such, Plaintiffs contend that Defendant has not adduced "any admissible evidence to support his claim that the diaries prove his program cures alcoholism." Plaintiffs' Response to Defendant's Motion for Summary Judgment at 13–14.

Plaintiffs present evidence in the form of a declaration by their expert witness, Dr. Kent E. Hutchinson.[32] Hutchinson states in his Declaration that "adequate scientific evidence" to support the efficacy of a proffered treatment of alcoholism by "intervention agents" such as those contained in the ACF Permanent Cure Program, requires two or more double-blind placebo-controlled 12–week clinical studies, each consisting of 150 to 1,000 human participants, with follow-up three to six months after the study's conclusion, and with accepted scientific measurement and data analysis. (Doc. 123–2; Hutchinson 3/30/11 Decl. ¶ 23).[33] Hutchinson avers that no well-designed, well-controlled, human clinical study, or scientific study of any kind, or any scientific literature, shows that any of the ingredients used in the ACF Permanent Cure Program, alone or in combination: (1) cure alcoholism for most persons; (2) cure alcoholism while allowing alcoholics to drink socially; or are (3) more effective than other treatments for alcoholism. Hutchinson 3/30/11 Decl. ¶¶ 24–29, 35. Specifically, Hutchinson states that his review of materials provided by Krotzer, and his search of available scientific evidence, failed to identify any peer-reviewed articles supporting the proposition that any of ACF's ingredients, alone or in combination, cure alcoholism in humans. Id. ¶ 24.

[32]     Dr. Hutchinson received his doctorate in clinical psychology from Oklahoma State University in 1995, and completed a three-year post-doctoral fellowship at the Center for Alcohol Treatment and Addiction Studies at Brown University. He is currently Chief Science Officer and Director of Neurogenetics Core, Mind Research Network, and Professor of Psychology at the University of Colorado (on leave). He has participated in a number of research grant projects involving alcohol dependence and substance abuse, among other

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 69 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

topics. (Doc. 123–2 at 16; Hutchinson Curriculum Vitae). Inasmuch as Krotzer has not challenged Dr. Hutchinson's expertise, (see Doc. 147; Defendant's Response to Motion to Exclude Testimony at 6), the Court considers Dr. Hutchinson's expert testimony. See generally Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338–39 (11th Cir. 2009).

33   A placebo-controlled double-blind study is "a study in which some persons are given the product whose effects are being investigated while others are given a placebo (with the allocation made at random), and neither the person who distributes the product nor the person who measures the effects knows which received the real product." FTC v. QT, Inc., 512 F.3d 858, 861 (7th Cir. 2008).

*36   According to Hutchinson, Krotzer's "Clinical Study: Alcoholism Cure Foundation, 29 Subjects Chosen By the State of Florida," and a chart entitled "Clinical Study results," authored by Krotzer, see (Docs. 61–30, [34] 61–31), "appear to be conclusions drawn about 29 consumer complaints about the 'Permanent Cure' Program," and "do not constitute competent and reliable scientific evidence" because the documents are not peer-reviewed reports of a controlled clinical study. Id. ¶ 25. Rather, Krotzer's "clinical study" involved an insufficient number of subjects to measure an intervention; did not employ reasonable and standard measures at designated points during and after the treatment period; did not involve a sufficiently long trial period or follow-up; and did not employ the standard scientific approach to data analysis. Id.

34   Krotzer's "Clinical Study: Alcoholism Cure Foundation," dated August 23, 2009, (Doc. 61–30), discussed by Hutchinson, is nearly identical to Krotzer's "Clinical Survey Alcoholism Cure Foundation; 29 Subjects Chosen By the State of Florida," also dated August 23, 2009, but displaying a "Revised 1/3/2010," cited by Krotzer in support of his Motion for Summary Judgment. See (Doc. 68–2; 96–5; DX–30). The later "Clinical Survey" adds to the "Methodology and Results" discussion.

Hutchinson also rejects Krotzer's reliance on the self-reported diaries of Permanent Cure Program customers who were reporting their experiences with the ACF Program. The information is not peer-reviewed nor is it a published report

of a clinical study. Hutchinson notes that there does not appear to be a control group treated with a placebo for comparison purposes; that it is unclear whether the self-reported "diaries" were collected from a random sample of subjects where a non-random sample will likely introduce bias in the data; that there did not appear to be reasonable standard measures; and that the collection of consumer diaries lacks any scientific control, verification, analysis, or follow-up. Id. ¶ 26. [35] Finally, Hutchinson notes that published studies on humans of certain individual ingredients used by ACF in its recommended Permanent Cure Program, "did not include alcoholism or its treatment and therefore do not provide adequate scientific evidence" in support of ACF's claim that its Permanent Cure Program "cures" alcoholism. Hutchinson Decl. ¶ 29.

35   Specifically, Hutchinson reviewed two compact disks containing Excel spreadsheets. The first CD contained 283 spreadsheets totaling 1,063 pages; Hutchinson does not specify the size of the material on the second CD. Hutchinson 3/30/11 Decl. ¶ 20, 21. He said that the spreadsheet "Diaries" do not constitute "competent and reliable scientific evidence" for the following reasons:

a. The information is not peer-reviewed or the published report of a clinical study.

b. There appears to be no control group that was treated with an alternative (e.g., placebo) that may be used as a comparison point for the effects of the "Permanent Cure" Program.

c. It is not clear whether information was collected from a random sample of subjects. As noted above, random assignment of subjects to one or more intervention groups, the assignment of which is unknown to both the author and the subjects, would permit comparing, without bias, the effect of intervention upon cravings for alcohol and drinking over a period of time. A non-random sample is likely to introduce bias in the data (e.g., individuals who submit diaries may have a different experience than individuals who do not)

d. It does not appear that the author or the individuals filling out the spreadsheets employed reasonable and standard measures, across subjects, of alcohol use, alcohol related problems,

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 70 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

and the efficacy of the intervention at baseline, during and at the conclusion of the treatment period, and during a follow-up period.

e. The drinking outcome information does not appear to be verified biochemically or by others (e.g., relatives or friends) close to the subject.

f. It does not appear the author employed a consistent trial period or conducted any follow-up at any specific periods thereafter. It is unclear precisely how long the trial period was for any given subject, but the period seemed to vary by subject.

g. It does not appear that the author compiled the data in a format that would allow for a statistical analysis or employed a standard approach to such an analysis. Even if compiled in such a fashion, such an analysis would not be meaningful, given the concerns mentioned above.

Id. ¶ 26.

**\*37** Krotzer responds to these observations by stating, "[s]trictly speaking, ... science does not support the constituent parts, and has nothing to do with the 'Easy to Avoid Substantial Harm' and 'Countervailing Benefits' allegations required by § 5(n)" of the FTC Act. Defendant's Motion for Summary Judgment at 16; see also id. at 24 ("the vast amount of good Molecule Multiplicity has done the Act under § 5(n) wipes away any of the relatively small sins alleged—offset by massive 'COUNTERVAILING BENEFITS' "). Indeed, Krotzer admits that ACF's claims that the Permanent Cure Program cures alcoholism "are not supported by traditional science." Krotzer Admission 45. In response to FTC's request for production of documents Krotzer acknowledged that neither he nor ACF have conducted any "[r]andomized double blind studies." (Doc. 123–1 at 1099–1100; Krotzer Response to FTC Request for Documents 8). Krotzer further states: "Of course, Molecule Multiplicity has not been reviewed by scientists. DEFENDANT NEVER CLAIMED IT WAS. **NOWHERE IN THE STATUTE DOES IT SAY IT MUST BE**. **New technologies by definition are not generally accepted** ...." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 2 (emphasis in original).

Krotzer's chief argument is that customer records, "actions," e-mails, testimonials, and "about 1000" customer diaries substantiate the efficacy of ACF's "cure" claims. Krotzer

Admissions 38, 39. [36] In his response to the FTC's request for documents, Krotzer wrote that his and ACF's substantiation for the claim that the ACF Program "cures" alcoholism: "PRIMARY SUPPORT IS All Diaries." (Doc. 123–1 at 1094; Krotzer Response to FTC Request for Documents 11). [37] "FTC ignores what really matters,—475 Individual Results: Why Krotzer won't quit." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 11; see also id. at 17 ("Plaintiffs ignoring—100 (20%) testimonials onsite ... and —100% of the diaries reporting success").

[36]    In another admission, Krotzer stated that approximately 450 consumers purchased the Permanent Cure Program. He does not explain the discrepancy. Krotzer Admission 123.

[37]    On March 15, 2011, Krotzer turned over to the FTC a CD containing "purported consumer diaries.... The CD contains the records of 405 individual consumers. Of the 405 individual consumers, 155 made at least one entry in their diary, 238 made no entry in their diary, and 12 were not accessible for viewing as they were password protected." Henry 2d Decl. ¶ 7.

Krotzer contends that by relying upon the customer diaries, his case presents one of "first impression," distinguishing it from decisions cited by the FTC involving "inherently unknowable fact situations" "where actual results were not provable." Id. at 5, 21–24. Krotzer argues that existing case-law requiring clinical studies is distinguishable because he provides "information about individual results as reported by the individuals in their own words." Defendant's Motion for Summary Judgment at 7 (emphasis in original). He cites no legal authority in support of his argument that anecdotal customer testimonials and self-documentation may supplant competent and reliable scientific evidence to substantiate his health-related claims.

Krotzer also dismisses Hutchinson's opinions as "[u]nremarkable expert testimony" that confirms what Krotzer has already disclosed, that is, that Krotzer "has not yet proven it [Molecular Multiplicity theory] to near the standards of a prescription drug." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 22. He argues that Plaintiffs' evidence is inadequate to dispute ACF's "cure" claims, stating that "[o]nly 11" consumers answered "the governments [sic] search for complaining affidavits," most of whom had "confirmed" they were "mostly cured," and notes

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 71 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

that only three consumers submitted to a deposition. Id. at 2, 8, 18–19, 24.

With leave of Court, Krotzer later supplemented his argument to contend that the "double-blind, randomized, placebo controlled" clinical study is not required to substantiate the efficacy of "natural medicines" "since the costs are huge and the '*Gold Standard*' will prevent any major inventions like Molecule Multiplicity ...." Defendant's Supplemental Memo of Law at 4. Krotzer argues that the "INHERENTLY SAFE NATURAL MOLECULES USED IN MOLECULE MULTIPLICITY NEED NO SUCH TESTING ...." Id. at 5 (emphasis in original). As support, Krotzer cites to an article recently published in Scientific American magazine, that argues in favor of less costly and less time-consuming "comparative effectiveness research," which involves combing computerized medical records of actual patients to determine the "comparative effectiveness" of various treatments. Id. at 5–6 (citing (Doc. 152–1; Sharon Begley, The Best Medicine, Scientific American, July 2011, at 50–55)). [38]

[38]    Krotzer's argument that the "disclaimers" in the ACF Website—"not FDA approved" and "patent pending"—accord him First Amendment protection from allegations of deceptive representations and false advertising is unavailing. See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 6–7 (citing cases); Defendant's Supplemental Memo of Law at 2, 7–8. Krotzer did not plead or raise the First Amendment as a defense, (See Docs. 53, 77), nor has he presented evidence or sought judgment based upon this defense. See Defendant's Motion for Summary Judgment.
Moreover, inherently deceptive claims, and false advertising are due no First Amendment protection. See Friedman v. Rogers, 440 U.S. 1, 9–10 (1979)("restrictions on false, deceptive and misleading commercial speech" are permissible).
Finally, references to the Food and Drug Administration ("FDA") on the ACF Website do not in anyway disclaim Defendants' claim that the Permanent Cure Program "cures" alcoholism. See 5/4/09 ACF Website at 1 ("All our ingredients have been used safely for centuries by millions of people as recognized by the FDA"); 4, 7, 9, 11, 15, 22, 25, 28, 30, 34, 36, 38, 40, 42, 44, 47, 52, 56, 58 ("No statements on this website have been evaluated

by the Food and Drug Administration (FDA"); 6, 14, 17, 30, 32, 34, 36, 38, 40, 42, 44, 47, 49, 52, 54, 58 ("Pharmas No Cure—FDA" hyperlink). Additionally, the statements "Patent Pending," id. at 4, 7, 25, 28; "Patents Applied For," id. at 9, 11, 17, 22, 30, 32, 36, 38, 40, 47, 52, 56, 58 and a hyperlink entitled "Patents," id. at 6, 14, 17, 19, 32, 34, 36, 38, 40, 42, 44, 47, 49, 52, 54, 58 tend to bolster the legitimacy of the "cure" claims made as opposed to disclaiming them.

**\*38** Plaintiffs have pleaded Count I in the alternative, alleging that ACF's "cure" claims are either unsubstantiated or are false. (See Doc. 153; Plaintiffs' Response to Defendant's Supplemental Memo of Law at 2–3). Accordingly, the Court will analyze whether ACF has a reasonable basis for claiming that the Permanent Cure Program "cured" alcoholism for most alcoholics who subscribed while permitting them to drink socially, and whether the Program was more effective than other treatments for alcoholism. Additionally, the Court will address whether ACF's "cure" claims are false.

### a. Reasonable Basis—Lack of Scientific Substantiation

ACF's Website, Krotzer's Recommendation of dietary supplements sent to consumers, and follow-up e-mail "consultations" all represented that the Permanent Cure Program will successfully "cure" alcoholism. Because ACF and Krotzer's representations implicate health concerns, they must be supported by "competent and reliable scientific evidence." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190; FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 300–01. " 'In determining whether an advertiser has satisfied the reasonable basis requirement, the ... court must first determine what level of substantiation the advertiser is required to have for his advertising claims. Then the adjudicator must determine whether the advertiser possessed that level of substantiation.' " FTC v. Braswell, 2005 WL 4227194, at *8 (quoting FTC v. Pantron I Corp., 33 F.3d at 1096. "[W]hat constitutes competent and reliable scientific evidence in this case is a question of fact for expert interpretation." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190. "The Court can look to what experts in the relevant area of study would consider to be adequate in determining the amount of and type of evidence that is sufficient." FTC v. Braswell, 2005 WL 4227194, at *10.

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 72 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Plaintiffs produced evidence establishing the application of a rigorous standard of scientific reliability via the testimony of their expert, Dr. Hutchinson. Hutchinson stated that "adequate scientific evidence proving the efficacy of intervention agents ... for treating or curing alcohol dependence should, at minimum, consist of two or more studies" that are "double-blinded and placebo-controlled" involving 150 to 1,000 human participants and lasting at least 12 weeks, with standard measures and data analysis, and follow-up three to six months later. Hutchinson 3/30/11 Decl. ¶ 23. Hutchinson stated that the ACF customer self-reported "diaries" (compact disks containing Excel spreadsheets) "do not constitute competent and reliable scientific evidence." Hutchinson 3/30/11 Decl. ¶ 26. The record reveals that ACF fell unquestionably short of the accepted scientific standard, and indeed, Defendant Krotzer admitted that ACF's claims are not substantiated by a controlled scientific study. Krotzer has proffered no legal or scientific support for his assertion that uncontrolled self-reported "diaries" in Excel chart format, and non-randomly selected anonymous testimonials are sufficient to substantiate his claims of a "cure" of alcoholism such that they are not deceptive. Krotzer cites to his own opinion of the efficacy the Permanent Cure Program, Krotzer's "Clinical Study: Alcoholism Cure Foundation," and a chart entitled "Clinical Study results," authored by Krotzer, selected customer "diaries" and testimonials, and two articles, [39] none of which constitute reliable scientific evidence substantiating ACF's claims, as confirmed by Plaintiffs' expert witness Hutchinson.

[39]     Krotzer cites to two publications as support for his argument that "natural medicines" in the form of "nutritional deficiency-support methods," which are "very similar to Molecule Multiplicity," are superior to traditional medical science in combating alcoholism. See Defendant's Response to Plaintiffs' Motion for Summary Judgment at 4 (citing The Vitamin Cure for Alcoholism, by Dr. Abram Hoffer, and Seven Weeks to Sobriety: The Proven Program To Fight Alcoholism through Nutrition, by Joan Mathews Larson; Dr. Joan Matthews–Larson, Ph.D. and Robert A. Parker, M.Sc., "Alcoholism Treatment with Biochemical Restoration as a Major Component," 9 Int'l J. of Biosocial Research 92–106 (1987)(see Docs. 96–18–96–20)); see also Defendant's Motion for Summary Judgment at 13–14, 24.

*39  Given the absence of clinical support for his claims, Krotzer argues that the clinical study requirement does not apply to "natural medicines." "While it seems well-accepted that double-blind, placebo-controlled studies are necessary to substantiate health-related efficacy claims, it is not firmly accepted by the courts how many such studies must be offered." FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 303. Cases embracing the placebo-controlled, double-blind clinical study as the most basic and fundamental requirement for scientific validity and reliability to support health-related claims (including dietary supplements) include: FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 9 (claims of multiple health benefits from coral calcium dietary supplement could have been substantiated by double-blind, placebo-controlled human studies); FTC v. Patron I Corp., 33 F.3d at 1096 n.23 ("Pantron should be required to possess some controlled clinical evidence that the Helsinki Formula [hair loss product] is effective," calling such a study a "minimal requirement"); FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1202–03 (inasmuch as defendants did not counter FTC expert testimony that substantiation required for dietary supplement claims involved an "independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled clinical trial[ ]," no issue of fact regarding requisite level of substantiation and court will rely on the standards set forth by FTC's experts); FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 303–04 (dietary supplements producing multiple health benefits requires substantiation by a double-blind, placebo-controlled study); FTC v. Braswell, 2005 WL 4227194, at *10 (controlled study required to substantiate claims regarding dietary supplements and other health-related products); FTC v. SlimAmerica, Inc., 77 F. Supp.2d at 1274 ("[s]cientific validation of the defendants' [weight loss] product claims requires a double blind study of the combination of ingredients used in Super–Formula"). The Court need not determine how many studies or the size or length of a scientifically controlled clinical study with human participants must be because the undisputed fact is that ACF and Krotzer fail to substantiate ACF's claims with any scientific evidence. Krotzer has not countered the testimony of Hutchinson, except to argue that in this case of "first impression," anonymous customer testimonials and self-reported diaries substantiate ACF's claims of "cure." Krotzer has offered no legal authority or scientific support for this position. Indeed, "the existence of some 'satisfied' customers is not a defense to FTC Act liability." FTC v. SlimAmerica, Inc., 77 F. Supp.2d at 1273. Moreover, Plaintiffs' expert Hutchinson states that these customer responses are not scientifically reliable and do not rise to the

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 73 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

level of competent reliable scientific study required. See FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 9 (no evidence advertiser received or reviewed any scientific substantiation for claims); FTC v. QT, Inc., 512 F.3d 858, 862 (7th Cir. 2008)(advertiser who relied in part on testimonials, had no proof of ionized bracelet's pain-relieving efficacy). Indeed, in Daniel Chapter One v. FTC, 405 F.App'x 505 (D.C. Cir. 2010), cert. denied, No. 10–1292, 2011 WL 1527273 (U.S. May 23, 2011), a case involving "natural" dietary supplements represented to prevent, treat and cure cancer, the Circuit Court of Appeals for the District of Columbia stated:

> ... [T]he [FTC] did not exceed its statutory authority by requiring [the marketer] to have a reasonable basis for its claims. See Thompson Med. Co., Inc. v. FTC, 791 F.2d 189, 193 (D.C. Cir. 1986)("in general an advertisement is considered deceptive if the advertiser lacks a 'reasonable basis' to support the claims made in it"). Nor is there anything unreasonable about the specific type of basis required by the Commission, namely "competent and reliable scientific evidence" including clinical trials with human subjects. Contrary to [the marketer's] claim the FTC is "raising the bar" as to the type of support necessary for a reasonable basis, ... the Commission applied the analysis it has consistently used and which this court approved in Thompson Medical, 791 F.2d at 195. The Commission's published compliance guide, moreover, gave notice that a reasonable basis for a claim concerning a dietary supplement consists of scientific evidence, including clinical trials. See FTC, Dietary Supplements: An Advertising Guide for Industry (April 2001).[40] As noted in the guide, the Commission generally relies upon experts for evidence of the "accepted norms in the relevant field," id., and the expert testimony before the Commission in the present case supports the type of substantiation it requires of [the marketer].

405 Fed.Appx. at 506 (denying marketer's petition for review of FTC Order prohibiting marketer from representing its herbal formula prevents, treats or cures cancer).

[40]     [available at   http://business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry (visited Sept. 9, 2011) ].

Krotzer's citation to two articles, with nothing more, does not constitute evidence of scientific substantiation for the Permanent Cure Program. See FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 10–11; FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 300–01. Neither study actually

addresses the specific combinations of dietary supplements recommended by ACF. Moreover, the only study attached to his Motion for Summary Judgment warns that "[t]he nature of our study demands [the] reader's restraint in extrapolating them to other alcoholism treatment programs" and that the "present study supports the hypothesis that a program emphasizing a biochemical based out-patient, non-drug, treatment modality will be more successful in producing long-term sobriety, than conventional therapy-only based programs. However, as these results are preliminary, controlled studies testing this approach under more rigid scientific controls are required." (Docs. 96–19, 96–20; DX–109B, 109C; Larson and Parker, Alcoholism Treatment with Biochemical Restoration as a Major Component at 101, 104) (emphasis added)). Likewise, the cited Scientific American article advocating comparative research based upon a review of medical records, is not applicable here. The article does not present a scientific study, nor does it address alcoholism generally, or ACF's Permanent Cure Program specifically. Moreover, it is unclear how scanning existing medical records to compare alternative treatments of a disease would apply to ascertaining the safety and efficacy of a new and untested health-related product, such as the Permanent Cure Program.

*40  Making "guesses" based on an internet Assessment Form completed by consumers,[41] Krotzer "prescribed" massive amounts of "natural" dietary supplements, to be ingested in combination, to consumers who believed the Permanent Cure Program could "cure" their alcoholism. He acknowledges the dietary supplements could and did cause adverse reactions among consumers, including but not limited to nausea, vomiting, diarrhea, difficulty sleeping, mental status changes, rigidity, hot flashes, rapidly fluctuating blood pressure and heart rate, and possible dangerous interactions with prescription drugs. Under Krotzer's theory, "natural medicines" or dietary supplements are appropriate for prescription and dissemination without any prior scientific study as to their efficacy and safety; Krotzer would rather the consumer rely on post-use reports and medical records. This argument has been rejected by the FTC, the Eleventh Circuit, and by other courts, who consistently require that a "reasonable basis" for a representation about the efficacy of "natural" dietary supplements must include an "independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled clinical trial." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1202.

[41]     See 9/12/08 Telephone Conversation Tr. at 6.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 74 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

In conclusion, the strong evidence establishing a scientific standard for evaluating ACF's claims of "cure," and the fact that Krotzer acknowledges that ACF lacked any scientific substantiation for the Permanent Cure Program, establish that there is no dispute that ACF lacked reliable and competent scientific substantiation for its claims that its Permanent Cure Program "cures" alcoholism for most participants, cures alcoholism while allowing alcoholics to drink socially, and is more effective than other treatments for alcoholism compels the legal conclusion that Defendant lacked a basis for the health claims it used to sell its product. Where advertisers lack a reasonable basis, their advertisements are deceptive as a matter of law. FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 8.

### b. **Falsity**

A "false advertisement" is one which is "misleading in a material respect." 15 U.S.C. § 55. ACF represents that its Permanent Cure program cures alcoholism for most alcoholics who sign up, permits social drinking while curing alcoholism, and is more effective than other treatments.

Plaintiffs' unrebutted expert Hutchinson opined that the Permanent Cure Program and other alcohol-related services offered by ACF and Krotzer are not scientifically proven to treat or cure alcoholism. Hutchinson 3/30/11 Decl. ¶ 35. Specifically, no well-designed, well-controlled, human clinical study, or scientific study of any kind, or any scientific literature, shows that any of the ingredients used in the ACF Permanent Cure Program, alone or in combination, cures alcoholism for most persons who sign up for the program; cures alcoholism while allowing alcoholics to drink socially; or is more effective than other treatments for alcoholism. Hutchinson 3/30/11 Decl. ¶¶ 24–29, 35; cf. FTC v. SlimAmerica, Inc., 77 F. Supp.2d at 1274 (advertiser's representations were false where the "vast majority of the materials purportedly relied on by defendants for support of their product efficacy claims, to the extent they purport to be studies, contain serious methodological and technical flaws, and therefore cannot be characterized as serious scientific research," including animal studies without medical proof that the effects would be the same in humans). Moreover, because of the lack of scientific substantiation, Krotzer is unable to show that the Permanent Cure Program recommended dietary supplements actually caused any of the customers self-reporting their experiences in "diaries" and "testimonials" to overcome alcoholism. "[A] claim of

product effectiveness is 'false' for purposes of section 12 of the Federal Trade Commission Act if evidence developed under accepted standards of scientific research demonstrates that the product has no force beyond its placebo effect." FTC v. Pantron I Corp., 33 F.3d at 1097–98; see also id. at 1098 ("Pantron's evidence of consumer satisfaction is the most obviously flawed"). [42] Here, where there is no scientific evidence suggesting that ACF's Molecule Multiplicity theory is effective and actually "cures" alcoholism, and no evidence that the Permanent Cure Program was responsible for reducing alcohol consumption or cravings, Krotzer failed to disprove the "placebo" effect. Accordingly, Krotzer ACF's claims of "cure" are materially misleading, and thus false. See FTC v. Patron I Corp. 33 F.3d at 1101; cf FTC v, Bronson Partners, LLC, 564 F. Supp.2d at 133–34 (defendant's expert's opinion about weight loss efficacy of green tea was not as strong as advertisement's claims about green tea, and thus representation was false; advertisement's objective claims were "wholly without support or patently false"). Indeed, the FTC "is not required to prove that a product is 'wholly ineffective' in order to carry its burden of showing that the seller's representations of product efficacy are 'false.' " FTC v. Pantron I Corp., 33 F.3d at 1100.

42      As observed by one court, testimonials "are not a form of proof [of product efficacy] because most testimonials represent logical fallacy: post hoc ergo propter hoc. (A person who experiences a reduction in pain after donning the bracelet may have enjoyed the same reduction without it ....)." FTC v. QT, Inc., 512 F.3d at 862.

**\*41** Krotzer's self-serving statements about cure do not create a genuine issue of fact on this issue. See FTC v. Career Assistance Planning, Inc., No. 1:96–CV–2187–MHS, 1996 WL 929696, at \*3 (N.D. Ga. Sept. 19, 1996). Nor is Krotzer's broad-brush citation to "over 10,000 unalterable Yahoo email admissions of cure, details of cure and payment negotiations," affidavits, business records, CDs, DVD, and books sufficient to create a material issue of fact. Krotzer does not cite to any competent, relevant or admissible evidence, and his citation to the record does not comply with the Rule 56, Federal Rules of Civil Procedure requirement that he make specific citation to the record and designate specific facts. See Rule 56(c)(3)("[t]he court need consider only the cited materials"). The undisputed competent evidence in the record supports a finding that ACF's "cure" claims are false. See FTC v. Medlab, Inc., 615 F. Supp.2d at 1079–80 (defendants' claims are false where FTC experts state that the claims are outside

the realm of plausible science, and defendants failed to put forth evidence establishing the existence of a factual dispute on the falsity of the representations).

### C. False Establishment Claims (Count II)

In Count II of the Complaint, the FTC alleges that ACF's and Krotzer's express or implied claims that the Permanent Cure Program:

    a. Is scientifically proven to cure alcoholism; and

    b. Has been validated by a $35,000,000 research study

constitute a deceptive act or practice, and the making of a false advertisement, in violation of Sections 5(a) and 12 of the FTC Act. 15 U.S.C. §§ 45(a) and 52. Complaint ¶¶ 41–43. The "scientific support" claims are first developed on Page 2 of the printed Website, which states that the Permanent Cure Program's "Molecule Multiplicity" theory was:

**Developed by:**

• Two times Nobel prize winner known for nutraceutical work **Dr. Linus Pauling**

• PhD teams at worldwide consulting firms

• Harvard University Medical School

• $35,000,000 validating research study

• Expensive clinics use some of our technology

**Backed up by:**

• Over $200,000,000 in research

• Clinical experience of many hundreds of cured members including many doctors, executives and other professionals

• FTC determination supported by substantial science ....

Id. at 2; see also e.g. id. at 3 ("A $35 million study validates our molecule multiplicity method"); 6, 11, 13, 14, 16; 17, 31, 35, 41, 43, 47, 49 55. The Website displays more similar representations:

• **Wall Street Journal** article validates *Molecule Multiplicity* methods, but in language too technical for most

• PhD teams at **Harvard University's prestigious Bert L. Vallee Foundation**

• **Many prominent Universities**

• Thousands of well recognized **research doctors (PhDs)**

• PhD teams at **worldwide consulting firms Governments** (US and Canada)

• Clinical experience of hundreds and hundreds of cured members including many doctors (MD, PhD, CD, JD), executives and other professionals

• **Dr. Johns A. Krasney, MD, PhD, Professor, University of Buffalo School of Medicine and Biomedical Sciences** a long time cured member of **Alcoholism Cure Foundation**

• Dr. **Linus Pauling**, two times **Nobel Prize** winner known for nutraceutical work

• Expensive clinics use some of our technology

• PayPal division of EBay vouches we have large numbers of satisfied members

• Huge Number of Testimonials

Id. at 8 (emphasis in original). "The Science is Overwhelming." Id. Later in the Website, ACF represents that "**The American Journal of Psychiatry** (the **most respected independent source** of information for MDs who treat alcoholism) and **The Wall Street Journal**" support the " 'Molecule Multiplicity' " theory. Id. at 22 (emphasis in original). Defendants encourage consumers to join "our:

**Science Based Programs**
**Tested and Validated**
**Permanent Cures to Alcohol Abuse and Addiction**"

Id. at 42 (emphasis in original). Additionally, the ACF Website repeats that "**Alcoholism Cure spent a fortune learning to use over $200,000,000** in medical research on how alcohol works." Id. at 9 (emphasis in original); see also id. 17, 31, 33, 41, 51. The ACF Website states that "Many research PhD's (including Nobel prize winners) have proven our **Molecule Multiplicity** methods really work." Id. at 27. The Website provides a hyperlink to a "bibliography" which ACF represents "is a sampling of 100 major scientific articles from well respected medical publications in our **Research Library**. There are 1,000s of

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 76 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

such **addiction articles**." Id. at 9 (emphasis in original); see also id. at 14 ("We spent $500,000 with 2 prominent groups of PhDs to tell us which nutraceuticals really cure alcoholism for some"); 35 ("**Over 100 Scientific articles showing our Formulas act like alcohol in Safely Stimulating Brain Pleasure Centers**" (emphasis in original)); 51. Page 39 of the printed ACF Website is entitled "Medical Science Journal Reports" and lists "Many Pages of Journal Articles Supporting our technology." Id. at 39–40. The ACF Assessment Page, which is the sign-up page on the ACF Website, reiterates: "**$35,000,000 Scientific Validation by the American Psychiatric Association**." Id. at 25.

 **\*42** The FTC argues that "[n]o study, scientific or otherwise, proves that Defendant's Program cures alcoholism" and that "Defendant's Program has not been validated by a $35,000,000 research study, or any study." Plaintiffs' Motion for Summary Judgment at 8. Plaintiffs cite to the Declaration of Dr. Hutchinson. Hutchinson states that he reviewed an eight-page bibliography of studies and abstracts downloaded from ACF's Website; copies of certain studies and abstracts listed in that bibliography; materials prepared for Krotzer by The Weinberg Group; an article from the Wall Street Journal, dated January 3, 2006, entitled "Antidepressant Use Evaluated," which discusses a government-funded $35 million study of anti-depression medication; and a peer-reviewed article from the American Journal of Psychiatry, dated January 2006, and entitled "Lower Serotonin Transporter Binding Potential in the Human Brain During Major Depressive Episodes," authoried by eleven researchers. 3/30/11 Hutchinson Decl. §§ 13.b, 13.c, 13.d, 18.a and 18.b and (Docs. 61–3, 61–4, 61–5, 61–33, 61–34; 10/15/10 Hutchinson Decl. Attachs. 3, 4, 5, 10, 11). In addition, at the request of the FTC, Hutchinson "searched for applicable published studies." 3/30/11 Hutchinson Decl. ¶ 22. Hutchinson stated that his "review of the materials provided and my search of the available scientific evidence failed to identify any peer-reviewed articles supporting the proposition that any of the ingredients [recommended by ACF], alone or in combination, cure alcoholism in humans." Id. ¶ 24. Hutchinson said that "[t]he American Journal of Psychiatry study ... referenced in the Wall Street Journal article... did not examine alcohol dependence or its treatment as an outcome and therefore does not provide adequate scientific evidence" that the Permanent Cure Program can "cure" alcoholism. Id. ¶ 27; see also Krotzer Admission 26. Other studies reviewed by Hutchinson examined the effects of certain individual ingredients included in the ACF recommended Permanent Cure Program on alcohol use by animals. 3/30/11 Hutchinson

Declaration ¶ 28. However, according to Hutchinson, "such research does not, by itself, provide scientific support for claims regarding the efficacy of that ingredient in treating alcoholism in humans." Id. Of the published studies involving individual ingredients on humans, "the outcomes examined did not include alcoholism or its treatment and therefore do not provide adequate scientific evidence" of ACF's "cure" claims. Id. ¶ 29; see also id. ¶¶ 30, 31, 32, 33. Hutchinson concluded that "[a] review of the available scientific evidence revealed no published study validating the 'Permanent Cure' Program" and that "[t]he 'Permanent Cure' Program and other alcohol-related services offered by ... Krotzer have not been validated by a $35,000,000 research study." Id. ¶ 34 and at 13.

Krotzer responds that "[t]he actual text [of the ACF Website] shows Krotzer never claimed science accepted Molecule Multiplicity." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 12 (emphasis in original). Rather, Krotzer argues that the ACF Website represents that

> 12. Molecule Multiplicity is successful "beyond our PhD's wildest dreams." That sure doesn't claim Molecule Multiplicy is generally accepted!
>
> 13. Then the claim our PhDs combined "vast amounts of accepted science." That's indisputably true. See ~900 medical journal reported studies, the "gold standard of medical science" at alcoholismcure.org/medical science/1, and the three following pages /2, /3 and /4 (Plaintiffs purported "exact copy" omits /3 and /4 referred to at the top of /1 and /2.)(quoted directly from the Weinberg report redacting names of natural medicines to avoid the dangers of do-it-yourselfers. Plaintiffs would have the Court believe Defendant routinely represented scientists supported Molecule Multiplicity, a proposition for which there is no support anywhere in the website.

Id. at 13. Krotzer cites to the two publications by Dr. Abram Hoffer and Dr. Joan Mathews Larsen, discussed above, but offers no evidence as to whether these publications appeared on the ACF Website, or that these publications actually support ACF's claims of scientific substantiation. See Defendant's Motion for Summary Judgment at 13–14, 24. Additionally, Krotzer continues to maintain that "Harvard Medical School studies" have established the efficacy of "Molecule Multiplicity" in curing alcoholism in humans, without citing the alleged report or evidence or testimony that the "report" in anyway relates to or is supportive

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 77 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

of the Permanent Cure Program's recommended dietary supplements. Id. at 20, 24.

As set forth above, the ACF Website repeatedly represents, expressly and impliedly, that the Permanent Cure Program is supported by scientific study. Indeed, ACF's claim that "molecule multiplicity" was "validated" by a $35 million study appears on nearly every page of the Website. Krotzer on the one hand, denies that the ACF Website contains any representation that "science accepted Molecule Multiplicity." On the other hand, he refers to "900 medical journal reported studies" and to Harvard Medical School, without further elucidation or evidence, as supporting "molecule multiplicity." The Court finds that construing the evidence in favor of Krotzer the ACF Website, and Krotzer himself, see 9/12/08 Telephone Conversation Tr. at 6, 16–17, expressly and impliedly represented that the Permanent Cure Program is scientifically proven to cure alcoholism and has been validated by a $35 million study. See FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1202 n.21 (rejecting defendants' argument that the claims were not made, and defendants' continued position that numerous studies regarding their products' ingredients support their ingredient-specific claims).

**\*43** Inasmuch as the representations regarding scientific support relate to health claims, they are presumed to be material. See Kraft, Inc. v. FTC, 970 F.2d at 320, 322; FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1190–91; see generally FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *34("[e]xpress claims and deliberately made implied claims are presumed material"). While not required to do so to establish materiality or actual consumer reliance in this context, see FTC v. Phoenix Avatar, LLC, 2004 WL 1746698, at *10 (quoting FTC v. World Traveler Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988)); see generally FTC v. FTN Promotions, Inc., No. 8:07–CV–1279–T–30TGW, 2008 WL 151888, at *7 (M.D. Fla. Jan. 15, 2008), the FTC proffered evidence that consumers believed and relied upon the science claims and that the science claims were instrumental in inducing them to sign up for the ACF Permanent Cure Program. See LS Deposition at 13–14; JR Deposition at 13; RJ Deposition at 14. The Court concludes that there exists no dispute as to whether the representations regarding scientific validation are material.

As to whether the representations were likely to mislead, in Count II the FTC is proceeding under the "falsity" theory. Plaintiffs' Motion for Summary Judgment at 27; see

also Plaintiffs' Response to Defendant's Supplemental Memo of Law at 2–3. This case is similar to the case FTC v. Nat'l Urological Group, Inc., supra, involving weight loss dietary supplements. There, the court found that defendants' advertising claim that a clinical test was performed on the product was inherently false and likely to mislead consumers because the defendants admitted that the products had not been clinically tested. 645 F. Supp.2d at 1203. The court determined that defendants did not concisely and with competent evidence counter the FTC's expert testimony that there was no evidence that the active ingredients in defendants' products could accomplish the weight loss promised. Id.

Here, ACF's claims that the Permanent Cure Program has been scientifically validated, cannot be construed as anything but an express representation. The undisputed evidence is that the oft-referred-to "$35 million study," which apparently refers to the study chronicled in the American Journal of Psychiatry, cited above, has nothing to do with alcoholism, "molecule multiplicity," or with the dietary supplements individually or in combination that are recommended to consumers by ACF and Krotzer. Moreover, Krotzer can cite to no study or scientific proof to counter Plaintiffs' evidence that such scientific validation does not exist. Krotzer's citation to a bibliography, which is included as an exhibit to Hutchinson's 10/15/10 Declaration, without more, is insufficient citation to the record to direct the Court to any evidence which disputes Hutchinson's opinion. See Rule 56(c) and (e).

Additionally, Krotzer's reliance on "1000 medical journal article reports about alcoholism," compiled by The Weinberg Group, (see Doc. 96–3; DX–3; "History and Development"), Defendant's Response to Plaintiff's Motion for Summary Judgment at 13, see also Defendant's Supplemental Memo at 7 ("Weinberg Group long ago determined each molecules [sic] of Molecule Multiplicity has signficant scientific support for curing some alcoholics"), is rebutted by evidence in the record that the work of the Weinberg Group does not support ACF's claims that the recommended dietary supplements of the Permanent Cure Program can "cure" alcoholism. Indeed, at deposition, (Doc. 123–1 at 1060; Weinberg Dep.), Matthew Weinberg, testified that The Weinberg Group conducted a scientific literature review and analysis, and presented its results to Krotzer; it did not conduct any clinical studies of the ingredients recommended by ACF in the Permanent Cure Program, nor did it conduct any original scientific research. Weinberg Dep. at 33; (see generally Docs.61–14–61–28; 10/15/10

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 78 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Hutchinson Declaration, Attach. 5, Reports, each of which includes a bibliography of publications, prepared by The Weinberg Group for Adams Beverages, Ltd. in connection with an alcohol-free drink, and regarding individual dietary supplements). After reviewing the available literature, the Weinberg Group reported to Krotzer that " '[t]o date, no study has evaluated the effect of the combination of ingredients included in Alcohol Free to stimulate the brain reward center." Rather, the Weinberg Group's evaluation focused upon each ingredient individually, and did not review a "mixture" of the ingredients. Weinberg Dep. at 51–52. The Weinberg's Group's role was to "provide[ ] advice and counsel in how to stay within DSHEA [the Dietary Supplement Health and Education Act], the dietary supplement regulations with regard to this product." Id. at 41. Weinberg testified in deposition that The Weinberg Group's analysis was on individual ingredients and whether the levels proposed by ACF were safe, and that no conclusions could be reached from its research about whether the mixture of ingredients was safe. Id. at 53, 56. Moreover, Weinberg testified: "I don't believe you can take what we wrote and use It to say that alcoholism can be cured." Id. at 43; see also id. at 50, 58–59. Weinberg further acknowledged that the Weinberg Group did not evaluate ACF's "proposed cure" for alcoholism. Id. at 59–60, 73–74; see also Krotzer Admission 31.

**\*44** Viewing the facts and representations in the light most favorable to Krotzer, the Court is nevertheless compelled to find that the undisputed evidence establishes that ACF and Krotzer made material representations, express and implied, regarding scientific validation of the Permanent Cure Program, that were likely to mislead reasonable consumers. These representations were patently false and deceptive as a matter of law, and no reasonable fact-finder could conclude otherwise. See FTC v, Bronson Partners, LLC, 564 F. Supp.2d at 133–34.

### D. False Claims About Cost and Cancellation Policy (Count III)

In Count III, Plaintiff FTC alleges that ACF and Krotzer's representations that:

   a The "Permanent Cure" Program is virtually free, costing only $350 or, at most, a few hundred dollars more; and

   b. Consumers can cancel the "Permanent Cure" Program anytime if not being cured.

constitute a deceptive act or practice, and false advertising, in violation of §§ 5(a) and 12 of the FTC Act. 15 U.S.C. §§ 45(a) and 52. Complaint ¶¶ 44, 46. The FTC alleges that in truth, "Defendants claim that consumers owe from $9,350 to more than $20,000 for the 'Permanent Cure' Program" and that "consumers cannot cancel the 'Permanent Cure' Program anytime if not being cured because, when they cancel, Defendants attempt to collect additional fees up to the full cost of the Program by, among other things, sending dunning notices, billing consumers without authorization, and filing lawsuits." Id. ¶ 45. The evidence and argument relating to Count III is extensive.

Again, the FTC proceeds under the falsity theory. When assessing whether an advertisement is "deceptive," in violation of § 5 of the FTC Act, "the court must look to the advertisement's overall, net impression rather than the literal truth or falsity of the words of the advertisement." FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1189; see also FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 549998, at \*32 "[W]hether a representation is likely to mislead reasonable consumers must be determined 'by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.' " FTC v. Peoples Credit First, LLC, 2005 WL 3468588, at \*6 (internal quotations and citations omitted). Deception may be accomplished by innuendo rather than outright false statements. FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at \*32. Additionally, headline, general tone, juxtaposition of phrases, and contradictions may all contribute to the "net impression" of a presentation. Id. Fine print notices placed in obscure locations of an advertisement will not preclude liability for deceptive practices under § 5 of the FTC Act. FTC v. Cyberspace.com LLC, 453 F.3d at 1200; see also FTC v. Medlab, Inc., 615 F. Supp.2d at 1077 (qualifying and cautionary statement in "minuscule type" does not excuse defendant from representations in the body of the text). Disclaimers or qualifications "are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." FTC v. Direct Mktg. Concepts, Inc., 624 F.3d at 12. Finally, "[w]hile '[p]roof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show a practice is likely to mislead consumers acting reasonably under the circumstances.' " FTC v. USA Financial, LLC, No.10–12152, 2011 WL 679430, at \*2 (11th Cir. Feb. 25, 2011)(quoting FTC v. Cyberspace.com LLC, 453 F.3d at 1201.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 79 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

**\*45** The ACF Website representations about cost and cancellation are legion. Page 1 of the printed ACF Website announces in bold print, "**Our Program is Virtually Free! Pay Little Until You See Results! Most fees payable from savings on alcohol not used.**" 5/4/09 ACF Website at 1 (emphasis in original). The first page claims, in bold-faced type:

**We will cure you ... guaranteed. Often within 1–10 weeks, nearly always by 5 months.**

**You may cancel anytime you are not being cured as we describe.**

**Virtually cost free. Cure dividends Savings typically exceed regular monthly fees.**

Id. This is followed by:

**Costs—Virtually free**

1–10 weeks. Difficult cases spend a few hundred dollars more. This **includes the cost of ingredients** which are purchased separately from major manufacturers of your choice to assure highest quality and freshness. Typically your costs are paid by your **Cure Dividend Savings**, the alcohol you no longer drink. You must follow your program for 5 months, since you may be a difficult case and may cancel anytime after 5 months if not being cured as we describe.

Base fees are—Heavy Drinker $2/day—Very Heavy Drinker $3.33/day. Fees step up by less than typical **Cure Dividend Savings**, cost savings as your alcohol consumption goes down. Daily fees step up a little after the first month, again in the third month to HD $6/day (VHD $9/day). **We cheerfully refund step up amounts** if results are slower than typical and to help make sure your fees are paid from **Cure Dividends**. The conditions? You must take your ingredients and submit reports....

Id. at 2; see also id. at 10, 26, 27, 43; see also id. e.g. at 6, 7, 26, 27, 31, 33 ("cure dividend"). Later, the Website proclaims: "**Our programs are Virtually Free / Most spend less than $350** (fees plus ingredients) before starting to save money on alcohol within 1–10 weeks." Id. at 43. The phrase "**Costs: You may cancel anytime** if not being cured as we tell you" appears repeatedly. Id. at 6, 10 [43], 21 [44], 26 [45], 27 [46], 29 [47], 43 [48]. Other bold-faced representations (and sometimes larger font) include: "**Low Cost Cure**," id. at 3, 5,

8, 10, 13, 21 ("**little cost to you**"), 31, 33, 43 ("**Many reasons for Low Cost**"), 45, 46, 51. ACF claims:

- Most member's monthly fees plus ingredients total less than $500 ($2 or $3/Day) until **Drinking Down Half**.

- **Overall cost almost never exceeds $750** compared to next best treatment—clinics costing **$30,000**.

- **Fees mostly payable only when you are cured**

- Fees mostly paid from Cure Dividend Savings ...

Id. at 16; see also id. at 47. The Website also distinguishes its Permanent Cure Program from other expensive treatments: "**Not the $15,000–$30,000 in advance fees** you may have thought about for a recovery ... **Not the $5,000–$10,000 cost of psychiatrists who have no drugs to permanently cure you**." Id. at 5 (emphasis in original); see also id. at 21, 36, 37. The Website offers the following unclear explanation about cancellation, directly following the claim: "**Costs: you may cancel anytime** if not being cured as we tell you":

- **$2,600 Resignup fee** When you join the first time, we **invest a lot of money in you**, counting on your being able to stick with our program for many months. Cancelling is a strong symptom of **alcohol caused brain damage**. Once you demonstrate we cannot count on you, you must pay our costs for curing you up front.

**\*46** Id. at 6 (emphasis in original). "You should plan on more than a year to be sure of your **Safety Net Formula**." Id.

[43] "**You may cancel anytime if not being cured** as we tell you on seven month's notice."

[44] "**• You may cancel anytime** you are not cured after following the program for five months.

[45] "**You may cancel anytime** you are not at least **Drinking Down Half** after following your program for five months, or if we can not bring you down to **Social Drinking** within a reasonable time

afterwards.... "**You may quit anytime if not being cured as we describe.**".

46 "**Monthly payments you can cancel unless you are being cured should make your decision so simple** you can comfortably sign up **Right Now**."

47 "**You may cancel at any time** on seven months notice if you are not being cured as we describe.... **We discourage canceling ....**"

48 "**You may cancel anytime** if not being cured as we tell you."

The ACF Website invites consumers to receive a "Free Assessment," by submitting their health histories and other personal information through ACF's on-line form. The Assessment page, which is headlined: "**Do Your Assessment —Then Sign Up**, states the following:

• **Costs are typically under $350 until you see results in 1–10 weeks**. Difficult cases only a few hundred more

• **We cheerfully refund step up fees** if you are not *drinking Down Half* in the typical 1–10 weeks. This typically keeps your costs (including ingredients) less than a single bar drink/day.

• **You may cancel** anytime you are not at least *Drinking Down Half* after following your program for five months, or we can not bring you down to *Social Drinking* within a reasonable time afterwards. The **Cure Dividend Savings** typically exceed all costs, and your program is virtually **cost free** until you are **Permanently Cured**.

Id. at 23 (emphasis in original). The Assessment page states, at the bottom of page 2: "By submitting your Free Assessment you agree to terms and conditions. A small hyperlink to "Terms and Conditions" appears at the bottom of the third page of the Assessment page. Id. at 25. 49

49 The 5/4/09 ACF Website repeats hyperlinks which direct consumers to key pages, many times appearing in a list of some 90 minuscule-type hyperlinks streaming down the margins of multiple pages in the 5/4/09 ACF Website.

The "Secure Sign–Up" page appears directly following the Assessment page. Id. at 26. The Sign–Up Page repeats the cancellation claim, stating "**You may cancel anytime you are not at least *Drinking Down Half*** after following your program for five months," and "**You may quit anytime if** not being cured as we describe." The Sign–Up Page offers multiple hyper-links to enable a consumer to sign-up for the Permanent Cure Program: "**Yes! I Want My Life Back**," "**Buy Now!**" "**Yes**," and "**PayPal Subscribe**." Id. at 26– 28. 50

50 The "Secure Sign Up" page does not have a hyperlink to the "Terms and Conditions." Sign– up hyperlinks in bold print announcing "**Sign Up Now**" "**Join Now**, "**Secure Sign Up**," and "**Yes! I Want My Life Back**!" appear on nearly every page of the 5/4/09 ACF Website.

The actual "Terms and Conditions Refunds and Cancellation Policies" pages consist of 110 paragraphs filled with very small print, reviewable on a computer screen two paragraphs at a time, appearing at the end of the ACF Website, thirty printed pages after the Assessment and Sign–Up pages. Id. at 53–55; Krotzer Admissions 85, 86. In the "Terms and Conditions" ACF repeats the phrase: "**You may cancel anytime if not being cured as described** after following your program for five months," Id. at 54, but then later states in very fine print that "you are an indefinite commitment if your long term drinking stops for any reason" and that "You may stop your membership only by meeting the unlikely conditions described below." Id. The "unlikely conditions" for proof of continued drinking to establish that the customer is not "cured" of alcoholism and thus eligible for cancellation, are represented to be: submitting "a hair sample for analysis which will disclose your drinking over an [sic] 90 day period, or your choice of two from our standard list of simple and inexpensive 'Proofs of Continued Drinking.' In extreme cases, we will require the hair test, which costs over $500." Id. at 55. The Website never discloses the draconian proof later required by Krotzer for cancellation including a notarized letter from a doctor and five friends, liquor receipts, extensive laboratory testing done at the customer's expense, and submission of pubic hair, and that Krotzer requires "as many as possible." See supra at 32 and n.9 (citing Doc. 58–11; Henry 1st Decl. Attach. J at 8–9). This same fine-print Terms and Conditions states:

**\*47** You authorize us now to charge then for part or all of your remaining fees totaling 76 months.... If you attempt to cancel prematurely, denying us the chance to permanently cure you, or fail to follow your program, you

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 81 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

are considered cured for all purposes and our fees are fully earned.... That means you have a legal obligation to follow these Cancellations and Refund Policies.

Id. at 54; see also id. at 55 ("you [sic] obligation to pay us for 76 months"). More fine-print speaks of cancellation "triggering the acceleration of your entire obligation as happens if you just quit paying." Id.

In his conversation with FTC investigator Henry, Krotzer alluded to a consumer's inability to cancel after receiving ACF's dietary supplement recommendation. "That's like getting the car from the car manufacturer and then saying, I've decided I'd rather not pay for it, but you'll let me keep the car, won't you?" 9/12/08 Telephone Conversation Tr. at 40. He went on to say, however, that "if we don't cure you, then you can cancel." Id. at 42. No where in the conversation did he suggest to the "consumer" that she would be contractually committed to pay thousands of dollars more if she signed up for the Permanent Cure Program.

Krotzer's method patent application is prescient. It talks about designing an "internet methodology" to "captur[e] the client during a short window of opportunity" by "providing a means to join the voluntary treatment program immediately online through acceptance of credit cards as payment; ... and providing a long-term contract that is executed by the individual, wherein the individual agrees to acceleration of all charges in the event of a cancellation request by the individual." Internet Patent Appl. at 1–2. "The request for cancellation is the trigger for acceleration ...." Id. at 6. Krotzer's patent application describes providing an Internet website "with multiple pages of text, the text ending beyond a single visible screen" to require the reader to continue scrolling. Id. at 2. "The client should find it very easy to sign up by credit card, with ample linking via many Express buttons to the sign-up [page]." Id. at 6. Krotzer explained that the consumers "need to be eased into pricing by avoiding the significance of the expense ...." Id.

While not necessarily required to do so in order to prove deception, see FTC v. USA Financial, LLC, 2011 WL 679430, at *2, Plaintiffs have submitted consumer evidence in which the customers consistently stated, either by declaration or in deposition, that they were misled by the ACF Website to believe that they could cancel their participation in the

Permanent Cure Program at any time after the first five months. None of the consumers believed that they would be liable for years of financial commitment, totaling anywhere from $13,000 to $20,000. None said that they read about the "accelerated payments" or a 76–month commitment, nor did they see the "Terms and Conditions section. E.g. JR Deposition at 12–13, 16–18, 44; RJ Deposition at 11, 19, 33–35; LS Deposition at 17–19; Consumer 1 Decl. ¶ 4.

Plaintiffs argue that while the ACF Website expressly represents to consumers that they may cancel at any time after five months participation, and that their costs will remain "typically" under $350, Krotzer admits that the "Program really costs $20,000 and being able to cancel is 'unlikely.' " Plaintiffs' Motion for Summary Judgment at 22 (citations omitted). Plaintiffs contend that "Defendant's intentionally buried, confusing, and inconsistent terms ... are insufficient to modify his express cost and cancellation claims." Id. (citations omitted). "Defendant's admissions, combined with his unauthorized billing practices, ... reveal that his advertised cost and cancellation claims are blatantly false and therefore deceptive." Id. Moreover, argue Plaintiffs, "Defendant has not shown ... that any of his alleged disclaimers effectively corrected the deceptive net impression created by his express cost and cancellation claims." Plaintiffs' Response to Defendant's Motion for Summary Judgment at 14–15.

**\*48** In response, Krotzer asserts that the "One–Sentence–Clickwrap–Contract" is "prominently featured many places, including where members read most carefully, right above where members clicked to sign up and make their first payment." Defendant's Motion for Summary Judgment at 17 (emphasis omitted)(citing DX–104 (displaying Website excerpts with hyperlink nomenclature "Heavy Drinker" and "Very Heavy Drinker"; the word "contract" does not appear on the Website excerpts displayed in the exhibit)); see also Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16. Krotzer argues that this "One–Sentence–Clickwrap–Contract" "was sufficient notice to establish the contingent payment contract and its acceleration ...," and "adequate disclosure to support $20,000 charges ...." Defendant's Motion for Summary Judgment at 17 and n.12; Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16. Krotzer states:

Perhaps 'You May Quit Anytime Not Being Cured as Described Following Your Customized Program for Five Months.' is not totally clear, but **it describes and suggests the most important major terms**. At the very least, it

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 82 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

gives glaring <u>Inquiry Notice</u> of the terms and conditions page <u>accessible by hyperlinks on nearly every page</u>.

Defendant's Motion for Summary Judgment at 22. Krotzer contends that the ACF Website's Terms and Conditions pages contain "language suggesting a long term commitment. Any reasonable consumers [sic] about to spend a lot of money could not fail understand he was authorizing long term payments unless he could prove he was not cured." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 14.

Additionally, Krotzer argues that "members could have avoided damages easily" by submitting "their choice of one in five simple proofs they continued to abuse alcohol." Defendant's Motion for Summary Judgment at 10. He contends "it was everywhere apparent ACF warned potential members it expected to cure them" and that if they "could not prove their continued abuse of alcohol, they owed many months of fees, quickly amounting to thousands of dollars/ year (but less than their savings on alcohol no longer used.)." <u>Id.</u> at 10–11. [51]

[51]    Indeed, Krotzer laments that:

    [t]he unavoidable weakness of Krotzer's business model is once alcoholics know how to stop they would rather save an additional $19,000. There is no car to repossess, so they thought they could get away with it—until Krotzer won many arbitrations and in Court.

    Defendant's Motion for Summary Judgment at 15. He contends that "[t]he only complaint from members is that they do not want to pay as agreed in their **One–Sentence–Clickwrap–Contract**." <u>Id.</u> at 18 (emphasis in original).

The indisputable net impression of the ACF Website is that the Permanent Cure Program is not expensive, and that the consumer can cancel at any time, after five months, if they are not being cured. Indeed, the ACF Website distinguishes the Permanent Cure Program from "other expensive treatments," such as "the $5,000–$10,000 cost of psychiatrists." 5/4/09 ACF Website at 5. Thus, the overall net impression is that the cost of the program to consumers never exceeds $350, or $750, depending on which cost representation read. <u>See e.g. id.</u> at 16, 23. Moreover, the "you may cancel anytime if not being cured" representation is repeated in bold-faced font throughout the Website, never disclosing how impossible it is to actually establish that you are not being cured. The ACF Website never informs consumers that the total cost

of their commitment could be more than $13,000 and as much as $20,000; nothing in the "One–Sentence–Clickwrap– Contract" sign-up hyperlinks cited by Krotzer puts any consumer on notice that they may be liable for $20,000 in accelerated fees if they request to cancel the Program. The closest the Website comes to disclosing the $20,000 financial liability espoused by Krotzer is the mention of a 76–month commitment, buried in fine print on the fifty-fifth page of the printed ACF Website, in the incomprehensible small print Terms and Conditions section, following repeated claims of "virtually free," "low cost," "no more than $350," and "you can cancel at any time." A careful reading of the "Terms and Conditions" section found at the end of the voluminous Website, reveals confusing and contradictory terms, none of which set forth the true total cost of the Program. The inconspicuous "Terms and Conditions" section in the ACF Website did nothing to affect, disclaim or qualify the repeated, highlighted and bold-faced claims of low cost and easy cancellation. Krotzer's assertion that the "Terms and Conditions" pages are "accessible by hyperlinks on nearly every page" and thus the consumer is on "inquiry notice" to read the Terms and Conditions is belied by the structure of the ACF Website and Krotzer's own admissions. The hyperlinks to which Krotzer refers appear at the end of a list of more than 90 hyperlinks presented in minuscule type along the right-hand margin of a number of web pages, and appear as "Cancellation Policy," and "Refund Policy." The consumer is never guided to navigate to the Terms and Conditions pages, and, no where is the consumer specifically advised of the total cost of the Permanent Cure Program. Nor does the Website advise of the unrealistic and impossible conditions Krotzer later demands in order for a customer to establish that he or she is not "cured" in order to cancel.

**\*49**    The Court concludes that no issue of fact exists regarding Count III. The indisputable net impression to be derived from the ACF Website is that the Permanent Care Program is low-cost, and that the customer may cancel the Program at anytime after five months if his or her alcoholism is not cured. This impression is borne out by evidence of consumers, who stated under oath that they were misled to believe those repeated representations. Such express and deliberately implied claims used to induce the purchase of a product or service are presumed to be material to consumers as a matter of law. <u>FTC v. 1st Guaranty</u> <u>Mortgage Corp., 2011 WL 1233207, at \*12</u>. Moreover, the testimony of the consumers confirms that the representations were material to their subscribing to the Permanent Cure Program. And, it is undisputed that the "virtually free," "low

cost" and "cancel anytime" claims were likely to mislead, and in fact did mislead. Krotzer himself has stated that the customer "[n]eeds to be eased into pricing by avoiding the significance of the expense." Internet Patent Appl. at 6. The ACF Website not only "avoided" the significance of the expense, it captured vulnerable and unsuspecting consumers, with deceptive representations which in no way disclosed that they would be liable for up to $20,000 in costs even if not cured of alcoholism. The FTC is entitled to summary judgment as to Count III.

### E. False Claims About Professional Qualifications (Count IV)

In Count IV of the Complaint, the FTC alleges that ACF and Krotzer represent "directly or indirectly, expressly or by implication, that Krotzer and other ACF employees have doctorates or licences in areas related to the treatment of alcohol." Complaint ¶ 47. The FTC alleges that "[n]either Krotzer nor any ACF employee, agent, or independent contractor holds any doctorates or licenses related to the treatment of alcoholism." Id. ¶ 13. This, contends the FTC, constitutes a deceptive act or practice, and the making of a false advertisement, in violation of §§ 5(a) and 12 of the FTC Act. 15 U.S.C. §§ 45(a), 52.

Photographs of men in white coats appear 20 times in the ACF Website. See 5/4/09 ACF Website at 9, 10, 11, 14, 17, 19–20, 21, 22, 29, 35, 37, 44, 47, 51–52, 58. [52] In the first instance, a caption reading: "The **team of doctors** employed by Alcoholism Cure did the research in the sciences of Alcoholism and Nutraceuticals ... Our clinical successes have been beyond their wildest dreams." Id. at 9; see also id. at 31 ("The **team of doctors** employed by Alcoholism Cure did the research in the two sciences"); 33 ("Doug hired a **prestigious group of doctors** and spent a fortune learning from all the research ...").

[52] There are actually three different photographs that are repeated throughout the Website. A photograph of a smiling man wearing a white coat appears 12 times. See 5/4/09 Website at 9, 10, 14, 17, 19–20, 21, 29–30, 35, 37, 47, 51–52, 58. A second photograph, this of a man in a white coat peering into an illuminated screen of a skull appears eight times. Id. at 11, 17, 22, 29, 44. A third image, a man holding a model of a brain in what appears to be a research laboratory, appears eight times. Id. at 1, 6, 16, 26, 27, 38, 41, 49.

The Website refers to "**our specialized knowledge, experience and monitoring**," Id. at 1, and cautions: "**No Lists of Ingredients in Advance**. Without supervision by our doctors ...." Id. at 1; see also id. at 6. The Website represents:

> **Your Personal Doctor** (PhD, ND, JD, not MD) studies your assessment answers for many insights into what you brain seeks in alcohol. He screens to avoid any adverse interactions with your medications. Based on our successful experience, he determines the composition and amounts of your First Recommendation. We do that so well, most are cured with few further adjustments.

> **Doctor Monitoring 15/7** We can safely do many things others cannot because Your World Class Specialist is only minutes away.

> . . .

> **Support Systems**: We encourage members to not change their minds in several ways:

>> • **Personal relationship** with your same doctor for your entire program

>> • **Weekly support**—ENews. Free to members

Id. at 2; see also id. at 5 ("**Doctor Monitoring** Your doctor is always available to answer your questions ... you talk to your doctor as soon as you need to"); 14 (**15/7 doctor monitoring**"). ACF promises that "Complex analysis of your reactions to many Formulas by World Class Specialists is the very heart of how we find out what your brain needs." Id. at 7. The Website exhorts that "The **team of doctors** employed by Alcoholism Cure are expert in addictive diseases and nutraceutical medicine." Id. at 3; see also id. at 13 ("**• Our Doctors**" and "**Only our experts can safely cure you**"); 47 ("you need **our doctors** reliably available to advise and support your, without the delay and cost of doctor appointments"); 48 ("**Only Our Doctors** ..."). The Website proclaims (next to a photograph of the smiling man in a white coat):

> **\*50** • **A World Class Doctor** who **regularly cures almost everyone** is assigned as your personal doctor for the duration of your program.

> • **His experience and careful detailed analysis** of your information determine your First Recommendations ingredients. **different for every individual**.

• We immediately have invested in your actual doctoring more than 15 times what the best clinics spend in 30–45 days....

Id. at 21.

Notably, the "not MD" disclaimer rarely appears with the "doctor" and "specialist" representations.[53] Indeed, at at least one point, the Website actually claims "MD" involvement, stating: "Our MDs do a great job at a reasonable price, since counseling by internet is available much more when you need it, and much more efficiently, maximizing the benefits of your counselors [sic] expensive time." Id. at 5.

[53]   The Court located several "not MD" disclaimers, all of which were in fine print. 5/4/09 Website at 1 ("Doctor (not MD) 15/7 monitored programs); 2 (**Your Personal Doctor** (PhD, ND, JD, not MD)"); 27 (**Talk to Your Alcoholism Cure Doctor** (not MD)($180/half hour)" and "**monitoring by world class doctor**")). At page 57 of the Website, there appears the following, in fine print: "Alcoholism Cure advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD)." Id. at 57.

Consumer testimony submitted by Plaintiffs consistently establishes that consumers believed from the representations they read on the ACF Website that they were being monitored by professionals, including medical doctors, trained in health care and curing alcoholism. See LS Dep. at 12, 14, 16–17 ("it was asserted that ... your results would be monitored by medical professionals"); JR Dep. at 11–12; RJ Dep. at 14–15; Consumer 1 Decl. ¶ 5; Consumer 4 Decl. ¶ 5. For example, one consumer stated that "I was told I would be assigned a doctor who would be in constant touch with me and would develop a plan of ingredients for me to take that was, supposedly, tailored to my specific physical needs." (Doc 60-14; Consumer 7 Aff. at 4). Even after becoming involved in the Permanent Cure Program, consumers believed that they were being monitored by specialists:

> I noticed that in Dr. Doug's emails he included "not md" after his signature. I did not necessarily expect the ACF recommendations to come from a medical doctor, as the ACF implied that medical doctors could not cure alcoholism. However, I

was under the impression that those recommendations would come from a specialist with a Ph.D in chemistry or another field relevant to alcoholism or addictive disease.

Consumer 1 Decl. ¶ 5.

According to Plaintiffs, "Defendant refers more than 500 times on his website to 'doctor,' 'world class specialist,' and other specialized and scientific knowledge." Plaintiffs' Motion for Summary Judgment at 8. Plaintiffs argue that "Defendant's professional qualification claims ... are false. 'Dr. Doug' and ACF's employees do not hold any scientific degree or license relevant to treating or curing alcoholism." Id. at 23 (citations omitted). Although Defendants sometimes parenthetically indicated that "the 'doctors' are 'PhD ND JD, not MD,' " Plaintiffs argue that "such disclaimers are ineffective because they do not correct consumers' false notion that they will be treated by someone with relevant scientific or professional qualifications." Id. (citations omitted).

 **\*51**  Krotzer argues only that there is "no support anywhere in the website" that "Defendant routinely represented scientists supported Molecule Multiplicity." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 13. Defendant does not otherwise specifically deny the allegations in Count IV other than to say that "[l]arge numbers" of customers "thanked him profusely, or compared him to God." Id. at 21.

There is no factual dispute that the ACF Website, and subsequent communications between consumers and "Dr. Doug" represented that "doctors," "world class specialists," "world class doctors," and "experts," would develop each customer's Permanent Cure Program recommended dietary supplement dosages; be available to answer customers' questions; and monitor and oversee each and every customer's use of the recommended dietary supplements. These representations were indisputably made to induce consumers to purchase Krotzer's service and were health related, and thus were presumptively material. FTC v. Urological Group, Inc., 645 F. Supp.2d at 1190. Defendant has offered no evidence or argument to overcome that presumption. Moreover, the representations regarding the involvement of professionally qualified specialists were likely to mislead. There is no dispute that the net impression of the ACF Website

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 85 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

and the subsequent communications between Krotzer and consumers was that customers would be cared for via e-mail communications by qualified professionals, with doctorates or licenses in relevant scientific or health-related fields. The representations made in the ACF Website were not subtle; they were repeated hundreds of times, and displayed prominently in bold-faced type, explicitly and, by innuendo, impliedly representing medical oversight. The fine-print "not MD" disclaimers were not adequate to dispel the unavoidable "net impression" of the ACF Website and subsequent communications. Accordingly, the Court determines that there is no triable issue as to whether Defendant's representations regarding the professional qualifications of Krotzer or ACF employees, agents or independent contractors were deceptive and false, in violation of § 5 of the FTC Act. See FTC v. Medlab, Inc., 615 F. Supp. 2d at 1079– 81 (advertiser's representations which included claim that weight loss supplement was a " 'doctor-designed' " therapy was a deceptive act or practice under the FTC Act); see also Stanley Lab., Inc. v. FTC, 138 F.2d 388, 390–91 (9th Cir. 1943)(evidence sustained FTC's findings that use of the letters "MD" or "M.D.," either alone or in conjunction with picturization of a doctor, nurse, or cross, in connection with medicated douche powder, was deceptive in leading public to believe that powder was endorsed by medical profession or by the Red Cross, justifying FTC's cease and desist order).

**F. False Privacy Claims (Count V)**

In Count V of the Complaint, the FTC alleges that ACF and Krotzer, directly or indirectly, made representations "that they would keep consumers' personal health information private, confidential, and anonymous." Complaint ¶ 50. Instead, according to the Plaintiffs' allegations, "in numerous instances, ... Defendants disclosed the personal and health information they collected from consumers to the Better Business Bureau, credit card companies, PayPal, other consumers, and the public, among others." Id. ¶ 51. Plaintiffs allege that the representations of privacy were false, and constituted a deceptive act or practice. Id. ¶ 52.

**\*52** The last page of the printed 5/4/09 ACF Website is a page devoted to ACF's "Privacy Policy." 5/4/09 ACF Website at 57. It states:

> We recognize that **many alcohol abusers cannot participate** in most recovery programs **because they are prominent** citizens, or work for **government** or **large corporations**. Disclosure would put their careers at risk, or otherwise **jeopardise** [sic] **their social lives**.

With Alcoholism Cure, you are **inherently protected by Internet anonymity**. Although we would rather deal with you by name, if you wish further secrecy, we accept aliases, other than on credit or contractual information.

**Under no circumstances will we sell or share your identity for commercial purposes to anyone, ever, period.**

**Your records are protected by us, Norton Internet Security Systems and PayPal ultra secure payment technology. Each the best in their class.**

5/4/09 ACF Website at 57. The Privacy Policy advises that "Alcoholism Cure advisors hold doctorate degrees (PhD, ND, JD) but are not medical doctors (MD). We strongly believe the DSHEA [the Dietary Supplement Health and Education Act] law gives us the right to extend to you the same total privacy rights extended by all medical doctors." Id. Small hyperlinks to the "Privacy Policy" appear on the right margin of pages throughout the ACF Website. Under "Benefits of Membership," the Website represents that the relationship between ACF and the consumer is "**Totally confidential and private**." Id. at 21. "As doctors, we have a stronger privacy policy than anywhere on the Internet." Id. Krotzer personally reassured Investigator Henry, who was posing as an interested consumer, that ACF "guards" the names of its members "jealously," and that ACF's "security is second to none." 9/12/08 Telephone Conversation Tr. at 46–47.

The privacy representations were material and important to consumers who actually did sign up for the Permanent Cure Program. See JR Dep. at 14–15 ("I live in a small town. I'm a professional. My husband's a professional. It's [privacy] very important"). They believed that they were going to be anonymous and that their privacy would be protected by the "doctor/patient" privilege. See LS Dep. at 17; JR Dep. at 14; RJ Dep. at 17.

Despite the repeated assurances of privacy, Krotzer threatened customers wishing to cancel their "membership" in the Permanent Cure Program, with filing a lawsuit which would invoke the "local media." (Doc. 58–13; Henry 1st Decl. Att. L; 2/2/07 E-Mail); see also JR Dep. at 52 ("felt threatened" that his name would become public if ACF and Krotzer filed a lawsuit); Consumer 3 Decl. ¶ 10. Krotzer also threatened to expose the alcoholism of a pilot to the FAA. LS Dep. at 42; RJ Dep. at 37; (Doc. 59–8; Consumer 5 Decl. Ex. G; 12/20/06 E-mail from Krotzer to Consumer 5

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 86 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

at 1). Additionally, ACF sent a "dunning" letter by certified mail to another consumer's office, which made the consumer concerned that his or her privacy was at risk. Consumer 4 Decl. ¶ 10.

The undisputed evidence further establishes that Krotzer exposed consumers' sensitive health information to third parties. For example, in response to inquiries from the Better Business Bureau with the State of Florida, or from credit card companies inquiring about customer chargeback requests, Krotzer would send the agency or company e-mails between Krotzer and the customer which included sensitive personal and health information. Further, Krotzer revealed the names of at least 11 consumers and purchasers of the Permanent Cure Program in small claims lawsuits filed against consumers who attempted to cancel. Krotzer Admissions 70, 109; Henry 1st Decl. ¶ 17 and Attach. M (Doc. 58–14; Krotzer letter to "Sean").

**\*53** Krotzer does not specifically address Plaintiffs' arguments as to the allegations of Count V of the Complaint. Instead he appears to rest upon his argument that "1.) Damages if they existed were easily avoidable by consumers and 2.) massive countervailing benefits." Defendant's Motion for Summary Judgment at 9. Krotzer argues that "Plaintiffs are still groping for a single credible, reasonable consumer who was materially harmed." Krotzer Motion for Summary Judgment at 19 (emphasis omitted).

Section 12 of the FTC Act addresses false advertising and provides that "dissemination of false advertisements—defined as advertisements that are misleading in a material respect—is an unfair or deceptive practice in commerce." FTC v. Nat'l Urological Group, 645 F. Supp.2d at 1188 (citing 15 U.S.C. §§ 52(b) and 55). Thus a violation of § 12 constitutes a violation of Section 5. Id. Consumer injury is not an element of a § 5 claim of deception and false advertising. FTC v. Braswell, 2005 WL 4227194, at \*4.

Here, it is undisputed that ACF and Krotzer, through the ACF Website, made representations that consumers' sensitive personal and health information would remain private, and that these representations were material to a consumer's decision to purchase the Permanent Cure Program product. Krotzer does not deny that he disclosed private information to third parties, and cites to no evidence establishing that he did not do so. As such, there is no dispute that the "privacy" representations were "likely to mislead." ACF and Krotzer's representations of privacy were "false" because Krotzer

routinely used disclosure of personal and health information as a threat to extract payment from consumers who expressed a desire to withdraw from the Program, and actually followed-through on those threats by revealing consumers' personal information to third parties. The Court concludes that there exist no triable issues as to Count V of the Complaint, and that the FTC is entitled to summary judgment. Cf. Dorfman v. FTC, 144 F.2d 737, 740 (8th Cir. 1944)("threats to sue for the purpose of extorting money from customers where no money is due may be forbidden by the Federal Trade Commission").

### G. Unauthorized Billing (Count VI)

Count VI of the Complaint presents an "unfair practices" claim. The FTC alleges that in connection with their advertising, promotion and sale of the Permanent Cure Program, ACF and Krotzer "have caused charges to be submitted for payment to financial institutions without obtaining the express informed consent of consumers." Complaint ¶ 53. The FTC alleges that ACF and Krotzer's "actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition." Id. ¶ 54. As such, the FTC contends that Krotzer's conduct violated § 5, of the FTC Act, 15 U.S.C. §§ 45(a), 45(n).

The FTC's factual allegations track the legal requirements for an "unfair practices" claim. " 'To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.' " FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 299 (citation omitted); 15 U.S.C. § 45(n); see also Orkin Exterminating Co. v. FTC, 849 F.2d at 1364. "Consumer injury" is required to establish liability for an "unfair practice." See FTC v. Braswell, 2005 WL 4227194, at \*4. "In most cases 'substantial injury' involves monetary harm." FTC v. Direct Mktg. Concepts, Inc., 569 F. Supp.2d at 299; see also FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d 1281, 1288 (M.D. Fla. 2008). As to the second prong of the unfairness standard, while certain practices can create a mixture of both beneficial and adverse consequences, "when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the unfairness of the practice is not outweighed." FTC v. Windward Mktg., Ltd, 1997 WL 33642380, at \*11 (citing Orkin Exterminating Co., 849 F.2d at 1365). Finally,

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

" '[c]onsumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it.' " FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d at 1289 (quoting Orkin Exterminating Co v. FTC, 849 F.2d at 1365). As such, when evaluating whether consumers reasonably could have avoided the injury, "the Court focuses on whether the consumers had a free and informed choice that would have enabled them to avoid the unfair practice." FTC v. Windward Mktg., Ltd., 1997 WL 33642380, at *11 (citing Amer. Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 976 (D.C. Cir. 1985)).

**\*54** Plaintiffs argue Krotzer and ACF's "buried disclaimers" do not entitle Krotzer to declare dissatisfied customers as "cured" and to place charges on their credit accounts, unbeknownst to the consumer. Plaintiffs' Motion for Summary Judgment at 12, 25. Further, argue Plaintiffs, "Consumers cannot avoid the harm where, as here, Defendant does not notify them of, and give them an opportunity to reject, the charges." Id. at 25. Plaintiffs reiterate that the cost and cancellation terms were deceptive and incoherent to consumers, making it impossible for consumers to discern that their credit cards would be charged thousands of dollars if they wished to cancel. Plaintiffs' Response to Defendant's Motion for Summary Judgment at 16–21.

In response, Krotzer again contends that "[t]he prominently featured **One–Sentence–Clickwrap–Contract** was sufficient notice to establish the contingent payment contract and its acceleration with great regularity by credit card companies, mediators and arbitrators, pre trial mediators and others," and that it was "adequate disclosure to support $20,000 charges as made more clear in the formal terms and conditions." Defendant's Motion for Summary Judgment at 17, 23; see also Defendant's Response to Plaintiffs' Motion for Summary Judgment at 16. [54] Krotzer argues that consumers could have "avoided" injury by providing "one of five simple proofs they continued to abuse alcohol." Defendant's Motion for Summary Judgment at 10, 23. Indeed, Krotzer contends that "cured" customers—those who could not prove they were continuing to abuse alcohol—were improperly trying to avoid their financial obligations:

> ### Unreasonable Consumers (Members)
> **Same benefits**, Nearly all positively or negatively confirmed their cure. Their refusal to pay once cured lead to acceleration of otherwise

monthly payments and meant not all got off "Virtually Free". This class of customers, **the cheaters and scofflaws, are entitled to no weight—they are Plaintiffs' whole case.**

Id. at 16. He contends that "No reasonable member was ever harmed other than being pressured to keep their **One–Sentence–Clickwrap–Contract** and the Cancellation Policies/Terms and Conditions of which it gave notice." Defendant's Response to Plaintiffs' Motion for Summary Judgment at 17.

[54]      Although citing no evidence in support, Krotzer asserts that ACF "won the majority of its chargeback cases amounting to about $100,000." See Defendant's Motion for Summary Judgment at 17(indicating that consumers disputed charges placed on their credit cards).

Undisputed consumer testimony illustrates Krotzer's scheme in action, and its devastating effects. Consumers consistently testified that they believed they were signing up for a five or six-month membership costing approximately $100 a month, and that they could cancel at anytime thereafter if not cured, without paying any additional money. LS Dep. at 17; JR Dep. at 12–13; RJ Dep. at 11, 19; Consumer 4 Decl. ¶ 5; Consumer 5 Decl. ¶¶ 4, 5. They did not see or read the Terms and Conditions, or accelerated payments or proof of cure. JR Dep. at 16–18; LS Dep. at 17; RJ Dep. at 35; Consumer 1 Decl. ¶ 4. They had no idea they were signing a "long-term contract" that committed them to thousands of dollars in accelerated fees if they attempted to cancel. LS Deposition at 18–19.

Consumers also testified they did not authorize ACF or Krotzer to charge their credit card for 52 weeks, 76 weeks, or for life, or for anywhere between $13,000 to $22,000. LS Dep. at 18–19, 28; JR Dep. at 44; RJ Dep. at 33–34. Nonetheless, ACF and Krotzer placed charges on the consumers' credit cards when they attempted to cancel. LS Dep. at 24–25, 28, 35 ($12,800); JR Deposition at 48 ($13,378); Consumer 1 Decl. ¶¶ 13, 15, 16 ($13,378, securing a $5,879.12 " 'refund")' Consumer 2 Decl. ¶ 12 ($3,950); Consumer 3 Decl. ¶ 10 ($7,000 charged to credit card and $13,527.96 still "owed"); Consumer 4 Decl. ¶ 11 ($8,400 "settlement fee"); Consumer 5 Decl. ¶¶ 7, 10 ($13,527.96, securing a $12,688.12 "charge-back" from her credit card company); (Doc. 59–5; Consumer 11 Aff., Ex. D; 11/29/06 e-mail from

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Krotzer to consumer stating: "**You have pre-authorized these charges on your credit card**. The sums of $839.84 for the five month commitment and $12,688.12 for the remaining 47 months of your contract have been charged today").

 **\*55**  In the context of this unfair practices claim, Krotzer's position amounts to an argument that the billing was with authorization, and thus was not an "unfair practice." This position is contradicted by the undisputed facts. The first prong of the unfairness standard requires a finding of substantial injury to consumers. The undisputed evidence establishes that consumers were monetarily injured by ACF and Krotzer's practices for which they did not bargain. Consumers testified they were charged as much as $13,000. While Krotzer contends that the FTC did not proffer sufficient consumer testimony regarding unauthorized charges, see Defendant's Response to Plaintiffs' Motion for Summary Judgment at 8, he does not deny that he did in fact charge consumers' credit cards when they attempted to cancel, and that he was aware of charge-back requests from consumers. Krotzer Admission 120. Once he obtained credit card information, Krotzer maintains that he was entitled to "accelerate" charges on it if the consumer expressed an interest in cancelling his or her "membership." Alternatively, he would threaten to bring a lawsuit or to expose the consumer in an attempt to secure a "settlement." Remarkably, Krotzer continues to justify the practice, the effects of which are far-reaching.

Second, consumer injury outweighed any countervailing benefits to consumers or competitors. Krotzer has adduced no admissible evidence that consumers were indeed "cured" of their alcoholism as a result of following the Permanent Cure Program dietary supplement regimen. Indeed, those wishing to cancel wanted to do so because the Program at best, was not working, and at worst, was making them sick. Krotzer has only proffered his conclusory statements on this point and inadmissible anonymous purported testimonials of persons he maintains were ACF customers. He has adduced no scientific evidence to substantiate any benefit to consumers caused by the Permanent Cure Program. Even if the ACF Permanent Cure Program has "cured" some consumers (of which there is no evidence in this record), the evidence submitted regarding the high volume of consumer complaints, charge-backs and credits shows that Krotzer deceived many others who were not "cured." Thus any alleged benefits do not offset the harm Defendants have done. See FTC v. The Crescent Publ'g Co., 129 F. Supp.2d 311, 322 (S.D. N.Y. 2001).

Finally, under the facts presented here, consumers could not have reasonably avoided their injuries because the ACF Website makes no mention of and gives consumers absolutely no reason to anticipate that their credit cards would be charged thousands of dollars if they wished to cancel or withdraw from the Permanent Cure Program. In Krotzer's own words, the consumers were unknowingly "captured" and "retained" in a "long-term contract," by representations which "avoided" the significance of the expense, where it was more costly to the consumer to drop the program due to automatic acceleration of credit card charges. Internet Patent Appl. at 1–2. While perhaps the repeated representations on the ACF Website could have been reasonably construed by consumers as providing for a five-month contract, nothing in the lengthy Website, and certainly nothing in the so-called "one-sentence-clickwrap-contract" where consumers clicked a hyperlink to the Sign–Up page, could have given consumers a reason to anticipate that they were signing up for a multi-year $20,000 contract which in essence could not be cancelled, and which subjected them to instant accelerated charges on their credit cards if they expressed a desire to cancel. Rather, consumers were led to believe they would be liable only for a monthly subscription fee of approximately $100 a month, for at least five months, and could cancel at any time thereafter if they were not "cured." The inconspicuous fine-print "Terms and Conditions" found at the end of the lengthy ACF Website, well beyond the Assessment and Sign–Up pages were confusing and self-contradictory. Mention of "legal obligation," "contract," "long term commitment" and "fees are fully earned" if the consumer "attempts" to cancel, 5/4/09 ACF Website at 53–54, and "obligation to pay us for 76 months" and "acceleration," id. at 55, all appear in fine print and fail to set forth any explanatory terms to put the consumer on notice of any obligation to pay thousands of dollars if they wish to cancel because they are not cured, as repeatedly claimed in boldface type. Moreover, the conclusion that consumers could not reasonably avoid the injury is supported by the fact that so many consumers sought cancellation of payment and charge-backs from their credit card companies and PayPal, complained to state and federal authorities, and sought refunds from Defendant. Indeed, Krotzer's argument that consumers could have avoided injury by submitting "one of five simple proofs" is belied by his own impossible demands on consumers that they submit notarized statements, expensive lab test results, product labels, and hair samples. See supra at 36–39.

 **\*56**  The Court concludes that ACF and Krotzer engaged in an unfair practice, in violation of § 5(a) of the FTC Act,

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 89 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

15 U.S.C. § 45(a), by charging consumer credit accounts without authorization. See FTC v. Global Mktg. Group, Inc., 594 F. Supp.2d at 1288–89 (defendant engaged in unfair acts and practices in violation of FTC Act by withdrawing funds from consumers' bank accounts for purchase of credit cards and credit card loss protection which consumers never received); FTC v. Capital Choice Consumer Credit, Inc., 2004 WL 5149998, at *37–38 (unauthorized debits were a violation of § 5 of the FTC Act, where consumers were tricked into providing authorizations by a nearly unintelligible recording which shows that consumers could not have reasonably avoided having their accounts debited); FTC v. The Crescent Publ'g Co., 129 F. Supp.2d at 322 (enjoining as an unfair practice internet pornographic websites which billed site visitors' credit cards without authorization through deliberate confusion as to when "free tour" ended); FTC v. Windward Mktg., LTD, 1997 WL 33642380, at *11–13 (unfair practices where defendants obtained victims' banking information by phone and illegitimately debited accounts for magazine subscriptions consumers did not realize they were purchasing; unauthorized billing practice (bank drafts) found to be "unfair"). The FTC is entitled to summary judgment as to Count VI of the Complaint.

## H. Violation of Florida Deceptive and Unfair Trade Practices Act (Count VII)

The State of Florida brings Count VII of the Complaint. The State of Florida alleges that Defendant violated FDUTPA based upon Defendants' representations that the Permanent Cure Program "cures alcoholism" while allowing alcoholics to drink socially; is "scientifically proven to cure alcoholism;" and is "virtually free" and can be cancelled at any time if the customer is not cured. Complaint ¶ 57 a.–c. Additionally, the State of Florida alleges Defendants violated FDUTPA by representing that Krotzer and others with ACF "hold doctorates or licenses in areas related to the treatment of alcoholism," and by representing that consumers gave authorization for their credit card or PayPal accounts to be charged for Defendants' services and accelerated payments without obtaining the express informed consent of consumers. Id. ¶ 57 d.–e. The State of Florida alleges that based upon these activities, "Defendants have engaged in representations, acts, practices, or omissions that are material, and which are likely to mislead consumers under the circumstances," constituting "deceptive acts or practices" in violation of FDUTPA. Id. ¶¶ 58–59. In essence, Count VII compiles all of the allegations contained in Counts I through VI to allege a violation of FDUPTA.

Plaintiffs argue that the State of Florida is entitled to summary judgment as to Count VII because "Deceptive or unfair acts or practices that violate Section 5 of the FTC Act also violated the FDUTPA." Plaintiffs' Motion for Summary Judgment at 17; Plaintiffs' Response to Defendant's Motion for Summary Judgment at 19 (citing Fla. Stat. § 501.203(3)(a)–(c)). Defendant Krotzer does not discuss Count VII in his papers.

The Florida Deceptive and Unfair Trade Practices Act makes clear that conduct which constitutes a "deceptive" act or practice, false advertising, and/or an "unfair" act or practice under the FTC Act is a violation of FDUPTA. Specifically, the Act provides that:

**501.202. Purposes; rules of construction**

The provisions of this part shall be construed liberally to promote the following policies:

(1) to simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3) to make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

**\*57** Fla. Stat. § 501.202. Additionally, FDUPTA provides that "Violation of this part" may be based upon any of the following:
. . .

(b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair deceptive, or unconscionable acts or practices.

Fla. Stat. § 501.203(3)(b) and (c). FDUPTA makes "unlawful":

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 90 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

(1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce ....

(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006.

Fla. Stat. § 501.204(1) and (2).

"The Florida legislature enacted FDUPTA in 1973 to protect consumers against commercial wrongdoing and it is patterned after the [FTC Act], 15 U.S.C. §§ 45 et. seq." Millennium Commc'ns & Fulfillment, Inc. v. Office of the Atty. Gen., 761 So.2d 1256, 1260 (Fla. 3d DCA 2000). Florida courts have determined that "subsection 501.204(2) should be interpreted to mean that, in determining whether particular conduct violates the Florida DTPA, a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under section 5(a)(1) of the FTC Act." Mack v. Bristol–Myers Squibb Co., 673 So.2d 100, 104 (Fla. 1st DCA 1996). "Because the legislature did not define what is an unfair or deceptive act, a practice which 'offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers may violate [F]DUPTA.' " State of Fla., Office of the Atty. Gen. v. Tenet Healthcare Corp., 420 F. Supp.2d 1288, 1310 (S.D. Fla. 2005)(citation omitted); see also Trent v. Mortgage Electronic Registration Sys., Inc., 618 F. Supp.2d 1356, 1365 (M.D. Fla. 2007). " '[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.' " Zlotnick v. Premier Sales Group, Inc., 480 F.3d 1281, 1284 (11th Cir. 2007)(quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003). FDUPTA empowers the State of Florida, Office of the Attorney General, Department of Legal Affairs to bring an action to "enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUPTA. Fla. Stat. §§ 501.203(2), 501.207(1)(b); see also Millennium Commc'ns, 761 So.2d at 1257, 1260.

For the reasons set forth above in the Court's analysis of Counts I through VI, in which the Court determined that Plaintiff FTC is entitled to summary judgment under the FTC

Act, the Court concludes that there are no triable issues and that the State of Florida is entitled to summary judgment as to Count VII.

### I. Krotzer's Individual Liability

**\*58** An individual may be held directly liable for his own violations of the FTC Act, or jointly and severally liable for a corporation's violation. FTC v. Windward Mktg., Ltd., 1997 WL 33642380, at \*13; see also FTC v. Nat'l Urological Group, Inc., 645 F. Supp.2d at 1207. FTC v. Capital Choice Consumer Credit, Inc. 2004 WL 5149998, at \*46.

It is undisputed that Krotzer communicated directly with consumers, repeating the same representations that appeared on the ACF Website. Additionally, he made representations to consumers which were not on the Website, including additional requirements for establishing that the consumer was "not cured"; representations regarding thousands of dollars owed; and threats of legal action and public disclosure. Because of these representations, Krotzer may be held individually liable for his direct violations of the FTC Act.

The undisputed evidence also establishes that Krotzer may be held liable for ACF's violations of the FTC Act. Krotzer is the 100 percent owner and sole corporate officer of ACF, and is literally the face of Alcoholism Cure Foundation, the fictitious name for Alcoholism Cure Corporation. He is singularly responsible for the ACF Website and the representations made thereon; he authored and signed all correspondence to consumers; and he initiated collection efforts against them. Krotzer does not dispute his singular control of ACF. As such, there is no triable issue as to whether Krotzer both participated directly in the deceptive acts or practices, false advertising and unfair acts and practices of ACF, had knowledge of ACF's wrongful acts and practices, and was in control of ACF at all times. On this record, Krotzer may be held personally liable for his own violations of the FTC as well as for ACF's violations. Accordingly, judgment is due to be entered in favor of Plaintiffs and against Defendant Krotzer as to Counts I through VII of the Complaint.[55]

55      The Court has previously denied without prejudice Plaintiffs' Motion for Entry of Default Judgment against Defendant ACF. (Doc. 141; 05/10/11 Order). In doing so, the Court did not address the merits of the motion, but rather denied it without prejudice based upon the procedural posture of the case. The Court specified that the Motion for

Default Judgment was "[d]enied without prejudice to refiling after the Court has made a final determination on the merits in this case as to Defendant Krotzer." Id. at 4.

### J. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. 123) will be **GRANTED**, and Defendant's Motion for Summary Judgment (Doc. 96) will be **DENIED**. [56]

> [56] Defendant has filed a second motion for summary judgment, entitled Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice—Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment). Krotzer's Second Motion for Summary Judgment repeats the arguments made in his first motion for summary judgment considered above, including the "one piece of paper" citation to a testimonial by "Pam," which Krotzer says appears on the ACF Website. See id. at 7–8, 18. Having already considered the arguments of the parties, and determined that Plaintiffs' Motion for Summary Judgment is due to be granted and Krotzer's Motion for Summary Judgment is due to be denied, Krotzer's Second Motion for Summary Judgment (Doc. 140), will be **DENIED AS MOOT**. In light of this determination, Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment (Doc. 142, will be **DENIED AS MOOT**.

### VI. The Stipulated Preliminary Injunction

**\*59** Several of the pending motions and responses are directed to the Stipulated Order for Preliminary Injunction previously entered in this case. (Doc. 12–1; Stipulated Preliminary Injunction). [57]

> [57] See Defendants' Motion to Vacate the Preliminary Injunction (Doc. 56; Motion to Vacate), and Plaintiffs' Response in opposition (Doc. 71; Plaintiffs' Response to Motion to Vacate); Plaintiffs' Motion for Order to Show Cause to Hold Defendant Krotzer in Civil Contempt (Doc. 58; Motion for Order to Show Cause) and Defendant Krotzer's Response in opposition

(Doc. 74; Defendant's Response to Motion for Order to Show Cause); Defendant's Motion To Permit Speaking And Book Writing (Doc. 144; Defendant's Motion To Give Speeches and Publish Books); Plaintiffs' Response in opposition (Doc. 146; Plaintiffs' Response to Motion to Give Speeches and Publish Books)

### A. Defendant's Motion to Vacate the Stipulated Preliminary Injunction (Doc. 56)

On October 16, 2010, Defendant Krotzer, proceeding pro se after having dismissed his attorney on July 14, 2010, (see Docs. 17 and 18; Motion to Withdraw and 7/19/10 Order), filed a Motion to Vacate the Stipulated Preliminary Injunction, or alternatively to "interpret" the injunction. Motion to Vacate. Krotzer contends that the Stipulated Preliminary Injunction, which was entered on May 26, 2010, should be vacated because it was "obtained under false pretenses, by fraud, and by intentional infliction of severe economic and emotional distress." Id. at 2. As support, Krotzer cites to a July 26, 2010 e-mail from counsel for the FTC to Krotzer saying that the FTC "would be happy to discuss with you any compliance issues with the Stipulated Final Judgment and Order ... after you sign and return it to us," which Krotzer terms as "sign first and ask questions later ... unethical legal advice trying to rush" him into signing an injunction order. Id. at 2 (citing Doc. 56–1; Motion to Vacate Ex. A). Krotzer argues that he was assured when he negotiated the Stipulated Preliminary Injunction, that he could continue making "minimal health claims that accurately described" the results of the Permanent Cure Program "without additional scientific support Plaintiff knew well Defendant cannot afford." Id. at 3.

**\*60** Plaintiffs oppose the Motion to Vacate, arguing that Krotzer voluntarily agreed to the terms of the Stipulated Preliminary Injunction, while represented by counsel. Plaintiffs' Response to Motion to Vacate at 2–3. Plaintiffs contend that the Stipulated Preliminary Injunction is a "valid order entered by the Court pursuant to agreement among all the parties when represented by counsel," and that Krotzer's contentions of "false pretenses, fraud, and duress" are not supported by the facts or any evidence. Id. at 3. As to Krotzer's argument of fraud, Plaintiffs respond that there is no evidence that Plaintiffs' counsel ever communicated directly with Krotzer, inasmuch as he was represented by counsel prior to and upon the entry of the Stipulated Preliminary Injunction. Id. at 4–5. Plaintiffs argue that Krotzer cannot make a claim of fraud in the inducement and that Krotzer's "unilateral mistake

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

provides no rationale for invalidating the Court's Order." Id. at 5–6.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Court to enter a preliminary injunction upon proper showing by the FTC. 15 U.S.C. § 53(b). This section invokes the full equitable jurisdiction of the district court. See FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984); FTC v. Home Assure, LLC., No. 8:09–cv–547–T–23TBM, 2009 WL 1043956, at *2 (M.D. Fla. April 16, 2009); see also Fla. Stat. § 501.207(1)(b).

Inasmuch as the Stipulated Preliminary Injunction is an interlocutory Court Order, it is unclear whether the standards for vacatur or modification set forth in Rule 60, Federal Rules of Civil Procedure, govern the Court's analysis of the question, see FTC v. Amer. Entertainment Distributors, Inc., No. 11–10150, 2011 WL 2672545, at *1 (11th Cir. July 8, 2011)(whether settlement agreement in the form of a proposed consent decree is a valid contract is determined by the substantive law of contracts of the forum state, but the court's authority to enter a consent decree is a question of federal procedural law); Reynolds v. McInnes, 338 F.3d 1221, 1225–27 (11th Cir. 2003)(applying Rule 60(b)(5) to analyze motion to modify a consent decree); Sierra Club v. Meiburg, 296 F.3d 1021, 1033 (11th Cir. 2002)(citing Rule 60(b)(5) as providing the district court with power to modify a consent decree); Doe, 1–13 v. Bush, 261 F.3d 1037, 1063 n.22 (11th Cir. 2001)("a consent decree is treated as 'a judicial decree that is subject to the rules generally applicable to other judgments and decrees' " (citation omitted)), or whether the determination to vacate or modify the Stipulated Preliminary Injunction is left to the sound discretion of the Court as with any interlocutory order.[58]

[58]    Rule 60(b) provides the "Grounds for Relief from a Final Judgment, Order, or Proceeding." However, "[t]he addition of the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires." Rule 60 1946 advisory committee's note. However, "[b]ecause of the extraordinary nature of a preliminary injunction, and the possibility of error when an action is predicated on less than a full and complete trial,

Congress by passing 28 U.S.C. § 1292 created an exception to the rule that an appeal will lie only after final judgment." Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005). Thus, a preliminary injunction order takes on many of the characteristics of a final order, and in that respect, is amenable to analysis pursuant to Rule 60(b). See Valpak Direct Mktg. Sys. v. Hyde, No. 8:06–cv–347–T–26–EAJ, 2006 WL 1982877, at *2 (M.D. Fla. July 13, 2006)(applying Rule 60(b)(1) analysis to deny request to vacate a Consent Preliminary Injunction); but see FTC v. Magui Publishers, Inc., No. CV 89–3818–RSWL, 1990 WL 132719, at *2 (C.D. Cal. April 24, 1990)(declining to grant relief from preliminary injunction pursuant to Rule 60(b) because rule is expressly applicable only to a "final judgment, order or proceeding," and interlocutory orders such as a preliminary injunction are not within the provisions of Rule 60(b)). The fact that the preliminary injunction is stipulated would not change a Rule 60(b) analysis. See Reynolds v. McInnes, 338 F.3d 1221, 1225 (11th Cir. 2003)("[f]or modification purposes, a consent decree is not treated as a contract, but as a judicial act akin to an injunction").

In the event Rule 60(b) standards are not applicable, alternatively the Court may afford such relief from an interlocutory order "as justice requires." Rule 60 1946 advisory committee's note. A district court, in the exercise of its own discretion, may reconsider or readdress any order prior to the entry of final judgment. See Harper v. Lawrence County, Ala., 592 F.3d 1227, 1231 (11th Cir. 2010)("[i]t is permissible for a district court to rescind its own interlocutory order"); Hardin v. Hayes, 52 F.3d 934, 938 (11th Cir. 1995). However, reconsideration of a previous order is "an extraordinary measure and should be applied sparingly in the interests of finality and conservation of scarce judicial resources." Scelta v. Delicatessen Support Servs., Inc., 89 F. Supp.2d 1311, 1320 (M.D. Fla. 2000).

**\*61** Rule 60(b) provides:

(b) ... On motion and just terms, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons:

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 93 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

(1) mistake, inadvertence, surprise, or excusable neglect;
. . .

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) ... applying [the judgment] prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Rule 60(b) "should be construed in order to do substantial justice." Griffin v. Swim–Tech Corp., 722 F.2d 677, 680 (11th Cir. 1984). "Motions under the rule are directed to the sound discretion of the district court." Id.; see also Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1355 (11th Cir. 2009). As the party seeking modification or vacation of the Stipulated Preliminary Injunction, Krotzer bears the burden of proof. [59] See Johnson v. Florida, 348 F.3d 1334, 1345 (11th Cir. 2003)(citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 393 (1992)); The Atlanta Journal and Constitution v. City of Atlanta Dep't of Aviation, 6 F. Supp.2d 1359 (N.D. Ga. 1998)("[o]n a motion to dissolve preliminary injunction, the movant has the burden of proof"). "Because the rule allows extraordinary judicial relief, it should be invoked only upon a showing of 'exceptional circumstances.' " Larsen Co. v. Consol. Mktg., Inc., 148 F.R.D. 664 (N.D. Ga. 1993)(citing Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986)), aff'd 15 F.3d 1098 (11th Cir. 1994). "Moreover, '[w]hen the parties submit to an agreed-upon disposition instead of seeking a resolution on the merits ... the burden to obtain Rule 60(b) relief is heavier than if one party proceeded to trial, lost, and failed to appeal.' " Id. (quoting Nemaizer, 793 F.2d at 63).

[59]     The Court has continuing jurisdiction over the Stipulated Preliminary Injunction. Stipulated Preliminary Injunction at 15–16; see also Hodge v. Dep't of Housing and Urban Dev., 862 F.2d 859, 861–62 (11th Cir. 1989); Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 578 (5th Cir. 1974); Atlanta Journal and Constitution v. City of Atlanta Dep't of Aviation, 6 F. Supp.2d 1359, 1364 (N.D. Ga. 1998).

Krotzer's first argument that he was mistaken about the interpretation of terms in the Stipulated Preliminary Injunction is insufficient to support vacatur here. Krotzer's alleged mistaken belief that he could make minimal health claims without further scientific support is not a "mistake of fact" that can be rectified under Rule 60(b)(1). " 'Rule 60(b)(1) was not intended to relieve a litigant from the consequences of ... a conscious decision, however unwise the decision may appear in retrospect.' " Valpak Direct Mktg. Sys. v. Hyde, No. 8:06–cv–347–T–26EAJ, 2006 WL 1982877, at *2 (M.D. Fla. July 13, 2006)(quoting Parrilla–Lopez v. United States, 841 F.2d 16, 20 (1st Cir. 1988)); see also Citibank, N.A. v. Data Lease Fin. Corp., 700 F. Supp. 1099, 1103 (S.D. Fla. 1988)(defendant may not amend stipulation and order of dismissal pursuant to rule 60(b)(1); " 'an attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from judgment' " (quoting Nemaizer, 793 F.2d at 62), aff'd 904 F.2d 1498, 1505 (11th Cir. 1990)("Data Lease, represented by counsel, entered into the stipulation dismissing its claims against agent directors 'with prejudice.' Represented by new counsel, Data Lease cannot avoid the consequences of such a prior act"). Krotzer cannot use Rule 60(b)(1) to vacate the prior Stipulated Preliminary Injunction based upon his "mistaken" understanding of it.

**\*62** Krotzer argues that he was induced to agree to the Stipulated Preliminary Injunction by fraud and "false pretenses" on the part of Plaintiffs. Relief under Rule 60(b)(3) is appropriate only if the movant establishes "by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." Montgomery v. Hall, 592 F.2d 278, 278–79 (5th Cir. 1979); accord Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1309 (11th Cir. 2003); Taylor v. Texgas Corp., 831 F.2d 255, 259 (11th Cir. 1987). Even if applicable to the Stipulated Preliminary Injunction, Krotzer has presented no more than conclusory allegations that he was the victim of "fraud" or "false pretenses." [60] The Stipulation was negotiated by lawyers for the Plaintiffs and Defendants, and there is no evidence whatsoever that Plaintiffs misrepresented any aspect of the Stipulation to Krotzer's attorney (or to Krotzer himself) during the course of these negotiations. [61]

[60]     Krotzer's reference to an e-mail sent by counsel for Plaintiff FTC is unavailing. The e-mail was sent during negotiations concerning a possible final

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 94 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

judgment in this case, occurring two months after entry of the Stipulated Preliminary Injunction. (See Doc. 56–1; Motion to Vacate Ex. A). As such, the e-mail is irrelevant to the question presented here.

61    Rule 60(b)(4) refers to judgments that are void. A judgment is void for Rule 60(b)(4) purposes "if the rendering court was powerless to enter it." Burke v. Smith, 252 F.3d 1260, 1263 (11th Cir. 2001). This Court had jurisdiction to enter a preliminary injunction pursuant to 15 U.S.C. § 53(b). FTC v. U.S. Oil & Gas Corp., 748 F.2d at 1434–35 ("preliminary injunction ... founded on the Court's equitable powers to provide relief ancillary to the Commission's complaint for permanent injunction"); see also FTC v. Bishop, No. 10–10715, 10–12901, 2011 WL 1560656, at *1 (11th Cir. April 25, 2011), Krotzer's argument notwithstanding. See Motion to Vacate at 13–16.

Rule 60(b)(5) "permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.' " Horne v. Flores, 129 S.Ct. 2579, 2593 (2009)(quoting Fed. R. Civ. P. 60(b)(5)). "[T]he Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.' " Horne, 129 S.Ct. at 2593 (quoting Rufo, 502 U.S. at 384). "Changed circumstances" justifying vacatur or modification of a consent decree are those that "have caused compliance with the decree to become substantially more onerous, or have rendered the decree impracticable, or its continued enforcement inimical to the public interest." Johnson, 348 F.3d at 1344. Generally invoked in litigation involving institutional reform and covering a span of years, under Rule 60(b)(5) the " 'party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree' " by showing a "significant change either in factual conditions or in law.' " Reynolds, 338 F.3d at 1226 (quoting Rufo, 502 U.S. at 383–84). Krotzer has failed to adduce any evidence to carry his burden of establishing any changed circumstances. Krotzer's reference to a "new" website does not eliminate the "basic purpose" of the Stipulated Preliminary Injunction. Nor has Krotzer established changed factual conditions which have made compliance with the Preliminary Injunction "substantially more onerous" or "unworkable," or detrimental to the public interest. Krotzer's conclusory statement that he cannot afford

scientific verification of the Permanent Cure Program does not represent a good-faith attempt to comply with the provisions of the Stipulated Preliminary Injunction, nor is it sufficient evidence that the Stipulated Preliminary Injunction is unworkable. See Reynolds, 338 F.3d at 1226–29.

**\*63** Finally, relief pursuant to Rule 60(b)(6) is available only "in the most 'extraordinary' circumstances," and "only in dealing with a request for relief not falling within clauses one through five." Harduvel v. Gen. Dynamics Corp., 801 F. Supp. 597, 612–13 (M.D. Fla. 1992); accord Beavers v. A.O. Smith Elec. Products Co., 265 Fed.Appx. 772, 779 (11th Cir. 2008); Solaroll Shade & Shutter Corp., Inc. v. Bio–Energy Sys., Inc., 803 F.2d 1130, 1133 (11th Cir. 1986). "The party seeking relief has the burden of showing that absent such relief, an 'extreme' and 'unexpected' hardship will result." Griffin, 772 F.2d at 680. Krotzer has not presented the "extraordinary circumstances" that require that the Stipulated Preliminary Injunction be vacated or modified. Nothing has changed since the entry of the Stipulated Preliminary Injunction other than the passage of time.

Alternatively, if the Stipulated Preliminary Injunction is to be considered interlocutory, the Court, in the exercise of its discretion, may reconsider or readdress it prior to the entry of final judgment. Hardin v. Hayes, 52 F.3d 934, 938 (11th Cir. 1995). "Principles governing general contract law apply to interpret settlement agreements," and even though the Stipulated Preliminary Injunction arises under federal law, state contract law directs the Court's analysis. Resnick v. Uccello Immobilien, GMBH, Inc., 227 F.3d 1347, 1350 (11th Cir. 2000). 62 Thus, Florida contract principles apply to evaluate Krotzer's attempt to vacate the Stipulated Preliminary Injunction in this case. Cf Shepard v. Fla. Power Corp., No. 8:09–CV–2398–T–27TGW, 2011 WL 1465995, at *2 (M.D. Fla. April 18, 2011)("[a] settlement agreement is a contract and, as such, its construction and enforcement are generally governed by state law"). Indeed, " '[t]he rules we use to interpret a consent decree are the same ones we use to interpret a contract—since a consent decree is a form of contract.' " FTC v. Leshin, 618 F.3d 1221, 1231 (11th Cir. 2010)(quoting Sierra Club v. Meiburg, 296 F.3d 1021, 1029 (11th Cir. 2002)). " 'One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted.' " Mid–South Towing Co. v. Har–Win, Inc., 733 F.2d 386, 392 (5th Cir. 1984)(quoting Callen v. Pa. R.R. Co., 332 U.S. 625, 630 (1948)). "[A]bsent claims of fraud or duress, a [party]

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 95 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

who executes a settlement agreement pursuant to the advice of independent counsel is presumed to have executed the agreement knowingly and voluntarily." Shepard, 2011 WL 1465995, at *2 (citing Myricks v. Fed. Reserve Bank of Am., 480 F.3d 1036, 1041 (11th Cir. 2007)).

62    "Federal common law may govern a state claim based on a contract with the United States, which was entered into under authority of a federal statute, if a national uniform rule is necessary to further the interests of the federal government." City of Huntsville v. City of Madison, 24 F.3d 169, 172 n.3 (11th Cir. 1994). The Court is aware of no authority mandating the application of "federal common law" to determine the validity of a settlement agreement such as the one embodied by the Stipulated Preliminary Injunction, where the FTC is a party to the agreement. Moreover, it does not appear to the Court that independent federal common law is necessary to protect uniquely federal interests in this matter or to further a uniform national rule. See FTC v. Leshin, 618 F.3d 1221, 1231 (11th Cir. 2010)(applying contract principles to interpret a stipulated injunction entered pursuant to the FTC Act).

*64 Krotzer alleges that the Stipulated Preliminary Injunction was obtained "by intentional infliction of severe economic and emotional duress." Motion to Vacate at 2. " 'Duress is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition.' " Peralta v. Peralta Food, Corp., 506 F. Supp.2d 1274, 1280 (S.D. Fla. 2007)(quoting City of Miami v. Kory, 394 So.2d 494, 497 (Fla. 3d DCA 1981)).

Florida courts have articulated two factors that must coexist when setting aside a contract or settlement on the grounds of duress ... Specifically, "[i]t must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side."

Id. (quoting Kory, 394 So.2d at 497). " '[I]t is not improper and therefore not duress to threaten what one has a legal right to do.' " Id. (quoting Kory, 394 So.2d at 498); see also G.E.E.N. Corp. v. Southeast Toyota Distributors, Inc., No. 93–632–CIV–ORL–19, 1994 WL 695364, at *4–5 (M.D. Fla.

Aug. 31, 1994). Here, Plaintiffs had a legal right to pursue a preliminary injunction. See FTC v. U.S. Oil & Gas Corp., 748 F.2d at 1434–35. The fact that Krotzer faced the possibility of opposing Plaintiffs' Motion for Preliminary Injunction does not create the type of duress necessary to vacate an agreed Stipulated Preliminary Injunction.

Alternatively, "[t]he doctrine of economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure." Amoco Oil Co. v. Gomez, 125 F.Supp.2d 492, 503 (S.D. Fla. 2000). Assuming arguendo that "economic duress" can provide a basis for invalidating a settlement agreement, see Edwards v. Kia Motors of Am., Inc., 486 F.3d 1229, 1235–37 (11th Cir. 2007)(analyzing the defense of economic duress under Alabama law to determine whether release was voidable), establishing economic duress, is "extremely difficult." Amoco Oil, 125 F. Supp.2d at 503. The aggrieved party must show: "(1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." Id. Krotzer has presented no evidence that Plaintiffs, by pursuing a Motion for Preliminary Injunction, were engaged in any "wrongful acts or threats." Moreover, because Krotzer could have opposed the impending Motion for Preliminary Injunction, he had available to him a reasonable alternative to entering into the Stipulation. Accordingly, Krotzer does not establish a basis to invalidate or modify the Stipulated Preliminary Injunction because he entered the agreement under "economic duress."

Additionally, Krotzer contends that he was fraudulently induced to enter into the Stipulated Preliminary Injunction by Plaintiffs' reassurances that he could continue making "minimal health claims," Motion to Vacate at 3–4. Under Florida law, the elements of fraudulent inducement are: "(1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance." Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1315 (11th Cir. 2007) (citing Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla. 4th DCA 2005); and Biscayne Inv. Group, Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So.2d 251, 255 (Fla. 3d DCA 2005)). Again, Krotzer has cited to no evidence of any allegedly false statement made by Plaintiffs' counsel in negotiating the Stipulated Preliminary Injunction. Moreover, even assuming false statements were made, Krotzer, who was represented by his own counsel at the time, has not

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 96 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

established that he was entitled to justifiably rely upon the representations made by Plaintiffs' counsel. See Pettinelli, 722 F.2d at 709–10 (parties in adversarial relationship not entitled to rely upon representations of opposing counsel in settlement negotiations (citing Columbus Hotel Corp. v. Hotel Mgmt. Co., 156 So. 893, 900 (1934)); see also Austin v. Spirit Airlines, Inc., No. 08–60540–CIV–COHN, 2008 WL 4927003, at *2 (S.D. Fla. Nov. 17, 2008)(citing Mergens v. Dreyfoos, 166 F.3d 1114, 1117–18 (11th Cir. 1999)); Somerset Pharms., Inc. v. Kimball, 49 F. Supp.2d 1335, 1340 (M.D. Fla. 1999)("In Mergens, the Eleventh Circuit held that reliance on misrepresentations or omissions by the opposing parties negotiating a settlement agreement in the context of a contentious and adversarial relationship is unreasonable as a matter of law.").

**\*65** Finally, Krotzer argues that he was mistaken as to the meaning of the term "implied" found in the Stipulated Preliminary Injunction, and Plaintiffs' broad construction of that term which he argues reaches beyond Krotzer's understanding of the agreement. Motion to Vacate at 3–4. "[A] unilateral mistake of fact is not a basis for avoidance of a settlement agreement...." Mid–South Towing Co., 733 F.2d at 391. In this vein, " '[a] party to a settlement who has the means in hand of ascertaining the facts, but neglects to use those means cannot thereafter have the settlement set aside because of mistake.' " Peralta, 506 F. Supp.2d at 1283 (quoting Davis v. Huskipower Outdoor Equip. Corp., 936 F.2d 193, 197–98 (5th Cir. 1991)). Krotzer, who says he has a Juris Doctorate degree himself, (see Doc. 17; Motion to Withdraw at 1), was represented by counsel during the negotiations which led to the Stipulated Preliminary Injunction. He later "dismissed his counsel so he could negotiate a Proposed Final Order directly with Plaintiff [sic] counsel that would not be marred by possible communication difficulties, which he feared since Plaintiff FTC steadfastly refused to talk with or confront Defendant." Motion to Vacate at 8. Moreover Krotzer cannot prevail based upon his claim that he did not understand the implication of the terms of the Proposed Preliminary Injunction because of an alleged communications breakdown between Plaintiffs and Krotzer, through Krotzer's former attorney. "[M]ere dissatisfaction with the advice of [an] attorney cannot support a finding that [the] agreement to settle ... was not knowing or voluntary." Shephard, 2011 WL 1465995, at *4; see also Myricks, 480 F.3d at 1041 ("an employee's decision to consult an attorney before signing a clear release creates a presumption that the release is enforceable"); Riley v. Am. Family Mut. Ins. Co., 881 F.2d 368, 373 (7th Cir. 1989)("a plaintiff who executes a release

within the context of a settlement pursuant to the advice of independent counsel is presumed to have executed the document knowingly and voluntarily absent claims of fraud or duress"). Defendant Krotzer is presumed to have known what he was agreeing too, and he has not presented any basis for believing otherwise. Having "paid a high price for this lesson," Motion to Vacate at 11, is not a basis for vacating the Stipulated Preliminary Injunction. The Motion to Vacate (Doc. 56) will be **DENIED**.

Alternatively, Krotzer moves to modify the terms of the Stipulated Preliminary Injunction. [63] Although the Stipulated Preliminary Injunction was agreed to by the parties, for modification purposes, it is treated as a judicial act, as opposed to a contract. Reynolds, 338 F.3d at 1226. If the Stipulated Preliminary Injunction is to be treated similarly to a consent decree, "Rule 60(b) ... allows a district court to modify a consent decree when 'it is no longer equitable that the judgment should have prospective application.' " Id. at 1226 (quoting Fed. R. Civ. P. 60(b)(5) prior to the 2007 Amendment re-wording the provision). However, as previously noted, Krotzer has failed to establish any change in law or factual circumstances, other than that he has discovered that he cannot continue marketing his alcoholism "cure" product. The fact that the Stipulated Preliminary Injunction may have turned out to be disadvantageous to Defendants is not a basis to modify it. Thus, to the extent Defendant's Motion to Vacate seeks to modify the Stipulated Preliminary Injunction, it is due to be **DENIED**.

[63]     This becomes abundantly clear in the context of his response to the Plaintiffs' Motion for Order to Show Cause why Krotzer should not be held in civil contempt for alleged violations of the Stipulated Preliminary Injunction. See Defendant's Response to Motion for Order to Show Cause at 9, 15.

The Stipulated Preliminary Injunction remains in full force and effect.

### B. Plaintiff's Motion To Give Speeches and Publish Books (Doc. 144)

On June 2, 2011, Defendant Krotzer filed a motion entitled Opposed Motion to Permit Unfettered Speaking and Book Writing. (Doc. 144; Motion to Give Speeches and Publish Books). In it, Krotzer asks the Court to give "Krotzer the peace of mind and unfettered freedom to give speeches and publish books describing Molecule Multiplicity and the results of his—500 members, without risking violating the

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 97 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Preliminary Injunction." Id. at 1–2. Alternatively, Krotzer requests that the Court "dismiss the Preliminary Injunction, in whole or in part" as "unconstitutional," or for the grounds set forth in his previous Motion to Vacate. Id. at 2, 11. Krotzer states that he is "nearing completion of a book," and he wishes to speak publically as part of marketing this yet-to-be published book. Id. at 3, 4. He contends that the Stipulated Preliminary Injunction is unconstitutional because it extends an order "enjoining sales of medicines to include preventing Speeches or Books," "chilling" his First Amendment right to free speech. Id. at 6, 10, 13. Krotzer complains that Plaintiffs seek to assert a right to approve speeches, or read any books by Krotzer "before deciding whether to ask the Court to issue a Contempt Order for violation of the Preliminary Injunction." Id. at 9–10.

**\*66** Plaintiffs oppose Krotzer's motion, arguing that Krotzer cannot receive a "guarantee that under no conceivable scenario," he be permitted to publish a book and give speeches. (Doc. 146; Response to Motion to Give Speeches and Publish Books at 1). Plaintiffs argue that Krotzer's motion should be denied because it fails to comply with the Local Rules by not stating a basis for the request or citing legal authority, and because it includes no evidentiary support. Id. at 2.

To the extent Krotzer asks the court to "dismiss" or vacate the Stipulated Preliminary Injunction, the motion is denied, for the reasons already set forth above in connection with Krotzer's Motion to Vacate the Stipulated Preliminary Injunction. Likewise, to the extent Krotzer requests that the Court advise that his yet to be published book and unspecified hypothetical speeches are exempt from the provisions of the Stipulated Preliminary Injunction, the motion must also be denied. While it may be within the discretion of the Court to entertain a petition for modification or construction of an injunction order "in the light of a concrete situation," it may not determine the operation of the Stipulated Preliminary Injunction in the face of a "sterile" or "abstract controversy" such as Krotzer presents here. See Regal Knitwear Co. v. Nat'l Labor Relations Bd., 324 U.S. 9, 15–16 (1945); see Kaimowitz v. The Florida Bar, 996 F.2d 1151, 1153 (11th Cir. 1993)(affirming denial of motion requesting to enjoin The Florida Bar's future interference with attorney's federal court practice, where The Florida Bar had taken no action to do so; "adjudication of the issue would constitute an advisory opinion treating a hypothetical case rather than an actual controversy"); Pac. and Southern Co. v. Duncan, 792 F.2d 1013, 1015 (11th Cir. 1986)(court refuses to alter the wording

of the injunction, and declines to issue an "advisory opinion" to address the "future possibility" that Plaintiff may wish to provide news summaries to clients). The Court declines Krotzer's invitation to enter an advisory opinion as to whether hypothetical situations might be contrary to the Stipulated Preliminary Injunction.

Finally, as to Krotzer's apparent First Amendment challenge to the Stipulated Preliminary Injunction, the government may ban commercial speech which is deceptive and misleading, and "more likely to deceive the public than to inform it." Central Hudson Gas & Electric Corp. v. Pub. Serv Comm'n of N.Y., 447 U.S. 557, 563, 566 (1980); FTC v. Direct Mktg. Concepts, Inc., 648 F.Supp.2d at 213.[64] The provisions of the Stipulated Preliminary Injunction do not raise First Amendment constitutional concerns because they prohibit only the dissemination of deceptive and misleading advertising which, by definition, does not have any First Amendment protection. FTC v. Direct Mktg. Concepts, Inc., 648 F. Supp.2d at 217. Moreover, the Stipulated Preliminary Injunction preserves the distinction between prior restraint of speech before it occurs, which is presumptively unlawful under the First Amendment, and subsequent punishment for deceptive speech. See Alexander v. United States, 509 U.S. 544, 553–54 (1993). Nothing in the Stipulated Preliminary Injunction requires Krotzer to obtain a permit or license or permission from Plaintiffs before he speaks or writes, nor does it suggest outright suppression of all speech on the part of Krotzer. Rather, it prohibits five categories of misleading and deceptive representations; requires clear and conspicuous disclosure of all costs and fees and conditions applicable to the purchase or cancellation of the product or service; prohibits unauthorized billing; and requires cessation of collection efforts. Stipulated Preliminary Injunction at 7–12. It is only after the speech is uttered that, if Krotzer has violated the Stipulated Preliminary Injunction, he may be brought into court by Plaintiffs to face possible subsequent punishment, after a hearing and an opportunity to be heard. Compare Suntrust Bank v. Houghton Mifflin Co., 252 F.3d 1165, 1166 (11th Cir. 2001)(unwarranted grant of preliminary injunction preventing publication of a specified book by copyright infringement defendant amounted to unlawful prior restraint in violation of the First Amendment). Nor is there any evidence that the provisions of the Stipulated Preliminary Injunction burden more speech than necessary to serve the government's significant interest in preventing deceptive and false advertising. See United States v. Kahn, 244 Fed.Appx. 270, 273–74 (11th Cir. 2007)(permanent injunction barring tax consultant from preparing frivolous letters and complaints

to the Internal Revenue Service, falsely advising client, and frustrating federal tax administration was not prior restraint on consultant's speech because the injunction burdened no more speech than necessary to serve significant government interest in administration and enforcement of internal revenue laws). Finally, the Stipulated Preliminary Injunction, entered with the consent of Plaintiffs and Defendant Krotzer, provides that the "Entry of this Order is in the public interest." Stipulated Preliminary Injunction ¶ 9. While not conceding in the Stipulated Preliminary Injunction any liability for the conduct alleged in Plaintiffs' Complaint, Krotzer does acknowledge that the Complaint does state a claim upon which relief may be granted, and that the Plaintiffs have the authority to seek the relief they have requested. Id. at 1 and ¶ 3. Thus, the Stipulated Preliminary Injunction is properly remedial in purpose, and not an improper prior restraint on speech. See Lucero v. Trosch, 121 F.3d 591, 600 (11th Cir. 1997). Accordingly, for these reasons, Krotzer's Motion to Give Speeches and Publish Books (Doc. 144) is due to be **DENIED**.

64    The four-part test to determine whether government regulation of commercial speech is permissible is set forth by the Supreme Court in Central Hudson as follows:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Central Hudson, 447 U.S. at 566. Thus, misleading commercial speech receives no First Amendment protection. FTC v. Direct Mktg. Concepts, Inc., 648 F. Supp.2d at 213.

### C. Plaintiffs' Motion for Order to Show Cause to Hold Defendant Krotzer in Civil Contempt (Doc. 58)

**\*67**  In their Motion, Plaintiffs ask the Court "to issue an order to show cause why Defendant ... Krotzer ... should not be held in civil contempt for multiple violations" of the Stipulated Preliminary Injunction. (Doc. 58; Motion for Order to Show Cause at 1). Krotzer responds in opposition that Plaintiffs have "[o]verly strict interpretations" of the

Stipulated Preliminary Injunction, and that the Injunction was not meant to prevent him from continuing his business, but rather to "to regularize his representations." (Doc. 74; Response to Motion for Order to Show Cause at 3). Krotzer denies Plaintiffs' allegation that he has violated the Stipulated Preliminary Injunction. Id. at 8. He wishes to communicate with "existing customers" and to continue to receive payments from them, contending that "cease collection efforts" does not prohibit him from receiving money from satisfied customers. Id. at 9. He also contends that the Stipulated Preliminary Injunction infringes on his First Amendment right of free speech because, according to Plaintiffs, it prevents Krotzer from "publicly talking about alcohol." Id. at 11; see also id. at 14, 15.

District courts have inherent and statutory power to enforce their Orders and to punish violators for contempt. Roadway Express Inc. v. Piper, 447 U.S. 752, 764–65 (1980). "Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949). "An injunction can be enforced, if necessary, through a contempt proceeding." Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002).

The Stipulated Preliminary Injunction was entered on May 26, 2010. Plaintiffs' Motion was filed on October 21, 2010. Plaintiffs contend that Krotzer's conduct as of that date violated the Stipulated Preliminary Injunction. Plaintiffs cite to a new website, www.guiltfreedrinking.com, ("Guiltfree Website") which was registered on May 26, 2010, by a person named "Magic Krotzer," believed to be Defendant Krotzer's wife, and which is "substantially similar" to the ACF Website challenged in the Complaint. The Guilt Free Website, though shorter, with six pages and 42 hyperlinks, has many of the same features, photographs and representations as the ACF Website. Motion for Order to Show Cause at 1, 4–8, 10–15; Henry 1st Decl. ¶¶ 26, 28–34. Plaintiffs also contend that Krotzer has made other violative representations on other websites, www.dougkrotzer.com, and www.linkedin.com. Motion for Order to Show Cause at 1, 4–8, 10–15. Plaintiffs cite to e-mail correspondence by Krotzer, dated June 26, 2010, July 27, 2010, and August 24, 2010, as support for their argument that Krotzer has contacted consumers for both advertising and debt collection purposes, in violation of the Stipulated Preliminary Injunction. Id. at 1, 16. Plaintiffs seek an Order requiring "a daily fine" of $1,000.00 to

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 99 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

coerce Krotzer's compliance and that Krotzer "redress to all consumers injured by Defendant's violations." Id. at 1–2, 21.

As set forth above, the Court has determined that the Plaintiffs are entitled to summary final judgment on Counts I through VII of the Complaint against Defendant Krotzer. Now that liability has been determined, the Court will enter the remedial phase of this litigation. Among the possible remedies to be considered, are: permanent injunction, freezing of Defendants' assets, and awarding consumers redress or restitution. E.g. FTC v. USA Financial, LLC, 2011 WL 679430, at *3–4; FTC v. RCA Credit Servs., LLC, 727 F. Supp.2d at 1335–40.

In light of the current posture of this case, the fact that the Stipulated Preliminary Injunction remains in place, and the time that has passed since the filing of Plaintiffs' Motion for Order to Show Cause and the basis therefore, the Court determines that the better course at this time is to deny Plaintiffs' Motion for Order to Show Cause without prejudice. If Plaintiffs believe it necessary to file an updated Motion for Order to Show Cause, they may do so, with supporting citation to alleged violations of the Stipulated Preliminary Injunction, and to a basis for the remedies sought. Krotzer is cautioned that, in the interim, the Court intends for the mandates of the Stipulated Preliminary Injunction to be followed strictly. To the extent the findings in this Order assist Krotzer in interpreting the Stipulated Preliminary Injunction, he should carefully review it. The Court will not hesitate to find Krotzer in civil contempt if he chooses to disregard the Court's mandate.

## VII. Remedies

**\*68** Having concluded that judgment should be entered in favor of Plaintiffs and against Defendant Krotzer on all claims and affirmative defenses, the Court must now determine the appropriate remedies. In their Complaint, Plaintiffs seek a permanent injunction against ACF and Krotzer, an award to redress consumers for injuries resulting from Defendants ACF and Krotzer's violations of the FTC Act and FDUPTA, "including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies," and costs of bringing this action. Complaint at 26.

In their Motion for Summary Judgment, Plaintiffs argued for entry of a permanent injunction with "broad fencing-in provisions" that would reach "other health-related claims." Motion for Summary Judgment at 28. Plaintiffs contend

that the "appropriate measure for redress is the aggregate amount paid by consumers less refunds made by Defendants." Id. at 29 (citing FTC v. Nat'l Urological Group, 645 F. Supp.2d at 1212 and FTC v. SlimAmerica, 77 F. Supp.2d at 1276). Plaintiffs cite to evidence in the record that indicates that "Krotzer, alone and with ACF, took in $732,480 from consumers." Id. Krotzer responds that should he be found to be liable, he "hopes for a token penalty" that rejects Plaintiffs' " 'fencing out' " provisions which he contends would deny him reasonable job prospects AND assure no legitimate scientist, responsible corporation, foundation or government will help him ...." Defendant's Response to Plaintiff's Motion for Summary Judgment at 7.

The parties have not fully briefed the issue of remedies. Issues which remain pending include whether permanent injunction should be entered, and if so, the scope of that permanent injunction; the proper baseline amount of Defendants' unjust gains; what reductions, if any, are appropriate when calculating Defendants' ultimate liability; the proper amount of equitable restitution or disgorgement; whether the Court should order an asset freeze; future monitoring; and costs recoverable by Plaintiffs. "To calculate the appropriate size of disgorgement relief, a district court must engage in a two-step burden shifting analysis. The FTC must first 'show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate.' " FTC v. QT, Inc., 448 F. Supp.2d at 974 (quoting FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997)). The burden for showing the amount of assets subject to disgorgement is light: "a reasonable approximation of a defendant's ill-gotten gains is required.... Exactitude is not a requirement." FTC v. Bishop, No. 10–10715, 2011 WL 1560656, at *1 (11th Cir. April 25, 2011)(citation and internal quotations omitted).

In consideration of the state of the record, the Court will require additional briefing to address the appropriate remedies in this case. Plaintiffs shall file their Motion for Remedies, setting forth legal and factual support for remedies sought, and including a proposed permanent injunction order, no later than **October 31, 2011**. Defendant shall file his response no later than **November 25, 2011**. [65]

[65]  Additionally, now that liability has been determined as to Defendant Krotzer, Plaintiffs may re-file their Motion for Entry of Default Judgment

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 100 of 192

Federal Trade Commission v. Alcoholism Cure Corporation, Not Reported in Fed....

2011 WL 13137951

Against Defendant Alcoholism Cure Corporation. (See Doc. 141; 5/10/11 Order).

Upon due consideration, and for the foregoing reasons, it is hereby

**ORDERED**:

1. The Stipulated Order For Preliminary Injunction (Doc. 12–1) remains in **full** force and effect.

**\*69** 2. Defendant's Opposed Motion to Vacate Preliminary Injunction Stipulated Under False Pretenses and Without Statutory Authority Or Jurisdiction. Alternatively Request For Order Interpreting The Injunction (Doc. 56; Motion to Vacate) is **DENIED**.

3. Plaintiffs' Motion For An Order To Show Cause Why Defendant Robert Douglas Krotzer Should Not Be Held In Civil Contempt, And Memorandum In Support (Doc. 58; Motion for Order to Show Cause) is **DENIED WITHOUT PREJUDICE**.

4. Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law; Oral Hearing Requested (Doc. 96; Defendant's Motion for Summary Judgment) is **DENIED**.

5. Plaintiffs' Motion To Strike Added Text And Certain Exhibits To Defendant Krotzer's "Amendment & Corrected Emergency Dispositive Motion #1: Summary Judgment, Failure To State A Claim, And Judgment As A Matter Of Law" (Doc. 99; Plaintiffs' Motion to Strike) is **GRANTED IN PART, AND DENIED IN PART**.

6. Plaintiffs' Motion For Summary Judgment And Memorandum In Support, Dispositive Motion (Doc. 123; Plaintiffs' Motion for Summary Judgment) is **GRANTED** as to liability.

7. Defendant's Motion To Strike Plaintiffs' Amended Documents (Doc #126, #128) (Doc. 131; Defendant's Motion to Strike) is **DENIED**.

8. Plaintiffs' Amended Motion To Strike The Affidavit Of Carl Edwards Filed By Defendant Robert Douglas Krotzer

(Doc. 135; Plaintiffs' Motion to Strike Edwards' Affidavit) is **DENIED WITHOUT PREJUDICE**.

9. Defendant's Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice—Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology (Doc. 140; Krotzer's Second Motion for Summary Judgment) is **DENIED AS MOOT**.

10. Plaintiffs' Motion To Strike Defendant Robert Douglas Krotzer's "Dispositive Motion #2: One Piece Of Paper Capsulizes Injustice—Need For Defendant's Judgment Without Delay Criticality Continues: Welfare will not fund advance of groundbreaking technology" (Doc 142; Plaintiffs' Motion to Strike Krotzer's Second Motion for Summary Judgment) is **DENIED AS MOOT**.

11. Plaintiffs' Motion To Exclude The Proffered Expert Testimony Of Defendant Robert Douglas Krotzer And Carl Edwards, And Memorandum In Support (Doc. 143; Plaintiffs' Motion to Exclude Krotzer and Edwards Expert Testimony) is **DENIED WITHOUT PREJUDICE**.

12. Defendant's Opposed Motion To Permit Unfettered Speaking And Book Writing (Doc. 144; Plaintiff's Motion To Give Speeches and Publish Books) is **DENIED**.

13. Plaintiffs may re-file their Motion for Entry of Default Judgment Against Defendant Alcoholism Cure Corporation.

14. Plaintiffs Federal Trade Commission and Office of the Attorney General, Department of Legal Affairs, State of Florida shall file their Motion for Remedies, setting forth legal and factual support for remedies sought, and including a proposed Permanent Injunction order, no later than **October 31, 2011**. Defendant Robert Douglas Krotzer shall filed his response no later than **November 25, 2011**.

**DONE AND ORDERED** in Jacksonville, Florida, this 16th day of September, 2011.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13137951

E

2016 WL 10654030
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
AMAZON.COM, INC., Defendant.

CASE NO. C14-1038-JCC
|
Signed 04/26/2016
|
Filed 07/22/2016

**Attorneys and Law Firms**

Jason Adler, Duane C. Pozza, Heather Allen, Helen P. Wong, Jane M. Ricci, Katharine Roller, Miya Sarah Tandon, Federal Trade Commission, Washington, DC, Laura Marie Solis, Federal Trade Commission, Seattle, WA, for Plaintiff.

Danielle R. Foley, J. Douglas Baldridge, Venable LLP, Washington, DC, James C. Grant, John Goldmark, Davis Wright Tremaine, David J. Burman, Eric J. Weiss, Harry H. Schneider, Jr., Jeffrey M. Hanson, Perkins Coie, Seattle, WA, for Defendant.

ORDER GRANTING AMAZON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING THE FTC'S MOTION FOR SUMMARY JUDGMENT

**REDACTED**

John C. Coughenour, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court on Amazon's Motion for Partial Summary Judgment (Dkt. Nos. 92 and 93), the FTC's Response (Dkt. Nos. 156 and 158), Amazon's Reply in Support (Dkt. Nos. 188 and 189), the FTC's Motion for Summary Judgment (Dkt. Nos. 109 and 138), Amazon's Opposition (Dkt. Nos. 167 and 179), and the FTC's Reply (Dkt. Nos. 182 and 184). The Court held oral argument on the FTC's Motion on Thursday, April 21, 2016.

Having thoroughly considered the parties' briefing, argument, and the relevant record, the Court hereby GRANTS Amazon's Motion with respect to injunctive relief, and GRANTS the FTC's Motion with respect to liability. The Court ORDERS further briefing with respect to the appropriate remedy.

**I. BACKGROUND**

**A. In-App Purchases**

Defendant Amazon.com, Inc. ("Amazon") operates an Appstore in which customers can view and download apps to use on Android mobile devices or Kindle Fire tablets. (Dkt. No. 1 at 3.) Apps take many forms, but include functions that allow users to read books, play games, stream movies, check weather, and organize files. (Dkt. No. 1 at 3; Dkt. No. 15 at 2.) Apps may be free or come at a cost to download and install. (Dkt. No. 15 at 3.) Certain user activities within some apps also come with monetary charges, starting at $0.99 and ranging up to $99.99. (*Id.*) These charges are known as "in-app purchases." (*Id.*) Amazon started charging customers for "in-app purchases" or "IAPs" in November 2011. (*Id.*)

While the app developers set the price for apps and in-app purchases, Amazon retains 30% of the revenue from every in-app sale. (Dkt. No. 1 at 4; Dkt. No. 15 at 3.)

Many apps geared towards children, and likely to be used by children, offer in-app purchases. (Dkt. No. 15 at 2-3, 7.) For example, a child may be prompted to use or acquire seemingly-fictitious currency, including a "boatload of doughnuts, a can of stars, and bars of gold," but in reality the child is making an in-app purchase using real money. (Dkt. No. 100 at 11.) In fact, in developing its Kindle Fire tablet, Amazon identified "soccer parents" as a key target customer base, referring to them as "low-hanging fruit." (Dkt. No. 121 at 8; *see also* Dkt. No. 122 at 3.)

Moreover, the evidence demonstrates that Amazon was aware that many customers did not understand in-app purchases when they were first implemented. In a confidential document regarding Amazon's marketing plan for launching in-app purchases, the company acknowledged that " 'IAP' isn't a concept widely known by customers." (Dkt. No. 120 at 5.) And, despite its assertion that "[c]ustomers are not looking for apps based on how much they cost," the company was aware that customers' top searches in selecting apps indicate that customers were seeking free apps to use. (*Id.* at n. 2; five of the top searches included the word "free.") Amazon was aware that in many instances, the person initiating the in-app purchase was a child: in a document discussing company strategy to promote increases in in-app purchasing, Amazon acknowledged "the disconnect between the account owner

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 103 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

(e.g., parent) and the app user (e.g., child)." (Dkt. No. 118 at 7.) On February 11, 2011, Amazon Appstore Director Aaron Rubenson forwarded an article discussing scrutiny that Apple faced for enabling children to accrue in-app purchases to Johanna May, who was working on designing the IAP user experience. (Dkt. No. 127 at 158.) Rubenson said to May, "We need to think this through for our IAP implementation." (Dkt. No. 115 at 10.)

**\*2** When Amazon's Appstore first implemented in-app purchases in November 2011, the default setting did not require account holder approval, by entry of a password or any other means, prior to completion of an in-app purchase. (Dkt. No. 127 at 160, 180.) Only if a customer had previously enabled parental controls would the IAP require entry of a pin code or password. (Dkt. No. 127 at 161.) As one Amazon employee explained, "If a parent gives the device to a child and the child is playing the game and they—they just decide, you know, outside of the parent's view or whatever, to purchase, they could do that." (Dkt. No. 181 at 304.)

In the Amazon Appstore, individual apps were displayed using what is called a "detail page," containing information relating to the app. (Dkt. No. 15 at ¶ 14; Dkt. No. 1 at ¶ 14.) When in-app purchases were launched in November 2011, the detail page looked like this:



(*See* Dkt. No. 100 at 3.) A button below the name of the app in the upper-left corner included the price of the app download: either "FREE" or a set dollar amount. (*Id.*) The price button itself did not acknowledge the existence of in-app charges. (*Id.*) Underneath the header, "Description" was a long note providing more information about the app. While the "Note" included more information about the presence of in-app purchases, a user often had to scroll "below the fold" to read it:



(*Id.* at 4-5.) Within the Note is language, about two-thirds of the way towards the bottom, beginning, "PLEASE NOTE." Prior to October 2012, the insertion of this language, warning users that the app enables users to "purchase digital content using actual money," was inserted manually and in some instances omitted altogether. (Dkt. No. 127 at 299-300.) After making an in-app purchase, Amazon customers were always notified via an e-mail. (*See, e.g.,* Dkt. No. 181 at 305.)

**B. Fallout from In-App Purchases Made By Children**

Amazon has received many complaints from adults who were surprised to find themselves charged for in-app purchases made by children. By December 2011, Aaron Rubenson referred to the amount of customer complaints as "near house on fire." (Dkt. No. 115 at 19.) Rubenson also referred to "accidental purchasing by kids" as one of two issues the company needed to solve. (*Id.*) Rubenson additionally stated that "we're clearly causing problems for a large percentage of our customers." (*Id.* at 14.) In the first two months of the Amazon Appstore offering IAPs, Amazon received [redacted text] customer service contacts requesting refunds for IAPs. (Dkt. No. 122 at 16.) The "primary root of the contacts was accidental purchases due to parent control issues." (*Id.* at 14.)

In March 2012, Amazon introduced a password prompt feature for in-app charges of $20 or more. (*See* Dkt. No. 1 at ¶ 20, Dkt. No. 15 at ¶ 20.) This initial step did not include charges below $20 or charges that, in combination, exceeded $20. (Dkt. No. 127 at 169-170; Dkt. No. 115 at 13.)

In August 2012, the FTC notified Amazon that it was investigating its in-app billing practices. (Dkt. No. 158 at 7; Dkt. No. 215 at 3; Dkt. No. 216 at 2.) In February 2013, in response to this investigation and high refund rates, Amazon began to require password prompts more frequently, though not consistently. (Dkt. No. 15 at ¶ 21.) Passwords became required when: a purchase over $20 was initiated, a second IAP purchase attempt was made within five minutes of a first,

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 104 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

and when parental controls were enabled. (Dkt. No. 124 at 15.) And once a password was entered, in-app purchases were often then authorized for the next sixty minutes. (Dkt. No. 15 at ¶ 21.) The fact that one password entry authorized in-app purchases for an additional window of time was not explained during the process. (Dkt. No. 127 at 117.) When asked in a Rule 30(b)(6) deposition whether the rules regarding when password prompts appeared was likely "transparent to consumers," Aaron Rubenson said, "they are not." (Dkt. No. 127 at 126.)

**\*3** In October 2012, Amazon released software entitled Kindle FreeTime, which allowed parents to control tablet usage by children in a variety of ways. (Dkt. No. 95 at 7.) Within Kindle FreeTime, in-app purchasing was disabled. (*Id.*) FreeTime was available on Kindle Fire tablets sold after September 2012. (*Id.*)

In March 2013, Amazon developed a list of "High-Risk Apps," those that had a refund rate of greater than 15 percent of its revenue, and those that were targeted at children. (Dkt. No. 127 at 114-115.) In-app purchases in High-Risk Apps then required entry of a password. (Dkt. No. 124 at 15.)

In May 2013, Amazon added a password requirement for all first-time in-app purchases on Kindle Fire tablets. (Dkt. No. 95 at 8.) The prompt is pictured below:



(Dkt. No. 97 at 103.) The prompt refers to authorization of a singular "in-app purchase."

In June 2013, Amazon changed the configuration of the AppStore so that the words "In-App Purchasing" would appear on an app's description page:



(Dkt. No. 200 at 6.) The words, "In-App Purchasing" are smaller than the remainder of the text on the screen and in the same font and color. Notably, though the words "In-App Purchasing" represented a clickable hyperlink which users could click on to learn more about in-app charges, the lettering is not presented in such a way as to make that obvious, such as setting the words in a different color or underlining them.

In June, after the FTC announced a settlement with Apple regarding its in-app purchases, Amazon refined its password prompt for first-time in-app purchases to be consistent with the terms of the Apple settlement. (Dkt. No. 95 at 9.) This new prompt enabled customers to select whether they would like to require a password for future IAPs:



To date, Kindle devices of the "First Generation," for which software updates are no longer available, enable customers to

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 105 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

make in-app purchases of $1 or less without authorization via entry of a password. (Dkt. No. 160 at 4-6.)

#### C. The Total Damage

The FTC has calculated its estimate of consumer damages due to unauthorized billing on in-app purchases. As discussed below, Amazon objects to the inclusion of the declarations of Julie Miller, the FTC employee who summarized and assessed the damages data as untimely and/or speculative. Amazon's objections are unwarranted.

To reach its estimate, the FTC summarized transactional and aggregate data produced by Amazon pertaining to "High-Risk" Apps. In so doing, The FTC omitted apps with the category "Casino," and added other apps that "would have qualified as High-Risk" before April 2013 ("High-Risk Non-Casino apps"). (Dkt. No. 110 at 2.) Julie Miller, a lead FTC data analyst, calculated the total in-app purchase revenue and refund amounts for seven different categories: (1) orders of $20 or more in High-Risk Non-Casino apps from the earliest date available to March 25, 2012,[1] (2) orders of $19.99 and below in High-Risk Non-Casino apps from the earliest date available to February 5, 2013, (3) orders of $19.99 and below in High-Risk Non-Casino apps from February 6-April 30, 2013 excluding those on the "Otter" device, (4) orders of $19.99 and below in High-Risk Non-Casino apps from May 1-July 30, 2013 excluding those on the Otter device, (5) orders of $19.98 and below in High-Risk Non-Casino apps from July 31, 2013-June 3, 2014 excluding those on the Otter device, (6) orders of $19.99 and below in High-Risk Non-Casino apps from February 6-October 9, 2013 on the Otter device, and (7) orders of $0.99 and below in High-Risk Non-Casino apps from October 10, 2013 to the latest date available on the Otter device. (*Id.*) These categories were selected in order to omit authorized charges. This calculation gave Ms. Miller a total of charges made without authorization by password. Ms. Miller calculated [redacted text] in revenue and also found that [redacted text] was provided in refunds. (Dkt. No. 110 at 3.)

[1]    As discussed above, Amazon began to require a password entry for all purchases of $20 or more in March 2012. (Dkt. No. 1 at ¶ 20, Dkt. No. 15 at ¶ 20.)

**\*4** Ms. Miller then calculated an "unauthorized charge rate," the rate at which users failed to properly enter a password in initiating an in-app purchase as a percentage of the overall total of password entry attempts. (Dkt. No. 110 at 4.) The

FTC argues that "[t]he rate at which users faced with such [password entry] prompts in a kids' app failed to enter the correct password *and* abandoned the charge attempt ... is a reasonable proxy for the rate at which children would incur an in-app charge without consent when a password entry was *not* required." (Dkt. No. 182 at 18.) Ms. Miller identified the unauthorized charge rate as [redacted text] (*Id.*)

By applying the unauthorized charge rate to the total un-refunded revenue, and revising in light of charges that were later deemed to have been authorized, the FTC estimates the total customer injury as $26,242,025.30. (Dkt. No. 183 at 2.)

#### D. The Present Litigation

The Federal Trade Commission ("FTC") brings suit against Amazon, alleging that the billing of parents and other account holders for in-app purchases incurred by children "without having obtained the account holders' express informed consent" is unlawful under Section 5 of the FTC Act, 15 U.S.C. § 45(n). (Dkt. No. 1 at 11.) The FTC argues, on summary judgment, that there is no remaining genuine dispute of material fact as to whether Amazon's billing practices for in-app purchases violated the FTC Act and seeks monetary and injunctive relief. (Dkt. No. 109.) Amazon also moves for partial summary judgment, solely over the FTC's request for injunctive relief. (Dkt. Nos. 92 and 93.)

## II. DISCUSSION

#### A. Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248-49. Ultimately, summary judgment is appropriate against a party who "fails

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 106 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

Contrary to Amazon's assertion, the material facts on record are not in meaningful dispute. Amazon's dispute pertains to whether the facts in the present case constitute an unfair practice under Section 5 of the FTC Act.

**B. Injunctive Relief**

The Court first turns to Amazon's Motion for Partial Summary Judgment. In its Complaint, the FTC seeks permanent injunctive relief, asserting that, absent such relief, Amazon "is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest." (Dkt. No. 1 at 11.) Such injunctive relief is authorized under Section 13(b) of the FTC Act. 15 U.S.C. § 53(b) ("in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."). The injunction sought would subject Amazon to government oversight for twenty years. (Dkt. No. 188 at 4.)

**\*5** A court may permanently enjoin defendants from violating the FTC Act where there exists "some cognizable danger of recurring violation." *FTC v. Gill,* 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999), *aff'd,* 265 F.3d 944 (9th Cir. 2001) (citing *United States v. W.T. Grant,* 345 U.S. 629, 633 (1953)). "The determination that such danger exists must be based on appropriate findings supported by the record." *United States v. Laerdal Mfg. Corp.,* 73 F.3d 852, 854 (9th Cir. 1995) (internal citation omitted).

Past violations of the FTC Act do not justify the imposition of a permanent injunction. *United States v. ACB Sales & Serv., Inc.,* 683 F. Supp. 734, 741 (D. Ariz. 1987) (citing *FTC v. Evans Products Co.,* 775 F.2d 1084, 1087 (9th Cir. 1985)). However, the Court may consider past conduct in determining the likelihood of a future, recurring violation. *FTC v. Sharp,* 782 F. Supp. 1445, 1454 (D. Nev. 1991) (citing *C.FTC v. Co. Petro Marketing,* 502 F.Supp. 806, 818 (C.D. Cal. 1980), *aff'd,* 680 F.2d 573 (9th Cir. 1981)). "In drawing the inference from past violations that future violations may occur, the Court should look at the 'totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.' " *Id.*

The FTC correctly asserts that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case ..." *FTC v.*

*Affordable Media, LLC,* 179 F.3d 1228, 1238 (9th Cir. 1999) (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 203 (1968)). However, the Court's inquiry upon Amazon's motion for partial summary judgment hinges upon whether the FTC has established, with evidence, a cognizable danger of a recurring violation: not whether Amazon has met a mootness burden. *See, e.g., Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1182 n. 10 (11th Cir. 2007) ("To be sure, the analysis of whether a case is moot overlaps with the analysis of whether a permanent injunction is appropriate on the merits because both are concerned with the likelihood of future unlawful conduct. But the two inquiries are strikingly different.").

While permanent injunctions are often awarded in cases where liability under the FTC Act is determined, Amazon correctly distinguishes those cases from the facts of this case. For example, in *FTC v. Gill,* the Ninth Circuit upheld a permanent injunction where defendants engaged in continuous, fraudulent practices and were deemed likely to reoffend based on the "systemic nature" of their misrepresentations. 265 F.3d 944, 950, 957 (9th Cir. 2001). Other cases in which a permanent injunction has been entered involved deceptive, ongoing practices. *See FTC v. Loewen,* 2013 WL 5816420, at \*7 (W.D. Wash. Oct. 29, 2013); *FTC v. Commerce Planet, Inc.,* 878 F. Supp. 2d 1048, 1086 (C.D. Cal 2012), *aff'd in part and reversed on other grounds,* 815 F.3d 593 (9th Cir. 2016); *FTC v. Inc21.com Corp.,* 745 F. Supp. 2d 975, 1010 (N.D. Cal. 2010).

The only potential ongoing violation of the FTC Act alleged is the fact that Amazon customers are still billed for in-app purchases under $1 without authorization on First Generation Kindle devices. The First Generation Kindle has not been sold since August 2012. (Dkt. No. 94 at 7.) The First Generation Kindle no longer receives software updates. (*Id.*) And the total in-app purchases for 99-cent items on the First Generation Kindle are, all told, very low. For each month since August 2015, the total refunds for such purchases have been [redacted text] (Dkt. No. 168 at 28.) Similarly, the total number of users making in-app purchases for 99-cents on First Generation Kindles has been steadily declining. (*Id.*)

**\*6** While unauthorized billing of customers, even for small purchases, constitutes part of the substantial harm that Amazon caused customers, and for which monetary damages should be assessed, the Court does not find this to represent a cognizable danger of a recurring violation. Accordingly, the Court finds that injunctive relief is not warranted here, and

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

GRANTS Amazon's Motion for Partial Summary Judgment (Dkt. Nos. 92 and 93.)

## C. Liability Under the FTC Act

The Court now turns to the FTC's Motion for Summary Judgment and Amazon's opposition. The FTC presents strong support for its entitlement to judgment as a matter of law. In opposition, Amazon argues that (1) the FTC is applying the wrong legal test for unfair business practices, (2) the witness employed by the FTC to calculate money damages was not timely disclosed and therefore her testimony should not be admitted or considered, and (3) its business practices around in-app purchases did not violate Section 5.

### 1. Proper Test for Liability Under the FTC Act

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Acts or practices are considered unfair if (1) they cause or are likely to cause substantial injury to consumers, (2) the injury is not reasonably avoidable by consumers, and (3) the injury is not outweighed by any countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

Amazon classifies the three-part test for unfair business practices as a "necessary but not sufficient prerequisite[ ] for unfairness." (Dkt. No. 179 at 10.) However, Amazon does not point the Court towards any concrete additional factors to incorporate into its review for unfairness. Rather, in its effort to urge the Court to adopt a more searching inquiry under 15 U.S.C. § 45(n), Amazon cites to a Third Circuit case in which the defendant suggested additional requirements for a practice to be deemed "unfair," such as unscrupulous or unethical behavior, and the court declined to adopt those additional requirements. *FTC v. Wyndham,* 799 F.3d 235, 244 (3rd Cir. 2015).

While accusing the FTC of adopting an expanded version of the FTC Act, it is Amazon that advocates for a new, more searching, definition of "unfair" practices. (*See* Dkt. No. 179 at 1.) The three-part test for whether a practice is "unfair" under the FTC Act, found in the statute itself, is followed without embellishment by courts in this Circuit. *See FTC v. Neovi, Inc.,* 604 F.3d 1150, 1153 (9th Cir. 2010); *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012). The Court follows suit in its analysis below.

### 2. Ms. Miller's Declaration/Testimony

As another preliminary matter, Amazon objects to the testimony of Ms. Miller, who calculated the damages estimates, claiming that (1) she was not timely disclosed as a witness and (2) that her statements are based on inadmissible conjecture. (Dkt. No. 179 at 16-21.)

#### a. Timeliness of Disclosure

First, Amazon argues that Ms. Miller was disclosed as a witness after the discovery cutoff. (Dkt. No. 179 at 17; Dkt. No. 172 at 2.) The calculated damages estimate was disclosed to Amazon on January 7, 2016. (Dkt. No. 172 at 2, 26-27.) The discovery cut-off date was originally September 28, 2015 (Dkt. No. 23), but after considering several discovery disputes, the Court extended it to December 23, 2015.[2] (Dkt. No. 77.)

> [2] While the Court extended the discovery cutoff pursuant to several motions, it did not specify that the extension of the cut-off was limited in any way.

**\*7** However, the FTC has made its intentions to seek monetary relief known since the beginning of this case. In September 2014, in its initial disclosures, the FTC identified monetary relief as "all charges consumers incurred in connection with [Amazon's] unfair billing practices, less any such charges that [Amazon] has already refunded." (Dkt. No. 172 at 33.) On November 6, 2014, the FTC requested, via interrogatories, the data upon which the damages calculations would be based. (*Id.*) Amazon objected and did not provide the information. (*Id.*) This request was eventually the subject of a motion to compel (Dkt. No. 24) which the Court granted (Dkt. No. 48.) On August 3, 2015, the Court ordered Amazon to provide the charge data by August 18, 2015. (Dkt. No. 48 at 5.) Amazon did not provide this data until nearly two months later on October 14, 2015. (Dkt. No. 172 at 34.)

A party must make its initial disclosures "based on the information then reasonably available to it," including those pertaining to the calculation of relief. Fed. R. Civ. P. 26(a)(1)(E). Moreover, "a party is not expected to provide a calculation of damages which depends on information in the possession of another party or person." *United States ex rel. Parikh v. Premera Blue Cross,* 2006 WL 2927609, at \*1 (W.D. Wash. Oct. 11, 2006) (quoting Fed. R. Civ. P. 26(a) advisory committee's note). Not only did the FTC make its intent to calculate damages roughly using Ms. Miller's methods well known, but it was Amazon's own delay in turning over the data that contributed to the timing of the disclosure of a more specific damages estimate. In short, the Court does

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 108 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

not exclude Ms. Miller's declaration for a lack of timeliness. The two-week "delay" in disclosure of the FTC's damages estimate was substantially justified.

Finally, the FTC classifies Ms. Miller's declaration as a summary of data provided by Amazon, permissible under Fed. R. Evid. 1006. (Dkt. No. 184 at 20.) This is a fair assessment, given that Ms. Miller does not offer additional facts or opinion evidence but simply ran calculations from data that Amazon provided. (*See* Dkt. Nos. 99, 157, 159, 183.)

### b. Ms. Miller's Methods

Next, Amazon argues that Ms. Miller's estimate is so "fundamentally flawed" as to not be able to support a finding of substantial injury. (Dkt. No. 179 at 18.) In so arguing, Amazon primarily takes issue with Ms. Miller's calculation of an "Unauthorized charge rate." (*Id.*) In dividing the number of password entry "failures" and dividing that by the total number of password prompts presented, the FTC argues that it identified a "reasonable proxy for the rate at which children would incur an in-app charge without consent .. when password entry was *not* required." (Dkt. No. 184 at 18.) Amazon asserts that this rate calculation "assumes that every single password failure was an attempt by a child that would otherwise have been a completed in-app purchase." (Dkt. No. 179 at 18.) This point is well taken: many password "failures" could have occurred because the user got distracted, changed his or her mind, or simply could not remember their password. However, it is reasonable to assume that of the group of users faced with a password prompt who ultimately failed to provide a password, many *were* children who, absent a password prompt, would have gone on to complete an in-app purchase.

The FTC's burden is to "reasonably approximate" monetary relief. *FTC v. Inc12.com Corp,* 475 Fed.Appx. 106, 110 (9th Cir. 2012); *see also FTC v. Febre,* 128 F.3d 530, 535 (7th Cir. 1997) ("The Commission must show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate.") (citing *SEC v. Lorin,* 76 F.3d 458, 462 (2nd Cir. 1996)); *United States Department of Housing & Urban Development v. Cost Control Marketing & Sales Mgmt. of Virginia, Inc.,* 64 F.3d 920, 927 (4th Cir. 1995); *FTC v. Direct Mktg. Concepts, Inc.,* 648 F. Supp.2d 202, 214 (D. Mass. 2009), *aff'd,* 624 F.3d 1 (1st Cir. 2010); *FTC v. Verity Intern., Ltd.,* 443 F.3d 48, 69 (2nd Cir. 2006).

**\*8** Considering that the FTC took reasonable measures to determine the rate of unauthorized charges and applied that rate to actual charges that occurred without a password prompt, this is a reasonable approximation based on the available data. However, the Court concludes that the unauthorized charge rate of [redacted text] is too inflated to be used in determining final money damages. As discussed below, further briefing will assist the Court in determining a more appropriate money damages award to enter in this case.

### 3. Liability Under 15 U.S.C. § 45(n)

Turning now to the three-part test for an "unfair practice" under 15 U.S.C. § 45(n), the Court finds that all three portions of the test are satisfied by the FTC's evidence. The Court reviews Amazon's billing practices around in-app purchases to determine whether (1) they caused (or were likely to cause) substantial injury to consumers, (2) that injury was not reasonably avoidable by consumers, and (3) the injury was not outweighed by any countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### a. Substantial Injury

An act or practice may cause substantial injury either by doing "small harm to a large number of people, or if it raises a significant risk of concrete harm." *FTC v. Neovi, Inc.,* 604 F.3d 1150, 1157 (9th Cir. 2010). Consumer injury can occur in "a variety of ways." *Id.* at 1156. While courts should look to any deception on the part of businesses, "the absence of deceit is not dispositive." *Id.* Nor is actual knowledge on the part of the consumer a requirement to establish substantial harm. *Id.* Injury can be shown where consumers are "injured by a practice for which they did not bargain." *Neovi,* 604 F.3d at 1157.

Courts have repeatedly held that billing customers without permission causes injury for the purposes of asserting a claim under Section 5 of the FTC Act. *See, e.g., Neovi,* 604 F.3d. at 1153; *FTC v. Ideal Fin. Solutions, Inc.,* 2014 WL 2565688, at *5 (D. Nev. June 5, 2014); *FTC v. Commerce Planet, Inc.,* 878 F. Supp. 2d 1048, 1078 (C.D. Cal. 2012); *FTC v. Inc21.com Corp.,* 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd,* 475 Fed.Appx. 106 (9th Cir. 2012); *FTC v. Crescent Publ'g Group, Inc.,* 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001); *FTC v. J.K. Publications, Inc.,* 99 F. Supp. 2d 1176, 1191-1192 (C.D. Cal. 2000); *FTC v. Willms,* 2011 WL 4103542, at *9 (W.D. Wash. Sept. 13, 2011); *FTC v. Kennedy,* 574 F. Supp. 2d 714, 719-720 (S.D. Tex. 2008).

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 109 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

The millions of dollars billed to Amazon customers without a mechanism for consent, the thousands of customers complaining about unauthorized charges, and the time spent seeking refunds for those charges, all demonstrate substantial injury. Amazon argues that because of its liberal practices around providing refunds, its customers were not injured. Amazon's argument conflates complaints with the total universe of injury. However, given the design of the Appstore and procedures around in-app purchases, it is reasonable to conclude that many customers were never aware that they had made an in-app purchase. Moreover, regardless of its reputation for customer service, it is Amazon's stated policy that in-app purchases are final and non-refundable, likely discouraging much of its customer base from attempting to seek refunds in the first place. (*See* Dkt. No. 127 at 275.) ("Yeah, that's the—that's our official policy, is digital content's not refundable.")

Finally, the time spent pursuing those refunds constitutes additional injury to Amazon's customers. *Neovi,* 598 F. Supp. 2d 1104 at 1115 (noting that "harm need not be monetary to qualify as injury" and finding that time consumers spent contesting unauthorized checks and "attempting to get their money back" contributed to substantial injury).

### b. Reasonably Avoidable

**\*9** An injury is reasonably avoidable under Section 5 of the FTC Act if the consumer could have made a "free and informed choice" to avoid it. *Neovi,* 604 F.3d at 1158. Amazon contends that its customers could have mitigated damages either before an in-app purchase through parental controls, or afterwards by pursuing a refund.

An injury is reasonably avoidable if consumers "have reason to anticipate the impending harm and the means to avoid it," or if consumers are aware of, and are reasonably capable of pursuing potential avenues toward mitigating the injury after the fact. *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1168-69 (9th Cir. 2012) (citing *Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1365-66 (11th Cir. 1988); *Neovi,* 604 F.3d at 1158).

Amazon argues that the harm to consumers was "reasonably avoidable" because (1) upon first linking their mobile device to their Amazon account a password entry was required, (2) the Appstore "Terms of Use" mentioned in-app purchasing, (3) in-app purchasing is mentioned on the app-description pages, (4) parental controls could always be activated, and (5)

complaining customers often received refunds for their in-app purchases.

Amazon argues that a reasonable consumer would preemptively "identify and sidestep a potential injury." (Dkt. No. 179 at 29.) However, evidence establishes that, when in-app purchases were introduced, most customers were unaware of their existence. (Dkt. No. 120 at 5.) Accordingly, it is unreasonable to expect customers to be familiar with the potential to accrue in-app purchases while using apps labeled as "FREE." Many of Amazon's arguments improperly assume a familiarity with in-app purchases on the part of consumers. For example, Amazon cites to a case determining that a "reasonable Amazon customer is accustomed to online shopping," but online shopping and spending real currency while obtaining virtual items in a game are completely different user activities. (Dkt. No. 179 at 29) (citing *Multi Time Mach., Inc. v. Amazon.com, Inc.,* 804 F.3d 930, 939 (9th Cir. 2015)). In other words, while entering a password linking her Amazon account to a new device, a reasonable consumer unaware of the possibility of in-app purchases would not assume she was authorizing unforeseen charges. Nor would a reasonable consumer have seen any connection between IAPs and parental controls until Amazon changed its Appstore interface in June 2013.

Amazon directs the Court to *Davis v. HSBC Bank Nevada, N.A.,* in which the Ninth Circuit held that a consumer's injury was "certainly avoidable" because the advertisement for the credit card he applied for contained the disclaimer, "other restrictions may apply," and such a disclaimer "would have motivated a reasonable consumer to consult the terms and conditions." 691 F.3d 1152, 1169 (9th Cir. 2012). Additionally, the *Davis* Court pointed to the credit card application process in which a "boldface and oversized font" alerted the consumer to the credit card's terms and conditions and instructed him to "read the notice below carefully." *Id.* The text alerting the customer to read the terms and conditions of the card was twice the size as the remaining text on the page. *Id.* at 1158. Finally, the consumer in *Davis* had to affirmatively check a box agreeing to the terms and conditions, and certifying that he read them. *Id.* at 1169.

**\*10** The notice that Amazon customers were given regarding in-app purchases is distinct from the notices in *Davis.* From 2011 until June 2013, the only warning about in-app purchases that customers would see during the download process on the Appstore was towards the bottom of a long

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 110 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 10654030

"description" note that a user would have to scroll down to see, in the same size and color font as the rest of the text:



Moreover, until Amazon began to introduce password prompts for in-app purchases in March 2012, no affirmative assent to the charges was required, like the check-box in *Davis*. And the password prompts introduced, asking customers to "confirm in-app purchase," did not make it clear that a single password entry served to authorize multiple IAPs within a certain timeframe. Even in June 2013 when the Appstore was reconfigured, the notice that an app included "in-app purchases" was not conspicuous: the text was in a smaller sized font of the same color as the rest of the text on the page, and though it was a hyperlink to more information, this was not obvious from the way the text was presented:



Finally, Amazon's argument that customers could reasonably avoid their injury by seeking a refund fails for four reasons. First, the refund rate of [redacted text] while high by Amazon's standards (*see* Dkt. No. 127 at 168), does not account for the entirety of customer injury. (*See also id.* at 122, referring to [redacted text] as a "high refund rate"). For example, the majority of in-app purchases by customers were for $2.99 or less, and so many reasonable customers would not have thought it worth the time to seek a refund for a relatively minor charge. (Dkt. No. 118 at 23; Dkt. No. 127 at 257.)

Second, it was Amazon's stated policy not to provide refunds for in-app purchases and so many customers would have reasonably believed such recourse was not available to them. (Dkt. No. 114 at 11.) Nothing on Amazon's website states

that in-app charges are refundable. (Dkt. No. 102 at 54.) The confirmation email Amazon sends to consumers following an in-app charge is consistent with this policy: it does not provide any information about whether refunds for in-app charges are available or how to obtain one. (Dkt. No. 127 at 138; Dkt. No. 125 at 41-43.)

Third, the time customers spent seeking refunds actually constitutes additional injury to them. *Neovi*, 598 F. Supp. 2d 1104 at 1115 (noting that "harm need not be monetary to qualify as injury" and finding that time consumers spent contesting unauthorized checks and "attempting to get their money back" contributed to substantial injury). Fourth, 1,573 known customers who sought refunds did not receive them. (Dkt. No. 167 at 21.)

### c. Countervailing Benefits

Finally, Amazon's billing practices around in-app purchases did not benefit consumers or competition. Amazon's argument to the contrary is twofold: (1) "consumers prefer a seamless, efficient mobile experience," essentially, that failing to require a password was a benefit, and (2) that the general interest in innovation constitutes a benefit to consumers. (Dkt. No. 179 at 37-39.)

First, even accepting as true the notion that consumers prefer a seamless and efficient experience, the "benefit" of ensuring a streamlined experience is not incompatible with the practice of affirmatively seeking a customer's authorized consent to a charge. In fact, a clear and conspicuous disclaimer regarding in-app purchases and request for authorization on the front-end of a customer's process could actually prove to better inform customers about their risk of accruing in-app purchases *and* be more seamless than the somewhat unpredictable password prompt formulas rolled out by Amazon. Moreover, as the FTC points out, Amazon has not provided evidence of any customers who reported being upset or harmed by the existence of a password prompt.

**\*11** Amazon's second argument about stifling innovation is too vague, and unsupported by any evidence, to create a genuine issue with respect to this cost-benefit analysis.

The cost-benefit prong of the unfairness test is "easily satisfied" where, as here, "a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000) (internal citation omitted); *see also In*

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 111 of 192

Federal Trade Commission v. Amazon.com, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 10654030

*re In-app Purchase Litig.*, 855 F. Supp. 2d 1030, 1041 (N.D. Cal. 2012).

In summary, the FTC has met its burden to demonstrate Amazon's liability under Section 5 of the FTC Act. In this respect, its motion for summary judgment is GRANTED.

### D. Damages

While, as discussed above, the general methods used by the FTC to reasonably approximate the damages to consumers by unauthorized in-app charges serve as a fair starting place, the Court finds that the unauthorized charge rate of [redacted text] is too high. The Court has received Amazon's "Adjustments to the FTC's Estimates of Injury and Monetary Relief" (Dkt. No. 221 at 2) and invites further briefing on the issue of the scope of appropriate monetary relief.

The Court determines that the scope of Amazon's unfair billing practices pertains to all in-app charges made by account users without express, informed authorization. The Court concludes that Amazon's injurious practices lasted up until users were clearly informed both about the existence of in-app purchases and the scope of their consent by virtue of the revised in-app purchase prompt on June 3, 2014. The Court finds that continuous unauthorized purchases on First Generation devices, not provided the benefit of updated password prompts, constitutes additional relevant injury.

The parties are hereby ORDERED to submit briefing with respect to the appropriate methodologies and final amount of monetary relief as follows:

1. Defendant Amazon is to submit a more detailed brief explaining all of the methodologies for which it

advocates in its Offer of Proof and attached declaration, including (1) which apps to include in determining the scope of injury, (2) the basis for excluding purchases made by customers who had previously received refunds, and (3) the basis for excluding purchases as described in paragraphs (f) and (g) of Jonathan Werner's declaration. (Dkt. No. 220-1.) This brief, not to exceed 16 pages, will be due to the Court on or before May 27, 2016.

2. Plaintiff FTC shall be afforded an opportunity to respond to Amazon's brief, in a response not to exceed 16 pages, due to the Court on or before June 17, 2016.

3. The parties are to notify the Court if they wish to hold oral argument on this issue, and if so, include proposed time limits for the hearing.

### III. CONCLUSION

 **\*12** For the foregoing reasons, Amazon's motion for partial summary judgment (Dkt. Nos. 92 and 93) is GRANTED and injunctive relief is denied. However, with respect to liability, the FTC's Motion for Summary Judgment (Dkt. Nos. 109 and 138) is GRANTED. Judgment is hereby entered in the FTC's favor. Following consideration of additional briefing and possibly oral argument, the Court will make a determination as to the appropriate remedy. Amazon's currently-pending Motions in Limine (Dkt. No. 209) are hereby TERMINATED as moot.

### All Citations

Not Reported in Fed. Supp., 2016 WL 10654030

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



F.T.C. v. Capital Choice Consumer Credit, Inc., Not Reported in F.Supp.2d (2004)

2004 WL 5149998

KeyCite Yellow Flag - Negative Treatment

Distinguished by F.T.C. v. Affiliate Strategies, Inc., D.Kan., July 26, 2011

2004 WL 5149998
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
CAPITAL CHOICE CONSUMER
CREDIT, INC., et al., Defendants.

No. 02-21050 CIV.
|
Feb. 20, 2004.

**Attorneys and Law Firms**

Brenda W. Doubrava, Brinley H. Williams, Michael Milgrom, Michael B. Rose, Steven W. Balster, Federal Trade Commission, Cleveland, OH, for Plaintiff.

Jose Quinon, Lisa Sharon Walsh, Gonzalez & Walsh, Howard Milton Srebnick, Black Srebnick Kornspan & Stumpf, Diane Wagner Katzen, Richman Greer Weil Brumbaugh Mirabito & Christensen, Miami, FL, Mark Louis Mallios, R. Stuart Huff, R. Stuart Huff, Law Offices, Gregg Joseph Ormond, Gregg J. Ormond & Associates, Coral Gables, FL, for Defendants.

Johnnie Smith, Miami Shores, FL, pro se.

Willfredo Lugo, Miramar, FL, pro se.

AMENDED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

UNGARO-BENAGES, District J.

**\*1** THIS CAUSE was tried before the Court between June 30, 2003 and July 10, 2003.

THE COURT has considered the pertinent portions of the record and is otherwise fully advised in the premises.

FINDINGS OF FACT

I. Procedural History

1. On April 8, 2002, Plaintiff filed its Complaint for Injunctive and Other Equitable Relief against Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., E-Credit Solutions, Inc., Ricardo E. Martinez, and Scott A. Burley, and its Application for an *Ex Parte* Temporary Restraining Order as to those Defendants.

2. On April 9, 2002, the Court entered an *Ex Parte* Temporary Restraining order (TRO) and a show cause order against Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., E-Credit Solutions, Inc., Ricardo E. Martinez, and Scott A. Burley, which froze Defendants' assets and appointed Judith Korchin, Esq., as Receiver for the corporate Defendants. The TRO was served on the Defendants on April 11, 2002.

3. On April 19, 2002, Plaintiff filed its Amended Complaint adding Ecommex Corp. as a defendant.

4. On April 19-23, 2002, a preliminary injunction hearing was held before the undersigned on the show cause order of April 9, 2002.

5. On April 23, 2002, the Court entered a Consent Order *Pendente Lite* as to Corporate Defendants Capital Choice, Millennium, Ecommex Corp., and Individual Defendant Ricardo Martinez. Pursuant to the Consent Order, Defendants discontinued the sale of their Capital Choice and National Credit Shopper credit card programs, but were permitted to continue marketing their other products and services. The Order directed the Receiver to transfer $2.25 million from the frozen bank accounts of the Corporate Defendants to the Court's depository account, and $1.25 million to a Receiver's escrow account. Individual Defendant Martinez was ordered to place $450,000 to the trust account of Gregg J. Ormond, P.A. The Order appointed J. Michael Jones monitor to oversee tasks that needed to be done to discontinue the Capital Choice and National Credit Shopper credit card programs.

6. On April 25, 2002, the Court entered a Stipulated Preliminary Injunction as to Corporate Defendant E-Credit Solutions, and Individual Defendant Scott Burley. The Order continued the receivership and asset freeze with respect to the Corporate Defendant.

7. On August 8, 2002, Plaintiff filed its Second Amended Complaint for Injunctive and Other Equitable Relief, adding Zentel Enterprises, Inc., Hartford Auto Club, Inc., Johnnie Smith, and Wilfredo Lugo, as defendants, and alleging

additional violations of Section 5 of the FTC Act and the Telemarketing Sales Rule, 16 C.F.R. Part 310. (The Second Amended Complaint alleges violations of the Telemarketing Sales Rule in effect on April 8, 2002. The Rule was amended in 2003, and the amendments have been codified at 16 C.F.R. Part 310. References to the provisions of the Telemarketing Sales Rule contained in the Second Amended Complaint and in these Findings of Fact and Conclusions of Law are to the Rule as it appeared in the Code of Federal Regulations in April 2002.)

**\*2** 8. On September 13, 2002, Plaintiff filed a motion for a preliminary injunction against Corporate Defendants Capital Choice, Millennium, Ecommex, Hartford Auto Club, and Individual Defendants Ricardo Martinez, Johnnie Smith, and Wilfredo Lugo relating to legal violations alleged in the Second Amended Complaint.

9. On October 15-16, 2002, there was an evidentiary hearing before Magistrate Judge Brown on Plaintiff's motion for a preliminary injunction.

10. On January 30, 2003, Judge Brown denied Plaintiff's motion for a preliminary injunction and issued his Findings of Fact and Conclusions of Law. The undersigned issued an Order affirming those findings on February 23, 2003.

11. On January 27, 2003, Plaintiff filed a Motion for Partial Summary Judgment Against Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., and Ecommex Corp.

12. On June 2, 2003, the undersigned issued an Order granting in part and denying in part Plaintiff's Motion for Partial Summary Judgment against Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment. Inc., and Ecommex Corp. Plaintiff was granted summary judgment on Count I of the Second Amended Complaint regarding the Defendants' so-called Approval Certificate and granted summary judgment as to Count III of the Second Amended Complaint. Plaintiff's motion for summary judgment on Counts II and IV of the Second Amended Complaint was denied.

13. On May 21, 2003, the Court issued a Stipulated Final Judgment and Order as to Defendants E-Credit Solutions, Inc., Scott A. Burley, and Zentel Enterprises, Inc.

14. Commencing June 30, 2003, a trial was held as to the remaining Defendants and complaint allegations.

15. On July 21, 2003, Defendants moved to dismiss and/or for Judgment as a Matter of Law on Counts II and VI of the Second Amended Complaint.

16. On September 29, 2003, the Court issued an Order Denying Defendants' Motion For Judgment as a Matter of Law on Count II and Granting Defendants' Motion for Judgment as a Matter of Law on Count VI.

17. By Order dated October 3, 2003, the undersigned denied Defendants' Motion for Judgment on Partial Findings as to Plaintiff's Claim for Individual Liability on the Approval Certificate.

## II. The Parties

### A. Plaintiff Federal Trade Commission

18. Plaintiff Federal Trade Commission (Commission or FTC) is an independent agency of the United States Government created by statute. (15 U.S.C. §§ 41-58, as amended) The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Telemarketing Sales Rule (TSR or the Rule), 16 C.F.R. Part 310, which prohibits deceptive or abusive telemarketing practices. The FTC promulgated the TSR at the direction of Congress to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-08. The Commission may initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act and the TSR to secure such equitable relief as may be appropriate in each case, including restitution for injured consumers. (15 U.S.C. §§ 53(b), 57b, and 6105(b))

### B. The Defendants

**\*3** 19. Defendant Capital Choice Consumer Credit, Inc. (Capital Choice), is a Florida corporation with its offices and principal place of business located at 9590 NW 25th Street, Miami, Florida. Capital Choice transacts business in the Southern District of Florida. Capital Choice also does business as National Credit Shopper and NCS. (Def.'s Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corp., Hartford Auto Club, Inc., Ricardo E. Martinez and Wilfredo Lugo's Answer

2004 WL 5149998

to Second Amended Compl. ¶ 5 (September 5, 2002) [hereinafter CCCC Ans.] )

20. Defendant Millennium Communications and Fulfillment, Inc. (Millennium), is Florida corporation with its principal office and place of business at 9590 NW 25th Street, Miami, Florida. Millennium transacts business in the Southern District of Florida. Millennium also does business as National Research Group. (CCCC Ans. ¶ 6.)

21. Defendant Ecommex Corporation (Ecommex) is a Florida corporation with its office and principal place of business at 9590 NW 25th St., Miami, Florida. Ecommex transacts business in the Southern District of Florida. Ecommex was formerly known as Millennium Express Group, Inc. (CCCC Ans. ¶ 9.)

22. Defendant Hartford Auto Club, Inc., (Hartford) is a Florida corporation, and it does business in the Southern District of Florida. (CCCC Ans. ¶ 10.) Hartford is a shell corporation with no employees or place of business. (1 R. at 180; PX 296, ¶ 8.) [1]

[1]     The trial record appears in separate transcripts, not sequentially page numbered, for each of the eight days of the trial and one day of closing argument. For convenience, the Court will refer to the record with an R. preceded by the number corresponding to the day of the trial. The record is thus cited as follows:

| | | |
|---|---|---|
| 1 R. (June 30, 2003) | 4 R. (July 3, 2003) | 7 R. (July 9, 2003) |
| 2 R. (July 1, 2003) | 5 R. (July 7, 2003) | 8 R. (July 10, 2003) |
| 3 R. (July 2, 2003) | 6 R. (July 8, 2003) | 9 R. (October 16, 2003). |

23. Defendant Ricardo E. Martinez is the owner, officer, and director of Defendants Capital Choice, Millennium, Ecommex, and Hartford. Martinez resides in Miami, Florida, and transacts business in the Southern District of Florida. (CCCC Ans. ¶ 11.)

24. Defendant Johnnie Smith is the Chief Executive Officer of Defendant Millennium Although he is not an officer of Defendants Capital Choice, and Ecommex, he has responsibilities with respect to the business activities of these other corporate defendants, as explained at paragraph 129, *infra*. (Smith Test., 1 R. at 144; PX 402 at Tr. 135).

25. Wilfredo Lugo is the General Manager of Defendant Millennium. Lugo oversees the operations of Millennium's call center. He is responsible for, among other things, monitoring sales representatives to assure that they follow Defendants' scripts and handling customer service, including consumer complaints. (*See* Findings of Fact, *infra* at ¶ 146).

26. Before discontinuing sales of credit cards, Defendants marketed credit card programs two ways: (1) through a direct mail approval certificate (the Approval Certificate program), and (2) through direct mail postcard solicitations asking consumers to dial an "800" number (the Earn-a-Bankcard program). (Joint Pretrial Stipulation at 12-13, Uncontested Fact 4 (March 7, 2003) [hereinafter Stipulation] ) Defendants also sold secondary products as "upsales" after making a sale on a primary product, such as a credit card program. (As used in these Findings, "Defendants" refers to collectively to Defendants Capital Choice, Millennium Communications, Ecommex, Hartford Auto, Ricardo Martinez, Johnnie Smith, and Wilfredo Lugo. Where appropriate, a more specific reference will be given.)

III. *Count One:* Whether Defendants Misrepresented That Consumers Would Receive a Major Unsecured Credit Card (Section 5(a) FTC Act)

A. The Approval Certificate Program

**\*4** 27. Under the Approval Certificate program, Defendant Capital Choice offered a credit card to consumers through a direct mail solicitation. In granting partial summary judgment, the Court has already ruled that the Approval Certificate was deceptive on its face. Specifically, while buyers of the Approval Certificate program received a credit card they could only use to buy merchandise from a merchandise catalog, the Court found that "[a]fter careful consideration of the record, this Court agrees with Plaintiff that the net impression created by Defendants' certificate is that consumers who paid the required fee would receive a general purpose credit card and, therefore, that the certificate is deceptive." (Order Grant. in Part and Den. in Part Pl's. Mot. Summ. J. at 8 (June 2, 2003) [hereinafter S.J. Order].)

28. By order dated October 3, 2003, the undersigned denied Defendants' Motion For Judgment on Partial Findings as to Plaintiff's Claim For Individual Liability on the Approval Certificate. In denying Defendants' motion, the Court noted that, corporate liability for the Approval Certificate program having been established by summary judgment, "[i]t remained for Plaintiff to prove, at trial, that the Individual

Defendants had the requisite knowledge and "participated directly in the practices or acts or had authority to control them' " (Order Den. Defendants Ricardo Martinez, Johnnie Smith and Wilfredo Lugo's Mot. for J. on Partial Findings as to Pl's. Claim for Individual Liability on the Approval Certificate at 4 (Oct. 3, 2003) (*quoting* *FTC v. Gem Merchandising Corp.,* 87 F.3d 466 (11th Cir.1996)).

29. Evidence demonstrating that Individual Defendants Martinez and Smith are liable for violations of the FTC Act in the sale of the Approval Certificate program is contained in Findings of Fact at paragraphs 127-128, 137-141, *infra.*

B. The Earn-a-Bankcard Program.

30. The Capital Choice Defendants [2] sold the Earn-a-Bankcard program from February 2000 to the commencement of this action in April 2002. At first, from February 2000 to November 2001, the Capital Choice Defendants sold the program directly through their own call centers (Joint Exh. 1 (chart submitted to the Court on October 16, 2003)) and from June 2001, through April 2002, the Capital Choice Defendants sold the program indirectly through Zentel Enterprises, Inc. (Zentel), and E-Credit Solutions, Inc. (E-Credit), whom Defendants had established as their sales agents or representatives. (PX 58 (Call Center Agreement); Joint Exh. 1), pursuant to the Call Center Agreement of May 29, 2001 between Millennium and Zentel. (PX 58)

[2] The Court refers to "Capital Choice Defendants" collectively for the reasons stated in paragraphs 115-123, *infra.*

31. Under the terms of the representation agreement between the Capital Choice Defendants and Zentel and the E-Credit Defendants, Defendant Millennium was required to provide leads of potential customers, (PX 58 at ¶ 2.3.2) mail the initial postcards, (*Id.* at ¶ 2.3.3; Smith Test., 3 R. at 20, *ll.* 6-9) and provide the sales scripts. (PX 58 at ¶ 2.3.6) While Zentel was to make the actual sales, Zentel was required in making the sales to strictly adhere to the sales presentation scripts and materials prepared or approved by Defendant Millennium and to maintain daily communication with Millennium. (*Id.* at ¶ 2.3.4, 2.3.6) Zentel was required to pay Defendant Millennium $25 per sale for its fulfillment services. (*Id.* at ¶ 2.3.7) Zentel was also to pay Defendants a consulting fee of $1.45 million. (*Id.* at ¶ 4.1).

**\*5** 32. Under the Earn-a-Bankcard program, the Defendants sent postcards to potential customers, who were selected

because their credit reports contained derogatory information or a meager credit history. (Smith Test., 5 R. at 148, *ll.* 17-19) The postcards then invited recipients to call an "800" number if they were interested in obtaining the credit card. (PX 320; PX 326; PX 348) The postcards that the Capital Choice Defendants used were substantively the same for both its direct sales from their own call centers, and for the sales made by the Defendants Zentel and E-Credit Solutions, differing only with respect to the return address appearing on the card and the identifying company name. (Smith Test., 3 R. at 20, *ll.* 6-20)

33. Between 2/2000 and 10/2000 consumers wishing to accept Defendants' credit card offer paid a fee of $189 and thereafter a fee of $199.95. (PX 51 at 03-01735-37; PXs 286-92) (Stipulation at 13, Uncontested Fact 9) Consumers then received in return, not a major, unsecured credit card, but rather, what Defendants called a Diamond Select card or a Platinum Plus card and the "right" to "earn" a Visa or Mastercard. The Diamond Select or Platinum Plus cards did not allow consumers to make purchases from merchants like an ordinary credit card, but only allowed consumers to purchase merchandise partially on credit from the Capital Choice Defendants' catalogs. (*See, e.g.,* 1R. at 32-33; 2 R. at 233) Moreover, in order to be eligible to obtain a Visa or Mastercard, consumers had to buy merchandise from the catalogs by paying 35% down plus 15% for shipping and handling, carry a credit balance with Defendants of at least $99, and repay it in three monthly payments of at least $33 each. (Stipulation at 15, Uncontested Fact 18) Thus, a consumer had to buy at least $152.30 in merchandise and pay $22.85 in shipping and handling charges, for a total of $175.15 in addition to the initial $199.95 fee (for a grand total of $375.10), to be eligible to receive the Visa or Mastercard. Assuming they surmounted these hurdles, consumers then received an application for a secured Visa card with a $240 limit and a $219 money order to be sent to the issuing bank.

34. In order to deliver the promised credit card to the few customers who completed the "program," Defendants did not issue the cards themselves but contracted with an outside financial institution. Sterling Bank issued the secured credit cards to Earn-a-Bankcard customers until the end of November 2001, when Sterling decided to terminate its relationship with Defendants. (Smith Test., 5 R. at 176 *l.* 18-177 *l.* 12) While Defendant Johnnie Smith did seek another financial institution to replace Sterling Bank, no other financial institution issued secured credit cards to Earn-a-Bankcard customers after November 2001. Nonetheless,

Defendants continued selling the program until April 2002, (Smith Test., 5 R. at 176 *l.* 1-179 *l.* 7), and during that time continued to promise consumers they would receive their Visa cards within 18-21 days from making their final payments. (PX 52) Defendants were able to do so with confidence because they knew that few, if any, customers would complete the program and apply for the credit card.

C. Defendants' Earn-a-Bankcard Program Misled Consumers Into Believing That They Would Receive a Major, Unsecured Credit Card.

*1. Defendants' sales materials*
 **\*6** 35. The Earn-a-Bankcard sales transaction began when the consumer received a postcard in the mail. One side of the postcard stated "THIS MAY BE YOUR FINAL NOTIFICATION," and showed an "approved credit limit" of $4,000, thereby suggesting that what was being offered was an unsecured credit card with a credit limit of $4,000. It also had boxes to indicate membership type, including boxes for Platinum, Diamond, Unsecured, and Secured. The postcard arrived with the boxes for Diamond and Unsecured checked, indicating that the type of card for which the consumer had been pre-approved. (PXs 326, 348). Additionally, in order to add an aura of legitimacy to the solicitation, the postcard instructed the consumer to call an "800" number for "activation," provided a "confirmation number," and contained the initials of the person who "approved" the extension of credit.

36. The other side of the postcard had the heading "Credit Approval Notification." It went on to state:

> We are notifying you that your credit card has not been activated. Our records show this card to have an approved line of credit of $4,000.00. THIS MAY BE YOUR FINAL NOTIFICATION[.]

(*Id.* (original emphasis)).

In fact, this is the only notification consumers received.

37. In addition, the card made no reference to a catalog, nor did it provide any indication that the card could be used only

to purchase merchandise from Defendants. Importantly, there was also no mention of a secured card with a credit limit of only $240. On the other hand, terms such as Platinum, Diamond, unsecured, and activated, which did appear in the text of the postcard, are terms commonly associated with credit cards and credit-card applications.

38. An earlier version of the postcard, sent to consumers until October 2000, told consumers: "[y]ou have been identified and confirmed to receive your very own Credit Card regardless of your past credit history with a credit limit of $4,000 Guaranteed." (PX 320 (original emphasis)) The postcard had boxes marked "secured" and "unsecured." The "unsecured" box was marked with an "x". The postcard described the credit card as a "platinum" membership. (*Id.*) The reverse side of the postcard informed the consumer: "you are approved to receive a CREDIT CARD with a personal credit limit of $4,000 to $7,500 GUARANTEED!" (*Id.*)

39. The postcards reflect that the Defendants anticipated that consumers dialing the 800 number would not be able to reach sales representatives. PX 326 ("Due to overwhelming response toll free lines may be busy during peak hours."). Consumers who were placed on hold heard a pre-recorded "on-hold" message that reinforced Defendants' credit-card theme. (PX 234 (transcript); Lugo Test., 4 R. at 104, *ll.* 8-11; *id.* at 107 *l.* 25-108 *l.* 2). The on-hold message referred several times to major bank cards and the ability of the consumer to qualify for a major bank card, but it omitted anything about a catalog or a $240 Visa card. It stated, for instance:

 **\*7** a. "Thank you for calling National Credit, your doorway to credit relief and financial freedom. Is this your first time calling to apply for a credit card?" (PX 234 at 3, *ll.* 5-8 (page numbers refer to transcript pages));

b. "Did you know that there are over 60 million people who suffer from negative credit ratings or the inability to qualify for a *major bank card?* " Through our Earn-a-Bank-Card Program, you'll get the things you need with credit you qualify for regardless of bad credit, no credit or low income." (*Id.* at 3, *ll.* 19-24 (emphasis added));

c. "This is truly the easiest way to receive a *major bank card.* If you're 18 years of age or older and have a valid savings or checking account, you're qualified." (*Id.* at 4, *ll.* 4-7 (emphasis added));

d. "We're proud to offer a low introductory rate on your Diamond Select card of only 6 percent, *the lowest in the*

*country* with no annual renewal fee." (*Id.* at 4, *ll.* 12-13 (emphasis added));

e. "Our research has confirmed that there are only three ways to obtain a *major bank card* without rejection for negative credit ratings. You've tried applying at your local bank and were turned down for poor credit or lack of credit. You've applied for a secured credit card, but you had to put up your own money and pay interest on it. Don't be discouraged. Your representative will explain the benefits of the Earn-A-Bank-Card Program, proven to be the simplest and most effective route to credit card approval." (*Id.* at 4 *l.* 21-5 *l.* 5 (emphasis added));

f. "You'll be happy to know that there is a solution for people seeking a *major bank credit card,* even if they've been turned down in the past.... Find out in advance if you qualify by answering these two simple questions: Are you 18 years of age or older? Do you have a valid checking or savings account? By answering yes you'll certainly qualify." (*Id.* at 5, *ll.* 7-16 (emphasis added))

40. The Defendants' on-hold message used the phrase "major bank card" four times (b, c, e and f), "credit card" two times (a and e), otherwise referred to credit four times (a, b, e), and made comparisons to conventional credit cards by referring to efforts of applying "at your local bank" (e) and having "the lowest [rates] in the country with no annual fee." (d) At the same time, it made no mention of any catalog or buying-club program, no mention of any card with a limit of only $240, and referred to a secured credit card only by making a disparaging comparison, reinforcing the impression that the bank card Defendants were offering was unsecured .(e)

41. Consumers also were subjected to the sales pitch for the Earn-a-Bankcard program, as reflected in Defendants' sales scripts. (Smith Test., 5 R. at 247-250) While the scripts mentioned two credit cards as part of the program, they did not explain that the consumer could only hope to get a Visa card with a $240 limit, or clearly explain that the Visa card could be obtained only after participating in Defendants' program for several months. (PX 51 at 03-01735-37; *see also,* PXs 286-92 (nearly identical scripts))

**\*8** 42. In a typical script, the sales representative started by answering the phone "National Credit authorization and processing center," and then asked "are you calling to obtain a credit card?" After asking consumers a series of "qualifying" questions, sales representatives were instructed to "wait 10-15 seconds" and then begin the sales pitch by stating:

Great! Based on the answers you have given me you have been approved for a credit limit of $4,000 dollars. [sic] OK? Now through our "Earn a Bankcard" Program, there are 2 credit cards *when* you complete the program. There's a Diamond Select merchandise card which is not a Visa® or MasterCard® and there's a *Visa® bankcard. The first card you'll receive is the Diamond Select Credit card issued by National Credit Shopper. Your card does not require a security deposit, there are no annual renewal fees and the 6% interest rate is among the lowest in the country. Also, your card will remain interest-free until the year 2002.*

(*Id.* (original emphasis)). The telemarketer began by stating that the consumer had been approved for a $4,000 credit limit. The consumer was then told that there would be two cards, both of which could be expected "when you complete the program," but the consumer was given no explanation of what each one was, or whether the credit limit applied to both.

43. In the second paragraph of a typical script, the telemarketer continued by giving the consumer an explanation of cardholder benefits, including a free credit-improvement booklet and a certificate for a mobile phone. (*Id.*) Again, there was no further explanation of what the two cards were.

44. In the third paragraph, the telemarketer mentioned two cards again, but failed to clearly state that the Diamond Select credit card was exclusively for catalog purchases. More importantly, this paragraph suggested that the consumer would receive an unsecured Visa card with a "guaranteed" credit limit of $7,500 "to be used worldwide..." when, in fact, the consumer was eligible to receive only a secured credit card with a $240 limit and then only if the consumer made both three on time payments of $33 each and maintained a $99 credit balance:

Now with your new Diamond Select Credit Card, you can charge hundreds of high quality products through our attractive catalogs. Initially, your charge purchases will include a 35% down payment with a standard 15% shipping and handling, however, once you receive your Visa credit card through our "Earn a Bankcard" Program, no down payment will be necessary. (*Mr./Mrs.*) (*Last name only*) it works like this: *Simply charge $99.00 and make three on time monthly payments of $33.00 and two important things will happen: Once your first payment is received on time, your $4,000 credit line will be reported to Equifax, which is one of the largest credit bureaus in the United States. Secondly, once all 3 payments are received, your credit line is guaranteed to be increased to $7,500.00; but most importantly you are guaranteed to receive your Visa credit card to be used worldwide, even if you've had problems with your credit in the past. It's that simple!*

**\*9** (*Id.* (original emphasis)) While Defendants argue that this paragraph tells consumers everything they needed to know about what was being offered, in fact, the paragraph was misleading in what it implied and what it omitted.

45. Defendants' own documents show that they knew that the contents of the sales scripts were not sufficient to overcome the net impression created that the consumer was going to get an ordinary, unsecured Visa card. Defendants developed the "Pull Tape Script," which they used when customers called in to challenge a transaction (Lugo Test., 4 R. at 119, *ll.* 14-17), in anticipation that consumers would understand that they would be receiving an unsecured Visa card with a substantial credit limit. After explaining that all calls are recorded, the customer service representative was instructed to state:

I'm also positive that the program was fully explained to you. It is a lot of information and your attention could have concentrated to the Major Visa Bankcard. You WILL receive one; just that ... it is the *second* step of the program.

(PX 51 at 03-01750 (original emphasis and ellipses)). The customer service representative was then required to repeat that the program is a "two-step" program. (*Id.*)

46. Per the sales script, the customer service representative then went on to discuss the bank-to-bank transfer for the initial $199.95 deposit, had the customer verify the authorization, and then included additional sales pitches for "up-sale" products. Nothing in the entire script informed the consumer that the Visa Card that could eventually be earned through the Earn-a-Bankcard program had a credit line of just $240. (*Id.* at 03-01735-37) In fact, by confirming that the consumer could expect to use the card "worldwide," (*id.* at 03-01736) the script gave the opposite impression.

47. Defendants then continued to obscure the fact that the Visa card was a secured credit card with a $240 credit limit in the "Bankcard Qualification Manual" they sent to consumers when they signed up for the program. It too failed to disclose that the credit limit on the Visa card was just $240, stating only cryptically that Defendants would "assume the first $240.00 in credit on your new major bank card in the form of a Preferred Customer Rebate Bonus paid to the card issuing bank on your behalf." (PX 322 at 9; PX 328 at 10)

48. In sum, an examination of Defendants' sales materials shows that they were likely to mislead reasonable consumers.

### 2. Consumer Witnesses

49. Not surprisingly, consumer witnesses testified that they were, in fact, misled by Defendants' Earn-a-Bankcard presentation. Rebecca Rose testified, for instance, that she participated in the Earn-a-Bankcard program, thinking that the postcard she received, which appears in the record as PX 348, "was offering me a credit card with the approved credit of $4,000." (4 R. at 80, *ll.* 5-8) This impression was confirmed when she called in and heard the sales script. According to

Rose, the telemarketer told her she had been approved for a $4,000 line of credit and that all she had to do was to pay the $199 activation fee. (4 R. at 80. *ll.* 22-25) The telemarketer confirmed that she would get a credit card after paying this activation fee, and never made any mention of the fact that there would only be a $240 line of credit on any Visa card she would receive. (4 R. at 81, *ll.* 11-13) She thus expected to receive in her initial package a Visa card with a $4,000 line of credit, based on both what the postcard said and on what the telemarketer said. (4 R. at 81, *ll.* 5-10)

 **\*10**  50. Rose's expectations were disappointed, however, when she received instead of a Visa or MasterCard, Defendants' packet of materials. (4 R. at 81 *l.* 19-82 *l.* 4) After reading through those materials, she called again and heard for the first time that in order to get a Visa card, she would first have to order merchandise from Defendants' catalog. (4 R. at 82, *ll.* 12-25) At that point she decided to complete the program, since she already had $200 invested in it. (4 R. at 83, *ll.* 1-6) Rose never completed the program, however, and did not get a Visa card. Although she ordered over $200 in merchandise, some of the items she ordered never came, while the merchandise she did receive was cheap and of poor quality. (4 R. at 84 *l.* 23-86 *l.* 7) Despite repeated attempts, Rose was unable to obtain a resolution of the unshipped items. (4 R. at 86 *l.* 8-87 *l.* 1)

51. Similarly, Marguerette Eubanks Lindsay testified that she thought the postcard she received, admitted as PX 320, offered her a Visa or MasterCard with a $4,000 line of credit. (2 R. at 187 *l.* 23-188 *l.* 4) That conclusion was based on the use of the term "Platinum," which Lindsay associated with Visa and MasterCard. (2 R. at 188, *ll.* 5-10) She then called the 800 number and was told that she would get a Visa card, which she noted on the postcard during the sales presentation. (2. R at 189, *ll.* 10-24) At no time did the telemarketer say that the limit on any Visa card she would get from Defendants would be $240. (2 R. at 191, *ll.* 2-4) Instead, she thought, based on the postcard and the script, that she would get a Visa or a $4,000 line of credit in her initial package. (2 R. at 191, *ll.* 5-12) She thus accepted Defendants' offer and agreed to the $199.95 charge. (2 R. at 191 *l.* 24-192 *l.* 3) When she received her package and there was no Visa or MasterCard included, Lindsay called to complain. (2 R. at 196, *ll.* 7-11) During that conversation she was told that Defendants would review a recording of her initial sales transaction, which would demonstrate, the telemarketer claimed, that the program had been fully explained to her. (2 R. at 197 *l.* 24-198 *l.* 6) Even during this second conversation, Lindsay testified, no

mention was ever made that the Visa card she could ultimately get would have a limit of only $240. (2 R. at 197, *ll.* 1-3) Although Lindsay agreed to set up an appointment to listen to the recording, Defendants never arranged to have it played. (2 R. at 198, *ll.* 11-15)

52. Similarly, Mary Witt thought she was being offered a $4,000 Visa card, based on what the postcard said, (2 R. at 230, *ll.* 15-17) and on what the telemarketer told her in the sales presentation. (2 R. at 232, *ll.* 6-16; *see also id.* at 240 *l.* 23-241 *l.* 10) Witt agreed to the $199 charges, and when she received Defendants' Diamond Select card, she even tried to use it at a children's store. (2 R. at 233, *ll.* 6-11) Witt completed the program, and Defendants sent her an application and money order payable to Sterling for the Sterling Visa card. (2 R. at 238 *l.* 5-239 *l.* 21) She did not follow through by sending these items on to Sterling, however, since she thought she was being deceived and would "end up giving more money to them and I would never get a Visa." (2 R. at 240 *ll.* 8-22) Moreover, Witt testified that one of the things she relied on in making her purchase was Defendants' claims that they would report her favorable credit to a credit bureau. Although she completed the program, she testified she ordered her credit report and was able to find no evidence that Defendants had made any favorable reports on her behalf. (2 R. at 241 *l.* 13-243 *l.* 16)

 **\*11**  53. Even Defendants' own consumer witness testified that he was confused as to Defendants' offer. Defendants billed Willie McCray as their "star witness." (5 R. at 187, *ll.* 20-21; *id.* at 188 *ll.* 9-12 (witness to be called to testify that Defendants put his life back together because he can now get credit)). Furthermore, even though Defendants admit that they did nothing prior to trial to determine whether their services ever improved anybody's credit (*id.* at 195, *ll.* 9-14), as their sales materials claimed (*see, e.g.,* PX 51 at 03-01736), Defendants assured the Court that McCray would be at least one example of a consumer whose credit was improved. According to counsel:

> He's our success story, Judge. He's the
> one who dotted all the I's, crossed all
> the T's, got his Visa card, was thrilled
> that he got it. It put him back on
> his feet. It helped him when he was
> applying for subsequent credit to be
> able to say that he had complied with
> all of the conditions, he had a payment

history, and it was helpful to him when he was applying for a home loan, when he was applying for other financing in his life. That's all he's going to testify, exactly what I indicated yesterday in my proffer.

(6 R. at 87)

54. In fact, while nothing in McCray's testimony shows that his credit was improved because of Capital Choice, his testimony does demonstrate that he was misled. McCray testified that he's 46 years old, (7 R. at 47, *ll.* 9-11) and that in years past he had bad credit because when he was 19 or 20 he ran up about $800 or $900 in credit, and then became delinquent on the amount. (7 R. at 49, *ll.* 11-20) He further testified that he had negative credit for about 15 years after that, until 2001, when he was solicited for Defendants' National Credit Shopper Earn-a-Bankcard program. (7 R. at 48, *ll.* 2-11) McCray further testified that for the last nine years he has held a steady job as an educational assistant with his local school district (7 R. at 47, *ll.* 5-6), and is now putting a daughter through college. (7 R. at 47, *ll.* 12-19)

55. Although there is no evidence that McCray actually had impaired credit, McCray testified that, because of his poor credit, he went without credit until 2001, when, in March of that year, he received Defendants' National Credit Shopper postcard offering him a credit card. (7 R. at 47 *l.* 23-48, *l.* 11) McCray testified that he jumped at the chance. He called the 800 number and signed up for the program after listening to the offer. (7 R. at 50, *ll.* 12-17; *id.* at *ll.* 20-25; *id.* at 51, *ll.* 20-23) McCray completed the program by making his three payments, and he then received his Sterling credit card. (7 R. at 57, *l.* 24-58, *l.* 3) At roughly the same time, other credit cards came in the mail, which McCray never asked for or applied for (7 R. at 60, *ll.* 8-12), and which McCray says might have come from "fate." (7 R. at 59, *ll.* 23-25 ("faith," according to the transcript))

**\*12** 56. While McCray eventually got a Sterling Visa card, McCray's testimony shows that he was mistaken about what he was going to get from Defendants' program. In the first place, when asked what he thought he was going to be getting, McCray never once mentioned the privilege of buying from a catalog, but stated repeatedly that he would have his credit improved and receive a credit card, such as a Visa or MasterCard:

THE COURT: Well, first of all, what did you think you were being offered when you saw the postcard?

THE WITNESS: When I saw-well, I looked at it this way. I haven't had a credit card in probably 14, 15 years. So to establish me some credit, I thought I'd just jump towards the opportunity.

THE COURT: So you saw on the postcard it said-

THE WITNESS: I saw the postcard and it said you can earn a credit-whatever it was, it was a credit card. So I called the 800 number, like Mr. Srebnick said.

THE COURT: So you thought this was something that would help you to reestablish-

THE WITNESS: Would help me, right, reestablish my credit, that's correct.

THE COURT: Did you understand anything about what, if any, credit cards would be issued to you to begin with?

THE WITNESS: No. I just looked-no, I really can't say that. I just looked at it that a credit card was going to be issued to me after I made a-I had to make a down deposit and I had to make three payments, and that deposit was kind of steep, and I questioned it, but I said, you know what? The way my history was in the past, I could never receive a credit card. I wasn't gonna sit there and complain.

THE COURT: Okay. And at the time you had this initial conversation, what kind of a credit card did you think you would get if you finished the program?

THE WITNESS: I didn't really know if it would be a Visa or Master. I really didn't know which one it was at the time. I knew I was gonna get a credit card to use, so I didn't know it was gonna be a Master or Visa. I just knew it was gonna be a credit card.

(7 R. at 50 *l.* 20-52 *l.* 25)

57. McCray, moreover, denied the importance of the catalog or the Diamond Select card, denying, in fact, that he even viewed the Diamond Select card as a credit card:

THE COURT: So, would it be fair to say you weren't particularly concerned about the Diamond Select card? You're issue [sic] was the credit card at the end of the day?

THE WITNESS: My issue was mostly the credit card.

THE COURT: Okay. So you didn't-did you think of the Diamond Select card as a credit card or did you-

THE WITNESS: I didn't really know. No, I didn't look at it like that. I just-

THE COURT: You thought the bank card was the credit card, the bank card-remember, on the postcard it said Earn-A-Bank card.

THE WITNESS: Yeah, it said a bank card.

THE COURT: So that's what you were really focused on.

THE WITNESS: And the three payments. Regardless, I was just trying to establish my credit again.

 **\*13**   (*Id.* at 55 *l.* 15-56 *l.* 5; *compare* PX 51 at 03-01750 ("your attention could have concentrated to the Major Visa Bankcard.")).

58. Thus, while McCray was not clear on what he thought he would be getting at each stage of the transaction, he joined the Earn-a-Bankcard program, not to purchase from Defendants' catalog, but to improve his credit rating and obtain a real credit card.

59. Not only did McCray focus on the credit card and credit repair to the exclusion of the catalog program, he was grossly mistaken as to the credit limit on the credit card we would receive:

THE COURT: And did you have any understanding from this original conversation, this original interaction, what the credit limit would be on the credit card?

THE WITNESS: Well, the credit limit was on the postcard itself.

THE COURT: And what did the postcard say?

THE WITNESS: It was like $4,000 to $7,000.

THE COURT: And is that what you thought?

THE WITNESS: Yes. By looking at the credit card, it said it had $4,000 to $7,000. But the bottom line is I really wanted the credit card.

(*Id.* at 53, *ll.* 1-11)

60. Indeed, McCray was still unaware, *at the time of his testimony,* that his Sterling Visa card had a credit limit of just $240. (7 R. at 60 *l.* 20-61 *l.* 7) McCray's confusion is even further demonstrated by his apparent ignorance of the secured nature of the Visa card. When asked about the money order that came along with his Sterling Bankcard application, McCray testified that he could not recall any such money order. (7 R. at 58, *ll.* 21-25) Thus, McCray apparently is also unaware that he could have asked Sterling Bank to return the $219 that secured his Visa card.

61. Thus, McCray (1) thought he was being offered a credit card, which was not the Diamond Select card, (2) was uninterested in signing up for Defendants' catalog program, and (3) was only interested in establishing credit and getting a Visa or MasterCard with a $4,000 to $7,000 limit. In fact, Defendants admit that the Sterling Bank card had only a $240, secured, limit. (5 R. at 133-35)

62. Moreover, contrary to Defendants' claims that their services helped people restore credit, nothing in McCray's testimony, or anything else in the record, supports that conclusion. There is no evidence that Defendants reported anything to any reporting agencies on McCray's behalf, and no evidence of what McCray's creditors, who remain nameless, relied on in extending him credit. While it would be wildly speculative to conclude that Defendants had anything to do with McCray's new-found credit, it is unremarkable that credit was extended to a person who has held a steady job for about seven years and has incurred no negative information for about fifteen years. McCray testified, in fact, that he now has 5 or 6 credit cards. (7 R. at 69, *ll.* 2-3)

63. In addition to McCray, at trial, in lieu of live testimony, Defendants proffered that they would call consumer witnesses to testify that they understood that there would be two credit cards, but conceded that none of the witnesses could recall being told that the credit limit on the Visa card would be only $240. (5 R. at 132 *l.* 23-133 *l.* 19; *see also id.* at 186, *ll.* 16-23 (establishing that 12 consumers would have testified))

 **\*14**  64. Thus, consumer testimony shows that consumers were, in fact, misled by Defendants' deceptive sales pitch.

*3. Customer Service Scripts and Sales Training Materials*
65. Defendants' customer-service scripts also show that Defendants knew that their sales pitch was misleading many consumers into believing they would receive a Visa card in the initial package. Defendants' Pull-Tape Script was drafted to respond to consumers who called to complain that a Visa card was not in their initial package:

> I'm also positive that the program was fully explained to you. It is a lot of information and your attention could have concentrated to the Major Visa Bankcard. You WILL receive one; just that ... it is the *second* step of the program.

(PX 51 at 03-01750) (original emphasis and ellipses) This script was posted at numerous workstations in the Customer Service department (Lugo Test., 4 R. at 120, *ll.* 3-9), showing that customer complaints about not receiving a Visa card in the initial package must have been among the most frequent, if not the most frequent, complaint consumers had.

66. Similarly, Defendants' sales-training materials show that Defendants instructed their sales representatives to purposely withhold important information that potential customers asked about, such as the fact that the Visa would have a credit line of only $240, that the consumer would receive an application for a Visa card (as opposed to a Visa card), and that the application would be sent only if in addition to making three on time payments of $33 the consumer also maintained a credit balance of $99. Their National Credit Shopper Sales Quiz, for instance, which Defendant Lugo testified was used to train new employees, (4 R. at 131 *l.* 10-132 *l.* 10) shows that Defendants instructed their sales representatives to withhold the fact that the credit line on the Visa card would have only be $240 and that it would be secured:

> How would you answer the following:
>
> *I would like to place an order, but:*

> 5. What will be my visa or MasterCard credit line? *(That will be determined by the issuing bank)*

(PX 240 at 2 (original emphasis); *see also* PX 52 at 04-00001.1 (rebuttal script containing same question and response)).

67. The only reasonable explanation for these scripted omissions is that the Defendants knew that even the small percentage of consumers solicited by Defendants who bought into the Earn-A-Bankcard program (*see* paragraph 68, *infra*) would not have done so had they known the Visa card would have a credit line of only $240, that the credit line was secured and that in order to receive it they would have to advance $375.10 to the Defendants. Defendants made numerous sales by withholding this information. Further, by concealing the low, $240 credit limit, Defendants reinforced the mis-impression created by their sales materials that consumers would receive an unsecured Visa card with a high credit limit that could be used "worldwide."

*4. Defendants' Admissions Regarding Customer Performance*
**\*15** 68. Defendants' admissions regarding customer performance reflect that the Earn-A-Bankcard program was intentionally designed to mislead consumers and that Defendants knew that consumers were being misled by their sales presentations. Defendants stipulate that only a small percentage of their Earn-a-Bankcard customers ever completed the program. While a total 199,846 consumers purchased the program, only 700, or less than one half of one percent of the purchasers, ever completed it and qualified for a Visa card. (Stipulation at 15-16, Uncontested Fact 21.) The number of consumers who actually received a Visa card is even smaller, since 235 of those who qualified never cashed the money orders Defendants supposedly sent to them. (*Id.*) While it would be normal to expect that some consumers would fall behind in making some monthly payments and thus not complete the program, surely more than one half of one percent of the purchasers would have completed the program had they understood its requirements and limitations before paying the $189 or $199.95 fee.

69. In fact, so few customers ever qualified for the Visa card that Defendants and/or their distributors sold the Earn-A-Bankcard program from the end of November 2001 to April 2002, without a financial institution that would provide credit cards to their customers. (Smith Test., 5 R. at 176, *l.* 18-179, *l.* 7; 244, *ll.* 16-19) Indeed, Defendant Smith testified that when he was assigned the task of finding a new credit card provider

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 124 of 192
F.T.C. v. Capital Choice Consumer Credit, Inc., Not Reported in F.Supp.2d (2004)
2004 WL 5149998

in late 2001, he did not view it as a desperate situation. (5 R. at 178, *l*. 9-10)

70. Further, of the 445,761 consumers who paid for the Approval Certificate Program and the Earn-A-Bankcard Program between February 2000 and April 2002, only 12,900 ever purchased an item from one of their catalogs. (Stipulation at 14, Uncontested Facts 15-16.) That is less than 3% of all consumers who bought one of Defendants credit card programs, and would be just 6.4% of the 199,846 Earn-a-Bankcard program buyers. Even if all consumers who purchased from a catalog were Earn-a-Bankcard customers, it simply is not logical to believe that nearly 94% of Earn-a-Bankcard purchasers would not have bought a single item from Defendants' catalog had they known they were paying $189 or $199.95 for a catalog card.

71. Finally, despite Defendants' claims that consumers were able to improve their credit ratings by participating in the Earn-A-Bankcard program, there is no evidence in the record showing that Defendants ever improved anybody's credit rating. In fact, the record is void of any evidence of any substantial consumer benefit, other than the meager number of cards issued though Defendants' Earn-a-Bankcard program. The fact that the overwhelming majority of Defendants' customers received no benefit from the fees they paid provides strong evidence of fraud.

72. In sum, the overall net impression that Defendants' sales presentation created for their Earn-a-Bankcard program was that consumers would get major, unsecured credit card, such as a Visa or MasterCard and that impression was knowingly created by the Defendants.

IV. *Count Two:* Whether Defendants Unfairly Debited Consumer Bank Accounts for "Upsales" (Section 5(a) of the FTC Act)

**\*16** 73. In addition to credit cards, the Defendants marketed, and continue to market, "upsale" products and services, such as the Nations Safe Drivers automobile club (Nations Safe), the Hartford Auto Club (Hartford Auto), the Continental Auto Rescue automobile club (CAR), the 1,000 Minute Mesa Saver phone card (MMS), the Premium Mega Saver phone card (PMS), and others. Defendants market these upsales both directly to consumers using their own telemarketer employees and through outside telemarketing agents.

74. For instance, the Capital Choice Defendants contracted with Defendant Zentel, Kyle Kimoto's company, to market the

upsales and the Capital Choice Defendants hired Kyle Kimoto to broker Hartford Auto and PMS to outside telemarketing call centers. These call centers sold the upsales supplied by the Capital Choice Defendants after pitching their own products to consumers. (Deposition of Kyle Kimoto at 36, *ll.* 6-22; 54, *l.* 17-55, *l.* 2 (filed July 9, 2003)) Kimoto brokered the Hartford Auto upsale to approximately 20 call centers. The call centers were required to pitch Defendants' upsales by computer and record the calls. (*Id.* at 53, *ll.* 6-23) Kimoto also brokered PMS to the same call centers. (*Id.* at 54, *l* 21-55, *l.* 2)

75. The Capital Choice Defendants debited consumer accounts for all upsales regardless of what company made the sale. Then, as explained by Kyle Kimoto, Millenium would remit a commission to the company that made the sale either directly or, if applicable, through the broker who sold the upsale to the company. (Kimoto at 36-37)

76. The FTC called Carmen Cala, a consumer witness to testify at trial on the issue of unauthorized debiting for the upsales.[3] On direct examination, Ms. Cala denied giving authorization for the debiting of her account for the PMS phone card and the Hartford Auto Club. On cross examination, the Defendants confronted her with a tape recording which consisted of a computer generated sales pitch, computer generated questions directed to Ms. Cala, and Ms. Cala's responses, in which, at a literal level, she appeared to have agreed to accept an offer of a "gift" consisting of a free trial membership in one of Defendants' upsale programs. Moreover, the recorded sales pitch and questions did not explain in express terms that her bank account would be debited, electronically or otherwise, if she did not cancel at the end of the applicable trial periods, and were so rapid fire as to be nearly unintelligible. Defendants agreed at trial that the recording was played in real time.

[3]    The FTC also called Ms. Melanie Foster to testify as to unauthorized debiting regarding the upsales. Ms. Foster testified that she did not recall-but she did not dispute that she may have been advised-that her account would be debited for the Nation's Safe program if she failed to cancel after the free trial period. (3 R. at 76). Additionally, she testified that the welcoming materials, which she failed to read until after her account was debited, "did say" that she would be billed $99 per year unless she cancelled prior to the expiration of the free trial period. (*Id.* at 74).

77. The company that pitched Ms. Cala was "Advantage Capital" and the FTC did not offer any direct evidence of a connection between the Capital Choice Defendants and Advantage Capital. However, according to Defendant Smith, the Capital Choice Defendants had a relationship with a company named "Advantage" that sold Hartford Auto Club and PMS. (PX 402 at Tr. 156) Also, according to the testimony of Kyle Kimoto, the Capital Choice Defendants required call centers to which the Hartford Auto Club had been brokered to pitch the upsales using the same method that appeared to have been utilized by Advantage Capital in its transactions with Ms. Cala, *i .e.* by pitching the sales through an IRV system. (Kimoto Dep. at 53) Additionally, the sales script used to pitch Ms. Cala appeared to be virtually identical to those utilized by the Defendants to pitch the Hartford Auto Club. Therefore, there is strong evidence that the Capital Choice Defendants directly or through an intermediary brokered the Hartford Auto Club and PMS upsale programs to Advantage Capital.

**\*17** 78. Whether sold by employees or outside telemarketers, the Capital Choice Defendants' upsale programs were offered on a free-trial, negative-option basis, meaning that the consumer had to call Defendants and cancel their memberships within the free-trial period in order to avoid being charged for the program. If consumers failed to cancel before the end of the trial period, charges for upsales were debited from consumers' bank accounts. (*See,* PXs 289-90, 292, 51 at 03-01735-37, and DX 23).

79. Electronic debits from consumers' bank accounts are processed through the automated clearing house network. The National Automated Clearing House Association, or NACHA, is an industry organization that writes and maintains rules governing network transactions (Larimer Test., 3 R. at 81, *ll.* 9-13). In September 2001, NACHA began permitting oral authorization of debit transactions by telephone. (*Id.* at 86, *l.* 20-87, *l.* 4). Jane Larimer, general counsel of NACHA, testified that, beginning in the second quarter of 2002, the rate of unauthorized for telephone, or TEL, transactions began to "skyrocket." (*Id.* at 87, *ll.* 23-25). In the third quarter of 2002, the unauthorized rate for TEL transactions reached 1.27% compared with an unauthorized rate of .05% for direct deposit payments. (*Id.* at 88, *ll.* 7-9) In response, NACHA changed its rules with respect to merchants with an unauthorized rate of 2.5% or higher to require that the merchant's bank provide certain information, explain why the merchant's unauthorized rate is so high and explain what will be done to bring the unauthorized rate down. (*Id.* at 89, *ll.* 11-22).

Thereafter, because Defendant Martinez knew the Capital Choice Defendants could not reduce their unauthorized rate, they ceased debiting electronically. (Martinez Test. 4R. at 8, *ll.* 7-10).

80. Global E-Telecom (Global) processed debits for Defendants' upsales beginning in March 2002. (Villarreal Test., 4 R. at 60, *ll .* 14-21) Eduardo Villarreal testified that Global debited consumers' bank accounts for Hartford Auto and PMS pursuant to contracts with Millennium, (*Id.* at 60, *l.* 4-61, *l.* 2) and with Style Decor (*Id.* at 62, *ll.* 8-11), a company used by Defendant Martinez to debit consumers for upsales after entry of the TRO in April 2002. (*Id.* at 63, *ll.* 7-15) In all, Global processed approximately 690,000 transactions for Defendants, totaling $55 million. (*Id.* at 65, *ll.* 3-9)

81. Approximately 55,000 debit transactions, or 8% of all transactions processed by Global, were charged back as unauthorized by consumers. (*Id.* at 66, *ll.* 19-24) The rate of unauthorized debits ranged from 4% to 13% depending on which upsale program Global was debiting for. (*Id.* at 67, *ll.* 18-24).

82. In addition, 207,000, or about 30% of the 690,000 transactions processed by Global were returned for insufficient funds, or NSF. (*Id.* at 67, *ll.* 2-3) Mr. Villarreal testified that, in his opinion, there is a correlation between high NSF rates and high unauthorized rates in the ACH industry because if those transactions that were returned NSF were actually debited from consumers accounts, more consumers would challenge the debits as being unauthorized. (8 R. at 27, *ll.* 9-17) Ms. Larimer of NACHA also testified that where there is a high NSF rate, the unauthorized rate is likely to be somewhat higher had the debits returned for insufficient funds been allowed to post. (3 R. at 90, *ll.* 11-13)

**\*18** 83. Mr. Villarreal testified that one of Global's ODFI's, or originating banks, contacted Global about Millennium's debit return rates. Villarreal understood the ODFI to mean that Millennium's return rates were higher than any other merchant in doing TEL transactions. (8 R. at 39, *ll.* 3-21) Global discontinued processing debit transactions for Defendants because of the ODFI's concerns. (*Id.* at 39, *ll.* 22-25)

84. ACH Direct processed debits for Millennium's credit card products, a phone card, and two auto clubs-Hartford Auto and CAR. (Thorness Test., 8R. at 90, *ll.* 11) When NACHA revised its rules and began scrutinizing unauthorized rates of

2.5% or more, ACH Direct terminated several telemarketers, including Defendants. Further, Defendant Smith received daily reports from ACH Direct that contained figures showing the number of transactions charged-back as unauthorized. (Thorness Test., 8 R. at 92, *l.* 15-93, *l.* 2) Smith testified that he reviewed these reports. (6 R. at 140, *ll.* 5-23) Smith also testified that he believed the unauthorized rate for debits processed by ACH Direct was 6 or 7%. (6 R. at 137, *ll.* 6-17)

85. Between January 2002, and May 6, 2002, Defendants sold MMS and Hartford Auto in outbound telemarketing calls using the script that appears in PX 51 at 03-01738. (Stipulation at 16, Uncontested Fact 22) The Court has already found that this script violates Section 5 of the Federal Trade Commission Act by failing to disclose that the "account on record" referred to in the script is the consumer's bank account and not their new Capital Choice credit card. (S.J. Order at 17)

86. Although consumers who purchased the Approval Certificate program made their checks payable to Capital Choice, the outbound upsale script directed telemarketers to say they were calling from Millennium Communications, a company consumers had never heard of before. (PX 51 at 03-01738; Smith Test., 3 R. at 31, *ll.* 1-6) Consumers had no reason to believe that Millennium had their bank account information. (Smith Test., 3 R. at 31, *l.* 9-32, *l.* 8)

87. Defendants' telemarketers congratulated consumers on their "new Platinum credit card[s] from Capital Choice Consumer Credit," (PX 51 at 03-01738) and went on to state that, because they were new cardholders, Millennium was sending them a "gift" of an MMS phone card for a 10-day trial. Consumers were told that after the trial period, the charge would be $39 "*billed* " to their "account on record." (*Id.* (emphasis added)) The script continued with a similar presentation for Hartford Auto. Telemarketers were to tell consumers that, after the trial period, the program was "just $8.25 a month *charged* annually in advance to your account on record with Capital Choice Consumer Credit." (*Id.* (emphasis added))

88. The script never mentioned the consumer's bank account or anything about debiting. (*Id.*) Under these circumstances, consumers did not authorize Defendants to debit their bank accounts for Hartford Auto or MMS. Indeed, Defendant Smith admitted that in April 2002, Defendant Lugo told him that consumers were complaining that they thought fees for Hartford Auto and MMS would be charged to their new credit cards, and that they had not authorized Defendants to debit their bank accounts. (3 R. at 34, *ll.* 2-14.)

**\*19** 89. The totality of the evidence summarized in paragraphs 73 through 88, *supra,* suggests strongly that while Defendants may be able to produce tape recordings which contain statements by consumers accepting Defendants' free trial offers, the customers did not authorize, and were not given an opportunity to decline to authorize, the Defendants to debit their bank accounts. [4] In this regard, the undersigned is particularly persuaded that the 30% rate of transactions returned for insufficient funds reflects that individuals were not knowingly authorizing the debiting of their bank accounts. Further, the likelihood that the high rate of transactions returned for insufficient funds resulted from customers who did not authorize the debits is reinforced by the fact that numerous customers whose "authorizations" were obtained using the script that employed the "account on record" language complained to the Capital Choice Defendants that they believed their "credit card" would be charged for the upsales rather than their bank accounts debited; the undersigned has already found that the script which referred to the "account on record" violated Section 5 of the FTC Act. This conclusion is further buttressed by the evidence respecting the manner in which Ms. Cala's agreement to the "free trial offers" was obtained.

[4]     The FTC also contends that it proved at trial that the Defendants violated Section 5 by debiting customer bank accounts for renewals of their auto club memberships without obtaining authorizations to do so. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 34. The Capital Choice Defendants objected to the presentation of the evidence relating to this claim at trial, *see* R. 5 at 209, and now object, arguing that this claim is outside the scope of the Second Amended Complaint. *See* Defendants' Proposed Findings of Fact and Conclusions of Law at 31-32. The Court agrees and, therefore, declines to deem the Second Amended Complaint amended to conform to the evidence. *See, e.g., Borden, Inc. v. Fla. East Coast Railway,* 772 F.2d 750 (11th Cir.1985); *Sun-Fun Products, Inc. v. Suntan Research & Dev., Inc.,* 656 F.2d 186 (5th Cir.1981); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552 (Fed.Cir.1984).

V. *Count Three:* Whether Defendants Deceptively Sold Upsale Products by Telling Consumers They Would be Billed on Their Account on Record Without Disclosing that Account on Record Meant Their Bank Accounts (Section 5(a) of the FTC Act).

90. The Court granted Plaintiff's motion for summary judgment on Count Three. (S.J. Ord. at 19.)

91. Evidence relating to liability of the Individual Defendants is discussed at Findings of Fact, paragraphs 127 through 153, *infra.*

VI. *Count Four:* Whether Defendants Misrepresented That Consumers Would Receive a Major Unsecured Credit Card (Telemarketing Sales Rule "TSR" Section 310.3(a)(2)(iii)).

92. Plaintiff alleged in Count Four of the Second Amended Complaint that Defendants violated the Telemarketing Sale Rule by misrepresenting their Earn-a-Bankcard program. The facts set forth *supra* in Findings of Facts, paragraphs 30 through 72 establish misrepresentations in violation of the Telemarketing Sales Rule.

VII. *Count Five:* Whether Defendants Requested and Accepted a Fee in Advance After Representing that Consumers Were Guaranteed or Highly Likely to Receive an Unsecured, Major Credit Card (Section 310.4(a)(4) of the TSR).

93. The TSR prohibits any telemarketer or seller from requesting or receiving a payment in advance of obtaining any extension of credit, including an unsecured major credit card, when the telemarketer or seller has guaranteed or represented a high likelihood of success in obtaining or arranging such extension of credit. (16 C.F.R. § 310.4(a)(4))

94. The Capital Choice Defendants like to characterize themselves as a catalog company. (9 R. at 85, *ll.* 20-23.) It is, however, clear that the Capital Choice Defendants, as part of the Earn-A-Bankcard program, asked for and received advance payments from consumers after guaranteeing them a Visa card.

**\*20** 95. First, Defendants' sales materials, including the initial postcard and subsequent telephone sales pitch, were likely to lead reasonable consumers to believe that Defendants were offering an unsecured, major credit card. (*See* Findings of Fact, *supra* at ¶¶ 35-48). Indeed, Defendants' Earn-a-Bankcard script told consumers that "most importantly you

are guaranteed to receive your Visa credit card to be used worldwide, even if you've had problems with your credit in the past," and implied that the credit limit was guaranteed to be \$7,500. (PXs 51 at 03-01735-37; 286-92.)

96. Second, five consumers, including Defendants' own witness, testified that they paid Defendants for the Earn-a-Bankcard program because they thought they were promised a Visa card. (Eubanks-Lindsay Test., 2 R. at 188, *ll.* 2-4; 192, *ll.* 15-24; Witt Test., 2 R. at 233, *ll.* 2-5; Rose Test., at 4 R. at 82, *ll.* 1-4; Foster 3 R. at 66, *ll.* 5-13; McCray Test., 7 R. at 55, *ll.* 1-18) Indeed, Defendants' own witness acknowledged, in response to the Court's inquiry, that the "bottom line is I really wanted the credit card." (7 R. 53, *ll.* 9-11)

97. Third, Defendants' assertion that what they sell is a catalog card is disproved by their admission that less than 3% of all their customers have ever ordered a single item from their catalog. (*See* Findings of Fact, *supra* at ¶ 70) Obviously, if consumers thought they were buying a catalog card, most would have bought from the catalog after sending in their \$189 or \$199.95 fee.

98. Finally, counsel for the Corporate Defendants, nowhere contradicted in the record, stated that "[t]he big difference in the Earn-A-Bank card program that comes in under these defendants, corporate defendants' program, is that the visa was indeed guaranteed." (1 R. at 30, *ll.* 14-16) Counsel furthermore reaffirmed what was set out as the most important part in Defendants' Earn-a-Bankcard pitch, that you are guaranteed to receive a Visa card:

> [M]ost importantly you're guaranteed to receive your Visa card, and so forth, even if you had credit problems in the past. That's true. It say it's that simple and that's exactly true.

(1 R. at 33, *ll.* 18-21)

99. Thus, Defendants, in their Earn-a-Bankcard program, promised a major, unsecured credit card, and asked for and accepted fees in advance of those promised credit cards.

100. Defendants maintain that Section 310.4(a)(4) of the TSR applies only to the offering of advance-fee loans, not credit cards, and that it is inapplicable to "firm offers." These

2004 WL 5149998

arguments fail for the reasons set forth in the Conclusions of Law at paragraphs 46 through 47, *infra.*

VIII. *Count Six:* Unauthorized Debiting Under the Telemarketing Sales Rule

101. The Court granted Defendants Judgment as a Matter of Law on Count Six. (Ord. Sept. 29, 2003.)

IX. *Count Seven:* Whether the Upsale Scripts Used by the Defendants and Provided to Other Telemarketers to Sell Defendants' Upsales Failed to Disclose the Identity of the Seller (Section 310.4(d) of the TSR).

*21 102. The TSR requires that telemarketers, in outbound telemarketing calls, disclose promptly and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; and (3) the nature of the goods or services. (16 C.F.R. § 310.4(d).)

103. The script Defendants used between January and May 6, 2002, to offer upsales to consumers who paid for the Approval Certificate states that the telemarketer is calling from "Millennium Communications," a company consumers had never heard of before. (PX 51 at 03-01738; Smith Test., 3 R. at 31, *ll.* 1-6.) The FTC contends that because these consumers had already done business with Defendants under the name Capital Choice Consumer Credit, the Capital Choice Defendants' identification of Defendant Millennium as the maker of the call was an abusive telemarketing practice. While the Court agrees with the FTC that there was no reason for consumers to know that Millennium was affiliated with Capital Choice, the FTC has not offered any convincing evidence that Defendant Millennium was not a person that was itself providing or arranging with others to provide the upsale program. [5]

[5] "Seller" is defined at 16 C.F.R. § 310.1(r) as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services in exchange for consideration."

104. Defendants introduced into evidence as DX 23 and DX 24 two undated "upsale scripts" for Hartford Auto Club and Premium Mega Saver (8 R. at 81) stating that they were used after April 11, 2002. Neither of these scripts identifies the seller as Millennium Communications and Fulfillment. However, as the Capital Choice Defendants point out, a

reading of these scripts indicate that they do not stand alone, without being attached to, or following another primary script or sale. *See* Capital Choice Defendants' Response to Plaintiff's Second Correction and Revised Second Correction to Proposed Findings of Fact and Conclusions of Law at 2. Plaintiff has offered no convincing evidence showing that the "seller" was not identified in the primary script or sale during the "outbound telephone call." 16 C.F.R. 310.4(d). As a result, the undersigned is unable to agree with the Plaintiff that DX 23 and DX 24 establish that the Capital Choice Defendants engaged in abusive telemarketing practices, thereby violating 16 C.F.R. § 310.4(d).

X. *Count Eight:* Whether Corporate Defendants Ecommex, Millennium, Capital Choice, and Hartford, and Individual Defendant Martinez Assisted and Facilitated E-Credit Solutions, Inc. and Zentel Enterprises, Inc., in Telemarketing the Earn-a-Bankcard Program (Section 310.3(b) of the TSR).

105. Defendant Millennium operated call centers in Tampa, Lakeland, and Miami, Florida. In May 2001, it agreed to sell the Tampa and Lakeland call center operations and equipment to Zentel Enterprises, Inc. The sales agreement between Millennium and Zentel ("the Agreement") appears as PX 58. (Stipulation at 17, Uncontested Fact 28.)

106. Under the terms of the Agreement, Zentel was required to use and occupy the call centers solely to sell the Earn-a-Bankard program and the Capital Choice Defendants' "upsales," with the exception of one of Zentel's own upsales. (Stipulation at 17-18, Uncontested Fact 29; PX 58 at ¶ 2.3.1.) Defendant Millennium reserved the right to set the prices to be charged for the bankcard program and the upsales.

*22 107. The Agreement permitted Zentel to market the Earn-a-Bankard program under a "private label" name. (PX 58 at ¶ 2.3.17.) Zentel telemarketed Defendants' Earn-a-Bankard program under the name E-Credit Solutions from the Tampa and Lakeland call centers purchased from Defendant Millennium. (Kimoto Dep. at 16.) Zentel sold Defendants' Earn-a-Bankard program under the name E-Credit Solutions from mid-June 2001, until April 11, 2002. (Kimoto Dep. at 34, 66; Joint Exh. 1) Other than lending its name to Defendant Zentel's bankcard program, Defendant E-Credit Solutions handled call center back office operations, such as bookkeeping, paying vendors, and interacting with Defendant Millennium.

108. The Agreement required Defendant Millennium to provide "leads," or the names of potential customers for Zentel, which would, in turn, "rent" the leads from Millennium. (Stipulation at 18, Uncontested Fact 30) The target audience of potential customers for the Earn-a-Bankcard program was consumers with bad credit or no credit. (5 R. at 148, *ll.* 17-19)

109. Pursuant to the agreement, Defendant Millennium retained the exclusive right to mail postcard solicitations on behalf of Zentel and to fulfill Zentel's sales of the National Credit Shopper Earn-a-Bankcard program and Defendant Millennium's upsale programs. (Stipulation at 18, Uncontested Fact 31) Additionally, Millennium retained the exclusive right to fulfill "after sale requirements," meaning the printing, mailing, personalizing and processing of mail ready packages and catalogs, for which Zentel was charged $25.00 per package.

110. Defendants designed the direct mail postcard solicitation used by E-Credit and Zentel (Kimoto Dep. at 49, *l.* 22-50, *l.* 2) That postcard solicitation was the same in all substantive respects as the postcard Defendants used to solicit consumers when they were selling the Earn-a-bankcard program with their own employee telemarketers. (3 R. at 20, *ll.* 10-20)

111. When consumers called Zentel's call centers, the E-Credit Defendants used a script provided by the Capital Choice Defendants to sell them the Earn-a-Bankcard program, as they were required to do by the Agreement. (Stipulation at 20, Uncontested Fact 7; 3 R. at 18, *l.* 18-20, *l.* 5) Defendants used the same script when they were selling the Earn-a-bankcard program under the name National Credit Shopper using employee telemarketers. (3 R. at 20)

112. Defendant Zentel had the ability under the Agreement to contract with its own ACH house for the purpose of debiting the accounts of customers who bought the Earn-A-Bankcard program and it did its own debiting. (PX 58 at ¶ 2.3.4.2). The upsales, however, were debited against customer accounts by Defendant Millennium through direct access to Defendant Zentel's database, and then Defendant Millennium remitted a commission of $35 per upsale to Defendant Zentel. (PX 58 at ¶ 2.3.8.2; Kimoto dep. at 36-37) Indeed, the Agreement required Defendant Zentel to allow Defendant Millennium "full and unfettered" access to its database with "remote administrative control capabilities." (PX 58 at ¶ 2.3.12)

**\*23** 113. The Agreement required that Defendant Zentel, upon its assumption of the operations of the call centers, re-hire most of the call center employees. (Stipulation at 18, Uncontested Fact 32.) The Agreement also required that Zentel meet a sales quota established by Defendants in order to market Defendants' Earn-a-Bankcard program. (3 R. at 18, *ll.* 1-3; PX 58 at ¶ 2.3.16)

114. Apart form the $25 per package fee, Defendant Zentel paid Defendant Millennium approximately $80,000 a month for consulting services under the terms of the Agreement. Among other things, Millennium provided consulting and training on how the credit card program should be operated, including scripting and setting guidelines, and on the use and updating of computer software. (Kimoto Dep. at 39-41.)

XI. *Common Enterprise:* Whether Corporate Defendants Capital Choice, Millennium, Ecommex, and Hartford Auto Club Constitute a Common Enterprise

115. Defendants Capital Choice, Millennium and Ecommex operated seamlessly for the purpose of marketing the Approval Certificate and Earn-A-Bankcard programs as well as the upsales to consumers. Although the Approval Certificate program may have been designed independently of Defendant Millennium, most consumers who purchased the Approval Certificate Program, the Earn-A-Bankcard Program or an upsale, whether directly or indirectly from the Capital Choice Defendants, could not complete the transaction without interacting with each of them. For example, a consumer purchasing the Approval Certificate program from Capital Choice, mailed a check to Capital Choice which Capital Choice then used to electronically debit the customer's bank account through an ACH that contracted with Defendant Millenium; the customer then received a "package" that was mailed from Ecommex containing materials designed by Millennium; and then the customer was pitched an upsale, like the Hartford Auto Club by Defendant Millennium or one of its distributors using scripts prepared by Millenium. Likewise, a consumer purchasing the EarnABankcard program also had his bank account debited through an ACH that contracted with Defendant Millennium, then received a "package" from Ecommex containing materials prepared by Millennium and thereafter was pitched an upsale, such as Hartford Auto Club, by Millennium or one of its distributors.

116. Capital Choice, Millennium, Hartford and Ecommex have the same owner and president. Since January 2002, all of these Defendant corporations have maintained their principal

offices at, and have operated out of, 9590 N.W. 25th Street, Miami, Florida, the same business premises. (Stipulation at 17, Uncontested Fact 26; 3 R. at 123)

117. Defendant Ricardo Martinez is the owner of all four corporations, and was the president of each company during the relevant time period alleged in the FTC's complaint. (3 R. at 121-122) Defendant appointed Miriam Montes president of Ecommex and his daughter, Caridad Martinez, president of Millennium in early 2003. (*Id.*) Defendant Smith has been the CEO of Defendant Millenium since November 2001 and in that capacity insures that Defendant Millennium fully supports the business operations of Capital Choice, Ecommex and Hartford Auto Club (as well as other upsale programs) by designing and preparing marketing materials, formulating marketing strategies and interacting with the ACH houses. Defendant Smith works closely with, and reports to, Defendant Martinez.

 *24 118. Defendant Martinez testified that his corporations performed specific functions in relation to sales-Millennium was the marketing company, Capital Choice was the credit card company, and Ecommex was the fulfillment company. (3 R. 148, *ll.* 4-8) But the three corporations shared responsibilities for the purpose of marketing the Approval Certificate Program, the Earn-A-Bankcard program whether marketed directly or indirectly by the Capital Choice Defendants, and the upsales made by the Capital Choice Defendants, Defendant Zentel, and their distributors.

119. The name National Credit Shopper is a d/b/a of Capital Choice. (3 R. at 123, *ll.* 12-15) The Capital Choice and National Credit Shopper Earn-a-Bankcard programs were owned by Capital Choice, but they were telemarketed by Millennium and "fulfilled" by Ecommex. (*Id.* at 125, *ll.* 3-9)

120. Ecommex Corp. has been dormant since early 2003. (1 R. at 177) Prior to becoming dormant, Ecommex served as a shipping/handling/processing/mailing company for Capital Choice and Millennium. (Stipulation at 17, Uncontested Fact 27) In that capacity, it printed and mailed the Capital Choice Approval Certificate (3 R. at 123, *ll.* 21-22.), and printed and mailed the postcard solicitations for the Capital Choice and National Credit Shopper Earn-a-Bankcard programs when those programs were being sold by Defendants' telemarketers. (*Id.* at 123, *l.* 23-124, *l.* 12) Ecommex also made payroll for Capital Choice and Millennium and obtained benefits, such as health care insurance, life insurance, and dental insurance for

Defendants' employees. (Stipulation at 17, Uncontested Fact 27)

121. Prior to the time that all three businesses began doing business at 9590 N.W. 25th Street, there was a research and development department at the Ecommex warehouse on N.W. 34th Street. The research and development department looked for new products for all three companies. (*Id.* at 147, *ll.* 20-23)

122. Hartford Auto Club, Inc. was incorporated by Defendant Martinez after this action was filed in April 2002. (3 R. at 125-26.) Mr. Martinez testified that Hartford Auto Club has never done business and has no employees. (*Id.* at 127-28)

123. Because of the interrelationship of the companies and the overlapping character of their interaction with the public, the undersigned can discern no meaningful distinction that can be made among the Capital Choice Defendants for the purpose of fashioning consumer redress.

XII. *Consumer Injury*

124. Between October 19, 2000, and November 15, 2001, 61,688 consumers paid Defendants $199.95, or a total of $12,334,515, for the National Credit Shopper "Diamond Select" Earn-a-Bankcard program. (Stipulation at 14, Uncontested Fact 12) Between February 23, 2000 and October 19, 2000, 11,730 consumers paid Defendants $189 .00, or a total of $2,216,970, for the Capital Choice "Platinum Plus" Earn-a-Bankcard program. (Stipulation at 13, Uncontested Fact 9) Consumers paid Defendants a total of $14,551,485 for the Earn-a-Bankcard program. Another 68,562 consumers purchased the National Credit Shopper "Diamond Select" Earn-a-Bankcard program from E-Credit Solutions and Zentel, to whom Defendants provided substantial assistance and support in violation of the TSR. These consumers paid $199.95, or a total of $13,708,971 for the Earn-a-Bankcard program. (Stipulation at 14, Uncontested Fact 14)

 *25 125. From February 23, 2000, to April 11, 2002, 234, 192 consumers responded to Defendants' direct mail Approval Certificate by sending Defendants checks for either $39 or $43. (Stipulation at 13, Uncontested Fact 6) Assuming all sales of the Approval Certificate were at $39, gross revenues to Defendants from the certificate program were at least $9,133,488. Approximately 12,334 consumers who purchased a Capital Choice credit card program received refunds. (Stipulation at 13, Uncontested Fact 8) Assuming all such refunds were to Approval Certificate purchasers in

the amount of $43, Defendants' gross receipts minus refunds given for the Approval Certificate program totaled at least $8,603,126.

126. Defendants debited consumers bank accounts without their authorizations for Hartford Auto and MMS using the script contained in PX 51 at 03-01738 in the amount of approximately $455,000. Defendant Lugo testified that between January and April 2002, Defendants operated two shifts of five telemarketers each in their outbound call center to sell upsales using that script. (4 R. at 134, *l.* 25-136 *l.* 4) According to Lugo, each telemarketer averaged one sale per hour, and that each shift generated approximately 30 sales. (*Id.* at 135, *ll.* 13-19) Sixty sales per day of Hartford Auto at $99 would result in debits from consumers' bank accounts totaling $5,940, and sixty sales per day of MMS at $39 would result in debits from consumers' bank accounts totaling $2,340. If those amounts are rounded to $5,000 per day and $2,000 per day, respectively, to account for returned transactions, Defendants debited consumers bank accounts without authorization in the sum of $7,000 per day, or $35,000 each 5-day workweek. Assuming Defendants began using the script on January 4, 2002, and sold from it until April 5, 2002, Defendants debited consumers' accounts without authorization at the rate of $35,000 per week for 13 weeks, or a total of $455,000. This amount is likely the least Defendants received from these unauthorized debits.

XIII. *Individual Liability:* Whether Defendants Martinez, Smith, Lugo Are Individually Liable

    A. Defendant Martinez had the Authority to Control the Activities of Corporate Defendants, Exercised that Control, and Knew or Should Have Know of That it was Illegal

127. Defendant Martinez is the sole owner and president of Defendants Capital Choice, Millennium, Ecommex, and Hartford. (Stipulation at 12, Uncontested Fact 1) At trial, Mr. Martinez stipulated that "the buck stops here." (3 R. at 139, *ll.* 17-18) That stipulation included approving the scripts, approving the sales materials, and doing everything that Mr. Martinez's companies did. (*Id.* at 140, *ll.* 14-25)

128. Defendant Martinez sets the compensation of his management employees, and he can fire them at will. (3 R. at 139, *l.* 19-140 *l.* 4) Martinez talks with Defendant Smith and Mr. Jose Estruch (erroneously referred to as "Struff" in the Record), another senior manager, three to four times a week, and receives "cash flow, sales and other

pertinent management reports." (*Id.* at 130.) These reports have included ACH reports. (*Id.* at 153, *ll* . 19-24) He had to have known that Defendants prepared rebuttal scripts to respond to consumers who obviously thought they were getting a major credit card, they prepared rebuttal scripts that declined to inform consumers who asked that the limit on the Visa card they would ultimately get would be just $240, and he had to have known that only a tiny fraction of his customers ever bought from the catalog, much less completed the program.

    B. Defendant Smith had the Authority to Control the Activities of Corporate Defendants, Participated Directly in the Challenged Conduct, and Knew or Should Have Known That it Was Illegal

**\*26** 129. Defendant Smith is the Chief Executive Officer of Defendant Millennium (Stipulation at 12, Uncontested Fact 2) and has been since late 2001. (1 R. at 153, *ll.* 15-18) Smith started with Millennium in May 1998. (1 R. at 153, *ll.* 19-21) He was hired by Defendant Ricardo Martinez, (1 R. at 154, *ll.* 2-4) and has always reported only to Martinez, the owner of Millennium. (1 R. at 158, *ll.* 9-10) Smith has oversight of the marketing activities of Millennium. (1 R. at 145, *ll.* 5-18) Before becoming CEO in 2001, Smith had been Chief Operating Officer and Senior Vice President of Millennium. (1 R. at 155, *ll.* 7-10) Although he is CEO of Millennium, Smith also has responsibilities with regard to Ecommex and Capital Choice. (1 R. at 144, *ll.* 9-19; *see also,* PX 402 at Tr. 136, *l.* 8-137, *l.* 1)

130. Prior to his employment by Millennium, Smith was employed by Corporate Center of Miami as sales manager. Corporate Center, like Millennium, marketed catalog cards to people with bad credit. (1 R. at 155, *ll.* 11-21)

131. Defendant Smith has been involved in Telemarketing for five years, (1 R. at 175, *ll.* 10-11) and claims to be very familiar with the Telemarketing Sales Rule. (6 R. at 133, *ll.* 22-24)

132. Simultaneous with Smith's arrival, Millennium began telemarketing the Continental Advantage credit card program, which was owned by a third party named Ray Evans. (1 R. at 159, *ll.* 3-16) Millennium was subsequently sued by the Florida Attorney General over the sale of the Continental Advantage card. (1 R. at 160, *l.* 24-161, *l.* 4)

*1. Defendant Smith's Liability for the Earn-A-Bankcard Program*

133. Defendant Smith participated directly in the development and sale of the Earn-a-Bankcard programs, had management responsibilities for the programs and knew or should have known that consumers were being deceived. He also knew that Defendants were requesting an advance fee in guaranteeing the acquisition of a credit card in violation of the TSR.

134. The testimony is that Defendant Martinez decided to develop his own credit card programs to replace the Continental Advantage credit card program. (1R., at 161, *ll.* 14-16) As a result Martinez, Smith, and Lugo jointly developed the Platinum, Platinum Plus, and National Credit Shopper programs. (1 R at 163, *ll.* 13-23, *see also,* n. 2 to Defendants Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corp., Hartford Auto Club, Inc., Ricardo Martinez and Wilfredo Lugo's Proposed Findings of Fact and Conclusions of Law (March 14, 2003)) The Platinum Plus and National Credit Shopper programs were the Earn-A-Bankcard programs, and were owned by Capital Choice with National Credit Shopper being a DBA of Capital Choice. (1 R. at 163, *l.* 23-164, *l.* 13) Smith had brought with him from Corporate Center telemarketing scripts, which served as the basis for the Capital Choice Platinum Plus and National Credit Shopper telemarketing scripts. (1 R. at 164, *l.* 14-165, *l.* 2) Smith assisted in modifying the Corporate Center scripts for use in selling the Earn-a-Bankcard programs. (1R. at 163, *l.* 13-165, *l.* 2) Smith also admits that he reviewed and commented to Martinez on the direct mail post card solicitation sent to prospective Earn-A-Bankcard customers. (1 R. at 165, *ll* 3-11) Smith also had overall responsibility for the telemarketing of the Earn-a-Bankcard programs including the customer service department, which was managed by Defendant Lugo who reported directly to Smith. (1 R. At 175 *ll.* 15-19)

**\*27** 135. Smith must certainly have been aware of the "Pull Tape Script," which Lugo's department used when customers called in to challenge Earn-a-Bankcard transactions, (Lugo Test, 4R at 119, *ll.* 14-17) and which was publicly posted at workstations in the Customer Service Department. (*Id.* at 120, *ll.* 3-9) The script instructed employees to tell customers "I'm certain that the program was fully explained to you. It is a lot of information and your attention could have concentrated to the Major VISA Bankcard. You WILL receive one; just that it is the second step of the program ." (PX 51 at 03-01750

(original emphasis and ellipsis.)) Smith also admits that he developed the "sales quiz." (PX 240; Smith Test. 5 R. At 142, *ll.* 5-21) That quiz was used to train telemarketers and directed them to tell inquiring consumers that the credit limit of the VISA card would be determined by the issuing bank, even though Smith admits that he knew that the secured VISA card would have a $240 credit limit. (Smith Test. 5 R. at 142 *l.* 21-43 *l.* 23) Smith's responsibility for the Capital Choice Earn-A-Bankcard programs is also demonstrated by the fact that it was he who was responsible for finding a replacement bank when Sterling Bank ceased issuing secured credit cards. (Smith Test., 5 R ., 177 *l.* 7-178 *l.* 3)

136. Smith was handsomely rewarded for his role in developing and managing the Earn-a-Bankcard programs. In addition to his $300,000 per year salary he received up to a $4.00 commission on each of the nearly 200,000 Earn-a-Bankcard sales made by defendants, E-Credit Solutions and, by Capital Choices' other distributors. (*See,* Stipulations at 13-14, Uncontested Facts 9, 12, 13, and 14) Under these facts Defendant Smith is jointly and severally liable for consumer redress to Earn-A-Bankcard consumers.

*2. Defendant Smith's Liability for the Approval Certificate Program.*

137. Smith is also jointly and severally liable for the consumer redress due the Approval Certificate (or Platinum card) consumers after January 2002. Smith contends that "there is not an iota of evidence that [he] had any involvement whatsoever in [the] ... approval certificate program," (1 R. at 47, *ll.* 3-5) and that he did not even know about the program. (1 R. at 48, *ll.* 2-8) The gravamen of Smith's argument is that the Approval Certificate program was conducted solely by Ecommex Corporation, which was managed by one Jose Estruch, and that Defendant Smith had no management control over Ecommex. The testimony and evidence show that these contentions are wrong. The Approval Certificate program belonged to Capital Choice, at least from January 2002 Smith exercised management responsibility over all Capital Choice credit card programs, and Smith knowingly acquiesced in and participated in the Approval Certificate program. He moreover exercised some management oversight of the certificate tasks performed by Ecommex after January 2002.

**\*28** 138. As found *supra,* at Findings of Fact ¶¶ 115 through 123, the Corporate Defendants were a joint enterprise. Defendant Martinez testified to this stating that Millennium was the marketing company, Ecommex the fulfillment

company and Capital Choice the credit card company and that Ecommex "does the dirty work the mailing, the shipping, the printing, stuff like that.... But what happened was at the end, the two companies kind of moved under one company and that is what all this mess about creating another department. Sometimes I get confused." (Martinez Test., 3 R. at 148, *ll.* 2-13) The companies moved under one roof in approximately January 2002.

139. Consumers who purchased the Approval Certificate program made out their checks to Capital Choice and the electronic processing of these checks was done in the name of Capital Choice. (*see* PX 116) For example, it was Defendant Smith who wrote and submitted PX 116 to ACH Direct. At least after January 2002, Smith was responsible for the processing of these checks through the ACH houses. In that document, Smith describes both the Earn-a-Bankcard program, and the Approval Certificate program and denominates them as Capital Choice programs. PX 116 thus demonstrates not only that the Approval Certificate program was a Capital Choice program, but also that Smith knew it and participated in the Approval Certificate program by, among other things, negotiating and maintaining the necessary ACH relationship. At the Preliminary Injunction Hearing in April of 2002, moreover, it was Smith who described the Approval Certificate program and how it worked to the Court. ( PX 402 at Tr. 139-48)

140. Other evidence demonstrates Smith's connection to the Approval Certificate as early as June 2001. Millennium used the information obtained from consumers checks and the application forms sent in response to the Approval Certificate to telemarket the Hartford Auto Club and Minutes Mega Saver to consumers using the script contained in PX 51 at 03-01738, a Millennium script. (5 R. at 165-67)

141. The evidence further shows that Smith's contention that he had no responsibility for Ecommex's fulfillment activities is false. Plaintiff introduced at trial three documents Ecommex personnel directed to him. (PXs 269, 270, and 282) Two of these documents dealing with Ecommex's fulfillment activities, and which were from Ecommex personnel, were in fact on Millennium, not Ecommex letterhead. (PXs 269 and 270) Smith testified that Dennis White, the author of PX 269 and PX 270) directed the reports to Smith because Mr. White did not "recognize Mr. Estruch" as his boss, (5 R. at 242 *l.* 24-243 *l.* 2) showing that White, at least, viewed Smith as a person in charge. The reports include sales information on the Approval Certificate program, and in PX 269, White

refers to directives discussed with "yourself" (Smith) and "Ricardo" (Martinez) about the fulfillment department. (5 R. at 246, *ll.* 11-16) Therefore as a matter of law Defendant Smith is liable for consumer redress to the victims of the Approval Certificate.

### 3. Defendant Smith's Liability for Unfair and Deceptive Practices Resulting from the Use of the Upsale Script in PX 51.

***29** 142. Defendant Smith is also jointly and severally liable for consumer redress to the consumer victims of the upsale script contained in PX 51 at 03-01738, which the court granted summary judgment on as to Count Three of the Second Amended Complaint, and which resulted in consumers bank accounts being unfairly debited as alleged in Count Two. Smith, in fact, agrees that the language of the PX 51 outbound upsale script confused and deceived consumers. (3 R. at 37, *l.* 22-38, *l.* 1) Although Smith testified that Defendant Martinez wrote the script, he admitted that he reviewed and approved it, and that it was a Millennium script. (3 R. at 28, *l.* 25-29, *l.* 14)

143. Smith also testified that Defendant Lugo informed him in "early April" 2002, that consumers were complaining that they thought that their Capital Choice credit cards, not their bank accounts, would be charged for upsales. Lugo suggested that they change the script's language to "bank account on record." (3 R. at 34, *ll.* 2-16.) Even so, Defendants continued to use the script until May 6, 2002. (Stipulation at 16, Uncontested Fact 22)

### 4. Defendant Smith's Liability for the Other Unfair Debiting Activities.

144. Defendant Smith is also jointly and severally liable for the other unfair debiting involved in Defendants' upsales. Millennium was responsible for upsales. (Smith Test., 1 R. at 152) Smith received daily reports from the ACH houses showing the rate of charge backs including the unauthorized rates where consumers filed affidavits with their banks stating that they had not authorized debits, (3 R. at 45 *l.* 10-46 *l.* 1) and that he reviewed the reports. (6 R. at 140, *ll.* 9-23) Smith testified that he did not specifically break out the rate for unauthorized debits on these reports because he believed consumers signed sworn affidavits with their banks that were not true just to get their money back. (3 R. at 46, *ll.* 4-14) Nevertheless, he believed the unauthorized rate was 6% or 7%. (6 R. at 136, *ll.* 6-17)

145. Millennium was responsible for handling customer service and it was Millennium under the direct management of Defendant Lugo that listened to tapes such as the one played in court and denied consumers refunds based on their alleged affirmative responses to such tapes.

C. Defendant Lugo had the Authority to Control the Activities of Corporate Defendants, Participated Directly in the Challenged Conduct, and Knew or Should Have Known That it Was Illegal

146. Defendant Lugo started with Millennium Communications as a sales manager in 1998, and has since become general manager. He oversees customer service, the compliance managers, and the sales managers. Also as part of his duties, he reviews recordings of consumer transactions to verify authorization. (4 R. at 101 *l*. 5-102 *l*. 3)

147. Part of Lugo's duties include finding out what customers are calling in to complain about. (4 R. at 108, *ll*. 13-17) Although the Customer Service Department was trained to respond to customer-service calls, Lugo would bring complaints to Defendant Smith's attention when necessary, and to no one else. (4 R. at 109, *ll*. 9-19) His responsibilities also include reporting to Defendant Smith any problems that might come to his attention relating to Defendants' inbound scripts, (5 R. at 17, *ll*. 20-22) and outbound scripts. (*Id.* at 23, *ll*. 16-22)

 **\*30** 148. Lugo testified that he had approved the use of the pull-tape script, *i.e.,* PX 51 at 0301750. That script responds to customer inquiries by telling consumers "I'm also positive that the program was fully explained to you. It is a lot of information and your attention could have concentrated to the Major Visa Bankcard. You WILL receive one; just that ... it is the second step of the program." He testified that he had no problems with it being used. (4 R. at 120, *l*. 16-121, *l*. 4)

149. Lugo also testified that he approved for use by customer service PX 52, another rebuttal script. (4 R. at 125) That script contains a planned response to a customer question asking what the credit line will be on the Visa or MasterCard, not by telling them that the credit line would be $240, but by telling the consumer that the issuing bank will determine the credit line. Lugo further testified that he had authority to make recommendations as to how this script should read, and that he failed to correct it. (*Id.* at 126, *l*. 22-127, *l*. 2) He further testified that the script was brought to Millennium by he and Defendant Smith, (*id.* at 129, *ll*. 15-19) and that he, Smith, and Ricardo Martinez modified it to conform to Millennium's

current practices. (*Id.* at 130, *ll*. 9-20) It's use was okay with each of them. (*Id.* at 130, *ll*. 21-22)

150. Lugo also testified that he, Smith, and Martinez, brought over to Millennium an answer key to a test given to potential sales representatives, (PX 240 (*identified at* Lugo Test. at 132, *ll*. 6-10)) and that the three of them updated it to reflect Millennium's practices. (*Id.* at 132, *ll*. 11-17) Later, he testified that Johnny Smith had originally created the sales quiz. (5 R. at 13, *ll*. 22-25) Like the rebuttal script admitted as PX 52, that answer key tells consumers who ask what their credit limit will be, not the truthful answer that it will be only $240, but that the issuing bank will determine the credit line.

151. Lugo also testified that he himself drafted PX 247, a rebuttal script that was used for Defendants' 1000 Minute Mega Saver program, (4 R. at 138, *ll*. 18-19) and which answers the questions "I was debited $39 from my checking/ savings account, what for?" and "I was never told about this calling card ...." Lugo further testified that customers in fact called in with those questions or comments. (*Id.* at 139, *ll*. 8-14) Similarly, Lugo also acknowledged that he drafted PX 246, (*id.* at 142, *ll* . 18-19) a rebuttal script Defendants used for their Premium Mega Saver and Minute Mega Saver programs.

152. Moreover, although Defendants characterize Lugo as the officer in charge of Compliance, (*see, e.g.,* Opening Arg., 1 R. at 55, *ll*. 1-10) there is nothing in the record to show what Lugo, or anyone else at Defendants' companies, did to instruct the sales force on the law of deception or to ensure that Defendants remained current on laws relating to deception as well as the TSR.

 **\*31** 153. Given the depth of Lugo's involvement with the Earn-a-Bankcard programs and the telemarketing of the upsales, Lugo must have known or should have known that consumers were being deceived.

## CONCLUSIONS OF LAW

I. Jurisdiction and Venue

1. The District Court for the Southern District of Florida has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, 1345, and 15 U.S.C. §§ 53(b), 57b, 6102(c), 6105(b).

2. Venue is proper in the Southern District of Florida under 28 U .S.C. § 1391(b) and (c), and under 15 U.S.C. § 53(b).

3. Defendants' offering and sale of credit related services have been in or affecting commerce, as "commerce" is define in section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44.

II. The Applicable Provisions of the Federal Trade Commission Act

4. The Federal Trade Commission ("Commission") is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41 et seq. The Commission is charged, inter alia, with enforcing section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), which declares unlawful unfair or deceptive acts or practices in or affecting commerce.

5. Section 16(a)(2) of the FTC Act, 15 U.S.C. § 56(a)(2), authorizes the Commission to commence and supervise litigation under sections 13 and 19 of the FTC Act.

6. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that, in proper cases and after proper proof, the district courts are authorized to issue permanent injunctions to restrain violations of the FTC Act.

7. Section 19 of the FTC Act, 15 U.S.C. § 57b, provides that the Federal Trade Commission may bring actions in the district courts for violations of Federal Trade Commission rules, such as the Telemarketing Sales Rule. Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), provides that the district court is authorized to order redress to consumers for such rule violations.

III. Count One (Section 5(a) of the FTC Act)

8. Plaintiff's Second Amended Complaint states in count one that "[i]n numerous instances, in connection with the marketing of advance fee credit cards, defendants or their employees or agents have represented, expressly or by implication, that after paying defendants a fee, consumers will, or are highly likely to, receive an unsecured major credit card, such as a VISA or MasterCard credit card." Second Amended Complaint at 9. "In truth and in fact, in numerous instances, after paying defendants a fee, consumers do not receive an unsecured major credit card, such as a VISA of MasterCard credit card. [ ] Therefore, the representation ... is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." Id.

9. An act or practice is deceptive in violation of section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), if there is:

(1) A representation, omission or practice likely to mislead the consumer;

**\*32** (2) the consumer is acting reasonably under the circumstances; and

(3) the representation, omission or practice is a material one likely to affect the consumer's purchase decision.

FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir.2003); FTC v. Wilcox, 926 F.Supp. 1091, 1098 (S.D.Fla.1995); FTC v. Atlantex Assoc., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,252-53 (S.D.Fla.1987), aff'd, 872 F.2d 966 (11th Cir.1989); FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir.1994), cert. denied, 514 U.S. 1083, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir.1988); In re Cliffdale Assoc., 103 F.T.C. 110, 164-65 (1984); FTC Deception Policy Statement, appended to Cliffdale, 103 F.T.C. at 174-84 (1984) [hereinafter Deception Policy Statement ].

10. To determine whether an act or practice is deceptive, a Court cannot rest on the literal truth or falsity of the sales pitch, but must instead consider the overall net impression that Defendants' representations have had on consumers. FTC v. Atlantex Assocs., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,254; see also Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir.1976); Removatron v. FTC, 884 F.2d 1489, 1497 (1st Cir.1989). Thus, implied claims as well as express claims may be deceptive, and a claim may be deceptive even though it is literally true. American Home Products v. FTC, 695 F.2d 618, 687 (3d Cir.1982) ("[t]he impression created by the advertising, not its literal truth or falsity, is the desideratum[.]"); Regina Corp. v. FTC, 322 F.2d 765, 768 (3d Cir.1976); FTC v. Cyberspace.com, No. C00-1806L, 2002 U.S. Dist. LEXIS 25565 at *7 (W.D.Wash. July 10, 2002) (deception may result from literally true statements); FTC v. Equifin Int'l, Inc., No. 97-4526, 1997 U.S. Dist. LEXIS 10288 at *43 (C.D.Cal. July 3, 1997) (claims deceptive when Defendants "knowingly tempted" buyers with irrelevant information). As this Court explained in Wilcox, "[e]xplicit deception is not necessary to a finding of violation under § 5(a). 'Deception may be accomplished by innuendo rather than by outright false statements.... It is sufficient that deception be possible.' " Wilcox, 926 F.Supp.

at 1098, citing *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir.1963) (original ellipses).

11. The elements of a sales presentation that contribute to the net impression, and so to the representations conveyed, include the headline, general tone, the presence or absence of elements contradicting a general impression or tone, the interaction of all the different elements, and the juxtaposition of phrases within the presentation. *See Thompson Medical Corp.,* 104 F.T.C. 648 at 789, 793, 799-800 (1984). Section 5 of the FTC Act is to be applied broadly to protect the public interest, and as the Eleventh Circuit has just recently stated, "*caveat emptor* is simply not the law ...." *Tashman,* 318 F.3d at 1277.

 **\*33** 12. Reliance may be presumed to be reasonable when it is in response to express claims, *FTC v. Crescent Publishing Group, Inc.,* 129 F.Supp. 311, 321 (S.D.N.Y.2001); *FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp. 502, 528 (S.D.N.Y.2000); or when it is in response to deliberately made implied claims. *FTC v. SlimAmerica,* 77 F.Supp.2d 1263, 1272 (S.D.Fla.1999); *Deception Policy Statement,* 103 F.T.C. at 178. As the Commission explained in its *Deception Policy Statement,* "[t]o be considered reasonable, the interpretation or reaction does not have to be the only one. When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. An interpretation will be presumed reasonable if it is the one the respondent intended to convey." *Id.* "An interpretation may be reasonable," moreover, "even though it is not shared by a majority of consumers in the relevant class, or by particularly sophisticated consumers." *Id.* at 177 n. 20. Extrinsic evidence of deception is not required, but deception may be found by reviewing the claims themselves. *Kraft Inc. v. FTC,* 970 F.2d 311, 319 (7th Cir.1992); *FTC v. Garvey,* 2001 U.S. Dist LEXIS 25,060 at \*20 (C.D.Ca. Nov. 7, 2001). In applying these principles, the Eleventh Circuit recently found that a Court may not ignore overwhelming evidence that reasonable consumers were likely to rely on, and in fact did rely on, Defendants misrepresentations and impose on consumers a duty of "walking around common sense." *Tashman,* 318 F.3d at 1278. As the *Tashman* Court explained, "[t]he FTCA does not have an 'extravagant claim' defense." *Id.* at 1277.

13. As with affirmative misstatements, failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive. *Five-Star Auto Club,* 97 F.Supp.2d at 532, citing *Transworld Accounts, Inc. v. FTC,* 594 F.2d

212, 214 (8th Cir.1979). As this Court has previously stated, "[d]eception by omission, as in the case of deception by affirmative misstatement, is established by the sales presentation itself. Proof of the actual materiality of the omitted fact through consumer testimony is unnecessary, as an inference of materiality may reasonably be made when a deceptive omission is found." *FTC v. U.S. Oil & Gas Corp.* 1987 U.S. Dist LEXIS 16137 at \*47-48 (S.D.Fla. July 10, 1987), citing *FTC v. Colgate-Palmolive,* 380 U.S. 374, 391-92, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965).

14. The Commission moreover need not show intent to deceive, *World Travel Vacation Brokers,* 861 F.2d at 1029, citing *Beneficial Corp. v. FTC,* 542 F.2d at 617; *Regina Corp. v. FTC,* 322 F.2d at 768, nor must it show that each individual consumer relied on the misrepresentations. *Wilcox,* 926 F.Supp. at 1105; *FTC v. Wolf,* 1996 U.S. Dist LEXIS 1760 at \*14 (S.D.Fla. Jan. 30, 1996), aff'd, 113 F.3d 1251 (11th Cir.1997) citing *FTC v. U.S. Oil & Gas Corp.,* 1987 U.S. Dist. LEXIS 16137 at \*68, (S.D.Fla.1987). "Not only would such proof be 'virtually impossible,' [*FTC* ] *v. Security Rare Coin* [ *& Bullion* ], 931 F.2d [1312], 1316 [ (8th Cir.1991) ], but such a requirement 'would thwart the effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section.' " *Wilcox,* 926 F.Supp. at 1105, quoting *FTC v. Figgie Int'l Inc.,* 994 F.2d 595, 605 (9th Cir.1993). Rather, once the Commission shows that the representations were of the type ordinarily relied on by reasonably prudent persons, that they were widely disseminated, and that consumers purchased the product, the burden then shifts to Defendants to show there was no reliance. *SlimAmerica,* 77 F.Supp.2d at 1275; *Wilcox,* 926 F.Supp. at 1105; *Security Rare Coin,* 931 F.2d at 1316; *World Travel Vacation Brokers,* 861 F.2d at 1029, citing *FTC v. Kitco of Nevada, Inc.* 612 F.Supp. 1282, 1293 (D.Minn.1985); *FTC. v. International Diamond Corp.,* 1983-2 Trade Cas. (CCH) ¶ 65,725 at 69,709 (N.D.Cal.1983).

 **\*34** 15. Moreover, because the FTC need not show that each individual consumer was injured, evidence that some consumers were not injured or were satisfied with Defendants' services is no defense and is not relevant to the question whether consumers were injured. *Wilcox,* 926 F.Supp. at 1009, citing *Amy Travel,* 875 F.2d 564, 572 (7th Cir.1989). *Cf. Tashman,* 318 F.3d at 1278 (evidence of a few satisfied customers was insufficient to overcome overwhelming evidence that reasonable consumers were likely to be and were misled, and District Court's finding to the contrary was clearly erroneous).

16. As stated earlier, to be actionable under section 5, the misrepresentations or practices need not be made with an intent to deceive. *See Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir.1963).* As such, "[a]n advertiser's good faith does not immunize it from responsibility for its misrepresentations...." *Chrysler Corp. v. FTC,* 561 F.2d 357, 363 n. 5 (D.C.Cir.1977). Where defendants should know that their conduct is wrong, that conduct cannot be sanctioned by outside advice that the conduct is legal, whether that advice comes from counsel, *Amy Travel,* 875 F.2d at 575 (reliance on advice of counsel [is] not a valid defense on the question of knowledge; counsel could not sanction something that the defendants "should have known was wrong"), defendants' probation officer, *FTC v. Sharp,* 782 F.Supp. 1445, 1451 (D.Nev.1991), an outside marketing company, a bank, "or anyone else for that matter ...." *FTC v. American Standard Credit Systems, Inc.,* 874 F.Supp. 1080, 1089 (C.D.Ca.1994).

17. Express claims and deliberately made implied claims are presumed material, *SlimAmerica,* 77 F.Supp.2d at 1272, *citing Pantron I Corp.,* 33 F.3d at 1096; *Wilcox,* 926 F.Supp. at 1098; *FTC v. Wolf,* 1996 U.S. Dist LEXIS 1760 at *15; *Thompson Medical,* 104 F.T.C. at 816; *Deception Policy Statement,* 103 F.T.C. at 182, as are claims that relate to the central characteristics of the product or service. *Deception Policy Statement* at 182. Moreover, "[w]here the seller knew, or should have known, that an ordinary consumer would need omitted information to evaluate the product or service, or that the claim was false, materiality will be presumed because the manufacturer intended the information or omission to have an effect." *Id.*

18. Defendants' offering of the Earn-a-Bankcard program created the overall net impression that consumers who paid Defendants $189 or $199.95 would receive an unsecured, major credit card with a high credit limit, instead of a secured Visa card with a $240 limit after paying an additional $175.15 for Defendants' catalog merchandise. Indeed, Defendants' sales materials (which included the post cards, *see* Findings of Fact, *supra* at ¶¶ 35-38, the on-hold message, *see id.* at ¶¶ 39-40, the sales script, *see id.* at ¶¶ 41-44, the pull tape, *see id.* at ¶¶ 45-46, and the Bankcard Qualification Manual, *see id.* at ¶ 47), the consumer witnesses, *see id.* at ¶¶ 49-64, the customer service scripts and sales training materials, *see id.* at ¶¶ 65-67, and Defendants' admissions regarding customer performance, *see id.* at ¶¶

68-71, show that Defendants deceived consumers acting reasonably under the circumstances about a material fact (namely that the consumers would receive an unsecured, major credit card with at least a $4,000 credit limit) which affected the consumers' purchasing decisions. Therefore, Defendants violated section 5 of the FTC Act, 15 U.S.C. § 45(a).

**\*35** 19. Defendants argue, citing to the FTC's own policy statement, that "[a] representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." Defendants' Proposed Findings of Fact and Conclusions of Law at 17 (emphasis and citation omitted). According to Defendants, the "F.T.C.'s four consumer witnesses cannot be considered a 'significant representative segment' of the class of persons to whom the postcard and telephone script were addressed," *see id.,* and, as a result, "it was incumbent on the F.T.C. to offer greater proof of deception," *id.* at 18, which, according to Defendants, should have could done through "expert testimony or survey evidence." *Id.* at 19.

20. However, as the evidence presented at trial showed, of a total of the 199,846 consumers who purchased the Earn-a-Bankcard program at a price of $189 or $199.95, only 700, or less than one half of one percent, ever completed the program and qualified for a Visa card. *See* Findings of Fact at ¶ 68. The number of consumers who actually received a Visa card was even smaller, because 235 of those who qualified never cashed the money orders Defendants supposedly sent them. These numbers demonstrate more graphically than a survey or expert testimony could that the consumers were deceived as to the requirements of the Earn-a-Bankcard program because, although it would be normal to expect that some consumers would fall behind in making their monthly payments and thus not complete the program, surely more than one half of one percent would have completed the program had they understood its requirements and limitations before paying the $189 or $199.95 fee.

21. Additionally, of the 445,761 consumers who paid for one of Defendants' credit card programs, only 12,900 ever purchased an item from one of the catalogs. That is less than 3% of all consumers who bought one of Defendants' credit card programs, and would be just 6.4% of the 199,846 Earn-a-Bankcard program buyers. This evidence shows that the consumers were deceived by Defendants' representations

2004 WL 5149998

as to the Earn-a-Bankcard program because, even assuming that all consumers who purchased from a catalog were Earn-a-Bankcard customers, it is illogical to believe that nearly 94% of Earn-a-Bankcard purchasers would not have bought a single item from the catalog had they known they were paying $189 or $199.95 for a catalog card.

22. Defendants further argue that in their presentations of the Earn-a-Bankcard program, they relied in good faith on a state-court decision sanctioning their post card, and on Florida Attorney General's approval of their sales script. Both arguments fail.

23. In 1998, the Florida Attorney General brought suit against Defendants-Millennium and Martinez, alleging deception in a credit-card scheme similar to Defendants' Earn-a-Bankcard program involved in this litigation. Based on the postcard used in 1998-and according to the uncontroverted record, based solely on that postcard (Collins Test., 4 R. at 30, *ll.* 16-23)-the trial court granted a temporary injunction "as to use of the postcard." (DX 28 (Ord.Grant.Pl's.Mtn.Temp.Inj., May 17, 1999)) The court then required the parties to confer on acceptable postcard modifications, and also required that they modify the sales script "to conform to [the] card." (*Id.*)

**\*36**  24. The parties then conferred over, and agreed on, modifications acceptable to both sides. According to the agreement, the post card was modified to expressly state "let us be your gateway to a major bankcard," and that "our Advantage Merchandise Card is not a Visa® or MasterCard® ...." (PX 265 at 6) The script was modified to include the disclosure that "there are 2 credit cards if you complete the program. There's an Advantage merchandise card which is not a Visa® or MasterCard®, and there's a National Core Network Visa® bankcard." (PX 265 at 3)

25. Defendants then appealed the grant of the temporary injunction and the Appellate Court reversed. According to the Court, the issue was "whether the trial court correctly determined that Millennium's postcard was deceptive ... and therefore, whether the [state] established a clear legal right to a temporary injunction." *Millennium Communications & Fulfillment, Inc., v. Office of the Attorney General,* 761 So.2d 1256, 1263 (Fla.Dist.Ct.App.2000). The court then ruled in the negative and dissolved the injunction. *Id.* at 1264.

26. Following the appeal, the trial court granted a protective order precluding discovery, and this time, the state appealed. The court again reversed, rejecting Defendants' argument that

the first appellate panel had found that Defendants' sales materials were not deceptive as a matter of law:

> Our review of "Millennium I" does not demonstrate that we made such a determination. We simply reversed a temporary injunction based on the fact that the postcard was not sufficiently deceptive to support the extraordinary remedy of injunctive relief.

*Office of the Attorney General v. Millennium Communications and Fulfillment, Inc.,* 800 So.2d 255, 257 (Fla.Dist.Ct.App.2001). For the reasons explained in paragraphs 27-30 below, nothing in this history supports Defendants' argument that they were merely selling their Earn-a-Bankcard program in good-faith reliance on the court and the Attorney General.

27. First, the postcards used in this case and the *Millennium I* case are different. In fact, the postcard in *Millennium I* does not include many of the misleading references involved in this litigation, such as "this may be your final notification," "your credit card has not been activated," and check marks indicating "Platinum" and "Unsecured."

28. Second, *Millennium I* was clear in framing the issue narrowly as to whether the postcard *alone* was sufficiently deceptive to support a temporary injunction. It ruled on neither the ultimate merits of the case, nor on the entirety of Defendants' sales pitch. (*Millennium I,* 761 So.2d at 1263; *see also* 4 R. at 30, *ll.* 17-22 (Judge Tobin ruled on the postcard alone and did not permit additional proof)). In fact, the litigation in state court remains pending.

29. Third, while the Attorney General approved the use of the modified script, she did so only because the postcard was also modified. Not only does the trial court's order state that "the script is to be changed to conform to [the] postcard," but the AG testified in this case that she agreed to the script only because Defendants agreed to the disclosures in the postcard. (Collins Test., 4 R. at 35, *ll.* 5-11) And in fact, Defendants negotiated the changes to the postcard and script together, (PXs 264-65) having had to have known that the two were a package. There is no basis in the record or in logic to support Defendants' claim that they thought the Attorney General approved the sales script separately from the postcard.

**\*37** 30. Finally, and most importantly, any good-faith belief that Defendants may have had that their program was not deceptive had to have been shattered by actual performance. In fact, Defendants prepared rebuttal scripts because they anticipated that consumers would believe they were getting a major credit card, *see* Findings of Fact, *supra* at ¶ 65, they prepared rebuttal scripts that failed to inform consumers that the limit on the Visa card they would ultimately get would be just $240 because they anticipated that customers would expect a card with a $4,000 limit, *see id.* at ¶ 66, and they knew that only a small fraction of their customers ever would buy from the catalog, much less complete the program and receive a Visa card. *See id.* at ¶ 68. Regardless of what Defendants thought the court said in *Millennium I,* they had to have known in the face of overwhelming evidence of consumer confusion that they were committing fraud. Their good faith is simply farfetched and, if anything, their abandonment of a more clear way to market their program, particularly when confronted with evidence that consumers were obviously misled, demonstrates fraudulent intent.

### IV. Count Two (Section 5(a) of the FTC Act)

31. Count two of the Second Amended states that "[i]n numerous instances, defendants cause consumers' checking accounts to be debited for defendants' Up-Sale programs without having previously obtained the consumer's authorization for such debit. Therefore, consumers cannot reasonably avoid the defendants' billing for these products or services. [...] Defendants' practice of debiting consumers' checking accounts without authorization causes substantial injury to consumers that is not outweighed by countervailing benefits to consumers or competition. [...] Therefore, defendants' practice, as outlined above, is unfair and violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." Second Amended Complaint at 10.

32. An act or practice is unfair within the meaning of section 5 of the FTC Act, 15 U.S.C. § 45, if it (1) causes substantial injury to consumers (2) which is not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing benefits to consumers or competition. (Stipulation, Uncontested Legal Issue 1 (March 7, 2003) [hereinafter UCLI] ) While conduct must meet each of these prongs to be deemed unfair, 15 U.S.C. § 45(n), conduct that is unfair violates section 5(a) of the FTC Act. *Orkin Exterminating Co. v. FTC,* 849 F.2d 1354, 1364 (11th Cir.1988).

33. As the evidence summarized at paragraphs 73 trough 89, *supra,* shows, the consumers who were solicited between January 2002 and May 6, 2002 for the MMS and Hartford upsales, in numerous instances, did not actually authorize Defendants to debit their bank accounts either because they were led to believe their credit cards would be charged for the upsales or because they otherwise were tricked into providing their authorizations. Additionally, the manner in which these authorizations were obtained-using the script that employed the "account on record" language which the Court found to violate section 5 of the FTC Act and using a recording played at such a speed so as to be nearly unintelligible-shows that the consumers could not reasonably have avoided having their accounts debited for the upsales. These unauthorized debits by the Defendants, in the aggregate, caused substantial injury to consumers, *see* Findings of Fact, *supra* at ¶¶ 124-126, and are not outweighed by countervailing benefits to consumers: they are therefore unfair. As a result, Defendants violated section 5 of the FTC Act, 15 U.S.C. § 45 as alleged in count two of the Second Amended Complaint.

### V. Count Four [6]  (Section 310.3(a)(2)(iii) of the TSR)

[6]     The Court granted Plaintiff's summary judgment motion with regards to count three.

**\*38** 34. In count four of the Second Amended Complaint, Plaintiff alleges that "[i]n numerous instances, in connection with the telemarketing of advance fee credit cards, defendants or their employees or agents have misrepresented, directly or by implication, that after paying defendants a fee, consumers will, or are highly likely to, receive an unsecured major credit card, such as a VISA or MasterCard credit card. [...] Defendants have thereby violated Section 310.3(a)(2)(iii) of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii)." Second Amended Complaint at 12.

35. Pursuant to section 3(c) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(c), and section 18(d)(3) of the Federal Trade Commission Act, 15 U.S.C. § 57a(d)(3), violations of the Telemarketing Sales Rule, 16 C.F.R. Part 310, constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (UCLI 2)

36. The Second Amended Complaint alleges violations of the Telemarketing Sales Rule in effect on April 8, 2002. The Rule was amended in 2003, and the amendments have been codified at 16 C.F.R. Part 310. References to the provisions

of the Telemarketing Sales Rule contained in the Second Amended Complaint and in these Findings of Fact and Conclusions of Law are to the Rule as it appeared in the Code of Federal Regulations in April 2002.

37. The Telemarketing Sales Rule ("TSR"), promulgated by the FTC pursuant to the Telemarketing Act, defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(u). The definition excludes catalog sales where the consumer initiates the telephone call after receiving a catalog. *Id.* The Rule defines a "telemarketer as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(t). The Rule defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2.

38. Defendants are, and have been, telemarketers and sellers within the meaning of the TSR since at least as early as January 2000.

39. The TSR prohibits telemarketers and sellers from misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii). (UCLI 4)

40. Defendants' sales presentation for the Earn-a-Bankcard program misrepresented a material aspect of the performance, efficacy, nature or central characteristics of the goods or services they were offering by suggesting that the targeted consumers would receive a major credit card with at least a $4,000 limit when they would receive a secured Visa card with a $240 limit and then only after paying an additional $175.15 for Defendants' catalog merchandise. In fact, as stated earlier, Defendants' sales materials (which included the post cards, *see* Findings of Fact, *supra* at ¶¶ 35-38, the on-hold message, *see id.* at ¶¶ 39-40, the sales script, *see id.* at ¶¶ 41-44, the pull tape, *see id.* at ¶¶ 45-46, and the Bankcard Qualification Manual, *see id.* at ¶ 47), the consumer witnesses, *see id.* at ¶¶ 49-64, the customer service scripts and sales training materials, *see id.* at ¶¶ 65-67, and Defendants' admissions regarding customer performance, *see id.* at ¶¶ 68-71, show that Defendants misrepresented a "material aspect of the performance, efficacy, nature, or

central characteristics of" the program they were offering. Accordingly, Defendants violated Section 310.3(a)(2)(iii) of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(a)(2)(iii), as alleged in count four of the Second Amended Complaint.

## VI. Count Five (Section 310.4(a)(4) of the TSR)

**\*39** 41. Count five of the Second Amended Complaint states that "[i]n numerous instances, in connection with the telemarketing of advance fee credit cards, defendants or their employees or agents have requested and received payment of a fee in advance of consumers obtaining a credit card when defendants have guaranteed or represented a high likelihood of success in obtaining or arranging for the acquisition of an unsecured credit card, such as a VISA or MasterCard credit card, for such consumers. [...] Defendants have thereby violated Section 310.4(a)(4) of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(4)." Second Amended Complaint at 12.

42. The TSR prohibits telemarketers and sellers from requesting or receiving payment of any fee or consideration in advance of obtaining or arranging a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging the loan or other extension of credit. 16 C.F.R. § 310.4(a)(4). UCLI 3. The prohibition against taking an advance fee applies any time a guarantee or representation of likelihood is made, regardless of whether it is made in conjunction with the sale of some other product that is not a loan or extension of credit. *FTC v. Consumer Alliance, Inc.,* 2003 U.S. Dist. LEXIS 17,423 at * 3-18 (N.D.Ill. Sept. 30, 2003) (advance-fee loan provision violated where, in connection with sales of credit-card-protection services, Defendants promised to provide or arrange to provide low-interest credit cards); *In re National Credit Management Group,* 21 F.Supp.2d 424, 457 (D.N.J.1998) (TSR does not violate First Amendment by restricting sales of "educational" materials on improving credit, "but merely regulates when payment may be collected in a situation where a company has represented or guaranteed a high likelihood of success of an extension of credit...."); *New York v. Vacco,* 930 F.Supp. 865, 870-71 (W.D.N.Y.1996) (state enforcement of TSR) (advance-fee loan provision of TSR violated, even though Defendants claimed they were merely selling club memberships that provided, *inter alia,* collateralized credit cards, where initial offering claimed consumer was pre-approved for a credit line). It thus prohibits the acceptance of a fee for any service after the guarantee or representation has been made.

43. Defendants requested and received $189 or $199.95 from the consumers "in advance of obtaining or arranging [an] ... extension of credit when [Defendants] ... guaranteed or represented the high likelihood of success in obtaining or arranging the ... extension of credit." 16 C.F.R. § 310.4(a)(4). In fact, the Earn-a-Bankcard postcard, the sales pitch and the testimony of the consumer witnesses, see Findings of Fact, supra at ¶¶ 35-67, all show that Defendants represented that the Visa card was "guaranteed" when Defendants had not obtained or arranged for the extension of credit. Therefore, Defendants violated the TSR, 16 C.F.R. § 310.4(a)(4).

**\*40** 44. Defendants characterize themselves as a catalog company. However, they marketed a major, unsecured credit card in the form of the Earn-a-Bankcard program. See Findings of Fact, supra at ¶¶ 30-34. Defendants' deliberately-made implied claims conveyed the impression that consumers were purchasing an unsecured, VISA card with at least a $4,000 credit limit, and that is what consumers paid Defendants for.

45. Moreover, regardless of how Defendants characterize themselves, the TSR prohibits the taking of an advance fee for a credit card even if that credit card is merely one part of a larger package. See Conclusions of Law, supra at ¶ 42.

46. Defendants argue that Section 310.4(a)(4) of the TSR applies only to loans and not to credit cards. That interpretation is wrong. Section 310.4(a)(4) specifically covers "loans or other extension of credit." "Credit" is defined in the Rule as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," § 310.2(e), and "credit card" is defined as "any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor or services on credit." § 310.2(f). Moreover, the Commission affirmed that the TSR as originally adopted prohibits advance-fee credit card offers in its explanatory statement to the recently implemented amendments to the Rule. Notice of Proposed Rule Making, 67 Fed.Reg. 4492 at 4512 (January 30, 2002). Accordingly, the Commission has filed cases alleging the sale of advance-fee credit cards to be a violation of § 310.4(a)(4) of the TSR. See, e.g., 67 Fed.Reg. at n. 191.

47. Defendants also argue that the TSR, 16 C.F.R. § 310.4(a)(4), does not apply to "firm offers of credit by a creditor who properly uses a prescreened list" and, in this case, Defendants "were the creditor making pre-screened, firm ("pre-approved") offers of credit to consumers." See

Defendants' Proposed Conclusions of Law at 24. This Court disagrees. It is well settled that firm offers are limited to offers of such a nature that the acceptance by the offeree will give rise to a binding contract. See, e.g., Webster v. Bowles, 213 F.2d 417 (1st Cir.1954); see also Hoover Co. v. Fuqua Industries, Inc., 1979 WL 1244, \*6 (N.D.Ohio 1979) ("[T]he offer is 'firm' because acceptance of the offer result in a binding contract to sell."). It is also well settled that in order for a binding contract to exist, a mutual assent or a meeting of the minds of the parties on all essential elements of the contract must occur. See, e.g., Joseph v. Donover Co., 261 F.2d 812 (9th Cir.1959); JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 29 (3d ed.1990). As the Court found earlier, see Findings of Fact at ¶ 72, Defendants deceived the consumers into believing that, by paying the $189 or $199.95 fee, they would receive a major unsecured credit card when, in reality, they received a catalog card and the right to earn a Visa or MasterCard. Therefore, the meeting of the minds required for the existence of an enforceable contract between Defendants and the consumers never occurred. As a result, the undersigned rejects Defendants' argument that their offers to the consumers constituted "firm offers" to which the TSR, 16 C.F.R. § 310.4(a)(4), does not apply.

VII. Count Seven [7] (Section 310.4(d) of the TSR)

[7]     The Court granted Defendants' motion for judgment as a matter of law as to count six of the Second Amended Complaint.

**\*41** 48. Count seven of the Second Amended Complaint states that "[i]n numerous instances, in connection with the telemarketing of defendants' Up-Sale programs, such as the Hartford Auto Club, 1000 Minute Mega Saver, and Premium Mega Saver, defendants have failed to promptly and in a clear conspicuous manner to the person receiving the call, the following information: 1) The identity of the seller, 2) That the purpose of the call is to sell goods or services; and 3) The nature of the goods or services. [...] Defendants have thereby violated Section 310.4(d) of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(d)." Second Amended Complaint at 13.

49. The TSR requires that telemarketers, in outbound telemarketing calls, disclose promptly and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller, (2) that the purpose of the call is to sell goods or services, and (3) the nature of the goods or services. 16 C .F.R. § 310.4(d). (UCLI 8.)

2004 WL 5149998

50. "Outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(n). (UCLI 7.)

51. As found earlier at paragraphs 102-104, *supra*, Plaintiff has failed to establish that the Capital Choice Defendants engaged in abusive telemarketing practice when using the scripts that were admitted into evidence as PX 51, DX 23 and DX 24. With regards to PX 51, Plaintiff has failed to offer any convincing evidence that Defendant Millenium, identified in the script, was not a person that was itself providing or arranging with others to provide the upsale program. As to DX 23 and DX 24, Plaintiff has not offered any convincing evidence showing that the "seller" using those scripts had not been identified during that same outbound telephone call in which the upsale took place. Accordingly, the Capital Choice Defendants did not engage in abusive telemarketing practices violating 16 C.F.R. § 310(4)(d) by using PX 51, DX 23 and DX 24.

VIII. Count Eight (Section 310.3(b) of the TSR)
52. In count eight of the Second Amended Complaint, Plaintiff alleges that "Defendants Capital Choice, Millennium, Ecommex, Hartford and Ricardo Martinez provide substantial assistance or support to defendants E-Credit and Zentel, including but not limited to, obtaining and paying for leads, approving scripts, and fulfilling sales of E-Credit and Zentel, when they know, or consciously avoid knowing that E-Credit and Zentel are engaged in acts or practices that violate the Telemarketing Sales Rule. [...] Defendants Capital Choice, Millennium, Ecommex, Hartford and Martinez have thereby violated Section 310.3(b) of the Telemarketing Sales Rule, 16 C.F.R. § 310.3(b)." Second Amended Complaint at 13.

53. Under the TSR, any person who provides substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a) or (c), or § 310.4 of the TSR, also is engaged in a deceptive act or practice and is also violating the TSR. 16 C.F.R. § 310.3(b). (UCLI 9.) Examples of what constitutes assisting and facilitating include: "providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel-related services; providing

any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered." Telemarketing Sales Rule Statement of Basis and Purpose, 60 Fed.Reg. 43,842, 43,852 (August 23, 1995).

**\*42** 54. The evidence summarized at paragraphs 105 through 114 shows that Defendants Capital Choice, Millennium, Ecommex, Hartford Auto Club, and Ricardo Martinez provided substantial assistance or support to E-Credit Solutions, Inc., and Zentel Enterprises, Inc., when they knew or consciously avoided knowing that E-Credit and Zentel misrepresented the nature and central characteristics of the Earn-a-Bankcard program and that Defendant E-Credit took a fee in advance after guaranteeing consumers would receive an unsecured, major credit card.

55. Therefore, Defendants Capital Choice, Millennium, Ecommex, Hartford Auto Club and Ricardo Martinez violated section 310.3(b) of the TSR, 16 C.F.R. § 310.3(b).

IX. Common Enterprise
56. Plaintiff has alleged in the Second Amended Complaint that "Defendants Capital Choice, Millennium, Ecommex and Hartford have operated as a common enterprise while engaging in the unfair and deceptive acts and practices and Telemarketing Sales Rule violations alleged above. Defendants E-Credit and Zentel have operated as a common enterprise while engaging in the unfair and deceptive acts and practices and Telemarketing Sales Rule violations alleged above." Second Amended Complaint at ¶ 57.

57. When two or more corporations act as a common enterprise, equity demands that they be held jointly and severally liable for their equitable misconduct. *U.S. Oil and Gas Corp.,* 1987 U.S. Dist LEXIS at \*58. "When determining whether a common enterprise exists, courts look to a variety of factors, including: common control, *Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171, 1175, (1st Cir.1973), *Waltham Precision Instrument Co. v. FTC,* 327 F.2d 427, 431 (7th Cir.1964); the sharing of office space and officers, *Zale Corp. and Corrigan-Republic, Inc. v. FTC,* 473 F.2d 1317, 1320 (5th Cir.1973); *Delaware Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir.1964); whether business is transacted through 'a maze of interrelated companies,' *Delaware Watch,* 322 F.2d at 746; the commingling of corporate funds and failure to maintain separation of companies, *SEC v. Elliott,* 953 F.2d

1560, 1565 n. 1 (11th Cir.1992); unified advertising, *Zale Corp.,* 473 F.2d at 1320; and "evidence which 'reveals that no real distinction existed between the Corporate Defendants,' *Jordan Ashley,* 1994-1 Trade Cas. (CCH) ¶ 70,570 at 72,095 [ (S.D.Fla.1994) ]." *Wolf,* 1996 U.S. Dist LEXIS at *22-23.

58. Defendants Millennium, Capital Choice, Ecommex, and Hartford are wholly owned by Defendant Ricardo E. Martinez. Among other things, they also share the same business premises, commingle funds, share information about consumers, share marketing strategies and responsibilities and have the same employees. *See* Findings of Fact, *supra* at ¶¶ 115-123. Therefore, they constitute a common enterprise as alleged in Paragraph 57 of the Second Amended Complaint.

X. This Court's Power to Grant Permanent Relief

 **\*43**  59. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes permanent injunctive relief against conduct in violation of any provision of law enforced by the Commission. *FTC v. Gem Merchandising Corp.,* 87 F.3d 466, 468 (11th Cir.1996); *FTC v. U .S. Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1111 (9th Cir.1982); *Kitco of Nevada,* 612 F.Supp. at 1291. Injunctive relief is appropriate where there is a cognizable danger of recurrent violation. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). *See also SlimAmerica,* 77 F. Supp 2d at 1275.

60. Injunctive relief is appropriate even as against conduct that may have stopped prior to the entry of relief where, as here, there is significant danger that practices will recur absent an injunction. *FTC v. Febre,* 1996 U.S. Dist. LEXIS 9487 at *22 (N.D.Ill. July 3, 1996), *citing FTC v. Security Rare Coin,* 1989-2 Trade Cas. at 62,205; *U.S. Oil & Gas Corp.* 1987 U.S. Dist LEXIS 16137 at *52. Or as the FTC has more colorfully stated, "a claim of abandonment is rarely sustainable as a defense to a Commission complaint where, as here, the alleged discontinuance occurred 'only after the Commission's hand was on the respondent's shoulder.' " *International Assoc. of Conf. Interpreters,* 123 F.T.C. 465, 658 (1997), *quoting Zale Corp.,* 78 F.T.C. 1195, 1240 (1971).

61. The court's authority to grant permanent injunctive relief includes all of the Court's inherent equitable powers, including the ability to order restitution and disgorgement of improper gains. *Gem Merchandising,* 87 F.3d at 468-69; *U.S. Oil & Gas Corp.,* 748 F.2d at 1434; *Security Rare Coin,* 931 F.2d at 1314-15; *Amy Travel Service,* 875 F.2d at 571-72; *World Travel,* 861 F.2d at 1026; *FTC v. Southwest Sunsites,*

*Inc.,* 665 F.2d 711, 718 (5th Cir.1982); *H.N. Singer, Inc.,* 668 F.2d at 1112-1113; *Wilcox,* 926 F.Supp. 1103.

62. The egregious nature of past violations of the FTC Act shows a likelihood of future violations and a need for permanent injunctive relief of a broad nature. *Wilcox,* 926 F.Supp. at 1103 (injunctive relief appropriate where conduct continued up to the time of the litigation); *Kitco,* 612 F.Supp. at 1296. *See generally Sterling Drug v. FTC,* 741 F.2d 1146 (9th Cir.1984); *Sears, Roebuck & Co. v. FTC,* 676 F.2d 385 (9th Cir.1982). Ancillary equitable relief is necessary to provide redress to consumers, to effectuate enforcement of Section 5 of the FTC Act, and to deter future violations by these Defendants. Moreover, as the Eleventh Circuit has stated previously, "since the public interest is involved in a proceeding of this nature, [the Court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Gem Merchandising,* 87 F.3d at 469.

63. There is a likelihood that Defendants' illegal conduct will recur. Defendants sold the Earn-a-Bankcard program with their own employees from February 2000, until November 2001. (*See* Findings of Fact, *supra* at ¶ 30) From June 2001, until served with this Court's TRO of April 9, 2002, Defendants provided substantial assistance and support to E-Credit Solutions and Zentel in the sale of the Earn-a-Bankcard program by, among other things, creating and mailing postcard solicitations and providing scripts to E-Credit Solutions and Zentel that were substantively identical to those used by Defendants when their own employees were telemarketing the program. (*See id.*).

 **\*44**  64. Further, Defendants' conduct was egregious and their fraud widespread. Sales scripts for the Earn-a-Bankcard program appear to have been crafted by Defendants to deceive consumers. Defendants' rebuttal script shows that they were well aware of the impression created in consumers' minds. Approximately 200,000 consumers paid either $189 or $199.95 for the deceptively marketed Earn-a-Bankcard program, (Stipulation at 15, Uncontested Fact 17) while over 234,000 consumers paid Defendants either $39 or $43 for the Approval Certificate program. (*See supra* Findings of Fact at ¶ 125)

65. Therefore, entry of injunctive relief against Defendants is warranted.

XI. Redress

66. Consumers injured as a result of Defendants' deceptive sales scheme are entitled to the monetary equivalent of rescission and restitution, even though that amount may exceed Defendants' unjust enrichment. As this Court has held in a previous 13(b) consumer fraud case, "[t]he appropriate measure of restitution is the aggregate amount invested by customers, less refunds made by Defendants." *SlimAmerica, 77 F. Supp 2d at 1276, quoting Wolf,* 1996 U.S. Dist. LEXIS at *27. *See also U.S. Oil and Gas Corp.,* 1987 U.S. Dist LEXIS at *64 (appropriate measure of restitution is aggregate amount invested by consumers, not defendants' unjust enrichment); *see also Security Rare Coin,* 931 F.2d at 1316 *; FTC v. Windward Marketing, Ltd.,* No. 1:96-CV-615 FMH, 1997 U.S. Dist LEXIS at *45-46 (N.D.Ga.1997) (proper equitable remedy is full amount paid by consumers); *Kitco of Nevada, Inc.,* 612 F.Supp. at 1295-96; *FTC v. International Diamond Corp.,* 1983-2 Trade Cas. (CCH) ¶ 65,725 at 69,709 (N.D.Cal.1983).

67. Indeed, the Eleventh Circuit has held that Courts may order disgorgement of amounts paid to defendants under Section 13(b), including disgorgement of unclaimed funds to the United States Treasury. *Gem Marketing,* 87 F.3d at 468-70. As the Court noted in *Gem Marketing,* "[t]o hold otherwise would permit a Defendant to retain such funds simply by keeping poor records. Such a result would permit unjust enrichment and undermine the deterrence function of section 13(b)." *Id.* at 470. While consumer redress is one objective of section 13(b), another is to deprive the wrongdoer of his ill-gotten gains so as to serve deterrence. *Id.*

68. Section 19(b) of the FTC Act similarly empowers the Court to fashion relief it finds necessary to redress consumer injury resulting from Defendants' Rule violations. "Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation ...." 15 U.S.C. § 57b(b). Like redress under section 13(b), redress under section 19(b) is not limited to Defendants' gains from the deceptive practices, but is properly measured by the loss suffered by the victims. *Figgie Int'l,* 994 F.2d at 606.

**\*45** 69. Relying on *Figgie,* Defendants argue that 1) the full amount consumers paid to Defendants is not the appropriate measure of redress because Defendants products had some value, and 2) redress should be accomplished by establishing a fund, presumably of a significantly smaller

amount, to which consumers may submit claims. (9 R. at 48-51.) Defendants reliance on *Figgie* is simply misplaced.

70. First, *Figgie* merely stands for the proposition that under Section 19(b), a court may not order disgorgement in excess of redress. Contrary to Defendants' argument, *Figgie* found that the value of what was received by consumers should not be taken into account in determining the amount of restitution. *Figgie Int'l,* 994 F.2d at 606. As the Court noted, "[t]he fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds ...." *Id.*

71. Second, as the Eleventh Circuit has explained, *Figgie,* which did not allow for disgorgement, is inapplicable to an action brought under Section 13(b) of the FTC Act because redress in *Figgie* was made pursuant to Section 19(b) of the Act. *Gem Marketing,* 87 F.3d at 468-70. The case at bar was brought pursuant to both Sections 13(b) and Section 19(b), which provides restitutionary relief for violations of FTC Rules, such as the TSR. In *FTC v. Wolf,* this Court held that Rule violations are also violations of Section 5 of the FTC Act, which may be redressed under Section 13(b), as well as Section 19(b). *FTC v. Wolf,* 1996 U.S. Dist LEXIS 1760 at *126 n. 4.

72. The measure of redress is thus the amount consumers paid. The FTC has established that consumers paid Defendants a total of $14,551,485 for the Earn-a-Bankcard program. Consumers paid E-Credit Solutions, to whom Defendants provided substantial assistance and support in violation of the TSR, a total of $13,708,971 for the Earn-a-Bankcard program. E-Credit Solutions, Inc., has paid redress in the amount of $601,030 pursuant to the Stipulated Final Judgment entered on May 21, 2003. Unredressed injury flowing from E-Credit's sale of the Earn-a-Bankcard program, for which Defendants are liable, is therefore $13,107,941. The appropriate redress amount for the Earn-a-Bankcard program is the amount consumers paid directly to Defendants and the unredressed amount paid to E-Credit for the Earn-a-Bankcard program, or a total of $27,659,426.

73. The FTC has established that consumers paid Defendants a total of at least $8,603,126 for the Approval Certificate program after refunds given by Defendants are subtracted from gross revenues for the program. This constitutes the appropriate redress amount for the Approval Certificate program.

74. The FTC has established that Defendants, using the script that appears at PX 51 at 03-01738, debited consumers' bank accounts without authorization for Hartford Auto and MMS in an amount totaling at least $455,000.

75. Therefore, the appropriate amount of consumer redress in this case is $36,716,000.00. In the event that the full amount of redress cannot be distributed to purchasers of Defendants programs, the remaining funds shall be disgorged to the United States Treasury.

XII. Individual Liability

**\*46** 76. An individual Defendant may be held jointly and severally liable for redress to consumers for violations of the FTC Act when that individual (a) directly participated in the conduct or had the authority to control the conduct, and (b) had knowledge of the deceptive practices. *SlimAmerica,* 77 F.Supp.2d at 1276; *Wilcox,* 926 F.Supp. at 1104; *FTC v. Jordan Ashley,* 1994 Trade Cas. (CCH) ¶ 70,570 at 72,096 (S.D.Fla.1994), *citing Amy Travel Service,* 875 F.2d at 573; *Kitco of Nevada,* 612 F.Supp. at 1292.

77. Authority to control the company can be shown by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer. *Amy Travel Service,* 875 F.2d at 573; *FTC v. National Business Consultants, Inc.,* 1990-1 Trade Cas. (CCH) ¶ 68,984 at 63,340 (E.D.La.1990); *Kitco of Nevada,* 612 F.Supp. at 1292.

78. The knowledge requirement may be met by showing that the individual had " 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.' " *SlimAmerica,* 77 F.Supp.2d at 1276; *Wilcox,* 926 F.Supp. at 1104; *Amy Travel Service,* 875 F.2d at 574, *quoting Kitco of Nevada,* 612 F.Supp. at 1292, *cited with approval by Jordan Ashley, 1994 Trade Cas.* at 72,096; *see also Wolf,* 1996 U.S. Dist LEXIS at \*23-24; *Atlantex Assoc.,* 1987-2 Trade Cas. at 59,255; *FTC v. Pantron I Corp.,* 33 F.3d at 1103; *FTC v. Windward Marketing, Ltd.,* No. 1:96-CV-615 FMH, 1997 U.S. Dist LEXIS at \*29 (N.D.Ga. Sept. 30, 1997); *Equifin,* 1997 U.S. Dist LEXIS at \*47; *FTC v. Hayes,* 1997-2 Trade Cas. (CCH) ¶ 71,880 at 80,217 (E.D.Mo.1997).

79. Principals, moreover, are liable under the FTC Act for their agents claims whether those agents are acting with actual or apparent authority, or whether the agents are employees or independent contractors. *U.S. Oil & Gas Co.,* 1987 U.S. Dist. LEXIS at \*48-49; *see also Southwest Sunsites, Inc. v. FTC,* 785 F.2d 1431, 1438-39 (9th Cir.1986) (Defendants liable for Section 5 violations committed by independent broker acting within the scope of its actual and apparent authority); *FTC v. Five Star Auto Club,* 97 F.Supp.2d 502, 527-28 (S.D.N.Y.2000) (for purposes of holding principals liable under section 5, it is irrelevant whether the agents are employees or independent contractors). As this Court said in *U.S. Oil & Gas,* "the 'independent contractor defense' has been frequently raised and invariably rejected." 1987 U.S. Dist. LEXIS at \*48 n. 99, *citing Goodman v. FTC,* 244 F.2d 584, 603-04 (9th Cir.1957).

80. Defendants Martinez, Smith, and Lugo participated directly in the design, implementation, and telemarketing of the Earn-a-Bankcard program. Defendants Martinez and Smith also had the authority to control the corporate Defendants' activities with respect to the Earn-a-Bankcard program. These Defendants knew or should have known that the marketing of the Earn-a-Bankcard program was deceptive, and that Defendants received payment in advance for an extension of credit. Defendants Martinez and Smith are also liable for consumer redress for violations of section 5 of the FTC Act and section 310.4(a)(4) of the TSR in connection with the Earn-a-Bankcard program.

**\*47** 81. Defendants Martinez and Smith participated directly in the sale and fulfillment of the Approval Certificate program. Defendants Martinez and Smith also had the authority to control the corporate Defendants' activities with respect to the Approval Certificate program, and knew or should have known that the marketing of the Approval Certificate was deceptive. However, Smith did not become involved with the Approval Certificate program until after January 2002. Therefore, Defendants Martinez and Smith are liable for consumer redress for violations of section 5 of the FTC Act in connection with the marketing of the Approval Certificate program, although Defendant Smith is responsible only after January 2002.

INJUNCTIVE PROVISIONS

DEFINITIONS

82. For purposes of these Injunctive Provisions, the following definitions apply:

1. *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

2. *Credit card* means any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

3. *Document* is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes writings, drawings, graphs, charts, photographs, audio and video recordings, computer records and other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

4. *Defendants* means Capital Choice Consumer Credit, Inc., Millennium Communications and Fulfillment, Inc., Ecommex Corporation, Hartford Auto Club, Inc., Ricardo E. Martinez, Johnnie Smith and Wilfredo Lugo, and each of them individually or severally.

5. *Corporate defendants* means Capital Choice Consumer Credit, Inc.; Millennium Communications and Fulfillment, Inc.; Ecommex Corporation; and Hartford Auto Club, Inc.; and each of them individually or severally.

6. *Individual defendants* means Ricardo E. Martinez, Johnnie Smith and Wilfredo Lugo, and each of them individually or severally.

7. *Consumer* means any person, including any individual, group, unincorporated association, limited or general partnership, corporation or other government or business entity.

8. *Assisting others* means knowingly providing any of the following goods or services to another entity: (1) performing customer service functions-including, but not limited to, receiving or responding to consumer complaints; (2) formulating or providing, or arranging for the formulation or provision of, any telephone sales script, mailing, electronic communication, point-of-purchase promotional material, advertisement or any other marketing material; (3) providing names of, or assisting in the generation of, potential customers; or (4) performing marketing services of any kind.

**\*48** 9. *And* and *or* have both conjunctive and disjunctive meanings.

## PERMANENT INJUNCTION

83. IT IS HEREBY ORDERED that defendants, whether acting directly or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from engaging or participating in the advertising, offering for sale, sale or distribution of credit cards.

## PROHIBITED BUSINESS PRACTICES

84. IT IS FURTHER ORDERED that defendants, individually and severally, and their agents, servants, employees, attorneys and all persons or entities directly or indirectly under defendants' control, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each such person, whether acting directly or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from offering for sale, selling or promoting any secured credit card or any debit card without disclosing clearly and conspicuously in all sales and promotional materials the fact that the card is a secured credit card or a debit card and the credit limit of the credit card. [8]

[8]     This provision is reasonable fencing-in that it covers debit cards, which are similar to credit cards and ensures that if the ban provision is unenforceable, Defendants cannot resume their conduct that has already been found to be illegal.

## RESTRICTION ON DEBITING CONSUMER ACCOUNTS

85. IT IS FURTHER ORDERED that defendants, individually and severally, and their agents, servants, employees, attorneys and all persons or entities directly or indirectly under defendants' control, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each such person, whether acting directly

or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from debiting or otherwise obtaining funds from any consumer's bank account, savings and loan account, credit union account or any other type of money or credit account unless, prior to making such debit or obtaining such funds, defendants have received in writing from the consumer whose account the funds are to come from a written and signed authorization which, at a minimum, contains the amount of the debit, the date(s) of such debit(s), the goods and/or services for which defendants are receiving payment and the name of the entity that is authorized to make the debit or obtain the funds.

## BOND PROVISION

86. IT IS FURTHER ORDERED that defendants, individually and jointly, are permanently restrained and enjoined from engaging in telemarketing or assisting others engaged in telemarketing unless they first obtain a performance bond in the principal sum of TEN MILLION DOLLARS ($10,000,000).

1. This bond shall be conditioned upon compliance with Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, the Telemarketing Sales Rule, 16 C.F.R. § 304, and the provisions of this Order. The bond shall be deemed continuous and remain in full force and effect as long as defendants continue to engage in telemarketing or continue to assist others engaged in telemarketing, and for at least three years after defendants have ceased to engage in such activity. The bond shall cite this Order as the subject matter of the bond, and shall provide surety thereunder against financial loss resulting from whole or partial failure of performance due in whole or in part to any violation of Section 5 of the Federal Trade Commission Act, the Telemarketing Sales Rule or the provisions of this Order, or any other violation of law.

**\*49** 2. The performance bond required pursuant to this Section shall be an insurance agreement providing surety for financial loss issued by a surety company that is admitted to do business in each of the states in which defendants do business and that holds a FEDERAL CERTIFICATE OF AUTHORITY AS ACCEPTABLE SURETY ON FEDERAL BOND AND REINSURING. Each such performance bond shall be in favor of both (1) the Federal Trade Commission for the benefit of any consumer injured as a result of any violation of Section 5

of the Federal Trade Commission Act, the Telemarketing Sales Rule or the provisions of this Order, made by any defendant or any of defendants' agents, or any other persons acting in concert with any defendant or under any defendant's authority, supervision or control, while engaged in telemarketing; and (2) any consumer so injured.

3. The bond required pursuant to this Section is in addition to, and not in lieu of, any other bond required by any other federal, state, or local law, or by any other court order not entered in this action.

4. At least ten days before the commencement of telemarketing or assisting others engaged in telemarketing, *defendant or defendants* shall provide a copy of the bond required by this Section to the Director of the East Central Region of the FTC at the address specified in Section XII of this Order.

5. Defendant or defendants shall not disclose the existence of the performance bond to any consumer or other purchaser or prospective purchaser of any product or service that is advertised, promoted, offered for sale, sold or distributed via telemarketing, without also disclosing clearly and prominently, at the same time, "AS REQUIRED BY ORDER OF THE U.S. DISTRICT COURT ARISING FROM CHARGES OF FALSE AND MISLEADING REPRESENTATIONS PREVIOUSLY MADE IN TELEMARKETING SALES."

## TELEMARKETING SALES RULE

87. IT IS FURTHER ORDERED that defendants, individually and severally, and their agents, servants, employees, attorneys and all persons or entities directly or indirectly under defendants' control, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each such person, whether acting directly or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from violating the Telemarketing Sales Rule, 16 C.F.R. § 310.

## PROHIBITIO AGAINST
## DISTRIBUTION OF CUSTOMER LISTS

88. IT IS FURTHER ORDERED that defendants, individually and severally, and their agents, servants, employees, attorneys and all persons or entities directly or indirectly under defendants' control, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each such person, whether acting directly or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from selling, renting, leasing, transferring or otherwise disclosing the name, address, telephone number, credit card number, bank account number or other identifying information of any person who paid any money to defendants at any time in connection with the offering for sale or sale of any good or service; *provided, however,* that any defendant may disclose such identifying information to a law enforcement agency or as required by any law, regulation or court order, and shall disclose such identifying information to the Commission pursuant to this Order.

## PROHIBITION ON TRANSFERRING BUSINESS INFORMATION

**\*50** 89. IT IS FURTHER ORDERED that defendants, individually and severally, and their agents, servants, employees, attorneys and all persons or entities directly or indirectly under defendants' control, and all other persons or entities in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each such person, whether acting directly or through any corporation, limited liability company, subsidiary, division or other device, are hereby permanently restrained and enjoined from transferring or in any other way providing to any person (other than a federal, state or local law enforcement agency or pursuant to a court order), directly or indirectly, any books, records, tapes, disks, accounting data, manuals, electronically stored data, banking records, invoices, telephone records, ledgers, payroll records, or other documents of any kind, including information stored in computer-maintained form, in the possession, custody or control of defendants, or any trade secrets or knowledge, whether recorded or otherwise, that are in any way related to defendants.

## MONETARY RELIEF

90 IT IS FURTHER ORDERED that the corporate defendants and defendant Ricardo E. Martinez, jointly and individually, are liable for payment of equitable monetary relief-including, but not limited to, consumer redress and/ or disgorgement, and for paying any attendant expenses of administration of any redress fund, in the amount of THIRTY-SIX MILLION, SEVEN HUNDRED AND SIXTEEN THOUSAND DOLLARS ($36,716,000): [9]

[9]    The amount of equitable monetary restitution equals the amount paid by the consumer victims, less refunds. *FTC v. Febre,* 128 F.3d at 536. *See also FTC v. Gem Merchandising,* 87 F.3d 466; *FTC v. Amy Travel,* 875 F.2d at 570; *FTC v. Renaissance Fine Arts, Ltd.,* 1995-2 TRADE CAS. (CCH) ¶ 71,086 at 75,194 (N.D.Ohio 1995); *FTC v. Siluetas Distribs., Inc.,* 1995-1 TRADE CAS. (CCH) ¶ 70,918 at 74,099 (N.D.Cal.1995).

1. EIGHT MILLION, SIX HUNDRED AND THREE THOUSAND DOLLARS ($8,603,000) for the credit card sold through the certificate program also known as the Platinum Card;

2. FOURTEEN MILLION, FIVE HUNDRED AND FIFTY ONE THOUSAND DOLLARS ($14,551,000) for defendants' direct sale of the Earn a Bankcard program, also known as the Platinum Card and NCS or Diamond Select program;

3. THIRTEEN MILLION, ONE HUNDRED AND SEVEN THOUSAND DOLLARS ($13,107,000) for the sale of the Diamond Select credit card through E-Credit Solutions/Zentel Corporation;

4. FOUR HUNDRED AND FIFTY-FIVE THOUSAND DOLLARS ($455,000) for 1,000 Minute Mega Saver and Hartford Auto Club sales made in response to the upsale script in PX 51.

91. IT IS FURTHER ORDERED that defendants Wilfredo Lugo and Johnnie Smith are individually and jointly liable with the other Defendants for payment of equitable monetary relief-including, but not limited to, consumer redress and/ or disgorgement and for paying any attendant expenses of the administration of any redress fund-in the amount of SIXTEEN MILLION, SEVEN HUNDRED NINETEEN THOUSAND DOLLARS ($16,719,000): [10]

10   Corporate and individual defendants may be held jointly and severally liable for the total amount of consumer injury. *FTC v. Amy Travel,* 875 F.2d at 570; *FTC v. Think Achievement Corp.,* 2000-2 TRADE CAS. (CCH) ¶ 73,084. Once the Commission shows that its calculations reasonably approximate the amount of consumers' net losses, the defendants have the burden of showing that the Commission's figures are inaccurate. *Febre,* 128 F.3d at 535; *Think Achievement Corp.,* 2000-2 Trade Cas. (CCH) ¶ 73,089.

1. FOURTEEN MILLION, FIVE HUNDRED AND FIFTY ONE THOUSAND DOLLARS ($14,551,000) for defendants' direct sale of the Earn-a-Bankcard program, also known as the Platinum Plus and NCS or Diamond Select program;

2. ONE MILLION, SEVEN AND THIRTEEN THOUSAND DOLLARS ($1,713,000) for the sale of the Diamond Select credit card through E-Credit Solutions/ Zentel Corporation based on TWENTY-FIVE DOLLARS ($25) per sale;

**\*51** 3. FOUR HUNDRED AND FIFTY-FIVE THOUSAND DOLLARS ($455,000) FOR 1,000 Minute Mega Saver and Hartford Auto Club sales made in response to the upsale script in PX 51.

92. IT IS FURTHER ORDERED that Defendant Johnnie Smith is individually and jointly liable with the other Defendants for payment of equitable monetary relief-including, but not limited to, consumer redress and/or disgorgement and for paying any attendant expenses of the administration of any redress fund-in the amount of NINE HUNDRED THOUSAND DOLLARS ($900,000) for the credit card sold through the certificate program also known as the Platinum Card.

ACKNOWLEDGMENT OF RECEIPT OF THIS ORDER

93. IT IS FURTHER ORDERED that, within ten (10) business days after entry of this Order, each of the defendants shall submit to the Commission a truthful sworn and notarized statement, in the form shown on Appendix A *infra,* that shall acknowledge receipt of this Order as entered.

USE OF CONSUMER REDRESS
AND DISGORGEMENT FUNDS

94. IT IS FURTHER ORDERED that:

1. Plaintiff shall deposit funds received from defendants pursuant to this Order in an interest-bearing account administered by plaintiff or its agent;

2. All funds paid pursuant to this section shall be used for equitable relief-including, but not limited to, consumer redress and any attendant expenses for the administration of any redress fund. In the event that direct redress to consumers is wholly or partially impracticable or funds remain after redress is completed, plaintiff may apply any remaining funds to such other equitable relief (including consumer education remedies) as they determine to be reasonably related to the defendants' practices alleged in the Complaint. Any funds not used for such equitable relief shall be deposited as disgorgement to the United States Treasury.

MONITORING

95. IT IS FURTHER ORDERED that, for the purpose of monitoring and investigating compliance with any provision of this Order,

1. Within ten (10) days of receipt of written notice from a representative of the Commission, defendants shall submit additional written reports, sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and/or provide entry during normal business hours to any business location in such defendants' possession or direct or indirect control to inspect the business operation.

2. In addition, the Commission is authorized to monitor compliance with this Order by all other lawful means-including, but not limited to, the following:

1. Obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed.R.Civ.P. 30, 31, 33, 34, 36 and 45;

2. Posing as consumers and suppliers to defendants' employees, or any other entity managed or controlled in whole or in part by any defendant;

*provided* that nothing in this Order shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

> **\*52** 3. Defendants shall permit representatives of the Commission to interview any employee, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order. The person interviewed may have counsel present.

## REPORTING PROVISIONS

96. IT IS FURTHER ORDERED that, in order that compliance with the provisions of this Order may be monitored: [11]

[11]   Courts may order record keeping and monitoring to ensure compliance with a permanent injunction. *See, e.g., FTC v. Slim America, Inc.,* 77 F.Supp.2d 1263, 1276 (S.D.Fla.1999); *see also FTC v. U.S. Sales Corp.,* 785 F.Supp. 737, 753-54 (N.D.Ill.1991); *FTC v. Sharp,* 782 F.Supp. 1445, 1456-57 (D.Nev.1991).

1. For a period of five (5) years from the date of entry of this Order,

> 1. The individual defendants shall notify the Commission of the following:

>> 1. Any changes in defendant's residence, mailing addresses, and telephone numbers, within ten (10) days of the date of such change;

>> 2. Any changes in defendant's employment status (including self-employment) within ten (10) days of the date of such change. Such notice shall

include the name and address of each business that defendant is affiliated with, employed by, or performs services for; a statement of the nature of the business; and a statement of defendant's duties and responsibilities in connection with the business; and

> 3. Any changes in defendant's name or use of any aliases or fictitious names; and

2. The corporate defendants shall notify the Commission of any changes in corporate structure that may affect compliance obligations arising under this Order-including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor corporation; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the filing of a bankruptcy petition; or a change in the corporate name or address, at least thirty (30) days prior to such change, *provided that,* with respect to any proposed change in the corporation about which the defendant learns less than thirty (30) days prior to the date such action is to take place, defendant shall notify the Commission as soon as is practicable after obtaining such knowledge.

2. One hundred eighty (180) days after the date of entry of this Order, defendants shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which they have complied and are complying with this Order. This report shall include, but not be limited to:

> 1. Any changes required to be reported pursuant to this Paragraph;

> 2. A copy of each acknowledgment of receipt of this Order obtained by defendants pursuant to this Paragraph.

3. For the purposes of this Order, defendant shall, unless otherwise directed by the Commission's authorized representatives, mail all written notifications to the Commission to:

REGIONAL DIRECTOR

Federal Trade Commission

F.T.C. v. Capital Choice Consumer Credit, Inc., Not Reported in F.Supp.2d (2004)
2004 WL 5149998

East Central Region

Eaton Center

1111 Superior Avenue-Suite 200

Cleveland, Ohio 44114-2507

Re: *FTC v. Capital Choice Consumer Credit, Inc., et al.*

Case No. 02-21050-CIV, U.S.D.C., S.D. Florida

**\*53**  4. For purposes of the compliance reporting required by this Paragraph, the Commission is authorized to communicate directly with the individual defendants.

97. IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order, defendants and their agents, employees, officers, corporations, successors, and assigns, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby restrained and enjoined from failing to create and retain the following records:

1. Accounting records that reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues;

2. Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable;

3. Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business;

4. Complaints and refund requests (whether received directly, indirectly or through any third party) and any responses to those complaints or requests; and

5. Copies of all sales scripts, training materials, advertisements, or other marketing materials.

98. IT IS FURTHER ORDERED that, for a period of five (5) years from the date of entry of this Order,

1. Defendants shall deliver a copy of this Order to all principals, officers, directors, managers, employees, agents and representatives having responsibilities with respect to the subject matter of this Order, and shall secure from each such person a signed and dated statement acknowledging receipt of the Order.

2. Corporate defendants shall deliver this Order to current personnel within fifteen (15) days after the date of service of this Order, and shall deliver this Order to new personnel within fifteen (15) days after the person assumes such position or responsibilities.

3. Individual defendants shall deliver a copy of this Order to the principals, officers, directors, managers and employees under his control for any business that (1) employs or contracts for personal services from him and (2) has responsibilities with respect to the subject matter of this Order. Each individual defendant shall secure from each such person a signed and dated statement acknowledging receipt of the Order within fifteen (15) days after the date of service of the Order or the commencement of the employment relationship.

99. IT IS FURTHER ORDERED that, within thirty (30) days of the date of this Order, the Clerk of this Court shall remit to the Federal Trade Commission all funds in the Court's depository account held in the name(s) of Millennium Communications and Fulfillment, Inc., Capital Choice Consumer Credit, Inc., and Ecommex Corporation that were placed in the depository account pursuant to the Consent Order *Pendente Lite* dated April 23, 2002. These funds shall be remitted to:

REGIONAL DIRECTOR

Federal Trade Commission

East Central Region

Eaton Center

1111 Superior Avenue-Suite 200

Cleveland, Ohio 44114-2507

**\*54** 100. IT IS FURTHER ORDERED that within thirty (30) days of the date of this Order, Gregg J. Ormond, Esq., shall remit to the Federal Trade Commission the FOUR HUNDRED AND FIFTY THOUSAND DOLLARS ($450,000), plus any accrued interest, that was placed in an interest-bearing account pursuant to the Consent Order *Pendente Lite* dated April 23, 2002. These funds shall be remitted to:

REGIONAL DIRECTOR

Federal Trade Commission

East Central Region

Eaton Center

1111 Superior Avenue-Suite 200

Cleveland, Ohio 44114-2507

101. IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for purposes of construction, modification and enforcement of this Order.

102. IT IS FURTHER ORDERED that the expiration of any requirements imposed by this Order shall not affect any other obligation arising under this Order.

103. IT IS FURTHER ORDERED that each party to this Order bear its own costs and attorneys fees incurred in connection with this action.

APPENDIX A

AFFIDAVIT OF DEFENDANT

I, _____, being duly sworn, hereby states and affirms as follows:

1. My name is _____. My current residence address is

_____

I am a citizen of the United States and am over the age of eighteen. I have personal knowledge of the facts set forth in this Affidavit.

2. I am a Defendant in *FTC v. Capital Choice Consumer Credit, et al.* (United States District Court for the Southern District of Florida).

3. On _____, 200___, I received a copy of the Final Order and Permanent Injunction, which was signed by the Honorable Judge Ursula Ungaro-Benages and entered by the Court on _____, 200___. A true and correct copy of the Order I received is appended to this Affidavit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed: _____, 200___

_____

NAME

State of _____, City of _____

Subscribed and sworn to before me this ____ day of _____, 20___.

_____

Notary Public

My Commission Expires: _____

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 5149998

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

G

2013 WL 3771322
United States District Court, M.D. Florida,
Orlando Division.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
DIRECT BENEFITS GROUP, LLC; Voice Net
Global, LLC; Solid Core Solutions, Inc.; Wkms,
Inc.; Kyle Wood; and Mark Berry, Defendants.

No. 6:11–cv–1186–Orl–28TBS.
|
July 18, 2013.

**Attorneys and Law Firms**

Harold E. Kirtz, Valerie M. Verduce, Barbara E. Bolton, Gideon E. Sinasohn, Federal Trade Commission, Atlanta, GA, for Plaintiff.

Richard A. Schonfeld, Chesnoff & Schonfeld, Las Vegas, NV, Robert Ryon Hendry, Hendry, Stoner, & Brown, PA, Orlando, FL, for Defendants.

**MEMORANDUM DECISION AND ORDER**

JOHN ANTOON II, District Judge.

*\*1* The Federal Trade Commission brought this action seeking injunctive and monetary equitable relief against four corporate entities and two individual Defendants, contending that the Defendants engaged in unfair and deceptive practices in violation of § 5(a) of the Federal Trade Commission Act [1] by debiting consumers' bank accounts without their consent and by failing to disclose material information on websites that they operated. After the FTC's motion for summary judgment was denied, (Doc. 198), the case proceeded to a bench trial, (see Trial Trs., Docs. 213–216) . [2] The parties thereafter submitted written closing arguments and proposed findings of fact and conclusions of law. [3]

[1]    Section 5(a) of the FTCA is codified at 15 U.S.C. § 45(a).

[2]    Citations to the trial transcripts will be denoted in this Order by the day of the trial followed by the page number. The transcript of Day 1 is Doc. 213;

for Day 2 is Doc. 214; for Day 3 is Doc. 215; and for Day 4 is Doc. 216. Thus, for example, "Tr. Day 1 at 2" denotes the second page of the transcript of Day 1—Doc. 213.

[3]    (Docs. 218, 219, 220, & 221). The parties were permitted to file objections to each other's submissions, but neither side did so. (See Mins., Doc. 208; Tr. Day 4 at 3–4).

Upon consideration of the evidence and testimony presented, argument of counsel, and the parties' proposed findings and conclusions, I issue the following opinion in accordance with Federal Rule of Civil Procedure 52. I conclude that the FTC has met its burden of proving by a preponderance of the evidence that the Defendants engaged in unfair and deceptive practices in violation of § 5(a); that the individual Defendants are liable for the corporate violations; and that the Defendants operated as a "common enterprise" such that each is liable for the acts of the others. Injunctive and monetary equitable relief will accordingly be granted.

*I. Factual and Procedural Background*

The FTC is an independent agency of the United States Government created by statute—the FTCA, 15 U.S.C. §§ 41–58. The FTC enforces § 5(a) of the FTCA, which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is authorized to initiate, by its own attorneys, federal district court proceedings to enjoin violations of the FTCA and to secure such equitable relief as may be appropriate in each case. See 15 U.S.C. §§ 53 & 56.

Defendants WKMS, Inc., and Solid Core Solutions, Inc., are Utah corporations with their principal places of business in Bluffdale, Utah. Defendants Direct Benefits Group, LLC, and Voice Net Global, LLC, are Wyoming limited liability companies with their principal places of business in Bluffdale, Utah.

Defendant Kyle Wood is the sole owner and officer of WKMS and is also the sole owner and manager of Direct Benefits Group. (Tr. Day 3 at 109; Wood Decl., Pl.'s Ex. 104). Wood described WKMS, which he founded in December 2008, as an online payday loan referral service and Direct Benefits Group as an online marketer of membership clubs called Direct Benefits Online and Unified Savings that offered various discounts and rebate opportunities to their members. (Tr. Day 3 at 109; Pl.'s Ex. 104; Wood Dep., Pl.'s Ex. 47, at 12). Wood created Direct Benefits Group in July 2009 in order to sell the

membership club products. (Tr. Day 3 at 18; Wood Dep. at 7–8, 22).

Defendant Mark Berry, a software engineer, is the sole owner and manager of Solid Core, a software development and staffing company that he formed in January 2009. (Tr. Day 3 at 161–62; Berry Decl., Pl.'s Ex. 52). Berry is also the sole owner and manager of Voice Net Global, which he described as a company that provides dial-through long-distance service. (Tr. Day 3 at 164–65, 184; Pl.'s Ex. 52). Voice Net Global also did business under the name "Thrifty Dial." (*Id.* at 188, 189). Wood and Berry operated their companies out of office space that they shared in Bluffdale, Utah.

 **\*2** WKMS operated several websites on which customers could fill out payday loan applications. These websites included, among others, citywestfinancial.com, mypaydayangel.com, paydaypickup.com, juniperloans.com, northcitymutual.com, and mycashpickup.com. WKMS did not provide payday loans but instead was a referral service; after a customer completed online loan applications, WKMS sent the customer's information to lenders or to intermediaries who would find a lender interested in making a loan to the customer. (Wood Dep. at 25). Over its three-year existence, WKMS received 2,908,576 loan applications and placed 594,956 applications with lenders. (Tr. Day 3 at 111 (Wood Test.)). [4]

[4]     As explained by Wood, the lenders and intermediaries paid WKMS a fee ranging from $1 to $100 for the information regarding the loan applicants, and consumers were not charged anything by WKMS for the lending referral.

Each of the discount programs—Thrifty Dial, Voice Net Global, Direct Benefits Online, and Unified Savings—offered long-distance service; members were provided with an 800 number and a PIN code, after which they could make long distance phone calls for the price of the membership fee. (Tr. Day 3 at 34 (Wood Test.); Defs.' Ex. 26). Direct Benefits Online and Unified Savings included additional features. Wood described some of the other benefits of these programs as rebate opportunities, travel vouchers, coupons, "daily deals," and medical discounts. (Tr. Day 3 at 21–22). Only the rebates section required Direct Benefits Group to pay something—aside from startup costs—in order to produce a benefit to the customer; customers could mail in a rebate form and a receipt from a specified retailer, and Direct Benefits

Group would send the customer the indicated rebate amount. (*Id.* at 25–27). The other available discounts were discount vouchers, compilations of coupons, or lists of products for sale obtained by an electronic feed, and it did not cost Direct Benefits Group anything if a customer used one of those products. (*Id.* at 30).

After mid–2009, consumers could sign up on WKMS's payday loan application websites for one of the discount programs. In the course of filling out payday loan applications on WKMS's websites, consumers provided financial information, including bank account numbers for the account where the desired payday loan was to be deposited. During the loan application process, the websites presented the consumers with offers for the discount programs through banner ads and pop-up boxes. If consumers knowingly or unwittingly enrolled in the programs in the course of submitting their payday loan applications, debits for the discount programs' monthly or annual fees were made from the bank accounts listed by the consumers on the payday loan applications. Initially, the discount programs were offered at a monthly fee ranging from $39.95 to $59.90. However, sometime in 2010, Wood came up with the idea to change from a monthly fee model to an annual fee model, (Tr. Day 3 at 189 (Berry Test.)), and the memberships then were offered-and bank accounts then were debited—for annual fees ranging from $98.40 to $99.90.

These debits sometimes came as a surprise to consumers, who often had not realized that they had enrolled in a discount program rather than merely submitting a payday loan application. Additionally, the debits sometimes resulted in bank overdraft charges for the consumers; those who had not realized they had enrolled were not expecting such a charge, and many of these payday loan seekers did not have enough money in their bank accounts to cover the debits. When consumers discovered debits from their bank accounts that they did not recognize, they typically contacted their banks or the Defendants or made complaints to Better Business Bureaus ("BBBs") or government entities, including the FTC. The FTC began investigating the matter in the spring of 2011 and filed this lawsuit in July 2011. Contemporaneous with the filing of its Complaint, the FTC sought and was granted a temporary restraining order with an asset freeze, and a receiver was appointed. (Doc. 15). A month later, a preliminary injunction was entered, (Doc. 71), and the case proceeded to trial in November 2012.

**\*3**  During the trial, the FTC presented testimony from thirteen witnesses—eight consumers, two FTC investigators, a Minnesota business owner, a banker, and the receiver who was appointed shortly after the filing of this case. Defendants presented the testimony of two witnesses—individual Defendants Wood and Berry. Both sides also submitted many exhibits into evidence.

### II. Website Operation and the Enrollment Process

The manner in which the payday loan websites and advertisements for, and enrollment in, the discount clubs on those websites operated is largely undisputed and was demonstrated at trial primarily during the testimony of FTC Investigator Reeve Tyndall. Tyndall explained his investigative activities regarding the Defendants, including three "undercover buys" that he conducted in April and May 2011 by applying online for payday loans and enrolling himself—using a secret identity—in the discount club memberships. Tyndall explained that after reading some consumer complaints, he approached the buys by "trying to be objective to see how the process worked from beginning to end." (Tr. Day 1 at 117). His goal was "to incur a charge" because the FTC knew that consumers were incurring charges after they submitted payday loan applications. (*Id.*). Tyndall took "screenshots" of what happened as he engaged in the undercover buys and, using software, he also recorded videos of each undercover buy. (*Id.* at 117–18; Pl.'s Exs. 35, 38–39, & 89–91).

For the first undercover buy, Tyndall went to mypaydayangel.com on April 7, 2011. (*Id.* at 117, 119–20). The landing page contained a graphic that said "Get cash up to $500 as soon as **1 hour!**" and promised "Easy to Apply—Approved in Minutes—Cash in Your Account." (*Id.* at 121; Pl.'s Ex. 35 at B1). Nothing on the landing page mentioned a discount club or long-distance phone service. (Tr. Day 1 at 121; Pl.'s Ex. 35 at B1). Tyndall selected the desired loan amount—$500—from a dropdown menu and then filled out the payday loan application. (Tr. Day 1 at 122; Pl.'s Ex. 35 at B2). The application required entry of information including name, address, social security number, employment, checking account number, bank name, and routing number. (Tr. Day 1 at 123; Pl.'s Ex. 35 at B3).

At the end of the application was an advertisement for Thrifty Dial's long distance service. (Tr. Day 1 at 122, 124; Pl.'s Ex. 35 at B4). The Thrifty Dial advertisement included a "check box," which was not checked by default, and accompanying text:

IF BOX IS SELECTED BELOW

I have read and understood, and agree to all terms of this offer, including charges for **$98.40** which includes 1 year of access to the services of Thrifty Dial. Yes, I want a year of services! ☐

(Pl.'s Ex. 35 at B4; Tr. Day 1 at 124). Tyndall left the box unchecked[5] and then clicked an orange "Submit Application" button on that page. (Tr. Day 1 at 124; Pl.'s Ex. 35 at B4). After Tyndall hit the Submit button, a pop-up box appeared on the screen. (Tr. Day 1 at 124; Pl.'s Ex. 35 at B5).

[5]  As correctly noted by the FTC, no evidence was presented at trial regarding any consumer purchasing the subject products by checking the box in the original banner advertisement. (*See* Pl.'s Closing Argument, Doc. 221, at 3 n. 2). The focus of the case was on enrollment that occurred via the pop-up box after the "Submit Application" button was clicked without the banner ad box being checked.

**\*4**  Tyndall first noticed two buttons in the pop-up box —"OK" and "Cancel"—and the OK button appeared to be highlighted in blue. (Tr. Day 1 at 124; Pl.'s Ex. 35 at B5). In the pop-up box above the OK and Cancel buttons was a block of text that read:

ATTENTION:

Read below before pressing OK

Press OK to submit your loan application and still take advantage of Thrifty Dial. By pressing OK, you agree you have read and understood and accept all terms for this cash advance offer, as well as all terms for Thrifty Dial, which includes a 1 year usage account for a single charge of 98.40, which provides access to services of all benefits described in the terms and conditions.

By pressing cancel, you still understand and accept all terms of this cash advance offer, but do not wish to buy Thrifty Dial today.

(Pl.'s Ex. 35 at B5). Tyndall read through the text a couple of times to make sure he understood it; he did not understand it at first and had to read through it again. (Tr. Day 1 at 125). Tyndall explained that "[a]t first, it seemed a bit counterintuitive, and it was something that I

wasn't expecting.... [A]t first, I thought it was maybe terms and conditions or something related to the payday loan application; but once I read it through a few times, I began to realize that it was related to the Thrifty Dial upsell." (*Id.*). Tyndall "was confused by the pop-up box"; he was not expecting it based on his initial investigation. (*Id.* at 127).

Tyndall reiterated that the choices appeared to be counterintuitive, explaining that he "think[s] of a pop-up box as sort of like a fork in the road where you can choose to go down one direction or another direction.... [His] first reaction to [the OK and Cancel buttons] was [that] OK would continue [him] down the path that [he] had already taken ... [and that] cancel [would mean] stop the application process." (*Id.*). Tyndall felt like the instruction to "read below before pressing OK" was pushing him toward the OK button. (*Id.* at 128). After reading the text in the pop-up box several times, however, he began to realize that pressing OK would change his previous choice not to buy Thrifty Dial and that cancel "would actually continue [him] down the path that [he] had already taken of ... not wanting the upsell." (*Id.*).

Ultimately, Tyndall pressed the Enter bar to continue, understanding that the enter bar would select the default option—the OK button. (*Id.* at 125, 128). Tyndall was then taken to another page that read in part: "We are currently finding the best lender match for your loan application.... Your business is important to us. Please review our email that will be sent to you. Please check your inbox and spam folder." (Pl.'s Ex. 35 at B6; Tr. Day 1 at 125). After this first undercover buy on mypaydayangel.com, Tyndall's undercover checking account was debited $98.40 for the Thrifty Dial product—consistent with his intention, on instructions from his manager, to buy something through the process. (Tr. Day 1 at 126 & 130).

**\*5** Tyndall conducted a second undercover buy on April 15, 2011, on the citywestfinancial.com website. (*Id.* at 132). Similar to his first buy, in the second buy Tyndall completed a payday loan application, again selecting a $500 loan amount and providing bank account information. (*Id.* at 132–33; Pl.'s Ex. 38 at E1–E2). On that application was an advertisement for the Unified Savings product and an unchecked "check box" and message similar to the Thrifty Dial check box and message:

SELECT BOX BELOW!

I have read and understood, and agree to all terms of this offer, including charges for **$99.90** which includes 1 year

of access to the services of Unified Savings. Yes, I want a year of benefits! ☐

(Pl.'s Ex. 38 at E2–E3; Tr. Day 1 at 133–34). Tyndall left the box unchecked and then clicked the green "Confirm" button on the page. (Tr. Day 1 at 134).

After Tyndall hit the Confirm button, two things occurred—first, the screen automatically scrolled to the top, and second, a pop-up box appeared. (*Id.* at 134). At the top of the page was a yellow dialogue box that stated: "Congratulations, please confirm the information below. Submit to begin your loan process." (*Id.;* Pl.'s Ex. 38 at E5). The pop-up box—like the pop-up box in the first buy—contained two options, "OK" and "Cancel." (Tr. Day 1 at 134; Pl.'s Ex. 38 at E5). It contained similar wording as well:

ATTENTION:

Read below before pressing OK

Press OK to validate your loan application and still take advantage of Unified Savings. By pressing OK, you agree you have read and understood and accept all terms for this cash advance offer, as well as all terms for Unified Savings, which includes a 1 year usage account for a single charge of $99.90, billed to the bank account you have provided today, which provides access to services of all benefits described in the terms and conditions. You will still need to confirm your sign up for Unified Savings by leaving the box checked upon submission. Pressing OK will only check the box for you on the application.

By pressing cancel, you still understand and accept all terms of this cash advance offer, but do not wish to buy Unified Savings today.

(Pl.'s Ex. 38 at E5). Tyndall read through the text in the pop-up box a few times because it was slightly different from the pop-up box in the first buy. (Tr. Day 1 at 135). After doing so, he clicked "OK," and he was taken to a page that told him to "wait while we search our cash provider network," (Pl.'s Ex. 38 at E6), and then to a page that said: "Thank you! Congratulations! We have found several offers for loans or other services in which you may be interested," (Pl.'s Ex. 38 at E7; Tr. Day 1 at 135).

On May 17, 2011, Tyndall conducted his third "undercover buy," again on citywestfinancial.com. (Tr. Day 1 at 136). He completed the payday loan application and encountered an

advertisement for Unified Savings with the unchecked check box and "select box below" message he had seen during his second buy. (*Id.* at 137; Pl.'s Ex. 39 at F2). Tyndall again left the box unchecked and clicked the green "Confirm" button. (Tr. Day 1 at 137; Pl.'s Ex. 39 at F3). The page scrolled to the top, and a yellow dialogue box and a pop-up box appeared. (Tr. Day 1 at 137; Pl.'s Ex. 39 at F4). The pop-up box had "OK" and "Cancel" buttons and began, "ATTENTION: Read below before pressing OK" like the other pop-up boxes. (Tr. Day 1 at 138; Pl.'s Ex. 39 at F4). In this pop-up box, however, the rest of the text was behind a scroll bar; it contained the same text as the pop-up box of the second buy, but Tyndall scrolled down using the scroll bar to read all of the text. (Tr. Day 1 at 138; Pl.'s Ex. 39 at F4–F7). The initial pop-up box that appeared—without scrolling—said only "ATTENTION: Read below before pressing OK" and then had the "OK" and "Cancel" buttons. (Tr. Day 1 at 139; Pl.'s Ex. 39 at F4). No other language would be seen absent scrolling. (Tr. Day 1 at 139).

**\*6** Tyndall clicked "OK" and the pop-up box disappeared. (*Id.*). Tyndall was then at the top of the application page, and as he scrolled down the page he noticed that the "check box" in the Unified Savings ad was then checked. (*Id.* at 140; Pl.'s Ex. 39 at F9). It appeared to Tyndall that when he hit the OK button, the effect was to check the Unified Savings box that was previously unchecked. (*Id.* at 142). Tyndall wanted to see what would happen if he then "unchecked" that box, so he unchecked it and then hit the green "Confirm" button. (*Id.*; Pl.'s Ex. 39 at F10). When he did so, he was taken to a different URL page—no longer citywestfinancial.com—and to an offer for a different financial product that appeared to be from a non-Defendant. (Tr. Day 1 at 143–44; Pl.'s Ex. 39 at F12). Tyndall ceased the third undercover buy at that point. (Tr. Day 1 at 144).

On cross-examination, Tyndall acknowledged that the pop-up box with the OK and Cancel buttons took up approximately the middle third of the computer screen and was in English, in a font that was large enough to read. (*Id.* at 180). Tyndall stated that he "eventually" came to the conclusion—after reading the box several times—that by clicking OK he would be signing up for a year of services and that by clicking Cancel he would be rejecting it. (*Id.* at 181–82). After doing that, he anticipated that his undercover bank account would indeed be debited, and three weeks after the first buy, it was. (*Id.* at 182–83). Tyndall also explained that when he conducted the third buy, he used a different workstation, which had a different version of the Firefox web browser on it than had the

workstations he had used previously. (*Id.* at 187–88). Using that version, he had to scroll down to read the full contents of the pop-up box. (*Id.* at 189).

Defendants Wood and Berry testified regarding their decision to use the "OK" or "Cancel" pop-up box on the websites, which they clarified is not a "pop-up window" that would be blocked by a pop-up blocker and which they referred to as a "confirm box." Berry explained that this "confirm box" is a standard Javascript call that is available on all common browsers. (Tr. Day 3 at 166). As stated by Berry, in light of the variety of available browsers and the advent of mobile devices, it is challenging to build a website that will work on all different browsers, and they employed this confirm box because it would work across various devices, including mobile devices, iPads, tablets, and older browsers. (*Id.* at 166–169, 221–22). This confirm box forces an interaction because the user cannot close the box without closing the entire screen —unless the browser or entire screen is closed, either OK or Cancel must be chosen for the confirm box to go away. (*Id.* at 38–40 (Wood Test.); *id.* at 168 (Berry Test.)).

Berry further explained that he could not change the labeling of the buttons when using this confirm box; he could not, for example, change "OK" to "Yes." (*Id.* at 168). However, he and Wood did have control over the text that appeared in the box. (*Id.*). Wood wrote the text that appeared in the box and elsewhere on the webpages, and it was Wood's ultimate decision as to what was put on the webpages and how the content was positioned on the pages. (*Id* . at 141–42). Wood gave Berry the text to put into the pop-up box, and Berry defined, technologically speaking, what would happen after a customer hit "OK" or "Cancel." (*Id.* at 218–19).

**\*7** Berry also testified regarding Tyndall's account of the third buy, in which Tyndall encountered a pop-up box that required scrolling to reveal all of the box's contents. Berry had not previously seen that occur, and Berry explained that Tyndall was using a beta version of Firefox during that buy; according to Berry's user records—which indicate operating systems and browsers of users—Tyndall was the only customer who used that version. (*Id* . at 177, 178, 180).

### III. Consumer Testimony

Eight consumers testified at trial regarding their experiences with Defendants' websites and enrollment in the discount clubs. All of these consumers filled out payday loan applications on one of WKMS's websites and later discovered debits from their bank accounts that they did not recognize.

Three of the eight recalled seeing a pop-up box but did not read the contents of the pop-up box. (Tr. Day 1 at 27–28, 33 (Nokes Test.); *id.* at 54 (Hill Test.); *id.* at 77, 79 (Love Test.)). One explained that the box "look[ed] like a normal 'I accept these terms and conditions' " type of box, and she assumed it was part of the terms and conditions of the payday loan, so she pressed OK as the box directed. (*Id.* at 27–28, 33 (Nokes Test.)). Another did not recognize the pop-up box that she was shown in court as the one she recalled. (*Id.* at 57–58 (Hill Test.)). The third thought the box had to do with the loan itself, and when she was unable to "x out" of the box, she eventually clicked "OK." (*Id.* at 63, 77–79 (Love Test.)). The other five consumers did not recall seeing a pop-up box during the loan application process.

Six of the eight testifying consumers received refunds of the debits after they complained to Defendants, BBBs, their banks, or a local law enforcement agency. But, several of those six did not receive refunds of the bank overdraft charges they incurred after their accounts were debited. The other two did not attest to receiving refunds of any charge. Additionally, several of the consumers testified that they ultimately closed their bank accounts and opened new ones, citing concerns about compromised security of their accounts. (*See, e.g., id.* at 32 (Nokes Test.); *id.* at 68 (Love Test.); Tr. Day 2 at 8 (Calvo Test.); *id.* at 27–28 (Madisen Test.)).

In addition to the consumers who testified at trial, the FTC presented declarations of nineteen other consumers. (Pl.'s Exs. 55–61, 63–68, 70–74, & 76). These consumers gave similar accounts of their experiences regarding unknowing enrollment in the discount programs. (*See, e.g.,* Battaglia Decl., Pl.'s Ex. 56, at 2–3 ("I am pretty careful about reading fine print and signing up for things, but I did not notice anything on the site mentioning advertising any kind of club, or indicating that by applying for a loan I was authorizing a membership club to withdraw money from my bank account.... I eventually got back the money that Direct Benefits took, but I did not get a refund of the overdraft charges from the bank.")).

### IV. Email Confirmations and Bank Account Debits

**\*8** Wood and Berry testified that immediately after a consumer enrolled in one of the discount clubs, an automatically generated confirmation or "welcome" email was immediately sent to the email address that the consumer had included on the payday loan application. (Tr. Day 3 at 66, 69 (Wood Test.); Defs.' Ex. 3; Tr. Day 3 at 174 (Berry Test.)). But, Wood acknowledged that nothing in the emails that were

sent-which had the subject line, for example, "Welcome to Unified Savings"—referred to a payday loan or a payday loan application; that he did not know how many of the emails ended up in a spam or junk mail folder; that "there's no process [by] which [they] can know how many consumers actually saw the email"; and that the amount that would be charged was not mentioned until the fourth page of the printed version of the email that was admitted into evidence. (Tr. Day 3 at 131–33; Defs.' Ex. 3). Berry testified that they "did what [they] could" to prevent the emails from ending up in a spam filter. (Tr. Day 3 at 175).

Tyndall, the FTC investigator who testified as to his "controlled buys" and was seeking to purchase the product, did receive a confirmation email on the day of the first buy confirming his purchase of Thrifty Dial in the amount of $98.40. (Tr. Day 1 at 183 (Tyndall Test.)). However, none of the testifying consumers—who, unlike Tyndall, were not seeking to enroll in one of the discount clubs and did not knowingly attempt to enroll—recalled ever se receiving such an email.

Wood and Berry testified, and the exhibits of both sides supported, that consumers' bank accounts were not debited until at least ten days after online enrollment in the discount clubs. (Tr. Day 3 at 105 (Wood Test.); *id.* at 174 (Berry Test.)). As explained by Wood, charges to consumers' bank accounts were done through demand draft debits, also called "remotely created payment orders." (*Id.* at 158). When the payment orders were created—after the "OK" button in the pop-up box was clicked—Defendants' payment processing company inserted the consumer's name, address, and bank account information on the order, and in the space for a signature, the payment order indicated "authorization on file." (*Id.* at 158–59).

### V. Complaints

Many consumers complained about the debits to their bank accounts—to their banks; to Defendants directly; to Defendants' payment processors; to BBBs; to local law enforcement agencies; to state attorneys general; and to the FTC. The FTC introduced into evidence composite exhibits of complaints that consumers made to BBBs in Florida, Wyoming, Colorado, Delaware, and Utah, (Pl.'s Exs. 43–46), and Wood acknowledged being aware of 272 complaints being made to either the BBB or the FTC, (Tr. Day 3 at 79).

All of the testifying consumers complained either directly to Defendants or to a BBB or governmental entity. Some

of them were given refunds upon request to Defendants, but others recounted a lack of cooperation from Defendants. For example, Victoria Nokes testified that she argued on the phone with Direct Benefits Group for thirty minutes, repeatedly asking for a refund, but was told there was no recourse; after complaining to the BBB, she did receive a refund. (Tr. Day 1 at 30–31). Others reported difficulty reaching a live person, rudeness, and that customer service representatives hung up on them. (Tr. Day 2 at 6, 7, & 22 (Calvo and Madisen Test.)).

**\*9** Gabrielle Lynn, the office manager at Defendants' Bluffdale, Utah office, testified in her deposition that ninety percent of the phone calls received in the office were from complaining or confused customers, fifty percent of whom were "irate." (Lynn Dep., Pl.'s Ex. 49, at 39). Lynn estimated that by July 2011—when calls had dwindled-they were receiving 50 or 60 calls per day. (*Id.* at 15–16). Complaints also were received via email and regular mail. (*Id.* at 14–16). Every few weeks, Lynn gave Wood a list regarding how complaints were handled. (*Id.* at 14). Defendants Berry and Wood acknowledged an awareness that the complaints were being made, but, despite their acknowledged supervisory roles over Lynn, who oversaw customer service, they were unable to estimate the number of complaints received. (*See, e.g.,* Tr. Day 3 at 185 (Berry Test.)).

Additionally, consumers complained to a Minnesota business named Direct Benefits, Inc. ("DBI"), which is not affiliated with Defendant Direct Benefits Group. The owner of DBI, Thomas Mayer, explained during his trial testimony that DBI is a managing general insurance agency that markets insurance products and has nothing to with payday loans, buying clubs, or long-distance telephone service. (Tr. Day 1 at 95–96). In January 2010, DBI began fielding calls, emails, and online chats from consumers asking to have their money returned. (*Id.* at 96). Initially, DBI told the consumers that DBI had not sold them anything and did not know what they were talking about. (*Id.*). DBI then did some research and found out about Direct Benefits Online, which was selling "these memberships." (*Id.*).

Mayer described the complaints that DBI received as "intense" and the callers as "irate." (*Id.* at 97). Mayer conservatively estimated that DBI received 2,000 complaints about Direct Benefits Group from January 2010 to July 2011. (*Id.*). During some weeks DBI received as many as fifty calls complaining about Direct Benefits Online. (*Id.*). There were ten people at Mayer's company, and each one of them might

deal with one or two of these calls per day. (*Id.* at 102–03). The callers began the calls by yelling and screaming at Mayer's staff. (*Id.* at 97). Some of the callers were distraught and in tears. (*Id.*). For example, some callers told Mayer that he had stolen $49 out of their checking account without authorization and asked how he had obtained their checking account information. (*Id.* at 98). DBI employees who took such calls first had to calm down the callers and explain that they had the wrong company; then they gave the callers the phone number and email address of Direct Benefits Online. (*Id.*).

After the calls started coming in, Mayer contacted Direct Benefits Online and talked to a "woman named Gabrielle"— now known to be Gabrielle Lynn, though she would not tell Mayer her last name when he asked for it. (*Id.* at 99–100). Mayer suggested that Direct Benefits Online put its 800 number on the checking statements so that the customers would know whom to call. (*Id.* at 100). He also suggested that Direct Benefits Online update its phone system to state that it was not affiliated with DBI. (*Id.*). Gabrielle told Mayer that she would talk to the manager and see if there was anything that she could do, but she would not tell Mayer the name of her manager or the owner of the company. (*Id.*).

**\*10** Mayer estimated that he spoke to Gabrielle about four times; his office manager also spoke to Gabrielle numerous times. (*Id.* at 101). At one point Mayer told Gabrielle that Direct Benefits Online was "killing [his] business" because it was having to field hundreds of calls from Direct Benefits Online's customers. (*Id.* at 102). Gabrielle told Mayer there was nothing more that Direct Benefits Online could do and that Mayer would "just have to live with this." (*Id.*).

By June 2010, Mayer was so frustrated that he filed a complaint with the BBB in Wyoming. (*Id.* at 103). After that, the complaints continued to come in. (*Id.* at 104). Mayer encouraged the callers to call BBBs and attorneys general. (*Id.* at 105). A sampling of the online chat complaints that DBI received was admitted into evidence. (Pl.'s Ex. 88). Mayer explained, however, that most of the complaints were received on the phone. (*Id.* at 106). No one other than Gabrielle ever responded to Mayer's phone calls to Direct Benefits Online. (*Id.* at 107). Mayer sent emails to Gabrielle also, but she never acknowledged receiving them. (*Id.* at 112). Wood's records reflected that Mayer sent forty-seven emails over an eighteen-month period. (Tr. Day 3 at 107 (Wood Test.); Defs.' Ex. 19).

*VI. Revenue and Returns*

From 2009 to 2011, 628,546 consumers were enrolled in, and charged for, the discount club programs through W KMS's payday loan websites, (Tr. Day 3 at 78, 160 (Wood Test.); Defs.' Ex. 1), each incurring a charge ranging from $39.95 to $99.90. The total amount processed by Defendants' payment processors for all of the discount club products was $35,628,176. (Tr. Day 3 at 125–26 (Wood Test.); Pl.'s Ex. 33). Returns, however, totaled over $22 million, and after chargebacks, returns, and refunds, the net revenue to Defendants for all of the products was $9,512,172. (Tr. Day 3 at 126–29 (Wood Test.); Pl.'s Ex. 33).

Defendants used several different payment processors, including Landmark Clearing and Public Savings Bank, to process the consumer payments for the discount club memberships. (Tr. Day 3 at 124–25 (Wood Test.); Tr. Day 2 at 80 (Barton Test.)). Landmark Clearing terminated its payment processing relationship with Direct Benefits Group in February 2011 based on complaints, overall return percentages, and unauthorized return percentages. (Pl.'s Ex. 42; Tr. Day 1 at 161 (Tyndall Test.)). Similarly, Public Savings Bank, which handled payment processing for Direct Benefits group beginning in the fall of 2010 and for Unified Savings and Thrifty Dial beginning in early 2011, ceased its payment processing relationship with these entities in late June 2011 due to high return rates.[6] (Tr. Day 2 at 80, 94, 98 (Barton Test.)).

[6]    In addition to these four clients, Public Savings Bank had other customers with similar high return rates, and the bank also terminated several other such customers at the same time for the same reason. (Tr. Day 2 at 99, 117–18). The bank decided in July 2011 to terminate business with all customers who had return rates of 50 percent or higher. (*Id.* at 117). Later in July, about fifteen more customers were terminated for that reason, and a few weeks later Public Savings Bank decided to discontinue all of its payment processing business. (*Id.* at 100).

Returned transactions represented a variety of situations, as explained at trial largely through the testimony of Jeffrey Barton, who worked for Public Savings Bank from January 2010 to August 2011. (*Id.* at 74). Barton explained that when a bank processes a check payment for a customer and the check cannot be processed for some reason, the bank has to return that check to the bank of first deposit. (*Id.* at 81). When

returning a check, the bank must select a reason for the return, and Barton reviewed return descriptions on a document called a "returns report detail" reflecting returned check activity of Direct Benefits Group, Voice Net Global, Unified Savings, and Thrifty Dial during the time that they did business at Public Savings Bank. (*Id.* at 79–80, 82; Attachs. to Pl.'s Ex. 102).

**\*11**  The total return rate by check volume for Direct Benefits Group was 54.96%; for Voice Net Global, 58.03%; for Unified Savings, 78.27%, and for Thrifty Dial, 79.86%. (Tr. Day 2 at 81; Attachs. to Pl.'s Ex. 102). The overall rates of return for "account closed"—meaning that the account against which the check was to be posted was closed—for Direct Benefits Group, Voice Net Global, Unified Savings, and Thrifty Dial, respectively, were 7.76%, 9.71%; 10.31%, and 10.90%. (Tr. Day 2 at 82–83; Attachs. to Pl.'s Ex. 102). The respective rates of return for "nonsufficient funds" were 29 .51%, 29.75%, 39.89%, and 40.12%. (Tr. Day 2 at 82; Attachs. to Pl.'s Ex. 102). In the category of "not authorized," which Barton explained means that the customer claimed to his or her bank that he or she did not initiate or authorize the transaction, the return rates for Direct Benefits Group, Voice Net Global, Unified Savings, and Thrifty Dial were 2.14%, 1.82%, 3.45%, and 3.46%, respectively. (Tr. Day 2 at 84; Attachs. to Pl.'s Ex. 102). In his trial testimony, Wood acknowledged that these return rates were accurate and that throughout the two years of their operations, the businesses had return rates of approximately 70%. (Tr. Day 3 at 134–37).

In response to the high return rates, Public Savings Bank increased the fees for unauthorized charges, but that did not result in any noticeable change in the amount of returns. (Tr. Day 2 at 91 (Barton Test.)). Additionally, Public Savings Bank received hundreds of complaints from consumers regarding Direct Benefits Group and the other companies. (*Id.* at 91–92). The nature of most of the complaints was that the consumer did not know about the charge or did not authorize it. (*Id.* at 92). And, in the spring of 2011, the bank received two formal letters—one from Wachovia Bank and one from Bank of America—expressing concern about the number of returns and asking Public Savings Bank to look into it. (*Id.* at 92–93).

The applications that Defendants filled out with their payment processors reflected that Defendants were anticipating a large percentage of returns. For example, on a Landmark Clearing "Required Survey for High Risk Clients" completed by Wood on behalf of Direct Benefits Group in April 2010, Wood

indicated that Direct Benefits Group expected 12,000 check transactions per month and 8000 returns per month, with 50% of those expected to be returned for insufficient funds. (Pl.'s Ex. 30; Tr. Day 1 at 174 (Tyndall Test.)). A survey reflecting the same expected levels of transactions and returns was completed by Berry or Lynn on behalf of Voice Net Global in May 2010. (Pl.'s Ex. 31; Lynn Dep. at 33–34). Another Direct Benefits Group payment processing application in April 2010 reflected that a return rate of 70% was anticipated. (Pl .'s Ex. 79; Tr. Day 1 at 162–63 (Tyndall Test.)).

*VII. The Bluffdale Office and Defendants' Business Operations*

As earlier noted, Wood and Berry operated their companies out of shared office space in Bluffdale, Utah. Lynn also worked there beginning in September 2009; she started as an administrative assistant and her title was later changed to office manager. (Lynn Dep. at 6–8). Over time, personnel were added to handle customer service calls, and ultimately there were eight to ten employees at the Bluffdale office.

**\*12** Shortly after the FTC filed this case, and in conjunction with the entry of a Temporary Restraining Order ("TRO") (Doc. 15), a receiver, Brian McDowell, was appointed as to the business entity Defendants. McDowell testified at trial regarding his receivership activities, which included taking custody and control of the Bluffdale premises. (Tr. Day 2 at 134). When McDowell arrived at the Bluffdale office, he or someone on his behalf interviewed all of the employees on-site—eight in all—including Wood. (*Id.* at 157–58).

McDowell described Wood as cooperative, and McDowell was given a demonstration of the functioning of the payday loan application websites and the Direct Benefits Online, Unified Savings, and Thrifty Dial offers. (*Id.* at 158). The activity that had been proscribed by the TRO had ceased about three weeks prior to McDowell's arrival in Bluffdale, but, as Defendants demonstrated to McDowell, it could have been reinstated at any time. (*Id.* at 146). The only business that was happening at Direct Benefits Group was the receipt of customer service calls, and McDowell was not able to identify that Voice Net Global was operating when he arrived. (*Id.* at 146–47).

McDowell explained that the businesses at the Bluffdale office were indistinct because of commonality of employees, independent contractors, physical location, and computer hardware. (*Id.* at 149, 163). According to the accounting records and employee interviews, Solid Core provided

employees to Direct Benefits Group and Voice Net Global and was compensated for providing those employees. (*Id.* at 169). Additionally, Solid Core personnel were involved in the work of Direct Benefits and were doing the work of Direct Benefits Group, which had no employees, as well as of the other entities. (*Id.* at 170–71). McDowell determined that all of the payroll charges for the businesses were being borne by Solid Core; all of the employees were either employees or independent contractors of Solid Core. (*Id.* at 148–49). There were financial transfers between and among the corporate entities, with a general flow of funds out of WKMS, Direct Benefits Group, and Voice Net Global to Solid Core and to non-Defendant World Wide Marketing Group, which was also owned by Wood. (*Id.* at 150). There were transactions back and forth on a regular basis. (*Id.*).

McDowell was not able to determine that WKMS's business —related to buying and selling payday loan leads—was prohibited by the TRO or was unlawful. (*Id.* at 168). McDowell accordingly informed Defendants that WKMS could continue to operate so long as Defendants funded it and did not put at risk funds that were seized pursuant to the TRO. (*Id.* at 165–66). Ultimately, however, Defendants' then-attorney informed McDowell that Defendants were not interested in continuing the business of WKMS. (*Id.* at 167).

Lynn explained in her deposition that she was hired and paid by Solid Core but that she performed work for Solid Core, Voice Net Global, WKMS, and Direct Benefits Group. (Lynn Dep. at 7, 10). Lynn was supervised by both Wood and Berry, and everyone at the Bluffdale location was paid through Solid Core. (*Id.* at 11–12).

**\*13** In their trial testimony and in declarations filed earlier in the case, Wood and Berry acknowledged their ownership and management of the four corporate entities—WKMS and Direct Benefits Group by Wood, and Solid Core and Voice Net Global by Berry. (Tr. Day 3 at 109 (Wood Test.); *id.* at 184 (Berry Test.); Pl.'s Exs. 52 & 104). They also acknowledged being close working partners with one another's businesses and to each being personally familiar with the operations of all four businesses. (Tr. Day 3 at 110 (Wood Test.); *id.* at 184–85 (Berry Test.); Pl.'s Exs. 52 & 104). Berry helped WKMS with its equipment, including buying CPUs and other equipment, and Berry acknowledged signing documents on behalf of Voice Net Global, including payment processing applications. (Tr. Day 3 at 197).

The FTC also presented evidence through another investigator, Michael Liggins, regarding Wood and Berry's affiliations with the four businesses, including records from the secretaries of state of Utah and Wyoming. (Tr. Day 2 at 184–91; Pl.'s Exs. 4, 7, 8, 10, 11, & 12). Additionally, Liggins testified regarding records he obtained from private companies reflecting that Berry was the registrant for many domain names, including directbenefitsonline.com, citywestfinancial.com, and wkmsinc.com. (Id. at 193–94; Pl.'s Exs. 14 & 15).

### VIII. The Merits of the FTC's Claims

Section 5(a) of the FTCA, 15 U.S.C. § 45(a), provides in part that "unfair or deceptive acts or practices in or affecting commerce[ ] are ... unlawful." In Count I, the FTC alleges that the Defendants engaged in unfair billing practices in violation of this section by obtaining consumers' bank account information and debiting those accounts without the consumers' consent. The FTC alleges in Count II that the Defendants engaged in deceptive acts in violation of this section by failing to adequately disclose material information. As set forth below, at trial the FTC established both of these violations.

### A. "In or Affecting Commerce"

As an initial matter, Defendants' acts and practices clearly were "in or affecting commerce" under § 5(a) the FTCA. See 15 U.S.C. § 44 (defining "commerce" as including "commerce among the several States"). From their Utah office and also using addresses in other states, Defendants engaged in transactions with customers throughout the United States.

### B. Unfair Billing Practices (Count I)

An "unfair practice" under § 5(a) is "one that '[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.' " FTC v. Accusearch Inc., 570 F.3d 1187, 1193 (10th Cir.2009) (alterations in original) (quoting 15 U.S.C. § 45(n)). An unfair practice does not require knowledge of consumer harm. FTC v. Neovi, Inc., 604 F.3d 1150, 1156 (9th Cir.2010).

At trial, the FTC established each of the three unfair practice elements. First, the FTC showed that the billing practices at issue caused substantial injury to consumers. "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people....' " Neovi, 604 F.3d at 1158 (9th Cir.2010) (quoting Am. Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 972 (D.C.Cir.1985)); see also Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1365 (11th Cir.1988). Such was the situation here. Each consumer who was enrolled in the discount programs incurred a bank account debit of between $39.95 and $99.90. More than 628,000 consumers were enrolled in the discount programs, resulting in payments to Defendants of more than $9.5 million after accounting for returns, refunds, and chargebacks. (Wood Test. Day 3 at 78, 129).

*14 Second, the FTC established that the injury was not reasonably avoidable by consumers because of the confusing and misleading way the payday loan application process operated. After entering bank account information for the purpose of receiving a payday loan, and after ignoring or not noticing an ad for an unrelated discount club product, thousands of consumers were enrolled in discount programs by clicking "OK" or hitting "enter" after a pop-up box appeared. As aptly explained by FTC Investigator Tyndall during his testimony, the application process and the pop-up box conveyed the impression that selecting "OK" would continue the applicant on the path that the applicant was already on—submitting a loan application without enrolling in a discount program or agreeing to a debit from a bank account that was supposed to used for direct deposit of a payday loan. Moreover, the pop-up box Tyndall encountered during his first undercover buy did not disclose that the consumer's bank account would be charged for the membership fee. (Pl.'s Ex. 35 at B5).

I agree with the FTC's characterization that the Defendants took advantage of financially distressed consumers who went to websites seeking payday loans to cover immediate expenses, only to end up having debits to their bank accounts that sometimes resulted in overdraft charges in addition to the initial charges themselves. Consumers incurred charges for products and services they were not seeking, did not want or need, could not afford, and did not intend to purchase. And, the fact that many customers were able to—eventually—obtain refunds from Defendants does not render the injury avoidable. Cf. Neovi, 604 F.3d at 1158 (" 'It is likely that some consumers never noticed the unauthorized withdrawals. Even if the consumer did notice, obtaining reimbursement required a substantial investment of time, trouble, aggravation, and money.... Regardless of whether a bank eventually restored consumers' money, the

consumer suffered unavoidable injuries that could not be fully mitigated.' " (quoting district court decision)).

Third, the substantial injury to consumers was not outweighed by countervailing benefits. Defendants' own evidence suggests that the vast majority of the more than 628,000 consumers who were enrolled in the discount programs never used any of the discount offerings. Wood testified that there were 26,616 unique visitors to the Direct Benefits Online website over an eleven-month period, and only a fraction of those logged in—with a membership name and password they received at enrollment—on sections of the site such as "staff picks," "coupons," and "vouchers" to view or possibly use the discounts available to them. [7] (Tr. Day 3 at 23–25; Defs.' Ex. 9). Even assuming that some consumers who were enrolled did use some of the discount products, such use would not outweigh the substantial injury to duped consumers.

[7]    A Google analytics document submitted by Defendants reflects that the largest number of logins on the Direct Benefits Online website —8,486—occurred on the "staff picks" section, followed by 3,819 on "vouchers" and other lower numbers of logins on other sections. (Defs.' Ex. 9). The "rebates" section, which pertained to the only product that would ultimately cost Defendants money in order to produce it to the customer to fulfill—was visited by only 649 customers. (*Id.;* Tr. Day 3 at 25 (Wood Test.)).

In sum, all three elements of an "unfair practice" are satisfied here, and thus the FTC prevails on Count I of the Complaint.

*C. Deceptive Acts (Count II)*

**\*15**  "A practice is deceptive under the Federal Trade Commission Act 'if it is likely to mislead consumers acting reasonably under the circumstances ... in a way that is material.' " *FTC v. Grant Connect, LLC,* 827 F.Supp.2d 1199, 1214 (D.Nev.2011) (alteration in original) (quoting *FTC v. Cyberspace.com LLC,* 453 F.3d 1196, 1199 (9th Cir.2006)). A § 5 violation "only requires a showing that misrepresentations 'possess a tendency to deceive.' " *FTC v. Commerce Planet, Inc.,* 878 F.Supp.2d 1048, 1073 (C.D.Cal.2012) (quoting *Trans World Accounts, Inc. v. FTC,* 594 F.2d 212, 214 (9th Cir.1979)). "While proof that consumers actually were deceived is not required, such evidence is 'highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.' " *Grant Connect,* 827

F.Supp.2d at 1215 (quoting *Cyberspace.com,* 453 F.3d at 1201).

"District courts consider the overall, common sense 'net impression' of the representation or act as a whole to determine whether it is misleading." *Commerce Planet,* 878 F.Supp.2d at 1063 (citing *FTC v. Gill,* 265 F.3d 944, 956 (9th Cir.2001)). " 'A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.' " *Grant Connect,* 827 F.Supp.2d at 1214 (quoting *Cyberspace.com,* 453 F.3d at 1200).

The FTC has established that Defendants engaged in deceptive practices in violation of § 5(a) by failing to adequately disclose material information on the websites. The operation of the pop-up box and manner in which consumers were enrolled in the discount programs was likely to mislead reasonably-acting consumers—and did mislead such consumers—in a material way. As demonstrated by the consumer testimony and the thousands of complaints made to Defendants and others, many consumers clearly were deceived and inadvertently became enrolled in Defendants' discount programs. This evidence is highly probative of the websites' tendency to mislead. *See Grant Connect,* 827 F.Supp.2d at 1215; *Commerce Planet,* 878 F.Supp.2d at 1075 (finding "the evidence of consumer complaints credible and highly probative evidence that the website marketing ... was misleading and deceptive"). Additionally, although intent to deceive is not required for a § 5(a) violation to occur, the fact that Defendants anticipated—and later actually experienced—a large percentage of returns, with half of those returns being for insufficient funds, is also indicative of the nature of this venture, as is the low usage of the discount memberships. *See Grant Connect,* 827 F.Supp.2d at 1221–22 ("The conclusion that Defendants' ... offers were deceptive as a matter of law is further bolstered by the high cancellation, refund, and chargeback rates, as well as the exceptionally low orders from the store in comparison to the number of people signed up for the offer."); *Commerce Planet,* 878 F.Supp.2d at 1076 ("The Court finds [the] history of excessive chargeback rates to be consistent with deceptive website marketing.").

**\*16**  The overall "net impression" created by the landing page and the payday loan application form on the payday loan websites is that they were intended for applying for payday loans and that the bank account information that applicants were asked to enter would be used for deposit of the payday loan—not so that the account could or would be

debited for the purchase of an unrelated product or service. Additionally, the common sense "net impression" of a pop-up box that appears after hitting a "Submit" button on a loan application would not be that clicking "OK" would result in the purchase of an unrelated product or that clicking "Cancel" would continue the application process without changes or additions. Indeed, quite the opposite is true; a reasonable user would think that hitting "OK" would continue the application process as it had progressed to that point and that "Cancel" would result in a change of course.

Defendants assert that their websites were compliant with the FTC's guidance for online advertising published in a document called "Dot Com Disclosures."[8] However, I cannot agree.

[8]    In their filings, Defendants cite the FTC's 2000 guidance document, FTC, *Dot Com Disclosures: Information About Online Advertising* (May 2000), *available at* http:// www.ftc.gov/ os/2000/05/0005dotcomstaffreport.pdf. (*See* Doc. 219 at 7.) The FTC issued updated guidance after the trial in this case. *See* FTC, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (March 2013), *available at* http:// www.ftc.gov/ os/2013/03/130312dotcomdisclosures.pdf. Citations in the text are to the 2000 guidance.

The "Dot Com Disclosures" guidance explains that "[m]any of the general principles of advertising law apply to Internet ads, but new issues arise almost as fast as technology develops." Dot Com Disclosures at 1. Additionally, "[d]isclosures that are required to prevent an ad from being misleading, to ensure that consumers receive material information about the terms of a transaction or to further public policy goals, must be clear and conspicuous." *Id.* Factors considered in determining whether disclosures are likely to be clear and conspicuous include: "the *placement* of the disclosure in an ad"; "its *proximity* to the relevant claim"; "the *prominence* of the disclosure"; "whether items in other parts of the ad *distract attention* from the disclosure"; and "whether the language of the disclosure is *understandable* to the intended audience." *Id.* (emphasis in original). Suggestions for making disclosures clear and conspicuous include: "[r]ecognize and respond to any technological limitations or unique characteristics of high tech methods of making disclosures, such as frames or pop-ups" and "[u]se

clear language and syntax so that consumers understand the disclosures." *Id.* at 2.

The Dot Com Disclosures further explain the importance of the "overall net impression" of the ad and advise advertisers that they "should assume that consumers don't read an entire Web site, just as they don't read every word on a printed page." *Id.* at 5. Further, the guidance notes that consumers "may not be looking for—or expecting to find—disclosures" and thus "disclosures must be communicated effectively so that consumers are likely to notice and understand them." *Id.* Additionally, the Dot Com Disclosures note that "Web sites ... are interactive and have a certain depth—with multiple pages linked together and pop-up screens, for example—that may affect how proximity is evaluated." *Id.* at 6.

**\*17** The FTC's Dot Com Disclosures guidance also advises advertisers to conduct research regarding whether a particular technique will effectively communicate information to consumers. *Id.* at 10. "For example, research may show that consumers don't actually read information in pop-up windows because they immediately close the pop-up on the page they want to view. It also may indicate whether consumers relate information in a pop-up window or on an interstitial page to a claim or product they haven't encountered yet ." *Id.* Additionally, the guidance emphasizes that "[d]isclosures must be effectively communicated to consumers *before* they make a purchase or incur a financial obligation." *Id.* at 11.

Applying these principles, the disclosures on the payday loan websites were not clear and conspicuous. As is apparent from the testimony of the consumer witnesses, consumers often did not notice the banner advertisements describing the discount club memberships. Then, when consumers clicked the "Submit" button to submit their loan applications without checking the box for the discount club membership enrollment, a g ray-backg rounded pop-up box would unexpectedly appear. The text of the pop-up box began "ATTENTION: Read below before pressing OK," suggesting that the next step in the loan application process was to press "OK," which in at least some instances was preselected and highlighted.[9] Some consumers testified that they pressed the OK button believing that by doing so, all they were doing was continuing the submission process for their payday loan application. Whether by hitting the enter button or "OK," many consumers unknowingly and unwittingly enrolled in the discount clubs.

9      I credit Tyndall's testimony—supported by the videos of the controlled buys, (Pl.'s Exs. 89–91)—that the "OK" button was preselected and highlighted, with the result that pushing the Enter key would choose the "OK" option. Even if this were not the case, however, my conclusions would be the same.

> Additionally, I accept Berry's testimony that Tyndall was the only enrollee who used the beta version of Firefox that required scrolling in the pop-up box. While the scrolling issue would make the pop-up box even more troubling, the conclusions in this Order apply even where browsers did not require scrolling to view the contents of the pop-up box.

The gray pop-up box appeared after consumers had already either not noticed or chosen to decline the offers for the discount clubs—products or services that were unrelated to the payday loans. The FTC investigator who went to the payday loan websites with the intention of enrolling in the discount programs as part of his investigation testified that he had to read the pop-up box several times before he could understand what the "OK" and "Cancel" buttons meant. At first, he thought that selecting "OK" would continue him down the path he had already taken—the payday loan application process—and that selecting "cancel" would stop the application process. This was a reasonable expectation and one that many, if not most, consumers would have—especially those who, unlike the FTC investigator, were not on notice of the discount programs or on the lookout for how enrollment in the discount programs occurred on the payday loan websites.

Although Defendants assert that the text of the pop-up box was in plain English, in a legible font, and not difficult to read, the pop-up box was confusing, distracting, and counterintuitive in its operation. The pop-up box obscured the banner ad by being on top of it, and the directions in the box to "read before pressing OK" suggested that ultimately users should press OK. Moreover, the Thrifty Dial pop-up box that Tyndall encountered during his first controlled buy did not even disclose in any terms that the consumer's bank account would be debited for the membership charge. (*See* Pl.'s Ex. 35 at B5). And, while Defendants claimed that their "hands were tied" by the "OK" and "Cancel" buttons in the confirm box, Defendants chose to use this type of box on the websites, and they admittedly retained control over the content of the text in the confirm box. Defendants may not properly blame the standard confirm box button labels for the shortcomings of their disclosures.

**\*18**  In sum, the evidence presented at trial establishes that Defendants did not adequately disclose to consumers that in addition to using consumers' financial information in connection with their payday loan applications, Defendants would also use that financial information to charge the consumers for unrelated products and services. This information was clearly material to the consumers. Defendants violated § 5(a) of the FTC Act by failing to adequately disclose that the bank account information would be used to charge consumers for unrelated products. The FTC prevails on Count II.

### IX. Common Enterprise

The FTC asserts that the Defendants acted as a "common enterprise" such that they are liable for the acts of one another. Based on the evidence presented at trial, I agree.

"If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." *FTC v. Wash. Data Res.,* 856 F.Supp.2d 1247, 1271 (M.D.Fla.2012), aff'd, 704 F.3d 1323 (11th Cir.2013). Thus, " '[w]hen corporations act as a common enterprise, each may be held liable for the deceptive acts and practices of the other.' " *Grant Connect,* 827 F.Supp.2d at 1216 (quoting *FTC v. Nat'l Urological Grp., Inc.,* 645 F.Supp.2d 1167, 1182 (N.D.Ga.2008)).

"When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.' " *Nat'l Urological Grp.,* 645 F.Supp.2d at 1182 (quoting *Del. Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir.1964)). "[C]ourts consider 'a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants.' " *FTC v. NHS Sys., Inc.,* Civ. Action No. 08–2215, 2013 WL 1285424, at \*7 (E.D.Pa. Mar.28, 2013) (quoting *FTC v. Millennium Telecard, Inc.,* No. 11–2479, 2011 WL 2745963, at \*8 (D.N.J. July 12, 2011); *accord Wash. Data Res.,* 856 F.Supp.2d at 1271 ("A 'common enterprise' operates if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."); *see also*

*FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1142–43 (9th Cir.2010) ("[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."). "Moreover, the common enterprise [inquiry] is not an alter ego analysis. The entities formally may be separate corporations[ ] but operate as a common enterprise." *Grant Connect,* 827 F.Supp.2d at 1218.

Applying these standards to the facts of this case, the four corporate entities—Direct Benefits Group, Voice Net Global, Solid Core, and WKMS—operated as a common enterprise such that each is liable for the acts of the others. The two individual Defendants were each sole owners and principals of two of the four corporate entities, were close working partners with each other, and were involved with one another's companies. They and their companies operated out of the same office space in Bluffdale, Utah with common employees and shared equipment, and they worked together in enrolling customers in the discount programs via the payday loan websites.

 *19 The corporate entities worked cooperatively and complemented one another in inducing consumers to enroll in the discount club products. WKMS operated the payday loan application websites where consumers became enrolled in the discount clubs of Direct Benefits Group and Voice Net Global, and Solid Core supplied employees and operational, administrative, and technological services to Direct Benefits Group, Voice Net Global, and WKMS. *See Network Servs. Depot,* 617 F.3d at 1143 (finding common enterprise where "companies pooled resources, staff, and funds; they were all owned and managed by [same owner] and his wife; and they all participated to some extent in a common venture to sell internet kiosks"); *Wash. Data Res.,* 856 F.Supp.2d at 1271–72 (finding common enterprise where entities had common employees and officers, commingled funds, shared advertising, and "failed to recognize a distinct corporate demarcation between each company").

Although WKMS's payday loan websites could have operated-and, for a time, apparently did operate—without the discount club "upsells" being included on them, this circumstance does not prevent WKMS from being part of the common enterprise involving the discount clubs. The payday loan websites played an integral role in the discount club enrollment process. Moreover, the messages on the websites during the enrollment process blurred the two types of

products and the offerors of those products. For example, after a loan application was submitted and the "OK" button was clicked, a message appeared stating that "[w]e are currently finding the best lender match for your loan application" and that the applicant should "review our email that will be sent to you" and "check your inbox and spam folder." (Pl.'s Ex. 35 at B6). Although the message suggests that an email regarding the payday loan was forthcoming, the email referenced in this message was instead an email from one of the discount clubs. The entities—including WKMS—all worked together as part of the enterprise, and WKMS is liable as well. *Cf. FTC v. Ivy Capital, Inc.,* No. 2:11–CV–283 JCM(GWF), 2013 WL 1224613, at *13–14 (D.Nev. Mar.26, 2013) (finding corporate entity liable where it "furthered [other entity] in the execution of its scam"; "[t]he roles of each entity varied, but all had a distinct role to play as part of the scam," and entities shared address and had common partners and officers and money flowed among them). Accordingly, WKMS's ore tenus motion (Doc. 206) for judgment on partial findings—made on the third day of trial—is denied. [10]

[10]   After the FTC rested its case, Defendants Wood, Berry, WKMS, and Solid Core moved ore tenus for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). (*See* Doc. 206; Tr. Day 3 at 10). This rule provides in pertinent part that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." I denied the motion as to Defendants Wood, Berry, and Solid Core and took it under advisement as to WKMS. (*See* Doc. 207; Tr. Day 3 at 16–17). As set forth in the text, that motion is now denied insofar as it pertains to WKMS as well.

In sum, considering the operation of the companies as a whole, all four functioned as a common enterprise with regard to enrollment of consumers in the discount clubs and debiting of their bank accounts. Thus, each entity is responsible for the acts of the others.

*X. Individual Liability*

The FTC also seeks to hold Wood and Berry individually liable for the § 5(a) violations of the corporate entities. In order to establish individual liability under the FTCA—including liability for monetary equitable relief—" 'the

FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them.... The FTC must then demonstrate that the individual had some knowledge of the practices.' " *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 470 (11th Cir.1996) (alteration in original) (quoting *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir.1989)); *accord Nat'l Urological Grp.,* 645 F.Supp.2d at 1206–07; *Ivy Capital,* 2013 WL 1224613, at *15 ("It is appropriate to impose equitable monetary relief against a defendant if ... the individual had some knowledge of the company's deceptive acts or practices."). The FTC established these elements in this case as to Defendants Wood and Berry, and accordingly both are individually liable for the violations by the corporate entity Defendants.

**\*20** First, although the FTC need only show either authority to control or direct participation in the subject practices, both have been established here. "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel,* 875 F.2d at 573. By their own testimony, Wood and Berry were actively involved in the affairs of these businesses that they formed and managed. Additionally, they acknowledged their direct participation in the subject activities. Wood wrote the text for the pop-up boxes, and Berry implemented the text and provided the technological expertise.

Second, Wood and Berry clearly had knowledge of the practices at issue. "Individuals possess the requisite knowledge if they: (1) had actual knowledge of the representations; (2) were recklessly indifferent to the truth or falsity of the misrepresentations; or (3) had an awareness of a high probability of deceptive conduct together with an intentional avoidance of the truth." *Ivy Capital,* 2013 WL 1224613, at *15. The evidence overwhelmingly shows that Wood and Berry knew of the contents of the websites—indeed, they created those contents—and that they knew of the probability and fact of deception.

Wood and Berry have asserted that they should not be held individually liable because they relied on advice of counsel and acted in good faith by seeking and obtaining such advice. Prior to trial, however, I granted the FTC's motion to strike the defense of reliance on advice of counsel, noting that "reliance on advice of counsel is not a valid defense on the question of knowledge required for individual liability." (Order, Doc. 199, at 7 (quoting *Cyberspace.com,* 453 F.3d at 1202 (internal quotations omitted))). Furthermore, I reject Wood and Berry's

contention that they must have acted in bad faith in order to be held personally liable. *See Commerce Planet,* 878 F.Supp.2d at 1084 ("As a matter of law, advice of counsel and good faith are not defenses to whether the defendant had the requisite knowledge under section 5(a).... Good faith is ... irrelevant to the question of knowledge.").

Thus, the FTC has established a basis for the imposition of both injunctive relief and monetary equitable relief against the individual Defendants along with the corporate entities.

### XI. Remedies

The FTC seeks both a permanent injunction and monetary equitable relief against the Defendants. As set forth below, I conclude that both of these requested remedies are appropriate in this case.

#### A. Permanent Injunction

Under § 13(b) of the FTCA, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). "[P]ermanent injunctive relief is appropriate if 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.' " *FTC v. USA Fin., LLC,* 415 F. App'x 970, 975 (11th Cir.2011) (quoting *SEC v. Caterinicchia,* 613 F.2d 102, 105 (5th Cir.1980)). "The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct." *Commerce Planet,* 878 F.Supp.2d at 1086. "Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations." *Id.*

**\*21** Here, the violative acts took place over a two-year period, and consumers suffered significant harm. Additionally, the evidence reflects that although Defendants had ceased the operation of the discount club upsells shortly prior to the receiver's arrival, they still had the ability to restart the operation at any time. Moreover, the Defendants have not recognized their culpability for these acts, and their awareness of complaints and their expectation of a significant number of returns—including significant returns for insufficient funds—demonstrates their state of mind. Under these circumstances, a permanent injunction is warranted.

F.T.C. v. Direct Benefits Group, LLC, Not Reported in F.Supp.2d (2013)

2013 WL 3771322, 2013-2 Trade Cases P 78,463

*B. Equitable Monetary Relief*

In addition to a permanent injunction, the FTC seeks equitable monetary relief. The Eleventh Circuit has recognized that § 13(b) grants courts authority to impose "the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits." *Gem Merch.*, 87 F.3d at 468. "Section 13(b) plays an important role in enabling the FTC to enforce consumer protection laws. Accordingly, disgorgement, the purpose of which 'is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain,' is appropriate." *Id.* at 470 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978)).

Earlier this year, the Eleventh Circuit squarely held that "the amount of net revenue (gross receipts minus refunds), rather than the amount of profit (net revenue minus expenses), is the correct measure of unjust gains under section 13(b)." *FTC v. Wash. Data Res.*, 704 F.3d 1323, 1327 (11th Cir.2013). At trial, the FTC established—and Defendants, through Wood, acknowledged—that the amount of Defendants' gross receipts was $35,628,176 and that returns, chargebacks, and refunds totaled $26,116,004—resulting in a net revenue amount of $9,512,172. (*See* Pl.'s Ex. 33; Tr. Day 3 at 125–29 (Wood Test.)). Thus, equitable monetary relief of $9,512,172 is appropriate, and Defendants shall be jointly and severally liable for this amount.

*XII. Conclusion*

For the foregoing reasons, I find in favor of the FTC and against all of the Defendants on both counts of the Complaint for unfair and deceptive practices under § 5(a) of the FTCA. The Defendants acted as a common enterprise, and the individual Defendants are also liable for the violations of the corporate entities. The FTC established entitlement to permanent injunctive relief and to disgorgement of $9,512,172.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant WKMS, Inc.'s ore tenus Motion for Judgment on Partial Findings (Doc. 206) is **DENIED.**

2. **No later than Monday, July 29, 2013,** the FTC shall submit [11] a proposed judgment and a proposed permanent injunction that complies with Federal Rule of Civil Procedure 65(d).

[11]    The proposals shall be filed in the electronic record and also emailed to chambers, preferably in WordPerfect format.

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3771322, 2013-2 Trade Cases P 78,463

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

H

2004 WL 1399185
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

DIRECT MARKETING CONCEPTS, INC., d/
b/a Today's Health and Direct Fulfillment; ITV
Direct, Inc., d/b/a Direct Fulfillment; Donald
W. Barrett; Healthy Solutions, LLC d/b/a Direct
Business Concepts; Health Solutions, Inc.; Alejandro
Guerrero, a/k/a Alex Guerrero; Michael Howell;
Greg Geremesz; Triad ML Marketing, Inc.;
King Media, Inc.; and Allen Stern, Defendants.

No. Civ.A.04–11136–GAO.
|
June 23, 2004.

**Attorneys and Law Firms**

Daniel Kaufman, Edward Glennon, Kial S. Young, Federal Trade Commission, Washington, DC, for Plaintiff.

Peter S. Brooks, Seyfarth Shaw, LLP, Boston, MA, for Defendants.

PRELIMINARY INJUNCTION ORDER AS TO DEFENDANTS DIRECT MARKETING CONCEPTS, INC., ITV DIRECT, INC., AND DONALD W. BARRETT

OTOOLE, J.

**\*1** The Federal Trade Commission ("FTC" or "Commission") filed a complaint against the above listed defendants pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and moved for a preliminary injunction with other equitable relief against defendants Direct Marketing Concepts, Inc. ("DMC"), ITV Direct, Inc. ("ITV"), and Donald W. Barrett ("Barrett") (collectively, the "Defendants") pursuant to Fed.R.Civ.P. 65. The Court having considered the pleadings, declarations and exhibits filed in support of and opposing said motion, and after hearing on the motion, enters the following order:

Findings of Fact

On the basis of the affidavits presented, the Court finds the following facts:

1. The FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. §§ 41–58. The Commission is charged, among other things, with enforcement of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit deceptive acts or practices in or affecting commerce, and false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

2. DMC and ITV are both Massachusetts corporations with their principal places of business in Saugus and Beverly Massachusetts, respectively. Barrett is the President and a director of both DMC and ITV, and he directs, controls, formulates, or participates in the acts and practices of both entities. Since at least August 2003, Barrett, DMC and ITV have advertised, promoted, offered for sale, and/or distributed a dietary supplement product called Supreme Greens with MSM ("Supreme Greens").

3. Barrett, DMC and ITV produced and widely disseminated a thirty-minute "infomercial" for Supreme Greens shown on cable television stations. Additionally, the Defendants marketed Supreme Greens on their website, www.todayshealth.com.

4. The infomercial features Donald Barrett and Alejandro Guerrero a/k/a Alex Guerrero discussing the health benefits of Supreme Greens—in a setting that mimics a conventional talk show—and includes the following passages:

BARRETT: Dr. Guerrero claims that most chronic degenerative diseases—such as cancer, arthritis, diabetes, even the number one killer out there, heart disease—can and are being cured and there are natural healing techniques being suppressed in this country. We have a very controversial show, so stay with us.

Complaint Ex. 6 at 3–4.

BARRETT: And now here's the question: If I alkalize my body, am I going to come up with one of these chronic degenerative diseases?

GUERRERO: No.

BARRETT: Such as cancer, arthritis -

GUERRERO: No.

BARRETT: How can you say that so confidently?

GUERRERO: I'm very confident in saying that, primarily because of the clinical studies we've done. I've seen it in my—in my—in my clinical practice. I've seen it every day in my clinical practice.

BARRETT: Tell me about -

**\*2** GUERRERO: I treat patients that have conditions -

BARRETT:—the studies—tell me about a study that you've done with—with chronic disease.

GUERRERO: Well, based on acid alkaline principles we wanted to take groups of people that had degenerative conditions—and, to me, it didn't really matter what their degenerative condition was and I preferred them to have a variety of conditions. So I certainly just didn't want to have a base of liver cancer or bone cancer or prostate cancer or breast cancer. I wanted to, you know, lump them into a group and see what the response would be over time. Well, now it's been—you know, now we're going into, you know, eight years and within a five-year period of time we took 200 people that had a variety of degenerative conditions. They weren't all the same conditions, they -

BARRETT: Were they terminal?

GUERRERO: They were diagnosed as terminal.

BARRETT: Two hundred people—now, eight years later, how many of them are still alive?

GUERRERO: Well, I've got—out of that—out of those 200 people that were terminal we lost eight. Eight passed away.

BARRETT: And that's amazing. People must have been amazed by those studies.

GUERRERO: Yeah. I mean, it was—it was really exciting to see at the time. And that's really what solidified, for me, this—you know, the concepts of acid and alkaline balance. And so, now, over the years I've just been afraid to deviate from what has worked for me in my clinic.

Complaint Ex. 6 at 11–13.

BARRETT: Now, explain. When a patient comes to your office—whether they have cancer or arthritis, diabetes, you start them on a few standard supplements.

GUERRERO: Right.

BARRETT: One being a product called Supreme Greens, the other one being a coral calcium type product.

GUERRERO: Yes.

Complaint Ex. 6 at 15.

BARRETT: Okay. Alex, why do so many people lose weight on the product? I know that a lot of people get on the product to either help with their diabetes or maybe their heart disease or even cancer, but they lose weight as a byproduct. How come?

Complaint Ex. 6 at 22.

GUERRERO: It's great for women that are pregnant because it certainly applies -

BARRETT: So she can take it when she's pregnant?

GUERRERO: No question. My wife took it, my wife took it through all of her pregnancies.

BARRETT: And you have five children?

GUERRERO: We have five children.

BARRETT: Okay.

GUERRERO: And she took it through all of her pregnancies, never had to deal with, you know, prenatal vitamins, never got morning sickness.

Complaint Ex. 6 at 22.

BARRETT: What are the other nutrients in there and does it interfere with any medication?

GUERRERO: Because I have, you know, a wide range of patients in different conditions, I needed to ensure that the formula was synergistic with all medications. And so, you know, the Supreme Greens with MSM is synergistic with medication. There is no contra-indication.

**\*3** BARRETT: So anybody out—anybody—

GUERRERO: (Inaudible).

BARRETT:—anybody out there basically on any type of medication, they can take the Supreme Greens product?

GUERRERO: Yes.

Complaint Ex. 6 at 29–30.

5. The Defendants' website made the following statements about Supreme Greens: If you or someone you love is suffering from Cancer, Arthritis, Osteoporosis, Fibromyalgia, Heart Disease, Diabetes, Heartburn, Fatigue, Excess Weight, or simply the everyday ravages of aging—it's time to start down the path to a healthier lifestyle ...

A number of health problems and degenerative conditions have been linked to highly acidic cell pH:

• Cancer

• Arthritis

  * * *

• High Blood Pressure

• High Cholesterol

  * * *

• Diabetes

  * * *

• Endometriosis

  * * *

• Overweight

• Heart Disease

So How Do You Rebalance Your Cells pH Levels and Get the Minerals and Nutrients You Need?

According to Health professionals, supplements are needed to give the body what it needs. But where most supplements either provide vitamins or proteins, Supreme Greens works to help rebalance your cell pH.

  * * *

Supreme Greens was formulated by Dr. Alex Guerrero, a renowned physician who has focused his career on working with people with various degenerative and chronic ailments. His breakthrough supplement has already helped thousands of people with cancer, diabetes, arthritis, lupus, fibromyalgia, chronic fatigue syndrome, and many others.

Complaint Ex. 7 at 2–3.

6. The Commission has alleged that through the above representations, and others, the Defendants have falsely or without substantiation represented that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

7. The Commission has provided the declarations of two experts: Barrie Cassileth, Ph.D, Chief of the Integrative Medicine Service of the Memorial Sloan–Kettering Cancer Center and Landon King, M.D., Associate Professor of Medicine and Biological Chemistry at the John Hopkins University School of Medicine. Together, their declarations express the opinions that the above claims are either false or not supported by reliable scientific evidence.

8. The Defendants have not proffered any experts to contradict the opinions of Drs. Cassileth and King.

Continuity Program
9. The Defendants have at times caused consumers to incur unauthorized charges on their credit and debit cards by enrolling them in an automatic shipment program for a supplement called E–8 Daily—without their prior approval—when they ordered Supreme Greens. The Defendants maintain they have taken steps to prevent recurrence of such unauthorized charges, but do not dispute that they occurred in the past.

Danger of Recurrence
10. In the Fall of 2003, the FTC contacted counsel for the Defendants and informed them that the Supreme Greens infomercial made claims that were false and/or unsubstantiated. Shortly thereafter, the Defendants agreed to withdraw the infomercial and replace it with a substantially modified version that did not make the above challenged claims.

 **\*4** 11. Notwithstanding their above promise to withdraw the original infomercial, the Defendants continued to run the

original version of the Supreme Greens infomercial at least through April 2004.

Consumer Injury

12. Although the Court has not yet seen any specific sales figures, the Defendants have not disputed the Commission's contention that sales through the infomercial likely totaled in the tens of millions of dollars. Additionally, it is undisputed that the bulk of the sales revenues went to DMC, ITV and Barrett, and not to the remaining defendants in this litigation.

Asset Dissipation & Potential Document Destruction

13. Two individuals who have engaged in business transactions with DMC and/or ITV have provided documentary evidence, in the form of bank records, that demonstrates that although the declarants' companies had contracted with DMC, Defendant Barrett requested that declarants' companies send hundreds of thousands of dollars directly to Barrett instead of to DMC. Additionally, one of the declarants says that he, at Barrett's request, forwarded hundreds of thousands of dollars to a separate company controlled by Barrett rather than to DMC.

14. Three former employees of DMC have provided declarations stating that they witnessed corporate funds at DMC and ITV being used to pay for non-business purchases, such as home furnishings and personal vehicles.

15. Two declarants provided declarations stating that in or about June 2003, after Barrett learned that the FTC had concerns about one of his earlier infomercials—for a product called Coral Calcium Daily—Barrett withdrew funds from certain accounts and distributed the funds to close relatives.

16. One declarant stated that in or about June 2003, at Barrett's direction, he removed approximately 40–50 boxes relating to Coral Calcium Daily from DMC's warehouse to his own storage facility because Barrett stated that he was concerned about the FTC pursuing him with respect to the product.

17. Defendants contend that the declarants relied on by the FTC are biased and untrustworthy and that their statements are false. It is difficult to make a credibility assessment on the basis of affidavits alone. Defendants make a plausible showing of bias. Nevertheless, even disregarding the most accusatory assertions, some of which are conclusory, the statements do show at least an ability on the part of

Defendants to move assets among related entities and/or persons.

Conclusions of Law

18. This Court has jurisdiction over the subject matter of this case and over these Defendants.

19. Venue in this District is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

20. The acts and practices of the Defendants are or have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

21. This Court has authority to grant a preliminary injunction and other appropriate relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Rule 65 of the Federal Rules of Civil Procedure. *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468–69 (11th Cir.1996); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1025–26 (7th Cir.1988).

**\*5** 22. Section 13(b) authorizes the issuance of such preliminary relief upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest. 15 U.S.C. § 53(b); *FTC v. Patriot Alcohol Testers, Inc.,* No. 91–11812–C, 1992 WL 27334, at \*3 (D.Mass. Feb.13, 1992).

Likelihood of Success on the Merits

23. The Commission has demonstrated a likelihood of success on the merits. Section 5(a) of the FTC Act prohibits deceptive acts and practices in or affecting commerce. Section 12 prohibits the dissemination of false advertising in order to induce the purchase of foods, drugs, devices, or cosmetics. To prevail under Sections 5(a) and 12, the FTC must demonstrate that "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir.1994) (citing *Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 164–65 (1984)). The FTC has established all three of these sufficiently for the Court to grant a preliminary injunction.

24. As demonstrated by the infomercial and website excerpts above, and despite the use of infrequent and/or inconspicuous

disclaimers, the Defendants have made the claims that Supreme Greens can cure, treat or prevent cancer, diabetes, arthritis and heart disease, and that Supreme Greens can be safely used by pregnant women, children, and consumers taking any medications.

25. The Commission is likely to prevail in demonstrating the falsity and/or lack of substantiation of these claims, based on the uncontradicted declarations of Drs. Cassileth and King.

26. The Defendants' misrepresentations are likely to mislead reasonable consumers. Consumers have no obligation to doubt the veracity of express claims, and false or unsubstantiated claims are inherently "likely to mislead." *In re Thompson Med. Co.,* 104 F .T.C. 648, 788, 818–19 (1984) (discussing with approval FTC's Policy Statement on Deception (Oct. 14, 1983)), *aff'd* 791 F.2d 189 (D.C.Cir.1986).

27. Given the express nature and importance of the challenged claims, and the fact that they go to the core reasons why consumers buy Supreme Greens, they are presumed to be material. *FTC v. SlimAmerica, Inc.,* 77 F.Supp.2d 1263, 1272 (S.D.Fla.1999) ("Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material.").

28. In addition, the airing of the infomercial for Supreme Greens in a talk-show format with only limited disclaimers before and after the broadcast is likely to mislead consumers and constitute a deceptive act or practice in violation of Section 5.

29. Further, the Defendants' practice of causing charges for automatic shipments of E–8 Daily dietary supplement to be billed to consumers' credit or debit cards without the consumers' authorization has caused or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits to consumers or competition. Therefore, this practice likely constitutes an unfair practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

 **\*6** 30. The Commission is also likely to succeed in holding the Defendants jointly and severally liable for these violations of the FTC Act. DMC and ITV produced and disseminated the Supreme Greens infomercial. Their purported reliance upon co-defendant Alex Guerrero's representations regarding the

product—even if true—is not a valid defense to a violation of the FTC Act. Moreover, as early as the Fall of 2003, the Defendants were on notice from the Commission as to the suspect nature of the Supreme Greens claims.

31. Individuals such as Barrett may be liable for corporate practices if they have "participated directly in the practices or acts or had authority to control them," and had some knowledge of the practices. *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir.1989). Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Id.*

32. The information presented indicates that Barrett knew as early as the Fall of 2003 that the Supreme Greens claims were suspect, based on the concerns raised by the FTC, yet he continued to actively participate in making the challenged claims as President and a director of DMC and ITV.

Balance of Equities
33. The Commission brought this action to halt and prevent further violations of federal law and to protect consumers from the marketing of products claimed to prevent and cure life threatening diseases. In such statutory enforcement cases, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the ... laws." *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975) (securities laws context).

34. The Commission's interest in protecting consumers outweighs the Defendants' interests that would be infringed by the requested injunction. The Defendants have no legitimate interest in engaging in practices that likely violate the FTC Act.

Injunctive Relief is in the Public Interest
35. Immediate injunctive relief is necessary to protect the public from the financial and/or physical harm that results from the Defendants' practices. Consumers suffering from cancer, heart disease, arthritis and diabetes are injured if they purchase Supreme Greens in lieu of pursuing treatments that may offer them real health benefits. In addition, direct economic injury arises from purchasing Supreme Greens under false pretenses and from the Defendants' imposition of charges to consumers' credit or debit cards without their knowledge or authorization.

Necessity for Preliminary Relief

36. There is good cause to believe that immediate and irreparable harm to consumers will result from ongoing violations of Sections 5(a) and 12 of the FTC Act by the Defendants unless they are preliminarily enjoined by order of this Court.

37. Where, as in this case, business operations are permeated by deceptive practices, and there is evidence of on-going transfers of business assets to unknown businesses, Barrett and his relatives, there is a possibility that assets may be dissipated during the pendency of the legal proceedings. An accounting and a restriction on the dissipation of the Defendants' assets is appropriate at this time to ensure the enforceability of any judgment that may be entered. However, should the accounting reveal that the Defendants have, presently are, or are likely to conceal or place assets beyond the Court's reach pending final resolution of this case, the Court will consider additional requests from the Commission for further relief necessary to ensure the enforceability of any judgment, including a freeze of the Defendants' assets and the appointment of a receiver.

*7 38. Weighing the equities and considering the Commission's likelihood of ultimate success, a preliminary injunction is in the public interest, and it is hereby ordered that:

DEFINITIONS

For the purpose of this order, the following definitions shall apply:

1. "DMC" means Direct Marketing Concepts, Inc., d/b/a "Today's Health" and "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 20 Oakpoint Ext., Saugus, MA 01906, and also doing business at 100 Cummings Center, Suite 139F, Beverly, MA 01915, and its divisions, subsidiaries, successors, assigns, and its officers, agents, representatives, and employees.

2. "ITV" means ITV Direct, Inc., d/b/a "Direct Fulfillment," a Massachusetts corporation with its principal place of business at 100 Cummings Center, Suite 506E, Beverly, MA 01915, and its divisions, subsidiaries, successors, assigns, and its officers, agents, representatives, and employees.

3. "Barrett" means Donald W. Barrett, individually and as an officer and director of DMC and ITV.

4. "Defendants" shall mean DMC, ITV, and Barrett, whether acting individually or through any corporation, subsidiary, division, or other entity.

5. "FTC" or "Commission" or "Plaintiff" means the Federal Trade Commission.

6. "Advertising" means any written or verbal statement, illustration or depiction that is designed to effect a sale or create interest in the purchasing of goods or services, whether it appears in a brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, packaging, package insert, label, film, slide, radio, television or cable television, audio program transmitted over a telephone system, program-length commercial ("infomercial"), the Internet, email, or in any other medium.

7. "Promotion" means any written or verbal statement, illustration, or depiction that is designed to effect a sale or create interest in the purchasing of goods or services that is not "advertising," including but not limited to video news releases and press releases.

8. "Endorsement" has the meaning set forth in 16 C.F.R. § 255.0(b).

9. "Substantially similar product" means any dietary supplement containing one or more of the ingredients contained in the proprietary blend of Supreme Greens with MSM.

10. "Assets" means any legal or equitable interest in, right to, or claim to, any real, personal, or intellectual property, including, but not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), and all cash, wherever located.

11. "Continuity program" shall mean any plan, arrangement, or system pursuant to which a consumer receives periodic shipments of products without prior notification by the seller before each shipment or service period, regardless of any trial

or approval period allowing the consumer to return or be reimbursed for the product.

**\*8** 12. "Assisting others" means knowingly providing any of the following services to any person or entity: (a) performing customer service functions for any person or entity, including but not limited to, receiving or responding to customer complaints; (b) formulating or providing or arranging for the formulation or provision of any telephone sales script or any other advertising or marketing material for any person or entity; or (c) performing advertising or marketing services of any kind for any person or entity.

13. "Commerce" has the meaning set forth in Section 4 of the FTC Act, 15 U.S.C. § 44.

14. "Competent and reliable scientific evidence" means tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

## PROHIBITED BUSINESS ACTIVITIES

### I.

IT IS ORDERED that the Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Supreme Greens with MSM or any substantially similar product, in or affecting commerce, are hereby preliminarily enjoined from making, or assisting others in making, directly or by implication, including through the use of endorsements or trade names, any representation that such product:

    A. Is an effective treatment, cure, or preventative for cancer;

    B. Is an effective treatment, cure, or preventative for heart disease;

    C. Is an effective treatment, cure, or preventative for diabetes;

    D. Is an effective treatment, cure, or preventative for arthritis; or

    E. Can be taken safely by pregnant women, by infants and children, or by any person taking any type of medication.

### II.

IT IS FURTHER ORDERED that the Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of Supreme Greens with MSM or any substantially similar product, in or affecting commerce, are hereby preliminarily enjoined from making, or assisting others in making, directly or by implication, including through the use of endorsements or the product name, any representation that such product can prevent, treat, or cure any disease unless, at the time the representation is made, the Defendants possess and rely upon competent and reliable scientific evidence that substantiates the representation.

## FORMATTING FOR BROADCAST ADVERTISING

### III.

**\*9** IT IS FURTHER ORDERED that the Defendants, directly or through any corporation, subsidiary, division, or other device, in connection with the labeling, advertising, promotion, offering for sale, sale, or distribution of any product, program, or service, in or affecting commerce, do forthwith cease and desist from creating, producing, selling, or disseminating:

A. Any advertisement that misrepresents, expressly or by implication, that it is not a paid advertisement; and

B. Any commercial or other video advertisement fifteen (15) minutes in length or longer or intended to fill a broadcasting

or cablecasting time slot of fifteen (15) minutes in length or longer that does not display visually in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and for a length of time sufficient for an ordinary consumer to read, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product or service, the following disclosure:

"THE PROGRAM YOU ARE WATCHING IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

(For the purposes of this provision, the oral or visual presentation of a telephone number or address through which viewers may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the display of the disclosure provided herein); and

C. Any radio advertisement fifteen (15) minutes in length or longer or intended to fill a time slot of fifteen (15) minutes in length or longer that does not state in the same language as the predominant language that is used in the advertisement, in a clear and prominent manner, and in a volume and cadence sufficient for an ordinary consumer to hear, within the first thirty (30) seconds of the commercial and immediately before each presentation of ordering instructions for the product, program, or service, the following disclosure:

"THE PROGRAM YOU ARE LISTENING TO IS A PAID ADVERTISEMENT FOR [THE PRODUCT, PROGRAM, OR SERVICE]."

(For the purposes of this provision, the presentation of a telephone number or address through which listeners may obtain more information or place an order for the product, program, or service shall be deemed a presentation of ordering instructions so as to require the stating of the disclosure provided herein.).

CONTINUITY PROGRAM

IV.

IT IS FURTHER ORDERED that:

A. The Defendants, directly or through any corporation, subsidiary, division, trade name, or other entity, and their officers, agents, servants, employees, and all persons and entities in active concert with them who receive actual notice of this Order by personal service or otherwise, including by facsimile, in connection with the manufacturing, labeling, promotion, offering for sale, sale, or distribution of any product, program, or service, in or affecting commerce, are hereby preliminarily enjoined from:

 **\*10** 1. Selling or distributing or causing to be sold or distributed products, programs, or services, by means of a Continuity Program without first obtaining the express, informed consent of consumers to participate in that program before any shipment is made; *Provided,* that the consumer's consent will be deemed to be informed for the purpose of this Part IV only if the Defendants clearly and conspicuously disclose, before the consumer consents to any purchase, all material terms and conditions of the Continuity Program, including but not limited to:

   a. the fact that periodic shipments will occur without further action by the consumer;

   b. a description of each good or type of good to be included in each shipment;

   c. the approximate interval between each shipment;

   d. a description of the billing procedure to be employed, including the total cost to be charged to the subscriber's credit or debit card, or otherwise billed to the subscriber, for each shipment;

   e. the minimum number of purchases required under the program, if any;

   f. all material terms and conditions of a guarantee, refund, or return policy if any representation is made about such a policy, or, if the Defendants have a policy of not making refunds or accepting returns, a statement that this is the Defendants' policy; and

g. a description of the terms and conditions under which, and the procedures by which, a subscriber may cancel further shipments, as set forth in Part IV.C below. Provided further, that the consumer's consent will be deemed to be express for the purpose of this Part IV only if the Defendants obtained the informed consent in a manner which clearly evidences that the consumer is consenting to the terms of the Continuity Program.

2. Making any representation, in any manner, expressly or by implication, that consumers owe money for Continuity Program merchandise shipped to consumers, unless the Defendants have obtained consumers' express, informed consent to receive and pay for the merchandise.

B. The Defendants shall convey the terms and conditions of the Continuity Program to the consumer in the following manner:

1. For any solicitation initiated or completed by telephone, the terms and conditions set forth in Part IV.A above shall be disclosed during that conversation in clear and understandable language;

2. For any solicitation by a print advertisement, direct mail, electronic mail, or by the Internet, the terms and conditions set forth in Part IV.A above shall be disclosed in a clear and prominent manner in close proximity to the ordering instructions, provided that, if the advertisement or mailing contains an order form or coupon on a separate page or document from the advertising material, the disclosure shall be made both in the advertising materials and on the order form or coupon.

C. The Defendants shall provide, in conjunction with each shipment made pursuant to any Continuity Program, a clear and conspicuous description of the terms and conditions under which, and the procedures by which, the subscriber may cancel future shipments.

 **\*11**  D. The Defendants shall not ship any product, program, or service to, or mail any bill or dunning communication to, or bill the credit or debit card of any subscriber who, having once subscribed to a Continuity Program and having fulfilled any minimum purchase requirement to which the subscriber has given express informed consent, notifies the Defendants of the subscriber's cancellation of further shipments.

## MAINTENANCE OF RECORDS

### V.

IT IS FURTHER ORDERED that the Defendants, and their officers, agents, directors, employees, salespersons, independent contractors, subsidiaries, affiliates, successors, assigns and all other persons or entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, whether acting directly or through any corporation, subsidiary, division or other device, are hereby preliminarily enjoined from:

1. failing to create and maintain books, records, accounts, bank statements, current accountants' reports, and any other data which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Defendants;

2. destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any books, records, tapes, discs, accounting data, checks (fronts and backs), correspondence, forms, advertisements, brochures, manuals, electronically stored data, banking records, customer lists, customer files, invoices, telephone records, ledgers, payroll records, or other documents of any kind, including information stored in computer-maintained form (such as electronic mail), in their possession, and other documents or records of any kind that relate to the business practices or finances of the Defendants; and

3. failing to maintain complete records of any consumer complaints and disputes, whether coming from the consumer or any intermediary, such as a government agency or Better Business Bureau, and any responses made to those complaints or disputes.

## ACCOUNTING

### VI.

IT IS FURTHER ORDERED that:

F.T.C. v. Direct Marketing Concepts, Inc., Not Reported in F.Supp.2d (2004)

2004 WL 1399185

A. For the purpose of conducting an accounting relating to the Defendants' sale and marketing of Supreme Greens with MSM, and the assets of Barrett, DMC and ITV and related and affiliated corporate entities, within ten (10) days after entry of this Order the Defendants shall retain an accountant and/or accounting firm (hereinafter "accounting firm") to be selected or approved by the Commission. The Defendants shall bear the costs and fees incurred by the accounting firm in conducting this accounting.

B. In this accounting, the accounting firm shall attempt to ascertain, within sixty (60) days from the date of entry of this Order, the following information, whether the information is located in the United States or outside the territorial United States, and shall prepare a report for the Plaintiff and the Defendants describing:

 *12  1. all revenues collected and obtained by the Defendants, directly or through any other corporation, partnership, limited liability corporation, or other entity, in connection with the sale in the United States of Supreme Greens with MSM, and the location and/or transfer of all such revenues;

2. the amount of all refunds provided by the Defendants to consumers, directly or through any other corporation, partnership, limited liability corporation, or other entity, in connection with the sale of Supreme Greens with MSM;

3. information sufficient to show the flows of all monies received by the Defendants, directly or indirectly, from the sale in the United States of Supreme Greens with MSM;

4. all costs and expenses incurred by the Defendants, directly or through any other corporation, partnership, limited liability corporation, or other entity, in connection with the sale or marketing of Supreme Greens with MSM in the United States;

5. all net profits collected and obtained by the Defendants, directly or through any other corporation, partnership, limited liability corporation, or other entity, in connection with the sale of Supreme Greens with MSM;

6. all transfers of assets between the Defendants and any related or affiliated corporate entities or individuals in excess of Ten thousand and 00/100 dollars ($10,000) since January 2003; and

7. the location and amount of all assets of the Defendants, including all assets held either (1) by any Defendant in this action, (2) for Barrett's, DMC's or ITV's benefit, or (3) under any Defendants' direct or indirect control, jointly or severally.

C. Such information gathered by and reports prepared by the accounting firm shall be designated as confidential information.

D. The Defendants and any other person or entity served with a copy of this Order, by personal service, facsimile, or otherwise, shall not interfere with the accounting firm's functions and shall fully cooperate and assist the accounting firm in accomplishing the purposes set forth in this Section, including providing access to documents and information located outside the territorial United States and including the gathering and preserving of documents relating to the Defendants' assets.

E. Should the accounting reveal that the Defendants have concealed, presently are concealing, or are likely to conceal or place assets beyond the Court's reach pending final resolution of this case, the Court will consider additional requests from the Commission for further relief necessary to ensure the enforceability of any judgment, including a freeze of the Defendants' assets and the appointment of a receiver.

FINANCIAL STATEMENTS

VII.

IT IS FURTHER ORDERED that:

A. The Defendants each shall prepare and provide to the Commission, within twenty (20) days from entry of this Order, a complete and accurate financial statement, signed under penalty of perjury, on the form attached to this Order as Attachment A (for Barrett) or Attachment B (for DMC and ITV). Barrett also shall include a list of all corporate entities that he has controlled, directly or indirectly, at any point since January 2002 until the present.

 *13  B. The Defendants each shall provide the Commission with access to records and documents pertaining to assets of each Defendant that are held by financial institutions outside the territory of the United States, by signing a document entitled "Consent to Release of Financial Records" in the form attached to this Order as Attachment C.

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 181 of 192

## RESTRICTION ON DISSIPATION
## OF CORPORATE ASSETS

### VIII.

IT IS FURTHER ORDERED that DMC and ITV and any of their officers, directors, agents, servants, employees, salespersons, distributors, corporations, subsidiaries, affiliates, successors, assigns, and those persons or entities in active concert or participation with them who receive actual notice of this Order by personal service, facsimile, or otherwise, are hereby preliminarily enjoined from directly or indirectly selling, liquidating, assigning, transferring, converting, loaning, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing of any funds, real, personal, or intellectual property, or other assets or any interest therein, wherever located, including any assets outside the territorial United States, which are owned and controlled by, or held for the benefit of, in whole or in part, or in the possession of DMC and/or ITV, or any other corporation owned or controlled by DMC and/or ITV, other than those transfers for actual and necessary business operations and expenses that such corporations will reasonably incur, including legal fees associated with *ITV Direct, Inc. v. Healthy Solutions, LLC,* 04–CV–10421–JLT (D.Mass.); *Trudeau v. Direct Mktg. Concepts, Inc.,* CV 02–02707 (C.D.Cal.); *Triad ML Mktg., Inc. v. Direct Mktg. Concepts. Inc.,* C.A. 03–CV–4321 (E.D.Pa.); *HBA Mktg. v. Marine Coral Calcium,* C.A. 03–5995 (E.D.Pa.); *Triad ML Mktg. v. MXM Essential Formulas,* C.A. 03–6047 (E.D.Pa.); and the instant action, *FTC v. Direct Mktg. Concepts, Inc.,* 04–CV–11136–GAO (D.Mass.). DMC and ITV shall not purchase or acquire, in whole or in part, directly or indirectly, any real property without prior permission from the Commission.

DMC and ITV shall maintain copies of documents reflecting such transfers or expenditures for actual and necessary business operations, including but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, and bank records (including monthly statements, canceled checks, records of wire transfers, and check registers). These documents shall be produced to the Commission monthly (by the tenth day of the following month) with respect to transfers or expenditures over Five thousand and 00/100 dollars ($5,000) from the date of entry of this Order. The funds, property and assets

affected by this Paragraph shall include both existing assets and assets acquired after the date of entry of this Order, including without limitation, those acquired by loan or gift.

## RESTRICTION ON DISSIPATION
## OF BARRETT'S ASSETS

### IX.

**\*14** IT IS FURTHER ORDERED that Barrett and his agents, servants, employees, salespersons, distributors, corporations, subsidiaries, affiliates, successors, assigns, and those persons or entities in active concert or participation with him who receive actual notice of this Order by personal service, facsimile, or otherwise, are hereby preliminarily enjoined from directly or indirectly selling, liquidating, assigning, transferring, converting, loaning, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing or any funds, real, personal, or intellectual property, or other assets or any interest therein, wherever located, including any assets outside the territorial United States, which are owned and controlled by, or held for the benefit of, in whole or in part, or in the possession of Barrett, other than those expenditures or transfers for actual and necessary business operations and business and personal expenses that he will reasonably incur, including legal fees associated with *ITV Direct. Inc. v. Healthy Solutions, LLC,* 04–CV–10421–JLT (D.Mass.); *Trudeau v. Direct Mktg. Concepts, Inc.,* CV 02–02707 (C.D.Cal.); *Triad ML Mktg., Inc. v. Direct Mktg. Concepts, Inc.,* C.A. 03–CV–4321 (E.D.Pa.); *HBA Mktg. v. Marine Coral Calcium,* C.A. 03–5995 (E. D.Pa.); *Triad ML Mktg. v. MXM Essential Formulas,* C.A. 03–6047 (E.D.Pa.); and the instant action, *FTC v. Direct Mktg. Concepts, Inc.,* 04–CV–11136–GAO (D.Mass.). Barrett shall not purchase or acquire, in whole or in part, directly or indirectly, any real property or pay for any significant home improvements or landscaping without prior permission from the Commission.

Barrett shall maintain copies of documents reflecting such transfers or expenditures for actual and necessary business operations and business and personal expenses, including but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, and bank records (including monthly statements, canceled checks, records of wire transfers, and check registers). These documents shall be produced to the Commission monthly (by the tenth day of the following month) with respect to transfers

or expenditures over Two thousand five hundred and 00/100 dollars ($2,500) from the date of entry of this Order. The funds, property and assets affected by this Paragraph shall include both existing assets and assets acquired after the date of entry of this Order, including, without limitation, those acquired by loan or gift.

EXPEDITED DISCOVERY

X.

IT IS FURTHER ORDERED that the Commission is granted leave at any time after service of this Order to depose or demand the production of documents from any person or entity relating to the nature, status, extent, location or other relevant information relating to the Defendants' assets, income, personal or business financial records, or the location of any Defendant or potential Defendant. Seven (7) days shall be deemed sufficient for any such production of documents from the Defendants, and ten (10) days shall be deemed sufficient for any such production of documents from any other person or entity, including but not limited to any bank, savings and loan, financial or brokerage institution, fund, escrow agent, or trustee. The production of documents submitted pursuant to this provision shall not in any way waive Plaintiff's rights to seek the production of additional documents.

RIGHT OF IMMEDIATE ACCESS

XI.

*15 IT IS FURTHER ORDERED that the Defendants and any other person who receives actual notice of this Order by personal service or otherwise, including by facsimile, shall permit the Commission's employees, agents, and assistants immediate access to any business premises and storage facilities, whether owned, controlled or used by the Defendants, in whole or in part, including but not limited to the offices located at 100 Cummings Center, Beverly, MA 01915 or at 20 Oakpoint Ext., Saugus, MA 01906. The purpose of this access shall be to inspect, copy and inventory documents referring or relating to:

A. advertising or marketing, including issues relating to safety, of Supreme Greens with MSM;

B. any business relationship between any of the Defendants and any other business entity;

C. the financial status of the Defendants, including but not limited to the nature or location of any bank account, safe deposit box, or other asset of the Defendants;

D. any transaction, correspondence or other communication by or between any consumer and any of the Defendants or any representatives, employees, agents, officers, servants, or assistants of the Defendants; and

E. any action, correspondence or other communication by or between any law enforcement agency, consumer group, or Better Business Bureau and the Defendants, or any representatives, employees, agents, officers, servants, or assistants of the Defendants.

The Commission's representatives may remove original documents from the business premises of the Defendants to make photocopies, provided that the originals are returned within a reasonable period of time. The Defendants shall provide Commission employees, agents and assistants with any necessary means of access to these documents, including but not limited to keys and lock combinations, computer access codes, and storage access information. The Defendants, and their officers, agents, directors, employees, salespersons, independent contractors, subsidiaries, affiliates, successors, assigns and all other persons or entities in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, including by facsimile, are hereby preliminarily enjoined from interfering with the Commission's right of access described herein.

CONSUMER REPORTS

XII.

IT IS FURTHER ORDERED that the Commission may obtain consumer reports concerning any of the Defendants pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to the Commission.

2004 WL 1399185

## DISTRIBUTION OF ORDER BY DEFENDANTS

### XIII.

IT IS FURTHER ORDERED that the Defendants shall immediately provide a copy of this Order to each affiliate, partner, subsidiary, division, sales entity, successor, assign, officer, director, employee, independent contractor, agent, attorney, fulfillment house, call center, and representative of the Defendants, and within ten (10) days following entry of this Order, shall provide the Commission with an affidavit identifying the names, titles, addresses, and telephone numbers of the persons and entities that the Defendants have served with a copy of this Order in compliance with this provision.

## SERVICE OF THIS ORDER BY PLAINTIFF

### XIV.

 **\*16** IT IS FURTHER ORDERED that copies of this Order may be served by facsimile transmission, personal or overnight delivery, or U.S. Mail, by agents and employees of the Commission or any state or federal law enforcement agency, on (1) any Defendant in this action, or (2) any other person or entity that may be subject to any provision of this

Order. Service upon any branch or office of any entity shall effect service upon the entire entity.

## RIGHT TO INVESTIGATE AND ADD ADDITIONAL PARTIES AND CLAIMS

### XV.

Nothing in this Order shall be construed as limiting or restricting the Commission's right or ability to investigate, take discovery from, add to this action, or bring further actions against any persons or entities not specifically named herein as a Defendant who may be in active concert or participation with any of the Defendants.

## RETENTION OF JURISDICTION

### XVI.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes.

It is SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1399185

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I

2013 WL 2455986, 2013-1 Trade Cases P 78,413

2013 WL 2455986
United States District Court, D. Maryland.

FEDERAL TRADE COMMISSION, Plaintiff
v.
LOMA INTERNATIONAL BUSINESS
GROUP INC., et al., Defendants.

Civil Action No. MJG–11–1483.
|
June 5, 2013.

*MEMORANDUM OF DECISION*

MARVIN J. GARBIS, District Judge.

 **\*1**  The Court has conducted a bench trial of Plaintiff's claims against Defendants Manuel Alban ("Mr.Alban") and Lola Alban ("Mrs.Alban") (collectively "the Albans"), ("Loma") and Servicios LatinoAmericanos De Maryland, Inc. ("Servicios").[1] The Court has heard the evidence presented, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.[2]

[1] Defendant Marco Alban, having filed a Motion for Summary Judgment resolved herewith, did not participate in the trial.

[2] "In an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed.R.Civ.P. 52(a)(1).

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

I. *INTRODUCTION*

For some ten years, from 2001 to 2011, Defendants Manuel Alban ("Mr.Alban") and Lola Alban ("Mrs.Alban") (collectively "the Albans"), being neither qualified nor accredited to do so, operated an immigration business serving—or in all too many cases disserving—Spanish-speaking customers. Furthermore, Mr. Alban, on occasion, engaged in the unauthorized practice—or malpractice—of law.

On June 1, 2011, the United States Federal Trade Commission ("FTC")[3] filed the instant suit alleging that the Defendants knowingly violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by expressly and impliedly misrepresenting to consumers that they were authorized immigration service providers, although they were not.

[3] The FTC is an independent agency of the United States government charged with enforcement of the FTC Act, which, under Section 5, prohibits unfair or deceptive acts and practices in commerce.

The FTC seeks to have the Court permanently enjoin the Defendants from violating § 5(a) of the FTC Act by engaging in unauthorized immigration services or any similar deceptive practice and seeks restitution in the amount of $750,000. As discussed herein, the Court finds that the FTC has established the need for injunctive relief against the Albans. However, the Court finds it necessary to conduct further proceedings to resolve remaining issues relating to the equitable relief to be provided.

II. *STATUTORY FRAMEWORK*
Section 5(a) of the Federal Trade Commission Act ("the FTC Act") states, in pertinent part:

(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, [with stated exceptions] from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

...

Case 3:17-cv-00101-RDM  Document 526-1  Filed 08/18/20  Page 186 of 192

F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)

2013 WL 2455986, 2013-1 Trade Cases ¶ 78,413

(B) All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available for acts and practices described in this paragraph, including restitution to domestic or foreign victims.

**\*2** 15 U.S.C. § 45(a) (West 2006).

Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b).

### III. *DISCUSSION*

#### A. *Background*

The Albans emigrated to the United States from Ecuador in the mid–1960's and became United States citizens. Mr. Alban was employed in the plastics industry until his retirement in the mid–1990's, and Mrs. Alban worked for a bank from 1973 until she retired in 2002.

After his retirement, Mr. Alban, together with others in the local Hispanic community, set up a Spanish-speaking radio station. The business did not succeed.

The Albans, in or about 1993, set up a Spanish-language newspaper called "El Heraldo." The Albans named the advertising arm of El Heraldo "Loma, Inc."[4] although the entity was not a corporation. The newspaper ceased operations in 2004.

[4]    The name "Loma" is derived from Mr. & Mrs. Alban's first names—LO for Lola and MA for Manuel.

Mr. Alban testified that in or about 2000, he attended an immigration seminar and was told that he did not need to be an attorney to assist with filling out immigration forms but that he needed to apply to the Executive Office for Immigration Review to be an accredited representative.[5] M. Alban Dep. 239:21–243:15, Pl.'s Ex. 30. In early 2001, Mr. Alban became aware that the pertinent agency of the United States government[6] provided that citizens of El Salvador and Honduras could apply for Temporary Protection Status ("TPS") benefits. Although Mr. Alban had been informed that he needed formal accreditation to do so, the Albans then began their immigration service business discussed herein without obtaining any such accreditation. The Albans

operated the immigration service business under the name "Loma, Inc."

[5]    To be properly accredited, an immigration services business must be operated by a licensed attorney, a law student acting under the supervision of a licensed attorney, an individual granted permission to appear on behalf of persons with whom the individual has a previous relationship and without remuneration, or a person formerly authorized to practice before USCIS. 8 C.F.R. § 292.1, 1292.1.

[6]    Initially the Department of Immigration and Naturalization Service ("INS"), which in 2003, officially became the Bureau of Citizenship and Immigration Services ("BCIS" or "USCIS"), operating under the Department of Homeland Security ("DHS").

In or about 2002, Mr. Alban attended a tax preparation seminar and obtained authorization to prepare income tax returns. He provided the income tax preparation and filing services under the "Loma, Inc." name.

At about the same time, Mr. Alban began to provide drug and alcohol counseling to members of the Hispanic community.[7] This business was operated under the name "Servicios LatinoAmericanos De Maryland, Inc." although, as with Loma, Inc., the name did not then refer to an existing corporation.

[7]    Regular classes were conducted by certified counselors, and a fee was charged per class. Mr. Alban took the courses for certification in drug and alcohol abuse counseling. M. Alban Dep. 15:18–17:4, Pl.'s Ex. 30.

In 2005, Mr. Alban prepared and signed incorporation papers for corporations to be named "Loma International Business Group, Inc."[8] and "Servicios LatinoAmericanos De Maryland, Inc." In 2007, the papers were filed and the corporations were formed. Mr. Alban was identified as the sole director of both corporations. Pl's Ex. 16, 17.

[8]    Apparently, the name "Loma. Inc." was not available.

#### B. *The Immigration Services Operation*

2013 WL 2455986, 2013-1 Trade Cases P 78,413

The Albans testified that when they first began offering assistance with completing immigration forms, most of their customers brought in their own forms [9] and they, purportedly, offered only a translation and "secretarial" service. The Court does not find this testimony credible and, rather, finds that from the beginning, and until the end of their immigration services, Mr. Alban and, to a lesser extent, Mrs. Alban did far more than translate and type what their customers told them to type.

[9]     Even if this were true as to the very beginning of their operation, the Albans purchased a software system in 2002 or 2003 that enabled them to produce and fill in forms on their computer.

**\*3** The Albans interviewed customers, decided which forms were needed, and filled in the forms. [10] The Albans also translated and made copies of required attachments such as birth certificates, photographs, provided a cover letter in English, and often mailed the documentary package to USCIS. [11] The Albans charged fees for their services as discussed below.

[10]    Usually, with information provided by the customers.

[11]    Renewal applications were much simpler than original applications. Renewals were either annually or every 18 months.

Initially, the Albans had the customers provide their personal checks or postal money orders that were sent to the Government with the immigration forms. However, in order to be able to verify the Government's receipt of the documents and payments, the Albans changed the process for customers not paying by check. The Albans obtained the funds from their customers, deposited the funds into a Servicios checking account, and then made payment to the Government by a Servicios check. The canceled check served as proof of receipt. The Albans stopped using the Servicios bank account for this purpose in 2007.

The Albans did not operate their immigration business competently. While some customers fortunately obtained what they sought, many did not. Data from USCIS shows that of more than 600 immigration applications capable of association with Defendants, over 60 percent were denied or rejected. Strong Decl. 2 ¶ 6, Pl.'s Ex. 9.

Some customers suffered severely for their reliance upon the Albans. Several of the Albans' customers were deported. One customer who relied upon the Albans' advice was arrested and jailed for almost 11 months. [12] In 2007 and 2008, the Albans [13] settled two separate lawsuits brought by customers by signing findings of fact acknowledging ineffective assistance with immigration applications. [14] Nevertheless, the Albans continued to operate their immigration business, as before, until June 1, 2011.

[12]    *See* Guevera Rivera Decl. 8 ¶ 29, Pl.'s Ex. 3.

[13]    And Loma.

[14]    *See* Pl.'s Ex. 23–*Miguel Zelaya, et.al. v. Manuel Alban, et. al.,* Civil Case No. 0101–0012695– 2007; Pl.'s Ex. 24–*Santos Bacilia Guevara Rivers v. Manuel Alban, etc. al.,* Civil Case No. 0101– 0004723–2008.

On June 1, 2011, the FTC filed the instant lawsuit, obtained an ex parte Temporary Restraining Order, appointment of a monitor, and permission to enter the Albans' business premises and seize records. The Albans' records were incomplete and poorly organized. Nevertheless, the monitor was able to identify and contact some of the estimated 1,000 immigration customers [15] to provide assistance with any outstanding immigration requirements. By virtue of the lack of reliable and adequate financial records, the monitor retained a forensic accountant to assist with a determination of the revenues received from the provision of immigration services. [16]

[15]    The monitor estimated that the Albans had approximately 1000 customers between 2001 and 2011. Not all of these were currently open cases requiring assistance.

[16]    *See* Monitor's Report, Pl's Ex. 105.3.

The Albans terminated their immigration service business as of June 1, 2011 and state that they do not intend ever again to provide any kind of immigration service.

### C. *Liability*

To establish liability under section 5 of the FTC Act, the FTC must establish that the activities of the Defendants were "in or affecting commerce" [17] and that:

Case 3:17-cv-00101-RDM    Document 526-1    Filed 08/18/20    Page 188 of 192

F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)
2013 WL 2455986, 2013-1 Trade Cases P 78,413

17      There is no doubt that the activities at issue affected commerce.

(1) there was a representation, omission, or practice;

(2) that was likely to mislead customers acting reasonably under the circumstances; and

**\*4** (3) the representation, omission, or practice was material.

*FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir.2003); *FTC v. Gill,* 265 F.3d 944, 950 (9th Cir.2001).

If these three elements are proven, the FTC need not prove any intent to deceive, and were the Defendants able to prove good faith, [18] it would not provide a defense. *FTC v. Patriot Alcohol Testers, Inc.,* 798 F.Supp. 851, 855 (D.Mass.1992); *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d Cir.2006); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir.1988).

18      The Albans have not, however, proven good faith. Indeed the Court finds that Mr. Alban intentionally sought to mislead his customers as to his competence and authority and Mrs. Alban was, at best, a willfully blind enabler of Mr. Alban's deception.

To hold an individual liable for the deceptive acts or practices of a corporate entity, the FTC must establish that the individual had some knowledge of the unlawful conduct, and the individual participated in the acts or had authority to control the conduct. *FTC v. Ross,* 897 F.Supp.2d 369, 384 (D.Md.2012) (citing *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573–74 (7th Cir.1989)). The knowledge requirement may be fulfilled by showing actual knowledge of material misrepresentations or reckless indifference to the truth or falsity of such misrepresentations. *Id.* "[T]he degree of participation in business affairs is probative of knowledge." *Id.* at 385 (quoting *Amy,* 875 F.3d at 574).

*1. Representations*

The FTC must prove that a defendant made some representation, whether implied or express. *Patriot,* 798 F.Supp. at 855; *see also FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 604 (9th Cir.1993) (noting that the difference between implied and express representations is "a distinction without a difference").

The FTC has proven that the Albans and Defendant Loma represented themselves, both expressly and impliedly, as qualified immigration consultants legally authorized to provide the immigration services they rendered for customers.

The Albans contend that they made no express representation of being authorized to provide immigration services and that simply operating the business does not serve as an implied representation that they were authorized to do so. However, lack of proper licensing is a material fact, which if not disclosed, deceives and is an unfair or deceptive trade practice. *Golt v. Phillips,* 517 A.2d 328, 332 (Md.1986). The provision of a service reasonably implied the legal authorization to provide such a service, hence is sufficient to support the finding that there was a representation, omission, or practice.

The evidence includes many consumers' USCIS immigration forms that were prepared [19] and filed by the Albans and Loma. Both Mr. and Mrs. Alban signed as preparer in the preparer's block and Loma's name and business address appeared on the forms. Indeed, the Albans and Loma specifically acknowledged providing immigration services in documents filed to settle state court litigation against them.

19      Starting in 2002 or 2003, the Albans and Loma used a software program to prepare and complete the forms on their office computer.

The Albans used Loma letterhead with "IMMIGRATION AND CITIZENSHIP" printed clearly to stand out from other services listed at the top of the page under the company name. *See, e.g.,* Pl's Ex. 5.13. The immigration services were marketed mainly by referrals and word of mouth but also by direct solicitation. *See, e.g.,* Lovo Decl. 1 ¶ 3, Pl.'s Ex. 1 ("My friend then told me about Manuel Alban, whom she described as a good attorney who had prepared her TPS application. My friend gave me Mr. Alban's phone number...."); Bernal Decl. 1 ¶ 2, Pl.'s Ex. 2 ("On several occasions ... I talked to Mr. Alban, who encouraged me to visit him and get his help."); Guevera Rivera Decl. 1 ¶ 3, Pl.'s Ex. 3 ("[ My sister] told me about an attorney named Manuel Alban who had prepared her immigration documents."); Vasquez Montoya Decl. 1 ¶ 2, Pl.'s Ex. 4 ("I heard of Mr. Alban through my brother ....").

**\*5** Although the finding is not necessary to establish liability in the instant case, the Court finds that the Albans by implication (and sometimes expressly) at times [20] falsely

F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)

2013 WL 2455986, 2013-1 Trade Cases P 78,413

represented Mr. Alban to be an attorney. *See, e.g.,* Lovo Decl. 3 ¶ 9, Pl.'s Ex. 1 ("I believed Mr. Alban was an attorney...."); Guevera Rivera Decl. 8 ¶ 29, Pl.'s Ex. 3 ("I would never have used Mr. Alban's services if I had known he was not an attorney."). One customer testified that Mr. Alban had specifically stated that he was an attorney. *See, e.g.,* Montoya Decl. 4 ¶ 14, Pl.'s Ex. 5 ("When I asked Mr. Alban if he was an attorney, he said 'of course I am an attorney.' "). One check was found payable to Manuel Alban for "legal fees." Pl's Ex. 58. Moreover, there is evidence of occasions when Mr. Alban sought to provide legal services, including his writing a letter on behalf of a "client" threating legal action. And in recorded telephone conversations, Mrs. Alban was less than candid when responding, "How can I help you?" to the question: "Is this attorney Manuel Alban's office?" Pl.'s Ex. 6.2. Nor did Mr. Alban choose to inform a telephone caller stating, "I am interested in getting attorney Manuel Alban's services" that he was not an attorney. Pl.'s Ex. 6.4.

20    In 2011, having been expressly warned by state authorities about practicing law without a license, the Albans had an erasable "whiteboard" on the office wall stating, in handwritten Spanish, "This is not a law office."

### 2. *Misleading*

The Court must consider whether a representation is likely to mislead a reasonable consumer by viewing the representation as a whole and focusing on the impression created, not its literal truth or falsity. *Patriot,* 798 F.Supp. at 855. "In evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer." *FTC v. Five–Star Auto Club, Inc.,* 97 F.Supp.2d 502, 532 (S.D.N.Y.2000).

The FTC did not have to prove that each individual customer relied on the Defendants' misrepresentations or omissions; a representative sample of injured consumers is sufficient. *Figgie,* 994 F.2d at 605. The FTC has provided adequate sampling evidence. For example, Ms. Guevara Rivera, Ms. Lovo, Mr. Maddox, and Mr. Vasquez Montoya testified that they hired and paid Defendant Manuel Alban to help them with their immigration needs because Defendants represented that Mr. Alban was qualified to provide immigration services. *See, e.g.,* Pl.'s Exs. 1, 3, 4, 50.

Even without this sampling testimony, the Court finds that the Albans' and Loma's representations were likely to mislead a reasonable consumer of the services provided to believe that the Albans and Loma were competent, qualified, and legally authorized to provide such services.

The fact that some of the Albans' and Loma's customers were satisfied with the services they received does not provide a defense. *Amy,* 875 F.2d at 572. Indeed, there is no reason to doubt that these customers relied upon the Albans' representations of competence, qualification and legal authority. Fortunately, they were not among the customers who suffered for their reliance.

### 3. *Materiality*

**\*6** A material representation is one that involves information that is important to consumers such that it is likely to affect their decisions or actions. *Patriot,* 798 F.Supp. at 855; *FTC v. Cyberspace.Com LLC,* 453 F.3d 1196, 1201 (9th Cir.2006). Express representations that are shown to be false are presumptively material. *Patriot,* 798 F.Supp. at 855.

The FTC has proven that the representations that the Albans and Loma were competent, qualified and legally authorized to provide the services at issue "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding [the services]." *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir.1992).

Although such evidence is not necessary, the FTC provided testimony of some customers that the Defendants' representations were material to their deciding to use the Defendants' services. Mr. Maddox, Ms. Guevara Rivera, Mr. Vasquez Montoya, and Ms. Lovo each testified that had they known that Manuel Alban was not authorized to provide immigration services, they would neither have sought nor paid for the services. Pl's Exs. 1, 3, 4, 50.

The Court finds that the FTC has proven the materiality element of the FTC Act § 5 violation.

### 4. *Liability Conclusion*

The Court finds that the FTC has proven each of the elements necessary to hold the Albans and Loma liable under § 5 of the FTC Act.

The Albans personally violated the statute by their own individual actions. Loma, Inc., acting through the Albans, also violated the statute, holding itself out as competent, qualified, and legally authorized to provide immigration services.

F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)

Case 3:17-cv-00101-RDM   Document 526-1   Filed 08/18/20   Page 190 of 192

2013 WL 2455986, 2013-1 Trade Cases P 78,413

The Court finds that the FTC has not proven that Servicios is liable under FTC Act § 5. Unlike Loma, Servicios was never held out as providing immigration services and did no more than provide—without compensation—a checking account conduit for the transmission of customer funds to the USCIS.

### C. Remedy

Courts have broad authority to issue a permanent injunction and ancillary relief for the violation of any law enforced by the FTC. *Amy,* 875 F.3d at 571–72; *FTC v. Ameridebt, Inc.,* 373 F.Supp.2d 558, 562–63 (D.Md.2005). Included in the power to grant ancillary relief is the authority to order payment for consumer redress. *Amy,* 875 F.3d at 571; *see also Ameridebt,* 373 F.Supp. at 562 ("The authority to grant such relief includes the power to grant any ancillary relief necessary to accomplish complete justice, including ordering equitable relief for consumer redress through the repayment of money, restitution, rescission, or disgorgement of unjust enrichment.").

### 1. Permanent Injunction

Permanent injunctive relief is appropriate when there is "some cognizable danger of recurring violation." *Ross,* 897 F.Supp.2d at 387 (citing *FTC v. Med. Billers Network, Inc.,* 543 F.Supp.2d 283, 323 (S.D.N.Y.2008) (internal quotations omitted)). Some factors to consider include: (1) defendants' scienter; (2) whether the conduct was isolated or recurrent; (3) whether defendants are positioned to commit future violations; (4) degree of consumer harm; (5) defendants' recognition of culpability; and (6) sincerity of defendants' assurances against future violations. *Id.* The injunction must not unduly harm the defendants but simply ensure that they do not continue the violations. *Id.* However, "the egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature." *Id.*

**\*7** The Defendants argue that an injunction is unnecessary because they ceased operating in June 2011 and do not intend to restart the immigration services business. However, the Court finds that injunctive relief is necessary to ensure that the Albans (and any entity that they control) do not, again, prey upon vulnerable consumers by purporting to offer services that they are not competent, qualified, and legally authorized to provide.

The Court finds that absent an injunction, there is a realistic danger that the Albans will find and take another opportunity

to mislead consumers, particularly those who speak Spanish and not English, in violation of § 5 of the FTC Act.

The FTC seeks, and may well be entitled to obtain, broad injunctive relief. However, the Court finds a need to hear further evidence and argument regarding the terms of the injunction to be issued. In particular, the Court wishes to consider providing injunctive relief regarding violations of § 5 of the FTC Act in addition to those only related to immigration services.[21]

[21]    For example, income tax preparation services. Indeed, the evidence at trial indicates that, while providing income tax return preparing services to the public, Mr. Alban prepared and filed unreliable —if not outright fraudulent—income tax returns on behalf of himself and his corporations.

### 2. Restitution

Since the Court holds that a permanent injunction is warranted, restitution may be provided. To obtain restitution under Section 13(b) of the FTC Act, the FTC must prove consumer reliance.

Consumer reliance can be established by a representative sample of injured consumers or by a showing that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *Ross,* 897 F.Supp.2d at 387 (quoting *FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1206 (10th Cir.2005)); *Figgie,* 994 F.2d at 605–06.

The Court finds that the FTC has met its burden to show consumer reliance in both fashions. There is evidence of a representative sample of injured customers. In addition, the Albans and Loma made false representations that were likely to deceive customers, were widely distributed in the context of the specific community to which directed and, in reliance on these false representations, consumers purchased the services at issue.

Under Section 13(b), the Court has authority to provide for disgorgement relating to the amount of the defendants' unjust enrichment. *FTC v. Washington Data Res., Inc.,* 704 F.3d 1323, 1326 (11th Cir.2013). "[I]n many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant." *Id.* (quoting *Verity,* 443 F.3d at

F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)

2013 WL 2455986, 2013-1 Trade Cases P 78,413

68). The correct measure of unjust gains under Section 13(b) is the "net revenue (gross receipts minus refunds), rather than the amount of profit (net revenue minus expenses)." *Id.* at 1327.

The FTC has the initial burden to show the amount of assets subject to disgorgement. *FTC v. Washington Data Res.,* 856 F.Supp.2d 1247, 1279 (M.D.Fla.2012) *aff'd sub nom. FTC v. Washington Data Res., Inc.,* 704 F.3d 1323 (11th Cir.2013). All that is required is "a reasonable approximation of a defendant's ill-gotten gains." *Id.* The burden then shifts to the defendants to show that the FTC's figures are inaccurate. *Id.* at 1281.

**\*8** The Defendants' incomplete and poorly organized files and lack of adequate and reliable financial records [22] made it impossible for the FTC to present definitive evidence establishing precisely their revenue derived from the services at issue. The FTC presented the testimony of Mr. Joseph Dengler, a former Internal Revenue Service Agent experienced in the reconstruction of income from incomplete records. Mr. Dengler used alternative methods [23] to estimate the Defendants' revenue received from the services at issue. He testified that the Defendants' revenue attributed to the services at issue was within a range from $479, 000 [24] to $753,406. [25]

[22]    The Defendants had no internal accounting program or method for recording the amount of money received from individual customers. Further, it appears that a substantial amount of the money received was in cash. Although the Albans report that Loma had its own bank account that should have been used to analyze bank deposits made during the period, there were no records available for that bank account prior to 2008.

[23]    *See* Pl's Ex. 105.3. Two different methodologies were used to estimate net revenues, each with two variables based on the bank account records found, the receipts that were found, a subset of 110 customer files from 2010, and information regarding fees charged as supplied by the Albans.

[24]    This figure is derived from estimation method # 1, which is based on deriving an average number of transactions per client of 4.79 based on the detailed review of 110 client files, *i.e.,* $100.00 constant

fee per transaction x 4.79 transactions x 1000 clients = $479,000.00. Using this same method with an average fee per transaction of $129.67, calculated from evidence of fees charged over the years ranging from $80.00 to $200.00, results in an estimation of $621,119.30, *i.e.,* $129.67 per transaction x 4.79 transactions x 1000 clients = $621,119.30.

[25]    This figure is derived from estimation method # 2—using the actual Servicios checks written to USCIS between April 2001 and July 2007 to derive a number of transactions per year, and extrapolating that average forward to 2011 after the Albans stopped using Servicios to write checks to USCIS, and using an average per transaction fee of $129.67 as in method # 1.

The Court finds Mr. Dengler's testimony to be reliable and adequate to provide a "reasonable approximation" of the relevant revenue and, therefore, shifts the burden to the Defendants to show that the estimated range is too high. *Washington Data Res.,* 856 F.Supp.2d at 1281.

Defendants contend that the estimated range is too high because the estimated fee per transaction was excessive, and some clients did not pay the total fee charged. [26] Mr. Alban testified that they charged $25 per client in 2001, and they increased the fee to $50 in 2004 and then to $100 sometime around 2007. [27] Additional fees were also charged, but they were for other services such as translation or photographs and not for filling out the immigration forms. The Defendants estimate—without support from any reliable documentation —that they received from the services at issue only about $200,000 in total.

[26]    Mr. Alban testified that some clients also did not pay the entire USCIS fee due and that Loma would advance the fee on an understanding that it would be repaid. Not all clients repaid these advances.

[27]    The Court notes that the monitor's report indicates that the customer affidavits and the documentary evidence do not support these lower numbers, but rather that the fee charged from 2001–2006 was $100, from 2007–2009 was $150, and from 2010– 2011 was $200. Monitor's Report 6, Pl.'s Ex. 105.3.

The reasonableness of an approximation varies depending on the information available, but "the risk of uncertainty

Case 3:17-cv-00101-RDM Document 526-1 Filed 08/18/20 Page 192 of 192
F.T.C. v. Loma Intern. Business Group Inc., Not Reported in F.Supp.2d (2013)
2013 WL 2455986, 2013-1 Trade Cases P 78,413

should fall on the wrongdoer .... " *Med. Billers Network,* 543 F.Supp.2d at 324. As stated by other courts:

[W]here defendants' record keeping has "so obscured matters that lawful gains cannot be distinguished from the unlawful without incurring inordinate expense, it is well within the district court's power to rule that the measurement of disgorgement will be the more readily measurable amount of losses incurred by the defendants' customers in the unlawful transactions."

*FTC v. Febre,* 128 F.3d 530, 535 (7th Cir.1997) (quoting *CFTC v. Am. Metals Exchange Corp.,* 991 F.2d 71, 77 (3d Cir.1993)).

The Court finds the Defendants testimony pertaining to their finances unreliable.[28] Thus, the Court finds that the Defendants' receipts from the services at issue are within the range of $479,000 to $753,406. However, the amount of disgorgement to be ordered does not necessarily equate to the revenue derived from the services.

[28]   Indeed, as established by the testimony at trial, the income tax return records that were available would, if correct, establish that the Albans provided all of the services at issue without receiving any income at all.

The Court, considering an equitable remedy, finds it appropriate to take into account the Defendants' current financial circumstances because disgorgement is designed to be remedial and not punitive. *See Febre,* 128 F.3d at 537. Moreover, it may be appropriate to consider the ultimate disposition [29] of any amount of disgorgement paid.

Therefore, the Court finds a need to hear further evidence and argument regarding the amount of disgorgement to be required.

[29]   For example, how—if at all—amounts paid would be utilized to "repair" the damage caused by the Defendants through refunds to customers or otherwise.

### IV. *CONCLUSION*

**\*9** For the foregoing reasons, as stated more fully herein:

1. The Court finds Defendant Manuel E. Alban, Lola P. Alban, and Loma International Business Group, Inc., but not Defendant Servicios LatinoAmericanos De Maryland, Inc., liable for violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the advertising, marketing, and sale of United States immigration services.

2. The Court finds that a permanent injunction pursuant to § 13(b) of the FTC Act, 5 U.S.C. § 53(b), is appropriate.

3. The Court finds that the injunctive relief should include a restitution requirement.

4. The Court finds it necessary to conduct further proceedings related to the terms of the aforesaid permanent injunction and the amount of the aforesaid restitution requirement.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 2455986, 2013-1 Trade Cases P 78,413

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.