J

Case 3:17-cv-00101-RDM Document 526-2 Filed 08/18/20 Page 2 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

KeyCite Yellow Flag - Negative Treatment

Distinguished by Commercial Credit Group, Inc. v. Falcon Equipment, LLC of Jax, W.D.N.C., January 8, 2010

1997 WL 33642380
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
WINDWARD MARKETING, LTD.; Genisis
Marketing & Administration, Inc.; Crestwood
Enterprises, Inc.; Wholesale Capital Corporation;
Mega Magazines, Inc.; All of the above-named
corporations doing business as: Wholesale
Magazine; Premium Magazine; Magazine Express;
Magazines Unlimited; Magazines of America;
Magazines Limited; Magazine Distributors of
America; Ronald "Ronny" Jay Pepper; Philip
Edward Dill; Matthew Corbitt Mizell, Jr.;
Sarfraz A. Tariq; and Sabir Saleem, Defendants.

No. Civ.A. 1:96–CV–615F.
|
Sept. 30, 1997.

**Attorneys and Law Firms**

John W. Ragsdale, Jr., Ragsdale Beals Hooper & Seigler, Atlanta, GA, for movants.

Katharine B. Alphin, Federal Trade Commission, Atlanta, GA, David M. Torok, Federal Trade Commission, Washington, DC, for plaintiff.

Lawrence S. Burnat, Debra A. Wilson, Schreeder Wheeler & Flint, John W. Ragsdale, Jr., Ragsdale Beals Hooper & Seigler, Sharon A. Cole, Office of Sharon A. Cole, Steven M. Kushner, Meadows Ichter & Trigg, Colette Resnik Steele, The Steel Law Firm, Michael Weinstock, Richard John Capriola, Weinstock & Scavo, Jay Lester Strongwater, Leeza Rhee Cherniak, Strongwater & Associates, Atlanta, GA, Steven B. Lieberman, Bowers Murphy Lieberman Amitrani & Lombo, Somerville, NJ, for defendants.

Sabir Saleem, Cos Cob, CT, pro se.

Mega Magazines, Inc., Forest Park, GA, pro se.

*FINAL JUDGMENT AND ORDER*
*FOR PERMANENT INJUNCTION*

HULL, J.

**\*1** Plaintiff Federal Trade Commission brings this action under the Federal Trade Commission Act ("FTC Act"). This matter is before the Court on Plaintiff's Motion for Summary Judgment [145–1] on its claims against corporate Defendant Wholesale Capital Corporation and individual Defendants Sarfraz Tariq and Sabir Saleem.

I. *FACTS* [1]

[1]   In support of its Motion for Summary Judgment, Plaintiff FTC filed a "Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried," in compliance with Local Rule 56.1.B(1) (formerly LR 220–5(b) NDGa). Defendants Wholesale and Tariq failed to file a Statement Of Material Facts To Which There Exists An Issue To Be Tried and thus failed to controvert specifically Plaintiff FTC's Statement Of Material Facts in the manner prescribed by the Local Rules of this Court. Thus, the material facts contained in Plaintiff FTC's "Statement Of Undisputed Material Facts" are deemed admitted as to Defendants Wholesale and Tariq. *See* LR 56.1.B(2) NDGa (formerly LR 220–5(b) NDGa); *see also Jones v. Gerwens,* 874 F.2d 1534, 1537 n. 3 (applying rule on appeal). Further, Defendant Saleem presents evidence relating only to his actual knowledge regarding the selling Defendants' practices and his relationship with corporate Defendant Wholesale. Defendant Saleem fails to present any evidence creating any genuine issues as to any other material facts.

This case involves the telemarketing of magazine subscriptions to consumers throughout the United States. Plaintiff Federal Trade Commission ("FTC") brings this action seeking permanent injunctive and other relief in this matter, pursuant to sections 5, 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"). 15 U.S.C. §§ 45, 53 & 57b. Plaintiff FTC presents evidence showing that Defendants conducted a nationwide telemarketing and banking scheme

Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 3 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

designed to obtain consumers' bank account numbers and then deposited unsigned demand drafts against the consumers' bank accounts without the consumers' authorization. Plaintiff FTC contends that Defendants' telemarketing and banking practices were false, deceptive, misleading, and unfair in violation of Section 5(a) of the FTC Act. 15 U.S.C. § 45(a).

A. *Defendants' Telemarketing Scheme*
Defendants' scheme required the cooperation of numerous parties. Each corporate Defendant and individual Defendant played an integral role in the telemarketing transactions in issue in this case.

1. *The Selling Defendants*
Defendant Genisis Marketing & Administration, Inc. ("Genisis"), whose owner and sole officer is Defendant Phillip Edward Dill, initiated the telemarketing transactions by making unsolicited telephone calls or "cold calls" to consumers. Defendant Genisis's role was to sell the magazines and obtain the consumers' bank account numbers. Defendant Genisis obtained the consumers' bank account numbers through making misrepresentations which were, at best, misleading, and, at worst, deceptive.

First, the Genisis telemarketers would congratulate the consumers on being "winners" or "finalists" in a sweepstakes. The telemarketers offered the consumers various awards, such as diamond watches, Bahamas vacations, and three-piece leather luggage sets. In addition, the telemarketers offered the consumers cash certificates for groceries, usually valued at $250, which the telemarketers claimed could be used "like cash" for groceries. Often, the Genisis telemarketers told the consumers that the cash certificate for groceries would pay virtually for the consumers' magazine subscriptions. The grocery certificates turned out to be numerous "cents off" coupons (for various products) that could be obtained in any Sunday newspaper.

The Genisis telemarketers offered the consumers two free one-year subscriptions to monthly magazines, such as *Life* or *Good Housekeeping,* if the consumers would agree to subscribe to weekly magazines, such as *Time* or *Newsweek.* The telemarketers offered multi-year subscription terms at various rates, typically $1 .89 or $1.91 per week (which translates to a range of $282.12 to $297 .96 for the three-year subscriptions the telemarketers pushed). Generally, the telemarketers did not tell the consumers the total prices for the subscriptions.

**\*2** Further, during these initial sales calls, the Genisis telemarketers usually failed to discuss a method of payment. Instead, they obtained the consumers' checking account numbers using one or more of several ruses. In some instances, the telemarketers told consumers that their account numbers were needed so that the sweepstakes winnings could be deposited directly into the consumers' accounts. In other cases, the telemarketers told consumers that their account numbers were needed for verification or identification purposes in order to receive the promised awards or to enter the sweepstakes. Still, in other cases, the telemarketers stated affirmatively that they could not withdraw money from the consumers' checking accounts without the consumers' permission. In fact, many consumers told the telemarketers outright that no money was to be withdrawn from their bank accounts.

In some instances, Genisis telemarketers disclosed the fact that money would be withdrawn from the consumers' bank accounts. But even in these instances, the telemarketers never told consumers that the withdrawals would be in one large lump sum. In those situations, consumers provided their account numbers with the mistaken understanding that they would be paying only $1.89 or $1.91 each week or month, rather than an immediate sum of $282.12 or $297.96.

2. *The Verifying Defendants*
After Defendant Genisis obtained the consumers' magazine orders and bank account numbers, Defendant Windward Marketing, Ltd. ("Windward") made follow-up "verification" calls to consumers, usually between one hour and two days after the initial calls from Genisis. These verification calls lasted approximately thirty seconds. During these second calls, Defendant Windward's telemarketers mentioned the sweepstakes and then reviewed and misrepresented again the "prizes" that the consumers were to receive. The Windward telemarketers then used the ruse of telling the consumers that the consumers' banks were a "billing agents." This deflated the consumers' concerns about the callers' having the consumers' bank account numbers.

These verification calls were the first occasion that many of the consumers learned that they somehow had unknowingly authorized Defendants to debit money from the consumers' bank accounts. During the verification calls, Defendant Windward's callers would tell consumers that when they gave out their bank account numbers, they authorized Defendants to debit their accounts to pay for the magazine subscriptions.

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)
Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 4 of 51
1997 WL 33642380

However, the callers did not express this matter clearly, but rather stated that, "when you gave us the checking account information, you authorized us to deduct *that* under the name Magazine Distributors of America" or the name of some other company. After stating that "you authorized us to deduct that," the callers quickly changed the subject to distract the consumers' attention by giving out the telemarketers' first names and customer service numbers. Through this process, Defendants Genisis and Windward contend that Defendant Windward "verified" that the consumers previously had authorized lump sum deductions of $297.96.

**\*3** However, in many of the transcribed "verification" calls, the consumers told the "verifiers" that the consumers understood that they were authorizing only $1.91 a week and not authorizing lump sum payments for three years. Other consumers explained that they were to receive billings and never authorized any direct withdrawals out of their bank accounts. During numerous other "verification" calls, the consumers stated that they never understood that any money was to come out of their bank accounts and either hung up or instructed the "verifiers" to cancel the whole thing.

Additionally, in some cases, the verifiers misrepresented the situation, asserting that no money was to be withdrawn from the consumers' accounts. In any event, the verifiers never asked consumers for express authorization to prepare bank drafts without the consumers' signatures and to debit their bank accounts by those bank drafts. The verifiers also never asked the consumers whether the consumers previously had authorized other callers to do so. Instead, the verifiers *told* consumers that when they provided their bank account information to the initial telemarketers, they "authorized us to deduct it."

Finally, while the Court recognizes that on some occasions, some consumers did appear to understand during the "verification" calls that they had bought a magazine subscription for thirty-six months for $297.96, even then the "verification" callers made it appear that the consumers had been billed the $297.96 through their banks as their billing agents and that, in any event, the costs were offset by free grocery shopping or grocery shopping "on us." Again, however, the free grocery shopping amounted to $250 worth of cents off coupons that could have been obtained in any Sunday newspaper.

Even interpreting the most favorable "verification" calls in the manner most favorable to Defendants, the "verification" calls, at most, attempted to verify something that never occurred. The evidence shows that the consumers never authorized Defendant Genisis to prepare demand drafts on their bank accounts or to debit immediately the consumers' bank accounts for $297.96 based on demand drafts without the consumers' signatures. Because there were no authorizations to begin with, there were no authorizations being "verified" in these calls. Even Defendant Windward admitted that in making these calls, Defendant Windward found that at least 37% of the consumers had not authorized anything.

### 3. The Debiting Defendants

After conducting this "verification" process, Defendant Windward, over Dill or Pepper's signature, sent Defendants Wholesale Capital Corporation ("Wholesale") and Crestwood Enterprises ("Crestwood")[2] a list of "verified" orders and bank drafts on the consumer accounts. Defendant Windward sent the bank drafts by Federal Express to expedite collection on the consumers' accounts. These bank drafts listed as payee one of multiple d/b/a's discussed below used by Defendants Wholesale and Crestwood. The bank drafts did not contain the signatures of the consumers, but instead asserted that an authorized signature was on file or audio recorded by depositor and guaranteed by the named payee listed on the check, as follows:

[2]     Defendant Crestwood was one of two corporations that received the bank drafts from Defendant Windward. Defendant Crestwood was responsible for debiting consumers' bank accounts to complete the telemarketing transactions begun by Defendants Genisis, Mega, and Windward. Defendant Corbitt Mizell ("Mizell") incorporated Crestwood on March 16, 1992 and was the sole owner and officer of Crestwood from 1992 until 1996. Crestwood had only one full-time employee, secretary Deborah Alston. In June, 1995, Kent Holbrook, an accountant, became a consultant to Defendant Crestwood. Subsequently, on January 11, 1996, Holbrook became president of Defendant Crestwood.

**\*4** Authorized signature on file and/or audio recorded by depositor and guaranteed by above named company. For questions regarding this draft please call [a toll-free number].

(*See, e.g.,* Pla. Exh. 58 at 5.).[3] In fact, the payee listed on the bank draft did not answer at the toll-free number.

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)
Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 5 of 51
1997 WL 33642380

Selling Defendant Windward answered at the toll-free number.

    In addition to evidence filed along with its Motion for Summary Judgment, Plaintiff FTC relies on evidence already submitted in support of its Motion for Preliminary Injunction. Unless otherwise noted, all exhibits referred to herein are exhibits presented in connection with Plaintiff FTC's Motion for Preliminary Injunction.

During 1994–96, Defendant Crestwood maintained commercial bank accounts in the names of "Magazines Unlimited" and "Magazine Distributors of America" and handled banking transactions through the accounts in those names. Likewise, Defendant Wholesale established bank accounts under the names "Wholesale Magazine," "Premium Magazine," and "Magazine Express." Theses were the names listed as payees on the consumers' bank drafts, and Defendants Crestwood and Wholesale deposited demand drafts drawn against consumers' accounts into these commercial bank accounts. Without access to these commercial bank accounts, Defendants Genisis, Mega, and Windward would not have been able to debit monies from the consumers' accounts and would not have been able to obtain the consumers' money. Thus, Defendants Wholesale and Crestwood were integral parts of Defendants Genisis, Mega, and Windward's overall scheme. Defendant Crestwood and individual Defendants Holbrook and Mizell have entered into stipulated final orders with Plaintiff FTC. Accordingly, the Court does not discuss their actions any further.

The evidence also shows that the individuals responsible for the day-to-day operations of Defendant Wholesale participated in this process. Defendant Sarfraz A. Tariq ("Tariq") is the president and sole owner of Wholesale. Defendant Tariq opened the bank accounts in New York and New Jersey that Defendant Wholesale used to process the bank drafts on consumers' accounts received from Defendant Windward. Defendant Tariq has signed other papers on behalf of Wholesale, including UCC financing statements and legal representation consent forms.

Plaintiff FTC also contends that Defendant Sabir Saleem ("Saleem") handles the day-to-day activities of Defendant Wholesale. Defendants Windward and Genisis contacted Saleem almost daily. In fact, Defendant Pepper always dealt with Defendant Saleem on business matters, between Defendant Windward and Defendant Wholesale. Defendant Tariq explains that "since the start of business of Wholesale Capital Corporation in 1994, Mr. Saleem has rendered functions that of a Controller for Wholesale Capital Corporation and performed the services of Bookkeeping, Accounting and Data Management." (Tariq aff., exh. B.) Defendant Tariq also testifies that Defendant Saleem handled all the records for Defendant Wholesale and was responsible for sending out all the money. Defendant Wholesale paid Defendant Saleem a retainer of $18,000 per year for these services. Defendant Saleem admits performing bookkeeping and accounting services for Defendant Wholesale and receiving $ 18,000 for these services.

 **\*5** Plaintiff FTC's undisputed evidence also shows that Defendant Saleem was the individual who received the unsigned bank drafts from Defendant Windward and deposited them into Defendant Wholesale's bank accounts. Defendant Saleem does not dispute that Defendant Windward sent the unsigned bank drafts via Federal Express to Defendant Wholesale in care of Defendant Saleem at Defendant Saleem's business in Connecticut, and does not dispute that he was the individual who received the bank drafts without the consumers' signatures. Further, Defendant Saleem admits that he physically deposited checks written by consumers on behalf of Defendant Wholesale.

It is important to note at this juncture that Defendant Wholesale was established for the purpose of factoring accounts. In other words, Defendant Wholesale's whole business was collecting on invoices or "bank checks" for a fee and remitting funds it collected (minus its fee) to its client. Thus, as the person responsible for maintaining Defendant Wholesale's records, depositing its checks (signed or unsigned), and sending money to Defendant Wholesale's clients (here, Defendants Windward and Genisis), Defendant Saleem clearly controlled the day-to-day activities of Defendant Wholesale.

Defendant Saleem contends that he had no control over Defendant Wholesale's activities. Defendant Saleem's sole position is that he was not an employee of Defendant Wholesale and thus cannot be said to have controlled Defendant Wholesale's activities. However, Defendant Saleem fails to present any evidence that supports this contention with his Response to Plaintiff FTC's Motion for Summary Judgment. Defendant Saleem also does not cite to any evidence in the record that supports this contention. Further, during his deposition, Defendant Saleem continually invoked his Fifth Amendment privilege and declined to answer any questions about his activities with Defendant Wholesale. The only evidentiary support in the entire

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

record for Defendant Saleem's contention that he was not an employee of Defendant Wholesale is a lone averment contained in a affidavit presented in 1996 in opposition to Plaintiff FTC's Motion for Preliminary Injunction.

Arguably, the Court does not need to consider this affidavit filed in opposition to Plaintiff FTC's Motion for Preliminary Injunction for purposes of Plaintiff FTC's Motion for Summary Judgment. However, even considering Defendant Saleem's earlier affidavit, he testifies only that he was not an employee of Defendant Wholesale. Even accepting this conclusory averment as true, Defendant Saleem's affidavit does not refute the fact that Defendant Saleem was a direct agent for Defendant Wholesale with full power and authority to handle all of Defendant Wholesale's financial matters.

Control over activities can be accomplished in a number of ways; and in determining whether a person has control over activities, the Court does not look solely to a person's position, but also considers the control that a person actually exercises over given activities. Defendant Saleem did not have to be Defendant Wholesale's employee, or even an officer, to control Defendant Wholesale's activities. The evidence shows, without dispute, that Defendant Saleem was given full authority, responsibility, and control in whatever capacity he chooses to classify himself, to handle all the financial matters relating to Defendant Wholesale's transactions with Defendant Windward. Indeed, Defendant Saleem specifically had the authority to control all of the precise actions which comprised the unfair practices for which Plaintiff FTC contends that Defendant Wholesale should be held liable.

B. *The Culpability Of Defendants Wholesale, Tariq, and Saleem*
 **\*6** Again, Defendant Wholesale processed printed bank drafts on consumers' accounts for Defendant Windward–but just used different fictitious magazine names as payees. In return, Defendant Wholesale received six to eight percent of the sums collected on the bank drafts. During January 21, 1994 through January 11, 1996, Defendant Wholesale deposited approximately $15,573,978 in bank drafts drawn on consumers' accounts for Defendant Windward. Defendant Wholesale received over $1 million in fees for providing this substantial assistance and for facilitating these telemarketing transactions.

Defendant Wholesale was incorporated in New Jersey and is wholly owned by Defendant Safraz A. Tariq. However, according to Plaintiff FTC, Defendant Tariq hired Defendant Sabir Saleem to handle the transactions between Defendant Windward and Defendant Wholesale. Defendant Tariq testifies that Defendant Saleem handled all the records for Defendant Wholesale and controlled the day to day activities of Defendant Wholesale. (Tariq dep. at 67–68.) Defendant Windward sent the bank drafts by Federal Express to Defendant Wholesale in care of Defendant Saleem at Saleem's business in Connecticut.

Defendant Saleem operates a business known as Cotton Fair Uniform ("Cotton Fair") in Coscob, Connecticut, which provides linens, physician and nursing uniforms, and towels to hospitals and other businesses. According to Saleem, Cotton Fair has over seventy active customers. President Tariq completed banking forms so that Defendant Wholesale's bank statements would be sent to Cotton Fair's address in Connecticut and not to Defendant Wholesale's office in New Jersey.

Defendant Saleem performed bookkeeping and accounting services for Defendant Wholesale and, according to Plaintiff FTC, deposited the bank drafts into Defendant Wholesale's accounts at the National Bank of Pakistan in New York under one of the three d/b/a's mentioned earlier–namely, "Magazine Express," "Premium Magazine," and "Wholesale Magazine." However, Defendant Wholesale experienced an average 40% return rate on the bank drafts received from Defendant Windward–that is, 40% of the checks were returned as unauthorized. *Both Defendants Tariq and Saleem were aware that at least 40% of the unsigned consumer bank drafts sent by Defendant Windward were being returned as unauthorized.*

In fact, the National Bank of Pakistan wrote Defendant Wholesale a letter, dated January 20, 1995, advising that it was closing Defendant Wholesale's bank accounts because of numerous consumer complaints that Defendant Wholesale was submitting for clearing drafts drawn on consumers' accounts without authorization. The letter stated as follows:

> It has come to our attention that the activities of the two corporations captioned above have resulted in numerous consumer complaints with respect to the operation of such accounts maintained with National Bank of Pakistan, New York Branch. We have been contacted by the office of the Attorney General of the State

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)
Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 7 of 51
1997 WL 33642380

of West Virginia who is presently investigating this matter. Among the allegations made are claims that the corporations have, without authorization, submitted to National Bank of Pakistan, for clearing, various sight drafts drawn on accounts on your prospective customers. These allegations are deemed serious, and in light of the fact that National Bank of Pakistan is listed as the address through whom your corporations may be contacted, we have determined to close both of the above referred two accounts thirty (30) days from the date of this letter.

**\*7** (Exh. 123 at 4). Other records of Defendant Wholesale show consumer complaints about unauthorized bank drafts as early as 1994. Despite the National Bank of Pakistan's warning that the bank drafts were not authorized by consumers and that the allegations were serious, Defendants Wholesale, Tariq, and Saleem continued to collect of the bank drafts received from Defendant Windward.

Investigators with the Georgia Governor's Office of Consumer Affairs conducted a telephone interview with Sabir Saleem on May 3, 1995 and explained to him all of the consumer complaints about Defendants Genisis and Windward, including the misrepresentations about the Bahamas vacations, the $250 in grocery certificates, the purportedly valuable diamond watches that are worth only $5–10, and the unauthorized withdrawals from consumers' bank accounts for magazine subscriptions. Defendant Saleem responded that Defendants Windward and Genisis had sold over 30,000 invoices and that he knew about only forty-three complaints. During that May 3, 1995 interview, the Georgia investigators told Defendant Saleem about the problems with Defendants Windward and Genisis's activities as follows:

> JB Well, see, you fail to understand what we are handling here is the Fair Business Practices Act; and we don't even need the volume that we have

here to recognize there's a problem and there's a violation of the law.

(Exhibit 103, at 15.) The investigator also told Defendant Saleem:

> DH I think one of the things, too, that you're not hearing is that even though you're dealing with our office right now, I have had inquiries from over twenty other states that want to take some type of administrative action [against] either Windward or Wholesale, whoever they can get a hold to or whoever they can figure out is at the bottom of this. So it's not just this state agency. We just finally got to you, because there was a web that was hiding who was involved with this.

(Exh. 103 at 16.) Later in the interview, Defendant Saleem responded as follows:

> SS Well, I'm sorry to hear that, and just all I need to know from you is if they are not doing proper business, then we have just to, we have to conclude that they are not a good customer and stop doing business with them.... I mean that is what I have to really be certain if they are really doing bad practices, then we don't want to do business with them.

(Exhibit 103, at 17.) Despite the 40% check return rate, the information from the National Bank of Pakistan, and the Georgia Governor's Office of Consumer Affairs' investigation, *Defendants Wholesale, Tariq, and Saleem continued unabated to deposit the unauthorized and unsigned bank drafts on the consumer accounts received from*

*Defendant Windward and to facilitate the telemarketing transactions for Defendants Genisis and Windward.*

### C. *Procedural History*

On March 12, 1996, Plaintiff FTC brought this action against Defendants and moved for an ex parte temporary restraining order ("TRO") to halt Defendants from continuing unfair and deceptive practices. On the same day, this Court entered a TRO freezing Defendants' assets, appointing a temporary receiver, and setting a hearing on Plaintiff FTC's Motion for Preliminary Injunction on March 14, 1996. The hearing was continued to March 19, 1996, and further continued to March 27, 1996. On March 27, 28, and 29, 1996, the Court conducted an evidentiary hearing on heard oral arguments from counsel. On April 3, 1996, the Court entered. a Preliminary Injunction enjoining Defendants' telemarketing activities, continuing the asset freeze as to most of Defendants' assets, and appointing a permanent receiver. On April 18, 1996, the Court vacated its April 3, 1996 Preliminary Injunction but reissued the same with minor corrections.

**\*8** By December 13, 1996, all Defendants, except for corporate Defendants Windward, Mega, and Wholesale and individual Defendants Pepper, Tariq, and Saleem, had settled with Plaintiff FTC and entered into Stipulated Final Orders for Permanent Injunction. On December 13, 1996, Plaintiff FTC filed its Motion for Summary Judgment against all the remaining Defendants. Subsequently, On February 20, 1997, Plaintiff FTC and Defendants Windward and Pepper entered into Stipulated Final Judgment and Order for Permanent Injunction. On April 22, 1997, the Court entered a Final Judgment and Order for Permanent Injunction against Defendant Mega based on Plaintiff FTC's unopposed Motion for Default Judgment.

Thus, the only remaining Defendants in this case are corporate Defendant Wholesale and individual Defendants Tariq and Saleem.

### II. *DISCUSSION*

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment as follows: courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The general rule of

summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Haves v.. City of Miami,* 52 F.3d 918, 920 (11th Cir.1995); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–09 (11th Cir.1991). Unless the movant for summary judgment meets its burden under Federal Rule of Civil Procedure 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion. *Clark,* 929 F.2d at 607–08.

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250; *see also Haves,* 52 F.3d at 920 ("[A] genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor."). A mere scintilla of evidence is insufficient to create a jury question; rather, there must be conflict in substantial evidence to create question for jury. *Anderson;* 477 U.S. at 252; *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 910 (11th Cir.1996). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248.

**\*9** Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Federal Rule of Civil, Procedure 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

### B. *Corporate Defendant Wholesale*

Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 9 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

Plaintiff FTC contends that Defendant Wholesale violated section 5 of the FTC Act by debiting consumers' bank accounts without the consumers' authorization. The FTC Act provides in relevant part that "unfair or deceptive acts or practices in or affecting commerce are declared unlawful." 15 U.S.C. § 45(a). Defendants' telemarketing scheme (the initial sales of magazine subscriptions and the subsequent use of demand drafts to debit customers' bank accounts) is commerce or affects commerce as the word "commerce" is defined in the Act. 15 U.S.C. § 44. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes this Court to enter a preliminary and permanent injunction and order consumer redress, disgorgement, and restitution to prevent or remedy any violation of any provision of law enforced by the FTC, as follows.

> Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond ... [and] in proper cases the Commission may seek, and after proper proof, the Court may issue, a permanent injunction.

15 U.S.C. § 53(b); *See also FTC v. GEM Merchandising Corp.,* 87 F.3d 466, 468 (11th Cir.1996); *FTC v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1434 (11th Cir.1984); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1113 (9th Cir.1982).

1. *Liability for Deceptive Practices under the FTC Act*
An act or practice is *deceptive* under section 5 if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Jordan Ashley, Inc.,* No. 93–2257, 1994 WL 200775, at *2 (S.D.Fla. Apr.5, 1994) (citing *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir.1989)); *FTC v. Atlantex Assocs.,* No. 87–45, 1987 WL 20384, at *9 (S.D.Fla. Nov.25, 1987), *aff'd,* 872 F.2d 966 (11th Cir.1989). A representation or omission is material if it is of the kind usually relied on by a reasonably prudent person. *Id.* The FTC, however, need not present proof of subjective reliance by each victim.

In an FTC Act Section 13(b) enforcement action in which the government seeks restitution to compensate thousands of individual victims of unlawful practices, in contrast to a private action for fraud, such representative proof of injury suffered is sufficient to justify the requested relief ... Requiring proof of subjective reliance by each individual consumer would thwart effective prosecution of large consumer redress actions and frustrate the statutory goals of the section.

*\*10 FTC v. U.S. Oil & Gas Corp.,* 1987 U.S. Dist. LEXIS 16137 at *68 (S.D.Fla. July 10, 1987). "A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *FTC v. Figgie Int'l. Inc.,* 994 F.2d 595, 605 (9th Cir.1993).

Express claims, or deliberately-made implied claims, used to induce the purchase of a particular product or service are presumed to be material. In re *Thompson Medical Co., Inc.,* 104 F.T.C. 648, 816 (1984), *aff'd,* 791 F.2d 189 (D.C.Cir.1986). Moreover, any representations concerning the price of a product or service are presumptively material. In re *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988), *aff'd,* 884 F.2d 1489 (1st Cir.1989) (citing *Thompson Medical,* 104 F.T.C. at 817). "Deception may be accomplished by innuendo rather than by outright false statements." *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir.1963).

Proof of intent to deceive is not required under section 5. "A company that deceives consumers through reckless even simply negligent disregard of the truth may do just as much harm as one that deceives consumers knowingly." *Sears Roebuck & Co. v. FTC,* 95 F.T.C. 406, 517 n. 9 (1980). In other words, Plaintiff FTC is required to show only that Defendants, here Defendant Wholesale, had or should have had knowledge or awareness of any relevant misrepresentations. *Amy Travel,* 875 F.2d at 574. This knowledge requirement may be satisfied by showing that Defendant Wholesale had either (1) actual knowledge of

Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 10 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

material misrepresentations, (2) reckless indifference to the truth or falsity of such representations, or (3) awareness of a high probability of fraud along with an intentional avoidance of the truth. *Id.*

### 2. *Liability for Unfair Practices under the FTC Act*

An act or practice is *unfair* under section 5 if it results in substantial consumer injury that is not reasonably avoidable and is not outweighed by any countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n); *see also Orkin Exterminating Co. v. FTC,* 849 F.2d 1354, 1364 (11th Cir.1988) (citing Letter from the FTC to Senators Danforth and Ford (December 17, 1980)); *American Financial Services v. FTC,* 767 F.2d 957, 971 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1011 (1986).

In 1980, the Commission promulgated a policy statement containing an abstract definition of "unfairness" which focuses on unjustified customer injury. *See American Fin. Servs.,* 767 F.2d at 971. Under the standard enunciated in this policy statement, to justify a finding of unfairness, the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and, it must be an injury that consumers themselves could not reasonably have avoided. *Orkin Exterminating Co.,* 849 F.2d at 1364 (citing Letter from the FTC to Senators Danforth and Ford dated December 17, 1980).

**\*11** Congress has not enacted any more particularized definition of unfairness to limit the Commission's discretion. Indeed, the most significant Congressional responses to the Policy Statement have not been criticisms or rejections, but proposals to enact the Commission's three-part consumer injury standard into law. *American Fin. Servs.,* 767 F.2d at 982 (citation omitted). Nevertheless, as the ultimate authority charged with the construction of federal statutes, the courts must set aside Commission orders that are inconsistent with the Commission's statutory mandate or Congressional intent. *FTC v. Colgate–Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). However, in deciding whether Defendants Wholesale, Tariq, and Saleem's conduct was "unfair," the Court owes "some deference" to the Commission's express position on the issue. *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

The first prong of the unfairness standard requires a finding of substantial injury to consumers. Plaintiff FTC can make

this showing by, among other things, establishing that the consumers here were injured by a practice for which they did not bargain. *Cf. Orkin Exterminating Co.,* 849 F.2d at 1364–65. Further, although the actual injury to individual customers may be small, this does not mean that such injury is not "substantial." *See American Fin. Servs.,* 767 F.2d at 972 (Commission's Policy Statement makes clear that injury may be, sufficiently substantial if it causes small harm to a large class of people). The large number of consumers was injured here is sufficient to establish substantial injury. *Id.*

As for the second prong of the unfairness standard, certain practices can create a mixture of both beneficial and adverse consequences. However, when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the unfairness of the practice is not outweighed. *Cf. Orkin Exterminating Co.,* 849 F.2d at 1365.

Finally, as to the third prong of the unfairness standard–that is, whether consumers reasonably could have avoided any injury–the Court focuses on whether the consumers had a free and informed choice that would have enabled them to avoid the unfair practice. *American Fin. Servs.,* 767 F.2d at 976; *see also International Harvester,* 104 F.T.C. at 1061. "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co.,* 849 F.2d at 1365 (quoting *FTC v. Orkin Exterminating Co.,* 108 F.T.C. 341, 366 (1986)).

### 3. *Defendant Wholesale is Liable for Its Own Unfair Practices Committed during Defendants' Telemarketing Scheme*

While the facts of this case would permit Plaintiff FTC to seek to hold corporate Defendant Wholesale and individual Defendants Tariq and Saleem liable for the deceptive practices of the other Defendants in this case on a theory of accomplice liability, that is not the basis of liability on which Plaintiff FTC relies. Rather, Plaintiff FTC contends that Defendants Wholesale, Tariq, and Saleem engaged in *unfair* practices that resulted in substantial injury to the consumers at issue in this case.

**\*12** The facts that Defendant Wholesale and Tariq are deemed to have admitted are outlined in detail above. However, numerous facts bear repeating. The evidence shows

that Defendant Wholesale facilitated and provided substantial assistance to Defendants Genisis and Windward's deceptive scheme by depositing unauthorized bank drafts on consumers' accounts into bank accounts opened by Defendant Wholesale in the names of various fictitious magazines. The magazine names under which Defendant Wholesale opened the bank accounts were the same magazines that Defendant Windward used as payees on the unauthorized checks. Further, while it was Defendant Wholesale that opened the bank accounts in the names of the fictitious magazines, the telephone number on the check to which consumers' banks were to refer if they had any questions was answered by Defendant Windward's employees.

Defendant Wholesale does not dispute that it opened bank accounts for the selling Defendants. Nor does Defendant Wholesale dispute that many of the bank drafts deposited into the bank accounts proved to be unauthorized. However, Defendant Wholesale contends that the selling Defendants informed Defendant Wholesale that all of the bank drafts were authorized and that it had no reason to believe otherwise. The evidence shows the contrary.

First, approximately 40% of the bank drafts were returned unauthorized; this amount includes checks returned for insufficient funds and checks returned because of stop-payment requests. [4] Despite this 40% return rate, Defendant Wholesale continued to deposit bank drafts on consumer accounts. Defendant Wholesale contends that a 40% return rate on checks is not uncommon in telemarketing. Defendant Wholesale argues that consumers often experience "buyer's remorse" and "lie" to their banks that the drafts were unauthorized. However, Defendant Wholesale fails to present any evidence of buyer's remorse here or any evidence that any consumers "lied" to their banks. In other words, Defendant Wholesale's speculation regarding buyer's remorse is not supported by any evidence in the record. [5]

[4]     The Court notes that several consumers notified the selling Defendants' telemarketers that they did not have the requisite funds available in their accounts.

[5]     Certainly buyers' remorse exists in general; however, there is no evidence that 40% of the consumers "lied" to their banks when 40% of the checks were returned as unauthorized. In fact, the checks were sent by Federal Express to Defendants Crestwood and Wholesale for collection, so that they could be deposited and cleared as soon

as possible–before the so-called buyer's remorse would set in and the buyers could call and "lie" to the banks.

Second, as stated earlier, the National Bank of Pakistan wrote Defendant Wholesale a letter, dated January 20, 1995, advising that it was closing Defendant Wholesale's bank accounts because of numerous consumer complaints that Defendant Wholesale was submitting for clearing drafts drawn on consumers' accounts without authorization. Other records of Defendant Wholesale show consumer complaints about unauthorized bank drafts as early as 1994. Despite the National Bank of Pakistan's warning that the bank drafts were not authorized by consumers and that the allegations were serious, Defendant Wholesale continued unabated its collection of the bank drafts received from Defendant Windward.

Finally, also noted earlier, investigators with the Georgia Governor's Office of Consumer Affairs conducted a telephone interview with Sabir Saleem on May 3, 1995 and explained to him all of the consumer complaints about Defendants Genisis and Windward, including the misrepresentations about the Bahamas vacations, the $ 250 in grocery certificates, the purported valuable diamond watches that are worth only $5–10, and the unauthorized withdrawals from consumers' bank accounts for magazine subscriptions. Defendant Saleem responded that Defendants Windward/Genisis had sold over 30,000 invoices and that he knew about only forty-three complaints. To Saleem, Windward and Genisis were the same. Despite the 40% check return rate, the information from the National Bank of Pakistan, and the Georgia Governor's Office of Consumer Affairs' investigation, Defendant Wholesale continued unabated to deposit the unauthorized bank drafts on the consumer accounts received from Defendant Windward and to facilitate the telemarketing transactions for Defendants Genisis and Windward.

**\*13** Based on the above undisputed facts (and facts that Defendant Wholesale is deemed to have admitted) the Court finds as a matter of law (a) that Defendant Wholesale engaged in the unfair practice of issuing bank drafts on consumers' accounts without the consumers' authorization, (b) that such practice resulted in substantial injury, and (c) that the practice was not outweighed by any benefits to consumers or competition. The Court also finds that Defendant Wholesale knew that the bank drafts sent by Defendant Windward for collection were not authorized by the consumers, or, at the very least, that Defendant Wholesale was on notice of a high probability of fraud and/or unfairness and consciously

Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 12 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)
1997 WL 33642380

avoided learning the truth. Accordingly, the Court GRANTS Plaintiffs' Motion for Summary Judgment against Defendant Wholesale.

### C. *Individual Defendants Tariq And Saleem*

In a case brought by the FTC, individual defendants are directly liable for their own violations of section 5 of the FTC Act. They also are liable for the corporate defendant's violations if the FTC demonstrates that: (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices *or* the individual defendants had authority to control the corporate defendants; and (3) the individual defendants had some knowledge of the wrongful acts or practices. *FTC v. GEM Merchandising Corp.,* 87 F.3d 466, 470 (11th Cir.1996); *Jordan Ashley,* 1994 WL 200775, at *3 (citing *Amy Travel,* 875 F.2d at 573).

An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation. "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." *Standard Educations, Inc. v. FTC,* 475 F.2d 401, 403 (D.C.Cir.1973).

Regarding section 5's knowledge requirement, the FTC "need not demonstrate ... that the individual defendants possessed the intent to defraud." *Jordan Ashley,* 1994 WL 200775, at *3 (citing *Amy Travel,* 875 F.2d at 573–74). In addition, "direct participation in the fraudulent practices is not a requirement for liability. Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." *Atlantex Assocs.,* 1987 WL 20384, at *11. An individual defendant's participation in corporate affairs is probative of knowledge. *FTC v. Kitco of Nevada, Inc.,* 612 F.Supp. 1282, 1292 (D.Minn.1985) (citing *FTC v. International Diamond Corp.,* No. 82–878, 1983 WL 1911, at *5 (N.D.Cal. Nov. 8, 1983)).

Plaintiff FTC's evidence, which proves facts deemed admitted by Defendant Tariq, shows that both Defendants Tariq and Saleem were on notice of unfair practices and that Defendant Tariq was in a position to control the activities in issue in which Defendant Wholesale engaged. Indeed, Defendant Tariq was Defendant Wholesale's owner and CEO. The evidence also shows that neither Defendant Tariq nor Defendant Saleem ceased doing business with the selling Defendants, or even questioned their practices. Rather,

Defendants Tariq and Saleem allowed Defendant Wholesale to continue issuing unauthorized bank drafts on consumers' banks accounts.

**\*14** The evidence also shows without dispute that Defendant Saleem personally participated in and controlled the unfair practice of depositing the unauthorized and unsigned bank drafts into Defendant Wholesale's bank accounts and that Defendant Saleem not only had the authority to control Defendant Wholesale's activities, but was the sole person performing these unfair practices on behalf of Defendant Wholesale. In fact, Defendant Tariq hired Defendant Saleem to handle all the transactions between Defendant Windward and Defendant Wholesale. Further, it was Defendant Saleem whom both the National Bank of Pakistan and the Georgia Governor's Office of Consumer Affairs contacted regarding consumer complaints about the bank drafts that Defendant Wholesale deposited; and it was Defendant Saleem whom Defendant Pepper dealt with on behalf of Defendant Windward on matters relating to Defendant Wholesale.

In his affidavit presented in support of Defendant Tariq's Response to Plaintiff FTC's Motion for Summary Judgment, Defendant Saleem admits that he handled transactions between Defendant Windward and Defendant Wholesale, stating that he "physically deposited hundreds of checks written by consumers" for magazine subscriptions. (Saleem aff. ¶ 4.) Thus, Defendant Saleem admits that he performs more than bookkeeping and accounting services and that he also deposits checks on behalf of Defendant Wholesale. Coupled with the undisputed fact that Defendant Windward sent the unsigned bank drafts on the consumers' accounts directly to Defendant Saleem, Defendant Saleem's admission shows that it was Defendant Saleem who also deposited the unauthorized bank drafts into Defendant Wholesale's accounts. As Defendant Tariq testifies, "[Defendant Saleem] was keeping all the records and sending the money—keeping all the records, you know, for Wholesale.... [H]e was doing everything.... [H]e had control, but he was telling me that we had this thing and that thing; but, he had all the control." (Tariq dep. at 67–68.)

In sum, the undisputed facts in the record show that Defendant Saleem participated in and controlled the day-to-day activities of Defendant Wholesale regarding the unfair practices at issue in this case.

For the foregoing reasons, and for the reasons stated regarding Defendant Wholesale, the Court GRANTS Plaintiff

FTC's Motion for Summary Judgment against individual Defendants Tariq and Saleem.

### D. *Remedies*

The FTC Act authorizes the Court to issue preliminary and permanent injunctions and to order consumer redress, disgorgement of profits, restitution, and other equitable and legal remedies. 15 U.S .C. §§ 53(b), 57b; *GEM Merchandising Corp.,* 87 F.3d at 468; *F.T .C. v. U.S. Oil & Gas Corp.,* 748 F.2d 1431, 1432–34 (11th Cir.1984). Here, Plaintiff FTC pursues remedies under §§ 53(b) and 57b, seeking disgorgement of profits and a restitutionary refund of the money consumers spent as part of any final equitable relief. Disgorgement of profits and restitution are equitable remedies. Plaintiff FTC also seeks to cabin the debiting Defendants' practices regarding telemarketing activities. *Waldrop v. Southern Co. Services, Inc.,* 24 F.3d 152, 157 (11th Cir.1994); *First Nat'l Life Ins. v. Sunshine–Jr. Food Stores,* 960 F.2d 1546, 1553 (11th Cir.1992).

**\*15** Defendants Wholesale and Tariq contend that Plaintiff FTC's proposed remedy to ban Defendants Wholesale and Tariq from engaging in any future telemarketing activities is too broad. However, Plaintiff FTC does not seek such a remedy. Rather, Plaintiff FTC's proposed permanent injunction seeks only to enjoin permanently Defendants Wholesale, Tariq, and Saleem at N.D.Cal:

> obtaining, submitting for payment, or assisting others to obtain or submit for payment a check, draft, or other form of negotiable instrument drawn on a person's checking, savings share or similar account without obtaining that person's express written authorization, in the form of that person's signature on the negotiable instrument.

(Proposed Order and Perm. Inj. at 7.)

It is well settled that those caught violating the FTC Act can expect some "fencing in." *FTC v. National Lead Co.,* 352 U.S. 419, 431, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957). "These 'fencing in' provisions are needed to prevent similar and related violations from occurring in the future." *Trans World Accounts, Inc. v. FTC,* 549 F.2d 212, 215 (9th Cir.1979).

Moreover, those who violate the law "call for repression by sterner measures than where the steps could reasonably have been thought permissible." *National Lead Co.,* 352 U.S. at 429. Here, Plaintiff FTC's proposed relief does not place a ban on the debiting Defendants' future telemarketing activities. Rather, it seeks to ensure that any future activities are less likely to violate the law in the manner accomplished via the practices at issue in this case. This "fencing in" provision of Plaintiff FTC's Proposed Permanent Injunction is not legally objectionable.

The debiting Defendants also contend that any disgorgement of profits directed at them must be limited to the amount of profits they earned. This position is incorrect. Defendants Wholesale, Tariq, Saleem, and all the other Defendants can be held jointly and severally liable for their violations of the Act. *E.g., F.T.C. v. Magui Publishers, Inc.,* No. 89–3818, 1991 WL 90895, slip op. at \*15–17 (C.D.Calif.Mar. 28, 1991); *F.T.C. v. Atlantex Assocs.,* No. 87–0045, 1987 WL 20384, slip op. at \*13 (S.D.Fla. Nov. 25, 1987), *aff'd,* 872 F.2d 966 (11th Cir.1989). Thus, any Defendant's liability may exceed the amount that particular Defendant received from his participation in the scheme, and, instead, a Defendant may be liable for all the money Defendants received from the telemarketing scheme. *See Magui,* slip op. at \*16; *F.T.C. v. International Diamond Corp.,* No. 82–0878, 1983 WL 1911, at \*7 (N.D.Cal. Nov.8, 1983).

For the foregoing reasons, the Court GRANTS Plaintiff FTC's Motion for Summary Judgment regarding Defendants' challenges to the remedies Plaintiff FTC seeks in this case.

### III. *CONCLUSION*

For the foregoing reasons, the Court GRANTS Plaintiff FTC's Motion for Summary Judgment [145–1] against Defendants Wholesale, Tariq, and Saleem.

In connection with the marketing and sale of magazine subscriptions, Defendants Wholesale, Tariq, and Saleem violated the unfairness prohibition of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by participating in a scheme to obtain consumers' bank account information and to deposit into the banking system demand drafts against consumers' bank accounts without the consumers' authorization.

**\*16** By violating Section 5 of the FTC Act, Defendants Wholesale, Tariq, and Saleem have caused substantial

Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 14 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

monetary injury of $12,693,401 to the public. A restitutionary refund of the full amount paid by consumers to the Defendants is a proper permanent equitable remedy. Moreover, consumers redress in the form of a restitutionary refund also will insure that all the Defendants disgorge their ill-gotten gains.

Defendants Wholesale, Tariq, and Saleem are likely to violate the FTC act unless they are permanently enjoined from obtaining, submitting for payment, or assisting others to obtain or submit for payment a check, draft, or other form of negotiable paper drawn on a person's checking, savings, share, or similar account without obtaining that person's express written authorization, in the form of that person's signature on the negotiable instrument.

The appointment of a liquidating receiver for Defendant Wholesale is necessary to collect the restitution for the injured consumers in this matter by collecting any monies owed to the receivership Defendant, including but not limited to instituting any and all appropriate legal actions, if necessary. Entry of the Permanent Injunction is in the public interest.

DEFINITIONS

For purposes of this Final Judgment and Order for Permanent Injunction, the following definitions shall apply:

(1) "Defendants" shall mean Wholesale Capital Corporation, Sarfraz A. Tariq, and Sabir Saleem.

(2) "Receiver" shall mean Robert L. Coley, Esquire, of Ragsdale, Beals, Hooper & Siegler, Atlanta Georgia.

(3) "Telemarketing" shall mean a plan, program, campaign which is conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call.

I.

IT IS THEREFORE ORDERED that Defendants Wholesale, Tariq, and Saleem are hereby permanently restrained and enjoined from obtaining, submitting for payment, or assisting others to obtain or submit for payment a check, draft, or other form of negotiable paper drawn on a person's checking, savings, share, or similar account without obtaining that

person's express written authorization, in the form of that person's signature on the negotiable instrument.

II.

IT IS FURTHER ORDERED that Defendants Wholesale, Tariq, and Saleem are hereby permanently restrained and enjoined from providing to any person, except agents of the Commission, the receiver, or other law enforcement authorities, the name, address, telephone number, or credit card or bank account number of any person who engaged in these telemarketing and banking transactions with any of Defendants Wholesale, Tariq, and Saleem, or any other Co-defendants in this case.

III.

IT IS FURTHER ORDERED that Judgment in the amount of $12,693,401 is entered in favor of the Federal Trade Commission against Defendants Wholesale, Tariq, and Saleem, jointly and severally. The receiver appointed pursuant to this Final Order is also appointed as agent of the Commission for the sole purpose of assisting in the collection of this Judgment and for assisting in the formulation and implementation of a redress plan. Any monies collected pursuant to this Judgment shall be used to provide restitution to consumers who made a purchase from the Defendants, and to pay any attendant expenses of administering the receivership estate or distribution of funds. If the Commission determines, in its sole discretion, that restitution to consumers is wholly or partially impracticable, any funds not so used shall be deposited into the United States Treasury. No portion of the payments as herein provided shall be deem payments of any fine, penalty, forfeiture, or punitive assessment.

IV.

 **\*17**  IT IS FURTHER ORDERED that Robert L. Coley, Esquire shall continue as permanent receiver, with the full power of an equity receiver, for Defendant Wholesale, and all of the funds, properties, premises, accounts, and other assets directly or indirectly owned, beneficially or otherwise, by Defendant Wholesale, with directions and authority to accomplish the following:

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 15 of 51

1997 WL 33642380

A. Assume full control of Defendant Wholesale by removing Defendants Tariq and Saleem and any other officer, independent contractor, employee, or agent of Defendant Wholesale from control and management of the affairs of said Defendant;

B. Take custody, control, and possession of all funds, property, premises, accounts, mail, and other assets of, or in the possession or under the control of, Defendant Wholesale, wherever situated, the income and profits therefrom, and all sums of money now or hereafter due or owing to Defendant Wholesale, with full power to: collect, receive, and take possession of all goods, chattels, rights, credits, monies, effects, lands, leases, books and records, work papers, and records of accounts, including computer-maintained information, contracts, financial records, monies on hand in banks and other financial institutions, and other papers and documents of Defendant Wholesale and consumers whose interests are now held by or under the direction, possession, custody, or control of Defendant Wholesale;

C. Conserve, hold, manage all receivership assets, and perform all acts necessary to preserve the value of those assets, in order to prevent any irreparable loss, damage, or injury to consumers, and all acts incidental thereto, including the suspension of operations;

D. Enter into such agreements in connection with administration of the receivership, including, but not limited to: (1) the retention and employment of investigators, attorneys, or accountants of the receiver's choice, including without limitation members and employees of the receiver's firm, to assist, advise, and represent the receiver, and (2) the movement and storage of any equipment, furniture, records, files, or other physical property of Defendant Wholesale;

E. Institute, prosecute, compromise, adjust, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the receiver deems necessary and advisable to preserve or augment the value of the properties of Defendant Wholesale or that the receiver deems necessary and advisable to carry out the receiver's mandate under this Final Order, and likewise to defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted against the receiver or Defendant Wholesale that the receiver deems necessary and advisable to preserve the properties of Defendant Wholesale or that the receiver

deems necessary and advisable to carry out the receiver's mandate under this Final Order. The receiver has the authority to bring suit for recovery of assets of the receivership estate against all parties to whom assets may have been fraudulently transferred;

*18 F. Institute, prosecute, compromise, adjust, intervene in, or become party to such actions in state, federal, or foreign courts, as the receiver deems necessary and advisable, against any and all individuals or entities who may be liable for or who assisted Defendant Wholesale in the activities set forth in the Commissions Complaint;

G. Disburse funds that the receiver deems necessary and advisable to preserve the properties of Defendant Wholesale or that the receiver deems necessary and advisable to carry out the receiver's mandate under this Final Order;

H. Collect any monies owed to Defendant Wholesale;

I. Liquidate all assets of Defendant Wholesale, and all assets transferred to the receiver in accordance with the terms of this Final Order;

J. Execute all bills of sale and deeds to personal and real property belonging to or coming into possession of Defendant Wholesale; and

K. Assist the Federal Trade Commission or its agents, when necessary, in the formulation and implementation of a redress plan for distribution of the assets of the receivership Defendant, pursuant to Paragraph III of this Final Order.

V.

IT IS FURTHER ORDERED that, immediately upon service of this Final Order upon them, if they have not already done so, Defendants Wholesale, Tariq, and Saleem shall deliver over to the receiver:

A. Possession and custody of all funds, assets, property owned beneficially or otherwise, and all other assets, wherever situated, of Defendant Wholesale;

B. Possession and custody of all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of

Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 16 of 51

F.T.C. v. Windward Marketing, Inc., Not Reported in F.Supp. (1997)

1997 WL 33642380

wire transfers, and check registers), client lists, title documents, and other papers of Defendant Wholesale;

C. Possession and custody of all funds and other assets belonging to members of the public now held by Defendant Wholesale;

D. All keys, computer passwords, entry codes, combinations to locks required to open or gain access to any of the property or effects, and all monies in any bank deposited to the credit, of Defendant Wholesale, wherever situated; and

E. Information identifying the accounts, employees, properties, or other assets or obligations of Defendant Wholesale.

### VI.

IT IS FURTHER ORDERED that the receiver and all personnel hired by the receiver as herein authorized, including counsel to the receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Final Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets held by, or in the possession or control of, or which may be received by, Defendant Wholesale. Prior to paying any compensation, the receiver shall file a request with the Court, outlining the services rendered and the related fees and expenses.

### VII.

IT IS FURTHER ORDERED that the receiver shall maintain the bond previously filed with the Clerk of this Court in the sum of $5,000.00 with sureties approved by the Court, conditioned that the receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs.

### VIII.

**\*19** IT IS FURTHER ORDERED that Defendants Wholesale, Tariq, and Saleem shall fully cooperate with and assist the receiver appointed in this action. Defendants Wholesale, Tariq, and Saleem are hereby permanently restrained and enjoined from, directly or indirectly, hindering or obstructing the receiver in any manner.

### IX.

IT IS FURTHER ORDERED that all banks, brokers, savings and loans, escrow agents, title companies, other financial institutions, or any other persons or entities which are served with a copy of this Final Order shall cooperate with all reasonable requests of the permanent receiver relating to implementation of this Order, including transferring funds of Defendant Wholesale at the receiver's direction, allowing the receiver access to safe deposit boxes of Defendant Wholesale, and producing records related to the accounts of Defendant Wholesale.

### X.

IT IS FURTHER ORDERED that except by leave of this Court, during the pendency of the receivership ordered herein, the Defendants and all customers, principals, investors, creditors, stockholders, lessors, and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendant Wholesale, and all others acting for or on behalf of such persons, including attorneys, trustees, agents, sheriffs, constables, marshals, and other officers and their deputies, and their respective attorneys, servants, agents, and employees be and are hereby stayed from:

A. Commencing, prosecuting, continuing, or enforcing any suit or proceeding against Defendant Wholesale, except that such actions may be filed to toll any applicable statute of limitations;

B. Commencing, prosecuting, continuing, or entering any suit or proceeding in the name or on behalf of Defendant Wholesale;

C. Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of Defendant Wholesale, or any property claimed by it, or attempting to foreclose, forfeit, alter, or terminate any of Defendant Wholesale's interests in property, whether such acts are part of a judicial proceeding or otherwise;

D. Using self-help or executing or issuing, or causing the execution or issuance of, any court attachment, subpoena, replevin, execution, or other process for the purpose of

impounding or taking possession of, interfering with, or creating or enforcing a lien upon, any property, wheresoever located, owned by or in the possession of Defendant Wholesale or the receiver appointed pursuant to this Order or any agent appointed by such receiver; and

E. Doing any act or thing whatsoever to interfere with the receiver taking control, possession, or management of the property subject to this receivership, or in any way to interfere with the receiver, or to harass or interfere with the duties of the receiver; or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of Defendant Wholesale, including the filing of a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* against Defendant Wholesale, without prior permission from this Court.

**\*20** *Provided, however,* nothing in this Paragraph shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against Defendant Wholesale.

## XI.

IT IS FURTHER ORDERED that, in order to facilitate the Commission's monitoring of compliance with the provisions of this Permanent Injunction, Defendants Tariq and Saleem shall each, for a period of five (5) years commencing with the date of entry of this Final Order:

A. Notify the Commission and the receiver in writing of any change in their residential address within ten (10) days of such change;

B. Notify the Commission and the receiver in writing of any change in their employment status within ten (10) days of such change. Such notice shall include the name and address of each business that Defendants Tariq and Saleem are employed by, a statement of the nature of the business, and a statement of their duties and responsibilities in connection with the business;

C. Notify the Commission and the receiver in writing at least thirty (30) days prior to the effective date of any proposed change in the structure of any business entity owned or controlled by Defendants Tariq and Saleem, such as the creation, incorporation, dissolution, assignment, or sale, of subsidiaries, or any other changes that may affect compliance obligations arising out of this Final Order;

D. After receiving reasonable notice from the Commission, permit duly authorized representatives of the Commission access during normal business hours to the offices of any business owned or controlled in whole or in part by Defendants Tariq and Saleem to inspect and copy all documents relating in any way to any conduct subject to this Final Order;

E. Refrain from interfering with duly authorized representatives of the Commission who wish to interview the officers, directors, or employees of any business owned or controlled in whole or in part by Defendants Tariq and Saleem with respect to any conduct subject to this Final Order;

F. Upon written request by any duly authorized representative of the Commission, submit written reports (under oath, if requested) and produce documents on thirty (30) days notice with respect to any conduct subject to this Final Order; and

G. Appear on fifteen (15) days notice for deposition with respect to any conduct subject to this Final Order.

## XII.

IT IS FURTHER ORDERED that, within sixty (60) days after the date of entry of this Final Order, Defendant Tariq and Saleem shall each file a report with the Commission and the receiver setting forth in detail the manner and form in which they have complied with this Final Order. This report shall include the current residence address for Defendants Tariq and Saleem, and their employment status, including the name and business address of their current employer(s), if any, a statement of the nature of the business, and a statement of their duties and responsibilities in connection with the business.

## XIII.

**\*21** IT IS FURTHER ORDERED that all notices required of Defendants Tariq and Saleem by this Final Order shall be mailed to the following addresses:

Associate Director

Division of Marketing Practices

Federal Trade Commission

Room 238

6th Street & Pennsylvania Ave., N.W.

Washington, D.C. 20580

Robert L. Coley, Esq.

Ragsdale, Beals, Hooper & Siegler

2400 Cain Tower Peachtree Center

229 Peachtree Street, N.E.

Atlanta, Georgia 30303–1629

XIV.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes, including but not limited to the enforcement of compliance therewith, or the punishment of violations thereof.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 33642380

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

K

**Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 20 of 51**

Lockette v. Morgan Stanley, Not Reported in Fed. Supp. (2018)

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

2018 WL 4778920
United States District Court, S.D. New York.

John LOCKETTE, Plaintiff,
v.
MORGAN STANLEY, et al., Defendants.

18-cv-876 (JGK)
|
Signed 10/03/2018

**Attorneys and Law Firms**

Linda Debra Friedman, Suzanne Elaine Bish, Shona Glink, Stowell & Friedman, Ltd., Chicago, IL, for Plaintiff.

Andrew Jay Schaffran, Sam Scott Shaulson, Brendan Thomas Killeen, Nicole M. Zito, Morgan Lewis & Bockius, LLP, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

John G. Koeltl, United States District Judge

 **\*1** The defendants – Morgan Stanley, Morgan Stanley Smith Barney LLC, and Morgan Stanley & Co. LLC – have moved to compel the plaintiff, John Lockette, to arbitrate his claims of racial discrimination and retaliation against them. At issue is whether the parties entered into a validly formed and enforceable arbitration agreement. For the reasons explained below, the defendants' motion to compel arbitration and stay this case is **granted**.

### I.

The following facts are undisputed except where noted.

The plaintiff joined the defendants' Philadelphia, Pennsylvania office in 2013 as a Regional Training Officer. Lockette Decl. ¶ 5; Drever Decl. ¶ 15. Upon joining the defendants' firm, the plaintiff signed an offer letter, which made no mention of an arbitration agreement, and a "Form U4" containing a predispute resolution clause explaining the Financial Industry Regulatory Authority's ("FINRA") arbitration rules. See Drever Decl. Ex. 1; Glink Decl. Ex. K. As to employment discrimination, the form provided:

> A claim alleging employment discrimination ... in violation of a statute is not required to be arbitrated under FINRA rules. Such a claim may be arbitrated at FINRA only if the parties have agreed to arbitrate it, either before or after the dispute arose. The rules of other arbitration forums may be different.

Glink Decl. Ex. K.

The defendants, however, had their own internal employee dispute resolution program entitled "CARE" (Convenient Access to Resolutions for Employees). Krentzman Decl. ¶ 3. The iteration of CARE in effect when the plaintiff joined the defendants' firm took effect in November 2009 and ran until June 2015. Id. This version of CARE and an explanatory guidebook were posted on the firm's intranet site. Id. The intranet site was available to all employees and contained a variety of general-employment and human-resources information. Id. The guidebook explaining the 2009-2015 CARE program stated:

> If you are a current or former employee who was underlined registered at any time during your employment with Morgan Stanley and you wish to pursue a statutory employment discrimination claim[,] ... you may, (1) proceed to arbitration, through (a) the arbitration forums administered by JAMS or AAA, if Morgan Stanley agrees, or (b) a self-regulatory organization (SRO), such as FINRA, or (2) go to court. For all other employment claims, underlined registered employees will continue to be required to submit their claims to binding arbitration as required by their Form U-4 Agreement.

Id. Ex. 1 at 9-10. Therefore, registered employees had the option of pursuing employment discrimination claims through arbitration by various alternative-dispute-resolution

Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 21 of 51

Lockette v. Morgan Stanley, Not Reported in Fed. Supp. (2018)

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

services or by filing suit in court. The 2009-2015 CARE Guidebook also explained:

**Changes to CARE**

Upon notice, the terms of CARE may change or be discontinued. Any material changes made to CARE will be announced in advance of their effective dates and will then become equally binding upon you and the Firm. In the event of such a change, pending claims will be governed by the Program in effect at the time of filing of the Request for Mediation/Arbitration Form(s) with the Program Administrator.

**\*2** Id. Ex. 1 at 14.

In 2015, the defendants announced that CARE would be expanded to make arbitration of all covered claims – including employment discrimination claims – mandatory for all employees, including registered employees; registered employees could no longer pursue covered claims in court. Id. ¶ 4. Beginning on May 20, 2015, the defendants notified employees of the expansion of the CARE program through an email to each employee's individualized work email account. Id. ¶¶ 4, 14. The emails were sent in waves, but the plaintiff was included in the first wave of emails, sent out on May 20, 2015. Id. ¶¶ 4, 10-12. The email's subject line read, "Expansion of CARE Arbitration Program," and its body, in relevant part, provided:

Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and given the success of the CARE program, Morgan Stanley is announcing the expansion of CARE and modifications to related Firm policies and programs to extend arbitration obligations for all US employees – registered and non-registered. Effective June 19, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a nonclass, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook. Please review the Arbitration Agreement [hyperlink] and CARE Guidebook [hyperlink] ....

**Next Steps**

By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration

provisions of the CARE Guidebook, unless you elect to opt out of the CARE Arbitration Program by completing, signing and submitting an effective CARE Arbitration Program Opt-Out Form [hyperlink] by June 19, 2015 .... If you remain employed and do not timely complete, sign and submit an effective CARE Arbitration Program Opt-Out Form, the Firm's records will reflect that you have consented and agreed to the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook....

Your decision to opt out of the Arbitration Agreement and the CARE Arbitration Program will not adversely affect your employment status with the Firm.

If you have questions about the Arbitration Agreement or the arbitration provisions in the CARE Guidebook, email carebox@morganstanley.com.

Id. Ex. 2 at 1-2. Thus, the email notified employees that (1) starting June 19, 2015, all employees – including registered employees – would be required to arbitrate all covered claims [1] through the CARE program; (2) unless an employee chose to opt out of CARE, the employee's continued employment would serve as a manifestation of assent to the program; and (3) employees could opt out by timely submitting an opt-out form. [2]

[1]      "Covered claims" were defined in the new arbitration agreement linked in the email. See Krentzman Decl. Ex. 3 at 1. There is no dispute that the claims in this case are "covered claims."

[2]      Information about the new CARE program and links to the updated CARE Guidebook were also posted on the defendants' intranet site. Krentzman Decl. ¶ 4.

**\*3** The plaintiff claims that he neither received nor saw the email until well after he was terminated in August 2016. Lockette Decl. ¶ 12. And even if he had, the plaintiff argues, the email was misleading and otherwise inadequate to provide notice of the defendants' changes to CARE. Thus, the plaintiff contends that, under either theory, no valid agreement to arbitrate his claims was formed. Further, the plaintiff adds that any agreement to the CARE expansion was void for a lack of consideration, and that he opted out of CARE through his involvement in a related class-action suit. None of these arguments are persuasive.

**Lockette v. Morgan Stanley**, Not Reported in Fed. Supp. (2018)

Case 3:17-cv-00101-RDM   Document 526-2   Filed 08/18/20   Page 22 of 51

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

## II.

Under 9 U.S.C. § 4, "a district court must enter an order to arbitrate upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 n.27 (1983) (quotation marks omitted). A court faced with a motion to compel arbitration and stay proceedings pending arbitration in a case covered by the Federal Arbitration Act has four tasks: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." Lewis Tree Serv., Inc. v. Lucent Techs., Inc., 239 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2002) (internal citation omitted), abrogated on other grounds by Katz v. Cellco P'ship, 794 F.3d 341 (2d Cir. 2015); see Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987). Only the first task is at issue here.

"The determination of whether parties have contractually bound themselves to arbitrate a dispute – a determination involving interpretation of state law – is a legal conclusion." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002). In answering that question, "the court applies a standard similar to that applicable for a motion for summary judgment. If there is any issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). "A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4." Manning v. Energy Conversion Devices, Inc., 833 F.2d 1096, 1103 (2d Cir. 1987).

"Arbitration clauses are a matter of contract law and, if valid, should be enforced." DuBois v. Macy's E. Inc., 338 F. App'x 32, 33 (2d Cir. 2009) (summary order). "[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002). Thus, "[w]hen deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the

formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); see also Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 749-50 (S.D.N.Y. 2017).

## III.

### A.

Because state contract law governs whether the parties agreed to arbitrate, it is first necessary to determine which state's law applies. As confirmed at oral argument, the parties do not dispute that New York law applies. [3]

[3] If it were disputed which state's law applied, and there were a conflict between the law of New York and that of the states whose laws might apply, then under New York's choice of law rules the Court would determine "which state has the most significant relationship to the transaction and the parties." Specht v. Netscape Commc'ns Corp., 150 F. Supp. 2d 585, 590 & n.7 (S.D.N.Y. 2001), aff'd, 306 F.3d 17 (2d Cir. 2002). The plaintiff's original employment contract was governed by New York law. See Drever Decl. Ex. 1 at 4. Moreover, the defendants' headquarters are in New York, and the plaintiff worked often in New York in addition to Pennsylvania and New Jersey. Compl. ¶ 2; Drever Decl. ¶ 19. Therefore, New York law would apply.

### B.

**\*4** The agreement to arbitrate must be proved by a preponderance of the evidence. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir. 1993). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (quotation marks omitted). Mutual assent need not be signified in writing; "[t]he manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." Id. (emphasis removed) (quotation marks omitted). Under New York law, "[a]n employee may consent to a modification to the terms of employment by continuing to work after receiving notice of the modification." Manigault v. Macy's E., LLC, 318 F.

Case 3:17-cv-00101-RDM  Document 526-2  Filed 08/18/20  Page 23 of 51

Lockette v. Morgan Stanley, Not Reported in Fed. Supp. (2018)

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

App'x 6, 8 (2d Cir. 2009) (summary order); see Isaacs v. OCE Bus. Servs., Inc., 968 F. Supp. 2d 564, 571 (S.D.N.Y. 2013) ("Under New York law, employee handbook revisions are binding when an employee continues to work after receiving notice of the revisions."). In such a circumstance, the employee's continued employment serves as an "objective manifestation[ ]" of the employee's intent to be bound. See Rightnour, 239 F. Supp. 3d at 750-52.

New York law, moreover, contains a presumption that a party has received an email when it is delivered to the party's email address in accordance with regular office procedures. See Clearfield v. HCL Am. Inc., No. 17cv1933, 2017 WL 2600116, at *2 (S.D.N.Y. June 15, 2017); see also Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985). To rebut this presumption, a plaintiff must produce admissible evidence showing that the email was not sent or was not received. Cf. Weiss v. Macy's Retail Holdings, Inc., No. 17-2219, 2018 WL 3409143, at *3 (2d Cir. July 12, 2018) (summary order) (holding that the plaintiff defeated New York's mailing presumption by "provid[ing] evidence of his family's regular procedure for reviewing with him the mail he received and assert[ing], with sworn support, that the relevant mailings did not arrive and go through that process"). But a plaintiff's mere denial of receipt of an email is insufficient. Clearfield, 2017 WL 2600116 at *2.

Here, the plaintiff contends that he and the defendants could not have formed a valid agreement because he did not receive the defendants' May 20, 2015, email noticing the changes to the CARE program. But New York's email presumption prevails. The plaintiff offers only a mere denial of receipt, a litany of more efficacious means by which the defendants could have issued its CARE-expansion proposal, and a case applying Illinois contract law in concluding that the plaintiff's denial of receipt of an email created a genuine dispute of fact, see Gupta v. Morgan Stanley Smith Barney, LLC, No. 17cv8375, 2018 WL 2130434 (N.D. Ill. May 9, 2018). None of these grounds is sufficient to rebut the presumption. Further, the defendants provide evidence that the email was addressed and delivered to the plaintiff's assigned email account, was not located in his SPAM folder, and did not trigger a "bounceback" email indicating it was not delivered or undeliverable. Krentzman Decl. ¶ 5 & Ex. 2; Waggoner Decl. ¶¶ 3-7 & Ex. 1. The defendants have also produced emails sent by the plaintiff dated May 22, 2018, indicating that the plaintiff was actively using his email account around the time of the May 20 email. See Drever Decl. Ex. 3. The

evidence therefore establishes that the plaintiff received the email.

The plaintiff next contends that the email did not provide sufficient notice of the essential terms of the defendants' offer. This argument also fails. The email's subject line, "Expansion of CARE Arbitration Program," clearly indicated its content. And the content itself conspicuously notified employees that: (1) all covered claims by employees – including registered employees such as the plaintiff – would be subject to mandatory arbitration; (2) unless employees opted out of CARE, their continued employment would be considered assent to the program; and (3) they could opt out by submitting a form before the program's effective date. The email also contained hyperlinks to the new arbitration agreement and CARE Guidebook. This is sufficient notice of the defendants' offer and its terms. See Pelligrino v. Morgan Stanley Smith Barney LLC, No. 17cv7865, 2018 WL 2452768, at *3 (S.D.N.Y. May 31, 2018) ("These facts – particularly, that Morgan Stanley sent the relevant email to Plaintiff, that the email provided a way to opt out of the expanded program, and that Plaintiff did not so opt out – compel the conclusion that Plaintiff is bound by the Arbitration Agreement and the CARE Guidebook's arbitration provisions in light of various principles of New York law." (quotation marks omitted) ); Clearfield, 2017 WL 2600116 at *2; cf. Meyer v. Uber Techs., Inc., 868 F.3d 66, 78 (2d Cir. 2017) ("That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice.").[4]

[4]     Although Meyer involved application of California law, "New York and California apply 'Substantially similar rules for determining whether the parties have mutually assented to a contract term.' " 868 F.3d at 74 (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012) ).

*5  Each case the plaintiff cites to the contrary is distinguishable. See Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 556–57 (1st Cir. 2005) (noting that the defendant did not typically use email to handle personnel matters and that the email in question did not state directly that the relevant policy "contained an arbitration agreement that was meant to effect a waiver of an employee's right to access a judicial forum"); Gupta, 2018 WL 2130434 (applying Illinois law); Schmell, 2018 WL 1128502 (applying New Jersey law and not noting an email, presumption similar to that under New York law); Rightnour, 239 F. Supp. 3d at

**Lockette v. Morgan Stanley, Not Reported in Fed. Supp. (2018)**

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

750-53 (involving a misleading email and a plaintiff's written objection to the defendant's offered arbitration program); Hudyka v. Sunoco, Inc., 474 F. Supp. 2d 712 (E.D. Pa. 2007) (applying Pennsylvania law in a case involving a nondescriptive email subject line, no essential terms in the email's body, and no hyperlink to a page explaining the defendant's arbitration program).

Finally, the plaintiff argues that the email is misleading and that he and the defendants therefore could not have entered into a valid agreement. The plaintiff points to the following language, contending that it downplayed the significance of the changes to the CARE program and read as if the changes applied to only nonregistered employees:

> Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and ... Morgan Stanley is announcing the expansion of CARE ... to extend arbitration obligations for all US employees – registered and non-registered. Effective June 19, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a nonclass, non-collective and non-representative action basis ....

The email is not misleading. Its text clearly conveys that registered employees, who once were required to arbitrate "most" claims, would now be required to arbitrate "all" covered claims. The email also contained hyperlinks to pages providing and explaining the new CARE program's terms and an email address to which questions could be sent.

In sum, under New York law the evidence establishes that the plaintiff received the email, and the email adequately set forth the essential terms of the defendants' expansion of the CARE program. Moreover, the email provided convenient ways – through hyperlinks and an email address for employees to direct questions – for the plaintiff to inquire about the changes to the CARE program.

**C.**

The plaintiff next argues that any purported agreement between the defendants and him is void for a lack of consideration.

However, continued employment generally serves as legal consideration sufficient to enforce an arbitration agreement. See Stern v. Espeed, Inc., No. 06cv958, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006). This is because "in at-will employment the employer has the right to discharge the employee ... without cause, and without being subject to inquiry as to his or her motives, [and] forbearance of that right is a legal detriment which can stand as consideration for a restrictive covenant." Zellner v. Stephen P. Conrad, M.D., P.C., 58 9 N.Y.S.2d 903, 907 (App. Div. 1992) (citation omitted). Thus, once the plaintiff continued his employment, the defendants chose to forgo their right to terminate him without cause and provided the requisite consideration. [5]

[5] The plaintiff also claims that FINRA Rule 13200 requires the defendants to arbitrate claims by registered employees solely before FINRA and points out that the CARE program requires certain claims by registered employees, including employment discrimination claims, to be arbitrated before JAMS, a non-FINRA dispute-resolution service. But in Credit Suisse Securities (USA) LLC v. Tracy, the Court of Appeals for the Second Circuit held that "[FINRA] Rule 13200 does not prohibit the enforcement of pre-dispute waivers of a FINRA arbitral forum." 812 F.3d 249, 257 (2d Cir. 2016). The CARE program therefore does not violate FINRA Rule 13200 by requiring some claims to be arbitrated before JAMS.

**D.**

**\*6** Finally, the plaintiff summarily asserts that he opted out of the defendants' arbitration proposal by virtue of his membership in the certified plaintiff class in Jaffe v. Morgan Stanley & Co., No. 06cv3903 (N.D. Cal.). [6] In that case, class counsel opted out of the defendants' CARE program on October 2, 2015, on behalf of the entire class. But the Jaffe class consisted of "African-Americans and Latinos employed as Financial Advisors or Registered Financial

**Lockette v. Morgan Stanley, Not Reported in Fed. Supp. (2018)**

2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

Advisor Trainees in the Global Wealth Management Group of Morgan Stanley & Co. Incorporated or its predecessor, Morgan Stanley DW Inc. at any time between October 12, 2002 and December 3, 2007." Jaffe v. Morgan Stanley & Co., No. 06cv3903, 2008 WL 346417, at *3 (N.D. Cal. Feb. 7, 2008). The plaintiff does not claim to have ever been employed as such. Rather, the plaintiff claims to have worked at Smith and Barney until its merger with Morgan Stanley in 2009. Lockette Decl. at ¶ 4, In any event, the opt out for the Jaffe class came months after the defendants' opt-out deadline and was therefore ineffective.[7]

[6]    The plaintiff also mentions – but does not state that he was a part of – two other class-action suits in which class counsel opted out of the defendants' CARE program, Augst-Johnson v. Morgan Stanley & Co., No. 06cvll42 (D.D.C.), and Frazier v. Morgan Stanley & Co., No. 16cv804 (S.D.N.Y.). The plaintiff would not have qualified for the subject classes in those cases.

[7]    Although it is unclear from the plaintiff's brief, he appears to argue that the defendants' deadline does not apply because the defendants improperly failed to inform the Jaffe class counsel about their CARE-expansion proposal. The plaintiff thus maintains that it would be inequitable not to enforce the class-wide opt out as applied to him. But the plaintiff does not explain why the defendants' failure to notify the class counsel was improper. And the lone authority the plaintiff cites, Weinstein v. Jenny Craig Operations, concerns a defendant who, unlike here, "implemented its new arbitration agreement on the very day the [relevant] litigation was commenced." 17 N.Y.S.3d 407, 408 (App. Div. 2015). Accordingly, the court held that

> [g]iven the authority granted to the [trial] court to protect putative class members and the fairness of the process, the court properly exercised its discretion by drawing the inference that the agreements had been implemented in response to this litigation and to preclude putative class members. Thus, the court properly declined to enforce those agreements signed after commencement of this litigation.

Id. (citations omitted). Here, the plaintiff has raised no issues of fact similar to those in Weinstein.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to compel arbitration is **granted**. This case is stayed pending the conclusion of the arbitration. The Clerk of Court is directed to close this case on the active docket of the Court subject to reinstatement depending on any developments in the arbitration.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4778920, 2018 Fair Empl.Prac.Cas. (BNA) 364,672

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

L

2020 WL 4280677

Only the Westlaw citation is currently available.

United States Court of Appeals, Third Circuit.

Commonwealth of PENNSYLVANIA

v.

NAVIENT CORP.; Navient Solutions LLC Appellants

No. 19-2116
|
Argued March 11, 2020
|
(Opinion filed: July 27, 2020)

**Synopsis**

**Background:** Commonwealth of Pennsylvania brought enforcement action against lender, alleging its actions in originating and servicing student loans constituted unfair, deceptive, and abusive practices in violation of both the Consumer Protection Act and the Pennsylvania Protection Law. The United States District Court for the Middle District of Pennsylvania, No. 3-17-cv-01814, Robert D. Mariani, J., denied motion to dismiss for failure to state a claim but certified questions of law for interlocutory appeal.

**Holdings:** After grant of permission to appeal, the Court of Appeals, Ambro, Circuit Judge, held that:

[1] Commonwealth court bring concurrent enforcement action against lender after Consumer Financial Protection Bureau had already filed suit against lender;

[2] Higher Education Act's express preemption of state claims premised on any disclosure requirement imposed by state law regarding covered loans does not expressly preempt claims to the extent they are alleging affirmative misrepresentations rather than failures of disclosure; and

[3] Higher Education Act does not field preempt the regulation of student loans.

Affirmed.

**Procedural Posture(s):** Interlocutory Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (29)

**[1]** **Education** 🗝 Federally guaranteed loans

Congress enacted the Higher Education Act in order to keep the college door open to all students of ability, regardless of socioeconomic background. 20 U.S.C.A. § 1001 et seq.

**[2]** **Federal Courts** 🗝 Proceedings for appeal

When reviewing an interlocutory appeal of a certified question of law, Court of Appeals exercises plenary review over the question certified. 28 U.S.C.A. § 1292(b).

**[3]** **Statutes** 🗝 Absence of Ambiguity; Application of Clear or Unambiguous Statute or Language

Courts typically do not look beyond statutory language where the meaning is clear.

**[4]** **Statutes** 🗝 Relation to plain, literal, or clear meaning; ambiguity

Courts may look behind a statute only when the plain meaning produces a result that is not just unwise but is clearly absurd.

**[5]** **Finance, Banking, and Credit** 🗝 Loans, Lending, and Credit; Interest

Commonwealth of Pennsylvania could bring concurrent enforcement action against student loan lender under the Consumer Financial Protection Act of 2010 after the Consumer Financial Protection Bureau had already filed suit against lender, even though Act provided for Bureau's intervention in any state-filed litigation; other provisions of Act expressly prohibited concurrent claims, but the section providing for state enforcement actions did not do so. 12 U.S.C.A. § 5552.

**[6]**    Federal Courts 🔑 Constitutional questions

Party cannot bring a freestanding constitutional challenge for first time in interlocutory appeal.

**[7]**    States 🔑 Conflicting or conforming laws or regulations

Supremacy clause invalidates any state law that interferes with or is contrary to federal law. U.S. Const. art. 6, cl. 2.

**[8]**    States 🔑 Preemption in general

While not rigidly distinct categories, there are three classes of preemption: (1) express preemption, (2) conflict preemption, and (3) field preemption.

**[9]**    States 🔑 Congressional intent

Express preemption applies where Congress explicitly preempts state law in the statutory language.

**[10]**    States 🔑 Conflicting or conforming laws or regulations

Conflict preemption occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.

**[11]**    States 🔑 Occupation of field

Field preemption focuses on when Congress does not expressly preempt state law but where federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law in that field.

**[12]**    States 🔑 Occupation of field

Where Congress expresses an intent to occupy an entire field, states are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards.

**[13]**    States 🔑 Congressional intent

Intent of Congress is the ultimate touchstone of preemption analysis.

**[14]**    States 🔑 Congressional intent

In discerning congressional intent as to preemption, court looks to the structure and purpose of the statute as a whole, as revealed not only in the text, but through the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

**[15]**    States 🔑 Congressional intent

In undertaking preemption analysis, court starts with basic assumption that Congress did not intend to displace state law.

**[16]**    States 🔑 Preemption in general

The presumption against congressional intent to preempt state law applies with particular force when the state is exercising its police power.

**[17]**    States 🔑 Congressional intent

The presence of an express preemption provision does not end court's preemption inquiry; while it means court need not inquire whether Congress intended to preempt some state law, court still must examine congressional intent as to the scope of the preemption provision.

**[18]**    States 🔑 Congressional intent
Statutes 🔑 Context
Statutes 🔑 Statutory scheme in general

To identify the domain expressly preempted by Congress, court reads the words of a statute in their context and with a view to their place in the overall statutory scheme.

**[19]**   **Education**   ⚷   Federally guaranteed loans

**States**   ⚷   Education

Higher Education Act expressly preempts any state claim premised on any disclosure requirement imposed by state law regarding loans made, insured, or guaranteed pursuant to program authorized by Title IV of Act. 20 U.S.C.A. § 1098g.

**[20]**   **Fraud**   ⚷   Fraudulent Concealment

**Fraud**   ⚷   Duty to disclose facts

To succeed on a failure-to-disclose claim, the plaintiff must establish that there was a duty to speak and the duty was breached.

**[21]**   **Fraud**   ⚷   Duty to disclose facts

A claim alleging an affirmative misrepresentation does not rely on a duty to disclose.

**[22]**   **Education**   ⚷   Federally guaranteed loans

**States**   ⚷   Education

Higher Education Act's express preemption of state claims premised on any disclosure requirement imposed by state law regarding covered loans does not expressly preempt claims to the extent they are alleging affirmative misrepresentations rather than failures of disclosure. 20 U.S.C.A. § 1098g.

**[23]**   **Fraud**   ⚷   Elements of Actual Fraud

Under Pennsylvania law, to state a claim for intentional misrepresentation a plaintiff must allege (1) a representation; (2) which is material; (3) made falsely, with knowledge of its falsity; (4) with the intent of misleading another; (5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance. Restatement (Second) of Torts § 525 (1977).

**[24]**   **Fraud**   ⚷   Fraudulent Concealment

Under Pennsylvania law, the tort of intentional non-disclosure has the same elements as intentional misrepresentation except, in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation.

**[25]**   **Fraud**   ⚷   Fraudulent Concealment

Under Pennsylvania law, concealment of a material fact can amount to actionable fraud if the seller intentionally concealed a material fact to deceive the purchaser.

**[26]**   **Education**   ⚷   Federally guaranteed loans

**States**   ⚷   Education

Uniformity is not an intended purpose of the provision of the Higher Education Act expressly preempting state claims premised on any disclosure requirement imposed by state law regarding covered loans. 20 U.S.C.A. § 1098g.

**[27]**   **States**   ⚷   Occupation of field

Court does not apply preemption from the comprehensive nature of a regulation alone.

**[28]**   **States**   ⚷   Occupation of field

Field preemption exists where Congress has legislated so comprehensively in an area of law that it has left no room for supplementary state legislation.

**[29]**   **Education**   ⚷   Federally guaranteed loans

**States**   ⚷   Education

Higher Education Act does not field preempt the regulation of student loans. 20 U.S.C.A. § 1098g.

Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. Civil Action No. 3-17-cv-01814), District Judge: Honorable Robert D. Mariani

**Attorneys and Law Firms**

Daniel T. Brier, Myers Brier & Kelly, 425 Spruce Street, Suite 200, Scranton, PA 18503, James P. Brown, Jennifer Levy, Patrick Brown, Mike Kilgarriff, Kirkland & Ellis, 1301 Pennsylvania Avenue, N.W., Washington, DC 20004, Michael Shumsky (Argued), Hyman Phelps & McNamara, 700 Thirteenth Street, N.W., Suite 1200, Washington, DC 20005, Counsel for Appellants

Josh Shapiro, Attorney General State of Pennsylvania, Howard G. Hopkirk (Argued), Senior Deputy Attorney General, Jesse F. Harvey, Chief Deputy Attorney General, John Abel, Senior Deputy Attorney General, Jill T. Ambrose, Deputy Attorney General, Office of the Attorney General of Pennsylvania, Strawberry Square, Harrisburg, PA 17120, Nicholas Smyth, Senior Deputy Attorney General, Office of Attorney General of Pennsylvania, 1251 Waterfront Place, Mezzanine Level, Pittsburgh, PA 15222 Counsel for Appellee

Mary McLeod, General Counsel, John Coleman, Deputy General Counsel, Steven Y. Bressler, Assistant General Counsel, Lawrence Demille-Wagman, Senior Litigation Counsel, Christopher Deal (Argued), Consumer Financial Protection Bureau, 1700 G Street, N.W., Washington, DC 20552, Counsel for Amicus Appellee Consumer Financial Protection Bureau

Faith E. Gay, Maria Ginzburg, Yelena Konanova, Margaret Larkin, Ryan W. Allison, Selendy & Gay, 1290 Avenue of the Americas, 17th Floor, New York, NY 10104, Mark Richard, Phillips, Richard & Rind, P.A., 9360 S.W., 72nd Street, Suite 283, Miami, FL 33173, Counsel for Amicus Appellee American Federation of Teachers

Letitia James, Attorney General State of New York, Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, Ester Murdukhayeva, Assistant Solicitor General of Counsel, Office of Attorney General of New York, 28 Liberty Street, 23rd Floor, New York, NY 10005, Counsel for Amicus Appellee State of New York

Jon Greenbaum, Lawyers' Committee for Civil Rights Under Law, 1500 K Street, N.W., Suite 900, Washington, DC 20005, Counsel for Amicus Appellee Lawyers Committee for Civil Rights Under Law

Benjamin J. Roesch, Jensen Morse Baker, 1809 Seventh Avenue, Suite 410, Seattle, WA 98101, Counsel for Amicus Appellees Student Borrower Protection Center; Seniorlaw Center; Center for Responsible Lending; New Jersey Citizen Action; Lawyers Committee for Civil Rights Under Law; Community Legal Services of Philadelphia

Before: McKEE, AMBRO, and PHIPPS, Circuit Judges

OPINION OF THE COURT

AMBRO, Circuit Judge

**\*1** We decide two issues in this appeal: first, whether the Commonwealth of Pennsylvania may bring a parallel enforcement action against Navient Corporation and Navient Solutions, LLC (together, "Navient") under the Consumer Financial Protection Act of 2010 (the "Consumer Protection Act"), codified in relevant part at 12 U.S.C. § 5552, after the Consumer Financial Protection Bureau (the "Bureau") has filed suit; and second, whether and to what extent the federal Higher Education Act of 1965 (the "Education Act"), 20 U.S.C. § 1001 *et seq.*, preempts the Commonwealth's loan-servicing claims under its Unfair Trade Practices and Consumer Protection Law (the "PA Protection Law"), 73 Pa. Cons. Stat. §§ 201-1 to 201-9.3.

We hold that the plain language of the Consumer Protection Act permits the Commonwealth's concurrent action. And we follow our sister Circuits in holding that although the preemption provision of the Education Act preempts claims based on failures to disclose information as required by the statute, it does not preempt claims based on affirmative misrepresentations. See *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 911 (11th Cir. 2020); *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 642 (7th Cir. 2019). *cf. Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010). As the Commonwealth's claims under the PA Protection Law based on affirmative misrepresentations and misconduct are not preempted, we affirm the District Court's denial of Navient's motion to dismiss.

**I. BACKGROUND**

### A. Statutory and Regulatory Background

**[1]**  Congress enacted the Education Act in order "to keep the college door open to all students of ability, regardless of socioeconomic background." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 640 (7th Cir. 2015) (citation omitted). To that end, the Act established two federal student loan programs that are designed to help every student afford the college or trade school of his or her choice: (i) the Direct Loan Program, under which the Department of Education (the "DOE") lends federal taxpayer dollars directly to student borrowers, *see* 20 U.S.C. § 1087a *et seq.*; and (ii) the Federal Family Education Loan Program (the "Indirect Loan Program"), under which the federal Government guarantees privately funded loans to student borrowers, *see* 20 U.S.C. § 1071 *et seq.*

The federal Government does not directly administer these loan programs. The DOE contracts with third parties like Navient to administer and service loans under the Direct Loan Program and imposes contractual requirements that govern what servicers may do when acting on the DOE's behalf. For both Direct Loan Program and Indirect Loan Program loans, the DOE has promulgated comprehensive regulations that control the student loan process, including the types of charges that are permitted, *see* 34 C.F.R. § 682.202; the kinds of repayment plans that are available, *see* §§ 682.209, 685.208; and the ways in which those plans can be restructured, *see* §§ 682.210–11, 685.204–05.

**\*2**  Federal student loans are eligible for several types of deferred payment plans to help borrowers avoid defaulting. Servicers may grant a "forbearance" to borrowers having financial trouble during the repayment period. This "permit[s] the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously were scheduled." § 682.211(a)(1). The DOE's regulations specify the circumstances under which a loan servicer may offer forbearance. *See, e.g.*, §§ 682.211(a)(2), 685.205. Borrowers who enter forbearance face significant costs, such as, among other things, having their monthly payments increase due to accumulated unpaid interest.

DOE regulations dictate how loan issuers and servicers must communicate with borrowers about forbearance. Lenders and servicers must make extensive disclosures, including those related to fees and repayment options, at many stages of a loan's lifecycle: "before disbursement," 20 U.S.C. § 1083(a); "before repayment," § 1083(b); "during repayment," §

1083(e); to "a borrower having difficulty making payments," § 1083(e)(2); and to "a borrower who is 60 days delinquent in making payments on a loan," § 1083(e)(3). Before placing borrowers into forbearance, loan servicers must disclose its terms, including that deferred interest will be capitalized. *See* §§ 1083(a)(6)(B), 1083(e)(2); *see also* § 1087e(p); 34 C.F.R. § 682.211. Servicers must repeat that disclosure within 30 days of granting forbearance and must disclose every 180 days during the forbearance period. *See* §§ 1083(b), 1087e(p); 34 C.F.R. § 682.211(e)(2).

In addition to forbearance, loan servicers offer an array of alternate repayment plans, referred to as Income-Driven Repayment ("IDR") plans, when borrowers encounter difficulties during the repayment period, each with varying qualification requirements and repayment provisions plans. Borrowers who enter an IDR plan do not defer payments entirely but instead adjust their monthly payments. To qualify for IDR, borrowers must fill out a federal application, submit supporting documents, and then recertify their income and family size annually. 34 C.F.R. §§ 682.215(e), 685.221(e).

As with forbearance, federal law details what, when, and how loan servicers must communicate with borrowers regarding the availability of IDR. *See* 20 U.S.C. § 1087e(p); 34 C.F.R. § 682.205(e). Once repayment begins, if "a borrower ... has notified the lender that the borrower is having difficulty making payments," the servicer must provide a written disclosure "in simple and understandable terms" that details both the expected costs associated with forbearance if the borrower chooses that option, and instructions for seeking IDR if a student borrower seeks an alternative to forbearance. 20 U.S.C. § 1083(e)(2) (Indirect Loan Program); *see also* § 1087e(p) (Direct Loan Program). [1]

[1]  In addition, among other disclosures, federal law requires lenders and loan servicers to disclose: the availability of IDR when the loan is disbursed and before repayment begins, §§ 1083(a)(11), (b)(6); 34 C.F.R. § 682.205(a)(2)(xii) (Indirect Loan Program); § 1087e(p) (Direct Loan Program); the availability of, and procedures for enrolling in, IDR before repayment begins, 20 U.S.C. § 1077(a)(2)(H); 34 C.F.R. § 682.205(e) (Indirect Loan Program); 20 U.S.C. §§ 1087e(d)(1)(D)–(E), 1087e(p) (Direct Loan Program); and the specified information regarding IDR on every statement sent to the borrower, including "a reminder that the borrower has the option to change repayment

plans," and a link to the DOE's IDR website, 20 U.S.C. § 1083(e)(1)(I); 34 C.F.R. § 682.205(a)(3) (ix) (Indirect Loan Program); § 1087e(p) (Direct Loan Program).

**\*3** DOE regulations also require that loan servicers provide oral disclosures regarding forbearance and IDR at other times. When a defaulted borrower orally requests a forbearance, the servicer must "orally review with the borrower the terms and conditions of the forbearance, including the consequences of interest capitalization, and all other repayment options available to the borrower," and must send a written notice with similar information. 34 C.F.R. §§ 682.211(d)(iii), 685.205(a) (8). DOE regulations do not require federal loan servicers to disclose the availability of IDR on each phone call. Federal law does require that multiple written or electronic notices and disclosures be provided to borrowers, including with each bill or statement. 20 U.S.C. §§ 1083(e)(1) (Indirect Loan Program), 1087e(p) (Direct Loan Program).

The Education Act grants the DOE broad discretion to regulate these loan programs, *see, e.g.*, § 1082(a)(1), and expressly requires the DOE to "prescribe standardized forms and procedures regarding" deferments, forbearance, and servicing, § 1082(I)(1)(D)–(F). These standardized procedures must "include all aspects of the loan process," § 1082(I)(2)(A), "be designed to minimize administrative costs and burdens," *id.*, and standardize and simplify procedures related to servicing, § 1082(I)(3)(A). [2]

[2]
> In the last decade, the federal Government considered steps to promote awareness of IDR. For example, a 2012 Presidential Memorandum noted that "too few borrowers are aware of the options available to them to help manage their student loan debt, including reducing their monthly payment through [IDR] ...." *See* The White House, June 7, 2012 Memorandum on Improving Repayment Options for Federal Student Loan Borrowers, 77 Fed. Reg. 35,241 (June 13, 2012), https://tinyurl.com/y5o39q4z. In July 2016, the DOE proposed that federal regulations should be amended to require that federal loan servicers employ "staff who receive enhanced training related to repayment and forgiveness options," and who in turn would (A) "assess the borrower's long-term and short-term financial situation and consider all available information about the borrower's income and family size," and

(B) "discuss the concept of [IDR] plans" with struggling borrowers. DOE, Policy Direction on Federal Student Loan Servicing (July 20, 2016), https://tinyurl.com/yxnkrava. In 2017, however, the DOE decided not to implement the proposed regulatory changes. *See* Letter from Secretary of Education re Student Loan Servicer Recompete (Apr. 11, 2017), https://tinyurl.com/y2v2m8uq.

## B. Navient's Conduct

### 1. Loan-Originating Related Conduct

Navient has been "engaged in trade and commerce by offering, selling, marketing and promoting student loans to borrowers and by servicing and collecting on borrowers' student loans." App. 105. [3] From 2004 until 2014, Navient's predecessors also were engaged in that business. [4]

[3]
> The alleged facts recounted herein are drawn from the Commonwealth's complaint.

[4]
> In 2014, Navient assumed the liabilities of its predecessors—SLM Corporation and Sallie Mae, Inc.—and took over their student loan servicing and debt collection business. The action against Navient includes conduct by those predecessors. For convenience, we refer to Navient, rather than its predecessors, during the time periods the latter entities were involved.

Until 2007, many school financial aid offices maintained a preferred lenders list to give students guidance in choosing between different lenders. Navient attempted to place itself at the top of those lists to obtain access to schools' potential borrowers. Navient marketed custom loan packages to schools, including Indirect Loan Program loans, private loans for borrowers who qualified for Navient's standard private student loan products ("prime loans"), and private loans for students who did not qualify for standard private student loans ("subprime loans"). This benefited schools by maximizing enrollment and Navient by giving it a greater share of the market.

**\*4** Subprime loans typically had high variable interest rates and high origination fees. Student borrowers who took out subprime loans were not informed that the loans were part of a subprime lending program and had a high likelihood of default. Navient internally described this strategy as "Current

Strategy is Working: —Use subprime to win school deals and secure [Indirect Loan Program] and standard private volume—View economics on an all-in basis." App. 119. A 2007 internal email describes one of Navient's subprime loan programs as "the baited hook to gain [Indirect Loan Program] volume." App. 119.

Navient allegedly loosened its required credit criteria so that subprime borrowers could qualify without knowing the true risk of default. Between 2000 and 2006 there was a substantial increase in the number of high-risk subprime loans made by Navient to students attending schools with a less than a 50% graduation rate and to students with credit scores of less than 640. From 2000 to 2007, between 68% and 87% of Navient's high-risk loans defaulted. [5]

[5]    In their Amicus Curiae brief, New York and its joining States allege widespread abuses by servicers like Navient that have harmed millions of borrowers by impeding their access to IDR plans and public-service loan-forgiveness programs. For example, an investigation by Illinois into Navient found that it routinely steered consumers into forbearances rather than IDR plans. California alleges that Navient misled struggling borrowers about the amount needed to bring their accounts current and induced them into making unnecessarily high payments. California, Washington, and Mississippi have sued Navient for these and other deceptive practices. The Attorneys General for Colorado, Kansas, Oregon, New Jersey, New York, and the District of Columbia have also issued civil investigative demands to Navient. Amicus Curiae Br. for States of New York et al. 7–13.

### 2. Loan Servicing-Related Conduct

#### a. Navient Allegedly Steered Borrowers into Forbearance.

Navient allegedly has encouraged borrowers repeatedly to communicate with its representatives for assistance, only to steer them into forbearance rather than more affordable alternatives like IDR plans. The Commonwealth argues that this was done because enrolling a borrower in forbearance can be completed in a few minutes without paperwork, while enrolling in an IDR plan requires the submission of paperwork and annual recertification, and Navient representatives were compensated based on average call time. Hence enrolling borrowers in IDR plans was costly.

Navient allegedly enrolled many borrowers into multiple consecutive forbearances even though they had demonstrated a long-term inability to repay their loans. For instance, between January 2010 and March 2015, Navient enrolled more than 1.5 million borrowers in multiple consecutive forbearances instead of helping them enroll in an IDR plan. During the same time period, the number of borrowers that Navient enrolled in forbearance generally exceeded the number of borrowers enrolled in IDR plans. Navient representatives would sometimes place borrowers in voluntary forbearance even though they would have qualified for $0 per month payments in an IDR plan. Navient also unnecessarily placed borrowers in forbearance before ultimately placing them in an IDR plan. The majority of IDR plan participants were enrolled in forbearance for more than three months before ultimately being enrolled in an IDR plan. This resulted in borrowers being adversely affected by the addition of interest to the loan's principal and losing credit for months that would have been counted toward loan forgiveness. [6]

[6]    Amici Curiae the Student Borrower Protection Center and joining organizations state that approximately 43 million people owe over $1.4 trillion on their federal student loans. Amici argue that "the consequences of servicers' misconduct can be catastrophic for struggling borrowers' ... lives." Amicus Curiae Br. for Student Borrowers Protection Center et al. 2–3. They further contend that older borrowers, facing limited and declining income and less access to technology, and borrowers of color (who are over-represented in the student bodies of predatory for-profit schools), are disproportionately affected by servicer misconduct. *Id.* at 3–4. It thus "systematically strips wealth from ... communities which are already economically disadvantaged." *Id.* at 18.

    Amicus Curiae the American Federation of Teachers ("AFT") argues that Navient's alleged schemes have especially affected the long-term cost of student loans for public servants, like AFT members, many of whom would be on track for the Public Student Loan Forgiveness program (the "Loan Forgiveness Program"), but who were

steered into forbearance by Navient. "Congress created the [Loan Forgiveness Program] in 2007, promising to forgive the complete balance of federal student loan debt for any public employee who makes 120 on-time payments on a qualifying repayment plan." Amicus Curiae Br. for AFT at 5. Yet, as a result of servicers' misconduct, public employees steered into forbearance by servicers made fewer qualifying payments even as unpaid interest accumulated on their account. *Id.* at 7–16.

### b. Issues with Recertification of IDR Plans

**\*5**  Between July 2011 and March 2015, more than 60% of Navient's borrowers who enrolled in IDR plans failed timely to renew their enrollment. From January 2010 to December 2012, Navient's annual renewal notices for IDR plans (sent via U.S. mail) allegedly did not provide notice of the actual date by which renewal applications had to be submitted. The notices stated that the IDR period would expire in "approximately 90 days" and that the "renewal process may take at least 30 days" to complete. App. 139. The Commonwealth alleges that the notices failed to advise borrowers of the negative consequences of submitting an untimely or incomplete application and of having a break in their enrollment in an IDR plan (including an immediate increase in monthly payments, accrued interest being added to their loan principal, loss of interest subsidies, and delays in loan forgiveness).

Between mid-2010 and March 2015, some borrowers had to log into an electronic portal using their username and password to view the notices. Seventy-three percent of Navient's federal loan borrowers agreed to receive electronic communications. Borrowers were sent an e-mail with a hyperlink to Navient's website. However, the e-mail did not provide any indication of the purpose of the notice.

### c. Misrepresentations Related to Cosigner Releases

A cosigner is generally required for a borrower to obtain a private student loan. After a borrower begins repayment, he or she can usually apply to release the cosigner after meeting eligibility criteria. As of January 2010, one of the eligibility criteria is that the borrower makes a minimum number of "consecutive, on-time payments." When a borrower makes multiple payments at one time, Navient applies the payment for the current month and then places the borrower in a

"paid ahead" status for subsequent months. App. 144. The borrower is then sent a bill for $0 for the subsequent months covered by the excess payment. However, until mid-2015, Navient allegedly treated these "non-payments" as a failure to make consecutive payments, reset the clock, and considered the consecutive on-time monthly payments as being zero. This increased the number of consecutive payments necessary to release a cosigner. Nothing on Navient's website, billing statements, or other documents provided to borrowers indicated that that the clock would be reset.

### d. Repeated Payment Processing Errors

The Commonwealth alleges that, since at least 2011, many borrowers have complained that Navient has misallocated or misapplied submitted payments, resulting in borrowers and cosigners being improperly charged late fees and increased interest charges, and in inaccurate negative information being furnished to consumer reporting agencies. Many borrowers have complained that, even after getting Navient to correct an error, the same payment-processing errors occurred repeatedly. Navient has allegedly failed to correct these recurring problems.

### C. Procedural History

In October 2017, the Commonwealth filed a complaint against Navient alleging its actions in originating and servicing student loans constitute unfair, deceptive, and abusive practices in violation of both the Consumer Protection Act and the PA Protection Law. The complaint contained nine counts: Count I under the PA Protection Law for unfairly and deceptively originating risky, expensive loans, which had a high likelihood of default, among other unlawful conduct; Count II under the PA Protection Law for steering borrowers suffering long-term financial hardship into costly forbearances; Count III under the Consumer Protection Act for steering borrowers suffering long-term financial hardship into costly forbearances; Count IV under the PA Protection Law for loan servicing failures related to recertification of IDR plans; Count V under the Consumer Protection Act for loan servicing failures related to recertification of IDR plans; Count VI under the PA Protection Law for misrepresentations relating to cosigner releases; Count VII under the Consumer Protection Act for misrepresentations relating to cosigner releases; Count VIII under the PA Protection Law for repeated payment-

processing errors; and Count IX under the Consumer Protection Act for repeated payment-processing errors.

**\*6** Nine months before the Commonwealth filed its suit, in January 2017, the Bureau, the State of Illinois, and the State of Washington filed similar lawsuits alleging, among other things, that Navient failed to disclose adequately the availability of IDR programs to federal student loan borrowers. *See* Compl., *Consumer Fin. Prot. Bureau v. Navient Corp., et al.*, No. 17-cv-101, 2017 WL 191446 (M.D. Pa., filed Jan. 18, 2017); Compl., *Illinois v. Navient Corp., et al.*, No. 2017-CH-00761, 2017 WL 374522 (Ill. Cir. Ct., filed Jan. 18, 2017); Compl., *Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (Wash. Super. Ct., filed Jan. 18, 2017). Navient alleges that the Commonwealth's claims are "a virtual cut-and-paste of the [Bureau]'s .... complaint." Navient Br. 21. It admits that the Commonwealth's complaint differs in that it challenges (A) the pre-2007 loan origination practices of Navient's corporate predecessor (Count I), and (B) Navient's alleged "fail[ure] to disclose a date certain by which a borrower must submit materials to recertify an [IDR] plan," App. 155–56 (Count IV); Navient Br. 22.

In December 2017, Navient filed a motion to dismiss the complaint for failure to state a claim. The District Court denied the motion in its entirety. *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018). First, it rejected Navient's argument that the Consumer Protection Act precluded a concurrent lawsuit by Pennsylvania, and it held that Section 5552(a)(1) of the Consumer Protection Act, 12 U.S.C. § 5552(a)(1), unambiguously confers a right on state attorneys general to file suit to enforce the Consumer Protection Act, and that there is nothing in the Act that would bar a parallel state action. *Id.* at 543–47. Second, the Court rejected Navient's preemption argument and concluded that the Commonwealth's claims survived under both express-preemption and conflict-preemption principles. It held that the Commonwealth's claims were not an attempt to impose disclosure requirements on Navient, but were instead distinct allegations of unfair and deceptive business practices brought pursuant to Pennsylvania's traditional state police powers. *Id.* at 548–52. It then ruled that conflict preemption did not apply because uniformity was not an express goal of Congress in enacting the Education Act and, even if it were, this goal is not defeated by allowing the Commonwealth to enforce its consumer protection laws. *Id.* at 553.

The District Court certified to us three questions of law for interlocutory appeal under 28 U.S.C. § 1292(b),

*see Pennsylvania v. Navient Corp.*, No. 17-cv-1814, 2019 WL 1052014 (M.D. Pa. Mar. 5, 2019), and we granted permission to appeal two of them, specifically: (1) whether the Commonwealth may bring a parallel enforcement action under the Consumer Protection Act after the Bureau has filed suit; and (2) whether the Education Act preempts the Commonwealth's loan-servicing claims under the PA Protection Law.

## II. DISCUSSION [7]

[7]
The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1292(b), as we certified two questions of law for interlocutory appeal. "When reviewing an interlocutory appeal under 28 U.S.C. § 1292(b), we exercise plenary review over the question certified." *Barbato v. Greystone All., LLC*, 916 F.3d 260, 264 (3d Cir. 2019) (citation omitted). In reviewing a motion to dismiss, we likewise review any legal determinations anew and presume that a complaint's factual allegations are true. *see James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

### A. The Consumer Protection Act Permits Concurrent State Claims.

[2] Navient argues that that Consumer Protection Act does not allow the state attorney general to bring a "copycat" claim "on behalf of the same borrowers, against the same defendants, for the same alleged conduct." Navient Br. 25. Navient acknowledges that the Consumer Protection Act expressly permits state attorneys general to file Consumer Protection Act claims, but argues that they may only do so where the Bureau itself has not filed a lawsuit. To support this interpretation, Navient cites the Consumer Protection Act's requirement that state attorneys general notify the Bureau before filing those claims and its grant of authority for the Bureau to intervene in states' lawsuits.

#### 1. The Plain Meaning of the Consumer Protection Act Permits State Concurrent Actions.

**\*7** [3] [4] [5] The plain language of the Consumer Protection Act permits state concurrent actions. Section 5552 provides that "the attorney general ... of any State may bring a civil action ... to enforce provisions of this title ... and to secure remedies under provisions of this title or remedies otherwise

provided under other law." 12 U.S.C. § 5552(a)(1). Courts typically do not look beyond statutory language where the meaning is clear. *Valansi v. Ashcroft*, 278 F.3d 203, 209 (3d Cir. 2002). They "may look behind a statute only when the plain meaning produces a result that is not just unwise but is clearly absurd." *In re Visteon Corp.*, 612 F.3d 210, 220 (3d Cir. 2010) (citation and internal quotation omitted). Here the plain meaning of § 5552 is that the Pennsylvania attorney general may bring an action to enforce the Consumer Protection Act.

Other provisions of the Consumer Protection Act do expressly prohibit concurrent claims, but not § 5552. Thus, under the canon of statutory construction announced in *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 23, 104 S.Ct. 296 (citation omitted). Three other provisions of the Consumer Protection Act prohibit concurrent claims. Section 5514 prohibits the FTC or the Bureau from filing a civil action against a defendant if the other agency has previously filed an action against the same defendant based on the same "provision of law" and "any violation alleged in the complaint." 12 U.S.C. § 5514(c)(3)(B)(i). Section 5515 grants the Bureau primary enforcement authority over "very large" depository institutions and provides "[b]ackup enforcement" for the other federal bank regulators to act if the Bureau does not. § 5515(c)(3). And § 5538 provides for a state's right of action to enforce mortgage rules promulgated by the Bureau, but contains an explicit bar on concurrent actions by states when the Bureau has already filed its own action against a party. § 5538(b)(6).

Thus, even if the language of § 5552(a)(1) were ambiguous —and it is not—a court should presume that Congress's omission of an explicit prohibition against concurrent claims from § 5552(a)(1) was intentional because Congress explicitly prohibited concurrent claims in three nearby sections of the statute.

### 2. The Consumer Protection Act's Pre-Suit Notice Requirement

Navient correctly points out that after initially granting state attorneys general a right to file Consumer Protection Act claims in § 5552(a), the Consumer Protection Act subjects that general grant of authority to a limitation: it

provides that "[b]efore initiating any action," the relevant state attorney general "shall timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau." 12 U.S.C. § 5552(b)(1)(A). In addition to requiring the state attorney general to detail "the alleged facts underlying the proceeding," § 5552(b)(1)(C)(ii), the statute requires that official to address "whether there may be a need to coordinate the prosecution of the proceeding so as not to interfere with *any action*, including any rulemaking, undertaken by the Bureau," § 5552(b)(1)(C)(iii) (emphasis added).

Navient would have us stretch too far the meaning of this pre-suit notice requirement. It argues that state-sponsored Consumer Protection Act claims are intended solely to address factual allegations and legal theories of which the Bureau is not aware or which are not already subject to a pending Bureau lawsuit. It suggests that in § 5552(b)(1)(C)(iii) "any action" refers only to rulemaking and to not other judicial proceedings. This fails. If Congress had intended to limit the phrase "action" in § 5552(b)(1)(C)(iii) to mean only "rulemaking," it could have drafted a simpler provision. Reading "action" to mean "rulemaking" only would render the words "any action, including" mere surplusage. *cf.United States v. Miller*, 527 F.3d 54, 62–63 (3d Cir. 2008).

**\*8** Moreover, the word "including" "is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration." *In re Fed. Mogul-Global, Inc.*, 348 F.3d 390, 401 (3d Cir. 2003) (citation omitted). And Congress twice used the phrase "any action" in a manner that includes litigation in a nearby provision: (1) in the pre-suit notice provision itself, § 5552(b)(1)(A) ("[b]efore initiating any action in court"), and (2) in § 5531(a) (the Bureau "may take any action authorized under part E").

Navient also argues that § 5552(b)(1)'s notice requirement would be superfluous if parallel actions were allowed because if the Bureau files a suit, then it knows the underlying facts such that there is no need for notice. This too fails. First, there are many ways in which a parallel state action could interfere with the Bureau's suit and require coordination. For example, there could be conflicting discovery schedules, conflicting legal theories, or competing settlement offers. And even if there is no conflict between the actions, the Bureau benefits from the notice requirement because it could use the information to identify additional victims or wrongs, to coordinate strategies with the state, or alternatively to drop certain counts from its own complaint because the issues will

be adequately addressed by the state. Amicus Curiae Br. of the Bureau 19–20.

Thus, the Consumer Protection Act's pre-suit notice requirement does not negate the statute's express authorization of parallel state actions. [8]

[8]    Navient also relies on a not relevant out-of-circuit district court case, *Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018), where the Court dismissed Consumer Protection Act claims filed by a tribal government when the Bureau had already settled similar claims. *Navajo Nation* is distinguishable because it was dismissed as *res judicata*. *Id.* at 1308. Nothing in it suggests an implied prohibition on concurrent claims under the Consumer Protection Act.

### 3. The Consumer Protection Act's Intervention Provision

Navient does correctly point out that the Bureau is authorized to intervene as a party-plaintiff in any state-filed Consumer Protection Act litigation. 12 U.S.C. § 5552(b)(2)(A). It argues that the intervention provision demonstrates that Congress intended to prevent concurrent state claims. Yet it fails to cite any case law supporting that, where a statute allows third-party intervention, concurrent claims are barred. And indeed, Congress has enacted numerous statutes that authorize state enforcement while limiting concurrent claims in some way and numerous statutes that authorize state enforcement without limiting concurrent claims. *Compare* 15 U.S.C. § 6103(d) *with* 49 U.S.C. § 14711. That the Consumer Protection Act allows for the Bureau to intervene does not clearly decide whether concurrent claims are permitted.

Navient further asserts that allowing concurrent claims would also run headlong into the rule against claim-splitting—the longstanding bar against having a single party-plaintiff simultaneously maintain two actions against the same defendant. *See, e.g.*, *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (*en banc*). However, cases like *Walton* are distinguishable. There, a single plaintiff filed two separate employment lawsuits based on the same underlying facts, in the same court, against the same defendant. *Id.* at 69–70. In contrast, Pennsylvania and the Bureau are two separate plaintiffs with two different lawsuits. Pennsylvania's lawsuit

is intended to protect the public from and remediate violations of both Pennsylvania and federal laws. [9]

[9]    The parties also dispute whether the Commonwealth and Bureau actions can be consolidated and the significance of that possibility. Navient argues that given the nine-month gap in the bringing of the cases and the vast disparity in the respective procedural postures, it would be impossible to consolidate these cases, and at best one action could be stayed until the other is resolved, at which point most issues in one suit would be resolved by prior decisions in the other case. This argument is a distraction. Navient can only speculate as to what will happen if both actions proceed. It is not clear to what extent issue preclusion will apply. Moreover, that this particular case may not be suitable for consolidation does not change the plain meaning of the statute.

### 4. Judicial Resources

**\*9**    Navient also argues that allowing Pennsylvania's concurrent claims will be a waste of judicial resources because they, "by definition, cannot achieve anything that the [Bureau's] own lawsuit cannot achieve, no matter how well the state litigates its ... claims." Navient Br. at 49. This argument falters for at least three reasons. First, even if the Bureau litigates this case through trial and obtains a judgment, it is possible that Pennsylvania could still achieve outcomes beyond what the Bureau achieves. For example, the Commonwealth could find witnesses and facts that persuade the court to order relief beyond that obtained by the Bureau. Second, Pennsylvania and other states have a fundamental right to protect their citizens and prevent harmful conduct from occurring in their jurisdictions. The interests of the states and the Bureau may not always be completely aligned. And third, states may be able to pick up slack when the federal Government fails to enforce and regulate. If the Bureau were under pressure to settle or withdraw its lawsuit, [10] states would still be free to protect the rights of consumers in their states.

[10]    Indeed, Navient's CEO has lobbied the Bureau to drop its lawsuit. "Navient CEO Met with CFPB as Company Seeks to End Lawsuit," Politico, June 28, 2018, https://www.politico.com/newsletters/

morningeducation/2018/06/28/kennedy-resignation-could-spark-changes-to-affirmative-action-266608.

The District Court correctly rejected Navient's argument that allowing concurrent claims would overburden the courts, because although "federal courts are indeed inundated with cases, adjudicating this case is a burden the Court is required to assume, absent a recognized statutory or procedural basis that precludes the Commonwealth from bringing its action." *Navient*, 354 F. Supp. 3d at 546.

**[6]** Accordingly, we hold that the clear statutory language of the Consumer Protection Act permits concurrent state claims, for nothing in the statutory framework suggests otherwise. [11]

[11]  Navient also raises several constitutional arguments not raised before the District Court that go far beyond the questions certified by us for interlocutory appeal. The Commonwealth correctly points out that Navient cannot bring a freestanding constitutional challenge for the first time in this interlocutory appeal. *see* *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 352 (3d Cir. 2014) (stating that an issue not raised in the district court is waived unless manifest injustice would result). We accordingly do not address its constitutional arguments at this stage.

### B. The Education Act Does Not Preempt the Commonwealth's Claims Under the PA Protection Law.

Navient claims that Section 1098g of the Education Act both expressly and impliedly preempts the Commonwealth's state-law claims. We disagree and follow our sister Circuits in holding that the Education Act expressly preempts only claims based on failures of disclosure, not claims based on affirmative misrepresentations, and that no other preemption principles bar the Commonwealth's claims. *see* *Lawson-Ross*, 955 F.3d at 911; *Nelson*, 928 F.3d at 648.

### 1. Preemption and the Presumption Against Preemption

**[7]** **[8]** The Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, invalidates any state law that "interferes with or is contrary to federal law[.]" *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). While not "rigidly distinct" categories, there are three classes of

preemption: (1) express preemption, (2) conflict preemption, and (3) field preemption. *Va. Uranium, Inc. v. Warren*, ––– U.S. ––––, 139 S. Ct. 1894, 1901, 204 L.Ed.2d 377 (2019) (*quoting* *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)); *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

**[9]** **[10]** **[11]** **[12]** Express preemption applies where Congress explicitly preempts state law in the statutory language. *see* *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Conflict preemption occurs "when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, or when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Id.* (internal citations and quotations omitted). Field preemption focuses on when Congress does not expressly preempt state law but where " 'federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law' in that field." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016) (citation omitted). "Where Congress expresses an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards." *Id.* Each mode of preemption serves the same underlying function: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Coll. Athletic Ass'n*, ––– U.S. ––––, 138 S. Ct. 1461, 1480, 200 L.Ed.2d 854 (2018).

**\*10** **[13]** **[14]** **[15]** **[16]** "In every preemption case, our inquiry is guided by two principles. First, the intent of Congress is the 'ultimate touchstone' of preemption analysis." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). In discerning congressional intent, we look to the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the ... way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lohr*, 518 U.S. at 486, 116 S.Ct. 2240 (internal citation omitted). "Second, we 'start[ ] with the basic assumption that Congress did not intend to displace state law.' " *Farina*, 625 F.3d at 116 (quoting *Maryland v. Louisiana*, 451 U.S. 725,

746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action." *Lohr*, 518 U.S. at 485, 116 S.Ct. 2240. The presumption applies with particular force when the state is exercising its police power. *Id.*

## 2. Section 1098g Does Not Expressly Preempt the Commonwealth's Claims Under the PA Protection Law.

Section 1098g provides that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act ... shall not be subject to *any* disclosure requirements of *any* State law." 20 U.S.C. § 1098g (emphases added).

Navient suggests we begin and end our inquiry with this language. It argues that Counts II and IV of the Commonwealth's Complaint fall squarely within § 1098g's prohibition because they target the sufficiency of the disclosures Navient allegedly made to borrowers and expressly fault it for failing to make "disclosures" or provide "notice" that state law required Navient to provide. *See* App. 152 (Count II) (alleging Navient violated the PA Protection Law because "[i]n phone calls[ ] [it] failed to meaningfully disclose ... that the federal [G]overnment offers IDR plans"); App. 156 (Count IV) (alleging Navient violated the PA Protection Law because it "[f]ailed to disclose a date certain by which a borrower must submit materials to recertify an [IDR] plan," and "[f]ailed to adequately notify borrowers ... of the existence of the renewal notice").

 [17]  [18]  [19]  The language of § 1098g is indeed broad and unqualified; it expressly preempts "any" state claim premised on "any" disclosure requirement imposed by state law regarding such loans. However, as noted above, "the presence of an express preemption provision does not end the inquiry. While it means we need not inquire whether Congress intended to preempt some state law, we still must examine congressional intent as to the scope of the preemption provision." *Farina*, 625 F.3d at 118. To identify the domain expressly preempted by Congress, we read "the words of a statute ... in their context and with a view to their place in the overall statutory scheme." *Home Depot U. S. A., Inc. v. Jackson*, ––– U.S. ––––, 139 S. Ct. 1743, 1748, 204 L.Ed.2d 34 (2019) (citation and internal quotation marks omitted).

Here, we are persuaded by the Eleventh and Seventh Circuits' recent statements on the scope of the Education Act's express preemption provision. In *Lawson-Ross*, borrowers brought suit under Florida's Consumer Collection Practices Act against their federal student loan provider for making affirmative misrepresentations about their eligibility for the Public Student Loan Forgiveness program (the "Loan Forgiveness Program"). 955 F.3d at 911. In determining what domain is expressly preempted by the Education Act, the Eleventh Circuit explained,

> Section 1098g concerns 'disclosure requirements,' but the [Education Act] does not define 'disclosure requirements' or 'disclosure.' The [Education Act] does, however, identify the disclosures it requires. Viewed in its statutory context, then, the term 'disclosure requirements' refers to the [Education Act]'s requirements that certain information be communicated to borrowers during the various stages of a loan, as laid out in § 1083 of the statute. Thus, the domain § 1098g preempts is the type of disclosures to borrowers that § 1083 requires.

**\*11** *Id.* at 917 (citing 20 U.S.C. §§ 1083(a), (b), (e)). The Court concluded "that the precise language Congress used in § 1098g preempts only state law that imposes disclosure requirements; state law causes of action arising out of affirmative misrepresentations a servicer voluntarily made that did not concern the subject matter of required disclosures impose no disclosure requirements." *Id.* (internal quotation marks omitted).

 [20]  [21]  The servicer in *Lawson-Ross*, like Navient here, argued that borrowers' affirmative misrepresentation claims were actually based on a failure to disclose correct information. The Court rejected this characterization of the claims. It saw "no allegation that [the servicer] failed to provide them with any information that it had a legal obligation to disclose. Rather, the [b]orrowers alleged that when [the servicer] chose to provide them with information it was not required to disclose ... it gave false information." *Id.* at 918. The Court found "support for this distinction between

an affirmative misrepresentation and a failure to disclose in the law of torts. To succeed on a failure-to-disclose claim, the plaintiff must establish that there was a duty to speak and the duty was breached." *Id.* at 918 (citing *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). "In contrast, a claim alleging an affirmative misrepresentation does not rely on a duty to disclose." *Id.* The borrowers' claims about the servicer's misrepresentations about their eligibility for the Loan Forgiveness Program were thus not preempted. *Id.* at 919-20.

Similarly, the Seventh Circuit in *Nelson* held that § 1098g does not expressly preempt state consumer protection laws to the extent they target affirmative misrepresentations rather than failures to disclose required information. 928 F.3d at 647–50. There a borrower's state-law consumer protection and tort claims alleged that her federal student loan servicer made affirmative misrepresentations while counseling her on her repayment plan options. The Court concluded her claims were not expressly preempted, explaining that

> [w]e recognize that it would be possible to apply state consumer protection laws to impose additional disclosure requirements on loan servicers of federally insured student loans. Such applications would be preempted under § 1098g .... But that result is not necessary or inherent in [the borrower's] claims, at least to the extent she alleges affirmative misrepresentations. We cannot say on the pleadings that all of [the borrower's] claims are preempted by § 1098g. On remand, the district court may need to use jury instructions and other tools to allow [the borrower] to proceed on her claims of affirmative misrepresentations while ensuring that the case does not become a vehicle for state law to impose new disclosure requirements.

*Id.* at 650 (internal citation omitted). The Court explained that "[t]he common law tort of fraud ordinarily requires a deliberately false statement of material fact. ... An omission or failure to disclose, on the other hand, will not support

a common law fraud claim but may be actionable as constructive fraud or fraudulent concealment. ..." *Id.* at 649 (internal citations omitted). Because the borrower alleged that the servicer "said something false that it was not required to say," the Court concluded that the claim did not imply a disclosure requirement. *Id.* at 649.

**\*12** Both *Nelson* and *Lawson-Ross* built on a distinction first drawn by the Ninth Circuit in *Chae*, 593 F.3d 936, wherein plaintiffs brought claims under California's consumer protection statute and accused Sallie Mae of both "misrepresent[ation]" and "improper ... disclosure" of information to borrowers about federal student loans. 593 F.3d at 942–43. The Court held that the plaintiffs' attempt to assert claims under California law regarding certain billing statements and coupon books was expressly preempted by § 1098g of the Education Act, but the plaintiffs were not barred from pursuing claims regarding other fraudulent and deceptive practices. *Id.* at 943. The Court made clear, however, that plaintiffs could not simply "relabel[ ]" their preempted disclosure claims as misrepresentation claims. *Id.* at 943 (citation omitted).

**[22]** We follow these well-reasoned decisions and adopt the distinction between affirmative misrepresentation and failure to disclosure information as required by the Education Act. Section 1098g does not expressly preempt claims to the extent they are alleging affirmative misrepresentations rather than failures of disclosure.

Turning to our case, we are not convinced that all, or even most, of the Commonwealth's claims are based on failures of disclosure. The Commonwealth's core allegations with respect to Counts II and IV are that Navient improperly steered consumers into costly forbearances and made misrepresentations to consumers regarding the recertification of their IDR plans. This included misrepresenting to consumers that Navient would inform them of the date by which they needed to renew and misrepresenting the consequences of failing to renew. To the extent the Commonwealth faults Navient for failing to disclose or notify borrowers of certain information, it does so only because Navient's failure to disclose certain information furthered the affirmative misrepresentations Navient voluntarily chose to make. For example, the Commonwealth alleges:

- Navient's website misrepresented to borrowers that its representatives would help them "make the right decision for [their] situation" and "find an option that ... minimizes [their] total interest cost." App. 130.

• Navient misrepresented to a consumer "that her only option for loan assistance was a forbearance, despite the fact that she qualified for an IDR plan." App. 135.

• Navient gave false information about public service loan forgiveness to one borrower, causing the borrower to lose out on seven years of payments that could have been applied to his forgiveness program but were not. App. 136.

• Navient repeatedly enrolled a consumer in forbearance various times over eleven years, allowing nearly $27,000 in interest to accrue, despite his later eligibility for an IDR plan. App. 136–37.

• Navient told a consumer enrolled in IDR who was having trouble making payments that "forbearance was his only option" when, in fact, "continuing his IDR plan would have been a better option for him in the long term." App. 137.

• In a notice to borrowers, Navient misrepresented that it would notify the borrowers when their IDR plan was up for renewal and, at that time, it would provide the borrower with a date to submit a new application. Yet the notices it sent did not include this date. App. 138–39.

• In a notice to borrowers, Navient misrepresented that the only consequence of providing incorrect or incomplete information during the IDR renewal process would be a delay in renewal when, in fact, providing incorrect or incomplete information resulted in financial harm to borrowers. App. 140.

• Navient told a consumer that it would send him an annual renewal reminder when, in fact, it did not. App. 142.

To the extent these allegations hold Navient accountable for its affirmative misconduct, they are not preempted. The Commonwealth cannot fault Navient for failing to provide consumers with more information about IDR plans or recertification, but it can fault Navient for providing misinformation.

 *13  Navient attempts to distinguish our case from *Nelson* by arguing that, unlike the voluntary and excessive statements there, some of the alleged misstatements it posted were required by federal law to appear on its website. Specifically, the Commonwealth alleges that Navient made the following

statements on its website regarding its ability to help borrowers:

• "If you're experiencing problems making your loans [sic] payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."

• "We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."

App. 130. The *Nelson* Court held nearly identical statements were indeed affirmative misrepresentations not preempted by § 1098g because the servicer made those statements voluntarily when it could have just remained silent or told the truth. *see Nelson, 928 F.3d at 649–50*; *see id. at 641–42* ("[o]ur trained experts work on your behalf" and "[y]ou don't have to pay for student loan services or advice," as "[o]ur expert representatives ... understand all of your options").

Navient does not actually cite to any provision of law that would have required it to misrepresent to borrowers that it will help them "make the right decision for [their] situation" or help them "minimize[ ] [their] total interest cost." The provisions it cites are off point. Section 1083 of the Education Act merely requires that lenders include on a "bill or statement ... the lender's or loan servicer's address and toll-free phone number for payment and billing error purposes" and "a link to the appropriate page of [the DOE's] website to obtain a more detailed description of the repayment plans ...." 20 U.S.C. § 1083(e)(1)(H) & (I). It does not say what statements Navient must make on its website. Navient went beyond providing addresses, telephone numbers, and links while affirmatively representing that it would help borrowers make the "right" decisions and "minimize" their interest payments.

 [23]  [24]  [25]  All this to say that the District Court correctly concluded that the Commonwealth's complaint alleges Navient made numerous affirmative misrepresentations, and claims based thereon are not expressly preempted by the Education Act. It is possible that on remand (especially if Navient again moves for dismissal) the District Court may need to conduct a closer, allegation-by-allegation, assessment of which claims in the Commonwealth's complaint are based on affirmative misrepresentations and which are possibly based on failures of disclosure. It would need to do so in the first instance in accord with this opinion and Pennsylvania law. *Lawson-Ross,*

955 F.3d at 911, and *Nelson*, 928 F.3d at 648, also provide guidance. [12]

[12] The District Court may also need to consider whether the Commonwealth alleges any material omissions, and if so, whether those claims would be preempted by § 1098g. While *Lawson-Ross*, 955 F.3d at 911, and *Nelson*, 928 F.3d at 648, provide insight into the distinction between an affirmative misrepresentation on one end, and a failure to disclose on the other, they do not discuss where the line is between the latter and a material omission. If, for example, a Navient representative told a borrower that her "best option" for resolving loan repayment issues was forbearance but failed to mention a more appropriate IDR plan, is the failure to mention the IDR plan a material omission or an affirmative misrepresentation? If the former, is it also expressly preempted by the Education Act? We decline to rule on this issue without briefing by the parties and without first giving the District Court an opportunity to assess this issue in light of Pennsylvania law. We also decline to say in the first instance whether the Commonwealth alleges any material omissions.

We note that, under Pennsylvania law, to state a claim for intentional misrepresentation a plaintiff must allege "(1) [a] representation; (2) which is material ...; (3) made falsely, with knowledge of its falsity ...; (4) with the intent of misleading another ...; (5) justifiable reliance on the misrepresentation; and[ ] (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (1999) (citing, *inter alia*, Restatement (Second) of Torts § 525 (1977)). The tort of "intentional non-disclosure has the same elements as intentional misrepresentation except[,] in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Id.* (citation and internal quotation marks omitted). Concealment of a material fact can amount to actionable fraud if the seller intentionally concealed a material fact to deceive the purchaser. *see Moser v. DeSetta*, 527 Pa. 157, 589 A.2d 679, 682 (1991); *Sevin v. Kelshaw*, 417 Pa.Super. 1, 611 A.2d 1232, 1237–1238 (1992) ("[A]ctive concealment of defects *known to be material* to the purchaser is legally equivalent to

an affirmative misrepresentation.") (emphasis in original); *see also Derby & Co., Inc. v. Seaview Petroleum Co.*, 756 F. Supp. 868, 876 (E.D. Pa. 1991) (stating that "[t]he failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith ...."). *But see Martin v. Hale Prods., Inc.*, 699 A.2d 1283, 1288 (Pa. Super. Ct. 1997) (stating that "[m]ere silence in the absence of a duty to speak" does not constitute fraud). Thus, it appears that under Pennsylvania law intentional material omissions are treated similarly to affirmative misrepresentations.

### 3. Section 1098g Does Not Impliedly Conflict Preempt the Commonwealth's State-Law Claims.

**\*14** We next turn to Navient's argument that even if § 1098g does not expressly preempt Counts II and IV, ordinary conflict-preemption principles bar them. *see Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–70, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (holding that the presence of an express preemption clause does not preclude "the ordinary working of conflict pre-emption principles"). To repeat, state laws are preempted if it is impossible for a party to comply with both state and federal law or they "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373, 120 S.Ct. 2288 (citation omitted).

The Supreme Court explained in *Cipollone* that "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, ... there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." 505 U.S. at 517, 112 S.Ct. 2608 (internal citation and quotation marks omitted). The Court relied on the statutory canon "of *expressio[ ] unius est exclusio alterius* [to include one is to exclude all others]: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.*

We agree with the Eleventh and the Seventh Circuits that, per the Supreme Court's instruction in *Cipollone*, we need not infer congressional intent to pre-empt state laws by the Education Act. Both reasoned that "[w]hen Congress has explicitly addressed preemption in a statute, an implication arises that it did not intend to preempt other areas of state law."

2020 WL 4280677

*Lawson-Ross*, 955 F.3d at 920 (citations omitted); *Nelson*, 928 F.3d at 648 (same). The Education Act includes several provisions expressly preempting specific areas of state law, including § 1098. *See also* 20 U.S.C. §§ 1078(d) (state usury laws); 1091a(a)(2) (state statutes of limitations); 1091a(b)(2) (state law infancy defense).

We note that the Ninth Circuit in *Chae* concluded otherwise and held that although some of the borrowers' claims were not expressly preempted by § 1098g, they nonetheless were implicitly preempted because they posed an obstacle to the uniform operation of the Education Act. 593 F.3d at 946-47. The Court concluded that uniformity was an intended purpose of the Education Act as illustrated by Congress's direction to the DOE to standardize the Indirect Loan Program's forms, procedures, terms, conditions, and benefits throughout federal student loan programs. *Id.* at 944–45. It reasoned that allowing state law causes of action to proceed would conflict with the purpose of uniformity. *Id.* at 943, 945.

[26] [27] We are not persuaded by the Ninth Circuit's conclusion that uniformity was an intended purpose of the Education Act, and we join the other Circuits that have rejected that idea. *Lawson-Ross*, 955 F.3d at 922; *Nelson*, 928 F.3d at 651; *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) ("We are unable to confirm that the creation of uniformity ... was actually an important goal of the [Education Act].") (internal quotation marks omitted). "To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive."*Hillsborough*, 471 U.S. at 717, 105 S.Ct. 2371. Thus we do not apply preemption from the comprehensive nature of a regulation alone. *seeN.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

The Seventh Circuit aptly pointed out that *Chae*'s broad language was based on a different sort of claim, relating to the method of setting late fees, repayment start dates, and interest calculations. The *Nelson* Court assumed that "the need for nationwide consistency on those sorts of *administrative mechanics* is substantial" and that there "the value of uniformity would be more compelling." 928 F.3d at 651 (emphasis added). Allegations of affirmative misrepresentations and misconduct stand in stark contrast. There is no indication that Congress had the sweeping goal of regulating all misconduct that could possibly occur in student-loan financing and requiring uniformity of all claims

tangentially related to the Education Act. "[S]tate law and federal law can exist in harmony" under the Education Act, *Nelson*, 928 F.3d at 651, and conflict preemption does not bar the Commonwealth's claims.

### 4. Section 1098g Does Not Field Preempt the Commonwealth's Claims under the PA Protection Law.

*15 [28] [29] Navient does not expressly argue that § 1098g preempts the field of regulation of student loans, but, to the extent it suggests as much, *see* Navient Br. 31, 35 (describing the language of § 1098g as "unqualified" and creating a "comprehensive federal regulatory scheme"), we reject that suggestion as well. Field preemption exists "where Congress has legislated so comprehensively [in an area of law] that it has left no room for supplementary state legislation." *R.J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). Every Circuit Court to consider the issue has concluded that the Education Act does not field preempt the regulation of student loans. *See, e.g.*, *Lawson-Ross*, 955 F.3d at 923; *Nelson*, 928 F.3d at 651-52; *Chae*, 593 F.3d at 941–42; *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999); *Kearns v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 226 (9th Cir. 1994). And indeed, consumer protection is a field that states have traditionally occupied. *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (noting the long history of state common-law and statutory remedies against unfair business practices); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (observing that statute to "prevent the deception of consumers" was within scope of state's police powers); *In re Nortel Networks, Inc.*, 669 F.3d 128, 137–38 (3d Cir. 2011) (noting that consumer protection is part of governmental police powers).

From a practical standpoint, if we were to hold that the Education Act preempts state-law consumer protection claims, consumers would be left with no protection against unfair or deceptive acts or practices by loan servicers because the Education Act contains no general prohibition against those practices. Taken to its logical conclusion, Navient's proposed outcome here would mean that servicers would in theory be free to mislead consumers provided that they met the Education Act's technical disclosure requirements. That outcome is untenable. "It is difficult to believe that Congress would, without comment, remove all means of judicial

recourse for those injured by illegal conduct." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). Field preemption thus does not apply to the Commonwealth's claims. [13]

[13]    The States argue in their Amicus brief that they are well positioned to protect their residents from unfair and deceptive practices by student loan servicers. Many States have developed comprehensive systems for tracking and responding to complaints from consumers. In the last five years, amici have collectively received and responded to thousands of complaints about federal student loan servicers—including many against Navient. And the federal Government has for decades welcomed the States' expertise and worked with the States to provide active oversight in the student loan industry. For example, the DOE's regulations and servicer contracts expressly require compliance with not only federal laws but also state laws. *See, e.g.*, 34 C.F.R. § 682.401. Starting in 2000, at the latest, the DOE routinely disclosed student loan information to state and local authorities that were investigating and prosecuting

crimes, civil frauds, and other violations in the student loan industry. *See* Privacy Act of 1974, 64 Fed. Reg. 72384, 72399 (Dec. 27, 1999); Privacy Act of 1974, 81 Fed. Reg. 12081-02, 12083 (Mar. 8, 2016). Likewise, the Bureau shares with states information it receives in consumer complaints. Amicus Curiae Br. for States of New York et al. 16–17.

\* \* \* \* \*

The Commonwealth's parallel enforcement action against Navient under the Consumer Protection Act is permitted by the statute's plain language, and the Education Act does not expressly preempt the Commonwealth's claims under the PA Protection Law to the extent they are based on affirmative misrepresentations and misconduct rather than failures of disclosure. No other preemption principle stands as a bar to the Commonwealth's claims. We thus affirm the District Court's well-reasoned ruling.

**All Citations**

--- F.3d ----, 2020 WL 4280677

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

M

2019 WL 4139297
United States District Court, W.D. Washington,
at Tacoma.

Corrie ROBBINS, individually, Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC,
a Delaware Limited Liability Company; and
Comcast Cable Communications Managemnet,
LLC, a Delaware Limited Liability Company,
d/b/a Comcast Corporation, Defendants.

CASE NO. 3:19-cv-05603-RBL
|
Signed 08/30/2019

**Attorneys and Law Firms**

Thaddeus P. Martin, Law Offices of Thaddeus P. Martin,
University Place, WA, for Plaintiff.

Kjersten Turpen, Gordon Rees Scully Mansukhani, Portland,
OR, Sarah N. Turner, Gordon Rees Scully Mansukhani LLP,
Seattle, WA, for Defendants.

ORDER ON DEFENDANT'S MOTION
TO COMPEL ARBITRATION

DKT. # 8

Ronald B. Leighton, United States District Judge

## INTRODUCTION

**\*1**  THIS MATTER is before the Court on Defendant
Comcast Corporation's Motion to Compel Arbitration. Dkt.
# 8. The underlying case involves allegations of sexual
harassment and retaliation at the workplace. Comcast argue
that Plaintiff Corrie Robbins should be compelled to arbitrate
this dispute consistent with the company's alternative dispute
resolution program. In opposition, Robbins claims that she
never agreed to be bound by an arbitration agreement.

For the following reasons, DENIES Comcast's Motion.

## BACKGROUND

Robbins began working at Comcast in 1999. She alleges that
in 2017 she began experiencing sexual harassment at work.
After some time, she managed to get transferred to a different
team and then started working from home. However, Comcast
later discharged Robbins on August 21, 2018. She filed
the current lawsuit asserting discrimination-related claims
on June 12, 2019, in state court. Defendants removed the
case to federal court on July 1. They then filed the current
Motion to Compel Arbitration, claiming that Robbins opted to
participate in Comcast's alternative dispute resolution (ADR)
program known as "Comcast Solutions."

Comcast Solutions was rolled out in 2013 and entails
three steps for resolving disputes. The first step is an
informal "review/facilitation" process and the second step
is mediation. Dkt. # 9, Ex. B, at 4-6. If both of these
fail, the employee may request that the parties proceed to
step three, which is binding arbitration. *Id.* at 6. Under the
program, the parties mutually select an arbitrator from a
professional dispute resolution organization. *Id.* The parties
are allowed some limited discovery and may obtain their
own legal representation. *Id.* at 6-7. Comcast pays for the
arbitration hearing and reimburses the employee for up to
$1,500 of their legal fees, regardless of the outcome. *Id.* at
7. However, all results are kept confidential. *Id.* The program
covers all "claims that involve an allegation that the employee
personally has been harmed or damaged by an unlawful action
taken by the Company or its representatives related to the
employment relationship." Dkt. # 9, Ex. C, at 3.

Comcast took several steps to inform existing employees
of its new ADR program. First, Comcast mailed a cover
letter and brochure to all employees at their address of
record on September 27, 2013. Dkt. # 9 at 2. The cover
letter informed employees that Comcast Solutions was an
"additional resource" offering a "faster, less expensive, and
impartial option for addressing concerns of a legal nature
affecting your employment." Dkt. # 9, Ex. D. In bold, the
letter states, "Your Action Required: ... If you prefer not to
participate in the program, all you need to do is complete
an "Opt Out" form ... and return it no later than November
8, 2013." *Id.* The brochure is a seven-page document that
broadly describes the Comcast Solution's 3-step approach.
Dkt. # 9, Ex. A. However, it only mentions that the program
involves waiving access to the judicial system in regular-sized
text on the last few pages. *Id.* at 5-6.

**\*2** Second, Comcast sent out a mass email to employees on October 16, 2013, with the subject line "Comcast Solutions." Dkt. # 9 at 3. The email began by stating, "Information regarding a new program called Comcast Solutions was recently mailed to your home address" and provided a link to a website with the program brochure. Dkt. # 9, Ex. F. The email went on to tell employees that "[t]he consideration period for participation in the Comcast Solutions Program ends on Friday, November 8, 2013.... [I]f you do not wish to participate in the program, you will need to complete and return an 'opt out' form ... by no later than November 8, 2013, if you have not already done so." *Id.*

Third, every year Comcast has employees acknowledge the company's Code of Conduct and Employee Handbook. Dkt. # 21 at 2. The acknowledgements form for 2017 and 2018 specifically state the following:

Unless I am not participating in Comcast Solutions because I (i) previously "opted out" of the program during the program roll out period, or (ii) am covered by a collective bargaining agreement or an authorized employment agreement which does not include participation in Comcast Solutions, I understand that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program. Further information about the Comcast Solutions Program — including the Program Guide, Frequently Asked Questions, and various Program forms (including the Initial Filing Form) — is available for me to review on ComcastNow.

Dkt. # 21, Ex. A, at 5, 7. The acknowledgements also state, "I understand that if I click 'I do not acknowledge' and disclose an exception below, I ... am still bound by the Comcast Solutions policy." *Id.* at 6, 8.

Comcast presents evidence that it mailed the September 27 cover letter and brochure to Robbins at her address of record, which was 1214 179th St. Ct. E, Spanaway, WA. Dkt. # 9, Ex. E. The letter was not returned as undeliverable. Dkt. # 9 at 3. Comcast also shows that the October 16 email was sent to Robbins at her work email address and was opened. *Id.* Comcast's email system allows the company to require a recipient to verify that they read a particular email, and Robbins provided such verification for the Comcast Solutions email. Dkt. # 9, Ex. G. There is also evidence that Robbins acknowledged Comcast's Code of Conduct and Employee Handbook for the years 2014, 2015, 2017, and 2018. Dkt. # 21, Ex. A. Comcast has no record of Robbins opting out of its ADR program. Dkt. # 9 at 3.

Robbins, however, disputes that she received and viewed the Comcast Solutions letter and email. In her sworn declaration, Robbins states that she owned the 1214 179th St. property in 2013 but had moved to a different address a few minutes away in 2004. Dkt. # 19 at 3. Comcast's records show that Robbins did not update her employee information to reflect this new home address until 2017. Dkt. # 21 at 2. Robbins

also states that she never opened any email regarding Comcast Solutions. Dkt. # 19 at 2. She explains that she received over 100 emails per day while working for Comcast and claims that, although she may have technically opened the email by scrolling through subject lines on her screen, she did not read its contents or open any attachments. *Id.* In short, Robbins maintains that she "never knew of any arbitration agreement or alternative dispute resolution program at all during [her] employment at Comcast." *Id.*

## DISCUSSION

### 1. Legal Standard

The Federal Arbitration Act provides for the enforceability of valid arbitration agreements and "permits a party 'aggrieved by the alleged ... refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 4). A court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* (citation omitted). If the answer to both questions is 'yes,' then the agreement must be enforced. *Id.* The FAA "leaves no place for the exercise of discretion by a district court;" instead it mandates "that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original).

**\*3** However, a court may "submit to arbitration only those disputes ... that the parties have agreed to submit." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (internal quotations omitted). "To interpret the parties' contract, a court should look to general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitrability in favor of arbitration." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1018 (9th Cir. 2016) (internal quotations omitted). However, "[i]f the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply." *Id.* Such formation issues are decided by a district court, not an arbitrator. *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007).

### 2. Existence of a Valid Arbitration Agreement

The parties do not appear to dispute that the FAA applies or that Robbins's claims are within the scope of the Comcast Solutions program.[1] Therefore, the Court's task is to decide whether an arbitration agreement was formed and whether it is enforceable. Comcast argues that Robbins effectively agreed to the company's ADR program when she failed to opt out of it in 2013 after being given five weeks to do so. Comcast contends that it informed Robbins about the program and her ability to opt out via US mail and email. Comcast also asserts that its ADR program is neither procedurally nor substantively unconscionable. Robbins responds by arguing that she never received notice of the Comcast Solutions program and that a contract could not have been formed for lack of consideration. Robbins also contends that that any agreement would be unconscionable and thus unenforceable.

[1]      In any case, the Court concludes that Robbins' claims would be within the scope of the arbitration provision if a valid agreement was formed.

The party seeking to compel arbitration must prove the existence of an agreement by a preponderance of the evidence. *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014); *see also Weiss v. Lonnquist*, 153 Wash. App. 502, 511 (2009). If there is a genuine issue of material fact regarding the formation of a contract, the court may schedule an evidentiary hearing or order limited discovery. *Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2012 WL 22380, at *10 (W.D. Wash. Jan. 3, 2012) (citing 9 U.S.C. § 4); *Keijiro Sakaeda v. Kotobuki-Ya, Inc.*, No. CV1201995GAFJCX, 2012 WL 12896522, at *4 (C.D. Cal. May 3, 2012). However, a court need not order additional discovery if it would be unlikely to yield new evidence. *See Voll v. HCL Techs. Ltd.*, No. 18-CV-04943-LHK, 2019 WL 144863, at *5 (N.D. Cal. Jan. 9, 2019).

*a. Consideration*

Under Washington law, "[i]ndependent, additional, consideration is required for the valid formation of a modification or subsequent agreement" once an employee has already been hired. *Labriola v. Pollard Grp., Inc.*, 152 Wash. 2d 828, 834 (2004). "Independent consideration involves new promises or obligations previously not required of the parties." *Id.* However, the Ninth Circuit has held that consideration for an arbitration agreement proposed subsequent to hiring may be found in the employer's own promise to be bound by the arbitration process. *See Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002). At least one court applying Washington law has reached

the same conclusion. *See Allbaugh v. Perma-Bound*, No. C08-5713-JCC, 2009 WL 10676437, at *7 (W.D. Wash. Aug. 14, 2009).

Here, although Comcast started its ADR program years after Robbins was hired, the program involved reciprocal promises that were sufficient consideration for a contract. Indeed, Comcast Solutions involves a fairly generous promise by Comcast to pay up to $1,500 of an employee's legal fees, win or lose, if they choose to initiate arbitration. Although Robbins cites to Washington cases holding that an employer may not unilaterally modify a contract to add a non-compete provision, arbitration agreements are different. Whereas non-compete provisions only impose obligations on the employee, arbitration agreements require both parties to abide by the arbitrator's decision. Although many employees may not want to submit to arbitration, that does not mean arbitration agreements don't involve reciprocal promises.

*b. Objective Manifestations of Assent*

**\*4** The remaining question is therefore whether Robbins's failure to opt out of Comcast's ARD program amounted to binding assent under these circumstances. A contract is formed by mutual assent to the essential terms, which "generally takes the form of an offer and an acceptance." *Weiss*, 153 Wash. App. at 511. The offeror is the "master of the offer" and may propose acceptance through conduct. *Discover Bank v. Ray*, 139 Wash. App. 723, 727 (2007). Washington courts regard silence as assent to a contract only in situations where there is a "duty to speak." *Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wash. App. 846, 853 (2001). The Ninth Circuit has found that such a duty exists when an employer provides employees with a new arbitration agreement and gives them adequate time to opt out. *See Najd*, 294 F.3d at 1109 (applying California law). Furthermore, where a party has expressed assent to a contract, failure to read its terms does not negate inclusion. *See Tjart v. Smith Barney, Inc.*, 107 Wash. App. 885, 896 (2001); *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 799 (2003).

When an offer is extended online, courts have often measured mutual assent in terms of the offeree's actual or constructive notice of the contract's terms. *See, e.g., Kwan v. Clearwire Corp.*, No. C09-1392JLR, 2012 WL 22380, at *7-11 (W.D. Wash. Jan. 3, 2012). As one court has explained, "the central issue of concern in Washington in determining whether or not a consumer is bound by an alleged contract is whether the consumer has notice of and access to the terms and conditions of the contract prior to the conduct which allegedly

indicates his or her assent." *Id.* at 9; *see also Miebach v. Colasurdo*, 102 Wash. 2d 170, 176 (1984) ("[K]nowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed."); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Ct. App. 1972) ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious."). This frame of analysis is typically applied to so-called "clickwrap" and "browsewrap," terms referring to the types of agreements that consumers encounter online while browsing a website or clicking through screens. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-77 (9th Cir. 2014). Nonetheless, the idea is grounded in the traditional requirements of contract law. *See id.* at 1175.

Several courts have found that evidence that an employee received and opened an email is sufficient to show the employee was on notice of its contents. *See Sturtevant v. Xerox Commercial Sols., LLC*, No. C16-1158RSM, 2016 WL 4992468, at *2, 5 (W.D. Wash. Sept. 19, 2016); *Voll v. HCL Techs. Ltd.*, No. 18-CV-04943-LHK, 2019 WL 144863, at *5 (N.D. Cal. Jan. 9, 2019). Similarly, "[t]he mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time." *Olson v. The Bon, Inc.*, 144 Wash. App. 627, 634 (2008). However, the presumption only arises with proper proof of mailing, such as independent proof of postmark or a dated receipt. *Id.* The presumption is also not conclusive; "[t]he sole purpose of a presumption is to establish which party has the burden of going forward with evidence on an issue." *Neuson v. Macy's Dep't Stores Inc.*, 160 Wash. App. 786, 794 (2011).

Here, determining whether Robbins is bound to Comcast's ADR program first requires assessing the evidence that Robbins received the September 27 letter and the October 16 email. Comcast's evidence that it mailed the letter to Robbins, which includes a photocopy of the envelope addressed to Robbins, is sufficient to create a presumption that Robbins received the letter. *See* Dkt. # 9, Ex. E. However, Robbins's assertion under oath that she had previously moved to a different address and never received the letter is sufficient to rebut that presumption. *See Gibson v. Rouse*, 81 Wash. 102, 109 (1914) (prima facie evidence that a letter was mailed holds "little weight against positive testimony that the letter was not received"). Besides arguing that it was Robbins's responsibility to update her employee file with

her new address, Comcast presents no additional evidence showing that Robbins actually received the letter, such as a return receipt or a signed acknowledgement. In the absence of such proof, Comcast has not met its burden of showing that Robbins more likely than not received the letter containing materials on Comcast Solutions. [2]

[2]
> If Comcast uncovers additional evidence on this issue through Discovery, it may opt to renew its Motion to Compel Arbitration. *See Neuson v. Macy's Dep't Stores Inc.*, 160 Wash. App. 786, 796 (2011); *Keijiro Sakaeda v. Kotobuki-Ya, Inc.*, No. CV1201995GAFJCX, 2012 WL 12896522, at *4 (C.D. Cal. May 3, 2012).

**\*5** The same is not true for the October 16 email. Comcast's email system allowed it to require Robbins to confirm that she had read a particular message, which she did for the 2013 email. Even if an employee sets their confirmation settings to automatic, an email cannot be confirmed as read unless the user opens it. This casts great doubt on Robbins's assertion that she never opened the email. Indeed, in her declaration Robbins equivocates about whether she "technically opened" the email. Dkt. # 19 at 2. In light of this, Comcast has met its burden of proving that Robbins received and read the October 16 email.

Nonetheless, this email alone is insufficient to form an arbitration agreement because it contains no language that would put a reasonable employee on notice that an offer to contract was on the table. Instead, the short message is littered with cryptic references to a "new program" that employees may want to "participate in." Dkt. # 9, Ex. F. The most informative text in the email states that "the Comcast Solutions Program offers [Comcast] employees a faster, less expensive and impartial option for addressing many employment-related legal claims." *Id.* at 3. But even this frames the program as merely one "option" for resolving claims, not a binding agreement that waives the right to bring civil suits. The email's several references to the November 8, 2013, "opt out" date are also insufficient to transform the email into a valid offer. *Id.* Merely telling an employee that they may opt out of "participation" in a program does not inform them that failing to do so will *bind* them to a set of contractual terms.

Finally, although clicking the hyperlink to the Comcast Solutions brochure may tip employees off regarding the contractual nature of the program, this is unhelpful when

the email itself does not inform employees that this is the case. [3] Consequently, Robbins did not form a contract by viewing the October 16 email and failing to opt out. Because Comcast has not submitted sufficient evidence to show that Robbins received the September 27 letter, the Court does not address whether those materials would be sufficient to form a contract.

[3]   Even if an employee did happen to click the link, the brochure also does not make the contractual nature of Comcast Solutions obvious at first glance and only mentions waiving the right to judicial action on the last few pages. *See* Dkt. # 9, Ex. A, at 5-6.

This leaves only the acknowledgement form that Robbins apparently reviewed in 2017 and 2018. Unlike the email, the acknowledgement form contains the following unmistakably contractual language: "I understand that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program." Dkt. # 21, Ex. A, at 5, 7. Although this statement still does not inform employees that Comcast Solutions involves a binding arbitration agreement, the next sentence explains where more information can be found. By acknowledging that she reviewed this form and then continuing to work for Comcast, Robbins agreed to be bound by the Comcast Solutions Program on January 1, 2017.

### 3. Unconscionability

In Washington, a contract may be unenforceable if it is found to be either procedurally or substantively unconscionable. *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1259 (9th Cir. 2005). A contract is procedurally unconscionable if the plaintiff "lacked a meaningful choice." *Romney v. Franciscan Med. Grp.*, 186 Wash. App. 728, 740 (2015). "Factors to be considered include the manner in which the contract was created, whether both parties had a reasonable opportunity to understand the terms of the agreement, and whether important terms were buried in a lot of fine print." *Mayne v. Monaco Enterprises, Inc.*, 191 Wash. App. 113, 119 (2015). "At minimum, an employee who asserts an arbitration agreement is procedurally unconscionable must show some evidence that the employer refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person

could not understand them." *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash. 2d 293, 306-07 (2004).

**\*6**  In the employment context, Washington courts have found arbitration provisions procedurally unconscionable when they are buried within a larger document that the employee did not get a fair chance to review before their signature was required. *See, e.g., Steven Burnett v. Pagliacci Pizza, Inc.*, 442 P.3d 1267, 1273 (Wash. Ct. App. 2019). Procedural unconscionability also exists if an arbitration clause is offered as a condition of continued employment that the employee has no option of turning down. *Mayne*, 191 Wash. App. at 121. On the other hand, an arbitration provision is not unconscionable simply because it is included within a larger document. *See id.* at 119; *see also Tjart v. Smith Barney, Inc.*, 107 Wash. App. 885, 899 (2001) (arbitration provision that was "obvious within a fairly short document" was not unconscionable).

Here, the process by which Robbins became bound by the Comcast Solutions Program was procedurally unconscionable. For the same reasons that the October 16 email was not a valid offer, it also did not provide Robbins with a meaningful choice about agreeing to Comcast's arbitration agreement. Indeed, the email appears purposely designed to give only the faintest hints that Comcast's new program involved a binding arbitration agreement. Where an offeror hides not only a contract's terms but also its very existence in such a manner, any resulting agreement must be unconscionable.

While the acknowledgement forms that Robbins reviewed in 2017 and 2018 at least announced that Comcast Solutions involves a binding contract, the "take it or leave it" nature of these offers deprived Robbins of any meaningful choice. The forms make clear that, even if an employee does not submit their acknowledgement, they are still bound by the Comcast Solutions Program if they continue working at the company if they did not originally opt out. Dkt. # 21, Ex. A, at 6, 8. In essence, there is no way for an employee to avoid entering the arbitration agreement besides quitting. Such a contract is unconscionable and unenforceable.

### CONCLUSION

For the reasons explained above, Comcast's Motion to Compel Arbitration is DENIED. If discovery gives rise to additional evidence that Robbins did receive the October 16

2019 WL 4139297, 2019 Fair Empl.Prac.Cas. (BNA) 326,528

letter containing materials on the Comcast Solutions Program, Comcast may renew their Motion.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 4139297, 2019 Fair Empl.Prac.Cas. (BNA) 326,528

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.