# Exhibit 2

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------x

 3   BUREAU OF CONSUMER FINANCIAL,

 4                Petitioner,

 5        -against-                    20 Civ. 3240(KMK)

 6   LAW OFFICES of CRYSTAL MORONEY,

 7                Respondent.

 8   ----------------------------------x

 9
                            United States Courthouse
10                          White Plains, New York

11                          August 18, 2020

12

13                  HONORABLE KENNETH M. KARAS,
                             District Court Judge
14

15

16   CONSUMER FINANCIAL PROTECTION BUREAU
             Attorneys for Petitioner
17           1700 G Street NW
             Washington, DC 20552
18   BY:  E. VANESSA ASSAE-BILLE
             KEVIN E. FRIEDL
19           JEHAN A. PATTERSON

20
     NEW CIVIL LIBERTIES ALLIANCE
21           Attorneys for Respondent
             1225 19th Street NW Suite 450
22           Washington, DC 20036
     BY:  MICHAEL P. DeGRANDIS
23           JARED McCLAIN

24

25

                    Angela O'Donnell, RPR, 914-390-4025
```

 1              THE CLERK:  Consumer Financial Protection versus Law

 2    Offices of Crystal Moroney PC, 20CV3240.

 3              Counsel, please state your appearances for the

 4    record.

 5              MS. ASSAE-BILLE:  E. Vanessa Assae-Bille for CFPB.

 6              MS. PATTERSON:  Jehan Patterson, also for the CFPB.

 7              MR. FRIEDL:  And Kevin Friedl, also for the CFPB.

 8              MR. DeGRANDIS:  Michael DeGrandis, for Law Offices of

 9    Crystal Moroney PC.

10              MR. McCLAIN:  Jared McClain, also for the Law Offices

11    of Crystal Moroney PC.

12              THE COURT:  All right, so we are gathered here for

13    the oral argument on the CFPB's petition to enforce its CID

14    that was issued back in November.  So I have read the papers,

15    but I certainly don't want to deny anybody the opportunity to

16    supplement them.  So I'll let you, CFPB, go first.

17              MS. ASSAE-BILLE:  Thank you, your Honor.  On behalf

18    of CFPB today I will address the issues that squarely relate to

19    the enforceability of the CID; however, my colleague, Kevin

20    Friedl, is available to answer any questions your Honor may

21    have regarding the constitutionality or ratification argument.

22              The central question before this Court is whether the

23    Bureau has met the four criteria that determine the

24    enforceability of a CID.  We contend that it has.

25              First and foremost, the Bureau has a legitimate

1    purpose for conducting this investigation.  As described in the

2    CFPB's notification of purpose, this investigation concerns

3    whether the respondents violated provisions of the Consumer

4    Financial Protection Act, the Fair Debt Collection Practices

5    Act, and the Fair Credit Reporting Act.

6         The CID, which we submitted as Exhibit A, is narrowly

7    focused on the company's performance of debt collection and

8    credit recording activities.  For instance, it requests

9    information concerning the respondent's operations, names of

10   companies for which it collects debt, consumer disputes and

11   complaints, policies and procedures, debt-collection phone

12   scripts, and importantly, recordings of debt-collection calls

13   with consumers.

14        The CID does not, however, ask for information

15   protected by the attorney-client privilege nor does the

16   privilege automatically attach simply because the respondent is

17   a law firm.  As the Second Circuit has articulated, documents

18   attain no special protection just because they are housed in

19   the law firm.  On the contrary, it attaches only once the party

20   asserting it has shown that the communications at issue

21   occurred between a lawyer and their client or potential client

22   and that the communication was for the purpose of securing an

23   opinion of law, legal services, or assistance in some legal

24   proceeding.  None the Bureau's requests seek communications

25   protected by the attorney-client privilege.  And in fact, the

1    only communications sought by the CID are call recordings in

2    which the respondent was collecting or attempting to collect

3    debts from consumers.

4          Now, the Bureau is subject to Section 5517 of the

5    Consumer Financial Protection Act which prohibits the Bureau

6    from exercising its enforcement authority over the practice of

7    law.  We note here that the exclusion contains important

8    qualifications that we believe take this CID out of danger, so

9    to speak, but the Court need not even reach this qualification

10   because Section 5517(n) authorizes the Bureau to issue a CID to

11   any person exempted by the practice of law exclusion where the

12   person is a service provider and the Bureau is carrying out its

13   responsibilities and function under Section 5562 of the statute

14   which applies to investigation and administrative discovery.

15   That Section, 5562, authorizes the Bureau to issue a CID to any

16   person that it has reason to believe may be in possession,

17   custody, or control of evidence that is relevant to a violation

18   of Federal Consumer Financial Law.  So, here the respondent is

19   a proper recipient of the CID because it is such a person.

20          Beyond demonstrating that its investigation has a

21   legitimate purpose and that the inquiry is relevant to that

22   purpose, for the CID to be enforceable, the Bureau must also

23   not have the information it sought in its possession.  This is

24   very much the case here.  As the Court is aware, the Bureau

25   issued a CID to the respondent in June 2017, but the

1    respondent's production in response to that CID was woefully

2    deficient.  For instance, as respondent concedes in its

3    opposition, it's withheld information responsive to at least 15

4    requests and some of their subparts.  The privilege log that

5    the respondent submitted in response to the 2017 CID asserts

6    that the respondent withheld 569,862 phone recordings that were

7    responsive to that first CID.  And in addition, respondent

8    withheld, by our count, at least 144 dispute letters from

9    consumers in part because these letters allegedly identified

10   the respondent's client.  And that's before we even get to the

11   many pages that the respondent clawed back.

12           To the extent the respondent did produce documents,

13   that production was overwhelmingly in an improper format.  The

14   Bureau's regulation at 12 C.F.R. 5562 requires that responses

15   to the Bureau's CID be submitted in a medium requested by the

16   Bureau.  To that end, the first CID was issued with clear and

17   detailed instructions regarding the formatting, including the

18   requirement that information be produced to the Bureau in

19   original or native files.  All in all, the only document that

20   the respondent produced in the correct format was a data

21   dictionary in Excel format.

22           Furthermore, none of the 2017 production was

23   certified, and so the Bureau has no guarantee that the answers

24   or documents that were produced at the time were and continue

25   to be true and accurate.

1        Lastly, we want to stress that the two CIDs are not

2   identical.  Crucially, the applicable period of the CID before

3   this Court is longer and covers a more recent span of time.  In

4   other words, it seeks information that did not exist in 2017 or

5   that changed in the years since.  And so it is the Bureau's

6   position that it is indeed requesting information that is not

7   in its possession.

8        Lastly, your Honor, the Bureau has followed the

9   administrative steps required to issue the CID.  The CID

10  contained the proper notification or purpose that informs the

11  respondent of the purpose of the investigation, it was issued

12  by a deputy assistant director in the office of enforcement,

13  and it was served to the respondent by certified U.S. Mail.

14  Therefore, the four elements of enforceability are met here,

15  and the Bureau's CID should be upheld.

16       I also want to touch on the Federal Rule of Civil

17  Procedure Rule 19 argument.  We believe that Rule 19 does not

18  require the joinder of FedChex in this matter.  Respondent has

19  provided no case law supporting the application of Rule 19 to a

20  miscellaneous proceeding like this one to enforce an

21  administrative CID, but even if the rule applied, joinder is

22  not needed to protect FedChex's interests because, again, the

23  CID does not seek communications between the respondent and

24  FedChex or any other information protected by the

25  attorney-client privilege.  And even if it did, the Second

1    Circuit has made clear that the attorney-client privilege can

2    be asserted by the client or by one authorized to do so on the

3    client's behalf.  There's no reason here that respondent could

4    not assert the attorney-client privilege over communications

5    they had with FedChex, and ostensibly respondent has attempted

6    to do so, although, again, the Bureau believes that respondent

7    has ultimately failed to meet its burden.

8            For these reasons, your Honor, the Bureau believes

9    joinder is unnecessary and that this Court should enforce the

10   CID.

11          THE COURT:  All right, thank you.  I know you had

12   mentioned that Mr. Friedl is available to answer questions on

13   the constitutional issues.

14          I don't know, Mr. Friedl, if you want to add anything

15   to what was said in your papers on those issues or you just

16   want to be reactive.

17          MR. FRIEDL:  Kevin Friedl here, your Honor.  I would

18   just say something brief at the outset about the funding

19   argument and the argument concerning the ratification, and I'll

20   take them in that order, unless the Court would prefer a

21   different approach.

22          With respect to funding, the Court is, of course,

23   aware of this argument already having seen it in respondent's

24   lawsuit against the Bureau where the respondent sought

25   preliminary injunction, essentially shutting down this

1    investigation.  In denying that request, this Court

2    specifically considered the argument that the Bureau's

3    statutory method of funding somehow violated the Constitution

4    and found that there was -- excuse me, the respondent had not

5    shown any likelihood of success on the merits of that claim.

6         I would just highlight one thing which was the

7    Court's observation of the "overwhelming weight of the case law

8    which rejects plaintiff's claim."  The Court cited district

9    court decisions from Central District of California, Middle

10   District of Pennsylvania, District of Montana, as well as the

11   DC Circuit sitting *en banc*, all of which looked at the Bureau's

12   funding specifically and rejected the argument that there was

13   any constitutional problem there.

14        We also cite a Third Circuit decision in our reply

15   which did not look specifically at the Bureau's statute but

16   does speak to the broader issue of Congress' flexibility in

17   exercising its power of the purse to fund in different ways

18   federal initiatives or federal agencies.

19        We submit that nothing in respondent's opposition in

20   this case warrants revisiting the Court's earlier, albeit

21   preliminary, conclusion with respect to this claim.

22        I'm happy to say more about this argument now if your

23   Honor has questions or potentially wait until after respondent

24   has a had a chance to --

25        THE COURT:  Yes, I don't have any questions now, so

1       if you want to turn to ratification, you can.

2              MR. FRIEDL:  Okay, and I'll try to be brief with this

3       one as well.  The ratification by Director Kraninger after

4       Supreme Court held invalid but severable this removal provision

5       fully remediates any objection that respondent might have to

6       the removal provision, the ratification really confirms that

7       this removal provision has played no role in the Bureau's

8       decision to issue and seek to enforce this CID.

9              I'd just say very briefly that ratification is a

10      well-established remedy drawn from principles of agency law and

11      it works retroactively to cure defects in an agency's initial

12      action by rendering that action valid.  Here, as I said,

13      respondent's objection has been that the CID was issued without

14      sufficient presidential oversight through an official who the

15      President could fire at will.  That objection has now been

16      fully addressed by the director's affirmation while she was

17      removable at will that the CID should be enforced.

18             Respondent objects in its opposition that while this

19      would really leave it with no remedy at all, but that's just

20      not the case.  The Supreme Court has emphasized, including in

21      the *Seila Law* decision itself where it was quoting its earlier

22      removal provision case for the enterprise funds, that in these

23      kinds of cases, the remedy has to be tailored to the

24      constitutional problem and that here you have really a very

25      neat one-to-one match between the scope of the problem alleged

1    and the scope of the remedy.  And that remedy I would point out

2    is also one that is well tailored to take into account the

3    other interests at stake here, including the interests of the

4    Bureau in pursuing its legitimate law enforcement

5    investigation, and the interests of those consumers who may

6    have been harmed by the suspected violations of law under

7    investigation here.

8            THE COURT:  On that point though, that's just kind of

9    an ends-justifies-the-means argument, but I think the

10   counterargument is that what incentive is there for somebody to

11   challenge something based on an unconstitutional structure is

12   what the argument is here, respondent's argument here, as it

13   was in *Seila Law*, and if ratification is this sort of the

14   rubber-stamp exercise, then why would anybody bother.

15           MR. FRIEDL:  Well, I think that, you know, the Court

16   in *Lucia* mentioned that in appointment clause cases it tries to

17   craft remedies that do create an incentive for bringing these

18   challenges.  It's notable that the Court in that case did not

19   dismiss the enforcement action at issue, it remanded for

20   another hearing before a properly appointed ALJ, the problem

21   with the appointment, of the first ALJ who had heard the SEC's

22   case.  The Court didn't think there that it was necessary to

23   actually commence that action.  It didn't think in *Seila Law*,

24   it gave no indication in *Seila Law* that it thought dismissal or

25   denial of that CID petition was necessary to incentivize to

1   bring such claims.  It remanded for further proceedings.

2   Surely it could have, if it thought it was necessary, simply

3   deny the CID petition.

4            So it's true that the court has talked about creating

5   incentives, but I think it has to also be read in light of the

6   court's other statement that these remedies have to be

7   tailored.  And, again, the basis of the objection here is we

8   shouldn't have to comply with the CID because we don't know

9   that the Bureau would have wanted to pursue it if the director

10  was under the President's plenary supervision.  That's what

11  makes the removal provision at all relevant to a CID proceeding

12  in the first place, and that objection has been squarely

13  answered by the director's confirmation after she became

14  removable at will that the CID should be enforced and this case

15  should move forward.

16           And, you know, I would also point out that the Bureau

17  certainly wouldn't recognize this as sort of a legitimate

18  incentive, but it is also the case that the respondent has one

19  significant delay in this, in the prosecution of the CID just

20  by raising this issue.  *Seila Law* itself, that involved a CID

21  that was issued in February 2017.

22           Clearly, I would submit that the on-the-ground

23  experience suggests that there is some sort of incentive to

24  raising these kinds of claims.

25           THE COURT:  Okay.  Anything else on this point?

1          MR. FRIEDL:  I would leave it there, your Honor.

2    Thank you.

3          THE COURT:  All right, anything else from the Bureau?

4          MS. ASSAE-BILLE:  Nothing else, your Honor.

5          THE COURT:  Thank you both very much.

6          Who wants to speak on behalf of the respondent?

7          MR. DeGRANDIS:  I would like to, your Honor, Michael

8    DeGrandis of the New Civil Liberties Alliance, appearing on

9    behalf of the respondent.

10          THE COURT:  (Indiscernible)

11          MR. DeGRANDIS:  I'm sorry, you're breaking up, sir.

12          THE COURT:  I just said good afternoon.

13          MR. DeGRANDIS:  Oh, thank you, good afternoon.

14          I'm joined, too, by Crystal Moroney and my colleague

15    at NCLA, Jared McClain.

16          Your Honor, the petition should be denied because the

17    Bureau manifests a structural or constitutional defect that the

18    Supreme Court in *Seila Law* didn't cure, and that's the funding

19    mechanism.  It violates Article I of the United States

20    Constitution.

21          Now, the Bureau tries to downplay its funding

22    structure as commonplace, but make no mistake, in the history

23    of United States, Congress has never before divested itself of

24    the power of the purse such that one agency can requisition

25    on-demand funding outside the appropriations process from a

1    second agency.  Moreover, the President has never had this

2    plenary authority over an agency where the funding is not

3    appropriated by Congress and not reviewed by Congress.

4            And so it's the respondent's position that this is a

5    threshold issue upon which all the other issues in this case

6    rely.  The Court can't enforce a second CID if the Bureau

7    doesn't have the authority to bring an enforcement action under

8    the CFPA.  So to be clear, this is a non-delegation doctrine

9    issue.  Because last year the Supreme Court explained that

10   Congress can't transfer to another branch powers which are

11   strictly and exclusively legislative.  And that's their words,

12   the *Gundy* case, strictly and exclusively legislative.

13           And so what we see with Title X is that Congress

14   isn't seeking assistance from a federal agency with

15   implementing law.  That's not how it structured the funding.

16   Congress is instead divesting itself of its strict and

17   exclusive legislative duties to make appropriations through

18   law.  That's the issue here.

19           The whole point of the appropriations clause was

20   directed for fear that the executive would possess unbounded

21   power.  That's decidedly what the founders did not want, and in

22   fact, then Judge Kavanaugh raised that issue in I think it was

23   *US Department of Navy versus FLRA*.

24           So today's Bureau embodies that fear though, the fear

25   that an executive would have control not just over executing

1   the law but also over determining what his or her funding

2   should be in executing the law.

3          What I really want to impart to the Court is this is

4   a case of first impression.  Contrary to the Bureau's

5   assertion, *Seila Law* did not bless the CFPB'S funding

6   structure.  In fact, it made the nondelegation problem even

7   worse.  The President now exercises complete financial and

8   strategic dominion over the Bureau.  And I'll also note he

9   exercises this power that he doesn't even enjoy with respect to

10  his own agency, the Executive Office of President of the United

11  States.  That receives funding in review from Congress, but the

12  CFPB does not.

13         So this issue of first impression is, of course, then

14  one that no court has ever ruled on because every single case

15  before this was one in which the director was not dependent on

16  the President for authority, and now the President has this

17  total control.

18         And in fact, I'd like to quote the *Seila Law* court

19  here, this should raise some red flags.  The *Seila Law* court

20  said, "Perhaps the most telling indication of a severe

21  constitutional problem with an executive and state is a lack of

22  historical precedent to support it."

23         Contrary to the Bureau's brief in this case, CFPB's

24  funding is not commonplace.  While certainly in rare instances

25  not applicable to the Bureau some courts have held that there

1    are appropriations clause exceptions of sorts for self-funding,

2    self-funding is limited, and the Bureau is not self-funding.

3    It doesn't collect fees.  It doesn't collect assessments.

4    Instead, it goes to another governmental entity and demands

5    funding that that governmental entity can't even refuse.

6         Just one of the examples that the CFPB gives for what

7    a similar, what it perceives to be similar agency, is the Fed

8    itself.  But the Fed gets assessments from large banks that are

9    regulated by the Feds.  There's a direct relationship there,

10   and that's an entirely different circumstance than the Feds

11   going somewhere else.

12        And I will also add, we noted this in our briefing,

13   so unless you want to get into the details, we don't

14   necessarily need to get into the details, but the self-funded

15   agency examples that do exist out there don't have the broad

16   investigative and enforcement authority as the CFPB does.  And

17   *Seila Law* made that clear just how extraordinary the CFPB is.

18   It is unique.  And I believe it called it, said that it had

19   knee-buckling penalties that it could assess against private

20   citizens.  And on top of all that, Title X prohibits the

21   appropriations committee to the House and Senate from reviewing

22   CFPB funding.

23        Now, perhaps Congress can appropriate through a

24   formula where an agency receives funding based upon receipts

25   for the agency's operation, and those are typically user fees.

1    But what it certainly cannot do is allow an agency or the

2    President to determine its own level of funding.  That's rank

3    divestment of Congress's strict and exclusive duty to

4    appropriate funding.  Congress has never done this before.  And

5    no court has ever reviewed this type of action before.

6            There's absolutely no historical analogue here.  And

7    I think that that should be a telling indication of a severe

8    constitutional problem.  And so I would say that with absolute

9    control over the CFPB funding, the President has nearly doubled

10   his funding resources just on top of the executive office of

11   president funds while Congress hasn't lifted a finger.  But it

12   could also go the other way around, couldn't it?  I mean, the

13   President could instead of seeking 690 plus million dollars for

14   CFPB, couldn't the President just pick one dollar?  Couldn't

15   the President just end CFPB operations for the year or for the

16   rest of his term or however that works out?  He certainly

17   could.  That's the nature of this non-delegation problem.

18   That's what happens when Congress divests itself of this

19   funding authority, and I think that it's an important point to

20   make.

21           One last thing that I would add to this is that we

22   also see that most of the time when courts, when the Supreme

23   Court is comfortable with a certain divergence from strict

24   appropriations clause funding for agencies, I'm talking about

25   usually a -- I shouldn't just say funding for agencies, any

 1   sort of structural nuance to an agency, court tends to be less

 2   understanding of that when there's more than one layer.  We see

 3   that in *Free Enterprise Fund*.  *Free Enterprise Fund* was dealing

 4   with a different issue as in it was the vesting power of the

 5   President.  Here we're dealing with the vesting power of

 6   Congress.  I think those two points are related, and the *Free*

 7   *Enterprise* court was particularly disturbed by two levels of

 8   tenure protection.  Here, we have two levels of appropriations

 9   protection.  This instance, the Fed, who gives money, gives

10   money when demanded by the CFPB, gives money to the CFPB, the

11   Fed itself doesn't receive regular appropriation, it is

12   appropriated through a funding formula that Congress has set up

13   for its operations.  So there's a double layer there as well.

14   So I think that that's important.

15           So this unchecked authority is inconsistent with

16   constitutional design and purpose.  The founders, it was very

17   important to them they vest control over spending and lawmaking

18   with Congress.  And again, just to quote *Seila Law*, quoting

19   Federalist 58, they warn that "The power over the purse is the

20   most complete and effectual weapon in representing the

21   interests of the people."  And so, Title X violates

22   nondelegation doctrine, does not fund the CFPB through the

23   constitutionally prescribed process of congressional enactment

24   via bicameralism and presentment.  I think those are important

25   issues here.  And I say that it is a threshold question because

1    we have to answer that question, is the CFPB constitutionally

2    funded, before we can get to the vacation issue because the

3    Supreme Court was clear in *Seila Law* explaining that, well, we

4    can't answer the ratification problem because, first of all, it

5    wasn't a question presented.  Second of all, because it wasn't

6    a question presented, it was not thoroughly briefed.

7          Moreover, the court said, and you know what,

8    ratification turns on case-specific factual and legal

9    questions, so this is a better question to ask lower courts.

10   Well, this Court won't be able to get to the factual and legal

11   question surrounding the nuances of this particular case

12   without first determining whether the CFPB is, in fact, a valid

13   entity as it is currently funded.  And so, when we look, if we

14   get to that point where we can look at ratification, I think

15   this also highlights why this is important, I believe the CFPB

16   and the law office agree on the baseline principle upon which

17   agency law is founded.  I think Judge Preska said it well in

18   the *RD Legal Funding* case, I'll quote her here, "Ratification

19   addresses situations in which an agent was without authority at

20   the time he or she acted and the principal later approved the

21   agent's prior unauthorized acts."

22          So to the extent that ratification is ever available,

23   the ratifier must be able to do the act at the time the

24   ratification is made.  The Supreme Court has talked about this

25   in *FEC versus NRA Political Fund*.  This is black letter agency

1  law, if the Bureau's funding is unconstitutional, Director

2  Kraninger can't ratify anything, so that the Court won't be

3  able to reach the factual or legal issues.

4        The Supreme Court has explained that remedies for

5  separation of powers violations must advance the Constitution's

6  structure and purpose, but also creates incentives to bring

7  such challenges.

8        And one thing that I would like to highlight here, I

9  don't think we should forget where we came from.  I don't think

10  we should forget what Ms. Moroney has gone through to get to

11  this point with respect to the stress and strain of close to

12  $80,000 worth of attorneys fees in defending, but also in

13  compliance fees in attempting to comply with the CFPB's first

14  CID.  This isn't nothing.  This is real harm to her, her

15  inability -- she's the only lawyer in her law firm.  The

16  inability of her to expand her firm.  She even engaged in

17  projecting for her business, being able to develop new

18  business, being able to control costs, and so on and so forth.

19  I won't belabor that point.  We discussed that in greater

20  detail during the preliminary injunction hearing.  I do think

21  it's important that we keep in mind where we come from.  And

22  that if the CFPB can just come back and say, never mind, I know

23  we were unconstitutionality structured before, we're just going

24  to ratify it, you were conducting that investigation and

25  Ms. Moroney suffered all of those costs, all of those harms

1    while you were unconstitutional.  That is hardly fair.

2          And I'll also add that the cases that the Bureau

3    cites here to support its position regarding ratification

4    involve appointments clause violations.  So there is a

5    difference between say Director Cordray, who is invalidly

6    appointed, then becoming validly appointed, and then ratifying

7    his prior act.  There's a difference between that and Director

8    Kraninger who was validly appointed.  No one questions her

9    appointment.  What we question, actually, we don't question,

10   what *Seila Law* told us was that she was unauthorized in the

11   first place, she lacked the authority because she's

12   unconstitutionally insulated from presidential control.  She

13   lacked the very authority to make the decisions in the first

14   place.  I think that's a very important point here.  And to

15   rule otherwise, to rule that the separation of powers violation

16   of the CFPB, of the director's position with the CFPB, I should

17   say, that it can simply be ratified by the very director who

18   was unauthorized to act in the first place, would render the

19   Supreme Court's *Seila Law* decision merely advisory and really

20   enable Director Kraninger to perpetuate the separation of

21   powers violation.  There must be a remedy here, and that remedy

22   should be dismissal.  She can't ratify this.

23          I will add that ratification is an actionable remedy,

24   the purpose of which is to convert unlawful acts, such as the

25   director's in this case, into lawful ones.  But there's also a

1    doctrine of unclean hands.  You can't benefit from an equitable

2    defense.  If the party has acted in a way that's unfair, has

3    gained an advantage, and I think that would certainly be the

4    case here, because at all relevant times, Director Kraninger

5    knew that her position was unconstitutionally empowered.  She

6    told Congress that in September 2019.  This CID was issued in

7    November 2019.  This is a blatant exercise of power that she

8    knew she did not have.  So this is not a good faith mistake.

9    This a deliberate constitutional violation.

10           To the extent the Court finds any of the citations

11   that the CFPB brings forth to suggest that the ratification is

12   valid, none of those apply because none of those are

13   circumstances in which the governmental agent that acted

14   unconstitutionally knew it was acting unconstitutionally at the

15   time, and that's the case here.

16           So the funding defect must be resolved before

17   reaching the issue of whether Director Kraninger can ratify the

18   this enforcement action because she has to make a showing, and

19   she hasn't made a showing, that the CID, that when issuing the

20   CID in the first instance, that she had the power to do so.

21   And it seems that she's already admitted, that she admitted in

22   September she didn't have the power to do so, and that the

23   Supreme Court has agreed that she did not have the power to do

24   so.

25           Now, I will say that, if we get past the

1    constitutional issue, and if the Court disagrees with the

2    respondent, if the Court believes that the CFPB is

3    constitutionally funded and then the Court says, you know what,

4    Director Kraninger can ratify her own prior bad action, then we

5    get to the issue of enforcing the second CID.

6            THE COURT:  Before we get to that, just one quick

7    question.

8            MR. DeGRANDIS:  Sure.

9            THE COURT:  What if the CFPB decided, what if the

10   director decided, okay, ratification is a tricky issue for us,

11   so withdraw the CID and I'm just going to issue a new one.  Is

12   there anything that could stop the director from doing that?

13           MR. DeGRANDIS:  Assuming that the CFPB is

14   constitutional, I think the only --

15           THE COURT:  Obviously, right.  Right, right.  You're

16   right, that question assumes, and I understand the argument

17   that that may very well be a prerequisite determination that

18   has to be made, but just with respect to the ratification

19   issue, and in particular, addressing your argument regarding

20   the stripping your client of a remedy here, what would stop the

21   director from doing that?

22           MR. DeGRANDIS:  Nothing would stop the director from

23   doing that.  The director could -- the director is now validly

24   in charge of the CFPB.  Again, assuming all of the other

25   assumptions here.  So, yes, she could say, you know what, let's

1    just go ahead and take a look at this issue again and reissue

2    the CID, which would be the next discussion, there would be

3    certain limitations there based on the facts of this case, I

4    believe.

5            Ms. Moroney isn't here to say to the CFPB, were it

6    the constitutional, cannot demand certain documents from her.

7    That's not her position.

8            So with respect to those limitations, there are

9    problems with the CID in whole or in part that prohibits the

10   CFPB from seeking its full enforcement here.  And as I say, I

11   said before, I think the parties are in agreement regarding the

12   four elements that the CFPB must meet, but the CFPB has failed

13   to meet these four elements.  So first and foremost, the

14   demands are not for a legitimate purpose.

15           So going back to your question, your Honor, if

16   Director Kraninger said, never mind, I'm just going to go ahead

17   and issue a third CID, that would be fine, but the third CID

18   must be for a legitimate purpose.  There are legitimate reasons

19   why the CFPB may want information from a law firm that collects

20   debt, but it can't impact the practice of law.  The CFPB itself

21   says, and I'm going to quote here, "The Bureau may not exercise

22   any supervisory or enforcement authority with respect to the

23   activity engaged in by an attorney as part of the practice of

24   law under the laws of the state in which the attorney is

25   licensed to practice law."  And that's exactly what's happening

1   here.  Ms. Moroney bent over backwards to comply with all

2   demands for documents and information related to a third-party

3   contact regarding debt the collection.  She drew the line at

4   client conferences and privileged information as required by

5   New York and New Jersey State bars.

6          THE COURT:  Why not do a privilege log?

7          MR. DeGRANDIS:  They have done a privilege log, and

8   we did attach it to our brief.  Mr. Canter had provided an

9   extensive list of the documents provided and not provided and

10  explained why those documents weren't provided.  To the extent

11  that the privilege log, the CFPB finds the privilege log

12  insufficient, I'll say, we need at some point a mediator to

13  help out with that.  The impasse was over this information.

14  And when Ms. Moroney said I'm not going to provide you with

15  client confidences or priveledged material, the CFPB -- I

16  should say after that she said I will try to get waivers for my

17  client, and the client said something to the effect of, oh,

18  heck no.  And so she couldn't do that.  She was duty-bound not

19  to turn that over.  The CFPB told her, well, then we're going

20  to enforce.  And so at that point there was nothing more to

21  negotiate with the CFPB on this issue and that -- to the extent

22  that the privilege log provided is in any way insufficient,

23  that should have been litigated at the November 2019 show cause

24  hearing, but the CFPB chose not to do that.

25          And I'll say, this is also related to CFPB's argument

1    that, hey, gee, we don't have documents in our possession.  Not

2    true.  You have the documents in your possession.  They make

3    these feeble process argument.  It's not in the format that we

4    requested.  Well, okay, it's not in the format that you

5    requested, but it's perfectly readable, and if you had any sort

6    of formatting objection, you waived that as soon as you mooted

7    the first show cause hearing.

8            So now that you issue a second CID it was incumbent

9    upon you to review those documents, narrowly tailor your second

10   CID for those documents you don't have.

11           It at least appears to Ms. Moroney that they haven't

12   looked at those documents.  You think if they were really

13   interested in -- and I think Mr. Friedl was saying that there

14   are suspected violations of law under investigation.  Well, if

15   they're suspected violations of law, my goodness, I certainly

16   would hope that the CFPB would have gone through the

17   information that it had in its possession.  It just seems

18   strange that they wouldn't do that.

19           I also take issue with how narrowly the CFPB is

20   viewing an attorney's responsibility to his or her client.

21   It's not just about privileged documents, and I appreciate CFPB

22   isn't specifically asking for privileged documents.  It's also

23   about confidentiality.  Attorneys have an equally important

24   responsibility in protecting privilege as it does in protecting

25   confidentiality.  That is a very important issue here that

1    implicates Ms. Moroney's license to practice law in New York

2    and New Jersey.  And the requests do implicate confidential

3    information that the attorney has that she received from her

4    client which is why we're now, I guess we're moving on three

5    plus years, we've been saying to the CFPB, I have and

6    Ms. Moroney's other attorneys have been saying, if you need

7    this information, go ahead and go to the client and seek that

8    information.  And we know the CFPB knows how to do this, and we

9    know that because they've got a case in California against one

10   of her clients, against FedChex.  That is the appropriate path,

11   not going through the attorney because going through the

12   attorney ends up interfering with the attorney-client

13   relationship.

14           So I will say this, too, I think the Supreme Court

15   case of *Endicott Johnson Corp. versus Perkins* really lays out

16   the question that the Court should ask of itself when trying to

17   determine whether the scope of an administrative subpoena like

18   a CID is reasonable, whether the CFPB is stepping outside its

19   statutory authority in trying to regulate the practice of law.

20   I'm slightly restating this for our purpose here, but the

21   Supreme Court essentially said the question is can the CFPB

22   fully perform its statutory duty without the attorney-client

23   confidences and privileged materials that it's demanding from

24   the law firm?  And I think the question has to be yes.  To the

25   extent that there are client confidences, there's no reason,

1    it's plainly irrelevant because the client confidences can be

2    discovered, can be acquired from the clients themselves.  And I

3    think that's an important point here.

4           And other thing, the CFPB glosses over all of the

5    interrogatories that Ms. Moroney's law firm answered.  There

6    are over 80 interrogatories that she answered.  There's no

7    explanation as to why she would have to reanswer those

8    questions, why even the format was something that the CFPB

9    didn't like.  It's just not clear why the CFPB is issuing a

10   second CID that doesn't take into account the information it

11   already has.

12          And I think the second point here though, and I think

13   I've probably have covered the issue a little bit, so I won't

14   belabor the point, is that the CFPB hasn't followed a lot of

15   the required administrative steps.  Again, some of this is

16   related more to the ratification argument.  There is a question

17   regarding the timing of ratification, of regulations, and

18   guidance, along with when this particular enforcement action

19   was ratified, but I want to highlight the Bureau is being a bit

20   disingenuous here.  They claim that the authority to issue and

21   enforce CID comes directly from the Consumer Financial

22   Protection Act rather than any Bureau regulation.  An element

23   of that is true, but that's not the complete truth.  In fact,

24   the amended petition to enforce the CID and the memorandum in

25   support cite to Code of Federal Regulations not fewer than nine

1    times, and the attachments not fewer than 18 additional times.

2    There's a whole host of implementing regulations and the CFPA

3    gives the CFPB the authority to implement those regulations

4    regarding investigations and CID enforcement and so on and so

5    forth.

6            So I think I would like to just reiterate one point,

7    and that is objections to the formalities, the extent CFPB is

8    claiming they don't have these documents.  I think those are

9    waived when it voluntarily dismissed the 2019 enforcement

10   action.  And I think for that reason the CFPB needs to go back

11   to the drawing board regarding its CID if it has the authority

12   to issue one in the first place.

13           The only last point I'd like to make here is related

14   to Rule 19.  I think the one thing, and I'm sure the Court is

15   aware of this but I think I should say it here, non-joinder

16   isn't a defense to an enforcement action.  The respondent is

17   not seeking relief here.  She merely asserts that if this Court

18   finds, obviously, the Bureau's funding structure doesn't

19   violate nondelegation doctrine, that the Bureau properly

20   ratified its unlawful acts, that in order to -- to the extent

21   that the CID implicates FedChex's interests, and only to that

22   extent, that FedChex must be joined to that portion so that

23   they can defend their interests, or the CFPB should amend the

24   petition to enforce to specifically exclude documents related

25   to FedChex.

```
 1            Again, this implicates Ms. Moroney's ethical
 2    obligations, and the concern is, what if California denies a
 3    petition to enforce against FedChex?  Ms. Moroney already asked
 4    FedChex if they would waive confidential privilege here, and
 5    they said, no.  So she's under instructions from her client,
 6    don't provide those documents.  What if the California court
 7    says, that's right, you don't have to provide those documents,
 8    but this Court is free to say, yes, Ms. Moroney, you do have to
 9    provide those documents.  Well, that puts Ms. Moroney in a very
10    awkward spot.  It also, as a practical matter, impedes
11    FedChex's ability to protect its interests.  There are
12    inconsistent obligations here for Ms. Moroney with respect to
13    what she is supposed to do in protecting her client's
14    confidential and privileged information.
15            So I think that's really all I have, and obviously
16    I'm happy to answer any questions you have, your Honor.
17            THE COURT:  You've covered a great deal of material,
18    and as I said, I've read the papers which were quite
19    comprehensive, so I very much appreciate your efforts, and I'm
20    sure your client does as well.
21            Thank you very much, Mr. DeGrandis.
22            MR. DeGRANDIS:  Thank you.
23            THE COURT:  All right, does anybody else from the
24    Bureau want to reply?
25            MS. ASSAE-BILLE:  Yes, your Honor.  I'd like to
```

1    respond to a few points that are not related to the

2    constitutionality or ratification points.

3            THE COURT:  Okay.

4            MS. ASSAE-BILLE:  So, first, the respondent brings up

5    *Endicott Johnson Corporation v. Perkins*.  Respondent cites this

6    1943 Supreme Court case and states on its brief on page 30 that

7    in that case the court concluded that the government could

8    issue an administrative subpoena because the evidence sought

9    was not plainly incompetent or irrelevant to any lawful

10   purpose.  Confusingly, however, the respondent then concludes

11   that the essential question is whether the Bureau can fully

12   perform its statutory duty without information demanded.  That

13   interpretation distorts the very standard that respondent

14   quotes in its own brief.  The central question is simply

15   whether the evidence sought is not plainly incompetent or

16   irrelevant, and that standard is certainly part of what is one

17   of the elements that is articulated in *United States*

18   *Construction Products*, which is the case that outlines the four

19   criteria for enforcing a CID.  We believe that distinction to

20   be meaningful because it is difficult in these investigations

21   for the government to collect a number of documents that are

22   certainly plainly relevant and not incompetent but that the

23   government may not necessarily rely upon to prove its case down

24   the line.  We doubt that the *Endicott* court intended to tie the

25   Bureau's hands in the way that the respondent attempts to do

1    now.  What matters here is relevance.  And as I said earlier,

2    nothing the Bureau has requested is irrelevant.

3              I also want to touch on the privilege log question.

4    We are clearly confused here because the respondent asserts

5    that they have provided a privilege log.  The CID before this

6    Court was issued on November 14, 2019.  The respondent has

7    produced nothing since that date.  They have not produced

8    documents, they have not produced answers.  And certainly they

9    have not produced a privilege log as required by -- and as is

10   their right under 12 C.F.R. 1088, which provides that if a

11   respondent is withholding information on the basis of

12   attorney-client privilege, then they must produce the privilege

13   log.

14             Again, respondent has not done so here, nor do they

15   identify any request to which they believe the attorney-client

16   privilege should attach in their opposition brief.  Instead,

17   they vaguely reference that there are concerns about that the

18   Bureau has sought information relating to their representation

19   of their client and that we have sought information regarding

20   their contacts with their clients, but those allusions do not

21   meet the burden in the legal standard.  And in the Second

22   Circuit case of *United States versus Construction Products*

23   *Research* where an administrative subpoena was challenged based

24   on the attorney-client privilege, failure to provide an

25   adequate privilege log was sufficient for the court to uphold

1    the subpoena.

2              In this the respondents suggests that perhaps a

3    mediator could help us resolve the issues down the line, but in

4    our view, your Honor, the respondents have had plenty of

5    opportunity to provide a privilege log, not only in response to

6    the CID, but after the director denied its position to set

7    aside or modify the CID, the respondent could have provided a

8    privilege log and did not do so.  They could have attempted to

9    provide a privilege log while opposing this very petition and

10   they have not done so.  So in our view, the time to submit a

11   log has passed, and respondent's failure to do so weighs in

12   favor of upholding and enforcing the CID.

13             I also want to touch on this confidentiality argument

14   that the respondent has referred to in, again, fairly vague

15   terms in their brief and again today in this hearing.  What

16   they're referring to is New York of Professional -- New York

17   Rule of Professional Conduct 1.6.  We contend that that rule

18   does not render the purpose of the CID illegitimate, nor does

19   it preclude enforcement of the CID.  We underscore again that

20   we are not seeking information related to the practice of law,

21   as is plain from the CID that is attached as Exhibit A.  And

22   Rule 1.6 applies to legal clients.

23             Here, any information the Bureau seeks about the

24   respondent's relationship to its client is limited to the

25   debt-collection services and credit-furnishing services that

1    the respondents provide.  So we contend that Rule 1.6 is not

2    triggered, but even if it were, a number of courts have

3    recognized that Rule 1.6 does not prevent a government agency

4    from obtaining certain client information through an

5    administrative subpoena.

6              In any event, the respondent appears to concede that

7    an order from this Court would fall under the exception to Rule

8    1.6 which permits disclosures of confidential information to

9    comply with other law or a court order.  The Bureau's position

10   is that this subpoena already brings, already triggers this

11   exception, but certainly a court order from the Court would

12   absolutely remove any Rule 1.6 concerns.

13             I also want to go back to this argument about what

14   the Bureau has in its possession.  The respondent characterizes

15   its production as perfectly reasonable.  While that may be

16   their view, that is not the standard that applies here.  Again,

17   the Bureau's regulation at 12 C.F.R. 5562(c)(1)(A) require that

18   responses to our CID be submitted in the medium requested by

19   the Bureau, pardon me, and that's also 12 U.S.C. (c)(10).  So

20   both the statute and the regulation permit us to ask for

21   information in a certain format, and that is not a cosmetic

22   concern.  A client's production would contain metadata at that

23   provides additional information about documents such as their

24   source, their dates of creation, their custodian, and so forth,

25   things that you cannot simply get from taking a look at a

1   document and seeing it as readable.  But, of course, all of

2   that is secondary to the fact that, again, the Bureau's statute

3   and regulation are fairly clear on what the respondent's

4   obligations were here, and we also do not follow the argument,

5   nor has the respondent provided any legal authority to support

6   its argument, it's contention, pardon me, that in withdrawing

7   its first petition the Bureau somehow waived its objections to

8   the production's format.  That is certainly not our position.

9   We have never conceded such a thing, and we continue to

10  maintain that the production was improper and that we should

11  not have to rely on it in response to the second CID.

12          Now, the respondent with respect to Rule 19 has

13  brought up that the Bureau could simply obtain the information

14  that it seeks from Moroney, from the respondent from its

15  client.  Even if FedChex -- even if the Bureau has issued a CID

16  to FedChex, and they had, and FedChex were to comply, the

17  respondent would still have to produce information in response

18  to each of the other -- to each of the requests in the CID

19  which asks for information relating to services that it offers

20  to other clients.  And, again, information that is not in the

21  Bureau's possession and information that is solely in the

22  custody or control of the respondent.

23          We also want to note that, as the respondent has

24  refused to comply with the CID, the Bureau does not have in its

25  possession information, complete information about who the

1    respondent's clients are.  So perhaps FedChex complies, but the

2    Bureau is interested in having a sense of the identity of those

3    other clients on whose behalf the respondent performed

4    debt-collection and credit-furnishing activities.  So that

5    argument to us again really does not -- should not exempt the

6    respondent from having to comply with the CID.

7          And I also want to add on that point that, again,

8    suggesting that the Bureau can obtain some of the information

9    from another party isn't -- it's not -- it doesn't resolve the

10   fact, it doesn't contradict the fact that the respondent is a

11   person under, as defined in the Bureau's organic statute is a

12   person from which the Bureau can seek information.

13         So we just don't believe that it makes any difference

14   that the Bureau could hypothetically obtain a modicum of

15   information from other parties.

16         And the last thing I'll say here is I just want to go

17   back to the practice of law exclusion that is in Section 5517

18   of the Consumer Financial Protection Bureau.  It's certainly

19   true that the Bureau cannot exercise supervisory and

20   enforcement authority over the practice of law, but as I

21   mentioned at the outset of this hearing, the exclusion contains

22   an important qualification, and we did not, for space-related

23   reasons, we did not outline those qualifications in our reply,

24   but I'll do so here to clarify this issue for the Court.

25         First, the law exclusion provision permits the Bureau

1    to bring lawsuits against any law firm engaged in the provision

2    of consumer financial services where the services are not part

3    of the legal representation.  And that's codified in 12 U.S.C.

4    5517(e)(2)(A).  This is in line with case law that says that

5    where an attorney acts as a collection agent, the

6    communications between him and his client are not protected by

7    the privilege.

8           Second, the limitation does not apply to a consumer

9    financial service that is offered or provided by an attorney to

10   any consumer who is not receiving legal advice or services from

11   the attorney in connection with such a financial service.  And

12   that's under (e)(2)(B) of the same statute.

13          So this exemption, for instance, clearly entitles the

14   Bureau to those debt-collection calls between the respondent

15   and consumers, presuming that the respondent is not providing

16   legal advice or opinions of law to the same consumers from whom

17   it is collecting facts.

18          And third, third and lastly, the limitation, the

19   statute says that the limitation is not to be construed to

20   limit the Bureau's authority with respect to any attorney to

21   the extent the attorney is otherwise subjected to any of the

22   enumerated consumer laws.  And here we want to point out that

23   the Federal Debt Collection Practices Act and the Fair Credit

24   Reporting Act are enumerated consumer laws.

25          So, again, we firmly believe that the practice-of-law

Angela O'Donnell, RPR, 914-390-4025

1    exclusion does not foreclose the enforcement of the CID before

2    this Court.

3           THE COURT:  All right.  Thank you very much,

4    Ms. Assae-Bille.

5           Mr. Friedl, did you want to address the

6    constitutional issues?  Again, I've read all the papers, but if

7    there's anything in particular that was said by Mr. DeGrandis,

8    feel free.

9           MR. FRIEDL:  Absolutely, your Honor.  I think

10   Mr. DeGrandis did cover a lot of ground.  It won't surprise you

11   to hear we disagree with it, but I will stand on the papers and

12   just highlight a few brief points out of respect for the

13   Court's time, which I recognize the Court has already been very

14   generous with this afternoon.

15          With respect to funding, Mr. DeGrandis said that this

16   is a nondelegation doctrine issue, but in all these filings and

17   in the presentation today, it's never -- such a challenge, it

18   has never actually articulated that doctrine requires certain

19   delegations of congressional authority to be guided by an

20   intelligible principle.  And so long as they are, there's not a

21   constitutional problem.

22          It's not even clear here exactly what the delegation

23   is that's under attack.  I presume it's the -- really the main

24   funding provision in 12 U.S.C. 5497(a) and (b), but that just

25   authorizes the transfer of a certain amount up to a capped

1    amount of funds from the combined earnings of the Federal

2    Reserve System as determined by the director to be reasonably

3    necessary to carry out the authorities of the Bureau under the

4    federal consumer financial law, and it actually goes on, I

5    won't read the whole thing.  But these provisions include, you

6    know, actually a far clearer and more definite principle to

7    guide the director's decision-making on that point as compared

8    to others that the Supreme Court has upheld against

9    nondelegation challenges.

10            The respondent also highlights that the Bureau draws

11   funds from the combined earnings of the Federal Reserve System,

12   such as one agency taking money from another as a factual

13   matter.  I don't know if this was in our brief, I want to be

14   clear that the Bureau is formally part of the Federal Reserve

15   System.  That's in 12 U.S.C. 5481(a).  But more to the point,

16   the factual distinction that respondent wants to draw between

17   the Bureau and other agencies really don't make a difference

18   under either the nondelegation doctrine or other framing of

19   this challenge under the appropriations clause.  That clause

20   requires that payment of money from the treasury must be

21   authorized by statute.  That was the Supreme Court's holding in

22   the *Office of Personnel Management* case we cite and, of course,

23   that is the case here, the Bureau's method of funding is

24   authorized by its organic statute and Congress remains free at

25   any time to amend that statute to do so.

                    Angela O'Donnell, RPR, 914-390-4025

 1          And so the comparison to *Free Enterprise Fund* where

 2     there were sort of two stacked removal restrictions really is

 3     completely in apposite.  The problem there was that double

 4     layers of removal provision made a difference for the

 5     President's ability to oversee the members of the accounting

 6     board that was at issue there.  He couldn't remove those

 7     officials even for cause, he had to work through the FEC

 8     commissioners who the court assumed for purpose of that case

 9     were removable only for cause.  So there was a double layer

10     that made a difference.

11          The Bureau's funding, whether it is drawing money

12     from Federal Reserve System, from its own imposition of fees or

13     from some other method, it really doesn't make any difference,

14     it's is an appropriation made by statute and it is something

15     that Congress could revisit at any time if it sees fit.

16          Unless your Honor has questions on this, I would just

17     turn to ratification and address two or three points quickly.

18          The respondent says the cases we cite on ratification

19     involve appointments clause violation.  That's not true.  We

20     cite a case from the DC Circuit, *FEC v Legi-Tech*, which

21     involves what the court called a structural separation of

22     powers problem where there were potentially congressional

23     appointees were part of that commission at that point in a

24     nonvoting capacity but an appointments clause issue.  Nor is

25     there any reason that this Court should ignore the cases that

 1   approved ratification in the appointments clause contact such

 2   as the just a Ninth Circuit's decision in *Gordon*.  In this

 3   case, as in cases like *Gordon*, the initial problem is with the

 4   exercise of authority by an agent, the head of the agency.  In

 5   *Gordon*, the problem is that official had not been properly

 6   appointed.  Here the problem was that official is not

 7   properly -- was not properly removable.  But in both cases that

 8   initial defect in the agent's authority secured by subsequent

 9   ratification once the problem is solved.  There's no reason to

10   discount those cases just because they involve the appointments

11   clause.

12          Respondent also invokes the doctrine of unclean hands

13   and suggests the Bureau couldn't ratify any bad actions.  But

14   what bad action?  The Bureau hasn't done anything in this case

15   beyond come to this Court seeking a judicial resolution of the

16   dispute over the CID in an attempt to carry out its

17   congressionally mandated mission.  And nothing in the *Seila Law*

18   decision suggests that -- undermines that or suggests that the

19   Bureau was engaged in some sort of bad conduct requiring overly

20   broad remedy to deter that conduct going forward.  It was the

21   Bureau's position that prevailed in *Seila Law*, that the removal

22   provision is unconstitutional but severable.  So I had to

23   address that point.  And the final -- I'll just rest there,

24   unless your Honor has any other questions, we would just stand

25   on our briefs.

1          THE COURT:  I have no other questions.  Thank you for

2    making this points.

3          All right, we've been at this for a while, but I

4    don't want to deny respondent a chance.  If there's anything

5    else you want to say, by all means.

6          MR. DeGRANDIS:  Thank you, your Honor, very quickly

7    then.  What I'd like to point out regarding the constitutional

8    issue is that the delegation problem is Congress divesting

9    itself trying to delegate its authority to make appropriations

10   through law.  So I would like to sort of answer or address that

11   concern that the CFPB stated there.  And regardless of its

12   place, the CFPB's place in federal agency hierarchy of things,

13   it's still deciding some funding.  It doesn't matter what its

14   relationship is to the Federal Reserve, what matters is that

15   the President or the director can demand of the Federal Reserve

16   payment instead of going to Congress and getting Congress to

17   appropriate those funds.

18         The next point I'd like to make with respect to

19   ratification is only that when I use the word bad, this wasn't

20   a moral argument.  I am not saying that the director is a bad

21   person or anyone at the CFPB is bad.  The bad acts are the

22   unconstitutional acts, and the director at all relevant times

23   knew that what she was doing was unconstitutional.  She knew

24   that she didn't have the constitutional authority, she

25   previously admitted that, and the *Seila Law* court confirmed

1    that for us.

2         I have two points that I'd like to close with which

3    are related to the CID itself.

4         First of all, with respect to waiver of any

5    formatting objection, my grounds for saying that are the same

6    reasons that I would think the CFPB is saying that it didn't

7    receive a privilege log with the second CID.  They're

8    100 percent correct, there is no privilege log with the second

9    CID.  Ms. Moroney has not complied with the second CID in any

10   way, shape, or form, so there is no privilege log.  But there

11   is also -- they still have documents in their possession from

12   the first CID.  So if they wanted, if the CFPB wanted to make

13   those objections, the right time to make those objections would

14   have been at the November show cause hearing, not now.  And I'm

15   a little confused by the CFPB's statement that the time to

16   submit a privilege log in this particular case has passed.

17   CFPB has jumped up and down and all around promising that there

18   is absolutely no harm in ignoring a CID until it comes time for

19   a court to order enforcement.  So it surprises me that they

20   would suggest the time has passed.  But we will admit that

21   there has not been a privilege log to this point for the second

22   CID.

23        And lastly, regarding the *Endicott* case, I would

24   agree the *Endicott* case doesn't tie the CFPB's hand.  I don't

25   think that's the right way to look at it.  The *Endicott* case

1    does deal with plainly incompetent or irrelevant information.

2    What makes information plainly incompetent or irrelevant is

3    where that information isn't targeted toward a legitimate

4    purpose, doesn't advance the exploration of issues related to

5    the CFPB's statutory duty, and that's our position here with

6    respect to the client confidences and names of clients and so

7    on and so forth.

8            So that's really the issue and why we think that

9    while we are subject certainly to CFPB inquiries regarding just

10   the collection of debt we'll say, that inquiry is limited to

11   third-party documents, it is limited to those sorts of things.

12   And Ms. Moroney, while she has turned over the vast majority of

13   that information, to the extent that there is more that's

14   required because the second CID has an additional two-year

15   timeframe roughly thereabouts, that would be an adjustment that

16   would have to be made if this Court decides to enforce a second

17   CID.  She's objecting to those legitimate portions of the CID.

18           That's all I have to say.

19           THE COURT:  All right.

20           Anything else from anybody?  Okay.

21           Well, what's the band say, a long strange trip it's

22   been.  So here we are.

23           Seila Law comes down which provides some elimination,

24   but what I want to do is give you a ruling now, because if you

25   wait for me to write an opinion, I think this will not be in

Angela O'Donnell, RPR, 914-390-4025

1    anybody's interest.  So I'm going to go through some factual

2    background.  Obviously what I relate to you here is taken from

3    submissions from both respondent and the Bureau.

4           Now, according to the Bureau, respondent is a law

5    firm that collects on delinquent or defaulted consumer debt on

6    behalf of various creditors.  Respondent also provides

7    information to credit reporting agencies about consumers from

8    whom it is seeking to collect debt, but respondent does clarify

9    and consistent themes throughout its position here in this case

10   that it is a law firm that provide legal advice and services to

11   clients.  Indeed, there's no disputing that, nor is there any

12   disputing the fact that Ms. Moroney is licensed to practice law

13   in this state and in New Jersey, and that her firm is regulated

14   by the New York and New Jersey Rules of Professional Conduct,

15   and of course her continued ability to practice as a licensed

16   attorney conditioned upon strict adherence to those rules.

17          We all know the first CID was issued to respondent

18   back in June of 2017.  According to the Bureau, this CID sought

19   "substantially similar" information to the 2019 CID but it's

20   not identical.  What's more, the Bureau claims that respondent

21   produced a partial response to the 2017 CID but it withheld and

22   "clawed back a significant amount of material."  And there's

23   also a claim that some of the documents were not produced in

24   compliance with the Bureau's standards regarding electronically

25   stored information, that there was no certification, that their

1    responses to the 2017 CID were true and complete.

2              Now respondent counters by noting that it did provide

3    written responses to the interrogatories, produced thousands of

4    pages of documents and other data, and to the extent that there

5    was a decision to not produce certain documents, that was based

6    on the attorney-client privilege and other nondisclosure

7    principles, or because the material, the responsive materials

8    might have been inextricably intertwined with privileged

9    material.  But in particular what the Bureau contends is that

10   respondent originally identified about 1793 pages of responsive

11   material, along with 1150 pages of which was comprised of data

12   dictionary tables that were duplicative of Excel spreadsheets

13   that the respondent also produced, and that the respondent also

14   withheld responses to at least 15 of the Bureau's requests,

15   including 144 letters of dispute that it deemed to be

16   responsive to the Bureau's request for legal actions and

17   administrative proceedings filed against respondent or its

18   principals relating to the company's debt or information

19   furnishing activities.

20             Now respondent does claim that, well, first of all,

21   respondent has made the point that it retained ethics counsel

22   for independent advice, and relied on that advice in evaluating

23   its duty under Rule 1.6 the New Jersey and New York Codes of

24   Professional Conduct to protect the information it deemed to be

25   covered by attorney-client privilege.  There was a request for

1    waiver from clients, which was declined.  And so from

2    respondent's perspective, the Bureau was putting respondent in

3    a position to violate ethical obligations regarding asserted

4    confidences.

5              There was correspondence that explained some of these

6    points and then ultimately what happened was is that in

7    November of 2019 the Bureau withdrew the 2017 CID.  That was on

8    November 4.

9              On November 14, the Bureau had issued the 2019 CID,

10   and all of what was requested is spelled out in the petition at

11   paragraph 1.  It's also Exhibit A to Ms. Assae-Bille's

12   declaration.  The respondent takes the view that the two CIDs

13   are not initiated due to any consumer complaints regarding any

14   of the purposes listed in the Notice of Purpose because

15   otherwise the Bureau would have indicated as such.

16             The CID was issued by a deputy assistant director of

17   the Office of Enforcement and was served on respondent by way

18   of certified U.S. Mail, return receipt requested.  The

19   materials were due by December 16 of 2019.  On December 2,

20   respondent and counsel for the Bureau met and conferred in

21   accordance with 12 C.F.R. 1080.6(c).

22             There was some discussion about modification, but

23   that was never forthcoming.  Instead, respondent filed a

24   petition requesting that the director set aside or modify the

25   CID which stated that line for respondent to actually answer

1   the CID.  And this request is made both on constitutional and

2   statutory grounds and sought a modification to excuse

3   respondent from producing any material that had previously been

4   submitted in connection with the 2017 CID.

5        That petition was denied.  There was a request to

6   have respondent fully comply with the 2019 CID within ten days.

7   Also, the director determined that the respondent's petition

8   was untimely.

9        The bottom line here is that by March 19 of 2020,

10  counsel for respondent indicated that respondent did not intend

11  to comply with the 2019 -- not comply, respond to the 2019 CID.

12       So there's been no production of materials in

13  response to the CID, and as has been acknowledged, there's been

14  no privilege log with respect to the 2019 CID, but respondent

15  does aver that the only documents that have been withheld from

16  its response to the 2017 CID were those related to the practice

17  of law, not documents exclusively related to third-party debt

18  collection, and that respondent has produced all policies and

19  procedures that the Bureau had requested in the 2017 CID.

20       There's also, I mean I'll note this because

21  respondent makes this point in its papers, there is a pending

22  petition to enforce a CID against FedChex Recovery, which I'll

23  just call FedChex today, which is another one of respondent's

24  clients, which is out in the Central District of California.

25  From respondent's perspective, that CID seeks the same

1  information sought and the CID at issue here regarding

2  respondent's contacts with that client.

3        So the 2019 CID does contain notification of purpose.

4  According to the Bureau, the CID sought from respondent

5  materials that may be relevant to the Bureau's investigation

6  that were not already in its possession, including certain

7  interrogatories, written reports, documents, et cetera.

8        The requests in the CID include, among other things,

9  respondent's organizational structure, its employees, business

10  activities, debt-collection activity, identities of creditors

11  or third parties for whom respondent performed debt-collection

12  activities, information on consumer complaints and disputes,

13  policies and procedures, handbooks, guidance, and training

14  materials, and recordings and calls between respondent and

15  consumers or third parties related to debt-collection attempts.

16        All right, so just for the record, in terms of some

17  background of CFPB, it was created in 2010 by Congress as a

18  "independent financial regulator within the Federal Reserve

19  System."  The statute that enables the Bureau is the CFPA, or

20  Title X, of the 2010 Dodd-Frank Wall Street Reform and Consumer

21  Protection Act.

22        The Bureau is tasked with implementing and enforcing

23  financial consumer protection laws.  This is all a laid out, of

24  course, in *Seila Law*.

25        Now, upon its creation, Congress transferred the

1    administration of 18 federal statutes to the Bureau and enacted

2    a new prohibition on any unfair, deceptive, or abusive act or

3    practice by certain participants in a consumer finance sector.

4    Also, the Bureau is able to implement this standard and the

5    statutes under its purview through binding regulations.

6          Also, along with its rule-making authority, the

7    Bureau also has adjudicatory authority, as it's allowed to

8    conduct certain administrative proceedings.

9          Congress vested the Bureau with certain enforcement

10   powers which allows it to conduct investigations, issue

11   subpoenas, and CIDs, initiate administrative adjudications, and

12   prosecute civil actions in federal court.

13         The Bureau is authorized to seek restitution,

14   disgorgement, injunction, and civil penalties up to $1 million

15   for each day that a violation occurs.

16         As part of its enforcement authority, the Bureau can

17   issue CIDs, which are a type of investigative administrative

18   subpoena.  In fact, the CFPA provides the Bureau with its

19   authority to issue the CIDs and enforce them in federal court.

20   For that I'm citing 12 U.S.C., Section 5562(c)(1) and (e)(1).

21         So under the CFPB the Bureau can issue a CID when "it

22   has reason to believe that any person...may have information

23   relevant to violation of federal consumer financial law."

24   That's from 5562(c)(1).

25         The Bureau can initiate a proceeding to enforce the

1    CID in federal court by filing a petition, which is what we're

2    dealing with here.

3           The director has a five-year term.  The director is

4    appointed by the President and does require Senate approval.

5           Until the Supreme Court's decision in *Seila Law*, the

6    President was able to remove the director only for

7    "inefficiency, neglect of duty, or malfeasance in office."  But

8    in *Seila Law*, the Supreme Court determined that the Bureau's

9    leadership by a single independent director violated separation

10   of powers, as it vested "significant governmental power in the

11   hand of a single individual accountable to no one," and that

12   the director's "insulation from removal by an accountable

13   President...rendered the agency's structure unconstitutional."

14   That's from 140 Supreme Court at pages 2203-4.  But the Supreme

15   Court did determine the removal restriction was severable from

16   the other provision of the law that established the Bureau.  So

17   the Court ruled that the agency may continue to operate, but

18   its director must be removable by the President at will.  Page

19   2192.

20          In terms of funding, the Bureau does not receive

21   direct appropriations from Congress.  Instead, each quarter the

22   Bureau receives funding directly from the Federal Reserve,

23   which transfers funds to finance the Bureau from "combined

24   earnings from the Federal Reserve System."  That's from Section

25   5497(a).  The Federal Reserve itself is funded outside the

1     appropriations process through bank assessment, as noted in

2     *Seila Law* at page 2194.

3            Each year the Bureau's director determines the amount

4     of funding "reasonably necessary to carry out" the duties of

5     the Bureau up to a cap of 12 percent of the combined earnings

6     annually adjusted for inflation.  In recent years, that budget

7     has exceeded a half a billion dollars.

8            To exceed the cap, the Bureau has to obtain

9     additional funding in the ordinary appropriations process.

10           The funding is not reviewable by Congress, including

11    the committees on appropriations in both the House and the

12    Senate, but the director does report annually to the House and

13    Senate appropriations Committee about the Bureau's "financial

14    operating plans and use of funds."  And that's spelled out in

15    5497(e)(4).

16           All right, so we got here because of the petition,

17    but also it's worth noting that the respondent brought an

18    action against the Bureau and against the director in her

19    official capacity seeking declaratory judgment and injunctive

20    relief against the bureau.

21           On January 22nd of this year, the Court did issue an

22    order to show cause.  Oral argument was held on February 27

23    where the Court from the bench denied the motion.  And then

24    amended complaint was filed on April 30th.

25           The instant petition was filed April 24, which was

1    accepted by this Court as related, and then we've had really

2    very thorough and comprehensive briefing through the early part

3    of the summer and here we are.

4           In terms of legal standard, it is well established

5    "that an agency can conduct an investigation even though it has

6    no probable cause to believe that any particular statute is

7    being violated."  That's what the Second Circuit said in *US*

8    *versus Construction Products Research Inc*., 73 F.3d 464, 470.

9    For example, administrative agencies can investigate merely on

10   suspicion that the law is being violated.

11          The Court's role in a proceeding to enforce an

12   administrative subpoena, which is basically what we're dealing

13   with here, is very limited, what the Second Circuit noted in

14   *NLR versus American Medical Response, Inc.*, but of course the

15   agency's efforts have to be reasonable.  Whatever information

16   they're seeking by way of the compulsory process has to be

17   reasonable, which is satisfied if an agency demonstrates that

18   the investigation is being conducted for a legitimate purpose,

19   that the inquiry may be relevant to that purpose, that the

20   information sought is not already in the administrative

21   agency's possession, and that the administrative steps required

22   have been followed.  That's all from *American Medical Response*

23   at page 192.

24          If a subpoena satisfies these requirements it's

25   typically enforced unless the party opposing it demonstrates

1   that the subpoena is unreasonable or issued in bad faith or for

2   some other improper purpose, or that compliance would be

3   unnecessarily burdensome.

4           In terms of the respondent's attacks on the subpoena,

5   I'll start with the funding structure, and respondent argued

6   that the Bureau itself is unconstitutional because it doesn't

7   receive appropriations from Congress, instead ceding Congress's

8   funding authority to the Bureau itself and to the President,

9   which violates, in respondent's view, the appropriations clause

10  and the vesting clause.  And this is all spelled in pages 14

11  through 19 of respondent's memorandum of law.  And what

12  respondent specifically argues is that in the wake of *Seila*

13  *Law*, that *Seila Law* ostensibly rendered the Bureau's funding

14  structure "inconsistent with the congressional statutory design

15  and purpose," and also is inconsistent with the constitutional

16  design and purpose given that it permits the President to

17  determine and direct the Bureau's funding and budget.  Of

18  course, the Bureau disagrees, and even goes so far as to say

19  that *Seila Law* resolved the issue of the CFPB's

20  constitutionality.

21          Article I, sections 1 and 9, provides that "no money

22  shall be drawn from the treasury, but in consequence of

23  appropriations made by law," and that "all legislative powers

24  herein granted shall be vested in a Congress of the United

25  States."

1    So with respect to the Appropriations Clause, the

2 Supreme Court has underscored its straightforward and explicit

3 command, "it simply means that no money can be paid out of the

4 Treasury unless it has been appropriated by an act of

5 Congress."  That's from *Office of Personnel Management versus*

6 *Richmond*, 496 U.S. 414, 424.

7    Here, the Bureau is funded from the earnings of the

8 Federal Reserve which Congress has, in fact, authorized by

9 statute.  I've already discussed 5497.  And that's important

10 here because the Appropriations Clause "does not in any way

11 circumscribe Congress from creating self-financing programs

12 without first appropriating the funds as it does in typical

13 appropriation and supplement appropriation acts," which is, in

14 the Court's view, what exactly what Congress has done here.

15 That's a quote from *AINS Inc. versus United States*, 56 Federal

16 Court of Claims 522, 539, I'll note a case that was affirmed by

17 the Federal Circuit but abrogated on other grounds by the

18 Federal Circuit.  Other cases that have addressed this issue is

19 *CFPB versus Think Finance, LLC*, 2018 WL 3707919 at *2, the

20 District of Montana there determined that the CFPB's funding

21 does not violate the Appropriations Clause; ditto the Central

22 District of California in two cases*, CFPB versus D&D Marketing*,

23 2016 WL 8849698, and *CFPB versus Morgan Drexen, Inc.*, 60

24 F.Supp. 3d 1082, 1089.  Indeed, although the Supreme Court

25 referenced the Bureau's funding structure in *Seila Law*, it did

1    so to point to the level power vested in a director removable

2    only for cause not to independently suggest that the funding

3    mechanisms were somehow unconstitutional.  For example, on page

4    2203, the Supreme Court noted "the CFPB's single-director

5    structure contravenes this carefully calibrated system by

6    vesting significant governmental power in the hands of a single

7    individual accountable to no one.  The director does not even

8    depend on Congress for annual appropriations."  So I think it's

9    fair to say that although the Bureau's funding structure was

10   not directly at issue in *Seila Law*, in deciding to sever the

11   for-cause removal provision of the CFPA, the Supreme Court did

12   note "the only constitutional defect we have identified in the

13   CFPB structure is the director's insulation from removal," and

14   that that constitutional defect "disappear[ed]" with a director

15   removable at will by the President.

16          It's also important to note that the courts have held

17   that Congress may "choose to loosen its own reins on public

18   expenditure.  Congress may also decide not to finance a federal

19   entity with appropriations."  This was noted in the *Morgan*

20   *Drexen* case at 1089.  Indeed, as the Bureau points out,

21   Congress has provided similar independence to other financial

22   regulators, like the Federal Reserve, the FDIC, the OCC, the

23   National Credit Union Administration, and the Federal Housing

24   Finance Agency.  And this was all discussed in *PHH Corp. versus*

25   *CFPB*, 881 F.3d 75, 81.  Also, *CFPB versus Navient Corp.*, 2017

1   WL 3380530 at *16, which lists these and some other agencies as

2   independent agencies that operate completely outside the normal

3   appropriations process.  Indeed, these other agencies have been

4   deemed to have complete, uncapped budgetary autonomy, as noted

5   in *PHH II*, 881 at page 81.  Indeed, the Federal Reserve has

6   been around for over 100 years, and like the CFPB, has brought

7   investigative and enforcement authority, including the power to

8   conduct on-site examinations of banks under its purview to

9   impose certainly monetary penalties.

10          Also, I just find it convincing, although it's

11  certainly stridently argued that the narrow exception limited

12  to agencies that receive funding from fees and the like.

13  There's really no authority to support this narrow exception

14  theory of the self-funded governmental entities.  I think on

15  *PHH II*, the case, in fact, respondent cites for the

16  proposition, the DC Circuit found "the way the CFPB is funded

17  fits within the tradition of independent financial regulators"

18  and does not violate the Constitution.  In fact, the DC Circuit

19  totally *en banc* found that "the requirement that the CFPB seek

20  congressional approval for funding beyond the statutory cap

21  makes it more constrained in this regard than other financial

22  regulators."

23          Plus, Congress hasn't relinquished control over all

24  the agency's funding, so although the CFPA restricts the House

25  and Senate Appropriations Committees from reviewing the

1    Bureau's primary funding source, it doesn't strip Congress as a

2    whole of its power to modify appropriations as it sees fit.

3    That's from *CFPB versus ITT Educational Services*, Inc., 219

4    F.Supp. 3d 878, 896, that's A Southern District of Indiana

5    decision from 2015.  In fact, the *CFPB* has a formula-based

6    spending cap on the amount that the Bureau's director can

7    derive from the Fed, and the CFPA further "imposes a number of

8    other conditions on the director's use of the funds so

9    derived."  And that's from the *ITT* case page 896 n.12.

10           What's more, Congress "might not have exempted the

11   CFPB from congressional oversight via the appropriations

12   process if it had known the CFPB would come under executive

13   control."  But it "remains free to change how the CFPB is

14   funded at any time."  That's noted by *Navient Corp.*, 2017 WL

15   3380530 at *16.  And in fact, the *PHH I* case, which is *PHH

16   Corp. versus CFPB*, reported at 839 F.3d 1, at page 36 n.16,

17   "Congress can always alter the CFPB'S funding in any

18   appropriations cycle or at any other time.  Section 5497 is not

19   an entrenched statute shielded from future congressional

20   alteration, nor could it be."

21           And to the extent that the argument is that the

22   nondelegation doctrine applies because Congress has transferred

23   its authority to another branch of government, which in fact is

24   the argument that's made at page 15, the Supreme Court has

25   indicated that "in our increasingly complex society replete

1    with ever changing and more technical problems...Congress

2    simply cannot do its job absent an ability to delegate power

3    under broad general directives."  That's from *Gundy versus*

4    *United States*, 139 Supreme Court at 2123.  Thus, "a statutory

5    delegation is constitutional as long as Congress lays down by

6    legislative act an intelligible principle to which the person

7    or body authorized to exercise the delegated authority is

8    directed to conform."  And that's from the same page.  As such,

9    "the constitutional question is whether a Congress has supplied

10   an intelligible principle to guide the delegee's use of

11   discretion," and there's really been no explanation of what

12   aspect of the funding structure lacks that intelligible

13   principle.  In fact, by limiting the funding that the director

14   may request from the Fed, with a formula-based spending cap on

15   the amount, it seems clear that the CFPB does not lack for a

16   principled or have some sort of unguided or unchecked authority

17   granted to the CFPB.  So the Court finds that Title X does not

18   violate appropriations and vesting clauses in the Constitution.

19          Turning to the ratification issue, on July 2nd, the

20   Bureau filed a notice of ratification issued by the director.

21   She noted that "in her capacity as the director, she considered

22   the basis for the CFPB's decision to issue the CID to

23   respondent, to deny respondent's request to modify or set aside

24   the CID, and to file a petition requesting that the District

25   Court enforce the CID."  She also noted that she ratified this

1    decision on behalf of the Bureau and that she understood that

2    the President may now remove her with or without cause."  And

3    that's from paragraph three, four and five of her declaration.

4             The argument is that the 2019 CID is invalid because

5    it's the product of an unconstitutional structured federal

6    agency, and when Director Kraninger acted prior to *Seila Law*,

7    she was an invalid agent acting without any authority, thus,

8    any actions taken by her were basically null and void and can't

9    be saved by ratification.  The second point is that even if

10   Director Kraninger was able to ratify her previous actions as

11   an unconstitutionally insulated director, the 2019 CID would

12   still be unenforceable because the ratification does not cure

13   the structural constitutional defect identified by the Supreme

14   Court, only the President himself can ratify the Director's

15   prior acts.  The third argument is that even if a director had

16   validated her prior acts, she did not purport to ratify the

17   regs until the week after she ratified the enforcement action.

18   And finally, that the director failed to perform a detached and

19   considered judgment of the act that she ratified.

20             Now, *Seila Law* left open the question of validity of

21   a ratification by the director, but of course, the

22   circumstances there were different, as the CID had been issued

23   by different director, Director Cordray, the first director,

24   and was subsequently ratified by Acting Director Mulvaney, who

25   the CFPB argued could be removed at will by the President

1    because of his status as an acting director.  The Supreme Court

2    found that the question of whether the alleged ratification, in

3    fact, occurred and whether it is legally sufficient to cure the

4    constitutional defect, the original demand...turned on

5    case-specific factual and legal questions not addressed below

6    and not briefed before the court.  So the court remanded that

7    question finding the appropriate course was for the lower court

8    to consider those questions in the first instance.  Of course,

9    the Court recognizes that Justice Thomas had a different view,

10   and it speaks for itself.  I'm sure you all have read it.

11        All right, so addressing sort of the arguments in

12   turn.  The first argument is, as I mentioned, that the actions

13   taken by the Bureau prior to *Seila Law* are nullities that

14   cannot be ratified.  And because the court's severance of the

15   removal provision in Title X was prospective, respondent argues

16   that when the director acted, she was an invalid agent, as

17   such, her acts are void *ab initio*.  And there's the other

18   argument, the related argument, that the ratification would

19   deprive the respondent of any remedy for the constitutional

20   violation, the separation of power violation, and vindication

21   for her claim that the Bureau was unconstitutionality ratified

22   to begin with.

23        And as I said, the other argument is that even if the

24   earlier actions could be ratified, only the President can do

25   so, because the President was the Bureau's only lawfully acting

1   principal prior to severing the for-cause removal provision.

2          Now, I think we all agree, and I think it was said so

3   during the argument, that the Supreme Court has made clear that

4   on the question of authorization or ratification, that this is

5   something that's typically governed by principles of agency

6   law.  And this is discussed in the *Political Victory Fund* case,

7   513 U.S. 88, 98, and lower cases precisely dealing with

8   challenges to the CFPB structure have noted such, among others,

9   the *Gordon* case, which is a Ninth Circuit case, reported 819

10  F.3d 1179, 1191, and then *RD Legal Funding*, 332 F.Supp. 3d 729,

11  785.

12         In *political Victory Fund* the Supreme Court has

13  looked to the restatement of agency to determine whether an

14  after-the-fact authorization by the Solicitor General related

15  back to the date of an unauthorized filing by the FEC such that

16  the authorization would make the filing timely.  The court

17  found that it didn't because under the restatement, "if an act

18  would be effective in creating a right against another or to

19  deprive him of a right must be performed before a specific

20  time, an affirmance is not effective against the other unless

21  made before such a time."  That's at page 98.  The Court stated

22  that the rationale behind the rule was that it was "essential

23  that the party ratifying should be able not merely to do the

24  act ratified at the time the act was done, but also at time the

25  ratification was made."  The emphasis is on the but-also

1    phrase, same page.  Thus, because the filing deadline would

2    have already passed at the time the Solicitor General

3    authorized the act, the authorization in that case was invalid.

4              Now, courts have interpreted this as really amounting

5    to addressing a timing issue.  So, for example, *Advance*

6    *Disposal Services Eastern, Inc.* versus *NLRB*, 820 F.3d 592, 603,

7    and they utilized the principles of agency law to determine

8    whether a later ratification authorizes an earlier action by an

9    agent particularly with respect to appropriations clause

10   violations.  So what the Third Circuit said in the *Advance*

11   *Disposal* case is that the timing problem in *Political Victory*

12   *Fund* has since been read to require that the ratifier had the

13   power to reconsider the earlier decision at the time of

14   ratification.  And so there the Third Circuit considered three

15   general requirements for ratification in determining whether a

16   properly constituted NLRB and its regional director could

17   ratify an action taken by the regional director at a time where

18   the board lacks a valid quorum given invalid recess

19   appointments of several members.  So the three requirement are:

20   "First, the ratifier must, at time of ratification, still have

21   the authority to take the action to be ratified; second, the

22   ratifier must have full knowledge of the decision to be

23   ratified; third, the ratifier must make a detached and

24   considered affirmation of the earlier decision."  So there the

25   Third Circuit ultimately found that the requirements were

1    satisfied, and that's the bottom line.

2         Now in *Gordon*, which is the Ninth Circuit case, the

3    parties agreed that although Director Cordray's initial recess

4    appointment was invalid and did not satisfy the requirements of

5    the appointments clause, later renomination and confirmation

6    was valid.  So based on that, the Ninth Circuit determined that

7    a ratification issue by Director Cordray with respect to

8    enforcement at issue in that case, paired with a subsequent

9    valid appointment, cured any initial Article II deficiencies.

10   In reaching that conclusion, the Ninth Circuit reasoned that

11   "under the second restatement, if the principal, [the](CFPB),

12   had authority to bring the action in question, then the

13   subsequent ratification of the decision to bring the case is

14   sufficient."  That's from 1191.  It bears noting that the Ninth

15   Circuit did cite the "less stringent" third restatement of

16   agency, Section 4.04 comment B., which "advises that a

17   ratification is valid even if principal did not have capacity

18   to act at the time, so long as the person ratifying had

19   capacity to act at the time of ratification."  So the Ninth

20   Circuit found that because Congress statutorily authorized the

21   Bureau to bring the action in question through the CFPA, the

22   Bureau had authority to bring the action at the time the

23   enforcement action was initiated, and thus, the director's

24   ratification, Director Cordray's ratification, after his proper

25   appointment resolved any appointment clause deficiencies.

1          So, as in *Advance Disposal* here, the Court's view is

2     that there appears to be no limitation that would prevent

3     Director Kraninger from bringing an enforcement action against

4     respondent at the time, given that she is not removal at will

5     by the President.  Indeed, I think that was conceded during

6     argument.  Furthermore, if the director is considered to be

7     both the agent and the principal, like the regional director in

8     *Advance Disposal*, she better than anyone else had full

9     knowledge of her earlier action.  And, as in *Gordon*, here, if

10    the CFPB, if the Bureau is to be considered the principal, and

11    Congress authorized the Bureau to issue CIDs and bring the

12    actions in federal court to enforce consumer protection

13    statutes and regulations.

14          Now, it's true that some courts have distinguished

15    between ratification and cases involving appointments clause

16    violations and those involving structural defects.  So this is,

17    of course, discussed and argued *RD Legal Funding* by Judge

18    Preska where she thought the distinction was dispositive.  But

19    unlike in the *RD Legal Funding* case, here the for-cause removal

20    provision has been severed and the structure of the Bureau is

21    no longer in contravention of the Constitution.  So the

22    constitutional deficiency issue doesn't exist here anymore.  Of

23    course, Judge Preska didn't have the benefit of the *Seila Law*

24    decision, which we obviously have here.  As such, the relevant

25    question seems to be whether the constitutional violation has

1  been remedied and whether the remedy was effective and

2  adequately addressed the prejudice to respondent from the

3  constitutional violation.  And that's the framing that was set

4  forth by the DC Circuit in the *Legi-Tech* decision, 75 F.3d 704,

5  708.  If that's true, then dismissal of the enforcement action

6  is neither necessary nor appropriate.

7       And I think *Legi-Tech* is instructive here as one of

8  the few cases where a court examined whether ratification of a

9  previously brought enforcement action, in light of a structural

10 constitutional defect that had been cured, was sufficient to

11 remedy respondent's claimed injury against whom the enforcement

12 action was taken.  In that case, what the DC Circuit did is it

13 handled a challenge to litigation brought by the FEC after the

14 circuit had determined that the agency's structure violated the

15 Constitution in the case called *FEC versus NRA Political*

16 *Victory Fund*, given the presence of two congressional officers

17 as non-voting *ex officio* members of the FEC.  As in *Seila Law*,

18 however, the DC Circuit determined that the provision was

19 severable and the FEC thereafter voted to reconstitute itself,

20 excluding those *ex officio* members from all proceedings and

21 ratified former actions, including the agency's previous

22 probable cause finding and civil enforcement action.

23       Just as has happened here, the respondent in that

24 case argued that separation of powers is a structural

25 constitutional defect that made the entire investigation void

1    and that the FEC's later ratification of the PC finding

2    couldn't cure the constitutional violation given that the vote

3    at the end of the administrative process doesn't the remove the

4    taint, the structural taint, from the sequence of the decision.

5             And there the DC Circuit even acknowledged the

6    respondent was, in fact, prejudiced given the structural defect

7    in place at time, but the court framed the question as "the

8    degree of continuing prejudice after the FEC's reconstitution

9    and ratification," at page 708.

10            The DC Circuit assumed that no matter what course was

11   followed, other than a dismissal with prejudice, some effects

12   of the unconstitutional structure of the FEC are to be presumed

13   to have impacted on the action.  The court nonetheless

14   determined there was no ideal solution to that problem because

15   "even were the commission to return to square one, it is

16   virtually inconceivable that its decisions would differ in any

17   way the second time from that which occurred the first time."

18   And that's what I think we have here, and that's what I

19   mentioned during argument.  But even if the Court were to

20   dismiss this enforcement action, there's really no reason to

21   believe that the Bureau's decision to issue the CID to bring an

22   action would differ another time around.  And I think that's

23   been acknowledged here.  So, as in *Legi-Tech*, where there is no

24   significant change in the membership of the commission, there's

25   been no significant change in the leadership here, forcing the

1    Bureau to start at the beginning of the process, given what the

2    DC Circuit described as human nature, "promises no more

3    detached and pure consideration of the merits of the case than

4    in this case the Bureau's ratification decision reflected."  So

5    the more efficient and sensible course seems to be to take the

6    ratification of this prior decision at face value and treat

7    that as the adequate remedy for the constitutional violation

8    bearing in mind "the discretion the judiciary employs in the

9    selection of remedies."

10          Indeed, ratification has similarly been found to be

11   an effective cure in cases involving appointments clause

12   violations that were later resolved, particularly when a

13   dismissal would likely result in a similar administrative

14   procedure.  So one case is the DC Circuit's decision in *Wilkes*

15   *Barr Hospital Company LLC versus NLRB*.  There's the *Doolin*

16   *Security Savings Bank* case, 139 F.3d 214, *Intercollegiate*

17   *Broadcast Systems*, 796 F.3d at 117.

18          Also, it's bears noting that before *Seila Law*, at

19   least two courts determined that even if the CFPA's for-cause

20   removal provision was severable, the enforcement action would

21   still being effective.  And I'll note both a *PHH I* and *II* cases

22   where then Judge Kavanaugh determined that the for-cause

23   removal provision was, in fact, unconstitutional but that it

24   was severable from the rest of the CFPA.  Judge Kavanaugh then

25   considered the petitioner's statutory objections to the

1    enforcement action and vacated the action on statutory grounds

2    but not based on the structural constitutional violation,

3    "because the constitutional ruling would not call for CFPB's

4    ongoing operations or the CFPB's ability to uphold the order

5    against the petitioners.

6            And similar decision was reached by Judge McMahon in

7    *CFPB versus NDG Financial Corp.*, 2016 WL 7188792.

8            Now, to the extent that there's the argument that not

9    only would this ruling deprive respondent of a remedy in this

10   case but also in the related case, the Court does not agree.

11   In the related case, the respondent seeks a declaratory

12   judgment that the CFPB'S single-director structure violates the

13   Constitution, but that's precisely the remedy that the

14   conclusion in *Seila Law* provides.

15           With respect to *Lucia versus SEC*, I think that case

16   is just different.  The Supreme Court there determined that the

17   appointment of an ALJ who presided over an enforcement

18   proceeding did not comport with the appointments clause.  The

19   court found that under its precedent, "one who makes a timely

20   challenge to the constitutional validity of the appointment of

21   an officer who adjudicates his case is entitled to relief."

22   That's from page 2055.  The court determined that the

23   appropriate remedy for an adjudication tainted with

24   appointments violation is a new hearing before a properly

25   appointed official.  But, here, as the Bureau points out, the

1  adjudication of the CID is before this Court, as is the

2  adjudication in the related case.  So it's an

3  apples-and-oranges comparison.  What's more, in *Lucia*, the

4  court found that another ALJ or the SEC itself would need to

5  hold a new hearing because the previous ALJ already both heard

6  the petitioner's case and issued an initial decision on the

7  merits.  But here, there's been no "adjudication," by the

8  Bureau or the director, with respect to the enforcement action

9  and also there's no substitute decision-maker to revisit the

10  decision such as another ALJ.

11        To the extent that the respondent argues that the

12  Supreme Court determined in *Seila Law* that the only lawfully

13  acting principal is the President, I just don't think that's a

14  fair reading of *Seila Law*.  Although the court, the Supreme

15  Court cited the well-established principle that the executive

16  power belongs to the President, it didn't issue any sort of

17  ruling on ratification in fact stating that "because it would

18  be impossible for one man to perform all the great business of

19  the state, the Constitution assumes that lesser executive

20  officers will assist the supreme magistrate in discharging the

21  duties of his trust."  Quoting from the writing of George

22  Washington.  Can you get a better source than that.  There

23  really isn't any other authority to support this proposition,

24  as clever as it is.

25        So the Court finds that where the for-cause removal

1  provision has been severed, and thus, the constitutional

2  violation has dissipated, the ratification of the prior action

3  is valid.

4         Now there's the other argument, as I said, there's

5  the argument that the director has not validly ratified the

6  Bureau's regulations and its related guidance documents that

7  her ratification of this action is invalid.  In fact, what the

8  respondent argues is because Director Kraninger ratified the

9  investigation and the enforcement on July 2 and regulations on

10 July 10, that she could not have attained the regulatory

11 authority to ratify this case until July 10 at the earliest.

12 And the respondent further argues that the ratification was, in

13 any event, ineffective, as "if anyone can ratify prior invalid

14 Bureau regulations, guidance documents, and enforcement

15 activities, only the President can."

16        The Court does not agree.  The Bureau's authority to

17 issue and enforce CIDs is derived not just from the CFPB but

18 from the CFPA, and in deciding that the Bureau was

19 unconstitutionally constituted, the Supreme Court determined

20 that the removal provision was severable from any other

21 statutory provision relating to the Bureau's powers and

22 responsibilities.  So the provisions related to the Bureau's

23 authority to issue CIDs, they remain valid based on *Seila Law*.

24        To the extent that there's this argument that the

25 director failed to perform a detached and considered judgment

1    of the actions she ratified, this argument is based on the

2    assumption that she couldn't have given the prior acts more

3    than a passing glance because it would have had to have been

4    done within a matter of days after *Seila Law*.

5              While it's certainly true a ratifier must make and

6    detached and considered judgment and not simply rubber-stamp an

7    earlier action, there's really no actual evidence to establish

8    that the director failed to conduct an independent evaluation

9    or make a detached considered judgment, it's merely speculation

10   based on sort of timing, but that's just, at the end of the

11   day, that's just not enough authority that says that somehow

12   that's enough.  So, for example, in *Advance Disposal Services*,

13   the Court noted that mere lack of detail in the director's

14   express ratification is not sufficient to overcome the

15   presumption of regularity.  In fact, elsewhere in that decision

16   was the Third Circuit noted that the presumption of regularity

17   applied to the actions of an agency, and finding that those

18   opposing ratification, in that case, had "not produced evidence

19   that cast doubt on the agency's claim that the board of

20   director properly ratified the earlier actions."  And the party

21   argued only that ratification was a "rubber-stamp."  And also

22   *Legi-Tech*, the DC Circuit said that it couldn't examine the

23   internal deliberations of the commission, at least absent the

24   contention that one or more commissioners was actually biased.

25              Here, the ratification states that the director

1    considered the basis for the Bureau's decisions to issue the

2    CID, to deny respondent's request to modify or set aside the

3    CID, and to file a petition requesting that the district court

4    enforce the CID, and she ratified those decisions on behalf of

5    the Bureau.  In the Court's view, that is sufficient under the

6    circumstances.

7          All right, now in terms of the enforceability of the

8    CID, as noted, the Court's role here is extremely limited, but

9    of course the information being sought has to be reasonable.

10   I've gone through all this.  An agency does have to make only a

11   *prime facie* showing that the four requirements I discussed

12   earlier had been met.

13         In terms of the purpose of the investigation, the CID

14   indicates the purpose.  It's all laid out in the CID.  In the

15   Court's view, this reflects a legitimate, investigatory

16   purpose, as the CFPA expressly authorizes the Bureau to

17   investigate suspected violations of consumer protection laws,

18   such as the FDCPA and the FCRA, which is what is the purpose

19   here, among others.  I'll just note a couple of cases that have

20   come to similar conclusions, *CFPB versus Heartland Campus*

21   *Decisions, ESCI*, 2018 WL 1089806, as I said, among others.

22         Now the argument here is that respondent sort of

23   states the purpose of the CID, arguing that it falls under the

24   practice-of-law exception, acknowledging that although the

25   respondent's services include debt-resolution activities that

1   might be regulated by the Bureau as the third party, the Bureau

2   the prohibited from regulating the practice of law and that the

3   Bureau has "pressed its obstinate demand for information and

4   documents, including those created in respondent's practice of

5   law that respondent is duty-bound to protect from disclosure."

6   The practice-of-law exclusion instructs the Bureau may not

7   exercise any supervisory or enforcement authority with respect

8   to an activity engaged in by an attorney as part of the

9   practice of law under the laws of the state in which the

10  attorney is licensed to practice law.  So though while it's

11  true the CID sought information that regulated the practice of

12  law and that that would be impermissible on its face, that's

13  note the purpose of the CID.  In fact, the Bureau has made they

14  quite clear that that is not the purpose of the CID.

15          The nature of the CID and the investigation falls

16  under an exception to the practice-of-law exclusion.  Section

17  5517(e)(2) states that the exclusion "shall not be construed as

18  to limit the authority of the Bureau with respect to any

19  attorney to the extent that such attorney is otherwise subject

20  to any of the enumerated consumer laws or authorities

21  transferred."  So here the Bureau seeks information about

22  possible violations, as I said, of the FDCPA and the FCRA, both

23  of which respondent is subject to and the Bureau represents

24  that the purpose of the CID is not to investigate in the actual

25  practice of law but is instead meant to gather information

1    about respondent's debt-collection activity, which the CID

2    specifically defines as activities, including attempts to

3    collect a debt, either directly or indirectly, excluding the

4    provision of legal services.  I think respondent acknowledges

5    that that's not an impermissible purpose.  I think there's just

6    a question of the extent to which the documents themselves that

7    are being sought, for example, might implicate attorney-client

8    privilege.  And I will certainly talk about that in a minute.

9    But on its face, the Court finds that the purpose is

10   legitimate.

11            In terms of relevance, that could be broadly

12   interpreted, and the courts are supposed to defer to an

13   agency's appraisal of relevance.  And so, unless it's obviously

14   wrong, the Court's not going to question it.  Again, this gets

15   into the attorney-client confidences issue.  And the Bureau

16   obviously disagrees that it is trying to seek or retain

17   information that is covered by the privilege because, for

18   example, the communications being sought do not reflect

19   communications by clients seeking an opinion of law, legal

20   services, or assistance in some legal proceeding involving

21   respondent.  Instead, the CID seeks information related to

22   respondent's debt-collection business and specifically defines

23   debt-collection activities as excluding the provision of legal

24   services and directs respondent that if any responsive

25   materials were held on the basis of privilege that respondent

1    should submit a schedule of the documents and information

2    withheld that includes details, such as the subject matter,

3    dates, names, address, et cetera.

4          And any party asserting attorney-client privilege has

5    to demonstrate:  The asserted holder of the privilege is or

6    sought to become a client; that the person to whom the

7    communication was made is the member of a bar or a court, or

8    that person's subordinate; in connection with this

9    communication is acting as lawyer; the communication relates to

10   a fact the attorney was informed, A, by a client, B, without

11   the presence of strangers, C, for the purpose of securing

12   primarily an opinion of law or legal services, or assistance in

13   some legal proceeding, and not for the purpose of committing a

14   crime or tort, and the privilege has been claimed and not

15   waived by the client.  That's all spelled out in *SEC versus*

16   *Yorkville Advisors, LLC* 300 F.R.D. 152, 161.

17         As I said, it's pretty clear that the material that

18   the Bureau seeks is relevant in terms of how it relates to the

19   investigation and the statutory violations that the Bureau is

20   statutorily charged with investigating, and on the face the

21   requests appear to be related to debt-collection services

22   provided by respondent, and so they are relevant to the

23   investigatory purpose.

24         To the extent that there are broad assertions of

25   attorney-client privilege, that's really not going to get it

1    done.  So, for example, to the extent that there is a claim

2    that the Bureau seeks attorney-client confidences and

3    privileged documents and information, those are not really

4    detailed at all, there's no specific examples given, there's

5    nothing about relating to specific legal advice the respondent

6    had given.  So, for example, some of the documents that the

7    Bureau seeks, information on consumer complaints in recordings

8    of calls between respondent and consumers, that's not embodied

9    by the attorney-client privilege.  Just on its face it's just

10   not.

11         And it also should be I think undisputed territory

12   that to the extent an attorney acts as a collection agent, any

13   communications between that attorney and the client are not

14   protected by the attorney-client privilege.  Among other cases

15   that was noted in *Avoletta versus Danforth*, 2012 WL 3113151.

16   Again, the Bureau is saying that all it wants is information

17   related to respondent's activity and debt-collection

18   activities.

19         To the extent that the there is information that is

20   privileged, then respondent can submit a privilege log, which

21   has not been done in connection with the CID.

22         And I think there's also, I think, force to the

23   Bureau's argument that Rule 1.6 specifically exempts an

24   attorney from any sort of responsibility to the extent the

25   information is required by an order of the Court.  Among other

1    cases, *In re Alghanim*, 2018 WL 2356660.

2           Thus, because the Court's view is that the Bureau is

3    not seeking privileged information, it's conducting an

4    investigation, and the respondent hasn't shown that the Court

5    should otherwise refuse to enforce the CID on the basis of

6    relevance, the Court finds that the Bureau has demonstrated

7    that the information it seeks is relevant.

8           Again, to the extent there are specific objections

9    because there are specific documents or portions of documents

10   that are privileged, then a privilege log can be submitted.

11          In terms of what's already in the Bureau's

12   possession, the Bureau I think persuasively makes the point

13   that the previously identified pages from the 2017 CID, there

14   were some issues about formatting which that was provided,

15   there was clawback.  So there was a clawback and redaction of

16   many of the pages that were responsive.  And to the extent

17   respondent generally has said, hey, I produced thousands of

18   pages in response to the 2017 CID, that's not sufficient to

19   rebut the Bureau's representation, its showing as to what it

20   has not been given.  Plus the 2017 and 2019 CIDs are not

21   identical.  And so absent more specific detail, the Court finds

22   this objection not to be persuasive.

23          In terms of the administrative steps taken, the only

24   argument here has to do with the ratification, but the Court

25   has already ruled on that.

                    Angela O'Donnell, RPR, 914-390-4025

1          With respect to FedChex issue, the Court agrees that

2     Rule 19 is essentially not applicable here, not applicable to

3     enforcement proceedings, and I don't think respondent has made

4     the showing that, even if it somehow did apply, that it should

5     apply here.  I'll note that the Court hasn't been able to find

6     a case within the Second Circuit regarding the applicability of

7     Rule 19 to enforcement proceedings, but there have been,

8     certainly are decisions that in the context of the SEC and CFTC

9     proceedings, that Rule 19 is not dispositive, among other cases

10    *SEC versus Princeton Economic International Limited*, 2001 WL

11    102333, at *1.

12         Even if it did apply, it's far from clear FedChex is

13    a necessary party.  To the extent that the respondent has

14    information that is responsive to the CID that might

15    tangentially relates to FedChex, then respondent should produce

16    that material.  To the extent that they are privileged, then

17    respondent can submit a privilege log, as previously discussed.

18         So for these reasons the Court grants the petition to

19    enforce the 2019 CID.  To the extent, as I said, that there are

20    objections, specific objections regarding privilege material,

21    respondent should submit a schedule of that material as

22    directed by the CID to the Bureau.  To the extent that the

23    respondent seeks modifications based on what it produced in

24    response to the 2017 CID, it can discuss this with the Bureau

25    and write specific details on the material if it feels

```
 1   satisfied the requests from the 2019 CID that are duplicative

 2   of the 2017 CID.

 3           Sorry to keep you so long, is there anything else?

 4           MS. ASSAE-BILLE:  Not from the Bureau, your Honor.

 5           MR. DeGRANDIS:  For the respondent, we have nothing

 6   further.  Thank you, your Honor.

 7           THE COURT:  All right.  Have a pleasant afternoon.

 8   Everybody stay healthy.

 9           MR. DeGRANDIS:  Thank you, you, too.

10           MS. ASSAE-BILLE:  Thank you, your Honor.

11           (Proceedings concluded)

12   CERTIFICATE:  I hereby certify that the foregoing is a true and
     accurate transcript, to the best of my skill and ability, from
13   my stenographic notes of this proceeding.
                 ------------------------------------
14   Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY

15

16

17

18

19

20

21

22

23

24

25
```

Angela O'Donnell, RPR, 914-390-4025